No. 23-1967

No. 23-1978

No. 24-1313

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official
capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their
individual and official capacities; Rhode Island OFFICE OF Child Support
Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK
DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN,
LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN,
JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities;
RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A.
SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF
RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND
ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity;
RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in
its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official
capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE
JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL,
MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their
individual and official capacities; RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF
THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual
capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Defendants-Appellees.

Appeal from the United States District Court

for the District of Rhode Island

_____

**APPELLANT'S MOTION TO TAKE JUDICIAL NOTICE PURSUANT TO FED. R. EVID. 201 AND REQUEST FOR HEARING PURSUANT TO FED. R. EVID. 201(e)**

**OF**

**APPELLANT'S RENEWED MOTION FOR SANCTIONS AGAINST APPELLEES AND COUNSELS FOR APPELLEES**

**FOR OBSTRUCTION OF JUSTICE FRAUD ON THE COURT,**

**CONSPIRACY TO SUBORN PERJURY AND CORRUPT ENDEAVORS TO PERVERT THE ADMINISTRATION OF JUSTICE,**

**MISPRISION OF FELONIES,**

**CONSPIRACY TO MAKE FALSE CLAIMS**

**FILED IN THE RELATED APPEAL No. 23-1851**

_____

**ORGANIZED FRAUD, THEFT OF PUBLIC MONEY AND GOVERNMENT PROGRAMS INVOLVING BILLIONS OF DOLLARS**

**Unlawful Interstate Collection of Unlawful 12% Compound Interest Within the Title IV-D Legal Framework Involving Organized Felonious Acts and Obstruction of Justice by Appellees, and Obstruction of Justice and Misprision of Felony by Appellee Counsels**

Appellant, MARY SEGUIN, hereby respectfully moves, pursuant to **28**

**U.S.C. § 2106,** Fed. R. App. P 27, 18 U.S.C. § 4, 18 U.S.C. § 503 and Fed. Rules

of Evid. 201 to take judicial notice of the Appellant's Renewed Motion for

Sanctions Against Appellees and Counsels for Appellees for Obstruction of Justice

Fraud on the Court, Conspiracy to suborn perjury and Corrupt Endeavors to

Pervert the Administration of Justice, Misprision of Felonies, Conspiracy to Make

False Claims.  Before the Court is Appellant's pending Fed. R. App. P 8 (a)(2)(D)

impaneling a panel of judges of this United Court of Appeals in the First Circuit.

As such, this motion for judicial notice is explicitly directed to the impaneled

judges under Fed. R. App. P 8(a)(2)(D) as well as to the Court-assigned judge

presiding over this matter here and in the related case Appeal No. 23-1851.

Appellant respectfully requests pursuant to Fed. R. Evid. 201(e) for a hearing

before the Fed. R. App. P 8(a)(2)(D) impaneled panel of judges as well as to the

Court-assigned judge presiding over this matter here in Appeal No. 23-1967 and

No. 23-1978 and the undisputedly related **No. 24-1313** explicitly appealing the

justice obstructive as well as the *functus officio* conduct by district court judge

William E. Smith, former partner of Edwards & Angell and former chief outside

counsel of the named Defendants-Appellees advising on the corrupt circumventive

felonious conduct adopted by official state policy from 1996 to 2002, which

official state policy Appellant attaches hereto in **Exhibit I** in **CA 23-cv-126**.

Appellant attaches hereto the Fed. R. Evid. 201 judicial notice requested

renewed motion to impose sanctions, Document 00118130601, as **Exhibit II**.

Accordingly, Appellant requests by right a hearing on the above pursuant to Fed. R. Evid. 201(e), before the Fed. R. App. P 8(a)(2)(D) impaneled panel of judges, as well as before the judge assigned to this matter, as well as before the judge assigned to Appeal No. 1978, as well as before the judge assigned to Appeal No. 24-1313.

Appellant further states in good faith that public interest, public justice and the national interest all dictate that this motion in its entirety be granted.

## **CONCLUSION**

The Court should grant this motion to take judicial notice and hold the requested hearings under Fed. R. Evid. 201(e). The Court should grant the pending Appellant motion to impose sanctions in this matter. The Court should order the withdrawal of Appellees-counsels named herein. Because Appeal No. 1851 is related to this matter and Appeal No. 1978 and Appeal No. 24-1313, the Court should order the Appellant-requested 9x $250,000 and no less than 9x $50,000 for each infraction named herein and in Appeal No. 23-1851 payable by all Appellees and Appellees counsels to the Appellant 4x, each in Appeal No. 23-1851, Appeal No. 23-1967, Appeal No. 23-1978 and Appeal No. 24-1313 for having to prosecute this motion and the motions to impose sanctions for

their felonious and corrupt conduct.  The Court should take judicial notice of Document 00118130601 filed under Fed. R. Evid. 201, 18 U.S.C. § 4 and invoking 18 U.S.C. § 503.  The Court should strike the Appellee's motion to strike from the record for fraud on the court and for violation of Fed. R. Civ. P 11(b).  The Court should on its own initiative under Fed. R. Civ. P 11(c)(3) order the Appellees and Appellees' counsels to show cause why conduct by the Appellees and their counsels specifically described in Document 00118126723 and Document 00118130601 and the pending Appellant's motion for sanctions in this matter has not violated Rule 11(b).  The judges of the United States have been explicitly conferred an expressed duty by Congress under 18 U.S.C. § 4 and 18 U.S.C. § 503 and must refer the criminal acts made known in Document 00118126723 and Document 00118130601 to the United States Attorney General Merrick Garland, an official expressly inferred under 18 U.S.C. § 4 and 18 U.S.C. § 503, pursuant to Fed. R. Civ. P 11(c)(4) "to deter repetition of the conduct or comparable conduct by others similarly situated," in the interest of the public. The Appellant respectfully requests any and all relief that is just under the circumstances.

Pursuant to Fed. R. Evidence 201(e), Appellant requests by right a hearing.

Respectfully submitted,

Mary Seguin
Pro Se
/s/        *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019


Dated: April 10, 2024

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system on April 10, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/        *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

EXHIBIT I.

# SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

EXHIBIT II.

No. 23-1851

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official
capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY
FOBERT, KARLA CABALLEROS and TIMOTHY FLYNN in their individual
and official capacities; GERO MEYERSIEK; BARBARA GRADY

Defendants-Appellees.

Appeal from the United States District Court
for the District of Rhode Island

_____

**APPELLANT'S RENEWED MOTION TO IMPOSE SANCTIONS
AGAINST APPELLEES AND COUNSELS FOR APPELLEES**

**FOR OBSTRUCTION OF JUSTICE FRAUD ON THE COURT,**

**CONSPIRACY TO SUBORN PERJURY, MISPRISION OF FELONIES,**

**CONSPIRACY TO MAKE FALSE CLAIMS**

_____

**ORGANIZED FRAUD, THEFT OF PUBLIC MONEY AND
GOVERNMENT PROGRAMS INVOLVING BILLIONS OF DOLLARS**

**Unlawful Interstate Collection of Unlawful 12% Compound Interest Within
the Title IV-D Legal Framework Involving Organized Felonious Acts and**

## Obstruction of Justice by Appellees, and Obstruction of Justice and Misprision of Felony by Appellee Counsels

Appellant, MARY SEGUIN, respectfully renews her motion for sanctions, pursuant to **28 U.S.C. § 2106** and Fed. R. App. P 27, against the Appellees and counsels for Appellees, for Obstruction of Justice, the conspiracy to defraud the Court, defraud the United States, make false claims, obstruct justice, obstruct official proceedings, falsification of records, conspiracy to suborn perjury and make false statements, including misprision of felony before this Court.

Appellant invokes 18 U.S.C. **§ § 503.**

Appellant invokes 18 U.S.C. **§ 4.**

Appellant invokes **18 U.S.C. § 2.**

Appellant invokes **18 U.S.C. § 3.**

Appellant invokes ***United States v. Olson***, **856 F.3d 1216 (9th Cir. 2017).**

Appellant invokes ***United States v. Sullivan***, **Case No. 3:20-cr-00337-WHO (N.D. Cal.).**

Appellant invokes ***Nix v. Whiteside***, **475 U.S. 157 (1986).**

Appellant invokes ***United States v. Silverman,*** 745 F.2d 1386, 1395 (11th Cir. 1984).

Appellant invokes **18 U.S.C.  § 2(b)**, and ***United States v. Walser***, 3 F.3d 380, 388 (11th Cir. 1993).

Appellant invokes Rules 1-102, 4-101 and 7-109 of the Code of Professional Responsibility.

Appellant invokes Canons 1,4, and 7, and Ethical Consideration 7-26.

Appellant invokes R.I. Gen. Law **§** 11-32-1.

Appellant invokes R.I. Gen. Law **§** 11-32-3.

Appellant invokes R.I. Gen. Law § 11-1-1.

Appellant invokes *State v. Flynn*, 100 R.I. 520 (R.I. 1966).

Appellant invokes *State v. Horton*, Dougherty, 47 R.I. 341 (R.I. 1926).

In support of the motion for sanctions, Appellant states as follows:

## Corrupt, felonious and indictable obstruction of justice and perversion of justice

Between April 4, 2024 and April 9, 2024, from the jurisdiction of Rhode Island, State Appellees and counsels for State Appellees, Special R.I. Attorney General M. Pizana and M. Shaw submitted to this Court nine (9) copies of the State Appellee-Brief that contains, signed by Attorney Pizana, fraud on the Court felonious lies

repeated over a dozen times that the Appellees are enforcing lawful interstate child support [interest] against the Texas Appellant.  Counsels and Appellees had repeatedly submitted from the jurisdiction of Rhode Island court filings signed by attorneys in the United States District Court and in this U.S. Court of Appeals, containing statements to similar effect, obstructing justice.

Plainly, this action concerns the **_unlawful_** collection by the Appellees of unlawful 12% compound interest under the Title IV-D Legal Framework through felonious acts that involve, as it turns out by official state policy, the felonious removal in interstate support cases of the unlawful 12% compound interest from the Title IV mandated automated data processing system in 2018 when the Appellees sent the support collection to TEXAS under 42 U.S.C. **§ 666(14)** in order to conceal the unlawful 12% compound interest (leaving it on the system would expose Rhode Island's ineligibility to participate in Title IV), and after inducing the Appellant to pay off the principle support in one lump sum $104,185.98 by representing to the Appellant that Appellee GERO MEYERSIEK waived interest as consideration of the lump sum payment, Appellees put back onto the system the unlawful 12% compound interest.  Appellees-counsels are accessories to the crimes after the fact, and conceal the felonious crimes through obstruction of justice, misprision of felonies, subornation of perjury and knowing false representations to (the requisite) truth-seeking United States judges who

themselves are under Oath to the United States Article III courts under the Constitution explicitly conferred duty by Congress under 18 U.S.C. **§** 4, 18 U.S.C. **§** 503 (United States judges are explicitly conferred expressed duty by Congress in the statutory text under 18 U.S.C. **§4).**

The omnibus clause, or "catch-all provision" of 18 U.S.C. § 1503, provides:

Whoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be (guilty of an offense).

In this case, the clause shall be read broadly to include any conduct interfering with the fair administration of justice if that conduct was undertaken with a corrupt motive, since Appellees corruptly reached interstate to TEXAS.  Appellees corruptly and feloniously sent false certifications to Texas in 2018 certifying there is no interest due, after Appellees corruptly and feloniously removed the unlawful 12% compound interest from the Title IV automated data processing and information retrieval system.  Then in 2021, Appellees placed fraudulent liens in Texas on Texas properties, and endeavored to and did corruptly influence, obstruct and impede the due administration of justice in Texas under 18 U.S.C. § 1503,

*United States v. Howard*, 569 F.2d 1331, 1333-36 (5th Cir.). Their justice obstructive acts are felonious in Texas and in the Fifth Circuit.

From the jurisdiction of Rhode Island, Appellees and counsels for Appellees in this action have actively submitted to courts of the United States in judicial proceedings over two dozen filings that consistently lie that they are collecting or enforcing lawful support interest. **The United States Supreme Court favors a <u>broad</u> reading of the omnibus clause. In *United States v. Aguilar*, ___ U.S. ___, 115 S.Ct. 2357 (1995).**

Convictions under the omnibus clause of 18 U.S.C. § 1503 have been based on the following conduct: Endeavoring to suborn perjury. ***United States v. Kenny*, 973 F.2d 339 (4th Cir. 1992); *United States v. Casel*, 995 F.2d 1299 (5th Cir. 1993); *United States v. Tranakos*, 911 F.2d 1225 (10th Cir. 1990); *Falk v. United States*, 370 F.2d 472 (9th Cir. 1966).**

Appellees' and their counsels' obstruction of justice acts are designed to thwart this Court's judicial function. *See United States v. Aguilar*, *supra.*

A party may be prosecuted under section 1503 for endeavoring to obstruct justice **United States v. Williams, 874 F.2d 968, 976 (5th Cir. 1989).**

The term "officer in or of any court of the United States" includes: United States District Judges, ***United States v. Jones*, 663 F.2d 567 (5th Cir. 1981) (by**

implication); ***United States v. Glickman***, 604 F.2d 625 (9th Cir. 1979) (by implication); ***United States v. Fasolino***, 586 F.2d 939 (2d Cir. 1978) (per curiam) (by implication); ***United States v. Margoles***, 294 F.2d 371, 373 (7th Cir.), **Supreme Court Justices, United States Courts of Appeals Judges, United States Magistrate Judges, clerks of Federal courts, law clerks to Federal judges, Federal court staff attorneys, Federal court reporters, Federal prosecutors and defense counsel.** Because 18 U.S.C. § 1503 applies to civil, as well as criminal judicial proceedings, ***Roberts v. United States***, 239 F.2d 467, 470 (9th Cir. 1956); ***Sneed v. United States***, 298 F. 911, 912 (5th Cir.), ***cert. denied***, 265 U.S. 590 (1924); *see* ***Nye v. United States***, 137 F.2d 73 (4th Cir.) (by implication), ***cert. denied***, 320 U.S. 755 (1943), private attorneys are also covered by the statute.

In this case, there are several pending judicial proceedings protected by and governed under 18 U.S.C. § 1503 (including the omnibus clause). ***United States v. Neal***, 951 F.2d 630 (5th Cir. 1992); ***United States v. Guzzino***, 810 F.2d 687 (7th Cir.), ***cert. denied***, 481 U.S. 1030 (1987); ***United States v. Capo***, 791 F.2d 1054, 1070 (2d Cir. 1986), ***reh'g granted on other grounds***, 817 F.2d 947 (2d Cir. 1987) (en banc); ***United States v. Johnson***, 605 F.2d 729, 730 (4th Cir. 1979), ***cert. denied***, 444 U.S. 1020 (1980); ***United States v. Baker***, 494 F.2d 1262, 1265 (6th Cir. 1974); ***United States v. Smith***, 729 F. Supp. 1380 (D.D.C. 1990).

The proceedings were pending once the judicial machinery has been activated, as is applicable to this matter. ***United States v. Gonzalez-Mares*, 752 F.2d 1485 (9th Cir.) (although a complaint had not been filed at time of the interview with the probation officer, the proceeding was pending because the defendant was in custody and had signed a waiver of her right to trial and sentencing by the court), *cert. denied*, 473 U.S. 913 (1985). *But see United States v. Blohm*, 585 F. Supp. 1112 (S.D.N.Y. 1984) (coverage of omnibus clause not limited to situations in which an action is pending; alternatively, action was pending because defendant was appealing the case at the time he committed the obstructive conduct).**

Appellees and counsels for appellees have knowledge that their perjurious, corrupt and felonious actions are likely to affect this and other pending judicial proceedings**, *United States v. Aguilar*, ___ U.S. ___, 115 S.Ct. 2357 (1995); *United States v. Frankhauser*, 80 F.3d 641 (1st Cir. 1996); *United States v. Vesich*, 724 F.2d 451 (5th Cir. 1984); *United States v. Jackson*, 850 F. Supp. 1481 (D. Kan. 1994); *but see United States v. Littleton*, 76 F.3d 614 (4th Cir. 1996). There is no requirement, however, that the defendant know that the proceedings are Federal in nature. *United States v. Duran*, 41 F.3d 540, 544 (9th Cir. 1994); *United States v. Mullins*, 22 F.3d 135, 1369 (6th Cir.**

1994); *United States v. Aragon*, 983 F.2d 1306, 1310 (4th Cir. 1993); *United*

*States v. Ardito*, 782 F.2d 358 (2d Cir.), *cert. denied*, 476 U.S. 1160 (1986).

"Corruptly" has been described to mean "for an evil or wicked purpose," *United*

*States v. Ryan*, 455 F.2d 728, 734 (9th Cir. 1972); "with the purpose of

obstructing justice," *Rasheed*, 663 F.2d at 852; "for an improper

motive," *United States v. Haas*, 583 F.2d 216, 220 (5th Cir. 1978), *cert. denied*,

440 U.S. 981 (1979); and, "at least in part, by a corrupt motive," *United States*

*v. Brand*, 775 F.2d 1460, 1465 (11th Cir. 1985).

The attached State Policy in Exhibit I shows the systemic and organized

violation by policy of 42 U.S.C. § 654(21)(A) by various Title IV-covered State

political subdivisions under Rhode Island's State Plan, and the Appellees'

coordinated, concerted and organized efforts to cover it up.  The felonious cover up

of Appellees' violation of 42 U.S.C. § 654(21)(A) entailed sophisticated felonious

removal of the unlawful 12% compound interest from the automated data

processing and information retrieval system on a routine basis to "zero out any

existing interest" for the explicit purpose of  "for the purpose of removing interest

from interstate cases."  The policy further states, "Two reports will be created.  The

first will detail the interstate cases for which a support order modification was done

first for which one or more interest adjustments were created.  The second report

will detail interstate cases for which the interest field is Y, B, B or P."  Explicitly

applied to this instant case, the Appellees, in accordance with the policy, feloniously removed tens of thousands of dollars of "interest" from the automated data processing and information retrieval system governed by 42 U.S.C. §651-669 and feloniously sent to the State of Texas in 2018 a total amount with the interest thus removed, feloniously certifying the support amount with interest thus removed as a true total support amount under, inter alia, 42 U.S.C. §666(14), showing prima facie felonious false certification, accounting fraud, false records. In so doing, Appellees feloniously sent a corresponding false certification to the United States.

The attached factual materials show on their face, beyond any doubt, that the judge-created laws created by the judges in the State's family court the establishment and enforcement of the State's "interest" that is "prohibited in interstate cases" that involve the routine felonious, corrupt and perversion of justice removal from the system the interest when certifying to another state like TEXAS and certifying State compliance to Title IV to the United States fraudulently. The Rhode Island Supreme Court's promulgated court Rule 5 governing access to court information that denies remote access to the public and to pro se litigants, therefore, on its face, *defacto* aids in the denial of public access to judge-created laws in the state's courts that knowingly and corruptly violate the federal statutory provisions of Title IV. Because the Rhode Island Supreme Court's Chief Judge and Associate Judge Lynch-Prata are former chief judge of or

former attorney practitioner in the state family court that routinely establishes and enforces the policy-described "interest" that is prohibited by state policy to be charged in interstate cases, which interest is plainly unlawful under the explicit statutory text of 42 U.S.C. § 654(21)(A), the Rhode Island Supreme Court promulgated Rule 5 governing public access to court information *de facto* covers up from the Public access to evidence of routine violations of Title IV within the political subdivisions of the state courts.

Because the entire support and "interest" order is assigned to the State, that then becomes a debt owed to the State by noncustodial parents under the provisions of 42 U.S.C. § 651-669, the "interest" on its face represents unlawful state revenue under color of state law.

**Because noncompliance with provisions of 42 U.S.C. § 654(1)-(34) incurs penalties of tens of millions of dollars in a fiscal year under 42 U.S.C. §651-669 and the State can lose TANF funding, Appellees and counsels for Appellees corruptly lie to this Court in the corrupt calculation in the hopes of corruptly cover up Rhode Island's noncompliance with 42 U.S.C. § 654 and thus corruptly retain TANF funding through felonious deceit. *See*, *Hodges v. Shalala*, 121 F.Supp.2d 854 (D.S.C. 2000), *Hodges v. Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).** As a condition of receipt of any federal funding under Title IV-D of

the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. **Congress, under the <u>Commerce Clause</u>, may <u>offer the States a choice of regulation under federal control or preemption under federal regulation</u>. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).**

As such, Appellant preserves and reserves the issue of district court judge William Smith's role in the scheme as the former chief counsel advising the executive, judicial and legislative political subdivisions of the State Plan from 1996 to 2002 concerning the State's corrupt policy to corruptly circumvent the mandatory implementation of the 1996 amendments of 42 U.S.C. § 654, through the State's corrupt adoption of the felonious state policy to corruptly and feloniously remove the unlawful 12% compound from the system in interstate cases, corruptly and feloniously adjust accounting of the support amount, and corruptly and feloniously certify the false accounting to cooperative states such as TEXAS and to the United States to corruptly avoid detection of the scheme.

Appellees-counsels even repeatedly plastered in the federal district court records as exhibits the state family court's February 10, 2023 court order that facially show Appellees' felonious scheme through the order's text, "…*interest put back on the system* without prejudice to the Defendant." Appellees counsels

feloniously misrepresent repeatedly to the Court that the felonious "putting back on

the system" the unlawful 12% compound interest means the family court found

Appellant owes the interest, in order to conceal the Appellees' felonious scheme of

removing the unlawful 12% compound interest from the system in 2018 when

Rhode Island sent it to TEXAS under 42 U.S.C. § 666(14) through false

certification and false claims, as it turns out by official state policy, in order to

conceal the unlawful 12% compound interest that would expose Rhode Island's

ineligibility to participate in Title IV at least since 1996.

### Rhode Island Criminal Laws Prohibit Special Attorneys General Pizana and Shaw from submitting 9 copies of the perjurious State Appellee-Brief

Misprision of felony is an indictable offense in Rhode Island by virtue of statute

providing for prosecution and punishment of common-law crimes. Rhode Island

G.L. 1956, § 11-1-1. Misprision of felony was a crime known at common law.  The

Rhode Island Supreme Court in *State v. Flynn*, **100 R.I. 520 (R.I. 1966)** held,

"Blackstone defined it as concealment of a felony which a man knows but never

assented to, 2 Sharswood's Blackstone's Commentaries, book 4, (1860 ed.) 121, p.

407, and Chitty said that any person knowing a crime to have been committed and

concealing it, even though he has not actively assisted the offender, will be guilty

of a misprision of the crime which he has been instrumental in concealing. 1

Chitty, Criminal Law (3d Am. ed. 1836), 3. Elsewhere it is described generally as a

criminal neglect either to prevent a felony from being committed, or to bring the

defendant to justice after its commission, but without such previous concert with or subsequent assistance to the felon as would make the concealer an accessory before or after the fact. *State* v. *Wilson,* 80 Vt. 249; *State* v. *Biddle,* 32 Del. 401; 1 Wharton, Criminal Law and Procedures (12th ed.) § 112, p. 244.

While the list of offenses punishable by the statutes of this state does not include misprision of felony, the legislature has provided in § 11-1-1 that every act and omission which was an offense at common law and for which no punishment is specifically prescribed may be prosecuted and punished as an offense at common law. Based upon that statute, or its precursors, this court held in ***State* v. *Horton,* 47 R.I. 341**, that the act of misleading, cheating, defrauding and defeating public justice was an indictable offense even though not interdicted under a specific statutory listing. We reached a similar result as to champerty in *Martin* v. *Clarke,* 8 R.I. 389, and in *State* v. *Eastern Coal Co.,* 29 R.I. 254, we said that the law relative to the common-law offense of engrossing, although dormant in this state, might, because of the statute making offenses at common law subject to prosecution and punishment, be applied.

In our judgment the statute is sufficiently embracing to make misprision of felony an indictable offense in this state. We answer the first question in the affirmative."

This Court moreover must take judicial notice of the century old holding in
***State* v. *Horton, 47 R.I. 341*** that establishes undisputably that the Special
Attorneys General Pizana and Shaw corruptly committed obstruction of justice,
obstruction of a judicial proceeding and misprision of felony indictable in Rhode
Island.

Firstly, ***State v. Horton*** upholds the criminality of conspiring to attempt to
obtain a decree of divorce by uttering and publishing a false and fraudulent
deposition, known to them to be such, "with the object of misleading, cheating,
defrauding and defeating public justice," and holding that conspiring to obtain the
entry of a decree of divorce by means of a false deposition known to them to be
such.

Secondly, to willfully mislead a court of justice by the production of false
evidence or to obstruct or pervert the administration of public justice is an offence
at common law, and to Defeat Public Justice is an Offence at Common Law.  In
State v. Horton, the acts found to defeat public justice were as follows, "defendants
fraudulently and unlawfully combined, confederated and conspired to attempt to
obtain a decree of divorce in a case pending in the Superior Court for the counties
of Providence and Bristol by uttering and publishing a false and fraudulent
deposition, purporting to be the deposition of one George E. Rands, with the object
of  misleading, cheating, defrauding and defeating public justice; and that the

defendants then and there well knew that said deposition was false, fraudulent and untrue."

Thirdly, the Rhode Island Supreme Court held, "the statutes of the State do not in terms include the act of misleading, cheating, defrauding and defeating public justice among the criminal offenses. It is provided, however, that every act which is an offense at common law and for which no punishment is specifically prescribed in the statutes may be prosecuted and punished as an offense at common law; and punishment is fixed for such offense. § 1, Chap. 402, Gen. Laws 1923. It cannot be questioned that willfully to mislead a court of justice by the production of false evidence or to obstruct or pervert the administration of public justice is an offense at common law. This has been recognized in *State* **v.** *Bacon,* **27 R.I. 252**. In that case, the respondents conspired to procure an action to be commenced upon a charge known to them to be false, unlawful and fraudulent with intent to cheat the defendant in such action. Although such intent was not alleged in the indictment, it was held that the count charged a conspiracy to pervert or obstruct justice. While the words, "misleading, cheating, defrauding and defeating public justice" are not synonymous with the words "perverting and obstructing justice" we think that, at most, they should be regarded as surplusage, and their presence is not fatal to the indictment."

Here, it is now plainly established that Appellees' corrupt felonious scheme comprised of corruptly and feloniously removing unlawful 12% compound interest from the Title IV automated data processing system and then endeavoring to corruptly enforce the unlawful 12% compound interest is nothing less than perverting and obstructing justice.

Special counsels Pizana and Shaw causing 9 copies of their feloniously written filings to be sent from Rhode Island to the judges of the Court of Appeals in the plain endeavor to corruptly influence the judges is *prima facie* perversion and obstruction of justice.

Undisputedly, Appellees and counsels for appellees violated 18 U.S.C. §503 and 18 U.S.C. §4, as well as wire fraud and mail fraud.

Among others, they violated 31 U.S.C. § 3279**,** 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18

U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18

U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968.

I. **Appellees-counsels conceal the True Felonious Nature of Appellees' Unlawful Interstate Enforcement of Unlawful Interest Arears on Overdue Support Under the Legal Framework of Title IV of The Social Security Act, repeated over a dozen times in the State Appellee Brief – Counsels' representation that Rhode Island has a state interest to enforce unlawful 12% compound interest Turns Out to Be False, Perjurious and Felonious Because Counsels Concealed Rhode Island's 12% Compound Interest Is Unlawful and the State's Enforcement Involves Organized Accounting Fraud, False Certifications and False Claims by Political Subdivisions of Rhode Island Regulated By 42 U.S.C. § 654**

A. **Lies to The Tribunal by The Rhode Island Attorney General Representing the State Appellees, All Political Subdivisions governed by 42 U.S.C. § 654(1)**

Firstly, if charged with the misprision of a felony, the Appellees and counsels for Appellees could face the following penalties if convicted:

(1) Fines of up to $250,000 and

(2) Up to three years in federal prison.

If charged with obstruction of justice, the Appellees and counsels for Appellees could face the following penalties if convicted:

(1) Fines of up to $5,000,000 and

(2) Up to twenty years in federal prison.

Counsel for the State Appellees is the attorney general of Rhode Island, the political subdivision under the State Plan regulated by 42 U.S.C. § 654(1), charged with enforcing the provisions of 42 U.S.C. § 654 in Rhode Island under the terms of Rhode Island's participation in the Title IV Program. The language of 42 U.S.C. § 654(1) is explicit. "A State plan for child and spousal support must-

(1) provide that it shall be in effect in **all** political subdivisions of the State." Therefore, Congress is explicit in requiring the State Plan must provide that it shall be in effect in the political subdivision of the Office of the Attorney General. Therefore, under the State Plan, the explicit requirement is that, as the attorney general, counsels for the State Appellees are charged with *enforcing* state compliance with 42 U.S.C. § 654, including 42 U.S.C. § 654(21)(A).

But the Rhode Island attorney general has shown throughout *this* appellate official proceeding alone that not only is s/he not interested in enforcing the State's compliance with 42 U.S.C. § 654(21)(A), s/he time and again lies to *this* United States Tribunal that Rhode Island lawfully enforces interstate interest on support, and time and again affirmatively CONCEALS the felonious official state policy adopted by the Appellees to feloniously remove the unlawful 12% compound interest in interstate cases and feloniously send false accounting and false certifications to TEXAS and the United States concealing Rhode Island's felonious removal of the unlawful 12% compound interest from the Title IV automated data

processing and information retrieval system, in a bald felonious attempt to influence this Tribunal to apply the *judge-made* Younger abstention that gets a judge-made re-invention every decade since the 1970s. Judge-made "rules" must give way to jurisdiction in this case – this case is not merely harassment, this case involves organized felonious scheme by the Appellees using the Title IV legal framework. *See Hamer v. Neighborhood Housing Services of Chicago*, 583 U.S. ___ (2017).

Because neither discovery nor a trial took place in this matter in the district court, the district court judge William Smith, the former chief outside counsel for the State Plan's political subdivisions from 1996 to 2002 when the 1996 Amendments to 42 U.S.C. § 654 should have been implemented by the Appellees, deliberately handicapped the Appellant's right to discovery and seek the truth in the district court. The district court dismissed Appellant's action at law on September 28, 2023, denying Appellant's motion to amend the complaint *nunc pro tunc*.

At this juncture, the Court must take judicial notice under Fed. R. Evid. 201 that in the related case, *Seguin v. R.I. Department of Human Services et al*., 1:23-cv-126-WES-PAS, the district court judge William Smith ordered on July 7, 2023, "Since District Judge William E. Smith has determined that this case is in fact related to CA 23-cv-34 this case is permanently assigned to District Judge William

E. Smith for all further proceedings."  This is relevant because judge Smith and his former firm Edwards & Angell used to and continue to be the chief outside counsel of the state political subdivisions responsible for implementing the 1996 amendments to 42 U.S.C. § 654 and advising the State Appellees here and the State Appellees in the CA 23-cv-126 on the statewide adoption of the State Policy.

As such, the Rhode Island Attorney General audaciously filed in the federal district court on August 7, 2023 the state family court order in **CA 23-cv-126, ECF 11**, as an exhibit in support of the State Appellees motion for extension of time to answer complaint there – the state family court order's text explicitly ordered, "***put interest back on the system*** *without prejudice* to the Defendant."  The complicit judge Smith thereafter granted a 60 day extension.

Without the availability of the State Policy in 2023, all these explicit language of "put interest back on the system" and "remove interest off the system" did not make meaningful sense.  But it was language well understood by the Appellees, the counsels for appellees and district court judge William E. Smith.

Pointedly, the State Policy entitled, "Specifications for OCSS Change Order" that "outlines the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases" was available in 2024, which Appellant

diligently made known to this Court at 1:00:16 AM on March 29, 2024, and

requested Judicial Notice under Fed. R. Evid. 201 in Appellant's subsequently

filed March 29, 2024 Motion to take judicial notice of Document 001182126131

Appellant's Notice requesting judicial notice and making known the commission

of crimes by Appellees was filed pursuant to **18 U.S.C. § 4**.  *See* Document No.:

00118126131 filed on March 29, 2024 at 1:00:16 AM Eastern Daylight Time. The

policy hereafter "State Policy."  Appellant invoked 18 U.S.C. **§ 4, unlawful 12%**

***that in part is aimed and directed at the Appellees and Appellees counsels.***

**Appellees affirmatively participated in the felonious removal of the unlawful**

**12% compound interest from the automated data processing system in 2018**

**when Rhode Island sent the support to TEXAS.  Appellees affirmatively**

**participated in feloniously "keeping the unlawful interest off the system" as**

**the key instrument/vehicle of deceit in 2021 when Appellant contacted the**

**Appellees to pay off support.  Appellees affirmatively recorded in Appellant's**

**Title IV-D case record the felonious "keep the interest off the system."**

**Appellees affirmatively recorded the felonious "agreed to keep the interest off**

**the system."  Appellees affirmatively recorded the felonious "changed his**

**mind and put the interest back on the system" after Appellant performed on**

**the agreement and paid the "$104k."  Therefore, even outside of the felonious**

**representations to the Appellant in 2021, Appellees affirmatively recorded**

their felonious scheme in public Title IV records that they sought to conceal. Therefore, it is shown and proven beyond a doubt that the Appellees counsels are accessories after the fact, and affirmatively and feloniously concealed the principals' felonious scheme.  **All Appellee-counsels violated 18 U.S.C. § 4.**

**The official state policy available in <u>2024</u> made sense of the felonious scheme.**

In aid of the Court, Appellant attaches the State Policy hereto for illustration purposes under **Exhibit I**.  The State Policy states as follows:

"This specification will outline the process by which ***interstate*** cases are selected, automatically adjusted, are created, and support orders are modified ***all for the purpose of removing interest from interstate cases*.**"  This policy goes on to state under its heading, "It is desirable for the Rhode Island Office of Child Support Services (OCSS) to ***prohibit the charging of interest in interstate cases***. This is <u>**manually done**</u> by placing an N in the interest field on page 2 of the support order. ***Entry of the N not only prohibits the charging of future interest but automatically creates adjustment to zero out any existing interest***."   This policy further states "Two reports will be created.  The first will detail the interstate cases for which a support order modification was done first for which one or more interest adjustments were created.  The second report will detail

interstate cases for which the interest field is Y, B, B or P." This 2024 available

undisputed policy document evidence is submitted pursuant to Fed. Rules of

Evidence 201, to this Court, and Appellant now and again respectfully requests

judicial notice under Fed. Rules of Evidence 201. This policy was newly available

in 2024, and with diligent compliance with Congressionally prescribed criminal

jurisdiction conferred on "judges" "of the United State"s pursuant **18 U.S.C. § 4**,

the Texas Appellant made known the state policy to the judges in the United States

Court of Appeals for the First Circuit, pursuant to Federal Rules of Evidence 201.

This policy made sense of the ensuing documentary evidence that were also

submitted and made known under 18 U.S.C. § 4 and Fed. R. Evid. 201.

Explicitly applied to this instant case, the Appellees, in accordance with the

policy, feloniously removed tens of thousands of dollars of "interest" from the

automated data processing and information retrieval system governed by 42 U.S.C.

§651-669 and feloniously sent to the State of Texas in 2018 a total amount with the

interest thus removed, feloniously certifying it under, *inter alia*, 42 U.S.C.

§666(14), showing prima facie felonious false certification, felonious accounting

fraud, felonious false records. In so doing, Appellees feloniously sent a

corresponding felonious false certification to the United States. See, **<u>EXHIBIT II</u>**.

The resulting effect of the above felonious removals from the automated

data processing and information retrieval system, fraudulent accounting, false

accounts, false certifications to Texas and to the United States, and corresponding

false claims to the United States under Title IV, feloniously produced fraudulent

online accounts created by the Appellees, that showed a felonious false record of

$0 payment in December 2021 for Appellant's very large lump sum payoff

payment of $104,185.98 wired from Texas.  *See* screenshot of Appellee-created

and maintained online Title IV-D account in **Exhibit III**.

The resulting effect of the above felonious removals produced the online

account that showed $0.00 under interest as of December 6, 2021, due to the

Appellees' felonious removal of the interest in 2018 when Appellees sent the

support to Texas for enforcement.  See **Exhibit IV**.  Appellees told the Appellant

that the $0.00 showing on the online account represents the waiver of interest by

the custodian parent, Appellee GERO MEYERSIEK.

Appellant recorded in Texas the phone conversation Appellant had with

Appellee John Langlois that took place on October 5, 2022, in which Appellee

John Langlois also stated that Appellee GERO MEYERSIEK waived interest and

changed his mind subsequent to Appellant performing on the agreed pay-off

amount of $104,185.98, so Appellees **put the 2018 removed interest back on the**

**system**.  Putting the 2018 feloniously removed interest back on the system is a

felony and the subsequent fraudulent liens levied on Appellant's TEXAS

properties are felonious that further violate TEXAS PENAL CODES.  Appellant

submitted this recording pursuant to Rhode Island Rules of Evidence 901 to the

state family court in K2001-0521M, and to federal court judges pursuant Federal

Rules of Evidence 901, 201, and pursuant to 18 U.S.C. §4, 18 U.S.C. §666, and

other applicable federal statutes.

Therefore, pursuant to Fed. Rules of Evid. 201 of judicial notices of related

concurrent court actions, Appellant requests judicial notice of the attached

recording submitted to the concurrent courts for concurrent pending actions at law.

https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-
hBMaEg9/view?usp=sharing

Additionally, Appellant submitted Congressionally published statutory text,

notes and amendments for 42 U.S.C. § 654, requesting judicial notice of the

explicit preemptive statutory notes under Congress's 1996 Amendment, that

explicitly provided State participation in the Title IV Program on the condition of

acceptance of the preemption of 42 U.S.C. § 654 over State laws and constitutions

that must be amended to comply with the 1996 Amendments.

Therefore, **as of 1:00:16 AM on March 29, 2024**, before the Court under

the explicit invocation of 18 U.S.C. § 4, is the evidentiary proof that the Appellee

felonious enforcement of unlawful interest that Appellees feloniously removed

from the automated system in 2018 and thereafter feloniously certified to TEXAS

and to the United States under 42 U.S.C. § 666(14) that there was no interest in Appellant's interstate support case that goes to show that the state's enforcement is not just harassing but constitutes felonious organized fraud, ***squarely confronted the Appellee-counsel***.  Appellee-counsels affirmative actions concealing the felonious scheme thereafter proves beyond a doubt that sanctions are warranted.

Subsequent to Appellant's foremost compliance under 18 U.S.C. § 4 to diligently make known criminal activities to judges of the United States, Appellant proceeded in the morning hours of March 29, 2024 to draft and prepare court filings for motions for judicial notice under Fed. R. of Evid. 201.

However, around 10 AM on March 29, 2024, Appellee-counsel filed Appellees' first Appellee-Brief, without offering any evidentiary proof, refuting the undisputable factual evidence squarely before the Court, contradictorily painting and claiming under Oath as officers of the court their unlawful enforcement as lawful, but <u>unsupported</u> by any evidence to support Appellees' unsubstantiated claim.

Appellees-counsel's solution to "remove" the evidentiary proof before the Court that proves the Appellee-Brief is filled with lies is to file a motion to strike the evidentiary proof accompanying the Appellee-Brief.  The filing of the motion to strike is squarely an affirmative act to *conceal* the felonious scheme.

Therefore, in the scenario in which Appellees prevail, there necessarily would entail countless "removals" from official records in official proceedings of incriminating evidence damning to the Appellees, e.g.,:

(1) Removal without basis in law from this official Appellate record evidence of Appellees' felonious removal of tens of thousands of interest from the automated data processing and information retrieval system

(2) Perpetuating the Appellees' felonious routine practice by policy under color of state law *in aid* of Appellees' felonious removal from the automated data processing system the unlawful 42 U.S.C. § 654(21)(A) prohibited 12% compound interest in interstate cases when Appellees feloniously send to other states like TEXAS under felonious false certifications that there is no interest in order to feloniously cover up Rhode Island's unlawful 12% compound interest felonious scheme, and when Appellees feloniously send to the United States under the Title IV Federal Program falsely and feloniously certifying compliance with 42 U.S.C. § 654 in order to feloniously obtain federal funding for which Rhode Island is ineligible.

Appellant avers in good faith that both scenarios above necessarily involve equally complicit acts by judges in this Court pursuant to 18 U.S.C. § 4, also reviewable under fraud on the court and other applicable federal criminal statutes.

This is because the Rules of Evid. 201 submitted material that invokes 18 U.S.C. §

4, shows systemic and organized felonious violation *by official policy* of 42 U.S.C.

§ 654(21)(A) by various Title IV-covered State political subdivisions under Rhode

Island's State Plan, and the Appellees' felonious coordinated, concerted and

organized efforts to feloniously cover it up.  The felonious cover up of Appellees'

violation of 42 U.S.C. § 654(21)(A) entailed sophisticated felonious removal of the

unlawful 12% compound interest from the automated data processing and

information retrieval system on a routine basis to "zero out any existing interest"

for the explicit felonious purpose of  "for the purpose of removing interest from

interstate cases."  The policy further states, "Two reports will be created.  The first

will detail the interstate cases for which a support order modification was done first

for which one or more interest adjustments were created.  The second report will

detail interstate cases for which the interest field is Y, B, B or P."  Explicitly

applied to this instant case, the Appellees, in accordance with the policy,

feloniously removed tens of thousands of dollars of "interest" from the automated

data processing and information retrieval system governed by 42 U.S.C. §651-669

and feloniously sent to the State of Texas in 2018 a total amount with the interest

thus removed, feloniously certifying it under, *inter alia*, 42 U.S.C. §666(14),

showing *prima facie* felonious false certification, accounting fraud, false records.

In so doing, Appellees feloniously sent a corresponding false certification to the United States.

The attached factual materials show on their face, beyond any doubt, that the judge-created "court order" laws created by the judges in the State's family court show felonious judge-created laws under color of state law the felonious establishment and felonious enforcement of the State's "interest" that is "prohibited in interstate cases" that involve the felonious routine removal from the system the interest when feloniously certifying to another state like TEXAS and feloniously certifying State compliance to the Title IV Program for federal funding, to the United States.

The above show unequivocally sanctionable defraud of the Court by the Appellees and Appellee-counsel(s), all of whom are additionally regulated under 42 U.S.C. § 654(1), including subornation of perjury and conspiracy to suborn perjury.

The above show unequivocally sanctionable defraud of the United States, defraud of Texas, defraud of the Appellant, making false claims, making false certifications, accounting fraud, falsification of records, obstruction of official proceedings, obstruction of justice, violation of 18 U.S.C. § 2(b), §3, §4 among numerous others by both the Appellees and Appellee-counsels.

## II.    <u>Misprision of Felony by the Appellees and Appellees-Counsels</u>

A. <u>**Requisite knowledge of "removing interest from the system," "keeping interest off the system," "agree to keeping interest off the system," "changed his mind and put interest back on the system" are felonies – and handshake partnership – *United States v. Olson*, 856 F.3d 1216 (9th Cir. 2017)**</u>

Firstly, the Court must take notice under Fed. R. Evid. 201 the textual language of 18 U.S.C. § 4.

The misprision of felony statute states:

"Whoever, *having knowledge of the actual commission of a felony cognizable by a court of the United States*, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both." 18 U.S.C. § 4 (emphasis added).  The emphasis was added by the 9th Circuit Court of Appeals in ***United States v. Olson*, 856 F.3d 1216 (9th Cir. 2017).**

To establish misprision of felony, the government must prove beyond a reasonable doubt: "(1) that the principal . . . committed and completed the felony alleged; (2) that the defendant had full knowledge of that fact; (3) that he failed to notify the authorities; and (4) that he took affirmative steps to conceal the crime of

the principal." *Lancey v. United States*, 356 F.2d 407, 409 (9th Cir. 1966)

(alterations omitted) (quoting *Neal v. United States*, 102 F.2d 643, 646 (8th Cir.

1939)).

Appellees have thus far resisted and fought discovery production in the on-

going state family court under advisement of the Rhode Island Attorney General

for any and all information regarding the Appellees' waiver of interest, or

partnerships or agreements or arrangements amongst the State Appellees and

Appellee GERO MEYERSIEK.

Nevertheless, the plain existence of a partnership and agreement is in plain

sight, upon the availability of State Policy attached hereto in Exhibit I that makes

sense of multiple referrals of "remove interest off the system," "keep interest off

the system," "agree to keep interest off the system," and "put interest back on the

system."

The TRAC records attached in Exhibit II records in plain and explicit terms the

multiple discussions and activity that is described in the terms of "remove interest

from the system," "keep interest off the system," "agree to keep interest off the

system," and "put interest back on the system."

Critically, the Rhode Island Attorney General before this Court attached copies

of the state family court order issued at a hearing dated February 10, 2023 that

explicitly ordered, "...*interest put back on the system* without prejudice to the

Defendant."

The full meaning of the interest "removed" or "keep off" or "agree to keep off"

or "put back" on the system cannot be fully comprehended until the 2024 available

State Policy attached hereto in Exhibit I made sense of those terms submitted in

numerous instances to this United States Court by the Appellee counsel, the Rhode

Island Attorney General.

It is plain that the Rhode Island Attorney General has the State Policy in HIS

possession, and he concealed it from this tribunal.

The record in this appeals court plainly show that the Rhode Island Attorney

General, confronted with Appellant's 1 AM March 29, 2024 submission of the

State Policy attached hereto in Exhibit I under 18 U.S.C.  § 4 and Fed. R. Evid.

201, *affirmatively* filed motions to strike it from the record on or around 9 AM

March 29, 2024.

Pursuant to *United States v. Olson*, **856 F.3d 1216 (9th Cir. 2017), a panel of

judges in the Ninth Circuit found that, "Congress intended the misprision

statute to apply solely to conduct the average person would understand as

criminal and serious."  "[M]isprision comprehends an offence which is of so**

**serious a character that an ordinary law-abiding citizen would realise he**

**ought to report it to the police."**

The certification and grant forms that the 42 U.S.C. § 654(1) political

subdivisions fill out to obtain federal grants and funding under 42 U.S.C. § 651-

669 bear the warning that any individual who submitted false statements could be

imprisoned up to five years. Appellees had seen similar warnings "many times,"

and the Court should infer Appellees' sophistication from experience as the state's

designated enforcement entity. This is the reason for the adoption of the State

Policy to "zero out interest" in interstate cases plainly for concealment purposes.

The state's Attorney General tasked with enforcing making into effect 42 U.S.C. §

654 in all political subdivisions under the State Plan has an even higher degree of

duty and sophistication having possession of the State Policy.

To illustrate this point, Appellant attaches herewith the 9th Circuit's opinion

***United States v. Olson***, **856 F.3d 1216 (9th Cir. 2017), as** ==**Exhibit V**==.

## B. Appellee GERO MEYERSIEK'S SOPHISTICATION AND KNOWLEDGE OF FELONY

The language used by Appellee GERO MEYERSIEK shows and proves beyond a

doubt that not only is MEYERSIEK a partner of the State Appellees, he is in the

know of the sophistication of the State Policy's purpose underlying Appellees'

felonious interest removals from the system, keeping interest off the system, agreeing to keeping the interest off the system, and changing his mind and putting interest back on the system.

Pointedly, MEYERSIEK's lawyer, Barbara Grady, and MEYERSIEK himself, explicitly describe their actions similarly in terms of felonious interest removals from the system, keeping interest off the system, agreeing to keeping the interest off the system, and changing his mind and putting interest back on the system, over and over again from 2018 to 2024. MEYERSIEK, if incognizant or unsophisticated, would not describe what ordinarily would be explained by a layman as "waive interest" or "agree to waive interest" or "changed his mind and demand interest" as felonious interest removals from the system, keeping interest off the system, agreeing to keeping the interest off the system, and changing his mind and putting interest back on the system.

Appellee-GERO MEYERSIEK's lawyers, Barbara Grady (in family court) and Joanna Achille, similarly have knowledge of and are in possession of the State Policy attached hereto in Exhibit I. Barbara Grady's husband Paul Dugan, a law firm partner of Dugan & Grady Law, was a former Deputy Chief Counsel of Appellee Office of Child Support Services and knew and was in possession f the State Policy, and among his job mandate, as are the individual State Appellees of this action, is to enforce and conceal the felonious State Policy and practice from

detection.  Appellee Gero Meyersiek, by and through his lawyer Barbara Grady, had partnered with the State Appellees to feloniously establish unlawful 12% compound interest in the interstate case involving TEXAS in the contemplated ensuing enforcement, necessarily involving contemplated felonious false accounting, false certification and fraudulent liens, and is an accessory to aiding and abetting in making false claims to the United States.

 Appellee-GERO MEYERSIEK's counsel, Joanna Achille, did not file an Appellee-Brief in this matter.  However, she plainly knew the substantive elements of the felonious false claim for interstate unlawful 12% compound interest that necessitated the felonious interest removals from the system, keeping interest off the system, agreeing to keeping the interest off the system, and changing his mind and putting interest back on the system.  Counsel for Appellee-GERO MEYERSIEK, confronted with the State Policy evidence attached hereto in Exhibit I as of March 29, 2024, similarly failed to make known to federal authorities the commission of felonious crimes, and has affirmatively concealed the crimes in violation of 18 U.S.C.  § 4 evidenced in this proceeding, alone.

III.  **_Nix v. Whiteside_, 475 U.S. 157 (1986) Requires Withdrawal of Appellee-Counsels pursuant to Model Rule of Professional Conduct 1.2 (stating that a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent); Model Rule 3.3 cmt. [12] (recognizing that lawyers have a special obligation to protect a tribunal against criminal or fraudulent conduct that undermines the integrity of the adjudicative**

**process, such as unlawfully destroying or concealing documents or other evidence or failing to disclose information to the tribunal when required by law to do so); Model Rule 1.16 (requiring that a lawyer withdraw from the representation of a client if the representation will result in violation of the rules of professional conduct or other law).**

The Court must further review the conduct of the counsels for Appellees pursuant to the duty of the Court and the judges' duty under 18 U.S.C. § 4, pursuant to *Nix v. Whiteside*, **475 U.S. 157 (1986).**

**The United States Supreme Court in *Nix v. Whiteside*, 475 U.S. 157 (1986)** makes plain that the attorneys here are required to withdraw pursuant to Model Rule of Professional Conduct 1.2 (stating that a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent); Model Rule 3.3 cmt. [12] (recognizing that lawyers have a special obligation to protect a tribunal against criminal or fraudulent conduct that undermines the integrity of the adjudicative process, such as unlawfully destroying or concealing documents or other evidence or failing to disclose information to the tribunal when required by law to do so); Model Rule 1.16 (requiring that a lawyer withdraw from the representation of a client if the representation will result in violation of the rules of professional conduct or other law).

## A. **Impeachable Conduct by the Rhode Island Attorney General**

Here, the record on appeal makes clear that the Rhode Island Attorney General, itself a political subdivision subject to regulation under 42 U.S.C. § 654, has had knowledge of the State Policy attached hereto in Exhibit I (hereafter "State Policy") since counsels' entry of appearance in this matter in January 2023, for over 15 months. The state attorney general as the premier law enforcement political subdivision under the regulation of 42 U.S.C. § 654 affirmatively knew and have known about the State Policy since its latest revision in 2011. As such, since 2011, the Attorney General of Rhode Island has affirmatively counseled Rhode Island political subdivisions to engage, or assist the subdivisions in implementing and put into practice the State Policy that the lawyer knows is feloniously criminal and feloniously fraudulent.

In this matter alone, the State Appellee counsel has egregiously \violated Model Rule 3.3 cmt. [12] (recognizing that lawyers have a special obligation to protect a tribunal against criminal or fraudulent conduct that undermines the integrity of the adjudicative process, such as unlawfully destroying or concealing documents or other evidence or failing to disclose information to the tribunal when required by law to do so). The Rhode Island attorney general has violated his special obligation, that is further regulated by 42 U.S.C. § 654, to protect this tribunal against felonious criminal and fraudulent conduct that

undermines the adjudicative process, such as feloniously concealing the State Policy and other evidence related to the Policy, feloniously moving the Court to strike the State Policy from the record under the ludicrously lame excuse of "another bite at the apple" and then failing to disclose the State Policy and related materials to the tribunal when required to do so.  Undisputedly, for the purpose of the furtherance of the appellate truth-seeking duty of this Court, Congress proscribed Fed. R. of Evidence 201 and Fed. R. Civ P. 60(b)(3), (4), (5), and (6) as *mainstays ENABLING* **"another bite at the apple"** in the furtherance of justice and public interest.  Rather than complying with federal law, including applicable federal and state criminal laws, counsels for the State Appellees engage in felonious acts in violation of *inter alia* 18 U.S.C.  § § 2, 3, and 4.

Model Rule 1.16 (requiring that a lawyer withdraw from the representation of a client if the representation will result in violation of the rules of professional conduct or other law) requires the Attorney General of Rhode Island to withdraw from the case, and any contradictory state case law or state judge-created laws interpreting Model Rule 1.16 and the state Attorney General's corrupt and felonious and indictable prerogative is preempted by  ***Nix v. Whiteside*, 475 U.S. 157 (1986) in this matter.**  Public interest or public justice dictates it.  The Rhode Island public should not be made to foot the bill for the

abject interstate felonious, corrupt and indictable commission of crimes before

this Court by the counsels for the State Appellees.

  The public of other states victimized by Rhode Island's felonious scheme

aided and abetted by the 42 U.S.C.  § 654 regulated Rhode Island Attorney

general should not be made to foot the bill for protecting themselves from

Appellees and Appellees-counsels scheme, just because of a Rhode Island state

judge-created law on the prerogative of a state attorney general to decide who to

represent.  In reality, the state attorney general's conduct is indictable and

impeachable.  This is not about whether the attorney general of Rhode Island

has a prerogative to decide who to represent, this is about whether his

prerogative conduct is felonious or indictable and impeachable conduct.

## B. **Mandatory Withdrawal of Counsel for Appellee-GERO MEYERSIEK**

For the foregoing reasons, counsel for Gero Meyersiek  is similarly required

to withdraw pursuant to Model Rule of Professional Conduct 1.2 (stating that a

lawyer shall not counsel a client to engage, or assist a client, in conduct that the

lawyer knows is criminal or fraudulent); Model Rule 3.3 cmt. [12] (recognizing

that lawyers have a special obligation to protect a tribunal against criminal or

fraudulent conduct that undermines the integrity of the adjudicative process,

such as unlawfully destroying or concealing documents or other evidence or

failing to disclose information to the tribunal when required by law to do so);

Model Rule 1.16 (requiring that a lawyer withdraw from the representation of a

client if the representation will result in violation of the rules of professional

conduct or other law).

## IV.    Fed. R. Civ. 11(c)(3)

Here, the State Policy was not available until 2024, during the time in which

the Appellees requested and were granted *two* extensions to file their appellate

brief from January 2024 to March 29, 2024.  Because the state policy was not

available until 2024, Appellant properly requested judicial notice of the State

policy pursuant to Fed. R. of Evidence 201 on March 29, 2024, and multiple times

thereafter.  Appellant further ***invoked*** ==**Fed. R. Evid. 201(e) for a hearing by right**==

in every filing made in this Court since the Appellant's filing of her Motion for

Judicial Notice pursuant to Fed. R. Evid. 201 on March 29, 2024.

Because the State Policy has long been available to the Appellee-counsel

and Fed. R. Civ. P 11 requires the Appellee-counsel to investigate the facts relating

to the State Policy available to the Appellee-counsel at counsel's disposal, the

Appellee-counsel's filing of the Appellee-brief and the lies contained therein has

shown to be utterly lacking in candor and blatantly lying to the Court, constituting

*prima facie* fraud on the court. As such the Appellee-Brief should be stricken from the record, pursuant to Fed. R. Civ. P 11.

The Court, on its own initiative under Fed. R. Civ. P 11(c)(3) should order the Appellees and Appellees' counsels to show cause why conduct by the Appellees and their counsels specifically described above has not violated Rule 11(b).

In aid of the Court, the Appellant attaches hereto in **Exhibit VI** Document 00118126131, that was reported to the judges of this United States Court of Appeals under 18 U.S.C. § 4 and Fed. R. Evid. 201.

Appellant moreover respectfully requests the judges of the United States, explicitly conferred by Congress the explicit duty under 18 U.S.C. § 4, to refer the criminal acts made known in Document 00118126131 to the United States Attorney General Merrick Garland, an official who also fits the bill under 18 U.S.C. § 4, pursuant to Fed. R. Civ. P 11(c)(4) "to deter repetition of the conduct or comparable conduct by others similarly situated."

Appellant respectfully requests furthermore that the Court order the Appellees pay the Appellant 9x $250,000 and no less than 9x $50,000 for each infraction named herein for having to prosecute this motion for their felonious conduct.

V.    **CONCLUSION**

The Court should grant this motion for sanctions.  The Court should

order the withdrawal of Appellee-counsels named herein.  The Court

should order the Appellant-requested 9x $250,000 and no less than 9x

$50,000 for each infraction named herein payable by the Appellees and

Appellees counsels to the Appellant, for having to prosecute this motion

for their felonious and corrupt conduct.  The Court should strike the 9

copies of the corrupt Appellee-Briefs from the record.  The Court should

strike the Appellee Brief from the record.  The Court should vacate the

Court's briefing schedule.  The Court should take judicial notice of

Document 00118126131 filed under Fed. R. Evid. 201 and 18 U.S.C. § 4.

The Court should strike the Appellee-Brief from the record for fraud on

the court and for violation of Fed. R. Civ. P 11(b).  The Court should

grant Appellant's Motion to file a supplemental opening brief.  The Court

should extend the time to file the Supplemental opening brief.  The Court

should on its own initiative under Fed. R. Civ. P 11(c)(3) order the

Appellees and Appellees' counsels to show cause why conduct by the

Appellees and their counsels specifically described above has not

violated Rule 11(b).  The judges of the United States Court of Appeals

have been explicitly conferred an expressed duty by Congress under 18

U.S.C. § 4 and 18 U.S.C. § 503 and should refer the corrupt criminal acts made known herein and in Document 00118126131 to the United States Attorney General Merrick Garland, an official under 18 U.S.C. § 4, pursuant to Fed. R. Civ. P 11(c)(4) "to deter repetition of the conduct or comparable conduct by others similarly situated," in the interest of the public, public justice and protection of government proceedings.  The Court should extend the time due for the Appellant Reply Brief until 30 days after the Court's resolution of the above-listed pending motions. The Appellant respectfully requests any and all relief that is just under the circumstances.

Pursuant to Fed. R. Evidence 201(e), Appellant requests by right a hearing.

Respectfully submitted,

Mary Seguin
Pro Se
/s/       *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: April 9, 2024

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing instrument has been served via the Court's ECF filing system on April 9, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

EXHIBIT I.

# SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

# EXHIBIT II.

11:28:47 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00             CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION       COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $_____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP_____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:          SEGUIN      MARY      CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO   K  PNL:
```

Case Number: P2001-0021M
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:56 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY             U024  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED_____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES____

RL: 80  12 22 ABSP:         SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:        MEYERSIEK   GERO    K   PNL:
```

Case Number: 23-1967   Document: 00118130006   Page: 60   Date Filed: 04/00/2024   Entry ID: 6634940
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:01 Tuesday, December 13, 2022

12/13/22   11:29          C A S E   T R A C K I N G          CSCL  ASMXA201
          TRAC.00                 CASE HISTORY                U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
          FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
          FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: 80  12 22 ABSP;          SEGUIN        MARY        CMD:
FNX: TRAC  D CLIENT:         MEYERSIEK     GERO    X   PNL:

Filed in Providence Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria G.

11:29:05 Tuesday, December 13, 2022

```
12/13/22   11:29          C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY               U824  PROD
STARTING DATE    09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT

RL: 80  12 22 ABSP:              SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK   GERO    K    PNL:
```

ed in Providence/Bristol County Family Court
ibmitted 6/7/2023 10:13 PM
welope: 4132704
wiewer: Maria O.

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G          CSCL   ASMXA201
           TRAC.00              CASE HISTORY               U824   PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN___
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS___
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:              SEGUIN        MARY         CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK     GERO    K    PNL:
```

```
12/13/22   11:28          C A S E    T R A C K I N G        CSCL  ASMXA201
           TRAC.00                CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
     TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
     58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

RL: 80  12 22 ABSP:              SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK   GERO    K    PNL:
```

Case Number: N2001052TM   Document: 00118130006   Page: 65   Date Filed: 04/00/2024   Entry ID: 6634940
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

```
12/13/22    11:28          C A S E    T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY                 U824    PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS_____

RL: 80  12 22 ABSP:            SEGUIN        MARY         CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK     GERO     K   PNL:
```

Filed in Providence/Bristol County Family Court    Document: 00118130006    Page: 66    Date Filed: 04/00/2024    Entry ID: 6634940

Submitted: 8/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28         C A S E    T R A C K I N G        CSCL  ASMXA201
            TRAC.00                   CASE HISTORY          U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

```
RL: 80  12 22 ABSP:                   SEGUIN       MARY          CMD: _____
FNX: TRAC D CLIENT:                   MEYERSIEK    GERO    K     PNL:
```

EXHIBIT III.



RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov:

State of Rhode Island
# Office of Child Support Services
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Seguin

Home  My Profile  Contact Us  Site Map  Log Out

## Menu
**Case Information**
- Last 5 Payments
- Last 13 Months
- Current Orders/ Past Due Balances
- Court Dates/ Appointments
- Enforcement Actions
- PIN Lookup

Home > Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek        CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|--------|-------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

EXHIBIT IV.



12:38 PM Mon Dec 6

cseinfo.dhs.ri.gov

ADCB Internet Banking | Community Health Choice | ... | Sign In - Community Healt... | Case Manager Portal | Offi... | RI OCSS Payment

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov:

**State of Rhode Island**
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Dugan                                          Home   My Profile   Contact Us   Site Map   Log

**Menu**

▼ Case Information
  ▶ Last 5 Payments
  ▶ Last 13 Months
  ▶ Current Orders/ Past Due Balances
  ▶ Court Dates/ Appointments
  ▶ Enforcement Actions
  ▶ PIN Lookup

Home > Current Orders and Past Due Balances

**Case Manager**

**Current Orders / Past Due Balances**

**Custodial Parent:** Gero K Meyersiek          **CSE ID:** 1689817

**Current Orders**

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

⚠ Note: Medical orders and medical arrears are not listed on this screen.

**Past Due Balances**

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |

EXHIBIT V.

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee*,

v.

KAREN B. OLSON,
  *Defendant-Appellant.*

No. 15-30022

D.C. No.
3:13-cr-00093-TMB-1

OPINION

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, Chief Judge, Presiding

Argued and Submitted August 4, 2016
Anchorage, Alaska

Filed May 15, 2017

Before: Raymond C. Fisher, Richard A. Paez
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Fisher;
Concurrence by Judge Hurwitz

2                 UNITED STATES V. OLSON

## SUMMARY*

### Criminal Law

The panel affirmed the defendant's conviction under 18 U.S.C. § 4 (misprision of felony) for concealing and failing to notify authorities of her business partner's submission of false statements to the United States Department of Agriculture Rural Development Program in connection with a federal grant application.

The panel held that, to secure a conviction under § 4, the government must prove not only that the defendant knew the principal engaged in conduct that satisfies the essential elements of the underlying felony, but also that the defendant knew the conduct was a felony; that to establish the latter, the government must prove the defendant knew the offense was punishable by death or a term of imprisonment exceeding one year; and that sufficient evidence supports the jury's finding that the defendant here knew the principal's crime was punishable by more than a year in custody.

Concurring in part and concurring in the result, Judge Hurwitz would leave to another day, in a case in which it matters to the outcome, whether the government must prove in a § 4 prosecution that the defendant knew the underlying offense was a felony.

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Glenda Kerry (argued), Law Office of Glenda J. Kerry, Girdwood, Alaska, for Defendant-Appellant.

Retta-Rae Randall (argued), Assistant United States Attorney, United States Attorney's Office, Anchorage, Alaska, for Plaintiff-Appellee.

---

**OPINION**

FISHER, Circuit Judge:

Karen Olson appeals her conviction for misprision of felony under 18 U.S.C. § 4. She was convicted of concealing and failing to notify authorities of her business partner's submission of false statements to the United States Department of Agriculture Rural Development Program (USDA) in connection with a federal grant application. She challenges her conviction, arguing the government failed to prove she knew the conduct she concealed constituted a felony. We address her argument in two parts. First, we agree with Olson that, to secure a conviction under 18 U.S.C. § 4, the government must prove not only that the defendant knew the principal engaged in conduct that satisfies the essential elements of the underlying felony, but also that the defendant knew the conduct was a felony. *See Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009) ("[C]ourts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element."). Second, applying that standard, we hold sufficient evidence supports the jury's

4                    UNITED STATES V. OLSON

finding that Olson had the requisite knowledge here. We therefore affirm.[1]

**BACKGROUND**

The USDA awarded a grant to Robert Wells to open a milk processing facility. The terms of the grant provided that certain equipment was to be purchased wholly or in part with grant funds, and that the USDA would hold a first lien position on any equipment purchased with grant money. Although the grant was in Wells' name, he had an informal "handshake" partnership with Olson, a former Alaska executive director of the USDA Farm Service Agency who wrote Wells' grant application. Wells described her as the "brains" behind the grant, and their informal partnership entitled her to 50 percent of the profits from the milk processing facility.

Around the same time, Kyle Beus received a separate USDA grant to establish an ice cream and cheese manufacturing facility. The paperwork for both Wells' and Beus' grant applications warned that anyone who made false, fictitious or fraudulent statements could be fined or imprisoned for up to five years.

Wells, Beus and Olson agreed to locate their two projects at the same facility. Unbeknownst to Wells and Olson, Beus instructed his contractor, Nether Industries, to inflate the value of certain dairy processing equipment – including a clean-in-place (CIP) system and a glycol chilling system – on papers submitted to the USDA for reimbursement. Beus also

---

[1] We reject Olson's remaining challenges in an unpublished memorandum disposition filed concurrently with this opinion.

submitted invoices to Nether, allegedly for project expenses, so he could personally receive a portion of the grant money the USDA disbursed.

A year into the enterprise, Beus told Wells and Olson he had leased certain "technologically obsolete" pieces of equipment rather than purchase new equipment as agreed in the original grant application, including a "really cheap old glycol unit" and an "incomplete clean-in-place system." As to some of this equipment, Olson informed the USDA there had been a change of plans that called for "leasing instead of outright purchasing some of the original smaller equipment." She did not do so, however, with respect to the CIP system and glycol cooling system. The attached "Proposed Money Grant Expenditure" included a CIP system listed at $35,000 and a glycol cooling system listed at $50,000 when, in fact, those systems had been leased rather than purchased.

After the USDA disbursed the grant funds, Olson filed a final report with the department. It included a "Final List of Expenditures by Category and Completion" that once again falsely listed the purchase of a $35,000 CIP system and a $50,000 glycol cooling system.

Olson later became aware that Beus had been misappropriating grant funds by submitting false invoices to Nether Industries and receiving payments – which Olson described as "kickbacks" – in return. Olson also discovered Beus had improperly used grant funds to make a $71,000 personal investment in a milk jug manufacturer. An entry in her day planner around this time reveals that she knew Beus' actions were improper. She wrote: "Began full-time work on financials/straightening out Kyle's mess. Learning of questionable deals – Nether – Kyle spent $190,000 of our

6                    UNITED STATES V. OLSON

grant on others, so Nether way over budget.  Also, Kyle misused our [] advance $ as his own stock purchases – !" Olson told the project's office assistant she "could send [Beus'] ass to jail."  She wrote members of her board that "[t]he revelations of the past week have crystallized for me that [Beus' agreement to co-locate the projects] was simply a way to divert our grant money into a grandiose plan that has not worked," and that Beus "has put the entire dairy industry at risk for an ever-widening investigation closing off all loan sources and public goodwill."

Olson was convicted after a jury trial of misprision of felony under 18 U.S.C. § 4.  Her conviction was based on her knowledge that Beus, the principal, submitted false statements to the USDA in furtherance of his scheme to misappropriate grant funds in violation of 18 U.S.C. § 1014 – a felony under federal law.  Olson appeals.

## STANDARD OF REVIEW

"We review a question of statutory construction de novo." *United States v. Weitzenhoff*, 35 F.3d 1275, 1283 (9th Cir. 1993).  "Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, which requires a court of appeals to determine whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (citation omitted).

## DISCUSSION

### I

The misprision of felony statute states:

> Whoever, *having knowledge of the actual commission of a felony cognizable by a court of the United States*, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 4 (emphasis added).

To establish misprision of felony, the government must prove beyond a reasonable doubt: "(1) that the principal . . . committed and completed the felony alleged; (2) that the defendant had full knowledge of that fact; (3) that he failed to notify the authorities; and (4) that he took affirmative steps to conceal the crime of the principal." *Lancey v. United States*, 356 F.2d 407, 409 (9th Cir. 1966) (alterations omitted) (quoting *Neal v. United States*, 102 F.2d 643, 646 (8th Cir. 1939)). Only the second element is at issue here.

To show a defendant has "knowledge of the actual commission of a felony cognizable by a court of the United States," 18 U.S.C. § 4, the parties agree the government must prove at least that the defendant knew the principal *engaged in conduct* that satisfies the essential elements of the underlying felony. In other words, the defendant must "know the facts that make [certain] conduct fit the definition of the

offense." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (quoting *Staples v. United States*, 511 U.S. 600, 608 n.3 (1994)). The parties disagree as to whether – and to what extent – the government must also prove the defendant knew such conduct *was a felony*. We conclude Olson has the stronger argument.

First, Olson's construction is consistent with the general presumption that a mens rea requirement applies to each element of an offense. "Absent indication of contrary purpose in the language or legislative history of the statute," *Liparota v. United States*, 471 U.S. 419, 425 (1985), we "ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element," *Flores-Figueroa*, 556 U.S. at 652. *See United States v. Williams*, 553 U.S. 285, 294 (2008) (applying a knowledge requirement to each subdivision in a statute in the absence of "grammar or structure enabl[ing] the challenged provision or some of its parts to be read apart from the 'knowingly' requirement"); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 77–78 (1994) ("[A]s a matter of grammar it is difficult to conclude that the word 'knowingly' modifies one of the elements in [the statute], but not the other."). This "presumption in favor of a scienter requirement," *X-Citement Video*, 513 U.S. at 72, "reflects the basic principal that 'wrongdoing must be conscious to be criminal,'" *Elonis*, 135 S. Ct. at 2009 (quoting *Morissette v. United States*, 342 U.S. 246, 252 (1952)). As a general matter, "a defendant must be 'blameworthy in mind' before he can be found guilty." *Id.* (quoting *Morissette*, 342 U.S. at 252).

In *Liparota*, for example, the statute at issue imposed criminal liability on "whoever knowingly uses, transfers,

acquires, alters, or possesses coupons or authorization cards in any manner not authorized by this chapter or the regulations issued pursuant to this chapter." *Liparota*, 471 U.S. at 420 n.1 (alteration omitted) (quoting 7 U.S.C. § 2024(b)(1) (1985)). The evidence showed the defendant purchased food stamps from an undercover agent for less than face value. *See id.* at 421. The government argued the statute required proof only that the defendant knew of his acquisition of the cards, not that the acquisition was unauthorized by law. *See id.* at 423. The Supreme Court disagreed. Because it was not clear from the text of the statute which phrase or phrases Congress intended the knowledge requirement to modify, and because the legislative history contained nothing to clarify congressional purpose, the knowledge requirement applied to each phrase in the statute. The government was required to show the defendant *knew* purchasing food stamps for less than face value was unauthorized by law. *See id.* at 425. Since *Liparota*, the Court has applied this presumption to a range of statutes. *See, e.g.*, *Flores-Figueroa*, 556 U.S. at 657 (applying a knowledge requirement to each phrase in the aggravated identity theft statute); *Williams*, 553 U.S. at 294 (applying a knowledge requirement to all elements in a child pornography statute); *X-Citement Video*, 513 U.S. at 78 (applying a knowledge requirement to all elements in a statute criminalizing the exploitation of minors).

The same presumption applies here. First, as in *Liparota*, the text of the misprision statute alone does not make clear whether the knowledge requirement applies to each element. *Compare* 18 U.S.C. § 4 ("Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States . . . ."), *with* 7 U.S.C. § 2024(b)(1) (1985) ("[W]hoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not

authorized by this chapter . . . .").  Putting aside the *Flores-Figueroa* presumption, the mental state in § 4 could plausibly be read to modify only "actual commission" or both "actual commission" and "of a felony cognizable by a court of the United States."    Under *Flores-Figueroa*, however, we presume Congress intended the knowledge requirement to apply to both phrases, *see* 556 U.S. at 652, and nothing in the text or legislative history negates the presumption that Congress so intended.  The government has not pointed to anything suggesting Congress intended to penalize someone who did not know she was witnessing the commission of a felony.  Accordingly, given the language of § 4 and the *Flores-Figueroa* presumption, the statute is best interpreted as requiring proof that, in addition to showing the defendant knew the principal engaged in conduct satisfying the essential elements of the underlying felony, the government must also show the defendant knew such conduct was a felony.

Second, even putting the presumption aside, the history of misprision also supports Olson's construction.  In England, before the advent of professional police forces, individual citizens bore the responsibility for combating crime.  *See* Carl Wilson Mullis, III, *Misprision of Felony: A Reappraisal*, 23 Emory L.J. 1095, 1114 (1974).  They had "a duty to raise the hue and cry and report felonies to the authorities." *Branzburg v. Hayes*, 408 U.S. 665, 696 (1972) (internal quotation marks omitted).  *See* Hue and Cry, *Black's Law Dictionary* (10th ed. 2014) ("The public uproar that, at common law, a citizen was expected to initiate after discovering a crime.").  A citizen who breached this duty could be charged with misprision.  *See* Mullis, *supra*, at 1095. In this country, the First Congress enacted the American misprision statute as part of the Crimes Act of 1790, the current version of which is "functionally identical" to its

predecessor. *United States v. Phillips*, 827 F.3d 1171, 1175 (9th Cir. 2016).

This context suggests Congress intended the misprision statute to apply solely to conduct the average person would understand as criminal and serious. As an English court has explained, requiring knowledge of the serious criminal nature of the underlying offense "disposes of many of the supposed absurdities, such as boys stealing apples, which many laymen would rank as a misdemeanour and no one would think he was bound to report to the police. . . . [M]isprision comprehends an offence which is of so serious a character that an ordinary law-abiding citizen would realise he ought to report it to the police." *Sykes v. Dir. of Pub. Prosecutions*, [1962] A.C. 528 at 563.[2]

The government argues in passing that *United States v. Graves*, 143 F.3d 1185 (9th Cir. 1998), *as amended* (June 4, 1988), supports its position. *Graves*, however, did not address the question we are considering here. *Graves* concerned the "accessory after the fact" statute, which states: "Whoever, *knowing that an offense against the United States has been committed*, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact." *Id.* at 1187 (emphasis added) (quoting 18 U.S.C. § 3). The defendant was charged as an accessory ("charged offense") to the crime

---

[2] Misprision has become a little used and much maligned criminal charge. England eliminated the offense a few years after the *Sykes* decision. *See* Mullis, *supra*, at 1100–01. American commentators have urged Congress to do the same, arguing the crime has outlived its usefulness in light of modern methods of law enforcement. *See, e.g.*, E. Lee Morgan, *Misprision of Felony*, 6 S.C. L. Q. 87, 95 (1953–54); Mullis, *supra*, at 1111 n.92 (listing commentators).

of felon in possession of a firearm ("underlying offense").
*See id.* at 1186.  The underlying offense, felon in possession
of a firearm, contains two elements: first, possession of a
weapon and second, a previous felony conviction.  *See id.* at
1187.    There was no evidence the defendant knew the
principal was a felon, but the government argued it need not
make such a showing.  *See id.*  We disagreed, holding a
"defendant who is accused of being an accessory after the fact
must be shown to have had actual knowledge of each element
of the underlying offense."  *Id.* at 1189.  The government was
therefore required to prove the defendant knew that "the
offender possessed a firearm" and that the offender "had
previously been convicted of a felony."  *Id.*

Applied here, *Graves* stands only for the undisputed
proposition that Olson must have had knowledge of the
elements of the *underlying offense* – submission of false
statements to the USDA.  *Graves* does not address or support
the  government's  argument  regarding  the  specified
knowledge requirement of the *charged offense* here –
misprision of a felony.**[3]**

In sum, in light of Supreme Court precedent and relevant
history, we hold the misprision statute requires knowledge
not only that the principal engaged in conduct that satisfies

---

**[3]** Both parties invoke *United States v. White Eagle*, 721 F.3d 1108
(9th Cir. 2013), in support of their respective positions.  This case has no
bearing on our analysis here because it did not address the knowledge
requirement of the misprision statute.  *See id.* at 1119–20 (addressing only
the "failure to notify the authorities" and the "affirmative step to conceal"
elements).

the essential elements of the underlying felony, but also that the underlying offense is a felony.[4]

## II

The question then becomes: What does it mean to know conduct constitutes a felony?

When a term used in a statute is defined by that statute or by "any other relevant statutory provision," *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012), we generally presume that definition applies to the statute's use of the term. *See Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning."); *see also Meese v. Keene*, 481 U.S. 465,

---

[4] Olson asks us to go further by holding the government must show the defendant knew the relevant conduct was a felony under *federal* law, based on the statute's language stating "of a felony *cognizable by a court of the United States.*" 18 U.S.C. § 4 (emphasis added). We decline to do so. "The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum." *United States v. Feola*, 420 U.S. 671, 685 (1975). The requirement that the felony be cognizable by a court of the United States was included in the statute to state the foundation for federal jurisdiction. *See United States v. Howey*, 427 F.2d 1017, 1018 (9th Cir. 1970). "A defendant's knowledge of the jurisdictional fact is irrelevant," *id.*, as has been held in numerous cases interpreting analogous statutory provisions. *See, e.g.*, *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1206–07 (9th Cir. 1991) (holding a defendant charged with being an accessory after the fact need not know the principal crime was one against the United States despite the presence of such language in the statute); *Feola*, 420 U.S. at 687 (holding a defendant charged with conspiracy need not know his conduct violated federal law despite the statute's prohibition on conspiring to commit an offense against the United States).

484 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term."); *United States v. Lettiere*, 640 F.3d 1271, 1274 (9th Cir. 2011) ("[There is a] well-settled principle that, for purposes of statutory interpretation, the language of the statute is the first and, if the language is clear, the only relevant inquiry.").

This presumption is not absolute, however. If interpreting a term consistently with its statutory definition would, for instance, lead to "obvious incongruities" or would "destroy one of the major [congressional] purposes," the statutory definition may yield to context. *See Lawson v. Suwannee Fruit & S.S. Co*., 336 U.S. 198, 201 (1949); *see also Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014) (confirming that the presumption of consistent usage may yield to context).

Here, the term "felony" is defined as part of the federal criminal code as a crime punishable by death or a term of imprisonment exceeding one year. *See* 18 U.S.C. § 3559(a); *see also Burgess v. United States*, 553 U.S. 124, 130 (2008) ("[T]he term 'felony' is commonly defined to mean a crime punishable by imprisonment for more than one year." (citing 18 U.S.C. § 3559(a))). Although the misprision offense and the felony definition are in separate sections of the United States Code, they were included in the same statute at least twice. In 1909, Congress passed an act to "codify, revise, and amend the penal laws of the United States." *See* Criminal Code of 1909, ch. 321, 35 Stat. 1088, 1088 (preamble) (the "1909 Crime Act"). Along with a slightly modified version of the original misprision statute, *see id.* § 146, 35 Stat. at 1114, the 1909 Crime Act included, apparently for the first time, a statutory definition for the term "felony," *see id.* § 335, 35 Stat. at 1152 ("All offenses which may be punished

by death, or imprisonment for a term exceeding one year, shall be deemed felonies."). The 1948 Crimes and Criminal Procedure Act (the "1948 Crime Act"), enacted to "revise, codify, and enact into positive law, Title 18 of the United States Code, entitled 'Crimes and Criminal Procedure,'" Crimes and Criminal Procedure Act, Pub. L. No. 80-772, 62 Stat. 683, 683 (1948) (preamble), similarly included versions of both provisions. *See id.* §§ 1, 4, 62 Stat. at 684. Indeed, the 1948 Crime Act actually included the felony definition and the misprision offense on the very same page. *See id.*

This is a case, therefore, in which Congress has adopted a statute using a term – "felony" – and in the same statute adopted a definition that presumptively applies. Moreover, it does not appear the presumption is rebutted by context. Applying the statutory definition, for instance, neither leads to incongruities nor destroys Congress' purposes. *See Lawson*, 336 U.S. at 201. The drafting history of the 1909 and 1948 Crime Acts supports this conclusion. Before 1909, the term "felony" lacked a uniform definition. A Senate Report on the 1909 Crime Act explained that the term "felony" had an "indefinite classification," resulting in its being "indiscriminately applied." S. Rep. No. 60-10, at 12 (1908). The report therefore underscored the need for a uniform definition, which would "characterize the whole system rather than pertain to any particular part of it." *Id.* Far from "destroy[ing] one of the major [congressional] purposes," *see Lawson*, 336 U.S. at 201, incorporating § 3559's definition into the misprision statute furthers Congress' intent to bring a measure of uniformity to the criminal code.

We therefore hold the government must prove the defendant knew the underlying offense was punishable by

16                    UNITED STATES V. OLSON

death or more than one year in prison.  The defendant need
not know the precise term of imprisonment authorized by
law, but at least she must know the potential punishment
exceeds one year in prison.**5**

### III

In Olson's case, there was sufficient evidence to support
a jury's finding that she knew submitting false statements to
the USDA was punishable by a sentence of incarceration
exceeding one year. *See Nevils*, 598 F.3d at 1163–64.**6**  The
USDA grant form Olson completed on behalf of Wells
explicitly warned that any individual who submitted false

---

**5** Knowledge is ordinarily a subjective standard, and the parties do not
argue the rule is otherwise here. *See, e.g.*, *United States v. Twine*,
853 F.2d 676, 680 (9th Cir. 1988) ("We drew our conclusion in the face
of Congress' use of the terms 'knowingly and willfully,' words which the
Model Penal Code defines in a subjective manner."); *United States v.
Jewell*, 532 F.2d 697, 707 (9th Cir. 1976) (en banc) (Kennedy, J.,
dissenting) ("[K]nowledge [is] a matter of subjective belief, an important
safeguard against diluting the guilty state of mind required for
conviction.").

**6** As to this issue, Olson raises only a sufficiency of the evidence
claim.  Olson does not contest the adequacy of the misprision jury
instruction apart from its failure to include a unanimity instruction – an
issue we address in a concurrently filed memorandum disposition.  Nor
did she proffer a jury instruction at trial clarifying this point of law.  We
therefore assume the jury was properly instructed on misprision and
address solely Olson's argument that there was insufficient evidence of
her knowledge.  In future cases, of course, a defendant in Olson's position
could request an instruction requiring the government to prove that she
knew the underlying offense was punishable by more than one year in
prison.  The instructions given here did not specifically address this issue,
but Olson did not challenge the instruction on appeal, so we need not
address whether the failure to give such an instruction was erroneous.

statements to the USDA could be imprisoned up to five years. Olson had seen similar warnings "many times," and the jury could have inferred Olson's sophistication from her experience as executive director of the USDA Farm Service Agency. This evidence was sufficient for a reasonable jury to find Olson knew Beus' crime was punishable by more than a year in custody.

## CONCLUSION

We hold 18 U.S.C. § 4 requires the government to prove the defendant knew the principal engaged in conduct that satisfies the essential elements of the underlying felony *and* that the defendant knew such conduct was a felony. To establish the latter, the government must prove the defendant knew the offense was punishable by death or a term of imprisonment exceeding one year. Sufficient evidence supports that finding here. For the reasons stated in this opinion and in a concurrently filed memorandum disposition, we affirm Olson's conviction.

**AFFIRMED.**

HURWITZ, Circuit Judge, concurring in part and concurring in the result:

This case does not turn on whether the government must prove in a misprision prosecution under 18 U.S.C. § 4 that the defendant knew the underlying offense was a felony. As the majority correctly concludes, the evidence at trial sufficed for a misprision conviction even if the government bears that burden of proof.

The majority's interpretation of the statute may be correct. But, I would leave such analysis for another day, in a case in which it matters to the outcome. *See Whitehouse v. Ill. Cent. R. Co.*, 349 U.S. 366, 372–73 (1955) ("These are perplexing questions.  Their difficulty admonishes us to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case."); *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (noting "the cardinal principle of judicial restraint" that "if it is not necessary to decide more, it is necessary not to decide more").

EXHIBIT VI.

No. 23-1851

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,


Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official
capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY
FOBERT, KARLA CABALLEROS and TIMOTHY FLYNN in their individual
and official capacities; GERO MEYERSIEK; BARBARA GRADY

Defendants-Appellees.


Appeal from the United States District Court

for the District of Rhode Island

_____

**APPELLANT'S NOTICE TO THE JUDGES OF THE UNITED STATES OF
THE COMMISSION OF ACTIVITIES BY PERSONS OR WHOEVER
INVOLVING RECORD TAMPERING; KNOWING PRESENTATION, OR
CAUSING TO BE PRESENTED OR CERTIFICATION OF A FALSE OR
FRAUDULENT CLAIM TO THE UNITED STATES, TO THE STATE OF
TEXAS, FOR PAYMENT OR APPROVAL; KNOWINGLY MAKING,
USING OR CAUSING TO BE MADE OR USED, A FALSE RECORD OR
STATEMENT MATERIAL TO A FALSE OR FRAUDULENT CLAIM;
CONSPIRING TO COMMIT A VIOLATION OF THE AFORESAID TO
PROCURE TITLE IV-D FUNDING, THAT INVOLVE VIOLATIONS OF 42
U.S.C. § 654 WHICH ARE**

**PENALTY-INCURRING AND FINES INCURRING UNDER 42 U.S.C. §
654, COMMITTED BY INDIVIDUAL APPELLEE PERSONS, WHOEVER,**

## AND AGENTS OF TITLE IV SOCIAL SECURITY ACT RHODE ISLAND STATE PLAN

**Pursuant to**

**18 U.S.C. § 4**
**18 U.S.C. § 666**

**18 U.S.C. § 287 - making false, fictitious claims,**

**18 U.S.C. § 371 - conspiracy to defraud the United States,**

**18 U.S.C. § 1001 - false documents or false statements to a federal agency,**

**18 U.S.C. § 1341 - mail fraud,**

**18 U.S.C. § 1343 - wire fraud,**

**18 U.S.C. § 641 - Public money, property or records,**

**31 U.S.C. § 3279 - federal civil false claims act**

**Et al.**

---------------------------------

## ORGANIZED FRAUD, THEFT OF PUBLIC MONEY AND GOVERNMENT PROGRAMS INVOLVING BILLIONS OF DOLLARS

Judicial Notice, in aid of the court, is respectfully requested of the following:

This case is related to Appeal No. 23-1967 and Appeal No. 23-1978.

In 2010, Appellee Gero Meyersiek (who is a non-welfare recipient and independently wealthy person, was represented by his private counsel, Barbara Grady, whose law firm partner, Paul Dugan, was formerly a Deputy Chief Counsel of State Appellee) paid Appellee Rhode Island Office of Child Support Services $25 under 42 U.S.C. §654(6)(B) for legal services that entailed, *inter alia*,

establishing and enforcement of interest on overdue support.  In return for
Appellee Gero Meyersiek's $25 payment, State Appellee's Deputy Chief Counsel
Priscilla Glucksman provided dedicated, individualized and customized services
beyond those prescribed by 42 U.S.C. §654(6)(B), to wit Glucksman appeared on
behalf of the State at *all non-welfare non-paternity family court* hearings in (over
12) 2010, (over 12) 2011, (over 12) 2012 and 2013 concerning *private custody
matters* relating to *Appellant's application to move her young daughters whom she
had physical custody up until she moved to TEXAS in 2010 when Appellant
remarried* in TEXAS.

Rhode Island Executive Office of Health and Human Services's Budget for
this Fiscal Year is $3,419,217,779.00 ($3.42 Billion) that consists of Federal
Funding.  Penalties and fines incurred as of and accrued from the year 1996 when
Congress amended Title IV-D of the Social Security Act providing for penalties
and fines levied against States' noncompliance with Title IV-D.  The amount of
penalties and fines incurred by Rhode Island under 42 U.S.C. § 654 and other
applicable federal laws, and the amount of funding Title IV-A TANF disgorgement
owed and due from Rhode Island to the United States pursuant to Congress linking
State eligibility for TANF funding to State compliance with Title IV-D date back
to 1996 through 2024.

Pursuant to **18 U.S.C. § 4,** APPELLANT, proceeding from TEXAS and as a citizen of TEXAS, in aid of the Court, respectfully in good faith makes known to the Judges of the United States in the United States Court of Appeals for the First Circuit of United States of America, the commission of penalties-incurring and fines-incurring, both civil and criminal, (negligent and intentional) violations by Appellee persons or whoever acting as agents of the **42 U.S.C. § 654(1) political subdivisions of the State Plan of the State of Rhode Island** and Appellee persons, pursuant to **18 U.S.C. § 666, 18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false documents or false statements to a federal agency, 18 U.S.C. § 1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud, 18 U.S.C. § 641 - Public money, property or records, 31 U.S.C. § 3279 - federal civil false claims act** *et al.* (a non-exhaustive list of Appellee-violated federal codes is invoked in the Conclusion Section of this Notice), and respectfully requests review by a panel of judges in this United States Court of Appeals for the First Circuit under **Fed. R. App. P 27(b).** Certain aspects of the fraud made known herein were also made known to the judges of the United States in the related case **Appeal Case No. 23-1967** pending before a panel of judges **pursuant to Appellant's motions invoked under Fed. R. App. P 8(a)(2)(D) and Fed. R. App. P 27(b) pending in that matter**.

**Please take Judicial Notice that Appellant, in Appeals No. 23-1967, respectfully requested a hearing by a panel of Judges on the Federal Question matters raised herein under Fed. R. App. P 8(a)(2)(D) and Fed. R. App. P 27(b)**.

I.   **APPELLANT'S LIMITED SCOPE PROSECUTION OF THE APPELLEES AND STATE OPERATIONS UNDER THE STATE PLAN UNDER 42 U.S.C. § 654 IN THE ==LIMITED== JURISDICTION 42 U.S.C. § 654(1) STATE FAMILY COURT TITLE IV CASE PROCEEDINGS**

The TEXAS Appellant, a victim of the Appellees' organized commission of organized Title IV-D and Title IV-A Program interstate fraud defrauding Appellant (and TEXAS because Rhode Island's official policy and practice to conceal any and all interest by removing it from the automated data processing system when certifying to Texas for collections under 42 U.S.C. § 666(14) in a scheme calculated to deny Texas's ability to request in sharing legitimate interest under Title IV-D's enforcement and collection states cooperative program scheme) of 42 U.S.C. § 654(21)(A) prohibited 12% compound interest on overdue support fraud, fraudulent liens in TEXAS on TEXAS properties consisting of 42 U.S.C. § 654(21)(A) violative 12% COMPOUND INTEREST on overdue support, fraud, theft, and accounting fraud, respectfully requests judicial notice, in aid of the Court, of the TEXAS Appellant's concurrent limited scope prosecution of the Appellees in the Rhode Island State Plan's 42 U.S.C. **§ 654(1)** political

subdivision, Rhode Island Judiciary limited jurisdiction family court, where certain symbiotic state judicial actors, such as state judge John McCann III, state judge Haiganush Bedrosian and state magistrate Susan Nahabedian, routinely establish and enforce under color of Rhode Island state law 12% compound interest on overdue support, upon information, since 1980, when the Rhode Island General Assembly enacted R.I. Gen. Laws § 15-5-16.5 on "support owing." Appellant respectfully attached hereto this Notice the publication by **Congress** of **42 U.S.C. § 654,** Appellant's motion to dismiss for lack of jurisdiction and close the case dated March 27, 2024; motions to compel compliance with subpoena filed on March 26, 2024 and March 21, 2024 to compel enforcement of that family court's properly issued subpoena for Appellant's Title IV-D case records including records showing the Appellee-Rhode Island Office of Child Support Service's accounting alterations and false support certifications to TEXAS involving any and all records as they relate to the removal of 12% compound interest in the amount of tens of thousands of dollars from the automated data processing system and putting the 12% compound interest in the amount of tens of thousands of dollars back on the system whether it be for certification of a compliant approved State Plan to the UNITED STATES for claims under Title IV-D and Title IV-A programs funding under 42 U.S.C. §§ 654(7), 654(10), 654(14), 654(15), 654(16), 654a, 654b; or certified to financial institutions or property-holding entities for the purpose of

placing or perfecting liens on Appellant's TEXAS properties, or certified to the State of TEXAS for enforcement against the Appellant (e.g., to TEXAS for cooperation under the State Plan Congressionally prescribed under 42 U.S.C. §666 (14) certifying the accuracy and legal sufficiency of Rhode Island's automated data processing system accounted amount) that must obviously exactly corroborate with the amounts directly represented to and demanded from the Appellant during the course of the Appellees' support collection activities – Appellant prosecuted judicial compulsion of Rhode Island Appellees' compliance with the subpoena **and compliance with 42 U.S.C. §654b's** requirement to furnish the information upon the noncustodial parent's information request by filing the motion to compel using the State's electronic court filing system, Odyssey, and attached hereto under **Exhibit A**.  This federal appellate Court is requested to scrutinize the attached Congressionally published Statutory Text as well as the Statutory Notes and Related Subsidiaries of all Congress's Amendments, especially the **1996 Amendments to 42 U.S.C. §654.**

       **As a threshold matter, Appellant respectfully requests Judicial Notice of the Explicit Preemptive Effect of 42 U.S.C. sec. 654 that** Congress offered to Rhode Island under the **Commerce Clause and the Spending Clause** of the United States Constitution as a condition for receiving Federal Funds under the Title IV Programs.

**A.  The Statutory Text and Statutory Notes and Related Subsidiaries of Congress's 1996 Amendment to 42 U.S.C. §654 Make Clear that Under the United States Constitution's Commerce Clause, Congress conditioned State Participation in 42 U.S.C. §654 with State Acceptance of 42 U.S.C. §654 Preemption of State Laws and State Constitutions**

Appellant respectfully requests Judicial Notice of the attached 42 U.S.C. § 654.  The Statutory text, Statutory Notes and Related Subsidiaries of Congress's 1996 Amendment to 42 U.S.C. § 654 makes clear that Under the United States Constitution's Commerce Clause, Congress conditioned State Participation in Title IV-D, as prescribed in 42 U.S.C. § 654, with State Acceptance of 42 U.S.C. § 654 Preemption of State Laws and State Constitutions.  Appellant requests Judicial Notice of the text under  "Effective Date of 1996" that states as follows:

"**Effective Date of 1996**

"(a) In General.-Except as otherwise specifically provided (but subject to subsections (b) and (c))-

"(1) the provisions of this title [see Tables for classification] requiring the enactment or amendment of State laws under **section 466 of the Social Security Act [42 U.S.C. 666], or revision of State plans under section 454 of such Act [this section], shall be effective** with respect to periods beginning on and after **October 1, 1996**; and

"(2) **all other provisions of this title shall become effective upon** the date of the enactment of this Act **[Aug. 22, 1996]**.

"(b) ==Grace Period for State Law Changes==.-The provisions of this title shall become effective with respect to a State on the later of-

"(1) the date specified in this title, or

"(2) the effective date of laws enacted by the legislature of such State implementing such provisions,

but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2-year legislative session, each year of such session shall be deemed to be a separate regular session of the State legislature.

"(c) **Grace Period for State Constitutional Amendment.-**A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of-

"(1) 1 year after the effective date of the necessary State constitutional amendment; or

"(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]."

## Specific 1996 Amendments to 42 U.S.C. §654b and 42 U.S.C. §654(21)(A).

Appellant respectfully requests Judicial Notice of Congress' specific 1996 Amendments to 42 U.S.C. § 654b and 42 U.S.C. §654(21)(A):

"Amendment by section 312(a) of Pub. L. 104–193 **effective Oct. 1, 1998, with limited exception for States which, as of Aug. 22, 1996, were processing the receipt of child support payments through local courts**, see section 312(d) of Pub. L. 104–193, set out as an Effective Date note under **section 654b of this title**."

Further the **1996 Amendments made changes to Par. (21)(A). Pub. L.**

**104**–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent".

==*Therefore, Congress makes it unequivocally clear that States are required as*==
==*a condition of State participation, to **change State Laws**, and if necessary, **amend***==
==***State Constitutions**, to comply with the 1996 Amendments to Title IV-D.*==  *See, e.g.,*

*"b) **Grace Period for State Law Changes**. - The provisions of this title shall*

*become effective with respect to a State on the later of the effective date of laws*

*enacted by the legislature of such State implementing such provisions."*

Therefore, in 1996, Congress made clear that States, such as Rhode Island,

that fail to enact by the legislature of such States implementing provisions of Title

IV-D, are no longer eligible to participate in Title IV-D, resulting in ineligibility to

receive federal funding, as of 1996.

Under 42 U.S.C. § 655(a)(4)(A) and 42 U.S.C. § 655(a)(5), by the text of the

Title IV-D statute, the Appellant respectfully requests Judicial Notice that the

legislature has prescribed **penalties** and that this penalty **shall** be **enforced**.

Here, in the case of Rhode Island, **noncompliance is through *deliberate***

**and *willful* fault of Rhode Island – Appellant respectfully requests Judicial**

**Notice of One of the Reports entitled "TRAC Record" generated by Appellee**

**Rhode Island Office of Child Support Services in Appellant's case that**

Appellant was denied under 42 U.S.C. § 654b(b)(4), but produced pursuant to

Appellant's Rhode Island Access to Public Records Act (APRA) showing an entry

made on December 6, 2021 by Appellee Kevin Tighe, Deputy Legal Chief Counsel

of Appellee Rhode Island Office of Child Support Services stating that "interest

was removed from the system in 2018 when we sent to Texas when case was made

IU" then blacked out REDACTION.  Appellant is prosecuting Rhode Island in the

state family court to produce the unredacted copy of the said public records that

were produced pursuant to APRA regarding this entry "interest was removed from

the system in 2018 when we sent to Texas when case was made IU."  *See* attached

**TRAC Records Exhibit C**. As it turned out, the alleged interest amount is in the

tens of thousands of dollars, for which the Appellees continue to refuse to furnish

the complete accounting books of their offline manual accounting of how much

was removed in 2018.

The State Appellees' removal of the interest from the automated data

processing and information retrieval system is material to this matter as the

evidence herein presented goes to show proof towards the willful and deliberate

noncompliance by Rhode Island of Title IV-D.   Congress made clear in its 1996

Amendment of Title IV to require the implementation of an automated data

processing and information retrieval system as a condition of eligibility because

the legacy manual computation, collection and disbursement of child and spousal

support were fraught with inaccuracies, that essentially ran afoul of safeguards against false accounting and falsified records by unscrupulous persons like the Appellees.  Congress made explicitly clear that accuracy was so central to the federal government's involvement in Title IV-D that It enacted punitive penalties and fines under 42 U.S.C. § 655 for States' noncompliance of 42 U.S.C. §§ 654, 666.

Therefore, the Appellees' knowing removal of tens of thousands of dollars representing Rhode Island's unlawful 12% compound interest prohibited under 42 U.S.C. § 654(21)(A) "when sent to Texas" makes clear Appellees knew the 12% compound interest was fraudulent and unlawful, and sought to cover it up from TEXAS authorities through the manual removal of the entire interest amount (consisting of tens of thousands of dollars) from the automated data processing and information retrieval system that is prohibited by 42 U.S.C. §§ 651-669.  The system is intended to certify the integrity and accuracy of the entire support amount in any given account.

Therefore, it is clearly established that Rhode Island covers up its noncompliance and it is clearly established that Rhode Island's noncompliance is willful and deliberate **because Rhode Island knowingly failed to comply with numerous provisions of 42 U.S.C. § 654 as follows**:

(1) Failed to enact State laws in 1996 implementing provisions clearly prescribed in 42 U.S.C. § 654(21)(A) that makes clear that States may opt to impose interest on overdue support, **but** no less than 3 percent and no more than 6 percent;  See attached ==Exhibit D==. R.I. Gen. Law§15-5-16.5 legislating 12% compound interest on overdue child and spousal support that is explicitly prohibited by 42 U.S.C. § 654(21)(A) (and contract to the selective violation of RIGL § 15-5-16.5 that Appellee-Rhode Island Child Support Services official policy states to ***prohibit*** charging interest on overdue support in ***interstate*** cases **only**. – See ==Policy== attached in ==Exhibit B==)

(2) Failed to enact State codes and procedures to comply with 42 U.S.C. § 654(21)(A) requirement "at the option of the State, impose a late payment fee on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, **in an amount equal to a ==uniform== percentage** determined by the State **(not less than 3 percent nor more than 6 percent)** of the overdue support" that would prohibit the State's Title IV-D operational policy saying, "it is desirable" to prohibit the State's Office of Child Support Services charging interest in interstate cases (implying in *intrastate* cases 12% compound interest is routinely established and enforced by State policy

in violation of the "not less than 3 percent nor more than 6 percent"

explicitly prescribed under 42 U.S.C. § 654(21)(A).

(3) Failed to disclose by deliberate omission (by concealment) to the United

States when certifying to the United States Secretary of the Department

of Health and Human Services for federal reimbursement payment and

incentive payment funding under the Title IV Programs Part D, 42

U.S.C. §§ 651-669, and Part A, TANF.

(4) Falsified accounting and falsified certifications sent to the United States

and other support enforcement cooperating States, like TEXAS, under,

*inter alia*, 42 U.S.C. §§ 651-669, through the State's official Policy and

official Practice of creating multiple accounting records and books of

accounts for the same support case through the manual removal of the

Section 654(21)(A) noncompliant (and incriminating) 12% compound

interest amount from the automated data processing system consisting of

tens of thousands of dollars for example, and putting the removed

interest back on the system by manually issuing fraudulent (based on

illegal 12% compound interest) liens on properties, for example,

fraudulent liens on Texas properties in TEXAS that further violated

TEXAS PENAL and CIVIL CODES.  *See* Appellee Rhode Island

Office of Child Support Services's Official Policy that states, "**It is**

**desirable for RI OCSS to prohibit the charging of interest in Interstate Cases**." The Policy goes on to state regarding operations of the automated data processing system, "Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest." Additionally the Policy states, "Two reports will be created. The first will detail the interstate cases for which a support order….. for which one or more interest adjustment were created." In **<mark>Exhibit B</mark>**.

(5) Concealment of the State's noncompliance with 42 U.S.C. **§ 654(21)(A)** by Cover Up and by Fraud, through the routine practice of illegal manual removal by Appellee Rhode Island Office of Child Support Services of Rhode Island's fraudulent and unlawful 12% compound interest from the 42 U.S.C. **§ 654(24) mandated *automated data processing* and *information retrieval system*** mandated and legislated under *inter alia* 42 U.S.C. **§ 654(24) and 42 U.S.C. §654a and 42 U.S.C. §654b to be *accurate*,** thereby deliberately and willfully violating, *inter alia*, 42 U.S.C. **§ 654b,** 42 U.S.C. **§654(20), 42 U.S.C. §666(14), 42 U.S.C. §654(24) and Congressional Requirements for accuracy of support calculations be performed by the automated data processing system, from which information is retrieved for all**

**support certifications sent to the United States and to cooperative enforcement States like TEXAS for 42 U.S.C. § 654(21)(A) fund sharing, Title IV-D Program federal fund reimbursements, and Title IV-A TANF federal fund procurement.**

(6) The illegal manual removal of the unlawful 12% compound interest from the automated data processing system is augmented by the illegal manual inputting back on the system the illegal 12% compound interest when Rhode Island generates fraudulent liens under the guise of support collection for the unlawful 12% compound interest.

(7) Operating a scheme of collecting unlawful 12% compound interest that Rhode Island converts to unlawful State revenue because under 42 U.S.C. **§§ 651-669** this "ordered" 12% compound interest is assigned by the welfare recipient to the State, thus the 12% compound interest represents a debt to the State owed by the noncustodial parent.

(8) Appellee Cover up of the illegal scheme from unsuspecting noncustodial parent victims like Appellant, by refusing or deny furnishing noncustodial parents "information upon request, timely information on the current status of support payments under an order requiring payments to be made by or to the parent – the timely information generated by the Appellee Rhode Island Office of Child Support

Services must comply with 42 U.S.C. **§ 654b(b) Required procedures mandating "**The State disbursement unit shall use automated procedures, electronic processes, and computer-driven technology to the maximum extent feasible, efficient, and economical, for the collection and disbursement of support payments, including procedures that furnish noncustodial parents their case files upon request.

(9)   Appellee Rhode Island Office of Child Support Service's unlawful policy and practice of manually removing support amounts through fraud from the automated data process system resulted in the generation of fraudulent and false accounting and false ledgers published in Appellant's online child support account maintained by State Appellees fraudulently showing "$0 payment" for Appellant's large sum of $104,185.98 payoff payment in full paid in Texas on December 7, 2021 – See screenshot taken of online account on December 3, 2022 that says **"$0.00"** under Payments for December 2021, attached hereto as **Exhibit E**.

(10)   Similarly, State Appellees concealed from through deceit that the "$0.00" Under Interest Due on the Appellant's online account shown on December 6, 2021 was in part because State Appellees unlawfully took interest off the automated data processing system and information

retrieval system in 2018 when they sent the support to TEXAS – this tampering with federal Title IV records in Appellant's case file was covered up by State Appellees.  See **Exhibit F**, Screen shot of Appellant's online support account taken on **December 6, 2021**, which shows **$0.00** under **Interest Due**.

(11)   **Appellee Rhode Island Office of Child Support Services Deputy Chief Counsel Kevin Tighe further violated Appellant's privacy rights protected under 42 U.S.C. §654(26)(A) by discussing in detail with Barbara Grady, Appellee Gero Meyersiek's private attorney, information and strategies regarding "taking interest off the system" and "keeping interest off the system" as they relate to support enforcement which is prohibited by the statutory text of 42 U.S.C. sec.,654(26)(A) mandating that the State Plan "have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the parties, including-(A) safeguards against unauthorized use or disclosure of information relating to proceedings or actions to enforce support. – See Exhibit C, TRAC records for December 6, 2021 showing Kevin Tighe's unauthorized disclosure to Barbara Grady of enforcement information regarding taking interest off the**

system in 2018 when sending to Texas in in violation of Appellant's privacy rights protected by 42 U.S.C. sec. 654(26)(A).  This disclosure was calculated to scheme with Barbara Grady on how to defraud the Appellant through "leaving the interest off the system" so as to cover up from the Appellant the unenforceable 12% compound interest rate as well as to deceive the Appellant through inducement, to accept Appellee's offer and to agree to pay off the large lump sum principle amount by representing to the Appellant that Appellee Gero Meyersiek waived interest if Appellant paid off support in full in one lump sum $104,185.98.

(12)   In addition to Appellee Rhode Island Office of Child Support Services, the State is culpable of a deliberate and willful failure to comply with 42 U.S.C. **§654(1) requiring "A State plan for child and spousal support must-(1) provide that it shall be in effect in ==all political subdivisions== of the State:**

    a. **Political subdivision limited jurisdiction Rhode Island state family court judiciary and justices routinely establish and enforce under color of state law and through fraud on the court absent jurisdiction the unlawful 12% compound interest in violation of 42 U.S.C. §654(21)(A)**

    b. **Political subdivision Office of the Attorney General knowingly aids and abets in and enforces the unlawful 12% compound interest**

c.  **Political subdivision Rhode Island Executive Office of Health and Human Services that has an annual budget of $3.42 Billion knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and participates in the consequentially unlawful collection of reimbursement of federal funds and federal grant money from the United States under Title IV-D Program.**

d.  **Political subdivision Rhode Island Office of the Treasurer knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and participates in the consequentially unlawful collection of reimbursement of federal funds and federal grant money from the United States under Title IV-D Program.**

e.  **Political subdivision Rhode Island Office of the Governor knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and participates in the consequentially unlawful collection of reimbursement of federal funds and federal grant money from the United States under Title IV-D Program.**

f.  **Political subdivision Appropriations Committee knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and causes to appropriate public funds in the consequentially unlawful State financial participation of the noncompliant State Plan, appropriating the State's public funds to the illegal Title IV-D operation that defrauds unsuspecting noncustodial parents and spousal support obligors for 12% compound interest on overdue support under color of state law.**

**B.  Hodel v. Virginia Surface Mining & Reclamation Assn., Inc. and Hodges v. Shalala, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th**

**Cir. 2002), cert. denied, 540 U.S. 811 (2003) - U.S. Supreme Court Affirms 42 U.S.C. §654 Preemption over State Laws and State Constitutions under the United States Spending Clause and Commerce Clause**

Congress prescribed both civil and criminal penalties for violations of Title IV of the Social Security Act. Firstly, consistent with its ==Spending Power==, Congress has the authority to attach conditions on the receipt of federal funds. *See **South Dakota v. Dole***, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16), (20), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See **Sullivan v. Stroop***, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely." The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." ***Hodges v. Shalala***, 121 F.2d at 879. Absent any discretion available to the Secretary to impose a

lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1]

Congress also enacted several criminal codes punishing actors, such as the Plaintiffs, who commit federal crimes, including cover up of unlawful activities.

The federal government has a longstanding involvement in child support enforcement programs. See ***Hodges v. Shalala***, 121 F.Supp.2d 854 (D.S.C. 2000), ***Hodges v. Shalala***, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003) As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements under 42 U.S.C. sec. 654(21)(A) that the State, at the option of the State, impose a late payment fee ('interest") on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina paid $75 million as of 2009 and was set to pay another $10 million for 2010. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
       Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A), among others

While Rhode Island submits to the United States that it has a federally certifiable statewide automated data processing system for child support, Office of Child Support Services produced APRA Public Records consisting of Title IV Public Records showing Rhode Island taking off from the automated data processing system tens of thousands of dollars allegedly representing the 42 U.S.C. sec. 654(21)(A) prohibited 12% compound interest late payment fee "interest" prior to certifying to TEXAS and the United States, and showing Rhode Island falsely certified to the amount's accuracy under 42 U.S.C. sec. 666(14) when in fact Rhode Island removed significant tens of thousands of dollars (See TRAC records in attached Exhibit).

The Title IV-D statute expressly provides that compliance with ALL 42 U.S.C. 654 requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A.

Again, the clear and unequivocal statement of the required conditions in the statute enabled South Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted).  The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop,* 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."

Emphatically, Congress may use its **Spending Power** to **influence** a State's

legislative choices by providing incentives for States to adopt certain policies, but may

not compel or coerce a State, or go so far as to "commandeer the legislative processes of

the States by directly compelling them to enact and enforce a federal regulatory

program." See *New York v. United States*, 505 U.S. at 161, **but** Congress, under the

==**Commerce Clause**==, **may** ==**offer the States a choice of regulation under federal**==

==**control or preemption under federal regulation**==. **See *Hodel v. Virginia***

==***Surface Mining & Reclamation Assn., Inc***==., 452 U.S. 264, 288 (1981). It is crystal

clear that upon Rhode Island's State Plan entering into agreement with the United

States under the ==**Commerce Clause**==, Rhode Island accepted the agreement terms of

regulation under federal control or preemption under federal regulation. See *Hodel v.*

*Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

*See* United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%
3AUSC-prelim-title42-
section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRp
b25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

**Appellant requests judicial Notice of attached ==Exhibit G==. *Hodges v.***

***Shalala*, 311 F.3d 316 (4th Cir. 2002)**

**C. Rhode Island's Defraud of TEXAS – Under 42 U.S.C. §654, "State**
**may allow the jurisdiction which makes the collection involved to retain any**
**application fee under paragraph (6)(B) or any late payment fee under**
**paragraph (21)" and Rhode Island Removed Tens of Thousands of**
**"paragraph (21)"**

The last provision after Provision (34) of 42 U.S.C. sec. 654 states as follows:

"The State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21). Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25."

See link:

**https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUSC-prelim-title42-section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRpb25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull**

Appellee Rhode Island Office of Child Support Service's routine practice of removal of tens of thousands of dollars of interest from the automated system before sending to other states like Texas in 2018 makes clear that the Appellees schemed to defraud TEXAS "who makes the collection to retain any late payment fee under paragraph (21)" – except TEXAS, a paragraph (21) compliant State that set 6% simple interest, would have known the 12% compound interest is unlawful and unenforceable in Texas.

### D. Rhode Island's Defraud of the UNITED STATES in Scheme Involving Routine Removals of 42 U.S.C. §654(21)

Appellant in good faith relies on the straightforward and clearly worded ruling of the United States Court of Appeals for the 4th Circuit in ***Hodges v. Shalala***, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003), that makes clear Congress's intent to prescribe

both civil *and* criminal penalties and fines for violations.  Consistent with its

Spending Power, Congress has the authority to attach conditions on the receipt of

federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Title IV-D

statute expressly provides that compliance with the 3-6% simple interest on

overdue support, operating the automated system for accuracy and SDU

requirements are conditions of approval of a state plan. See 42 U.S.C. §§ 654(7),

(10), (14), (15), (16), (21)(A), (24), (27)A, § 654a, § 654b. The clear and

unequivocal statement of the required conditions in the statute enabled Rhode

Island to "exercise [her] choice knowingly, cognizant of the consequences of [her]

participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court

has recognized that Congress intended the linkages between child support

programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990)

(concluding Congress intended the two programs to "operate together closely."

The penalty provisions of the statute and the wording of the statute are plain.

Where the Secretary determines that a state plan would be disapproved, and where

the State has made and continues to make a good faith effort to comply and has

submitted a corrective compliance plan, "the Secretary shall not disapprove the

State plan . . . and the Secretary shall reduce the amount otherwise payable to the

State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II)

(emphasis added). "[B]y the text of the statute, the legislature has prescribed that

the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at 879.

Absent any discretion available to the Secretary to impose a lesser penalty than the

alternative penalty as outlined in the statute, Rhode Island is liable for the

statutorily prescribed penalties.[2]   Congress also enacted several criminal codes

punishing persons, whoever who act as agents, such as the Appellees, who commit

federal crimes, including cover up of unlawful activities under federal criminal

codes, e.g., *see* **8 U.S.C. § 666, 18 U.S.C. § 287 - making false, fictitious claims,**

**18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 -**

**false documents or false statements to a federal agency, 18 U.S.C. § 1341 -**

**mail fraud, 18 U.S.C. § 1343 - wire fraud, 31 U.S.C. § 3279 - federal civil false**

**claims act** *et al.* (a non-exhaustive list of Appellee-violated federal codes is

invoked in the Conclusion Section of this Notice).   Penalties and fines against the

State for noncompliance (including due process violations provided in 42 U.S.C.

---

[2] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra,* and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to TEXAS and to the United States in order to conceal the unlawful 12% compound interest from the noncustodial parent and from TEXAS and Federal authorities in the false amounts certified to TEXAS and to the United States for incentive claims, cooperation claims and Title IV-D and Title IV-A funding claims.

§654(20) and corresponding §666) is explicit under federal codes Title IV-D, Title

IV-A, and 18 U.S.C. § 666, and upheld.

Appellant attaches the 4th Circuit's ruling (***Hodges v. Shalala***, 121 F. Supp.

2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S.

811 (2003) herewith under **Exhibit G**.

Appellant  moreover in good faith relies on the straightforward and clearly

worded Brief filed by the United States Department of Justice and Secretary of the

United States Department of Health and Human Services in the seminal United

States Supreme Court case ***Turner v. Rogers***, 564 U.S. 431 (2011) that showed

South Carolina (found by the 4th Circuit Court of Appeals) liable for $75 million in

penalties for that state's 42 U.S.C. § 654 violations that did not even involve, *inter*

*alia*, fraud and tampering with the record or unlawful 12% compound interest put

into, then taken off, then put back on, the automated data processing system as here

in Rhode Island by the political subdivision Appellees.  The TEXAS Appellant, the

victim of fraud and organized fraud by Rhode Island's political subdivisions under

42 U.S.C. **§ 654(1),** in good faith made known the above activities to "some

judges" of "the United States" such as the judges sitting in the Court of Appeals for

the First Circuit and other relevant federal authorities under 18 U.S.C. **§ 4.**

Appellant attaches the aforesaid Brief filed in the U.S. Supreme Court by the United States in ***Turner v. Rogers***, 564 U.S. 431 (2011) herewith under **Exhibit H.**

**Relying on the Turner v. Rogers United States Amicus Brief, it is crystal clear from Appellant's making known, *inter alia*, to judges of the United States the routine false certifications to United States and other States under 42 U.S.C. sec. 654, 655, 658a, 666 et al to defraud the federal Title IV Program funding of ineligible funds under Title IV-D and TANF, the defraud of noncustodial parents and grandparents through the 42 U.S.C. sec. 654 legal framework under color of state law, the defraud of State public funds of Rhode Island and of Texas to enforce fraudulent void and voidable support orders targeting noncustodial victims that established unlawful 12% compound interest on overdue support, and the defraud of cooperative States like Texas from sharing the "late fee" provided by 42 U.S.C. sec. 654 by Appellees' removal of the interest amount from the automated system prior to certification to Texas for enforcement, Rhode Island has accrued billions of dollars in penalties and fines under both civil and criminal statutes, both federal and state.**

      II.    **STATE JUDICIARY'S VIOLATION OF GOVERNMENT EDICTS DOCTRINE, CALCULATED FAILURE TO INTEGRATE TITLE IV-D AGENCY ELECTRONIC FILING SYSTEM WITH ODYSSEY MAKING THEIR FILINGS INVISIBLE TO ALL E-COURT USERS OTHER THAN THE**

JUDGE AND THEMSELVES AND VIOLATION OF ACCESS
TO COURT INFORMATION OF PUBLIC TITLE IV-D
PROCEEDINGS IN RHODE ISLAND'S STATEWIDE
ELECTRONIC COURTS

### a. DENIAL OF PUBLIC AND PRO SE-LITIGANT ACCESS TO COURT INFORMATION INCLUDING JUDGE-CREATED LAWS BY 42 USC 654(1) POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY

The Rhode Island Judiciary is a political subdivision of the State of Rhode Island under 42 USC 654(1).  While publicizing during the implementation of the $6 million installation of Odyssey (the statewide electronic filing system) in 2014 that the electronic courts will enable ALL court users to pull up court record information with ease from their phones, the Rhode Island Judiciary quietly implemented Rule 5 of the Rhode Island Rules and Practice denying the Public, pro-se litigants and all parties to a case in Rhode Island remote access to court record information including judge-created orders and laws, including their own. Through this deceit, the Rhode Island Judiciary lied to the Public, while denying access and thereby covering up the routine ordering of unenforceable body of judge-created laws ordering 12% compound interest in public cases and public hearings under 42 USC 654 in public Title IV-D cases, such as Appellant's, by symbiotic pliant judges like Judge McCann and Magistrate Nahabedian.  The denial of access to pro-se litigants of their own cases' court records containing support orders violates, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.  The denial of public access to public

court records documenting the routine systemic violations of 42 USC 654(21)(A)

in electronic courts violates the First Amendment and the public's right to know

the law, even if these fraud on the court unenforceable judge-created laws are

unenforceable in both Rhode Island and elsewhere Title IV Part D reaches.  The

denial of public access to judge-created laws that is also motivated by cover-up

fundamentally violates the established Government Edicts Doctrine that the United

States Supreme Court specifically held applies to electronic formats of government

doctrines, such as judge-created laws in digital courts. See ***Georgia v. Public***

***Resource.Org, Inc***., No. 18-1150, 590 U.S. ___ (2020).  The Appellant has been

denied access by the political subdivision Rhode Island Judiciary to her court

records and information regarding the orders in question that must be furnished

pursuant to 42 USC 654b thus in violation of 42 USC 654.  The Appellant has been

denied access by the political subdivision Rhode Island Judiciary to unenforceable

and impeachable judge-created fraud on the court void laws that routinely establish

unenforceable 12% compound interest by certain symbiotic pliant judges, like

Judge McCann and Magistrate Nahabedian, who work hand-in-hand with the

Rhode Island Office of Child Support Services in Title IV-D cases, in violation of

Appellant's Due Process and Equal Protection rights to know the law to be

meaningfully heard and right to meaningful access to justice – they are in violation

of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

The family court held at the hearing in this matter scheduled on March 6, 2023 that the Rhode Island Office of Child Support Services is ordered to show that the alleged arrears is accurate.  See attached March 6, 2023 hearing transcript. Explicitly stated throughout 42 USC 654, "accuracy" requires no accounting alterations generated offline then unsubstantiated hard inputs into the automated system, no fraud, no inducements, no interstate extortion under color of state law, and for certain no 12% compound interest on overdue support.

**b. CALCULATED FAILURE BY THE JUDICIARY TO INTEGRATE THE TITLE IV-D AGENCIES' ELECTRONIC FILING SYSTEM INTO ODYSSEY RESULTING IN AGENCY FILINGS BEING INVISIBLE TO ALL COURT USERS EXCEPT THE JUDGE AND THE AGENCIES THEMSELVES – COVER UP**

Because under the State's Plan the Title IV-D agencies routinely file in the Rhode Island court system for the illegal enforcement of illegal 12% compound interest disallowed under 42 USC 654(21)(A), the political subdivision Rhode Island Judiciary deliberately failed to integrate the Title IV-D Agencies' electronic filing system with the State's electronic filing system Odyssey in order to make Title IV-D Agency electronic filings invisible to all court users except the judge and the agencies  themselves, calculated to cover up the 12% compound interest

from audit by the federal authorities and from the Public.  This came to light at the

WebEx hearing in this Title IV-D matter before family court Judge Merola on June

8, 2023 scheduled at 2PM, where Judge Merola, showing he was unaware of the

failure of systems integration, questioned Appellee Paul Gould of Rhode Island

Office of Child Support Services, why the Appellant is unable to see the agency's

electronic filings that the judge can see in the system.  Without hesitation, Appellee

Paul Gould explained that this is due to the electronic court implementation

process that was supposed to integrate the agency's legacy system to Odyssey,

demonstrating conclusively that Gould, the Lead Counsel of the Rhode Island

Office of Child Support Services responsible and overseeing agency court filings

in all Title IV-D cases under the State Plan, undisputedly was in the know and part

of the conspiracy involving the deliberate failure of filing system integration and

its continuing perpetration in Title IV proceedings that made Title IV agencies'

filings invisible as part of the cover up.

### c. CRIMINAL VIOLATIONS REPORTED TO SOME JUDGE OF THE UNITED STATES AND OTHER LISTED AUTHORITIES UNDER 18 U.S.C. § 4

The Appellant, in good faith and reliant on the plain language of 18 USC §

4, misprision of felony, as well as the Brief filed in the United States Supreme

Court by the United States of America in the Supreme Court case, *Turner v.*

*Rogers*, 564 U.S. 431 (2011) that showed South Carolina (found by the 4th Circuit

Court of Appeals) liable for $88 million in penalties for that state's 42 U.S.C. sec. 654 violations that did not even involve, inter alia, fraud and tampering with the record or unlawful 12% compound interest put into then taken off then put back on the automated data processing system as here in Rhode Island, made known the above activities to "some judges" of "the United States" and other relevant federal authorities – counting among the United States judges Appellant made known publicly in the Amended Complaint filed in the United States District Court for the District of Rhode Island, Judge William E. Smith.  The issue of what Judge Smith has done with the information "made known to him" is pending before the United States Court of Appeals for the First Circuit before a requested panel of judges under the federal appellate law of civil procedure in Appeal Case No. 23-1967. Therefore, under 18 U.S.C. Sec. 4, the above reported activities have been "made known" to several high ranking Judges of the United States, including the Judge in this case.

### III.    VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Appellant made known to the panel of judges of the United States allegations contained in the Amended Complaint filed in Federal Court of the commission of acts by the Rhode Island political subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein in this motion, the afore-described acts violating **31**

**U.S.C. § 3279,** 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18

U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a),

18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18

U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18

U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285,

18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C.

§1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18

U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18

U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C.

§1968  – such violative acts by the Appellees in this matter, and/or Judge Smith on

this list are not exhaustive.  It is undisputable, among others, that Title IV-D

penalties were incurred by, Criminal penalties were incurred by, and Title IV-D

and Title IV-A disgorgement is due from the applicable State of Rhode Island's

political subdivisions.

## IV. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in UNITED STATES OF

AMERICA v. DONALD J. TRUMP, DC Circuit, the DC Circuit United States

Court of Appeals reminds the Public and all applicable tribunals that Judges are

similarly liable to the criminal laws for their official acts.  A notable example is *Ex*

*parte Commonwealth of Virginia*, in which the Supreme Court affirmed the

criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A
county judge was indicted in federal court for violating a federal statute that
prohibited discriminating on the basis of race in jury selection. Id. at 340, 344. The
Supreme Court began by observing the principle that officers are bound to follow
the law: "We do not perceive how holding an office under a State, and claiming to
act for the State, can relieve the holder from obligation to obey the Constitution of
the United States, or take away the power of Congress to punish his

disobedience." *Id.* at 348. The Court then addressed the judge's argument that the
Court lacked the authority to punish a state judge for "his official acts." *Id.* Its
response was twofold. First, the Court described juror selection as "merely a
ministerial act, as much so as the act of a sheriff holding an execution, in
determining upon what piece of property he will make a levy, or the act of a
roadmaster in selecting laborers to work upon the roads." *Id.* The Court then
explained that even if juror selection is considered a "judicial act," the judge had a
legal duty to obey the criminal laws:

> "But if the selection of jurors could be considered
> in any case a judicial act, can the act charged
> against the petitioner be considered such when
> he acted outside of his authority and in direct
> violation of the spirit of the State statute? That
> statute gave him no authority, when selecting

jurors, from whom a panel might be drawn for
a circuit court, to exclude all colored men
merely because they were colored. Such an
exclusion was not left within the limits of his
discretion. It is idle, therefore, to say that the
act of Congress is unconstitutional because it
inflicts penalties upon State judges for their
judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute"
is to the Virginia law charging the county judge with the duty to select jurors in the
circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges
are not immune from criminal liability for their official acts. *O'Shea v. Littleton*
confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for
equitable relief brought against a county magistrate and associate judge of a county
circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the
requested injunction was not the only available remedy because both judges
remained answerable to the federal criminal laws:

[W]e have never held that the performance of
the duties of judicial, legislative, or executive
officers, requires or contemplates the
immunization of otherwise criminal deprivation

of constitutional rights. On the contrary, the
judicially fashioned doctrine of official
immunity does not reach 'so far as to immunize
criminal conduct proscribed by an Act of
Congress . . . .'

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting

Gravel, 408 U.S. at 627). Similarly, in *Dennis v. Sparks,* the Court affirmed

judicial immunity from civil money damages in the context of bribery allegations

but explained that judges "are subject to criminal prosecutions as are other

citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity

because "the challenged conduct" — allegedly issuing an injunction corruptly after

accepting bribes as part of a conspiracy — was "an official judicial act within his

statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial

immunity thus aligns with civil Presidential immunity under *Fitzgerald*, but a

judge has no criminal immunity for the same "official act." See also *Imbler v.

Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil

immunity for centuries, could be punished criminally for willful deprivations of

constitutional rights . . . ."); *United States v. Gillock,* 445 U.S. 360, 372 (1980)

("[T]he cases in this Court which have recognized an immunity from civil suit for

state officials have presumed the existence of federal criminal liability as a

restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. See *United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not immune, and employees of the political subdivisions of Rhode Island under 42 USC § 654(1) similarly are not immune. Barbara Grady and Gero Meyersiek are undisputedly liable.

## IV.   LACK OF JURISDICTION – APPELLEE 42 U.S.C. § 654(1) STATE PLAN POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (CREATED UNDER RIGL 8-6-3) LACKS JURISDICTION

### A. RI'S 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY LACKS JURISDICTION TO ESTABLISH OR ENFORCE 42 USC § 654(21)(A) VIOLATIVE 12% COMPOUND INTEREST ON OVERDUE SUPPORT – DOING SO INCURS PENALTY UNDER 42 USC 654(24) AND REINFORCES ITS STATE PLAN'S INELIGIBILITY

**FOR FEDERAL FUNDING UNDER BOTH TITLE IV-D AND TITLE IV-A, WARRANTING DISGORGEMENT OF TANF AND TITLE IV-D FUNDING – SEE HODGES v. SHALALA**

The statutory provision of 42 U.S.C. 654(21)(A) makes it

explicitly clear that Title IV-D and Title IV-A participating 42

USC 654(1) state political subdivisions, such as the political

subdivision Rhode Island Judiciary, lack the authority to establish

12% compound interest.

To do so "routinely" simply incurs more penalties, more fines

constituting more false claim consequences, and imprisonment of

the culpable persons and agents.

B. **RI's 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (See RIGL 8-6-3) LACKS JURISDICTION OVER QUESTIONS AND MATTERS OF FEDERAL CRIMINAL VIOLATIONS BY RHODE ISLAND SDU OF ROUTINE RECORD TAMPERING WITH 42 U.S.C. 654a AUTOMATED DATA PROCESSING SYSTEM COMMITTING ACCOUNTING FRAUD (e.g., REMOVAL OF UNLAWFUL 12% COMPOUND INTEREST IN ORDER TO CONCEAL IT WHEN CERTIFYING TO OTHER STATE AUTHORITIES AND FEDERAL AUTHORITIES) AND THE CRIMINAL CERTIFICATION OF FRAUDULENT ACCOUNTS THAT CONTAIN MANUALLY REMOVED UNLAWFUL FRAUDULENT 12%**

**COMPOUND INTEREST (UNDER COLOR OF RI'S PREEMPTED STATE LAW) FROM THE SYSTEM**

Title IV-D 42 USC 651-669, 31 U.S.C. § 3279, 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 also make clear that the State Plan's 42 USC 654(1) political subdivision limited jurisdiction Rhode Island family court lacks jurisdiction over FEDERAL CRIMINAL VIOLATIONS BY RHODE ISLAND SDU OF ROUTINE RECORD TAMPERING WITH 42 U.S.C. 654a AUTOMATED DATA PROCESSING SYSTEM

COMMITTING ACCOUNTING FRAUD (e.g.,

REMOVAL OF UNLAWFUL 12% COMPOUND

INTEREST IN ORDER TO CONCEAL IT WHEN

CERTIFYING TO OTHER STATE AUTHORITIES AND

FEDERAL AUTHORITIES) AND THE CRIMINAL

CERTIFICATION OF FRAUDULENT ACCOUNTS

THAT CONTAIN MANUALLY REMOVED

UNLAWFUL FRAUDULENT 12% COMPOUND

INTEREST (UNDER COLOR OF RI'S PREEMPTED

STATE LAW) FROM THE SYSTEM.  Appellant attaches

herewith in **Exhibit I.** Rhode Island Gen. Laws Sec. 8-10-3

that makes clear family court is a court of limited

jurisdiction that lacks jurisdiction over the Appellees'

criminal violations.


**C.  RI's 42 USC 654(1) POLITICAL SUBDIVISION
JUDICIARY'S LIMITED JURISDICTION FAMILY COURT
(See RIGL 8-6-3) LACKS JURISDICTION OVER FEDERAL
CRIMINAL VIOLATIONS COMMITTED BY ITSELF
INVOLVING CERTAIN SYMBIOTIC RHODE ISLAND
FAMILY COURT JUSTICES, SUCH AS JUDGE JOHN
McCANN AND MAGISTRATE SUSAN NAHABEDIAN,
WHO KNOWINGLY AND ROUTINELY FRAUDULENTLY
ESTABLISH AND ENFORCE UNLAWFUL 12%
COMPOUND INTEREST TARGETING UNSUSPECTING
NONCUSTODIAL PARENT VICTIMS**

Title IV-D 42 USC 651-669, 31 U.S.C. § 3279, 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 also make clear that the State Plan's 42 USC 654(1) political subdivision Rhode Island family court lacks jurisdiction over FEDERAL CRIMINAL VIOLATIONS COMMITTED BY ITSELF INVOLVING CERTAIN SYMBIOTIC RHODE ISLAND FAMILY COURT JUSTICES, SUCH AS JUDGE JOHN McCANN AND MAGISTRATE SUSAN NAHABEDIAN, WHO KNOWINGLY AND ROUTINELY FRAUDULENTLY ESTABLISH AND ENFORCE UNLAWFUL 12% COMPOUND

INTEREST TARGETING UNSUSPECTING NONCUSTODIAL

PARENT VICTIMS.


## CONCLUSION

**WHEREFORE**, this Court should hold Oral Arguments regarding the

Federal Questions and serious criminal matters raised herein.  This Court should

reverse the district court's judgement and remand for further proceedings.

Appellant requests Oral Argument on all issues raised herein before the Court.

Appellant requests any and all Relief deemed just.

Respectfully submitted,

Mary Seguin
Pro Se
/s/        *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: March 29, 2024


## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system on March 29, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

# Exhibit A

---

**42 USC 654: State plan for child and spousal support**
Text contains those laws in effect on March 25, 2024

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
    CHAPTER 7-SOCIAL SECURITY
    SUBCHAPTER IV-GRANTS TO STATES FOR AID AND SERVICES TO NEEDY FAMILIES WITH
    CHILDREN AND FOR CHILD-WELFARE SERVICES
    Part D-Child Support and Establishment of Paternity
**Jump To:**
    <u>Source Credit</u>
    <u>Miscellaneous</u>
    <u>References In Text</u>
    <u>Codification</u>
    <u>Amendments</u>
    <u>Effective Date</u>

---

# §654. State plan for child and spousal support

A State plan for child and spousal support must-

(1) provide that it shall be in effect in all political subdivisions of the State;

(2) provide for financial participation by the State;

(3) provide for the establishment or designation of a single and separate organizational unit, which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan;

(4) provide that the State will-

(A) provide services relating to the establishment of paternity or the establishment, modification, or enforcement of child support obligations, as appropriate, under the plan with respect to-

(i) each child for whom (I) assistance is provided under the State program funded under part A of this subchapter, (II) benefits or services for foster care maintenance are provided under the State program funded under part E of this subchapter, (III) medical assistance is provided under the State plan approved under subchapter XIX, or (IV) cooperation is required pursuant to section 2015(l)(1) of title 7, unless, in accordance with paragraph (29), good cause or other exceptions exist;

(ii) any other child, if an individual applies for such services with respect to the child (except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application); and

(B) enforce any support obligation established with respect to-

(i) a child with respect to whom the State provides services under the plan; or

(ii) the custodial parent of such a child;

(5) provide that (A) in any case in which support payments are collected for an individual with respect to whom an assignment pursuant to section 608(a)(3) of this title is effective, such payments shall be made to the State for distribution pursuant to section 657 of this title and shall not be paid directly to the family, and the individual will be notified on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden) of the amount of the support payments collected, and (B) in any case in which support payments are collected for an individual pursuant to the assignment made under section 1396k of this title, such payments shall be made to the State for distribution pursuant to section 1396k of this title, except that this clause shall not apply to such payments for any month after the month

in which the individual ceases to be eligible for medical assistance;

(6) provide that-

(A) services under the plan shall be made available to residents of other States on the same terms as to residents of the State submitting the plan;

(B)(i) an application fee for furnishing such services shall be imposed on an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section 2015 of title 7, and shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (I) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (II) may vary among such individuals on the basis of ability to pay (as determined by the State); and

(ii) in the case of an individual who has never received assistance under a State program funded under part A and for whom the State has collected at least $550 of support, the State shall impose an annual fee of $35 for each case in which services are furnished, which shall be retained by the State from support collected on behalf of the individual (but not from the first $550 so collected), paid by the individual applying for the services, recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and the fees shall be considered income to the program);

(C) a fee of not more than $25 may be imposed in any case where the State requests the Secretary of the Treasury to withhold past-due support owed to or on behalf of such individual from a tax refund pursuant to section 664(a)(2) of this title;

(D) a fee (in accordance with regulations of the Secretary) for performing genetic tests may be imposed on any individual who is not a recipient of assistance under a State program funded under part A; and

(E) any costs in excess of the fees so imposed may be collected-

(i) from the parent who owes the child or spousal support obligation involved; or

(ii) at the option of the State, from the individual to whom such services are made available, but only if such State has in effect a procedure whereby all persons in such State having authority to order child or spousal support are informed that such costs are to be collected from the individual to whom such services were made available;


(7) provide for entering into cooperative arrangements with appropriate courts and law enforcement officials and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering the plan, including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;

(8) provide that, for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title the agency administering the plan will establish a service to locate parents utilizing-

(A) all sources of information and available records; and

(B) the Federal Parent Locator Service established under section 653 of this title,


and shall, subject to the privacy safeguards required under paragraph (26), disclose only the information described in sections 653 and 663 of this title to the authorized persons specified in such sections for the purposes specified in such sections;

(9) provide that the State will, in accordance with standards prescribed by the Secretary, cooperate with any other State-

(A) in establishing paternity, if necessary;

(B) in locating a noncustodial parent residing in the State (whether or not permanently) against

whom any action is being taken under a program established under a plan approved under this part in another State;

 (C) in securing compliance by a noncustodial parent residing in such State (whether or not permanently) with an order issued by a court of competent jurisdiction against such parent for the support and maintenance of the child or children or the parent of such child or children with respect to whom aid is being provided under the plan of such other State;

 (D) in carrying out other functions required under a plan approved under this part; and

 (E) not later than March 1, 1997, in using the forms promulgated pursuant to section 652(a)(11) of this title for income withholding, imposition of liens, and issuance of administrative subpoenas in interstate child support cases;

 (10) provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;

 (11)(A) provide that amounts collected as support shall be distributed as provided in section 657 of this title; and

 (B) provide that any payment required to be made under section 656 or 657 of this title to a family shall be made to the resident parent, legal guardian, or caretaker relative having custody of or responsibility for the child or children;

 (12) provide for the establishment of procedures to require the State to provide individuals who are applying for or receiving services under the State plan, or who are parties to cases in which services are being provided under the State plan-

 (A) with notice of all proceedings in which support obligations might be established or modified; and

 (B) with a copy of any order establishing or modifying a child support obligation, or (in the case of a petition for modification) a notice of determination that there should be no change in the amount of the child support award, within 14 days after issuance of such order or determination;

 (13) provide that the State will comply with such other requirements and standards as the Secretary determines to be necessary to the establishment of an effective program for locating noncustodial parents, establishing paternity, obtaining support orders, and collecting support payments and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan;

 (14)(A) comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

 (B) maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them to conceal in the accounting records the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

 (15) provide for-

 (A) a process for annual reviews of and reports to the Secretary on the State program operated under the State plan approved under this part, including such information as may be necessary to measure State compliance with Federal requirements for expedited procedures, using such standards and procedures as are required by the Secretary, under which the State agency will determine the extent to which the program is operated in compliance with this part; and

 (B) a process of extracting from the automated data processing system required by paragraph (16) and transmitting to the Secretary data and calculations concerning the levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 652(g) and 658a of this title;

 (16) provide for the establishment and operation by the State agency, in accordance with an (initial and annually updated) advance automated data processing planning document approved under section 652(d) of this title, of a statewide automated data processing and information retrieval system meeting the requirements of section 654a of this title designed effectively and efficiently to assist management in

the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan;

(17) provide that the State will have in effect an agreement with the Secretary entered into pursuant to section 663 of this title for the use of the Parent Locator Service established under section 653 of this title, and provide that the State will accept and transmit to the Secretary requests for information authorized under the provisions of the agreement to be furnished by such Service to authorized persons, will impose and collect (in accordance with regulations of the Secretary) a fee sufficient to cover the costs to the State and to the Secretary incurred by reason of such requests, will transmit to the Secretary from time to time (in accordance with such regulations) so much of the fees collected as are attributable to such costs to the Secretary so incurred, and during the period that such agreement is in effect will otherwise comply with such agreement and regulations of the Secretary with respect thereto;

(18) provide that the State has in effect procedures necessary to obtain payment of past-due support from overpayments made to the Secretary of the Treasury as set forth in section 664 of this title, and take all steps necessary to implement and utilize such procedures;

(19) provide that the agency administering the plan-

(A) shall determine on a periodic basis, from information supplied pursuant to section 508 of the Unemployment Compensation Amendments of 1976, whether any individuals receiving compensation under the State's unemployment compensation law (including amounts payable pursuant to any agreement under any Federal unemployment compensation law) owe child support obligations which are being enforced by such agency; and

(B) shall enforce any such child support obligations which are owed by such an individual but are not being met-

(i) through an agreement with such individual to have specified amounts withheld from compensation otherwise payable to such individual and by submitting a copy of any such agreement to the State agency administering the unemployment compensation law; or

(ii) in the absence of such an agreement, by bringing legal process (as defined in section 659(i)(5) of this title) to require the withholding of amounts from such compensation;

(20) provide, to the extent required by section 666 of this title, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws;

(21)(A) at the option of the State, impose a late payment fee on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; and

(B) assure that the fee will be collected in addition to, and only after full payment of, the overdue support, and that the imposition of the late payment fee shall not directly or indirectly result in a decrease in the amount of the support which is paid to the child (or spouse) to whom, or on whose behalf, it is owed;

(22) in order for the State to be eligible to receive any incentive payments under section 658a of this title, provide that, if one or more political subdivisions of the State participate in the costs of carrying out activities under the State plan during any period, each such subdivision shall be entitled to receive an appropriate share (as determined by the State) of any such incentive payments made to the State for such period, taking into account the efficiency and effectiveness of the activities carried out under the State plan by such political subdivision;

(23) provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services and a telephone number or postal address at which further information may be obtained and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate;

(24) provide that the State will have in effect an automated data processing and information retrieval system-

(A) by October 1, 1997, which meets all requirements of this part which were enacted on or before October 13, 1988; and

(B) by October 1, 2000, which meets all requirements of this part enacted on or before August 22, 1996, except that such deadline shall be extended by 1 day for each day (if any) by which the Secretary fails to meet the deadline imposed by section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996;

(25) provide that if a family with respect to which services are provided under the plan ceases to receive assistance under the State program funded under part A, the State shall provide appropriate notice to the family and continue to provide such services, subject to the same conditions and on the same basis as in the case of other individuals to whom services are furnished under the plan, except that an application or other request to continue services shall not be required of such a family and paragraph (6)(B) shall not apply to the family;

(26) have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the parties, including-

(A) safeguards against unauthorized use or disclosure of information relating to proceedings or actions to establish paternity, or to establish, modify, or enforce support, or to make or enforce a child custody determination;

(B) prohibitions against the release of information on the whereabouts of 1 party or the child to another party against whom a protective order with respect to the former party or the child has been entered;

(C) prohibitions against the release of information on the whereabouts of 1 party or the child to another person if the State has reason to believe that the release of the information to that person may result in physical or emotional harm to the party or the child;

(D) in cases in which the prohibitions under subparagraphs (B) and (C) apply, the requirement to notify the Secretary, for purposes of section 653(b)(2) of this title, that the State has reasonable evidence of domestic violence or child abuse against a party or the child and that the disclosure of such information could be harmful to the party or the child; and

(E) procedures providing that when the Secretary discloses information about a parent or child to a State court or an agent of a State court described in section 653(c)(2) or 663(d)(2)(B) of this title, and advises that court or agent that the Secretary has been notified that there is reasonable evidence of domestic violence or child abuse pursuant to section 653(b)(2) of this title, the court shall determine whether disclosure to any other person of information received from the Secretary could be harmful to the parent or child and, if the court determines that disclosure to any other person could be harmful, the court and its agents shall not make any such disclosure;

(27) provide that, on and after October 1, 1998, the State agency will-

(A) operate a State disbursement unit in accordance with section 654b of this title; and

(B) have sufficient State staff (consisting of State employees) and (at State option) contractors reporting directly to the State agency to-

(i) monitor and enforce support collections through the unit in cases being enforced by the State pursuant to paragraph (4) (including carrying out the automated data processing responsibilities described in section 654a(g) of this title); and

(ii) take the actions described in section 666(c)(1) of this title in appropriate cases;

(28) provide that, on and after October 1, 1997, the State will operate a State Directory of New Hires in accordance with section 653a of this title;

(29) provide that the State agency responsible for administering the State plan-

(A) shall make the determination (and redetermination at appropriate intervals) as to whether an individual who has applied for or is receiving assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, is cooperating in good faith with the State in establishing the paternity of, or in establishing, modifying, or enforcing a support order for, any child of the individual by providing the State agency with the name of, and such other information as the State agency may require with respect to, the noncustodial parent of the child, subject to good cause and other exceptions which-

(i) in the case of the State program funded under part A, the State program under part E, or the State program under subchapter XIX shall, at the option of the State, be defined, taking into account the best interests of the child, and applied in each case, by the State agency administering such program; and

(ii) in the case of the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, shall be defined and applied in each case under that program in accordance with section 2015(l)(2) of title 7;

(B) shall require the individual to supply additional necessary information and appear at interviews, hearings, and legal proceedings;

(C) shall require the individual and the child to submit to genetic tests pursuant to judicial or administrative order;

(D) may request that the individual sign a voluntary acknowledgment of paternity, after notice of the rights and consequences of such an acknowledgment, but may not require the individual to sign an acknowledgment or otherwise relinquish the right to genetic tests as a condition of cooperation and eligibility for assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7; and

(E) shall promptly notify the individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, of each such determination, and if noncooperation is determined, the basis therefor;

(30) provide that the State shall use the definitions established under section 652(a)(5) of this title in collecting and reporting information as required under this part;

(31) provide that the State agency will have in effect a procedure for certifying to the Secretary, for purposes of the procedure under section 652(k) of this title, determinations that individuals owe arrearages of child support in an amount exceeding $2,500, under which procedure-

(A) each individual concerned is afforded notice of such determination and the consequences thereof, and an opportunity to contest the determination; and

(B) the certification by the State agency is furnished to the Secretary in such format, and accompanied by such supporting documentation, as the Secretary may require;

(32)(A) provide that any request for services under this part by a foreign reciprocating country, a foreign treaty country, or a foreign country with which the State has an arrangement described in section 659a(d) of this title shall be treated as a request by a State;

(B) provide, at State option, notwithstanding paragraph (4) or any other provision of this part, for services under the plan for enforcement of a spousal support order not described in paragraph (4)(B) entered by such a country (or subdivision); and

(C) provide that no applications will be required from, and no costs will be assessed for such services against, the foreign reciprocating country, foreign treaty country, or foreign individual (but costs may at State option be assessed against the obligor);

(33) provide that a State that receives funding pursuant to section 628 of this title and that has within its borders Indian country (as defined in section 1151 of title 18) may enter into cooperative agreements with an Indian tribe or tribal organization (as defined in subsections (e) and (l) of section 5304 of title 25), if the Indian tribe or tribal organization demonstrates that such tribe or organization has an established tribal court system or a Court of Indian Offenses with the authority to establish paternity, establish, modify, or enforce support orders, or to enter support orders in accordance with child support guidelines established or adopted by such tribe or organization, under which the State and tribe or organization shall provide for the cooperative delivery of child support enforcement services in Indian country and for the forwarding of all collections pursuant to the functions performed by the tribe or organization to the State agency, or conversely, by the State agency to the tribe or organization, which shall distribute such collections in

accordance with such agreement; and

(34) include an election by the State to apply section 657(a)(2)(B) of this title or former section 657(a)(2)(B) of this title (as in effect for the State immediately before the date this paragraph first applies to the State) to the distribution of the amounts which are the subject of such sections and, for so long as the State elects to so apply such former section, the amendments made by subsection (b)(1) of section 7301 of the Deficit Reduction Act of 2005 shall not apply with respect to the State, notwithstanding subsection (e) of such section 7301.

The State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21). Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25.

(Aug. 14, 1935, ch. 531, title IV, §454, as added Pub. L. 93–647, §101(a), Jan. 4, 1975, 88 Stat. 2354 ; amended Pub. L. 94–88, title II, §208(b), (c), Aug. 9, 1975, 89 Stat. 436 ; Pub. L. 95–30, title V, §502(a), May 23, 1977, 91 Stat. 162 ; Pub. L. 96–265, title IV, §405(b), June 9, 1980, 94 Stat. 463 ; Pub. L. 96–611, §9(a), Dec. 28, 1980, 94 Stat. 3571 ; Pub. L. 97–35, title XXIII, §§2331(b), 2332(d), 2333(a), (b), 2335(a), Aug. 13, 1981, 95 Stat. 860 , 862, 863; Pub. L. 97–248, title I, §§171(a), (b)(1), 173(a), Sept. 3, 1982, 96 Stat. 401 , 403; Pub. L. 98–369, div. B, title VI, §2663(c)(14), (j)(2)(B)(x), July 18, 1984, 98 Stat. 1166 , 1170; Pub. L. 98–378, §§3(a), (c)–(f), 5(b), 6(a), 11(b)(1), 12(a), (b), 14(a), 21(d), Aug. 16, 1984, 98 Stat. 1306 , 1310, 1311, 1314, 1318, 1319, 1320, 1324; Pub. L. 100–203, title IX, §§9141(a)(2), 9142(a), Dec. 22, 1987, 101 Stat. 1330–321 ; Pub. L. 100–485, title I, §§104(a), 111(c), 123(a), (d), Oct. 13, 1988, 102 Stat. 2348 , 2349, 2352, 2353; Pub. L. 104–35, §1(a), Oct. 12, 1995, 109 Stat. 294 ; Pub. L. 104–193, title I, §108(c)(11), (12), title III, §§301(a), (b), 302(b)(2), 303(a), 304(a), 312(a), 313(a), 316(g)(1), 324(b), 332, 333, 342(a), 343(b), 344(a)(1), (4), 370(a)(2), 371(b), 375(a), (c), 395(d)(1)(D), (2)(B), Aug. 22, 1996, 110 Stat. 2166 , 2199, 2204, 2205, 2207, 2209, 2218, 2223, 2230, 2233, 2234, 2236, 2252, 2254, 2256, 2259, 2260; Pub. L. 105–33, title V, §§5531(a), 5542(c), 5545, 5546(a), 5548, 5552, 5556(b), Aug. 5, 1997, 111 Stat. 625 , 631, 633, 635, 637; Pub. L. 106–169, title IV, §401(g), (h), Dec. 14, 1999, 113 Stat. 1858 ; Pub. L. 109–171, title VII, §§7301(b)(1)(C), 7303(b), 7310(a), Feb. 8, 2006, 120 Stat. 143 , 145, 147; Pub. L. 110–234, title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), May 22, 2008, 122 Stat. 1095–1097 , 1110; Pub. L. 110–246, §4(a), title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), June 18, 2008, 122 Stat. 1664 , 1857, 1858, 1871; Pub. L. 113–79, title IV, §4030(v), Feb. 7, 2014, 128 Stat. 815 ; Pub. L. 113–183, title III, §301(c), Sept. 29, 2014, 128 Stat. 1943 ; Pub. L. 115–123, div. E, title XII, §53117(a), Feb. 9, 2018, 132 Stat. 307 .)

### EDITORIAL NOTES

## REFERENCES IN TEXT

Section 508 of the Unemployment Compensation Amendments of 1976, referred to in par. (19), is section 508 of Pub. L. 94–566, Oct. 20, 1976, 90 Stat. 2689 , which enacted section 603a of this title and amended section 49b of Title 29, Labor.

Section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, referred to in par. (24), is section 344(a)(3) of Pub. L. 104–193, which is set out as a Regulations note under section 654a of this title.

Section 2012(l) of title 7, referred to in par. (29), was struck out, and a new section 2012(t) of title 7 similarly defining "supplemental nutrition assistance program" was enacted, by Pub. L. 113–79, title IV, §4030(a)(3), (5), Feb. 7, 2014, 128 Stat. 813 .

Section 7301 of the Deficit Reduction Act of 2005, referred to in par. (34), is section 7301 of Pub. L. 109–171, title VII, Feb. 8, 2006, 120 Stat. 141 . Subsec. (b)(1) of section 7301 of Pub. L. 109–171 amended this section and section 657 of this title. Subsec. (e) of section 7301 of Pub. L. 109–171 is set out as an Effective Date of 2006 Amendment note under section 608 of this title.

## Codification

Pub. L. 110–234 and Pub. L. 110–246 made identical amendments to this section. The amendments by Pub. L. 110–234 were repealed by section 4(a) of Pub. L. 110–246.

## Amendments

**2018**-Par. (6)(B)(ii). Pub. L. 115–123 substituted "$35" for "$25" and, in two places, substituted "$550" for "$500".

**2014**-Par. (4)(A)(ii). Pub. L. 113–183, §301(c)(1), inserted before semicolon "(except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the individual to request the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application)".

Par. (29)(A), (D), (E). Pub. L. 113–79, §4030(v), amended Pub. L. 110–246, §4115(c)(2)(H). See 2008 Amendment note below.

Par. (32)(A). Pub. L. 113–183, §301(c)(2)(A), inserted ", a foreign treaty country," after "a foreign reciprocating country".

Par. (32)(C). Pub. L. 113–183, §301(c)(2)(B), substituted ", foreign treaty country, or foreign individual" for "or foreign obligee".

**2008**-Pars. (4)(A)(i)(IV), (6)(B)(i). Pub. L. 110–246, §4002(b)(1)(B), (2)(V), made technical amendment to references in original act which appear in text as references to sections 2015(l)(1) and 2015 of title 7.

Par. (29)(A), (D), (E). Pub. L. 110–246, §4115(c)(2)(H), as amended by Pub. L. 113–79, §4030(v), substituted "section 2012(l)" for "section 2012(h)" wherever appearing.

Pub. L. 110–246, §4002(b)(1)(A), (B), (2)(V), substituted "supplemental nutrition assistance program" for "food stamp program" wherever appearing and made technical amendment to references in original act which appear in text as references to sections 2012(h) and 2015(l)(2) of title 7.

**2006**-Par. (6)(B). Pub. L. 109–171, §7310(a), designated existing provisions as cl. (i), redesignated former cls. (i) and (ii) as subcls. (I) and (II), respectively, of cl. (i), and added cl. (ii).

Par. (31). Pub. L. 109–171, §7303(b), substituted "$2,500" for "$5,000" in introductory provisions.

Par. (34). Pub. L. 109–171, §7301(b)(1)(C), added par. (34).

**1999**-Par. (6)(E)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (9)(A) to (C). Pub. L. 106–169, §401(g)(2), substituted semicolon for comma at end.

Par. (19)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (19)(B)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (24)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (24)(B). Pub. L. 106–169, §401(h), made technical amendment to reference in original act which appears in text as reference to August 22, 1996.

**1997**-Par. (4)(A)(i)(IV). Pub. L. 105–33, §5548(a), added subcl. (IV).

Par. (6)(B). Pub. L. 105–33, §5531(a), substituted "an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section

2015 of title 7, and" for "individuals not receiving assistance under any State program funded under part A, which".

Par. (8). Pub. L. 105–33, §5552(1)(D), inserted concluding provisions.

Pub. L. 105–33, §5552(1)(A), in introductory provisions, inserted ", for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title" after "provide that" and struck out "noncustodial" before "parents".

Par. (8)(A). Pub. L. 105–33, §5552(1)(B), substituted "records; and" for "records, and".

Par. (8)(B). Pub. L. 105–33, §5552(1)(C), substituted "title," for "title;".

Par. (16). Pub. L. 105–33, §5556(b), made technical amendment to directory language of Pub. L. 104–193, §344(a)(1)(F). See 1996 Amendment note below.

Par. (17). Pub. L. 105–33, §5552(2), substituted "provide that the State will have" for "in the case of a State which has" and inserted "and" after "section 653 of this title,".

Par. (19)(B)(ii). Pub. L. 105–33, §5542(c), substituted "section 659(i)(5)" for "section 662(e)".

Par. (26). Pub. L. 105–33, §5552(3)(A), struck out "will" before "have in effect" in introductory provisions.

Par. (26)(A). Pub. L. 105–33, §5552(3)(B), inserted ", modify," after "or to establish" and ", or to make or enforce a child custody determination" after "support".

Par. (26)(B). Pub. L. 105–33, §5552(3)(C)(i), (ii), inserted "or the child" after "1 party" and after "former party".

Par. (26)(C). Pub. L. 105–33, §5552(3)(D), inserted "or the child" after "1 party", substituted "another person" for "another party", inserted "to that person" after "release of the information", and substituted "party or the child" for "former party".

Par. (26)(D), (E). Pub. L. 105–33, §5552(3)(C)(iii), (E), added subpars. (D) and (E).

Par. (29)(A). Pub. L. 105–33, §5548(b)(1)(B), substituted cls. (i) and (ii) for

"(i) shall be defined, taking into account the best interests of the child, and

"(ii) shall be applied in each case,

by, at the option of the State, the State agency administering the State program under part A of this subchapter, this part, or subchapter XIX;".

Pub. L. 105–33, §5548(b)(1)(A), in introductory provisions, substituted "part A, the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7," for "part A of this subchapter or the State program under subchapter XIX".

Par. (29)(D). Pub. L. 105–33, §5548(b)(2), substituted "the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7" for "or the State program under subchapter XIX".

Par. (29)(E). Pub. L. 105–33, §5548(b)(3), substituted "individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the food stamp program, as defined under section 2012(h) of title 7," for "individual, the State agency administering the State program funded under part A, and the State agency administering the State program under subchapter XIX,".

Par. (32)(A). Pub. L. 105–33, §5545, substituted "section 659a(d)" for "section 659a(d)(2)".

Par. (33). Pub. L. 105–33, §5546(a), substituted "or enforce support orders, or" for "and enforce support orders, and", "guidelines established or adopted by such tribe or organization"

for "guidelines established by such tribe or organization", "all collections" for "all funding collected", and "such collections" for "such funding".

**1996**-Pub. L. 104–193, §375(a)(4), inserted at end of closing provisions "Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25."

Par. (4). Pub. L. 104–193, §301(a)(1), amended par. (4) generally. Prior to amendment, par. (4) read as follows: "provide that such State will undertake-

"(A) in the case of a child born out of wedlock with respect to whom an assignment under section 602(a)(26) of this title or section 1396k of this title is effective, to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so, or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and

"(B) in the case of any child with respect to whom such assignment is effective, including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter, to secure support for such child from his parent (or from any other person legally liable for such support), and from such parent for his spouse (or former spouse) receiving aid to families with dependent children or medical assistance under a State plan approved under subchapter XIX of this chapter (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan), utilizing any reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A or E of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so), except that when such arrangements and other means have proven ineffective, the State may utilize the Federal courts to obtain or enforce court orders for support;".

Par. (5)(A). Pub. L. 104–193, §108(c)(11), substituted "pursuant to section 608(a)(3) of this title" for "under section 602(a)(26) of this title" and "payments collected," for "payments collected; except that this paragraph shall not apply to such payments for any month following the first month in which the amount collected is sufficient to make such family ineligible for assistance under the State plan approved under part A of this subchapter;".

Par. (6). Pub. L. 104–193, §301(a)(2)(A), substituted "provide that-" for "provide that" in introductory provisions.

Par. (6)(A). Pub. L. 104–193, §301(a)(2)(B), added subpar. (A) and struck out former subpar. (A) which read as follows: "the child support collection or paternity determination services established under the plan shall be made available to any individual not otherwise eligible for such services upon application filed by such individual with the State, including support collection services for the spouse (or former spouse) with whom the absent parent's child is living (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan),".

Par. (6)(B). Pub. L. 104–193, §301(a)(2)(C), (D), inserted "on individuals not receiving assistance under any State program funded under part A" after "such services shall be imposed", realigned margins, and substituted semicolon for comma at end.

Par. (6)(C). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma at end.

Par. (6)(D). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma before "and" at end.

Pub. L. 104–193, §108(c)(12), substituted "assistance under a State program funded" for "aid under a State plan approved".

Par. (6)(E). Pub. L. 104–193, §301(a)(2)(D)(i), (E), realigned margins.

Pub. L. 104–193, §301(a)(2)(D)(ii), which directed substitution of a semicolon for the final comma, could not be executed because subpar. (E) already ended in a semicolon and not a comma.

Par. (7). Pub. L. 104–193, §375(c), inserted "and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25)" after "law enforcement officials".

Par. (8). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial" for "absent" in introductory provisions.

Par. (8)(B). Pub. L. 104–193, §316(g)(1)(A), amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: "the Parent Locator Service in the Department of Health and Human Services;".

Par. (9)(B), (C). Pub. L. 104–193, §395(d)(2)(B), substituted "a noncustodial parent" for "an absent parent".

Par. (9)(E). Pub. L. 104–193, §324(b), added subpar. (E).

Par. (11). Pub. L. 104–193, §302(b)(2), designated existing provisions as subpar. (A), inserted "and" after semicolon at end, and redesignated par. (12) as subpar. (B).

Par. (12). Pub. L. 104–193, §304(a), added par. (12). Former par. (12) redesignated (11)(B).

Pub. L. 104–193, §302(b)(2)(B), redesignated par. (12) as (11)(B).

Par. (13). Pub. L. 104–193, §§316(g)(1)(B), 395(d)(1)(D), substituted "noncustodial parents" for "absent parents" and inserted before semicolon at end "and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan".

Par. (14). Pub. L. 104–193, §342(a)(1), (2), designated existing provisions as subpar. (A) and redesignated par. (15) as subpar. (B).

Par. (15). Pub. L. 104–193, §342(a)(3), added par. (15). Former par. (15) redesignated (14)(B).

Pub. L. 104–193, §342(a)(2), redesignated par. (15) as (14)(B).

Par. (16). Pub. L. 104–193, §344(a)(1), as amended by Pub. L. 105–33, §5556(b), struck out ", at the option of the State," before "for the establishment", inserted "and operation by the State agency" after "for the establishment" and "meeting the requirements of section 654a of this title" after "information retrieval system", substituted "so as to control" for "in the State and localities thereof, so as (A) to control", struck out "(i)" before "all the factors in the support enforcement collection", and struck out before semicolon at end "(including, but not limited to, (I) identifiable correlation factors (such as social security numbers, names, dates of birth, home addresses and mailing addresses (including postal ZIP codes) of any individual with respect to whom support obligations are sought to be established or enforced and with respect to any person to whom such support obligations are owing) to assure sufficient compatibility among the systems of different jurisdictions to permit periodic screening to determine whether such

individual is paying or is obligated to pay support in more than one jurisdiction, (II) checking of records of such individuals on a periodic basis with Federal, intra- and inter-State, and local agencies, (III) maintaining the data necessary to meet the Federal reporting requirements on a timely basis, and (IV) delinquency and enforcement activities), (ii) the collection and distribution of support payments (both intra- and inter-State), the determination, collection, and distribution of incentive payments both inter- and intra-State, and the maintenance of accounts receivable on all amounts owed, collected and distributed, and (iii) the costs of all services rendered, either directly or by interfacing with State financial management and expenditure information, (B) to provide interface with records of the State's aid to families with dependent children program in order to determine if a collection of a support payment causes a change affecting eligibility for or the amount of aid under such program, (C) to provide for security against unauthorized access to, or use of, the data in such system, (D) to facilitate the development and improvement of the income withholding and other procedures required under section 666(a) of this title through the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur, and (E) to provide management information on all cases under the State plan from initial referral or application through collection and enforcement".

Par. (21)(A). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent".

Par. (23). Pub. L. 104–193, §332, inserted "and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate" before semicolon.

Par. (24). Pub. L. 104–193, §344(a)(4), amended par. (24) generally. Prior to amendment, par. (24) read as follows: "provide that if the State, as of October 13, 1988, does not have in effect an automated data processing and information retrieval system meeting all of the requirements of paragraph (16), the State-

    "(A) will submit to the Secretary by October 1, 1991, for review and approval by the Secretary within 9 months after submittal an advance automated data processing planning document of the type referred to in such paragraph; and

    "(B) will have in effect by October 1, 1997, an operational automated data processing and information retrieval system, meeting all the requirements of that paragraph, which has been approved by the Secretary;".

Par. (25). Pub. L. 104–193, §301(b), added par. (25).

Par. (26). Pub. L. 104–193, §303(a), added par. (26).

Par. (27). Pub. L. 104–193, §312(a), added par. (27).

Par. (28). Pub. L. 104–193, §313(a), added par. (28).

Par. (29). Pub. L. 104–193, §333, added par. (29).

Par. (30). Pub. L. 104–193, §343(b), added par. (30).

Par. (31). Pub. L. 104–193, §370(a)(2), added par. (31).

Par. (32). Pub. L. 104–193, §371(b), added par. (32).

Par. (33). Pub. L. 104–193, §375(a)(1)–(3), added par. (33).

**1995**–Par. (24)(B). Pub. L. 104–35 substituted "1997" for "1995".

**1988**–Par. (5)(A). Pub. L. 100–485, §104(a), substituted "on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden)" for "at least

annually".

Par. (6)(D), (E). Pub. L. 100–485, §111(c), added cl. (D) and redesignated former cl. (D) as (E).

Par. (16). Pub. L. 100–485, §123(d), substituted "advance automated" for "advance automatic" in introductory provisions.

Pub. L. 100–485, §123(a)(2), substituted "a statewide automated" for "an automatic".

Par. (24). Pub. L. 100–485, §123(a)(1), added par. (24).

**1987**—Par. (4)(A). Pub. L. 100–203, §9142(a)(1)(A), (B), substituted "an assignment under section 602(a)(26) of this title or section 1396k of this title" for "an assignment under section 602(a)(26) of this title" and ", or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and" for ", and".

Par. (4)(B). Pub. L. 100–203, §9142(a)(1)(C), inserted "or medical assistance under a State plan approved under subchapter XIX of this chapter" after "children".

Par. (5). Pub. L. 100–203, §9142(a)(2), substituted "provide that (A)" for "provide that," and added cl. (B).

Pub. L. 100–203, §9141(a)(2), struck out "(except as provided in section 657(c) of this title)" after "apply to such payments".

**1984**—Par. (4)(B). Pub. L. 98–378, §11(b)(1), inserted "including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter," after "such assignment is effective," and inserted "or E" after "part A".

Par. (4)(B). Pub. L. 98–378, §12(a), substituted ", and" for "and, at the option of the State," before "from such parent" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (5). Pub. L. 98–378, §3(e), inserted ", and the individual will be notified at least annually of the amount of the support payments collected;".

Par. (6)(A). Pub. L. 98–378, §12(b), struck out ", at the option of the State," before "support collection services" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (6)(B). Pub. L. 98–378, §3(c), substituted "shall be imposed, which shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (i) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (ii) may vary among such individuals on the basis of ability to pay (as determined by the State), and" for "may be imposed, except that the amount of any such application fee shall be reasonable, as determined under regulations of the Secretary,".

Par. (6)(C). Pub. L. 98–378, §21(d)(1), (3), added cl. (C). Former cl. (C) redesignated (D).

Par. (6)(D). Pub. L. 98–378, §21(d)(1), (2), redesignated former cl. (C) as (D) and substituted "fees" for "fee" before "so imposed".

Par. (8)(B). Pub. L. 98–369, §2663(j)(2)(B)(x), substituted "Health and Human Services" for "Health, Education, and Welfare".

Par. (9)(C). Pub. L. 98–369, §2663(c)(14)(A), struck out "of such parent" before "with respect to whom aid".

Par. (16)(A)(ii). Pub. L. 98–369, §2663(c)(14)(B), substituted "collection, and distribution" for "collection and distribution," before "of incentive payments".

Par. (16)(D), (E). Pub. L. 98–378, §6(a), added cl. (D) and redesignated former cl. (D) as (E).

Par. (17). Pub. L. 98–378, §2663(c)(14)(C), realigned margin, substituted "provide that the State will accept" for "to accept", "will impose" for "and to impose", "will transmit" for "to transmit", and "will otherwise comply" for ", otherwise to comply".

Par. (20). Pub. L. 98–378, §3(a), added par. (20).

Par. (21). Pub. L. 98–378, §3(d), added par. (21).

Par. (22). Pub. L. 98–378, §5(b), added par. (22).

Par. (23). Pub. L. 98–378, §14(a), added par. (23).

Pub. L. 98–378, §3(f), inserted after numbered paragraphs provision that the State may allow the jurisdiction which makes the collection involved to retain any application fee under par. (6)(B) or any late payment fee under par. (21).

**1982**–Par. (5). Pub. L. 97–248, §173(a), inserted "following the first month" after "for any month".

Par. (6). Pub. L. 97–248, §171(a), in cl. (A) inserted provisions relating to inclusion of, at the option of the State, support collection services for the spouse or former spouse, in cl. (B) substituted "such services" for "services under the State plan (other than collection of support)", and in cl. (C) substituted provisions relating to collection of any costs in excess of the fee imposed, for provisions relating to the State retaining any fee imposed under State law as required under former par. (19).

Pars. (18) to (20). Pub. L. 97–248, §171(b)(1), inserted "and" at end of par. (18), struck out par. (19) relating to imposition of a fee on an individual who owes child or spousal support obligation, and redesignated par. (20) as (19).

**1981**–Pub. L. 97–35, §2332(d)(2), substituted in provision preceding par. (1) "child and spousal support" for "child support".

Par. (4)(B). Pub. L. 97–35, §2332(d)(3), substituted "such support) and, at the option of the State, from such parent for his spouse (or former spouse) receiving aid to families with dependent children (but only if a support obligation has been established with respect to such spouse), utilizing" for "such support), utilizing".

Par. (5). Pub. L. 97–35, §2332(d)(4), substituted "support payments" for "child support payments" and "collected for an individual" for "collected for a child".

Par. (6)(B). Pub. L. 97–35, §2333(a)(1), substituted "services under the State plan (other than collection of support)" for "such services".

Par. (6)(C). Pub. L. 97–35, §2333(a)(2), substituted "the State will retain, but only if it is the State which makes the collection, the fee imposed under State law as required under paragraph (19)" for "any costs in excess of the fee so imposed may be collected from such individual by deducting such costs from the amount of any recovery made".

Par. (9)(C). Pub. L. 97–35, §2332(d)(5), substituted "of the child or children or the parent of such child or children" for "of a child or children".

Par. (11). Pub. L. 97–35, §2332(d)(6), substituted "collected as support" for "collected as child support".

Par. (16). Pub. L. 97–35, §2332(d)(7), substituted "support enforcement" for "child support enforcement", "whom support obligations" for "whom child support obligations", and "obligated to pay support" for "obligated to pay child support".

Par. (18). Pub. L. 97–35, §2331(b), added par. (18).

Par. (19). Pub. L. 97–35, §2333(b), added par. (19).

Par. (20). Pub. L. 97–35, §2335(a), added par. (20).

**1980**-Par. (16). Pub. L. 96–265 added par. (16).

Par. (17). Pub. L. 96–611 added par. (17).

**1977**-Pars. (14), (15). Pub. L. 95–30 added pars. (14) and (15).

**1975**-Par. (4)(A). Pub. L. 94–88, §208(b), substituted "to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so" for "to establish the paternity of such child".

Par. (4)(B). Pub. L. 94–88, §208(c), substituted "reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so)" for "reciprocal arrangements adopted with other States".

<div align="center">S<small>TATUTORY</small> N<small>OTES AND</small> R<small>ELATED</small> S<small>UBSIDIARIES</small></div>

## E<small>FFECTIVE</small> D<small>ATE OF</small> 2018 A<small>MENDMENT</small>

Pub. L. 115–123, div. E, title XII, §53117(b), Feb. 9, 2018, 132 Stat. 307 , provided that:

"(1) I<small>N GENERAL</small>.-The amendments made by subsection (a) [amending this section] shall take effect on the 1st day of the 1st fiscal year that begins on or after the date of the enactment of this Act [Feb. 9, 2018], and shall apply to payments under part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) for calendar quarters beginning on or after such 1st day.

"(2) D<small>ELAY PERMITTED IF STATE LEGISLATION REQUIRED</small>.-If the Secretary of Health and Human Services determines that State legislation (other than legislation appropriating funds) is required in order for a State plan developed pursuant to part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) to meet the requirements imposed by the amendment made by subsection (a), the plan shall not be regarded as failing to meet such requirements before the 1st day of the 1st calendar quarter beginning after the first regular session of the State legislature that begins after the date of the enactment of this Act. For purposes of the preceding sentence, if the State has a 2-year legislative session, each year of the session is deemed to be a separate regular session of the State legislature."

## E<small>FFECTIVE</small> D<small>ATE OF</small> 2008 A<small>MENDMENT</small>

Amendment of this section and repeal of Pub. L. 110–234 by Pub. L. 110–246 effective May 22, 2008, the date of enactment of Pub. L. 110–234, except as otherwise provided, see section 4 of Pub. L. 110–246, set out as an Effective Date note under section 8701 of Title 7, Agriculture.

Amendment by sections 4002(b)(1)(A), (B), (2)(V), and 4115(c)(2)(H) of Pub. L. 110–246 effective Oct. 1, 2008, see section 4407 of Pub. L. 110–246, set out as a note under section 1161 of Title 2, The Congress.

## E<small>FFECTIVE</small> D<small>ATE OF</small> 2006 A<small>MENDMENT</small>

Amendment by section 7301(b)(1)(C) of Pub. L. 109–171 effective Oct. 1, 2009, and applicable to payments under parts A and D of this subchapter for calendar quarters beginning on or after such date, subject to certain State options, see section 7301(e) of Pub. L. 109–171, set out as a note under section 608 of this title.

Amendment by section 7303(b) of Pub. L. 109–171 effective Oct. 1, 2006, see section 7303(c) of Pub. L. 109–171, set out as a note under section 652 of this title.

Pub. L. 109–171, title VII, §7310(c), Feb. 8, 2006, 120 Stat. 148 , provided that: "The amendments made by this section [amending this section and section 657 of this title] shall take effect on October 1, 2006."

### EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106–169 effective as if included in the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 401(q) of Pub. L. 106–169, set out as a note under section 602 of this title.

### EFFECTIVE DATE OF 1997 AMENDMENT

Amendment by Pub. L. 105–33 effective as if included in the enactment of title III of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 5557 of Pub. L. 105–33, set out as a note under section 608 of this title.

### EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by section 108(c)(11), (12) of Pub. L. 104–193 effective July 1, 1997, with transition rules relating to State options to accelerate such date, rules relating to claims, actions, and proceedings commenced before such date, rules relating to closing out of accounts for terminated or substantially modified programs and continuance in office of Assistant Secretary for Family Support, and provisions relating to termination of entitlement under AFDC program, see section 116 of Pub. L. 104–193, as amended, set out as an Effective Date note under section 601 of this title.

Amendment by section 302(b)(2) of Pub. L. 104–193 effective Aug. 22, 1996, see section 302(c)(2) of Pub. L. 104–193, set out as a note under section 657 of this title.

Pub. L. 104–193, title III, §303(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Pub. L. 104–193, title III, §304(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Amendment by section 312(a) of Pub. L. 104–193 effective Oct. 1, 1998, with limited exception for States which, as of Aug. 22, 1996, were processing the receipt of child support payments through local courts, see section 312(d) of Pub. L. 104–193, set out as an Effective Date note under section 654b of this title.

Amendment by section 342(a) of Pub. L. 104–193 effective with respect to calendar quarters beginning 12 months or more after Aug. 22, 1996, see section 342(c) of Pub. L. 104–193, set out as a note under section 652 of this title.

Amendment by section 370(a)(2) of Pub. L. 104–193 effective Oct. 1, 1997, see section 370(b) of Pub. L. 104–193, set out as a note under section 652 of this title.

Pub. L. 104–193, title III, §395(a)–(c), Aug. 22, 1996, 110 Stat. 2259 , provided that:

"(a) IN GENERAL.-Except as otherwise specifically provided (but subject to subsections (b) and (c))-

"(1) the provisions of this title [see Tables for classification] requiring the enactment or amendment of State laws under section 466 of the Social Security Act [42 U.S.C. 666], or revision of State plans under section 454 of such Act [this section], shall be effective with

respect to periods beginning on and after October 1, 1996; and

"(2) all other provisions of this title shall become effective upon the date of the enactment of this Act [Aug. 22, 1996].

"(b) Grace Period for State Law Changes.-The provisions of this title shall become effective with respect to a State on the later of-

"(1) the date specified in this title, or

"(2) the effective date of laws enacted by the legislature of such State implementing such provisions,

but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2-year legislative session, each year of such session shall be deemed to be a separate regular session of the State legislature.

"(c) Grace Period for State Constitutional Amendment.-A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of-

"(1) 1 year after the effective date of the necessary State constitutional amendment; or

"(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]."

## Effective Date of 1988 Amendment

Pub. L. 100–485, title I, §104(b), Oct. 13, 1988, 102 Stat. 2348 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on the first day of the first calendar quarter which begins 4 or more years after the date of the enactment of this Act [Oct. 13, 1988]."

Pub. L. 100–485, title I, §111(f)(2), Oct. 13, 1988, 102 Stat. 2350 , provided that: "The amendments made by subsections (b) and (c) [amending this section and section 666 of this title] shall become effective on the first day of the first month beginning one year or more after the date of the enactment of this Act [Oct. 13, 1988]."

## Effective Date of 1987 Amendment

Pub. L. 100–203, title IX, §9141(b), Dec. 22, 1987, 101 Stat. 1330–321 , provided that: "The amendments made by subsection (a) [amending this section and section 657 of this title] shall become effective upon enactment [Dec. 22, 1987]."

Pub. L. 100–203, title IX, §9142(b), Dec. 22, 1987, 101 Stat. 1330–322 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective on July 1, 1988."

## Effective Date of 1984 Amendment

Pub. L. 98–378, §3(g), Aug. 16, 1984, 98 Stat. 1311 , provided that:

"(1) Except as provided in paragraphs (2) and (3), the amendments made by this section [enacting section 666 of this title and amending this section] shall become effective on October 1, 1985.

"(2) Section 454(21) of the Social Security Act [42 U.S.C. 654(21)] (as added by subsection (d) of this section), and section 466(e) of such Act [42 U.S.C. 666(e)] (as added by subsection (b) of this section), shall be effective with respect to support owed for any month beginning after the date of the enactment of this Act [Aug. 16, 1984].

"(3) In the case of a State with respect to which the Secretary of Health and Human Services

has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this section, the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the beginning of the fourth month beginning after the end of the first session of the State legislature which ends on or after October 1, 1985. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

Pub. L. 98–378, §5(c)(1), Aug. 16, 1984, 98 Stat. 1314 , provided that: "The amendments made by the preceding provisions of this section [amending this section and section 658 of this title] shall become effective on October 1, 1985."

Pub. L. 98–378, §6(c), Aug. 16, 1984, 98 Stat. 1315 , provided that: "The amendments made by this section [amending this section and section 655 of this title] shall apply with respect to quarters beginning on or after October 1, 1984."

Pub. L. 98–378, §11(e), Aug. 16, 1984, 98 Stat. 1318 , provided that: "The amendments made by this section [amending this section and sections 656, 657, 664, and 671 of this title] shall become effective October 1, 1984, and shall apply to collections made on or after that date."

Pub. L. 98–378, §12(c), Aug. 16, 1984, 98 Stat. 1319 , provided that: "The amendments made by this section [amending this section] shall become effective October 1, 1985."

Pub. L. 98–378, §14(b), Aug. 16, 1984, 98 Stat. 1320 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective October 1, 1985."

Amendment by section 21(d) of Pub. L. 98–378 applicable with respect to refunds payable under section 6402 of Title 26, Internal Revenue Code, after Dec. 31, 1985, see section 21(g) of Pub. L. 98–378, set out as a note under section 6103 of Title 26.

Amendment by Pub. L. 98–369 effective July 18, 1984, but not to be construed as changing or affecting any right, liability, status, or interpretation which existed (under the provisions of law involved) before that date, see section 2664(b) of Pub. L. 98–369, set out as a note under section 401 of this title.

### EFFECTIVE DATE OF **1982** AMENDMENT

Amendment by section 171(a), (b)(1) of Pub. L. 97–248 effective on and after Aug. 13, 1981, see section 171(c) of Pub. L. 97–248, set out as a note under section 503 of this title.

Pub. L. 97–248, title I, §173(b), Sept. 3, 1982, 96 Stat. 403 , provided that: "The amendment made by this section [amending this section] shall become effective on October 1, 1982."

### EFFECTIVE DATE OF **1981** AMENDMENT

Amendments by sections 2331(b), 2332(d)(2)–(7), and 2333(a), (b) of Pub. L. 97–35 effective Oct. 1, 1981, except as otherwise specifically provided, see section 2336 of Pub. L. 97–35, set out as a note under section 651 of this title.

Amendment by section 2335(a) of Pub. L. 97–35 effective Aug. 13, 1981, except that such amendment shall not be requirements under this section or section 503 of this title before Oct. 1, 1982, see section 2335(c) of Pub. L. 97–35, set out as a note under section 503 of this title.

### EFFECTIVE DATE OF **1980** AMENDMENT

Amendment by Pub. L. 96–265 effective July 1, 1981, and to be effective only with respect to expenditures, referred to in section 655(a)(3) of this title, made on or after such date, see section 405(e) of Pub. L. 96–265, set out as a note under section 652 of this title.

## EFFECTIVE DATE OF 1977 AMENDMENT

Pub. L. 95–30, title V, §502(b), May 23, 1977, 91 Stat. 162 , provided that: "The amendments made by this section [amending this section] shall take effect on the first day of the first calendar month which begins after the date of enactment of this Act [May 23, 1977]."

## EFFECTIVE DATE OF 1975 AMENDMENT

Pub. L. 94–88, title II, §210, Aug. 9, 1975, 89 Stat. 437 , provided that: "The amendments made by this title [amending this section and sections 602, 603, and 655 of this title and enacting provisions set out as notes under sections 602 and 655 of this title] shall, unless otherwise specified therein, become effective August 1, 1975."

## EXCEPTION TO GENERAL EFFECTIVE DATE FOR STATE PLANS REQUIRING STATE LAW AMENDMENTS

Pub. L. 109–171, title VII, §7311, Feb. 8, 2006, 120 Stat. 148 , provided that: "In the case of a State plan under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] which the Secretary determines requires State legislation in order for the plan to meet the additional requirements imposed by the amendments made by this subtitle [subtitle C (§§7301–7311) of title VII of Pub. L. 109–171, amending this section, sections 608, 652, 653, 655, 657, 664, and 666 of this title, section 6402 of Title 26, Internal Revenue Code, and provisions set out as a note under section 1169 of Title 29, Labor], the effective date of the amendments imposing the additional requirements shall be 3 months after the first day of the first calendar quarter beginning after the close of the first regular session of the State legislature that begins after the date of the enactment of this Act [Feb. 8, 2006]. For purposes of the preceding sentence, in the case of a State that has a 2-year legislative session, each year of the session shall be considered to be a separate regular session of the State legislature."

## STATE COMMISSIONS ON CHILD SUPPORT

Pub. L. 98–378, §15, Aug. 16, 1984, 98 Stat. 1320 , provided that:

"(a) As a condition of the State's eligibility for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] for quarters beginning more than 30 days after the date of the enactment of this Act [Aug. 16, 1984] and ending prior to October 1, 1985, the Governor of each State, on or before December 1, 1984, shall (subject to subsection (f)) appoint a State Commission on Child Support.

"(b) Each State Commission appointed under subsection (a) shall be composed of members appropriately representing all aspects of the child support system, including custodial and non-custodial parents, the agency or organizational unit administering the State's plan under part D of such title IV [42 U.S.C. 651 et seq.], the State judiciary, the executive and legislative branches of the State government, child welfare and social services agencies, and others.

"(c) It shall be the function of each State Commission to examine, investigate, and study the operation of the State's child support system for the primary purpose of determining the extent to which such system has been successful in securing support and parental involvement both for children who are eligible for aid under a State plan approved under part A of title IV of such Act [42 U.S.C. 601 et seq.] and for children who are not eligible for such aid, giving particular attention to such specific problems (among others) as visitation, the establishment of appropriate objective standards for support, the enforcement of interstate obligations, the availability, cost, and effectiveness of services both to children who are eligible for such aid and to children who are not, and the need for additional State or Federal legislation to obtain

support for all children.

"(d) Each State Commission shall submit to the Governor of the State and make available to the public, no later than October 1, 1985, a full and complete report of its findings and recommendations resulting from the examination, investigation, and study under this section. The Governor shall transmit such report to the Secretary of Health and Human Services along with the Governor's comments thereon.

"(e) None of the costs incurred in the establishment and operation of a State Commission under this section, or incurred by such a Commission in carrying out its functions under subsections (c) and (d), shall be considered as expenditures qualifying for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] or be otherwise payable or reimbursable by the United States or any agency thereof.

"(f) If the Secretary determines, at the request of any State on the basis of information submitted by the State and such other information as may be available to the Secretary, that such State-

"(1) has placed in effect and is implementing objective standards for the determination and enforcement of child support obligations,

"(2) has established within the five years prior to the enactment of this Act [Aug. 16, 1984] a commission or council with substantially the same functions as the State Commissions provided for under this section, or

"(3) is making satisfactory progress toward fully effective child support enforcement and will continue to do so,

then such State shall not be required to establish a State Commission under this section and the preceding provisions of this section shall not apply."

### DELAYED EFFECTIVE DATE IN CASES REQUIRING STATE LEGISLATION

Pub. L. 97–248, title I, §176, Sept. 3, 1982, 96 Stat. 403 , provided that: "In the case of a State with respect to which the Secretary of Health and Human Services has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this subtitle [subtitle E (§§171–176) of title I of Pub. L. 97–248, see Tables for classification], the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the end of the first session of the State legislature which begins after October 1, 1982, or which began prior to October 1, 1982, and remained in session for at least twenty-five calendar days after such date. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

[1] _See References in Text note below._

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                      FAMILY COURT

State of Rhode Island ex rel.          :
GERO MEYERSIEK                         :
    *Plaintiff*                    :
                                       :
VS.                                    :          DOCKET NO: K20010521M
                                       :          Title IV Part D Case under
                                       :          42 U.S.C. §§ 651-669
MARY SEGUIN                            :
    *Defendant*                    :

## DEFENDANT'S EMERGENCY MOTION TO DISMISS FOR LACK OF JURISDICTION

## And

## CLOSE THE CASE

    The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby respectfully moves the Court to **Dismiss** **for** **Lack of Jurisdiction** over the State's Motion to Set Arrears that is in violation of 42 U.S.C. sec. 654. The Defendant respectfully moves to close the case based on the plain fact that the Defendant paid off in full all "principle" support. The child in question was emancipated in April 2018.

    This motion to dismiss relies on the plain Federal statutory requirements of Title IV of the Social Security Act binding the Rhode Island Plaintiffs, binding the State Plan, binding the limited jurisdiction Family Court, and binding the Witness Rhode Island Executive Office of Health and Human Services.

    The Defendant reserves the right to raise all other multiple jurisdiction defect and nullity issues at the appropriate time in accordance with all applicable the laws of civil

procedure governing federal questions of the Title IV Program, the Commerce Clause and jurisdiction over the falsification of Title IV records certified to Texas and to the United States, among others.

The Defendant respectfully requests that the Court issues a written opinion stating the Court's reasoning.

If the Court wishes to hold a hearing on the matter, the Defendant respectfully requests the Court give priority to and settles the threshold jurisdiction challenge, in accordance with the law.

## I.    Lack of Jurisdiction under 42 U.S.C. sec. 654

Congress enacted and offered the State of Rhode Island along with all states in the Union participation in Title IV of the Social Security Act attaching conditions to states' participation under the ==Commerce Clause== and ==Spending Clause== of the United States Constitution.  The conditional requirements mandate that participating States must amend their respective state constitutions to comply with Congressional amendments to 42 U.S.C. sec. 654.  See, e.g., STATUTORY NOTES AND RELATED SUBSIDIARIES, Effective Date of 1996 Amendment, "(b) ==GRACE PERIOD FOR STATE LAW CHANGES==.-The provisions of this title shall become effective with respect to a State on the later of- "(1) the date specified in this title, or "(2) the effective date of laws enacted by the legislature of such State implementing such provisions, but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2- year legislative session, each year of such session shall be deemed to be a

separate regular session of the State legislature. "**(c) GRACE PERIOD FOR STATE CONSTITUTIONAL AMENDMENT**.-A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of- "(1) 1 year after the effective date of the necessary State constitutional amendment; or "(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]." *See also*, Amendments for 1996 Par. (21)(A). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent." Therefore, it is abundantly and explicitly clear that as of the 1996 Amendment to 42 U.S.C. sec. 654 legislating penalties for state noncompliance, Congress explicitly required participating states like Rhode Island to amend its state constitution for compliance with 42 U.S.C. sec. 654. Therefore, Congress explicitly mandates that **Rhode Island general laws that are out of compliance with 42 U.S.C. sec. 654(21)(A)** that was moreover highlighted in the statutory notes for the Amendments in 1996, are **<u>required</u>** to be changed. See **<u>Exhibit A</u>**. **The United States Congress publication of 42 U.S.C. sec. 654**.

Therefore, it is firmly and unequivocally established that **Rhode Island's R.I. Gen. Laws § 15-5-16.5 that legislates 12% compound interest** on overdue support is **out of compliance**. **The plain statutory text of 42 U.S.C. sec. 654(21)(A) states 3 to 6 percent** and requires the State to set a **<u>uniform</u>** rate for all, not 12% compound interest in intrastate cases but 0% by policy in interstate cases, complicated by setting yet another category of 12% compound interest in targeted interstate cases, such as TEXAS Defendant's interstate case. The fact that Rhode Island certifies that its State laws, such as R.I.

Gen. Laws § 15-5-16.5, are in compliance with 42 U.S.C. sec. 654(21)(A) shows *prima*

*facie* false certification, and the grace period for the change of law expired in August

1996, 28 years ago. See **Exhibit B**. **R.I. Gen. Laws § 15-5-16.**5.

Per the Rhode Island State Government publication of the History of Section for

R.I. Gen. Laws § 15-5-16.5, the Rhode Island General Assembly Public Legislature

actually amended and reviewed R.I. Gen. Laws § 15-5-16.5in 2001, showing the Public

the knowing noncompliance by the Rhode Island General Assembly. *See*, "History of

Section. P.L. 1980, ch. 308, § 1; P.L. 1984, ch. 167, § 1; P.L. **2001**, ch. 155, § 1."

Therefore, the limited jurisdiction court lacks jurisdiction to preempt 42 U.S.C.

sec. 654, when 42 U.S.C. sec. 654 plainly requires unequivocally that "the State is

required to so comply by amending the State constitution."


## II. Family Court is a court of Limited Jurisdiction created under RIGL 8-10-3 and Rhode Island, Having Participated in Title IV, lacks jurisdiction to preempt 42 U.S.C. sec. 654

Moreover, Rhode Island state family court is a court of limited jurisdiction

created by the General Assembly under **RIGL 8-10-3**. See, **Exhibit C**. Plainly, the

limited jurisdiction conferred to the state family court lacks the authority to preempt 42

U.S.C. sec. 654. When the judge violates federal law or aids in the violation of federal

criminal laws, the judge has no immunity. See section below entitled "No Immunity."

For example, RIGL 8-10-3 plainly confers the limited jurisdiction family court the

authority to hear motions on support establishment and enforcement, but does NOT

confer the family court the authority to preempt 42 U.S.C. sec. 654.  Indeed the

statutory terms in the Statutory Notes Section and the language of 42 U.S.C. sec. 654

plainly conditions Title IV preemption of State constitutions for State acceptance of

participation.  The Defendant reserves all rights to raise the other multiple other

jurisdictional defects as they apply to this matter, but the basic jurisdictional threshold

regarding the authority to preempt 42 U.S.C. sec. 654(21)(A) must fundamentally be

met – and this court lacks jurisdiction.

 The clearly established lack of authority of this court to preempt 42 U.S.C. sec.

654 leads the court to address the question of the court's lack of jurisdiction over the

Rhode Island Office of Child Support's written policy, "**It is desirable for RI OCSS to**

**prohibit the charging of interest in Interstate Cases**."  See **Exhibit D**, Rhode

Island Office of Child Support Services Written Policy stating, "**It is desirable for RI**

**OCSS to prohibit the charging of interest in Interstate Cases**."

 III.   **RI OCSS Policy that States "It is desirable for RI OCSS to**
  **prohibit the charging of interest in Interstate Cases" – This**
  **Court lacks jurisdiction over the Policy and lacks jurisdiction**
  **hear legal actions at law regarding the effect and the motive**
  **behind establishing this policy**


 A plain reading of RIGL 8-10-3 concludes that the limited jurisdiction family

court lacks jurisdiction over the RI OCSS Policy attached Exhibit D that states, ""**It is**

**desirable for RI OCSS to prohibit the charging of interest in Interstate**

**Cases**."  The Policy goes on to state regarding operations of the automated data

processing system, "Entry of the N not only prohibits the charging of future interest but

automatically creates adjustments to zero out any existing interest."  Additionally the

Policy states, "Two reports will be created. The first will detail the interstate cases for which a support order….. for which one or more interest adjustment were created." For the purposes of this motion, it suffices to raise that it is documented unequivocally the Office of Child Support Services creates multiple books of account reports for the completely un-uniform interest rates applied to support cases and that routinely "one or more interest adjustment were created" – 42 U.S.C. sec. 654 emphatically forbids all the policy practices enumerated in the Policy and the egregious issue of certifying a support record under 42 U.S.C. sec. 666(14), for example, that involves one or more interest adjustments and "two reports will be created" as it relates to compliance with 42 U.S.C. sec. 654 *et al* is a matter over which this court plainly lacks jurisdiction.

Applying the aforesaid RI OCSS Policy to this court's order dated September 25, 2012 that allegedly "established interest" in this interstate Title IV case, that this court also judicially noticed on February 2, 2024, the court ***must scrutinize*** the September 25, 2012 Order prepared by RI OCSS and signed and entered by Judge John McCann III that is challenged.

## IV. <u>This Court Lacks Jurisdiction Over any Legal Action in Law Regarding the Violation of 42 U.S.C. sec. 654 By This Court</u>

Subsequent to the review of the Title IV-D **TRAC** records selectively only produced by RI OCSS for December 2021 to April 2022 (see **<u>Exhibit F</u>**) (and the aforesaid RI OCSS Policy), the TEXAS Defendant filed legal actions in law in Federal courts that have jurisdiction over the Federal question and Federal matters in this interstate case. Furthermore, subsequent to Defendant raising in court at the WebEx hearing in this matter scheduled on October 18, 2023 that Defendant is denied access to

her own case records by the Rhode Island Rules and Practice 5 denying the public and

pro se litigants remote access to court information (except the docket), the Defendant

was emailed a copy of the September 25, 2012 court order allegedly establishing 12%

compound interest between December 2023 and January 2024, the delayed access

(Defendant has been denied access to information regarding the court orders and the

ordered interest since November 2021 to January 2023) of which is already <u>egregiously</u>

<u>outrageous</u> and the delay itself constituted countless multiple penalty-incurring

compliance failure violations.

For the purpose of this motion, a strict scrutiny of the First Amendment access-

denied September 25, 2012 order is plainly required.

On a Rhode Island Office of Child Support presented order by Deputy Chief

Counsel Priscilla Glucksman, in this interstate non-welfare Title IV-D case, in which

Plaintiff Gero Plaintiff (who is additionally represented by his own private attorney

Barbara E. Grady, whose husband and law firm partner Paul Dugan was formerly

Deputy Chief Legal Counsel for RI OCSS) paid RI OCSS under 42 U.S.C. sec. 654 a

whopping $25 application fee that acquired for him the entire suite of full and complete

individualized customized and dedicated child support interest establishment and

enforcement legal services involving at least seven (7) Deputy Chief Legal Counsels and

Chief Legal Counsel (e.g., 1. Priscilla Glucksman, 2. Kevin Tighe, 3. Frank DiBiaise, 4.

Paul Gould, 5. John Langlois, 6. Lisa Pinnsonneault, 7. Carl Beauregard) from 2010 to

the present from RI OCSS, Item 4 of the September 25, 2024 Order states, "The State's

Oral request to clarifying whether or not interest was to run o n the child support and

medical arrears as found in the May 24, 2012 court order is addressed. Interest will continue to run on the money due."

It is plainly explicit that 12% compound interest rate is not expressly provided in the text of the order.

It is plainly explicit that 42 U.S.C. sec. 654(21)(A) preempts RIGL 15-16-15.5.

It is plainly explicit that the RI OCSS Policy states RI OCSS is prohibit from charging interest in interstate cases, meaning in interstate cases, the interest is 0%.

It is plainly explicit that the plain statutory text of 42 U.S.C. sec. 654(21)(A) requires that the State must set uniform interest and if the State opts to set interest, it **must** be "**no less than 3 percent and no more than 6 percent**."

**Accordingly, this court has jurisdiction to set the only lawful rate set by State Policy as stated in the RI OCSS Policy, which is zero percent (0%), uniformly, be it interstate or intrastate, given the plain statutory text of 42 U.S.C. sec. 654(21)(A).**

The TEXAS Defendant explicitly requests respectfully that this Court take judicial notice of the fact that the Rhode Island Office of Child Support claims multiple times under Oath that, although the September 25, 2012 Order plainly omits the percent being charged for overdue support, Judge McCann ordered 12% compound interest that he knew or should have known, be it interstate or intrastate, is unlawful under 42 U.S.C. sec. 654 and preempted by the plain statutory language of 42 U.S.C. sec. 654(21)(A).

Based on the aforesaid obvious effect of ordering 12% compound interest, Judge John McCann III knew or should have known that "two reports" will be created in the

automated data processing system and the resulting removal of the interest amount from the automated system resulting in Rhode Island certifying "no interest" when sending to Texas and to Federal authorities for enforcement under 42 U.S.C. sec. 666(14).  Judge McCann's knowing aiding in the false certification of Title IV records via wire and via Mail interstate to Texas and to the United States plainly violates Federal criminal law.  **The judge had a legal duty to obey the criminal laws.**

V.     **Any Order Now Re-Establishing 12% Compound Interest Simply Results in the Creation of "zero interest" in Certifications to Texas under 42 U.S.C. sec. 666(14)**

Enforceability of any order now re-establishing 12% compound interest simply results in the creation of "zero interest" in enforcement certifications to Texas under 42 U.S.C. sec. 666(14).   With the child emancipated since 2018, the Office of Child Support Services claiming in the TRAC Record it certified to TEXAS child support amount due with ZERO INTEREST also in 2018, and the fact that principle was paid off by the Defendant three years ago in December 2021 per representations by the Office of Child Support Services, the Court lacks jurisdiction to establish or modify or re-set or set arrears or whatever legal moniker that essentially dresses up organized fraud based on this set of circumstances raised herein in this motion alone.

The fact that the Office of Child Support Services filed a motion before this court to set interest "arrears" in January 2023 a year after Defendant paid off the principle in December 2021 reeks of fraud.  If lawful and legitimate interest is actually due, logic dictates the State's support enforcement political subdivision under 42 U.S.C. sec. 654(3) simply enforces it without necessitating this court to "set interest arrears."  This

court's addressment of this issue was punting it from Magistrate Monaco to Judge Merola to Magistrate Nahabedian who showed her colors by stating on the record affirming that the Rhode Island judiciary orders 12% compound interest that it knows is preempted by 42 U.S.C. sec. 654, thereby necessitating the aforesaid RI OCSS Policy "it is **desirable** for RI OCSS to prohibit the charging of interest in interstate cases." Why? Because it is plain under 42 U.S.C. 654 that Rhode Island's "effective enforcement" of interest in interstate cases may necessitate certifying to another state, like to TEXAS, an "interest-removed-from-the-system" consisting of zero interest, to better keep track of their several "reports" that "will be created." In other words, the no interest in interstate cases policy better helps to keep RI OCSS's lies and fraud straight.

Although Defendant reserves the right to fully raise the issue of fraud by the certain symbiotic judges and by RI OCSS at the right time, Defendant raises the fact that t**he judge has a legal duty to obey the criminal laws. Obviously RI OCSS has a legal duty to obey criminal laws.**

## VI.    Statutory and Federal Authority

Certainly, among others, in order to avoid yet another penalty-incurring violation of 42 U.S.C. sec. 654, the court must dismiss for lack of jurisdiction and close the case.

Congress prescribed both civil and criminal penalties for violations of Title IV of the Social Security Act. Firstly, consistent with its **Spending Power**, Congress has the authority to attach conditions on the receipt of federal funds. *See **South Dakota v. Dole***, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See

42 U.S.C. §§ 654(10), (14), (15), (16), (20), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See **Sullivan v. Stroop***, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."   The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." ***Hodges v. Shalala***, 121 F.2d at 879.  Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1]

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina paid $75 million as of 2009 and was set to pay another $10 million for 2010.  South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
        Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the

Congress also enacted several criminal codes punishing actors, such as the Plaintiffs, who commit federal crimes, including cover up of unlawful activities.

The federal government has a longstanding involvement in child support enforcement programs. See ***Hodges v. Shalala***, 121 F.Supp.2d 854 (D.S.C. 2000). As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements under 42 U.S.C. sec. 654(21)(A) that the State, at the option of the State, impose a late payment fee ('interest") on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A), among others

While Rhode Island submits to the United States that it has a federally certifiable statewide automated data processing system for child support, Office of Child Support Services produced APRA Public Records consisting of Title IV Public Records showing Rhode Island taking off from the automated data processing system tens of thousands of dollars allegedly representing the 42 U.S.C. sec. 654(21)(A) prohibited 12% compound

---

automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

interest late payment fee "interest" prior to certifying to TEXAS and the United States, and showing Rhode Island falsely certified to the amount's accuracy under 42 U.S.C. sec. 666(14) when in fact Rhode Island removed significant tens of thousands of dollars (See TRAC records in attached Exhibit).

The Title IV-D statute expressly provides that compliance with ALL 42 U.S.C. 654 requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A.

Again, the clear and unequivocal statement of the required conditions in the statute enabled South Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted).  The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop,* 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."

Emphatically, Congress may use its **Spending Power** to **influence** a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, **but** Congress, under the ==**Commerce Clause**, **may offer the States a choice of regulation under federal control or preemption under federal regulation**. **See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc*==., 452 U.S. 264, 288 (1981).  It is crystal clear that upon Rhode Island's State Plan entering into agreement with the United States under the ==**Commerce Clause**==, Rhode Island accepted the agreement terms of

regulation under federal control or preemption under federal regulation. See *Hodel v.*

*Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

*See* United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUS

C-prelim-title42-

section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRp

b25z%7CdHJlZXNvcnQQ%3D%7C%7C1862%7Cfalse%7Cnull

## A. VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Defendant made

known to the panel of judges of the United States allegations contained in the Amended

Complaint filed in Federal Court of the commission of acts by the Rhode Island political

subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein

in this motion, the afore-described acts violating 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C.

§13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18

U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. §

241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18

U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C.

§1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C.

§1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C.

§1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18

U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968  – such violative acts by the Plaintiffs in

this matter, along with the political subdivisions and employees thereof named in the

federal matter on this list are not exhaustive.  It is undisputable, among others, that

Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-D and Title IV-A disgorgement is due from the applicable State of Rhode Island's Title IV political subdivisions.

## B. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF AMERICA v. DONALD J. TRUMP*, DC Circuit, the DC Circuit United States Court of Appeals reminds the Public and all applicable tribunals that Judges are similarly liable to the criminal laws for their official acts. A notable example is *Ex parte Commonwealth of Virginia*, in which the Supreme Court affirmed the criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for violating a federal statute that prohibited discriminating on the basis of race in jury selection. *Id*. at 340, 344. The Supreme Court began by observing the principle that officers are bound to follow the law: "We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the holder from obligation to obey the Constitution of the United States, or take away the power of Congress to punish his disobedience." *Id*. at 348. The Court then addressed the judge's argument that the Court lacked the authority to punish a state judge for "his official acts." *Id*. Its response was twofold. First, the Court described juror selection as "merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads." *Id*. The Court then explained that even if juror selection is considered a "judicial act," the judge had a legal duty to obey the criminal laws:

"But if the selection of jurors could be considered

in any case a judicial act, can the act charged
against the petitioner be considered such when
he acted outside of his authority and in direct
violation of the spirit of the State statute? That
statute gave him no authority, when selecting
jurors, from whom a panel might be drawn for
a circuit court, to exclude all colored men
merely because they were colored. Such an
exclusion was not left within the limits of his
discretion. It is idle, therefore, to say that the
act of Congress is unconstitutional because it
inflicts penalties upon State judges for their
judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute" is to
the Virginia law charging the county judge with the duty to select jurors in the circuit
and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are
not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed
the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief
brought against a county magistrate and associate judge of a county circuit. 414 U.S.
488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction
was not the only available remedy because both judges remained answerable to the
federal criminal laws:

[W]e have never held that the performance of
the duties of judicial, legislative, or executive

> *officers, requires or contemplates the*
> *immunization of otherwise criminal deprivation*
> *of constitutional rights. On the contrary, the*
> *judicially fashioned doctrine of official*
> *immunity does not reach 'so far as to immunize*
> *criminal conduct proscribed by an Act of*
> *Congress . . . .'*

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See* also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of

bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not immune, and employees of the political subdivisions of Rhode Island under 42 USC 654(1) similarly are not immune.  Barbara Grady and Gero Meyersiek are unquestionably liable.

## VII.   CONCLUSION

**Under 42 USC sec. 654 this court only has jurisdiction to set the only lawful rate set by State, articulated in writing in the State's Policy as stated in the RI OCSS Policy, which is zero percent (0%), uniformly, be it interstate or intrastate, given the plain statutory text of 42 U.S.C. sec. 654(21)(A).  Defendant paid off the principle in full as of December 7, 2021.  This Court must dismiss for lack of jurisdiction and close the case.**

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or designee-Judge Merola of this Honorable Court to:

1. Grant Defendant's Motion to Dismiss for Lack of Jurisdiction and Close the Case.

2. Order the Title IV case closed.

3. Order appropriate sanctions against Rhode Island Office of Child Support Services and Plaintiff, for *among others* fraud on the court, including ordering referral of the matters raised herein to the Office of Inspector General, both state and federal.

4. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request.

5. Declare that Defendant's child support file maintained by the Rhode Island Office of Child Support Services under the supervision of RI EOHHS must be produced to the Defendant Noncustodial Parent upon request.

6. Issue a written decision on the Court's decision.

7. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here: https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

8. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

March 27, 2024

FOR DEFENDANT

MARY SEGUIN, Pro Se.

By: _Mary Seguin_

Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

**NOTICE OF HEARING**

Please take notice that if necessary, the foregoing Emergency Motion to Dismiss for Lack of Jurisdiction and Close the Case will be called for hearing on a priority basis to determine the threshold jurisdiction challenge before the Rhode Island Family Court, One Dorrance Plaza, Providence, RI 02903 at 10:00 AM on March 28, 2024 (case is already scheduled for that date/time) by WebEx hearing https://ricourts.webex.com/meet/garrahy5F

**CERTIFICATION**

I hereby certify that a copy of the within Emergency Motion was filed on March 27, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

_Mary Seguin_

Exhibit A

**42 USC 654: State plan for child and spousal support**
Text contains those laws in effect on March 25, 2024

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
　　　CHAPTER 7-SOCIAL SECURITY
　　　SUBCHAPTER IV-GRANTS TO STATES FOR AID AND SERVICES TO NEEDY FAMILIES WITH
　　　CHILDREN AND FOR CHILD-WELFARE SERVICES
　　　Part D-Child Support and Establishment of Paternity
**Jump To:**
　　　<u>Source Credit</u>
　　　<u>Miscellaneous</u>
　　　<u>References In Text</u>
　　　<u>Codification</u>
　　　<u>Amendments</u>
　　　<u>Effective Date</u>

# §654. State plan for child and spousal support

A State plan for child and spousal support must-

(1) provide that it shall be in effect in all political subdivisions of the State;

(2) provide for financial participation by the State;

(3) provide for the establishment or designation of a single and separate organizational unit, which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan;

(4) provide that the State will-

(A) provide services relating to the establishment of paternity or the establishment, modification, or enforcement of child support obligations, as appropriate, under the plan with respect to-

(i) each child for whom (I) assistance is provided under the State program funded under part A of this subchapter, (II) benefits or services for foster care maintenance are provided under the State program funded under part E of this subchapter, (III) medical assistance is provided under the State plan approved under subchapter XIX, or (IV) cooperation is required pursuant to section 2015(l)(1) of title 7, unless, in accordance with paragraph (29), good cause or other exceptions exist;

(ii) any other child, if an individual applies for such services with respect to the child (except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application); and

(B) enforce any support obligation established with respect to-

(i) a child with respect to whom the State provides services under the plan; or

(ii) the custodial parent of such a child;

(5) provide that (A) in any case in which support payments are collected for an individual with respect to whom an assignment pursuant to section 608(a)(3) of this title is effective, such payments shall be made to the State for distribution pursuant to section 657 of this title and shall not be paid directly to the family, and the individual will be notified on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden) of the amount of the support payments collected, and (B) in any case in which support payments are collected for an individual pursuant to the assignment made under section 1396k of this title, such payments shall be made to the State for distribution pursuant to section 1396k of this title, except that this clause shall not apply to such payments for any month after the month

in which the individual ceases to be eligible for medical assistance;

(6) provide that-

(A) services under the plan shall be made available to residents of other States on the same terms as to residents of the State submitting the plan;

(B)(i) an application fee for furnishing such services shall be imposed on an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section 2015 of title 7, and shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (I) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (II) may vary among such individuals on the basis of ability to pay (as determined by the State); and

(ii) in the case of an individual who has never received assistance under a State program funded under part A and for whom the State has collected at least $550 of support, the State shall impose an annual fee of $35 for each case in which services are furnished, which shall be retained by the State from support collected on behalf of the individual (but not from the first $550 so collected), paid by the individual applying for the services, recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and the fees shall be considered income to the program);

(C) a fee of not more than $25 may be imposed in any case where the State requests the Secretary of the Treasury to withhold past-due support owed to or on behalf of such individual from a tax refund pursuant to section 664(a)(2) of this title;

(D) a fee (in accordance with regulations of the Secretary) for performing genetic tests may be imposed on any individual who is not a recipient of assistance under a State program funded under part A; and

(E) any costs in excess of the fees so imposed may be collected-

(i) from the parent who owes the child or spousal support obligation involved; or

(ii) at the option of the State, from the individual to whom such services are made available, but only if such State has in effect a procedure whereby all persons in such State having authority to order child or spousal support are informed that such costs are to be collected from the individual to whom such services were made available;


(7) provide for entering into cooperative arrangements with appropriate courts and law enforcement officials and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering the plan, including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;

(8) provide that, for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title the agency administering the plan will establish a service to locate parents utilizing-

(A) all sources of information and available records; and

(B) the Federal Parent Locator Service established under section 653 of this title,


and shall, subject to the privacy safeguards required under paragraph (26), disclose only the information described in sections 653 and 663 of this title to the authorized persons specified in such sections for the purposes specified in such sections;

(9) provide that the State will, in accordance with standards prescribed by the Secretary, cooperate with any other State-

(A) in establishing paternity, if necessary;

(B) in locating a noncustodial parent residing in the State (whether or not permanently) against

whom any action is being taken under a program established under a plan approved under this part in another State;

    (C) in securing compliance by a noncustodial parent residing in such State (whether or not permanently) with an order issued by a court of competent jurisdiction against such parent for the support and maintenance of the child or children or the parent of such child or children with respect to whom aid is being provided under the plan of such other State;

    (D) in carrying out other functions required under a plan approved under this part; and

    (E) not later than March 1, 1997, in using the forms promulgated pursuant to section 652(a)(11) of this title for income withholding, imposition of liens, and issuance of administrative subpoenas in interstate child support cases;

    (10) provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;

    (11)(A) provide that amounts collected as support shall be distributed as provided in section 657 of this title; and

    (B) provide that any payment required to be made under section 656 or 657 of this title to a family shall be made to the resident parent, legal guardian, or caretaker relative having custody of or responsibility for the child or children;

    (12) provide for the establishment of procedures to require the State to provide individuals who are applying for or receiving services under the State plan, or who are parties to cases in which services are being provided under the State plan-

    (A) with notice of all proceedings in which support obligations might be established or modified; and

    (B) with a copy of any order establishing or modifying a child support obligation, or (in the case of a petition for modification) a notice of determination that there should be no change in the amount of the child support award, within 14 days after issuance of such order or determination;

    (13) provide that the State will comply with such other requirements and standards as the Secretary determines to be necessary to the establishment of an effective program for locating noncustodial parents, establishing paternity, obtaining support orders, and collecting support payments and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan;

    (14)(A) comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

    (B) maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them to conceal in the accounting records the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

    (15) provide for-

    (A) a process for annual reviews of and reports to the Secretary on the State program operated under the State plan approved under this part, including such information as may be necessary to measure State compliance with Federal requirements for expedited procedures, using such standards and procedures as are required by the Secretary, under which the State agency will determine the extent to which the program is operated in compliance with this part; and

    (B) a process of extracting from the automated data processing system required by paragraph (16) and transmitting to the Secretary data and calculations concerning the levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 652(g) and 658a of this title;

    (16) provide for the establishment and operation by the State agency, in accordance with an (initial and annually updated) advance automated data processing planning document approved under section 652(d) of this title, of a statewide automated data processing and information retrieval system meeting the requirements of section 654a of this title designed effectively and efficiently to assist management in

the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan;

(17) provide that the State will have in effect an agreement with the Secretary entered into pursuant to section 663 of this title for the use of the Parent Locator Service established under section 653 of this title, and provide that the State will accept and transmit to the Secretary requests for information authorized under the provisions of the agreement to be furnished by such Service to authorized persons, will impose and collect (in accordance with regulations of the Secretary) a fee sufficient to cover the costs to the State and to the Secretary incurred by reason of such requests, will transmit to the Secretary from time to time (in accordance with such regulations) so much of the fees collected as are attributable to such costs to the Secretary so incurred, and during the period that such agreement is in effect will otherwise comply with such agreement and regulations of the Secretary with respect thereto;

(18) provide that the State has in effect procedures necessary to obtain payment of past-due support from overpayments made to the Secretary of the Treasury as set forth in section 664 of this title, and take all steps necessary to implement and utilize such procedures;

(19) provide that the agency administering the plan-

(A) shall determine on a periodic basis, from information supplied pursuant to section 508 of the Unemployment Compensation Amendments of 1976, whether any individuals receiving compensation under the State's unemployment compensation law (including amounts payable pursuant to any agreement under any Federal unemployment compensation law) owe child support obligations which are being enforced by such agency; and

(B) shall enforce any such child support obligations which are owed by such an individual but are not being met-

(i) through an agreement with such individual to have specified amounts withheld from compensation otherwise payable to such individual and by submitting a copy of any such agreement to the State agency administering the unemployment compensation law; or

(ii) in the absence of such an agreement, by bringing legal process (as defined in section 659(i)(5) of this title) to require the withholding of amounts from such compensation;


(20) provide, to the extent required by section 666 of this title, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws;

(21)(A) at the option of the State, impose a late payment fee on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; and

(B) assure that the fee will be collected in addition to, and only after full payment of, the overdue support, and that the imposition of the late payment fee shall not directly or indirectly result in a decrease in the amount of the support which is paid to the child (or spouse) to whom, or on whose behalf, it is owed;

(22) in order for the State to be eligible to receive any incentive payments under section 658a of this title, provide that, if one or more political subdivisions of the State participate in the costs of carrying out activities under the State plan during any period, each such subdivision shall be entitled to receive an appropriate share (as determined by the State) of any such incentive payments made to the State for such period, taking into account the efficiency and effectiveness of the activities carried out under the State plan by such political subdivision;

(23) provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services and a telephone number or postal address at which further information may be obtained and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate;

(24) provide that the State will have in effect an automated data processing and information retrieval system-

(A) by October 1, 1997, which meets all requirements of this part which were enacted on or before October 13, 1988; and

(B) by October 1, 2000, which meets all requirements of this part enacted on or before August 22, 1996, except that such deadline shall be extended by 1 day for each day (if any) by which the Secretary fails to meet the deadline imposed by section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996;

(25) provide that if a family with respect to which services are provided under the plan ceases to receive assistance under the State program funded under part A, the State shall provide appropriate notice to the family and continue to provide such services, subject to the same conditions and on the same basis as in the case of other individuals to whom services are furnished under the plan, except that an application or other request to continue services shall not be required of such a family and paragraph (6)(B) shall not apply to the family;

(26) have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the parties, including-

(A) safeguards against unauthorized use or disclosure of information relating to proceedings or actions to establish paternity, or to establish, modify, or enforce support, or to make or enforce a child custody determination;

(B) prohibitions against the release of information on the whereabouts of 1 party or the child to another party against whom a protective order with respect to the former party or the child has been entered;

(C) prohibitions against the release of information on the whereabouts of 1 party or the child to another person if the State has reason to believe that the release of the information to that person may result in physical or emotional harm to the party or the child;

(D) in cases in which the prohibitions under subparagraphs (B) and (C) apply, the requirement to notify the Secretary, for purposes of section 653(b)(2) of this title, that the State has reasonable evidence of domestic violence or child abuse against a party or the child and that the disclosure of such information could be harmful to the party or the child; and

(E) procedures providing that when the Secretary discloses information about a parent or child to a State court or an agent of a State court described in section 653(c)(2) or 663(d)(2)(B) of this title, and advises that court or agent that the Secretary has been notified that there is reasonable evidence of domestic violence or child abuse pursuant to section 653(b)(2) of this title, the court shall determine whether disclosure to any other person of information received from the Secretary could be harmful to the parent or child and, if the court determines that disclosure to any other person could be harmful, the court and its agents shall not make any such disclosure;

(27) provide that, on and after October 1, 1998, the State agency will-

(A) operate a State disbursement unit in accordance with section 654b of this title; and

(B) have sufficient State staff (consisting of State employees) and (at State option) contractors reporting directly to the State agency to-

(i) monitor and enforce support collections through the unit in cases being enforced by the State pursuant to paragraph (4) (including carrying out the automated data processing responsibilities described in section 654a(g) of this title); and

(ii) take the actions described in section 666(c)(1) of this title in appropriate cases;

(28) provide that, on and after October 1, 1997, the State will operate a State Directory of New Hires in accordance with section 653a of this title;

(29) provide that the State agency responsible for administering the State plan-

(A) shall make the determination (and redetermination at appropriate intervals) as to whether an individual who has applied for or is receiving assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, is cooperating in good faith with the State in establishing the paternity of, or in establishing, modifying, or enforcing a support order for, any child of the individual by providing the State agency with the name of, and such other information as the State agency may require with respect to, the noncustodial parent of the child, subject to good cause and other exceptions which-

(i) in the case of the State program funded under part A, the State program under part E, or the State program under subchapter XIX shall, at the option of the State, be defined, taking into account the best interests of the child, and applied in each case, by the State agency administering such program; and

(ii) in the case of the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, shall be defined and applied in each case under that program in accordance with section 2015(l)(2) of title 7;

(B) shall require the individual to supply additional necessary information and appear at interviews, hearings, and legal proceedings;

(C) shall require the individual and the child to submit to genetic tests pursuant to judicial or administrative order;

(D) may request that the individual sign a voluntary acknowledgment of paternity, after notice of the rights and consequences of such an acknowledgment, but may not require the individual to sign an acknowledgment or otherwise relinquish the right to genetic tests as a condition of cooperation and eligibility for assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7; and

(E) shall promptly notify the individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, of each such determination, and if noncooperation is determined, the basis therefor;

(30) provide that the State shall use the definitions established under section 652(a)(5) of this title in collecting and reporting information as required under this part;

(31) provide that the State agency will have in effect a procedure for certifying to the Secretary, for purposes of the procedure under section 652(k) of this title, determinations that individuals owe arrearages of child support in an amount exceeding $2,500, under which procedure-

(A) each individual concerned is afforded notice of such determination and the consequences thereof, and an opportunity to contest the determination; and

(B) the certification by the State agency is furnished to the Secretary in such format, and accompanied by such supporting documentation, as the Secretary may require;

(32)(A) provide that any request for services under this part by a foreign reciprocating country, a foreign treaty country, or a foreign country with which the State has an arrangement described in section 659a(d) of this title shall be treated as a request by a State;

(B) provide, at State option, notwithstanding paragraph (4) or any other provision of this part, for services under the plan for enforcement of a spousal support order not described in paragraph (4)(B) entered by such a country (or subdivision) and

(C) provide that no applications will be required from, and no costs will be assessed for such services against, the foreign reciprocating country, foreign treaty country, or foreign individual (but costs may at State option be assessed against the obligor);

(33) provide that a State that receives funding pursuant to section 628 of this title and that has within its borders Indian country (as defined in section 1151 of title 18) may enter into cooperative agreements with an Indian tribe or tribal organization (as defined in subsections (e) and (l) of section 5304 of title 25), if the Indian tribe or tribal organization demonstrates that such tribe or organization has an established tribal court system or a Court of Indian Offenses with the authority to establish paternity, establish, modify, or enforce support orders, or to enter support orders in accordance with child support guidelines established or adopted by such tribe or organization, under which the State and tribe or organization shall provide for the cooperative delivery of child support enforcement services in Indian country and for the forwarding of all collections pursuant to the functions performed by the tribe or organization to the State agency, or conversely, by the State agency to the tribe or organization, which shall distribute such collections in

accordance with such agreement; and

    (34) include an election by the State to apply section 657(a)(2)(B) of this title or former section 657(a)(2)(B) of this title (as in effect for the State immediately before the date this paragraph first applies to the State) to the distribution of the amounts which are the subject of such sections and, for so long as the State elects to so apply such former section, the amendments made by subsection (b)(1) of section 7301 of the Deficit Reduction Act of 2005 shall not apply with respect to the State, notwithstanding subsection (e) of such section 7301.

    The State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21). Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25.

(Aug. 14, 1935, ch. 531, title IV, §454, as added Pub. L. 93–647, §101(a), Jan. 4, 1975, 88 Stat. 2354 ; amended Pub. L. 94–88, title II, §208(b), (c), Aug. 9, 1975, 89 Stat. 436 ; Pub. L. 95–30, title V, §502(a), May 23, 1977, 91 Stat. 162 ; Pub. L. 96–265, title IV, §405(b), June 9, 1980, 94 Stat. 463 ; Pub. L. 96–611, §9(a), Dec. 28, 1980, 94 Stat. 3571 ; Pub. L. 97–35, title XXIII, §§2331(b), 2332(d), 2333(a), (b), 2335(a), Aug. 13, 1981, 95 Stat. 860 , 862, 863; Pub. L. 97–248, title I, §§171(a), (b)(1), 173(a), Sept. 3, 1982, 96 Stat. 401 , 403; Pub. L. 98–369, div. B, title VI, §2663(c)(14), (j)(2)(B)(x), July 18, 1984, 98 Stat. 1166 , 1170; Pub. L. 98–378, §§3(a), (c)–(f), 5(b), 6(a), 11(b)(1), 12(a), (b), 14(a), 21(d), Aug. 16, 1984, 98 Stat. 1306 , 1310, 1311, 1314, 1318, 1319, 1320, 1324; Pub. L. 100–203, title IX, §§9141(a)(2), 9142(a), Dec. 22, 1987, 101 Stat. 1330–321 ; Pub. L. 100–485, title I, §§104(a), 111(c), 123(a), (d), Oct. 13, 1988, 102 Stat. 2348 , 2349, 2352, 2353; Pub. L. 104–35, §1(a), Oct. 12, 1995, 109 Stat. 294 ; Pub. L. 104–193, title I, §108(c)(11), (12), title III, §§301(a), (b), 302(b)(2), 303(a), 304(a), 312(a), 313(a), 316(g)(1), 324(b), 332, 333, 342(a), 343(b), 344(a)(1), (4), 370(a)(2), 371(b), 375(a), (c), 395(d)(1)(D), (2)(B), Aug. 22, 1996, 110 Stat. 2166 , 2199, 2204, 2205, 2207, 2209, 2218, 2223, 2230, 2233, 2234, 2236, 2252, 2254, 2256, 2259, 2260; Pub. L. 105–33, title V, §§5531(a), 5542(c), 5545, 5546(a), 5548, 5552, 5556(b), Aug. 5, 1997, 111 Stat. 625 , 631, 633, 635, 637; Pub. L. 106–169, title IV, §401(g), (h), Dec. 14, 1999, 113 Stat. 1858 ; Pub. L. 109–171, title VII, §§7301(b)(1)(C), 7303(b), 7310(a), Feb. 8, 2006, 120 Stat. 143 , 145, 147; Pub. L. 110–234, title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), May 22, 2008, 122 Stat. 1095–1097 , 1110; Pub. L. 110–246, §4(a), title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), June 18, 2008, 122 Stat. 1664 , 1857, 1858, 1871; Pub. L. 113–79, title IV, §4030(v), Feb. 7, 2014, 128 Stat. 815 ; Pub. L. 113–183, title III, §301(c), Sept. 29, 2014, 128 Stat. 1943 ; Pub. L. 115–123, div. E, title XII, §53117(a), Feb. 9, 2018, 132 Stat. 307 .)

<div align="center">

### EDITORIAL NOTES

## REFERENCES IN TEXT

</div>

    Section 508 of the Unemployment Compensation Amendments of 1976, referred to in par. (19), is section 508 of Pub. L. 94–566, Oct. 20, 1976, 90 Stat. 2689 , which enacted section 603a of this title and amended section 49b of Title 29, Labor.

    Section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, referred to in par. (24), is section 344(a)(3) of Pub. L. 104–193, which is set out as a Regulations note under section 654a of this title.

    Section 2012(l) of title 7, referred to in par. (29), was struck out, and a new section 2012(t) of title 7 similarly defining "supplemental nutrition assistance program" was enacted, by Pub. L. 113–79, title IV, §4030(a)(3), (5), Feb. 7, 2014, 128 Stat. 813 .

    Section 7301 of the Deficit Reduction Act of 2005, referred to in par. (34), is section 7301 of Pub. L. 109–171, title VII, Feb. 8, 2006, 120 Stat. 141 . Subsec. (b)(1) of section 7301 of Pub. L. 109–171 amended this section and section 657 of this title. Subsec. (e) of section 7301 of Pub. L. 109–171 is set out as an Effective Date of 2006 Amendment note under section 608 of this title.

## CODIFICATION

Pub. L. 110–234 and Pub. L. 110–246 made identical amendments to this section. The amendments by Pub. L. 110–234 were repealed by section 4(a) of Pub. L. 110–246.

## AMENDMENTS

**2018**-Par. (6)(B)(ii). Pub. L. 115–123 substituted "$35" for "$25" and, in two places, substituted "$550" for "$500".

**2014**-Par. (4)(A)(ii). Pub. L. 113–183, §301(c)(1), inserted before semicolon "(except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the individual to request the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application)".

Par. (29)(A), (D), (E). Pub. L. 113–79, §4030(v), amended Pub. L. 110–246, §4115(c)(2)(H). See 2008 Amendment note below.

Par. (32)(A). Pub. L. 113–183, §301(c)(2)(A), inserted ", a foreign treaty country," after "a foreign reciprocating country".

Par. (32)(C). Pub. L. 113–183, §301(c)(2)(B), substituted ", foreign treaty country, or foreign individual" for "or foreign obligee".

**2008**-Pars. (4)(A)(i)(IV), (6)(B)(i). Pub. L. 110–246, §4002(b)(1)(B), (2)(V), made technical amendment to references in original act which appear in text as references to sections 2015(l)(1) and 2015 of title 7.

Par. (29)(A), (D), (E). Pub. L. 110–246, §4115(c)(2)(H), as amended by Pub. L. 113–79, §4030(v), substituted "section 2012(l)" for "section 2012(h)" wherever appearing.

Pub. L. 110–246, §4002(b)(1)(A), (B), (2)(V), substituted "supplemental nutrition assistance program" for "food stamp program" wherever appearing and made technical amendment to references in original act which appear in text as references to sections 2012(h) and 2015(l)(2) of title 7.

**2006**-Par. (6)(B). Pub. L. 109–171, §7310(a), designated existing provisions as cl. (i), redesignated former cls. (i) and (ii) as subcls. (I) and (II), respectively, of cl. (i), and added cl. (ii).

Par. (31). Pub. L. 109–171, §7303(b), substituted "$2,500" for "$5,000" in introductory provisions.

Par. (34). Pub. L. 109–171, §7301(b)(1)(C), added par. (34).

**1999**-Par. (6)(E)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (9)(A) to (C). Pub. L. 106–169, §401(g)(2), substituted semicolon for comma at end.

Par. (19)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (19)(B)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (24)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (24)(B). Pub. L. 106–169, §401(h), made technical amendment to reference in original act which appears in text as reference to August 22, 1996.

**1997**-Par. (4)(A)(i)(IV). Pub. L. 105–33, §5548(a), added subcl. (IV).

Par. (6)(B). Pub. L. 105–33, §5531(a), substituted "an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section

2015 of title 7, and" for "individuals not receiving assistance under any State program funded under part A, which".

Par. (8). Pub. L. 105–33, §5552(1)(D), inserted concluding provisions.

Pub. L. 105–33, §5552(1)(A), in introductory provisions, inserted ", for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title" after "provide that" and struck out "noncustodial" before "parents".

Par. (8)(A). Pub. L. 105–33, §5552(1)(B), substituted "records; and" for "records, and".

Par. (8)(B). Pub. L. 105–33, §5552(1)(C), substituted "title," for "title;".

Par. (16). Pub. L. 105–33, §5556(b), made technical amendment to directory language of Pub. L. 104–193, §344(a)(1)(F). See 1996 Amendment note below.

Par. (17). Pub. L. 105–33, §5552(2), substituted "provide that the State will have" for "in the case of a State which has" and inserted "and" after "section 653 of this title,".

Par. (19)(B)(ii). Pub. L. 105–33, §5542(c), substituted "section 659(i)(5)" for "section 662(e)".

Par. (26). Pub. L. 105–33, §5552(3)(A), struck out "will" before "have in effect" in introductory provisions.

Par. (26)(A). Pub. L. 105–33, §5552(3)(B), inserted ", modify," after "or to establish" and ", or to make or enforce a child custody determination" after "support".

Par. (26)(B). Pub. L. 105–33, §5552(3)(C)(i), (ii), inserted "or the child" after "1 party" and after "former party".

Par. (26)(C). Pub. L. 105–33, §5552(3)(D), inserted "or the child" after "1 party", substituted "another person" for "another party", inserted "to that person" after "release of the information", and substituted "party or the child" for "former party".

Par. (26)(D), (E). Pub. L. 105–33, §5552(3)(C)(iii), (E), added subpars. (D) and (E).

Par. (29)(A). Pub. L. 105–33, §5548(b)(1)(B), substituted cls. (i) and (ii) for

"(i) shall be defined, taking into account the best interests of the child, and
"(ii) shall be applied in each case,
by, at the option of the State, the State agency administering the State program under part A of this subchapter, this part, or subchapter XIX;".

Pub. L. 105–33, §5548(b)(1)(A), in introductory provisions, substituted "part A, the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7," for "part A of this subchapter or the State program under subchapter XIX".

Par. (29)(D). Pub. L. 105–33, §5548(b)(2), substituted "the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7" for "or the State program under subchapter XIX".

Par. (29)(E). Pub. L. 105–33, §5548(b)(3), substituted "individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the food stamp program, as defined under section 2012(h) of title 7," for "individual, the State agency administering the State program funded under part A, and the State agency administering the State program under subchapter XIX,".

Par. (32)(A). Pub. L. 105–33, §5545, substituted "section 659a(d)" for "section 659a(d)(2)".

Par. (33). Pub. L. 105–33, §5546(a), substituted "or enforce support orders, or" for "and enforce support orders, and", "guidelines established or adopted by such tribe or organization"

for "guidelines established by such tribe or organization", "all collections" for "all funding collected", and "such collections" for "such funding".

**1996**-Pub. L. 104–193, §375(a)(4), inserted at end of closing provisions "Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25."

Par. (4). Pub. L. 104–193, §301(a)(1), amended par. (4) generally. Prior to amendment, par. (4) read as follows: "provide that such State will undertake-

"(A) in the case of a child born out of wedlock with respect to whom an assignment under section 602(a)(26) of this title or section 1396k of this title is effective, to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so, or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and

"(B) in the case of any child with respect to whom such assignment is effective, including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter, to secure support for such child from his parent (or from any other person legally liable for such support), and from such parent for his spouse (or former spouse) receiving aid to families with dependent children or medical assistance under a State plan approved under subchapter XIX of this chapter (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan), utilizing any reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A or E of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so), except that when such arrangements and other means have proven ineffective, the State may utilize the Federal courts to obtain or enforce court orders for support;".

Par. (5)(A). Pub. L. 104–193, §108(c)(11), substituted "pursuant to section 608(a)(3) of this title" for "under section 602(a)(26) of this title" and "payments collected," for "payments collected; except that this paragraph shall not apply to such payments for any month following the first month in which the amount collected is sufficient to make such family ineligible for assistance under the State plan approved under part A of this subchapter;".

Par. (6). Pub. L. 104–193, §301(a)(2)(A), substituted "provide that-" for "provide that" in introductory provisions.

Par. (6)(A). Pub. L. 104–193, §301(a)(2)(B), added subpar. (A) and struck out former subpar. (A) which read as follows: "the child support collection or paternity determination services established under the plan shall be made available to any individual not otherwise eligible for such services upon application filed by such individual with the State, including support collection services for the spouse (or former spouse) with whom the absent parent's child is living (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan),".

Par. (6)(B). Pub. L. 104–193, §301(a)(2)(C), (D), inserted "on individuals not receiving assistance under any State program funded under part A" after "such services shall be imposed", realigned margins, and substituted semicolon for comma at end.

Par. (6)(C). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma at end.

Par. (6)(D). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma before "and" at end.

Pub. L. 104–193, §108(c)(12), substituted "assistance under a State program funded" for "aid under a State plan approved".

Par. (6)(E). Pub. L. 104–193, §301(a)(2)(D)(i), (E), realigned margins.

Pub. L. 104–193, §301(a)(2)(D)(ii), which directed substitution of a semicolon for the final comma, could not be executed because subpar. (E) already ended in a semicolon and not a comma.

Par. (7). Pub. L. 104–193, §375(c), inserted "and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25)" after "law enforcement officials".

Par. (8). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial" for "absent" in introductory provisions.

Par. (8)(B). Pub. L. 104–193, §316(g)(1)(A), amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: "the Parent Locator Service in the Department of Health and Human Services;".

Par. (9)(B), (C). Pub. L. 104–193, §395(d)(2)(B), substituted "a noncustodial parent" for "an absent parent".

Par. (9)(E). Pub. L. 104–193, §324(b), added subpar. (E).

Par. (11). Pub. L. 104–193, §302(b)(2), designated existing provisions as subpar. (A), inserted "and" after semicolon at end, and redesignated par. (12) as subpar. (B).

Par. (12). Pub. L. 104–193, §304(a), added par. (12). Former par. (12) redesignated (11)(B).

Pub. L. 104–193, §302(b)(2)(B), redesignated par. (12) as (11)(B).

Par. (13). Pub. L. 104–193, §§316(g)(1)(B), 395(d)(1)(D), substituted "noncustodial parents" for "absent parents" and inserted before semicolon at end "and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan".

Par. (14). Pub. L. 104–193, §342(a)(1), (2), designated existing provisions as subpar. (A) and redesignated par. (15) as subpar. (B).

Par. (15). Pub. L. 104–193, §342(a)(3), added par. (15). Former par. (15) redesignated (14)(B).

Pub. L. 104–193, §342(a)(2), redesignated par. (15) as (14)(B).

Par. (16). Pub. L. 104–193, §344(a)(1), as amended by Pub. L. 105–33, §5556(b), struck out ", at the option of the State," before "for the establishment", inserted "and operation by the State agency" after "for the establishment" and "meeting the requirements of section 654a of this title" after "information retrieval system", substituted "so as to control" for "in the State and localities thereof, so as (A) to control", struck out "(i)" before "all the factors in the support enforcement collection", and struck out before semicolon at end "(including, but not limited to, (I) identifiable correlation factors (such as social security numbers, names, dates of birth, home addresses and mailing addresses (including postal ZIP codes) of any individual with respect to whom support obligations are sought to be established or enforced and with respect to any person to whom such support obligations are owing) to assure sufficient compatibility among the systems of different jurisdictions to permit periodic screening to determine whether such

individual is paying or is obligated to pay support in more than one jurisdiction, (II) checking of records of such individuals on a periodic basis with Federal, intra- and inter-State, and local agencies, (III) maintaining the data necessary to meet the Federal reporting requirements on a timely basis, and (IV) delinquency and enforcement activities), (ii) the collection and distribution of support payments (both intra- and inter-State), the determination, collection, and distribution of incentive payments both inter- and intra-State, and the maintenance of accounts receivable on all amounts owed, collected and distributed, and (iii) the costs of all services rendered, either directly or by interfacing with State financial management and expenditure information, (B) to provide interface with records of the State's aid to families with dependent children program in order to determine if a collection of a support payment causes a change affecting eligibility for or the amount of aid under such program, (C) to provide for security against unauthorized access to, or use of, the data in such system, (D) to facilitate the development and improvement of the income withholding and other procedures required under section 666(a) of this title through the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur, and (E) to provide management information on all cases under the State plan from initial referral or application through collection and enforcement".

Par. (21)(A). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent".

Par. (23). Pub. L. 104–193, §332, inserted "and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate" before semicolon.

Par. (24). Pub. L. 104–193, §344(a)(4), amended par. (24) generally. Prior to amendment, par. (24) read as follows: "provide that if the State, as of October 13, 1988, does not have in effect an automated data processing and information retrieval system meeting all of the requirements of paragraph (16), the State-

    "(A) will submit to the Secretary by October 1, 1991, for review and approval by the Secretary within 9 months after submittal an advance automated data processing planning document of the type referred to in such paragraph; and

    "(B) will have in effect by October 1, 1997, an operational automated data processing and information retrieval system, meeting all the requirements of that paragraph, which has been approved by the Secretary;".

Par. (25). Pub. L. 104–193, §301(b), added par. (25).

Par. (26). Pub. L. 104–193, §303(a), added par. (26).

Par. (27). Pub. L. 104–193, §312(a), added par. (27).

Par. (28). Pub. L. 104–193, §313(a), added par. (28).

Par. (29). Pub. L. 104–193, §333, added par. (29).

Par. (30). Pub. L. 104–193, §343(b), added par. (30).

Par. (31). Pub. L. 104–193, §370(a)(2), added par. (31).

Par. (32). Pub. L. 104–193, §371(b), added par. (32).

Par. (33). Pub. L. 104–193, §375(a)(1)–(3), added par. (33).

**1995**-Par. (24)(B). Pub. L. 104–35 substituted "1997" for "1995".

**1988**-Par. (5)(A). Pub. L. 100–485, §104(a), substituted "on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden)" for "at least

annually".

Par. (6)(D), (E). Pub. L. 100–485, §111(c), added cl. (D) and redesignated former cl. (D) as (E).

Par. (16). Pub. L. 100–485, §123(d), substituted "advance automated" for "advance automatic" in introductory provisions.

Pub. L. 100–485, §123(a)(2), substituted "a statewide automated" for "an automatic".

Par. (24). Pub. L. 100–485, §123(a)(1), added par. (24).

**1987**–Par. (4)(A). Pub. L. 100–203, §9142(a)(1)(A), (B), substituted "an assignment under section 602(a)(26) of this title or section 1396k of this title" for "an assignment under section 602(a)(26) of this title" and ", or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and" for ", and".

Par. (4)(B). Pub. L. 100–203, §9142(a)(1)(C), inserted "or medical assistance under a State plan approved under subchapter XIX of this chapter" after "children".

Par. (5). Pub. L. 100–203, §9142(a)(2), substituted "provide that (A)" for "provide that," and added cl. (B).

Pub. L. 100–203, §9141(a)(2), struck out "(except as provided in section 657(c) of this title)" after "apply to such payments".

**1984**–Par. (4)(B). Pub. L. 98–378, §11(b)(1), inserted "including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter," after "such assignment is effective," and inserted "or E" after "part A".

Par. (4)(B). Pub. L. 98–378, §12(a), substituted ", and" for "and, at the option of the State," before "from such parent" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (5). Pub. L. 98–378, §3(e), inserted ", and the individual will be notified at least annually of the amount of the support payments collected;".

Par. (6)(A). Pub. L. 98–378, §12(b), struck out ", at the option of the State," before "support collection services" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (6)(B). Pub. L. 98–378, §3(c), substituted "shall be imposed, which shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (i) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (ii) may vary among such individuals on the basis of ability to pay (as determined by the State), and" for "may be imposed, except that the amount of any such application fee shall be reasonable, as determined under regulations of the Secretary,".

Par. (6)(C). Pub. L. 98–378, §21(d)(1), (3), added cl. (C). Former cl. (C) redesignated (D).

Par. (6)(D). Pub. L. 98–378, §21(d)(1), (2), redesignated former cl. (C) as (D) and substituted "fees" for "fee" before "so imposed".

Par. (8)(B). Pub. L. 98–369, §2663(j)(2)(B)(x), substituted "Health and Human Services" for "Health, Education, and Welfare".

Par. (9)(C). Pub. L. 98–369, §2663(c)(14)(A), struck out "of such parent" before "with respect to whom aid".

Par. (16)(A)(ii). Pub. L. 98–369, §2663(c)(14)(B), substituted "collection, and distribution" for "collection and distribution," before "of incentive payments".

Par. (16)(D), (E). Pub. L. 98–378, §6(a), added cl. (D) and redesignated former cl. (D) as (E).

Par. (17). Pub. L. 98–378, §2663(c)(14)(C), realigned margin, substituted "provide that the State will accept" for "to accept", "will impose" for "and to impose", "will transmit" for "to transmit", and "will otherwise comply" for ", otherwise to comply".

Par. (20). Pub. L. 98–378, §3(a), added par. (20).

Par. (21). Pub. L. 98–378, §3(d), added par. (21).

Par. (22). Pub. L. 98–378, §5(b), added par. (22).

Par. (23). Pub. L. 98–378, §14(a), added par. (23).

Pub. L. 98–378, §3(f), inserted after numbered paragraphs provision that the State may allow the jurisdiction which makes the collection involved to retain any application fee under par. (6)(B) or any late payment fee under par. (21).

**1982**-Par. (5). Pub. L. 97–248, §173(a), inserted "following the first month" after "for any month".

Par. (6). Pub. L. 97–248, §171(a), in cl. (A) inserted provisions relating to inclusion of, at the option of the State, support collection services for the spouse or former spouse, in cl. (B) substituted "such services" for "services under the State plan (other than collection of support)", and in cl. (C) substituted provisions relating to collection of any costs in excess of the fee imposed, for provisions relating to the State retaining any fee imposed under State law as required under former par. (19).

Pars. (18) to (20). Pub. L. 97–248, §171(b)(1), inserted "and" at end of par. (18), struck out par. (19) relating to imposition of a fee on an individual who owes child or spousal support obligation, and redesignated par. (20) as (19).

**1981**-Pub. L. 97–35, §2332(d)(2), substituted in provision preceding par. (1) "child and spousal support" for "child support".

Par. (4)(B). Pub. L. 97–35, §2332(d)(3), substituted "such support) and, at the option of the State, from such parent for his spouse (or former spouse) receiving aid to families with dependent children (but only if a support obligation has been established with respect to such spouse), utilizing" for "such support), utilizing".

Par. (5). Pub. L. 97–35, §2332(d)(4), substituted "support payments" for "child support payments" and "collected for an individual" for "collected for a child".

Par. (6)(B). Pub. L. 97–35, §2333(a)(1), substituted "services under the State plan (other than collection of support)" for "such services".

Par. (6)(C). Pub. L. 97–35, §2333(a)(2), substituted "the State will retain, but only if it is the State which makes the collection, the fee imposed under State law as required under paragraph (19)" for "any costs in excess of the fee so imposed may be collected from such individual by deducting such costs from the amount of any recovery made".

Par. (9)(C). Pub. L. 97–35, §2332(d)(5), substituted "of the child or children or the parent of such child or children" for "of a child or children".

Par. (11). Pub. L. 97–35, §2332(d)(6), substituted "collected as support" for "collected as child support".

Par. (16). Pub. L. 97–35, §2332(d)(7), substituted "support enforcement" for "child support enforcement", "whom support obligations" for "whom child support obligations", and "obligated to pay support" for "obligated to pay child support".

Par. (18). Pub. L. 97–35, §2331(b), added par. (18).

Par. (19). Pub. L. 97–35, §2333(b), added par. (19).

Par. (20). Pub. L. 97–35, §2335(a), added par. (20).

**1980**-Par. (16). Pub. L. 96–265 added par. (16).

Par. (17). Pub. L. 96–611 added par. (17).

**1977**-Pars. (14), (15). Pub. L. 95–30 added pars. (14) and (15).

**1975**-Par. (4)(A). Pub. L. 94–88, §208(b), substituted "to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so" for "to establish the paternity of such child".

Par. (4)(B). Pub. L. 94–88, §208(c), substituted "reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so)" for "reciprocal arrangements adopted with other States".

<div align="center">STATUTORY NOTES AND RELATED SUBSIDIARIES</div>

### EFFECTIVE DATE OF 2018 AMENDMENT

Pub. L. 115–123, div. E, title XII, §53117(b), Feb. 9, 2018, 132 Stat. 307 , provided that:

"(1) IN GENERAL.-The amendments made by subsection (a) [amending this section] shall take effect on the 1st day of the 1st fiscal year that begins on or after the date of the enactment of this Act [Feb. 9, 2018], and shall apply to payments under part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) for calendar quarters beginning on or after such 1st day.

"(2) DELAY PERMITTED IF STATE LEGISLATION REQUIRED.-If the Secretary of Health and Human Services determines that State legislation (other than legislation appropriating funds) is required in order for a State plan developed pursuant to part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) to meet the requirements imposed by the amendment made by subsection (a), the plan shall not be regarded as failing to meet such requirements before the 1st day of the 1st calendar quarter beginning after the first regular session of the State legislature that begins after the date of the enactment of this Act. For purposes of the preceding sentence, if the State has a 2-year legislative session, each year of the session is deemed to be a separate regular session of the State legislature."

### EFFECTIVE DATE OF 2008 AMENDMENT

Amendment of this section and repeal of Pub. L. 110–234 by Pub. L. 110–246 effective May 22, 2008, the date of enactment of Pub. L. 110–234, except as otherwise provided, see section 4 of Pub. L. 110–246, set out as an Effective Date note under section 8701 of Title 7, Agriculture.

Amendment by sections 4002(b)(1)(A), (B), (2)(V), and 4115(c)(2)(H) of Pub. L. 110–246 effective Oct. 1, 2008, see section 4407 of Pub. L. 110–246, set out as a note under section 1161 of Title 2, The Congress.

### EFFECTIVE DATE OF 2006 AMENDMENT

Amendment by section 7301(b)(1)(C) of Pub. L. 109–171 effective Oct. 1, 2009, and applicable to payments under parts A and D of this subchapter for calendar quarters beginning on or after such date, subject to certain State options, see section 7301(e) of Pub. L. 109–171, set out as a note under section 608 of this title.

Amendment by section 7303(b) of Pub. L. 109–171 effective Oct. 1, 2006, see section 7303(c) of Pub. L. 109–171, set out as a note under section 652 of this title.

Pub. L. 109–171, title VII, §7310(c), Feb. 8, 2006, 120 Stat. 148 , provided that: "The amendments made by this section [amending this section and section 657 of this title] shall take effect on October 1, 2006."

### EFFECTIVE DATE OF 1999 AMENDMENT

Amendment by Pub. L. 106–169 effective as if included in the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 401(q) of Pub. L. 106–169, set out as a note under section 602 of this title.

### EFFECTIVE DATE OF 1997 AMENDMENT

Amendment by Pub. L. 105–33 effective as if included in the enactment of title III of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 5557 of Pub. L. 105–33, set out as a note under section 608 of this title.

### EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by section 108(c)(11), (12) of Pub. L. 104–193 effective July 1, 1997, with transition rules relating to State options to accelerate such date, rules relating to claims, actions, and proceedings commenced before such date, rules relating to closing out of accounts for terminated or substantially modified programs and continuance in office of Assistant Secretary for Family Support, and provisions relating to termination of entitlement under AFDC program, see section 116 of Pub. L. 104–193, as amended, set out as an Effective Date note under section 601 of this title.

Amendment by section 302(b)(2) of Pub. L. 104–193 effective Aug. 22, 1996, see section 302(c)(2) of Pub. L. 104–193, set out as a note under section 657 of this title.

Pub. L. 104–193, title III, §303(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Pub. L. 104–193, title III, §304(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Amendment by section 312(a) of Pub. L. 104–193 effective Oct. 1, 1998, with limited exception for States which, as of Aug. 22, 1996, were processing the receipt of child support payments through local courts, see section 312(d) of Pub. L. 104–193, set out as an Effective Date note under section 654b of this title.

Amendment by section 342(a) of Pub. L. 104–193 effective with respect to calendar quarters beginning 12 months or more after Aug. 22, 1996, see section 342(c) of Pub. L. 104–193, set out as a note under section 652 of this title.

Amendment by section 370(a)(2) of Pub. L. 104–193 effective Oct. 1, 1997, see section 370(b) of Pub. L. 104–193, set out as a note under section 652 of this title.

Pub. L. 104–193, title III, §395(a)–(c), Aug. 22, 1996, 110 Stat. 2259 , provided that:

"(a) IN GENERAL.-Except as otherwise specifically provided (but subject to subsections (b) and (c))-

"(1) the provisions of this title [see Tables for classification] requiring the enactment or amendment of State laws under section 466 of the Social Security Act [42 U.S.C. 666], or revision of State plans under section 454 of such Act [this section], shall be effective with

respect to periods beginning on and after October 1, 1996; and

"(2) all other provisions of this title shall become effective upon the date of the enactment of this Act [Aug. 22, 1996].

"(b) Grace Period for State Law Changes.-The provisions of this title shall become effective with respect to a State on the later of-

"(1) the date specified in this title, or

"(2) the effective date of laws enacted by the legislature of such State implementing such provisions,

but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2-year legislative session, each year of such session shall be deemed to be a separate regular session of the State legislature.

"(c) Grace Period for State Constitutional Amendment.-A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of-

"(1) 1 year after the effective date of the necessary State constitutional amendment; or

"(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]."

### Effective Date of 1988 Amendment

Pub. L. 100–485, title I, §104(b), Oct. 13, 1988, 102 Stat. 2348 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on the first day of the first calendar quarter which begins 4 or more years after the date of the enactment of this Act [Oct. 13, 1988]."

Pub. L. 100–485, title I, §111(f)(2), Oct. 13, 1988, 102 Stat. 2350 , provided that: "The amendments made by subsections (b) and (c) [amending this section and section 666 of this title] shall become effective on the first day of the first month beginning one year or more after the date of the enactment of this Act [Oct. 13, 1988]."

### Effective Date of 1987 Amendment

Pub. L. 100–203, title IX, §9141(b), Dec. 22, 1987, 101 Stat. 1330–321 , provided that: "The amendments made by subsection (a) [amending this section and section 657 of this title] shall become effective upon enactment [Dec. 22, 1987]."

Pub. L. 100–203, title IX, §9142(b), Dec. 22, 1987, 101 Stat. 1330–322 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective on July 1, 1988."

### Effective Date of 1984 Amendment

Pub. L. 98–378, §3(g), Aug. 16, 1984, 98 Stat. 1311 , provided that:

"(1) Except as provided in paragraphs (2) and (3), the amendments made by this section [enacting section 666 of this title and amending this section] shall become effective on October 1, 1985.

"(2) Section 454(21) of the Social Security Act [42 U.S.C. 654(21)] (as added by subsection (d) of this section), and section 466(e) of such Act [42 U.S.C. 666(e)] (as added by subsection (b) of this section), shall be effective with respect to support owed for any month beginning after the date of the enactment of this Act [Aug. 16, 1984].

"(3) In the case of a State with respect to which the Secretary of Health and Human Services

has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this section, the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the beginning of the fourth month beginning after the end of the first session of the State legislature which ends on or after October 1, 1985. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

Pub. L. 98–378, §5(c)(1), Aug. 16, 1984, 98 Stat. 1314 , provided that: "The amendments made by the preceding provisions of this section [amending this section and section 658 of this title] shall become effective on October 1, 1985."

Pub. L. 98–378, §6(c), Aug. 16, 1984, 98 Stat. 1315 , provided that: "The amendments made by this section [amending this section and section 655 of this title] shall apply with respect to quarters beginning on or after October 1, 1984."

Pub. L. 98–378, §11(e), Aug. 16, 1984, 98 Stat. 1318 , provided that: "The amendments made by this section [amending this section and sections 656, 657, 664, and 671 of this title] shall become effective October 1, 1984, and shall apply to collections made on or after that date."

Pub. L. 98–378, §12(c), Aug. 16, 1984, 98 Stat. 1319 , provided that: "The amendments made by this section [amending this section] shall become effective October 1, 1985."

Pub. L. 98–378, §14(b), Aug. 16, 1984, 98 Stat. 1320 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective October 1, 1985."

Amendment by section 21(d) of Pub. L. 98–378 applicable with respect to refunds payable under section 6402 of Title 26, Internal Revenue Code, after Dec. 31, 1985, see section 21(g) of Pub. L. 98–378, set out as a note under section 6103 of Title 26.

Amendment by Pub. L. 98–369 effective July 18, 1984, but not to be construed as changing or affecting any right, liability, status, or interpretation which existed (under the provisions of law involved) before that date, see section 2664(b) of Pub. L. 98–369, set out as a note under section 401 of this title.

### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by section 171(a), (b)(1) of Pub. L. 97–248 effective on and after Aug. 13, 1981, see section 171(c) of Pub. L. 97–248, set out as a note under section 503 of this title.

Pub. L. 97–248, title I, §173(b), Sept. 3, 1982, 96 Stat. 403 , provided that: "The amendment made by this section [amending this section] shall become effective on October 1, 1982."

### EFFECTIVE DATE OF 1981 AMENDMENT

Amendments by sections 2331(b), 2332(d)(2)–(7), and 2333(a), (b) of Pub. L. 97–35 effective Oct. 1, 1981, except as otherwise specifically provided, see section 2336 of Pub. L. 97–35, set out as a note under section 651 of this title.

Amendment by section 2335(a) of Pub. L. 97–35 effective Aug. 13, 1981, except that such amendment shall not be requirements under this section or section 503 of this title before Oct. 1, 1982, see section 2335(c) of Pub. L. 97–35, set out as a note under section 503 of this title.

### EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–265 effective July 1, 1981, and to be effective only with respect to expenditures, referred to in section 655(a)(3) of this title, made on or after such date, see section 405(e) of Pub. L. 96–265, set out as a note under section 652 of this title.

## Effective Date of 1977 Amendment

Pub. L. 95–30, title V, §502(b), May 23, 1977, 91 Stat. 162 , provided that: "The amendments made by this section [amending this section] shall take effect on the first day of the first calendar month which begins after the date of enactment of this Act [May 23, 1977]."

## Effective Date of 1975 Amendment

Pub. L. 94–88, title II, §210, Aug. 9, 1975, 89 Stat. 437 , provided that: "The amendments made by this title [amending this section and sections 602, 603, and 655 of this title] and enacting provisions set out as notes under sections 602 and 655 of this title] shall, unless otherwise specified therein, become effective August 1, 1975."

## Exception to General Effective Date for State Plans Requiring State Law Amendments

Pub. L. 109–171, title VII, §7311, Feb. 8, 2006, 120 Stat. 148 , provided that: "In the case of a State plan under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] which the Secretary determines requires State legislation in order for the plan to meet the additional requirements imposed by the amendments made by this subtitle [subtitle C (§§7301–7311) of title VII of Pub. L. 109–171, amending this section, sections 608, 652, 653, 655, 657, 664, and 666 of this title, section 6402 of Title 26, Internal Revenue Code, and provisions set out as a note under section 1169 of Title 29, Labor], the effective date of the amendments imposing the additional requirements shall be 3 months after the first day of the first calendar quarter beginning after the close of the first regular session of the State legislature that begins after the date of the enactment of this Act [Feb. 8, 2006]. For purposes of the preceding sentence, in the case of a State that has a 2-year legislative session, each year of the session shall be considered to be a separate regular session of the State legislature."

## State Commissions on Child Support

Pub. L. 98–378, §15, Aug. 16, 1984, 98 Stat. 1320 , provided that:

"(a) As a condition of the State's eligibility for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] for quarters beginning more than 30 days after the date of the enactment of this Act [Aug. 16, 1984] and ending prior to October 1, 1985, the Governor of each State, on or before December 1, 1984, shall (subject to subsection (f)) appoint a State Commission on Child Support.

"(b) Each State Commission appointed under subsection (a) shall be composed of members appropriately representing all aspects of the child support system, including custodial and non-custodial parents, the agency or organizational unit administering the State's plan under part D of such title IV [42 U.S.C. 651 et seq.], the State judiciary, the executive and legislative branches of the State government, child welfare and social services agencies, and others.

"(c) It shall be the function of each State Commission to examine, investigate, and study the operation of the State's child support system for the primary purpose of determining the extent to which such system has been successful in securing support and parental involvement both for children who are eligible for aid under a State plan approved under part A of title IV of such Act [42 U.S.C. 601 et seq.] and for children who are not eligible for such aid, giving particular attention to such specific problems (among others) as visitation, the establishment of appropriate objective standards for support, the enforcement of interstate obligations, the availability, cost, and effectiveness of services both to children who are eligible for such aid and to children who are not, and the need for additional State or Federal legislation to obtain

support for all children.

"(d) Each State Commission shall submit to the Governor of the State and make available to the public, no later than October 1, 1985, a full and complete report of its findings and recommendations resulting from the examination, investigation, and study under this section. The Governor shall transmit such report to the Secretary of Health and Human Services along with the Governor's comments thereon.

"(e) None of the costs incurred in the establishment and operation of a State Commission under this section, or incurred by such a Commission in carrying out its functions under subsections (c) and (d), shall be considered as expenditures qualifying for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] or be otherwise payable or reimbursable by the United States or any agency thereof.

"(f) If the Secretary determines, at the request of any State on the basis of information submitted by the State and such other information as may be available to the Secretary, that such State-

"(1) has placed in effect and is implementing objective standards for the determination and enforcement of child support obligations,

"(2) has established within the five years prior to the enactment of this Act [Aug. 16, 1984] a commission or council with substantially the same functions as the State Commissions provided for under this section, or

"(3) is making satisfactory progress toward fully effective child support enforcement and will continue to do so,

then such State shall not be required to establish a State Commission under this section and the preceding provisions of this section shall not apply."

### Delayed Effective Date in Cases Requiring State Legislation

Pub. L. 97–248, title I, §176, Sept. 3, 1982, 96 Stat. 403 , provided that: "In the case of a State with respect to which the Secretary of Health and Human Services has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this subtitle [subtitle E (§§171–176) of title I of Pub. L. 97–248, see Tables for classification], the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the end of the first session of the State legislature which begins after October 1, 1982, or which began prior to October 1, 1982, and remained in session for at least twenty-five calendar days after such date. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

*1* *See References in Text note below.*

Exhibit B

# Title 15
# Domestic Relations

## Chapter 5
## Divorce and Separation

### R.I. Gen. Laws § 15-5-16.5

**§ 15-5-16.5. Interest on arrearages.**

Interest at the rate of twelve percent (12%) per annum on any support debt due or owing, child or spousal support, shall be assessed unless the responsible party shall, for good cause shown, be relieved of the obligation to pay interest by the family court.

History of Section.
P.L. 1980, ch. 308, § 1; P.L. 1984, ch. 167, § 1; P.L. 2001, ch. 155, § 1.

Exhibit C

# Title 8
# Courts and Civil Procedure — Courts

## Chapter 10
## Family Court

### R.I. Gen. Laws § 8-10-3

**§ 8-10-3. Establishment of court — Jurisdiction — Seal — Oaths.**

**(a)** There is hereby established a family court, consisting of a chief judge and eleven (11) associate justices, to hear and determine all petitions for divorce from the bond of marriage and from bed and board; all motions for allowance, alimony, support and custody of children, allowance of counsel and witness fees, and other matters arising out of petitions and motions relative to real and personal property in aid thereof, including, but not limited to, partitions, accountings, receiverships, sequestration of assets, resulting and constructive trust, impressions of trust, and such other equitable matters arising out of the family relationship, wherein jurisdiction is acquired by the court by the filing of petitions for divorce, bed and board and separate maintenance; all motions for allowance for support and educational costs of children attending high school at the time of their eighteenth (18th) birthday and up to ninety (90) days after high school graduation, but in no case beyond their nineteenth (19th) birthday; enforcement of any order or decree granting alimony and/or child support, and/or custody and/or visitation of any court of competent jurisdiction of another state; modification of any order or decree granting alimony and/or custody and/or visitation of any court of competent jurisdiction of another state on the ground that there has been a change of circumstances; modification of any order or decree granting child support of any court of competent jurisdiction of another state provided: (1) the order has been registered in Rhode Island for the purposes of modification pursuant to § 15-23.1-611, or (2) Rhode Island issued the order and has continuing exclusive jurisdiction over the parties; antenuptial agreements, property settlement agreements and all other contracts between persons, who at the time of execution of the contracts, were husband and wife or planned to enter into that relationship; complaints for support of parents and children; those matters relating to delinquent, wayward, dependent, neglected, or children with disabilities who by reason of any disability requires special education or treatment and other related services; to hear and determine all petitions for guardianship of any child who has been placed in the care, custody, and control of the department for children, youth, and families pursuant to the provisions of chapter 1 of title 14 and chapter 11 of title 40; adoption of children under eighteen (18) years of age; change of names of children under the age of eighteen (18) years; paternity of children born out of wedlock and provision for the support and disposition of such children or their mothers; child marriages; those matters referred to the court in accordance with the provisions of § 14-1-28; those matters relating to adults who shall be involved with paternity of children born out of wedlock; responsibility for or contributing to the delinquency, waywardness, or neglect of children under sixteen (16) years of age; desertion, abandonment, or failure to provide subsistence for any children dependent upon such adults for support; neglect to send

any child to school as required by law; bastardy proceedings and custody to children in proceedings, whether or not supported by petitions for divorce or separate maintenance or for relief without commencement of divorce proceedings; and appeals of administrative decisions concerning setoff of income tax refunds for past due child support in accordance with §§ 44-30.1-5 and 40-6-21. The holding of real estate as tenants by the entirety shall not in and of itself preclude the family court from partitioning real estate so held for a period of six (6) months after the entry of final decree of divorce.

**(b)** The family court shall be a court of record and shall have a seal which shall contain such words and devices as the court shall adopt.

**(c)** The judges and clerk of the family court shall have power to administer oaths and affirmations.

**(d)** The family court shall have exclusive initial jurisdiction of all appeals from any administrative agency or board affecting or concerning children under the age of eighteen (18) years and appeals of administrative decisions concerning setoff of income tax refunds, lottery set offs, insurance intercept, and lien enforcement provisions for past due child support, in accordance with §§ 44-30.1-5 and 40-6-21, and appeals of administrative agency orders of the department of human services to withhold income under chapter 16 of title 15.

**(e)** The family court shall have jurisdiction over those civil matters relating to the enforcement of laws regulating child care providers and child placing agencies.

**(f)** The family court shall have exclusive jurisdiction of matters relating to the revocation or nonrenewal of a license of an obligor due to noncompliance with a court order of support, in accordance with chapter 11.1 of title 15.

   [See § 12-1-15 of the General Laws.]

**(g)** Notwithstanding any general or public law to the contrary, the family court shall have jurisdiction over all protective orders provided pursuant to the Rhode Island general laws, when either party is a juvenile.

History of Section.
P.L. 1961, ch. 73, § 1; P.L. 1972, ch. 30, § 1; P.L. 1973, ch. 125, § 1; P.L. 1974, ch. 85, § 1; P.L. 1975, ch. 3, § 1; P.L. 1976, ch. 252, § 1; P.L. 1977, ch. 89, § 1; P.L. 1980, ch. 54, § 1; P.L. 1981, ch. 319, § 1; P.L. 1984, ch. 167, § 3; P.L. 1984, ch. 281, § 1; P.L. 1987, ch. 163, § 2; P.L. 1988, ch. 84, § 7; P.L. 1992, ch. 326, § 1; P.L. 1994, ch. 158, § 2, P.L. 1994, ch. 195, § 3; P.L. 1994, ch. 244, § 1; P.L. 1994, ch. 263, § 3; P.L. 1995, ch. 370, art. 29, § 10; P.L. 1995, ch. 374, § 10; P.L. 1996, ch. 129, § 1; P.L. 1996, ch. 131, § 1; P.L. 1996, ch. 132, § 1; P.L. 1996, ch. 133, § 1; P.L. 1997, ch. 170, § 23; P.L. 1999, ch. 83, § 6; P.L. 1999, ch. 130, § 6; P.L. 2007, ch. 73, art. 3, § 9; P.L. 2010, ch. 216, § 1; P.L. 2010, ch. 236, § 1.

# Exhibit D

## SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

EXHIBIT E

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22    11:28         C A S E   T R A C K I N G         CSCL  ASMXA201
            TRAC.00                 CASE HISTORY            U824  PROD
STARTING DATE    09 01 2021
SELECTION     COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I_____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (███████████████████_____
████████████████████████████). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

_____
12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:         SEGUIN      MARY      CMD: _____
FNX: TRAC  D CLIENT:        MEYERSIEK   GERO   K  PNL:
```

Case Number: K2001652
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10 13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

12/13/22   11:20          C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00            CASE HISTORY                    U024  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSIDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES____

RL: 80  12 22 ABSP:          SEGUIN       MARY        CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK    GERO    K   PNL:

Case Number: 23-1867
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

| | | | |
|---|---|---|---|
| 12/13/22 | 11:29 | C A S E   T R A C K I N G | CSCL  ASMXA201 |
| | TRAC.00 | CASE HISTORY | U824   PROD |

STARTING DATE  09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
    FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
    FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

| | | | | |
|---|---|---|---|---|
| RL: SO  12 22 ABSP: | SEGUIN | MARY | | CMD: |
| FWX: TRAC  D CLIENT: | MEYERSIEK | GERO | X | PNL: |

Case Number: 20-1067A   Document: 00118130806   Page: 209   Date Filed: 04/09/2024   Entry ID: 6632260
Filed in Providence/Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria G.

11:29:05 Tuesday, December 13, 2022

```
12/13/22   11:29          C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00                CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

```
RL: 80  12 22 ABSP:              SEGUIN       MARY         CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK    GERO     K   PNL:
```

ed in Providence/Bristol County Family Court
ibmitted 6/1/2023 10.13 PM Document: 00118130086   Page: 209   Date Filed: 03/09/2024   Entry ID: 6632260
ivelope: 4132704
iviewer: Maria O
11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28      C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY           U824   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN___
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
        TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
        58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75.

RL: 80  12 22 ABSP:          SEGUIN      MARY       CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K  PNL:
```

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28          C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00              CASE HISTORY                  U824    PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42
```

```
12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)
```

```
12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY
```

```
12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75.
```

```
RL: 80  12 22 ABSP:              SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK   GERO     K    PNL:
```

11:29:13 Tuesday, December 13, 2022

```
12/13/22    11:28         C A S E   T R A C K I N G         CSCL   ASMXA201
            TRAC.00              CASE HISTORY               UB24   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS___

RL: 80  12 22 ABSP:           SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK   GERO    K     PNL:
```

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G      CSCL  ASMXA201
            TRAC.00              CASE HISTORY           U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985
```

```
RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:         SEGUIN       MARY           CMD: _____
                            MEYERSIEK    GERO     K      PNL:
```

EXHIBIT F

STATE OF RHODE ISLAND              **FAMILY COURT**

PROVIDENCE, SC                   **FAMILY COURT NO. K01-521M**

---

State of Rhode Island ex rel.
GERO K MEYERSIEK

     vs

MARY SEGUIN

## JUDGMENT / ORDER

This matter came for hearing on September 25, 2012 before Justice
JOHN E. MCCANN upon the Private Motion for Custody, Support & Atty
Fees filed by the Plaintiff and after hearing thereon, it is hereby:

### ORDERED, ADJUDGED, AND DECREED

1) That this matter is continued to November 13, 2012 for
hearing on private issues only with all subpoenas to remain in full
force and effect.

2) The Defendant filed a private Motion for Visitation.

3) The court enters order relative to private issues of
visitation, attorney fees and other numerous private issues.

4) The State's oral request to clarify whether or not interest
was to run on the child support and medical arrears as found in the
May 24, 2012 court order is addressed. Interest will continue to run
on the money due.

5) If there is an arrears when the youngest child is
emancipated - the child support order, medical order and arrears
order will be added together and applied towards the arrears until it
is paid in full.

6) Pursuant to Federal Law, either party has a right to request

398

a review and modification of their child support order by filing a
motion with Family Court.  State law requires both parties to notify
the child support agency within ten (10) days of any address change
or change of employment.

Presented by: _____

PRISCILLA B. GLUCKSMAN ESQUIRE    Bar No.: 5701
Legal Counsel - Office of Child Support Services

## CERTIFICATION

I hereby certify that on October 8, 2012 I delivered by mail a copy
of the within order to THOMAS R. DESIMONE ESQUIRE, 735 SMITH STREET
PROVIDENCE RI 02908.
I hereby certify that on October 8, 2012 I delivered by mail a copy
of the within order to MARY SEGUIN,
I hereby certify that on October 8, 2012 I delivered by mail a copy
of the within order to GERO A. MEYERSIEK,
I hereby certify that on October 8, 2012 I delivered by mail a copy
of the within order to BARBARA E. GRADY ESQUIRE, 975 SMITH STREET
PROVIDENCE RI 02908.

RECEIVED

OCT 15 2012

R.I. FAMILY COURT
RONALD J. PAGLIARINI
ADMINISTRATOR / CLERK

ENTERED 10.23.12

ADMINISTRATOR/CLERK

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                    FAMILY COURT

State of Rhode Island ex rel.          :
GERO MEYERSIEK                         :
    *Plaintiff*                         :
                                       :
VS.                                    :          DOCKET NO: K20010521M
                                       :          Title IV Part D Case under
                                       :          42 U.S.C. §§ 651-669
MARY SEGUIN                            :
    *Defendant*                        :

### DEFENDANT'S MOTION TO COMPEL RI EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVICES ("EOHHS") COMPLIANCE WITH SUBPOENA

The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby moves to compel compliance with Defendant's Subpoena (attached hereto as **Exhibit A**) served upon the **Rhode Island Executive Office of Health and Human Services ("RI EOHHS")**. On March 26, 2024, RI EOHHS filed a motion to quash subpoena.

### I.    Defendant Does NOT Compel Production of or Testimony on Deliberations of November 29, 2022 Agency Dismissal That Cites Loss of Jurisdiction Which Speaks for Itself

The Title IV records for Rhode Island Executive Office of Health and Human Services ("RI EOHHS") show that in the RI EOHHS **Appeal case Docket# 22-2116** a hearing was scheduled for December 1, 2022. However no hearing or trial took place on December 1, 2022. Emphatically, a hearing never took place in that matter.

As the RI EOHHS November 29, 2022 decision dismissing the Defendant-initiated appeals case for lack of jurisdiction clearly states, upon the Office of Child Support Service's withdrawal of the enforcement instrument Notice of Lien on October 14, 2022, the RI EOHHS determined it lost jurisdiction over the matter before any hearing was conducted and before the December 1, 2022 scheduled hearing that never took place as a result of the dismissal based on its determination of loss of jurisdiction. The decision regarding loss of jurisdiction speaks for itself.  The subpoena clearly does not seek production of documents relating to the November 29, 2022 Agency decision relating to loss of jurisdiction.

The subpoena seeks production and testimony relating to the facts evidenced in the Rhode Island Office of Child Support produced PUBLIC RECORDS TRAC records that RI EOHHS in its supervisory capacity over Department of Human Services and Office of Child Support Serviced caused to be produced in response to Defendant's APRA Request for public records filed with RI EOHHS on December 1, 2022.

I.      **Title IV-D Records and Facts relating to Public Records Produced by RI EOHHS's Response to Defendant's APRA (Rhode Island Access to Public Records) Record Request are Obviously Open to the Public and Obviously Not Privileged**

Subsequent to the aforesaid RI EOHHS issuance of its November 29, 2022 decision citing loss of jurisdiction, TEXAS Defendant MARY SEGUIN filed a Rhode Island Access to Public Records Act ("APRA") request for Defendant's Title IV case records on December 1, 2022 emailed to then Acting Secretary Ana Novais of RI EOHHS.

On December 16, 2022, Ms. Lisa Martinelli, Esq., Chief Legal Counsel for RI EOHHS sent an APRA response letter to TEXAS Defendant MARY SEGUIN informing the Defendant that public records are being produced.  However TEXAS Defendant's Title IV records are maintained, Rhode Island Executive Office of Health and Human Services by and through its Chief Legal Counsel Ms. Lisa Martinelli confirmed its own oversight over Department of Human Services (and Office of Child Support Services) as a Title IV Agency.  See **Exhibit B**.  Letter from Ms. Lisa Martinelli.

On December 22, 2022 Rhode Island Department of Human Services and Rhode Island Office of Child Support Services produced under Rhode Island's Access to Public Records ("APRA")  public records of Defendant's Title IV-D case TRAC records that show the taking off from the 42 U.S.C. sec. 654a automated data processing system Rhode Island's 12% compound interest when Rhode Island Office of Child Support Services prior to Rhode Island sending to and certifying to TEXAS under 42 U.S.C. sec. 666(14).   APRA Public Records TRAC records attached **Exhibit C**.

This APRA-produced TRAC records are not only Public records in Rhode Island, they also consist of Public Records in TEXAS and consist of Public Records of the United States of America.

As such, there is nothing privileged about Rhode Island EOHHS's first-hand knowledge of the public records being maintained by the Rhode Island Office of Child Support Services under the Rhode Island Department of Human Services all of which the Rhode Island EOHHS oversees and exercises supervisory responsibility and control under 42 U.S.C. sections 651-669.

II. **APRA Public Records Show RI EOHHS and Ms. Lisa Martinelli has First Hand Knowledge or Should Have First Hand Knowledge of Facts Documented in the RI EOHHS Produced APRA Public Records Relating to the Rhode Island Office of Child Support Services Practice of Taking Interest Amounts off from the 42 U.S.C. sec. 654a automated data processing system when certifying to TEXAS under 42 U.S.C. sec. 666(14) in 2018, and Putting An Ever-Changing Interest Amount Back on the 42 U.S.C. sec. 654a automated system**

The APRA Public Records produced pursuant to Defendant's December 1, 2022 APRA Record Request show that RI EOHHS, Chief Counsel Ms. Debra Barclay, and Chief Counsel Ms. Lisa Martinelli (and Chief Counsel Ms. Jennifer Buckley) have First Hand Knowledge or Should Have First Hand Knowledge of Facts Documented in the RI EOHHS-Produced APRA Public Records Relating to the Rhode Island Office of Child Support Services' Practice of Taking Interest Amounts off from the 42 U.S.C. sec. 654a automated data processing system when certifying to other states, and in Defendant's case, when certifying to TEXAS under 42 U.S.C. sec. 666(14) in 2018, and Putting back the Ever-Changing Interest Amount Back on the 42 U.S.C. sec. 654a automated system in the amount of tens of thousands of dollars. Office of Child Support Service's taking the interest amount off the automated system and putting the interest back on the automated system is so public and routine that they not only form part of transcripts of public hearings in this Title IV proceeding, they also form the basis of written public court orders entered in this Title IV case from February 10, 2023 to the present.

**A RI EOHHS Officer testifying** to the RI EOHHS's First Hand Knowledge and testifying to Whether the RI EOHHS Knew Or Should Have Known that the Rhode Island Office of Child Support Services routinely certifies and submits child support

records that entails the removals or adding back on to the system tens of thousands of dollars in interest amounts that are documented in the APRA public records produced on December 22, 2022, which **corroborate** with all the information, materials, evidence, filings and facts presented during the course of the RI EOHHS Appeal Docket# 22-2116 in which NO FORMAL HEARING ever took place, simply and straightforwardly **complies with DUE PROCESS** requirements prescribed by 42 U.S.C. sec. 666 that 42 U.S.C. sec. 654(20) requires as a condition of Rhode Island's participating in Title IV-D and as a condition of receiving Title IV-A TANF federal funding.

### III.   <u>Statutory and Federal Authority</u>

In order to avoid yet another penalty-incurring violation of 42 U.S.C. sec. 654, the RI EOHHS and Ms. Debra DeStefano must produce subpoenaed information and testify to facts and any and all first-hand knowledge of the APRA public records that RI EOHHS caused to be produced relating to Rhode Island Office of Child Support Service's Practice of taking tens of thousands of dollars of alleged interest amounts off the 42 U.S.C. sec. 654a automated data processing system when certifying and sending to TEXAS under 42 U.S.C. sec. 666(14) documented in the TRAC records in Defendant's Title IV-D case.

Congress prescribed both civil and criminal penalties for violations. Consistent with its Spending Power, Congress has the authority to attach conditions on the receipt of federal funds. *See **South Dakota v. Dole**, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a

condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16), (20), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See **Sullivan v. Stroop***, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely." The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." ***Hodges v. Shalala***, 121 F.2d at 879. Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1] Congress also enacted several criminal codes

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the

punishing actors, such as the Plaintiffs, who commit federal crimes, including cover up of unlawful activities.

The federal government has a longstanding involvement in child support enforcement programs. See ***Hodges v. Shalala***, 121 F.Supp.2d 854 (D.S.C. 2000). As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements under 42 U.S.C. sec. 654(21)(A) that the State, at the option of the State, impose a late payment fee ('interest") on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A), among others

While Rhode Island submits to the United States that it has a federally certifiable statewide automated data processing system for child support, RI EOHHS caused Office of Child Support Services to produce APRA Public Records consisting of Title IV Public Records showing Rhode Island taking off from the automated data processing system tens of thousands of dollars allegedly representing the 42 U.S.C. sec. 654(21)(A)

---

automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

prohibited 12% compound interest late payment fee "interest" prior to certifying to TEXAS and the United States, and showing Rhode Island falsely certified to the amount's accuracy under 42 U.S.C. sec. 666(14) when in fact Rhode Island removed significant tens of thousands of dollars (See TRAC records in Exhibit C).

RI EOHHS is being called as a witness in this Title IV hearing matter to testify to the facts, furthermore in its supervisory capacity, relating to the APRA records RI EOHHS caused to be produced, and Ms. Debra DeStefano to testify, among others, her first-hand knowledge of said facts relating to Office of Child Support Services taking off the 42 U.S.C. sec. 654(21)(A) interest from the automated data processing system and then putting it back on the system that is corroborated by the APRA Public Records produced as a result of RI EOHHS's response to TEXAS Defendant's RI APRA public records request.

Defendant reiterates that failure to furnish information regarding the State Plan's and the SDU's Title IV-D operations relating to the tens of thousands of dollars removed from the automated system prior to certifying to Texas and the United States and then put back on the system tens of thousands of dollars shown in Defendant's case file public records is penalty incurring and shows the state plan fails to meet all requirements under 42 U.S.C. sec. 654.  Without an approved state plan, a State may lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). See 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2). Alternatively, a State may opt for an alternative penalty in lieu of disapproval of their state plan and the withholding of federal funds if the State is making a good faith effort to comply with the

program's requirements and the State has submitted a corrective compliance plan. See 42 U.S.C. § 655(a)(4).

The Title IV-D statute expressly provides that compliance with ALL 42 U.S.C. 654 requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A.

The clear and unequivocal statement of the required conditions in the statute enabled South Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop,* 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."

Emphatically, Congress may use its **Spending Power** to **influence** a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, but Congress, under the **Commerce Clause**, **may offer the States a choice of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc*.**, 452 U.S. 264, 288 (1981). It is crystal clear that upon Rhode Island's State Plan entering into agreement with the United States, Rhode Island accepted the agreement terms of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

Defendant filed a Motion to Dismiss Interest Arrears on February 4, 2024 and

Defendant's Motion is scheduled on the Court's calendar to be heard on March 28,

2024.  For the hearing, the Defendant served the attached Subpoena, attached hereto as

Exhibit A, upon the witness RI EOHHS, the entity that further supervises the Rhode

Island Office of Child Support Services, both acting and designated as the State agency

under the State Plan pursuant to ==42 U.S.C. § 654.== *See* United States Congress's

publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUS

C-prelim-title42-

section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHHJlZ3VsYXRp

b25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

### V. RI EOHHS Has Access to and Has Supervisory Access to Pursuant Its Supervisory Control of Rhode Island Office of Child Support Services, Title IV-D records related to Defendant Mary Seguin

Defendant subpoenaed "(1) All records relating to Administrative Appeal Docket

# 22-2116 CSE ID: 1689817, including notes taken, messages generated and received

through Microsoft teams meeting at the pre-hearing conference call with Appellant

Mary Seguin and John Langlois of Rhode Island Office of Chiild Support Services on

October 5, 2022; (2) All records relating to Mary Seguin."

*See* attached **subpoena**, **Exhibit A**.

The RI EOHHS has pursuant to its supervisory control access to records of Rhode

Island Office of Child Support Services' actions in this Title IV-D case's proceedings

since 2010 evidence by the entries of orders in this matter prepared and submitted in

her official and individual capacities, Priscilla Glucksman – they make clear the Office of

Child Support Services is one of the State Plan's key "organizational unit which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan" under **42 U.S.C. § 654(3), and the RI EOHHS has supervisory responsibility over Office of Child Support Services, and is a 42 U.S.C. § 654(3) entity itself and is further a 42 U.S.C. § 654(1) entity in which all requirements of 42 U.S.C. § 654 must be in effect.**

 **Rhode Island EOHHS' refusal** *to comply with the Subpoena to produce Title IV-D records relating to the above to the requesting noncustodial parent is a prima facie* **42 U.S.C. § 654b violation that incurs penalties** in this **fiscal year under 42 U.S.C. § 655(a)(5)** as well **42 U.S.C. § 655(a)(4), and represents complicit cover-up,** which penalty-incurring violations the Defendant had reported, is reporting and will continue to report to relevant law enforcement authorities at the federal and state levels.  (Judicial notice is respectfully requested that the Defendant in January 2023 reported Office of Child Support's violations to the Rhode Island Office of Attorney General that is further directed by the December 16, 2022 Letter sent by Ms. Lisa Martinelli, Esq., Chief Counsel of RI EOHHS, who instead of enforcing the requirements of the State Plan as the Attorney General is similarly a political subdivision under 42 USC 654(1), opted to reinforce, aid, shield and protect Rhode Island political subdivisions' unlawful activities – this is reported to United States authorities).  As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654.  Among the prerequisites for approval of a Title IV-D Plan are the requirements that the State

may only uniformly charge 3-6% simple interest on overdue support, *see* 42 U.S.C. § 654(21)(A), and a State must establish and operate an automated data processing and information retrieval system ***without*** taking computer calculated amounts off and then put other numbers back on the system or hardcoding/inputting new numbers computed offline onto the system, see 42 U.S.C. § 654(24), and the State **must** have a state child support disbursement unit (SDU) that complies with all the requirements of 42 U.S.C. § 654, 42 U.S.C. § 654a, 42 U.S.C. § 654b, *see* 42 U.S.C. § 654(27)(A).  Rhode Island deliberately fails to meet all the requirements, including continuously inputting 12% compound interest on overdue support and the Rhode Island Office of Child Support Services covers up their noncompliance with accounting fraud inputting into the system and taking off from the automated data processing system amounts that are inflated, unlawful, and submitting false books of accounts that  removed the unlawful inflated amounts to the Federal authorities to make it look like Rhode Island is in compliance so as to procure federal funding for which Rhode Island is ineligible.

The deliberate fraud makes clear the State operates an unlawful plan, in fact a criminally unlawful plan, and does not have an approved state plan under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, and should lose and disgorge unlawfully procured federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). *See* 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).  *See*, *Hodges v. Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).

**Any attempt interfering with the Defendant's reporting, pursuant to 18 U.S.C. § 4, to law enforcement authorities the commission of crimes by**

**political subdivisions of the State within this Title IV-D proceeding is unenforceable.** Any and all failures to comply with 18 U.S.C. § 4 constitutes misprision of a felony.

## A. VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Defendant made known to the panel of judges of the United States allegations contained in the Amended Complaint filed in Federal Court of the commission of acts by the Rhode Island political subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein in this motion, the afore-described acts violating 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968  – such violative acts by the Plaintiffs in this matter, along with the political subdivisions and employees thereof named in the federal matter on this list are not exhaustive.  It is undisputable, among others, that Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-D and Title IV-A disgorgement is due from the applicable State of Rhode Island's political subdivisions.

## B. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF AMERICA v.*

*DONALD J. TRUMP*, DC Circuit, the DC Circuit United States Court of Appeals reminds

the Public and all applicable tribunals that Judges are similarly liable to the criminal

laws for their official acts.  A notable example is *Ex parte Commonwealth of Virginia*, in

which the Supreme Court affirmed the criminal indictment of a judge based on an

official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for

violating a federal statute that prohibited discriminating on the basis of race in jury

selection. *Id*. at 340, 344. The Supreme Court began by observing the principle that

officers are bound to follow the law: "We do not perceive how holding an office under a

State, and claiming to act for the State, can relieve the holder from obligation to obey the

Constitution of the United States, or take away the power of Congress to punish his

disobedience." *Id*. at 348. The Court then addressed the judge's argument that the Court

lacked the authority to punish a state judge for "his official acts." *Id*. Its response was

twofold. First, the Court described juror selection as "merely a ministerial act, as much

so as the act of a sheriff holding an execution, in determining upon what piece of

property he will make a levy, or the act of a roadmaster in selecting laborers to work

upon the roads." *Id*. The Court then explained that even if juror selection is considered a

"judicial act," ==the judge had a legal duty to obey the criminal laws==:

> "But if the selection of jurors could be considered
> in any case a judicial act, can the act charged
> against the petitioner be considered such when
> he acted outside of his authority and in direct
> violation of the spirit of the State statute? That
> statute gave him no authority, when selecting

> jurors, from whom a panel might be drawn for
> a circuit court, to exclude all colored men
> merely because they were colored. Such an
> exclusion was not left within the limits of his
> discretion. It is idle, therefore, to say that the
> act of Congress is unconstitutional because it
> inflicts penalties upon State judges for their
> judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

> [W]e have never held that the performance of
> the duties of judicial, legislative, or executive
> officers, requires or contemplates the
> immunization of otherwise criminal deprivation
> of constitutional rights. On the contrary, the
> judicially fashioned doctrine of official
> immunity does not reach 'so far as to immunize

*criminal conduct proscribed by an Act of*
*Congress . . . .'*

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See* also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493

F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled

on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not

immune, and employees of the political subdivisions of Rhode Island under 42 USC

654(1) similarly are not immune.  Barbara Grady and Gero Meyersiek are

unquestionably liable.

I.    **CONCLUSION**

**Under 42 USC 654b, the Defendant is entitled to be furnished all subpoenaed records – conversely, the Rhode Island Executive Office of Health and Human Services, the SDU under the State's Plan under 42 USC 654, must furnish all subpoenaed information and RI EOHHS Hearing Officer must testify to first-hand knowledge of information related to factual information furnished by Rhode Island Office of Child Support Services that are corroborated by the Title IV-D public records RI EOHHS caused to be produced in response to Defendant's RI APRA public records request – refusal of which incurs yet another penalty.**

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or

designee-Judge Merola of this Honorable Court to:

1. Grant the Defendant's Motion to Compel.

2. Grant the Defendant's request for any and all records relating to her Title IV record information that includes record information relating to the "TRAC notes of 12/6/2021 and 12/7/2021" that records taking interest off the system when sending to Texas then REDACTION, as well as relating to the substance of John Langlois's audio recorded October 5, 2022 statements regarding "what happened in this case" that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the Child Support Services that Gero Meyersiek

said yes, he "agreed to waive the $73k or $75k that are in arrears" as of December 6, 2021 and October 5, 2022 which are part of Defendant's child support case file.

3. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request.

4. Declare that Defendant's child support file maintained by the Rhode Island Office of Child Support Services under the supervision of RI EOHHS must be produced to the Defendant Noncustodial Parent upon request.

5. Order a hearing on the herein issues raised in this matter.

6. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here:

   https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

7. Order testimony and document production by Ms. Jennifer Lynch Buckley who replaced Ms. Lisa Martinelli as they relate to RI EOHHS Agency's APRA public records production in response to Defendant's December 1, 2022 APRA request sent to RI EOHHS requesting Defendant's Title IV records.

8. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

March 26, 2024

FOR DEFENDANT

MARY SEGUIN, Pro Se.

By: _____ *Mary Seguin* _____
Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

**NOTICE OF HEARING**

Please take notice that the foregoing Motion will be called for hearing before the Rhode Island Family Court, One Dorrance Plaza, Providence, RI 02903 at 10:00 AM on March 28, 2024 (case is already scheduled for that date/time) by WebEx hearing https://ricourts.webex.com/meet/garrahy5F

**CERTIFICATION**

I hereby certify that a copy of the within Motion was filed on March 26, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov, Jennifer.buckley@ohhs.ri.gov and dhs.courtfile@dhs.ri.gov

*Mary Seguin*

Exhibit A



# STATE OF RHODE ISLAND

## FAMILY COURT

### SUBPOENA - CIVIL

| Plaintiff STATE OF RHODE ISLAND EX REL. GERO MEYERSIEK | Civil Action File Number K2001-0521M |
|---|---|
| Defendant MARY SEGUIN | |

| ☐ Murray Judicial Complex<br>Newport County<br>45 Washington Square<br>Newport, Rhode Island 02840-2913<br>*(401) 841-8340 | ☐ Noel Judicial Complex<br>Kent County<br>222 Quaker Lane<br>Warwick, Rhode Island 02886-0107<br>*(401) 822-6725 |
|---|---|
| ☐ McGrath Judicial Complex<br>Washington County<br>4800 Tower Hill Road<br>Wakefield, Rhode Island 02879-2239<br>*(401) 782-4111 | ☑ Garrahy Judicial Complex<br>Providence/Bristol County<br>One Dorrance Plaza<br>Providence, Rhode Island 02903-2719<br>*(401) 458-3200 |

TO: DEBRA  DESTEFANO
of RHODE ISLAND EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVICES APPEALS OFFICE 3 WEST RD.

☑ **YOU ARE HEREBY COMMANDED** to appear in the Family Court listed above at the CRANSTON, date, time, and courtroom specified below to testify in the above-entitled case and bring with RI 02920 you:

① ALL RECORDS RELATING TO ADMINISTRATIVE APPEAL DOCKET # 22-2116 CSE ID: 1689817, INCLUDING NOTES TAKEN MESSAGES GENERATED AND RECEIVED THROUGH MICROSOFT TEAMS MEETING AT THE PRE-HEARING CONFERENCE CALL WITH APPELLANT MARY SEGUIN AND JOHN LANGLOIS OF RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICE ON OCTOBER 5, 2022
② ALL RECORDS RELATING TO MARY SEGUIN

TRUE COPY ATTEST
DEPUTY SHERIFF #11

| Courtroom | Date | Time |
|---|---|---|
| GARRAHY COURTROOM 5F | MARCH 28, 2024 | 9:30 AM |

If you need language assistance, please contact the Office of Court Interpreters at (401) 222-8710 or by email at interpreterfeedback@courts.ri.gov before your court appearance.

* If an accommodation for a disability is necessary, please contact the Family Court Clerk's Office at the telephone number listed above as soon as possible. TTY users can contact the District Court through Rhode Island Relay at 7-1-1 or 1-800-745-5555 (TTY) to voice number.

FC-73 (revised June 2020)



# STATE OF RHODE ISLAND

## FAMILY COURT

☐ **YOU ARE HEREBY COMMANDED** to appear at the location, date, and time specified below to testify at the taking of a deposition in the above-entitled case.

| Location of Deposition | Date | Time |
|---|---|---|
|  |  |  |

☑ **YOU ARE HEREBY COMMANDED** to produce and permit inspection and copying of the following documents or objects at location, date, and time specified below (list documents or objects):

SEE ITEMIZED ① AND ② ON PAGE 1 OF THIS SUBPOENA - BRING / PRODUCE ALL RECORDS FOR INSPECTION AND COPYING AND EMAIL TO MARYSEGUIN22022@GMAIL.COM

| Location | Date | Time |
|---|---|---|
| GARRAHY COURTROOM 5F | MARCH 28, 2024 | 9:30 AM |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf and may set forth, for each person designated, the matters on which the person will testify (R.Dom.Rel.P. 30(b)(6)).

Failure to comply with this Subpoena may result in a finding of contempt under R.Dom.Rel.P. 45 or the imposition of sanctions under R.Dom.Rel.P. 37.

| /s/ | Rhode Island Bar Number: |
|---|---|
| Attorney for the ☐ Plaintiff ☐ Defendant or the ☐ Plaintiff ☐ Defendant | Date: |
| Telephone Number: | |

| Issued by ☐ Clerk, ☑ Notary, or ☐ Issuing Official pursuant to G.L. 1956 § 9-17-3 | Date: 3/4/2024 |
|---|---|

/s/ _____
Clerk

Cassandra Dominguez
Name of Notary

Cassandra Dominguez CL Dav*g*
Signature of Notary

Notary commission expires: **01-13-2026**   Notary identification number: **133533272**

> CASSANDRA DOMINGUEZ
> Notary Public, State of Texas
> Comm. Expires 01-13-2026
> Notary ID 133533272

Name of Issuing Official

Signature of Issuing Official

Page 2 of 2



# STATE OF RHODE ISLAND

## FAMILY COURT

| Plaintiff STATE OF RHODE ISLAND EX.REL. GERO MEYERSIEK | Civil Action File Number K2001-0521M |
|---|---|
| Defendant MARY SEGUIN | |

### PROOF OF SERVICE

☑ I hereby certify that on the date below I served a copy of this Subpoena on

_____ personally.

☐ I hereby certify that I was unable to make service after the following reasonable attempts:

_____

SERVICE DATE: __3_/_15_/_24__    SERVICE FEE $_____
            Month  Day  Year

Signature of SHERIFF or DEPUTY SHERIFF or CONSTABLE

_Russell D Emley #42_

SIGNATURE OF PERSON OTHER THAN A SHERIFF or DEPUTY SHERIFF or CONSTABLE MUST BE NOTARIZED.

_____
Signature

State of _____
County of _____

   On this _____ day of _____, 20____, before me, the undersigned notary public, personally appeared _____
☐ personally known to the notary or ☐ proved to the notary through satisfactory evidence of identification, which was _____, to be the person who signed above in my presence, and who swore or affirmed to the notary that the contents of the document are truthful to the best of his or her knowledge.

            Notary Public: _____
            My commission expires: _____
            Notary identification number: _____

FC-73 (revised June 2020)

Exhibit B



Rhode Island Executive Office of Health and Human Services
Legal Office, Three West Road, Virks Building, 4th Floor, Cranston, RI 02920
phone: 401.462.2326   fax: 401.462.1678

December 16, 2022

**VIA EMAIL and US Mail:** marylive22022@gmail.com

Ms. Mary Seguin
2303 Elmen Street
Houston, TX 77019

**Re:  Response to Correspondence dated December 1, 2022**

Dear Ms. Seguin:

I am responding on behalf of Secretary Novais to your correspondence of December 1, 2022.  It is my understanding that you have been seeking records related to a matter pending with the Office of Child Support Services (OCSS).  I have contacted OCSS Chief Legal Counsel Attorney Paul Gould and he assured me that records relating to your file will be forwarded to you in the next couple of days.  Attorney Gould is copied on this correspondence.

In reply to your correspondence/petition of December 1, 2022, the Executive Office of Health and Human Services (EOHHS) and its Appeals Office do not have any documents responsive to your request regarding your file with OCSS.   You may not be aware that the OCSS is part of the Rhode Island Department of Human Services (DHS) and file documents are not commingled between agencies.   This response is solely on behalf of EOHHS and not any other agency or branch of state government.  Further, the Appeals Office never received any documents from your file from the OCSS when the appeal was pending.  When DHS OCSS withdrew the adverse action (the Notice of Lien), which gave rise to your appeal, there was no longer an underlying case for the Appeals Office to adjudicate, and the appeal was dismissed for lack of jurisdiction. (See attached Final Notice of Dismissal and Order).

If you are seeking an appeal of an Access to Public Records request, that action is governed by R.I. Gen. Laws § 38-2-8 and is answered by the Chief Administrative Officer for the agency that has custody of the requested records.   The Chief Administrative Officer for the DHS OCSS is the Director of the Rhode Island Department of Human Services, Acting Director Kimberly Brito or you may elect to directly appeal a decision to the Rhode Island Office of the Attorney General, 150 South Main Street, Providence, RI 02903.

Very truly yours,

Lisa M. Martinelli, Esq.
Executive Legal Counsel

cc:  Deb Barclay, Esq., Paul Gould, Esq.

Exhibit C

Case Number: PC-2016-021M    Document: 00118120006    Page: 243    Date Filed: 04/09/2024    Entry ID: 6632760

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION       COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (█████████████████████_____
██████████████████████████████). WE REMOVED THE INTEREST WHEN_____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $_____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP_____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:           SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK   GERO    K   PNL:
```

Case Number K20061832M4
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

12/13/22   11:20        C A S E   T R A C K I N G        CSCL   ASMXA201
           TRAC.00              CASE HISTORY              U024   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSMENTS SO WE CAN GET THIS SORTED____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.___
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL___
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES___

RL: 80  12 22 ABSP:        SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:       MEYERSIEK   GERO    K    PHL:

Case Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

```
12/13/22    11:29          C A S E   T R A C K I N G         CSCL  ASMXA201
            TRAC.00                CASE HISTORY               U824   PROD
STARTING DATE  09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
     FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID: ██████
     FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

```
RL: SO  12 22 ABSP:              SEGUIN       MARY        CMD: _____
FWX: TRAC  D CLIENT:             MEYERSIEK    GERO    X   PNL:
```

Filed 12 Providence Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria G.

11:29:55 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

```
RL: 80  12 22 ABSP:              SEGUIN      MARY        CMD: _____
FXX: TRAC  D CLIENT:             MEYERSIEK   GERO    K   PNL:
```

ed in Providence/Bristol County Family Court
ibmitted 6/1/2023 10.13 PM
ivelope: 4132704
iviewer: Maria O

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY             U824   PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
    TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
    58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:           SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK   GERO    K    PNL:
```

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
       TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
       50 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

```
RL: 80  12 22 ABSP:            SEGUIN        MARY          CMD:
FNX: TRAC  D CLIENT:           MEYERSIEK     GERO      K   PNL:
```

11:29:13 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00            CASE HISTORY                U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____
_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO___
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

```
RL: 80  12 22 ABSP:              SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK   GERO    K    PNL:
```

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28      C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY           U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

```
RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:          SEGUIN      MARY          CMD: _____
                             MEYERSIEK    GERO     K    PNL:
```

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                            FAMILY COURT

| | | |
|---|---|---|
| State of Rhode Island ex rel. | : | |
| GERO MEYERSIEK | : | |
| *Plaintiff* | : | |
| | : | |
| VS. | : | DOCKET NO: K20010521M |
| | : | Title IV Part D Case under |
| | : | 42 U.S.C. §§ 651-669 |
| MARY SEGUIN | : | |
| *Defendant* | : | |

**DEFENDANT'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENA**

The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby moves to compel compliance with Defendant's Subpoena (attached hereto as **Exhibit A**) served upon the Rhode Island Office of Child Support Services, which is acting on behalf of the State of Rhode Island ex. rel. GERO MEYERSIEK, and acting as the "State Agency" under the Rhode Island State Plan under ==**42 U.S.C. § 654**, **42 U.S.C. § 654a**, **42 U.S.C. § 654b**, **42 U.S.C. § 666** *et al*==., and all applicable state and Federal Laws, both civil and criminal, regulating Plaintiffs' actions and omissions under the legal framework of ==**Title IV-D of the Social Security Act**==.  Defendant respectfully ==**requests and moves for a hearing on Defendant's herein Motion to Compel Compliance with Subpoena**== **– the Rhode Island Office of Child Support Services refuses to respond to and refuses to comply with the Subpoena, and filed a motion to quash the subpoena on March 20, 2024 - the requested information is further regulated and mandated to be produced under the State Plan in compliance under** ==**42 U.S.C. § 654b**,== **therefore those**

**requested documents must be produced by the State within this proceeding as well as without judicial compulsion**.  The Subpoena further summons Kevin Tighe, Paul Gould and John Langlois to appear to Court to testify at the hearing scheduled in this matter on March 28, 2024 at 10:00 AM.

### I. RHODE ISLAND'S STATE PLAN'S PENALTY-INCURRING VIOLATIONS OF TITLE IV-D

### AND

### ORGANIZED CRIMINAL COMMISSION OF INTERSTATE FRAUD

Congress prescribed both civil and criminal penalties for violations.  Consistent with its Spending Power, Congress has the authority to attach conditions on the receipt of federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."  The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not

disapprove the State plan . . . and the Secretary shall reduce the amount otherwise

payable to the State [by the designated alternative penalty]." 42 U.S.C. §

655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has

prescribed that the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at

879. Absent any discretion available to the Secretary to impose a lesser penalty than the

alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily

prescribed penalties.[1] Congress also enacted several criminal codes punishing actors,

such as the Plaintiffs, who commit federal crimes, including cover up of unlawful

activities.

Defendant filed a Motion to Dismiss Interest Arrears on February 4, 2024 and

Defendant's Motion is scheduled on the Court's calendar to be heard on March 28,

2024. For the hearing, the Defendant served the attached Subpoena, attached hereto as

Exhibit A, upon the State ex. rel. Plaintiff, Rhode Island Office of Child Support

Services, the State agency under the State Plan pursuant to **42 U.S.C. § 654.** *See*

United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUS

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and
Human Services' (HHS) authority to impose a penalty for its non-compliance, see
*Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and
accepted imposition of a penalty retroactive to 1998. The State paid more than $55
million in penalties through 2007. South Carolina Dep't of Social Servs., Response to
Budget Proviso 13.27 at 4 (Aug. 31, 2007),
http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
        Emphatically, note that South Carolina's violations and penalties do not involve
deliberate alterations of and tampering with government records involved in accounting
fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the
automated system, then manually removing or adjusting them for purposes of
certification purposes to Texas and to the United States in order to conceal the 12%
compound interest from the noncustodial parent and to Texas and Federal authorities.

C-prelim-title42-

section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRp

b25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

Defendant subpoenaed "(1) All records, files, notes, public records, documents, films, materials generated in the course of administration and enforcement of relating to Defendant Mary Seguin, from 2010 to the present in this Title IV-D Case under the Social Security Act; (2) All records relating to Defendant Mary Seguin from 2010to the present, including notes and messages taken and generated on October 5, 2022."

*See* attached **subpoena**, <u>**Exhibit A**</u>.

The Rhode Island Office of Child Support Services' actions in this Title IV-D case's proceedings since 2010 with the entries of orders prepared and submitted in her official and individual capacities, Priscilla Glucksman, make clear the Office of Child Support Services is one of the State Plan's key "organizational unit which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan" under 42 U.S.C. § 654(3).

**Rhode Island Office of Child Support Services' refusal** *to comply with the Subpoena is a prima facie* 42 U.S.C. § 654b **violation that incurs penalties** in this **fiscal year under 42 U.S.C. § 655(a)(5) as well as 42 U.S.C. § 655(a)(4)**, which penalty-incurring violations the Defendant had reported, is reporting and will continue to report to relevant law enforcement authorities at the federal and state levels. (Judicial notice is respectfully requested that the Defendant in January 2023 reported Office of Child Support's violations to the Rhode Island Office of Attorney General, who instead of enforcing the requirements of the State Plan as the Attorney General is

similarly a political subdivision under 42 USC 654(1), opted to reinforce, aid, shield and
protect Rhode Island political subdivisions' unlawful activities – this is reported to
United States authorities).  As a condition of receipt of any federal funding under Title
IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved
state plan for child and spousal support that meets all the requirements of 42 U.S.C. §
654.  Among the prerequisites for approval of a Title IV-D Plan are the requirements
that the State may only uniformly charge 3-6% simple interest on overdue support, *see*
42 U.S.C. § 654(21)(A), and a State must establish and operate an automated data
processing and information retrieval system ***without*** taking computer calculated
amounts off and then put other numbers back on the system or hardcoding/inputting
new numbers computed offline onto the system, see 42 U.S.C. § 654(24), and the State
**must** have a state child support disbursement unit (SDU) that complies with all the
requirements of 42 U.S.C. § 654, 42 U.S.C. § 654a, 42 U.S.C. § 654b, *see* 42 U.S.C. §
654(27)(A).  Rhode Island deliberately fails to meet all the requirements, including
continuously inputting 12% compound interest on overdue support and the Rhode
Island Office of Child Support Services covers up their noncompliance with accounting
fraud inputting into the system and taking off from the automated data processing
system amounts that are inflated, unlawful, and submitting false books of accounts that
removed the unlawful inflated amounts to the Federal authorities to make it look like
Rhode Island is in compliance so as to procure federal funding for which Rhode Island
is ineligible.

 The deliberate fraud makes clear the State operates an unlawful plan, in fact a
criminally unlawful plan, and does not have an approved state plan under Title IV-D of

the Social Security Act, 42 U.S.C. §§ 651-669, and should lose and disgorge unlawfully

procured federal funding under both Title IV-D (child support enforcement) and Title

IV-A (TANF). *See* 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).  *See*, *Hodges v.*

*Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert.

denied, 540 U.S. 811 (2003).

**Any attempt interfering with the Defendant's reporting, pursuant to**

**18 U.S.C. § 4, to law enforcement authorities the commission of crimes by**

**political subdivisions of the State within this Title IV-D proceeding is**

**unenforceable.**  Any and all failures to comply with 18 U.S.C. § 4 constitutes

misprision of a felony.


**A. THIS PROCEEDING IS GOVERNED by 42 U.S.C. § 654 et al.**
**UNDER TITLE IV-D THAT REGULATE <u>ALL POLITICAL SUBDIVISIONS</u> OF**
**THE STATE OF RHODE ISLAND**


The Political Subdivision of the State of Rhode Island under <mark>42 U.S.C. § 654(1),</mark>

namely by and through the **Office of Child Support Services' Lead Legal Counsel**

**Paul Gould,** Esq., made several claims before this Court under Oath throughout this

Title IV-D case hearings and proceedings that **the laws of Congress do not matter,**

**only this court orders matter and they do not need to conform to**

**Congressional prescribed federal statutes.** *E.g.*,  See <u>Exhibit B</u> Transcript **of**

**February 2, 2024** Hearing in this matter**.  Rhode Island is wrong and Paul**

**Gould is wrong, and both know it.  That flagrant lawlessness is at the heart**

**of the violations of federal law under color of state law in this interstate**

Title IV-D case.  **Rhode Island participates in Title IV-D, and** in so participating **through its State Plan, <u>must</u> comply** with **Title IV-D.  *See*, *Hodges v. Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).  *See New York v. United States*, 505 U.S. at 161, Congress, under the Commerce Clause, may offer the States a choice of regulation under federal control or preemption under federal regulation. *See* *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).  The Title IV-D statute expressly provides that compliance with 42 U.S.C. sec. 654, and compliance with the automated data processing system and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted);  *See* South Dakota v. Dole, 483 U.S. 203, 206 (1987). The textual language of 42 U.S.C. § 654(1) states,**

> "A State plan for child and spousal support must—
> **(1)**   provide that it shall be in effect in all political subdivisions of the State"

The facts and established law thus make it crystal clear *all political subdivisions* of Rhode Island, including the **Rhode Island Department of Human Services**, the **Office of Child Support Services <u>AND</u>** the **Rhode Island Judiciary political subdivisions of the State of Rhode Island <u>MUST</u> comply** with 42 U.S.C. § 654.  **However, because the Rhode Island Office of Child Support Services,**

the State Plan's SDU unit, flagrantly and expressly states in this Title IV-D case that Title IV-D statute and Congressionally prescribed federal statutes do not apply in this case nor in  Rhode Island, the State of Rhode Island's political subdivisions have flagrantly flouted 42 USC sec. 654 and then adjusted and tampered with the automated data processing system accounting to defraud the United States of federal funding, and to defraud the Defendant of her Texas properties.

Therefore the Defendant respectfully reminds all participants involved in this Title IV proceeding and gives notice to the applicable State political subdivisions (*e.g.*, Rhode Island Judiciary) and agencies, including the SDU under the State Plan under ==42 U.S.C. § 654(1)==, *e.g.*, the **Rhode Island Office of Child Support Services,** that this yet again noncompliance by the State of Rhode Island with the Subpoenaed information egregiously constitutes yet another of the many numerous failures of Rhode Island agencies and its State Plan during this fiscal year to comply with the requirements of section 654b, as well as 654, 654a and 666 of Title IV which shall be considered yet another of the many numerous failures of the State to comply with subparagraphs (A) and (B)(i) of section 654(27) of this title during the fiscal year, that is clearly stipulated in 42 U.S.C. **§ 655(a)(5)(A)(ii) by a penalty amount of up to 30 percent of the penalty base, in the case of the fifth or any subsequent such fiscal year in which such a failure by the State occurs (regardless of whether a penalty is imposed under this paragraph with respect to the failure). (ii) The term "penalty base" means, with respect to a failure of a State to comply with a subparagraph of section 654(24) of this title during a fiscal**

year, the amount otherwise payable to the State under paragraph (1)(A) of this subsection for the preceding fiscal year.

Additionally, the deliberate noncompliance motivated by cover up makes clear the State knowingly and intentionally operates an illegal plan, the State knows Rhode Island does not have an approved state plan under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, and therefore should lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). *See* 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).

## B. FRAUD

In this Title IV case, serial noncompliance, motivated by fraud, and their resulting incurred penalties, both civil and criminal, accrued since the initiation of this Title IV case fourteen years ago in **2010, upon Plaintiff Gero Meyersiek's application for services under Title IV through his own private attorney, *Barbara Grady*, whose former law firm partner and diseased husband *Paul Dugan*, was himself a former Senior Counsel of the Rhode Island Office of Child Support Services, one of the key Title IV-D agencies under Rhode Island's State Plan charged under 42 U.S.C. § 654(3) with State compliance with 42 U.S.C. § 654, 654a, 654b, 655, 658a, among others – Barbara Grady through Paul Dugan has intimate knowledge of and is a knowing participant in the State's accounting fraud reporting to the United States for federal funding reimbursement and federal funding Incentive Payment payouts (658a) worth hundreds of millions of dollars under the Title IV Program to the Secretary and Department of Health and Human Services, among**

others.  Upon information and belief, the Plaintiff Gero Meyersiek and

Barbara Grady and the Rhode Island Office of Child Support Services have a

series of unlawfully obtained "12% compound interest" money receipt

sharing arrangements involving the fraudulent procurement through the

Title IV framework of exorbitant 12% compound interest interstate

targeting Defendant's Texas properties on overdue support enabled

through accounting fraud, among others – this arrangement involving

interstate defraud of the Texas Defendant and simultaneous theft of the

United States of ineligible Title IV funding entails, *inter alia*, the Rhode

Island Office of Child Support Services discussing in great detail at length

with Barbara Grady the agency's fraudulent removal from the 42 U.S.C. §

654(24), 42 U.S.C. § 654(27) and 42 U.S.C. § 654a mandated automated data

processing system of 12% compound interest when sending to Texas in 2018

thus creating fraudulent books of accounts under 42 U.S.C. §

666(14)(A)(ii)(I) and (II) *fraudulently certifying to Texas via wire and via*

*mail inaccurate support due accounts* – discussions of this scheme further

violated the Defendant's privacy rights, that are documented in the TRAC

record of the Defendant's Title IV case file for December 2021 recording the

agency's discussions with Barbara Grady at length regarding taking interest

off when sending to Texas, and keeping it off the system when

communicating to Defendant that Gero Meyersiek waived interest, and then

putting interest back on the system after they defrauded the Defendant

inducing the Defendant to payoff support that comprised of the principle in

one lump sum of $104,185.98 in consideration of Gero Meyersiek waiving

interest – the agency discussing its illegal and criminal enforcement information with Barbara Grady is in itself a violation of 42 U.S.C. 654 (26)(A) that mandates the State Plan to have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the <mark>privacy rights of the parties</mark>, such as this Texas Defendant, including—

(A)<mark>safeguards against unauthorized use or disclosure of information relating to</mark> proceedings or <mark>actions to</mark> establish paternity, or to establish, modify, or <mark>enforce support</mark>.

See Exhibit B. Rhode Island Office of Child Support **TRAC** document for December 2021 attached hereto as <mark>**EXHIBIT**</mark> B.

Under **Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669**, the Texas Defendant has the **protected** right to be furnished under Subpoena with all TRAC records in Defendant's Title IV-D case file from 2010 to the present to establish the accuracy of the alleged Rhode Island computations mandated to be performed by the automated data processing system, but has instead been hard-programmed numbers created offline that are then manually input into the automated data processing system several times, thus fabricating several different Rhode Island-certified false books of accounts of amounts due transmitted by mail and by wire to Texas and the Texas Defendant and to the United States for the purposes of procuring federal funding under Title IV-D and Title IV-A that violate Federal and Texas State civil and criminal codes.  The Rhode Island Office of Child Support Services refuses to

produce any TRAC records for 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021 January to November, 2023 and 2024.

This violation of, among others, 42 U.S.C. 654(26)(A) constitutes a violation of 42 U.S.C. 654(27) that counts as a penalty in the many violations in fiscal year 2021 alone which exceeds 30% of the penalty base in 2021 – and that's just civil penalties under Title IV – numerous other federal criminal and civil violations incurring additional penalties are applicable, including Texas criminal and civil code violations.

### C. 42 U.S.C. § 654b(4)

Under Rhode Island's State Plan, the Rhode Island Office of Child Support Services is mandated to **"furnish to any parent, upon request, timely information on the current status of support payments under an order requiring payments to be made by or to the parent."**

Therefore, information relating to the Orders in question and relevant information relating to those orders **must** be furnished.  Information relating to the putting of 12% compound interest on the automated data processing system from 2010 to the present must be furnished.  Information relating to the removal of any alleged computed online or offline related to 12% compound interest from the automated data processing system in 2018 and at any and all times from 2010 to the present must be furnished.  Information relating to the waiver by the Plaintiff by and through his private attorney Barbara Grady of the 12% compound interest that was represented to Defendant as the $0.00 showing under interest calculated by the automated data processing system in Defendant's case file on December 6, 2021 must be furnished. Information relating to the Rhode Island Office of Child Support Services calculated

total due showing $92,214,56 calculated by the automated data processing system in

Defendant's case file on December 6, 2021 that calculates arrears from 2010 must be

furnished.  See attached hereto **December 6, 2021 screen shot of the Defendant's**

**online OCSS account** showing the calculated amounts of which is mandated by Title

IV-D to be populated by the automated data processing system as **EXHIBIT C**.

Information relating to the interest amount before it was taken off the automated data

processing system in 2018 must be furnished, as well as any time interest was taken off

the system from 2010 to the present.  Information relating to the interest put back on

the automated data processing system in 2021 after Defendant accepted the

$104,185.98 payoff number given by Office of Child Support Services by wire via email

must be furnished.  Information relating to how $104,185.98 was computed by the

automatic data processing system on December 7, 2021 must be furnished, when the

automated data processing system calculated $92k just the day before on December 6,

2021 must be furnished.  Information relating to how $75,658.00 was calculated by the

automated data processing system on March 3, 2022 that was then issued to Texas to

lien Texas properties by Mail and by wire must be furnished.  And this is not exhaustive

– see Subpoena attached hereto as Exhibit A.


### D. 2012 JUDGE McCANN (and 2024 MAGISTRATE NAHABEDIAN) VIOLATIONS of 42 U.S.C. § 654(21)(A) – EIGHT FAILURES AND PENALTIES (FOUR IN 2012 and FOUR IN 2024 by and through POLITICAL SUBDIVISION RI FAMILY COURT) – (THIS DOES NOT INCLUDE CRIMINAL AND CIVIL PENALTIES UNDER APPLICABLE CRIMINAL AND CIVIL CODES UNDER FEDERAL LAWS AND TEXAS LAWS)

This Court took judicial notice on February 10, 2023of the *issuance* of two Orders issued by Judge McCann in 2012.  Magistrate Monaco clarified at the hearing on March 6, 2023 he did NOT take judicial notice of the contents of the orders, only the issuance of the orders.   See attached transcript of March 6, 2023 hearing. **Exhibit D**.

Those 2012 orders were issued by Judge McCann of the Rhode Island Family Court, a political subdivision of the State, in which the State Plan must be in effect under 42 U.S.C. **§ 654(1).**  Therefore, it is crystal clear that **the Rhode Island Family Court and its justices under the State Plan MUST comply with all provisions of Title IV-D, including** U.S.C. **§ 654(21)(A)** that makes it crystal clear **interest on overdue support must be between 3-6% simple interest.**  However, **Judge McCann knowingly ordered 12% compound interest in this interstate Title IV-D on overdue support to be illegally put into the** State Plan's **automated data processing system mandated under** U.S.C. **§ 654a and** U.S.C. **§ 654b in knowing violation of 42 U.S.C. § 654(21)(A).  Certainly, the Rhode Island Office of Child Support Services today claims 12% compound interest was what Judge McCann ordered, undisputedly making Judge McCann an accomplice.**  The knowing violation of the political subdivision Rhode Island Family Court by and through Justice **McCann of 42 U.S.C. § 654(21)(A) through fraud on the court and under color of state law violates 42 U.S.C. § 654(24), 42 U.S.C. § 654a and 42 U.S.C. § 654b  and incurs** <mark>FOUR</mark> **failures and penalties in this case alone for the fiscal year** <mark>2012</mark> **under 42 U.S.C. § 655(a)(4) and 42 U.S.C. § 655(a)(5), through just the State family court political subdivision alone.**

In 2024, the Rhode Island political subdivision of the family court by and through Magistrate Nahabedian flagrantly declared at the February 2, 2024 hearing in this matter that the State knowingly orders to be put into the automated data processing system 12% compound interest in Rhode Island under color of state law and through fraud on the court in knowing violation of the Rhode Island certified approved State Plan that mandates 3-6% simple interest under 42 U.S.C. § 654(21)(A), with her actions representing **four** failures and penalties in fiscal year **2024**.  See transcript **Exhibit F.**  Failure of compliance with all provisions of Title IV-D results in the State's loss of federal funding for Title IV-D and Title IV-A under Federal Law.  **See Exhibit E, Court Reporter Certified Transcripts of February 2, 2024 Title IV case hearing in this matter.**

**E. 2012 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES (and 2012 Priscilla Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and 42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 – OVER TWENTY FAILURES AND INCURRED PENALTIES in 2012 by and through POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES THROUGH FRAUD AND UNDER COLOR OF STATE LAW**

In order to cover up the flagrantly unlawful 12% compound interest that represents unlawful and fraudulently obtained and extorted under color of law Rhode Island State revenue through the Social Security Act in welfare cases, **Rhode Island Office of Child Support Services adopted the Official Policy not to pursue interest in interstate cases (in order to cover it up from federal authorities and other state authorities see 42 USC sec. 666(14) – cooperation with other states – EXHIBIT F  Attached hereto Rhode Island Office of Child**

Support Services **Official Written Policy** that was produced by RI OCSS during February 10, 2023 court ordered discovery. This policy document evidences the official policy of criminal and civil fraud by the State of Rhode Island's political subdivisions applicable under 42 U.S.C. § 654(1).

This policy evidences the routine extortions of noncustodial parents through the enforcement of 12% compound interest in-state under color of state law that incur penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences the political subdivisions of Rhode Island's concealment and cover up from out-of-state and federal authorities of the State's illegal extortion of 12% compound interest under color of state law by adopting an official policy <u>not to pursue interest</u> in out of state interstate cases that incurs penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences accounting fraud concealing 12% compound interest applied to certain selected out-of-state cases such as the Defendant's, as well as accounting fraud adjustments that conceal the 12% compound interest in in-state cases when submitting for Title IV-D and Title IV-A reimbursement to the United States.

The pattern of agency discussions and considerations of its illegal and criminal enforcement information with Barbara Grady is in itself an organized scheme involving schemes to commit accounting fraud and false

certification of Title IV-D accounts, in violation of, inter alia, **42 U.S.C. 654 (26)(A) that mandates the State Plan to have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the** ==**privacy rights of the**== **Texas Defendant.**

In 2012, Priscilla Glucksman, individually and on behalf of the Rhode Island Office of Child Support Services, **under 42 U.S.C. 654(1), on oral motion moved for 12% compound interest, that by Rhode Island's official policy should not be pursued in this interstate Title IV-D case, with the intent and scheme to commit accounting fraud and fraudulent certification of amounts due by removing the 12% compound interest from the automated data processing system in the anticipated event Rhode Island sends it to Texas authorities and Federal authorities for enforcement under 42 U.S.C. 666 (14)**.  Priscilla Glucksman schemed with Barbara Grady and Gero Meyersiek to orally move for interest in order to minimize a paper trail of paper filings in this interstate Title IV case so that a written record of the ordered 12% compound interest is buried within a one line of the order, with no documentation of a written paper motion that would otherwise contain or omit the State's legal justification moving for 12% compound interest in this interstate Title IV-D case.  In 2012, Paul Dugan was alive and participated in the arrangement. The symbiotic pliant Judge McCann readily complied under color of state law, knowing fully well 12% compound interest is not enforceable in any state and definitely not enforceable in Texas under Title IV-D, and knowing that Rhode Island Office of Child Support Services intended to remove the interest amount if and when Rhode Island sends to Texas for collection while falsely certifying the total amount due and then put

the interest back on the system and then file a subsequent motion to set interest arrears

back in Rhode Island through the symbiotic pliant family court political subdivision of

the State of Rhode Island before a symbiotic pliant judge like Judge McCann,

committing interstate fraud in violation of, *inter alia*, 42 U.S.C. sections 652-669, RICO,

wire fraud, mail fraud, tampering with government records and accounting fraud.  This

list of criminal codes violated by the Plaintiffs is not exhaustive.  Defendant shall

present a list of the violated federal criminal codes later in this motion under Section IV

of this motion.

**F. 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES (and 2012 Priscilla Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and 42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 and Title IV-A – OVER TWENTY ANNUAL FAILURES AND INCURRED PENALTIES in 2013-2024 by and through POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES THROUGH FRAUD AND UNDER COLOR OF STATE LAW**

Title IV-A TANF benefits are conditioned upon the State's compliance with **_all_**

requirements of **42 U.S.C. § 654,** and from 2012 to 2024 and on-going, based on

violations in this case alone, Rhode Island has been and continues to be ineligible and

the State is receiving funds through false representations and alteration of government

records to procure federal funding.  From 2012 to 2024, Defendant has the information

to aver that the State of Rhode Island's political subdivisions under **42 U.S.C. § 654(1)**

sent by mail and by wire false accounts of amount due and of liens that contained Title

IV-D violative illegal and unenforceable 12% compound interest fraudulently

misrepresented as "child support due" to multiple institutions, including banks, credit

bureaus to Texas in violation of Texas Penal Codes that carry additional fines and jail

time.  Then Rhode Island Office of Child Support Services and the financial comptroller of the Rhode Island Judiciary and the State Treasurer's Office fraudulently concealed through removal and other false accounting itemizations the 12% compound interest when sending to United States Department of Health and Human Services for federal incentive payments payouts and federal funding payments under Title IV-D and Title IV-A.

The total Title IV penalties incurred, disgorgement due back to the United States for ineligible Title IV-D and Title IV-A funding, and criminal fines incurred by Rhode Island in this case alone from 2012 to 2024 run upwards of hundreds of millions of dollars.   From 2012 to 2024, Rhode Island's Title IV-D political subdivisions conspired to violate, in addition to 42 U.S.C. 654(21)(A), among others, several requirements under 42 U.S.C. 654 whose plain textual requirements requires the State Plan **MUST**:

**(7)**provide for entering into cooperative arrangements with appropriate courts and law enforcement officials and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering the plan, including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;

**(10)** provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;

**(14)**

**(A)**

comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

**(B)**

maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them **to conceal in the accounting records** the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

**(15)** provide for—

**(A)**

a process for annual reviews of and reports to the Secretary on the State program operated under the State plan approved under this part, including such information as may be necessary to measure State compliance with Federal requirements for expedited procedures, using such standards and procedures as are required by the Secretary, under which the State agency will determine the extent to which the program is operated in compliance with this part; and

**(B)**

a process of extracting from the automated data processing system required by paragraph (16) and transmitting to the Secretary data and calculations concerning the

levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 652(g) and 658a of this title;

**(16)**

provide for the establishment and operation by the State agency, in accordance with an (initial and annually updated) advance automated data processing planning document approved under section 652(d) of this title, of a statewide automated data processing and information retrieval system meeting the requirements of section 654a of this title designed effectively and efficiently to assist management in the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan

**(20)**

**provide, to the extent required by section 666 of this title,** particularly the Due Process protections, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws.

**(23)**

provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services

and a telephone number or postal address at which further information may be obtained

and will publicize the availability and encourage the use of procedures for voluntary

establishment of paternity and child support by means the State deems appropriate

## G. COVER UP AND FRAUD

In 2012, the child in question was 12 years old.  From 2012 to 2018, Defendant

does not have any records (due to several prior Title IV-D information denials by the

Rhode Island Office of Child Support Services for purposes of cover-up, that further

incurred penalties and fines for each and every information denial under 42 USC

654(24) and 42 USC 654(27) and 42 USC 655) of Rhode Island's political subdivisions

under 42 USC 654(1) sending to Texas or to federal authorities the support amount for

enforcement under 42 USC 654(7) or 42 USC 666(14).  Obviously, sending the support

amount in the automated data processing system without the removal of the interest

from the system exposes the illegal 12% compound interest disallowed under 42 USC

654(21)(A), which would incur Title IV-D and Title IV-A penalties, disgorgement of

ineligible federal funds and incur criminal fines.  It is for this very reason that the Rhode

Island political subdivisions adopted the written official policy not to pursue interest in

interstate cases, that moreover runs afoul of 42 USC 654(21)(A) plain language that the

State Plan must apply UNIFORM interest on overdue support, not State-targeted 0% in

some interstate cases and then 12% compound interest in all other cases, such as in this

case.  Moreover, if the State claims they actually did send notices of support due to the

Defendant in Texas, each transmission would constitute patterns of federal crimes,

including Mail Fraud, since the 12% compound interest in this Title IV-D case is illegal

and fraudulent and unenforceable.  This scheme is in violation of 42 USC §§ 654(7), (10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions under 42 USC 654(1) also transmitted by wire and by mail to the United States Department of State a hold on the renewal of Defendant's passport, again omitting and concealing the principle amount as well as the fact that the State attempts to enforce interstate an illegal 12% compound interest on overdue support.  This scheme is in violation of 42 USC §§ 654(7), (10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions made the illegal decision between top management employees of the Rhode Island SDU unit, dressed up as "administrative decision," to illegally and criminally remove the illegal 12% compound interest from the automated accounting data processing system that clearly is required to prevent activities "**to conceal in the accounting records" Rhode Island's** illegal 12% compound interest prescribed under 42 U.S.C. § 654(14). *See* TRAC records attached hereto in ==Exhibit B==.

Upon information, Rhode Island routinely removes the illegal 12% compound interest from the automated data processing system when reporting to the Secretary of the United States Department of Health and Human Services in violation of 42 USC §§ 654(10), (14), (15), (16), (20), (21), (23), (24), (27), and applicable federal criminal codes.  See TRAC records attached hereto in Exhibit B of the routine practice of illegal accounting adjustments of the automated data processing system in the hundreds of thousands of dollars in December 2021 alone.  In this case alone, the aforesaid accounting fraud and record tampering violations motivated by theft of the Title IV-D

and Title IV-A programs and defraud of the Texas Defendant targeting Texas properties

occurred in 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021, 2022, 2023, and

2024.

## II.    FACTUAL ALLEGATIONS

The child in question was emancipated in April 2018 and is now an adult 24 years

old.  Therefore accrued "interest on overdue support" stopped in April 2018.

Due to the hold placed on Defendant's passport renewal, Defendant discovered

on and around November 2021 there is alleged support due.  Defendant retained a

lawyer in Texas to contact the Rhode Island Office of Child Support Services to obtain

information on the amount due.  The Rhode Island Office of Child Support Services

refused to provide information to Defendant's Texas attorney, in violation of 42 USC §§

654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), and concealed the fact that the

agency illegally removed the illegal 12% compound interest amount from the automated

data processing system from 2018 to December 2021.  To this day, the Rhode Island

Office of Child Support Services covers up and refuses to furnish information to the

Defendant the amount of interest that was removed from the system.  Continuing

refusal to furnish requested information motivated by cover up is in violation of, *inter*

*alia*, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).  The Office of

Child Support Services and Barbara Grady and Gero Meyersiek schemed to deprive

Defendant of counsel that would facilitate defrauding the Defendant and to conceal

from Texas counsel the accounting fraud relating to the illegal 12% compound interest

that is unenforceable in Texas as well as legally unenforceable in Rhode Island (however

routinely enforced through fraud under color of state law) under Title IV-D, and refused

to deal with Defendant's Texas attorney, fraudulently claiming it is the State's policy to

deal with the noncustodial parent directly.  This is obviously a blatant lie because the

TRAC record shows Kevin Tighe initiating phone calls directly to Barbara Grady, Gero

Meyersiek's private attorney (and not contacting Gero Meyersiek directly) to discuss

enforcement actions in detail involving the Rhode Island Office of Child Support

Service's fraudulent accounting that entailed the agency's removal in 2018 (when it

planned to send to Texas) of the interest from the automated system in December 2021.

This is in violation of, *inter alia*, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21),

(23), (24), (27).  The Defendant avers and declares, under oath, the following facts:

1. On December 6, 2021, the State/Plaintiff showed the Defendant her OCSS
   online account that showed $0.00 under interest.  Further the online account
   that is populated by the automated data processing system shows $93,214.56
   Total Due, and $0.00 under Interest on December 6, 2021, published online
   in the State's OCSS online account for Defendant, as of November 30, 2021.
   See attached Screen Shot attached hereto this motion.  (The Office of Child
   Support Services told the Defendant that the $0.00 under interest shows that
   Gero Meyersiek waived interest.  The Office of Child Support Services
   deliberately misrepresented by omission that the interest amount was taken
   off the system illegally in 2018 and that the interest amount was calculated
   pursuant to an illegal 12% compound interest that is unenforceable under
   Title IV-D.  Therefore in reality there was no consideration given to the
   Defendant, as falsely represented, calculated to induce the Defendant into

paying a large lump sum amount. The Office of Child Support Services

brokered a settlement deal between the Defendant and Gero Meyersiek where

Meyersiek waived interest in consideration of the Defendant paying a lump

sum payoff amount of $104,185.98 from Texas, which the State, under its

authority, agreed to the deal with the Defendant on December 7, 2021, having

calculated the $104,185.98 figure by and through its accountant(s) manually

offline and not by the mandated automated data processing system, and

actively brokered the terms of the deal itself, namely, Deputy Legal Counsel

Kevin Tigue who reports to Mr. Paul Gould, the attorney of record who filed

the State's/Plaintiff's Motion to Set Arrears.    The Defendant requests this

Court to take notice of the fact that the State also failed to provide this Court

as well as to the Defendant an accounting now and upon Defendant's request

at the time in 2021 of how this figure $104,185.98 was calculated nor how the

alleged $81k is calculated.  This is in violation of, *inter alia*, 42 USC §§ 654b,

654(10), (14), (15), (16), (20), (21), (23), (24), (27).

2. The State's/Plaintiff's' authority to forgive arrears debts is an official policy
   and authority reported to the Office of the U.S. Commissioner Tangular Gray
   of the Office of Child Support Enforcement of the U.S. Department of Health
   and Human Services.

3. The Defendant in Texas good faith accepted and paid the $104,185.98 on
   December 7, 2021.

4. From December 6, 2021 to the present, the State/Plaintiff has represented to
   the Defendant at least seven (7) sets of books of very large arrears and interest

calculations, which the State/Plaintiff has either failed or refused to provide
the Defendant with requested documentation of debt validation and
verification records supporting the State's calculation (in violation of, *inter
alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24),
(27)):

   a. $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021,
      published online in the State's OCSS online account for Defendant, as
      of November 30, 2021. (Screenshot of this taken on December 6, 2021
      is attached to this Motion).

   b. $104,185.98 Total Payoff Amount on December 7, 2021.

   c. $75,638.00 on a Notice of Intent to Lien dated March 3, 2022.  RI
      OCSS rescinded this figure based on alleged unspecified errors on
      October 14, 2022.

   d. $73,000.00 per RI OCSS Deputy Chief Counsel John Langlois's (staff
      counsel who also reports to Mr. Paul Gould, who was also the attorney
      of record for the State at the Appeals Hearing) representation at the
      agency RI EOHHS (Rhode Island Executive Office of Human and
      Health Services) administrative appeal Pre-hearing held on October 5,
      2022.

   e. $55,000.00 on RI OCSS correspondence with Meyersiek on October
      13, 2022.

      f.   $75,623.71 Total Due for "Interest," online on the afordsaid OCSS

          online account, as of November 30, 2022.  A screenshot taken on

          December 3, 2022 thereof is attached to this Motion.

      g.   $81,652.46 on the Motion as of December 22, 2022.

5.   Maintaining at least seven books of account in Defendant's case file, while

     obstructing the Defendant's 42 USC 654b and all Title IV-D protected due

     process right to documents of accounting validation and verification depriving

     the Defendant's right to meaningfully refute the State's claim is unlawful,

     covers up the illegal 12% compound interest that is also ballooned through

     several fraudulent manual accounting calculations NOT USING the Title IV-D

     mandated automated data processing system.  There are pending breach of

     contract, fraud and Civil RICO et al actions in Federal Courts regarding the

     conduct of the Plaintiffs.

6.   The Defendant respectfully requests the Court to take notice of the fact that

     the alleged interest published online by the State/Plaintiff as of November 30,

     2022 that states the very specific number of $75,623.71 ballooned to

     $81,652.46 as of December 22, 2022, by a whopping $6,028.75 in a matter of

     22 days as stated in the State's/Plaintiff's Motion, is usurious, and clearly

     shows the falsity of the State's/Plaintiff's Motion, paragraph numbered 8 that

     says, "That, because interest only accrues on principal balances and not on

     interest balances, the interest balance owed on arrears has not changed since

     the principal balance was paid in full on December 9, 2021."  This is in

violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

7. The Defendant avers it is nigh on impossible for the Defendant to be able to respond to the State's/Plaintiff's Motion and their unverified and unvalidated seven (7) books of accounts represented by the State/Plaintiff since December 6, 2021 to as of December 22, 2022, where the State's/Plaintiff's calculations of very large amounts have been clearly either refuted and rescinded or have shown to be inaccurate or false. This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

8. The Defendant respectfully requests the Court to take notice of the fact that after the Defendant accepted the deal in Texas and paid the payoff amount of $104,185.98 from Texas on December 7, 2021, the State/Plaintiff sent to the Defendant in Texas by Mail a Notice of Intent to Lien dated March 3, 2022 for $75,638.00 without any information justifying the fraudulent interest lien on Defendant's Texas properties – the $75,638.00 amount on the fraudulent lien on Defendant's Texas properties was deliberately calculated manually then hard input into the automated data processing system in violation of Title IV-D. This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Defendant appealed this fraudulent lien to the Appeals Office of Rhode Island Executive Office of Health and Human Services ("RI EOHHS"), a political subdivision of the State of Rhode Island applicable under 42 USC 654(1), on April 1, 2022. Throughout the procedurally defective appeals process where the Defendant was denied by the

State/Plaintiff to access her case file, the State/Plaintiff refused or ignored the Defendant's over ten(10) record requests for the legal and accounting basis of the $75,638.00 lien.  Each record information denial is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Defendant also submitted to the Appeals Office records of the written email advisement by the State/Plaintiff that "accounting says" to pay $104,185.98 and records of the Defendant's bank wire transfer payment.  The Appeals Office continued the hearing for the maximum 3 times due to the State/Plaintiff's refusal to comply with discovery that would render the proceeding procedurally defective.   Paul Gould and John Langlois were listed as representing the State.  Their collective violations incur penalties and fines under, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 655, 658a, Title IV-A. To resolve the discovery issues, the Executive Hearing Officer ("EHO"), Debra DeStefano, scheduled a telephonic Prehearing Conference on October 5, 2022, and only when told by the EHO the burden of proof lies on the State/Plaintiff to show arrears are due (as applies here), did John Langlois (who attended the Prehearing Conference) state the following, which the Defendant in Texas recorded as a party of the call:

"EHO: The agency will have to submit proof of the allegation for arrears to support their position.

Langlois: The reason why I asked earlier whether Mary spoke to Karla after she made the payment was because there was a change of circumstances right after that. I don't know if anyone in my agency had ever explained that to Mary.

Seguin: Wait a minute, wait a minute,

EHO: Wait Mary, I know what you asked for, let me get to what John just said, so John, you said there was a change in circumstances subsequent to her making a payment but before the notice of lien went out?

Langlois: Yeah.

EHO: OK, so...

Langlois: Can I just back up and explain what happened, 99% of this is a misunderstanding...

EHO: OK?

Seguin: Including what was on the screenshot, was that a misunderstanding??

Langlois: Can I speak without being shouted over?

Seguin: I am flabbergasted, really.

Langlois: What happened in this case is when Mary's representative, her attorney, called us in late November 2021, and said she wants her passport released and what does she have to do to release her passport, they put her in touch with Karla who gave her the $104,185.98 number. Where that number came from, was one of our attorneys contacted the custodial parent, Gero Meyersiek, so we contacted his attorney, it wasn't me, it was someone in my office, and said if she's willing to make a $104K to

pay off the principle, would you agree to waive the $73K in interest? He said yes.  So

Karla notified Mary that if she paid the $104K, it would be paid in full because he was

willing to waive the interest and accept just the principal.  What happened was the day

after Karla spoke to Mary to wire in the $104K the attorney for Mr. Meyersiek contacted

us again and said he changed his mind, please put the interest back on the system, so we

did.  So the number that was given to her on the day it was given to her was correct, the

$104K, because he was waiving the interest, but then changed his mind, so we put the

interest back on the system, because he was waiving the interest, and that interest was

put back on the system and that's why the system is now saying she owes $73K.  That's

why in March when the system saw that she had some sort of personal injury insurance

in the system, our system was showing she owed $73K so we issued the lien.  But that

was what happened, he changed his mind the next day and that's what messed up the

numbers. So that's how all this happened, it was a pure misunderstanding, I don't know

whether anyone has ever explained that to Mary how that happened.

EHO: OK, Mary, did anyone ever explain that to you before?

Seguin: No. No one ever explained any of that.  This is why I am asking for my

case file, I think this is more basis to ask for my entire case file from 2020.  It's news to

me for example and its new information to me that your office's lawyer would not talk to

me directly but would be picking up the phone and calling the attorney for the custodial

parent.  And then not saying you were doing this deal.  I never offered $104K.  You had

determined this number, and that's why I am looking for documentation as to whether

this is something you guys do in every case.

EHO: OK, John, are you intending to submit then, the documentation showing the full balance, which would include the principle and the interest before she paid the $104k, and then what happened after, you're prepared to submit documentation to show everything that you said just happened.

Langlois: Yes.  I can show the account balance before he agreed to waive the interest.  And I can show you the account balance after she made the payment. And then when we put the interest back on the system.

EHO: And you're going to testify as to why it all occurred, I mean basically what you just told us.

Langlois: Yes.

Seguin: But the screenshot on December 6th showed $93K."

A true copy of the recording evidence has been submitted by the Defendant to this court, a Rhode Island political subdivision under Title IV-D proceeding in June 2023 and in February 2024.

However, instead of going forward with the testimony and providing the alleged debt validation and verification accounting records promised by John Langlois to the EHO at the upcoming RI EOHHS scheduled Appeal Hearing at the time on December 1, 2022, the State/Plaintiff opted to rescind the Notice of Lien that states there are unspecified errors on October 14, 2022, and emailed the RI EOHHS Appeals Office that the State/Plaintiff will litigate the issue in Family Court.  This showed the intent of the State/Plaintiff to deprive the agency Appeals Office of jurisdiction by withdrawing the enforcement instrument that vests the Appeals Office's jurisdiction by regulation, in the

clear hope of a more favorable outcome to the State/Plaintiff, in the hopes of symbiotic and pliant judge shopping, in the hopes of getting a judge like McCann who ordered the illegal and unenforceable 12% compound in a Title IV-D case to rubber stamp the fraudulent 12% compound interest arrears due, and thereby needlessly increasing litigation.  Mr. Paul Gould is the co-counsel of record for the State/Plaintiff in the RI EOHHS agency appeal. This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 655, 658a.

9.  The State's/Plaintiffs' actions and the State's/Plaintiff's Motion needlessly extending the agency appeal to Family Court litigation and obstructing Defendant's discovery rights for debt validation and verification as well as documentation of the Plaintiffs' waiver of interest are violative of Family Ct. R. Dom. Rel. P. 11 and are in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.  It is in criminal violation of 18 USC § 666 and a scheme to commit fraud on the court and interstate fraud through unenforceable Title IV-D orders that appear to be routinely issued by pliant Title IV-D judges like Judge John McCann III and Magistrate Susan Nahabedian.

10. Due to the State's/Plaintiff's conduct of obstructing the Defendant's right to access debt validation and verification records of publicly noticed liens of alleged arrears issued by the State/Plaintiff throughout the agency appeal, the Defendant filed an Access to Public Records ("APRA") request to the then Secretary Ana Novais of the RI EOHHS that manages the State/Plaintiff

agency OCSS.   These are all political subdivisions of the State of Rhode Island under 42 USC 654(1).

11. The RI EOHHS Office in its management capacity required the State/Plaintiff OCSS to respond to the APRA request, but even then the State/Plaintiff **denied the Defendant's APRA request for accounting records**, again refused to release the requested debt validation accounting records, but released the Case History Tracking records in the Defendant's case file, which showed entries made by Kevin Tigue and RI OCSS staff between December 6, 2021 to April 2022 of activity that corroborated John Langlois's representations of taking interest off the system, interest waiver at the agency Prehearing Conference on October 5, 2022 that is outlined above in paragraph 10, then putting interest back on the system after Defendant accepted the offer in Texas, and performed on the contract in Texas paying off all due support from Texas, through Defendant's Texas bank account, namely Texas properties.  Plaintiffs' record denials are violations of *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

12. Both the RI OCSS counsel who denied the Defendant's APRA request and the Executive Legal Counsel of the Secretary of RI EOHHS, Lisa Martinelli (to whom Ms. Deb Barclay reports and to whom Mr. Paul Gould reports, per organization charts supplied by the Secretary of State of the State of Rhode Island) informed the Defendant via official written letter correspondence to appeal RI OCSS's APRA request denial to the Attorney General pursuant to

R.I.G.L. sec. 38-2-8.  Their collective denials are in violation of *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.  Following their collective official written advisement, the Defendant appealed the RI OCSS APRA denial under R.I.G.L. sec. 38-2-8 to the Office of the Attorney General and the Superior Court as provided by R.I.G.L. sec. 38-2-8.  The Office of the Attorney General and the Superior Court of are political subdivisions of the State of Rhode Island under 42 USC 654(1).  Instead of releasing the Defendant's Title IV-D alleged debt validation and verification records information, the State/Plaintiff continues to resist releasing alleged arrears/debt verification accounting records in Superior Court, including failing to comply with the Defendant's Court-issued subpoena for said records and resisting subpoena compliance with extended litigation in Superior Court in violation of *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

   a.   The Defendant served the State/Plaintiff by email Defendant's Request for Production of Documents for the same accounting records and interest waiver records pursuant to Family Ct. R. Dom. Rel. P. 34, to which the State/Plaintiff has so far produced one set of book of accounts of the seven different books of accounts.  However, the numbers do not corroborate with any of the seven official legal representations of alleged arrears due, e.g., $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Defendant, as of November 30, 2021;

$104,185.98 Total Payoff Amount on December 7, 2021; $75,638.00 on

a Notice of Intent to Lien dated March 3, 2022 that RI OCSS rescinded

based on alleged unspecified errors on October 14, 2022; $73,000.00

per RI OCSS Deputy Chief Counsel John Langlois's (staff counsel who

also reports to Mr. Paul Gould, who was also the attorney of record for

the State at the Appeals Hearing) representation at the agency RI

EOHHS (Rhode Island Executive Office of Human and Health

Services) administrative appeal Pre-hearing held on October 5, 2022;

$55,000.00 on RI OCSS correspondence with Meyersiek on October

13, 2022; $75,623.71 Total Due for "Interest," online on the aforesaid

OCSS online account, as of November 30, 2022.  A screenshot taken on

December 3, 2022 thereof is attached to this Motion; $81,652.46 on

the Motion as of December 22, 2022; this is in violation of, *inter alia*,

42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24),

(27), 666, 655, 658a that is consistent with the State/Plaintiff's pattern

of obstructing the Defendant of due process right access to her case file

records of RI OCSS's debt verification itemized accounting calculations

of very large sums of alleged arrearages of at least 7 books of accounts

from December 6, 2021 to the present in Title IV-D proceedings.

III.   **JUDICIARY VIOLATION OF GOVERNMENT EDICTS
       DOCTRINE, CALCULATED FAILURE TO INTEGRATE TITLE IV-
       D AGENCY ELECTRONIC FILING SYSTEM WITH ODYSSEY
       MAKING THEIR FILINGS INVISIBLE TO ALL E-COURT USERS
       OTHER THAN THE JUDGE AND THEMSELVES AND
       VIOLATION OF ACCESS TO COURT INFORMATION OF PUBLIC
       TITLE IV-D PROCEEDINGS IN RHODE ISLAND'S STATEWIDE
       ELECTRONIC COURTS**

**A. DENIAL OF PUBLIC AND PRO SE-LITIGANT ACCESS TO COURT INFORMATION INCLUDING JUDGE-CREATED LAWS BY 42 USC 654(1) POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY**

The Rhode Island Judiciary is a political subdivision of the State of Rhode Island under 42 USC 654(1). While publicizing during the implementation of the $6 million installation of Odyssey (the statewide electronic filing system) in 2014 that the electronic courts will enable ALL court users to pull up court record information with ease from their phones, the Rhode Island Judiciary quietly implemented Rule 5 of the Rhode Island Rules and Practice denying the Public, pro-se litigants and all parties to a case in Rhode Island remote access to court record information including judge-created orders and laws, including their own. Through this deceit, the Rhode Island Judiciary lied to the Public, while denying access and thereby covering up the routine ordering of unenforceable body of judge-created laws ordering 12% compound interest in public cases and public hearings under 42 USC 654 in public Title IV-D cases, such as this one, by symbiotic pliant judges like Judge McCann and Magistrate Nahabedian. The denial of access to pro-se litigants of their own cases' court records containing support orders violates, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a. The denial of public access to public court records documenting the routine systemic violations of 42 USC 654(21)(A) in electronic courts violates the First Amendment and the public's right to know the law, even if these fraud on the court unenforceable judge-created laws are unenforceable in both Rhode Island and elsewhere Title IV Part D reaches. The denial of public access to judge-created laws that is also motivated by cover-up fundamentally violates the established Government Edicts Doctrine that the United States Supreme Court specifically held applies to electronic

formats of government doctrines, such as judge-created laws in digital courts. *See*

***Georgia v. Public Resource.Org, Inc**., No. 18-1150, 590 U.S. ____ (2020). The

Defendant has been denied access by the political subdivision Rhode Island Judiciary to

her court records and information regarding the orders in question that must be

furnished pursuant to 42 USC 654b thus in violation of 42 USC 654. The Defendant has

been denied access by the political subdivision Rhode Island Judiciary to unenforceable

judge-created laws that routinely establish unenforceable 12% compound interest by

certain symbiotic pliant judges, like Judge McCann and Magistrate Nahabedian, who

work hand-in-hand with the Rhode Island Office of Child Support Services in Title IV-D

cases, in violation of Defendant's Due Process and Equal Protection rights to know the

law to be meaningfully heard and right to meaningful access to justice – they are in

violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23),

(24), (27), 666, 655, 658a.

This Court held at the hearing in this matter scheduled on March 6, 2023 that the

Rhode Island Office of Child Support Services is ordered to show that the alleged arrears

is accurate. *See* attached March 6, 2023 hearing transcript. Explicitly stated

throughout 42 USC 654, "accuracy" requires no accounting alterations generated offline

then hard input into the automated system, no fraud, no inducements, no interstate

extortion under color of state law, and for certain no 12% compound interest on overdue

support.

**B. CALCULATED FAILURE BY THE JUDICIARY TO INTEGRATE THE TITLE IV-D AGENCIES' ELECTRONIC FILING SYSTEM INTO ODYSSEY RESULTING IN AGENCY FILINGS BEING INVISIBLE TO ALL COURT USERS EXCEPT THE JUDGE AND THE AGENCIES THEMSELVES – COVER UP**

Because under the State's Plan the Title IV-D agencies routinely file in the Rhode Island court system for the illegal enforcement of illegal 12% compound interest disallowed under 42 USC 654(21)(A), the political subdivision Rhode Island Judiciary deliberately failed to integrate the Title IV-D Agencies' electronic filing system with the State's electronic filing system Odyssey in order to make Title IV-D Agency electronic filings invisible to all court users except the judge and the agencies themselves, calculated to cover up the 12% compound interest from audit by the federal authorities and from the Public. This came to light at the WebEx hearing in this Title IV-D matter before Judge Merolla on June 8, 2023 scheduled at 2PM, where Judge Merolla, showing he was unaware of the failure of systems integration, questioned Paul Gould of Rhode Island Office of Child Support Services, why Defendant is unable to see the agency's electronic filings that the judge can see in the system. Without hesitation, Paul Gould explained that this is due to the electronic court implementation process that was supposed to integrate the agency's legacy system to Odyssey, demonstrating conclusively that Gould, the Lead Counsel of the Rhode Island Office of Child Support Services responsible and overseeing agency court filings in Title IV-D cases, undisputedly was in the know and part of the conspiracy involving the deliberate failure of filing system integration and its continuing perpetration in Title IV proceedings that made Title IV agencies' filings invisible as part of the cover up.

## C. FALSIFYING ACCOUNTING TO SHOW $0.00 PAYMENT IN DECEMBER 2021 in DEFENDANT'S TITLE IV-D ACCOUNT POWERED BY THE AUTOMATED DATA PROCESSING SYSTEM IN ORDER TO DEFRAUD DEFENDANT IN THE FUTURE

Defendant attaches hereto **EXHIBIT G**, that shows the Defendant's online Title IV-D OCSS account which is powered by the Automated Data Processing System, as of November 2022 at the time of the RI EOHHS Appeal, which showed **$0.00 Payment for December 2021**.  Therefore, the Rhode Island Office of Child Support Services through accounting fraud never recorded, as late as November 2022, in the Automated Data Processing System Defendant's large lump sum payoff of $104,185.98 bank wired from Texas on December 7, 2021, showing prima facie accounting fraud.  This shows a scheme to defraud the Texas Defendant in the future.  This shows that the Rhode Island Office of Child Support Services received Defendant's wired funds and treated it as a cash receipt, without ever recording in the automated data processing system such a large lump sum payment.  Kevin Tighe, Barbara Grady, Gero Meyersiek, John Langlois, Paul Gould, and Priscilla Glucksman, among others, distributed the $104,185.98 among themselves in their organized conspiracy to defraud.  Defendant's lump sum payment was distributed allegedly via a check, not through the usual cash card on December 9, 2021, (see attached hereto TRAC record for December 2021) record information of which check that was allegedly issued by the Office of Child Support Services the agency refuses to furnish the Defendant, and which are under subpoena now.  Further, the Office of Child Support Service's maintaining a separate offline accounting system in this case constitutes fraud and accounting fraud, targeting the Defendant in Texas, targeting Texas properties and targeting the United States of America.  This is why they never utilized the 42 USC 654(7), (14), (20) and 42 USC 666(14) cooperative system with Texas, so as to enable them to divide the defrauded cash spoils offline among the members participating in the scheme.  This accounting fraud and scheme to defraud

violate mail fraud, wire fraud, honest services fraud, RICO, record tampering, theft of the United States, and felonious fraud, among others.

In reality, under 42 USC 651-669, employees who engage in, aid and abet and facilitate the above must be terminated and must not be permitted to continue criminal activities of record tampering, accounting fraud, fraud, theft under color of state law and cover up.

**IV.    CRIMINAL VIOLATIONS REPORTED TO SOME JUDGE OF THE UNITED STATES AND OTHER LISTED AUTHORITIES UNDER 18 U.S.C. sec. 4**

The Defendant, in good faith and reliant on the plain language of 18 USC § 4, misprision of felony, as well as the Brief filed in the United States Supreme Court by the United States of America in the Supreme Court case, *Turner v. Rogers*, 564 U.S. 431 (2011) that showed South Carolina (found by the 4th Circuit Court of Appeals) liable for $75 million in penalties for that state's 42 USC 654 violations that did not even involve, *inter alia*, fraud and tampering with the record or unlawful 12% compound interest put into then taken off then put back on the automated data processing system as here in Rhode Island, made known the above activities to "some judges" of "the United States" and other relevant federal authorities – counting among the United States judges Defendant made known publicly in the Amended Complaint filed in the United States District Court for the District of Rhode Island, Judge William E. Smith.  The issue of what Judge Smith has done with the information "made known to him" is pending before the United States Court of Appeals for the First Circuit before a requested panel of judges under the federal law of civil procedure.  Therefore, under 18 USC 4, the above

reported activities have been "made known" to several high ranking judges of the United States.

## A. VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Defendant made known to the panel of judges of the United States allegations contained in the Amended Complaint filed in Federal Court of the commission of acts by the Rhode Island political subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein in this motion, the afore-described acts violating 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 – such violative acts by the Plaintiffs in this matter, along with the political subdivisions and employees thereof named in the federal matter, and/or Judge Smith on this list are not exhaustive.  It is undisputable, among others, that Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-D and Title IV-A disgorgement is due from the applicable State of Rhode Island's political subdivisions.

## B. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF AMERICA v.*

*DONALD J. TRUMP*, DC Circuit, the DC Circuit United States Court of Appeals reminds

the Public and all applicable tribunals that Judges are similarly liable to the criminal

laws for their official acts.  A notable example is *Ex parte Commonwealth of Virginia*, in

which the Supreme Court affirmed the criminal indictment of a judge based on an

official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for

violating a federal statute that prohibited discriminating on the basis of race in jury

selection. *Id*. at 340, 344. The Supreme Court began by observing the principle that

officers are bound to follow the law: "We do not perceive how holding an office under a

State, and claiming to act for the State, can relieve the holder from obligation to obey the

Constitution of the United States, or take away the power of Congress to punish his

disobedience." *Id*. at 348. The Court then addressed the judge's argument that the Court

lacked the authority to punish a state judge for "his official acts." *Id*. Its response was

twofold. First, the Court described juror selection as "merely a ministerial act, as much

so as the act of a sheriff holding an execution, in determining upon what piece of

property he will make a levy, or the act of a roadmaster in selecting laborers to work

upon the roads." *Id*. The Court then explained that even if juror selection is considered a

"judicial act," <u>the judge had a legal duty to obey the criminal laws</u>:

> "But if the selection of jurors could be considered
> in any case a judicial act, can the act charged
> against the petitioner be considered such when
> he acted outside of his authority and in direct
> violation of the spirit of the State statute? That
> statute gave him no authority, when selecting

jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

[W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation of constitutional rights. On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize

> *criminal conduct proscribed by an Act of*
> *Congress . . . .'*

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See* also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493

F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled

on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not

immune, and employees of the political subdivisions of Rhode Island under 42 USC

654(1) similarly are not immune.  Barbara Grady and Gero Meyersiek are

unquestionably liable.

### V.    CONCLUSION

**Under 42 USC 654b, the Defendant is entitled to be furnished all subpoenaed records – conversely, the Rhode Island Office of Child Support Services, the SDU under the State's Plan under 42 USC 654, must furnish all subpoenaed information – refusal of which incurs another penalty.**

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or

designee-Judge Merolla of this Honorable Court to:

1. Grant the Defendant's Motion to Compel.

2. Grant the Defendant's request for her Title IV record information that
   includes record information relating to the "TRAC notes of 12/6/2021 and
   12/7/2021" as well as relating to the substance of John Langlois's audio
   recorded October 5, 2022 statements regarding "what happened in this case"
   that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the
   Child Support Services that Gero Meyersiek said yes, he "agreed to waive the
   $73k or $75k that are in arrears" as of December 6, 2021 and October 5, 2022
   which are part of Defendant's child support case file.

3. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request.

4. Order a hearing on the herein issues raised in this matter.

5. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here:

   https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

6. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

March 21, 2024

FOR DEFENDANT

MARY SEGUIN, Pro Se.

By: *Mary Seguin*
Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

**NOTICE OF HEARING**

Please take notice that the foregoing Motion will be called for hearing before the Rhode Island Family Court, One Dorrance Plaza, Providence, RI 02903 at 10:00 AM on March 28, 2024 (case is already scheduled for that date/time) by WebEx hearing https://ricourts.webex.com/meet/garrahy5F

## CERTIFICATION

I hereby certify that a copy of the within Motion was filed on March 21, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

*Mary Seguin*

Exhibit A



# STATE OF RHODE ISLAND

## FAMILY COURT

### SUBPOENA - CIVIL

| Plaintiff | Civil Action File Number |
|---|---|
| STATE OF RHODE ISLAND EX REL. GERO MEYERSIEK | K2001 - 0521 M |
| Defendant | |
| MARY SEGUIN | |

| ☐ Murray Judicial Complex | ☐ Noel Judicial Complex |
|---|---|
| Newport County | Kent County |
| 45 Washington Square | 222 Quaker Lane |
| Newport, Rhode Island 02840-2913 | Warwick, Rhode Island 02886-0107 |
| *(401) 841-8340 | *(401) 822-6725 |
| ☐ McGrath Judicial Complex | ☑ Garrahy Judicial Complex |
| Washington County | Providence/Bristol County |
| 4800 Tower Hill Road | One Dorrance Plaza |
| Wakefield, Rhode Island 02879-2239 | Providence, Rhode Island 02903-2719 |
| *(401) 782-4111 | *(401) 458-3200 |

TO: JOHN LANGLOIS, KEVIN TIGHE; PAUL GOULD, FRANK DIBIASE
of RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES 77 DORRANCE ST PROVIDENCE RI 02903

☑ **YOU ARE HEREBY COMMANDED** to appear in the Family Court listed above at the date, time, and courtroom specified below to testify in the above-entitled case and bring with you:

① ALL RECORDS, FILES NOTES, PUBLIC RECORDS, DOCUMENTS, FILMS, MATERIALS GENERATED IN THE COURSE OF ADMINISTRATION OF AND ENFORCEMENT OF RELATING TO DEFENDANT MARY SEGUIN, FROM 2010 TO THE PRESENT, IN THIS TITLE IV-D CASE UNDER THE SOCIAL SECURITY ACT
② ALL RECORDS RELATING TO DEFENDANT MARY SEGUIN FROM 2010 TO THE PRESENT, INCLUDING NOTES AND MESSAGES TAKEN AND GENERATED ON OCTOBER 5, 2022.

| Courtroom | Date | Time |
|---|---|---|
| GARRAHY COURTROOM 5F | MARCH 28, 2024 | 9:30 AM |

If you need language assistance, please contact the Office of Court Interpreters at (401) 222-8710 or by email at interpreterfeedback@courts.ri.gov before your court appearance.

* If an accommodation for a disability is necessary, please contact the Family Court Clerk's Office at the telephone number listed above as soon as possible. TTY users can contact the District Court through Rhode Island Relay at 7-1-1 or 1-800-745-5555 (TTY) to voice number.

Page 1 of 2

FC-73 (revised June 2020)

Exhibit B

11:28:47 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00               CASE HISTORY            U824  PROD
STARTING DATE   09 01 2021
SELECTION     COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (███████████████████████████
███████████████████████████████████████). WE REMOVED THE INTEREST WHEN_____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $_____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP_____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:          SEGUIN      MARY       CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K  PNL:
```

Case Number K20018321M
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10 13 PM
Envelope 4132704
Reviewer Maria O.

11:29:56 Tuesday, December 13, 2022

12/13/22   11:28          C A S E   T R A C K I N G          CSCL  ASMXA201
          TRAC.00              CASE HISTORY                  U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED_____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSIDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES____

RL: 80  12 22 ABSP:          SEGUIN       MARY        CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK    GERO    K   PHL:

Case Number: 23-1867
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:01 Tuesday, December 13, 2022

```
12/13/22    11:29        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION     COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
        FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
    FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: SO  12 22 ABSP:              SEGUIN      MARY       CMD:
FWX: TRAC  D CLIENT:             MEYERSIEK   GERO    X  PNL:
```

Case Number: 23-1067A Document: 00118130806 Page: 306 Date Filed: 04/09/2024 Entry ID: 6632760
Filed 12 Providence Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria C.

11:29:53 Tuesday, December 13, 2022

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

RL: 80  12 22 ABSP:              SEGUIN        MARY          CMD: _____
FXX: TRAC  D CLIENT:             MEYERSIEK     GERO     K    PNL:

ed in Providence/Bristol County Family Court
ibmitted: 6/1/2023 10.13 PM
velope: 4132704
viewer: Maria O

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00            CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:              SEGUIN       MARY         CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK    GERO    K    PNL:
```

Case Number: 2001687M  Document: 00118130006  Page: 308  Date Filed: 03/00/2024  Entry ID: 6632260
Filed in Providence/Bristol County Family Court
Submitted: 5/1/2023 10:13 PM
Envelope: 4132704
Reviewed: Mary G.  11:28:09 Tuesday, December 13, 2022

```
12/13/22   11:28          C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00                 CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42
_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
        TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)
_____
12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
        58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY
_____
12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75.
_____

RL: 80  12 22 ABSP:              SEGUIN        MARY          CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK     GERO      K   PNL:
```

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022


12/13/22    11:28          C A S E    T R A C K I N G        CSCL   ASMXA201
            TRAC.00             CASE HISTORY                 U824   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

RL: 80  12 22 ABSP:           SEGUIN       MARY         CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK    GERO    K    PNL:

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E    T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

```
RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:              SEGUIN      MARY        CMD: _____
                                 MEYERSIEK   GERO    K   PNL:
```

Exhibit C



Exhibit D

State of Rhode Island and Providence Plantations


PROVIDENCE, Sc.                         FAMILY COURT




*******************************
GERO MEYERSIEK



Vs.                        F.C. FILE NO. K2001-0521M



MARY SEGUIN
*******************************


Heard Before:

The Honorable Magistrate Armando O. Monaco

On March 6, 2023


**APPEARANCES:**


FOR MS. SEGUIN. . . . . Pro se

FOR THE STATE. . . . .. Paul Gould, Esq.


1

I HEREBY CERTIFY THAT THE

FOLLOWING IS A TRUE AND ACCURATE

TRANSCRIPT IN THE CASE OF

GERO MEYERSIEK VS. MARY SEGUIN

HEARD BEFORE

MAGISTRATE ARMANDO O. MONACO

ON MARCH 6,2023.




STEVEN FAZIO
ELECTRONIC COURT REPORTER

1              **GERO MEYERSIEK V. MARY SEGUIN**

2                    **F.C. NO. K2001-0521M**

3                    **MARCH 6, 2023**

4

5              **MARY SEGUIN:** Having been

6    duly sworn testifies as follows:

7                    THE COURT: After the

8    February 12th hearing two orders were submitted

9    one by each side, objections were filed through

10   your order being entered, ma'am.

11                   MS. SEGUIN: Thank you Your

12   Honor. I am sorry. Could you repeat that again?

13   Sorry.

14                   THE COURT: Subsequent to the

15   hearing of February 10,2023, two separate orders

16   were submitted for my signature. One you

17   submitted and one the State submitted. The State

18   filed an objection to the submission of your

19   order on the basis that they alleged, I believe,

20   that it is not what I said.

21                   MS. SEGUIN: And I also filed

22   an objection to their proposed order that also

23   clearly states a lot of additional items that

24   were never before the Court. Including the

25   number now that they have now, they submitted a

                              3

1    $75,623.71 and then another one for $6028.75.

2    These two numbers were not even in their

3    original motion to establish arrears that was up

4    before the court on February the 10th and those

5    two numbers were never brought up as well. And

6    without a clear understanding and audit of what

7    those numbers represent. Because they

8    unilaterally of their own volition without any

9    court approval.

10                    ATTORNEY GOULD: Judge,

11   objection.

12                    MS. SEGUIN: Took off the

13   interest.

14                    THE COURT: Let me interrupt

15   you, ma'am. Where are you getting these two

16   numbers from? I do not see them anywhere.

17                    MS. SEGUIN: Exactly. That is

18   the order proposed order that the State had

19   filed. You are absolutely right. Your Honor.

20   Those two numbers--

21                    THE COURT: I am looking at

22   the proposed state order that has different

23   numbers then what you are saying.

24                    MS. SEGUIN: The proposed

25   order that they submitted to me, on #4 it says

4

```
 1        $75,623.71 for interest. And then a medical

 2        support interest for $6028.75. Now these two

 3        numbers were never before the Court before on

 4        February the 10th. On February the 10th they

 5        brought up a motion that mentioned $81,000.

 6                        THE COURT: Well, maybe that

 7        is a combination of the two numbers.

 8                        ATTORNEY GOULD: Yeah, Judge.

 9        That is the combination.

10                        MS. SEGUIN: So sorry, go

11        ahead.

12                        ATTORNEY GOULD: There was an

13        objection, Judge.

14                        THE COURT: Yeah, what is

15        your objection, Paul?

16                        ATTORNEY GOULD: We are off

17        the subject. The subject is whether this order

18        should enter or not.

19                        THE COURT: Right.

20                        ATTORNEY GOULD: Not about

21        any agreements, not about anything else other

22        than the numbers and Judge if I may or I will

23        let the defendant continue Judge.

24                        THE COURT: I thought my

25        order was very simply was to set the arrears as
```

1          they appear on the State computer but without

2          prejudice and then there will be a subsequent

3          hearing to determine whether or not those

4          numbers are in fact accurate. As I am reading

5          the order, they put two numbers in and it is

6          clearly, let me read the paragraph. Yeah,

7          paragraph six, the Court finds that the total

8          the arrears of $81,000, which is the combined

9          number is placed on the Child Support ledger

10         without prejudice to the June 8, 2023 hearing.

11         The State agrees it shall respond to the

12         defendant's first request for production of

13         documents forthwith.

14                    MS. SEGUIN: Yes, Your Honor.

15         So therefore, you had not made any kind of

16         findings of fact of whatever they might be. You

17         simply said put the interest back--

18                    THE COURT: Yeah, I said

19         whatever the computer says is the balance. Put

20         it on the computer without prejudice, which

21         means that we need a starting point. You need to

22         know what they allege you owe and that is what

23         they are alleging you owe. You disagree with

24         that number. You asked them for the

25         documentation to substantiate that number. That

6

```
 1        is why I continued it out all the way to June so

 2        that you would have an opportunity to get their

 3        materials, for you to you digest their

 4        materials, provide counter materials back to

 5        them. So that in June, a full hearing can be

 6        held with everyone totally prepared as to argue

 7        either position. Either there is no money due or

 8        there is a balance due. I never made any finding

 9        whatsoever there is in fact a balance due. If I

10        did, I would not have continued the hearing.

11                    MS. SEGUIN: Thank you, Your

12        Honor. That is exactly what my understanding as

13        well.

14                    THE COURT: Right. That is

15        what the order says. It says put the number on

16        the computer, but without prejudice, which means

17        both sides have to argue and convince the Judge

18        that that is in fact the number. Or you are

19        going to argue it is an incorrect number and you

20        are going to substantiate it by whatever

21        arguments you present. They going to

22        substantiate it by whatever arguments they

23        present. And then whoever hears it in June will

24        decide which side is correct.

25                    MS. SEGUIN: Thank you, Your
```

7

```
1        Honor. I wanted to make sure that, you know,

2        that all parties understand that because at this

3        point, the State is saying that you already

4        found that I had—-

5                        THE COURT: No, no. The State

6        is not saying that because the order clearly

7        says those numbers or that number is without

8        prejudice, which means I did not establish that

9        number. We do it in many of these cases to get

10       the ball rolling, so either side knows what they

11       need to produce to substantiate their positions.

12       The same way they can come in now and say, Oh,

13       no, we made a mistake. She actually owes

14       $185,000.

15                       MS. SEGUIN: You are giving

16       me a heart attack, Your Honor.

17                       THE COURT: It puts a cap on

18       what they can argue.

19                       ATTORNEY GOULD: Judge, can I

20       respond now?

21                       MS. SEGUIN: So, Your Honor,

22       with that in mind, just to clarify, that is what

23       they are saying in 2018 when they first took

24       off--

25                       ATTORNEY GOULD: Objection.
```

8

1          THE COURT: Just a minute.

2     The order speaks for itself. It says the balance

3     on the computer as of whatever dates in there. I

4     cannot read it now quickly, whatever dates in

5     there, that is the balance on the computer. They

6     have to substantiate it. They are going to send

7     you documentation supposedly to substantiate it.

8     If they cannot substantiate, then they are not

9     going to get that number.

10          ATTORNEY GOULD: Judge, I

11     disagree with that. Judge, we have no obligation

12     to substantiate this. There is a Child Support

13     number that was established by Judge McCann. You

14     took judicial notice of that.

15          THE COURT: I took judicial

16     notice that there was no appeal of his order.

17     That is what the judicial notice of.

18          MS. SEGUIN: Thank you, Your

19     Honor. Thank you, Your Honor. That is my

20     understanding as well that you took judicial

21     notice of the orders themselves. But what is in

22     dispute is how the child support office has

23     handled this computation.

24          THE COURT: That's the

25     argument for June, ma'am. That is the argument

9

1    for June.

2                    MS. SEGUIN: Taking that off

3    the system without your approval. Now, put it

4    that way--

5                    THE COURT: What you are

6    arguing now is what you need to argue in June. I

7    am satisfied that the order that has been

8    presented by the State that breaks down the two

9    balances that the total is $81,000 is in fact

10    the appropriate order from the hearing. It is

11    without prejudice. They are going to provide

12    documents that you requested so that you can

13    then decide whether or not you agree or

14    disagree. And if you disagree with their method

15    of calculating it, you need to present why you

16    think that method is incorrect and what should

17    be the correct number if any.

18                    MS. SEGUIN: Yes, and

19    including a waiver of interest –

20                    THE COURT: You are arguing

21    whether the number is correct or not. That is

22    the whole purpose of making it without

23    prejudice.

24                    MS. SEGUIN: Yes, and that

25    would include the waiver of interest that had

10

1    occurred.

2                    THE COURT: No, that is the

3    subject of the hearing. That is the subject of

4    the hearing. I am making no finding about

5    whether there was or was not a waiver of

6    interest.

7                    MS. SEGUIN: Thank you, Your

8    Honor. So that is part of the discovery that

9    needs to happen.

10                    THE COURT: Well, that is

11    what I assume you are asking for. Is to get the

12    documentation that would have substantiate your

13    belief that there was the waiver of the

14    interest.

15                    MS. SEGUIN: Thank you, Your

16    Honor.

17                    THE COURT: So, if you can

18    substantiate that there was a waiver of

19    interest, that balance disappears.

20                    MS. SEGUIN: So, the State is

21    objecting to producing those protected

22    documents—

23                    THE COURT: No, no. They are

24    not objecting to producing any documents. The

25    line paragraph says in paragraph 10, The State

11

1    agrees it shall respond to the defendant's first

2    request for production of documents forthwith.

3    So, whatever you asked them for, they are going

4    to they are going to provide to you. If you do

5    not think they provided everything you asked

6    for, you file a supplemental request.

7                    ATTORNEY GOULD: The State

8    filed its answer in response to her request for

9    production, Judge. And I will stand by that. And

10    I will argue those issues that we refuse to

11    answer, or we objected on procedural grounds or

12    we objected on legal grounds for what we did.

13    And I will respond to that when it is

14    appropriate.

15                    THE COURT: That would be

16    June 8th. That will be done on June 8th. So, you

17    can be prepared to go forward on whatever your

18    objections are and whoever hears it will decide

19    whether the objections were valid or not.

20                    MS. SEGUIN: Your Honor, Mr.

21    Gould had said something to me, emailed

22    something to me to the affect that he said you

23    will be retiring June the 8th. I just wanted to

24    know why he emailed me something like that.

25                    THE COURT: It has been

12

1      projected that I am to retire sometime before

2      July 1st. They are dealing with my successor and

3      I sit until my successor is appointed and

4      qualified. And the projection is by the end of

5      the by end of June, the latest could be earlier.

6      I do not think it could be later, but it is

7      possible.

8                    ATTORNEY GOULD: And Judge,

9      because we, I guess, we like making these

10     artificial records, I will make this record

11     here. I did not say that snd I resent the

12     defendant putting words in my mouth.

13                   MS. SEGUIN: I indicated the

14     email that you wrote to me.

15                   THE COURT: Listen, just a

16     minute, just a minute. Whether I sit or I do not

17     sit is an immaterial situation, it has nothing

18     to do with what is before me today. I am ruling

19     on the order they sent you breaking down the

20     balances between the child support and medical

21     arrears is valid as to what I said the last time

22     we were here. I am going to sign that order and

23     proceed with their discovery. Whatever

24     objections you have relative to the discovery

25     and whoever sits here, whether it is me or

13

1    someone else, they will be prepared to address

2    the situation. Okay.

3              MS. SEGUIN: Thank you, Your

4    Honor. Thank you. One last question about number

5    11 and 12. I mean, those elements—

6              THE COURT:  11 and 12?

7              MS. SEGUIN: Yeah, 11 and 12.

8              THE COURT: 11 tells you how

9    to contact us. 11 is how to contact us and 12 is

10   a standard paragraph that they put in indicating

11   that, I don't know why it's here, but they that

12   the standard paragraph they stick in every case

13   has no bearing on this one. Other than it says

14   that until it is paid in full, you know, the

15   order will continue to run. But there is no

16   order running in terms of what your obligation

17   to pay that is.

18             MS. SEGUIN: Okay, okay. So

19   that is something that is boilerplate.

20             THE COURT: That is

21   boilerplate and 11 is how you get in touch with

22   us.

23             MS. SEGUIN: Sure.

24             THE COURT: We do not put

25   that in, we will never have any hearings.

14

1                    MS. SEGUIN: Thank you, Your

2    Honor.

3                    ATTORNEY GOULD: If I could

4    talk this time a little bit. Maybe just for the

5    record. Those same paragraphs were in the

6    September 25th, 2012 orders. And that same

7    boilerplate languages in a July 11, 2012 orders

8    and any other order that she would receive.

9    August 15, 2012. That same identical language

10    was contained in those. It is boilerplate.

11                    THE COURT: Yeah,

12    boilerplate. All right, we will see you on June

13    8th at 2:30. Wait a minute. Daylight savings

14    time is starting soon.

15                    MS. SEGUIN: Oh, yeah.

16                    THE COURT: All right. Do you

17    go on daylight saving time? Pay attention.

18                    MS. SEGUIN: Okay.

19                    THE COURT: This coming

20    Saturday, our clocks jump forward an hour. So,

21    your clock does not jump forward. You are going

22    to have to call in an hour earlier.

23                    MS. SEGUIN: All right.

24                    THE COURT: I have friends

25    that live in Arizona, and they told me that in

15

1      Arizona, there were three different time zones

2      in the summer.

3                    MS. SEGUIN: Yeah, every

4      county is allowed to do that out here.

5                    THE COURT: I know that. That

6      is why that is why I pay attention to it because

7      they tell me that people have trouble. They

8      think, Oh, I am going to be on time, I am going

9      to Court. They said, No, you are an hour late.

10      What do you mean? This is the time across the

11      street. No, that is an hour different than us.

12                    MS. SEGUIN: It really is

13      crazy. That they have marked it off, not a

14      county, but across the street. You are

15      absolutely right.

16                    THE COURT:  All right. So,

17      pay attention. It is 2:30 our time.

18                    ATTORNEY GOULD: Judge, if I

19      may. The order I submitted that contains 12

20      paragraphs.

21                    THE COURT: Yes.

22                    ATTORNEY GOULD: February 10,

23      2023, starting with paragraph one, the matter is

24      continued.

25                    THE COURT: Yes.

16

```
1                        ATTORNEY GOULD: That order

2         is going to be accepted by the Court. That will

3         be the order of the Court for that day?

4                        THE COURT: Right.

5                        ATTORNEY GOULD: The order

6         that she submitted will be stricken, correct?

7                        THE COURT: Right.

8                        MS. SEGUIN: Yes, that is my

9         understanding, too. Yes.

10                        ATTORNEY GOULD: Thank you,

11        Judge.

12                        THE COURT:  All right. We

13        will see you in June.

14                        ATTORNEY GOULD: One more

15        thing. I am sorry. Judge, if I may, can the

16        defendant place her address on the record?

17        Because we sent some correspondence that was

18        sent back to us. Now we have used her email as a

19        courtesy to her and we also need an actual

20        street address so that we can send her

21        documents.

22                        MS. SEGUIN: Your Honor, I

23        think this is, I do not really understand why --

24                        THE COURT: Let me just

25        interrupt. Let me interrupt. When you enter your
```

17

1    appearance, you need to provide under the rules

2    your address, your phone number, and your email

3    address.

4               MS. SEGUIN: Yes.

5               THE COURT: And if you were

6    an attorney, obviously your bar number. Okay so

7    if you change any of those addresses or emails,

8    you are under an obligation to keep updating it

9    because if they send anything to the address or

10   the email that you provided, it's not a defense

11   later on, Oh, it's not my address or email, I

12   changed it. So that is why they are asking to be

13   sure they get the right method to contact you,

14   depending on what they have to send. It is a

15   part of the Court order that you provide your

16   address and email address.

17              MS. SEGUIN: Your Honor, may

18   I also then ask that the State sent me a or e-

19   file any notices? Because they have been mailing

20   things to me in Texas, which takes 10 to 12 days

21   for me to receive by regular mail. So, could you

22   also please, I am going to ask you please to

23   ask, to make them, to order them to notice me by

24   electronic means as well.

25              THE COURT: Well, that's part

18

1   of the rules, too.

2                   MS. SEGUIN: Okay.

3                   THE COURT: All right?

4                   MS. SEGUIN: Okay. Thank you,

5   Your Honor. I appreciate you telling me.

6                   THE COURT: All right, June

7   8th.

8                   ATTORNEY GOULD: I do not

9   have an address, Judge.

10                  THE COURT: Oh, that is

11  right. What is your updated address?

12                  MS. SEGUIN: My address is on

13  the on file is P. O. Box 22022 Houston, Texas,

14  77019.

15                  THE COURT: What about email?

16                  MS. SEGUIN: That's Mary

17  Seguin 22022 at Gmail.com. They are also in my

18  pleadings as well.

19                  THE COURT: Slow down. Slow

20  down. We do not type that fast.

21                  THE CLERK: I did not get

22  that P. O. Box. Can you give it to me again,

23  please?

24                  MS. SEGUIN: Yes, it is,

25  22022.

```
1                              THE COURT: That is the P. O.

2        Box number?

3                              MS. SEGUIN: Yes, Your Honor.

4                              THE COURT: Making sure it

5        was not the zip or area code.

6                              MS. SEGUIN: It is one too

7        many numbers.

8                              THE COURT: What is the zip

9        in Houston?

10                             MS. SEGUIN: It is 77019.

11                             THE COURT: All right, all

12       set?

13                             MS. SEGUIN: Thank you, Your

14       Honor.

15                             THE COURT: Okay, June 8.

16                             ATTORNEY GOULD: Thank you,

17       Judge.

18                             MS. SEGUIN: Thank you, Your

19       Honor.

20

21

22
```

EXHIBIT E

I HEREBY CERTIFY THAT THE FOLLOWING

IS A TRUE AND ACCURATE TRANSCRIPT

IN THE CASE OF MEYERSIEK VS. SEGUIN

BEFORE THE HONORABLE MAGISTRATE

SUSAN NAHABEDIAN ON FEBRUARY 2ND,

2024.


*A.B. Kuski*


AMANDA B. KUSKI
ELECTRONIC COURT REPORTER

1              THE COURT: Good afternoon.

2              PLAINTIFF: Good afternoon.

3              THE COURT: This is K20010521, Gero

4    Meyersiek versus Mary Seguin. Both parties are present. Mr. Meyersiek's

5    Attorney, um, Achille, she's here. Um, the Clerk will swear you both in.

6              CLERK: Miss Seguin, Mr. Meyersiek,

7    raise your right hands, please. You do solemnly swear that the testimony you

8    shall give to the Court in the matter now in hearing shall be the truth, the whole

9    truth and nothing but the truth, so help you God?

10              PLAINTIFF: I do.

11              DEFENDANT: I do.

12              CLERK: Miss, Miss Seguin, just state your

13    name for the record.

14              DEFENDANT: Mary Seguin.

15              CLERK: Mr. Meyersiek, your name,

16    please, for the record.

17              PLAINTIFF: Gero Meyersiek.

18              CLERK: Thank you.

19              THE COURT: Okay, good afternoon,

20    folks. This matter was continued from December 15$^{th}$ in order for the, uh, Court

21    Clerk to, uh, copy Court filings and other documents that were requested by

22    Miss Seguin. It's my understanding that those documents were sent to her

23    electronically, um, in various emails, uh, in December and the remainder of

24    those were sent at the beginning of January. Um, Miss Seguin, were you able to

25    review those and are you satisfied that you received everything that you request-

1

1    ed?

2    DEFENDANT: Um, thank you, Your

3    Honor. I had, uh, received, as you said, in two batches, uh, the Court records

4    that, um, Mr. Santamarina had, um, had emailed. Uh, the last several batches,

5    uh, were, sorry, batch was several documents, um, were only emailed about a

6    couple weeks ago. Uh, there, there were sent in separately about fifteen emails. I

7    think Your Honor was copied on all of them, as well as Mr. Gould, um, on those

8    emails, um, and so the records themselves, um, you know, that were sent to me

9    or emailed to me, um, the, the Court has a copy of those. Um-

10    THE COURT: I, I, so my question is, are,

11    are you, did, were you able to review them and are you satisfied that everything

12    that you requested, you received?

13    DEFENDANT: Um, I have not, uh,

14    received the actual audio recordings of the, that's part of the record.  Um, those

15    were-

16    THE COURT: Did you request, did you

17    request the audio recording from Mr. Santamaria?

18    DEFENDANT: Well, I requested all the

19    records. So, one of the paper documents had said that the, there was, uh,

20    attached to it, an audio recording of the State saying that Gero waived interest,

21    and I think that's very relevant to this case-

22    THE COURT: Okay-

23    DEFENDANT: -especially as it links to-

24    THE COURT: -let me just stop you-

25    DEFENDANT: -(inaudible)-

2

1                       THE COURT: -let me just stop you, let me

2  just stop you for a minute, please. I'm new to this case, so I'm not familiar with

3  the audio recordings request. I'm not aware that you made that type of request.

4  Can you tell me the date of the audio recording and when you made that

5  request?

6                      DEFENDANT: I made the request for all

7  Court information in this case. All Court information encompasses all

8  documents and all forms of records. Uh, that's, um, that's the, I believe, legal

9  understanding of all Court information of records.

10                   THE COURT: Alright, Mr.-

11                   DEFENDANT: So, that was part, that was-

12                   THE COURT: -excuse me, excuse me one

13  minute. Mr. Gould, I'm trying to unmute you and I'm not able to do it from my

14  end. So, if you need to be unmuted, you'll have to do it yourself.

15                   DEFENDANT: I had to, so I had

16  submitted those and this, uh, audio recording ha-, uh, is part of the Court records

17  as of, um, June 2023. That was emailed to me in a rel-, in a paper document

18  referring to attached, attached audio recording that is, um, that, that was emailed

19  by Mr. Santamaria. So, that recording, I want to make sure, uh, and, and that's

20  also copied to you by the way, Your Honor-

21                   THE COURT: Alright, so-

22                   DEFENDANT: -(inaudible).

23                   THE COURT: -just, just, just going back

24  to December, okay, you provided, um, a request for documentation to be copied

25  by the Court Clerk, Mr. Santamaria, and all of those documents were scanned

1    and sent to you in an electronic form. Did you specifically request anything that

2    referred to an audio recording?

3                      DEFENDANT: I specifically record, uh,

4    requested all Court information, any and all Court information in the records of

5    my, of this particular case file. Those are the wording that I used, because I, I

6    don't know what's being, what's on, what's, what the Court record has. You

7    know, this is the reason why we went through this process, is, the, the, um,

8    Rhode Island Judiciary has set up this, uh, uh-

9                      THE COURT: So, Miss Seguin-

10                     DEFENDANT: -electronic Court system-

11                     THE COURT: -we're not-

12                     DEFENDANT: -where the (inaudible)-

13                     THE COURT: -so, Miss Seguin, we're not

14    gonna get into the Judiciary's access to the, um, to the portal. We're not gonna

15    get into that. We made every effort to make electronic copies of every Court

16    document pertinent to this case and sent them to you, at no cost, in an electronic

17    version. You did not, at any point, follow up with Mr. Santamaria to request an

18    audio recording.

19                     DEFENDANT: I'm just in a process of

20    reviewing this. That was part of your question, uh, Your Honor, is have I had a

21    chance to review all of these materials. It's, it's, it's, as, as you can see, several

22    because you've been covered, uh, copied on all the emails. There were several

23    emails, uh, you know, all together, probably thirty-something emails. Uh, I do

24    appreciate that. I, you know, I thank Your Honor for ordering that, um, and I

25    also, um, you know, am, am reviewing, have been reviewing. So, I came across,

4

1    to answer your question to the best of my ability, is I came across that doc-,

2    document where it refers to the audio file, uh, that's being submitted into the

3    record. I've asked for the Court records. So, um-

4                                        THE COURT: You received every Court

5    record, every document going back to-

6                                        DEFENDANT: Paper. I, I, I think what,

7    what-

8                                        THE COURT: Correct.

9                                        DEFENDANT: -wanted to, you know,

10    just, just to have a basic understanding of document is, in paper form, but Court

11    rec-, information as the Court record encompasses various different formats. All

12    public records encompasses various different formats. Uh, you know, that's,

13    that's written by statute and, you know, as I understand it what public records is.

14    Court records are a form of public records and, and it forms the basis of, um,

15    Judge created laws, and therefore, those are critical in my, uh, uh, you know,

16    access and that's the basis of this process that we're going through is accessing

17    those public records, Court information records, and, uh, accessing the laws that

18    were created, Judge created laws that were created, in this particular case or

19    relevant to this particular case. So, I, I'm just trying to, um, respond to your

20    question, uh, Your Honor, as to if I had a chance to review those, am I satisfied,

21    and so, these are the, what I'm raising to the Court, to Your Honor, to, in

22    response to your question is, I received the paper document, uh, I'm, I'm in the

23    process of reviewing them, um, because they, they form a chronology, they form

24    a, a, a background chronological, uh, reasoning behind, you know, uh, Judge

25    created laws, which are the orders, uh, issued. And in so doing, there are refer-

5

1  ences to a, a Court document that was sent to me, actually a couple of them, that

2  talks about an audio recording of the State saying that Gero waived interest, and,

3  uh, also the document, uh, there are documents that say Gero did not ask for

4  interest, but the State on oral motion asked for interest, but then the State's

5  policy is not to ask for interest in interstate cases-

6                                        ATTORNEY GOULD: Judge, Judge, if I

7  may-

8                                        DEFENDANT: -that is why. So-

9                                        ATTORNEY GOULD: -Judge, can I be

10  heard?

11                                        DEFENDANT: -that's why I need to

12  understand and get a full-

13                                        ATTORNEY GOULD: If I may, Judge?

14                                        THE COURT: Hold, just one, one minute,

15  Mr., Mr. Gould. So, the answer, so, your answer is, you're not satisfied with

16  what was sent?

17                                        DEFENDANT: I'm explaining to you

18  what's missing.

19                                        THE COURT: So, you are, you-

20                                        DEFENDANT: And I'm trying to identify

21  to you what is missing-

22                                        THE COURT: So, this Court-

23                                        DEFENDANT: -and the Court records,

24  already are, are showing-

25                                        THE COURT: -this Court, alright, ex-,

1    excuse me, Miss Seguin. Mr. Santamaria spent hours with a coworker manually

2    scanning and copying those files during a period of time that the Court was very

3    short handed. All of that documentation, okay, every pertinent document related

4    to this case, going back decades, two decades, was scanned and sent to you,

5    okay. We do not have a copy of an audio recording. So, we're not able to

6    provide that to you. There is no such audio recording in the Court record that

7    you, you are referring to. So, now I'm gonna give Mr. Gould an opportunity to

8    respond. Mr. Gould?

9                        ATTORNEY GOULD: Judge, like,

10   likewise, if she's requesting a transcript, then she has to go through the normal

11   process of paying for a transcript, ordering the specific date of the transcript she

12   wants. This is a Defendant who has failed to come to this Court with clean

13   hands, Judge. I've stayed silent-

14                       DEFENDANT: I object! I object, Your

15   Honor!

16                       ATTORNEY GOULD: -the whole time-

17                       THE COURT: Your objection is noted and

18   Miss Seguin, no one interrupted, you're muted. You're muted. You're muted

19   and you're going to stay muted. You're muted. Mr. Gould?

20                       ATTORNEY GOULD: Thank you, Judge.

21   We've let this go on for months after months. She brought up an issue relative

22   to, uh, the Court system. State of Rhode Island Child Support Enforcement, the

23   Magistrate hearing this case, has no control over that. She's now filed a Federal

24   lawsuit in the, uh, District of Texas, Judge. That's gonna play it's course 'cause

25   she'll file and follow through on that. This is a simple case of whether or not

7

1    interest is to accrue on this case and what payments were made. It's simple

2    math, it's simple, in, in fact, Judge, there's maybe five questions I have for the

3    Defendant, uh, of the Plaintiff relative to this, uh, inquiry. It would be a short

4    hearing. Uh, whether or not there was any monies paid, what was received, and

5    the fact that the Court can take Judicial notice of two orders. The fact that

6    there's a child support order that continues to run, and two, the fact that interest

7    has continued to run pursuant to Mag-, pursuant to Judge, uh, John McCann's

8    order dated 9/25/2012.

9                                    THE COURT: Okay, the original support

10   order was entered May 24th of 2012?

11                                   ATTORNEY GOULD: That's when it was

12   allowed to run on the Child Support system. That was at a period of time when

13   the arrears were set somewhere in the amount of $30,000.00. I have a copy of

14   the order. Paragraph four of the May 24th, 2012 order indicates that there was an

15   arrears of $30,458.00, as of May 24th, 2012. September-

16                                   THE COURT: And am I, am-

17                                   ATTORNEY GOULD: Sorry.

18                                   THE COURT: -there were, there was no

19   appeal taken from that order.

20                                   ATTORNEY GOULD: Correct.

21                                   THE COURT: Just a minute, Miss Seguin.

22   I'm giving Mr. Gould an opportunity to speak, just like I gave you an

23   opportunity to speak. In that October 23rd, 2012 order, um, there is language that

24   indicates that interest would continue to run.

25                                   ATTORNEY GOULD: Correct.

8

1                THE COURT: And nothing has changed

2  since then?

3                ATTORNEY GOULD: There's been no

4  order from the Rhode Island Family Court suspending interest. Correct.

5                THE COURT: Miss Seguin?

6                DEFENDANT: I object to every, uh,

7  statement that Mr. Gould had, uh, stated because they are, um, uh, perjurious.

8                THE COURT: You (inaudible), excuse

9  me-

10               DEFENDANT: Mr. Gould and Mr.

11  Langlois-

12               THE COURT: Excuse me, they're what?

13               DEFENDANT: They are perjuries. Mr.

14  Gould and Mr. Langlois and the State of Rhode Island representing the Rhode

15  Island Child Support Office, had, um, per this Court record, there is a document

16  that say's that they, that they had said that Gero had waived interest. (Inaudible)

17  2021 and they made that statement in 2022.

18               THE COURT: Ma'am, there's no Court

19  order that ever suspended-

20               DEFENDANT: (Inaudible).

21               THE COURT: -there's no Court order that

22  ever set the interest to zero. There's no Court order. You've received everything,

23  I've reviewed the file. There is nothing in the system where it, it was ever

24  waived or set to zero. The interest has stayed on the system.

25               DEFENDANT: We're, we're talking, uh,

1    actually on, on February the 10th, 2023, the first Court order of this, of this

2    decade that was issued has clearly, um, proven as evidence that interest was

3    taken off of the system. Mr. Gould had taken the interest off of the system, he

4    said in Court, in 2018. That is what he had said, and so, in, in Court, and

5    therefore, he has asked the Judge, or the Magistrate, uh, Monaco to put it back

6    on the record or, uh, Mr., and then Judge, um, uh, Monaco had only put it on

7    there with prejudice because he said that there's, that doesn't mean, that's just a

8    placeholder.

9                       ATTORNEY GOULD: Objection.

10                       DEFENDANT: So, Mr. Gould had lied,

11    just now, that's perjury on-

12                       THE COURT: Uh-

13                       DEFENDANT: -I'm deeply concerned

14    about this. These, these are documented in the order. The February 10th order

15    cannot be refuted. It was, it was prepared by Mr. Gould himself. It said that the

16    Court-

17                       THE COURT: I don't see it.

18                       CLERK: I don't see anything-

19                       DEFENDANT: -(inaudible)-

20                       THE COURT: -hold on, hold on. I'd, I'd

21    like to review that order and I, I don't see it.

22                       CLERK: I don't see anything filed from

23    2013-

24                       ATTORNEY GOULD: I'd like to be heard

25    on the objection, Judge.

1                        CLERK: -to '22. I see nothing.

2                        DEFENDANT: Well, that's a problem.

3                        THE COURT: Are you saying that, excuse

4 me, just let me just clarify this. Again, I'm new to the case-

5                        DEFENDANT: That was-

6                        THE COURT: -you just made-

7                        DEFENDANT: -that was-

8                        THE COURT: -you just mentioned

9 Magistrate Monaco heard this and I'm looking for an order from that hearing

10 and I don't see one.

11                        ATTORNEY GOULD: Since I was

12 accused of perjury, Judge, can I clarify something?

13                        THE COURT: Yeah, Miss Seguin, I'm

14 gonna give Mr. opportunity, uh, Mr. Gould an opportunity to reply.

15                        ATTORNEY GOULD: See, Miss Seguin

16 is a little confused about how the process is running. That there is an agency and

17 the Child Support Office is an agency charged with running the child support on

18 our system. The Court is in charge of ordering parties to pay child support and in

19 this case, pursuant to the order of Judge McCann back in 2012, he ordered child

20 support paid. Again in 2012, he ordered interest paid. Our system in 2018, our

21 system, the Child Support system, not a Court order, our system removed

22 interest because of an administrative decision, because this case had become an

23 interstate case, the Plaintiff was out of, the Defendant mother was out of state.

24 There was a decision to remove interest from cases running on our system. That

25 doesn't mean that the interest doesn't run. It meant that the interest was removed

1  from our system, so that other jurisdictions were not confused, and it had to do

2  with, a lot of it, the, the fact that jurisdictions had different interest rates running.

3  So, in order to alleviate any confusion, our Administrator made a determination

4  to stop interest on all, uh, stop interest running on our system, not stop interest

5  pursuant to a Court order. So, that's the distinction. So, when I said earlier today

6  that there's no order that, uh, stopped the interest on the case, there is no order,

7  and then the other statement that, uh, the Plaintiff made, uh, Defendant made

8  relative to, um, the issue of prejudice of Judge Monaco's order, that's an

9  outright lie, Judge. Judge Monaco never said in Court, there's no Court order

10  that is without, or with prejudice, Judge. So, that's just an outright lie. I'll leave

11  it at that because I know I'll have another twenty minutes of, of rambling on by

12  the Defendant. So, I'll (inaudible)-

13              THE COURT: Well, just, just to be clear, I

14  just want both sides to, to, to know, I don't see anything in the system reflecting,

15  um, any, any decision by Magistrate Monaco in May of this year. I don't see-

16              DEFENDANT: Uh, February, February,

17  February of this year. So, February the 10th. February the 10th. This I why at the

18  same time the discovery was ordered, and this is why we are here on discovery

19  issues, as well, because it was ordered without, sorry, it was placed on the

20  system and the interest is WITH prejudice.

21              ATTORNEY GOULD: No, Judge, I object

22  to that, that is not true. That is as far as the truth can be, Judge.

23              DEFENDANT: Perjury, perjury-

24              THE COURT: So, excuse me, hold on,

25  hold on, folks. I just found the order now that I just see that. It's February 10th,

1    paragraph four, "The Court finds the arrears of $81,652.46 that'll be placed on

2    the ledger without prejudice to the June 8th hearing. The arrears reflect interest

3    on the child support in the amount of $75,623.71 and interest of the medical

4    support in the amount of $6028.75".

5                       ATTORNEY GOULD: So, Judge, is her

6    comments about prejudice, is that perjury? So, did she just commit perjury,

7    Judge, because I wasn't under oath, but I'll let that go.

8                       DEFENDANT: The order, the order

9    clearly says that the-

10                     THE COURT: That it was placed, that it

11    was placed on the ledger without prejudice. That's all, that's all it says. It was-

12                     DEFENDANT: Which means-

13                     THE COURT: -placed on the ledger-

14                     DEFENDANT: -it means, it means it's not

15    owed.

16                     THE COURT: No, it means, it doesn't

17    mean it's not owed. It, it, it's, it's, let's see, motion to set arrears and discovery

18    motions were not concluded on that date. Okay, so it was placed on the ledger

19    without prejudice because it was still an issue that was left open. Am I correct,

20    Mr., Mr. Gould?

21                     ATTORNEY GOULD: Yes, Your Honor.

22                     THE COURT: And with that, you may

23    inquire of Mr. Meyersiek. Thank you.

24                     ATTORNEY GOULD: Thank you. First of

25    all, Judge-

1    THE COURT: You're muted. You're

2    muted.

3    ATTORNEY GOULD: I'd ask the Court,

4    I'd ask the Court to take judicial notice of the May 24$^{th}$, 2012 order by Judge

5    McCann, in which he established the child support order, in which he establishes

6    an arrears of $30,458.00. That order was not appealed. That is the order of this

7    Court.

8    THE COURT: The Court takes judicial

9    notice entered on May 24$^{th}$, 2012, from which no appeal was taken.

10    ATTORNEY GOULD: I'd ask the Court

11    to take judicial notice for the September 25$^{th}$, 2012 order of Justice John

12    McCann in which the paragraph four indicates, "Interest will continue to run on

13    monies due".

14    THE COURT: Likewise, the Court takes

15    judicial notice of the September 25$^{th}$, 2012 order, again, in which no appeal was

16    taken.

17    ATTORNEY GOULD: Thank you, Judge.

18    If I could inquire of the Plaintiff?

19    THE COURT: Yes.

20    ATTORNEY GOULD: Mr. Meyersiek,

21    you had a child support order that ran to your, uh, ran to your benefit in the

22    amount of $218.00 per week. Is that correct?

23    THE COURT: Can't hear you, Sir.

24    PLAINTIFF: (Inaudible).

25    THE COURT: Very, very faint. It's hard to

14

1    hear you.

2                                    PLAINTIFF: Is this better?

3                                    THE COURT: Perfect.

4                                    PLAINTIFF: Okay, good. Sorry. Yes, to

5    the best of my recollection, that was the amount.

6                                    ATTORNEY GOULD: Did you ever

7    receive child support from the Defendant mother directly, after May 24th, 2012?

8                                    PLAINTIFF: I only received two

9    payments. I believe one was in 2019 and one was in 2021.

10                                   ATTORNEY GOULD: So, from-

11                                   PLAINTIFF: I never, I never received

12   anything directly.

13                                   ATTORNEY GOULD: From 2012 to

14   2018, you received nothing in child support, correct?

15                                   PLAINTIFF: Not a single penny.

16                                   ATTORNEY GOULD: And that was a

17   time when the child was a minor, correct?

18                                   PLAINTIFF: Correct.

19                                   ATTORNEY GOULD: That was during a

20   period of time when you could've used the money for the child, correct?

21                                   PLAINTIFF: That is absolutely correct.

22                                   ATTORNEY GOULD: And you received

23   nothing, correct?

24                                   PLAINTIFF: That is correct, and I

25   should've had, I had to send my daughter to a school, I had to pay for every

1    meal, I had to pay for her clothing, I had to pay for everything.

2                                              ATTORNEY GOULD: You received a

3    payment sometime in 2018 in the amount of $6,461.95, correct?

4                                              PLAINTIFF: That is correct.

5                                              ATTORNEY GOULD: And then you

6    received a payment in 2021, on or about 12/9 for 2021, in the amount of

7    $4,185.98, is that correct?

8                                              PLAINTIFF: I don't recall the exact

9    amount.

10                                             ATTORNEY GOULD: Does that number

11   refresh your memory somewhat?

12                                             PLAINTIFF: Yes, it does.

13                                             ATTORNEY GOULD: Are you looking to

14   collect interest that accrued on that money from, from, I'm sorry, from May

15   202-, May 24th, 2012 up until today's date?

16                                             PLAINTIFF: Yes.

17                                             ATTORNEY GOULD: Did you make any

18   contracts, agreements with Miss Seguin outside Court that indicated that you

19   were going to waive interest?

20                                             PLAINTIFF: Absolutely not.

21                                             ATTORNEY GOULD: I have no further

22   questions of the Plaintiff.

23                                             PLAINTIFF: Thank you.

24                                             DEFENDANT: Uh, Your Honor, I have

25   been unable to object to anything because, uh, I was put on mute, but-

16

1          THE COURT: Okay, well, we can note

2     your objection now.

3          DEFENDANT: The, the, uh, at the last

4     hearing, uh, as well as, uh, the, uh, hearing before you were, uh, appointed, uh,

5     by the, uh, Judge, uh, in June 2023, we were on a motion to compel. So,

6     therefore, I do not have, based on discovery, discovery has not been completed.

7     Therefore, I am not ready to present the, uh, evidence and present the

8     arguments.

9          THE COURT: What, uh, what specifically,

10    what are you seeking in discovery that you haven't received yet?

11          DEFENDANT: I have, uh, as you can see,

12    I have that motion, uh, that is pending, that has been pending since June of 2023,

13    to compel production relative to my, uh, request for documents. I, I have a

14    pending motion-

15          THE COURT: You, you, you received all

16    of the Court documents.

17          DEFENDANT: No-

18          THE COURT: What out, what outside of

19    the Court documents are you seeking in discovery?

20          DEFENDANT: I'm seeking based on my,

21    uh, on the Court record that would show that I'm seeking my case file.

22          THE COURT: You have-

23          DEFENDANT: I'm entitled-

24          THE COURT: -you, no, no.

25          DEFENDANT: I do not have a, my case

1    file-

2                              THE COURT: You do have your case file.

3                              DEFENDANT: -I do not have my-

4                              THE COURT: It was scanned-

5                              DEFENDANT: I do not!

6                              THE COURT: -and sent to you as you

7    already acknowledged by Mr. Santamaria in numerous emails. The entire Court

8    file was scanned in and sent to you.

9                              DEFENDANT: Oh, you're talking about

10   the Court file. I'm talking about my child support case file. I'm entitled under

11   Federal law to have access to my Federal, my child support case file, and that's

12   the discovery that's being ordered. I have not been able, they have denied, on

13   paper, which is submitted within this Court record. The Court record shows that

14   they have, uh, refused, uh, uh, raising all kinds of issues to produce my child

15   support case record.

16                             ATTORNEY GOULD: Objection.

17                             DEFENDANT: Under Federal law, under

18   the Federal law, under Title IV of the Social Security Act, which is what this

19   process and this legal hearing is under-

20                             ATTORNEY GOULD: Objection.

21                             DEFENDANT: -(inaudible) under-

22                             THE COURT: Alright, what's-

23                             DEFENDANT: I have rights.

24                             THE COURT: -what's the basis of your

25   objection-

1            DEFENDANT: -I have a Federal rights-

2            THE COURT: -Mr. Gould?

3            DEFENDANT: -(inaudible), I have a

4    Federal right to my child support case file.

5            THE COURT: Hold on, Ma'am. He

6    objected and I wanna know the basis of his objection.

7            ATTORNEY GOULD: Relevance to the

8    issue before the Court, Judge. The issue before the Court is interest. The motions

9    that she's alleging that she's pursuing, the State file appropriate objections to her

10    discovery request. So, she needs a hearing on it instead of her other diversions

11    that she's had at the last nine months. We could've addressed these, Judge, but

12    we wanna keep pushing this off and pushing this off. So, the State has filed, the

13    State has responded to the discovery. I've had a conference with Miss Seguin, at

14    one point, to try to go over some of our disputes with regard to, with regard to

15    discovery. Uh, that did not turn out to be very productive. Uh, I have stated, uh,

16    on my, on her requests, uh, all the basis for our objections and I'm ready to

17    argue those objections, when she puts forth specific allegations, specific

18    documents in the specific request that she's looking for, but until then, Judge,

19    this is a real simple case of about whether or not this lady paid child support and

20    whether or not this gentleman is entitled to interest-

21            DEFENDANT: Objection.

22            ATTORNEY GOULD: -the Court has-

23            DEFENDANT: Objection.

24            ATTORNEY GOULD: -the Court has-

25            THE COURT: (Inaudible).

1               ATTORNEY GOULD: -filed-

2               DEFENDANT: Fundamentally, in order to

3    claim that I owe anything, I have a right to my child support case file under

4    Federal law.

5               THE COURT: Ma'am, what's this-

6               DEFENDANT: I have-

7               THE COURT: -what's specific document-

8               DEFENDANT: -(inaudible)-

9               THE COURT: -what specific document-

10              DEFENDANT: -since '21-

11              THE COURT: Ma'am, Ma'am, Ma'am, if

12   you keep yelling over me and over the Attorneys, this is not going to be

13   productive. I'm trying to just narrow this down to the specific piece of

14   information that you're seeking.

15              DEFENDANT: I am, Your Honor, I need

16   to have my entire case file. I, I have, the Court order-

17              THE COURT: Do you, do you-

18              DEFENDANT: -on February the 10th

19   ordered discovery. There were, by law, my right is to have my entire case file,

20   and, and by Federal Court, Federal law, I am entitled to have my entire case file.

21   Child support interstate encompasses, and this is an interstate case, encompasses

22   Federal law. It encompasses Texas law, because you are reaching your, your

23   long arm into the State of Texas. Therefore, I am entitled, by Federal law, and

24   by Texas law, as well as Rhode Island law, to have access to my child support

25   file.

1              THE COURT: Thank you Miss, Thank

2    you, Miss Seguin. Mr. Gould-

3              DEFENDANT: (Inaudible) Mr. Gould-

4              THE COURT: -what, what is the, what is

5    the State's objection-

6              ATTORNEY GOULD: Rel-, well for the

7    most part-

8              THE COURT: -to give-

9              ATTORNEY GOULD: -relevance, Judge.

10   She's, she is not gonna use the documents that she's requesting, in this case,

11   when she, when the documents you're requesting is what she is the target for in

12   her Federal case. So, she's not gonna use me as a pawn to get, to do her

13   discovery in her Federal case. This is a simple issue of child support, simple

14   issue of payments, but what she's trying to do is she tried to do her discovery,

15   her Federal discovery in this child support case. So, what I did is I laid out in, in

16   our responses, our objections, based on relevance. So, again, again, we went

17   another ten minutes of her for asking for certain, a multitude of documents

18   without her saying one specific document that she wants, one specific item, one

19   specific request for production that she's, we can do this, Judge. We can go for

20   another twenty minutes and do the same thing, but until she gets her eyes on a

21   piece of paper and looking at her motions and going word by word, and until we

22   can do that, Judge, I, we can't go anywhere. I've, I've stated our objection-

23             THE COURT: Well, that, I'm, I'm trying,

24   you know, I'm trying to work with you, Miss Seguin, to see if you can narrow it

25   down to a specific, a specific issue or a specific document that you believe

21

1    supports you and your contention that at some point, there was an agreement or

2    there was an order that waived the interest, but to be going on a fishing

3    expedition and insist that the State, uh, provide you with your case file, um, you

4    know-

5                                    DEFENDANT: Your, Your Honor,

6    discovery is to get my entire case file. I think that is something Federal law

7    guarantees, and it says so from 42 USC Section 654, all the way to 666. That

8    law luminous, uh, Federal law, codified by Congress, provides everyone in the

9    country the right to access all the case file, child support case file, maintained by

10    every and any State Government, and that is, I'm not the, eh, the, Congress has

11    never said that's sufficient expedition (?). Congress has said, you're allowed to

12    have your entire case file and from there on, you're even allowed to ask

13    questions. Why was this, why was, that's the due process and that is the equal

14    protection, and that is the Privileges and Immunities Clause that we're all

15    guaranteed and living under. This is an interstate case. I am entitled by the

16    Constitution and by Federal laws 654 to 666 to have access to my entire file. I

17    cannot, I am unable, no custodial parent or non-custodial parent is able, that's

18    mentioned in the Social Security Act, would be un-,would be able to actually

19    identify, say this is the document I'm asking for, but they don't have access to,

20    to the file.

21                                    THE COURT: Ma'am, you have access to

22    all of the Court orders.

23                                    DEFENDANT: I-

24                                    THE COURT: The Court-

25                                    DEFENDANT: But I-

22

1          THE COURT: -the Court, the Court is

2    what establishes the, the child support order, the arrears order, and interest goes

3    along with that, Ma'am. So-

4          DEFENDANT: You're talking about this

5    agreement that we're deal, talking about. Agreement that you just mentioned

6    that, Your Honor, deals with my case file and this is the case file I am, by law,

7    by the (inaudible), by Federal law, by Texas law, and by Rhode Island law,

8    entitled to have access to, and Mr. Gould and the Child Support, uh, Services

9    and, uh, of Human Services denies me both, all denying me access to those. So,

10   I am again, asking for that. I will ask in every possible jurisdiction for those

11   because I am entitled, by law, at least three jurisdictions. By Texas law, by

12   Federal law-

13         THE COURT: Thank you.

14         DEFENDANT: -and by Rhode Island law.

15         THE COURT: Thank you-

16         DEFENDANT: Nevermore-

17         THE COURT: -Mr. Gould? Thank you.

18   Okay, you've, you've you've made your point. I understand what your argument

19   is. Mr. Gould?

20         ATTORNEY GOULD: Judge, I went

21   another, I think, ten minutes, maybe nine minutes that time. I still don't know

22   what she's looking for. Uh, it's a motion to compel. If, if that's what she wanted,

23   then let's have the motion to compel. Let's hear that. Maybe, maybe she could

24   put those thoughts into words again and maybe come up with a plan that she

25   wants for this discovery, Judge, but what we're doing now is wasting your time,

1    and wasting my time, and we're not getting anywhere. So, we've provided her

2    volumes upon volumes of documents relative to her case. She had specific

3    questions that I objected to. The, the objections were timely. We had a

4    conference, we went through them. After the conference, I had not heard

5    anything from Miss, uh, Seguin. We've gone through, I think, since February,

6    five or six appearances, a couple before you. I, I could, that, that could be an

7    exaggeration. It could've been four, uh, but we've been before the Court and,

8    and we've come with other issues every time and we continue this and continue

9    this. Judge, again, in order to have equity, you have to have clean hands, and this

10   is a person who has failed to comply with THIS Court's orders. Not the

11   Constitution, not the Texas law, not the, not the Congress law. This is someone

12   who has failed to comply with your orders, with your Court's orders on a

13   specific matter-

14                                    DEFENDANT: Objection.

15                                    ATTORNEY GOULD: -with child support

16   with a very-

17                                    DEFENDANT: Ob, objection.

18                                    ATTORNEY GOULD: -very basic needs

19   of a child-

20                                    DEFENDANT: Objection.

21                                    ATTORNEY GOULD: -and we're gonna

22   give-

23                                    THE COURT: I'm gonna, I'm gonna, I'm

24   going to allow him to speak, just like I allowed you to speak. Mr., Mr. Gould,

25   continue.

1    ATTORNEY GOULD: I, I've said

2    enough, Judge.

3    DEFENDANT: Objection.

4    THE COURT: Again, the Court, the Court

5    takes judicial notice of both the May 24th, 2012 Court order, as well as the

6    subsequent September 25th, 2012 Court order. Um, there was, um, no appeal,

7    um, taken from either one of those Court orders. With respect to, um-

8    DEFENDANT: Objection. Objection,

9    Your Honor.

10    THE COURT: Your objection is noted,

11    thank you very, thank you, your objection is noted.

12    DEFENDANT: He, he-

13    THE COURT: Mr. Gould, what is the

14    specific, uh, amount of interest that, um, is, uh, should be on the system? Is it

15    $81,652.49?

16    ATTORNEY GOULD: Yes, Judge.

17    THE COURT: Okay, and was that the

18    amount that was, um, placed on the system back in February?

19    ATTORNEY GOULD: Correct, Judge.

20    THE COURT: The Court finds-

21    ATTORNEY GOULD: That number

22    (inaudible)-

23    THE COURT: -the Court finds that that is,

24    based on no, absolutely no evidence to the contrary, that that is the amount, um,

25    that should be set on this as of today, today's date.

1                                     ATTORNEY GOULD: Thank you, Your

2    Honor.

3                                      DEFENDANT: Objection.

4                                      THE COURT: Your objection is noted. I

5    gave my ruling.

6                                      DEFENDANT: May, Your Honor, Your

7    Honor-

8                                      THE COURT: I've made my ruling.

9                                      DEFENDANT: - I would like to place on

10   the record that I have not been able to complete the discovery that there, that the,

11   uh, the, uh, Child Support Agency had placed on the record that there is an

12   agree-, asking about an agreement. I have not been able to cross examine the

13   Defendant. That is a violative of due process-

14                                THE COURT: Sir, you can, Sir-

15                                DEFENDANT: -because my, I have-

16                                THE COURT: Ma'am, Ma'am, Ma'am-

17                                DEFENDANT: -the right to examine-

18                                THE COURT: -if you have any questions-

19                                DEFENDANT: -(inaudible)-

20                                THE COURT: -for Mr. Meyersiek, feel

21   free to, feel free to ask him.

22                                DEFENDANT: So, therefore, we are now

23   vacating your prior decision-

24                                THE COURT: No, we're not! No, we're

25   not!

1          DEFENDANT: -because we, because we

2    are, we have not gone through due process in terms of my asking, be able to

3    cross examine the Defendant. I'm sorry, the Plaintiff, the opposing party. I, I

4    would like to ask for my witness, Mr. Gould, to be, to the witness stand.

5          THE COURT: Mr. Gould-

6          ATTORNEY GOULD: Objection, Judge.

7          THE COURT: Mr. Gould is not, is not a

8    witness.

9          DEFENDANT: The State. The State, on

10   the State of Rhode Island and he represents the State of Rhode Island. He was

11   instrumen-, he had communicated with me prior to this particular proceeding,

12   the start of proceeding in 2022, by email, by conversation, and with John

13   Langlois. So, that's my witness. I'd like to put on the stand, as my witness-

14         THE COURT: Today, the matter before-

15         DEFENDANT: -regarding-

16         THE COURT: -the matter before the

17   Court-

18         DEFENDANT: -regarding-

19         THE COURT: -is a motion to set-

20         DEFENDANT: -the waiver of interest-

21         THE COURT: -to set arrears-

22         DEFENDANT: -regarding-

23         THE COURT: Ma'am, Ma'am-

24         DEFENDANT: -the waiver of interest-

25         THE COURT: Ma'am, I'm gonna mute

27

1    you again. The matter before the Court today is simply a motion to set arrears.

2    We set the arrears, there's nothing further before the Court. If you wanna file a

3    different motion, feel free to do so, but this matter is concluded with your arrears

4    being set at $81,652.49.

5                                    DEFENDANT: Your, unmute, am I

6    unmuted?

7                                    THE COURT: No. Yeah.

8                                    DEFENDANT: Am I unmuted? Uh, I am

9    filing, I am asking for, um, uh, reconsideration because there is, I have not, I've

10    been, uh, uh, barred, obstructed from presenting evidence. I'd like to play, uh,

11    the audio recording of the waiver of interest.

12                                    THE COURT: Today is the motion to set

13    the, to set the interest.

14                                    DEFENDANT: And that's my defense-

15                                    THE COURT: The motion to set arrears,

16                                    DEFENDANT: -my defense is, I would

17    like to play the recording of the waiver of interest that the State had represented

18    that Gero had done. If I'm obstructed from, uh, providing evidence and we have

19    a due process issue in this proceeding. I have not been, I want to present

20    evidence, I want to cross examine the witness, I want to pro-, I want to call my

21    witness and I have a right to do so-

22                                    THE COURT: Ma'am, if you want to do

23    that, this is not, this is not the forum for that. I can do that in another proceeding.

24                                    DEFENDANT: Yes, it is! Yes, it is-

25                                    THE COURT: Uh, well, I respectfully dis-

1   agree with you.

2                              DEFENDANT: -because we are here-

3                              THE COURT:  I respectfully disagree-

4                              DEFENDANT: -to establish, we are here

5   to establish, we're here supposedly to establish interest and I am presenting

6   evidence that interest was waived.

7                              THE COURT: Interest was not waived in

8   any Court order and that is the basis upon which-

9                              DEFENDANT: It was waived-

10                             THE COURT: -I made my decision today.

11                             DEFENDANT: -(inaudible)-

12                             THE COURT: Ma'am, Ma'am-

13                             DEFENDANT: -it was waived-

14                             THE COURT: -I'm muting you because

15   you don't let me speak. There is no Court order by this Court by any Magistrate

16   or Judge that waived or set the interest to zero. It is still in the system, and that is

17   why today I am going to establish that the interest owed by you on this account

18   is set at $81,652.49. There was no Court order to the contrary. This matter is

19   now concluded.

20                             DEFENDANT: I am now, I am now

21   raising the issue, uh, that interest was waived by contract and agreement-

22                             THE COURT: Ma'am, I, Ma'am-

23                             DEFENDANT: -with Gero Meyersiek-

24                             THE COURT: -I, I just, Ma'am-

25                             DEFENDANT: -and this is all part of the-

1      THE COURT: -I just gave you the

2  reasoning-

3      DEFENDANT: -(inaudible) process-

4      THE COURT: -for the Court's decision is

5  based on the fact that the Court file is void of any order or judgement that

6  waived the interest of set it to zero.

7      DEFENDANT: Also, the interest rate of

8  12% compounding interest is illegal under, uh, Social Security Act. They have

9  put out-

10      THE COURT: Well, that's the interest rate

11  that-

12      DEFENDANT: -12% compound interest-

13      THE COURT:  -that's been established-

14      DEFENDANT: -that is illegal under-

15      THE COURT: -by the State of Rhode

16  Island.

17      DEFENDANT: -Federal law, which

18  preempts Rhode Island law.

19      THE COURT: Thank you very much, Miss

20  Seguin-

21      DEFENDANT: I just wanna make sure

22  that-

23      THE COURT: Your objection is moted.

24      DEFENDANT: -(inaudible)-

25      THE COURT: Thank you very much-

1      DEFENDANT: -(inaudible)-

2      THE COURT: -Mr. Meyersiek-

3      DEFENDANT: -also entitled-

4      THE COURT: -Attorney Gould-

5      DEFENDANT: -to see Judge created laws

6   on these, this issue. I have been prevented from accessing those. There's

7   (inaudible) public records (inaudible)-

8      THE COURT: Ma'am, we gave you every

9   Court record you requested.

10      DEFENDANT: -Federal-

11      THE COURT: You requested-

12      DEFENDANT: -that was all Judge

13   created-

14      THE COURT: -you requested the Court

15   file-

16      DEFENDANT: -laws. (Inaudible) 12%

17   compounding interest-

18      THE COURT: -for a number of years. I'm

19   not going to let you yell at me.

20      DEFENDANT: Why-

21      THE COURT: You're not going to talk

22   over me.

23      DEFENDANT: Why-

24      THE COURT: This hearing is concluded.

25   Thank you very much.

```
 1                                   ATTORNEY GOULD: Thank you, Judge.

 2                                   DEFENDANT: I object and raise that the-

 3                                   THE COURT: Thank you-

 4                                   DEFENDANT: -interest, as well-

 5                                   THE COURT: Thank you.

 6                                   DEFENDANT: -and compound interest is

 7     illegal-

 8                                   ATTORNEY GOULD: Thank you, Judge.

 9                                   DEFENDANT: I'm looking to appeal this

10     to the Judge, Miss, uh, Your Honor, Magistrate-

11                                   THE COURT: And you're, and you're free

12     to do so.

13                                   DEFENDANT: And I'm doing that on an

14     oral basis, so here are-

15                                   THE COURT: You can file that with the

16     Clerk-

17                                   DEFENDANT: -I am doing that orally-

18                                   THE COURT: You can file that with the

19     Clerk. I will make a notation.

20                                   DEFENDANT: -this is an oral motion, an

21     oral motion, this is an oral motion-

22                                   THE COURT: Thank you.

23                                   DEFENDANT: -to-

24                                   THE COURT: It's noted.

25                                   DEFENDANT: -appeal the Magistrate's
```

1    order-

2                                    THE COURT: Your appeal from my

3    decision is noted. It will be put in the order.

4                                    DEFENDANT: -for a hearing, there was

5    no hearing on this, there was no trial on this, no trial was provided. I was

6    prevented from, uh, from, uh, from, uh, from presenting evidence-

7                                    THE COURT: And you may appeal my

8    decision-

9                                    DEFENDANT: -(inaudible) audio

10   recording-

11                                   THE COURT: -to a Famiy Court Justice.

12   Thank you very much.

13                                   DEFENDANT: I'm appealing it. I, I have

14   appealed it orally, now.

15                                   CLERK: Nope, can't do that.

16                                   THE COURT: You have to file an appeal

17   yourself in the Clerk's office.

18                                   CLERK: And she has to pay for a

19   transcript-

20                                   DEFENDANT: According to Turner

21   versus Rodgers, another U.S. Supreme Court case, I am entitled to not have to

22   do a, uh, a written motion. I can do an oral motion for an appeal to a, uh, to, to

23   the Jus-, Judge, uh, at iss-, that's, uh, of issue and I'm requesting a hearing date

24   for that appeal.

25                                   CLERK: Sorry, that goes before a Judge.

1                                DEFENDANT: Clerk (inaudible)-

2                                THE COURT: That has to go before a

3     Family Court Judge.

4                                CLERK: Only the Office can give appeal

5     dates, and there's a process and she has to order a transcript, and pay for it,

6     before that transcript will even be typed out.

7                                THE COURT: Miss Seguin, did you hear

8     the Clerk?

9                                DEFENDANT: Who is the, uh, who is the,

10    uh, the Scribe for this, the, uh, Stenographer? So, today, I wanna make very

11    clear, you all know you're establishing this Court, um, establishing interest and

12    what you're also saying is that the, the, uh, the interest was supposedly

13    established but you're reestablishing interest?

14                               THE COURT: I've made my ruling-

15                               DEFENDANT: There's no-

16                               THE COURT: -I've made my ruling-

17                               DEFENDANT: -(inaudible)-

18                               THE COURT: -Miss Seguin, I've made

19    my ruling. You've indicated you're interest in appealing. That is noted for the

20    record. We have other cases that are waiting to be heard. Thank you very much

21    and-

22                               DEFENDANT: I'm looking to-

23                               THE COURT: -you're free to follow up-

24                               DEFENDANT: -as a pro se litigant-

25                               THE COURT: -however you see fit. Thank

1    you so much.

2                                    DEFENDANT: -I'm looking to-

3                                    THE COURT: I understand that and thank

4    you.

5                                    DEFENDANT: -understand what the

6    Court order will say.

7                                    THE COURT: Thank-

8                                    DEFENDANT: What will the Court order

9    say? What will the Court order say?

10                                   THE COURT: Mr. Gould will draft the

11   Court order for my signature, and you'll receive a copy of it. Thnak you very

12   much.

13                                   DEFENDANT: Now, what would it, what

14   would it, so that we're all clear, so I can also put on the record any objections.

15   The objection, so, you're-

16                                   THE COURT: Miss Seguin-

17                                   DEFENDANT: -ordering reestablishment

18   because that's the motion. The motion is to reestablish interest.

19                                   THE COURT: It's not reestablish.

20                                   DEFENDANT: And-

21                                   THE COURT: It's set arrears. That was the

22   motion, to set arrears. The arrears are the interest that you owe on the case,

23   Ma'am, and this hearing is over.

24                                   DEFENDANT: So, you are-

25                                   THE COURT: I'm going to end the

35

1    hearing-

2                                    DEFENDANT: -you are (inaudible)-

3                                    THE COURT: You are not going to talk

4    over me. The hearing is over. You can file your appeal. Thank you very much.

5    Have a good day.

6                                    DEFENDANT: I would like to put on the

7    record-

8                                    THE COURT: The hearing is over,

9    Ma'am.

10                                   DEFENDANT: -um, my appeal.

11                                   THE COURT: The hearing is over. You

12   can't cont-

13                                   DEFENDANT: I would like to put on the

14   record for the appeal, because the appeal is critically important.

15                                   THE COURT: I understand that.

16                                   DEFENDANT: The appeal basically-

17                                   THE COURT: We're not, no, we're not

18   going to hear your appeal now.

19                                   DEFENDANT: You don't have-

20                                   THE COURT: We're not going to hear

21   your appeal now.

22                                   DEFENDANT: You don't have, this Court

23   does not have jurisdiction-

24                                   THE COURT: You've noted you're

25   objection, you've noted your objection, you're not going to argue your appeal

1  now and you're not gonna talk over me, okay. I've made my ruling. You

2  disagree with it. You have a right to appeal and the hearing is over, okay. You're

3  not going to argue your appeal here. You don't like my decision, you don't

4  agree with my decision, and the hearing is over, because there's nothing left to

5  discuss. I'm ending this meeting for everyone. I'm ending-

6                                      DEFENDANT: You-

7                                      THE COURT: I'm ending the meeting for

8  everyone.

9                                      DEFENDANT: The Family Court does not

10  have jurisdiction-

11                                      THE COURT: Thank you.

12                                      DEFENDANT: -over agreements between

13  Gero and myself-

14                                      THE COURT: Thank you. I'm ending, I'm

15  ending the meeting. Thank you.

16                                      DEFENDANT: I'm putting that on the

17  record. The Family Court lacks subject matter-

18                                      THE COURT: Okay.

19                                      DEFENDANT: -jurisdiction, nor personal

20  jurisdiction regarding agreements-

21                                      THE COURT: I'm ending the meeting-

22                                      DEFENDANT: -between Gero Meyersiek-

23                                      THE COURT: -for everyone.

24                                      DEFENDANT: -and myself-

25                                      THE COURT: Thank you, Mr. Meyersiek-

1                                    DEFENDANT: -and that was a question-

2                                    THE COURT: -thank you, Mr. Gould-

3                                    DEFENDANT: -Mr. Gould had posed-

4                                    THE COURT: Thank you very much. I'm

5       ending the meeting for everyone.

6                                    DEFENDANT: In-

7

8

9                                    **HEARING CONCLUDED.**

10

11

12

13

14

EXHIBIT F

## SPECIFICATION FOR OCSS CHANGE ORDER
### Auto Adjustment of Interstate Interest

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

- 1 -

EXHIBIT G

cseinfo.dhs.ri.gov

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov:

State of Rhode Island
# Office of Child Support Services
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Seguin

Home  My Profile  Contact Us  Site Map  Log Out

## Menu
- Case Information
  - Last 5 Payments
  - Last 13 Months
  - Current Orders/ Past Due Balances
  - Court Dates/ Appointments
  - Enforcement Actions
- PIN Lookup

Home > Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek          CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|--------|--------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Exhibit B

### SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

### FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

- 1 -

Exhibit C

Case Number: PC-2019-1857    Document: 00118120996    Page: 383    Date Filed: 04/09/2024    Entry ID: 6632760

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22   11:28          C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION     COMPREHENSIVE CASE HISTORY
```

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I_____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (████████████████). WE REMOVED THE INTEREST WHEN_____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $_____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP_____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

```
RL: 80  12 22 ABSP:          SEGUIN      MARY      CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K PNL:
```

Case Number K20001822M1
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10 13 PM
Envelope 4132704
Reviewer Maria O.

11:29:56 Tuesday, December 13, 2022

12/13/22   11:28           C A S E   T R A C K I N G           CSCL  ASMXA201
           TRAC.00               CASE HISTORY                   U024  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED_____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES_____

RL: 80  12 22 ABSP:          SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K   PNL:

Case 23-1807
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer: Maria O.

11:29:01 Tuesday, December 13, 2022

12/13/22   11:29          C A S E   T R A C K I N G          CSCL   ASMXA201
           TRAC.00             CASE HISTORY                   U824   PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
     FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
     FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: SO  12 22 ABSP;          SEGUIN      MARY          CMD: _____
FWK: TRAC  D CLIENT:         MEYERSIEK   GERO    X     PNL:

Case Number: 20-1067M    Document: 00118130806    Page: 386    Date Filed: 04/09/2024    Entry ID: 6632260
Filed: Providence Brazos County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maia G.

11:29:03 Tuesday, December 13, 2022

12/09/21 KEVIN TIGHE (KOT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

RL: 80  12 22 ABSP:                SEGUIN        MARY          CMD: _____
FXX: TRAC  D CLIENT:               MEYERSIEK     GERO      K   PNL:

ed in Providence/Bristol County Family Court
ibmitted 6/1/2023 10.13 PM
velope: 4132704
viewer Maria O
11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00            CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
     TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
     58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:           SEGUIN       MARY        CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK    GERO    K   PNL:
```

Case Number: 23001628M  Document: 00118130006  Page: 388  Date Filed: 03/09/2024  Entry ID: 6632260
Filed in Providence/Bristol County Family Court
Submitted: 5/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maya S.
11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28          C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00              CASE HISTORY                 U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
      TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
      58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

```
RL: 80  12 22 ABSP:              SEGUIN      MARY           CMD:
FNX: TRAC  D CLIENT:             MEYERSIEK   GERO      K    PNL:
```

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00            CASE HISTORY               UB24  PROD
STARTING DATE    09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

```
RL: 80  12 22 ABSP:          SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K     PNL:
```

ed in Providence/Bristol County Family Court
bmitted: 6/1/2023 10:13 PM
Viewer: Maria O.
Envelope: 4132704

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E    T R A C K I N G          CSCL  ASMXA201
            TRAC.00                 CASE HISTORY              U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985


RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:            SEGUIN        MARY         CMD: _____
                               MEYERSIEK     GERO    K    PNL:
```

Exhibit D

# Title 15
# Domestic Relations

## Chapter 5
## Divorce and Separation

### R.I. Gen. Laws § 15-5-16.5

**§ 15-5-16.5. Interest on arrearages.**

Interest at the rate of twelve percent (12%) per annum on any support debt due or owing, child or spousal support, shall be assessed unless the responsible party shall, for good cause shown, be relieved of the obligation to pay interest by the family court.

History of Section.
P.L. 1980, ch. 308, § 1; P.L. 1984, ch. 167, § 1; P.L. 2001, ch. 155, § 1.

Exhibit E



cseinfo.dhs.ri.gov

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov:

State of Rhode Island
## Office of Child Support Services
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Seguin

Home  My Profile  Contact Us  Site Map  Log Out

### Menu

**Case Information**
- Last 5 Payments
- Last 13 Months
- Current Orders/ Past Due Balances
- Court Dates/ Appointments
- Enforcement Actions
- PIN Lookup

Home > Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek        CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|--------|-------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

EXHIBIT F



EXHIBIT G

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JIM HODGES, in his official capacity
as Governor of the State of South
Carolina; JEAN HOEFER TOAL, in her
official capacity as Chief Justice of
South Carolina; SOUTH CAROLINA
DEPARTMENT OF SOCIAL SERVICES;
STATE OF SOUTH CAROLINA; PEOPLE OF
SC, on Behalf of the State of South
Carolina; JOHN DOE; JANE DOE, and
those similarly situated,
                    *Plaintiffs-Appellants,*

            v.                                      No. 00-2512

TOMMY G. THOMPSON, SECRETARY,
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; WADE
F. HORN, Ph.D. in his official
capacity as Assistant Secretary of
the United States Department of
Health and Human Services for
Children and Families; U.S.
DEPARTMENT OF HEALTH & HUMAN
SERVICES,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Julian Abele Cook, Jr., Senior District Judge, sitting by designation.
(CA-00-2048-3-17)

Argued: December 6, 2001

Decided: November 15, 2002

2                    HODGES v. THOMPSON

Before WIDENER, NIEMEYER, and MOTZ, Circuit Judges.

---

Affirmed by published per curiam opinion.

---

## COUNSEL

**ARGUED:** Marcus Angelo Manos, NEXSEN, PRUET, JACOBS & POLLARD, L.L.C., Columbia, South Carolina, for Appellants. Gregory George Katsas, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Wilburn Brewer, Jr., NEXSEN, PRUET, JACOBS & POLLARD, L.L.C., Columbia, South Carolina; A.E. Dick Howard, Charlottesville, Virginia, for Appellants. Stuart E. Schiffer, Acting Assistant Attorney General, Scott N. Schools, United States Attorney, Jacob M. Lewis, Peter J. Smith, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

## OPINION

PER CURIAM:

The Governor of South Carolina appeals the grant of summary judgment to the Secretary of the United States Department of Health and Human Services in the State's action seeking injunctive and declaratory relief from conditions imposed for federal funding of the Temporary Assistance to Needy Families (TANF) program.

South Carolina challenges the district court finding that Congress acted within its Spending Clause authority when it conditioned States' receipt of federal funds under the child support enforcement program and the TANF program on compliance with the requirement that States develop and maintain automated child support enforcement systems and that such a condition was not so coercive as to violate the Tenth Amendment. The State further alleges the district court

erred when it found that the Secretary did not have the discretion to amend the statutory penalty structure for a State's noncompliance with the child support systems requirements. In addition, South Carolina contends the court erred in finding that the State could not invoke the protections of the Due Process Clause. After considering the parties' briefs and the record, and following oral argument, we affirm substantially on the reasoning of the district court.

## I.

The district court opinion contains a comprehensive history, the details of which need not be repeated here, of the federal government's longstanding involvement in child support enforcement programs and related federal efforts to work with the States to solve the serious problem of nonpayment of child support. See *Hodges v. Shalala*, 121 F.Supp.2d 854 (D.S.C. 2000). Currently, as a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements that the State establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A). South Carolina concedes that it has neither a federally certifiable statewide automated system for child support nor an SDU. See *Hodges*, 121 F. Supp. 2d at 861.

Without an approved state plan, a State may lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). See 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2). Alternatively, a State may opt for an alternative penalty in lieu of disapproval of their state plan and the withholding of federal funds if the State is making a good faith effort to comply with the program's requirements and the State has submitted a corrective compliance plan. See 42 U.S.C. § 655(a)(4). South Carolina has elected to incur the alternative penalty.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and review a district court's grant of summary judgment *de novo*. See *United States v. Kanasco, Ltd.*, 123 F.3d 209, 210 (4th Cir. 1997).

4                              HODGES v. THOMPSON

II.

We turn first to South Carolina's contention that the federal government's requirements and penalties associated with the state-wide automated systems, which South Carolina failed to provide, exceed Congressional authority under the Spending Clause and the Tenth Amendment.

Consistent with its Spending Power, Congress may attach conditions on the receipt of federal funds. See *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Spending Power is not unlimited, of course, and the Supreme Court has recognized four general limitations: spending must be in pursuit of the general welfare; any attached conditions must be unambiguous; conditions must also be related to a federal interest; and, the obligations imposed by Congress may not violate any independent constitutional provisions. See *Dole*, 483 U.S. at 207-08.

The district court found that "Congress made a considered judgment that the American people would benefit significantly from the enhanced enforcement of child-support decrees and the diminution of the number of parents who are able to avoid their obligations simply by moving across local or state lines." *Hodges*, 121 F. Supp. 2d at 873. Thus, like the district court, we are satisfied that Congress acted in the general welfare when it enacted the child support enforcement programs and the associated funding conditions under Title IV-D.

South Carolina's contention that the Title IV-D conditions are ambiguous is without merit. The statute expressly provides that compliance with the automated system and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A. We agree with the district court that the clear and unequivocal statement of the required conditions in the statute enabled South Carolina to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted).

A third limitation on the Spending Power requires that conditions "bear some relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992) (citing *Dole*, 483 U.S. at 207-08, n.3). Here, there is a complementary relationship

between efficient child support enforcement and the broader goals of providing assistance to needy families through the TANF program. Establishing paternity and collecting child support may enable families to reduce their dependence on the welfare system, and both programs are intended to reduce the incidence of poverty among children and families. The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely to provide uniform levels of support for children of equal need").[1]

South Carolina does not contend that the Title IV-D conditions violate the fourth limitation on the Spending Power — that the conditions violate any independent Constitutional prohibition, rather it raises a Tenth Amendment[2] challenge. As we have recently reconfirmed, "the Tenth Amendment itself *does not* act as a constitutional bar to Congress's spending power; rather, the fourth restriction on Congress's spending power stands for the more general proposition that Congress may not induce the states to engage in activities that would themselves be unconstitutional." *James Island Pub. Serv. Dist. v. City of Charleston*, 249 F.3d 323, 327 (4th Cir. 2001) (citing *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000)) (italics in original). We therefore next consider South Carolina's Tenth Amendment argument, not as a limitation related to the Spending Clause, but as an independent constitutional challenge.

South Carolina argues that the coercive effect of the Title IV-D conditions run afoul of the protections of the Tenth Amendment. The Supreme Court has recognized that the Tenth Amendment may be implicated when the financial incentives offered by the federal government to the States cross the impermissible line where "pressure

---

[1] *Sullivan* considered the relationship between child enforcement programs and Aid to Families with Dependent Children (AFDC). 496 U.S. at 478. TANF is a block grant program established in 1996 as the successor to the AFDC program. See 42 U.S.C. §§ 601-618.

[2] The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

turns into compulsion." See *Dole*, 483 U.S. at 211 (citations omitted). Congress may use its Spending Power to influence a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, but Congress, under the Commerce Clause, may offer the States a choice of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

The district court found that, based on the State's own admission, the alternative penalty, which South Carolina has now elected, would result in the loss of a small fraction of the State's TANF funds and that such a proportion was noncoercive. Given the linkages between child support enforcement and aid to needy families and the level of the alternative penalty, we agree with the district court's conclusion that "the Title IV-D conditions are not so overbearing as to create an unconstitutional compulsion." *Hodges*, 121 F.2d at 875.

South Carolina next contends that the Secretary of the Department of Health and Human Services (HHS) has the discretion to deviate from the alternative penalty structure of Title VI-D in order to respond to the peculiar circumstances that led to South Carolina's noncompliance. Specifically, South Carolina argues that its inability to comply with the automated system and SDU requirements was caused by the failure of its prime contractor, Unisys, to deliver on its contract with the State. South Carolina maintains that because its noncompliance was no fault of its own and its alternative systems are in substantial compliance with the goals of the statute, the Secretary abused her discretion by refusing to grant South Carolina an evidentiary hearing and waive or amend the alternative penalty for noncompliance.

We have examined the penalty provisions of the statute and, like the district court, cannot find the discretion South Carolina envisions. The wording of the statute is plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submit-

ted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and *the Secretary shall reduce the amount otherwise payable to the State* [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). Again, we agree with the district court that "[b]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges*, 121 F.2d at 879. Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, South Carolina's assertion that it is entitled to an evidentiary hearing must also fail.[3]

### III.

For the foregoing reasons, we are of opinion that the Title IV-D provisions are constitutionally valid under the Spending Clause and the Tenth Amendment and that the Secretary lacks discretion under Title IV-D to deviate from the penalty provisions.

The judgment of the district court is accordingly

*AFFIRMED.*

---

[3]In the district court, South Carolina asserted a Due Process claim which the district court denied. The court concluded that the "State cannot invoke the protections of the Fifth Amendment with claims that [the State] has been harmed." *Hodges*, 121 F.2d at 865. South Carolina does not take issue with the district court's holding, but rather, on appeal it asserts that the State is entitled to assert a Due Process claim on behalf of its citizens. Because this contention was never properly presented to the district court, we do not consider it now. See *McGowan v. Gillenwater*, 429 F.2d 586, 587 (4th Cir. 1970).

EXHIBIT H

No. 10-10

# In the Supreme Court of the United States

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

*ON WRIT OF CERTIORARI*
*TO THE SUPREME COURT OF SOUTH CAROLINA*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**
**SUPPORTING REVERSAL**

NEAL KUMAR KATYAL
  *Acting Solicitor General*
  *Counsel of Record*
TONY WEST
  *Assistant Attorney General*
LEONDRA R. KRUGER
  *Acting Deputy Solicitor*
  *General*
JOSEPH R. PALMORE
  *Assistant to the Solicitor*
  *General*
LEONARD SCHAITMAN
EDWARD HIMMELFARB
  *Attorneys*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

SALLY A. HOWARD
  *Acting General Counsel*
ROBERT E. KEITH
  *Associate General Counsel*
LISETTE PEDRE MESTRE
  *Attorney*
  *Department of Health and*
  *Human Services*
  *Washington, D.C. 20201*

**QUESTIONS PRESENTED**

1.  Whether the Court has jurisdiction to review the decision of the South Carolina Supreme Court.

2.  Whether due process requires that the State provide counsel, at its expense, to an indigent parent in a child-support proceeding, when the parent is subject to a civil-contempt order for non-payment that may lead to confinement.

(I)

**TABLE OF CONTENTS**

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Argument:
    I.    The Court has jurisdiction to review the decision of
          the South Carolina Supreme Court . . . . . . . . . . . . . . . 13
    II.   The absence of adequate procedures necessary
          to secure an accurate adjudication of civil
          contempt violated due process . . . . . . . . . . . . . . . . . . . 16
          A.  Confinement for civil contempt is
              permitted only when the contemnor is
              presently able to comply with the
              underlying order . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
          B.  The Family Court's procedures were
              inadequate to ensure an accurate
              determination of present ability to pay . . . . . . . . 19
          C.  Due Process can be satisfied by a variety of
              procedures intended to assure an accurate
              determination of present ability to pay in a
              civil contempt proceeding . . . . . . . . . . . . . . . . . . 23
              1.  Courts can comply with Due Process by
                  providing a meaningful opportunity for an
                  alleged contemnor to establish his present
                  ability to pay . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
              2.  There is no basis for an inflexible right to
                  counsel rule in civil contempt proceedings . . . 25
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

(III)

IV

# TABLE OF AUTHORITIES

Cases:

*Alvarez* v. *Smith*, 130 S. Ct. 576 (2009) . . . . . . . . . . . . . . . 15

*Blessing* v. *Freestone*, 520 U.S. 329 (1997) . . . . . . . . . . . . . 3

*Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886
    (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Carlson* v. *Landon*, 342 U.S. 524 (1952) . . . . . . . . . . . . . . 32

*City of L.A.* v. *Lyons*, 461 U.S. 95 (1983) . . . . . . . . . . 14, 15

*DeFunis* v. *Odegaard*, 416 U.S. 312 (1975) . . . . . . . . . . . . 14

*First Nat'l Bank* v. *Bellotti*, 435 U.S. 765 (1978) . . . . . . . . 14

*Foucha* v. *Louisiana*, 504 U.S. 71 (1992) . . . . . . . . . . . . . 20

*Gagnon* v. *Scarpelli*, 411 U.S. 778
    (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25, 26, 27, 28, 29

*Gault, In re*, 387 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . 26

*Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418
    (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Hicks* v. *Feiock*, 485 U.S. 624 (1988) . . . . . . . . . . . . . . 17, 18

*Hodges* v. *Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000),
    aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied,
    540 U.S. 811 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*INS* v. *Lopez-Mendoza*, 468 U.S. 1032 (1984) . . . . . . . . . 32

*International Union, United Mine Workers* v.
    *Bagwell*, 512 U.S. 821 (1994) . . . . . . . . . . . . . . . . 18, 19, 26

*Landon* v. *Plasencia*, 459 U.S. 21 (1982) . . . . . . . . . . . . . 31

*Lassiter* v. *Department of Soc. Servs.*, 452 U.S. 18
    (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189
    (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Maggio* v. *Zeitz*, 333 U.S. 56 (1948) . . . . . . . . . . . . . . 17, 18

*Mathews* v. *Eldridge*, 424 U.S. 319
    (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19, 20, 25, 26, 29

V

Cases—Continued:                                      Page

*Middendorf* v. *Henry*, 425 U.S. 25 (1976) . . . . . 12, 26, 29, 31

*Mohammed* v. *Gonzales*, 400 F.3d 785 (9th Cir. 2005) . . . 32

*Morrissey* v. *Brewer*, 408 U.S. 471 (1972) . . . . . . . . . . . 19, 26

*Moseley* v. *Mosier*, 306 S.E.2d 624 (S.C. 1983) . . . . . . . . 17

*Murphy* v. *Hunt*, 455 U.S. 478 (1982) . . . . . . . . . . . . . 13, 14

*Nazakat* v. *INS*, 981 F.2d 1146 (10th Cir. 1992) . . . . . . . 33

*Olmstead* v. *L.C.*, 527 U.S. 581 (1999) . . . . . . . . . . . . . . . 15

*Shillitani* v. *United States*, 384 U.S. 364 (1966) . . . . . 11, 17

*Spencer* v. *Kemna*, 523 U.S. 1 (1998) . . . . . . . . . . . . . . 13, 14

*United States* v. *Bauer*, 956 F.2d 693 (7th Cir.),
    cert. denied, 506 U.S. 882 (1992) . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Campos-Asencio*, 822 F.2d 506
    (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States* v. *Gasca-Kraft*, 522 F.2d 149 (9th Cir.
    1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Rylander*, 460 U.S. 752 (1983) . . . . . . . . 18

*United States* v. *Torres-Sanchez*, 68 F.3d 227 (8th Cir.
    1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States Parole Comm'n* v. *Geraghty*,
    445 U.S. 388 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Vitek* v. *Jones*, 445 U.S. 480 (1980) . . . . . . . . . . . . . . . 26, 27

*Walters* v. *National Ass'n of Radiation Survivors*,
    473 U.S. 305 (1985) . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

*Weinstein* v. *Bradford*, 423 U.S. 147 (1975) . . . . . . . . . . . 14

*Wilkinson* v. *Austin*, 545 U.S. 209 (2005) . . . . . . . . . . . . . 19

*Yee* v. *City of Escondido*, 503 U.S. 519 (1992) . . . . . . . . . . 24

VI

Constitution, statutes and regulations:                Page

U.S. Const.:

  Amend. V (Due Process Clause) . . . . . . . . . . . . . . . . . 9, 19

  Amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 26, 27

  Amend. XIV (Due Process Clause) . . . . . . . . . . . . . . . 19

Social Services Amendments of 1974, Pub. L.
No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651
*et seq.*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

  § 101(c)(5)(C), 88 Stat. 2360 . . . . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 654(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 654(6) (1976) . . . . . . . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 654(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 654(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    42 U.S.C. 654(24) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    42 U.S.C. 654a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 654a(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 654a(e)(4) . . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 654a(e)(5) . . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 654a(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 655(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    42 U.S.C. 655(a)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . 2

    42 U.S.C. 655(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . 4

    42 U.S.C. 655(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 656(a)(1) (1976) . . . . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 657(a)(4)(B) (1976) . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 657(b) (1976) . . . . . . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 666(a)(1)-(8) . . . . . . . . . . . . . . . . . . . . . . . 4

VII

Statutes and regulations—Continued:                    Page

    42 U.S.C. 666(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . 30

    42 U.S.C. 666(a)(7)(B)(i) . . . . . . . . . . . . . . . . . . . . 30

    42 U.S.C. 666(a)(8)(A)(iv) . . . . . . . . . . . . . . . . . . . 30

    42 U.S.C. 666(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    42 U.S.C. 666(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 666(c)(1)(H) . . . . . . . . . . . . . . . . . . . . . . 30

Child Support Enforcement Amendments of 1984,
  Pub. L. No. 98-378,  98 Stat. 1329:

    § 6, 98 Stat. 1314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    § 23(a)(2), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . . . 4

    § 23(a)(5), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . . . 4

Family Support Act of 1988, Pub. L. No. 100-485,
  102 Stat. 2343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    § 123(a)(C), 102 Stat. 2352 . . . . . . . . . . . . . . . . . . . 5

Personal Responsibility and Work Opportunity
  Reconciliation Act of 1996, Pub. L. No. 104-193,
  110 Stat. 2105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    § 344(a)(2), 110 Stat. 2235 . . . . . . . . . . . . . . . . . . . . 6

Social Security Act Amendments of 1950, ch. 809,
  § 321(b), 64 Stat. 550 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Social Security Amendments of 1967, Pub. L.
  No. 90-248, § 201(a)(1), 81 Stat. 877-879 . . . . . . . . . . . . 2

    § 201(a)(1), 81 Stat. 879 . . . . . . . . . . . . . . . . . . . . . . . 3

8 U.S.C. 1229a(b)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . 32

8 U.S.C. 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. 3006A(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

28 U.S.C. 1257(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. 602(a)(26) (1976) . . . . . . . . . . . . . . . . . . . . . . 3

VIII

Statutes and regulations—Continued:                     Page

    42 U.S.C. 608(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

    42 U.S.C. 608(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    45 C.F.R.:

        Section 302.70(a)(5)(iii) . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.5(g)(2)(iii) . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.6 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        Section 303.6 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        Section 303.20(c)(7) (1975) . . . . . . . . . . . . . . . . . . . . . 4

        Section 303.20(c)(7) (1989) . . . . . . . . . . . . . . . . . . . . . 5

        Section 303.100(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.100(f)(4) . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.101(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.102(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.104(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 304.20(b)(3)(iv) . . . . . . . . . . . . . . . . . . . . . . . 5

        Section 304.23(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 304.23(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Sup. Ct. R. 14.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    S.C. Rule of Family Ct.:

        R. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        R. 24(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        R. 24(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    S.C. Code Ann. (West):

        § 43-5-220(c) (Supp. 2009) . . . . . . . . . . . . . . . . . . . . 25

        § 43-5-235 (Supp. 2009) . . . . . . . . . . . . . . . . . . . . . . . 7

        § 63-3-620 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

IX

Miscellaneous:                                        Page

   52 Fed. Reg. 32,130 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 31

   U.S. Dep't of Health & Human Servs.:

     National Child Support Enforcement, *Strategic Plan: FY 2005-2009*, http://www.acf.hhs.gov/programs/cse/pubs/2004/Strategic_Plan_FY2005-2009.pdf . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

     Office of Child Support Enforcement, *National Status of Automated Child Support Systems*, http://www.acf.hhs.gov/programs/cse/stsys/certmap.htm . . . . . . . . . . . . . . . . . . . . . . . . . 6

   Elizabeth G. Patterson, *Civil Contempt & the Indigent Child Support Obligor: The Silent Return of Debtor's Prison*, 18 Cornell J.L. & Pub. Pol'y 95 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

   S. Rep. No. 387, 98th Cong., 2d Sess. (1984) . . . . . . . . . . 30

   Elaine Sorensen et al., *Assessing Child Support Arrears in Nine Large States & the Nation* (2007) http://aspe.hhs.gov/hsp/07/assessing-CS-debt/report.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

   South Carolina Dep't of Social Servs., *Response to Budget Proviso 13.27* (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_083107.doc . . . . . . . . . . . . . . . . . . 6

# In the Supreme Court of the United States

---

No. 10-10

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

---

*ON WRIT OF CERTIORARI*
*TO THE SUPREME COURT OF SOUTH CAROLINA*

---

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**
**SUPPORTING REVERSAL**

---

### INTEREST OF THE UNITED STATES

This case concerns the due process protections that apply in a state civil contempt proceeding for non-payment of court-ordered child support. The state child-support enforcement program at issue in the case, like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 *et seq.*) (adding Title IV-D to the Social Security Act). The program, which is administered by the Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for 66% of the costs of operating their child-support enforcement programs. 42 U.S.C.

(1)

2

655(a)(2)(C). The United States has a substantial interest in the effective and equitable operation of such child-support programs.

### STATEMENT

1.  This case involves proceedings in South Carolina family court to enforce a child-support order entered against petitioner for the support of his and respondent Rogers' minor child. South Carolina, like every other State, maintains a child-support enforcement program as a condition of receiving federal funding for its Temporary Assistance for Needy Families program. Since Congress first required States receiving federal funds to undertake child-support enforcement efforts, it has shifted its emphasis from a localized, court-based enforcement approach to centralized and automated efforts. South Carolina, however, maintains a localized, court-based approach to child-support enforcement.

a.  Congress first required States receiving federal funds to establish child-support enforcement programs in 1950, pursuant to the Aid to Families with Dependent Children (AFDC) program. See Social Security Act Amendments of 1950, ch. 809, § 321(b), 64 Stat. 550 (requiring States receiving AFDC funds to "provide for prompt notice to appropriate law-enforcement officials of the furnishing of aid to dependent children in respect of a child who has been deserted or abandoned by a parent"). In 1968, Congress required States participating in AFDC to create statewide or local "organizational unit[s]" for establishing paternity and collecting child support. Social Security Amendments of 1967, Pub. L. No. 90-248, § 201(a)(1), 81 Stat. 877-879. It also required States to "provide for entering into cooperative arrangements with appropriate courts and law enforce-

3

ment officials  *  *  *  to assist" with administration of the program.  *Id.* § 201(a)(1), 81 Stat. 879.

b.  In 1975, Congress adopted Title IV-D, 42 U.S.C. 651 *et seq.*, and established the general statutory framework that exists today.  See 1975 Act § 101(a), 88 Stat. 2351; *Blessing* v. *Freestone*, 520 U.S. 329, 333-335 (1997) (describing program).  The 1975 Act required States participating in AFDC to "have in effect a plan approved" by the Secretary under Title IV-D and to "operate a child support program in conformity with such plan."  1975 Act § 101(c)(5)(C), 88 Stat. 2360.  In particular, each State was required to provide services to locate noncustodial parents and to establish the paternity of, and secure support for, children receiving AFDC benefits.  42 U.S.C. 654(4).

Under the 1975 Act, AFDC recipients were required to assign their support rights to the State and cooperate in enforcement efforts.  42 U.S.C. 602(a)(26) (1976).  Amounts recovered generally were retained by the State to reimburse it and the federal government for AFDC assistance provided to the child's family.  42 U.S.C. 657(b) (1976).  Once assigned, the support obligation was owed to the State and was collectible under all applicable state processes.  42 U.S.C. 656(a)(1) (1976).[1]

The Secretary's regulations implementing the 1975 Act reflected a localized, court-centered approach to enforcement.  States' efforts to collect past-due child support were required to include ("as applicable and necessary"):  "[c]ontempt proceedings to enforce an extant court order," court-ordered wage garnishment, and

---

[1]  Congress required States to provide services to non-AFDC families as well, 42 U.S.C. 654(6) (1976), although those families were not required to assign their support rights and any child support the State collected was paid to the family, 42 U.S.C. 657(a)(4)(B) (1976).

4

attachment of real and personal property. 45 C.F.R. 303.6 (1975). States were also required to maintain sufficient staff (either statewide or locally) to "enforce collection of support" by "executing contempt proceedings, wage assignments, obtaining garnishment orders, attaching real and personal property, criminal prosecution and executing judgments." 45 C.F.R. 303.20(c)(7) (1975).

c.  In 1984, Congress found that there remained "a critical lack of child support enforcement," which had "a critical impact on the health and welfare of the children of the Nation." Child Support Enforcement Amendments of 1984 (1984 Amendments), Pub. L. No. 98-378, § 23(a)(2) and (5), 98 Stat. 1329. The 1984 Amendments required States to adopt laws and procedures providing for, among other things, (i) mandatory wage withholding; (ii) expedited processes for obtaining and enforcing support orders; (iii) state income tax refund intercepts; and (iv) reporting overdue support to consumer credit agencies. 42 U.S.C. 666(a)(1)-(8) and (b).

Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for (optional) State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur." 1984 Amendments § 6, 98 Stat. 1314; 42 U.S.C. 654(16); 655(a)(3)(A).

d.  Congress amended Title IV-D again in 1988 to improve the rate of child-support collection. Family Support Act of 1988 (1988 Act), Pub. L. No. 100-485,

5

102 Stat. 2343. Because effective child-support enforce-
ment "had long been thwarted by localized enforcement
systems that were unable to quickly and effectively
track delinquent parents who crossed county and state
lines," *Hodges* v. *Shalala*, 121 F. Supp. 2d 854, 874
(D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert.
denied, 540 U.S. 811 (2003), Congress in the 1988 Act
emphasized centralized, automated record-keeping and
information retrieval in order to improve collection
rates. In particular, Congress mandated "automated
data processing and information retrieval system[s]"
that had previously been optional. 1988 Act § 123(a)(C),
102 Stat. 2352; 42 U.S.C. 654(24).

The Title IV-D regulations were amended after
adoption of the 1988 Act. As amended, the regulations
omitted specific references to contempt proceedings as
required means for enforcing child-support obligations.
See 45 C.F.R. 303.6, 303.20(c)(7) (1989);[2] cf. pp. 3-4, *su-
pra*.

e. Finally, Congress made further changes to the
child-support enforcement system in the Personal Re-
sponsibility and Work Opportunity Reconciliation Act of
1996 (1996 Act), Pub. L. No. 104-193, 110 Stat. 2105,
which, among other things, replaced AFDC with the
block-grant program called Temporary Assistance for
Needy Families (TANF).[3] Those changes again empha-
sized a centralized, automated approach to child-support

---

[2] Federal financial support remained available for "[e]nforcement of
a support obligation" through a variety of means, including contempt
citations. 45 C.F.R. 304.20(b)(3)(iv).

[3] The 1996 Act also imposed a five-year cap on benefits. 42 U.S.C.
608(a)(7). As before, a custodial parent is required to assign her rights
to child support to the State as part of the application for TANF assis-
tance. 42 U.S.C. 608(a)(3)(A).

6

enforcement. The amended statute established detailed requirements for the "statewide automated data processing and information retrieval systems" made mandatory in 1988. *Id.* § 344(a)(2), 110 Stat. 2235, 42 U.S.C. 654a(a). Among other things, the system must include a state case registry that includes every child-support case in the State, including the amount of monthly support owed and collected in all cases administered by the state agency. 42 U.S.C. 654a(e)(1) and (4); see 42 U.S.C. 654a(e)(5) (States must "promptly * * * update" case records when circumstances change). The States are required to use their centralized databases "to the maximum extent feasible, to assist and facilitate the collection and disbursement of support payments," including by establishing wage-withholding orders and sending wage-withholding notices to employers. 42 U.S.C. 654a(g)(1); see 42 U.S.C. 666(c).

f. Despite the changes in federal law, South Carolina maintains a localized, court-based approach to child-support enforcement. It is the only State that does not have a certified automated system. See Office of Child Support Enforcement, U.S. Dep't of Health & Human Servs., *National Status of Automated Child Support Systems*, http://www.acf.hhs.gov/programs/cse/stsys/certmap.htm.[4]

---

[4] In the 1996 Act, Congress determined that any State that failed to automate its child-support program should incur substantial penalties. 42 U.S.C. 655(a)(4). In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges* v. *Shalala*, *supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., *Response to Budget Proviso 13.27* at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

7

Acting pursuant to express statutory authority, S.C. Code Ann. § 43-5-235 (West Supp. 2009), the State's Department of Social Services has contracted with county clerks of court across the State to administer its program.  The South Carolina courts have in turn adopted a special rule governing child-support enforcement.  See S.C. Rule of Family Ct. 24 (S.C. Rule 24).  The rule requires clerks of court to review on a monthly basis "all child support and periodic alimony accounts paid through the clerk of court," as are all accounts for children whose custodial parent receives TANF assistance.  S.C. Rule 24(a); see 42 U.S.C. 608(a)(3)(A).  When any such account is in arrears, the clerk is required to "issue a rule to show cause and an affidavit identifying the order of the court which requires such payments to be made and the amount of the arrearage [and] directing the party in arrears to appear in court at a specific time and date" to face contempt proceedings.  S.C. Rule 24(b).

A "wilful[]" violation of a "lawful order" of a South Carolina court constitutes contempt and may subject the contemnor to up to 12 months confinement.  S.C. Code Ann. § 63-3-620 (West 2010).

2.  Respondent Rogers and petitioner are the parents of a minor child, B.L.P.  In 2003, the family court in Oconee County, South Carolina, entered an Order of Financial Responsibility against petitioner.  Although the order noted that petitioner was unemployed, the court imputed a gross monthly income of $1386 to him and ordered him to pay $59.72 a week in child support through the court.  Pet. App. 22a; see *id.* at 19a-24a, 25a.

083107.doc.  We are informed by HHS that the State has now paid a total of more than $72 million in penalties to date and currently owes an additional incurred penalty of more than $10 million for fiscal year 2010.

8

Because respondent Rogers was receiving public assistance, she assigned her right to collect child support to the Department of Social Services.  Pet. Br. 8; see *id.* at 9 n.6 (payments were remitted to respondent Rogers starting in 2004 because her benefits had ended but her case continued to be administered as a Title IV-D case). Petitioner fell behind on his payments, received a number of rules to show cause from the court clerk why he should not be held in contempt, and was jailed three times as a result.  *Id.* at 9-10.

By 2007, petitioner was $5728.76 behind on his child-support payments, and a judge of the Oconee County Family Court issued a bench warrant for his arrest. Pet. App. 6a; Pet. Br. 8-9.  A hearing was held on January 3, 2008.  After noting petitioner's outstanding balance and stating that he had not made a payment since August 2006, the judge asked petitioner, "[i]s there anything you want to say?"  *Id.* at 17a.  Petitioner responded:

> Well, when I first got out, I got back on dope.  I done meth, smoked pot and everything else, and I paid a little bit here and there.  And, when I finally did get to working, I broke my back, back in September.  I filed for disability and SSI.  And, I didn't get straightened out off the dope until I broke my back and laid up for two months.  And, now I'm off the dope and everything.  I just hope that you give me a chance.  I don't know what else to say.  I mean, I know I done wrong, and I should have been paying and helping her, and I'm sorry.  I mean, dope had a hold to me.

*Ibid.*

9

After a brief exchange between petitioner and respondent about his SSI application, the court said:

> If there's nothing else, this will be the Order of the Court. I find the Defendant in willful contempt. I'm gonna sentence him to twelve months in the Oconee County Detention Center. He may purge himself of the contempt and avoid the sentence by having a zero balance on or before his release.

Pet. App. 18a. The court made no finding that petitioner was capable of paying the arrears while incarcerated. See *id.* at 17a-18a.

At this hearing, neither petitioner nor respondent Rogers was represented by counsel. Pet. App. 6a. However, pro bono counsel filed an appeal on petitioner's behalf, alleging that petitioner had a right under the Sixth Amendment and the Due Process Clause to have appointed counsel in the contempt proceeding. *Id.* at 10a-15a. Before the intermediate state court could rule, the South Carolina Supreme Court granted discretionary review and affirmed the family court. *Id.* at 1a-5a.

The court noted that the "purpose of civil contempt is to coerce the defendant to comply with the court's order," while criminal contempt's purpose is "to punish a party for disobedience or disrespect." Pet. App. 2a-3a. "Civil contempt sanctions are conditioned on compliance with the court's order. * * * A contemnor imprisoned for civil contempt is said to hold the keys to his cell because he may end the imprisonment and purge himself of the sentence at any time." *Id.* at 3a. The court recognized that the "distinction between civil and criminal contempt is crucial because criminal contempt triggers additional constitutional safeguards not mandated in civil contempt proceedings." *Ibid.*

10

The court noted that in this case the family court had said that petitioner could "purge himself of the contempt" by achieving a "zero balance" on his arrearage. Pet. App. 3a. Reasoning that "[t]his conditional sentence is a classic civil contempt sanction," the court concluded that petitioner had no right to appointed counsel. *Ibid.*

### SUMMARY OF ARGUMENT

1. The Court has jurisdiction to review the decision of the South Carolina Supreme Court. Petitioner has completed his term of confinement for civil contempt and has not identified any collateral consequences flowing from the contempt. Those facts would ordinarily render his case moot. Petitioner, however, qualifies for a narrow exception to the mootness doctrine because the controversy is capable of repetition yet evading review. Sentences for civil contempt in South Carolina are limited to 12 months, and it is highly unlikely that petitioner would be able to secure plenary review by this Court within any future period of confinement. In addition, the constitutional violation petitioner asserts is capable of repetition because he remains subject to the underlying child-support order and still has substantial arrears. There is thus a reasonable expectation that he will receive automatically-generated rules to show cause for contempt in the future. Indeed, since the contempt at issue in this case, petitioner has been jailed again for civil contempt.

2. Petitioner's confinement for civil contempt violated due process, not because he lacked counsel, but because the procedures employed by the family court were inadequate to ensure the accurate determination of petitioner's present ability to pay his child-support ar-

11

rears.  That ability to pay was a necessary predicate to
the civil contempt sanction.

The defining feature of confinement for civil con-
tempt is its purpose to coerce compliance with a court
order.  Such confinement must therefore end upon dis-
charge of the contemnor's obligations; he is said to hold
"the keys of [his] prison in [his] own pocket[]."  *Shilli-
tani* v. *United States*, 384 U.S. 364, 368 (1966) (citation
omitted).  Such confinement may not be imposed, how-
ever, where the contemnor demonstrates his inability to
comply with the order.  In such cases, he does not truly
hold the keys to the prison; to confine him nonetheless
would render the confinement punitive and thus a sanc-
tion that may be imposed only after compliance with
criminal case safeguards.

The question of petitioner's ability to pay his child-
support arrears therefore should have been a focus of
the civil contempt proceeding, but it was not.  Pro se
petitioner was afforded no meaningful opportunity to
establish his indigency, and even after he made a state-
ment that could have easily been understood to mean he
had no present ability to pay nearly $6000 to avoid jail,
the family court judge made no further inquiry on the
matter before committing him to a nominally conditional
term of confinement.

The proceeding did not comply with due process be-
cause there was a serious risk of erroneous deprivation
of petitioner's liberty through the procedures employed
and because additional procedures would have enhanced
the accuracy of the proceeding without materially im-
pinging on any governmental interest.  See *Mathews* v.
*Eldridge*, 424 U.S. 319, 335 (1976).  Provision of counsel
would have been a sufficient, but not a necessary, means
of satisfying due process in this case.  There were other

12

means of providing petitioner with a meaningful opportunity to establish his present inability to pay, such as asking him to complete an understandable form seeking his financial information, or asking him questions on the topic as necessary at a hearing. In the typical case, providing basic information about one's personal finances is not the kind of undertaking that requires assistance of counsel, and due process protections are based on the requirements of the mine-run case, not the exceptional one.

There is no basis for petitioner's proposed categorical due process right to appointed counsel in civil contempt proceedings where confinement is imposed. The Court has declined to recognize a categorical constitutional right to appointed counsel in the context of other non-criminal proceedings that can result in confinement. *Gagnon* v. *Scarpelli*, 411 U.S. 778, 782-790 (1973) (probation revocation); *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (summary court-martial). Civil contempt proceedings in child-support cases are relatively brief; the custodial parent may not be represented by counsel; and the issues in dispute are generally not complex. Given those circumstances, there is no warrant for recognizing a categorical right to defense counsel in such proceedings. Finally, recognizing a due process right to counsel in such proceedings would upset the balance struck by Title IV-D and its implementing regulations, both of which stress the importance of due process protections in child-support proceedings but neither of which permit federal funding for provision of counsel.

13

## ARGUMENT

### I. THE COURT HAS JURISDICTION TO REVIEW THE DE-CISION OF THE SOUTH CAROLINA SUPREME COURT

Although petitioner has completed his term of confinement for the civil contempt at issue here, his claim is not moot because he remains subject to the underlying child-support order and because there is a reasonable expectation that he will face future contempt proceedings. His claim thus avoids mootness because it is capable of repetition yet evading review. This Court thus has jurisdiction to review the final judgment of the South Carolina Supreme Court. See 28 U.S.C. 1257(a).

1. "In general a case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy* v. *Hunt*, 455 U.S. 478, 481 (1982) (internal quotation marks omitted) (quoting *United States Parole Comm'n* v. *Geraghty*, 445 U.S. 388, 396 (1980)). While a currently confined individual's challenge to his confinement generally presents no question of mootness, an individual who has been released from confinement ordinarily may continue to press his challenge only if he suffers some "collateral consequence" that constitutes a "concrete and continuing injury." *Spencer* v. *Kemna*, 523 U.S. 1, 7 (1998). Because this Court "ha[s] been willing to presume that a wrongful conviction has continuing collateral consequences," the Court ordinarily will not dismiss as moot a criminal defendant's challenge to his conviction once the defendant has completed his term of imprisonment. *Id.* at 8. But the Court has not employed that presumption in other contexts, instead requiring a party not in custody to demonstrate that he will actually face collateral consequences if he does not secure relief

14

on appeal. See *id.* at 14 (no presumption of collateral consequences for parole revocation); see also *id.* at 14-16 (reviewing party's claimed collateral consequences).

Petitioner has completed his term of confinement for civil contempt. Because he challenges a civil order, not a criminal conviction, no presumption of collateral consequences applies. Moreover, petitioner has not identified any collateral consequences flowing from the finding of civil contempt. Ordinarily, petitioner's challenge to that finding would be considered moot and beyond this Court's jurisdiction.

2. Petitioner's claim in this case, however, avoids mootness because his is one of the "exceptional situations" in which a claim is capable of repetition, yet evading review. *City of L.A.* v. *Lyons*, 461 U.S. 95, 109 (1983). In non-class actions, this doctrine requires satisfaction of two elements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy*, 455 U.S. at 482 (quoting *Weinstein* v. *Bradford*, 423 U.S. 147, 149 (1975) (per curiam)). Petitioner satisfies both elements.

First, confinement for civil contempt in South Carolina is limited to 12 months, S.C. Code Ann. § 63-3-620 (West 2010), and it is exceedingly unlikely that a contemnor could appeal through the South Carolina court system, petition this Court for a writ of certiorari, and receive a decision on his claim within such a limited time period. See, *e.g.*, *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765, 774 (1978) (18 months was "too short a period of time for appellants to obtain complete judicial review"); cf. *DeFunis* v. *Odegaard*, 416 U.S. 312, 319 (1975) (per curiam) (future challenge to law school

15

admission procedure could likely come to this Court for decision within three-year period of law school matriculation). Indeed, in this case, petitioner had completed his term of imprisonment for civil contempt more than a year before the South Carolina Supreme Court rendered its decision. Compare Pet. App. 8a with *id.* at 1a.

Second, petitioner "can make a reasonable showing that he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109. Petitioner is still subject to the underlying order for child support, and he is nearly $14,000 in arrears. Pet. Br. 15; J.A. 104a. Given that clerks of court in South Carolina automatically issue rules to show cause when a non-custodial parent is late on a required payment, there is a reasonable expectation that petitioner will again be subject to contempt proceedings. Indeed, after he was released from jail for the contempt at issue here, petitioner was again held in contempt and reincarcerated. In May 2010 yet another rule to show cause for contempt issued due to failure to pay support to respondent. Pet. Br. 13-15; see *id.* at 15 (May 2010 rule to show cause is still outstanding); see also *Olmstead* v. *L.C.*, 527 U.S. 581, 594 n.6 (1999) (suit by plaintiffs seeking community-based services rather than institutionalization not moot even though they were then receiving desired services, because of "the multiple institutional placements [they] ha[d] experienced"). This is thus far from "an abstract dispute about the law" that might be thought "unlikely to affect [petitioner] any more than it affects other [South Carolina] citizens." *Alvarez* v. *Smith*, 130 S. Ct. 576, 580 (2009).[5]

---

[5] That petitioner was represented by pro bono counsel in a subsequent contempt proceeding involving a different support order, see Pet. Br. 15 n.10, does not mean his claim is incapable of repetition. Were pro bono counsel bound to represent petitioner in every future contempt

16

## II. THE ABSENCE OF ADEQUATE PROCEDURES NECES-SARY TO SECURE AN ACCURATE ADJUDICATION OF CIVIL CONTEMPT VIOLATED DUE PROCESS

The validity of the civil contempt order against petitioner turned on a critical fact:  his present ability to purge himself of contempt by paying off his past-due child support.  The family court's procedures in this case violated due process because they were inadequate to ensure an accurate determination of that fact and thus prevent an erroneous deprivation of petitioner's liberty. Although provision of government-provided counsel would have been a sufficient means of complying with due process requirements in this case, it was not a necessary one.  Other mechanisms, such as requiring an affidavit for disclosure of financial information and a preliminary assessment of petitioner's current ability to pay child support, would have satisfied the requirements of due process.

### A. Confinement For Civil Contempt Is Permitted Only When The Contemnor Is Presently Able To Comply With The Underlying Order

Both civil and criminal contempt can lead to confinement, but this Court has long distinguished the two based on the "character and purpose" of the sanction imposed.  *Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911).  In civil contempt, the "punishment * * * [is] remedial," in that it is intended to "coerc[e]

---

proceeding, then his claim of entitlement to the assistance of counsel would be moot.  There is no indication in the record, however, that pro bono counsel is under any such obligation and, in fact, counsel did not appear in a 2009 contempt proceeding involving support owed respondent, see *id.* at 13-14 (noting that petitioner appeared pro se in 2009 and served six months for civil contempt).

17

the defendant to do what he had refused to do." *Id.* at 442. Punishment for criminal contempt, on the other hand, is "punitive" and is imposed "to vindicate the authority of the court." *Id.* at 441.

Because of that fundamental distinction, confinement imposed for civil contempt is conditional. The sentence must include a purge clause under which the contemnor will be immediately released upon compliance with the underlying court order. *Hicks* v. *Feiock*, 485 U.S. 624, 634 (1988). When confined under such a civil contempt order, the contemnor holds "the keys of [his] prison in [his] own pocket[ ]." *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted); see *id.* at 370 ("While any imprisonment, of course, has punitive and deterrent effects, it must be viewed as remedial if the court conditions release upon the contemnor's willingness" to comply with a court order.).

A purge clause by itself, however, will not render the contemnor's confinement remedial rather than punitive because "the justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order." *Shillitani*, 384 U.S. at 370-371. Accordingly, "punishment may not be imposed in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." *Hicks*, 485 U.S. at 638 n.9; see *Maggio* v. *Zeitz*, 333 U.S. 56, 72 (1948) ("[T]o jail one for a contempt for omitting an act he is powerless to perform would * * * make the proceeding purely punitive, to describe it charitably."); see also *Moseley* v. *Mosier*, 306 S.E.2d 624, 626 (S.C. 1983)

18

("When the parent is *unable* to make the required payments, he is not in contempt.").[6]

The burdens of production and persuasion may be placed on the defendant to demonstrate his present inability to comply with an order.  See *Hicks*, 485 U.S. at 637; *United States* v. *Rylander*, 460 U.S. 752, 757 (1983). Accordingly, if the defendant "offers no evidence as to his inability to comply," "stands mute," or is disbelieved by the court, then he fails to carry his burden and may be held in contempt.  *Maggio*, 333 U.S. at 75.  But the trial court "is obliged" to consider "all the evidence properly before it in the contempt proceeding in determining whether or not there is actually a present ability to comply and whether failure so to do constitutes deliberate defiance which a jail term will break."  *Id.* at 76.

If, upon examination, a contempt penalty is considered punitive rather than remedial, it will be vacated unless all "the protections that the Constitution requires of * * * criminal proceedings" were provided.  *International Union, United Mine Workers* v. *Bagwell*, 512 U.S. 821, 826 (1994) (quoting *Hicks*, 485 U.S. at 632).

---

  [6]  A defendant may not avoid a finding of civil contempt for violating an order by collaterally attacking that order in the contempt proceeding.  See *Maggio*, 333 U.S. at 74-75.  The defendant may, however, make the distinct assertion that he has a "*present* inability to comply with the order in question."  *United States* v. *Rylander*, 460 U.S. 752, 757 (1983); see *ibid.* ("While the court is bound by the enforcement order, it will not be blind to evidence that compliance is now factually impossible.  Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."); *Maggio*, 333 U.S. at 74-75.

19

### B. The Family Court's Procedures Were Inadequate To Ensure An Accurate Determination Of Present Ability To Pay

The procedures employed by the family court violated petitioner's due process rights because they were inadequate to ensure that petitioner was not erroneously confined as an inducement to perform a task he was powerless to perform, while additional procedures to ensure petitioner's present ability to pay his child-support arrears would have been minimally burdensome.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews* v. *Eldridge*, 424 U.S. 319, 332 (1976). Confinement for civil contempt is a deprivation of liberty, and the alleged contemnor is thus entitled to procedural due process protections before its imposition. Cf. *Morrissey* v. *Brewer*, 408 U.S. 471, 482 (1972) (termination of parole triggers due process protections); see also *Bagwell*, 512 U.S. at 827 (civil contempt requires "notice and an opportunity to be heard").

The conclusion that due process applies is the beginning of the inquiry, not its end, because "the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands.'" *Wilkinson* v. *Austin*, 545 U.S. 209, 224 (2005) (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The Court has "generally * * * declined to establish rigid rules and instead ha[s] embraced a framework to evaluate the sufficiency of particular procedures." *Ibid.* That framework involves "consideration of three distinct factors:

20

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews*, 424 U.S. at 335.

Application of the *Mathews* factors here demonstrates that the family court proceeding did not comply with the requirements of procedural due process. First, petitioner's private interest in avoiding incarceration was significant. See *Foucha* v. *Louisiana*, 504 U.S. 71, 80 (1992).

Second, there was a serious "risk of an erroneous deprivation" of petitioner's liberty interest under the procedures employed by the family court, and there would have been value in additional procedures. *Mathews*, 424 U.S. at 335. Petitioner did not dispute that he had failed to comply with his child-support order, so the propriety of his confinement for civil contempt thus turned on his present ability to do so. See pp. 17-18, *supra*; Pet. Br. 3-4 (petitioner's ability to pay "was the precise question before the family court"); *id.* at 17. But South Carolina automatically referred petitioner for contempt proceedings without considering whether petitioner was employed or had assets. At the contempt hearing, the court solicited no financial information from petitioner, nor was there apparently any mechanism in place for him to provide it on his own. Petitioner's statement at the hearing that he had been un-

21

able to work because he broke his back, Pet. App. 17a, could reasonably be understood to constitute a claim that he had no present ability to pay nearly $6000. The court did not explore this question, however; it made no inquiry into petitioner's income or assets. Instead, the court imposed a jail sentence unaccompanied by any finding that petitioner had the ability to pay off his outstanding balance from a jail cell.[7] Taking additional modest steps to determine whether petitioner had the present ability to discharge his obligation, see pp. 24-25, *infra*, would have improved the accuracy of the proceeding.

Finally, the government's interests also favor additional procedural safeguards to ensure that only those parents with a present ability to pay are confined for civil contempt. While the State has a strong interest in enforcing child-support orders, it secures no benefit from jailing a non-custodial parent who cannot discharge his obligation. The period of incarceration makes it less, rather than more, likely that such parent will be able to pay child support. See Elizabeth G. Patterson, *Civil Contempt & the Indigent Child Support Obligor: The Silent Return of Debtor's Prison*, 18 Cornell J.L. & Pub. Pol'y 95, 126 (2008) (*Civil Contempt*). Meanwhile, the State incurs the substantial expense of confinement.

Moreover, as a general matter, the routine use of contempt for non-payment of child support is likely to be an ineffective strategy for enforcing support orders. See National Child Support Enforcement, U.S. Dep't of Health & Human Servs., *Strategic Plan: FY 2005-2009*, at 2, 10 (*Strategic Plan*), http://www.acf.hhs.gov/

---

[7] The judge told petitioner, "[i]f you've got a job, I'll make you eligible for work release," Pet. App. 18a, but petitioner states he was ineligible for work release, Pet. Br. 12 n.8.

programs/cse/pubs/2004/Strategic_Plan_FY2005-2009.
pdf.  While child-support recovery efforts once "followed
a business model predicated on enforcement" that "in-
tervened only after debt, at times substantial, accumu-
lated and often too late for collection to be successful, let
alone of real value to the child," experience has shown
that alternative methods—such as order modifications,
increased contact with non-custodial parents, and use of
"automation to detect non-compliance as early as possi-
ble"—are more effective.  *Id.* at 2.

A substantial portion of child-support obligors have
no or low reported income.  Elaine Sorensen et al., *As-
sessing Child Support Arrears in Nine Large States &
the Nation* 22 (2007) (*Assessing Child Support Arrears*),
http://aspe.hhs.gov/hsp/07/assessing-CS-debt/report.pdf
(obligors with $10,000 or less in annual income consti-
tuted half of the child-support obligors and owed 70% of
the arrears in a nine-state study).  Such individuals'
child-support obligations are often substantial.  See *id.*
at 54 ("For obligors with reported income of $10,000 a
year or less, the median percent of reported income that
was due as current support was 83[%].").  A low-income
individual in arrears on child-support payments is
"rarely a candidate for civil incarceration because of the
likelihood that he or she is unable to pay the hefty sum
represented by the accumulated arrears, or even a por-
tion thereof that may be set by the court as the purge
amount." *Civil Contempt* 116.[8]

---

[8]  To be sure, coercive enforcement remedies, such as contempt, have
a role to play in child-support enforcement efforts, such as with non-
custodial parents who are hiding assets or unreported self-employment
or under-the-table income.  See *Strategic Plan* 2; *Assessing Child
Support Arrears* 4-5, 22-23, 25; *Civil Contempt* 97.  There is no evi-

23

Many States have taken alternative steps to avoid child-support arrears, such as establishing more realistic support orders, "increas[ing] parental participation in the order establishment process," providing employment services to non-custodial parents, or using automation tools to improve wage withholding. *Assessing Child Support Arrears* 10-11, 80-89; see *id.* at 85 (study of Florida program that provides employment services and case management to non-custodial parents found that program participants paid nearly five dollars in child support for every dollar spent on the program). Such alternatives, which focus on early intervention rather than after-the-fact efforts to collect substantial accumulated arrears, are more likely to be effective means of enforcing the child-support obligations of the substantial number of low-income obligors. See *Strategic Plan* 2.

### C. Due Process Can Be Satisfied By A Variety Of Procedures Intended To Assure An Accurate Determination Of Present Ability To Pay In A Civil Contempt Proceeding

Petitioner argues that, in order to ensure that his civil contempt proceeding "remain[ed] civil," Pet. Br. 39, due process required the appointment of counsel to assist him in establishing his inability to comply with the court's order, see *id.* at 41. Although we agree that petitioner's due process rights were violated, we disagree that the State's failure to appoint counsel was itself the basis of the violation. Appointment of counsel is certainly one way to help ensure an accurate determination of the obligor's current ability to pay—the determination on which the "civil" nature of a civil contempt sanction rests—but it is not the only way. It was the State's

dence, however, that routine use of contempt among low-income non-custodial parents is generally effective. See *Civil Contempt* 126.

24

failure to provide any meaningful mechanism for making that determination in this case, and not its failure to provide counsel in particular, that violated petitioner's due process rights.[9]

> **1. Courts can comply with due process by providing a meaningful opportunity for an alleged contemnor to establish his present ability to pay**

While there is no basis for a constitutional rule categorically requiring appointment of counsel in all civil contempt that could lead to deprivation of physical liberty, see pp. 25-32, *infra*, due process does require procedures sufficient to ensure fundamental fairness. In the context of a civil contempt proceeding for non-payment of child support that could lead to confinement, this means procedures adequate to allow a pro se contemnor to attempt to carry his burden of establishing his present inability to pay.

Such procedures may include requiring a non-paying parent to complete an understandable form seeking financial information. South Carolina already requires

---

[9] Although petitioner's submissions below and in this Court have focused on the value of appointed counsel in ensuring that indigent child-support obligors are not erroneously jailed as a means of inducing them to comply with their obligations, see, *e.g.*, Pet. i, Pet. App. 13a, fairly encompassed in those submissions is the proposition that due process demands an appropriate procedure to evaluate an obligor's present ability to pay. See Sup. Ct. R. 14.1(a); *Yee* v. *City of Escondido*, 503 U.S. 519, 534 (1992). In conducting that inquiry, it should be open to the Court to consider whether there are alternative procedures, other than the specific procedure petitioner has proposed, that would satisfy constitutional requirements. To the extent the Court concludes otherwise, however, the proper course would be to dismiss the writ of certiorari as improvidently granted and await a case that expressly raises a broader due process claim.

25

noncustodial parents to fill out such a form when a sup-
port order is originally sought in a Title IV-D case, see
S.C. Code Ann. § 43-5-220(c) (West Supp. 2009), but ap-
parently does not do so in subsequent contempt proceed-
ings.  Requiring that such forms be completed at the
outset of a contempt proceeding would impose little ex-
pense on the State or burden on the proceeding while
materially advancing the accuracy of the court's deter-
mination.  Such information could by itself establish the
contemnor's present inability to pay his arrears or, con-
versely, demonstrate his ability to pay.  To the extent
the court had questions about the information on the
form or disbelieved it, the court could question the
contemnor about his finances at the contempt hearing.
Such simple, minimally burdensome procedures would
enable the court to evaluate whether the alleged
contemnor has the ability to pay his arrears and is thus
an appropriate candidate for a civil contempt sanction.

### 2.  *There is no basis for an inflexible right to counsel rule in civil contempt proceedings*

Although the constitutional inadequacy of the family
court's procedures could have been cured by appoint-
ment of counsel (who presumably would have addressed
petitioner's inability to pay his arrears and urged the
court not to jail him for that reason), appointment of
counsel was not constitutionally compelled.

a.  "The very nature of due process negates any con-
cept of inflexible procedures universally applicable to
every imaginable situation."  *Lujan* v. *G&G Fire Sprin-
klers, Inc.*, 532 U.S. 189, 196 (2001) (quoting *Cafeteria &
Rest. Workers* v. *McElroy*, 367 U.S. 886, 895 (1961)); see
*Mathews*, 424 U.S. at 334 ("[D]ue process is flexible and
calls for such procedural protections as the particular

26

situation demands.") (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The question in a due process case is how to ensure a fundamentally fair proceeding, taking into account the importance of the private interest at issue, the risk of error and value of additional procedures, and the government's interest. See *id.* at 335. This is not an inquiry that typically lends itself to the kind of categorical approach advocated by petitioner. See *Gagnon* v. *Scarpelli*, 411 U.S. 778, 789 (1973) (contrasting categorical Sixth Amendment right to counsel in criminal prosecution "with the more limited due process right" in other contexts).[10]

In fact, in areas outside traditional criminal prosecutions where an individual's liberty is nonetheless at stake, the Court has declined to recognize a categorical right to counsel, instead relying on alternative procedural safeguards to ensure due process. See *Gagnon*, 411 U.S. at 782-790; see also *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (no due process right to counsel for summary courts-martial).[11] For example, in *Gagnon*,

_____

[10] The Sixth Amendment right to counsel is inapplicable to a civil contempt proceeding because it is not a "criminal prosecution[ ]." U.S. Const. Amend. VI; see *Bagwell*, 512 U.S. at 826-827.

[11] In *In re Gault*, 387 U.S. 1 (1967), the Court recognized a due process right to appointed counsel in a juvenile delinquency proceeding, but, as the Court later explained, that was because the proceeding "while denominated civil, was functionally akin to a criminal trial." *Gagnon*, 411 U.S. at 789 n.12. In *Vitek* v. *Jones*, 445 U.S. 480 (1980), a plurality would have held that there is a due process right to counsel before a State involuntarily transfers a prisoner to a state mental hospital for psychiatric treatment. See *id.* at 497. Justice Powell's controlling concurrence, however, disagreed, concluding that "the fairness of an informal hearing designed to determine a medical issue" does not "require[ ] participation by lawyers." *Id.* at 500. Justice Powell agreed that a prisoner "required assistance" in such a proceeding to ensure

27

the Court held that due process required the government to provide a preliminary and final hearing before it could incarcerate an individual for violating the terms of his probation.  See 411 U.S. at 782; see also *id.* at 785-786 (hearings necessary in order to provide notice of the alleged probation violation and ensure "accurate finding of fact and the informed use of discretion").  At the same time, however, the Court rejected the "contention that the State is under a constitutional duty to provide counsel for indigents in all probation or parole revocation cases." *Id.* at 787; see *id.* at 790 (stating that due process may require appointment of counsel in exceptional cases).  The Court recognized that "such a rule has the appeal of simplicity" but concluded that "it would impose direct costs and serious collateral disadvantages without regard to the need or the likelihood in a particular case for a constructive contribution by counsel." *Id.* at 787.

The Court in *Gagnon* noted that in many cases a probationer's mitigating evidence may be "so simple as not to require either investigation or exposition by counsel." 411 U.S. at 787.  Here too, with the provision of easy-to-understand forms on assets and income and, if necessary, a colloquy with the trial court, it will often be simple for a delinquent child-support obligor to demonstrate his present inability to discharge his obligation without the assistance of appointed counsel.  Indeed, even in criminal cases to which the Sixth Amendment right of counsel applies, defendants are not entitled to government-appointed counsel for the purpose of filling out the forms routinely used to establishing their financial eligibility for government-appointed counsel.  See

---

fairness, but said that it could be "rendered by competent laymen in some cases." *Ibid.*

28

18 U.S.C. 3006A(b) (counsel will be appointed only after court is "satisfied after appropriate inquiry that the person is financially unable to obtain counsel"); *United States* v. *Bauer*, 956 F.2d 693, 695 (7th Cir.) ("Under the Criminal Justice Act, the public fisc need not contribute one penny unless the accused first establishes that he cannot afford counsel.  Nothing in the statute directs the Treasury to assist the accused in making this determination."), cert. denied, 506 U.S. 882 (1992).  Just as "[n]o legal expertise is needed to participate effectively in hearings under the Criminal Justice Act," *ibid.*, no legal expertise is generally required to establish inability to pay child-support arrears.

*Gagnon* also expressed concern that "[t]he introduction of counsel into a revocation proceeding will alter significantly the nature of the proceeding," since the States typically relied on probation officers to conduct revocation hearings but might turn to attorneys if all probationers were represented.  411 U.S. at 787.  "[T]he decisionmaking process will be prolonged, and the financial cost to the State  *  *  *  will not be insubstantial." *Id.* at 788.  In the context of civil contempt for child support as well, automatic appointment of counsel could delay the proceedings, create an asymmetry in representation between non-custodial parents and custodial parents who may appear pro se, see, *e.g.*, Pet. App. 16a, and impose considerable financial cost on the government without an automatic increase in accuracy.

*Lassiter* v. *Department of Social Services*, 452 U.S. 18 (1981), upon which petitioner relies, see, *e.g.*, Pet. Br. 32-33, is not to the contrary.  In that decision, the Court held that there was no due process right to counsel in a parental-rights termination proceeding.  See *Lassiter*, 452 U.S. at 32-33.  In dictum, the Court said its cases

29

had established a "presumption" that an indigent had a
right to appointed counsel "when, if he loses, he may be
deprived of his physical liberty." *Id.* at 26-27. The
Court has not subsequently relied on any such presump-
tion derived from the *Lassiter* dictum, and *Lassiter* it-
self recognized that *Gagnon*, which involved a depriva-
tion of physical liberty, had held that "due process is not
so rigid as to require that the significant interests in
informality, flexibility and economy must always be sac-
rificed" through appointment of counsel. *Id.* at 31 (quot-
ing *Gagnon*, 411 U.S. at 788).

That there may be atypical cases with "complex fac-
tual and legal issues" (Pet. Br. 46) in which counsel
would provide a significant benefit beyond what could be
obtained through other procedural safeguards does not
mean there should be a right to counsel. "[P]rocedural
due process rules are shaped by the risk of error inher-
ent in the truth-finding process as applied to the gener-
ality of cases, not the rare exceptions." *Walters* v. *Na-
tional Ass'n of Radiation Survivors*, 473 U.S. 305, 321
(1985) (quoting *Mathews*, 424 U.S. at 344); see *id.* at 331
("existence of complexity in some cases" was not "suffi-
cient to warrant a conclusion that the right to retain and
compensate an attorney in [Veterans Administration]
cases is a necessary element of procedural fairness un-
der the Fifth Amendment").

b. A recognition that due process requires fair pro-
ceedings before a child-support obligor can be held in
civil contempt but that this due process right does not
encompass appointment of government-funded counsel
is also consistent with the balance struck by Congress
and the Secretary in enacting and administering the
Title IV-D program. Cf. *Middendorf*, 425 U.S. at 43
("[W]e must give particular deference to the determina-

30

tion of Congress, made under its authority to regulate the land and naval forces, U.S. Const., Art. I, § 8, that counsel should not be provided in summary courts-martial."); *Walters*, 473 U.S. at 319-320 ("This deference to congressional judgment must be afforded even though the claim is that a statute Congress has enacted effects a denial of the procedural due process guaranteed by the Fifth Amendment.").

Congress and the Secretary have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program.[12] At the same time, however, they have declined to reimburse the States for the cost of providing counsel to non-custodial parents. See S. Rep. No. 387, 98th Cong., 2d Sess. 23 (1984) (statute does not provide federal funding for "defense counsel for absent parents" or "incarceration of delinquent obligors"); 45 C.F.R. 304.23 (i) and (j) (no federal funding for "[t]he costs of counsel for indigent defendants in

---

[12] See, *e.g.*, 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, including notice and a reasonable opportunity to contest the accuracy of such information."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for notice, opportunity to contest the action, and opportunity for an appeal on the record to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

31

IV-D actions" or "[a]ny expenditure for jailing of parents in child-support enforcement cases"); see also 52 Fed. Reg. 32,130 (1987) (Federal "policy since the inception of the [Title IV-D] program has been that costs of incarceration of delinquent obligors and costs of defense counsel are not necessary and reasonable costs associated with the proper and efficient administration of the Title IV-D program.").

Finally, at its broadest, the categorical rule petitioner suggests—that there is a right to government-appointed counsel in all "proceedings denominated as 'civil' where an individual nonetheless faces the prospect of confinement to state custody," Pet. Br. 30—conflicts with Congress's express judgment that provision of government-funded counsel is not warranted in all such areas. See *Middendorf*, 425 U.S. at 43 (deferring to such a judgment); *Walters*, 473 U.S. at 319-320 (same); see also *Landon* v. *Plasencia*, 459 U.S. 21, 34-35 (1982) ("The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy.").

For example, while aliens are sometimes detained during removal proceedings or pending enforcement of removal orders, Congress has long explicitly provided that there is no obligation to provide government payment for counsel in such proceedings. See 8 U.S.C. 1362 ("In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (*at no expense to the Government*) by such counsel, authorized to practice in such proceedings,

32

as he shall choose.") (emphasis added); 8 U.S.C.
1229a(b)(4)(A). Congress's judgment is consistent with
this Court's repeated holdings that removal proceedings
are civil and non-punitive, see, *e.g.*, *INS* v. *Lopez-
Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation
proceeding is a purely civil action to determine eligibil-
ity to remain in this country, not to punish an unlawful
entry, though entering or remaining unlawfully in this
country is itself a crime."), and its conclusion that deten-
tion of an alien during the removal process is permissi-
ble because it is incidental to the proceedings, and not
their purpose or goal, see, *e.g.*, *Carlson* v. *Landon*,
342 U.S. 524, 538 (1952) ("Detention is necessarily a part
of this deportation procedure.").   As the Court has
also noted, removal proceedings—whose purpose is re-
moval of aliens from the country, not deprivation of their
physical liberty—are "streamlined" administrative pro-
ceedings held before administrative personnel, immigra-
tion judges, under rules offering the aliens more limited
procedural rights than are available in court.   *Lopez-
Mendoza*, 468 U.S. at 1039; see *ibid.* ("a deportation
hearing is intended to provide a streamlined determina-
tion of eligibility to remain in this country, nothing
more").  The due process guarantee of fundamental fair-
ness does not mandate the appointment of counsel in
such proceedings, which would be contrary to the judg-
ment of Congress.[13]

---

[13] For these reasons, the lower courts have held that aliens in removal
proceedings have no constitutional right to appointment of counsel at
government expense.  *United States* v. *Gasca-Kraft*, 522 F.2d 149, 152
(9th Cir. 1975) ("courts have uniformly held in this circuit and elsewhere
that in light of the non-criminal nature of both the proceedings and the
order which may be a result, that respondents are not entitled to have
counsel appointed at government expense") (citing cases); see *Moham-*

33

**CONCLUSION**

The judgment of the Supreme Court of South Caro-
lina should be reversed.

Respectfully submitted.

|  |  |
|---|---|
| | NEAL KUMAR KATYAL<br>   *Acting Solicitor General* |
| | TONY WEST<br>   *Assistant Attorney General* |
| SALLY A. HOWARD<br>   *Acting General Counsel* | LEONDRA R. KRUGER<br>   *Acting Deputy Solicitor*<br>     *General* |
| ROBERT E. KEITH<br>   *Associate General Counsel* | JOSEPH PALMORE<br>   *Assistant to the Solicitor* |
| LISETTE PEDRE MESTRE<br>   *Attorney*<br>   *Department of Health and*<br>     *Human Services* |      *General*<br>LEONARD SCHAITMAN<br>EDWARD HIMMELFARB<br>   *Attorneys* |

JANUARY 2011

---

*med* v. *Gonzales*, 400 F.3d 785, 793 (9th Cir. 2005); *United States* v.
*Torres-Sanchez*, 68 F.3d 227, 230 (8th Cir. 1995); *Nazakat* v. *INS*, 981
F.2d 1146, 1148 (10th Cir. 1992); *United States* v. *Campos-Asencio*, 822
F.2d 506, 509 (5th Cir. 1987).

# EXHIBIT I.

# Title 8
# Courts and Civil Procedure — Courts

## Chapter 10
## Family Court

### R.I. Gen. Laws § 8-10-3

**§ 8-10-3. Establishment of court — Jurisdiction — Seal — Oaths.**

**(a)** There is hereby established a family court, consisting of a chief judge and eleven (11) associate justices, to hear and determine all petitions for divorce from the bond of marriage and from bed and board; all motions for allowance, alimony, support and custody of children, allowance of counsel and witness fees, and other matters arising out of petitions and motions relative to real and personal property in aid thereof, including, but not limited to, partitions, accountings, receiverships, sequestration of assets, resulting and constructive trust, impressions of trust, and such other equitable matters arising out of the family relationship, wherein jurisdiction is acquired by the court by the filing of petitions for divorce, bed and board and separate maintenance; all motions for allowance for support and educational costs of children attending high school at the time of their eighteenth (18th) birthday and up to ninety (90) days after high school graduation, but in no case beyond their nineteenth (19th) birthday; enforcement of any order or decree granting alimony and/or child support, and/or custody and/or visitation of any court of competent jurisdiction of another state; modification of any order or decree granting alimony and/or custody and/or visitation of any court of competent jurisdiction of another state on the ground that there has been a change of circumstances; modification of any order or decree granting child support of any court of competent jurisdiction of another state provided: (1) the order has been registered in Rhode Island for the purposes of modification pursuant to § 15-23.1-611, or (2) Rhode Island issued the order and has continuing exclusive jurisdiction over the parties; antenuptial agreements, property settlement agreements and all other contracts between persons, who at the time of execution of the contracts, were husband and wife or planned to enter into that relationship; complaints for support of parents and children; those matters relating to delinquent, wayward, dependent, neglected, or children with disabilities who by reason of any disability requires special education or treatment and other related services; to hear and determine all petitions for guardianship of any child who has been placed in the care, custody, and control of the department for children, youth, and families pursuant to the provisions of chapter 1 of title 14 and chapter 11 of title 40; adoption of children under eighteen (18) years of age; change of names of children under the age of eighteen (18) years; paternity of children born out of wedlock and provision for the support and disposition of such children or their mothers; child marriages; those matters referred to the court in accordance with the provisions of § 14-1-28; those matters relating to adults who shall be involved with paternity of children born out of wedlock; responsibility for or contributing to the delinquency, waywardness, or neglect of children under sixteen (16) years of age; desertion, abandonment, or failure to provide subsistence for any children dependent upon such adults for support; neglect to send

any child to school as required by law; bastardy proceedings and custody to children in proceedings, whether or not supported by petitions for divorce or separate maintenance or for relief without commencement of divorce proceedings; and appeals of administrative decisions concerning setoff of income tax refunds for past due child support in accordance with §§ 44-30.1-5 and 40-6-21. The holding of real estate as tenants by the entirety shall not in and of itself preclude the family court from partitioning real estate so held for a period of six (6) months after the entry of final decree of divorce.

**(b)** The family court shall be a court of record and shall have a seal which shall contain such words and devices as the court shall adopt.

**(c)** The judges and clerk of the family court shall have power to administer oaths and affirmations.

**(d)** The family court shall have exclusive initial jurisdiction of all appeals from any administrative agency or board affecting or concerning children under the age of eighteen (18) years and appeals of administrative decisions concerning setoff of income tax refunds, lottery set offs, insurance intercept, and lien enforcement provisions for past due child support, in accordance with §§ 44-30.1-5 and 40-6-21, and appeals of administrative agency orders of the department of human services to withhold income under chapter 16 of title 15.

**(e)** The family court shall have jurisdiction over those civil matters relating to the enforcement of laws regulating child care providers and child placing agencies.

**(f)** The family court shall have exclusive jurisdiction of matters relating to the revocation or nonrenewal of a license of an obligor due to noncompliance with a court order of support, in accordance with chapter 11.1 of title 15.

[See § 12-1-15 of the General Laws.]

**(g)** Notwithstanding any general or public law to the contrary, the family court shall have jurisdiction over all protective orders provided pursuant to the Rhode Island general laws, when either party is a juvenile.

History of Section.
P.L. 1961, ch. 73, § 1; P.L. 1972, ch. 30, § 1; P.L. 1973, ch. 125, § 1; P.L. 1974, ch. 85, § 1; P.L. 1975, ch. 3, § 1; P.L. 1976, ch. 252, § 1; P.L. 1977, ch. 89, § 1; P.L. 1980, ch. 54, § 1; P.L. 1981, ch. 319, § 1; P.L. 1984, ch. 167, § 3; P.L. 1984, ch. 281, § 1; P.L. 1987, ch. 163, § 2; P.L. 1988, ch. 84, § 7; P.L. 1992, ch. 326, § 1; P.L. 1994, ch. 158, § 2, P.L. 1994, ch. 195, § 3; P.L. 1994, ch. 244, § 1; P.L. 1994, ch. 263, § 3; P.L. 1995, ch. 370, art. 29, § 10; P.L. 1995, ch. 374, § 10; P.L. 1996, ch. 129, § 1; P.L. 1996, ch. 131, § 1; P.L. 1996, ch. 132, § 1; P.L. 1996, ch. 133, § 1; P.L. 1997, ch. 170, § 23; P.L. 1999, ch. 83, § 6; P.L. 1999, ch. 130, § 6; P.L. 2007, ch. 73, art. 3, § 9; P.L. 2010, ch. 216, § 1; P.L. 2010, ch. 236, § 1.