No. 24-1313

No. 23-1967

No. 23-1978

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official
capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their
individual and official capacities; Rhode Island OFFICE OF Child Support
Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK
DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN,
LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN,
JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities;
RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A.
SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF
RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND
ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity;
RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in
its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official
capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE
JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL,
MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their
individual and official capacities; RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF
THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual
capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Defendants-Appellees.

Appeal from the United States District Court

for the District of Rhode Island

_____

**APPELLANT'S RENEWED MOTION TO IMPOSE SANCTIONS
AGAINST APPELLEES AND COUNSELS FOR APPELLEES**

**FOR OBSTRUCTION OF JUSTICE FRAUD ON THE COURT,**

**CONSPIRACY TO SUBORN PERJURY, MISPRISION OF FELONIES,**

**CONSPIRACY TO MAKE FALSE CLAIMS**

_____

**ORGANIZED FRAUD, THEFT OF PUBLIC MONEY AND
GOVERNMENT PROGRAMS INVOLVING BILLIONS OF DOLLARS**

**Unlawful Interstate Collection of Unlawful 12% Compound Interest Within
the Title IV-D Legal Framework Involving Organized Felonious Acts by
Appellees and Misprision of Felony by Appellee Counsels**

Appellant, MARY SEGUIN, hereby respectfully moves, pursuant to **28
U.S.C. § 2106** and Fed. R. App. P 27, for sanctions against the State Appellees and
counsels for State Appellees, Special Attorney M.D. Pizana, for Obstruction of
Justice, the conspiracy to defraud the Court, defraud the United States, make false
claims, obstruct justice, obstruct official proceedings, falsification of records,
conspiracy to suborn perjury and make false statements, including misprision of
felony before this Court.

Appellant invokes 18 U.S.C. **§ § 503.**

Appellant invokes 18 U.S.C. **§ 4.**

Appellant invokes **18 U.S.C. § 2.**

Appellant invokes **18 U.S.C. § 3.**

Appellant invokes ***United States v. Olson***, **856 F.3d 1216 (9th Cir. 2017).**

Appellant invokes ***United States v. Sullivan***, **Case No. 3:20-cr-00337-WHO (N.D. Cal.).**

Appellant invokes ***Nix v. Whiteside***, **475 U.S. 157 (1986).**

Appellant invokes ***United States v. Silverman,*** 745 F.2d 1386, 1395 (11th Cir. 1984).

Appellant invokes **18 U.S.C.  § 2(b)**, and ***United States v. Walser***, 3 F.3d 380, 388 (11th Cir. 1993).

Appellant invokes Rules 1-102, 4-101 and 7-109 of the Code of Professional Responsibility.

Appellant invokes Canons 1,4, and 7, and Ethical Consideration 7-26.

Appellant invokes R.I. Gen. Law **§** 11-32-1.

Appellant invokes R.I. Gen. Law **§** 11-32-3.

Appellant invokes R.I. Gen. Law § 11-1-1.

Appellant invokes *State v. Flynn*, 100 R.I. 520 (R.I. 1966).

Appellant invokes *State v. Horton*, Dougherty, 47 R.I. 341 (R.I. 1926).

In support of the motion for sanctions, Appellant states as follows:

Before the Court are pending motions to impose Sanctions against the counsels for the State Appellees, including Special Attorney Marissa Danielle Pizana, moving, among others, for counsels withdrawal, invoking the above, in the related cases 23-1967 and 23-1978.  See Document: 00118129531, filed on April 7, 2024, attached hereto as Exhibit I.

Additionally, before the Court are pending motions to impose Sanctions against the counsels for the State Appellees, including Marissa Danielle Pizana in the related case 23-1851.  See, e.g., Document: 00118130601, filed on April 9, 2024 attached hereto as Exhibit II.  Appellant filed a motion for judicial notice of Document 00118130601 in this matter, and concurrently in 23-1967 and 23-1978, on April 10, 2024.

The aforesaid pending motions for sanctions against Special Attorney Marissa Danielle Pizana remain unresolved.

Without waiting for the Court's resolution of the pending egregious issues before the Court, Special Attorney Pizana jumps the gun to file entry of appearance a day after notice of docketing in this matter, with the apparent approval of her supervisor, the Rhode Island Attorney General, that shows another incident of violation of 18 U.S.C. § 503. Appellant hereby fully incorporates the aforesaid motions for sanctions as fully alleged and moved herein.

Appellant respectfully raises the issue that the Special Attorney's entry of appearance is indictable and impeachable under 18 U.S.C. § 503 and 18 U.S.C. § 4.

Appellant moreover respectfully requests the judges of the United States, explicitly conferred by Congress the explicit duty under 18 U.S.C. § 4, to refer the criminal acts made known in Document 00118126723 to the United States Attorney General Merrick Garland, an official expressly conferred authority under 18 U.S.C. § 4, pursuant to Fed. R. Civ. P 11(c)(4) "to deter repetition of the conduct or comparable conduct by others similarly situated."

Appellant respectfully requests furthermore that the Court order the State Appellees and counsels for the State Appellees pay the Appellant 10x $250,000 and no less than 10x $50,000 for each infraction named herein (fully incorporated

from Document 00118129531 and 00119130601), for having to prosecute this

motion for their felonious, indictable and impeachable conduct.

## **CONCLUSION**

The Court should grant this motion for sanctions.  The Court should

order the withdrawal of Appellee-counsels Special Attorney Marissa

Danielle Pizana and Attorney Peter Nehronha.  The Court should order

the Appellant-requested 10x $250,000 and no less than 10x $50,000 for

each infraction named herein payable by the Appellees and Appellees

counsels to the Appellant, for having to prosecute this motion for their

felonious conduct.  The Court should take judicial notice of Document

00118126723 filed under Fed. R. Evid. 201 and 18 U.S.C. § 4.  The

Court should strike the Appellee's motion to strike from the record for

fraud on the court and for violation of Fed. R. Civ. P 11(b).  The Court

should on its own initiative under Fed. R. Civ. P 11(c)(3) order the

Appellees and Appellees' counsels to show cause why conduct by the

Appellees and their counsels specifically described above has not

violated Rule 11(b).  The judges of the United States have been explicitly

conferred an explicit duty by Congress under 18 U.S.C. § 4 and 18

U.S.C. § 503 should refer the criminal acts made known in Document

00118126723 to the United States Attorney General Merrick Garland, an

official who also is conferred authority under 18 U.S.C. § 4 and 18

U.S.C. § 503, pursuant to Fed. R. Civ. P 11(c)(4) "to deter repetition of

the conduct or comparable conduct by others similarly situated," in the

interest of the public. The Appellant respectfully requests any and all

relief that is just under the circumstances.

Pursuant to Fed. R. Evidence 201(e), Appellant requests by right a hearing.

Respectfully submitted,

Mary Seguin
Pro Se
/s/      _Mary Seguin_
Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: April 11, 2024

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the
Court's ECF filing system on April 11, 2024, on all registered counsel of record,
and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/      _Mary Seguin_
Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

EXHIBIT I.

No. 23-1967

No. 23-1978

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official
capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their
individual and official capacities; Rhode Island OFFICE OF Child Support
Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK
DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN,
LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN,
JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities;
RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A.
SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF
RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND
ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity;
RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in
its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official
capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE
JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL,
MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their
individual and official capacities; RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF
THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual
capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Defendants-Appellees.

Appeal from the United States District Court

for the District of Rhode Island

———————————

**APPELLANT'S MOTION FOR SANCTIONS AGAINST APPELLEES AND COUNSELS FOR APPELLEES**

**FOR FRAUD ON THE COURT,**

**CONSPIRACY TO SUBORN PERJURY, MISPRISION OF FELONY**

**CONSPIRACY TO MAKE FALSE CLAIMS**

———————————

**ORGANIZED FRAUD, THEFT OF PUBLIC MONEY AND GOVERNMENT PROGRAMS INVOLVING BILLIONS OF DOLLARS**

**Unlawful Interstate Collection of Unlawful 12% Compound Interest Within the Title IV-D Legal Framework Involving Organized Felonious Acts by Appellees and Misprision of Felony by Appellee Counsels**

Appellant, MARY SEGUIN, hereby respectfully moves, pursuant to **28 U.S.C. § 2106** and Fed. R. App. P 27, for sanctions against the Appellees and counsels for Appellees, for the conspiracy to defraud the Court, defraud the United States, make false claims, obstruct justice, obstruct official proceedings, falsification of records, conspiracy to suborn perjury and make false statements, including misprision of felony before this Court.

Appellant invokes 18 U.S.C. **§ 4.**

Appellant invokes **18 U.S.C. § 2.**

Appellant invokes **18 U.S.C. § 3.**

Appellant invokes ==*United States v. Olson*==**, 856 F.3d 1216 (9th Cir. 2017).**

Appellant invokes ==*United States v. Sullivan*==**, Case No. 3:20-cr-00337-WHO (N.D. Cal.).**

Appellant invokes ==*Nix v. Whiteside*==**, 475 U.S. 157 (1986).**

Appellant invokes *United States v. Silverman,* 745 F.2d 1386, 1395 (11th Cir. 1984).

Appellant invokes **18 U.S.C. § 2(b)**, and *United States v. Walser*, 3 F.3d 380, 388 (11th Cir. 1993).

Appellant invokes Rules 1-102, 4-101 and 7-109 of the Code of Professional Responsibility.

Appellant invokes Canons 1,4, and 7, and Ethical Consideration 7-26.

In support of the motion for sanctions, Appellant states as follows:

Plainly, this action concerns the unlawful collection by the Appellees of unlawful 12% compound interest under the Title IV-D Legal Framework through felonious acts that involve, as it turns out by official state policy, the felonious removal in interstate support cases of the unlawful 12% compound interest from the Title IV mandated automated data processing system in 2018 when the

Appellees sent the support collection to TEXAS under 42 U.S.C. **§ 666(14)** in order to conceal the unlawful 12% compound interest (leaving it on the system would expose Rhode Island's ineligibility to participate in Title IV), and after inducing the Appellant to pay off the principle support in one lump sump $104,185.98 by representing to the Appellant that Appellee GERO MEYERSIEK waived interest as consideration of the lump sum payment, Appellees put back onto the system the unlawful 12% compound interest.  Appellees-counsels are accessories to the crimes after the fact, and conceal the felonious crimes through subornation of perjury and knowing false representations to (the requisite) truth-seeking United States judges who themselves are under Oath to the United States Article III courts under the Constitution (United States judges are explicitly conferred explicit duty by Congress in the statutory text under 18 U.S.C. **§4).**

**Appellant preserves and reserves the issue of district court judge William Smith's role in the scheme as the former chief counsel advising the executive, judicial and legislative political subdivisions of the State Plan from 1996 to 2002 concerning the State's conscious policy to deliberately circumvent the mandatory implementation of the 1996 amendments of 42 U.S.C.  § 654, through the State's knowing adoption of the felonious state policy to feloniously remove the unlawful 12% compound from the system in interstate cases, feloniously adjust accounting of the support amount, and feloniously**

certify the false accounting to cooperative states such as TEXAS and to the United States to avoid detection of the scheme.

Appellees-counsels even repeatedly plastered in the federal district court records the state family court's February 10, 2023 court order that facially show Appellees' felonious scheme through the order's text, "…*interest put back on the system* without prejudice to the Defendant." *See* <mark>ECF 11,</mark> Exhibit in Support by Rhode Island Department of Human Services, Rhode Island Office of Child Support Services in support of [10] Motion for an Extension of Time to File Answer dated August 7, 2023. Appellees counsels feloniously misrepresent repeatedly to the Court that the felonious "putting back on the system" the unlawful 12% compound interest means the family court found Appellant owes the interest, in order to conceal the Appellees' felonious scheme of removing the unlawful 12% compound interest from the system in 2018 when Rhode Island sent it to TEXAS under 42 U.S.C. § 666(14) through false certification and false claims, as it turns out by official state policy, in order to conceal the unlawful 12% compound interest that would expose Rhode Island's ineligibility to participate in Title IV at least since 1996.

I.  <u>Appellees-counsels conceal the True Felonious Nature of Appellees' Unlawful Interstate Enforcement of Unlawful Interest Arears on Overdue Support Under the Legal Framework of Title IV of The Social Security Act, repeated over a dozen times in the State Appellee Brief in the related case Appeal No. 23-1851 – Counsels'</u>

**representation that Rhode Island has a state interest to enforce unlawful 12% compound interest Turns Out to Be False, Perjurious and Felonious Because Counsels Concealed Rhode Island's 12% Compound Interest Is Unlawful and the State's Enforcement Involves Organized Accounting Fraud, False Certifications and False Claims by Political Subdivisions of Rhode Island Regulated By 42 U.S.C. § 654**

**A. Lies to The Tribunal by The Rhode Island Attorney General Representing the State Appellees, All Political Subdivisions governed by 42 U.S.C. § 654(1)**

Firstly, if charged with the misprision of a felony, the Appellees and counsels for Appellees could face the following penalties if convicted:

(1) Fines of up to $250,000 and

(2) Up to three years in federal prison.

Counsel for the State Appellees is the attorney general of Rhode Island, the political subdivision under the State Plan regulated by 42 U.S.C. § 654(1), charged with enforcing the provisions of 42 U.S.C. § 654 in Rhode Island under the terms of Rhode Island's participation in the Title IV Program. The language of 42 U.S.C. § 654(1) is explicit. "A State plan for child and spousal support must-

(1) provide that it shall be in effect in **all** political subdivisions of the State." Therefore, Congress is explicit in requiring the State Plan must provide that it shall be in effect in the political subdivision of the Office of the Attorney General. Therefore, under the State Plan, the explicit requirement is that, as the attorney

general, counsels for the State Appellees are charged with *enforcing* state compliance with 42 U.S.C. § 654, including 42 U.S.C. § 654(21)(A).

But the Rhode Island attorney general has shown throughout *this* appellate official proceeding and the related appellate proceeding in Appeal No. 23-1851 that not only is s/he not interested in enforcing the State's compliance with 42 U.S.C. § 654(21)(A), s/he time and again lies to *this* United States Tribunal that Rhode Island lawfully enforces interstate interest on support, and time and again affirmatively CONCEALS the felonious official state policy adopted by the Appellees to feloniously remove the unlawful 12% compound interest in interstate cases and feloniously send false accounting and false certifications to TEXAS and the United States concealing Rhode Island's felonious removal of the unlawful 12% compound interest from the Title IV automated data processing and information retrieval system, in a bald, audacious and felonious attempt to influence this Tribunal to apply the *judge-made* Younger abstention that gets a judge-made re-invention every decade since the 1970s. Judge-made "rules" must give way to jurisdiction in this case – this case is not merely harassment; this case involves organized felonious scheme by the Appellees using the Title IV legal framework. *See **Hamer v. Neighborhood Housing Services of Chicago**, **583 U.S. ___ (2017).***

Because neither discovery nor a trial took place in this matter in the district court, the district court judge William Smith, the former outside chief counsel for the State Plan's political subdivisions from 1996 to 2002, and his former firm Edwards & Angell that remains the chief external counsel for the State Plan's political subdivisions when the 1996 Amendments to 42 U.S.C. § 654 should have been implemented by the Appellees, deliberately handicapped the Appellant's right to discovery and seek the truth in the district court. The district court *sua sponte* dismissed Appellant's action at law on October 19, 2023, prior to the Appellees ever filing an answer to the Amended Complaint (ECF 25) – the amended complaint itself was a 18 U.S.C. § 4 report to the judge of the United States of felonious interstate collection of 12% compound interest.

At this juncture, the Court must take judicial notice under Fed. R. Evid. 201 that the district court judge William Smith ordered on July 7, 2023, that this case is related to *Seguin v. R.I. Office of Child Support Services et al*., 1:23-cv-34-WES-PAS, "Since District Judge William E. Smith has determined that this case is in fact related to CA 23-cv-34 this case is permanently assigned to District Judge William E. Smith for all further proceedings." This is relevant because judge Smith and his former firm Edwards & Angell used to and continue to be the chief outside counsel of the state political subdivisions responsible for implementing the 1996 amendments to 42 U.S.C. § 654 and advising the State Appellees here and

the State Appellees in the CA 23-cv-34 on the statewide adoption of the State Policy.

As such, the Rhode Island Attorney General audaciously filed in the federal district court on August 7, 2023 the state family court order in **CA 23-cv-126, ECF 11**, as an exhibit in support of the State Appellees motion for extension of time to answer complaint there – the state family court order's text explicitly ordered, "***put interest back on the system*** ***without prejudice*** to the Defendant."  The complicit judge Smith thereafter granted a 60 day extension.

Without the availability of the State Policy in 2023, all these explicit language of "put interest back on the system" and "remove interest off the system" did not make meaningful sense.  But the language was well understood by the Appellees, the counsels for appellees and district court judge William E. Smith.

Pointedly, the State Policy entitled, "Specifications for OCSS Change Order" that "outlines the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases" was available in 2024, which Appellant diligently made known to this Court on March 24, 2024, Document 00118126723 and requested Judicial Notice under Fed. R. Evid. 201 in Appellant's subsequently filed March 29, 2024 Motion to take judicial notice of Document 001182126723.

Appellant's Notice requesting judicial notice and making known the commission of crimes by Appellees was filed pursuant to **18 U.S.C. § 4**.  *See* Document No.: 00118126723 filed on March 24, 2024. The policy is hereafter "State Policy."  In Document 00118126723 Appellant invoked 18 U.S.C. **§ 4**, *that in part is aimed and directed at the Appellees and Appellees counsels*.  **Appellees affirmatively participated in the felonious removal of the unlawful 12% compound interest from the automated data processing system in 2018 when Rhode Island sent the support to TEXAS.  Appellees affirmatively participated in feloniously "keeping the unlawful interest off the system" as the key instrument/vehicle of deceit in 2021 when Appellant contacted the Appellees to pay off support.  Appellees affirmatively recorded in Appellant's Title IV-D case record the felonious "keep the interest off the system."  Appellees affirmatively recorded the felonious "agreed to keep the interest off the system."  Appellees affirmatively recorded the felonious "changed his mind and put the interest back on the system" after Appellant performed on the agreement and paid the "$104k."  Therefore, even outside of the felonious representations to the Appellant in 2021, Appellees affirmatively recorded their felonious scheme in public Title IV records that they sought to conceal.  Therefore, it is shown and proven beyond a doubt that the Appellees counsels are accessories after the**

fact, and affirmatively and feloniously concealed the principals' felonious scheme. **All Appellee-counsels violated 18 U.S.C. § 4.**

**The official state policy available in <u>2024</u> made sense of the felonious scheme.**

In aid of the Court, Appellant attaches the State Policy hereto for illustration purposes under **Exhibit I**. The State Policy states as follows:

"This specification will outline the process by which ***interstate*** cases are selected, automatically adjusted, are created, and support orders are modified ***all for the purpose of removing interest from interstate cases***." This policy goes on to state under its heading, "It is desirable for the Rhode Island Office of Child Support Services (OCSS) to ***prohibit the charging of interest in interstate cases***. This is **<u>manually done</u>** by placing an N in the interest field on page 2 of the support order. ***Entry of the N not only prohibits the charging of future interest but automatically creates adjustment to zero out any existing interest***." This policy further states "Two reports will be created. The first will detail the interstate cases for which a support order modification was done first for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B, B or P." This 2024 available undisputed policy document evidence is submitted pursuant to Fed. Rules of

Evidence 201, to this Court, and Appellant now and again respectfully requests

judicial notice under Fed. Rules of Evidence 201. This policy was newly available

in 2024, and with diligent compliance with Congressionally prescribed criminal

jurisdiction conferred on "judges" "of the United State"s pursuant **18 U.S.C. § 4**,

the Texas Appellant made the state policy known to the judges in the United States

Court of Appeals for the First Circuit, pursuant to Federal Rules of Evidence 201.

This policy made sense of the ensuing documentary evidence that were also

submitted and made known under 18 U.S.C. § 4 and Fed. R. Evid. 201.

Explicitly applied to this instant case, the Appellees, in accordance with the

policy, feloniously removed tens of thousands of dollars of "interest" from the

automated data processing and information retrieval system governed by 42 U.S.C.

§651-669 and feloniously sent to the State of Texas in 2018 a total amount with the

interest thus removed, feloniously certifying it under, *inter alia*, 42 U.S.C.

§666(14), showing prima facie felonious false certification, felonious accounting

fraud, felonious false records.  In so doing, Appellees feloniously sent a

corresponding felonious false certification to the United States.  See, **<u>EXHIBIT II</u>**.

The resulting effect of the above felonious removals from the automated

data processing and information retrieval system, fraudulent accounting, false

accounts, false certifications to Texas and to the United States, and corresponding

false claims to the United States under Title IV, feloniously produced fraudulent

online accounts created by the Appellees, that showed a felonious false record of $0 payment in December 2021 for Appellant's very large lump sum payoff payment of $104,185.98 wired from Texas. *See* screenshot of Appellee-created and maintained online Title IV-D account in **Exhibit III**.

The resulting effect of the above felonious removals produced the online account that showed $0.00 under interest as of December 6, 2021, due to the Appellees' felonious removal of the interest in 2018 when Appellees sent the support to Texas for enforcement. See **Exhibit IV**. Appellees told the Appellant that the $0.00 showing on the online account represents the waiver of interest by the custodian parent, Appellee GERO MEYERSIEK.

Appellant recorded in Texas the phone conversation Appellant had with Appellee John Langlois that took place on October 5, 2022, in which Appellee John Langlois also stated that Appellee GERO MEYERSIEK waived interest and changed his mind subsequent to Appellant performing on the agreed pay-off amount of $104,185.98, so Appellees **put the 2018 removed interest back on the system**. Putting the 2018 feloniously removed interest back on the system is a felony and the subsequent fraudulent liens levied on Appellant's TEXAS properties are felonious that further violate TEXAS PENAL CODES. Appellant submitted this recording pursuant to Rhode Island Rules of Evidence 901 to the state family court in K2001-0521M, and to federal court judges pursuant Federal

Rules of Evidence 901, 201, and pursuant to 18 U.S.C. §4, 18 U.S.C. §666, and other applicable federal statutes.

Therefore, pursuant to Fed. Rules of Evid. 201 of judicial notices of related concurrent court actions, Appellant requests judicial notice of the attached recording submitted to the concurrent courts for concurrent pending actions at law.

https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

Additionally, Appellant submitted Congressionally published statutory text, notes and amendments for 42 U.S.C. § 654, requesting judicial notice of the explicit preemptive statutory notes under Congress's 1996 Amendment, that explicitly provided State participation in the Title IV Program on the condition of acceptance of the preemption of 42 U.S.C. § 654 over State laws and constitutions that must be amended to comply with the 1996 Amendments.

Therefore, **as of March 24, 2024**, before the Court under the explicit invocation of 18 U.S.C. § 4, is the evidentiary proof that the Appellee felonious enforcement of unlawful interest that Appellees feloniously removed from the automated system in 2018 and thereafter feloniously certified to TEXAS and to the United States under 42 U.S.C. § 666(14) that there was no interest in Appellant's interstate support case that goes to show that the state's enforcement is not just

harassing but constitutes felonious organized fraud, ***squarely confronted the Appellee-counsel***.  Appellee-counsels affirmative actions concealing the felonious scheme thereafter proves beyond a doubt that sanctions are warranted.

Subsequent to Appellant's foremost compliance under 18 U.S.C. § 4 to diligently make known criminal activities to judges of the United States, Appellant proceeded in the morning hours of March 29, 2024 to draft and prepare court filings for motions for judicial notice under Fed. R. of Evid. 201.

However, around 10 AM on March 29, 2024, Appellee-counsel first filed Appellees' Appellee-Brief in the related case No. 23-1851, without offering any evidentiary proof, refuting the undisputable factual evidence squarely before the Court, contradictorily painting and claiming under Oath as officers of the court their unlawful enforcement as lawful, but <u>unsupported</u> by any evidence to support Appellees' unsubstantiated claim.

Appellees-counsel's solution to "remove" the evidentiary proof before the Court filed by the Appellant since March 24, 2924 that proves the Appellee-Brief filed in Appeal No. 23-1851 is filled with lies is to file a motion to strike Document 00118126723 that Appellant filed here on March 24, 2024 that consisted of evidentiary proof of the Appellees and Appellees-counsels' affirmative and felonious concealment.  State Appellees' filing of the motion to

strike here, as well as in the related case No. 23-1851, is squarely affirmative acts to *conceal* Appellees' felonious scheme.

Therefore, in the scenario in which Appellees prevail, there necessarily would entail countless "removals" from official records in official proceedings of incriminating evidence damning to the Appellees, e.g.,:

(1) Removal without basis in law from this official Appellate record evidence of Appellees' felonious removal of tens of thousands of interest from the automated data processing and information retrieval system

(2) Perpetuating the Appellees' felonious routine practice by policy under color of state law *in aid* of Appellees' felonious removal from the automated data processing system the unlawful 42 U.S.C. § 654(21)(A) prohibited 12% compound interest in interstate cases when Appellees feloniously send to other states like TEXAS under felonious false certifications that there is no interest in order to feloniously cover up Rhode Island's unlawful 12% compound interest felonious scheme, and when Appellees feloniously send to the United States under the Title IV Federal Program falsely and feloniously certifying compliance with 42 U.S.C. § 654 in order to feloniously obtain federal funding for which Rhode Island is ineligible.

Appellant avers in good faith that both scenarios above necessarily involve equally complicit acts by judges in this Court pursuant to 18 U.S.C. § 4, also reviewable under fraud on the court and other applicable federal criminal statutes. This is because the Rules of Evid. 201 submitted material that invokes 18 U.S.C. § 4, shows systemic and organized felonious violation ***by official policy*** of 42 U.S.C. § 654(21)(A) by various Title IV-covered State political subdivisions under Rhode Island's State Plan, and the Appellees' felonious coordinated, concerted and organized efforts to feloniously cover it up. The felonious cover up of Appellees' violation of 42 U.S.C. § 654(21)(A) entailed sophisticated felonious removal of the unlawful 12% compound interest from the automated data processing and information retrieval system on a routine basis to "zero out any existing interest" for the explicit felonious purpose of "for the purpose of removing interest from interstate cases." The policy further states, "Two reports will be created. The first will detail the interstate cases for which a support order modification was done first for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B, B or P." Explicitly applied to this instant case, the Appellees, in accordance with the policy, feloniously removed tens of thousands of dollars of "interest" from the automated data processing and information retrieval system governed by 42 U.S.C. §651-669 and feloniously sent to the State of Texas in 2018 a total amount with the interest

thus removed, feloniously certifying it under, *inter alia*, 42 U.S.C. §666(14),

showing *prima facie* felonious false certification, accounting fraud, false records.

In so doing, Appellees feloniously sent a corresponding false certification to the

United States.

The attached factual materials show on their face, beyond any doubt,

that the judge-created "court order" laws created by the judges in the State's family

court show felonious judge-created laws under color of state law the felonious

establishment and felonious enforcement of the State's "interest" that is

"prohibited in interstate cases" that involve the felonious routine removal from the

system the interest when feloniously certifying to another state like TEXAS and

feloniously certifying State compliance to the Title IV Program for federal

funding, to the United States.

The above show unequivocally sanctionable defraud of the Court by the

Appellees and Appellee-counsel(s), all of whom are additionally regulated under

42 U.S.C. § 654(1), including subornation of perjury and conspiracy to suborn

perjury.

The above show unequivocally sanctionable defraud of the United States,

defraud of Texas, defraud of the Appellant, making false claims, making false

certifications, accounting fraud, falsification of records, obstruction of official

proceedings, obstruction of justice, violation of 18 U.S.C. § 2(b), §3, §4 among

numerous others by both the Appellees and Appellee-counsels.

## II.    Misprision of Felony by the Appellees and Appellees-Counsels

### A. Requisite knowledge of "removing interest from the system," "keeping interest off the system," "agree to keeping interest off the system," "changed his mind and put interest back on the system" are felonies – and handshake partnership – *United States v. Olson*, 856 F.3d 1216 (9th Cir. 2017)

Firstly, the Court must take notice under Fed. R. Evid. 201 the textual language

of 18 U.S.C. § 4.

The misprision of felony statute states:

"Whoever, *having knowledge of the actual commission of a felony cognizable*

*by a court of the United States*, conceals and does not as soon as possible make

known the same to some judge or other person in civil or military authority under

the United States, shall be fined under this title or imprisoned not more than three

years, or both." 18 U.S.C. § 4 (emphasis added). The emphasis was added by the

9th Circuit Court of Appeals in *United States v. Olson*, **856 F.3d 1216 (9th Cir.**

**2017).**

To establish misprision of felony, the government must prove beyond a

reasonable doubt: "(1) that the principal . . . committed and completed the felony

alleged; (2) that the defendant had full knowledge of that fact; (3) that he failed to notify the authorities; and (4) that he took affirmative steps to conceal the crime of the principal." *Lancey v. United States*, 356 F.2d 407, 409 (9th Cir. 1966) (alterations omitted) (quoting *Neal v. United States*, 102 F.2d 643, 646 (8th Cir. 1939)).

Appellees have thus far resisted and fought discovery production in the on-going state family court under advisement of the Rhode Island Attorney General for any and all information regarding the Appellees' waiver of interest, or partnerships or agreements or arrangements amongst the State Appellees and Appellee GERO MEYERSIEK.

Nevertheless, the plain existence of a partnership and agreement is in plain sight, upon the availability of State Policy attached hereto in Exhibit I that makes sense of multiple referrals of "remove interest off the system," "keep interest off the system," "agree to keep interest off the system," and "put interest back on the system."

The TRAC records attached in Exhibit II records in plain and explicit terms the multiple discussions and activity that are described in terms of "remove interest from the system," "keep interest off the system," "agree to keep interest off the system," and "put interest back on the system."

Critically, the Rhode Island Attorney General before this Court attached copies of the state family court order issued at a hearing dated February 10, 2023 that explicitly ordered, "…*interest put back on the system* without prejudice to the Defendant."

The full meaning of the interest "removed" or "keep off" or "agree to keep off" or "put back" on the system cannot be fully comprehended until the 2024 available State Policy attached hereto in Exhibit I made sense of those terms submitted in numerous instances to this United States Court by the Appellee counsel, the Rhode Island Attorney General.

It is plain that the Rhode Island Attorney General has the State Policy in HIS possession, and he affirmatively concealed it from this tribunal.

The record in this appeals court plainly show that the Rhode Island Attorney General, confronted with Appellant's March 24, 2024 submission of the State Policy attached hereto in Exhibit I under 18 U.S.C. § 4 and Fed. R. Evid. 201, *affirmatively* filed motions to strike it from the record on or around 9 AM March 29, 2024. The irony is, just as the Appellees feloniously remove unlawful 12% compound interest from the automated data processing and information retrieval system, the Rhode Island Attorney General similarly seeks to feloniously remove

the State Policy exposing and making sense of the systemic interstate fraud from the court record keeping system in this tribunal.

Pursuant to *United States v. Olson*, **856 F.3d 1216 (9th Cir. 2017), a panel of judges in the Ninth Circuit found that, "Congress intended the misprision statute to apply solely to conduct the average person would understand as criminal and serious." "[M]isprision comprehends an offence which is of so serious a character that an ordinary law-abiding citizen would realise he ought to report it to the police."**

The certification and grant forms that the 42 U.S.C. § 654(1) political subdivisions fill out to obtain federal grants and funding under 42 U.S.C. § 651-669 bear the warning that any individual who submitted false statements could be imprisoned up to five years. Appellees had seen similar warnings "many times," and the Court should infer Appellees' sophistication from experience as the state's designated enforcement entity. This is the reason for the adoption of the State Policy to "zero out interest" in interstate cases plainly for concealment purposes. The state's Attorney General tasked with enforcing making into effect 42 U.S.C. § 654 in all political subdivisions under the State Plan has an even higher degree of duty and sophistication having possession of the State Policy.

To illustrate this point, Appellant attaches herewith the 9th Circuit's opinion *United States v. Olson*, 856 F.3d 1216 (9th Cir. 2017), as <mark>Exhibit V</mark>.

## B. Appellee GERO MEYERSIEK'S SOPHISTICATION AND KNOWLEDGE OF FELONY

The language used by Appellee GERO MEYERSIEK shows and proves beyond a doubt that not only is MEYERSIEK a partner of the State Appellees, he is in the know of the sophistication of the State Policy's purpose underlying Appellees' felonious interest removals from the system, keeping interest off the system, agreeing to keeping the interest off the system, and changing his mind and putting interest back on the system.

Pointedly, MEYERSIEK's lawyer, Barbara Grady, and MEYERSIEK himself, explicitly describe their actions similarly in terms of felonious interest removals from the system, keeping interest off the system, agreeing to keeping the interest off the system, and changing his mind and putting interest back on the system, over and over again from 2018 to 2024. MEYERSIEK, if incognizant or unsophisticated, would not describe what ordinarily would be explained by a layman as "waive interest" or "agree to waive interest" or "changed his mind and demand interest" as felonious interest removals from the system, keeping interest

off the system, agreeing to keeping the interest off the system, and changing his mind and putting interest back on the system.

Appellee-GERO MEYERSIEK's lawyers, Barbara Grady (in family court) and Joanna Achille, similarly have knowledge of and are in possession of the State Policy attached hereto in Exhibit I. Barbara Grady's husband Paul Dugan, a law firm partner of Dugan & Grady Law, was a former Deputy Chief Counsel of Appellee Office of Child Support Services and knew and was in possession f the State Policy, and among his job mandate, as are the individual State Appellees of this action, is to enforce and conceal the felonious State Policy and practice from detection. Appellee Gero Meyersiek, by and through his lawyer Barbara Grady, had partnered with the State Appellees to feloniously establish unlawful 12% compound interest in the interstate case involving TEXAS in the contemplated ensuing enforcement, necessarily involving contemplated felonious false accounting, false certification and fraudulent liens, and is an accessory to aiding and abetting in making false claims to the United States.

Appellee-GERO MEYERSIEK's counsel, Joanna Achille, did not file an Appellee-Brief in the related matter in Appeal No. 23-1851 nor did she file any disclosure of the State Policy and her client GERO MEYERSIEK's scheme with the State Appellees to remove the interest off the system and to keep the interest off the system until Appellees induced the TEXAS Appellant to pay the lump sum

payoff amount of $104,185.98, then schemed with the Appellees to put the interest

back on the system.  However, she plainly knew the substantive elements of the

felonious false claim for interstate unlawful 12% compound interest that

necessitated the felonious interest removals from the system, keeping interest off

the system, agreeing to keeping the interest off the system, and changing his mind

and putting interest back on the system.  Counsel for Appellee-GERO

MEYERSIEK, confronted with the State Policy evidence attached hereto in

Exhibit I as of March 24, 2024 in this matter, similarly failed to make known to

federal authorities the commission of felonious crimes, and has affirmatively

concealed the crimes in violation of 18 U.S.C.  § 4 evidenced in this proceeding

alone.

III.  **_Nix v. Whiteside_, 475 U.S. 157 (1986) Requires Withdrawal of
      Appellee-Counsels pursuant to Model Rule of Professional Conduct
      1.2 (stating that a lawyer shall not counsel a client to engage, or assist
      a client, in conduct that the lawyer knows is criminal or
      fraudulent); Model Rule 3.3 cmt. [12] (recognizing that lawyers have
      a special obligation to protect a tribunal against criminal or
      fraudulent conduct that undermines the integrity of the adjudicative
      process, such as unlawfully destroying or concealing documents or
      other evidence or failing to disclose information to the tribunal when
      required by law to do so); Model Rule 1.16 (requiring that a lawyer
      withdraw from the representation of a client if the representation
      will result in violation of the rules of professional conduct or other
      law).**

The Court must further review the conduct of the counsels for Appellees pursuant to the duty of the Court and the judges' duty under 18 U.S.C. § 4, pursuant to *Nix v. Whiteside*, **475 U.S. 157 (1986).**

**The United States Supreme Court in *Nix v. Whiteside*, 475 U.S. 157 (1986)** makes plain that the attorneys here are required to withdraw pursuant to Model Rule of Professional Conduct 1.2 (stating that a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent); Model Rule 3.3 cmt. [12] (recognizing that lawyers have a special obligation to protect a tribunal against criminal or fraudulent conduct that undermines the integrity of the adjudicative process, such as unlawfully destroying or concealing documents or other evidence or failing to disclose information to the tribunal when required by law to do so); Model Rule 1.16 (requiring that a lawyer withdraw from the representation of a client if the representation will result in violation of the rules of professional conduct or other law).

### A. <u>Impeachable Conduct by the Rhode Island Attorney General</u>

Here, the record on appeal makes clear that the Rhode Island Attorney General, itself a political subdivision subject to regulation under 42 U.S.C. § 654, has had knowledge of the State Policy attached hereto in Exhibit I (hereafter "State

Policy") since counsels' entry of appearance in this matter in January 2023, for over 15 months.  The state attorney general as the premier law enforcement political subdivision under the regulation of 42 U.S.C.  § 654 affirmatively knew and have known about the State Policy since its latest revision in 2011.  As such, since 2011, the Attorney General of Rhode Island has affirmatively counseled Rhode Island political subdivisions to engage, or assist the subdivisions in implementing and put into practice the State Policy that the lawyer knows is feloniously criminal and feloniously fraudulent.

In this matter alone, the State Appellee counsel has egregiously violated Model Rule 3.3 cmt. [12] (recognizing that lawyers have a special obligation to protect a tribunal against criminal or fraudulent conduct that undermines the integrity of the adjudicative process, such as unlawfully destroying or concealing documents or other evidence or failing to disclose information to the tribunal when required by law to do so).  The Rhode Island attorney general has violated his special obligation, that is further regulated by 42 U.S.C.  § 654, to protect this tribunal against felonious criminal and fraudulent conduct that undermines the adjudicative process, such as feloniously concealing the State Policy and other evidence related to the Policy, feloniously moving the Court to strike the State Policy from the record under the ludicrously lame excuse of "another bite at the apple" and then failing to disclose the State Policy and

related materials to the tribunal when required to do so.  Undisputedly, for the

purpose of the furtherance of the appellate truth-seeking duty of this Court,

Congress proscribed Fed. R. of Evidence 201 and Fed. R. Civ P. 60(b)(3), (4),

(5), and (6) as *mainstays ENABLING* **"another bite at the apple"** in the

furtherance of justice and public interest.  Rather than complying with federal

law, including applicable federal and state criminal laws, counsels for the State

Appellees engage in felonious acts in violation of *inter alia* 18 U.S.C.  § § 2, 3,

and 4.

Model Rule 1.16 (requiring that a lawyer withdraw from the representation of a

client if the representation will result in violation of the rules of professional

conduct or other law) requires the Attorney General of Rhode Island to

withdraw from the case, and any contradictory state case law or state judge-

created laws interpreting Model Rule 1.16 and the state Attorney General's

prerogative is preempted by *Nix v. Whiteside*, **475 U.S. 157 (1986) in this**

**matter.**  Public interest dictates it.  The Rhode Island public should not be

made to foot the bill for the abject interstate felonious commission of crimes

before this Court by the counsels for the State Appellees.

  The public/citizens of other states victimized by Rhode Island's felonious

scheme aided and abetted by the 42 U.S.C. § 654 regulated Rhode Island

Attorney general should not be made to foot the bill for protecting themselves

from Appellees and Appellees-counsels scheme, just because of a Rhode Island state judge-created law on the prerogative of a state attorney general to decide who to represent.  In reality, the state attorney general's conduct is impeachable.  ***This is not about whether the attorney general of Rhode Island has a prerogative to decide who to represent, this is about whether his prerogative choice is felonious and impeachable conduct***.

## B. <u>Mandatory Withdrawal of Counsel for Appellee-GERO MEYERSIEK</u>

For the foregoing reasons, counsel for Gero Meyersiek is similarly required to withdraw pursuant to Model Rule of Professional Conduct 1.2 (stating that a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent); Model Rule 3.3 cmt. [12] (recognizing that lawyers have a special obligation to protect a tribunal against criminal or fraudulent conduct that undermines the integrity of the adjudicative process, such as unlawfully destroying or concealing documents or other evidence or failing to disclose information to the tribunal when required by law to do so); Model Rule 1.16 (requiring that a lawyer withdraw from the representation of a client if the representation will result in violation of the rules of professional conduct or other law).

## IV.    Fed. R. Civ. 11(c)(3)

Here, the State Policy was not available until 2024, during the time that the functus officio district court judge William E. Smith modified the record on appeal post-appeal several times, in a felonious attempt to interfere with the cause of the appeal.  Because the state policy was not available until 2024, Appellant properly requested judicial notice of the State policy pursuant to Fed. R. of Evidence 201 on March 24, 2024, and multiple times thereafter.  Appellant further ***invoked*** ==**Fed. R. Evid. 201(e) for a hearing by right**== in every filing made in this Court since the Appellant's filing of her Motion for Judicial Notice pursuant to Fed. R. Evid. 201 on March 24, 2024 and March 29, 2024

Because the State Policy has long been available to the Appellee-counsel and Fed. R. Civ. P 11 requires the Appellee-counsel to investigate the facts relating to the State Policy available to the Appellee-counsel at counsel's disposal, the Appellee-counsel's filing of the Appellee-brief and the lies contained therein has shown to be utterly lacking in candor and blatantly lying to the Court, constituting *prima facie* fraud on the court.  As such the Appellee-Brief should be stricken from the record, pursuant to Fed. R. Civ. P 11.

The Court, on its own initiative under Fed. R. Civ. P 11(c)(3) should order the Appellees and Appellees' counsels to show cause why conduct by the

Appellees and their counsels specifically described above has not violated Rule 11(b).

In aid of the Court, the Appellant attaches hereto in **Exhibit VI** Document 00118126723, that was reported to the judges of this United States Court of Appeals under 18 U.S.C. § 4 and Fed. R. Evid. 201.

Appellant moreover respectfully requests the judges of the United States, explicitly conferred by Congress the explicit duty under 18 U.S.C. § 4, to refer the criminal acts made known in Document 00118126723 to the United States Attorney General Merrick Garland, an official who also foots the bill under 18 U.S.C. § 4, pursuant to Fed. R. Civ. P 11(c)(4) "to deter repetition of the conduct or comparable conduct by others similarly situated."

Appellant respectfully requests furthermore that the Court order the Appellees pay the Appellant $250,000 and no less than $50,000 for each infraction named herein, for having to prosecute this motion for their felonious conduct.

## V.    <u>CONCLUSION</u>

The Court should grant this motion for sanctions.  The Court should order the withdrawal of Appellee-counsels named herein.  The Court should order the Appellant-requested $250,000 and no less than $50,000 for each infraction named herein payable by the Appellees and Appellees

counsels to the Appellant, for having to prosecute this motion for their felonious conduct.  The Court should take judicial notice of Document 00118126723 filed under Fed. R. Evid. 201 and 18 U.S.C. § 4.  The Court should strike the Appellee's motion to strike from the record for fraud on the court and for violation of Fed. R. Civ. P 11(b).  The Court should on its own initiative under Fed. R. Civ. P 11(c)(3) order the Appellees and Appellees' counsels to show cause why conduct by the Appellees and their counsels specifically described above has not violated Rule 11(b).  The judges of the United States have been explicitly conferred an explicit duty by Congress under 18 U.S.C. § 4 and should refer the criminal acts made known in Document 00118126723 to the United States Attorney General Merrick Garland, an official who also foots the bill under 18 U.S.C. § 4, pursuant to Fed. R. Civ. P 11(c)(4) "to deter repetition of the conduct or comparable conduct by others similarly situated," in the interest of the public. The Appellant respectfully requests any and all relief that is just under the circumstances.

Pursuant to Fed. R. Evidence 201(e), Appellant requests by right a hearing.

Respectfully submitted,

Mary Seguin
Pro Se
/s/    *Mary Seguin*

Email: [maryseguin22022@gmail.com](mailto:maryseguin22022@gmail.com)
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: April 7, 2024

## CERTIFICATE OF SERVICE

    This is to certify that the foregoing instrument has been served via the Court's ECF filing system on April 7, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/    *Mary Seguin*
Email: [maryseguin22022@gmail.com](mailto:maryseguin22022@gmail.com)
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

EXHIBIT I.

### SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

### FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

EXHIBIT II.

11:28:47 Tuesday, December 13, 2022

```
12/13/22   11:28          C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00                CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION      COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (██████████████████). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $_____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BY NCP____
AS NCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:          SEGUIN      MARY      CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K PNL:
```

Case Number 23-1967 Document: 00118129551 Page: 38 Date Filed: 04/07/2024 Entry ID: 6635188

Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

```
12/13/22   11:20        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00            CASE HISTORY               U024  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED_____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT._____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL_____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES_____

RL: 80  12 22 ABSP:        SEGUIN        MARY          CMD: _____
FNX: TRAC  D CLIENT:       MEYERSIEK     GERO     K    PHL:
```

Case Number: 28-1907   Document: 00118139551   Page: 47   Date Filed: 04/07/2024   Entry ID: 6635188
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSIDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
          FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
     FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: SO  12 22 ABSP;              SEGUIN       MARY           CMD: _____
FWX: TRAC  D CLIENT:             MEYERSIEK    GERO      X    PNL:

Case Number: 22-1196M Document: 00118139551 Page: 48 Date Filed: 04/07/2024 Entry ID: 6635166
Filed in Providence/Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria G.

11:29:13 Tuesday, December 13, 2022

12/13/22   11:29          C A S E   T R A C K I N G          CSCL   ASMXA201
           TRAC.00              CASE HISTORY                 U824   PROD
**STARTING DATE**   09 01 2021
**SELECTION**   COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

RL: 80  12 22 ABSP:              SEGUIN        MARY           CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK     GERO      K    PNL:

ed in Providence/Bristol County Family Court
Submitted: 8/1/2023 10.13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
      TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
      58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:            SEGUIN       MARY         CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK    GERO    K    PNL:
```

```
12/13/22    11:28          C A S E   T R A C K I N G          CSCL  ASMXA201
            TRAC.00              CASE HISTORY                  U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42
_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
    TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
    58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75.

RL: 80  12 22 ABSP:              SEGUIN       MARY           CMD: _____
FNX: TRAC  D CLIENT:            MEYERSIEK     GERO      K    PNL:
```

Case Number: N2001052tM   Document: 00118129531   Page: 53   Date Filed: 04/07/2024   Entry ID: 6635188
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

12/13/22   11:28          C A S E   T R A C K I N G          CSCL   ASMXA201
              TRAC.00              CASE HISTORY                UB24   PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

RL: 80  12 22 ABSP:              SEGUIN       MARY          CMD: _____
FNX: TRAC  D CLIENT:            MEYERSIEK     GERO     K    PNL:

ed in Providence/Bristol County Family Court
bmitted: 6/1/2023 10:13 PM
velope: 4132704
viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

```
RL: 80  12 22 ABSP:                  SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:                 MEYERSIEK   GERO    K     PNL:
```

# EXHIBIT III.



State of Rhode Island
# Office of Child Support Services
### DEPARTMENT OF HUMAN SERVICES

Welcome Mary Seguin

**Menu**
- Case Information
  - Last 5 Payments
  - Last 13 Months
  - Current Orders/ Past Due Balances
  - Court Dates/ Appointments
  - Enforcement Actions
- PIN Lookup

Home > Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek        CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|--------|-------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

EXHIBIT IV.



State of Rhode Island
## Office of Child Support Services
DEPARTMENT OF HUMAN SERVICES

Home > Current Orders and Past Due Balances

**Case Manager**

### Current Orders / Past Due Balances

**Custodial Parent:** Gero K Meyersiek     **CSE ID:** 1689817

**Current Orders**

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

⚠ Note: Medical orders and medical arrears are not listed on this screen.

**Past Due Balances**

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |

# EXHIBIT V.

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. KAREN B. OLSON, *Defendant-Appellant.* | No. 15-30022 D.C. No. 3:13-cr-00093-TMB-1 OPINION |

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, Chief Judge, Presiding

Argued and Submitted August 4, 2016
Anchorage, Alaska

Filed May 15, 2017

Before: Raymond C. Fisher, Richard A. Paez
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Fisher;
Concurrence by Judge Hurwitz

## SUMMARY[*]

### Criminal Law

The panel affirmed the defendant's conviction under 18 U.S.C. § 4 (misprision of felony) for concealing and failing to notify authorities of her business partner's submission of false statements to the United States Department of Agriculture Rural Development Program in connection with a federal grant application.

The panel held that, to secure a conviction under § 4, the government must prove not only that the defendant knew the principal engaged in conduct that satisfies the essential elements of the underlying felony, but also that the defendant knew the conduct was a felony; that to establish the latter, the government must prove the defendant knew the offense was punishable by death or a term of imprisonment exceeding one year; and that sufficient evidence supports the jury's finding that the defendant here knew the principal's crime was punishable by more than a year in custody.

Concurring in part and concurring in the result, Judge Hurwitz would leave to another day, in a case in which it matters to the outcome, whether the government must prove in a § 4 prosecution that the defendant knew the underlying offense was a felony.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Glenda Kerry (argued), Law Office of Glenda J. Kerry, Girdwood, Alaska, for Defendant-Appellant.

Retta-Rae Randall (argued), Assistant United States Attorney, United States Attorney's Office, Anchorage, Alaska, for Plaintiff-Appellee.

## OPINION

FISHER, Circuit Judge:

Karen Olson appeals her conviction for misprision of felony under 18 U.S.C. § 4. She was convicted of concealing and failing to notify authorities of her business partner's submission of false statements to the United States Department of Agriculture Rural Development Program (USDA) in connection with a federal grant application. She challenges her conviction, arguing the government failed to prove she knew the conduct she concealed constituted a felony. We address her argument in two parts. First, we agree with Olson that, to secure a conviction under 18 U.S.C. § 4, the government must prove not only that the defendant knew the principal engaged in conduct that satisfies the essential elements of the underlying felony, but also that the defendant knew the conduct was a felony. *See Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009) ("[C]ourts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element."). Second, applying that standard, we hold sufficient evidence supports the jury's

finding that Olson had the requisite knowledge here. We therefore affirm.[1]

## BACKGROUND

The USDA awarded a grant to Robert Wells to open a milk processing facility. The terms of the grant provided that certain equipment was to be purchased wholly or in part with grant funds, and that the USDA would hold a first lien position on any equipment purchased with grant money. Although the grant was in Wells' name, he had an informal "handshake" partnership with Olson, a former Alaska executive director of the USDA Farm Service Agency who wrote Wells' grant application. Wells described her as the "brains" behind the grant, and their informal partnership entitled her to 50 percent of the profits from the milk processing facility.

Around the same time, Kyle Beus received a separate USDA grant to establish an ice cream and cheese manufacturing facility. The paperwork for both Wells' and Beus' grant applications warned that anyone who made false, fictitious or fraudulent statements could be fined or imprisoned for up to five years.

Wells, Beus and Olson agreed to locate their two projects at the same facility. Unbeknownst to Wells and Olson, Beus instructed his contractor, Nether Industries, to inflate the value of certain dairy processing equipment – including a clean-in-place (CIP) system and a glycol chilling system – on papers submitted to the USDA for reimbursement. Beus also

---

[1] We reject Olson's remaining challenges in an unpublished memorandum disposition filed concurrently with this opinion.

submitted invoices to Nether, allegedly for project expenses, so he could personally receive a portion of the grant money the USDA disbursed.

A year into the enterprise, Beus told Wells and Olson he had leased certain "technologically obsolete" pieces of equipment rather than purchase new equipment as agreed in the original grant application, including a "really cheap old glycol unit" and an "incomplete clean-in-place system." As to some of this equipment, Olson informed the USDA there had been a change of plans that called for "leasing instead of outright purchasing some of the original smaller equipment." She did not do so, however, with respect to the CIP system and glycol cooling system. The attached "Proposed Money Grant Expenditure" included a CIP system listed at $35,000 and a glycol cooling system listed at $50,000 when, in fact, those systems had been leased rather than purchased.

After the USDA disbursed the grant funds, Olson filed a final report with the department. It included a "Final List of Expenditures by Category and Completion" that once again falsely listed the purchase of a $35,000 CIP system and a $50,000 glycol cooling system.

Olson later became aware that Beus had been misappropriating grant funds by submitting false invoices to Nether Industries and receiving payments – which Olson described as "kickbacks" – in return. Olson also discovered Beus had improperly used grant funds to make a $71,000 personal investment in a milk jug manufacturer. An entry in her day planner around this time reveals that she knew Beus' actions were improper. She wrote: "Began full-time work on financials/straightening out Kyle's mess. Learning of questionable deals – Nether – Kyle spent $190,000 of our

6                    UNITED STATES V. OLSON

grant on others, so Nether way over budget.  Also, Kyle
misused our [] advance $ as his own stock purchases – !"
Olson told the project's office assistant she "could send
[Beus'] ass to jail."  She wrote members of her board that
"[t]he revelations of the past week have crystallized for me
that [Beus' agreement to co-locate the projects] was simply
a way to divert our grant money into a grandiose plan that has
not worked," and that Beus "has put the entire dairy industry
at risk for an ever-widening investigation closing off all loan
sources and public goodwill."

     Olson was convicted after a jury trial of misprision of
felony under 18 U.S.C. § 4.  Her conviction was based on her
knowledge that Beus, the principal, submitted false
statements to the USDA in furtherance of his scheme to
misappropriate grant funds in violation of 18 U.S.C. § 1014
– a felony under federal law.  Olson appeals.

                    **STANDARD OF REVIEW**

     "We review a question of statutory construction de novo."
*United States v. Weitzenhoff*, 35 F.3d 1275, 1283 (9th Cir.
1993).  "Our review of the constitutional sufficiency of
evidence to support a criminal conviction is governed by
*Jackson v. Virginia*, which requires a court of appeals to
determine whether, 'after viewing the evidence in the light
most favorable to the prosecution, *any* rational trier of fact
could have found the essential elements of the crime beyond
a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158,
1163–64 (9th Cir. 2010) (en banc) (quoting *Jackson v.
Virginia*, 443 U.S. 307, 319 (1979)) (citation omitted).

## DISCUSSION

### I

The misprision of felony statute states:

> Whoever, *having knowledge of the actual commission of a felony cognizable by a court of the United States*, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 4 (emphasis added).

To establish misprision of felony, the government must prove beyond a reasonable doubt: "(1) that the principal . . . committed and completed the felony alleged; (2) that the defendant had full knowledge of that fact; (3) that he failed to notify the authorities; and (4) that he took affirmative steps to conceal the crime of the principal." *Lancey v. United States*, 356 F.2d 407, 409 (9th Cir. 1966) (alterations omitted) (quoting *Neal v. United States*, 102 F.2d 643, 646 (8th Cir. 1939)).  Only the second element is at issue here.

To show a defendant has "knowledge of the actual commission of a felony cognizable by a court of the United States," 18 U.S.C. § 4, the parties agree the government must prove at least that the defendant knew the principal *engaged in conduct* that satisfies the essential elements of the underlying felony.  In other words, the defendant must "know the facts that make [certain] conduct fit the definition of the

offense." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (quoting *Staples v. United States*, 511 U.S. 600, 608 n.3 (1994)). The parties disagree as to whether – and to what extent – the government must also prove the defendant knew such conduct *was a felony*. We conclude Olson has the stronger argument.

First, Olson's construction is consistent with the general presumption that a mens rea requirement applies to each element of an offense. "Absent indication of contrary purpose in the language or legislative history of the statute," *Liparota v. United States*, 471 U.S. 419, 425 (1985), we "ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element," *Flores-Figueroa*, 556 U.S. at 652. *See United States v. Williams*, 553 U.S. 285, 294 (2008) (applying a knowledge requirement to each subdivision in a statute in the absence of "grammar or structure enabl[ing] the challenged provision or some of its parts to be read apart from the 'knowingly' requirement"); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 77–78 (1994) ("[A]s a matter of grammar it is difficult to conclude that the word 'knowingly' modifies one of the elements in [the statute], but not the other."). This "presumption in favor of a scienter requirement," *X-Citement Video*, 513 U.S. at 72, "reflects the basic principal that 'wrongdoing must be conscious to be criminal,'" *Elonis*, 135 S. Ct. at 2009 (quoting *Morissette v. United States*, 342 U.S. 246, 252 (1952)). As a general matter, "a defendant must be 'blameworthy in mind' before he can be found guilty." *Id.* (quoting *Morissette*, 342 U.S. at 252).

In *Liparota*, for example, the statute at issue imposed criminal liability on "whoever knowingly uses, transfers,

acquires, alters, or possesses coupons or authorization cards in any manner not authorized by this chapter or the regulations issued pursuant to this chapter." *Liparota*, 471 U.S. at 420 n.1 (alteration omitted) (quoting 7 U.S.C. § 2024(b)(1) (1985)). The evidence showed the defendant purchased food stamps from an undercover agent for less than face value. *See id.* at 421. The government argued the statute required proof only that the defendant knew of his acquisition of the cards, not that the acquisition was unauthorized by law. *See id.* at 423. The Supreme Court disagreed. Because it was not clear from the text of the statute which phrase or phrases Congress intended the knowledge requirement to modify, and because the legislative history contained nothing to clarify congressional purpose, the knowledge requirement applied to each phrase in the statute. The government was required to show the defendant *knew* purchasing food stamps for less than face value was unauthorized by law. *See id.* at 425. Since *Liparota*, the Court has applied this presumption to a range of statutes. *See, e.g.*, *Flores-Figueroa*, 556 U.S. at 657 (applying a knowledge requirement to each phrase in the aggravated identity theft statute); *Williams*, 553 U.S. at 294 (applying a knowledge requirement to all elements in a child pornography statute); *X-Citement Video*, 513 U.S. at 78 (applying a knowledge requirement to all elements in a statute criminalizing the exploitation of minors).

The same presumption applies here. First, as in *Liparota*, the text of the misprision statute alone does not make clear whether the knowledge requirement applies to each element. *Compare* 18 U.S.C. § 4 ("Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States . . . ."), *with* 7 U.S.C. § 2024(b)(1) (1985) ("[W]hoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not

authorized by this chapter . . . .").  Putting aside the *Flores-Figueroa* presumption, the mental state in § 4 could plausibly be read to modify only "actual commission" or both "actual commission" and "of a felony cognizable by a court of the United States."     Under *Flores-Figueroa*, however, we presume Congress intended the knowledge requirement to apply to both phrases, *see* 556 U.S. at 652, and nothing in the text or legislative history negates the presumption that Congress so intended.  The government has not pointed to anything suggesting Congress intended to penalize someone who did not know she was witnessing the commission of a felony.  Accordingly, given the language of § 4 and the *Flores-Figueroa* presumption, the statute is best interpreted as requiring proof that, in addition to showing the defendant knew the principal engaged in conduct satisfying the essential elements of the underlying felony, the government must also show the defendant knew such conduct was a felony.

Second, even putting the presumption aside, the history of misprision also supports Olson's construction.  In England, before the advent of professional police forces, individual citizens bore the responsibility for combating crime.  *See* Carl Wilson Mullis, III, *Misprision of Felony: A Reappraisal*, 23 Emory L.J. 1095, 1114 (1974).  They had "a duty to raise the hue and cry and report felonies to the authorities." *Branzburg v. Hayes*, 408 U.S. 665, 696 (1972) (internal quotation marks omitted).  *See* Hue and Cry, *Black's Law Dictionary* (10th ed. 2014) ("The public uproar that, at common law, a citizen was expected to initiate after discovering a crime.").  A citizen who breached this duty could be charged with misprision.  *See* Mullis, *supra*, at 1095. In this country, the First Congress enacted the American misprision statute as part of the Crimes Act of 1790, the current version of which is "functionally identical" to its

predecessor.  *United States v. Phillips*, 827 F.3d 1171, 1175 (9th Cir. 2016).

This context suggests Congress intended the misprision statute to apply solely to conduct the average person would understand as criminal and serious.  As an English court has explained, requiring knowledge of the serious criminal nature of the underlying offense "disposes of many of the supposed absurdities, such as boys stealing apples, which many laymen would rank as a misdemeanour and no one would think he was bound to report to the police. . . .  [M]isprision comprehends an offence which is of so serious a character that an ordinary law-abiding citizen would realise he ought to report it to the police."  *Sykes v. Dir. of Pub. Prosecutions*, [1962] A.C. 528 at 563.[2]

The government argues in passing that *United States v. Graves*, 143 F.3d 1185 (9th Cir. 1998), *as amended* (June 4, 1988), supports its position.  *Graves*, however, did not address the question we are considering here.  *Graves* concerned the "accessory after the fact" statute, which states: "Whoever, *knowing that an offense against the United States has been committed*, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact."  *Id.* at 1187 (emphasis added) (quoting 18 U.S.C. § 3).  The defendant was charged as an accessory ("charged offense") to the crime

---

[2] Misprision has become a little used and much maligned criminal charge.  England eliminated the offense a few years after the *Sykes* decision.  *See* Mullis, *supra*, at 1100–01.  American commentators have urged Congress to do the same, arguing the crime has outlived its usefulness in light of modern methods of law enforcement.  *See, e.g.*, E. Lee Morgan, *Misprision of Felony*, 6 S.C. L. Q. 87, 95 (1953–54); Mullis, *supra*, at 1111 n.92 (listing commentators).

of felon in possession of a firearm ("underlying offense"). *See id.* at 1186. The underlying offense, felon in possession of a firearm, contains two elements: first, possession of a weapon and second, a previous felony conviction. *See id.* at 1187. There was no evidence the defendant knew the principal was a felon, but the government argued it need not make such a showing. *See id.* We disagreed, holding a "defendant who is accused of being an accessory after the fact must be shown to have had actual knowledge of each element of the underlying offense." *Id.* at 1189. The government was therefore required to prove the defendant knew that "the offender possessed a firearm" and that the offender "had previously been convicted of a felony." *Id.*

Applied here, *Graves* stands only for the undisputed proposition that Olson must have had knowledge of the elements of the *underlying offense* – submission of false statements to the USDA. *Graves* does not address or support the government's argument regarding the specified knowledge requirement of the *charged offense* here – misprision of a felony.**[3]**

In sum, in light of Supreme Court precedent and relevant history, we hold the misprision statute requires knowledge not only that the principal engaged in conduct that satisfies

---

**[3]** Both parties invoke *United States v. White Eagle*, 721 F.3d 1108 (9th Cir. 2013), in support of their respective positions. This case has no bearing on our analysis here because it did not address the knowledge requirement of the misprision statute. *See id.* at 1119–20 (addressing only the "failure to notify the authorities" and the "affirmative step to conceal" elements).

the essential elements of the underlying felony, but also that the underlying offense is a felony.[4]

## II

The question then becomes:  What does it mean to know conduct constitutes a felony?

When a term used in a statute is defined by that statute or by "any other relevant statutory provision," *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012), we generally presume that definition applies to the statute's use of the term.  *See Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning."); *see also Meese v. Keene*, 481 U.S. 465,

---

[4] Olson asks us to go further by holding the government must show the defendant knew the relevant conduct was a felony under *federal* law, based on the statute's language stating "of a felony *cognizable by a court of the United States.*"  18 U.S.C. § 4 (emphasis added).  We decline to do so.  "The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum."  *United States v. Feola*, 420 U.S. 671, 685 (1975).  The requirement that the felony be cognizable by a court of the United States was included in the statute to state the foundation for federal jurisdiction.  *See United States v. Howey*, 427 F.2d 1017, 1018 (9th Cir. 1970).   "A defendant's knowledge of the jurisdictional fact is irrelevant," *id.*, as has been held in numerous cases interpreting analogous statutory provisions.  *See, e.g.*, *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1206–07 (9th Cir. 1991) (holding a defendant charged with being an accessory after the fact need not know the principal crime was one against the United States despite the presence of such language in the statute); *Feola*, 420 U.S. at 687 (holding a defendant charged with conspiracy need not know his conduct violated federal law despite the statute's prohibition on conspiring to commit an offense against the United States).

14                 UNITED STATES V. OLSON

484 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term."); *United States v. Lettiere*, 640 F.3d 1271, 1274 (9th Cir. 2011) ("[There is a] well-settled principle that, for purposes of statutory interpretation, the language of the statute is the first and, if the language is clear, the only relevant inquiry.").

This presumption is not absolute, however. If interpreting a term consistently with its statutory definition would, for instance, lead to "obvious incongruities" or would "destroy one of the major [congressional] purposes," the statutory definition may yield to context. *See Lawson v. Suwannee Fruit & S.S. Co*., 336 U.S. 198, 201 (1949); *see also Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014) *(*confirming that the presumption of consistent usage may yield to context).

Here, the term "felony" is defined as part of the federal criminal code as a crime punishable by death or a term of imprisonment exceeding one year. *See* 18 U.S.C. § 3559(a); *see also Burgess v. United States*, 553 U.S. 124, 130 (2008) ("[T]he term 'felony' is commonly defined to mean a crime punishable by imprisonment for more than one year." (citing 18 U.S.C. § 3559(a))). Although the misprision offense and the felony definition are in separate sections of the United States Code, they were included in the same statute at least twice. In 1909, Congress passed an act to "codify, revise, and amend the penal laws of the United States." *See* Criminal Code of 1909, ch. 321, 35 Stat. 1088, 1088 (preamble) (the "1909 Crime Act"). Along with a slightly modified version of the original misprision statute, *see id.* § 146, 35 Stat. at 1114, the 1909 Crime Act included, apparently for the first time, a statutory definition for the term "felony," *see id.* § 335, 35 Stat. at 1152 ("All offenses which may be punished

by death, or imprisonment for a term exceeding one year, shall be deemed felonies."). The 1948 Crimes and Criminal Procedure Act (the "1948 Crime Act"), enacted to "revise, codify, and enact into positive law, Title 18 of the United States Code, entitled 'Crimes and Criminal Procedure,'" Crimes and Criminal Procedure Act, Pub. L. No. 80-772, 62 Stat. 683, 683 (1948) (preamble), similarly included versions of both provisions. *See id.* §§ 1, 4, 62 Stat. at 684. Indeed, the 1948 Crime Act actually included the felony definition and the misprision offense on the very same page. *See id.*

This is a case, therefore, in which Congress has adopted a statute using a term – "felony" – and in the same statute adopted a definition that presumptively applies. Moreover, it does not appear the presumption is rebutted by context. Applying the statutory definition, for instance, neither leads to incongruities nor destroys Congress' purposes. *See Lawson*, 336 U.S. at 201. The drafting history of the 1909 and 1948 Crime Acts supports this conclusion. Before 1909, the term "felony" lacked a uniform definition. A Senate Report on the 1909 Crime Act explained that the term "felony" had an "indefinite classification," resulting in its being "indiscriminately applied." S. Rep. No. 60-10, at 12 (1908). The report therefore underscored the need for a uniform definition, which would "characterize the whole system rather than pertain to any particular part of it." *Id.* Far from "destroy[ing] one of the major [congressional] purposes," *see Lawson*, 336 U.S. at 201, incorporating § 3559's definition into the misprision statute furthers Congress' intent to bring a measure of uniformity to the criminal code.

We therefore hold the government must prove the defendant knew the underlying offense was punishable by

death or more than one year in prison. The defendant need
not know the precise term of imprisonment authorized by
law, but at least she must know the potential punishment
exceeds one year in prison.[5]

## III

In Olson's case, there was sufficient evidence to support
a jury's finding that she knew submitting false statements to
the USDA was punishable by a sentence of incarceration
exceeding one year. *See Nevils*, 598 F.3d at 1163–64.[6] The
USDA grant form Olson completed on behalf of Wells
explicitly warned that any individual who submitted false

___

[5] Knowledge is ordinarily a subjective standard, and the parties do not
argue the rule is otherwise here. *See, e.g.*, *United States v. Twine*,
853 F.2d 676, 680 (9th Cir. 1988) ("We drew our conclusion in the face
of Congress' use of the terms 'knowingly and willfully,' words which the
Model Penal Code defines in a subjective manner."); *United States v.
Jewell*, 532 F.2d 697, 707 (9th Cir. 1976) (en banc) (Kennedy, J.,
dissenting) ("[K]nowledge [is] a matter of subjective belief, an important
safeguard against diluting the guilty state of mind required for
conviction.").

[6] As to this issue, Olson raises only a sufficiency of the evidence
claim. Olson does not contest the adequacy of the misprision jury
instruction apart from its failure to include a unanimity instruction – an
issue we address in a concurrently filed memorandum disposition. Nor
did she proffer a jury instruction at trial clarifying this point of law. We
therefore assume the jury was properly instructed on misprision and
address solely Olson's argument that there was insufficient evidence of
her knowledge. In future cases, of course, a defendant in Olson's position
could request an instruction requiring the government to prove that she
knew the underlying offense was punishable by more than one year in
prison. The instructions given here did not specifically address this issue,
but Olson did not challenge the instruction on appeal, so we need not
address whether the failure to give such an instruction was erroneous.

statements to the USDA could be imprisoned up to five years. Olson had seen similar warnings "many times," and the jury could have inferred Olson's sophistication from her experience as executive director of the USDA Farm Service Agency. This evidence was sufficient for a reasonable jury to find Olson knew Beus' crime was punishable by more than a year in custody.

## CONCLUSION

We hold 18 U.S.C. § 4 requires the government to prove the defendant knew the principal engaged in conduct that satisfies the essential elements of the underlying felony *and* that the defendant knew such conduct was a felony. To establish the latter, the government must prove the defendant knew the offense was punishable by death or a term of imprisonment exceeding one year. Sufficient evidence supports that finding here. For the reasons stated in this opinion and in a concurrently filed memorandum disposition, we affirm Olson's conviction.

**AFFIRMED.**

HURWITZ, Circuit Judge, concurring in part and concurring in the result:

This case does not turn on whether the government must prove in a misprision prosecution under 18 U.S.C. § 4 that the defendant knew the underlying offense was a felony. As the majority correctly concludes, the evidence at trial sufficed for a misprision conviction even if the government bears that burden of proof.

The majority's interpretation of the statute may be correct.  But, I would leave such analysis for another day, in a case in which it matters to the outcome. *See Whitehouse v. Ill. Cent. R. Co.*, 349 U.S. 366, 372–73 (1955) ("These are perplexing questions.  Their difficulty admonishes us to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case."); *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (noting "the cardinal principle of judicial restraint" that "if it is not necessary to decide more, it is necessary not to decide more").

EXHIBIT VI.

No. 23-1967

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities; Rhode Island OFFICE OF Child Support Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Appellants-Appellees.

Appeal from the United States District Court

for the District of Rhode Island

_____

**APPELLANT'S NOTICE TO THE JUDGES OF THE UNITED STATES OF THE COMMISSION OF ACTIVITIES BY PERSONS OR WHOEVER INVOLVING RECORD TAMPERING; KNOWING PRESENTATION, OR CAUSING TO BE PRESENTED, A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OR APPROVAL; KNOWINGLY MAKING, USING OR CAUSING TO BE MADE OR USED, A FALSE RECORD OR STATEMENT MATERIAL TO A FALSE OR FRAUDULENT CLAIM; CONSPIRING TO COMMIT A VIOLATION OF THE AFORESAID TO PROCURE TITLE IV-D FUNDING, THAT INVOLVE VIOLATIONS OF 42 U.S.C. § 654 WHICH ARE**

**PENALTY-INCURRING AND FINES INCURRING UNDER 42 U.S.C. § 654, COMMITTED BY APPELLEE AGENTS OF TITLE IV SOCIAL SECURITY ACT STATE PLAN POLITICAL SUBDIVISIONS OF THE STATE OF RHODE ISLAND AND APPELLEE PERSONS**

**Pursuant to**

**18 U.S.C. § 4**

**18 U.S.C. § 666**

**18 U.S.C. § 287 - making false, fictitious claims,**

**18 U.S.C. § 371 - conspiracy to defraud the United States,**

**18 U.S.C. § 1001 - false documents or false statements to a federal agency,**

**18 U.S.C. § 1341 - mail fraud,**

**18 U.S.C. § 1343 - wire fraud,**

**31 U.S.C. § 3279 - federal civil false claims act**

**Et al.**

_____

Pursuant to **18 U.S.C. § 4,** Appellant, proceeding from Texas and as a citizen of Texas, in aid of the Court, respectfully in good faith makes known to the Judges of the United States in the United States Court of Appeals for the First Circuit of United States of America, the commission of penalties-incurring and fines-incurring, both civil and criminal, (negligent and intentional) violations by Appellee persons or whoever acting as agents of the **42 U.S.C. § 654(1) political subdivisions of the State Plan of the State of Rhode Island** and Appellee persons, pursuant to **18 U.S.C. § 666, 18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false documents or false statements to a federal agency, 18 U.S.C. § 1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud, 31 U.S.C. § 3279 - federal civil false claims act** _et al._ (a non-exhaustive list of Appellee-violated federal codes is invoked in the Conclusion Section of this Notice), and respectfully requests review by a panel of judges in this United States Court of Appeals for the First Circuit under **Fed. R. App. P 27(b) and Fed. R. App. P 8(a)(2)(D) invoked in the pending Fed. R. App. P 27(b) motion and Fed. R. App. P 8(a)(2)(D) motion pending in this matter**.

**Appellant respectfully requests a hearing on the matters raised herein**.

## I.  APPELLANT'S LIMITED SCOPE PROSECUTION OF THE APPELLEES IN ==LIMITED== JURISDICTION 42 U.S.C. § 654(1) STATE FAMILY COURT TITLE IV CASE PROCEEDING

The Texas Appellant, a victim of the Appellees' organized commission of Title IV-D and Title IV-A violative interstate 12% compound interest on overdue support fraud, fraudulent liens consisting of 42 U.S.C. § 654(21)(A) violative 12% COMPOUND INTEREST on overdue support on Texas properties, fraud, theft, and accounting fraud, respectfully requests judicial notice, in aid of the Court, of the Texas Appellant's concurrent limited scope prosecution of the Appellees in the Rhode Island State Plan's 42 U.S.C. **§ 654(1)** political subdivision, Rhode Island Judiciary limited jurisdiction family court, where certain symbiotic state judicial actors, such as state judge John McCann III, state judge Haiganush Bedrosian and state magistrate Susan Nahabedian, routinely establish and enforce under color of Rhode Island state law 12% compound interest on overdue support, upon information, since 1988, with the possibility of since 1974.  Appellant respectfully attached hereto this Notice Appellant's February 4, 2024 and March 21, 2024 electronic filings moving to compel enforcement of that court's properly issued subpoena for Appellant's Title IV-D case records including records showing the Appellee-Rhode Island Office of Child Support Service's accounting alterations involving any and all records as they relate to the removal of 12% compound interest from the automated data processing system and putting the 12% compound

interest back on the system whether it be for certification of a compliant approved State Plan to the United States for claims under Title IV-D and Title IV-A programs funding under 42 U.S.C. §§ 654(7), 654(10), 654(14), 654(15), 654(16), 654a, 654b; or certified to financial institutions or property-holding entities for the purpose of placing or perfecting liens on Appellant's Texas properties, or certified to Texas for enforcement against the Appellant (e.g., to Texas for cooperation under 42 U.S.C. §666 (14) certifying the accuracy and legal sufficiency of Rhode Island's automated data processing system accounted amount) that must obviously exactly corroborate with the amounts directly represented to and demanded from the Appellant during the course of the Appellees' support collection activities – Appellant prosecuted judicial compulsion of Rhode Island Appellees' compliance with the subpoena and compliance with 42 U.S.C. §654b's requirement to furnish the information upon the noncustodial parent's information request by filing the motion to compel using the State's electronic court filing system, Odyssey, attached hereto under **Exhibit A**.

Appellant in good faith relies on the straightforward and clearly worded ruling of the United States Court of Appeals for the 4th Circuit in ***Hodges v. Shalala***, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003), that makes clear Congress's intent to prescribe both civil *and* criminal penalties and fines for violations.  Consistent with its

Spending Power, Congress has the authority to attach conditions on the receipt of federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements are conditions of approval of a state plan. See 42 U.S.C. §§ 654(7), (10), (14), (15), (16), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely." The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at 879.

Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1]  Congress also enacted several criminal codes punishing persons, whoever who act as agents, such as the Appellees, who commit federal crimes, including cover up of unlawful activities under federal criminal codes, e.g., *see* **8 U.S.C. § 666, 18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false documents or false statements to a federal agency, 18 U.S.C. § 1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud, 31 U.S.C. § 3279 - federal civil false claims act *et al.*** (a non-exhaustive list of Appellee-violated federal codes is invoked in the Conclusion Section of this Notice).  Penalties and fines against the State for noncompliance (including due process violations provided in 42 U.S.C.

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra,* and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

       Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the unlawful 12% compound interest from the noncustodial parent and from Texas and Federal authorities in the false amounts certified to Texas and to the United States for incentive claims, cooperation claims and Title IV-D and Title IV-A funding claims.

§654(20) and corresponding §666) is explicit under federal codes Title IV-D, Title

IV-A, and 18 U.S.C. § 666, and upheld.

Appellant attaches the 4th Circuit's ruling (***Hodges v. Shalala***, 121 F. Supp.

2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S.

811 (2003) herewith under **Exhibit B**.

Appellant  moreover in good faith relies on the straightforward and clearly

worded Brief filed by the United States Department of Justice and Secretary of the

United States Department of Health and Human Services in the seminal United

States Supreme Court case ***Turner v. Rogers***, 564 U.S. 431 (2011) that showed

South Carolina (found by the 4th Circuit Court of Appeals) liable for $75 million in

penalties for that state's 42 U.S.C. § 654 violations that did not even involve, *inter*

*alia*, fraud and tampering with the record or unlawful 12% compound interest put

into, then taken off, then put back on, the automated data processing system as here

in Rhode Island by the political subdivision Appellees.  The Texas Appellant, the

victim of fraud and organized fraud by Rhode Island's political subdivisions under

42 U.S.C. **§ 654(1),** in good faith made known the above activities to "some

judges" of "the United States" such as the judges sitting in the Court of Appeals for

the First Circuit and other relevant federal authorities under 18 U.S.C. **§ 4.**

Appellant attaches the aforesaid Brief filed in the U.S. Supreme Court by the

United States in ==*Turner v. Rogers*==, 564 U.S. 431 (2011) herewith under **Exhibit C.**

I.     **SUA SPONTE RECUSAL OF RHODE ISLAND'S TITLE IV POLITICAL SUBDIVISION STATE MAGISTRATE SUSAN NAHABEDIAN WHO OPENLY DECLARED ON THE RECORD RHODE ISLAND LAW SAYS 12% COMPOUND INTEREST ON FEBRUARY 2, 2024 – THE 12% COMPOUND INTEREST RATE WAS DELIBERATELY OMITTED AND CONCEALED BY APPELLEES (BOTH JUDICIAL AND SDU) SINCE 2010 IN APPELLANT'S TITLE IV CASE ALONE**

Appellant, similar to Michael Turner in ==*Turner v. Rogers*==, 564 U.S. 431

(2011), is a victim of unconstitutional unlawful seizures, here of Appellant's Texas

properties for fraudulent and unlawful 12% compound interest on overdue support

liens (and their refusal to release fraudulent liens in violation of Texas Penal

Codes) under Rhode Island fraud on the court under color of Rhode Island state

law within the Title IV legal framework. The United State's Brief elaborating the

incentive structure of the Title IV legal framework against the implemented due

process violative enforcement structure in South Carolina in *Turner* makes clear

that South Carolina's unlawful and unconstitutional deprivation of Turner's liberty

is calculated to show improved "enforcement" rates (unconstitutionally and

unlawfully induced) in order to make claims for, *inter alia*, enforcement incentive

payments under 42 U.S.C. § 658a.

Here, Rhode Island's Title IV political subdivisions operate a sophisticated accounting fraud 42 U.S.C. § 654 non-compliant data processing system that is clearly not "automated" that involves, *inter alia*, routine removals of the 12% compound interest from the automated data processing system whenever Rhode Island risks detection when making certifications to other states such as Texas (under 42 U.S.C§666(14)) and emphatically when submitting certifications to the United States when making claims for Title IV-D and Title IV-A funding under, inter alia, 42 U.S.C. §§654(7), (10), (14), (15), (16), 42 U.S.C. §654a, 42 U.S.C. § 654b, 42 U.S.C. § 658a,  42 U.S.C. § 658b. among others.  Aiding these agents of the state subdivisions are certain symbiotic judicial persons that operate a minimized paper trail system that involves omitting stating 12% compound interest rate on overdue support orders for the purpose of covering up the State Plan's violation of 42 U.S.C. § 654(21)(A) that explicitly permits **UNFORMLY** either 0% or if interest is set, a 3-6% simple interest on overdue support.  Symbiotic to the collective aim to conceal the State Plan's noncompliance, the Appellee-Rhode Island Office of Child Support's adopted official policy that explicitly states in writing NOT to pursue interest in interstate cases ONLY.  For three long years, since November 2021, Appellant has been diligently and exhaustingly, and with outrageously exorbitant undue burden, seeking through three Rhode Island state Title IV-D proceedings and two federal actions at law in the district of Rhode

Island presided by a judge (Smith) who built his entire law practice representing Rhode Island 42 U.S.C. § 654(1) political subdivisions and their employees, for information regarding that rate of interest input into the 42 U.S.C. §§ 654 (7), (10), (14), (15), (16) (24), (27), §654a, § 654b mandated automated system, with every legal maneuvering thrown at Appellant at every turn to thwart and obstruct furnishing the accounting information that is mandated to be produced by statute under 42 U.S.C. §654b to the noncustodial parent Appellant anyway, without judicial compulsion. The language of Title IV-D makes clear that the permitted 42 U.S.C. 654(21) 3-6% interest represents an "incentive" fee to the States, and stipulates that in welfare (Title IV-A) cases the established support order is assigned to the State, making clear that the interest on overdue support represents a form of revenue for the State in the form of debt owed to the State by the noncustodial parent.

Through court ordered discovery in the state family court, yet through continuing refusals by Appellees to produce requested information relating to the accounting and removals from the automated data process system, Appellant nevertheless diligently obtained evidence of the Appellee-Rhode Island Office of Child Support Service's policy of not pursuing interest in interstate support cases only, in violation of 42 U.S.C. § 654(21)(A) explicit requirement to set UNIFORM rates, attached hereto as ==**Exhibit D.**==

Among others, because Appellees Barbara Grady, Gero Meyersiek and

Priscilla Glucksman and certain employees of political subdivision state family

court believe that the Appellant "married a rich oil man" in Texas, they schemed to

defraud the Appellant in this interstate Title IV-D case since 2010, to wit the

guardian ad litem's demand to pay the outrageous $55,000.00 per visitation, even

though the State has been receiving through filing claims for grants at a minimum

$10,000,000.00 in grants under 42 U.S.C. §669b to facilitate visitation etc.  In

retaliation for Appellant's federal lawsuits in 2012 against the Appellees for their

racketeering Appellee Priscilla Glucksman on "oral" motion secured from Judge

McCann an unspecified "interest" on overdue support in Appellant's interstate

case, against written policy (see policy Exhibit D) with the intent to remove from

the automated data process system the 12% compound interest when certifying to

Texas under 42 U.S.C. § 666(14) to conceal from Texas and federal authorities the

disallowed therefore fraudulent 12% compound interest.  Similarly, Appellees

routinely remove the 12% compound interest amount from the automated system

in instate cases whenever it certifies to the United States for federal claims under

Title IV-D and Title IV-A to conceal the State Plan's noncompliance with 42

U.S.C. §654(21)(A), and then put the interest back on the system again after

obtaining federal funding or after a federal audit, similarly to how Appellee Rhode

Island Office of Child Support Services put interest back on the system in

December 2021 after inducing the Appellant by agreement in Texas to pay off the principle in one lump sum in consideration of Appellee Gero Meyersiek waiving interest (interest that was in reality unenforceable, null and void under 42 U.S.C. §654(21)(A)).

Since November 2021, for thirty (30) months, several times each month, Appellant in good faith diligently and unwaveringly requested for her own case accounting and all information relating to the alleged interest and support due, and was denied each time, each denial constituted a failure and incurred penalties explicitly provided by Congress under, inter alia, 42 U.S.C. §§654(24), (27), § 654a, § 654b, § 658a, § 658b, and because the denials were motivated by **cover up** of criminal fraud, accounting fraud and false certifications to Texas and the United States to claim funds from federal funding programs involving the taking off and putting back onto the automated data processing system noncompliant and fraudulent 12% compound interest, the explicit penalties under 42 U.S.C. § 654, 658 and as they relate to Rhode Island's ineligibility for Title IV-A funding are penalty and fine incurring also under 18 U.S.C. §666, **18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false documents or false statements to a federal agency, 18 U.S.C. § 1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud, 31 U.S.C. § 3279 - federal civil false claims act *et al.*,** among others.  Congress is adamantly

explicit on the conditioning of federal funding claimed under Title IV-D and Title

IV-A and explicit on the punitive penalties and fines specifically liable by the

States, agents of the States, including employees and persons in conspiracy with

whomever, explicit and reinforced under 18 U.S.C. **§ 666, 18 U.S.C. § 287 -**

**making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the**

**United States, 18 U.S.C. § 1001 - false documents or false statements to a**

**federal agency, 18 U.S.C. § 1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud, 31**

**U.S.C. § 3279 - federal civil false claims act** *et al.*

Appellant finally obtained evidence of the illegal 12% compound interest on

overdue support Appellee-Rhode Island Office of Child Support Services routinely

input into the automated data processing system through propounding

interrogatories.  Appellant attaches hereto the Appellees' Answers to

Interrogatories as <mark>**Exhibit  E**</mark>  - see Interrogatory Answer 11(c) on page 5

"Plaintiff's Answers to Appellants' Interrogatories" that states, "ANSWER 11(c)

Rhode Island General Laws 15-5-16.5; 12% per annum on any support debt due

and owning for child support and/or spousal support."

Rhode Island evades detection and falsely certifies to the Secretary under

Title IV through accounting fraud.  Appellant's case file for December 2021 to

April 2022 shows over a dozen instances of unsubstantiated by any accepted

accounting standards inflationary manual upward "adjustments" to the automated

data process system that balloons the interest arrears due by tens of thousands of

dollars within weeks each time, which is clearly unclearly unlawful when Title IV

mandates by 42 U.S.C. 654(24), 42 U.S.C. 654(27) and 42 USC 654a and 42 USC

654b that the automated data process system must be used for calculating support

to ensure accuracy and to prevent accounting fraud or theft.  *E.g.*, see 42 U.S.C.

sec. 654(7),(10), (14), (15), (16), (20) clearly requiring accounting and reporting

controls involving the automated accounting data processing system and

compliance with 42 U.S.C. sec. 654a and 654b.  It is crystal clear that, just like

how the Appellees routinely manually altered the amounts due Appellant's account

that is mandated to be calculated by the automated data processing system in

Appellant's case file, in order to cover up detection by Federal authorities of the

unlawful and fraudulent 12% compound interest, Rhode Island flagrantly and

routinely and **criminally** removes the unlawful 12% compound interest amounts

from the 42 U.S.C. 654a required automated data processing system when

reporting to the Secretary under 42 U.S.C. secs. 654(10), (14), (15), (16) for

example, then put the interest back on the system after reportings to the Secretary

and subsequent to the Title IV three-year audit cycle.  This way, Rhode Island

fraudulently falsifies accounting in order to make it appear that the State Plan is in

compliance with 42 U.S.C. sec. 654(21)(A).  As the payouts involve hundreds of

millions of dollars, and due to the possibility of kick back arrangement to look the

other way by federal delegated authorities, Appellant in good faith "made known" the possibility to Congressional Oversight officials.

For the purpose of this matter at hand, the Appellant respectfully requests the Judges of this United States Court of Appeals to take proper steps to ensure that official federal judicial proceeding review on the merits of the accuracy of the accounting reporting of Appellant's account that is central to this matter is conducted in accordance with all applicable Federal Law where theft of the United States has occurred and is occurring and is clearly implicated, and where theft of the Appellant has occurred and is occurring and concretely established by evidence.

**A. MAGISTRATE SUSAN NAHABEDIAN FALSIFYING AND TAMPERING WITH TITLE IV RECORDS BY MUTING THE APPELLANT THROUGHOUT WEBEX TITLE IV-D PROCEEDING SO AS TO OBSTRUCT APPELLANT FROM BEING HEARD, SPECIFICALLY OBSTRUCTING APPELLANT FROM SUBMITTING INTO EVIDENCE TRAC RECORDS AND AUDIO RECORDING SHOWING THE REMOVAL OF FRAUDUELNT 12% COMPOUND INTEREST AND PUTTING INTEREST BACK ON THE SYSTEM ACCOUNTING FRAUD AND OBSTRUCT APPELLANT FROM CROSS-EXAMINING PERJUROUS TESTIMONY BY WITNESS APPELLEE GERO MEYERSIEK AND ATTEMPTS TO SET 12% COMPOUND INTEREST IN VIOLATION OF 42 U.S.C. sec. 654(21)(A) – Multiple Failures that are Penalty Incurring Fraud on the Court**

On February 2, 2024, in the Title IV-D State Plan hearing conducted by political subdivision limited jurisdiction family court, Appellee Rhode

Island Office of Child Support Services Chief Legal Counsel Paul Gould

attempted to set 12% compound interest arrears of over $81k in

Appellant's interstate case but not in certain other interstate cases,

constituting multiple violations of 42 U.S.C. sec. 654(21)(A).  Appellee

Paul Gould also stated that in the Title IV-D proceeding, what Congress

says does not matter, what the U.S. Supreme Court says does not matter,

what the Constitution says does not matter, only what the limited

jurisdiction family court's orders matter.  Appellee Paul Gould is wrong.

Appellee Rhode Island Office of Child Support Services is wrong.

Attempting and conspiring to seek 12% compound interest violates 42

U.S.C. sec. 654(21)(A), and counts as one failure in the fiscal year, and

incurs the penalty for one failure for Appellee Paul Gould's actions under

42 U.S.C. sec. 655, 658a, 658b.


Attempting and conspiring to not seek uniform interest, targeting Texas

Appellant in an interstate case for illegal 12% compound interest while

not pursing interest in other interstate cases also violates 42 U.S.C. sec.

654(21)(A) and counts as two failures in the fiscal year, and incurs the

penalty for two failures.

Attempting and conspiring to openly flout Title IV-D regulations in a

Title IV-D proceeding by the Chief Legal Counsel of the Title IV-D SDU

counts as at least three failures and incur penalties for at least five

failures.

Attempting and conspiring to openly flout Congress and the United

States Supreme Court in a Title IV-D proceeding count as at least three

failures and incur penalties for at least eight failures, as well as

disbarment and other fines and penalties.

Attempting and conspiring to openly flout the Constitution in a Title IV-

D proceeding by the Chief Legal Counsel of the State Plan's SDU should

count as treason to the Constitution.

Attempting by any 42 U.S.C. sec. 654(1) political subdivision to establish

12% compound interest, be it judicial political subdivisions or

administrative political subdivisions, Consistent with its Spending Power,

Congress has the authority to attach conditions on the receipt of federal

funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Title IV-

D statute expressly provides that compliance with the 3-6% simple

interest on overdue support, operating the automated system for accuracy and SDU requirements are conditions of approval of a state plan. See 42 U.S.C. §§ 654(7), (10), (14), (15), (16), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely." The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at 879. Absent any discretion available to the

Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.

Magistrate Nahabedian proceeded to mute the Appellant from the point of Paul Gould calling Appellee Gero Meyersiek as his only witness ALL THE WAY TO THE reading of the ruling into the record constituted deprivation of due process, obstruction of an official Title IV-D proceeding and record tampering; it made the record falsely look as if Appellant did not mount any arguments, defense or objections nor sought to be heard. Magistrate Nahabedian's falsification using Webex muting of the 42 U.S.C. sec. 666-protected Appellant in a remote hearing for the entire phase of the "trial towards the merits" of the Title IV-D hearing, thus falsifying the record, falsifying the record for appeal is criminal in nature, obstructs the official proceeding, obstructs justice, and are impeachable offenses, especially when it is clearly established her impeachable actions are motivated by the scheme to set 12% compound interest arrears that she knew are unlawful, unenforceable, fraudulent, and are preempted by 42 U.S.C. sec. 654(21)(A) – the political subdivision lacks jurisdiction to set 12% compound interest having

willingly entered into contract with the United States to participate in

Title IV-D.  The clear and unequivocal statement of the required

conditions in the Title IV-D statute enabled Rhode Island to "exercise

[her] choice knowingly, cognizant of the consequences of [her]

participation." *See Dole*, 483 U.S. at 207 (citations omitted).

As far as 42 USC 655 penalties are concerned, at least twenty failures

occurred under 42 USC 654 alone, along with other federal and Texas

criminal codes.

Appellee Gero Meyersiek committed perjury and falsification of Title

IV-D records.  Appellee Paul Gould and counsel Achille for Appellee

Gero Meyersiek are persons whomever committing subornation of

perjury and aiding in certifying false claims to the United States and

falsifying Title IV-D records.


## B. APPELLANT FILED MOTIONS TO DISQUALIFY, MOTION FOR VIDEO RECORDING OF WEBEX HEARING AND MOTION TO DISMISS INTEREST ARREARS; APPELLANT EMAILED CLERKS OF TITLE IV-D PROCEEDING AUDIO RECORDING AS EVIDENCE SUBMISSIONS

Appellant diligently prosecuted the Rhode Island State Plan's legitimacy,

prosecuted the impeachable magistrate and Title IV-D proceeding which

was conducted under criminal racketeering motivated fraud on the court.

Appellant filed a motion to disqualify Magistrate Nahabedian.  See

Attached **Exhibit F**.

Appellant filed a motion for Video Audio Recording of Webex Hearing.

See Attached **Exhibit G**.

Appellant filed a motion to Dismiss Interest Arrears.  See Attached

**Exhibit H**.

## C. APPELLANT FILED IN THIS COURT FED. R. App. P. 8(a)(2)(D) MOTION ON MARCH 11, 2024

On March 11, 2024, Appellant filed in this Court Appellant's Fed. R.

App. P. 8(a)(2) Motion; See, (Case:23-1967 Document:00118118391

Date Filed 03/11/2024  Entry ID: 6628012)  Appellant attaches it hereto

as **Exhibit I**.

On March 11, 2024 Appellant further caused to issue a family court

subpoena for Appellant's Title IV-D case file information onto 42 U.S.C.

sec. 654(1) political subdivisions of the State Plan and properly served on

to their agents and persons, e.g., Appellees Rhode Island Office of Child

Support Services, Paul Gould, John Langlois, Kevin Tighe, Frank

DiBiase and others.

### D. MAGISTRATE SUSAN NAHABEDIAN SUA SPONTE RECUSAL NEVER SIGNING NOR ENTERING THE 12% COMPOUND INTEREST ORDER, WHICH IS VOID AND IMPEACHABLE

Sometime between March 11, 2024 and March 21, 2024, Magistrate

Susan Nahabedian sua sponte recused herself, never signing nor entering

any orders for the illegal and fraudulent 12% compound interest.

Nobody notified the Appellant.  Appellant only discovered the fact when

Appellant sought to obtain information from the state family court

supervisor clerk, Rhonda, as to procedures submitting audio recording

evidence during trial for Appellant's filed Motion to Dismiss.


Bewilderingly, the state family court clerk for a Title IV-D proceeding

stated that their office of the clerk does not have a procedure for

submitting audio recording evidence for Webex hearings in Title IV-D

proceedings, which are administratively ordered by the Chief Judge of

Rhode Island Family Court for remote hearings only, further claiming in

the state's $6 million digital court, digital formats of audio files, such as

saved on a flash drive, or google drive, or attached to email are

disallowed.  Further, there is judiciary-operated cloud drive for parties to upload digital audio recording evidence either.

In this digital day and age, old fashioned audio cassettes are technologically obsolete and no longer available for sale; nor are cassette recorders.

Appellant avers this is yet another failure, or deliberate ruse, calculated to obstruct Appellant's submission of damning evidence incriminating to the Appellees.  This constitutes more penalty-incurring failures under Title IV-D and Title IV-A alone.

## E. RHODE ISLAND'S STATE PLAN'S PENALTY-INCURRING VIOLATIONS OF TITLE IV-D AND ORGANIZED CRIMINAL COMMISSION OF INTERSTATE FRAUD

Congress prescribed both civil and criminal penalties for violations. Consistent with its Spending Power, Congress has the authority to attach conditions on the receipt of federal funds. See South Dakota v. Dole, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16),

(21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely." The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges v. Shalala,* 121 F.2d at 879. Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily

prescribed penalties.[2]   Congress also enacted several criminal codes

punishing actors, such as the Appellees who commit federal crimes,

including cover up of unlawful activities.

See Title IV-D 42 U.S.C. § 651-669. See United States Congress's

publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3

AUSC-prelim-title42-

section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3V

sYXRpb25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

Appellant subpoenaed "(1) All records, files, notes, public records,

documents, films, materials generated in the course of administration and

enforcement of relating to Appellant Mary Seguin, from 2010 to the present in this

Title IV-D Case under the Social Security Act; (2) All records relating to Appellant

---

[2] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
    Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

Mary Seguin from 2010 to the present, including notes and messages taken and generated on October 5, 2022."

See attached subpoena, Exhibit J.

The Appellee Rhode Island Office of Child Support Services' actions in the Title IV-D case's proceedings in question since 2010 with the entries of orders prepared and submitted in her official and individual capacities, Appellee Priscilla Glucksman, make clear the Office of Child Support Services is one of the State Plan's key "organizational unit which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan" under 42 U.S.C. § 654(3).

Rhode Island Office of Child Support Services' refusal to comply with the Subpoena is a *prima facie* 42 U.S.C. § 654b violation that incurs penalties in this fiscal year under 42 U.S.C. § 655(a)(5) as well as 42 U.S.C. § 655(a)(4), which penalty-incurring violations resulting in making false federal claims under federal funding programs the Appellant had reported, is reporting and will continue to report to relevant law enforcement authorities at the federal and state levels. (Judicial notice is respectfully requested that the Appellant in January 2023 reported Appellee Office of Child Support's violations to the Rhode Island Office of Attorney General, who instead of enforcing the requirements of the State Plan as

the Appellee Attorney General is similarly a political subdivision under 42 USC

654(1), opted to reinforce, aid, shield and protect Appellee Rhode Island political

subdivisions' unlawful activities – this is reported to United States authorities).  As

a condition of receipt of any federal funding under Title IV-D of the Social

Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for

child and spousal support that meets <mark>**all the requirements of 42 U.S.C. § 654**</mark>.

Among the prerequisites for approval of a Title IV-D Plan are the requirements

that the State may only uniformly charge 3-6% simple interest on overdue support,

see 42 U.S.C. § 654(21)(A), and a State must establish and operate an automated

data processing and information retrieval system without taking computer

calculated amounts off and then put other numbers back on the system or

hardcoding/inputting new numbers computed offline onto the system, see 42

U.S.C. § 654(24), and the State must have a state child support disbursement unit

(SDU) that complies with all the requirements of 42 U.S.C. § 654, 42 U.S.C. §

654a, 42 U.S.C. § 654b, see 42 U.S.C. § 654(27)(A).  Rhode Island deliberately

fails to meet all the requirements, including continuously inputting 12% compound

interest on overdue support and the Rhode Island Office of Child Support Services

covers up their noncompliance with accounting fraud inputting into the system and

taking off from the automated data processing system amounts that are inflated,

unlawful, and submitting false books of accounts that  removed the unlawful

inflated amounts falsely certified to the Federal authorities to make it look like Rhode Island is in compliance so as to procure false claims for federal funding for which Rhode Island is ineligible.

The deliberate fraud makes clear the State operates an unlawful plan, in fact a criminally unlawful plan, and does not have an approved state plan under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, and should lose and disgorge unlawfully procured federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). See 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).  See, *Hodges v. Shalala,* 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).

Appellant respectfully reminded the Appellees that any attempt interfering with, chilling, thwarting and dismissive of the Appellant's prosecuting, reporting, pursuant to 18 U.S.C. § 4 and other federal statutes, to law enforcement authorities the commission of crimes by political subdivisions of the State involved in the Title IV-D proceeding is unenforceable.   Any and all failures to comply with 18 U.S.C. § 4 constitutes misprision of a felony.

**F. ALL PROCEEDINGS CONCERNING RHODE ISLAND'S 42 USC 654(21)(A) DISALLOWED 12% COMPOUND INTEREST ARE GOVERNED by 42 U.S.C. § 654 et al. UNDER TITLE IV-D THAT**

**REGULATE ALL POLITICAL SUBDIVISIONS OF THE STATE OF
RHODE ISLAND**

The Appellant respectfully reminded the state family court that the Political

Subdivision of the State of Rhode Island under 42 U.S.C. § 654(1), namely by and

through the Office of Child Support Services' Lead Legal Counsel Paul Gould,

Esq., made several claims before the limited jurisdiction family court under Oath

throughout the Title IV-D case hearings and proceedings in question that the laws

of Congress, the Constitution and Title IV-D do not matter, only that court's orders

matter and they do not need to conform to Congressional prescribed federal

statutes. Appellant submitted as an Exhibit B to the state family court the

Transcript of February 2, 2024 Hearing in that matter.  Rhode Island is wrong and

Paul Gould is wrong, and both know it.  That flagrant lawlessness is at the heart of

the violations of federal law under color of state law in this interstate Title IV-D

case.  Rhode Island participates in Title IV-D, and in so participating through its

State Plan, must comply with Title IV-D.  See, Hodges v. Shalala, 121 F. Supp. 2d

854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811

(2003).  *See **New York v. United States***, 505 U.S. at 161, Congress, under the

Commerce Clause, may offer the States a choice of regulation under federal

control or preemption under federal regulation. See ***Hodel v. Virginia Surface***

***Mining & Reclamation Assn., Inc.,*** 452 U.S. 264, 288 (1981).  The Title IV-D

statute expressly provides that compliance with 42 U.S.C. sec. 654, and

compliance with the automated data processing system and SDU requirements are

conditions of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A. The

clear and unequivocal statement of the required conditions in the statute enabled

Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences

of [her] participation." See Dole, 483 U.S. at 207 (citations omitted);  See **South**

**Dakota v. Dole**, 483 U.S. 203, 206 (1987). The textual language of 42 U.S.C. §

654(1) states,

> "A State plan for child and spousal support must—
>
> (1)    provide that it shall be in effect in all political subdivisions of the
>        State"

The facts and established law thus make it crystal clear all political

subdivisions of Rhode Island, including the Rhode Island Department of Human

Services, the Office of Child Support Services AND the Rhode Island Judiciary

political subdivisions of the State of Rhode Island MUST comply with 42 U.S.C. §

654.  However, because the Rhode Island Office of Child Support Services, the

State Plan's SDU unit, flagrantly and expressly states in a Title IV-D case that

Title IV-D statute and Congressionally prescribed federal statutes do not apply in

Title IV-D cases nor in  Rhode Island, the State of Rhode Island's political

subdivisions have flagrantly flouted 42 USC sec. 654 and then adjusted and

tampered with the automated data processing system accounting to defraud the United States of federal funding, and to defraud the Appellant of her Texas properties.

Therefore the Appellant respectfully reminds all participants involved in this official federal proceeding concerning the federal question of federal law involving state non-compliance, fraud against the Appellant using the Title IV legal framework that further involves false claims for Title IV funding and gives notice to the applicable State political subdivisions (e.g., Rhode Island Judiciary) and agencies, including the SDU under the State Plan under 42 U.S.C. § 654(1), e.g., the Rhode Island Office of Child Support Services, that this yet again noncompliance by the State of Rhode Island with the Subpoenaed information egregiously constitutes yet another of the many numerous failures of Rhode Island agencies and its State Plan during this fiscal year to comply with the requirements of section 654b, as well as 654, 654a and 666 of Title IV which shall be considered yet another of the many numerous failures of the State to comply with subparagraphs (A) and (B)(i) of section 654(27) of this title during the fiscal year, that is clearly stipulated in 42 U.S.C. § 655(a)(5)(A)(ii) by a penalty amount of up to 30 percent of the penalty base, in the case of the fifth or any subsequent such fiscal year in which such a failure by the State occurs (regardless of whether a penalty is imposed under this paragraph with respect to the failure). (ii) The term

"penalty base" means, with respect to a failure of a State to comply with a subparagraph of section 654(24) of this title during a fiscal year, the amount otherwise payable to the State under paragraph (1)(A) of this subsection for the preceding fiscal year.

Additionally, the deliberate noncompliance motivated by cover up makes clear the State knowingly and intentionally operates an illegal plan, the State knows Rhode Island does not have an approved state plan under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, and therefore should lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). See 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).

### G. FRAUD

In this Title IV case at issue, serial noncompliance, motivated by fraud, and their resulting incurred penalties, both civil and criminal, accrued since the initiation of the Title IV case fourteen years ago in 2010, upon Appellee Gero Meyersiek's application for services under Title IV through his own private attorney, Appellee Barbara Grady, whose former law firm partner and diseased husband Paul Dugan, was himself a former Senior Counsel of the Appellee Rhode Island Office of Child Support Services, one of the key Title IV-D agencies under Rhode Island's State Plan charged under 42 U.S.C. § 654(3) with State compliance

with 42 U.S.C. § 654, 654a, 654b, 655, 658a, among others – Appellee Barbara

Grady through Paul Dugan has intimate knowledge of and is a knowing participant

in the State's accounting fraud reporting to the United States for federal funding

reimbursement and federal funding Incentive Payment payouts (658a) worth

hundreds of millions of dollars under the Title IV Program to the Secretary and

Department of Health and Human Services, among others.  Upon information and

belief, the Appellee Gero Meyersiek and Barbara Grady and the Rhode Island

Office of Child Support Services have a series of unlawfully obtained "12%

compound interest" money receipt sharing arrangements involving the fraudulent

procurement through the Title IV framework of exorbitant and unenforceable 12%

compound interest interstate targeting Appellant's Texas properties on overdue

support enabled through accounting fraud, among others – this arrangement

involving interstate defraud of the Texas Appellant and simultaneous theft of the

United States of ineligible Title IV funding entails, inter alia, the Rhode Island

Office of Child Support Services discussing in great detail at length with Barbara

Grady the agency's fraudulent removal from the 42 U.S.C. § 654(24), 42 U.S.C. §

654(27) and 42 U.S.C. § 654a mandated automated data processing system of 12%

compound interest when sending to Texas in 2018 thus creating fraudulent books

of accounts under 42 U.S.C. § 666(14)(A)(ii)(I) and (II) fraudulently certifying to

Texas via wire and via mail inaccurate support due accounts – discussions of this

scheme further violated the Appellant's privacy rights, that are documented in the TRAC record of the Appellant's Title IV case file for December 2021 recording the agency's discussions with Barbara Grady at length regarding taking interest off when sending to Texas, and keeping it off the system when communicating to Appellant that Gero Meyersiek waived interest, and then putting interest back on the system after they defrauded the Appellant inducing the Appellant to payoff support that comprised of the principle in one lump sum of $104,185.98 in consideration of Gero Meyersiek waiving interest – the agency discussing its illegal and criminal enforcement information with Barbara Grady is in itself a violation of 42 U.S.C. 654 (26)(A) that mandates the State Plan to have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the parties, such as this Texas Appellant, including—

(A)safeguards against unauthorized use or disclosure of information relating to proceedings or actions to establish paternity, or to establish, modify, or enforce support.

See **Exhibit K**. Rhode Island Office of Child Support TRAC document for December 2021 attached hereto as **Exhibit K**.

Under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, the Texas Appellant has the protected right to be furnished under Subpoena with all TRAC records in Appellant's Title IV-D case file from 2010 to the present to establish the accuracy of the alleged Rhode Island computations mandated to be performed by the automated data processing system, but has instead been hard-programmed numbers created offline that are covered up, which are then manually input into the automated data processing system several times, thus fabricating several different Rhode Island-certified false books of accounts of amounts due transmitted by mail and by wire to Texas and the Texas Appellant and to the United States for the purposes of procuring federal funding under Title IV-D and Title IV-A that violate Federal and Texas State civil and criminal codes.  The Rhode Island Office of Child Support Services refuses to produce any TRAC records for 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021 January to November, 2023 and 2024.

This violation of, among others, 42 U.S.C. 654(26)(A) constitutes a violation of 42 U.S.C. 654(27) that counts as a penalty in the many violations in fiscal year 2021 alone which exceeds 30% of the penalty base in 2021 – and that's just civil penalties under Title IV – numerous other federal criminal and civil violations incurring additional penalties are applicable, including Texas criminal and civil code violations.

## H. 42 U.S.C. § 654b(4)

Under Rhode Island's State Plan, the Rhode Island Office of Child Support Services is mandated to "furnish to any parent, upon request, timely information on the current status of support payments under an order requiring payments to be made by or to the parent."

Therefore, information relating to the Orders in question and relevant information relating to those orders must be furnished. Information relating to the putting of 12% compound interest on the automated data processing system from 2010 to the present must be furnished. Information relating to the removal of any alleged computed online or offline related to 12% compound interest from the automated data processing system in 2018 and at any and all times from 2010 to the present must be furnished. Information relating to the waiver by the Appellee Gero Meyersiek by and through his private attorney Appellee Barbara Grady of the 12% compound interest that was represented to Appellant as the "$0.00" showing under interest calculated by the automated data processing system in Appellant's case file on December 6, 2021 must be furnished. Information relating to the Rhode Island Office of Child Support Services calculated total due showing $92,214,56 calculated by the automated data processing system in Appellant's case file on December 6, 2021 that calculates arrears from 2010 must be furnished. See attached hereto December 6, 2021 screen shot of the Appellant's online OCSS

account showing the calculated amounts of which is mandated by Title IV-D to be populated by the automated data processing system as **<mark>EXHIBIT L</mark>**.  Information relating to the interest amount before it was taken off the automated data processing system in 2018 must be furnished, as well as any time interest was taken off the system from 2010 to the present.  Information relating to the interest put back on the automated data processing system in 2021 after Appellant accepted the $104,185.98 payoff number given by Office of Child Support Services by wire via email must be furnished.  Information relating to how $104,185.98 was computed by the automatic data processing system on December 7, 2021 must be furnished, when the automated data processing system calculated $92k just the day before on December 6, 2021 must be furnished.  Information relating to how $75,658.00 was calculated by the automated data processing system on March 3, 2022 that was then issued to Texas to lien Texas properties by Mail and by wire must be furnished.  And this is not exhaustive.


**I. 2012 JUDGE McCANN (and 2024 MAGISTRATE NAHABEDIAN) VIOLATIONS of 42 U.S.C. § 654(21)(A) – EIGHT FAILURES AND PENALTIES (FOUR IN 2012 and FOUR IN 2024 by and through POLITICAL SUBDIVISION RI FAMILY COURT) – (THIS DOES NOT INCLUDE CRIMINAL AND CIVIL PENALTIES UNDER APPLICABLE CRIMINAL AND CIVIL CODES UNDER FEDERAL LAWS AND TEXAS LAWS)**

This state family court took judicial notice on February 10, 2023 of the issuance of two Orders issued by Judge McCann in 2012. Magistrate Monaco clarified at the hearing on March 6, 2023 he did NOT take judicial notice of the contents of the orders, only the issuance of the orders and that there was no appeal of those orders. See attached transcript of March 6, 2023 hearing. **Exhibit M**.

Those 2012 orders were issued by Judge McCann of the Rhode Island Family Court, a political subdivision of the State, in which the State Plan must be in effect under 42 U.S.C. § 654(1). Therefore, it is crystal clear that the Rhode Island Family Court and its justices under the State Plan MUST comply with all provisions of Title IV-D, including U.S.C. § 654(21)(A) that makes it crystal clear interest on overdue support must be between 3-6% simple interest. However, Judge McCann knowingly ordered 12% compound interest in interstate Title IV-D on overdue support to be illegally put into the State Plan's automated data processing system mandated under U.S.C. § 654a and U.S.C. § 654b in knowing violation of 42 U.S.C. § 654(21)(A). Certainly, the Rhode Island Office of Child Support Services today claims 12% compound interest was what Judge McCann ordered, undisputedly making Judge McCann an accomplice and complicit. The knowing violation of the political subdivision Rhode Island Family Court by and through Justice McCann of 42 U.S.C. § 654(21)(A) through fraud on the court and under color of state law violates 42 U.S.C. § 654(24), 42 U.S.C. § 654a and 42

U.S.C. § 654b and incurs FOUR failures and penalties in Appellant's case alone for the fiscal year 2012 under 42 U.S.C. § 655(a)(4) and 42 U.S.C. § 655(a)(5), through just the State family court political subdivision alone.

In 2024, the Rhode Island political subdivision of the family court by and through Magistrate Nahabedian flagrantly declared at the February 2, 2024 webex hearing that the State knowingly orders to be put into the automated data processing system 12% compound interest in Rhode Island under color of state law and through fraud on the court in knowing violation of the Rhode Island certified approved State Plan that mandates 3-6% simple interest under 42 U.S.C. § 654(21)(A), with her actions representing four failures and penalties in fiscal year 2024. Failure of compliance with all provisions of Title IV-D results in the State's loss of federal funding for Title IV-D and Title IV-A under Federal Law.

### J. 2012 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES (and 2012 Priscilla Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and 42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 – OVER TWENTY FAILURES AND INCURRED PENALTIES in 2012 by and through POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES THROUGH FRAUD AND UNDER COLOR OF STATE LAW

In order to cover up the flagrantly unlawful 12% compound interest that represents unlawful and fraudulently obtained and extorted under color of law Rhode Island State revenue through the Social Security Act in welfare cases, Rhode Island Office of Child Support Services adopted the Official Policy not to

pursue interest in interstate cases (in order to cover it up from federal authorities and other state authorities see 42 USC sec. 666(14) – cooperation with other states – Attached hereto Rhode Island Office of Child Support Services Official Written Policy that was produced by RI OCSS during February 10, 2023 court ordered discovery.  This policy document evidences the official policy of criminal and civil fraud by the State of Rhode Island's political subdivisions applicable under 42 U.S.C. § 654(1).

This policy evidences the routine extortions of noncustodial parents through the enforcement of 12% compound interest in-state under color of state law that incur penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences the political subdivisions of Rhode Island's concealment and cover up from out-of-state and federal authorities of the State's illegal extortion of 12% compound interest under color of state law by adopting an official policy not to pursue interest in out of state interstate cases that incurs penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences accounting fraud adjustments concealing 12% compound interest applied to certain selected out-of-state cases such as the Appellant's, as well as accounting fraud adjustments that conceal the 12% compound interest in in-state cases when submitting for Title IV-D and Title IV-A

reimbursement to the United States.  It also evidences that interest is not set uniformly, further violating 42 USC 654(21)(A) requirement that interest must be uniform.

The pattern of Appellee agency discussions and considerations of its illegal and criminal enforcement information with Appellee Barbara Grady is in itself an organized scheme involving schemes to commit accounting fraud and false certification of Title IV-D accounts, in violation of, inter alia, 42 U.S.C. 654 (26)(A) that mandates the State Plan to have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the Texas Appellant.

In 2012, Priscilla Glucksman, individually and on behalf of the Rhode Island Office of Child Support Services, under 42 U.S.C. 654(1), on oral motion moved for 12% compound interest, that by Rhode Island's official policy should not be pursued in Appellant's interstate Title IV-D case, with the intent and scheme to commit accounting fraud and fraudulent certification of amounts due by removing the 12% compound interest from the automated data processing system in the anticipated event Rhode Island sends it to Texas authorities and Federal authorities for enforcement under 42 U.S.C. 666 (14) and for certifying for false claims for federal funding under Title IV-D and Title IV-A neither for which is Rhode Island's noncompliant State Plan eligible.  Appellee Priscilla Glucksman schemed

with Appellee Barbara Grady and Appellee Gero Meyersiek to orally move for

interest in order to minimize a paper trail of paper filings so that a written record of

the ordered 12% compound interest is buried within a one line of the order,

deliberately omitting the interest rate in order to cover up that it is the

unenforceable 12% compound rate, and with no documentation of a written paper

motion that would otherwise contain or omit the State's legal justification moving

for 12% compound interest.  In 2012, Paul Dugan was alive and participated in the

arrangement.  The symbiotic pliant Judge McCann readily complied under color of

state law, knowing fully well Rhode Island's illegal 12% compound interest is not

enforceable in any state and definitely not enforceable in Texas under Title IV-D,

and knowing that Rhode Island Office of Child Support Services intended to

remove the interest amount if and when Rhode Island sends to Texas for collection

while falsely certifying the total amount due and then put the interest back on the

system and then file a subsequent motion to set interest arrears back in Rhode

Island through the symbiotic pliant family court political subdivision of the State

of Rhode Island before a symbiotic pliant judge like Judge McCann, committing

interstate fraud in violation of, inter alia, 42 U.S.C. sections 652-669, RICO, wire

fraud, mail fraud, tampering with government records, accounting fraud and false

claims.  This list of criminal codes violated by the Appellees is not exhaustive.

Appellant shall present a list of the violated federal criminal codes later in this

Notice.

**K. 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES (and 2012 Priscilla Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and 42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 and Title IV-A – OVER TWENTY ANNUAL FAILURES AND INCURRED PENALTIES in 2013-2024 by and through POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES THROUGH FRAUD AND UNDER COLOR OF STATE LAW**

Title IV-A TANF benefits are conditioned upon the State's compliance with

all requirements of 42 U.S.C. § 654, and from 2012 to 2024 and on-going, based

on violations in this case alone, Rhode Island has been and continues to be

ineligible and the State is receiving funds through false representations and

alteration of government records to procure false claims for federal funding.  From

2012 to 2024, Appellant has the information to aver that the State of Rhode

Island's political subdivisions under 42 U.S.C. § 654(1) sent by mail and by wire

false accounts of amount due and of liens that contained Title IV-D violative

illegal and unenforceable 12% compound interest fraudulently misrepresented as

"child support due" to multiple institutions, including banks, credit bureaus to

Texas in violation of Texas Penal Codes that carry additional fines and jail time.

Then Rhode Island Office of Child Support Services and the financial comptroller

of the Rhode Island Judiciary and the State Treasurer's Office fraudulently

concealed through removal and other false accounting itemizations the 12% compound interest when certifying to United States Department of Health and Human Services for federal incentive payments claims and federal funding claims under Title IV-D and Title IV-A.

The total Title IV penalties incurred, disgorgement due back to the United States for ineligible Title IV-D and Title IV-A funding, and criminal fines incurred by Rhode Island in Appellant's case alone from 2012 to 2024 run upwards of hundreds of millions of dollars.   From 2012 to 2024, Rhode Island's Title IV-D political subdivisions conspired to violate, in addition to 42 U.S.C. 654(21)(A), among others, several requirements under 42 U.S.C. 654 whose plain textual requirements requires the State Plan MUST:

(7)provide for entering into cooperative arrangements with appropriate courts and law enforcement officials and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering the plan, including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;

(10) provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;

(14)

(A)

comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

(B)

maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them to conceal in the accounting records the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

(15)provide for—

(A)

a process for annual reviews of and reports to the Secretary on the State

program operated under the State plan approved under this part, including such

information as may be necessary to measure State compliance with Federal

requirements for expedited procedures, using such standards and procedures as are

required by the Secretary, under which the State agency will determine the extent

to which the program is operated in compliance with this part; and

(B)

a process of extracting from the automated data processing system required

by paragraph (16) and transmitting to the Secretary data and calculations

concerning the levels of accomplishment (and rates of improvement) with respect

to applicable performance indicators (including paternity establishment

percentages) to the extent necessary for purposes of sections 652(g) and 658a of

this title;

(16)

provide for the establishment and operation by the State agency, in

accordance with an (initial and annually updated) advance automated data

processing planning document approved under section 652(d) of this title, of a

statewide automated data processing and information retrieval system meeting the

requirements of section 654a of this title designed effectively and efficiently to

assist management in the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan

(20)

provide, to the extent required by section 666 of this title, particularly the Due Process protections, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws.

(23)

provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services and a telephone number or postal address at which further information may be obtained and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate

## L. COVER UP AND FRAUD

In 2012, the child in question was 12 years old. From 2012 to 2018, Appellant does not have any records (due to several prior Title IV-D information denials by the Rhode Island Office of Child Support Services for purposes of cover-up, that further incurred penalties and fines for each and every information denial under 42 USC 654(24) and 42 USC 654(27) and 42 USC 655) of Rhode Island's political subdivisions under 42 USC 654(1) sending to Texas or to federal authorities the support amount for enforcement under 42 USC 654(7) or 42 USC 666(14). Obviously, sending the support amount in the automated data processing system without the removal of the interest from the system exposes the illegal 12% compound interest disallowed under 42 USC 654(21)(A), which would incur Title IV-D and Title IV-A penalties, disgorgement of ineligible federal funds and incur criminal fines. It is for this very reason that the Rhode Island political subdivisions adopted the written official policy not to pursue interest in interstate cases, that moreover runs afoul of 42 USC 654(21)(A) plain language that the State Plan must apply UNIFORM interest on overdue support, not State-targeted 0% in some interstate cases and then 12% compound interest in all other cases, such as in this case. Moreover, if the State claims they actually did send notices of support due to the Appellant in Texas, each transmission would constitute patterns of federal crimes, including Mail and Wire Fraud, since the 12% compound interest in this

Title IV-D case is illegal and fraudulent and unenforceable.  This scheme is in violation of 42 USC §§ 654(7), (10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions under 42 USC 654(1) also transmitted by wire and by mail to the United States Department of State a hold on the renewal of Appellant's passport, again omitting and concealing the principle amount as well as the fact that the State attempts to enforce interstate an illegal 12% compound interest on overdue support within the Title IV-D legal framework.  This scheme is in violation of 42 USC §§ 654(7), (10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions made the illegal decision between top management employees of the Rhode Island SDU unit, dressed up as "administrative decision," to illegally and criminally remove the illegal 12% compound interest from the automated accounting data processing system that clearly is required to prevent activities "to conceal in the accounting records" Rhode Island's illegal 12% compound interest prescribed under 42 U.S.C. § 654(14).  See TRAC records attached hereto in **Exhibit K.**

Upon information, Rhode Island routinely removes the illegal 12% compound interest from the automated data processing system when certifying to and reporting to and making false claims for federal funding to the Secretary of the

United States Department of Health and Human Services in violation of 42 USC §§ 654(10), (14), (15), (16), (20), (21), (23), (24), (27), and applicable federal criminal codes.  See TRAC records attached hereto in **Exhibit K** of the routine practice of illegal accounting adjustments of the automated data processing system in the hundreds of thousands of dollars in December 2021 alone.  In this case alone, the aforesaid accounting fraud and record tampering violations motivated by theft of and false claims for funding of the Title IV-D and Title IV-A programs and defraud of the Texas Appellant targeting Texas properties occurred in 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021, 2022, 2023, and 2024.

## M. FACTUAL ALLEGATIONS

The child in question was emancipated in April 2018 and is now an adult 24 years old.  Therefore accrued "interest on overdue support" stopped in April 2018.

Due to the hold placed on Appellant's passport renewal, Appellant discovered on and around November 2021 there is alleged support due.  Appellant retained a lawyer in Texas to contact the Rhode Island Office of Child Support Services to obtain information on the amount due.  The Rhode Island Office of Child Support Services refused to provide information to Appellant's Texas attorney, in violation of 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23),

(24), (27), and concealed the fact that the agency illegally removed the illegal 12% compound interest amount from the automated data processing system from 2018 to December 2021. To this day, the Rhode Island Office of Child Support Services covers up and refuses to furnish information to the Appellant the amount of interest that was removed from the system. Continuing refusal to furnish requested information motivated by cover up is in violation of, inter alia, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Office of Child Support Services and Barbara Grady and Gero Meyersiek schemed to deprive Appellant of counsel that would facilitate defrauding the Appellant and to conceal from Texas counsel the accounting fraud relating to the illegal 12% compound interest that is unenforceable in Texas as well as legally unenforceable in Rhode Island (however routinely enforced through fraud under color of state law) under Title IV-D, and refused to deal with Appellant's Texas attorney, fraudulently claiming it is the State's policy to deal with the noncustodial parent directly. This is obviously a blatant lie because the TRAC record shows Kevin Tighe initiating phone calls directly to Barbara Grady, Gero Meyersiek's private attorney (and not contacting Gero Meyersiek directly) to discuss enforcement actions in detail involving the Rhode Island Office of Child Support Service's fraudulent accounting that entailed the agency's removal in 2018 (when it planned to send to Texas) of the interest from the automated system in December 2021. This is in violation of, inter alia, 42

USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Appellant avers and declares, under oath, the following facts:

1. On December 6, 2021, the State/Plaintiff showed the Appellant her OCSS online account that showed $0.00 under interest. Further the online account that is populated by the automated data processing system shows $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Appellant, as of November 30, 2021. See attached Screen Shot attached hereto this motion. (The Office of Child Support Services told the Appellant that the $0.00 under interest shows that Gero Meyersiek waived interest. The Office of Child Support Services deliberately misrepresented by omission that the interest amount was taken off the system illegally in 2018 and that the interest amount was calculated pursuant to an illegal 12% compound interest that is unenforceable under Title IV-D. Therefore in reality there was no consideration given to the Appellant, as falsely represented, calculated to induce the Appellant into paying a large lump sum amount. The Office of Child Support Services brokered a settlement deal between the Appellant and Gero Meyersiek where Meyersiek waived interest in consideration of the Appellant paying a lump sum payoff amount of $104,185.98 from Texas, which the State, under its

authority, agreed to the deal with the Appellant on December 7, 2021, having calculated the $104,185.98 figure by and through its accountant(s) manually offline and not by the mandated automated data processing system, and actively brokered the terms of the deal itself, namely, Deputy Legal Counsel Kevin Tigue who reports to Mr. Paul Gould, the attorney of record who filed the State's/Plaintiff's Motion to Set Arrears.    The Appellant requests this Court to take notice of the fact that the State also failed to provide this Court as well as to the Appellant an accounting now and upon Appellant's request at the time in 2021 of how this figure $104,185.98 was calculated nor how the alleged $81k is calculated.  This is in violation of, inter alia, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

2. The State's/Plaintiff's' authority to forgive arrears debts is an official policy and authority reported to the Office of the U.S. Commissioner Tangular Gray of the Office of Child Support Enforcement of the U.S. Department of Health and Human Services.

3. The Appellant in Texas good faith accepted and paid the $104,185.98 on December 7, 2021.

4. From December 6, 2021 to the present, the State/Plaintiff has represented to the Appellant at least seven (7) sets of books of very large arrears and interest calculations, which the State/Plaintiff has either failed or refused to provide the Appellant with requested documentation of debt validation and verification records supporting the State's calculation (in violation of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27)):

   a. $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Appellant, as of November 30, 2021. (Screenshot of this taken on December 6, 2021 is attached to this Notice).

   b. $104,185.98 Total Payoff Amount on December 7, 2021.

   c. $75,638.00 on a Notice of Intent to Lien dated March 3, 2022. RI OCSS rescinded this figure based on alleged unspecified errors on October 14, 2022.

   d. $73,000.00 per RI OCSS Deputy Chief Counsel John Langlois's (staff counsel who also reports to Mr. Paul Gould, who was also the attorney of record for the State at the Appeals Hearing) representation at the agency RI EOHHS (Rhode Island Executive

Office of Human and Health Services) administrative appeal Pre-

hearing held on October 5, 2022.

e.  $55,000.00 on RI OCSS correspondence with Meyersiek on

October 13, 2022.

f.  $75,623.71 Total Due for "Interest," online on the afordsaid OCSS

online account, as of November 30, 2022.  A screenshot taken on

December 3, 2022 thereof is attached to this Notice.

g.  $81,652.46 on the Motion as of December 22, 2o22.

5.  Maintaining at least seven books of account in Appellant's case file,

while obstructing the Appellant's 42 USC 654b and all Title IV-D

protected due process right to documents of accounting validation and

verification depriving the Appellant's right to meaningfully refute the

State's claim is unlawful, covers up the illegal 12% compound interest

that is also ballooned through several fraudulent manual accounting

calculations NOT USING the Title IV-D mandated automated data

processing system.  There are pending breach of contract, fraud and Civil

RICO et al actions in Federal Courts regarding the conduct of the

Appellees.

6. The Appellant respectfully requests the Court to take notice of the fact that the alleged interest published online by the State/Plaintiff as of November 30, 2022 that states the very specific number of $75,623.71 ballooned to $81,652.46 as of December 22, 2022, by a whopping $6,028.75 in a matter of 22 days as stated in the State's/Plaintiff's Motion, is usurious, and clearly shows the falsity of the State's/Plaintiff's Motion, paragraph numbered 8 that says, "That, because interest only accrues on principal balances and not on interest balances, the interest balance owed on arrears has not changed since the principal balance was paid in full on December 9, 2021."  This is in violation of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

7. The Appellant respectfully requests the Court to take notice of the fact that after the Appellant accepted the deal in Texas and paid the payoff amount of $104,185.98 from Texas on December 7, 2021, the State sent to the Appellant in Texas by Mail a Notice of Intent to Lien dated March 3, 2022 for $75,638.00 without any information justifying the fraudulent interest lien on Appellant's Texas properties – the $75,638.00 amount on the fraudulent lien on Appellant's Texas properties was deliberately calculated manually without any substantiated records then hard input into the automated data processing system in violation of Title IV-D.

This is in violation of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Appellant appealed this fraudulent lien to the Appeals Office of Rhode Island Executive Office of Health and Human Services ("RI EOHHS"), a political subdivision of the State of Rhode Island applicable under 42 USC 654(1), on April 1, 2022. Throughout the procedurally defective appeals process where the Appellant was denied by the State/Plaintiff to access her case file, the State/Plaintiff refused or ignored the Appellant's over ten(10) record requests for the legal and accounting basis of the $75,638.00 lien. Each record information denial is in violation of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Appellant also submitted to the Appeals Office records of the written email advisement by the State that "accounting says" to pay $104,185.98 and records of the Appellant's bank wire transfer payment. The Appeals Office continued the hearing for the maximum 3 times due to the State/Plaintiff's refusal to comply with discovery that would render the proceeding procedurally defective. Paul Gould and John Langlois were listed as representing the State. Their collective violations incur penalties and fines under, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 655, 658a, disgorgement of all ineligible

funding under Title IV-A that were received through false claims. To resolve the discovery issues, the Executive Hearing Officer ("EHO"), Debra DeStefano, scheduled a telephonic Prehearing Conference on October 5, 2022, and only when told by the EHO the burden of proof lies on the State/Plaintiff to show arrears are due (as applies here), did John Langlois (who attended the Prehearing Conference) state the following, which the Appellant in Texas recorded as a party of the call:

"EHO: The agency will have to submit proof of the allegation for arrears to support their position.

Langlois: The reason why I asked earlier whether Mary spoke to Karla after she made the payment was because there was a change of circumstances right after that. I don't know if anyone in my agency had ever explained that to Mary.

Seguin: Wait a minute, wait a minute,

EHO: Wait Mary, I know what you asked for, let me get to what John just said, so John, you said there was a change in circumstances subsequent to her making a payment but before the notice of lien went out?

Langlois: Yeah.

EHO: OK, so…

Langlois: Can I just back up and explain what happened, 99% of this is a misunderstanding…

EHO: OK?

Seguin: Including what was on the screenshot, was that a misunderstanding??

Langlois: Can I speak without being shouted over?

Seguin: I am flabbergasted, really.

Langlois: What happened in this case is when Mary's representative, her attorney, called us in late November 2021, and said she wants her passport released and what does she have to do to release her passport, they put her in touch with Karla who gave her the $104,185.98 number. Where that number came from, was one of our attorneys contacted the custodial parent, Gero Meyersiek, so we contacted his attorney, it wasn't me, it was someone in my office, and said if she's willing to make a $104K to pay off the principle, would you agree to waive the $73K in interest? He said yes. So Karla notified Mary that if she paid the $104K, it would be paid in full because he was willing to waive the interest and accept just the principal. What happened was the day after Karla spoke to Mary to wire in the $104K the attorney for Mr. Meyersiek contacted us again and said he changed his mind, please put the interest back on the system, so we did. So the number that

was given to her on the day it was given to her was correct, the $104K, because he was waiving the interest, but then changed his mind, so we put the interest back on the system, because he was waiving the interest, and that interest was put back on the system and that's why the system is now saying she owes $73K. That's why in March when the system saw that she had some sort of personal injury insurance in the system, our system was showing she owed $73K so we issued the lien. But that was what happened, he changed his mind the next day and that's what messed up the numbers. So that's how all this happened, it was a pure misunderstanding, I don't know whether anyone has ever explained that to Mary how that happened.

EHO: OK, Mary, did anyone ever explain that to you before?

Seguin: No. No one ever explained any of that. This is why I am asking for my case file, I think this is more basis to ask for my entire case file from 2020. It's news to me for example and its new information to me that your office's lawyer would not talk to me directly but would be picking up the phone and calling the attorney for the custodial parent. And then not saying you were doing this deal. I never offered $104K. You had determined this number, and that's why I am looking for documentation as to whether this is something you guys do in every case.

EHO: OK, John, are you intending to submit then, the documentation showing the full balance, which would include the principle and the interest before she paid the $104k, and then what happened after, you're prepared to submit documentation to show everything that you said just happened.

Langlois: Yes. I can show the account balance before he agreed to waive the interest. And I can show you the account balance after she made the payment. And then when we put the interest back on the system.

EHO: And you're going to testify as to why it all occurred, I mean basically what you just told us.

Langlois: Yes.

Seguin: But the screenshot on December 6th showed $93K."

A true copy of the recording evidence has been submitted by the Appellant to this court, a Rhode Island political subdivision under Title IV-D proceeding in June 2023 and in February 2024.

However, instead of going forward with the testimony and providing the alleged debt validation and verification accounting records promised by John Langlois to the EHO at the upcoming RI EOHHS scheduled Appeal Hearing at the time on December 1, 2022, the State opted to rescind the Notice of Lien that states there are unspecified errors on October 14, 2022, and emailed the RI EOHHS

Appeals Office that the State will litigate the issue in Family Court. This showed the intent of the State to deprive the agency Appeals Office of jurisdiction by withdrawing the enforcement instrument that vests the Appeals Office's jurisdiction by regulation, in the clear hope of a more favorable outcome to the State, in the hopes of symbiotic and pliant judge shopping, in the hopes of getting a judge like McCann who ordered the illegal and unenforceable 12% compound in a Title IV-D case to rubber stamp the fraudulent 12% compound interest arrears due, and thereby needlessly increasing litigation. Mr. Paul Gould is the co-counsel of record for the State in the RI EOHHS agency appeal. These activities are in violation of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 655, 658a.

8. The State's actions obstructing Appellant's discovery rights for debt validation and verification as well as documentation of the Plaintiffs' waiver of interest are violative of Family Ct. R. Dom. Rel. P. 11 and are in violation of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a. It is in criminal violation of 18 USC § 666 and a scheme to commit fraud on the court and interstate fraud through unenforceable Title IV-D orders that appear to be routinely issued by pliant Title IV-D judges like Judge John McCann III and Magistrate Susan Nahabedian.

9. Due to the State's conduct of obstructing the Appellant's right to access debt validation and verification records of publicly noticed liens of alleged arrears issued by the State throughout the agency appeal, the Appellant filed an Access to Public Records ("APRA") request to the then Secretary Ana Novais of the RI EOHHS that manages the State/Plaintiff agency OCSS.   These are all political subdivisions of the State of Rhode Island under 42 USC 654(1).

10. The RI EOHHS Office in its management capacity required the State OCSS to respond to the APRA request, but even then the State denied the Appellant's APRA request for accounting records, again refused to release the requested debt validation accounting records, but released the Case History Tracking records in the Appellant's case file, which showed entries made by Kevin Tigue and RI OCSS staff between December 6, 2021 to April 2022 of activity that corroborated John Langlois's representations of taking interest off the system, interest waiver at the agency Prehearing Conference on October 5, 2022 that is outlined above in paragraph 10, then putting interest back on the system after Appellant accepted the offer in Texas, and performed on the contract in Texas paying off all due support from Texas, through Appellant's Texas bank account, namely Texas properties.  Appellees' record denials are

violations of inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

11. Both the RI OCSS counsel who denied the Appellant's APRA request and the Executive Legal Counsel of the Secretary of RI EOHHS, Lisa Martinelli (to whom Ms. Deb Barclay reports and to whom Mr. Paul Gould reports, per organization charts supplied by the Secretary of State of the State of Rhode Island) informed the Appellant via official written letter correspondence to appeal RI OCSS's APRA request denial to the Attorney General pursuant to R.I.G.L. sec. 38-2-8. Their collective denials are in violation of inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a. Following their collective official written advisement, the Appellant appealed the RI OCSS APRA denial under R.I.G.L. sec. 38-2-8 to the Office of the Attorney General and the Superior Court as provided by R.I.G.L. sec. 38-2-8. The Office of the Attorney General and the Superior Court of Rhode Island are political subdivisions of the State of Rhode Island under 42 USC 654(1). Instead of releasing the Appellant's Title IV-D alleged debt validation and verification records information, the State continues to resist releasing alleged arrears/debt verification accounting records in Superior Court, including failing to comply with the Appellant's Court-

issued subpoena for said records and resisting subpoena compliance with

extended litigation in Superior Court in violation of inter alia, 42 USC §§

654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666,

655, 658a.

    a.  The Appellant served the State by email Appellant's Request for

Production of Documents for the same accounting records and

interest waiver records pursuant to Family Ct. R. Dom. Rel. P. 34,

to which the State/Plaintiff has so far produced one set of book of

accounts out of the seven different books of accounts.  However,

the numbers do not corroborate with any of the seven official legal

representations of alleged arrears due, e.g., $93,214.56 Total Due,

and $0.00 under Interest on December 6, 2021, published online in

the State's OCSS online account for Appellant, as of November

30, 2021; $104,185.98 Total Payoff Amount on December 7, 2021;

$75,638.00 on a Notice of Intent to Lien dated March 3, 2022 that

RI OCSS rescinded based on alleged unspecified errors on October

14, 2022; $73,000.00 per RI OCSS Deputy Chief Counsel John

Langlois's (staff counsel who also reports to Mr. Paul Gould, who

was also the attorney of record for the State at the Appeals

Hearing) representation at the agency RI EOHHS (Rhode Island

Executive Office of Human and Health Services) administrative appeal Pre-hearing held on October 5, 2022; $55,000.00 on RI OCSS correspondence with Meyersiek on October 13, 2022; $75,623.71 Total Due for "Interest," online on the aforesaid OCSS online account, as of November 30, 2022. A screenshot taken on December 3, 2022 thereof is attached to this Motion; $81,652.46 on the Motion as of December 22, 2022; this is in violation of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a that is consistent with the State/Plaintiff's pattern of obstructing the Appellant of due process right access to her case file records of RI OCSS's debt verification itemized accounting calculations of very large sums of alleged arrearages of at least 7 books of accounts from December 6, 2021 to the present in Title IV-D proceedings.

**N. JUDICIARY VIOLATION OF GOVERNMENT EDICTS DOCTRINE, CALCULATED FAILURE TO INTEGRATE TITLE IV-D AGENCY ELECTRONIC FILING SYSTEM WITH ODYSSEY MAKING THEIR FILINGS INVISIBLE TO ALL E-COURT USERS OTHER THAN THE JUDGE AND THEMSELVES AND VIOLATION OF ACCESS TO COURT INFORMATION OF PUBLIC TITLE IV-D PROCEEDINGS IN RHODE ISLAND'S STATEWIDE ELECTRONIC COURTS**

**a. DENIAL OF PUBLIC AND PRO SE-LITIGANT ACCESS TO COURT INFORMATION INCLUDING JUDGE-CREATED LAWS BY 42 USC 654(1) POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY**

The Rhode Island Judiciary is a political subdivision of the State of Rhode Island under 42 USC 654(1). While publicizing during the implementation of the $6 million installation of Odyssey (the statewide electronic filing system) in 2014 that the electronic courts will enable ALL court users to pull up court record information with ease from their phones, the Rhode Island Judiciary quietly implemented Rule 5 of the Rhode Island Rules and Practice denying the Public, pro-se litigants and all parties to a case in Rhode Island remote access to court record information including judge-created orders and laws, including their own. Through this deceit, the Rhode Island Judiciary lied to the Public, while denying access and thereby covering up the routine ordering of unenforceable body of judge-created laws ordering 12% compound interest in public cases and public hearings under 42 USC 654 in public Title IV-D cases, such as Appellant's, by symbiotic pliant judges like Judge McCann and Magistrate Nahabedian. The denial of access to pro-se litigants of their own cases' court records containing support orders violates, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a. The denial of public access to public court records documenting the routine systemic violations of 42 USC 654(21)(A) in electronic courts violates the First Amendment and the public's right to know the law, even if these fraud on the court unenforceable judge-created laws are unenforceable in both Rhode Island and elsewhere Title IV Part D reaches. The

denial of public access to judge-created laws that is also motivated by cover-up

fundamentally violates the established Government Edicts Doctrine that the United

States Supreme Court specifically held applies to electronic formats of government

doctrines, such as judge-created laws in digital courts. See ***Georgia v. Public***

***Resource.Org, Inc***., No. 18-1150, 590 U.S. ___ (2020).  The Appellant has been

denied access by the political subdivision Rhode Island Judiciary to her court

records and information regarding the orders in question that must be furnished

pursuant to 42 USC 654b thus in violation of 42 USC 654.  The Appellant has been

denied access by the political subdivision Rhode Island Judiciary to unenforceable

and impeachable judge-created fraud on the court void laws that routinely establish

unenforceable 12% compound interest by certain symbiotic pliant judges, like

Judge McCann and Magistrate Nahabedian, who work hand-in-hand with the

Rhode Island Office of Child Support Services in Title IV-D cases, in violation of

Appellant's Due Process and Equal Protection rights to know the law to be

meaningfully heard and right to meaningful access to justice – they are in violation

of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23),

(24), (27), 666, 655, 658a.

The family court held at the hearing in this matter scheduled on March 6,

2023 that the Rhode Island Office of Child Support Services is ordered to show

that the alleged arrears is accurate.  See attached March 6, 2023 hearing transcript.

Explicitly stated throughout 42 USC 654, "accuracy" requires no accounting

alterations generated offline then unsubstantiated hard inputs into the automated

system, no fraud, no inducements, no interstate extortion under color of state law,

and for certain no 12% compound interest on overdue support.

### b. CALCULATED FAILURE BY THE JUDICIARY TO INTEGRATE THE TITLE IV-D AGENCIES' ELECTRONIC FILING SYSTEM INTO ODYSSEY RESULTING IN AGENCY FILINGS BEING INVISIBLE TO ALL COURT USERS EXCEPT THE JUDGE AND THE AGENCIES THEMSELVES – COVER UP

Because under the State's Plan the Title IV-D agencies routinely file in the

Rhode Island court system for the illegal enforcement of illegal 12% compound

interest disallowed under 42 USC 654(21)(A), the political subdivision Rhode

Island Judiciary deliberately failed to integrate the Title IV-D Agencies' electronic

filing system with the State's electronic filing system Odyssey in order to make

Title IV-D Agency electronic filings invisible to all court users except the judge

and the agencies  themselves, calculated to cover up the 12% compound interest

from audit by the federal authorities and from the Public.  This came to light at the

WebEx hearing in this Title IV-D matter before family court Judge Merola on June

8, 2023 scheduled at 2PM, where Judge Merola, showing he was unaware of the

failure of systems integration, questioned Appellee Paul Gould of Rhode Island

Office of Child Support Services, why the Appellant is unable to see the agency's

electronic filings that the judge can see in the system. Without hesitation, Appellee Paul Gould explained that this is due to the electronic court implementation process that was supposed to integrate the agency's legacy system to Odyssey, demonstrating conclusively that Gould, the Lead Counsel of the Rhode Island Office of Child Support Services responsible and overseeing agency court filings in all Title IV-D cases under the State Plan, undisputedly was in the know and part of the conspiracy involving the deliberate failure of filing system integration and its continuing perpetration in Title IV proceedings that made Title IV agencies' filings invisible as part of the cover up.

### c. FALSIFYING ACCOUNTING TO SHOW $0.00 PAYMENT IN DECEMBER 2021 in APPELLANT'S TITLE IV-D ACCOUNT POWERED BY THE AUTOMATED DATA PROCESSING SYSTEM IN ORDER TO DEFRAUD APPELLANT IN THE FUTURE

Appellant attaches hereto **EXHIBIT N**, that shows the Appellant's online Title IV-D OCSS account which is powered by the Automated Data Processing System, as of November 2022 at the time of the RI EOHHS Appeal, which showed $0.00 Payment for December 2021. Therefore, the Rhode Island Office of Child Support Services through accounting fraud never recorded, as late as November 2022, in the Automated Data Processing System Appellant's large lump sum payoff of $104,185.98 bank wired from Texas on December 7, 2021, showing prima facie accounting fraud. This shows a scheme to defraud the Texas Appellant in the future. This shows that the Rhode Island Office of Child Support Services

received Appellant's wired funds and treated it as a cash receipt, without ever recording in the automated data processing system such a large lump sum payment. Appellees Kevin Tighe, Barbara Grady, Gero Meyersiek, John Langlois, Paul Gould, and Priscilla Glucksman, among others, distributed the $104,185.98 among themselves in their organized conspiracy to defraud. Appellant's lump sum payment was distributed allegedly via a check, not through the usual cash card on December 9, 2021, (see attached hereto TRAC record for December 2021) record information of which check that was allegedly issued by the Office of Child Support Services the agency refuses to furnish the Appellant, and which are under subpoena now. Further, the Office of Child Support Service's maintaining a separate offline accounting system in this case constitutes fraud and accounting fraud, targeting the Appellant in Texas, targeting Texas properties and targeting the United States of America. This is why they never utilized the 42 USC 654(7), (14), (20) and 42 USC 666(14) cooperative system with Texas, so as to enable them to divide the defrauded cash spoils offline among the members participating in the scheme. This accounting fraud and scheme to defraud violate mail fraud, wire fraud, honest services fraud, RICO, record tampering, theft of the United States, false claims and felonious fraud, among others.

In reality, under 42 USC 651-669, employees who engage in, aid and abet and facilitate the above must be terminated and must not be permitted to continue

criminal activities of record tampering, accounting fraud, fraud, theft under color of state law and cover up.

### f.  CRIMINAL VIOLATIONS REPORTED TO SOME JUDGE OF THE UNITED STATES AND OTHER LISTED AUTHORITIES UNDER 18 U.S.C. sec. 4

The Appellant, in good faith and reliant on the plain language of 18 USC § 4, misprision of felony, as well as the Brief filed in the United States Supreme Court by the United States of America in the Supreme Court case, ***Turner v. Rogers***, 564 U.S. 431 (2011) that showed South Carolina (found by the 4th Circuit Court of Appeals) liable for $75 million in penalties for that state's 42 USC 654 violations that did not even involve, inter alia, fraud and tampering with the record or unlawful 12% compound interest put into then taken off then put back on the automated data processing system as here in Rhode Island, made known the above activities to "some judges" of "the United States" and other relevant federal authorities – counting among the United States judges Appellant made known publicly in the Amended Complaint filed in the United States District Court for the District of Rhode Island, Judge William E. Smith.  The issue of what Judge Smith has done with the information "made known to him" is pending before the United States Court of Appeals for the First Circuit before a requested panel of judges under the federal law of civil procedure.  Therefore, under 18 USC 4, the above

reported activities have been "made known" to several high ranking judges of the United States.

## A. VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Appellant made known to the panel of judges of the United States allegations contained in the Amended Complaint filed in Federal Court of the commission of acts by the Rhode Island political subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein in this motion, the afore-described acts violating **31 U.S.C. § 3279,** 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 – such violative acts by the Appellees in this matter, and/or Judge Smith on this list are not exhaustive.  It is undisputable, among others, that Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-D

and Title IV-A disgorgement is due from the applicable State of Rhode Island's political subdivisions.

## O. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in UNITED STATES OF AMERICA v. DONALD J. TRUMP, DC Circuit, the DC Circuit United States Court of Appeals reminds the Public and all applicable tribunals that Judges are similarly liable to the criminal laws for their official acts.  A notable example is *Ex parte Commonwealth of Virginia*, in which the Supreme Court affirmed the criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for violating a federal statute that prohibited discriminating on the basis of race in jury selection. Id. at 340, 344. The Supreme Court began by observing the principle that officers are bound to follow the law: "We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the holder from obligation to obey the Constitution of the United States, or take away the power of Congress to punish his disobedience." *Id.* at 348. The Court then addressed the judge's argument that the Court lacked the authority to punish a state judge for "his official acts." *Id.* Its response was twofold. First, the Court described juror selection as "merely a ministerial act, as much so as the act of a sheriff holding an execution, in

determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads." *Id.* The Court then explained that even if juror selection is considered a "judicial act," the judge had a legal duty to obey the criminal laws:

> "But if the selection of jurors could be considered in any case a judicial act, can the act charged against the petitioner be considered such when he acted outside of his authority and in direct violation of the spirit of the State statute? That statute gave him no authority, when selecting jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing.

*Id.* at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

> [W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation of constitutional rights. On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress . . . .'

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting Gravel, 408 U.S. at 627). Similarly, in *Dennis v. Sparks,* the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity

because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id*. at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under *Fitzgerald*, but a judge has no criminal immunity for the same "official act." See also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock,* 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. See *United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings,* 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not immune, and employees of the political subdivisions of Rhode Island under 42 USC § 654(1) similarly are not immune. Barbara Grady and Gero Meyersiek are undisputedly liable.

## II. LACK OF JURISDICTION – APPELLEE 42 U.S.C. sec. 654(1) STATE PLAN POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (CREATED UNDER RIGL 8-6-3) LACKS JURISDICTION

### A. RI'S 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY LACKS JURISDICTION TO ESTABLISH OR ENFORCE 42 USC sec. 654(21)(A) VIOLATIVE 12% COMPOUND INTEREST ON OVERDUE SUPPORT – DOING SO INCURS PENALTY UNDER 42 USC 654(24) AND REINFORCES ITS STATE PLAN'S INELIGIBILITY FOR FEDERAL FUNDING UNDER BOTH TITLE IV-D AND TITLE IV-A, WARRANTING DISGORGEMENT OF TANF AND TITLE IV-D FUNDING – SEE HODGES v. SHALALA

The statutory provision of 42 U.S.C. 654(21)(A) makes it explicitly clear that Title IV-D and Title IV-A participating 42 USC 654(1) state political subdivisions, such as the political subdivision Rhode Island Judiciary, lack the authority to establish 12% compound interest.

To do so "routinely" simply incurs more penalties, more fines

constituting more false claim consequences, and imprisonment of

the culpable persons and agents.

**B. RI's 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (See RIGL 8-6-3) LACKS JURISDICTION OVER QUESTIONS AND MATTERS OF FEDERAL CRIMINAL VIOLATIONS BY RHODE ISLAND SDU OF ROUTINE RECORD TAMPERING WITH 42 U.S.C. 654a AUTOMATED DATA PROCESSING SYSTEM COMMITTING ACCOUNTING FRAUD (e.g., REMOVAL OF UNLAWFUL 12% COMPOUND INTEREST IN ORDER TO CONCEAL IT WHEN CERTIFYING TO OTHER STATE AUTHORITIES AND FEDERAL AUTHORITIES) AND THE CRIMINAL CERTIFICATION OF FRAUDULENT ACCOUNTS THAT CONTAIN MANUALLY REMOVED UNLAWFUL FRAUDULENT 12% COMPOUND INTEREST (UNDER COLOR OF RI'S PREEMPTED STATE LAW) FROM THE SYSTEM**

Title IV-D 42 USC 651-669, 31 U.S.C. § 3279, 18 U.S.C. §2, 18

U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18

U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. §

2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18

U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. §

1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18

U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C.

§225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512,

18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18

U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C.

§1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513,

RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C.

§1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968

also make clear that the State Plan's 42 USC 654(1) political

subdivision limited jurisdiction Rhode Island family court

lacks jurisdiction over FEDERAL CRIMINAL

VIOLATIONS BY RHODE ISLAND SDU OF ROUTINE

RECORD TAMPERING WITH 42 U.S.C. 654a

AUTOMATED DATA PROCESSING SYSTEM

COMMITTING ACCOUNTING FRAUD (e.g.,

REMOVAL OF UNLAWFUL 12% COMPOUND

INTEREST IN ORDER TO CONCEAL IT WHEN

CERTIFYING TO OTHER STATE AUTHORITIES AND

FEDERAL AUTHORITIES) AND THE CRIMINAL

CERTIFICATION OF FRAUDULENT ACCOUNTS

THAT CONTAIN MANUALLY REMOVED

UNLAWFUL FRAUDULENT 12% COMPOUND

INTEREST (UNDER COLOR OF RI'S PREEMPTED

STATE LAW) FROM THE SYSTEM.

**C. RI's 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (See RIGL 8-6-3) LACKS JURISDICTION OVER FEDERAL CRIMINAL VIOLATIONS COMMITTED BY ITSELF INVOLVING CERTAIN SYMBIOTIC RHODE ISLAND FAMILY COURT JUSTICES, SUCH AS JUDGE JOHN McCANN AND MAGISTRATE SUSAN NAHABEDIAN, WHO KNOWINGLY AND ROUTINELY FRAUDULENTLY ESTABLISH AND ENFORCE UNLAWFUL 12% COMPOUND INTEREST TARGETING UNSUSPECTING NONCUSTODIAL PARENT VICTIMS**

Title IV-D 42 USC 651-669, 31 U.S.C. § 3279, 18 U.S.C. §2, 18

U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C.

§285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18

U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C.

§ 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18

U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18

U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506,

18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C.

§1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18

U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C.

§1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C.

§1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 also

make clear that the State Plan's 42 USC 654(1) political

subdivision Rhode Island family court lacks jurisdiction over

FEDERAL CRIMINAL VIOLATIONS COMMITTED BY

ITSELF INVOLVING CERTAIN SYMBIOTIC RHODE

ISLAND FAMILY COURT JUSTICES, SUCH AS JUDGE

JOHN McCANN AND MAGISTRATE SUSAN NAHABEDIAN,

WHO KNOWINGLY AND ROUTINELY FRAUDULENTLY

ESTABLISH AND ENFORCE UNLAWFUL 12% COMPOUND

INTEREST TARGETING UNSUSPECTING NONCUSTODIAL

PARENT VICTIMS.


## CONCLUSION

**WHEREFORE**, this Court should GRANT Appellant's herein motion to

stay the district court's Fed. R. App. P 4(a)(5) denials and to stay the tolling of

time to file a Notice of Appeal pending the Court's resolution of the pending

Appellant's March 8, 2024 Fed. R. App. P 27(b) Motion to Reconsider and extend

the time to file Appellant's Notice of Appeal or amended Notice of Appeal to April

2, 2024.  This Court should GRANT Appellant's March 8, 2024 Fed. R. App. P

27(b) Motion to Reconsider and extend the time to file Appellant's Notice of

Appeal or amended Notice of Appeal to April 2, 2024. This Court should instruct

the clerks of the courts to correct the falsely altered record. This Court should

order divestiture of jurisdiction of the district court throughout the pendency of the

appeal and the trial court is *functus officio*. This Court should appropriately and

fittingly sanction the district court actors involved in falsifying the record for

misconduct. Appellant requests Oral Argument on all issues raised herein before

the Court. Appellant requests any and all Relief deemed just.

Respectfully submitted,

Mary Seguin
Pro Se
/s/        *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: March 24, 2024

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the
Court's ECF filing system on March 24, 2024, on all registered counsel of record,
and has been transmitted to the Clerk of the Court.

Mary Seguin

Pro Se

/s/ _Mary Seguin_____

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Exhibit A

 Gmail

**Mary Seguin <maryseguin22022@gmail.com>**

---

## Filing Submitted for Case: K20010521M; GERO MEYERSIEK vs. MARY SEGUIN; Envelope Number: 4544999

1 message

---

**no-reply@efilingmail.tylertech.cloud** <no-reply@efilingmail.tylertech.cloud>
To: maryseguin22022@gmail.com

Thu, Mar 21, 2024 at 6:49 PM



# Filing Submitted

Envelope Number: 4544999
Case Number: K20010521M
Case Style: GERO MEYERSIEK vs. MARY SEGUIN

The filing below has been submitted to the clerk's office for review. Please allow twenty-four (24) to forty-eight (48) hours for the clerk's office to process your filing.

| Filing Details | |
|---|---|
| **Court** | Family Court |
| **Date/Time Submitted** | 3/21/2024 7:47 PM EST |
| **Filing Type** | Motion to Compel |
| **Filing Description** | Defendant's Motion to Compel Compliance with Subpoena |
| **Type of Filing** | EFileAndServe |
| **Filed By** | Mary Seguin |
| **Filing Attorney** | |

| Fee Details |
|---|
| Your account is never charged until your filing is accepted. If you see any pending charges on your account prior to acceptance, the pending charges are an authorization hold to ensure that the funds are available so your filing can be accepted without delay. |
| If the filing is canceled or rejected, the funds will be released and will return to your account according to your financial institution's policies (typically three (3) to ten (10) business days). |

| This envelope is pending review and fees may change. | |
|---|---|
| Case Fee Information | $0.00 |
| Motion to Compel | $0.00 |
| **Total:**$0.00 (The envelope still has pending filings and the fees are subject to change) | |

| Document Details | |
|---|---|
| **Lead Document** | RI Family Court Motion to Compel Compliance with EXHIBITS OF Subpoena and 42 USC 654 and 654b and 655 FINAL 032124.pdf |
| **Lead Document Page Count** | 129 |
| **File Copy** | [Download Document](#) |
| This link is active for forty-five (45) days. | |

For technical assistance, contact your service provider

Need Help? Help
Visit: https://rhodeisland.tylertech.cloud/ofsweb
Email: efiling.support@tylertech.com

Please do not reply to this email. It was automatically generated.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                    FAMILY COURT

State of Rhode Island ex rel.          :
GERO MEYERSIEK                         :
    *Plaintiff*                        :
                                       :
VS.                                    :          DOCKET NO: K20010521M
                                       :          Title IV Part D Case under
                                       :          42 U.S.C. §§ 651-669
MARY SEGUIN                            :
    *Defendant*                       :

## DEFENDANT'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENA

      The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby moves to compel compliance with Defendant's Subpoena (attached hereto as **Exhibit A**) served upon the Rhode Island Office of Child Support Services, which is acting on behalf of the State of Rhode Island ex. rel. GERO MEYERSIEK, and acting as the "State Agency" under the Rhode Island State Plan under **42 U.S.C. § 654**, **42 U.S.C. § 654a**, **42 U.S.C. § 654b**, **42 U.S.C. § 666** *et al*., and all applicable state and Federal Laws, both civil and criminal, regulating Plaintiffs' actions and omissions under the legal framework of **Title IV-D of the Social Security Act**.  Defendant respectfully **requests and moves for a hearing on Defendant's herein Motion to Compel Compliance with Subpoena** – the Rhode Island Office of Child Support Services refuses to respond to and refuses to comply with the Subpoena, and filed a motion to quash the subpoena on March 20, 2024 - the requested information is further regulated and mandated to be produced under the State Plan in compliance under **42 U.S.C. § 654b**, therefore those

**requested documents must be produced by the State within this proceeding as well as without judicial compulsion**.  The Subpoena further summons Kevin Tighe, Paul Gould and John Langlois to appear to Court to testify at the hearing scheduled in this matter on March 28, 2024 at 10:00 AM.

## I.   RHODE ISLAND'S STATE PLAN'S PENALTY-INCURRING VIOLATIONS OF TITLE IV-D
### AND
### ORGANIZED CRIMINAL COMMISSION OF INTERSTATE FRAUD

Congress prescribed both civil and criminal penalties for violations.  Consistent with its Spending Power, Congress has the authority to attach conditions on the receipt of federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."   The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not

disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at 879. Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1] Congress also enacted several criminal codes punishing actors, such as the Plaintiffs, who commit federal crimes, including cover up of unlawful activities.

Defendant filed a Motion to Dismiss Interest Arrears on February 4, 2024 and Defendant's Motion is scheduled on the Court's calendar to be heard on March 28, 2024. For the hearing, the Defendant served the attached Subpoena, attached hereto as Exhibit A, upon the State ex. rel. Plaintiff, Rhode Island Office of Child Support Services, the State agency under the State Plan pursuant to **42 U.S.C. § 654.** *See* United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUS

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007),
http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
    Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

C-prelim-title42-

section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRp

b25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

Defendant subpoenaed "(1) All records, files, notes, public records, documents, films, materials generated in the course of administration and enforcement of relating to Defendant Mary Seguin, from 2010 to the present in this Title IV-D Case under the Social Security Act; (2) All records relating to Defendant Mary Seguin from 2010to the present, including notes and messages taken and generated on October 5, 2022."

*See* attached **subpoena**, **Exhibit A**.

The Rhode Island Office of Child Support Services' actions in this Title IV-D case's proceedings since 2010 with the entries of orders prepared and submitted in her official and individual capacities, Priscilla Glucksman, make clear the Office of Child Support Services is one of the State Plan's key "organizational unit which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan" under **42 U.S.C. § 654(3).**

**Rhode Island Office of Child Support Services' refusal** *to comply with the Subpoena is a prima facie* **42 U.S.C. § 654b violation that incurs penalties** in this **fiscal year under 42 U.S.C. § 655(a)(5) as well as 42 U.S.C. § 655(a)(4),** which penalty-incurring violations the Defendant had reported, is reporting and will continue to report to relevant law enforcement authorities at the federal and state levels. (Judicial notice is respectfully requested that the Defendant in January 2023 reported Office of Child Support's violations to the Rhode Island Office of Attorney General, who instead of enforcing the requirements of the State Plan as the Attorney General is

similarly a political subdivision under 42 USC 654(1), opted to reinforce, aid, shield and protect Rhode Island political subdivisions' unlawful activities – this is reported to United States authorities).  As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654.  Among the prerequisites for approval of a Title IV-D Plan are the requirements that the State may only uniformly charge 3-6% simple interest on overdue support, *see* 42 U.S.C. § 654(21)(A), and a State must establish and operate an automated data processing and information retrieval system ***without*** taking computer calculated amounts off and then put other numbers back on the system or hardcoding/inputting new numbers computed offline onto the system, see 42 U.S.C. § 654(24), and the State **must** have a state child support disbursement unit (SDU) that complies with all the requirements of 42 U.S.C. § 654, 42 U.S.C. § 654a, 42 U.S.C. § 654b, *see* 42 U.S.C. § 654(27)(A).  Rhode Island deliberately fails to meet all the requirements, including continuously inputting 12% compound interest on overdue support and the Rhode Island Office of Child Support Services covers up their noncompliance with accounting fraud inputting into the system and taking off from the automated data processing system amounts that are inflated, unlawful, and submitting false books of accounts that removed the unlawful inflated amounts to the Federal authorities to make it look like Rhode Island is in compliance so as to procure federal funding for which Rhode Island is ineligible.

The deliberate fraud makes clear the State operates an unlawful plan, in fact a criminally unlawful plan, and does not have an approved state plan under Title IV-D of

the Social Security Act, 42 U.S.C. §§ 651-669, and should lose and disgorge unlawfully procured federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). *See* 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).  *See*, *Hodges v. Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).

**Any attempt interfering with the Defendant's reporting, pursuant to 18 U.S.C. § 4, to law enforcement authorities the commission of crimes by political subdivisions of the State within this Title IV-D proceeding is unenforceable.**   Any and all failures to comply with 18 U.S.C. § 4 constitutes misprision of a felony.

**A. THIS PROCEEDING IS GOVERNED by 42 U.S.C. § 654 et al. UNDER TITLE IV-D THAT REGULATE <u>ALL POLITICAL SUBDIVISIONS</u> OF THE STATE OF RHODE ISLAND**

The Political Subdivision of the State of Rhode Island under 42 U.S.C. § 654(1), namely by and through the **Office of Child Support Services' Lead Legal Counsel Paul Gould,** Esq., made several claims before this Court under Oath throughout this Title IV-D case hearings and proceedings that **the laws of Congress do not matter, only this court orders matter and they do not need to conform to Congressional prescribed federal statutes.** *E.g.,*  See <u>Exhibit B</u> Transcript **of February 2, 2024** Hearing in this matter**.  Rhode Island is wrong and Paul Gould is wrong, and both know it.  That flagrant lawlessness is at the heart of the violations of federal law under color of state law in this interstate**

Title IV-D case.  **Rhode Island participates in Title IV-D, and** in so participating **through its State Plan, <u>must</u> comply** with **Title IV-D.  *See*, *Hodges v. Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).  *See New York v. United States*, 505 U.S. at 161, Congress, under the Commerce Clause, may offer the States a choice of regulation under federal control or preemption under federal regulation. *See* *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).  The Title IV-D statute expressly provides that compliance with 42 U.S.C. sec. 654, and compliance with the automated data processing system and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted);  *See* South Dakota v. Dole, 483 U.S. 203, 206 (1987). The textual language of 42 U.S.C. § 654(1) states,**

> **"A State plan for child and spousal support must—**
>
> **(1)    provide that it shall be in effect in all political subdivisions of the State"**

The facts and established law thus make it crystal clear *all political subdivisions* of Rhode Island, including the **Rhode Island Department of Human Services**, the **Office of Child Support Services <u>AND</u>** the **Rhode Island Judiciary political subdivisions of the State of Rhode Island <u>MUST</u> comply with 42 U.S.C. § 654.  However, because the Rhode Island Office of Child Support Services,**

the State Plan's SDU unit, flagrantly and expressly states in this Title IV-D case that Title IV-D statute and Congressionally prescribed federal statutes do not apply in this case nor in  Rhode Island, the State of Rhode Island's political subdivisions have flagrantly flouted 42 USC sec. 654 and then adjusted and tampered with the automated data processing system accounting to defraud the United States of federal funding, and to defraud the Defendant of her Texas properties.

Therefore the Defendant respectfully reminds all participants involved in this Title IV proceeding and gives notice to the applicable State political subdivisions (*e.g.*, Rhode Island Judiciary) and agencies, including the SDU under the State Plan under **42 U.S.C. § 654(1)**, *e.g.*, the **Rhode Island Office of Child Support Services,** that this yet again noncompliance by the State of Rhode Island with the Subpoenaed information egregiously constitutes yet another of the many numerous failures of Rhode Island agencies and its State Plan during this fiscal year to comply with the requirements of section 654b, as well as 654, 654a and 666 of Title IV which shall be considered yet another of the many numerous failures of the State to comply with subparagraphs (A) and (B)(i) of section 654(27) of this title during the fiscal year, that is clearly stipulated in 42 U.S.C. **§ 655(a)(5)(A)(ii) by a penalty amount of up to 30 percent of the penalty base, in the case of the fifth or any subsequent such fiscal year in which such a failure by the State occurs (regardless of whether a penalty is imposed under this paragraph with respect to the failure). (ii) The term "penalty base" means, with respect to a failure of a State to comply with a subparagraph of section 654(24) of this title during a fiscal**

year, the amount otherwise payable to the State under paragraph (1)(A) of this subsection for the preceding fiscal year.

Additionally, the deliberate noncompliance motivated by cover up makes clear the State knowingly and intentionally operates an illegal plan, the State knows Rhode Island does not have an approved state plan under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, and therefore should lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). *See* 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).

## B. FRAUD

In this Title IV case, serial noncompliance, motivated by fraud, and their resulting incurred penalties, both civil and criminal, accrued since the initiation of this Title IV case fourteen years ago in **2010, upon Plaintiff Gero Meyersiek's application for services under Title IV through his own private attorney, *Barbara Grady*, whose former law firm partner and diseased husband *Paul Dugan*, was himself a former Senior Counsel of the Rhode Island Office of Child Support Services, one of the key Title IV-D agencies under Rhode Island's State Plan charged under 42 U.S.C. § 654(3) with State compliance with 42 U.S.C. § 654, 654a, 654b, 655, 658a, among others – Barbara Grady through Paul Dugan has intimate knowledge of and is a knowing participant in the State's accounting fraud reporting to the United States for federal funding reimbursement and federal funding Incentive Payment payouts (658a) worth hundreds of millions of dollars under the Title IV Program to the Secretary and Department of Health and Human Services, among**

others.  Upon information and belief, the Plaintiff Gero Meyersiek and Barbara Grady and the Rhode Island Office of Child Support Services have a series of unlawfully obtained "12% compound interest" money receipt sharing arrangements involving the fraudulent procurement through the Title IV framework of exorbitant 12% compound interest interstate targeting Defendant's Texas properties on overdue support enabled through accounting fraud, among others – this arrangement involving interstate defraud of the Texas Defendant and simultaneous theft of the United States of ineligible Title IV funding entails, *inter alia*, the Rhode Island Office of Child Support Services discussing in great detail at length with Barbara Grady the agency's fraudulent removal from the 42 U.S.C. § 654(24), 42 U.S.C. § 654(27) and 42 U.S.C. § 654a mandated automated data processing system of 12% compound interest when sending to Texas in 2018 thus creating fraudulent books of accounts under 42 U.S.C. § 666(14)(A)(ii)(I) and (II) *fraudulently certifying to Texas via wire and via mail inaccurate support due accounts* – discussions of this scheme further violated the Defendant's privacy rights, that are documented in the TRAC record of the Defendant's Title IV case file for December 2021 recording the agency's discussions with Barbara Grady at length regarding taking interest off when sending to Texas, and keeping it off the system when communicating to Defendant that Gero Meyersiek waived interest, and then putting interest back on the system after they defrauded the Defendant inducing the Defendant to payoff support that comprised of the principle in one lump sum of $104,185.98 in consideration of Gero Meyersiek waiving

interest – the agency discussing its illegal and criminal enforcement information with Barbara Grady is in itself a violation of 42 U.S.C. 654 (26)(A) that mandates the State Plan to have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the ==privacy rights of the parties==, such as this Texas Defendant, including—

(A)==safeguards against unauthorized use or disclosure of information relating to== proceedings or ==actions to== establish paternity, or to establish, modify, or ==enforce suppor==t.

See Exhibit B. Rhode Island Office of Child Support **TRAC** document for December 2021 attached hereto as ==**EXHIBIT** B==.

Under **Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669**, the Texas Defendant has the **protected** right to be furnished under Subpoena with all TRAC records in Defendant's Title IV-D case file from 2010 to the present to establish the accuracy of the alleged Rhode Island computations mandated to be performed by the automated data processing system, but has instead been hard-programmed numbers created offline that are then manually input into the automated data processing system several times, thus fabricating several different Rhode Island-certified false books of accounts of amounts due transmitted by mail and by wire to Texas and the Texas Defendant and to the United States for the purposes of procuring federal funding under Title IV-D and Title IV-A that violate Federal and Texas State civil and criminal codes.  The Rhode Island Office of Child Support Services refuses to

produce any TRAC records for 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021 January to November, 2023 and 2024.

This violation of, among others, 42 U.S.C. 654(26)(A) constitutes a violation of 42 U.S.C. 654(27) that counts as a penalty in the many violations in fiscal year 2021 alone which exceeds 30% of the penalty base in 2021 – and that's just civil penalties under Title IV – numerous other federal criminal and civil violations incurring additional penalties are applicable, including Texas criminal and civil code violations.

### C. 42 U.S.C. § 654b(4)

Under Rhode Island's State Plan, the Rhode Island Office of Child Support Services is mandated to **"furnish to any parent, upon request, timely information on the current status of support payments under an order requiring payments to be made by or to the parent."**

Therefore, information relating to the Orders in question and relevant information relating to those orders **must** be furnished. Information relating to the putting of 12% compound interest on the automated data processing system from 2010 to the present must be furnished. Information relating to the removal of any alleged computed online or offline related to 12% compound interest from the automated data processing system in 2018 and at any and all times from 2010 to the present must be furnished. Information relating to the waiver by the Plaintiff by and through his private attorney Barbara Grady of the 12% compound interest that was represented to Defendant as the $0.00 showing under interest calculated by the automated data processing system in Defendant's case file on December 6, 2021 must be furnished. Information relating to the Rhode Island Office of Child Support Services calculated

total due showing $92,214,56 calculated by the automated data processing system in Defendant's case file on December 6, 2021 that calculates arrears from 2010 must be furnished.  See attached hereto **December 6, 2021 screen shot of the Defendant's online OCSS account** showing the calculated amounts of which is mandated by Title IV-D to be populated by the automated data processing system as **EXHIBIT C**. Information relating to the interest amount before it was taken off the automated data processing system in 2018 must be furnished, as well as any time interest was taken off the system from 2010 to the present.  Information relating to the interest put back on the automated data processing system in 2021 after Defendant accepted the $104,185.98 payoff number given by Office of Child Support Services by wire via email must be furnished.  Information relating to how $104,185.98 was computed by the automatic data processing system on December 7, 2021 must be furnished, when the automated data processing system calculated $92k just the day before on December 6, 2021 must be furnished.  Information relating to how $75,658.00 was calculated by the automated data processing system on March 3, 2022 that was then issued to Texas to lien Texas properties by Mail and by wire must be furnished.  And this is not exhaustive – see Subpoena attached hereto as Exhibit A.


**D. 2012 JUDGE McCANN (and 2024 MAGISTRATE NAHABEDIAN) VIOLATIONS of 42 U.S.C. § 654(21)(A) – EIGHT FAILURES AND PENALTIES (FOUR IN 2012 and FOUR IN 2024 by and through POLITICAL SUBDIVISION RI FAMILY COURT) – (THIS DOES NOT INCLUDE CRIMINAL AND CIVIL PENALTIES UNDER APPLICABLE CRIMINAL AND CIVIL CODES UNDER FEDERAL LAWS AND TEXAS LAWS)**

This Court took judicial notice on February 10, 2023of the *issuance* of two Orders issued by Judge McCann in 2012.  Magistrate Monaco clarified at the hearing on March 6, 2023 he did NOT take judicial notice of the contents of the orders, only the issuance of the orders.   See attached transcript of March 6, 2023 hearing. **Exhibit D**.

Those 2012 orders were issued by Judge McCann of the Rhode Island Family Court, a political subdivision of the State, in which the State Plan must be in effect under 42 U.S.C. **§ 654(1).**  Therefore, it is crystal clear that **the Rhode Island Family Court and its justices under the State Plan MUST comply with all provisions of Title IV-D, including** U.S.C. **§ 654(21)(A)** that makes it crystal clear **interest on overdue support must be between 3-6% simple interest.**  However, **Judge McCann knowingly ordered 12% compound interest in this interstate Title IV-D on overdue support to be illegally put into the** State Plan's **automated data processing system mandated under** U.S.C. **§ 654a and** U.S.C. **§ 654b in knowing violation of 42 U.S.C. § 654(21)(A).  Certainly, the Rhode Island Office of Child Support Services today claims 12% compound interest was what Judge McCann ordered, undisputedly making Judge McCann an accomplice.**  The knowing violation of the political subdivision Rhode Island Family Court by and through Justice **McCann of 42 U.S.C. § 654(21)(A) through fraud on the court and under color of state law violates 42 U.S.C. § 654(24), 42 U.S.C. § 654a and 42 U.S.C. § 654b  and incurs** ==FOUR== **failures and penalties in this case alone for the fiscal year** ==2012== **under 42 U.S.C. § 655(a)(4) and 42 U.S.C. § 655(a)(5), through just the State family court political subdivision alone.**

In 2024, the Rhode Island political subdivision of the family court by and through Magistrate Nahabedian flagrantly declared at the February 2, 2024 hearing in this matter that the State knowingly orders to be put into the automated data processing system 12% compound interest in Rhode Island under color of state law and through fraud on the court in knowing violation of the Rhode Island certified approved State Plan that mandates 3-6% simple interest under 42 U.S.C. § 654(21)(A), with her actions representing **four** failures and penalties in fiscal year **2024**.  See transcript **Exhibit F.**  Failure of compliance with all provisions of Title IV-D results in the State's loss of federal funding for Title IV-D and Title IV-A under Federal Law.  **See Exhibit E, Court Reporter Certified Transcripts of February 2, 2024 Title IV case hearing in this matter.**

**E. 2012 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES (and 2012 Priscilla Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and 42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 – OVER TWENTY FAILURES AND INCURRED PENALTIES in 2012 by and through POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES THROUGH FRAUD AND UNDER COLOR OF STATE LAW**

In order to cover up the flagrantly unlawful 12% compound interest that represents unlawful and fraudulently obtained and extorted under color of law Rhode Island State revenue through the Social Security Act in welfare cases, **Rhode Island Office of Child Support Services adopted the Official Policy not to pursue interest in interstate cases (in order to cover it up from federal authorities and other state authorities see 42 USC sec. 666(14) – cooperation with other states – EXHIBIT F  Attached hereto Rhode Island Office of Child**

Support Services **Official Written Policy** that was produced by RI OCSS during February 10, 2023 court ordered discovery. This policy document evidences the official policy of criminal and civil fraud by the State of Rhode Island's political subdivisions applicable under 42 U.S.C. § 654(1).

This policy evidences the routine extortions of noncustodial parents through the enforcement of 12% compound interest in-state under color of state law that incur penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences the political subdivisions of Rhode Island's concealment and cover up from out-of-state and federal authorities of the State's illegal extortion of 12% compound interest under color of state law by adopting an official policy <u>not to pursue interest</u> in out of state interstate cases that incurs penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences accounting fraud concealing 12% compound interest applied to certain selected out-of-state cases such as the Defendant's, as well as accounting fraud adjustments that conceal the 12% compound interest in in-state cases when submitting for Title IV-D and Title IV-A reimbursement to the United States.

The pattern of agency discussions and considerations of its illegal and criminal enforcement information with Barbara Grady is in itself an organized scheme involving schemes to commit accounting fraud and false

certification of Title IV-D accounts, in violation of, inter alia, **42 U.S.C. 654**

**(26)(A) that mandates the State Plan to have in effect safeguards, applicable**

**to all confidential information handled by the State agency, that are**

**designed to protect the <mark>privacy rights of the</mark> Texas Defendant.**

In 2012, Priscilla Glucksman, individually and on behalf of the Rhode Island

Office of Child Support Services, **under 42 U.S.C. 654(1), on oral motion moved**

**for 12% compound interest, that by Rhode Island's official policy should not**

**be pursued in this interstate Title IV-D case, with the intent and scheme to**

**commit accounting fraud and fraudulent certification of amounts due by**

**removing the 12% compound interest from the automated data processing**

**system in the anticipated event Rhode Island sends it to Texas authorities**

**and Federal authorities for enforcement under 42 U.S.C. 666 (14)**.  Priscilla

Glucksman schemed with Barbara Grady and Gero Meyersiek to orally move for interest

in order to minimize a paper trail of paper filings in this interstate Title IV case so that a

written record of the ordered 12% compound interest is buried within a one line of the

order, with no documentation of a written paper motion that would otherwise contain or

omit the State's legal justification moving for 12% compound interest in this interstate

Title IV-D case.  In 2012, Paul Dugan was alive and participated in the arrangement.

The symbiotic pliant Judge McCann readily complied under color of state law, knowing

fully well 12% compound interest is not enforceable in any state and definitely not

enforceable in Texas under Title IV-D, and knowing that Rhode Island Office of Child

Support Services intended to remove the interest amount if and when Rhode Island

sends to Texas for collection while falsely certifying the total amount due and then put

the interest back on the system and then file a subsequent motion to set interest arrears

back in Rhode Island through the symbiotic pliant family court political subdivision of

the State of Rhode Island before a symbiotic pliant judge like Judge McCann,

committing interstate fraud in violation of, *inter alia*, 42 U.S.C. sections 652-669, RICO,

wire fraud, mail fraud, tampering with government records and accounting fraud.  This

list of criminal codes violated by the Plaintiffs is not exhaustive.  Defendant shall

present a list of the violated federal criminal codes later in this motion under Section IV

of this motion.

**F. 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES (and 2012 Priscilla Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and 42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 and Title IV-A – OVER TWENTY ANNUAL FAILURES AND INCURRED PENALTIES in 2013-2024 by and through POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES THROUGH FRAUD AND UNDER COLOR OF STATE LAW**

Title IV-A TANF benefits are conditioned upon the State's compliance with ***all***

requirements of **42 U.S.C. § 654,** and from 2012 to 2024 and on-going, based on

violations in this case alone, Rhode Island has been and continues to be ineligible and

the State is receiving funds through false representations and alteration of government

records to procure federal funding.  From 2012 to 2024, Defendant has the information

to aver that the State of Rhode Island's political subdivisions under **42 U.S.C. § 654(1)**

sent by mail and by wire false accounts of amount due and of liens that contained Title

IV-D violative illegal and unenforceable 12% compound interest fraudulently

misrepresented as "child support due" to multiple institutions, including banks, credit

bureaus to Texas in violation of Texas Penal Codes that carry additional fines and jail

time.  Then Rhode Island Office of Child Support Services and the financial comptroller of the Rhode Island Judiciary and the State Treasurer's Office fraudulently concealed through removal and other false accounting itemizations the 12% compound interest when sending to United States Department of Health and Human Services for federal incentive payments payouts and federal funding payments under Title IV-D and Title IV-A.

The total Title IV penalties incurred, disgorgement due back to the United States for ineligible Title IV-D and Title IV-A funding, and criminal fines incurred by Rhode Island in this case alone from 2012 to 2024 run upwards of hundreds of millions of dollars.  From 2012 to 2024, Rhode Island's Title IV-D political subdivisions conspired to violate, in addition to 42 U.S.C. 654(21)(A), among others, several requirements under 42 U.S.C. 654 whose plain textual requirements requires the State Plan **MUST**:

**(7)** provide for entering into cooperative arrangements with appropriate courts and law enforcement officials and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering the plan, including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;

**(10)** provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;

**(14)**

**(A)**

comply with such bonding requirements, for employees who receive, disburse,

handle, or have access to, cash, as the Secretary shall by regulations prescribe;

**(B)**

maintain methods of administration which are designed to assure

that persons responsible for handling cash receipts shall not participate in accounting or

operating functions which would permit them **to conceal in the accounting**

**records** the misuse of cash receipts (except that the Secretary shall by regulations

provide for exceptions to this requirement in the case of sparsely populated areas where

the hiring of unreasonable additional staff would otherwise be necessary);

**(15)** provide for—

**(A)**

a process for annual reviews of and reports to the Secretary on the State program

operated under the State plan approved under this part, including such information as

may be necessary to measure State compliance with Federal requirements for expedited

procedures, using such standards and procedures as are required by the Secretary,

under which the State agency will determine the extent to which the program is

operated in compliance with this part; and

**(B)**

a process of extracting from the automated data processing system required by

paragraph (16) and transmitting to the Secretary data and calculations concerning the

levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 652(g) and 658a of this title;

**(16)**

provide for the establishment and operation by the State agency, in accordance with an (initial and annually updated) advance automated data processing planning document approved under section 652(d) of this title, of a statewide automated data processing and information retrieval system meeting the requirements of section 654a of this title designed effectively and efficiently to assist management in the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan

**(20)**

**provide, to the extent required by <u>section 666 of this title</u>,** particularly the Due Process protections, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws.

**(23)**

provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services

and a telephone number or postal address at which further information may be obtained

and will publicize the availability and encourage the use of procedures for voluntary

establishment of paternity and child support by means the State deems appropriate

### G. COVER UP AND FRAUD

In 2012, the child in question was 12 years old.  From 2012 to 2018, Defendant

does not have any records (due to several prior Title IV-D information denials by the

Rhode Island Office of Child Support Services for purposes of cover-up, that further

incurred penalties and fines for each and every information denial under 42 USC

654(24) and 42 USC 654(27) and 42 USC 655) of Rhode Island's political subdivisions

under 42 USC 654(1) sending to Texas or to federal authorities the support amount for

enforcement under 42 USC 654(7) or 42 USC 666(14).  Obviously, sending the support

amount in the automated data processing system without the removal of the interest

from the system exposes the illegal 12% compound interest disallowed under 42 USC

654(21)(A), which would incur Title IV-D and Title IV-A penalties, disgorgement of

ineligible federal funds and incur criminal fines.  It is for this very reason that the Rhode

Island political subdivisions adopted the written official policy not to pursue interest in

interstate cases, that moreover runs afoul of 42 USC 654(21)(A) plain language that the

State Plan must apply UNIFORM interest on overdue support, not State-targeted 0% in

some interstate cases and then 12% compound interest in all other cases, such as in this

case.  Moreover, if the State claims they actually did send notices of support due to the

Defendant in Texas, each transmission would constitute patterns of federal crimes,

including Mail Fraud, since the 12% compound interest in this Title IV-D case is illegal

and fraudulent and unenforceable.  This scheme is in violation of 42 USC §§ 654(7),
(10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions under 42
USC 654(1) also transmitted by wire and by mail to the United States Department of
State a hold on the renewal of Defendant's passport, again omitting and concealing the
principle amount as well as the fact that the State attempts to enforce interstate an
illegal 12% compound interest on overdue support.  This scheme is in violation of 42
USC §§ 654(7), (10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions made the
illegal decision between top management employees of the Rhode Island SDU unit,
dressed up as "administrative decision," to illegally and criminally remove the illegal
12% compound interest from the automated accounting data processing system that
clearly is required to prevent activities "**to conceal in the accounting records**"
**Rhode Island's** illegal 12% compound interest prescribed under 42 U.S.C. § 654(14).
*See* TRAC records attached hereto in **Exhibit B**.

Upon information, Rhode Island routinely removes the illegal 12% compound
interest from the automated data processing system when reporting to the Secretary of
the United States Department of Health and Human Services in violation of 42 USC §§
654(10), (14), (15), (16), (20), (21), (23), (24), (27), and applicable federal criminal
codes.  See TRAC records attached hereto in Exhibit B of the routine practice of illegal
accounting adjustments of the automated data processing system in the hundreds of
thousands of dollars in December 2021 alone.  In this case alone, the aforesaid
accounting fraud and record tampering violations motivated by theft of the Title IV-D

and Title IV-A programs and defraud of the Texas Defendant targeting Texas properties occurred in 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021, 2022, 2023, and 2024.

## II.    FACTUAL ALLEGATIONS

The child in question was emancipated in April 2018 and is now an adult 24 years old.  Therefore accrued "interest on overdue support" stopped in April 2018.

Due to the hold placed on Defendant's passport renewal, Defendant discovered on and around November 2021 there is alleged support due.  Defendant retained a lawyer in Texas to contact the Rhode Island Office of Child Support Services to obtain information on the amount due.  The Rhode Island Office of Child Support Services refused to provide information to Defendant's Texas attorney, in violation of 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), and concealed the fact that the agency illegally removed the illegal 12% compound interest amount from the automated data processing system from 2018 to December 2021.  To this day, the Rhode Island Office of Child Support Services covers up and refuses to furnish information to the Defendant the amount of interest that was removed from the system.  Continuing refusal to furnish requested information motivated by cover up is in violation of, *inter alia*, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).  The Office of Child Support Services and Barbara Grady and Gero Meyersiek schemed to deprive Defendant of counsel that would facilitate defrauding the Defendant and to conceal from Texas counsel the accounting fraud relating to the illegal 12% compound interest that is unenforceable in Texas as well as legally unenforceable in Rhode Island (however

routinely enforced through fraud under color of state law) under Title IV-D, and refused to deal with Defendant's Texas attorney, fraudulently claiming it is the State's policy to deal with the noncustodial parent directly.  This is obviously a blatant lie because the TRAC record shows Kevin Tighe initiating phone calls directly to Barbara Grady, Gero Meyersiek's private attorney (and not contacting Gero Meyersiek directly) to discuss enforcement actions in detail involving the Rhode Island Office of Child Support Service's fraudulent accounting that entailed the agency's removal in 2018 (when it planned to send to Texas) of the interest from the automated system in December 2021.  This is in violation of, *inter alia*, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).  The Defendant avers and declares, under oath, the following facts:

1. On December 6, 2021, the State/Plaintiff showed the Defendant her OCSS online account that showed $0.00 under interest.  Further the online account that is populated by the automated data processing system shows $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Defendant, as of November 30, 2021. See attached Screen Shot attached hereto this motion.  (The Office of Child Support Services told the Defendant that the $0.00 under interest shows that Gero Meyersiek waived interest.  The Office of Child Support Services deliberately misrepresented by omission that the interest amount was taken off the system illegally in 2018 and that the interest amount was calculated pursuant to an illegal 12% compound interest that is unenforceable under Title IV-D.  Therefore in reality there was no consideration given to the Defendant, as falsely represented, calculated to induce the Defendant into

paying a large lump sum amount. The Office of Child Support Services

brokered a settlement deal between the Defendant and Gero Meyersiek where

Meyersiek waived interest in consideration of the Defendant paying a lump

sum payoff amount of $104,185.98 from Texas, which the State, under its

authority, agreed to the deal with the Defendant on December 7, 2021, having

calculated the $104,185.98 figure by and through its accountant(s) manually

offline and not by the mandated automated data processing system, and

actively brokered the terms of the deal itself, namely, Deputy Legal Counsel

Kevin Tigue who reports to Mr. Paul Gould, the attorney of record who filed

the State's/Plaintiff's Motion to Set Arrears.   The Defendant requests this

Court to take notice of the fact that the State also failed to provide this Court

as well as to the Defendant an accounting now and upon Defendant's request

at the time in 2021 of how this figure $104,185.98 was calculated nor how the

alleged $81k is calculated.  This is in violation of, *inter alia*, 42 USC §§ 654b,

654(10), (14), (15), (16), (20), (21), (23), (24), (27).

2. The State's/Plaintiff's' authority to forgive arrears debts is an official policy

   and authority reported to the Office of the U.S. Commissioner Tangular Gray

   of the Office of Child Support Enforcement of the U.S. Department of Health

   and Human Services.

3. The Defendant in Texas good faith accepted and paid the $104,185.98 on

   December 7, 2021.

4. From December 6, 2021 to the present, the State/Plaintiff has represented to

   the Defendant at least seven (7) sets of books of very large arrears and interest

calculations, which the State/Plaintiff has either failed or refused to provide the Defendant with requested documentation of debt validation and verification records supporting the State's calculation (in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27)):

a. $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Defendant, as of November 30, 2021. (Screenshot of this taken on December 6, 2021 is attached to this Motion).

b. $104,185.98 Total Payoff Amount on December 7, 2021.

c. $75,638.00 on a Notice of Intent to Lien dated March 3, 2022.  RI OCSS rescinded this figure based on alleged unspecified errors on October 14, 2022.

d. $73,000.00 per RI OCSS Deputy Chief Counsel John Langlois's (staff counsel who also reports to Mr. Paul Gould, who was also the attorney of record for the State at the Appeals Hearing) representation at the agency RI EOHHS (Rhode Island Executive Office of Human and Health Services) administrative appeal Pre-hearing held on October 5, 2022.

e. $55,000.00 on RI OCSS correspondence with Meyersiek on October 13, 2022.

      f.   $75,623.71 Total Due for "Interest," online on the afordsaid OCSS

          online account, as of November 30, 2022.  A screenshot taken on

          December 3, 2022 thereof is attached to this Motion.

      g.   $81,652.46 on the Motion as of December 22, 2022.

5.  Maintaining at least seven books of account in Defendant's case file, while

     obstructing the Defendant's 42 USC 654b and all Title IV-D protected due

     process right to documents of accounting validation and verification depriving

     the Defendant's right to meaningfully refute the State's claim is unlawful,

     covers up the illegal 12% compound interest that is also ballooned through

     several fraudulent manual accounting calculations NOT USING the Title IV-D

     mandated automated data processing system.  There are pending breach of

     contract, fraud and Civil RICO et al actions in Federal Courts regarding the

     conduct of the Plaintiffs.

6.  The Defendant respectfully requests the Court to take notice of the fact that

     the alleged interest published online by the State/Plaintiff as of November 30,

     2022 that states the very specific number of $75,623.71 ballooned to

     $81,652.46 as of December 22, 2022, by a whopping $6,028.75 in a matter of

     22 days as stated in the State's/Plaintiff's Motion, is usurious, and clearly

     shows the falsity of the State's/Plaintiff's Motion, paragraph numbered 8 that

     says, "That, because interest only accrues on principal balances and not on

     interest balances, the interest balance owed on arrears has not changed since

     the principal balance was paid in full on December 9, 2021."  This is in

violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

7. The Defendant avers it is nigh on impossible for the Defendant to be able to respond to the State's/Plaintiff's Motion and their unverified and unvalidated seven (7) books of accounts represented by the State/Plaintiff since December 6, 2021 to as of December 22, 2022, where the State's/Plaintiff's calculations of very large amounts have been clearly either refuted and rescinded or have shown to be inaccurate or false. This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

8. The Defendant respectfully requests the Court to take notice of the fact that after the Defendant accepted the deal in Texas and paid the payoff amount of $104,185.98 from Texas on December 7, 2021, the State/Plaintiff sent to the Defendant in Texas by Mail a Notice of Intent to Lien dated March 3, 2022 for $75,638.00 without any information justifying the fraudulent interest lien on Defendant's Texas properties – the $75,638.00 amount on the fraudulent lien on Defendant's Texas properties was deliberately calculated manually then hard input into the automated data processing system in violation of Title IV-D. This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Defendant appealed this fraudulent lien to the Appeals Office of Rhode Island Executive Office of Health and Human Services ("RI EOHHS"), a political subdivision of the State of Rhode Island applicable under 42 USC 654(1), on April 1, 2022. Throughout the procedurally defective appeals process where the Defendant was denied by the

State/Plaintiff to access her case file, the State/Plaintiff refused or ignored the Defendant's over ten(10) record requests for the legal and accounting basis of the $75,638.00 lien.  Each record information denial is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Defendant also submitted to the Appeals Office records of the written email advisement by the State/Plaintiff that "accounting says" to pay $104,185.98 and records of the Defendant's bank wire transfer payment.  The Appeals Office continued the hearing for the maximum 3 times due to the State/Plaintiff's refusal to comply with discovery that would render the proceeding procedurally defective.   Paul Gould and John Langlois were listed as representing the State.  Their collective violations incur penalties and fines under, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 655, 658a, Title IV-A. To resolve the discovery issues, the Executive Hearing Officer ("EHO"), Debra DeStefano, scheduled a telephonic Prehearing Conference on October 5, 2022, and only when told by the EHO the burden of proof lies on the State/Plaintiff to show arrears are due (as applies here), did John Langlois (who attended the Prehearing Conference) state the following, which the Defendant in Texas recorded as a party of the call:

"EHO: The agency will have to submit proof of the allegation for arrears to support their position.

Langlois: The reason why I asked earlier whether Mary spoke to Karla after she made the payment was because there was a change of circumstances right after that. I don't know if anyone in my agency had ever explained that to Mary.

Seguin: Wait a minute, wait a minute,

EHO: Wait Mary, I know what you asked for, let me get to what John just said, so John, you said there was a change in circumstances subsequent to her making a payment but before the notice of lien went out?

Langlois: Yeah.

EHO: OK, so...

Langlois: Can I just back up and explain what happened, 99% of this is a misunderstanding...

EHO: OK?

Seguin: Including what was on the screenshot, was that a misunderstanding??

Langlois: Can I speak without being shouted over?

Seguin: I am flabbergasted, really.

Langlois: What happened in this case is when Mary's representative, her attorney, called us in late November 2021, and said she wants her passport released and what does she have to do to release her passport, they put her in touch with Karla who gave her the $104,185.98 number. Where that number came from, was one of our attorneys contacted the custodial parent, Gero Meyersiek, so we contacted his attorney, it wasn't me, it was someone in my office, and said if she's willing to make a $104K to

pay off the principle, would you agree to waive the $73K in interest? He said yes.  So Karla notified Mary that if she paid the $104K, it would be paid in full because he was willing to waive the interest and accept just the principal.  What happened was the day after Karla spoke to Mary to wire in the $104K the attorney for Mr. Meyersiek contacted us again and said he changed his mind, please put the interest back on the system, so we did.  So the number that was given to her on the day it was given to her was correct, the $104K, because he was waiving the interest, but then changed his mind, so we put the interest back on the system, because he was waiving the interest, and that interest was put back on the system and that's why the system is now saying she owes $73K.  That's why in March when the system saw that she had some sort of personal injury insurance in the system, our system was showing she owed $73K so we issued the lien.  But that was what happened, he changed his mind the next day and that's what messed up the numbers. So that's how all this happened, it was a pure misunderstanding, I don't know whether anyone has ever explained that to Mary how that happened.

EHO: OK, Mary, did anyone ever explain that to you before?

Seguin: No. No one ever explained any of that.  This is why I am asking for my case file, I think this is more basis to ask for my entire case file from 2020.  It's news to me for example and its new information to me that your office's lawyer would not talk to me directly but would be picking up the phone and calling the attorney for the custodial parent.  And then not saying you were doing this deal.  I never offered $104K.  You had determined this number, and that's why I am looking for documentation as to whether this is something you guys do in every case.

EHO: OK, John, are you intending to submit then, the documentation showing the full balance, which would include the principle and the interest before she paid the $104k, and then what happened after, you're prepared to submit documentation to show everything that you said just happened.

Langlois: Yes. I can show the account balance before he agreed to waive the interest. And I can show you the account balance after she made the payment. And then when we put the interest back on the system.

EHO: And you're going to testify as to why it all occurred, I mean basically what you just told us.

Langlois: Yes.

Seguin: But the screenshot on December 6th showed $93K."

A true copy of the recording evidence has been submitted by the Defendant to this court, a Rhode Island political subdivision under Title IV-D proceeding in June 2023 and in February 2024.

However, instead of going forward with the testimony and providing the alleged debt validation and verification accounting records promised by John Langlois to the EHO at the upcoming RI EOHHS scheduled Appeal Hearing at the time on December 1, 2022, the State/Plaintiff opted to rescind the Notice of Lien that states there are unspecified errors on October 14, 2022, and emailed the RI EOHHS Appeals Office that the State/Plaintiff will litigate the issue in Family Court. This showed the intent of the State/Plaintiff to deprive the agency Appeals Office of jurisdiction by withdrawing the enforcement instrument that vests the Appeals Office's jurisdiction by regulation, in the

clear hope of a more favorable outcome to the State/Plaintiff, in the hopes of symbiotic and pliant judge shopping, in the hopes of getting a judge like McCann who ordered the illegal and unenforceable 12% compound in a Title IV-D case to rubber stamp the fraudulent 12% compound interest arrears due, and thereby needlessly increasing litigation. Mr. Paul Gould is the co-counsel of record for the State/Plaintiff in the RI EOHHS agency appeal. This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 655, 658a.

9. The State's/Plaintiffs' actions and the State's/Plaintiff's Motion needlessly extending the agency appeal to Family Court litigation and obstructing Defendant's discovery rights for debt validation and verification as well as documentation of the Plaintiffs' waiver of interest are violative of Family Ct. R. Dom. Rel. P. 11 and are in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a. It is in criminal violation of 18 USC § 666 and a scheme to commit fraud on the court and interstate fraud through unenforceable Title IV-D orders that appear to be routinely issued by pliant Title IV-D judges like Judge John McCann III and Magistrate Susan Nahabedian.

10. Due to the State's/Plaintiff's conduct of obstructing the Defendant's right to access debt validation and verification records of publicly noticed liens of alleged arrears issued by the State/Plaintiff throughout the agency appeal, the Defendant filed an Access to Public Records ("APRA") request to the then Secretary Ana Novais of the RI EOHHS that manages the State/Plaintiff

agency OCSS.   These are all political subdivisions of the State of Rhode Island under 42 USC 654(1).

11. The RI EOHHS Office in its management capacity required the State/Plaintiff OCSS to respond to the APRA request, but even then the State/Plaintiff **denied the Defendant's APRA request for accounting records**, again refused to release the requested debt validation accounting records, but released the Case History Tracking records in the Defendant's case file, which showed entries made by Kevin Tigue and RI OCSS staff between December 6, 2021 to April 2022 of activity that corroborated John Langlois's representations of taking interest off the system, interest waiver at the agency Prehearing Conference on October 5, 2022 that is outlined above in paragraph 10, then putting interest back on the system after Defendant accepted the offer in Texas, and performed on the contract in Texas paying off all due support from Texas, through Defendant's Texas bank account, namely Texas properties.  Plaintiffs' record denials are violations of *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

12. Both the RI OCSS counsel who denied the Defendant's APRA request and the Executive Legal Counsel of the Secretary of RI EOHHS, Lisa Martinelli (to whom Ms. Deb Barclay reports and to whom Mr. Paul Gould reports, per organization charts supplied by the Secretary of State of the State of Rhode Island) informed the Defendant via official written letter correspondence to appeal RI OCSS's APRA request denial to the Attorney General pursuant to

R.I.G.L. sec. 38-2-8. Their collective denials are in violation of *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a. Following their collective official written advisement, the Defendant appealed the RI OCSS APRA denial under R.I.G.L. sec. 38-2-8 to the Office of the Attorney General and the Superior Court as provided by R.I.G.L. sec. 38-2-8. The Office of the Attorney General and the Superior Court of are political subdivisions of the State of Rhode Island under 42 USC 654(1). Instead of releasing the Defendant's Title IV-D alleged debt validation and verification records information, the State/Plaintiff continues to resist releasing alleged arrears/debt verification accounting records in Superior Court, including failing to comply with the Defendant's Court-issued subpoena for said records and resisting subpoena compliance with extended litigation in Superior Court in violation of *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

   a. The Defendant served the State/Plaintiff by email Defendant's Request for Production of Documents for the same accounting records and interest waiver records pursuant to Family Ct. R. Dom. Rel. P. 34, to which the State/Plaintiff has so far produced one set of book of accounts of the seven different books of accounts. However, the numbers do not corroborate with any of the seven official legal representations of alleged arrears due, e.g., $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Defendant, as of November 30, 2021;

$104,185.98 Total Payoff Amount on December 7, 2021; $75,638.00 on a Notice of Intent to Lien dated March 3, 2022 that RI OCSS rescinded based on alleged unspecified errors on October 14, 2022; $73,000.00 per RI OCSS Deputy Chief Counsel John Langlois's (staff counsel who also reports to Mr. Paul Gould, who was also the attorney of record for the State at the Appeals Hearing) representation at the agency RI EOHHS (Rhode Island Executive Office of Human and Health Services) administrative appeal Pre-hearing held on October 5, 2022; $55,000.00 on RI OCSS correspondence with Meyersiek on October 13, 2022; $75,623.71 Total Due for "Interest," online on the aforesaid OCSS online account, as of November 30, 2022.  A screenshot taken on December 3, 2022 thereof is attached to this Motion; $81,652.46 on the Motion as of December 22, 2022; this is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a that is consistent with the State/Plaintiff's pattern of obstructing the Defendant of due process right access to her case file records of RI OCSS's debt verification itemized accounting calculations of very large sums of alleged arrearages of at least 7 books of accounts from December 6, 2021 to the present in Title IV-D proceedings.

III.    **JUDICIARY VIOLATION OF GOVERNMENT EDICTS DOCTRINE, CALCULATED FAILURE TO INTEGRATE TITLE IV-D AGENCY ELECTRONIC FILING SYSTEM WITH ODYSSEY MAKING THEIR FILINGS INVISIBLE TO ALL E-COURT USERS OTHER THAN THE JUDGE AND THEMSELVES AND VIOLATION OF ACCESS TO COURT INFORMATION OF PUBLIC TITLE IV-D PROCEEDINGS IN RHODE ISLAND'S STATEWIDE ELECTRONIC COURTS**

### A. DENIAL OF PUBLIC AND PRO SE-LITIGANT ACCESS TO COURT INFORMATION INCLUDING JUDGE-CREATED LAWS BY 42 USC 654(1) POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY

The Rhode Island Judiciary is a political subdivision of the State of Rhode Island under 42 USC 654(1). While publicizing during the implementation of the $6 million installation of Odyssey (the statewide electronic filing system) in 2014 that the electronic courts will enable ALL court users to pull up court record information with ease from their phones, the Rhode Island Judiciary quietly implemented Rule 5 of the Rhode Island Rules and Practice denying the Public, pro-se litigants and all parties to a case in Rhode Island remote access to court record information including judge-created orders and laws, including their own. Through this deceit, the Rhode Island Judiciary lied to the Public, while denying access and thereby covering up the routine ordering of unenforceable body of judge-created laws ordering 12% compound interest in public cases and public hearings under 42 USC 654 in public Title IV-D cases, such as this one, by symbiotic pliant judges like Judge McCann and Magistrate Nahabedian. The denial of access to pro-se litigants of their own cases' court records containing support orders violates, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a. The denial of public access to public court records documenting the routine systemic violations of 42 USC 654(21)(A) in electronic courts violates the First Amendment and the public's right to know the law, even if these fraud on the court unenforceable judge-created laws are unenforceable in both Rhode Island and elsewhere Title IV Part D reaches. The denial of public access to judge-created laws that is also motivated by cover-up fundamentally violates the established Government Edicts Doctrine that the United States Supreme Court specifically held applies to electronic

formats of government doctrines, such as judge-created laws in digital courts. *See*

***Georgia v. Public Resource.Org, Inc***., No. 18-1150, 590 U.S. ____ (2020).  The

Defendant has been denied access by the political subdivision Rhode Island Judiciary to

her court records and information regarding the orders in question that must be

furnished pursuant to 42 USC 654b thus in violation of 42 USC 654.  The Defendant has

been denied access by the political subdivision Rhode Island Judiciary to unenforceable

judge-created laws that routinely establish unenforceable 12% compound interest by

certain symbiotic pliant judges, like Judge McCann and Magistrate Nahabedian, who

work hand-in-hand with the Rhode Island Office of Child Support Services in Title IV-D

cases, in violation of Defendant's Due Process and Equal Protection rights to know the

law to be meaningfully heard and right to meaningful access to justice – they are in

violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23),

(24), (27), 666, 655, 658a.

This Court held at the hearing in this matter scheduled on March 6, 2023 that the

Rhode Island Office of Child Support Services is ordered to show that the alleged arrears

is accurate.  *See* attached March 6, 2023 hearing transcript.   Explicitly stated

throughout 42 USC 654, "accuracy" requires no accounting alterations generated offline

then hard input into the automated system, no fraud, no inducements, no interstate

extortion under color of state law, and for certain no 12% compound interest on overdue

support.

**B. CALCULATED FAILURE BY THE JUDICIARY TO INTEGRATE THE
TITLE IV-D AGENCIES' ELECTRONIC FILING SYSTEM INTO ODYSSEY
RESULTING IN AGENCY FILINGS BEING INVISIBLE TO ALL COURT
USERS EXCEPT THE JUDGE AND THE AGENCIES THEMSELVES – COVER
UP**

Because under the State's Plan the Title IV-D agencies routinely file in the Rhode Island court system for the illegal enforcement of illegal 12% compound interest disallowed under 42 USC 654(21)(A), the political subdivision Rhode Island Judiciary deliberately failed to integrate the Title IV-D Agencies' electronic filing system with the State's electronic filing system Odyssey in order to make Title IV-D Agency electronic filings invisible to all court users except the judge and the agencies themselves, calculated to cover up the 12% compound interest from audit by the federal authorities and from the Public. This came to light at the WebEx hearing in this Title IV-D matter before Judge Merolla on June 8, 2023 scheduled at 2PM, where Judge Merolla, showing he was unaware of the failure of systems integration, questioned Paul Gould of Rhode Island Office of Child Support Services, why Defendant is unable to see the agency's electronic filings that the judge can see in the system. Without hesitation, Paul Gould explained that this is due to the electronic court implementation process that was supposed to integrate the agency's legacy system to Odyssey, demonstrating conclusively that Gould, the Lead Counsel of the Rhode Island Office of Child Support Services responsible and overseeing agency court filings in Title IV-D cases, undisputedly was in the know and part of the conspiracy involving the deliberate failure of filing system integration and its continuing perpetration in Title IV proceedings that made Title IV agencies' filings invisible as part of the cover up.

**C. FALSIFYING ACCOUNTING TO SHOW $0.00 PAYMENT IN DECEMBER 2021 in DEFENDANT'S TITLE IV-D ACCOUNT POWERED BY THE AUTOMATED DATA PROCESSING SYSTEM IN ORDER TO DEFRAUD DEFENDANT IN THE FUTURE**

Defendant attaches hereto **EXHIBIT G**, that shows the Defendant's online Title IV-D OCSS account which is powered by the Automated Data Processing System, as of November 2022 at the time of the RI EOHHS Appeal, which showed **$0.00 Payment for December 2021**.  Therefore, the Rhode Island Office of Child Support Services through accounting fraud never recorded, as late as November 2022, in the Automated Data Processing System Defendant's large lump sum payoff of $104,185.98 bank wired from Texas on December 7, 2021, showing prima facie accounting fraud.  This shows a scheme to defraud the Texas Defendant in the future.  This shows that the Rhode Island Office of Child Support Services received Defendant's wired funds and treated it as a cash receipt, without ever recording in the automated data processing system such a large lump sum payment.  Kevin Tighe, Barbara Grady, Gero Meyersiek, John Langlois, Paul Gould, and Priscilla Glucksman, among others, distributed the $104,185.98 among themselves in their organized conspiracy to defraud.  Defendant's lump sum payment was distributed allegedly via a check, not through the usual cash card on December 9, 2021, (see attached hereto TRAC record for December 2021) record information of which check that was allegedly issued by the Office of Child Support Services the agency refuses to furnish the Defendant, and which are under subpoena now.  Further, the Office of Child Support Service's maintaining a separate offline accounting system in this case constitutes fraud and accounting fraud, targeting the Defendant in Texas, targeting Texas properties and targeting the United States of America.  This is why they never utilized the 42 USC 654(7), (14), (20) and 42 USC 666(14) cooperative system with Texas, so as to enable them to divide the defrauded cash spoils offline among the members participating in the scheme.  This accounting fraud and scheme to defraud

violate mail fraud, wire fraud, honest services fraud, RICO, record tampering, theft of the United States, and felonious fraud, among others.

In reality, under 42 USC 651-669, employees who engage in, aid and abet and facilitate the above must be terminated and must not be permitted to continue criminal activities of record tampering, accounting fraud, fraud, theft under color of state law and cover up.

### IV.    CRIMINAL VIOLATIONS REPORTED TO SOME JUDGE OF THE UNITED STATES AND OTHER LISTED AUTHORITIES UNDER 18 U.S.C. sec. 4

The Defendant, in good faith and reliant on the plain language of 18 USC § 4, misprision of felony, as well as the Brief filed in the United States Supreme Court by the United States of America in the Supreme Court case, *Turner v. Rogers*, 564 U.S. 431 (2011) that showed South Carolina (found by the 4th Circuit Court of Appeals) liable for $75 million in penalties for that state's 42 USC 654 violations that did not even involve, *inter alia*, fraud and tampering with the record or unlawful 12% compound interest put into then taken off then put back on the automated data processing system as here in Rhode Island, made known the above activities to "some judges" of "the United States" and other relevant federal authorities – counting among the United States judges Defendant made known publicly in the Amended Complaint filed in the United States District Court for the District of Rhode Island, Judge William E. Smith. The issue of what Judge Smith has done with the information "made known to him" is pending before the United States Court of Appeals for the First Circuit before a requested panel of judges under the federal law of civil procedure. Therefore, under 18 USC 4, the above

reported activities have been "made known" to several high ranking judges of the United States.

## A. VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Defendant made known to the panel of judges of the United States allegations contained in the Amended Complaint filed in Federal Court of the commission of acts by the Rhode Island political subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein in this motion, the afore-described acts violating 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 – such violative acts by the Plaintiffs in this matter, along with the political subdivisions and employees thereof named in the federal matter, and/or Judge Smith on this list are not exhaustive.  It is undisputable, among others, that Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-D and Title IV-A disgorgement is due from the applicable State of Rhode Island's political subdivisions.

## B. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF AMERICA v.*
*DONALD J. TRUMP*, DC Circuit, the DC Circuit United States Court of Appeals reminds
the Public and all applicable tribunals that Judges are similarly liable to the criminal
laws for their official acts.  A notable example is *Ex parte Commonwealth of Virginia*, in
which the Supreme Court affirmed the criminal indictment of a judge based on an
official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for
violating a federal statute that prohibited discriminating on the basis of race in jury
selection. *Id*. at 340, 344. The Supreme Court began by observing the principle that
officers are bound to follow the law: "We do not perceive how holding an office under a
State, and claiming to act for the State, can relieve the holder from obligation to obey the
Constitution of the United States, or take away the power of Congress to punish his
disobedience." *Id*. at 348. The Court then addressed the judge's argument that the Court
lacked the authority to punish a state judge for "his official acts." *Id*. Its response was
twofold. First, the Court described juror selection as "merely a ministerial act, as much
so as the act of a sheriff holding an execution, in determining upon what piece of
property he will make a levy, or the act of a roadmaster in selecting laborers to work
upon the roads." *Id*. The Court then explained that even if juror selection is considered a
"judicial act," <u>the judge had a legal duty to obey the criminal laws</u>:

> "But if the selection of jurors could be considered
> in any case a judicial act, can the act charged
> against the petitioner be considered such when
> he acted outside of his authority and in direct
> violation of the spirit of the State statute? That
> statute gave him no authority, when selecting

jurors, from whom a panel might be drawn for
a circuit court, to exclude all colored men
merely because they were colored. Such an
exclusion was not left within the limits of his
discretion. It is idle, therefore, to say that the
act of Congress is unconstitutional because it
inflicts penalties upon State judges for their
judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute" is to
the Virginia law charging the county judge with the duty to select jurors in the circuit
and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are
not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed
the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief
brought against a county magistrate and associate judge of a county circuit. 414 U.S.
488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction
was not the only available remedy because both judges remained answerable to the
federal criminal laws:

[W]e have never held that the performance of
the duties of judicial, legislative, or executive
officers, requires or contemplates the
immunization of otherwise criminal deprivation
of constitutional rights. On the contrary, the
judicially fashioned doctrine of official
immunity does not reach 'so far as to immunize

>    *criminal conduct proscribed by an Act of*
>    *Congress . . . .'*

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See* also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493

F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled

on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not

immune, and employees of the political subdivisions of Rhode Island under 42 USC

654(1) similarly are not immune.  Barbara Grady and Gero Meyersiek are

unquestionably liable.

## V.    CONCLUSION

**Under 42 USC 654b, the Defendant is entitled to be furnished all subpoenaed records – conversely, the Rhode Island Office of Child Support Services, the SDU under the State's Plan under 42 USC 654, must furnish all subpoenaed information – refusal of which incurs another penalty.**

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or

designee-Judge Merolla of this Honorable Court to:

1. Grant the Defendant's Motion to Compel.

2. Grant the Defendant's request for her Title IV record information that

   includes record information relating to the "TRAC notes of 12/6/2021 and

   12/7/2021" as well as relating to the substance of John Langlois's audio

   recorded October 5, 2022 statements regarding "what happened in this case"

   that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the

   Child Support Services that Gero Meyersiek said yes, he "agreed to waive the

   $73k or $75k that are in arrears" as of December 6, 2021 and October 5, 2022

   which are part of Defendant's child support case file.

3. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request.

4. Order a hearing on the herein issues raised in this matter.

5. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here:

   https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

6. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

March 21, 2024

FOR DEFENDANT

MARY SEGUIN, Pro Se.

By: *Mary Seguin*

Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

**NOTICE OF HEARING**

Please take notice that the foregoing Motion will be called for hearing before the Rhode Island Family Court, One Dorrance Plaza, Providence, RI 02903 at 10:00 AM on March 28, 2024 (case is already scheduled for that date/time) by WebEx hearing https://ricourts.webex.com/meet/garrahy5F

## CERTIFICATION

I hereby certify that a copy of the within Motion was filed on March 21, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

*Mary Seguin*

Exhibit A



# STATE OF RHODE ISLAND

## FAMILY COURT

### SUBPOENA - CIVIL

| Plaintiff | Civil Action File Number |
|---|---|
| STATE OF RHODE ISLAND EX REL. GERO MEYERSIEK | K2001- 0521M |
| Defendant |  |
| MARY SEGUIN |  |

| ☐ Murray Judicial Complex | ☐ Noel Judicial Complex |
|---|---|
| Newport County | Kent County |
| 45 Washington Square | 222 Quaker Lane |
| Newport, Rhode Island 02840-2913 | Warwick, Rhode Island 02886-0107 |
| *(401) 841-8340 | *(401) 822-6725 |
| ☐ McGrath Judicial Complex | ☑ Garrahy Judicial Complex |
| Washington County | Providence/Bristol County |
| 4800 Tower Hill Road | One Dorrance Plaza |
| Wakefield, Rhode Island 02879-2239 | Providence, Rhode Island 02903-2719 |
| *(401) 782-4111 | *(401) 458-3200 |

TO: JOHN LANGLOIS, KEVIN TIGHE; PAUL GOULD, FRANK DIBIASE
of RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES 77 DORRANCE ST PROVIDENCE RI 02903

☑ **YOU ARE HEREBY COMMANDED** to appear in the Family Court listed above at the date, time, and courtroom specified below to testify in the above-entitled case and bring with you:

① ALL RECORDS, FILES, NOTES, PUBLIC RECORDS, DOCUMENTS, FILMS, MATERIALS GENERATED IN THE COURSE OF ADMINISTRATION OF AND ENFORCEMENT OF RELATING TO DEFENDANT MARY SEGUIN, FROM 2010 TO THE PRESENT, IN THIS TITLE IV-D CASE UNDER THE SOCIALSECURITY ACT

② ALL RECORDS RELATING TO DEFENDANT MARY SEGUIN FROM 2010 TO THE PRESENT, INCLUDING NOTES AND MESSAGES TAKEN AND GENERATED ON OCTOBER 5, 2022.

| Courtroom | Date | Time |
|---|---|---|
| GARRAHY COURTROOM 5F | MARCH 28, 2024 | 9:30 AM |

If you need language assistance, please contact the Office of Court Interpreters at (401) 222-8710 or by email at interpreterfeedback@courts.ri.gov before your court appearance.

* If an accommodation for a disability is necessary, please contact the Family Court Clerk's Office at the telephone number listed above as soon as possible. TTY users can contact the District Court through Rhode Island Relay at 7-1-1 or 1-800-745-5555 (TTY) to voice number.

Page 1 of 2

FC-73 (revised June 2020)

Exhibit B

11:28:47 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL ASMXA201
            TRAC.00              CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION      COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (███████████████████). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $_____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:           SEGUIN        MARY       CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK     GERO    K  PNL:
```

Case Number K20018321M
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10 13 PM
Envelope 4132704
Reviewer Maria O.

11:28:56 Tuesday, December 13, 2022

12/13/22   11:28          C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00              CASE HISTORY                  U824   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT.

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSIDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES

RL: 80  12 22 ABSP:          SEGUIN       MARY         CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK    GERO     K   PHL:

Case 23-1907  Document: 00118129833  Page: 249  Date Filed: 03/27/2024  Entry ID: 6636800
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

| | | | |
|---|---|---|---|
| 12/13/22 | 11:29 | **C A S E   T R A C K I N G** | CSCL  ASMXA201 |
| | TRAC.00 | CASE HISTORY | U824  PROD |

**STARTING DATE** 09 01 2021
**SELECTION** COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSIDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTEREST
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
        FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID: ▬▬▬▬▬
        FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

| | | | | |
|---|---|---|---|---|
| RL: 80  12 22 ABSP: | SEGUIN | MARY | | CMD: _____ |
| FWX: TRAC  D CLIENT: | MEYERSIEK | GERO | X | PNL: |

Case Number: 2021-987M
Filed in Providence/Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4332704
Reviewer: Maria G.

11:29:33 Tuesday, December 13, 2022

```
12/13/22   11:29          C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00                CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

```
RL: 80  12 22 ABSP:            SEGUIN       MARY         CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK    GERO    K    PNL:
```

ed in Providence/Bristol County Family Court
ibmitted 6/1/2023 10.13 PM
ivelope: 4132704
iviewer: Maria O

11:29:09 Tuesday, December 13, 2022

```
12/13/22    11:28         C A S E   T R A C K I N G        CSCL   ASMXA201
            TRAC.00              CASE HISTORY              U824   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN___
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
       TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
       58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS___
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:              SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK   GERO     K    PNL:
```

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00            CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR. RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
    TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
    58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

RL: 80  12 22 ABSP:              SEGUIN      MARY          CMD:
FNX: TRAC  D CLIENT:            MEYERSIEK    GERO     K    PNL:
```

Case Number: K20010521M    Document: 00118129633    Page: 223    Date Filed: 03/27/2024    Entry ID: 6636300
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

12/13/22    11:28          C A S E    T R A C K I N G         CSCL  ASMXA201
            TRAC.00              CASE HISTORY                  UB24   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

RL: 80  12 22 ABSP:              SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:            MEYERSIEK    GERO     K    PNL:

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

```
RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:          SEGUIN      MARY        CMD: _____
                             MEYERSIEK   GERO    K   PNL:
```

Exhibit C



Exhibit D

State of Rhode Island and Providence Plantations


PROVIDENCE, Sc.                      FAMILY COURT




*******************************
GERO MEYERSIEK



Vs.                    F.C. FILE NO. K2001-0521M



MARY SEGUIN
*******************************


Heard Before:

The Honorable Magistrate Armando O. Monaco

On March 6, 2023


**APPEARANCES:**


FOR MS. SEGUIN. . . . . Pro se

FOR THE STATE. . . . .. Paul Gould, Esq.


1

I HEREBY CERTIFY THAT THE

FOLLOWING IS A TRUE AND ACCURATE

TRANSCRIPT IN THE CASE OF

GERO MEYERSIEK VS. MARY SEGUIN

HEARD BEFORE

MAGISTRATE ARMANDO O. MONACO

ON MARCH 6,2023.

STEVEN FAZIO
ELECTRONIC COURT REPORTER

1              **GERO MEYERSIEK V. MARY SEGUIN**

2                  **F.C. NO. K2001-0521M**

3                    **MARCH 6, 2023**

4

5              **MARY SEGUIN:** Having been

6    duly sworn testifies as follows:

7                    THE COURT: After the

8    February 12th hearing two orders were submitted

9    one by each side, objections were filed through

10   your order being entered, ma'am.

11                   MS. SEGUIN: Thank you Your

12   Honor. I am sorry. Could you repeat that again?

13   Sorry.

14                   THE COURT: Subsequent to the

15   hearing of February 10,2023, two separate orders

16   were submitted for my signature. One you

17   submitted and one the State submitted. The State

18   filed an objection to the submission of your

19   order on the basis that they alleged, I believe,

20   that it is not what I said.

21                   MS. SEGUIN: And I also filed

22   an objection to their proposed order that also

23   clearly states a lot of additional items that

24   were never before the Court. Including the

25   number now that they have now, they submitted a

3

1     $75,623.71 and then another one for $6028.75.

2     These two numbers were not even in their

3     original motion to establish arrears that was up

4     before the court on February the 10th and those

5     two numbers were never brought up as well. And

6     without a clear understanding and audit of what

7     those numbers represent. Because they

8     unilaterally of their own volition without any

9     court approval.

10                    ATTORNEY GOULD: Judge,

11     objection.

12                    MS. SEGUIN: Took off the

13     interest.

14                    THE COURT: Let me interrupt

15     you, ma'am. Where are you getting these two

16     numbers from? I do not see them anywhere.

17                    MS. SEGUIN: Exactly. That is

18     the order proposed order that the State had

19     filed. You are absolutely right. Your Honor.

20     Those two numbers--

21                    THE COURT: I am looking at

22     the proposed state order that has different

23     numbers then what you are saying.

24                    MS. SEGUIN: The proposed

25     order that they submitted to me, on #4 it says

4

1     $75,623.71 for interest. And then a medical

2     support interest for $6028.75. Now these two

3     numbers were never before the Court before on

4     February the 10th. On February the 10th they

5     brought up a motion that mentioned $81,000.

6             THE COURT: Well, maybe that

7     is a combination of the two numbers.

8             ATTORNEY GOULD: Yeah, Judge.

9     That is the combination.

10             MS. SEGUIN: So sorry, go

11     ahead.

12             ATTORNEY GOULD: There was an

13     objection, Judge.

14             THE COURT: Yeah, what is

15     your objection, Paul?

16             ATTORNEY GOULD: We are off

17     the subject. The subject is whether this order

18     should enter or not.

19             THE COURT: Right.

20             ATTORNEY GOULD: Not about

21     any agreements, not about anything else other

22     than the numbers and Judge if I may or I will

23     let the defendant continue Judge.

24             THE COURT: I thought my

25     order was very simply was to set the arrears as

1    they appear on the State computer but without

2    prejudice and then there will be a subsequent

3    hearing to determine whether or not those

4    numbers are in fact accurate. As I am reading

5    the order, they put two numbers in and it is

6    clearly, let me read the paragraph. Yeah,

7    paragraph six, the Court finds that the total

8    the arrears of $81,000, which is the combined

9    number is placed on the Child Support ledger

10    without prejudice to the June 8, 2023 hearing.

11    The State agrees it shall respond to the

12    defendant's first request for production of

13    documents forthwith.

14            MS. SEGUIN: Yes, Your Honor.

15    So therefore, you had not made any kind of

16    findings of fact of whatever they might be. You

17    simply said put the interest back--

18            THE COURT: Yeah, I said

19    whatever the computer says is the balance. Put

20    it on the computer without prejudice, which

21    means that we need a starting point. You need to

22    know what they allege you owe and that is what

23    they are alleging you owe. You disagree with

24    that number. You asked them for the

25    documentation to substantiate that number. That

6

1    is why I continued it out all the way to June so

2    that you would have an opportunity to get their

3    materials, for you to you digest their

4    materials, provide counter materials back to

5    them. So that in June, a full hearing can be

6    held with everyone totally prepared as to argue

7    either position. Either there is no money due or

8    there is a balance due. I never made any finding

9    whatsoever there is in fact a balance due. If I

10   did, I would not have continued the hearing.

11            MS. SEGUIN: Thank you, Your

12   Honor. That is exactly what my understanding as

13   well.

14            THE COURT: Right. That is

15   what the order says. It says put the number on

16   the computer, but without prejudice, which means

17   both sides have to argue and convince the Judge

18   that that is in fact the number. Or you are

19   going to argue it is an incorrect number and you

20   are going to substantiate it by whatever

21   arguments you present. They going to

22   substantiate it by whatever arguments they

23   present. And then whoever hears it in June will

24   decide which side is correct.

25            MS. SEGUIN: Thank you, Your

1      Honor. I wanted to make sure that, you know,

2      that all parties understand that because at this

3      point, the State is saying that you already

4      found that I had—-

5                        THE COURT: No, no. The State

6      is not saying that because the order clearly

7      says those numbers or that number is without

8      prejudice, which means I did not establish that

9      number. We do it in many of these cases to get

10     the ball rolling, so either side knows what they

11     need to produce to substantiate their positions.

12     The same way they can come in now and say, Oh,

13     no, we made a mistake. She actually owes

14     $185,000.

15                        MS. SEGUIN: You are giving

16     me a heart attack, Your Honor.

17                        THE COURT: It puts a cap on

18     what they can argue.

19                        ATTORNEY GOULD: Judge, can I

20     respond now?

21                        MS. SEGUIN: So, Your Honor,

22     with that in mind, just to clarify, that is what

23     they are saying in 2018 when they first took

24     off--

25                        ATTORNEY GOULD: Objection.

8

1      THE COURT: Just a minute.

2      The order speaks for itself. It says the balance

3      on the computer as of whatever dates in there. I

4      cannot read it now quickly, whatever dates in

5      there, that is the balance on the computer. They

6      have to substantiate it. They are going to send

7      you documentation supposedly to substantiate it.

8      If they cannot substantiate, then they are not

9      going to get that number.

10      ATTORNEY GOULD: Judge, I

11      disagree with that. Judge, we have no obligation

12      to substantiate this. There is a Child Support

13      number that was established by Judge McCann. You

14      took judicial notice of that.

15      THE COURT: I took judicial

16      notice that there was no appeal of his order.

17      That is what the judicial notice of.

18      MS. SEGUIN: Thank you, Your

19      Honor. Thank you, Your Honor. That is my

20      understanding as well that you took judicial

21      notice of the orders themselves. But what is in

22      dispute is how the child support office has

23      handled this computation.

24      THE COURT: That's the

25      argument for June, ma'am. That is the argument

9

1    for June.

2                    MS. SEGUIN: Taking that off

3    the system without your approval. Now, put it

4    that way--

5                    THE COURT: What you are

6    arguing now is what you need to argue in June. I

7    am satisfied that the order that has been

8    presented by the State that breaks down the two

9    balances that the total is $81,000 is in fact

10   the appropriate order from the hearing. It is

11   without prejudice. They are going to provide

12   documents that you requested so that you can

13   then decide whether or not you agree or

14   disagree. And if you disagree with their method

15   of calculating it, you need to present why you

16   think that method is incorrect and what should

17   be the correct number if any.

18                   MS. SEGUIN: Yes, and

19   including a waiver of interest –

20                   THE COURT: You are arguing

21   whether the number is correct or not. That is

22   the whole purpose of making it without

23   prejudice.

24                   MS. SEGUIN: Yes, and that

25   would include the waiver of interest that had

10

1    occurred.

2                      THE COURT: No, that is the

3    subject of the hearing. That is the subject of

4    the hearing. I am making no finding about

5    whether there was or was not a waiver of

6    interest.

7                      MS. SEGUIN: Thank you, Your

8    Honor. So that is part of the discovery that

9    needs to happen.

10                     THE COURT: Well, that is

11   what I assume you are asking for. Is to get the

12   documentation that would have substantiate your

13   belief that there was the waiver of the

14   interest.

15                     MS. SEGUIN: Thank you, Your

16   Honor.

17                     THE COURT: So, if you can

18   substantiate that there was a waiver of

19   interest, that balance disappears.

20                     MS. SEGUIN: So, the State is

21   objecting to producing those protected

22   documents—

23                     THE COURT: No, no. They are

24   not objecting to producing any documents. The

25   line paragraph says in paragraph 10, The State

1     agrees it shall respond to the defendant's first

2     request for production of documents forthwith.

3     So, whatever you asked them for, they are going

4     to they are going to provide to you. If you do

5     not think they provided everything you asked

6     for, you file a supplemental request.

7             ATTORNEY GOULD: The State

8     filed its answer in response to her request for

9     production, Judge. And I will stand by that. And

10    I will argue those issues that we refuse to

11    answer, or we objected on procedural grounds or

12    we objected on legal grounds for what we did.

13    And I will respond to that when it is

14    appropriate.

15             THE COURT: That would be

16    June 8th. That will be done on June 8th. So, you

17    can be prepared to go forward on whatever your

18    objections are and whoever hears it will decide

19    whether the objections were valid or not.

20             MS. SEGUIN: Your Honor, Mr.

21    Gould had said something to me, emailed

22    something to me to the affect that he said you

23    will be retiring June the 8th. I just wanted to

24    know why he emailed me something like that.

25             THE COURT: It has been

1    projected that I am to retire sometime before

2    July 1st. They are dealing with my successor and

3    I sit until my successor is appointed and

4    qualified. And the projection is by the end of

5    the by end of June, the latest could be earlier.

6    I do not think it could be later, but it is

7    possible.

8                    ATTORNEY GOULD: And Judge,

9    because we, I guess, we like making these

10   artificial records, I will make this record

11   here. I did not say that snd I resent the

12   defendant putting words in my mouth.

13                   MS. SEGUIN: I indicated the

14   email that you wrote to me.

15                   THE COURT: Listen, just a

16   minute, just a minute. Whether I sit or I do not

17   sit is an immaterial situation, it has nothing

18   to do with what is before me today. I am ruling

19   on the order they sent you breaking down the

20   balances between the child support and medical

21   arrears is valid as to what I said the last time

22   we were here. I am going to sign that order and

23   proceed with their discovery. Whatever

24   objections you have relative to the discovery

25   and whoever sits here, whether it is me or

13

1    someone else, they will be prepared to address

2    the situation. Okay.

3                    MS. SEGUIN: Thank you, Your

4    Honor. Thank you. One last question about number

5    11 and 12. I mean, those elements—

6                    THE COURT:  11 and 12?

7                    MS. SEGUIN: Yeah, 11 and 12.

8                    THE COURT: 11 tells you how

9    to contact us. 11 is how to contact us and 12 is

10    a standard paragraph that they put in indicating

11    that, I don't know why it's here, but they that

12    the standard paragraph they stick in every case

13    has no bearing on this one. Other than it says

14    that until it is paid in full, you know, the

15    order will continue to run. But there is no

16    order running in terms of what your obligation

17    to pay that is.

18                    MS. SEGUIN: Okay, okay. So

19    that is something that is boilerplate.

20                    THE COURT: That is

21    boilerplate and 11 is how you get in touch with

22    us.

23                    MS. SEGUIN: Sure.

24                    THE COURT: We do not put

25    that in, we will never have any hearings.

14

1          MS. SEGUIN: Thank you, Your

2     Honor.

3          ATTORNEY GOULD: If I could

4     talk this time a little bit. Maybe just for the

5     record. Those same paragraphs were in the

6     September 25th, 2012 orders. And that same

7     boilerplate languages in a July 11, 2012 orders

8     and any other order that she would receive.

9     August 15, 2012. That same identical language

10    was contained in those. It is boilerplate.

11         THE COURT: Yeah,

12    boilerplate. All right, we will see you on June

13    8th at 2:30. Wait a minute. Daylight savings

14    time is starting soon.

15         MS. SEGUIN: Oh, yeah.

16         THE COURT: All right. Do you

17    go on daylight saving time? Pay attention.

18         MS. SEGUIN: Okay.

19         THE COURT: This coming

20    Saturday, our clocks jump forward an hour. So,

21    your clock does not jump forward. You are going

22    to have to call in an hour earlier.

23         MS. SEGUIN: All right.

24         THE COURT: I have friends

25    that live in Arizona, and they told me that in

```
 1        Arizona, there were three different time zones
 2        in the summer.
 3                      MS. SEGUIN: Yeah, every
 4        county is allowed to do that out here.
 5                      THE COURT: I know that. That
 6        is why that is why I pay attention to it because
 7        they tell me that people have trouble. They
 8        think, Oh, I am going to be on time, I am going
 9        to Court. They said, No, you are an hour late.
10        What do you mean? This is the time across the
11        street. No, that is an hour different than us.
12                      MS. SEGUIN: It really is
13        crazy. That they have marked it off, not a
14        county, but across the street. You are
15        absolutely right.
16                      THE COURT:  All right. So,
17        pay attention. It is 2:30 our time.
18                      ATTORNEY GOULD: Judge, if I
19        may. The order I submitted that contains 12
20        paragraphs.
21                      THE COURT: Yes.
22                      ATTORNEY GOULD: February 10,
23        2023, starting with paragraph one, the matter is
24        continued.
25                      THE COURT: Yes.
```

1                    ATTORNEY GOULD: That order

2       is going to be accepted by the Court. That will

3       be the order of the Court for that day?

4                    THE COURT: Right.

5                    ATTORNEY GOULD: The order

6       that she submitted will be stricken, correct?

7                    THE COURT: Right.

8                    MS. SEGUIN: Yes, that is my

9       understanding, too. Yes.

10                   ATTORNEY GOULD: Thank you,

11      Judge.

12                   THE COURT:  All right. We

13      will see you in June.

14                   ATTORNEY GOULD: One more

15      thing. I am sorry. Judge, if I may, can the

16      defendant place her address on the record?

17      Because we sent some correspondence that was

18      sent back to us. Now we have used her email as a

19      courtesy to her and we also need an actual

20      street address so that we can send her

21      documents.

22                   MS. SEGUIN: Your Honor, I

23      think this is, I do not really understand why --

24                   THE COURT: Let me just

25      interrupt. Let me interrupt. When you enter your

17

1    appearance, you need to provide under the rules

2    your address, your phone number, and your email

3    address.

4                    MS. SEGUIN: Yes.

5                    THE COURT: And if you were

6    an attorney, obviously your bar number. Okay so

7    if you change any of those addresses or emails,

8    you are under an obligation to keep updating it

9    because if they send anything to the address or

10   the email that you provided, it's not a defense

11   later on, Oh, it's not my address or email, I

12   changed it. So that is why they are asking to be

13   sure they get the right method to contact you,

14   depending on what they have to send. It is a

15   part of the Court order that you provide your

16   address and email address.

17                   MS. SEGUIN: Your Honor, may

18   I also then ask that the State sent me a or e-

19   file any notices? Because they have been mailing

20   things to me in Texas, which takes 10 to 12 days

21   for me to receive by regular mail. So, could you

22   also please, I am going to ask you please to

23   ask, to make them, to order them to notice me by

24   electronic means as well.

25                   THE COURT: Well, that's part

                              18

1    of the rules, too.

2                    MS. SEGUIN: Okay.

3                    THE COURT: All right?

4                    MS. SEGUIN: Okay. Thank you,

5    Your Honor. I appreciate you telling me.

6                    THE COURT: All right, June

7    8th.

8                    ATTORNEY GOULD: I do not

9    have an address, Judge.

10                   THE COURT: Oh, that is

11   right. What is your updated address?

12                   MS. SEGUIN: My address is on

13   the on file is P. O. Box 22022 Houston, Texas,

14   77019.

15                   THE COURT: What about email?

16                   MS. SEGUIN: That's Mary

17   Seguin 22022 at Gmail.com. They are also in my

18   pleadings as well.

19                   THE COURT: Slow down. Slow

20   down. We do not type that fast.

21                   THE CLERK: I did not get

22   that P. O. Box. Can you give it to me again,

23   please?

24                   MS. SEGUIN: Yes, it is,

25   22022.

1              THE COURT: That is the P. O.

2    Box number?

3              MS. SEGUIN: Yes, Your Honor.

4              THE COURT: Making sure it

5    was not the zip or area code.

6              MS. SEGUIN: It is one too

7    many numbers.

8              THE COURT: What is the zip

9    in Houston?

10              MS. SEGUIN: It is 77019.

11              THE COURT: All right, all

12    set?

13              MS. SEGUIN: Thank you, Your

14    Honor.

15              THE COURT: Okay, June 8.

16              ATTORNEY GOULD: Thank you,

17    Judge.

18              MS. SEGUIN: Thank you, Your

19    Honor.

20

21

22

EXHIBIT E

I HEREBY CERTIFY THAT THE FOLLOWING

IS A TRUE AND ACCURATE TRANSCRIPT

IN THE CASE OF MEYERSIEK VS. SEGUIN

BEFORE THE HONORABLE MAGISTRATE

SUSAN NAHABEDIAN ON FEBRUARY 2ND,

2024.


*A.B. Kuski*


AMANDA B. KUSKI
ELECTRONIC COURT REPORTER

1              THE COURT: Good afternoon.

2              PLAINTIFF: Good afternoon.

3              THE COURT: This is K20010521, Gero

4    Meyersiek versus Mary Seguin. Both parties are present. Mr. Meyersiek's

5    Attorney, um, Achille, she's here. Um, the Clerk will swear you both in.

6              CLERK: Miss Seguin, Mr. Meyersiek,

7    raise your right hands, please. You do solemnly swear that the testimony you

8    shall give to the Court in the matter now in hearing shall be the truth, the whole

9    truth and nothing but the truth, so help you God?

10             PLAINTIFF: I do.

11             DEFENDANT: I do.

12             CLERK: Miss, Miss Seguin, just state your

13   name for the record.

14             DEFENDANT: Mary Seguin.

15             CLERK: Mr. Meyersiek, your name,

16   please, for the record.

17             PLAINTIFF: Gero Meyersiek.

18             CLERK: Thank you.

19             THE COURT: Okay, good afternoon,

20   folks. This matter was continued from December 15th in order for the, uh, Court

21   Clerk to, uh, copy Court filings and other documents that were requested by

22   Miss Seguin. It's my understanding that those documents were sent to her

23   electronically, um, in various emails, uh, in December and the remainder of

24   those were sent at the beginning of January. Um, Miss Seguin, were you able to

25   review those and are you satisfied that you received everything that you request-

1　ed?

2　　　　　　　　　　　DEFENDANT: Um, thank you, Your

3　Honor. I had, uh, received, as you said, in two batches, uh, the Court records

4　that, um, Mr. Santamarina had, um, had emailed. Uh, the last several batches,

5　uh, were, sorry, batch was several documents, um, were only emailed about a

6　couple weeks ago. Uh, there, there were sent in separately about fifteen emails. I

7　think Your Honor was copied on all of them, as well as Mr. Gould, um, on those

8　emails, um, and so the records themselves, um, you know, that were sent to me

9　or emailed to me, um, the, the Court has a copy of those. Um-

10　　　　　　　　　　　THE COURT: I, I, so my question is, are,

11　are you, did, were you able to review them and are you satisfied that everything

12　that you requested, you received?

13　　　　　　　　　　　DEFENDANT: Um, I have not, uh,

14　received the actual audio recordings of the, that's part of the record.  Um, those

15　were-

16　　　　　　　　　　　THE COURT: Did you request, did you

17　request the audio recording from Mr. Santamaria?

18　　　　　　　　　　　DEFENDANT: Well, I requested all the

19　records. So, one of the paper documents had said that the, there was, uh,

20　attached to it, an audio recording of the State saying that Gero waived interest,

21　and I think that's very relevant to this case-

22　　　　　　　　　　　THE COURT: Okay-

23　　　　　　　　　　　DEFENDANT: -especially as it links to-

24　　　　　　　　　　　THE COURT: -let me just stop you-

25　　　　　　　　　　　DEFENDANT: -(inaudible)-

1     THE COURT: -let me just stop you, let me

2 just stop you for a minute, please. I'm new to this case, so I'm not familiar with

3 the audio recordings request. I'm not aware that you made that type of request.

4 Can you tell me the date of the audio recording and when you made that

5 request?

6     DEFENDANT: I made the request for all

7 Court information in this case. All Court information encompasses all

8 documents and all forms of records. Uh, that's, um, that's the, I believe, legal

9 understanding of all Court information of records.

10     THE COURT: Alright, Mr.-

11     DEFENDANT: So, that was part, that was-

12     THE COURT: -excuse me, excuse me one

13 minute. Mr. Gould, I'm trying to unmute you and I'm not able to do it from my

14 end. So, if you need to be unmuted, you'll have to do it yourself.

15     DEFENDANT: I had to, so I had

16 submitted those and this, uh, audio recording ha-, uh, is part of the Court records

17 as of, um, June 2023. That was emailed to me in a rel-, in a paper document

18 referring to attached, attached audio recording that is, um, that, that was emailed

19 by Mr. Santamaria. So, that recording, I want to make sure, uh, and, and that's

20 also copied to you by the way, Your Honor-

21     THE COURT: Alright, so-

22     DEFENDANT: -(inaudible).

23     THE COURT: -just, just, just going back

24 to December, okay, you provided, um, a request for documentation to be copied

25 by the Court Clerk, Mr. Santamaria, and all of those documents were scanned

1   and sent to you in an electronic form. Did you specifically request anything that

2   referred to an audio recording?

3                      DEFENDANT: I specifically record, uh,

4   requested all Court information, any and all Court information in the records of

5   my, of this particular case file. Those are the wording that I used, because I, I

6   don't know what's being, what's on, what's, what the Court record has. You

7   know, this is the reason why we went through this process, is, the, the, um,

8   Rhode Island Judiciary has set up this, uh, uh-

9                      THE COURT: So, Miss Seguin-

10                     DEFENDANT: -electronic Court system-

11                     THE COURT: -we're not-

12                     DEFENDANT: -where the (inaudible)-

13                     THE COURT: -so, Miss Seguin, we're not

14   gonna get into the Judiciary's access to the, um, to the portal. We're not gonna

15   get into that. We made every effort to make electronic copies of every Court

16   document pertinent to this case and sent them to you, at no cost, in an electronic

17   version. You did not, at any point, follow up with Mr. Santamaria to request an

18   audio recording.

19                     DEFENDANT: I'm just in a process of

20   reviewing this. That was part of your question, uh, Your Honor, is have I had a

21   chance to review all of these materials. It's, it's, it's, as, as you can see, several

22   because you've been covered, uh, copied on all the emails. There were several

23   emails, uh, you know, all together, probably thirty-something emails. Uh, I do

24   appreciate that. I, you know, I thank Your Honor for ordering that, um, and I

25   also, um, you know, am, am reviewing, have been reviewing. So, I came across,

1   to answer your question to the best of my ability, is I came across that doc-,

2   document where it refers to the audio file, uh, that's being submitted into the

3   record. I've asked for the Court records. So, um-

4                                    THE COURT: You received every Court

5   record, every document going back to-

6                                    DEFENDANT: Paper. I, I, I think what,

7   what-

8                                    THE COURT: Correct.

9                                    DEFENDANT: -wanted to, you know,

10  just, just to have a basic understanding of document is, in paper form, but Court

11  rec-, information as the Court record encompasses various different formats. All

12  public records encompasses various different formats. Uh, you know, that's,

13  that's written by statute and, you know, as I understand it what public records is.

14  Court records are a form of public records and, and it forms the basis of, um,

15  Judge created laws, and therefore, those are critical in my, uh, uh, you know,

16  access and that's the basis of this process that we're going through is accessing

17  those public records, Court information records, and, uh, accessing the laws that

18  were created, Judge created laws that were created, in this particular case or

19  relevant to this particular case. So, I, I'm just trying to, um, respond to your

20  question, uh, Your Honor, as to if I had a chance to review those, am I satisfied,

21  and so, these are the, what I'm raising to the Court, to Your Honor, to, in

22  response to your question is, I received the paper document, uh, I'm, I'm in the

23  process of reviewing them, um, because they, they form a chronology, they form

24  a, a, a background chronological, uh, reasoning behind, you know, uh, Judge

25  created laws, which are the orders, uh, issued. And in so doing, there are refer-

1     ences to a, a Court document that was sent to me, actually a couple of them, that

2     talks about an audio recording of the State saying that Gero waived interest, and,

3     uh, also the document, uh, there are documents that say Gero did not ask for

4     interest, but the State on oral motion asked for interest, but then the State's

5     policy is not to ask for interest in interstate cases-

6                         ATTORNEY GOULD: Judge, Judge, if I

7     may-

8                         DEFENDANT: -that is why. So-

9                         ATTORNEY GOULD: -Judge, can I be

10    heard?

11                        DEFENDANT: -that's why I need to

12    understand and get a full-

13                        ATTORNEY GOULD: If I may, Judge?

14                        THE COURT: Hold, just one, one minute,

15    Mr., Mr. Gould. So, the answer, so, your answer is, you're not satisfied with

16    what was sent?

17                        DEFENDANT: I'm explaining to you

18    what's missing.

19                        THE COURT: So, you are, you-

20                        DEFENDANT: And I'm trying to identify

21    to you what is missing-

22                        THE COURT: So, this Court-

23                        DEFENDANT: -and the Court records,

24    already are, are showing-

25                        THE COURT: -this Court, alright, ex-,

1    excuse me, Miss Seguin. Mr. Santamaria spent hours with a coworker manually

2    scanning and copying those files during a period of time that the Court was very

3    short handed. All of that documentation, okay, every pertinent document related

4    to this case, going back decades, two decades, was scanned and sent to you,

5    okay. We do not have a copy of an audio recording. So, we're not able to

6    provide that to you. There is no such audio recording in the Court record that

7    you, you are referring to. So, now I'm gonna give Mr. Gould an opportunity to

8    respond. Mr. Gould?

9                    ATTORNEY GOULD: Judge, like,

10    likewise, if she's requesting a transcript, then she has to go through the normal

11    process of paying for a transcript, ordering the specific date of the transcript she

12    wants. This is a Defendant who has failed to come to this Court with clean

13    hands, Judge. I've stayed silent-

14                    DEFENDANT: I object! I object, Your

15    Honor!

16                    ATTORNEY GOULD: -the whole time-

17                    THE COURT: Your objection is noted and

18    Miss Seguin, no one interrupted, you're muted. You're muted. You're muted

19    and you're going to stay muted. You're muted. Mr. Gould?

20                    ATTORNEY GOULD: Thank you, Judge.

21    We've let this go on for months after months. She brought up an issue relative

22    to, uh, the Court system. State of Rhode Island Child Support Enforcement, the

23    Magistrate hearing this case, has no control over that. She's now filed a Federal

24    lawsuit in the, uh, District of Texas, Judge. That's gonna play it's course 'cause

25    she'll file and follow through on that. This is a simple case of whether or not

7

1  interest is to accrue on this case and what payments were made. It's simple

2  math, it's simple, in, in fact, Judge, there's maybe five questions I have for the

3  Defendant, uh, of the Plaintiff relative to this, uh, inquiry. It would be a short

4  hearing. Uh, whether or not there was any monies paid, what was received, and

5  the fact that the Court can take Judicial notice of two orders. The fact that

6  there's a child support order that continues to run, and two, the fact that interest

7  has continued to run pursuant to Mag-, pursuant to Judge, uh, John McCann's

8  order dated 9/25/2012.

9                          THE COURT: Okay, the original support

10  order was entered May 24th of 2012?

11                          ATTORNEY GOULD: That's when it was

12  allowed to run on the Child Support system. That was at a period of time when

13  the arrears were set somewhere in the amount of $30,000.00. I have a copy of

14  the order. Paragraph four of the May 24th, 2012 order indicates that there was an

15  arrears of $30,458.00, as of May 24th, 2012. September-

16                          THE COURT: And am I, am-

17                          ATTORNEY GOULD: Sorry.

18                          THE COURT: -there were, there was no

19  appeal taken from that order.

20                          ATTORNEY GOULD: Correct.

21                          THE COURT: Just a minute, Miss Seguin.

22  I'm giving Mr. Gould an opportunity to speak, just like I gave you an

23  opportunity to speak. In that October 23rd, 2012 order, um, there is language that

24  indicates that interest would continue to run.

25                          ATTORNEY GOULD: Correct.

1   THE COURT: And nothing has changed

2   since then?

3   ATTORNEY GOULD: There's been no

4   order from the Rhode Island Family Court suspending interest. Correct.

5   THE COURT: Miss Seguin?

6   DEFENDANT: I object to every, uh,

7   statement that Mr. Gould had, uh, stated because they are, um, uh, perjurious.

8   THE COURT: You (inaudible), excuse

9   me-

10  DEFENDANT: Mr. Gould and Mr.

11  Langlois-

12  THE COURT: Excuse me, they're what?

13  DEFENDANT: They are perjuries. Mr.

14  Gould and Mr. Langlois and the State of Rhode Island representing the Rhode

15  Island Child Support Office, had, um, per this Court record, there is a document

16  that say's that they, that they had said that Gero had waived interest. (Inaudible)

17  2021 and they made that statement in 2022.

18  THE COURT: Ma'am, there's no Court

19  order that ever suspended-

20  DEFENDANT: (Inaudible).

21  THE COURT: -there's no Court order that

22  ever set the interest to zero. There's no Court order. You've received everything,

23  I've reviewed the file. There is nothing in the system where it, it was ever

24  waived or set to zero. The interest has stayed on the system.

25  DEFENDANT: We're, we're talking, uh,

9

1   actually on, on February the 10th, 2023, the first Court order of this, of this

2   decade that was issued has clearly, um, proven as evidence that interest was

3   taken off of the system. Mr. Gould had taken the interest off of the system, he

4   said in Court, in 2018. That is what he had said, and so, in, in Court, and

5   therefore, he has asked the Judge, or the Magistrate, uh, Monaco to put it back

6   on the record or, uh, Mr., and then Judge, um, uh, Monaco had only put it on

7   there with prejudice because he said that there's, that doesn't mean, that's just a

8   placeholder.

9                                    ATTORNEY GOULD: Objection.

10                                   DEFENDANT: So, Mr. Gould had lied,

11  just now, that's perjury on-

12                                   THE COURT: Uh-

13                                   DEFENDANT: -I'm deeply concerned

14  about this. These, these are documented in the order. The February 10th order

15  cannot be refuted. It was, it was prepared by Mr. Gould himself. It said that the

16  Court-

17                                   THE COURT: I don't see it.

18                                   CLERK: I don't see anything-

19                                   DEFENDANT: -(inaudible)-

20                                   THE COURT: -hold on, hold on. I'd, I'd

21  like to review that order and I, I don't see it.

22                                   CLERK: I don't see anything filed from

23  2013-

24                                   ATTORNEY GOULD: I'd like to be heard

25  on the objection, Judge.

1      CLERK: -to '22. I see nothing.

2      DEFENDANT: Well, that's a problem.

3      THE COURT: Are you saying that, excuse

4    me, just let me just clarify this. Again, I'm new to the case-

5      DEFENDANT: That was-

6      THE COURT: -you just made-

7      DEFENDANT: -that was-

8      THE COURT: -you just mentioned

9    Magistrate Monaco heard this and I'm looking for an order from that hearing

10   and I don't see one.

11      ATTORNEY GOULD: Since I was

12   accused of perjury, Judge, can I clarify something?

13      THE COURT: Yeah, Miss Seguin, I'm

14   gonna give Mr. opportunity, uh, Mr. Gould an opportunity to reply.

15      ATTORNEY GOULD: See, Miss Seguin

16   is a little confused about how the process is running. That there is an agency and

17   the Child Support Office is an agency charged with running the child support on

18   our system. The Court is in charge of ordering parties to pay child support and in

19   this case, pursuant to the order of Judge McCann back in 2012, he ordered child

20   support paid. Again in 2012, he ordered interest paid. Our system in 2018, our

21   system, the Child Support system, not a Court order, our system removed

22   interest because of an administrative decision, because this case had become an

23   interstate case, the Plaintiff was out of, the Defendant mother was out of state.

24   There was a decision to remove interest from cases running on our system. That

25   doesn't mean that the interest doesn't run. It meant that the interest was removed

1   from our system, so that other jurisdictions were not confused, and it had to do

2   with, a lot of it, the, the fact that jurisdictions had different interest rates running.

3   So, in order to alleviate any confusion, our Administrator made a determination

4   to stop interest on all, uh, stop interest running on our system, not stop interest

5   pursuant to a Court order. So, that's the distinction. So, when I said earlier today

6   that there's no order that, uh, stopped the interest on the case, there is no order,

7   and then the other statement that, uh, the Plaintiff made, uh, Defendant made

8   relative to, um, the issue of prejudice of Judge Monaco's order, that's an

9   outright lie, Judge. Judge Monaco never said in Court, there's no Court order

10  that is without, or with prejudice, Judge. So, that's just an outright lie. I'll leave

11  it at that because I know I'll have another twenty minutes of, of rambling on by

12  the Defendant. So, I'll (inaudible)-

13              THE COURT: Well, just, just to be clear, I

14  just want both sides to, to, to know, I don't see anything in the system reflecting,

15  um, any, any decision by Magistrate Monaco in May of this year. I don't see-

16              DEFENDANT: Uh, February, February,

17  February of this year. So, February the 10th. February the 10th. This I why at the

18  same time the discovery was ordered, and this is why we are here on discovery

19  issues, as well, because it was ordered without, sorry, it was placed on the

20  system and the interest is WITH prejudice.

21              ATTORNEY GOULD: No, Judge, I object

22  to that, that is not true. That is as far as the truth can be, Judge.

23              DEFENDANT: Perjury, perjury-

24              THE COURT: So, excuse me, hold on,

25  hold on, folks. I just found the order now that I just see that. It's February 10th,

1   paragraph four, "The Court finds the arrears of $81,652.46 that'll be placed on

2   the ledger without prejudice to the June 8th hearing. The arrears reflect interest

3   on the child support in the amount of $75,623.71 and interest of the medical

4   support in the amount of $6028.75".

5                                    ATTORNEY GOULD: So, Judge, is her

6   comments about prejudice, is that perjury? So, did she just commit perjury,

7   Judge, because I wasn't under oath, but I'll let that go.

8                                    DEFENDANT: The order, the order

9   clearly says that the-

10                                   THE COURT: That it was placed, that it

11  was placed on the ledger without prejudice. That's all, that's all it says. It was-

12                                   DEFENDANT: Which means-

13                                   THE COURT: -placed on the ledger-

14                                   DEFENDANT: -it means, it means it's not

15  owed.

16                                   THE COURT: No, it means, it doesn't

17  mean it's not owed. It, it, it's, it's, let's see, motion to set arrears and discovery

18  motions were not concluded on that date. Okay, so it was placed on the ledger

19  without prejudice because it was still an issue that was left open. Am I correct,

20  Mr., Mr. Gould?

21                                   ATTORNEY GOULD: Yes, Your Honor.

22                                   THE COURT: And with that, you may

23  inquire of Mr. Meyersiek. Thank you.

24                                   ATTORNEY GOULD: Thank you. First of

25  all, Judge-

13

1        THE COURT: You're muted. You're

2   muted.

3        ATTORNEY GOULD: I'd ask the Court,

4   I'd ask the Court to take judicial notice of the May 24th, 2012 order by Judge

5   McCann, in which he established the child support order, in which he establishes

6   an arrears of $30,458.00. That order was not appealed. That is the order of this

7   Court.

8        THE COURT: The Court takes judicial

9   notice entered on May 24th, 2012, from which no appeal was taken.

10        ATTORNEY GOULD: I'd ask the Court

11  to take judicial notice for the September 25th, 2012 order of Justice John

12  McCann in which the paragraph four indicates, "Interest will continue to run on

13  monies due".

14        THE COURT: Likewise, the Court takes

15  judicial notice of the September 25th, 2012 order, again, in which no appeal was

16  taken.

17        ATTORNEY GOULD: Thank you, Judge.

18  If I could inquire of the Plaintiff?

19        THE COURT: Yes.

20        ATTORNEY GOULD: Mr. Meyersiek,

21  you had a child support order that ran to your, uh, ran to your benefit in the

22  amount of $218.00 per week. Is that correct?

23        THE COURT: Can't hear you, Sir.

24        PLAINTIFF: (Inaudible).

25        THE COURT: Very, very faint. It's hard to

1    hear you.

2                              PLAINTIFF: Is this better?

3                              THE COURT: Perfect.

4                              PLAINTIFF: Okay, good. Sorry. Yes, to

5    the best of my recollection, that was the amount.

6                              ATTORNEY GOULD: Did you ever

7    receive child support from the Defendant mother directly, after May 24th, 2012?

8                              PLAINTIFF: I only received two

9    payments. I believe one was in 2019 and one was in 2021.

10                             ATTORNEY GOULD: So, from-

11                             PLAINTIFF: I never, I never received

12   anything directly.

13                             ATTORNEY GOULD: From 2012 to

14   2018, you received nothing in child support, correct?

15                             PLAINTIFF: Not a single penny.

16                             ATTORNEY GOULD: And that was a

17   time when the child was a minor, correct?

18                             PLAINTIFF: Correct.

19                             ATTORNEY GOULD: That was during a

20   period of time when you could've used the money for the child, correct?

21                             PLAINTIFF: That is absolutely correct.

22                             ATTORNEY GOULD: And you received

23   nothing, correct?

24                             PLAINTIFF: That is correct, and I

25   should've had, I had to send my daughter to a school, I had to pay for every

1   meal, I had to pay for her clothing, I had to pay for everything.

2                                ATTORNEY GOULD: You received a

3   payment sometime in 2018 in the amount of $6,461.95, correct?

4                                PLAINTIFF: That is correct.

5                                ATTORNEY GOULD: And then you

6   received a payment in 2021, on or about 12/9 for 2021, in the amount of

7   $4,185.98, is that correct?

8                                PLAINTIFF: I don't recall the exact

9   amount.

10                               ATTORNEY GOULD: Does that number

11  refresh your memory somewhat?

12                               PLAINTIFF: Yes, it does.

13                               ATTORNEY GOULD: Are you looking to

14  collect interest that accrued on that money from, from, I'm sorry, from May

15  202-, May 24th, 2012 up until today's date?

16                               PLAINTIFF: Yes.

17                               ATTORNEY GOULD: Did you make any

18  contracts, agreements with Miss Seguin outside Court that indicated that you

19  were going to waive interest?

20                               PLAINTIFF: Absolutely not.

21                               ATTORNEY GOULD: I have no further

22  questions of the Plaintiff.

23                               PLAINTIFF: Thank you.

24                               DEFENDANT: Uh, Your Honor, I have

25  been unable to object to anything because, uh, I was put on mute, but-

1          THE COURT: Okay, well, we can note

2    your objection now.

3          DEFENDANT: The, the, uh, at the last

4    hearing, uh, as well as, uh, the, uh, hearing before you were, uh, appointed, uh,

5    by the, uh, Judge, uh, in June 2023, we were on a motion to compel. So,

6    therefore, I do not have, based on discovery, discovery has not been completed.

7    Therefore, I am not ready to present the, uh, evidence and present the

8    arguments.

9          THE COURT: What, uh, what specifically,

10   what are you seeking in discovery that you haven't received yet?

11         DEFENDANT: I have, uh, as you can see,

12   I have that motion, uh, that is pending, that has been pending since June of 2023,

13   to compel production relative to my, uh, request for documents. I, I have a

14   pending motion-

15         THE COURT: You, you, you received all

16   of the Court documents.

17         DEFENDANT: No-

18         THE COURT: What out, what outside of

19   the Court documents are you seeking in discovery?

20         DEFENDANT: I'm seeking based on my,

21   uh, on the Court record that would show that I'm seeking my case file.

22         THE COURT: You have-

23         DEFENDANT: I'm entitled-

24         THE COURT: -you, no, no.

25         DEFENDANT: I do not have a, my case

1    file-

2                                      THE COURT: You do have your case file.

3                                      DEFENDANT: -I do not have my-

4                                      THE COURT: It was scanned-

5                                      DEFENDANT: I do not!

6                                      THE COURT: -and sent to you as you

7    already acknowledged by Mr. Santamaria in numerous emails. The entire Court

8    file was scanned in and sent to you.

9                                      DEFENDANT: Oh, you're talking about

10   the Court file. I'm talking about my child support case file. I'm entitled under

11   Federal law to have access to my Federal, my child support case file, and that's

12   the discovery that's being ordered. I have not been able, they have denied, on

13   paper, which is submitted within this Court record. The Court record shows that

14   they have, uh, refused, uh, uh, raising all kinds of issues to produce my child

15   support case record.

16                                     ATTORNEY GOULD: Objection.

17                                     DEFENDANT: Under Federal law, under

18   the Federal law, under Title IV of the Social Security Act, which is what this

19   process and this legal hearing is under-

20                                     ATTORNEY GOULD: Objection.

21                                     DEFENDANT: -(inaudible) under-

22                                     THE COURT: Alright, what's-

23                                     DEFENDANT: I have rights.

24                                     THE COURT: -what's the basis of your

25   objection-

                                        18

1          DEFENDANT: -I have a Federal rights-

2          THE COURT: -Mr. Gould?

3          DEFENDANT: -(inaudible), I have a

4  Federal right to my child support case file.

5          THE COURT: Hold on, Ma'am. He

6  objected and I wanna know the basis of his objection.

7          ATTORNEY GOULD: Relevance to the

8  issue before the Court, Judge. The issue before the Court is interest. The motions

9  that she's alleging that she's pursuing, the State file appropriate objections to her

10  discovery request. So, she needs a hearing on it instead of her other diversions

11  that she's had at the last nine months. We could've addressed these, Judge, but

12  we wanna keep pushing this off and pushing this off. So, the State has filed, the

13  State has responded to the discovery. I've had a conference with Miss Seguin, at

14  one point, to try to go over some of our disputes with regard to, with regard to

15  discovery. Uh, that did not turn out to be very productive. Uh, I have stated, uh,

16  on my, on her requests, uh, all the basis for our objections and I'm ready to

17  argue those objections, when she puts forth specific allegations, specific

18  documents in the specific request that she's looking for, but until then, Judge,

19  this is a real simple case of about whether or not this lady paid child support and

20  whether or not this gentleman is entitled to interest-

21          DEFENDANT: Objection.

22          ATTORNEY GOULD: -the Court has-

23          DEFENDANT: Objection.

24          ATTORNEY GOULD: -the Court has-

25          THE COURT: (Inaudible).

19

1          ATTORNEY GOULD: -filed-

2          DEFENDANT: Fundamentally, in order to

3    claim that I owe anything, I have a right to my child support case file under

4    Federal law.

5          THE COURT: Ma'am, what's this-

6          DEFENDANT: I have-

7          THE COURT: -what's specific document-

8          DEFENDANT: -(inaudible)-

9          THE COURT: -what specific document-

10          DEFENDANT: -since '21-

11          THE COURT: Ma'am, Ma'am, Ma'am, if

12    you keep yelling over me and over the Attorneys, this is not going to be

13    productive. I'm trying to just narrow this down to the specific piece of

14    information that you're seeking.

15          DEFENDANT: I am, Your Honor, I need

16    to have my entire case file. I, I have, the Court order-

17          THE COURT: Do you, do you-

18          DEFENDANT: -on February the 10th

19    ordered discovery. There were, by law, my right is to have my entire case file,

20    and, and by Federal Court, Federal law, I am entitled to have my entire case file.

21    Child support interstate encompasses, and this is an interstate case, encompasses

22    Federal law. It encompasses Texas law, because you are reaching your, your

23    long arm into the State of Texas. Therefore, I am entitled, by Federal law, and

24    by Texas law, as well as Rhode Island law, to have access to my child support

25    file.

1          THE COURT: Thank you Miss, Thank

2   you, Miss Seguin. Mr. Gould-

3          DEFENDANT: (Inaudible) Mr. Gould-

4          THE COURT: -what, what is the, what is

5   the State's objection-

6          ATTORNEY GOULD: Rel-, well for the

7   most part-

8          THE COURT: -to give-

9          ATTORNEY GOULD: -relevance, Judge.

10  She's, she is not gonna use the documents that she's requesting, in this case,

11  when she, when the documents you're requesting is what she is the target for in

12  her Federal case. So, she's not gonna use me as a pawn to get, to do her

13  discovery in her Federal case. This is a simple issue of child support, simple

14  issue of payments, but what she's trying to do is she tried to do her discovery,

15  her Federal discovery in this child support case. So, what I did is I laid out in, in

16  our responses, our objections, based on relevance. So, again, again, we went

17  another ten minutes of her for asking for certain, a multitude of documents

18  without her saying one specific document that she wants, one specific item, one

19  specific request for production that she's, we can do this, Judge. We can go for

20  another twenty minutes and do the same thing, but until she gets her eyes on a

21  piece of paper and looking at her motions and going word by word, and until we

22  can do that, Judge, I, we can't go anywhere. I've, I've stated our objection-

23          THE COURT: Well, that, I'm, I'm trying,

24  you know, I'm trying to work with you, Miss Seguin, to see if you can narrow it

25  down to a specific, a specific issue or a specific document that you believe

1  supports you and your contention that at some point, there was an agreement or

2  there was an order that waived the interest, but to be going on a fishing

3  expedition and insist that the State, uh, provide you with your case file, um, you

4  know-

5                          DEFENDANT: Your, Your Honor,

6  discovery is to get my entire case file. I think that is something Federal law

7  guarantees, and it says so from 42 USC Section 654, all the way to 666. That

8  law luminous, uh, Federal law, codified by Congress, provides everyone in the

9  country the right to access all the case file, child support case file, maintained by

10 every and any State Government, and that is, I'm not the, eh, the, Congress has

11 never said that's sufficient expedition (?). Congress has said, you're allowed to

12 have your entire case file and from there on, you're even allowed to ask

13 questions. Why was this, why was, that's the due process and that is the equal

14 protection, and that is the Privileges and Immunities Clause that we're all

15 guaranteed and living under. This is an interstate case. I am entitled by the

16 Constitution and by Federal laws 654 to 666 to have access to my entire file. I

17 cannot, I am unable, no custodial parent or non-custodial parent is able, that's

18 mentioned in the Social Security Act, would be un-,would be able to actually

19 identify, say this is the document I'm asking for, but they don't have access to,

20 to the file.

21                          THE COURT: Ma'am, you have access to

22 all of the Court orders.

23                          DEFENDANT: I-

24                          THE COURT: The Court-

25                          DEFENDANT: But I-

22

1          THE COURT: -the Court, the Court is

2   what establishes the, the child support order, the arrears order, and interest goes

3   along with that, Ma'am. So-

4          DEFENDANT: You're talking about this

5   agreement that we're deal, talking about. Agreement that you just mentioned

6   that, Your Honor, deals with my case file and this is the case file I am, by law,

7   by the (inaudible), by Federal law, by Texas law, and by Rhode Island law,

8   entitled to have access to, and Mr. Gould and the Child Support, uh, Services

9   and, uh, of Human Services denies me both, all denying me access to those. So,

10  I am again, asking for that. I will ask in every possible jurisdiction for those

11  because I am entitled, by law, at least three jurisdictions. By Texas law, by

12  Federal law-

13         THE COURT: Thank you.

14         DEFENDANT: -and by Rhode Island law.

15         THE COURT: Thank you-

16         DEFENDANT: Nevermore-

17         THE COURT: -Mr. Gould? Thank you.

18  Okay, you've, you've you've made your point. I understand what your argument

19  is. Mr. Gould?

20         ATTORNEY GOULD: Judge, I went

21  another, I think, ten minutes, maybe nine minutes that time. I still don't know

22  what she's looking for. Uh, it's a motion to compel. If, if that's what she wanted,

23  then let's have the motion to compel. Let's hear that. Maybe, maybe she could

24  put those thoughts into words again and maybe come up with a plan that she

25  wants for this discovery, Judge, but what we're doing now is wasting your time,

1  and wasting my time, and we're not getting anywhere. So, we've provided her

2  volumes upon volumes of documents relative to her case. She had specific

3  questions that I objected to. The, the objections were timely. We had a

4  conference, we went through them. After the conference, I had not heard

5  anything from Miss, uh, Seguin. We've gone through, I think, since February,

6  five or six appearances, a couple before you. I, I could, that, that could be an

7  exaggeration. It could've been four, uh, but we've been before the Court and,

8  and we've come with other issues every time and we continue this and continue

9  this. Judge, again, in order to have equity, you have to have clean hands, and this

10 is a person who has failed to comply with THIS Court's orders. Not the

11 Constitution, not the Texas law, not the, not the Congress law. This is someone

12 who has failed to comply with your orders, with your Court's orders on a

13 specific matter-

14                         DEFENDANT: Objection.

15                         ATTORNEY GOULD: -with child support

16 with a very-

17                         DEFENDANT: Ob, objection.

18                         ATTORNEY GOULD: -very basic needs

19 of a child-

20                         DEFENDANT: Objection.

21                         ATTORNEY GOULD: -and we're gonna

22 give-

23                         THE COURT: I'm gonna, I'm gonna, I'm

24 going to allow him to speak, just like I allowed you to speak. Mr., Mr. Gould,

25 continue.

24

1        ATTORNEY GOULD: I, I've said

2 enough, Judge.

3        DEFENDANT: Objection.

4        THE COURT: Again, the Court, the Court

5 takes judicial notice of both the May 24th, 2012 Court order, as well as the

6 subsequent September 25th, 2012 Court order. Um, there was, um, no appeal,

7 um, taken from either one of those Court orders. With respect to, um-

8        DEFENDANT: Objection. Objection,

9 Your Honor.

10       THE COURT: Your objection is noted,

11 thank you very, thank you, your objection is noted.

12       DEFENDANT: He, he-

13       THE COURT: Mr. Gould, what is the

14 specific, uh, amount of interest that, um, is, uh, should be on the system? Is it

15 $81,652.49?

16       ATTORNEY GOULD: Yes, Judge.

17       THE COURT: Okay, and was that the

18 amount that was, um, placed on the system back in February?

19       ATTORNEY GOULD: Correct, Judge.

20       THE COURT: The Court finds-

21       ATTORNEY GOULD: That number

22 (inaudible)-

23       THE COURT: -the Court finds that that is,

24 based on no, absolutely no evidence to the contrary, that that is the amount, um,

25 that should be set on this as of today, today's date.

1                      ATTORNEY GOULD: Thank you, Your

2 Honor.

3                      DEFENDANT: Objection.

4                      THE COURT: Your objection is noted. I

5 gave my ruling.

6                      DEFENDANT: May, Your Honor, Your

7 Honor-

8                      THE COURT: I've made my ruling.

9                      DEFENDANT: - I would like to place on

10 the record that I have not been able to complete the discovery that there, that the,

11 uh, the, uh, Child Support Agency had placed on the record that there is an

12 agree-, asking about an agreement. I have not been able to cross examine the

13 Defendant. That is a violative of due process-

14                      THE COURT: Sir, you can, Sir-

15                      DEFENDANT: -because my, I have-

16                      THE COURT: Ma'am, Ma'am, Ma'am-

17                      DEFENDANT: -the right to examine-

18                      THE COURT: -if you have any questions-

19                      DEFENDANT: -(inaudible)-

20                      THE COURT: -for Mr. Meyersiek, feel

21 free to, feel free to ask him.

22                      DEFENDANT: So, therefore, we are now

23 vacating your prior decision-

24                      THE COURT: No, we're not! No, we're

25 not!

1                            DEFENDANT: -because we, because we

2    are, we have not gone through due process in terms of my asking, be able to

3    cross examine the Defendant. I'm sorry, the Plaintiff, the opposing party. I, I

4    would like to ask for my witness, Mr. Gould, to be, to the witness stand.

5                            THE COURT: Mr. Gould-

6                            ATTORNEY GOULD: Objection, Judge.

7                            THE COURT: Mr. Gould is not, is not a

8    witness.

9                            DEFENDANT: The State. The State, on

10   the State of Rhode Island and he represents the State of Rhode Island. He was

11   instrumen-, he had communicated with me prior to this particular proceeding,

12   the start of proceeding in 2022, by email, by conversation, and with John

13   Langlois. So, that's my witness. I'd like to put on the stand, as my witness-

14                        THE COURT: Today, the matter before-

15                       DEFENDANT: -regarding-

16                       THE COURT: -the matter before the

17   Court-

18                       DEFENDANT: -regarding-

19                       THE COURT: -is a motion to set-

20                       DEFENDANT: -the waiver of interest-

21                       THE COURT: -to set arrears-

22                       DEFENDANT: -regarding-

23                       THE COURT: Ma'am, Ma'am-

24                       DEFENDANT: -the waiver of interest-

25                       THE COURT: Ma'am, I'm gonna mute

1    you again. The matter before the Court today is simply a motion to set arrears.

2    We set the arrears, there's nothing further before the Court. If you wanna file a

3    different motion, feel free to do so, but this matter is concluded with your arrears

4    being set at $81,652.49.

5                                    DEFENDANT: Your, unmute, am I

6    unmuted?

7                                    THE COURT: No. Yeah.

8                                    DEFENDANT: Am I unmuted? Uh, I am

9    filing, I am asking for, um, uh, reconsideration because there is, I have not, I've

10   been, uh, uh, barred, obstructed from presenting evidence. I'd like to play, uh,

11   the audio recording of the waiver of interest.

12                                   THE COURT: Today is the motion to set

13   the, to set the interest.

14                                   DEFENDANT: And that's my defense-

15                                   THE COURT: The motion to set arrears,

16                                   DEFENDANT: -my defense is, I would

17   like to play the recording of the waiver of interest that the State had represented

18   that Gero had done. If I'm obstructed from, uh, providing evidence and we have

19   a due process issue in this proceeding. I have not been, I want to present

20   evidence, I want to cross examine the witness, I want to pro-, I want to call my

21   witness and I have a right to do so-

22                                   THE COURT: Ma'am, if you want to do

23   that, this is not, this is not the forum for that. I can do that in another proceeding.

24                                   DEFENDANT: Yes, it is! Yes, it is-

25                                   THE COURT: Uh, well, I respectfully dis-

1    agree with you.

2                                    DEFENDANT: -because we are here-

3                                    THE COURT:  I respectfully disagree-

4                                    DEFENDANT: -to establish, we are here

5    to establish, we're here supposedly to establish interest and I am presenting

6    evidence that interest was waived.

7                                    THE COURT: Interest was not waived in

8    any Court order and that is the basis upon which-

9                                    DEFENDANT: It was waived-

10                                   THE COURT: -I made my decision today.

11                                   DEFENDANT: -(inaudible)-

12                                   THE COURT: Ma'am, Ma'am-

13                                   DEFENDANT: -it was waived-

14                                   THE COURT: -I'm muting you because

15   you don't let me speak. There is no Court order by this Court by any Magistrate

16   or Judge that waived or set the interest to zero. It is still in the system, and that is

17   why today I am going to establish that the interest owed by you on this account

18   is set at $81,652.49. There was no Court order to the contrary. This matter is

19   now concluded.

20                                   DEFENDANT: I am now, I am now

21   raising the issue, uh, that interest was waived by contract and agreement-

22                                   THE COURT: Ma'am, I, Ma'am-

23                                   DEFENDANT: -with Gero Meyersiek-

24                                   THE COURT: -I, I just, Ma'am-

25                                   DEFENDANT: -and this is all part of the-

1                          THE COURT: -I just gave you the

2    reasoning-

3                          DEFENDANT: -(inaudible) process-

4                          THE COURT: -for the Court's decision is

5    based on the fact that the Court file is void of any order or judgement that

6    waived the interest of set it to zero.

7                          DEFENDANT: Also, the interest rate of

8    12% compounding interest is illegal under, uh, Social Security Act. They have

9    put out-

10                         THE COURT: Well, that's the interest rate

11   that-

12                         DEFENDANT: -12% compound interest-

13                         THE COURT:  -that's been established-

14                         DEFENDANT: -that is illegal under-

15                         THE COURT: -by the State of Rhode

16   Island.

17                         DEFENDANT: -Federal law, which

18   preempts Rhode Island law.

19                         THE COURT: Thank you very much, Miss

20   Seguin-

21                         DEFENDANT: I just wanna make sure

22   that-

23                         THE COURT: Your objection is moted.

24                         DEFENDANT: -(inaudible)-

25                         THE COURT: Thank you very much-

1          DEFENDANT: -(inaudible)-

2          THE COURT: -Mr. Meyersiek-

3          DEFENDANT: -also entitled-

4          THE COURT: -Attorney Gould-

5          DEFENDANT: -to see Judge created laws

6    on these, this issue. I have been prevented from accessing those. There's

7    (inaudible) public records (inaudible)-

8          THE COURT: Ma'am, we gave you every

9    Court record you requested.

10          DEFENDANT: -Federal-

11          THE COURT: You requested-

12          DEFENDANT: -that was all Judge

13   created-

14          THE COURT: -you requested the Court

15   file-

16          DEFENDANT: -laws. (Inaudible) 12%

17   compounding interest-

18          THE COURT: -for a number of years. I'm

19   not going to let you yell at me.

20          DEFENDANT: Why-

21          THE COURT: You're not going to talk

22   over me.

23          DEFENDANT: Why-

24          THE COURT: This hearing is concluded.

25   Thank you very much.

1                                       ATTORNEY GOULD: Thank you, Judge.

2                                       DEFENDANT: I object and raise that the-

3                                       THE COURT: Thank you-

4                                       DEFENDANT: -interest, as well-

5                                       THE COURT: Thank you.

6                                       DEFENDANT: -and compound interest is

7       illegal-

8                                       ATTORNEY GOULD: Thank you, Judge.

9                                       DEFENDANT: I'm looking to appeal this

10      to the Judge, Miss, uh, Your Honor, Magistrate-

11                                      THE COURT: And you're, and you're free

12      to do so.

13                                      DEFENDANT: And I'm doing that on an

14      oral basis, so here are-

15                                      THE COURT: You can file that with the

16      Clerk-

17                                      DEFENDANT: -I am doing that orally-

18                                      THE COURT: You can file that with the

19      Clerk. I will make a notation.

20                                      DEFENDANT: -this is an oral motion, an

21      oral motion, this is an oral motion-

22                                      THE COURT: Thank you.

23                                      DEFENDANT: -to-

24                                      THE COURT: It's noted.

25                                      DEFENDANT: -appeal the Magistrate's

1    order-

2                                    THE COURT: Your appeal from my

3    decision is noted. It will be put in the order.

4                                    DEFENDANT: -for a hearing, there was

5    no hearing on this, there was no trial on this, no trial was provided. I was

6    prevented from, uh, from, uh, from, uh, from presenting evidence-

7                                    THE COURT: And you may appeal my

8    decision-

9                                    DEFENDANT: -(inaudible) audio

10    recording-

11                                    THE COURT: -to a Famiy Court Justice.

12    Thank you very much.

13                                    DEFENDANT: I'm appealing it. I, I have

14    appealed it orally, now.

15                                    CLERK: Nope, can't do that.

16                                    THE COURT: You have to file an appeal

17    yourself in the Clerk's office.

18                                    CLERK: And she has to pay for a

19    transcript-

20                                    DEFENDANT: According to Turner

21    versus Rodgers, another U.S. Supreme Court case, I am entitled to not have to

22    do a, uh, a written motion. I can do an oral motion for an appeal to a, uh, to, to

23    the Jus-, Judge, uh, at iss-, that's, uh, of issue and I'm requesting a hearing date

24    for that appeal.

25                                    CLERK: Sorry, that goes before a Judge.

1                                         DEFENDANT: Clerk (inaudible)-

2                                        THE COURT: That has to go before a

3   Family Court Judge.

4                                        CLERK: Only the Office can give appeal

5   dates, and there's a process and she has to order a transcript, and pay for it,

6   before that transcript will even be typed out.

7                                        THE COURT: Miss Seguin, did you hear

8   the Clerk?

9                                        DEFENDANT: Who is the, uh, who is the,

10  uh, the Scribe for this, the, uh, Stenographer? So, today, I wanna make very

11  clear, you all know you're establishing this Court, um, establishing interest and

12  what you're also saying is that the, the, uh, the interest was supposedly

13  established but you're reestablishing interest?

14                                   THE COURT: I've made my ruling-

15                                   DEFENDANT: There's no-

16                                   THE COURT: -I've made my ruling-

17                                   DEFENDANT: -(inaudible)-

18                                   THE COURT: -Miss Seguin, I've made

19  my ruling. You've indicated you're interest in appealing. That is noted for the

20  record. We have other cases that are waiting to be heard. Thank you very much

21  and-

22                                   DEFENDANT: I'm looking to-

23                                   THE COURT: -you're free to follow up-

24                                   DEFENDANT: -as a pro se litigant-

25                                   THE COURT: -however you see fit. Thank

1    you so much.

2                      DEFENDANT: -I'm looking to-

3                      THE COURT: I understand that and thank

4    you.

5                      DEFENDANT: -understand what the

6    Court order will say.

7                      THE COURT: Thank-

8                      DEFENDANT: What will the Court order

9    say? What will the Court order say?

10                    THE COURT: Mr. Gould will draft the

11    Court order for my signature, and you'll receive a copy of it. Thnak you very

12    much.

13                    DEFENDANT: Now, what would it, what

14    would it, so that we're all clear, so I can also put on the record any objections.

15    The objection, so, you're-

16                    THE COURT: Miss Seguin-

17                    DEFENDANT: -ordering reestablishment

18    because that's the motion. The motion is to reestablish interest.

19                    THE COURT: It's not reestablish.

20                    DEFENDANT: And-

21                    THE COURT: It's set arrears. That was the

22    motion, to set arrears. The arrears are the interest that you owe on the case,

23    Ma'am, and this hearing is over.

24                    DEFENDANT: So, you are-

25                    THE COURT: I'm going to end the

1    hearing-

2                                    DEFENDANT: -you are (inaudible)-

3                                    THE COURT: You are not going to talk

4    over me. The hearing is over. You can file your appeal. Thank you very much.

5    Have a good day.

6                                    DEFENDANT: I would like to put on the

7    record-

8                                    THE COURT: The hearing is over,

9    Ma'am.

10                                   DEFENDANT: -um, my appeal.

11                                   THE COURT: The hearing is over. You

12   can't cont-

13                                   DEFENDANT: I would like to put on the

14   record for the appeal, because the appeal is critically important.

15                                   THE COURT: I understand that.

16                                   DEFENDANT: The appeal basically-

17                                   THE COURT: We're not, no, we're not

18   going to hear your appeal now.

19                                   DEFENDANT: You don't have-

20                                   THE COURT: We're not going to hear

21   your appeal now.

22                                   DEFENDANT: You don't have, this Court

23   does not have jurisdiction-

24                                   THE COURT: You've noted you're

25   objection, you've noted your objection, you're not going to argue your appeal

1  now and you're not gonna talk over me, okay. I've made my ruling. You

2  disagree with it. You have a right to appeal and the hearing is over, okay. You're

3  not going to argue your appeal here. You don't like my decision, you don't

4  agree with my decision, and the hearing is over, because there's nothing left to

5  discuss. I'm ending this meeting for everyone. I'm ending-

6                              DEFENDANT: You-

7                              THE COURT: I'm ending the meeting for

8  everyone.

9                              DEFENDANT: The Family Court does not

10  have jurisdiction-

11                              THE COURT: Thank you.

12                              DEFENDANT: -over agreements between

13  Gero and myself-

14                              THE COURT: Thank you. I'm ending, I'm

15  ending the meeting. Thank you.

16                              DEFENDANT: I'm putting that on the

17  record. The Family Court lacks subject matter-

18                              THE COURT: Okay.

19                              DEFENDANT: -jurisdiction, nor personal

20  jurisdiction regarding agreements-

21                              THE COURT: I'm ending the meeting-

22                              DEFENDANT: -between Gero Meyersiek-

23                              THE COURT: -for everyone.

24                              DEFENDANT: -and myself-

25                              THE COURT: Thank you, Mr. Meyersiek-

1                              DEFENDANT: -and that was a question-

2                              THE COURT: -thank you, Mr. Gould-

3                              DEFENDANT: -Mr. Gould had posed-

4                              THE COURT: Thank you very much. I'm

5   ending the meeting for everyone.

6                              DEFENDANT: In-

7

8

9                              **HEARING CONCLUDED.**

10

11

12

13

14

EXHIBIT F

## SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

EXHIBIT G



cseinfo.dhs.ri.gov

State of Rhode Island
# Office of Child Support Services
DEPARTMENT OF HUMAN SERVICES

RI Government Agencies | Privacy policy | Search RI.gov:

Home  My Profile  Contact Us  Site Map  Log Out

**Menu**
- **Case Information**
  - Last 5 Payments
  - Last 13 Months
  - Current Orders/ Past Due Balances
  - Court Dates/ Appointments
  - Enforcement Actions
  - PIN Lookup

Home > Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek          CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|--------|--------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Exhibit B

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JIM HODGES, in his official capacity
as Governor of the State of South
Carolina; JEAN HOEFER TOAL, in her
official capacity as Chief Justice of
South Carolina; SOUTH CAROLINA
DEPARTMENT OF SOCIAL SERVICES;
STATE OF SOUTH CAROLINA; PEOPLE OF
SC, on Behalf of the State of South
Carolina; JOHN DOE; JANE DOE, and
those similarly situated,

                    *Plaintiffs-Appellants,*

            v.                                      No. 00-2512

TOMMY G. THOMPSON, SECRETARY,
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; WADE
F. HORN, Ph.D. in his official
capacity as Assistant Secretary of
the United States Department of
Health and Human Services for
Children and Families; U.S.
DEPARTMENT OF HEALTH & HUMAN
SERVICES,

                    *Defendants-Appellees.*

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Julian Abele Cook, Jr., Senior District Judge, sitting by designation.
(CA-00-2048-3-17)

Argued: December 6, 2001

Decided: November 15, 2002

Before WIDENER, NIEMEYER, and MOTZ, Circuit Judges.

---

Affirmed by published per curiam opinion.

---

## COUNSEL

**ARGUED:** Marcus Angelo Manos, NEXSEN, PRUET, JACOBS & POLLARD, L.L.C., Columbia, South Carolina, for Appellants. Gregory George Katsas, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Wilburn Brewer, Jr., NEXSEN, PRUET, JACOBS & POLLARD, L.L.C., Columbia, South Carolina; A.E. Dick Howard, Charlottesville, Virginia, for Appellants. Stuart E. Schiffer, Acting Assistant Attorney General, Scott N. Schools, United States Attorney, Jacob M. Lewis, Peter J. Smith, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

## OPINION

PER CURIAM:

   The Governor of South Carolina appeals the grant of summary judgment to the Secretary of the United States Department of Health and Human Services in the State's action seeking injunctive and declaratory relief from conditions imposed for federal funding of the Temporary Assistance to Needy Families (TANF) program.

   South Carolina challenges the district court finding that Congress acted within its Spending Clause authority when it conditioned States' receipt of federal funds under the child support enforcement program and the TANF program on compliance with the requirement that States develop and maintain automated child support enforcement systems and that such a condition was not so coercive as to violate the Tenth Amendment. The State further alleges the district court

erred when it found that the Secretary did not have the discretion to amend the statutory penalty structure for a State's noncompliance with the child support systems requirements. In addition, South Carolina contends the court erred in finding that the State could not invoke the protections of the Due Process Clause. After considering the parties' briefs and the record, and following oral argument, we affirm substantially on the reasoning of the district court.

## I.

The district court opinion contains a comprehensive history, the details of which need not be repeated here, of the federal government's longstanding involvement in child support enforcement programs and related federal efforts to work with the States to solve the serious problem of nonpayment of child support. See *Hodges v. Shalala*, 121 F.Supp.2d 854 (D.S.C. 2000). Currently, as a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements that the State establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A). South Carolina concedes that it has neither a federally certifiable statewide automated system for child support nor an SDU. See *Hodges*, 121 F. Supp. 2d at 861.

Without an approved state plan, a State may lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). See 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2). Alternatively, a State may opt for an alternative penalty in lieu of disapproval of their state plan and the withholding of federal funds if the State is making a good faith effort to comply with the program's requirements and the State has submitted a corrective compliance plan. See 42 U.S.C. § 655(a)(4). South Carolina has elected to incur the alternative penalty.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and review a district court's grant of summary judgment *de novo*. See *United States v. Kanasco, Ltd.*, 123 F.3d 209, 210 (4th Cir. 1997).

4                                      HODGES v. THOMPSON

## II.

We turn first to South Carolina's contention that the federal government's requirements and penalties associated with the state-wide automated systems, which South Carolina failed to provide, exceed Congressional authority under the Spending Clause and the Tenth Amendment.

Consistent with its Spending Power, Congress may attach conditions on the receipt of federal funds. See *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Spending Power is not unlimited, of course, and the Supreme Court has recognized four general limitations: spending must be in pursuit of the general welfare; any attached conditions must be unambiguous; conditions must also be related to a federal interest; and, the obligations imposed by Congress may not violate any independent constitutional provisions. See *Dole*, 483 U.S. at 207-08.

The district court found that "Congress made a considered judgment that the American people would benefit significantly from the enhanced enforcement of child-support decrees and the diminution of the number of parents who are able to avoid their obligations simply by moving across local or state lines." *Hodges*, 121 F. Supp. 2d at 873. Thus, like the district court, we are satisfied that Congress acted in the general welfare when it enacted the child support enforcement programs and the associated funding conditions under Title IV-D.

South Carolina's contention that the Title IV-D conditions are ambiguous is without merit. The statute expressly provides that compliance with the automated system and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A. We agree with the district court that the clear and unequivocal statement of the required conditions in the statute enabled South Carolina to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted).

A third limitation on the Spending Power requires that conditions "bear some relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992) (citing *Dole*, 483 U.S. at 207-08, n.3). Here, there is a complementary relationship

between efficient child support enforcement and the broader goals of providing assistance to needy families through the TANF program. Establishing paternity and collecting child support may enable families to reduce their dependence on the welfare system, and both programs are intended to reduce the incidence of poverty among children and families. The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely to provide uniform levels of support for children of equal need").[1]

South Carolina does not contend that the Title IV-D conditions violate the fourth limitation on the Spending Power — that the conditions violate any independent Constitutional prohibition, rather it raises a Tenth Amendment[2] challenge. As we have recently reconfirmed, "the Tenth Amendment itself *does not* act as a constitutional bar to Congress's spending power; rather, the fourth restriction on Congress's spending power stands for the more general proposition that Congress may not induce the states to engage in activities that would themselves be unconstitutional." *James Island Pub. Serv. Dist. v. City of Charleston*, 249 F.3d 323, 327 (4th Cir. 2001) (citing *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000)) (italics in original). We therefore next consider South Carolina's Tenth Amendment argument, not as a limitation related to the Spending Clause, but as an independent constitutional challenge.

South Carolina argues that the coercive effect of the Title IV-D conditions run afoul of the protections of the Tenth Amendment. The Supreme Court has recognized that the Tenth Amendment may be implicated when the financial incentives offered by the federal government to the States cross the impermissible line where "pressure

---

[1] *Sullivan* considered the relationship between child enforcement programs and Aid to Families with Dependent Children (AFDC). 496 U.S. at 478. TANF is a block grant program established in 1996 as the successor to the AFDC program. See 42 U.S.C. §§ 601-618.

[2] The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

turns into compulsion." See *Dole*, 483 U.S. at 211 (citations omitted). Congress may use its Spending Power to influence a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, but Congress, under the Commerce Clause, may offer the States a choice of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

The district court found that, based on the State's own admission, the alternative penalty, which South Carolina has now elected, would result in the loss of a small fraction of the State's TANF funds and that such a proportion was noncoercive. Given the linkages between child support enforcement and aid to needy families and the level of the alternative penalty, we agree with the district court's conclusion that "the Title IV-D conditions are not so overbearing as to create an unconstitutional compulsion." *Hodges*, 121 F.2d at 875.

South Carolina next contends that the Secretary of the Department of Health and Human Services (HHS) has the discretion to deviate from the alternative penalty structure of Title VI-D in order to respond to the peculiar circumstances that led to South Carolina's noncompliance. Specifically, South Carolina argues that its inability to comply with the automated system and SDU requirements was caused by the failure of its prime contractor, Unisys, to deliver on its contract with the State. South Carolina maintains that because its noncompliance was no fault of its own and its alternative systems are in substantial compliance with the goals of the statute, the Secretary abused her discretion by refusing to grant South Carolina an evidentiary hearing and waive or amend the alternative penalty for noncompliance.

We have examined the penalty provisions of the statute and, like the district court, cannot find the discretion South Carolina envisions. The wording of the statute is plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submit-

HODGES v. THOMPSON                    7

ted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and *the Secretary shall reduce the amount otherwise payable to the State* [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). Again, we agree with the district court that "[b]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges*, 121 F.2d at 879. Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, South Carolina's assertion that it is entitled to an evidentiary hearing must also fail.[3]

### III.

For the foregoing reasons, we are of opinion that the Title IV-D provisions are constitutionally valid under the Spending Clause and the Tenth Amendment and that the Secretary lacks discretion under Title IV-D to deviate from the penalty provisions.

The judgment of the district court is accordingly

*AFFIRMED*.

---

[3]In the district court, South Carolina asserted a Due Process claim which the district court denied. The court concluded that the "State cannot invoke the protections of the Fifth Amendment with claims that [the State] has been harmed." *Hodges*, 121 F.2d at 865. South Carolina does not take issue with the district court's holding, but rather, on appeal it asserts that the State is entitled to assert a Due Process claim on behalf of its citizens. Because this contention was never properly presented to the district court, we do not consider it now. See *McGowan v. Gillenwater*, 429 F.2d 586, 587 (4th Cir. 1970).

Exhibit C

No. 10-10

# In the Supreme Court of the United States

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

*ON WRIT OF CERTIORARI
TO THE SUPREME COURT OF SOUTH CAROLINA*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING REVERSAL**

SALLY A. HOWARD
  *Acting General Counsel*
ROBERT E. KEITH
  *Associate General Counsel*
LISETTE PEDRE MESTRE
  *Attorney*
  *Department of Health and*
    *Human Services*
  *Washington, D.C. 20201*

NEAL KUMAR KATYAL
  *Acting Solicitor General*
    *Counsel of Record*
TONY WEST
  *Assistant Attorney General*
LEONDRA R. KRUGER
  *Acting Deputy Solicitor*
    *General*
JOSEPH R. PALMORE
  *Assistant to the Solicitor*
    *General*
LEONARD SCHAITMAN
EDWARD HIMMELFARB
  *Attorneys*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**QUESTIONS PRESENTED**

1.  Whether the Court has jurisdiction to review the decision of the South Carolina Supreme Court.

2.  Whether due process requires that the State provide counsel, at its expense, to an indigent parent in a child-support proceeding, when the parent is subject to a civil-contempt order for non-payment that may lead to confinement.

(I)

**TABLE OF CONTENTS**

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Argument:
    I.    The Court has jurisdiction to review the decision of
        the South Carolina Supreme Court . . . . . . . . . . . . . . . 13
   II.    The absence of adequate procedures necessary
        to secure an accurate adjudication of civil
        contempt violated due process . . . . . . . . . . . . . . . . . . . 16
        A.   Confinement for civil contempt is
            permitted only when the contemnor is
            presently able to comply with the
            underlying order . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
        B.   The Family Court's procedures were
            inadequate to ensure an accurate
            determination of present ability to pay . . . . . . . . 19
        C.   Due Process can be satisfied by a variety of
            procedures intended to assure an accurate
            determination of present ability to pay in a
            civil contempt proceeding . . . . . . . . . . . . . . . . . . 23
            1.  Courts can comply with Due Process by
                providing a meaningful opportunity for an
                alleged contemnor to establish his present
                ability to pay . . . . . . . . . . . . . . . . . . . . . . . . . . 24
            2.  There is no basis for an inflexible right to
                counsel rule in civil contempt proceedings . . . 25
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

(III)

IV

## TABLE OF AUTHORITIES

Cases:

*Alvarez* v. *Smith*, 130 S. Ct. 576 (2009) . . . . . . . . . . . . . . . 15

*Blessing* v. *Freestone*, 520 U.S. 329 (1997) . . . . . . . . . . . . . 3

*Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886
    (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Carlson* v. *Landon*, 342 U.S. 524 (1952) . . . . . . . . . . . . . . 32

*City of L.A.* v. *Lyons*, 461 U.S. 95 (1983) . . . . . . . . . . 14, 15

*DeFunis* v. *Odegaard*, 416 U.S. 312 (1975) . . . . . . . . . . . . 14

*First Nat'l Bank* v. *Bellotti*, 435 U.S. 765 (1978) . . . . . . . . 14

*Foucha* v. *Louisiana*, 504 U.S. 71 (1992) . . . . . . . . . . . . . . 20

*Gagnon* v. *Scarpelli*, 411 U.S. 778
    (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25, 26, 27, 28, 29

*Gault, In re*, 387 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . 26

*Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418
    (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Hicks* v. *Feiock*, 485 U.S. 624 (1988) . . . . . . . . . . . . . . 17, 18

*Hodges* v. *Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000),
    aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied,
    540 U.S. 811 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*INS* v. *Lopez-Mendoza*, 468 U.S. 1032 (1984) . . . . . . . . . 32

*International Union, United Mine Workers* v.
    *Bagwell*, 512 U.S. 821 (1994) . . . . . . . . . . . . . . . 18, 19, 26

*Landon* v. *Plasencia*, 459 U.S. 21 (1982) . . . . . . . . . . . . . 31

*Lassiter* v. *Department of Soc. Servs.*, 452 U.S. 18
    (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189
    (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Maggio* v. *Zeitz*, 333 U.S. 56 (1948) . . . . . . . . . . . . . . . 17, 18

*Mathews* v. *Eldridge*, 424 U.S. 319
    (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19, 20, 25, 26, 29

V

Cases—Continued:                                          Page

*Middendorf* v. *Henry*, 425 U.S. 25 (1976) . . . . . 12, 26, 29, 31

*Mohammed* v. *Gonzales*, 400 F.3d 785 (9th Cir. 2005) . . . 32

*Morrissey* v. *Brewer*, 408 U.S. 471 (1972) . . . . . . . . . . 19, 26

*Moseley* v. *Mosier*, 306 S.E.2d 624 (S.C. 1983) . . . . . . . . 17

*Murphy* v. *Hunt*, 455 U.S. 478 (1982) . . . . . . . . . . . . . 13, 14

*Nazakat* v. *INS*, 981 F.2d 1146 (10th Cir. 1992) . . . . . . . 33

*Olmstead* v. *L.C.*, 527 U.S. 581 (1999) . . . . . . . . . . . . . . . 15

*Shillitani* v. *United States*, 384 U.S. 364 (1966) . . . . . 11, 17

*Spencer* v. *Kemna*, 523 U.S. 1 (1998) . . . . . . . . . . . . . . 13, 14

*United States* v. *Bauer*, 956 F.2d 693 (7th Cir.),
  cert. denied, 506 U.S. 882 (1992) . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Campos-Asencio*, 822 F.2d 506
  (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States* v. *Gasca-Kraft*, 522 F.2d 149 (9th Cir.
  1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Rylander*, 460 U.S. 752 (1983) . . . . . . . . 18

*United States* v. *Torres-Sanchez*, 68 F.3d 227 (8th Cir.
  1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States Parole Comm'n* v. *Geraghty*,
  445 U.S. 388 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Vitek* v. *Jones*, 445 U.S. 480 (1980) . . . . . . . . . . . . . . . 26, 27

*Walters* v. *National Ass'n of Radiation Survivors*,
  473 U.S. 305 (1985) . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

*Weinstein* v. *Bradford*, 423 U.S. 147 (1975) . . . . . . . . . . . 14

*Wilkinson* v. *Austin*, 545 U.S. 209 (2005) . . . . . . . . . . . . . 19

*Yee* v. *City of Escondido*, 503 U.S. 519 (1992) . . . . . . . . . . 24

VI

Constitution, statutes and regulations:                    Page

U.S. Const.:

  Amend. V (Due Process Clause) . . . . . . . . . . . . . . . . . 9, 19

  Amend. VI  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 26, 27

  Amend. XIV (Due Process Clause)  . . . . . . . . . . . . . . . 19

Social Services Amendments of 1974, Pub. L.
No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651
*et seq.*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

  § 101(c)(5)(C), 88 Stat. 2360  . . . . . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 654(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 654(6) (1976) . . . . . . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 654(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 654(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    42 U.S.C. 654(24) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    42 U.S.C. 654a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 654a(e)(1)  . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 654a(e)(4)  . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 654a(e)(5)  . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 654a(g)(1)  . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 655(a)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . 4

    42 U.S.C. 655(a)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . 2

    42 U.S.C. 655(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . 4

    42 U.S.C. 655(a)(4)  . . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 656(a)(1) (1976) . . . . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 657(a)(4)(B) (1976) . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 657(b) (1976) . . . . . . . . . . . . . . . . . . . . . . 3

    42 U.S.C. 666(a)(1)-(8)  . . . . . . . . . . . . . . . . . . . . . . 4

VII

Statutes and regulations—Continued:                    Page

      42 U.S.C. 666(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . 30

      42 U.S.C. 666(a)(7)(B)(i) . . . . . . . . . . . . . . . . . . . . 30

      42 U.S.C. 666(a)(8)(A)(iv) . . . . . . . . . . . . . . . . . . . 30

      42 U.S.C. 666(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      42 U.S.C. 666(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      42 U.S.C. 666(c)(1)(H) . . . . . . . . . . . . . . . . . . . . . . . 30

Child Support Enforcement Amendments of 1984,
    Pub. L. No. 98-378,  98 Stat. 1329:

      § 6, 98 Stat. 1314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      § 23(a)(2), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . . 4

      § 23(a)(5), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . . 4

Family Support Act of 1988, Pub. L. No. 100-485,
    102 Stat. 2343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      § 123(a)(C), 102 Stat. 2352 . . . . . . . . . . . . . . . . . . . . 5

Personal Responsibility and Work Opportunity
    Reconciliation Act of 1996, Pub. L. No. 104-193,
    110 Stat. 2105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      § 344(a)(2), 110 Stat. 2235 . . . . . . . . . . . . . . . . . . . . 6

Social Security Act Amendments of 1950, ch. 809,
    § 321(b), 64 Stat. 550 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Social Security Amendments of 1967, Pub. L.
    No. 90-248, § 201(a)(1), 81 Stat. 877-879 . . . . . . . . . . . . 2

      § 201(a)(1), 81 Stat. 879 . . . . . . . . . . . . . . . . . . . . . . . 3

8 U.S.C. 1229a(b)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . 32

8 U.S.C. 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. 3006A(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

28 U.S.C. 1257(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. 602(a)(26) (1976) . . . . . . . . . . . . . . . . . . . . . . . 3

VIII

Statutes and regulations—Continued:                    Page

42 U.S.C. 608(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

42 U.S.C. 608(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

45 C.F.R.:

    Section 302.70(a)(5)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Section 303.5(g)(2)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Section 303.6 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Section 303.6 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Section 303.20(c)(7) (1975) . . . . . . . . . . . . . . . . . . . . . . . 4

    Section 303.20(c)(7) (1989) . . . . . . . . . . . . . . . . . . . . . . . 5

    Section 303.100(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Section 303.100(f)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Section 303.101(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Section 303.102(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Section 303.104(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Section 304.20(b)(3)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Section 304.23(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Section 304.23(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Sup. Ct. R. 14.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

S.C. Rule of Family Ct.:

    R. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    R. 24(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    R. 24(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

S.C. Code Ann. (West):

    § 43-5-220(c) (Supp. 2009) . . . . . . . . . . . . . . . . . . . . . . . 25

    § 43-5-235 (Supp. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    § 63-3-620 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

IX

Miscellaneous:                                                            Page

    52 Fed. Reg. 32,130 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    U.S. Dep't of Health & Human Servs.:

      National Child Support Enforcement, *Strategic*
        *Plan: FY 2005-2009*, http://www.acf.hhs.gov/
        programs/cse/pubs/2004/Strategic_Plan_
        FY2005-2009.pdf . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

      Office of Child Support Enforcement, *National*
        *Status of Automated Child Support Systems*,
        http://www.acf.hhs.gov/programs/
        cse/stsys/certmap.htm . . . . . . . . . . . . . . . . . . . . . . . . . 6

    Elizabeth G. Patterson, *Civil Contempt & the*
      *Indigent Child Support Obligor: The Silent*
      *Return of Debtor's Prison*, 18 Cornell J.L. & Pub.
      Pol'y 95 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

    S. Rep. No. 387, 98th Cong., 2d Sess. (1984) . . . . . . . . . . 30

    Elaine Sorensen et al., *Assessing Child Support*
      *Arrears in Nine Large States & the Nation* (2007)
      http://aspe.hhs.gov/hsp/07/assessing-CS-debt/
      report.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

    South Carolina Dep't of Social Servs., *Response to*
      *Budget Proviso 13.27* (Aug. 31, 2007),
      http://www.scstatehouse.gov/reports/DSS/
      Provisoresponse1327_083107.doc . . . . . . . . . . . . . . . . . . 6

# In the Supreme Court of the United States

—————

No. 10-10

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

—————

*ON WRIT OF CERTIORARI*
*TO THE SUPREME COURT OF SOUTH CAROLINA*

—————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**
**SUPPORTING REVERSAL**

—————

### INTEREST OF THE UNITED STATES

This case concerns the due process protections that apply in a state civil contempt proceeding for non-payment of court-ordered child support. The state child-support enforcement program at issue in the case, like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 *et seq.*) (adding Title IV-D to the Social Security Act). The program, which is administered by the Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for 66% of the costs of operating their child-support enforcement programs. 42 U.S.C.

(1)

2

655(a)(2)(C). The United States has a substantial interest in the effective and equitable operation of such child-support programs.

## STATEMENT

1. This case involves proceedings in South Carolina family court to enforce a child-support order entered against petitioner for the support of his and respondent Rogers' minor child. South Carolina, like every other State, maintains a child-support enforcement program as a condition of receiving federal funding for its Temporary Assistance for Needy Families program. Since Congress first required States receiving federal funds to undertake child-support enforcement efforts, it has shifted its emphasis from a localized, court-based enforcement approach to centralized and automated efforts. South Carolina, however, maintains a localized, court-based approach to child-support enforcement.

a. Congress first required States receiving federal funds to establish child-support enforcement programs in 1950, pursuant to the Aid to Families with Dependent Children (AFDC) program. See Social Security Act Amendments of 1950, ch. 809, § 321(b), 64 Stat. 550 (requiring States receiving AFDC funds to "provide for prompt notice to appropriate law-enforcement officials of the furnishing of aid to dependent children in respect of a child who has been deserted or abandoned by a parent"). In 1968, Congress required States participating in AFDC to create statewide or local "organizational unit[s]" for establishing paternity and collecting child support. Social Security Amendments of 1967, Pub. L. No. 90-248, § 201(a)(1), 81 Stat. 877-879. It also required States to "provide for entering into cooperative arrangements with appropriate courts and law enforce-

3

ment officials  *  *  *  to assist" with administration of
the program.  *Id.* § 201(a)(1), 81 Stat. 879.

b.  In 1975, Congress adopted Title IV-D, 42 U.S.C.
651 *et seq.*, and established the general statutory frame-
work that exists today.  See 1975 Act § 101(a), 88 Stat.
2351; *Blessing* v. *Freestone*, 520 U.S. 329, 333-335 (1997)
(describing program).  The 1975 Act required States
participating in AFDC to "have in effect a plan ap-
proved" by the Secretary under Title IV-D and to "op-
erate a child support program in conformity with such
plan."  1975 Act § 101(c)(5)(C), 88 Stat. 2360.  In particu-
lar, each State was required to provide services to locate
noncustodial parents and to establish the paternity of,
and secure support for, children receiving AFDC bene-
fits.  42 U.S.C. 654(4).

Under the 1975 Act, AFDC recipients were required
to assign their support rights to the State and cooperate
in enforcement efforts.  42 U.S.C. 602(a)(26) (1976).
Amounts recovered generally were retained by the State
to reimburse it and the federal government for AFDC
assistance provided to the child's family.  42 U.S.C.
657(b) (1976).  Once assigned, the support obligation was
owed to the State and was collectible under all applica-
ble state processes.  42 U.S.C. 656(a)(1) (1976).[1]

The Secretary's regulations implementing the 1975
Act reflected a localized, court-centered approach to
enforcement.  States' efforts to collect past-due child
support were required to include ("as applicable and
necessary"):  "[c]ontempt proceedings to enforce an ex-
tant court order," court-ordered wage garnishment, and

---

[1]  Congress required States to provide services to non-AFDC families
as well, 42 U.S.C. 654(6) (1976), although those families were not requi-
red to assign their support rights and any child support the State collec-
ted was paid to the family, 42 U.S.C. 657(a)(4)(B) (1976).

4

attachment of real and personal property. 45 C.F.R. 303.6 (1975). States were also required to maintain sufficient staff (either statewide or locally) to "enforce collection of support" by "executing contempt proceedings, wage assignments, obtaining garnishment orders, attaching real and personal property, criminal prosecution and executing judgments." 45 C.F.R. 303.20(c)(7) (1975).

c. In 1984, Congress found that there remained "a critical lack of child support enforcement," which had "a critical impact on the health and welfare of the children of the Nation." Child Support Enforcement Amendments of 1984 (1984 Amendments), Pub. L. No. 98-378, § 23(a)(2) and (5), 98 Stat. 1329. The 1984 Amendments required States to adopt laws and procedures providing for, among other things, (i) mandatory wage withholding; (ii) expedited processes for obtaining and enforcing support orders; (iii) state income tax refund intercepts; and (iv) reporting overdue support to consumer credit agencies. 42 U.S.C. 666(a)(1)-(8) and (b).

Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for (optional) State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur." 1984 Amendments § 6, 98 Stat. 1314; 42 U.S.C. 654(16); 655(a)(3)(A).

d. Congress amended Title IV-D again in 1988 to improve the rate of child-support collection. Family Support Act of 1988 (1988 Act), Pub. L. No. 100-485,

5

102 Stat. 2343. Because effective child-support enforcement "had long been thwarted by localized enforcement systems that were unable to quickly and effectively track delinquent parents who crossed county and state lines," *Hodges* v. *Shalala*, 121 F. Supp. 2d 854, 874 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003), Congress in the 1988 Act emphasized centralized, automated record-keeping and information retrieval in order to improve collection rates. In particular, Congress mandated "automated data processing and information retrieval system[s]" that had previously been optional. 1988 Act § 123(a)(C), 102 Stat. 2352; 42 U.S.C. 654(24).

The Title IV-D regulations were amended after adoption of the 1988 Act. As amended, the regulations omitted specific references to contempt proceedings as required means for enforcing child-support obligations. See 45 C.F.R. 303.6, 303.20(c)(7) (1989);[2] cf. pp. 3-4, *supra*.

e. Finally, Congress made further changes to the child-support enforcement system in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (1996 Act), Pub. L. No. 104-193, 110 Stat. 2105, which, among other things, replaced AFDC with the block-grant program called Temporary Assistance for Needy Families (TANF).[3] Those changes again emphasized a centralized, automated approach to child-support

---

[2] Federal financial support remained available for "[e]nforcement of a support obligation" through a variety of means, including contempt citations. 45 C.F.R. 304.20(b)(3)(iv).

[3] The 1996 Act also imposed a five-year cap on benefits. 42 U.S.C. 608(a)(7). As before, a custodial parent is required to assign her rights to child support to the State as part of the application for TANF assistance. 42 U.S.C. 608(a)(3)(A).

6

enforcement. The amended statute established detailed requirements for the "statewide automated data processing and information retrieval systems" made mandatory in 1988. *Id.* § 344(a)(2), 110 Stat. 2235, 42 U.S.C. 654a(a). Among other things, the system must include a state case registry that includes every child-support case in the State, including the amount of monthly support owed and collected in all cases administered by the state agency. 42 U.S.C. 654a(e)(1) and (4); see 42 U.S.C. 654a(e)(5) (States must "promptly * * * update" case records when circumstances change). The States are required to use their centralized databases "to the maximum extent feasible, to assist and facilitate the collection and disbursement of support payments," including by establishing wage-withholding orders and sending wage-withholding notices to employers. 42 U.S.C. 654a(g)(1); see 42 U.S.C. 666(c).

f. Despite the changes in federal law, South Carolina maintains a localized, court-based approach to child-support enforcement. It is the only State that does not have a certified automated system. See Office of Child Support Enforcement, U.S. Dep't of Health & Human Servs., *National Status of Automated Child Support Systems*, http://www.acf.hhs.gov/programs/cse/stsys/certmap.htm.[4]

---

[4] In the 1996 Act, Congress determined that any State that failed to automate its child-support program should incur substantial penalties. 42 U.S.C. 655(a)(4). In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges* v. *Shalala*, *supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., *Response to Budget Proviso 13.27* at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

7

Acting pursuant to express statutory authority, S.C. Code Ann. § 43-5-235 (West Supp. 2009), the State's Department of Social Services has contracted with county clerks of court across the State to administer its program. The South Carolina courts have in turn adopted a special rule governing child-support enforcement. See S.C. Rule of Family Ct. 24 (S.C. Rule 24). The rule requires clerks of court to review on a monthly basis "all child support and periodic alimony accounts paid through the clerk of court," as are all accounts for children whose custodial parent receives TANF assistance. S.C. Rule 24(a); see 42 U.S.C. 608(a)(3)(A). When any such account is in arrears, the clerk is required to "issue a rule to show cause and an affidavit identifying the order of the court which requires such payments to be made and the amount of the arrearage [and] directing the party in arrears to appear in court at a specific time and date" to face contempt proceedings. S.C. Rule 24(b).

A "wilful[]" violation of a "lawful order" of a South Carolina court constitutes contempt and may subject the contemnor to up to 12 months confinement. S.C. Code Ann. § 63-3-620 (West 2010).

2. Respondent Rogers and petitioner are the parents of a minor child, B.L.P. In 2003, the family court in Oconee County, South Carolina, entered an Order of Financial Responsibility against petitioner. Although the order noted that petitioner was unemployed, the court imputed a gross monthly income of $1386 to him and ordered him to pay $59.72 a week in child support through the court. Pet. App. 22a; see *id.* at 19a-24a, 25a.

---

083107.doc. We are informed by HHS that the State has now paid a total of more than $72 million in penalties to date and currently owes an additional incurred penalty of more than $10 million for fiscal year 2010.

8

Because respondent Rogers was receiving public assis-
tance, she assigned her right to collect child support to
the Department of Social Services. Pet. Br. 8; see *id.* at
9 n.6 (payments were remitted to respondent Rogers
starting in 2004 because her benefits had ended but her
case continued to be administered as a Title IV-D case).
Petitioner fell behind on his payments, received a num-
ber of rules to show cause from the court clerk why he
should not be held in contempt, and was jailed three
times as a result. *Id.* at 9-10.

By 2007, petitioner was $5728.76 behind on his child-
support payments, and a judge of the Oconee County
Family Court issued a bench warrant for his arrest.
Pet. App. 6a; Pet. Br. 8-9. A hearing was held on Janu-
ary 3, 2008. After noting petitioner's outstanding bal-
ance and stating that he had not made a payment
since August 2006, the judge asked petitioner, "[i]s there
anything you want to say?" *Id.* at 17a. Petitioner re-
sponded:

> Well, when I first got out, I got back on dope. I done
> meth, smoked pot and everything else, and I paid a
> little bit here and there. And, when I finally did get
> to working, I broke my back, back in September. I
> filed for disability and SSI. And, I didn't get
> straightened out off the dope until I broke my back
> and laid up for two months. And, now I'm off the
> dope and everything. I just hope that you give me a
> chance. I don't know what else to say. I mean, I
> know I done wrong, and I should have been paying
> and helping her, and I'm sorry. I mean, dope had a
> hold to me.

*Ibid.*

9

After a brief exchange between petitioner and re-
spondent about his SSI application, the court said:

> If there's nothing else, this will be the Order of the
> Court.  I find the Defendant in willful contempt.  I'm
> gonna sentence him to twelve months in the Oconee
> County Detention Center.  He may purge himself of
> the contempt and avoid the sentence by having a zero
> balance on or before his release.

Pet. App. 18a.  The court made no finding that petitioner
was capable of paying the arrears while incarcerated.
See *id.* at 17a-18a.

At this hearing, neither petitioner nor respondent
Rogers was represented by counsel.  Pet. App. 6a.  How-
ever, pro bono counsel filed an appeal on petitioner's
behalf, alleging that petitioner had a right under the
Sixth Amendment and the Due Process Clause to have
appointed counsel in the contempt proceeding.  *Id.* at
10a-15a.  Before the intermediate state court could rule,
the South Carolina Supreme Court granted discretion-
ary review and affirmed the family court.  *Id.* at 1a-5a.

The court noted that the "purpose of civil contempt
is to coerce the defendant to comply with the court's
or-der," while criminal contempt's purpose is "to punish a
party for disobedience or disrespect."  Pet. App. 2a-3a.
"Civil contempt sanctions are conditioned on compliance
with the court's order.  * * *  A contemnor imprisoned
for civil contempt is said to hold the keys to his cell be-
cause he may end the imprisonment and purge himself
of the sentence at any time."  *Id.* at 3a.  The court recog-
nized that the "distinction between civil and criminal
contempt is crucial because criminal contempt triggers
additional constitutional safeguards not mandated in
civil contempt proceedings."  *Ibid.*

10

The court noted that in this case the family court had said that petitioner could "purge himself of the contempt" by achieving a "zero balance" on his arrearage. Pet. App. 3a.  Reasoning that "[t]his conditional sentence is a classic civil contempt sanction," the court concluded that petitioner had no right to appointed counsel. *Ibid.*

## SUMMARY OF ARGUMENT

1.  The Court has jurisdiction to review the decision of the South Carolina Supreme Court.  Petitioner has completed his term of confinement for civil contempt and has not identified any collateral consequences flowing from the contempt.  Those facts would ordinarily render his case moot.  Petitioner, however, qualifies for a narrow exception to the mootness doctrine because the controversy is capable of repetition yet evading review.  Sentences for civil contempt in South Carolina are limited to 12 months, and it is highly unlikely that petitioner would be able to secure plenary review by this Court within any future period of confinement.  In addition, the constitutional violation petitioner asserts is capable of repetition because he remains subject to the underlying child-support order and still has substantial arrears.  There is thus a reasonable expectation that he will receive automatically-generated rules to show cause for contempt in the future.  Indeed, since the contempt at issue in this case, petitioner has been jailed again for civil contempt.

2.  Petitioner's confinement for civil contempt violated due process, not because he lacked counsel, but because the procedures employed by the family court were inadequate to ensure the accurate determination of petitioner's present ability to pay his child-support ar-

11

rears.  That ability to pay was a necessary predicate to the civil contempt sanction.

The defining feature of confinement for civil contempt is its purpose to coerce compliance with a court order.  Such confinement must therefore end upon discharge of the contemnor's obligations; he is said to hold "the keys of [his] prison in [his] own pocket[]."  *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted).  Such confinement may not be imposed, however, where the contemnor demonstrates his inability to comply with the order.  In such cases, he does not truly hold the keys to the prison; to confine him nonetheless would render the confinement punitive and thus a sanction that may be imposed only after compliance with criminal case safeguards.

The question of petitioner's ability to pay his child-support arrears therefore should have been a focus of the civil contempt proceeding, but it was not.  Pro se petitioner was afforded no meaningful opportunity to establish his indigency, and even after he made a statement that could have easily been understood to mean he had no present ability to pay nearly $6000 to avoid jail, the family court judge made no further inquiry on the matter before committing him to a nominally conditional term of confinement.

The proceeding did not comply with due process because there was a serious risk of erroneous deprivation of petitioner's liberty through the procedures employed and because additional procedures would have enhanced the accuracy of the proceeding without materially impinging on any governmental interest.  See *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976).  Provision of counsel would have been a sufficient, but not a necessary, means of satisfying due process in this case.  There were other

12

means of providing petitioner with a meaningful opportunity to establish his present inability to pay, such as asking him to complete an understandable form seeking his financial information, or asking him questions on the topic as necessary at a hearing. In the typical case, providing basic information about one's personal finances is not the kind of undertaking that requires assistance of counsel, and due process protections are based on the requirements of the mine-run case, not the exceptional one.

There is no basis for petitioner's proposed categorical due process right to appointed counsel in civil contempt proceedings where confinement is imposed. The Court has declined to recognize a categorical constitutional right to appointed counsel in the context of other non-criminal proceedings that can result in confinement. *Gagnon* v. *Scarpelli*, 411 U.S. 778, 782-790 (1973) (probation revocation); *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (summary court-martial). Civil contempt proceedings in child-support cases are relatively brief; the custodial parent may not be represented by counsel; and the issues in dispute are generally not complex. Given those circumstances, there is no warrant for recognizing a categorical right to defense counsel in such proceedings. Finally, recognizing a due process right to counsel in such proceedings would upset the balance struck by Title IV-D and its implementing regulations, both of which stress the importance of due process protections in child-support proceedings but neither of which permit federal funding for provision of counsel.

13

## ARGUMENT

### I.  THE COURT HAS JURISDICTION TO REVIEW THE DE-CISION OF THE SOUTH CAROLINA SUPREME COURT

Although petitioner has completed his term of confinement for the civil contempt at issue here, his claim is not moot because he remains subject to the underlying child-support order and because there is a reasonable expectation that he will face future contempt proceedings.  His claim thus avoids mootness because it is capable of repetition yet evading review.  This Court thus has jurisdiction to review the final judgment of the South Carolina Supreme Court.  See 28 U.S.C. 1257(a).

1.  "In general a case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy* v. *Hunt*, 455 U.S. 478, 481 (1982) (internal quotation marks omitted) (quoting *United States Parole Comm'n* v. *Geraghty*, 445 U.S. 388, 396 (1980)).  While a currently confined individual's challenge to his confinement generally presents no question of mootness, an individual who has been released from confinement ordinarily may continue to press his challenge only if he suffers some "collateral consequence" that constitutes a "concrete and continuing injury." *Spencer* v. *Kemna*, 523 U.S. 1, 7 (1998).  Because this Court "ha[s] been willing to presume that a wrongful conviction has continuing collateral consequences," the Court ordinarily will not dismiss as moot a criminal defendant's challenge to his conviction once the defendant has completed his term of imprisonment.  *Id.* at 8.  But the Court has not employed that presumption in other contexts, instead requiring a party not in custody to demonstrate that he will actually face collateral consequences if he does not secure relief

14

on appeal. See *id.* at 14 (no presumption of collateral consequences for parole revocation); see also *id.* at 14-16 (reviewing party's claimed collateral consequences).

Petitioner has completed his term of confinement for civil contempt. Because he challenges a civil order, not a criminal conviction, no presumption of collateral consequences applies. Moreover, petitioner has not identified any collateral consequences flowing from the finding of civil contempt. Ordinarily, petitioner's challenge to that finding would be considered moot and beyond this Court's jurisdiction.

2. Petitioner's claim in this case, however, avoids mootness because his is one of the "exceptional situations" in which a claim is capable of repetition, yet evading review. *City of L.A.* v. *Lyons*, 461 U.S. 95, 109 (1983). In non-class actions, this doctrine requires satisfaction of two elements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy*, 455 U.S. at 482 (quoting *Weinstein* v. *Bradford*, 423 U.S. 147, 149 (1975) (per curiam)). Petitioner satisfies both elements.

First, confinement for civil contempt in South Carolina is limited to 12 months, S.C. Code Ann. § 63-3-620 (West 2010), and it is exceedingly unlikely that a contemnor could appeal through the South Carolina court system, petition this Court for a writ of certiorari, and receive a decision on his claim within such a limited time period. See, *e.g.*, *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765, 774 (1978) (18 months was "too short a period of time for appellants to obtain complete judicial review"); cf. *DeFunis* v. *Odegaard*, 416 U.S. 312, 319 (1975) (per curiam) (future challenge to law school

15

admission procedure could likely come to this Court for decision within three-year period of law school matriculation).  Indeed, in this case, petitioner had completed his term of imprisonment for civil contempt more than a year before the South Carolina Supreme Court rendered its decision.  Compare Pet. App. 8a with *id.* at 1a.

Second, petitioner "can make a reasonable showing that he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109.  Petitioner is still subject to the underlying order for child support, and he is nearly $14,000 in arrears.  Pet. Br. 15; J.A. 104a.  Given that clerks of court in South Carolina automatically issue rules to show cause when a non-custodial parent is late on a required payment, there is a reasonable expectation that petitioner will again be subject to contempt proceedings.  Indeed, after he was released from jail for the contempt at issue here, petitioner was again held in contempt and reincarcerated.  In May 2010 yet another rule to show cause for contempt issued due to failure to pay support to respondent.  Pet. Br. 13-15; see *id.* at 15 (May 2010 rule to show cause is still outstanding); see also *Olmstead* v. *L.C.*, 527 U.S. 581, 594 n.6 (1999) (suit by plaintiffs seeking community-based services rather than institutionalization not moot even though they were then receiving desired services, because of "the multiple institutional placements [they] ha[d] experienced").  This is thus far from "an abstract dispute about the law" that might be thought "unlikely to affect [petitioner] any more than it affects other [South Carolina] citizens." *Alvarez* v. *Smith*, 130 S. Ct. 576, 580 (2009).[5]

---

[5] That petitioner was represented by pro bono counsel in a subsequent contempt proceeding involving a different support order, see Pet. Br. 15 n.10, does not mean his claim is incapable of repetition.  Were pro bono counsel bound to represent petitioner in every future contempt

16

## II. THE ABSENCE OF ADEQUATE PROCEDURES NECES-SARY TO SECURE AN ACCURATE ADJUDICATION OF CIVIL CONTEMPT VIOLATED DUE PROCESS

The validity of the civil contempt order against petitioner turned on a critical fact:  his present ability to purge himself of contempt by paying off his past-due child support.  The family court's procedures in this case violated due process because they were inadequate to ensure an accurate determination of that fact and thus prevent an erroneous deprivation of petitioner's liberty. Although provision of government-provided counsel would have been a sufficient means of complying with due process requirements in this case, it was not a necessary one.  Other mechanisms, such as requiring an affidavit for disclosure of financial information and a preliminary assessment of petitioner's current ability to pay child support, would have satisfied the requirements of due process.

### A. Confinement For Civil Contempt Is Permitted Only When The Contemnor Is Presently Able To Comply With The Underlying Order

Both civil and criminal contempt can lead to confinement, but this Court has long distinguished the two based on the "character and purpose" of the sanction imposed.  *Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911).  In civil contempt, the "punishment * * * [is] remedial," in that it is intended to "coerc[e]

---

proceeding, then his claim of entitlement to the assistance of counsel would be moot.  There is no indication in the record, however, that pro bono counsel is under any such obligation and, in fact, counsel did not appear in a 2009 contempt proceeding involving support owed respondent, see *id.* at 13-14 (noting that petitioner appeared pro se in 2009 and served six months for civil contempt).

17

the defendant to do what he had refused to do." *Id.* at 442. Punishment for criminal contempt, on the other hand, is "punitive" and is imposed "to vindicate the authority of the court." *Id.* at 441.

Because of that fundamental distinction, confinement imposed for civil contempt is conditional. The sentence must include a purge clause under which the contemnor will be immediately released upon compliance with the underlying court order. *Hicks* v. *Feiock*, 485 U.S. 624, 634 (1988). When confined under such a civil contempt order, the contemnor holds "the keys of [his] prison in [his] own pocket[ ]." *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted); see *id.* at 370 ("While any imprisonment, of course, has punitive and deterrent effects, it must be viewed as remedial if the court conditions release upon the contemnor's willingness" to comply with a court order.).

A purge clause by itself, however, will not render the contemnor's confinement remedial rather than punitive because "the justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order." *Shillitani*, 384 U.S. at 370-371. Accordingly, "punishment may not be imposed in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." *Hicks*, 485 U.S. at 638 n.9; see *Maggio* v. *Zeitz*, 333 U.S. 56, 72 (1948) ("[T]o jail one for a contempt for omitting an act he is powerless to perform would * * * make the proceeding purely punitive, to describe it charitably."); see also *Moseley* v. *Mosier*, 306 S.E.2d 624, 626 (S.C. 1983)

18

("When the parent is *unable* to make the required payments, he is not in contempt.").[6]

The burdens of production and persuasion may be placed on the defendant to demonstrate his present inability to comply with an order. See *Hicks*, 485 U.S. at 637; *United States* v. *Rylander*, 460 U.S. 752, 757 (1983). Accordingly, if the defendant "offers no evidence as to his inability to comply," "stands mute," or is disbelieved by the court, then he fails to carry his burden and may be held in contempt. *Maggio*, 333 U.S. at 75. But the trial court "is obliged" to consider "all the evidence properly before it in the contempt proceeding in determining whether or not there is actually a present ability to comply and whether failure so to do constitutes deliberate defiance which a jail term will break." *Id.* at 76.

If, upon examination, a contempt penalty is considered punitive rather than remedial, it will be vacated unless all "the protections that the Constitution requires of * * * criminal proceedings" were provided. *International Union, United Mine Workers* v. *Bagwell*, 512 U.S. 821, 826 (1994) (quoting *Hicks*, 485 U.S. at 632).

---

[6] A defendant may not avoid a finding of civil contempt for violating an order by collaterally attacking that order in the contempt proceeding. See *Maggio*, 333 U.S. at 74-75. The defendant may, however, make the distinct assertion that he has a "*present* inability to comply with the order in question." *United States* v. *Rylander*, 460 U.S. 752, 757 (1983); see *ibid.* ("While the court is bound by the enforcement order, it will not be blind to evidence that compliance is now factually impossible. Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."); *Maggio*, 333 U.S. at 74-75.

19

### B. The Family Court's Procedures Were Inadequate To Ensure An Accurate Determination Of Present Ability To Pay

The procedures employed by the family court violated petitioner's due process rights because they were inadequate to ensure that petitioner was not erroneously confined as an inducement to perform a task he was powerless to perform, while additional procedures to ensure petitioner's present ability to pay his child-support arrears would have been minimally burdensome.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews* v. *Eldridge*, 424 U.S. 319, 332 (1976). Confinement for civil contempt is a deprivation of liberty, and the alleged contemnor is thus entitled to procedural due process protections before its imposition. Cf. *Morrissey* v. *Brewer*, 408 U.S. 471, 482 (1972) (termination of parole triggers due process protections); see also *Bagwell*, 512 U.S. at 827 (civil contempt requires "notice and an opportunity to be heard").

The conclusion that due process applies is the beginning of the inquiry, not its end, because "the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands.'" *Wilkinson* v. *Austin*, 545 U.S. 209, 224 (2005) (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The Court has "generally * * * declined to establish rigid rules and instead ha[s] embraced a framework to evaluate the sufficiency of particular procedures." *Ibid.* That framework involves "consideration of three distinct factors:

20

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews*, 424 U.S. at 335.

Application of the *Mathews* factors here demonstrates that the family court proceeding did not comply with the requirements of procedural due process. First, petitioner's private interest in avoiding incarceration was significant. See *Foucha* v. *Louisiana*, 504 U.S. 71, 80 (1992).

Second, there was a serious "risk of an erroneous deprivation" of petitioner's liberty interest under the procedures employed by the family court, and there would have been value in additional procedures. *Mathews*, 424 U.S. at 335. Petitioner did not dispute that he had failed to comply with his child-support order, so the propriety of his confinement for civil contempt thus turned on his present ability to do so. See pp. 17-18, *supra*; Pet. Br. 3-4 (petitioner's ability to pay "was the precise question before the family court"); *id.* at 17. But South Carolina automatically referred petitioner for contempt proceedings without considering whether petitioner was employed or had assets. At the contempt hearing, the court solicited no financial information from petitioner, nor was there apparently any mechanism in place for him to provide it on his own. Petitioner's statement at the hearing that he had been un-

21

able to work because he broke his back, Pet. App. 17a, could reasonably be understood to constitute a claim that he had no present ability to pay nearly $6000. The court did not explore this question, however; it made no inquiry into petitioner's income or assets. Instead, the court imposed a jail sentence unaccompanied by any finding that petitioner had the ability to pay off his out-standing balance from a jail cell.[7]  Taking additional modest steps to determine whether petitioner had the present ability to discharge his obligation, see pp. 24-25, *infra*, would have improved the accuracy of the proceeding.

Finally, the government's interests also favor additional procedural safeguards to ensure that only those parents with a present ability to pay are confined for civil contempt. While the State has a strong interest in enforcing child-support orders, it secures no benefit from jailing a non-custodial parent who cannot discharge his obligation. The period of incarceration makes it less, rather than more, likely that such parent will be able to pay child support. See Elizabeth G. Patterson, *Civil Contempt & the Indigent Child Support Obligor: The Silent Return of Debtor's Prison*, 18 Cornell J.L. & Pub. Pol'y 95, 126 (2008) (*Civil Contempt*). Meanwhile, the State incurs the substantial expense of confinement.

Moreover, as a general matter, the routine use of contempt for non-payment of child support is likely to be an ineffective strategy for enforcing support orders. See National Child Support Enforcement, U.S. Dep't of Health & Human Servs., *Strategic Plan: FY 2005-2009*, at 2, 10 (*Strategic Plan*), http://www.acf.hhs.gov/

---

[7]  The judge told petitioner, "[i]f you've got a job, I'll make you eligible for work release," Pet. App. 18a, but petitioner states he was ineligible for work release, Pet. Br. 12 n.8.

programs/cse/pubs/2004/Strategic_Plan_FY2005-2009.
pdf. While child-support recovery efforts once "followed
a business model predicated on enforcement" that "in-
tervened only after debt, at times substantial, accumu-
lated and often too late for collection to be successful, let
alone of real value to the child," experience has shown
that alternative methods—such as order modifications,
increased contact with non-custodial parents, and use of
"automation to detect non-compliance as early as possi-
ble"—are more effective. *Id.* at 2.

A substantial portion of child-support obligors have
no or low reported income. Elaine Sorensen et al., *As-
sessing Child Support Arrears in Nine Large States &
the Nation* 22 (2007) (*Assessing Child Support Arrears*),
http://aspe.hhs.gov/hsp/07/assessing-CS-debt/report.pdf
(obligors with $10,000 or less in annual income consti-
tuted half of the child-support obligors and owed 70% of
the arrears in a nine-state study). Such individuals'
child-support obligations are often substantial. See *id.*
at 54 ("For obligors with reported income of $10,000 a
year or less, the median percent of reported income that
was due as current support was 83[%].").  A low-income
individual in arrears on child-support payments is
"rarely a candidate for civil incarceration because of the
likelihood that he or she is unable to pay the hefty sum
represented by the accumulated arrears, or even a por-
tion thereof that may be set by the court as the purge
amount." *Civil Contempt* 116.[8]

---

[8]  To be sure, coercive enforcement remedies, such as contempt, have
a role to play in child-support enforcement efforts, such as with non-
custodial parents who are hiding assets or unreported self-employment
or under-the-table income. See *Strategic Plan* 2; *Assessing Child
Support Arrears* 4-5, 22-23, 25; *Civil Contempt* 97. There is no evi-

23

Many States have taken alternative steps to avoid child-support arrears, such as establishing more realistic support orders, "increas[ing] parental participation in the order establishment process," providing employment services to non-custodial parents, or using automation tools to improve wage withholding. *Assessing Child Support Arrears* 10-11, 80-89; see *id.* at 85 (study of Florida program that provides employment services and case management to non-custodial parents found that program participants paid nearly five dollars in child support for every dollar spent on the program). Such alternatives, which focus on early intervention rather than after-the-fact efforts to collect substantial accumulated arrears, are more likely to be effective means of enforcing the child-support obligations of the substantial number of low-income obligors. See *Strategic Plan* 2.

### C. Due Process Can Be Satisfied By A Variety Of Procedures Intended To Assure An Accurate Determination Of Present Ability To Pay In A Civil Contempt Proceeding

Petitioner argues that, in order to ensure that his civil contempt proceeding "remain[ed] civil," Pet. Br. 39, due process required the appointment of counsel to assist him in establishing his inability to comply with the court's order, see *id.* at 41. Although we agree that petitioner's due process rights were violated, we disagree that the State's failure to appoint counsel was itself the basis of the violation. Appointment of counsel is certainly one way to help ensure an accurate determination of the obligor's current ability to pay—the determination on which the "civil" nature of a civil contempt sanction rests—but it is not the only way. It was the State's

---

dence, however, that routine use of contempt among low-income non-custodial parents is generally effective. See *Civil Contempt* 126.

24

failure to provide any meaningful mechanism for making that determination in this case, and not its failure to provide counsel in particular, that violated petitioner's due process rights.[9]

> ### 1. Courts can comply with due process by providing a meaningful opportunity for an alleged contemnor to establish his present ability to pay

While there is no basis for a constitutional rule categorically requiring appointment of counsel in all civil contempt that could lead to deprivation of physical liberty, see pp. 25-32, *infra*, due process does require procedures sufficient to ensure fundamental fairness. In the context of a civil contempt proceeding for non-payment of child support that could lead to confinement, this means procedures adequate to allow a pro se contemnor to attempt to carry his burden of establishing his present inability to pay.

Such procedures may include requiring a non-paying parent to complete an understandable form seeking financial information. South Carolina already requires

---

[9] Although petitioner's submissions below and in this Court have focused on the value of appointed counsel in ensuring that indigent child-support obligors are not erroneously jailed as a means of inducing them to comply with their obligations, see, *e.g.*, Pet. i, Pet. App. 13a, fairly encompassed in those submissions is the proposition that due process demands an appropriate procedure to evaluate an obligor's present ability to pay. See Sup. Ct. R. 14.1(a); *Yee* v. *City of Escondido*, 503 U.S. 519, 534 (1992). In conducting that inquiry, it should be open to the Court to consider whether there are alternative procedures, other than the specific procedure petitioner has proposed, that would satisfy constitutional requirements. To the extent the Court concludes otherwise, however, the proper course would be to dismiss the writ of certiorari as improvidently granted and await a case that expressly raises a broader due process claim.

25

noncustodial parents to fill out such a form when a support order is originally sought in a Title IV-D case, see S.C. Code Ann. § 43-5-220(c) (West Supp. 2009), but apparently does not do so in subsequent contempt proceedings. Requiring that such forms be completed at the outset of a contempt proceeding would impose little expense on the State or burden on the proceeding while materially advancing the accuracy of the court's determination. Such information could by itself establish the contemnor's present inability to pay his arrears or, conversely, demonstrate his ability to pay. To the extent the court had questions about the information on the form or disbelieved it, the court could question the contemnor about his finances at the contempt hearing. Such simple, minimally burdensome procedures would enable the court to evaluate whether the alleged contemnor has the ability to pay his arrears and is thus an appropriate candidate for a civil contempt sanction.

### 2. *There is no basis for an inflexible right to counsel rule in civil contempt proceedings*

Although the constitutional inadequacy of the family court's procedures could have been cured by appointment of counsel (who presumably would have addressed petitioner's inability to pay his arrears and urged the court not to jail him for that reason), appointment of counsel was not constitutionally compelled.

a. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001) (quoting *Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886, 895 (1961)); see *Mathews*, 424 U.S. at 334 ("[D]ue process is flexible and calls for such procedural protections as the particular

26

situation demands.") (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The question in a due process case is how to ensure a fundamentally fair proceeding, taking into account the importance of the private interest at issue, the risk of error and value of additional procedures, and the government's interest. See *id.* at 335. This is not an inquiry that typically lends itself to the kind of categorical approach advocated by petitioner. See *Gagnon* v. *Scarpelli*, 411 U.S. 778, 789 (1973) (contrasting categorical Sixth Amendment right to counsel in criminal prosecution "with the more limited due process right" in other contexts).[10]

In fact, in areas outside traditional criminal prosecutions where an individual's liberty is nonetheless at stake, the Court has declined to recognize a categorical right to counsel, instead relying on alternative procedural safeguards to ensure due process. See *Gagnon*, 411 U.S. at 782-790; see also *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (no due process right to counsel for summary courts-martial).[11] For example, in *Gagnon*,

---

[10] The Sixth Amendment right to counsel is inapplicable to a civil contempt proceeding because it is not a "criminal prosecution[ ]." U.S. Const. Amend. VI; see *Bagwell*, 512 U.S. at 826-827.

[11] In *In re Gault*, 387 U.S. 1 (1967), the Court recognized a due process right to appointed counsel in a juvenile delinquency proceeding, but, as the Court later explained, that was because the proceeding "while denominated civil, was functionally akin to a criminal trial." *Gagnon*, 411 U.S. at 789 n.12. In *Vitek* v. *Jones*, 445 U.S. 480 (1980), a plurality would have held that there is a due process right to counsel before a State involuntarily transfers a prisoner to a state mental hospital for psychiatric treatment. See *id.* at 497. Justice Powell's controlling concurrence, however, disagreed, concluding that "the fairness of an informal hearing designed to determine a medical issue" does not "require[ ] participation by lawyers." *Id.* at 500. Justice Powell agreed that a prisoner "required assistance" in such a proceeding to ensure

27

the Court held that due process required the government to provide a preliminary and final hearing before it could incarcerate an individual for violating the terms of his probation.  See 411 U.S. at 782; see also *id.* at 785-786 (hearings necessary in order to provide notice of the alleged probation violation and ensure "accurate finding of fact and the informed use of discretion").  At the same time, however, the Court rejected the "contention that the State is under a constitutional duty to provide counsel for indigents in all probation or parole revocation cases." *Id.* at 787; see *id.* at 790 (stating that due process may require appointment of counsel in exceptional cases).  The Court recognized that "such a rule has the appeal of simplicity" but concluded that "it would impose direct costs and serious collateral disadvantages without regard to the need or the likelihood in a particular case for a constructive contribution by counsel." *Id.* at 787.

The Court in *Gagnon* noted that in many cases a probationer's mitigating evidence may be "so simple as not to require either investigation or exposition by counsel." 411 U.S. at 787.  Here too, with the provision of easy-to-understand forms on assets and income and, if necessary, a colloquy with the trial court, it will often be simple for a delinquent child-support obligor to demonstrate his present inability to discharge his obligation without the assistance of appointed counsel.  Indeed, even in criminal cases to which the Sixth Amendment right of counsel applies, defendants are not entitled to government-appointed counsel for the purpose of filling out the forms routinely used to establishing their financial eligibility for government-appointed counsel.  See

---

fairness, but said that it could be "rendered by competent laymen in some cases." *Ibid.*

28

18 U.S.C. 3006A(b) (counsel will be appointed only after court is "satisfied after appropriate inquiry that the person is financially unable to obtain counsel"); *United States* v. *Bauer*, 956 F.2d 693, 695 (7th Cir.) ("Under the Criminal Justice Act, the public fisc need not contribute one penny unless the accused first establishes that he cannot afford counsel. Nothing in the statute directs the Treasury to assist the accused in making this determination."), cert. denied, 506 U.S. 882 (1992). Just as "[n]o legal expertise is needed to participate effectively in hearings under the Criminal Justice Act," *ibid.*, no legal expertise is generally required to establish inability to pay child-support arrears.

*Gagnon* also expressed concern that "[t]he introduction of counsel into a revocation proceeding will alter significantly the nature of the proceeding," since the States typically relied on probation officers to conduct revocation hearings but might turn to attorneys if all probationers were represented. 411 U.S. at 787. "[T]he decisionmaking process will be prolonged, and the financial cost to the State * * * will not be insubstantial." *Id.* at 788. In the context of civil contempt for child support as well, automatic appointment of counsel could delay the proceedings, create an asymmetry in representation between non-custodial parents and custodial parents who may appear pro se, see, *e.g.*, Pet. App. 16a, and impose considerable financial cost on the government without an automatic increase in accuracy.

*Lassiter* v. *Department of Social Services*, 452 U.S. 18 (1981), upon which petitioner relies, see, *e.g.*, Pet. Br. 32-33, is not to the contrary. In that decision, the Court held that there was no due process right to counsel in a parental-rights termination proceeding. See *Lassiter*, 452 U.S. at 32-33. In dictum, the Court said its cases

29

had established a "presumption" that an indigent had a right to appointed counsel "when, if he loses, he may be deprived of his physical liberty." *Id.* at 26-27. The Court has not subsequently relied on any such presumption derived from the *Lassiter* dictum, and *Lassiter* itself recognized that *Gagnon*, which involved a deprivation of physical liberty, had held that "due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed" through appointment of counsel. *Id.* at 31 (quoting *Gagnon*, 411 U.S. at 788).

That there may be atypical cases with "complex factual and legal issues" (Pet. Br. 46) in which counsel would provide a significant benefit beyond what could be obtained through other procedural safeguards does not mean there should be a right to counsel. "[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." *Walters* v. *National Ass'n of Radiation Survivors*, 473 U.S. 305, 321 (1985) (quoting *Mathews*, 424 U.S. at 344); see *id.* at 331 ("existence of complexity in some cases" was not "sufficient to warrant a conclusion that the right to retain and compensate an attorney in [Veterans Administration] cases is a necessary element of procedural fairness under the Fifth Amendment").

b. A recognition that due process requires fair proceedings before a child-support obligor can be held in civil contempt but that this due process right does not encompass appointment of government-funded counsel is also consistent with the balance struck by Congress and the Secretary in enacting and administering the Title IV-D program. Cf. *Middendorf*, 425 U.S. at 43 ("[W]e must give particular deference to the determina-

30

tion of Congress, made under its authority to regulate the land and naval forces, U.S. Const., Art. I, § 8, that counsel should not be provided in summary courts-martial."); *Walters*, 473 U.S. at 319-320 ("This deference to congressional judgment must be afforded even though the claim is that a statute Congress has enacted effects a denial of the procedural due process guaranteed by the Fifth Amendment.").

Congress and the Secretary have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program.[12] At the same time, however, they have declined to reimburse the States for the cost of providing counsel to non-custodial parents. See S. Rep. No. 387, 98th Cong., 2d Sess. 23 (1984) (statute does not provide federal funding for "defense counsel for absent parents" or "incarceration of delinquent obligors"); 45 C.F.R. 304.23 (i) and (j) (no federal funding for "[t]he costs of counsel for indigent defendants in

---

[12] See, *e.g.*, 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, including notice and a reasonable opportunity to contest the accuracy of such information."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for notice, opportunity to contest the action, and opportunity for an appeal on the record to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

31

IV-D actions" or "[a]ny expenditure for jailing of parents in child-support enforcement cases"); see also 52 Fed. Reg. 32,130 (1987) (Federal "policy since the inception of the [Title IV-D] program has been that costs of incarceration of delinquent obligors and costs of defense counsel are not necessary and reasonable costs associated with the proper and efficient administration of the Title IV-D program.").

Finally, at its broadest, the categorical rule petitioner suggests—that there is a right to government-appointed counsel in all "proceedings denominated as 'civil' where an individual nonetheless faces the prospect of confinement to state custody," Pet. Br. 30—conflicts with Congress's express judgment that provision of government-funded counsel is not warranted in all such areas. See *Middendorf*, 425 U.S. at 43 (deferring to such a judgment); *Walters*, 473 U.S. at 319-320 (same); see also *Landon* v. *Plasencia*, 459 U.S. 21, 34-35 (1982) ("The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy.").

For example, while aliens are sometimes detained during removal proceedings or pending enforcement of removal orders, Congress has long explicitly provided that there is no obligation to provide government payment for counsel in such proceedings. See 8 U.S.C. 1362 ("In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (*at no expense to the Government*) by such counsel, authorized to practice in such proceedings,

32

as he shall choose.") (emphasis added); 8 U.S.C.
1229a(b)(4)(A). Congress's judgment is consistent with
this Court's repeated holdings that removal proceedings
are civil and non-punitive, see, *e.g.*, *INS* v. *Lopez-
Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation
proceeding is a purely civil action to determine eligibil-
ity to remain in this country, not to punish an unlawful
entry, though entering or remaining unlawfully in this
country is itself a crime."), and its conclusion that deten-
tion of an alien during the removal process is permissi-
ble because it is incidental to the proceedings, and not
their purpose or goal, see, *e.g.*, *Carlson* v. *Landon*,
342 U.S. 524, 538 (1952) ("Detention is necessarily a part
of this deportation procedure.").   As the Court has
also noted, removal proceedings—whose purpose is re-
moval of aliens from the country, not deprivation of their
physical liberty—are "streamlined" administrative pro-
ceedings held before administrative personnel, immigra-
tion judges, under rules offering the aliens more limited
procedural rights than are available in court.  *Lopez-
Mendoza*, 468 U.S. at 1039; see *ibid.* ("a deportation
hearing is intended to provide a streamlined determina-
tion of eligibility to remain in this country, nothing
more").  The due process guarantee of fundamental fair-
ness does not mandate the appointment of counsel in
such proceedings, which would be contrary to the judg-
ment of Congress.[13]

---

[13] For these reasons, the lower courts have held that aliens in removal
proceedings have no constitutional right to appointment of counsel at
government expense.  *United States* v. *Gasca-Kraft*, 522 F.2d 149, 152
(9th Cir. 1975) ("courts have uniformly held in this circuit and elsewhere
that in light of the non-criminal nature of both the proceedings and the
order which may be a result, that respondents are not entitled to have
counsel appointed at government expense") (citing cases); see *Moham-*

33

**CONCLUSION**

The judgment of the Supreme Court of South Carolina should be reversed.

Respectfully submitted.

NEAL KUMAR KATYAL
  *Acting Solicitor General*

TONY WEST
  *Assistant Attorney General*

SALLY A. HOWARD
  *Acting General Counsel*

ROBERT E. KEITH
  *Associate General Counsel*

LISETTE PEDRE MESTRE
  *Attorney*
  *Department of Health and*
    *Human Services*

LEONDRA R. KRUGER
  *Acting Deputy Solicitor*
    *General*

JOSEPH PALMORE
  *Assistant to the Solicitor*
    *General*

LEONARD SCHAITMAN
EDWARD HIMMELFARB
  *Attorneys*

JANUARY 2011

---

*med* v. *Gonzales*, 400 F.3d 785, 793 (9th Cir. 2005); *United States* v. *Torres-Sanchez*, 68 F.3d 227, 230 (8th Cir. 1995); *Nazakat* v. *INS*, 981 F.2d 1146, 1148 (10th Cir. 1992); *United States* v. *Campos-Asencio*, 822 F.2d 506, 509 (5th Cir. 1987).

Exhibit D

# SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

EXHIBIT E

STATE OF RHODE ISLAND

PROVIDENCE, S.C.                              FAMILY COURT

State of Rhode Island ex rel.          :
GERO MEYERSIEK                      :
    Plaintiff                              :
                                           :
VS.                                         :          DOCKET NO: K010521M
                                           :
MARY SEGUIN                         :
    Defendant                          :

PLAINTIFF'S ANSWERS TO DEFENDANT'S
*REVISED* (on or about May 9, 2023) FIRST SET OF INTERROGATORIES

NOW COMES PLAINTIFF the Rhode Island Office of Child Support Services ("OCSS") and hereby responds to Defendant's First Set of Interrogatories revised and amended on May 9, 2023, following negotiations with Defendant.

1. Separately for 2012 and each subsequent year to the present, describe in detail and quantify each separate arrear calculation for interest by month, relating to the interest arrears your agency seeks to establish in your Motion to Establish Arrears.

ANSWER: The interest is a calculation pursuant to Rhode Island statute. This calculation of interest has previously been produced to the Defendant in this case.

2. State all reasons, include events and occurrences or otherwise by date and time since 2012 to the present, identify actions by persons, organizations, groups, or entities that caused your agency to seek to establish interest arrears by motion at this time.

ANSWER: Objection, overly broad and not relevant. Without waiving said objections, the foregoing interest was to run pursuant to Court Orders dated May 24, 2012, and September 25, 2012 and Rhode Island statute. Seeking Court adjudication of arrears due under Court orders and securing Court orders for repayment of same is a routine function of OCSS.

3. Name all experts and witnesses you propose to call as witnesses and for each describe the nature of their specialties, involvement, participation, expertise, training and affiliations, all opinions which they have reached/rendered to give at in the case at bar and the factual basis for each such opinion. Attach to your answers copies of all written reports made by each expert and the expert's CV or

1

resume.

ANSWER:  None at this time other than the parties to this case.  The OCSS expects the parties to testify to their factual knowledge.  Objection to the reference to "attach" as improper because it is a Request for Production of Documents.

4. State the name, address, email and telephone number of each person having knowledge of facts material to this case and indicate the content of their knowledge and what you expect them to testify to at trial.

ANSWER:  Objection, overly broad. OCSS asserts that the parties and current and former employees of the OCSS have knowledge of this case in that this case has been pending for over 20 years.  At this time, the Plaintiff does not know which employees will be called to testify at the hearing. The phrases "content of their knowledge" and "what you expect them to testify at trial" call for hearsay and speculation.

5. State the factual basis of your substantiation for each and every claim that you raised in your Motion to Establish Arrears.

ANSWER:  Objection, prepared in anticipation of litigation.  The support obligation of the Defendant was established by the Order of the Court.  The Court ordered interest to accrue per state statute.  The records indicate the Defendant failed to make payments when due.  Further, the factual basis is pursuant to state statute and the fundamental principles of mathematics.

6. State the factual basis for and describe in detail the conversation, communication, discussion or otherwise of the telephone call Kevin Tighe made to the attorney or agent or representative of GERO MEYERSIEK on December 6, 2021, to advise and to discuss interest. Include information of, regarding, on, relating to any and all notes, recordings, records Kevin Tighe made of the telephone conversation and call he made to the attorney or agent or representative of GERO MEYERSIEK on December 6, 2021.  *Question 6 is a compound question and is being answered as two separate interrogatories.*

6(a) State the factual basis for and describe in detail the conversation, communication, discussion or otherwise of the telephone call Kevin Tighe made to the attorney or agent or representative of GERO MEYERSIEK on December 6, 2021, to advise and to discuss interest.

ANSWER 6(a): See TRAC note of 12/6/21, pursuant to Rule 33(d), previously provided to the Defendant.

6(b) Include information of, regarding, on, relating to any and all notes, recordings, records Kevin Tighe made of the telephone conversation and call he

2

made to the attorney or agent or representative of GERO MEYERSIEK on December 6, 2021.

ANSWER 6(b): See TRAC note of 12/6/21, pursuant to Rule 33(d), previously provided to the Defendant.

7. State the factual basis for, including identifying the person who instructed Timothy Flynn to do so and describe in detail the subpoena Timothy Flynn mailed and request for information regarding the Defendant to Bank of America by Timothy Flynn on December 14, 2021. Attach to your answer a copy of the subpoena and all records related to Timothy Flynn's request for information. *Question 7 is a compound question and is being answered as two separate interrogatories.*

7(a) State the factual basis for, including identifying the person who instructed Timothy Flynn to do so.

ANSWER 7(a): Objection, not relevant to the Motion to Establish Arrears.

7(b). Describe in detail the subpoena Timothy Flynn mailed and request for information regarding the Defendant to Bank of America by Timothy Flynn on December 14, 2021.

ANSWER 7(b): Objection, not relevant to the Motion to Establish Arrears. Objection to the reference to "attach" as improper because it is a Request for Production of Documents.

8. State the factual basis and describe in detail the conversation, communication, discussion or otherwise of the telephone or otherwise conversation Timothy Flynn made on January 4, 2022, to Marie at Bank of America regarding a subpoena that Timothy Flynn had sent to Bank of America regarding the Defendant. Attach to your answer a copy of the subpoena and request for information.

ANSWER: Objection, not relevant to the Motion to Establish Arrears. Objection to the reference to "attach" as improper because it is a Request for Production of Documents.

9. State the factual basis and describe in detail all actions, discussions, notes made of conversations, communication, or otherwise made by Timothy Flynn as they relate to Defendant's case from December 2021 to the present.

ANSWER: Objection, not relevant to the Motion to Establish Arrears.

10. Identify the name, address, phone number and email of all persons Timothy Flynn contacted, spoke to, discussed, communicated, and interacted in any and all forms regarding the Defendant from December 2021 to the present. Attach

3

to your answer all documents and records as they relate to Timothy Flynn's conversations regarding the subject matter.

ANSWER: Objection, not relevant to the Motion to Set Arrears. Objection to the reference to "attach" as improper because it is a Request for Production of Documents.

11. Describe in detail and state the factual basis for all documents that set forth, describe, reflect, contain, refer, or relate to the legal authority by the Rhode Island Office of Child Support Services to calculate child support interest per annum, and the method interest per annum is calculated by the agency in the Defendant's case. Cite the specific statute, regulation or any law by which the Rhode Island Office of Child Support Services uses to compute interest and the specific rate. *Question 11 is a compound question and is being answered as three separate interrogatories.*

11(a) Describe in detail and state the factual basis for all documents that set forth, describe, reflect, contain, refer, or relate to the legal authority by the Rhode Island Office of Child Support Services to calculate child support interest per annum.

ANSWER 11(a): Objection, not relevant to the Motion to Set Arrears. Without waiving said objection, including, but not limited to, the following citations:

42 USC 651, et seq.
45 CFR 200 et seq.
45 CFR 300 et seq.
RIGL 15-5 et seq.
RIGL 15-8.1 et seq.
RIGL 15-9 et seq.
RIGL 15-11.1 et seq.
RIGL 15-12 et seq.
RIGL 15-13 et seq.
RIGL 15-21 et seq.
RIGL 15-22 et seq.
RIGL 15-23.1 et seq.
RIGL 15-24 et seq.
RIGL 15-25 et seq.
RIGL 15-26 et seq.
RIGL 15-28 et seq.
RIGL 15-29 et seq.
RIGL 15-30 et seq.
218-RICR-30-00-1 et seq.
Rhode Island State Plan promulgated pursuant to 45 CFR 200 et seq.

4

IRS Publication 1075

11(b) and the method interest per annum is calculated by the agency in the Defendant's case.

ANSWER 11(b): Interest is calculated at 1% per month on the ending principal balance of the preceding month.

11(c) Cite the specific statute, regulation or any law by which the Rhode Island Office of Child Support Services uses to compute interest and the specific rate.

ANSWER 11(c) Rhode Island General Laws 15-5-16.5; 12% per annum on any support debt due and owning for child support and/or spousal support.

12. Describe in detail and state the factual basis for all documents that set forth, describe, reflect, contain, refer, or relate to the legal authority by the Rhode Island Office of Child Support Services to deny noncustodial parents access to any portion of their case files, including the agency's accounting calculations and method of calculation of alleged arrears. Attach to your answer all documents that relate to the relevant calculations of interest arrears in the Defendant's case file.

ANSWER: Objection, not relevant to lead to the discovery of admissible evidence, not relevant to the Motion to Establish Arrears and lastly, the attaching of documents is in the nature of a Request for Production of Documents. Without waiving said objections, see the statutes listed *supra*.

13. Describe in detail and state the factual basis for the creation, faxing and mailing offline of the Notice of Intent to Lien receipt of letter, communication or correspondence by Timothy Flynn from Bank of America regarding the Defendant from January 12, 2022, to January 22, 2023. Attach to your answer a copy of documents created and sent offline by Timothy Flynn related to the Defendant.

ANSWER: Objection, not relevant to the Motion to Establish Arrears. Objection to the reference to "attach" as improper because it is a Request for Production of Documents.

14. Describe in detail and state the factual basis for not mailing to the Defendant a copy of the Notice of Intent to Lien on January 12, 2022. State and identify the person or persons who authorized, instructed, directed or otherwise caused Timothy Flynn to do so. State the factual basis and describe in detail the legal authority for Timothy Flynn to do so. *Question 14 is a compound question and is being answered as three separate interrogatories.*

14(a) Describe in detail and state the factual basis for not mailing to the Defendant a copy of the Notice of Intent to Lien on January 12, 2022.

ANSWER 14(a): Objection, not relevant to the Motion to Set Arrears.

14(b) State and identify the person or persons who authorized, instructed, directed or otherwise cause Timothy Flynn to do so.

ANSWER 14(b): Objection, not relevant to the Motion to Set Arrears.

14(c) State the factual basis and describe in detail the legal authority for Timothy Flynn to do so.

ANSWER 14(c): Objection, not relevant to the Motion to Set Arrears.

15. Describe in detail and state the factual basis for all actions and system input by any and all employees or former employees of your agency that caused the system at your agency to generate a Notice of Intent to Lien on or about March 3, 2023. Attached to your answer all documents that set forth, describe, reflect, contain, refer, or relate to your answer.

ANSWER: Objection, not relevant to the Motion to Set Arrears. Objection to the reference to "attach" as improper because it is a Request for Production of Documents.

16. Describe in detail and state the factual basis for your agency's failure to remove, suspend or otherwise stop the issuance of the notice of perfected lien subsequent to receipt of appeal from the Defendant on or about April 1, 2022. Attached to your answer all documents that set forth, describe, reflect, contain, refer, or relate to your answer.

ANSWER: Objection, not relevant to the Motion to Establish Arrears and further the reference to "attach" as improper because it is a Request for Production of Documents.

17. Describe in detail the two emails in the possession of Frank DiBiase as they relate to the Defendant. Attach to your answer a copy of each email and all documents as they relate to the authorship of each and every email, and the persons set to, sent from and copied on each and every email.

ANSWER: Objection, not relevant to the Motion to Establish Arrears and further the reference to "attach" as improper because it is a Request for Production of Documents.

18. Describe in detail the job function, job title, job tasks and every day-to-day function of Kevin Tighe at your agency from January 2021 to the present. Attach to your answer all documents as they relate to the duties, obligations, responsibilities, services and code of conduct as they relate to Kevin Tighe.

ANSWER:  See job description for Deputy Chief of Legal Services as described on the State of Rhode Island – Division of Human Services – Department of Administration website. See Rhode Island Supreme Court Rule of Professional Conduct.

19. Set forth in detail the following information pertaining to all policies or agreements of liability insurance covering or pertaining to acts or omissions committed by or on your behalf as a result of enforcing child support interest ordered by the Family Court in 2012 at the time of occurrence referenced in the Case Tracking Case History from 2018 to the present, designating which, if any are primary coverage and which are excess coverage: name and address of the insurance carrier, all limits of liability coverage, name and address of the named insured and policy number, full description of the acts or omissions to which coverage extends, full description of any and all exclusions, the dates of coverage, and the present custodian of the policy.

ANSWER: Objection, not relevant to the Motion to Establish Arrears.

20. Identify in detail and give the substance of each statement, action or omission, or declaration relating to interest, or satisfied with no receipt of interest or satisfied with receipt of less interest, or waived interest, whether oral or written, by conduct, silence or otherwise, which you contend was made by or on behalf of the Plaintiff, GERO MEYERSIEK, and provided the place and date when each such statement was made and any witnesses to same.

ANSWER: See TRAC note of 12/6/21, and emails dated October 11, 2022 and October 13, 2022 pursuant to Rule 33(d), previously provided to the Defendant.

21. Identify the name, address, telephone number and email address of the person or persons responsible for publishing the Total Due and Interest Due, payments made, and history of all payments in Defendant's online OCSS account each and every month from 2012 to the present.

ANSWER: Objection, not relevant to the Motion to Establish Arrears..

22. State the name, address, telephone number, and position of each person having personal knowledge of facts material to this case.  Include your own full name, address, phone number, email, employer, title and position.

ANSWER: Objection, overly broad in that this case has been pending since 2001, has

had multiple hearings in RI Family Court, has been appealed to the RI Supreme Court, and has had litigation in Federal District Court. Currently, OCSS is aware of the current Family Court proceedings as well as actions in Federal District Court and the RI Supreme Court.

23. If you have obtained any written or recorded statements concerning the dispute in this matter, set forth the name and address, phone number and email of the person who gave the statement/recording, the date the statement was made, the content of the statement, and the present custodian of the statement.

ANSWER: None.

24. If you are aware of the existence of any evidence relative to the dispute in this matter, then identify each such item, state the date produced or obtained, and the name, address, telephone number and email of the present custodian of each such demonstrative item

.

ANSWER: See Rhode Island Family Court Orders in this case from hearing dates on May 24, 2012 and September 25, 2012 currently in the custody of the Rhode Island Family Court. The child support ledger currently in the custody of OCSS. The interest calculation currently in the custody of OCSS.

25. Describe in detail any and all policies, guidelines, protocols, standards, and orders your agency relied on in the administrations and enforcement of Defendant's case from 2012 to the present. Attach to your answers all documents as they relate to said policies, protocols, standards and orders.

ANSWER: The State hereby objects to Interrogatory Number 25. Pursuant to Rule 33(b) of the Rules of Civil Procedure, this Interrogatory exceeds the number of allowable interrogatories. Eleazer v. Ted Reed Thermal, Inc., 576 A. 2d 1217 (1990).

.

26. If you claim any of Defendant's agency case file records are missing information, contain an incorrect or false information or any information was modified in any way, shape or form, identify the specific page of the record, the date and time of the entry, identify the information which is missing, identify which information is false/incorrect, and state which information has been modified or changed.

ANSWER: The State hereby objects to Interrogatory Number 26. Pursuant to Rule 33(b) of the Rules of Civil Procedure, this Interrogatory exceeds the number of allowable interrogatories. Eleazer v. Ted Reed Thermal, Inc., 576 A. 2d 1217 (1990).

27. Did you and any and all employees at your agency have the knowledge, training, and education to accurately issue any and all notices of intent to lien, notices of

perfected notice of lien and notices of levy against the Defendant's property? Attach to your answer supporting documentation substantiating your answer.

ANSWER:  The State hereby objects to Interrogatory Number 27.  Pursuant to Rule 33(b) of the Rules of Civil Procedure, this Interrogatory exceeds the number of allowable interrogatories.  Eleazer v. Ted Reed Thermal, Inc., 576 A. 2d 1217 (1990).

28. State based on factual basis and described in detail the errors alleged in your agency's October 14, 2022 Recission of Liens issued by John Langlois. Attach to your answer all documents as they relate to and support your answer.

ANSWER: The State hereby objects to Interrogatory Number 28.  Pursuant to Rule 33(b) of the Rules of Civil Procedure, this Interrogatory exceeds the number of allowable interrogatories.  Eleazer v. Ted Reed Thermal, Inc., 576 A. 2d 1217 (1990).

29. State based on factual basis and describe in detail the basis of your agency's allegation that it will continue to enforce arrears owed stated in your agency's October 14, 2022, Recission of Liens issued by John Langlois. Attach to your answer all documents as they relate to and support your answer.

ANSWER:  The State hereby objects to Interrogatory Number 29.  Pursuant to Rule 33(b) of the Rules of Civil Procedure, this Interrogatory exceeds the number of allowable interrogatories.  Eleazer v. Ted Reed Thermal, Inc., 576 A. 2d 1217 (1990).

30. State based on factual basis and describe in detail the documentary information John Langlois agreed to produce at the October 5, 2022 Prehearing held by the Rhode Island Executive Office of Health and Human Services Office of Appeals. Attach to your answer all documents John Langlois agreed to produce. State based on factual basis and describe in detail the account balance before Gero Meyersiek agreed to waive the interest, the account balance after Defendant made the payment, and the account balance when your agency put the interest back on the system.  Attach to your answer all documents as they relate to and support your answer.

 ANSWER:  The State hereby objects to Interrogatory Number 30.  Pursuant to Rule 33(b) of the Rules of Civil Procedure, this Interrogatory exceeds the number of allowable interrogatories.  Eleazer v. Ted Reed Thermal, Inc., 576 A. 2d 1217 (1990).

Respectfully submitted,

/s/ Lisa Pinsonneault, Esquire (#5979)
Department of Human Services
Office of Child Support Services
77 Dorrance Street
Providence, Rhode Island 02903

Lisa.Pinsonneault@dhs.ri.gov
401-458-4404

<div align="center">

CERTIFICATION

</div>

I hereby certify that on May 30, 2023, I mailed a copy of this Response to Mary Seguin P.O. Box 22022 Houston, Texas 77019 postage pre-paid and via email marylive22022@gmail.com.

<div align="right">

*/s/ Lisa Pinsonneault*

</div>

EXHIBIT F

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                    FAMILY COURT

| | | |
|---|---|---|
| State of Rhode Island ex rel. | : | |
| GERO MEYERSIEK | : | |
|    *Plaintiff* | : | |
| | : | |
| VS. | : | DOCKET NO: K20010521M |
| | : | |
| | : | |
| MARY SEGUIN | : | |
|    *Defendant* | : | |

## **DEFENDANT'S MOTION TO DISQUALIFY MAGISTRATE NAHABEDIAN**

      The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby requests the Chief Judge or the Chief Judge's designee-judge the Honorable Judge Merolla that this Honorable Court disqualify Magistrate Susan Nahabedian from this matter.  The Magistrate is prejudiced against the Defendant by her prejudicial muzzle of the Defendant using the WebEx Host/Administrator's capability to mute the Defendant throughout the entire time allocated to the trial hearing on the State's Motion to Set Arrears, from the point State counsel Paul Gould called the Plaintiff as the State's witness, all the way to the point where the Magistrate read her decision into the record. Magistrate Nahabedian muted the Defendant to prevent the Defendant from mounting her defense, which the record shows has all along been the Defendant's intent to mount her defense.  The aforesaid public court hearing was streamed by the Rhode Island Courts and was heard remotely via WebEx hearing on February 2, 2024 scheduled at 2 PM Eastern Time.

      The amount of and whether the arrears that comprises solely of interest are in dispute.  The accuracy of the alleged arrears that is computed by the State is in dispute.

      The Court had ordered **discovery (against the State)** a year ago at the **February 10, 2023** court hearing on the State's Motion to Set Arrears, and the court

records in this matter shows Defendant's pending discovery motions had been continued to the February 2, 2024 hearing.

Discovery was not completed.

Magistrate Nahabedian, who presided over the remote hearing, using the WebEx Host/Administrator's capability to mute any WebEx hearing participant, but without any warning to Defendant, muted the Defendant effectively muzzling the Defendant in a remote hearing several times (approximately 8) before the decision was read into the record – **but the undisputed prejudice to the Defendant is the Magistrate's muting the Defendant the entire time from the point of the State's calling of its witness, to the subsequent entire duration of the State's witness testimony of the Plaintiff, GERO MEYERSIEK, that included posing to the Gero Meyersiek 5-6 questions that were irrelevant, leading or lacked timeframe, that were additionally not about Defendant's pending discovery motions, but on the State's Motion to Set Arrears.**

Magistrate's Nahabedian's WebEx muting of Defendant prevented the Defendant from objecting after each question be it on grounds, on relevance, it's leading, or timeframe or personal knowledge, etc.

**Magistrate Nahabedian continued to mute the Defendant at the conclusion of State's witness testimony.  Continuing to place the Defendant on mute, Magistrate Nahabedian went straight to read into the record her decision.  Only at the close of reading the decision into the record did Magistrate Nahabedian unmute the Defendant.**

During the entirety of the State's witness testimony Defendant was muted/prevented from putting on the record objections or objecting to State's questions immediately after each question.  After the State finished questioning Plaintiff's witness, Magistrate Nahabedian continued to mute the Defendant to prevent the Defendant from cross-examining the State's witness.

Using WebEx's mute mechanism, Magistrate Nahabedian prevented the Defendant from presenting Defendant's evidence, be it calling Defendant's witnesses or

proffering documentary evidence that were already submitted into the record in 2023 via attachments to motions, affidavits, objections and filings into the record in this matter.

Using WebEx's mute mechanism, Magistrate Nahabedian prevented Defendant from presenting arguments, effectively prevented from lodging a defense.

After the State finished putting on its case, the Defendant was continuously muted to prevent her from being heard, be it to cross-examine State's evidence or present Defendant's evidence and arguments.

To unilaterally reach a decision by proactively using WebEx's mute capability to muzzle the Defendant without affording the opportunity to Defendant to object to the State's questions, nor cross-examine the State's witness, nor present Defendant's case by muzzling/muting the Defendant in a remote WebEx hearing, when **the amount of or arrears is in dispute** shows prejudice against the Defendant, is prejudicial to the Defendant, and is a gross miscarriage of justice, especially when the amount in dispute is a substantial $81,000.00 +.   The ruling in favor of the State was a foregone conclusion.

In the WebEx hearing, Magistrate Nahabedian sought to create a false record, denying Defendant her right to a meaningful appeal, through using the WebEx mute against the Defendant to falsely make it look like Defendant failed to mount any defense, when in reality Defendant was muzzled and muted by Magistrate Nahabedian from presenting evidence and arguing her case, and denied Defendant's right to object to the line of questioning or object to or cross-examine the State's claim of over $81,000.00 in interest arrears.

Through continuous muting the Defendant throughout the State's examination of its witness, continuing to the rendering of the Court's decision in the aforesaid manner, Magistrate Nahabedian denied the Defendant her constitutional rights to present evidence and present arguments because Defendant could not lodge objections nor present evidence while Defendant was muted.   The WebEx mute cannot serve as an excuse to deny a defendant due process, thwart the right to present arguments, object to

the State's witness questions, cross-examine the State's witness, present the evidence, or silence the Defendant.

Defendant's exclusion from participation in the hearing through Magistrate Nahabedian's use of the WebEx mute function to silence the Defendant during the presentation of evidence and arguments throughout the entirety of the trial phase (that proceeded without conclusion of discovery, without resolution of pending motions to compel discovery) placed the Defendant at a "total and complete disadvantage" and showed bias that requires that she be removed.

## Demonstrated Lack of Competence to Preside

After the Magistrate read her decision into the record, Defendant was finally unmuted.  Only at that time after the decision was read did the Magistrate give the Defendant permission to cross examine the State's witness, with the caveat that any cross-examination is not going to change her decision.  It is plainly obvious that unmuting and giving the Defendant permission to cross-examine the witness after the decision was read into the record is futile and renders the decision void, as it was decided without due process.  Defendant also called Paul Gould representing the State as her first witness, as is Defendant's right, to testify on the alleged interest arrears amount.  Without any basis in law, Magistrate Nahabedian denied Defendant her right to call the State as a witness as well, the central witness who stated on the record had prepared and administered the amount of the alleged arrears.  After preventing the Defendant from calling her first witness, Magistrate Nahabedian prevented the Defendant from presenting an audio recording of the State's deputy chief counsel John Langlois stating the Plaintiff Gero Meyersiek had waived interest, which the Defendant had already submitted and filed into the record in this matter as early as June 6, 2023 (See **Exhibit A**).  Magistrate Nahabedian prevented Defendant from presenting any evidence at all, effectively preventing the Defendant from litigating by presenting her evidence and defense, stating that the Magistrate's decision is just based on there is no other court order in the record that brings interest to zero, so there is no need for the Defendant to mount a defense disputing the alleged arrears with evidence.

The Magistrate clearly shows her own confusion and reasonably calls into question her competence by stating that <mark>a hearing on the motion to set arrears brought by the State is restricted to only hearing what court orders issued twelve and eleven years ago in 2012 and 2013 say in the court record in this matter</mark>.  The Magistrate shows she is in effect either flouting or <mark>lacks understanding of the intent of the Court's February 2023 Order that ordered discovery</mark>.  The Magistrate then instructed the Defendant to file a Motion if the Defendant disagrees.

The Magistrate's insistence that Defendant has to file another motion in order to litigate Defendant's dispute of the State's alleged interest arrears violates the pro-se Defendant's right to a speedy trial, efficiency and economy, prejudicing the Defendant.

The aforesaid spectacle of: (1) declaring the Magistrate is restricting the scope of the hearing on the State's motion to set arrears to only taking judicial notice of a twelve-year old 2012 court order, (2) while muzzling/muting the Defendant throughout the State's calling and examination of Its witness, and then (3) upon the conclusion of the State's direct questions, going straight to reading her decision while continuously muting the Defendant preventing the Defendant from lodging objections/cross-examination/presenting evidence and present arguments, reasonably calls into question the Magistrate's competence.

Under ***Turner v. Rogers, et al.*, 564 U.S. 431 (2011),** the pro-se Texas Defendant has the due process and equal protection right to (1) identify the central issues; (2) present evidence; (3) present arguments.  Magistrate Nahabedian shows she is confused about the central issues, restricts the scope of the hearing to just take judicial notice of what the prior court orders say, and flouts the Title IV-D Program statutory provisions of the Social Security Act.

1. The above is violative of Title IV-D Program mandates that govern this child support interest related matter.  *See* **Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act)**

The issue of paramount concern, among others, is the due process protections that apply.   The state child-support enforcement program at issue in this matter (which

is an **interstate** child support case), like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act).

2. Congress and the Secretary of the U.S. Department of Health and Human Services have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program. (E.g. See, e.g., 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, **including notice and a reasonable opportunity to contest the accuracy of such information**."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for **notice**, **opportunity to contest the action**, and **opportunity for an appeal on the record** to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

3. It is therefore no doubt and unequivocal that due process in any State tribunal in the United States must provide **the opportunity to contest the accuracy** of the information, **the accuracy of the alleged arrears** put forth by the State Agency, a Title IV-D Program State Agency, as here. Yet, Magistrate Nahabedian restricts the scope of a hearing to set the arrears brought by the State to only determining whether there exists a prior court

order that set interest, and disallowing litigation challenging the accuracy of the alleged arrears put forth by the State Agency.

4.  Having chosen to participate in the Title IV-D Program, the Rhode Island State here is mandated to comply with the clearly defined meaning of due process in 42 U.S.C. 666(a)(7)(B)(i).   Federal law preempts all State customs, preempts State practices, preempts State policies or interests, and preempts State laws that go contrary to the statutory provisions of the Federal Title IV-D Program.

The Magistrate's WebEx muting of the Defendant for the entire duration of: (1) the State's questioning of its witness obstructing her from objecting to the questions, (2) denying the Defendant the opportunity to cross-examine the witness, (3) denying the Defendant the opportunity to challenge the accuracy of the State's information, (4) denying the Defendant the opportunity to present evidence and present arguments.  The Magistrate's statement after unmuting the Defendant after reading into the record the decision that the Defendant's then-allowed post-judgment cross-examination of the State's witness "won't change her decision" unequivocally demonstrates prejudice against the Defendant and calls into question her competence.

The American Bar Association, ("ABA") in its seminal report produced for remote hearings and technology integration into the courts that further address court procedures during the COVID-19 Pandemic states that 60% to 100% of the approximately 30 million cases annually in the United States have a pro se litigant as a party, and that holds especially true in state <u>family courts</u> across the country.  This implies that the Magistrate's muting of the Texas pro-se Defendant that obstructs her from lodging objections during the State's examination of its witness showing due process violations irreparably injure the vast majority of the pro se public in this Court, such as the Defendant proceeding pro se, and from Texas, by knowingly muting the Defendant and stating after rendering her decision and unmuting the Defendant that any of the Defendant's post-judgment cross-examination of the witness "won't change

her decision" is an abuse of the electronic technology system to disadvantage the pro-se Defendant in the digital court.  *See* ABA Report here: https://www.srln.org/system/files/attachments/AppendixA.ABA%20remote.117-annual-2020.pdf

**Implication of Violating Due Process Mandates Under _Turner v. Rogers, et al._, 564 U.S. 431 (2011) on State Eligibility of Participation in Title IV-D Program**

1. It is in the Public's interest AND the State's interest to disqualify Magistrate Nahabedian who uses the WebEx mute function to muzzle the pro-se Defendant, failing to comply with **_Turner v. Rogers, et al._, 564 U.S. 431 (2011).**

2. In this matter, on motion to re-establish child support interest brought by under Title IV-D Program, the State and the Plaintiff and all persons etc., are mandated by **_Turner v. Rogers, et al._, 564 U.S. 431 (2011) to comply with due process safeguards Congress intended.**  Specific to the due process requirement Congress intended is the requirement to develop a record that allows for appeal.  Here, the record development requirement is violative of due process.

   *See* **Congressional Intent at eg. 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for notice, opportunity to contest the action, and opportunity for an appeal on the record to an independent administrative or judicial tribunal") (Emphasis added)**

3. As Congress, the United States Department of Justice, and the Secretary of the U.S. Department of Health and Human Services have demonstrated their concern that child-support-related proceedings be conducted fairly by

**repeatedly making compliance with procedural due process rules a requirement of State participation in the program**, it is further in the State's interest to disqualify Magistrate Nahabedian.

4. The Defendant seeks to preserve this important issue on the record, for appeal.

5. After the conclusion of the hearing on February 2, 2024, the Defendant sent a formal written email request to the Clerk of the Court, Magistrate Nahabedian's Clerk, copying the State counsel, Paul Gould, requesting an electronic recording copy of the WebEx hearing, a public hearing that was also livestreamed. Defendant is informed by WebEx that WebEx hearings are recorded. A record of the muting, periods of muting, Defendant's repeated press of the "raise hand button" when she was muted to show her intent to object but could not lodge them audibly on the record because she was muted, is requested.

6. In support of the above, the Defendant attaches herein a copy of the aforesaid Defendant email request made on February 2, 2024.

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or designee-Judge Merolla of this Honorable Court to:

1. Grant the Defendant's Motion to Disqualify Magistrate Nahabedian.
2. Stay proceedings in this matter to investigate the raised due process violations raised herein as well as due process violation matters relating to Title IV-D Programs that mandate due process proceedings, in order to enforce Title IV-D Program requirements and to enforce the State to comply with Title IV-D Program participation eligibility requirements.
3. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

February 4, 2024

FOR DEFENDANT
MARY SEGUIN, Pro Se.

By: _Mary Seguin_
Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

## CERTIFICATION

I hereby certify that a copy of the within Motion was filed on February 4, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

_Mary Seguin_

Exhibit A

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/17/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 0011812963 3   Page: 370   Date Filed: 03/27/2024   Entry ID: 6638886

## STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                    FAMILY COURT

| | | |
|---|---|---|
| State of Rhode Island ex rel. | : | |
| GERO MEYERSIEK | : | |
| *Plaintiff* | : | |
| | : | |
| VS. | : | DOCKET NO: K010521M |
| | : | |
| | : | |
| MARY SEGUIN | : | |
| *Defendant* | | |

### MARY SEGUIN'S DECLARATION PURSUANT TO RULE 37(a)(2) IN SUPPORT OF DEFENDANT'S THIRD RULE 7(b)(3)(G) MOTION TO COMPEL PRODUCTION UNDER RULE 34(b), RULE 37(a)(2)(3), RULE 26(b)((1), RULE 26(b)(5)

I, MARY SEGUIN ("Plaintiff"), resident of the State of Texas, in good faith,

certify, declare, verify and state pursuant to 28 U.S. Code sec 1746, under penalty of

perjury that the foregoing is true and correct:

1.   I received in the mail a Notice of Lien for the amount of $75,638.00 dated

   March 3, 2022 issued by the Rhode Island Office of Child Support Services on

   and around mid-March 2022.  In April 2022, I filed a written appeal of the

   lien.  My written appeal was docketed on April 4, 2022 at the Office of

   Appeals of the Rhode Island Executive Office of Health and Human Services,

   Docket#22-2116.   The Administrative Hearing was continued to the

   maximum of three times by the Appeals Office due to the failure of the Office

   of Child Support Services to grant me, the Appellant, access to my case file.

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/17/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 0011812963 3     Page: 371     Date Filed: 03/27/2024     Entry ID: 6639300

On October 5, 2022 a telephonic conference took place prior to the Administrative Hearing. The participants of the telephone call were John Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode Island, Debra DeStefano, Esq., the Hearing Officer of the Rhode Island Executive Office of Health and Human Services Office of Appeals in Rhode Island, and myself in Texas. I, in Texas, recorded the phone call starting at 12:30PM Central Time, or 1:30PM Eastern Time. The recording of the telephone call is 1 hour 35 minutes and 38 seconds long. I am admitting into evidence the recording.

2. Because the entire recording is over one and half hour long, I admit into evidence the attached true and accurate part of the recording where John Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode Island stated to me and Debra DeStefano "what happened in this case is when Mary's representative, her attorney, called us in later November 2021 and said she wants her passport released, what does she have to do to release her passport, they put her in touch with Karla, who gave her the $104k number. Where that number came from was the department attorney contacted the custodial parent, Mr. MEYERSIEK. So, we contacted his attorney, it wasn't me, it was somebody else in my office, and said, if she was willing to make a $104k payment to pay off the principal, would you be willing to waive the $75k or $73k in arrears. At that time, he said yes. So Karla notified Mary that if she paid the $104k, it would be paid in full because he was willing to waive the interest, that was just the principal. What happened was the day after Karla told Mary to wire the $104k the attorney for Mr. Meyersiek contacted us

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/12/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 0011812363331    Page: 372    Date Filed: 03/27/2024    Entry ID: 6638300

again and said he changed his mind.  Please put the interest back on the system.  So we did."

3.  I attempted to attach the audio file recording to the Rhode Island Courts e-filing Tyler Technologies system but was informed by the system that audio files cannot be uploaded as attachments.

4.  Therefore, I uploaded the audio file to Google Drive and shared it with DomesticExhibits@Courts.ri.gov and paul.gould@dhs.ri.gov

5.  I further attach here the link of the shared Audio File on Google Drive as https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

6.  I granted access to this audio file on Google Drive to DomesticExhibits@courts.ri.gov and paul.gould@dhs.ri.gov

7.  I further emailed DomesticExhibits@courts.ri.gov and paul.gould@dhs.ri.gov that this is the audio file attached to my affidavit filed herein in Court to Admit the audio file into evidence in the above captioned matter in Family Court, K20010521M.

8.  The Family Court Clerk told me to email my exhibits and evidence along with the case number K20010521M to DomesticExhibits@courts.ri.gov

9.  Karla Caballeros of the Rhode Island Office of Child Support Services notified me on December 7, 2021 that if I paid the $104,185.98 it would be paid in full because Gero Meyersiek waived the interest.  I agreed, and on December 7, 2021, on the same day of Karla Caballeros' notification, I paid the $104,185.98 through bank wire.  After I paid the full amount through bank wire, I emailed Karla Caballeros also on the same day on December 7, 2021 that I wired it.

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/12023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 0011812983 3    Page: 303 307    Date Filed: 03/27/2024    Entry ID: 6639300

10. Rhode Island Office of Child Support Services also emailed and mailed through regular mail to me during litigation the TRAC note of 12/06/2021 and 12/07/2021 that says, "Agent contacted me that NCP wants to pay all arrears to obtain passport. I called CP private attorney Barbara Grady to advise, and to discuss if CP wants the interest put back on the case (REDACTED). We removed the interest when case was made UI when we were filing to Texas. Atty Grady checked with CP and CP is satisfied with the lump sum payment of principle of $104k+/-. After conference with Monique and Frank Dibiase, it was decided to require payment in more secure/less reversable form than credit card, so $ will need to be wired by bank check. Agent will be contacted back by NCP as NCP won't give phone number or email address. Agent is not even sure if NCP is in country. Interest is not included in amount that is considered for passport purposes in any event."

11. The statements contained in the Defendant's Second Rule 7(b)(3)(G) Motion to Compel Production filed on March 27 3, 2023 in the Family Court and Defendant's Third Rule 7(b)(3)(G) Motion to Compel filed on June 1, 2023 are, to my knowledge, true and correct.

12. I filed my/Defendant's First Rule 7(b)(3)(G) Motion to Compel Production on February 3, 2023 and the Court heard this motion at the hearing in this matter on February 10, 2023.

13. The Court ruled at the February 10, 2023 and March 6, 2023 hearings in this matter that the State ex. Rel. GERO MEYERSIEK, Plaintiff, shall comply with discovery forthwith.

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/17/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 0011812-9633    Page: 306    Date Filed: 03/27/2024    Entry ID: 6639800

14. At the hearing held on February 10, 2023 in this matter, the State through and by Paul Gould, Esq., represented to the Court that the State on its own removed interest from the system in Defendant's case file in 2018. TRAC notes dated 12/06/2021 and 12/07/2021 also state that the State on its own removed interest from the system in Defendant's case file in October 2018.

15. At the hearing held on February 10, 2023 in this matter, the Court ordered the State to put interest back on the system without prejudice to the Defendant.

16. The Court ruled at the March 6, 2023 hearing in this matter that the interest number put back on the system without prejudice to the Defendant is only a "starting point" for the sole purpose of having a number to start with, without prejudice to the Defendant. The Court elucidates to the Defendant, "You have to have a number to start with. The State is not saying you owe this number."

17. The Court ruled at the March 6, 2023 hearing in this matter that the State ex. Rel. GERO MEYERSIEK, Plaintiff, shall substantiate the interest number which the Court ordered to put back on the system without prejudice to the Defendant.

18. I, the Defendant in this matter, in good faith, attempted to confer with the State/Plaintiff, by and through Paul Gould, Esq., in Court at the March 6, 2023 hearing to make discovery in an effort to secure the information and documents requested in my/Defendant's Request for Product of Documents without court action in the form of a formal Motion to Compel. However, the State/ Plaintiff replied in Court that the State stands by the responses propounded by the State/Plaintiff in the Plaintiff's Response to Defendant's Request for Production of Documents dated February 16, 2023 and continues

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 0011812963    Page: 375    Date Filed: 03/27/2024    Entry ID: 6638800

to stand by those said responses up to June 8, 2023, the date this matter is continued for hearing on the State/Plaintiff's DHS Motion.

19. I, the Defendant in this matter, in good faith, again attempted to confer with the State/Plaintiff, by and through Paul Gould, Esq., since April 14, 2023, including sending more than 12 email confer attempts to make discovery in an effort to secure the information and documents requested in my/Defendant's Requests for Production of Documents without court action in the form of a formal Motion to Compel. However, the State/Plaintiff again replied during a May 9, 2023 telephone conference with the Defendant that the State/Plaintiff stands by the responses propounded by the State/Plaintiff in the Plaintiff's Responses to Defendant's Requests for Production of Documents in February and April of 2023. The Defendant further revised Defendant's First Set of Interrogatories pursuant to discussions at the aforesaid May 9, 2023 discovery telephone conference, as well as asked the State/Plaintiff in writing via email to reply to the Defendant if the State/Plaintiff has any further questions or issues to discuss without court action, but again, the State/Plaintiff failed to communicate any objections or issues with the Defendant.

20. I certify that the above is true and correct.

Declaration Executed on June 1, 2023 by Mary Seguin

_____
Mary Seguin

Exhibit B



**Mary Seguin <maryseguin22022@gmail.com>**

---

## Request for Audio Recording of Remote WebEx hearing

**Mary Seguin** <maryseguin22022@gmail.com>                                    Fri, Feb 2, 2024 at 7:21 PM
To: virtualfamilyclerk@courts.ri.gov
Cc: Richard Santamaria <Rdsantamaria@courts.ri.gov>, "Nahabedian, Susan" <snahabedian@courts.ri.gov>

Dear Clerk of the Family Court,

I am respectfully requesting the audio recording of the WebEx hearing in this matter, Gero Meyersiek v. Mary Seguin, K2001-0521M that was scheduled on February 2, 2024 at 2PM EST.

Please email the audio recording to me as soon as possible.

Thank you.

Respectfully Submitted,
Mary Seguin

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Fri, Feb 2, 2024 at 2:38 PM
Subject: Request for Audio Recording of Remote WebEx hearing
To: Santamaria, Richard <rdsantamaria@courts.ri.gov>
Cc: Gould, Paul (DHS) <Paul.Gould@dhs.ri.gov>, Nahabedian, Susan <snahabedian@courts.ri.gov>

Dear Clerk of the Court,

I am respectfully requesting the WebEx hearing audio recording of the hearing in this matter, Gero Meyersiek v Mary Seguin, K-0521M that was scheduled on February 2, 2024 at 2PM EST.

Please email the audio recording to me.

Thank you.

Respectfully submitted,
Mary Seguin

On Jan 18, 2024, at 2:18 PM, Santamaria, Richard <rdsantamaria@courts.ri.gov> wrote:

Ms. Seguin,

We have finished scanning the entire file.   I will be emailing you the documents In increments, as I did before.

Thank you for your patience during this process.

Regards,

Richard

---



&lt;image001.jpg&gt;

**Richard Santamaria, Jr.**

Deputy Clerk

Domestic Clerk's Office

Rhode Island Family Court

One Dorrance Plaza

Providence, RI 02903

Phone: 401-458-3122

rdsantamaria@courts.ri.gov |
www.courts.ri.gov

&lt;Order Entered.tif&gt;
&lt;Motion to Adjudge in Contempt.pdf&gt;
&lt;Motion to Adjudge in Contempt 1.pdf&gt;
&lt;Order Entered.pdf&gt;
&lt;Order Entered 1.pdf&gt;
&lt;Order Entered 2.pdf&gt;
&lt;Order Entered 3.pdf&gt;

EXHIBIT G

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                          FAMILY COURT

| | | |
|---|---|---|
| State of Rhode Island ex rel. | : | |
| GERO MEYERSIEK | : | |
| *Plaintiff* | : | |
| | : | |
| VS. | : | DOCKET NO: K010521M |
| | : | |
| | : | |
| MARY SEGUIN | : | |
| *Defendant* | : | |

### DEFENDANT'S MOTION FOR A VIDEO RECORDING OF TITLE IV-D WEBEX HEARING

Now comes the Texas Defendant, MARY SEGUIN ("Seguin") and hereby respectfully moves the Chief Judge of Family Court, the Honorable Michael Forte, to send the Defendant **a sound recording and video recording** of the public court hearing heard via WebEx scheduled on February 2, 2024 at 2 PM Eastern Time in the above-captioned matter, a **Title IV-D Case**.

Defendant requests a hearing on this matter.

Defendant proceeds pro-se in Texas.  The State alleges a substantial but unsubstantiated **$81,652.46 in interest arrears without any evidentiary substantiation of the validity and accuracy of the alleged arrears on the record** in this **interstate** Title IV-D Program case.

During the entirety of the trial phase of the Title IV-D case WebEx hearing on the State's alleged $81,852.46 in interest arrears, the WebEx Host/Magistrate forcibly muted the Defendant for the entire "trial phase" all the way to and through the Magistrate's reading the decision into the record.  Only after the decision was read into the record was the Defendant unmuted by the WebEx Host/Magistrate.  Defendant was unable to unmute the Host's/Magistrate's mute, and repeatedly pushed the "raise hand" button to signal Defendant's intent to speak to present Defendant's case, but to no avail.

## I.    **Background**

While the court records lacks documentary evidence substantiating the State's allegation of the $81,654.62 in interest arrears, on the other hand, Defendant has filed several motions and submitted evidence into the record from February 3, 2023 to August 2023 documentary evidence of screen shots taken on December 6, 2021 showing "$0.00 interest" reflected on the Defendant's online account as of November 30, 2021 which Office of Child Support Services represented to the Texas Defendant showed that interest was waived by the Plaintiff.   Defendant's online account screenshot on December 6, 2021 showing "$0.00 interest" coupled with Office of Child Support Services representation that the "$0.00 interest" showed interest was waived by the Plaintiff led the Texas Plaintiff to reasonably rely on the accuracy of the State's representation that interest was waived, in consideration of the Defendant agreeing to pay off the principle in one lump sum.  Defendant in Texas accepted and paid in full IN ONE LUMP SUM the pay off of $104,185.98  that Office of Child Support sent to Defendant in writing by email to pay off arrears in full via bank wire on December 7, 2021, in consideration of the Plaintiff GERO MEYERSIEK waiving interest.  The agreement was brokered by the State, by Deputy Legal Counsel Kevin Tigue ("Tigue") of Office of Child Support Services and Attorney Barbara Grady on behalf of Plaintiff GERO MEYERSIEK.  This is documented in the Defendant's Title IV-D Child Support case file on the "TRAC dated 12/06/2021 and 12/07/2021" that shows Tigue brokering the interest waiver with Attorney Barbara Grady on behalf of Gero Meyersiek in consideration of Defendant paying a lump sum payment of $104, 185.98 in principle as payoff.  Defendant submitted the aforesaid documents into the record, attached to Defendant's affidavits.  Defendant again attaches the aforesaid online account screen shot showing "$0.00 interest" as of November 30, 2021 and the "TRAC for 12/06/2021 and 12/07/2021" as **Exhibit A** to this Motion.

Additionally, at a Prehearing telephonic conference that took place on October 5, 2022, The participants of the telephone call were John Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode Island, Debra DeStefano, Esq., the Hearing Officer of the Rhode Island Executive Office of Health and Human Services Office of Appeals in Rhode Island, and Defendant in Texas. Defendant, in Texas,

recorded the phone call starting at 12:30PM Central Time, or 1:30PM Eastern Time. The recording of the telephone call is 1 hour 35 minutes and 38 seconds long.  Defendant is admitting into evidence the recording.  Listen to the audio recording at the link here:

https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

Because the entire recording is over one and half hour long, Defendant admitted into evidence the attached true and accurate part of the recording where John Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode Island stated to Defendant and Debra DeStefano "what happened in this case is when Mary's representative, her attorney, called us in later November 2021 and said she wants her passport released, what does she have to do to release her passport, they put her in touch with Karla, who gave her the $104k number. Where that number came from was the department attorney contacted the custodial parent, Mr. MEYERSIEK. So, we contacted his attorney, it wasn't me, it was somebody else in my office, and said, if she was willing to make a $104k payment to pay off the principal, would you be willing to waive the $75k or $73k in arrears. At that time, he said yes. So Karla notified Mary that if she paid the $104k, it would be paid in full because he was willing to waive the interest, that was just the principle. What happened was the day after Karla told Mary to wire the $104k the attorney for Mr. Meyersiek contacted us again and said he changed his mind. Please put the interest back on the system. So we did."

https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

The above are but some of the many evidence the Defendant had already submitted into the record on file, but not formally admitted into evidence by a trial justice at a hearing.  Therefore, the record is amply clear that Defendant intends and seeks to exercise her right to the opportunity to be heard (not muted in a WebEx hearing by the Magistrate the duration of the trial phase of the hearing).

## II.     **Defendant was forcibly Muted for the Entire Duration of the Trial Phase of the Hearing**

1. The WebEx Host/Magistrate had put Defendant on mute throughout the duration of the State's witness testimony all the way through to reading into the record the decision using a new WebEx Mute function. Defendant was unable as an individual participant to unmute the WebEx Host's mute of the Defendant.

2. For the duration of the opposing party's testimony and then through to the end of the reading of the decision into the record, Defendant was forcibly put on mute.

3. Defendant pressed the "raise hand" button repeatedly seeking to be heard, but to no avail.

4. If the act of forcibly muting Defendant is not on the appeal record in the WebEx hearing, the record is inaccurate, falsely making it look like Defendant didn't mount a defense/present evidence before the decision, when in fact Defendant was forcibly muted and used the "raise hand" button repeatedly to signal Defendant's intent to speak/present evidence/present argument throughout the "trial evidence and argument" phase, but to no avail.

5. The transcript must accurately reflect the fact that the WebEx Host/Magistrate had forcibly put the Defendant on mute throughout the duration of the trial, resulting in the trial consisted only of the State's witness testimony, all the way through to the reading into the record the court's decision using a new WebEx Host mute function. Defendant was unable as an individual participant to unmute the WebEx Host's mute of the Defendant.

6. The Host's/Magistrate's mute of the Defendant was not explicitly verbalized on the record beforehand or after unmuting. But the act of the forcible Host/Magistrate muting of the Defendant, when said muting occurred during the State's testimony/evidence/argument, is crucial to the accuracy of the record, that is guaranteed by the due process provisions of Federal Title IV-D.

7. Defendant was forcibly muted from raising objections to the opposing party's questions on their direct.

8. Defendant was forcibly muted from cross-examining the State's witness.

9. Defendant was forcibly muted from presenting Defendant's evidence, *inter alia* the above-mentioned evidence.

10. Defendant was forcibly muted from presenting Defendant's arguments regarding the State's insufficiency/lack of evidence substantiating or supporting the accuracy of alleged arrears calculated and alleged owed.

11. Defendant was forcibly muted from being heard on evidence and arguments.

12. Then, going straight to reading a judgment into the record while still keeping Defendant on mute makes the alleged judgement read into the record lack due process.  The record must reflect the act of muting the Defendant for the entire trial phase of the hearing.

13. If the act of forcibly muting the Defendant is not on the record in the WebEx hearing, the record is inaccurate, making it look like Defendant did not mount a defense/present evidence before the decision, when in fact Defendant was forcibly muted and vigorously used the "raise hand" button repeatedly to signal Defendant's intent to speak and present Defendant's evidentiary case throughout the "trial evidence and argument" phase, but to no avail.

14. From the start of mute to the time of unmuting must be part of the record.

15. The Texas Defendant was summoned to a WebEx hearing where Defendant was forcibly muted and prevented from being heard for the crucial entire phase of the "trial, evidence and argument" of the hearing all the way through to the reading of the decision into the record, which must be preserved in the record to reflect a true/accurate record of the proceeding.

16. The Defendant respectfully requests to obtain a complete and true video record of the WebEx hearing that appeared on the computer screen replete with being forcibly muted as is indicated by a crossed out microphone icon at the bottom-right corner of the participant's window, replete with showing the "raising hand" icon pressed and all the crucial records showing the suppression of Defendant's intent to be heard that must be preserved on the record.

17. This was a public hearing which was live-streamed.

18. Defendant requests a sound and video recording of the above WebEx hearing.

19. The issue of paramount concern, among others, is the due process protections that apply.   The state child-support enforcement program at issue in this matter (which is an **interstate** child support case), like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act).

20. Congress and the Secretary of the U.S. Department of Health and Human Services have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program. (E.g. See, e.g., 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, **including notice and a reasonable opportunity to contest the accuracy of such information**."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for **notice**, **opportunity to contest the action**, and **opportunity for an appeal on the record** to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

21. It is therefore unequivocal that due process in any and all tribunal(s) must provide **the Defendant Noncustodial Parent the opportunity to contest the accuracy** of the information **and/or the accuracy of the alleged arrears** put forth by the State Agency, a Title IV-D Program State Agency, as in this instant case here.

22. Under ***Turner v. Rogers, et al.***, **564** U.S. **431 (2011)**, the pro-se Texas Defendant has the due process and equal protection right to (1) identify the central issues; (2) present evidence; (3) present arguments.

23. Defendant further sent a written letter request to the Office of the Chief Judge of the Family Court for the same audio and video recordings.

24. In support of this motion, the Defendant attaches to this herein motion the following evidence ( just a portion of the total evidence) that Defendant was prevented from presenting at the WebEx hearing – these were also previously submitted into the record by the Defendant from February 2023 to June 2023:

    (1) A copy of the screen shots of Noncustodial Parent Defendant's online child support account statement of total arrears owed that shows "$0.00" under "Interest" as of November 30, 2021 which Karla Cabelleros of Office of Child Support Services told the Defendant showing Gero Meyersiek waived interest and to rely on the arrears amount figures on the screen stating "$93,214.56  of principle arrears, $0.00 of interest."

    (2) A copy of the TRAC notes of 12/6/2021 and 12/7/2021

    (3) A copy of the emails between Defendant and Karla Caballeros on December 6, 2021 and December 7, 2021.

**WHEREFORE**, the Defendant respectfully requests the Chief Judge of this Honorable Court to:

1. Grant the Defendant's Motion for an audio recording and Video recording of the February 2, 2024 Title IV-D WebEx Hearing on this matter.
2. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request, including the factual events in this case relating to the waiver of interest that is material to the accuracy of the alleged interest arrears.
3. Order a hearing.
4. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here: https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

5.  For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

February 5, 2024

FOR DEFENDANT
MARY SEGUIN, Pro Se.

By:  _Mary Seguin_
Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

**CERTIFICATION**

I hereby certify that a copy of the within Motion was filed on February 5, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

_Mary Seguin_



**Case Manager**

## Current Orders / Past Due Balances

**Custodial Parent:** Gero K Meyersiek    **CSE ID:** 1689817

### Current Orders

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

⚠ Note: Medical orders and medical arrears are not listed on this screen.

### Past Due Balances

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |



M Gmail

**Mary Roberts <marylive22022@gmail.com>**

---

## Request for administrative hearing of Notice dated March 3, 2022 : Re: K01-521M Child Support Payment Schedule Information

---

**Mary Roberts <marylive22022@gmail.com>**
To: <karla.samayoa@dhs.ri.gov>

Fri, Apr 1, 3:12 PM

Karla,

I am writing to request an administrative hearing in the above matter, and am attaching to this email the written request (in pdf file named "Request for Administrative Hearing April 1, 2022") that I had also sent via regular mail.  On March 15, 2022, I received the attached notice which was sent from child support office.

As indicated in my attached request, I am pro-se at this time and out-of-state, and further due to surging Covid, I respectfully request instructional materials on how to proceed for hearing, such as date(s) to submit my written petition/brief/motion/memorandum in support of my request for hearing, and the date of hearing via zoom (including dial-in information) for individuals/the general public without counsel, to be emailed to me as soon as possible.

Sincerely,
Mary

Cc: via regular mail Tracy Gedris, PO Box 480, Elmford, NY 10523

On Tue, Dec 7, 2021 at 11:14 AM Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov> wrote:

> ### Yes, that is correct.
>
> **From:** Mary Roberts <marylive22022@gmail.com>
> **Sent:** Tuesday, December 7, 2021 12:09 PM
> **To:** Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov>
> **Subject:** [EXTERNAL] : Re: K01-521M Child Support Payment Schedule Information
>
> Thank you Karla!
>
> The child support case number is 0366029181, correct?  Just wanted to confirm.
>
> Thank you!
>
> Mary
>
> On Tue, Dec 7, 2021 at 10:40 AM Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov> wrote:
>
> > Hi Mary:
> >
> > This is the response I received from accounting:

include her child support case #, the routing and account numbers, her name obviously, and name of account: Child Support

**Bank name : Citizens Bank**

**Account name: Child Support**

**Routing number is 011500120**

**Account number is 11076461**

**She should wire the 104,185.98 and cancel the 12/06 payment if possible.**

[google.com]

Karla Caballeros

Child Support Administrative Officer

Office of Child Support Services

77 Dorrance Street [google.com]

Providence, RI 02903 [google.com]

401-458-4519

401-458-4410 fax

Karla.Caballeros@dhs.ri.gov

**From:** Mary Roberts <marylive22022@gmail.com>
**Sent:** Tuesday, December 7, 2021 10:48 AM
**To:** Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov>
**Subject:** Re: [EXTERNAL] : Fwd: 88298: Child Support Payment Schedule Information

Good morning Karla,

Thank you so much for the information!

And do I remit $104,185.98 and cancel the $9991 I scheduled for 12/13/2021?

Thanks again for your help.

Mary

On Tue, Dec 7, 2021 at 8:47 AM Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov> wrote:

Good Morning Mary:

Please see below information received by our accounting office as to the transferring of funds to pay the arrears:

She will need to know the following information for the wire transfer:

Bank name : Citizens Bank

Account name: Child Support

ABA# 011500120110076461

If you have any other questions, please do not hesitate to reach out to me.

[google.com]

Karla Caballeros

Child Support Administrative Officer

Office of Child Support Services

77 Dorrance Street [google.com]

Providence, RI 02903 [google.com]

401-458-4519

401-458-4410 fax

Karla.Caballeros@dhs.ri.gov

11:28:47 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (████████████████████). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BY NCP___
AS NCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:           SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK   GERO     K   PNL:
```

Case Number: PD00165JM
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10 13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

12/13/22    11:20        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY              U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT.

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES

RL: 80  12 22 ABSP:           SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK   GERO     K    PNL:

Case Number 23-1907
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

12/13/22   11:29         C A S E   T R A C K I N G         CSCL   ASMXA201
           TRAC.00              CASE HISTORY               U824   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
      FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
      FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: SO  12 22 ABSP;           SEGUIN        MARY         CMD: _____
FWX: TRAC  D CLIENT:          MEYERSIEK     GERO    X    PNL:

Case Number: 20-1937A    Document: 00118129633    Page: 395    Date Filed: 04/07/2024    Entry ID: 6630800
Filed: Providence/Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maya G.

11:29:53 Tuesday, December 13, 2022

**STARTING DATE**   09 01 2021
**SELECTION**    COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

RL: 80  12 22 ABSP:              SEGUIN        MARY          CMD: _____
FXX: TRAC  0 CLIENT:             MEYERSIEK     GERO     K    PNL:

ed in Providence/Bristol County Family Court
ibmitted 6/17/2023 10.13 PM Document: 0011812 3683   Page: 396   Date Filed: 06/27/2024   Entry ID: 6636300
ivelope: 4132704
iviewer Maria O
11:29:09 Tuesday, December 13, 2022

```
12/13/22    11:28          C A S E   T R A C K I N G          CSCL    ASMXA201
            TRAC.00                  CASE HISTORY             U824    PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN___
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
    TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
    58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS___
ED TO BE $6028.75._____

RL: 80  12 22 ABSP:              SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK   GERO     K    PNL:
```

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G      CSCL  ASMXA201
           TRAC.00            CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
     TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
     58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

```
RL: 80  12 22 ABSP:          SEGUIN      MARY          CMD:
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO     K    PNL:
```

11:29:13 Tuesday, December 13, 2022

```
12/13/22   11:28         C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY              UB24  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

RL: 80  12 22 ABSP:              SEGUIN       MARY          CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK    GERO    K     PNL:
```

Submitted in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Viewer: Maria O.
Envelope: 4132704

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28       C A S E   T R A C K I N G      CSCL  ASMXA201
            TRAC.00              CASE HISTORY          U824  PROD
STARTING DATE    09 01 2021
SELECTION     COMPREHENSIVE CASE HISTORY
```

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

```
RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:         SEGUIN      MARY         CMD:
                             MEYERSIEK   GERO    K    PNL:
```

EXHIBIT H

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                         FAMILY COURT

| | | |
|---|---|---|
| State of Rhode Island ex rel. | : | |
| GERO MEYERSIEK | : | |
| *Plaintiff* | : | |
| | : | |
| VS. | : | DOCKET NO: K20010521M |
| | : | |
| | : | |
| MARY SEGUIN | : | |
| *Defendant* | : | |

### DEFENDANT'S MOTION TO DISMISS INTEREST ARREARS

The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby moves to dismiss interest arrears. Defendant respectfully **requests and moves for a hearing on Defendant's herein Motion to Dismiss Interest Arrears**.

Defendant separately filed accompanying this motion Defendant's Motion to Disqualify Magistrate Nahabedian, that is related to this herein motion. As facts fully alleged herein, Defendant incorporates all the facts averred to in Defendant's Motion to Disqualify that outlines the fact at the WebEx Hearing scheduled at 2 PM Eastern Time on February 2, 2024, Magistrate Nahabedian instructed the Defendant to file a separate Motion to challenge the accuracy of the information presented on the record in this matter by the Office of Child Support Services ("the State") of the alleged interest owed and to challenge whether interest is owed. Additionally, the Defendant requests and moves for a hearing to present evidence showing that the Plaintiff's private attorney Barbara Grady provided oral representation and sent written statements representing to the Office of Child Support Services that Gero Meyersiek waived interest.

In support of Defendant's herein Motion to Dismiss Interest Arrears, the Defendant again re-attaches Defendant's Affidavit of the Facts filed and submitted into the record in this matter on June 1, 2023 (see **Exhibit A**) and states the following facts:

1. The State (Rhode Island Office of Child Support Services) computation of alleged interest arrears of over $81k is inaccurate and the Defendant moves for a hearing to challenge and question the State on the State's information and computation.

2. The child in question turned 18 years old and was emancipated on April 21, 2018, and is now a 24 year old adult.

3. Further, Defendant received in the mail a Notice of Lien for the amount of $75,638.00 dated March 3, 2022 issued by the Rhode Island Office of Child Support Services without supporting documentation justifying the lien amount on and around mid-March 2022.

4. In April 2022, Defendant filed a written appeal of the lien. Defendant's written appeal was docketed on April 4, 2022 at the Office of Appeals of the Rhode Island Executive Office of Health and Human Services, Docket#22-2116. The Administrative Hearing was continued to the maximum of three times by the Appeals Office due to the failure of the Office of Child Support Services to grant Defendant access to Defendant's child support case file.

5. On October 5, 2022 a telephonic conference took place prior to the Administrative Hearing. The participants of the telephone call were John Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode Island, Debra DeStefano, Esq., the Hearing Officer of the Rhode Island Executive Office of Health and Human Services Office of Appeals in Rhode Island, and Defendant in Texas. Defendant, in Texas, recorded the phone call starting at 12:30PM Central Time, or 1:30PM Eastern Time. The recording of the telephone call is 1 hour 35 minutes and 38 seconds long.  Defendant is admitting into evidence the recording, **Exhibit A. Listen to the audio recording at the link here:** https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

6. Because the entire recording is over one and half hour long, Defendant admits into evidence the attached true and accurate part of the recording where John Langlois, Esq., of the Rhode Island Office of Child Support

Services in Rhode Island stated to Defendant and Debra DeStefano "what happened in this case is when Mary's representative, her attorney, called us in later November 2021 and said she wants her passport released, what does she have to do to release her passport, they put her in touch with Karla, who gave her the $104k number. Where that number came from was the department attorney contacted the custodial parent, Mr. MEYERSIEK. So, we contacted his attorney, it wasn't me, it was somebody else in my office, and said, if she was willing to make a $104k payment to pay off the principal, would you be willing to waive the $75k or $73k in arrears. At that time, he said yes. So Karla notified Mary that if she paid the $104k, it would be paid in full because he was willing to waive the interest, that was just the principal. What happened was the day after Karla told Mary to wire the $104k the attorney for Mr. Meyersiek contacted us again and said he changed his mind. Please put the interest back on the system. So we did."

https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

7. Karla Caballeros of the Rhode Island Office of Child Support Services notified the Texas Defendant Seguin on December 7, 2021 that if the Defendant paid the $104,185.98 it would be paid in full because Gero Meyersiek waived the interest. Defendant agreed, and on December 7, 2021, on the same day of Karla Caballeros' notification, Defendant paid the $104,185.98 through bank wire in Texas. After Defendant paid the full amount through bank wire, Defendant emailed Karla Caballeros also on the same day on December 7, 2021 that Defendant wired it.

8. Rhode Island Office of Child Support Services also emailed and mailed through regular mail to Defendant on or about February 2023 during Court ordered discovery the Office of Child Support's "TRAC note" of 12/06/2021 and 12/07/2021 that states, "Agent contacted me that NCP wants to pay all arrears to obtain passport. I called CP private attorney Barbara Grady to advise, and to discuss if CP wants the interest put back on the case (REDACTED). We removed the interest when case was made

UI when we were filing to Texas. Atty Grady checked with CP and CP is satisfied with the lump sum payment of principle of $104k+/-. After conference with Monique and Frank Dibiase, it was decided to require payment in more secure/less reversable form than credit card, so $ will need to be wired by bank check. Agent will be contacted back by NCP as NCP won't give phone number or email address. Agent is not even sure if NCP is in country. Interest is not included in amount that is considered for passport purposes in any event." The statements contained in the Defendant's Second Rule 7(b)(3)(G) Motion to Compel Production filed on March 27 3, 2023 in the Family Court and Defendant's Third Rule 7(b)(3)(G) Motion to Compel filed on June 1, 2023 are, to Defendant's knowledge, true and correct.

9. Defendant filed Defendant's First Rule 7(b)(3)(G) Motion to Compel Production on February 3, 2023 and the Court heard this motion at the hearing in this matter on February 10, 2023.

10. The Court ruled at the February 10, 2023 and March 6, 2023 hearings in this matter that the State ex. Rel. GERO MEYERSIEK, Plaintiff, shall comply with discovery forthwith.

11. At both the WebEx hearing held on February 10, 2023 in this matter and at the February 2, 2024 WebEx hearing in this matter, the State through and by Paul Gould, Esq., represented to the Court that the State on its own removed interest from the system in Defendant's case file in 2018. TRAC notes dated 12/06/2021 and 12/07/2021 also state that the State on its own removed interest from the system in Defendant's case file in October 2018.

12. At the hearing held on February 10, 2023 in this matter, the Court ordered the State to put interest back on the system without prejudice to the Defendant.

13. The Court ruled at the March 6, 2023 hearing in this matter that the interest number put back on the system without prejudice to the Defendant is only a "starting point" for the sole purpose of having a number to start with, without prejudice to the Defendant. The Court

elucidates to the Defendant, "You have to have a number to start with. The State is not saying you owe this number."

14. The Court ruled at the March 6, 2023 hearing in this matter that the State ex. Rel. GERO MEYERSIEK, Plaintiff, shall substantiate the interest number which the Court ordered to put back on the system without prejudice to the Defendant.

15. The Defendant in this matter, in good faith, attempted to confer with the State/Plaintiff, by and through Paul Gould, Esq., in Court at the March 6, 2023 hearing to make discovery in an effort to secure the information and documents requested in Defendant's Request for Product of Documents without court action in the form of a formal Motion to Compel. However, the State/ Plaintiff replied in Court that the State stands by the responses propounded by the State/Plaintiff in the Plaintiff's Response to Defendant's Request for Production of Documents dated February 16, 2023 and continues to stand by those said responses up to June 8, 2023.

16. The Defendant requested any and all documents in Defendant's child support case file relating to the TRAC notes of 12/6/2021 and 12/7/2021 as well as relating the substance of John Langlois's statements regarding "what happened in this case" that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the Child Support Services that Gero Meyersiek said yes, he "agreed to waive the $73k or $75k that are in arrears," which are part of Defendant's child support case file.  (audio recording of John Langlois is here https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing But, the Office of the Child Support Services refused to produce those records, claiming Client-Attorney Privilege. However, the State never produced any Privilege Log, as is required by law.

17. The Defendant in good faith again attempted to confer with the State/Plaintiff, by and through Paul Gould, Esq., since April 14, 2023, including sending more than 12 email confer attempts to make discovery in an effort to secure the information and documents requested in

my/Defendant's Requests for Production of Documents without court action in the form of a formal Motion to Compel. However, the State/Plaintiff again replied during a May 9, 2023 telephone conference with the Defendant that the State/Plaintiff stands by the responses propounded by the State/Plaintiff in the Plaintiff's Responses to Defendant's Requests for Production of Documents in February and April of 2023. The Defendant further revised Defendant's First Set of Interrogatories pursuant to discussions at the aforesaid May 9, 2023 discovery telephone conference, as well as asked the State/Plaintiff in writing via email to produce Defendant's requested documents in Defendant's child support case file relating to "TRAC notes of 12/6/2021 and 12/7/2021" as well as relating to the substance of John Langlois's audio recorded October 5, 2022 statements regarding "what happened in this case" that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the Child Support Services that Gero Meyersiek said yes, he "agreed to waive the $73k or $75k that are in arrears," which are part of Defendant's child support case file.

18. The issue of paramount concern, among others, is the due process protections that apply.   The state child-support enforcement program at issue in this matter (which is an **interstate** child support case), like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act).

19. Congress and the Secretary of the U.S. Department of Health and Human Services have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program. (E.g. See, e.g., 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process

requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, **including notice and a reasonable opportunity to contest the accuracy of such information**."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for **notice**, **opportunity to contest the action**, and **opportunity for an appeal on the record** to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

20. It is therefore unequivocal that due process in any and all State tribunal(s) in the United States must provide **the Defendant Noncustodial Parent the opportunity to contest the accuracy** of the information **and/or the accuracy of the alleged arrears** put forth by the State Agency, a Title IV-D Program State Agency, as in this instant case here.

21. In support of this motion, the Defendant attaches to this herein motion the following:

(1) A copy of the screen shots of Noncustodial Parent Defendant's online child support account statement of total arrears owed that shows "$0.00" under "Interest" as of November 30, 2021 which Karla Cabelleros of Office of Child Support Services told the Defendant showing Gero Meyersiek waived interest and to rely on the arrears amount figures on the screen stating "$93,214.56 of principle arrears, $0.00 of interest." Marked as **Exhibit B**

(2) A copy of the TRAC notes of 12/6/2021 and 12/7/2021 marked as **Exhibit C**

(3) A copy of the letter from Executive Office of Health and Human Services Appeals Officer, Debra DeStefano, sent to the Defendant in Texas outlining agreements made at the pre-hearing conference held on October 5, 2022, where John Langlois stated, "So, we contacted his attorney, it wasn't me, it was somebody else in my office, and said, if she was willing to make a $104k payment to pay off the principal, would you be willing to waive the $75k or $73k in arrears. At that time, he said yes. So Karla notified Mary that if she paid the $104k, it would be paid in full because he was willing to waive the interest, that was just the principal." Listen to the audio recording here:
https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing  Marked as **Exhibit D**.

(4) A copy of the emails between Defendant and Karla Caballeros on December 6, 2021 and December 7, 2021. Marked as **Exhibit E**.

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or designee-Judge Merolla of this Honorable Court to:

1. Grant the Defendant's Motion to Dismiss Interest Arrears.
2. Grant the Defendant's request for her records relating to the "TRAC notes of 12/6/2021 and 12/7/2021" as well as relating to the substance of John Langlois's audio recorded October 5, 2022 statements regarding "what happened in this case" that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the Child Support Services that Gero Meyersiek said yes, he "agreed to waive the $73k or $75k that are in arrears" as of December 6, 2021 and October 5, 2022 which are part of Defendant's child support case file.
3. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request.
4. Order a hearing on the herein issues raised in this matter.
5. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here:
https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

6. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

February 4, 2024

FOR DEFENDANT
MARY SEGUIN, Pro Se.

By: _____*Mary Seguin*_____
Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

**CERTIFICATION**

I hereby certify that a copy of the within Motion was filed on February 4, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

_____*Mary Seguin*_____

Exhibit A

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/17/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.
Document: 00118129633     Page: 305     Date Filed: 03/27/2024     Entry ID: 6638300

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                      FAMILY COURT

State of Rhode Island ex rel.           :
GERO MEYERSIEK                          :
    *Plaintiff*                         :
                                        :
VS.                                     :        DOCKET NO: K010521M
                                        :
                                        :
MARY SEGUIN                             :
    *Defendant*

### MARY SEGUIN'S DECLARATION PURSUANT TO RULE 37(a)(2) IN SUPPORT OF DEFENDANT'S THIRD RULE 7(b)(3)(G) MOTION TO COMPEL PRODUCTION UNDER RULE 34(b), RULE 37(a)(2)(3), RULE 26(b)((1), RULE 26(b)(5)

I, MARY SEGUIN ("Plaintiff"), resident of the State of Texas, in good faith, certify, declare, verify and state pursuant to 28 U.S. Code sec 1746, under penalty of perjury that the foregoing is true and correct:

1.  I received in the mail a Notice of Lien for the amount of $75,638.00 dated March 3, 2022 issued by the Rhode Island Office of Child Support Services on and around mid-March 2022. In April 2022, I filed a written appeal of the lien. My written appeal was docketed on April 4, 2022 at the Office of Appeals of the Rhode Island Executive Office of Health and Human Services, Docket#22-2116. The Administrative Hearing was continued to the maximum of three times by the Appeals Office due to the failure of the Office of Child Support Services to grant me, the Appellant, access to my case file.

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/17/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 0011812953311    Page: 402    Date Filed: 03/27/2024    Entry ID: 6636800

On October 5, 2022 a telephonic conference took place prior to the
Administrative Hearing. The participants of the telephone call were John
Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode
Island, Debra DeStefano, Esq., the Hearing Officer of the Rhode Island
Executive Office of Health and Human Services Office of Appeals in Rhode
Island, and myself in Texas. I, in Texas, recorded the phone call starting at
12:30PM Central Time, or 1:30PM Eastern Time. The recording of the
telephone call is 1 hour 35 minutes and 38 seconds long. I am admitting into
evidence the recording.

2. Because the entire recording is over one and half hour long, I admit into
evidence the attached true and accurate part of the recording where John
Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode
Island stated to me and Debra DeStefano "what happened in this case is when
Mary's representative, her attorney, called us in later November 2021 and said
she wants her passport released, what does she have to do to release her
passport, they put her in touch with Karla, who gave her the $104k number.
Where that number came from was the department attorney contacted the
custodial parent, Mr. MEYERSIEK. So, we contacted his attorney, it wasn't
me, it was somebody else in my office, and said, if she was willing to make a
$104k payment to pay off the principal, would you be willing to waive the
$75k or $73k in arrears. At that time, he said yes. So Karla notified Mary that
if she paid the $104k, it would be paid in full because he was willing to waive
the interest, that was just the principal. What happened was the day after
Karla told Mary to wire the $104k the attorney for Mr. Meyersiek contacted us

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/17/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 0011812963311    Page: 403    Date Filed: 03/27/2024    Entry ID: 6636800

again and said he changed his mind. Please put the interest back on the system. So we did."

3. I attempted to attach the audio file recording to the Rhode Island Courts e-filing Tyler Technologies system but was informed by the system that audio files cannot be uploaded as attachments.

4. Therefore, I uploaded the audio file to Google Drive and shared it with DomesticExhibits@Courts.ri.gov and paul.gould@dhs.ri.gov

5. I further attach here the link of the shared Audio File on Google Drive as https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

6. I granted access to this audio file on Google Drive to DomesticExhibits@courts.ri.gov and paul.gould@dhs.ri.gov

7. I further emailed DomesticExhibits@courts.ri.gov and paul.gould@dhs.ri.gov that this is the audio file attached to my affidavit filed herein in Court to Admit the audio file into evidence in the above captioned matter in Family Court, K20010521M.

8. The Family Court Clerk told me to email my exhibits and evidence along with the case number K20010521M to DomesticExhibits@courts.ri.gov

9. Karla Caballeros of the Rhode Island Office of Child Support Services notified me on December 7, 2021 that if I paid the $104,185.98 it would be paid in full because Gero Meyersiek waived the interest. I agreed, and on December 7, 2021, on the same day of Karla Caballeros' notification, I paid the $104,185.98 through bank wire. After I paid the full amount through bank wire, I emailed Karla Caballeros also on the same day on December 7, 2021 that I wired it.

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/17/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 0011812963 3     Page: 406     Date Filed: 03/07/2024     Entry ID: 6636806

10. Rhode Island Office of Child Support Services also emailed and mailed through regular mail to me during litigation the TRAC note of 12/06/2021 and 12/07/2021 that says, "Agent contacted me that NCP wants to pay all arrears to obtain passport. I called CP private attorney Barbara Grady to advise, and to discuss if CP wants the interest put back on the case (REDACTED). We removed the interest when case was made UI when we were filing to Texas. Atty Grady checked with CP and CP is satisfied with the lump sum payment of principle of $104k+/-. After conference with Monique and Frank Dibiase, it was decided to require payment in more secure/less reversable form than credit card, so $ will need to be wired by bank check. Agent will be contacted back by NCP as NCP won't give phone number or email address. Agent is not even sure if NCP is in country. Interest is not included in amount that is considered for passport purposes in any event."

11. The statements contained in the Defendant's Second Rule 7(b)(3)(G) Motion to Compel Production filed on March 27 3, 2023 in the Family Court and Defendant's Third Rule 7(b)(3)(G) Motion to Compel filed on June 1, 2023 are, to my knowledge, true and correct.

12. I filed my/Defendant's First Rule 7(b)(3)(G) Motion to Compel Production on February 3, 2023 and the Court heard this motion at the hearing in this matter on February 10, 2023.

13. The Court ruled at the February 10, 2023 and March 6, 2023 hearings in this matter that the State ex. Rel. GERO MEYERSIEK, Plaintiff, shall comply with discovery forthwith.

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 0011812963 3    Page: 407    Date Filed: 03/27/2024    Entry ID: 6638866

14. At the hearing held on February 10, 2023 in this matter, the State through and by Paul Gould, Esq., represented to the Court that the State on its own removed interest from the system in Defendant's case file in 2018. TRAC notes dated 12/06/2021 and 12/07/2021 also state that the State on its own removed interest from the system in Defendant's case file in October 2018.

15. At the hearing held on February 10, 2023 in this matter, the Court ordered the State to put interest back on the system without prejudice to the Defendant.

16. The Court ruled at the March 6, 2023 hearing in this matter that the interest number put back on the system without prejudice to the Defendant is only a "starting point" for the sole purpose of having a number to start with, without prejudice to the Defendant. The Court elucidates to the Defendant, "You have to have a number to start with. The State is not saying you owe this number."

17. The Court ruled at the March 6, 2023 hearing in this matter that the State ex. Rel. GERO MEYERSIEK, Plaintiff, shall substantiate the interest number which the Court ordered to put back on the system without prejudice to the Defendant.

18. I, the Defendant in this matter, in good faith, attempted to confer with the State/Plaintiff, by and through Paul Gould, Esq., in Court at the March 6, 2023 hearing to make discovery in an effort to secure the information and documents requested in my/Defendant's Request for Product of Documents without court action in the form of a formal Motion to Compel. However, the State/ Plaintiff replied in Court that the State stands by the responses propounded by the State/Plaintiff in the Plaintiff's Response to Defendant's Request for Production of Documents dated February 16, 2023 and continues

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 0011812_9623    Page: 306    Date Filed: 03/27/2024    Entry ID: 6638308

to stand by those said responses up to June 8, 2023, the date this matter is continued for hearing on the State/Plaintiff's DHS Motion.

19. I, the Defendant in this matter, in good faith, again attempted to confer with the State/Plaintiff, by and through Paul Gould, Esq., since April 14, 2023, including sending more than 12 email confer attempts to make discovery in an effort to secure the information and documents requested in my/Defendant's Requests for Production of Documents without court action in the form of a formal Motion to Compel. However, the State/Plaintiff again replied during a May 9, 2023 telephone conference with the Defendant that the State/Plaintiff stands by the responses propounded by the State/Plaintiff in the Plaintiff's Responses to Defendant's Requests for Production of Documents in February and April of 2023. The Defendant further revised Defendant's First Set of Interrogatories pursuant to discussions at the aforesaid May 9, 2023 discovery telephone conference, as well as asked the State/Plaintiff in writing via email to reply to the Defendant if the State/Plaintiff has any further questions or issues to discuss without court action, but again, the State/Plaintiff failed to communicate any objections or issues with the Defendant.

20. I certify that the above is true and correct.

Declaration Executed on June 1, 2023 by Mary Seguin


_____
Mary Seguin
Mary Seguin

Exhibit B



12:38 PM Mon Dec 6

cseinfo.dhs.ri.gov

ADCB Internet Banking    Community Health Choice | ...    Sign In - Community Healt...    Case Manager Portal | Offi...    RI OCSS Payment

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov

**State of Rhode Island**
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Gagan

Home  My Profile  Contact Us  Site Map  Log

**Menu**
▼ Case Information
  ▶ Last 5 Payments
  ▶ Last 13 Months
  ▶ Current Orders/ Past Due Balances
  ▶ Court Dates/ Appointments
  ▶ Enforcement Actions
  ▶ PIN Lookup

Home > Current Orders and Past Due Balances

**Case Manager**

## Current Orders / Past Due Balances

**Custodial Parent:** Gero K Meyersiek    **CSE ID:** 1689817

**Current Orders**

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

⚠ Note: Medical orders and medical arrears are not listed on this screen.

**Past Due Balances**

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |

Exhibit C

11:28:47 Tuesday, December 13, 2022

```
12/13/22    11:28          C A S E   T R A C K I N G         CSCL  ASMXA201
            TRAC.00                 CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (██████████████████). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $_____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:          SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K   PNL:
```

Case Number PC001682AM
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:56 Tuesday, December 13, 2022

12/13/22   11:28        C A S E   T R A C K I N G        CSCL   ASMXA201
           TRAC.00            CASE HISTORY               U024   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED_____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES_____

RL: 80  12 22 ABSP:          SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K   PNL:

Case Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

12/13/22   11:29          C A S E   T R A C K I N G        CSCL   ASMXA201
           TRAC.00              CASE HISTORY               U824   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSIDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTEREST
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/08/21 WENDY POBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
      FROM CASE DATA PANEL

12/08/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
      FROM OFST PANEL

12/08/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: 80  12 22 ABSP:              SEGUIN       MARY      CMD:
FNX: TRAC  D CLIENT:             MEYERSIEK    GERO    X PNL:

Case Number: 2051987A    Document: 00118123633    Page: 423    Date Filed: 03/07/2024    Entry ID: 6630300

Filed in Providence/Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria G.

11:29:53 Tuesday, December 13, 2022

```
12/13/22   11:29        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT

RL: 80  12 22 ABSP:            SEGUIN       MARY         CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK    GERO     K   PNL:
```

```
12/13/22    11:28        C A S E    T R A C K I N G       CSCL   ASMXA201
            TRAC.00              CASE HISTORY              U824   PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
    TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
    58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:            SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK   GERO    K     PNL:
```

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E    T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY               U824   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
         50 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

RL: 80  12 22 ABSP:            SEGUIN       MARY           CMD:
FNX: TRAC  D CLIENT:          MEYERSIEK     GERO      K    PNL:
```

Case Number: K20010821M   Document: 00118129833   Page: 426   Date Filed: 03/27/2024   Entry ID: 6630800
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G      CSCL  ASMXA201
           TRAC.00              CASE HISTORY            UB24  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS___

RL: 80  12 22 ABSP:          SEGUIN     MARY        CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK  GERO    K   PNL:
```

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

```
11:29:17 Tuesday, December 13, 2022


    12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
                TRAC.00                 CASE HISTORY          U824  PROD
    STARTING DATE    09 01 2021
    SELECTION   COMPREHENSIVE CASE HISTORY

    01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
    PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
    A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
    THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
    NOTICE NCP VIA MAIL AT THE TEN DAY MARK

    02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
    MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
    REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

    03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
    KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
    ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
    CLAIM NUMBER: TX027985


    RL: 80  12 22 ABSP:
    FNX: TRAC  D CLIENT:          SEGUIN      MARY         CMD: _____
                                  MEYERSIEK   GERO    K    PNL:
```

Exhibit D



Executive Office of Health and Human Services
Appeals Office, Virks Building, 3 West Road, Cranston, RI 02920
Phone: 401.462.2132  Fax: 401.462.0458
Email: OHHS.AppealsOffice@ohhs.ri.gov

October 6, 2022

Mary Seguin
2303 Elmen Street
Houston, TX 77019
(marylive22022@gmail.com)

John Langlois, Esq.
R.I. OCSS
77 Dorrance Street
Providence, RI 02903
(John.Langlois@dhs.ri.gov)

Dear Mary Seguin and John Langlois, Esq.,

By agreement of the parties during a pre-hearing conference held telephonically on October 5, 2022, in the matter of Mary Sequin, Administrative Appeal, Docket#22-2116:

- o  Attorney Langlois will immediately begin the process to rescind the Perfected Notice of Lien issued by the R.I. Office of Child Support Services (hereinafter "OCSS") on April 4, 2022, and notify the EOHHS Appeals Office when the process has been completed. Upon receipt, the Appeals Office will forward a copy of that notification to the Appellant by email.

- o  The OCSS will refrain from perfecting the lien pending the outcome of the Administrative Appeal.

- o  Both parties will send to the EOHHS Appeals Office, before the close of business on Wednesday October 26, 2022, all documentary evidence they intend to offer as exhibits during the Administrative Hearing. The Agency's submission will include documentation of the Appellant's child support account from June 2018 going forward

- o  Copies of all documentary evidence received by the Appeals Office will be provided to the opposing party by email.

This letter confirms the above understanding.


/s/Debra DeStefano
EOHHS Appeals Officer

Exhibit E



# Request for administrative hearing of Notice dated March 3, 2022 : Re: K01-521M Child Support Payment Schedule Information

**Mary Roberts** <marylive22022@gmail.com>
To: <karla.samayoa@dhs.ri.gov>

Fri, Apr 1, 3:12 PM

Karla,

I am writing to request an administrative hearing in the above matter, and am attaching to this email the written request (in pdf file named "Request for Administrative Hearing April 1, 2022") that I had also sent via regular mail. On March 15, 2022, I received the attached notice which was sent from child support office.

As indicated in my attached request, I am pro-se at this time and out-of-state, and further due to surging Covid, I respectfully request instructional materials on how to proceed for hearing, such as date(s) to submit my written petition/brief/motion/memorandum in support of my request for hearing, and the date of hearing via zoom (including dial-in information) for individuals/the general public without counsel, to be emailed to me as soon as possible.

Sincerely,
Mary

Cc: via regular mail Tracy Gedris, PO Box 480, Elmford, NY 10523

On Tue, Dec 7, 2021 at 11:14 AM Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov> wrote:

## Yes, that is correct.

From: Mary Roberts <marylive22022@gmail.com>
Sent: Tuesday, December 7, 2021 12:09 PM
To: Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov>
Subject: [EXTERNAL] : Re: K01-521M Child Support Payment Schedule Information

Thank you Karla!

The child support case number is 0366029181, correct? Just wanted to confirm.

Thank you!

Mary

On Tue, Dec 7, 2021 at 10:40 AM Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov> wrote:

Hi Mary:

This is the response I received from accounting:

include her child support case #, the routing and account numbers, her name obviously, and name of account: Child Support

**Bank name : Citizens Bank**

**Account name: Child Support**

**Routing number is 011500120**

**Account number is 11076461**

**She should wire the 104,185.98 and cancel the 12/06 payment if possible.**

[google.com]

Karla Caballeros

Child Support Administrative Officer

Office of Child Support Services

77 Dorrance Street [google.com]

Providence, RI 02903 [google.com]

401-458-4519

401-458-4410 fax

Karla.Caballeros@dhs.ri.gov

**From:** Mary Roberts <marylive22022@gmail.com>
**Sent:** Tuesday, December 7, 2021 10:48 AM
**To:** Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov>
**Subject:** Re: [EXTERNAL] : Fwd: 88298: Child Support Payment Schedule Information

Good morning Karla,

Thank you so much for the information!

And do I remit $104,185.98 and cancel the $9991 I scheduled for 12/13/2021?

Thanks again for your help.

Mary

On Tue, Dec 7, 2021 at 8:47 AM Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov> wrote:

Good Morning Mary:

Please see below information received by our accounting office as to the transferring of funds to pay the arrears:

She will need to know the following information for the wire transfer:

Bank name : Citizens Bank

Account name: Child Support

ABA# 011500120110076461

If you have any other questions, please do not hesitate to reach out to me.

[google.com]

Karla Caballeros

Child Support Administrative Officer

Office of Child Support Services

77 Dorrance Street [google.com]

Providence, RI 02903 [google.com]

401-458-4519

401-458-4410 fax

Karla.Caballeros@dhs.ri.gov

EXHIBIT I

No. 23-1967

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official
capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their
individual and official capacities; Rhode Island OFFICE OF Child Support
Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK
DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN,
LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN,
JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities;
RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A.
SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF
RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND
ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity;
RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in
its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official
capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE
JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL,
MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their
individual and official capacities; RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF
THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual
capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Defendants-Appellees.

Appeal from the United States District Court

for the District of Rhode Island

———————————

**APPELLANT'S MOTION TO STAY PURSUANT TO Fed. R. App. P 8(a)(2)**

———————————

Pursuant to **Fed. R. App. P 8(a)(2),** and pursuant to **Fed. R. App. P 8(a)(2)(D),** Appellant, proceeding from Texas and as a citizen of Texas, respectfully requests review by a panel of judges in this United States Court of Appeals for the First Circuit under **Fed. R. App. P 8(a)(2)(D),** and requests the Court, under **Fed. R. App. P 8(a)(2),** to stay the district court's two denials of Appellant's two requests for time extensions to file an amended Notice of Appeal (and requests the Court to stay the respective tolling of time to file to file Notice of Appeal of said denials), which the district court issued on March 7, 2024 and March 8, 2024 denying Appellant's **03/01/2024** and 03/07/2024 **Fed. R. App. P 4(a)(5) motions for extensions of time (ECF 49, ECF 50)** which were filed in the district court in order to comply with *this* Court's March 1, 2024 Court Order that explicitly states, "The appellant shall inform this court whether or not she intends to file a notice of appeal or amended notice of appeal from the district court's post-judgment order," and " <u>See also</u> Fed. R. App. P. 4(a)(5) (allowing the district court to grant an extension of time to file a notice of appeal if the party so moved no

later than 30 days after the time prescribed by Rule 4(a) expires)" (Case: 23-1967 Document: 00118115155 Page: 2 Date Filed: 03/01/2024 Entry ID: 6626341). Appellant attaches this Court's Order herewith as **<u>EXHIBIT A</u>**.

It is self-evident that this Court's March 1, 2024 Order in this matter explicitly instructed the Appellant, MARY SEGUIN, to file a Fed. R. App. 4(a)(5) motion in district court, *see* ("<u>See also</u> Fed. R. App. P. 4(a)(5) (allowing the district court to grant an extension of time to file a notice of appeal if the party so moved no later than 30 days after the time prescribed by Rule 4(a) expires)") because this Court's March 1, 2024 was issued at the late hour at **4:39 PM** on **Friday March 1**, 2024, a mere 30 hours prior to the "30 days after the time prescribed by Rule 4(a) expires" at midnight Saturday March 2, 2024.

At issue is a post-appeal Order issued in the district court by Judge William Smith dated February 1, 2024. At issue also is the fact that this Court had on January 22, 2024 set the Briefing schedule setting the due date of Appellant Brief for Monday March 4, 2024. Therefore, Saturday, March 2, 2024 was the deadline to file an amended Notice of Appeal, and Monday March 4, 2024 was the deadline to file the Appellant Brief.

As the Court can see, **the Court's** late hour **4:39 PM Friday March 1**, **2024 Court Order** ordered the Appellant to RESPOND to the Court and is an external

factor beyond the Appellant's control that materially affects the following timing
beyond Appellant's control:

(1) The ability to meet the deadline to file an amended Notice of Appeal by
right under Fed. R. App. P 4 by burdening the Appellant to review,
consider and respond to the Court's March 1, 2024 Order

(2) Vacating the Briefing schedule, in recognition that the Court's March 1,
2024 *could* materially alter the scope of the appeal

(3) Instructs the Appellant to RESPOND to the Court whether the Appellant
intends to file an amended notice of appeal or notice of appeal of the
district court's February 1, 2024 post-appeal order.

(4) Instructs the Appellant explicitly to extend the time to do the above,
explicitly citing "See also Fed. R. App. P. 4(a)(5) (allowing the district
court to grant an extension of time to file a notice of appeal if the party so
moved no later than 30 days after the time prescribed by Rule 4(a)
expires)"

(5) Explicitly instructs the Court and the district court by way of Court Order
regarding **Fed. R. App. P. 4(a)(5)**, explicitly protecting constitutional
safeguards of and in compliance with **DUE PROCESS – that the
district court (Judge Smith), which is devoid of jurisdiction, violates
with calculated and deliberate intent**.

Therefore, Appellant respectfully files this motion to stay under **Fed. R. App. P 8(a)(2)** and demonstrates the following:

(1) It is impracticable to file in the district court before a disqualified judge.

(2) It is impracticable to file in the district court that violates due process.

(3) It is impracticable to file in the district court that is devoid of jurisdiction post-appeal.

(4) It is impracticable to file in the district court that altered the record of appeal, tampered with the record of appeal, and obstructed the docketing of pre-appeal motions that were also denied pre-appeal that raise issues of disqualification and tampering with the record of appeal by obstructing the docketing of three motions.

(5) It is impracticable to file in the district court/judge Smith that/who engages in a pattern of obstruction of a federal proceeding and tampering with the record of appeal in a federal proceeding.

## I. DISQUALIFICATION – DEFENDANTS-APPELLEES ARE JUDGE SMITH'S FORMER CLIENTS AND JUDGE SMITH HAS KNOWLEDGE OF APPELLEES' EMPLOYMENT PERFORMANCES TIED TO STATE REVENUE GENERATED FROM ILLEGAL 12% COMPOUND INTEREST COLLECTIONS THROUGH ACCOUNTING FRAUD AND DEFRAUDING THE UNITED STATES AND NONCUSTODIAL PARENTS THROUGH, inter alia, ALTERING THE AUTOMATED ACCOUNTING RECORD SYSTEM MANDATED BY 42 U.S.C. 654a, 42 U.S.C. 655 OF TITLE IV OF THE SOCIAL SECURITY ACT

**A. The Amended Complaint (ECF 25) makes known to a Judge of the United States of the commissions of federal crimes That Incur Penalties under 42 U.S.C. § 655(a)(5)(A)(ii) for the Defendants-Appellees' Systemic violations of, inter alia, 42 U.S.C. 654b and Their Cover-up Thereof Through Accounting Fraud Submitted to Federal Authorities**

Relying on and with 18 U.S.C. § 4 applicable to this matter, Appellant in good faith drafted the Amended Complaint (ECF 25) to make known to "some judge of the United States" the commission of federal crimes including theft of the United States in violation of 18 U.S.C. § 666 using the framework of Title IV of the Social Security Act for monetary gain and defraud of the United the States and defrauding the Appellant by the Defendants-Appellees.  The "some judge" of the United States in question is district court Judge William Smith sitting in this matter.  The Amended Complaint reports organized criminal activities of systemic Rhode Island establishment and collection of 12% compound interest for overdue support that is disallowed under 42 U.S.C. § 654 (21)(A) that makes clear the Rhode Island State Plan **must** strict interest to simple 3-6%.  Rhode Island's 12% compound interest is motivated by Title IV-D's provision that the interest represents incentivized state revenue in welfare cases, as the support order is assigned to the State by the welfare recipient.  Establishing and collecting the 42 U.S.C. § 654 (21)(A) disallowed 12% compound interest under color of state law is criminal and entails accounting fraud ballooning the support amount due that is mandated to be

calculated by the automated record system stipulated in 42 U.S.C. 654a and disbursed and paid and accounted for and reported to the United States for reimbursement of federal funds under Title IV-D Program through mandated accurate administration and calculations using the automated record system that is mandated under 42 U.S.C. § 654b.  Therefore, for example, illegal record alterations that entails "taking unlawful 12% compound interest off the system" or "putting unlawful 12% compound interest back on the system" or "not accounting for any payments made by the noncustodial parent" or "removal from the system any payments made by the noncustodial parent" are explicit violations of, *inter alia*, 42 U.S.C. § 654b.    42 U.S.C. § 655 (a)(5)(A)(ii) states, "All failures of a State during a fiscal year to comply with any of the requirements of section 654b of this title shall be considered a single failure of the State to comply with subparagraphs (A) and (B)(i) of section 654(27) of this title during the fiscal year for purposes of this paragraph."  Needless to say, these organized defrauding targeting Texas properties and defrauding Appellant in Texas of illegal 12% compound interest, when the Defendants-Appellees recorded in Appellant's Title IV support case file that they removed the illegal 12% compound interest when sending to Texas in order to cover up from out-of-state and federal authorities the illegal 12% compound interest (via wire and via mail, constituting wire and mail fraud), defrauded and fraudulently induced the Appellant that the resulting 0%

interest shown on the automated system online is because Appellee Gero

Meyersiek waived interest if Appellant paid off the entire principle due in one

lump sum (wire fraud), then clandestinely put the illegal 12% compound interest

back onto the automated system when Appellant accepted the offer and performed

on the contract paying off support in one lump sum in Texas, then lien Texas

properties using fraudulent liens (by email and by mail constituting wire and mail

fraud), then submitting to the United States for the cost of collection of fraudulent

12% compound interest that are thus untraceable to a principle base that would

otherwise have exposed the illegal 12% compound interest all constitute a pattern

of criminal interstate accounting fraud in order to defraud the Appellant, the State

of Texas, and the United States of America (*inter alia*, wire and mail fraud).  In the

period of just 2021 to 2023 alone, Defendants-Appellees sent by wire and by mail

to the Appellant at least **eight** **different** sets of books of accounts of alleged arrears

owed (resulting from the aforesaid alterations of the records through the illegal

taking off interest from the system or putting it back on the system or manually

adding alleged medical support arrears twice onto the system) that allegedly were

generated by the automated record keeping system mandated by 42 U.S.C. § 654a

and 42 U.S.C. § 654b to be accurate.  And this scheme of altering the 42 U.S.C. §

654a and 42 U.S.C. § 654b mandated automated record system and manipulating

its accounting is routine to this day, from the time Rhode Island installed the 42

U.S.C. § 654a  mandated automated record system, and before that, from the time

Rhode Island participated in the Title IV Program, because Rhode Island had

always routine established and collected, and continues to illegally establish and

collect the 12% compound interest under color of state law, defrauding the

noncustodial parents and defrauding the United States through accounting fraud,

with or without the automated system.  In 1996, Congress explicitly authorized

penalties under 42 U.S.C. § 655 for States' noncompliance with 42 U.S.C. § 654a

and 42 U.S.C. § 654b.  Therefore, Rhode Island's intentional noncompliance

penalties under 42 U.S.C. § 655 provisions relating to its deliberate accounting

fraud altering records that Congress mandated to be maintained by the States in

order to keep ACCURATE records using the automated record system accrues

since 1996.  Defendants-Appellees' Record alterations/tampering with/falsifying

federal government records, and with the intent to defraud, incur other criminal

penalties too numerous to discuss for the purposes of this motion, so accordingly,

Appellant reserves the right to raise them at the right time in accordance with

proper procedures in this federal proceeding.  Moreover, in sending falsified

records in 2018, 2021, 2022 and 2023, and fraudulent liens to Texas on Texas

properties, Defendants-Appellees violated Texas Penal Codes and incurred Texas

penalties. (Rhode Island civil and criminal laws were violated as well, but the

Rhode Island Attorney General chooses to represent and engage in cover up, aiding

and abetting and subornation of perjury instead). The cumulative penalties accrued

alone run upwards of hundreds of millions of dollars, potentially billions.

**Appellant respectfully requests Oral Argument on this important issue**.

**B. Defendants-Appellees' Financial and Employment Incentives are tied to successful collection of illegal 12% compound interest to boost State revenue through Fraud and Judge Smith has knowledge of the scheme as former counsel of the Defendants-Appellees, including representing Appellees in Employment disputes**

Appellant states that it is appropriate to present at Oral Argument the

incentives tied to the successful collection of illegal 12% compound interest,

as that, while important, is not the basis of this motion; however it suffices

now to raise in this motion under Fed. R. App. P 8 that the Appellant

presents the basis of Judge Smith's disqualification. **28 U.S.C. § 455** deals

with the disqualification of district court judges and it states in part:

Any justice, judge, or magistrate, of the United States shall disqualify

himself/herself in any proceeding in which his/her impartiality might

reasonably be questioned.  *See also* 28 U.S.C. Sec. 144; Code of Judicial

Conduct, Canon 3.C(1)(a).  *In re Martinez-Catala,* 129 F.3d 213, 220 (1st

Cir. 1998) makes clear that disqualification is self-executing, and that the

standard is whether there is an appearance of bias by an objective observer.

The district court judge is disqualified if the objective observer in **28**

**U.S.C. § 455(a)** having possession of all the facts in this case might question

the judge's impartiality, *See*, "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality **might** reasonably be questioned." That objective observer, for starters, needs to look no further than the district court's website of Judge Smith's Public Relations biography that clearly summarizes the depth of client relationship and his former firm's existing client relationship with (both formerly and presently) with the Defendants-Appellees, including the Rhode Island Judiciary and Rhode Island state employees, including representing the them in employment disputes where he has intimate knowledge of the employment incentive schemes. *See*, **Exhibit B**, and weblink – he built the Edwards & Angell firm's Public Law (Defense) Practice based on acquiring and representing key government clients like the **state courts (and employees thereof)** and representations of employees within the state's major political subdivision such as the **governor's office (and employees thereof)**, the **state secretary (and employees thereof)**, the **state treasurer (and employees thereof)**, various **state agencies (and employees thereof)**, negotiated through the then-novel **flat fee contracts** that were designed to generate high volumes to increase the number of representations in all areas; *see*

https://www.rid.uscourts.gov/sites/rid/files/documents/judges/articles/FBA%20Profile%2009-14%20Smith-Hon-William-E.pdf

Records of these representations are a matter of public records since attorney's fees are funded by Rhode Island's public funds.

To the objective observer, this judge, William Smith, shall disqualify himself in this proceeding as his impartiality **might** reasonably be questioned under 28 U.S.C. **§ 455**(a).

**C. Judge Smith did nothing and failed to act on the filed Amended Complaint Allegations of federal and state criminal activities made known to him in an official federal proceeding, then Obstructed the district court clerk's docketing of Appellant's filed motions, then Altered the record of appeal in order to Aid the Defendants-Appellees by cover up and Interfere with the On-going Appeal Proceeding Under Color of Law**

A play-by-play review of the record of this case requires Judge Smith's disqualification and shows his bias protecting, aiding and abetting and covering up the criminal acts by the Defendants-Appellees "made known to him" in the Amended Complaint (ECF 25) and interference of appellate review including jurisdictionally devoid attempts to interfere with the appeal.

After the filing of the Amended Complaint on September 1, 2023 (ECF 25), that alleges details of, *inter alia*, the Defendants-Appellees'

attempts to cover up, *inter alia*, their significant federal civil and criminal penalty-incurring schemes under, *inter-alia*, 42 U.S.C. **§** 655, entailing, among others, fraudulent accounting and theft of the United States using the 42 USC **§** 654a automated record system, Judge Smith *did nothing* to conduct the requisite federal proceeding getting to the merits of the Amended Complaint's alleged egregious interstate federal crimes.  Nor did Judge Smith refer the alleged egregious interstate federal crimes to appropriate law enforcement authorities, including to a United States Attorney General.  Nor did Judge Smith take actions required of "some judge of the United States" when allegations of egregious interstate federal crimes are officially filed in a United States District Court of Law in an official federal proceeding "made known to him" under 18 U.S.C. **§** 4.  Nor did Judge Smith make a report to Congress, be it the House Congressional Oversight Committee or House Congressional Judiciary Committee or another applicable Congressional Committee.  Nor did Judge Smith make a report to the Secretary of the U.S. Department of Health and Human Services or an appropriate federal authority.

Instead, Judge Smith *sua sponte* dismissed the case claiming the United States District Court for the District of Rhode Island **lacks subject matter jurisdiction over, inter alia, violations of 42 U.S.C. § 654, 655,**

**1983, and 18 U.S.C. § 1964 (and revoking Appellant's electronic filing privileges thus attempting to muzzle the Appellant in a scheme to obstruct future filings)** on **October 19, 2023 entering final judgment**.

Fed. R. of App. P 4 makes clear that the Notice of Appeal must be filed in 30 days, Saturday November 18, 2023.

In the afternoon of **November 16, 2023,** Appellant from Texas filed with the district court clerk via email a timely Rule 59 motion within 28 days of the final judgment. Appellant followed up the filing of the November 16, 2023 Rule 59 motion with filing a Rule 60(b) motion on the same day via email on November 16, 2023. *See* ECF 32, ECF 32-1. This is preserved in the Clerk Certified Record of Appeal transmitted to the Court of Appeals on November 17, 2023 in ECF 33, 33-1. *See* Attachment **Exhibit C**, **ECF 33-1**.

On November 16, 2023, Appellant called from Texas to Rhode Island's federal clerk's office to confirm that the clerks are in receipt of Appellant's two November 16, 2023 motion filings, and the clerks confirmed in the affirmative. Timely motions under Rule 59 and Rule 60 are treated as Rule 59(e) motions if filed within 28 days post-judgment, which suspend the finality of the judgment. *See*, *Gonzalez-Arroyo v.*

*Doctors' Ctr. Hosp. Bayamon, Inc.*, 54 F.4th 7, 19 (1st Cir. 2022) "A Rule 59(e) motion briefly suspends finality" of a judgment so the district court can "fix any mistakes and thereby perfect its judgment before a possible appeal." quoting *Banister v. Davis*, 140 S.Ct. 1698, 1708 (2020)."

On the morning of November 17, 2023, Appellant still not seeing the docketing of her timely November 16, 2023 filed two motions which by law are treated as Rule 59(e) motions, called the district court clerk's office and was told that Judge Smith obstructed the docketing of Appellant's timely November 16, 2023 rule 59 motions, in violation of, among others, Fed. R. Civ. P 79.  District Court Clerk Meghan Kenny told the Appellant that the clerk cannot do what the Appellant tells the clerk to do and the clerk is going to do what the judge tells her to do, then hung up the phone.

Subsequent to the disturbing phone exchange, the district court issued the first of the two denials that states,

"TEXT ORDER The Court is in receipt of Plaintiff' **two** recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders."

Appellant quickly filed via email with the district clerk's office the only motion Appellant filed on November 17, 2023, a rule 60(b)(1) motion

requesting relief from Judge Smith's obstruction of docketing of Appellant's properly filed motions, moving the Court to order the clerks to docket Appellant's motions.

Approximately two hours thereafter, Judge Smith issued the second of the two text order denials dated November 17, 2023 that states,

"TEXT ORDER The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders."

Deeply disturbed by the continuous obstruction of docketing of Appellant's properly filed motions, then denying those motions thus tampering with the record of appeal, Appellant called the clerk's office again.  This time clerk Meghan Kenny again informed Appellant Judge Smith was obstructing the docketing of Appellant's motions and then screamed, "File your notice of appeal……. appeal everything!"  Then, the clerk hung up the phone.

Within a few minutes, Appellant filed her Notice of Appeal in this matter, ECF 32, 32-1, that is over 83 pages long, detailing the above obstruction of docketing timely November 16, 2023 Rule 50(e) motions that critically raise issues, among others, of Judge Smith's disqualification, and tampering with the record of appeal.

Before the end of the day on November 17, 2023, the Clerk of the Court of the District Court transmitted the clerk certified record of appeal, ECF 33, and sent up to this Court ECF 33-1, where the docket sheet critically showed only THREE entries under November 17, 2023:

- TEXT ORDER The Court is in receipt of Plaintiff' **two** recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders.
- TEXT ORDER The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders.
- ECF 32, NOTICE OF APPEAL by Mary Seguin as to Text Order, Text Order (Attachments #1 Envelope)(Kenny, Meghan)(Entered: 11/17/2023).

ECF 33-1 demonstrates with concrete evidence that as of the time of the notice of appeal filed in this matter on November 17, 2023, the only three entries on the docket for November 17, 2023 that listed above.

However, that is not what is shown today, with several **revisions** instructed by Judge Smith on November 20, 2023, who as of November 17, 2023 was divested of jurisdiction.

### D. As of November 20, 2023, the District Court has been and remains DIVESTED OF JURISDICTION

ECF 33-1 proves beyond a reasonable doubt that Appellant did not file any motions subsequent to the second TEXT ORDER that says, "TEXT ORDER The

Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders." On the heals of this second text order entered on November 17, 2023, Appellant filed the Notice of Appeal, ECF 32, 32-1, demonstrating that **there were no pending motions at the time of the filing of the Notice of Appeal, ECF 32**.

Judge Smith's second November 17, 2023 text order makes clear that "The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court **construes this email as a motion for leave to file the motion attached to the email** and **denies** leave to file**." Judge Smith's first November 17, 2023 text order similarly makes clear that "The Court is in receipt of Plaintiff' **two** recent emails to the Clerk's Office. The Court **construes these emails as motions for leave to file the motions attached to those emails** and **denies leave to file** for the reasons given in its earlier text orders." Judge Smith made it crystal clear that the district court **reviewed** and **considered on the merits** and **denied** "**motions attached to those emails.**" Therefore, when Appellant filed her Notice of Appeal on November 17, 2023, ECF 32, ==**THERE WAS NOTHING PENDING BEFORE THE COURT**==.

**The filing of a notice of appeal "divests" the district court of jurisdiction over the case**, *See Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam).

**Nothing was pending before the court when Appellant filed her November 17, 2023 appeal, as evidenced in the proof preserved in ECF 33-1** docketed on **November 17, 2023**. *See* attached **Exhibit C**.

However, because Appellant's November 17, 2023 Notice of Appeal documents preserves evidence of Judge Smith's obstruction of docketing Appellant's timely two Rule 59(e) motions filed on November 16, 2023 and Appellant's Rule 60(b)(1) motion filed on November 17, 2023, Judge Smith attempts to cover up his docket obstructions that not only violate Fed. R. Civ. P 79, but also violates several federal criminal codes as they relate to government record alterations, obstructing an official federal proceeding and falsifying/tampering with government records  – therefore Judge Smith actively tampered with the docket and the record of appeal in this case starting November 20, 2023 to date.

Without any pending motion before the district court after his own two denial TEXT ORDER disposals of Appellant's post-judgment motions, Judge Smith instructed the district court clerk to falsify and alter the record on November 20, 2023, when the district court was **divested of jurisdiction**.

**Firstly**, as an initial step, Judge Smith sought to fraudulently fabricate the false appearance of retention of jurisdiction for himself/district court, thus deliberately ordered the district court clerk to falsify the record by docketing on the record all of Appellant's "motions attached to the emails" the district court received from November 16, 2023 to November 17, 2023, as entries ECF 34, 35, 37 under the date November 17, 2023 entered **AFTER** the Notice of Appeal (ECF 32) in order to falsely make it appear as if Appellant filed three motions subsequent to her filing of the Notice of Appeal (ECF 32), thus fraudulently fabricating "retaining jurisdiction" over pending motions filed after the Notice of Appeal, when in reality, Judge Smith had already in two text orders "denied all the motions attached to Plaintiff's emails" **before** the docketing of the November 17, 2023 Notice of Appeal (ECF 32).

**Secondly**, after thus fraudulent fabricating the appearance of jurisdiction retention, Judge Smith ordered the district court clerk to falsely enter Appellant's timely 28 day November 16, 2023 Rule 59 motions under entries dated November 17, 2023 in order to fraudulently make them appear filed out of time (*see*, entries ECF 34, ECF 35 entered under docket entry date November 17, 2023.  But, *see* ECF 34-1 and ECF 35-1 Envelopes consisting of Appellant's gmail emails' filings date-stamped by Gmail showing **November 16, 2023**.)  **Thus, Judge Smith**

sought to also falsify the record to make timely filed Rule 59 motions to falsely appear out-of-time.

**Thirdly**, after thus **fraudulently** and **falsely "retaining jurisdiction"** through the tampering of government records, Judge Smith sought to *interfere with*, *obstruct* and *subvert* appellate review by his very **delayed disposition of the falsely-appearing pending motions _until after_ this Court _set the briefing schedule_**.  Therefore, Judge Smith waited almost 75 days until February 1, 2024 to issue a foregone conclusion denial that further deceptively misapplied and quoted out-of-context *Gonzalez-Arroyo v. Doctors' Ctr. Hosp. Bayamon, Inc.*, 54 F.4th 7, 19 (1st Cir. 2022), when in reality the *Gonzalez-Arroyo* Court made clear that **the Notice of Appeal divests the district court of jurisdiction** if there **isn't any outstanding pending motions at the time of the filing of the Notice of Appeal**, as **is the case here**.  *See* **docket sheet transmitted to this Court** on **November 17, 2023, ECF 33-1**.  The truth of the matter is Judge Smith fabricated through fraudulent falsification of  the appeal record abusing his Office using the text order November 20, 2023 to falsely make it appear as if there were pending motions filed post-appeal by the Appellant by falsely docketing pre-appeal filed and previously obstructed and denied motions misleadingly labeled as ECF 34, 35 and 37 as entries <u>after</u> the entry of the ECF 32 Notice of Appeal.

**E. Judge Smith's February 1, 2024 is similarly Void**

Having established the above undisputable facts supported by record evidence, this Court must find that Judge Smith's February 1, 2024 is similarly devoid of jurisdiction. The district court orders entered from November 20, 2023 to March 8, 2024 are null and void and of **no force and effect** as they are issued by fraud, without jurisdiction, result of unlawful rulings, are unconstitutional and violate due process and obstruct justice – they obstruct this official federal proceeding and are criminal in nature.  An order that exceeds the jurisdiction of the court is void, and can be attacked in any proceeding in any court where the validity of the judgment comes into issue. (*See  Pennoyer v. Neff*, 95 U.S. 714 (1878)).

Thus, the objective observer is left with the disturbing appearance that not only did the judge do nothing, he sought to cover up the Defendants-Appellees' crimes alleged in the Amended Complaint (ECF 25) and evidence of his own association with the Appellees-scheme after the docketing of the Amended Complaint (ECF 25) on September 1, 2023.


## II.    DISTRICT COURT DENIALS OF COURT COMPLIANT TIMELY Fed. R. App. P 4(a)(5) MOTION CONSISTENTLY WRONGLY APPLYING "EXCUSABLE NEGLECT"

### A. FACTUAL TRAVEL OF THE GOOD CAUSE Fed. R. App. P 4(a)(5)(A) motions filed in District Court

At 4:39 PM on March 1, 2024, this Court issued its Order, *See,* (Case: 23-1967 Document: 00118115155 Page: 2 Date Filed: 03/01/2024 Entry ID: 6626341). The Court's March 1, 2024 Court Order states, "The appellant shall inform this court whether or not she intends to file a notice of appeal or amended notice of appeal from the district court's post-judgment order," and " <u>See also</u> Fed. R. App. P. 4(a)(5) (allowing the district court to grant an extension of time to file a notice of appeal if the party so moved no later than 30 days after the time prescribed by Rule 4(a) expires)." *See* paragraph 3 of Order (Case: 23-1967 Document: 00118115155 Page: 2 Date Filed: 03/01/2024 Entry ID: 6626341). This Court instructs the Appellant to file Fed. R. App. P 4(a)(5) motion in order to be **DUE PROCESS** compliant because the Court vacated its Briefing Schedule a mere 3 days prior to the due date of Appellant's Brief set for March 4, 2024, as well as instructed the Appellant to respond to the Court as to Appellant's intentions whether Appellant will file a Notice of Appeal or Amended Notice of Appeal to incorporate the February 1, 2024 district court order to the Notice of Appeal Appellant filed on November 17, 2023 (ECF 32), while the Court is cognizant of the March 2, 2024 deadline next day on a Saturday to file said Notice of Appeal or Amended Notice of Appeal. Therefore, it is crystal clear and explicit that this Court instructs the Appellant to file the Fed. R. App. P 4(a)(5) motion in order to be **DUE PROCESS** compliant allowing the Appellant an adequate opportunity to

review, consider and respond to this Court.  All indications show that this Court on March 1, 2024 did not anticipate a biased, disqualified and criminally compromised district court judge involved in record tampering to deny the Fed. R. App. P 4(a)(5) that this Court itself instructed filing by Court Order.

Under Fed. R. App. P 4(a)(5)(A), this Court's issuance of the March 1, 2024 Court Order that vacated the Court's previously issued January 22, 2024 briefing schedule, and explicitly stating in the text of the Order directing the Appellant to "inform this court whether or not she intends to file a notice of appeal or amended notice of appeal from the district court's post-judgment order," and " See also Fed. R. App. P. 4(a)(5) (allowing the district court to grant an extension of time to file a notice of appeal if the party so moved no later than 30 days after the time prescribed by Rule 4(a) expires)" makes clear that this Court's March 1, 2024 Order is the GOOD CAUSE basis to move for extension of time under **Fed. R. App. P. 4(a)(5)** that this Court *explicitly instructed the Appellant*, since the Order affects any and all preparation of the filing of an amended Notice of Appeal or a Notice of Appeal.

Accordingly, in compliance with the Court's March 1, 2024 Order, Appellant diligently and in good faith filed in the district court on March 1, 2024 the Order prescribed Fed. R. App. P 4(a)(5) Motion for Extension of Time, and immediately afterwards, filed here in this Court Appellant's Notice dated March 1,

2024 notifying this Court Appellant complied with the Court's Order by filing the explicitly instructed Fed. R. App. P 4(a)(5) motion for an extension of time in the district court and informing the Court that Appellant intends to file a notice of appeal or an amended notice of appeal. *See* Appellant's March 1, 2024 Notice (*See, e.g.*, (Case: 23-1967 Document: 00118115266 Page: 2 Date Filed: 03/01/2024 Entry ID: 6626396) – "APPELLANT'S NOTICE OF PLAINTIFF-APPELLANT'S SUBMISSION/FILING MOTION FOR EXTENSION OF TIME PURSUANT TO Fed. R. App. P 4(a)(5)"); *See also*, *e.g.*, ECF 49. Friday, March 1, 2024 is **29** days after the district court's jurisdictionally devoid February 1, 2024 order.

## PLAIN READING OF THE TEXT OF Fed. R. App. P 4(a)(5)

**Fed. R. App. P 4(a)(5) Motion for Extension of Time** states as follows:

Fed. R. App. P 4(a)(5)(A)(i) states, "a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and"

Fed R. App. P 4(a)(5)(A)(ii) states, "regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause."

Fed. R. App. P 4(a)(5)(C) states, "No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later."

Therefore, a plain textual reading of Fed. R. App. P 4(a)(5) Motion for Extension of Time makes clear that **good cause** is the standard of review to be applied by the district court of Appellant's Fed. R. App. P 4(a)(5) Motion for Extension of Time filed on Friday, March 1, 2024 that is 29 days from the district court February 1, 2024 order.  Appellant **showed good cause** for a 30 day extension **based on the _this_ Court's aforesaid March 1, 2024 Court Order** *that explicitly says to the Appellant to file a Fed. R. App. P 4(a)(5) motion for extension of time if necessary, since the Court's Order affects the Appellant's "intent to file a Notice of Appeal or an amended Notice of Appeal" and the preparation of the Notice of Appeal –* therefore pursuant to the appellate rule's prescribed **good cause showing**, Appellant requested the 30 days extension to adequately review and consider this Court's March 1, 2024 Court Order that affects Appellant's preparation of the Notice of Appeal. *See* this Court's 03/01/2024 Court Order (Case: 23-1967 Document: 00118115155 Page: 2 Date Filed: 03/01/2024 Entry ID: 6626341)

However, the district court <u>did not</u> review Appellant's timely 29 day Fed. R. App. P 4(a)(5) motion for extension of time applying the appellate rule's standard of <u>good cause</u> that is explicitly prescribed by Fed. R. App. P 4(a)(5)(A)(ii).

On March 7, 2024 the district court denied Appellant's timely 29 day Fed. R. App. P 4(a)(5) motion for extension of time showing good cause this Court's March 1, 2024 Court Order that affects Appellant's preparation of Appellant's Notice of Appeal.

Wrongly, the district court denied Appellant's timely 29 day Fed. R. App. P 4(a)(5) motion for extension of time filed on March 1, 2024 wrongly applying "excusable neglect" relying on "extraordinary circumstances" deliberately omitting mention of this Court's "good cause" March 1, 2024 Court Order and instead falsely accusing the Appellant of "not knowing the rules" that caused the Appellant to file a notice of appeal out of time.  That is categorically a false, fraudulent distortion of the facts, calculated to deliberately omit this Court's March 1, 2024 Order, to make it "disappear" – consistent with Judge Smith's track record of "making Appellant's motions disappear" from the record by obstructing the docketing of Appellant's motions from November 16, 2023 to November 17, 2023, AND consistent with his Defendants-Appellees-former clients' record tampering methodology of removing from the automated record system Rhode Island's illegal

12% compound interest to cover up criminal activity.  Record tampering and falsifying the records are their *modus operandi*.

Accordingly, Appellant filed with the district court clerk on Thursday, March 7, 2024, Appellant's motion for reconsideration and Appellant's Motion for Extension of Time pursuant to Fed. R. App. P 4(a)(5)(A)(i), Fed. R. App. P 4(a)(5)(A)(ii), and Fed. R. App. P 4(a)(5)(C) moving the district court to apply the good cause standard because Appellant already filed on March 1st Appellant's timely Fed. R. App. P 4(a)(5) Motion for Extension of time within **29 days**, that had **already shown good cause** that Appellant *required the 30 day extension to adequately review and consider this Appellate Court's March 1, 2024 Order that affects Appellant's preparation of Notice of Appeal*. For example, Paragraph one (1) of Appellant's March 1, 2024 FRAP 4(a)(5) Motion clearly states as <u>good cause</u> that "Plaintiff only received the Appellate Court March 1, 2024 Court Order on the afternoon of March 1, 2024, and has not had an adequate opportunity to adequately review, consider or respond."  *See*, ECF 49, first paragraph.

The district court docketed the Appellant's district court motion for reconsideration as ECF 53.

Appellant immediately filed here into this case her Response to the Court's March 1, 2024 Order again responding that the Appellant intends to file a notice of

appeal or an amended notice of appeal, and noticed the Court Appellant's filing in the district court the March 7, 2024 motion for reconsideration.  (*See*,  (Case: 23-1967 Document: 00118117753 Page: 2 Date Filed: 03/07/2024 Entry ID: 6627688)

On Friday, March 8, 2024 the district court denied Appellant's March 7, 2024 motion for reconsideration (ECF 53) with a curt TEXT ORDER, saying the second denial is on the same basis as the district court's March 7, 2024 denial, again wrongly applying an "excusable neglect" standard by distorting the facts through omission of this Court's March 1, 2024 Court Order, then falsely accusing the Appellant of not knowing the rules and filing a Notice of Appeal out of time.

At this juncture, Appellant can file a Notice of Appeal of the district court March 7th and 8th, 2024 denials, incorporating those orders into the final judgment.  However, Appellant respectfully reminds the Court that Judge Smith's post-appeal orders dated November 20, 2023, February 1, 2024, and the resulting March 7, 2024 and March 8, 2024 denial orders have already resulted in the creation of two appeal cases, Appeal No. 23-1967 and 23-1978.  A third appeal case created under these circumstances is not in the interest of judicial economy.

Accordingly, Appellant respectfully filed in this Court a motion for reconsideration before this Court, pursuant to a reading of the rules' texts under Fed. R. App. P **27(b), 26(b)(1) and 4(a)(5)(A).**

Appellant in good faith and with diligence filed in the district court on March 8, 2024 a Fed. R. App. P 8(a)(1)(A) to stay the denials and to stay the tolling of time to file Appellant's Notice of Appeal pending this Court's resolution of this herein motion for reconsideration.  In so doing, in the interest of judicial economy, the Appellant in good faith afforded the district court a third opportunity to reconsider its Fed. R. App. P 4 extension of time denials, prior to filing a Fed. R. App. P 8(a)(2) motion before this Court.  Appellants asked the district court to <u>resolve</u> Appellant's Fed. R. App. P 8(a)(1)(A) motion to stay <u>by the end of day on March 8, 2024</u>, based on the district court's record of speedy two denials throughout this week.  However, the district court failed to resolve it by the requested time.

Consequently, Appellant filed in the district court a Notice of <u>Withdrawal</u> of Appellant's Fed. R. App. P 8(a)(1)(A) motion to stay on March 11, 2024.

Subsequently, with no pending motions before the district court, Appellant files this Fed. R. App. P 8(a)(2) motion to stay the district court's denials and to stay the tolling of time to file a Notice of Appeal, pending the resolution by this Court of Appellant's Fed. R. App. P 27(b), 26(b)(1) and 4 motion to reconsider. Appellant, in complying with and responding to the Court's March 1, 2024 Order that instructed the Appellant to respond and to file with the district court the Fed.

R. App. P 4(a)(5) motion for extension of time, has been adversely affected by a jurisdictionally devoid district court and this appeal proceeding has been interfered with through his tampering of the record of appeal criminally by the disqualified bias judge in district court, William Smith.

### THE COMMISION BY DEFENDANTS-APPELLEES and JUDGE SMITH of FEDERAL CRIMINAL VIOLATIONS MADE KNOWN TO A JUDGE OF THE UNITED STATES HEREIN

Herein, Appellant, in filing this motion and raising before the Court the filing of the Amended Complaint (ECF 25) in this matter, made known to judges of the United States, pursuant to 18 U.S.C. §4, in the official proceeding allegations of the commission of acts by Defendants-Appellees violating 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 – such violative acts by the Defendants-Appellees and/or Judge Smith on this list is not exhaustive.

## <u>No Immunity</u>

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF AMERICA v. DONALD J. TRUMP*, DC Circuit, the DC Circuit Court reminds the Court that Judges are similarly liable to the criminal laws for their official acts. A notable example is *Ex parte Commonwealth of Virginia*, in which the Supreme Court affirmed the criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for violating a federal statute that prohibited discriminating on the basis of race in jury selection. *Id*. at 340, 344. The Supreme Court began by observing the principle that officers are bound to follow the law: "We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the holder from obligation to obey the Constitution of the United States, or take away the power of Congress to punish his disobedience." *Id*. at 348. The Court then addressed the judge's argument that the Court lacked the authority to punish a state judge for "his official acts." *Id*. Its response was twofold. First, the Court described juror selection as "merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads." *Id*. The Court then

explained that even if juror selection is considered a "judicial act," the judge had a legal duty to obey the criminal laws:

> "But if the selection of jurors could be considered in any case a judicial act, can the act charged against the petitioner be considered such when he acted outside of his authority and in direct violation of the spirit of the State statute? That statute gave him no authority, when selecting jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for

equitable relief brought against a county magistrate and associate judge of a county

circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the

requested injunction was not the only available remedy because both judges

remained answerable to the federal criminal laws:

> [W]e have never held that the performance of
> the duties of judicial, legislative, or executive
> officers, requires or contemplates the
> immunization of otherwise criminal deprivation
> of constitutional rights. On the contrary, the
> judicially fashioned doctrine of official
> immunity does not reach 'so far as to immunize
> criminal conduct proscribed by an Act of
> Congress . . . .'

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*,

408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial

immunity from civil money damages in the context of bribery allegations but

explained that judges "are subject to criminal prosecutions as are other

citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity

because "the challenged conduct" — allegedly issuing an injunction corruptly after

accepting bribes as part of a conspiracy — was "an official judicial act within

his statutory jurisdiction, broadly construed." *Id*. at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See* also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

# CONCLUSION

**WHEREFORE**, this Court should GRANT Appellant's herein motion to stay the district court's Fed. R. App. P 4(a)(5) denials and to stay the tolling of time to file a Notice of Appeal pending the Court's resolution of the pending Appellant's March 8, 2024 Fed. R. App. P 27(b) Motion to Reconsider and extend the time to file Appellant's Notice of Appeal or amended Notice of Appeal to April 2, 2024. This Court should GRANT Appellant's March 8, 2024 Fed. R. App. P 27(b) Motion to Reconsider and extend the time to file Appellant's Notice of Appeal or amended Notice of Appeal to April 2, 2024. This Court should instruct the clerks of the courts to correct the falsely altered record. This Court should order divestiture of jurisdiction of the district court throughout the pendency of the appeal and the trial court is *functus officio*. This Court should appropriately and fittingly sanction the district court actors involved in falsifying the record for misconduct. Appellant requests Oral Argument on all issues raised herein before the Court. Appellant requests any and all Relief deemed just.

Respectfully submitted,

Mary Seguin
Pro Se
/s/      *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: March 11, 2024

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing instrument has been served via the Court's ECF filing system on March 11, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Exhibit A

# United States Court of Appeals
## For the First Circuit
_____

No. 23-1967

MARY SEGUIN,

Plaintiff - Appellant,

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES, in its official capacity; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES, in its official capacity; GERO MEYERSIEK, in his individual and official capacity; PRISCILLA GLUCKSMAN; JOHN A. LANGLOIS; PAUL GOULD; MICHAEL D. COLEMAN, in his individual and official capacity; DEBORAH A. BARCLAY, in her individual and official capacity; LISA PINSONNEAULT, in her individual and official capacity; CARL BEAUREGARD, in his individual and official capacity; KEVIN TIGHE; MONIQUE BONIN; FRANK DIBIASE; WENDY FOBERT; KARLA CABALLEROS; TIMOTHY FLYNN; RHODE ISLAND COURT SYSTEM; MARISA BROWN; PAUL A. SUTTELL, in his individual and official capacity as Executive Head of Rhode Island State Court System; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT; RHODE ISLAND JUDICIAL COUNCIL; RHODE ISLAND SUPERIOR COURT; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL; THE JUDICIAL TECHNOLOGY CENTER; JULIE HAMIL; JOHN JOSEPH BAXTER, JR.; JUSTIN CORREA; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT; ADAM D. ROACH; PETER F. NERONHA; TYLER TECHNOLOGIES, INC.,

Defendants - Appellees.
_____

**ORDER OF COURT**

Entered: March 1, 2024
Pursuant to 1st Cir. R. 27.0(d)

The briefing schedule entered on January 22, 2024 is hereby vacated as entered in error.

In 1:23-cv-00126-WES-PAS (D.R.I), Plaintiff-appellant Mary Seguin filed three post-judgment motions pursuant to Rule 59, Rule 60(b) and Rule 60(b)(1) (Docket Entries #34, #35 and #37) which, per Fed. R. App. P. 4(a)(4)(B)(i), tolled the effectiveness of her November 17, 2023 notice of appeal until the district court disposed of the post-judgment motions. On February 1, 2024, the district court entered an order denying the post judgment motions. (D.E. # 48)

The appellant shall inform this court whether or not she intends to file a notice of appeal or amended notice of appeal from the district court's post-judgment order. <u>See</u> Fed. R. App. P. 4(a)(4)(B)(ii) (noting that if appellant seeks appeal an order disposing of a post-judgment motion or incorporate it into a prior appeal, they must file a notice of appeal or amended notice of appeal within the 30 day period after the order enters). <u>See also</u> Fed. R. App. P. 4(a)(5) (allowing the district court to grant an extension of time to file a notice of appeal if the party so moved no later than 30 days after the time prescribed by Rule 4(a) expires).

A briefing schedule will enter in due course.

By the Court:

Maria R. Hamilton, Clerk

cc:
Mary Seguin
Marissa D. Pizana
Joanna M. Achille
Peter F. Neronha

Exhibit B

Published September 2014



by Amy E. Moses



# Hon. William E. Smith
# Chief Judge, U.S. District Court for the
# District of Rhode Island



Born and raised in Boise, Idaho, Chief Judge William E. Smith of the U.S. District Court for the District of Rhode Island got a taste of both politics and the judiciary at a young age. His late father, Walter E. "Bill" Smith, was a successful candidate for the Ada County Probate Court in the 1950s. Chief Judge Smith recalls many fall days during his childhood handing out palm cards and walking in parades for his father's campaigns.

Judge W.E. Smith was an early champion of court reform, and his efforts ultimately led to merit-selection for state judges in Idaho. Selected by the governor for a seat on the Idaho District Court, the trial court of general jurisdiction, W.E. Smith was the first member of Idaho's judiciary appointed under the new merit selection process.

Chief Judge Smith considers his father to be his earliest and most influential judicial mentor. His father was a devoted public servant who spent the vast majority of his legal career as a judge; he was committed to following the highest ethical standards and dedicated to the rule of law. Chief Judge Smith recalls frequently walking from his elementary school to the county courthouse to get a ride home; he would do homework while his father drafted opinions or sit in the courtroom and watch trials. The late W.E. Smith's devotion to the law appears to have influenced all of his children's professional paths: Stephen is in private practice in Idaho; Tom is a law professor in California; and Trish is a district attorney in Utah.

Chief Judge Smith left Idaho to study at Georgetown University, following in his brother Stephen's footsteps. Thanks to Idaho's Democratic Sen. Frank Church, he worked during college as a messenger in the U.S. Senate Foreign Relations Committee, of which Sen. Church was

Chief Judge Smith and Court Security Officer Charlie Penelton standing in front of a portrait of Senior Judge Lagueux. Penelton worked for both judges.

chair. He worked upward of 30 hours a week to help support himself and pay for his undergraduate education.

During the summer of 1980, Chief Judge Smith returned

*Amy E. Moses served as Chief Judge Smith's law clerk during the 2005 – 2006 term. She is a member of the board of the Rhode Island Chapter of the Federal Bar Association.© 2014 Amy E. Moses. All rights reserved.*



home to work on Sen. Church's re-election campaign. He coordinated volunteers, drafted issue papers, and occasionally drove the senator to campaign events across Idaho. Although close, the campaign did not survive the "Reagan Revolution," which unseated numerous long-serving democratic senators and left Chief Judge Smith without a job. Through Sen. Church's former Chief of Staff Peter Fenn, he secured a position at the newly formed Democrats for the '80s, a political action committee. There he worked as a research assistant helping to draft two fact books for democratic candidates running in 1982 and 1984. While at Georgetown, Chief Judge Smith met his future wife, classmate Christine Boris, a native of Westerly, R.I.; he occasionally traveled with her to Rhode Island to visit her family in the summer.

Shortly after graduating from Georgetown in 1982, Chief Judge Smith enrolled in the night program at Georgetown's Law School. By taking courses at night, he was able to work full time during the day to pay for his education. Thanks to his connections at Democrats for the '80s, he secured a paralegal/law clerk position at Akin Gump Strauss Hauer & Feld and worked there through much of law school (taking time off in summers to clerk in several other firms). During his third year, he and Christine married.

In 1987, after considering law firms in Portland, Maine, and Providence, R.I., Chief Judge Smith accepted a position at Edwards & Angell, then Providence's largest and most prestigious law firm. Other than Christine's family down in Westerly, he "didn't know a soul in Rhode Island," but his instincts told him that Rhode Island was a place where a young lawyer could have an impact and make a name for himself. As a young associate, Chief Judge Smith built a practice focused on labor law and pubic-sector law. In his new hometown of West Warwick, he served as an assistant solicitor and later became the municipal judge. In neighboring Warwick, after now-Governor Lincoln Chafee (D) was elected mayor in 1992, Chief Judge Smith competed for and won a contract to consolidate all of the city's legal services and was designated as the city solicitor. Revolutionary at the time, he convinced Mayor Chafee that his firm could handle the city's legal work efficiently and effectively for a flat fee, saving the city $100,000 per year. Under this contract, Chief Judge Smith represented Warwick in numerous matters involving police officers, firefighters, and municipal unions; civil rights cases; utility rate cases; tax and zoning matters; and cases regarding the interpretation of the city charter, to name a few. This experience led to a similar flat-fee contract representing the Rhode Island Secretary of State. In due course, Chief Judge Smith's burgeoning public-sector practice expanded to include representing the governor, a public library, and the Rhode Island State Courts in a variety of high-profile labor-related legal battles. At the same time, Chief Judge Smith continued to represent an increasing variety of private sector and nonprofit clients on labor and employment matters, including grocery chains, banks, and manufacturing companies, as well as colleges.

While in private practice, Chief Judge Smith also became politically active. Although a Democrat in his college days, he found himself more at home with Rhode Island's small Republican party. Early on, he was active with the 1988 Bob Dole (R) presidential campaign,. Through his legal work for the town of Warwick, he became good friends with Mayor Chafee and supported his re-election campaigns.

In late 1999, following the sudden death of U.S. Sen. John Chafee, Mayor Lincoln Chafee was appointed by the governor to serve the remaining year of his father's term. The following November, Sen. Chafee ran for the seat. He was the clear underdog going into the 2000 race, campaigning against the much more seasoned Rep. Robert Weygand (D). Bringing his campaign experience from a U.S. Senate race 20 years prior, Chief Judge Smith left his partnership at Edwards & Angell to serve as the staff director in Sen. Chafee's Rhode Island office. From 9 to 5, Chief Judge Smith worked on Senate matters, but all of his spare time was devoted to the campaign, overseeing everything from staffing to scheduling, media, and debate preparation.

After serving for a year as staff director and seeing Chafee to victory in November, Chief Judge Smith returned to Edwards & Angell. Shortly thereafter, U.S. District Judge Ronald R. Lagueux announced he would take senior status, opening up a seat on the federal bench. Sen. Chafee suggested Chief Judge Smith to President George W. Bush, and after a relatively uneventful process, he was confirmed by the U.S. Senate on Nov. 14, 2002. Looking back, Chief Judge Smith appreciates that the stars unexpectedly aligned: but for both Sen. Chafee and President Bush winning close and perhaps unexpected victories in 2000, he would not have been appointed to the federal bench.

Taking the bench in his early forties, Chief Judge Smith brought with him innovative ideas about the work of judging. In one high-stakes patent case involving complex computer algorithms, for example, he broke new ground by combining the digital audio of testimony with the demonstrative video used by the witness to create a movie that he embedded into his decision; readers can click on the embedded link to watch the movie.[1] In another case, when it came time to award attorneys' fees in a securities class-action matter,[2] he adopted a market-based approach championed by Judges Vaughn Walker and Milton Shadur in the post-settlement context using available data about fee awards.[3]

Early on in his judicial career, Chief Judge Smith became focused on issues of fundamental fairness. In the wake of *Booker*[4] and disturbed by the disparity between crack and cocaine sentences, he conducted extensive research on the scientific differences between the two substances and the history of the 100-to-1 sentencing ratio in use at the time. His thoughtful and comprehensive opinion on this issue, *United States v. Perry*,[5] was used by other judges

**Outside of the courthouse, you might catch a glimpse of Chief Judge Smith peddling through downtown Providence or on the East Bay bike path. Weather permitting, he occasionally rides his bike the almost 25 miles from home to work.**

considering rejecting the 100-to-1 ratio and got a shout out from the U.S. Supreme Court in the *United States v. Spears*[6] opinion, which upheld the discretion of district court judges to vary from the sentencing guidelines based on policy disagreements. On another topic, Chief Judge Smith chastised law enforcement's persistent failure to record custodial interrogations, warning that in future cases he would take remedial measures, including instructing the jury to treat with caution testimony of law enforcement officers about statements made during custodial interrogations where recording equipment was not utilized.[7] These efforts, along with those of many other judges and commentators, arguably have contributed to a sea change in practices on custodial recording.[8]

Chief Judge Smith has taught at Roger Williams University School of Law, the state's only law school, since 2007. He believes that the law school plays a unique role in Rhode Island's legal community by educating many of the state's lawyers, fostering intellectual exchanges through seminars and conferences, and expanding legal services through its clinics and Pro Bono Collaborative. His courses have included a year-long capstone course of his own design in federal practice, which mimics an actual federal civil case from start to finish; a course in expert and scientific evidence; and a seminar in judicial process, which explores how judges decide cases with an emphasis on the psychological and less well understood influences in decision-making. Chief Judge Smith greatly enjoys mentoring students and interacting with faculty and staff. He recently accepted appointment as chair of the law school's board of directors and looks forward to helping the school navigate the changing seas of legal education.

During his tenure as a district judge, Chief Judge Smith has accepted numerous invitations to sit with the First and Ninth Circuit Courts of Appeals. He enjoys the sparring and camaraderie in the appellate bench. Indeed, Chief Judge Smith was nominated by President Bush to a seat on the First Circuit in December of 2007, but (somewhat ironically given his early political background) was "blue-slipped" by Rhode Island's Democratic senators in the waning months of the Bush administration.

Outside of the courthouse, you might catch a glimpse of Chief Judge Smith peddling through downtown Providence or on the East Bay bike path. Weather permitting, he occasionally rides his bike the almost 25 miles from home to work. During lunch, he usually catches a game of competitive squash. And on the weekends, he enjoys hiking, tennis, and mountain biking. He is an avid reader, mostly of nonfiction, with a particular interest in history, policy, and science.

In December 2013, Chief Judge Smith began his seven-year term as chief judge. The youngest person ever to serve as chief judge in the District of Rhode Island,[9] he brings new energy and enthusiasm to the position. While he continues to innovate and focus on fairness, Chief Judge Smith is committed broadening his effort to make the court a friendlier and more welcoming place for litigants, lawyers, and the public. During his first few months as chief, he established a court Twitter account, modernized the *pro hac vice* process, issued an order permitting the electronic filing of complaints, and initiated a protocol to allow reporters to use electronic devices in the courtroom (with the judge's approval) to report via Twitter, blogs, or otherwise. Currently he is overseeing an initiative to make admission to practice in the District of Rhode Island more practical for new lawyers, a program to provide *pro bono* counsel in civil cases, the development of a re-entry court to offer an alternative to supervised release, and a litigation academy to help train young lawyers (at low cost) in some of the basic skills of litigation. (The academy is a partnership between the court, the Federal Bar Association, and the Roger Williams University School of Law.)

Looking forward, Chief Judge Smith is not certain if he will retire or take senior status when eligible, but he does not think of himself as the kind of judge who has to be on the bench. While he cherishes his judicial position, he has numerous interests and enjoys traveling. And while that decision is still a long ways off, he says it might be interesting to do some "completely different" kind of public service. That, above all, is what he learned from his father: a life of devoted public service is its own reward. ◉

# Endnotes

[1] *Uniloc USA, Inc. v. Microsoft Corp.*, 640 F. Supp. 2d 150 (D.R.I. 2009).

[2] *In re Cabletron Systems, Inc. Securities Litigation*, 239 F.R.D. 30 (D.N.H. 2006).

[3] *See, e.g.*, *In re Oracle Securities Litig.*, 131 F.R.D. 688 (N.D. Cal. 1990) (Walker, J.); *In re Amino Acid Lysine Antitrust Litig.*, 918 F. Supp. 1190 (N.D. Ill. 1996) (Shadur, J.); Report of the Third Circuit Task Force on Selection of Class Counsel, 208 F.R.D. 340, 354 n.31 (2002).

[4] *United States v. Booker*, 543 U.S. 220 (2005).

[5] *United States v. Perry*, 389 F. Supp. 2d 278 (D.R.I. 2005).

[6] *Spears v. United States*, 555 U.S. 261, 261, 266 (2009).

[7] *United States v. Mason*, 497 F. Supp. 2d 328, 336 (D.R.I. 2007) ("It is for this reason that continued indifference (or resistance) by the Providence Police Department to practices aimed at curing the problems discussed above risks this Court's use of corrective measures."); *see also United States v. Mejia*, Cr. No. 07-005S, Jury Instructions, p. 36, www.rid. uscourts.gov/menu/judges/jurycharges/CRdocs/07-05S%20 US%20v%20Tejada-Pichardo%20et%20al%20(Ricardo%20 Mejia).pdf ("Testimony regarding unrecorded statements, particularly in circumstances where recording equipment is available, must be viewed with caution."); Katie Mulvaney, Police resist judge's call that they record interrogations, PROVIDENCE JOURNAL, March 18, 2009.

[8] *See* Thomas P. Sullivan, *Recording Custodial Interrogations*, THE CHAMPION, April 2014.

[9] *See* Federal Judicial Center, Biographical Directory of Federal Judges, 1789 present, www.fjc.gov/history/home. nsf/page/judges.html (containing dates of birth and years of service as District of Rhode Island Chief Judge).

Exhibit C

APPEAL,Pro Se ECF Filer,Pro Se Plaintiff

# U.S. District Court
## District of Rhode Island (Providence)
## CIVIL DOCKET FOR CASE #: <u>1:23−cv−00126−WES−PAS</u>

| | |
|---|---|
| Seguin v. Rhode Island Department of Human Services et al | Date Filed: 03/30/2023 |
| Assigned to: District Judge William E. Smith | Date Terminated: 10/19/2023 |
| Referred to: Magistrate Judge Patricia A. Sullivan | Jury Demand: Both |
| Demand: $3,000,000 | Nature of Suit: 440 Civil Rights: Other |
| Cause: 18:1962 Racketeering (RICO) Act | Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| **Mary Seguin** | represented by | **Mary Seguin** |
| | | P.O. Box 22022 |
| | | Houston, TX 77019 |
| | | 281−744−2016 |
| | | Email: maryseguin22022@gmail.com |
| | | PRO SE |

V.

**Defendant**

| | | |
|---|---|---|
| **Rhode Island Department of Human Services** | represented by | **Marissa D. Pizana** |
| *In its official capacity* | | RI Department of Attorney General |
| | | Civil Division |
| | | 150 South Main Street |
| | | Providence, RI 02903 |
| | | 401−274−4400 |
| | | Email: mpizana@riag.ri.gov |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Rhode Island Department of Human Services Office Of Child Support Services** | represented by | **Marissa D. Pizana** |
| *In its official capacity* | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Gero Meyersiek** | represented by | **Joanna M. Achille** |
| *In his individual and official capacity* | | Burns & Levinson LLP |
| | | 1 Citizens Plaza |
| | | Providence, RI 02903 |
| | | (401) 831−8330 |
| | | Fax: (617) 345−3299 |
| | | Email: jachille@burnslev.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

**Michael D. Coleman**
*In his individual and official capacity*

<u>**Defendant**</u>

**Deborah A. Barclay**
*In her individual and official capacity*

<u>**Defendant**</u>

**Lisa Pinsoneault**
*In her individual and official capacity*

<u>**Defendant**</u>

**Carl Beauregard**
*In his individual and official capacity*

<u>**Defendant**</u>

**Kevin Tighe**

<u>**Defendant**</u>

**Monique Bonin**

<u>**Defendant**</u>

**Frank Dibiase**

<u>**Defendant**</u>

**Wendy A. Fobert**

<u>**Defendant**</u>

**Karla Caballeros**

<u>**Defendant**</u>

**Timothy Flynn**

<u>**Defendant**</u>

**Rhode Island Court System**

<u>**Defendant**</u>

**Paul A Suttell**
*L in his individual and official capacity*
*as Executive Head OF Rhode Island State*
*Court System*

<u>**Defendant**</u>

**Rhode Island Administrative Office of
State Courts**

<u>**Defendant**</u>

2

**Rhode Island Administrative Office of
the Superior Court**

**Defendant**

**Rhode Island Judicial Council**

**Defendant**

**Rhode Island Superior Court**

**Defendant**

**Rhode Island Superior Court Judicial
Council**

**Defendant**

**The Judicial Technology Center**

**Defendant**

**Julie Hamil**

**Defendant**

**Marisa P. Brown**

**Defendant**

**John Joseph Baxter, Jr.**

**Defendant**

**Justin Correa**

**Defendant**

**Rhode Island Office of the Attorney
General**

**Defendant**

**Rhode Island Office of the Attorney
General Open Government Unit**

**Defendant**

**Adam Roach**

**Defendant**

**Peter Neronha**

**Defendant**

**Tyler Technologies, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/30/2023 | 1 | COMPLAINT ( filing fee paid $ 402.00 receipt number ARIDC−1855567 ), filed by Mary Seguin.(DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | | <span style="color:red">CORRECTIVE DOCKET ENTRY Regarding: 1 Complaint. **CORRECTIVE DOCKET ENTRY:** This case has been electronically filed and processed, however, after a quality control review the following deficiencies were found:</span><span style="color:blue">Civil Cover Sheet not attached.</span> <span style="color:red">The filer is directed to file a Civil Cover Sheet within one day.</span> (DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | 2 | Civil Cover Sheet filed by Mary Seguin. Regarding New Case: 1 Complaint. (Attachments: # 1 Email)(DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | 3 | Summons Request filed by Mary Seguin. (Attachments: # 1 Rhode Island Department of Human Services Office of Child Support Services Summons, # 2 Gero Meyersiek Summons)(DaCruz, Kayla) (Additional attachment(s) added on 3/30/2023: # 3 Email) (DaCruz, Kayla). (Entered: 03/30/2023) |
| 03/30/2023 | 4 | MOTION for Leave to Proceed as Pro Se Electronic Filer filed by Mary Seguin. (Attachments: # 1 Email)(DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | | CASE CONDITIONALLY ASSIGNED to District Judge William E. Smith and Magistrate Judge Patricia A. Sullivan. Related Case Number 23cv34 based upon a related case previously assigned to the presiding judge. The assignment is subject to the presiding judge's determination that the cases, in fact, are related. (DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | 5 | CASE OPENING NOTICE ISSUED (DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | 6 | Summons Issued as to Gero Meyersiek, Rhode Island Department of Human Services, Rhode Island Department of Human Services Office of Child Support Services. (Attachments: # 1 Rhode Island Department of Human Services Office Of Child Support Services Summons, # 2 Gero Meyersiek Summons)(DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | | TEXT ORDER granting 4 Motion for Leave to Proceed as Pro Se Electronic Filer. So Ordered by District Judge William E. Smith on 3/30/2023. (Urizandi, Nissheneyra) (Entered: 03/30/2023) |
| 07/07/2023 | 7 | ORDER TO SHOW CAUSE entered. Show Cause Response due by 7/21/2023. So Ordered by District Judge William E. Smith on 7/7/2023. (Urizandi, Nissheneyra) (Entered: 07/07/2023) |
| 07/07/2023 | | CASE PERMANENTLY ASSIGNED: Since District Judge William E. Smith has determined that this case is in fact related to CA 22−cv−34 this case is permanently assigned to District Judge William E. Smith for all further proceedings. (Urizandi, Nissheneyra) (Entered: 07/07/2023) |
| 07/20/2023 | 8 | AFFIDAVIT re 7 Order to Show Cause *Rule 4(m) Show Cause Declaration* by Mary Seguin. (Attachments: # 1 Exhibit Exhibits A to B attached to Plaintiff's Rule 4(m) Show Cause Declaration)(Seguin, Mary) (Entered: 07/20/2023) |
| 08/07/2023 | 9 | NOTICE of Appearance by Marissa D. Pizana on behalf of Rhode Island Department of Human Services, Rhode Island Department of Human Services Office Of Child Support Services (Pizana, Marissa) (Entered: 08/07/2023) |

| 08/07/2023 | 10 | MOTION for an Extension of Time to File Answer re 1 Complaint *or Otherwise Respond to the Complaint* filed by Rhode Island Department of Human Services, Rhode Island Department of Human Services Office Of Child Support Services. **Responses due by 8/21/2023.** (Pizana, Marissa) (Entered: 08/07/2023) |
|---|---|---|
| 08/07/2023 | 11 | EXHIBIT IN SUPPORT by Rhode Island Department of Human Services, Rhode Island Department of Human Services Office Of Child Support Services in support of 10 MOTION for an Extension of Time to File Answer re 1 Complaint *or Otherwise Respond to the Complaint* . (Pizana, Marissa) (Entered: 08/07/2023) |
| 08/08/2023 | 12 | MOTION for an Extension of Time to Amend 1 Complaint *Pursuant to Rule 15* filed by Mary Seguin. **Responses due by 8/22/2023.** (Attachments: # 1 Exhibit Exhibit A to E attached to Plaintiff Motion for Extension of Time To Amend Complaint 080823, # 2 Affidavit Affidavit in Support of Plaintiff Motion for Extension of Time to Amend Complaint 080823, # 3 Exhibit Exhibit A to D attached to Affidavit in Support of Plaintiff Motion for Extension of Time to Amend Complaint 080823)(Seguin, Mary) (Entered: 08/08/2023) |
| 08/10/2023 | 13 | NOTICE of Appearance by Joanna M. Achille on behalf of Gero Meyersiek (Achille, Joanna) (Entered: 08/10/2023) |
| 08/10/2023 | 14 | First MOTION for an Extension of Time to File Answer re 1 Complaint filed by Gero Meyersiek. **Responses due by 8/24/2023.** (Achille, Joanna) (Entered: 08/10/2023) |
| 08/15/2023 | | TEXT ORDER granting 10 Motion for Extension of Time to Answer. Rhode Island Department of Human Services answer due 10/9/2023; Rhode Island Department of Human Services Office of Child Support Services answer due 10/9/2023. So Ordered by District Judge William E. Smith on 8/15/2023. (Urizandi, Nissheneyra) (Entered: 08/15/2023) |
| 08/16/2023 | 15 | RESPONSE In Opposition to 12 MOTION for an Extension of Time to Amend 1 Complaint *Pursuant to Rule 15* filed by Rhode Island Department of Human Services, Rhode Island Department of Human Services Office Of Child Support Services. **Replies due by 8/23/2023.** (Pizana, Marissa) (Entered: 08/16/2023) |
| 08/16/2023 | 16 | REPLY to Response re 15 Response to Motion, *Plaintiff's Motion for Extension of Time to Amend Complaint* filed by Mary Seguin. (Seguin, Mary) (Entered: 08/16/2023) |
| 08/17/2023 | 17 | MOTION for Temporary Restraining Order filed by Mary Seguin. (Attachments: # 1 Supporting Memorandum Memorandum In Support of Motion for Preliminary Injunction and Temporary Restraining Order, # 2 Affidavit Affidavit in Support of Plaintiff Motion for TRO, # 3 Exhibit Exhibits Attached to Plaintiff Motion for TRO and Preliminary Injunction)(Seguin, Mary) (Entered: 08/17/2023) |
| 08/17/2023 | 18 | AFFIDAVIT re 17 MOTION for Temporary Restraining Order *and Motion for Preliminary Injunction* by Mary Seguin. (Seguin, Mary) (Entered: 08/17/2023) |
| 08/18/2023 | 19 | AFFIDAVIT re 17 MOTION for Temporary Restraining Order *and Rule 65(a) Motion for Injunctive Relief* by Mary Seguin. (Attachments: # 1 Exhibit Rhode Island Family Court Emergency Motion to Stay Proceedings)(Seguin, Mary) (Entered: 08/18/2023) |
| 08/18/2023 | 20 | EXHIBIT IN SUPPORT by Mary Seguin in support of 18 Affidavit, 17 MOTION for Temporary Restraining Order , 1 Complaint, 19 Affidavit *Affidavit in Support of Evidence Submitted for Complaint and Motion for Temporary Restraining Order*. (Seguin, Mary) (Entered: 08/18/2023) |

| 08/18/2023 | 21 | EXHIBIT IN SUPPORT by Mary Seguin in support of 1 Complaint . (Attachments: # 1 Exhibit Documentary Evidentiary Support, # 2 Exhibit Evidentiary Support, # 3 Exhibit Evidentiary Support, # 4 Exhibit Evidentiary Support, # 5 Exhibit Evidentiary Support, # 6 Exhibit Evidentiary Support, # 7 Exhibit Audio Recording Evidentiary Support)(Seguin, Mary) (Entered: 08/18/2023) |
|---|---|---|
| 08/18/2023 | 22 | DOCKET NOTE: Audio file was received and will be maintained in the Clerk's Office. Regarding: 20 Exhibit in Support, 21 Exhibit in Support, 18 Affidavit, 17 MOTION for Temporary Restraining Order , 1 Complaint, 19 Affidavit. (Kenny, Meghan) (Entered: 08/18/2023) |
| 08/18/2023 | 23 | Emergency MOTION for Hearing re 17 MOTION for Temporary Restraining Order filed by Mary Seguin. **Responses due by 9/1/2023.** (Seguin, Mary) (Entered: 08/18/2023) |
| 08/18/2023 | 24 | Second MOTION for Hearing re 17 MOTION for Temporary Restraining Order filed by Mary Seguin. **Responses due by 9/1/2023.** (Kenny, Meghan) (Entered: 08/18/2023) |
| 08/18/2023 | | TEXT ORDER denying Plaintiff's 17 Motion for Temporary Restraining Order and Preliminary Injunction. Because the ongoing proceedings in state court implicate a significant state interest, the Younger abstention doctrine applies, requiring this Court to abstain from enjoining ongoing state proceedings. See Younger v. Harris, 401 U.S. 37 (1971); Sirva Relocation, LLC v. Richie, 794 F.3d 185, 191−93 (1st Cir. 2015). The ongoing proceeding in Family Court implicates the State's interest in enforcing the orders and judgments of its courts and in its ability to collect child support payments, the state court is fully competent to adjudicate Plaintiff's claims, and no Younger abstention exceptions apply. See Sirva, 794 F.3d at 192. Accordingly, Plaintiff's 17 Motion for Temporary Restraining Order and Preliminary Injunction is DENIED. So Ordered by District Judge William E. Smith on 8/18/2023. (Urizandi, Nissheneyra) (Entered: 08/18/2023) |
| 08/18/2023 | | TEXT ORDER granting Plaintiff's 12 Motion for an Extension of Time to Amend Complaint and Defendant Gero Meyersiek's 14 First Motion for an Extension of Time to File Answer. Because Defendants have not yet filed a responsive pleading, Plaintiff is permitted to amend her Complaint pursuant to Federal Rule of Civil Procedure 15(a). Plaintiff is directed to file her amended complaint within fourteen days from the date of this order. In light of this extension, Defendant Gero Meyersieks request for an extension of time is also granted, and he is directed to respond to Plaintiff's amended complaint within 60 days of its filing. So Ordered by District Judge William E. Smith on 8/18/2023. (Urizandi, Nissheneyra) (Entered: 08/18/2023) |
| 08/18/2023 | | TEXT ORDER denying Plaintiff's 23 Emergency Motion for Hearing and 24 Second Motion for Hearing. In light of the denial of Plaintiff's 17 Motion for Temporary Restraining Order and Preliminary Injunction, Plaintiff's requests for a hearing on that motion are DENIED as MOOT. So Ordered by District Judge William E. Smith on 8/18/2023. (Urizandi, Nissheneyra) (Entered: 08/18/2023) |
| 09/01/2023 | 25 | AMENDED COMPLAINT against All Defendants, filed by Mary Seguin.(Seguin, Mary) (Entered: 09/01/2023) |
| 09/05/2023 | 26 | NOTICE by Mary Seguin *Notice and Demand of Claims Against Defendants' Liability Insurance Policies and Coverage* (Seguin, Mary) (Entered: 09/05/2023) |
| 09/06/2023 | 27 | MOTION for an Extension of Time to File Answer re 25 Amended Complaint filed by Rhode Island Department of Human Services, Rhode Island Department of Human |

| | | Services Office Of Child Support Services. **Responses due by 9/20/2023.** (Pizana, Marissa) (Entered: 09/06/2023) |
|---|---|---|
| 09/08/2023 | 28 | RESPONSE In Opposition to 27 MOTION for an Extension of Time to File Answer re 25 Amended Complaint filed by Mary Seguin. **Replies due by 9/15/2023.** (Seguin, Mary) (Entered: 09/08/2023) |
| 09/19/2023 | | TEXT ORDER granting 27 Motion for an Extension of Time to File Answer. Rhode Island Department of Human Services' answer is due November 17, 2023; Rhode Island Department of Human Services Office of Child Support Services' answer is due November 17, 2023. So Ordered by District Judge William E. Smith on 9/19/2023. (Urizandi, Nissheneyra) (Entered: 09/19/2023) |
| 09/30/2023 | 29 | First MOTION for Recusal *Pursuant to 28 U.S.C. § 455* filed by Mary Seguin. **Responses due by 10/16/2023.** (Seguin, Mary) (Entered: 09/30/2023) |
| 10/02/2023 | | TEXT ORDER denying Plaintiff's 29 Motion for Recusal. Plaintiff "moves to recuse and/or disqualify" me and "all justices, judges, or magistrate judges... in the U.S. District Court of Rhode Island." A judge may be disqualified from a case if "(1) the judges impartiality may reasonably be questioned; or (2) the judge may have a personal bias or prejudice concerning a party." United States v. Kelley, 712 F.2d 884, 889 (1st Cir. 1983); see 28 U.S.C. § 455. Plaintiff argues that I and the other judges of this Court should disqualify ourselves because we did so sua sponte in her past lawsuits. Plaintiff does not identify any other facts to support her argument that I should recuse myself from this case. Plaintiffs argument is plainly insufficient to justify recusal and disqualification. See United States v. Houston, No. 3:13−10−DCR, 2013 WL 3975405, at *10 (E.D. Tenn. July 29, 2013) ("A judges recusal in a prior case does not alone require disqualification in a subsequent case."). Accordingly, Plaintiffs motion for Recusal is DENIED. So Ordered by District Judge William E. Smith on 10/2/2023. (Urizandi, Nissheneyra) (Entered: 10/02/2023) |
| 10/17/2023 | 30 | Summons Request filed by Mary Seguin. (Attachments: # 1 Summons Request, # 2 Summons Request)(Kenny, Meghan) (Entered: 10/17/2023) |
| 10/19/2023 | | TEXT ORDER dismissing the action under Younger abstention. Though not raised by the parties, the Court has the power and obligation to dismiss an action if the principles of abstention so require. See Guillemard−Ginorio v. Contreras−Gomez, 585 F.3d 508, 517−18 (1st Cir. 2009); see also Bellotti v. Baird, 428 U.S. 132, 14344 n.10 (1976) (recognizing that "abstention may be raised by the court sua sponte"). Plaintiff filed a 91−page Amended Complaint asking the Court to address the child support payments for which she alleges she is being wrongfully charged and her perceived grievance that she is being denied access to court records under the Rhode Island Access to Public Records Act ("APRA"). See generally Am. Compl., ECF No. 25 . Plaintiff seeks to impede both the child support proceedings before the Rhode Island Family Court ("Family Court") and her action before the Rhode Island Superior Court ("Superior Court") concerning her alleged denial of access to court records. The telltale signs that Plaintiff is attempting to encumber state court proceedings are the facts that Plaintiff, in her Amended Complaint, included as parties, among others, the Superior Court, various state court clerks, and the Chief Justice of the Rhode Island Supreme Court; Plaintiff filed a Motion for Temporary Restraining Order and Preliminary Injunction seeking to "enjoin[] and restrain[] the Defendants from continuing prosecution of the family court proceeding against the Plaintiff," Mot. for TRO and Prelim. Inj. 16, ECF No. 17 ; and Plaintiff asked the Court, in her Amended Complaint, to "[e]njoin the Defendants'[] enforcement and practices of rules, practices, and/or policies" of the state courts, Am. |

Compl. 90. The issues being considered before the Family Court directly relate to this case because, according to the Amended Complaint, Defendant Rhode Island Department of Human Services ("RIDHS") is seeking child support arrearage interest from Plaintiff. See Am. Compl.&para&para 135−37 (recognizing that RIDHS is seeking compound interest). Moreover, Plaintiff admits that she has a pending case before the Superior Court where she alleges violations of the APRA. See Am. Compl. &para 2; see also Seguin v. R.I. Dept of Human Servs., PC−2022−07215 (R.I. Super. Ct.). The Court takes judicial notice of the proceedings before both state tribunals. See Meyersiek v. Seguin, K−2001−0521M (R.I. Fam. Ct.); see also Fed. R. Evid. 201 (permitting, "at any stage of the proceeding," sua sponte judicial notice of facts "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). The Younger abstention doctrine, derived from Younger v. Harris, 401 U.S. 37 (1971), "counsels federal−court abstention when there is a pending state proceeding." Moore v. Sims, 442 U.S. 415, 423 (1979). For the doctrine to apply, certain elements must be met. "First, the pending state [court] proceeding must fall into one of three categories: 1) criminal prosecutions, 2) civil proceedings that are 'akin to criminal prosecutions' ('quasi−criminal proceedings') or 3) civil proceedings that 'implicate a State's interest in enforcing the orders and judgments of its courts.'" Credit Acceptance Corp. v. Healey, 544 F. Supp. 3d 139, 143 (D. Mass. 2021) (quoting Sirva Relocation, LLC v. Richie, 794 F.3d 185, 192 (1st Cir. 2015)). Here, relief for Plaintiff in the pending Family Court case would implicate the state's interest in enforcing the orders and judgments of its courts concerning the payment and collection of child support. See Seguin v. Bedrosian, No. 12−cv−614−JD, 2013 WL 367722, at *2 (D.R.I. Jan. 30, 2013). Moreover, the state has an asserted interest in having appeals under the APRA be heard before the Superior Court. See R.I. Gen. Laws § 38−2−9. Second, the state court case must satisfy the factors identified in Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423 (1982): "1) the state proceeding is ongoing, 2) it involves significant state interests and 3) it provides an adequate opportunity for the plaintiff to raise his federal claims in state court." Credit Acceptance Corp., 544 F. Supp. 3d at 143; see also Middlesex, 457 U.S. at 432. The first factor is satisfied because the proceedings are ongoing. The second factor is satisfied because the state has an interest in family relations and the payment and collection of child support, see Eastman v. New Hampshire, No. 11−cv−316−SM, 2012 WL 405487, at *3 (D.N.H. Jan. 17, 2012), report and recommendation adopted, No. 11−cv−316−SM, 2012 WL 405507 (D.N.H. Feb. 8, 2012), and an interest in the "fair and orderly administration of justice" that includes maintaining sensitive and confidential judicial records, see Courthouse News Serv. v. Quinlan, 32 F.4th 15, 21 (1st Cir. 2022). As for the third factor, "[e]xcept in the most extraordinary cases, a federal court must presume that state courts, consistent with the imperatives of the Supremacy Clause, see U.S. Const. art. VI, are fully competent to adjudicate federal constitutional and statutory claims properly presented by the parties." Casa Marie, Inc. v. Super. Ct. of P.R., 988 F.2d 252, 262 (1st Cir. 1993) (footnote omitted). Nothing suggests that the Family Court and the Superior Court cannot hear Plaintiff's federal claims. Third, none of the Younger abstention exceptions apply. See Sirva, 794 F.3d at 192 (finding abstention inappropriate if 1) the state proceeding is brought "in bad faith" to harass, 2) the state forum cannot adequately protect federal rights, or 3) the state statute is "flagrantly and patently violative of express constitutional prohibitions" (citations omitted)). Accordingly, because the Court does not have jurisdiction over Plaintiff's case, it is DISMISSED in its entirety. Because Plaintiff has a history of filing frivolous and repetitive motions following decisions of the Court of which she disapproves, see Seguin v. R.I. Office of Child Support Servs., No. 1:23−cv−00034−WES−PAS

| | | |
|---|---|---|
| | | (D.R.I.), it is further ORDERED that the Courts March 30, 2023, Text Order granting Plaintiff Leave to Proceed as a Pro Se Electronic Filer is VACATED. Plaintiff's Electronic Filer privileges are revoked. <u>See</u> LR Gen 302(b). So Ordered by District Judge William E. Smith on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 10/19/2023 | <u>31</u> | JUDGMENT. So Ordered by Clerk of Court on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's two recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) Modified on 11/17/2023 to correct a typo. (Urizandi, Nissheneyra). (Entered: 11/17/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) (Entered: 11/17/2023) |
| 11/17/2023 | <u>32</u> | NOTICE OF APPEAL by Mary Seguin as to Text Order, Text Order, <br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at <u>http://pacer.psc.uscourts.gov/cmecf/</u>. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at <u>http://www.ca1.uscourts.gov/cmecf</u>** Appeal Record due by 11/24/2023. (Attachments: # <u>1</u> Envelope)(Kenny, Meghan) (Entered: 11/17/2023) |

## Form 1A

### Notice of Appeal to a Court of Appeals From a Judgment of a District Court

United States District Court for the
District of Rhode Island
Docket Number 1:23-cv-126-WES-PAS

MARY SEGUIN, Plaintiff

v.

RHODE ISLAND DEPARTMENT
OF HUMAN SERVICES in its
official capacity; MICHAEL D.
COLEMAN, DEBORAH A.
BARCLAY in their individual and
official capacities;
RHODE ISLAND OFFICE OF
CHILD SUPPORT SERVICES in its
official capacity; KEVIN TIGHE,
MONIQUE BONIN, FRANK
DIBIASE, WENDY FOBERT,
KARLA CABALLEROS,
TIMOTHY FLYNN, LISA
PINSONNEAULT, CARL
BEAUREGARD, PRISCILLA
GLUCKSMAN, JOHN LANGLOIS,
PAUL GOULD, in their individual
and official capacities; RHODE
ISLAND STATE COURT SYSTEM
in its official capacity; PAUL A.
SUTTELL in his individual and
official capacity as EXECUTIVE
HEAD OF RHODE ISLAND
STATE COURT SYSTEM; RHODE
ISLAND ADMINISTRATIVE
OFFICE OF STATE COURTS in its
official capacity; RHODE ISLAND
ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its
official capacity; RHODE ISLAND
JUDICIAL COUNCIL in its official
capacity; RHODE ISLAND
SUPERIOR COURT in its official

**Notice of Appeal**

capacity; RHODE ISLAND
SUPERIOR COURT JUDICIAL
COUNCIL in its official capacity;
THE JUDICIAL TECHNOLOGY
CENTER in its official capacity;
JULIE HAMIL, MARISA BROWN,
JOHN JOSEPH BAXTER, JR.,
JUSTIN CORREA in their
individual and official capacities;
RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its
official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY
GENERAL OPEN GOVERNMENT
UNIT in its official capacity; ADAM
D. ROACH, PETER NERONHA in
their official and individual
capacities; TYLER
TECHNOLOGIES, INC.; GERO
MEYERSIEK, Defendants

MARY SEGUIN (name all parties taking the appeal)* appeals to the United States Court of Appeals for the FIRST Circuit from the final judgment entered on October 19, 2023 (state the date the judgment was entered).

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 17, 2023

---

* See Rule 3(c) for permissible ways of identifying appellants.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                        Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

   *Defendants*

**PLAINTIFF'S DOCKETING STATEMENT TO THE UNITED STATES COURT**

**OF APPEALS FOR THE FIRST CIRCUIT AND THE UNITED STATES DISTRICT**

**COURT OF THE DISTRICT OF RHODE ISLAND**

1. Plaintiff, proceeding pro se from and as a citizen of Texas, respectfully states to the

   U.S. Court of Appeals for the First Circuit and the United States District Court of the

   District of Rhode Island that this case is related to the pending appellate case, *Mary*

   *Seguin v. Rhode Island Office of Child Support Services, et al*, Case Number 23-1851.

2. Plaintiff respectfully requests the U.S. Court of Appeals for the First Circuit to review Plaintiff's timely filed Rule 59 Motion and Rule 60 Motion that were filed in the U.S. District Court of the District of Rhode Island on November 16, 2023 as proper part of the record of appeal.  Prior to filing this Notice of Appeal, Plaintiff also filed a Rule 60(b)(1) Motion regarding the District Court's interference with Plaintiff's right to file Rule 59 and Rule 60 post judgement in which Plaintiff sought to preserve issues for appeal on the record.  Plaintiff attaches all relevant documentation, including all relevant emails to the Clerk of the Court of the District Court and Plaintiff's properly filed post judgment motions pursuant to Rule 59 and Rule 60 herein to this Notice of Appeal and Docket Statement.

3. Plaintiff's Rule 59 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

4. Plaintiff's first Rule 60 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

5. Plaintiff attaches the aforesaid post judgment Motions and requests appellate review under these extraordinary and troubling factual circumstances that violate and obstruct the fundamental First Amendment right of access to the Court of Record, due process and obstruction to justice in the First Circuit, and *inter alia*, interference with the accuracy of the court's record for appeal in this matter.

**CERTIFICATE OF SERVICE**

13

I HEREBY CERTIFY that on November 16, 2023, I filed the within Motion with the

Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 17, 2023



# URGENT - TIME SENSITIVE - FILE TODAY RULE 60(b)(1) MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS

**Mary Seguin** <maryseguin22022@gmail.com>                          Fri, Nov 17, 2023 at 1:38 PM
Draft

Dear Clerks of the Court,

I spoke with Clerk Meghan today regarding an update on the docketing of my motions.

Following our discussion, I respectfully request the Clerk of the Court to docket today my attached Rule 60(b)(1) Motion, dated November 17, 2023, that is time-sensitive.

Please make sure that my attached Rule 60(b)(1) Motion is docketed as ECF 32.

Please make sure that the law is followed that my attached Rule 60(b)(1) Motion is NOT forwarded to Chambers prior to docketing.  I am NOT requesting the Court leave to file, since it is my right to file the attached Rule 60(b)(1) Motion.  No Chamber interference should be taking place to prevent the docketing of my attached Rule 60(b)(1) Motion.

Thank you for your assistance.

Respectfully Submitted,
Mary Seguin
Houston, Texas

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Fri, Nov 17, 2023 at 12:33 PM
Subject: Fwd: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerks of the Court,

I am respectfully following up on my Rule 59 Motion filing.

Yesterday, November 16, 2023, at 1:31 PM Central Time, I filed via email below, my Rule 59 Motion in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.  As indicated in my email below, I emphasized that docketing the Rule 59 Motion on November 16, 2023 is urgent, to comply with the 28 day filing post-judgment deadline, which my filing meets - November 16, 2023 is within the 28 day deadline of Fed. R. of Civ. P. 59 that tolls the time for filing an appeal.

I followed up with telephone calls to the Clerk's Office at 1:32 PM Central Time, and at 3:42 PM Central Time to request timely docket of my Rule 59 Motion, and the Clerk's Office assured me each time that a deputy clerk is working on it and that it will be docketed on the day it was received and that the docket will reflect the email date stamp of the day the Rule 59 Motion is received by email.  Further, I was told that **all filings** I email to the Clerk's Office will be docketed and considered by the Court as having been filed on the day that the motion was emailed to the Clerk's Office.

Therefore, my Rule 59 Motion emailed on November 16, 2023 should be accordingly docketed as **ECF 32** with the **entry of/stating filing on November 16, 2023**, in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

However, as of this time, on November 17, 2023 almost 24 hours later, my Rule 59 Motion is still not docketed.

I would like to respectfully clarify that the Text Order dated October 19, 2023 in this matter states that only my electronic filing privilege was revoked, but there is **no** order requiring that I need to file for leave of Court to file any post-judgment motions, such as my Rule 59 Motion.

Today, November 17, 2023, I telephoned the Clerk's Office first thing at 8:00 AM Central Time, and spoke with Clerk Meghan, who informed me that yesterday she had forwarded my Rule 59 Motion to Chambers upon receipt, but has yet to hear back from Chambers, but did not know what was causing the hold up when I asked why Chambers' response is taking almost 24 hours which impacts the docketing date of the Rule 59 Motion. I expressed my concern of the Rule 59 deadline, emphasizing that it tolls the time for filing an appeal, therefore I respectfully requested that the docket accurately reflects my timely filing of my Rule 59 Motion on November 16, 2023 (at 1:31 PM Central Time).

Additionally, I informed Clerk Meghan that I relied on the Clerk's Office's information provided above, and I had also filed a timely **Rule 60** Motion yesterday, **November 16, 2023**, at **4:39 PM Central Time**, similarly requesting docketing to reflect it was timely filed via email to on November 16, 2023. I emphasized to Clerk Meghan that timeliness is critical, as Rule 60 Motion filed within 28 days post-judgment tolls the time for filing an appeal. Clerk Meghan told me that my Rule 60 Motion was forwarded to Chambers as well. According to the Clerk's Office's information, my **Rule 60 Motion** needs to be docketed/filed as **ECF 33**, dated stamped filed on **November 16, 2023**.

Due to the above information regarding the processing of my post-judgment motions, I expressed to Clerk Megghan my concern regarding the Court's procedure of forwarding my time-sensitive post-judgment motions to Chambers without docketing/filing, and then those time-sensitive motions seemingly to languish in Chambers past the date of the 28-day deadline stipulated by Rule 59, and Rule 60 as they relate to tolling the time for filing an appeal. I expressed my explicit concern that I seek to preserve my right of appeal, and that I respectfully seek to preserve on the record the issues contained in my Rule 59 and Rule 60 Motions that are currently before Chambers, without docketing, by law within the jurisdiction of the U.S. District Court of Rhode Island. My Rule 59 and Rule 60 Motions are not ex-parte or emergency motions.

Moreover, I expressed to Clerk Meghan my concern that the processing of my post-judgment motions forwarded to Chambers and seemingly pending before Chambers without the motions being docketed, impacts my right of appeal 30-days post judgment, and today, I told the Clerk that under the circumstances in this matter, I seek to preserve for appeal the issues raised in my timely filed Rule 59 Motion and Rule 60 Motion, and that I seek to preserve my right to appeal within the 30-day postjudgment period.

I also discussed with the Clerk that my timely filed but undocketed Rule 59 Motion and Rule 60 Motion that were forwarded to and currently before Chambers cause an uncertain effect, impacting the date of my filing of Notice of Appeal, the deadline of which is November 18, 2023, a Saturday. Based on the current facts and issues regarding simply docketing my filings on the record, I am concerned my rights of access to the Courts are impacted, and that my Notice of Appeal may also languish I do not believe any pro se litigant should be made to be uncertain of the timeliness of filing a Notice of Appeal as a matter of right that is caused by inaction by Chambers on timely-filed Rule 59 and Rule 60 Motions that toll the time to file an appeal. I explicitly expressed my concern on the effect on my access to the Courts.

I respectfully request that this email communication regarding the filing/docketing of my Rule 59 Motion be docketed to accurately reflect the record on appeal along with the Rule 59 Motion at the time the Rule 59 Motion is docketed by the Clerk.

Thank you in advance for you assistance.

Respectfully submitted,
Mary Seguin

--------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Thu, Nov 16, 2023 at 1:31 PM
Subject: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

16

Dear Clerk of the Court,

Kindly urgently file today, November 16, 2023, my attached Rule 59 Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 59 Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023.  I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX  77019
(281) 244-2016

---

**CA 126 Rule 60(b)(1) Motion with Attachments FINAL 111723.pdf**
679K

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                          Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

    *Defendants*

## **PLAINTIFF'S RULE 60(b)(1) MOTION**

1. Plaintiff, proceeding from and as a citizen of Texas, respectfully requests pursuant to

Fed. R. Civ. P. Rule 60(b)(1), (3), (4) and (6) for a new trial.  Judge Smith had obstructed

Plaintiff access to the Court, by instructing the Clerk of the Court, Meghan, to not docket

Plaintiff's timely filed Rule 59 and Rule 60 Motions filed with the Clerk via email on November

16, 2023, as to obstruct Plaintiff's right to access the Court to preserve the issues for appeal.

Plaintiff avers the following, supported by affidavit attached:

(1) On November 16, 2023, at 1:31 PM Central Time, Plaintiff filed via email to the Office of the Clerk In-Take email, Plaintiff's timely-filed Rule 59 Motion, requesting a new trial as Rule 59(e) provides. Plaintiff requested in her email that the Clerk timely docket the time-sensitive Rule 59 Motion on November 16, 2023. Plaintiff telephoned the Clerk's Office twice on November 16, 2023 to make sure of the Clerk's receipt of Plaintiff's filings, and was confirmed, and told that all motions emailed to the Clerk's Office are docketed as filed on the date stamp receipt by the Court's Clerk's Office. <u>See attached email and email-attached Motion.</u>

(2) On November 16, 2023, at 4:39 PM Central Time, Plaintiff filed via email to the Office of the Clerk In-Take email, Plaintiff's timely-filed Rule 60(b) Motion, requesting a new trial. Plaintiff requested in her email that the Clerk timely docket the time-sensitive Rule 60 Motion on November 16, 2023. <u>See attached email and email-attached Motion.</u>

(3) However, neither motions were docketed by the Clerk of the Court, and Plaintiff followed up first thing on November 17, 2023 at 8:00 AM Central Time. Plaintiff spoke to Clerk Meghan who informed Plaintiff that she had forwarded Plaintiff's Rule 59 and Rule 60 Motion to Chambers because the Court told her to, without docketing Plaintiff's Motions. Clerk Meghan told Plaintiff she will email Chambers to "find out what is going on." No Order in this matter requires Plaintiff to file for leave of Court to file any post judgement motions, and even if leave is required, Plaintiff's court-submitted Rule 59 and Rule 60 Motions seeking to preserve issues for appeal are required by law to be docketed in all courts of law to complete an accurate record for appeal.

(4) Plaintiff expressed to Clerk Meghan Plaintiff's concern that the irregular forwarding of timely filed Rule 59 Motion and Rule 60 Motion languishing in Chambers without being docketed on the record adversely impede and obstruct Plaintiff's right of access to the Court, as

well as obstructs Plaintiff's right to preserve legal issues for appeal, and fabricating an inaccurate record for appeal, as well as violates due process.

(5) At 12:20 PM, Plaintiff followed up by telephone, and was told that there were no updates from Chambers and Plaintiff's Rule 59 and Rule 60 Motions are still not docketed. Plaintiff emailed the Clerk's office documenting in writing the irregularity described above. At the very same moment, Judge Smith entered a text order stating that the Court is in receipt of two emails sent by the Plaintiff and construes them as motion for leave to file, that are denied. Plaintiff's Rule 59 and Rule 60 Motions continue to be not docketed. Plaintiff phoned the Office of the Clerk again, and the Clerk informed Plaintiff that the Court is telling her not to docket Plaintiff's Rule 59 and Rule 60 motions. This is *prima facie* judicial obstruction of Plaintiff's right to file Rule 59 and Rule 60 Motions against the Plaintiff to preserve issues on the record for appeal. Plaintiff attaches herewith the aforesaid November 17, 2023 email for the record.

WHEREFORE, Plaintiff requests the Court to docket Plaintiff's timely filed Rule 59 and Rule 60 Motions and the aforesaid three emails to preserve the record accurately. Plaintiff requests the Court treat Plaintiff's timely filed Rule 59 Motion and Rule 60 Motion filed on November 16, 2023 as timely filed. Plaintiff requests the disqualification of Judge Smith by the Court. Plaintiff requests any and all such relief deemed just under the circumstances.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 17, 2023, I filed the within Motion with the Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 17, 2023



Mary Seguin <maryseguin22022@gmail.com>

## URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS

2 messages

**Mary Seguin** <maryseguin22022@gmail.com>                                       Thu, Nov 16, 2023 at 1:31 PM
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk of the Court,

Kindly urgently file today, November 16, 2023, my attached Rule 59 Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 59 Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023. I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX 77019
(281) 244-2016

 **CA 126 Plaintiff Rule 59 Motion with Affidavit 111623.pdf**
387K

**Mary Seguin** <maryseguin22022@gmail.com>                                       Fri, Nov 17, 2023 at 12:33 PM
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerks of the Court,

I am respectfully following up on my Rule 59 Motion filing.

Yesterday, November 16, 2023, at 1:31 PM Central Time, I filed via email below, my Rule 59 Motion in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS. As indicated in my email below, I emphasized that docketing the Rule 59 Motion on November 16, 2023 is urgent, to comply with the 28 day filing post-judgment deadline, which my filing meets - November 16, 2023 is within the 28 day deadline of Fed. R. of Civ. P. 59 that tolls the time for filing an appeal.

I followed up with telephone calls to the Clerk's Office at 1:32 PM Central Time, and at 3:42 PM Central Time to request timely docket of my Rule 59 Motion, and the Clerk's Office assured me each time that a deputy clerk is working on it and that it will be docketed on the day it was received and that the docket will reflect the email date stamp of the day the Rule 59 Motion is received by email. Further, I was told that **all filings** I email to the Clerk's Office will be docketed and considered by the Court as having been filed on the day that the motion was emailed to the Clerk's Office.

Therefore, my Rule 59 Motion emailed on November 16, 2023 should be accordingly docketed as **ECF 32** with the **entry of/stating filing on November 16, 2023**, in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

However, as of this time, on November 17, 2023 almost 24 hours later, my Rule 59 Motion is still not docketed.

I would like to respectfully clarify that the Text Order dated October 19, 2023 in this matter states that only my electronic filing privilege was revoked, but there is **no** order requiring that I need to file for leave of Court to file any post-judgment motions, such as my Rule 59 Motion.

Today, November 17, 2023, I telephoned the Clerk's Office first thing at 8:00 AM Central Time, and spoke with Clerk Meghan, who informed me that yesterday she had forwarded my Rule 59 Motion to Chambers upon receipt, but has yet to hear back from Chambers, but did not know what was causing the hold up when I asked why Chambers' response is taking almost 24 hours which impacts the docketing date of the Rule 59 Motion. I expressed my concern of the Rule 59 deadline, emphasizing that it tolls the time for filing an appeal, therefore I respectfully requested that the docket accurately reflects my timely filing of my Rule 59 Motion on November 16, 2023 (at 1:31 PM Central Time).

Additionally, I informed Clerk Meghan that I relied on the Clerk's Office's information provided above, and I had also filed a timely **Rule 60** Motion yesterday, **November 16, 2023**, at **4:39 PM Central Time**, similarly requesting docketing to reflect it was timely filed via email to on November 16, 2023. I emphasized to Clerk Meghan that timeliness is critical, as Rule 60 Motion filed within 28 days post-judgment tolls the time for filing an appeal. Clerk Meghan told me that my Rule 60 Motion was forwarded to Chambers as well. According to the Clerk's Office's information, my **Rule 60 Motion** needs to be docketed/filed as **ECF 33, dated stamped filed on November 16, 2023**.

Due to the above information regarding the processing of my post-judgment motions, I expressed to Clerk Megghan my concern regarding the Court's procedure of forwarding my time-sensitive post-judgment motions to Chambers without docketing/filing, and then those time-sensitive motions seemingly to languish in Chambers past the date of the 28-day deadline stipulated by Rule 59, and Rule 60 as they relate to tolling the time for filing an appeal. I expressed my explicit concern that I seek to preserve my right of appeal, and that I respectfully seek to preserve on the record the issues contained in my Rule 59 and Rule 60 Motions that are currently before Chambers, without docketing, by law within the jurisdiction of the U.S. District Court of Rhode Island. My Rule 59 and Rule 60 Motions are not ex-parte or emergency motions.

Moreover, I expressed to Clerk Meghan my concern that the processing of my post-judgment motions forwarded to Chambers and seemingly pending before Chambers without the motions being docketed, impacts my right of appeal 30-days post judgment, and today, Friday, is Day 29. I told the Clerk that under the circumstances in this matter, I seek to preserve for appeal the issues raised in my timely filed Rule 59 Motion and Rule 60 Motion, and that I seek to preserve my right to appeal within the 30-day postjudgment period.

I also discussed with the Clerk that my timely filed but undocketed Rule 59 Motion and Rule 60 Motion that were forwarded to and currently before Chambers cause an uncertain effect, impacting the date of my filing of Notice of Appeal, the deadline of which is November 18, 2023, a Saturday. Based on the current facts and issues regarding simply docketing my filings on the record, I am concerned my rights of access to the Courts are impacted, and that my Notice of Appeal may also languish I do not believe any pro se litigant should be made to be uncertain of the timeliness of filing a Notice of Appeal as a matter of right that is caused by inaction by Chambers on timely-filed Rule 59 and Rule 60 Motions that toll the time to file an appeal. I explicitly expressed my concern on the effect on my access to the Courts.

I respectfully request that this email communication regarding the filing/docketing of my Rule 59 Motion be docketed to accurately reflect the record on appeal along with the Rule 59 Motion at the time the Rule 59 Motion is docketed by the Clerk.

Thank you in advance for you assistance.

Respectfully submitted,
Mary Seguin
[Quoted text hidden]

---

📄 **CA 126 Plaintiff Rule 59 Motion with Affidavit 111623.pdf**
387K

Case: Case 1:23-cv-00126-WES-PAS Document 3005-2 Filed: 11/27/23 Page 24 of 36 PageID #: 3800
Page 553



**Mary Seguin <maryseguin22022@gmail.com>**

---

## URGENT - TIME SENSITIVE - FILE TODAY RULE 60 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS

1 message

---

**Mary Seguin** <maryseguin22022@gmail.com>                                      Thu, Nov 16, 2023 at 4:39 PM
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk/Deputy Clerk of the Court,

Kindly urgently file and docket today, November 16, 2023, my attached Rule 60(b) Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 60(b) Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023.  I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX  77019
(281) 244-2016

---


**CA 126 Rule 60(b) Motion with Affidavit 111623.pdf**
379K

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                        Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

> *Defendants*

## PLAINTIFF'S RULE 59 MOTION FOR A NEW TRIAL

1. Plaintiff, proceeding from and as a citizen of Texas, respectfully requests pursuant to

Fed. R. Civ. P. Rule 59 for a new trial. Plaintiff avers the following, supported by affidavit

attached: The 91-page First Amended Complaint [ECF 25] filed on September 1, 2023 seeks

monetary damages against the Rhode Island State Defendants and the private actor Defendants

for:

(1) The Rhode Island Judiciary and Tyler Technologies' monopoly of publication of law.

(2) The Rhode Island Judiciary and Tyler Technologies' denial to the Public and to all Pro Se Litigants all access and the denial of free access to the contents of the law created, authored, and deliberated by the Rhode Island Judiciary.

(3) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to knowingly fail to properly integrate the legacy electronic court case management systems used by Rhode Island Department of Human Services and Office of Child Support Services during the implementation of Odyssey from 2013 to 2014 (the State's official electronic court filing and electronic case management system), so that these state agencies' filings are discriminately invisible only to the Public, to Pro Se Litigants and to the Rhode Island Virtual Clerk of the Courts in the Rhode Island Family Court, a limited jurisdiction court of record. The State's filings are only visible to the judges and to the State filers, thus manipulating the proceeding towards a foregone conclusion in favor of the State filers.

(4) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to misrepresent to the Public and to the Pro Se Litigants that the implemented electronic court case records of judge created laws are available to *all* court users, in order to cover up their monopolization of the publication of law denies the Public and the Pro Se Litigant access to the judge-created laws.

(5) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services that the State routinely establishes and enforces 12% compound interest on child and spousal support in Title IV of the Social Security Act state family court proceedings, in violation of the uniform statutory requirement of 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and

*if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest, targeting noncustodial parents victims. In welfare cases, support are assigned by the custodial parent to the State, and the 12% compound interest represents a fee for the State's "services" in the support's establishment and enforcement paid to the State, which at 12% compound interest represents lucrative, illegally obtained revenue to the State actors, who are financially incentivized to obtain as much as possible.

(6) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services and Tyler Technologies to knowingly fail to properly integrate Odyssey with the State's legacy electronic court filing system resulting in the State's filings seeking illegal 12% compound interest, as well as to deny the Public and to Pro Se Litigants' access to their publication of judge-created law records for the purpose of cover up of this wholesale illegal defraud of the court, extortionary defraud under color of state law targeting the unsuspecting noncustodial parents victims, and defraud of the United States (66% of the cost of these child support "operations" is funded by the U.S. Department of Health and Human Services through Title IV of the Social Security Act through funds appropriated by Congress through the annual budget appropriations.)

(7) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Tyler Technologies to operate the Title IV Program of the Social Security Act in all manners violative of due process, in prima facie due process violative State Electronic Courts, for the purpose of generating state revenue through fraud and deceit, through conspired tortious interference of rights of access to the courts, rights of

access to state case documents, and rights of access to judge-created laws targeting

litigants, targeting the Public and targeting Pro Se Litigants.

(8) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of

Human Services and Tyler Technologies to cover up their public-access-denied

publication of state judge-created laws of illegal 12% compound interest benefiting the

state's revenue by adopting a State policy not to establish nor enforce any interest in

*interstate* support cases only, calculated to cover up the collective fraud from federal

enforcement officials and other states' enforcement officials of court orders (laws)

showing 12% compounded interest established and funded under Title IV that are facially

illegally violative of 42 U.S.C. § 654(21)(A) which explicitly provides States *may* opt to

charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12%

compound interest.  The federal Title IV Program regulation by Congressional intent

explicitly preempts any related state laws of all participating states.

(9) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of

Human Services and Office of Child Support Services and Barbara Grady and Gero

Meyersiek to use the fraudulent, First Amendment-, Fourth Amendment-, Fifth

Amendment-, Seventh Amendment-, and Fourteenth Amendment violative state court

machinery weaponizing Title IV Program of the Social Security Act to target the Plaintiff

*pro se* noncustodial parent in Texas to retaliate against Plaintiff for her past lawsuits

against them, namely ten years ago in Seguin v. Chafee et al., Civil No. 12-cv-708-JD

(D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and

Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued

them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state

court's under color of state law abuse of the legal frame work of another federal-funded

human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*,

through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00

per visitation if Plaintiff wanted to see her children in Rhode Island, because the state

court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent

any other legally sufficient basis. Plaintiff had reported this *prima facie* extortion under

color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal

law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S.

Department of Justice in Texas. Here, Plaintiff's ==retaliation== damages claims have been

issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge

Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455,

additionally given the fact Judge Smith had also self-recused from <u>Seguin v. Chafee et</u>

<u>al.</u>, Civil No. 12-cv-708-JD (D.R.I. 2013), <u>Seguin v. Bedrosian et al,</u> Civil No. 12-cv-

614-JD (D.R.I. 2013), and <u>Seguin v. Suttell et al,</u> Civil No. 13-cv-95-JNL-LM (D.R.I.

2013) ten years ago. *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998)

("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no

party has requested it").

(10) The Rhode Island Judiciary continues the pattern of cover up by denying Plaintiff's

request for public judicial records related to the monopoly of publication of judge-created

records submitted to the State Judiciary pursuant to the Rhode Island Access to Public

Records Act ("RI APRA").

4. Plaintiff obtained new evidence on October 6, 2023 that the Rhode Island Judiciary is a

former client of Judge Smith, and on November 9, 2023, Plaintiff obtained new evidence that the

Rhode Island Judiciary remains a major client of Judge Smith's former law firm. Plaintiff's due diligence search for conflict of interest has been impeded by the Rhode Island Judiciary and Tyler Technologies monopoly of publication of judge-created laws in the state's electronic court system and their denial of access to the judge-created laws, and Plaintiff, as a member of the Public and proceeding pro se without a Rhode Island Attorney license, the issuance of which is also monopolized by the Rhode Island Judiciary, has further been denied access to official records, including through the Rhode Island Access to Public Records Act, consistent with a pattern of civil conspiracy cover up.

5. A new trial or a stay of the Judgment is necessary to prevent irreparable harm to Plaintiff, and to Americans across the First Circuit who would be needlessly deprived of access to the federal courts of law in the First Circuit for monetary damages redress - the judicially created doctrine of Younger Abstention that functioned as a court of equity - regarding Plaintiff's monetary damages claims against the Rhode Island Judiciary and Tyler Technologies' scheme to monopolize the publication of judge-created laws that denies, tortiously interferes, tortiously abridges and tortiously obstruct the Public access to those very laws; regarding Defendant Rhode Island Office of Child Support Services' unlawful seizures of interstate Texas properties outside of Rhode Island under color of Rhode Island state law based on legally insufficient interest charge on overdue support based on the unlawful rate of 12% compound interest that is disallowed under Title IV-D Program of the Social Security Act, specifically 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest. And this is on top of Defendants' breach of contract that was brokered by Defendant Rhode Island Office of Child Support Services on behalf of the agency's client; the contract between the custodial parent client, defendant Gero

Meyersiek and the Texas Plaintiff stipulated that the custodial parent waived interest upon the

Texas Plaintiff paying a lump sum of $104,185.98 pay-off amount, which Plaintiff performed

from Texas on December 7, 2021. Even at the point of contractual agreement, Defendant Rhode

Island Office of Child Support Services in conjunction with Defendant Gero Meyersiek,

misrepresented there was lawful and enforceable interest to be waived, as they removed the

accrued interest from the Title IV-D Program mandated support record system in order to cover

up from the Plaintiff, and from federal and Texas authorities the unlawful 12% compound rate.

After fraudulently inducing Plaintiff in Texas to agree to and to perform on the contract, the

Defendants immediately put the interest back into the Title IV-D Program-mandated automated

support record system and started to seize Plaintiff's properties in Texas under color of Rhode

Island state law.

6. The final judgment is on its face violative of binding First Circuit caselaw that

mandates lower courts to *stay* monetary damages claims when applying Younger Abstention.

*See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997) (relying on *Quackenbush v. Allstate

Ins. Co.,* 517 U.S. 706 (1996) in holding that abstention does not allow for dismissal of damages

claim).

7. 42 U.S.C. § 654(21)(A) has been in effect since the enactment of the Title IV-D

Program of the Social Security Act several decades ago, and Congress's original intent was to

combat poverty within the populace of single mothers and children in welfare cases; Congress at

no time intended to shift the undue burden of Rhode Island's 12% compound interest on overdue

support under color of Rhode Island state law to noncustodial parents, whether targeting Texas

or across the country, which in welfare cases Rhode Island converts the 12% compound interest

to assigned debts owed by noncustodial parents to Rhode Island's state agencies and state

government, representing underhanded unlawful state revenue unlawfully obtained through the

legal framework of Title IV-D Program of the Social Security Act, targeting unsuspecting

noncustodial parents victims.  As a legal point of a state's lawful application of 42 U.S.C. §

654(21)(A) within the First Circuit, New Hampshire, in compliance with the letter of federal law,

opts into Title IV-D Program and opts not to charge any interest whatsoever, as per the letter of

law and the original intent of Congress, 42 U.S.C. § 654(21)(A).  Similarly, Texas charges 6% in

compliance with 42 U.S.C. § 654(21)(A).

8. Defendant Rhode Island Office of Child Support Service's illegal denial and

obstruction of access to Plaintiff's own child support case file that contains the incriminating

illegal and arguably criminal scheme of removing the interest rate from the Title IV-D Program

mandated and federally funded support record system to cover up the unlawful 12% compound

interest from federal and Texas authorities, as well as from the Plaintiff in Texas, violates due

process, obstructs justice, obstructs a federally funded and federal program proceeding, and the

legal framework of Title IV-D of the Social Security Act, specifically, 42 U.S.C. § 654 and 42

U.S.C. § 666.

9. Judge Smith's dismissal of Texas Plaintiff's legal remedy monetary damages and

breach of contract fraudulent inducement damages claims under Younger Abstention in this

Court of law represents irreparable harm violative of the First Amendment, Fourth Amendment,

Fifth Amendment, the Fourteenth Amendment, the Seventh Amendment and the First

Amendment access to the Court.  The undisputable fact remains, Plaintiff's legal remedy request

for monetary damages in this court of law consisting of twenty-two causes of action that cannot

be dismissed under Younger Abstention, namely monetary damages claims of breach of contract

fraudulent inducement, breach of implied contract, unjust enrichment, misrepresentation,

negligent misrepresentation, intentional/fraudulent misrepresentation, common law bad faith, breach of the covenant of good faith and fair dealings, tortious breach of the covenant of good faith and fair dealings, breach of fraudulent concealment/common law fraud, concealed fraud, tort of deceit, reckless indifference to the rights of Plaintiff, deliberate indifference to the rights of Plaintiff, abuse of process, breach of duty, accounting fraud, fraud cover up, RI Government Tort Liability (R.I. Gen. Laws 9-31-1, *et seq*.), 42 U.S.C. § 1983 Claim for Reckless Indifference of Plaintiff's Clearly Established Constitutional Rights, 42 U.S.C. § 1983 claim of Fourth Amendment Illegal Seizure of Plaintiff's Texas Property, state tort of liability against defendants under 42 U.S.C. § 1983, Civil RICO [ECF 25].

10. Judge Smith's legally-unsupported and factually-unsupported, and "legally insufficient" opinion that the limited jurisdiction family court is an adequate forum to raise Plaintiff's federal legal damages claims of breach of contract et al., contravenes Rhode Island law: R.I. Gen Laws 8-10-3 makes clear that family court is not a court of general jurisdiction, can only conduct bench trials functioning as a court of equity, not of law, and prohibits family court from exercising jurisdiction over breach of contract claims et al between the Texas Plaintiff and the Defendants; family court lacks jurisdiction over the Plaintiff's federal causes of actions; lacks the jurisdiction to summon a jury for jury trial in a court of law.

11. Finally, but equally critically, twenty-one days post judgment Plaintiff discovered troubling new evidence on November 9, 2023, that Judge Smith appears to have impermissibly acted in favor of the interests of the defendants – he is automatically disqualified under 28 U.S.C. § 455, because as a partner in his past practice and firm, the state government and the Rhode Island Judiciary were not only his clients, but continue to be that firm's major client under a flat fee contract and he has knowledge of the defendants' actions in this action – as a major

partner in his firm, the Rhode Island Judiciary is his and his form's past and current clients, the

state government actors and the state courts actors, cooperate in the routine establishment and

enforcement of 12% compound interest under the legal framework of Title IV-D Program of the

Social Security Act, where 12% compound interest is disallowed under 42 U.S.C. § 654(21)(A).

To the objective observer, having knowledge of the facts and circumstances of this case, and

being a partner in his past firm that continues to have the Rhode Island Judiciary as a client,

Judge Smith appears biased in favor of the defendants' interest to continue raking in state

revenue under the auspices of 42 U.S.C. § 654(21))(A) that explicitly disallows state debts of

12% compound interest assigned to Rhode Island that the state actors who cover up the 12%

compound rate by obstructing the noncustodial parent's access to her own child support case file

that is further violative of the due process provisions under 42 U.S.C. § 654 and §666, in Rhode

Island's federally funded operation with funds appropriated by Congress intended for the *lawful*

operation of Title IV-D of the Social Security Act.  Although under the judicial self-executing

expectation under 28 U.S.C. §455, the Texas Plaintiff is not expected to cull court records in the

Rhode Island state courts for judicial conflict of interest, nevertheless the Plaintiff in good faith

and diligently attempted to perform a remote search of Rhode Island's electronic court case

management system, Odyssey in 2023.  In so doing, Plaintiff discovered troubling newly-

discovered evidence that the Rhode Island Judiciary, while publicly representing that the 2014 $6

million state transition from paper courts to electronic courts promises *all court users* will be

able to call up court documents remotely from their mobile devices, in reality Rhode Island

adopted rules only denying the public and pro se litigants remote access to court case

information, including pro-se litigants' own case records, that both the public and all litigants

had equal statutory, common law and constitutional rights of access in paper courts – Judge

Smith's firm's clients, the Rhode Island Judiciary, therefore implemented electronic court public access denials that obstructed Plaintiff's and the public's discovery of Judge Smith's judicial disqualification regarding his former clients such as the state courts, the defendant state actors and other conflict entities.

**I. LEGAL STANDARD**

11. The United States Supreme Court in 2020 reaffirmed, in *GEORGIA, ET AL., PETITIONERS v. PUBLIC.RESOURCE.ORG, INC*, 590 U.S. ___ (2020), the century-old government edicts doctrine, making clear that officials empowered to speak with the force of law cannot be the authors of—and therefore cannot monopolize access—the works they create in the course of their official duties. The U.S. Supreme Court previously applied that doctrine to hold that non-binding, explanatory legal materials when created by judges who possess the authority to make and interpret the law shall not monopolize access to it. *See Banks v. Manchester*, 128 U. S. 244 (1888). Tyler Technologies is a for profit organization that aims to facilitate public access to government judge-created records and legal materials. Tyler Technologies is contracted by the Rhode Island Judiciary to implement the State's electronic courts in 2013 and together, they both publicly represented that access to the contents of judge-created laws records will be readily called on mobile devices to *all* court users, namely, to the Public and to pro se litigators.

12. Under the government edicts doctrine, judges may not be considered the "authors" of the works they produce in the course of their official duties as judges. That rule applies regardless of whether a given material carries the force of law. In *Banks v. Manchester,* 128 U. S. 244 (1888) the Supreme Court concluded that "the judge who, in his judicial capacity, prepares the opinion or decision, the statement of the case and the syllabus or head note" cannot "be regarded as their author or their proprietor. *Banks*, 128 U. S, at 253 (emphasis in original).

Rather, "[t]he whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all." *Ibid.* (citing *Nash v. Lathrop*, 142 Mass. 29, 6 N. E. 559 (1886)). These cases establish a straightforward rule: Because judges are vested with the authority to make and interpret the law, they cannot be the "author" of the works they prepare "in the discharge of their judicial duties." Banks, 128 U. S., at 253. This rule applies both to binding works (such as opinions) and to non-binding works (such as headnotes and syllabi). *Ibid.* The animating principle behind this rule is that no one can own the law. "Every citizen is presumed to know the law," and "it needs no argument to show . . . that all should have free access" to its contents. *Nash,* 142 Mass., at 35, 6 N. E., at 560 (cited by *Banks*, 128 U. S., at 253–254). Rather than attempting to catalog the materials that constitute "the law," the doctrine bars the officials responsible for creating the law from being considered the "author[s]" of "whatever work they perform in their capacity" as lawmakers. *Ibid.* (emphasis added). Because these officials are generally empowered to make and interpret law, their "whole work" is deemed part of the "authentic exposition and interpretation of the law" and must be "free for publication to all." *Ibid.*

13.  Rhode Island Judiciary and Tyler Technologies monopoly of publication of the judge-created laws and their "whole works" making and interpreting the law that explicitly by design deny access to the Public and to the Pro Se Litigant runs afoul of the government edicts doctrine.

14. Courts have long understood the government edicts doctrine to apply to legislative materials. See, e.g., *Nash*, 142 Mass., at 35, 6 N. E., at 560 (judicial opinions and statutes stand "on substantially the same footing" for purposes of the government edicts doctrine); moreover, just as the doctrine applies to "whatever work [judges] perform in their capacity as judges,"

*Banks*, 128 U. S., at 253, it applies to whatever work judges perform in their capacity as judges. *Banks*, following *Wheaton* and the "judicial consensus" it inspired, denied publication monopoly protection to judicial opinions without excepting concurrences and dissents that carry no legal force. 128 U. S., at 253 (emphasis deleted). As every judge learns the hard way, "comments in [a] dissenting opinion" about legal principles and precedents "are just that: comments in a dissenting opinion." *Railroad Retirement Bd. v. Fritz,* 449 U. S. 166, 177, n. 10 (1980). Yet such comments are covered by the government edicts doctrine because they come from an official with authority to make and interpret the law. Indeed, *Banks* went even further and withheld publication monopoly protection from headnotes and syllabi produced by judges. 128 U. S., at 253. Surely these supplementary materials do not have the force of law, yet they are covered by the doctrine. The simplest explanation is the one *Banks* provided: These non-binding works are not copyrightable because of who creates them—judges acting in their judicial capacity.  *See ibid.* The textual basis for the doctrine is the "authorship" requirement, which unsurprisingly focuses on—the author, the judges*.*  The Supreme Court long ago interpreted the 'author" to be officials empowered to speak with the force of law.  The doctrine distinguishes between some authors (who are empowered to speak with the force of law) and others (who are not).  The Supreme Court explicitly rejects allowing the States to "monetize its entire suite of legislative and judicial history. With today's *digital tools*, States might even launch a subscription or pay-per-law service." See *Georgia v, Public Resources Org.* at 590 U. S. ____ (2020)  It is obviously explicitly clear that the Supreme Court refers to the prohibition against the Rhode Island Judiciary and Tyler Technology's monopolization of  the digital publication of DIGITAL COURT JUDICIAL COURT RECORDS that denies publication access of judge-created laws and their work materials to the Public and to Pro Se Litigants.

15. There is no legitimate Rhode Island government interest in the knowing illegal denial of access to the public and to pro se litigants the digital records of the Rhode Island Judiciary's and Tyler Technologies' illegal monopolization of digital publication of judge-created laws involving the establishment nor enforcement of unlawful 12% compound interest violative of explicitly clear 42 U.S.C. § 654(21)(A) within the legal framework of Title IV-D Program targeting noncustodial parties in Texas who are outside of Rhode Island that Rhode Island already knows is unenforceable in Texas, and thus had removed the 12% compound interest in 2018 calculated to cover it up from federal and Texas authorities. Rhode Island's abuse of the legal framework of the government edict doctrine and the legal framework of Title IV-D Program are diametrically at odds with the intent of Congress and binding caselaws of the U.S. Supreme Court. The civil conspiracy to cover up the illegal machinery of the digital electronic courts in Rhode Island is clear. *See Turner v. Rogers*, 131 S. Ct. 2507, 2518 (2011). *See Georgia v, Public Resources Org.* at 590 U. S. ____ (2020); *See* HOUSE COMM. WAYS & MEANS, Section 8: Child Support Enforcement Program, in 2004 GREEN BOOK: BACKGROUND MATERIAL AND DATA ON THE PROGRAMS WITHIN THE JURISDICTION OF THE COMMITTEE ON WAYS AND MEANS 8-1, 8-2 (2004). *See* Social Services Amendments of 1974, Pub. L. No. 93-647, § 101, 88 Stat. 2337, 2351. Where the mother receives public aid, federal and state governments will provide the child support payment to the mother and hold the father indebted to the government for that amount. In cases where the mother is not dependent on welfare, the government has largely stayed out of the fray. *See* HOUSE COMM. WAYS & MEANS, *supra* note 38. Yet, this case does not involve a welfare case, as the custodial father is wealthy, but the Defendants are motivated by retaliation against the Plaintiff for suing them ten years ago in Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian

et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and <u>Seguin v. Suttell et al</u>, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state court's under color of state law abuse of the legal frame work of another federal-funded human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00 per visitation if she wanted to see her children in Rhode Island, because the state court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other legally sufficient basis. Plaintiff had reported this *prima facie* extortion under color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas. Here, Plaintiff's retaliation damages claims have been issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455, additionally given the fact Judge Smith had also self-recused from <u>Seguin v. Chafee et al.</u>, Civil No. 12-cv-708-JD (D.R.I. 2013), <u>Seguin v. Bedrosian et al,</u> Civil No. 12-cv-614-JD (D.R.I. 2013), and <u>Seguin v. Suttell et al</u>, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013) ten years ago. *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998) ("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no party has requested it").

## II. ARGUMENT

16. Plaintiff has appealed the Court's/Judge Smith's judgment in its entirety in the related case, <u>Seguin v, RI Office of Child Support Services et al</u> Civil No. 23-cv-34-WES-PAS (D.R.I. 2023) and respectfully submits that she is likely to secure a complete reversal of this Court's

holding that the judicially created doctrine of Younger Abstention applies to the *dismissal* of her

monetary damages and breach of contract damages claims.

17. Plaintiff further submits that she is likely to secure a complete reversal of this Court's

in this case.

18. Conducting state proceedings funded by federal funding appropriated by Congress

under Title IV of the Social Security Act in state monopolized electronic courts that violate the

long-established government edict doctrine as it related to the Public's access of the digital

publication of judge-created laws and violate the Constitution targeting Texas assets and Texas

parties for illegal 12% compound interest involving fraudulent inducement that cannot be

enforceable in Texas is the prima facie example of government fraud and government waste,

warranting cut off from federal funding at the very minimum.  Not even Judge Smith, friend of

the Rhode Island Judiciary, can punt these egregious state activities to later addressment via the

attention of the Supreme Court and to Congress Appropriation Committees, wrongfully using

Younger Abstention.

19. Judge Smith's holding is defect in claiming without a shred of factual basis that

Plaintiff can raise her federal monetary damages claims and fraudulent inducement breach of

contract claims in the jurisdictionally defective Rhode Island family court, that R.I. Gen. Laws 8-

10-3 plainly states the family court is *not* a court of general jurisdiction, and which lacks the

jurisdiction over the controversy for legal relief of monetary damages tort claims and fraudulent

inducement breach of contract damages claims over both the Plaintiff and all the named

defendants.

20.  Plaintiff seeks a new trial or a stay pending appeal as Plaintiff's likelihood of success on appeal, together with the lopsided balance of hardships, weigh heavily in favor of granting the stay being sought pending appellate review.

## A. Plaintiff is Likely To Succeed On Appeal Of the Judgment Ordered By the Court:

21. Although Plaintiff recognizes that the Court has ruled against her as to the scope of relief, Plaintiff is likely to succeed on appeal of those issues, and has raised serious legal questions and presented a substantial case. *See Arnold v. Garlock, Inc.*, 278 F.3d 426, 438-39 (5th Cir. 2001).

22. Plaintiff incorporates by reference her prior remedy arguments.  Plaintiff reserves the right to make any and all arguments on appeal.

23. Among the substantial questions raised by Plaintiff is whether the Court erred in awarding Defendants dismissal of Plaintiff's monetary damages claim in this First Circuit under Younger Abstention and erred in failing to self-execute 28 U.S.C. § 455. And Plaintiff respectfully submits that she is likely to succeed on appeal in arguing that, in these circumstances, dismissal was not properly ordered in the particular circumstances of this case pursuant to established binding First Circuit caselaws on both the Court's errors applying Younger Abstention as well as judicial disqualification. *See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997)**;** *In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998); *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996).  *See also Allen v. La. State Bd. of Dentistry*, 835 F.2d 100, 104 (5th Cir. 1988). ("Younger abstention does not apply to claims for monetary damages.")

41

24. Absence of a new trial or a stay of the judgment will erode confidence in the Judiciary in the First Circuit by creating an impression that it is violating national law regarding the government edict doctrine and setting illegal new national policy regarding the Title IV-D Program. It may also have the effect of "encouraging forum shopping." *Trump v. Hawaii,* 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). It further "undermines the judicial system's goals of allowing the 'airing of competing views' and permitting multiple judges and circuits to weigh in on significant issues." *See* also *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (traditional remedial principles account for "the public interest" and "the balance of equities"); *EME Homer City Generation, LP v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.) (declining to vacate unlawful agency action under the APA because "vacatur could cause substantial disruption"). In this context, the dismissal of Plaintiff's state government tort monetary damages claims entered by the Court could cause substantial disruption to the *uniform* application of the legal framework of the Title IV-D Program Congress explicitly intended.

25. The serious legal questions raised in this case regarding the scope of remedy go beyond the questions of whether a Younger abstention is applicable to federal monetary damages claims and or the feeble assertion of *comity* applied to the Rhode Island Judiciary and Tyler Technology's gross violation of the government edict doctrine—and indeed, those questions should not have even entered into this case. Here, among Plaintiff's challenges was to state Judiciary, Tyler Technologies and agency actions, and Plaintiff pursued fraudulent inducement breach of contract damages claims and tort monetary damages claims. Instead, the Court at law cannot vacate a federal statute—i.e., cannot "delete a previously enacted statute from the books" such as 42 U.S.C. § 1983. *See* also Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va.

L. Rev. 933, 936 (2018) ("The federal courts have no authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute. The power of judicial review is more limited." (footnotes omitted). Legal monetary damages relief under 42 U.S.C. § 1983 that would hold the Rhode Island state government accountable under the Rhode Island Government Tort Act for Rhode Island government actors' tortious actions violating the legal framework of the Title IV-D Program federal statutes targeting the Plaintiff in Texas was a legal remedy conferred by Congress to federal courts to grant legal relief appropriate in this case. The Court has an unflagging obligation to exercise jurisdiction conferred to it by Congress. *See Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013)

26. With respect, although the Court has entered a judgment otherwise, Plaintiff has demonstrated a likelihood of success on appeal of the Final Judgment sufficient to justify a stay of the judgment.

**B. The Balance of the Equities Overwhelmingly Favors the Requested New Trial or Stay**

27. The balance of the equities overwhelmingly favors a new trial or stay: The State of Rhode Island plainly lacks any legitimate interest in the State's systemic knowing violation of the government edict doctrine and violation of 42 U.S.C. § 654(21)(A) that they now target Plaintiff in Texas, and which they sought to cover up from federal and Texas authorities, as well as from Plaintiff, by knowingly and unlawfully removing interest from the automated support record system. Americans outside of Rhode Island re fraudulently, unlawfully and systemically fleeced by Rhode Island's illegal scheme that is illegally funded through the State's defrauding of the United States lying to the United States that these activities are eligible for federal funds

appropriated by Congress for the legal administration of Title IV Program of the Social Security Act.

28. Defendants will face no harm from Plaintiff's requested new trial or stay. The judgment that is specifically directed to and protects the prevailing Defendants from legal accountability of their illegal actions, is further issued by a disqualified judge, Judge Smith, who was the former counsel for the Defendants and a partner of the firm whose major client is the Rhode Island Judiciary, *e.g.*, Rhode Island state government entities, including the state courts and state agencies. The requested new trial or stay will thus impose no hardship on the prevailing Defendants at all.

29. By contrast, the public and the Plaintiff face significant harm if now new trial is ordered or the judgment is not stayed. As an initial matter, "any time a [government]" violates "statutes enacted by representatives of its people," the people "suffer a form of irreparable injury." *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). But the harm here is much greater and more far-reaching. The government edict doctrine is willfully violated by the Rhode Island Judiciary and Tyler Technology in a civil conspiracy to cover up the illegal state family court creating judge-created laws ordering and enforcing 12% compound interest, aided and abetted by the Department of Human Services - Title IV-D requires the uniform application and compliance by participating States with the Social Security Act. Congress's as well as the United States through the Secretary of the U.S. Department of Health and Human Services' interest in the uniform compliance of 42 U.S.C. § 654(21)(A), § 654 and 42 U.S.C. § 666 are well established. The States are reimbursed 66% of the cost of operations through federal funding appropriated by Congress under Title IV-D of the Social Security Act. The Defendants' arbitrary illegal removal of the illegal unenforceable 12%

compound interest from the automated support record system and cover up of their illegal 12% compound interest scheme from the federal and Texas authorities targeting Texas properties and targeting the Plaintiff in Texas demonstrates Rhode Island government agencies (who are former clients of Judge Smith) knowingly committed criminal schemes illegally seizing Plaintiff's properties interstate in Texas that they know are violative of federal criminal codes and Texas civil and penal codes. *See,* e.g., Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act). The program, which is administered by the United States Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for a significant sixty-six percent (66%) of the costs of operating their child-support enforcement programs. 42 U.S.C. §v655(a)(2)(C). In 1975, Congress adopted Title IV-D, 42 U.S.C. §v651 *et seq*., and established the general statutory framework that exists today. See 1975 Act § 101(a), 88 Stat. 2351; *Blessing v. Freestone*, 520 U.S. 329, 333-335 (1997) (describing program). Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support. Therefore, the Defendants' illegal operations cannot be funded by Congressional appropriations.

30. Judge Smith's failure to self-execute his disqualification under 28 U.S.C. § 455 as well as Canon 3E of the Code of Judicial Conduct, then his subsequent refusal to recuse in the related case, <u>Seguin v, RI Office of Child Support Services et al Civil</u> No. 23-cv-34-WES-PAS (D.R.I. 2023), upon Plaintiff's request after she raised newly discovered discovery post judgment

on October 6, 2023 of his direct and past public sector law practice's contract legal representation of the Defendants, state courts, state agencies and other conflict entities, have the appearance, to the objective observer, of the Court's issuance of judgment in favor of the Defendants in error that contravenes established First Circuit case law on Younger Abstention as well as disqualification, calculated to benefit the interests of his former clients, as partner of his former firm that represents the Rhode Island Judiciary and the state government.

31. Moreover, the Court's judgment effectively functions as a denial of Plaintiff's access to this Court of law to redress her legal monetary damages claims and fraudulent inducement breach of contract damages claims. It is well-settled that even minimal loss of First Amendment freedoms, "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality)); *see also Elrod*, 427 U.S. at 373.; *N.Y. Times v. United States*, 403 U.S. 713, 715 (1971). Accordingly, Plaintiff has a strong likelihood of success on the merits, will suffer irreparable injury without a stay, and a stay will not injure others while furthering the public interest.

### III. CONCLUSION

27. For the foregoing reasons, Plaintiff has demonstrated a likelihood of success on appeal of the Judgment ordered, and has demonstrated that the balance of the equities favors a new trial or a stay. Plaintiff respectfully requests that the Court stay the final judgment for the duration of appellate proceedings relating to the related Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I. 2023).

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 16, 2023, I filed the within Motion with the

Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 16, 2023

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                    Civil Action No. 1:23-cv-126-WES-PAS


RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

*Defendants*

### MARY SEGUIN'S DECLARATION IN SUPPORT OF PLAINTIFF'S RULE 59 MOTION


      I, MARY SEGUIN, hereby declare under penalty of perjury, pursuant to 28 U.S.C. sec.
1746(2) that the following statements are true and correct:

1. That I am the Plaintiff, Pro Se, in the above captioned matter.

2. That I exercised, am exercising and continue to exercise my statutory right to appear
   pro se party in the above captioned civil matter in federal court by statute 28 U.S.C.
   sec. 1654.

3. That in state proceedings in Rhode Island, I am required to comply with Rhode Island Article X. Rules Governing Electronic Filing, Rule 2. Official Court Record, (a) Official Court Record. "Upon the implementation of the Electronic Filing System ("EFS") in each court, all documents shall be filed electronically and shall be the official court record."

4. That the state proceedings in which I am a party are public and are not about child custody nor involve a minor.

5. That the **Rhode Island Family Court**, through its adoption and promulgation of **Administrative Order 2021-01 A2)** mandated that all child support interest matters shall be heard remotely via WebEx. Further, **Administrative Order 2021-01 B1)** mandated that all non-emergency filings shall be filed using the electronic filing system in accordance with the Family Court Rules of Domestic Relations Procedure, which is the **Odyssey system**.

6. That the **"RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION, Rule 5. Access to Case Information, (c) Remote Access to Case Information. (1) Policy. To allow <u>limited</u> Remote Access to the Database through the Public Portal. Non-public case types shall not be remotely accessible except for certain case types to attorneys who have entered an appearance in a case. (2) Content. (a) The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall <u>not</u> have Remote Access to other Electronic Case Information"** bar, deny, violate, abridge, infringe and interfere with Pro Se Litigants' and the Public's fundamental rights to access public court records and Pro Se Litigants' fundamental right to meaningful access to the courts. See **"<u>RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION</u>"** Rule 5(c)(2)(a) **"<u>The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall not have Remote Access to other Electronic Case Information.</u>"** See also **"<u>RHODE ISLAND JUDICIARY, Access to Case Information, 2. Remote Access to Case Information A. The Public, Self-represented Litigants, and Parties to a Case, The public, self-represented litigants, and parties in a case shall have remote access to the register of actions or docket but shall not have remote access to other electronic case information</u>."**

7. That I, the Plaintiff, learned and verified on July 10, 2023 directly from the Rhode Island Judiciary itself through numerous (14) correspondences with the Rhode Island Judiciary from June 10, 2023 to July 10, 2023, pursuant to my RI Access to Public Records Act ("APRA") request for public records from the Rhode Island Judiciary, that as a matter of State policy, State Court Rule, and Judiciary Rule, in the digital courts implemented by the Rhode Island Judiciary, the State Court, the Rhode Island

Judiciary deny remote digital access of the Rhode Island Judiciary's monopolized publication of court and judicial records using the digital tool maintained and published by Tyler Technologies, Odyssey, including judge-created, judge-authored court decisions arising from state proceedings in the State's digital electronic courts, and digital court transcripts ordered by and paid by pro-se litigants that are published by the Judiciary digitally on Tyer Technologies' Odyssey are also denied access to the Public, pro-se litigants, and parties to the litigation (who are represented by counsel). The Rhode Island State Court only grants remote access to digital court and judicial records created by judges produced in digital courts to Rhode Island attorneys and state and federal agencies that are approved by the Rhode Island Judiciary's monopoly. On this matter, I corresponded in writing fourteen (14) APRA correspondence emails with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023.

8. That the State Defendants in this matter electronically file all notices using another electronic filing system that is even separate and different from the EFS (Odyssey).

9. That the State Defendants' court electronic filings are not noticed to me in Texas.

10. That the State Defendants' court electronic filings are not visible to me on the Rhode Island courts' EFS.

11. That the State Defendants' court electronic filing court records cannot be accessed remotely by me, solely because I am a self-represented litigant.

12. That the State Defendants' court electronic filing court records cannot be accessed remotely by the public, by self-represented litigants, nor by parties to the case, but can be accessed remotely and instantly through the internet by attorneys in Rhode Island and state and federal agencies.

13. That the Rhode Island Court Clerks state to me over the phone that they are prohibited from reading the contents of the court records over the phone to me.

14. That the Rhode Island Court virtual clerks state to me over the phone that even they are unable to see or access the court record information of filings by the State Defendants from the virtual clerks' access portals.

15. That the Rhode Island Electronic Filing System, case management system, rules and practices outright and unconstitutionally restrict and deny access to the court to three classes: (1) the public; (2) pro-se litigants; (3) parties to the case (who are represented by counsel), and is obviously outright reserved for only the government and Rhode Island attorneys.

16. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS.

17. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and

withdrew from my-initiated RI EOHHS agency appeal in 2022 in a scheme to procure a favorable judgment in a state proceeding that deny my federal constitutional and due process rights in Texas.

18. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and initiated the family court state proceeding on January 31, 2023 before the Covid Emergency Declaration was lifted.

19. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices that appear to **only allow remote, instant and full court access to a restricted club of R.I. lawyers and the government**, pose unconstitutional and undue burden on me, a citizen of Texas over 2,500 miles away.

20. That the State Defendant have full knowledge of the egregiously unfair due process violations of the Rhode Island state court EFS system/architecture/rules/practices that deny me access to the required **electronic court transcripts** prepared by the court reporter and electronically filed in the state EFS that **I ordered and paid for** for appeal, but the State Defendants have instant remote access by state court design.

21. That the State Defendants have full knowledge of the above unconstitutional restriction on access to court records and information to the public and non-lawyers is deliberate, by design and calculated to be unfair, violating constitutional guarantees of full and fair opportunity to raise claims in state proceedings.

22. That the above-raised unconstitutional restrictions are not exhaustive.

23. That my federal monetary damages claims on the unconstitutionality of the Rhode Island state court rules, practices and proceedings that violate the government edict doctrine and violate the pro-se litigants', such as my-self, federal constitutional rights: (1) federal constitutional right of equal access to the courts, (2) federal constitutional right to equal access to court records to receive information on the contents of all electronically filed notices, pleadings, court decisions, and transcripts that I myself ordered and paid for for appeal that are required to be electronically filed by state court rules and practices, (3) federal constitutional due process right and equal right to be given equal and timely notice of electronic filings and entries by the courts (including court decisions, court orders, court judgments, full docket entries, etc.) that the Rhode Island Judiciary deliberately deny by category all pro-se litigants access to court information, namely the contents of judicial/court records of cases to which I am the self-represented party, (4) federal constitutional due process right to be heard (Rhode Island Superior Court threatens me, the Texas pro-se plaintiff, with denial of my request to conduct WebEx hearings for the purpose of denying the Texas pro-se litigant access to the court and to be heard), (5) federal constitutional due process right to decision by a neutral decision-maker (the court that denies pro-se litigant

access to the court and the corollary opportunity to be heard fails the neutral decision-maker test). This list is not exhaustive.

24. That I seek to sue in federal court the State Defendants and add additional defendants.

25. I am an out-of-state diversity and a pro-se litigant in two state proceedings in Rhode Island, and have been unconstitutionally singled out by the State Judiciary, by category "self-represented litigant," to be barred from accessing electronic case information authored by judges and which the Judiciary has a monopoly in the publication of the judge-created laws in which state court cases I am the pro-se party, and therefore have standing to raise claims against this unconstitutional state practice and unconstitutional state court practice and rules. I understand the Rhode Island Judiciary's monopoly in the digital publication of judge-created laws in the Judiciary' implemented digital/electronic courts and the Judiciary's denial to the Public and to me from accessing the monopolized electronic publication of the judge-created laws in the court records violate the government edict doctrine.

26. Additionally, my fundamental First and Fourteenth Amendment constitutional right and common law right to equal, meaningful, and timely access to judicial records and public court records in litigation, given timely notice, adequate opportunity to be heard and to decision by a neutral decision-maker are fundamental First and Fourth Amendment and Fourteenth Amendment rights. Critically, the unconstitutional abridgement, infringement, and denial of judicial and court records to out-of-state pro-se litigants by the Rhode Island State Courts, Rhode Island State Judiciary and the Rhode Island Superior Court Bench Bar Committee directly relate to Younger Abstention Exception.

27. The State Defendants deliberately file all the State's pleadings outside of the State's electronic filing system, "Odyssey," and deliberately use a wholly different un-named electronic filing system, different and separate from that ("Odyssey") provided for pro-se litigants, so that pro-se litigants do not receive any requisite automated electronic notices of court motions or pleadings the State Defendants file electronically, nor are pro se litigants able to electronically access the content information of the State Defendants' electronically-filed pleadings. The only way the pro se litigant, such as me, the Texas Plaintiff, can access the court record is to personally go over 2,500 miles away to the courthouse in Rhode Island to access the court pleading information, or get a "courtesy notice" via email or get a "courtesy notice" through U.S. Mail sent by the State Defendants at whim. The State Defendants deliberately fail to send the notices electronically or by U.S. Mail, and the state courts deliberately promulgated court rules disallowing the public, pro-se litigants and even the parties who are represented by lawyers, remote access to court records, and critically, deny access to crucial court decisions, judgments and orders of public cases, as well as deny remote access to the transcripts ordered by pro-se litigants for appeal. Critically, the State court's abridgment and denial of access to court documents to the pro se litigant and the general public result in the

unconstitutional abridgment and denial of equal, timely and meaningful access to court complaints, decisions, judgments and orders. What is truly shocking is that the Rhode Island Judiciary even denies and/or bars pro-se litigants remote access of court transcripts that were ordered by pro-se litigants for appeal.

28. Thirdly, the Texas Pro-Se Plaintiff discovered and verified the fact, on or about July 7, 2023, that the Rhode Island Judiciary, using the aforesaid state court rule barring, by category, pro-se litigants from accessing court case information remotely, bars the Plaintiff by category ("self-represented litigant") from accessing state court proceeding transcripts that the Texas Plaintiff ordered and paid for, for appeal. In other words, the RI Supreme Court Clerk stated to the Texas Plaintiff that the Plaintiff, in Texas, is unconstitutionally barred from remotely accessing the transcripts of court proceedings that she ordered and paid for in her appeal to the RI Supreme Court in the Plaintiff-initiated APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215**, and yet the State Defendants are inequitably granted instant and free remote access to those very transcripts that the Texas Plaintiff ordered and paid for, for appeal. The federal Texas Plaintiff respectfully requests this Court the extension of time to present the new evidence and plead the verified facts.

29. Fourthly, the Texas Plaintiff discovered and verified the fact, on or about July 11, 2023, that, despite the Texas Plaintiff's several phone inquiries to the RI Superior Court in the past several weeks regarding the status of the appeal, the RI Superior Court, for undisclosed reasons, failed and continue to fail to relinquish jurisdiction and transfer the court case file of **Seguin v. RI Office of Child Support Services, PC-22-07215** to the RI Supreme Court within the requisite 60 days after Plaintiff's filing of Notice of Appeal on April 3, 2023, as required by the RI Supreme Court rules and procedures. At the same time, the Texas Plaintiff verified the fact that the Plaintiff-ordered transcripts of the state proceedings in the Federal Plaintiff-initiated state APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215** show the RI Superior Court further unconstitutionally sought to deny the Texas Plaintiff access to the state court and opportunity to be heard by outright threatening the Plaintiff in open court that the Judge, David Cruise, during the hearing of March 24, 2023 in that matter, shall use the state court's discretionary power in the future to deny all of the Texas pro-se Plaintiff's petitions for remote WebEx hearings to effectively deny her access to the state superior court. The state court that denies court access and the opportunity to be heard fails the neutral-decision-maker test required under the Fourteenth Amendment. I now specifically request further the Court to judicially notice that this court access denial and denial to be heard occurred on March 24, 2023, PRIOR to President Biden's lifting of the COVID-19 National Health Emergency Declaration. I, the Texas Plaintiff, aver this is a direct contributory reason for the RI Superior Court's failure to transfer the case file to the Supreme Court within 60 days (by June 3, 2023) of the Plaintiff's filing of Notice of Appeal on April 3, 2023 in **Seguin v. RI Office of Child Support Services, PC-22-07215**.

53

30. Fifthly, the Plaintiff presents to this Court and respectfully requests the Court to take judicial notice of the undisputed fact of the court rule-making process in Rhode Island. The 1966 Rules were promulgated by the justices of the superior court pursuant to section 8-6-2 of the General Laws of Rhode Island. This enabling act departed from the Federal Rules Enabling Act and most state enabling legislation conferring rule-making power on the supreme courts of the respective governments. The Rhode Island Enabling Act was adopted in 1940, 1940 R.I. Pub. Laws ch. 943, sec. 1. It conferred the power on the justices of the superior court and the 1966 reform was the product of that court. In 1969 an amendment to section 8-6-2 made the Rules thereafter adopted by the trial courts subject to the approval of the Supreme Court. 1969 R.I. Pub. Laws ch. 239, sec 2. Therefore, all public records relating to the adoption and promulgation of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION" are "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, judicial, regulatory, or administrative body of the state, or any political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to Public Records Act ("APRA"). Even though the Rhode Island Enabling Act conferred the power on the judiciary public body to promulgate and adopt court rules, a.k.a. rule-making process, the Rhode Island Judiciary, pursuant to the Plaintiff's APRA request for public records, denied the Plaintiff's APRA request within the 10 business day period, as well as denies it possesses public records, as defined by APRA, relating to the rule-making process by the judiciary of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," including denying possession of public records that show the intent of the rule-makers to promulgate and adopt court rules denying fundamental right of public access to electronic case information remotely to the public, to self-represented litigants, and to parties to a case. **See Exhibit D** fourteen (14) APRA correspondence emails between the Plaintiff and/with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023. The Texas pro-se Plaintiff respectfully requests the extension of time to present the new evidence and plead the newly verified facts and claims, and amend the complaint, which is further in the interest of judicial economy. The Plaintiff further seeks to appeal and file her claim against the implausible denial by the RI Judiciary, which is conferred by the Rhode Island Enabling Act to make rules of the court, that it possesses public records relating to the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," that the judiciary, conferred power by the Rhode Island Enabling Act, "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, judicial, regulatory, or administrative body of the state, or any political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to

Public Records Act ("APRA"). Because the RI Superior Court clearly ruled in **Seguin v. RI Office of Child Support Services, PC-22-07215** that it lacked subject matter jurisdiction to hear my/the Texas Plaintiff's APRA-related claims, I, the Texas Plaintiff, now exercise my statutory and constitutional rights to petition this Federal Court, invoking 28 U.S.C. § 1343(a)(3) (civil rights) and 28 U.S.C. § 1367 that provides supplemental jurisdiction over the state law tort claims that arose from the same common nuclei of facts, invoking 28 U.S.C. § 1331 (federal question), and invoking 42 U.S.C. § 1983 for violations of civil rights under the First, Fourth and Fourteenth Amendments to the United States Constitution. I, the Plaintiff, respectfully request this Court for the extension of time to file my claims.

31. Plaintiff discovered on October 6, 2023 that the Rhode Island Judiciary and Government Defendants are former clients of Judge Smith, a partner in his former firm, Edwards & Angell.

32. Plaintiff discovered on November 9, 2023 that the Rhode Isand Judiciary and Government Defendants are current clients of the firm Edwards & Angell, the former firm of Judge Smith, a partner in the firm.

33. A plain reading of 28 U.S.C. sec. 455 makes clear that Judge Smith is disqualified from this case, and a plain reading of case law makes clear that 28 U.S.C. sec. 455 is self-executing, without necessitating any party's request.


Respectfully submitted,

Date: November 16, 2023

MARY SEGUIN

*Mary Seguin*

Mary Seguin

P.O. Box 22022

Houston, TX 77019

maryseguin22022@gmail.com

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                             Civil Action No. 1:23-cv-126-WES-PAS


RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

        *Defendants*

## **PLAINTIFF'S RULE 60(b) MOTION**

    1. Plaintiff, proceeding from and as a citizen of Texas, respectfully requests pursuant to

Fed. R. Civ. P. Rule 60(b)(1), (3), (4) and (6) for a new trial.  Plaintiff avers the following,

supported by affidavit attached: The 91-page First Amended Complaint [ECF 25] filed on

September 1, 2023 seeks monetary damages against the Rhode Island State Defendants and the

private actor Defendants for:

    (1) The Rhode Island Judiciary and Tyler Technologies' monopoly of publication of law.

(2) The Rhode Island Judiciary and Tyler Technologies' denial to the Public and to all Pro Se Litigants all access and the denial of free access to the contents of the law created, authored, and deliberated by the Rhode Island Judiciary.

(3) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to knowingly fail to properly integrate the legacy electronic court case management systems used by Rhode Island Department of Human Services and Office of Child Support Services during the implementation of Odyssey from 2013 to 2014 (the State's official electronic court filing and electronic case management system), so that these state agencies' filings are discriminately invisible only to the Public, to Pro Se Litigants and to the Rhode Island Virtual Clerk of the Courts in the Rhode Island Family Court, a limited jurisdiction court of record. The State's filings are only visible to the judges and to the State filers, thus manipulating the proceeding towards a foregone conclusion in favor of the State filers.

(4) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to misrepresent to the Public and to the Pro Se Litigants that the implemented electronic court case records of judge created laws are available to *all* court users, in order to cover up their monopolization of the publication of law denies the Public and the Pro Se Litigant access to the judge-created laws.

(5) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services that the State routinely establishes and enforces 12% compound interest on child and spousal support in Title IV of the Social Security Act state family court proceedings, in violation of the uniform statutory requirement of 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and

*if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest, targeting noncustodial parents victims. In welfare cases, support are assigned by the custodial parent to the State, and the 12% compound interest represents a fee for the State's "services" in the support's establishment and enforcement paid to the State, which at 12% compound interest represents lucrative, illegally obtained revenue to the State actors, who are financially incentivized to obtain as much as possible.

(6) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services and Tyler Technologies to knowingly fail to properly integrate Odyssey with the State's legacy electronic court filing system resulting in the State's filings seeking illegal 12% compound interest, as well as to deny the Public and to Pro Se Litigants' access to their publication of judge-created law records for the purpose of cover up of this wholesale illegal defraud of the court, extortionary defraud under color of state law targeting the unsuspecting noncustodial parents victims, and defraud of the United States (66% of the cost of these child support "operations" is funded by the U.S. Department of Health and Human Services through Title IV of the Social Security Act through funds appropriated by Congress through the annual budget appropriations.)

(7) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Tyler Technologies to operate the Title IV Program of the Social Security Act in all manners violative of due process, in prima facie due process violative State Electronic Courts, for the purpose of generating state revenue through fraud and deceit, through conspired tortious interference of rights of access to the courts, rights of

access to state case documents, and rights of access to judge-created laws targeting

litigants, targeting the Public and targeting Pro Se Litigants.

(8) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of

Human Services and Tyler Technologies to cover up their public-access-denied

publication of state judge-created laws of illegal 12% compound interest benefiting the

state's revenue by adopting a State policy not to establish nor enforce any interest in

*interstate* support cases only, calculated to cover up the collective fraud from federal

enforcement officials and other states' enforcement officials of court orders (laws)

showing 12% compounded interest established and funded under Title IV that are facially

illegally violative of 42 U.S.C. § 654(21)(A) which explicitly provides States *may* opt to

charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12%

compound interest.  The federal Title IV Program regulation by Congressional intent

explicitly preempts any related state laws of all participating states.

(9) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of

Human Services and Office of Child Support Services and Barbara Grady and Gero

Meyersiek to use the fraudulent, First Amendment-, Fourth Amendment-, Fifth

Amendment-, Seventh Amendment-, and Fourteenth Amendment violative state court

machinery weaponizing Title IV Program of the Social Security Act to target the Plaintiff

*pro se* noncustodial parent in Texas to retaliate against Plaintiff for her past lawsuits

against them, namely ten years ago in Seguin v. Chafee et al., Civil No. 12-cv-708-JD

(D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and

Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued

them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state

court's under color of state law abuse of the legal frame work of another federal-funded human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00 per visitation if Plaintiff wanted to see her children in Rhode Island, because the state court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other legally sufficient basis. Plaintiff had reported this *prima facie* extortion under color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas. Here, Plaintiff's ==retaliation== damages claims have been issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455, additionally given the fact Judge Smith had also self-recused from <u>Seguin v. Chafee et al.</u>, Civil No. 12-cv-708-JD (D.R.I. 2013), <u>Seguin v. Bedrosian et al,</u> Civil No. 12-cv-614-JD (D.R.I. 2013), and <u>Seguin v. Suttell et al</u>, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013) ten years ago. *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998) ("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no party has requested it").

(10) The Rhode Island Judiciary continues the pattern of cover up by denying Plaintiff's request for public judicial records related to the monopoly of publication of judge-created records submitted to the State Judiciary pursuant to the Rhode Island Access to Public Records Act ("RI APRA").

4. Plaintiff obtained new evidence on October 6, 2023 that the Rhode Island Judiciary is a former client of Judge Smith, and on November 9, 2023, Plaintiff obtained new evidence that the

Rhode Island Judiciary remains a major client of Judge Smith's former law firm. Plaintiff's due diligence search for conflict of interest has been impeded by the Rhode Island Judiciary and Tyler Technologies monopoly of publication of judge-created laws in the state's electronic court system and their denial of access to the judge-created laws, and Plaintiff, as a member of the Public and proceeding pro se without a Rhode Island Attorney license, the issuance of which is also monopolized by the Rhode Island Judiciary, has further been denied access to official records, including through the Rhode Island Access to Public Records Act, consistent with a pattern of civil conspiracy cover up.

5.   A new trial or a stay of the Judgment is necessary to prevent irreparable harm to Plaintiff, and to Americans across the First Circuit who would be needlessly deprived of access to the federal courts of law in the First Circuit for monetary damages redress - the judicially created doctrine of Younger Abstention that functioned as a court of equity - regarding Plaintiff's monetary damages claims against the Rhode Island Judiciary and Tyler Technologies' scheme to monopolize the publication of judge-created laws that denies, tortiously interferes, tortiously abridges and tortiously obstruct the Public access to those very laws; regarding Defendant Rhode Island Office of Child Support Services' unlawful seizures of interstate Texas properties outside of Rhode Island under color of Rhode Island state law based on legally insufficient interest charge on overdue support based on the unlawful rate of 12% compound interest that is disallowed under Title IV-D Program of the Social Security Act, specifically 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest. And this is on top of Defendants' breach of contract that was brokered by Defendant Rhode Island Office of Child Support Services on behalf of the agency's client; the contract between the custodial parent client, defendant Gero

Meyersiek and the Texas Plaintiff stipulated that the custodial parent waived interest upon the

Texas Plaintiff paying a lump sum of $104,185.98 pay-off amount, which Plaintiff performed

from Texas on December 7, 2021. Even at the point of contractual agreement, Defendant Rhode

Island Office of Child Support Services in conjunction with Defendant Gero Meyersiek,

misrepresented there was lawful and enforceable interest to be waived, as they removed the

accrued interest from the Title IV-D Program mandated support record system in order to cover

up from the Plaintiff, and from federal and Texas authorities the unlawful 12% compound rate.

After fraudulently inducing Plaintiff in Texas to agree to and to perform on the contract, the

Defendants immediately put the interest back into the Title IV-D Program-mandated automated

support record system and started to seize Plaintiff's properties in Texas under color of Rhode

Island state law.

     6. The final judgment is on its face violative of binding First Circuit caselaw that

mandates lower courts to ***stay*** monetary damages claims when applying Younger Abstention.

*See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997) (relying on *Quackenbush v. Allstate*

*Ins. Co.,* 517 U.S. 706 (1996) in holding that abstention does not allow for dismissal of damages

claim).

     7. 42 U.S.C. § 654(21)(A) has been in effect since the enactment of the Title IV-D

Program of the Social Security Act several decades ago, and Congress's original intent was to

combat poverty within the populace of single mothers and children in welfare cases; Congress at

no time intended to shift the undue burden of Rhode Island's 12% compound interest on overdue

support under color of Rhode Island state law to noncustodial parents, whether targeting Texas

or across the country, which in welfare cases Rhode Island converts the 12% compound interest

to assigned debts owed by noncustodial parents to Rhode Island's state agencies and state

government, representing underhanded unlawful state revenue unlawfully obtained through the

legal framework of Title IV-D Program of the Social Security Act, targeting unsuspecting

noncustodial parents victims.  As a legal point of a state's lawful application of 42 U.S.C. §

654(21)(A) within the First Circuit, New Hampshire, in compliance with the letter of federal law,

opts into Title IV-D Program and opts not to charge any interest whatsoever, as per the letter of

law and the original intent of Congress, 42 U.S.C. § 654(21)(A).  Similarly, Texas charges 6% in

compliance with 42 U.S.C. § 654(21)(A).

8. Defendant Rhode Island Office of Child Support Service's illegal denial and

obstruction of access to Plaintiff's own child support case file that contains the incriminating

illegal and arguably criminal scheme of removing the interest rate from the Title IV-D Program

mandated and federally funded support record system to cover up the unlawful 12% compound

interest from federal and Texas authorities, as well as from the Plaintiff in Texas, violates due

process, obstructs justice, obstructs a federally funded and federal program proceeding, and the

legal framework of Title IV-D of the Social Security Act, specifically, 42 U.S.C. § 654 and 42

U.S.C. § 666.

9. Judge Smith's dismissal of Texas Plaintiff's legal remedy monetary damages and

breach of contract fraudulent inducement damages claims under Younger Abstention in this

Court of law represents irreparable harm violative of the First Amendment, Fourth Amendment,

Fifth Amendment, the Fourteenth Amendment, the Seventh Amendment and the First

Amendment access to the Court.  The undisputable fact remains, Plaintiff's legal remedy request

for monetary damages in this court of law consisting of twenty-two causes of action that cannot

be dismissed under Younger Abstention, namely monetary damages claims of breach of contract

fraudulent inducement, breach of implied contract, unjust enrichment, misrepresentation,

negligent misrepresentation, intentional/fraudulent misrepresentation, common law bad faith, breach of the covenant of good faith and fair dealings, tortious breach of the covenant of good faith and fair dealings, breach of fraudulent concealment/common law fraud, concealed fraud, tort of deceit, reckless indifference to the rights of Plaintiff, deliberate indifference to the rights of Plaintiff, abuse of process, breach of duty, accounting fraud, fraud cover up, RI Government Tort Liability (R.I. Gen. Laws 9-31-1, *et seq*.), 42 U.S.C. § 1983 Claim for Reckless Indifference of Plaintiff's Clearly Established Constitutional Rights, 42 U.S.C. § 1983 claim of Fourth Amendment Illegal Seizure of Plaintiff's Texas Property, state tort of liability against defendants under 42 U.S.C. § 1983, Civil RICO [ECF 25].

10. Judge Smith's legally-unsupported and factually-unsupported, and "legally insufficient" opinion that the limited jurisdiction family court is an adequate forum to raise Plaintiff's federal legal damages claims of breach of contract et al., contravenes Rhode Island law: R.I. Gen Laws 8-10-3 makes clear that family court is not a court of general jurisdiction, can only conduct bench trials functioning as a court of equity, not of law, and prohibits family court from exercising jurisdiction over breach of contract claims et al between the Texas Plaintiff and the Defendants; family court lacks jurisdiction over the Plaintiff's federal causes of actions; lacks the jurisdiction to summon a jury for jury trial in a court of law.

11. Finally, but equally critically, twenty-one days post judgment Plaintiff discovered troubling new evidence on November 9, 2023, that Judge Smith appears to have impermissibly acted in favor of the interests of the defendants – he is automatically disqualified under 28 U.S.C. § 455, because as a partner in his past practice and firm, the state government and the Rhode Island Judiciary were not only his clients, but continue to be that firm's major client under a flat fee contract and he has knowledge of the defendants' actions in this action – as a major

partner in his firm, the Rhode Island Judiciary is his and his form's past and current clients, the

state government actors and the state courts actors, cooperate in the routine establishment and

enforcement of 12% compound interest under the legal framework of Title IV-D Program of the

Social Security Act, where 12% compound interest is disallowed under 42 U.S.C. § 654(21)(A).

To the objective observer, having knowledge of the facts and circumstances of this case, and

being a partner in his past firm that continues to have the Rhode Island Judiciary as a client,

Judge Smith appears biased in favor of the defendants' interest to continue raking in state

revenue under the auspices of 42 U.S.C. § 654(21))(A) that explicitly disallows state debts of

12% compound interest assigned to Rhode Island that the state actors who cover up the 12%

compound rate by obstructing the noncustodial parent's access to her own child support case file

that is further violative of the due process provisions under 42 U.S.C. § 654 and §666, in Rhode

Island's federally funded operation with funds appropriated by Congress intended for the *lawful*

operation of Title IV-D of the Social Security Act.  Although under the judicial self-executing

expectation under 28 U.S.C. §455, the Texas Plaintiff is not expected to cull court records in the

Rhode Island state courts for judicial conflict of interest, nevertheless the Plaintiff in good faith

and diligently attempted to perform a remote search of Rhode Island's electronic court case

management system, Odyssey in 2023.  In so doing, Plaintiff discovered troubling newly-

discovered evidence that the Rhode Island Judiciary, while publicly representing that the 2014 $6

million state transition from paper courts to electronic courts promises *all court users* will be

able to call up court documents remotely from their mobile devices, in reality Rhode Island

adopted rules only denying the public and pro se litigants remote access to court case

information, including pro-se litigants' own case records, that both the public and all litigants

had equal statutory, common law and constitutional rights of access in paper courts – Judge

Smith's firm's clients, the Rhode Island Judiciary, therefore implemented electronic court public access denials that obstructed Plaintiff's and the public's discovery of Judge Smith's judicial disqualification regarding his former clients such as the state courts, the defendant state actors and other conflict entities.

## I. LEGAL STANDARD

11. The United States Supreme Court in 2020 reaffirmed, in *GEORGIA, ET AL., PETITIONERS v. PUBLIC.RESOURCE.ORG, INC*, 590 U.S. ___ (2020), the century-old government edicts doctrine, making clear that officials empowered to speak with the force of law cannot be the authors of—and therefore cannot monopolize access—the works they create in the course of their official duties. The U.S. Supreme Court previously applied that doctrine to hold that non-binding, explanatory legal materials when created by judges who possess the authority to make and interpret the law shall not monopolize access to it. *See Banks v. Manchester*, 128 U. S. 244 (1888). Tyler Technologies is a for profit organization that aims to facilitate public access to government judge-created records and legal materials. Tyler Technologies is contracted by the Rhode Island Judiciary to implement the State's electronic courts in 2013 and together, they both publicly represented that access to the contents of judge-created laws records will be readily called on mobile devices to *all* court users, namely, to the Public and to pro se litigators.

12. Under the government edicts doctrine, judges may not be considered the "authors" of the works they produce in the course of their official duties as judges. That rule applies regardless of whether a given material carries the force of law. In *Banks v. Manchester,* 128 U. S. 244 (1888) the Supreme Court concluded that "the judge who, in his judicial capacity, prepares the opinion or decision, the statement of the case and the syllabus or head note" cannot "be regarded as their author or their proprietor. *Banks*, 128 U. S, at 253 (emphasis in original).

Rather, "[t]he whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all." *Ibid.* (citing *Nash v. Lathrop*, 142 Mass. 29, 6 N. E. 559 (1886)). These cases establish a straightforward rule: Because judges are vested with the authority to make and interpret the law, they cannot be the "author" of the works they prepare "in the discharge of their judicial duties." Banks, 128 U. S., at 253. This rule applies both to binding works (such as opinions) and to non-binding works (such as headnotes and syllabi). *Ibid.* The animating principle behind this rule is that no one can own the law. "Every citizen is presumed to know the law," and "it needs no argument to show . . . that all should have free access" to its contents. *Nash,* 142 Mass., at 35, 6 N. E., at 560 (cited by *Banks*, 128 U. S., at 253–254). Rather than attempting to catalog the materials that constitute "the law," the doctrine bars the officials responsible for creating the law from being considered the "author[s]" of "whatever work they perform in their capacity" as lawmakers. *Ibid.* (emphasis added). Because these officials are generally empowered to make and interpret law, their "whole work" is deemed part of the "authentic exposition and interpretation of the law" and must be "free for publication to all." *Ibid.*

13. Rhode Island Judiciary and Tyler Technologies monopoly of publication of the judge-created laws and their "whole works" making and interpreting the law that explicitly by design deny access to the Public and to the Pro Se Litigant runs afoul of the government edicts doctrine.

14. Courts have long understood the government edicts doctrine to apply to legislative materials. See, e.g., *Nash*, 142 Mass., at 35, 6 N. E., at 560 (judicial opinions and statutes stand "on substantially the same footing" for purposes of the government edicts doctrine); moreover, just as the doctrine applies to "whatever work [judges] perform in their capacity as judges,"

*Banks*, 128 U. S., at 253, it applies to whatever work judges perform in their capacity as judges.

*Banks*, following *Wheaton* and the "judicial consensus" it inspired, denied publication monopoly protection to judicial opinions without excepting concurrences and dissents that carry no legal force. 128 U. S., at 253 (emphasis deleted). As every judge learns the hard way, "comments in [a] dissenting opinion" about legal principles and precedents "are just that: comments in a dissenting opinion." *Railroad Retirement Bd. v. Fritz,* 449 U. S. 166, 177, n. 10 (1980). Yet such comments are covered by the government edicts doctrine because they come from an official with authority to make and interpret the law. Indeed, *Banks* went even further and withheld publication monopoly protection from headnotes and syllabi produced by judges. 128 U. S., at 253. Surely these supplementary materials do not have the force of law, yet they are covered by the doctrine. The simplest explanation is the one *Banks* provided: These non-binding works are not copyrightable because of who creates them—judges acting in their judicial capacity. *See ibid.* The textual basis for the doctrine is the "authorship" requirement, which unsurprisingly focuses on—the author, the judges. The Supreme Court long ago interpreted the 'author" to be officials empowered to speak with the force of law. The doctrine distinguishes between some authors (who are empowered to speak with the force of law) and others (who are not). The Supreme Court explicitly rejects allowing the States to "monetize its entire suite of legislative and judicial history. With today's *digital tools*, States might even launch a subscription or pay-per-law service." See *Georgia v, Public Resources Org.* at 590 U. S. ____ (2020) It is obviously explicitly clear that the Supreme Court refers to the prohibition against the Rhode Island Judiciary and Tyler Technology's monopolization of the digital publication of DIGITAL COURT JUDICIAL COURT RECORDS that denies publication access of judge-created laws and their work materials to the Public and to Pro Se Litigants.

Case: Case 1:23-1:23-cv-00012-JDiv-WEIN-WAS-JD Document 34-7 32 Filed Filed 11/27/24 27/24 Page 6 Page 6 of 16 of 16 PageID 6384 884

Page 1 of 9009

15. There is no legitimate Rhode Island government interest in the knowing illegal denial of access to the public and to pro se litigants the digital records of the Rhode Island Judiciary's and Tyler Technologies' illegal monopolization of digital publication of judge-created laws involving the establishment nor enforcement of unlawful 12% compound interest violative of explicitly clear 42 U.S.C. § 654(21)(A) within the legal framework of Title IV-D Program targeting noncustodial parties in Texas who are outside of Rhode Island that Rhode Island already knows is unenforceable in Texas, and thus had removed the 12% compound interest in 2018 calculated to cover it up from federal and Texas authorities.  Rhode Island's abuse of the legal framework of the government edict doctrine and the legal framework of Title IV-D Program are diametrically at odds with the intent of Congress and binding caselaws of the U.S. Supreme Court.  The civil conspiracy to cover up the illegal machinery of the digital electronic courts in Rhode Island is clear.  *See Turner v. Rogers*, 131 S. Ct. 2507, 2518 (2011). *See Georgia v, Public Resources Org.* at 590 U. S. ____ (2020);  *See* HOUSE COMM. WAYS & MEANS, Section 8: Child Support Enforcement Program, in 2004 GREEN BOOK: BACKGROUND MATERIAL AND DATA ON THE PROGRAMS WITHIN THE JURISDICTION OF THE COMMITTEE ON WAYS AND MEANS 8-1, 8-2 (2004). *See* Social Services Amendments of 1974, Pub. L. No. 93-647, § 101, 88 Stat. 2337, 2351.  Where the mother receives public aid, federal and state governments will provide the child support payment to the mother and hold the father indebted to the government for that amount.  In cases where the mother is not dependent on welfare, the government has largely stayed out of the fray. *See* HOUSE COMM. WAYS & MEANS, *supra* note 38.  Yet, this case does not involve a welfare case, as the custodial father is wealthy, but the Defendants are motivated by retaliation against the Plaintiff for suing them ten years ago in <u>Seguin v. Chafee et al</u>., Civil No. 12-cv-708-JD (D.R.I. 2013), <u>Seguin v. Bedrosian</u>

et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state court's under color of state law abuse of the legal frame work of another federal-funded human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00 per visitation if she wanted to see her children in Rhode Island, because the state court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other legally sufficient basis. Plaintiff had reported this *prima facie* extortion under color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas. Here, Plaintiff's retaliation damages claims have been issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455, additionally given the fact Judge Smith had also self-recused from Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013) ten years ago. *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998) ("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no party has requested it").

## II. ARGUMENT

16. Plaintiff has appealed the Court's/Judge Smith's judgment in its entirety in the related case, Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I. 2023) and respectfully submits that she is likely to secure a complete reversal of this Court's

holding that the judicially created doctrine of Younger Abstention applies to the *dismissal* of her monetary damages and breach of contract damages claims.

17. Plaintiff further submits that she is likely to secure a complete reversal of this Court's in this case.

18. Conducting state proceedings funded by federal funding appropriated by Congress under Title IV of the Social Security Act in state monopolized electronic courts that violate the long-established government edict doctrine as it related to the Public's access of the digital publication of judge-created laws and violate the Constitution targeting Texas assets and Texas parties for illegal 12% compound interest involving fraudulent inducement that cannot be enforceable in Texas is the prima facie example of government fraud and government waste, warranting cut off from federal funding at the very minimum. Not even Judge Smith, friend of the Rhode Island Judiciary, can punt these egregious state activities to later addressment via the attention of the Supreme Court and to Congress Appropriation Committees, wrongfully using Younger Abstention.

19. Judge Smith's holding is defect in claiming without a shred of factual basis that Plaintiff can raise her federal monetary damages claims and fraudulent inducement breach of contract claims in the jurisdictionally defective Rhode Island family court, that R.I. Gen. Laws 8-10-3 plainly states the family court is *not* a court of general jurisdiction, and which lacks the jurisdiction over the controversy for legal relief of monetary damages tort claims and fraudulent inducement breach of contract damages claims over both the Plaintiff and all the named defendants.

20.  Plaintiff seeks a new trial or a stay pending appeal as Plaintiff's likelihood of success

on appeal, together with the lopsided balance of hardships, weigh heavily in favor of granting the

stay being sought pending appellate review.

### A. Plaintiff is Likely To Succeed On Appeal Of the Judgment Ordered By the Court:

21. Although Plaintiff recognizes that the Court has ruled against her as to the scope of

relief, Plaintiff is likely to succeed on appeal of those issues, and has raised serious legal

questions and presented a substantial case. *See Arnold v. Garlock, Inc.*, 278 F.3d 426,

438-39 (5th Cir. 2001).

22. Plaintiff incorporates by reference her prior remedy arguments.  Plaintiff reserves the

right to make any and all arguments on appeal.

23. Among the substantial questions raised by Plaintiff is whether the Court erred in

awarding Defendants dismissal of Plaintiff's monetary damages claim in this First Circuit under

Younger Abstention and erred in failing to self-execute 28 U.S.C. § 455. And Plaintiff

respectfully submits that she is likely to succeed on appeal in arguing that, in these

circumstances, dismissal was not properly ordered in the particular circumstances of this case

pursuant to established binding First Circuit caselaws on both the Court's errors applying

Younger Abstention as well as judicial disqualification. *See DeMauro v. DeMauro,* 115 F.3d 94,

98 (1st Cir. 1997)**;** *In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998); *Quackenbush v.*

*Allstate Ins. Co.*, 517 U.S. 706 (1996).  *See* also *Allen v. La. State Bd. of Dentistry*, 835 F.2d 100,

104 (5th Cir. 1988). ("Younger abstention does not apply to claims for monetary damages.")

24. Absence of a new trial or a stay of the judgment will erode confidence in the Judiciary in the First Circuit by creating an impression that it is violating national law regarding the government edict doctrine and setting illegal new national policy regarding the Title IV-D Program. It may also have the effect of "encouraging forum shopping." *Trump v. Hawaii,* 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). It further "undermines the judicial system's goals of allowing the 'airing of competing views' and permitting multiple judges and circuits to weigh in on significant issues." *See* also *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (traditional remedial principles account for "the public interest" and "the balance of equities"); *EME Homer City Generation, LP v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.) (declining to vacate unlawful agency action under the APA because "vacatur could cause substantial disruption"). In this context, the dismissal of Plaintiff's state government tort monetary damages claims entered by the Court could cause substantial disruption to the *uniform* application of the legal framework of the Title IV-D Program Congress explicitly intended.

25. The serious legal questions raised in this case regarding the scope of remedy go beyond the questions of whether a Younger abstention is applicable to federal monetary damages claims and or the feeble assertion of *comity* applied to the Rhode Island Judiciary and Tyler Technology's gross violation of the government edict doctrine—and indeed, those questions should not have even entered into this case. Here, among Plaintiff's challenges was to state Judiciary, Tyler Technologies and agency actions, and Plaintiff pursued fraudulent inducement breach of contract damages claims and tort monetary damages claims. Instead, the Court at law cannot vacate a federal statute—i.e., cannot "delete a previously enacted statute from the books" such as 42 U.S.C. § 1983. *See* also Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va.

L. Rev. 933, 936 (2018) ("The federal courts have no authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute. The power of judicial review is more limited." (footnotes omitted). Legal monetary damages relief under 42 U.S.C. § 1983 that would hold the Rhode Island state government accountable under the Rhode Island Government Tort Act for Rhode Island government actors' tortious actions violating the legal framework of the Title IV-D Program federal statutes targeting the Plaintiff in Texas was a legal remedy conferred by Congress to federal courts to grant legal relief appropriate in this case. The Court has an unflagging obligation to exercise jurisdiction conferred to it by Congress. *See Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013)

26. With respect, although the Court has entered a judgment otherwise, Plaintiff has demonstrated a likelihood of success on appeal of the Final Judgment sufficient to justify a stay of the judgment.

### B. The Balance of the Equities Overwhelmingly Favors the Requested New Trial or Stay

27. The balance of the equities overwhelmingly favors a new trial or stay: The State of Rhode Island plainly lacks any legitimate interest in the State's systemic knowing violation of the government edict doctrine and violation of 42 U.S.C. § 654(21)(A) that they now target Plaintiff in Texas, and which they sought to cover up from federal and Texas authorities, as well as from Plaintiff, by knowingly and unlawfully removing interest from the automated support record system. Americans outside of Rhode Island re fraudulently, unlawfully and systemically fleeced by Rhode Island's illegal scheme that is illegally funded through the State's defrauding of the United States lying to the United States that these activities are eligible for federal funds

appropriated by Congress for the legal administration of Title IV Program of the Social Security Act.

28. Defendants will face no harm from Plaintiff's requested new trial or stay. The judgment that is specifically directed to and protects the prevailing Defendants from legal accountability of their illegal actions, is further issued by a disqualified judge, Judge Smith, who was the former counsel for the Defendants and a partner of the firm whose major client is the Rhode Island Judiciary, *e.g.*, Rhode Island state government entities, including the state courts and state agencies. The requested new trial or stay will thus impose no hardship on the prevailing Defendants at all.

29. By contrast, the public and the Plaintiff face significant harm if now new trial is ordered or the judgment is not stayed. As an initial matter, "any time a [government]" violates "statutes enacted by representatives of its people," the people "suffer a form of irreparable injury." *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). But the harm here is much greater and more far-reaching. The government edict doctrine is willfully violated by the Rhode Island Judiciary and Tyler Technology in a civil conspiracy to cover up the illegal state family court creating judge-created laws ordering and enforcing 12% compound interest, aided and abetted by the Department of Human Services - Title IV-D requires the uniform application and compliance by participating States with the Social Security Act. Congress's as well as the United States through the Secretary of the U.S. Department of Health and Human Services' interest in the uniform compliance of 42 U.S.C. § 654(21)(A), § 654 and 42 U.S.C. § 666 are well established. The States are reimbursed 66% of the cost of operations through federal funding appropriated by Congress under Title IV-D of the Social Security Act. The Defendants' arbitrary illegal removal of the illegal unenforceable 12%

compound interest from the automated support record system and cover up of their illegal 12% compound interest scheme from the federal and Texas authorities targeting Texas properties and targeting the Plaintiff in Texas demonstrates Rhode Island government agencies (who are former clients of Judge Smith) knowingly committed criminal schemes illegally seizing Plaintiff's properties interstate in Texas that they know are violative of federal criminal codes and Texas civil and penal codes. *See,* e.g., Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act). The program, which is administered by the United States Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for a significant sixty-six percent (66%) of the costs of operating their child-support enforcement programs. 42 U.S.C. §v655(a)(2)(C). In 1975, Congress adopted Title IV-D, 42 U.S.C. §v651 *et seq*., and established the general statutory framework that exists today. See 1975 Act § 101(a), 88 Stat. 2351; *Blessing v. Freestone*, 520 U.S. 329, 333-335 (1997) (describing program). Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support. Therefore, the Defendants' illegal operations cannot be funded by Congressional appropriations.

30. Judge Smith's failure to self-execute his disqualification under 28 U.S.C. § 455 as well as Canon 3E of the Code of Judicial Conduct, then his subsequent refusal to recuse in the related case, <u>Seguin v, RI Office of Child Support Services et al Civil</u> No. 23-cv-34-WES-PAS (D.R.I. 2023), upon Plaintiff's request after she raised newly discovered discovery post judgment

on October 6, 2023 of his direct and past public sector law practice's contract legal representation of the Defendants, state courts, state agencies and other conflict entities, have the appearance, to the objective observer, of the Court's issuance of judgment in favor of the Defendants in error that contravenes established First Circuit case law on Younger Abstention as well as disqualification, calculated to benefit the interests of his former clients, as partner of his former firm that represents the Rhode Island Judiciary and the state government.

31. Moreover, the Court's judgment effectively functions as a denial of Plaintiff's access to this Court of law to redress her legal monetary damages claims and fraudulent inducement breach of contract damages claims. It is well-settled that even minimal loss of First Amendment freedoms, "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality)); *see also Elrod*, 427 U.S. at 373.; *N.Y. Times v. United States*, 403 U.S. 713, 715 (1971). Accordingly, Plaintiff has a strong likelihood of success on the merits, will suffer irreparable injury without a stay, and a stay will not injure others while furthering the public interest.

### III. CONCLUSION

27. For the foregoing reasons, Plaintiff has demonstrated a likelihood of success on appeal of the Judgment ordered, and has demonstrated that the balance of the equities favors a new trial or a stay. Plaintiff respectfully requests that the Court stay the final judgment for the duration of appellate proceedings relating to the related Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I. 2023).

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 16, 2023, I filed the within Motion with the

Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/   *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 16, 2023

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                             Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

*Defendants*

## **MARY SEGUIN'S DECLARATION IN SUPPORT OF PLAINTIFF'S RULE 60(b) MOTION**

I, MARY SEGUIN, hereby declare under penalty of perjury, pursuant to 28 U.S.C. sec. 1746(2) that the following statements are true and correct:

1. That I am the Plaintiff, Pro Se, in the above captioned matter.

2. That I exercised, am exercising and continue to exercise my statutory right to appear pro se party in the above captioned civil matter in federal court by statute 28 U.S.C. sec. 1654.

3. That in state proceedings in Rhode Island, I am required to comply with Rhode Island Article X. Rules Governing Electronic Filing, Rule 2. Official Court Record, (a) Official Court Record. "Upon the implementation of the Electronic Filing System ("EFS") in each court, all documents shall be filed electronically and shall be the official court record."

4. That the state proceedings in which I am a party are public and are not about child custody nor involve a minor.

5. That the **Rhode Island Family Court**, through its adoption and promulgation of **Administrative Order 2021-01 A2)** mandated that all child support interest matters shall be heard remotely via WebEx. Further, **Administrative Order 2021-01 B1)** mandated that all non-emergency filings shall be filed using the electronic filing system in accordance with the Family Court Rules of Domestic Relations Procedure, which is the **Odyssey system**.

6. That the **"RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION, Rule 5. Access to Case Information, (c) Remote Access to Case Information. (1) Policy. To allow <u>limited</u> Remote Access to the Database through the Public Portal. Non-public case types shall not be remotely accessible except for certain case types to attorneys who have entered an appearance in a case. (2) Content. (a) The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall <u>not</u> have Remote Access to other Electronic Case Information"** bar, deny, violate, abridge, infringe and interfere with Pro Se Litigants' and the Public's fundamental rights to access public court records and Pro Se Litigants' fundamental right to meaningful access to the courts. See **"<u>RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION</u>"** Rule 5(c)(2)(a) **"<u>The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall not have Remote Access to other Electronic Case Information.</u>"** See also **"<u>RHODE ISLAND JUDICIARY, Access to Case Information, 2. Remote Access to Case Information A. The Public, Self-represented Litigants, and Parties to a Case, The public, self-represented litigants, and parties in a case shall have remote access to the register of actions or docket but shall not have remote access to other electronic case information</u>."**

7. That I, the Plaintiff, learned and verified on July 10, 2023 directly from the Rhode Island Judiciary itself through numerous (14) correspondences with the Rhode Island Judiciary from June 10, 2023 to July 10, 2023, pursuant to my RI Access to Public Records Act ("APRA") request for public records from the Rhode Island Judiciary, that as a matter of State policy, State Court Rule, and Judiciary Rule, in the digital courts implemented by the Rhode Island Judiciary, the State Court, the Rhode Island

Judiciary deny remote digital access of the Rhode Island Judiciary's monopolized publication of court and judicial records using the digital tool maintained and published by Tyler Technologies, Odyssey, including judge-created, judge-authored court decisions arising from state proceedings in the State's digital electronic courts, and digital court transcripts ordered by and paid by pro-se litigants that are published by the Judiciary digitally on Tyer Technologies' Odyssey are also denied access to the Public, pro-se litigants, and parties to the litigation (who are represented by counsel). The Rhode Island State Court only grants remote access to digital court and judicial records created by judges produced in digital courts to Rhode Island attorneys and state and federal agencies that are approved by the Rhode Island Judiciary's monopoly. On this matter, I corresponded in writing fourteen (14) APRA correspondence emails with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023.

8. That the State Defendants in this matter electronically file all notices using another electronic filing system that is even separate and different from the EFS (Odyssey).

9. That the State Defendants' court electronic filings are not noticed to me in Texas.

10. That the State Defendants' court electronic filings are not visible to me on the Rhode Island courts' EFS.

11. That the State Defendants' court electronic filing court records cannot be accessed remotely by me, solely because I am a self-represented litigant.

12. That the State Defendants' court electronic filing court records cannot be accessed remotely by the public, by self-represented litigants, nor by parties to the case, but can be accessed remotely and instantly through the internet by attorneys in Rhode Island and state and federal agencies.

13. That the Rhode Island Court Clerks state to me over the phone that they are prohibited from reading the contents of the court records over the phone to me.

14. That the Rhode Island Court virtual clerks state to me over the phone that even they are unable to see or access the court record information of filings by the State Defendants from the virtual clerks' access portals.

15. That the Rhode Island Electronic Filing System, case management system, rules and practices outright and unconstitutionally restrict and deny access to the court to three classes: (1) the public; (2) pro-se litigants; (3) parties to the case (who are represented by counsel), and is obviously outright reserved for only the government and Rhode Island attorneys.

16. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS.

17. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and

withdrew from my-initiated RI EOHHS agency appeal in 2022 in a scheme to procure a favorable judgment in a state proceeding that deny my federal constitutional and due process rights in Texas.

18. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and initiated the family court state proceeding on January 31, 2023 before the Covid Emergency Declaration was lifted.

19. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices that appear to **only allow remote, instant and full court access to a restricted club of R.I. lawyers and the government**, pose unconstitutional and undue burden on me, a citizen of Texas over 2,500 miles away.

20. That the State Defendant have full knowledge of the egregiously unfair due process violations of the Rhode Island state court EFS system/architecture/rules/practices that deny me access to the required **electronic court transcripts** prepared by the court reporter and electronically filed in the state EFS that **I ordered and paid for** for appeal, but the State Defendants have instant remote access by state court design.

21. That the State Defendants have full knowledge of the above unconstitutional restriction on access to court records and information to the public and non-lawyers is deliberate, by design and calculated to be unfair, violating constitutional guarantees of full and fair opportunity to raise claims in state proceedings.

22. That the above-raised unconstitutional restrictions are not exhaustive.

23. That my federal monetary damages claims on the unconstitutionality of the Rhode Island state court rules, practices and proceedings that violate the government edict doctrine and violate the pro-se litigants', such as my-self, federal constitutional rights: (1) federal constitutional right of equal access to the courts, (2) federal constitutional right to equal access to court records to receive information on the contents of all electronically filed notices, pleadings, court decisions, and transcripts that I myself ordered and paid for for appeal that are required to be electronically filed by state court rules and practices, (3) federal constitutional due process right and equal right to be given equal and timely notice of electronic filings and entries by the courts (including court decisions, court orders, court judgments, full docket entries, etc.) that the Rhode Island Judiciary deliberately deny by category all pro-se litigants access to court information, namely the contents of judicial/court records of cases to which I am the self-represented party, (4) federal constitutional due process right to be heard (Rhode Island Superior Court threatens me, the Texas pro-se plaintiff, with denial of my request to conduct WebEx hearings for the purpose of denying the Texas pro-se litigant access to the court and to be heard), (5) federal constitutional due process right to decision by a neutral decision-maker (the court that denies pro-se litigant

access to the court and the corollary opportunity to be heard fails the neutral decision-maker test). This list is not exhaustive.

24. That I seek to sue in federal court the State Defendants and add additional defendants.

25. I am an out-of-state diversity and a pro-se litigant in two state proceedings in Rhode Island, and have been unconstitutionally singled out by the State Judiciary, by category "self-represented litigant," to be barred from accessing electronic case information authored by judges and which the Judiciary has a monopoly in the publication of the judge-created laws in which state court cases I am the pro-se party, and therefore have standing to raise claims against this unconstitutional state practice and unconstitutional state court practice and rules. I understand the Rhode Island Judiciary's monopoly in the digital publication of judge-created laws in the Judiciary' implemented digital/electronic courts and the Judiciary's denial to the Public and to me from accessing the monopolized electronic publication of the judge-created laws in the court records violate the government edict doctrine.

26. Additionally, my fundamental First and Fourteenth Amendment constitutional right and common law right to equal, meaningful, and timely access to judicial records and public court records in litigation, given timely notice, adequate opportunity to be heard and to decision by a neutral decision-maker are fundamental First and Fourth Amendment and Fourteenth Amendment rights. Critically, the unconstitutional abridgement, infringement, and denial of judicial and court records to out-of-state pro-se litigants by the Rhode Island State Courts, Rhode Island State Judiciary and the Rhode Island Superior Court Bench Bar Committee directly relate to Younger Abstention Exception.

27. The State Defendants deliberately file all the State's pleadings outside of the State's electronic filing system, "Odyssey," and deliberately use a wholly different un-named electronic filing system, different and separate from that ("Odyssey") provided for pro-se litigants, so that pro-se litigants do not receive any requisite automated electronic notices of court motions or pleadings the State Defendants file electronically, nor are pro se litigants able to electronically access the content information of the State Defendants' electronically-filed pleadings. The only way the pro se litigant, such as me, the Texas Plaintiff, can access the court record is to personally go over 2,500 miles away to the courthouse in Rhode Island to access the court pleading information, or get a "courtesy notice" via email or get a "courtesy notice" through U.S. Mail sent by the State Defendants at whim. The State Defendants deliberately fail to send the notices electronically or by U.S. Mail, and the state courts deliberately promulgated court rules disallowing the public, pro-se litigants and even the parties who are represented by lawyers, remote access to court records, and critically, deny access to crucial court decisions, judgments and orders of public cases, as well as deny remote access to the transcripts ordered by pro-se litigants for appeal. Critically, the State court's abridgment and denial of access to court documents to the pro se litigant and the general public result in the

unconstitutional abridgment and denial of equal, timely and meaningful access to court complaints, decisions, judgments and orders.  What is truly shocking is that the Rhode Island Judiciary even denies and/or bars pro-se litigants remote access of court transcripts that were ordered by pro-se litigants for appeal.

28. Thirdly, the Texas Pro-Se Plaintiff discovered and verified the fact, on or about July 7, 2023, that the Rhode Island Judiciary, using the aforesaid state court rule barring, by category, pro-se litigants from accessing court case information remotely, bars the Plaintiff by category ("self-represented litigant") from accessing state court proceeding transcripts that the Texas Plaintiff ordered and paid for, for appeal.  In other words, the RI Supreme Court Clerk stated to the Texas Plaintiff that the Plaintiff, in Texas, is unconstitutionally barred from remotely accessing the transcripts of court proceedings that she ordered and paid for in her appeal to the RI Supreme Court in the Plaintiff-initiated APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215**, and yet the State Defendants are inequitably granted instant and free remote access to those very transcripts that the Texas Plaintiff ordered and paid for, for appeal.  The federal Texas Plaintiff respectfully requests this Court the extension of time to present the new evidence and plead the verified facts.

29. Fourthly, the Texas Plaintiff discovered and verified the fact, on or about July 11, 2023, that, despite the Texas Plaintiff's several phone inquiries to the RI Superior Court in the past several weeks regarding the status of the appeal, the RI Superior Court, for undisclosed reasons, failed and continue to fail to relinquish jurisdiction and transfer the court case file of **Seguin v. RI Office of Child Support Services, PC-22-07215** to the RI Supreme Court within the requisite 60 days after Plaintiff's filing of Notice of Appeal on April 3, 2023, as required by the RI Supreme Court rules and procedures.  At the same time, the Texas Plaintiff verified the fact that the Plaintiff-ordered transcripts of the state proceedings in the Federal Plaintiff-initiated state APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215** show the RI Superior Court further unconstitutionally sought to deny the Texas Plaintiff access to the state court and opportunity to be heard by outright threatening the Plaintiff in open court that the Judge, David Cruise, during the hearing of March 24, 2023 in that matter, shall use the state court's discretionary power in the future to deny all of the Texas pro-se Plaintiff's petitions for remote WebEx hearings to effectively deny her access to the state superior court.   The state court that denies court access and the opportunity to be heard fails the neutral-decision-maker test required under the Fourteenth Amendment.  I now specifically request further the Court to judicially notice that this court access denial and denial to be heard occurred on March 24, 2023, PRIOR to President Biden's lifting of the COVID-19 National Health Emergency Declaration.  I, the Texas Plaintiff, aver this is a direct contributory reason for the RI Superior Court's failure to transfer the case file to the Supreme Court within 60 days (by June 3, 2023) of the Plaintiff's filing of Notice of Appeal on April 3, 2023 in **Seguin v. RI Office of Child Support Services, PC-22-07215**.

30. Fifthly, the Plaintiff presents to this Court and respectfully requests the Court to take
judicial notice of the undisputed fact of the court rule-making process in Rhode
Island. The 1966 Rules were promulgated by the justices of the superior court
pursuant to section 8-6-2 of the General Laws of Rhode Island. This enabling act
departed from the Federal Rules Enabling Act and most state enabling legislation
conferring rule-making power on the supreme courts of the respective governments.
The Rhode Island Enabling Act was adopted in 1940, 1940 R.I. Pub. Laws ch. 943,
sec. 1. It conferred the power on the justices of the superior court and the 1966
reform was the product of that court. In 1969 an amendment to section 8-6-2 made
the Rules thereafter adopted by the trial courts subject to the approval of the Supreme
Court. 1969 R.I. Pub. Laws ch. 239, sec 2. Therefore, all public records relating to
the adoption and promulgation of the "RHODE ISLAND JUDICIARY RULES OF
PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE
INFORMATION" are "made in the course of, made or received pursuant to law or
ordinance or in connection with the transaction of official business by any agency,
""agency" or "public body" means any executive, legislative, judicial, regulatory, or
administrative body of the state, or any political subdivision thereof" as per R.I. Gen.
Laws § 38-2-2, a.k.a. RI Access to Public Records Act ("APRA"). Even though the
Rhode Island Enabling Act conferred the power on the judiciary public body to
promulgate and adopt court rules, a.k.a. rule-making process, the Rhode Island
Judiciary, pursuant to the Plaintiff's APRA request for public records, denied the
Plaintiff's APRA request within the 10 business day period, as well as denies it
possesses public records, as defined by APRA, relating to the rule-making process by
the judiciary of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE
GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION,"
including denying possession of public records that show the intent of the rule-makers
to promulgate and adopt court rules denying fundamental right of public access to
electronic case information remotely to the public, to self-represented litigants, and to
parties to a case. **See <u>Exhibit D</u>** fourteen (14) APRA correspondence emails between
the Plaintiff and/with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode
Island Judiciary from June 10, 2023 to July 10, 2023. The Texas pro-se Plaintiff
respectfully requests the extension of time to present the new evidence and plead the
newly verified facts and claims, and amend the complaint, which is further in the
interest of judicial economy. The Plaintiff further seeks to appeal and file her claim
against the implausible denial by the RI Judiciary, which is conferred by the Rhode
Island Enabling Act to make rules of the court, that it possesses public records
relating to the "RHODE ISLAND JUDICIARY RULES OF PRACTICE
GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," that
the judiciary, conferred power by the Rhode Island Enabling Act, "made in the course
of, made or received pursuant to law or ordinance or in connection with the
transaction of official business by any agency, ""agency" or "public body" means any
executive, legislative, judicial, regulatory, or administrative body of the state, or any
political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to

Public Records Act ("APRA").  Because the RI Superior Court clearly ruled in **Seguin v. RI Office of Child Support Services, PC-22-07215** that it lacked subject matter jurisdiction to hear my/the Texas Plaintiff's APRA-related claims, I, the Texas Plaintiff, now exercise my statutory and constitutional rights to petition this Federal Court, invoking 28 U.S.C. § 1343(a)(3) (civil rights) and 28 U.S.C. § 1367 that provides supplemental jurisdiction over the state law tort claims that arose from the same common nuclei of facts, invoking  28 U.S.C. § 1331 (federal question), and invoking 42 U.S.C. § 1983 for violations of civil rights under the First, Fourth and Fourteenth Amendments to the United States Constitution.  I, the Plaintiff, respectfully request this Court for the extension of time to file my claims.

31. Plaintiff discovered on October 6, 2023 that the Rhode Island Judiciary and Government Defendants are former clients of Judge Smith, a partner in his former firm, Edwards & Angell.

32. Plaintiff discovered on November 9, 2023 that the Rhode Isand Judiciary and Government Defendants are current clients of the firm Edwards & Angell, the former firm of Judge Smith, a partner in the firm.

33. A plain reading of 28 U.S.C. sec. 455 makes clear that Judge Smith is disqualified from this case, and a plain reading of case law makes clear that 28 U.S.C. sec. 455 is self-executing, without necessitating any party's request.


Respectfully submitted,

Date: November 16, 2023

MARY SEGUIN

*Mary Seguin*

Mary Seguin

P.O. Box 22022

Houston, TX 77019

maryseguin22022@gmail.com

## Meghan Kenny

| | |
|---|---|
| **From:** | Mary Seguin <maryseguin22022@gmail.com> |
| **Sent:** | Friday, November 17, 2023 3:21 PM |
| **To:** | RID_ECF_INTAKE |
| **Subject:** | URGENT - TIME SENSITIVE - FILE TODAY NOTICE OF APPEAL in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS |
| **Attachments:** | CA 126 Notice of Appeal 111723.pdf |
| | |
| **Categories:** | Being Worked On MK |

**CAUTION - EXTERNAL:**

Dear Clerks of the Court,

I spoke with Clerk Meghan today regarding an update on the docketing of my motions and filing a Notice of Appeal in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Following our discussion, I emailed and filed today at 3:10 PM Eastern Time to the Clerk of the Court and respectfully requested the Clerk of the Court to docket today my Rule 60(b)(1) Motion, dated November 17, 2023, that is time-sensitive, per my email below.

**Please make sure that my previously filed Rule 60(b)(1) Motion referred in my below email is docketed as ECF 32.**

Please make sure that the law is followed so that my attached Rule 60(b)(1) Motion is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Rule 60(b)(1) Motion. No Chamber interference should be taking place to prevent the docketing of my attached Rule 60(b)(1) Motion.

Additionally, subsequent to my filing of the aforementioned Rule 60(b)(1) Motion referenced in my email below that I had requested be docketed as ECF 32, I am herewith filing my attached **Notice of Appeal** in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

**Please make sure that my Notice of Appeal filed herewith that is attached to this email is docketed today as ECF 33.**

Please make sure that the law is followed so that my attached Notice of Appeal docketed immediately upon receipt and is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Notice of Appeal. No Chamber interference should be taking place to prevent the docketing of my attached Notice of Appeal.

Thank you for your assistance.

Respectfully Submitted,
Mary Seguin
Houston, Texas

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Fri, Nov 17, 2023 at 2:10 PM
Subject: URGENT - TIME SENSITIVE - FILE TODAY RULE 60(b)(1) MOTION in Seguin v. Ri Dept of Human Services et al, Civil

Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerks of the Court,

I spoke with Clerk Meghan today regarding an update on the docketing of my motions.

Following our discussion, I respectfully request the Clerk of the Court to docket today my attached Rule 60(b)(1) Motion, dated November 17, 2023, that is time-sensitive.

**Please make sure that my attached Rule 60(b)(1) Motion is docketed as ECF 32.**

Please make sure that the law is followed that my attached Rule 60(b)(1) Motion is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Rule 60(b)(1) Motion. No Chamber interference should be taking place to prevent the docketing of my attached Rule 60(b)(1) Motion.

Thank you for your assistance.

Respectfully Submitted,
Mary Seguin
Houston, Texas

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Fri, Nov 17, 2023 at 12:33 PM
Subject: Fwd: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerks of the Court,

I am respectfully following up on my Rule 59 Motion filing.

Yesterday, November 16, 2023, at 1:31 PM Central Time, I filed via email below, my Rule 59 Motion in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS. As indicated in my email below, I emphasized that docketing the Rule 59 Motion on November 16, 2023 is urgent, to comply with the 28 day filing post-judgment deadline, which my filing meets - November 16, 2023 is within the 28 day deadline of Fed. R. of Civ. P. 59 that tolls the time for filing an appeal.

I followed up with telephone calls to the Clerk's Office at 1:32 PM Central Time, and at 3:42 PM Central Time to request timely docket of my Rule 59 Motion, and the Clerk's Office assured me each time that a deputy clerk is working on it and that it will be docketed on the day it was received by email. Further, I was told that **all filings** I email to the Clerk's Office will be docketed and considered by the Court as having been filed on the day that the motion was emailed to the Clerk's Office.

Therefore, my Rule 59 Motion emailed on November 16, 2023 should be accordingly docketed as **ECF 32** with the **entry of/stating filing on November 16, 2023**, in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

However, as of this time, on November 17, 2023 almost 24 hours later, my Rule 59 Motion is still not docketed.

2

I would like to respectfully clarify that the Text Order dated October 19, 2023 in this matter states that only my electronic filing privilege was revoked, but there is **no** order requiring that I need to file for leave of Court to file any post-judgment motions, such as my Rule 59 Motion.

Today, November 17, 2023, I telephoned the Clerk's Office first thing at 8:00 AM Central Time, and spoke with Clerk Meghan, who informed me that yesterday she had forwarded my Rule 59 Motion to Chambers upon receipt, but has yet to hear back from Chambers, but did not know what was causing the hold up when I asked why Chambers' response is taking almost 24 hours which impacts the docketing date of the Rule 59 Motion. I expressed my concern of the Rule 59 deadline, emphasizing that it tolls the time for filing an appeal, therefore I respectfully requested that the docket accurately reflects my timely filing of my Rule 59 Motion on November 16, 2023 (at 1:31 PM Central Time).

Additionally, I informed Clerk Meghan that I relied on the Clerk's Office's information provided above, and I had also filed a timely **Rule 60** Motion yesterday, **November 16, 2023**, at **4:39 PM Central Time**, similarly requesting docketing to reflect it was timely filed via email to on November 16, 2023. I emphasized to Clerk Meghan that timeliness is critical, as Rule 60 Motion filed within 28 days post-judgment tolls the time for filing an appeal. Clerk Meghan told me that my Rule 60 Motion was forwarded to Chambers as well. According to the Clerk's Office's information, my **Rule 60 Motion** needs to be docketed/filed as **ECF 33, dated stamped filed on November 16, 2023**.

Due to the above information regarding the processing of my post-judgment motions, I expressed to Clerk Megghan my concern regarding the Court's procedure of forwarding my time-sensitive post-judgment motions to Chambers without docketing/filing, and then those time-sensitive motions seemingly to languish in Chambers past the date of the 28-day deadline stipulated by Rule 59, and Rule 60 as they relate to tolling the time for filing an appeal. I expressed my explicit concern that I seek to preserve my right of appeal, and that I respectfully seek to preserve on the record the issues contained in my Rule 59 and Rule 60 Motions that are currently before Chambers, without docketing, by law within the jurisdiction of the U.S. District Court of Rhode Island. My Rule 59 and Rule 60 Motions are not ex-parte or emergency motions.

Moreover, I expressed to Clerk Meghan my concern that the processing of my post-judgment motions forwarded to Chambers and seemingly pending before Chambers without the motions being docketed, impacts my right of appeal 30-days post judgment, and today, Friday, is Day 29. I told the Clerk that under the circumstances in this matter, I seek to preserve for appeal the issues raised in my timely filed Rule 59 Motion and Rule 60 Motion, and that I seek to preserve my right to appeal within the 30-day postjudgment period.

I also discussed with the Clerk that my timely filed but undocketed Rule 59 Motion and Rule 60 Motion that were forwarded to and currently before Chambers cause an uncertain effect, impacting the date of my filing of Notice of Appeal, the deadline of which is November 18, 2023, a Saturday. Based on the current facts and issues regarding simply docketing my filings on the record, I am concerned my rights of access to the Courts are impacted, and that my Notice of Appeal may also languish I do not believe any pro se litigant should be made to be uncertain of the timeliness of filing a Notice of Appeal as a matter of right that is caused by inaction by Chambers on timely-filed Rule 59 and Rule 60 Motions that toll the time to file an appeal. I explicitly expressed my concern on the effect on my access to the Courts.

I respectfully request that this email communication regarding the filing/docketing of my Rule 59 Motion be docketed to accurately reflect the record on appeal along with the Rule 59 Motion at the time the Rule 59 Motion is docketed by the Clerk.

Thank you in advance for you assistance.

Respectfully submitted,
Mary Seguin

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Thu, Nov 16, 2023 at 1:31 PM
Subject: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk of the Court,

Kindly urgently file today, November 16, 2023, my attached Rule 59 Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 59 Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023. I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX 77019
(281) 244-2016

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

```
MIME-Version:1.0
From:cmecf@rid.uscourts.gov
To:cmecfnef@rid.uscourts.gov
Bcc:
--Case Participants: Joanna M. Achille (jachille@burnslev.com), Marissa D. Pizana
(ddiaz@riag.ri.gov, mpizana@riag.ri.gov), Mary Seguin (maryseguin22022@gmail.com),
District Judge William E. Smith (breegan_semonelli@rid.uscourts.gov,
john_hindley@rid.uscourts.gov, judge_smith@rid.uscourts.gov,
kathryn_alfus@rid.uscourts.gov, mitchell_kosht@rid.uscourts.gov,
patrick_mcgourty@rid.uscourts.gov, wesnef2@rid.uscourts.gov, wesnef@rid.uscourts.gov),
Magistrate Judge Patricia A. Sullivan (juliana_mckittrick@rid.uscourts.gov,
mag_judge_sullivan@rid.uscourts.gov, pasnef@rid.uscourts.gov,
patrick_cunningham@rid.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:1900843@rid.uscourts.gov
Subject:Activity in Case 1:23-cv-00126-WES-PAS Seguin v. Rhode Island Department of Human
Services et al Order
```
Content−Type: text/html

## U.S. District Court

## District of Rhode Island

## Notice of Electronic Filing

The following transaction was entered on 11/17/2023 at 3:39 PM EST and filed on 11/17/2023

| | |
|---|---|
| **Case Name:** | Seguin v. Rhode Island Department of Human Services et al |
| **Case Number:** | 1:23−cv−00126−WES−PAS |
| **Filer:** | |

**WARNING: CASE CLOSED on 10/19/2023**

**Document Number:** No document attached

**Docket Text:**
 **TEXT ORDER: The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra)**


**1:23−cv−00126−WES−PAS Notice has been electronically mailed to:**

Joanna M. Achille &nbsp &nbsp jachille@burnslev.com

Marissa D. Pizana &nbsp &nbsp mpizana@riag.ri.gov, ddiaz@riag.ri.gov

Mary Seguin &nbsp &nbsp maryseguin22022@gmail.com

**1:23−cv−00126−WES−PAS Notice has been delivered by other means to:**

```
MIME-Version:1.0
From:cmecf@rid.uscourts.gov
To:cmecfnef@rid.uscourts.gov
Bcc:
--Case Participants: Joanna M. Achille (jachille@burnslev.com), Marissa D. Pizana
(ddiaz@riag.ri.gov, mpizana@riag.ri.gov), Mary Seguin (maryseguin22022@gmail.com),
District Judge William E. Smith (breegan_semonelli@rid.uscourts.gov,
john_hindley@rid.uscourts.gov, judge_smith@rid.uscourts.gov,
kathryn_alfus@rid.uscourts.gov, mitchell_kosht@rid.uscourts.gov,
patrick_mcgourty@rid.uscourts.gov, wesnef2@rid.uscourts.gov, wesnef@rid.uscourts.gov),
Magistrate Judge Patricia A. Sullivan (juliana_mckittrick@rid.uscourts.gov,
mag_judge_sullivan@rid.uscourts.gov, pasnef@rid.uscourts.gov,
patrick_cunningham@rid.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:1900703@rid.uscourts.gov
Subject:Activity in Case 1:23-cv-00126-WES-PAS Seguin v. Rhode Island Department of Human
Services et al Order
```
Content−Type: text/html

## U.S. District Court

## District of Rhode Island

## Notice of Electronic Filing

The following transaction was entered on 11/17/2023 at 1:26 PM EST and filed on 11/17/2023

| | |
|---|---|
| **Case Name:** | Seguin v. Rhode Island Department of Human Services et al |
| **Case Number:** | 1:23−cv−00126−WES−PAS |
| **Filer:** | |

**WARNING: CASE CLOSED on 10/19/2023**

**Document Number:** No document attached

**Docket Text:**
**EXT ORDER: The Court is in receipt of Plaintiff's two recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra)**

**1:23−cv−00126−WES−PAS Notice has been electronically mailed to:**

Joanna M. Achille &nbsp &nbsp jachille@burnslev.com

Marissa D. Pizana &nbsp &nbsp mpizana@riag.ri.gov, ddiaz@riag.ri.gov

Mary Seguin &nbsp &nbsp maryseguin22022@gmail.com

**1:23−cv−00126−WES−PAS Notice has been delivered by other means to:**

EXHIBIT J



# STATE OF RHODE ISLAND

## FAMILY COURT

### SUBPOENA - CIVIL

| Plaintiff | Civil Action File Number |
|---|---|
| STATE OF RHODE ISLAND EX REL. GERO MEYERSIEK | K2001-0521M |
| **Defendant** | |
| MARY SEGUIN | |

| ☐ Murray Judicial Complex<br>Newport County<br>45 Washington Square<br>Newport, Rhode Island 02840-2913<br>*(401) 841-8340 | ☐ Noel Judicial Complex<br>Kent County<br>222 Quaker Lane<br>Warwick, Rhode Island 02886-0107<br>*(401) 822-6725 |
|---|---|
| ☐ McGrath Judicial Complex<br>Washington County<br>4800 Tower Hill Road<br>Wakefield, Rhode Island 02879-2239<br>*(401) 782-4111 | ☑ Garrahy Judicial Complex<br>Providence/Bristol County<br>One Dorrance Plaza<br>Providence, Rhode Island 02903-2719<br>*(401) 458-3200 |

TO: JOHN LANGLOIS, KEVIN TIGHE, PAUL GOULD, FRANK DIBIASE

of RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES 77 DORRANCE ST PROVIDENCE RI 02903

☑ **YOU ARE HEREBY COMMANDED** to appear in the Family Court listed above at the date, time, and courtroom specified below to testify in the above-entitled case and bring with you:

① ALL RECORDS, FILES NOTES, PUBLIC RECORDS, DOCUMENTS, FILMS, MATERIALS GENERATED IN THE COURSE OF ADMINISTRATION OF AND ENFORCEMENT OF RELATING TO DEFENDANT MARY SEGUIN, FROM 2010 TO THE PRESENT, IN THIS TITLE IV-D CASE UNDER THE SOCIAL SECURITY ACT

② ALL RECORDS RELATING TO DEFENDANT MARY SEGUIN FROM 2010 TO THE PRESENT, INCLUDING NOTES AND MESSAGES TAKEN AND GENERATED ON OCTOBER 5, 2022.

| Courtroom | Date | Time |
|---|---|---|
| GARRAHY COURTROOM 5F | MARCH 28, 2024 | 9:30 AM |

If you need language assistance, please contact the Office of Court Interpreters at (401) 222-8710 or by email at interpreterfeedback@courts.ri.gov before your court appearance.

* If an accommodation for a disability is necessary, please contact the Family Court Clerk's Office at the telephone number listed above as soon as possible. TTY users can contact the District Court through Rhode Island Relay at 7-1-1 or 1-800-745-5555 (TTY) to voice number.

FC-73 (revised June 2020)

EXHIBIT K

11:28:47 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E    T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY              U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP
WANTS THE INTEREST PUT BACK ON THE CASE ( ████████████████████████████
████████████████████████████ ). WE REMOVED THE INTEREST WHEN
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-.
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED
FOR PASSPORT PURPOSES IN ANY EVENT.

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

```
RL: 80  12 22 ABSP:              SEGUIN        MARY           CMD:
FNX: TRAC  D CLIENT:             MEYERSIEK     GERO     K     PNL:
```

11:28:56 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E    T R A C K I N G           CSCL  ASMXA201
            TRAC.00                  CASE HISTORY             U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSMENTS SO WE CAN GET THIS SORTED
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT.

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES

```
RL: 80  12 22 ABSP:          SEGUIN        MARY           CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK     GERO    K      PNL:
```

11:29:01 Tuesday, December 13, 2022

```
12/13/22    11:28         C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00                CASE HISTORY            U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES____
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.____

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE_____
     FROM CASE DATA PANEL_____

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT_____
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y_____
FROM CASE ID: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓_____
     FROM OFST PANEL_____   .

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

```
RL: .80  12 22 ABSP:              SEGUIN       MARY          CMD: _____
FNX: TRAC  D CLIENT:              MEYERSIEK    GERO      K   PNL:
```

```
12/13/22   11:28          C A S E   T R A C K I N G           CSCL  ASMXA201
.          TRAC.00              CASE HISTORY                  U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN____
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT___
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE____
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN____
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE____
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-____
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE____
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW____
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE_____
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS_____
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS_____
CONCERNED ABOUT MAILING THE CHECK._____

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____

RL: 80  12 22 ABSP:           SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK   GERO    K    PNL:
```

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00           CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
     TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
     58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

RL: 80  12 22 ABSP:            SEGUIN      MARY          CMD:
FNX: TRAC  D CLIENT:           MEYERSIEK   GERO     K    PNL:
```

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E    T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
     TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
     58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

```
RL: 80  12 22 ABSP:           SEGUIN      MARY          CMD:
FNX: TRAC  D CLIENT:          MEYERSIEK   GERO     K    PNL:
```

11:29:13 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

RL: 80  12 22 ABSP:           SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK   GERO    K   PNL:
```

11:29:17 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E    T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY              U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

```
RL: 80  12 22 ABSP:            SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK   GERO    K   PNL:
```

11:29:27 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00                CASE HISTORY            U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

04/05/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE PERFECTED LIEN OF INSURANCE ASSETS FORM
ON 04/04/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

04/28/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED NOTICE OF LEVY TO BANK OF AMERICA REGARDING A LIEN ON NCP.'S
ACCOUNT. COPY MAILED TO NCP

11/29/22 FORM, NOTICE OR LETTER GENERATED
         2310 LEGAL FORMS: MOTIONS INITIAL MOTION

11/29/22 KARLA SAMAYOA (KWS1263) ENTERED COMMENT
PER ATTY JL REQUEST TO SET ARREARS; PROCESSED FIRST PART OF MOTION TO SET
ARREARS.

```
RL: 80  12 22 ABSP:            SEGUIN        MARY            CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK     GERO      K     PNL:
```

11:29:32 Tuesday, December 13, 2022

```
  12/13/22   11:28        C A S E   T R A C K I N G       CSCL  ASMXA201
                TRAC.00              CASE HISTORY          U824  PROD
  STARTING DATE   09 01 2021
  SELECTION    COMPREHENSIVE CASE HISTORY

  12/09/22 RICHARD MULCAHEY (RJM3553) ENTERED COMMENT_____
  PARTIES HAD TWO CASES ON SYSTEM ONE WITH DASH DUE TO CHANGE OF_____
  CUSTODY._____
  THE CASE WITH THE - ALSO OMITTED A 0 IN THE CASE DOCKET NUMBER._____
  THIS PREVENTED ANYTHING FROM BEING SENT OR RCVD FROM RIFC, AND MADE____
  OUR DOCKET NUMBER APPEAR INCORRECT WHEN IT IS GENERATED ON FORMS._____
  THE K010521M CASE WAS A CLOSED CASE. DEACTIVATED THAT DOCKET, AND PLACED_____
  THE CLOSED CASE ON A NEW RECIPROCAL NUMBER ■■■■■■■■■- 22R????._____
  THE K01-521M CASE HAS BEEN CHANGED TO THE CORRECT DOCKET, IT IS NOW____
  K010521M IN ACCORDANCE WITH THE DOCKET THAT THE FC HAS FOR THE CASE.___

  12/09/22 FORM, NOTICE OR LETTER GENERATED_____
       2310 LEGAL FORMS: MOTIONS INITIAL MOTION_____


  RL: 80  12 22 ABSP:            SEGUIN      MARY         CMD: _____
  FNX: TRAC  D CLIENT:           MEYERSIEK   GERO     K   PNL:
```

## Langlois, John (DHS)

| | |
|---|---|
| **From:** | Barbara Grady <bgrady@dugangradylaw.com> |
| **Sent:** | Thursday, October 13, 2022 2:53 PM |
| **To:** | Langlois, John (DHS) |
| **Subject:** | [EXTERNAL] : RE: Meyersiek v. Seguin; K01-521M |

John

I finally connected with my client and as I suspected he is not willing to waive 100% of the interest. Mary NEVER paid a single dollar in child support or any other expenses for Julia so he is not particularly warm to the idea of wiping out the interest that is owed to him. However in an effort to resolve this he is willing to accept $55,000 which is approx. 50% of what is owed. Please advise if that will do it. Thanks

***Barbara E. Grady, Attorney***
**Dugan Grady Law Offices**
303 Jefferson Boulevard
Suite 3
Warwick, RI (401) 351-4800
(401) 351-4802 Fax

THIS TRANSMITTAL IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE TRANSMITTAL TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DELETE THE ORIGINAL MESSAGE. THANK YOU.

**From:** Langlois, John (DHS) <John.Langlois@dhs.ri.gov>
**Sent:** Tuesday, October 11, 2022 2:57 PM
**To:** Barbara Grady <bgrady@dugangradylaw.com>
**Subject:** Meyersiek v. Seguin; K01-521M

Hi Barbara, have you had a chance to speak to Mr. Meyersiek yet? Is he willing to waive the interest to resolve the case?

John A. Langlois
Deputy Chief Legal Counsel
Executive Offices of Health and Human Services
77 Dorrance Street
Providence, RI 02903
Telephone (401) 458-4481
Facsimile (401) 458-4409

This message and all attachments are confidential or proprietary to DHS, and disclosures, or distribution to anyone other than the intended recipient without the prior written permission of DHS is prohibited. This message and any attachments may contain confidential health information and/or confidential and/or proprietary information that is protected by law. This information is intended only for the use of the individual or entity names above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, or distribution is strictly prohibited. If you think you have received this message in error, please notify the sender by replying to the e-mail and delete the message without disclosure. Thank you.

EXHIBIT L



cseinfo.dhs.ri.gov

ADCB Internet Banking | Community Health Choice |... | Sign In - Community Healt... | Case Manager Portal | Offi... | RI OCSS Payment

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov

**State of Rhode Island**
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Home  My Profile  Contact Us  Site Map  Log

**Menu**

Case Information
- Last 5 Payments
- Last 13 Months
- Current Orders/Past Due Balances
- Court Dates/Appointments
- Enforcement Actions
- PIN Lookup

Home > Current Orders and Past Due Balances

**Case Manager**

### Current Orders / Past Due Balances

**Custodial Parent:** Gero K Meyersiek    **CSE ID:** 1689817

**Current Orders**

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

↑ Note: Medical orders and medical arrears are not listed on this screen.

**Past Due Balances**

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |

EXHIBIT M

State of Rhode Island and Providence Plantations


PROVIDENCE, Sc.                          FAMILY COURT




*******************************
GERO MEYERSIEK



Vs.                      F.C. FILE NO. K2001-0521M



MARY SEGUIN
*******************************


Heard Before:

The Honorable Magistrate Armando O. Monaco

On March 6, 2023


**APPEARANCES:**


FOR MS. SEGUIN. . . . . Pro se

FOR THE STATE. . . . .. Paul Gould, Esq.


1

                    I HEREBY CERTIFY THAT THE

                    FOLLOWING IS A TRUE AND ACCURATE

                    TRANSCRIPT IN THE CASE OF

                    GERO MEYERSIEK VS. MARY SEGUIN

                    HEARD BEFORE

                    MAGISTRATE ARMANDO O. MONACO

                    ON MARCH 6,2023.




                    STEVEN FAZIO
                    ELECTRONIC COURT REPORTER

2

1          **GERO MEYERSIEK V. MARY SEGUIN**

2               **F.C. NO. K2001-0521M**

3               **MARCH 6, 2023**

4

5               **MARY SEGUIN:** Having been

6     duly sworn testifies as follows:

7                    THE COURT: After the

8     February 12th hearing two orders were submitted

9     one by each side, objections were filed through

10    your order being entered, ma'am.

11                   MS. SEGUIN: Thank you Your

12    Honor. I am sorry. Could you repeat that again?

13    Sorry.

14                   THE COURT: Subsequent to the

15    hearing of February 10,2023, two separate orders

16    were submitted for my signature. One you

17    submitted and one the State submitted. The State

18    filed an objection to the submission of your

19    order on the basis that they alleged, I believe,

20    that it is not what I said.

21                   MS. SEGUIN: And I also filed

22    an objection to their proposed order that also

23    clearly states a lot of additional items that

24    were never before the Court. Including the

25    number now that they have now, they submitted a

                              3

1     $75,623.71 and then another one for $6028.75.

2     These two numbers were not even in their

3     original motion to establish arrears that was up

4     before the court on February the 10th and those

5     two numbers were never brought up as well. And

6     without a clear understanding and audit of what

7     those numbers represent. Because they

8     unilaterally of their own volition without any

9     court approval.

10                    ATTORNEY GOULD: Judge,

11    objection.

12                    MS. SEGUIN: Took off the

13    interest.

14                    THE COURT: Let me interrupt

15    you, ma'am. Where are you getting these two

16    numbers from? I do not see them anywhere.

17                    MS. SEGUIN: Exactly. That is

18    the order proposed order that the State had

19    filed. You are absolutely right. Your Honor.

20    Those two numbers--

21                    THE COURT: I am looking at

22    the proposed state order that has different

23    numbers then what you are saying.

24                    MS. SEGUIN: The proposed

25    order that they submitted to me, on #4 it says

4

1        $75,623.71 for interest. And then a medical

2        support interest for $6028.75. Now these two

3        numbers were never before the Court before on

4        February the 10th. On February the 10th they

5        brought up a motion that mentioned $81,000.

6                        THE COURT: Well, maybe that

7        is a combination of the two numbers.

8                        ATTORNEY GOULD: Yeah, Judge.

9        That is the combination.

10                       MS. SEGUIN: So sorry, go

11       ahead.

12                       ATTORNEY GOULD: There was an

13       objection, Judge.

14                       THE COURT: Yeah, what is

15       your objection, Paul?

16                       ATTORNEY GOULD: We are off

17       the subject. The subject is whether this order

18       should enter or not.

19                       THE COURT: Right.

20                       ATTORNEY GOULD: Not about

21       any agreements, not about anything else other

22       than the numbers and Judge if I may or I will

23       let the defendant continue Judge.

24                       THE COURT: I thought my

25       order was very simply was to set the arrears as

5

1    they appear on the State computer but without

2    prejudice and then there will be a subsequent

3    hearing to determine whether or not those

4    numbers are in fact accurate. As I am reading

5    the order, they put two numbers in and it is

6    clearly, let me read the paragraph. Yeah,

7    paragraph six, the Court finds that the total

8    the arrears of $81,000, which is the combined

9    number is placed on the Child Support ledger

10   without prejudice to the June 8, 2023 hearing.

11   The State agrees it shall respond to the

12   defendant's first request for production of

13   documents forthwith.

14               MS. SEGUIN: Yes, Your Honor.

15   So therefore, you had not made any kind of

16   findings of fact of whatever they might be. You

17   simply said put the interest back--

18               THE COURT: Yeah, I said

19   whatever the computer says is the balance. Put

20   it on the computer without prejudice, which

21   means that we need a starting point. You need to

22   know what they allege you owe and that is what

23   they are alleging you owe. You disagree with

24   that number. You asked them for the

25   documentation to substantiate that number. That

6

1      is why I continued it out all the way to June so

2      that you would have an opportunity to get their

3      materials, for you to you digest their

4      materials, provide counter materials back to

5      them. So that in June, a full hearing can be

6      held with everyone totally prepared as to argue

7      either position. Either there is no money due or

8      there is a balance due. I never made any finding

9      whatsoever there is in fact a balance due. If I

10     did, I would not have continued the hearing.

11              MS. SEGUIN: Thank you, Your

12     Honor. That is exactly what my understanding as

13     well.

14              THE COURT: Right. That is

15     what the order says. It says put the number on

16     the computer, but without prejudice, which means

17     both sides have to argue and convince the Judge

18     that that is in fact the number. Or you are

19     going to argue it is an incorrect number and you

20     are going to substantiate it by whatever

21     arguments you present. They going to

22     substantiate it by whatever arguments they

23     present. And then whoever hears it in June will

24     decide which side is correct.

25              MS. SEGUIN: Thank you, Your

7

1  Honor. I wanted to make sure that, you know,

2  that all parties understand that because at this

3  point, the State is saying that you already

4  found that I had—-

5      THE COURT: No, no. The State

6  is not saying that because the order clearly

7  says those numbers or that number is without

8  prejudice, which means I did not establish that

9  number. We do it in many of these cases to get

10  the ball rolling, so either side knows what they

11  need to produce to substantiate their positions.

12  The same way they can come in now and say, Oh,

13  no, we made a mistake. She actually owes

14  $185,000.

15      MS. SEGUIN: You are giving

16  me a heart attack, Your Honor.

17      THE COURT: It puts a cap on

18  what they can argue.

19      ATTORNEY GOULD: Judge, can I

20  respond now?

21      MS. SEGUIN: So, Your Honor,

22  with that in mind, just to clarify, that is what

23  they are saying in 2018 when they first took

24  off--

25      ATTORNEY GOULD: Objection.

8

1                THE COURT: Just a minute.

2    The order speaks for itself. It says the balance

3    on the computer as of whatever dates in there. I

4    cannot read it now quickly, whatever dates in

5    there, that is the balance on the computer. They

6    have to substantiate it. They are going to send

7    you documentation supposedly to substantiate it.

8    If they cannot substantiate, then they are not

9    going to get that number.

10              ATTORNEY GOULD: Judge, I

11    disagree with that. Judge, we have no obligation

12    to substantiate this. There is a Child Support

13    number that was established by Judge McCann. You

14    took judicial notice of that.

15              THE COURT: I took judicial

16    notice that there was no appeal of his order.

17    That is what the judicial notice of.

18              MS. SEGUIN: Thank you, Your

19    Honor. Thank you, Your Honor. That is my

20    understanding as well that you took judicial

21    notice of the orders themselves. But what is in

22    dispute is how the child support office has

23    handled this computation.

24              THE COURT: That's the

25    argument for June, ma'am. That is the argument

1    for June.

2                        MS. SEGUIN: Taking that off

3    the system without your approval. Now, put it

4    that way--

5                        THE COURT: What you are

6    arguing now is what you need to argue in June. I

7    am satisfied that the order that has been

8    presented by the State that breaks down the two

9    balances that the total is $81,000 is in fact

10   the appropriate order from the hearing. It is

11   without prejudice. They are going to provide

12   documents that you requested so that you can

13   then decide whether or not you agree or

14   disagree. And if you disagree with their method

15   of calculating it, you need to present why you

16   think that method is incorrect and what should

17   be the correct number if any.

18                        MS. SEGUIN: Yes, and

19   including a waiver of interest –

20                        THE COURT: You are arguing

21   whether the number is correct or not. That is

22   the whole purpose of making it without

23   prejudice.

24                        MS. SEGUIN: Yes, and that

25   would include the waiver of interest that had

                              10

1    occurred.

2                        THE COURT: No, that is the

3    subject of the hearing. That is the subject of

4    the hearing. I am making no finding about

5    whether there was or was not a waiver of

6    interest.

7                        MS. SEGUIN: Thank you, Your

8    Honor. So that is part of the discovery that

9    needs to happen.

10                        THE COURT: Well, that is

11    what I assume you are asking for. Is to get the

12    documentation that would have substantiate your

13    belief that there was the waiver of the

14    interest.

15                        MS. SEGUIN: Thank you, Your

16    Honor.

17                        THE COURT: So, if you can

18    substantiate that there was a waiver of

19    interest, that balance disappears.

20                        MS. SEGUIN: So, the State is

21    objecting to producing those protected

22    documents—

23                        THE COURT: No, no. They are

24    not objecting to producing any documents. The

25    line paragraph says in paragraph 10, The State

11

1    agrees it shall respond to the defendant's first

2    request for production of documents forthwith.

3    So, whatever you asked them for, they are going

4    to they are going to provide to you. If you do

5    not think they provided everything you asked

6    for, you file a supplemental request.

7                      ATTORNEY GOULD: The State

8    filed its answer in response to her request for

9    production, Judge. And I will stand by that. And

10   I will argue those issues that we refuse to

11   answer, or we objected on procedural grounds or

12   we objected on legal grounds for what we did.

13   And I will respond to that when it is

14   appropriate.

15                      THE COURT: That would be

16   June 8th. That will be done on June 8th. So, you

17   can be prepared to go forward on whatever your

18   objections are and whoever hears it will decide

19   whether the objections were valid or not.

20                      MS. SEGUIN: Your Honor, Mr.

21   Gould had said something to me, emailed

22   something to me to the affect that he said you

23   will be retiring June the 8th. I just wanted to

24   know why he emailed me something like that.

25                      THE COURT: It has been

1    projected that I am to retire sometime before

2    July 1st. They are dealing with my successor and

3    I sit until my successor is appointed and

4    qualified. And the projection is by the end of

5    the by end of June, the latest could be earlier.

6    I do not think it could be later, but it is

7    possible.

8                        ATTORNEY GOULD: And Judge,

9    because we, I guess, we like making these

10    artificial records, I will make this record

11    here. I did not say that snd I resent the

12    defendant putting words in my mouth.

13                        MS. SEGUIN: I indicated the

14    email that you wrote to me.

15                        THE COURT: Listen, just a

16    minute, just a minute. Whether I sit or I do not

17    sit is an immaterial situation, it has nothing

18    to do with what is before me today. I am ruling

19    on the order they sent you breaking down the

20    balances between the child support and medical

21    arrears is valid as to what I said the last time

22    we were here. I am going to sign that order and

23    proceed with their discovery. Whatever

24    objections you have relative to the discovery

25    and whoever sits here, whether it is me or

1    someone else, they will be prepared to address

2    the situation. Okay.

3              MS. SEGUIN: Thank you, Your

4    Honor. Thank you. One last question about number

5    11 and 12. I mean, those elements—

6              THE COURT:  11 and 12?

7              MS. SEGUIN: Yeah, 11 and 12.

8              THE COURT: 11 tells you how

9    to contact us. 11 is how to contact us and 12 is

10    a standard paragraph that they put in indicating

11    that, I don't know why it's here, but they that

12    the standard paragraph they stick in every case

13    has no bearing on this one. Other than it says

14    that until it is paid in full, you know, the

15    order will continue to run. But there is no

16    order running in terms of what your obligation

17    to pay that is.

18              MS. SEGUIN: Okay, okay. So

19    that is something that is boilerplate.

20              THE COURT: That is

21    boilerplate and 11 is how you get in touch with

22    us.

23              MS. SEGUIN: Sure.

24              THE COURT: We do not put

25    that in, we will never have any hearings.

14

1          MS. SEGUIN: Thank you, Your

2     Honor.

3               ATTORNEY GOULD: If I could

4     talk this time a little bit. Maybe just for the

5     record. Those same paragraphs were in the

6     September 25th, 2012 orders. And that same

7     boilerplate languages in a July 11, 2012 orders

8     and any other order that she would receive.

9     August 15, 2012. That same identical language

10    was contained in those. It is boilerplate.

11              THE COURT: Yeah,

12    boilerplate. All right, we will see you on June

13    8th at 2:30. Wait a minute. Daylight savings

14    time is starting soon.

15              MS. SEGUIN: Oh, yeah.

16              THE COURT: All right. Do you

17    go on daylight saving time? Pay attention.

18              MS. SEGUIN: Okay.

19              THE COURT: This coming

20    Saturday, our clocks jump forward an hour. So,

21    your clock does not jump forward. You are going

22    to have to call in an hour earlier.

23              MS. SEGUIN: All right.

24              THE COURT: I have friends

25    that live in Arizona, and they told me that in

15

1    Arizona, there were three different time zones

2    in the summer.

3              MS. SEGUIN: Yeah, every

4    county is allowed to do that out here.

5              THE COURT: I know that. That

6    is why that is why I pay attention to it because

7    they tell me that people have trouble. They

8    think, Oh, I am going to be on time, I am going

9    to Court. They said, No, you are an hour late.

10    What do you mean? This is the time across the

11    street. No, that is an hour different than us.

12              MS. SEGUIN: It really is

13    crazy. That they have marked it off, not a

14    county, but across the street. You are

15    absolutely right.

16              THE COURT:  All right. So,

17    pay attention. It is 2:30 our time.

18              ATTORNEY GOULD: Judge, if I

19    may. The order I submitted that contains 12

20    paragraphs.

21              THE COURT: Yes.

22              ATTORNEY GOULD: February 10,

23    2023, starting with paragraph one, the matter is

24    continued.

25              THE COURT: Yes.

16

1              ATTORNEY GOULD: That order

2      is going to be accepted by the Court. That will

3      be the order of the Court for that day?

4              THE COURT: Right.

5              ATTORNEY GOULD: The order

6      that she submitted will be stricken, correct?

7              THE COURT: Right.

8              MS. SEGUIN: Yes, that is my

9      understanding, too. Yes.

10             ATTORNEY GOULD: Thank you,

11     Judge.

12             THE COURT:  All right. We

13     will see you in June.

14             ATTORNEY GOULD: One more

15     thing. I am sorry. Judge, if I may, can the

16     defendant place her address on the record?

17     Because we sent some correspondence that was

18     sent back to us. Now we have used her email as a

19     courtesy to her and we also need an actual

20     street address so that we can send her

21     documents.

22             MS. SEGUIN: Your Honor, I

23     think this is, I do not really understand why --

24             THE COURT: Let me just

25     interrupt. Let me interrupt. When you enter your

17

1    appearance, you need to provide under the rules

2    your address, your phone number, and your email

3    address.

4               MS. SEGUIN: Yes.

5               THE COURT: And if you were

6    an attorney, obviously your bar number. Okay so

7    if you change any of those addresses or emails,

8    you are under an obligation to keep updating it

9    because if they send anything to the address or

10    the email that you provided, it's not a defense

11    later on, Oh, it's not my address or email, I

12    changed it. So that is why they are asking to be

13    sure they get the right method to contact you,

14    depending on what they have to send. It is a

15    part of the Court order that you provide your

16    address and email address.

17               MS. SEGUIN: Your Honor, may

18    I also then ask that the State sent me a or e-

19    file any notices? Because they have been mailing

20    things to me in Texas, which takes 10 to 12 days

21    for me to receive by regular mail. So, could you

22    also please, I am going to ask you please to

23    ask, to make them, to order them to notice me by

24    electronic means as well.

25               THE COURT: Well, that's part

```
1    of the rules, too.

2                    MS. SEGUIN: Okay.

3                    THE COURT: All right?

4                    MS. SEGUIN: Okay. Thank you,

5    Your Honor. I appreciate you telling me.

6                    THE COURT: All right, June

7    8th.

8                    ATTORNEY GOULD: I do not

9    have an address, Judge.

10                   THE COURT: Oh, that is

11   right. What is your updated address?

12                   MS. SEGUIN: My address is on

13   the on file is P. O. Box 22022 Houston, Texas,

14   77019.

15                   THE COURT: What about email?

16                   MS. SEGUIN: That's Mary

17   Seguin 22022 at Gmail.com. They are also in my

18   pleadings as well.

19                   THE COURT: Slow down. Slow

20   down. We do not type that fast.

21                   THE CLERK: I did not get

22   that P. O. Box. Can you give it to me again,

23   please?

24                   MS. SEGUIN: Yes, it is,

25   22022.
```

1                          THE COURT: That is the P. O.

2      Box number?

3                          MS. SEGUIN: Yes, Your Honor.

4                          THE COURT: Making sure it

5      was not the zip or area code.

6                          MS. SEGUIN: It is one too

7      many numbers.

8                          THE COURT: What is the zip

9      in Houston?

10                         MS. SEGUIN: It is 77019.

11                         THE COURT: All right, all

12     set?

13                         MS. SEGUIN: Thank you, Your

14     Honor.

15                         THE COURT: Okay, June 8.

16                         ATTORNEY GOULD: Thank you,

17     Judge.

18                         MS. SEGUIN: Thank you, Your

19     Honor.

20

21

22

EXHIBIT N

cseinfo.dhs.ri.gov

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov:

State of Rhode Island
## Office of Child Support Services
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Seguin

Home My Profile Contact Us Site Map Log Out

**Menu**

▼ Case Information
  ▸ Last 5 Payments
  ▸ Last 13 Months
  ▸ Current Orders/ Past Due Balances
  ▸ Court Dates/ Appointments
  ▸ Enforcement Actions
▸ PIN Lookup

Home > Last 13 Months

Case Manager

### Last 13 Months

Custodial Parent: Gero K Meyersiek          CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|--------|--------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

EXHIBIT II.

No. 23-1851

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official
capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY
FOBERT, KARLA CABALLEROS and TIMOTHY FLYNN in their individual
and official capacities; GERO MEYERSIEK; BARBARA GRADY

Defendants-Appellees.

Appeal from the United States District Court
for the District of Rhode Island

_____

**APPELLANT'S RENEWED MOTION TO IMPOSE SANCTIONS
AGAINST APPELLEES AND COUNSELS FOR APPELLEES**

**FOR OBSTRUCTION OF JUSTICE FRAUD ON THE COURT,**

**CONSPIRACY TO SUBORN PERJURY, MISPRISION OF FELONIES,**

**CONSPIRACY TO MAKE FALSE CLAIMS**

_____

**ORGANIZED FRAUD, THEFT OF PUBLIC MONEY AND
GOVERNMENT PROGRAMS INVOLVING BILLIONS OF DOLLARS**

**Unlawful Interstate Collection of Unlawful 12% Compound Interest Within
the Title IV-D Legal Framework Involving Organized Felonious Acts and**

## Obstruction of Justice by Appellees, and Obstruction of Justice and Misprision of Felony by Appellee Counsels

Appellant, MARY SEGUIN, respectfully renews her motion for sanctions, pursuant to **28 U.S.C. § 2106** and Fed. R. App. P 27, against the Appellees and counsels for Appellees, for Obstruction of Justice, the conspiracy to defraud the Court, defraud the United States, make false claims, obstruct justice, obstruct official proceedings, falsification of records, conspiracy to suborn perjury and make false statements, including misprision of felony before this Court.

Appellant invokes 18 U.S.C. **§ § 503.**

Appellant invokes 18 U.S.C. **§ 4.**

Appellant invokes **18 U.S.C. § 2.**

Appellant invokes **18 U.S.C. § 3.**

Appellant invokes ***United States v. Olson*, 856 F.3d 1216 (9th Cir. 2017).**

Appellant invokes ***United States v. Sullivan*, Case No. 3:20-cr-00337-WHO (N.D. Cal.).**

Appellant invokes ***Nix v. Whiteside*, 475 U.S. 157 (1986).**

Appellant invokes ***United States v. Silverman,*** 745 F.2d 1386, 1395 (11th Cir. 1984).

Appellant invokes **18 U.S.C. § 2(b)**, and ***United States v. Walser***, 3 F.3d 380, 388 (11th Cir. 1993).

Appellant invokes Rules 1-102, 4-101 and 7-109 of the Code of Professional Responsibility.

Appellant invokes Canons 1,4, and 7, and Ethical Consideration 7-26.

Appellant invokes R.I. Gen. Law **§** 11-32-1.

Appellant invokes R.I. Gen. Law **§** 11-32-3.

Appellant invokes R.I. Gen. Law § 11-1-1.

Appellant invokes *State v. Flynn*, 100 R.I. 520 (R.I. 1966).

Appellant invokes *State v. Horton*, Dougherty, 47 R.I. 341 (R.I. 1926).

In support of the motion for sanctions, Appellant states as follows:

### Corrupt, felonious and indictable obstruction of justice and perversion of justice

Between April 4, 2024 and April 9, 2024, from the jurisdiction of Rhode Island, State Appellees and counsels for State Appellees, Special R.I. Attorney General M. Pizana and M. Shaw submitted to this Court nine (9) copies of the State Appellee-Brief that contains, signed by Attorney Pizana, fraud on the Court felonious lies

repeated over a dozen times that the Appellees are enforcing lawful interstate child support [interest] against the Texas Appellant.  Counsels and Appellees had repeatedly submitted from the jurisdiction of Rhode Island court filings signed by attorneys in the United States District Court and in this U.S. Court of Appeals, containing statements to similar effect, obstructing justice.

Plainly, this action concerns the **<u>unlawful</u>** collection by the Appellees of unlawful 12% compound interest under the Title IV-D Legal Framework through felonious acts that involve, as it turns out by official state policy, the felonious removal in interstate support cases of the unlawful 12% compound interest from the Title IV mandated automated data processing system in 2018 when the Appellees sent the support collection to TEXAS under 42 U.S.C. **§ 666(14)** in order to conceal the unlawful 12% compound interest (leaving it on the system would expose Rhode Island's ineligibility to participate in Title IV), and after inducing the Appellant to pay off the principle support in one lump sum $104,185.98 by representing to the Appellant that Appellee GERO MEYERSIEK waived interest as consideration of the lump sum payment, Appellees put back onto the system the unlawful 12% compound interest.  Appellees-counsels are accessories to the crimes after the fact, and conceal the felonious crimes through obstruction of justice, misprision of felonies, subornation of perjury and knowing false representations to (the requisite) truth-seeking United States judges who

themselves are under Oath to the United States Article III courts under the Constitution explicitly conferred duty by Congress under 18 U.S.C. § 4, 18 U.S.C. § 503 (United States judges are explicitly conferred expressed duty by Congress in the statutory text under 18 U.S.C. §4).

The omnibus clause, or "catch-all provision" of 18 U.S.C. § 1503, provides:

Whoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be (guilty of an offense).

In this case, the clause shall be read broadly to include any conduct interfering with the fair administration of justice if that conduct was undertaken with a corrupt motive, since Appellees corruptly reached interstate to TEXAS. Appellees corruptly and feloniously sent false certifications to Texas in 2018 certifying there is no interest due, after Appellees corruptly and feloniously removed the unlawful 12% compound interest from the Title IV automated data processing and information retrieval system. Then in 2021, Appellees placed fraudulent liens in Texas on Texas properties, and endeavored to and did corruptly influence, obstruct and impede the due administration of justice in Texas under 18 U.S.C. § 1503,

*United States v. Howard*, 569 F.2d 1331, 1333-36 (5th Cir.).  Their justice obstructive acts are felonious in Texas and in the Fifth Circuit.

From the jurisdiction of Rhode Island, Appellees and counsels for Appellees in this action have actively submitted to courts of the United States in judicial proceedings over two dozen filings that consistently lie that they are collecting or enforcing lawful support interest.  **The United States Supreme Court favors a <u>broad</u> reading of the omnibus clause. In** ***United States v. Aguilar***, **___ U.S. ___, 115 S.Ct. 2357 (1995).**

Convictions under the omnibus clause of 18 U.S.C. § 1503 have been based on the following conduct: Endeavoring to suborn perjury. ***United States v. Kenny*, 973 F.2d 339 (4th Cir. 1992);** ***United States v. Casel*, 995 F.2d 1299 (5th Cir. 1993);** ***United States v. Tranakos*, 911 F.2d 1225 (10th Cir. 1990);** ***Falk v. United States*, 370 F.2d 472 (9th Cir. 1966).**

Appellees' and their counsels' obstruction of justice acts are designed to thwart this Court's judicial function**.**  *See United States v. Aguilar*, *supra.*

A party may be prosecuted under section 1503 for endeavoring to obstruct justice ***United States v. Williams*, 874 F.2d 968, 976 (5th Cir. 1989).**

The term "officer in or of any court of the United States" includes**:** United States District Judges, ***United States v. Jones*, 663 F.2d 567 (5th Cir. 1981) (by**

implication); *United States v. Glickman*, 604 F.2d 625 (9th Cir. 1979) (by

implication); *United States v. Fasolino*, 586 F.2d 939 (2d Cir. 1978) (per

curiam) (by implication); *United States v. Margoles*, 294 F.2d 371, 373 (7th

Cir.), Supreme Court Justices, United States Courts of Appeals Judges,

United States Magistrate Judges, clerks of Federal courts, law clerks to

Federal judges, Federal court staff attorneys, Federal court reporters, Federal

prosecutors and defense counsel. Because 18 U.S.C. § 1503 applies to civil, as

well as criminal judicial proceedings, *Roberts v. United States*, 239 F.2d 467, 470

(9th Cir. 1956); *Sneed v. United States*, 298 F. 911, 912 (5th Cir.), *cert. denied*,

265 U.S. 590 (1924); *see Nye v. United States*, 137 F.2d 73 (4th Cir.) (by

implication), *cert. denied*, 320 U.S. 755 (1943), private attorneys are also covered

by the statute.

In this case, there are several pending judicial proceedings protected by and

governed under 18 U.S.C. § 1503 (including the omnibus clause). *United States v.*

*Neal*, 951 F.2d 630 (5th Cir. 1992); *United States v. Guzzino*, 810 F.2d 687 (7th

Cir.), *cert. denied*, 481 U.S. 1030 (1987); *United States v. Capo*, 791 F.2d 1054,

1070 (2d Cir. 1986), *reh'g granted on other grounds*, 817 F.2d 947 (2d Cir.

1987) (en banc); *United States v. Johnson*, 605 F.2d 729, 730 (4th Cir.

1979), *cert. denied*, 444 U.S. 1020 (1980); *United States v. Baker*, 494 F.2d 1262,

1265 (6th Cir. 1974); *United States v. Smith*, 729 F. Supp. 1380 (D.D.C. 1990).

The proceedings were pending once the judicial machinery has been activated, as is applicable to this matter. ***United States v. Gonzalez-Mares*, 752 F.2d 1485 (9th Cir.) (although a complaint had not been filed at time of the interview with the probation officer, the proceeding was pending because the defendant was in custody and had signed a waiver of her right to trial and sentencing by the court), *cert. denied*, 473 U.S. 913 (1985). *But see United States v. Blohm*, 585 F. Supp. 1112 (S.D.N.Y. 1984) (coverage of omnibus clause not limited to situations in which an action is pending; alternatively, action was pending because defendant was appealing the case at the time he committed the obstructive conduct).**

Appellees and counsels for appellees have knowledge that their perjurious, corrupt and felonious actions are likely to affect this and other pending judicial proceedings**, *United States v. Aguilar*, ___ U.S. ___, 115 S.Ct. 2357 (1995); *United States v. Frankhauser*, 80 F.3d 641 (1st Cir. 1996); *United States v. Vesich*, 724 F.2d 451 (5th Cir. 1984); *United States v. Jackson*, 850 F. Supp. 1481 (D. Kan. 1994); *but see United States v. Littleton*, 76 F.3d 614 (4th Cir. 1996). There is no requirement, however, that the defendant know that the proceedings are Federal in nature. *United States v. Duran*, 41 F.3d 540, 544 (9th Cir. 1994); *United States v. Mullins*, 22 F.3d 135, 1369 (6th Cir.**

1994); *United States v. Aragon*, 983 F.2d 1306, 1310 (4th Cir. 1993); *United States v. Ardito*, 782 F.2d 358 (2d Cir.), *cert. denied*, 476 U.S. 1160 (1986).

"Corruptly" has been described to mean "for an evil or wicked purpose," *United States v. Ryan*, 455 F.2d 728, 734 (9th Cir. 1972); "with the purpose of obstructing justice," *Rasheed*, 663 F.2d at 852; "for an improper motive," *United States v. Haas*, 583 F.2d 216, 220 (5th Cir. 1978), *cert. denied*, 440 U.S. 981 (1979); and, "at least in part, by a corrupt motive," *United States v. Brand*, 775 F.2d 1460, 1465 (11th Cir. 1985).

The attached State Policy in Exhibit I shows the systemic and organized violation by policy of 42 U.S.C. § 654(21)(A) by various Title IV-covered State political subdivisions under Rhode Island's State Plan, and the Appellees' coordinated, concerted and organized efforts to cover it up.  The felonious cover up of Appellees' violation of 42 U.S.C. § 654(21)(A) entailed sophisticated felonious removal of the unlawful 12% compound interest from the automated data processing and information retrieval system on a routine basis to "zero out any existing interest" for the explicit purpose of  "for the purpose of removing interest from interstate cases."  The policy further states, "Two reports will be created.  The first will detail the interstate cases for which a support order modification was done first for which one or more interest adjustments were created.  The second report will detail interstate cases for which the interest field is Y, B, B or P."  Explicitly

applied to this instant case, the Appellees, in accordance with the policy, feloniously removed tens of thousands of dollars of "interest" from the automated data processing and information retrieval system governed by 42 U.S.C. §651-669 and feloniously sent to the State of Texas in 2018 a total amount with the interest thus removed, feloniously certifying the support amount with interest thus removed as a true total support amount under, inter alia, 42 U.S.C. §666(14), showing prima facie felonious false certification, accounting fraud, false records. In so doing, Appellees feloniously sent a corresponding false certification to the United States.

The attached factual materials show on their face, beyond any doubt, that the judge-created laws created by the judges in the State's family court the establishment and enforcement of the State's "interest" that is "prohibited in interstate cases" that involve the routine felonious, corrupt and perversion of justice removal from the system the interest when certifying to another state like TEXAS and certifying State compliance to Title IV to the United States fraudulently. The Rhode Island Supreme Court's promulgated court Rule 5 governing access to court information that denies remote access to the public and to pro se litigants, therefore, on its face, *defacto* aids in the denial of public access to judge-created laws in the state's courts that knowingly and corruptly violate the federal statutory provisions of Title IV. Because the Rhode Island Supreme Court's Chief Judge and Associate Judge Lynch-Prata are former chief judge of or

former attorney practitioner in the state family court that routinely establishes and
enforces the policy-described "interest" that is prohibited by state policy to be
charged in interstate cases, which interest is plainly unlawful under the explicit
statutory text of 42 U.S.C. § 654(21)(A), the Rhode Island Supreme Court
promulgated Rule 5 governing public access to court information *de facto* covers
up from the Public access to evidence of routine violations of Title IV within the
political subdivisions of the state courts.

Because the entire support and "interest" order is assigned to the State, that
then becomes a debt owed to the State by noncustodial parents under the
provisions of 42 U.S.C. § 651-669, the "interest" on its face represents unlawful
state revenue under color of state law.

**Because noncompliance with provisions of 42 U.S.C. § 654(1)-(34) incurs
penalties of tens of millions of dollars in a fiscal year under 42 U.S.C. §651-669
and the State can lose TANF funding, Appellees and counsels for Appellees
corruptly lie to this Court in the corrupt calculation in the hopes of corruptly
cover up Rhode Island's noncompliance with 42 U.S.C.  § 654 and thus
corruptly retain TANF funding through felonious deceit.  *See*, *Hodges v.
Shalala*, 121 F.Supp.2d 854 (D.S.C. 2000), *Hodges v. Shalala*, 121 F. Supp. 2d
854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S.
811 (2003).**  As a condition of receipt of any federal funding under Title IV-D of

the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. **Congress, under the <u>Commerce Clause</u>, may <u>offer the States a choice of regulation under federal control or preemption under federal regulation</u>. See _Hodel v. Virginia Surface Mining & Reclamation Assn., Inc._, 452 U.S. 264, 288 (1981).**

As such, Appellant preserves and reserves the issue of district court judge William Smith's role in the scheme as the former chief counsel advising the executive, judicial and legislative political subdivisions of the State Plan from 1996 to 2002 concerning the State's corrupt policy to corruptly circumvent the mandatory implementation of the 1996 amendments of 42 U.S.C. § 654, through the State's corrupt adoption of the felonious state policy to corruptly and feloniously remove the unlawful 12% compound from the system in interstate cases, corruptly and feloniously adjust accounting of the support amount, and corruptly and feloniously certify the false accounting to cooperative states such as TEXAS and to the United States to corruptly avoid detection of the scheme.

Appellees-counsels even repeatedly plastered in the federal district court records as exhibits the state family court's February 10, 2023 court order that facially show Appellees' felonious scheme through the order's text, "…<mark>_interest put back on the system_</mark> _without prejudice_ to the Defendant." Appellees counsels

feloniously misrepresent repeatedly to the Court that the felonious "putting back on

the system" the unlawful 12% compound interest means the family court found

Appellant owes the interest, in order to conceal the Appellees' felonious scheme of

removing the unlawful 12% compound interest from the system in 2018 when

Rhode Island sent it to TEXAS under 42 U.S.C. § 666(14) through false

certification and false claims, as it turns out by official state policy, in order to

conceal the unlawful 12% compound interest that would expose Rhode Island's

ineligibility to participate in Title IV at least since 1996.

### Rhode Island Criminal Laws Prohibit Special Attorneys General Pizana and Shaw from submitting 9 copies of the perjurious State Appellee-Brief

Misprision of felony is an indictable offense in Rhode Island by virtue of statute

providing for prosecution and punishment of common-law crimes. Rhode Island

G.L. 1956, § 11-1-1. Misprision of felony was a crime known at common law.  The

Rhode Island Supreme Court in *State v. Flynn*, 100 R.I. 520 (R.I. 1966) held,

"Blackstone defined it as concealment of a felony which a man knows but never

assented to, 2 Sharswood's Blackstone's Commentaries, book 4, (1860 ed.) 121, p.

407, and Chitty said that any person knowing a crime to have been committed and

concealing it, even though he has not actively assisted the offender, will be guilty

of a misprision of the crime which he has been instrumental in concealing. 1

Chitty, Criminal Law (3d Am. ed. 1836), 3. Elsewhere it is described generally as a

criminal neglect either to prevent a felony from being committed, or to bring the

defendant to justice after its commission, but without such previous concert with or subsequent assistance to the felon as would make the concealer an accessory before or after the fact. *State* v. *Wilson,* 80 Vt. 249; *State* v. *Biddle,* 32 Del. 401; 1 Wharton, Criminal Law and Procedures (12th ed.) § 112, p. 244.

While the list of offenses punishable by the statutes of this state does not include misprision of felony, the legislature has provided in § 11-1-1 that every act and omission which was an offense at common law and for which no punishment is specifically prescribed may be prosecuted and punished as an offense at common law. Based upon that statute, or its precursors, this court held in **State v. Horton, 47 R.I. 341**, that the act of misleading, cheating, defrauding and defeating public justice was an indictable offense even though not interdicted under a specific statutory listing. We reached a similar result as to champerty in *Martin* v. *Clarke,* 8 R.I. 389, and in *State* v. *Eastern Coal Co.,* 29 R.I. 254, we said that the law relative to the common-law offense of engrossing, although dormant in this state, might, because of the statute making offenses at common law subject to prosecution and punishment, be applied.

In our judgment the statute is sufficiently embracing to make misprision of felony an indictable offense in this state. We answer the first question in the affirmative."

This Court moreover must take judicial notice of the century old holding in *State* **v.** *Horton,* **47 R.I. 341** that establishes undisputably that the Special Attorneys General Pizana and Shaw corruptly committed obstruction of justice, obstruction of a judicial proceeding and misprision of felony indictable in Rhode Island.

Firstly, ***State v. Horton*** upholds the criminality of conspiring to attempt to obtain a decree of divorce by uttering and publishing a false and fraudulent deposition, known to them to be such, "with the object of misleading, cheating, defrauding and defeating public justice," and holding that conspiring to obtain the entry of a decree of divorce by means of a false deposition known to them to be such.

Secondly, to willfully mislead a court of justice by the production of false evidence or to obstruct or pervert the administration of public justice is an offence at common law, and to Defeat Public Justice is an Offence at Common Law. In State v. Horton, the acts found to defeat public justice were as follows, "defendants fraudulently and unlawfully combined, confederated and conspired to attempt to obtain a decree of divorce in a case pending in the Superior Court for the counties of Providence and Bristol by uttering and publishing a false and fraudulent deposition, purporting to be the deposition of one George E. Rands, with the object of  misleading, cheating, defrauding and defeating public justice; and that the

defendants then and there well knew that said deposition was false, fraudulent and untrue."

Thirdly, the Rhode Island Supreme Court held, "the statutes of the State do not in terms include the act of misleading, cheating, defrauding and defeating public justice among the criminal offenses. It is provided, however, that every act which is an offense at common law and for which no punishment is specifically prescribed in the statutes may be prosecuted and punished as an offense at common law; and punishment is fixed for such offense. § 1, Chap. 402, Gen. Laws 1923. It cannot be questioned that willfully to mislead a court of justice by the production of false evidence or to obstruct or pervert the administration of public justice is an offense at common law. This has been recognized in *State* **v.** *Bacon,* **27 R.I. 252**. In that case, the respondents conspired to procure an action to be commenced upon a charge known to them to be false, unlawful and fraudulent with intent to cheat the defendant in such action. Although such intent was not alleged in the indictment, it was held that the count charged a conspiracy to pervert or obstruct justice. While the words, "misleading, cheating, defrauding and defeating public justice" are not synonymous with the words "perverting and obstructing justice" we think that, at most, they should be regarded as surplusage, and their presence is not fatal to the indictment."

Here, it is now plainly established that Appellees' corrupt felonious scheme comprised of corruptly and feloniously removing unlawful 12% compound interest from the Title IV automated data processing system and then endeavoring to corruptly enforce the unlawful 12% compound interest is nothing less than perverting and obstructing justice.

Special counsels Pizana and Shaw causing 9 copies of their feloniously written filings to be sent from Rhode Island to the judges of the Court of Appeals in the plain endeavor to corruptly influence the judges is *prima facie* perversion and obstruction of justice.

Undisputedly, Appellees and counsels for appellees violated 18 U.S.C. §503 and 18 U.S.C. §4, as well as wire fraud and mail fraud.

Among others, they violated 31 U.S.C. § 3279**,** 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18

U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18

U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968.

I. **Appellees-counsels conceal the True Felonious Nature of Appellees'
Unlawful Interstate Enforcement of Unlawful Interest Arears on
Overdue Support Under the Legal Framework of Title IV of The
Social Security Act, repeated over a dozen times in the State Appellee
Brief – Counsels' representation that Rhode Island has a state
interest to enforce unlawful 12% compound interest Turns Out to Be
False, Perjurious and Felonious Because Counsels Concealed Rhode
Island's 12% Compound Interest Is Unlawful and the State's
Enforcement Involves Organized Accounting Fraud, False
Certifications and False Claims by Political Subdivisions of Rhode
Island Regulated By 42 U.S.C.  § 654**

A. **Lies to The Tribunal by The Rhode Island Attorney General
Representing the State Appellees, All Political Subdivisions
governed by 42 U.S.C.  § 654(1)**

Firstly, if charged with the misprision of a felony, the Appellees and counsels

for Appellees could face the following penalties if convicted:

(1) Fines of up to $250,000 and

(2) Up to three years in federal prison.

If charged with obstruction of justice, the Appellees and counsels for Appellees

could face the following penalties if convicted:

(1) Fines of up to $5,000,000 and

(2) Up to twenty years in federal prison.

Counsel for the State Appellees is the attorney general of Rhode Island, the political subdivision under the State Plan regulated by 42 U.S.C. § 654(1), charged with enforcing the provisions of 42 U.S.C. § 654 in Rhode Island under the terms of Rhode Island's participation in the Title IV Program. The language of 42 U.S.C. § 654(1) is explicit. "A State plan for child and spousal support must-

(1) provide that it shall be in effect in **all** political subdivisions of the State." Therefore, Congress is explicit in requiring the State Plan must provide that it shall be in effect in the political subdivision of the Office of the Attorney General. Therefore, under the State Plan, the explicit requirement is that, as the attorney general, counsels for the State Appellees are charged with *enforcing* state compliance with 42 U.S.C. § 654, including 42 U.S.C. § 654(21)(A).

But the Rhode Island attorney general has shown throughout *this* appellate official proceeding alone that not only is s/he not interested in enforcing the State's compliance with 42 U.S.C. § 654(21)(A), s/he time and again lies to *this* United States Tribunal that Rhode Island lawfully enforces interstate interest on support, and time and again affirmatively CONCEALS the felonious official state policy adopted by the Appellees to feloniously remove the unlawful 12% compound interest in interstate cases and feloniously send false accounting and false certifications to TEXAS and the United States concealing Rhode Island's felonious removal of the unlawful 12% compound interest from the Title IV automated data

processing and information retrieval system, in a bald felonious attempt to influence this Tribunal to apply the *judge-made* Younger abstention that gets a judge-made re-invention every decade since the 1970s. Judge-made "rules" must give way to jurisdiction in this case – this case is not merely harassment, this case involves organized felonious scheme by the Appellees using the Title IV legal framework. *See Hamer v. Neighborhood Housing Services of Chicago*, 583 U.S. ___ (2017).

Because neither discovery nor a trial took place in this matter in the district court, the district court judge William Smith, the former chief outside counsel for the State Plan's political subdivisions from 1996 to 2002 when the 1996 Amendments to 42 U.S.C. § 654 should have been implemented by the Appellees, deliberately handicapped the Appellant's right to discovery and seek the truth in the district court. The district court dismissed Appellant's action at law on September 28, 2023, denying Appellant's motion to amend the complaint *nunc pro tunc*.

At this juncture, the Court must take judicial notice under Fed. R. Evid. 201 that in the related case, *Seguin v. R.I. Department of Human Services et al*., 1:23-cv-126-WES-PAS, the district court judge William Smith ordered on July 7, 2023, "Since District Judge William E. Smith has determined that this case is in fact related to CA 23-cv-34 this case is permanently assigned to District Judge William

E. Smith for all further proceedings."  This is relevant because judge Smith and his former firm Edwards & Angell used to and continue to be the chief outside counsel of the state political subdivisions responsible for implementing the 1996 amendments to 42 U.S.C.  § 654 and advising the State Appellees here and the State Appellees in the CA 23-cv-126 on the statewide adoption of the State Policy.

As such, the Rhode Island Attorney General audaciously filed in the federal district court on August 7, 2023 the state family court order in **CA 23-cv-126, ECF 11**, as an exhibit in support of the State Appellees motion for extension of time to answer complaint there – the state family court order's text explicitly ordered, "***put interest back on the system*** *without prejudice* to the Defendant."  The complicit judge Smith thereafter granted a 60 day extension.

Without the availability of the State Policy in 2023, all these explicit language of "put interest back on the system" and "remove interest off the system" did not make meaningful sense.  But it was language well understood by the Appellees, the counsels for appellees and district court judge William E. Smith.

Pointedly, the State Policy entitled, "Specifications for OCSS Change Order" that "outlines the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases" was available in 2024, which Appellant

diligently made known to this Court at 1:00:16 AM on March 29, 2024, and

requested Judicial Notice under Fed. R. Evid. 201 in Appellant's subsequently

filed March 29, 2024 Motion to take judicial notice of Document 001182126131

Appellant's Notice requesting judicial notice and making known the commission

of crimes by Appellees was filed pursuant to **18 U.S.C. § 4**.  *See* Document No.:

00118126131 filed on March 29, 2024 at 1:00:16 AM Eastern Daylight Time. The

policy hereafter "State Policy."  Appellant invoked 18 U.S.C. **§ 4, unlawful 12%**

***that in part is aimed and directed at the Appellees and Appellees counsels.***

**Appellees affirmatively participated in the felonious removal of the unlawful**

**12% compound interest from the automated data processing system in 2018**

**when Rhode Island sent the support to TEXAS.  Appellees affirmatively**

**participated in feloniously "keeping the unlawful interest off the system" as**

**the key instrument/vehicle of deceit in 2021 when Appellant contacted the**

**Appellees to pay off support.  Appellees affirmatively recorded in Appellant's**

**Title IV-D case record the felonious "keep the interest off the system."**

**Appellees affirmatively recorded the felonious "agreed to keep the interest off**

**the system."  Appellees affirmatively recorded the felonious "changed his**

**mind and put the interest back on the system" after Appellant performed on**

**the agreement and paid the "$104k."  Therefore, even outside of the felonious**

**representations to the Appellant in 2021, Appellees affirmatively recorded**

their felonious scheme in public Title IV records that they sought to conceal. Therefore, it is shown and proven beyond a doubt that the Appellees counsels are accessories after the fact, and affirmatively and feloniously concealed the principals' felonious scheme.  All Appellee-counsels violated 18 U.S.C.  § 4.

The official state policy available in 2024 made sense of the felonious scheme.

In aid of the Court, Appellant attaches the State Policy hereto for illustration purposes under Exhibit I.  The State Policy states as follows:

"This specification will outline the process by which *interstate* cases are selected, automatically adjusted, are created, and support orders are modified *all for the purpose of removing interest from interstate cases*."  This policy goes on to state under its heading, "It is desirable for the Rhode Island Office of Child Support Services (OCSS) to *prohibit the charging of interest in interstate cases*. This is **manually done** by placing an N in the interest field on page 2 of the support order. *Entry of the N not only prohibits the charging of future interest but automatically creates adjustment to zero out any existing interest*."  This policy further states "Two reports will be created.  The first will detail the interstate cases for which a support order modification was done first for which one or more interest adjustments were created.  The second report will detail

interstate cases for which the interest field is Y, B, B or P." This 2024 available undisputed policy document evidence is submitted pursuant to Fed. Rules of Evidence 201, to this Court, and Appellant now and again respectfully requests judicial notice under Fed. Rules of Evidence 201. This policy was newly available in 2024, and with diligent compliance with Congressionally prescribed criminal jurisdiction conferred on "judges" "of the United State"s pursuant **18 U.S.C. § 4**, the Texas Appellant made known the state policy to the judges in the United States Court of Appeals for the First Circuit, pursuant to Federal Rules of Evidence 201. This policy made sense of the ensuing documentary evidence that were also submitted and made known under 18 U.S.C. § 4 and Fed. R. Evid. 201.

Explicitly applied to this instant case, the Appellees, in accordance with the policy, feloniously removed tens of thousands of dollars of "interest" from the automated data processing and information retrieval system governed by 42 U.S.C. §651-669 and feloniously sent to the State of Texas in 2018 a total amount with the interest thus removed, feloniously certifying it under, *inter alia*, 42 U.S.C. §666(14), showing prima facie felonious false certification, felonious accounting fraud, felonious false records. In so doing, Appellees feloniously sent a corresponding felonious false certification to the United States. See, **<u>EXHIBIT II</u>**.

The resulting effect of the above felonious removals from the automated data processing and information retrieval system, fraudulent accounting, false

accounts, false certifications to Texas and to the United States, and corresponding false claims to the United States under Title IV, feloniously produced fraudulent online accounts created by the Appellees, that showed a felonious false record of $0 payment in December 2021 for Appellant's very large lump sum payoff payment of $104,185.98 wired from Texas. *See* screenshot of Appellee-created and maintained online Title IV-D account in **Exhibit III**.

The resulting effect of the above felonious removals produced the online account that showed $0.00 under interest as of December 6, 2021, due to the Appellees' felonious removal of the interest in 2018 when Appellees sent the support to Texas for enforcement. See **Exhibit IV**. Appellees told the Appellant that the $0.00 showing on the online account represents the waiver of interest by the custodian parent, Appellee GERO MEYERSIEK.

Appellant recorded in Texas the phone conversation Appellant had with Appellee John Langlois that took place on October 5, 2022, in which Appellee John Langlois also stated that Appellee GERO MEYERSIEK waived interest and changed his mind subsequent to Appellant performing on the agreed pay-off amount of $104,185.98, so Appellees **put the 2018 removed interest <u>back on the system</u>**. Putting the 2018 feloniously removed interest back on the system is a felony and the subsequent fraudulent liens levied on Appellant's TEXAS properties are felonious that further violate TEXAS PENAL CODES. Appellant

submitted this recording pursuant to Rhode Island Rules of Evidence 901 to the

state family court in K2001-0521M, and to federal court judges pursuant Federal

Rules of Evidence 901, 201, and pursuant to 18 U.S.C. §4, 18 U.S.C. §666, and

other applicable federal statutes.

Therefore, pursuant to Fed. Rules of Evid. 201 of judicial notices of related

concurrent court actions, Appellant requests judicial notice of the attached

recording submitted to the concurrent courts for concurrent pending actions at law.

https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-
hBMaEg9/view?usp=sharing

Additionally, Appellant submitted Congressionally published statutory text,

notes and amendments for 42 U.S.C. § 654, requesting judicial notice of the

explicit preemptive statutory notes under Congress's 1996 Amendment, that

explicitly provided State participation in the Title IV Program on the condition of

acceptance of the preemption of 42 U.S.C. § 654 over State laws and constitutions

that must be amended to comply with the 1996 Amendments.

Therefore, **as of 1:00:16 AM on March 29, 2024**, before the Court under

the explicit invocation of 18 U.S.C. § 4, is the evidentiary proof that the Appellee

felonious enforcement of unlawful interest that Appellees feloniously removed

from the automated system in 2018 and thereafter feloniously certified to TEXAS

and to the United States under 42 U.S.C. § 666(14) that there was no interest in Appellant's interstate support case that goes to show that the state's enforcement is not just harassing but constitutes felonious organized fraud, ***squarely confronted the Appellee-counsel***. Appellee-counsels affirmative actions concealing the felonious scheme thereafter proves beyond a doubt that sanctions are warranted.

Subsequent to Appellant's foremost compliance under 18 U.S.C. § 4 to diligently make known criminal activities to judges of the United States, Appellant proceeded in the morning hours of March 29, 2024 to draft and prepare court filings for motions for judicial notice under Fed. R. of Evid. 201.

However, around 10 AM on March 29, 2024, Appellee-counsel filed Appellees' first Appellee-Brief, without offering any evidentiary proof, refuting the undisputable factual evidence squarely before the Court, contradictorily painting and claiming under Oath as officers of the court their unlawful enforcement as lawful, but <u>unsupported</u> by any evidence to support Appellees' unsubstantiated claim.

Appellees-counsel's solution to "remove" the evidentiary proof before the Court that proves the Appellee-Brief is filled with lies is to file a motion to strike the evidentiary proof accompanying the Appellee-Brief. The filing of the motion to strike is squarely an affirmative act to *conceal* the felonious scheme.

Therefore, in the scenario in which Appellees prevail, there necessarily would entail countless "removals" from official records in official proceedings of incriminating evidence damning to the Appellees, e.g.,:

(1) Removal without basis in law from this official Appellate record evidence of Appellees' felonious removal of tens of thousands of interest from the automated data processing and information retrieval system

(2) Perpetuating the Appellees' felonious routine practice by policy under color of state law *in aid* of Appellees' felonious removal from the automated data processing system the unlawful 42 U.S.C. § 654(21)(A) prohibited 12% compound interest in interstate cases when Appellees feloniously send to other states like TEXAS under felonious false certifications that there is no interest in order to feloniously cover up Rhode Island's unlawful 12% compound interest felonious scheme, and when Appellees feloniously send to the United States under the Title IV Federal Program falsely and feloniously certifying compliance with 42 U.S.C. § 654 in order to feloniously obtain federal funding for which Rhode Island is ineligible.

Appellant avers in good faith that both scenarios above necessarily involve equally complicit acts by judges in this Court pursuant to 18 U.S.C. § 4, also reviewable under fraud on the court and other applicable federal criminal statutes.

This is because the Rules of Evid. 201 submitted material that invokes 18 U.S.C. §
4, shows systemic and organized felonious violation *by official policy* of 42 U.S.C.
§ 654(21)(A) by various Title IV-covered State political subdivisions under Rhode
Island's State Plan, and the Appellees' felonious coordinated, concerted and
organized efforts to feloniously cover it up.  The felonious cover up of Appellees'
violation of 42 U.S.C. § 654(21)(A) entailed sophisticated felonious removal of the
unlawful 12% compound interest from the automated data processing and
information retrieval system on a routine basis to "zero out any existing interest"
for the explicit felonious purpose of "for the purpose of removing interest from
interstate cases."  The policy further states, "Two reports will be created.  The first
will detail the interstate cases for which a support order modification was done first
for which one or more interest adjustments were created.  The second report will
detail interstate cases for which the interest field is Y, B, B or P."  Explicitly
applied to this instant case, the Appellees, in accordance with the policy,
feloniously removed tens of thousands of dollars of "interest" from the automated
data processing and information retrieval system governed by 42 U.S.C. §651-669
and feloniously sent to the State of Texas in 2018 a total amount with the interest
thus removed, feloniously certifying it under, *inter alia*, 42 U.S.C. §666(14),
showing *prima facie* felonious false certification, accounting fraud, false records.

In so doing, Appellees feloniously sent a corresponding false certification to the United States.

The attached factual materials show on their face, beyond any doubt, that the judge-created "court order" laws created by the judges in the State's family court show felonious judge-created laws under color of state law the felonious establishment and felonious enforcement of the State's "interest" that is "prohibited in interstate cases" that involve the felonious routine removal from the system the interest when feloniously certifying to another state like TEXAS and feloniously certifying State compliance to the Title IV Program for federal funding, to the United States.

The above show unequivocally sanctionable defraud of the Court by the Appellees and Appellee-counsel(s), all of whom are additionally regulated under 42 U.S.C. § 654(1), including subornation of perjury and conspiracy to suborn perjury.

The above show unequivocally sanctionable defraud of the United States, defraud of Texas, defraud of the Appellant, making false claims, making false certifications, accounting fraud, falsification of records, obstruction of official proceedings, obstruction of justice, violation of 18 U.S.C. § 2(b), §3, §4 among numerous others by both the Appellees and Appellee-counsels.

## II.    Misprision of Felony by the Appellees and Appellees-Counsels

### A. Requisite knowledge of "removing interest from the system," "keeping interest off the system," "agree to keeping interest off the system," "changed his mind and put interest back on the system" are felonies – and handshake partnership – *United States v. Olson*, 856 F.3d 1216 (9th Cir. 2017)

Firstly, the Court must take notice under Fed. R. Evid. 201 the textual language of 18 U.S.C. § 4.

The misprision of felony statute states:

"Whoever, *having knowledge of the actual commission of a felony cognizable by a court of the United States*, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both." 18 U.S.C. § 4 (emphasis added).  The emphasis was added by the 9th Circuit Court of Appeals in *United States v. Olson*, 856 F.3d 1216 (9th Cir. 2017).

To establish misprision of felony, the government must prove beyond a reasonable doubt: "(1) that the principal . . . committed and completed the felony alleged; (2) that the defendant had full knowledge of that fact; (3) that he failed to notify the authorities; and (4) that he took affirmative steps to conceal the crime of

the principal." *Lancey v. United States*, 356 F.2d 407, 409 (9th Cir. 1966) (alterations omitted) (quoting *Neal v. United States*, 102 F.2d 643, 646 (8th Cir. 1939)).

Appellees have thus far resisted and fought discovery production in the on-going state family court under advisement of the Rhode Island Attorney General for any and all information regarding the Appellees' waiver of interest, or partnerships or agreements or arrangements amongst the State Appellees and Appellee GERO MEYERSIEK.

Nevertheless, the plain existence of a partnership and agreement is in plain sight, upon the availability of State Policy attached hereto in Exhibit I that makes sense of multiple referrals of "remove interest off the system," "keep interest off the system," "agree to keep interest off the system," and "put interest back on the system."

The TRAC records attached in Exhibit II records in plain and explicit terms the multiple discussions and activity that is described in the terms of "remove interest from the system," "keep interest off the system," "agree to keep interest off the system," and "put interest back on the system."

Critically, the Rhode Island Attorney General before this Court attached copies of the state family court order issued at a hearing dated February 10, 2023 that

explicitly ordered, "…*interest put back on the system* without prejudice to the Defendant."

The full meaning of the interest "removed" or "keep off" or "agree to keep off" or "put back" on the system cannot be fully comprehended until the 2024 available State Policy attached hereto in Exhibit I made sense of those terms submitted in numerous instances to this United States Court by the Appellee counsel, the Rhode Island Attorney General.

It is plain that the Rhode Island Attorney General has the State Policy in HIS possession, and he concealed it from this tribunal.

The record in this appeals court plainly show that the Rhode Island Attorney General, confronted with Appellant's 1 AM March 29, 2024 submission of the State Policy attached hereto in Exhibit I under 18 U.S.C. § 4 and Fed. R. Evid. 201, *affirmatively* filed motions to strike it from the record on or around 9 AM March 29, 2024.

Pursuant to **United States v. Olson**, **856 F.3d 1216 (9th Cir. 2017), a panel of judges in the Ninth Circuit found that, "Congress intended the misprision statute to apply solely to conduct the average person would understand as criminal and serious." "[M]isprision comprehends an offence which is of so**

**serious a character that an ordinary law-abiding citizen would realise he
ought to report it to the police."**

The certification and grant forms that the 42 U.S.C. § 654(1) political
subdivisions fill out to obtain federal grants and funding under 42 U.S.C. § 651-
669 bear the warning that any individual who submitted false statements could be
imprisoned up to five years. Appellees had seen similar warnings "many times,"
and the Court should infer Appellees' sophistication from experience as the state's
designated enforcement entity. This is the reason for the adoption of the State
Policy to "zero out interest" in interstate cases plainly for concealment purposes.
The state's Attorney General tasked with enforcing making into effect 42 U.S.C. §
654 in all political subdivisions under the State Plan has an even higher degree of
duty and sophistication having possession of the State Policy.

To illustrate this point, Appellant attaches herewith the 9th Circuit's opinion
*United States v. Olson*, **856 F.3d 1216 (9th Cir. 2017), as** ==Exhibit V==.

## B. Appellee GERO MEYERSIEK'S SOPHISTICATION AND KNOWLEDGE OF FELONY

The language used by Appellee GERO MEYERSIEK shows and proves beyond a
doubt that not only is MEYERSIEK a partner of the State Appellees, he is in the
know of the sophistication of the State Policy's purpose underlying Appellees'

felonious interest removals from the system, keeping interest off the system, agreeing to keeping the interest off the system, and changing his mind and putting interest back on the system.

Pointedly, MEYERSIEK's lawyer, Barbara Grady, and MEYERSIEK himself, explicitly describe their actions similarly in terms of felonious interest removals from the system, keeping interest off the system, agreeing to keeping the interest off the system, and changing his mind and putting interest back on the system, over and over again from 2018 to 2024. MEYERSIEK, if incognizant or unsophisticated, would not describe what ordinarily would be explained by a layman as "waive interest" or "agree to waive interest" or "changed his mind and demand interest" as felonious interest removals from the system, keeping interest off the system, agreeing to keeping the interest off the system, and changing his mind and putting interest back on the system.

Appellee-GERO MEYERSIEK's lawyers, Barbara Grady (in family court) and Joanna Achille, similarly have knowledge of and are in possession of the State Policy attached hereto in Exhibit I. Barbara Grady's husband Paul Dugan, a law firm partner of Dugan & Grady Law, was a former Deputy Chief Counsel of Appellee Office of Child Support Services and knew and was in possession f the State Policy, and among his job mandate, as are the individual State Appellees of this action, is to enforce and conceal the felonious State Policy and practice from

detection.  Appellee Gero Meyersiek, by and through his lawyer Barbara Grady, had partnered with the State Appellees to feloniously establish unlawful 12% compound interest in the interstate case involving TEXAS in the contemplated ensuing enforcement, necessarily involving contemplated felonious false accounting, false certification and fraudulent liens, and is an accessory to aiding and abetting in making false claims to the United States.

 Appellee-GERO MEYERSIEK's counsel, Joanna Achille, did not file an Appellee-Brief in this matter.  However, she plainly knew the substantive elements of the felonious false claim for interstate unlawful 12% compound interest that necessitated the felonious interest removals from the system, keeping interest off the system, agreeing to keeping the interest off the system, and changing his mind and putting interest back on the system.  Counsel for Appellee-GERO MEYERSIEK, confronted with the State Policy evidence attached hereto in Exhibit I as of March 29, 2024, similarly failed to make known to federal authorities the commission of felonious crimes, and has affirmatively concealed the crimes in violation of 18 U.S.C.  § 4 evidenced in this proceeding, alone.

III.     ***<u>Nix v. Whiteside</u>*, 475 U.S. 157 (1986) Requires Withdrawal of Appellee-Counsels pursuant to Model Rule of Professional Conduct 1.2 (stating that a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent); Model Rule 3.3 cmt. [12] (recognizing that lawyers have a special obligation to protect a tribunal against criminal or fraudulent conduct that undermines the integrity of the adjudicative**

**process, such as unlawfully destroying or concealing documents or other evidence or failing to disclose information to the tribunal when required by law to do so); Model Rule 1.16 (requiring that a lawyer withdraw from the representation of a client if the representation will result in violation of the rules of professional conduct or other law).**

The Court must further review the conduct of the counsels for Appellees pursuant to the duty of the Court and the judges' duty under 18 U.S.C. § 4, pursuant to *Nix v. Whiteside*, 475 U.S. 157 (1986).

**The United States Supreme Court in *Nix v. Whiteside*, 475 U.S. 157 (1986)** makes plain that the attorneys here are required to withdraw pursuant to Model Rule of Professional Conduct 1.2 (stating that a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent); Model Rule 3.3 cmt. [12] (recognizing that lawyers have a special obligation to protect a tribunal against criminal or fraudulent conduct that undermines the integrity of the adjudicative process, such as unlawfully destroying or concealing documents or other evidence or failing to disclose information to the tribunal when required by law to do so); Model Rule 1.16 (requiring that a lawyer withdraw from the representation of a client if the representation will result in violation of the rules of professional conduct or other law).

## A. **Impeachable Conduct by the Rhode Island Attorney General**

Here, the record on appeal makes clear that the Rhode Island Attorney General, itself a political subdivision subject to regulation under 42 U.S.C. § 654, has had knowledge of the State Policy attached hereto in Exhibit I (hereafter "State Policy") since counsels' entry of appearance in this matter in January 2023, for over 15 months. The state attorney general as the premier law enforcement political subdivision under the regulation of 42 U.S.C. § 654 affirmatively knew and have known about the State Policy since its latest revision in 2011. As such, since 2011, the Attorney General of Rhode Island has affirmatively counseled Rhode Island political subdivisions to engage, or assist the subdivisions in implementing and put into practice the State Policy that the lawyer knows is feloniously criminal and feloniously fraudulent.

In this matter alone, the State Appellee counsel has egregiously \violated Model Rule 3.3 cmt. [12] (recognizing that lawyers have a special obligation to protect a tribunal against criminal or fraudulent conduct that undermines the integrity of the adjudicative process, such as unlawfully destroying or concealing documents or other evidence or failing to disclose information to the tribunal when required by law to do so). The Rhode Island attorney general has violated his special obligation, that is further regulated by 42 U.S.C. § 654, to protect this tribunal against felonious criminal and fraudulent conduct that

undermines the adjudicative process, such as feloniously concealing the State Policy and other evidence related to the Policy, feloniously moving the Court to strike the State Policy from the record under the ludicrously lame excuse of "another bite at the apple" and then failing to disclose the State Policy and related materials to the tribunal when required to do so. Undisputedly, for the purpose of the furtherance of the appellate truth-seeking duty of this Court, Congress proscribed Fed. R. of Evidence 201 and Fed. R. Civ P. 60(b)(3), (4), (5), and (6) as *mainstays ENABLING* "**another bite at the apple**" in the furtherance of justice and public interest. Rather than complying with federal law, including applicable federal and state criminal laws, counsels for the State Appellees engage in felonious acts in violation of *inter alia* 18 U.S.C. § § 2, 3, and 4.

Model Rule 1.16 (requiring that a lawyer withdraw from the representation of a client if the representation will result in violation of the rules of professional conduct or other law) requires the Attorney General of Rhode Island to withdraw from the case, and any contradictory state case law or state judge-created laws interpreting Model Rule 1.16 and the state Attorney General's corrupt and felonious and indictable prerogative is preempted by *Nix v. Whiteside*, **475 U.S. 157 (1986) in this matter.** Public interest or public justice dictates it. The Rhode Island public should not be made to foot the bill for the

abject interstate felonious, corrupt and indictable commission of crimes before this Court by the counsels for the State Appellees.

The public of other states victimized by Rhode Island's felonious scheme aided and abetted by the 42 U.S.C.  § 654 regulated Rhode Island Attorney general should not be made to foot the bill for protecting themselves from Appellees and Appellees-counsels scheme, just because of a Rhode Island state judge-created law on the prerogative of a state attorney general to decide who to represent.  In reality, the state attorney general's conduct is indictable and impeachable.  This is not about whether the attorney general of Rhode Island has a prerogative to decide who to represent, this is about whether his prerogative conduct is felonious or indictable and impeachable conduct.

### B.  Mandatory Withdrawal of Counsel for Appellee-GERO MEYERSIEK

For the foregoing reasons, counsel for Gero Meyersiek  is similarly required to withdraw pursuant to Model Rule of Professional Conduct 1.2 (stating that a lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent); Model Rule 3.3 cmt. [12] (recognizing that lawyers have a special obligation to protect a tribunal against criminal or fraudulent conduct that undermines the integrity of the adjudicative process, such as unlawfully destroying or concealing documents or other evidence or

failing to disclose information to the tribunal when required by law to do so);
Model Rule 1.16 (requiring that a lawyer withdraw from the representation of a
client if the representation will result in violation of the rules of professional
conduct or other law).

## IV.    Fed. R. Civ. 11(c)(3)

Here, the State Policy was not available until 2024, during the time in which
the Appellees requested and were granted *two* extensions to file their appellate
brief from January 2024 to March 29, 2024.  Because the state policy was not
available until 2024, Appellant properly requested judicial notice of the State
policy pursuant to Fed. R. of Evidence 201 on March 29, 2024, and multiple times
thereafter.  Appellant further ***invoked*** Fed. R. Evid. 201(e) for a hearing by right
in every filing made in this Court since the Appellant's filing of her Motion for
Judicial Notice pursuant to Fed. R. Evid. 201 on March 29, 2024.

Because the State Policy has long been available to the Appellee-counsel
and Fed. R. Civ. P 11 requires the Appellee-counsel to investigate the facts relating
to the State Policy available to the Appellee-counsel at counsel's disposal, the
Appellee-counsel's filing of the Appellee-brief and the lies contained therein has
shown to be utterly lacking in candor and blatantly lying to the Court, constituting

*prima facie* fraud on the court.  As such the Appellee-Brief should be stricken from the record, pursuant to Fed. R. Civ. P 11.

The Court, on its own initiative under Fed. R. Civ. P 11(c)(3) should order the Appellees and Appellees' counsels to show cause why conduct by the Appellees and their counsels specifically described above has not violated Rule 11(b).

In aid of the Court, the Appellant attaches hereto in **Exhibit VI** Document 00118126131, that was reported to the judges of this United States Court of Appeals under 18 U.S.C. § 4 and Fed. R. Evid. 201.

Appellant moreover respectfully requests the judges of the United States, explicitly conferred by Congress the explicit duty under 18 U.S.C. § 4, to refer the criminal acts made known in Document 00118126131 to the United States Attorney General Merrick Garland, an official who also fits the bill under 18 U.S.C. § 4, pursuant to Fed. R. Civ. P 11(c)(4) "to deter repetition of the conduct or comparable conduct by others similarly situated."

Appellant respectfully requests furthermore that the Court order the Appellees pay the Appellant 9x $250,000 and no less than 9x $50,000 for each infraction named herein for having to prosecute this motion for their felonious conduct.

## V.    <u>**CONCLUSION**</u>

The Court should grant this motion for sanctions.  The Court should order the withdrawal of Appellee-counsels named herein.  The Court should order the Appellant-requested 9x $250,000 and no less than 9x $50,000 for each infraction named herein payable by the Appellees and Appellees counsels to the Appellant, for having to prosecute this motion for their felonious and corrupt conduct.  The Court should strike the 9 copies of the corrupt Appellee-Briefs from the record.  The Court should strike the Appellee Brief from the record.  The Court should vacate the Court's briefing schedule.  The Court should take judicial notice of Document 00118126131 filed under Fed. R. Evid. 201 and 18 U.S.C. § 4. The Court should strike the Appellee-Brief from the record for fraud on the court and for violation of Fed. R. Civ. P 11(b).  The Court should grant Appellant's Motion to file a supplemental opening brief.  The Court should extend the time to file the Supplemental opening brief.  The Court should on its own initiative under Fed. R. Civ. P 11(c)(3) order the Appellees and Appellees' counsels to show cause why conduct by the Appellees and their counsels specifically described above has not violated Rule 11(b).  The judges of the United States Court of Appeals have been explicitly conferred an expressed duty by Congress under 18

U.S.C. § 4 and 18 U.S.C. § 503 and should refer the corrupt criminal acts made known herein and in Document 00118126131 to the United States Attorney General Merrick Garland, an official under 18 U.S.C. § 4, pursuant to Fed. R. Civ. P 11(c)(4) "to deter repetition of the conduct or comparable conduct by others similarly situated," in the interest of the public, public justice and protection of government proceedings. The Court should extend the time due for the Appellant Reply Brief until 30 days after the Court's resolution of the above-listed pending motions. The Appellant respectfully requests any and all relief that is just under the circumstances.

Pursuant to Fed. R. Evidence 201(e), Appellant requests by right a hearing.

Respectfully submitted,

Mary Seguin
Pro Se
/s/     *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: April 9, 2024

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing instrument has been served via the Court's ECF filing system on April 9, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

EXHIBIT I.

### SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

# EXHIBIT II.

Case Number: K2001085M   Document: 0111813106501   Page: 660   Date Filed: 04/09/2024   Entry ID: 6663457460

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22    11:28         C A S E   T R A C K I N G      CSCL  ASMXA201
            TRAC.00               CASE HISTORY           U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (████████████████). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:          SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K   PNL:
```

Case Number K2001021U Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10 13 PM
Envelope 4132704
Reviewer Maria O.

Case: 23-19657   Document: 0011813106501   Page: 661   Date Filed: 04/09/2024   Entry ID: 6663457140

11:29:56 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00          CASE HISTORY                 U024  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES___

RL: 80  12 22 ABSP:        SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:       MEYERSIEK   GERO    K   PHL:
```

Case Number: 22d-1995 Document: 1181-30601 Page: 662 Date Filed: 04/09/2024 Entry ID: 6653760
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:01 Tuesday, December 13, 2022

| 12/13/22 | 11:29 | **C A S E   T R A C K I N G** | CSCL | ASMXA201 |
|---|---|---|---|---|
| | TRAC.00 | CASE HISTORY | U824 | PROD |

STARTING DATE 09 01 2021
SELECTION     COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSIDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
       FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
       FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

| RL: SO  12 22 ABSP: | SEGUIN | MARY | | CMD: |
|---|---|---|---|---|
| FWX: TRAC  D CLIENT: | MEYERSIEK | GERO | K | PNL: |

Case Number: 2023-002274    Document: 0001119113300511    Page: 663    Date Filed: 04/09/2024    Entry ID: 6663574630
Filed in the Providence/Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria G.

11:29:53 Tuesday, December 13, 2022

```
12/13/22   11:29          C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00               CASE HISTORY              U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

```
RL: 80  12 22 ABSP:          SEGUIN       MARY        CMD: _____
FXX: TRAC  D CLIENT:         MEYERSIEK    GERO     K  PNL:
```

ed in Providence/Bristol County Family Court
ibmitted 6/1/2023 10.13 PM
ivelope: 4132704
iviewer: Maria O

11:29:09 Tuesday, December 13, 2022

```
12/13/22    11:28         C A S E   T R A C K I N G       CSCL  ASMXA201
            TRAC.00             CASE HISTORY              U824  PROD
STARTING DATE    09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN___
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
      TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
      58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:            SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK   GERO     K    PNL:
```

Case Number: 22901234M   Document: 0011183133065011   Page: 665   Date Filed: 04/09/2024   Entry ID: 666357460
Filed in Providence/Bristol County Family Court
Submitted: 5/1/2023 10:13 PM
Envelope 4132704
Reviewer: Maya J

11:29:09 Tuesday, December 13, 2022

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
     TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
     58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

RL: 80  12 22 ABSP:                SEGUIN       MARY           CMD: _____
FNX: TRAC  D CLIENT:               MEYERSIEK    GERO      K    PNL:

Case Number: K2001092M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

Document: 000111811310501 — Page: 666 — Date Filed: 01/01/2021 — Entry ID: 6663571460

11:29:13 Tuesday, December 13, 2022

```
12/13/22   11:28         C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00            CASE HISTORY                 UB24  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

RL: 80  12 22 ABSP:              SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK   GERO    K   PNL:
```

Submitted in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28       C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00            CASE HISTORY               U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985


RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:              SEGUIN      MARY        CMD: _____
                                 MEYERSIEK   GERO   K    PNL:
```

EXHIBIT III.



RI.gov · R.I. Government Agencies | Privacy policy | Search RI.gov:

## State of Rhode Island
## Office of Child Support Services
### DEPARTMENT OF HUMAN SERVICES

Welcome Mary Seguin    Home  My Profile  Contact Us  Site Map  Log Out

**Menu**

- **Case Information**
  - Last 5 Payments
  - Last 13 Months
  - Current Orders/ Past Due Balances
  - Court Dates/ Appointments
  - Enforcement Actions
  - PIN Lookup

Home ) Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek        CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|--------|--------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

EXHIBIT IV.



12:38 PM Mon Dec 6

cseinfo.dhs.ri.gov

ADCB Internet Banking   Community Health Choice |...   Sign In - Community Healt...   Case Manager Portal | Offi...   RI OCSS Payment

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov:

**State of Rhode Island**
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Dugan   Home   My Profile   Contact Us   Site Map   Log

**Menu**
▼ Case Information
  ▶ Last 5 Payments
  ▶ Last 13 Months
  ▶ Current Orders/ Past Due Balances
  ▶ Court Dates/ Appointments
  ▶ Enforcement Actions
  ▶ PIN Lookup

Home > Current Orders and Past Due Balances

**Case Manager**

## Current Orders / Past Due Balances

**Custodial Parent:** Gero K Meyersiek      **CSE ID:** 1689817

**Current Orders**

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

⚠ Note: Medical orders and medical arrears are not listed on this screen.

**Past Due Balances**

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |

EXHIBIT V.

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

KAREN B. OLSON,
*Defendant-Appellant.*

No. 15-30022

D.C. No.
3:13-cr-00093-TMB-1

OPINION

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, Chief Judge, Presiding

Argued and Submitted August 4, 2016
Anchorage, Alaska

Filed May 15, 2017

Before: Raymond C. Fisher, Richard A. Paez
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Fisher;
Concurrence by Judge Hurwitz

**SUMMARY**[*]

**Criminal Law**

The panel affirmed the defendant's conviction under 18 U.S.C. § 4 (misprision of felony) for concealing and failing to notify authorities of her business partner's submission of false statements to the United States Department of Agriculture Rural Development Program in connection with a federal grant application.

The panel held that, to secure a conviction under § 4, the government must prove not only that the defendant knew the principal engaged in conduct that satisfies the essential elements of the underlying felony, but also that the defendant knew the conduct was a felony; that to establish the latter, the government must prove the defendant knew the offense was punishable by death or a term of imprisonment exceeding one year; and that sufficient evidence supports the jury's finding that the defendant here knew the principal's crime was punishable by more than a year in custody.

Concurring in part and concurring in the result, Judge Hurwitz would leave to another day, in a case in which it matters to the outcome, whether the government must prove in a § 4 prosecution that the defendant knew the underlying offense was a felony.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Glenda Kerry (argued), Law Office of Glenda J. Kerry, Girdwood, Alaska, for Defendant-Appellant.

Retta-Rae Randall (argued), Assistant United States Attorney, United States Attorney's Office, Anchorage, Alaska, for Plaintiff-Appellee.

---

**OPINION**

FISHER, Circuit Judge:

Karen Olson appeals her conviction for misprision of felony under 18 U.S.C. § 4. She was convicted of concealing and failing to notify authorities of her business partner's submission of false statements to the United States Department of Agriculture Rural Development Program (USDA) in connection with a federal grant application. She challenges her conviction, arguing the government failed to prove she knew the conduct she concealed constituted a felony. We address her argument in two parts. First, we agree with Olson that, to secure a conviction under 18 U.S.C. § 4, the government must prove not only that the defendant knew the principal engaged in conduct that satisfies the essential elements of the underlying felony, but also that the defendant knew the conduct was a felony. *See Flores-Figueroa v. United States*, 556 U.S. 646, 652 (2009) ("[C]ourts ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element."). Second, applying that standard, we hold sufficient evidence supports the jury's

finding that Olson had the requisite knowledge here. We therefore affirm.[1]

## BACKGROUND

The USDA awarded a grant to Robert Wells to open a milk processing facility. The terms of the grant provided that certain equipment was to be purchased wholly or in part with grant funds, and that the USDA would hold a first lien position on any equipment purchased with grant money. Although the grant was in Wells' name, he had an informal "handshake" partnership with Olson, a former Alaska executive director of the USDA Farm Service Agency who wrote Wells' grant application. Wells described her as the "brains" behind the grant, and their informal partnership entitled her to 50 percent of the profits from the milk processing facility.

Around the same time, Kyle Beus received a separate USDA grant to establish an ice cream and cheese manufacturing facility. The paperwork for both Wells' and Beus' grant applications warned that anyone who made false, fictitious or fraudulent statements could be fined or imprisoned for up to five years.

Wells, Beus and Olson agreed to locate their two projects at the same facility. Unbeknownst to Wells and Olson, Beus instructed his contractor, Nether Industries, to inflate the value of certain dairy processing equipment – including a clean-in-place (CIP) system and a glycol chilling system – on papers submitted to the USDA for reimbursement. Beus also

---

[1] We reject Olson's remaining challenges in an unpublished memorandum disposition filed concurrently with this opinion.

submitted invoices to Nether, allegedly for project expenses, so he could personally receive a portion of the grant money the USDA disbursed.

A year into the enterprise, Beus told Wells and Olson he had leased certain "technologically obsolete" pieces of equipment rather than purchase new equipment as agreed in the original grant application, including a "really cheap old glycol unit" and an "incomplete clean-in-place system." As to some of this equipment, Olson informed the USDA there had been a change of plans that called for "leasing instead of outright purchasing some of the original smaller equipment." She did not do so, however, with respect to the CIP system and glycol cooling system. The attached "Proposed Money Grant Expenditure" included a CIP system listed at $35,000 and a glycol cooling system listed at $50,000 when, in fact, those systems had been leased rather than purchased.

After the USDA disbursed the grant funds, Olson filed a final report with the department. It included a "Final List of Expenditures by Category and Completion" that once again falsely listed the purchase of a $35,000 CIP system and a $50,000 glycol cooling system.

Olson later became aware that Beus had been misappropriating grant funds by submitting false invoices to Nether Industries and receiving payments – which Olson described as "kickbacks" – in return. Olson also discovered Beus had improperly used grant funds to make a $71,000 personal investment in a milk jug manufacturer. An entry in her day planner around this time reveals that she knew Beus' actions were improper. She wrote: "Began full-time work on financials/straightening out Kyle's mess. Learning of questionable deals – Nether – Kyle spent $190,000 of our

grant on others, so Nether way over budget. Also, Kyle misused our [] advance $ as his own stock purchases – !" Olson told the project's office assistant she "could send [Beus'] ass to jail." She wrote members of her board that "[t]he revelations of the past week have crystallized for me that [Beus' agreement to co-locate the projects] was simply a way to divert our grant money into a grandiose plan that has not worked," and that Beus "has put the entire dairy industry at risk for an ever-widening investigation closing off all loan sources and public goodwill."

Olson was convicted after a jury trial of misprision of felony under 18 U.S.C. § 4. Her conviction was based on her knowledge that Beus, the principal, submitted false statements to the USDA in furtherance of his scheme to misappropriate grant funds in violation of 18 U.S.C. § 1014 – a felony under federal law. Olson appeals.

## STANDARD OF REVIEW

"We review a question of statutory construction de novo." *United States v. Weitzenhoff*, 35 F.3d 1275, 1283 (9th Cir. 1993). "Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia*, which requires a court of appeals to determine whether, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (citation omitted).

## DISCUSSION

### I

The misprision of felony statute states:

> Whoever, *having knowledge of the actual commission of a felony cognizable by a court of the United States*, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

18 U.S.C. § 4 (emphasis added).

To establish misprision of felony, the government must prove beyond a reasonable doubt: "(1) that the principal . . . committed and completed the felony alleged; (2) that the defendant had full knowledge of that fact; (3) that he failed to notify the authorities; and (4) that he took affirmative steps to conceal the crime of the principal." *Lancey v. United States*, 356 F.2d 407, 409 (9th Cir. 1966) (alterations omitted) (quoting *Neal v. United States*, 102 F.2d 643, 646 (8th Cir. 1939)). Only the second element is at issue here.

To show a defendant has "knowledge of the actual commission of a felony cognizable by a court of the United States," 18 U.S.C. § 4, the parties agree the government must prove at least that the defendant knew the principal *engaged in conduct* that satisfies the essential elements of the underlying felony. In other words, the defendant must "know the facts that make [certain] conduct fit the definition of the

offense." *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015) (quoting *Staples v. United States*, 511 U.S. 600, 608 n.3 (1994)).  The parties disagree as to whether – and to what extent – the government must also prove the defendant knew such conduct *was a felony*.  We conclude Olson has the stronger argument.

First, Olson's construction is consistent with the general presumption that a mens rea requirement applies to each element of an offense.  "Absent indication of contrary purpose in the language or legislative history of the statute," *Liparota v. United States*, 471 U.S. 419, 425 (1985), we "ordinarily read a phrase in a criminal statute that introduces the elements of a crime with the word 'knowingly' as applying that word to each element," *Flores-Figueroa*, 556 U.S. at 652. *See United States v. Williams*, 553 U.S. 285, 294 (2008) (applying a knowledge requirement to each subdivision in a statute in the absence of "grammar or structure enabl[ing] the challenged provision or some of its parts to be read apart from the 'knowingly' requirement"); *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 77–78 (1994) ("[A]s a matter of grammar it is difficult to conclude that the word 'knowingly' modifies one of the elements in [the statute], but not the other.").  This "presumption in favor of a scienter requirement," *X-Citement Video*, 513 U.S. at 72, "reflects the basic principal that 'wrongdoing must be conscious to be criminal,'" *Elonis*, 135 S. Ct. at 2009 (quoting *Morissette v. United States*, 342 U.S. 246, 252 (1952)).  As a general matter, "a defendant must be 'blameworthy in mind' before he can be found guilty." *Id.* (quoting *Morissette*, 342 U.S. at 252).

In *Liparota*, for example, the statute at issue imposed criminal liability on "whoever knowingly uses, transfers,

acquires, alters, or possesses coupons or authorization cards in any manner not authorized by this chapter or the regulations issued pursuant to this chapter." *Liparota*, 471 U.S. at 420 n.1 (alteration omitted) (quoting 7 U.S.C. § 2024(b)(1) (1985)). The evidence showed the defendant purchased food stamps from an undercover agent for less than face value. *See id.* at 421. The government argued the statute required proof only that the defendant knew of his acquisition of the cards, not that the acquisition was unauthorized by law. *See id.* at 423. The Supreme Court disagreed. Because it was not clear from the text of the statute which phrase or phrases Congress intended the knowledge requirement to modify, and because the legislative history contained nothing to clarify congressional purpose, the knowledge requirement applied to each phrase in the statute. The government was required to show the defendant *knew* purchasing food stamps for less than face value was unauthorized by law. *See id.* at 425. Since *Liparota*, the Court has applied this presumption to a range of statutes. *See, e.g.*, *Flores-Figueroa*, 556 U.S. at 657 (applying a knowledge requirement to each phrase in the aggravated identity theft statute); *Williams*, 553 U.S. at 294 (applying a knowledge requirement to all elements in a child pornography statute); *X-Citement Video*, 513 U.S. at 78 (applying a knowledge requirement to all elements in a statute criminalizing the exploitation of minors).

The same presumption applies here. First, as in *Liparota*, the text of the misprision statute alone does not make clear whether the knowledge requirement applies to each element. *Compare* 18 U.S.C. § 4 ("Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States . . . ."), *with* 7 U.S.C. § 2024(b)(1) (1985) ("[W]hoever knowingly uses, transfers, acquires, alters, or possesses coupons or authorization cards in any manner not

authorized by this chapter . . . .").  Putting aside the *Flores-Figueroa* presumption, the mental state in § 4 could plausibly be read to modify only "actual commission" or both "actual commission" and "of a felony cognizable by a court of the United States."    Under *Flores-Figueroa*, however, we presume Congress intended the knowledge requirement to apply to both phrases, *see* 556 U.S. at 652, and nothing in the text or legislative history negates the presumption that Congress so intended.  The government has not pointed to anything suggesting Congress intended to penalize someone who did not know she was witnessing the commission of a felony.  Accordingly, given the language of § 4 and the *Flores-Figueroa* presumption, the statute is best interpreted as requiring proof that, in addition to showing the defendant knew the principal engaged in conduct satisfying the essential elements of the underlying felony, the government must also show the defendant knew such conduct was a felony.

Second, even putting the presumption aside, the history of misprision also supports Olson's construction.  In England, before the advent of professional police forces, individual citizens bore the responsibility for combating crime.  *See* Carl Wilson Mullis, III, *Misprision of Felony: A Reappraisal*, 23 Emory L.J. 1095, 1114 (1974).  They had "a duty to raise the hue and cry and report felonies to the authorities." *Branzburg v. Hayes*, 408 U.S. 665, 696 (1972) (internal quotation marks omitted).  *See* Hue and Cry, *Black's Law Dictionary* (10th ed. 2014) ("The public uproar that, at common law, a citizen was expected to initiate after discovering a crime.").  A citizen who breached this duty could be charged with misprision.  *See* Mullis, *supra*, at 1095. In this country, the First Congress enacted the American misprision statute as part of the Crimes Act of 1790, the current version of which is "functionally identical" to its

predecessor. *United States v. Phillips*, 827 F.3d 1171, 1175 (9th Cir. 2016).

This context suggests Congress intended the misprision statute to apply solely to conduct the average person would understand as criminal and serious. As an English court has explained, requiring knowledge of the serious criminal nature of the underlying offense "disposes of many of the supposed absurdities, such as boys stealing apples, which many laymen would rank as a misdemeanour and no one would think he was bound to report to the police. . . . [M]isprision comprehends an offence which is of so serious a character that an ordinary law-abiding citizen would realise he ought to report it to the police." *Sykes v. Dir. of Pub. Prosecutions*, [1962] A.C. 528 at 563.[2]

The government argues in passing that *United States v. Graves*, 143 F.3d 1185 (9th Cir. 1998), *as amended* (June 4, 1988), supports its position. *Graves*, however, did not address the question we are considering here. *Graves* concerned the "accessory after the fact" statute, which states: "Whoever, *knowing that an offense against the United States has been committed*, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact." *Id.* at 1187 (emphasis added) (quoting 18 U.S.C. § 3). The defendant was charged as an accessory ("charged offense") to the crime

---

[2] Misprision has become a little used and much maligned criminal charge. England eliminated the offense a few years after the *Sykes* decision. *See* Mullis, *supra*, at 1100–01. American commentators have urged Congress to do the same, arguing the crime has outlived its usefulness in light of modern methods of law enforcement. *See, e.g.*, E. Lee Morgan, *Misprision of Felony*, 6 S.C. L. Q. 87, 95 (1953–54); Mullis, *supra*, at 1111 n.92 (listing commentators).

of felon in possession of a firearm ("underlying offense").
*See id.* at 1186. The underlying offense, felon in possession
of a firearm, contains two elements: first, possession of a
weapon and second, a previous felony conviction. *See id.* at
1187. There was no evidence the defendant knew the
principal was a felon, but the government argued it need not
make such a showing. *See id.* We disagreed, holding a
"defendant who is accused of being an accessory after the fact
must be shown to have had actual knowledge of each element
of the underlying offense." *Id.* at 1189. The government was
therefore required to prove the defendant knew that "the
offender possessed a firearm" and that the offender "had
previously been convicted of a felony." *Id.*

Applied here, *Graves* stands only for the undisputed
proposition that Olson must have had knowledge of the
elements of the *underlying offense* – submission of false
statements to the USDA. *Graves* does not address or support
the government's argument regarding the specified
knowledge requirement of the *charged offense* here –
misprision of a felony.**[3]**

In sum, in light of Supreme Court precedent and relevant
history, we hold the misprision statute requires knowledge
not only that the principal engaged in conduct that satisfies

---

**[3]** Both parties invoke *United States v. White Eagle*, 721 F.3d 1108
(9th Cir. 2013), in support of their respective positions. This case has no
bearing on our analysis here because it did not address the knowledge
requirement of the misprision statute. *See id.* at 1119–20 (addressing only
the "failure to notify the authorities" and the "affirmative step to conceal"
elements).

the essential elements of the underlying felony, but also that the underlying offense is a felony.**[4]**

## II

The question then becomes: What does it mean to know conduct constitutes a felony?

When a term used in a statute is defined by that statute or by "any other relevant statutory provision," *Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012), we generally presume that definition applies to the statute's use of the term. *See Stenberg v. Carhart*, 530 U.S. 914, 942 (2000) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning."); *see also Meese v. Keene*, 481 U.S. 465,

---

**[4]** Olson asks us to go further by holding the government must show the defendant knew the relevant conduct was a felony under *federal* law, based on the statute's language stating "of a felony *cognizable by a court of the United States.*" 18 U.S.C. § 4 (emphasis added). We decline to do so. "The concept of criminal intent does not extend so far as to require that the actor understand not only the nature of his act but also its consequence for the choice of a judicial forum." *United States v. Feola*, 420 U.S. 671, 685 (1975). The requirement that the felony be cognizable by a court of the United States was included in the statute to state the foundation for federal jurisdiction. *See United States v. Howey*, 427 F.2d 1017, 1018 (9th Cir. 1970). "A defendant's knowledge of the jurisdictional fact is irrelevant," *id.*, as has been held in numerous cases interpreting analogous statutory provisions. *See, e.g.*, *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1206–07 (9th Cir. 1991) (holding a defendant charged with being an accessory after the fact need not know the principal crime was one against the United States despite the presence of such language in the statute); *Feola*, 420 U.S. at 687 (holding a defendant charged with conspiracy need not know his conduct violated federal law despite the statute's prohibition on conspiring to commit an offense against the United States).

484 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term."); *United States v. Lettiere*, 640 F.3d 1271, 1274 (9th Cir. 2011) ("[There is a] well-settled principle that, for purposes of statutory interpretation, the language of the statute is the first and, if the language is clear, the only relevant inquiry.").

This presumption is not absolute, however. If interpreting a term consistently with its statutory definition would, for instance, lead to "obvious incongruities" or would "destroy one of the major [congressional] purposes," the statutory definition may yield to context. *See Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949); *see also Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014) (*c*onfirming that the presumption of consistent usage may yield to context).

Here, the term "felony" is defined as part of the federal criminal code as a crime punishable by death or a term of imprisonment exceeding one year. *See* 18 U.S.C. § 3559(a); *see also Burgess v. United States*, 553 U.S. 124, 130 (2008) ("[T]he term 'felony' is commonly defined to mean a crime punishable by imprisonment for more than one year." (citing 18 U.S.C. § 3559(a))). Although the misprision offense and the felony definition are in separate sections of the United States Code, they were included in the same statute at least twice. In 1909, Congress passed an act to "codify, revise, and amend the penal laws of the United States." *See* Criminal Code of 1909, ch. 321, 35 Stat. 1088, 1088 (preamble) (the "1909 Crime Act"). Along with a slightly modified version of the original misprision statute, *see id.* § 146, 35 Stat. at 1114, the 1909 Crime Act included, apparently for the first time, a statutory definition for the term "felony," *see id.* § 335, 35 Stat. at 1152 ("All offenses which may be punished

by death, or imprisonment for a term exceeding one year, shall be deemed felonies."). The 1948 Crimes and Criminal Procedure Act (the "1948 Crime Act"), enacted to "revise, codify, and enact into positive law, Title 18 of the United States Code, entitled 'Crimes and Criminal Procedure,'" Crimes and Criminal Procedure Act, Pub. L. No. 80-772, 62 Stat. 683, 683 (1948) (preamble), similarly included versions of both provisions. *See id.* §§ 1, 4, 62 Stat. at 684. Indeed, the 1948 Crime Act actually included the felony definition and the misprision offense on the very same page. *See id.*

This is a case, therefore, in which Congress has adopted a statute using a term – "felony" – and in the same statute adopted a definition that presumptively applies. Moreover, it does not appear the presumption is rebutted by context. Applying the statutory definition, for instance, neither leads to incongruities nor destroys Congress' purposes. *See Lawson*, 336 U.S. at 201. The drafting history of the 1909 and 1948 Crime Acts supports this conclusion. Before 1909, the term "felony" lacked a uniform definition. A Senate Report on the 1909 Crime Act explained that the term "felony" had an "indefinite classification," resulting in its being "indiscriminately applied." S. Rep. No. 60-10, at 12 (1908). The report therefore underscored the need for a uniform definition, which would "characterize the whole system rather than pertain to any particular part of it." *Id.* Far from "destroy[ing] one of the major [congressional] purposes," *see Lawson*, 336 U.S. at 201, incorporating § 3559's definition into the misprision statute furthers Congress' intent to bring a measure of uniformity to the criminal code.

We therefore hold the government must prove the defendant knew the underlying offense was punishable by

death or more than one year in prison. The defendant need
not know the precise term of imprisonment authorized by
law, but at least she must know the potential punishment
exceeds one year in prison.**[5]**

## III

In Olson's case, there was sufficient evidence to support
a jury's finding that she knew submitting false statements to
the USDA was punishable by a sentence of incarceration
exceeding one year. *See Nevils*, 598 F.3d at 1163–64.**[6]** The
USDA grant form Olson completed on behalf of Wells
explicitly warned that any individual who submitted false

---

**[5]** Knowledge is ordinarily a subjective standard, and the parties do not
argue the rule is otherwise here. *See, e.g.*, *United States v. Twine*,
853 F.2d 676, 680 (9th Cir. 1988) ("We drew our conclusion in the face
of Congress' use of the terms 'knowingly and willfully,' words which the
Model Penal Code defines in a subjective manner."); *United States v.
Jewell*, 532 F.2d 697, 707 (9th Cir. 1976) (en banc) (Kennedy, J.,
dissenting) ("[K]nowledge [is] a matter of subjective belief, an important
safeguard against diluting the guilty state of mind required for
conviction.").

**[6]** As to this issue, Olson raises only a sufficiency of the evidence
claim. Olson does not contest the adequacy of the misprision jury
instruction apart from its failure to include a unanimity instruction – an
issue we address in a concurrently filed memorandum disposition. Nor
did she proffer a jury instruction at trial clarifying this point of law. We
therefore assume the jury was properly instructed on misprision and
address solely Olson's argument that there was insufficient evidence of
her knowledge. In future cases, of course, a defendant in Olson's position
could request an instruction requiring the government to prove that she
knew the underlying offense was punishable by more than one year in
prison. The instructions given here did not specifically address this issue,
but Olson did not challenge the instruction on appeal, so we need not
address whether the failure to give such an instruction was erroneous.

statements to the USDA could be imprisoned up to five years. Olson had seen similar warnings "many times," and the jury could have inferred Olson's sophistication from her experience as executive director of the USDA Farm Service Agency. This evidence was sufficient for a reasonable jury to find Olson knew Beus' crime was punishable by more than a year in custody.

## CONCLUSION

We hold 18 U.S.C. § 4 requires the government to prove the defendant knew the principal engaged in conduct that satisfies the essential elements of the underlying felony *and* that the defendant knew such conduct was a felony. To establish the latter, the government must prove the defendant knew the offense was punishable by death or a term of imprisonment exceeding one year. Sufficient evidence supports that finding here. For the reasons stated in this opinion and in a concurrently filed memorandum disposition, we affirm Olson's conviction.

**AFFIRMED.**

HURWITZ, Circuit Judge, concurring in part and concurring in the result:

This case does not turn on whether the government must prove in a misprision prosecution under 18 U.S.C. § 4 that the defendant knew the underlying offense was a felony. As the majority correctly concludes, the evidence at trial sufficed for a misprision conviction even if the government bears that burden of proof.

18                      UNITED STATES V. OLSON

The majority's interpretation of the statute may be correct. But, I would leave such analysis for another day, in a case in which it matters to the outcome. *See Whitehouse v. Ill. Cent. R. Co.*, 349 U.S. 366, 372–73 (1955) ("These are perplexing questions.    Their difficulty admonishes us to observe the wise limitations on our function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case."); *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (noting "the cardinal principle of judicial restraint" that "if it is not necessary to decide more, it is necessary not to decide more").

EXHIBIT VI.

No. 23-1851

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official
capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY
FOBERT, KARLA CABALLEROS and TIMOTHY FLYNN in their individual
and official capacities; GERO MEYERSIEK; BARBARA GRADY

Defendants-Appellees.

Appeal from the United States District Court
for the District of Rhode Island

———————————

**APPELLANT'S NOTICE TO THE JUDGES OF THE UNITED STATES OF
THE COMMISSION OF ACTIVITIES BY PERSONS OR WHOEVER
INVOLVING RECORD TAMPERING; KNOWING PRESENTATION, OR
CAUSING TO BE PRESENTED OR CERTIFICATION OF A FALSE OR
FRAUDULENT CLAIM TO THE UNITED STATES, TO THE STATE OF
TEXAS, FOR PAYMENT OR APPROVAL; KNOWINGLY MAKING,
USING OR CAUSING TO BE MADE OR USED, A FALSE RECORD OR
STATEMENT MATERIAL TO A FALSE OR FRAUDULENT CLAIM;
CONSPIRING TO COMMIT A VIOLATION OF THE AFORESAID TO
PROCURE TITLE IV-D FUNDING, THAT INVOLVE VIOLATIONS OF 42
U.S.C. § 654 WHICH ARE**

**PENALTY-INCURRING AND FINES INCURRING UNDER 42 U.S.C. §
654, COMMITTED BY INDIVIDUAL APPELLEE PERSONS, WHOEVER,**

## AND AGENTS OF TITLE IV SOCIAL SECURITY ACT RHODE ISLAND STATE PLAN

**Pursuant to**

**18 U.S.C. § 4**
**18 U.S.C. § 666**

**18 U.S.C. § 287 - making false, fictitious claims,**

**18 U.S.C. § 371 - conspiracy to defraud the United States,**

**18 U.S.C. § 1001 - false documents or false statements to a federal agency,**

**18 U.S.C. § 1341 - mail fraud,**

**18 U.S.C. § 1343 - wire fraud,**

**18 U.S.C. § 641 - Public money, property or records,**

**31 U.S.C. § 3279 - federal civil false claims act**

**Et al.**

———————————————

## ORGANIZED FRAUD, THEFT OF PUBLIC MONEY AND GOVERNMENT PROGRAMS INVOLVING BILLIONS OF DOLLARS

Judicial Notice, in aid of the court, is respectfully requested of the following:

This case is related to Appeal No. 23-1967 and Appeal No. 23-1978.

In 2010, Appellee Gero Meyersiek (who is a non-welfare recipient and independently wealthy person, was represented by his private counsel, Barbara Grady, whose law firm partner, Paul Dugan, was formerly a Deputy Chief Counsel of State Appellee) paid Appellee Rhode Island Office of Child Support Services $25 under 42 U.S.C. §654(6)(B) for legal services that entailed, *inter alia*,

establishing and enforcement of interest on overdue support.  In return for

Appellee Gero Meyersiek's $25 payment, State Appellee's Deputy Chief Counsel

Priscilla Glucksman provided dedicated, individualized and customized services

beyond those prescribed by 42 U.S.C. §654(6)(B), to wit Glucksman appeared on

behalf of the State at *all non-welfare non-paternity family court* hearings in (over

12) 2010, (over 12) 2011, (over 12) 2012 and 2013 concerning *private custody*

*matters* relating to *Appellant's application to move her young daughters whom she*

*had physical custody up until she moved to TEXAS in 2010 when Appellant*

*remarried* in TEXAS.

Rhode Island Executive Office of Health and Human Services's Budget for

this Fiscal Year is $3,419,217,779.00 ($3.42 Billion) that consists of Federal

Funding.  Penalties and fines incurred as of and accrued from the year 1996 when

Congress amended Title IV-D of the Social Security Act providing for penalties

and fines levied against States' noncompliance with Title IV-D.  The amount of

penalties and fines incurred by Rhode Island under 42 U.S.C. § 654 and other

applicable federal laws, and the amount of funding Title IV-A TANF disgorgement

owed and due from Rhode Island to the United States pursuant to Congress linking

State eligibility for TANF funding to State compliance with Title IV-D date back

to 1996 through 2024.

Pursuant to **18 U.S.C. § 4,** APPELLANT, proceeding from TEXAS and as a citizen of TEXAS, in aid of the Court, respectfully in good faith makes known to the Judges of the United States in the United States Court of Appeals for the First Circuit of United States of America, the commission of penalties-incurring and fines-incurring, both civil and criminal, (negligent and intentional) violations by Appellee persons or whoever acting as agents of the **42 U.S.C. § 654(1) political subdivisions of the State Plan of the State of Rhode Island** and Appellee persons, pursuant to **18 U.S.C. § 666, 18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false documents or false statements to a federal agency, 18 U.S.C. § 1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud, 18 U.S.C. § 641 - Public money, property or records, 31 U.S.C. § 3279 - federal civil false claims act *et al.* ** (a non-exhaustive list of Appellee-violated federal codes is invoked in the Conclusion Section of this Notice), and respectfully requests review by a panel of judges in this United States Court of Appeals for the First Circuit under **Fed. R. App. P 27(b).** Certain aspects of the fraud made known herein were also made known to the judges of the United States in the related case **Appeal Case No. 23-1967** pending before a panel of judges **pursuant to Appellant's motions invoked under Fed. R. App. P 8(a)(2)(D) and Fed. R. App. P 27(b) pending in that matter**.

Please take Judicial Notice that Appellant, in Appeals No. 23-1967,
respectfully requested a hearing by a panel of Judges on the Federal Question
matters raised herein under Fed. R. App. P 8(a)(2)(D) and Fed. R. App. P
27(b).

I.    **APPELLANT'S LIMITED SCOPE PROSECUTION OF THE
APPELLEES AND STATE OPERATIONS UNDER THE
STATE PLAN UNDER 42 U.S.C. § 654 IN THE ==LIMITED==
JURISDICTION 42 U.S.C. § 654(1) STATE FAMILY COURT
TITLE IV CASE PROCEEDINGS**

The TEXAS Appellant, a victim of the Appellees' organized commission of

organized Title IV-D and Title IV-A Program interstate fraud defrauding Appellant

(and TEXAS because Rhode Island's official policy and practice to conceal any

and all interest by removing it from the automated data processing system when

certifying to Texas for collections under 42 U.S.C. § 666(14) in a scheme

calculated to deny Texas's ability to request in sharing legitimate interest under

Title IV-D's enforcement and collection states cooperative program scheme) of 42

U.S.C. § 654(21)(A) prohibited 12% compound interest on overdue support fraud,

fraudulent liens in TEXAS on TEXAS properties consisting of 42 U.S.C. §

654(21)(A) violative 12% COMPOUND INTEREST on overdue support, fraud,

theft, and accounting fraud, respectfully requests judicial notice, in aid of the

Court, of the TEXAS Appellant's concurrent limited scope prosecution of the

Appellees in the Rhode Island State Plan's 42 U.S.C. **§ 654(1)** political

subdivision, Rhode Island Judiciary limited jurisdiction family court, where certain symbiotic state judicial actors, such as state judge John McCann III, state judge Haiganush Bedrosian and state magistrate Susan Nahabedian, routinely establish and enforce under color of Rhode Island state law 12% compound interest on overdue support, upon information, since 1980, when the Rhode Island General Assembly enacted R.I. Gen. Laws § 15-5-16.5 on "support owing." Appellant respectfully attached hereto this Notice the publication by **Congress** of **42 U.S.C. § 654,** Appellant's motion to dismiss for lack of jurisdiction and close the case dated March 27, 2024; motions to compel compliance with subpoena filed on March 26, 2024 and March 21, 2024 to compel enforcement of that family court's properly issued subpoena for Appellant's Title IV-D case records including records showing the Appellee-Rhode Island Office of Child Support Service's accounting alterations and false support certifications to TEXAS involving any and all records as they relate to the removal of 12% compound interest in the amount of tens of thousands of dollars from the automated data processing system and putting the 12% compound interest in the amount of tens of thousands of dollars back on the system whether it be for certification of a compliant approved State Plan to the UNITED STATES for claims under Title IV-D and Title IV-A programs funding under 42 U.S.C. §§ 654(7), 654(10), 654(14), 654(15), 654(16), 654a, 654b; or certified to financial institutions or property-holding entities for the purpose of

placing or perfecting liens on Appellant's TEXAS properties, or certified to the State of TEXAS for enforcement against the Appellant (e.g., to TEXAS for cooperation under the State Plan Congressionally prescribed under 42 U.S.C. §666 (14) certifying the accuracy and legal sufficiency of Rhode Island's automated data processing system accounted amount) that must obviously exactly corroborate with the amounts directly represented to and demanded from the Appellant during the course of the Appellees' support collection activities – Appellant prosecuted judicial compulsion of Rhode Island Appellees' compliance with the subpoena **and compliance with 42 U.S.C. §654b's** requirement to furnish the information upon the noncustodial parent's information request by filing the motion to compel using the State's electronic court filing system, Odyssey, and attached hereto under **Exhibit A**.  This federal appellate Court is requested to scrutinize the attached Congressionally published Statutory Text as well as the Statutory Notes and Related Subsidiaries of all Congress's Amendments, especially the **1996 Amendments to 42 U.S.C. §654.**

As a threshold matter, Appellant respectfully requests Judicial Notice of the Explicit Preemptive Effect of 42 U.S.C. sec. 654 that** Congress offered to Rhode Island under the **Commerce Clause and the Spending Clause** of the United States Constitution as a condition for receiving Federal Funds under the Title IV Programs.

**A.  The Statutory Text and Statutory Notes and Related Subsidiaries of Congress's 1996 Amendment to 42 U.S.C. §654 Make Clear that Under the United States Constitution's Commerce Clause, Congress conditioned State Participation in 42 U.S.C. §654 with State Acceptance of 42 U.S.C. §654 Preemption of State Laws and State Constitutions**

Appellant respectfully requests Judicial Notice of the attached 42 U.S.C. § 654.  The Statutory text, Statutory Notes and Related Subsidiaries of Congress's 1996 Amendment to 42 U.S.C. § 654 makes clear that Under the United States Constitution's Commerce Clause, Congress conditioned State Participation in Title IV-D, as prescribed in 42 U.S.C. § 654, with State Acceptance of 42 U.S.C. § 654 Preemption of State Laws and State Constitutions.  Appellant requests Judicial Notice of the text under  "Effective Date of 1996" that states as follows:

"**Effective Date of 1996**

"(a) In General.-Except as otherwise specifically provided (but subject to subsections (b) and (c))-

"(1) the provisions of this title [see Tables for classification] requiring the enactment or amendment of State laws under **section 466 of the Social Security Act [42 U.S.C. 666], or revision of State plans under section 454 of such Act [this section], shall be effective** with respect to periods beginning on and after **October 1, 1996**; and

"(2) **all other provisions of this title shall become effective upon** the date of the enactment of this Act **[Aug. 22, 1996]**.

"(b) <mark>**Grace Period for State Law Changes**</mark>.-The provisions of this title shall become effective with respect to a State on the later of-

"(1) the date specified in this title, or

"(2) the effective date of laws enacted by the legislature of such State implementing such provisions,

but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2-year legislative session, each year of such session shall be deemed to be a separate regular session of the State legislature.

"(c) **Grace Period for State Constitutional Amendment.-**A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of-

"(1) 1 year after the effective date of the necessary State constitutional amendment; or

"(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]."

## Specific 1996 Amendments to 42 U.S.C. §654b and 42 U.S.C. §654(21)(A).

Appellant respectfully requests Judicial Notice of Congress' specific 1996 Amendments to 42 U.S.C. § 654b and 42 U.S.C. §654(21)(A):

"Amendment by section 312(a) of Pub. L. 104–193 **effective Oct. 1, 1998, with limited exception for States which, as of Aug. 22, 1996, were processing the receipt of child support payments through local courts**, see section 312(d) of Pub. L. 104–193, set out as an Effective Date note under **section 654b of this title**."

Further the **1996 Amendments made changes to Par. (21)(A). Pub. L. 104**–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent".

==*Therefore, Congress makes it unequivocally clear that States are <u>required as a condition of State participation</u>, to **<u>change State Laws</u>**, and if necessary, **<u>amend State Constitutions</u>**, to comply with the 1996 Amendments to Title IV-D.*==  *See, e.g., "b) **Grace Period for State Law Changes**. - The provisions of this title shall become effective with respect to a State on the later of the effective date of laws enacted by the legislature of such State implementing such provisions."*

Therefore, in 1996, Congress made clear that States, such as Rhode Island, that fail to enact by the legislature of such States implementing provisions of Title IV-D, are no longer eligible to participate in Title IV-D, resulting in ineligibility to receive federal funding, as of 1996.

Under 42 U.S.C. § 655(a)(4)(A) and 42 U.S.C. § 655(a)(5), by the text of the Title IV-D statute, the Appellant respectfully requests Judicial Notice that the legislature has prescribed **penalties** and that this penalty **shall** be **enforced**.

Here, in the case of Rhode Island, **noncompliance is through *deliberate* and *willful* fault of Rhode Island – Appellant respectfully requests Judicial Notice of One of the Reports entitled "TRAC Record" generated by Appellee Rhode Island Office of Child Support Services in Appellant's case that**

Appellant was denied under 42 U.S.C. § 654b(b)(4), but produced pursuant to

Appellant's Rhode Island Access to Public Records Act (APRA) showing an entry

made on December 6, 2021 by Appellee Kevin Tighe, Deputy Legal Chief Counsel

of Appellee Rhode Island Office of Child Support Services stating that "interest

was removed from the system in 2018 when we sent to Texas when case was made

IU" then blacked out REDACTION.  Appellant is prosecuting Rhode Island in the

state family court to produce the unredacted copy of the said public records that

were produced pursuant to APRA regarding this entry "interest was removed from

the system in 2018 when we sent to Texas when case was made IU."  *See* attached

**TRAC Records Exhibit C**. As it turned out, the alleged interest amount is in the

tens of thousands of dollars, for which the Appellees continue to refuse to furnish

the complete accounting books of their offline manual accounting of how much

was removed in 2018.

The State Appellees' removal of the interest from the automated data

processing and information retrieval system is material to this matter as the

evidence herein presented goes to show proof towards the willful and deliberate

noncompliance by Rhode Island of Title IV-D.   Congress made clear in its 1996

Amendment of Title IV to require the implementation of an automated data

processing and information retrieval system as a condition of eligibility because

the legacy manual computation, collection and disbursement of child and spousal

support were fraught with inaccuracies, that essentially ran afoul of safeguards against false accounting and falsified records by unscrupulous persons like the Appellees.  Congress made explicitly clear that accuracy was so central to the federal government's involvement in Title IV-D that It enacted punitive penalties and fines under 42 U.S.C. § 655 for States' noncompliance of 42 U.S.C. §§ 654, 666.

Therefore, the Appellees' knowing removal of tens of thousands of dollars representing Rhode Island's unlawful 12% compound interest prohibited under 42 U.S.C. § 654(21)(A) "when sent to Texas" makes clear Appellees knew the 12% compound interest was fraudulent and unlawful, and sought to cover it up from TEXAS authorities through the manual removal of the entire interest amount (consisting of tens of thousands of dollars) from the automated data processing and information retrieval system that is prohibited by 42 U.S.C. §§ 651-669.  The system is intended to certify the integrity and accuracy of the entire support amount in any given account.

Therefore, it is clearly established that Rhode Island covers up its noncompliance and it is clearly established that Rhode Island's noncompliance is willful and deliberate **because Rhode Island knowingly failed to comply with numerous provisions of 42 U.S.C. § 654 as follows**:

(1) Failed to enact State laws in 1996 implementing provisions clearly prescribed in 42 U.S.C. § 654(21)(A) that makes clear that States may opt to impose interest on overdue support, **but** no less than 3 percent and no more than 6 percent;  See attached ==**Exhibit D**==. R.I. Gen. Law§15-5-16.5 legislating 12% compound interest on overdue child and spousal support that is explicitly prohibited by 42 U.S.C. § 654(21)(A) (and contract to the selective violation of RIGL § 15-5-16.5 that Appellee-Rhode Island Child Support Services official policy states to *prohibit* charging interest on overdue support in *interstate* cases **only**. – See ==**Policy**== attached in ==**Exhibit B**==)

(2) Failed to enact State codes and procedures to comply with 42 U.S.C. § 654(21)(A) requirement "at the option of the State, impose a late payment fee on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, **in an amount equal to a ==uniform== percentage** determined by the State **(not less than 3 percent nor more than 6 percent**) of the overdue support" that would prohibit the State's Title IV-D operational policy saying, "it is desirable" to prohibit the State's Office of Child Support Services charging interest in interstate cases (implying in *intrastate* cases 12% compound interest is routinely established and enforced by State policy

in violation of the "not less than 3 percent nor more than 6 percent" explicitly prescribed under 42 U.S.C. § 654(21)(A).

(3) Failed to disclose by deliberate omission (by concealment) to the United States when certifying to the United States Secretary of the Department of Health and Human Services for federal reimbursement payment and incentive payment funding under the Title IV Programs Part D, 42 U.S.C. §§ 651-669, and Part A, TANF.

(4) Falsified accounting and falsified certifications sent to the United States and other support enforcement cooperating States, like TEXAS, under, *inter alia*, 42 U.S.C. §§ 651-669, through the State's official Policy and official Practice of creating multiple accounting records and books of accounts for the same support case through the manual removal of the Section 654(21)(A) noncompliant (and incriminating) 12% compound interest amount from the automated data processing system consisting of tens of thousands of dollars for example, and putting the removed interest back on the system by manually issuing fraudulent (based on illegal 12% compound interest) liens on properties, for example, fraudulent liens on Texas properties in TEXAS that further violated TEXAS PENAL and CIVIL CODES. *See* Appellee Rhode Island Office of Child Support Services's Official Policy that states, "**It is**

**desirable for RI OCSS to prohibit the charging of interest in Interstate Cases**.” The Policy goes on to state regarding operations of the automated data processing system, “Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.” Additionally the Policy states, “Two reports will be created. The first will detail the interstate cases for which a support order….. for which one or more interest adjustment were created.” In **Exhibit B**.

(5) Concealment of the State’s noncompliance with 42 U.S.C. **§ 654(21)(A)** by Cover Up and by Fraud, through the routine practice of illegal manual removal by Appellee Rhode Island Office of Child Support Services of Rhode Island’s fraudulent and unlawful 12% compound interest from the 42 U.S.C. **§ 654(24) mandated *automated data processing* and *information retrieval system*** mandated and legislated under *inter alia* 42 U.S.C. **§ 654(24) and 42 U.S.C. §654a and 42 U.S.C. §654b to be *accurate*,** thereby deliberately and willfully violating, *inter alia*, 42 U.S.C. **§ 654b,** 42 U.S.C. **§654(20), 42 U.S.C. §666(14), 42 U.S.C. §654(24) and Congressional Requirements for accuracy of support calculations be performed by the automated data processing system, from which information is retrieved for all**

**support certifications sent to the United States and to cooperative enforcement States like TEXAS for 42 U.S.C. § 654(21)(A) fund sharing, Title IV-D Program federal fund reimbursements, and Title IV-A TANF federal fund procurement.**

(6) The illegal manual removal of the unlawful 12% compound interest from the automated data processing system is augmented by the illegal manual inputting back on the system the illegal 12% compound interest when Rhode Island generates fraudulent liens under the guise of support collection for the unlawful 12% compound interest.

(7) Operating a scheme of collecting unlawful 12% compound interest that Rhode Island converts to unlawful State revenue because under 42 U.S.C. **§§ 651-669** this "ordered" 12% compound interest is assigned by the welfare recipient to the State, thus the 12% compound interest represents a debt to the State owed by the noncustodial parent.

(8) Appellee Cover up of the illegal scheme from unsuspecting noncustodial parent victims like Appellant, by refusing or deny furnishing noncustodial parents "information upon request, timely information on the current status of support payments under an order requiring payments to be made by or to the parent – the timely information generated by the Appellee Rhode Island Office of Child Support

Services must comply with 42 U.S.C. **§ 654b(b) Required procedures mandating "**The State disbursement unit shall use automated procedures, electronic processes, and computer-driven technology to the maximum extent feasible, efficient, and economical, for the collection and disbursement of support payments, including procedures that furnish noncustodial parents their case files upon request.

(9) Appellee Rhode Island Office of Child Support Service's unlawful policy and practice of manually removing support amounts through fraud from the automated data process system resulted in the generation of fraudulent and false accounting and false ledgers published in Appellant's online child support account maintained by State Appellees fraudulently showing "$0 payment" for Appellant's large sum of $104,185.98 payoff payment in full paid in Texas on December 7, 2021 – See screenshot taken of online account on December 3, 2022 that says **"$0.00"** under Payments for December 2021, attached hereto as **Exhibit E**.

(10)   Similarly, State Appellees concealed from through deceit that the "$0.00" Under Interest Due on the Appellant's online account shown on December 6, 2021 was in part because State Appellees unlawfully took interest off the automated data processing system and information

retrieval system in 2018 when they sent the support to TEXAS – this tampering with federal Title IV records in Appellant's case file was covered up by State Appellees.  See **Exhibit F**, Screen shot of Appellant's online support account taken on **December 6, 2021**, which shows **$0.00** under **Interest Due**.

(11)   **Appellee Rhode Island Office of Child Support Services Deputy Chief Counsel Kevin Tighe further violated Appellant's privacy rights protected under 42 U.S.C. §654(26)(A) by discussing in detail with Barbara Grady, Appellee Gero Meyersiek's private attorney, information and strategies regarding "taking interest off the system" and "keeping interest off the system" as they relate to support enforcement which is prohibited by the statutory text of 42 U.S.C. sec.,654(26)(A) mandating that the State Plan "have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the parties, including-(A) safeguards against unauthorized use or disclosure of information relating to proceedings or actions to enforce support. – See Exhibit C, TRAC records for December 6, 2021 showing Kevin Tighe's unauthorized disclosure to Barbara Grady of enforcement information regarding taking interest off the**

system in 2018 when sending to Texas in in violation of Appellant's privacy rights protected by 42 U.S.C. sec. 654(26)(A). This disclosure was calculated to scheme with Barbara Grady on how to defraud the Appellant through "leaving the interest off the system" so as to cover up from the Appellant the unenforceable 12% compound interest rate as well as to deceive the Appellant through inducement, to accept Appellee's offer and to agree to pay off the large lump sum principle amount by representing to the Appellant that Appellee Gero Meyersiek waived interest if Appellant paid off support in full in one lump sum $104,185.98.

(12)   In addition to Appellee Rhode Island Office of Child Support Services, the State is culpable of a deliberate and willful failure to comply with 42 U.S.C. **§654(1) requiring "A State plan for child and spousal support must-(1) provide that it shall be in effect in ==all political subdivisions== of the State:**

   a. **Political subdivision limited jurisdiction Rhode Island state family court judiciary and justices routinely establish and enforce under color of state law and through fraud on the court absent jurisdiction the unlawful 12% compound interest in violation of 42 U.S.C. §654(21)(A)**

   b. **Political subdivision Office of the Attorney General knowingly aids and abets in and enforces the unlawful 12% compound interest**

c. **Political subdivision Rhode Island Executive Office of Health and Human Services that has an annual budget of $3.42 Billion knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and participates in the consequentially unlawful collection of reimbursement of federal funds and federal grant money from the United States under Title IV-D Program.**

d. **Political subdivision Rhode Island Office of the Treasurer knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and participates in the consequentially unlawful collection of reimbursement of federal funds and federal grant money from the United States under Title IV-D Program.**

e. **Political subdivision Rhode Island Office of the Governor knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and participates in the consequentially unlawful collection of reimbursement of federal funds and federal grant money from the United States under Title IV-D Program.**

f. **Political subdivision Appropriations Committee knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and causes to appropriate public funds in the consequentially unlawful State financial participation of the noncompliant State Plan, appropriating the State's public funds to the illegal Title IV-D operation that defrauds unsuspecting noncustodial parents and spousal support obligors for 12% compound interest on overdue support under color of state law.**

**B. Hodel v. Virginia Surface Mining & Reclamation Assn., Inc. and Hodges v. Shalala, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th**

## Cir. 2002), cert. denied, 540 U.S. 811 (2003) - U.S. Supreme Court Affirms 42 U.S.C. §654 Preemption over State Laws and State Constitutions under the United States Spending Clause and Commerce Clause

Congress prescribed both civil and criminal penalties for violations of Title IV of the Social Security Act.  Firstly, consistent with its **Spending Power**, Congress has the authority to attach conditions on the receipt of federal funds. *See **South Dakota v. Dole***, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16), (20), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See **Sullivan v. Stroop***, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."   The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." ***Hodges v. Shalala***, 121 F.2d at 879.  Absent any discretion available to the Secretary to impose a

lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1]

Congress also enacted several criminal codes punishing actors, such as the Plaintiffs, who commit federal crimes, including cover up of unlawful activities.

The federal government has a longstanding involvement in child support enforcement programs. See ***Hodges v. Shalala***, 121 F.Supp.2d 854 (D.S.C. 2000), ***Hodges v. Shalala***, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003) As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements under 42 U.S.C. sec. 654(21)(A) that the State, at the option of the State, impose a late payment fee ('interest") on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina paid $75 million as of 2009 and was set to pay another $10 million for 2010.  South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
   Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A), among others

While Rhode Island submits to the United States that it has a federally certifiable statewide automated data processing system for child support, Office of Child Support Services produced APRA Public Records consisting of Title IV Public Records showing Rhode Island taking off from the automated data processing system tens of thousands of dollars allegedly representing the 42 U.S.C. sec. 654(21)(A) prohibited 12% compound interest late payment fee "interest" prior to certifying to TEXAS and the United States, and showing Rhode Island falsely certified to the amount's accuracy under 42 U.S.C. sec. 666(14) when in fact Rhode Island removed significant tens of thousands of dollars (See TRAC records in attached Exhibit).

The Title IV-D statute expressly provides that compliance with ALL 42 U.S.C. 654 requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A.

Again, the clear and unequivocal statement of the required conditions in the statute enabled South Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop,* 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."

Emphatically, Congress may use its **Spending Power** to **influence** a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, <u>**but**</u> Congress, under the <mark>**Commerce Clause**</mark>, **may** <mark>offer the States a choice of regulation under federal control or preemption under federal regulation</mark>. **See** *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc*., 452 U.S. 264, 288 (1981). It is crystal clear that upon Rhode Island's State Plan entering into agreement with the United States under the <mark>**Commerce Clause**</mark>, Rhode Island accepted the agreement terms of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

*See* United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUSC-prelim-title42-section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRpb25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

**Appellant requests judicial Notice of attached <mark>Exhibit G</mark>.** *Hodges v. Shalala*, **311 F.3d 316 (4th Cir. 2002)**

**C. Rhode Island's Defraud of TEXAS – Under 42 U.S.C. §654, "State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21)" and Rhode Island Removed Tens of Thousands of "paragraph (21)"**

The last provision after Provision (34) of 42 U.S.C. sec. 654 states as follows:

"The State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21). Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25."

See link:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUSC-prelim-title42-section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRpb25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

Appellee Rhode Island Office of Child Support Service's routine practice of removal of tens of thousands of dollars of interest from the automated system before sending to other states like Texas in 2018 makes clear that the Appellees schemed to defraud TEXAS "who makes the collection to retain any late payment fee under paragraph (21)" – except TEXAS, a paragraph (21) compliant State that set 6% simple interest, would have known the 12% compound interest is unlawful and unenforceable in Texas.

### D. Rhode Island's Defraud of the UNITED STATES in Scheme Involving Routine Removals of 42 U.S.C. §654(21)

Appellant in good faith relies on the straightforward and clearly worded ruling of the United States Court of Appeals for the 4th Circuit in *Hodges v. Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003), that makes clear Congress's intent to prescribe

both civil *and* criminal penalties and fines for violations.  Consistent with its

Spending Power, Congress has the authority to attach conditions on the receipt of

federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Title IV-D

statute expressly provides that compliance with the 3-6% simple interest on

overdue support, operating the automated system for accuracy and SDU

requirements are conditions of approval of a state plan. See 42 U.S.C. §§ 654(7),

(10), (14), (15), (16), (21)(A), (24), (27)A, § 654a, § 654b. The clear and

unequivocal statement of the required conditions in the statute enabled Rhode

Island to "exercise [her] choice knowingly, cognizant of the consequences of [her]

participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court

has recognized that Congress intended the linkages between child support

programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990)

(concluding Congress intended the two programs to "operate together closely."

The penalty provisions of the statute and the wording of the statute are plain.

Where the Secretary determines that a state plan would be disapproved, and where

the State has made and continues to make a good faith effort to comply and has

submitted a corrective compliance plan, "the Secretary shall not disapprove the

State plan . . . and the Secretary shall reduce the amount otherwise payable to the

State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II)

(emphasis added). "[B]y the text of the statute, the legislature has prescribed that

the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at 879.

Absent any discretion available to the Secretary to impose a lesser penalty than the

alternative penalty as outlined in the statute, Rhode Island is liable for the

statutorily prescribed penalties.[2]    Congress also enacted several criminal codes

punishing persons, whoever who act as agents, such as the Appellees, who commit

federal crimes, including cover up of unlawful activities under federal criminal

codes, e.g., *see* **8 U.S.C. § 666, 18 U.S.C. § 287 - making false, fictitious claims,**

**18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 -**

**false documents or false statements to a federal agency, 18 U.S.C. § 1341 -**

**mail fraud, 18 U.S.C. § 1343 - wire fraud, 31 U.S.C. § 3279 - federal civil false**

**claims act *et al***. (a non-exhaustive list of Appellee-violated federal codes is

invoked in the Conclusion Section of this Notice).    Penalties and fines against the

State for noncompliance (including due process violations provided in 42 U.S.C.

---

[2] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

   Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to TEXAS and to the United States in order to conceal the unlawful 12% compound interest from the noncustodial parent and from TEXAS and Federal authorities in the false amounts certified to TEXAS and to the United States for incentive claims, cooperation claims and Title IV-D and Title IV-A funding claims.

§654(20) and corresponding §666) is explicit under federal codes Title IV-D, Title

IV-A, and 18 U.S.C. § 666**,** and upheld.

Appellant attaches the 4th Circuit's ruling (***Hodges v. Shalala***, 121 F. Supp.

2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S.

811 (2003) herewith under **Exhibit G**.

Appellant  moreover in good faith relies on the straightforward and clearly

worded Brief filed by the United States Department of Justice and Secretary of the

United States Department of Health and Human Services in the seminal United

States Supreme Court case ***Turner v. Rogers***, 564 U.S. 431 (2011) that showed

South Carolina (found by the 4th Circuit Court of Appeals) liable for $75 million in

penalties for that state's 42 U.S.C. § 654 violations that did not even involve, *inter*

*alia*, fraud and tampering with the record or unlawful 12% compound interest put

into, then taken off, then put back on, the automated data processing system as here

in Rhode Island by the political subdivision Appellees.  The TEXAS Appellant, the

victim of fraud and organized fraud by Rhode Island's political subdivisions under

42 U.S.C. **§ 654(1),** in good faith made known the above activities to "some

judges" of "the United States" such as the judges sitting in the Court of Appeals for

the First Circuit and other relevant federal authorities under 18 U.S.C. **§ 4.**

Appellant attaches the aforesaid Brief filed in the U.S. Supreme Court by the United States in ***Turner v. Rogers***, 564 U.S. 431 (2011) herewith under **Exhibit H.**

**Relying on the Turner v. Rogers United States Amicus Brief, it is crystal clear from Appellant's making known, *inter alia*, to judges of the United States the routine false certifications to United States and other States under 42 U.S.C. sec. 654, 655, 658a, 666 et al to defraud the federal Title IV Program funding of ineligible funds under Title IV-D and TANF, the defraud of noncustodial parents and grandparents through the 42 U.S.C. sec. 654 legal framework under color of state law, the defraud of State public funds of Rhode Island and of Texas to enforce fraudulent void and voidable support orders targeting noncustodial victims that established unlawful 12% compound interest on overdue support, and the defraud of cooperative States like Texas from sharing the "late fee" provided by 42 U.S.C. sec. 654 by Appellees' removal of the interest amount from the automated system prior to certification to Texas for enforcement, Rhode Island has accrued billions of dollars in penalties and fines under both civil and criminal statutes, both federal and state.**

    II.     **STATE JUDICIARY'S VIOLATION OF GOVERNMENT EDICTS DOCTRINE, CALCULATED FAILURE TO INTEGRATE TITLE IV-D AGENCY ELECTRONIC FILING SYSTEM WITH ODYSSEY MAKING THEIR FILINGS INVISIBLE TO ALL E-COURT USERS OTHER THAN THE**

**JUDGE AND THEMSELVES AND VIOLATION OF ACCESS TO COURT INFORMATION OF PUBLIC TITLE IV-D PROCEEDINGS IN RHODE ISLAND'S STATEWIDE ELECTRONIC COURTS**

**a. DENIAL OF PUBLIC AND PRO SE-LITIGANT ACCESS TO COURT INFORMATION INCLUDING JUDGE-CREATED LAWS BY 42 USC 654(1) POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY**

The Rhode Island Judiciary is a political subdivision of the State of Rhode Island under 42 USC 654(1).  While publicizing during the implementation of the $6 million installation of Odyssey (the statewide electronic filing system) in 2014 that the electronic courts will enable ALL court users to pull up court record information with ease from their phones, the Rhode Island Judiciary quietly implemented Rule 5 of the Rhode Island Rules and Practice denying the Public, pro-se litigants and all parties to a case in Rhode Island remote access to court record information including judge-created orders and laws, including their own. Through this deceit, the Rhode Island Judiciary lied to the Public, while denying access and thereby covering up the routine ordering of unenforceable body of judge-created laws ordering 12% compound interest in public cases and public hearings under 42 USC 654 in public Title IV-D cases, such as Appellant's, by symbiotic pliant judges like Judge McCann and Magistrate Nahabedian.  The denial of access to pro-se litigants of their own cases' court records containing support orders violates, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.  The denial of public access to public

court records documenting the routine systemic violations of 42 USC 654(21)(A) in electronic courts violates the First Amendment and the public's right to know the law, even if these fraud on the court unenforceable judge-created laws are unenforceable in both Rhode Island and elsewhere Title IV Part D reaches. The denial of public access to judge-created laws that is also motivated by cover-up fundamentally violates the established Government Edicts Doctrine that the United States Supreme Court specifically held applies to electronic formats of government doctrines, such as judge-created laws in digital courts. See ***Georgia v. Public Resource.Org, Inc***., No. 18-1150, 590 U.S. ___ (2020). The Appellant has been denied access by the political subdivision Rhode Island Judiciary to her court records and information regarding the orders in question that must be furnished pursuant to 42 USC 654b thus in violation of 42 USC 654. The Appellant has been denied access by the political subdivision Rhode Island Judiciary to unenforceable and impeachable judge-created fraud on the court void laws that routinely establish unenforceable 12% compound interest by certain symbiotic pliant judges, like Judge McCann and Magistrate Nahabedian, who work hand-in-hand with the Rhode Island Office of Child Support Services in Title IV-D cases, in violation of Appellant's Due Process and Equal Protection rights to know the law to be meaningfully heard and right to meaningful access to justice – they are in violation

of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

The family court held at the hearing in this matter scheduled on March 6, 2023 that the Rhode Island Office of Child Support Services is ordered to show that the alleged arrears is accurate.  See attached March 6, 2023 hearing transcript. Explicitly stated throughout 42 USC 654, "accuracy" requires no accounting alterations generated offline then unsubstantiated hard inputs into the automated system, no fraud, no inducements, no interstate extortion under color of state law, and for certain no 12% compound interest on overdue support.

**b. CALCULATED FAILURE BY THE JUDICIARY TO INTEGRATE THE TITLE IV-D AGENCIES' ELECTRONIC FILING SYSTEM INTO ODYSSEY RESULTING IN AGENCY FILINGS BEING INVISIBLE TO ALL COURT USERS EXCEPT THE JUDGE AND THE AGENCIES THEMSELVES – COVER UP**

Because under the State's Plan the Title IV-D agencies routinely file in the Rhode Island court system for the illegal enforcement of illegal 12% compound interest disallowed under 42 USC 654(21)(A), the political subdivision Rhode Island Judiciary deliberately failed to integrate the Title IV-D Agencies' electronic filing system with the State's electronic filing system Odyssey in order to make Title IV-D Agency electronic filings invisible to all court users except the judge and the agencies  themselves, calculated to cover up the 12% compound interest

from audit by the federal authorities and from the Public.  This came to light at the

WebEx hearing in this Title IV-D matter before family court Judge Merola on June

8, 2023 scheduled at 2PM, where Judge Merola, showing he was unaware of the

failure of systems integration, questioned Appellee Paul Gould of Rhode Island

Office of Child Support Services, why the Appellant is unable to see the agency's

electronic filings that the judge can see in the system.  Without hesitation, Appellee

Paul Gould explained that this is due to the electronic court implementation

process that was supposed to integrate the agency's legacy system to Odyssey,

demonstrating conclusively that Gould, the Lead Counsel of the Rhode Island

Office of Child Support Services responsible and overseeing agency court filings

in all Title IV-D cases under the State Plan, undisputedly was in the know and part

of the conspiracy involving the deliberate failure of filing system integration and

its continuing perpetration in Title IV proceedings that made Title IV agencies'

filings invisible as part of the cover up.

### c.  CRIMINAL VIOLATIONS REPORTED TO SOME JUDGE OF THE UNITED STATES AND OTHER LISTED AUTHORITIES UNDER 18 U.S.C. § 4

The Appellant, in good faith and reliant on the plain language of 18 USC §

4, misprision of felony, as well as the Brief filed in the United States Supreme

Court by the United States of America in the Supreme Court case, *Turner v.*

*Rogers*, 564 U.S. 431 (2011) that showed South Carolina (found by the 4th Circuit

Court of Appeals) liable for $88 million in penalties for that state's 42 U.S.C. sec. 654 violations that did not even involve, inter alia, fraud and tampering with the record or unlawful 12% compound interest put into then taken off then put back on the automated data processing system as here in Rhode Island, made known the above activities to "some judges" of "the United States" and other relevant federal authorities – counting among the United States judges Appellant made known publicly in the Amended Complaint filed in the United States District Court for the District of Rhode Island, Judge William E. Smith.  The issue of what Judge Smith has done with the information "made known to him" is pending before the United States Court of Appeals for the First Circuit before a requested panel of judges under the federal appellate law of civil procedure in Appeal Case No. 23-1967. Therefore, under 18 U.S.C. Sec. 4, the above reported activities have been "made known" to several high ranking Judges of the United States, including the Judge in this case.

### III.   VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Appellant made known to the panel of judges of the United States allegations contained in the Amended Complaint filed in Federal Court of the commission of acts by the Rhode Island political subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein in this motion, the afore-described acts violating **31**

**U.S.C. § 3279,** 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18

U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a),

18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18

U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18

U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285,

18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C.

§1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18

U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18

U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C.

§1968  – such violative acts by the Appellees in this matter, and/or Judge Smith on

this list are not exhaustive.  It is undisputable, among others, that Title IV-D

penalties were incurred by, Criminal penalties were incurred by, and Title IV-D

and Title IV-A disgorgement is due from the applicable State of Rhode Island's

political subdivisions.

## IV. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in UNITED STATES OF

AMERICA v. DONALD J. TRUMP, DC Circuit, the DC Circuit United States

Court of Appeals reminds the Public and all applicable tribunals that Judges are

similarly liable to the criminal laws for their official acts.  A notable example is *Ex

parte Commonwealth of Virginia*, in which the Supreme Court affirmed the

criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A

county judge was indicted in federal court for violating a federal statute that

prohibited discriminating on the basis of race in jury selection. Id. at 340, 344. The

Supreme Court began by observing the principle that officers are bound to follow

the law: "We do not perceive how holding an office under a State, and claiming to

act for the State, can relieve the holder from obligation to obey the Constitution of

the United States, or take away the power of Congress to punish his

disobedience." *Id.* at 348. The Court then addressed the judge's argument that the

Court lacked the authority to punish a state judge for "his official acts." *Id.* Its

response was twofold. First, the Court described juror selection as "merely a

ministerial act, as much so as the act of a sheriff holding an execution, in

determining upon what piece of property he will make a levy, or the act of a

roadmaster in selecting laborers to work upon the roads." *Id.* The Court then

explained that even if juror selection is considered a "judicial act," the judge had a

legal duty to obey the criminal laws:

> "But if the selection of jurors could be considered
> in any case a judicial act, can the act charged
> against the petitioner be considered such when
> he acted outside of his authority and in direct
> violation of the spirit of the State statute? That
> statute gave him no authority, when selecting

jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing.

*Id.* at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

[W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation

of constitutional rights. On the contrary, the
judicially fashioned doctrine of official
immunity does not reach 'so far as to immunize
criminal conduct proscribed by an Act of
Congress . . . .'

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting

Gravel, 408 U.S. at 627). Similarly, in *Dennis v. Sparks,* the Court affirmed

judicial immunity from civil money damages in the context of bribery allegations

but explained that judges "are subject to criminal prosecutions as are other

citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity

because "the challenged conduct" — allegedly issuing an injunction corruptly after

accepting bribes as part of a conspiracy — was "an official judicial act within his

statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial

immunity thus aligns with civil Presidential immunity under *Fitzgerald*, but a

judge has no criminal immunity for the same "official act." See also *Imbler v.*

*Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil

immunity for centuries, could be punished criminally for willful deprivations of

constitutional rights . . . ."); *United States v. Gillock,* 445 U.S. 360, 372 (1980)

("[T]he cases in this Court which have recognized an immunity from civil suit for

state officials have presumed the existence of federal criminal liability as a

restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. See *United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings,* 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not immune, and employees of the political subdivisions of Rhode Island under 42 USC § 654(1) similarly are not immune.  Barbara Grady and Gero Meyersiek are undisputedly liable.

**IV.   LACK OF JURISDICTION – APPELLEE 42 U.S.C. § 654(1) STATE PLAN POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (CREATED UNDER RIGL 8-6-3) LACKS JURISDICTION**

**A. RI'S 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY LACKS JURISDICTION TO ESTABLISH OR ENFORCE 42 USC § 654(21)(A) VIOLATIVE 12% COMPOUND INTEREST ON OVERDUE SUPPORT – DOING SO INCURS PENALTY UNDER 42 USC 654(24) AND REINFORCES ITS STATE PLAN'S INELIGIBILITY**

**FOR FEDERAL FUNDING UNDER BOTH TITLE IV-D AND TITLE IV-A, WARRANTING DISGORGEMENT OF TANF AND TITLE IV-D FUNDING – SEE HODGES v. SHALALA**

The statutory provision of 42 U.S.C. 654(21)(A) makes it

explicitly clear that Title IV-D and Title IV-A participating 42

USC 654(1) state political subdivisions, such as the political

subdivision Rhode Island Judiciary, lack the authority to establish

12% compound interest.

To do so "routinely" simply incurs more penalties, more fines

constituting more false claim consequences, and imprisonment of

the culpable persons and agents.

B. **RI's 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (See RIGL 8-6-3) LACKS JURISDICTION OVER QUESTIONS AND MATTERS OF FEDERAL CRIMINAL VIOLATIONS BY RHODE ISLAND SDU OF ROUTINE RECORD TAMPERING WITH 42 U.S.C. 654a AUTOMATED DATA PROCESSING SYSTEM COMMITTING ACCOUNTING FRAUD (e.g., REMOVAL OF UNLAWFUL 12% COMPOUND INTEREST IN ORDER TO CONCEAL IT WHEN CERTIFYING TO OTHER STATE AUTHORITIES AND FEDERAL AUTHORITIES) AND THE CRIMINAL CERTIFICATION OF FRAUDULENT ACCOUNTS THAT CONTAIN MANUALLY REMOVED UNLAWFUL FRAUDULENT 12%**

**COMPOUND INTEREST (UNDER COLOR OF RI'S PREEMPTED STATE LAW) FROM THE SYSTEM**

Title IV-D 42 USC 651-669, 31 U.S.C. § 3279, 18 U.S.C. §2, 18

U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18

U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. §

2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18

U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. §

1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18

U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C.

§225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512,

18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18

U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C.

§1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513,

RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C.

§1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968

also make clear that the State Plan's 42 USC 654(1) political

subdivision limited jurisdiction Rhode Island family court

lacks jurisdiction over FEDERAL CRIMINAL

VIOLATIONS BY RHODE ISLAND SDU OF ROUTINE

RECORD TAMPERING WITH 42 U.S.C. 654a

AUTOMATED DATA PROCESSING SYSTEM

COMMITTING ACCOUNTING FRAUD (e.g.,
REMOVAL OF UNLAWFUL 12% COMPOUND
INTEREST IN ORDER TO CONCEAL IT WHEN
CERTIFYING TO OTHER STATE AUTHORITIES AND
FEDERAL AUTHORITIES) AND THE CRIMINAL
CERTIFICATION OF FRAUDULENT ACCOUNTS
THAT CONTAIN MANUALLY REMOVED
UNLAWFUL FRAUDULENT 12% COMPOUND
INTEREST (UNDER COLOR OF RI'S PREEMPTED
STATE LAW) FROM THE SYSTEM.  Appellant attaches
herewith in **Exhibit I.** Rhode Island Gen. Laws Sec. 8-10-3
that makes clear family court is a court of limited
jurisdiction that lacks jurisdiction over the Appellees'
criminal violations.

**C.  RI's 42 USC 654(1) POLITICAL SUBDIVISION
JUDICIARY'S LIMITED JURISDICTION FAMILY COURT
(See RIGL 8-6-3) LACKS JURISDICTION OVER FEDERAL
CRIMINAL VIOLATIONS COMMITTED BY ITSELF
INVOLVING CERTAIN SYMBIOTIC RHODE ISLAND
FAMILY COURT JUSTICES, SUCH AS JUDGE JOHN
McCANN AND MAGISTRATE SUSAN NAHABEDIAN,
WHO KNOWINGLY AND ROUTINELY FRAUDULENTLY
ESTABLISH AND ENFORCE UNLAWFUL 12%
COMPOUND INTEREST TARGETING UNSUSPECTING
NONCUSTODIAL PARENT VICTIMS**

Title IV-D 42 USC 651-669, 31 U.S.C. § 3279, 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 also make clear that the State Plan's 42 USC 654(1) political subdivision Rhode Island family court lacks jurisdiction over FEDERAL CRIMINAL VIOLATIONS COMMITTED BY ITSELF INVOLVING CERTAIN SYMBIOTIC RHODE ISLAND FAMILY COURT JUSTICES, SUCH AS JUDGE JOHN McCANN AND MAGISTRATE SUSAN NAHABEDIAN, WHO KNOWINGLY AND ROUTINELY FRAUDULENTLY ESTABLISH AND ENFORCE UNLAWFUL 12% COMPOUND

INTEREST TARGETING UNSUSPECTING NONCUSTODIAL

PARENT VICTIMS.


## CONCLUSION

**WHEREFORE**, this Court should hold Oral Arguments regarding the

Federal Questions and serious criminal matters raised herein.  This Court should

reverse the district court's judgement and remand for further proceedings.

Appellant requests Oral Argument on all issues raised herein before the Court.

Appellant requests any and all Relief deemed just.

Respectfully submitted,

Mary Seguin
Pro Se
/s/        *Mary Seguin*
_____

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: March 29, 2024


## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system on March 29, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/      *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Exhibit A

**42 USC 654: State plan for child and spousal support**
Text contains those laws in effect on March 25, 2024

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
　　CHAPTER 7-SOCIAL SECURITY
　　SUBCHAPTER IV-GRANTS TO STATES FOR AID AND SERVICES TO NEEDY FAMILIES WITH
　　CHILDREN AND FOR CHILD-WELFARE SERVICES
　　Part D-Child Support and Establishment of Paternity
**Jump To:**
　　**Source Credit**
　　**Miscellaneous**
　　**References In Text**
　　**Codification**
　　**Amendments**
　　**Effective Date**

# §654. State plan for child and spousal support

A State plan for child and spousal support must-

(1) provide that it shall be in effect in all political subdivisions of the State;

(2) provide for financial participation by the State;

(3) provide for the establishment or designation of a single and separate organizational unit, which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan;

(4) provide that the State will-

(A) provide services relating to the establishment of paternity or the establishment, modification, or enforcement of child support obligations, as appropriate, under the plan with respect to-

(i) each child for whom (I) assistance is provided under the State program funded under part A of this subchapter, (II) benefits or services for foster care maintenance are provided under the State program funded under part E of this subchapter, (III) medical assistance is provided under the State plan approved under subchapter XIX, or (IV) cooperation is required pursuant to section 2015(l)(1) of title 7, unless, in accordance with paragraph (29), good cause or other exceptions exist;

(ii) any other child, if an individual applies for such services with respect to the child (except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the individual to request the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application); and

(B) enforce any support obligation established with respect to-

(i) a child with respect to whom the State provides services under the plan; or

(ii) the custodial parent of such a child;

(5) provide that (A) in any case in which support payments are collected for an individual with respect to whom an assignment pursuant to section 608(a)(3) of this title is effective, such payments shall be made to the State for distribution pursuant to section 657 of this title and shall not be paid directly to the family, and the individual will be notified on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden) of the amount of the support payments collected, and (B) in any case in which support payments are collected for an individual pursuant to the assignment made under section 1396k of this title, such payments shall be made to the State for distribution pursuant to section 1396k of this title, except that this clause shall not apply to such payments for any month after the month

in which the individual ceases to be eligible for medical assistance;

(6) provide that-

(A) services under the plan shall be made available to residents of other States on the same terms as to residents of the State submitting the plan;

(B)(i) an application fee for furnishing such services shall be imposed on an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section 2015 of title 7, and shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (I) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (II) may vary among such individuals on the basis of ability to pay (as determined by the State); and

(ii) in the case of an individual who has never received assistance under a State program funded under part A and for whom the State has collected at least $550 of support, the State shall impose an annual fee of $35 for each case in which services are furnished, which shall be retained by the State from support collected on behalf of the individual (but not from the first $550 so collected), paid by the individual applying for the services, recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and the fees shall be considered income to the program);

(C) a fee of not more than $25 may be imposed in any case where the State requests the Secretary of the Treasury to withhold past-due support owed to or on behalf of such individual from a tax refund pursuant to section 664(a)(2) of this title;

(D) a fee (in accordance with regulations of the Secretary) for performing genetic tests may be imposed on any individual who is not a recipient of assistance under a State program funded under part A; and

(E) any costs in excess of the fees so imposed may be collected-

(i) from the parent who owes the child or spousal support obligation involved; or

(ii) at the option of the State, from the individual to whom such services are made available, but only if such State has in effect a procedure whereby all persons in such State having authority to order child or spousal support are informed that such costs are to be collected from the individual to whom such services were made available;


(7) provide for entering into cooperative arrangements with appropriate courts and law enforcement officials and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering the plan, including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;

(8) provide that, for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title the agency administering the plan will establish a service to locate parents utilizing-

(A) all sources of information and available records; and

(B) the Federal Parent Locator Service established under section 653 of this title,


and shall, subject to the privacy safeguards required under paragraph (26), disclose only the information described in sections 653 and 663 of this title to the authorized persons specified in such sections for the purposes specified in such sections;

(9) provide that the State will, in accordance with standards prescribed by the Secretary, cooperate with any other State-

(A) in establishing paternity, if necessary;

(B) in locating a noncustodial parent residing in the State (whether or not permanently) against

whom any action is being taken under a program established under a plan approved under this part in another State;

(C) in securing compliance by a noncustodial parent residing in such State (whether or not permanently) with an order issued by a court of competent jurisdiction against such parent for the support and maintenance of the child or children or the parent of such child or children with respect to whom aid is being provided under the plan of such other State;

(D) in carrying out other functions required under a plan approved under this part; and

(E) not later than March 1, 1997, in using the forms promulgated pursuant to section 652(a)(11) of this title for income withholding, imposition of liens, and issuance of administrative subpoenas in interstate child support cases;

(10) provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;

(11)(A) provide that amounts collected as support shall be distributed as provided in section 657 of this title; and

(B) provide that any payment required to be made under section 656 or 657 of this title to a family shall be made to the resident parent, legal guardian, or caretaker relative having custody of or responsibility for the child or children;

(12) provide for the establishment of procedures to require the State to provide individuals who are applying for or receiving services under the State plan, or who are parties to cases in which services are being provided under the State plan-

(A) with notice of all proceedings in which support obligations might be established or modified; and

(B) with a copy of any order establishing or modifying a child support obligation, or (in the case of a petition for modification) a notice of determination that there should be no change in the amount of the child support award, within 14 days after issuance of such order or determination;

(13) provide that the State will comply with such other requirements and standards as the Secretary determines to be necessary to the establishment of an effective program for locating noncustodial parents, establishing paternity, obtaining support orders, and collecting support payments and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan;

(14)(A) comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

(B) maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them to conceal in the accounting records the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

(15) provide for-

(A) a process for annual reviews of and reports to the Secretary on the State program operated under the State plan approved under this part, including such information as may be necessary to measure State compliance with Federal requirements for expedited procedures, using such standards and procedures as are required by the Secretary, under which the State agency will determine the extent to which the program is operated in compliance with this part; and

(B) a process of extracting from the automated data processing system required by paragraph (16) and transmitting to the Secretary data and calculations concerning the levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 652(g) and 658a of this title;

(16) provide for the establishment and operation by the State agency, in accordance with an (initial and annually updated) advance automated data processing planning document approved under section 652(d) of this title, of a statewide automated data processing and information retrieval system meeting the requirements of section 654a of this title designed effectively and efficiently to assist management in

the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan;

(17) provide that the State will have in effect an agreement with the Secretary entered into pursuant to section 663 of this title for the use of the Parent Locator Service established under section 653 of this title, and provide that the State will accept and transmit to the Secretary requests for information authorized under the provisions of the agreement to be furnished by such Service to authorized persons, will impose and collect (in accordance with regulations of the Secretary) a fee sufficient to cover the costs to the State and to the Secretary incurred by reason of such requests, will transmit to the Secretary from time to time (in accordance with such regulations) so much of the fees collected as are attributable to such costs to the Secretary so incurred, and during the period that such agreement is in effect will otherwise comply with such agreement and regulations of the Secretary with respect thereto;

(18) provide that the State has in effect procedures necessary to obtain payment of past-due support from overpayments made to the Secretary of the Treasury as set forth in section 664 of this title, and take all steps necessary to implement and utilize such procedures;

(19) provide that the agency administering the plan-

(A) shall determine on a periodic basis, from information supplied pursuant to section 508 of the Unemployment Compensation Amendments of 1976, whether any individuals receiving compensation under the State's unemployment compensation law (including amounts payable pursuant to any agreement under any Federal unemployment compensation law) owe child support obligations which are being enforced by such agency; and

(B) shall enforce any such child support obligations which are owed by such an individual but are not being met-

(i) through an agreement with such individual to have specified amounts withheld from compensation otherwise payable to such individual and by submitting a copy of any such agreement to the State agency administering the unemployment compensation law; or

(ii) in the absence of such an agreement, by bringing legal process (as defined in section 659(i)(5) of this title) to require the withholding of amounts from such compensation;


(20) provide, to the extent required by section 666 of this title, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws;

(21)(A) at the option of the State, impose a late payment fee on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; and

(B) assure that the fee will be collected in addition to, and only after full payment of, the overdue support, and that the imposition of the late payment fee shall not directly or indirectly result in a decrease in the amount of the support which is paid to the child (or spouse) to whom, or on whose behalf, it is owed;

(22) in order for the State to be eligible to receive any incentive payments under section 658a of this title, provide that, if one or more political subdivisions of the State participate in the costs of carrying out activities under the State plan during any period, each such subdivision shall be entitled to receive an appropriate share (as determined by the State) of any such incentive payments made to the State for such period, taking into account the efficiency and effectiveness of the activities carried out under the State plan by such political subdivision;

(23) provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services and a telephone number or postal address at which further information may be obtained and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate;

(24) provide that the State will have in effect an automated data processing and information retrieval system-

(A) by October 1, 1997, which meets all requirements of this part which were enacted on or before October 13, 1988; and

(B) by October 1, 2000, which meets all requirements of this part enacted on or before August 22, 1996, except that such deadline shall be extended by 1 day for each day (if any) by which the Secretary fails to meet the deadline imposed by section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996;

(25) provide that if a family with respect to which services are provided under the plan ceases to receive assistance under the State program funded under part A, the State shall provide appropriate notice to the family and continue to provide such services, subject to the same conditions and on the same basis as in the case of other individuals to whom services are furnished under the plan, except that an application or other request to continue services shall not be required of such a family and paragraph (6)(B) shall not apply to the family;

(26) have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the parties, including-

(A) safeguards against unauthorized use or disclosure of information relating to proceedings or actions to establish paternity, or to establish, modify, or enforce support, or to make or enforce a child custody determination;

(B) prohibitions against the release of information on the whereabouts of 1 party or the child to another party against whom a protective order with respect to the former party or the child has been entered;

(C) prohibitions against the release of information on the whereabouts of 1 party or the child to another person if the State has reason to believe that the release of the information to that person may result in physical or emotional harm to the party or the child;

(D) in cases in which the prohibitions under subparagraphs (B) and (C) apply, the requirement to notify the Secretary, for purposes of section 653(b)(2) of this title, that the State has reasonable evidence of domestic violence or child abuse against a party or the child and that the disclosure of such information could be harmful to the party or the child; and

(E) procedures providing that when the Secretary discloses information about a parent or child to a State court or an agent of a State court described in section 653(c)(2) or 663(d)(2)(B) of this title, and advises that court or agent that the Secretary has been notified that there is reasonable evidence of domestic violence or child abuse pursuant to section 653(b)(2) of this title, the court shall determine whether disclosure to any other person of information received from the Secretary could be harmful to the parent or child and, if the court determines that disclosure to any other person could be harmful, the court and its agents shall not make any such disclosure;

(27) provide that, on and after October 1, 1998, the State agency will-

(A) operate a State disbursement unit in accordance with section 654b of this title; and

(B) have sufficient State staff (consisting of State employees) and (at State option) contractors reporting directly to the State agency to-

(i) monitor and enforce support collections through the unit in cases being enforced by the State pursuant to paragraph (4) (including carrying out the automated data processing responsibilities described in section 654a(g) of this title); and

(ii) take the actions described in section 666(c)(1) of this title in appropriate cases;

(28) provide that, on and after October 1, 1997, the State will operate a State Directory of New Hires in accordance with section 653a of this title;

(29) provide that the State agency responsible for administering the State plan-

(A) shall make the determination (and redetermination at appropriate intervals) as to whether an individual who has applied for or is receiving assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, is cooperating in good faith with the State in establishing the paternity of, or in establishing, modifying, or enforcing a support order for, any child of the individual by providing the State agency with the name of, and such other information as the State agency may require with respect to, the noncustodial parent of the child, subject to good cause and other exceptions which-

(i) in the case of the State program funded under part A, the State program under part E, or the State program under subchapter XIX shall, at the option of the State, be defined, taking into account the best interests of the child, and applied in each case, by the State agency administering such program; and

(ii) in the case of the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, shall be defined and applied in each case under that program in accordance with section 2015(l)(2) of title 7;

(B) shall require the individual to supply additional necessary information and appear at interviews, hearings, and legal proceedings;

(C) shall require the individual and the child to submit to genetic tests pursuant to judicial or administrative order;

(D) may request that the individual sign a voluntary acknowledgment of paternity, after notice of the rights and consequences of such an acknowledgment, but may not require the individual to sign an acknowledgment or otherwise relinquish the right to genetic tests as a condition of cooperation and eligibility for assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7; and

(E) shall promptly notify the individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, of each such determination, and if noncooperation is determined, the basis therefor;

(30) provide that the State shall use the definitions established under section 652(a)(5) of this title in collecting and reporting information as required under this part;

(31) provide that the State agency will have in effect a procedure for certifying to the Secretary, for purposes of the procedure under section 652(k) of this title, determinations that individuals owe arrearages of child support in an amount exceeding $2,500, under which procedure-

(A) each individual concerned is afforded notice of such determination and the consequences thereof, and an opportunity to contest the determination; and

(B) the certification by the State agency is furnished to the Secretary in such format, and accompanied by such supporting documentation, as the Secretary may require;

(32)(A) provide that any request for services under this part by a foreign reciprocating country, a foreign treaty country, or a foreign country with which the State has an arrangement described in section 659a(d) of this title shall be treated as a request by a State;

(B) provide, at State option, notwithstanding paragraph (4) or any other provision of this part, for services under the plan for enforcement of a spousal support order not described in paragraph (4)(B) entered by such a country (or subdivision) and

(C) provide that no applications will be required from, and no costs will be assessed for such services against, the foreign reciprocating country, foreign treaty country, or foreign individual (but costs may at State option be assessed against the obligor);

(33) provide that a State that receives funding pursuant to section 628 of this title and that has within its borders Indian country (as defined in section 1151 of title 18) may enter into cooperative agreements with an Indian tribe or tribal organization (as defined in subsections (e) and (l) of section 5304 of title 25), if the Indian tribe or tribal organization demonstrates that such tribe or organization has an established tribal court system or a Court of Indian Offenses with the authority to establish paternity, establish, modify, or enforce support orders, or to enter support orders in accordance with child support guidelines established or adopted by such tribe or organization, under which the State and tribe or organization shall provide for the cooperative delivery of child support enforcement services in Indian country and for the forwarding of all collections pursuant to the functions performed by the tribe or organization to the State agency, or conversely, by the State agency to the tribe or organization, which shall distribute such collections in

accordance with such agreement; and

    (34) include an election by the State to apply section 657(a)(2)(B) of this title or former section 657(a)(2)(B) of this title (as in effect for the State immediately before the date this paragraph first applies to the State) to the distribution of the amounts which are the subject of such sections and, for so long as the State elects to so apply such former section, the amendments made by subsection (b)(1) of section 7301 of the Deficit Reduction Act of 2005 shall not apply with respect to the State, notwithstanding subsection (e) of such section 7301.

    The State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21). Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25.

(Aug. 14, 1935, ch. 531, title IV, §454, as added Pub. L. 93–647, §101(a), Jan. 4, 1975, 88 Stat. 2354 ; amended Pub. L. 94–88, title II, §208(b), (c), Aug. 9, 1975, 89 Stat. 436 ; Pub. L. 95–30, title V, §502(a), May 23, 1977, 91 Stat. 162 ; Pub. L. 96–265, title IV, §405(b), June 9, 1980, 94 Stat. 463 ; Pub. L. 96–611, §9(a), Dec. 28, 1980, 94 Stat. 3571 ; Pub. L. 97–35, title XXIII, §§2331(b), 2332(d), 2333(a), (b), 2335(a), Aug. 13, 1981, 95 Stat. 860 , 862, 863; Pub. L. 97–248, title I, §§171(a), (b)(1), 173(a), Sept. 3, 1982, 96 Stat. 401 , 403; Pub. L. 98–369, div. B, title VI, §2663(c)(14), (j)(2)(B)(x), July 18, 1984, 98 Stat. 1166 , 1170; Pub. L. 98–378, §§3(a), (c)–(f), 5(b), 6(a), 11(b)(1), 12(a), (b), 14(a), 21(d), Aug. 16, 1984, 98 Stat. 1306 , 1310, 1311, 1314, 1318, 1319, 1320, 1324; Pub. L. 100–203, title IX, §§9141(a)(2), 9142(a), Dec. 22, 1987, 101 Stat. 1330–321 ; Pub. L. 100–485, title I, §§104(a), 111(c), 123(a), (d), Oct. 13, 1988, 102 Stat. 2348 , 2349, 2352, 2353; Pub. L. 104–35, §1(a), Oct. 12, 1995, 109 Stat. 294 ; Pub. L. 104–193, title I, §108(c)(11), (12), title III, §§301(a), (b), 302(b)(2), 303(a), 304(a), 312(a), 313(a), 316(g)(1), 324(b), 332, 333, 342(a), 343(b), 344(a)(1), (4), 370(a)(2), 371(b), 375(a), (c), 395(d)(1)(D), (2)(B), Aug. 22, 1996, 110 Stat. 2166 , 2199, 2204, 2205, 2207, 2209, 2218, 2223, 2230, 2233, 2234, 2236, 2252, 2254, 2256, 2259, 2260; Pub. L. 105–33, title V, §§5531(a), 5542(c), 5545, 5546(a), 5548, 5552, 5556(b), Aug. 5, 1997, 111 Stat. 625 , 631, 633, 635, 637; Pub. L. 106–169, title IV, §401(g), (h), Dec. 14, 1999, 113 Stat. 1858 ; Pub. L. 109–171, title VII, §§7301(b)(1)(C), 7303(b), 7310(a), Feb. 8, 2006, 120 Stat. 143 , 145, 147; Pub. L. 110–234, title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), May 22, 2008, 122 Stat. 1095–1097 , 1110; Pub. L. 110–246, §4(a), title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), June 18, 2008, 122 Stat. 1664 , 1857, 1858, 1871; Pub. L. 113–79, title IV, §4030(v), Feb. 7, 2014, 128 Stat. 815 ; Pub. L. 113–183, title III, §301(c), Sept. 29, 2014, 128 Stat. 1943 ; Pub. L. 115–123, div. E, title XII, §53117(a), Feb. 9, 2018, 132 Stat. 307 .)

<div align="center">

EDITORIAL NOTES

## REFERENCES IN TEXT

</div>

    Section 508 of the Unemployment Compensation Amendments of 1976, referred to in par. (19), is section 508 of Pub. L. 94–566, Oct. 20, 1976, 90 Stat. 2689 , which enacted section 603a of this title and amended section 49b of Title 29, Labor.

    Section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, referred to in par. (24), is section 344(a)(3) of Pub. L. 104–193, which is set out as a Regulations note under section 654a of this title.

    Section 2012(l) of title 7, referred to in par. (29), was struck out, and a new section 2012(t) of title 7 similarly defining "supplemental nutrition assistance program" was enacted, by Pub. L. 113–79, title IV, §4030(a)(3), (5), Feb. 7, 2014, 128 Stat. 813 .

    Section 7301 of the Deficit Reduction Act of 2005, referred to in par. (34), is section 7301 of Pub. L. 109–171, title VII, Feb. 8, 2006, 120 Stat. 141 . Subsec. (b)(1) of section 7301 of Pub. L. 109–171 amended this section and section 657 of this title. Subsec. (e) of section 7301 of Pub. L. 109–171 is set out as an Effective Date of 2006 Amendment note under section 608 of this title.

<div align="center">

### CODIFICATION
</div>

Pub. L. 110–234 and Pub. L. 110–246 made identical amendments to this section. The amendments by Pub. L. 110–234 were repealed by section 4(a) of Pub. L. 110–246.

<div align="center">

### AMENDMENTS
</div>

**2018**-Par. (6)(B)(ii). Pub. L. 115–123 substituted "$35" for "$25" and, in two places, substituted "$550" for "$500".

**2014**-Par. (4)(A)(ii). Pub. L. 113–183, §301(c)(1), inserted before semicolon "(except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the individual to request the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application)".

Par. (29)(A), (D), (E). Pub. L. 113–79, §4030(v), amended Pub. L. 110–246, §4115(c)(2)(H). See 2008 Amendment note below.

Par. (32)(A). Pub. L. 113–183, §301(c)(2)(A), inserted ", a foreign treaty country," after "a foreign reciprocating country".

Par. (32)(C). Pub. L. 113–183, §301(c)(2)(B), substituted ", foreign treaty country, or foreign individual" for "or foreign obligee".

**2008**-Pars. (4)(A)(i)(IV), (6)(B)(i). Pub. L. 110–246, §4002(b)(1)(B), (2)(V), made technical amendment to references in original act which appear in text as references to sections 2015(l)(1) and 2015 of title 7.

Par. (29)(A), (D), (E). Pub. L. 110–246, §4115(c)(2)(H), as amended by Pub. L. 113–79, §4030(v), substituted "section 2012(l)" for "section 2012(h)" wherever appearing.

Pub. L. 110–246, §4002(b)(1)(A), (B), (2)(V), substituted "supplemental nutrition assistance program" for "food stamp program" wherever appearing and made technical amendment to references in original act which appear in text as references to sections 2012(h) and 2015(l)(2) of title 7.

**2006**-Par. (6)(B). Pub. L. 109–171, §7310(a), designated existing provisions as cl. (i), redesignated former cls. (i) and (ii) as subcls. (I) and (II), respectively, of cl. (i), and added cl. (ii).

Par. (31). Pub. L. 109–171, §7303(b), substituted "$2,500" for "$5,000" in introductory provisions.

Par. (34). Pub. L. 109–171, §7301(b)(1)(C), added par. (34).

**1999**-Par. (6)(E)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (9)(A) to (C). Pub. L. 106–169, §401(g)(2), substituted semicolon for comma at end.

Par. (19)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (19)(B)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (24)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (24)(B). Pub. L. 106–169, §401(h), made technical amendment to reference in original act which appears in text as reference to August 22, 1996.

**1997**-Par. (4)(A)(i)(IV). Pub. L. 105–33, §5548(a), added subcl. (IV).

Par. (6)(B). Pub. L. 105–33, §5531(a), substituted "an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section

2015 of title 7, and" for "individuals not receiving assistance under any State program funded under part A, which".

Par. (8). Pub. L. 105–33, §5552(1)(D), inserted concluding provisions.

Pub. L. 105–33, §5552(1)(A), in introductory provisions, inserted ", for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title" after "provide that" and struck out "noncustodial" before "parents".

Par. (8)(A). Pub. L. 105–33, §5552(1)(B), substituted "records; and" for "records, and".

Par. (8)(B). Pub. L. 105–33, §5552(1)(C), substituted "title," for "title;".

Par. (16). Pub. L. 105–33, §5556(b), made technical amendment to directory language of Pub. L. 104–193, §344(a)(1)(F). See 1996 Amendment note below.

Par. (17). Pub. L. 105–33, §5552(2), substituted "provide that the State will have" for "in the case of a State which has" and inserted "and" after "section 653 of this title,".

Par. (19)(B)(ii). Pub. L. 105–33, §5542(c), substituted "section 659(i)(5)" for "section 662(e)".

Par. (26). Pub. L. 105–33, §5552(3)(A), struck out "will" before "have in effect" in introductory provisions.

Par. (26)(A). Pub. L. 105–33, §5552(3)(B), inserted ", modify," after "or to establish" and ", or to make or enforce a child custody determination" after "support".

Par. (26)(B). Pub. L. 105–33, §5552(3)(C)(i), (ii), inserted "or the child" after "1 party" and after "former party".

Par. (26)(C). Pub. L. 105–33, §5552(3)(D), inserted "or the child" after "1 party", substituted "another person" for "another party", inserted "to that person" after "release of the information", and substituted "party or the child" for "former party".

Par. (26)(D), (E). Pub. L. 105–33, §5552(3)(C)(iii), (E), added subpars. (D) and (E).

Par. (29)(A). Pub. L. 105–33, §5548(b)(1)(B), substituted cls. (i) and (ii) for

"(i) shall be defined, taking into account the best interests of the child, and

"(ii) shall be applied in each case,

by, at the option of the State, the State agency administering the State program under part A of this subchapter, this part, or subchapter XIX;".

Pub. L. 105–33, §5548(b)(1)(A), in introductory provisions, substituted "part A, the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7," for "part A of this subchapter or the State program under subchapter XIX".

Par. (29)(D). Pub. L. 105–33, §5548(b)(2), substituted "the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7" for "or the State program under subchapter XIX".

Par. (29)(E). Pub. L. 105–33, §5548(b)(3), substituted "individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the food stamp program, as defined under section 2012(h) of title 7," for "individual, the State agency administering the State program funded under part A, and the State agency administering the State program under subchapter XIX,".

Par. (32)(A). Pub. L. 105–33, §5545, substituted "section 659a(d)" for "section 659a(d)(2)".

Par. (33). Pub. L. 105–33, §5546(a), substituted "or enforce support orders, or" for "and enforce support orders, and", "guidelines established or adopted by such tribe or organization"

for "guidelines established by such tribe or organization", "all collections" for "all funding collected", and "such collections" for "such funding".

**1996**—Pub. L. 104–193, §375(a)(4), inserted at end of closing provisions "Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25."

Par. (4). Pub. L. 104–193, §301(a)(1), amended par. (4) generally. Prior to amendment, par. (4) read as follows: "provide that such State will undertake-

"(A) in the case of a child born out of wedlock with respect to whom an assignment under section 602(a)(26) of this title or section 1396k of this title is effective, to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so, or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and

"(B) in the case of any child with respect to whom such assignment is effective, including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter, to secure support for such child from his parent (or from any other person legally liable for such support), and from such parent for his spouse (or former spouse) receiving aid to families with dependent children or medical assistance under a State plan approved under subchapter XIX of this chapter (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan), utilizing any reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A or E of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so), except that when such arrangements and other means have proven ineffective, the State may utilize the Federal courts to obtain or enforce court orders for support;".

Par. (5)(A). Pub. L. 104–193, §108(c)(11), substituted "pursuant to section 608(a)(3) of this title" for "under section 602(a)(26) of this title" and "payments collected," for "payments collected; except that this paragraph shall not apply to such payments for any month following the first month in which the amount collected is sufficient to make such family ineligible for assistance under the State plan approved under part A of this subchapter;".

Par. (6). Pub. L. 104–193, §301(a)(2)(A), substituted "provide that-" for "provide that" in introductory provisions.

Par. (6)(A). Pub. L. 104–193, §301(a)(2)(B), added subpar. (A) and struck out former subpar. (A) which read as follows: "the child support collection or paternity determination services established under the plan shall be made available to any individual not otherwise eligible for such services upon application filed by such individual with the State, including support collection services for the spouse (or former spouse) with whom the absent parent's child is living (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan),".

Par. (6)(B). Pub. L. 104–193, §301(a)(2)(C), (D), inserted "on individuals not receiving assistance under any State program funded under part A" after "such services shall be imposed", realigned margins, and substituted semicolon for comma at end.

Par. (6)(C). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma at end.

Par. (6)(D). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma before "and" at end.

Pub. L. 104–193, §108(c)(12), substituted "assistance under a State program funded" for "aid under a State plan approved".

Par. (6)(E). Pub. L. 104–193, §301(a)(2)(D)(i), (E), realigned margins.

Pub. L. 104–193, §301(a)(2)(D)(ii), which directed substitution of a semicolon for the final comma, could not be executed because subpar. (E) already ended in a semicolon and not a comma.

Par. (7). Pub. L. 104–193, §375(c), inserted "and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25)" after "law enforcement officials".

Par. (8). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial" for "absent" in introductory provisions.

Par. (8)(B). Pub. L. 104–193, §316(g)(1)(A), amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: "the Parent Locator Service in the Department of Health and Human Services;".

Par. (9)(B), (C). Pub. L. 104–193, §395(d)(2)(B), substituted "a noncustodial parent" for "an absent parent".

Par. (9)(E). Pub. L. 104–193, §324(b), added subpar. (E).

Par. (11). Pub. L. 104–193, §302(b)(2), designated existing provisions as subpar. (A), inserted "and" after semicolon at end, and redesignated par. (12) as subpar. (B).

Par. (12). Pub. L. 104–193, §304(a), added par. (12). Former par. (12) redesignated (11)(B).

Pub. L. 104–193, §302(b)(2)(B), redesignated par. (12) as (11)(B).

Par. (13). Pub. L. 104–193, §§316(g)(1)(B), 395(d)(1)(D), substituted "noncustodial parents" for "absent parents" and inserted before semicolon at end "and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan".

Par. (14). Pub. L. 104–193, §342(a)(1), (2), designated existing provisions as subpar. (A) and redesignated par. (15) as subpar. (B).

Par. (15). Pub. L. 104–193, §342(a)(3), added par. (15). Former par. (15) redesignated (14)(B).

Pub. L. 104–193, §342(a)(2), redesignated par. (15) as (14)(B).

Par. (16). Pub. L. 104–193, §344(a)(1), as amended by Pub. L. 105–33, §5556(b), struck out ", at the option of the State," before "for the establishment", inserted "and operation by the State agency" after "for the establishment" and "meeting the requirements of section 654a of this title" after "information retrieval system", substituted "so as to control" for "in the State and localities thereof, so as (A) to control", struck out "(i)" before "all the factors in the support enforcement collection", and struck out before semicolon at end "(including, but not limited to, (I) identifiable correlation factors (such as social security numbers, names, dates of birth, home addresses and mailing addresses (including postal ZIP codes) of any individual with respect to whom support obligations are sought to be established or enforced and with respect to any person to whom such support obligations are owing) to assure sufficient compatibility among the systems of different jurisdictions to permit periodic screening to determine whether such

individual is paying or is obligated to pay support in more than one jurisdiction, (II) checking of records of such individuals on a periodic basis with Federal, intra- and inter-State, and local agencies, (III) maintaining the data necessary to meet the Federal reporting requirements on a timely basis, and (IV) delinquency and enforcement activities), (ii) the collection and distribution of support payments (both intra- and inter-State), the determination, collection, and distribution of incentive payments both inter- and intra-State, and the maintenance of accounts receivable on all amounts owed, collected and distributed, and (iii) the costs of all services rendered, either directly or by interfacing with State financial management and expenditure information, (B) to provide interface with records of the State's aid to families with dependent children program in order to determine if a collection of a support payment causes a change affecting eligibility for or the amount of aid under such program, (C) to provide for security against unauthorized access to, or use of, the data in such system, (D) to facilitate the development and improvement of the income withholding and other procedures required under section 666(a) of this title through the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur, and (E) to provide management information on all cases under the State plan from initial referral or application through collection and enforcement".

Par. (21)(A). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent".

Par. (23). Pub. L. 104–193, §332, inserted "and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate" before semicolon.

Par. (24). Pub. L. 104–193, §344(a)(4), amended par. (24) generally. Prior to amendment, par. (24) read as follows: "provide that if the State, as of October 13, 1988, does not have in effect an automated data processing and information retrieval system meeting all of the requirements of paragraph (16), the State-

"(A) will submit to the Secretary by October 1, 1991, for review and approval by the Secretary within 9 months after submittal an advance automated data processing planning document of the type referred to in such paragraph; and

"(B) will have in effect by October 1, 1997, an operational automated data processing and information retrieval system, meeting all the requirements of that paragraph, which has been approved by the Secretary;".

Par. (25). Pub. L. 104–193, §301(b), added par. (25).

Par. (26). Pub. L. 104–193, §303(a), added par. (26).

Par. (27). Pub. L. 104–193, §312(a), added par. (27).

Par. (28). Pub. L. 104–193, §313(a), added par. (28).

Par. (29). Pub. L. 104–193, §333, added par. (29).

Par. (30). Pub. L. 104–193, §343(b), added par. (30).

Par. (31). Pub. L. 104–193, §370(a)(2), added par. (31).

Par. (32). Pub. L. 104–193, §371(b), added par. (32).

Par. (33). Pub. L. 104–193, §375(a)(1)–(3), added par. (33).

**1995**-Par. (24)(B). Pub. L. 104–35 substituted "1997" for "1995".

**1988**-Par. (5)(A). Pub. L. 100–485, §104(a), substituted "on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden)" for "at least

annually".

Par. (6)(D), (E). Pub. L. 100–485, §111(c), added cl. (D) and redesignated former cl. (D) as (E).

Par. (16). Pub. L. 100–485, §123(d), substituted "advance automated" for "advance automatic" in introductory provisions.

Pub. L. 100–485, §123(a)(2), substituted "a statewide automated" for "an automatic".

Par. (24). Pub. L. 100–485, §123(a)(1), added par. (24).

**1987**–Par. (4)(A). Pub. L. 100–203, §9142(a)(1)(A), (B), substituted "an assignment under section 602(a)(26) of this title or section 1396k of this title" for "an assignment under section 602(a)(26) of this title" and ", or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and" for ", and".

Par. (4)(B). Pub. L. 100–203, §9142(a)(1)(C), inserted "or medical assistance under a State plan approved under subchapter XIX of this chapter" after "children".

Par. (5). Pub. L. 100–203, §9142(a)(2), substituted "provide that (A)" for "provide that," and added cl. (B).

Pub. L. 100–203, §9141(a)(2), struck out "(except as provided in section 657(c) of this title)" after "apply to such payments".

**1984**–Par. (4)(B). Pub. L. 98–378, §11(b)(1), inserted "including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter," after "such assignment is effective," and inserted "or E" after "part A".

Par. (4)(B). Pub. L. 98–378, §12(a), substituted ", and" for "and, at the option of the State," before "from such parent" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (5). Pub. L. 98–378, §3(e), inserted ", and the individual will be notified at least annually of the amount of the support payments collected;".

Par. (6)(A). Pub. L. 98–378, §12(b), struck out ", at the option of the State," before "support collection services" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (6)(B). Pub. L. 98–378, §3(c), substituted "shall be imposed, which shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (i) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (ii) may vary among such individuals on the basis of ability to pay (as determined by the State), and" for "may be imposed, except that the amount of any such application fee shall be reasonable, as determined under regulations of the Secretary,".

Par. (6)(C). Pub. L. 98–378, §21(d)(1), (3), added cl. (C). Former cl. (C) redesignated (D).

Par. (6)(D). Pub. L. 98–378, §21(d)(1), (2), redesignated former cl. (C) as (D) and substituted "fees" for "fee" before "so imposed".

Par. (8)(B). Pub. L. 98–369, §2663(j)(2)(B)(x), substituted "Health and Human Services" for "Health, Education, and Welfare".

Par. (9)(C). Pub. L. 98–369, §2663(c)(14)(A), struck out "of such parent" before "with respect to whom aid".

Par. (16)(A)(ii). Pub. L. 98–369, §2663(c)(14)(B), substituted "collection, and distribution" for "collection and distribution," before "of incentive payments".

Par. (16)(D), (E). Pub. L. 98–378, §6(a), added cl. (D) and redesignated former cl. (D) as (E).

Par. (17). Pub. L. 98–378, §2663(c)(14)(C), realigned margin, substituted "provide that the State will accept" for "to accept", "will impose" for "and to impose", "will transmit" for "to transmit", and "will otherwise comply" for ", otherwise to comply".

Par. (20). Pub. L. 98–378, §3(a), added par. (20).

Par. (21). Pub. L. 98–378, §3(d), added par. (21).

Par. (22). Pub. L. 98–378, §5(b), added par. (22).

Par. (23). Pub. L. 98–378, §14(a), added par. (23).

Pub. L. 98–378, §3(f), inserted after numbered paragraphs provision that the State may allow the jurisdiction which makes the collection involved to retain any application fee under par. (6)(B) or any late payment fee under par. (21).

**1982**-Par. (5). Pub. L. 97–248, §173(a), inserted "following the first month" after "for any month".

Par. (6). Pub. L. 97–248, §171(a), in cl. (A) inserted provisions relating to inclusion of, at the option of the State, support collection services for the spouse or former spouse, in cl. (B) substituted "such services" for "services under the State plan (other than collection of support)", and in cl. (C) substituted provisions relating to collection of any costs in excess of the fee imposed, for provisions relating to the State retaining any fee imposed under State law as required under former par. (19).

Pars. (18) to (20). Pub. L. 97–248, §171(b)(1), inserted "and" at end of par. (18), struck out par. (19) relating to imposition of a fee on an individual who owes child or spousal support obligation, and redesignated par. (20) as (19).

**1981**-Pub. L. 97–35, §2332(d)(2), substituted in provision preceding par. (1) "child and spousal support" for "child support".

Par. (4)(B). Pub. L. 97–35, §2332(d)(3), substituted "such support) and, at the option of the State, from such parent for his spouse (or former spouse) receiving aid to families with dependent children (but only if a support obligation has been established with respect to such spouse), utilizing" for "such support), utilizing".

Par. (5). Pub. L. 97–35, §2332(d)(4), substituted "support payments" for "child support payments" and "collected for an individual" for "collected for a child".

Par. (6)(B). Pub. L. 97–35, §2333(a)(1), substituted "services under the State plan (other than collection of support)" for "such services".

Par. (6)(C). Pub. L. 97–35, §2333(a)(2), substituted "the State will retain, but only if it is the State which makes the collection, the fee imposed under State law as required under paragraph (19)" for "any costs in excess of the fee so imposed may be collected from such individual by deducting such costs from the amount of any recovery made".

Par. (9)(C). Pub. L. 97–35, §2332(d)(5), substituted "of the child or children or the parent of such child or children" for "of a child or children".

Par. (11). Pub. L. 97–35, §2332(d)(6), substituted "collected as support" for "collected as child support".

Par. (16). Pub. L. 97–35, §2332(d)(7), substituted "support enforcement" for "child support enforcement", "whom support obligations" for "whom child support obligations", and "obligated to pay support" for "obligated to pay child support".

Par. (18). Pub. L. 97–35, §2331(b), added par. (18).

Par. (19). Pub. L. 97–35, §2333(b), added par. (19).

Par. (20). Pub. L. 97–35, §2335(a), added par. (20).

**1980**-Par. (16). Pub. L. 96–265 added par. (16).

Par. (17). Pub. L. 96–611 added par. (17).

**1977**-Pars. (14), (15). Pub. L. 95–30 added pars. (14) and (15).

**1975**-Par. (4)(A). Pub. L. 94–88, §208(b), substituted "to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so" for "to establish the paternity of such child".

Par. (4)(B). Pub. L. 94–88, §208(c), substituted "reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so)" for "reciprocal arrangements adopted with other States".

### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 2018 AMENDMENT

Pub. L. 115–123, div. E, title XII, §53117(b), Feb. 9, 2018, 132 Stat. 307 , provided that:

"(1) IN GENERAL.-The amendments made by subsection (a) [amending this section] shall take effect on the 1st day of the 1st fiscal year that begins on or after the date of the enactment of this Act [Feb. 9, 2018], and shall apply to payments under part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) for calendar quarters beginning on or after such 1st day.

"(2) DELAY PERMITTED IF STATE LEGISLATION REQUIRED.-If the Secretary of Health and Human Services determines that State legislation (other than legislation appropriating funds) is required in order for a State plan developed pursuant to part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) to meet the requirements imposed by the amendment made by subsection (a), the plan shall not be regarded as failing to meet such requirements before the 1st day of the 1st calendar quarter beginning after the first regular session of the State legislature that begins after the date of the enactment of this Act. For purposes of the preceding sentence, if the State has a 2-year legislative session, each year of the session is deemed to be a separate regular session of the State legislature."

### EFFECTIVE DATE OF 2008 AMENDMENT

Amendment of this section and repeal of Pub. L. 110–234 by Pub. L. 110–246 effective May 22, 2008, the date of enactment of Pub. L. 110–234, except as otherwise provided, see section 4 of Pub. L. 110–246, set out as an Effective Date note under section 8701 of Title 7, Agriculture.

Amendment by sections 4002(b)(1)(A), (B), (2)(V), and 4115(c)(2)(H) of Pub. L. 110–246 effective Oct. 1, 2008, see section 4407 of Pub. L. 110–246, set out as a note under section 1161 of Title 2, The Congress.

### EFFECTIVE DATE OF 2006 AMENDMENT

Amendment by section 7301(b)(1)(C) of Pub. L. 109–171 effective Oct. 1, 2009, and applicable to payments under parts A and D of this subchapter for calendar quarters beginning on or after such date, subject to certain State options, see section 7301(e) of Pub. L. 109–171, set out as a note under section 608 of this title.

Amendment by section 7303(b) of Pub. L. 109–171 effective Oct. 1, 2006, see section 7303(c) of Pub. L. 109–171, set out as a note under section 652 of this title.

Pub. L. 109–171, title VII, §7310(c), Feb. 8, 2006, 120 Stat. 148 , provided that: "The amendments made by this section [amending this section and section 657 of this title] shall take effect on October 1, 2006."

### Effective Date of 1999 Amendment

Amendment by Pub. L. 106–169 effective as if included in the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 401(q) of Pub. L. 106–169, set out as a note under section 602 of this title.

### Effective Date of 1997 Amendment

Amendment by Pub. L. 105–33 effective as if included in the enactment of title III of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 5557 of Pub. L. 105–33, set out as a note under section 608 of this title.

### Effective Date of 1996 Amendment

Amendment by section 108(c)(11), (12) of Pub. L. 104–193 effective July 1, 1997, with transition rules relating to State options to accelerate such date, rules relating to claims, actions, and proceedings commenced before such date, rules relating to closing out of accounts for terminated or substantially modified programs and continuance in office of Assistant Secretary for Family Support, and provisions relating to termination of entitlement under AFDC program, see section 116 of Pub. L. 104–193, as amended, set out as an Effective Date note under section 601 of this title.

Amendment by section 302(b)(2) of Pub. L. 104–193 effective Aug. 22, 1996, see section 302(c)(2) of Pub. L. 104–193, set out as a note under section 657 of this title.

Pub. L. 104–193, title III, §303(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Pub. L. 104–193, title III, §304(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Amendment by section 312(a) of Pub. L. 104–193 effective Oct. 1, 1998, with limited exception for States which, as of Aug. 22, 1996, were processing the receipt of child support payments through local courts, see section 312(d) of Pub. L. 104–193, set out as an Effective Date note under section 654b of this title.

Amendment by section 342(a) of Pub. L. 104–193 effective with respect to calendar quarters beginning 12 months or more after Aug. 22, 1996, see section 342(c) of Pub. L. 104–193, set out as a note under section 652 of this title.

Amendment by section 370(a)(2) of Pub. L. 104–193 effective Oct. 1, 1997, see section 370(b) of Pub. L. 104–193, set out as a note under section 652 of this title.

Pub. L. 104–193, title III, §395(a)–(c), Aug. 22, 1996, 110 Stat. 2259 , provided that:

"(a) In General.-Except as otherwise specifically provided (but subject to subsections (b) and (c))-

"(1) the provisions of this title [see Tables for classification] requiring the enactment or amendment of State laws under section 466 of the Social Security Act [42 U.S.C. 666], or revision of State plans under section 454 of such Act [this section], shall be effective with

respect to periods beginning on and after October 1, 1996; and

"(2) all other provisions of this title shall become effective upon the date of the enactment of this Act [Aug. 22, 1996].

"(b) GRACE PERIOD FOR STATE LAW CHANGES.-The provisions of this title shall become effective with respect to a State on the later of-

"(1) the date specified in this title, or

"(2) the effective date of laws enacted by the legislature of such State implementing such provisions,

but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2-year legislative session, each year of such session shall be deemed to be a separate regular session of the State legislature.

"(c) GRACE PERIOD FOR STATE CONSTITUTIONAL AMENDMENT.-A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of-

"(1) 1 year after the effective date of the necessary State constitutional amendment; or

"(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]."

## EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–485, title I, §104(b), Oct. 13, 1988, 102 Stat. 2348 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on the first day of the first calendar quarter which begins 4 or more years after the date of the enactment of this Act [Oct. 13, 1988]."

Pub. L. 100–485, title I, §111(f)(2), Oct. 13, 1988, 102 Stat. 2350 , provided that: "The amendments made by subsections (b) and (c) [amending this section and section 666 of this title] shall become effective on the first day of the first month beginning one year or more after the date of the enactment of this Act [Oct. 13, 1988]."

## EFFECTIVE DATE OF 1987 AMENDMENT

Pub. L. 100–203, title IX, §9141(b), Dec. 22, 1987, 101 Stat. 1330–321 , provided that: "The amendments made by subsection (a) [amending this section and section 657 of this title] shall become effective upon enactment [Dec. 22, 1987]."

Pub. L. 100–203, title IX, §9142(b), Dec. 22, 1987, 101 Stat. 1330–322 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective on July 1, 1988."

## EFFECTIVE DATE OF 1984 AMENDMENT

Pub. L. 98–378, §3(g), Aug. 16, 1984, 98 Stat. 1311 , provided that:

"(1) Except as provided in paragraphs (2) and (3), the amendments made by this section [enacting section 666 of this title and amending this section] shall become effective on October 1, 1985.

"(2) Section 454(21) of the Social Security Act [42 U.S.C. 654(21)] (as added by subsection (d) of this section), and section 466(e) of such Act [42 U.S.C. 666(e)] (as added by subsection (b) of this section), shall be effective with respect to support owed for any month beginning after the date of the enactment of this Act [Aug. 16, 1984].

"(3) In the case of a State with respect to which the Secretary of Health and Human Services

has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this section, the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the beginning of the fourth month beginning after the end of the first session of the State legislature which ends on or after October 1, 1985. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

Pub. L. 98–378, §5(c)(1), Aug. 16, 1984, 98 Stat. 1314 , provided that: "The amendments made by the preceding provisions of this section [amending this section and section 658 of this title] shall become effective on October 1, 1985."

Pub. L. 98–378, §6(c), Aug. 16, 1984, 98 Stat. 1315 , provided that: "The amendments made by this section [amending this section and section 655 of this title] shall apply with respect to quarters beginning on or after October 1, 1984."

Pub. L. 98–378, §11(e), Aug. 16, 1984, 98 Stat. 1318 , provided that: "The amendments made by this section [amending this section and sections 656, 657, 664, and 671 of this title] shall become effective October 1, 1984, and shall apply to collections made on or after that date."

Pub. L. 98–378, §12(c), Aug. 16, 1984, 98 Stat. 1319 , provided that: "The amendments made by this section [amending this section] shall become effective October 1, 1985."

Pub. L. 98–378, §14(b), Aug. 16, 1984, 98 Stat. 1320 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective October 1, 1985."

Amendment by section 21(d) of Pub. L. 98–378 applicable with respect to refunds payable under section 6402 of Title 26, Internal Revenue Code, after Dec. 31, 1985, see section 21(g) of Pub. L. 98–378, set out as a note under section 6103 of Title 26.

Amendment by Pub. L. 98–369 effective July 18, 1984, but not to be construed as changing or affecting any right, liability, status, or interpretation which existed (under the provisions of law involved) before that date, see section 2664(b) of Pub. L. 98–369, set out as a note under section 401 of this title.

### Effective Date of 1982 Amendment

Amendment by section 171(a), (b)(1) of Pub. L. 97–248 effective on and after Aug. 13, 1981, see section 171(c) of Pub. L. 97–248, set out as a note under section 503 of this title.

Pub. L. 97–248, title I, §173(b), Sept. 3, 1982, 96 Stat. 403 , provided that: "The amendment made by this section [amending this section] shall become effective on October 1, 1982."

### Effective Date of 1981 Amendment

Amendments by sections 2331(b), 2332(d)(2)–(7), and 2333(a), (b) of Pub. L. 97–35 effective Oct. 1, 1981, except as otherwise specifically provided, see section 2336 of Pub. L. 97–35, set out as a note under section 651 of this title.

Amendment by section 2335(a) of Pub. L. 97–35 effective Aug. 13, 1981, except that such amendment shall not be requirements under this section or section 503 of this title before Oct. 1, 1982, see section 2335(c) of Pub. L. 97–35, set out as a note under section 503 of this title.

### Effective Date of 1980 Amendment

Amendment by Pub. L. 96–265 effective July 1, 1981, and to be effective only with respect to expenditures, referred to in section 655(a)(3) of this title, made on or after such date, see section 405(e) of Pub. L. 96–265, set out as a note under section 652 of this title.

### Effective Date of 1977 Amendment

Pub. L. 95–30, title V, §502(b), May 23, 1977, 91 Stat. 162 , provided that: "The amendments made by this section [amending this section] shall take effect on the first day of the first calendar month which begins after the date of enactment of this Act [May 23, 1977]."

### Effective Date of 1975 Amendment

Pub. L. 94–88, title II, §210, Aug. 9, 1975, 89 Stat. 437 , provided that: "The amendments made by this title [amending this section and sections 602, 603, and 655 of this title and enacting provisions set out as notes under sections 602 and 655 of this title] shall, unless otherwise specified therein, become effective August 1, 1975."

### Exception to General Effective Date for State Plans Requiring State Law Amendments

Pub. L. 109–171, title VII, §7311, Feb. 8, 2006, 120 Stat. 148 , provided that: "In the case of a State plan under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] which the Secretary determines requires State legislation in order for the plan to meet the additional requirements imposed by the amendments made by this subtitle [subtitle C (§§7301–7311) of title VII of Pub. L. 109–171, amending this section, sections 608, 652, 653, 655, 657, 664, and 666 of this title, section 6402 of Title 26, Internal Revenue Code, and provisions set out as a note under section 1169 of Title 29, Labor], the effective date of the amendments imposing the additional requirements shall be 3 months after the first day of the first calendar quarter beginning after the close of the first regular session of the State legislature that begins after the date of the enactment of this Act [Feb. 8, 2006]. For purposes of the preceding sentence, in the case of a State that has a 2-year legislative session, each year of the session shall be considered to be a separate regular session of the State legislature."

### State Commissions on Child Support

Pub. L. 98–378, §15, Aug. 16, 1984, 98 Stat. 1320 , provided that:

"(a) As a condition of the State's eligibility for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] for quarters beginning more than 30 days after the date of the enactment of this Act [Aug. 16, 1984] and ending prior to October 1, 1985, the Governor of each State, on or before December 1, 1984, shall (subject to subsection (f)) appoint a State Commission on Child Support.

"(b) Each State Commission appointed under subsection (a) shall be composed of members appropriately representing all aspects of the child support system, including custodial and non-custodial parents, the agency or organizational unit administering the State's plan under part D of such title IV [42 U.S.C. 651 et seq.], the State judiciary, the executive and legislative branches of the State government, child welfare and social services agencies, and others.

"(c) It shall be the function of each State Commission to examine, investigate, and study the operation of the State's child support system for the primary purpose of determining the extent to which such system has been successful in securing support and parental involvement both for children who are eligible for aid under a State plan approved under part A of title IV of such Act [42 U.S.C. 601 et seq.] and for children who are not eligible for such aid, giving particular attention to such specific problems (among others) as visitation, the establishment of appropriate objective standards for support, the enforcement of interstate obligations, the availability, cost, and effectiveness of services both to children who are eligible for such aid and to children who are not, and the need for additional State or Federal legislation to obtain

support for all children.

"(d) Each State Commission shall submit to the Governor of the State and make available to the public, no later than October 1, 1985, a full and complete report of its findings and recommendations resulting from the examination, investigation, and study under this section. The Governor shall transmit such report to the Secretary of Health and Human Services along with the Governor's comments thereon.

"(e) None of the costs incurred in the establishment and operation of a State Commission under this section, or incurred by such a Commission in carrying out its functions under subsections (c) and (d), shall be considered as expenditures qualifying for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] or be otherwise payable or reimbursable by the United States or any agency thereof.

"(f) If the Secretary determines, at the request of any State on the basis of information submitted by the State and such other information as may be available to the Secretary, that such State-

"(1) has placed in effect and is implementing objective standards for the determination and enforcement of child support obligations,

"(2) has established within the five years prior to the enactment of this Act [Aug. 16, 1984] a commission or council with substantially the same functions as the State Commissions provided for under this section, or

"(3) is making satisfactory progress toward fully effective child support enforcement and will continue to do so,

then such State shall not be required to establish a State Commission under this section and the preceding provisions of this section shall not apply."

## DELAYED EFFECTIVE DATE IN CASES REQUIRING STATE LEGISLATION

Pub. L. 97–248, title I, §176, Sept. 3, 1982, 96 Stat. 403 , provided that: "In the case of a State with respect to which the Secretary of Health and Human Services has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this subtitle [subtitle E (§§171–176) of title I of Pub. L. 97–248, see Tables for classification], the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the end of the first session of the State legislature which begins after October 1, 1982, or which began prior to October 1, 1982, and remained in session for at least twenty-five calendar days after such date. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

[1] *See References in Text note below.*

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                         FAMILY COURT

State of Rhode Island ex rel.          :
GERO MEYERSIEK                         :
    *Plaintiff*                            :
                                       :
VS.                                    :          DOCKET NO: K20010521M
                                       :          Title IV Part D Case under
                                       :          42 U.S.C. §§ 651-669
MARY SEGUIN                            :
    *Defendant*                           :

## DEFENDANT'S EMERGENCY MOTION TO DISMISS FOR LACK OF JURISDICTION

## And

## CLOSE THE CASE

The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby respectfully moves the Court to **Dismiss** for **Lack of Jurisdiction** over the State's Motion to Set Arrears that is in violation of 42 U.S.C. sec. 654. The Defendant respectfully moves to close the case based on the plain fact that the Defendant paid off in full all "principle" support. The child in question was emancipated in April 2018.

This motion to dismiss relies on the plain Federal statutory requirements of Title IV of the Social Security Act binding the Rhode Island Plaintiffs, binding the State Plan, binding the limited jurisdiction Family Court, and binding the Witness Rhode Island Executive Office of Health and Human Services.

The Defendant reserves the right to raise all other multiple jurisdiction defect and nullity issues at the appropriate time in accordance with all applicable the laws of civil

procedure governing federal questions of the Title IV Program, the Commerce Clause and jurisdiction over the falsification of Title IV records certified to Texas and to the United States, among others.

The Defendant respectfully requests that the Court issues a written opinion stating the Court's reasoning.

If the Court wishes to hold a hearing on the matter, the Defendant respectfully requests the Court give priority to and settles the threshold jurisdiction challenge, in accordance with the law.

### I.     Lack of Jurisdiction under 42 U.S.C. sec. 654

Congress enacted and offered the State of Rhode Island along with all states in the Union participation in Title IV of the Social Security Act attaching conditions to states' participation under the **Commerce Clause** and **Spending Clause** of the United States Constitution.  The conditional requirements mandate that participating States must amend their respective state constitutions to comply with Congressional amendments to 42 U.S.C. sec. 654.  See, e.g., STATUTORY NOTES AND RELATED SUBSIDIARIES, Effective Date of 1996 Amendment, "(b) **GRACE PERIOD FOR STATE LAW CHANGES**.-The provisions of this title shall become effective with respect to a State on the later of- "(1) the date specified in this title, or "(2) the effective date of laws enacted by the legislature of such State implementing such provisions, but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2- year legislative session, each year of such session shall be deemed to be a

separate regular session of the State legislature. "**(c) GRACE PERIOD FOR STATE CONSTITUTIONAL AMENDMENT**.-A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of- "(1) 1 year after the effective date of the necessary State constitutional amendment; or "(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]." *See also*, Amendments for 1996 Par. (21)(A). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent." Therefore, it is abundantly and explicitly clear that as of the 1996 Amendment to 42 U.S.C. sec. 654 legislating penalties for state noncompliance, Congress explicitly required participating states like Rhode Island to amend its state constitution for compliance with 42 U.S.C. sec. 654.  Therefore, Congress explicitly mandates that **Rhode Island general laws that are out of compliance with 42 U.S.C. sec. 654(21)(A)** that was moreover highlighted in the statutory notes for the Amendments in 1996, are **<u>required</u>** to be changed.  See **<u>Exhibit A</u>**.  **The United States Congress publication of 42 U.S.C. sec. 654**.

Therefore, it is firmly and unequivocally established that **Rhode Island's R.I. Gen. Laws § 15-5-16.5** that **legislates 12% compound interest** on overdue support is **out of compliance**.  **The plain statutory text of 42 U.S.C. sec. 654(21)(A) states 3 to 6 percent** and requires the State to set a **<u>uniform</u>** rate for all, not 12% compound interest in intrastate cases but 0% by policy in interstate cases, complicated by setting yet another category of 12% compound interest in targeted interstate cases, such as TEXAS Defendant's interstate case.  The fact that Rhode Island certifies that its State laws, such as R.I.

Gen. Laws § 15-5-16.5, are in compliance with 42 U.S.C. sec. 654(21)(A) shows *prima facie* false certification, and the grace period for the change of law expired in August 1996, 28 years ago.  See **Exhibit B**. **R.I. Gen. Laws § 15-5-16.**5.

Per the Rhode Island State Government publication of the History of Section for R.I. Gen. Laws § 15-5-16.5, the Rhode Island General Assembly Public Legislature actually amended and reviewed R.I. Gen. Laws § 15-5-16.5in 2001, showing the Public the knowing noncompliance by the Rhode Island General Assembly.  *See*, "History of Section. P.L. 1980, ch. 308, § 1; P.L. 1984, ch. 167, § 1; P.L. 2001, ch. 155, § 1."

Therefore, the limited jurisdiction court lacks jurisdiction to preempt 42 U.S.C. sec. 654, when 42 U.S.C. sec. 654 plainly requires unequivocally that "the State is required to so comply by amending the State constitution."

## II.    **Family Court is a court of Limited Jurisdiction created under RIGL 8-10-3 and Rhode Island, Having Participated in Title IV, lacks jurisdiction to preempt 42 U.S.C. sec. 654**

Moreover, Rhode Island state family court is a court of limited jurisdiction created by the General Assembly under **RIGL 8-10-3**.  See, **Exhibit C**.  Plainly, the limited jurisdiction conferred to the state family court lacks the authority to preempt 42 U.S.C. sec. 654.  When the judge violates federal law or aids in the violation of federal criminal laws, the judge has no immunity.  See section below entitled "No Immunity."

For example, RIGL 8-10-3 plainly confers the limited jurisdiction family court the authority to hear motions on support establishment and enforcement, but does NOT

confer the family court the authority to preempt 42 U.S.C. sec. 654.  Indeed the

statutory terms in the Statutory Notes Section and the language of 42 U.S.C. sec. 654

plainly conditions Title IV preemption of State constitutions for State acceptance of

participation.  The Defendant reserves all rights to raise the other multiple other

jurisdictional defects as they apply to this matter, but the basic jurisdictional threshold

regarding the authority to preempt 42 U.S.C. sec. 654(21)(A) must fundamentally be

met – and this court lacks jurisdiction.

The clearly established lack of authority of this court to preempt 42 U.S.C. sec.

654 leads the court to address the question of the court's lack of jurisdiction over the

Rhode Island Office of Child Support's written policy, "**It is desirable for RI OCSS to**

**prohibit the charging of interest in Interstate Cases**."  See **Exhibit D**, Rhode

Island Office of Child Support Services Written Policy stating, "**It is desirable for RI**

**OCSS to prohibit the charging of interest in Interstate Cases**."

### III.   RI OCSS Policy that States "It is desirable for RI OCSS to prohibit the charging of interest in Interstate Cases" – This Court lacks jurisdiction over the Policy and lacks jurisdiction hear legal actions at law regarding the effect and the motive behind establishing this policy

A plain reading of RIGL 8-10-3 concludes that the limited jurisdiction family

court lacks jurisdiction over the RI OCSS Policy attached Exhibit D that states, ""**It is**

**desirable for RI OCSS to prohibit the charging of interest in Interstate**

**Cases**."  The Policy goes on to state regarding operations of the automated data

processing system, "Entry of the N not only prohibits the charging of future interest but

automatically creates adjustments to zero out any existing interest."  Additionally the

Policy states, "Two reports will be created.  The first will detail the interstate cases for which a support order….. for which one or more interest adjustment were created."  For the purposes of this motion, it suffices to raise that it is documented unequivocally the Office of Child Support Services creates multiple books of account reports for the completely un-uniform interest rates applied to support cases and that routinely "one or more interest adjustment were created" – 42 U.S.C. sec. 654 emphatically forbids all the policy practices enumerated in the Policy and the egregious issue of certifying a support record under 42 U.S.C. sec. 666(14), for example, that involves one or more interest adjustments and "two reports will be created" as it relates to compliance with 42 U.S.C. sec. 654 *et al* is a matter over which this court plainly lacks jurisdiction.

Applying the aforesaid RI OCSS Policy to this court's order dated September 25, 2012 that allegedly "established interest" in this interstate Title IV case, that this court also judicially noticed on February 2, 2024, the court ***must scrutinize*** the September 25, 2012 Order prepared by RI OCSS and signed and entered by Judge John McCann III that is challenged.

### IV.  <u>This Court Lacks Jurisdiction Over any Legal Action in Law Regarding the Violation of 42 U.S.C. sec. 654 By This Court</u>

Subsequent to the review of the Title IV-D **TRAC** records selectively only produced by RI OCSS for December 2021 to April 2022 (see **<u>Exhibit F</u>**) (and the aforesaid RI OCSS Policy), the TEXAS Defendant filed legal actions in law in Federal courts that have jurisdiction over the Federal question and Federal matters in this interstate case.  Furthermore, subsequent to Defendant raising in court at the WebEx hearing in this matter scheduled on October 18, 2023 that Defendant is denied access to

her own case records by the Rhode Island Rules and Practice 5 denying the public and pro se litigants remote access to court information (except the docket), the Defendant was emailed a copy of the September 25, 2012 court order allegedly establishing 12% compound interest between December 2023 and January 2024, the delayed access (Defendant has been denied access to information regarding the court orders and the ordered interest since November 2021 to January 2023) of which is already <u>egregiously outrageous</u> and the delay itself constituted countless multiple penalty-incurring compliance failure violations.

For the purpose of this motion, a strict scrutiny of the First Amendment access-denied September 25, 2012 order is plainly required.

On a Rhode Island Office of Child Support presented order by Deputy Chief Counsel Priscilla Glucksman, in this interstate non-welfare Title IV-D case, in which Plaintiff Gero Plaintiff (who is additionally represented by his own private attorney Barbara E. Grady, whose husband and law firm partner Paul Dugan was formerly Deputy Chief Legal Counsel for RI OCSS) paid RI OCSS under 42 U.S.C. sec. 654 a whopping $25 application fee that acquired for him the entire suite of full and complete individualized customized and dedicated child support interest establishment and enforcement legal services involving at least seven (7) Deputy Chief Legal Counsels and Chief Legal Counsel (e.g., 1. Priscilla Glucksman, 2. Kevin Tighe, 3. Frank DiBiaise, 4. Paul Gould, 5. John Langlois, 6. Lisa Pinnsonneault, 7. Carl Beauregard) from 2010 to the present from RI OCSS, Item 4 of the September 25, 2024 Order states, "The State's Oral request to clarifying whether or not interest was to run o n the child support and

medical arrears as found in the May 24, 2012 court order is addressed.  Interest will continue to run on the money due."

It is plainly explicit that 12% compound interest rate is not expressly provided in the text of the order.

It is plainly explicit that 42 U.S.C. sec. 654(21)(A) preempts RIGL 15-16-15.5.

 It is plainly explicit that the RI OCSS Policy states RI OCSS is prohibit from charging interest in interstate cases, meaning in interstate cases, the interest is 0%.

It is plainly explicit that the plain statutory text of 42 U.S.C. sec. 654(21)(A) requires that the State must set uniform interest and if the State opts to set interest, it **<u>must</u>** be "**no less than 3 percent and no more than 6 percent**."

**Accordingly, this court has jurisdiction to set the only lawful rate set by State Policy as stated in the RI OCSS Policy, which is zero percent (0%), uniformly, be it interstate or intrastate, given the plain statutory text of 42 U.S.C. sec. 654(21)(A).**

The TEXAS Defendant explicitly requests respectfully that this Court take judicial notice of the fact that the Rhode Island Office of Child Support claims multiple times under Oath that, although the September 25, 2012 Order plainly omits the percent being charged for overdue support, Judge McCann ordered 12% compound interest that he knew or should have known, be it interstate or intrastate, is unlawful under 42 U.S.C. sec. 654 and preempted by the plain statutory language of 42 U.S.C. sec. 654(21)(A).

Based on the aforesaid obvious effect of ordering 12% compound interest, Judge John McCann III knew or should have known that "two reports" will be created in the

automated data processing system and the resulting removal of the interest amount from the automated system resulting in Rhode Island certifying "no interest" when sending to Texas and to Federal authorities for enforcement under 42 U.S.C. sec. 666(14). Judge McCann's knowing aiding in the false certification of Title IV records via wire and via Mail interstate to Texas and to the United States plainly violates Federal criminal law. **The judge had a legal duty to obey the criminal laws.**

### V.    Any Order Now Re-Establishing 12% Compound Interest Simply Results in the Creation of "zero interest" in Certifications to Texas under 42 U.S.C. sec. 666(14)

Enforceability of any order now re-establishing 12% compound interest simply results in the creation of "zero interest" in enforcement certifications to Texas under 42 U.S.C. sec. 666(14). With the child emancipated since 2018, the Office of Child Support Services claiming in the TRAC Record it certified to TEXAS child support amount due with ZERO INTEREST also in 2018, and the fact that principle was paid off by the Defendant three years ago in December 2021 per representations by the Office of Child Support Services, the Court lacks jurisdiction to establish or modify or re-set or set arrears or whatever legal moniker that essentially dresses up organized fraud based on this set of circumstances raised herein in this motion alone.

The fact that the Office of Child Support Services filed a motion before this court to set interest "arrears" in January 2023 a year after Defendant paid off the principle in December 2021 reeks of fraud. If lawful and legitimate interest is actually due, logic dictates the State's support enforcement political subdivision under 42 U.S.C. sec. 654(3) simply enforces it without necessitating this court to "set interest arrears." This

court's addressment of this issue was punting it from Magistrate Monaco to Judge Merola to Magistrate Nahabedian who showed her colors by stating on the record affirming that the Rhode Island judiciary orders 12% compound interest that it knows is preempted by 42 U.S.C. sec. 654, thereby necessitating the aforesaid RI OCSS Policy "it is **desirable** for RI OCSS to prohibit the charging of interest in interstate cases." Why? Because it is plain under 42 U.S.C. 654 that Rhode Island's "effective enforcement" of interest in interstate cases may necessitate certifying to another state, like to TEXAS, an "interest-removed-from-the-system" consisting of zero interest, to better keep track of their several "reports" that "will be created." In other words, the no interest in interstate cases policy better helps to keep RI OCSS's lies and fraud straight.

Although Defendant reserves the right to fully raise the issue of fraud by the certain symbiotic judges and by RI OCSS at the right time, Defendant raises the fact that t**he judge has a legal duty to obey the criminal laws. Obviously RI OCSS has a legal duty to obey criminal laws.**

## VI.    Statutory and Federal Authority

Certainly, among others, in order to avoid yet another penalty-incurring violation of 42 U.S.C. sec. 654, the court must dismiss for lack of jurisdiction and close the case.

Congress prescribed both civil and criminal penalties for violations of Title IV of the Social Security Act. Firstly, consistent with its **Spending Power**, Congress has the authority to attach conditions on the receipt of federal funds. *See **South Dakota v. Dole***, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See

42 U.S.C. §§ 654(10), (14), (15), (16), (20), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See **Sullivan v. Stroop**,* 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."   The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." ***Hodges v. Shalala***, 121 F.2d at 879.  Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1]

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina paid $75 million as of 2009 and was set to pay another $10 million for 2010.  South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

        Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the

Congress also enacted several criminal codes punishing actors, such as the
Plaintiffs, who commit federal crimes, including cover up of unlawful activities.

The federal government has a longstanding involvement in child support
enforcement programs. See **Hodges v. Shalala**, 121 F.Supp.2d 854 (D.S.C. 2000). As
a condition of receipt of any federal funding under Title IV-D of the Social Security Act,
42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal
support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for
approval of a Title IV-D Plan are the requirements under 42 U.S.C. sec. 654(21)(A) that
the State, at the option of the State, impose a late payment fee ('interest") on all overdue
support (as defined in section 666(e) of this title) under any obligation being enforced
under this part, in an amount equal to a uniform percentage determined by the State
(not less than 3 percent nor more than 6 percent) of the overdue support, which shall be
payable by the noncustodial parent owing the overdue support; establish and operate an
automated data processing and information retrieval system, see 42 U.S.C. § 654(24),
and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A), among
others

While Rhode Island submits to the United States that it has a federally certifiable
statewide automated data processing system for child support, Office of Child Support
Services produced APRA Public Records consisting of Title IV Public Records showing
Rhode Island taking off from the automated data processing system tens of thousands of
dollars allegedly representing the 42 U.S.C. sec. 654(21)(A) prohibited 12% compound

---

automated system, then manually removing or adjusting them for purposes of
certification purposes to Texas and to the United States in order to conceal the 12%
compound interest from the noncustodial parent and to Texas and Federal authorities.

interest late payment fee "interest" prior to certifying to TEXAS and the United States, and showing Rhode Island falsely certified to the amount's accuracy under 42 U.S.C. sec. 666(14) when in fact Rhode Island removed significant tens of thousands of dollars (See TRAC records in attached Exhibit).

The Title IV-D statute expressly provides that compliance with ALL 42 U.S.C. 654 requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A.

Again, the clear and unequivocal statement of the required conditions in the statute enabled South Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop,* 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."

Emphatically, Congress may use its **Spending Power** to **influence** a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, **but** Congress, under the **Commerce Clause**, **may offer the States a choice of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc*.,** 452 U.S. 264, 288 (1981). It is crystal clear that upon Rhode Island's State Plan entering into agreement with the United States under the **Commerce Clause**, Rhode Island accepted the agreement terms of

regulation under federal control or preemption under federal regulation. See *Hodel v.*

*Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

*See* United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUS
C-prelim-title42-
section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRp
b25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

### A. VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Defendant made

known to the panel of judges of the United States allegations contained in the Amended

Complaint filed in Federal Court of the commission of acts by the Rhode Island political

subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein

in this motion, the afore-described acts violating 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C.

§13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18

U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. §

241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18

U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C.

§1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C.

§1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C.

§1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18

U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968  – such violative acts by the Plaintiffs in

this matter, along with the political subdivisions and employees thereof named in the

federal matter on this list are not exhaustive.  It is undisputable, among others, that

Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-D and Title IV-A disgorgement is due from the applicable State of Rhode Island's Title IV political subdivisions.

## B. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF AMERICA v. DONALD J. TRUMP*, DC Circuit, the DC Circuit United States Court of Appeals reminds the Public and all applicable tribunals that Judges are similarly liable to the criminal laws for their official acts. A notable example is *Ex parte Commonwealth of Virginia*, in which the Supreme Court affirmed the criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for violating a federal statute that prohibited discriminating on the basis of race in jury selection. *Id*. at 340, 344. The Supreme Court began by observing the principle that officers are bound to follow the law: "We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the holder from obligation to obey the Constitution of the United States, or take away the power of Congress to punish his disobedience." *Id*. at 348. The Court then addressed the judge's argument that the Court lacked the authority to punish a state judge for "his official acts." *Id*. Its response was twofold. First, the Court described juror selection as "merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads." *Id*. The Court then explained that even if juror selection is considered a "judicial act," the judge had a legal duty to obey the criminal laws:

"But if the selection of jurors could be considered

in any case a judicial act, can the act charged
against the petitioner be considered such when
he acted outside of his authority and in direct
violation of the spirit of the State statute? That
statute gave him no authority, when selecting
jurors, from whom a panel might be drawn for
a circuit court, to exclude all colored men
merely because they were colored. Such an
exclusion was not left within the limits of his
discretion. It is idle, therefore, to say that the
act of Congress is unconstitutional because it
inflicts penalties upon State judges for their
judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute" is to
the Virginia law charging the county judge with the duty to select jurors in the circuit
and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are
not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed
the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief
brought against a county magistrate and associate judge of a county circuit. 414 U.S.
488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction
was not the only available remedy because both judges remained answerable to the
federal criminal laws:

[W]e have never held that the performance of
the duties of judicial, legislative, or executive

> *officers, requires or contemplates the*
> *immunization of otherwise criminal deprivation*
> *of constitutional rights. On the contrary, the*
> *judicially fashioned doctrine of official*
> *immunity does not reach 'so far as to immunize*
> *criminal conduct proscribed by an Act of*
> *Congress . . . .'*

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See* also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of

bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not immune, and employees of the political subdivisions of Rhode Island under 42 USC 654(1) similarly are not immune. Barbara Grady and Gero Meyersiek are unquestionably liable.

## VII.  CONCLUSION

**Under 42 USC sec. 654 this court only has jurisdiction to set the only lawful rate set by State, articulated in writing in the State's Policy as stated in the RI OCSS Policy, which is zero percent (0%), uniformly, be it interstate or intrastate, given the plain statutory text of 42 U.S.C. sec. 654(21)(A).  Defendant paid off the principle in full as of December 7, 2021.  This Court must dismiss for lack of jurisdiction and close the case.**

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or designee-Judge Merola of this Honorable Court to:

1. Grant Defendant's Motion to Dismiss for Lack of Jurisdiction and Close the Case.

2. Order the Title IV case closed.

3. Order appropriate sanctions against Rhode Island Office of Child Support Services and Plaintiff, for *among others* fraud on the court, including ordering referral of the matters raised herein to the Office of Inspector General, both state and federal.

4. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request.

5. Declare that Defendant's child support file maintained by the Rhode Island Office of Child Support Services under the supervision of RI EOHHS must be produced to the Defendant Noncustodial Parent upon request.

6. Issue a written decision on the Court's decision.

7. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here:

   https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

8. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

March 27, 2024

FOR DEFENDANT

MARY SEGUIN, Pro Se.

By: _____*Mary Seguin*_____
Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

## NOTICE OF HEARING

Please take notice that if necessary, the foregoing Emergency Motion to Dismiss for Lack of Jurisdiction and Close the Case will be called for hearing on a priority basis to determine the threshold jurisdiction challenge before the Rhode Island Family Court, One Dorrance Plaza, Providence, RI 02903 at 10:00 AM on March 28, 2024 (case is already scheduled for that date/time) by WebEx hearing https://ricourts.webex.com/meet/garrahy5F

## CERTIFICATION

I hereby certify that a copy of the within Emergency Motion was filed on March 27, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

_____*Mary Seguin*_____

Exhibit A

---

**42 USC 654: State plan for child and spousal support**
Text contains those laws in effect on March 25, 2024

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
    CHAPTER 7-SOCIAL SECURITY
    SUBCHAPTER IV-GRANTS TO STATES FOR AID AND SERVICES TO NEEDY FAMILIES WITH
    CHILDREN AND FOR CHILD-WELFARE SERVICES
    Part D-Child Support and Establishment of Paternity
**Jump To:**
    **Source Credit**
    **Miscellaneous**
    **References In Text**
    **Codification**
    **Amendments**
    **Effective Date**

---

# §654. State plan for child and spousal support

A State plan for child and spousal support must-

(1) provide that it shall be in effect in all political subdivisions of the State;

(2) provide for financial participation by the State;

(3) provide for the establishment or designation of a single and separate organizational unit, which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan;

(4) provide that the State will-

(A) provide services relating to the establishment of paternity or the establishment, modification, or enforcement of child support obligations, as appropriate, under the plan with respect to-

(i) each child for whom (I) assistance is provided under the State program funded under part A of this subchapter, (II) benefits or services for foster care maintenance are provided under the State program funded under part E of this subchapter, (III) medical assistance is provided under the State plan approved under subchapter XIX, or (IV) cooperation is required pursuant to section 2015(l)(1) of title 7, unless, in accordance with paragraph (29), good cause or other exceptions exist;

(ii) any other child, if an individual applies for such services with respect to the child (except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the State to request the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application); and

(B) enforce any support obligation established with respect to-

(i) a child with respect to whom the State provides services under the plan; or

(ii) the custodial parent of such a child;

(5) provide that (A) in any case in which support payments are collected for an individual with respect to whom an assignment pursuant to section 608(a)(3) of this title is effective, such payments shall be made to the State for distribution pursuant to section 657 of this title and shall not be paid directly to the family, and the individual will be notified on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden) of the amount of the support payments collected, and (B) in any case in which support payments are collected for an individual pursuant to the assignment made under section 1396k of this title, such payments shall be made to the State for distribution pursuant to section 1396k of this title, except that this clause shall not apply to such payments for any month after the month

in which the individual ceases to be eligible for medical assistance;

(6) provide that-

(A) services under the plan shall be made available to residents of other States on the same terms as to residents of the State submitting the plan;

(B)(i) an application fee for furnishing such services shall be imposed on an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section 2015 of title 7, and shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (I) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (II) may vary among such individuals on the basis of ability to pay (as determined by the State); and

(ii) in the case of an individual who has never received assistance under a State program funded under part A and for whom the State has collected at least $550 of support, the State shall impose an annual fee of $35 for each case in which services are furnished, which shall be retained by the State from support collected on behalf of the individual (but not from the first $550 so collected), paid by the individual applying for the services, recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and the fees shall be considered income to the program);

(C) a fee of not more than $25 may be imposed in any case where the State requests the Secretary of the Treasury to withhold past-due support owed to or on behalf of such individual from a tax refund pursuant to section 664(a)(2) of this title;

(D) a fee (in accordance with regulations of the Secretary) for performing genetic tests may be imposed on any individual who is not a recipient of assistance under a State program funded under part A; and

(E) any costs in excess of the fees so imposed may be collected-

(i) from the parent who owes the child or spousal support obligation involved; or

(ii) at the option of the State, from the individual to whom such services are made available, but only if such State has in effect a procedure whereby all persons in such State having authority to order child or spousal support are informed that such costs are to be collected from the individual to whom such services were made available;


(7) provide for entering into cooperative arrangements with appropriate courts and law enforcement officials and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering the plan, including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;

(8) provide that, for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title the agency administering the plan will establish a service to locate parents utilizing-

(A) all sources of information and available records; and

(B) the Federal Parent Locator Service established under section 653 of this title,


and shall, subject to the privacy safeguards required under paragraph (26), disclose only the information described in sections 653 and 663 of this title to the authorized persons specified in such sections for the purposes specified in such sections;

(9) provide that the State will, in accordance with standards prescribed by the Secretary, cooperate with any other State-

(A) in establishing paternity, if necessary;

(B) in locating a noncustodial parent residing in the State (whether or not permanently) against

whom any action is being taken under a program established under a plan approved under this part in another State;

(C) in securing compliance by a noncustodial parent residing in such State (whether or not permanently) with an order issued by a court of competent jurisdiction against such parent for the support and maintenance of the child or children or the parent of such child or children with respect to whom aid is being provided under the plan of such other State;

(D) in carrying out other functions required under a plan approved under this part; and

(E) not later than March 1, 1997, in using the forms promulgated pursuant to section 652(a)(11) of this title for income withholding, imposition of liens, and issuance of administrative subpoenas in interstate child support cases;

(10) provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;

(11)(A) provide that amounts collected as support shall be distributed as provided in section 657 of this title; and

(B) provide that any payment required to be made under section 656 or 657 of this title to a family shall be made to the resident parent, legal guardian, or caretaker relative having custody of or responsibility for the child or children;

(12) provide for the establishment of procedures to require the State to provide individuals who are applying for or receiving services under the State plan, or who are parties to cases in which services are being provided under the State plan-

(A) with notice of all proceedings in which support obligations might be established or modified; and

(B) with a copy of any order establishing or modifying a child support obligation, or (in the case of a petition for modification) a notice of determination that there should be no change in the amount of the child support award, within 14 days after issuance of such order or determination;

(13) provide that the State will comply with such other requirements and standards as the Secretary determines to be necessary to the establishment of an effective program for locating noncustodial parents, establishing paternity, obtaining support orders, and collecting support payments and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan;

(14)(A) comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

(B) maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them to conceal in the accounting records the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

(15) provide for-

(A) a process for annual reviews of and reports to the Secretary on the State program operated under the State plan approved under this part, including such information as may be necessary to measure State compliance with Federal requirements for expedited procedures, using such standards and procedures as are required by the Secretary, under which the State agency will determine the extent to which the program is operated in compliance with this part; and

(B) a process of extracting from the automated data processing system required by paragraph (16) and transmitting to the Secretary data and calculations concerning the levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 652(g) and 658a of this title;

(16) provide for the establishment and operation by the State agency, in accordance with an (initial and annually updated) advance automated data processing planning document approved under section 652(d) of this title, of a statewide automated data processing and information retrieval system meeting the requirements of section 654a of this title designed effectively and efficiently to assist management in

the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan;

(17) provide that the State will have in effect an agreement with the Secretary entered into pursuant to section 663 of this title for the use of the Parent Locator Service established under section 653 of this title, and provide that the State will accept and transmit to the Secretary requests for information authorized under the provisions of the agreement to be furnished by such Service to authorized persons, will impose and collect (in accordance with regulations of the Secretary) a fee sufficient to cover the costs to the State and to the Secretary incurred by reason of such requests, will transmit to the Secretary from time to time (in accordance with such regulations) so much of the fees collected as are attributable to such costs to the Secretary so incurred, and during the period that such agreement is in effect will otherwise comply with such agreement and regulations of the Secretary with respect thereto;

(18) provide that the State has in effect procedures necessary to obtain payment of past-due support from overpayments made to the Secretary of the Treasury as set forth in section 664 of this title, and take all steps necessary to implement and utilize such procedures;

(19) provide that the agency administering the plan-

(A) shall determine on a periodic basis, from information supplied pursuant to section 508 of the Unemployment Compensation Amendments of 1976, whether any individuals receiving compensation under the State's unemployment compensation law (including amounts payable pursuant to any agreement under any Federal unemployment compensation law) owe child support obligations which are being enforced by such agency; and

(B) shall enforce any such child support obligations which are owed by such an individual but are not being met-

(i) through an agreement with such individual to have specified amounts withheld from compensation otherwise payable to such individual and by submitting a copy of any such agreement to the State agency administering the unemployment compensation law; or

(ii) in the absence of such an agreement, by bringing legal process (as defined in section 659(i)(5) of this title) to require the withholding of amounts from such compensation;

(20) provide, to the extent required by section 666 of this title, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws;

(21)(A) at the option of the State, impose a late payment fee on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; and

(B) assure that the fee will be collected in addition to, and only after full payment of, the overdue support, and that the imposition of the late payment fee shall not directly or indirectly result in a decrease in the amount of the support which is paid to the child (or spouse) to whom, or on whose behalf, it is owed;

(22) in order for the State to be eligible to receive any incentive payments under section 658a of this title, provide that, if one or more political subdivisions of the State participate in the costs of carrying out activities under the State plan during any period, each such subdivision shall be entitled to receive an appropriate share (as determined by the State) of any such incentive payments made to the State for such period, taking into account the efficiency and effectiveness of the activities carried out under the State plan by such political subdivision;

(23) provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services and a telephone number or postal address at which further information may be obtained and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate;

(24) provide that the State will have in effect an automated data processing and information retrieval system-

(A) by October 1, 1997, which meets all requirements of this part which were enacted on or before October 13, 1988; and

(B) by October 1, 2000, which meets all requirements of this part enacted on or before August 22, 1996, except that such deadline shall be extended by 1 day for each day (if any) by which the Secretary fails to meet the deadline imposed by section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996;

(25) provide that if a family with respect to which services are provided under the plan ceases to receive assistance under the State program funded under part A, the State shall provide appropriate notice to the family and continue to provide such services, subject to the same conditions and on the same basis as in the case of other individuals to whom services are furnished under the plan, except that an application or other request to continue services shall not be required of such a family and paragraph (6)(B) shall not apply to the family;

(26) have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the parties, including-

(A) safeguards against unauthorized use or disclosure of information relating to proceedings or actions to establish paternity, or to establish, modify, or enforce support, or to make or enforce a child custody determination;

(B) prohibitions against the release of information on the whereabouts of 1 party or the child to another party against whom a protective order with respect to the former party or the child has been entered;

(C) prohibitions against the release of information on the whereabouts of 1 party or the child to another person if the State has reason to believe that the release of the information to that person may result in physical or emotional harm to the party or the child;

(D) in cases in which the prohibitions under subparagraphs (B) and (C) apply, the requirement to notify the Secretary, for purposes of section 653(b)(2) of this title, that the State has reasonable evidence of domestic violence or child abuse against a party or the child and that the disclosure of such information could be harmful to the party or the child; and

(E) procedures providing that when the Secretary discloses information about a parent or child to a State court or an agent of a State court described in section 653(c)(2) or 663(d)(2)(B) of this title, and advises that court or agent that the Secretary has been notified that there is reasonable evidence of domestic violence or child abuse pursuant to section 653(b)(2) of this title, the court shall determine whether disclosure to any other person of information received from the Secretary could be harmful to the parent or child and, if the court determines that disclosure to any other person could be harmful, the court and its agents shall not make any such disclosure;

(27) provide that, on and after October 1, 1998, the State agency will-

(A) operate a State disbursement unit in accordance with section 654b of this title; and

(B) have sufficient State staff (consisting of State employees) and (at State option) contractors reporting directly to the State agency to-

(i) monitor and enforce support collections through the unit in cases being enforced by the State pursuant to paragraph (4) (including carrying out the automated data processing responsibilities described in section 654a(g) of this title); and

(ii) take the actions described in section 666(c)(1) of this title in appropriate cases;

(28) provide that, on and after October 1, 1997, the State will operate a State Directory of New Hires in accordance with section 653a of this title;

(29) provide that the State agency responsible for administering the State plan-

(A) shall make the determination (and redetermination at appropriate intervals) as to whether an individual who has applied for or is receiving assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, is cooperating in good faith with the State in establishing the paternity of, or in establishing, modifying, or enforcing a support order for, any child of the individual by providing the State agency with the name of, and such other information as the State agency may require with respect to, the noncustodial parent of the child, subject to good cause and other exceptions which-

(i) in the case of the State program funded under part A, the State program under part E, or the State program under subchapter XIX shall, at the option of the State, be defined, taking into account the best interests of the child, and applied in each case, by the State agency administering such program; and

(ii) in the case of the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, shall be defined and applied in each case under that program in accordance with section 2015(l)(2) of title 7;

(B) shall require the individual to supply additional necessary information and appear at interviews, hearings, and legal proceedings;

(C) shall require the individual and the child to submit to genetic tests pursuant to judicial or administrative order;

(D) may request that the individual sign a voluntary acknowledgment of paternity, after notice of the rights and consequences of such an acknowledgment, but may not require the individual to sign an acknowledgment or otherwise relinquish the right to genetic tests as a condition of cooperation and eligibility for assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7; and

(E) shall promptly notify the individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, of each such determination, and if noncooperation is determined, the basis therefor;

(30) provide that the State shall use the definitions established under section 652(a)(5) of this title in collecting and reporting information as required under this part;

(31) provide that the State agency will have in effect a procedure for certifying to the Secretary, for purposes of the procedure under section 652(k) of this title, determinations that individuals owe arrearages of child support in an amount exceeding $2,500, under which procedure-

(A) each individual concerned is afforded notice of such determination and the consequences thereof, and an opportunity to contest the determination; and

(B) the certification by the State agency is furnished to the Secretary in such format, and accompanied by such supporting documentation, as the Secretary may require;

(32)(A) provide that any request for services under this part by a foreign reciprocating country, a foreign treaty country, or a foreign country with which the State has an arrangement described in section 659a(d) of this title shall be treated as a request by a State;

(B) provide, at State option, notwithstanding paragraph (4) or any other provision of this part, for services under the plan for enforcement of a spousal support order not described in paragraph (4)(B) entered by such a country (or subdivision); and

(C) provide that no applications will be required from, and no costs will be assessed for such services against, the foreign reciprocating country, foreign treaty country, or foreign individual (but costs may at State option be assessed against the obligor);

(33) provide that a State that receives funding pursuant to section 628 of this title and that has within its borders Indian country (as defined in section 1151 of title 18) may enter into cooperative agreements with an Indian tribe or tribal organization (as defined in subsections (e) and (l) of section 5304 of title 25), if the Indian tribe or tribal organization demonstrates that such tribe or organization has an established tribal court system or a Court of Indian Offenses with the authority to establish paternity, establish, modify, or enforce support orders, or to enter support orders in accordance with child support guidelines established or adopted by such tribe or organization, under which the State and tribe or organization shall provide for the cooperative delivery of child support enforcement services in Indian country and for the forwarding of all collections pursuant to the functions performed by the tribe or organization to the State agency, or conversely, by the State agency to the tribe or organization, which shall distribute such collections in

accordance with such agreement; and

(34) include an election by the State to apply section 657(a)(2)(B) of this title or former section 657(a)(2)(B) of this title (as in effect for the State immediately before the date this paragraph first applies to the State) to the distribution of the amounts which are the subject of such sections and, for so long as the State elects to so apply such former section, the amendments made by subsection (b)(1) of section 7301 of the Deficit Reduction Act of 2005 shall not apply with respect to the State, notwithstanding subsection (e) of such section 7301.

The State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21). Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25.

(Aug. 14, 1935, ch. 531, title IV, §454, as added Pub. L. 93–647, §101(a), Jan. 4, 1975, 88 Stat. 2354 ; amended Pub. L. 94–88, title II, §208(b), (c), Aug. 9, 1975, 89 Stat. 436 ; Pub. L. 95–30, title V, §502(a), May 23, 1977, 91 Stat. 162 ; Pub. L. 96–265, title IV, §405(b), June 9, 1980, 94 Stat. 463 ; Pub. L. 96–611, §9(a), Dec. 28, 1980, 94 Stat. 3571 ; Pub. L. 97–35, title XXIII, §§2331(b), 2332(d), 2333(a), (b), 2335(a), Aug. 13, 1981, 95 Stat. 860 , 862, 863; Pub. L. 97–248, title I, §§171(a), (b)(1), 173(a), Sept. 3, 1982, 96 Stat. 401 , 403; Pub. L. 98–369, div. B, title VI, §2663(c)(14), (j)(2)(B)(x), July 18, 1984, 98 Stat. 1166 , 1170; Pub. L. 98–378, §§3(a), (c)–(f), 5(b), 6(a), 11(b)(1), 12(a), (b), 14(a), 21(d), Aug. 16, 1984, 98 Stat. 1306 , 1310, 1311, 1314, 1318, 1319, 1320, 1324; Pub. L. 100–203, title IX, §§9141(a)(2), 9142(a), Dec. 22, 1987, 101 Stat. 1330–321 ; Pub. L. 100–485, title I, §§104(a), 111(c), 123(a), (d), Oct. 13, 1988, 102 Stat. 2348 , 2349, 2352, 2353; Pub. L. 104–35, §1(a), Oct. 12, 1995, 109 Stat. 294 ; Pub. L. 104–193, title I, §108(c)(11), (12), title III, §§301(a), (b), 302(b)(2), 303(a), 304(a), 312(a), 313(a), 316(g)(1), 324(b), 332, 333, 342(a), 343(b), 344(a)(1), (4), 370(a)(2), 371(b), 375(a), (c), 395(d)(1)(D), (2)(B), Aug. 22, 1996, 110 Stat. 2166 , 2199, 2204, 2205, 2207, 2209, 2218, 2223, 2230, 2233, 2234, 2236, 2252, 2254, 2256, 2259, 2260; Pub. L. 105–33, title V, §§5531(a), 5542(c), 5545, 5546(a), 5548, 5552, 5556(b), Aug. 5, 1997, 111 Stat. 625 , 631, 633, 635, 637; Pub. L. 106–169, title IV, §401(g), (h), Dec. 14, 1999, 113 Stat. 1858 ; Pub. L. 109–171, title VII, §§7301(b)(1)(C), 7303(b), 7310(a), Feb. 8, 2006, 120 Stat. 143 , 145, 147; Pub. L. 110–234, title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), May 22, 2008, 122 Stat. 1095–1097 , 1110; Pub. L. 110–246, §4(a), title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), June 18, 2008, 122 Stat. 1664 , 1857, 1858, 1871; Pub. L. 113–79, title IV, §4030(v), Feb. 7, 2014, 128 Stat. 815 ; Pub. L. 113–183, title III, §301(c), Sept. 29, 2014, 128 Stat. 1943 ; Pub. L. 115–123, div. E, title XII, §53117(a), Feb. 9, 2018, 132 Stat. 307 .)

<div align="center">

### EDITORIAL NOTES

## REFERENCES IN TEXT

</div>

Section 508 of the Unemployment Compensation Amendments of 1976, referred to in par. (19), is section 508 of Pub. L. 94–566, Oct. 20, 1976, 90 Stat. 2689 , which enacted section 603a of this title and amended section 49b of Title 29, Labor.

Section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, referred to in par. (24), is section 344(a)(3) of Pub. L. 104–193, which is set out as a Regulations note under section 654a of this title.

Section 2012(l) of title 7, referred to in par. (29), was struck out, and a new section 2012(t) of title 7 similarly defining "supplemental nutrition assistance program" was enacted, by Pub. L. 113–79, title IV, §4030(a)(3), (5), Feb. 7, 2014, 128 Stat. 813 .

Section 7301 of the Deficit Reduction Act of 2005, referred to in par. (34), is section 7301 of Pub. L. 109–171, title VII, Feb. 8, 2006, 120 Stat. 141 . Subsec. (b)(1) of section 7301 of Pub. L. 109–171 amended this section and section 657 of this title. Subsec. (e) of section 7301 of Pub. L. 109–171 is set out as an Effective Date of 2006 Amendment note under section 608 of this title.

## CODIFICATION

Pub. L. 110–234 and Pub. L. 110–246 made identical amendments to this section. The amendments by Pub. L. 110–234 were repealed by section 4(a) of Pub. L. 110–246.

## AMENDMENTS

**2018**-Par. (6)(B)(ii). Pub. L. 115–123 substituted "$35" for "$25" and, in two places, substituted "$550" for "$500".

**2014**-Par. (4)(A)(ii). Pub. L. 113–183, §301(c)(1), inserted before semicolon "(except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the individual to request the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application)".

Par. (29)(A), (D), (E). Pub. L. 113–79, §4030(v), amended Pub. L. 110–246, §4115(c)(2)(H). See 2008 Amendment note below.

Par. (32)(A). Pub. L. 113–183, §301(c)(2)(A), inserted ", a foreign treaty country," after "a foreign reciprocating country".

Par. (32)(C). Pub. L. 113–183, §301(c)(2)(B), substituted ", foreign treaty country, or foreign individual" for "or foreign obligee".

**2008**-Pars. (4)(A)(i)(IV), (6)(B)(i). Pub. L. 110–246, §4002(b)(1)(B), (2)(V), made technical amendment to references in original act which appear in text as references to sections 2015(l)(1) and 2015 of title 7.

Par. (29)(A), (D), (E). Pub. L. 110–246, §4115(c)(2)(H), as amended by Pub. L. 113–79, §4030(v), substituted "section 2012(l)" for "section 2012(h)" wherever appearing.

Pub. L. 110–246, §4002(b)(1)(A), (B), (2)(V), substituted "supplemental nutrition assistance program" for "food stamp program" wherever appearing and made technical amendment to references in original act which appear in text as references to sections 2012(h) and 2015(l)(2) of title 7.

**2006**-Par. (6)(B). Pub. L. 109–171, §7310(a), designated existing provisions as cl. (i), redesignated former cls. (i) and (ii) as subcls. (I) and (II), respectively, of cl. (i), and added cl. (ii).

Par. (31). Pub. L. 109–171, §7303(b), substituted "$2,500" for "$5,000" in introductory provisions.

Par. (34). Pub. L. 109–171, §7301(b)(1)(C), added par. (34).

**1999**-Par. (6)(E)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (9)(A) to (C). Pub. L. 106–169, §401(g)(2), substituted semicolon for comma at end.

Par. (19)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (19)(B)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (24)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (24)(B). Pub. L. 106–169, §401(h), made technical amendment to reference in original act which appears in text as reference to August 22, 1996.

**1997**-Par. (4)(A)(i)(IV). Pub. L. 105–33, §5548(a), added subcl. (IV).

Par. (6)(B). Pub. L. 105–33, §5531(a), substituted "an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section

2015 of title 7, and" for "individuals not receiving assistance under any State program funded under part A, which".

Par. (8). Pub. L. 105–33, §5552(1)(D), inserted concluding provisions.

Pub. L. 105–33, §5552(1)(A), in introductory provisions, inserted ", for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title" after "provide that" and struck out "noncustodial" before "parents".

Par. (8)(A). Pub. L. 105–33, §5552(1)(B), substituted "records; and" for "records, and".

Par. (8)(B). Pub. L. 105–33, §5552(1)(C), substituted "title," for "title;".

Par. (16). Pub. L. 105–33, §5556(b), made technical amendment to directory language of Pub. L. 104–193, §344(a)(1)(F). See 1996 Amendment note below.

Par. (17). Pub. L. 105–33, §5552(2), substituted "provide that the State will have" for "in the case of a State which has" and inserted "and" after "section 653 of this title,".

Par. (19)(B)(ii). Pub. L. 105–33, §5542(c), substituted "section 659(i)(5)" for "section 662(e)".

Par. (26). Pub. L. 105–33, §5552(3)(A), struck out "will" before "have in effect" in introductory provisions.

Par. (26)(A). Pub. L. 105–33, §5552(3)(B), inserted ", modify," after "or to establish" and ", or to make or enforce a child custody determination" after "support".

Par. (26)(B). Pub. L. 105–33, §5552(3)(C)(i), (ii), inserted "or the child" after "1 party" and after "former party".

Par. (26)(C). Pub. L. 105–33, §5552(3)(D), inserted "or the child" after "1 party", substituted "another person" for "another party", inserted "to that person" after "release of the information", and substituted "party or the child" for "former party".

Par. (26)(D), (E). Pub. L. 105–33, §5552(3)(C)(iii), (E), added subpars. (D) and (E).

Par. (29)(A). Pub. L. 105–33, §5548(b)(1)(B), substituted cls. (i) and (ii) for

"(i) shall be defined, taking into account the best interests of the child, and

"(ii) shall be applied in each case,

by, at the option of the State, the State agency administering the State program under part A of this subchapter, this part, or subchapter XIX;".

Pub. L. 105–33, §5548(b)(1)(A), in introductory provisions, substituted "part A, the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7," for "part A of this subchapter or the State program under subchapter XIX".

Par. (29)(D). Pub. L. 105–33, §5548(b)(2), substituted "the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7" for "or the State program under subchapter XIX".

Par. (29)(E). Pub. L. 105–33, §5548(b)(3), substituted "individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the food stamp program, as defined under section 2012(h) of title 7," for "individual, the State agency administering the State program funded under part A, and the State agency administering the State program under subchapter XIX,".

Par. (32)(A). Pub. L. 105–33, §5545, substituted "section 659a(d)" for "section 659a(d)(2)".

Par. (33). Pub. L. 105–33, §5546(a), substituted "or enforce support orders, or" for "and enforce support orders, and", "guidelines established or adopted by such tribe or organization"

for "guidelines established by such tribe or organization", "all collections" for "all funding collected", and "such collections" for "such funding".

**1996**-Pub. L. 104–193, §375(a)(4), inserted at end of closing provisions "Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25."

Par. (4). Pub. L. 104–193, §301(a)(1), amended par. (4) generally. Prior to amendment, par. (4) read as follows: "provide that such State will undertake-

"(A) in the case of a child born out of wedlock with respect to whom an assignment under section 602(a)(26) of this title or section 1396k of this title is effective, to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so, or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and

"(B) in the case of any child with respect to whom such assignment is effective, including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter, to secure support for such child from his parent (or from any other person legally liable for such support), and from such parent for his spouse (or former spouse) receiving aid to families with dependent children or medical assistance under a State plan approved under subchapter XIX of this chapter (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan), utilizing any reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A or E of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so), except that when such arrangements and other means have proven ineffective, the State may utilize the Federal courts to obtain or enforce court orders for support;".

Par. (5)(A). Pub. L. 104–193, §108(c)(11), substituted "pursuant to section 608(a)(3) of this title" for "under section 602(a)(26) of this title" and "payments collected," for "payments collected; except that this paragraph shall not apply to such payments for any month following the first month in which the amount collected is sufficient to make such family ineligible for assistance under the State plan approved under part A of this subchapter;".

Par. (6). Pub. L. 104–193, §301(a)(2)(A), substituted "provide that-" for "provide that" in introductory provisions.

Par. (6)(A). Pub. L. 104–193, §301(a)(2)(B), added subpar. (A) and struck out former subpar. (A) which read as follows: "the child support collection or paternity determination services established under the plan shall be made available to any individual not otherwise eligible for such services upon application filed by such individual with the State, including support collection services for the spouse (or former spouse) with whom the absent parent's child is living (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan),".

Par. (6)(B). Pub. L. 104–193, §301(a)(2)(C), (D), inserted "on individuals not receiving assistance under any State program funded under part A" after "such services shall be imposed", realigned margins, and substituted semicolon for comma at end.

Par. (6)(C). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma at end.

Par. (6)(D). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma before "and" at end.

Pub. L. 104–193, §108(c)(12), substituted "assistance under a State program funded" for "aid under a State plan approved".

Par. (6)(E). Pub. L. 104–193, §301(a)(2)(D)(i), (E), realigned margins.

Pub. L. 104–193, §301(a)(2)(D)(ii), which directed substitution of a semicolon for the final comma, could not be executed because subpar. (E) already ended in a semicolon and not a comma.

Par. (7). Pub. L. 104–193, §375(c), inserted "and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25)" after "law enforcement officials".

Par. (8). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial" for "absent" in introductory provisions.

Par. (8)(B). Pub. L. 104–193, §316(g)(1)(A), amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: "the Parent Locator Service in the Department of Health and Human Services;".

Par. (9)(B), (C). Pub. L. 104–193, §395(d)(2)(B), substituted "a noncustodial parent" for "an absent parent".

Par. (9)(E). Pub. L. 104–193, §324(b), added subpar. (E).

Par. (11). Pub. L. 104–193, §302(b)(2), designated existing provisions as subpar. (A), inserted "and" after semicolon at end, and redesignated par. (12) as subpar. (B).

Par. (12). Pub. L. 104–193, §304(a), added par. (12). Former par. (12) redesignated (11)(B).

Pub. L. 104–193, §302(b)(2)(B), redesignated par. (12) as (11)(B).

Par. (13). Pub. L. 104–193, §§316(g)(1)(B), 395(d)(1)(D), substituted "noncustodial parents" for "absent parents" and inserted before semicolon at end "and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan".

Par. (14). Pub. L. 104–193, §342(a)(1), (2), designated existing provisions as subpar. (A) and redesignated par. (15) as subpar. (B).

Par. (15). Pub. L. 104–193, §342(a)(3), added par. (15). Former par. (15) redesignated (14)(B).

Pub. L. 104–193, §342(a)(2), redesignated par. (15) as (14)(B).

Par. (16). Pub. L. 104–193, §344(a)(1), as amended by Pub. L. 105–33, §5556(b), struck out ", at the option of the State," before "for the establishment", inserted "and operation by the State agency" after "for the establishment" and "meeting the requirements of section 654a of this title" after "information retrieval system", substituted "so as to control" for "in the State and localities thereof, so as (A) to control", struck out "(i)" before "all the factors in the support enforcement collection", and struck out before semicolon at end "(including, but not limited to, (I) identifiable correlation factors (such as social security numbers, names, dates of birth, home addresses and mailing addresses (including postal ZIP codes) of any individual with respect to whom support obligations are sought to be established or enforced and with respect to any person to whom such support obligations are owing) to assure sufficient compatibility among the systems of different jurisdictions to permit periodic screening to determine whether such

individual is paying or is obligated to pay support in more than one jurisdiction, (II) checking of records of such individuals on a periodic basis with Federal, intra- and inter-State, and local agencies, (III) maintaining the data necessary to meet the Federal reporting requirements on a timely basis, and (IV) delinquency and enforcement activities), (ii) the collection and distribution of support payments (both intra- and inter-State), the determination, collection, and distribution of incentive payments both inter- and intra-State, and the maintenance of accounts receivable on all amounts owed, collected and distributed, and (iii) the costs of all services rendered, either directly or by interfacing with State financial management and expenditure information, (B) to provide interface with records of the State's aid to families with dependent children program in order to determine if a collection of a support payment causes a change affecting eligibility for or the amount of aid under such program, (C) to provide for security against unauthorized access to, or use of, the data in such system, (D) to facilitate the development and improvement of the income withholding and other procedures required under section 666(a) of this title through the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur, and (E) to provide management information on all cases under the State plan from initial referral or application through collection and enforcement".

Par. (21)(A). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent".

Par. (23). Pub. L. 104–193, §332, inserted "and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate" before semicolon.

Par. (24). Pub. L. 104–193, §344(a)(4), amended par. (24) generally. Prior to amendment, par. (24) read as follows: "provide that if the State, as of October 13, 1988, does not have in effect an automated data processing and information retrieval system meeting all of the requirements of paragraph (16), the State-

"(A) will submit to the Secretary by October 1, 1991, for review and approval by the Secretary within 9 months after submittal an advance automated data processing planning document of the type referred to in such paragraph; and

"(B) will have in effect by October 1, 1997, an operational automated data processing and information retrieval system, meeting all the requirements of that paragraph, which has been approved by the Secretary;".

Par. (25). Pub. L. 104–193, §301(b), added par. (25).

Par. (26). Pub. L. 104–193, §303(a), added par. (26).

Par. (27). Pub. L. 104–193, §312(a), added par. (27).

Par. (28). Pub. L. 104–193, §313(a), added par. (28).

Par. (29). Pub. L. 104–193, §333, added par. (29).

Par. (30). Pub. L. 104–193, §343(b), added par. (30).

Par. (31). Pub. L. 104–193, §370(a)(2), added par. (31).

Par. (32). Pub. L. 104–193, §371(b), added par. (32).

Par. (33). Pub. L. 104–193, §375(a)(1)–(3), added par. (33).

**1995**-Par. (24)(B). Pub. L. 104–35 substituted "1997" for "1995".

**1988**-Par. (5)(A). Pub. L. 100–485, §104(a), substituted "on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden)" for "at least

annually".

Par. (6)(D), (E). Pub. L. 100–485, §111(c), added cl. (D) and redesignated former cl. (D) as (E).

Par. (16). Pub. L. 100–485, §123(d), substituted "advance automated" for "advance automatic" in introductory provisions.

Pub. L. 100–485, §123(a)(2), substituted "a statewide automated" for "an automatic".

Par. (24). Pub. L. 100–485, §123(a)(1), added par. (24).

**1987**—Par. (4)(A). Pub. L. 100–203, §9142(a)(1)(A), (B), substituted "an assignment under section 602(a)(26) of this title or section 1396k of this title" for "an assignment under section 602(a)(26) of this title" and ", or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and" for ", and".

Par. (4)(B). Pub. L. 100–203, §9142(a)(1)(C), inserted "or medical assistance under a State plan approved under subchapter XIX of this chapter" after "children".

Par. (5). Pub. L. 100–203, §9142(a)(2), substituted "provide that (A)" for "provide that," and added cl. (B).

Pub. L. 100–203, §9141(a)(2), struck out "(except as provided in section 657(c) of this title)" after "apply to such payments".

**1984**—Par. (4)(B). Pub. L. 98–378, §11(b)(1), inserted "including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter," after "such assignment is effective," and inserted "or E" after "part A".

Par. (4)(B). Pub. L. 98–378, §12(a), substituted ", and" for "and, at the option of the State," before "from such parent" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (5). Pub. L. 98–378, §3(e), inserted ", and the individual will be notified at least annually of the amount of the support payments collected;".

Par. (6)(A). Pub. L. 98–378, §12(b), struck out ", at the option of the State," before "support collection services" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (6)(B). Pub. L. 98–378, §3(c), substituted "shall be imposed, which shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (i) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (ii) may vary among such individuals on the basis of ability to pay (as determined by the State), and" for "may be imposed, except that the amount of any such application fee shall be reasonable, as determined under regulations of the Secretary,".

Par. (6)(C). Pub. L. 98–378, §21(d)(1), (3), added cl. (C). Former cl. (C) redesignated (D).

Par. (6)(D). Pub. L. 98–378, §21(d)(1), (2), redesignated former cl. (C) as (D) and substituted "fees" for "fee" before "so imposed".

Par. (8)(B). Pub. L. 98–369, §2663(j)(2)(B)(x), substituted "Health and Human Services" for "Health, Education, and Welfare".

Par. (9)(C). Pub. L. 98–369, §2663(c)(14)(A), struck out "of such parent" before "with respect to whom aid".

Par. (16)(A)(ii). Pub. L. 98–369, §2663(c)(14)(B), substituted "collection, and distribution" for "collection and distribution," before "of incentive payments".

Par. (16)(D), (E). Pub. L. 98–378, §6(a), added cl. (D) and redesignated former cl. (D) as (E).

Par. (17). Pub. L. 98–378, §2663(c)(14)(C), realigned margin, substituted "provide that the State will accept" for "to accept", "will impose" for "and to impose", "will transmit" for "to transmit", and "will otherwise comply" for ", otherwise to comply".

Par. (20). Pub. L. 98–378, §3(a), added par. (20).

Par. (21). Pub. L. 98–378, §3(d), added par. (21).

Par. (22). Pub. L. 98–378, §5(b), added par. (22).

Par. (23). Pub. L. 98–378, §14(a), added par. (23).

Pub. L. 98–378, §3(f), inserted after numbered paragraphs provision that the State may allow the jurisdiction which makes the collection involved to retain any application fee under par. (6)(B) or any late payment fee under par. (21).

**1982**-Par. (5). Pub. L. 97–248, §173(a), inserted "following the first month" after "for any month".

Par. (6). Pub. L. 97–248, §171(a), in cl. (A) inserted provisions relating to inclusion of, at the option of the State, support collection services for the spouse or former spouse, in cl. (B) substituted "such services" for "services under the State plan (other than collection of support)", and in cl. (C) substituted provisions relating to collection of any costs in excess of the fee imposed, for provisions relating to the State retaining any fee imposed under State law as required under former par. (19).

Pars. (18) to (20). Pub. L. 97–248, §171(b)(1), inserted "and" at end of par. (18), struck out par. (19) relating to imposition of a fee on an individual who owes child or spousal support obligation, and redesignated par. (20) as (19).

**1981**-Pub. L. 97–35, §2332(d)(2), substituted in provision preceding par. (1) "child and spousal support" for "child support".

Par. (4)(B). Pub. L. 97–35, §2332(d)(3), substituted "such support) and, at the option of the State, from such parent for his spouse (or former spouse) receiving aid to families with dependent children (but only if a support obligation has been established with respect to such spouse), utilizing" for "such support), utilizing".

Par. (5). Pub. L. 97–35, §2332(d)(4), substituted "support payments" for "child support payments" and "collected for an individual" for "collected for a child".

Par. (6)(B). Pub. L. 97–35, §2333(a)(1), substituted "services under the State plan (other than collection of support)" for "such services".

Par. (6)(C). Pub. L. 97–35, §2333(a)(2), substituted "the State will retain, but only if it is the State which makes the collection, the fee imposed under State law as required under paragraph (19)" for "any costs in excess of the fee so imposed may be collected from such individual by deducting such costs from the amount of any recovery made".

Par. (9)(C). Pub. L. 97–35, §2332(d)(5), substituted "of the child or children or the parent of such child or children" for "of a child or children".

Par. (11). Pub. L. 97–35, §2332(d)(6), substituted "collected as support" for "collected as child support".

Par. (16). Pub. L. 97–35, §2332(d)(7), substituted "support enforcement" for "child support enforcement", "whom support obligations" for "whom child support obligations", and "obligated to pay support" for "obligated to pay child support".

Par. (18). Pub. L. 97–35, §2331(b), added par. (18).

Par. (19). Pub. L. 97–35, §2333(b), added par. (19).

Par. (20). Pub. L. 97–35, §2335(a), added par. (20).

**1980**-Par. (16). Pub. L. 96–265 added par. (16).

Par. (17). Pub. L. 96–611 added par. (17).

**1977**-Pars. (14), (15). Pub. L. 95–30 added pars. (14) and (15).

**1975**-Par. (4)(A). Pub. L. 94–88, §208(b), substituted "to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so" for "to establish the paternity of such child".

Par. (4)(B). Pub. L. 94–88, §208(c), substituted "reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so)" for "reciprocal arrangements adopted with other States".

<div align="center">

STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 2018 AMENDMENT

</div>

Pub. L. 115–123, div. E, title XII, §53117(b), Feb. 9, 2018, 132 Stat. 307 , provided that:

"(1) IN GENERAL.-The amendments made by subsection (a) [amending this section] shall take effect on the 1st day of the 1st fiscal year that begins on or after the date of the enactment of this Act [Feb. 9, 2018], and shall apply to payments under part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) for calendar quarters beginning on or after such 1st day.

"(2) DELAY PERMITTED IF STATE LEGISLATION REQUIRED.-If the Secretary of Health and Human Services determines that State legislation (other than legislation appropriating funds) is required in order for a State plan developed pursuant to part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) to meet the requirements imposed by the amendment made by subsection (a), the plan shall not be regarded as failing to meet such requirements before the 1st day of the 1st calendar quarter beginning after the first regular session of the State legislature that begins after the date of the enactment of this Act. For purposes of the preceding sentence, if the State has a 2-year legislative session, each year of the session is deemed to be a separate regular session of the State legislature."

<div align="center">

### EFFECTIVE DATE OF 2008 AMENDMENT

</div>

Amendment of this section and repeal of Pub. L. 110–234 by Pub. L. 110–246 effective May 22, 2008, the date of enactment of Pub. L. 110–234, except as otherwise provided, see section 4 of Pub. L. 110–246, set out as an Effective Date note under section 8701 of Title 7, Agriculture.

Amendment by sections 4002(b)(1)(A), (B), (2)(V), and 4115(c)(2)(H) of Pub. L. 110–246 effective Oct. 1, 2008, see section 4407 of Pub. L. 110–246, set out as a note under section 1161 of Title 2, The Congress.

<div align="center">

### EFFECTIVE DATE OF 2006 AMENDMENT

</div>

Amendment by section 7301(b)(1)(C) of Pub. L. 109–171 effective Oct. 1, 2009, and applicable to payments under parts A and D of this subchapter for calendar quarters beginning on or after such date, subject to certain State options, see section 7301(e) of Pub. L. 109–171, set out as a note under section 608 of this title.

Amendment by section 7303(b) of Pub. L. 109–171 effective Oct. 1, 2006, see section 7303(c) of Pub. L. 109–171, set out as a note under section 652 of this title.

Pub. L. 109–171, title VII, §7310(c), Feb. 8, 2006, 120 Stat. 148 , provided that: "The amendments made by this section [amending this section and section 657 of this title] shall take effect on October 1, 2006."

## Effective Date of 1999 Amendment

Amendment by Pub. L. 106–169 effective as if included in the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 401(q) of Pub. L. 106–169, set out as a note under section 602 of this title.

## Effective Date of 1997 Amendment

Amendment by Pub. L. 105–33 effective as if included in the enactment of title III of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 5557 of Pub. L. 105–33, set out as a note under section 608 of this title.

## Effective Date of 1996 Amendment

Amendment by section 108(c)(11), (12) of Pub. L. 104–193 effective July 1, 1997, with transition rules relating to State options to accelerate such date, rules relating to claims, actions, and proceedings commenced before such date, rules relating to closing out of accounts for terminated or substantially modified programs and continuance in office of Assistant Secretary for Family Support, and provisions relating to termination of entitlement under AFDC program, see section 116 of Pub. L. 104–193, as amended, set out as an Effective Date note under section 601 of this title.

Amendment by section 302(b)(2) of Pub. L. 104–193 effective Aug. 22, 1996, see section 302(c)(2) of Pub. L. 104–193, set out as a note under section 657 of this title.

Pub. L. 104–193, title III, §303(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Pub. L. 104–193, title III, §304(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Amendment by section 312(a) of Pub. L. 104–193 effective Oct. 1, 1998, with limited exception for States which, as of Aug. 22, 1996, were processing the receipt of child support payments through local courts, see section 312(d) of Pub. L. 104–193, set out as an Effective Date note under section 654b of this title.

Amendment by section 342(a) of Pub. L. 104–193 effective with respect to calendar quarters beginning 12 months or more after Aug. 22, 1996, see section 342(c) of Pub. L. 104–193, set out as a note under section 652 of this title.

Amendment by section 370(a)(2) of Pub. L. 104–193 effective Oct. 1, 1997, see section 370(b) of Pub. L. 104–193, set out as a note under section 652 of this title.

Pub. L. 104–193, title III, §395(a)–(c), Aug. 22, 1996, 110 Stat. 2259 , provided that:

"(a) In General.-Except as otherwise specifically provided (but subject to subsections (b) and (c))-

"(1) the provisions of this title [see Tables for classification] requiring the enactment or amendment of State laws under section 466 of the Social Security Act [42 U.S.C. 666], or revision of State plans under section 454 of such Act [this section], shall be effective with

respect to periods beginning on and after October 1, 1996; and

"(2) all other provisions of this title shall become effective upon the date of the enactment of this Act [Aug. 22, 1996].

"(b) Grace Period for State Law Changes.-The provisions of this title shall become effective with respect to a State on the later of-

"(1) the date specified in this title, or

"(2) the effective date of laws enacted by the legislature of such State implementing such provisions,

but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2-year legislative session, each year of such session shall be deemed to be a separate regular session of the State legislature.

"(c) Grace Period for State Constitutional Amendment.-A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of-

"(1) 1 year after the effective date of the necessary State constitutional amendment; or

"(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]."

## Effective Date of 1988 Amendment

Pub. L. 100–485, title I, §104(b), Oct. 13, 1988, 102 Stat. 2348 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on the first day of the first calendar quarter which begins 4 or more years after the date of the enactment of this Act [Oct. 13, 1988]."

Pub. L. 100–485, title I, §111(f)(2), Oct. 13, 1988, 102 Stat. 2350 , provided that: "The amendments made by subsections (b) and (c) [amending this section and section 666 of this title] shall become effective on the first day of the first month beginning one year or more after the date of the enactment of this Act [Oct. 13, 1988]."

## Effective Date of 1987 Amendment

Pub. L. 100–203, title IX, §9141(b), Dec. 22, 1987, 101 Stat. 1330–321 , provided that: "The amendments made by subsection (a) [amending this section and section 657 of this title] shall become effective upon enactment [Dec. 22, 1987]."

Pub. L. 100–203, title IX, §9142(b), Dec. 22, 1987, 101 Stat. 1330–322 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective on July 1, 1988."

## Effective Date of 1984 Amendment

Pub. L. 98–378, §3(g), Aug. 16, 1984, 98 Stat. 1311 , provided that:

"(1) Except as provided in paragraphs (2) and (3), the amendments made by this section [enacting section 666 of this title and amending this section] shall become effective on October 1, 1985.

"(2) Section 454(21) of the Social Security Act [42 U.S.C. 654(21)] (as added by subsection (d) of this section), and section 466(e) of such Act [42 U.S.C. 666(e)] (as added by subsection (b) of this section), shall be effective with respect to support owed for any month beginning after the date of the enactment of this Act [Aug. 16, 1984].

"(3) In the case of a State with respect to which the Secretary of Health and Human Services

has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this section, the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the beginning of the fourth month beginning after the end of the first session of the State legislature which ends on or after October 1, 1985. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

Pub. L. 98–378, §5(c)(1), Aug. 16, 1984, 98 Stat. 1314 , provided that: "The amendments made by the preceding provisions of this section [amending this section and section 658 of this title] shall become effective on October 1, 1985."

Pub. L. 98–378, §6(c), Aug. 16, 1984, 98 Stat. 1315 , provided that: "The amendments made by this section [amending this section and section 655 of this title] shall apply with respect to quarters beginning on or after October 1, 1984."

Pub. L. 98–378, §11(e), Aug. 16, 1984, 98 Stat. 1318 , provided that: "The amendments made by this section [amending this section and sections 656, 657, 664, and 671 of this title] shall become effective October 1, 1984, and shall apply to collections made on or after that date."

Pub. L. 98–378, §12(c), Aug. 16, 1984, 98 Stat. 1319 , provided that: "The amendments made by this section [amending this section] shall become effective October 1, 1985."

Pub. L. 98–378, §14(b), Aug. 16, 1984, 98 Stat. 1320 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective October 1, 1985."

Amendment by section 21(d) of Pub. L. 98–378 applicable with respect to refunds payable under section 6402 of Title 26, Internal Revenue Code, after Dec. 31, 1985, see section 21(g) of Pub. L. 98–378, set out as a note under section 6103 of Title 26.

Amendment by Pub. L. 98–369 effective July 18, 1984, but not to be construed as changing or affecting any right, liability, status, or interpretation which existed (under the provisions of law involved) before that date, see section 2664(b) of Pub. L. 98–369, set out as a note under section 401 of this title.

### Effective Date of 1982 Amendment

Amendment by section 171(a), (b)(1) of Pub. L. 97–248 effective on and after Aug. 13, 1981, see section 171(c) of Pub. L. 97–248, set out as a note under section 503 of this title.

Pub. L. 97–248, title I, §173(b), Sept. 3, 1982, 96 Stat. 403 , provided that: "The amendment made by this section [amending this section] shall become effective on October 1, 1982."

### Effective Date of 1981 Amendment

Amendments by sections 2331(b), 2332(d)(2)–(7), and 2333(a), (b) of Pub. L. 97–35 effective Oct. 1, 1981, except as otherwise specifically provided, see section 2336 of Pub. L. 97–35, set out as a note under section 651 of this title.

Amendment by section 2335(a) of Pub. L. 97–35 effective Aug. 13, 1981, except that such amendment shall not be requirements under this section or section 503 of this title before Oct. 1, 1982, see section 2335(c) of Pub. L. 97–35, set out as a note under section 503 of this title.

### Effective Date of 1980 Amendment

Amendment by Pub. L. 96–265 effective July 1, 1981, and to be effective only with respect to expenditures, referred to in section 655(a)(3) of this title, made on or after such date, see section 405(e) of Pub. L. 96–265, set out as a note under section 652 of this title.

### EFFECTIVE DATE OF 1977 AMENDMENT

Pub. L. 95–30, title V, §502(b), May 23, 1977, 91 Stat. 162 , provided that: "The amendments made by this section [amending this section] shall take effect on the first day of the first calendar month which begins after the date of enactment of this Act [May 23, 1977]."

### EFFECTIVE DATE OF 1975 AMENDMENT

Pub. L. 94–88, title II, §210, Aug. 9, 1975, 89 Stat. 437 , provided that: "The amendments made by this title [amending this section and sections 602, 603, and 655 of this title and enacting provisions set out as notes under sections 602 and 655 of this title] shall, unless otherwise specified therein, become effective August 1, 1975."

### EXCEPTION TO GENERAL EFFECTIVE DATE FOR STATE PLANS REQUIRING STATE LAW AMENDMENTS

Pub. L. 109–171, title VII, §7311, Feb. 8, 2006, 120 Stat. 148 , provided that: "In the case of a State plan under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] which the Secretary determines requires State legislation in order for the plan to meet the additional requirements imposed by the amendments made by this subtitle [subtitle C (§§7301–7311) of title VII of Pub. L. 109–171, amending this section, sections 608, 652, 653, 655, 657, 664, and 666 of this title, section 6402 of Title 26, Internal Revenue Code, and provisions set out as a note under section 1169 of Title 29, Labor], the effective date of the amendments imposing the additional requirements shall be 3 months after the first day of the first calendar quarter beginning after the close of the first regular session of the State legislature that begins after the date of the enactment of this Act [Feb. 8, 2006]. For purposes of the preceding sentence, in the case of a State that has a 2-year legislative session, each year of the session shall be considered to be a separate regular session of the State legislature."

### STATE COMMISSIONS ON CHILD SUPPORT

Pub. L. 98–378, §15, Aug. 16, 1984, 98 Stat. 1320 , provided that:

"(a) As a condition of the State's eligibility for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] for quarters beginning more than 30 days after the date of the enactment of this Act [Aug. 16, 1984] and ending prior to October 1, 1985, the Governor of each State, on or before December 1, 1984, shall (subject to subsection (f)) appoint a State Commission on Child Support.

"(b) Each State Commission appointed under subsection (a) shall be composed of members appropriately representing all aspects of the child support system, including custodial and non-custodial parents, the agency or organizational unit administering the State's plan under part D of such title IV [42 U.S.C. 651 et seq.], the State judiciary, the executive and legislative branches of the State government, child welfare and social services agencies, and others.

"(c) It shall be the function of each State Commission to examine, investigate, and study the operation of the State's child support system for the primary purpose of determining the extent to which such system has been successful in securing support and parental involvement both for children who are eligible for aid under a State plan approved under part A of title IV of such Act [42 U.S.C. 601 et seq.] and for children who are not eligible for such aid, giving particular attention to such specific problems (among others) as visitation, the establishment of appropriate objective standards for support, the enforcement of interstate obligations, the availability, cost, and effectiveness of services both to children who are eligible for such aid and to children who are not, and the need for additional State or Federal legislation to obtain

support for all children.

"(d) Each Commission shall submit to the Governor of the State and make available to the public, no later than October 1, 1985, a full and complete report of its findings and recommendations resulting from the examination, investigation, and study under this section. The Governor shall transmit such report to the Secretary of Health and Human Services along with the Governor's comments thereon.

"(e) None of the costs incurred in the establishment and operation of a State Commission under this section, or incurred by such a Commission in carrying out its functions under subsections (c) and (d), shall be considered as expenditures qualifying for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] or be otherwise payable or reimbursable by the United States or any agency thereof.

"(f) If the Secretary determines, at the request of any State on the basis of information submitted by the State and such other information as may be available to the Secretary, that such State-

"(1) has placed in effect and is implementing objective standards for the determination and enforcement of child support obligations,

"(2) has established within the five years prior to the enactment of this Act [Aug. 16, 1984] a commission or council with substantially the same functions as the State Commissions provided for under this section, or

"(3) is making satisfactory progress toward fully effective child support enforcement and will continue to do so,

then such State shall not be required to establish a State Commission under this section and the preceding provisions of this section shall not apply."

### Delayed Effective Date in Cases Requiring State Legislation

Pub. L. 97–248, title I, §176, Sept. 3, 1982, 96 Stat. 403 , provided that: "In the case of a State with respect to which the Secretary of Health and Human Services has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this subtitle [subtitle E (§§171–176) of title I of Pub. L. 97–248, see Tables for classification], the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the end of the first session of the State legislature which begins after October 1, 1982, or which began prior to October 1, 1982, and remained in session for at least twenty-five calendar days after such date. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

[1] See References in Text note below.

Exhibit B

# Title 15
# Domestic Relations

## Chapter 5
## Divorce and Separation

### R.I. Gen. Laws § 15-5-16.5

**§ 15-5-16.5. Interest on arrearages.**

Interest at the rate of twelve percent (12%) per annum on any support debt due or owing, child or spousal support, shall be assessed unless the responsible party shall, for good cause shown, be relieved of the obligation to pay interest by the family court.

History of Section.
P.L. 1980, ch. 308, § 1; P.L. 1984, ch. 167, § 1; P.L. 2001, ch. 155, § 1.

Exhibit C

# Title 8
# Courts and Civil Procedure — Courts

## Chapter 10
## Family Court

### R.I. Gen. Laws § 8-10-3

**§ 8-10-3. Establishment of court — Jurisdiction — Seal — Oaths.**

**(a)** There is hereby established a family court, consisting of a chief judge and eleven (11) associate justices, to hear and determine all petitions for divorce from the bond of marriage and from bed and board; all motions for allowance, alimony, support and custody of children, allowance of counsel and witness fees, and other matters arising out of petitions and motions relative to real and personal property in aid thereof, including, but not limited to, partitions, accountings, receiverships, sequestration of assets, resulting and constructive trust, impressions of trust, and such other equitable matters arising out of the family relationship, wherein jurisdiction is acquired by the court by the filing of petitions for divorce, bed and board and separate maintenance; all motions for allowance for support and educational costs of children attending high school at the time of their eighteenth (18th) birthday and up to ninety (90) days after high school graduation, but in no case beyond their nineteenth (19th) birthday; enforcement of any order or decree granting alimony and/or child support, and/or custody and/or visitation of any court of competent jurisdiction of another state; modification of any order or decree granting alimony and/or custody and/or visitation of any court of competent jurisdiction of another state on the ground that there has been a change of circumstances; modification of any order or decree granting child support of any court of competent jurisdiction of another state provided: (1) the order has been registered in Rhode Island for the purposes of modification pursuant to § 15-23.1-611, or (2) Rhode Island issued the order and has continuing exclusive jurisdiction over the parties; antenuptial agreements, property settlement agreements and all other contracts between persons, who at the time of execution of the contracts, were husband and wife or planned to enter into that relationship; complaints for support of parents and children; those matters relating to delinquent, wayward, dependent, neglected, or children with disabilities who by reason of any disability requires special education or treatment and other related services; to hear and determine all petitions for guardianship of any child who has been placed in the care, custody, and control of the department for children, youth, and families pursuant to the provisions of chapter 1 of title 14 and chapter 11 of title 40; adoption of children under eighteen (18) years of age; change of names of children under the age of eighteen (18) years; paternity of children born out of wedlock and provision for the support and disposition of such children or their mothers; child marriages; those matters referred to the court in accordance with the provisions of § 14-1-28; those matters relating to adults who shall be involved with paternity of children born out of wedlock; responsibility for or contributing to the delinquency, waywardness, or neglect of children under sixteen (16) years of age; desertion, abandonment, or failure to provide subsistence for any children dependent upon such adults for support; neglect to send

any child to school as required by law; bastardy proceedings and custody to children in proceedings, whether or not supported by petitions for divorce or separate maintenance or for relief without commencement of divorce proceedings; and appeals of administrative decisions concerning setoff of income tax refunds for past due child support in accordance with §§ 44-30.1-5 and 40-6-21. The holding of real estate as tenants by the entirety shall not in and of itself preclude the family court from partitioning real estate so held for a period of six (6) months after the entry of final decree of divorce.

**(b)** The family court shall be a court of record and shall have a seal which shall contain such words and devices as the court shall adopt.

**(c)** The judges and clerk of the family court shall have power to administer oaths and affirmations.

**(d)** The family court shall have exclusive initial jurisdiction of all appeals from any administrative agency or board affecting or concerning children under the age of eighteen (18) years and appeals of administrative decisions concerning setoff of income tax refunds, lottery set offs, insurance intercept, and lien enforcement provisions for past due child support, in accordance with §§ 44-30.1-5 and 40-6-21, and appeals of administrative agency orders of the department of human services to withhold income under chapter 16 of title 15.

**(e)** The family court shall have jurisdiction over those civil matters relating to the enforcement of laws regulating child care providers and child placing agencies.

**(f)** The family court shall have exclusive jurisdiction of matters relating to the revocation or nonrenewal of a license of an obligor due to noncompliance with a court order of support, in accordance with chapter 11.1 of title 15.

[See § 12-1-15 of the General Laws.]

**(g)** Notwithstanding any general or public law to the contrary, the family court shall have jurisdiction over all protective orders provided pursuant to the Rhode Island general laws, when either party is a juvenile.

History of Section.
P.L. 1961, ch. 73, § 1; P.L. 1972, ch. 30, § 1; P.L. 1973, ch. 125, § 1; P.L. 1974, ch. 85, § 1; P.L. 1975, ch. 3, § 1; P.L. 1976, ch. 252, § 1; P.L. 1977, ch. 89, § 1; P.L. 1980, ch. 54, § 1; P.L. 1981, ch. 319, § 1; P.L. 1984, ch. 167, § 3; P.L. 1984, ch. 281, § 1; P.L. 1987, ch. 163, § 2; P.L. 1988, ch. 84, § 7; P.L. 1992, ch. 326, § 1; P.L. 1994, ch. 158, § 2, P.L. 1994, ch. 195, § 3; P.L. 1994, ch. 244, § 1; P.L. 1994, ch. 263, § 3; P.L. 1995, ch. 370, art. 29, § 10; P.L. 1995, ch. 374, § 10; P.L. 1996, ch. 129, § 1; P.L. 1996, ch. 131, § 1; P.L. 1996, ch. 132, § 1; P.L. 1996, ch. 133, § 1; P.L. 1997, ch. 170, § 23; P.L. 1999, ch. 83, § 6; P.L. 1999, ch. 130, § 6; P.L. 2007, ch. 73, art. 3, § 9; P.L. 2010, ch. 216, § 1; P.L. 2010, ch. 236, § 1.

Exhibit D

## SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

EXHIBIT E

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22    11:28         C A S E   T R A C K I N G      CSCL  ASMXA201
            TRAC.00                CASE HISTORY           U824  PROD
STARTING DATE   09 01 2021
SELECTION       COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (██████████████████). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-.____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BY NCP____
AS NCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:         SEGUIN      MARY       CMD: _____
FNX: TRAC  D CLIENT:        MEYERSIEK   GERO    K  PNL: _____
```

Case Number K20010521M
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10 13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

```
12/13/22   11:20        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY             U024  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED_____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSIDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES____

RL: 80  12 22 ABSP:        SEGUIN      MARY       CMD: _____
FNX: TRAC  D CLIENT:       MEYERSIEK   GERO    K  PHL:
```

Case Number: 23-1067
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

```
12/13/22   11:29         C A S E   T R A C K I N G        CSCL   ASMXA201
           TRAC.00              CASE HISTORY              U824   PROD
STARTING DATE  09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/03/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
     FROM CASE DATA PANEL_____

12/03/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT_____
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID: ████████
     FROM OFST PANEL_____

12/03/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:              SEGUIN      MARY         CMD: _____
FMX: TRAC  D CLIENT:             MEYERSIEK   GERO    X    PNL:
```

Filed 12/13/2023 Providence/Bristol County Family Court
Submitted: 9/21/2023 10:13 PM
Envelope: 4332704
Reviewer: Maria C.

11:29:53 Tuesday, December 13, 2022

| 12/13/22 | 11:29 | **C A S E   T R A C K I N G** | CSCL | ASMXA201 |
|---|---|---|---|---|
| | TRAC.00 | **CASE HISTORY** | U824 | PROD |

**STARTING DATE** 09 01 2021
**SELECTION** COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

| RL: 80  12 22 ABSP: | SEGUIN | MARY | | CMD: _____ |
|---|---|---|---|---|
| FXX: TRAC  D CLIENT: | MEYERSIEK | GERO | E | PNL: |

ed in Providence/Bristol County Family Court Document: 00118130681    Page: 800    Date Filed: 03/09/2024    Entry ID: 6638760
ibmitted 6/1/2023 10.13 PM
ivelope: 4132704
iviewer: Maria O
        11:29:09 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL   ASMXA201
            TRAC.00              CASE HISTORY             UB24   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN___
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS___
ED TO BE $6028.75._____

RL: 80  12 22 ABSP:            SEGUIN       MARY            CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK    GERO     K      PNL:
```

Case Number: 2001682M   Document: 00118120601   Page: 802   Date Filed: 04/09/2024   Entry ID: 6638760
Filed in Providence/Bristol County Family Court
Submitted: 5/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maya 11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28          C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00             CASE HISTORY                U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75.

```
RL: 80  12 22 ABSP:          SEGUIN        MARY          CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK     GERO      K   PNL:
```

Case Number: K20010524M     Document: 00118130881     Page: 813     Date Filed: 03/29/2024     Entry ID: 6638760
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

```
12/13/22   11:28          C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00             CASE HISTORY                UB24  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

RL: 80  12 22 ABSP:          SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO     K    PNL:
```

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22   11:28      C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00           CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

```
RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:           SEGUIN      MARY        CMD: _____
                               MEYERSIEK   GERO    K   PNL:
```

EXHIBIT F

STATE OF RHODE ISLAND                    FAMILY COURT

PROVIDENCE, SC                           FAMILY COURT NO. K01-521M

State of Rhode Island ex rel.
GERO K MEYERSIEK

   vs

MARY SEGUIN

## JUDGMENT / ORDER

This matter came for hearing on September 25, 2012 before Justice
JOHN E. MCCANN upon the Private Motion for Custody, Support & Atty
Fees filed by the Plaintiff and after hearing thereon, it is hereby:

### ORDERED, ADJUDGED, AND DECREED

   1) That this matter is continued to November 13, 2012 for
hearing on private issues only with all subpoenas to remain in full
force and effect.

   2) The Defendant filed a private Motion for Visitation.

   3) The court enters order relative to private issues of
visitation, attorney fees and other numerous private issues.

   4) The State's oral request to clarify whether or not interest
was to run on the child support and medical arrears as found in the
May 24, 2012 court order is addressed. Interest will continue to run
on the money due.

   5) If there is an arrears when the youngest child is
emancipated - the child support order, medical order and arrears
order will be added together and applied towards the arrears until it
is paid in full.

   6) Pursuant to Federal Law, either party has a right to request

398



a review and modification of their child support order by filing a
motion with Family Court.  State law requires both parties to notify
the child support agency within ten (10) days of any address change
or change of employment.

Presented by: _____

        PRISCILLA B. GLUCKSMAN ESQUIRE    Bar No.: 5701
        Legal Counsel - Office of Child Support Services

## CERTIFICATION

I hereby certify that on October 8, 2012 I delivered by mail a copy
of the within order to THOMAS R. DESIMONE ESQUIRE, 735 SMITH STREET
PROVIDENCE RI 02908.

I hereby certify that on October 8, 2012 I delivered by mail a copy
of the within order to MARY SEGUIN,

I hereby certify that on October 8, 2012 I delivered by mail a copy
of the within order to GERO A. MEYERSIEK,

I hereby certify that on October 8, 2012 I delivered by mail a copy
of the within order to BARBARA E. GRADY ESQUIRE, 975 SMITH STREET
PROVIDENCE RI 02908.

RECEIVED

OCT 15 2012

R.I. FAMILY COURT
RONALD J. PAGLIARINI
ADMINISTRATOR / CLERK

ENTERED  10-23-12

ADMINISTRATOR/CLERK

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                            FAMILY COURT

| | | |
|---|---|---|
| State of Rhode Island ex rel. | : | |
| GERO MEYERSIEK | : | |
| *Plaintiff* | : | |
| | : | |
| VS. | : | DOCKET NO: K20010521M |
| | : | Title IV Part D Case under |
| | : | 42 U.S.C. §§ 651-669 |
| MARY SEGUIN | : | |
| *Defendant* | : | |

## DEFENDANT'S MOTION TO COMPEL RI EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVICES ("EOHHS") COMPLIANCE WITH SUBPOENA

The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby moves to compel compliance with Defendant's Subpoena (attached hereto as **Exhibit A**) served upon the **Rhode Island Executive Office of Health and Human Services ("RI EOHHS")**.  On March 26, 2024, RI EOHHS filed a motion to quash subpoena.

## I.     Defendant Does NOT Compel Production of or Testimony on Deliberations of November 29, 2022 Agency Dismissal That Cites Loss of Jurisdiction Which Speaks for Itself

The Title IV records for Rhode Island Executive Office of Health and Human Services ("RI EOHHS") show that in the RI EOHHS **Appeal case Docket# 22-2116** a hearing was scheduled for December 1, 2022.   However no hearing or trial took place on December 1, 2022.  Emphatically, a hearing never took place in that matter.

As the RI EOHHS November 29, 2022 decision dismissing the Defendant-initiated appeals case for lack of jurisdiction clearly states, upon the Office of Child Support Service's withdrawal of the enforcement instrument Notice of Lien on October 14, 2022, the RI EOHHS determined it lost jurisdiction over the matter before any hearing was conducted and before the December 1, 2022 scheduled hearing that never took place as a result of the dismissal based on its determination of loss of jurisdiction. The decision regarding loss of jurisdiction speaks for itself.  The subpoena clearly does not seek production of documents relating to the November 29, 2022 Agency decision relating to loss of jurisdiction.

The subpoena seeks production and testimony relating to the facts evidenced in the Rhode Island Office of Child Support produced PUBLIC RECORDS TRAC records that RI EOHHS in its supervisory capacity over Department of Human Services and Office of Child Support Serviced caused to be produced in response to Defendant's APRA Request for public records filed with RI EOHHS on December 1, 2022.

I. **Title IV-D Records and Facts relating to Public Records Produced by RI EOHHS's Response to Defendant's APRA (Rhode Island Access to Public Records) Record Request are Obviously Open to the Public and Obviously Not Privileged**

Subsequent to the aforesaid RI EOHHS issuance of its November 29, 2022 decision citing loss of jurisdiction, TEXAS Defendant MARY SEGUIN filed a Rhode Island Access to Public Records Act ("APRA") request for Defendant's Title IV case records on December 1, 2022 emailed to then Acting Secretary Ana Novais of RI EOHHS.

On December 16, 2022, Ms. Lisa Martinelli, Esq., Chief Legal Counsel for RI EOHHS sent an APRA response letter to TEXAS Defendant MARY SEGUIN informing the Defendant that public records are being produced.  However TEXAS Defendant's Title IV records are maintained, Rhode Island Executive Office of Health and Human Services by and through its Chief Legal Counsel Ms. Lisa Martinelli confirmed its own oversight over Department of Human Services (and Office of Child Support Services) as a Title IV Agency.  See **Exhibit B**.  Letter from Ms. Lisa Martinelli.

On December 22, 2022 Rhode Island Department of Human Services and Rhode Island Office of Child Support Services produced under Rhode Island's Access to Public Records ("APRA")  public records of Defendant's Title IV-D case TRAC records that show the taking off from the 42 U.S.C. sec. 654a automated data processing system Rhode Island's 12% compound interest when Rhode Island Office of Child Support Services prior to Rhode Island sending to and certifying to TEXAS under 42 U.S.C. sec. 666(14).  APRA Public Records TRAC records attached **Exhibit C**.

This APRA-produced TRAC records are not only Public records in Rhode Island, they also consist of Public Records in TEXAS and consist of Public Records of the United States of America.

As such, there is nothing privileged about Rhode Island EOHHS's first-hand knowledge of the public records being maintained by the Rhode Island Office of Child Support Services under the Rhode Island Department of Human Services all of which the Rhode Island EOHHS oversees and exercises supervisory responsibility and control under 42 U.S.C. sections 651-669.

**II.    APRA Public Records Show RI EOHHS and Ms. Lisa Martinelli has First Hand Knowledge or Should Have First Hand Knowledge of Facts Documented in the RI EOHHS Produced APRA Public Records Relating to the Rhode Island Office of Child Support Services Practice of Taking Interest Amounts off from the 42 U.S.C. sec. 654a automated data processing system when certifying to TEXAS under 42 U.S.C. sec. 666(14) in 2018, and Putting An Ever-Changing Interest Amount Back on the 42 U.S.C. sec. 654a automated system**

The APRA Public Records produced pursuant to Defendant's December 1, 2022 APRA Record Request show that RI EOHHS, Chief Counsel Ms. Debra Barclay, and Chief Counsel Ms. Lisa Martinelli (and Chief Counsel Ms. Jennifer Buckley) have First Hand Knowledge or Should Have First Hand Knowledge of Facts Documented in the RI EOHHS-Produced APRA Public Records Relating to the Rhode Island Office of Child Support Services' Practice of Taking Interest Amounts off from the 42 U.S.C. sec. 654a automated data processing system when certifying to other states, and in Defendant's case, when certifying to TEXAS under 42 U.S.C. sec. 666(14) in 2018, and Putting back the Ever-Changing Interest Amount Back on the 42 U.S.C. sec. 654a automated system in the amount of tens of thousands of dollars.  Office of Child Support Service's taking the interest amount off the automated system and putting the interest back on the automated system is so public and routine that they not only form part of transcripts of public hearings in this Title IV proceeding, they also form the basis of written public court orders entered in this Title IV case from February 10, 2023 to the present.

**A RI EOHHS Officer testifying** to the RI EOHHS's First Hand Knowledge and testifying to Whether the RI EOHHS Knew Or Should Have Known that the Rhode Island Office of Child Support Services routinely certifies and submits child support

records that entails the removals or adding back on to the system tens of thousands of dollars in interest amounts that are documented in the APRA public records produced on December 22, 2022, which **corroborate** with all the information, materials, evidence, filings and facts presented during the course of the RI EOHHS Appeal Docket# 22-2116 in which NO FORMAL HEARING ever took place, simply and straightforwardly **complies with DUE PROCESS** requirements prescribed by 42 U.S.C. sec. 666 that 42 U.S.C. sec. 654(20) requires as a condition of Rhode Island's participating in Title IV-D and as a condition of receiving Title IV-A TANF federal funding.

### III.   Statutory and Federal Authority

In order to avoid yet another penalty-incurring violation of 42 U.S.C. sec. 654, the RI EOHHS and Ms. Debra DeStefano must produce subpoenaed information and testify to facts and any and all first-hand knowledge of the APRA public records that RI EOHHS caused to be produced relating to Rhode Island Office of Child Support Service's Practice of taking tens of thousands of dollars of alleged interest amounts off the 42 U.S.C. sec. 654a automated data processing system when certifying and sending to TEXAS under 42 U.S.C. sec. 666(14) documented in the TRAC records in Defendant's Title IV-D case.

Congress prescribed both civil and criminal penalties for violations.  Consistent with its Spending Power, Congress has the authority to attach conditions on the receipt of federal funds. *See **South Dakota v. Dole**, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a

condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16), (20), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See **Sullivan v. Stroop***, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."   The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." ***Hodges v. Shalala***, 121 F.2d at 879.  Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1]   Congress also enacted several criminal codes

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
    Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the

punishing actors, such as the Plaintiffs, who commit federal crimes, including cover up of unlawful activities.

The federal government has a longstanding involvement in child support enforcement programs. See ***Hodges v. Shalala***, 121 F.Supp.2d 854 (D.S.C. 2000). As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements under 42 U.S.C. sec. 654(21)(A) that the State, at the option of the State, impose a late payment fee ('interest") on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A), among others

While Rhode Island submits to the United States that it has a federally certifiable statewide automated data processing system for child support, RI EOHHS caused Office of Child Support Services to produce APRA Public Records consisting of Title IV Public Records showing Rhode Island taking off from the automated data processing system tens of thousands of dollars allegedly representing the 42 U.S.C. sec. 654(21)(A)

---

automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

prohibited 12% compound interest late payment fee "interest" prior to certifying to TEXAS and the United States, and showing Rhode Island falsely certified to the amount's accuracy under 42 U.S.C. sec. 666(14) when in fact Rhode Island removed significant tens of thousands of dollars (See TRAC records in Exhibit C).

RI EOHHS is being called as a witness in this Title IV hearing matter to testify to the facts, furthermore in its supervisory capacity, relating to the APRA records RI EOHHS caused to be produced, and Ms. Debra DeStefano to testify, among others, her first-hand knowledge of said facts relating to Office of Child Support Services taking off the 42 U.S.C. sec. 654(21)(A) interest from the automated data processing system and then putting it back on the system that is corroborated by the APRA Public Records produced as a result of RI EOHHS's response to TEXAS Defendant's RI APRA public records request.

Defendant reiterates that failure to furnish information regarding the State Plan's and the SDU's Title IV-D operations relating to the tens of thousands of dollars removed from the automated system prior to certifying to Texas and the United States and then put back on the system tens of thousands of dollars shown in Defendant's case file public records is penalty incurring and shows the state plan fails to meet all requirements under 42 U.S.C. sec. 654.  Without an approved state plan, a State may lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). See 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2). Alternatively, a State may opt for an alternative penalty in lieu of disapproval of their state plan and the withholding of federal funds if the State is making a good faith effort to comply with the

program's requirements and the State has submitted a corrective compliance plan. See 42 U.S.C. § 655(a)(4).

The Title IV-D statute expressly provides that compliance with ALL 42 U.S.C. 654 requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A.

The clear and unequivocal statement of the required conditions in the statute enabled South Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop,* 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."

Emphatically, Congress may use its **Spending Power** to **influence** a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, but Congress, under the **Commerce Clause**, **may offer the States a choice of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc*.,** 452 U.S. 264, 288 (1981). It is crystal clear that upon Rhode Island's State Plan entering into agreement with the United States, Rhode Island accepted the agreement terms of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S. 264, 288 (1981).

Defendant filed a Motion to Dismiss Interest Arrears on February 4, 2024 and Defendant's Motion is scheduled on the Court's calendar to be heard on March 28, 2024.  For the hearing, the Defendant served the attached Subpoena, attached hereto as Exhibit A, upon the witness RI EOHHS, the entity that further supervises the Rhode Island Office of Child Support Services, both acting and designated as the State agency under the State Plan pursuant to **42 U.S.C. § 654.** *See* United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUS C-prelim-title42-

section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHHJlZ3VsYXRp

b25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

### V. RI EOHHS Has Access to and Has Supervisory Access to Pursuant Its Supervisory Control of Rhode Island Office of Child Support Services, Title IV-D records related to Defendant Mary Seguin

Defendant subpoenaed "(1) All records relating to Administrative Appeal Docket # 22-2116 CSE ID: 1689817, including notes taken, messages generated and received through Microsoft teams meeting at the pre-hearing conference call with Appellant Mary Seguin and John Langlois of Rhode Island Office of Chiild Support Services on October 5, 2022; (2) All records relating to Mary Seguin."

*See* attached **subpoena**, **Exhibit A**.

The RI EOHHS has pursuant to its supervisory control access to records of Rhode Island Office of Child Support Services' actions in this Title IV-D case's proceedings since 2010 evidence by the entries of orders in this matter prepared and submitted in her official and individual capacities, Priscilla Glucksman – they make clear the Office of

Child Support Services is one of the State Plan's key "organizational unit which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan" under **42 U.S.C. § 654(3), and the RI EOHHS has supervisory responsibility over Office of Child Support Services, and is a 42 U.S.C. § 654(3) entity itself and is further a 42 U.S.C. § 654(1) entity in which all requirements of 42 U.S.C. § 654 must be in effect.**

**Rhode Island EOHHS' refusal** *to comply with the Subpoena to produce Title IV-D records relating to the above to the requesting noncustodial parent is a prima facie* **42 U.S.C. § 654b violation that incurs penalties** in this **fiscal year under 42 U.S.C. § 655(a)(5) as well as 42 U.S.C. § 655(a)(4), and represents complicit cover-up,** which penalty-incurring violations the Defendant had reported, is reporting and will continue to report to relevant law enforcement authorities at the federal and state levels. (Judicial notice is respectfully requested that the Defendant in January 2023 reported Office of Child Support's violations to the Rhode Island Office of Attorney General that is further directed by the December 16, 2022 Letter sent by Ms. Lisa Martinelli, Esq., Chief Counsel of RI EOHHS, who instead of enforcing the requirements of the State Plan as the Attorney General is similarly a political subdivision under 42 USC 654(1), opted to reinforce, aid, shield and protect Rhode Island political subdivisions' unlawful activities – this is reported to United States authorities). As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements that the State

may only uniformly charge 3-6% simple interest on overdue support, *see* 42 U.S.C. §

654(21)(A), and a State must establish and operate an automated data processing and

information retrieval system **without** taking computer calculated amounts off and then

put other numbers back on the system or hardcoding/inputting new numbers computed

offline onto the system, see 42 U.S.C. § 654(24), and the State **must** have a state child

support disbursement unit (SDU) that complies with all the requirements of 42 U.S.C. §

654, 42 U.S.C. § 654a, 42 U.S.C. § 654b, *see* 42 U.S.C. § 654(27)(A).  Rhode Island

deliberately fails to meet all the requirements, including continuously inputting 12%

compound interest on overdue support and the Rhode Island Office of Child Support

Services covers up their noncompliance with accounting fraud inputting into the system

and taking off from the automated data processing system amounts that are inflated,

unlawful, and submitting false books of accounts that  removed the unlawful inflated

amounts to the Federal authorities to make it look like Rhode Island is in compliance so

as to procure federal funding for which Rhode Island is ineligible.

The deliberate fraud makes clear the State operates an unlawful plan, in fact a

criminally unlawful plan, and does not have an approved state plan under Title IV-D of

the Social Security Act, 42 U.S.C. §§ 651-669, and should lose and disgorge unlawfully

procured federal funding under both Title IV-D (child support enforcement) and Title

IV-A (TANF). *See* 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).  *See*, *Hodges v.

Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert.

denied, 540 U.S. 811 (2003).

**Any attempt interfering with the Defendant's reporting, pursuant to**

**18 U.S.C. § 4, to law enforcement authorities the commission of crimes by**

**political subdivisions of the State within this Title IV-D proceeding is**

**unenforceable.** Any and all failures to comply with 18 U.S.C. § 4 constitutes

misprision of a felony.

## A. VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Defendant made

known to the panel of judges of the United States allegations contained in the Amended

Complaint filed in Federal Court of the commission of acts by the Rhode Island political

subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein

in this motion, the afore-described acts violating 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C.

§13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18

U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. §

241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18

U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C.

§1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C.

§1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C.

§1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18

U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968  – such violative acts by the Plaintiffs in

this matter, along with the political subdivisions and employees thereof named in the

federal matter on this list are not exhaustive.  It is undisputable, among others, that

Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-

D and Title IV-A disgorgement is due from the applicable State of Rhode Island's

political subdivisions.

## B. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF AMERICA v. DONALD J. TRUMP*, DC Circuit, the DC Circuit United States Court of Appeals reminds the Public and all applicable tribunals that Judges are similarly liable to the criminal laws for their official acts. A notable example is *Ex parte Commonwealth of Virginia*, in which the Supreme Court affirmed the criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for violating a federal statute that prohibited discriminating on the basis of race in jury selection. *Id.* at 340, 344. The Supreme Court began by observing the principle that officers are bound to follow the law: "We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the holder from obligation to obey the Constitution of the United States, or take away the power of Congress to punish his disobedience." *Id.* at 348. The Court then addressed the judge's argument that the Court lacked the authority to punish a state judge for "his official acts." *Id.* Its response was twofold. First, the Court described juror selection as "merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads." *Id.* The Court then explained that even if juror selection is considered a "judicial act," the judge had a legal duty to obey the criminal laws:

> "But if the selection of jurors could be considered
> in any case a judicial act, can the act charged
> against the petitioner be considered such when
> he acted outside of his authority and in direct
> violation of the spirit of the State statute? That
> statute gave him no authority, when selecting

jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

*[W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation of constitutional rights. On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize*

> *criminal conduct proscribed by an Act of*
> *Congress . . . .'*

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See* also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493

F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled

on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not

immune, and employees of the political subdivisions of Rhode Island under 42 USC

654(1) similarly are not immune.  Barbara Grady and Gero Meyersiek are

unquestionably liable.

## I.    CONCLUSION

**Under 42 USC 654b, the Defendant is entitled to be furnished all subpoenaed records – conversely, the Rhode Island Executive Office of Health and Human Services, the SDU under the State's Plan under 42 USC 654, must furnish all subpoenaed information and RI EOHHS Hearing Officer must testify to first-hand knowledge of information related to factual information furnished by Rhode Island Office of Child Support Services that are corroborated by the Title IV-D public records RI EOHHS caused to be produced in response to Defendant's RI APRA public records request – refusal of which incurs yet another penalty.**

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or

designee-Judge Merola of this Honorable Court to:

1. Grant the Defendant's Motion to Compel.

2. Grant the Defendant's request for any and all records relating to her Title IV record information that includes record information relating to the "TRAC notes of 12/6/2021 and 12/7/2021" that records taking interest off the system when sending to Texas then REDACTION, as well as relating to the substance of John Langlois's audio recorded October 5, 2022 statements regarding "what happened in this case" that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the Child Support Services that Gero Meyersiek

said yes, he "agreed to waive the $73k or $75k that are in arrears" as of

December 6, 2021 and October 5, 2022 which are part of Defendant's child

support case file.

3. Declare that Defendant's child support record file maintained by the Rhode

   Island Office of Child Support Services that by law codified in Title IV-D

   Program of the Social Security Act must be produced to the Defendant

   Noncustodial Parent upon request.

4. Declare that Defendant's child support file maintained by the Rhode Island

   Office of Child Support Services under the supervision of RI EOHHS must be

   produced to the Defendant Noncustodial Parent upon request.

5. Order a hearing on the herein issues raised in this matter.

6. Listen to and admit into evidence the audio recording of John Langlois of

   Office of Child Support Services here:

   https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-
   hBMaEg9/view?usp=sharing

7. Order testimony and document production by Ms. Jennifer Lynch Buckley

   who replaced Ms. Lisa Martinelli as they relate to RI EOHHS Agency's APRA

   public records production in response to Defendant's December 1, 2022

   APRA request sent to RI EOHHS requesting Defendant's Title IV records.

8. For further relief as the Court deems reasonable and fair under the

   circumstances.

Respectfully submitted,

March 26, 2024

FOR DEFENDANT

MARY SEGUIN, Pro Se.

By: _____ *Mary Seguin* _____
Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

**NOTICE OF HEARING**

Please take notice that the foregoing Motion will be called for hearing before the Rhode Island Family Court, One Dorrance Plaza, Providence, RI 02903 at 10:00 AM on March 28, 2024 (case is already scheduled for that date/time) by WebEx hearing https://ricourts.webex.com/meet/garrahy5F

**CERTIFICATION**

I hereby certify that a copy of the within Motion was filed on March 26, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov, Jennifer.buckley@ohhs.ri.gov and dhs.courtfile@dhs.ri.gov

*Mary Seguin*

Exhibit A



# STATE OF RHODE ISLAND

## FAMILY COURT

### SUBPOENA - CIVIL

| Plaintiff STATE OF RHODE ISLAND EX REL. GERO MEYERSIEK | Civil Action File Number K2001 - 0521M |
|---|---|
| Defendant MARY SEGUIN | |

| ☐ Murray Judicial Complex<br>Newport County<br>45 Washington Square<br>Newport, Rhode Island 02840-2913<br>*(401) 841-8340 | ☐ Noel Judicial Complex<br>Kent County<br>222 Quaker Lane<br>Warwick, Rhode Island 02886-0107<br>*(401) 822-6725 |
|---|---|
| ☐ McGrath Judicial Complex<br>Washington County<br>4800 Tower Hill Road<br>Wakefield, Rhode Island 02879-2239<br>*(401) 782-4111 | ☑ Garrahy Judicial Complex<br>Providence/Bristol County<br>One Dorrance Plaza<br>Providence, Rhode Island 02903-2719<br>*(401) 458-3200 |

TO: DEBRA DESTEFANO
of RHODE ISLAND EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVICES APPEALS OFFICE 3 WEST RD.

☑ **YOU ARE HEREBY COMMANDED** to appear in the Family Court listed above at the CRANSTON, date, time, and courtroom specified below to testify in the above-entitled case and bring with RI 02920 you:

(1) ALL RECORDS RELATING TO ADMINISTRATIVE APPEAL DOCKET #22-2116
CSE ID: 1689817, INCLUDING NOTES TAKEN MESSAGES GENERATED
AND RECEIVED THROUGH MICROSOFT TEAMS MEETING AT THE PRE-HEARING
CONFERENCE CALL WITH APPELLANT MARY SEGUIN AND JOHN LANGLOIS OF
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICE ON OCTOBER 5, 2022
(2) ALL RECORDS RELATING TO MARY SEGUIN

TRUE COPY ATTEST
DEPUTY SHERIFF #IL

| Courtroom | Date | Time |
|---|---|---|
| GARRAHY COURTROOM 5F | MARCH 28, 2024 | 9:30 AM |

If you need language assistance, please contact the Office of Court Interpreters at (401) 222-8710 or by email at interpreterfeedback@courts.ri.gov before your court appearance.

* If an accommodation for a disability is necessary, please contact the Family Court Clerk's Office at the telephone number listed above as soon as possible. TTY users can contact the District Court through Rhode Island Relay at 7-1-1 or 1-800-745-5555 (TTY) to voice number.

Page 1 of 2

FC-73 (revised June 2020)



# STATE OF RHODE ISLAND

# FAMILY COURT

☐ **YOU ARE HEREBY COMMANDED** to appear at the location, date, and time specified below to testify at the taking of a deposition in the above-entitled case.

| Location of Deposition | Date | Time |
|---|---|---|
|  |  |  |

☑ **YOU ARE HEREBY COMMANDED** to produce and permit inspection and copying of the following documents or objects at location, date, and time specified below (list documents or objects):

_SEE ITEMIZED ① AND ② ON PAGE 1 OF THIS SUBPOENA - BRING / PRODUCE_
_ALL RECORDS FOR INSPECTION AND COPYING AND EMAIL TO MARYSEGUIN22022@GMAIL.COM_

| Location | Date | Time |
|---|---|---|
| GARRAHY COURTROOM 5F | MARCH 28, 2024 | 9:30 AM |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf and may set forth, for each person designated, the matters on which the person will testify (R.Dom.Rel.P. 30(b)(6)).

Failure to comply with this Subpoena may result in a finding of contempt under R.Dom.Rel.P. 45 or the imposition of sanctions under R.Dom.Rel.P. 37.

| /s/ | Rhode Island Bar Number: |
|---|---|
| Attorney for the ☐ Plaintiff ☐ Defendant or the ☐ Plaintiff ☐ Defendant | Date: |
| Telephone Number: | |

| Issued by ☐ Clerk, ☑ Notary, or ☐ Issuing Official pursuant to G.L. 1956 § 9-17-3 | Date: 3/4/2024 |
|---|---|

/s/
_____
Clerk

_Cassandra Dominguez_
Name of Notary

_Cassandra Dominguez CL Quirg_
Signature of Notary

Notary commission expires: **01-13-2026**    Notary identification number: **133533272**

CASSANDRA DOMINGUEZ
Notary Public, State of Texas
Comm. Expires 01-13-2026
Notary ID 133533272

_____
Name of Issuing Official

_____
Signature of Issuing Official

Page 2 of 2

FC-73 (revised June 2020)



# STATE OF RHODE ISLAND

## FAMILY COURT

| Plaintiff *STATE OF RHODE ISLAND EX. REL. GERO MEYERSIEK* | Civil Action File Number *K2001-0521M* |
| --- | --- |
| **Defendant** *MARY SEGUIN* | |

### PROOF OF SERVICE

☑ I hereby certify that on the date below I served a copy of this Subpoena on

_____ personally.

☐ I hereby certify that I was unable to make service after the following reasonable attempts:

_____

SERVICE DATE: __*3*__ / __*15*__ / __*24*__          SERVICE FEE $ _____
                      Month   Day   Year

Signature of SHERIFF or DEPUTY SHERIFF or CONSTABLE

*Russell D Emley #142*

SIGNATURE OF PERSON OTHER THAN A SHERIFF or DEPUTY SHERIFF or CONSTABLE MUST BE NOTARIZED.

_____

 Signature

State of _____

County of _____

  On this _____ day of _____, 20____, before me, the undersigned notary public, personally appeared _____
☐ personally known to the notary or ☐ proved to the notary through satisfactory evidence of identification, which was _____, to be the person who signed above in my presence, and who swore or affirmed to the notary that the contents of the document are truthful to the best of his or her knowledge.

            Notary Public: _____
            My commission expires: _____
            Notary identification number: _____

FC-73 (revised June 2020)

Exhibit B



Rhode Island Executive Office of Health and Human Services
Legal Office, Three West Road, Virks Building, 4th Floor, Cranston, RI 02920
phone: 401.462.2326   fax: 401.462.1678

December 16, 2022

**VIA EMAIL and US Mail:** marylive22022@gmail.com

Ms. Mary Seguin
2303 Elmen Street
Houston, TX 77019

**Re:  Response to Correspondence dated December 1, 2022**

Dear Ms. Seguin:

I am responding on behalf of Secretary Novais to your correspondence of December 1, 2022.  It is my understanding that you have been seeking records related to a matter pending with the Office of Child Support Services (OCSS).  I have contacted OCSS Chief Legal Counsel Attorney Paul Gould and he assured me that records relating to your file will be forwarded to you in the next couple of days.  Attorney Gould is copied on this correspondence.

In reply to your correspondence/petition of December 1, 2022, the Executive Office of Health and Human Services (EOHHS) and its Appeals Office do not have any documents responsive to your request regarding your file with OCSS.   You may not be aware that the OCSS is part of the Rhode Island Department of Human Services (DHS) and file documents are not commingled between agencies.   This response is solely on behalf of EOHHS and not any other agency or branch of state government.  Further, the Appeals Office never received any documents from your file from the OCSS when the appeal was pending.  When DHS OCSS withdrew the adverse action (the Notice of Lien), which gave rise to your appeal, there was no longer an underlying case for the Appeals Office to adjudicate, and the appeal was dismissed for lack of jurisdiction. (See attached Final Notice of Dismissal and Order).

If you are seeking an appeal of an Access to Public Records request, that action is governed by R.I. Gen. Laws § 38-2-8 and is answered by the Chief Administrative Officer for the agency that has custody of the requested records.   The Chief Administrative Officer for the DHS OCSS is the Director of the Rhode Island Department of Human Services, Acting Director Kimberly Brito or you may elect to directly appeal a decision to the Rhode Island Office of the Attorney General, 150 South Main Street, Providence, RI 02903.

Very truly yours,

*Lisa M. Martinelli*

Lisa M. Martinelli, Esq.
Executive Legal Counsel

cc:  Deb Barclay, Esq., Paul Gould, Esq.

Exhibit C

11:28:47 Tuesday, December 13, 2022

| 12/13/22 | 11:28 | C A S E    T R A C K I N G | CSCL | ASMXA201 |
| | TRAC.00 | CASE HISTORY | U824 | PROD |

**STARTING DATE** 09 01 2021
**SELECTION** COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-.____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

| RL: 80  12 22 ABSP: | SEGUIN | MARY | | CMD: _____ |
| FNX: TRAC  D CLIENT: | MEYERSIEK | GERO | K | PNL: |

Case Number K2001032104
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

```
12/13/22   11:20        C A S E   T R A C K I N G       CSCL  ASMXA201
           TRAC.00          CASE HISTORY                U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSIDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES___

RL: 80  12 22 ABSP:          SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K    PNL:
```

Case 23-1867   Document: 00118120681   Page: 847   Date Filed: 03/29/2024   Entry ID: 6638760
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

12/13/22   11:29        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE  09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
      FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
      FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: 80  12 22 ABSP:              SEGUIN      MARY       CMD: _____
FWX: TRAC  D CLIENT:             MEYERSIEK   GERO    X  PNL:

Case Number: 2021-0874   Document: 00118130881   Page: 848   Date Filed: 04/09/2024   Entry ID: 6638760
Filed 1/2 Providence/Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria G.

11:29:05 Tuesday, December 13, 2022

```
12/13/22   11:29        C A S E   T R A C K I N G        CSCL  ASMXA201
                TRAC.00             CASE HISTORY         U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

```
RL: 80  12 22 ABSP:          SEGUIN      MARY       CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K  PNL:
```

ed in Providence/Bristol County Family Court
ibmitted 6/1/2023 10.13 PM
ivelope: 4132704
iviewer: Maria O

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00            CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

```
RL: 80  12 22 ABSP:          SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K    PNL:
```

Case Number: 22000681M   Document: 00118120681   Page: 850   Date Filed: 03/09/2024   Entry ID: 6632760

Filed in Providence/Bristol County Family Court
Submitted: 5/1/2023 10:13 PM
Envelope: 4132704
Reviewed: Mary
11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28          C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00                CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR. RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
    TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
    58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

```
RL: 80  12 22 ABSP:            SEGUIN       MARY           CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK    GERO      K    PNL:
```

11:29:13 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00             CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

RL: 80  12 22 ABSP:           SEGUIN        MARY         CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK     GERO    K    PNL:
```

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00               CASE HISTORY            U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS_____
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN_____
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL_____
NOTICE NCP VIA MAIL AT THE TEN DAY MARK_____

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA_____
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP_____

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT_____
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM_____
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)_____
CLAIM NUMBER: TX027985_____

RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:          SEGUIN      MARY         CMD: _____
                             MEYERSIEK   GERO    K    PNL:
```

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                  FAMILY COURT

| | | |
|---|---|---|
| State of Rhode Island ex rel. | : | |
| GERO MEYERSIEK | : | |
| *Plaintiff* | : | |
| | : | |
| VS. | : | DOCKET NO: K20010521M |
| | : | Title IV Part D Case under |
| | : | 42 U.S.C. §§ 651-669 |
| MARY SEGUIN | : | |
| *Defendant* | : | |

## DEFENDANT'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENA

The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby moves to compel compliance with Defendant's Subpoena (attached hereto as **Exhibit A**) served upon the Rhode Island Office of Child Support Services, which is acting on behalf of the State of Rhode Island ex. rel. GERO MEYERSIEK, and acting as the "State Agency" under the Rhode Island State Plan under **42 U.S.C. § 654**, **42 U.S.C. § 654a**, **42 U.S.C. § 654b**, **42 U.S.C. § 666 *et al*.**, and all applicable state and Federal Laws, both civil and criminal, regulating Plaintiffs' actions and omissions under the legal framework of **Title IV-D of the Social Security Act**.  Defendant respectfully **requests and moves for a hearing on Defendant's herein Motion to Compel Compliance with Subpoena** – the Rhode Island Office of Child Support Services refuses to respond to and refuses to comply with the Subpoena, and filed a motion to quash the subpoena on March 20, 2024 - the requested information is further regulated and mandated to be produced under the State Plan in compliance under **42 U.S.C. § 654b**, therefore those

**requested documents must be produced by the State within this proceeding as well as without judicial compulsion**.  The Subpoena further summons Kevin Tighe, Paul Gould and John Langlois to appear to Court to testify at the hearing scheduled in this matter on March 28, 2024 at 10:00 AM.

### I.   RHODE ISLAND'S STATE PLAN'S PENALTY-INCURRING VIOLATIONS OF TITLE IV-D

### AND

### ORGANIZED CRIMINAL COMMISSION OF INTERSTATE FRAUD

Congress prescribed both civil and criminal penalties for violations.  Consistent with its Spending Power, Congress has the authority to attach conditions on the receipt of federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."   The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not

disapprove the State plan . . . and the Secretary shall reduce the amount otherwise

payable to the State [by the designated alternative penalty]." 42 U.S.C. §

655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has

prescribed that the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at

879.  Absent any discretion available to the Secretary to impose a lesser penalty than the

alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily

prescribed penalties.[1]  Congress also enacted several criminal codes punishing actors,

such as the Plaintiffs, who commit federal crimes, including cover up of unlawful

activities.

Defendant filed a Motion to Dismiss Interest Arrears on February 4, 2024 and

Defendant's Motion is scheduled on the Court's calendar to be heard on March 28,

2024.  For the hearing, the Defendant served the attached Subpoena, attached hereto as

Exhibit A, upon the State ex. rel. Plaintiff, Rhode Island Office of Child Support

Services, the State agency under the State Plan pursuant to **42 U.S.C. § 654.** *See*

United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUS

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and
Human Services' (HHS) authority to impose a penalty for its non-compliance, see
*Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and
accepted imposition of a penalty retroactive to 1998. The State paid more than $55
million in penalties through 2007. South Carolina Dep't of Social Servs., Response to
Budget Proviso 13.27 at 4 (Aug. 31, 2007),
http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
    Emphatically, note that South Carolina's violations and penalties do not involve
deliberate alterations of and tampering with government records involved in accounting
fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the
automated system, then manually removing or adjusting them for purposes of
certification purposes to Texas and to the United States in order to conceal the 12%
compound interest from the noncustodial parent and to Texas and Federal authorities.

C-prelim-title42-

section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRp

b25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

Defendant subpoenaed "(1) All records, files, notes, public records, documents, films, materials generated in the course of administration and enforcement of relating to Defendant Mary Seguin, from 2010 to the present in this Title IV-D Case under the Social Security Act; (2) All records relating to Defendant Mary Seguin from 2010to the present, including notes and messages taken and generated on October 5, 2022."

*See* attached **subpoena**, **Exhibit A**.

The Rhode Island Office of Child Support Services' actions in this Title IV-D case's proceedings since 2010 with the entries of orders prepared and submitted in her official and individual capacities, Priscilla Glucksman, make clear the Office of Child Support Services is one of the State Plan's key "organizational unit which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan" under **42 U.S.C. § 654(3).**

**Rhode Island Office of Child Support Services' refusal** *to comply with the Subpoena is a prima facie* **42 U.S.C. § 654b violation that incurs penalties** in this **fiscal year under 42 U.S.C. § 655(a)(5) as well as 42 U.S.C. § 655(a)(4)**, which penalty-incurring violations the Defendant had reported, is reporting and will continue to report to relevant law enforcement authorities at the federal and state levels. (Judicial notice is respectfully requested that the Defendant in January 2023 reported Office of Child Support's violations to the Rhode Island Office of Attorney General, who instead of enforcing the requirements of the State Plan as the Attorney General is

similarly a political subdivision under 42 USC 654(1), opted to reinforce, aid, shield and protect Rhode Island political subdivisions' unlawful activities – this is reported to United States authorities).  As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654.  Among the prerequisites for approval of a Title IV-D Plan are the requirements that the State may only uniformly charge 3-6% simple interest on overdue support, *see* 42 U.S.C. § 654(21)(A), and a State must establish and operate an automated data processing and information retrieval system ***without*** taking computer calculated amounts off and then put other numbers back on the system or hardcoding/inputting new numbers computed offline onto the system, see 42 U.S.C. § 654(24), and the State **must** have a state child support disbursement unit (SDU) that complies with all the requirements of 42 U.S.C. § 654, 42 U.S.C. § 654a, 42 U.S.C. § 654b, *see* 42 U.S.C. § 654(27)(A).  Rhode Island deliberately fails to meet all the requirements, including continuously inputting 12% compound interest on overdue support and the Rhode Island Office of Child Support Services covers up their noncompliance with accounting fraud inputting into the system and taking off from the automated data processing system amounts that are inflated, unlawful, and submitting false books of accounts that removed the unlawful inflated amounts to the Federal authorities to make it look like Rhode Island is in compliance so as to procure federal funding for which Rhode Island is ineligible.

The deliberate fraud makes clear the State operates an unlawful plan, in fact a criminally unlawful plan, and does not have an approved state plan under Title IV-D of

the Social Security Act, 42 U.S.C. §§ 651-669, and should lose and disgorge unlawfully procured federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). *See* 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).  *See*, *Hodges v. Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).

**Any attempt interfering with the Defendant's reporting, pursuant to 18 U.S.C. § 4, to law enforcement authorities the commission of crimes by political subdivisions of the State within this Title IV-D proceeding is unenforceable.**   Any and all failures to comply with 18 U.S.C. § 4 constitutes misprision of a felony.

**A. THIS PROCEEDING IS GOVERNED by 42 U.S.C. § 654 et al. UNDER TITLE IV-D THAT REGULATE <u>ALL POLITICAL SUBDIVISIONS</u> OF THE STATE OF RHODE ISLAND**

The Political Subdivision of the State of Rhode Island under <mark>42 U.S.C. § 654(1),</mark> namely by and through the **Office of Child Support Services' Lead Legal Counsel Paul Gould,** Esq., made several claims before this Court under Oath throughout this Title IV-D case hearings and proceedings that **the laws of Congress do not matter, only this court orders matter and they do not need to conform to Congressional prescribed federal statutes.** *E.g.*,  See <u>Exhibit B</u> Transcript **of February 2, 2024** Hearing in this matter**.  Rhode Island is wrong and Paul Gould is wrong, and both know it.  That flagrant lawlessness is at the heart of the violations of federal law under color of state law in this interstate**

Title IV-D case.  **Rhode Island participates in Title IV-D, and** in so participating **through its State Plan, <u>must</u> comply** with **Title IV-D.  _See_, _Hodges v. Shalala_, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).  _See New York v. United States_, 505 U.S. at 161, Congress, under the Commerce Clause, may offer the States a choice of regulation under federal control or preemption under federal regulation. _See_ _Hodel v. Virginia Surface Mining & Reclamation Assn., Inc._, 452 U.S. 264, 288 (1981).  The Title IV-D statute expressly provides that compliance with 42 U.S.C. sec. 654, and compliance with the automated data processing system and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." _See Dole_, 483 U.S. at 207 (citations omitted);  _See_ South Dakota v. Dole, 483 U.S. 203, 206 (1987). The textual language of 42 U.S.C. § 654(1) states,**

> **"A State plan for child and spousal support must—**
> **(1)    provide that it shall be in effect in all political subdivisions of the State"**

The facts and established law thus make it crystal clear _all political subdivisions_ of Rhode Island, including the **Rhode Island Department of Human Services**, the **Office of Child Support Services <u>AND</u>** the **Rhode Island Judiciary political subdivisions of the State of Rhode Island <u>MUST</u> comply with 42 U.S.C. § 654.  However, because the Rhode Island Office of Child Support Services,**

**the State Plan's SDU unit, flagrantly and expressly states in this Title IV-D case that Title IV-D statute and Congressionally prescribed federal statutes do not apply in this case nor in Rhode Island, the State of Rhode Island's political subdivisions have flagrantly flouted 42 USC sec. 654 and then adjusted and tampered with the automated data processing system accounting to defraud the United States of federal funding, and to defraud the Defendant of her Texas properties.**

Therefore the Defendant respectfully reminds all participants involved in this Title IV proceeding and gives notice to the applicable State political subdivisions (*e.g.*, Rhode Island Judiciary) and agencies, including the SDU under the State Plan under ==**42 U.S.C. § 654(1)**==, *e.g.*, the **Rhode Island Office of Child Support Services,** that this yet again noncompliance by the State of Rhode Island with the Subpoenaed information egregiously constitutes yet another of the many numerous failures of Rhode Island agencies and its State Plan during this fiscal year to comply with the requirements of section 654b, as well as 654, 654a and 666 of Title IV which shall be considered yet another of the many numerous failures of the State to comply with subparagraphs (A) and (B)(i) of section 654(27) of this title during the fiscal year, that is clearly stipulated in 42 U.S.C. **§ 655(a)(5)(A)(ii) by a penalty amount of up to 30 percent of the penalty base, in the case of the fifth or any subsequent such fiscal year in which such a failure by the State occurs (regardless of whether a penalty is imposed under this paragraph with respect to the failure). (ii) The term "penalty base" means, with respect to a failure of a State to comply with a subparagraph of section 654(24) of this title during a fiscal**

**year, the amount otherwise payable to the State under paragraph (1)(A) of this subsection for the preceding fiscal year.**

Additionally, the deliberate noncompliance motivated by cover up makes clear the State knowingly and intentionally operates an illegal plan, the State knows Rhode Island does not have an approved state plan under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, and therefore should lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). *See* 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).

## B. FRAUD

In this Title IV case, serial noncompliance, motivated by fraud, and their resulting incurred penalties, both civil and criminal, accrued since the initiation of this Title IV case fourteen years ago in **2010, upon Plaintiff Gero Meyersiek's application for services under Title IV through his own private attorney, *Barbara Grady*, whose former law firm partner and diseased husband *Paul Dugan*, was himself a former Senior Counsel of the Rhode Island Office of Child Support Services, one of the key Title IV-D agencies under Rhode Island's State Plan charged under 42 U.S.C. § 654(3) with State compliance with 42 U.S.C. § 654, 654a, 654b, 655, 658a, among others – Barbara Grady through Paul Dugan has intimate knowledge of and is a knowing participant in the State's accounting fraud reporting to the United States for federal funding reimbursement and federal funding Incentive Payment payouts (658a) worth hundreds of millions of dollars under the Title IV Program to the Secretary and Department of Health and Human Services, among**

others.  Upon information and belief, the Plaintiff Gero Meyersiek and Barbara Grady and the Rhode Island Office of Child Support Services have a series of unlawfully obtained "12% compound interest" money receipt sharing arrangements involving the fraudulent procurement through the Title IV framework of exorbitant 12% compound interest interstate targeting Defendant's Texas properties on overdue support enabled through accounting fraud, among others – this arrangement involving interstate defraud of the Texas Defendant and simultaneous theft of the United States of ineligible Title IV funding entails, *inter alia*, the Rhode Island Office of Child Support Services discussing in great detail at length with Barbara Grady the agency's fraudulent removal from the 42 U.S.C. § 654(24), 42 U.S.C. § 654(27) and 42 U.S.C. § 654a mandated automated data processing system of 12% compound interest when sending to Texas in 2018 thus creating fraudulent books of accounts under 42 U.S.C. § 666(14)(A)(ii)(I) and (II) *fraudulently certifying to Texas via wire and via mail inaccurate support due accounts* – discussions of this scheme further violated the Defendant's privacy rights, that are documented in the TRAC record of the Defendant's Title IV case file for December 2021 recording the agency's discussions with Barbara Grady at length regarding taking interest off when sending to Texas, and keeping it off the system when communicating to Defendant that Gero Meyersiek waived interest, and then putting interest back on the system after they defrauded the Defendant inducing the Defendant to payoff support that comprised of the principle in one lump sum of $104,185.98 in consideration of Gero Meyersiek waiving

interest – the agency discussing its illegal and criminal enforcement information with Barbara Grady is in itself a violation of 42 U.S.C. 654 (26)(A) that mandates the State Plan to have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the ==privacy rights of the parties==, such as this Texas Defendant, including—

(A) ==safeguards against unauthorized use or disclosure of information relating to== proceedings or ==actions to== establish paternity, or to establish, modify, or ==enforce support==.

See Exhibit B. Rhode Island Office of Child Support **TRAC** document for December 2021 attached hereto as ==**EXHIBIT** B==.

Under **Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669**, the Texas Defendant has the **protected** right to be furnished under Subpoena with all TRAC records in Defendant's Title IV-D case file from 2010 to the present to establish the accuracy of the alleged Rhode Island computations mandated to be performed by the automated data processing system, but has instead been hard-programmed numbers created offline that are then manually input into the automated data processing system several times, thus fabricating several different Rhode Island-certified false books of accounts of amounts due transmitted by mail and by wire to Texas and the Texas Defendant and to the United States for the purposes of procuring federal funding under Title IV-D and Title IV-A that violate Federal and Texas State civil and criminal codes.  The Rhode Island Office of Child Support Services refuses to

produce any TRAC records for 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021 January to November, 2023 and 2024.

This violation of, among others, 42 U.S.C. 654(26)(A) constitutes a violation of 42 U.S.C. 654(27) that counts as a penalty in the many violations in fiscal year 2021 alone which exceeds 30% of the penalty base in 2021 – and that's just civil penalties under Title IV – numerous other federal criminal and civil violations incurring additional penalties are applicable, including Texas criminal and civil code violations.

### C. 42 U.S.C. § 654b(4)

Under Rhode Island's State Plan, the Rhode Island Office of Child Support Services is mandated to **"furnish to any parent, upon request, timely information on the current status of support payments under an order requiring payments to be made by or to the parent."**

Therefore, information relating to the Orders in question and relevant information relating to those orders **must** be furnished.  Information relating to the putting of 12% compound interest on the automated data processing system from 2010 to the present must be furnished.  Information relating to the removal of any alleged computed online or offline related to 12% compound interest from the automated data processing system in 2018 and at any and all times from 2010 to the present must be furnished.  Information relating to the waiver by the Plaintiff by and through his private attorney Barbara Grady of the 12% compound interest that was represented to Defendant as the $0.00 showing under interest calculated by the automated data processing system in Defendant's case file on December 6, 2021 must be furnished. Information relating to the Rhode Island Office of Child Support Services calculated

total due showing $92,214,56 calculated by the automated data processing system in Defendant's case file on December 6, 2021 that calculates arrears from 2010 must be furnished.  See attached hereto **December 6, 2021 screen shot of the Defendant's online OCSS account** showing the calculated amounts of which is mandated by Title IV-D to be populated by the automated data processing system as **EXHIBIT C**.

Information relating to the interest amount before it was taken off the automated data processing system in 2018 must be furnished, as well as any time interest was taken off the system from 2010 to the present.  Information relating to the interest put back on the automated data processing system in 2021 after Defendant accepted the $104,185.98 payoff number given by Office of Child Support Services by wire via email must be furnished.  Information relating to how $104,185.98 was computed by the automatic data processing system on December 7, 2021 must be furnished, when the automated data processing system calculated $92k just the day before on December 6, 2021 must be furnished.  Information relating to how $75,658.00 was calculated by the automated data processing system on March 3, 2022 that was then issued to Texas to lien Texas properties by Mail and by wire must be furnished.  And this is not exhaustive – see Subpoena attached hereto as Exhibit A.


### D. 2012 JUDGE McCANN (and 2024 MAGISTRATE NAHABEDIAN) VIOLATIONS of 42 U.S.C. § 654(21)(A) – **EIGHT** FAILURES AND PENALTIES (FOUR IN 2012 and FOUR IN 2024 by and through POLITICAL SUBDIVISION RI FAMILY COURT) – (THIS DOES NOT INCLUDE CRIMINAL AND CIVIL PENALTIES UNDER APPLICABLE CRIMINAL AND CIVIL CODES UNDER FEDERAL LAWS AND TEXAS LAWS)

This Court took judicial notice on February 10, 2023of the *issuance* of two Orders issued by Judge McCann in 2012.  Magistrate Monaco clarified at the hearing on March 6, 2023 he did NOT take judicial notice of the contents of the orders, only the issuance of the orders.   See attached transcript of March 6, 2023 hearing. **Exhibit D**.

Those 2012 orders were issued by Judge McCann of the Rhode Island Family Court, a political subdivision of the State, in which the State Plan must be in effect under 42 U.S.C. **§ 654(1).**  Therefore, it is crystal clear that **the Rhode Island Family Court and its justices under the State Plan MUST comply with all provisions of Title IV-D, including** U.S.C. **§ 654(21)(A)** that makes it crystal clear **interest on overdue support must be between 3-6% simple interest.**  However, **Judge McCann knowingly ordered 12% compound interest in this interstate Title IV-D on overdue support to be illegally put into the** State Plan's **automated data processing system mandated under** U.S.C. **§ 654a and** U.S.C. **§ 654b in knowing violation of 42 U.S.C. § 654(21)(A).  Certainly, the Rhode Island Office of Child Support Services today claims 12% compound interest was what Judge McCann ordered, undisputedly making Judge McCann an accomplice.**  The knowing violation of the political subdivision Rhode Island Family Court by and through Justice **McCann of 42 U.S.C. § 654(21)(A) through fraud on the court and under color of state law violates 42 U.S.C. § 654(24), 42 U.S.C. § 654a and 42 U.S.C. § 654b  and incurs FOUR failures and penalties in this case alone for the fiscal year 2012 under 42 U.S.C. § 655(a)(4) and 42 U.S.C. § 655(a)(5), through just the State family court political subdivision alone.**

In 2024, the Rhode Island political subdivision of the family court by and through Magistrate Nahabedian flagrantly declared at the February 2, 2024 hearing in this matter that the State knowingly orders to be put into the automated data processing system 12% compound interest in Rhode Island under color of state law and through fraud on the court in knowing violation of the Rhode Island certified approved State Plan that mandates 3-6% simple interest under 42 U.S.C. § 654(21)(A), with her actions representing **four** failures and penalties in fiscal year **2024**. See transcript **Exhibit F.** Failure of compliance with all provisions of Title IV-D results in the State's loss of federal funding for Title IV-D and Title IV-A under Federal Law. **See Exhibit E, Court Reporter Certified Transcripts of February 2, 2024 Title IV case hearing in this matter.**

**E. 2012 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES (and 2012 Priscilla Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and 42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 – OVER TWENTY FAILURES AND INCURRED PENALTIES in 2012 by and through POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES THROUGH FRAUD AND UNDER COLOR OF STATE LAW**

In order to cover up the flagrantly unlawful 12% compound interest that represents unlawful and fraudulently obtained and extorted under color of law Rhode Island State revenue through the Social Security Act in welfare cases, **Rhode Island Office of Child Support Services adopted the Official Policy not to pursue interest in interstate cases (in order to cover it up from federal authorities and other state authorities see 42 USC sec. 666(14) – cooperation with other states – EXHIBIT F Attached hereto Rhode Island Office of Child**

Support Services **Official Written Policy** that was produced by RI OCSS during February 10, 2023 court ordered discovery.  This policy document evidences the official policy of criminal and civil fraud by the State of Rhode Island's political subdivisions applicable under 42 U.S.C. § 654(1).

This policy evidences the routine extortions of noncustodial parents through the enforcement of 12% compound interest in-state under color of state law that incur penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences the political subdivisions of Rhode Island's concealment and cover up from out-of-state and federal authorities of the State's illegal extortion of 12% compound interest under color of state law by adopting an official policy <u>not to pursue interest</u> in out of state interstate cases that incurs penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences accounting fraud concealing 12% compound interest applied to certain selected out-of-state cases such as the Defendant's, as well as accounting fraud adjustments that conceal the 12% compound interest in in-state cases when submitting for Title IV-D and Title IV-A reimbursement to the United States.

The pattern of agency discussions and considerations of its illegal and criminal enforcement information with Barbara Grady is in itself an organized scheme involving schemes to commit accounting fraud and false

certification of Title IV-D accounts, in violation of, inter alia, **42 U.S.C. 654 (26)(A) that mandates the State Plan to have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the** ==**privacy rights of the**== **Texas Defendant.**

In 2012, Priscilla Glucksman, individually and on behalf of the Rhode Island Office of Child Support Services, **under 42 U.S.C. 654(1), on oral motion moved for 12% compound interest, that by Rhode Island's official policy should not be pursued in this interstate Title IV-D case, with the intent and scheme to commit accounting fraud and fraudulent certification of amounts due by removing the 12% compound interest from the automated data processing system in the anticipated event Rhode Island sends it to Texas authorities and Federal authorities for enforcement under 42 U.S.C. 666 (14)**. Priscilla Glucksman schemed with Barbara Grady and Gero Meyersiek to orally move for interest in order to minimize a paper trail of paper filings in this interstate Title IV case so that a written record of the ordered 12% compound interest is buried within a one line of the order, with no documentation of a written paper motion that would otherwise contain or omit the State's legal justification moving for 12% compound interest in this interstate Title IV-D case. In 2012, Paul Dugan was alive and participated in the arrangement. The symbiotic pliant Judge McCann readily complied under color of state law, knowing fully well 12% compound interest is not enforceable in any state and definitely not enforceable in Texas under Title IV-D, and knowing that Rhode Island Office of Child Support Services intended to remove the interest amount if and when Rhode Island sends to Texas for collection while falsely certifying the total amount due and then put

the interest back on the system and then file a subsequent motion to set interest arrears

back in Rhode Island through the symbiotic pliant family court political subdivision of

the State of Rhode Island before a symbiotic pliant judge like Judge McCann,

committing interstate fraud in violation of, *inter alia*, 42 U.S.C. sections 652-669, RICO,

wire fraud, mail fraud, tampering with government records and accounting fraud.  This

list of criminal codes violated by the Plaintiffs is not exhaustive.  Defendant shall

present a list of the violated federal criminal codes later in this motion under Section IV

of this motion.

**F. 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES (and 2012 Priscilla Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and 42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 and Title IV-A – OVER TWENTY ANNUAL FAILURES AND INCURRED PENALTIES in 2013-2024 by and through POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES THROUGH FRAUD AND UNDER COLOR OF STATE LAW**

Title IV-A TANF benefits are conditioned upon the State's compliance with ***all***

requirements of **42 U.S.C. § 654,** and from 2012 to 2024 and on-going, based on

violations in this case alone, Rhode Island has been and continues to be ineligible and

the State is receiving funds through false representations and alteration of government

records to procure federal funding.  From 2012 to 2024, Defendant has the information

to aver that the State of Rhode Island's political subdivisions under **42 U.S.C. § 654(1)**

sent by mail and by wire false accounts of amount due and of liens that contained Title

IV-D violative illegal and unenforceable 12% compound interest fraudulently

misrepresented as "child support due" to multiple institutions, including banks, credit

bureaus to Texas in violation of Texas Penal Codes that carry additional fines and jail

time.  Then Rhode Island Office of Child Support Services and the financial comptroller of the Rhode Island Judiciary and the State Treasurer's Office fraudulently concealed through removal and other false accounting itemizations the 12% compound interest when sending to United States Department of Health and Human Services for federal incentive payments payouts and federal funding payments under Title IV-D and Title IV-A.

The total Title IV penalties incurred, disgorgement due back to the United States for ineligible Title IV-D and Title IV-A funding, and criminal fines incurred by Rhode Island in this case alone from 2012 to 2024 run upwards of hundreds of millions of dollars.  From 2012 to 2024, Rhode Island's Title IV-D political subdivisions conspired to violate, in addition to 42 U.S.C. 654(21)(A), among others, several requirements under 42 U.S.C. 654 whose plain textual requirements requires the State Plan **MUST**:

**(7)**provide for entering into cooperative arrangements with appropriate courts and law enforcement officials and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering the plan, including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;

**(10)** provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;

**(14)**

**(A)**

comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

**(B)**

maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them **to conceal in the accounting records** the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

**(15)** provide for—

**(A)**

a process for annual reviews of and reports to the Secretary on the State program operated under the State plan approved under this part, including such information as may be necessary to measure State compliance with Federal requirements for expedited procedures, using such standards and procedures as are required by the Secretary, under which the State agency will determine the extent to which the program is operated in compliance with this part; and

**(B)**

a process of extracting from the automated data processing system required by paragraph (16) and transmitting to the Secretary data and calculations concerning the

levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 652(g) and 658a of this title;

**(16)**

provide for the establishment and operation by the State agency, in accordance with an (initial and annually updated) advance automated data processing planning document approved under section 652(d) of this title, of a statewide automated data processing and information retrieval system meeting the requirements of section 654a of this title designed effectively and efficiently to assist management in the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan

**(20)**

**provide, to the extent required by section 666 of this title,** particularly the Due Process protections, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws.

**(23)**

provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services

and a telephone number or postal address at which further information may be obtained

and will publicize the availability and encourage the use of procedures for voluntary

establishment of paternity and child support by means the State deems appropriate

## G. COVER UP AND FRAUD

In 2012, the child in question was 12 years old.  From 2012 to 2018, Defendant

does not have any records (due to several prior Title IV-D information denials by the

Rhode Island Office of Child Support Services for purposes of cover-up, that further

incurred penalties and fines for each and every information denial under 42 USC

654(24) and 42 USC 654(27) and 42 USC 655) of Rhode Island's political subdivisions

under 42 USC 654(1) sending to Texas or to federal authorities the support amount for

enforcement under 42 USC 654(7) or 42 USC 666(14).  Obviously, sending the support

amount in the automated data processing system without the removal of the interest

from the system exposes the illegal 12% compound interest disallowed under 42 USC

654(21)(A), which would incur Title IV-D and Title IV-A penalties, disgorgement of

ineligible federal funds and incur criminal fines.  It is for this very reason that the Rhode

Island political subdivisions adopted the written official policy not to pursue interest in

interstate cases, that moreover runs afoul of 42 USC 654(21)(A) plain language that the

State Plan must apply UNIFORM interest on overdue support, not State-targeted 0% in

some interstate cases and then 12% compound interest in all other cases, such as in this

case.  Moreover, if the State claims they actually did send notices of support due to the

Defendant in Texas, each transmission would constitute patterns of federal crimes,

including Mail Fraud, since the 12% compound interest in this Title IV-D case is illegal

and fraudulent and unenforceable.  This scheme is in violation of 42 USC §§ 654(7), (10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions under 42 USC 654(1) also transmitted by wire and by mail to the United States Department of State a hold on the renewal of Defendant's passport, again omitting and concealing the principle amount as well as the fact that the State attempts to enforce interstate an illegal 12% compound interest on overdue support.  This scheme is in violation of 42 USC §§ 654(7), (10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions made the illegal decision between top management employees of the Rhode Island SDU unit, dressed up as "administrative decision," to illegally and criminally remove the illegal 12% compound interest from the automated accounting data processing system that clearly is required to prevent activities "**to conceal in the accounting records" Rhode Island's** illegal 12% compound interest prescribed under 42 U.S.C. § 654(14). *See* TRAC records attached hereto in **Exhibit B**.

Upon information, Rhode Island routinely removes the illegal 12% compound interest from the automated data processing system when reporting to the Secretary of the United States Department of Health and Human Services in violation of 42 USC §§ 654(10), (14), (15), (16), (20), (21), (23), (24), (27), and applicable federal criminal codes.  See TRAC records attached hereto in Exhibit B of the routine practice of illegal accounting adjustments of the automated data processing system in the hundreds of thousands of dollars in December 2021 alone.  In this case alone, the aforesaid accounting fraud and record tampering violations motivated by theft of the Title IV-D

and Title IV-A programs and defraud of the Texas Defendant targeting Texas properties

occurred in 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021, 2022, 2023, and

2024.

## II.    FACTUAL ALLEGATIONS

The child in question was emancipated in April 2018 and is now an adult 24 years

old.  Therefore accrued "interest on overdue support" stopped in April 2018.

Due to the hold placed on Defendant's passport renewal, Defendant discovered

on and around November 2021 there is alleged support due.  Defendant retained a

lawyer in Texas to contact the Rhode Island Office of Child Support Services to obtain

information on the amount due.  The Rhode Island Office of Child Support Services

refused to provide information to Defendant's Texas attorney, in violation of 42 USC §§

654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), and concealed the fact that the

agency illegally removed the illegal 12% compound interest amount from the automated

data processing system from 2018 to December 2021.  To this day, the Rhode Island

Office of Child Support Services covers up and refuses to furnish information to the

Defendant the amount of interest that was removed from the system.  Continuing

refusal to furnish requested information motivated by cover up is in violation of, *inter*

*alia*, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).  The Office of

Child Support Services and Barbara Grady and Gero Meyersiek schemed to deprive

Defendant of counsel that would facilitate defrauding the Defendant and to conceal

from Texas counsel the accounting fraud relating to the illegal 12% compound interest

that is unenforceable in Texas as well as legally unenforceable in Rhode Island (however

routinely enforced through fraud under color of state law) under Title IV-D, and refused

to deal with Defendant's Texas attorney, fraudulently claiming it is the State's policy to

deal with the noncustodial parent directly.  This is obviously a blatant lie because the

TRAC record shows Kevin Tighe initiating phone calls directly to Barbara Grady, Gero

Meyersiek's private attorney (and not contacting Gero Meyersiek directly) to discuss

enforcement actions in detail involving the Rhode Island Office of Child Support

Service's fraudulent accounting that entailed the agency's removal in 2018 (when it

planned to send to Texas) of the interest from the automated system in December 2021.

This is in violation of, *inter alia*, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21),

(23), (24), (27).  The Defendant avers and declares, under oath, the following facts:

1. On December 6, 2021, the State/Plaintiff showed the Defendant her OCSS
   online account that showed $0.00 under interest.  Further the online account
   that is populated by the automated data processing system shows $93,214.56
   Total Due, and $0.00 under Interest on December 6, 2021, published online
   in the State's OCSS online account for Defendant, as of November 30, 2021.
   See attached Screen Shot attached hereto this motion.  (The Office of Child
   Support Services told the Defendant that the $0.00 under interest shows that
   Gero Meyersiek waived interest.  The Office of Child Support Services
   deliberately misrepresented by omission that the interest amount was taken
   off the system illegally in 2018 and that the interest amount was calculated
   pursuant to an illegal 12% compound interest that is unenforceable under
   Title IV-D.  Therefore in reality there was no consideration given to the
   Defendant, as falsely represented, calculated to induce the Defendant into

paying a large lump sum amount. The Office of Child Support Services

brokered a settlement deal between the Defendant and Gero Meyersiek where

Meyersiek waived interest in consideration of the Defendant paying a lump

sum payoff amount of $104,185.98 from Texas, which the State, under its

authority, agreed to the deal with the Defendant on December 7, 2021, having

calculated the $104,185.98 figure by and through its accountant(s) manually

offline and not by the mandated automated data processing system, and

actively brokered the terms of the deal itself, namely, Deputy Legal Counsel

Kevin Tigue who reports to Mr. Paul Gould, the attorney of record who filed

the State's/Plaintiff's Motion to Set Arrears.   The Defendant requests this

Court to take notice of the fact that the State also failed to provide this Court

as well as to the Defendant an accounting now and upon Defendant's request

at the time in 2021 of how this figure $104,185.98 was calculated nor how the

alleged $81k is calculated.  This is in violation of, *inter alia*, 42 USC §§ 654b,

654(10), (14), (15), (16), (20), (21), (23), (24), (27).

2. The State's/Plaintiff's' authority to forgive arrears debts is an official policy
   and authority reported to the Office of the U.S. Commissioner Tangular Gray
   of the Office of Child Support Enforcement of the U.S. Department of Health
   and Human Services.

3. The Defendant in Texas good faith accepted and paid the $104,185.98 on
   December 7, 2021.

4. From December 6, 2021 to the present, the State/Plaintiff has represented to
   the Defendant at least seven (7) sets of books of very large arrears and interest

calculations, which the State/Plaintiff has either failed or refused to provide the Defendant with requested documentation of debt validation and verification records supporting the State's calculation (in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27)):

a. $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Defendant, as of November 30, 2021. (Screenshot of this taken on December 6, 2021 is attached to this Motion).

b. $104,185.98 Total Payoff Amount on December 7, 2021.

c. $75,638.00 on a Notice of Intent to Lien dated March 3, 2022. RI OCSS rescinded this figure based on alleged unspecified errors on October 14, 2022.

d. $73,000.00 per RI OCSS Deputy Chief Counsel John Langlois's (staff counsel who also reports to Mr. Paul Gould, who was also the attorney of record for the State at the Appeals Hearing) representation at the agency RI EOHHS (Rhode Island Executive Office of Human and Health Services) administrative appeal Pre-hearing held on October 5, 2022.

e. $55,000.00 on RI OCSS correspondence with Meyersiek on October 13, 2022.

f. $75,623.71 Total Due for "Interest," online on the afordsaid OCSS online account, as of November 30, 2022. A screenshot taken on December 3, 2022 thereof is attached to this Motion.

g. $81,652.46 on the Motion as of December 22, 2022.

5. Maintaining at least seven books of account in Defendant's case file, while obstructing the Defendant's 42 USC 654b and all Title IV-D protected due process right to documents of accounting validation and verification depriving the Defendant's right to meaningfully refute the State's claim is unlawful, covers up the illegal 12% compound interest that is also ballooned through several fraudulent manual accounting calculations NOT USING the Title IV-D mandated automated data processing system. There are pending breach of contract, fraud and Civil RICO et al actions in Federal Courts regarding the conduct of the Plaintiffs.

6. The Defendant respectfully requests the Court to take notice of the fact that the alleged interest published online by the State/Plaintiff as of November 30, 2022 that states the very specific number of $75,623.71 ballooned to $81,652.46 as of December 22, 2022, by a whopping $6,028.75 in a matter of 22 days as stated in the State's/Plaintiff's Motion, is usurious, and clearly shows the falsity of the State's/Plaintiff's Motion, paragraph numbered 8 that says, "That, because interest only accrues on principal balances and not on interest balances, the interest balance owed on arrears has not changed since the principal balance was paid in full on December 9, 2021." This is in

violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

7.  The Defendant avers it is nigh on impossible for the Defendant to be able to respond to the State's/Plaintiff's Motion and their unverified and unvalidated seven (7) books of accounts represented by the State/Plaintiff since December 6, 2021 to as of December 22, 2022, where the State's/Plaintiff's calculations of very large amounts have been clearly either refuted and rescinded or have shown to be inaccurate or false.  This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

8.  The Defendant respectfully requests the Court to take notice of the fact that after the Defendant accepted the deal in Texas and paid the payoff amount of $104,185.98 from Texas on December 7, 2021, the State/Plaintiff sent to the Defendant in Texas by Mail a Notice of Intent to Lien dated March 3, 2022 for $75,638.00 without any information justifying the fraudulent interest lien on Defendant's Texas properties – the $75,638.00 amount on the fraudulent lien on Defendant's Texas properties was deliberately calculated manually then hard input into the automated data processing system in violation of Title IV-D.  This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Defendant appealed this fraudulent lien to the Appeals Office of Rhode Island Executive Office of Health and Human Services ("RI EOHHS"), a political subdivision of the State of Rhode Island applicable under 42 USC 654(1), on April 1, 2022. Throughout the procedurally defective appeals process where the Defendant was denied by the

State/Plaintiff to access her case file, the State/Plaintiff refused or ignored the Defendant's over ten(10) record requests for the legal and accounting basis of the $75,638.00 lien. Each record information denial is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Defendant also submitted to the Appeals Office records of the written email advisement by the State/Plaintiff that "accounting says" to pay $104,185.98 and records of the Defendant's bank wire transfer payment. The Appeals Office continued the hearing for the maximum 3 times due to the State/Plaintiff's refusal to comply with discovery that would render the proceeding procedurally defective. Paul Gould and John Langlois were listed as representing the State. Their collective violations incur penalties and fines under, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 655, 658a, Title IV-A. To resolve the discovery issues, the Executive Hearing Officer ("EHO"), Debra DeStefano, scheduled a telephonic Prehearing Conference on October 5, 2022, and only when told by the EHO the burden of proof lies on the State/Plaintiff to show arrears are due (as applies here), did John Langlois (who attended the Prehearing Conference) state the following, which the Defendant in Texas recorded as a party of the call:

"EHO: The agency will have to submit proof of the allegation for arrears to support their position.

Langlois: The reason why I asked earlier whether Mary spoke to Karla after she made the payment was because there was a change of circumstances right after that.  I don't know if anyone in my agency had ever explained that to Mary.

Seguin: Wait a minute, wait a minute,

EHO: Wait Mary, I know what you asked for, let me get to what John just said, so John, you said there was a change in circumstances subsequent to her making a payment but before the notice of lien went out?

Langlois: Yeah.

EHO: OK, so...

Langlois: Can I just back up and explain what happened, 99% of this is a misunderstanding...

EHO: OK?

Seguin: Including what was on the screenshot, was that a misunderstanding??

Langlois: Can I speak without being shouted over?

Seguin: I am flabbergasted, really.

Langlois: What happened in this case is when Mary's representative, her attorney, called us in late November 2021, and said she wants her passport released and what does she have to do to release her passport, they put her in touch with Karla who gave her the $104,185.98  number.  Where that number came from, was one of our attorneys contacted the custodial parent, Gero Meyersiek, so we contacted his attorney, it wasn't me, it was someone in my office, and said if she's willing to make a $104K to

pay off the principle, would you agree to waive the $73K in interest? He said yes.  So

Karla notified Mary that if she paid the $104K, it would be paid in full because he was

willing to waive the interest and accept just the principal.  What happened was the day

after Karla spoke to Mary to wire in the $104K the attorney for Mr. Meyersiek contacted

us again and said he changed his mind, please put the interest back on the system, so we

did.  So the number that was given to her on the day it was given to her was correct, the

$104K, because he was waiving the interest, but then changed his mind, so we put the

interest back on the system, because he was waiving the interest, and that interest was

put back on the system and that's why the system is now saying she owes $73K.  That's

why in March when the system saw that she had some sort of personal injury insurance

in the system, our system was showing she owed $73K so we issued the lien.  But that

was what happened, he changed his mind the next day and that's what messed up the

numbers. So that's how all this happened, it was a pure misunderstanding, I don't know

whether anyone has ever explained that to Mary how that happened.

EHO: OK, Mary, did anyone ever explain that to you before?

Seguin: No. No one ever explained any of that.  This is why I am asking for my

case file, I think this is more basis to ask for my entire case file from 2020.  It's news to

me for example and its new information to me that your office's lawyer would not talk to

me directly but would be picking up the phone and calling the attorney for the custodial

parent.  And then not saying you were doing this deal.  I never offered $104K.  You had

determined this number, and that's why I am looking for documentation as to whether

this is something you guys do in every case.

EHO: OK, John, are you intending to submit then, the documentation showing the full balance, which would include the principle and the interest before she paid the $104k, and then what happened after, you're prepared to submit documentation to show everything that you said just happened.

Langlois: Yes. I can show the account balance before he agreed to waive the interest. And I can show you the account balance after she made the payment. And then when we put the interest back on the system.

EHO: And you're going to testify as to why it all occurred, I mean basically what you just told us.

Langlois: Yes.

Seguin: But the screenshot on December 6th showed $93K."

A true copy of the recording evidence has been submitted by the Defendant to this court, a Rhode Island political subdivision under Title IV-D proceeding in June 2023 and in February 2024.

However, instead of going forward with the testimony and providing the alleged debt validation and verification accounting records promised by John Langlois to the EHO at the upcoming RI EOHHS scheduled Appeal Hearing at the time on December 1, 2022, the State/Plaintiff opted to rescind the Notice of Lien that states there are unspecified errors on October 14, 2022, and emailed the RI EOHHS Appeals Office that the State/Plaintiff will litigate the issue in Family Court. This showed the intent of the State/Plaintiff to deprive the agency Appeals Office of jurisdiction by withdrawing the enforcement instrument that vests the Appeals Office's jurisdiction by regulation, in the

clear hope of a more favorable outcome to the State/Plaintiff, in the hopes of symbiotic and pliant judge shopping, in the hopes of getting a judge like McCann who ordered the illegal and unenforceable 12% compound in a Title IV-D case to rubber stamp the fraudulent 12% compound interest arrears due, and thereby needlessly increasing litigation.  Mr. Paul Gould is the co-counsel of record for the State/Plaintiff in the RI EOHHS agency appeal. This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 655, 658a.

9. The State's/Plaintiffs' actions and the State's/Plaintiff's Motion needlessly extending the agency appeal to Family Court litigation and obstructing Defendant's discovery rights for debt validation and verification as well as documentation of the Plaintiffs' waiver of interest are violative of Family Ct. R. Dom. Rel. P. 11 and are in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.  It is in criminal violation of 18 USC § 666 and a scheme to commit fraud on the court and interstate fraud through unenforceable Title IV-D orders that appear to be routinely issued by pliant Title IV-D judges like Judge John McCann III and Magistrate Susan Nahabedian.

10. Due to the State's/Plaintiff's conduct of obstructing the Defendant's right to access debt validation and verification records of publicly noticed liens of alleged arrears issued by the State/Plaintiff throughout the agency appeal, the Defendant filed an Access to Public Records ("APRA") request to the then Secretary Ana Novais of the RI EOHHS that manages the State/Plaintiff

agency OCSS.   These are all political subdivisions of the State of Rhode Island under 42 USC 654(1).

11. The RI EOHHS Office in its management capacity required the State/Plaintiff OCSS to respond to the APRA request, but even then the State/Plaintiff **denied the Defendant's APRA request for accounting records**, again refused to release the requested debt validation accounting records, but released the Case History Tracking records in the Defendant's case file, which showed entries made by Kevin Tigue and RI OCSS staff between December 6, 2021 to April 2022 of activity that corroborated John Langlois's representations of taking interest off the system, interest waiver at the agency Prehearing Conference on October 5, 2022 that is outlined above in paragraph 10, then putting interest back on the system after Defendant accepted the offer in Texas, and performed on the contract in Texas paying off all due support from Texas, through Defendant's Texas bank account, namely Texas properties.  Plaintiffs' record denials are violations of *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

12. Both the RI OCSS counsel who denied the Defendant's APRA request and the Executive Legal Counsel of the Secretary of RI EOHHS, Lisa Martinelli (to whom Ms. Deb Barclay reports and to whom Mr. Paul Gould reports, per organization charts supplied by the Secretary of State of the State of Rhode Island) informed the Defendant via official written letter correspondence to appeal RI OCSS's APRA request denial to the Attorney General pursuant to

R.I.G.L. sec. 38-2-8.  Their collective denials are in violation of *inter alia*, 42

USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666,

655, 658a.  Following their collective official written advisement, the

Defendant appealed the RI OCSS APRA denial under R.I.G.L. sec. 38-2-8 to

the Office of the Attorney General and the Superior Court as provided by

R.I.G.L. sec. 38-2-8.  The Office of the Attorney General and the Superior

Court of are political subdivisions of the State of Rhode Island under 42 USC

654(1).  Instead of releasing the Defendant's Title IV-D alleged debt validation

and verification records information, the State/Plaintiff continues to resist

releasing alleged arrears/debt verification accounting records in Superior

Court, including failing to comply with the Defendant's Court-issued

subpoena for said records and resisting subpoena compliance with extended

litigation in Superior Court in violation of *inter alia*, 42 USC §§ 654a, 654b,

654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

a.  The Defendant served the State/Plaintiff by email Defendant's Request

for Production of Documents for the same accounting records and

interest waiver records pursuant to Family Ct. R. Dom. Rel. P. 34, to

which the State/Plaintiff has so far produced one set of book of

accounts of the seven different books of accounts.  However, the

numbers do not corroborate with any of the seven official legal

representations of alleged arrears due, e.g., $93,214.56 Total Due, and

$0.00 under Interest on December 6, 2021, published online in the

State's OCSS online account for Defendant, as of November 30, 2021;

$104,185.98 Total Payoff Amount on December 7, 2021; $75,638.00 on

a Notice of Intent to Lien dated March 3, 2022 that RI OCSS rescinded

based on alleged unspecified errors on October 14, 2022; $73,000.00

per RI OCSS Deputy Chief Counsel John Langlois's (staff counsel who

also reports to Mr. Paul Gould, who was also the attorney of record for

the State at the Appeals Hearing) representation at the agency RI

EOHHS (Rhode Island Executive Office of Human and Health

Services) administrative appeal Pre-hearing held on October 5, 2022;

$55,000.00 on RI OCSS correspondence with Meyersiek on October

13, 2022; $75,623.71 Total Due for "Interest," online on the aforesaid

OCSS online account, as of November 30, 2022.  A screenshot taken on

December 3, 2022 thereof is attached to this Motion; $81,652.46 on

the Motion as of December 22, 2022; this is in violation of, *inter alia*,

42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24),

(27), 666, 655, 658a that is consistent with the State/Plaintiff's pattern

of obstructing the Defendant of due process right access to her case file

records of RI OCSS's debt verification itemized accounting calculations

of very large sums of alleged arrearages of at least 7 books of accounts

from December 6, 2021 to the present in Title IV-D proceedings.

III.  **JUDICIARY VIOLATION OF GOVERNMENT EDICTS
DOCTRINE, CALCULATED FAILURE TO INTEGRATE TITLE IV-
D AGENCY ELECTRONIC FILING SYSTEM WITH ODYSSEY
MAKING THEIR FILINGS INVISIBLE TO ALL E-COURT USERS
OTHER THAN THE JUDGE AND THEMSELVES AND
VIOLATION OF ACCESS TO COURT INFORMATION OF PUBLIC
TITLE IV-D PROCEEDINGS IN RHODE ISLAND'S STATEWIDE
ELECTRONIC COURTS**

## A. DENIAL OF PUBLIC AND PRO SE-LITIGANT ACCESS TO COURT INFORMATION INCLUDING JUDGE-CREATED LAWS BY 42 USC 654(1) POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY

The Rhode Island Judiciary is a political subdivision of the State of Rhode Island under 42 USC 654(1).  While publicizing during the implementation of the $6 million installation of Odyssey (the statewide electronic filing system) in 2014 that the electronic courts will enable ALL court users to pull up court record information with ease from their phones, the Rhode Island Judiciary quietly implemented Rule 5 of the Rhode Island Rules and Practice denying the Public, pro-se litigants and all parties to a case in Rhode Island remote access to court record information including judge-created orders and laws, including their own.  Through this deceit, the Rhode Island Judiciary lied to the Public, while denying access and thereby covering up the routine ordering of unenforceable body of judge-created laws ordering 12% compound interest in public cases and public hearings under 42 USC 654 in public Title IV-D cases, such as this one, by symbiotic pliant judges like Judge McCann and Magistrate Nahabedian.  The denial of access to pro-se litigants of their own cases' court records containing support orders violates, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.  The denial of public access to public court records documenting the routine systemic violations of 42 USC 654(21)(A) in electronic courts violates the First Amendment and the public's right to know the law, even if these fraud on the court unenforceable judge-created laws are unenforceable in both Rhode Island and elsewhere Title IV Part D reaches.  The denial of public access to judge-created laws that is also motivated by cover-up fundamentally violates the established Government Edicts Doctrine that the United States Supreme Court specifically held applies to electronic

formats of government doctrines, such as judge-created laws in digital courts. *See*
**Georgia v. Public Resource.Org, Inc**., No. 18-1150, 590 U.S. ____ (2020). The
Defendant has been denied access by the political subdivision Rhode Island Judiciary to
her court records and information regarding the orders in question that must be
furnished pursuant to 42 USC 654b thus in violation of 42 USC 654. The Defendant has
been denied access by the political subdivision Rhode Island Judiciary to unenforceable
judge-created laws that routinely establish unenforceable 12% compound interest by
certain symbiotic pliant judges, like Judge McCann and Magistrate Nahabedian, who
work hand-in-hand with the Rhode Island Office of Child Support Services in Title IV-D
cases, in violation of Defendant's Due Process and Equal Protection rights to know the
law to be meaningfully heard and right to meaningful access to justice – they are in
violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23),
(24), (27), 666, 655, 658a.

This Court held at the hearing in this matter scheduled on March 6, 2023 that the
Rhode Island Office of Child Support Services is ordered to show that the alleged arrears
is accurate. *See* attached March 6, 2023 hearing transcript. Explicitly stated
throughout 42 USC 654, "accuracy" requires no accounting alterations generated offline
then hard input into the automated system, no fraud, no inducements, no interstate
extortion under color of state law, and for certain no 12% compound interest on overdue
support.

**B. CALCULATED FAILURE BY THE JUDICIARY TO INTEGRATE THE
TITLE IV-D AGENCIES' ELECTRONIC FILING SYSTEM INTO ODYSSEY
RESULTING IN AGENCY FILINGS BEING INVISIBLE TO ALL COURT
USERS EXCEPT THE JUDGE AND THE AGENCIES THEMSELVES – COVER
UP**

Because under the State's Plan the Title IV-D agencies routinely file in the Rhode Island court system for the illegal enforcement of illegal 12% compound interest disallowed under 42 USC 654(21)(A), the political subdivision Rhode Island Judiciary deliberately failed to integrate the Title IV-D Agencies' electronic filing system with the State's electronic filing system Odyssey in order to make Title IV-D Agency electronic filings invisible to all court users except the judge and the agencies themselves, calculated to cover up the 12% compound interest from audit by the federal authorities and from the Public.  This came to light at the WebEx hearing in this Title IV-D matter before Judge Merolla on June 8, 2023 scheduled at 2PM, where Judge Merolla, showing he was unaware of the failure of systems integration, questioned Paul Gould of Rhode Island Office of Child Support Services, why Defendant is unable to see the agency's electronic filings that the judge can see in the system.  Without hesitation, Paul Gould explained that this is due to the electronic court implementation process that was supposed to integrate the agency's legacy system to Odyssey, demonstrating conclusively that Gould, the Lead Counsel of the Rhode Island Office of Child Support Services responsible and overseeing agency court filings in Title IV-D cases, undisputedly was in the know and part of the conspiracy involving the deliberate failure of filing system integration and its continuing perpetration in Title IV proceedings that made Title IV agencies' filings invisible as part of the cover up.

### C. FALSIFYING ACCOUNTING TO SHOW $0.00 PAYMENT IN DECEMBER 2021 in DEFENDANT'S TITLE IV-D ACCOUNT POWERED BY THE AUTOMATED DATA PROCESSING SYSTEM IN ORDER TO DEFRAUD DEFENDANT IN THE FUTURE

Defendant attaches hereto **EXHIBIT G**, that shows the Defendant's online Title IV-D OCSS account which is powered by the Automated Data Processing System, as of November 2022 at the time of the RI EOHHS Appeal, which showed **$0.00 Payment for December 2021**.  Therefore, the Rhode Island Office of Child Support Services through accounting fraud never recorded, as late as November 2022, in the Automated Data Processing System Defendant's large lump sum payoff of $104,185.98 bank wired from Texas on December 7, 2021, showing prima facie accounting fraud.  This shows a scheme to defraud the Texas Defendant in the future.  This shows that the Rhode Island Office of Child Support Services received Defendant's wired funds and treated it as a cash receipt, without ever recording in the automated data processing system such a large lump sum payment.  Kevin Tighe, Barbara Grady, Gero Meyersiek, John Langlois, Paul Gould, and Priscilla Glucksman, among others, distributed the $104,185.98 among themselves in their organized conspiracy to defraud.  Defendant's lump sum payment was distributed allegedly via a check, not through the usual cash card on December 9, 2021, (see attached hereto TRAC record for December 2021) record information of which check that was allegedly issued by the Office of Child Support Services the agency refuses to furnish the Defendant, and which are under subpoena now.  Further, the Office of Child Support Service's maintaining a separate offline accounting system in this case constitutes fraud and accounting fraud, targeting the Defendant in Texas, targeting Texas properties and targeting the United States of America.  This is why they never utilized the 42 USC 654(7), (14), (20) and 42 USC 666(14) cooperative system with Texas, so as to enable them to divide the defrauded cash spoils offline among the members participating in the scheme.  This accounting fraud and scheme to defraud

violate mail fraud, wire fraud, honest services fraud, RICO, record tampering, theft of the United States, and felonious fraud, among others.

In reality, under 42 USC 651-669, employees who engage in, aid and abet and facilitate the above must be terminated and must not be permitted to continue criminal activities of record tampering, accounting fraud, fraud, theft under color of state law and cover up.

### IV.     CRIMINAL VIOLATIONS REPORTED TO SOME JUDGE OF THE UNITED STATES AND OTHER LISTED AUTHORITIES UNDER 18 U.S.C. sec. 4

The Defendant, in good faith and reliant on the plain language of 18 USC § 4, misprision of felony, as well as the Brief filed in the United States Supreme Court by the United States of America in the Supreme Court case, *Turner v. Rogers*, 564 U.S. 431 (2011) that showed South Carolina (found by the 4th Circuit Court of Appeals) liable for $75 million in penalties for that state's 42 USC 654 violations that did not even involve, *inter alia*, fraud and tampering with the record or unlawful 12% compound interest put into then taken off then put back on the automated data processing system as here in Rhode Island, made known the above activities to "some judges" of "the United States" and other relevant federal authorities – counting among the United States judges Defendant made known publicly in the Amended Complaint filed in the United States District Court for the District of Rhode Island, Judge William E. Smith.  The issue of what Judge Smith has done with the information "made known to him" is pending before the United States Court of Appeals for the First Circuit before a requested panel of judges under the federal law of civil procedure.  Therefore, under 18 USC 4, the above

reported activities have been "made known" to several high ranking judges of the United States.

## A. VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Defendant made known to the panel of judges of the United States allegations contained in the Amended Complaint filed in Federal Court of the commission of acts by the Rhode Island political subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein in this motion, the afore-described acts violating 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 – such violative acts by the Plaintiffs in this matter, along with the political subdivisions and employees thereof named in the federal matter, and/or Judge Smith on this list are not exhaustive.  It is undisputable, among others, that Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-D and Title IV-A disgorgement is due from the applicable State of Rhode Island's political subdivisions.

## B. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF AMERICA v.*

*DONALD J. TRUMP*, DC Circuit, the DC Circuit United States Court of Appeals reminds

the Public and all applicable tribunals that Judges are similarly liable to the criminal

laws for their official acts.  A notable example is *Ex parte Commonwealth of Virginia*, in

which the Supreme Court affirmed the criminal indictment of a judge based on an

official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for

violating a federal statute that prohibited discriminating on the basis of race in jury

selection. *Id*. at 340, 344. The Supreme Court began by observing the principle that

officers are bound to follow the law: "We do not perceive how holding an office under a

State, and claiming to act for the State, can relieve the holder from obligation to obey the

Constitution of the United States, or take away the power of Congress to punish his

disobedience." *Id*. at 348. The Court then addressed the judge's argument that the Court

lacked the authority to punish a state judge for "his official acts." *Id*. Its response was

twofold. First, the Court described juror selection as "merely a ministerial act, as much

so as the act of a sheriff holding an execution, in determining upon what piece of

property he will make a levy, or the act of a roadmaster in selecting laborers to work

upon the roads." *Id.* The Court then explained that even if juror selection is considered a

"judicial act," the judge had a legal duty to obey the criminal laws:

> "But if the selection of jurors could be considered
> in any case a judicial act, can the act charged
> against the petitioner be considered such when
> he acted outside of his authority and in direct
> violation of the spirit of the State statute? That
> statute gave him no authority, when selecting

> jurors, from whom a panel might be drawn for
> a circuit court, to exclude all colored men
> merely because they were colored. Such an
> exclusion was not left within the limits of his
> discretion. It is idle, therefore, to say that the
> act of Congress is unconstitutional because it
> inflicts penalties upon State judges for their
> judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

> [W]e have never held that the performance of
> the duties of judicial, legislative, or executive
> officers, requires or contemplates the
> immunization of otherwise criminal deprivation
> of constitutional rights. On the contrary, the
> judicially fashioned doctrine of official
> immunity does not reach 'so far as to immunize

> *criminal conduct proscribed by an Act of*
> *Congress . . . .'*

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See* also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493

F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled

on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not

immune, and employees of the political subdivisions of Rhode Island under 42 USC

654(1) similarly are not immune.  Barbara Grady and Gero Meyersiek are

unquestionably liable.

### V.    CONCLUSION

**Under 42 USC 654b, the Defendant is entitled to be furnished all subpoenaed records – conversely, the Rhode Island Office of Child Support Services, the SDU under the State's Plan under 42 USC 654, must furnish all subpoenaed information – refusal of which incurs another penalty.**

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or

designee-Judge Merolla of this Honorable Court to:

1. Grant the Defendant's Motion to Compel.

2. Grant the Defendant's request for her Title IV record information that includes record information relating to the "TRAC notes of 12/6/2021 and 12/7/2021" as well as relating to the substance of John Langlois's audio recorded October 5, 2022 statements regarding "what happened in this case" that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the Child Support Services that Gero Meyersiek said yes, he "agreed to waive the $73k or $75k that are in arrears" as of December 6, 2021 and October 5, 2022 which are part of Defendant's child support case file.

3. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request.

4. Order a hearing on the herein issues raised in this matter.

5. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here:

   https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

6. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

March 21, 2024

FOR DEFENDANT

MARY SEGUIN, Pro Se.

By: *Mary Seguin*

Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

**NOTICE OF HEARING**

Please take notice that the foregoing Motion will be called for hearing before the Rhode Island Family Court, One Dorrance Plaza, Providence, RI 02903 at 10:00 AM on March 28, 2024 (case is already scheduled for that date/time) by WebEx hearing https://ricourts.webex.com/meet/garrahy5F

## CERTIFICATION

I hereby certify that a copy of the within Motion was filed on March 21, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

*Mary Seguin*

Exhibit A



# STATE OF RHODE ISLAND

## FAMILY COURT

### SUBPOENA - CIVIL

| Plaintiff | Civil Action File Number |
|---|---|
| STATE OF RHODE ISLAND EX REL. GERO MEYERSIEK | K2001- 0521M |
| **Defendant**<br>MARY SEGUIN | |

☐ **Murray Judicial Complex**
Newport County
45 Washington Square
Newport, Rhode Island 02840-2913
*(401) 841-8340

☐ **Noel Judicial Complex**
Kent County
222 Quaker Lane
Warwick, Rhode Island 02886-0107
*(401) 822-6725

☐ **McGrath Judicial Complex**
Washington County
4800 Tower Hill Road
Wakefield, Rhode Island 02879-2239
*(401) 782-4111

☑ **Garrahy Judicial Complex**
Providence/Bristol County
One Dorrance Plaza
Providence, Rhode Island 02903-2719
*(401) 458-3200

TO: JOHN LANGLOIS, KEVIN TIGHE; PAUL GOULD, FRANK DIBIASE
of RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES 77 DORRANCE ST PROVIDENCE RI 02903

☑ **YOU ARE HEREBY COMMANDED** to appear in the Family Court listed above at the date, time, and courtroom specified below to testify in the above-entitled case and bring with you:

① ALL RECORDS, FILES NOTES, PUBLIC RECORDS, DOCUMENTS, FILMS, MATERIALS GENERATED IN THE COURSE OF ADMINISTRATION OF AND ENFORCEMENT OF RELATING TO DEFENDANT MARY SEGUIN, FROM 2010 TO THE PRESENT, IN THIS TITLE IV-D CASE UNDER THE SOCIAL SECURITY ACT

② ALL RECORDS RELATING TO DEFENDANT MARY SEGUIN FROM 2010 TO THE PRESENT, INCLUDING NOTES AND MESSAGES TAKEN AND GENERATED ON OCTOBER 5, 2022.

| Courtroom | Date | Time |
|---|---|---|
| GARRAHY COURTROOM 5F | MARCH 28, 2024 | 9:30 AM |

If you need language assistance, please contact the Office of Court Interpreters at (401) 222-8710 or by email at interpreterfeedback@courts.ri.gov before your court appearance.

* If an accommodation for a disability is necessary, please contact the Family Court Clerk's Office at the telephone number listed above as soon as possible. TTY users can contact the District Court through Rhode Island Relay at 7-1-1 or 1-800-745-5555 (TTY) to voice number.

Page 1 of 2

FC-73 (revised June 2020)

Exhibit B

Case Number: PC-2013-5221M   Document: 001181200661   Page: 905   Date Filed: 04/09/2024   Entry ID: 6638760
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL ASMXA201
           TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION      COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (██████████████████████████). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BY NCP___
AS NCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:           SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK   GERO    K   PNL:
```

Case Number PC00182714
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

12/13/22   11:20        C A S E   T R A C K I N G        CSCL   ASMXA201
          TRAC.00               CASE HISTORY             U024   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSMENTS SO WE CAN GET THIS SORTED____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES___

RL: 80  12 22 ABSP:        SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:       MEYERSIEK   GERO     K    PNL:

Case 23-1867 Document: 00118130661 Page: 907 Date Filed: 03/29/2024 Entry ID: 6638760
Case 23-1867 Document: 00118130661
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

12/13/22    11:29         C A S E    T R A C K I N G         CSCL   ASMXA201
            TRAC.00                 CASE HISTORY              U824   PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSIDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
        FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KXM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID: ▆▆▆▆▆▆
        FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: SO  12 22 ABSP:              SEGUIN      MARY          CMD: _____
FWK: TRAC  D CLIENT:            MEYERSIEK    GERO    X     PNL:

Case Number: 20-1067A    Document: 00118130881    Page: 908    Date Filed: 04/09/2024    Entry ID: 6638760
Filed in Providence/Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria G.

11:29:53 Tuesday, December 13, 2022

```
12/13/22   11:29        C A S E   T R A C K I N G       CSCL  ASMXA201
.          TRAC.00          CASE HISTORY                U824  PROD
STARTING DATE   09 01 2021
SELECTION     COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

RL: 80  12 22 ABSP:            SEGUIN       MARY        CMD: _____
FXX: TRAC  D CLIENT:           MEYERSIEK    GERO     K  PNL:
```

ed in Providence/Bristol County Family Court
ibmitted 6/7/2023 10.13 PM     Document: 00118130681     Page: 909     Date Filed: 03/09/2024     Entry ID: 6638760
ivelope: 4132704
iviewer: Maria O
11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00            CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
       TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
       58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

RL: 80  12 22 ABSP:          SEGUIN       MARY          CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK    GERO    K     PNL:
```

12/13/22   11:28          C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00               CASE HISTORY                U824   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
   TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
   58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

RL: 80  12 22 ABSP:              SEGUIN        MARY          CMD:
FNX: TRAC  D CLIENT:            MEYERSIEK      GERO      K   PNL:

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00               CASE HISTORY            UB24  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS__

```
RL: 80  12 22 ABSP:            SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK   GERO    K   PNL:
```

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E    T R A C K I N G      CSCL  ASMXA201
            TRAC.00              CASE HISTORY            U824   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

```
RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:              SEGUIN     MARY          CMD: _____
                                 MEYERSIEK  GERO    K     PNL:
```

Exhibit C



Exhibit D

State of Rhode Island and Providence Plantations


PROVIDENCE, Sc.                          FAMILY COURT




*******************************
GERO MEYERSIEK



Vs.                          F.C. FILE NO. K2001-0521M



MARY SEGUIN
*******************************


Heard Before:

The Honorable Magistrate Armando O. Monaco

On March 6, 2023


**APPEARANCES:**


FOR MS. SEGUIN. . . . . Pro se

FOR THE STATE. . . . .. Paul Gould, Esq.




1

I HEREBY CERTIFY THAT THE

FOLLOWING IS A TRUE AND ACCURATE

TRANSCRIPT IN THE CASE OF

GERO MEYERSIEK VS. MARY SEGUIN

HEARD BEFORE

MAGISTRATE ARMANDO O. MONACO

ON MARCH 6,2023.

STEVEN FAZIO
ELECTRONIC COURT REPORTER

1                **GERO MEYERSIEK V. MARY SEGUIN**

2                      **F.C. NO. K2001-0521M**

3                      **MARCH 6, 2023**

4

5                **MARY SEGUIN:** Having been

6      duly sworn testifies as follows:

7                      THE COURT: After the

8      February 12th hearing two orders were submitted

9      one by each side, objections were filed through

10     your order being entered, ma'am.

11                     MS. SEGUIN: Thank you Your

12     Honor. I am sorry. Could you repeat that again?

13     Sorry.

14                     THE COURT: Subsequent to the

15     hearing of February 10,2023, two separate orders

16     were submitted for my signature. One you

17     submitted and one the State submitted. The State

18     filed an objection to the submission of your

19     order on the basis that they alleged, I believe,

20     that it is not what I said.

21                     MS. SEGUIN: And I also filed

22     an objection to their proposed order that also

23     clearly states a lot of additional items that

24     were never before the Court. Including the

25     number now that they have now, they submitted a

3

1    $75,623.71 and then another one for $6028.75.

2    These two numbers were not even in their

3    original motion to establish arrears that was up

4    before the court on February the 10th and those

5    two numbers were never brought up as well. And

6    without a clear understanding and audit of what

7    those numbers represent. Because they

8    unilaterally of their own volition without any

9    court approval.

10                    ATTORNEY GOULD: Judge,

11    objection.

12                    MS. SEGUIN: Took off the

13    interest.

14                    THE COURT: Let me interrupt

15    you, ma'am. Where are you getting these two

16    numbers from? I do not see them anywhere.

17                    MS. SEGUIN: Exactly. That is

18    the order proposed order that the State had

19    filed. You are absolutely right. Your Honor.

20    Those two numbers--

21                    THE COURT: I am looking at

22    the proposed state order that has different

23    numbers then what you are saying.

24                    MS. SEGUIN: The proposed

25    order that they submitted to me, on #4 it says

4

1    $75,623.71 for interest. And then a medical

2    support interest for $6028.75. Now these two

3    numbers were never before the Court before on

4    February the 10th. On February the 10th they

5    brought up a motion that mentioned $81,000.

6                    THE COURT: Well, maybe that

7    is a combination of the two numbers.

8                    ATTORNEY GOULD: Yeah, Judge.

9    That is the combination.

10                   MS. SEGUIN: So sorry, go

11   ahead.

12                   ATTORNEY GOULD: There was an

13   objection, Judge.

14                   THE COURT: Yeah, what is

15   your objection, Paul?

16                   ATTORNEY GOULD: We are off

17   the subject. The subject is whether this order

18   should enter or not.

19                   THE COURT: Right.

20                   ATTORNEY GOULD: Not about

21   any agreements, not about anything else other

22   than the numbers and Judge if I may or I will

23   let the defendant continue Judge.

24                   THE COURT: I thought my

25   order was very simply was to set the arrears as

1    they appear on the State computer but without

2    prejudice and then there will be a subsequent

3    hearing to determine whether or not those

4    numbers are in fact accurate. As I am reading

5    the order, they put two numbers in and it is

6    clearly, let me read the paragraph. Yeah,

7    paragraph six, the Court finds that the total

8    the arrears of $81,000, which is the combined

9    number is placed on the Child Support ledger

10   without prejudice to the June 8, 2023 hearing.

11   The State agrees it shall respond to the

12   defendant's first request for production of

13   documents forthwith.

14               MS. SEGUIN: Yes, Your Honor.

15   So therefore, you had not made any kind of

16   findings of fact of whatever they might be. You

17   simply said put the interest back--

18               THE COURT: Yeah, I said

19   whatever the computer says is the balance. Put

20   it on the computer without prejudice, which

21   means that we need a starting point. You need to

22   know what they allege you owe and that is what

23   they are alleging you owe. You disagree with

24   that number. You asked them for the

25   documentation to substantiate that number. That

6

1    is why I continued it out all the way to June so

2    that you would have an opportunity to get their

3    materials, for you to you digest their

4    materials, provide counter materials back to

5    them. So that in June, a full hearing can be

6    held with everyone totally prepared as to argue

7    either position. Either there is no money due or

8    there is a balance due. I never made any finding

9    whatsoever there is in fact a balance due. If I

10   did, I would not have continued the hearing.

11            MS. SEGUIN: Thank you, Your

12   Honor. That is exactly what my understanding as

13   well.

14            THE COURT: Right. That is

15   what the order says. It says put the number on

16   the computer, but without prejudice, which means

17   both sides have to argue and convince the Judge

18   that that is in fact the number. Or you are

19   going to argue it is an incorrect number and you

20   are going to substantiate it by whatever

21   arguments you present. They going to

22   substantiate it by whatever arguments they

23   present. And then whoever hears it in June will

24   decide which side is correct.

25            MS. SEGUIN: Thank you, Your

7

1  Honor. I wanted to make sure that, you know,

2  that all parties understand that because at this

3  point, the State is saying that you already

4  found that I had—-

5              THE COURT: No, no. The State

6  is not saying that because the order clearly

7  says those numbers or that number is without

8  prejudice, which means I did not establish that

9  number. We do it in many of these cases to get

10 the ball rolling, so either side knows what they

11 need to produce to substantiate their positions.

12 The same way they can come in now and say, Oh,

13 no, we made a mistake. She actually owes

14 $185,000.

15             MS. SEGUIN: You are giving

16 me a heart attack, Your Honor.

17             THE COURT: It puts a cap on

18 what they can argue.

19             ATTORNEY GOULD: Judge, can I

20 respond now?

21             MS. SEGUIN: So, Your Honor,

22 with that in mind, just to clarify, that is what

23 they are saying in 2018 when they first took

24 off--

25             ATTORNEY GOULD: Objection.

8

1          THE COURT: Just a minute.

2     The order speaks for itself. It says the balance

3     on the computer as of whatever dates in there. I

4     cannot read it now quickly, whatever dates in

5     there, that is the balance on the computer. They

6     have to substantiate it. They are going to send

7     you documentation supposedly to substantiate it.

8     If they cannot substantiate, then they are not

9     going to get that number.

10          ATTORNEY GOULD: Judge, I

11    disagree with that. Judge, we have no obligation

12    to substantiate this. There is a Child Support

13    number that was established by Judge McCann. You

14    took judicial notice of that.

15          THE COURT: I took judicial

16    notice that there was no appeal of his order.

17    That is what the judicial notice of.

18          MS. SEGUIN: Thank you, Your

19    Honor. Thank you, Your Honor. That is my

20    understanding as well that you took judicial

21    notice of the orders themselves. But what is in

22    dispute is how the child support office has

23    handled this computation.

24          THE COURT: That's the

25    argument for June, ma'am. That is the argument

9

1     for June.

2                    MS. SEGUIN: Taking that off

3     the system without your approval. Now, put it

4     that way--

5                    THE COURT: What you are

6     arguing now is what you need to argue in June. I

7     am satisfied that the order that has been

8     presented by the State that breaks down the two

9     balances that the total is $81,000 is in fact

10    the appropriate order from the hearing. It is

11    without prejudice. They are going to provide

12    documents that you requested so that you can

13    then decide whether or not you agree or

14    disagree. And if you disagree with their method

15    of calculating it, you need to present why you

16    think that method is incorrect and what should

17    be the correct number if any.

18                    MS. SEGUIN: Yes, and

19    including a waiver of interest –

20                    THE COURT: You are arguing

21    whether the number is correct or not. That is

22    the whole purpose of making it without

23    prejudice.

24                    MS. SEGUIN: Yes, and that

25    would include the waiver of interest that had

10

1    occurred.

2                    THE COURT: No, that is the

3    subject of the hearing. That is the subject of

4    the hearing. I am making no finding about

5    whether there was or was not a waiver of

6    interest.

7                    MS. SEGUIN: Thank you, Your

8    Honor. So that is part of the discovery that

9    needs to happen.

10                    THE COURT: Well, that is

11    what I assume you are asking for. Is to get the

12    documentation that would have substantiate your

13    belief that there was the waiver of the

14    interest.

15                    MS. SEGUIN: Thank you, Your

16    Honor.

17                    THE COURT: So, if you can

18    substantiate that there was a waiver of

19    interest, that balance disappears.

20                    MS. SEGUIN: So, the State is

21    objecting to producing those protected

22    documents—

23                    THE COURT: No, no. They are

24    not objecting to producing any documents. The

25    line paragraph says in paragraph 10, The State

11

1      agrees it shall respond to the defendant's first

2      request for production of documents forthwith.

3      So, whatever you asked them for, they are going

4      to they are going to provide to you. If you do

5      not think they provided everything you asked

6      for, you file a supplemental request.

7                    ATTORNEY GOULD: The State

8      filed its answer in response to her request for

9      production, Judge. And I will stand by that. And

10     I will argue those issues that we refuse to

11     answer, or we objected on procedural grounds or

12     we objected on legal grounds for what we did.

13     And I will respond to that when it is

14     appropriate.

15                    THE COURT: That would be

16     June 8th. That will be done on June 8th. So, you

17     can be prepared to go forward on whatever your

18     objections are and whoever hears it will decide

19     whether the objections were valid or not.

20                    MS. SEGUIN: Your Honor, Mr.

21     Gould had said something to me, emailed

22     something to me to the affect that he said you

23     will be retiring June the 8th. I just wanted to

24     know why he emailed me something like that.

25                    THE COURT: It has been

1    projected that I am to retire sometime before

2    July 1st. They are dealing with my successor and

3    I sit until my successor is appointed and

4    qualified. And the projection is by the end of

5    the by end of June, the latest could be earlier.

6    I do not think it could be later, but it is

7    possible.

8            ATTORNEY GOULD: And Judge,

9    because we, I guess, we like making these

10   artificial records, I will make this record

11   here. I did not say that snd I resent the

12   defendant putting words in my mouth.

13           MS. SEGUIN: I indicated the

14   email that you wrote to me.

15           THE COURT: Listen, just a

16   minute, just a minute. Whether I sit or I do not

17   sit is an immaterial situation, it has nothing

18   to do with what is before me today. I am ruling

19   on the order they sent you breaking down the

20   balances between the child support and medical

21   arrears is valid as to what I said the last time

22   we were here. I am going to sign that order and

23   proceed with their discovery. Whatever

24   objections you have relative to the discovery

25   and whoever sits here, whether it is me or

1    someone else, they will be prepared to address

2    the situation. Okay.

3              MS. SEGUIN: Thank you, Your

4    Honor. Thank you. One last question about number

5    11 and 12. I mean, those elements—

6              THE COURT:  11 and 12?

7              MS. SEGUIN: Yeah, 11 and 12.

8              THE COURT: 11 tells you how

9    to contact us. 11 is how to contact us and 12 is

10   a standard paragraph that they put in indicating

11   that, I don't know why it's here, but they that

12   the standard paragraph they stick in every case

13   has no bearing on this one. Other than it says

14   that until it is paid in full, you know, the

15   order will continue to run. But there is no

16   order running in terms of what your obligation

17   to pay that is.

18             MS. SEGUIN: Okay, okay. So

19   that is something that is boilerplate.

20             THE COURT: That is

21   boilerplate and 11 is how you get in touch with

22   us.

23             MS. SEGUIN: Sure.

24             THE COURT: We do not put

25   that in, we will never have any hearings.

14

1           MS. SEGUIN: Thank you, Your

2     Honor.

3           ATTORNEY GOULD: If I could

4     talk this time a little bit. Maybe just for the

5     record. Those same paragraphs were in the

6     September 25th, 2012 orders. And that same

7     boilerplate languages in a July 11, 2012 orders

8     and any other order that she would receive.

9     August 15, 2012. That same identical language

10     was contained in those. It is boilerplate.

11           THE COURT: Yeah,

12     boilerplate. All right, we will see you on June

13     8th at 2:30. Wait a minute. Daylight savings

14     time is starting soon.

15           MS. SEGUIN: Oh, yeah.

16           THE COURT: All right. Do you

17     go on daylight saving time? Pay attention.

18           MS. SEGUIN: Okay.

19           THE COURT: This coming

20     Saturday, our clocks jump forward an hour. So,

21     your clock does not jump forward. You are going

22     to have to call in an hour earlier.

23           MS. SEGUIN: All right.

24           THE COURT: I have friends

25     that live in Arizona, and they told me that in

15

1    Arizona, there were three different time zones

2    in the summer.

3    MS. SEGUIN: Yeah, every

4    county is allowed to do that out here.

5    THE COURT: I know that. That

6    is why that is why I pay attention to it because

7    they tell me that people have trouble. They

8    think, Oh, I am going to be on time, I am going

9    to Court. They said, No, you are an hour late.

10   What do you mean? This is the time across the

11   street. No, that is an hour different than us.

12   MS. SEGUIN: It really is

13   crazy. That they have marked it off, not a

14   county, but across the street. You are

15   absolutely right.

16   THE COURT:  All right. So,

17   pay attention. It is 2:30 our time.

18   ATTORNEY GOULD: Judge, if I

19   may. The order I submitted that contains 12

20   paragraphs.

21   THE COURT: Yes.

22   ATTORNEY GOULD: February 10,

23   2023, starting with paragraph one, the matter is

24   continued.

25   THE COURT: Yes.

16

1          ATTORNEY GOULD: That order

2     is going to be accepted by the Court. That will

3     be the order of the Court for that day?

4               THE COURT: Right.

5               ATTORNEY GOULD: The order

6     that she submitted will be stricken, correct?

7               THE COURT: Right.

8               MS. SEGUIN: Yes, that is my

9     understanding, too. Yes.

10               ATTORNEY GOULD: Thank you,

11     Judge.

12               THE COURT:  All right. We

13     will see you in June.

14               ATTORNEY GOULD: One more

15     thing. I am sorry. Judge, if I may, can the

16     defendant place her address on the record?

17     Because we sent some correspondence that was

18     sent back to us. Now we have used her email as a

19     courtesy to her and we also need an actual

20     street address so that we can send her

21     documents.

22               MS. SEGUIN: Your Honor, I

23     think this is, I do not really understand why --

24               THE COURT: Let me just

25     interrupt. Let me interrupt. When you enter your

17

1        appearance, you need to provide under the rules

2        your address, your phone number, and your email

3        address.

4                        MS. SEGUIN: Yes.

5                        THE COURT: And if you were

6        an attorney, obviously your bar number. Okay so

7        if you change any of those addresses or emails,

8        you are under an obligation to keep updating it

9        because if they send anything to the address or

10       the email that you provided, it's not a defense

11       later on, Oh, it's not my address or email, I

12       changed it. So that is why they are asking to be

13       sure they get the right method to contact you,

14       depending on what they have to send. It is a

15       part of the Court order that you provide your

16       address and email address.

17                       MS. SEGUIN: Your Honor, may

18       I also then ask that the State sent me a or e-

19       file any notices? Because they have been mailing

20       things to me in Texas, which takes 10 to 12 days

21       for me to receive by regular mail. So, could you

22       also please, I am going to ask you please to

23       ask, to make them, to order them to notice me by

24       electronic means as well.

25                       THE COURT: Well, that's part

18

1    of the rules, too.

2                    MS. SEGUIN: Okay.

3                    THE COURT: All right?

4                    MS. SEGUIN: Okay. Thank you,

5    Your Honor. I appreciate you telling me.

6                    THE COURT: All right, June

7    8th.

8                    ATTORNEY GOULD: I do not

9    have an address, Judge.

10                    THE COURT: Oh, that is

11   right. What is your updated address?

12                    MS. SEGUIN: My address is on

13   the on file is P. O. Box 22022 Houston, Texas,

14   77019.

15                    THE COURT: What about email?

16                    MS. SEGUIN: That's Mary

17   Seguin 22022 at Gmail.com. They are also in my

18   pleadings as well.

19                    THE COURT: Slow down. Slow

20   down. We do not type that fast.

21                    THE CLERK: I did not get

22   that P. O. Box. Can you give it to me again,

23   please?

24                    MS. SEGUIN: Yes, it is,

25   22022.

1                           THE COURT: That is the P. O.

2       Box number?

3                           MS. SEGUIN: Yes, Your Honor.

4                           THE COURT: Making sure it

5       was not the zip or area code.

6                           MS. SEGUIN: It is one too

7       many numbers.

8                           THE COURT: What is the zip

9       in Houston?

10                          MS. SEGUIN: It is 77019.

11                          THE COURT: All right, all

12      set?

13                          MS. SEGUIN: Thank you, Your

14      Honor.

15                          THE COURT: Okay, June 8.

16                          ATTORNEY GOULD: Thank you,

17      Judge.

18                          MS. SEGUIN: Thank you, Your

19      Honor.

20

21

22

EXHIBIT E

I HEREBY CERTIFY THAT THE FOLLOWING

IS A TRUE AND ACCURATE TRANSCRIPT

IN THE CASE OF MEYERSIEK VS. SEGUIN

BEFORE THE HONORABLE MAGISTRATE

SUSAN NAHABEDIAN ON FEBRUARY 2ND,

2024.

*A.B. Kuski*

AMANDA B. KUSKI
ELECTRONIC COURT REPORTER

1                            THE COURT: Good afternoon.

2                            PLAINTIFF: Good afternoon.

3                            THE COURT: This is K20010521, Gero

4  Meyersiek versus Mary Seguin. Both parties are present. Mr. Meyersiek's

5  Attorney, um, Achille, she's here. Um, the Clerk will swear you both in.

6                            CLERK: Miss Seguin, Mr. Meyersiek,

7  raise your right hands, please. You do solemnly swear that the testimony you

8  shall give to the Court in the matter now in hearing shall be the truth, the whole

9  truth and nothing but the truth, so help you God?

10                           PLAINTIFF: I do.

11                           DEFENDANT: I do.

12                           CLERK: Miss, Miss Seguin, just state your

13  name for the record.

14                           DEFENDANT: Mary Seguin.

15                           CLERK: Mr. Meyersiek, your name,

16  please, for the record.

17                           PLAINTIFF: Gero Meyersiek.

18                           CLERK: Thank you.

19                           THE COURT: Okay, good afternoon,

20  folks. This matter was continued from December 15th in order for the, uh, Court

21  Clerk to, uh, copy Court filings and other documents that were requested by

22  Miss Seguin. It's my understanding that those documents were sent to her

23  electronically, um, in various emails, uh, in December and the remainder of

24  those were sent at the beginning of January. Um, Miss Seguin, were you able to

25  review those and are you satisfied that you received everything that you request-

1  ed?

2  DEFENDANT: Um, thank you, Your

3  Honor. I had, uh, received, as you said, in two batches, uh, the Court records

4  that, um, Mr. Santamarina had, um, had emailed. Uh, the last several batches,

5  uh, were, sorry, batch was several documents, um, were only emailed about a

6  couple weeks ago. Uh, there, there were sent in separately about fifteen emails. I

7  think Your Honor was copied on all of them, as well as Mr. Gould, um, on those

8  emails, um, and so the records themselves, um, you know, that were sent to me

9  or emailed to me, um, the, the Court has a copy of those. Um-

10  THE COURT: I, I, so my question is, are,

11  are you, did, were you able to review them and are you satisfied that everything

12  that you requested, you received?

13  DEFENDANT: Um, I have not, uh,

14  received the actual audio recordings of the, that's part of the record.  Um, those

15  were-

16  THE COURT: Did you request, did you

17  request the audio recording from Mr. Santamaria?

18  DEFENDANT: Well, I requested all the

19  records. So, one of the paper documents had said that the, there was, uh,

20  attached to it, an audio recording of the State saying that Gero waived interest,

21  and I think that's very relevant to this case-

22  THE COURT: Okay-

23  DEFENDANT: -especially as it links to-

24  THE COURT: -let me just stop you-

25  DEFENDANT: -(inaudible)-

2

1    THE COURT: -let me just stop you, let me

2    just stop you for a minute, please. I'm new to this case, so I'm not familiar with

3    the audio recordings request. I'm not aware that you made that type of request.

4    Can you tell me the date of the audio recording and when you made that

5    request?

6    DEFENDANT: I made the request for all

7    Court information in this case. All Court information encompasses all

8    documents and all forms of records. Uh, that's, um, that's the, I believe, legal

9    understanding of all Court information of records.

10    THE COURT: Alright, Mr.-

11    DEFENDANT: So, that was part, that was-

12    THE COURT: -excuse me, excuse me one

13    minute. Mr. Gould, I'm trying to unmute you and I'm not able to do it from my

14    end. So, if you need to be unmuted, you'll have to do it yourself.

15    DEFENDANT: I had to, so I had

16    submitted those and this, uh, audio recording ha-, uh, is part of the Court records

17    as of, um, June 2023. That was emailed to me in a rel-, in a paper document

18    referring to attached, attached audio recording that is, um, that, that was emailed

19    by Mr. Santamaria. So, that recording, I want to make sure, uh, and, and that's

20    also copied to you by the way, Your Honor-

21    THE COURT: Alright, so-

22    DEFENDANT: -(inaudible).

23    THE COURT: -just, just, just going back

24    to December, okay, you provided, um, a request for documentation to be copied

25    by the Court Clerk, Mr. Santamaria, and all of those documents were scanned

1   and sent to you in an electronic form. Did you specifically request anything that

2   referred to an audio recording?

3                          DEFENDANT: I specifically record, uh,

4   requested all Court information, any and all Court information in the records of

5   my, of this particular case file. Those are the wording that I used, because I, I

6   don't know what's being, what's on, what's, what the Court record has. You

7   know, this is the reason why we went through this process, is, the, the, um,

8   Rhode Island Judiciary has set up this, uh, uh-

9                          THE COURT: So, Miss Seguin-

10                         DEFENDANT: -electronic Court system-

11                         THE COURT: -we're not-

12                         DEFENDANT: -where the (inaudible)-

13                         THE COURT: -so, Miss Seguin, we're not

14  gonna get into the Judiciary's access to the, um, to the portal. We're not gonna

15  get into that. We made every effort to make electronic copies of every Court

16  document pertinent to this case and sent them to you, at no cost, in an electronic

17  version. You did not, at any point, follow up with Mr. Santamaria to request an

18  audio recording.

19                         DEFENDANT: I'm just in a process of

20  reviewing this. That was part of your question, uh, Your Honor, is have I had a

21  chance to review all of these materials. It's, it's, it's, as, as you can see, several

22  because you've been covered, uh, copied on all the emails. There were several

23  emails, uh, you know, all together, probably thirty-something emails. Uh, I do

24  appreciate that. I, you know, I thank Your Honor for ordering that, um, and I

25  also, um, you know, am, am reviewing, have been reviewing. So, I came across,

1    to answer your question to the best of my ability, is I came across that doc-,

2    document where it refers to the audio file, uh, that's being submitted into the

3    record. I've asked for the Court records. So, um-

4                                    THE COURT: You received every Court

5    record, every document going back to-

6                                    DEFENDANT: Paper. I, I, I think what,

7    what-

8                                    THE COURT: Correct.

9                                    DEFENDANT: -wanted to, you know,

10    just, just to have a basic understanding of document is, in paper form, but Court

11    rec-, information as the Court record encompasses various different formats. All

12    public records encompasses various different formats. Uh, you know, that's,

13    that's written by statute and, you know, as I understand it what public records is.

14    Court records are a form of public records and, and it forms the basis of, um,

15    Judge created laws, and therefore, those are critical in my, uh, uh, you know,

16    access and that's the basis of this process that we're going through is accessing

17    those public records, Court information records, and, uh, accessing the laws that

18    were created, Judge created laws that were created, in this particular case or

19    relevant to this particular case. So, I, I'm just trying to, um, respond to your

20    question, uh, Your Honor, as to if I had a chance to review those, am I satisfied,

21    and so, these are the, what I'm raising to the Court, to Your Honor, to, in

22    response to your question is, I received the paper document, uh, I'm, I'm in the

23    process of reviewing them, um, because they, they form a chronology, they form

24    a, a, a background chronological, uh, reasoning behind, you know, uh, Judge

25    created laws, which are the orders, uh, issued. And in so doing, there are refer-

1  ences to a, a Court document that was sent to me, actually a couple of them, that

2  talks about an audio recording of the State saying that Gero waived interest, and,

3  uh, also the document, uh, there are documents that say Gero did not ask for

4  interest, but the State on oral motion asked for interest, but then the State's

5  policy is not to ask for interest in interstate cases-

6                              ATTORNEY GOULD: Judge, Judge, if I

7  may-

8                              DEFENDANT: -that is why. So-

9                              ATTORNEY GOULD: -Judge, can I be

10  heard?

11                              DEFENDANT: -that's why I need to

12  understand and get a full-

13                              ATTORNEY GOULD: If I may, Judge?

14                              THE COURT: Hold, just one, one minute,

15  Mr., Mr. Gould. So, the answer, so, your answer is, you're not satisfied with

16  what was sent?

17                              DEFENDANT: I'm explaining to you

18  what's missing.

19                              THE COURT: So, you are, you-

20                              DEFENDANT: And I'm trying to identify

21  to you what is missing-

22                              THE COURT: So, this Court-

23                              DEFENDANT: -and the Court records,

24  already are, are showing-

25                              THE COURT: -this Court, alright, ex-,

6

1    excuse me, Miss Seguin. Mr. Santamaria spent hours with a coworker manually

2    scanning and copying those files during a period of time that the Court was very

3    short handed. All of that documentation, okay, every pertinent document related

4    to this case, going back decades, two decades, was scanned and sent to you,

5    okay. We do not have a copy of an audio recording. So, we're not able to

6    provide that to you. There is no such audio recording in the Court record that

7    you, you are referring to. So, now I'm gonna give Mr. Gould an opportunity to

8    respond. Mr. Gould?

9                   ATTORNEY GOULD: Judge, like,

10    likewise, if she's requesting a transcript, then she has to go through the normal

11    process of paying for a transcript, ordering the specific date of the transcript she

12    wants. This is a Defendant who has failed to come to this Court with clean

13    hands, Judge. I've stayed silent-

14                   DEFENDANT: I object! I object, Your

15    Honor!

16                   ATTORNEY GOULD: -the whole time-

17                   THE COURT: Your objection is noted and

18    Miss Seguin, no one interrupted, you're muted. You're muted. You're muted

19    and you're going to stay muted. You're muted. Mr. Gould?

20                   ATTORNEY GOULD: Thank you, Judge.

21    We've let this go on for months after months. She brought up an issue relative

22    to, uh, the Court system. State of Rhode Island Child Support Enforcement, the

23    Magistrate hearing this case, has no control over that. She's now filed a Federal

24    lawsuit in the, uh, District of Texas, Judge. That's gonna play it's course 'cause

25    she'll file and follow through on that. This is a simple case of whether or not

1   interest is to accrue on this case and what payments were made. It's simple

2   math, it's simple, in, in fact, Judge, there's maybe five questions I have for the

3   Defendant, uh, of the Plaintiff relative to this, uh, inquiry. It would be a short

4   hearing. Uh, whether or not there was any monies paid, what was received, and

5   the fact that the Court can take Judicial notice of two orders. The fact that

6   there's a child support order that continues to run, and two, the fact that interest

7   has continued to run pursuant to Mag-, pursuant to Judge, uh, John McCann's

8   order dated 9/25/2012.

9                            THE COURT: Okay, the original support

10   order was entered May 24th of 2012?

11                           ATTORNEY GOULD: That's when it was

12   allowed to run on the Child Support system. That was at a period of time when

13   the arrears were set somewhere in the amount of $30,000.00. I have a copy of

14   the order. Paragraph four of the May 24th, 2012 order indicates that there was an

15   arrears of $30,458.00, as of May 24th, 2012. September-

16                           THE COURT: And am I, am-

17                           ATTORNEY GOULD: Sorry.

18                           THE COURT: -there were, there was no

19   appeal taken from that order.

20                           ATTORNEY GOULD: Correct.

21                           THE COURT: Just a minute, Miss Seguin.

22   I'm giving Mr. Gould an opportunity to speak, just like I gave you an

23   opportunity to speak. In that October 23rd, 2012 order, um, there is language that

24   indicates that interest would continue to run.

25                           ATTORNEY GOULD: Correct.

1          THE COURT: And nothing has changed

2   since then?

3          ATTORNEY GOULD: There's been no

4   order from the Rhode Island Family Court suspending interest. Correct.

5          THE COURT: Miss Seguin?

6          DEFENDANT: I object to every, uh,

7   statement that Mr. Gould had, uh, stated because they are, um, uh, perjurious.

8          THE COURT: You (inaudible), excuse

9   me-

10          DEFENDANT: Mr. Gould and Mr.

11   Langlois-

12          THE COURT: Excuse me, they're what?

13          DEFENDANT: They are perjuries. Mr.

14   Gould and Mr. Langlois and the State of Rhode Island representing the Rhode

15   Island Child Support Office, had, um, per this Court record, there is a document

16   that say's that they, that they had said that Gero had waived interest. (Inaudible)

17   2021 and they made that statement in 2022.

18          THE COURT: Ma'am, there's no Court

19   order that ever suspended-

20          DEFENDANT: (Inaudible).

21          THE COURT: -there's no Court order that

22   ever set the interest to zero. There's no Court order. You've received everything,

23   I've reviewed the file. There is nothing in the system where it, it was ever

24   waived or set to zero. The interest has stayed on the system.

25          DEFENDANT: We're, we're talking, uh,

1    actually on, on February the 10th, 2023, the first Court order of this, of this

2    decade that was issued has clearly, um, proven as evidence that interest was

3    taken off of the system. Mr. Gould had taken the interest off of the system, he

4    said in Court, in 2018. That is what he had said, and so, in, in Court, and

5    therefore, he has asked the Judge, or the Magistrate, uh, Monaco to put it back

6    on the record or, uh, Mr., and then Judge, um, uh, Monaco had only put it on

7    there with prejudice because he said that there's, that doesn't mean, that's just a

8    placeholder.

9                                    ATTORNEY GOULD: Objection.

10                                   DEFENDANT: So, Mr. Gould had lied,

11    just now, that's perjury on-

12                                   THE COURT: Uh-

13                                   DEFENDANT: -I'm deeply concerned

14    about this. These, these are documented in the order. The February 10th order

15    cannot be refuted. It was, it was prepared by Mr. Gould himself. It said that the

16    Court-

17                                   THE COURT: I don't see it.

18                                   CLERK: I don't see anything-

19                                   DEFENDANT: -(inaudible)-

20                                   THE COURT: -hold on, hold on. I'd, I'd

21    like to review that order and I, I don't see it.

22                                   CLERK: I don't see anything filed from

23    2013-

24                                   ATTORNEY GOULD: I'd like to be heard

25    on the objection, Judge.

10

1         CLERK: -to '22. I see nothing.

2         DEFENDANT: Well, that's a problem.

3         THE COURT: Are you saying that, excuse

4 me, just let me just clarify this. Again, I'm new to the case-

5         DEFENDANT: That was-

6         THE COURT: -you just made-

7         DEFENDANT: -that was-

8         THE COURT: -you just mentioned

9 Magistrate Monaco heard this and I'm looking for an order from that hearing

10 and I don't see one.

11        ATTORNEY GOULD: Since I was

12 accused of perjury, Judge, can I clarify something?

13        THE COURT: Yeah, Miss Seguin, I'm

14 gonna give Mr. opportunity, uh, Mr. Gould an opportunity to reply.

15        ATTORNEY GOULD: See, Miss Seguin

16 is a little confused about how the process is running. That there is an agency and

17 the Child Support Office is an agency charged with running the child support on

18 our system. The Court is in charge of ordering parties to pay child support and in

19 this case, pursuant to the order of Judge McCann back in 2012, he ordered child

20 support paid. Again in 2012, he ordered interest paid. Our system in 2018, our

21 system, the Child Support system, not a Court order, our system removed

22 interest because of an administrative decision, because this case had become an

23 interstate case, the Plaintiff was out of, the Defendant mother was out of state.

24 There was a decision to remove interest from cases running on our system. That

25 doesn't mean that the interest doesn't run. It meant that the interest was removed

1  from our system, so that other jurisdictions were not confused, and it had to do

2  with, a lot of it, the, the fact that jurisdictions had different interest rates running.

3  So, in order to alleviate any confusion, our Administrator made a determination

4  to stop interest on all, uh, stop interest running on our system, not stop interest

5  pursuant to a Court order. So, that's the distinction. So, when I said earlier today

6  that there's no order that, uh, stopped the interest on the case, there is no order,

7  and then the other statement that, uh, the Plaintiff made, uh, Defendant made

8  relative to, um, the issue of prejudice of Judge Monaco's order, that's an

9  outright lie, Judge. Judge Monaco never said in Court, there's no Court order

10  that is without, or with prejudice, Judge. So, that's just an outright lie. I'll leave

11  it at that because I know I'll have another twenty minutes of, of rambling on by

12  the Defendant. So, I'll (inaudible)-

13                              THE COURT: Well, just, just to be clear, I

14  just want both sides to, to, to know, I don't see anything in the system reflecting,

15  um, any, any decision by Magistrate Monaco in May of this year. I don't see-

16                              DEFENDANT: Uh, February, February,

17  February of this year. So, February the 10th. February the 10th. This I why at the

18  same time the discovery was ordered, and this is why we are here on discovery

19  issues, as well, because it was ordered without, sorry, it was placed on the

20  system and the interest is WITH prejudice.

21                              ATTORNEY GOULD: No, Judge, I object

22  to that, that is not true. That is as far as the truth can be, Judge.

23                              DEFENDANT: Perjury, perjury-

24                              THE COURT: So, excuse me, hold on,

25  hold on, folks. I just found the order now that I just see that. It's February 10th,

1    paragraph four, "The Court finds the arrears of $81,652.46 that'll be placed on

2    the ledger without prejudice to the June 8th hearing. The arrears reflect interest

3    on the child support in the amount of $75,623.71 and interest of the medical

4    support in the amount of $6028.75".

5                                    ATTORNEY GOULD: So, Judge, is her

6    comments about prejudice, is that perjury? So, did she just commit perjury,

7    Judge, because I wasn't under oath, but I'll let that go.

8                                    DEFENDANT: The order, the order

9    clearly says that the-

10                                   THE COURT: That it was placed, that it

11   was placed on the ledger without prejudice. That's all, that's all it says. It was-

12                                   DEFENDANT: Which means-

13                                   THE COURT: -placed on the ledger-

14                                   DEFENDANT: -it means, it means it's not

15   owed.

16                                   THE COURT: No, it means, it doesn't

17   mean it's not owed. It, it, it's, it's, let's see, motion to set arrears and discovery

18   motions were not concluded on that date. Okay, so it was placed on the ledger

19   without prejudice because it was still an issue that was left open. Am I correct,

20   Mr., Mr. Gould?

21                                   ATTORNEY GOULD: Yes, Your Honor.

22                                   THE COURT: And with that, you may

23   inquire of Mr. Meyersiek. Thank you.

24                                   ATTORNEY GOULD: Thank you. First of

25   all, Judge-

13

1                            THE COURT: You're muted. You're

2   muted.

3                            ATTORNEY GOULD: I'd ask the Court,

4   I'd ask the Court to take judicial notice of the May 24th, 2012 order by Judge

5   McCann, in which he established the child support order, in which he establishes

6   an arrears of $30,458.00. That order was not appealed. That is the order of this

7   Court.

8                            THE COURT: The Court takes judicial

9   notice entered on May 24th, 2012, from which no appeal was taken.

10                        ATTORNEY GOULD: I'd ask the Court

11   to take judicial notice for the September 25th, 2012 order of Justice John

12   McCann in which the paragraph four indicates, "Interest will continue to run on

13   monies due".

14                        THE COURT: Likewise, the Court takes

15   judicial notice of the September 25th, 2012 order, again, in which no appeal was

16   taken.

17                        ATTORNEY GOULD: Thank you, Judge.

18   If I could inquire of the Plaintiff?

19                        THE COURT: Yes.

20                        ATTORNEY GOULD: Mr. Meyersiek,

21   you had a child support order that ran to your, uh, ran to your benefit in the

22   amount of $218.00 per week. Is that correct?

23                        THE COURT: Can't hear you, Sir.

24                        PLAINTIFF: (Inaudible).

25                        THE COURT: Very, very faint. It's hard to

1    hear you.

2                      PLAINTIFF: Is this better?

3                      THE COURT: Perfect.

4                      PLAINTIFF: Okay, good. Sorry. Yes, to

5    the best of my recollection, that was the amount.

6                      ATTORNEY GOULD: Did you ever

7    receive child support from the Defendant mother directly, after May 24th, 2012?

8                      PLAINTIFF: I only received two

9    payments. I believe one was in 2019 and one was in 2021.

10                     ATTORNEY GOULD: So, from-

11                     PLAINTIFF: I never, I never received

12    anything directly.

13                     ATTORNEY GOULD: From 2012 to

14    2018, you received nothing in child support, correct?

15                     PLAINTIFF: Not a single penny.

16                     ATTORNEY GOULD: And that was a

17    time when the child was a minor, correct?

18                     PLAINTIFF: Correct.

19                     ATTORNEY GOULD: That was during a

20    period of time when you could've used the money for the child, correct?

21                     PLAINTIFF: That is absolutely correct.

22                     ATTORNEY GOULD: And you received

23    nothing, correct?

24                     PLAINTIFF: That is correct, and I

25    should've had, I had to send my daughter to a school, I had to pay for every

1    meal, I had to pay for her clothing, I had to pay for everything.

2                                ATTORNEY GOULD: You received a

3    payment sometime in 2018 in the amount of $6,461.95, correct?

4                                PLAINTIFF: That is correct.

5                                ATTORNEY GOULD: And then you

6    received a payment in 2021, on or about 12/9 for 2021, in the amount of

7    $4,185.98, is that correct?

8                                PLAINTIFF: I don't recall the exact

9    amount.

10                               ATTORNEY GOULD: Does that number

11   refresh your memory somewhat?

12                               PLAINTIFF: Yes, it does.

13                               ATTORNEY GOULD: Are you looking to

14   collect interest that accrued on that money from, from, I'm sorry, from May

15   202-, May 24th, 2012 up until today's date?

16                               PLAINTIFF: Yes.

17                               ATTORNEY GOULD: Did you make any

18   contracts, agreements with Miss Seguin outside Court that indicated that you

19   were going to waive interest?

20                               PLAINTIFF: Absolutely not.

21                               ATTORNEY GOULD: I have no further

22   questions of the Plaintiff.

23                               PLAINTIFF: Thank you.

24                               DEFENDANT: Uh, Your Honor, I have

25   been unable to object to anything because, uh, I was put on mute, but-

1          THE COURT: Okay, well, we can note

2    your objection now.

3          DEFENDANT: The, the, uh, at the last

4    hearing, uh, as well as, uh, the, uh, hearing before you were, uh, appointed, uh,

5    by the, uh, Judge, uh, in June 2023, we were on a motion to compel. So,

6    therefore, I do not have, based on discovery, discovery has not been completed.

7    Therefore, I am not ready to present the, uh, evidence and present the

8    arguments.

9          THE COURT: What, uh, what specifically,

10   what are you seeking in discovery that you haven't received yet?

11         DEFENDANT: I have, uh, as you can see,

12   I have that motion, uh, that is pending, that has been pending since June of 2023,

13   to compel production relative to my, uh, request for documents. I, I have a

14   pending motion-

15         THE COURT: You, you, you received all

16   of the Court documents.

17         DEFENDANT: No-

18         THE COURT: What out, what outside of

19   the Court documents are you seeking in discovery?

20         DEFENDANT: I'm seeking based on my,

21   uh, on the Court record that would show that I'm seeking my case file.

22         THE COURT: You have-

23         DEFENDANT: I'm entitled-

24         THE COURT: -you, no, no.

25         DEFENDANT: I do not have a, my case

1    file-

2                              THE COURT: You do have your case file.

3                              DEFENDANT: -I do not have my-

4                              THE COURT: It was scanned-

5                              DEFENDANT: I do not!

6                              THE COURT: -and sent to you as you

7    already acknowledged by Mr. Santamaria in numerous emails. The entire Court

8    file was scanned in and sent to you.

9                              DEFENDANT: Oh, you're talking about

10   the Court file. I'm talking about my child support case file. I'm entitled under

11   Federal law to have access to my Federal, my child support case file, and that's

12   the discovery that's being ordered. I have not been able, they have denied, on

13   paper, which is submitted within this Court record. The Court record shows that

14   they have, uh, refused, uh, uh, raising all kinds of issues to produce my child

15   support case record.

16                             ATTORNEY GOULD: Objection.

17                             DEFENDANT: Under Federal law, under

18   the Federal law, under Title IV of the Social Security Act, which is what this

19   process and this legal hearing is under-

20                             ATTORNEY GOULD: Objection.

21                             DEFENDANT: -(inaudible) under-

22                             THE COURT: Alright, what's-

23                             DEFENDANT: I have rights.

24                             THE COURT: -what's the basis of your

25   objection-

                                      18

1          DEFENDANT: -I have a Federal rights-

2          THE COURT: -Mr. Gould?

3          DEFENDANT: -(inaudible), I have a

4    Federal right to my child support case file.

5          THE COURT: Hold on, Ma'am. He

6    objected and I wanna know the basis of his objection.

7          ATTORNEY GOULD: Relevance to the

8    issue before the Court, Judge. The issue before the Court is interest. The motions

9    that she's alleging that she's pursuing, the State file appropriate objections to her

10   discovery request. So, she needs a hearing on it instead of her other diversions

11   that she's had at the last nine months. We could've addressed these, Judge, but

12   we wanna keep pushing this off and pushing this off. So, the State has filed, the

13   State has responded to the discovery. I've had a conference with Miss Seguin, at

14   one point, to try to go over some of our disputes with regard to, with regard to

15   discovery. Uh, that did not turn out to be very productive. Uh, I have stated, uh,

16   on my, on her requests, uh, all the basis for our objections and I'm ready to

17   argue those objections, when she puts forth specific allegations, specific

18   documents in the specific request that she's looking for, but until then, Judge,

19   this is a real simple case of about whether or not this lady paid child support and

20   whether or not this gentleman is entitled to interest-

21          DEFENDANT: Objection.

22          ATTORNEY GOULD: -the Court has-

23          DEFENDANT: Objection.

24          ATTORNEY GOULD: -the Court has-

25          THE COURT: (Inaudible).

19

1       ATTORNEY GOULD: -filed-

2       DEFENDANT: Fundamentally, in order to

3    claim that I owe anything, I have a right to my child support case file under

4    Federal law.

5       THE COURT: Ma'am, what's this-

6       DEFENDANT: I have-

7       THE COURT: -what's specific document-

8       DEFENDANT: -(inaudible)-

9       THE COURT: -what specific document-

10      DEFENDANT: -since '21-

11      THE COURT: Ma'am, Ma'am, Ma'am, if

12   you keep yelling over me and over the Attorneys, this is not going to be

13   productive. I'm trying to just narrow this down to the specific piece of

14   information that you're seeking.

15      DEFENDANT: I am, Your Honor, I need

16   to have my entire case file. I, I have, the Court order-

17      THE COURT: Do you, do you-

18      DEFENDANT: -on February the 10th

19   ordered discovery. There were, by law, my right is to have my entire case file,

20   and, and by Federal Court, Federal law, I am entitled to have my entire case file.

21   Child support interstate encompasses, and this is an interstate case, encompasses

22   Federal law. It encompasses Texas law, because you are reaching your, your

23   long arm into the State of Texas. Therefore, I am entitled, by Federal law, and

24   by Texas law, as well as Rhode Island law, to have access to my child support

25   file.

1          THE COURT: Thank you Miss, Thank

2     you, Miss Seguin. Mr. Gould-

3          DEFENDANT: (Inaudible) Mr. Gould-

4          THE COURT: -what, what is the, what is

5     the State's objection-

6          ATTORNEY GOULD: Rel-, well for the

7     most part-

8          THE COURT: -to give-

9          ATTORNEY GOULD: -relevance, Judge.

10    She's, she is not gonna use the documents that she's requesting, in this case,

11    when she, when the documents you're requesting is what she is the target for in

12    her Federal case. So, she's not gonna use me as a pawn to get, to do her

13    discovery in her Federal case. This is a simple issue of child support, simple

14    issue of payments, but what she's trying to do is she tried to do her discovery,

15    her Federal discovery in this child support case. So, what I did is I laid out in, in

16    our responses, our objections, based on relevance. So, again, again, we went

17    another ten minutes of her for asking for certain, a multitude of documents

18    without her saying one specific document that she wants, one specific item, one

19    specific request for production that she's, we can do this, Judge. We can go for

20    another twenty minutes and do the same thing, but until she gets her eyes on a

21    piece of paper and looking at her motions and going word by word, and until we

22    can do that, Judge, I, we can't go anywhere. I've, I've stated our objection-

23          THE COURT: Well, that, I'm, I'm trying,

24    you know, I'm trying to work with you, Miss Seguin, to see if you can narrow it

25    down to a specific, a specific issue or a specific document that you believe

21

1  supports you and your contention that at some point, there was an agreement or

2  there was an order that waived the interest, but to be going on a fishing

3  expedition and insist that the State, uh, provide you with your case file, um, you

4  know-

5                                    DEFENDANT: Your, Your Honor,

6  discovery is to get my entire case file. I think that is something Federal law

7  guarantees, and it says so from 42 USC Section 654, all the way to 666. That

8  law luminous, uh, Federal law, codified by Congress, provides everyone in the

9  country the right to access all the case file, child support case file, maintained by

10  every and any State Government, and that is, I'm not the, eh, the, Congress has

11  never said that's sufficient expedition (?). Congress has said, you're allowed to

12  have your entire case file and from there on, you're even allowed to ask

13  questions. Why was this, why was, that's the due process and that is the equal

14  protection, and that is the Privileges and Immunities Clause that we're all

15  guaranteed and living under. This is an interstate case. I am entitled by the

16  Constitution and by Federal laws 654 to 666 to have access to my entire file. I

17  cannot, I am unable, no custodial parent or non-custodial parent is able, that's

18  mentioned in the Social Security Act, would be un-,would be able to actually

19  identify, say this is the document I'm asking for, but they don't have access to,

20  to the file.

21                                    THE COURT: Ma'am, you have access to

22  all of the Court orders.

23                                    DEFENDANT: I-

24                                    THE COURT: The Court-

25                                    DEFENDANT: But I-

1          THE COURT: -the Court, the Court is

2     what establishes the, the child support order, the arrears order, and interest goes

3     along with that, Ma'am. So-

4          DEFENDANT: You're talking about this

5     agreement that we're deal, talking about. Agreement that you just mentioned

6     that, Your Honor, deals with my case file and this is the case file I am, by law,

7     by the (inaudible), by Federal law, by Texas law, and by Rhode Island law,

8     entitled to have access to, and Mr. Gould and the Child Support, uh, Services

9     and, uh, of Human Services denies me both, all denying me access to those. So,

10    I am again, asking for that. I will ask in every possible jurisdiction for those

11    because I am entitled, by law, at least three jurisdictions. By Texas law, by

12    Federal law-

13          THE COURT: Thank you.

14          DEFENDANT: -and by Rhode Island law.

15          THE COURT: Thank you-

16          DEFENDANT: Nevermore-

17          THE COURT: -Mr. Gould? Thank you.

18    Okay, you've, you've you've made your point. I understand what your argument

19    is. Mr. Gould?

20          ATTORNEY GOULD: Judge, I went

21    another, I think, ten minutes, maybe nine minutes that time. I still don't know

22    what she's looking for. Uh, it's a motion to compel. If, if that's what she wanted,

23    then let's have the motion to compel. Let's hear that. Maybe, maybe she could

24    put those thoughts into words again and maybe come up with a plan that she

25    wants for this discovery, Judge, but what we're doing now is wasting your time,

1   and wasting my time, and we're not getting anywhere. So, we've provided her

2   volumes upon volumes of documents relative to her case. She had specific

3   questions that I objected to. The, the objections were timely. We had a

4   conference, we went through them. After the conference, I had not heard

5   anything from Miss, uh, Seguin. We've gone through, I think, since February,

6   five or six appearances, a couple before you. I, I could, that, that could be an

7   exaggeration. It could've been four, uh, but we've been before the Court and,

8   and we've come with other issues every time and we continue this and continue

9   this. Judge, again, in order to have equity, you have to have clean hands, and this

10  is a person who has failed to comply with THIS Court's orders. Not the

11  Constitution, not the Texas law, not the, not the Congress law. This is someone

12  who has failed to comply with your orders, with your Court's orders on a

13  specific matter-

14                          DEFENDANT: Objection.

15                          ATTORNEY GOULD: -with child support

16  with a very-

17                          DEFENDANT: Ob, objection.

18                          ATTORNEY GOULD: -very basic needs

19  of a child-

20                          DEFENDANT: Objection.

21                          ATTORNEY GOULD: -and we're gonna

22  give-

23                          THE COURT: I'm gonna, I'm gonna, I'm

24  going to allow him to speak, just like I allowed you to speak. Mr., Mr. Gould,

25  continue.

1          ATTORNEY GOULD: I, I've said

2     enough, Judge.

3          DEFENDANT: Objection.

4          THE COURT: Again, the Court, the Court

5     takes judicial notice of both the May 24th, 2012 Court order, as well as the

6     subsequent September 25th, 2012 Court order. Um, there was, um, no appeal,

7     um, taken from either one of those Court orders. With respect to, um-

8          DEFENDANT: Objection. Objection,

9     Your Honor.

10         THE COURT: Your objection is noted,

11    thank you very, thank you, your objection is noted.

12         DEFENDANT: He, he-

13         THE COURT: Mr. Gould, what is the

14    specific, uh, amount of interest that, um, is, uh, should be on the system? Is it

15    $81,652.49?

16         ATTORNEY GOULD: Yes, Judge.

17         THE COURT: Okay, and was that the

18    amount that was, um, placed on the system back in February?

19         ATTORNEY GOULD: Correct, Judge.

20         THE COURT: The Court finds-

21         ATTORNEY GOULD: That number

22    (inaudible)-

23         THE COURT: -the Court finds that that is,

24    based on no, absolutely no evidence to the contrary, that that is the amount, um,

25    that should be set on this as of today, today's date.

1                      ATTORNEY GOULD: Thank you, Your

2 Honor.

3                      DEFENDANT: Objection.

4                      THE COURT: Your objection is noted. I

5 gave my ruling.

6                      DEFENDANT: May, Your Honor, Your

7 Honor-

8                      THE COURT: I've made my ruling.

9                      DEFENDANT: - I would like to place on

10 the record that I have not been able to complete the discovery that there, that the,

11 uh, the, uh, Child Support Agency had placed on the record that there is an

12 agree-, asking about an agreement. I have not been able to cross examine the

13 Defendant. That is a violative of due process-

14                      THE COURT: Sir, you can, Sir-

15                      DEFENDANT: -because my, I have-

16                      THE COURT: Ma'am, Ma'am, Ma'am-

17                      DEFENDANT: -the right to examine-

18                      THE COURT: -if you have any questions-

19                      DEFENDANT: -(inaudible)-

20                      THE COURT: -for Mr. Meyersiek, feel

21 free to, feel free to ask him.

22                      DEFENDANT: So, therefore, we are now

23 vacating your prior decision-

24                      THE COURT: No, we're not! No, we're

25 not!

1                              DEFENDANT: -because we, because we

2    are, we have not gone through due process in terms of my asking, be able to

3    cross examine the Defendant. I'm sorry, the Plaintiff, the opposing party. I, I

4    would like to ask for my witness, Mr. Gould, to be, to the witness stand.

5                              THE COURT: Mr. Gould-

6                              ATTORNEY GOULD: Objection, Judge.

7                              THE COURT: Mr. Gould is not, is not a

8    witness.

9                              DEFENDANT: The State. The State, on

10   the State of Rhode Island and he represents the State of Rhode Island. He was

11   instrumen-, he had communicated with me prior to this particular proceeding,

12   the start of proceeding in 2022, by email, by conversation, and with John

13   Langlois. So, that's my witness. I'd like to put on the stand, as my witness-

14                             THE COURT: Today, the matter before-

15                             DEFENDANT: -regarding-

16                             THE COURT: -the matter before the

17   Court-

18                             DEFENDANT: -regarding-

19                             THE COURT: -is a motion to set-

20                             DEFENDANT: -the waiver of interest-

21                             THE COURT: -to set arrears-

22                             DEFENDANT: -regarding-

23                             THE COURT: Ma'am, Ma'am-

24                             DEFENDANT: -the waiver of interest-

25                             THE COURT: Ma'am, I'm gonna mute

                                        27

1  you again. The matter before the Court today is simply a motion to set arrears.

2  We set the arrears, there's nothing further before the Court. If you wanna file a

3  different motion, feel free to do so, but this matter is concluded with your arrears

4  being set at $81,652.49.

5                           DEFENDANT: Your, unmute, am I

6  unmuted?

7                           THE COURT: No. Yeah.

8                           DEFENDANT: Am I unmuted? Uh, I am

9  filing, I am asking for, um, uh, reconsideration because there is, I have not, I've

10  been, uh, uh, barred, obstructed from presenting evidence. I'd like to play, uh,

11  the audio recording of the waiver of interest.

12                           THE COURT: Today is the motion to set

13  the, to set the interest.

14                           DEFENDANT: And that's my defense-

15                           THE COURT: The motion to set arrears,

16                           DEFENDANT: -my defense is, I would

17  like to play the recording of the waiver of interest that the State had represented

18  that Gero had done. If I'm obstructed from, uh, providing evidence and we have

19  a due process issue in this proceeding. I have not been, I want to present

20  evidence, I want to cross examine the witness, I want to pro-, I want to call my

21  witness and I have a right to do so-

22                           THE COURT: Ma'am, if you want to do

23  that, this is not, this is not the forum for that. I can do that in another proceeding.

24                           DEFENDANT: Yes, it is! Yes, it is-

25                           THE COURT: Uh, well, I respectfully dis-

1    agree with you.

2                                    DEFENDANT: -because we are here-

3                                    THE COURT:  I respectfully disagree-

4                                    DEFENDANT: -to establish, we are here

5    to establish, we're here supposedly to establish interest and I am presenting

6    evidence that interest was waived.

7                                    THE COURT: Interest was not waived in

8    any Court order and that is the basis upon which-

9                                    DEFENDANT: It was waived-

10                                   THE COURT: -I made my decision today.

11                                   DEFENDANT: -(inaudible)-

12                                   THE COURT: Ma'am, Ma'am-

13                                   DEFENDANT: -it was waived-

14                                   THE COURT: -I'm muting you because

15   you don't let me speak. There is no Court order by this Court by any Magistrate

16   or Judge that waived or set the interest to zero. It is still in the system, and that is

17   why today I am going to establish that the interest owed by you on this account

18   is set at $81,652.49. There was no Court order to the contrary. This matter is

19   now concluded.

20                                   DEFENDANT: I am now, I am now

21   raising the issue, uh, that interest was waived by contract and agreement-

22                                   THE COURT: Ma'am, I, Ma'am-

23                                   DEFENDANT: -with Gero Meyersiek-

24                                   THE COURT: -I, I just, Ma'am-

25                                   DEFENDANT: -and this is all part of the-

1          THE COURT: -I just gave you the

2    reasoning-

3          DEFENDANT: -(inaudible) process-

4          THE COURT: -for the Court's decision is

5    based on the fact that the Court file is void of any order or judgement that

6    waived the interest of set it to zero.

7          DEFENDANT: Also, the interest rate of

8    12% compounding interest is illegal under, uh, Social Security Act. They have

9    put out-

10         THE COURT: Well, that's the interest rate

11   that-

12         DEFENDANT: -12% compound interest-

13         THE COURT:  -that's been established-

14         DEFENDANT: -that is illegal under-

15         THE COURT: -by the State of Rhode

16   Island.

17         DEFENDANT: -Federal law, which

18   preempts Rhode Island law.

19         THE COURT: Thank you very much, Miss

20   Seguin-

21         DEFENDANT: I just wanna make sure

22   that-

23         THE COURT: Your objection is moted.

24         DEFENDANT: -(inaudible)-

25         THE COURT: Thank you very much-

1            DEFENDANT: -(inaudible)-

2            THE COURT: -Mr. Meyersiek-

3            DEFENDANT: -also entitled-

4            THE COURT: -Attorney Gould-

5            DEFENDANT: -to see Judge created laws

6    on these, this issue. I have been prevented from accessing those. There's

7    (inaudible) public records (inaudible)-

8            THE COURT: Ma'am, we gave you every

9    Court record you requested.

10           DEFENDANT: -Federal-

11           THE COURT: You requested-

12           DEFENDANT: -that was all Judge

13   created-

14           THE COURT: -you requested the Court

15   file-

16           DEFENDANT: -laws. (Inaudible) 12%

17   compounding interest-

18           THE COURT: -for a number of years. I'm

19   not going to let you yell at me.

20           DEFENDANT: Why-

21           THE COURT: You're not going to talk

22   over me.

23           DEFENDANT: Why-

24           THE COURT: This hearing is concluded.

25   Thank you very much.

1           ATTORNEY GOULD: Thank you, Judge.

2           DEFENDANT: I object and raise that the-

3           THE COURT: Thank you-

4           DEFENDANT: -interest, as well-

5           THE COURT: Thank you.

6           DEFENDANT: -and compound interest is

7    illegal-

8           ATTORNEY GOULD: Thank you, Judge.

9           DEFENDANT: I'm looking to appeal this

10    to the Judge, Miss, uh, Your Honor, Magistrate-

11           THE COURT: And you're, and you're free

12    to do so.

13           DEFENDANT: And I'm doing that on an

14    oral basis, so here are-

15           THE COURT: You can file that with the

16    Clerk-

17           DEFENDANT: -I am doing that orally-

18           THE COURT: You can file that with the

19    Clerk. I will make a notation.

20           DEFENDANT: -this is an oral motion, an

21    oral motion, this is an oral motion-

22           THE COURT: Thank you.

23           DEFENDANT: -to-

24           THE COURT: It's noted.

25           DEFENDANT: -appeal the Magistrate's

1    order-

2                                    THE COURT: Your appeal from my

3    decision is noted. It will be put in the order.

4                                    DEFENDANT: -for a hearing, there was

5    no hearing on this, there was no trial on this, no trial was provided. I was

6    prevented from, uh, from, uh, from, uh, from presenting evidence-

7                                    THE COURT: And you may appeal my

8    decision-

9                                    DEFENDANT: -(inaudible) audio

10    recording-

11                                    THE COURT: -to a Famiy Court Justice.

12    Thank you very much.

13                                    DEFENDANT: I'm appealing it. I, I have

14    appealed it orally, now.

15                                    CLERK: Nope, can't do that.

16                                    THE COURT: You have to file an appeal

17    yourself in the Clerk's office.

18                                    CLERK: And she has to pay for a

19    transcript-

20                                    DEFENDANT: According to Turner

21    versus Rodgers, another U.S. Supreme Court case, I am entitled to not have to

22    do a, uh, a written motion. I can do an oral motion for an appeal to a, uh, to, to

23    the Jus-, Judge, uh, at iss-, that's, uh, of issue and I'm requesting a hearing date

24    for that appeal.

25                                    CLERK: Sorry, that goes before a Judge.

1                 DEFENDANT: Clerk (inaudible)-

2                 THE COURT: That has to go before a

3 Family Court Judge.

4                 CLERK: Only the Office can give appeal

5 dates, and there's a process and she has to order a transcript, and pay for it,

6 before that transcript will even be typed out.

7                 THE COURT: Miss Seguin, did you hear

8 the Clerk?

9                 DEFENDANT: Who is the, uh, who is the,

10 uh, the Scribe for this, the, uh, Stenographer? So, today, I wanna make very

11 clear, you all know you're establishing this Court, um, establishing interest and

12 what you're also saying is that the, the, uh, the interest was supposedly

13 established but you're reestablishing interest?

14                 THE COURT: I've made my ruling-

15                 DEFENDANT: There's no-

16                 THE COURT: -I've made my ruling-

17                 DEFENDANT: -(inaudible)-

18                 THE COURT: -Miss Seguin, I've made

19 my ruling. You've indicated you're interest in appealing. That is noted for the

20 record. We have other cases that are waiting to be heard. Thank you very much

21 and-

22                 DEFENDANT: I'm looking to-

23                 THE COURT: -you're free to follow up-

24                 DEFENDANT: -as a pro se litigant-

25                 THE COURT: -however you see fit. Thank

1   you so much.

2                                    DEFENDANT: -I'm looking to-

3                                    THE COURT: I understand that and thank

4   you.

5                                    DEFENDANT: -understand what the

6   Court order will say.

7                                    THE COURT: Thank-

8                                    DEFENDANT: What will the Court order

9   say? What will the Court order say?

10                                   THE COURT: Mr. Gould will draft the

11  Court order for my signature, and you'll receive a copy of it. Thnak you very

12  much.

13                                   DEFENDANT: Now, what would it, what

14  would it, so that we're all clear, so I can also put on the record any objections.

15  The objection, so, you're-

16                                   THE COURT: Miss Seguin-

17                                   DEFENDANT: -ordering reestablishment

18  because that's the motion. The motion is to reestablish interest.

19                                   THE COURT: It's not reestablish.

20                                   DEFENDANT: And-

21                                   THE COURT: It's set arrears. That was the

22  motion, to set arrears. The arrears are the interest that you owe on the case,

23  Ma'am, and this hearing is over.

24                                   DEFENDANT: So, you are-

25                                   THE COURT: I'm going to end the

1    hearing-

2                              DEFENDANT: -you are (inaudible)-

3                              THE COURT: You are not going to talk

4    over me. The hearing is over. You can file your appeal. Thank you very much.

5    Have a good day.

6                              DEFENDANT: I would like to put on the

7    record-

8                              THE COURT: The hearing is over,

9    Ma'am.

10                             DEFENDANT: -um, my appeal.

11                             THE COURT: The hearing is over. You

12   can't cont-

13                             DEFENDANT: I would like to put on the

14   record for the appeal, because the appeal is critically important.

15                             THE COURT: I understand that.

16                             DEFENDANT: The appeal basically-

17                             THE COURT: We're not, no, we're not

18   going to hear your appeal now.

19                             DEFENDANT: You don't have-

20                             THE COURT: We're not going to hear

21   your appeal now.

22                             DEFENDANT: You don't have, this Court

23   does not have jurisdiction-

24                             THE COURT: You've noted you're

25   objection, you've noted your objection, you're not going to argue your appeal

1   now and you're not gonna talk over me, okay. I've made my ruling. You

2   disagree with it. You have a right to appeal and the hearing is over, okay. You're

3   not going to argue your appeal here. You don't like my decision, you don't

4   agree with my decision, and the hearing is over, because there's nothing left to

5   discuss. I'm ending this meeting for everyone. I'm ending-

6              DEFENDANT: You-

7              THE COURT: I'm ending the meeting for

8   everyone.

9              DEFENDANT: The Family Court does not

10  have jurisdiction-

11             THE COURT: Thank you.

12             DEFENDANT: -over agreements between

13  Gero and myself-

14             THE COURT: Thank you. I'm ending, I'm

15  ending the meeting. Thank you.

16             DEFENDANT: I'm putting that on the

17  record. The Family Court lacks subject matter-

18             THE COURT: Okay.

19             DEFENDANT: -jurisdiction, nor personal

20  jurisdiction regarding agreements-

21             THE COURT: I'm ending the meeting-

22             DEFENDANT: -between Gero Meyersiek-

23             THE COURT: -for everyone.

24             DEFENDANT: -and myself-

25             THE COURT: Thank you, Mr. Meyersiek-

1          DEFENDANT: -and that was a question-

2          THE COURT: -thank you, Mr. Gould-

3          DEFENDANT: -Mr. Gould had posed-

4          THE COURT: Thank you very much. I'm

5    ending the meeting for everyone.

6          DEFENDANT: In-

7

8

9          **HEARING CONCLUDED.**

10

11

12

13

14

EXHIBIT F

## SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

EXHIBIT G

cseinfo.dhs.ri.gov

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov:

## State of Rhode Island
## Office of Child Support Services
### DEPARTMENT OF HUMAN SERVICES

Welcome Mary Seguin

Home   My Profile   Contact Us   Site Bar   Log Out

**Menu**
▼ **Case Information**
- ▶ Last 5 Payments
- ▶ Last 13 Months
- ▶ Current Orders/ Past Due Balances
- ▶ Court Dates/ Appointments
- ▶ Enforcement Actions
- ▶ PIN Lookup

Home > Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek     CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|---------|-------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Exhibit B

## SPECIFICATION FOR OCSS CHANGE ORDER
### Auto Adjustment of Interstate Interest

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

Exhibit C

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G      CSCL  ASMXA201
           TRAC.00           CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION     COMPREHENSIVE CASE HISTORY
```

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP
WANTS THE INTEREST PUT BACK ON THE CASE (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓). WE REMOVED THE INTEREST WHEN
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-.
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BY NCP
AS NCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED
FOR PASSPORT PURPOSES IN ANY EVENT.

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

```
RL: 80  12 22 ABSP:         SEGUIN     MARY      CMD: _____
FNX: TRAC  D CLIENT:        MEYERSIEK  GERO   K  PNL:
```

Case Number PC001821M
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

```
12/13/22   11:20         C A S E   T R A C K I N G        CSCL  ASMXXA201
           TRAC.00              CASE HISTORY               U024  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT.

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES

```
RL: 80  12 22 ABSP:          SEGUIN       MARY          CMD:
FNX: TRAC  D CLIENT:         MEYERSIEK    GERO     K    PNL:
```

Case 23-1007    Document: 00118120861    Page: 956    Date Filed: 04/29/2024    Entry ID: 6638760
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

| 12/13/22 | 11:29 | C A S E   T R A C K I N G | CSCL | ASMXA201 |
| | TRAC.00 | CASE HISTORY | U824 | PROD |

STARTING DATE  09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSIDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
        FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
        FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: SO  12 22 ABSP:              SEGUIN     MARY       CMD: _____
FWX: TRAC  D CLIENT:             MEYERSIEK  GERO    X  PNL:

11:29:03 Tuesday, December 13, 2022

| 12/13/22 | 11:29 | C A S E   T R A C K I N G | CSCL | ASMXA201 |
| | TRAC.00 | CASE HISTORY | U824 | PROD |

**STARTING DATE** 09 01 2021
**SELECTION** COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

| RL: 80  12 22 ABSP: | | SEGUIN | MARY | | CMD: ____ |
| FXX: TRAC  D CLIENT: | | MEYERSIEK | GERO | K | PNL: |

ed in Providence/Bristol County Family Court
ibmitted 6/1/2023 10.13 PM    Document: 00118130881    Page: 989    Date Filed: 03/29/2024    Entry ID: 6638760
ivelope: 4132704
iviewer: Maria O.
    11:29:09 Tuesday, December 13, 2022

```
12/13/22    11:28         C A S E   T R A C K I N G        CSCL   ASMXA201
            TRAC.00            CASE HISTORY                U824   PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

```
12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN___
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____
```

```
12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
    TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____
```

```
12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
    58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____
```

```
12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS___
ED TO BE $6028.75._____
```

```
RL: 80  12 22 ABSP:              SEGUIN       MARY         CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK    GERO    K    PNL:
```

```
12/13/22   11:28           C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00                CASE HISTORY               U824   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42
_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
        TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
        58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY
_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75.
_____

RL: 80  12 22 ABSP:            SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK   GERO     K    PNL:
```

Case Number: K20010521M Document: 00118120081 Page: 990 Date Filed: 03/09/2024 Entry ID: 6638760
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E    T R A C K I N G        CSCL   ASMXA201
            TRAC.00              CASE HISTORY              UB24   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

```
RL: 80  12 22 ABSP:              SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK   GERO    K   PNL:
```

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28       C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY            U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

```
RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:          SEGUIN       MARY          CMD: _____
                             MEYERSIEK     GERO     K    PNL: _____
```

Exhibit D

# Title 15
# Domestic Relations

## Chapter 5
## Divorce and Separation

### R.I. Gen. Laws § 15-5-16.5

**§ 15-5-16.5. Interest on arrearages.**

Interest at the rate of twelve percent (12%) per annum on any support debt due or owing, child or spousal support, shall be assessed unless the responsible party shall, for good cause shown, be relieved of the obligation to pay interest by the family court.

History of Section.
P.L. 1980, ch. 308, § 1; P.L. 1984, ch. 167, § 1; P.L. 2001, ch. 155, § 1.

Exhibit E



cseinfo.dhs.ri.gov

RI.gov                                                                R.I. Government Agencies | Privacy policy | Search RI.gov:

State of Rhode Island
## Office of Child Support Services
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Seguin                                    Home  My Profile  Contact Us  Site Map  Log Out

**Menu**

- **Case Information**
  - Last 5 Payments
  - Last 13 Months
  - Current Orders/ Past Due Balances
  - Court Dates/ Appointments
  - Enforcement Actions
  - PIN Lookup

Home > Last 13 Months

Case Manager

### Last 13 Months                                                                    ⓘ

Custodial Parent: Gero K Meyersiek          CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|--------|-------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Office of Child Support Services | RI Department of Human Services
Version 2.1.0 - OCSS Case Manager (JRA_NXB-4A) - Last Updated: June 17, 2020

EXHIBIT F



12:30 PM  Mon Dec 6

cseinfo.dhs.ri.gov

ADCB Internet Banking    Community Health Choice |...    Sign In - Community Healt...    Case Manager Portal | Offi...    RI OCSS Payment

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov

State of Rhode Island
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Degan

Home  My Profile  Contact Us  Site Map  Log

**Menu**

Case Information
  Last 5 Payments
  Last 13 Months
  Current Orders/ Past Due Balances
  Court Dates/ Appointments
  Enforcement Actions
  PIN Lookup

Home > Current Orders and Past Due Balances

**Case Manager**

### Current Orders / Past Due Balances

**Custodial Parent:** Gero K Meyersiek        **CSE ID:** 1689817

**Current Orders**

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

⚠ Note: Medical orders and medical arrears are not listed on this screen.

**Past Due Balances**

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |

EXHIBIT G

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JIM HODGES, in his official capacity
as Governor of the State of South
Carolina; JEAN HOEFER TOAL, in her
official capacity as Chief Justice of
South Carolina; SOUTH CAROLINA
DEPARTMENT OF SOCIAL SERVICES;
STATE OF SOUTH CAROLINA; PEOPLE OF
SC, on Behalf of the State of South
Carolina; JOHN DOE; JANE DOE, and
those similarly situated,

        *Plaintiffs-Appellants,*

    v.

TOMMY G. THOMPSON, SECRETARY,
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; WADE
F. HORN, Ph.D. in his official
capacity as Assistant Secretary of
the United States Department of
Health and Human Services for
Children and Families; U.S.
DEPARTMENT OF HEALTH & HUMAN
SERVICES,

        *Defendants-Appellees.*

No. 00-2512

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Julian Abele Cook, Jr., Senior District Judge, sitting by designation.
(CA-00-2048-3-17)

Argued: December 6, 2001

Decided: November 15, 2002

Before WIDENER, NIEMEYER, and MOTZ, Circuit Judges.

---

Affirmed by published per curiam opinion.

---

## COUNSEL

**ARGUED:** Marcus Angelo Manos, NEXSEN, PRUET, JACOBS & POLLARD, L.L.C., Columbia, South Carolina, for Appellants. Gregory George Katsas, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Wilburn Brewer, Jr., NEXSEN, PRUET, JACOBS & POLLARD, L.L.C., Columbia, South Carolina; A.E. Dick Howard, Charlottesville, Virginia, for Appellants. Stuart E. Schiffer, Acting Assistant Attorney General, Scott N. Schools, United States Attorney, Jacob M. Lewis, Peter J. Smith, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

## OPINION

PER CURIAM:

The Governor of South Carolina appeals the grant of summary judgment to the Secretary of the United States Department of Health and Human Services in the State's action seeking injunctive and declaratory relief from conditions imposed for federal funding of the Temporary Assistance to Needy Families (TANF) program.

South Carolina challenges the district court finding that Congress acted within its Spending Clause authority when it conditioned States' receipt of federal funds under the child support enforcement program and the TANF program on compliance with the requirement that States develop and maintain automated child support enforcement systems and that such a condition was not so coercive as to violate the Tenth Amendment. The State further alleges the district court

erred when it found that the Secretary did not have the discretion to amend the statutory penalty structure for a State's noncompliance with the child support systems requirements. In addition, South Carolina contends the court erred in finding that the State could not invoke the protections of the Due Process Clause. After considering the parties' briefs and the record, and following oral argument, we affirm substantially on the reasoning of the district court.

I.

The district court opinion contains a comprehensive history, the details of which need not be repeated here, of the federal government's longstanding involvement in child support enforcement programs and related federal efforts to work with the States to solve the serious problem of nonpayment of child support. See *Hodges v. Shalala*, 121 F.Supp.2d 854 (D.S.C. 2000). Currently, as a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements that the State establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A). South Carolina concedes that it has neither a federally certifiable statewide automated system for child support nor an SDU. See *Hodges*, 121 F. Supp. 2d at 861.

Without an approved state plan, a State may lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). See 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2). Alternatively, a State may opt for an alternative penalty in lieu of disapproval of their state plan and the withholding of federal funds if the State is making a good faith effort to comply with the program's requirements and the State has submitted a corrective compliance plan. See 42 U.S.C. § 655(a)(4). South Carolina has elected to incur the alternative penalty.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and review a district court's grant of summary judgment *de novo*. See *United States v. Kanasco, Ltd.*, 123 F.3d 209, 210 (4th Cir. 1997).

## II.

We turn first to South Carolina's contention that the federal government's requirements and penalties associated with the state-wide automated systems, which South Carolina failed to provide, exceed Congressional authority under the Spending Clause and the Tenth Amendment.

Consistent with its Spending Power, Congress may attach conditions on the receipt of federal funds. See *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Spending Power is not unlimited, of course, and the Supreme Court has recognized four general limitations: spending must be in pursuit of the general welfare; any attached conditions must be unambiguous; conditions must also be related to a federal interest; and, the obligations imposed by Congress may not violate any independent constitutional provisions. See *Dole*, 483 U.S. at 207-08.

The district court found that "Congress made a considered judgment that the American people would benefit significantly from the enhanced enforcement of child-support decrees and the diminution of the number of parents who are able to avoid their obligations simply by moving across local or state lines." *Hodges*, 121 F. Supp. 2d at 873. Thus, like the district court, we are satisfied that Congress acted in the general welfare when it enacted the child support enforcement programs and the associated funding conditions under Title IV-D.

South Carolina's contention that the Title IV-D conditions are ambiguous is without merit. The statute expressly provides that compliance with the automated system and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A. We agree with the district court that the clear and unequivocal statement of the required conditions in the statute enabled South Carolina to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted).

A third limitation on the Spending Power requires that conditions "bear some relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992) (citing *Dole*, 483 U.S. at 207-08, n.3). Here, there is a complementary relationship

between efficient child support enforcement and the broader goals of providing assistance to needy families through the TANF program. Establishing paternity and collecting child support may enable families to reduce their dependence on the welfare system, and both programs are intended to reduce the incidence of poverty among children and families. The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely to provide uniform levels of support for children of equal need").[1]

South Carolina does not contend that the Title IV-D conditions violate the fourth limitation on the Spending Power — that the conditions violate any independent Constitutional prohibition, rather it raises a Tenth Amendment[2] challenge. As we have recently reconfirmed, "the Tenth Amendment itself *does not* act as a constitutional bar to Congress's spending power; rather, the fourth restriction on Congress's spending power stands for the more general proposition that Congress may not induce the states to engage in activities that would themselves be unconstitutional." *James Island Pub. Serv. Dist. v. City of Charleston*, 249 F.3d 323, 327 (4th Cir. 2001) (citing *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000)) (italics in original). We therefore next consider South Carolina's Tenth Amendment argument, not as a limitation related to the Spending Clause, but as an independent constitutional challenge.

South Carolina argues that the coercive effect of the Title IV-D conditions run afoul of the protections of the Tenth Amendment. The Supreme Court has recognized that the Tenth Amendment may be implicated when the financial incentives offered by the federal government to the States cross the impermissible line where "pressure

---

[1] *Sullivan* considered the relationship between child enforcement programs and Aid to Families with Dependent Children (AFDC). 496 U.S. at 478. TANF is a block grant program established in 1996 as the successor to the AFDC program. See 42 U.S.C. §§ 601-618.

[2] The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

turns into compulsion." See *Dole*, 483 U.S. at 211 (citations omitted). Congress may use its Spending Power to influence a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, but Congress, under the Commerce Clause, may offer the States a choice of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

The district court found that, based on the State's own admission, the alternative penalty, which South Carolina has now elected, would result in the loss of a small fraction of the State's TANF funds and that such a proportion was noncoercive. Given the linkages between child support enforcement and aid to needy families and the level of the alternative penalty, we agree with the district court's conclusion that "the Title IV-D conditions are not so overbearing as to create an unconstitutional compulsion." *Hodges*, 121 F.2d at 875.

South Carolina next contends that the Secretary of the Department of Health and Human Services (HHS) has the discretion to deviate from the alternative penalty structure of Title VI-D in order to respond to the peculiar circumstances that led to South Carolina's noncompliance. Specifically, South Carolina argues that its inability to comply with the automated system and SDU requirements was caused by the failure of its prime contractor, Unisys, to deliver on its contract with the State. South Carolina maintains that because its noncompliance was no fault of its own and its alternative systems are in substantial compliance with the goals of the statute, the Secretary abused her discretion by refusing to grant South Carolina an evidentiary hearing and waive or amend the alternative penalty for noncompliance.

We have examined the penalty provisions of the statute and, like the district court, cannot find the discretion South Carolina envisions. The wording of the statute is plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submit-

ted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and *the Secretary shall reduce the amount otherwise payable to the State* [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). Again, we agree with the district court that "[b]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges*, 121 F.2d at 879. Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, South Carolina's assertion that it is entitled to an evidentiary hearing must also fail.[3]

### III.

For the foregoing reasons, we are of opinion that the Title IV-D provisions are constitutionally valid under the Spending Clause and the Tenth Amendment and that the Secretary lacks discretion under Title IV-D to deviate from the penalty provisions.

The judgment of the district court is accordingly

*AFFIRMED*.

---

[3]In the district court, South Carolina asserted a Due Process claim which the district court denied. The court concluded that the "State cannot invoke the protections of the Fifth Amendment with claims that [the State] has been harmed." *Hodges*, 121 F.2d at 865. South Carolina does not take issue with the district court's holding, but rather, on appeal it asserts that the State is entitled to assert a Due Process claim on behalf of its citizens. Because this contention was never properly presented to the district court, we do not consider it now. See *McGowan v. Gillenwater*, 429 F.2d 586, 587 (4th Cir. 1970).

EXHIBIT H

No. 10-10

# In the Supreme Court of the United States

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

*ON WRIT OF CERTIORARI*
*TO THE SUPREME COURT OF SOUTH CAROLINA*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**
**SUPPORTING REVERSAL**

NEAL KUMAR KATYAL
  *Acting Solicitor General*
  *Counsel of Record*
TONY WEST
  *Assistant Attorney General*
LEONDRA R. KRUGER
  *Acting Deputy Solicitor*
  *General*
JOSEPH R. PALMORE
  *Assistant to the Solicitor*
  *General*
LEONARD SCHAITMAN
EDWARD HIMMELFARB
  *Attorneys*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

SALLY A. HOWARD
  *Acting General Counsel*
ROBERT E. KEITH
  *Associate General Counsel*
LISETTE PEDRE MESTRE
  *Attorney*
  *Department of Health and*
  *Human Services*
  *Washington, D.C. 20201*

**QUESTIONS PRESENTED**

1.  Whether the Court has jurisdiction to review the decision of the South Carolina Supreme Court.

2.  Whether due process requires that the State provide counsel, at its expense, to an indigent parent in a child-support proceeding, when the parent is subject to a civil-contempt order for non-payment that may lead to confinement.

(I)

**TABLE OF CONTENTS**

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Argument:
   I.   The Court has jurisdiction to review the decision of
       the South Carolina Supreme Court . . . . . . . . . . . . . . . 13
  II.  The absence of adequate procedures necessary
      to secure an accurate adjudication of civil
      contempt violated due process . . . . . . . . . . . . . . . . . . . 16
      A.  Confinement for civil contempt is
          permitted only when the contemnor is
          presently able to comply with the
          underlying order . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      B.  The Family Court's procedures were
          inadequate to ensure an accurate
          determination of present ability to pay . . . . . . . . 19
      C.  Due Process can be satisfied by a variety of
          procedures intended to assure an accurate
          determination of present ability to pay in a
          civil contempt proceeding . . . . . . . . . . . . . . . . . . 23
          1.  Courts can comply with Due Process by
              providing a meaningful opportunity for an
              alleged contemnor to establish his present
              ability to pay . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          2.  There is no basis for an inflexible right to
              counsel rule in civil contempt proceedings . . . 25
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

(III)

IV

## TABLE OF AUTHORITIES

Cases:

*Alvarez* v. *Smith*, 130 S. Ct. 576 (2009) . . . . . . . . . . . . . . . 15

*Blessing* v. *Freestone*, 520 U.S. 329 (1997) . . . . . . . . . . . . . 3

*Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Carlson* v. *Landon*, 342 U.S. 524 (1952) . . . . . . . . . . . . . . 32

*City of L.A.* v. *Lyons*, 461 U.S. 95 (1983) . . . . . . . . . . . 14, 15

*DeFunis* v. *Odegaard*, 416 U.S. 312 (1975) . . . . . . . . . . . . . 14

*First Nat'l Bank* v. *Bellotti*, 435 U.S. 765 (1978) . . . . . . . . 14

*Foucha* v. *Louisiana*, 504 U.S. 71 (1992) . . . . . . . . . . . . . . 20

*Gagnon* v. *Scarpelli*, 411 U.S. 778 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25, 26, 27, 28, 29

*Gault, In re*, 387 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . 26

*Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Hicks* v. *Feiock*, 485 U.S. 624 (1988) . . . . . . . . . . . . . . . 17, 18

*Hodges* v. *Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*INS* v. *Lopez-Mendoza*, 468 U.S. 1032 (1984) . . . . . . . . . 32

*International Union, United Mine Workers* v. *Bagwell*, 512 U.S. 821 (1994) . . . . . . . . . . . . . . . . 18, 19, 26

*Landon* v. *Plasencia*, 459 U.S. 21 (1982) . . . . . . . . . . . . . 31

*Lassiter* v. *Department of Soc. Servs.*, 452 U.S. 18 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Maggio* v. *Zeitz*, 333 U.S. 56 (1948) . . . . . . . . . . . . . . . 17, 18

*Mathews* v. *Eldridge*, 424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19, 20, 25, 26, 29

V

Cases—Continued:                                                    Page

*Middendorf* v. *Henry*, 425 U.S. 25 (1976) . . . . . 12, 26, 29, 31

*Mohammed* v. *Gonzales*, 400 F.3d 785 (9th Cir. 2005) . . . 32

*Morrissey* v. *Brewer*, 408 U.S. 471 (1972) . . . . . . . . . . . 19, 26

*Moseley* v. *Mosier*, 306 S.E.2d 624 (S.C. 1983) . . . . . . . . 17

*Murphy* v. *Hunt*, 455 U.S. 478 (1982) . . . . . . . . . . . . . 13, 14

*Nazakat* v. *INS*, 981 F.2d 1146 (10th Cir. 1992) . . . . . . . 33

*Olmstead* v. *L.C.*, 527 U.S. 581 (1999) . . . . . . . . . . . . . . . 15

*Shillitani* v. *United States*, 384 U.S. 364 (1966) . . . . . 11, 17

*Spencer* v. *Kemna*, 523 U.S. 1 (1998) . . . . . . . . . . . . . . 13, 14

*United States* v. *Bauer*, 956 F.2d 693 (7th Cir.),
   cert. denied, 506 U.S. 882 (1992) . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Campos-Asencio*, 822 F.2d 506
   (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States* v. *Gasca-Kraft*, 522 F.2d 149 (9th Cir.
   1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Rylander*, 460 U.S. 752 (1983) . . . . . . . . 18

*United States* v. *Torres-Sanchez*, 68 F.3d 227 (8th Cir.
   1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States Parole Comm'n* v. *Geraghty*,
   445 U.S. 388 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Vitek* v. *Jones*, 445 U.S. 480 (1980) . . . . . . . . . . . . . . . 26, 27

*Walters* v. *National Ass'n of Radiation Survivors*,
   473 U.S. 305 (1985) . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

*Weinstein* v. *Bradford*, 423 U.S. 147 (1975) . . . . . . . . . . . 14

*Wilkinson* v. *Austin*, 545 U.S. 209 (2005) . . . . . . . . . . . . . 19

*Yee* v. *City of Escondido*, 503 U.S. 519 (1992) . . . . . . . . . . 24

VI

Constitution, statutes and regulations:       Page

U.S. Const.:

Amend. V (Due Process Clause) . . . . . . . . . . . . . . . . . 9, 19

Amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 26, 27

Amend. XIV (Due Process Clause) . . . . . . . . . . . . . . . 19

Social Services Amendments of 1974, Pub. L.
No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651
*et seq.*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

§ 101(c)(5)(C), 88 Stat. 2360 . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 654(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 654(6) (1976) . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 654(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 654(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. 654(24) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. 654a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 654a(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 654a(e)(4) . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 654a(e)(5) . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 654a(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 655(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. 655(a)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. 655(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. 655(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 656(a)(1) (1976) . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 657(a)(4)(B) (1976) . . . . . . . . . . . . . . . . . 3

42 U.S.C. 657(b) (1976) . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 666(a)(1)-(8) . . . . . . . . . . . . . . . . . . . . . . . 4

Statutes and regulations—Continued:          Page

42 U.S.C. 666(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . 30
42 U.S.C. 666(a)(7)(B)(i) . . . . . . . . . . . . . . . . . . . . 30
42 U.S.C. 666(a)(8)(A)(iv) . . . . . . . . . . . . . . . . . . . 30
42 U.S.C. 666(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
42 U.S.C. 666(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
42 U.S.C. 666(c)(1)(H) . . . . . . . . . . . . . . . . . . . . . . 30

Child Support Enforcement Amendments of 1984,
Pub. L. No. 98-378, 98 Stat. 1329:

§ 6, 98 Stat. 1314 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
§ 23(a)(2), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . 4
§ 23(a)(5), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . 4

Family Support Act of 1988, Pub. L. No. 100-485,
102 Stat. 2343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
§ 123(a)(C), 102 Stat. 2352 . . . . . . . . . . . . . . . . . . . 5

Personal Responsibility and Work Opportunity
Reconciliation Act of 1996, Pub. L. No. 104-193,
110 Stat. 2105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
§ 344(a)(2), 110 Stat. 2235 . . . . . . . . . . . . . . . . . . . 6

Social Security Act Amendments of 1950, ch. 809,
§ 321(b), 64 Stat. 550 . . . . . . . . . . . . . . . . . . . . . . . . 2

Social Security Amendments of 1967, Pub. L.
No. 90-248, § 201(a)(1), 81 Stat. 877-879 . . . . . . . . . . . . . 2
§ 201(a)(1), 81 Stat. 879 . . . . . . . . . . . . . . . . . . . . . 3

8 U.S.C. 1229a(b)(4)(A) . . . . . . . . . . . . . . . . . . . . . . 32
8 U.S.C. 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
18 U.S.C. 3006A(b) . . . . . . . . . . . . . . . . . . . . . . . . . 28
28 U.S.C. 1257(a) . . . . . . . . . . . . . . . . . . . . . . . . . . 13
42 U.S.C. 602(a)(26) (1976) . . . . . . . . . . . . . . . . . . . 3

VIII

Statutes and regulations—Continued:      Page

    42 U.S.C. 608(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

    42 U.S.C. 608(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    45 C.F.R.:

        Section 302.70(a)(5)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.5(g)(2)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.6 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        Section 303.6 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        Section 303.20(c)(7) (1975) . . . . . . . . . . . . . . . . . . . . . . . 4

        Section 303.20(c)(7) (1989) . . . . . . . . . . . . . . . . . . . . . . . 5

        Section 303.100(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.100(f)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.101(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.102(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.104(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 304.20(b)(3)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . 5

        Section 304.23(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 304.23(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Sup. Ct. R. 14.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    S.C. Rule of Family Ct.:

        R. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        R. 24(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        R. 24(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    S.C. Code Ann. (West):

        § 43-5-220(c) (Supp. 2009) . . . . . . . . . . . . . . . . . . . . . . 25

        § 43-5-235 (Supp. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 7

        § 63-3-620 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

Miscellaneous:                                                      Page

   52 Fed. Reg. 32,130 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

   U.S. Dep't of Health & Human Servs.:

      National Child Support Enforcement, *Strategic
        Plan: FY 2005-2009*, http://www.acf.hhs.gov/
        programs/cse/pubs/2004/Strategic_Plan_
        FY2005-2009.pdf . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

      Office of Child Support Enforcement, *National
        Status of Automated Child Support Systems*,
        http://www.acf.hhs.gov/programs/
        cse/stsys/certmap.htm . . . . . . . . . . . . . . . . . . . . . . . . . 6

   Elizabeth G. Patterson, *Civil Contempt & the
      Indigent Child Support Obligor: The Silent
      Return of Debtor's Prison*, 18 Cornell J.L. & Pub.
      Pol'y 95 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

   S. Rep. No. 387, 98th Cong., 2d Sess. (1984) . . . . . . . . . . 30

   Elaine Sorensen et al., *Assessing Child Support
      Arrears in Nine Large States & the Nation* (2007)
      http://aspe.hhs.gov/hsp/07/assessing-CS-debt/
      report.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

   South Carolina Dep't of Social Servs., *Response to
      Budget Proviso 13.27* (Aug. 31, 2007),
      http://www.scstatehouse.gov/reports/DSS/
      Provisoresponse1327_083107.doc . . . . . . . . . . . . . . . . 6

# In the Supreme Court of the United States

———

No. 10-10

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

———

*ON WRIT OF CERTIORARI*
*TO THE SUPREME COURT OF SOUTH CAROLINA*

———

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING REVERSAL**

———

**INTEREST OF THE UNITED STATES**

This case concerns the due process protections that apply in a state civil contempt proceeding for non-payment of court-ordered child support. The state child-support enforcement program at issue in the case, like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 *et seq.*) (adding Title IV-D to the Social Security Act). The program, which is administered by the Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for 66% of the costs of operating their child-support enforcement programs. 42 U.S.C.

(1)

655(a)(2)(C).  The United States has a substantial interest in the effective and equitable operation of such child-support programs.

## STATEMENT

1.  This case involves proceedings in South Carolina family court to enforce a child-support order entered against petitioner for the support of his and respondent Rogers' minor child.  South Carolina, like every other State, maintains a child-support enforcement program as a condition of receiving federal funding for its Temporary Assistance for Needy Families program.  Since Congress first required States receiving federal funds to undertake child-support enforcement efforts, it has shifted its emphasis from a localized, court-based enforcement approach to centralized and automated efforts.  South Carolina, however, maintains a localized, court-based approach to child-support enforcement.

a.  Congress first required States receiving federal funds to establish child-support enforcement programs in 1950, pursuant to the Aid to Families with Dependent Children (AFDC) program.  See Social Security Act Amendments of 1950, ch. 809, § 321(b), 64 Stat. 550 (requiring States receiving AFDC funds to "provide for prompt notice to appropriate law-enforcement officials of the furnishing of aid to dependent children in respect of a child who has been deserted or abandoned by a parent").  In 1968, Congress required States participating in AFDC to create statewide or local "organizational unit[s]" for establishing paternity and collecting child support.  Social Security Amendments of 1967, Pub. L. No. 90-248, § 201(a)(1), 81 Stat. 877-879.  It also required States to "provide for entering into cooperative arrangements with appropriate courts and law enforce-

3

ment officials * * * to assist" with administration of the program. *Id.* § 201(a)(1), 81 Stat. 879.

b. In 1975, Congress adopted Title IV-D, 42 U.S.C. 651 *et seq.*, and established the general statutory framework that exists today. See 1975 Act § 101(a), 88 Stat. 2351; *Blessing* v. *Freestone*, 520 U.S. 329, 333-335 (1997) (describing program). The 1975 Act required States participating in AFDC to "have in effect a plan approved" by the Secretary under Title IV-D and to "operate a child support program in conformity with such plan." 1975 Act § 101(c)(5)(C), 88 Stat. 2360. In particular, each State was required to provide services to locate noncustodial parents and to establish the paternity of, and secure support for, children receiving AFDC benefits. 42 U.S.C. 654(4).

Under the 1975 Act, AFDC recipients were required to assign their support rights to the State and cooperate in enforcement efforts. 42 U.S.C. 602(a)(26) (1976). Amounts recovered generally were retained by the State to reimburse it and the federal government for AFDC assistance provided to the child's family. 42 U.S.C. 657(b) (1976). Once assigned, the support obligation was owed to the State and was collectible under all applicable state processes. 42 U.S.C. 656(a)(1) (1976).[1]

The Secretary's regulations implementing the 1975 Act reflected a localized, court-centered approach to enforcement. States' efforts to collect past-due child support were required to include ("as applicable and necessary"): "[c]ontempt proceedings to enforce an extant court order," court-ordered wage garnishment, and

---

[1] Congress required States to provide services to non-AFDC families as well, 42 U.S.C. 654(6) (1976), although those families were not required to assign their support rights and any child support the State collected was paid to the family, 42 U.S.C. 657(a)(4)(B) (1976).

4

attachment of real and personal property. 45 C.F.R. 303.6 (1975). States were also required to maintain sufficient staff (either statewide or locally) to "enforce collection of support" by "executing contempt proceedings, wage assignments, obtaining garnishment orders, attaching real and personal property, criminal prosecution and executing judgments." 45 C.F.R. 303.20(c)(7) (1975).

c. In 1984, Congress found that there remained "a critical lack of child support enforcement," which had "a critical impact on the health and welfare of the children of the Nation." Child Support Enforcement Amendments of 1984 (1984 Amendments), Pub. L. No. 98-378, § 23(a)(2) and (5), 98 Stat. 1329. The 1984 Amendments required States to adopt laws and procedures providing for, among other things, (i) mandatory wage withholding; (ii) expedited processes for obtaining and enforcing support orders; (iii) state income tax refund intercepts; and (iv) reporting overdue support to consumer credit agencies. 42 U.S.C. 666(a)(1)-(8) and (b).

Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for (optional) State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur." 1984 Amendments § 6, 98 Stat. 1314; 42 U.S.C. 654(16); 655(a)(3)(A).

d. Congress amended Title IV-D again in 1988 to improve the rate of child-support collection. Family Support Act of 1988 (1988 Act), Pub. L. No. 100-485,

5

102 Stat. 2343. Because effective child-support enforcement "had long been thwarted by localized enforcement systems that were unable to quickly and effectively track delinquent parents who crossed county and state lines," *Hodges* v. *Shalala*, 121 F. Supp. 2d 854, 874 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003), Congress in the 1988 Act emphasized centralized, automated record-keeping and information retrieval in order to improve collection rates. In particular, Congress mandated "automated data processing and information retrieval system[s]" that had previously been optional. 1988 Act § 123(a)(C), 102 Stat. 2352; 42 U.S.C. 654(24).

The Title IV-D regulations were amended after adoption of the 1988 Act. As amended, the regulations omitted specific references to contempt proceedings as required means for enforcing child-support obligations. See 45 C.F.R. 303.6, 303.20(c)(7) (1989);[2] cf. pp. 3-4, *supra*.

e. Finally, Congress made further changes to the child-support enforcement system in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (1996 Act), Pub. L. No. 104-193, 110 Stat. 2105, which, among other things, replaced AFDC with the block-grant program called Temporary Assistance for Needy Families (TANF).[3] Those changes again emphasized a centralized, automated approach to child-support

---

[2] Federal financial support remained available for "[e]nforcement of a support obligation" through a variety of means, including contempt citations. 45 C.F.R. 304.20(b)(3)(iv).

[3] The 1996 Act also imposed a five-year cap on benefits. 42 U.S.C. 608(a)(7). As before, a custodial parent is required to assign her rights to child support to the State as part of the application for TANF assistance. 42 U.S.C. 608(a)(3)(A).

6

enforcement.  The amended statute established detailed requirements for the "statewide automated data processing and information retrieval systems" made mandatory in 1988.  *Id.* § 344(a)(2), 110 Stat. 2235, 42 U.S.C. 654a(a).  Among other things, the system must include a state case registry that includes every child-support case in the State, including the amount of monthly support owed and collected in all cases administered by the state agency.  42 U.S.C. 654a(e)(1) and (4); see 42 U.S.C. 654a(e)(5) (States must "promptly * * * update" case records when circumstances change).  The States are required to use their centralized databases "to the maximum extent feasible, to assist and facilitate the collection and disbursement of support payments," including by establishing wage-withholding orders and sending wage-withholding notices to employers.  42 U.S.C. 654a(g)(1); see 42 U.S.C. 666(c).

    f.   Despite the changes in federal law, South Carolina maintains a localized, court-based approach to child-support enforcement.  It is the only State that does not have a certified automated system.  See Office of Child Support Enforcement, U.S. Dep't of Health & Human Servs., *National Status of Automated Child Support Systems*,  http://www.acf.hhs.gov/programs/cse/stsys/certmap.htm.[4]

---

[4]   In the 1996 Act, Congress determined that any State that failed to automate its child-support program should incur substantial penalties.  42 U.S.C. 655(a)(4).  In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges* v. *Shalala*, *supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998.  The State paid more than $55 million in penalties through 2007.  South Carolina Dep't of Social Servs., *Response to Budget Proviso 13.27* at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

7

Acting pursuant to express statutory authority, S.C. Code Ann. § 43-5-235 (West Supp. 2009), the State's Department of Social Services has contracted with county clerks of court across the State to administer its program. The South Carolina courts have in turn adopted a special rule governing child-support enforcement. See S.C. Rule of Family Ct. 24 (S.C. Rule 24). The rule requires clerks of court to review on a monthly basis "all child support and periodic alimony accounts paid through the clerk of court," as are all accounts for children whose custodial parent receives TANF assistance. S.C. Rule 24(a); see 42 U.S.C. 608(a)(3)(A). When any such account is in arrears, the clerk is required to "issue a rule to show cause and an affidavit identifying the order of the court which requires such payments to be made and the amount of the arrearage [and] directing the party in arrears to appear in court at a specific time and date" to face contempt proceedings. S.C. Rule 24(b).

A "wilful[]" violation of a "lawful order" of a South Carolina court constitutes contempt and may subject the contemnor to up to 12 months confinement. S.C. Code Ann. § 63-3-620 (West 2010).

2. Respondent Rogers and petitioner are the parents of a minor child, B.L.P. In 2003, the family court in Oconee County, South Carolina, entered an Order of Financial Responsibility against petitioner. Although the order noted that petitioner was unemployed, the court imputed a gross monthly income of $1386 to him and ordered him to pay $59.72 a week in child support through the court. Pet. App. 22a; see *id.* at 19a-24a, 25a.

---

083107.doc. We are informed by HHS that the State has now paid a total of more than $72 million in penalties to date and currently owes an additional incurred penalty of more than $10 million for fiscal year 2010.

8

Because respondent Rogers was receiving public assistance, she assigned her right to collect child support to the Department of Social Services. Pet. Br. 8; see *id.* at 9 n.6 (payments were remitted to respondent Rogers starting in 2004 because her benefits had ended but her case continued to be administered as a Title IV-D case). Petitioner fell behind on his payments, received a number of rules to show cause from the court clerk why he should not be held in contempt, and was jailed three times as a result. *Id.* at 9-10.

By 2007, petitioner was $5728.76 behind on his child-support payments, and a judge of the Oconee County Family Court issued a bench warrant for his arrest. Pet. App. 6a; Pet. Br. 8-9. A hearing was held on January 3, 2008. After noting petitioner's outstanding balance and stating that he had not made a payment since August 2006, the judge asked petitioner, "[i]s there anything you want to say?" *Id.* at 17a. Petitioner responded:

> Well, when I first got out, I got back on dope. I done meth, smoked pot and everything else, and I paid a little bit here and there. And, when I finally did get to working, I broke my back, back in September. I filed for disability and SSI. And, I didn't get straightened out off the dope until I broke my back and laid up for two months. And, now I'm off the dope and everything. I just hope that you give me a chance. I don't know what else to say. I mean, I know I done wrong, and I should have been paying and helping her, and I'm sorry. I mean, dope had a hold to me.

*Ibid.*

After a brief exchange between petitioner and respondent about his SSI application, the court said:

> If there's nothing else, this will be the Order of the Court. I find the Defendant in willful contempt. I'm gonna sentence him to twelve months in the Oconee County Detention Center. He may purge himself of the contempt and avoid the sentence by having a zero balance on or before his release.

Pet. App. 18a. The court made no finding that petitioner was capable of paying the arrears while incarcerated. See *id.* at 17a-18a.

At this hearing, neither petitioner nor respondent Rogers was represented by counsel. Pet. App. 6a. However, pro bono counsel filed an appeal on petitioner's behalf, alleging that petitioner had a right under the Sixth Amendment and the Due Process Clause to have appointed counsel in the contempt proceeding. *Id.* at 10a-15a. Before the intermediate state court could rule, the South Carolina Supreme Court granted discretionary review and affirmed the family court. *Id.* at 1a-5a.

The court noted that the "purpose of civil contempt is to coerce the defendant to comply with the court's order," while criminal contempt's purpose is "to punish a party for disobedience or disrespect." Pet. App. 2a-3a. "Civil contempt sanctions are conditioned on compliance with the court's order. * * * A contemnor imprisoned for civil contempt is said to hold the keys to his cell because he may end the imprisonment and purge himself of the sentence at any time." *Id.* at 3a. The court recognized that the "distinction between civil and criminal contempt is crucial because criminal contempt triggers additional constitutional safeguards not mandated in civil contempt proceedings." *Ibid.*

The court noted that in this case the family court had said that petitioner could "purge himself of the contempt" by achieving a "zero balance" on his arrearage. Pet. App. 3a.   Reasoning that "[t]his conditional sentence is a classic civil contempt sanction," the court concluded that petitioner had no right to appointed counsel. *Ibid.*

### SUMMARY OF ARGUMENT

1.   The Court has jurisdiction to review the decision of the South Carolina Supreme Court.   Petitioner has completed his term of confinement for civil contempt and has not identified any collateral consequences flowing from the contempt.   Those facts would ordinarily render his case moot.   Petitioner, however, qualifies for a narrow exception to the mootness doctrine because the controversy is capable of repetition yet evading review. Sentences for civil contempt in South Carolina are limited to 12 months, and it is highly unlikely that petitioner would be able to secure plenary review by this Court within any future period of confinement.   In addition, the constitutional violation petitioner asserts is capable of repetition because he remains subject to the underlying child-support order and still has substantial arrears.   There is thus a reasonable expectation that he will receive automatically-generated rules to show cause for contempt in the future.   Indeed, since the contempt at issue in this case, petitioner has been jailed again for civil contempt.

2.   Petitioner's confinement for civil contempt violated due process, not because he lacked counsel, but because the procedures employed by the family court were inadequate to ensure the accurate determination of petitioner's present ability to pay his child-support ar-

11

rears. That ability to pay was a necessary predicate to the civil contempt sanction.

The defining feature of confinement for civil contempt is its purpose to coerce compliance with a court order. Such confinement must therefore end upon discharge of the contemnor's obligations; he is said to hold "the keys of [his] prison in [his] own pocket[]." *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted). Such confinement may not be imposed, however, where the contemnor demonstrates his inability to comply with the order. In such cases, he does not truly hold the keys to the prison; to confine him nonetheless would render the confinement punitive and thus a sanction that may be imposed only after compliance with criminal case safeguards.

The question of petitioner's ability to pay his child-support arrears therefore should have been a focus of the civil contempt proceeding, but it was not. Pro se petitioner was afforded no meaningful opportunity to establish his indigency, and even after he made a statement that could have easily been understood to mean he had no present ability to pay nearly $6000 to avoid jail, the family court judge made no further inquiry on the matter before committing him to a nominally conditional term of confinement.

The proceeding did not comply with due process because there was a serious risk of erroneous deprivation of petitioner's liberty through the procedures employed and because additional procedures would have enhanced the accuracy of the proceeding without materially impinging on any governmental interest. See *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976). Provision of counsel would have been a sufficient, but not a necessary, means of satisfying due process in this case. There were other

means of providing petitioner with a meaningful opportunity to establish his present inability to pay, such as asking him to complete an understandable form seeking his financial information, or asking him questions on the topic as necessary at a hearing. In the typical case, providing basic information about one's personal finances is not the kind of undertaking that requires assistance of counsel, and due process protections are based on the requirements of the mine-run case, not the exceptional one.

There is no basis for petitioner's proposed categorical due process right to appointed counsel in civil contempt proceedings where confinement is imposed. The Court has declined to recognize a categorical constitutional right to appointed counsel in the context of other non-criminal proceedings that can result in confinement. *Gagnon* v. *Scarpelli*, 411 U.S. 778, 782-790 (1973) (probation revocation); *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (summary court-martial). Civil contempt proceedings in child-support cases are relatively brief; the custodial parent may not be represented by counsel; and the issues in dispute are generally not complex. Given those circumstances, there is no warrant for recognizing a categorical right to defense counsel in such proceedings. Finally, recognizing a due process right to counsel in such proceedings would upset the balance struck by Title IV-D and its implementing regulations, both of which stress the importance of due process protections in child-support proceedings but neither of which permit federal funding for provision of counsel.

13

**ARGUMENT**

**I. THE COURT HAS JURISDICTION TO REVIEW THE DE-
CISION OF THE SOUTH CAROLINA SUPREME COURT**

Although petitioner has completed his term of con-
finement for the civil contempt at issue here, his claim is
not moot because he remains subject to the underlying
child-support order and because there is a reasonable
expectation that he will face future contempt proceed-
ings. His claim thus avoids mootness because it is capa-
ble of repetition yet evading review. This Court thus
has jurisdiction to review the final judgment of the
South Carolina Supreme Court. See 28 U.S.C. 1257(a).

1. "In general a case becomes moot when the issues
presented are no longer 'live' or the parties lack a le-
gally cognizable interest in the outcome." *Murphy* v.
*Hunt*, 455 U.S. 478, 481 (1982) (internal quotation marks
omitted) (quoting *United States Parole Comm'n* v.
*Geraghty*, 445 U.S. 388, 396 (1980)). While a currently
confined individual's challenge to his confinement gener-
ally presents no question of mootness, an individual who
has been released from confinement ordinarily may con-
tinue to press his challenge only if he suffers some "col-
lateral consequence" that constitutes a "concrete
and continuing injury." *Spencer* v. *Kemna*, 523 U.S. 1,
7 (1998). Because this Court "ha[s] been willing to pre-
sume that a wrongful conviction has continuing collat-
eral consequences," the Court ordinarily will not dismiss
as moot a criminal defendant's challenge to his convic-
tion once the defendant has completed his term of im-
prisonment. *Id.* at 8. But the Court has not employed
that presumption in other contexts, instead requiring a
party not in custody to demonstrate that he will actually
face collateral consequences if he does not secure relief

14

on appeal. See *id.* at 14 (no presumption of collateral consequences for parole revocation); see also *id.* at 14-16 (reviewing party's claimed collateral consequences).

Petitioner has completed his term of confinement for civil contempt. Because he challenges a civil order, not a criminal conviction, no presumption of collateral consequences applies. Moreover, petitioner has not identified any collateral consequences flowing from the finding of civil contempt. Ordinarily, petitioner's challenge to that finding would be considered moot and beyond this Court's jurisdiction.

2. Petitioner's claim in this case, however, avoids mootness because his is one of the "exceptional situations" in which a claim is capable of repetition, yet evading review. *City of L.A.* v. *Lyons*, 461 U.S. 95, 109 (1983). In non-class actions, this doctrine requires satisfaction of two elements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy*, 455 U.S. at 482 (quoting *Weinstein* v. *Bradford*, 423 U.S. 147, 149 (1975) (per curiam)). Petitioner satisfies both elements.

First, confinement for civil contempt in South Carolina is limited to 12 months, S.C. Code Ann. § 63-3-620 (West 2010), and it is exceedingly unlikely that a contemnor could appeal through the South Carolina court system, petition this Court for a writ of certiorari, and receive a decision on his claim within such a limited time period. See, *e.g.*, *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765, 774 (1978) (18 months was "too short a period of time for appellants to obtain complete judicial review"); cf. *DeFunis* v. *Odegaard*, 416 U.S. 312, 319 (1975) (per curiam) (future challenge to law school

15

admission procedure could likely come to this Court for decision within three-year period of law school matriculation).  Indeed, in this case, petitioner had completed his term of imprisonment for civil contempt more than a year before the South Carolina Supreme Court rendered its decision.  Compare Pet. App. 8a with *id.* at 1a.

Second, petitioner "can make a reasonable showing that he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109.  Petitioner is still subject to the underlying order for child support, and he is nearly $14,000 in arrears.  Pet. Br. 15; J.A. 104a.  Given that clerks of court in South Carolina automatically issue rules to show cause when a non-custodial parent is late on a required payment, there is a reasonable expectation that petitioner will again be subject to contempt proceedings.  Indeed, after he was released from jail for the contempt at issue here, petitioner was again held in contempt and reincarcerated.  In May 2010 yet another rule to show cause for contempt issued due to failure to pay support to respondent.  Pet. Br. 13-15; see *id.* at 15 (May 2010 rule to show cause is still outstanding); see also *Olmstead* v. *L.C.*, 527 U.S. 581, 594 n.6 (1999) (suit by plaintiffs seeking community-based services rather than institutionalization not moot even though they were then receiving desired services, because of "the multiple institutional placements [they] ha[d] experienced").  This is thus far from "an abstract dispute about the law" that might be thought "unlikely to affect [petitioner] any more than it affects other [South Carolina] citizens." *Alvarez* v. *Smith*, 130 S. Ct. 576, 580 (2009).[5]

---

[5]  That petitioner was represented by pro bono counsel in a subsequent contempt proceeding involving a different support order, see Pet. Br. 15 n.10, does not mean his claim is incapable of repetition.  Were pro bono counsel bound to represent petitioner in every future contempt

## II. THE ABSENCE OF ADEQUATE PROCEDURES NECES-SARY TO SECURE AN ACCURATE ADJUDICATION OF CIVIL CONTEMPT VIOLATED DUE PROCESS

The validity of the civil contempt order against petitioner turned on a critical fact: his present ability to purge himself of contempt by paying off his past-due child support. The family court's procedures in this case violated due process because they were inadequate to ensure an accurate determination of that fact and thus prevent an erroneous deprivation of petitioner's liberty. Although provision of government-provided counsel would have been a sufficient means of complying with due process requirements in this case, it was not a necessary one. Other mechanisms, such as requiring an affidavit for disclosure of financial information and a preliminary assessment of petitioner's current ability to pay child support, would have satisfied the requirements of due process.

### A. Confinement For Civil Contempt Is Permitted Only When The Contemnor Is Presently Able To Comply With The Underlying Order

Both civil and criminal contempt can lead to confinement, but this Court has long distinguished the two based on the "character and purpose" of the sanction imposed. *Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911). In civil contempt, the "punishment * * * [is] remedial," in that it is intended to "coerc[e]

---

proceeding, then his claim of entitlement to the assistance of counsel would be moot. There is no indication in the record, however, that pro bono counsel is under any such obligation, and, in fact, counsel did not appear in a 2009 contempt proceeding involving support owed respondent, see *id.* at 13-14 (noting that petitioner appeared pro se in 2009 and served six months for civil contempt).

17

the defendant to do what he had refused to do." *Id.* at 442. Punishment for criminal contempt, on the other hand, is "punitive" and is imposed "to vindicate the authority of the court." *Id.* at 441.

Because of that fundamental distinction, confinement imposed for civil contempt is conditional. The sentence must include a purge clause under which the contemnor will be immediately released upon compliance with the underlying court order. *Hicks* v. *Feiock*, 485 U.S. 624, 634 (1988). When confined under such a civil contempt order, the contemnor holds "the keys of [his] prison in [his] own pocket[ ]." *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted); see *id.* at 370 ("While any imprisonment, of course, has punitive and deterrent effects, it must be viewed as remedial if the court conditions release upon the contemnor's willingness" to comply with a court order.).

A purge clause by itself, however, will not render the contemnor's confinement remedial rather than punitive because "the justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order." *Shillitani*, 384 U.S. at 370-371. Accordingly, "punishment may not be imposed in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." *Hicks*, 485 U.S. at 638 n.9; see *Maggio* v. *Zeitz*, 333 U.S. 56, 72 (1948) ("[T]o jail one for a contempt for omitting an act he is powerless to perform would * * * make the proceeding purely punitive, to describe it charitably."); see also *Moseley* v. *Mosier*, 306 S.E.2d 624, 626 (S.C. 1983)

("When the parent is *unable* to make the required payments, he is not in contempt.").[6]

The burdens of production and persuasion may be placed on the defendant to demonstrate his present inability to comply with an order. See *Hicks*, 485 U.S. at 637; *United States* v. *Rylander*, 460 U.S. 752, 757 (1983). Accordingly, if the defendant "offers no evidence as to his inability to comply," "stands mute," or is disbelieved by the court, then he fails to carry his burden and may be held in contempt. *Maggio*, 333 U.S. at 75. But the trial court "is obliged" to consider "all the evidence properly before it in the contempt proceeding in determining whether or not there is actually a present ability to comply and whether failure so to do constitutes deliberate defiance which a jail term will break." *Id.* at 76.

If, upon examination, a contempt penalty is considered punitive rather than remedial, it will be vacated unless all "the protections that the Constitution requires of * * * criminal proceedings" were provided. *International Union, United Mine Workers* v. *Bagwell*, 512 U.S. 821, 826 (1994) (quoting *Hicks*, 485 U.S. at 632).

---

[6] A defendant may not avoid a finding of civil contempt for violating an order by collaterally attacking that order in the contempt proceeding. See *Maggio*, 333 U.S. at 74-75. The defendant may, however, make the distinct assertion that he has a "*present* inability to comply with the order in question." *United States* v. *Rylander*, 460 U.S. 752, 757 (1983); see *ibid.* ("While the court is bound by the enforcement order, it will not be blind to evidence that compliance is now factually impossible. Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."); *Maggio*, 333 U.S. at 74-75.

19

### B. The Family Court's Procedures Were Inadequate To Ensure An Accurate Determination Of Present Ability To Pay

The procedures employed by the family court violated petitioner's due process rights because they were inadequate to ensure that petitioner was not erroneously confined as an inducement to perform a task he was powerless to perform, while additional procedures to ensure petitioner's present ability to pay his child-support arrears would have been minimally burdensome.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews* v. *Eldridge*, 424 U.S. 319, 332 (1976). Confinement for civil contempt is a deprivation of liberty, and the alleged contemnor is thus entitled to procedural due process protections before its imposition. Cf. *Morrissey* v. *Brewer*, 408 U.S. 471, 482 (1972) (termination of parole triggers due process protections); see also *Bagwell*, 512 U.S. at 827 (civil contempt requires "notice and an opportunity to be heard").

The conclusion that due process applies is the beginning of the inquiry, not its end, because "the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands.'" *Wilkinson* v. *Austin*, 545 U.S. 209, 224 (2005) (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The Court has "generally * * * declined to establish rigid rules and instead ha[s] embraced a framework to evaluate the sufficiency of particular procedures." *Ibid.* That framework involves "consideration of three distinct factors:

20

First, the private interest that will be affected by the
official action; second, the risk of an erroneous depri-
vation of such interest through the procedures used,
and the probable value, if any, of additional or substi-
tute procedural safeguards; and finally, the Govern-
ment's interest, including the function involved and
the fiscal and administrative burdens that the addi-
tional or substitute procedural requirements would
entail.

*Mathews*, 424 U.S. at 335.

Application of the *Mathews* factors here demon-
strates that the family court proceeding did not comply
with the requirements of procedural due process. First,
petitioner's private interest in avoiding incarceration
was significant. See *Foucha* v. *Louisiana*, 504 U.S. 71,
80 (1992).

Second, there was a serious "risk of an erroneous
deprivation" of petitioner's liberty interest under the
procedures employed by the family court, and there
would have been value in additional procedures.
*Mathews*, 424 U.S. at 335. Petitioner did not dispute
that he had failed to comply with his child-support or-
der, so the propriety of his confinement for civil con-
tempt thus turned on his present ability to do so. See
pp. 17-18, *supra*; Pet. Br. 3-4 (petitioner's ability to pay
"was the precise question before the family court"); *id.*
at 17. But South Carolina automatically referred peti-
tioner for contempt proceedings without considering
whether petitioner was employed or had assets. At the
contempt hearing, the court solicited no financial infor-
mation from petitioner, nor was there apparently any
mechanism in place for him to provide it on his own. Pe-
titioner's statement at the hearing that he had been un-

21

able to work because he broke his back, Pet. App. 17a, could reasonably be understood to constitute a claim that he had no present ability to pay nearly $6000. The court did not explore this question, however; it made no inquiry into petitioner's income or assets. Instead, the court imposed a jail sentence unaccompanied by any finding that petitioner had the ability to pay off his outstanding balance from a jail cell.[7] Taking additional modest steps to determine whether petitioner had the present ability to discharge his obligation, see pp. 24-25, *infra*, would have improved the accuracy of the proceeding.

Finally, the government's interests also favor additional procedural safeguards to ensure that only those parents with a present ability to pay are confined for civil contempt. While the State has a strong interest in enforcing child-support orders, it secures no benefit from jailing a non-custodial parent who cannot discharge his obligation. The period of incarceration makes it less, rather than more, likely that such parent will be able to pay child support. See Elizabeth G. Patterson, *Civil Contempt & the Indigent Child Support Obligor: The Silent Return of Debtor's Prison*, 18 Cornell J.L. & Pub. Pol'y 95, 126 (2008) (*Civil Contempt*). Meanwhile, the State incurs the substantial expense of confinement.

Moreover, as a general matter, the routine use of contempt for non-payment of child support is likely to be an ineffective strategy for enforcing support orders. See National Child Support Enforcement, U.S. Dep't of Health & Human Servs., *Strategic Plan: FY 2005-2009*, at 2, 10 (*Strategic Plan*), http://www.acf.hhs.gov/

---

[7]  The judge told petitioner, "[i]f you've got a job, I'll make you eligible for work release," Pet. App. 18a, but petitioner states he was ineligible for work release, Pet. Br. 12 n.8.

22

programs/cse/pubs/2004/Strategic_Plan_FY2005-2009. pdf. While child-support recovery efforts once "followed a business model predicated on enforcement" that "intervened only after debt, at times substantial, accumulated and often too late for collection to be successful, let alone of real value to the child," experience has shown that alternative methods—such as order modifications, increased contact with non-custodial parents, and use of "automation to detect non-compliance as early as possible"—are more effective. *Id.* at 2.

A substantial portion of child-support obligors have no or low reported income. Elaine Sorensen et al., *Assessing Child Support Arrears in Nine Large States & the Nation* 22 (2007) (*Assessing Child Support Arrears*), http://aspe.hhs.gov/hsp/07/assessing-CS-debt/report.pdf (obligors with $10,000 or less in annual income constituted half of the child-support obligors and owed 70% of the arrears in a nine-state study). Such individuals' child-support obligations are often substantial. See *id.* at 54 ("For obligors with reported income of $10,000 a year or less, the median percent of reported income that was due as current support was 83[%].")." A low-income individual in arrears on child-support payments is "rarely a candidate for civil incarceration because of the likelihood that he or she is unable to pay the hefty sum represented by the accumulated arrears, or even a portion thereof that may be set by the court as the purge amount." *Civil Contempt* 116.[8]

---

[8]  To be sure, coercive enforcement remedies, such as contempt, have a role to play in child-support enforcement efforts, such as with non-custodial parents who are hiding assets or unreported self-employment or under-the-table income. See *Strategic Plan* 2; *Assessing Child Support Arrears* 4-5, 22-23, 25; *Civil Contempt* 97. There is no evi-

Many States have taken alternative steps to avoid child-support arrears, such as establishing more realistic support orders, "increas[ing] parental participation in the order establishment process," providing employment services to non-custodial parents, or using automation tools to improve wage withholding. *Assessing Child Support Arrears* 10-11, 80-89; see *id.* at 85 (study of Florida program that provides employment services and case management to non-custodial parents found that program participants paid nearly five dollars in child support for every dollar spent on the program). Such alternatives, which focus on early intervention rather than after-the-fact efforts to collect substantial accumulated arrears, are more likely to be effective means of enforcing the child-support obligations of the substantial number of low-income obligors. See *Strategic Plan* 2.

### C. Due Process Can Be Satisfied By A Variety Of Procedures Intended To Assure An Accurate Determination Of Present Ability To Pay In A Civil Contempt Proceeding

Petitioner argues that, in order to ensure that his civil contempt proceeding "remain[ed] civil," Pet. Br. 39, due process required the appointment of counsel to assist him in establishing his inability to comply with the court's order, see *id.* at 41. Although we agree that petitioner's due process rights were violated, we disagree that the State's failure to appoint counsel was itself the basis of the violation. Appointment of counsel is certainly one way to help ensure an accurate determination of the obligor's current ability to pay—the determination on which the "civil" nature of a civil contempt sanction rests—but it is not the only way. It was the State's

---

dence, however, that routine use of contempt among low-income non-custodial parents is generally effective. See *Civil Contempt* 126.

failure to provide any meaningful mechanism for making that determination in this case, and not its failure to provide counsel in particular, that violated petitioner's due process rights.[9]

> **1. Courts can comply with due process by providing a meaningful opportunity for an alleged contemnor to establish his present ability to pay**

While there is no basis for a constitutional rule categorically requiring appointment of counsel in all civil contempt that could lead to deprivation of physical liberty, see pp. 25-32, *infra*, due process does require procedures sufficient to ensure fundamental fairness. In the context of a civil contempt proceeding for non-payment of child support that could lead to confinement, this means procedures adequate to allow a pro se contemnor to attempt to carry his burden of establishing his present inability to pay.

Such procedures may include requiring a non-paying parent to complete an understandable form seeking financial information. South Carolina already requires

---

[9] Although petitioner's submissions below and in this Court have focused on the value of appointed counsel in ensuring that indigent child-support obligors are not erroneously jailed as a means of inducing them to comply with their obligations, see, *e.g.*, Pet. i, Pet. App. 13a, fairly encompassed in those submissions is the proposition that due process demands an appropriate procedure to evaluate an obligor's present ability to pay. See Sup. Ct. R. 14.1(a); *Yee* v. *City of Escondido*, 503 U.S. 519, 534 (1992). In conducting that inquiry, it should be open to the Court to consider whether there are alternative procedures, other than the specific procedure petitioner has proposed, that would satisfy constitutional requirements. To the extent the Court concludes otherwise, however, the proper course would be to dismiss the writ of certiorari as improvidently granted and await a case that expressly raises a broader due process claim.

25

noncustodial parents to fill out such a form when a support order is originally sought in a Title IV-D case, see S.C. Code Ann. § 43-5-220(c) (West Supp. 2009), but apparently does not do so in subsequent contempt proceedings. Requiring that such forms be completed at the outset of a contempt proceeding would impose little expense on the State or burden on the proceeding while materially advancing the accuracy of the court's determination. Such information could by itself establish the contemnor's present inability to pay his arrears or, conversely, demonstrate his ability to pay. To the extent the court had questions about the information on the form or disbelieved it, the court could question the contemnor about his finances at the contempt hearing. Such simple, minimally burdensome procedures would enable the court to evaluate whether the alleged contemnor has the ability to pay his arrears and is thus an appropriate candidate for a civil contempt sanction.

### 2. There is no basis for an inflexible right to counsel rule in civil contempt proceedings

Although the constitutional inadequacy of the family court's procedures could have been cured by appointment of counsel (who presumably would have addressed petitioner's inability to pay his arrears and urged the court not to jail him for that reason), appointment of counsel was not constitutionally compelled.

a. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001) (quoting *Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886, 895 (1961)); see *Mathews*, 424 U.S. at 334 ("[D]ue process is flexible and calls for such procedural protections as the particular

situation demands.") (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The question in a due process case is how to ensure a fundamentally fair proceeding, taking into account the importance of the private interest at issue, the risk of error and value of additional procedures, and the government's interest. See *id.* at 335. This is not an inquiry that typically lends itself to the kind of categorical approach advocated by petitioner. See *Gagnon* v. *Scarpelli*, 411 U.S. 778, 789 (1973) (contrasting categorical Sixth Amendment right to counsel in criminal prosecution "with the more limited due process right" in other contexts).[10]

In fact, in areas outside traditional criminal prosecutions where an individual's liberty is nonetheless at stake, the Court has declined to recognize a categorical right to counsel, instead relying on alternative procedural safeguards to ensure due process. See *Gagnon*, 411 U.S. at 782-790; see also *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (no due process right to counsel for summary courts-martial).[11] For example, in *Gagnon*,

---

[10] The Sixth Amendment right to counsel is inapplicable to a civil contempt proceeding because it is not a "criminal prosecution[ ]." U.S. Const. Amend. VI; see *Bagwell*, 512 U.S. at 826-827.

[11] In *In re Gault*, 387 U.S. 1 (1967), the Court recognized a due process right to appointed counsel in a juvenile delinquency proceeding, but, as the Court later explained, that was because the proceeding "while denominated civil, was functionally akin to a criminal trial." *Gagnon*, 411 U.S. at 789 n.12. In *Vitek* v. *Jones*, 445 U.S. 480 (1980), a plurality would have held that there is a due process right to counsel before a State involuntarily transfers a prisoner to a state mental hospital for psychiatric treatment. See *id.* at 497. Justice Powell's controlling concurrence, however, disagreed, concluding that "the fairness of an informal hearing designed to determine a medical issue" does not "require[] participation by lawyers." *Id.* at 500. Justice Powell agreed that a prisoner "required assistance" in such a proceeding to ensure

the Court held that due process required the government to provide a preliminary and final hearing before it could incarcerate an individual for violating the terms of his probation. See 411 U.S. at 782; see also *id.* at 785-786 (hearings necessary in order to provide notice of the alleged probation violation and ensure "accurate finding of fact and the informed use of discretion"). At the same time, however, the Court rejected the "contention that the State is under a constitutional duty to provide counsel for indigents in all probation or parole revocation cases." *Id.* at 787; see *id.* at 790 (stating that due process may require appointment of counsel in exceptional cases). The Court recognized that "such a rule has the appeal of simplicity" but concluded that "it would impose direct costs and serious collateral disadvantages without regard to the need or the likelihood in a particular case for a constructive contribution by counsel." *Id.* at 787.

The Court in *Gagnon* noted that in many cases a probationer's mitigating evidence may be "so simple as not to require either investigation or exposition by counsel." 411 U.S. at 787. Here too, with the provision of easy-to-understand forms on assets and income and, if necessary, a colloquy with the trial court, it will often be simple for a delinquent child-support obligor to demonstrate his present inability to discharge his obligation without the assistance of appointed counsel. Indeed, even in criminal cases to which the Sixth Amendment right of counsel applies, defendants are not entitled to government-appointed counsel for the purpose of filling out the forms routinely used to establishing their financial eligibility for government-appointed counsel. See

---

fairness, but said that it could be "rendered by competent laymen in some cases." *Ibid.*

28

18 U.S.C. 3006A(b) (counsel will be appointed only after court is "satisfied after appropriate inquiry that the person is financially unable to obtain counsel"); *United States* v. *Bauer*, 956 F.2d 693, 695 (7th Cir.) ("Under the Criminal Justice Act, the public fisc need not contribute one penny unless the accused first establishes that he cannot afford counsel. Nothing in the statute directs the Treasury to assist the accused in making this determination."), cert. denied, 506 U.S. 882 (1992). Just as "[n]o legal expertise is needed to participate effectively in hearings under the Criminal Justice Act," *ibid.*, no legal expertise is generally required to establish inability to pay child-support arrears.

*Gagnon* also expressed concern that "[t]he introduction of counsel into a revocation proceeding will alter significantly the nature of the proceeding," since the States typically relied on probation officers to conduct revocation hearings but might turn to attorneys if all probationers were represented. 411 U.S. at 787. "[T]he decisionmaking process will be prolonged, and the financial cost to the State * * * will not be insubstantial." *Id.* at 788. In the context of civil contempt for child support as well, automatic appointment of counsel could delay the proceedings, create an asymmetry in representation between non-custodial parents and custodial parents who may appear pro se, see, *e.g.*, Pet. App. 16a, and impose considerable financial cost on the government without an automatic increase in accuracy.

*Lassiter* v. *Department of Social Services*, 452 U.S. 18 (1981), upon which petitioner relies, see, *e.g.*, Pet. Br. 32-33, is not to the contrary. In that decision, the Court held that there was no due process right to counsel in a parental-rights termination proceeding. See *Lassiter*, 452 U.S. at 32-33. In dictum, the Court said its cases

29

had established a "presumption" that an indigent had a right to appointed counsel "when, if he loses, he may be deprived of his physical liberty." *Id.* at 26-27. The Court has not subsequently relied on any such presumption derived from the *Lassiter* dictum, and *Lassiter* itself recognized that *Gagnon*, which involved a deprivation of physical liberty, had held that "due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed" through appointment of counsel. *Id.* at 31 (quoting *Gagnon*, 411 U.S. at 788).

That there may be atypical cases with "complex factual and legal issues" (Pet. Br. 46) in which counsel would provide a significant benefit beyond what could be obtained through other procedural safeguards does not mean there should be a right to counsel. "[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." *Walters* v. *National Ass'n of Radiation Survivors*, 473 U.S. 305, 321 (1985) (quoting *Mathews*, 424 U.S. at 344; see *id.* at 331 ("existence of complexity in some cases" was not "sufficient to warrant a conclusion that the right to retain and compensate an attorney in [Veterans Administration] cases is a necessary element of procedural fairness under the Fifth Amendment").

b. A recognition that due process requires fair proceedings before a child-support obligor can be held in civil contempt but that this due process right does not encompass appointment of government-funded counsel is also consistent with the balance struck by Congress and the Secretary in enacting and administering the Title IV-D program. Cf. *Middendorf*, 425 U.S. at 43 ("[W]e must give particular deference to the determina-

tion of Congress, made under its authority to regulate the land and naval forces, U.S. Const., Art. I, § 8, that counsel should not be provided in summary courts-martial."); *Walters*, 473 U.S. at 319-320 ("This deference to congressional judgment must be afforded even though the claim is that a statute Congress has enacted effects a denial of the procedural due process guaranteed by the Fifth Amendment.").

Congress and the Secretary have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program.[12]  At the same time, however, they have declined to reimburse the States for the cost of providing counsel to non-custodial parents. See S. Rep. No. 387, 98th Cong., 2d Sess. 23 (1984) (statute does not provide federal funding for "defense counsel for absent parents" or "incarceration of delinquent obligors"); 45 C.F.R. 304.23 (i) and (j) (no federal funding for "[t]he costs of counsel for indigent defendants in

---

[12] See, *e.g.*, 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, including notice and a reasonable opportunity to contest the accuracy of such information."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for notice, opportunity to contest the action, and opportunity for an appeal on the record to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

IV-D actions" or "[a]ny expenditure for jailing of parents in child-support enforcement cases"); see also 52 Fed. Reg. 32,130 (1987) (Federal "policy since the inception of the [Title IV-D] program has been that costs of incarceration of delinquent obligors and costs of defense counsel are not necessary and reasonable costs associated with the proper and efficient administration of the Title IV-D program.").

Finally, at its broadest, the categorical rule petitioner suggests—that there is a right to government-appointed counsel in all "proceedings denominated as 'civil' where an individual nonetheless faces the prospect of confinement to state custody," Pet. Br. 30—conflicts with Congress's express judgment that provision of government-funded counsel is not warranted in all such areas. See *Middendorf*, 425 U.S. at 43 (deferring to such a judgment); *Walters*, 473 U.S. at 319-320 (same); see also *Landon* v. *Plasencia*, 459 U.S. 21, 34-35 (1982) ("The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy.").

For example, while aliens are sometimes detained during removal proceedings or pending enforcement of removal orders, Congress has long explicitly provided that there is no obligation to provide government payment for counsel in such proceedings. See 8 U.S.C. 1362 ("In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (*at no expense to the Government*) by such counsel, authorized to practice in such proceedings,

32

as he shall choose.") (emphasis added); 8 U.S.C. 1229a(b)(4)(A). Congress's judgment is consistent with this Court's repeated holdings that removal proceedings are civil and non-punitive, see, *e.g.*, *INS* v. *Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime."), and its conclusion that detention of an alien during the removal process is permissible because it is incidental to the proceedings, and not their purpose or goal, see, *e.g.*, *Carlson* v. *Landon*, 342 U.S. 524, 538 (1952) ("Detention is necessarily a part of this deportation procedure."). As the Court has also noted, removal proceedings—whose purpose is removal of aliens from the country, not deprivation of their physical liberty—are "streamlined" administrative proceedings held before administrative personnel, immigration judges, under rules offering the aliens more limited procedural rights than are available in court. *Lopez-Mendoza*, 468 U.S. at 1039; see *ibid.* ("a deportation hearing is intended to provide a streamlined determination of eligibility to remain in this country, nothing more"). The due process guarantee of fundamental fairness does not mandate the appointment of counsel in such proceedings, which would be contrary to the judgment of Congress.[13]

---

[13] For these reasons, the lower courts have held that aliens in removal proceedings have no constitutional right to appointment of counsel at government expense. *United States* v. *Gasca-Kraft*, 522 F.2d 149, 152 (9th Cir. 1975) ("courts have uniformly held in this circuit and elsewhere that in light of the non-criminal nature of both the proceedings and the order which may be a result, that respondents are not entitled to have counsel appointed at government expense") (citing cases); see *Moham-*

33

## CONCLUSION

The judgment of the Supreme Court of South Carolina should be reversed.

Respectfully submitted.

SALLY A. HOWARD
  *Acting General Counsel*
ROBERT E. KEITH
  *Associate General Counsel*
LISETTE PEDRE MESTRE
  *Attorney*
  *Department of Health and*
  *Human Services*

NEAL KUMAR KATYAL
  *Acting Solicitor General*
TONY WEST
  *Assistant Attorney General*
LEONDRA R. KRUGER
  *Acting Deputy Solicitor*
  *General*
JOSEPH PALMORE
  *Assistant to the Solicitor*
  *General*
LEONARD SCHAITMAN
EDWARD HIMMELFARB
  *Attorneys*

JANUARY 2011

---

*med* v. *Gonzalez*, 400 F.3d 785, 793 (9th Cir. 2005); *United States* v. *Torres-Sanchez*, 68 F.3d 227, 230 (8th Cir. 1995); *Nazakat* v. *INS*, 981 F.2d 1146, 1148 (10th Cir. 1992); *United States* v. *Campos-Asencio*, 822 F.2d 506, 509 (5th Cir. 1987).

EXHIBIT I.

# Title 8
# Courts and Civil Procedure — Courts

## Chapter 10
## Family Court

### R.I. Gen. Laws § 8-10-3

**§ 8-10-3. Establishment of court — Jurisdiction — Seal — Oaths.**

**(a)** There is hereby established a family court, consisting of a chief judge and eleven (11) associate justices, to hear and determine all petitions for divorce from the bond of marriage and from bed and board; all motions for allowance, alimony, support and custody of children, allowance of counsel and witness fees, and other matters arising out of petitions and motions relative to real and personal property in aid thereof, including, but not limited to, partitions, accountings, receiverships, sequestration of assets, resulting and constructive trust, impressions of trust, and such other equitable matters arising out of the family relationship, wherein jurisdiction is acquired by the court by the filing of petitions for divorce, bed and board and separate maintenance; all motions for allowance for support and educational costs of children attending high school at the time of their eighteenth (18th) birthday and up to ninety (90) days after high school graduation, but in no case beyond their nineteenth (19th) birthday; enforcement of any order or decree granting alimony and/or child support, and/or custody and/or visitation of any court of competent jurisdiction of another state; modification of any order or decree granting alimony and/or custody and/or visitation of any court of competent jurisdiction of another state on the ground that there has been a change of circumstances; modification of any order or decree granting child support of any court of competent jurisdiction of another state provided: (1) the order has been registered in Rhode Island for the purposes of modification pursuant to § 15-23.1-611, or (2) Rhode Island issued the order and has continuing exclusive jurisdiction over the parties; antenuptial agreements, property settlement agreements and all other contracts between persons, who at the time of execution of the contracts, were husband and wife or planned to enter into that relationship; complaints for support of parents and children; those matters relating to delinquent, wayward, dependent, neglected, or children with disabilities who by reason of any disability requires special education or treatment and other related services; to hear and determine all petitions for guardianship of any child who has been placed in the care, custody, and control of the department for children, youth, and families pursuant to the provisions of chapter 1 of title 14 and chapter 11 of title 40; adoption of children under eighteen (18) years of age; change of names of children under the age of eighteen (18) years; paternity of children born out of wedlock and provision for the support and disposition of such children or their mothers; child marriages; those matters referred to the court in accordance with the provisions of § 14-1-28; those matters relating to adults who shall be involved with paternity of children born out of wedlock; responsibility for or contributing to the delinquency, waywardness, or neglect of children under sixteen (16) years of age; desertion, abandonment, or failure to provide subsistence for any children dependent upon such adults for support; neglect to send

any child to school as required by law; bastardy proceedings and custody to children in proceedings, whether or not supported by petitions for divorce or separate maintenance or for relief without commencement of divorce proceedings; and appeals of administrative decisions concerning setoff of income tax refunds for past due child support in accordance with §§ 44-30.1-5 and 40-6-21. The holding of real estate as tenants by the entirety shall not in and of itself preclude the family court from partitioning real estate so held for a period of six (6) months after the entry of final decree of divorce.

**(b)** The family court shall be a court of record and shall have a seal which shall contain such words and devices as the court shall adopt.

**(c)** The judges and clerk of the family court shall have power to administer oaths and affirmations.

**(d)** The family court shall have exclusive initial jurisdiction of all appeals from any administrative agency or board affecting or concerning children under the age of eighteen (18) years and appeals of administrative decisions concerning setoff of income tax refunds, lottery set offs, insurance intercept, and lien enforcement provisions for past due child support, in accordance with §§ 44-30.1-5 and 40-6-21, and appeals of administrative agency orders of the department of human services to withhold income under chapter 16 of title 15.

**(e)** The family court shall have jurisdiction over those civil matters relating to the enforcement of laws regulating child care providers and child placing agencies.

**(f)** The family court shall have exclusive jurisdiction of matters relating to the revocation or nonrenewal of a license of an obligor due to noncompliance with a court order of support, in accordance with chapter 11.1 of title 15.

[See § 12-1-15 of the General Laws.]

**(g)** Notwithstanding any general or public law to the contrary, the family court shall have jurisdiction over all protective orders provided pursuant to the Rhode Island general laws, when either party is a juvenile.

History of Section.
P.L. 1961, ch. 73, § 1; P.L. 1972, ch. 30, § 1; P.L. 1973, ch. 125, § 1; P.L. 1974, ch. 85, § 1; P.L. 1975, ch. 3, § 1; P.L. 1976, ch. 252, § 1; P.L. 1977, ch. 89, § 1; P.L. 1980, ch. 54, § 1; P.L. 1981, ch. 319, § 1; P.L. 1984, ch. 167, § 3; P.L. 1984, ch. 281, § 1; P.L. 1987, ch. 163, § 2; P.L. 1988, ch. 84, § 7; P.L. 1992, ch. 326, § 1; P.L. 1994, ch. 158, § 2, P.L. 1994, ch. 195, § 3; P.L. 1994, ch. 244, § 1; P.L. 1994, ch. 263, § 3; P.L. 1995, ch. 370, art. 29, § 10; P.L. 1995, ch. 374, § 10; P.L. 1996, ch. 129, § 1; P.L. 1996, ch. 131, § 1; P.L. 1996, ch. 132, § 1; P.L. 1996, ch. 133, § 1; P.L. 1997, ch. 170, § 23; P.L. 1999, ch. 83, § 6; P.L. 1999, ch. 130, § 6; P.L. 2007, ch. 73, art. 3, § 9; P.L. 2010, ch. 216, § 1; P.L. 2010, ch. 236, § 1.