THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT
Appeal from the United States District Court for the District of Rhode Island

MARY SEGUIN                                          No. 23-1967
*Plaintiff-Appellant*                                No. 23-1978
                                                     No. 24-1313

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES, et al.
*Defendants-Appellees*

————————————

**APPELLANT'S MOTION TO SUPPLEMENT THE RECORD WITH ECF 65: APPELLANT'S RULE 62.1 MOTION FOR INDICATIVE RULING ON MOTIONS TO AMEND AND SUPPLEMENT COMPLAINT UNDER Fed. R. Civ. P 15(a)(2) and 15(d) TO ADD BIVENS CLAIMS FOR DAMAGES, PUNITIVE DAMAGES AND INJUNCTIVE RELIEF**

**And**

**L.R. 45.0(a) MOTION TO REINSTATE Appeal Cases No. 23-1978 and 24-1313 MOTION FOR AN ORDER WAIVING FEES In Cases No. 23-1978 and No. 24-1313 UNDER THE REMEDY PRINCIPLE UNDER BIVENS THAT IS PENDING BEFORE THIS COURT: DOCUMENT: 00118189824**

————————————

**Pursuant to FRE 201, the Inherent Authority of the Court Pursuant to Supervening Change of Facts and Change in Law**

**28 U.S.C. § 2106 and Fed. R. App. P. 27**

Texas Appellant, MARY SEGUIN, respectfully moves to supplement the record which applies to the Opening Brief that is respectfully tendered by the Appellant dated September 13, 2024. Appellant hereby moves under FRE 201(c)(2), the Inherent Authority of the Court pursuant to supervening change of facts and change in law under 28 U.S.C. sec. 2106 and FRAP 27. Under FRE

201(c)(2), Appellant supplies the Court the attached document in Exhibit I.,

**Document: 00118189824,** that comprises of Appellant's L.R. 45.0(a) Motion to

Re-Instate Appeals 23-1978 and 24-1313 based on the **Bivens** principle for remedy

for constitutional injury – to which appellate motion, **ECF 65** document in the

underlying district court case **23-cv-126** is <u>attached</u>: the crux of the fact is that

Appellant has ***Bivens*** Claims for *monetary damages* and *punitive damages* claims

against individual federal and state officers *acting under color of federal law*, and

*injunctive relief* claims against federal and state agencies in their official capacities

authorized by federal law to act in a federal capacity that *acted **under color of***

***federal law***, including officers authorized by federal law to act in a federal capacity

who *acted under color of federal law (federal Title IV-D of the Social Security*

*Act)*;  Plaintiff-Appellant has a Bivens claim and is entitled under the law to sue;

among others, for example, the Court's supplemented facts and evidence to date

shows post-appeal *functus officio void ab initio* actions altering records during this

official appellate proceeding that the Supreme Court has long held can be attacked

at any time in any court, either directly or collaterally.  Here, the *functus officio*

*void ab initio* William E. Smith altered the record on appeal during the pendency

of Appeal 23-1967 in order to criminally hijack and criminally divest this Court of

jurisdiction over properly filed appeals.  *See*, *Vallely v. Northern Fire & Marine*

*Ins. Co.*, 254 U.S. 348, 41 S. Ct. 116 (1920) "a void order may be attacked at any

time in any court, either directly or collaterally"; "[void] orders are regarded as nullities. They are not voidable, but simply void, and this even prior to reversal." *Old Wayne Mut. I. Assoc. v. McDonough*, 204 U.S. 8, 27 S. Ct. 236 (1907). The Defendant-Appellees, their counsels and their public-attorney-offices, who are officers of the federal court, knowingly followed the Smith-led obstruction charge to alter/falsify the record, and filed functus officio void ab initio nullity filings in the *functus officio district court* under *color of federal law* during the pendency of both 23-1967 and 23-1978 <u>official proceedings</u>. *Functus Officio* William E. Smith, by definition of *functus officio*, acted in his unofficial capacity and individual capacity under *color of federal law*. *Functus officio* by definition has "no outer perimeter." William E. Smith is a judicial employee under Article III, and is under the employment supervision of the Chief Judge of the Court of Appeals for the First Circuit, and the U.S. Courts Office within this jurisdiction must be enjoined in its official capacity from not just one but *a series* and *prolonged* (spanning eleven months from November 17, 2023 to the present, September 16, 2024) *functus officio* interference with two official proceedings pending before the Court of Appeals for the First Circuit. The district court's *functus officio* alterations of the record on appeal during two official proceedings pending before this Court are categorically <u>not judicial acts</u>, but *unofficial acts*, by definition of ***functus officio***,

and are ***acts under color of federal law***. Accordingly, these corrupt acts under color of federal law are further subject to injunctive relief under Bivens.

Just as relevant is the 2024 evidence discovery of Title IV-D administrative procedures of federal Title IV-D record alteration by the Defendant-Appellees officers' and agencies' administration of federal law Title IV-D of the Social Security Act, that includes 18 U.S.C. sec. 1512(c)(2) federal Title IV-D record alterations and falsifications of court orders' 12% compound interests, to "zero them out." The corrupt obstruction federal Title IV-D administrative procedure acts by the agencies authorized under federal law to act in a federal capacity, and *acting under federal law,* are in a *federal capacity* under *color of federal law* by the Defendant-Appellees, that are moreover the <u>direct causation</u> of the above-raised corrupt alteration of the federal court records under appeal during the pendency of TWO official proceedings before this Court (23-1978, 24-1313). Accordingly, on September 16, 2024, Plaintiff-Appellant filed a Rule 62.1 Motion for Indicative Ruling on Plaintiff-Appellant's Rule 60(b) motions, Rule 15(a)(2) motion to amend and Rule 15(d) motion to supplement the Amended Complaint (ECF 25) for the purpose, *inter alia*, of bringing/adding Bivens claims and to add defendants – docketed on September 16, 2024 (ECF 65).

Given the underlying Amended Complaint (ECF 25) was dismissed *sua sponte* by <u>Judge</u> William E. Smith (who subsequently in his *functus officio*

unofficial capacity criminally altered federal records of the record on appeal during the pendency of TWO appellate proceedings appealing his judgment, merged orders, and pre-appeal obstruction attempt to alter federal records, and later his *functus officio* orders), under Younger, prior to any of the Defendants filing any responses, Appellant hereby invokes the aforesaid  FRE 201(c)(2) *et al*., to supplement the record, and requests judicial notice that Plaintiff-Appellant seeks to bring **<mark>*Bivens*</mark>** claims and/or actions, including, *inter alia*, for ***injunctive relief*** against Rhode Island state agencies that act under federal authority in a federal capacity under federal law (federal Title IV-D of the Social Security Act) and criminally (obstruction) altering and falsifying *federal Title IV-D federal* records in a ***federal capacity reach under federal Title IV-D* of the Social Security Act** to the <mark>**Sovereign State of Texas**</mark>, ***under color of federal Title IV-D law***, that is on-going.

In support, Plaintiff-Appellant states the follows:

1. <u>Public Interest</u> is implicated – the Public has an interest in the fair administration of justice in the federal courts in the First Circuit, accordingly and namely, the Public has an interest in Appellant's **<u>right</u>** to proceed in pending official proceedings before this Court in Appeal 23-1967, then additionally 23-1978, <u>unfettered</u>, <u>un-interfered</u>, <u>unobstructed</u>, and *<u>free</u>* from a <u>multitude</u> of *functus officio void ab initio* interference or *functus officio* **under color of federal law**

alterations and falsifications of the record on appeal by William E. Smith, a *functus officio* federal public officer under the <u>ministerial</u> <u>administrative</u> supervision of the Chief Judge of the Court of Appeals in the First Circuit.  Appellant is injured and is prejudiced as a result.  Under applicable Supreme Court laws, the Appellant is entitled to remedy for injury resulting from federal public officers, *inter alia*, *functus officio* officers, acting *under color of federal law* that moreover violate <u>criminal obstruction laws</u>, under ***Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)**; *see, also,* ***Fischer v. U.S.*, 603 U.S. __ (2024)**;  district courts have jurisdiction over Bivens causes of action under 28 U.S.C. § 1331 because they are "civil actions arising under the Constitution." ***Carlson***, 446 U.S. at 21-22 ("[O]ur decisions, although not expressly addressing and deciding the question, indicate that <u>**punitive damages**</u> **may be awarded in a *Bivens* suit**."); ***Sanchez v. Rowe***, 651 F. Supp. 571, 574 (N.D. Tex. 1986) ("**[P]unitive damages may be awarded against an individual defendant in a Bivens suit**") (citing ***Carlson***, 446 U.S. at 22). The Supreme Court has reasoned that a *Bivens* action deters future constitutional violations of individual officers by providing a mechanism by which they can be held accountable for their unlawful actions. See ***Malesko***, 534 U.S. at 70 ("The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations.").  **Plaintiff moreover is entitled to <u>injunctive actions</u> brought against officers who**, in their **official**

**capacities**, have the authority to carry out the requested injunctive relief. *See, e.g.,* ==*Hubbard v. EPA Adm'r*==, 809 F.2d 1, 11 (D.C. Cir. 1986) (recognizing claim against the agency for equitable relief to remedy constitutional violations); ==*Solida v. McKelvey*==, 820 F.3d 1090 (9th Cir. 2016) (holding that **Bivens suits are individual capacity suits**; and **official government action can be enjoined**).

Thus, in this case in which claims for both damages under *Bivens* and injunctive relief can be brought, the Plaintiff seeks to sue public officers in both their individual capacity (for the Bivens claim) and their official capacity (for the injunctive relief claim), including but not limited to federal auditors or persons or officers who knew or should have known of alteration and falsification of federal records and obstruction committed in Rhode Island, including federal court records.  *See*, the Ninth Circuit affirmed the availability of a Bivens remedy "where a federal official willfully submitted *false documentation evidence* and the submission of this evidence resulted in a complete bar to relief to which the individual was otherwise entitled under congressionally enacted laws." *Lanuza v. Love*, 899 F.3d 1019, 1028 (9th Cir. 2018), indicating that Congress contemplated the availability of civil actions for **statutory or constitutional violations** by *federal officers* and *state officers authorized to act in a federal capacity*)).

Notably, Bivens applies to First and Fourth Amendment injuries: In 2021, the Ninth Circuit recognized a Bivens remedy against a border patrol agent for First

and Fourth Amendment violations; *see, Boule v. Egbert,* 998 F.3d 370 (9th Cir. 2021) (federal agent entered the plaintiff's private property and physically injured him).

Moreover, the Supreme Court held in *Hormel v. Helvering*, 312 U.S. 552 (1941) that "Rules of practice and procedure are *devised to promote the ends of justice, not to defeat them*. A *rigid* and *undeviating* judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not been previously urged would be out of harmony with this policy. Rules of procedure do not require sacrifice of the rules of fundamental justice." *Id*. at 557.

On September 15, 2024, Appellant filed with the clerk of the court of the district court for the District of Rhode Island the attached Rule 62.1 Motion for Indicative Ruling to amend and supplement under Rules 15(a)(2) and 15(d) *Bivens* claims. On September 16, 2024, the district court docketed the Rule 62.1 Motion as ECF 65. *See* attached filing, attached to Exhibit I.

Appellant's September 15, 2024 filed Rule 62.1 Motion for Indicative Ruling on Rule 15(a) and 15(d) to add and supplement Bivens Claims in district court makes clear that Appellant is entitled to monetary ***damages and punitive damages remedy as well as injunctive relief*** in district courts as well as entitled to

relief in appellate courts, under Article III's fundamental obligation towards the fair administration of justice, and under Public Interest.

Further to take notice, Appellant filed the aforesaid **Document: 00118189824** in Appeals No. **23-1967**, as well as **23-1978** and **24-1313**, document of which filings is also attached hereto in Exhibit I, pursuant to FRE 201(c)(2) *et al*.

## CONCLUSION

WHEREFORE, the Appellant respectfully requests this Appeals Court to GRANT the Appellant's herein Motion to Supplement the Record.  The Appellant respectfully requests any and all relief under these extraordinary circumstances involving, *inter alia*, 18 U.S.C. §1512(c) and Section 1503 obstruction by officers of the federal court in the district court for the district of Rhode Island, and public officers authorized under federal law acting in a federal capacity.

Respectfully submitted,

Mary Seguin
Pro Se
/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: September 16, 2024

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the

Court's ECF filing system on September 16, 2024, on all registered counsel of

record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

EXHIBIT I

 Gmail

**Mary Seguin <maryseguin22022@gmail.com>**

## 23-1978 Seguin v. Rhode Island Department of Human Services, et al "Motion (other)"

**CA01NoticeDocketActivity@ca1.uscourts.gov** <CA01NoticeDocketActivity@ca1.uscourts.gov>
To: Maryseguin22022@gmail.com

Sun, Sep 15, 2024 at
4:43 PM

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of
record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed
electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To
avoid later charges, download a copy of each document during this first viewing.

### United States Court of Appeals for the First Circuit

**Notice of Docket Activity**

The following transaction was entered on 09/15/2024 at 5:43:55 PM Eastern Daylight Time and filed on 09/15/2024

| | |
|---|---|
| **Case Name:** | Seguin v. Rhode Island Department of Human Services, et al |
| **Case Number:** | 23-1978 |
| **Document(s):** | Document(s) |

**Docket Text:**
MOTION *LR 45.0(a) Motion to Reinstate 23-1978 and 24-1313 under Bivens Principle of Access to Remedy for Injury By
Public Officers Under Color of Federal Law - Request to Waive Filing Fees under Bivens* filed by Appellant Mary Seguin in
23-1978, 23-1967, 24-1313. Served on 09/15/2024. [23-1978, 23-1967, 24-1313] (MS)

**Notice will be electronically mailed to:**

Peter F. Neronha
Marissa D. Pizana
Joanna M. Achille
Mary Seguin

The following document(s) are associated with this transaction:
**Document Description:** Main Document
**Original Filename:** 23-1967 and 23-1978 and 24-1313 LR 45.0(a) Motion to Reinstate under Bivens WITH EXHIBITS
091524.pdf
**Electronic Document Stamp:**
[STAMP acecfStamp_ID=1104935054 [Date=09/15/2024] [FileNumber=6667446-0] [01b88ff154c302855a027d60c04cfe
c41ed37e2cfbb7263e4f0b6f7c7e97e351321a9348ce4abd8cc3d2a0bdcdbccfb9538945477610778cd0bcb2bf430832d6]]

THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT
Appeal from the United States District Court for the District of Rhode Island

MARY SEGUIN                                     No. 23-1967
*Plaintiff-Appellant*                           No. 23-1978
                                                No. 24-1313

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES, et al.
*Defendants-Appellees*

––––––––––––––––––––

**APPELLANT'S L.R. 45.0(a) MOTION TO REINSTATE Appeal Cases No. 23-1978 and 24-1313**

**and**

**MOTION FOR AN ORDER WAIVING FEES In Cases No. 23-1978 and No. 24-1313 UNDER THE REMEDY PRINCIPLE UNDER BIVENS**

––––––––––––––––––––

Texas Appellant, MARY SEGUIN, respectfully moves under Local Rule 45.0 (a) to set aside the dismissal and reinstate Appeals No. 23-1978 and 24-1313. Public Interest is implicated – the Public has an interest in the fair administration of justice in the federal courts in the First Circuit, namely the Public has an interest in Appellant's right to proceed in the pending official proceeding before this Court in Appeal 23-1967, free from a multitude of *functus officio void ab initio* interference or *functus officio* under color of federal law alterations and falsifications of record on appeal by William E. Smith, a *functus officio* federal public officer under the ministerial supervision of the Chief Judge of the Court of Appeals in the First Circuit.  Appellant is injured and is prejudiced as a result.

Under applicable Supreme Court laws, the Appellant is entitled to remedy for injury resulting from federal public officers, *inter alia*, *functus officio* officers, acting under color of federal law that moreover violate criminal obstruction laws, under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971); *see, also, Fischer v. U.S.*, 603 U.S. __ (2024);  district courts have jurisdiction over Bivens causes of action under 28 U.S.C. § 1331 because they are "civil actions arising under the Constitution." *Carlson*, 446 U.S. at 21-22 ("[O]ur decisions, although not expressly addressing and deciding the question, indicate that punitive damages may be awarded in a *Bivens* suit."); *Sanchez v. Rowe*, 651 F. Supp. 571, 574 (N.D. Tex. 1986) ("[P]unitive damages may be awarded against an individual defendant in a Bivens suit") (citing *Carlson,* 446 U.S. at 22). The Supreme Court has reasoned that a *Bivens* action deters future constitutional violations of individual officers by providing a mechanism by which they can be held accountable for their unlawful actions. See *Malesko*, 534 U.S. at 70 ("The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations.").  Plaintiff moreover is entitled to injunctive actions brought against officers who, in their official capacities, have the authority to carry out the requested injunctive relief. *See, e.g., Hubbard v. EPA Adm'r*, 809 F.2d 1, 11 (D.C. Cir. 1986) (recognizing claim against the agency for equitable relief to remedy constitutional violations); *Solida v. McKelvey*, 820 F.3d 1090 (9th Cir.

2016) (holding that Bivens suits are individual capacity suits; and official government action can be enjoined). Thus, in this case in which claims for both damages under *Bivens* and injunctive relief can be brought, the Plaintiff seeks to sue public officers in both their individual capacity (for the Bivens claim) and their official capacity (for the injunctive relief claim), including federal auditors or persons or officers who knew or should have known of alteration and falsification of federal records and obstruction in Rhode Island, including federal court records. *See*, the Ninth Circuit affirmed the availability of a Bivens remedy "where a federal official willfully submitted *false documentation evidence* and the submission of this evidence resulted in a complete bar to relief to which the individual was otherwise entitled under congressionally enacted laws." *Lanuza v. Love*, 899 F.3d 1019, 1028 (9th Cir. 2018), indicating that Congress contemplated the availability of civil actions for statutory or constitutional violations by *federal officers* and *state officers authorized to act in a federal capacity*)).  Notably Bivens applies to First and Fourth Amendment injuries: In 2021, the Ninth Circuit recognized a Bivens remedy against a border patrol agent for First and Fourth Amendment violations; *see*, *Boule v. Egbert,* 998 F.3d 370 (9th Cir. 2021) (federal agent entered the plaintiff's private property and physically injured him).

Moreover, the Supreme Court held in *Hormel v. Helvering*, 312 U.S. 552 (1941) that "Rules of practice and procedure are *devised to promote the ends of*

*justice*, *not to defeat them*. A *rigid* and *undeviating* judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not been previously urged would be out of harmony with this policy.  Rules of procedure do not require sacrifice of the rules of fundamental justice." *Id*. at 557.

Appellant is entitled to the requested remedy of waiving $605 filing and docketing fees per appeal prescribed under mere appellate rules, in order to appeal *functus officio* public officers' criminal obstruction of this Court's records under color of federal law, interfering with Appeal No. 23-1967.  Requiring fee payment under pains of dismissal amounts to nothing more than "sacrifice of the rules of fundamental justice." *Id.* at 557.

On September 15, 2024, Appellant filed with the clerk of the court of the district court for the District of Rhode Island the attached Rule 62.1 Motion for Indicative Ruling to amend and supplement under Rules 15(a)(2) and 15(d) *Bivens* claims.  *See* attached filing, attached to Exhibit I.

Just as Appellant is entitled under the law to access to Bivens claims in district courts, Appellant is entitled to *remedy* for injury *suffered here* in the pending official proceeding Appeal No. 23-1967 by *functus officio* public officers' alterations and falsifications of the record on appeal held in the district and

appellate Courthouses in the First Circuit.  Appellant's reasonable request for partial remedy directly available in the appellate court at this time is the waiving of the court fees.  Rigid adherence to the $605 per appeal fee payment fails to serve any purpose in the furtherance of the Court's obligation towards the fair administration of justice, as *void ab initio* orders can be attacked collaterally at any time in any court.  *See, e.g.*, *Vallely v. Northern Fire & Marine Ins. Co.*, 254 U.S. 348, 41 S. Ct. 116 (1920) "a void order may be attacked at any time in any court, either directly or collaterally"; "[void] orders are regarded as nullities.  They are not voidable, but simply void, and this even prior to reversal." *Old Wayne Mut. I. Assoc. v. McDonough*, 204 U.S. 8, 27 S. Ct. 236 (1907).  Accordingly, under these circumstances, forcing the Appellant to "pay to challenge access" or "pay for remedy relief" or "pay to play" runs afoul of First Amendment rights and federal laws, and the fair administration of justice.  Appellant is prejudiced.

On September 3, 2024, Appellant had moreover filed a motion to waive fees. Document: 00118185554.  The Court's September 4, 2024 Order (Document: 00118185743) relies on Rule 45.0(a) and is silent on Appellant's September 3, 2024 Document: 00118185554 motion to waive fees.  The Court's August 15, 2024 Order had not considered the *Bivens* holding, that by its principle, entitles Appellant to remedy for injuries caused by *functus officio* public officers under color of federal law.  Appellant's September 15, 2024 filed Rule 62.1 Motion for

Indicative Ruling on Rule 15(a) and (d) Bivens Claims in district court makes clear that Appellant is entitled to damages remedy in district courts as well as entitled to waived fees relief in appellate courts under the fair administration of justice, and under Public Interest.

## CONCLUSION

WHEREFORE, the Appellant respectfully requests this Appeals Court to GRANT the Appellant's herein Motion for an Order waiving fees, and reinstate Appeal No. 23-1978 and 24-1313 under L.R. 45.0(a). The Appellant requests the Court to commit its decision and reasoning in writing, including adequate redress for the *functus officio mispriscio clericio* harm suffered by the Appellant after the Court already performed forensic investigation of the record on appeal showing forensic misconduct in May 2024, for Article III Supreme Court review. The Appellant respectfully requests any and all relief under these extraordinary circumstances involving 18 U.S.C. §1512(c) and Section 1503 obstruction by officers of the federal court in the district court for the district of Rhode Island.

Respectfully submitted,

Mary Seguin
Pro Se
/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022

Houston, TX  77019

Dated: September 15, 2024

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the

Court's ECF filing system on September 15, 2024, on all registered counsel of

record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/    *Mary Seguin*
Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

EXHIBIT I.

# United States Court of Appeals
## For the First Circuit

_____

No. 23-1978

MARY SEGUIN,

Plaintiff - Appellant,

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES, in its official capacity; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES, in its official capacity; GERO MEYERSIEK, in his individual and official capacity; PRISCILLA GLUCKSMAN; PAUL GOULD; JOHN A. LANGLOIS; MICHAEL D. COLEMAN, in his individual and official capacity; DEBORAH A. BARCLAY, in her individual and official capacity; LISA PINSONNEAULT, in her individual and official capacity; CARL BEAUREGARD, in his individual and official capacity; KEVIN TIGHE; MONIQUE BONIN; WENDY FOBERT; KARLA CABALLEROS; TIMOTHY FLYNN; RHODE ISLAND COURT SYSTEM; PAUL A. SUTTELL, in his individual and official capacity as Executive Head of Rhode Island State Court System; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT; RHODE ISLAND JUDICIAL COUNCIL; RHODE ISLAND SUPERIOR COURT; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL; THE JUDICIAL TECHNOLOGY CENTER; JULIE PATALANO HAMIL; MARISA P. BROWN; FRANK DIBIASE; JOHN JOSEPH BAXTER, JR.; JUSTIN CORREA; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT; ADAM D. ROACH; PETER F. NERONHA; TYLER TECHNOLOGIES, INC.,

Defendants - Appellees.

_____

## JUDGMENT

Entered: September 4, 2024
Pursuant to 1st Cir. R. 27.0(d)

Plaintiff-Appellant Mary Seguin is presently in default for failure to pay the docketing fee. The court previously issued an order to appellant on August 13, 2024, which warned appellant that failure to pay the docketing fee would result in this appeal's dismissal for lack of diligent prosecution. The order extended appellant's deadline to pay the docketing fee until September 3, 2024. Appellant has failed to comply.

Accordingly, it is ordered that the above-captioned appeal be dismissed. See 1st Cir. R. 3.0(b) and 45.0(a).

By the Court:

Maria R. Hamilton, Clerk

cc:
Peter F. Neronha
Joanna M. Achille
Mary Seguin
Marissa D. Pizana

 Gmail

**Mary Seguin <maryseguin22022@gmail.com>**

---

### 23-cv-126 Plaintiff's Second Rule 62.1 Motion on Indicative Ruling on Rule 15(a) and 15(d) Motions to Add Bivens Claims

---

**Mary Seguin** <maryseguin22022@gmail.com>                    Sun, Sep 15, 2024 at 3:11 PM
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerks of the Court,

Please find attached my Second Rule 62.1 Motion on Indicative Ruling on Rule 15(a) and 15(d) to add, among others, Bivens claims.

Please docket, pursuant Fed. R. Civ. P 79.

Thank you in advance for your assistance.

Wish you a nice day.

Respectfully submitted,
Mary Seguin

---

📄 **Final 23-cv-126 Rule 62.1 motion on Rule 15(a) and 15(d) motions to add Bivens WITH EXHIBITS 091524.pdf**
6037K

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                          Civil Action No. 1:23-cv-126-WES-PAS
                             U.S. Court of Appeals for the First Circuit Appeal No. 23-1967
                             Related Appeal No. 23-1851
                             Related Appeal No. 24-1451

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES, et al.
*Defendants-Appellees*

*Defendants*


## SECOND RULE 62.1 INDICATIVE MOTION ON PLAINTIFF'S

## RULE 60(b), RULE 15(a)(2) and RULE 15(d) MOTIONS TO SUPPLEMENT AND ADD BIVENS AND TORT CLAIMS AND FEDERAL AND STATE DEFENDANTS FOR DAMAGES CLAIMS AND INJUNCTIVE RELIEF


## ORAL ARGUMENT REQUESTED

—————————————


## STATE-SPONSORED ORGANIZED FRAUD, THEFT OF PUBLIC MONEY AND GOVERNMENT PROGRAMS INVOLVING BILLIONS OF DOLLARS

**Unlawful Interstate Collection of Unlawful 12% Compound Interest Within the Title IV-D Legal Framework Involving Organized Felonious Obstruction of Justice Acts by Defendants, Obstruction of Justice and Misprision of Felony by Defendant Counsels, and**


### I.    UNDISPUTED FACTS

Before the Court is Plaintiff's Rule 62.1 Indicative Motion filed on September

6, 2024 (ECF 64).  On September 13, 2024, Plaintiff-Appellant filed Appellant's

Opening Brief in Appeal No. 23-1967 that arises from the above-captioned district

court case.  Plaintiff, MARY SEGUIN, hereby incorporates all factual allegations

and arguments alleged therein (in ECF 64 and 23-1967 Opening Brief) as fully

alleged herein, and hereby moves under Rule 62.1 for an Indicative Ruling on

Plaintiff's Rule 15(a)(2) and Rule 15(d) Motions to (1) add tort and ***Bivens*** claims

to the Amended Complaint (ECF 25), and to (2) supplement the Pleading with

facts subsequent to the September 1, 2023 Amended Complaint; and to add

defendants William E. Smith, John Doe and Jane Doe clerks of the United States

District Court for the District of Rhode Island, Joanna Achille, Marissa Pizana and

Peter Neronha and all named individual defendants in their individual *functus*

*officio void ab initio* capacities under Bivens (federal) and official and individual

liability of the defendants for tort claims, Sections 1983 claims and RICO claims

(monetary damages) for *misprisio clerici* obstruction acts that further involve

concealing any and all federal record alteration and falsification already aforesaid

raised before this Court and the Court of Appeals in the First Circuit, and

interfering with the pending Appeals 23-1967, then 23-1978, that exposes the

above named for Bivens, tort, 42 U.S.C. §1983, civil RICO, among others.

Plaintiff seeks $605,000 in damages per count and $605 Million in damages for the

conspiracy.  Public Interest is implicated - their obstruction acts and conspiracy go towards the legitimacy of the judiciary and the legitimacy of the government.

Plaintiff hereby preserves the issues raised in this motion for Article III review by the U.S. Supreme Court and states on the record that the raised and preserved issues are ripe for Supreme Court review.

In support thereof, the Plaintiff states the follows:

## I. LAW AND ARGUMENT

1.  Plaintiff is injured and seeks to sue aforesaid William E. Smith, John Doe and Jane Doe individually under Bivens claims for his and their post-appeal *functus officio void ab initio acts*, altering and concealing the alteration and falsification of federal records of the record on appeal, and aiding in and concealing his former clients' alteration and falsification of federal Title IV-D federal Central Registry records for the purpose of making false claims that exposes him and the above-named to, *among others*, civil rights deprivation, obstruction and RICO liability and monetary damages.  The Ninth Circuit Court of Appeals explains that "[t]he whole administrative record," as per 5 U.S.C. § 706, "'is not necessarily those documents that the agency has complied and submitted as 'the' administrative record.' 'The 'whole' administrative record . . . consists of all documents and materials directly or indirectly considered by agency decision-makers and includes

evidence contrary to the agency's position.'" *Thompson v. United States Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (emphasis in original; citations omitted). The newly discovered evidence prescribing administrative procedures that systemically and systematically shows falsification and alteration of federal Title IV-D records as it relates to Rhode Island's unlawful 12% compound interest that prescribes "zeroing out" interest and altering support orders to zero out interest, purposefully on its face is intended to conceal the unlawful and 42 U.S.C. § 654(21)(A) noncompliant 12% compound interest Rhode Island Defendants seek to collect in actions in debt, triggering systemic (1) RICO liability, (2) false claims liability and (3) obstruction liability.  The Supreme Court *Trump v. U.S.*, 603 U.S.__(2024) and *Fischer v. U.S.*, 603 U.S. __ (2024) made it crystal clear that alterations and falsification of court orders trigger 18 U.S.C. § 1512(c)(2), record alterations that interfere with a pending proceeding, which is precisely what the functus officio William E. Smith leading the charge of the remainder aforesaid persons did post-appeal, and concealed the record alteration, that as it turns out, goes towards the impeding and impairing the availability of, and concealment of [precisely and textually what the new evidence prescribes to do, alter court orders to zero out the interest.  The whole district court post-judgment administrative record and Smith's former clients' Title IV-D administrative record must now be brought before this Court.

## II. FED. R. CIV. P. 62.1 ALLOWS THIS COURT TO REMEDY SMITH'S, JOHN DOE'S, JANE DOE'S AND DEFENDANTS' CRIMINAL MALFEASANCE.

2.   Defendants' criminal record alteration and falsification obstruction malfeasance infiltrates the federal district court for the District of Rhode Island by their former attorney, the *functus officio* William E. Smith, who led the *functus officio* charge to tamper the record on appeal of 23-1967 post-appeal during the pendency of the appeal, corruptly calculated in part to make the federal appellate court to falsely believe it lacked jurisdiction over an appeal proper before it – since post-judgment Smith obstructed appellate review of Plaintiff's monetary damages claims for, as it turns out, his former clients' systemic administrative procedures of Title IV-D that alters and falsifies the interest records calculated to ultimately make false claims for Rhode Island's unlawful 12% compound interest debt, and to make false claims for federal funding operating the RICO scheme – Smith himself has a personal interest in the outcome of this matter, as he knew and should have known the systemic odious Title IV-D federal record falsification that is in effect throughout all political subdivisions of Rhode Island, who are his former clients, with whom he had in addition, intimate political and personal relationships – his judgeship is precisely owed to this very loyal political relationship to Governor Chafee who is responsible for approving the record alteration administrative procedures dated **2011** that is in question in **2011**, (see Exhibit I, at bottom left

corner of document, date of 2011); central to the facts and evidence is the fact that

Governor Chafee oversaw the Executive Office of Health and Human Services that

also had to approve the record alteration administrative procedures under Rhode

Island laws and regulations that themselves are regulated by federal law and

auditors under Title IV-D.   *See*, Rhode Island General Laws § 42-7.2-2, § 42-7.2-

4, § 42-7.2-5, § 42-7.2-6, § 42-7.2-6.1(2).  The new evidence makes clear that the

"zeroing out interest" procedures apply to Rhode Island's prior legacy Title IV-D

computer system named InRed.  *See* Exhibit I.  InRed is the legacy system that

Rhode Island implement in response to Congress's 1996 Amendments to Title IV-

D that required participating States to implement a computer record system for

federal Title IV-D records, that needed to be in effect by the year 2000.  See 42

U.S.C. §654(24), (27).  From 1996 to 2002, Smith built and headed the largest

Rhode Island Public Law Practice advising a broad base of political subdivisions

of Rhode Island covered by 42 U.S.C. §654(1), who knew and should have known

Rhode Island's falsification of Title IV-D records in response to Congress's 1996

Amendments across the State in order to falsely make it look like Rhode Island

federal law compliant, calculated to make claims for federal funding Rhode Island

knew it is ineligible for, and would moreover incur substantial penalties.  *See* 42

U.S.C. §655.  Accordingly, Smith's personal interest in the outcome of this matter

is so great that he led the charge pre-appeal to obstruct docketing of three post-

judgment motions raising his disqualification, and then post-appeal to alter the record on appeal, to falsely make it look like there were pending post-judge motions before the filing of the notice of appeal in order to falsely make the appellate falsely believe that the appellate court lacked jurisdiction to review *de novo* Plaintiff's properly filed appeal (ECF 32, 32-1, 33, 33-1). Smith *et al.* is exposed to Bivens liabilities under federal law for their post-appeal actions, and Defendants' and their counsels' federal obstruction actions expose them to tort, Section 1983 and RICO monetary damages liabilities.

2. Plaintiff has already proffered the newly discovered evidence to obtain an indicative ruling – see ECF 64. To reiterate, "A party proffering newly discovered evidence may obtain an indicative ruling from a district court concerning relief from judgment pending appeal." *Franken v. Mukamal,* 449 F. App'x 776, 779 (11th Cir. 2011) (citing Fed. R. Civ. P. 62.1; Fed. R. App. P. 12.1); see also *Amarin Pharm. Ireland v. Food & Drug Admin*., 139 F. Supp. 3d 437, 447 (D.D.C. 2015) ("Where a district court concludes, for example, that newly discovered evidence warrants vacatur of a judgment that is already on appeal, the court can issue an indicative ruling . . . .").

3. Once an appeal is filed, the District Court no longer has jurisdiction to consider motions to vacate judgment. *Gould v. Mut. Life Ins. Co. of N.Y*., 790 F.2d 769, 772 (9th Cir.1986). However, the District Court may entertain and decide a motion

after notice of appeal is filed if the movant adheres to Rule 62.1, which sets forth a

process to "ask the district court whether it wishes to entertain the motion, or to

grant it, and then move this court, if appropriate, for remand of the case." *Id*; see

also *Crateo, Inc. v. Intermark, Inc.,* 536 F.2d 862, 869 (9th Cir. 1976) ("The most

the District Court could do was to either indicate that it would 'entertain' such a

motion or indicate that it would grant such a motion."). If the District Court states

that it would grant the motion or that the motion raises a "substantial issue," the

movant must notify the Circuit Clerk and the District Court "may decide the

motion if the court of appeals remands for that purpose." Fed. R. Civ. P. 62.1(b),

(c); see also *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv*., No. 16- 04294,

2018 WL 2010980, at *4 (N.D. Cal. Apr. 30, 2018) (district courts "have authority

to deny [a motion], but . . . may not grant it without a remand from the court of

appeals").

## 1. Fed. R. Civ. P. 60(b) Relief From This Court's Judgment is Appropriate.

4. Usually, Rule 62.1 relief is sought under Rule 60(b). See *Williams v. Woodford*,

384 F.3d 567, 586 (9th Cir. 2004) ("To seek Rule 60(b) relief during the pendency

of an appeal, the proper procedure is to ask the district court whether it wishes to

entertain the motion, or to grant it, and then move this court, if appropriate, for

remand of the case."). As explained in *Hake v. Guardian Life Ins. Co*.: Rule 62.1

permits the Court to make an "indicative ruling" on a post-judgment motion to give

the Court of Appeals an indication on how the Court would rule if it still had

jurisdiction to rule. The Rule 62.1 "indicative ruling" procedure was instituted to

deal with post-appeal Rule 60(b) motions, where a district court lacks jurisdiction

to rule directly. No. 07-1712, 2010 WL 11578944, at *2 (D. Nev. Apr. 1, 2010)

(citing Fed. R. Civ. P. 62.1 advisory committee's note). In *Comm. on Oversight &*

*Gov't Reform, United States House of Representatives v. Sessions* it was similarly

explained: Rule 62.1 provides that upon the timely filing of a motion for relief that

the court lacks authority to grant because of an appeal that has been docketed and

is pending, the court may: (1) defer considering the motion; (2) deny the motion; or

(3) state either that it would grant the motion if the court of appeals remands for

that purpose or that the motion raises a substantial issue. This rule is invoked in

situations where a court has lost jurisdiction over a case because it has been

docketed for appeal, and therefore cannot entertain motions such as those made

under Rule 60(b) for relief from judgment. Rule 62.1 allows a court to indicate to

the appeals court that it would grant the party's motion if remanded to the lower

court. 344 F. Supp. 3d 1, 7 (D.D.C. 2018) (quotation omitted).

## 2. Fed. R. Civ. P. 15(a)(2) Leave To Amend Is Also Appropriate.

5. While "Rule 62.1 codifies the procedure most courts used to address Rule 60(b)

motions to vacate final judgments which had already been appealed . . . , nothing in

Rule 62.1's language limits its application to Rule 60(b) motions or to motions

made after final judgment." *Ret. Bd. of Policemen's Annuity v. Bank of New York Mellon*, 297 F.R.D. 218, 221 (S.D.N.Y. 2013). The Advisory Committee's note confirms that it "adopt[ed] for any motion that the district court cannot grant because of a pending appeal the practice that most courts follow when a party makes a Rule 60(b) motion to vacate a judgment that is pending on appeal." Fed. R. Civ. P. 62.1 Advisory Committee's Note; see also *Idaho Bldg. & Const. Trades Council, AFL-CIO v. Wasden,* No. 11-0253, 2013 WL 1867067, at *3 (D. Idaho May 1, 2013) (issuing an indicative ruling under Rule 62.1 regarding a motion to add a party under Rule 21); *Reflex Media, Inc. v. Chan*, No. 16- 0795, 2017 WL 8223985, at *1 (C.D. Cal. Oct. 17, 2017) ("Rule 62.1 provisions were originally drafted as an addition to Rule 60, addressing only relief under Rule 60 pending appeal, but the proposal was broadened to include all circumstances in which a pending appeal ousts district court authority to grant relief."). Thus, an indicative ruling is appropriate where, under any Rule of Federal Procedure, it would "allow for the timely resolution of motions which may further the appeal or obviate its necessity" and not simply "place a district court in a position where it must predict the outcome of an appeal of its own decision." *United States v. Brennan,* 385 F. Supp. 3d 205, 208 (W.D.N.Y. 2019) (quotation omitted); see e.g. *Rabang v. Kelly*, No. 17-088, 2018 WL 1737944, at *3 (W.D. Wash. Apr. 11, 2018) (denying a Rule 62.1 motion that was "simply asking this Court to decide the question on appeal").

6.  Plaintiff is requesting that this Court allow Plaintiff to assert new ***Bivens***

claims, tort claims, Section 1983 claims and RICO claims, and add new federal

and state individual defendants, based on both pre-appeal federal records

falsification obstruction (covering both federal Title IV-D records and federal court

records) and also subsequent actions by *functus officio* William Smith leading the

charge altering federal records on appeal during the pendency of an official

proceeding and based on new evidence that was not—but should have been—

available when Defendants made their filings in the district court.  Attached to

Exhibit I is so the forensic investigation of the record on appeal that Smith et al.

altered performed by Plaintiff and the appellate court in an official proceeding,

after which the appellate court found, despite Smith *et al,*'s record alteration, that

the appellate court has jurisdiction, inherent in which Smith *et al,*'s post-appeal

alterations of the record are nothing but *functus officio void ab initio* actions and

inactions that obstructed the pending appellate proceeding, inherently criminally.

### 3. Fed. R. Civ. P. 15(d) Leave To Supplement Is Also Appropriate.

6.  Fed. R. Civ. P. 15(d) provides:

"Supplemental Pleadings. On motion and reasonable notice, the court may,
on just terms, permit a party to serve a supplemental pleading setting out
any transaction, occurrence, or event that happened after the date of the
pleading to be supplemented. The court may permit supplementation even

though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time."

7. The rule is intended "to give district courts broad discretion in allowing supplemental pleadings[,]" and promote judicial economy and convenience. Moreover, "[i]t is a useful device, enabling a court to award complete relief, or more nearly complete relief, in one action, and to avoid the cost, delay and waste of separate actions which must be separately tried and prosecuted." *See, U.S. ex rel. Gadbois v. PharMerica Corp*., 809 F.3d 1, 4 (1st Cir. 2015) ("Fed. R. Civ. P. 15(d) affords litigants a pathway for pleading any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The rule shares the core objective of the Civil Rules: to make pleadings a means to achieve an orderly and fair administration of justice."). *See*, *also*, *San Luis & Delta-Mendota Water Auth. v. U.S. Dept. of Int*., 236 F.R.D. 491, 495-96 (E.D. Cal. 2006) (quoting *Keith v. Volpe*, 858 F.2d 467, 473, 496. (9th Cir. 1988)). A supplemental pleading differs from an amended pleading: although an amended pleading concerns matters that happened prior to the original pleading and serves to completely replace the original pleading, a supplemental pleading concerns events that happened after the initial pleading and adds to the initial pleading. Therefore, it is appropriate for parties to follow up their pleadings with supplemental pleadings should that be

needed to bring a case up to date. *See*,   *Habitat Educ. Ctr., Inc. v. Kimbell*, 250
F.R.D. 397, 401 (E.D. Wis. 2008); *Millay v. Surry Sch. Dept*., 584 F. Supp. 2d 219,
226 (D. Maine 2008) (quoting *United States v. Russell*, 241 F.2d 879, 882 (1st Cir.
1957)); see also,  *Francis ex rel. Estate of Francis v. Northumberland Cty.*, 636 F.
Supp. 2d 368, 383 (M.D. Pa. 2009).  Supplemental pleadings are particularly
flexible—even when parties have mislabeled requests for supplemental pleadings,
courts have granted leave to file the correct type of pleading. Because the motions
under the rule for amended pleading and supplemental pleading are both within the
discretion of the court, the fact that parties may incorrectly plead one or the other is
not fatal. Thus, courts may treat amended pleadings which seek to add claims to
the original pleadings as if they had been properly filed pursuant to Rule 15(d),
even if incorrectly labeled. *See, e.g*., *Broadview Chem. Corp. v. Loctite Corp.,* No.
13104, 1970 WL 10113, *1 (D. Conn. Sept. 23, 1970); *Soler v. G & U, Inc*., 103
F.R.D. 69, 73 (S.D.N.Y. 1984).

8. A supplemental pleading may be used for numerous purposes. Supplemental
pleadings may be used to introduce facts which bring the original pleading up to
date, including new facts which enlarge or change the relief first sought.
Additionally, supplemental pleadings may reflect events that occurred after the
original pleading was first filed. Although some courts have held that supplemental
pleadings cannot assert new causes of action, other courts have allowed such

pleadings so long as the new pleading is based on the events and facts raised in the original pleading and does not unduly prejudice the opposing party.  *See*, *Kaiser-Frazier Corp. v. Otis & Co*., 8 F.R.D. 364, 367 (S.D.N.Y. 1948); *see*, *City of Texarkana, Tex. v. Arkansas, Louisiana Gas Co.*, 306 U.S. 188, 203 (1939); *see also, Health Ins. Ass'n of America v. Goddard Claussen Porter Novelli*, 213 F.R.D. 63, 67 (D.D.C. 2003) (quoting *Aftergood v. Central Intelligence Agency*, 225 F. Supp. 2d 27, 30 (D.D.C. 2002)).

9.  Under the 1963 amendments to the Federal Rules of Civil Procedure, courts have been given great discretion to allow for supplemental pleadings, even under circumstances concerning defective original pleadings. The court may allow supplemental pleading even though the original pleading is defective in stating a claim or defense. All of this is to say that Fed. R. Civ. P. 15(d) allows for broad and flexible supplemental pleading, which permits litigants to correct, add and supplement without the added cost and expense of dismissal and subsequent suits over the same set of issues or bringing new claims in a *separate* suit. *See*, Notes of Advisory Committee on 1963 Amendment to FED. R. CIV. P. 15(d); *see also, Harnett v. Barr*, 538 F. Supp. 2d 511, 514 (N.D.N.Y. 2008).  Under the law, Plaintiff is entitled to Rule 15(d) relief to supplement the amended complaint.

## II.    PLAINTIFF DESERVES FED. R. CIV. P. 60(B), 15(A)(2) AND 15(D) RELIEF.

**1. Plaintiff Deserves Leave To Supplement Pleading and To Plead New Bivens, Tort, Section 1983 and Civil RICO Claims By Amendment.**

10. Under *U.S. ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1, 4 (1st Cir. 2015), ("Fed. R. Civ. P. 15(d) affords litigants, such as the Plaintiff, a pathway for pleading any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The rule shares the core objective of the Civil Rules: to make pleadings a means to achieve an orderly and fair administration of justice.") Moreover, a motion to amend the complaint "can be entertained if the judgment is first reopened under a motion brought under Rule 59 or 60." *Lindauer v. Rogers*, 91 F.3d 1355, 1357 (9th Cir. 1996); see also *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (same). Under Rule 60(b)(6), a judgment may be vacated for any "reason justifying relief from operation of the judgment." Fed. R. Civ. P. 60(b)(6). The U.S. Supreme Court has held that a "motion to vacate the judgment in order to allow amendment of the complaint" constitutes such a justifying reason, so long as the movant meets the requirements of Rule 15(a). *Foman v. Davis,* 371 U.S. 178, 182 (1962). As the *Foman* rule was more recently articulated by the Fourth Circuit: "To determine whether vacatur is warranted . . . the court need not concern itself with either [Rule 59 or 60]'s legal standards. The court need only ask whether the amendment should be granted, just as it would on a prejudgment motion to amend pursuant to Fed. R. Civ. P. 15(a). In other words, a court should

evaluate a post judgment motion to amend the complaint under the same legal standard as a similar motion filed before judgment was entered—for prejudice, bad faith, or futility." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011) (quotation omitted).

11. Had the Defendants not withheld in both 2022 and 2023 the new 2024 evidence, when the public officers Defendants originally produced documents pursuant to APRA in 2022, and in the district court as required by federal law based on their administration of Title IV-D, pursuant to Rule 11(b)(3), 18 U.S.C. § 4, 1503 and 1512(c)(2), the Plaintiff would have had the factual and legal basis required by Rule 11(b)(3) to seek leave to amend Plaintiff's Amended Complaint and add the above referenced claims and add new defendants, e.g., William E. Smith, Lincoln Chafee, Office of the Governor, Secretary of Executive Office of Health and Human Services, former Firm Edwards & Angell. Plaintiff now has the evidence Plaintiff needs to bring those damages claims and add the new defendants. Plaintiff was manifestly prejudiced by not being able to seek leave to plead those five new claims to the Court under Rule 15(a). None of the new claims would be futile. All claims are plausible, if not dispositive in favor of Plaintiff. Defendants, on the other hand, have demonstrated bad faith by not originally producing the federal record alteration and falsification evidence either as part of the administrative record in July 2023, or in response to Plaintiff's APRA-FOIA

request for administrative procedures documents or in response to Plaintiff's

APRA-FOIA request for administrative procedures documents on December 1,

2022.

12.  Moreover, post-appeal of this matter from November 17, 2023 onward, it is

well settled law the district court is *functus officio* and *loses jurisdiction* over the

matter – there is no "outer-perimeter," for example, allowing for altering records

on appeal to make it falsely look like the appellate court lacks appellate jurisdiction

over a properly filed appeal where the district court clerk certified there were no

pending motions at the time of filing of appeal (ECF 32, 32-1, 33, 33-1).

Obstruction *Functus Officio* acts are unofficial.  Plaintiff is entitled to Bivens

claims and add William E. Smith, John Doe, Jane Doe; and Plaintiff is entitled to

add tort, Sections 1983 and Civil RICO claims, and add the aforesaid state

defendants.  Under *Bivens v. Six Unknown Named Agents of Federal Bureau of*

*Narcotics,* 403 U.S. 388 (1971), individuals have access to a judicial damages

remedy for federal officers conduct by federal agents that violates the U.S.

Constitution. In *Bivens*, the Supreme Court held that where a federal officer

"acting under color of [federal] authority" commits a constitutional tort, a cause of

action for money damages arises directly under the Constitution. *Bivens*, 403 U.S.

at 389.  The Court reasoned that "where legal rights have been invaded . . . federal

courts may

use any available remedy to make good the wrong done." Id. at 396 (quotation and citation

omitted). In addition, the Court found "no special factors counselling hesitation in the absence of affirmative action by Congress." *Id.* Accordingly, the Court held that Mr. Bivens pled a cause of action under the Fourth Amendment and therefore could recover monetary damages for the agents' violations thereof. *Id.* at 397. The Court also recognized that federal courts had the power to award equitable relief—such as injunctive relief—directly under the Constitution. *Id.*; *see also id.* at 400 (Harlan, J., concurring). Unlike a Federal Tort Claims Act (FTCA) claim, Plaintiff can file a *Bivens* action directly in district court.

## 2. Plaintiff Should Also Be Granted Rule 60(b)(2) Relief.

13. Rule 15(a) aside, Plaintiff is independently entitled to Rule 60(b)(2) relief under the "newly discovered evidence" rule. Fed. R. Civ. P. 60(b)(2). For the Court to grant relief under this rule "the movant must show the evidence (1) existed at the time of the [judgment], (2) could not have been discovered through due diligence, and (3) was of such magnitude that production of it earlier would have been likely to change the disposition of the case." *Jones v. Aero/Chem Corp.,* 921 F.2d 875, 878 (9th Cir. 1990) (quotation omitted). Requirements (1) and (2) are easily met. There is no doubt that this evidence was discovered after the now-appealed

judgment was issued. There is no doubt that Plaintiff made several APRA-FOIA

requests for administrative procedure documents to both the Department of Human

Services and Rhode Island Judiciary Defendants in 2022 and 2023. This evidence,

particularly was of such magnitude that production of it earlier would have been

likely to change the disposition of the case. Those new evidence show that in

making systemic falsification of federal records to zero out interest in Title IV-D

federal registry, federal interests are not only central to this case, but that

Defendants are involved in systematic and systemic falsifying records in official

proceedings systematic for the purpose of making false claims to both the United

States and support obligors, in actions at debt at common law, and creating

purposeful constitutional infirm Title IV proceeding forums to rig the process in a

RICO scheme, that purposefully impair the availability of public Title IV-D

actions in debt at common law proceeding records to federal auditors, pro se

support obligors and to the public. This is not permitted under Title IV-D that is

subject to the Administrative Procedures Act (APA). *Id*. at 43; see also, e.g., *ATX,*

*Inc. v. U.S. Dep't of Transp*., 41 F.3d 1522, 1527 (D.C. Cir. 1994) ("The test is

whether 'extraneous factors intruded into the calculus of consideration' of the

individual decisionmaker.") (quoting *Peter Kiewit Sons' Co. v. United States Army*

*Corps of Eng'rs,* 714 F.2d 163, 170 (D.C. Cir. 1983)); *Saget v. Trump,* 375 F.

Supp. 3d 280, 360 (E.D.N.Y. 2019) (finding an agency "decision was arbitrary and

capricious due to improper political influence"); *Connecticut v. U.S. Dep't of the Interior,* 363 F. Supp. 3d 45, 65 (D.D.C. 2019) (APA claim where "significant political pressure was brought to bear on the issue and the Secretary may have improperly succumbed to such pressure"); *Tummino v. Torti,* 603 F. Supp. 2d 519, 544 (E.D.N.Y. 2009) ("An agency's consideration of some relevant factors does not immunize the decision; it would still be invalid if based in whole or in part on the pressures emanating from political actors.") (quotation omitted). The new evidence would have easily produced a different result. In addition, as noted above, had Plaintiff been in possession of the record falsification record, in particular, Plaintiff would have sought to amend Plaintiff's Complaint pursuant to Rule 15(a) to allege additional claims and add additional defendants, as alleged above already. See e.g. *Jianhong Zhai v. Ning Liu,* No. 16-7242, 2017 WL 7156251, at *2 (C.D. Cal. Aug. 17, 2017) (instructing plaintiffs to "file a motion to set aside the default judgment pursuant to Rule 60(b) in conjunction with a motion to supplement the complaint pursuant to Rule 15(d)" in order to include new evidence in a pleading).

14. Plaintiff is moreover entitled to Rule 60(b)(3) relief for fraud, as the new evidence delineates in detail falsification of records for false claims in actions in debt at common law – and is corollary to the *functus officio* Smith-led charge to alter the federal record on appeal.

15.  Plaintiff is further entitled to Rule 60(b)(4) relief to vacate all void orders issued post appeal after November 17, 2023 by William Smith, as outlined above.

17. Plaintiff is additionally entitled to Rule 60(b)(6) relief to vacate based on the extraordinary egregious gross irreparable harm to Plaintiff that has been outlined in detail above, that implicates Public Interests in the legitimacy of the judiciary and the legitimacy of the government.  District courts have jurisdiction over Bivens causes of action under 28 U.S.C. § 1331 because they are "civil actions arising under the Constitution." *Carlson*, 446 U.S. at 21-22 ("[O]ur decisions, although not expressly addressing and deciding the question, indicate that punitive damages may be awarded in a *Bivens* suit."); *Sanchez v. Rowe*, 651 F. Supp. 571, 574 (N.D. Tex. 1986) ("[P]unitive damages may be awarded against an individual defendant in a Bivens suit") (citing *Carlson,* 446 U.S. at 22). The Supreme Court has reasoned that a *Bivens* action deters future constitutional violations of individual officers by providing a mechanism by which they can be held accountable for their unlawful actions. See *Malesko*, 534 U.S. at 70 ("The purpose of *Bivens* is to deter individual federal officers from committing constitutional violations.").  Plaintiff moreover is entitled to injunctive actions must brought against officers who, in their official capacities, have the authority to carry out the requested injunctive relief. *See, e.g., Hubbard v. EPA Adm'r*, 809 F.2d 1, 11 (D.C. Cir. 1986) (recognizing claim against the agency for equitable relief to remedy constitutional

violations); *Solida v. McKelvey*, 820 F.3d 1090 (9th Cir. 2016) (holding that

Bivens suits are individual capacity suits; and official government action can be

enjoined). Thus, in this case in which claims for both damages under *Bivens* and

injunctive relief can be brought, the Plaintiff seeks to sue in both their individual

capacity (for the Bivens claim) and their official capacity (for the injunctive relief

claim), covering federal auditors or persons or officers who knew or should have

known of alteration and falsification of federal records and obstruction in Rhode

Island.  *See*, the Ninth Circuit affirmed the availability of a Bivens remedy "where

a federal official willfully submitted *false documentation evidence* and the

submission of this evidence resulted in a complete bar to relief to which the

individual was otherwise entitled under congressionally enacted laws." *Lanuza v.*

*Love*, 899 F.3d 1019, 1028 (9th Cir. 2018), indicating that Congress contemplated

the availability of civil actions for statutory or constitutional violations by *federal*

*officers* and *state officers authorized to act in a federal capacity*)).  Notably Bivens

applies to First and Fourth Amendment injuries: In 2021, the Ninth Circuit

recognized a Bivens remedy against a border patrol agent for First and

Fourth Amendment violations; *see*, *Boule v. Egbert,* 998 F.3d 370 (9th Cir. 2021)

(federal agent entered the plaintiff's private property and physically injured him).

18. Based on the above, the Court must disqualify William E. Smith and re-assign

to hear this motion.  As stated by James Madison, "No man is allowed to be a

judge in his own cause; because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity." The Federalist No. 10, at 59 (J. Cooke ed. 1961). William E. Smith is exposed to Bivens liability and Plaintiff has a Bivens claim against Smith. As 28 U.S.C. §455(a) is self-executing, Smith is moreover required under the law to recuse. *See*, *In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1991).

19. The issues raised herein are hereby preserved on the record and is ripe for Article III review by the Supreme Court of the United States.

## VI. CONCLUSION

20. Plaintiff is entitled to Bivens claims, tort claims, Section 1983 claims and civil RICO claims for both monetary damages remedies, punitive remedies and injunctive relief; Plaintiff is entitled to Rule 60(b), 15(a)(2) and Rule 15(d) reliefs. Plaintiff is entitled to the availability of civil actions for statutory or constitutional violations by *federal officers* and *state officers authorized to act in a federal capacity*). This Court must be allowed to discover who (state and federal) and what actually caused to and to what extent, and how falsified Title IV-D records have been transmitted to the federal Central Registry, based on which how much federal public funds has been knowingly falsely claimed to the United States under the Title IV-D legal framework to operate the RICO scheme and to support

obligors, and to the Plaintiff.  Plaintiff and this Court must allow amendment and

supplements to the complaint.  Oral Argument is Requested.

Respectfully submitted,

Mary Seguin
Pro Se
/s/    *Mary Seguin*
Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: September 15, 2024

## CERTIFICATE OF SERVICE

This is to certify that the foregoing motion has been filed on September 15,
2024 electronically transmitted to the Clerk of the Court who serves via the Court's
ECF filing system, on all registered counsel of record.

Mary Seguin
Pro Se
/s/    *Mary Seguin*
Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

EXHIBIT I.

# SPECIFICATION FOR OCSS CHANGE ORDER
## Auto Adjustment of Interstate Interest

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

January 25, 2011
N:\CSB\Specifications\OOS Interest\Adjust OOS Interest.doc

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.

Civil Action No. 1:23-cv-126-WES-PAS
U.S. Court of Appeals for the First Circuit Appeal No. 23-1967
Related Appeal No. 23-1851
Related Appeal No. 24-1451

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES, et al.
*Defendants-Appellees*

*Defendants*

## RULE 62.1 INDICATIVE MOTION ON PLAINTIFF'S

## RULE 60(b)(2) Motion based on New Evidence

## AND

## RULE 60(b)(3) Motion based on Fraud to Vacate the Final Judgment

## AND

## RULE 60(b)(4) MOTION to Vacate Void Post Appeal Orders

## AND

## RULE 60(b)(6) MOTION to Vacate based on 28 U.S.C. § 655(a) Disqualification of William E. Smith for *Functus Officio* Pattern of *Mispricio Clericio* Obstruction Involving the Alteration and Falsification of the Record on Appeal Corruptly Influencing A Pending Official Appellate Proceeding, NECESSITATING DISQUALIFICATION and RE-ASSIGN

## AND

## RULE 15(a)(2) MOTION

## ORAL ARGUMENT REQUESTED

---

## STATE-SPONSORED ORGANIZED FRAUD, THEFT OF PUBLIC MONEY AND GOVERNMENT PROGRAMS INVOLVING BILLIONS OF DOLLARS

### Unlawful Interstate Collection of Unlawful 12% Compound Interest Within the Title IV-D Legal Framework Involving Organized Felonious Obstruction of Justice Acts by Defendants, Obstruction of Justice and Misprision of Felony by Defendant Counsels, and

## I.    UNDISPUTED FACTS

State Title IV-D Administrator and private partner Defendants withheld from the Court, concealed from United States judges and federal authorities listed in 18 U.S.C. §§ 1503, 1512, and 4 *concealed* document evidence (Exhibit A) within their possession (and knowledge) that shows the decades-long and on-going official Rhode-Island State-prescribed administrative procedure that prescribes altering and falsifying federal Central Registry records and state court orders for the purpose of concealment by "zeroing out" Rhode Island's unlawful usurious 12% compound interest in interstate support cases, which on its face runs afoul of federal laws and regulations requiring the Rhode Island Title IV-D State Plan Administrator State Defendants to only charge interest (if any) between 3%-6% simple interest, per 42 U.S.C. § 654(21)(A).  The new evidence shows the corrupt scheme put in place (regarding altering and falsifying the interest records in the

State's new computer Title IV record system as of 2011 by the State Defendants Administrators of federal Title IV-A and Title IV-D of the Social Security Act) entails the coordination of all political subdivisions of the State of Rhode Island (*see* 42 U.S.C. § 654(1) requiring the State's Title IV-D administrative procedures in place to be in effect in *all* political subdivisions of the State), to order 12% compound interest through the complicit state family court, which the Title IV-D State Administrators (State Defendants) subsequently "zero out" in the 42 U.S.C. § 654(27) computer federal records when transmitting support records to the federal Central Registry (*see* federal regulation 45 CFR 303.2 and 45 CFR 303.7), including "modifying court orders" that contain Rhode Island's unlawful 12% compound interest.  Federal regulation requires the State Title IV-D Administrator Defendants to certify records transmitted to the federal Central Registry within Title IV-D framework (see 45 CFR 303), which the State Title IV-D Administrator Defendants falsely certified to the accuracies of the interest "zeroed-out" support records and support court orders that the Defendants modified, aided in modifying and knew were modified.  In interstate support cases under 42 U.S.C. § 666(14), the State Title IV-D Administrator Defendants moreover certify systematically and systemically to Receiving States, such as Texas, that there is no interest in the support cases, after falsifying the records and support orders "zeroing out" interest. In this matter, State Title IV-D Administrator Defendants' false certifications of

"zero interest" to the United States and to Texas occurred in 2018, 2019, 2020, 2021, 2022, 2023 and 2024, and is on-going, pursuant to the new evidenced Defendants' Title IV-D administrative procedures. New evidence shows that after the aforesaid 12% compound interest record is "zeroed out," Defendants represent to support obligor victims that interest was "waived" then fraudulently "put interest back on the system" and pursue debt collection activities and legal actions in debt at common law, including placing fraudulent liens on properties for the Defendants' "zeroed out" 12% compound interest against the support obligor victims, dressed up as "enforcement" under the Title IV-D legal framework in "Title IV" proceedings in constitutionally infirm forums, that moreover deprive the right to jury trial. The infirm state family court forum's domestic procedure does not even contain rules (*e.g.* domestic rule 38 of the state family court's rules and procedures is intentionally left blank as "reserved") preserving the right to jury trial – the deprivation of trial by jury in a thoroughly constitutionally infirm forum for Title IV-D proceedings is intentional, so that the Defendants' egregious systemic and systematic *criminal* "zeroing out" of Rhode Island's unlawful 12% compound interest in both Title IV federal records and modification of support orders has not been at issue in the annals of Rhode Island Supreme Court caselaw. To that end, the Judiciary Title IV-D State Administrator Defendants make sure to conceal, impair and otherwise obstruct the availability to the public and federal

auditors alike of state court records and state judge-created laws in the State's

digital courts so as to obstruct and impair the availability and access to cases in

which the systemic criminal federal record alteration "zeroing out of interest"

issues are actually raised in cases in the state's digital courts.  Finally, to ensure

that judge-created laws relating to the unlawful 12% compound interest that is

"zeroed out" is cleaned up so that the State Defendants' criminal systemic record

alterations in Title IV proceedings are equally "erased from the record," the State

Judiciary Defendants implemented and continuously operate digital courts that

operate two separate electronic case management systems, one undisclosed and

unnamed "legacy system" with its own separate set of court clerks called "clerks of

Reciprocal" for the filings for State Title IV-D Administrator Defendants who

"zero out interest" record alterations and falsifications that only the State and the

judge can see, and another separate electronic case filing system for everyone else

called Odyssey, purposefully failing to integrate the two case management

systems, so that: (1) State Administrator Defendants' electronic filings  (pursuing

12% compound interest) cannot be seen by anyone else other than the judge and

the State Defenders; (2) State Administrator Defendants' electronic filings are not

noticed to the opposing party who is predominantly pro se; (3) the clerks of the

state family court are not able to see the State Administrator Defendants' filings

nor can the Rhode Island's Virtual Clerk see their "legacy system" filings; (4)

despite objections filed by the opposing party to the State Administrator's

proposed orders (that obscure the unlawful 12% compound interest and zeroing out

interest facts purposefully in vague language in order to conceal it), the judge

automatically signs and enters the State's proposed orders without a hearing, in

violation of due process; (5) pro se litigants are denied electronic remote access to

their own court case information; (6) the public, pro se litigants and federal

auditors are denied remote access to court information of Rhode Island's digital

courts, effectively denied access to, obstructed from access to Rhode Island judge-

created laws, in violation of the First Amendment, the Due Process and Equal

Protection and Privileges and Immunities Clauses, the Supremacy Clause, the

Administrative Procedures Act, and the Government Edicts Doctrine – *see* Rhode

Island Supreme Court promulgated and enforced Rule 5 Denying Remote Access

to Court Information to the public, pro se litigants and Federal Auditors – see new

evidence Exhibit A showing Rhode Island Supreme Court acknowledgement that

Rule 5 "is a problem."  More importantly, Defendants' acts carry federal criminal

penalties, in violation of RICO (making false claims for debt), wire fraud, mail

fraud, computer fraud, obstruction (*inter alia* 18 U.S.C.  §§1512, 1503, 1516, 666).

Plaintiff repeatedly raised these facts and issues of egregious criminality, to which

neither Defendants nor Defendant counsel disputed, including the Rhode Island

Attorney General, in the pending official federal proceeding Appeal 23-1967, nor

any explanatory justification whatsoever for systemically and systematically altering and falsifying federal Title IV records zeroing out Rhode Island's 12% compound interest for both federal central registry computer records and "modifying court orders zeroing out interest," then certifying there is no interest to both the United States and to receiving State Sovereigns.   Under the Administrative Procedures Act, State Defendants' criminal record falsification and alteration to conceal Rhode Island's unlawful 12% compound interest systemically and systematically altering court orders in the system to zero out interest in order to conceal it, falsely certifying to the altered records' accuracy then making claims for federal funds under Title IV-A and Title IV-D when the State is knowingly noncompliant with federal regulation are egregious, treasonous crimes.  Obvious to the Court and to *any objective observer* under 28 U.S.C. § 455(a), the integrity of federal records for one of the largest State-Federal work-together Programs is damaged, the legitimacy of the agency administration and political subdivision administration of an Act of Congress is grossly harmed, the United States is the recipient of false claims from Rhode Island, and the State Defendants systemically make false claims to support obligors within the federal Title IV-D legal framework.  Defendants caused gross *irreparable harm* to the Plaintiff, and the systemic nature of Defendants' corrupt egregiously criminal administration of an

Act of Congress is a matter of extraordinary public interest causing extraordinary irreparable public harm. <u>The aforesaid is at the state level</u>.

<u>At the federal level</u>, the Plaintiff is moreover irreparably harmed by the federal judiciary in the district for Rhode Island, for similar pattern of criminal *misprisio clericio* record alteration, falsification, impairment and obstruction of the record on appeal during the pendency of Appeal No. 23-1967 by the *functus officio* William E. Smith and associating clerks of the court in the district court, in violation of 18 U.S.C. § § 1512(c)(2) and 1503. Moreover, the Plaintiff has raised the facts and criminal issues of the record on appeal in this matter in the pending Appeal No. 23-1967 to United States judges – again, none of the Defendants-Appellees disputed. The undisputed facts of the record on appeal shows the follows:

(1) Emblazoned on the Federal Judiciary website for the district of Rhode Island is the undisputed biographical facts that U.S. District Court Judge William E. Smith has had unusually intimate multi-prong and multi-layered personal, professional **attorney-client relationship**s with *numerous* state (inter alia Office of the Governor and Office of the Treasury) and municipal political subdivisions of the State of Rhode Island, and loyal political relationships with the Rhode Island government judicial and executive Appellees, who implemented the 2024 newly evidenced systemic and systematic *criminal* document alteration

of Title IV of the Social Security Act *federal records* procedures

approved and operating under former Rhode Island Governor Lincoln

Chafee in 2011 (systemic criminal computer record alteration procedures

evidenced in the 2024 new evidence shows it is effective from 2011 (start

of Chafee Governorship) to the present), for whom William Smith had

quit his Partnership at his former firm Edwards & Angell in order to run

Chafee's campaign full-time for the U.S. Senate in 2000; Chafee, after

successful election to the Senate, in turn rewarded Smith's personal and

political loyalty by nominating Smith to the federal judgeship that Smith

started twenty-two years ago in 2002.

(2) Earlier iterations (from 1996 to 2011) of the 2024 evidence showing

Rhode Island's systemic and systematic *criminal* federal document

alteration procedures were implemented by and in effect in *all* political

subdivisions of Rhode Island (including counties, cities, towns, villages)

under the Rhode Island State Plan pursuant to 42 U.S.C. § 654(1).

Chafee served as the mayor of W. Warwick at the time of the seismic

1996 Congressional Amendments to Part D of Title IV of the Social

Security Act, and the Rhode Island *criminal* federal document alteration

procedures were in effect in W. Warwick, a political subdivision of

Rhode Island, as early as 1996, zeroing out Rhode Island's 12%

compound interest systemically and systematically electronically and manually.

(3) Smith had complex and in-depth attorney-client relationships with political subdivisions of Rhode Island at multiple levels, e.g., towns, cities, counties, state judiciary, state attorney-general, state secretary, state treasury, state governor and executive subdivisions, to a well-known *personal* attorney-client relationship fact in Rhode Island with Lincoln Chafee from 1996 to 2002. This fact is so well known that the ***Federal Judiciary Website*** itself credits Smith with building Edward & Angell's Public Law Practice based on Smith's person, professional and political attorney-client relationships with the judiciary and executive Appellees, in part through his personal relationship with Chafee. Smith knew and or should have known the 2024 new evidence of Rhode Island systemic alteration of federal records for the purpose of making false claims to the United States for federal public funds of billions of dollars, and making false claims to support obligors for tens of millions of dollars within the reach of the Title IV legal framework.

(4) Before the Notice of Appeal was filed on November 17, 2024 (ECF 32), Smith interfered three times with the docketing of Appellant's filed papers on November 16, 2024 and November 17, 2024, in a pending

judicial proceeding at the federal district court in the district of Rhode Island in violation of Federal Rules of Civil Procedure 79, and federal *criminal* laws 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 1503, among others, such as *misprisio clerici.*

(5) There were no pending motions before the docketing of the Notice of Appeal (ECF 32) on November 17, 2023 – this critical fact is now undisputable: The Court Order dated May 24, 2024 in Appeal No. 23-1967 **Document: 00118148678** found the Court has jurisdiction over Appeal No. 23-1978 after reviewing Appellant's court-ordered Show Cause, which is only legally possible if there were no pending motions at the time of notice of appeal filing on November 17, 2023 (ECF 32).

(6) Moreover, the district court clerk had certified there were no pending motions on November 17, 2023 (ECF 33, 33-1) – this critical fact is also undisputable:  The Court Order dated May 24, 2024 in Appeal No. 23-1967 **Document: 00118148678** found the Court has jurisdiction over Appeal No. 23-1978 after reviewing Appellant's court-ordered Show Cause.

(7) Three days post appeal (23-1967), on November 20, 2023, the *functus officio misprisio clerici* district court judge William E. Smith, whose personal, political and professional attorney-client relationship with the

executive and judicial Appellees are at issue on appeal (and the
subsequent 2024 new evidence shows Smith knew or should have known
of the systemic Rhode Island falsification of federal Title IV official
records in the federal Central Registry), in his *unofficial capacity*
schemed to alter the record on appeal.  Issuing a void, *functus officio*
directive dressed up as "an order," William E. Smith instructed the
district court clerks in Rhode Island to alter the district court docket and
the record on appeal, that purposefully *falsified* the record on appeal to
make it look like there were pending motions on November 17, 2023.
Therefore, while the federal Appeal 23-1967 was pending, Smith and the
district court clerks knowingly falsified the federal record on appeal by
post-appeal docketing three motions under the date November 17, 2023,
to corruptly fabricate a false appellate record aimed to confuse this Court
to falsely believe there were pending motions on November 17, 2023 this
Court lacked jurisdiction over properly filed appeal no. 23-1978 that
precisely appealed the district court's void November 20, 2023 text order
and the subsequent resulting falsification and alteration of the original
record on appeal, docketing on November 20, 2023 three motions under
the November 17, 2023 docket entry date for the purpose of falsely
making it look like there were pending motions on November 17, 2023,

for the purpose of corruptly influencing this Court into believing it lacked

jurisdiction over properly filed appeal No. 23-1978 (that appealed the

validity of William Smith's post-appeal *functus officio* November 20,

2023 order). The knowing functus officio actions by William E. Smith

and persons in the district court altering the record on appeal for the

purpose of corruptly influencing and interfering with a pending federal

official proceeding in their unofficial capacities, trigger 18 U.S.C. §

1512(c)(2) and § 1503, and *misprisio clerici* among others.

(8) William E. Smith's former clients, the Rhode Island government

judiciary and executive Appellees, in coordination with Smith,

knowingly and purposefully filed dressed up "objections" in the district

court while Appeal No. 23-1967 was pending, in coordination with the

functus officio district court transmitting altered and falsified record on

appeal with the purpose of interfering with the pending No. 23-1967 and

23-1978, moreover triggered 18 U.S.C. § 1512(c)(2) and § 1503 and

among others, *misprisio clerici*.

(9) On February 1, 2024, William Smith in his functus officio *misprisio

clerici* unofficial capacity issued a void "order" dressed up as "in aid of

the court" to interfere with the pending appeals 23-1967 and 23-1978.

(10)   This appellate Court fell for the *functus officio* William E. Smith's and the Rhode Island judiciary and executive Appellees' *criminal misprisio clerici* ruse.  Three days prior to the due date of the opening brief, this Court vacated its original briefing schedule on the late afternoon of a Friday, on March 1, 2024, with explicit instructions to the Appellant to file a motion for extension of time under FRAP 4 or amend the complaint in Appeal no. 23-1967.

(11)   Appeal No. 24-1313 arises from the district court's equally *functus officio misprisio clerici* VOID denials (dressed up as legitimate) of timely filed FRAP 4 motions for extensions of time, that this Court-instructed Appellant to file.

(12)   The *functus officio misprisio clerici* William E. Smith, in his unofficial capacity, persons in the district court in coordination with Smith, and William Smith's former clients, Rhode Island judiciary and executive Appellees, in coordination with Smith, knowingly altered and falsified the record on appeal, committed at common law *misprisio clerici*, and collectively interfered with Appeal No. 23-1967 and 23-1978, that <u>succeeded</u> in confusing this Court and succeeded in interfering with pending proceedings in this Court, which necessitated the filing of an

appeal of yet more *functus officio* VOID denial orders in March 2024, the
resulting Appeal 24-1313.

(13)   The newly discovered evidence showing criminal systemic and
systematic procedures altering and falsifying federal records by the
Appellees and all political subdivisions under the State Plan federally
regulated and federally funded under Part D of Title IV of the Social
Security Act shows the motive behind the elaborate falsification and
alteration of federal records of pending official proceedings in Appeals
No. 23-1967 and 23-1978 by the *functus officio* William E. Smith, the
Appellees with whom William E. Smith had intimate, extensive and
broad multiple attorney-client relationships at multiple levels of political
divisions and political subdivisions of the State of Rhode Island in which
the systemic and systematic falsification of federal records procedures
were in effect pursuant to federal regulation under 42 U.S.C. § 654(1),
and *functus officio* persons employed by the district court for the district
of Rhode Island, who ***all knew or should have known*** that making
*functus officio* alterations to the record pursuant to a *functus officio*
judge's void orders during the pendency of said appeals to falsely make it
look like the appellate court lacked jurisdiction over a properly filed
appeal corruptly interferes with the pending official appellate

proceedings. The forensic misconduct implicates on its face *misprisio clerici* by officers of the federal court, whose misconduct this Court has ministerial supervision responsibility.

(14) After this Court performed a forensic investigation of the record on appeal in the same underlying district court matter 23-cv-126 and determined that the Court has jurisdiction over Appeal 23-1978 because the forensic record investigation concluded there were no pending motions on November 17, 2023, the Court in effect determined forensic misconduct *misprisio clerici* by the *functus officio* William E. Smith who issued not one but FIVE *functus officio misprisio clerici* VOID orders post appeal, purposefully and corruptly dressed up as legitimate orders by falsifying the docket entry post-appeal on November 20, 2023 to make it look like there were pending motions at the time of the appeal of the final judgment on November 17, 2023. The forensic investigation of the record performed by this Court shows as a matter of undisputed fact that the acts of William E. Smith, the Appellees with whom Smith had extensive attorney-client relationships, and persons at the district court triggered federal criminal 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 1503, as well as *misprisio clerici* among others.

(15)   Pursuant to the performance of forensic investigation of the record on appeal, the Court of Appeals, at Plaintiff-Appellant's request, consolidated three appeals, 23-1967, 23-1978 and 24-1313.

(16)   These above extraordinary circumstances involve federal obstruction crimes by federal officers of the district court for the district of Rhode Island under *misprisio clerici* at common law.

(17)   Under these extraordinary circumstances that involve the commission of **==*misprisio clerici*== by *functus officio* persons of the federal judiciary in and officers of the lower district court for the district of Rhode Island**, this Court's <u>equitable obligations</u> and the Court's adherence to 28 U.S.C. § 455(a) require the Court to disqualify William E. Smith, at the minimum, <u>whose actions caused</u> appeals No. 23-1978 and 24-1313, that had stemmed from injurious harm to Appellant caused by the ==**misprisio clerici**== *functus officio* <u>forensic misconduct</u> by William E. Smith.  The Court by law should apply the superseding *Fischer vs. U.S.*, 603 U.S. ___ (2024), *Trump vs. U.S.*, 603 U.S. ___ (2024), and *Lopes Bright Enterprises, Inc. vs. Raimondo* (2024)(Slip Opinion).

Plaintiff hereby incorporates the Appellate Court's May 24, 2024 Order in **Appeal No. 23-1967 Document: 00118148678 as fully referenced herein**.

Plaintiff hereby incorporates the Appellate Court's filings Documents

00118162842 and Document **00118178653** as fully alleged herein.  The Court

must note and find as a matter of fact in the record on appeal in Appeal 23-1967

that Plaintiff-Appellant repeatedly made several filings of the above facts in the

pending Appeal 23-1967 for seven months from March 2024 to September 2024,

to which facts the Defendants from March 2024 to September 2024 ***do not dispute***.

The state government defendants as a matter and fundamental issue of government

legitimacy concern must dispute allegations challenging the legitimacy and legality

of its actions that violate federal criminal laws in our democratic government

system.  The Title IV-D Administrator Defendants never disputed any of the above

aforesaid facts.  The aforesaid facts are **undisputed facts**.  William E. Smith's

extensive, broad and political attorney-client relationship makes it clear to the 28

U.S.C.  § 455(a) objective observer that Smith knew or should have known about

the systemic and systematic criminal alteration and falsification of federal Title IV-

D records effective in ALL political subdivisions of Rhode Island under 42 U.S.C.

§ 654(1)with whom Smith had intimate, broad, in depth political and personal and

***attorney-client relationships*** in one of the largest state-federal work-together

programs in the counry.

  In light of this newly discovered withheld and concealed evidence, Plaintiff

respectfully requests that the Court indicate to the First Circuit that it would grant

Plaintiffs' Rule 60(b) and 15(a)(2) Motions.

Had Defendants, who are not just officers of the federal Court but are also
public officers in the First Circuit under *United States v. §ballo-Rodriguez,* 480
F.3d 62 (1st Cir. 2007) (who are also referenced as public officers in Section 1503
and Section 1512) that applies to *any and all **public federal** and state officials*
throughout the First Circuit as required by federal law, and when required by this
Court nearly a year ago, Plaintiff would have sought leave to bring five
Administrative Procedure Act ("APA") claims, *i.e.*, that State Defendant Agency
Rhode Island Department of Human Service's November 29, 2022, decision (1) is
per se arbitrary and capricious; and (2) resulted from improper criminal influence
by the Office of the Child Support Services and for reasons that Congress did not
intend him to consider; Defendants' "zeroing out interest" of Title IV-D records
then put the zeroed out and State falsely certified "no-interest" back on the system
are criminal obstruction; Defendants' Rule 5 concealment, impairment of
availability of court information records showing the State's systemic and
systematic zeroing out of interest from federal auditors are criminal obstruction;
denials of access to administrative procedures relating to the State's making claims
for all Title IV federal Public Funds related to the zeroed out interest records that
are criminal obstruction. **5 U.S.C. § 706**; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.
State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)

Plaintiff has now presented new evidence that "raises a substantial issue," the relevance of which Plaintiff and this Court should at least be allowed to explore. Fed. R. Civ. P. 62.1. Plaintiff has otherwise "made [a] showing that defendants' actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." **5 U.S.C. § 706.** This Court should not countenance Defendants' now transparent criminal dereliction of agencies' duties—especially Title IV-D administrators' statutory and regulatory obligation to furnish this Court the whole record. **5 U.S.C. § 706**.

## II. The Omitted New Evidence Reveal Defendants' and Smith's Scheme To Help Operate A 'Racket' Under RICO.

The aforesaid makes clear that Defendants' and William E. Smith's scheme help operate a "racket" under RICO and operating false claims that involves document obstruction under 18 U.S.C. § 1512(c)(2) and 1503, including *mispisio clerico*.

## III. Defendants Withheld The Systemic and Systematic Title IV-D Administrative Procedures Prescribing "Zero Out Interest" Federal Record Alteration and Falsification Evidence Despite Plaintiffs' APRA-FOIA Request.

The Defendant State Administrators of Title IV-D withheld the federal record alteration and falsification Title IV-D administrative procedures prescribing zeroing out to conceal Rhode Island's unlawful 12% compound interest despite Plaintiff's APRA-FOIA request. The Defendant's administration of Title IV-D

involves falsifying federal Title IV-D records in the federal Central Registry that is regulated by federal law and regulations and the Defendants' administration is funded by federal public funds contingent upon compliance with federal laws and regulations, which Defendants purposefully schemed to violate, conceal and aimed to operate a RICO debt collecting enterprise, funded by federal public funds.  It is utterly outrageous and goes towards the legitimacy of the government that commits systemic fraud and obstruction with each count punishable by 20 years imprisonment.

## IV.  FEDERAL OBSTRUCTION OF JUSTICE CONSTRUCTION STATUTES RELATING TO DOCUMENTS IS <u>BROAD</u>

1. The undisputed fact remains that Smith, persons in the district court and the Appellees altered the record on appeal in part to make it look like the Court lacked jurisdiction over Appeal 23-1978 and subsequent post-appeal void orders, succeeded in confusing this Court, the Court had to perform a forensic investigation of the record, found forensic alteration implicating *functus officio misprisio clerici* forensic misconduct by officers of the district court, and that it turns out in part was calculated to conceal a more egregious systemic document alteration and falsification crime by the State Appellees, with whom William E. Smith had extensive and broad attorney-client relationships, and who knew and should have known about the systemic federal record falsification implicating false

claims involving billions of federal public funds, showing Smith's commission of egregious *misprisio clerici* with broad implications affecting the legitimacy of the judiciary and the corrupt administration of the federal Title IV-A and Title IV-D programs.

2. Obstruction of justice as both a concept and a legal term of art has adorned the halls of Anglo-American justice in the context of professional misconduct for over four centuries. See *People ex. rel. Karlin v. Culkin*, 162 N.E. 487, 489-92 (N.Y. 1928) (Cardozo, C.J.) (tracing, with <u>derision</u>, the history of barristers and attorneys who have been charged with obstruction of justice back to the seventeenth century and making comparisons to contemporaneous prosecutions). In analyzing a case involving "practices obstructive or harmful to the administration of justice," Justice Cardozo considered the early instances of the attachment of culpability for such behavior, and that history underscores the importance of documentation in the judicial process dating to the 16th Century.' *Id.* at 490-91 (discussing the charge of *misprisio clerici*: the submission of writs without the required formalities). The appearance of judicial propriety, equity, and fairness was the underlying rationale behind the charge, as the Court emphatically must apply <u>here</u>. "Our court is 'slandered and evil spoken of, our cares and labors made void and frustrate' by the 'negligence of clerks and ministers;' the client 'beginneth to think evil of us that are judges, to suspect our skill,' and to speak evil

of the law." *Id.* (quoting in part the Lord Chief Justice of the Common Pleas,

Easter Term, 9 Eliz. 1567). The charge of obstruction of justice was carried into

the Americas and retained its strongly negative normative overtone. *See* THE

DECLARATION OF INDEPENDENCE para. 2, 10 (U.S. 1776), noted in

*O'Malley v. Woodrough*, 307 U.S. 277, 284 (1939). The Declaration of

Independence is illustrative: "The history of the present King of Great Britain is a

history of repeated injuries and usurpations, all having in direct object the

establishment of an absolute Tyranny over these States .... He has obstructed the

Administration of Justice, by refusing his Assent to Laws for establishing Judiciary

powers. ' *Id*. (emphasis added). In the twentieth century, federal obstruction of

justice provisions expanded from Section 1503, the wellspring from which most of

the obstruction of justice provisions arose, including section 1512. See *United*

*States v. Poindexter,* 951 F.2d 359, 380-83 (D.C. Cir. 1991) (providing a detailed

history of the development of federal obstruction of justice statutes including §§

1503, 1505, and 1512). Sections 1503 and 1512 have been broadly construed to

proscribe actions beyond those enumerated in their provisions. *See* Michael E.

Tigar, *Crime Talk, Rights Talk, and Double-Talk*: *Thoughts on Reading the*

*Encyclopedia of Crime and Justice*, 65 TEX. L. REV. 101, 111 n.72 (1986).

Section 1512 was thought to "significantly broaden" the reach of Section 1503,

even while 1503 was being read to reach outside its specifically enumerated scope.

Tigar, *supra* note 33, at 111 n.72. Modern readings of the statutes texts "corrupt"

intent require only that the act in question have the reasonably foreseeable effect of

obstructing a proceeding, regardless of the defendant's actual intent. *See* Jeffrey R.

Kallstrom & Suzanne E. Roe, *Obstruction of Justice*, 38 AM. CRIM. L. REV.

1090-91 (2001). The prosecutorial inquiry is not, therefore, the presence of intent

to obstruct the proceeding per se, but rather the presence of intent to commit an act

that could reasonably be foreseen to have that effect. *Id*. Already having had to

apply the necessary prosecutorial inquiry itself during the Appellate Court's own

performance of forensic investigation of the appellate record in order to determine

that Appeal 23-1978 could proceed, the Appellate Court already answered in the

affirmative the "presence of intent to commit an act that could reasonably be

foreseen to have that effect" – the act did in fact confuse the Appellate Court, did

in fact mislead the Appellate Court into falsely believing initially that the

Appellate Court lacked jurisdiction over 23-1978 after William E. Smith and

officers of the court in the district court altered and falsified the appellate record

post-appeal (on November 20, 2023) to falsely make it look like there were

pending motions when the notice of appeal was filed for appeal no. 23-1967 (ECF

32 filed on November 17, 2023). (Successfully) Misleading the Appellate Court

through record alteration into falsely believing the Appellate Court lacks threshold

jurisdiction over a properly filed notice of appeal (23-1978) is a <u>fundamental</u> <u>material</u> corruption of the record on appeal.

3. Moreover, under construction of Section 1503, to be "corrupt" an act must only have the natural and probable effect of interfering with an official proceeding. Both natural and probable effect of interfering with this pending official proceeding occurred here.  See *United States v. Aguilar*, 515 U.S. 593, 598-601 (1995).  In *United States v. Aguilar*, a federal judge was convicted of both illegally disclosing a wiretap and obstruction of justice.  Section 1512(c)(1) states, "alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding." Section 1512(c)(2) states, "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both."

4. The Supreme Court in *Fischer vs. U.S.*, 603 U.S. ___ (2024) made clear that Section 1512(c)(2) "otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so," relates to any official proceeding obstruction involving documents and records, that this Court must apply to the district court's acts in these consolidated matters.  The Court must independently review the facts of travel of the appellate record post appeal after the overturn of the *Chevron* deference (see *Lopes Bright Enterprise vs. Raimondo*, (2024) (Slip Opinion), with

no deference to the agency Defendant-Appellees who aided and abetted the
criminal alteration of the record on appeal. *Trump vs. U.S.*, 603 U.S. ___ (2024)
instructs the Court to review official and unofficial acts by public officials, that
when applied here, must make the distinction among *functus officio* void acts of
*mispriscio clericio* dressed up as valid judge-created law that on its face states "in
aid of the court" showing intent to corruptly influence and interfere with the
appellate judges in a pending official appellate proceeding when the *functus officio*
William Smith lacked any authority, that the 2024 new evidence shows Smith's
action is calculated to conceal, impair, impede the availability of egregiously
incriminating evidence from coming to light showing systemic and systematic
federal record falsification and alteration procedures that went on for decades in
Rhode Island covered by 18 U.S.C. §1512(c)(1) and (2), each count up to 20 years
imprisonment.

5.  Under the Court's fundamental truth-finding and equitable obligations, these
sets of extraordinary circumstances involving systematic and systemic obstruction
with each count up to 20 years imprisonment warrants the Court to explore the
"substantial issue."    Smith's obstruction act is not merely prejudicial to the
Plaintiff-Appellant but compounds the officer *mispriscio clericio* injury rather than
provide requisite truth-seeking and equitable obligation the Court by law is
required to remedy.   The harm of any resulting error would be irreparable and

goes towards the legitimacy of the judiciary.  Appellant hereby preserves the issues

raised in this motion for Article III review by the U.S. Supreme Court and states on

the record that the raised and preserved issues are ripe for Supreme Court review.

### V. LAW AND ARGUMENT

6. The Ninth Circuit Court of Appeals explains that "[t]he whole administrative

record," as per 5 U.S.C. § 706, "'is not necessarily those documents that the

agency has complied and submitted as 'the' administrative record.' 'The 'whole'

administrative record . . . consists of all documents and materials directly or

indirectly considered by agency decision-makers and includes evidence contrary to

the agency's position.'" *Thompson v. United States Dep't of Labor*, 885 F.2d 551,

555 (9th Cir. 1989) (emphasis in original; citations omitted).  The newly

discovered evidence prescribing administrative procedures that systemically and

systematically shows falsification and alteration of federal Title IV-D records as it

relates to Rhode Island's unlawful 12% compound interest that prescribes "zeroing

out" interest and altering support orders to zero out interest, purposefully on its

face is intended to conceal the unlawful and 42 U.S.C. § 654(21)(A) noncompliant

12% compound interest Rhode Island Defendants seek to collect in actions in debt,

triggering systemic (1) RICO liability, (2) false claims liability and (3) obstruction

liability.  The Supreme Court ***Trump v. U.S.***, 603 U.S.__(2024) made it crystal

clear that alterations and falsification of court orders trigger 18 U.S.C.  §

1512(c)(2), which is [precisely and textually what the new evidence prescribes to do, alter court orders to zero out the interest. The whole administrative record must now be brought before this Court.

### A. FED. R. CIV. P. 62.1 ALLOWS THIS COURT TO REMEDY DEFENDANTS' CRIMINAL MALFEASANCE.

7. "A party proffering newly discovered evidence may obtain an indicative ruling from a district court concerning relief from judgment pending appeal." *Franken v. Mukamal,* 449 F. App'x 776, 779 (11th Cir. 2011) (citing Fed. R. Civ. P. 62.1; Fed. R. App. P. 12.1); see also *Amarin Pharm. Ireland v. Food & Drug Admin*., 139 F. Supp. 3d 437, 447 (D.D.C. 2015) ("Where a district court concludes, for example, that newly discovered evidence warrants vacatur of a judgment that is already on appeal, the court can issue an indicative ruling . . . .").

8. Once an appeal is filed, the District Court no longer has jurisdiction to consider motions to vacate judgment. *Gould v. Mut. Life Ins. Co. of N.Y.*, 790 F.2d 769, 772 (9th Cir.1986). However, the District Court may entertain and decide a motion after notice of appeal is filed if the movant adheres to Rule 62.1, which sets forth a process to "ask the district court whether it wishes to entertain the motion, or to grant it, and then move this court, if appropriate, for remand of the case." *Id*; see also *Crateo, Inc. v. Intermark, Inc.,* 536 F.2d 862, 869 (9th Cir. 1976) ("The most the District Court could do was to either indicate that it would 'entertain' such a

motion or indicate that it would grant such a motion."). If the District Court states that it would grant the motion or that the motion raises a "substantial issue," the movant must notify the Circuit Clerk and the District Court "may decide the motion if the court of appeals remands for that purpose." Fed. R. Civ. P. 62.1(b), (c); see also *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, No. 16- 04294, 2018 WL 2010980, at *4 (N.D. Cal. Apr. 30, 2018) (district courts "have authority to deny [a motion], but . . . may not grant it without a remand from the court of appeals").

## 1. Fed. R. Civ. P. 60(b) Relief From This Court's Judgment is Appropriate.

9. Usually, Rule 62.1 relief is sought under Rule 60(b). See *Williams v. Woodford*, 384 F.3d 567, 586 (9th Cir. 2004) ("To seek Rule 60(b) relief during the pendency of an appeal, the proper procedure is to ask the district court whether it wishes to entertain the motion, or to grant it, and then move this court, if appropriate, for remand of the case."). As explained in *Hake v. Guardian Life Ins. Co.*: Rule 62.1 permits the Court to make an "indicative ruling" on a post-judgment motion to give the Court of Appeals an indication on how the Court would rule if it still had jurisdiction to rule. The Rule 62.1 "indicative ruling" procedure was instituted to deal with post-appeal Rule 60(b) motions, where a district court lacks jurisdiction to rule directly. No. 07-1712, 2010 WL 11578944, at *2 (D. Nev. Apr. 1, 2010) (citing Fed. R. Civ. P. 62.1 advisory committee's note). In *Comm. on Oversight &*

*Gov't Reform, United States House of Representatives v. Sessions* it was similarly

explained: Rule 62.1 provides that upon the timely filing of a motion for relief that

the court lacks authority to grant because of an appeal that has been docketed and

is pending, the court may: (1) defer considering the motion; (2) deny the motion; or

(3) state either that it would grant the motion if the court of appeals remands for

that purpose or that the motion raises a substantial issue. This rule is invoked in

situations where a court has lost jurisdiction over a case because it has been

docketed for appeal, and therefore cannot entertain motions such as those made

under Rule 60(b) for relief from judgment. Rule 62.1 allows a court to indicate to

the appeals court that it would grant the party's motion if remanded to the lower

court. 344 F. Supp. 3d 1, 7 (D.D.C. 2018) (quotation omitted).

### 2. Fed. R. Civ. P. 15(a)(2) Leave To Amend Is Also Appropriate.

10. While "Rule 62.1 codifies the procedure most courts used to address Rule

60(b) motions to vacate final judgments which had already been appealed . . . ,

nothing in Rule 62.1's language limits its application to Rule 60(b) motions or to

motions made after final judgment." *Ret. Bd. of Policemen's Annuity v. Bank of*

*New York Mellon*, 297 F.R.D. 218, 221 (S.D.N.Y. 2013). The Advisory

Committee's note confirms that it "adopt[ed] for any motion that the district court

cannot grant because of a pending appeal the practice that most courts follow when

a party makes a Rule 60(b) motion to vacate a judgment that is pending on appeal."

Fed. R. Civ. P. 62.1 Advisory Committee's Note; see also *Idaho Bldg. & Const. Trades Council, AFL-CIO v. Wasden,* No. 11-0253, 2013 WL 1867067, at *3 (D. Idaho May 1, 2013) (issuing an indicative ruling under Rule 62.1 regarding a motion to add a party under Rule 21); *Reflex Media, Inc. v. Chan*, No. 16- 0795, 2017 WL 8223985, at *1 (C.D. Cal. Oct. 17, 2017) ("Rule 62.1 provisions were originally drafted as an addition to Rule 60, addressing only relief under Rule 60 pending appeal, but the proposal was broadened to include all circumstances in which a pending appeal ousts districtcourt authority to grant relief."). Thus, an indicative ruling is appropriate where, under any Rule of Federal Procedure, it would "allow for the timely resolution of motions which may further the appeal or obviate its necessity" and not simply "place a district court in a position where it must predict the outcome of an appeal of its own decision." *United States v. Brennan,* 385 F. Supp. 3d 205, 208 (W.D.N.Y. 2019) (quotation omitted); see e.g. *Rabang v. Kelly*, No. 17-088, 2018 WL 1737944, at *3 (W.D. Wash. Apr. 11, 2018) (denying a Rule 62.1 motion that was "simply asking this Court to decide the question on appeal").

11.  Plaintiff is requesting that this Court allow Plaintiff to assert five new claims, based on new evidence that was not—but should have been—available when Defendants made their filings in the district court.

## C. PLAINTIFF DESERVES BOTH FED. R. CIV. P. 60(B) AND 15(A)(2) RELIEF.

### 1. Plaintiff Deserves Leave To Plead Two New APA Claims By Amendment.

12. A motion to amend the complaint "can be entertained if the judgment is first reopened under a motion brought under Rule 59 or 60." *Lindauer v. Rogers*, 91 F.3d 1355, 1357 (9th Cir. 1996); see also *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006) (same). Under Rule 60(b)(6), a judgment may be vacated for any "reason justifying relief from operation of the judgment." Fed. R. Civ. P. 60(b)(6). The U.S. Supreme Court has held that a "motion to vacate the judgment in order to allow amendment of the complaint" constitutes such a justifying reason, so long as the movant meets the requirements of Rule 15(a). *Foman v. Davis,* 371 U.S. 178, 182 (1962). As the Foman rule was more recently articulated by the Fourth Circuit: "To determine whether vacatur is warranted . . . the court need not concern itself with either [Rule 59 or 60]'s legal standards. The court need only ask whether the amendment should be granted, just as it would on a prejudgment motion to amend pursuant to Fed. R. Civ. P. 15(a). In other words, a court should evaluate a post judgment motion to amend the complaint under the same legal standard as a similar motion filed before judgment was entered—for prejudice, bad faith, or futility." *Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011) (quotation omitted).

13. Had the Defendants not withheld in both 2022 and 2023 the new 2024
evidence, Plaintiff (also — per 5 U.S.C. § 706) when the public officers
Defendants originally produced documents pursuant to APRA in 2022, and in the
district court as required by federal law based on their administration of Title IV-
D, pursuant to Rule 11(b)(3), 18 U.S.C.  § 4, 1503 and 1512(c)(2), the Plaintiff
would have had the factual and legal basis required by Rule 11(b)(3) to seek leave
to amend Plaintiff's Amended Complaint and add five new Administrative
Procedure Act (APA) claims.  Plaintiff now has the evidence Plaintiff needs to
bring those five claims. Plaintiff was manifestly prejudiced by not being able to
seek leave to plead those five new claims to the Court under Rule 15(a). None of
the new claims would be futile. All claims are plausible, if not dispositive in favor
of Plaintiff. Defendants, on the other hand, have demonstrated bad faith by not
originally producing the federal record alteration and falsification evidence either
as part of the administrative record in July 2023, or in response to Plaintiff's
APRA-FOIA request for administrative  procedures documents or in response to
Plaintiff's APRA-FOIA request for administrative procedures documents on
December 1, 2022.

## 2. Plaintiff Should Also Be Granted Rule 60(b)(2) Relief.

14. Rule 15(a) aside, Plaintiff is independently entitled to Rule 60(b)(2) relief
under the "newly discovered evidence" rule. Fed. R. Civ. P. 60(b)(2). For the Court

to grant relief under this rule "the movant must show the evidence (1) existed at the time of the [judgment], (2) could not have been discovered through due diligence, and (3) was of such magnitude that production of it earlier would have been likely to change the disposition of the case." *Jones v. Aero/Chem Corp.,* 921 F.2d 875, 878 (9th Cir. 1990) (quotation omitted). Requirements (1) and (2) are easily met. There is no doubt that this evidence was discovered after the now-appealed judgment was issued.  There is no doubt that Plaintiff made several APRA-FOIA requests for administrative procedure documents to both the Department of Human Services and Rhode Island Judiciary Defendants in 2022 and 2023.  This evidence, particularly was of such magnitude that production of it earlier would have been likely to change the disposition of the case. Those new evidence show that in making systemic falsification of federal records to zero out interest in Title IV-D federal registry, federal interests are not only central to this case, but that Defendants are involved in systematic and systemic falsifying records in official proceedings systematic for the purpose of making false claims to both the United States and support obligors, in actions at debt at common law, and creating purposeful constitutional infirm Title IV proceeding forums to rig the process in a RICO scheme, that purposefully impair the availability of public Title IV-D actions in debt at common law proceeding records to federal auditors, pro se support obligors and to the public. This is not permitted under the APA. *Id*. at 43;

see also, e.g., *ATX, Inc. v. U.S. Dep't of Transp.*, 41 F.3d 1522, 1527 (D.C. Cir. 1994) ("The test is whether 'extraneous factors intruded into the calculus of consideration' of the individual decisionmaker.") (quoting *Peter Kiewit Sons' Co. v. United States Army Corps of Eng'rs,* 714 F.2d 163, 170 (D.C. Cir. 1983)); *Saget v. Trump*, 375 F. Supp. 3d 280, 360 (E.D.N.Y. 2019) (finding an agency "decision was arbitrary and capricious due to improper political influence"); *Connecticut v. U.S. Dep't of the Interior,* 363 F. Supp. 3d 45, 65 (D.D.C. 2019) (APA claim where "significant political pressure was brought to bear on the issue and the Secretary may have improperly succumbed to such pressure"); *Tummino v. Torti,* 603 F. Supp. 2d 519, 544 (E.D.N.Y. 2009) ("An agency's consideration of some relevant factors does not immunize the decision; it would still be invalid if based in whole or in part on the pressures emanating from political actors.") (quotation omitted). The new evidence would have easily produced a different result. In addition, as noted above, had Plaintiff been in possession of the record falsification record, in particular, Plaintiff would have sought to amend Plaintiff's Complaint pursuant to Rule 15(a) to allege additional five APA claims, as alleged above already. See e.g. *Jianhong Zhai v. Ning Liu,* No. 16-7242, 2017 WL 7156251, at *2 (C.D. Cal. Aug. 17, 2017) (instructing plaintiffs to "file a motion to set aside the default judgment pursuant to Rule 60(b) in conjunction with a motion to

supplement the complaint pursuant to Rule 15(d)" in order to include new evidence in a pleading).

15. Plaintiff is moreover entitled to Rule 60(b)(3) relief for fraud, as the new evidence delineates in detail falsification of records for false claims in actions in debt at common law.

16.  Plaintiff is further entitled to Rule 60(b)(4) relief to vacate all void orders issued post appeal after November 17, 2023 by William Smith, as outlined above.

17. Plaintiff is additionally entitled to Rule 60(b)(6) relief to vacate based on the extraordinary egregious gross irreparable harm to Plaintiff that has been outlined in detail above.

18. Based on the above, the Court must disqualify William E. Smith and re-assign to hear this motion.

19.  The issues raised herein are hereby preserved on the record and is ripe for Article III review by the Supreme Court of the United States.

## VI. CONCLUSION

20. Plaintiff and this Court must be allowed to discover who and what actually caused to and to what extent, and how falsified Title IV-D records have been transmitted to the federal Central Registry, based on which how much federal

public funds has been knowingly falsely claimed to the United States to operate the

RICO scheme and to support obligors, and to the Plaintiff.  Oral Argument is

Requested.

Respectfully submitted,

Mary Seguin
Pro Se
/s/          *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: September 5, 2024

## CERTIFICATE OF SERVICE

This is to certify that the foregoing motion has been filed on September 5, 2024 electronically transmitted to the Clerk of the Court who serves via the Court's ECF filing system, on all registered counsel of record.

Mary Seguin
Pro Se
/s/          *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Exhibit A

## SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

Case Number: PC-2023-0001261/PB-1859002 Document Page 89 Filed 06/09/15 Page 240 of 108 PageID 67696
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

#: 2429

11:28:47 Tuesday, December 13, 2022

```
12/13/22    11:28         C A S E   T R A C K I N G       CSCL  ASMXA201
            TRAC.00                CASE HISTORY            U824   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP
WANTS THE INTEREST PUT BACK ON THE CASE (              ). WE REMOVED THE INTEREST WHEN
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-.
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED
FOR PASSPORT PURPOSES IN ANY EVENT.

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: 80  12 22 ABSP:          SEGUIN        MARY        CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK     GERO     K  PNL:
```

Case: Case 9723-cv-00126-WES-PAS 9802 Document 640 Filed 06/06/24 09/15/22 Page 241 of 118 Page 3567606
#: 2430

Case Number #20010011M
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

12/13/22    11:20        C A S E    T R A C K I N G        CSCL   ASMXA201
            TRAC.00            CASE HISTORY                 U024   PROD
**STARTING DATE**    09 01 2021
**SELECTION**    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSMENTS SO WE CAN GET THIS SORTED
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT.

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES

RL: 80  12 22 ABSP:          SEGUIN       MARY          CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK    GERO     K    PHL:

Case 1:23-cv-00126-WES-PAS Document 49 Filed 07/06/24 Page 242 of 118 PageID #: 2431

Submitted 6/1/2023 10:13 PM
Filed in Providence/Bristol County Family Court
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

| 12/13/22 | 11:29 | C A S E   T R A C K I N G | CSCL | ASMXA201 |
|----------|-------|---------------------------|------|----------|
|          | TRAC.00 | CASE HISTORY | U824 | PROD |

STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
    FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
    FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: 80  12 22 ABSP:                SEGUIN        MARY          CMD:
FWX: TRAC  D CLIENT:               MEYERSIEK     GERO      X   FNL:

Case Number: 03-2022-DR-000126-XXXX-XX Document #: 2432 Filed 09/06/2023 09/15/2023 Page 243 of 618 Page ID 67608
Submitted: 9/1/2023 10:13 PM
Envelope: 41332704
Reviewer: Maria G.

11:29:53 Tuesday, December 13, 2022

```
12/13/22    11:28          C A S E   T R A C K I N G      CSCL  ASMXA201
            TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

```
RL: 80  12 22 ABSP:            SEGUIN       NARY          CMD: _____
FXX: TRAC  D CLIENT:           MEYERSIEK    GERO      K   PNL:
```

ed in Providence/Bristol County Family Court
ibmitted 6/7/2023 10:13 PM
velope: 4132704
viewer: Maria O

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00           CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
      TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
      58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:            SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK   GERO    K   PNL:
```

Case Number: C2C6082123-cV-00112611-WBS1PAS900D0cumRage642 Filedt0970612409/18/202245 of 508yPage3567608
Filed in Providence/Bristol County Family Court #: 2434
Submitted: 5/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maya P 11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28          C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

RL: 80  12 22 ABSP:             SEGUIN        MARY            CMD: _____
FNX: TRAC  D CLIENT:            MEYERSIEK     GERO      K     PNL:
```

Case Number: PC-2013-... Submitted: 6/1/2023 10:13 PM
Filed in Providence/Bristol County Family Court
Envelope: 4132704
Reviewer: Maria O.
#: 2435

11:29:13 Tuesday, December 13, 2022

| 12/13/22 | 11:28 | C A S E   T R A C K I N G | CSCL | ASMXA201 |
| | TRAC.00 | CASE HISTORY | U824 | PROD |

STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS___

| RL: 80  12 22 ABSP: | SEGUIN | MARY | | CMD: _____ |
| FNX: TRAC  D CLIENT: | MEYERSIEK | GERO | K | PNL: |

ed in Providence/Bristol County Family Court    Case Number WE31PA3900DV    Document #: 2436    Filed 09/06/2.9/15 2:00:47 of 1118 Page 96/7606
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

12/13/22    11:28       C A S E    T R A C K I N G           CSCL  ASMXA201
            TRAC.00                  CASE HISTORY              U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

RL: 80  12 22 ABSP:                    SEGUIN        MARY          CMD: _____
FNX: TRAC  D CLIENT:                   MEYERSIEK     GERO      K   PNL:

Case:Case9123-cv-00120-WES-PAS 90006ocuReent643 Filed07/06/249/F6age248 of En8 Pageb567698
#: 2437





RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov:

## State of Rhode Island
# Office of Child Support Services
### DEPARTMENT OF HUMAN SERVICES

Welcome Mary Seguin

Home  My Profile  Contact Us  Site Map  Log Out

**Menu**
- Case Information
  - Last 5 Payments
  - Last 13 Months
  - Current Orders/ Past Due Balances
  - Court Dates/ Appointments
  - Enforcement Actions
  - PIN Lookup

Home > Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek          CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|--------|--------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

# Recorded Phone Call

## Recording Name:

[Recording of phone conversations among John Langlois, Debra DeStefano and
Mary Seguin recorded in Texas by Mary Seguin on October 5 2022]

## Transcript Prepared By:



720-287-3710
3801 E. Florida Ave.
Suite 500
Denver, CO 80210

DUNS Number: 037801851
CAGE Code: 6C7D5
Tax ID #: 27-2983097

| 1 | Seguin: | 'Cause all -- like, if -- if we base the practice on |
| 2 | | how things are done of -- based on what Mr. Langlois, |
| 3 | | John, is representing today, everyone should be able |
| 4 | | to look at that screenshot, that screen, and be able |
| 5 | | to rely on it, correct? |
| 6 | DeStefano: | Well, yeah, I -- |
| 7 | Seguin: | And its accuracy, correct? |
| 8 | DeStefano: | -- I mean, the agen- -- |
| 9 | Seguin: | So -- |
| 10 | DeStefano: | The agency is going to have to prove it.  Yes.  The |
| 11 | | agency is going to have to submit -- and, again, it -- |
| 12 | | it's difficult for me to know how relevant what you're |
| 13 | | asking for is 'cause I don't know what the agency's |
| 14 | | gonna submit yet, uh, to -- to support their position. |
| 15 | | So -- |
| 16 | Langlois: | And can I -- can I just say, the reason I asked |
| 17 | | earlier whether, uh, Mary had spoken to Carla after |
| 18 | | she made the $104,000 payment was because there was a |
| 19 | | change in circumstances immediately after that and I |
| 20 | | don't know whether anyone in my agency has ever |
| 21 | | explained that to Mary. |
| 22 | Seguin: | Wait -- wait -- wait a minute. |
| 23 | Langlois: | (Inaudible - 00:01:10) |
| 24 | Seguin: | Wait a minute. |
| 25 | Langlois: | (Inaudible - 00:01:11) |

 1   Seguin:   Wait -- wait -- wait -- wait a minute.  Wait a minute.

 2             If there is --

 3   DeStefano:  Wait a minute.

 4   Seguin:   -- I'd like to get some documents of that.  Okay?  So

 5             -- so, again --

 6   DeStefano:  Mary, what do you --

 7   Seguin:   -- I've asked for, I think --

 8   DeStefano:  Oh.  Wait a minute --

 9   Seguin:   I -- I'm so sorry.  I'm --

10   DeStefano:  -- Mary.  I know -- I know what you asked for.  Let

11             me get to -- let me understand what John just said

12             before.  So, John, you're saying there was a change

13             subsequent to her making a payment --

14   Langlois: Correct.

15   DeStefano:  -- but before the Notice of Lien went out?

16   Langlois: Yes.

17   DeStefano:  Okay.  So --

18   Langlois: And can I -- can -- if I could just back up and

19             explain what happened.  Okay?

20   DeStefano:  Okay.

21   Seguin:   This --

22   Langlois: This is -- 99 percent of this is a misunderstanding.

23   DeStefano:  Okay.

24   Langlois: Okay?

25   Seguin:   Including --



```
 1   Langlois: (Inaudible - 00:01:51)
 2   Seguin:   -- what's on the screenshot?  Is that a
 3             misunderstanding?
 4   Langlois: Can -- can I speak without being shouted over?
 5   Seguin:   Well, I'm --
 6   DeStefano:  Mary, let --
 7   Seguin:   I'm sh- --
 8   DeStefano:  Let --
 9   Seguin:   I'm flabbergasted really.
10   DeStefano:  Uh, Mary, you've got to let me --
11   Seguin:   Sorry.
12   DeStefano:  -- listen --
13   Seguin:   Sorry.
14   DeStefano:  -- to what the agency is gonna --
15   Seguin:   I appreciate that.
16   DeStefano:  I mean, I know -- I only know that -- what's in
17             front of me and I don't know everything that has
18             happened in this case, but if -- if -- let me just
19             listen to the agency and see what they have to say for
20             --
21   Seguin:   Sure.
22   DeStefano:  Go ahead, John.
23   Langlois: What -- what happened in this case is when, uh --
24             Mary's representative, her attorney, called us in late
25             November 2021 and said there's a -- she wants her
```



1      passport released.  What does she have to do to
2      release her passport?  They put her in touch with
3      Carla, who gave her the $104,000 number.  Where that
4      number came from, was the department attorney
5      contacted the custodial parent, Mr. Miurski (ph) or,
6      uh, Mr. -- I can't pronounce her last name.
7      Meyersiek.  So we contacted his attorney -- it wasn't
8      me, but it was someone in my office -- and said, "If
9      she's willing to make a $104,000 payment to pay off
10     the principal, would you agree to waive the $75,000" -
11     - I think it was $73,000 in arrears at that time?  He
12     said yes.  So Carla notified Mary that, if she paid
13     $104,000, it would be paid in full because he was
14     willing to waive the interest.  That was just the
15     principal.  What happened was, the day after Carla
16     spoke to Mary and told her to mail in the -- or to --
17     to wire the $104,000, the attorney for Mr., um,
18     Meyersiek contacted us again and said he changed his
19     mind, please put the interest back up on the system,
20     so we did.  That's his money.  The state is just
21     collecting for -- for this past child support that's
22     owed to him.  If he wants the arrears, he has every
23     right to ask for it.  So the number that was given to
24     her was correct on the day it was given to her.  The
25     arrears for $104,000.  Because when he was waiving the



1       arrears, wen he changed his mind the next day, we put

2       the arrear -- I mean, interest back up on the system.

3   Seguin:   I think --

4   Langlois: He was waiving the interest, and when that interest

5       went back up on the system, that's why the system is

6       now saying she owes $73,000.  That's why, in March,

7       when the system saw that she had a, uh -- some kind of

8       a personal injury settlement or some kind of an

9       insurance settlement, we had -- we -- our system was

10      showing that she owed $73,000 in interest, so we

11      issued the lien.  But that's what happened, is when he

12      changed his mind the next day, and that's what messed

13      up the numbers.  So that's how this all happened.  It

14      was a pure misunderstanding.  I don't know whether

15      anyone has ever explained that to Mary, how that

16      happened.

17  DeStefano:  Okay.  Mary, did anybody ever explain that to you

18      before?

19  Seguin:   No.  No one ever --

20  DeStefano:  That the system has just -- just --

21  Seguin:   -- explained any of that, and I --

1                    TRANSCRIBER'S CERTIFICATE

2

3            I, Laurel Keller, do hereby certify that I have

4    listened to the recording of the foregoing; further that the

5    foregoing transcript, Pages 1 through 5, was reduced to

6    typewritten form from a digital recording of the proceedings

7    held October 5, 2022, in this matter; that Participant Mary

8    Seguin has stated John Langlois and Debra DeStefano present were

9    included in this recording; and that the foregoing is an

10   accurate record of the proceedings as above transcribed in this

11   matter on the date set forth.

12           DATED this 20th day of June, 2024.

13

14

15                                   _Laurel Keller_____

16                                   Laurel Keller

17                                   Ditto Transcripts
                                     3801 E. Florida Ave.
18                                   Suite 500
                                     Denver, CO 80210
19                                   Tel: 720-287-3710
                                     Fax: 720-952-9897
20

21                                   DUNS Number: 037801851
                                     CAGE Code: 6C7D5
22                                   Tax ID #: 27-2983097

23

24

25

**Supreme Court**

No. 2023-278-A.

|                                                          |     |
|----------------------------------------------------------|-----|
| Mary Seguin                                              | :   |
| v.                                                       | :   |
| Rhode Island Department of Human Services Office of Child Support Services. | :   |

**O R D E R**

The appellant's "Second Motion to Repeal Rule 5 of the Rhode Island Rules of Practice Governing Public Access to Electronic Case Information", as prayed, is denied.

The appellant's "Second Motion to Stay Proceedings Until Repeal of Rule 5 of Rules of Practice Governing Public Access to Electronic Case Information", as prayed, is denied.

The appellant's "Motion to Compel and Comply with the Court's Order", as prayed, is denied. This Court's November 27, 2023 Order stated that, to extent the appellant needed any materials "***related to this matter***" during the pendency of this appeal, the Clerk's Office was directed to make reasonable efforts to provide her with the requested materials. Pursuant to that Order, the appellant is only permitted to request materials from the Clerk's Office that have been filed in her Superior Court case (PC 22-07215) or in this appeal.

The appellant's "Third Motion for an Extension of Time to File Statement of the Case and a Summary of the Issues Proposed to be Argued" is granted. The appellant shall either file her Rule 12A statement within ***thirty (30) days*** of the date of this Order or she

may seek to hold this appeal in abeyance until she is permitted remote access to case materials as a pro se litigant which access we estimate will be in effect by the end of the year.

      Chief Justice Suttell did not participate.

      Justice Lynch Prata did not participate.

      Entered as an Order of this Court this **29th** day of ***March 2024.***

                    By Order,

                    /s/ *Meredith A. Benoit*
                    Clerk

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

STATE OF RHODE ISLAND                    SUPREME COURT

MARY SEGUIN
 *Appellant*

VS.                              C.A. NO. SU-2023-0278-A

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES *et al.*
 *Appellees*

## **APPELLANT'S MOTION FOR PRELIMINARY INJUNCTION**

Texas Appellant, MARY SEGUIN, proceeding self-represented ("pro se"),

respectfully moves the Court for a preliminary injunction to enjoin the Court, also

known as the Rhode Island Supreme Court, in its ministerial capacity as the Rhode

Island courts rules promulgator, administrator and digital court implementor to

immediately enjoin from enforcing (1) Rhode Island Supreme Court promulgated

and administered Rule 5 that denies remote access to judge-created laws and all

digital court information (except for the docket sheet) to the public, pro-se litigants

and federal agency or federal auditors in Rhode Island's digital courts; (2) enjoin

from enforcing and ministering grossly structurally defective digital courts that

operates TWO digital case management systems and TWO sets of court clerks,

effectively, TWO court systems within the court that forces pro-se and all other

court users to use Odyssey while executive administrative agencies, such as the

Appellee Department of Human Services, file through an unnamed LEGACY case

management system where agency filings are (a) only visible to themselves and the

judge, (b) are invisible to pro se litigants, the public and the Virtual Clerk in

Case Number: SU-2023-0278-A
Filed in Supreme Court 2023-Cv-00126-WBS-PAS Document 6479 Filed 09/06/24 Page 290 of 318 PageID 867-603
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan
#: 2449

Odyssey, (c) are not digitally nor electronically noticed to the pro-se litigant, (d) the agencies' filings are managed by a separate "reciprocal court clerks" that fail to coordinate with the main court clerks who manage everyone else's filings through Odyssey, (d) that result in agency proposed orders automatically entered and signed by a judge even though objections are filed by defendants through Odyssey without a hearing thereby unconstitutionally structurally prejudiced to advantage Rhode Island's agencies in violation of *inter alia* Due Process and Equal Protection Clauses; (3) enjoin Appellees and this Court's ministered Rhode Island Family Court forum from structurally depriving defendants of United States Constitutional Seventh Amend rights to trial by jury in civil actions at law and civil actions in debt at common law (ordered support are debts (including debts signed over to the State in welfare cases) with the federal Title IV legal framework in Title IV proceedings – this Court's ministered Domestic Family Relations Rule 38 that traditionally provide for preserving the right for jury trial does not exist and is "reserved"; (4) enjoin Appellees and this Court's ministered Rhode Island Family Court forum from structurally depriving defendants of Rhode Island constitutional right to jury under Section 15 right to jury trial shall be inviolate in civil actions at law and civil action in debt at common law (ordered support are debts (including debts signed over to the State in welfare cases) within the federal Title IV llegal framework in Title IV proceedings.  Appellant is unconstitutionally denied access

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

to judge-created laws in Rhode Island's digital courts and hereby reserves and preserves Appellant's right to amend and supplement this motion with Rhode Island judge-created laws created by the Superior Court judges, Family Court judges, and Supreme Court judges that are unpublished and freely publicly accessible on all issues raised herein. This State's constitution moreover guarantees the right to justice and entitles the Appellant to the requested remedy under Section 5 that guarantees Appellant the right to "obtain justice freely, without purchase, completely and without denial, promptly and without delay, comformably to the laws." This Court in its ministerial capacity promulgating and administering the rules of the courts and the structures of the digital courts purposefully and knowingly violate established principles of the Government Edicts Doctrine, the First Amendment, Due Process and Equal Protection, Privileges and Immunities Clauses, the Seventh Amendment, and the Supremacy Clause, as well as this state's constitution guarantees in Section 5 and Section 15. In support of this motion for preliminary injunction, Appellant incorporates all motions files before this Court requesting access to judge-created laws and court information in Rhode Island's digital courts, that have been acknowledged by this Court as "a problem" and won't be resolved until the "end of the year," and simultaneously denied immediate relief in violation of the First Amendment, Due Process, Equal Protection, Privileges and Immunities Clauses and the Government

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

Edicts Doctrine, violating constitutional guarantees for prompt remedy without delay and purchase, and contravening constitutional requirement to comform to the laws. The laws require this Court to minister the judicial branch's court architecture and basic structure to conform to the Laws and to the Constitution, not structurally rig proceedings to the advantage of agencies, such as the Appellees. Appellant has raised this fundamental structural issue in both lower courts (in superior court incorporating the Administrative Procedure Act over Title IV administration by Appellee, and in the family court incorporating compliance to Title IV in Title IV proceedings) to _no avail_, saying they can't do anything about it (denying remedy) and to go and ask the Rhode Island Supreme Court for remedy. Appellant hereby moves this Court now for the above requested remedy to enjoin the aforesaid structural bias promulgated, implemented and ministered by this Court – in other words, the lower courts point to THIS Court for unconstitutional structural bias causation - and preserves this Rhode Island Supreme Court fundamental _ministerial_ unconstitutional court structural bias for United States Supreme Court review – Appellant preserves the issue of structural bias and raises before the Court that it is ripe for Article III review. Appellant raises before the Court that the Court's ministered structural bias functions to CONCEAL _criminal_ agency administration of federal programs calculated to make false claims in constitutionally infirm forums that deny the fundamental right to jury trial in civil

Case Number: SU-2023-0278-A
Filed in Supreme Court Case: SU-2023-0278-A Document: 6402 Filed: 09/06/2409 Page 54 of 118 PageID #: 67606
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan
#: 2452

actions at common law, to wit the Appellees' criminal policy and procedure to

falsify interstate interest support records zeroing out Rhode Island's illegal 12%

compound interest disallowed by 42 U.S.C. sec. 654(21)(A) then electronically

transmits the falsified zeroed out interest support records to the Federal Central

Registry within the Title IV legal framework, while falsely certifying the falsified

support record and falsely transmitting a falsified zeroed out interest support order

to the Federal Central Registry and to the Receiving State, in this case, to Texas,

thus damaging and destroying the integrity of both the Federal Central Registry

records and the Receiving State (this case Texas) Registry records within the Title

IV legal framework – that encompassed the calculation to ultimately make false

claims to the United States Title IV federal program for funding in the attempt to

CONCEAL the 12% compound interest that facially contravenes 42 U.S.C. sec.

654(21)(A) for the purpose of receiving TANF and Title IV-D 66% funding that

the Appellee agency persons know(s) they are not eligible for when they falsify

records, zero out the unlawful 12% compound interest and "collect debt" in actions

in debt at common law in constitutionally infirm forums like this Court's

ministered family court that operates the illegal aforesaid structurally biased two

digital case management systems that further deprives access to court information

and judge-created laws to pro se litigants and the public, as well as deprive

defendants the right to jury trial in actions in debt at common law, and which the

Case 1:23-cv-00124-WES-PAS Document 64-3 Filed 09/06/24 Page 54 of 138 PageID #: 2453

Appellee agencies knowingly scheme to <u>conceal</u> this penalty incurring scheme

from federal auditor detection under 42 U.S.C. sec. 655.  This Court's ministering

and enforcement of Rule 5 effectively functions to CONCEAL from and obstruct

federal auditors access to judge-created law Title IV proceeding documents that

involve documented evidence of the falsification of Title IV records by Appellees

routinely zeroing out Rhode Island's unlawful 12% compound interest in Title IV

interstate support cases, false certifications of Title IV compliance, routinely

falsifying support orders with zeroed out interest, routinely transmitting falsified

records to the Federal Central Registry and routinely transmitting falsified records

to the receiving states' registry carrying false certifications of regulatory

compliance within the Title IV legal framework.  As such, Appellant incorporates

the Administrative Procedure Act that is triggered upon injury to the Appellant.

This Access to Public Records Act action over the Appellees' interstate

administration of the Title IV program incorporates by definition the

Administrative Procedure Act.  The Appellant submitted the public records request

to the Appellee agency on December 1, 2022, at which time there was no pending

action initiated by the Appellees.  The Appellees' public records written denial on

December 13, 2022 relied on alleged "unsegregable" reasons, not impending

litigation.  The Appellee agency Chief Counsel Ms. Martinelli's written public

records denial letter dated December 16, 2022 also relied on unsegregable reasons

not impending litigation, notifying Appellant in writing of Appellant's right to appeal under the Access to Public Records Act. Mr. Coleman's written claims in this proceeding contravenes his boss Ms. Martinelli's written reasons for record denial. Either Mr. Coleman is lying on July 31, 2024 before this Court or his boss Ms. Martinelli is lying, in writing, dated December 16, 2022. Either way, the Appellee is lying, in writing, before this Court and/or committing wire fraud interstate to Texas lying about public record denials under both open records laws and the Administrative Procedure Act governing Appellee administration procedures of the federal Title IV program, that it turns out, involves routine interstate criminal fraud, false claims, obstruction, and obstruction of federal auditors. This state's open government laws never differentiate textually between Title IV records and other federal program records, conferring the family court jurisdiction over public access to Title IV records – instead jurisdiction is conferred to the Superior Court over ALL records access denial appeals irrespective of program, agency or nature. No litigation was pending at the time of APRA request and Appellee counsel Ms. Martinelli never stated impending litigation as a basis for denial on December 16, 2022, instead stating in writing "unsegregable" as the reason. The Superior Court structurally is required to review the disputed records to make a determination, not defer to Appellee agency opinions, which is controlled by new Supreme Court case law, ***Loper Bright***

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

*Enterprise Inc. vs. Raimondo*, Slip opinion (2024) conclusively overturning the Chevron deference.   In support of this motion, Appellant incorporates Appellant's Rule 12A Statement, all of Appellant's filed motions to repeal Rule 5 and grant access to judge-created laws, motion to stay, and the Court's orders to date in this matter, as fully alleged and raised herein.  Moreover, Appellant states the follows:

## New Controlling United States Supreme Court Case Law

### Overturn of the Chevron Deference

1. This Court's ministering of the biased court structure rigged in favor of the Appellee agency, replete with family court structure operating the aforesaid said biased and illegal TWO digital case management systems that blinds the pro se litigant, fails to notice the pro se litigant and coupled with access denial to court information and judge-created laws effectively functions as this Court's deference to the agency on steroids, that implements and enforces and administers structural biased rigged in favor of the Appellee agency.  This Court's ministerial bias in gross deference to the Administrative State is ripe for United States Supreme Court review of this State's administration of federal Title IV that incorporates the Administrative Procedure Act over the subsequently enacted Title IV.

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

2. ***Lopes Bright Enterprises Inc. vs. Raimondo*** (Slip Opinion) (2024)
   overturned the Chevron deference, and gives Article III courts
   independent review of all agency administrative actions of federal
   programs. This Court's ministerial administration of structurally biased
   state courts involving federal Title IV programs in favor of the agency
   that de facto functions to conceal from the public and support obligors
   and conceal from federal auditors court documents and otherwise
   records evidence relating to the Appellee agency's routine falsification
   of Title IV records zeroing out Rhode Island's unlawful 12% compound
   interest in interstate cases in order to make false claims is
   unconstitutional and Appellant is entitled under the Constitution to
   remedy upon injury. Appellant preserves the issue for United States
   Supreme Court review of Appellee and court structural ministering by
   this Court triggering 18 U.S.C. § 4 and incorporates 18 U.S.C. § 1512,
   18 U.S.C. § 666, 18 U.S.C. § 241, 18 U.S.C. § 1516.

3. ***Corner Post, Inc. v. Board of Governors of the Federal Reserve***
   ***System***, 603 U. S. _____ (2024) makes clear that Appellant is entitled to
   remedy upon injury by the aforesaid Court ministered structural defect
   and the Appellee's corrupt administration of a federal program,
   including covering up and denying access to Appellees' routine

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

falsification of interstate Title IV support records under the Administrative Procedure Act that requires disclosure of records. Appellant is injured now and continues to seek denied remedy. Appellant's entitlement to remedy upon injury is moreover guaranteed by the Rhode Island constitution Section 5. This issue of remedy denial thus far is preserved for United States Supreme Court review. Appellant seeks remedy now that conform to the laws, that this Court acknowledges "is a problem" but denies Appellant the requisite immediate remedy to irreparable harms by the Court's ministerial acts. Appellant is entitled to access Rhode Island's judge's created laws relating to access to all Title IV public records, Appellee procedures zeroing out interest, procedures falsifying and certifying zeroed out interest in interstate Title IV support cases, and the procedures relating to the transmission of falsified zeroed out interest records to the Federal Central Registry and the receiving state that is moreover governed under the Administrative Procedure Act. This Court's ministerial court information and judge-created laws access denial as it relates to what the judges are up to in Rhode Island as it relates to agency administration of federal programs requires immediate First Amendment injury remedial access. This issue is preserved for Article III review.

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

4.   On June 28, 2024, the United States Supreme Court reinforced in

==*Fischer v. U.S.*==, 603 U. S. _____ (2024), that 18 U.S.C. § 1512(c)(1) and

Section 1512(c)(2) cover criminal conduct altering, fabricating and

falsifying U.S. Government Federal Central Registry computer records

by the State Appellees and Appellee client Gero Meyersiek.  On page 9,

the U.S. Supreme Court held "…subsection (c)(2) makes it a crime to

impair the availability or integrity of records, documents, or objects used

in an official proceeding in ways other than those specified in (c)(1). For

example, it is possible to violate (c)(2) by creating false evidence—

rather than altering incriminating evidence. See, e.g., *United States v.

Reich*, 479 F. 3d 179, 185–187 (CA2 2007) (Sotomayor, J.) (prosecution

under subsection (c)(2) for transmitting a forged court order). Subsection

(c)(2) also ensures that liability is still imposed for impairing the

availability or integrity of other things used in an official proceeding

beyond the "record[s], document[s], or other object[s]" enumerated in

(c)(1), such as witness testimony or intangible information. See, e.g.,

*United States v. Mintmire*, 507 F. 3d 1273, 1290 (CA11 2007)

(prosecution under subsection (c)(2) based in part on the defendant's

attempt to orchestrate a witness's grand jury testimony)." *Id.*  It is plain

that the district court's description of "state enforcement" that

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

Appellant's newly-discovered evidence proves fundamentally involves the *wholesale policy-prescribed* criminal alteration, fabrication and falsification of federal computer government records and State Appellees' false certification of federal law compliance that are calculated to make false claims to the United States for billions of dollars of federal funding Rhode Island is not eligible for, conceal from federal auditors Rhode Island's policy-prescibed wholesale criminal falsification of federal Central Registry support obligation records and conceal from federal auditors Rhode Island's false certification of federal law compliance, in violation of 18 U.S.C. § 1512(c)(1) and (c)(2), and to make false claims to interstate support obligors for unlawful interest debt and false claims for waived interest does not only go towards the issue of Younger Abstention, but show Appellant's reporting to the United States judges under 18 U.S.C. § 4 the State Appellees' and Appellee Gero Meyersiek's violate a slew of multiple federal criminal laws discussed by *Fischer v. U.S.*, 603 U. S. \_\_\_\_ (2024), such as 18 U.S.C. § 1516 (impairing or obstructing federal audit),  18 U.S.C. § 1503(a), for example, makes it a crime to "corruptly, or by threats or force, or by any threatening . . . communication, endeavor[] to influence, intimidate, or impede" any juror or court

Case 1:23-cv-00126-WES-PAS Document 64-3 Filed 09/06/24 Page 71 of 118 PageID #: 2460

officer"; "sub-sections (a)(2)(C), (b)(3), and **(d)(2) criminalize various means of preventing someone from ==giving a judge== or law enforcement officer ==information relating to the commission or possible commission of a federal offense==**. And subsections (d)(3) and (4) make it a crime to harass someone and thereby dissuade them from arresting or prosecuting a person alleged to have committed a federal offense. ==*None of these crimes requires an "official proceeding*==." *Id.* (emphasis added). "For a person to have violated (c)(2), "an official proceeding need not be pending or about to be instituted." §1512(f )(1). And interference with an arrest or with communications to authorities about federal offenses could very well obstruct the initiation of future official proceedings." *Id.* Applying the Supreme Court's rulings of obstruction acts in *Fischer* to this matter, the record in this matter shows State Appellees, counsel for State Appellees (a state official who knows, aids and abets in the furtherance of the State Policy to falsify federal records to impair their integrity that is calculated to aid and abet Rhode Island to make false claims to the United States for federal funds Rhode Island is not eligible for and to conceal the federal penalty-incurring criminal conduct under 42 U.S.C. § 655) and Appellee Title IV client Gero Meyersiek engaging in criminal activities discussed by the

Supreme Court in *Fischer*.   The Appellees by policy conceal Rhode
Island's unlawful 12% compound interest by removing it thereby
falsifying federal Central Registry records that impairs the records'
integrity.  After removing the interest that all users relying on the
integrity of the records rely on record truthfulness, the Appellees then
represent to the support obligor, the Appellant, that interest was waived.
After removing the interest from the record, State Appellees further
falsely certify to federal authorities and federal auditors that Rhode
Island is federal law compliant.  Then, the Appellees put back on the
*state* register the unlawful 12% compound interest, then fraudulently lien
Appellant's Texas properties.  The State Appellee John Langlois again
states in 2022 in Rhode Island's Title IV enforcement agency appeal
proceeding that Appellee Gero Meyersiek waived the interest.  See
attached Exhibit I Transcript of audio recording Appellant made in
Texas on October 5, 2022 of telephone call Appellant had with Appellee
John Langlois, Esq., Deputy Chief Counsel of the Appellee Office of
Child Support Services, and Debra DeStefano, Rhode Island Executive
Office of Health and Human Services Appeals Officer in a Title IV
enforcement agency appeal proceeding  in agency Appeal No. 22-2116

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

that occurred on October 5, 2022, at the Title IV-D enforcement Appeal

telephonic Hearing, pages 2-5:

"DeStefano: -- Mary. I know -- I know what you asked for. Let

11 me get to -- let me understand what John just said

12 before. So, John, you're saying there was a change

13 subsequent to her making a payment --

14 Langlois: Correct.

15 DeStefano: -- but before the Notice of Lien went out?

16 Langlois: Yes.

17 DeStefano: Okay. So --

18 Langlois: And can I -- can -- if I could just back up and

19 explain what happened. Okay?

20 DeStefano: Okay.

21 Seguin: This --

22 Langlois: This is -- 99 percent of this is a misunderstanding.

23 DeStefano: Okay.

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

Case 1:23-cv-00128-WES-PAS Document 64-3 Filed 09/06/24 Page 124 of 138 PageID #: 2463

24 Langlois: Okay?

25 Seguin: Including --

Page 3

1 Langlois: (Inaudible - 00:01:51)

2 Seguin: -- what's on the screenshot? Is that a

3 misunderstanding?

4 Langlois: Can -- can I speak without being shouted over?

5 Seguin: Well, I'm --

6 DeStefano: Mary, let --

7 Seguin: I'm sh- --

8 DeStefano: Let --

9 Seguin: I'm flabbergasted really.

10 DeStefano: Uh, Mary, you've got to let me --

11 Seguin: Sorry.

12 DeStefano: -- listen --

13 Seguin: Sorry.

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

14 DeStefano: -- to what the agency is gonna --

15 Seguin: I appreciate that.

16 DeStefano: I mean, I know -- I only know that -- what's in

17 front of me and I don't know everything that has

18 happened in this case, but if -- if -- let me just

19 listen to the agency and see what they have to say for

20 --

21 Seguin: Sure.

22 DeStefano: Go ahead, John.

23 Langlois: What -- what happened in this case is when, uh --

24 Mary's representative, her attorney, called us in late

25 November 2021 and said there's a -- she wants her

Page 4

1 passport released. What does she have to do to

2 release her passport? They put her in touch with

3 Carla, who gave her the $104,000 number. Where that

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

4 number came from, was the department attorney

5 contacted the custodial parent, Mr. Miurski (ph) or,

6 uh, Mr. -- I can't pronounce her last name.

7 Meyersiek. So we contacted his attorney -- it wasn't

8 me, but it was someone in my office -- and said, "If

9 she's willing to make a $104,000 payment to pay off

10 the principal, would you agree to waive the $75,000" -

11 - I think it was $73,000 in arrears at that time? He

12 said yes. So Carla notified Mary that, if she paid

13 $104,000, it would be paid in full because he was

14 willing to waive the interest. That was just the

15 principal. What happened was, the day after Carla

16 spoke to Mary and told her to mail in the -- or to --

17 to wire the $104,000, the attorney for Mr., um,

18 Meyersiek contacted us again and said he changed his

19 mind, please put the interest back up on the system,

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

20 so we did. That's his money. The state is just

21 collecting for -- for this past child support that's

22 owed to him. If he wants the arrears, he has every

23 right to ask for it. So the number that was given to

24 her was correct on the day it was given to her. The

25 arrears for $104,000. Because when he was waiving the

Page 5

2  arrears, when he changed his mind the next day, we put

2 the arrear -- I mean, interest back up on the system."

Then, after that agency proceeding was dismissed, Appellant on December 1,

2022 requested the Title IV debt collection procedure  records in general

jurisdiction Superior Court under this state's open records act that incorporates the

federal Administrative Procedure Act.  After the Appellant initiated the open

records act record denial appeal in the Superior Court, the State Appellees initiated

a judicial proceeding in the limited jurisdiction state family court that utterly lacks

jurisdiction to put back on the federal computer system the unlawful 12%

compound interest that Rhode Island Office of Child Support Services removes

(and modifies the court order/falsified court order) from the Federal Central

Registry computer system, by Rhode Island's official criminal State Policy and that Appellee nonwelfare client Gero Meyersiek waived – under Title IV and all applicable federal (preemption) law, the limited jurisdiction state family court lacks jurisdiction to oblige Rhode Island State Appellees and Appellee client Gero Meyersiek. As the United States Supreme Court warns corrupt officials on July 1, 2024, "The President is not above the law." *Trump v. U.S*., 603 U. S. ____ (2024). Nobody is above the law, the United States Supreme Court warned, much less the Appellees in Rhode Island, whose conduct by conclusive evidence have been shown to be criminally corrupt falsifying federal records for the purpose of making false claims, and reveal a sense of being above the law for decades, in this matter alone, from 1996 to the present, and is on-going. Similarly, the Court's ministerial acts described herein as it relates to ministering the structurally defective courts that favors the Appellee agency, conceals judge-created laws relating to the Appellee criminal administration of Title IV and deprives defenders' right to jury trial in actions in law and in debt at common law, are not above the law. the state family court lacks jurisdiction to unlawfully establish 12% compound interest that violates the preemptive 42 U.S.C. § 654(21)(A), or establish the 12% compound interest retroactively that violates 42 U.S.C. § 666(9)(C), or enforce unlawful 12% compound interest that is by Rhode Island's State Policy always and "automatically" removed from the Federal Government

Central Registry computer system records, including transmitting modified support orders (falsified court orders in violation of 18 U.S.C. § 1512(c)(2) see June 28, 2024 United States Supreme Court holding, ***Fischer v. U.S***., 603 U. S. ____ (2024), citing ***United States v. Reich***, 479 F. 3d 179, 185–187 (CA2 2007) (Sotomayor, J.) (prosecution under subsection (c)(2) for trans mitting a forged court order). "Subsection (c)(2) also ensures that liability is still imposed for impairing the availability or integrity of other things used in an official proceeding be yond the "record[s], document[s], or other object[s]" enumerated in (c)(1), such as witness testimony or intangible information. See, e.g., ***United States v. Mintmire***, 507 F. 3d 1273, 1290 (CA11 2007) (prosecution under subsection (c)(2) based in part on the defendant's attempt to orchestrate a witness's grand jury testimony)") in order to conceal unlawful 12% compound interest from federal auditors (in violation of 18 U.S.C. § 1216, see *Fischer v. U.S., Id*.), the State Judiciary Appellees exercise the ministerial function of establishing "court rules" governing the digital courts the state judiciary implemented calculated to conceal from the public, from federal authorities, from pro-se litigants any and all judge-created laws (and the respective syllabi that show the State Appellee Department of Human Services and Office of Child Support routinely establishing and administering and enforcing unlawful 12% compound interest enabled in the state family court of limited jurisdiction that is by Rhode Island state policy criminally

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

Case 1:23-cv-00128-WES-PAS Document 62 Filed 09/06/24 Page 30 of 118 PageID #: 2469

removed from the Federal Central Registry, to which the Appellees transmit forged

falsified self-modified court orders and whenever certifications of federal law

compliance is performed) created by the state family court that lacks jurisdiction to

preempt Title IV of the Social Security Act. *See*, ***Trump vs. U.S.***, 603 U. S. ____

(2024) (reinforcing and directing Special Prosecutor Jack Smith to apply *Fischer

vs. U.S.*, 603 U. S. ____ (2024); ***Fischer vs. U.S.***, 603 U. S. ____ (2024); ***LOPER

BRIGHT ENTERPRISES ET AL. v. RAIMONDO, SECRETARY OF

COMMERCE, ET AL***., No. 22-451 *Together with No. 22–1219, ***Relentless, Inc.,

et al. v. Department of Commerce***, et al.; ***Corner Post, Inc. v. Board of Governors

of the Federal Reserve System***, 603 U. S. ____ (2024)

> THIS COURT MINISTERS STRUCTURALLY
> CONSTITUTIONALLY INFIRM FORUMS THAT DEPRIVE THE
> SEVENTH AMENDMENT TRIAL BY JURY RIGHT AND R.I.
> CONSTITUTION SECTION 15 JURY TRIAL RIGHT IN DEBT
> ENFORCEMENT PROCEEDINGS THAT THE LIMITED
> JURISDICTION FAMILY COURT LACKS THE AUTHORITY TO
> CALL – APPELLANT MOVES TO ENJOIN APPELLEES AND THE
> COURT FROM MINISTERING FORUMS THAT DEPRIVE JURY
> TRIAL RIGHTS IN LEGAL ACTIONS IN DEBT AT COMMON LAW

5. the United States Supreme Court's June 28, 2024 ruling in ***S.E.C. v.

Jarkesy***, 603 U.S.___(2024), that upheld the defendant's right to a trial

by jury, not just a judge as in the limited jurisdiction family court, in

debt enforcement proceedings. "Actions by the Government to recover

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

Case 1:23-cv-00128-WES-PAS Document 48 Filed 09/06/24 Page 24 of 118 PageID #: 2470

civil penalties under statutory provisions," we explained, "historically

ha[d] been viewed as [a] type of action in debt requiring trial by jury"

quoting ==*Tull v. U.S*==., 481 U.S., at 418-419 (1987).

6. When the state family court adjudicates, there are no juries. R.I.G.L. 8-

10-3 confers no authority to the limited jurisdiction state family court to

call juries. In these proceedings, the above-mentioned unconstitutional

structural defect already violates the due process mandate Congress

legislated in 42 U.S.C. § 666. The Fifth Circuit applied a two-part test

from *Granfinan ciera, S. A. v. Nordberg*, 492 U. S. 33 (1989), the panel

held that the agency's decision to adjudicate the matter in-house violated

Jarkesy's and Patriot28's Seventh Amendment right to a jury trial. 34 F.

4th, at 451. First, the panel determined that because these SEC antifraud

claims were "***akin to [a] traditional action[] in debt***," a jury trial would

be required if this case were brought in an Article III court. Id., at 454;

see id., at 453–455. The Fifth Circuit panel concluded that case should

have been brought in federal court, where a ***jury could have found the***

***facts***. Based on this Seventh Amendment violation, the panel vacated the

final order. *Id*., at 459. It also identified two further constitutional

problems. First, it determined that Congress had violated the non

delegation doctrine by authorizing the SEC, without adequate guidance,

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

to choose whether to litigate this action in an Article III court or to adjudicate the matter itself. See *id*., at 459–463. The panel also found that the insulation of the SEC ALJs from executive supervision with two layers of for-cause removal protections violated the separation of powers. See *id*., at 463–466.

7. Interest on overdue support claims are traditional actions in debt, and a jury trial would be required if this case were brought in an Article III court. The state family court is a constitutionally infirm forum for actions in debt that violate Seventh Amendment right and to Section 15 of the R.I. Constitution guarantee to jury trial at common law. This Court's ministering of Title IV proceedings for actions in debt at common law in constitutionally infirm forums that deprive the defendant of the Seventh Amendment right to jury trial and Section 15 of the R.I. constitution's right to jury trial at common law must moreover be immediately enjoined. The Appellees' knowing deception against support obligors in actions in debt at common law in constitutionally infirm forums like the family court that deprive defendants' right to jury trial at common law must moreover be immediately enjoined. *S.E.C. vs. Jarkesy*, 603 U.S.___(2024) is controlling, and Appellant preserves and reserves this issue (Appellant is denied access by this Court to review

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

R.I. judge created laws in all Rhode Island courts on the right of jury trial and further reserves the right to supplement once access is granted by the end of the year, per this Court's orders) that is ripe for United States Supreme Court review.  A jury would have found the facts that the Appellees actively sought to conceal, obstruct access to, and impair access to documents relating to Appellee falsification of Title IV records, zeroing out Rhode Island's unlawful 12% compound interest that facially violate 42 U.S.C. sec. 654(21)(A) in order to make false claims.  The Court's ministerial acts depriving Title IV support obligors in Title IV proceedings that deprive the right to trial by jury to find all triable facts de facto functions to aid and abet agency Appellees' making false claims to support obligors and the United States.  A jury would have found triable facts surrounding the Appellee agency removal or zeroing out Rhode Island's 12% compound interest, then stating to support obligors that the $0 interest showing resulting from the removal means interest was waived, then clandestinely illegally put the interest back on the system to make false claims.  This fraudulent alteration of federal Title IV interest record by Appellees in constitutionally infirm and grossly structurally defective lower state courts implemented and ministered by the Rhode Island Supreme Court must be enjoined

immediately, must be remedied and is ripe for United States Supreme Court review. The Court's ministerial acts and the Appellees moreover violate Separation of Powers, so that the Court denies immediate remedy that conform with the law under both the U.S. Constitution and R.I. constitution. This Court's denial of remedy concerning federal interstate programs that involve egregious criminal activity thus far is ripe for Article III review.

8. Appellant incorporates this Court's four orders dated November 27, 2023, January 19, 2024, March 29, 2024 and June 7, 2024 and all motions filed before this Court to date by reference as proof of Appellant-raised and preserved but unremedied fundamental structural defect issues prejudicing not just this appeal forum but all state lower court structural defects implemented and ministered against the Appellant that violate core tenets of law and order in our democratic system, namely the Government Edicts Doctrine, the First Amendment, the Seventh Amendment, Sections 1, 5, 15 of the R.I. constitution, Due Process and Equal Protection, Privileges and Immunities Clauses and Separation of Powers in this Court's ministered digital court structure and purposely unlawfully designed architecture that shows conclusive evidence of prejudice, bias, *concealment* with knowing, <u>admitted</u> and

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

purposeful violation of the Constitution, of the First Amendment, the Due Process Clause, the Equal Protection Clause, and the Privileges and Immunities Clauses, the Seventh Amendment, Separation of Powers, and the Supremacy Clause.   Denied access to judge-created laws created in Rhode Island, Appellant's Due Process is violated and Appellant is unconstitutionally targeted as a class (the public and the pro se litigants are denied access) – this evidently ministerial court policy that motivates the Rule 5 denial is upheld by the very persons who sit in a judicial capacity in this matter to continue to deny judge-created law access by its latest June 6, 2024 order denying Appellant's application for access in its entirety.   Because access denial to Rhode Island's judge-created laws functions to *conceal* the law in Rhode Island relating to corrupt administration of federal programs by the Appellees and conceal from the public what the courts in Rhode Island are up to as they relate to the continuing corrupt administration of the federal programs by the Appellees, under the United States Supreme Court's established case laws on public access to court information and judge-created laws, the Court in its ministerial acts and the Appellees violate the core tenets of our democracy: see,  *Richmond Newspapers v. Virginia*,  448 U.S. at 587–88 (1980) (emphasis added) "the First Amendment . . . has a

*structural* role to play in securing and fostering our republican system of self-government. Implicit in this *structural* role is not only 'the principle that debate on public issues should be uninhibited, robust, and wide-open,' but the antecedent assumption that valuable public debate—as well as other civic behavior—*must be informed*. The *structural* model links the First Amendment to that process of communication necessary for a democracy to survive, and thus entails solicitude not only for communication itself but also for the indispensable conditions of meaningful communication." The structure of this Court fails to comport with the fundamental tenets of our republican system of self-government and the Constitution, evidently by design and purposefully, and rejects Appellant's proper requests to timely comply with the Constitution under the First Amendment. As such, ***Appellant hereby reserves and preserves all rights to supplement Appellant's motion to enjoin until such time Appellant is granted remote access to judge-created laws created by Rhode Island judges.*** Since the Court acknowledges the problem and acknowledges proceeding is due process violative, Appellant concurrently filed separately a motion to stay pursuant to the Court's Order dated March 29, 2024 relating to this matter – however, the structural defects raised in this motion must be enjoined and

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

Case 1:23-cv-00126-WES-PAS Document 64 Filed 09/06/24 Page 37 of 118 PageID #: 2476

remedied without delay nor could they be held in abeyance, which are categorically ripe for review by Article III, the United States Supreme Court. *Jarkesy, Lopes Bright Enterprise Inc., Fischer,* and *Trump* show the United States Supreme Court places paramount priority reigning in the excesses of the [criminal] abuses of the Administrative State of government agency actions, as It should, that this matter shows the Administrative State engages in criminal schemes to harm the public, defraud the public and undermine core tenets and the rule of law of our democracy.

### Officials' Violation of the Law Is Treated As More Severe That Is Herein Preserved For Article III Review

9. Under 18 U.S.C. § 4, hinderance, concealment, suppression, affirmative neglect, or unjustified delay are "especially culpable for public officers, since they received a higher penalty for the crime than that received by ordinary citizens at common law." Mullis, *supra*. at 1113. The public officers specifically named in the Federal misprision statutory text with a duty to act upon the receipt of information are "judge(s) and civil authorities." The First Circuit federal appeals court equally applies the Federal misprision statute to state and local public officers, such as the Appellees and Mr. Coleman, and this Court's justices in their ministerial capacities ministering, promulgating, administering, implementing the

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

afore-described structurally defective and constitutionally infirm forums targeting pro se litigants and concealing what the Appellees and the judges in Rhode Island are up to, by denying access to court information to the public and to Appellant regarding the judge-created laws concerning the Appellees' corrupt administration of Title IV program that involves routine falsification of federal support records zeroing out interest and otherwise alterations of the Title IV records to make false claims. *United States v. Caraballo-Rodriguez,* 480 F.3d 62 (1st Cir. 2007). The First Circuit in *Caraballo* further noted that the Supreme Court also noted in *Branzburg v. Hayes,* 408 U.S. 665, 696 n. 36, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), that some lower courts had construed the statute to require both knowledge of a crime and an affirmative act of concealment or participation, but that both the Supreme Court and the First Circuit did not adopt that construction. Appellant preserves this issue as it relates to this matter concerning Appellee conduct, Mr. Coleman's conduct, and the Court's ministerial conduct, and the issue is ripe for Article III review by the United States Supreme Court. Moreover, the Plaintiff-Appellant raised the specter of Appellee Misprision of felony committed before this Court on July 31, 2024 evidenced by the Appellee's 12A Counter Statement and Objection to

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

Case 3:23-cv-01126-WGS-RAS Document 6-6 Filed 09/06/24 Page 39 of 118 PageID 67606 #: 2478

Motion to Stay submitted by the Appellees through Mr. Coleman, an

agency Deputy Chief Counsel, a public officer. The First Circuit in

*Caraballo* (precedent) cited **United States v. Sessions**, Nos. 00-1756, 00-

1791, 2000 WL 1456903 (8th Cir. Oct.2, 2000) (unpublished decision),

holding that the misprision statute was satisfied where the individual

"gave incomplete information regarding his knowledge of the [crime],"

at least where he "gave the police partial information that was

misleading." Id. at *1, 2000 WL 1456903. If the statute is geared toward

avoiding the misleading of authorities, *Ciambrone*, 750 F.2d at 1418, it

is still possible, in concept and in fact, that even a truthful but partial

disclosure could conceal by misleading the government through the

withholding of key information, specifically in footnote 10 that "it is

commonly accepted in other areas of law. The specific cases the First

Circuit Court cited and relied on are all in the form of omitted facts in

filings submitted to judges in a federal court of law in official federal

proceedings that "may mislead." (Emphatically, it is obvious that the

omission of key facts submitted in this Court which satisfies the

misprision statute equally applies to the omission of key facts submitted

in the federal appellate court). See the *Caraballo* Court cited cases,

**United States v. Nelson-Rodriguez**, 319 F.3d 12, 33 (1st Cir.2003)

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

(recognizing that ==omitted facts in a wiretap warrant affidavit may mislead==); *United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir.1996) (commenting that a =="bare-bones description" submitted to judge may have been "calculated to mislead"==); *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir.1985) (holding that ==omitted facts in a warrant affidavit may mislead==); *United States v. Previte*, 648 F.2d 73, 85 (1st Cir.1981) (noting that trial court's use of slide transparencies to deliver jury instructions "had some potential to mislead the jury, more by what they omitted than by what they contained"). Therefore it is abundantly plain that the First Circuit *Caraballo* Court applied the **misprision statute** to court "filings submitted to a judge." The federal misprision of felony statute is a carry-over of common law misprision of felony that equally applies to Rhode Island state misprision of felony – accordingly both apply as they relate to Title IV program administration and corrupt ministering or aid and abet of corrupt administration of federal programs by state persons. Accordingly, the Appellee Rule 12A Counter Statement and Objection to motion to stay that were filed before this very Court, that grossly and egregiously omitted key facts evidenced in the previously Appellant-submitted state policy documenting the falsification of federal computer records zeroing out the unlawful 12%

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

Case 1:23-cv-00126-WES-PAS Document 64-8 Filed 09/06/24 Page 141 of 118 PageID #: 2480

compound interest in order to conceal it for the felonious purpose of

feloniously making false claims to the United States and to support-

obligors, "may have been calculated to mislead" which the First Circuit

held in ==*United States v. Caraballo-Rodriguez,*== 480 F.3d 62 (1st Cir.

2007) **satisfies the misprision of felony statute,** holding that the

misprision statute was satisfied where the individual "gave incomplete

information regarding his knowledge of the [crime]," at least where he

"gave the partial information that was misleading"  which the Plaintiff-

Appellant plainly contends before this same Court was committed by the

Appellees, and Plaintiff-Appellant now preserves this misprision of

felony by the Appellees filings submitted to appellate Rhode Island

supreme court judges omitting the substantial fact of falsification of

federal computer records zeroing out the unlawful 12% compound

interest for the purpose of making false claims "calculated to mislead"

and "satisfies the misprision statute" for *all* applicable prosecution under

misprision of felony by the Appellant, and all qualifying persons, and

that it is ripe for review by Article III United States Supreme Court.  The

Court should note that the Plaintiff-Appellant applies for the $250,000

per Appellee submission per count allowed under the misprision statute

by law and should grant under the misprision law – there is no basis in

law or fact for NO consequence or no addressment or indifference or inaction or denying remedy by this Court under the misprision statute or at common law, as painstakingly detailed by the First Circuit in ***United States v. Caraballo-Rodriguez,*** 480 F.3d 62 (1st Cir. 2007).

10. Under ***United States v. Caraballo-Rodriguez,*** 480 F.3d 62 (1st Cir. 2007), immediate remedy and relief to the Appellant at the first opportunity further complies with 18 U.S.C. § 4 and Rhode Island's misprision of felony at common law and by the First Circuit Court's own addressment in *Caraballo*, is <u>required at common law</u>, having at length described as a forewarning the consequences of <u>failure to act by public officers</u>. This applies in equal force to this Court's ministerial acts implementing, ministering and enforcing structurally defective and constitutionally infirm lower courts in the administration of federal Title IV proceedings in the administration of federal programs, incorporating the Administrative Procedure Act.

## **CONCLUSION**

WHEREFORE, the Court should GRANT Appellant's motion to enjoin. The Court should commit its decision, remedy <u>or lack thereof</u> and reasoning in writing. The structurally defective and all issues raised herein are preserved and are ripe for the United States Supreme Court

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

review of the State's corrupt, unlawful, unconstitutional, and criminally obstructive administration of a federal program that implicates billions of federal funds falsely claimed by the State and billions of dollars falsely claimed by the State against support obligors since the 1996 Amendments to Title IV through the routine falsification of Title IV records zeroing out Rhode Island's 12% compound interest by the Appellees since 1996, such as the Appellant. The Court should GRANT Appellant's application for $250,000 per Appellee concealment, obstruction and misprision of felony under common law by the Appellees. Appellant condemns the Appellees. Appellant preserves the issue of Appellee violation of, and the Court's ministering of Rule 5's violation of, and those persons knowingly ministering Rule 5, and denial of public, federal auditors and Appellant's right to remote access of court information and judge-created laws in violation of the following federal criminal codes (that are not exhaustive): 18 U.S.C. § 2, 18 U.S.C. §3, 18 U.S.C. § 4, 18 U.S.C. § 1512, 18 U.S.C. § 1516, 18 U.S.C. § 666, 18 U.S.C. § 241. Appellant reserves and preserves all rights to supplement this motion upon being granted remote access to Rhode Island's judge-created laws in all its courts.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: August 1, 2024


## CERTIFICATE OF SERVICE


I HEREBY CERTIFY that on August 1, 2024, I filed the within Motion with the Clerk of the Court via the Rhode Island Electronic filing system, and a copy to Attorney Michael Coleman, Esq., 25 Howard Bldg. 57, Cranston, RI  02920.  A copy of the filing through the Court's EFS is available for downloading and viewing.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: August 1, 2024

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

# EXHIBIT I.

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

# Recorded Phone Call

### Recording Name:

[Recording of phone conversations among John Langlois, Debra DeStefano and
Mary Seguin recorded in Texas by Mary Seguin on October 5 2022]

### Transcript Prepared By:



720-287-3710
3801 E. Florida Ave.
Suite 500
Denver, CO 80210

DUNS Number: 037801851
CAGE Code: 6C7D5
Tax ID #: 27-2983097

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/7/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

| | |
|---|---|
| 1 | Seguin: 'Cause all -- like, if -- if we base the practice on |
| 2 | how things are done of -- based on what Mr. Langlois, |
| 3 | John, is representing today, everyone should be able |
| 4 | to look at that screenshot, that screen, and be able |
| 5 | to rely on it, correct? |
| 6 | DeStefano: Well, yeah, I -- |
| 7 | Seguin: And its accuracy, correct? |
| 8 | DeStefano: -- I mean, the agen- -- |
| 9 | Seguin: So -- |
| 10 | DeStefano: The agency is going to have to prove it. Yes. The |
| 11 | agency is going to have to submit -- and, again, it -- |
| 12 | it's difficult for me to know how relevant what you're |
| 13 | asking for is 'cause I don't know what the agency's |
| 14 | gonna submit yet, uh, to -- to support their position. |
| 15 | So -- |
| 16 | Langlois: And can I -- can I just say, the reason I asked |
| 17 | earlier whether, uh, Mary had spoken to Carla after |
| 18 | she made the $104,000 payment was because there was a |
| 19 | change in circumstances immediately after that and I |
| 20 | don't know whether anyone in my agency has ever |
| 21 | explained that to Mary. |
| 22 | Seguin: Wait -- wait -- wait a minute. |
| 23 | Langlois: (Inaudible - 00:01:10) |
| 24 | Seguin: Wait a minute. |
| 25 | Langlois: (Inaudible - 00:01:11) |



Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/7/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

```
 1    Seguin:    Wait -- wait -- wait -- wait a minute.  Wait a minute.

 2               If there is --

 3    DeStefano:  Wait a minute.

 4    Seguin:    -- I'd like to get some documents of that.  Okay?  So

 5               -- so, again --

 6    DeStefano:  Mary, what do you --

 7    Seguin:    -- I've asked for, I think --

 8    DeStefano:  Oh.  Wait a minute --

 9    Seguin:    I -- I'm so sorry.  I'm --

10    DeStefano:  -- Mary.  I know -- I know what you asked for.  Let

11               me get to -- let me understand what John just said

12               before.  So, John, you're saying there was a change

13               subsequent to her making a payment --

14    Langlois:  Correct.

15    DeStefano:  -- but before the Notice of Lien went out?

16    Langlois:  Yes.

17    DeStefano:  Okay.  So --

18    Langlois:  And can I -- can -- if I could just back up and

19               explain what happened.  Okay?

20    DeStefano:  Okay.

21    Seguin:    This --

22    Langlois:  This is -- 99 percent of this is a misunderstanding.

23    DeStefano:  Okay.

24    Langlois:  Okay?

25    Seguin:    Including --
```



Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/17/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

```
 1   Langlois: (Inaudible - 00:01:51)

 2   Seguin:   -- what's on the screenshot?  Is that a

 3            misunderstanding?

 4   Langlois: Can -- can I speak without being shouted over?

 5   Seguin:   Well, I'm --

 6   DeStefano:  Mary, let --

 7   Seguin:   I'm sh- --

 8   DeStefano:  Let --

 9   Seguin:   I'm flabbergasted really.

10   DeStefano:  Uh, Mary, you've got to let me --

11   Seguin:   Sorry.

12   DeStefano:  -- listen --

13   Seguin:   Sorry.

14   DeStefano:  -- to what the agency is gonna --

15   Seguin:   I appreciate that.

16   DeStefano:  I mean, I know -- I only know that -- what's in

17            front of me and I don't know everything that has

18            happened in this case, but if -- if -- let me just

19            listen to the agency and see what they have to say for

20            --

21   Seguin:   Sure.

22   DeStefano:  Go ahead, John.

23   Langlois: What -- what happened in this case is when, uh --

24            Mary's representative, her attorney, called us in late

25            November 2021 and said there's a -- she wants her
```



Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/1/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

4

1    passport released.  What does she have to do to

2    release her passport?  They put her in touch with

3    Carla, who gave her the $104,000 number.  Where that

4    number came from, was the department attorney

5    contacted the custodial parent, Mr. Miurski (ph) or,

6    uh, Mr. -- I can't pronounce her last name.

7    Meyersiek.  So we contacted his attorney -- it wasn't

8    me, but it was someone in my office -- and said, "If

9    she's willing to make a $104,000 payment to pay off

10   the principal, would you agree to waive the $75,000" -

11   - I think it was $73,000 in arrears at that time?  He

12   said yes.  So Carla notified Mary that, if she paid

13   $104,000, it would be paid in full because he was

14   willing to waive the interest.  That was just the

15   principal.  What happened was, the day after Carla

16   spoke to Mary and told her to mail in the -- or to --

17   to wire the $104,000, the attorney for Mr., um,

18   Meyersiek contacted us again and said he changed his

19   mind, please put the interest back up on the system,

20   so we did.  That's his money.  The state is just

21   collecting for -- for this past child support that's

22   owed to him.  If he wants the arrears, he has every

23   right to ask for it.  So the number that was given to

24   her was correct on the day it was given to her.  The

25   arrears for $104,000.  Because when he was waiving the



Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/12/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

| 1 | | arrears, wen he changed his mind the next day, we put |
|---|---|---|
| 2 | | the arrear -- I mean, interest back up on the system. |
| 3 | Seguin: | I think -- |
| 4 | Langlois: | He was waiving the interest, and when that interest |
| 5 | | went back up on the system, that's why the system is |
| 6 | | now saying she owes $73,000.  That's why, in March, |
| 7 | | when the system saw that she had a, uh -- some kind of |
| 8 | | a personal injury settlement or some kind of an |
| 9 | | insurance settlement, we had -- we -- our system was |
| 10 | | showing that she owed $73,000 in interest, so we |
| 11 | | issued the lien.  But that's what happened, is when he |
| 12 | | changed his mind the next day, and that's what messed |
| 13 | | up the numbers.  So that's how this all happened.  It |
| 14 | | was a pure misunderstanding.  I don't know whether |
| 15 | | anyone has ever explained that to Mary, how that |
| 16 | | happened. |
| 17 | DeStefano: | Okay.  Mary, did anybody ever explain that to you |
| 18 | | before? |
| 19 | Seguin: | No.  No one ever -- |
| 20 | DeStefano: | That the system has just -- just -- |
| 21 | Seguin: | -- explained any of that, and I -- |

Case Number: SU-2023-0278-A
Filed in Supreme Court
Submitted: 8/12/2024 4:26 PM
Envelope: 4740095
Reviewer: Zoila Corporan

```
 1                    TRANSCRIBER'S CERTIFICATE

 2

 3          I, Laurel Keller, do hereby certify that I have

 4   listened to the recording of the foregoing; further that the

 5   foregoing transcript, Pages 1 through 5, was reduced to

 6   typewritten form from a digital recording of the proceedings

 7   held October 5, 2022, in this matter; that Participant Mary

 8   Seguin has stated John Langlois and Debra DeStefano present were

 9   included in this recording; and that the foregoing is an

10   accurate record of the proceedings as above transcribed in this

11   matter on the date set forth.

12          DATED this 20th day of June, 2024.

13

14

15                                     Laurel Keller
                                       _____
16                                     Laurel Keller

17                                     Ditto Transcripts
                                       3801 E. Florida Ave.
18                                     Suite 500
                                       Denver, CO 80210
19                                     Tel: 720-287-3710
                                       Fax: 720-952-9897
20

21                                     DUNS Number: 037801851
                                       CAGE Code: 6C7D5
22                                     Tax ID #: 27-2983097

23

24

25
```



🇺🇸 An official website of the United States government   Here's how you know

# State Child Support Agencies with Debt Compromise Policies

Listen

**Publication Date:** June 2, 2023 **Current as of:** June 2, 2023

OCSS found that at least 36 states and the District of Columbia have debt compromise options available to noncustodial parents.  Although the approach varies from state to state, each has the same goal to encourage consistent payments and foster better family relationships.

Please check with the state in which you have your child support order for additional information. **See our map for contact information for each state**.

## Alabama

An interest rebate law allows for forgiveness of interest owed to the state and custodial parent (if the custodial parent agrees), in cases where current support is paid consistently for at least 12 months.

Source: **Code of Alabama §30-3-6.1** ↗

**Back to top**

## Alaska

The state offers debt forgiveness for noncustodial parents who have accrued at least $1,500 in state-owed child support arrears and meets other eligibility criteria. If the parent complies with the arrears forgiveness agreement, state-owed debt will be forgiven in stages over a 6-year period.

Source: **15 AAC 125.650** ↗

**Back to top**

## Arizona

The Division of Child Support Services (DCSS) Settlement Program assists noncustodial parents who may have a large arrears balance on their child support case. It provides an opportunity to pay off past-due balances.

If you are limited in your ability to pay, you may offer to settle your arrears balance by paying either a lump sum or by making monthly installments that can be accepted for up to three months.

To participate in the program:

1. Think about how much you would like to offer to settle the past due amount.
2. Stop by a local DCSS office or contact the DCSS Customer Service Center at 602-252-4045 or 1-800-882-4151, or email the DCSS Settlement Team at **dcsssettlement@azdes.gov** to submit your settlement offer.

Note: The state's role is not to advocate the amount of the settlement, but to facilitate whatever offer is appropriate for the state and the parties involved in the case. The DCSS cannot require a custodial parent to accept a settlement offer.

Source: **Arizona Parents who Pay Child Support** ⧉

**Back to top**

## Arkansas

Does not have a program.

**Back to top**

## California

The California Department of Child Support Services' Debt Reduction Program aims to increase support collected for families and resolve uncollectable debt that is owed to the state of California. The Debt Reduction Program allows for the acceptance of a partial-pay offer in exchange for compromising the remainder of permanently assigned arrears owed by a participant.

Source: **Child Support Reduction Program** ⧉

**Back to top**

## Colorado

County child support offices have the ability to offer arrears compromise for assigned child support arrears. It is up to the counties to determine if they want to implement an arrears compromise program

and, if so, what criteria they wish to use.

Source: State

**Back to top**

## Connecticut

Connecticut has implemented two arrears programs. The first one, the Arrears Adjustment Program, is designed to reduce state-owed debt as well as encourage the positive involvement of NCPs in the lives of their children and to pay current support. The second program, the Arrears Liquidation Program, is designed to liquidate state-owed arrears by allowing obligors to pay off arrears in a lump-sum payment at a discounted rate.

Source: **Regulations of Connecticut State Agencies §17b-179b-1 to §17b-179b-4** ⧉

**Back to top**

## Delaware

Does not have a program.

**Back to top**

## District of Columbia

The Fresh Start program allows for a portion of Temporary Assistance for Needy Families (TANF) arrears to be forgiven in return for successfully making consecutive timely payments on the current support obligation or making a lump sum payment towards arrears. The Child Support Services Division must invite noncustodial parents to participate in the program.

Qualifications are:

- At least $1,000 owed in TANF arrears
- No voluntary payment in at least 12 months
- Previous unsuccessful enforcement efforts
- Valid addresses for both parties
- Failure to pay support must not be due to bad faith
- Responding interstate cases are not eligible for the program

Source: **District of Columbia Fresh Start Program** ⧉

Back to top

## Florida

Does not have a program.

Back to top

## Georgia

A state statute gives the child support program the authority to waive, reduce, or negotiate the payment of state-owed arrears for administrative child support orders if it is determined that there is good cause for nonpayment or that enforcement would result in substantial and unreasonable hardship to the parent or parents responsible for the support. Courts have discretion in applying or waiving past-due interest owed on arrears.

Source: O.C.G.A. § 19-11-5, § 7-4-12.1; Ga. Comp. R. & Regs. r. 290-7-1-.20

Back to top

## Hawaii

Does not have a program.

Back to top

## Idaho

Does not have a program.

Back to top

## Illinois

Project Clean Slate provides opportunities for low-income noncustodial parents to apply for forgiveness of assigned arrears in exchange for making regular, ordered payments of current support to the custodial parent for six months. The noncustodial parent must have demonstrated that they were unable to pay the assigned support at the time it was owed due to unemployment, incarceration, or serious illness. The noncustodial parent must also meet low-income standards.

Source: **Clean Slate Program** ⧉ ; Illinois Public Aid Code §5/10-17.12; 89 Illinois Administrative Code Section 160.64.

<div align="right">**Back to top**</div>

# Indiana

Does not have a program.

<div align="right">**Back to top**</div>

# Iowa

The Promoting Opportunities for Parents Program assists parents in overcoming the barriers which interfere with fulfilling their obligations to their children. In order to encourage parent participation, Iowa's Child Support Recovery Unit may partner with community providers and resources and offer incentives. The incentives include satisfactions of arrears due to the state for payment of court-ordered child support.

Source: **Iowa CSRU Customer Handbook** ⧉

<div align="right">**Back to top**</div>

# Kansas

The updated incentive program returned January 1, 2021, with an effective date of September 1, 2020. The focus of the updated incentive program is to work with payors to achieve stable employment. The primary incentive remains: a reduction of state-owed arrears only, with a lifetime maximum of $2500 and an additional incentive of $1000 for those payors who complete their GED or high school diploma. So, the lifetime maximum for those who obtain a GED is $3500.

There are three different categories in the incentives:
1) Career enhancement: Enables a payor to progress in their career, $2000 cap (HVAC certificate, barbershop or cosmetology license, forklift driver certificate, etc.)

2) Education: $1000 cap (GED or high school equivalent)

3) Personal enhancement: $500 cap (fatherhood or parenting class, finance class, addiction class, etc.)

The incentives are capped by their category. For example, the completion of an addiction class and a financial class will only result in one $500 incentive. Completion of both the HVAC and Welding certificate programs will only result in one $2000 incentive. In addition, if a payor has already received the maximum amount under prior versions of the incentive program, they will not receive additional incentives. If, however, a payor only received $500 previously, they could be eligible for additional incentives under this program.

Beginning January 1, 2021, all incentives program requests with their appropriate documentation (certificates of completion, attendance logs, etc.) must be sent to **DCF.CSSIncentives@ks.gov** for consideration and approval of credit.

**Back to top**

# Kentucky

Does not have a program.

**Back to top**

# Louisiana

Does not have a program.

**Back to top**

# Maine

Does not have a formal program. The state considers debt forgiveness on a case-by-case basis only for assigned arrears. Factors considered are:

- Ability to pay (present and future)
- Partial or continuing payments for current or partial debt
- Reduction in state owed arrears
- Potential case closure

**Back to top**

# Maryland

The Payment Incentive Program encourages the noncustodial parent to make consistent child support payments by:

- Reducing state-owed arrears by half if the noncustodial parent makes full child support payments for a year.
- Eliminating the balance owed if the noncustodial parent makes full child support payments for two years.

The noncustodial parent will receive credit for uninterrupted court-ordered payments made immediately prior to participation in the program. Consideration will be given for periods of unemployment due to

seasonal work and no-fault termination.

Source: **Maryland Payment Incentive Program** ⧉

Back to top

## Massachusetts

Massachusetts child support regulations allow for the settlement of interest, penalties, and arrears, as well as equitable adjustment of arrears. The Child Support Commissioner may waive all or a portion of the interest and penalties owed to the Commonwealth if the Commissioner determines such waiver is in the best interest of the Commonwealth and will maximize collection of current and past-due child support.

The Commissioner may also accept an offer in settlement that is less than the full amount of state-owed arrears, where there is serious doubt as to liability or collectability of such arrearages. The Commissioner may also equitably adjust the amount of child support arrearages owed to the Commonwealth when the obligor has no present or future ability to pay the full arrearages.

Source: **830 CMR 119.A.6.2** ⧉

Back to top

## Michigan

Several laws allow for adjustment of arrears and interest.

- In some cases, the Department of Human Services or its designee may use discretion to settle and compromise state-owed arrears (MCL 205.13).
- Other laws allow noncustodial parents who do not have the ability to pay the arrearage in full, presently, or in the near future to request a payment plan (for a minimum of 24 months). At the completion of the payment plan, the court may waive any remaining arrears owed to the state (MCL 552.605e).
- Additionally, noncustodial parents may request a payment plan as a means to have the surcharge (interest) waived or reduced if regular payments are made (MCL 552.603d).

Source: **MCL 205.13** ⧉ , **MCL 552.605e** ⧉ , **MCL 552.603d** ⧉

Back to top

## Minnesota

State statute gives the parties (including the public authority with assigned arrears) the authority to compromise unpaid support debts or arrearages owed by one party to another, whether or not docketed as a judgment.

Source: **Minn. Stat. §518A.62** ⬀

Back to top

# Mississippi

Does not have a program.

Back to top

# Missouri

Does not have a program.

Back to top

# Montana

Does not have a program.

Back to top

# Nebraska

Does not have a program.

Back to top

# Nevada

Nevada will only consider arrears-only cases where there is no money owed to the custodian. The noncustodial parent must apply and provide supporting documents. Each application is reviewed, and a recommendation is provided to the Administrator of the Division of Welfare and Support Services who has authority to forgive state debt.

Source: State

Back to top

## New Hampshire

The New Hampshire Division of Child Support Services does not have a formal debt compromise policy. Child support workers do have some discretion to negotiate agreements to secure current support that may include forgiveness of assistance debt owed to the state that accrued prior to the establishment of a child support order and which was based on imputed income. Any such agreement must be approved by the child support worker's supervisor. Check with the state for more information.

Source: State

**Back to top**

## New Jersey

Occasionally, the New Jersey Child Support Program will offer a time-limited match on payments made towards the child support case and credit the same amount towards the arrears balance owed to the state. The program is announced yearly and is based on availability of funds.

Source: **New Jersey Arrears Match Program** ⧉

**Back to top**

## New Mexico

New Mexico's Child Support Arrears Management Program, *Fresh Start,* supports the needs of today's modern family by reviewing cases to focus on right-sized court orders, resulting in more payments and less debt.  This program may provide an option for the noncustodial parent to reduce the amount of assigned arrears by providing a lumpsum payment or consistent monthly payments to the custodial parent. To be eligible, the noncustodial parent must have over $1,000 of state-owed arrears and meet other additional criteria outlined on the **Fresh Start Arrears Management Program** ⧉ .

Source: State

**Back to top**

## New York

New York State offers several debt compromise programs to noncustodial parents who owe the state. The program varies depending on the local district. Interested persons must confirm with the local district where their order was issued if the service is available.

- Arrears Cap: a limit on the amount of child support debt owed to the government.

- Arrears Credit Program: open to noncustodial parents who owe Department of Social Services child support arrears and do not have more than $3,000 in the bank or more than $5,000 in property.

- Parent Success Program: designed to help noncustodial parents by supporting their well-being and strengthening their ability to provide for their children by completing a substance-use treatment program.

- Pay It Off: a time-limited program that enables noncustodial parents to pay off NYC DSS child support debt twice as fast. See the website for more information about each program.

Source: **New York Debt Reduction** ↗

**Back to top**

# North Carolina

To be eligible the obligor must:

- Owe a minimum of $15,000 in state-owed arrears
- Agree to make 24 consecutive monthly payments for current support and an amount toward arrears
- Comply with the agreement.

Source: **NC General Statute, Chapter 110, Section 135 (§ 110-135)** ↗ (PDF)

**Back to top**

# North Dakota

North Dakota has three goals for its debt compromise program:

1. Motivate obligors to comply with long-term payment plan
2. Eliminate uncollectible debt
3. Facilitate case closure where appropriate

Compromise of assigned arrears is permitted if an offer is received for at least 95% of the outstanding arrears balance (after subtracting all negotiable interest) or 90% with IV-D Director approval.

Interest may be compromised when an obligor enters into a payment plan to avoid license suspension or other enforcement remedies or when an obligor has been making payments on a regular basis.

In both cases, interest is not charged while regular payments are made and, after one year of regular payments, any unpaid interest that had accrued before that date can be compromised.

Interest can also be considered uncollectible under certain circumstances. Some situations are pre-approved, such as an obligor is receiving Supplemental Security Income. In these cases, a worker may prevent interest from accruing on the case and can request an adjustment to the payment record for any unpaid interest that has already accrued.

In situations that are not pre-approved, the worker cannot suspend interest or have it waived as uncollectible without IV-D Director approval.

Source: State

**Back to top**

# Ohio

Permanently assigned arrears can be reduced if/ when the obligor satisfies all the terms and conditions of a waiver, installment plan compromise, lump sum compromise, or a family support program.

Source: **Ohio Administrative Code: Rule 5101:12-60-70** ⧉

**Back to top**

# Oklahoma

The state permits a waiver of some or all child support arrears with court approval, provided the parents mutually agree (or the state agrees when the debt is owed to the state).

Settlements of past support may include an agreement that the noncustodial parent make a lump-sum partial payment or a series of payments toward the total amount of past support.

Settlements also may include an agreement for the noncustodial parent to pay a specified number of current child support payments or in-kind payments in the future.

In addition, the state has established an amnesty program for accrued interest owed to the state. The state attorney in the local district must approve all settlements of state-owed interest.

Source: **43 O.S. §112 Oklahoma Administrative Code 340:25-5-140 56 O.S. §234** ⧉

**Back to top**

# Oregon

The Oregon Child Support Program/ Division of Child Support does not have a formal program, but forgiveness is used in appropriate situations. The program considers the family's best interest and may

satisfy all or any portion of child support arrears that are assigned to the State of Oregon or to any other jurisdiction if:

- The arrears are a substantial hardship to the paying parent
- A compromise will result in greater collections on the case; or
- The paying parent enters into an agreement with the program to enhance the parent's ability to pay or their relationship with the children for whom the parent owes arrears.

Source: **OAR Rule 137-055-6120** ⧉

---

## Pennsylvania

Per Pennsylvania Supreme Court Rule, any compromise of state-owed debt must be approved by the court.

Source: State

**Back to top**

## Rhode Island

The Office of Child Support Services has the discretion to compromise state-owed arrears.

Source: State

**Back to top**

## South Carolina

Does not have a program.

**Back to top**

## South Dakota

South Dakota Division of Child Support (DCS) does not have a formal debt compromise policy.

Child support workers do have some discretion to negotiate a lump sum settlement of 75% of state-owed arrears. If the parents agree to a lump sum settlement for arrears owed to the family, DCS has a forgiveness

of arrears form, which the parties can sign. The form is submitted to the court for approval. If the court approves the settlement, DCS will remove the arrears from the case.

Source: State

Back to top

## Tennessee

With the approval of the court, the parties have the right to compromise and settle child support arrears owed directly to the person owed support (family-owed arrears). State-owed debt cannot be forgiven.

Source: **Public Chapter 200, amending Tennessee Code Annotated, Section 36-5-101(f)** ⧉ (PDF)

Back to top

## Texas

The child support agency may establish and administer a payment incentive program to promote payment by noncustodial parents who are delinquent in satisfying child support arrearages assigned to the child support agency under Section 231.104(a).

The program must provide to a participating noncustodial parent a credit for every dollar amount paid on interest and arrearage balances during each month of the NCP's voluntary enrollment in the program.

Source: **Texas Family Code 231.124** ⧉

Back to top

## Utah

The Prisoner Forgiveness Program targets recently released prisoners and forgives state-owed arrears for those who are approved for the program and pay 12 consecutive months of current support plus a nominal amount toward arrears.

Utah also targets obligors in treatment programs and forgives state-owed arrears for those who are approved for the program and pay 12 consecutive months of current support and/or arrears.

Source: UT Admin. Code Rule R527-258

Back to top

## Vermont

The court may limit the child support debt, taking into consideration the criteria of 15 V.S.A. § 659.

Source: **33 VSA §3903** ⧉

<div align="right"><strong>Back to top</strong></div>

## Virginia

The Division of Child Support Enforcement's Temporary Assistance for Needy Families (TANF) Debt Compromise Program is available to parents who owe TANF debt under a Virginia court or administrative order.

The program is designed to encourage consistent child support payments by offering eligible parents a debt reduction in TANF debt. There are three tiers of participation based on your ability to pay. For more information on how much you may be eligible to save, call 800-468-8894 or visit your local district office.

Source: **State Child Support TANF Debt** ⧉

<div align="right"><strong>Back to top</strong></div>

## Washington

The Child Support Department may accept offers of compromise of disputed claims and may grant partial or total charge-off of support arrears owed to the state.

The state established an administrative dispute resolution process through its Child Support Conference Boards to hear parents' request to reduce the amount of arrears and make determinations based on the individual circumstances.

Source: **Rev. Code of Washington 74.20A.220** ⧉ , **Washington Admin. Code 388-14A-6400 through 388-14A-6415** ⧉

**Washington Child Support Conference Boards** ⧉  (PDF)

<div align="right"><strong>Back to top</strong></div>

## West Virginia

This program allows forgiveness of interest for obligors who pay off all arrears within 5 years/60 months. This is a voluntary program and requires all parties to voluntarily agree to forgive the interest.

Source: **West Virginia Code §48-1-302 (c)** ⧉

<div align="right"><strong>Back to top</strong></div>

## Wisconsin

Local child support agencies may forgive all or part of the state-owed arrears under a variety of circumstances, including when the obligor is unable to pay the arrearage based on income, earning capacity, and assets, or the obligor has a long-term disability.

Source: Child Support Bulletin # CSB 20-06

Back to top

## Wyoming

Does not have a program.

Back to top

## Puerto Rico

Does not have a program.

Back to top

## Virgin Islands

Does not have a program.

Back to top

## American Samoa

Does not have a program.

Back to top

## Commonwealth of the Northern Mariana Islands

Does not have a program.

Back to top

## Guam

Does not have a program.

Back to top

# Federated States of Micronesia

Does not have a program.

Back to top

# Republic of the Marshall Islands

Does not have a program.

Back to top

# Republic of Palau

Does not have a program.

Back to top

**Types:**
**Outreach Material**

**Audiences:**
**Parents** , **States**

# United States Court of Appeals
## For the First Circuit
_____

No. 23-1967

MARY SEGUIN,

Plaintiff - Appellant,

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES, in its official capacity; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES, in its official capacity; GERO MEYERSIEK, in his individual and official capacity; PRISCILLA GLUCKSMAN; JOHN A. LANGLOIS; PAUL GOULD; MICHAEL D. COLEMAN, in his individual and official capacity; DEBORAH A. BARCLAY, in her individual and official capacity; LISA PINSONNEAULT, in her individual and official capacity; CARL BEAUREGARD, in his individual and official capacity; KEVIN TIGHE; MONIQUE BONIN; FRANK DIBIASE; WENDY FOBERT; KARLA CABALLEROS; TIMOTHY FLYNN; RHODE ISLAND COURT SYSTEM; MARISA BROWN; PAUL A. SUTTELL, in his individual and official capacity as Executive Head of Rhode Island State Court System; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT; RHODE ISLAND JUDICIAL COUNCIL; RHODE ISLAND SUPERIOR COURT; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL; THE JUDICIAL TECHNOLOGY CENTER; JULIE HAMIL; JOHN JOSEPH BAXTER, JR.; JUSTIN CORREA; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT; ADAM D. ROACH; PETER F. NERONHA; TYLER TECHNOLOGIES, INC.,

Defendants - Appellees.

Nos.    23-1978
        24-1313

MARY SEGUIN,

Plaintiff - Appellant,

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES, in its official capacity; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES, in its official capacity; GERO MEYERSIEK, in his individual and official capacity,

Defendants - Appellees,

MICHAEL D. COLEMAN, in his individual and official capacity; DEBORAH A. BARCLAY, in her individual and official capacity; LISA PINSONEAULT, in her individual and official capacity; CARL BEAUREGARD, in his individual and official capacity; KEVIN TIGHE; MONIQUE BONIN; WENDY A. FOBERT; KARLA CABALLEROS; TIMOTHY FLYNN; RHODE ISLAND COURT SYSTEM; PAUL A. SUTTELL, in his individual and official capacity as Executive Head of Rhode Island State Court System; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT; RHODE ISLAND JUDICIAL COUNCIL; RI SUPERIOR COURT; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL; THE JUDICIAL TECHNOLOGY CENTER; JULIE PATALANO HAMIL; FRANK DIBIASE; MARISA P. BROWN; JOHN JOSEPH BAXTER, JR.; JUSTIN CORREA; RHODE ISLAND ATTORNEY GENERAL'S OFFICE; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT; ADAM D. ROACH; PETER F. NERONHA; TYLER TECHNOLOGIES, INC.,

Defendants.

_____

**ORDER OF COURT**

Entered: May 24, 2024

Plaintiff-Appellant Mary Seguin has filed three related appeals from rulings made in a single district court case concerning child-support matters. Seguin named as defendants various Rhode Island agencies, officials and employees, (collectively, "the State Defendants-Appellees"), as well as an individual by the name of Gero Meyersiek.

The court has considered Seguin's response to the order to show cause entered in Appeal No. 23-1978. That appeal shall proceed, with all jurisdictional and other issues reserved to the ultimate merits panel. Further, the three above-captioned appeals are consolidated for purposes of briefing and disposition. A consolidated briefing schedule will enter in the ordinary course. The ultimate merits panel will decide the proper scope of the appeals and will consider to an appropriate extent each argument developed in briefing.

Numerous motions currently are pending in the appeals. As an initial matter, this court resolves appeals through the briefing process and generally does not engage in piecemeal adjudication of individual issues by way of motion practice. Going forward, the parties should focus on briefing and are strongly discouraged from filing further motions, especially motions addressing the merits of the district court's rulings and procedural handling of the underlying matter.

Many of Seguin's motions concern the merits of the district court's rulings in the underlying matter and/or offer materials and arguments not placed before the district court. Those motions are underlined: denied, though Seguin is free to address relevant matters during briefing, and this denial is without prejudice to the pursuit of any specific argument during briefing. Again, the ultimate merits panel

will decide this appeal based on the parties' briefs and will consider those matters properly encompassed by the appeals. In light of the foregoing, any requests for the court to strike filings by Seguin are <u>denied</u>.

Seguin's sanctions motions are all <u>denied</u>, as Seguin has failed to identify legitimately sanctionable conduct, and Seguin is strongly discouraged from filing further such baseless motions.

Any pending motions or requests not specifically addressed above are <u>denied</u>. Again, a consolidated briefing schedule will enter, and the parties are strongly encouraged to focus their attentions on briefing, not further motion practice.

By the Court:

Maria R. Hamilton, Clerk

cc:
Mary Seguin
Marissa D. Pizana
Joanna M. Achille
Peter F. Neronha

No. 23-1978

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official
capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their
individual and official capacities; Rhode Island OFFICE OF Child Support
Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK
DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN,
LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN,
JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities;
RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A.
SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF
RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND
ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity;
RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in
its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official
capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE
JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL,
MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their
individual and official capacities; RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF
THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual
capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Defendants-Appellees.

Appeal from the United States District Court for the District of Rhode Island

———————————————

### APPELLANT'S SHOW CAUSE IN SUPPORT OF APPELLANT'S MOTION TO CONSOLIDATE

———————————————

In response to the Court's Order Extending Time to April 1, 2024 for Appellant to show cause, including in support of Appellant's Motion to Consolidate, Appellant respectfully states the **November 20, 2023 Notice of Appeal (ECF 38)** filed by the Appellant in this matter appeals the district court's November 20, 2023 Text Order, and as such the appeal is a **direct attack** on the district court's **void** order issued on November 20, 2023 when the district court became ***functus officio,*** yet plainly and explicitly **modified** *without authority* the district court's November 17, 2023 **two denials** denying the Plaintiff-Appellant post-judgment motions.

This appeal is a direct attack on the district court's November 20, 2023 void order.

As such all subsequent void orders or "corrections arising from omissions" resulting from, stemming from, caused by, effected by, linked to, or corollary to the district court's November 20, 2023 void order are subject to appellate review in this matter, including the February 1, 2024 district court denial, another void order.

The Notice of Appeal in this matter dated November 20, 2024 appeals the ==**void**== district court November 20, 2023 Text order issued ***three days after*** the Notice of Appeal of the Final Judgement was filed (or perfected) on November 17, 2023. See, ECF 32, 32-1, 33, 33-1.

Pursuant to ***Griggs v. Provident Consumer Discount Company***, 459 U.S. 56 (1982) the district court on November 20, 2023 was ***divested of jurisdiction*** to modify its judgment or ***take other action affecting the cause without permission from the court of appeals***.

Appellant states, in support of the Show Cause, that a straightforward timeline and content examination of the November 17, 2023 docketed Notice of Appeal of the Final Judgment (ECF 32, 32-1) and the docketed district court clerk's certification of the appeal record (ECF 33, 33-1), all dated November 17, 2023, emphatically shows the district court was ==**divested of jurisdiction** as of **November 17, 2023**==.

As such, the district court's November 20, 2023 and February 1, 2024 court orders in this matter are null and void, pursuant to ***Griggs v. Provident Consumer Discount Company***, 459 U.S. 56 (1982).

The Appellant avers the follows in support of consolidation:

**I.** **The November 17, 2023 district court certified record on appeal, ECF 33 and ECF 33-1, shows on November 17, 2023, no pending motions were docketed.**

1. Emphatically, the November 17, 2023 district court certified record on appeal, ECF 33 and ECF 33-1 shows on November 17, 2023, no motions were docketed, ***proving there were no pending motions*** filed prior to the Notice of Appeal of the Final Judgment.

2. Emphatically, the November 17, 2023 district court certified record on appeal, ECF 33 and ECF 33-1, shows only two entries for November 17, 2023: the two text orders dated November 17, 2023.

By way of visual illustration in support of this Show Cause, Appellant attaches herewith a screenshot of ECF 33-1, of page 9 of 92:

| | | |
|---|---|---|
| | | (D.R.I.), it is further ORDERED that the Courts March 30, 2023, Text Order granting Plaintiff Leave to Proceed as a Pro Se Electronic Filer is VACATED. Plaintiff's Electronic Filer privileges are revoked. <u>See</u> LR Gen 302(b). So Ordered by District Judge William E. Smith on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 10/19/2023 | <u>31</u> | JUDGMENT. So Ordered by Clerk of Court on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's two recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) Modified on 11/17/2023 to correct a typo. (Urizandi, Nissheneyra). (Entered: 11/17/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) (Entered: 11/17/2023) |
| 11/17/2023 | <u>32</u> | NOTICE OF APPEAL by Mary Seguin as to Text Order, Text Order,<br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at <u>http://pacer.psc.uscourts.gov/cmecf/</u>. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at <u>http://www.ca1.uscourts.gov/cmecf</u>** Appeal Record due by 11/24/2023. (Attachments: # <u>1</u> Envelope)(Kenny, Meghan) (Entered: 11/17/2023) |

3. Moreover, the Court is requested to Judicially Notice pursuant to

   **Fed. R. Evid. 201** that the docket entry for ECF 32 on November

   17, 2023 states unequivocally, "<mark>**NOTICE OF APPEAL by Mary**</mark>

   <mark>**Seguin as to Text Order, Text Order**</mark>" making it explicitly clear

   that the only two docket entries of November 17, 2023, "Text

   Order and Text Order," are the district court's denials of

   Appellant's first November 16, 2023 post-judgment Rule 59

   motions and then the one November 17, 2023 post-judgment Rule

   60(b)(1) motion which the docket entry for ECF 32 makes clear

that Appellant's Notice of Appeal of the Final Judgment filed on November 17, 2023 (ECF **32**, **32-1) explicitly appeals "as to TEXT ORDER, TEXT ORDER"** *in addition* **to the Final Judgment**. Therefore, all post-judgment motion filings actually filed by the Appellant were disposed by the two post-judgment denial Text Orders on November 17, 2023, prior to the filing of the Notice of Appeal (ECF 32). Attached herewith for show cause purposes are the aforementioned electronic court filing entry documents:

==**Exhibit I.**==: ECF **32**, ECF **32-1**

==**Exhibit II.**==: ECF **33**, **33-1**


Therefore, the examination of ECF 32, 32-1, 33 and ECF 33-1 evidences that are attached to Exhibits A and B shows the ==***functus officio***== district court was ==***divested of jurisdiction***== upon the filing of the November 17, 2023 Notice of Appeal ==**appealing**== the ==**Final Judgment** *and*== the ==**two text orders issued on November 17, 2023**== "as to Text Order, Text Order."


## II.   The District Court is DIVESTED of JURISDICTION *Griggs v. Provident Consumer Discount Company*, 459 U.S. 56 (1982) and

**the November 20, 2023 Notice of Appeal in this matter appeals the Void November 20, 2023**

As a general rule, an appeal <mark>**divests**</mark> the district court of power to modify its judgment or take other action affecting the cause without permission from the court of appeals ***Griggs v. Provident Consumer Discount Company***, 459 U.S. 56 (1982). *See* also ***Hamer v. Neighborhood Housing Services of Chicago***, 583 U.S. ___ (2017). The appeal filed on November 17, 2023 is from a Final Judgment. Once a district court enters final judgment and once the district court denies post-judgment motions, the final judgment and district court's denials of post-judgment motions become subject to appellate review. See *Commonwealth School, Inc. v. Commonwealth Academy Holdings LLC*, 2021 WL 1398268 (1st Cir. Apr. 14, 2021). *See* also *John's Insulation, Inc.v. L. Addison and Assocs.*, 156 F.3d 101, 105 (1st Cir. 1998).

Here, the two text orders docketed on November 17, 2023 are clearly denials of the only post-judgment motions the Appellant filed on November 16, 2023 and November 17, 2023 – as such the two November 17, 2023 text orders disposed and denied Appellant's post-judgment motions on November 17, 2023.  Subsequent to the district court's November 17, 2023 denials of post-judgment motions, in the

late afternoon of November 17, 2023, Appellant filed the Notice of
Appeal (ECF 32, 32-1) appealing:

(1) the Final Judgment,

(2) the district court's two denials of post-judgment motions
text orders of November 17, 2023, and

(3) the obstruction by Judge William Smith of the docketing by
the clerk of Appellant's post-judgment motions between November
16th and 17th of 2023.

Therefore, **the filing of the Notice of Appeal (ECF-32) meant
the final judgment and district court's denials of post-judgment
motions dated November 17, 2023 become subject to appellate
review**.

Therefore, here, the general rule that an appeal **divests** the
district court of power to modify its judgment or take other action
affecting the cause without permission from the court of appeals,
applies; *see*, *Griggs v. Provident Consumer Discount Company*, 459
U.S. 56 (1982).

The district court became *functus officio* and the district court *functus
offico* judge William Smith, *no longer holding office or having official
authority*, as he, nor the *functus officio* district court **no longer had the**

*power to modify the two text orders judge Smith made on November 17, 2023*.

As such, on **November 20, 2023**, the ***<mark>functus officio</mark>*** district court, **divested of jurisdiction**, *no longer had the authority* to order **modifications to the two text orders** judge Smith made on November 17, 2023.

Accordingly, the district court's **November 20, 2023 Text Order** that plainly **modified** his November 17, 2023 *two* denials for leave to file, are **<mark>VOID</mark>**.

Accordingly, the November 20, 2023 Notice of Appeal in this matter filed by the Appellant appeals the **void** November 20, 2023 Text Order.

Having established that the appeal in this matter appeals the district court's **<mark>void</mark>** November 20, 2023 Text Order, the Appellant respectfully requests Judicial Notice under Fed. R. Evid. 201 the 77-page Notice of Appeal (ECF-32).

A. **Notice of Appeal (ECF 32) appeals the district court's "interference with appeal"**

Appellant attaches herewith a screenshot of page 4 of the Notice of Appeal, and under Fed. R. Evid. 201, requests Judicial Notice of numbered paragraph 3 to 5:

2. Plaintiff respectfully requests the U.S. Court of Appeals for the First Circuit to review Plaintiff's timely filed Rule 59 Motion and Rule 60 Motion that were filed in the U.S. District Court of the District of Rhode Island on November 16, 2023 as proper part of the record of appeal. Prior to filing this Notice of Appeal, Plaintiff also filed a Rule 60(b)(1) Motion regarding the District Court's interference with Plaintiff's right to file Rule 59 and Rule 60 post judgement in which Plaintiff sought to preserve issues for appeal on the record. Plaintiff attaches all relevant documentation, including all relevant emails to the Clerk of the Court of the District Court and Plaintiff's properly filed post judgment motions pursuant to Rule 59 and Rule 60 herein to this Notice of Appeal and Docket Statement.

3. Plaintiff's Rule 59 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

4. Plaintiff's first Rule 60 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

5. Plaintiff attaches the aforesaid post judgment Motions and requests appellate review under these extraordinary and troubling factual circumstances that violate and obstruct the fundamental First Amendment right of access to the Court of Record, due process and obstruction to justice in the First Circuit, and *inter alia*, interference with the accuracy of the court's record for appeal in this matter.

---

The Notice of Appeal requests appellate review of the refusal by the United States District Court for the District of Rhode Island's ***refusal to docket on the record*** Plaintiff-Appellant's 28-day post-judgment motions filed on November 16, 2023 and the third post-judgment motion

filed on November 17, 2023, "**_pursuant to instructions by Judge Smith_**."

In enumerated paragraph 5, the Plaintiff plainly appeals, " Plaintiff attaches the aforesaid post judgment Motions and requests appellate review under these extraordinary and troubling factual circumstances that violate and obstruct the fundamental First Amendment right of access to the Court of Record, due process and obstruction to justice in the First Circuit, and inter alia, **interference with the accuracy of the court's record for appeal in this matter**."

Therefore, the "interference with the accuracy of the court's record for appeal in this matter" is under appellate review in Appeal No. 23-1967.

Therefore, the appeal **<u>divests</u>** the district court of power to take other action affecting the cause without permission from the court of appeals. **_Griggs v. Provident Consumer Discount Company_**, 459 U.S. 56 (1982). *See* also **_Hamer v. Neighborhood Housing Services of Chicago_**, 583 U.S. ___ (2017).

Since Judge Smith's <u>repeating</u> "<u>interference with the accuracy of the court's record for the appeal</u>" on November 20, 2023 issuing the ***<u>functus officio</u>*** **<u>void</u>** <u>November 20, 2023 Text Order</u> modifying his pre-appeal November 17, 2023 text order denials <u>is the order under appeal here</u>, and <u>is a continuance</u> of the "<u>interference with the accuracy of the court's record for the appeal</u>" that is <u>under appellate review in Appeal No. 23-1967</u>, the *legal justification* to **<u>consolidate Appeal No. 23-1967 and Appeal No. 23-1978 is compelling</u>**.

**B.** **<u>"Purported Mistake has Been Rectified" - The functus officio district court admits in the February 1, 2024 order that the November 20, 2023 "rectified the mistake" of the district court's November 17, 2023 text orders that are under appeal in Appeal No. 23-1967 showing continuing "interference with the accuracy of the court's record for the appeal" by rectifying mistakes after the appeal and while the appeal is pending without authorization from the court of appeals</u>**

In the void February 1, 2024 district court order, (ECF 48) the ***<u>functus officio</u>*** district court **<u>admits</u>** that the November 20, 2023 order purported to "rectify the mistake" of the two Text Orders of November 17, 2023 that are under appeal in Appeal No. 23-1967.   Appellant quotes the

February 1, 2024 order, last paragraph of the last page of the

order " … Text Order (Nov. 20, 2023). Thus, the purported

mistake has been rectified."  The Appellant attaches

herewith the screenshot of the void February 1, 2024 order

bearing Judge Smith's signature, and under Fed. R. Evid.

201 requests judicial notice of the screenshot pasted to this

Show Cause here below (see page 14 of this Show Cause):

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
(4) the judgment is void;
(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). Plaintiff's motion, however, merely rehashes the same arguments that she made in her Rule 59 Motion. For the same reasons above, Plaintiff's Rule 60(b) Motion is DENIED.

Finally, Plaintiff's third motion is brought under Rule 60(b)(1). In it, she aggrieves the Clerk's office's delay in docketing her first and second motions. Despite the delay, the Court ordered the motions to be docketed. Text Order (Nov. 20, 2023). Thus, the purported mistake has been rectified. Plaintiff's Rule 60(b)(1) Motion is DENIED as MOOT.

IT IS SO ORDERED.

_WESmith_

William E. Smith
District Judge
Date: February 1, 2024

5

Therefore, Judge Smith admits that on November 20, 2023, when the district court became divested of jurisdiction, the district court issued the void order purportedly to "rectify the

mistake" of the district court order's November 17, 2023 text orders.

This Court is fully cognizant of the interference with the accuracy of the record on appeal Judge Smith's admitted rectification caused.  It is crystal clear that the ***functus officio*** judge Smith lacked any authority on November 20, 2023 to modify the two November 17, 2023 district court text orders issued before the filing of the Notice of Appeal ***without*** the ***authority of the court of appeals***.

Therefore, Appeal No. 23-1967 and 23-1978 should be consolidated.

### III.   Judge Smith's ***Functus Officio*** obstructions and interferences of the appeal in this matter appears to be calculated to conceal from judicial notice of the crucial fact that *he* was Defendant-Appellees' chief outside counsel at Edwards & Angell representing the State of Rhode Island at the time of the 1996 Amendment of Title IV-D of the Social Security Act

The pinnacle matter of this action at law is the fact that the Rhode Island Appellees in an organized and deliberate manner fail to comply with the 1996 Amendment to Title IV Part D of the Social Security Act.  Indeed, the billion dollar question at the heart of the matter is the extent to which the organized knowing failure to comply with Title IV

pervades the 42 U.S.C. sec. 654(1) political subdivisions of Rhode
Island, and thus the amount in billions of dollars of penalties and
fines, that may involve jail time, incurred and accrued since 1996
when Judge Smith was the chief outside counsel of the Rhode Island
Appellees and their employees.

Title IV, one of the largest federal-state cooperative Entitlement
Program appropriated hundreds of billions to trillions of dollars
annually, saw Congress enact meaningful penalties against
noncompliant states in 1996, and as such Judge Smith as the lead
outside counsel for an extensive majority of the political subdivisions
of the State of Rhode Island had and should have had knowledge of
issues of noncompliance with Title IV-D, Title IV-A and 42 U.S.C.
sec. 654.

Accordingly, in support of this Show Cause, A**ppellant moves
for judicial notice of the following, pursuant to Fed. R. Evid. 201
and the Court's inherent truth-seeking authority**.
Diligently scouring the federal appellate rules and procedures,
Appellant could not find any explicit requirements to file a stand-
alone separate application or motion for Fed. R. Evid. 201 for judicial
notice, therefore, if Appellant, just as do judges and courts that make

mistakes, respectfully requests good cause or excusable neglect reasons for failing to find any textually explicit requirement to file a motion for judicial notice under Fed. R. Evid. 201 separately.  If the Court so orders, Appellant will absolutely comply.

**IV.    Appellant's Motion pursuant to Fed. R. Evid. 201 and 18 U.S.C. sec. 4 for Judicial Notice of the Commission of Organized Crimes**

Under **Fed. R. Evid. 201** and pursuant to **U.S.C. § 4, 18 U.S.C. § 666**

**18 U.S.C. § 287 - making false, fictitious claims,**

**18 U.S.C. § 371 - conspiracy to defraud the United States,**

**18 U.S.C. § 1001 - false documents or false statements to a federal agency,**

**18 U.S.C. § 1341 - mail fraud,**

**18 U.S.C. § 1343 - wire fraud,**

**18 U.S.C. § 641 - Public money, property or records,**

**31 U.S.C. § 3279 - federal civil false claims act Et al. , Appellant respectfully requests judicial notice of all that is made known to judges of the United States below.**

Under **Fed. R. Evid. 201(e),** Appellant requests for a hearing on Appellant's motion to take judicial notice.

The Court may take judicial notice of any matter "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed R. Evid. 201(b).

The legislations publication, concurrent litigation court information, United States' Briefs and Judge-Created Laws are available through the Congress's official website, through the Rhode Island Publications of State Legislations, through Rhode Island's Digital Courts' online portals, and through the United States Department of Justice Website, and, thus, is properly subject to judicial notice. *See Daniels-Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998-99 (9th Cir. 2010) (taking judicial notice of information contained in school district websites).

The State Policy attached in **==Exhibit A==** was not available until 2024 and is highly indisputable fact.  It is a written policy regarding, inter alia, the removal of interest from the automated data processing and information retrieval system in ***interstate*** cases, and at the top of the one page policy, it states, "This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified **==all for the purpose of removing interest== from ==interstate cases==**."  It is directly relevant to and at the heart of this INTERSTATE matter.  Rhode Island's policy and practice administering the Title IV Program requiring by Policy "Specification for OCSS Change Order" the systemic unlawful and fraudulent removal from the automated data processing

and information retrieval system mandated by 42 U.S.C. sec. 654, thus creating, *inter alia*, false accounting records, false certifications to the State of TEXAS and to the UNITED STATES under 42 U.S.C. sec. 654 and 42 U.S.C. sec. 666 are crucial factual allegations at the heart of this matter – see Amended Complaint, **ECF 25**. And Judge Smith knew and should have known and advised the Rhode Island Appellees on the legality of this scheme from 1996 to the time of his appointment as Federal Judge in 2002. As such, Judge Smith had an obligation to make it known to a judge or other civil or military authority of the United States under 18 U.S.C. sec. 4.

The next paragraph of this Policy states, "It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest."

The last paragraph of this one-page policy states, "**Two reports** will be created" for several different categories of various manual adjustments N, Y, B or P. Therefore, in this interstate case targeting TEXAS, interest was manually removed from the system when Rhode Island falsely certified the accuracy of the total amount due in violation of, inter alia, 42 U.S.C. sec. 666(14), lying and deceiving TEXAS that there is no interest when in fact the interest amounting to

tens of thousands of dollars were unlawfully and fraudulently removed from the system.  This simultaneously created a false certification to the UNITED STATES under the Title IV-D and Title IV-A Programs to fraudulently certify that Rhode Island is in compliant with Title IV in order to procure billions of dollars of federal funding it is ineligible for, which automated system adjustments to conceal the noncompliant 12% compound interest and false certification acts since the 1996 Amendments to 42 U.S.C. sec. 654, incurred and accrued over a billion dollars.

At the bottom of the Policy page, it is dated January 25, 2011.  12% compound interest was established in 2012 in Appellant's case.  Therefore, the Policy affects and is directly and materially relevant to this matter.

The screenshots of the Appellees' State Plan operated online Child Support account that is operated by the State Plan's automated data processing and information retrieval system are extensively described in the Amended Complaint in this matter. The Policy is relevant because it states the policy that "it is undesirable for the Rhode Office of Child Support Services to charge interest in interstate cases."  The Amended Complaint describes an interstate case in which interest is charged by the Appellees.  The policy is moreover relevant because it states "two reports" will be created that shows retrieval of data from the automated data processing and retrieval system, one with adjustments and another without adjustments, which is described in the Amended Complaint, describing at least

seven different sets of books of accounts showing accounting fraud in interstate cases. The Policy describing detailed instructions on how to make adjustments to the automated data processing and information retrieval system to create two reports in interstate cases relating to adjustments of "undesirable" interest in interstate cases shows an organized falsification of certification and government records in Title IV-D Program official records and documents, that are straightforward criminal. That "undesirable" interest in interstate cases concerns the routine establishment and enforcement of 12% compound interest in Rhode Island under color of state law, R.I.G.L. sec. 15-5-16.5. It is "undesirable" because under Title IV-D, specifically 42 U.S.C. sec. 654(21)(A), 12% compound interest is prohibited, and it is "undesirable" in interstate cases because Rhode Island knows full well that the 12% compound interest state legislation is preempted by 42 U.S.C. sec. 654(21)(A) upon State's acceptance of participation in Title IV-D. The Policy evidences the knowing violation and organized Rhode Island circumvention of 42 U.S.C. sec. 654(21)(A) through the creation of multiple books or reports of accounts that are false in interstate cases. The Policy evidences that the charging of the color of state law 12% compound interest necessarily involves a symbiotic entity that establishes the "undesirable" 12% compound interest in interstate cases – that would be the 42 U.S.C. sec. 654(1) state political

subdivision, Rhode Island state family court and certain pliant judges sitting therein.

The Younger abstention issue squarely before this Court then is, unlike other state proceedings, the federal government is heavily involved in Title IV-D proceedings, and prescribed explicitly by statute tens of millions of dollars of penalty liable by the State for a single unwilful noncompliance.  This State Policy (**Exhibit A**) that explicitly provides for "it is undesirable to charge interest in interstate cases" and the creations of "two reports" resulting from "adjustments" to the automated data processing and information retrieval system in interstate cases makes it plain that noncompliance is not just willful by policy and systemic, but also involves acts that violate the Federal Criminal Codes, as it entails theft of the Federal Program Funding under 18 U.S.C. sec. 666 and 18 U.S.C. sec. 641 through falsification of records.  Therefore, does the Comity envisioned in our Union envisioned by Appellees and the district court under *Younger* Abstention apply when the federal preemptive statutory text of Title IV-D explicitly provide for steep penalties for single noncompliance in fiscal year that runs up to tens of millions of dollars, with a penalty compounding effect (of its own!) of subsequent State failures up to 30% of the amount of federal funding paid to the State – certainly additional penalties accrued in 2023 and now in 2024 directly as a result of applying Younger Abstention, and that certainly is not in the State's interest to

continue to fail to comply, willfully, in light of Appellant's challenges, here, in

Appeal No. 23-1967, 23-1978 and in yet a possible fourth appeal.

The Appellant is introducing highly indisputable facts.

These facts are compelling because they provide a tantamount service to the

United States and are moreover proffered to the Judges of the United States under

18 U.S.C. sec. 4.

Under the Appellate Court's inherent equitable authority, moreover, the

federal courts of appeals have relied on the truth-seeking function of the judiciary

to permit supplementation of evidence.  *See., e.g.*, "It would be nonsensical to

overlook the existence of materials that bear heavily on the contested issue."

 ***Colbert v. Potter***, **471 F.3d 158, 166** (D.C. Cir. 2006).  Here, one of the threshold

issues of *Younger Abstention* is whether the limited jurisdiction state family court,

itself a 42 U.S.C. sec. 654(1) political subdivision that 42 U.S.C. sec. 654 binds,

has the authority to enforce, establish or address Rhode Island's routine 42 U.S.C.

sec. 654(21)(A) prohibited 12% compound interest on overdue support under color

of state law when Rhode Island participates in Title IV-D that Congress in its

statutory text explicitly preempts State general laws and State constitutions to the

extent that Congress prescribes "Grace Periods for Effective Date" prescribing the

States to amend the State constitution for compliance, or whether proceedings as

such lack any authority under the law as plainly "under color of state law" void, voidable and nullity proceedings that are fraudulent and penalty-incurring (tens of millions of dollars for a single willful violation under Title IV-D). Therefore, in this case, Rhode Island's noncompliance incurs monetary liability that are in the tens of millions of dollars per single violation explicitly prescribed by Congress in 42 U.S.C. sec. 654. States lack any interest in the knowing and abusive violation of the preemptive 42 U.S.C. sec. 654, abusively dressed up as a state "interest to enforce child support." In reality, Rhode Island has an overwhelming and compelling State interest to comply with 42 U.S.C. sec. 654 rather than violate provisions of 42 U.S.C. sec. 654. For this First Circuit, the question of the resulting harm inflicted on the State of Texas to have to then address the unenforceability and issues of void judgments under color of Rhode Island state law, and Rhode Island's inherent attempt to harm citizens of Texas, harming Texas's State interest, as well as Texas Appellant's individual interests, must be decided, and the decision affects the National Interest and the Public's Interest nationally. This Court must take judicial notice of the fact that all other applicable federal districts within the First Circuit, Massachusetts, New Hampshire, Maine are 42 U.S.C. sec. 654(21)(A) compliant (setting 0% - 6% interest). Title IV-D also specifically prescribes federal and states review (executive and judicial) of whether support orders are enforceable and Congress cast doubt to the accuracy of support

orders and enforcement operations that prompted Congress to act and enact the 1996 Amendments to 42 U.S.C. sec. 654, specifically explicitly providing penalties that could amount to tens of millions of dollars to over hundred million dollars in a fiscal year for State noncompliance – to wit the $10 million penalty incurred by South Carolina in 2010 described in the United States Brief in the seminal case, Turner v. Rogers.  It is against the public interest and against the "Comity" to permit the wanton continuation of Rhode Island's 12% compound interest under color of state law targeting noncustodial victims that, if allowed to mushroom, reaches its tentacles across all corners of the United States, out of an inequitable disproportionate concern for Appellee-alleged Rhode Island's "interest" that essentially is no interest at all.  Essentially, it is in Rhode Island's interest to comply with 42 U.S.C. sec. 654.  For the majority law-abiding 360 million population's interest in the United States to subserve to the law-violating Rhode Island's Appellee-alleged "state interest," in essence, non-interest, runs afoul of Inherent Justice for all.

### The Court's Truth-Seeking Function and Fed. R. Evid. 201

**I.   Inherent Equitable Authority**

The lower court dismissed Appellant's Amended Complaint without leave to amend, with the Appellees answering the Amended Complaint.  The First

Amended Complaint in that action amends the original complaint filed in the action at law filed on March 30, 2023, based on factual circumstances here, namely presenting in pleading of facts supported by evidence produced by the State Appellees pursuant to court ordered discovery since seven months ago in February 2023 by the family court in State ex. rel. Gero Meyersiek v. Mary Seguin, K20010521M and information obtained through **statutory right of access to public records via federal and state freedom of information act and access to public records acts**.

Federal courts of appeals have held that a plaintiff appealing an FRCP 12(b) dismissal may request that the court consider extra-record materials, in determining whether the complaint should have been dismissed without leave to amend.  In *Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909 (7th Cir. 1985), for example, the Seventh Circuit considered evidence produced during discovery in a parallel case but never introduced at trial in the case on appeal.

As Judge Posner explained in *Orthmann*, although the materials presented for the first time on appeal were "no part of the official record," the appellant, hoping "to show that the complaint should not have been dismissed on its face" could present "an unsubstantiated version of the events," so long as that story "was not inconsistent with the allegations of the complaint." *Orthmann*, supra n. 46, at 914-15.

The supplemental materials, he noted, "[were] usable to show how the accident might have happened." *Id.* at 915.

Here, the supplemental materials are usable to show how the breach of contract, fraud and deprivation of Constitutional rights might have happened, since much of the legislative history and statutory notes of 42 U.S.C. sec. 654 showing its <mark>preemptive</mark> effect on State legislation as well as State constitutions, and the State's prima facie Policy showing its "work-around" scheme to circumvent detection of its unlawful 12% compound interest through the creation of "two reports" that are then interchangeably used to cover up the unlawful 12% compound interest when certifying to Texas and to the United States, then another "report" when it enforces the unlawful 12% compound interest in the state's family court and intrastate under color of state law are usable to show how the breach of contract and fraud, as well as deprivation of Appellant's due process rights protected by 42 U.S.C. sec. 654 as well as Federal Constitutional rights happened with organized intent by the Appellees.

Appellant relies on the 2024 recently discovered **State Policy** to show how breach of contract, fraud and deprivation of Constitutional rights might have been established and, accordingly, why the district court should not have dismissed Appellant's complaint, not even without leave to amend.  Moreover, this evidence

corroborates the Amended Complaint filed in the concurrent matter before this Court of Appeals, in Appeal Case. No. 23-1967.

Accordingly, Appellant files this motion pursuant to the Court's inherent truth seeking function authority to supplement the record.

## II.  Federal Rules of Evidence 201

Under Fed. R. Evid. 201, federal courts of appeals can take judicial notice of highly indisputable facts or other court proceedings that directly relate to the issues on appeal. The record on appeal is subject to the right of an appellate court to take judicial notice of new developments not considered by the lower court." *See* e.g. *Landy v. FDIC*, 486 F.2d 139, 151 (3d Cir. 1973). Parties may in consequence seek to supplement the appellate record with new materials under Fed. R. Fed. 201.

Judicial Notice of Legislative Acts by Congress and Congressional statutory notes and texts that explicitly provide for the preemptive effect of 42 U.S.C. sec. 654 over State general laws and State constitutions, are under Fed. R. Evid. 201[a] Advisory Committee's note or are "established truths, facts or pronouncements that do not change from case to case" and "do not relate specifically to the…litigants." [*United States v. Gould*, 536 F.2d 216, 220 [8th Cir. 1976]]. In general, courts are free to take notice of legislative facts, including research data and writings like those cited in the famous "Brandeis briefs." Appellate courts take judicial notice of

such legislative facts, because they help them develop reasonable rules of law that will apply in future cases.

Appellant was not aware of the Rhode Island State Policy that prohibits the charging of interest rate in interstate cases until 2024, *see* Appellee Rhode Island Office of Child Support Services **Policy Exhibit A**. Therefore, this evidence was not available at the time final judgment was issued on October 19, 2023 in this matter. Judicial Notice, in aid of the court, is respectfully requested of it. Whether requesting or opposing judicial notice, litigants have a right to be heard on the issue under **Rule 201[e], therefore, Appellant requests a hearing on the issue under Rule 201(e).**

**Under Fed. R. Evid. 201[f]**, judicial notice of adjudicative facts may be taken at any stage of the proceedings, including on appeal. In practice, appellate courts frequently take judicial notice of both adjudicative and legislative facts presented for the first time on appeal, whether requested by a party or on their own initiative. See, e.g., *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 [2d Cir. 2002]; In *re Indian Palms Assoc. Ltd* ., 61 F.3d 197, 205 [3d Cir. 1995]. *See also, White v. Gaetz*, 588 F.3d 1135, 1137 n. 2 (7th Cir. 2009) (taking judicial notice of state court transcript). The federal courts of appeals may take judicial notice of a proceeding in another court if the proceeding

has a direct connection to the issues on appeal, *See Philips Med. Sys. Intl., B.V. v. Bruetman*, 982 F.2d 211, 215 (7th Cir. 1992).

Appellant respectfully requests the Court to take judicial notice under Fed. R. Evid. 201 of the attached Objection and Notice to Take Judicial Notice Pursuant to Fed. R. Evid 201 and 18 U.S.C. sec. 4 filed in Appeal No. 23-1967, Document: 00118126457 filed on March 29, 2024. See **Exhibit B**. Document: 00118126457.

Judicial Notice in practice is taken at any time of a proceeding, including for the first time on appeal, of legislative history and statutory amendments, etc.,, e.g., the legislative history of 42 U.S.C. sec. 654 regarding Congress's Amendment in 1996. This similarly applies to the State of Rhode Island's legislative history, to wit, the failure of Rhode Island Gen. Law. 15-5-16.5 to comply with the 1996 Amendment of 42 U.S.C. sec. 654. 42 U.S.C. sec. 654 makes it explicitly clear that such failures incur penalties. The fact that Rhode Island family court is a court of limited jurisdiction, as prescribed by R.I. Gen. Law. 8-10-3 where limited relief is authorized by State legislation is a matter of legislative fact, that in practice is judicially noted at any time of a proceeding, including for the first time on appeal.

Appellant attaches the above legislations, requesting judicial notice of Congress's publication of 42 U.S.C. sec. 654 that answers all threshold questions of jurisdiction. The Congressional 1996 Amendment for 42 U.S.C. sec. 654

*explicitly* make clear that 42 U.S.C. sec. 654 preempts State laws and State

constitutions, and mandates that participating States must change State laws and

amend State constitutions accordingly to comply with the 1996 Amendment

provisions of 42 U.S.C. sec. 654.  The pre-emptive effect of the explicit language

in the statutory provisions under Amendment 1996 of 42 U.S.C. sec. 654 make

clear that the State of Rhode Island is operating an unlawful State Plan that

unlawfully charges 12% compound interest on overdue support under color of state

law, which noncompliant state law is the basis of the current "State enforcement"

of its routine "court orders" charging 12% compound interest without jurisdiction.

Moreover, the fact that since 1996 Rhode Island falsely certified to the United

States for the past twenty-eight (28) years that its State laws are compliant with 42

U.S.C. sec. 654 violates Federal Criminal Codes, is a fact that this Court must take

judicial notice under Fed. R. Evid. 201, its inherent truth-seeking authority, and

under Appellant's invocation of 18 U.S.C. sec. 4.   Since a trial did not occur in

this matter, at this juncture the Court must take all factual allegations in the

Amended Complaint in this matter as true, and it plainly pleads that the State

Appellee represented to the Appellant in Texas that if Appellant paid $104,185.98

in one lump sum, Appellee Gero Meyersiek waived interest, and that the

$104,185.98 is a pay-off amount that does not include interest.  And this allegedly

enforceable interest was established under R.I. Gen Laws 15-5-16.5 that is

explicitly preempted by 42 U.S.C. sec. 654 upon Rhode Island's acceptance of participation in 42 U.S.C. sec. 654 since 1996, along with the 1996 Amendment's explicitly provided penalties for noncompliance – in Rhode Island's case, as shown by the posture of the Appellees in multiple jurisdictions, the noncompliance is willful and defiant.  Rhode Island is free to continue enforcing its 12% compound interest state law, but that, by Federal Law, requires withdrawing from participation in Title IV, per the plain language of Title IV-D, and paying the penalties it incurred and accrued since 1996 during Rhode Island's participation that amounts to up to billions of dollars, as explicitly provided for in 42 U.S.C. sec. 654 to make the United States whole.  To make Appellant whole, Appellant seeks millions of dollars in damages in this action at law.

Appellee Gero Meyersiek changed his mind after the Texas Appellant accepted the offer in Texas, performed and paid the lump sum $104,185.98.  The "changed his mind" entailed the action of "putting interest back on the system" that consists of 12% compound interest (see attached R.I.G.L. sec. 15-5-16.5.).

Since the State Plan that charges 12% compound interest, takes interest off the system only during certifications to the TEXAS and UNITED STATES authorities, and then puts interest back on the system when Appellee Gero Meyersiek "changed his mind" waiving interest after Texas Appellant performed on the terms of the agreement, it is abundantly clear that the Appellees,

government and private persons, operate a criminally unlawful State Plan. Since all Appellees participate in the "take interest off the system" when certifying to TEXAS and when certifying to the UNITED STATES the total support due, and since the State Policy provides for the creation of "two reports," Fed. R.Evidence 201 evidence is abundantly clear before this Court and before a panel of "some judges" pursuant to the pending Fed. R. App. P 8(a)(2)(D) motion supported by affidavit in Appeal No. 23-1967 of organized criminal fraud and the lack of jurisdiction of the limited jurisdiction state family court to issue orders for 12% compound interest on overdue support that 42 U.S.C. 654(21)(A) explicitly prohibits, this Court must take judicial notice of legislative and adjudicative facts relating to these critical matters materially relevant to this case.

For the convenience of the Judges of this Court, Appellant attached hereto Congress's publication of 42 U.S.C.. sec. 654, the RI Gen. Law 15-5-16.5.

Appellees' request to strike Fed. R. Evid. 201 evidence of crimes made known to "some judges" under 18 U.S.C. sec. 4 from the record in a matter that involves Appellees' organized criminal activity that violates, inter alia, 18 U.S.C. sec. 666 and 18 U.S.C. sec. 641, 18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false documents or false statements to a federal agency,18 U.S.C. § 1341 - mail fraud,

18 U.S.C. § 1343 - wire fraud by the Appellees is an obstruction of an official proceeding and an obstruction of justice.

Finally, undisputed Appellees' operational evidence that includes unlawful redactions made sense only after the availability in 2024 of the State Policy that evidences the State Plan operating an unlawful Child Support enforcement program by policy of creating "two reports" in interstate cases, one with the unlawful 12% compound interest to enforce under color of law, and one report for the purposes of making false claims, false certifications, and falsifying official government documents to unlawfully apply for Federal Title IV Program funding that the Appellees knew Rhode Island is ineligible for.  That amounts to billions of dollars of theft against the United States.

Emphatically, Congress intended, by making "some judge(s)"…"of the United States" to whom the commission of crimes is mandated to be made known, explicitly conferred the duty on Judges of the United States under Federal Criminal Law the same duty, obligations and responsibility acting as authorities under the United States, as the "other persons in civil or military authority under the United States" explicitly named in the federal criminal statute 18 U.S.C. sec. 4.  Appellant requested Judicial Notice under 18 U.S.C. sec. 4 to the "some judges" as the "person in authority under the United States" under 18 U.S.C. sec. 4.   Striking from the record Congressional legislation history of 42 U.S.C. sec. 654, State

legislation history, Rhode Island State Plan 42 U.S.C. sec. 654(3) State operating

and disbursement unit's Policy that are neither classified information nor

confidential or privileged information to the United States are further not in the

interest of the United States.

Striking evidence that shows $0.00 interest on a December 6, 2021

screenshot of the Appellee-operated 42 U.S.C. sec. 654a automated data

processing and information retrieval system accomplishes nothing other than

taking as true the factual allegations in the Amended Complaint that details

Appellant being shown the $0.00 Under Interest generated by the automated data

processing and information retrieval system.  The Fed. R. Evid. visual evidence

aids the court to visualize the truth of Appellant's factual allegations.

Striking evidence of a screenshot of the Appellee-operated 42 U.S.C. sec.

654a automated data processing and information retrieval system that shows $0.00

Payment for Appellant's whopping lump sum $104,185.98 December 7, 2021

payment accomplishes nothing, when the screenshot is a visual evidence of the

"two reports" explicitly stated in the Appellee State Policy to create "two reports"

that consist of falsified records – these are evidence in the aid of the court of

Appellant's 18 U.S.C. sec. 4 and Fed. R. Evid. request to take judicial notice of

activities that harm the United States and steal from Federal Program Funds.

This case is related to Appeal No. 23-1967 and Appeal No. 23-1978.

**Under Fed. R. Evid. 201[f]**, judicial notice of adjudicative facts may be taken at any stage of the proceedings, including on appeal. In practice, appellate courts frequently take judicial notice of both adjudicative and legislative facts presented for the first time on appeal, whether requested by a party or on their own initiative. See, e.g., *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 [2d Cir. 2002]; In re *Indian Palms Assoc. Ltd* ., 61 F.3d 197, 205 [3d Cir. 1995].

Appellate courts take judicial notice of facts that were not available to litigants at trial and events that occurred after judgment was entered. For example, courts have taken judicial notice of guilty pleas entered in a related criminal case after judgment in the civil case was entered. See, e.g., *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 [4th Cir. 1989]. Similarly, appellate courts have taken judicial notice of post-judgment changes in the conditions in a foreign country relevant to an immigration appeal, *Ivezaj v. INS* , 84 F.3d 215, 218-19 [6th Cir. 1996], as well as post-trial changes in the racial composition of a state's judiciary in a discrimination suit. *Southern Christian Leadership Conference of Alabama v. Sessions*, 56 F.3d 1281, 1288 n.13 [11th Cir. 1995].

Certain categories of facts have long been the subject of judicial notice on appeal. Courts routinely take judicial notice of pleadings and records in other court cases [see, e.g., *Green v. Warden*, U.S. Penitentiary, 699 F.2d 364, 369 [7th Cir. 1983]; *E.I. du Pont de Nemours & Co. Inc. v. Cullen*, 791 F.2d 5, 7 [1st Cir. 1986]] and in administrative agency proceedings [see, e.g., *Opeka v. INS*, 194 F.3d 392, 394-95 [7th Cir. 1996]], Courts are generally willing to take judicial notice of data, pronouncements and publications issued by the government, such as Environmental Protection Agency research [*Nebraska v. EPA*, 331 F.3d 995, 998 n.3 [D.C. Cir. 2003]]; State Department travel warnings [*Parsons v. United Tech. Corp* ., 700 A.2d 655, 665 n.18 [Conn. 1997]]; and a federal fisheries management plan approved by formal rule [*City of Charleston v. A Fisherman's Best Inc*., 310 F.3d 155, 172 [4th Cir. 2002], cert. denied, 123 S.Ct. 2573 [2003]]. Appellate courts are also likely to take judicial notice of relevant newspaper articles [see, e.g., *The Washington Post v. Robinson*, 935 F.2d 282, 291-92 [D.C. Cir. 1991]] and historical information contained in authoritative publications, such as a text on the history of Lincoln Center [see, e.g., Hotel Employees, 311 F.3d at 540 n.1.].

Courts take judicial notice of online information.  Appellate courts have increasingly cited information found on the Internet. In today's digital courts, all court information filed in concurrent and related state court proceedings are available online, on government websites, such as Rhode Island's digital courts

where this Federal Appeals Court should by the plain textual language of Rhode Island Rules and Practice Rule 5 relating to access to court information (that denies the Public and pro-se litigants remote access), should have no trouble accessing court information through Rhode Island's digital courts' online portal.  Rhode Island's judge-created laws regarding all relating cases enforcing the 12% compound interest published online should also be available to this Federal Court online under the Government Edicts Doctrine (although they are accessible to the Public and to the pro-se litigants) – see *Georgia v.  Public.Resource.Org, Inc.,* 590 U.S. ___ (2020).  As with hard-copy publications, courts are most willing to take judicial notice of information found on government Web sites, such as the time of sunrise found on the Web site of the U.S. Naval Observatory [*U.S. v. Bervaldi*, 226 F.3d 1256, 1266 n.9 [11th Cir. 2000]]; the prime interest rate on the Federal Reserve Board Web site [*Levan v. Capital Cities/ABC Inc.*, 190 F.3d 1230, 1235 n.12 [11th Cir. 1999]]; and records of retired military personnel on a federal Web site [*Denius*, 330 F.3d at 926]. Courts have even been willing to take judicial notice of information on arguably less reliable commercial Internet sites, including mileage information on Mapquest [*In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 731 n.12 [W.D. La. 1999]]; historical information on Liberia on the "Geocities" Web site [*Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 278 n.2 [S.D.N.Y. 1999]]; and information regarding a bank's ownership from the bank's

Web site [see *Laborers' Pension Fund v. Blackmore Sewer Constr. Inc.*, 298 F.3d 600, 607 [7th Cir. 2002]].  Therefore, information on the complete extent of Rhode Island's citizenry harmed by the State's unlawful establishment and enforcement of the unlawful and Title IV-D-preempted 12% compound interest under color of state law that is available online on Rhode Island's Government's Digital Courts Website, is *reliable*, is *judge-created by state judges*, and is directly related to the Amended Complaint, motion to amend complaint *nunc pro tunc*, the September 28, 2023 judgment in this matter, and the State Policy attached in Exhibit A that was available to the Appellant in 2024, after the Appellant filed her Opening Brief in 2023 pursuant to the Court's Briefing schedule.

The use of judicial notice spans a wide spectrum of cases, from the most historically significant-such as Chief Justice Earl Warren's reliance in *Brown v. Board of Ed.*, 347 U.S. 483, 494 n.11 [1954], on scholarly publications documenting the effect of segregated schools on minority children-to the most mundane, such as the 2d U.S. Circuit Court of Appeals' judicial notice of the "traditional features of a snowman." *Eden Toys Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 n.1 [2d Cir. 1982].

In general, courts are free to take notice of legislative facts, including research data and writings like those cited in the famous "Brandeis briefs." Appellate courts are understandably more willing to take judicial notice of such

legislative facts, because they help them develop reasonable rules of law that will apply in future cases. "Legislative facts," which are facts of general "relevance to legal reasoning and the lawmaking process" [Fed. R. Evid. 201[a] Advisory Committee's note] or are "established truths, facts or pronouncements that do not change from case to case" and "do not relate specifically to the…litigants." [*United States v. Gould*, 536 F.2d 216, 220 [8th Cir. 1976]].  42 U.S.C. sec. 654 relates to all interested parties and the United States, and are established truths and facts that do not change from case to case, and do not specifically only apply just to this matter.  Likewise R.I. Gen. Laws. Sec, 15-5-16.5 relates to all interested parties and the United States, not just to this matter.  Likewise the Appellees' State Policy prohibiting the charging of interest in interstate cases and creating "two reports" from the policy adjustments to the 42 U.S.C. sec. 654a automated data processing and information retrieval system is established truths and facts that do not change from case to case, and do not specifically only apply just to this matter.  The resultant Screenshot evidence of the resulting false records created by the "two reports" do not change because Rhode Island creates two reports in intrastate cases in order to evade detection of the unlawful 12% compound interest under color of state law, one for enforcement under color of law, one for false certification of State Plan compliance to the United States Title IV Program.  While full suite of issues concerning State noncompliance with 42 U.S.C. sec. 654 this Court notices

under the *Turner v. Rogers Amicus Brief* submitted by the United States can be

noticed on the Court's own initiative, however, the full suite of the issues

contained therein made sense of the State Policy that was not available to the

Appellant under 2024 – nevertheless, Appellant makes known this evidence to the

judges of the First Circuit Court of Appeals under 18 U.S.C. sec. 4 and Fed. R.

Evid. 201.

As such, all public truths and facts and publications "made known" to this Court

under **18 U.S.C. sec. 4** and **Fed. R. Evid. 201** should be judicially noticed.

Appellant attaches the Brief hereto.

Appellant declares under **Fed. R. Evid. 201 and 28 U.S.C. sec. 1746(2),**
**that all the facts "made known" to the United States Panel of Judges invoking**
**18 U.S.C. sec. 4 and/or Fed. R. Evid. 201 in Appellant's Notice of the**
**Commission of Facts are true to the best of Appellant's knowledge.**

**Appellant attaches hereto the 18 U.S.C. sec. 4 materials that are subject**
**of this Fed. R. Evid. 201 Motion to Take Judicial Notice.**

Accordingly, Appellant requests judicial notice of the documents attached

here to.  Pursuant to **Fed. R. Evidence 201(e)**, Appellant requests by right a

hearing.

## **CONCLUSION**

For the above reasons the Court should consolidate Appeal No. 23-1967 and

Appeal No. 23-1978.

Respectfully submitted,

Mary Seguin
Pro Se
/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: March 31, 2024

## **CERTIFICATE OF SERVICE**

This is to certify that the foregoing instrument has been served via the
Court's ECF filing system on March 31, 2024, on all registered counsel of record,
and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

EXHIBIT I.

**Form 1A**

**Notice of Appeal to a Court of Appeals From a Judgment of a District Court**

United States District Court for the
District of Rhode Island
Docket Number 1:23-cv-126-WES-PAS

| | |
|---|---|
| MARY SEGUIN, Plaintiff<br><br>v.<br><br>RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;<br>RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official | **Notice of Appeal** |

capacity; RHODE ISLAND
SUPERIOR COURT JUDICIAL
COUNCIL in its official capacity;
THE JUDICIAL TECHNOLOGY
CENTER in its official capacity;
JULIE HAMIL, MARISA BROWN,
JOHN JOSEPH BAXTER, JR.,
JUSTIN CORREA in their
individual and official capacities;
RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its
official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY
GENERAL OPEN GOVERNMENT
UNIT in its official capacity; ADAM
D. ROACH, PETER NERONHA in
their official and individual
capacities; TYLER
TECHNOLOGIES, INC.; GERO
MEYERSIEK, Defendants

MARY SEGUIN (name all parties taking the appeal)* appeals to the United States Court of Appeals for the FIRST Circuit from the final judgment entered on October 19, 2023 (state the date the judgment was entered).

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 17, 2023

---

* See Rule 3(c) for permissible ways of identifying appellants.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                                   Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

> *Defendants*

## PLAINTIFF'S DOCKETING STATEMENT TO THE UNITED STATES COURT

## OF APPEALS FOR THE FIRST CIRCUIT AND THE UNITED STATES DISTRICT

## COURT OF THE DISTRICT OF RHODE ISLAND

1. Plaintiff, proceeding pro se from and as a citizen of Texas, respectfully states to the

   U.S. Court of Appeals for the First Circuit and the United States District Court of the

   District of Rhode Island that this case is related to the pending appellate case, *Mary*

   *Seguin v. Rhode Island Office of Child Support Services, et al*, Case Number 23-1851.

2. Plaintiff respectfully requests the U.S. Court of Appeals for the First Circuit to review Plaintiff's timely filed Rule 59 Motion and Rule 60 Motion that were filed in the U.S. District Court of the District of Rhode Island on November 16, 2023 as proper part of the record of appeal.  Prior to filing this Notice of Appeal, Plaintiff also filed a Rule 60(b)(1) Motion regarding the District Court's interference with Plaintiff's right to file Rule 59 and Rule 60 post judgement in which Plaintiff sought to preserve issues for appeal on the record.  Plaintiff attaches all relevant documentation, including all relevant emails to the Clerk of the Court of the District Court and Plaintiff's properly filed post judgment motions pursuant to Rule 59 and Rule 60 herein to this Notice of Appeal and Docket Statement.

3. Plaintiff's Rule 59 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

4. Plaintiff's first Rule 60 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

5. Plaintiff attaches the aforesaid post judgment Motions and requests appellate review under these extraordinary and troubling factual circumstances that violate and obstruct the fundamental First Amendment right of access to the Court of Record, due process and obstruction to justice in the First Circuit, and *inter alia*, interference with the accuracy of the court's record for appeal in this matter.


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 16, 2023, I filed the within Motion with the

Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 17, 2023

No. 23-1978

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official
capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their
individual and official capacities; Rhode Island OFFICE OF Child Support
Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK
DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN,
LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN,
JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities;
RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A.
SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF
RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND
ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity;
RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in
its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official
capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE
JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL,
MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their
individual and official capacities; RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF
THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual
capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Defendants-Appellees.

Appeal from the United States District Court for the District of Rhode Island

————————————

**APPELLANT'S SUPPLEMENTAL SHOW CAUSE IN SUPPORT OF
APPELLANT'S MOTION TO CONSOLIDATE**

————————————

Appellant, MARY SEGUIN, respectfully supplement Appellant's Show
Cause (filed on March 31, 2024) with the following documentary proof, namely
the district court's Clerk's Certificate and Appellate Cover Sheet **ECF 33**, that the
district court's ***functus officio*** actions taken subsequent to the November 17, 2023
filing of the Notice of Appeal of Judgment are void. In the section under "Record
Information," the district clerk checked off "**NO**" as to ***whether motions are
pending***, **proving** that at the time of the filing of the Notice of Appeal of the final
judgment on November 17, 2023, **NO MOTIONS WERE PENDING**, per the
district court clerk's **certification**. This certification is electronically signed by
district court Deputy Clerk Meghan Kenny.

The Appeal **divested** the district court of power to modify its pre-Appeal
orders or take other actions affecting the cause without permission from the court
of appeals. Since the district court clerk certified on the date of the Appeal on
November 17, 2023 that there were **NO** pending motions (see **ECF 33**), the
***functus officio*** judge William Smith's post-appeal actions affecting the cause

without permission from the court of appeals are <mark>**void**</mark>. His actions ***interfered*** with the cause without permission from the court of appeals.

This appeal of the district court's November 20, 2023 ***functus officio*** Text Order appeals the ***functus officio*** November 20, 2023 Text order and actions taken by the district court from November 20, 2023 onward.

In aid of the Court, Appellant attaches the screenshot of <mark>**ECF 33**</mark> below, and requests judicial notice pursuant to Fed. R. of Evid. 201 of this undisputable fact:

Case 1:23-cv-00126-WES-PAS   Document 33   Filed 11/17/23   Page 1 of 1 PageID #: 931

**UNITED STATES DISTRICT COURT**
*District of Rhode Island*

**CLERK'S CERTIFICATE AND APPELLATE COVER SHEET**
**ABBREVIATED ELECTRONIC RECORD**

| Case Information | | |
|---|---|---|

Case Caption: **Seguin**   vs.   **RI Dept of Human Services**

District Court Number: **1:23cv126-WES-PAS**   Presiding Judge: **Judge Smith**

Notice of Appeal filed by: **Plaintiff**   Notice of Appeal document number: **32**

Appeal from: **Text Order dated 11/17/2023 and Text Order dated 11/17/2023**

Other information:

Fee status: **Due**   Pro se case: Yes ☑ No ☐

Emergency or requires expedition: **No**   *If yes, reason:*

| Record Information | | |
|---|---|---|

Motions Pending   Yes ☐ No ☑
*If yes, document #*

Other record information:

Related case(s) on appeal:

| Certification | | |
|---|---|---|

I, Hanorah Tyer-Witek, Clerk of the United States District Court for the District of Rhode Island, do certify that the following annexed electronic documents constitute the abbreviated record on appeal in the above referenced case:

**HANORAH TYER-WITEK**
Clerk of Court
**/s/ Meghan Kenny**
Deputy Clerk

Date: **11/17/2023**

Appellant attaches herewith in **Exhibit A**, the Clerk's Certificate and

Appellate Cover Sheet **ECF 33.**

The *functus officio* jurisdiction-divested district court judge's post-appeal

*functus officio* actions that are under appeal have interfered with the cause of the

appeal of the final judgment.  The *functus officio* district court actions interfered

with the Appellant's right to amend the appeal.

The *functus officio* district court's void post-appeal actions interfered with

Appellant's right to amend the appeal in Appeal No. 23-1967.

The functus district court's void post-appeal actions interfering with

Appellant's right to amend the appeal in No. 23-1967 necessitated a third Notice of

Appeal to be filed appealing the district court's denials of the Appellant's FRAP 4

motions for extension of time to amend the appeal – Appellant filed the extension

of time pursuant to the Court of Appeal's late-hour March 1, 2024 Court order in

Appeal No. 23-1967 vacating the briefing schedule there out of confusion over the

altered record on appeal that the *functus officio* district court altered without

authority and unlawfully, intentionally.  Judge William E. Smith, prior to his

federal judicial appointment, was the Chief outside counsel for the Appellee Rhode

Island political subdivisions under the State Plan under Title IV of the Social

Security Act, from 1996 to 2002, and had advised the Appellee Rhode Island

political subdivisions on the State's noncompliant charge of 12% compound

interest that violates 42 U.S.C. sec. 654(21)(A) (which permits only 0%-6% simple

interest), and the State's unlawful and organized cover-up circumventing practices

of making manual adjustments to the automated data processing and information

retrieval system through the ***removal*** of the unlawful 12% compound interest

whenever the State certifies the accounting fraud as a "true account," whether to

other states, like TEXAS, for enforcement cooperations under 42 U.S.C. sec. 666,

or to the United States for the unlawful procurement of federal funding under the

Title IV Programs.  Because Rhode Island knows violations of 42 U.S.C. sec. 654

incurs tens of millions of penalties in a fiscal year and may cause it to lose TANF

funding, and the willful violation may cause it to become ineligible to participate

in Title IV Programs, Rhode Island engages in systemic cover up, accounting

fraud, falsification of government records and false certifications, all of which

Judge William Smith had advised to as the Chief outside counsel for Rhode Island

political subdivisions and the Rhode Island Appellees.  This is essentially a cover

up of organized unlawful theft of TEXAS, theft of the United States and theft of

targeted unsuspecting noncustodial parent victims under color of Rhode Island

state law.

The Notice of Appeal of the November 20, 2023 Text Order in this matter

encompasses the void district court actions from November 20, 2023 onward, as

well as the self-executing disqualification of the district court judge is one of the cause of appeal in this matter.

In aid of the Court, the Appellant attaches herewith in **Exhibit B** , (**ECF 59**) the Notice of Appeal, filed on April 1, 2024, appealing from the district court's March 7th, 2024, March 8th, 2024 and March 11th, 2024 Text Orders.

Appellant appeals to the United States Court of Appeals for the FIRST Circuit from all the ***functus officio*** modifications to the district court's orders or ***functus officio*** actions taken in the district court after the filing of the appeal on November 17, 2023, affecting the cause without permission from the court of appeals.

Appellant appeals to the United States Court of Appeals for the FIRST CIRCUIT from the ***functus officio*** actions taken in the district court after the filing of the appeal on November 17, 2023 (ECF 32), affecting the cause without permission from the court of appeals, that moreover deprived Plaintiff's right to file an amended notice of appeal.

Appellant appeals to the United States Court of Appeals for the FIRST CIRCUIT and filed that direct attack on the ***functus officio* void** actions taken in the district court without jurisdiction or without authority after the filing of the appeal on November 17, 2023 (ECF 32), affecting the cause without permission

from the court of appeals. The appeal divested the district court of authority to modify the TWO November 17, 2023 Text Orders appealed from (ECF 32) or take other actions affecting the cause without permission from the court of appeals.

Appellant appeals to the United States Court of Appeals for the FIRST CIRCUIT the matter of the self-executing disqualification of the ***functus officio*** district court Judge William E. Smith.

Appellant **appeals to the Court of Appeals for the FIRST CIRCUIT from Post-Appeal Orders and Actions Taken by the District Court Affecting the Cause under appeal.**

> By way of visual illustration in support of this Show Cause, and in aid of the Court, Appellant further attaches herewith a screenshot of ECF 33-1, of page 9 of 92, that corroborates with the clerk's certification of the record on appeal (ECF 33) certifying that there were **NO** pending motions at the time of the filing of the Notice of Appeal of the Final Judgment on November 17, 2023:

| | | |
|---|---|---|
| | | (D.R.I.), it is further ORDERED that the Courts March 30, 2023, Text Order granting Plaintiff Leave to Proceed as a Pro Se Electronic Filer is VACATED. Plaintiff's Electronic Filer privileges are revoked. See LR Gen 302(b). So Ordered by District Judge William E. Smith on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 10/19/2023 | 31 | JUDGMENT. So Ordered by Clerk of Court on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's two recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) Modified on 11/17/2023 to correct a typo. (Urizandi, Nissheneyra). (Entered: 11/17/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) (Entered: 11/17/2023) |
| 11/17/2023 | 32 | NOTICE OF APPEAL by Mary Seguin as to Text Order, Text Order, **NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** Appeal Record due by 11/24/2023. (Attachments: # 1 Envelope)(Kenny, Meghan) (Entered: 11/17/2023) |

Accordingly, Appellant requests judicial notice of the documents attached here to and screenshots of the documents affixed to the text of this Show Cause response to the Court.  Pursuant to **Fed. R. Evidence 201(e)**, Appellant requests by right a hearing.

## **CONCLUSION**

For the above reasons the Court should consolidate Appeal No. 23-1967 and Appeal No. 23-1978.

Respectfully submitted,

Mary Seguin
Pro Se
/s/_____ *Mary Seguin*
Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: April 2, 2024

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system on April 2, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/_____ *Mary Seguin*
Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019



## UNITED STATES DISTRICT COURT
### *District of Rhode Island*

### CLERK'S CERTIFICATE AND APPELLATE COVER SHEET
### ABBREVIATED ELECTRONIC RECORD

**Case Information**

Case Caption: **Seguin**  vs.  **RI Dept of Human Services**

District Court Number: **1:23cv126-WES-PAS**  Presiding Judge: **Judge Smith**

Notice of Appeal filed by: **Plaintiff**  Notice of Appeal document number: **32**

Appeal from: **Text Order dated 11/17/2023 and Text Order dated 11/17/2023**

Other information:

Fee status: **Due**  Pro se case: Yes ✔  No

Emergency or requires expedition: **No**  If yes, reason:

**Record Information**

Motions Pending  Yes  No ✔
If yes, document #

Other record information:

Related case(s) on appeal:

**Certification**

I, Hanorah Tyer-Witek, Clerk of the United States District Court for the District of Rhode Island, do certify that the following annexed electronic documents constitute the abbreviated record on appeal in the above referenced case:

**HANORAH TYER-WITEK**
Clerk of Court

Date: **11/17/2023**

/s/ Meghan Kenny

Deputy Clerk

Exhibit A



# UNITED STATES DISTRICT COURT
*District of Rhode Island*

### CLERK'S CERTIFICATE AND APPELLATE COVER SHEET
### ABBREVIATED ELECTRONIC RECORD

| Case Information |
|---|

Case Caption: **Seguin**      vs. **RI Dept of Human Services**

District Court Number: **1:23cv126-WES-PAS**      Presiding Judge: **Judge Smith**

Notice of Appeal filed by: **Plaintiff**      Notice of Appeal document number: **32**

Appeal from: **Text Order dated 11/17/2023 and Text Order dated 11/17/2023**

Other information:

Fee status: **Due**      Pro se case:   Yes ✔   No ☐

Emergency or requires expedition: **No**   *If yes, reason:*

| Record Information |
|---|

Motions Pending   Yes ☐   No ✔
*If yes, document #*

Other record information:

Related case(s) on appeal:

| Certification |
|---|

I, Hanorah Tyer-Witek, Clerk of the United States District Court for the District of Rhode Island, do certify that the following annexed electronic documents constitute the abbreviated record on appeal in the above referenced case:

**HANORAH TYER-WITEK**
Clerk of Court

**/s/ Meghan Kenny**

Deputy Clerk

Date: **11/17/2023**

Exhibit B

**Notice of Appeal to a Court of Appeals From Post-Appeal Orders of a District Court**

United States District Court for the District of Rhode Island
Docket Number 1:23-cv-126-WES-PAS

| | |
|---|---|
| MARY SEGUIN, Plaintiff<br><br>v.<br><br>RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;<br>RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL TECHNOLOGY | **Notice of Appeal** |

CENTER in its official capacity;
JULIE HAMIL, MARISA BROWN,
JOHN JOSEPH BAXTER, JR.,
JUSTIN CORREA in their
individual and official capacities;
RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its
official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY
GENERAL OPEN GOVERNMENT
UNIT in its official capacity; ADAM
D. ROACH, PETER NERONHA in
their official and individual
capacities; TYLER
TECHNOLOGIES, INC.; GERO
MEYERSIEK, Defendants

Plaintiff, MARY SEGUIN (name all parties taking the appeal),* appeals to the United States Court of Appeals for the FIRST Circuit from the Text Orders entered on March 7, 2024, on March 8, 2024 and on March 11, 2024.

Plaintiff, MARY SEGUIN, appeals to the United States Court of Appeals for the FIRST Circuit all the *functus officio* modifications to the district court's orders or *functus officio* actions taken in the district court after the filing of the appeal on November 17, 2023, affecting the cause without permission from the court of appeals.

Plaintiff, MARY SEGUIN, appeals to the United States Court of Appeals for the FIRST CIRCUIT the *functus officio* actions taken in the district court after the filing of the appeal on November 17, 2023 (ECF 32), affecting the cause without permission from the court of appeals, that moreover deprived Plaintiff's right to file an amended notice of appeal.

Plaintiff, MARY SEGUIN, appeals to the United States Court of Appeals for the FIRST CIRCUIT this direct attack on the *functus officio* **void** actions taken in the district court without jurisdiction or without authority after the filing of the appeal on November 17, 2023 (ECF 32), affecting the cause without permission from the court of appeals. The appeal divested the district court of authority to modify the TWO November 17, 2023 Text Orders appealed from (ECF 32) or take other actions affecting the cause without permission from the court of appeals.

Plaintiff, MARY SEGUIN, appeals to the United States Court of Appeals for the FIRST CIRCUIT the matter of the self-executing disqualification of the *functus officio* district court Judge William E. Smith.

---

* See Rule 3(c) for permissible ways of identifying appellants.

**Plaintiff, MARY SEGUIN, appeals to the Court of Appeals for the FIRST CIRCUIT from Post-Appeal Orders and Actions Taken by the District Court Affecting the Cause under appeal.**

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX 77019

Dated: April 1, 2024

No. 23-1978

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official
capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their
individual and official capacities; Rhode Island OFFICE OF Child Support
Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK
DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN,
LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN,
JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities;
RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A.
SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF
RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND
ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity;
RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in
its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official
capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE
JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL,
MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their
individual and official capacities; RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF
THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual
capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Defendants-Appellees.

Appeal from the United States District Court for the District of Rhode Island

_____

**APPELLANT'S SUPPLEMENTAL SHOW CAUSE IN SUPPORT OF
APPELLANT'S MOTION TO CONSOLIDATE**

_____

Appellant, MARY SEGUIN, respectfully supplement Appellant's Show
Cause (filed on March 31, 2024) with the following documentary proof, namely
the district court's Clerk's Certificate and Appellate Cover Sheet **ECF 33**, that the
district court's *functus officio* actions taken subsequent to the November 17, 2023
filing of the Notice of Appeal of Judgment are void.  In the section under "Record
Information," the district clerk checked off "**NO**" as to *whether motions are
pending*, **proving** that at the time of the filing of the Notice of Appeal of the final
judgment on November 17, 2023, **NO MOTIONS WERE PENDING**, per the
district court clerk's **certification**.  This certification is electronically signed by
district court Deputy Clerk Meghan Kenny.

The Appeal **divested** the district court of power to modify its pre-Appeal
orders or take other actions affecting the cause without permission from the court
of appeals.  Since the district court clerk certified on the date of the Appeal on
November 17, 2023 that there were **NO** pending motions (see **ECF 33**), the
*functus officio* judge William Smith's post-appeal actions affecting the cause

without permission from the court of appeals are <mark>**void**</mark>. His actions ***interfered*** with the cause without permission from the court of appeals.

This appeal of the district court's November 20, 2023 <mark>***functus officio***</mark> Text Order appeals the <mark>***functus officio***</mark> November 20, 2023 Text order and actions taken by the district court from November 20, 2023 onward.

In aid of the Court, Appellant attaches the screenshot of <mark>**ECF 33**</mark> below, and requests judicial notice pursuant to Fed. R. of Evid. 201 of this undisputable fact:



Appellant attaches herewith in **<u>Exhibit A</u>**, the Clerk's Certificate and
Appellate Cover Sheet **<u>ECF 33.</u>**

The ***functus officio*** jurisdiction-divested district court judge's post-appeal
***functus officio*** actions that are under appeal have interfered with the cause of the
appeal of the final judgment.  The ***functus officio*** district court actions interfered
with the Appellant's right to amend the appeal.

The ***functus officio*** district court's void post-appeal actions interfered with
Appellant's right to amend the appeal in Appeal No. 23-1967.

The functus district court's void post-appeal actions interfering with
Appellant's right to amend the appeal in No. 23-1967 necessitated a third Notice of
Appeal to be filed appealing the district court's denials of the Appellant's FRAP 4
motions for extension of time to amend the appeal – Appellant filed the extension
of time pursuant to the Court of Appeal's late-hour March 1, 2024 Court order in
Appeal No. 23-1967 vacating the briefing schedule there out of confusion over the
altered record on appeal that the ***functus officio*** district court altered without
authority and unlawfully, intentionally.  Judge William E. Smith, prior to his
federal judicial appointment, was the Chief outside counsel for the Appellee Rhode
Island political subdivisions under the State Plan under Title IV of the Social
Security Act, from 1996 to 2002, and had advised the Appellee Rhode Island

political subdivisions on the State's noncompliant charge of 12% compound interest that violates 42 U.S.C. sec. 654(21)(A) (which permits only 0%-6% simple interest), and the State's unlawful and organized cover-up circumventing practices of making manual adjustments to the automated data processing and information retrieval system through the ***removal*** of the unlawful 12% compound interest whenever the State certifies the accounting fraud as a "true account," whether to other states, like TEXAS, for enforcement cooperations under 42 U.S.C. sec. 666, or to the United States for the unlawful procurement of federal funding under the Title IV Programs. Because Rhode Island knows violations of 42 U.S.C. sec. 654 incurs tens of millions of penalties in a fiscal year and may cause it to lose TANF funding, and the willful violation may cause it to become ineligible to participate in Title IV Programs, Rhode Island engages in systemic cover up, accounting fraud, falsification of government records and false certifications, all of which Judge William Smith had advised to as the Chief outside counsel for Rhode Island political subdivisions and the Rhode Island Appellees. This is essentially a cover up of organized unlawful theft of TEXAS, theft of the United States and theft of targeted unsuspecting noncustodial parent victims under color of Rhode Island state law.

The Notice of Appeal of the November 20, 2023 Text Order in this matter encompasses the void district court actions from November 20, 2023 onward, as

well as the self-executing disqualification of the district court judge is one of the cause of appeal in this matter.

In aid of the Court, the Appellant attaches herewith in **Exhibit B** , (**ECF 59**) the Notice of Appeal, filed on April 1, 2024, appealing from the district court's March 7th, 2024, March 8th, 2024 and March 11th, 2024 Text Orders.

Appellant appeals to the United States Court of Appeals for the FIRST Circuit from all the *functus officio* modifications to the district court's orders or *functus officio* actions taken in the district court after the filing of the appeal on November 17, 2023, affecting the cause without permission from the court of appeals.

Appellant appeals to the United States Court of Appeals for the FIRST CIRCUIT from the *functus officio* actions taken in the district court after the filing of the appeal on November 17, 2023 (ECF 32), affecting the cause without permission from the court of appeals, that moreover deprived Plaintiff's right to file an amended notice of appeal.

Appellant appeals to the United States Court of Appeals for the FIRST CIRCUIT and filed that direct attack on the *functus officio* **void** actions taken in the district court without jurisdiction or without authority after the filing of the appeal on November 17, 2023 (ECF 32), affecting the cause without permission

from the court of appeals. The appeal divested the district court of authority to modify the TWO November 17, 2023 Text Orders appealed from (ECF 32) or take other actions affecting the cause without permission from the court of appeals.

Appellant appeals to the United States Court of Appeals for the FIRST CIRCUIT the matter of the self-executing disqualification of the ***functus officio*** district court Judge William E. Smith.

Appellant **appeals to the Court of Appeals for the FIRST CIRCUIT from Post-Appeal Orders and Actions Taken by the District Court Affecting the Cause under appeal.**

By way of visual illustration in support of this Show Cause, and in aid of the Court, Appellant further attaches herewith a screenshot of ECF 33-1, of page 9 of 92, that corroborates with the clerk's certification of the record on appeal (ECF 33) certifying that there were <mark>**NO**</mark> pending motions at the time of the filing of the Notice of Appeal of the Final Judgment on November 17, 2023:

| | | |
|---|---|---|
| | | (D.R.I.), it is further ORDERED that the Courts March 30, 2023, Text Order granting Plaintiff Leave to Proceed as a Pro Se Electronic Filer is VACATED. Plaintiff's Electronic Filer privileges are revoked. See LR Gen 302(b). So Ordered by District Judge William E. Smith on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 10/19/2023 | 31 | JUDGMENT. So Ordered by Clerk of Court on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's two recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) Modified on 11/17/2023 to correct a typo. (Urizandi, Nissheneyra). (Entered: 11/17/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) (Entered: 11/17/2023) |
| 11/17/2023 | 32 | NOTICE OF APPEAL by Mary Seguin as to Text Order, Text Order, **NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at  http://www.ca1.uscourts.gov/cmecf** Appeal Record due by 11/24/2023. (Attachments: # 1 Envelope)(Kenny, Meghan) (Entered: 11/17/2023) |

Accordingly, Appellant requests judicial notice of the documents attached here to and screenshots of the documents affixed to the text of this Show Cause response to the Court.  Pursuant to **Fed. R. Evidence 201(e)**, Appellant requests by right a hearing.

## **CONCLUSION**

For the above reasons the Court should consolidate Appeal No. 23-1967 and Appeal No. 23-1978.

Respectfully submitted,

Mary Seguin
Pro Se
/s/_____Mary Seguin_____

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX 77019

Dated: April 2, 2024

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system on April 2, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/_____Mary Seguin_____

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX 77019



# UNITED STATES DISTRICT COURT
## *District of Rhode Island*

### CLERK'S CERTIFICATE AND APPELLATE COVER SHEET
### ABBREVIATED ELECTRONIC RECORD

| Case Information |
|---|

Case Caption: **Seguin**          vs.   **RI Dept of Human Services**

District Court Number: **1:23cv126-WES-PAS**   Presiding Judge: **Judge Smith** ▼

Notice of Appeal filed by: **Plaintiff** ▼    Notice of Appeal document number: **32**

Appeal from: **Text Order dated 11/17/2023 and Text Order dated 11/17/2023**

Other information:

Fee status: **Due** ▼      Pro se case:   Yes ✔   No ☐

Emergency or requires expedition: **No** ▼  *If yes, reason:*

| Record Information |
|---|

Motions Pending   Yes ☐   No ✔
*If yes, document #*

Other record information:

Related case(s) on appeal:

| Certification |
|---|

I, Hanorah Tyer-Witek, Clerk of the United States District Court for the District of Rhode Island, do certify that the following annexed electronic documents constitute the abbreviated record on appeal in the above referenced case:

**HANORAH TYER-WITEK**
Clerk of Court
/s/ Meghan Kenny
Deputy Clerk

Date: **11/17/2023**

Exhibit A



# UNITED STATES DISTRICT COURT
## *District of Rhode Island*

### CLERK'S CERTIFICATE AND APPELLATE COVER SHEET
### ABBREVIATED ELECTRONIC RECORD

| Case Information |
|---|

Case Caption: **Seguin**               vs. **RI Dept of Human Services**

District Court Number: **1:23cv126-WES-PAS**        Presiding Judge: **Judge Smith**

Notice of Appeal filed by: **Plaintiff**          Notice of Appeal document number: **32**

Appeal from: **Text Order dated 11/17/2023 and Text Order dated 11/17/2023**

Other information:

Fee status: **Due**          Pro se case:     Yes ✔    No ☐

Emergency or requires expedition: **No**     *If yes, reason:*

| Record Information |
|---|

Motions Pending     Yes ☐    No ✔
*If yes, document #*

Other record information:

Related case(s) on appeal:

| Certification |
|---|

I, Hanorah Tyer-Witek, Clerk of the United States District Court for the District of Rhode Island, do certify that the following annexed electronic documents constitute the abbreviated record on appeal in the above referenced case:

**HANORAH TYER-WITEK**
Clerk of Court

**/s/ Meghan Kenny**

Deputy Clerk

Date: **11/17/2023**

Exhibit B

**Notice of Appeal to a Court of Appeals From Post-Appeal Orders of a District Court**

United States District Court for the District of Rhode Island
Docket Number 1:23-cv-126-WES-PAS

| | |
|---|---|
| MARY SEGUIN, Plaintiff<br><br>v.<br><br>RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;<br>RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL TECHNOLOGY | **Notice of Appeal** |

CENTER in its official capacity;
JULIE HAMIL, MARISA BROWN,
JOHN JOSEPH BAXTER, JR.,
JUSTIN CORREA in their
individual and official capacities;
RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its
official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY
GENERAL OPEN GOVERNMENT
UNIT in its official capacity; ADAM
D. ROACH, PETER NERONHA in
their official and individual
capacities; TYLER
TECHNOLOGIES, INC.; GERO
MEYERSIEK, Defendants

Plaintiff, MARY SEGUIN (name all parties taking the appeal),[*] appeals to the United States Court of Appeals for the FIRST Circuit from the Text Orders entered on March 7, 2024, on March 8, 2024 and on March 11, 2024.

Plaintiff, MARY SEGUIN, appeals to the United States Court of Appeals for the FIRST Circuit all the *functus officio* modifications to the district court's orders or *functus officio* actions taken in the district court after the filing of the appeal on November 17, 2023, affecting the cause without permission from the court of appeals.

Plaintiff, MARY SEGUIN, appeals to the United States Court of Appeals for the FIRST CIRCUIT the *functus officio* actions taken in the district court after the filing of the appeal on November 17, 2023 (ECF 32), affecting the cause without permission from the court of appeals, that moreover deprived Plaintiff's right to file an amended notice of appeal.

Plaintiff, MARY SEGUIN, appeals to the United States Court of Appeals for the FIRST CIRCUIT this direct attack on the *functus officio* **void** actions taken in the district court without jurisdiction or without authority after the filing of the appeal on November 17, 2023 (ECF 32), affecting the cause without permission from the court of appeals. The appeal divested the district court of authority to modify the TWO November 17, 2023 Text Orders appealed from (ECF 32) or take other actions affecting the cause without permission from the court of appeals.

Plaintiff, MARY SEGUIN, appeals to the United States Court of Appeals for the FIRST CIRCUIT the matter of the self-executing disqualification of the *functus officio* district court Judge William E. Smith.

---

[*] See Rule 3(c) for permissible ways of identifying appellants.

Plaintiff, MARY SEGUIN, appeals to the Court of Appeals for the FIRST CIRCUIT from Post-Appeal Orders and Actions Taken by the District Court Affecting the Cause under appeal.

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX 77019

Dated: April 1, 2024

No. 23-1978

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official
capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their
individual and official capacities; Rhode Island OFFICE OF Child Support
Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK
DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN,
LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN,
JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities;
RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A.
SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF
RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND
ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity;
RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in
its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official
capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE
JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL,
MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their
individual and official capacities; RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF
THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual
capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Defendants-Appellees.

Appeal from the United States District Court for the District of Rhode Island

_____

**APPELLANT'S SHOW CAUSE IN SUPPORT OF APPELLANT'S
MOTION TO CONSOLIDATE**

_____

In response to the Court's Order Extending Time to April 1, 2024 for Appellant to show cause, including in support of Appellant's Motion to Consolidate, Appellant respectfully states the ==**November 20, 2023 Notice of Appeal (ECF 38)**== filed by the Appellant in this matter appeals the district court's November 20, 2023 Text Order, and as such the appeal is a ==**direct attack**== on the district court's ==**void**== order issued on November 20, 2023 when the district court became ==***functico officio,***== yet plainly and explicitly ==**modified**== *without authority* the district court's November 17, 2023 **two denials** denying the Plaintiff-Appellant post-judgment motions.

This appeal is a direct attack on the district court's November 20, 2023 void order.

As such all subsequent void orders or "corrections arising from omissions" resulting from, stemming from, caused by, effected by, linked to, or corollary to the district court's November 20, 2023 void order are subject to appellate review in this matter, including the February 1, 2024 district court denial, another void order.

The Notice of Appeal in this matter dated November 20, 2024 appeals the **<mark>void</mark>** district court November 20, 2023 Text order issued ***three days after*** the Notice of Appeal of the Final Judgement was filed (or perfected) on November 17, 2023.  See, ECF 32, 32-1, 33, 33-1.

Pursuant to ***Griggs v. Provident Consumer Discount Company***, 459 U.S. 56 (1982) the district court on November 20, 2023 was ***divested of jurisdiction*** to modify its judgment or ***take other action affecting the cause without permission from the court of appeals***.

Appellant states, in support of the Show Cause, that a straightforward timeline and content examination of the November 17, 2023 docketed Notice of Appeal of the Final Judgment (ECF 32, 32-1) and the docketed district court clerk's certification of the appeal record (ECF 33, 33-1), all dated November 17, 2023, emphatically shows the district court was **<mark>divested of jurisdiction as of November 17, 2023</mark>**.

As such, the district court's November 20, 2023 and February 1, 2024 court orders in this matter are null and void, pursuant to ***Griggs v. Provident Consumer Discount Company***, 459 U.S. 56 (1982).

The Appellant avers the follows in support of consolidation:

**I.**   **The November 17, 2023 district court certified record on appeal, ECF 33 and ECF 33-1, shows on November 17, 2023, no pending motions were docketed.**

1. Emphatically, the November 17, 2023 district court certified record on appeal, ECF 33 and ECF 33-1 shows on November 17, 2023, no motions were docketed, ***proving there were no pending motions*** filed prior to the Notice of Appeal of the Final Judgment.

2. Emphatically, the November 17, 2023 district court certified record on appeal, ECF 33 and ECF 33-1, shows only two entries for November 17, 2023: the two text orders dated November 17, 2023.

By way of visual illustration in support of this Show Cause, Appellant attaches herewith a screenshot of ECF 33-1, of page 9 of 92:

| | | |
|---|---|---|
| | | (D.R.I.), it is further ORDERED that the Courts March 30, 2023, Text Order granting Plaintiff Leave to Proceed as a Pro Se Electronic Filer is VACATED. Plaintiff's Electronic Filer privileges are revoked. See LR Gen 302(b). So Ordered by District Judge William E. Smith on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 10/19/2023 | 31 | JUDGMENT. So Ordered by Clerk of Court on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's two recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) Modified on 11/17/2023 to correct a typo. (Urizandi, Nissheneyra). (Entered: 11/17/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) (Entered: 11/17/2023) |
| 11/17/2023 | 32 | NOTICE OF APPEAL by Mary Seguin as to Text Order, Text Order, **NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** Appeal Record due by 11/24/2023. (Attachments: # 1 Envelope)(Kenny, Meghan) (Entered: 11/17/2023) |

3. Moreover, the Court is requested to Judicially Notice pursuant to

**Fed. R. Evid. 201** that the docket entry for ECF 32 on November

17, 2023 states unequivocally, "<mark>NOTICE OF APPEAL by Mary</mark>

<mark>Seguin as to Text Order, Text Order</mark>" making it explicitly clear

that the only two docket entries of November 17, 2023, "Text

Order and Text Order," are the district court's denials of

Appellant's first November 16, 2023 post-judgment Rule 59

motions and then the one November 17, 2023 post-judgment Rule

60(b)(1) motion which the docket entry for ECF 32 makes clear

that Appellant's Notice of Appeal of the Final Judgment filed on

November 17, 2023 (ECF **32**, **32-1) explicitly appeals "as to**

**TEXT ORDER, TEXT ORDER"** *in addition* **to the Final**

**Judgment**. Therefore, all post-judgment motion filings actually

filed by the Appellant were disposed by the two post-judgment

denial Text Orders on November 17, 2023, prior to the filing of the

Notice of Appeal (ECF 32).   Attached herewith for show cause

purposes are the aforementioned electronic court filing entry

documents:

==**Exhibit I.**==: ECF **32**, ECF **32-1**

==**Exhibit II.**==: ECF **33**, **33-1**


Therefore, the examination of ECF 32, 32-1, 33 and ECF 33-1

evidences that are attached to Exhibits A and B shows the ==***functus***

***officio***== district court was ==***divested of jurisdiction***== upon the filing of the

November 17, 2023 Notice of Appeal ==**appealing**== the ==**Final Judgment**

*and*== the ==**two text orders issued on November 17, 2023**== "as to Text

Order, Text Order."


## II.   The District Court is DIVESTED of JURISDICTION *Griggs v. Provident Consumer Discount Company*, 459 U.S. 56 (1982) and

**the November 20, 2023 Notice of Appeal in this matter appeals the Void November 20, 2023**

As a general rule, an appeal **<mark>divests</mark>** the district court of power to modify its judgment or take other action affecting the cause without permission from the court of appeals ***Griggs v. Provident Consumer Discount Company***, 459 U.S. 56 (1982). *See* also ***Hamer v. Neighborhood Housing Services of Chicago***, 583 U.S. ___ (2017). The appeal filed on November 17, 2023 is from a Final Judgment. Once a district court enters final judgment and once the district court denies post-judgment motions, the final judgment and district court's denials of post-judgment motions become subject to appellate review. See *Commonwealth School, Inc. v. Commonwealth Academy Holdings LLC*, 2021 WL 1398268 (1st Cir. Apr. 14, 2021). *See* also *John's Insulation, Inc.v. L. Addison and Assocs.*, 156 F.3d 101, 105 (1st Cir. 1998).

Here, the two text orders docketed on November 17, 2023 are clearly denials of the only post-judgment motions the Appellant filed on November 16, 2023 and November 17, 2023 – as such the two November 17, 2023 text orders disposed and denied Appellant's post-judgment motions on November 17, 2023. Subsequent to the district court's November 17, 2023 denials of post-judgment motions, in the

late afternoon of November 17, 2023, Appellant filed the Notice of

Appeal (ECF 32, 32-1) appealing:

(1) the Final Judgment,

(2) the district court's two denials of post-judgment motions

text orders of November 17, 2023, and

(3) the obstruction by Judge William Smith of the docketing by

the clerk of Appellant's post-judgment motions between November

16th and 17th of 2023.

Therefore, **the filing of the Notice of Appeal (ECF-32) meant**

**the final judgment and district court's denials of post-judgment**

**motions dated November 17, 2023 become subject to appellate**

**review**.

Therefore, here, the general rule that an appeal **divests** the

district court of power to modify its judgment or take other action

affecting the cause without permission from the court of appeals,

applies; *see*, ***Griggs v. Provident Consumer Discount Company***, 459

U.S. 56 (1982).

The district court became ***functus officio*** and the district court ***functus***

***offico*** judge William Smith, *no longer holding office or having official*

*authority*, as he, nor the ***functus officio*** district court **no longer had the**

*power to modify the two text orders judge Smith made on November 17,*

*2023*.

As such, on **November 20, 2023**, the ***<mark>functus officio</mark>*** district court,

**divested of jurisdiction**, *no longer had the authority* to order

**modifications to the two text orders** judge Smith made on November 17,

2023.

Accordingly, the district court's **November 20, 2023 Text Order** that

plainly **modified** his November 17, 2023 *two* denials for leave to file, are

<mark>**VOID**</mark>.

Accordingly, the November 20, 2023 Notice of Appeal in this matter

filed by the Appellant appeals the **void** November 20, 2023 Text Order.

Having established that the appeal in this matter appeals the district

court's <mark>**void**</mark> November 20, 2023 Text Order, the Appellant respectfully

requests Judicial Notice under Fed. R. Evid. 201 the 77-page Notice of

Appeal (ECF-32).

A.  **Notice of Appeal (ECF 32) appeals the district court's**

**"interference with appeal"**

Appellant attaches herewith a screenshot of page 4 of the

Notice of Appeal, and under Fed. R. Evid. 201, requests

Judicial Notice of numbered paragraph 3 to 5:

2. Plaintiff respectfully requests the U.S. Court of Appeals for the First Circuit to review Plaintiff's timely filed Rule 59 Motion and Rule 60 Motion that were filed in the U.S. District Court of the District of Rhode Island on November 16, 2023 as proper part of the record of appeal.  Prior to filing this Notice of Appeal, Plaintiff also filed a Rule 60(b)(1) Motion regarding the District Court's interference with Plaintiff's right to file Rule 59 and Rule 60 post judgement in which Plaintiff sought to preserve issues for appeal on the record.  Plaintiff attaches all relevant documentation, including all relevant emails to the Clerk of the Court of the District Court and Plaintiff's properly filed post judgment motions pursuant to Rule 59 and Rule 60 herein to this Notice of Appeal and Docket Statement.

3. Plaintiff's Rule 59 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

4. Plaintiff's first Rule 60 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

5. Plaintiff attaches the aforesaid post judgment Motions and requests appellate review under these extraordinary and troubling factual circumstances that violate and obstruct the fundamental First Amendment right of access to the Court of Record, due process and obstruction to justice in the First Circuit, and *inter alia*, interference with the accuracy of the court's record for appeal in this matter.

---

The Notice of Appeal requests appellate review of the refusal by the United States District Court for the District of Rhode Island's ***refusal to docket on the record*** Plaintiff-Appellant's 28-day post-judgment motions filed on November 16, 2023 and the third post-judgment motion

filed on November 17, 2023, "***<u>pursuant to instructions by Judge Smith</u>***."

In enumerated paragraph 5, the Plaintiff plainly appeals, "Plaintiff attaches the aforesaid post judgment Motions and requests appellate review under these extraordinary and troubling factual circumstances that violate and obstruct the fundamental First Amendment right of access to the Court of Record, due process and obstruction to justice in the First Circuit, and inter alia, **interference with the accuracy of the court's record for appeal in this matter**."

Therefore, the "interference with the accuracy of the court's record for appeal in this matter" is under appellate review in Appeal No. 23-1967.

Therefore, the appeal **<u>divests</u>** the district court of power to take other action affecting the cause without permission from the court of appeals. ***Griggs v. Provident Consumer Discount Company***, 459 U.S. 56 (1982). *See* also ***Hamer v. Neighborhood Housing Services of Chicago***, 583 U.S. ___ (2017).

Since Judge Smith's <u>repeating</u> "<u>interference with the accuracy of the court's record for the appeal</u>" on November 20, 2023 issuing the ***<mark>functus officio</mark>*** <u>**<mark>void</mark>**</u> <u>November 20, 2023 Text Order</u> modifying his pre-appeal November 17, 2023 text order denials <u>is the order under appeal here</u>, and <u>is a continuance</u> of the "<u>interference with the accuracy of the court's record for the appeal</u>" that is <u>under appellate review in Appeal No. 23-1967</u>, the *legal justification* to **<mark>consolidate Appeal No. 23-1967 and Appeal No. 23-1978 is compelling</mark>**.

**B.** **<u>"Purported Mistake has Been Rectified" - The functus officio district court admits in the February 1, 2024 order that the November 20, 2023 "rectified the mistake" of the district court's November 17, 2023 text orders that are under appeal in Appeal No. 23-1967 showing continuing "interference with the accuracy of the court's record for the appeal" by rectifying mistakes after the appeal and while the appeal is pending without authorization from the court of appeals</u>**

In the void February 1, 2024 district court order, (ECF 48) the ***<mark>functus officio</mark>*** district court **admits** that the November 20, 2023 order purported to "rectify the mistake" of the two Text Orders of November 17, 2023 that are under appeal in Appeal No. 23-1967.   Appellant quotes the

February 1, 2024 order, last paragraph of the last page of the order " … Text Order (Nov. 20, 2023). Thus, the purported mistake has been rectified."  The Appellant attaches herewith the screenshot of the void February 1, 2024 order bearing Judge Smith's signature, and under Fed. R. Evid. 201 requests judicial notice of the screenshot pasted to this Show Cause here below (see page 14 of this Show Cause):

(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
(4) the judgment is void;
(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b). Plaintiff's motion, however, merely rehashes the same arguments that she made in her Rule 59 Motion. For the same reasons above, Plaintiff's Rule 60(b) Motion is DENIED.

Finally, Plaintiff's third motion is brought under Rule 60(b)(1). In it, she aggrieves the Clerk's office's delay in docketing her first and second motions. Despite the delay, the Court ordered the motions to be docketed. Text Order (Nov. 20, 2023). Thus, the purported mistake has been rectified. Plaintiff's Rule 60(b)(1) Motion is DENIED as MOOT.

IT IS SO ORDERED.

_WESmith_

William E. Smith
District Judge
Date: February 1, 2024

5

Therefore, Judge Smith admits that on November 20, 2023, when the district court became divested of jurisdiction, the district court issued the void order purportedly to "rectify the

mistake" of the district court order's November 17, 2023 text orders.

This Court is fully cognizant of the interference with the accuracy of the record on appeal Judge Smith's admitted rectification caused.  It is crystal clear that the ***functus officio*** judge Smith lacked any authority on November 20, 2023 to modify the two November 17, 2023 district court text orders issued before the filing of the Notice of Appeal ***without*** the ***authority of the court of appeals***.

Therefore, Appeal No. 23-1967 and 23-1978 should be consolidated.

### III.    Judge Smith's ***Functus Officio*** obstructions and interferences of the appeal in this matter appears to be calculated to conceal from judicial notice of the crucial fact that *he* was Defendant-Appellees' chief outside counsel at Edwards & Angell representing the State of Rhode Island at the time of the 1996 Amendment of Title IV-D of the Social Security Act

The pinnacle matter of this action at law is the fact that the Rhode Island Appellees in an organized and deliberate manner fail to comply with the 1996 Amendment to Title IV Part D of the Social Security Act.  Indeed, the billion dollar question at the heart of the matter is the extent to which the organized knowing failure to comply with Title IV

pervades the 42 U.S.C. sec. 654(1) political subdivisions of Rhode

Island, and thus the amount in billions of dollars of penalties and

fines, that may involve jail time, incurred and accrued since 1996

when Judge Smith was the chief outside counsel of the Rhode Island

Appellees and their employees.

Title IV, one of the largest federal-state cooperative Entitlement

Program appropriated hundreds of billions to trillions of dollars

annually, saw Congress enact meaningful penalties against

noncompliant states in 1996, and as such Judge Smith as the lead

outside counsel for an extensive majority of the political subdivisions

of the State of Rhode Island had and should have had knowledge of

issues of noncompliance with Title IV-D, Title IV-A and 42 U.S.C.

sec. 654.

Accordingly, in support of this Show Cause, A**ppellant moves

for judicial notice of the following, pursuant to Fed. R. Evid. 201

and the Court's inherent truth-seeking authority**.

Diligently scouring the federal appellate rules and procedures,

Appellant could not find any explicit requirements to file a stand-

alone separate application or motion for Fed. R. Evid. 201 for judicial

notice, therefore, if Appellant, just as do judges and courts that make

mistakes, respectfully requests good cause or excusable neglect

reasons for failing to find any textually explicit requirement to file a

motion for judicial notice under Fed. R. Evid. 201 separately.  If the

Court so orders, Appellant will absolutely comply.

**IV.** **Appellant's Motion pursuant to Fed. R. Evid. 201 and 18 U.S.C. sec. 4 for Judicial Notice of the Commission of Organized Crimes**

Under **Fed. R. Evid. 201** and pursuant to **U.S.C. § 4, 18 U.S.C. § 666**

**18 U.S.C. § 287 - making false, fictitious claims,**

**18 U.S.C. § 371 - conspiracy to defraud the United States,**

**18 U.S.C. § 1001 - false documents or false statements to a federal**

**agency,**

**18 U.S.C. § 1341 - mail fraud,**

**18 U.S.C. § 1343 - wire fraud,**

**18 U.S.C. § 641 - Public money, property or records,**

**31 U.S.C. § 3279 - federal civil false claims act Et al. , Appellant**

**respectfully requests judicial notice of all that is made known to**

**judges of the United States below.**

Under **Fed. R. Evid. 201(e),** Appellant requests for a hearing

on Appellant's motion to take judicial notice.

The Court may take judicial notice of any matter "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed R. Evid. 201(b).

The legislations publication, concurrent litigation court information, United States' Briefs and Judge-Created Laws are available through the Congress's official website, through the Rhode Island Publications of State Legislations, through Rhode Island's Digital Courts' online portals, and through the United States Department of Justice Website, and, thus, is properly subject to judicial notice.  *See Daniels-Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998-99 (9th Cir. 2010) (taking judicial notice of information contained in school district websites).

The State Policy attached in **Exhibit A** was not available until 2024 and is highly indisputable fact.  It is a written policy regarding, inter alia, the removal of interest from the automated data processing and information retrieval system in **_interstate_** cases, and at the top of the one page policy, it states, "This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified **all for the purpose of _removing interest_ from _interstate_ cases**."  It is directly relevant to and at the heart of this INTERSTATE matter.  Rhode Island's policy and practice administering the Title IV Program requiring by Policy "Specification for OCSS Change Order" the systemic unlawful and fraudulent removal from the automated data processing

and information retrieval system mandated by 42 U.S.C. sec. 654, thus creating,

*inter alia*, false accounting records, false certifications to the State of TEXAS and

to the UNITED STATES under 42 U.S.C. sec. 654 and 42 U.S.C. sec. 666 are

crucial factual allegations at the heart of this matter – see Amended Complaint,

**ECF 25**.  And Judge Smith knew and should have known and advised the Rhode

Island Appellees on the legality of this scheme from 1996 to the time of his

appointment as Federal Judge in 2002.  As such, Judge Smith had an obligation to

make it known to a judge or other civil or military authority of the United States

under 18 U.S.C. sec. 4.

The next paragraph of this Policy states, "It is desirable for the Rhode Island

Office of Child Support Services (OCSS) to prohibit the charging of interest on

interstate cases.  This is manually done by placing an N in the interest field on page

2 of the support order.  Entry of the N not only prohibits the charging of future

interest but automatically creates adjustments to zero out any existing interest."

The last paragraph of this one-page policy states, "**Two reports** will be

created" for several different categories of various manual adjustments N, Y, B or

P.  Therefore, in this interstate case targeting TEXAS, interest was manually

removed from the system when Rhode Island falsely certified the accuracy of the

total amount due in violation of, inter alia, 42 U.S.C. sec. 666(14), lying and

deceiving TEXAS that there is no interest when in fact the interest amounting to

tens of thousands of dollars were unlawfully and fraudulently removed from the system.  This simultaneously created a false certification to the UNITED STATES under the Title IV-D and Title IV-A Programs to fraudulently certify that Rhode Island is in compliant with Title IV in order to procure billions of dollars of federal funding it is ineligible for, which automated system adjustments to conceal the noncompliant 12% compound interest and false certification acts since the 1996 Amendments to 42 U.S.C. sec. 654, incurred and accrued over a billion dollars.

At the bottom of the Policy page, it is dated January 25, 2011.  12% compound interest was established in 2012 in Appellant's case.  Therefore, the Policy affects and is directly and materially relevant to this matter.

The screenshots of the Appellees' State Plan operated online Child Support account that is operated by the State Plan's automated data processing and information retrieval system are extensively described in the Amended Complaint in this matter. The Policy is relevant because it states the policy that "it is undesirable for the Rhode Office of Child Support Services to charge interest in interstate cases."  The Amended Complaint describes an interstate case in which interest is charged by the Appellees.  The policy is moreover relevant because it states "two reports" will be created that shows retrieval of data from the automated data processing and retrieval system, one with adjustments and another without adjustments, which is described in the Amended Complaint, describing at least

seven different sets of books of accounts showing accounting fraud in interstate

cases.  The Policy describing detailed instructions on how to make adjustments to

the automated data processing and information retrieval system to create two

reports in interstate cases relating to adjustments of "undesirable" interest in

interstate cases shows an organized falsification of certification and government

records in Title IV-D Program official records and documents, that are

straightforward criminal.  That "undesirable" interest in interstate cases concerns

the routine establishment and enforcement of 12% compound interest in Rhode

Island under color of state law, R.I.G.L. sec. 15-5-16.5.  It is "undesirable" because

under Title IV-D, specifically 42 U.S.C. sec. 654(21)(A), 12% compound interest

is prohibited, and it is "undesirable" in interstate cases because Rhode Island

knows full well that the 12% compound interest state legislation is preempted by

42 U.S.C. sec. 654(21)(A) upon State's acceptance of participation in Title IV-D.

The Policy evidences the knowing violation and organized Rhode Island

circumvention of 42 U.S.C. sec. 654(21)(A) through the creation of multiple books

or reports of accounts that are false in interstate cases.  The Policy evidences that

the charging of the color of state law 12% compound interest necessarily involves

a symbiotic entity that establishes the "undesirable" 12% compound interest in

interstate cases – that would be the 42 U.S.C. sec. 654(1) state political

subdivision, Rhode Island state family court and certain pliant judges sitting therein.

The Younger abstention issue squarely before this Court then is, unlike other state proceedings, the federal government is heavily involved in Title IV-D proceedings, and prescribed explicitly by statute tens of millions of dollars of penalty liable by the State for a single unwilful noncompliance. This State Policy (**Exhibit A**) that explicitly provides for "it is undesirable to charge interest in interstate cases" and the creations of "two reports" resulting from "adjustments" to the automated data processing and information retrieval system in interstate cases makes it plain that noncompliance is not just willful by policy and systemic, but also involves acts that violate the Federal Criminal Codes, as it entails theft of the Federal Program Funding under 18 U.S.C. sec. 666 and 18 U.S.C. sec. 641 through falsification of records. Therefore, does the Comity envisioned in our Union envisioned by Appellees and the district court under *Younger* Abstention apply when the federal preemptive statutory text of Title IV-D explicitly provide for steep penalties for single noncompliance in fiscal year that runs up to tens of millions of dollars, with a penalty compounding effect (of its own!) of subsequent State failures up to 30% of the amount of federal funding paid to the State – certainly additional penalties accrued in 2023 and now in 2024 directly as a result of applying Younger Abstention, and that certainly is not in the State's interest to

continue to fail to comply, willfully, in light of Appellant's challenges, here, in

Appeal No. 23-1967, 23-1978 and in yet a possible fourth appeal.

The Appellant is introducing highly indisputable facts.

These facts are compelling because they provide a tantamount service to the

United States and are moreover proffered to the Judges of the United States under

18 U.S.C. sec. 4.

Under the Appellate Court's inherent equitable authority, moreover, the

federal courts of appeals have relied on the truth-seeking function of the judiciary

to permit supplementation of evidence. *See., e.g.*, "It would be nonsensical to

overlook the existence of materials that bear heavily on the contested issue."

*Colbert v. Potter*, **471 F.3d 158, 166** (D.C. Cir. 2006). Here, one of the threshold

issues of *Younger Abstention* is whether the limited jurisdiction state family court,

itself a 42 U.S.C. sec. 654(1) political subdivision that 42 U.S.C. sec. 654 binds,

has the authority to enforce, establish or address Rhode Island's routine 42 U.S.C.

sec. 654(21)(A) prohibited 12% compound interest on overdue support under color

of state law when Rhode Island participates in Title IV-D that Congress in its

statutory text explicitly preempts State general laws and State constitutions to the

extent that Congress prescribes "Grace Periods for Effective Date" prescribing the

States to amend the State constitution for compliance, or whether proceedings as

such lack any authority under the law as plainly "under color of state law" void, voidable and nullity proceedings that are fraudulent and penalty-incurring (tens of millions of dollars for a single willful violation under Title IV-D). Therefore, in this case, Rhode Island's noncompliance incurs monetary liability that are in the tens of millions of dollars per single violation explicitly prescribed by Congress in 42 U.S.C. sec. 654. States lack any interest in the knowing and abusive violation of the preemptive 42 U.S.C. sec. 654, abusively dressed up as a state "interest to enforce child support." In reality, Rhode Island has an overwhelming and compelling State interest to comply with 42 U.S.C. sec. 654 rather than violate provisions of 42 U.S.C. sec. 654. For this First Circuit, the question of the resulting harm inflicted on the State of Texas to have to then address the unenforceability and issues of void judgments under color of Rhode Island state law, and Rhode Island's inherent attempt to harm citizens of Texas, harming Texas's State interest, as well as Texas Appellant's individual interests, must be decided, and the decision affects the National Interest and the Public's Interest nationally. This Court must take judicial notice of the fact that all other applicable federal districts within the First Circuit, Massachusetts, New Hampshire, Maine are 42 U.S.C. sec. 654(21)(A) compliant (setting 0% - 6% interest). Title IV-D also specifically prescribes federal and states review (executive and judicial) of whether support orders are enforceable and Congress cast doubt to the accuracy of support

orders and enforcement operations that prompted Congress to act and enact the

1996 Amendments to 42 U.S.C. sec. 654, specifically explicitly providing penalties

that could amount to tens of millions of dollars to over hundred million dollars in a

fiscal year for State noncompliance – to wit the $10 million penalty incurred by

South Carolina in 2010 described in the United States Brief in the seminal case,

Turner v. Rogers.  It is against the public interest and against the "Comity" to

permit the wanton continuation of Rhode Island's 12% compound interest under

color of state law targeting noncustodial victims that, if allowed to mushroom,

reaches its tentacles across all corners of the United States, out of an inequitable

disproportionate concern for Appellee-alleged Rhode Island's "interest" that

essentially is no interest at all.  Essentially, it is in Rhode Island's interest to

comply with 42 U.S.C. sec. 654.  For the majority law-abiding 360 million

population's interest in the United States to subserve to the law-violating Rhode

Island's Appellee-alleged "state interest," in essence, non-interest, runs afoul of

Inherent Justice for all.

## The Court's Truth-Seeking Function and Fed. R. Evid. 201

### I.    Inherent Equitable Authority

The lower court dismissed Appellant's Amended Complaint without leave to

amend, with the Appellees answering the Amended Complaint.  The First

Amended Complaint in that action amends the original complaint filed in the action at law filed on March 30, 2023, based on factual circumstances here, namely presenting in pleading of facts supported by evidence produced by the State Appellees pursuant to court ordered discovery since seven months ago in February 2023 by the family court in State ex. rel. Gero Meyersiek v. Mary Seguin, K20010521M and information obtained through **statutory right of access to public records via federal and state freedom of information act and access to public records acts**.

Federal courts of appeals have held that a plaintiff appealing an FRCP 12(b) dismissal may request that the court consider extra-record materials, in determining whether the complaint should have been dismissed without leave to amend.  In *Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909 (7th Cir. 1985), for example, the Seventh Circuit considered evidence produced during discovery in a parallel case but never introduced at trial in the case on appeal.

As Judge Posner explained in *Orthmann*, although the materials presented for the first time on appeal were "no part of the official record," the appellant, hoping "to show that the complaint should not have been dismissed on its face" could present "an unsubstantiated version of the events," so long as that story "was not inconsistent with the allegations of the complaint." *Orthmann*, supra n. 46, at 914-15.

The supplemental materials, he noted, "[were] usable to show how the accident might have happened." *Id.* at 915.

Here, the supplemental materials are usable to show how the breach of contract, fraud and deprivation of Constitutional rights might have happened, since much of the legislative history and statutory notes of 42 U.S.C. sec. 654 showing its <mark>preemptive</mark> effect on State legislation as well as State constitutions, and the State's prima facie Policy showing its "work-around" scheme to circumvent detection of its unlawful 12% compound interest through the creation of "two reports" that are then interchangeably used to cover up the unlawful 12% compound interest when certifying to Texas and to the United States, then another "report" when it enforces the unlawful 12% compound interest in the state's family court and intrastate under color of state law are usable to show how the breach of contract and fraud, as well as deprivation of Appellant's due process rights protected by 42 U.S.C. sec. 654 as well as Federal Constitutional rights happened with organized intent by the Appellees.

Appellant relies on the 2024 recently discovered **State Policy** to show how breach of contract, fraud and deprivation of Constitutional rights might have been established and, accordingly, why the district court should not have dismissed Appellant's complaint, not even without leave to amend. Moreover, this evidence

corroborates the Amended Complaint filed in the concurrent matter before this

Court of Appeals, in Appeal Case. No. 23-1967.

Accordingly, Appellant files this motion pursuant to the Court's inherent

truth seeking function authority to supplement the record.

## II.    Federal Rules of Evidence 201

Under Fed. R. Evid. 201, federal courts of appeals can take judicial notice of

highly indisputable facts or other court proceedings that directly relate to the issues

on appeal. The record on appeal is subject to the right of an appellate court to take

judicial notice of new developments not considered by the lower court." *See* e.g.

*Landy v. FDIC*, 486 F.2d 139, 151 (3d Cir. 1973). Parties may in consequence seek

to supplement the appellate record with new materials under Fed. R. Fed. 201.

Judicial Notice of Legislative Acts by Congress and Congressional statutory

notes and texts that explicitly provide for the preemptive effect of 42 U.S.C. sec.

654 over State general laws and State constitutions, are under Fed. R. Evid. 201[a]

Advisory Committee's note or are "established truths, facts or pronouncements that

do not change from case to case" and "do not relate specifically to the…litigants."

[*United States v. Gould*, 536 F.2d 216, 220 [8th Cir. 1976]]. In general, courts are

free to take notice of legislative facts, including research data and writings like

those cited in the famous "Brandeis briefs." Appellate courts take judicial notice of

such legislative facts, because they help them develop reasonable rules of law that will apply in future cases.

Appellant was not aware of the Rhode Island State Policy that prohibits the charging of interest rate in interstate cases until 2024, *see* Appellee Rhode Island Office of Child Support Services **Policy Exhibit A**. Therefore, this evidence was not available at the time final judgment was issued on October 19, 2023 in this matter. Judicial Notice, in aid of the court, is respectfully requested of it. Whether requesting or opposing judicial notice, litigants have a right to be heard on the issue under **Rule 201[e], therefore, Appellant requests a hearing on the issue under Rule 201(e).**

**Under Fed. R. Evid. 201[f]**, judicial notice of adjudicative facts may be taken at any stage of the proceedings, including on appeal. In practice, appellate courts frequently take judicial notice of both adjudicative and legislative facts presented for the first time on appeal, whether requested by a party or on their own initiative. See, e.g., *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 [2d Cir. 2002]; In *re Indian Palms Assoc. Ltd* ., 61 F.3d 197, 205 [3d Cir. 1995]. *See also, White v. Gaetz*, 588 F.3d 1135, 1137 n. 2 (7th Cir. 2009) (taking judicial notice of state court transcript). The federal courts of appeals may take judicial notice of a proceeding in another court if the proceeding

has a direct connection to the issues on appeal, *See Philips Med. Sys. Intl., B.V. v. Bruetman*, 982 F.2d 211, 215 (7th Cir. 1992).

Appellant respectfully requests the Court to take judicial notice under Fed. R. Evid. 201 of the attached Objection and Notice to Take Judicial Notice Pursuant to Fed. R. Evid 201 and 18 U.S.C. sec. 4 filed in Appeal No. 23-1967, Document: 00118126457 filed on March 29, 2024.  See **Exhibit B**. Document: 00118126457.

Judicial Notice in practice is taken at any time of a proceeding, including for the first time on appeal, of legislative history and statutory amendments, etc.,, e.g., the legislative history of 42 U.S.C. sec. 654 regarding Congress's Amendment in 1996.  This similarly applies to the State of Rhode Island's legislative history, to wit, the failure of Rhode Island Gen. Law. 15-5-16.5 to comply with the 1996 Amendment of 42 U.S.C. sec. 654.  42 U.S.C. sec. 654 makes it explicitly clear that such failures incur penalties.  The fact that Rhode Island family court is a court of limited jurisdiction, as prescribed by R.I. Gen. Law. 8-10-3 where limited relief is authorized by State legislation is a matter of legislative fact, that in practice is judicially noted at any time of a proceeding, including for the first time on appeal.

Appellant attaches the above legislations, requesting judicial notice of Congress's publication of 42 U.S.C. sec. 654 that answers all threshold questions of jurisdiction.  The Congressional 1996 Amendment for 42 U.S.C. sec. 654

*explicitly* make clear that 42 U.S.C. sec. 654 preempts State laws and State

constitutions, and mandates that participating States must change State laws and

amend State constitutions accordingly to comply with the 1996 Amendment

provisions of 42 U.S.C. sec. 654. The pre-emptive effect of the explicit language

in the statutory provisions under Amendment 1996 of 42 U.S.C. sec. 654 make

clear that the State of Rhode Island is operating an unlawful State Plan that

unlawfully charges 12% compound interest on overdue support under color of state

law, which noncompliant state law is the basis of the current "State enforcement"

of its routine "court orders" charging 12% compound interest without jurisdiction.

Moreover, the fact that since 1996 Rhode Island falsely certified to the United

States for the past twenty-eight (28) years that its State laws are compliant with 42

U.S.C. sec. 654 violates Federal Criminal Codes, is a fact that this Court must take

judicial notice under Fed. R. Evid. 201, its inherent truth-seeking authority, and

under Appellant's invocation of 18 U.S.C. sec. 4. Since a trial did not occur in

this matter, at this juncture the Court must take all factual allegations in the

Amended Complaint in this matter as true, and it plainly pleads that the State

Appellee represented to the Appellant in Texas that if Appellant paid $104,185.98

in one lump sum, Appellee Gero Meyersiek waived interest, and that the

$104,185.98 is a pay-off amount that does not include interest. And this allegedly

enforceable interest was established under R.I. Gen Laws 15-5-16.5 that is

explicitly preempted by 42 U.S.C. sec. 654 upon Rhode Island's acceptance of

participation in 42 U.S.C. sec. 654 since 1996, along with the 1996 Amendment's

explicitly provided penalties for noncompliance – in Rhode Island's case, as shown

by the posture of the Appellees in multiple jurisdictions, the noncompliance is

willful and defiant.  Rhode Island is free to continue enforcing its 12% compound

interest state law, but that, by Federal Law, requires withdrawing from

participation in Title IV, per the plain language of Title IV-D, and paying the

penalties it incurred and accrued since 1996 during Rhode Island's participation

that amounts to up to billions of dollars, as explicitly provided for in 42 U.S.C. sec.

654 to make the United States whole.  To make Appellant whole, Appellant seeks

millions of dollars in damages in this action at law.

Appellee Gero Meyersiek changed his mind after the Texas Appellant

accepted the offer in Texas, performed and paid the lump sum $104,185.98.  The

"changed his mind" entailed the action of "putting interest back on the system" that

consists of 12% compound interest (see attached R.I.G.L. sec. 15-5-16.5.).

Since the State Plan that charges 12% compound interest, takes interest off

the system only during certifications to the TEXAS and UNITED STATES

authorities, and then puts interest back on the system when Appellee Gero

Meyersiek "changed his mind" waiving interest after Texas Appellant performed

on the terms of the agreement, it is abundantly clear that the Appellees,

government and private persons, operate a criminally unlawful State Plan. Since

all Appellees participate in the "take interest off the system" when certifying to

TEXAS and when certifying to the UNITED STATES the total support due, and

since the State Policy provides for the creation of "two reports," Fed. R.Evidence

201 evidence is abundantly clear before this Court and before a panel of "some

judges" pursuant to the pending Fed. R. App. P 8(a)(2)(D) motion supported by

affidavit in Appeal No. 23-1967 of organized criminal fraud and the lack of

jurisdiction of the limited jurisdiction state family court to issue orders for 12%

compound interest on overdue support that 42 U.S.C. 654(21)(A) explicitly

prohibits, this Court must take judicial notice of legislative and adjudicative facts

relating to these critical matters materially relevant to this case.

For the convenience of the Judges of this Court, Appellant attached hereto

Congress's publication of 42 U.S.C.. sec. 654, the RI Gen. Law 15-5-16.5.

Appellees' request to strike Fed. R. Evid. 201 evidence of crimes made

known to "some judges" under 18 U.S.C. sec. 4 from the record in a matter that

involves Appellees' organized criminal activity that violates, inter alia, 18 U.S.C.

sec. 666 and 18 U.S.C. sec. 641, 18 U.S.C. § 287 - making false, fictitious claims,

18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false

documents or false statements to a federal agency,18 U.S.C. § 1341 - mail fraud,

18 U.S.C. § 1343 - wire fraud by the Appellees is an obstruction of an official proceeding and an obstruction of justice.

Finally, undisputed Appellees' operational evidence that includes unlawful redactions made sense only after the availability in 2024 of the State Policy that evidences the State Plan operating an unlawful Child Support enforcement program by policy of creating "two reports" in interstate cases, one with the unlawful 12% compound interest to enforce under color of law, and one report for the purposes of making false claims, false certifications, and falsifying official government documents to unlawfully apply for Federal Title IV Program funding that the Appellees knew Rhode Island is ineligible for.  That amounts to billions of dollars of theft against the United States.

Emphatically, Congress intended, by making "some judge(s)"…"of the United States" to whom the commission of crimes is mandated to be made known, explicitly conferred the duty on Judges of the United States under Federal Criminal Law the same duty, obligations and responsibility acting as authorities under the United States, as the "other persons in civil or military authority under the United States" explicitly named in the federal criminal statute 18 U.S.C. sec. 4.  Appellant requested Judicial Notice under 18 U.S.C. sec. 4 to the "some judges" as the "person in authority under the United States" under 18 U.S.C. sec. 4.   Striking from the record Congressional legislation history of 42 U.S.C. sec. 654, State

legislation history, Rhode Island State Plan 42 U.S.C. sec. 654(3) State operating and disbursement unit's Policy that are neither classified information nor confidential or privileged information to the United States are further not in the interest of the United States.

Striking evidence that shows $0.00 interest on a December 6, 2021 screenshot of the Appellee-operated 42 U.S.C. sec. 654a automated data processing and information retrieval system accomplishes nothing other than taking as true the factual allegations in the Amended Complaint that details Appellant being shown the $0.00 Under Interest generated by the automated data processing and information retrieval system.  The Fed. R. Evid. visual evidence aids the court to visualize the truth of Appellant's factual allegations.

Striking evidence of a screenshot of the Appellee-operated 42 U.S.C. sec. 654a automated data processing and information retrieval system that shows $0.00 Payment for Appellant's whopping lump sum $104,185.98 December 7, 2021 payment accomplishes nothing, when the screenshot is a visual evidence of the "two reports" explicitly stated in the Appellee State Policy to create "two reports" that consist of falsified records – these are evidence in the aid of the court of Appellant's 18 U.S.C. sec. 4 and Fed. R. Evid. request to take judicial notice of activities that harm the United States and steal from Federal Program Funds.

This case is related to Appeal No. 23-1967 and Appeal No. 23-1978.

**Under Fed. R. Evid. 201[f]**, judicial notice of adjudicative facts may be taken at any stage of the proceedings, including on appeal. In practice, appellate courts frequently take judicial notice of both adjudicative and legislative facts presented for the first time on appeal, whether requested by a party or on their own initiative. See, e.g., *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 [2d Cir. 2002]; In *re Indian Palms Assoc. Ltd* ., 61 F.3d 197, 205 [3d Cir. 1995].

Appellate courts take judicial notice of facts that were not available to litigants at trial and events that occurred after judgment was entered. For example, courts have taken judicial notice of guilty pleas entered in a related criminal case after judgment in the civil case was entered. See, e.g., *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 [4th Cir. 1989]. Similarly, appellate courts have taken judicial notice of post-judgment changes in the conditions in a foreign country relevant to an immigration appeal, *Ivezaj v. INS* , 84 F.3d 215, 218-19 [6th Cir. 1996], as well as post-trial changes in the racial composition of a state's judiciary in a discrimination suit. *Southern Christian Leadership Conference of Alabama v. Sessions*, 56 F.3d 1281, 1288 n.13 [11th Cir. 1995].

Certain categories of facts have long been the subject of judicial notice on appeal. Courts routinely take judicial notice of pleadings and records in other court cases [see, e.g., *Green v. Warden*, U.S. Penitentiary, 699 F.2d 364, 369 [7th Cir. 1983]; *E.I. du Pont de Nemours & Co. Inc. v. Cullen*, 791 F.2d 5, 7 [1st Cir. 1986]] and in administrative agency proceedings [see, e.g., *Opeka v. INS*, 194 F.3d 392, 394-95 [7th Cir. 1996]], Courts are generally willing to take judicial notice of data, pronouncements and publications issued by the government, such as Environmental Protection Agency research [*Nebraska v. EPA*, 331 F.3d 995, 998 n.3 [D.C. Cir. 2003]]; State Department travel warnings [*Parsons v. United Tech. Corp* ., 700 A.2d 655, 665 n.18 [Conn. 1997]]; and a federal fisheries management plan approved by formal rule [*City of Charleston v. A Fisherman's Best Inc*., 310 F.3d 155, 172 [4th Cir. 2002], cert. denied, 123 S.Ct. 2573 [2003]]. Appellate courts are also likely to take judicial notice of relevant newspaper articles [see, e.g., *The Washington Post v. Robinson*, 935 F.2d 282, 291-92 [D.C. Cir. 1991]] and historical information contained in authoritative publications, such as a text on the history of Lincoln Center [see, e.g., Hotel Employees, 311 F.3d at 540 n.1.].

Courts take judicial notice of online information.  Appellate courts have increasingly cited information found on the Internet. In today's digital courts, all court information filed in concurrent and related state court proceedings are available online, on government websites, such as Rhode Island's digital courts

where this Federal Appeals Court should by the plain textual language of Rhode

Island Rules and Practice Rule 5 relating to access to court information (that denies

the Public and pro-se litigants remote access), should have no trouble accessing

court information through Rhode Island's digital courts' online portal.  Rhode

Island's judge-created laws regarding all relating cases enforcing the 12%

compound interest published online should also be available to this Federal Court

online under the Government Edicts Doctrine (although they are accessible to the

Public and to the pro-se litigants) – see *Georgia v. Public.Resource.Org, Inc.,* 590

U.S. ___ (2020).  As with hard-copy publications, courts are most willing to take

judicial notice of information found on government Web sites, such as the time of

sunrise found on the Web site of the U.S. Naval Observatory [*U.S. v. Bervaldi*, 226

F.3d 1256, 1266 n.9 [11th Cir. 2000]]; the prime interest rate on the Federal

Reserve Board Web site [*Levan v. Capital Cities/ABC Inc*., 190 F.3d 1230, 1235

n.12 [11th Cir. 1999]]; and records of retired military personnel on a federal Web

site [*Denius*, 330 F.3d at 926]. Courts have even been willing to take judicial

notice of information on arguably less reliable commercial Internet sites, including

mileage information on Mapquest [*In re Extradition of Gonzalez*, 52 F. Supp. 2d

725, 731 n.12 [W.D. La. 1999]]; historical information on Liberia on the

"Geocities" Web site [*Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 278 n.2

[S.D.N.Y. 1999]]; and information regarding a bank's ownership from the bank's

Web site [see *Laborers' Pension Fund v. Blackmore Sewer Constr. Inc.*, 298 F.3d 600, 607 [7th Cir. 2002]].  Therefore, information on the complete extent of Rhode Island's citizenry harmed by the State's unlawful establishment and enforcement of the unlawful and Title IV-D-preempted 12% compound interest under color of state law that is available online on Rhode Island's Government's Digital Courts Website, is *reliable*, is *judge-created by state judges*, and is directly related to the Amended Complaint, motion to amend complaint *nunc pro tunc*, the September 28, 2023 judgment in this matter, and the State Policy attached in Exhibit A that was available to the Appellant in 2024, after the Appellant filed her Opening Brief in 2023 pursuant to the Court's Briefing schedule.

The use of judicial notice spans a wide spectrum of cases, from the most historically significant-such as Chief Justice Earl Warren's reliance in *Brown v. Board of Ed.*, 347 U.S. 483, 494 n.11 [1954], on scholarly publications documenting the effect of segregated schools on minority children-to the most mundane, such as the 2d U.S. Circuit Court of Appeals' judicial notice of the "traditional features of a snowman." *Eden Toys Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 n.1 [2d Cir. 1982].

In general, courts are free to take notice of legislative facts, including research data and writings like those cited in the famous "Brandeis briefs." Appellate courts are understandably more willing to take judicial notice of such

legislative facts, because they help them develop reasonable rules of law that will

apply in future cases. "Legislative facts," which are facts of general "relevance to

legal reasoning and the lawmaking process" [Fed. R. Evid. 201[a] Advisory

Committee's note] or are "established truths, facts or pronouncements that do not

change from case to case" and "do not relate specifically to the…litigants." [*United

States v. Gould*, 536 F.2d 216, 220 [8th Cir. 1976]].  42 U.S.C. sec. 654 relates to

all interested parties and the United States, and are established truths and facts that

do not change from case to case, and do not specifically only apply just to this

matter.  Likewise R.I. Gen. Laws. Sec, 15-5-16.5 relates to all interested parties

and the United States, not just to this matter.  Likewise the Appellees' State Policy

prohibiting the charging of interest in interstate cases and creating "two reports"

from the policy adjustments to the 42 U.S.C. sec. 654a automated data processing

and information retrieval system is established truths and facts that do not change

from case to case, and do not specifically only apply just to this matter.  The

resultant Screenshot evidence of the resulting false records created by the "two

reports" do not change because Rhode Island creates two reports in intrastate cases

in order to evade detection of the unlawful 12% compound interest under color of

state law, one for enforcement under color of law, one for false certification of

State Plan compliance to the United States Title IV Program.  While full suite of

issues concerning State noncompliance with 42 U.S.C. sec. 654 this Court notices

under the *Turner v. Rogers Amicus Brief* submitted by the United States can be

noticed on the Court's own initiative, however, the full suite of the issues

contained therein made sense of the State Policy that was not available to the

Appellant under 2024 – nevertheless, Appellant makes known this evidence to the

judges of the First Circuit Court of Appeals under 18 U.S.C. sec. 4 and Fed. R.

Evid. 201.

As such, all public truths and facts and publications "made known" to this Court

under **18 U.S.C. sec. 4** and **Fed. R. Evid. 201** should be judicially noticed.

Appellant attaches the Brief hereto.

Appellant declares under **Fed. R. Evid. 201 and 28 U.S.C. sec. 1746(2),**
**that all the facts "made known" to the United States Panel of Judges invoking**
**18 U.S.C. sec. 4 and/or Fed. R. Evid. 201 in Appellant's Notice of the**
**Commission of Facts are true to the best of Appellant's knowledge.**

**Appellant attaches hereto the 18 U.S.C. sec. 4 materials that are subject**
**of this Fed. R. Evid. 201 Motion to Take Judicial Notice.**

Accordingly, Appellant requests judicial notice of the documents attached

here to.  Pursuant to **Fed. R. Evidence 201(e)**, Appellant requests by right a

hearing.

## <u>CONCLUSION</u>

For the above reasons the Court should consolidate Appeal No. 23-1967 and

Appeal No. 23-1978.

Respectfully submitted,

>Mary Seguin
>Pro Se
>/s/ _Mary Seguin_
>
>Email: maryseguin22022@gmail.com
>Phone: (281)744-2016
>P.O. Box 22022
>Houston, TX  77019
>
>Dated: March 31, 2024

## **CERTIFICATE OF SERVICE**

This is to certify that the foregoing instrument has been served via the
Court's ECF filing system on March 31, 2024, on all registered counsel of record,
and has been transmitted to the Clerk of the Court.

>Mary Seguin
>Pro Se
>/s/ _Mary Seguin_
>
>Email: maryseguin22022@gmail.com
>Phone: (281)744-2016
>P.O. Box 22022
>Houston, TX  77019

EXHIBIT I.

**Form 1A**

**Notice of Appeal to a Court of Appeals From a Judgment of a District Court**

United States District Court for the
District of Rhode Island
Docket Number 1:23-cv-126-WES-PAS

| | |
|---|---|
| MARY SEGUIN, Plaintiff<br><br>v.<br><br>RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official | **Notice of Appeal** |

capacity; RHODE ISLAND
SUPERIOR COURT JUDICIAL
COUNCIL in its official capacity;
THE JUDICIAL TECHNOLOGY
CENTER in its official capacity;
JULIE HAMIL, MARISA BROWN,
JOHN JOSEPH BAXTER, JR.,
JUSTIN CORREA in their
individual and official capacities;
RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its
official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY
GENERAL OPEN GOVERNMENT
UNIT in its official capacity; ADAM
D. ROACH, PETER NERONHA in
their official and individual
capacities; TYLER
TECHNOLOGIES, INC.; GERO
MEYERSIEK, Defendants

MARY SEGUIN (name all parties taking the appeal)* appeals to the United States Court of Appeals for the FIRST Circuit from the final judgment entered on October 19, 2023 (state the date the judgment was entered).

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 17, 2023

---

* See Rule 3(c) for permissible ways of identifying appellants.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                              Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

　　　　*Defendants*

## **PLAINTIFF'S DOCKETING STATEMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT AND THE UNITED STATES DISTRICT COURT OF THE DISTRICT OF RHODE ISLAND**

1.  Plaintiff, proceeding pro se from and as a citizen of Texas, respectfully states to the U.S. Court of Appeals for the First Circuit and the United States District Court of the District of Rhode Island that this case is related to the pending appellate case, *Mary Seguin v. Rhode Island Office of Child Support Services, et al*, Case Number 23-1851.

2. Plaintiff respectfully requests the U.S. Court of Appeals for the First Circuit to review Plaintiff's timely filed Rule 59 Motion and Rule 60 Motion that were filed in the U.S. District Court of the District of Rhode Island on November 16, 2023 as proper part of the record of appeal. Prior to filing this Notice of Appeal, Plaintiff also filed a Rule 60(b)(1) Motion regarding the District Court's interference with Plaintiff's right to file Rule 59 and Rule 60 post judgement in which Plaintiff sought to preserve issues for appeal on the record. Plaintiff attaches all relevant documentation, including all relevant emails to the Clerk of the Court of the District Court and Plaintiff's properly filed post judgment motions pursuant to Rule 59 and Rule 60 herein to this Notice of Appeal and Docket Statement.

3. Plaintiff's Rule 59 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

4. Plaintiff's first Rule 60 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

5. Plaintiff attaches the aforesaid post judgment Motions and requests appellate review under these extraordinary and troubling factual circumstances that violate and obstruct the fundamental First Amendment right of access to the Court of Record, due process and obstruction to justice in the First Circuit, and *inter alia*, interference with the accuracy of the court's record for appeal in this matter.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 16, 2023, I filed the within Motion with the

Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 17, 2023



Mary Seguin <maryseguin22022@gmail.com>

---

# URGENT - TIME SENSITIVE - FILE TODAY RULE 60(b)(1) MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS

Mary Seguin <maryseguin22022@gmail.com>                    Fri, Nov 17, 2023 at 1:38 PM
Draft

Dear Clerks of the Court,

I spoke with Clerk Meghan today regarding an update on the docketing of my motions.

Following our discussion, I respectfully request the Clerk of the Court to docket today my attached Rule 60(b)(1) Motion, dated November 17, 2023, that is time-sensitive.

Please make sure that my attached Rule 60(b)(1) Motion is docketed as ECF 32.

Please make sure that the law is followed that my attached Rule 60(b)(1) Motion is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Rule 60(b)(1) Motion. No Chamber interference should be taking place to prevent the docketing of my attached Rule 60(b)(1) Motion.

Thank you for your assistance.

Respectfully Submitted,
Mary Seguin
Houston, Texas

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Fri, Nov 17, 2023 at 12:33 PM
Subject: Fwd: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerks of the Court,

I am respectfully following up on my Rule 59 Motion filing.

Yesterday, November 16, 2023, at 1:31 PM Central Time, I filed via email below, my Rule 59 Motion in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS. As indicated in my email below, I emphasized that docketing the Rule 59 Motion on November 16, 2023 is urgent, to comply with the 28 day filing post-judgment deadline, which my filing meets - November 16, 2023 is within the 28 day deadline of Fed. R. of Civ. P. 59 that tolls the time for filing an appeal.

I followed up with telephone calls to the Clerk's Office at 1:32 PM Central Time, and at 3:42 PM Central Time to request timely docket of my Rule 59 Motion, and the Clerk's Office assured me each time that a deputy clerk is working on it and that it will be docketed on the day it was received and that the docket will reflect the email date stamp of the day the Rule 59 Motion is received by email. Further, I was told that **all filings** I email to the Clerk's Office will be docketed and considered by the Court as having been filed on the day that the motion was emailed to the Clerk's Office.

Therefore, my Rule 59 Motion emailed on November 16, 2023 should be accordingly docketed as **ECF 32** with the **entry of/stating filing on November 16, 2023**, in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

However, as of this time, on November 17, 2023 almost 24 hours later, my Rule 59 Motion is still not docketed.

I would like to respectfully clarify that the Text Order dated October 19, 2023 in this matter states that only my electronic filing privilege was revoked, but there is **no** order requiring that I need to file for leave of Court to file any post-judgment motions, such as my Rule 59 Motion.

Today, November 17, 2023, I telephoned the Clerk's Office first thing at 8:00 AM Central Time, and spoke with Clerk Meghan, who informed me that yesterday she had forwarded my Rule 59 Motion to Chambers upon receipt, but has yet to hear back from Chambers, but did not know what was causing the hold up when I asked why Chambers' response is taking almost 24 hours which impacts the docketing date of the Rule 59 Motion.  I expressed my concern of the Rule 59 deadline, emphasizing that it tolls the time for filing an appeal, therefore I respectfully requested that the docket accurately reflects my timely filing of my Rule 59 Motion on November 16, 2023 (at 1:31 PM Central Time).

Additionally, I informed Clerk Meghan that I relied on the Clerk's Office's information provided above, and I had also filed a timely **Rule 60** Motion yesterday, **November 16, 2023**, at **4:39 PM Central Time**, similarly requesting docketing to reflect it was timely filed via email to on November 16, 2023.  I emphasized to Clerk Meghan that timeliness is critical, as Rule 60 Motion filed within 28 days post-judgment tolls the time for filing an appeal.  Clerk Meghan told me that my Rule 60 Motion was forwarded to Chambers as well.  According to the Clerk's Office's information, my **Rule 60 Motion** needs to be docketed/filed as **ECF 33, dated stamped filed on November 16, 2023**.

Due to the above information regarding the processing of my post-judgment motions, I expressed to Clerk Megghan my concern regarding the Court's procedure of forwarding my time-sensitive post-judgment motions to Chambers without docketing/filing, and then those time-sensitive motions seemingly to languish in Chambers past the date of the 28-day deadline stipulated by Rule 59, and Rule 60 as they relate to tolling the time for filing an appeal.  I expressed my explicit concern that I seek to preserve my right of appeal, and that I respectfully seek to preserve on the record the issues contained in my Rule 59 and Rule 60 Motions that are currently before Chambers, without docketing, by law within the jurisdiction of the U.S. District Court of Rhode Island.  My Rule 59 and Rule 60 Motions are not ex-parte or emergency motions.

Moreover, I expressed to Clerk Meghan my concern that the processing of my post-judgment motions forwarded to Chambers and seemingly pending before Chambers without the motions being docketed, impacts my right of appeal 30-days post judgment, and today, Friday, is Day 29.  I told the Clerk that under the circumstances in this matter, I seek to preserve for appeal the issues raised in my timely filed Rule 59 Motion and Rule 60 Motion, and that I seek to preserve my right to appeal within the 30-day postjudgment period.

I also discussed with the Clerk that my timely filed but undocketed Rule 59 Motion and Rule 60 Motion that were forwarded to and currently before Chambers cause an uncertain effect, impacting the date of my filing of Notice of Appeal, the deadline of which is November 18, 2023, a Saturday.   Based on the current facts and issues regarding simply docketing my filings on the record, I am concerned my rights of access to the Courts are impacted, and that my Notice of Appeal may also languish I do not believe any pro se litigant should be made to be uncertain of the timeliness of filing a Notice of Appeal as a matter of right that is caused by inaction by Chambers on timely-filed Rule 59 and Rule 60 Motions that toll the time to file an appeal. I explicitly expressed my concern on the effect on my access to the Courts.

I respectfully request that this email communication regarding the filing/docketing of my Rule 59 Motion be docketed to accurately reflect the record on appeal along with the Rule 59 Motion at the time the Rule 59 Motion is docketed by the Clerk.

Thank you in advance for you assistance.


Respectfully submitted,
Mary Seguin

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Thu, Nov 16, 2023 at 1:31 PM
Subject: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk of the Court,

Kindly urgently file today, November 16, 2023, my attached Rule 59 Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 59 Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023. I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX 77019
(281) 244-2016

---

📄 **CA 126 Rule 60(b)(1) Motion with Attachments FINAL 111723.pdf**
679K

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                                      Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

     *Defendants*

## **PLAINTIFF'S RULE 60(b)(1) MOTION**

1. Plaintiff, proceeding from and as a citizen of Texas, respectfully requests pursuant to

Fed. R. Civ. P. Rule 60(b)(1), (3), (4) and (6) for a new trial.  Judge Smith had obstructed

Plaintiff access to the Court, by instructing the Clerk of the Court, Meghan, to not docket

Plaintiff's timely filed Rule 59 and Rule 60 Motions filed with the Clerk via email on November

16, 2023, as to obstruct Plaintiff's right to access the Court to preserve the issues for appeal.

Plaintiff avers the following, supported by affidavit attached:

(1) On November 16, 2023, at 1:31 PM Central Time, Plaintiff filed via email to the Office of the Clerk In-Take email, Plaintiff's timely-filed Rule 59 Motion, requesting a new trial as Rule 59(e) provides. Plaintiff requested in her email that the Clerk timely docket the time-sensitive Rule 59 Motion on November 16, 2023. Plaintiff telephoned the Clerk's Office twice on November 16, 2023 to make sure of the Clerk's receipt of Plaintiff's filings, and was confirmed, and told that all motions emailed to the Clerk's Office are docketed as filed on the date stamp receipt by the Court's Clerk's Office. <u>See attached email and email-attached Motion.</u>

(2) On November 16, 2023, at 4:39 PM Central Time, Plaintiff filed via email to the Office of the Clerk In-Take email, Plaintiff's timely-filed Rule 60(b) Motion, requesting a new trial. Plaintiff requested in her email that the Clerk timely docket the time-sensitive Rule 60 Motion on November 16, 2023. <u>See attached email and email-attached Motion.</u>

(3) However, neither motions were docketed by the Clerk of the Court, and Plaintiff followed up first thing on November 17, 2023 at 8:00 AM Central Time. Plaintiff spoke to Clerk Meghan who informed Plaintiff that she had forwarded Plaintiff's Rule 59 and Rule 60 Motion to Chambers because the Court told her to, without docketing Plaintiff's Motions. Clerk Meghan told Plaintiff she will email Chambers to "find out what is going on." No Order in this matter requires Plaintiff to file for leave of Court to file any post judgement motions, and even if leave is required, Plaintiff's court-submitted Rule 59 and Rule 60 Motions seeking to preserve issues for appeal are required by law to be docketed in all courts of law to complete an accurate record for appeal.

(4) Plaintiff expressed to Clerk Meghan Plaintiff's concern that the irregular forwarding of timely filed Rule 59 Motion and Rule 60 Motion languishing in Chambers without being docketed on the record adversely impede and obstruct Plaintiff's right of access to the Court, as

well as obstructs Plaintiff's right to preserve legal issues for appeal, and fabricating an inaccurate record for appeal, as well as violates due process.

(5) At 12:20 PM, Plaintiff followed up by telephone, and was told that there were no updates from Chambers and Plaintiff's Rule 59 and Rule 60 Motions are still not docketed. Plaintiff emailed the Clerk's office documenting in writing the irregularity described above. At the very same moment, Judge Smith entered a text order stating that the Court is in receipt of two emails sent by the Plaintiff and construes them as motion for leave to file, that are denied. Plaintiff's Rule 59 and Rule 60 Motions continue to be not docketed. Plaintiff phoned the Office of the Clerk again, and the Clerk informed Plaintiff that the Court is telling her not to docket Plaintiff's Rule 59 and Rule 60 motions. This is *prima facie* judicial obstruction of Plaintiff's right to file Rule 59 and Rule 60 Motions against the Plaintiff to preserve issues on the record for appeal. Plaintiff attaches herewith the aforesaid November 17, 2023 email for the record.

WHEREFORE, Plaintiff requests the Court to docket Plaintiff's timely filed Rule 59 and Rule 60 Motions and the aforesaid three emails to preserve the record accurately. Plaintiff requests the Court treat Plaintiff's timely filed Rule 59 Motion and Rule 60 Motion filed on November 16, 2023 as timely filed. Plaintiff requests the disqualification of Judge Smith by the Court. Plaintiff requests any and all such relief deemed just under the circumstances.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 17, 2023, I filed the within Motion with the Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 17, 2023

 Gmail

Mary Seguin <maryseguin22022@gmail.com>

## URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS

2 messages

**Mary Seguin** <maryseguin22022@gmail.com>                              Thu, Nov 16, 2023 at 1:31 PM
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk of the Court,

Kindly urgently file today, November 16, 2023, my attached Rule 59 Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 59 Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023.  I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX  77019
(281) 244-2016

 **CA 126 Plaintiff Rule 59 Motion with Affidavit 111623.pdf**
387K

**Mary Seguin** <maryseguin22022@gmail.com>                              Fri, Nov 17, 2023 at 12:33 PM
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerks of the Court,

I am respectfully following up on my Rule 59 Motion filing.

Yesterday, November 16, 2023, at 1:31 PM Central Time, I filed via email below, my Rule 59 Motion in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.  As indicated in my email below, I emphasized that docketing the Rule 59 Motion on November 16, 2023 is urgent, to comply with the 28 day filing post-judgment deadline, which my filing meets - November 16, 2023 is within the 28 day deadline of Fed. R. of Civ. P. 59 that tolls the time for filing an appeal.

I followed up with telephone calls to the Clerk's Office at 1:32 PM Central Time, and at 3:42 PM Central Time to request timely docket of my Rule 59 Motion, and the Clerk's Office assured me each time that a deputy clerk is working on it and that it will be docketed on the day it was received and that the docket will reflect the email date stamp of the day the Rule 59 Motion is received by email.  Further, I was told that **all filings** I email to the Clerk's Office will be docketed and considered by the Court as having been filed on the day that the motion was emailed to the Clerk's Office.

Therefore, my Rule 59 Motion emailed on November 16, 2023 should be accordingly docketed as **ECF 32** with the **entry of/stating filing on November 16, 2023**, in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

However, as of this time, on November 17, 2023 almost 24 hours later, my Rule 59 Motion is still not docketed.

I would like to respectfully clarify that the Text Order dated October 19, 2023 in this matter states that only my electronic filing privilege was revoked, but there is **no** order requiring that I need to file for leave of Court to file any post-judgment motions, such as my Rule 59 Motion.

Today, November 17, 2023, I telephoned the Clerk's Office first thing at 8:00 AM Central Time, and spoke with Clerk Meghan, who informed me that yesterday she had forwarded my Rule 59 Motion to Chambers upon receipt, but has yet to hear back from Chambers, but did not know what was causing the hold up when I asked why Chambers' response is taking almost 24 hours which impacts the docketing date of the Rule 59 Motion. I expressed my concern of the Rule 59 deadline, emphasizing that it tolls the time for filing an appeal, therefore I respectfully requested that the docket accurately reflects my timely filing of my Rule 59 Motion on November 16, 2023 (at 1:31 PM Central Time).

Additionally, I informed Clerk Meghan that I relied on the Clerk's Office's information provided above, and I had also filed a timely **Rule 60** Motion yesterday, **November 16, 2023**, at **4:39 PM Central Time**, similarly requesting docketing to reflect it was timely filed via email to on November 16, 2023. I emphasized to Clerk Meghan that timeliness is critical, as Rule 60 Motion filed within 28 days post-judgment tolls the time for filing an appeal. Clerk Meghan told me that my Rule 60 Motion was forwarded to Chambers as well. According to the Clerk's Office's information, my **Rule 60 Motion** needs to be docketed/filed as **ECF 33, dated stamped filed on November 16, 2023**.

Due to the above information regarding the processing of my post-judgment motions, I expressed to Clerk Megghan my concern regarding the Court's procedure of forwarding my time-sensitive post-judgment motions to Chambers without docketing/filing, and then those time-sensitive motions seemingly to languish in Chambers past the date of the 28-day deadline stipulated by Rule 59, and Rule 60 as they relate to tolling the time for filing an appeal. I expressed my explicit concern that I seek to preserve my right of appeal, and that I respectfully seek to preserve on the record the issues contained in my Rule 59 and Rule 60 Motions that are currently before Chambers, without docketing, by law within the jurisdiction of the U.S. District Court of Rhode Island. My Rule 59 and Rule 60 Motions are not ex-parte or emergency motions.

Moreover, I expressed to Clerk Meghan my concern that the processing of my post-judgment motions forwarded to Chambers and seemingly pending before Chambers without the motions being docketed, impacts my right of appeal 30-days post judgment, and today, Friday, is Day 29. I told the Clerk that under the circumstances in this matter, I seek to preserve for appeal the issues raised in my timely filed Rule 59 Motion and Rule 60 Motion, and that I seek to preserve my right to appeal within the 30-day postjudgment period.

I also discussed with the Clerk that my timely filed but undocketed Rule 59 Motion and Rule 60 Motion that were forwarded to and currently before Chambers cause an uncertain effect, impacting the date of my filing of Notice of Appeal, the deadline of which is November 18, 2023, a Saturday. Based on the current facts and issues regarding simply docketing my filings on the record, I am concerned my rights of access to the Courts are impacted, and that my Notice of Appeal may also languish I do not believe any pro se litigant should be made to be uncertain of the timeliness of filing a Notice of Appeal as a matter of right that is caused by inaction by Chambers on timely-filed Rule 59 and Rule 60 Motions that toll the time to file an appeal. I explicitly expressed my concern on the effect on my access to the Courts.

I respectfully request that this email communication regarding the filing/docketing of my Rule 59 Motion be docketed to accurately reflect the record on appeal along with the Rule 59 Motion at the time the Rule 59 Motion is docketed by the Clerk.

Thank you in advance for you assistance.


Respectfully submitted,
Mary Seguin
[Quoted text hidden]

---

📄 **CA 126 Plaintiff Rule 59 Motion with Affidavit 111623.pdf**
387K



**Mary Seguin <maryseguin22022@gmail.com>**

---

## URGENT - TIME SENSITIVE - FILE TODAY RULE 60 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS

1 message

---

**Mary Seguin** <maryseguin22022@gmail.com>                                          Thu, Nov 16, 2023 at 4:39 PM
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk/Deputy Clerk of the Court,

Kindly urgently file and docket today, November 16, 2023, my attached Rule 60(b) Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 60(b) Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023.  I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX  77019
(281) 244-2016

---



**CA 126 Rule 60(b) Motion with Affidavit 111623.pdf**
379K

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                                 Civil Action No. 1:23-cv-126-WES-PAS


RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

*Defendants*

**PLAINTIFF'S RULE 59 MOTION FOR A NEW TRIAL**

1. Plaintiff, proceeding from and as a citizen of Texas, respectfully requests pursuant to

Fed. R. Civ. P. Rule 59 for a new trial. Plaintiff avers the following, supported by affidavit

attached: The 91-page First Amended Complaint [ECF 25] filed on September 1, 2023 seeks

monetary damages against the Rhode Island State Defendants and the private actor Defendants

for:

(1) The Rhode Island Judiciary and Tyler Technologies' monopoly of publication of law.

(2) The Rhode Island Judiciary and Tyler Technologies' denial to the Public and to all Pro Se Litigants all access and the denial of free access to the contents of the law created, authored, and deliberated by the Rhode Island Judiciary.

(3) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to knowingly fail to properly integrate the legacy electronic court case management systems used by Rhode Island Department of Human Services and Office of Child Support Services during the implementation of Odyssey from 2013 to 2014 (the State's official electronic court filing and electronic case management system), so that these state agencies' filings are discriminately invisible only to the Public, to Pro Se Litigants and to the Rhode Island Virtual Clerk of the Courts in the Rhode Island Family Court, a limited jurisdiction court of record. The State's filings are only visible to the judges and to the State filers, thus manipulating the proceeding towards a foregone conclusion in favor of the State filers.

(4) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to misrepresent to the Public and to the Pro Se Litigants that the implemented electronic court case records of judge created laws are available to *all* court users, in order to cover up their monopolization of the publication of law denies the Public and the Pro Se Litigant access to the judge-created laws.

(5) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services that the State routinely establishes and enforces 12% compound interest on child and spousal support in Title IV of the Social Security Act state family court proceedings, in violation of the uniform statutory requirement of 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and

*if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest, targeting noncustodial parents victims. In welfare cases, support are assigned by the custodial parent to the State, and the 12% compound interest represents a fee for the State's "services" in the support's establishment and enforcement paid to the State, which at 12% compound interest represents lucrative, illegally obtained revenue to the State actors, who are financially incentivized to obtain as much as possible.

(6) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services and Tyler Technologies to knowingly fail to properly integrate Odyssey with the State's legacy electronic court filing system resulting in the State's filings seeking illegal 12% compound interest, as well as to deny the Public and to Pro Se Litigants' access to their publication of judge-created law records for the purpose of cover up of this wholesale illegal defraud of the court, extortionary defraud under color of state law targeting the unsuspecting noncustodial parents victims, and defraud of the United States (66% of the cost of these child support "operations" is funded by the U.S. Department of Health and Human Services through Title IV of the Social Security Act through funds appropriated by Congress through the annual budget appropriations.)

(7) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Tyler Technologies to operate the Title IV Program of the Social Security Act in all manners violative of due process, in prima facie due process violative State Electronic Courts, for the purpose of generating state revenue through fraud and deceit, through conspired tortious interference of rights of access to the courts, rights of

access to state case documents, and rights of access to judge-created laws targeting litigants, targeting the Public and targeting Pro Se Litigants.

(8) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Tyler Technologies to cover up their public-access-denied publication of state judge-created laws of illegal 12% compound interest benefiting the state's revenue by adopting a State policy not to establish nor enforce any interest in *interstate* support cases only, calculated to cover up the collective fraud from federal enforcement officials and other states' enforcement officials of court orders (laws) showing 12% compounded interest established and funded under Title IV that are facially illegally violative of 42 U.S.C. § 654(21)(A) which explicitly provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest. The federal Title IV Program regulation by Congressional intent explicitly preempts any related state laws of all participating states.

(9) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services and Barbara Grady and Gero Meyersiek to use the fraudulent, First Amendment-, Fourth Amendment-, Fifth Amendment-, Seventh Amendment-, and Fourteenth Amendment violative state court machinery weaponizing Title IV Program of the Social Security Act to target the Plaintiff *pro se* noncustodial parent in Texas to retaliate against Plaintiff for her past lawsuits against them, namely ten years ago in Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state

court's under color of state law abuse of the legal frame work of another federal-funded human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00 per visitation if Plaintiff wanted to see her children in Rhode Island, because the state court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other legally sufficient basis. Plaintiff had reported this *prima facie* extortion under color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas. Here, Plaintiff's ==retaliation== damages claims have been issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455, additionally given the fact Judge Smith had also self-recused from Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013) ten years ago. *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998) ("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no party has requested it").

(10) The Rhode Island Judiciary continues the pattern of cover up by denying Plaintiff's request for public judicial records related to the monopoly of publication of judge-created records submitted to the State Judiciary pursuant to the Rhode Island Access to Public Records Act ("RI APRA").

4. Plaintiff obtained new evidence on October 6, 2023 that the Rhode Island Judiciary is a former client of Judge Smith, and on November 9, 2023, Plaintiff obtained new evidence that the

Rhode Island Judiciary remains a major client of Judge Smith's former law firm.  Plaintiff's due diligence search for conflict of interest has been impeded by the Rhode Island Judiciary and Tyler Technologies monopoly of publication of judge-created laws in the state's electronic court system and their denial of access to the judge-created laws, and Plaintiff, as a member of the Public and proceeding pro se without a Rhode Island Attorney license, the issuance of which is also monopolized by the Rhode Island Judiciary, has further been denied  access to official records, including through the Rhode Island Access to Public Records Act, consistent with a pattern of civil conspiracy cover up.

5.  A new trial or a stay of the Judgment is necessary to prevent irreparable harm to Plaintiff, and to Americans across the First Circuit who would be needlessly deprived of access to the federal courts of law in the First Circuit for monetary damages redress - the judicially created doctrine of Younger Abstention that functioned as a court of equity - regarding Plaintiff's monetary damages claims against the Rhode Island Judiciary and Tyler Technologies' scheme to monopolize the publication of judge-created laws that denies, tortiously interferes, tortiously abridges and tortiously obstruct the Public access to those very laws; regarding Defendant Rhode Island Office of Child Support Services' unlawful seizures of interstate Texas properties outside of Rhode Island under color of Rhode Island state law based on legally insufficient interest charge on overdue support based on the unlawful rate of 12% compound interest that is disallowed under Title IV-D Program of the Social Security Act, specifically 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest.  And this is on top of Defendants' breach of contract that was brokered by Defendant Rhode Island Office of Child Support Services on behalf of the agency's client; the contract between the custodial parent client, defendant Gero

Meyersiek and the Texas Plaintiff stipulated that the custodial parent waived interest upon the Texas Plaintiff paying a lump sum of $104,185.98 pay-off amount, which Plaintiff performed from Texas on December 7, 2021. Even at the point of contractual agreement, Defendant Rhode Island Office of Child Support Services in conjunction with Defendant Gero Meyersiek, misrepresented there was lawful and enforceable interest to be waived, as they removed the accrued interest from the Title IV-D Program mandated support record system in order to cover up from the Plaintiff, and from federal and Texas authorities the unlawful 12% compound rate. After fraudulently inducing Plaintiff in Texas to agree to and to perform on the contract, the Defendants immediately put the interest back into the Title IV-D Program-mandated automated support record system and started to seize Plaintiff's properties in Texas under color of Rhode Island state law.

6. The final judgment is on its face violative of binding First Circuit caselaw that mandates lower courts to *stay* monetary damages claims when applying Younger Abstention. *See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997) (relying on *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706 (1996) in holding that abstention does not allow for dismissal of damages claim).

7. 42 U.S.C. § 654(21)(A) has been in effect since the enactment of the Title IV-D Program of the Social Security Act several decades ago, and Congress's original intent was to combat poverty within the populace of single mothers and children in welfare cases; Congress at no time intended to shift the undue burden of Rhode Island's 12% compound interest on overdue support under color of Rhode Island state law to noncustodial parents, whether targeting Texas or across the country, which in welfare cases Rhode Island converts the 12% compound interest to assigned debts owed by noncustodial parents to Rhode Island's state agencies and state

government, representing underhanded unlawful state revenue unlawfully obtained through the legal framework of Title IV-D Program of the Social Security Act, targeting unsuspecting noncustodial parents victims.  As a legal point of a state's lawful application of 42 U.S.C. § 654(21)(A) within the First Circuit, New Hampshire, in compliance with the letter of federal law, opts into Title IV-D Program and opts not to charge any interest whatsoever, as per the letter of law and the original intent of Congress, 42 U.S.C. § 654(21)(A).  Similarly, Texas charges 6% in compliance with 42 U.S.C. § 654(21)(A).

8. Defendant Rhode Island Office of Child Support Service's illegal denial and obstruction of access to Plaintiff's own child support case file that contains the incriminating illegal and arguably criminal scheme of removing the interest rate from the Title IV-D Program mandated and federally funded support record system to cover up the unlawful 12% compound interest from federal and Texas authorities, as well as from the Plaintiff in Texas, violates due process, obstructs justice, obstructs a federally funded and federal program proceeding, and the legal framework of Title IV-D of the Social Security Act, specifically, 42 U.S.C. § 654 and 42 U.S.C. § 666.

9. Judge Smith's dismissal of Texas Plaintiff's legal remedy monetary damages and breach of contract fraudulent inducement damages claims under Younger Abstention in this Court of law represents irreparable harm violative of the First Amendment, Fourth Amendment, Fifth Amendment, the Fourteenth Amendment, the Seventh Amendment and the First Amendment access to the Court.  The undisputable fact remains, Plaintiff's legal remedy request for monetary damages in this court of law consisting of twenty-two causes of action that cannot be dismissed under Younger Abstention, namely monetary damages claims of breach of contract fraudulent inducement, breach of implied contract, unjust enrichment, misrepresentation,

negligent misrepresentation, intentional/fraudulent misrepresentation, common law bad faith, breach of the covenant of good faith and fair dealings, tortious breach of the covenant of good faith and fair dealings, breach of fraudulent concealment/common law fraud, concealed fraud, tort of deceit, reckless indifference to the rights of Plaintiff, deliberate indifference to the rights of Plaintiff, abuse of process, breach of duty, accounting fraud, fraud cover up, RI Government Tort Liability (R.I. Gen. Laws 9-31-1, *et seq.*), 42 U.S.C. § 1983 Claim for Reckless Indifference of Plaintiff's Clearly Established Constitutional Rights, 42 U.S.C. § 1983 claim of Fourth Amendment Illegal Seizure of Plaintiff's Texas Property, state tort of liability against defendants under 42 U.S.C. § 1983, Civil RICO [ECF 25].

10. Judge Smith's legally-unsupported and factually-unsupported, and "legally insufficient" opinion that the limited jurisdiction family court is an adequate forum to raise Plaintiff's federal legal damages claims of breach of contract et al., contravenes Rhode Island law: R.I. Gen Laws 8-10-3 makes clear that family court is not a court of general jurisdiction, can only conduct bench trials functioning as a court of equity, not of law, and prohibits family court from exercising jurisdiction over breach of contract claims et al between the Texas Plaintiff and the Defendants; family court lacks jurisdiction over the Plaintiff's federal causes of actions; lacks the jurisdiction to summon a jury for jury trial in a court of law.

11. Finally, but equally critically, twenty-one days post judgment Plaintiff discovered troubling new evidence on November 9, 2023, that Judge Smith appears to have impermissibly acted in favor of the interests of the defendants – he is automatically disqualified under 28 U.S.C. § 455, because as a partner in his past practice and firm, the state government and the Rhode Island Judiciary were not only his clients, but continue to be that firm's major client under a flat fee contract and he has knowledge of the defendants' actions in this action – as a major

partner in his firm, the Rhode Island Judiciary is his and his form's past and current clients, the state government actors and the state courts actors, cooperate in the routine establishment and enforcement of 12% compound interest under the legal framework of Title IV-D Program of the Social Security Act, where 12% compound interest is disallowed under 42 U.S.C. § 654(21)(A). To the objective observer, having knowledge of the facts and circumstances of this case, and being a partner in his past firm that continues to have the Rhode Island Judiciary as a client, Judge Smith appears biased in favor of the defendants' interest to continue raking in state revenue under the auspices of 42 U.S.C. § 654(21))(A) that explicitly disallows state debts of 12% compound interest assigned to Rhode Island that the state actors who cover up the 12% compound rate by obstructing the noncustodial parent's access to her own child support case file that is further violative of the due process provisions under 42 U.S.C. § 654 and §666, in Rhode Island's federally funded operation with funds appropriated by Congress intended for the *lawful* operation of Title IV-D of the Social Security Act. Although under the judicial self-executing expectation under 28 U.S.C. §455, the Texas Plaintiff is not expected to cull court records in the Rhode Island state courts for judicial conflict of interest, nevertheless the Plaintiff in good faith and diligently attempted to perform a remote search of Rhode Island's electronic court case management system, Odyssey in 2023. In so doing, Plaintiff discovered troubling newly-discovered evidence that the Rhode Island Judiciary, while publicly representing that the 2014 $6 million state transition from paper courts to electronic courts promises *all court users* will be able to call up court documents remotely from their mobile devices, in reality Rhode Island adopted rules only denying the public and pro se litigants remote access to court case information, including pro-se litigants' own case records, that both the public and all litigants had equal statutory, common law and constitutional rights of access in paper courts – Judge

Smith's firm's clients, the Rhode Island Judiciary, therefore implemented electronic court public access denials that obstructed Plaintiff's and the public's discovery of Judge Smith's judicial disqualification regarding his former clients such as the state courts, the defendant state actors and other conflict entities.

## I. LEGAL STANDARD

11. The United States Supreme Court in 2020 reaffirmed, in *GEORGIA, ET AL., PETITIONERS v. PUBLIC.RESOURCE.ORG, INC*, 590 U.S. ___ (2020), the century-old government edicts doctrine, making clear that officials empowered to speak with the force of law cannot be the authors of—and therefore cannot monopolize access—the works they create in the course of their official duties. The U.S. Supreme Court previously applied that doctrine to hold that non-binding, explanatory legal materials when created by judges who possess the authority to make and interpret the law shall not monopolize access to it. *See Banks v. Manchester*, 128 U. S. 244 (1888). Tyler Technologies is a for profit organization that aims to facilitate public access to government judge-created records and legal materials. Tyler Technologies is contracted by the Rhode Island Judiciary to implement the State's electronic courts in 2013 and together, they both publicly represented that access to the contents of judge-created laws records will be readily called on mobile devices to *all* court users, namely, to the Public and to pro se litigants.

12. Under the government edicts doctrine, judges may not be considered the "authors" of the works they produce in the course of their official duties as judges. That rule applies regardless of whether a given material carries the force of law. In *Banks v. Manchester,* 128 U. S. 244 (1888) the Supreme Court concluded that "the judge who, in his judicial capacity, prepares the opinion or decision, the statement of the case and the syllabus or head note" cannot "be regarded as their author or their proprietor. *Banks*, 128 U. S, at 253 (emphasis in original).

Rather, "[t]he whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all." *Ibid.* (citing *Nash v. Lathrop*, 142 Mass. 29, 6 N. E. 559 (1886)). These cases establish a straightforward rule: Because judges are vested with the authority to make and interpret the law, they cannot be the "author" of the works they prepare "in the discharge of their judicial duties." Banks, 128 U. S., at 253. This rule applies both to binding works (such as opinions) and to non-binding works (such as headnotes and syllabi). *Ibid.* The animating principle behind this rule is that no one can own the law. "Every citizen is presumed to know the law," and "it needs no argument to show . . . that all should have free access" to its contents. *Nash,* 142 Mass., at 35, 6 N. E., at 560 (cited by *Banks*, 128 U. S., at 253–254). Rather than attempting to catalog the materials that constitute "the law," the doctrine bars the officials responsible for creating the law from being considered the "author[s]" of "whatever work they perform in their capacity" as lawmakers. *Ibid.* (emphasis added). Because these officials are generally empowered to make and interpret law, their "whole work" is deemed part of the "authentic exposition and interpretation of the law" and must be "free for publication to all." *Ibid.*

13.  Rhode Island Judiciary and Tyler Technologies monopoly of publication of the judge-created laws and their "whole works" making and interpreting the law that explicitly by design deny access to the Public and to the Pro Se Litigant runs afoul of the government edicts doctrine.

14. Courts have long understood the government edicts doctrine to apply to legislative materials. See, e.g., *Nash*, 142 Mass., at 35, 6 N. E., at 560 (judicial opinions and statutes stand "on substantially the same footing" for purposes of the government edicts doctrine); moreover, just as the doctrine applies to "whatever work [judges] perform in their capacity as judges,"

*Banks*, 128 U. S., at 253, it applies to whatever work judges perform in their capacity as judges. *Banks*, following *Wheaton* and the "judicial consensus" it inspired, denied publication monopoly protection to judicial opinions without excepting concurrences and dissents that carry no legal force. 128 U. S., at 253 (emphasis deleted). As every judge learns the hard way, "comments in [a] dissenting opinion" about legal principles and precedents "are just that: comments in a dissenting opinion." *Railroad Retirement Bd. v. Fritz,* 449 U. S. 166, 177, n. 10 (1980). Yet such comments are covered by the government edicts doctrine because they come from an official with authority to make and interpret the law. Indeed, *Banks* went even further and withheld publication monopoly protection from headnotes and syllabi produced by judges. 128 U. S., at 253. Surely these supplementary materials do not have the force of law, yet they are covered by the doctrine. The simplest explanation is the one *Banks* provided: These non-binding works are not copyrightable because of who creates them—judges acting in their judicial capacity.  *See ibid.* The textual basis for the doctrine is the "authorship" requirement, which unsurprisingly focuses on—the author, the judges.  The Supreme Court long ago interpreted the 'author" to be officials empowered to speak with the force of law.  The doctrine distinguishes between some authors (who are empowered to speak with the force of law) and others (who are not).  The Supreme Court explicitly rejects allowing the States to "monetize its entire suite of legislative and judicial history. With today's *digital tools*, States might even launch a subscription or pay-per-law service."  See *Georgia v, Public Resources Org.* at 590 U. S. ____ (2020)  It is obviously explicitly clear that the Supreme Court refers to the prohibition against the Rhode Island Judiciary and Tyler Technology's monopolization of  the digital publication of DIGITAL COURT JUDICIAL COURT RECORDS that denies publication access of judge-created laws and their work materials to the Public and to Pro Se Litigants.

15. There is no legitimate Rhode Island government interest in the knowing illegal denial of access to the public and to pro se litigants the digital records of the Rhode Island Judiciary's and Tyler Technologies' illegal monopolization of digital publication of judge-created laws involving the establishment nor enforcement of unlawful 12% compound interest violative of explicitly clear 42 U.S.C. § 654(21)(A) within the legal framework of Title IV-D Program targeting noncustodial parties in Texas who are outside of Rhode Island that Rhode Island already knows is unenforceable in Texas, and thus had removed the 12% compound interest in 2018 calculated to cover it up from federal and Texas authorities. Rhode Island's abuse of the legal framework of the government edict doctrine and the legal framework of Title IV-D Program are diametrically at odds with the intent of Congress and binding caselaws of the U.S. Supreme Court. The civil conspiracy to cover up the illegal machinery of the digital electronic courts in Rhode Island is clear. *See Turner v. Rogers*, 131 S. Ct. 2507, 2518 (2011). *See Georgia v, Public Resources Org.* at 590 U. S. ____ (2020); *See* HOUSE COMM. WAYS & MEANS, Section 8: Child Support Enforcement Program, in 2004 GREEN BOOK: BACKGROUND MATERIAL AND DATA ON THE PROGRAMS WITHIN THE JURISDICTION OF THE COMMITTEE ON WAYS AND MEANS 8-1, 8-2 (2004). *See* Social Services Amendments of 1974, Pub. L. No. 93-647, § 101, 88 Stat. 2337, 2351. Where the mother receives public aid, federal and state governments will provide the child support payment to the mother and hold the father indebted to the government for that amount. In cases where the mother is not dependent on welfare, the government has largely stayed out of the fray. *See* HOUSE COMM. WAYS & MEANS, *supra* note 38. Yet, this case does not involve a welfare case, as the custodial father is wealthy, but the Defendants are motivated by retaliation against the Plaintiff for suing them ten years ago in Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian

et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state court's under color of state law abuse of the legal frame work of another federal-funded human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00 per visitation if she wanted to see her children in Rhode Island, because the state court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other legally sufficient basis. Plaintiff had reported this *prima facie* extortion under color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas. Here, Plaintiff's retaliation damages claims have been issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455, additionally given the fact Judge Smith had also self-recused from Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013) ten years ago. *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998) ("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no party has requested it").

## II. ARGUMENT

16. Plaintiff has appealed the Court's/Judge Smith's judgment in its entirety in the related case, Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I. 2023) and respectfully submits that she is likely to secure a complete reversal of this Court's

holding that the judicially created doctrine of Younger Abstention applies to the *dismissal* of her monetary damages and breach of contract damages claims.

17. Plaintiff further submits that she is likely to secure a complete reversal of this Court's in this case.

18. Conducting state proceedings funded by federal funding appropriated by Congress under Title IV of the Social Security Act in state monopolized electronic courts that violate the long-established government edict doctrine as it related to the Public's access of the digital publication of judge-created laws and violate the Constitution targeting Texas assets and Texas parties for illegal 12% compound interest involving fraudulent inducement that cannot be enforceable in Texas is the prima facie example of government fraud and government waste, warranting cut off from federal funding at the very minimum. Not even Judge Smith, friend of the Rhode Island Judiciary, can punt these egregious state activities to later addressment via the attention of the Supreme Court and to Congress Appropriation Committees, wrongfully using Younger Abstention.

19. Judge Smith's holding is defect in claiming without a shred of factual basis that Plaintiff can raise her federal monetary damages claims and fraudulent inducement breach of contract claims in the jurisdictionally defective Rhode Island family court, that R.I. Gen. Laws 8-10-3 plainly states the family court is *not* a court of general jurisdiction, and which lacks the jurisdiction over the controversy for legal relief of monetary damages tort claims and fraudulent inducement breach of contract damages claims over both the Plaintiff and all the named defendants.

20.  Plaintiff seeks a new trial or a stay pending appeal as Plaintiff's likelihood of success on appeal, together with the lopsided balance of hardships, weigh heavily in favor of granting the stay being sought pending appellate review.

### A. Plaintiff is Likely To Succeed On Appeal Of the Judgment Ordered By the Court:

21. Although Plaintiff recognizes that the Court has ruled against her as to the scope of relief, Plaintiff is likely to succeed on appeal of those issues, and has raised serious legal questions and presented a substantial case. *See Arnold v. Garlock, Inc*., 278 F.3d 426, 438-39 (5th Cir. 2001).

22. Plaintiff incorporates by reference her prior remedy arguments.  Plaintiff reserves the right to make any and all arguments on appeal.

23. Among the substantial questions raised by Plaintiff is whether the Court erred in awarding Defendants dismissal of Plaintiff's monetary damages claim in this First Circuit under Younger Abstention and erred in failing to self-execute 28 U.S.C. § 455. And Plaintiff respectfully submits that she is likely to succeed on appeal in arguing that, in these circumstances, dismissal was not properly ordered in the particular circumstances of this case pursuant to established binding First Circuit caselaws on both the Court's errors applying Younger Abstention as well as judicial disqualification. *See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997)**;** *In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998); *Quackenbush v. Allstate Ins. Co*., 517 U.S. 706 (1996).  *See* also *Allen v. La. State Bd. of Dentistry*, 835 F.2d 100, 104 (5th Cir. 1988). ("Younger abstention does not apply to claims for monetary damages.")

24. Absence of a new trial or a stay of the judgment will erode confidence in the Judiciary in the First Circuit by creating an impression that it is violating national law regarding the government edict doctrine and setting illegal new national policy regarding the Title IV-D Program. It may also have the effect of "encouraging forum shopping." *Trump v. Hawaii,* 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). It further "undermines the judicial system's goals of allowing the 'airing of competing views' and permitting multiple judges and circuits to weigh in on significant issues." *See* also *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (traditional remedial principles account for "the public interest" and "the balance of equities"); *EME Homer City Generation, LP v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.) (declining to vacate unlawful agency action under the APA because "vacatur could cause substantial disruption"). In this context, the dismissal of Plaintiff's state government tort monetary damages claims entered by the Court could cause substantial disruption to the *uniform* application of the legal framework of the Title IV-D Program Congress explicitly intended.

25. The serious legal questions raised in this case regarding the scope of remedy go beyond the questions of whether a Younger abstention is applicable to federal monetary damages claims and or the feeble assertion of *comity* applied to the Rhode Island Judiciary and Tyler Technology's gross violation of the government edict doctrine—and indeed, those questions should not have even entered into this case. Here, among Plaintiff's challenges was to state Judiciary, Tyler Technologies and agency actions, and Plaintiff pursued fraudulent inducement breach of contract damages claims and tort monetary damages claims. Instead, the Court at law cannot vacate a federal statute—i.e., cannot "delete a previously enacted statute from the books" such as 42 U.S.C. § 1983. *See* also Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va.

L. Rev. 933, 936 (2018) ("The federal courts have no authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute. The power of judicial review is more limited." (footnotes omitted). Legal monetary damages relief under 42 U.S.C. § 1983 that would hold the Rhode Island state government accountable under the Rhode Island Government Tort Act for Rhode Island government actors' tortious actions violating the legal framework of the Title IV-D Program federal statutes targeting the Plaintiff in Texas was a legal remedy conferred by Congress to federal courts to grant legal relief appropriate in this case. The Court has an unflagging obligation to exercise jurisdiction conferred to it by Congress. *See Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013)

26. With respect, although the Court has entered a judgment otherwise, Plaintiff has demonstrated a likelihood of success on appeal of the Final Judgment sufficient to justify a stay of the judgment.

## B. The Balance of the Equities Overwhelmingly Favors the Requested New Trial or Stay

27. The balance of the equities overwhelmingly favors a new trial or stay: The State of Rhode Island plainly lacks any legitimate interest in the State's systemic knowing violation of the government edict doctrine and violation of 42 U.S.C. § 654(21)(A) that they now target Plaintiff in Texas, and which they sought to cover up from federal and Texas authorities, as well as from Plaintiff, by knowingly and unlawfully removing interest from the automated support record system. Americans outside of Rhode Island re fraudulently, unlawfully and systemically fleeced by Rhode Island's illegal scheme that is illegally funded through the State's defrauding of the United States lying to the United States that these activities are eligible for federal funds

appropriated by Congress for the legal administration of Title IV Program of the Social Security Act.

28. Defendants will face no harm from Plaintiff's requested new trial or stay. The judgment that is specifically directed to and protects the prevailing Defendants from legal accountability of their illegal actions, is further issued by a disqualified judge, Judge Smith, who was the former counsel for the Defendants and a partner of the firm whose major client is the Rhode Island Judiciary, *e.g.*, Rhode Island state government entities, including the state courts and state agencies. The requested new trial or stay will thus impose no hardship on the prevailing Defendants at all.

29. By contrast, the public and the Plaintiff face significant harm if now new trial is ordered or the judgment is not stayed. As an initial matter, "any time a [government]" violates "statutes enacted by representatives of its people," the people "suffer a form of irreparable injury." *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). But the harm here is much greater and more far-reaching. The government edict doctrine is willfully violated by the Rhode Island Judiciary and Tyler Technology in a civil conspiracy to cover up the illegal state family court creating judge-created laws ordering and enforcing 12% compound interest, aided and abetted by the Department of Human Services - Title IV-D requires the uniform application and compliance by participating States with the Social Security Act. Congress's as well as the United States through the Secretary of the U.S. Department of Health and Human Services' interest in the uniform compliance of 42 U.S.C. § 654(21)(A), § 654 and 42 U.S.C. § 666 are well established. The States are reimbursed 66% of the cost of operations through federal funding appropriated by Congress under Title IV-D of the Social Security Act. The Defendants' arbitrary illegal removal of the illegal unenforceable 12%

compound interest from the automated support record system and cover up of their illegal 12%

compound interest scheme from the federal and Texas authorities targeting Texas properties and

targeting the Plaintiff in Texas demonstrates Rhode Island government agencies (who are former

clients of Judge Smith) knowingly committed criminal schemes illegally seizing Plaintiff's

properties interstate in Texas that they know are violative of federal criminal codes and Texas

civil and penal codes. *See,* e.g., Social Services Amendments of 1974 (1975 Act), Pub. L. No.

93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security

Act). The program, which is administered by the United States Secretary of Health and Human

Services (Secretary), provides that States with approved plans for child and spousal support that

meet federal requirements are reimbursed by the federal government for a significant sixty-six

percent (66%) of the costs of operating their child-support enforcement programs. 42 U.S.C.

§v655(a)(2)(C). In 1975, Congress adopted Title IV-D, 42 U.S.C. §v651 *et seq*., and established

the general statutory framework that exists today. See 1975 Act § 101(a), 88 Stat. 2351; *Blessing*

*v. Freestone*, 520 U.S. 329, 333-335 (1997) (describing program). Congress ultimately set the

federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the

availability of matching funds at the 90% level for State expenditures for automating data

processing systems to improve "the monitoring of support payments, the maintenance of

accurate records regarding the payment of support. Therefore, the Defendants' illegal operations

cannot be funded by Congressional appropriations.

　　30. Judge Smith's failure to self-execute his disqualification under 28 U.S.C. § 455 as

well as Canon 3E of the Code of Judicial Conduct, then his subsequent refusal to recuse in the

related case, <u>Seguin v, RI Office of Child Support Services et al Civil</u> No. 23-cv-34-WES-PAS

(D.R.I. 2023), upon Plaintiff's request after she raised newly discovered discovery post judgment

on October 6, 2023 of his direct and past public sector law practice's contract legal representation of the Defendants, state courts, state agencies and other conflict entities, have the appearance, to the objective observer, of the Court's issuance of judgment in favor of the Defendants in error that contravenes established First Circuit case law on Younger Abstention as well as disqualification, calculated to benefit the interests of his former clients, as partner of his former firm that represents the Rhode Island Judiciary and the state government.

31. Moreover, the Court's judgment effectively functions as a denial of Plaintiff's access to this Court of law to redress her legal monetary damages claims and fraudulent inducement breach of contract damages claims. It is well-settled that even minimal loss of First Amendment freedoms, "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality)); *see also Elrod*, 427 U.S. at 373.; *N.Y. Times v. United States*, 403 U.S. 713, 715 (1971). Accordingly, Plaintiff has a strong likelihood of success on the merits, will suffer irreparable injury without a stay, and a stay will not injure others while furthering the public interest.

### III. CONCLUSION

27. For the foregoing reasons, Plaintiff has demonstrated a likelihood of success on appeal of the Judgment ordered, and has demonstrated that the balance of the equities favors a new trial or a stay. Plaintiff respectfully requests that the Court stay the final judgment for the duration of appellate proceedings relating to the related Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I. 2023).

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 16, 2023, I filed the within Motion with the

Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX 77019

Dated: November 16, 2023

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                               Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

*Defendants*

## **MARY SEGUIN'S DECLARATION IN SUPPORT OF PLAINTIFF'S RULE 59 MOTION**

I, MARY SEGUIN, hereby declare under penalty of perjury, pursuant to 28 U.S.C. sec.
1746(2) that the following statements are true and correct:

1. That I am the Plaintiff, Pro Se, in the above captioned matter.

2. That I exercised, am exercising and continue to exercise my statutory right to appear
   pro se party in the above captioned civil matter in federal court by statute 28 U.S.C.
   sec. 1654.

3. That in state proceedings in Rhode Island, I am required to comply with Rhode Island Article X. Rules Governing Electronic Filing, Rule 2. Official Court Record, (a) Official Court Record. "Upon the implementation of the Electronic Filing System ("EFS") in each court, all documents shall be filed electronically and shall be the official court record."

4. That the state proceedings in which I am a party are public and are not about child custody nor involve a minor.

5. That the **Rhode Island Family Court**, through its adoption and promulgation of **Administrative Order 2021-01 A2)** mandated that all child support interest matters shall be heard remotely via WebEx.  Further, **Administrative Order 2021-01 B1)** mandated that all non-emergency filings shall be filed using the electronic filing system in accordance with the Family Court Rules of Domestic Relations Procedure, which is the **Odyssey system**.

6. That the **"RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION, Rule 5. Access to Case Information, (c) Remote Access to Case Information. (1) Policy. To allow <u>limited</u> Remote Access to the Database through the Public Portal.  Non-public case types shall not be remotely accessible except for certain case types to attorneys who have entered an appearance in a case.  (2) Content. (a) The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall <u>not</u> have Remote Access to other Electronic Case Information"** bar, deny, violate, abridge, infringe and interfere with Pro Se Litigants' and the Public's fundamental rights to access public court records and Pro Se Litigants' fundamental right to meaningful access to the courts.  See "<u>**RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION**</u>"  **Rule 5(c)(2)(a)** "<u>**The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall not have Remote Access to other Electronic Case Information.**</u>" See also "<u>**RHODE ISLAND JUDICIARY, Access to Case Information,  2. Remote Access to Case Information A. The Public, Self-represented Litigants, and Parties to a Case, The public, self-represented litigants, and parties in a case shall have remote access to the register of actions or docket but shall not have remote access to other electronic case information**</u>."

7. That I, the Plaintiff, learned and verified on July 10, 2023 directly from the Rhode Island Judiciary itself through numerous (14) correspondences with the Rhode Island Judiciary from June 10, 2023 to July 10, 2023, pursuant to my RI Access to Public Records Act ("APRA") request for public records from the Rhode Island Judiciary, that as a matter of State policy, State Court Rule, and Judiciary Rule, in  the digital courts implemented by the Rhode Island Judiciary, the State Court, the Rhode Island

Judiciary deny remote digital access of the Rhode Island Judiciary's monopolized publication of court and judicial records using the digital tool maintained and published by Tyler Technologies, Odyssey, including judge-created, judge-authored court decisions arising from state proceedings in the State's digital electronic courts, and digital court transcripts ordered by and paid by pro-se litigants that are published by the Judiciary digitally on Tyer Technologies' Odyssey are also denied access to the Public, pro-se litigants, and parties to the litigation (who are represented by counsel). The Rhode Island State Court only grants remote access to digital court and judicial records created by judges produced in digital courts to Rhode Island attorneys and state and federal agencies that are approved by the Rhode Island Judiciary's monopoly. On this matter, I corresponded in writing fourteen (14) APRA correspondence emails with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023.

8. That the State Defendants in this matter electronically file all notices using another electronic filing system that is even separate and different from the EFS (Odyssey).

9. That the State Defendants' court electronic filings are not noticed to me in Texas.

10. That the State Defendants' court electronic filings are not visible to me on the Rhode Island courts' EFS.

11. That the State Defendants' court electronic filing court records cannot be accessed remotely by me, solely because I am a self-represented litigant.

12. That the State Defendants' court electronic filing court records cannot be accessed remotely by the public, by self-represented litigants, nor by parties to the case, but can be accessed remotely and instantly through the internet by attorneys in Rhode Island and state and federal agencies.

13. That the Rhode Island Court Clerks state to me over the phone that they are prohibited from reading the contents of the court records over the phone to me.

14. That the Rhode Island Court virtual clerks state to me over the phone that even they are unable to see or access the court record information of filings by the State Defendants from the virtual clerks' access portals.

15. That the Rhode Island Electronic Filing System, case management system, rules and practices outright and unconstitutionally restrict and deny access to the court to three classes: (1) the public; (2) pro-se litigants; (3) parties to the case (who are represented by counsel), and is obviously outright reserved for only the government and Rhode Island attorneys.

16. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS.

17. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and

withdrew from my-initiated RI EOHHS agency appeal in 2022 in a scheme to procure a favorable judgment in a state proceeding that deny my federal constitutional and due process rights in Texas.

18. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and initiated the family court state proceeding on January 31, 2023 before the Covid Emergency Declaration was lifted.

19. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices that appear to **only allow remote, instant and full court access to a restricted club of R.I. lawyers and the government**, pose unconstitutional and undue burden on me, a citizen of Texas over 2,500 miles away.

20. That the State Defendant have full knowledge of the egregiously unfair due process violations of the Rhode Island state court EFS system/architecture/rules/practices that deny me access to the <u>required</u> **electronic court transcripts** prepared by the court reporter and electronically filed in the state EFS that **I ordered and paid for** appeal, but the State Defendants have instant remote access by state court design.

21. That the State Defendants have full knowledge of the above unconstitutional restriction on access to court records and information to the public and non-lawyers is deliberate, by design and calculated to be unfair, violating constitutional guarantees of full and fair opportunity to raise claims in state proceedings.

22. That the above-raised unconstitutional restrictions are not exhaustive.

23. That my federal monetary damages claims on the unconstitutionality of the Rhode Island state court rules, practices and proceedings that violate the government edict doctrine and violate the pro-se litigants', such as my-self, federal constitutional rights: (1) federal constitutional right of equal access to the courts, (2) federal constitutional right to equal access to court records to receive information on the contents of all electronically filed notices, pleadings, court decisions, and transcripts that I myself ordered <u>and</u> paid for for appeal that are required to be electronically filed by state court rules and practices, (3) federal constitutional due process right and equal right to be given equal and timely notice of electronic filings and entries by the courts (including court decisions, court orders, court judgments, full docket entries, etc.) that the Rhode Island Judiciary deliberately deny by category all pro-se litigants access to court information, namely the contents of judicial/court records of cases to which I am the self-represented party, (4) federal constitutional due process right to be heard (Rhode Island Superior Court threatens me, the Texas pro-se plaintiff, with denial of my request to conduct WebEx hearings for the purpose of denying the Texas pro-se litigant access to the court and to be heard), (5) federal constitutional due process right to decision by a neutral decision-maker (the court that denies pro-se litigant

access to the court and the corollary opportunity to be heard fails the neutral decision-maker test).  This list is not exhaustive.

24. That I seek to sue in federal court the State Defendants and add additional defendants.

25. I am an out-of-state diversity and a pro-se litigant in two state proceedings in Rhode Island, and have been unconstitutionally singled out by the State Judiciary, by category "self-represented litigant," to be barred from accessing electronic case information authored by judges and which the Judiciary has a monopoly in the publication of the judge-created laws in which state court cases I am the pro-se party, and therefore have standing to raise claims against this unconstitutional state practice and unconstitutional state court practice and rules.  I understand the Rhode Island Judiciary's monopoly in the digital publication of judge-created laws in the Judiciary' implemented digital/electronic courts and the Judiciary's denial to the Public and to me from accessing the monopolized electronic publication of the judge-created laws in the court records violate the government edict doctrine.

26. Additionally, my fundamental First and Fourteenth Amendment constitutional right and common law right to equal, meaningful, and timely access to judicial records and public court records in litigation, given timely notice, adequate opportunity to be heard and to decision by a neutral decision-maker are fundamental First and Fourth Amendment and Fourteenth Amendment rights.  Critically, the unconstitutional abridgement, infringement, and denial of judicial and court records to out-of-state pro-se litigants by the Rhode Island State Courts, Rhode Island State Judiciary and the Rhode Island Superior Court Bench Bar Committee directly relate to Younger Abstention Exception.

27. The State Defendants deliberately file all the State's pleadings outside of the State's electronic filing system, "Odyssey," and deliberately use a wholly different un-named electronic filing system, different and separate from that ("Odyssey") provided for pro-se litigants, so that pro-se litigants do not receive any requisite automated electronic notices of court motions or pleadings the State Defendants file electronically, nor are pro se litigants able to electronically access the content information of the State Defendants' electronically-filed pleadings.  The only way the pro se litigant, such as me, the Texas Plaintiff, can access the court record is to personally go over 2,500 miles away to the courthouse in Rhode Island to access the court pleading information, or get a "courtesy notice" via email or get a "courtesy notice" through U.S. Mail sent by the State Defendants at whim.   The State Defendants deliberately fail to send the notices electronically or by U.S. Mail, and the state courts deliberately promulgated court rules disallowing the public, pro-se litigants and even the parties who are represented by lawyers, remote access to court records, and critically, deny access to crucial court decisions, judgments and orders of public cases, as well as deny remote access to the transcripts ordered by pro-se litigants for appeal.  Critically, the State court's abridgment and denial of access to court documents to the pro se litigant and the general public result in the

unconstitutional abridgment and denial of equal, timely and meaningful access to court complaints, decisions, judgments and orders. What is truly shocking is that the Rhode Island Judiciary even denies and/or bars pro-se litigants remote access of court transcripts that were ordered by pro-se litigants for appeal.

28. Thirdly, the Texas Pro-Se Plaintiff discovered and verified the fact, on or about July 7, 2023, that the Rhode Island Judiciary, using the aforesaid state court rule barring, by category, pro-se litigants from accessing court case information remotely, bars the Plaintiff by category ("self-represented litigant") from accessing state court proceeding transcripts that the Texas Plaintiff ordered and paid for, for appeal. In other words, the RI Supreme Court Clerk stated to the Texas Plaintiff that the Plaintiff, in Texas, is unconstitutionally barred from remotely accessing the transcripts of court proceedings that she ordered and paid for in her appeal to the RI Supreme Court in the Plaintiff-initiated APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215**, and yet the State Defendants are inequitably granted instant and free remote access to those very transcripts that the Texas Plaintiff ordered and paid for, for appeal. The federal Texas Plaintiff respectfully requests this Court the extension of time to present the new evidence and plead the verified facts.

29. Fourthly, the Texas Plaintiff discovered and verified the fact, on or about July 11, 2023, that, despite the Texas Plaintiff's several phone inquiries to the RI Superior Court in the past several weeks regarding the status of the appeal, the RI Superior Court, for undisclosed reasons, failed and continue to fail to relinquish jurisdiction and transfer the court case file of **Seguin v. RI Office of Child Support Services, PC-22-07215** to the RI Supreme Court within the requisite 60 days after Plaintiff's filing of Notice of Appeal on April 3, 2023, as required by the RI Supreme Court rules and procedures. At the same time, the Texas Plaintiff verified the fact that the Plaintiff-ordered transcripts of the state proceedings in the Federal Plaintiff-initiated state APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215** show the RI Superior Court further unconstitutionally sought to deny the Texas Plaintiff access to the state court and opportunity to be heard by outright threatening the Plaintiff in open court that the Judge, David Cruise, during the hearing of March 24, 2023 in that matter, shall use the state court's discretionary power in the future to deny all of the Texas pro-se Plaintiff's petitions for remote WebEx hearings to effectively deny her access to the state superior court. The state court that denies court access and the opportunity to be heard fails the neutral-decision-maker test required under the Fourteenth Amendment. I now specifically request further the Court to judicially notice that this court access denial and denial to be heard occurred on March 24, 2023, PRIOR to President Biden's lifting of the COVID-19 National Health Emergency Declaration. I, the Texas Plaintiff, aver this is a direct contributory reason for the RI Superior Court's failure to transfer the case file to the Supreme Court within 60 days (by June 3, 2023) of the Plaintiff's filing of Notice of Appeal on April 3, 2023 in **Seguin v. RI Office of Child Support Services, PC-22-07215**.

30. Fifthly, the Plaintiff presents to this Court and respectfully requests the Court to take judicial notice of the undisputed fact of the court rule-making process in Rhode Island. The 1966 Rules were promulgated by the justices of the superior court pursuant to section 8-6-2 of the General Laws of Rhode Island. This enabling act departed from the Federal Rules Enabling Act and most state enabling legislation conferring rule-making power on the supreme courts of the respective governments. The Rhode Island Enabling Act was adopted in 1940, 1940 R.I. Pub. Laws ch. 943, sec. 1. It conferred the power on the justices of the superior court and the 1966 reform was the product of that court. In 1969 an amendment to section 8-6-2 made the Rules thereafter adopted by the trial courts subject to the approval of the Supreme Court. 1969 R.I. Pub. Laws ch. 239, sec 2. Therefore, all public records relating to the adoption and promulgation of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION" are "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, judicial, regulatory, or administrative body of the state, or any political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to Public Records Act ("APRA"). Even though the Rhode Island Enabling Act conferred the power on the judiciary public body to promulgate and adopt court rules, a.k.a. rule-making process, the Rhode Island Judiciary, pursuant to the Plaintiff's APRA request for public records, denied the Plaintiff's APRA request within the 10 business day period, as well as denies it possesses public records, as defined by APRA, relating to the rule-making process by the judiciary of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," including denying possession of public records that show the intent of the rule-makers to promulgate and adopt court rules denying fundamental right of public access to electronic case information remotely to the public, to self-represented litigants, and to parties to a case. **See Exhibit D** fourteen (14) APRA correspondence emails between the Plaintiff and/with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023. The Texas pro-se Plaintiff respectfully requests the extension of time to present the new evidence and plead the newly verified facts and claims, and amend the complaint, which is further in the interest of judicial economy. The Plaintiff further seeks to appeal and file her claim against the implausible denial by the RI Judiciary, which is conferred by the Rhode Island Enabling Act to make rules of the court, that it possesses public records relating to the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," that the judiciary, conferred power by the Rhode Island Enabling Act, "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, judicial, regulatory, or administrative body of the state, or any political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to

Public Records Act ("APRA"). Because the RI Superior Court clearly ruled in **Seguin v. RI Office of Child Support Services, PC-22-07215** that it lacked subject matter jurisdiction to hear my/the Texas Plaintiff's APRA-related claims, I, the Texas Plaintiff, now exercise my statutory and constitutional rights to petition this Federal Court, invoking 28 U.S.C. § 1343(a)(3) (civil rights) and 28 U.S.C. § 1367 that provides supplemental jurisdiction over the state law tort claims that arose from the same common nuclei of facts, invoking 28 U.S.C. § 1331 (federal question), and invoking 42 U.S.C. § 1983 for violations of civil rights under the First, Fourth and Fourteenth Amendments to the United States Constitution. I, the Plaintiff, respectfully request this Court for the extension of time to file my claims.

31. Plaintiff discovered on October 6, 2023 that the Rhode Island Judiciary and Government Defendants are former clients of Judge Smith, a partner in his former firm, Edwards & Angell.

32. Plaintiff discovered on November 9, 2023 that the Rhode Isand Judiciary and Government Defendants are current clients of the firm Edwards & Angell, the former firm of Judge Smith, a partner in the firm.

33. A plain reading of 28 U.S.C. sec. 455 makes clear that Judge Smith is disqualified from this case, and a plain reading of case law makes clear that 28 U.S.C. sec. 455 is self-executing, without necessitating any party's request.

Respectfully submitted,

Date: November 16, 2023

MARY SEGUIN

*Mary Seguin*

Mary Seguin

P.O. Box 22022

Houston, TX 77019

maryseguin22022@gmail.com

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                          Civil Action No. 1:23-cv-126-WES-PAS


RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

     *Defendants*

## **PLAINTIFF'S RULE 60(b) MOTION**

1. Plaintiff, proceeding from and as a citizen of Texas, respectfully requests pursuant to

Fed. R. Civ. P. Rule 60(b)(1), (3), (4) and (6) for a new trial.  Plaintiff avers the following,

supported by affidavit attached: The 91-page First Amended Complaint [ECF 25] filed on

September 1, 2023 seeks monetary damages against the Rhode Island State Defendants and the

private actor Defendants for:

(1) The Rhode Island Judiciary and Tyler Technologies' monopoly of publication of law.

(2) The Rhode Island Judiciary and Tyler Technologies' denial to the Public and to all Pro Se Litigants all access and the denial of free access to the contents of the law created, authored, and deliberated by the Rhode Island Judiciary.

(3) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to knowingly fail to properly integrate the legacy electronic court case management systems used by Rhode Island Department of Human Services and Office of Child Support Services during the implementation of Odyssey from 2013 to 2014 (the State's official electronic court filing and electronic case management system), so that these state agencies' filings are discriminately invisible only to the Public, to Pro Se Litigants and to the Rhode Island Virtual Clerk of the Courts in the Rhode Island Family Court, a limited jurisdiction court of record. The State's filings are only visible to the judges and to the State filers, thus manipulating the proceeding towards a foregone conclusion in favor of the State filers.

(4) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to misrepresent to the Public and to the Pro Se Litigants that the implemented electronic court case records of judge created laws are available to *all* court users, in order to cover up their monopolization of the publication of law denies the Public and the Pro Se Litigant access to the judge-created laws.

(5) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services that the State routinely establishes and enforces 12% compound interest on child and spousal support in Title IV of the Social Security Act state family court proceedings, in violation of the uniform statutory requirement of 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and

*if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest, targeting noncustodial parents victims. In welfare cases, support are assigned by the custodial parent to the State, and the 12% compound interest represents a fee for the State's "services" in the support's establishment and enforcement paid to the State, which at 12% compound interest represents lucrative, illegally obtained revenue to the State actors, who are financially incentivized to obtain as much as possible.

(6) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services and Tyler Technologies to knowingly fail to properly integrate Odyssey with the State's legacy electronic court filing system resulting in the State's filings seeking illegal 12% compound interest, as well as to deny the Public and to Pro Se Litigants' access to their publication of judge-created law records for the purpose of cover up of this wholesale illegal defraud of the court, extortionary defraud under color of state law targeting the unsuspecting noncustodial parents victims, and defraud of the United States (66% of the cost of these child support "operations" is funded by the U.S. Department of Health and Human Services through Title IV of the Social Security Act through funds appropriated by Congress through the annual budget appropriations.)

(7) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Tyler Technologies to operate the Title IV Program of the Social Security Act in all manners violative of due process, in prima facie due process violative State Electronic Courts, for the purpose of generating state revenue through fraud and deceit, through conspired tortious interference of rights of access to the courts, rights of

access to state case documents, and rights of access to judge-created laws targeting

litigants, targeting the Public and targeting Pro Se Litigants.

(8) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of

Human Services and Tyler Technologies to cover up their public-access-denied

publication of state judge-created laws of illegal 12% compound interest benefiting the

state's revenue by adopting a State policy not to establish nor enforce any interest in

*interstate* support cases only, calculated to cover up the collective fraud from federal

enforcement officials and other states' enforcement officials of court orders (laws)

showing 12% compounded interest established and funded under Title IV that are facially

illegally violative of 42 U.S.C. § 654(21)(A) which explicitly provides States *may* opt to

charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12%

compound interest.  The federal Title IV Program regulation by Congressional intent

explicitly preempts any related state laws of all participating states.

(9) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of

Human Services and Office of Child Support Services and Barbara Grady and Gero

Meyersiek to use the fraudulent, First Amendment-, Fourth Amendment-, Fifth

Amendment-, Seventh Amendment-, and Fourteenth Amendment violative state court

machinery weaponizing Title IV Program of the Social Security Act to target the Plaintiff

*pro se* noncustodial parent in Texas to retaliate against Plaintiff for her past lawsuits

against them, namely ten years ago in Seguin v. Chafee et al., Civil No. 12-cv-708-JD

(D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and

Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued

them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state

court's under color of state law abuse of the legal frame work of another federal-funded human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00 per visitation if Plaintiff wanted to see her children in Rhode Island, because the state court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other legally sufficient basis. Plaintiff had reported this *prima facie* extortion under color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas. Here, Plaintiff's ==retaliation== damages claims have been issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455, additionally given the fact Judge Smith had also self-recused from <u>Seguin v. Chafee et al.</u>, Civil No. 12-cv-708-JD (D.R.I. 2013), <u>Seguin v. Bedrosian et al,</u> Civil No. 12-cv-614-JD (D.R.I. 2013), and <u>Seguin v. Suttell et al,</u> Civil No. 13-cv-95-JNL-LM (D.R.I. 2013) ten years ago. *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998) ("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no party has requested it").

(10) The Rhode Island Judiciary continues the pattern of cover up by denying Plaintiff's request for public judicial records related to the monopoly of publication of judge-created records submitted to the State Judiciary pursuant to the Rhode Island Access to Public Records Act ("RI APRA").

4. Plaintiff obtained new evidence on October 6, 2023 that the Rhode Island Judiciary is a former client of Judge Smith, and on November 9, 2023, Plaintiff obtained new evidence that the

Rhode Island Judiciary remains a major client of Judge Smith's former law firm. Plaintiff's due diligence search for conflict of interest has been impeded by the Rhode Island Judiciary and Tyler Technologies monopoly of publication of judge-created laws in the state's electronic court system and their denial of access to the judge-created laws, and Plaintiff, as a member of the Public and proceeding pro se without a Rhode Island Attorney license, the issuance of which is also monopolized by the Rhode Island Judiciary, has further been denied access to official records, including through the Rhode Island Access to Public Records Act, consistent with a pattern of civil conspiracy cover up.

5. A new trial or a stay of the Judgment is necessary to prevent irreparable harm to Plaintiff, and to Americans across the First Circuit who would be needlessly deprived of access to the federal courts of law in the First Circuit for monetary damages redress - the judicially created doctrine of Younger Abstention that functioned as a court of equity - regarding Plaintiff's monetary damages claims against the Rhode Island Judiciary and Tyler Technologies' scheme to monopolize the publication of judge-created laws that denies, tortiously interferes, tortiously abridges and tortiously obstruct the Public access to those very laws; regarding Defendant Rhode Island Office of Child Support Services' unlawful seizures of interstate Texas properties outside of Rhode Island under color of Rhode Island state law based on legally insufficient interest charge on overdue support based on the unlawful rate of 12% compound interest that is disallowed under Title IV-D Program of the Social Security Act, specifically 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest. And this is on top of Defendants' breach of contract that was brokered by Defendant Rhode Island Office of Child Support Services on behalf of the agency's client; the contract between the custodial parent client, defendant Gero

Meyersiek and the Texas Plaintiff stipulated that the custodial parent waived interest upon the

Texas Plaintiff paying a lump sum of $104,185.98 pay-off amount, which Plaintiff performed

from Texas on December 7, 2021.  Even at the point of contractual agreement, Defendant Rhode

Island Office of Child Support Services in conjunction with Defendant Gero Meyersiek,

misrepresented there was lawful and enforceable interest to be waived, as they removed the

accrued interest from the Title IV-D Program mandated support record system in order to cover

up from the Plaintiff, and from federal and Texas authorities the unlawful 12% compound rate.

After fraudulently inducing Plaintiff in Texas to agree to and to perform on the contract, the

Defendants immediately put the interest back into the Title IV-D Program-mandated automated

support record system and started to seize Plaintiff's properties in Texas under color of Rhode

Island state law.

6. The final judgment is on its face violative of binding First Circuit caselaw that

mandates lower courts to *stay* monetary damages claims when applying Younger Abstention.

*See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997) (relying on *Quackenbush v. Allstate*

*Ins. Co.,* 517 U.S. 706 (1996) in holding that abstention does not allow for dismissal of damages

claim).

7. 42 U.S.C. § 654(21)(A) has been in effect since the enactment of the Title IV-D

Program of the Social Security Act several decades ago, and Congress's original intent was to

combat poverty within the populace of single mothers and children in welfare cases; Congress at

no time intended to shift the undue burden of Rhode Island's 12% compound interest on overdue

support under color of Rhode Island state law to noncustodial parents, whether targeting Texas

or across the country, which in welfare cases Rhode Island converts the 12% compound interest

to assigned debts owed by noncustodial parents to Rhode Island's state agencies and state

government, representing underhanded unlawful state revenue unlawfully obtained through the legal framework of Title IV-D Program of the Social Security Act, targeting unsuspecting noncustodial parents victims.  As a legal point of a state's lawful application of 42 U.S.C. § 654(21)(A) within the First Circuit, New Hampshire, in compliance with the letter of federal law, opts into Title IV-D Program and opts not to charge any interest whatsoever, as per the letter of law and the original intent of Congress, 42 U.S.C. § 654(21)(A).  Similarly, Texas charges 6% in compliance with 42 U.S.C. § 654(21)(A).

8. Defendant Rhode Island Office of Child Support Service's illegal denial and obstruction of access to Plaintiff's own child support case file that contains the incriminating illegal and arguably criminal scheme of removing the interest rate from the Title IV-D Program mandated and federally funded support record system to cover up the unlawful 12% compound interest from federal and Texas authorities, as well as from the Plaintiff in Texas, violates due process, obstructs justice, obstructs a federally funded and federal program proceeding, and the legal framework of Title IV-D of the Social Security Act, specifically, 42 U.S.C. § 654 and 42 U.S.C. § 666.

9. Judge Smith's dismissal of Texas Plaintiff's legal remedy monetary damages and breach of contract fraudulent inducement damages claims under Younger Abstention in this Court of law represents irreparable harm violative of the First Amendment, Fourth Amendment, Fifth Amendment, the Fourteenth Amendment, the Seventh Amendment and the First Amendment access to the Court.  The undisputable fact remains, Plaintiff's legal remedy request for monetary damages in this court of law consisting of twenty-two causes of action that cannot be dismissed under Younger Abstention, namely monetary damages claims of breach of contract fraudulent inducement, breach of implied contract, unjust enrichment, misrepresentation,

negligent misrepresentation, intentional/fraudulent misrepresentation, common law bad faith, breach of the covenant of good faith and fair dealings, tortious breach of the covenant of good faith and fair dealings, breach of fraudulent concealment/common law fraud, concealed fraud, tort of deceit, reckless indifference to the rights of Plaintiff, deliberate indifference to the rights of Plaintiff, abuse of process, breach of duty, accounting fraud, fraud cover up, RI Government Tort Liability (R.I. Gen. Laws 9-31-1, *et seq.*), 42 U.S.C. § 1983 Claim for Reckless Indifference of Plaintiff's Clearly Established Constitutional Rights, 42 U.S.C. § 1983 claim of Fourth Amendment Illegal Seizure of Plaintiff's Texas Property, state tort of liability against defendants under 42 U.S.C. § 1983, Civil RICO [ECF 25].

10. Judge Smith's legally-unsupported and factually-unsupported, and "legally insufficient" opinion that the limited jurisdiction family court is an adequate forum to raise Plaintiff's federal legal damages claims of breach of contract et al., contravenes Rhode Island law: R.I. Gen Laws 8-10-3 makes clear that family court is not a court of general jurisdiction, can only conduct bench trials functioning as a court of equity, not of law, and prohibits family court from exercising jurisdiction over breach of contract claims et al between the Texas Plaintiff and the Defendants; family court lacks jurisdiction over the Plaintiff's federal causes of actions; lacks the jurisdiction to summon a jury for jury trial in a court of law.

11. Finally, but equally critically, twenty-one days post judgment Plaintiff discovered troubling new evidence on November 9, 2023, that Judge Smith appears to have impermissibly acted in favor of the interests of the defendants – he is automatically disqualified under 28 U.S.C. § 455, because as a partner in his past practice and firm, the state government and the Rhode Island Judiciary were not only his clients, but continue to be that firm's major client under a flat fee contract and he has knowledge of the defendants' actions in this action – as a major

partner in his firm, the Rhode Island Judiciary is his and his form's past and current clients, the

state government actors and the state courts actors, cooperate in the routine establishment and

enforcement of 12% compound interest under the legal framework of Title IV-D Program of the

Social Security Act, where 12% compound interest is disallowed under 42 U.S.C. § 654(21)(A).

To the objective observer, having knowledge of the facts and circumstances of this case, and

being a partner in his past firm that continues to have the Rhode Island Judiciary as a client,

Judge Smith appears biased in favor of the defendants' interest to continue raking in state

revenue under the auspices of 42 U.S.C. § 654(21))(A) that explicitly disallows state debts of

12% compound interest assigned to Rhode Island that the state actors who cover up the 12%

compound rate by obstructing the noncustodial parent's access to her own child support case file

that is further violative of the due process provisions under 42 U.S.C. § 654 and §666, in Rhode

Island's federally funded operation with funds appropriated by Congress intended for the *lawful*

operation of Title IV-D of the Social Security Act. Although under the judicial self-executing

expectation under 28 U.S.C. §455, the Texas Plaintiff is not expected to cull court records in the

Rhode Island state courts for judicial conflict of interest, nevertheless the Plaintiff in good faith

and diligently attempted to perform a remote search of Rhode Island's electronic court case

management system, Odyssey in 2023. In so doing, Plaintiff discovered troubling newly-

discovered evidence that the Rhode Island Judiciary, while publicly representing that the 2014 $6

million state transition from paper courts to electronic courts promises *all court users* will be

able to call up court documents remotely from their mobile devices, in reality Rhode Island

adopted rules only denying the public and pro se litigants remote access to court case

information, including pro-se litigants' own case records, that both the public and all litigants

had equal statutory, common law and constitutional rights of access in paper courts – Judge

Smith's firm's clients, the Rhode Island Judiciary, therefore implemented electronic court public access denials that obstructed Plaintiff's and the public's discovery of Judge Smith's judicial disqualification regarding his former clients such as the state courts, the defendant state actors and other conflict entities.

## I. LEGAL STANDARD

11. The United States Supreme Court in 2020 reaffirmed, in *GEORGIA, ET AL., PETITIONERS v. PUBLIC.RESOURCE.ORG, INC*, 590 U.S. ___ (2020), the century-old government edicts doctrine, making clear that officials empowered to speak with the force of law cannot be the authors of—and therefore cannot monopolize access—the works they create in the course of their official duties. The U.S. Supreme Court previously applied that doctrine to hold that non-binding, explanatory legal materials when created by judges who possess the authority to make and interpret the law shall not monopolize access to it. *See Banks v. Manchester*, 128 U. S. 244 (1888). Tyler Technologies is a for profit organization that aims to facilitate public access to government judge-created records and legal materials. Tyler Technologies is contracted by the Rhode Island Judiciary to implement the State's electronic courts in 2013 and together, they both publicly represented that access to the contents of judge-created laws records will be readily called on mobile devices to *all* court users, namely, to the Public and to pro se litigators.

12. Under the government edicts doctrine, judges may not be considered the "authors" of the works they produce in the course of their official duties as judges. That rule applies regardless of whether a given material carries the force of law. In *Banks v. Manchester,* 128 U. S. 244 (1888) the Supreme Court concluded that "the judge who, in his judicial capacity, prepares the opinion or decision, the statement of the case and the syllabus or head note" cannot "be regarded as their author or their proprietor. *Banks*, 128 U. S, at 253 (emphasis in original).

Rather, "[t]he whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all." *Ibid.* (citing *Nash v. Lathrop*, 142 Mass. 29, 6 N. E. 559 (1886)). These cases establish a straightforward rule: Because judges are vested with the authority to make and interpret the law, they cannot be the "author" of the works they prepare "in the discharge of their judicial duties." Banks, 128 U. S., at 253. This rule applies both to binding works (such as opinions) and to non-binding works (such as headnotes and syllabi). *Ibid.* The animating principle behind this rule is that no one can own the law. "Every citizen is presumed to know the law," and "it needs no argument to show . . . that all should have free access" to its contents. *Nash,* 142 Mass., at 35, 6 N. E., at 560 (cited by *Banks*, 128 U. S., at 253–254). Rather than attempting to catalog the materials that constitute "the law," the doctrine bars the officials responsible for creating the law from being considered the "author[s]" of "whatever work they perform in their capacity" as lawmakers. *Ibid.* (emphasis added). Because these officials are generally empowered to make and interpret law, their "whole work" is deemed part of the "authentic exposition and interpretation of the law" and must be "free for publication to all." *Ibid.*

13.  Rhode Island Judiciary and Tyler Technologies monopoly of publication of the judge-created laws and their "whole works" making and interpreting the law that explicitly by design deny access to the Public and to the Pro Se Litigant runs afoul of the government edicts doctrine.

14. Courts have long understood the government edicts doctrine to apply to legislative materials. See, e.g., *Nash*, 142 Mass., at 35, 6 N. E., at 560 (judicial opinions and statutes stand "on substantially the same footing" for purposes of the government edicts doctrine); moreover, just as the doctrine applies to "whatever work [judges] perform in their capacity as judges,"

*Banks*, 128 U. S., at 253, it applies to whatever work judges perform in their capacity as judges. *Banks*, following *Wheaton* and the "judicial consensus" it inspired, denied publication monopoly protection to judicial opinions without excepting concurrences and dissents that carry no legal force. 128 U. S., at 253 (emphasis deleted). As every judge learns the hard way, "comments in [a] dissenting opinion" about legal principles and precedents "are just that: comments in a dissenting opinion." *Railroad Retirement Bd. v. Fritz,* 449 U. S. 166, 177, n. 10 (1980). Yet such comments are covered by the government edicts doctrine because they come from an official with authority to make and interpret the law. Indeed, *Banks* went even further and withheld publication monopoly protection from headnotes and syllabi produced by judges. 128 U. S., at 253. Surely these supplementary materials do not have the force of law, yet they are covered by the doctrine. The simplest explanation is the one *Banks* provided: These non-binding works are not copyrightable because of who creates them—judges acting in their judicial capacity. *See ibid.* The textual basis for the doctrine is the "authorship" requirement, which unsurprisingly focuses on—the author, the judges*.* The Supreme Court long ago interpreted the 'author" to be officials empowered to speak with the force of law. The doctrine distinguishes between some authors (who are empowered to speak with the force of law) and others (who are not). The Supreme Court explicitly rejects allowing the States to "monetize its entire suite of legislative and judicial history. With today's *digital tools*, States might even launch a subscription or pay-per-law service." See *Georgia v, Public Resources Org.* at 590 U. S. ____ (2020) It is obviously explicitly clear that the Supreme Court refers to the prohibition against the Rhode Island Judiciary and Tyler Technology's monopolization of  the digital publication of DIGITAL COURT JUDICIAL COURT RECORDS that denies publication access of judge-created laws and their work materials to the Public and to Pro Se Litigants.

15. There is no legitimate Rhode Island government interest in the knowing illegal denial of access to the public and to pro se litigants the digital records of the Rhode Island Judiciary's and Tyler Technologies' illegal monopolization of digital publication of judge-created laws involving the establishment nor enforcement of unlawful 12% compound interest violative of explicitly clear 42 U.S.C. § 654(21)(A) within the legal framework of Title IV-D Program targeting noncustodial parties in Texas who are outside of Rhode Island that Rhode Island already knows is unenforceable in Texas, and thus had removed the 12% compound interest in 2018 calculated to cover it up from federal and Texas authorities.  Rhode Island's abuse of the legal framework of the government edict doctrine and the legal framework of Title IV-D Program are diametrically at odds with the intent of Congress and binding caselaws of the U.S. Supreme Court.  The civil conspiracy to cover up the illegal machinery of the digital electronic courts in Rhode Island is clear.  *See Turner v. Rogers*, 131 S. Ct. 2507, 2518 (2011). *See Georgia v, Public Resources Org.* at 590 U. S. ____ (2020);  *See* HOUSE COMM. WAYS & MEANS, Section 8: Child Support Enforcement Program, in 2004 GREEN BOOK: BACKGROUND MATERIAL AND DATA ON THE PROGRAMS WITHIN THE JURISDICTION OF THE COMMITTEE ON WAYS AND MEANS 8-1, 8-2 (2004). *See* Social Services Amendments of 1974, Pub. L. No. 93-647, § 101, 88 Stat. 2337, 2351.  Where the mother receives public aid, federal and state governments will provide the child support payment to the mother and hold the father indebted to the government for that amount.  In cases where the mother is not dependent on welfare, the government has largely stayed out of the fray. *See* HOUSE COMM. WAYS & MEANS, *supra* note 38.  Yet, this case does not involve a welfare case, as the custodial father is wealthy, but the Defendants are motivated by retaliation against the Plaintiff for suing them ten years ago in <u>Seguin v. Chafee et al</u>., Civil No. 12-cv-708-JD (D.R.I. 2013), <u>Seguin v. Bedrosian</u>

et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state court's under color of state law abuse of the legal frame work of another federal-funded human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00 per visitation if she wanted to see her children in Rhode Island, because the state court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other legally sufficient basis.  Plaintiff had reported this *prima facie* extortion under color of state law and under color of federal law 34 U.S.C. § 12471 *et seq*., to the federal law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas. Here, Plaintiff's retaliation damages claims have been issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455, additionally given the fact Judge Smith had also self-recused from Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013) ten years ago.  *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998) ("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no party has requested it").

## II. ARGUMENT

16. Plaintiff has appealed the Court's/Judge Smith's judgment in its entirety in the related case, Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I. 2023) and respectfully submits that she is likely to secure a complete reversal of this Court's

holding that the judicially created doctrine of Younger Abstention applies to the *dismissal* of her monetary damages and breach of contract damages claims.

17. Plaintiff further submits that she is likely to secure a complete reversal of this Court's in this case.

18. Conducting state proceedings funded by federal funding appropriated by Congress under Title IV of the Social Security Act in state monopolized electronic courts that violate the long-established government edict doctrine as it related to the Public's access of the digital publication of judge-created laws and violate the Constitution targeting Texas assets and Texas parties for illegal 12% compound interest involving fraudulent inducement that cannot be enforceable in Texas is the prima facie example of government fraud and government waste, warranting cut off from federal funding at the very minimum. Not even Judge Smith, friend of the Rhode Island Judiciary, can punt these egregious state activities to later addressment via the attention of the Supreme Court and to Congress Appropriation Committees, wrongfully using Younger Abstention.

19. Judge Smith's holding is defect in claiming without a shred of factual basis that Plaintiff can raise her federal monetary damages claims and fraudulent inducement breach of contract claims in the jurisdictionally defective Rhode Island family court, that R.I. Gen. Laws 8-10-3 plainly states the family court is *not* a court of general jurisdiction, and which lacks the jurisdiction over the controversy for legal relief of monetary damages tort claims and fraudulent inducement breach of contract damages claims over both the Plaintiff and all the named defendants.

20.  Plaintiff seeks a new trial or a stay pending appeal as Plaintiff's likelihood of success

on appeal, together with the lopsided balance of hardships, weigh heavily in favor of granting the

stay being sought pending appellate review.

### A. Plaintiff is Likely To Succeed On Appeal Of the Judgment Ordered By the Court:

21. Although Plaintiff recognizes that the Court has ruled against her as to the scope of

relief, Plaintiff is likely to succeed on appeal of those issues, and has raised serious legal

questions and presented a substantial case. *See Arnold v. Garlock, Inc*., 278 F.3d 426,

438-39 (5th Cir. 2001).

22. Plaintiff incorporates by reference her prior remedy arguments.  Plaintiff reserves the

right to make any and all arguments on appeal.

23. Among the substantial questions raised by Plaintiff is whether the Court erred in

awarding Defendants dismissal of Plaintiff's monetary damages claim in this First Circuit under

Younger Abstention and erred in failing to self-execute 28 U.S.C. § 455. And Plaintiff

respectfully submits that she is likely to succeed on appeal in arguing that, in these

circumstances, dismissal was not properly ordered in the particular circumstances of this case

pursuant to established binding First Circuit caselaws on both the Court's errors applying

Younger Abstention as well as judicial disqualification. *See DeMauro v. DeMauro,* 115 F.3d 94,

98 (1st Cir. 1997)**;** *In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998); *Quackenbush v.*

*Allstate Ins. Co*., 517 U.S. 706 (1996).  *See* also *Allen v. La. State Bd. of Dentistry*, 835 F.2d 100,

104 (5th Cir. 1988). ("Younger abstention does not apply to claims for monetary damages.")

24. Absence of a new trial or a stay of the judgment will erode confidence in the Judiciary in the First Circuit by creating an impression that it is violating national law regarding the government edict doctrine and setting illegal new national policy regarding the Title IV-D Program. It may also have the effect of "encouraging forum shopping." *Trump v. Hawaii,* 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). It further "undermines the judicial system's goals of allowing the 'airing of competing views' and permitting multiple judges and circuits to weigh in on significant issues." *See also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (traditional remedial principles account for "the public interest" and "the balance of equities"); *EME Homer City Generation, LP v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.) (declining to vacate unlawful agency action under the APA because "vacatur could cause substantial disruption"). In this context, the dismissal of Plaintiff's state government tort monetary damages claims entered by the Court could cause substantial disruption to the *uniform* application of the legal framework of the Title IV-D Program Congress explicitly intended.

25. The serious legal questions raised in this case regarding the scope of remedy go beyond the questions of whether a Younger abstention is applicable to federal monetary damages claims and or the feeble assertion of *comity* applied to the Rhode Island Judiciary and Tyler Technology's gross violation of the government edict doctrine—and indeed, those questions should not have even entered into this case. Here, among Plaintiff's challenges was to state Judiciary, Tyler Technologies and agency actions, and Plaintiff pursued fraudulent inducement breach of contract damages claims and tort monetary damages claims. Instead, the Court at law cannot vacate a federal statute—i.e., cannot "delete a previously enacted statute from the books" such as 42 U.S.C. § 1983. *See* also Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va.

L. Rev. 933, 936 (2018) ("The federal courts have no authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute. The power of judicial review is more limited." (footnotes omitted). Legal monetary damages relief under 42 U.S.C. § 1983 that would hold the Rhode Island state government accountable under the Rhode Island Government Tort Act for Rhode Island government actors' tortious actions violating the legal framework of the Title IV-D Program federal statutes targeting the Plaintiff in Texas was a legal remedy conferred by Congress to federal courts to grant legal relief appropriate in this case. The Court has an unflagging obligation to exercise jurisdiction conferred to it by Congress. *See Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013)

26. With respect, although the Court has entered a judgment otherwise, Plaintiff has demonstrated a likelihood of success on appeal of the Final Judgment sufficient to justify a stay of the judgment.

## **B. The Balance of the Equities Overwhelmingly Favors the Requested New Trial or Stay**

27. The balance of the equities overwhelmingly favors a new trial or stay: The State of Rhode Island plainly lacks any legitimate interest in the State's systemic knowing violation of the government edict doctrine and violation of 42 U.S.C. § 654(21)(A) that they now target Plaintiff in Texas, and which they sought to cover up from federal and Texas authorities, as well as from Plaintiff, by knowingly and unlawfully removing interest from the automated support record system. Americans outside of Rhode Island re fraudulently, unlawfully and systemically fleeced by Rhode Island's illegal scheme that is illegally funded through the State's defrauding of the United States lying to the United States that these activities are eligible for federal funds

appropriated by Congress for the legal administration of Title IV Program of the Social Security Act.

28. Defendants will face no harm from Plaintiff's requested new trial or stay. The judgment that is specifically directed to and protects the prevailing Defendants from legal accountability of their illegal actions, is further issued by a disqualified judge, Judge Smith, who was the former counsel for the Defendants and a partner of the firm whose major client is the Rhode Island Judiciary, *e.g.*, Rhode Island state government entities, including the state courts and state agencies. The requested new trial or stay will thus impose no hardship on the prevailing Defendants at all.

29. By contrast, the public and the Plaintiff face significant harm if now new trial is ordered or the judgment is not stayed. As an initial matter, "any time a [government]" violates "statutes enacted by representatives of its people," the people "suffer a form of irreparable injury." *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). But the harm here is much greater and more far-reaching. The government edict doctrine is willfully violated by the Rhode Island Judiciary and Tyler Technology in a civil conspiracy to cover up the illegal state family court creating judge-created laws ordering and enforcing 12% compound interest, aided and abetted by the Department of Human Services - Title IV-D requires the uniform application and compliance by participating States with the Social Security Act. Congress's as well as the United States through the Secretary of the U.S. Department of Health and Human Services' interest in the uniform compliance of 42 U.S.C. § 654(21)(A), § 654 and 42 U.S.C. § 666 are well established. The States are reimbursed 66% of the cost of operations through federal funding appropriated by Congress under Title IV-D of the Social Security Act. The Defendants' arbitrary illegal removal of the illegal unenforceable 12%

compound interest from the automated support record system and cover up of their illegal 12% compound interest scheme from the federal and Texas authorities targeting Texas properties and targeting the Plaintiff in Texas demonstrates Rhode Island government agencies (who are former clients of Judge Smith) knowingly committed criminal schemes illegally seizing Plaintiff's properties interstate in Texas that they know are violative of federal criminal codes and Texas civil and penal codes. *See,* e.g., Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act). The program, which is administered by the United States Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for a significant sixty-six percent (66%) of the costs of operating their child-support enforcement programs. 42 U.S.C. §v655(a)(2)(C). In 1975, Congress adopted Title IV-D, 42 U.S.C. §v651 *et seq*., and established the general statutory framework that exists today. See 1975 Act § 101(a), 88 Stat. 2351; *Blessing v. Freestone*, 520 U.S. 329, 333-335 (1997) (describing program). Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support. Therefore, the Defendants' illegal operations cannot be funded by Congressional appropriations.

30. Judge Smith's failure to self-execute his disqualification under 28 U.S.C. § 455 as well as Canon 3E of the Code of Judicial Conduct, then his subsequent refusal to recuse in the related case, <u>Seguin v, RI Office of Child Support Services et al Civil</u> No. 23-cv-34-WES-PAS (D.R.I. 2023), upon Plaintiff's request after she raised newly discovered discovery post judgment

on October 6, 2023 of his direct and past public sector law practice's contract legal representation of the Defendants, state courts, state agencies and other conflict entities, have the appearance, to the objective observer, of the Court's issuance of judgment in favor of the Defendants in error that contravenes established First Circuit case law on Younger Abstention as well as disqualification, calculated to benefit the interests of his former clients, as partner of his former firm that represents the Rhode Island Judiciary and the state government.

31. Moreover, the Court's judgment effectively functions as a denial of Plaintiff's access to this Court of law to redress her legal monetary damages claims and fraudulent inducement breach of contract damages claims. It is well-settled that even minimal loss of First Amendment freedoms, "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality)); *see also Elrod*, 427 U.S. at 373.; *N.Y. Times v. United States*, 403 U.S. 713, 715 (1971). Accordingly, Plaintiff has a strong likelihood of success on the merits, will suffer irreparable injury without a stay, and a stay will not injure others while furthering the public interest.

### III. CONCLUSION

27. For the foregoing reasons, Plaintiff has demonstrated a likelihood of success on appeal of the Judgment ordered, and has demonstrated that the balance of the equities favors a new trial or a stay. Plaintiff respectfully requests that the Court stay the final judgment for the duration of appellate proceedings relating to the related Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I. 2023).

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 16, 2023, I filed the within Motion with the

Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 16, 2023

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                             Civil Action No. 1:23-cv-126-WES-PAS


RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

*Defendants*

## MARY SEGUIN'S DECLARATION IN SUPPORT OF PLAINTIFF'S RULE 60(b) MOTION


I, MARY SEGUIN, hereby declare under penalty of perjury, pursuant to 28 U.S.C. sec.
1746(2) that the following statements are true and correct:

1. That I am the Plaintiff, Pro Se, in the above captioned matter.

2. That I exercised, am exercising and continue to exercise my statutory right to appear
   pro se party in the above captioned civil matter in federal court by statute 28 U.S.C.
   sec. 1654.

3. That in state proceedings in Rhode Island, I am required to comply with Rhode Island Article X. Rules Governing Electronic Filing, Rule 2. Official Court Record, (a) Official Court Record. "Upon the implementation of the Electronic Filing System ("EFS") in each court, all documents shall be filed electronically and shall be the official court record."

4. That the state proceedings in which I am a party are public and are not about child custody nor involve a minor.

5. That the **Rhode Island Family Court**, through its adoption and promulgation of **Administrative Order 2021-01 A2)** mandated that all child support interest matters shall be heard remotely via WebEx.  Further, **Administrative Order 2021-01 B1)** mandated that all non-emergency filings shall be filed using the electronic filing system in accordance with the Family Court Rules of Domestic Relations Procedure, which is the **Odyssey system**.

6. That the **"RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION, Rule 5. Access to Case Information, (c) Remote Access to Case Information. (1) Policy. To allow <u>limited</u> Remote Access to the Database through the Public Portal.  Non-public case types shall not be remotely accessible except for certain case types to attorneys who have entered an appearance in a case.  (2) Content. (a) The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall <u>not</u> have Remote Access to other Electronic Case Information"** bar, deny, violate, abridge, infringe and interfere with Pro Se Litigants' and the Public's fundamental rights to access public court records and Pro Se Litigants' fundamental right to meaningful access to the courts.  See "**<u>RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION</u>**"  **Rule 5(c)(2)(a)** "**<u>The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall not have Remote Access to other Electronic Case Information.</u>**" See also "**<u>RHODE ISLAND JUDICIARY, Access to Case Information,  2. Remote Access to Case Information A. The Public, Self-represented Litigants, and Parties to a Case, The public, self-represented litigants, and parties in a case shall have remote access to the register of actions or docket but shall not have remote access to other electronic case information</u>**."

7. That I, the Plaintiff, learned and verified on July 10, 2023 directly from the Rhode Island Judiciary itself through numerous (14) correspondences with the Rhode Island Judiciary from June 10, 2023 to July 10, 2023, pursuant to my RI Access to Public Records Act ("APRA") request for public records from the Rhode Island Judiciary, that as a matter of State policy, State Court Rule, and Judiciary Rule, in  the digital courts implemented by the Rhode Island Judiciary, the State Court, the Rhode Island

Judiciary deny remote digital access of the Rhode Island Judiciary's monopolized publication of court and judicial records using the digital tool maintained and published by Tyler Technologies, Odyssey, including judge-created, judge-authored court decisions arising from state proceedings in the State's digital electronic courts, and digital court transcripts ordered by and paid by pro-se litigants that are published by the Judiciary digitally on Tyer Technologies' Odyssey are also denied access to the Public, pro-se litigants, and parties to the litigation (who are represented by counsel). The Rhode Island State Court only grants remote access to digital court and judicial records created by judges produced in digital courts to Rhode Island attorneys and state and federal agencies that are approved by the Rhode Island Judiciary's monopoly. On this matter, I corresponded in writing fourteen (14) APRA correspondence emails with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023.

8. That the State Defendants in this matter electronically file all notices using another electronic filing system that is even separate and different from the EFS (Odyssey).

9. That the State Defendants' court electronic filings are not noticed to me in Texas.

10. That the State Defendants' court electronic filings are not visible to me on the Rhode Island courts' EFS.

11. That the State Defendants' court electronic filing court records cannot be accessed remotely by me, solely because I am a self-represented litigant.

12. That the State Defendants' court electronic filing court records cannot be accessed remotely by the public, by self-represented litigants, nor by parties to the case, but can be accessed remotely and instantly through the internet by attorneys in Rhode Island and state and federal agencies.

13. That the Rhode Island Court Clerks state to me over the phone that they are prohibited from reading the contents of the court records over the phone to me.

14. That the Rhode Island Court virtual clerks state to me over the phone that even they are unable to see or access the court record information of filings by the State Defendants from the virtual clerks' access portals.

15. That the Rhode Island Electronic Filing System, case management system, rules and practices outright and unconstitutionally restrict and deny access to the court to three classes: (1) the public; (2) pro-se litigants; (3) parties to the case (who are represented by counsel), and is obviously outright reserved for only the government and Rhode Island attorneys.

16. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS.

17. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and

withdrew from my-initiated RI EOHHS agency appeal in 2022 in a scheme to procure a favorable judgment in a state proceeding that deny my federal constitutional and due process rights in Texas.

18. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and initiated the family court state proceeding on January 31, 2023 before the Covid Emergency Declaration was lifted.

19. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices that appear to **only allow remote, instant and full court access to a restricted club of R.I. lawyers and the government**, pose unconstitutional and undue burden on me, a citizen of Texas over 2,500 miles away.

20. That the State Defendant have full knowledge of the egregiously unfair due process violations of the Rhode Island state court EFS system/architecture/rules/practices that deny me access to the required **electronic court transcripts** prepared by the court reporter and electronically filed in the state EFS that **I ordered and paid for** for appeal, but the State Defendants have instant remote access by state court design.

21. That the State Defendants have full knowledge of the above unconstitutional restriction on access to court records and information to the public and non-lawyers is deliberate, by design and calculated to be unfair, violating constitutional guarantees of full and fair opportunity to raise claims in state proceedings.

22. That the above-raised unconstitutional restrictions are not exhaustive.

23. That my federal monetary damages claims on the unconstitutionality of the Rhode Island state court rules, practices and proceedings that violate the government edict doctrine and violate the pro-se litigants', such as my-self, federal constitutional rights: (1) federal constitutional right of equal access to the courts, (2) federal constitutional right to equal access to court records to receive information on the contents of all electronically filed notices, pleadings, court decisions, and transcripts that I myself ordered and paid for for appeal that are required to be electronically filed by state court rules and practices, (3) federal constitutional due process right and equal right to be given equal and timely notice of electronic filings and entries by the courts (including court decisions, court orders, court judgments, full docket entries, etc.) that the Rhode Island Judiciary deliberately deny by category all pro-se litigants access to court information, namely the contents of judicial/court records of cases to which I am the self-represented party, (4) federal constitutional due process right to be heard (Rhode Island Superior Court threatens me, the Texas pro-se plaintiff, with denial of my request to conduct WebEx hearings for the purpose of denying the Texas pro-se litigant access to the court and to be heard), (5) federal constitutional due process right to decision by a neutral decision-maker (the court that denies pro-se litigant

access to the court and the corollary opportunity to be heard fails the neutral decision-maker test).  This list is not exhaustive.

24. That I seek to sue in federal court the State Defendants and add additional defendants.

25. I am an out-of-state diversity and a pro-se litigant in two state proceedings in Rhode Island, and have been unconstitutionally singled out by the State Judiciary, by category "self-represented litigant," to be barred from accessing electronic case information authored by judges and which the Judiciary has a monopoly in the publication of the judge-created laws in which state court cases I am the pro-se party, and therefore have standing to raise claims against this unconstitutional state practice and unconstitutional state court practice and rules.  I understand the Rhode Island Judiciary's monopoly in the digital publication of judge-created laws in the Judiciary' implemented digital/electronic courts and the Judiciary's denial to the Public and to me from accessing the monopolized electronic publication of the judge-created laws in the court records violate the government edict doctrine.

26. Additionally, my fundamental First and Fourteenth Amendment constitutional right and common law right to equal, meaningful, and timely access to judicial records and public court records in litigation, given timely notice, adequate opportunity to be heard and to decision by a neutral decision-maker are fundamental First and Fourth Amendment and Fourteenth Amendment rights.  Critically, the unconstitutional abridgement, infringement, and denial of judicial and court records to out-of-state pro-se litigants by the Rhode Island State Courts, Rhode Island State Judiciary and the Rhode Island Superior Court Bench Bar Committee directly relate to Younger Abstention Exception.

27. The State Defendants deliberately file all the State's pleadings outside of the State's electronic filing system, "Odyssey," and deliberately use a wholly different un-named electronic filing system, different and separate from that ("Odyssey") provided for pro-se litigants, so that pro-se litigants do not receive any requisite automated electronic notices of court motions or pleadings the State Defendants file electronically, nor are pro se litigants able to electronically access the content information of the State Defendants' electronically-filed pleadings.  The only way the pro se litigant, such as me, the Texas Plaintiff, can access the court record is to personally go over 2,500 miles away to the courthouse in Rhode Island to access the court pleading information, or get a "courtesy notice" via email or get a "courtesy notice" through U.S. Mail sent by the State Defendants at whim.   The State Defendants deliberately fail to send the notices electronically or by U.S. Mail, and the state courts deliberately promulgated court rules disallowing the public, pro-se litigants and even the parties who are represented by lawyers, remote access to court records, and critically, deny access to crucial court decisions, judgments and orders of public cases, as well as deny remote access to the transcripts ordered by pro-se litigants for appeal.  Critically, the State court's abridgment and denial of access to court documents to the pro se litigant and the general public result in the

unconstitutional abridgment and denial of equal, timely and meaningful access to court complaints, decisions, judgments and orders. What is truly shocking is that the Rhode Island Judiciary even denies and/or bars pro-se litigants remote access of court transcripts that were ordered by pro-se litigants for appeal.

28. Thirdly, the Texas Pro-Se Plaintiff discovered and verified the fact, on or about July 7, 2023, that the Rhode Island Judiciary, using the aforesaid state court rule barring, by category, pro-se litigants from accessing court case information remotely, bars the Plaintiff by category ("self-represented litigant") from accessing state court proceeding transcripts that the Texas Plaintiff ordered and paid for, for appeal. In other words, the RI Supreme Court Clerk stated to the Texas Plaintiff that the Plaintiff, in Texas, is unconstitutionally barred from remotely accessing the transcripts of court proceedings that she ordered and paid for in her appeal to the RI Supreme Court in the Plaintiff-initiated APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215**, and yet the State Defendants are inequitably granted instant and free remote access to those very transcripts that the Texas Plaintiff ordered and paid for, for appeal. The federal Texas Plaintiff respectfully requests this Court the extension of time to present the new evidence and plead the verified facts.

29. Fourthly, the Texas Plaintiff discovered and verified the fact, on or about July 11, 2023, that, despite the Texas Plaintiff's several phone inquiries to the RI Superior Court in the past several weeks regarding the status of the appeal, the RI Superior Court, for undisclosed reasons, failed and continue to fail to relinquish jurisdiction and transfer the court case file of **Seguin v. RI Office of Child Support Services, PC-22-07215** to the RI Supreme Court within the requisite 60 days after Plaintiff's filing of Notice of Appeal on April 3, 2023, as required by the RI Supreme Court rules and procedures. At the same time, the Texas Plaintiff verified the fact that the Plaintiff-ordered transcripts of the state proceedings in the Federal Plaintiff-initiated state APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215** show the RI Superior Court further unconstitutionally sought to deny the Texas Plaintiff access to the state court and opportunity to be heard by outright threatening the Plaintiff in open court that the Judge, David Cruise, during the hearing of March 24, 2023 in that matter, shall use the state court's discretionary power in the future to deny all of the Texas pro-se Plaintiff's petitions for remote WebEx hearings to effectively deny her access to the state superior court. The state court that denies court access and the opportunity to be heard fails the neutral-decision-maker test required under the Fourteenth Amendment. I now specifically request further the Court to judicially notice that this court access denial and denial to be heard occurred on March 24, 2023, PRIOR to President Biden's lifting of the COVID-19 National Health Emergency Declaration. I, the Texas Plaintiff, aver this is a direct contributory reason for the RI Superior Court's failure to transfer the case file to the Supreme Court within 60 days (by June 3, 2023) of the Plaintiff's filing of Notice of Appeal on April 3, 2023 in **Seguin v. RI Office of Child Support Services, PC-22-07215**.

30. Fifthly, the Plaintiff presents to this Court and respectfully requests the Court to take judicial notice of the undisputed fact of the court rule-making process in Rhode Island. The 1966 Rules were promulgated by the justices of the superior court pursuant to section 8-6-2 of the General Laws of Rhode Island. This enabling act departed from the Federal Rules Enabling Act and most state enabling legislation conferring rule-making power on the supreme courts of the respective governments. The Rhode Island Enabling Act was adopted in 1940, 1940 R.I. Pub. Laws ch. 943, sec. 1. It conferred the power on the justices of the superior court and the 1966 reform was the product of that court. In 1969 an amendment to section 8-6-2 made the Rules thereafter adopted by the trial courts subject to the approval of the Supreme Court. 1969 R.I. Pub. Laws ch. 239, sec 2. Therefore, all public records relating to the adoption and promulgation of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION" are "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, judicial, regulatory, or administrative body of the state, or any political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to Public Records Act ("APRA"). Even though the Rhode Island Enabling Act conferred the power on the judiciary public body to promulgate and adopt court rules, a.k.a. rule-making process, the Rhode Island Judiciary, pursuant to the Plaintiff's APRA request for public records, denied the Plaintiff's APRA request within the 10 business day period, as well as denies it possesses public records, as defined by APRA, relating to the rule-making process by the judiciary of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," including denying possession of public records that show the intent of the rule-makers to promulgate and adopt court rules denying fundamental right of public access to electronic case information remotely to the public, to self-represented litigants, and to parties to a case. **See <u>Exhibit D</u>** fourteen (14) APRA correspondence emails between the Plaintiff and/with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023. The Texas pro-se Plaintiff respectfully requests the extension of time to present the new evidence and plead the newly verified facts and claims, and amend the complaint, which is further in the interest of judicial economy. The Plaintiff further seeks to appeal and file her claim against the implausible denial by the RI Judiciary, which is conferred by the Rhode Island Enabling Act to make rules of the court, that it possesses public records relating to the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," that the judiciary, conferred power by the Rhode Island Enabling Act, "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, judicial, regulatory, or administrative body of the state, or any political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to

Public Records Act ("APRA"). Because the RI Superior Court clearly ruled in **Seguin v. RI Office of Child Support Services, PC-22-07215** that it lacked subject matter jurisdiction to hear my/the Texas Plaintiff's APRA-related claims, I, the Texas Plaintiff, now exercise my statutory and constitutional rights to petition this Federal Court, invoking 28 U.S.C. § 1343(a)(3) (civil rights) and 28 U.S.C. § 1367 that provides supplemental jurisdiction over the state law tort claims that arose from the same common nuclei of facts, invoking 28 U.S.C. § 1331 (federal question), and invoking 42 U.S.C. § 1983 for violations of civil rights under the First, Fourth and Fourteenth Amendments to the United States Constitution. I, the Plaintiff, respectfully request this Court for the extension of time to file my claims.

31. Plaintiff discovered on October 6, 2023 that the Rhode Island Judiciary and Government Defendants are former clients of Judge Smith, a partner in his former firm, Edwards & Angell.

32. Plaintiff discovered on November 9, 2023 that the Rhode Isand Judiciary and Government Defendants are current clients of the firm Edwards & Angell, the former firm of Judge Smith, a partner in the firm.

33. A plain reading of 28 U.S.C. sec. 455 makes clear that Judge Smith is disqualified from this case, and a plain reading of case law makes clear that 28 U.S.C. sec. 455 is self-executing, without necessitating any party's request.


Respectfully submitted,

Date: November 16, 2023

MARY SEGUIN


*Mary Seguin*
_____

Mary Seguin

P.O. Box 22022

Houston, TX 77019

maryseguin22022@gmail.com

**Meghan Kenny**

| | |
|---|---|
| **From:** | Mary Seguin <maryseguin22022@gmail.com> |
| **Sent:** | Friday, November 17, 2023 3:21 PM |
| **To:** | RID_ECF_INTAKE |
| **Subject:** | URGENT - TIME SENSITIVE - FILE TODAY NOTICE OF APPEAL in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS |
| **Attachments:** | CA 126 Notice of Appeal 111723.pdf |
| | |
| **Categories:** | Being Worked On MK |

**CAUTION - EXTERNAL:**

Dear Clerks of the Court,

I spoke with Clerk Meghan today regarding an update on the docketing of my motions and filing a Notice of Appeal in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Following our discussion, I emailed and filed today at 3:10 PM Eastern Time to the Clerk of the Court and respectfully requested the Clerk of the Court to docket today my Rule 60(b)(1) Motion, dated November 17, 2023, that is time-sensitive, per my email below.

**Please make sure that my previously filed Rule 60(b)(1) Motion referred in my below email is docketed as ECF 32.**

Please make sure that the law is followed so that my attached Rule 60(b)(1) Motion is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Rule 60(b)(1) Motion. No Chamber interference should be taking place to prevent the docketing of my attached Rule 60(b)(1) Motion.

Additionally, subsequent to my filing of the aforementioned Rule 60(b)(1) Motion referenced in my email below that I had requested be docketed as ECF 32, I am herewith filing my attached **Notice of Appeal** in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

**Please make sure that my Notice of Appeal filed herewith that is attached to this email is docketed today as ECF 33.**

Please make sure that the law is followed so that my attached Notice of Appeal docketed immediately upon receipt and is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Notice of Appeal. No Chamber interference should be taking place to prevent the docketing of my attached Notice of Appeal.

Thank you for your assistance.

Respectfully Submitted,
Mary Seguin
Houston, Texas

---------- Forwarded message ---------
From: **Mary Seguin <maryseguin22022@gmail.com>**
Date: Fri, Nov 17, 2023 at 2:10 PM
Subject: URGENT - TIME SENSITIVE - FILE TODAY RULE 60(b)(1) MOTION in Seguin v. Ri Dept of Human Services et al, Civil

Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerks of the Court,

I spoke with Clerk Meghan today regarding an update on the docketing of my motions.

Following our discussion, I respectfully request the Clerk of the Court to docket today my attached Rule 60(b)(1) Motion, dated November 17, 2023, that is time-sensitive.

**Please make sure that my attached Rule 60(b)(1) Motion is docketed as ECF 32.**

Please make sure that the law is followed that my attached Rule 60(b)(1) Motion is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Rule 60(b)(1) Motion. No Chamber interference should be taking place to prevent the docketing of my attached Rule 60(b)(1) Motion.

Thank you for your assistance.

Respectfully Submitted,
Mary Seguin
Houston, Texas

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Fri, Nov 17, 2023 at 12:33 PM
Subject: Fwd: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerks of the Court,

I am respectfully following up on my Rule 59 Motion filing.

Yesterday, November 16, 2023, at 1:31 PM Central Time, I filed via email below, my Rule 59 Motion in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS. As indicated in my email below, I emphasized that docketing the Rule 59 Motion on November 16, 2023 is urgent, to comply with the 28 day filing post-judgment deadline, which my filing meets - November 16, 2023 is within the 28 day deadline of Fed. R. of Civ. P. 59 that tolls the time for filing an appeal.

I followed up with telephone calls to the Clerk's Office at 1:32 PM Central Time, and at 3:42 PM Central Time to request timely docket of my Rule 59 Motion, and the Clerk's Office assured me each time that a deputy clerk is working on it and that it will be docketed on the day it was received and that the docket will reflect the email date stamp of the day the Rule 59 Motion is received by email. Further, I was told that **all filings** I email to the Clerk's Office will be docketed and considered by the Court as having been filed on the day that the motion was emailed to the Clerk's Office.

Therefore, my Rule 59 Motion emailed on November 16, 2023 should be accordingly docketed as **ECF 32** with the **entry of/stating filing on November 16, 2023**, in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

However, as of this time, on November 17, 2023 almost 24 hours later, my Rule 59 Motion is still not docketed.

I would like to respectfully clarify that the Text Order dated October 19, 2023 in this matter states that only my electronic filing privilege was revoked, but there is **no** order requiring that I need to file for leave of Court to file any post-judgment motions, such as my Rule 59 Motion.

Today, November 17, 2023, I telephoned the Clerk's Office first thing at 8:00 AM Central Time, and spoke with Clerk Meghan, who informed me that yesterday she had forwarded my Rule 59 Motion to Chambers upon receipt, but has yet to hear back from Chambers, but did not know what was causing the hold up when I asked why Chambers' response is taking almost 24 hours which impacts the docketing date of the Rule 59 Motion. I expressed my concern of the Rule 59 deadline, emphasizing that it tolls the time for filing an appeal, therefore I respectfully requested that the docket accurately reflects my timely filing of my Rule 59 Motion on November 16, 2023 (at 1:31 PM Central Time).

Additionally, I informed Clerk Meghan that I relied on the Clerk's Office's information provided above, and I had also filed a timely **Rule 60** Motion yesterday, **November 16, 2023**, at **4:39 PM Central Time**, similarly requesting docketing to reflect it was timely filed via email to on November 16, 2023. I emphasized to Clerk Meghan that timeliness is critical, as Rule 60 Motion filed within 28 days post-judgment tolls the time for filing an appeal. Clerk Meghan told me that my Rule 60 Motion was forwarded to Chambers as well. According to the Clerk's Office's information, my **Rule 60 Motion** needs to be docketed/filed as **ECF 33, dated stamped filed on November 16, 2023**.

Due to the above information regarding the processing of my post-judgment motions, I expressed to Clerk Megghan my concern regarding the Court's procedure of forwarding my time-sensitive post-judgment motions to Chambers without docketing/filing, and then those time-sensitive motions seemingly to languish in Chambers past the date of the 28-day deadline stipulated by Rule 59, and Rule 60 as they relate to tolling the time for filing an appeal. I expressed my explicit concern that I seek to preserve my right of appeal, and that I respectfully seek to preserve on the record the issues contained in my Rule 59 and Rule 60 Motions that are currently before Chambers, without docketing, by law within the jurisdiction of the U.S. District Court of Rhode Island. My Rule 59 and Rule 60 Motions are not ex-parte or emergency motions.

Moreover, I expressed to Clerk Meghan my concern that the processing of my post-judgment motions forwarded to Chambers and seemingly pending before Chambers without the motions being docketed, impacts my right of appeal 30-days post judgment, and today, Friday, is Day 29. I told the Clerk that under the circumstances in this matter, I seek to preserve for appeal the issues raised in my timely filed Rule 59 Motion and Rule 60 Motion, and that I seek to preserve my right to appeal within the 30-day postjudgment period.

I also discussed with the Clerk that my timely filed but undocketed Rule 59 Motion and Rule 60 Motion that were forwarded to and currently before Chambers cause an uncertain effect, impacting the date of my filing of Notice of Appeal, the deadline of which is November 18, 2023, a Saturday. Based on the current facts and issues regarding simply docketing my filings on the record, I am concerned my rights of access to the Courts are impacted, and that my Notice of Appeal may also languish I do not believe any pro se litigant should be made to be uncertain of the timeliness of filing a Notice of Appeal as a matter of right that is caused by inaction by Chambers on timely-filed Rule 59 and Rule 60 Motions that toll the time to file an appeal. I explicitly expressed my concern on the effect on my access to the Courts.

I respectfully request that this email communication regarding the filing/docketing of my Rule 59 Motion be docketed to accurately reflect the record on appeal along with the Rule 59 Motion at the time the Rule 59 Motion is docketed by the Clerk.

Thank you in advance for you assistance.

Respectfully submitted,
Mary Seguin

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Thu, Nov 16, 2023 at 1:31 PM
Subject: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk of the Court,

Kindly urgently file today, November 16, 2023, my attached Rule 59 Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 59 Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023. I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX  77019
(281) 244-2016

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

EXHIBIT II.



# UNITED STATES DISTRICT COURT
## *District of Rhode Island*

### CLERK'S CERTIFICATE AND APPELLATE COVER SHEET
### ABBREVIATED ELECTRONIC RECORD

| Case Information |
|---|

Case Caption: **Seguin**                           vs. **RI Dept of Human Services**

District Court Number: **1:23cv126-WES-PAS**        Presiding Judge: **Judge Smith**

Notice of Appeal filed by: **Plaintiff**            Notice of Appeal document number: **32**

Appeal from: **Text Order dated 11/17/2023 and Text Order dated 11/17/2023**

Other information:

Fee status: **Due**              Pro se case:      Yes ✔    No ☐

Emergency or requires expedition: **No**   *If yes, reason:*

| Record Information |
|---|

Motions Pending        Yes ☐    No ✔
*If yes, document #*

Other record information:

Related case(s) on appeal:

| Certification |
|---|

I, Hanorah Tyer-Witek, Clerk of the United States District Court for the District of Rhode Island, do certify that the following annexed electronic documents constitute the abbreviated record on appeal in the above referenced case:

**HANORAH TYER-WITEK**
Clerk of Court

**/s/ Meghan Kenny**

Deputy Clerk

Date: **11/17/2023**

APPEAL,Pro Se ECF Filer,Pro Se Plaintiff

# U.S. District Court
## District of Rhode Island (Providence)
## CIVIL DOCKET FOR CASE #: <u>1:23−cv−00126−WES−PAS</u>

| | |
|---|---|
| Seguin v. Rhode Island Department of Human Services et al | Date Filed: 03/30/2023 |
| Assigned to: District Judge William E. Smith | Date Terminated: 10/19/2023 |
| Referred to: Magistrate Judge Patricia A. Sullivan | Jury Demand: Both |
| Demand: $3,000,000 | Nature of Suit: 440 Civil Rights: Other |
| Cause: 18:1962 Racketeering (RICO) Act | Jurisdiction: Federal Question |

**<u>Plaintiff</u>**

**Mary Seguin**                           represented by   **Mary Seguin**
                                                           P.O. Box 22022
                                                           Houston, TX 77019
                                                           281−744−2016
                                                           Email: <u>maryseguin22022@gmail.com</u>
                                                           PRO SE

V.

**<u>Defendant</u>**

**Rhode Island Department of Human**      represented by   **Marissa D. Pizana**
**Services**                                               RI Department of Attorney General
*In its official capacity*                                 Civil Division
                                                           150 South Main Street
                                                           Providence, RI 02903
                                                           401−274−4400
                                                           Email: <u>mpizana@riag.ri.gov</u>
                                                           *ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Rhode Island Department of Human**      represented by   **Marissa D. Pizana**
**Services Office Of Child Support**                       (See above for address)
**Services**                                               *ATTORNEY TO BE NOTICED*
*In its official capacity*

**<u>Defendant</u>**

**Gero Meyersiek**                        represented by   **Joanna M. Achille**
*In his individual and official capacity*                  Burns & Levinson LLP
                                                           1 Citizens Plaza
                                                           Providence, RI 02903
                                                           (401) 831−8330
                                                           Fax: (617) 345−3299
                                                           Email: <u>jachille@burnslev.com</u>
                                                           *LEAD ATTORNEY*
                                                           *ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Michael D. Coleman**
*In his individual and official capacity*

**Defendant**

**Deborah A. Barclay**
*In her individual and official capacity*

**Defendant**

**Lisa Pinsoneault**
*In her individual and official capacity*

**Defendant**

**Carl Beauregard**
*In his individual and official capacity*

**Defendant**

**Kevin Tighe**

**Defendant**

**Monique Bonin**

**Defendant**

**Frank Dibiase**

**Defendant**

**Wendy A. Fobert**

**Defendant**

**Karla Caballeros**

**Defendant**

**Timothy Flynn**

**Defendant**

**Rhode Island Court System**

**Defendant**

**Paul A Suttell**
*L in his individual and official capacity*
*as Executive Head OF Rhode Island State*
*Court System*

**Defendant**

**Rhode Island Administrative Office of
State Courts**

**Defendant**

**Rhode Island Administrative Office of
the Superior Court**

<u>Defendant</u>

**Rhode Island Judicial Council**

<u>Defendant</u>

**Rhode Island Superior Court**

<u>Defendant</u>

**Rhode Island Superior Court Judicial
Council**

<u>Defendant</u>

**The Judicial Technology Center**

<u>Defendant</u>

**Julie Hamil**

<u>Defendant</u>

**Marisa P. Brown**

<u>Defendant</u>

**John Joseph Baxter, Jr.**

<u>Defendant</u>

**Justin Correa**

<u>Defendant</u>

**Rhode Island Office of the Attorney
General**

<u>Defendant</u>

**Rhode Island Office of the Attorney
General Open Government Unit**

<u>Defendant</u>

**Adam Roach**

<u>Defendant</u>

**Peter Neronha**

<u>Defendant</u>

**Tyler Technologies, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/30/2023 | 1 | COMPLAINT ( filing fee paid $ 402.00 receipt number ARIDC−1855567 ), filed by Mary Seguin.(DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | | <span style="color:red">CORRECTIVE DOCKET ENTRY Regarding: 1 Complaint. **CORRECTIVE DOCKET ENTRY:** This case has been electronically filed and processed, however, after a quality control review the following deficiencies were found:</span><span style="color:blue">Civil Cover Sheet not attached.</span> <span style="color:red">The filer is directed to file a Civil Cover Sheet within one day.</span> (DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | 2 | Civil Cover Sheet filed by Mary Seguin. Regarding New Case: 1 Complaint. (Attachments: # 1 Email)(DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | 3 | Summons Request filed by Mary Seguin. (Attachments: # 1 Rhode Island Department of Human Services Office of Child Support Services Summons, # 2 Gero Meyersiek Summons)(DaCruz, Kayla) (Additional attachment(s) added on 3/30/2023: # 3 Email) (DaCruz, Kayla). (Entered: 03/30/2023) |
| 03/30/2023 | 4 | MOTION for Leave to Proceed as Pro Se Electronic Filer filed by Mary Seguin. (Attachments: # 1 Email)(DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | | CASE CONDITIONALLY ASSIGNED to District Judge William E. Smith and Magistrate Judge Patricia A. Sullivan. Related Case Number 23cv34 based upon a related case previously assigned to the presiding judge. The assignment is subject to the presiding judge's determination that the cases, in fact, are related. (DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | 5 | CASE OPENING NOTICE ISSUED (DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | 6 | Summons Issued as to Gero Meyersiek, Rhode Island Department of Human Services, Rhode Island Department of Human Services Office of Child Support Services. (Attachments: # 1 Rhode Island Department of Human Services Office Of Child Support Services Summons, # 2 Gero Meyersiek Summons)(DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | | TEXT ORDER granting 4 Motion for Leave to Proceed as Pro Se Electronic Filer. So Ordered by District Judge William E. Smith on 3/30/2023. (Urizandi, Nissheneyra) (Entered: 03/30/2023) |
| 07/07/2023 | 7 | ORDER TO SHOW CAUSE entered. Show Cause Response due by 7/21/2023. So Ordered by District Judge William E. Smith on 7/7/2023. (Urizandi, Nissheneyra) (Entered: 07/07/2023) |
| 07/07/2023 | | CASE PERMANENTLY ASSIGNED: Since District Judge William E. Smith has determined that this case is in fact related to CA 22−cv−34 this case is permanently assigned to District Judge William E. Smith for all further proceedings. (Urizandi, Nissheneyra) (Entered: 07/07/2023) |
| 07/20/2023 | 8 | AFFIDAVIT re 7 Order to Show Cause *Rule 4(m) Show Cause Declaration* by Mary Seguin. (Attachments: # 1 Exhibit Exhibits A to B attached to Plaintiff's Rule 4(m) Show Cause Declaration)(Seguin, Mary) (Entered: 07/20/2023) |
| 08/07/2023 | 9 | NOTICE of Appearance by Marissa D. Pizana on behalf of Rhode Island Department of Human Services, Rhode Island Department of Human Services Office Of Child Support Services (Pizana, Marissa) (Entered: 08/07/2023) |

| 08/07/2023 | 10 | MOTION for an Extension of Time to File Answer re 1 Complaint *or Otherwise Respond to the Complaint* filed by Rhode Island Department of Human Services, Rhode Island Department of Human Services Office Of Child Support Services. **Responses due by 8/21/2023.** (Pizana, Marissa) (Entered: 08/07/2023) |
| --- | --- | --- |
| 08/07/2023 | 11 | EXHIBIT IN SUPPORT by Rhode Island Department of Human Services, Rhode Island Department of Human Services Office Of Child Support Services in support of 10 MOTION for an Extension of Time to File Answer re 1 Complaint *or Otherwise Respond to the Complaint* . (Pizana, Marissa) (Entered: 08/07/2023) |
| 08/08/2023 | 12 | MOTION for an Extension of Time to Amend 1 Complaint *Pursuant to Rule 15* filed by Mary Seguin. **Responses due by 8/22/2023.** (Attachments: # 1 Exhibit Exhibit A to E attached to Plaintiff Motion for Extension of Time To Amend Complaint 080823, # 2 Affidavit Affidavit in Support of Plaintiff Motion for Extension of Time to Amend Complaint 080823, # 3 Exhibit Exhibit A to D attached to Affidavit in Support of Plaintiff Motion for Extension of Time to Amend Complaint 080823)(Seguin, Mary) (Entered: 08/08/2023) |
| 08/10/2023 | 13 | NOTICE of Appearance by Joanna M. Achille on behalf of Gero Meyersiek (Achille, Joanna) (Entered: 08/10/2023) |
| 08/10/2023 | 14 | First MOTION for an Extension of Time to File Answer re 1 Complaint filed by Gero Meyersiek. **Responses due by 8/24/2023.** (Achille, Joanna) (Entered: 08/10/2023) |
| 08/15/2023 | | TEXT ORDER granting 10 Motion for Extension of Time to Answer. Rhode Island Department of Human Services answer due 10/9/2023; Rhode Island Department of Human Services Office of Child Support Services answer due 10/9/2023. So Ordered by District Judge William E. Smith on 8/15/2023. (Urizandi, Nissheneyra) (Entered: 08/15/2023) |
| 08/16/2023 | 15 | RESPONSE In Opposition to 12 MOTION for an Extension of Time to Amend 1 Complaint *Pursuant to Rule 15* filed by Rhode Island Department of Human Services, Rhode Island Department of Human Services Office Of Child Support Services. **Replies due by 8/23/2023.** (Pizana, Marissa) (Entered: 08/16/2023) |
| 08/16/2023 | 16 | REPLY to Response re 15 Response to Motion, *Plaintiff's Motion for Extension of Time to Amend Complaint* filed by Mary Seguin. (Seguin, Mary) (Entered: 08/16/2023) |
| 08/17/2023 | 17 | MOTION for Temporary Restraining Order filed by Mary Seguin. (Attachments: # 1 Supporting Memorandum Memorandum In Support of Motion for Preliminary Injunction and Temporary Restraining Order, # 2 Affidavit Affidavit in Support of Plaintiff Motion for TRO, # 3 Exhibit Exhibits Attached to Plaintiff Motion for TRO and Preliminary Injunction)(Seguin, Mary) (Entered: 08/17/2023) |
| 08/17/2023 | 18 | AFFIDAVIT re 17 MOTION for Temporary Restraining Order *and Motion for Preliminary Injunction* by Mary Seguin. (Seguin, Mary) (Entered: 08/17/2023) |
| 08/18/2023 | 19 | AFFIDAVIT re 17 MOTION for Temporary Restraining Order *and Rule 65(a) Motion for Injunctive Relief* by Mary Seguin. (Attachments: # 1 Exhibit Rhode Island Family Court Emergency Motion to Stay Proceedings)(Seguin, Mary) (Entered: 08/18/2023) |
| 08/18/2023 | 20 | EXHIBIT IN SUPPORT by Mary Seguin in support of 18 Affidavit, 17 MOTION for Temporary Restraining Order , 1 Complaint, 19 Affidavit *Affidavit in Support of Evidence Submitted for Complaint and Motion for Temporary Restraining Order*. (Seguin, Mary) (Entered: 08/18/2023) |

| 08/18/2023 | 21 | EXHIBIT IN SUPPORT by Mary Seguin in support of 1 Complaint . (Attachments: # 1 Exhibit Documentary Evidentiary Support, # 2 Exhibit Evidentiary Support, # 3 Exhibit Evidentiary Support, # 4 Exhibit Evidentiary Support, # 5 Exhibit Evidentiary Support, # 6 Exhibit Evidentiary Support, # 7 Exhibit Audio Recording Evidentiary Support)(Seguin, Mary) (Entered: 08/18/2023) |
| --- | --- | --- |
| 08/18/2023 | 22 | DOCKET NOTE: Audio file was received and will be maintained in the Clerk's Office. Regarding: 20 Exhibit in Support, 21 Exhibit in Support, 18 Affidavit, 17 MOTION for Temporary Restraining Order , 1 Complaint, 19 Affidavit. (Kenny, Meghan) (Entered: 08/18/2023) |
| 08/18/2023 | 23 | Emergency MOTION for Hearing re 17 MOTION for Temporary Restraining Order filed by Mary Seguin. **Responses due by 9/1/2023.** (Seguin, Mary) (Entered: 08/18/2023) |
| 08/18/2023 | 24 | Second MOTION for Hearing re 17 MOTION for Temporary Restraining Order filed by Mary Seguin. **Responses due by 9/1/2023.** (Kenny, Meghan) (Entered: 08/18/2023) |
| 08/18/2023 | | TEXT ORDER denying Plaintiff's 17 Motion for Temporary Restraining Order and Preliminary Injunction. Because the ongoing proceedings in state court implicate a significant state interest, the Younger abstention doctrine applies, requiring this Court to abstain from enjoining ongoing state proceedings. See Younger v. Harris, 401 U.S. 37 (1971); Sirva Relocation, LLC v. Richie, 794 F.3d 185, 191−93 (1st Cir. 2015). The ongoing proceeding in Family Court implicates the State's interest in enforcing the orders and judgments of its courts and in its ability to collect child support payments, the state court is fully competent to adjudicate Plaintiff's claims, and no Younger abstention exceptions apply. See Sirva, 794 F.3d at 192. Accordingly, Plaintiff's 17 Motion for Temporary Restraining Order and Preliminary Injunction is DENIED. So Ordered by District Judge William E. Smith on 8/18/2023. (Urizandi, Nissheneyra) (Entered: 08/18/2023) |
| 08/18/2023 | | TEXT ORDER granting Plaintiff's 12 Motion for an Extension of Time to Amend Complaint and Defendant Gero Meyersiek's 14 First Motion for an Extension of Time to File Answer. Because Defendants have not yet filed a responsive pleading, Plaintiff is permitted to amend her Complaint pursuant to Federal Rule of Civil Procedure 15(a). Plaintiff is directed to file her amended complaint within fourteen days from the date of this order. In light of this extension, Defendant Gero Meyersieks request for an extension of time is also granted, and he is directed to respond to Plaintiff's amended complaint within 60 days of its filing. So Ordered by District Judge William E. Smith on 8/18/2023. (Urizandi, Nissheneyra) (Entered: 08/18/2023) |
| 08/18/2023 | | TEXT ORDER denying Plaintiff's 23 Emergency Motion for Hearing and 24 Second Motion for Hearing. In light of the denial of Plaintiff's 17 Motion for Temporary Restraining Order and Preliminary Injunction, Plaintiff's requests for a hearing on that motion are DENIED as MOOT. So Ordered by District Judge William E. Smith on 8/18/2023. (Urizandi, Nissheneyra) (Entered: 08/18/2023) |
| 09/01/2023 | 25 | AMENDED COMPLAINT against All Defendants, filed by Mary Seguin.(Seguin, Mary) (Entered: 09/01/2023) |
| 09/05/2023 | 26 | NOTICE by Mary Seguin *Notice and Demand of Claims Against Defendants' Liability Insurance Policies and Coverage* (Seguin, Mary) (Entered: 09/05/2023) |
| 09/06/2023 | 27 | MOTION for an Extension of Time to File Answer re 25 Amended Complaint filed by Rhode Island Department of Human Services, Rhode Island Department of Human |

| | | Services Office Of Child Support Services. **Responses due by 9/20/2023.** (Pizana, Marissa) (Entered: 09/06/2023) |
|---|---|---|
| 09/08/2023 | 28 | RESPONSE In Opposition to 27 MOTION for an Extension of Time to File Answer re 25 Amended Complaint filed by Mary Seguin. **Replies due by 9/15/2023.** (Seguin, Mary) (Entered: 09/08/2023) |
| 09/19/2023 | | TEXT ORDER granting 27 Motion for an Extension of Time to File Answer. Rhode Island Department of Human Services' answer is due November 17, 2023; Rhode Island Department of Human Services Office of Child Support Services' answer is due November 17, 2023. So Ordered by District Judge William E. Smith on 9/19/2023. (Urizandi, Nissheneyra) (Entered: 09/19/2023) |
| 09/30/2023 | 29 | First MOTION for Recusal *Pursuant to 28 U.S.C. § 455* filed by Mary Seguin. **Responses due by 10/16/2023.** (Seguin, Mary) (Entered: 09/30/2023) |
| 10/02/2023 | | TEXT ORDER denying Plaintiff's 29 Motion for Recusal. Plaintiff "moves to recuse and/or disqualify" me and "all justices, judges, or magistrate judges... in the U.S. District Court of Rhode Island." A judge may be disqualified from a case if "(1) the judges impartiality may reasonably be questioned; or (2) the judge may have a personal bias or prejudice concerning a party." United States v. Kelley, 712 F.2d 884, 889 (1st Cir. 1983); see 28 U.S.C. § 455. Plaintiff argues that I and the other judges of this Court should disqualify ourselves because we did so sua sponte in her past lawsuits. Plaintiff does not identify any other facts to support her argument that I should recuse myself from this case. Plaintiffs argument is plainly insufficient to justify recusal and disqualification. See United States v. Houston, No. 3:13−10−DCR, 2013 WL 3975405, at *10 (E.D. Tenn. July 29, 2013) ("A judges recusal in a prior case does not alone require disqualification in a subsequent case."). Accordingly, Plaintiffs motion for Recusal is DENIED. So Ordered by District Judge William E. Smith on 10/2/2023. (Urizandi, Nissheneyra) (Entered: 10/02/2023) |
| 10/17/2023 | 30 | Summons Request filed by Mary Seguin. (Attachments: # 1 Summons Request, # 2 Summons Request)(Kenny, Meghan) (Entered: 10/17/2023) |
| 10/19/2023 | | TEXT ORDER dismissing the action under Younger abstention. Though not raised by the parties, the Court has the power and obligation to dismiss an action if the principles of abstention so require. See Guillemard−Ginorio v. Contreras−Gomez, 585 F.3d 508, 517−18 (1st Cir. 2009); see also Bellotti v. Baird, 428 U.S. 132, 14344 n.10 (1976) (recognizing that "abstention may be raised by the court sua sponte"). Plaintiff filed a 91−page Amended Complaint asking the Court to address the child support payments for which she alleges she is being wrongfully charged and her perceived grievance that she is being denied access to court records under the Rhode Island Access to Public Records Act ("APRA"). See generally Am. Compl., ECF No. 25 . Plaintiff seeks to impede both the child support proceedings before the Rhode Island Family Court ("Family Court") and her action before the Rhode Island Superior Court ("Superior Court") concerning her alleged denial of access to court records. The telltale signs that Plaintiff is attempting to encumber state court proceedings are the facts that Plaintiff, in her Amended Complaint, included as parties, among others, the Superior Court, various state court clerks, and the Chief Justice of the Rhode Island Supreme Court; Plaintiff filed a Motion for Temporary Restraining Order and Preliminary Injunction seeking to "enjoin[] and restrain[] the Defendants from continuing prosecution of the family court proceeding against the Plaintiff," Mot. for TRO and Prelim. Inj. 16, ECF No. 17 ; and Plaintiff asked the Court, in her Amended Complaint, to "[e]njoin the Defendants'[] enforcement and practices of rules, practices, and/or policies" of the state courts, Am. |

Compl. 90. The issues being considered before the Family Court directly relate to this case because, according to the Amended Complaint, Defendant Rhode Island Department of Human Services ("RIDHS") is seeking child support arrearage interest from Plaintiff. See Am. Compl.&para;&para; 135−37 (recognizing that RIDHS is seeking compound interest). Moreover, Plaintiff admits that she has a pending case before the Superior Court where she alleges violations of the APRA. See Am. Compl. &para; 2; see also Seguin v. R.I. Dept of Human Servs., PC−2022−07215 (R.I. Super. Ct.). The Court takes judicial notice of the proceedings before both state tribunals. See Meyersiek v. Seguin, K−2001−0521M (R.I. Fam. Ct.); see also Fed. R. Evid. 201 (permitting, "at any stage of the proceeding," sua sponte judicial notice of facts "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). The Younger abstention doctrine, derived from Younger v. Harris, 401 U.S. 37 (1971), "counsels federal−court abstention when there is a pending state proceeding." Moore v. Sims, 442 U.S. 415, 423 (1979). For the doctrine to apply, certain elements must be met. "First, the pending state [court] proceeding must fall into one of three categories: 1) criminal prosecutions, 2) civil proceedings that are 'akin to criminal prosecutions' ('quasi−criminal proceedings') or 3) civil proceedings that 'implicate a State's interest in enforcing the orders and judgments of its courts.'" Credit Acceptance Corp. v. Healey, 544 F. Supp. 3d 139, 143 (D. Mass. 2021) (quoting Sirva Relocation, LLC v. Richie, 794 F.3d 185, 192 (1st Cir. 2015)). Here, relief for Plaintiff in the pending Family Court case would implicate the state's interest in enforcing the orders and judgments of its courts concerning the payment and collection of child support. See Seguin v. Bedrosian, No. 12−cv−614−JD, 2013 WL 367722, at *2 (D.R.I. Jan. 30, 2013). Moreover, the state has an asserted interest in having appeals under the APRA be heard before the Superior Court. See R.I. Gen. Laws § 38−2−9. Second, the state court case must satisfy the factors identified in Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423 (1982): "1) the state proceeding is ongoing, 2) it involves significant state interests and 3) it provides an adequate opportunity for the plaintiff to raise his federal claims in state court." Credit Acceptance Corp., 544 F. Supp. 3d at 143; see also Middlesex, 457 U.S. at 432. The first factor is satisfied because the proceedings are ongoing. The second factor is satisfied because the state has an interest in family relations and the payment and collection of child support, see Eastman v. New Hampshire, No. 11−cv−316−SM, 2012 WL 405487, at *3 (D.N.H. Jan. 17, 2012), report and recommendation adopted, No. 11−cv−316−SM, 2012 WL 405507 (D.N.H. Feb. 8, 2012), and an interest in the "fair and orderly administration of justice" that includes maintaining sensitive and confidential judicial records, see Courthouse News Serv. v. Quinlan, 32 F.4th 15, 21 (1st Cir. 2022). As for the third factor, "[e]xcept in the most extraordinary cases, a federal court must presume that state courts, consistent with the imperatives of the Supremacy Clause, see U.S. Const. art. VI, are fully competent to adjudicate federal constitutional and statutory claims properly presented by the parties." Casa Marie, Inc. v. Super. Ct. of P.R., 988 F.2d 252, 262 (1st Cir. 1993) (footnote omitted). Nothing suggests that the Family Court and the Superior Court cannot hear Plaintiff's federal claims. Third, none of the Younger abstention exceptions apply. See Sirva, 794 F.3d at 192 (finding abstention inappropriate if 1) the state proceeding is brought "in bad faith" to harass, 2) the state forum cannot adequately protect federal rights, or 3) the state statute is "flagrantly and patently violative of express constitutional prohibitions" (citations omitted)). Accordingly, because the Court does not have jurisdiction over Plaintiff's case, it is DISMISSED in its entirety. Because Plaintiff has a history of filing frivolous and repetitive motions following decisions of the Court of which she disapproves, see Seguin v. R.I. Office of Child Support Servs., No. 1:23−cv−00034−WES−PAS

| | | |
|---|---|---|
| | | (D.R.I.), it is further ORDERED that the Courts March 30, 2023, Text Order granting Plaintiff Leave to Proceed as a Pro Se Electronic Filer is VACATED. Plaintiff's Electronic Filer privileges are revoked. <u>See</u> LR Gen 302(b). So Ordered by District Judge William E. Smith on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 10/19/2023 | <u>31</u> | JUDGMENT. So Ordered by Clerk of Court on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's two recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) Modified on 11/17/2023 to correct a typo. (Urizandi, Nissheneyra). (Entered: 11/17/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) (Entered: 11/17/2023) |
| 11/17/2023 | <u>32</u> | NOTICE OF APPEAL by Mary Seguin as to Text Order, Text Order, **NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf/. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf** Appeal Record due by 11/24/2023. (Attachments: # <u>1</u> Envelope)(Kenny, Meghan) (Entered: 11/17/2023) |

**Form 1A**

**Notice of Appeal to a Court of Appeals From a Judgment of a District Court**

United States District Court for the
District of Rhode Island
Docket Number 1:23-cv-126-WES-PAS

| | |
|---|---|
| MARY SEGUIN, Plaintiff<br><br>v.<br><br>RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official | **Notice of Appeal** |

capacity; RHODE ISLAND
SUPERIOR COURT JUDICIAL
COUNCIL in its official capacity;
THE JUDICIAL TECHNOLOGY
CENTER in its official capacity;
JULIE HAMIL, MARISA BROWN,
JOHN JOSEPH BAXTER, JR.,
JUSTIN CORREA in their
individual and official capacities;
RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its
official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY
GENERAL OPEN GOVERNMENT
UNIT in its official capacity; ADAM
D. ROACH, PETER NERONHA in
their official and individual
capacities; TYLER
TECHNOLOGIES, INC.; GERO
MEYERSIEK, Defendants

MARY SEGUIN (name all parties taking the appeal)* appeals to the United States Court of Appeals for the FIRST Circuit from the final judgment entered on October 19, 2023 (state the date the judgment was entered).

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 17, 2023

---

* See Rule 3(c) for permissible ways of identifying appellants.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                             Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

    *Defendants*

## **PLAINTIFF'S DOCKETING STATEMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT AND THE UNITED STATES DISTRICT COURT OF THE DISTRICT OF RHODE ISLAND**

1. Plaintiff, proceeding pro se from and as a citizen of Texas, respectfully states to the U.S. Court of Appeals for the First Circuit and the United States District Court of the District of Rhode Island that this case is related to the pending appellate case, *Mary Seguin v. Rhode Island Office of Child Support Services, et al*, Case Number 23-1851.

2. Plaintiff respectfully requests the U.S. Court of Appeals for the First Circuit to review Plaintiff's timely filed Rule 59 Motion and Rule 60 Motion that were filed in the U.S. District Court of the District of Rhode Island on November 16, 2023 as proper part of the record of appeal.  Prior to filing this Notice of Appeal, Plaintiff also filed a Rule 60(b)(1) Motion regarding the District Court's interference with Plaintiff's right to file Rule 59 and Rule 60 post judgement in which Plaintiff sought to preserve issues for appeal on the record.  Plaintiff attaches all relevant documentation, including all relevant emails to the Clerk of the Court of the District Court and Plaintiff's properly filed post judgment motions pursuant to Rule 59 and Rule 60 herein to this Notice of Appeal and Docket Statement.

3. Plaintiff's Rule 59 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

4. Plaintiff's first Rule 60 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

5. Plaintiff attaches the aforesaid post judgment Motions and requests appellate review under these extraordinary and troubling factual circumstances that violate and obstruct the fundamental First Amendment right of access to the Court of Record, due process and obstruction to justice in the First Circuit, and *inter alia*, interference with the accuracy of the court's record for appeal in this matter.


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 16, 2023, I filed the within Motion with the

Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 17, 2023



---

# URGENT - TIME SENSITIVE - FILE TODAY RULE 60(b)(1) MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS

---

**Mary Seguin** <maryseguin22022@gmail.com>                                      Fri, Nov 17, 2023 at 1:38 PM
Draft

Dear Clerks of the Court,

I spoke with Clerk Meghan today regarding an update on the docketing of my motions.

Following our discussion, I respectfully request the Clerk of the Court to docket today my attached Rule 60(b)(1) Motion, dated November 17, 2023, that is time-sensitive.

Please make sure that my attached Rule 60(b)(1) Motion is docketed as ECF 32.

Please make sure that the law is followed that my attached Rule 60(b)(1) Motion is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Rule 60(b)(1) Motion. No Chamber interference should be taking place to prevent the docketing of my attached Rule 60(b)(1) Motion.

Thank you for your assistance.

Respectfully Submitted,
Mary Seguin
Houston, Texas

--------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Fri, Nov 17, 2023 at 12:33 PM
Subject: Fwd: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>


Dear Clerks of the Court,

I am respectfully following up on my Rule 59 Motion filing.

Yesterday, November 16, 2023, at 1:31 PM Central Time, I filed via email below, my Rule 59 Motion in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS. As indicated in my email below, I emphasized that docketing the Rule 59 Motion on November 16, 2023 is urgent, to comply with the 28 day filing post-judgment deadline, which my filing meets - November 16, 2023 is within the 28 day deadline of Fed. R. of Civ. P. 59 that tolls the time for filing an appeal.

I followed up with telephone calls to the Clerk's Office at 1:32 PM Central Time, and at 3:42 PM Central Time to request timely docket of my Rule 59 Motion, and the Clerk's Office assured me each time that a deputy clerk is working on it and that it will be docketed on the day it was received and that the docket will reflect the email date stamp of the day the Rule 59 Motion is received by email. Further, I was told that **all filings** I email to the Clerk's Office will be docketed and considered by the Court as having been filed on the day that the motion was emailed to the Clerk's Office.

Therefore, my Rule 59 Motion emailed on November 16, 2023 should be accordingly docketed as **ECF 32** with the **entry of/stating filing on November 16, 2023**, in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

However, as of this time, on November 17, 2023 almost 24 hours later, my Rule 59 Motion is still not docketed.

I would like to respectfully clarify that the Text Order dated October 19, 2023 in this matter states that only my electronic filing privilege was revoked, but there is **no** order requiring that I need to file for leave of Court to file any post-judgment motions, such as my Rule 59 Motion.

Today, November 17, 2023, I telephoned the Clerk's Office first thing at 8:00 AM Central Time, and spoke with Clerk Meghan, who informed me that yesterday she had forwarded my Rule 59 Motion to Chambers upon receipt, but has yet to hear back from Chambers, but did not know what was causing the hold up when I asked why Chambers' response is taking almost 24 hours which impacts the docketing date of the Rule 59 Motion.  I expressed my concern of the Rule 59 deadline, emphasizing that it tolls the time for filing an appeal, therefore I respectfully requested that the docket accurately reflects my timely filing of my Rule 59 Motion on November 16, 2023 (at 1:31 PM Central Time).

Additionally, I informed Clerk Meghan that I relied on the Clerk's Office's information provided above, and I had also filed a timely **Rule 60** Motion yesterday, **November 16, 2023**, at **4:39 PM Central Time**, similarly requesting docketing to reflect it was timely filed via email to on November 16, 2023.  I emphasized to Clerk Meghan that timeliness is critical, as Rule 60 Motion filed within 28 days post-judgment tolls the time for filing an appeal.  Clerk Meghan told me that my Rule 60 Motion was forwarded to Chambers as well. According to the Clerk's Office's information, my **Rule 60 Motion** needs to be docketed/filed as **ECF 33**, dated stamped filed on **November 16, 2023**.

Due to the above information regarding the processing of my post-judgment motions, I expressed to Clerk Megghan my concern regarding the Court's procedure of forwarding my time-sensitive post-judgment motions to Chambers without docketing/filing, and then those time-sensitive motions seemingly to languish in Chambers past the date of the 28-day deadline stipulated by Rule 59, and Rule 60 as they relate to tolling the time for filing an appeal.  I expressed my explicit concern that I seek to preserve my right of appeal, and that I respectfully seek to preserve on the record the issues contained in my Rule 59 and Rule 60 Motions that are currently before Chambers, without docketing, by law within the jurisdiction of the U.S. District Court of Rhode Island.  My Rule 59 and Rule 60 Motions are not ex-parte or emergency motions.

Moreover, I expressed to Clerk Meghan my concern that the processing of my post-judgment motions forwarded to Chambers and seemingly pending before Chambers without the motions being docketed, impacts my right of appeal 30-days post judgment, and today, Friday, November 17, is Day 29.  I told the Clerk that under the circumstances in this matter, I seek to preserve for appeal the issues raised in my timely filed Rule 59 Motion and Rule 60 Motion, and that I seek to preserve my right to appeal within the 30-day postjudgment period.

I also discussed with the Clerk that my timely filed but undocketed Rule 59 Motion and Rule 60 Motion that were forwarded to and currently before Chambers cause an uncertain effect, impacting the date of my filing of Notice of Appeal, the deadline of which is November 18, 2023, a Saturday.   Based on the current facts and issues regarding simply docketing my filings on the record, I am concerned my rights of access to the Courts are impacted, and that my Notice of Appeal may also languish I do not believe any pro se litigant should be made to be uncertain of the timeliness of filing a Notice of Appeal as a matter of right that is caused by inaction by Chambers on timely-filed Rule 59 and Rule 60 Motions that toll the time to file an appeal. I explicitly expressed my concern on the effect on my access to the Courts.

I respectfully request that this email communication regarding the filing/docketing of my Rule 59 Motion be docketed to accurately reflect the record on appeal along with the Rule 59 Motion at the time the Rule 59 Motion is docketed by the Clerk.

Thank you in advance for you assistance.

Respectfully submitted,
Mary Seguin

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Thu, Nov 16, 2023 at 1:31 PM
Subject: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk of the Court,

Kindly urgently file today, November 16, 2023, my attached Rule 59 Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 59 Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023.  I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX  77019
(281) 244-2016

---

**CA 126 Rule 60(b)(1) Motion with Attachments FINAL 111723.pdf**
679K

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                              Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

    *Defendants*

## **PLAINTIFF'S RULE 60(b)(1) MOTION**

1. Plaintiff, proceeding from and as a citizen of Texas, respectfully requests pursuant to

Fed. R. Civ. P. Rule 60(b)(1), (3), (4) and (6) for a new trial.  Judge Smith had obstructed

Plaintiff access to the Court, by instructing the Clerk of the Court, Meghan, to not docket

Plaintiff's timely filed Rule 59 and Rule 60 Motions filed with the Clerk via email on November

16, 2023, as to obstruct Plaintiff's right to access the Court to preserve the issues for appeal.

Plaintiff avers the following, supported by affidavit attached:

18

(1) On November 16, 2023, at 1:31 PM Central Time, Plaintiff filed via email to the Office of the Clerk In-Take email, Plaintiff's timely-filed Rule 59 Motion, requesting a new trial as Rule 59(e) provides. Plaintiff requested in her email that the Clerk timely docket the time-sensitive Rule 59 Motion on November 16, 2023. Plaintiff telephoned the Clerk's Office twice on November 16, 2023 to make sure of the Clerk's receipt of Plaintiff's filings, and was confirmed, and told that all motions emailed to the Clerk's Office are docketed as filed on the date stamp receipt by the Court's Clerk's Office. See attached email and email-attached Motion.

(2) On November 16, 2023, at 4:39 PM Central Time, Plaintiff filed via email to the Office of the Clerk In-Take email, Plaintiff's timely-filed Rule 60(b) Motion, requesting a new trial. Plaintiff requested in her email that the Clerk timely docket the time-sensitive Rule 60 Motion on November 16, 2023. See attached email and email-attached Motion.

(3) However, neither motions were docketed by the Clerk of the Court, and Plaintiff followed up first thing on November 17, 2023 at 8:00 AM Central Time. Plaintiff spoke to Clerk Meghan who informed Plaintiff that she had forwarded Plaintiff's Rule 59 and Rule 60 Motion to Chambers because the Court told her to, without docketing Plaintiff's Motions. Clerk Meghan told Plaintiff she will email Chambers to "find out what is going on." No Order in this matter requires Plaintiff to file for leave of Court to file any post judgement motions, and even if leave is required, Plaintiff's court-submitted Rule 59 and Rule 60 Motions seeking to preserve issues for appeal are required by law to be docketed in all courts of law to complete an accurate record for appeal.

(4) Plaintiff expressed to Clerk Meghan Plaintiff's concern that the irregular forwarding of timely filed Rule 59 Motion and Rule 60 Motion languishing in Chambers without being docketed on the record adversely impede and obstruct Plaintiff's right of access to the Court, as

well as obstructs Plaintiff's right to preserve legal issues for appeal, and fabricating an inaccurate record for appeal, as well as violates due process.

(5) At 12:20 PM, Plaintiff followed up by telephone, and was told that there were no updates from Chambers and Plaintiff's Rule 59 and Rule 60 Motions are still not docketed. Plaintiff emailed the Clerk's office documenting in writing the irregularity described above. At the very same moment, Judge Smith entered a text order stating that the Court is in receipt of two emails sent by the Plaintiff and construes them as motion for leave to file, that are denied. Plaintiff's Rule 59 and Rule 60 Motions continue to be not docketed. Plaintiff phoned the Office of the Clerk again, and the Clerk informed Plaintiff that the Court is telling her not to docket Plaintiff's Rule 59 and Rule 60 motions. This is *prima facie* judicial obstruction of Plaintiff's right to file Rule 59 and Rule 60 Motions against the Plaintiff to preserve issues on the record for appeal. Plaintiff attaches herewith the aforesaid November 17, 2023 email for the record.

WHEREFORE, Plaintiff requests the Court to docket Plaintiff's timely filed Rule 59 and Rule 60 Motions and the aforesaid three emails to preserve the record accurately. Plaintiff requests the Court treat Plaintiff's timely filed Rule 59 Motion and Rule 60 Motion filed on November 16, 2023 as timely filed. Plaintiff requests the disqualification of Judge Smith by the Court. Plaintiff requests any and all such relief deemed just under the circumstances.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 17, 2023, I filed the within Motion with the Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Page 3 of 4

20

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 17, 2023



Mary Seguin <maryseguin22022@gmail.com>

---

## URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS

2 messages

---

**Mary Seguin** <maryseguin22022@gmail.com>                    Thu, Nov 16, 2023 at 1:31 PM
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk of the Court,

Kindly urgently file today, November 16, 2023, my attached Rule 59 Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 59 Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023.  I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX  77019
(281) 244-2016

 **CA 126 Plaintiff Rule 59 Motion with Affidavit 111623.pdf**
387K

---

**Mary Seguin** <maryseguin22022@gmail.com>                    Fri, Nov 17, 2023 at 12:33 PM
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerks of the Court,

I am respectfully following up on my Rule 59 Motion filing.

Yesterday, November 16, 2023, at 1:31 PM Central Time, I filed via email below, my Rule 59 Motion in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.  As indicated in my email below, I emphasized that docketing the Rule 59 Motion on November 16, 2023 is urgent, to comply with the 28 day filing post-judgment deadline, which my filing meets - November 16, 2023 is within the 28 day deadline of Fed. R. of Civ. P. 59 that tolls the time for filing an appeal.

I followed up with telephone calls to the Clerk's Office at 1:32 PM Central Time, and at 3:42 PM Central Time to request timely docket of my Rule 59 Motion, and the Clerk's Office assured me each time that a deputy clerk is working on it and that it will be docketed on the day it was received and that the docket will reflect the email date stamp of the day the Rule 59 Motion is received by email.  Further, I was told that **all filings** I email to the Clerk's Office will be docketed and considered by the Court as having been filed on the day that the motion was emailed to the Clerk's Office.

Therefore, my Rule 59 Motion emailed on November 16, 2023 should be accordingly docketed as **ECF 32** with the **entry of/stating filing on November 16, 2023**, in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

However, as of this time, on November 17, 2023 almost 24 hours later, my Rule 59 Motion is still not docketed.

I would like to respectfully clarify that the Text Order dated October 19, 2023 in this matter states that only my electronic filing privilege was revoked, but there is **no** order requiring that I need to file for leave of Court to file any post-judgment motions, such as my Rule 59 Motion.

Today, November 17, 2023, I telephoned the Clerk's Office first thing at 8:00 AM Central Time, and spoke with Clerk Meghan, who informed me that yesterday she had forwarded my Rule 59 Motion to Chambers upon receipt, but has yet to hear back from Chambers, but did not know what was causing the hold up when I asked why Chambers' response is taking almost 24 hours which impacts the docketing date of the Rule 59 Motion.  I expressed my concern of the Rule 59 deadline, emphasizing that it tolls the time for filing an appeal, therefore I respectfully requested that the docket accurately reflects my timely filing of my Rule 59 Motion on November 16, 2023 (at 1:31 PM Central Time).

Additionally, I informed Clerk Meghan that I relied on the Clerk's Office's information provided above, and I had also filed a timely **Rule 60** Motion yesterday, **November 16, 2023**, at **4:39 PM Central Time**, similarly requesting docketing to reflect it was timely filed via email to on November 16, 2023.  I emphasized to Clerk Meghan that timeliness is critical, as Rule 60 Motion filed within 28 days post-judgment tolls the time for filing an appeal.  Clerk Meghan told me that my Rule 60 Motion was forwarded to Chambers as well.  According to the Clerk's Office's information, my **Rule 60 Motion** needs to be docketed/filed as **ECF 33, dated stamped filed on November 16, 2023**.

Due to the above information regarding the processing of my post-judgment motions, I expressed to Clerk Megghan my concern regarding the Court's procedure of forwarding my time-sensitive post-judgment motions to Chambers without docketing/filing, and then those time-sensitive motions seemingly to languish in Chambers past the date of the 28-day deadline stipulated by Rule 59, and Rule 60 as they relate to tolling the time for filing an appeal.  I expressed my explicit concern that I seek to preserve my right of appeal, and that I respectfully seek to preserve on the record the issues contained in my Rule 59 and Rule 60 Motions that are currently before Chambers, without docketing, by law within the jurisdiction of the U.S. District Court of Rhode Island.  My Rule 59 and Rule 60 Motions are not ex-parte or emergency motions.

Moreover, I expressed to Clerk Meghan my concern that the processing of my post-judgment motions forwarded to Chambers and seemingly pending before Chambers without the motions being docketed, impacts my right of appeal 30-days post judgment, and today, Friday, is Day 29.  I told the Clerk that under the circumstances in this matter, I seek to preserve for appeal the issues raised in my timely filed Rule 59 Motion and Rule 60 Motion, and that I seek to preserve my right to appeal within the 30-day postjudgment period.

I also discussed with the Clerk that my timely filed but undocketed Rule 59 Motion and Rule 60 Motion that were forwarded to and currently before Chambers cause an uncertain effect, impacting the date of my filing of Notice of Appeal, the deadline of which is November 18, 2023, a Saturday.   Based on the current facts and issues regarding simply docketing my filings on the record, I am concerned my rights of access to the Courts are impacted, and that my Notice of Appeal may also languish I do not believe any pro se litigant should be made to be uncertain of the timeliness of filing a Notice of Appeal as a matter of right that is caused by inaction by Chambers on timely-filed Rule 59 and Rule 60 Motions that toll the time to file an appeal.  I explicitly expressed my concern on the effect on my access to the Courts.

I respectfully request that this email communication regarding the filing/docketing of my Rule 59 Motion be docketed to accurately reflect the record on appeal along with the Rule 59 Motion at the time the Rule 59 Motion is docketed by the Clerk.

Thank you in advance for you assistance.


Respectfully submitted,
Mary Seguin
[Quoted text hidden]

---

📄 **CA 126 Plaintiff Rule 59 Motion with Affidavit 111623.pdf**
387K

Case: 1:23-cv-00126-WES-PAS Document 360-32 Filed 10/23/2024 Page 400 of 1599 PageID #: 67600
Page 55364



**Mary Seguin <maryseguin22022@gmail.com>**

---

## URGENT - TIME SENSITIVE - FILE TODAY RULE 60 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS

1 message

---

**Mary Seguin** <maryseguin22022@gmail.com>                          Thu, Nov 16, 2023 at 4:39 PM
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk/Deputy Clerk of the Court,

Kindly urgently file and docket today, November 16, 2023, my attached Rule 60(b) Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 60(b) Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023.  I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX  77019
(281) 244-2016

---



📄 **CA 126 Rule 60(b) Motion with Affidavit 111623.pdf**
379K

24

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                   Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

  *Defendants*

**PLAINTIFF'S RULE 59 MOTION FOR A NEW TRIAL**

1. Plaintiff, proceeding from and as a citizen of Texas, respectfully requests pursuant to

Fed. R. Civ. P. Rule 59 for a new trial.  Plaintiff avers the following, supported by affidavit

attached: The 91-page First Amended Complaint [ECF 25] filed on September 1, 2023 seeks

monetary damages against the Rhode Island State Defendants and the private actor Defendants

for:

(1) The Rhode Island Judiciary and Tyler Technologies' monopoly of publication of law.

(2) The Rhode Island Judiciary and Tyler Technologies' denial to the Public and to all Pro Se Litigants all access and the denial of free access to the contents of the law created, authored, and deliberated by the Rhode Island Judiciary.

(3) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to knowingly fail to properly integrate the legacy electronic court case management systems used by Rhode Island Department of Human Services and Office of Child Support Services during the implementation of Odyssey from 2013 to 2014 (the State's official electronic court filing and electronic case management system), so that these state agencies' filings are discriminately invisible only to the Public, to Pro Se Litigants and to the Rhode Island Virtual Clerk of the Courts in the Rhode Island Family Court, a limited jurisdiction court of record. The State's filings are only visible to the judges and to the State filers, thus manipulating the proceeding towards a foregone conclusion in favor of the State filers.

(4) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to misrepresent to the Public and to the Pro Se Litigants that the implemented electronic court case records of judge created laws are available to *all* court users, in order to cover up their monopolization of the publication of law denies the Public and the Pro Se Litigant access to the judge-created laws.

(5) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services that the State routinely establishes and enforces 12% compound interest on child and spousal support in Title IV of the Social Security Act state family court proceedings, in violation of the uniform statutory requirement of 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and

*if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest, targeting noncustodial parents victims. In welfare cases, support are assigned by the custodial parent to the State, and the 12% compound interest represents a fee for the State's "services" in the support's establishment and enforcement paid to the State, which at 12% compound interest represents lucrative, illegally obtained revenue to the State actors, who are financially incentivized to obtain as much as possible.

(6) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services and Tyler Technologies to knowingly fail to properly integrate Odyssey with the State's legacy electronic court filing system resulting in the State's filings seeking illegal 12% compound interest, as well as to deny the Public and to Pro Se Litigants' access to their publication of judge-created law records for the purpose of cover up of this wholesale illegal defraud of the court, extortionary defraud under color of state law targeting the unsuspecting noncustodial parents victims, and defraud of the United States (66% of the cost of these child support "operations" is funded by the U.S. Department of Health and Human Services through Title IV of the Social Security Act through funds appropriated by Congress through the annual budget appropriations.)

(7) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Tyler Technologies to operate the Title IV Program of the Social Security Act in all manners violative of due process, in prima facie due process violative State Electronic Courts, for the purpose of generating state revenue through fraud and deceit, through conspired tortious interference of rights of access to the courts, rights of

access to state case documents, and rights of access to judge-created laws targeting

litigants, targeting the Public and targeting Pro Se Litigants.

(8) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of

Human Services and Tyler Technologies to cover up their public-access-denied

publication of state judge-created laws of illegal 12% compound interest benefiting the

state's revenue by adopting a State policy not to establish nor enforce any interest in

*interstate* support cases only, calculated to cover up the collective fraud from federal

enforcement officials and other states' enforcement officials of court orders (laws)

showing 12% compounded interest established and funded under Title IV that are facially

illegally violative of 42 U.S.C. § 654(21)(A) which explicitly provides States *may* opt to

charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12%

compound interest. The federal Title IV Program regulation by Congressional intent

explicitly preempts any related state laws of all participating states.

(9) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of

Human Services and Office of Child Support Services and Barbara Grady and Gero

Meyersiek to use the fraudulent, First Amendment-, Fourth Amendment-, Fifth

Amendment-, Seventh Amendment-, and Fourteenth Amendment violative state court

machinery weaponizing Title IV Program of the Social Security Act to target the Plaintiff

*pro se* noncustodial parent in Texas to retaliate against Plaintiff for her past lawsuits

against them, namely ten years ago in Seguin v. Chafee et al., Civil No. 12-cv-708-JD

(D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and

Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued

them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state

court's under color of state law abuse of the legal frame work of another federal-funded

human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*,

through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00

per visitation if Plaintiff wanted to see her children in Rhode Island, because the state

court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent

any other legally sufficient basis.  Plaintiff had reported this *prima facie* extortion under

color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal

law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S.

Department of Justice in Texas.  Here, Plaintiff's ==retaliation== damages claims have been

issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge

Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455,

additionally given the fact Judge Smith had also self-recused from Seguin v. Chafee et

al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-

614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I.

2013) ten years ago.  *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998)

("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no

party has requested it").

(10) The Rhode Island Judiciary continues the pattern of cover up by denying Plaintiff's

request for public judicial records related to the monopoly of publication of judge-created

records submitted to the State Judiciary pursuant to the Rhode Island Access to Public

Records Act ("RI APRA").

4. Plaintiff obtained new evidence on October 6, 2023 that the Rhode Island Judiciary is a

former client of Judge Smith, and on November 9, 2023, Plaintiff obtained new evidence that the

Rhode Island Judiciary remains a major client of Judge Smith's former law firm. Plaintiff's due diligence search for conflict of interest has been impeded by the Rhode Island Judiciary and Tyler Technologies monopoly of publication of judge-created laws in the state's electronic court system and their denial of access to the judge-created laws, and Plaintiff, as a member of the Public and proceeding pro se without a Rhode Island Attorney license, the issuance of which is also monopolized by the Rhode Island Judiciary, has further been denied access to official records, including through the Rhode Island Access to Public Records Act, consistent with a pattern of civil conspiracy cover up.

5. A new trial or a stay of the Judgment is necessary to prevent irreparable harm to Plaintiff, and to Americans across the First Circuit who would be needlessly deprived of access to the federal courts of law in the First Circuit for monetary damages redress - the judicially created doctrine of Younger Abstention that functioned as a court of equity - regarding Plaintiff's monetary damages claims against the Rhode Island Judiciary and Tyler Technologies' scheme to monopolize the publication of judge-created laws that denies, tortiously interferes, tortiously abridges and tortiously obstruct the Public access to those very laws; regarding Defendant Rhode Island Office of Child Support Services' unlawful seizures of interstate Texas properties outside of Rhode Island under color of Rhode Island state law based on legally insufficient interest charge on overdue support based on the unlawful rate of 12% compound interest that is disallowed under Title IV-D Program of the Social Security Act, specifically 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest. And this is on top of Defendants' breach of contract that was brokered by Defendant Rhode Island Office of Child Support Services on behalf of the agency's client; the contract between the custodial parent client, defendant Gero

Meyersiek and the Texas Plaintiff stipulated that the custodial parent waived interest upon the

Texas Plaintiff paying a lump sum of $104,185.98 pay-off amount, which Plaintiff performed

from Texas on December 7, 2021. Even at the point of contractual agreement, Defendant Rhode

Island Office of Child Support Services in conjunction with Defendant Gero Meyersiek,

misrepresented there was lawful and enforceable interest to be waived, as they removed the

accrued interest from the Title IV-D Program mandated support record system in order to cover

up from the Plaintiff, and from federal and Texas authorities the unlawful 12% compound rate.

After fraudulently inducing Plaintiff in Texas to agree to and to perform on the contract, the

Defendants immediately put the interest back into the Title IV-D Program-mandated automated

support record system and started to seize Plaintiff's properties in Texas under color of Rhode

Island state law.

6. The final judgment is on its face violative of binding First Circuit caselaw that

mandates lower courts to *stay* monetary damages claims when applying Younger Abstention.

*See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997) (relying on *Quackenbush v. Allstate*

*Ins. Co.,* 517 U.S. 706 (1996) in holding that abstention does not allow for dismissal of damages

claim).

7. 42 U.S.C. § 654(21)(A) has been in effect since the enactment of the Title IV-D

Program of the Social Security Act several decades ago, and Congress's original intent was to

combat poverty within the populace of single mothers and children in welfare cases; Congress at

no time intended to shift the undue burden of Rhode Island's 12% compound interest on overdue

support under color of Rhode Island state law to noncustodial parents, whether targeting Texas

or across the country, which in welfare cases Rhode Island converts the 12% compound interest

to assigned debts owed by noncustodial parents to Rhode Island's state agencies and state

government, representing underhanded unlawful state revenue unlawfully obtained through the legal framework of Title IV-D Program of the Social Security Act, targeting unsuspecting noncustodial parents victims.  As a legal point of a state's lawful application of 42 U.S.C. § 654(21)(A) within the First Circuit, New Hampshire, in compliance with the letter of federal law, opts into Title IV-D Program and opts not to charge any interest whatsoever, as per the letter of law and the original intent of Congress, 42 U.S.C. § 654(21)(A).  Similarly, Texas charges 6% in compliance with 42 U.S.C. § 654(21)(A).

8. Defendant Rhode Island Office of Child Support Service's illegal denial and obstruction of access to Plaintiff's own child support case file that contains the incriminating illegal and arguably criminal scheme of removing the interest rate from the Title IV-D Program mandated and federally funded support record system to cover up the unlawful 12% compound interest from federal and Texas authorities, as well as from the Plaintiff in Texas, violates due process, obstructs justice, obstructs a federally funded and federal program proceeding, and the legal framework of Title IV-D of the Social Security Act, specifically, 42 U.S.C. § 654 and 42 U.S.C. § 666.

9. Judge Smith's dismissal of Texas Plaintiff's legal remedy monetary damages and breach of contract fraudulent inducement damages claims under Younger Abstention in this Court of law represents irreparable harm violative of the First Amendment, Fourth Amendment, Fifth Amendment, the Fourteenth Amendment, the Seventh Amendment and the First Amendment access to the Court.  The undisputable fact remains, Plaintiff's legal remedy request for monetary damages in this court of law consisting of twenty-two causes of action that cannot be dismissed under Younger Abstention, namely monetary damages claims of breach of contract fraudulent inducement, breach of implied contract, unjust enrichment, misrepresentation,

negligent misrepresentation, intentional/fraudulent misrepresentation, common law bad faith, breach of the covenant of good faith and fair dealings, tortious breach of the covenant of good faith and fair dealings, breach of fraudulent concealment/common law fraud, concealed fraud, tort of deceit, reckless indifference to the rights of Plaintiff, deliberate indifference to the rights of Plaintiff, abuse of process, breach of duty, accounting fraud, fraud cover up, RI Government Tort Liability (R.I. Gen. Laws 9-31-1, *et seq.*), 42 U.S.C. § 1983 Claim for Reckless Indifference of Plaintiff's Clearly Established Constitutional Rights, 42 U.S.C. § 1983 claim of Fourth Amendment Illegal Seizure of Plaintiff's Texas Property, state tort of liability against defendants under 42 U.S.C. § 1983, Civil RICO [ECF 25].

10. Judge Smith's legally-unsupported and factually-unsupported, and "legally insufficient" opinion that the limited jurisdiction family court is an adequate forum to raise Plaintiff's federal legal damages claims of breach of contract et al., contravenes Rhode Island law: R.I. Gen Laws 8-10-3 makes clear that family court is not a court of general jurisdiction, can only conduct bench trials functioning as a court of equity, not of law, and prohibits family court from exercising jurisdiction over breach of contract claims et al between the Texas Plaintiff and the Defendants; family court lacks jurisdiction over the Plaintiff's federal causes of actions; lacks the jurisdiction to summon a jury for jury trial in a court of law.

11. Finally, but equally critically, twenty-one days post judgment Plaintiff discovered troubling new evidence on November 9, 2023, that Judge Smith appears to have impermissibly acted in favor of the interests of the defendants – he is automatically disqualified under 28 U.S.C. § 455, because as a partner in his past practice and firm, the state government and the Rhode Island Judiciary were not only his clients, but continue to be that firm's major client under a flat fee contract and he has knowledge of the defendants' actions in this action – as a major

partner in his firm, the Rhode Island Judiciary is his and his form's past and current clients, the

state government actors and the state courts actors, cooperate in the routine establishment and

enforcement of 12% compound interest under the legal framework of Title IV-D Program of the

Social Security Act, where 12% compound interest is disallowed under 42 U.S.C. § 654(21)(A).

To the objective observer, having knowledge of the facts and circumstances of this case, and

being a partner in his past firm that continues to have the Rhode Island Judiciary as a client,

Judge Smith appears biased in favor of the defendants' interest to continue raking in state

revenue under the auspices of 42 U.S.C. § 654(21))(A) that explicitly disallows state debts of

12% compound interest assigned to Rhode Island that the state actors who cover up the 12%

compound rate by obstructing the noncustodial parent's access to her own child support case file

that is further violative of the due process provisions under 42 U.S.C. § 654 and §666, in Rhode

Island's federally funded operation with funds appropriated by Congress intended for the *lawful*

operation of Title IV-D of the Social Security Act.  Although under the judicial self-executing

expectation under 28 U.S.C. §455, the Texas Plaintiff is not expected to cull court records in the

Rhode Island state courts for judicial conflict of interest, nevertheless the Plaintiff in good faith

and diligently attempted to perform a remote search of Rhode Island's electronic court case

management system, Odyssey in 2023.  In so doing, Plaintiff discovered troubling newly-

discovered evidence that the Rhode Island Judiciary, while publicly representing that the 2014 $6

million state transition from paper courts to electronic courts promises *all court users* will be

able to call up court documents remotely from their mobile devices, in reality Rhode Island

adopted rules only denying the public and pro se litigants remote access to court case

information, including pro-se litigants' own case records, that both the public and all litigants

had equal statutory, common law and constitutional rights of access in paper courts – Judge

Smith's firm's clients, the Rhode Island Judiciary, therefore implemented electronic court public access denials that obstructed Plaintiff's and the public's discovery of Judge Smith's judicial disqualification regarding his former clients such as the state courts, the defendant state actors and other conflict entities.

## I. LEGAL STANDARD

11. The United States Supreme Court in 2020 reaffirmed, in *GEORGIA, ET AL., PETITIONERS v. PUBLIC.RESOURCE.ORG, INC*, 590 U.S. ___ (2020), the century-old government edicts doctrine, making clear that officials empowered to speak with the force of law cannot be the authors of—and therefore cannot monopolize access—the works they create in the course of their official duties. The U.S. Supreme Court previously applied that doctrine to hold that non-binding, explanatory legal materials when created by judges who possess the authority to make and interpret the law shall not monopolize access to it. *See Banks v. Manchester*, 128 U. S. 244 (1888). Tyler Technologies is a for profit organization that aims to facilitate public access to government judge-created records and legal materials. Tyler Technologies is contracted by the Rhode Island Judiciary to implement the State's electronic courts in 2013 and together, they both publicly represented that access to the contents of judge-created laws records will be readily called on mobile devices to *all* court users, namely, to the Public and to pro se litigants.

12. Under the government edicts doctrine, judges may not be considered the "authors" of the works they produce in the course of their official duties as judges. That rule applies regardless of whether a given material carries the force of law. In *Banks v. Manchester,* 128 U. S. 244 (1888) the Supreme Court concluded that "the judge who, in his judicial capacity, prepares the opinion or decision, the statement of the case and the syllabus or head note" cannot "be regarded as their author or their proprietor. *Banks*, 128 U. S, at 253 (emphasis in original).

Rather, "[t]he whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all." *Ibid.* (citing *Nash v. Lathrop*, 142 Mass. 29, 6 N. E. 559 (1886)). These cases establish a straightforward rule: Because judges are vested with the authority to make and interpret the law, they cannot be the "author" of the works they prepare "in the discharge of their judicial duties." Banks, 128 U. S., at 253. This rule applies both to binding works (such as opinions) and to non-binding works (such as headnotes and syllabi). *Ibid.* The animating principle behind this rule is that no one can own the law. "Every citizen is presumed to know the law," and "it needs no argument to show . . . that all should have free access" to its contents. *Nash,* 142 Mass., at 35, 6 N. E., at 560 (cited by *Banks*, 128 U. S., at 253–254). Rather than attempting to catalog the materials that constitute "the law," the doctrine bars the officials responsible for creating the law from being considered the "author[s]" of "whatever work they perform in their capacity" as lawmakers. *Ibid.* (emphasis added). Because these officials are generally empowered to make and interpret law, their "whole work" is deemed part of the "authentic exposition and interpretation of the law" and must be "free for publication to all." *Ibid.*

13.  Rhode Island Judiciary and Tyler Technologies monopoly of publication of the judge-created laws and their "whole works" making and interpreting the law that explicitly by design deny access to the Public and to the Pro Se Litigant runs afoul of the government edicts doctrine.

14. Courts have long understood the government edicts doctrine to apply to legislative materials. See, e.g., *Nash*, 142 Mass., at 35, 6 N. E., at 560 (judicial opinions and statutes stand "on substantially the same footing" for purposes of the government edicts doctrine); moreover, just as the doctrine applies to "whatever work [judges] perform in their capacity as judges,"

*Banks*, 128 U. S., at 253, it applies to whatever work judges perform in their capacity as judges. *Banks*, following *Wheaton* and the "judicial consensus" it inspired, denied publication monopoly protection to judicial opinions without excepting concurrences and dissents that carry no legal force. 128 U. S., at 253 (emphasis deleted). As every judge learns the hard way, "comments in [a] dissenting opinion" about legal principles and precedents "are just that: comments in a dissenting opinion." *Railroad Retirement Bd. v. Fritz,* 449 U. S. 166, 177, n. 10 (1980). Yet such comments are covered by the government edicts doctrine because they come from an official with authority to make and interpret the law. Indeed, *Banks* went even further and withheld publication monopoly protection from headnotes and syllabi produced by judges. 128 U. S., at 253. Surely these supplementary materials do not have the force of law, yet they are covered by the doctrine. The simplest explanation is the one *Banks* provided: These non-binding works are not copyrightable because of who creates them—judges acting in their judicial capacity. *See ibid.* The textual basis for the doctrine is the "authorship" requirement, which unsurprisingly focuses on—the author, the judges. The Supreme Court long ago interpreted the 'author" to be officials empowered to speak with the force of law. The doctrine distinguishes between some authors (who are empowered to speak with the force of law) and others (who are not). The Supreme Court explicitly rejects allowing the States to "monetize its entire suite of legislative and judicial history. With today's *digital tools*, States might even launch a subscription or pay-per-law service." See *Georgia v, Public Resources Org.* at 590 U. S. ____ (2020) It is obviously explicitly clear that the Supreme Court refers to the prohibition against the Rhode Island Judiciary and Tyler Technology's monopolization of the digital publication of DIGITAL COURT JUDICIAL COURT RECORDS that denies publication access of judge-created laws and their work materials to the Public and to Pro Se Litigants.

15. There is no legitimate Rhode Island government interest in the knowing illegal denial of access to the public and to pro se litigants the digital records of the Rhode Island Judiciary's and Tyler Technologies' illegal monopolization of digital publication of judge-created laws involving the establishment nor enforcement of unlawful 12% compound interest violative of explicitly clear 42 U.S.C. § 654(21)(A) within the legal framework of Title IV-D Program targeting noncustodial parties in Texas who are outside of Rhode Island that Rhode Island already knows is unenforceable in Texas, and thus had removed the 12% compound interest in 2018 calculated to cover it up from federal and Texas authorities. Rhode Island's abuse of the legal framework of the government edict doctrine and the legal framework of Title IV-D Program are diametrically at odds with the intent of Congress and binding caselaws of the U.S. Supreme Court. The civil conspiracy to cover up the illegal machinery of the digital electronic courts in Rhode Island is clear. *See Turner v. Rogers*, 131 S. Ct. 2507, 2518 (2011). *See Georgia v, Public Resources Org.* at 590 U. S. ____ (2020); *See* HOUSE COMM. WAYS & MEANS, Section 8: Child Support Enforcement Program, in 2004 GREEN BOOK: BACKGROUND MATERIAL AND DATA ON THE PROGRAMS WITHIN THE JURISDICTION OF THE COMMITTEE ON WAYS AND MEANS 8-1, 8-2 (2004). *See* Social Services Amendments of 1974, Pub. L. No. 93-647, § 101, 88 Stat. 2337, 2351. Where the mother receives public aid, federal and state governments will provide the child support payment to the mother and hold the father indebted to the government for that amount. In cases where the mother is not dependent on welfare, the government has largely stayed out of the fray. *See* HOUSE COMM. WAYS & MEANS, *supra* note 38. Yet, this case does not involve a welfare case, as the custodial father is wealthy, but the Defendants are motivated by retaliation against the Plaintiff for suing them ten years ago in <u>Seguin v. Chafee et al</u>., Civil No. 12-cv-708-JD (D.R.I. 2013), <u>Seguin v. Bedrosian</u>

et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-

LM (D.R.I. 2013), in which Plaintiff sued them, *inter alia*, for monetary damages claims for

extortion by the Rhode Island state court's under color of state law abuse of the legal frame work

of another federal-funded human services program Violence Against Women Act, 34 U.S.C. §

12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor

$55,000.00 per visitation if she wanted to see her children in Rhode Island, because the state

court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other

legally sufficient basis.  Plaintiff had reported this *prima facie* extortion under color of state law

and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal law enforcement

authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas.

Here, Plaintiff's retaliation damages claims have been issues pending before the Court since

September 1, 2023 [ECF 25], at which point Judge Smith was disqualified under the self-

executing expectation under 28 U.S.C. § 455, additionally given the fact Judge Smith had also

self-recused from Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v.

Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-

cv-95-JNL-LM (D.R.I. 2013) ten years ago.  *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st

Cir. 1998) ("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no

party has requested it").

## II. ARGUMENT

16. Plaintiff has appealed the Court's/Judge Smith's judgment in its entirety in the related

case, Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I.

2023) and respectfully submits that she is likely to secure a complete reversal of this Court's

holding that the judicially created doctrine of Younger Abstention applies to the *dismissal* of her monetary damages and breach of contract damages claims.

17. Plaintiff further submits that she is likely to secure a complete reversal of this Court's in this case.

18. Conducting state proceedings funded by federal funding appropriated by Congress under Title IV of the Social Security Act in state monopolized electronic courts that violate the long-established government edict doctrine as it related to the Public's access of the digital publication of judge-created laws and violate the Constitution targeting Texas assets and Texas parties for illegal 12% compound interest involving fraudulent inducement that cannot be enforceable in Texas is the prima facie example of government fraud and government waste, warranting cut off from federal funding at the very minimum. Not even Judge Smith, friend of the Rhode Island Judiciary, can punt these egregious state activities to later addressment via the attention of the Supreme Court and to Congress Appropriation Committees, wrongfully using Younger Abstention.

19. Judge Smith's holding is defect in claiming without a shred of factual basis that Plaintiff can raise her federal monetary damages claims and fraudulent inducement breach of contract claims in the jurisdictionally defective Rhode Island family court, that R.I. Gen. Laws 8-10-3 plainly states the family court is *not* a court of general jurisdiction, and which lacks the jurisdiction over the controversy for legal relief of monetary damages tort claims and fraudulent inducement breach of contract damages claims over both the Plaintiff and all the named defendants.

20.   Plaintiff seeks a new trial or a stay pending appeal as Plaintiff's likelihood of success on appeal, together with the lopsided balance of hardships, weigh heavily in favor of granting the stay being sought pending appellate review.

### A. Plaintiff is Likely To Succeed On Appeal Of the Judgment Ordered By the Court:

21. Although Plaintiff recognizes that the Court has ruled against her as to the scope of relief, Plaintiff is likely to succeed on appeal of those issues, and has raised serious legal questions and presented a substantial case. *See Arnold v. Garlock, Inc*., 278 F.3d 426, 438-39 (5th Cir. 2001).

22. Plaintiff incorporates by reference her prior remedy arguments.  Plaintiff reserves the right to make any and all arguments on appeal.

23. Among the substantial questions raised by Plaintiff is whether the Court erred in awarding Defendants dismissal of Plaintiff's monetary damages claim in this First Circuit under Younger Abstention and erred in failing to self-execute 28 U.S.C. § 455. And Plaintiff respectfully submits that she is likely to succeed on appeal in arguing that, in these circumstances, dismissal was not properly ordered in the particular circumstances of this case pursuant to established binding First Circuit caselaws on both the Court's errors applying Younger Abstention as well as judicial disqualification. *See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997)**;** *In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998); *Quackenbush v. Allstate Ins. Co*., 517 U.S. 706 (1996).  *See also Allen v. La. State Bd. of Dentistry*, 835 F.2d 100, 104 (5th Cir. 1988). ("Younger abstention does not apply to claims for monetary damages.")

24. Absence of a new trial or a stay of the judgment will erode confidence in the Judiciary in the First Circuit by creating an impression that it is violating national law regarding the government edict doctrine and setting illegal new national policy regarding the Title IV-D Program. It may also have the effect of "encouraging forum shopping." *Trump v. Hawaii,* 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). It further "undermines the judicial system's goals of allowing the 'airing of competing views' and permitting multiple judges and circuits to weigh in on significant issues." *See* also *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (traditional remedial principles account for "the public interest" and "the balance of equities"); *EME Homer City Generation, LP v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.) (declining to vacate unlawful agency action under the APA because "vacatur could cause substantial disruption"). In this context, the dismissal of Plaintiff's state government tort monetary damages claims entered by the Court could cause substantial disruption to the *uniform* application of the legal framework of the Title IV-D Program Congress explicitly intended.

25. The serious legal questions raised in this case regarding the scope of remedy go beyond the questions of whether a Younger abstention is applicable to federal monetary damages claims and or the feeble assertion of *comity* applied to the Rhode Island Judiciary and Tyler Technology's gross violation of the government edict doctrine—and indeed, those questions should not have even entered into this case. Here, among Plaintiff's challenges was to state Judiciary, Tyler Technologies and agency actions, and Plaintiff pursued fraudulent inducement breach of contract damages claims and tort monetary damages claims. Instead, the Court at law cannot vacate a federal statute—i.e., cannot "delete a previously enacted statute from the books" such as 42 U.S.C. § 1983. *See* also Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va.

L. Rev. 933, 936 (2018) ("The federal courts have no authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute. The power of judicial review is more limited." (footnotes omitted). Legal monetary damages relief under 42 U.S.C. § 1983 that would hold the Rhode Island state government accountable under the Rhode Island Government Tort Act for Rhode Island government actors' tortious actions violating the legal framework of the Title IV-D Program federal statutes targeting the Plaintiff in Texas was a legal remedy conferred by Congress to federal courts to grant legal relief appropriate in this case. The Court has an unflagging obligation to exercise jurisdiction conferred to it by Congress. *See Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013)

26. With respect, although the Court has entered a judgment otherwise, Plaintiff has demonstrated a likelihood of success on appeal of the Final Judgment sufficient to justify a stay of the judgment.

## B. The Balance of the Equities Overwhelmingly Favors the Requested New Trial or Stay

27. The balance of the equities overwhelmingly favors a new trial or stay: The State of Rhode Island plainly lacks any legitimate interest in the State's systemic knowing violation of the government edict doctrine and violation of 42 U.S.C. § 654(21)(A) that they now target Plaintiff in Texas, and which they sought to cover up from federal and Texas authorities, as well as from Plaintiff, by knowingly and unlawfully removing interest from the automated support record system. Americans outside of Rhode Island re fraudulently, unlawfully and systemically fleeced by Rhode Island's illegal scheme that is illegally funded through the State's defrauding of the United States lying to the United States that these activities are eligible for federal funds

appropriated by Congress for the legal administration of Title IV Program of the Social Security Act.

28. Defendants will face no harm from Plaintiff's requested new trial or stay. The judgment that is specifically directed to and protects the prevailing Defendants from legal accountability of their illegal actions, is further issued by a disqualified judge, Judge Smith, who was the former counsel for the Defendants and a partner of the firm whose major client is the Rhode Island Judiciary, *e.g.*, Rhode Island state government entities, including the state courts and state agencies. The requested new trial or stay will thus impose no hardship on the prevailing Defendants at all.

29. By contrast, the public and the Plaintiff face significant harm if now new trial is ordered or the judgment is not stayed. As an initial matter, "any time a [government]" violates "statutes enacted by representatives of its people," the people "suffer a form of irreparable injury." *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). But the harm here is much greater and more far-reaching. The government edict doctrine is willfully violated by the Rhode Island Judiciary and Tyler Technology in a civil conspiracy to cover up the illegal state family court creating judge-created laws ordering and enforcing 12% compound interest, aided and abetted by the Department of Human Services - Title IV-D requires the uniform application and compliance by participating States with the Social Security Act. Congress's as well as the United States through the Secretary of the U.S. Department of Health and Human Services' interest in the uniform compliance of 42 U.S.C. § 654(21)(A), § 654 and 42 U.S.C. § 666 are well established. The States are reimbursed 66% of the cost of operations through federal funding appropriated by Congress under Title IV-D of the Social Security Act. The Defendants' arbitrary illegal removal of the illegal unenforceable 12%

compound interest from the automated support record system and cover up of their illegal 12% compound interest scheme from the federal and Texas authorities targeting Texas properties and targeting the Plaintiff in Texas demonstrates Rhode Island government agencies (who are former clients of Judge Smith) knowingly committed criminal schemes illegally seizing Plaintiff's properties interstate in Texas that they know are violative of federal criminal codes and Texas civil and penal codes. *See,* e.g., Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act). The program, which is administered by the United States Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for a significant sixty-six percent (66%) of the costs of operating their child-support enforcement programs. 42 U.S.C. §v655(a)(2)(C). In 1975, Congress adopted Title IV-D, 42 U.S.C. §v651 *et seq.*, and established the general statutory framework that exists today. See 1975 Act § 101(a), 88 Stat. 2351; *Blessing v. Freestone*, 520 U.S. 329, 333-335 (1997) (describing program). Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support. Therefore, the Defendants' illegal operations cannot be funded by Congressional appropriations.

30. Judge Smith's failure to self-execute his disqualification under 28 U.S.C. § 455 as well as Canon 3E of the Code of Judicial Conduct, then his subsequent refusal to recuse in the related case, <u>Seguin v, RI Office of Child Support Services et al Civil</u> No. 23-cv-34-WES-PAS (D.R.I. 2023), upon Plaintiff's request after she raised newly discovered discovery post judgment

on October 6, 2023 of his direct and past public sector law practice's contract legal representation of the Defendants, state courts, state agencies and other conflict entities, have the appearance, to the objective observer, of the Court's issuance of judgment in favor of the Defendants in error that contravenes established First Circuit case law on Younger Abstention as well as disqualification, calculated to benefit the interests of his former clients, as partner of his former firm that represents the Rhode Island Judiciary and the state government.

31. Moreover, the Court's judgment effectively functions as a denial of Plaintiff's access to this Court of law to redress her legal monetary damages claims and fraudulent inducement breach of contract damages claims. It is well-settled that even minimal loss of First Amendment freedoms, "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality)); *see also Elrod*, 427 U.S. at 373.; *N.Y. Times v. United States*, 403 U.S. 713, 715 (1971). Accordingly, Plaintiff has a strong likelihood of success on the merits, will suffer irreparable injury without a stay, and a stay will not injure others while furthering the public interest.

### III. CONCLUSION

27. For the foregoing reasons, Plaintiff has demonstrated a likelihood of success on appeal of the Judgment ordered, and has demonstrated that the balance of the equities favors a new trial or a stay. Plaintiff respectfully requests that the Court stay the final judgment for the duration of appellate proceedings relating to the related Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I. 2023).

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 16, 2023, I filed the within Motion with the

Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 16, 2023

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                             Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

*Defendants*

## **MARY SEGUIN'S DECLARATION IN SUPPORT OF PLAINTIFF'S RULE 59 MOTION**

I, MARY SEGUIN, hereby declare under penalty of perjury, pursuant to 28 U.S.C. sec.
1746(2) that the following statements are true and correct:

1. That I am the Plaintiff, Pro Se, in the above captioned matter.

2. That I exercised, am exercising and continue to exercise my statutory right to appear
   pro se party in the above captioned civil matter in federal court by statute 28 U.S.C.
   sec. 1654.

3. That in state proceedings in Rhode Island, I am required to comply with Rhode Island Article X. Rules Governing Electronic Filing, Rule 2. Official Court Record, (a) Official Court Record. "Upon the implementation of the Electronic Filing System ("EFS") in each court, all documents shall be filed electronically and shall be the official court record."

4. That the state proceedings in which I am a party are public and are not about child custody nor involve a minor.

5. That the **Rhode Island Family Court**, through its adoption and promulgation of **Administrative Order 2021-01 A2)** mandated that all child support interest matters shall be heard remotely via WebEx. Further, **Administrative Order 2021-01 B1)** mandated that all non-emergency filings shall be filed using the electronic filing system in accordance with the Family Court Rules of Domestic Relations Procedure, which is the **Odyssey system**.

6. That the **"RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION, Rule 5. Access to Case Information, (c) Remote Access to Case Information. (1) Policy. To allow** <u>limited</u> **Remote Access to the Database through the Public Portal. Non-public case types shall not be remotely accessible except for certain case types to attorneys who have entered an appearance in a case. (2) Content. (a) The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall** <u>not</u> **have Remote Access to other Electronic Case Information"** bar, deny, violate, abridge, infringe and interfere with Pro Se Litigants' and the Public's fundamental rights to access public court records and Pro Se Litigants' fundamental right to meaningful access to the courts. See "<u>RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION</u>" Rule 5(c)(2)(a) "<u>The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall not have Remote Access to other Electronic Case Information.</u>" See also "<u>RHODE ISLAND JUDICIARY, Access to Case Information, 2. Remote Access to Case Information A. The Public, Self-represented Litigants, and Parties to a Case, The public, self-represented litigants, and parties in a case shall have remote access to the register of actions or docket but shall not have remote access to other electronic case information</u>."

7. That I, the Plaintiff, learned and verified on July 10, 2023 directly from the Rhode Island Judiciary itself through numerous (14) correspondences with the Rhode Island Judiciary from June 10, 2023 to July 10, 2023, pursuant to my RI Access to Public Records Act ("APRA") request for public records from the Rhode Island Judiciary, that as a matter of State policy, State Court Rule, and Judiciary Rule, in the digital courts implemented by the Rhode Island Judiciary, the State Court, the Rhode Island

Judiciary deny remote digital access of the Rhode Island Judiciary's monopolized publication of court and judicial records using the digital tool maintained and published by Tyler Technologies, Odyssey, including judge-created, judge-authored court decisions arising from state proceedings in the State's digital electronic courts, and digital court transcripts ordered by and paid by pro-se litigants that are published by the Judiciary digitally on Tyer Technologies' Odyssey are also denied access to the Public, pro-se litigants, and parties to the litigation (who are represented by counsel). The Rhode Island State Court only grants remote access to digital court and judicial records created by judges produced in digital courts to Rhode Island attorneys and state and federal agencies that are approved by the Rhode Island Judiciary's monopoly. On this matter, I corresponded in writing fourteen (14) APRA correspondence emails with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023.

8. That the State Defendants in this matter electronically file all notices using another electronic filing system that is even separate and different from the EFS (Odyssey).

9. That the State Defendants' court electronic filings are not noticed to me in Texas.

10. That the State Defendants' court electronic filings are not visible to me on the Rhode Island courts' EFS.

11. That the State Defendants' court electronic filing court records cannot be accessed remotely by me, solely because I am a self-represented litigant.

12. That the State Defendants' court electronic filing court records cannot be accessed remotely by the public, by self-represented litigants, nor by parties to the case, but can be accessed remotely and instantly through the internet by attorneys in Rhode Island and state and federal agencies.

13. That the Rhode Island Court Clerks state to me over the phone that they are prohibited from reading the contents of the court records over the phone to me.

14. That the Rhode Island Court virtual clerks state to me over the phone that even they are unable to see or access the court record information of filings by the State Defendants from the virtual clerks' access portals.

15. That the Rhode Island Electronic Filing System, case management system, rules and practices outright and unconstitutionally restrict and deny access to the court to three classes: (1) the public; (2) pro-se litigants; (3) parties to the case (who are represented by counsel), and is obviously outright reserved for only the government and Rhode Island attorneys.

16. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS.

17. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and

withdrew from my-initiated RI EOHHS agency appeal in 2022 in a scheme to procure a favorable judgment in a state proceeding that deny my federal constitutional and due process rights in Texas.

18. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and initiated the family court state proceeding on January 31, 2023 before the Covid Emergency Declaration was lifted.

19. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices that appear to **only allow remote, instant and full court access to a restricted club of R.I. lawyers and the government**, pose unconstitutional and undue burden on me, a citizen of Texas over 2,500 miles away.

20. That the State Defendant have full knowledge of the egregiously unfair due process violations of the Rhode Island state court EFS system/architecture/rules/practices that deny me access to the required **electronic court transcripts** prepared by the court reporter and electronically filed in the state EFS that **I ordered and paid for** for appeal, but the State Defendants have instant remote access by state court design.

21. That the State Defendants have full knowledge of the above unconstitutional restriction on access to court records and information to the public and non-lawyers is deliberate, by design and calculated to be unfair, violating constitutional guarantees of full and fair opportunity to raise claims in state proceedings.

22. That the above-raised unconstitutional restrictions are not exhaustive.

23. That my federal monetary damages claims on the unconstitutionality of the Rhode Island state court rules, practices and proceedings that violate the government edict doctrine and violate the pro-se litigants', such as my-self, federal constitutional rights: (1) federal constitutional right of equal access to the courts, (2) federal constitutional right to equal access to court records to receive information on the contents of all electronically filed notices, pleadings, court decisions, and transcripts that I myself ordered and paid for for appeal that are required to be electronically filed by state court rules and practices, (3) federal constitutional due process right and equal right to be given equal and timely notice of electronic filings and entries by the courts (including court decisions, court orders, court judgments, full docket entries, etc.) that the Rhode Island Judiciary deliberately deny by category all pro-se litigants access to court information, namely the contents of judicial/court records of cases to which I am the self-represented party, (4) federal constitutional due process right to be heard (Rhode Island Superior Court threatens me, the Texas pro-se plaintiff, with denial of my request to conduct WebEx hearings for the purpose of denying the Texas pro-se litigant access to the court and to be heard), (5) federal constitutional due process right to decision by a neutral decision-maker (the court that denies pro-se litigant

access to the court and the corollary opportunity to be heard fails the neutral decision-maker test).  This list is not exhaustive.

24. That I seek to sue in federal court the State Defendants and add additional defendants.

25. I am an out-of-state diversity and a pro-se litigant in two state proceedings in Rhode Island, and have been unconstitutionally singled out by the State Judiciary, by category "self-represented litigant," to be barred from accessing electronic case information authored by judges and which the Judiciary has a monopoly in the publication of the judge-created laws in which state court cases I am the pro-se party, and therefore have standing to raise claims against this unconstitutional state practice and unconstitutional state court practice and rules.  I understand the Rhode Island Judiciary's monopoly in the digital publication of judge-created laws in the Judiciary' implemented digital/electronic courts and the Judiciary's denial to the Public and to me from accessing the monopolized electronic publication of the judge-created laws in the court records violate the government edict doctrine.

26. Additionally, my fundamental First and Fourteenth Amendment constitutional right and common law right to equal, meaningful, and timely access to judicial records and public court records in litigation, given timely notice, adequate opportunity to be heard and to decision by a neutral decision-maker are fundamental First and Fourth Amendment and Fourteenth Amendment rights.  Critically, the unconstitutional abridgement, infringement, and denial of judicial and court records to out-of-state pro-se litigants by the Rhode Island State Courts, Rhode Island State Judiciary and the Rhode Island Superior Court Bench Bar Committee directly relate to Younger Abstention Exception.

27. The State Defendants deliberately file all the State's pleadings outside of the State's electronic filing system, "Odyssey," and deliberately use a wholly different un-named electronic filing system, different and separate from that ("Odyssey") provided for pro-se litigants, so that pro-se litigants do not receive any requisite automated electronic notices of court motions or pleadings the State Defendants file electronically, nor are pro se litigants able to electronically access the content information of the State Defendants' electronically-filed pleadings.  The only way the pro se litigant, such as me, the Texas Plaintiff, can access the court record is to personally go over 2,500 miles away to the courthouse in Rhode Island to access the court pleading information, or get a "courtesy notice" via email or get a "courtesy notice" through U.S. Mail sent by the State Defendants at whim.   The State Defendants deliberately fail to send the notices electronically or by U.S. Mail, and the state courts deliberately promulgated court rules disallowing the public, pro-se litigants and even the parties who are represented by lawyers, remote access to court records, and critically, deny access to crucial court decisions, judgments and orders of public cases, as well as deny remote access to the transcripts ordered by pro-se litigants for appeal.  Critically, the State court's abridgment and denial of access to court documents to the pro se litigant and the general public result in the

unconstitutional abridgment and denial of equal, timely and meaningful access to court complaints, decisions, judgments and orders. What is truly shocking is that the Rhode Island Judiciary even denies and/or bars pro-se litigants remote access of court transcripts that were ordered by pro-se litigants for appeal.

28. Thirdly, the Texas Pro-Se Plaintiff discovered and verified the fact, on or about July 7, 2023, that the Rhode Island Judiciary, using the aforesaid state court rule barring, by category, pro-se litigants from accessing court case information remotely, bars the Plaintiff by category ("self-represented litigant") from accessing state court proceeding transcripts that the Texas Plaintiff ordered and paid for, for appeal. In other words, the RI Supreme Court Clerk stated to the Texas Plaintiff that the Plaintiff, in Texas, is unconstitutionally barred from remotely accessing the transcripts of court proceedings that she ordered and paid for in her appeal to the RI Supreme Court in the Plaintiff-initiated APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215**, and yet the State Defendants are inequitably granted instant and free remote access to those very transcripts that the Texas Plaintiff ordered and paid for, for appeal. The federal Texas Plaintiff respectfully requests this Court the extension of time to present the new evidence and plead the verified facts.

29. Fourthly, the Texas Plaintiff discovered and verified the fact, on or about July 11, 2023, that, despite the Texas Plaintiff's several phone inquiries to the RI Superior Court in the past several weeks regarding the status of the appeal, the RI Superior Court, for undisclosed reasons, failed and continue to fail to relinquish jurisdiction and transfer the court case file of **Seguin v. RI Office of Child Support Services, PC-22-07215** to the RI Supreme Court within the requisite 60 days after Plaintiff's filing of Notice of Appeal on April 3, 2023, as required by the RI Supreme Court rules and procedures. At the same time, the Texas Plaintiff verified the fact that the Plaintiff-ordered transcripts of the state proceedings in the Federal Plaintiff-initiated state APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215** show the RI Superior Court further unconstitutionally sought to deny the Texas Plaintiff access to the state court and opportunity to be heard by outright threatening the Plaintiff in open court that the Judge, David Cruise, during the hearing of March 24, 2023 in that matter, shall use the state court's discretionary power in the future to deny all of the Texas pro-se Plaintiff's petitions for remote WebEx hearings to effectively deny her access to the state superior court. The state court that denies court access and the opportunity to be heard fails the neutral-decision-maker test required under the Fourteenth Amendment. I now specifically request further the Court to judicially notice that this court access denial and denial to be heard occurred on March 24, 2023, PRIOR to President Biden's lifting of the COVID-19 National Health Emergency Declaration. I, the Texas Plaintiff, aver this is a direct contributory reason for the RI Superior Court's failure to transfer the case file to the Supreme Court within 60 days (by June 3, 2023) of the Plaintiff's filing of Notice of Appeal on April 3, 2023 in **Seguin v. RI Office of Child Support Services, PC-22-07215**.

30. Fifthly, the Plaintiff presents to this Court and respectfully requests the Court to take
judicial notice of the undisputed fact of the court rule-making process in Rhode
Island.  The 1966 Rules were promulgated by the justices of the superior court
pursuant to section 8-6-2 of the General Laws of Rhode Island.  This enabling act
departed from the Federal Rules Enabling Act and most state enabling legislation
conferring rule-making power on the supreme courts of the respective governments.
The Rhode Island Enabling Act was adopted in 1940, 1940 R.I. Pub. Laws ch. 943,
sec. 1.  It conferred the power on the justices of the superior court and the 1966
reform was the product of that court.  In 1969 an amendment to section 8-6-2 made
the Rules thereafter adopted by the trial courts subject to the approval of the Supreme
Court. 1969 R.I. Pub. Laws ch. 239, sec 2.  Therefore, all public records relating to
the adoption and promulgation of the "RHODE ISLAND JUDICIARY RULES OF
PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE
INFORMATION" are "made in the course of, made or received pursuant to law or
ordinance or in connection with the transaction of official business by any agency,
""agency" or "public body" means any executive, legislative, judicial, regulatory, or
administrative body of the state, or any political subdivision thereof" as per R.I. Gen.
Laws § 38-2-2, a.k.a. RI Access to Public Records Act ("APRA").  Even though the
Rhode Island Enabling Act conferred the power on the judiciary public body to
promulgate and adopt court rules, a.k.a. rule-making process, the Rhode Island
Judiciary, pursuant to the Plaintiff's APRA request for public records, denied the
Plaintiff's APRA request within the 10 business day period, as well as denies it
possesses public records, as defined by APRA, relating to the rule-making process by
the judiciary of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE
GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION,"
including denying possession of public records that show the intent of the rule-makers
to promulgate and adopt court rules denying fundamental right of public access to
electronic case information remotely to the public, to self-represented litigants, and to
parties to a case.  **See Exhibit D** fourteen (14) APRA correspondence emails between
the Plaintiff and/with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode
Island Judiciary from June 10, 2023 to July 10, 2023.  The Texas pro-se Plaintiff
respectfully requests the extension of time to present the new evidence and plead the
newly verified facts and claims, and amend the complaint, which is further in the
interest of judicial economy.  The Plaintiff further seeks to appeal and file her claim
against the implausible denial by the RI Judiciary, which is conferred by the Rhode
Island Enabling Act to make rules of the court, that it possesses public records
relating to the "RHODE ISLAND JUDICIARY RULES OF PRACTICE
GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," that
the judiciary, conferred power by the Rhode Island Enabling Act, "made in the course
of, made or received pursuant to law or ordinance or in connection with the
transaction of official business by any agency, ""agency" or "public body" means any
executive, legislative, judicial, regulatory, or administrative body of the state, or any
political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to

Public Records Act ("APRA"). Because the RI Superior Court clearly ruled in **Seguin v. RI Office of Child Support Services, PC-22-07215** that it lacked subject matter jurisdiction to hear my/the Texas Plaintiff's APRA-related claims, I, the Texas Plaintiff, now exercise my statutory and constitutional rights to petition this Federal Court, invoking 28 U.S.C. § 1343(a)(3) (civil rights) and 28 U.S.C. § 1367 that provides supplemental jurisdiction over the state law tort claims that arose from the same common nuclei of facts, invoking 28 U.S.C. § 1331 (federal question), and invoking 42 U.S.C. § 1983 for violations of civil rights under the First, Fourth and Fourteenth Amendments to the United States Constitution. I, the Plaintiff, respectfully request this Court for the extension of time to file my claims.

31. Plaintiff discovered on October 6, 2023 that the Rhode Island Judiciary and Government Defendants are former clients of Judge Smith, a partner in his former firm, Edwards & Angell.

32. Plaintiff discovered on November 9, 2023 that the Rhode Isand Judiciary and Government Defendants are current clients of the firm Edwards & Angell, the former firm of Judge Smith, a partner in the firm.

33. A plain reading of 28 U.S.C. sec. 455 makes clear that Judge Smith is disqualified from this case, and a plain reading of case law makes clear that 28 U.S.C. sec. 455 is self-executing, without necessitating any party's request.


Respectfully submitted,

Date: November 16, 2023

MARY SEGUIN


*Mary Seguin*

Mary Seguin

P.O. Box 22022

Houston, TX 77019

maryseguin22022@gmail.com

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                              Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

     *Defendants*

**PLAINTIFF'S RULE 60(b) MOTION**

1. Plaintiff, proceeding from and as a citizen of Texas, respectfully requests pursuant to

Fed. R. Civ. P. Rule 60(b)(1), (3), (4) and (6) for a new trial.  Plaintiff avers the following,

supported by affidavit attached: The 91-page First Amended Complaint [ECF 25] filed on

September 1, 2023 seeks monetary damages against the Rhode Island State Defendants and the

private actor Defendants for:

(1) The Rhode Island Judiciary and Tyler Technologies' monopoly of publication of law.

(2) The Rhode Island Judiciary and Tyler Technologies' denial to the Public and to all Pro Se Litigants all access and the denial of free access to the contents of the law created, authored, and deliberated by the Rhode Island Judiciary.

(3) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to knowingly fail to properly integrate the legacy electronic court case management systems used by Rhode Island Department of Human Services and Office of Child Support Services during the implementation of Odyssey from 2013 to 2014 (the State's official electronic court filing and electronic case management system), so that these state agencies' filings are discriminately invisible only to the Public, to Pro Se Litigants and to the Rhode Island Virtual Clerk of the Courts in the Rhode Island Family Court, a limited jurisdiction court of record. The State's filings are only visible to the judges and to the State filers, thus manipulating the proceeding towards a foregone conclusion in favor of the State filers.

(4) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to misrepresent to the Public and to the Pro Se Litigants that the implemented electronic court case records of judge created laws are available to *all* court users, in order to cover up their monopolization of the publication of law denies the Public and the Pro Se Litigant access to the judge-created laws.

(5) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services that the State routinely establishes and enforces 12% compound interest on child and spousal support in Title IV of the Social Security Act state family court proceedings, in violation of the uniform statutory requirement of 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and

*if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest, targeting noncustodial parents victims.  In welfare cases, support are assigned by the custodial parent to the State, and the 12% compound interest represents a fee for the State's "services" in the support's establishment and enforcement paid to the State, which at 12% compound interest represents lucrative, illegally obtained revenue to the State actors, who are financially incentivized to obtain as much as possible.

(6) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services and Tyler Technologies to knowingly fail to properly integrate Odyssey with the State's legacy electronic court filing system resulting in the State's filings seeking illegal 12% compound interest, as well as to deny the Public and to Pro Se Litigants' access to their publication of judge-created law records for the purpose of cover up of this wholesale illegal defraud of the court, extortionary defraud under color of state law targeting the unsuspecting noncustodial parents victims, and defraud of the United States (66% of the cost of these child support "operations" is funded by the U.S. Department of Health and Human Services through Title IV of the Social Security Act through funds appropriated by Congress through the annual budget appropriations.)

(7) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Tyler Technologies to operate the Title IV Program of the Social Security Act in all manners violative of due process, in prima facie due process violative State Electronic Courts, for the purpose of generating state revenue through fraud and deceit, through conspired tortious interference of rights of access to the courts, rights of

access to state case documents, and rights of access to judge-created laws targeting litigants, targeting the Public and targeting Pro Se Litigants.

(8) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Tyler Technologies to cover up their public-access-denied publication of state judge-created laws of illegal 12% compound interest benefiting the state's revenue by adopting a State policy not to establish nor enforce any interest in *interstate* support cases only, calculated to cover up the collective fraud from federal enforcement officials and other states' enforcement officials of court orders (laws) showing 12% compounded interest established and funded under Title IV that are facially illegally violative of 42 U.S.C. § 654(21)(A) which explicitly provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest. The federal Title IV Program regulation by Congressional intent explicitly preempts any related state laws of all participating states.

(9) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services and Barbara Grady and Gero Meyersiek to use the fraudulent, First Amendment-, Fourth Amendment-, Fifth Amendment-, Seventh Amendment-, and Fourteenth Amendment violative state court machinery weaponizing Title IV Program of the Social Security Act to target the Plaintiff *pro se* noncustodial parent in Texas to retaliate against Plaintiff for her past lawsuits against them, namely ten years ago in Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state

court's under color of state law abuse of the legal frame work of another federal-funded

human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*,

through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00

per visitation if Plaintiff wanted to see her children in Rhode Island, because the state

court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent

any other legally sufficient basis.  Plaintiff had reported this *prima facie* extortion under

color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal

law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S.

Department of Justice in Texas.  Here, Plaintiff's ==retaliation== damages claims have been

issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge

Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455,

additionally given the fact Judge Smith had also self-recused from Seguin v. Chafee et

al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-

614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I.

2013) ten years ago.  *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998)

("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no

party has requested it").

(10) The Rhode Island Judiciary continues the pattern of cover up by denying Plaintiff's

request for public judicial records related to the monopoly of publication of judge-created

records submitted to the State Judiciary pursuant to the Rhode Island Access to Public

Records Act ("RI APRA").

4. Plaintiff obtained new evidence on October 6, 2023 that the Rhode Island Judiciary is a

former client of Judge Smith, and on November 9, 2023, Plaintiff obtained new evidence that the

Rhode Island Judiciary remains a major client of Judge Smith's former law firm.  Plaintiff's due diligence search for conflict of interest has been impeded by the Rhode Island Judiciary and Tyler Technologies monopoly of publication of judge-created laws in the state's electronic court system and their denial of access to the judge-created laws, and Plaintiff, as a member of the Public and proceeding pro se without a Rhode Island Attorney license, the issuance of which is also monopolized by the Rhode Island Judiciary, has further been denied  access to official records, including through the Rhode Island Access to Public Records Act, consistent with a pattern of civil conspiracy cover up.

5.  A new trial or a stay of the Judgment is necessary to prevent irreparable harm to Plaintiff, and to Americans across the First Circuit who would be needlessly deprived of access to the federal courts of law in the First Circuit for monetary damages redress - the judicially created doctrine of Younger Abstention that functioned as a court of equity - regarding Plaintiff's monetary damages claims against the Rhode Island Judiciary and Tyler Technologies' scheme to monopolize the publication of judge-created laws that denies, tortiously interferes, tortiously abridges and tortiously obstruct the Public access to those very laws; regarding Defendant Rhode Island Office of Child Support Services' unlawful seizures of interstate Texas properties outside of Rhode Island under color of Rhode Island state law based on legally insufficient interest charge on overdue support based on the unlawful rate of 12% compound interest that is disallowed under Title IV-D Program of the Social Security Act, specifically 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest.  And this is on top of Defendants' breach of contract that was brokered by Defendant Rhode Island Office of Child Support Services on behalf of the agency's client; the contract between the custodial parent client, defendant Gero

Meyersiek and the Texas Plaintiff stipulated that the custodial parent waived interest upon the

Texas Plaintiff paying a lump sum of $104,185.98 pay-off amount, which Plaintiff performed

from Texas on December 7, 2021. Even at the point of contractual agreement, Defendant Rhode

Island Office of Child Support Services in conjunction with Defendant Gero Meyersiek,

misrepresented there was lawful and enforceable interest to be waived, as they removed the

accrued interest from the Title IV-D Program mandated support record system in order to cover

up from the Plaintiff, and from federal and Texas authorities the unlawful 12% compound rate.

After fraudulently inducing Plaintiff in Texas to agree to and to perform on the contract, the

Defendants immediately put the interest back into the Title IV-D Program-mandated automated

support record system and started to seize Plaintiff's properties in Texas under color of Rhode

Island state law.

6. The final judgment is on its face violative of binding First Circuit caselaw that

mandates lower courts to *stay* monetary damages claims when applying Younger Abstention.

*See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997) (relying on *Quackenbush v. Allstate*

*Ins. Co.,* 517 U.S. 706 (1996) in holding that abstention does not allow for dismissal of damages

claim).

7. 42 U.S.C. § 654(21)(A) has been in effect since the enactment of the Title IV-D

Program of the Social Security Act several decades ago, and Congress's original intent was to

combat poverty within the populace of single mothers and children in welfare cases; Congress at

no time intended to shift the undue burden of Rhode Island's 12% compound interest on overdue

support under color of Rhode Island state law to noncustodial parents, whether targeting Texas

or across the country, which in welfare cases Rhode Island converts the 12% compound interest

to assigned debts owed by noncustodial parents to Rhode Island's state agencies and state

government, representing underhanded unlawful state revenue unlawfully obtained through the legal framework of Title IV-D Program of the Social Security Act, targeting unsuspecting noncustodial parents victims. As a legal point of a state's lawful application of 42 U.S.C. § 654(21)(A) within the First Circuit, New Hampshire, in compliance with the letter of federal law, opts into Title IV-D Program and opts not to charge any interest whatsoever, as per the letter of law and the original intent of Congress, 42 U.S.C. § 654(21)(A). Similarly, Texas charges 6% in compliance with 42 U.S.C. § 654(21)(A).

8. Defendant Rhode Island Office of Child Support Service's illegal denial and obstruction of access to Plaintiff's own child support case file that contains the incriminating illegal and arguably criminal scheme of removing the interest rate from the Title IV-D Program mandated and federally funded support record system to cover up the unlawful 12% compound interest from federal and Texas authorities, as well as from the Plaintiff in Texas, violates due process, obstructs justice, obstructs a federally funded and federal program proceeding, and the legal framework of Title IV-D of the Social Security Act, specifically, 42 U.S.C. § 654 and 42 U.S.C. § 666.

9. Judge Smith's dismissal of Texas Plaintiff's legal remedy monetary damages and breach of contract fraudulent inducement damages claims under Younger Abstention in this Court of law represents irreparable harm violative of the First Amendment, Fourth Amendment, Fifth Amendment, the Fourteenth Amendment, the Seventh Amendment and the First Amendment access to the Court. The undisputable fact remains, Plaintiff's legal remedy request for monetary damages in this court of law consisting of twenty-two causes of action that cannot be dismissed under Younger Abstention, namely monetary damages claims of breach of contract fraudulent inducement, breach of implied contract, unjust enrichment, misrepresentation,

negligent misrepresentation, intentional/fraudulent misrepresentation, common law bad faith, breach of the covenant of good faith and fair dealings, tortious breach of the covenant of good faith and fair dealings, breach of fraudulent concealment/common law fraud, concealed fraud, tort of deceit, reckless indifference to the rights of Plaintiff, deliberate indifference to the rights of Plaintiff, abuse of process, breach of duty, accounting fraud, fraud cover up, RI Government Tort Liability (R.I. Gen. Laws 9-31-1, *et seq.*), 42 U.S.C. § 1983 Claim for Reckless Indifference of Plaintiff's Clearly Established Constitutional Rights, 42 U.S.C. § 1983 claim of Fourth Amendment Illegal Seizure of Plaintiff's Texas Property, state tort of liability against defendants under 42 U.S.C. § 1983, Civil RICO [ECF 25].

10. Judge Smith's legally-unsupported and factually-unsupported, and "legally insufficient" opinion that the limited jurisdiction family court is an adequate forum to raise Plaintiff's federal legal damages claims of breach of contract et al., contravenes Rhode Island law: R.I. Gen Laws 8-10-3 makes clear that family court is not a court of general jurisdiction, can only conduct bench trials functioning as a court of equity, not of law, and prohibits family court from exercising jurisdiction over breach of contract claims et al between the Texas Plaintiff and the Defendants; family court lacks jurisdiction over the Plaintiff's federal causes of actions; lacks the jurisdiction to summon a jury for jury trial in a court of law.

11. Finally, but equally critically, twenty-one days post judgment Plaintiff discovered troubling new evidence on November 9, 2023, that Judge Smith appears to have impermissibly acted in favor of the interests of the defendants – he is automatically disqualified under 28 U.S.C. § 455, because as a partner in his past practice and firm, the state government and the Rhode Island Judiciary were not only his clients, but continue to be that firm's major client under a flat fee contract and he has knowledge of the defendants' actions in this action – as a major

partner in his firm, the Rhode Island Judiciary is his and his form's past and current clients, the

state government actors and the state courts actors, cooperate in the routine establishment and

enforcement of 12% compound interest under the legal framework of Title IV-D Program of the

Social Security Act, where 12% compound interest is disallowed under 42 U.S.C. § 654(21)(A).

To the objective observer, having knowledge of the facts and circumstances of this case, and

being a partner in his past firm that continues to have the Rhode Island Judiciary as a client,

Judge Smith appears biased in favor of the defendants' interest to continue raking in state

revenue under the auspices of 42 U.S.C. § 654(21))(A) that explicitly disallows state debts of

12% compound interest assigned to Rhode Island that the state actors who cover up the 12%

compound rate by obstructing the noncustodial parent's access to her own child support case file

that is further violative of the due process provisions under 42 U.S.C. § 654 and §666, in Rhode

Island's federally funded operation with funds appropriated by Congress intended for the *lawful*

operation of Title IV-D of the Social Security Act. Although under the judicial self-executing

expectation under 28 U.S.C. §455, the Texas Plaintiff is not expected to cull court records in the

Rhode Island state courts for judicial conflict of interest, nevertheless the Plaintiff in good faith

and diligently attempted to perform a remote search of Rhode Island's electronic court case

management system, Odyssey in 2023. In so doing, Plaintiff discovered troubling newly-

discovered evidence that the Rhode Island Judiciary, while publicly representing that the 2014 $6

million state transition from paper courts to electronic courts promises *all court users* will be

able to call up court documents remotely from their mobile devices, in reality Rhode Island

adopted rules only denying the public and pro se litigants remote access to court case

information, including pro-se litigants' own case records, that both the public and all litigants

had equal statutory, common law and constitutional rights of access in paper courts – Judge

Smith's firm's clients, the Rhode Island Judiciary, therefore implemented electronic court public access denials that obstructed Plaintiff's and the public's discovery of Judge Smith's judicial disqualification regarding his former clients such as the state courts, the defendant state actors and other conflict entities.

## I. LEGAL STANDARD

11. The United States Supreme Court in 2020 reaffirmed, in *GEORGIA, ET AL., PETITIONERS v. PUBLIC.RESOURCE.ORG, INC*, 590 U.S. ___ (2020), the century-old government edicts doctrine, making clear that officials empowered to speak with the force of law cannot be the authors of—and therefore cannot monopolize access—the works they create in the course of their official duties. The U.S. Supreme Court previously applied that doctrine to hold that non-binding, explanatory legal materials when created by judges who possess the authority to make and interpret the law shall not monopolize access to it. *See Banks v. Manchester*, 128 U. S. 244 (1888). Tyler Technologies is a for profit organization that aims to facilitate public access to government judge-created records and legal materials. Tyler Technologies is contracted by the Rhode Island Judiciary to implement the State's electronic courts in 2013 and together, they both publicly represented that access to the contents of judge-created laws records will be readily called on mobile devices to *all* court users, namely, to the Public and to pro se litigants.

12. Under the government edicts doctrine, judges may not be considered the "authors" of the works they produce in the course of their official duties as judges. That rule applies regardless of whether a given material carries the force of law. In *Banks v. Manchester,* 128 U. S. 244 (1888) the Supreme Court concluded that "the judge who, in his judicial capacity, prepares the opinion or decision, the statement of the case and the syllabus or head note" cannot "be regarded as their author or their proprietor. *Banks*, 128 U. S, at 253 (emphasis in original).

Rather, "[t]he whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all." *Ibid.* (citing *Nash v. Lathrop*, 142 Mass. 29, 6 N. E. 559 (1886)). These cases establish a straightforward rule: Because judges are vested with the authority to make and interpret the law, they cannot be the "author" of the works they prepare "in the discharge of their judicial duties." Banks, 128 U. S., at 253. This rule applies both to binding works (such as opinions) and to non-binding works (such as headnotes and syllabi). *Ibid.* The animating principle behind this rule is that no one can own the law. "Every citizen is presumed to know the law," and "it needs no argument to show . . . that all should have free access" to its contents. *Nash,* 142 Mass., at 35, 6 N. E., at 560 (cited by *Banks*, 128 U. S., at 253–254). Rather than attempting to catalog the materials that constitute "the law," the doctrine bars the officials responsible for creating the law from being considered the "author[s]" of "whatever work they perform in their capacity" as lawmakers. *Ibid.* (emphasis added). Because these officials are generally empowered to make and interpret law, their "whole work" is deemed part of the "authentic exposition and interpretation of the law" and must be "free for publication to all." *Ibid.*

13.   Rhode Island Judiciary and Tyler Technologies monopoly of publication of the judge-created laws and their "whole works" making and interpreting the law that explicitly by design deny access to the Public and to the Pro Se Litigant runs afoul of the government edicts doctrine.

14. Courts have long understood the government edicts doctrine to apply to legislative materials. See, e.g., *Nash*, 142 Mass., at 35, 6 N. E., at 560 (judicial opinions and statutes stand "on substantially the same footing" for purposes of the government edicts doctrine); moreover, just as the doctrine applies to "whatever work [judges] perform in their capacity as judges,"

*Banks*, 128 U. S., at 253, it applies to whatever work judges perform in their capacity as judges. *Banks*, following *Wheaton* and the "judicial consensus" it inspired, denied publication monopoly protection to judicial opinions without excepting concurrences and dissents that carry no legal force. 128 U. S., at 253 (emphasis deleted). As every judge learns the hard way, "comments in [a] dissenting opinion" about legal principles and precedents "are just that: comments in a dissenting opinion." *Railroad Retirement Bd. v. Fritz,* 449 U. S. 166, 177, n. 10 (1980). Yet such comments are covered by the government edicts doctrine because they come from an official with authority to make and interpret the law. Indeed, *Banks* went even further and withheld publication monopoly protection from headnotes and syllabi produced by judges. 128 U. S., at 253. Surely these supplementary materials do not have the force of law, yet they are covered by the doctrine. The simplest explanation is the one *Banks* provided: These non-binding works are not copyrightable because of who creates them—judges acting in their judicial capacity. *See ibid.* The textual basis for the doctrine is the "authorship" requirement, which unsurprisingly focuses on—the author, the judges. The Supreme Court long ago interpreted the 'author" to be officials empowered to speak with the force of law. The doctrine distinguishes between some authors (who are empowered to speak with the force of law) and others (who are not). The Supreme Court explicitly rejects allowing the States to "monetize its entire suite of legislative and judicial history. With today's *digital tools*, States might even launch a subscription or pay-per-law service." See *Georgia v, Public Resources Org.* at 590 U. S. ____ (2020) It is obviously explicitly clear that the Supreme Court refers to the prohibition against the Rhode Island Judiciary and Tyler Technology's monopolization of the digital publication of DIGITAL COURT JUDICIAL COURT RECORDS that denies publication access of judge-created laws and their work materials to the Public and to Pro Se Litigants.

15. There is no legitimate Rhode Island government interest in the knowing illegal denial of access to the public and to pro se litigants the digital records of the Rhode Island Judiciary's and Tyler Technologies' illegal monopolization of digital publication of judge-created laws involving the establishment nor enforcement of unlawful 12% compound interest violative of explicitly clear 42 U.S.C. § 654(21)(A) within the legal framework of Title IV-D Program targeting noncustodial parties in Texas who are outside of Rhode Island that Rhode Island already knows is unenforceable in Texas, and thus had removed the 12% compound interest in 2018 calculated to cover it up from federal and Texas authorities. Rhode Island's abuse of the legal framework of the government edict doctrine and the legal framework of Title IV-D Program are diametrically at odds with the intent of Congress and binding caselaws of the U.S. Supreme Court. The civil conspiracy to cover up the illegal machinery of the digital electronic courts in Rhode Island is clear. *See Turner v. Rogers*, 131 S. Ct. 2507, 2518 (2011). *See Georgia v. Public Resources Org.* at 590 U. S. ____ (2020); *See* HOUSE COMM. WAYS & MEANS, Section 8: Child Support Enforcement Program, in 2004 GREEN BOOK: BACKGROUND MATERIAL AND DATA ON THE PROGRAMS WITHIN THE JURISDICTION OF THE COMMITTEE ON WAYS AND MEANS 8-1, 8-2 (2004). *See* Social Services Amendments of 1974, Pub. L. No. 93-647, § 101, 88 Stat. 2337, 2351. Where the mother receives public aid, federal and state governments will provide the child support payment to the mother and hold the father indebted to the government for that amount. In cases where the mother is not dependent on welfare, the government has largely stayed out of the fray. *See* HOUSE COMM. WAYS & MEANS, *supra* note 38. Yet, this case does not involve a welfare case, as the custodial father is wealthy, but the Defendants are motivated by retaliation against the Plaintiff for suing them ten years ago in <u>Seguin v. Chafee et al</u>., Civil No. 12-cv-708-JD (D.R.I. 2013), <u>Seguin v. Bedrosian</u>

et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state court's under color of state law abuse of the legal frame work of another federal-funded human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00 per visitation if she wanted to see her children in Rhode Island, because the state court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other legally sufficient basis. Plaintiff had reported this *prima facie* extortion under color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas. Here, Plaintiff's retaliation damages claims have been issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455, additionally given the fact Judge Smith had also self-recused from Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013) ten years ago. *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998) ("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no party has requested it").

## II. ARGUMENT

16. Plaintiff has appealed the Court's/Judge Smith's judgment in its entirety in the related case, Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I. 2023) and respectfully submits that she is likely to secure a complete reversal of this Court's

holding that the judicially created doctrine of Younger Abstention applies to the *dismissal* of her monetary damages and breach of contract damages claims.

17. Plaintiff further submits that she is likely to secure a complete reversal of this Court's in this case.

18. Conducting state proceedings funded by federal funding appropriated by Congress under Title IV of the Social Security Act in state monopolized electronic courts that violate the long-established government edict doctrine as it related to the Public's access of the digital publication of judge-created laws and violate the Constitution targeting Texas assets and Texas parties for illegal 12% compound interest involving fraudulent inducement that cannot be enforceable in Texas is the prima facie example of government fraud and government waste, warranting cut off from federal funding at the very minimum. Not even Judge Smith, friend of the Rhode Island Judiciary, can punt these egregious state activities to later addressment via the attention of the Supreme Court and to Congress Appropriation Committees, wrongfully using Younger Abstention.

19. Judge Smith's holding is defect in claiming without a shred of factual basis that Plaintiff can raise her federal monetary damages claims and fraudulent inducement breach of contract claims in the jurisdictionally defective Rhode Island family court, that R.I. Gen. Laws 8-10-3 plainly states the family court is *not* a court of general jurisdiction, and which lacks the jurisdiction over the controversy for legal relief of monetary damages tort claims and fraudulent inducement breach of contract damages claims over both the Plaintiff and all the named defendants.

20.  Plaintiff seeks a new trial or a stay pending appeal as Plaintiff's likelihood of success on appeal, together with the lopsided balance of hardships, weigh heavily in favor of granting the stay being sought pending appellate review.

### A. Plaintiff is Likely To Succeed On Appeal Of the Judgment Ordered By the Court:

21. Although Plaintiff recognizes that the Court has ruled against her as to the scope of relief, Plaintiff is likely to succeed on appeal of those issues, and has raised serious legal questions and presented a substantial case. *See Arnold v. Garlock, Inc*., 278 F.3d 426, 438-39 (5th Cir. 2001).

22. Plaintiff incorporates by reference her prior remedy arguments.  Plaintiff reserves the right to make any and all arguments on appeal.

23. Among the substantial questions raised by Plaintiff is whether the Court erred in awarding Defendants dismissal of Plaintiff's monetary damages claim in this First Circuit under Younger Abstention and erred in failing to self-execute 28 U.S.C. § 455. And Plaintiff respectfully submits that she is likely to succeed on appeal in arguing that, in these circumstances, dismissal was not properly ordered in the particular circumstances of this case pursuant to established binding First Circuit caselaws on both the Court's errors applying Younger Abstention as well as judicial disqualification. *See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997)**;** *In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998); *Quackenbush v. Allstate Ins. Co*., 517 U.S. 706 (1996).  *See* also *Allen v. La. State Bd. of Dentistry*, 835 F.2d 100, 104 (5th Cir. 1988). ("Younger abstention does not apply to claims for monetary damages.")

24. Absence of a new trial or a stay of the judgment will erode confidence in the Judiciary in the First Circuit by creating an impression that it is violating national law regarding the government edict doctrine and setting illegal new national policy regarding the Title IV-D Program. It may also have the effect of "encouraging forum shopping." *Trump v. Hawaii,* 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). It further "undermines the judicial system's goals of allowing the 'airing of competing views' and permitting multiple judges and circuits to weigh in on significant issues." *See* also *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (traditional remedial principles account for "the public interest" and "the balance of equities"); *EME Homer City Generation, LP v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.) (declining to vacate unlawful agency action under the APA because "vacatur could cause substantial disruption"). In this context, the dismissal of Plaintiff's state government tort monetary damages claims entered by the Court could cause substantial disruption to the *uniform* application of the legal framework of the Title IV-D Program Congress explicitly intended.

25. The serious legal questions raised in this case regarding the scope of remedy go beyond the questions of whether a Younger abstention is applicable to federal monetary damages claims and or the feeble assertion of *comity* applied to the Rhode Island Judiciary and Tyler Technology's gross violation of the government edict doctrine—and indeed, those questions should not have even entered into this case. Here, among Plaintiff's challenges was to state Judiciary, Tyler Technologies and agency actions, and Plaintiff pursued fraudulent inducement breach of contract damages claims and tort monetary damages claims. Instead, the Court at law cannot vacate a federal statute—i.e., cannot "delete a previously enacted statute from the books" such as 42 U.S.C. § 1983. *See* also Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va.

L. Rev. 933, 936 (2018) ("The federal courts have no authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute. The power of judicial review is more limited." (footnotes omitted). Legal monetary damages relief under 42 U.S.C. § 1983 that would hold the Rhode Island state government accountable under the Rhode Island Government Tort Act for Rhode Island government actors' tortious actions violating the legal framework of the Title IV-D Program federal statutes targeting the Plaintiff in Texas was a legal remedy conferred by Congress to federal courts to grant legal relief appropriate in this case. The Court has an unflagging obligation to exercise jurisdiction conferred to it by Congress. *See Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013)

26. With respect, although the Court has entered a judgment otherwise, Plaintiff has demonstrated a likelihood of success on appeal of the Final Judgment sufficient to justify a stay of the judgment.

### **B. The Balance of the Equities Overwhelmingly Favors the Requested New Trial or Stay**

27. The balance of the equities overwhelmingly favors a new trial or stay: The State of Rhode Island plainly lacks any legitimate interest in the State's systemic knowing violation of the government edict doctrine and violation of 42 U.S.C. § 654(21)(A) that they now target Plaintiff in Texas, and which they sought to cover up from federal and Texas authorities, as well as from Plaintiff, by knowingly and unlawfully removing interest from the automated support record system. Americans outside of Rhode Island re fraudulently, unlawfully and systemically fleeced by Rhode Island's illegal scheme that is illegally funded through the State's defrauding of the United States lying to the United States that these activities are eligible for federal funds

appropriated by Congress for the legal administration of Title IV Program of the Social Security Act.

28. Defendants will face no harm from Plaintiff's requested new trial or stay. The judgment that is specifically directed to and protects the prevailing Defendants from legal accountability of their illegal actions, is further issued by a disqualified judge, Judge Smith, who was the former counsel for the Defendants and a partner of the firm whose major client is the Rhode Island Judiciary, *e.g.*, Rhode Island state government entities, including the state courts and state agencies. The requested new trial or stay will thus impose no hardship on the prevailing Defendants at all.

29. By contrast, the public and the Plaintiff face significant harm if now new trial is ordered or the judgment is not stayed. As an initial matter, "any time a [government]" violates "statutes enacted by representatives of its people," the people "suffer a form of irreparable injury." *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). But the harm here is much greater and more far-reaching. The government edict doctrine is willfully violated by the Rhode Island Judiciary and Tyler Technology in a civil conspiracy to cover up the illegal state family court creating judge-created laws ordering and enforcing 12% compound interest, aided and abetted by the Department of Human Services - Title IV-D requires the uniform application and compliance by participating States with the Social Security Act. Congress's as well as the United States through the Secretary of the U.S. Department of Health and Human Services' interest in the uniform compliance of 42 U.S.C. § 654(21)(A), § 654 and 42 U.S.C. § 666 are well established. The States are reimbursed 66% of the cost of operations through federal funding appropriated by Congress under Title IV-D of the Social Security Act. The Defendants' arbitrary illegal removal of the illegal unenforceable 12%

compound interest from the automated support record system and cover up of their illegal 12% compound interest scheme from the federal and Texas authorities targeting Texas properties and targeting the Plaintiff in Texas demonstrates Rhode Island government agencies (who are former clients of Judge Smith) knowingly committed criminal schemes illegally seizing Plaintiff's properties interstate in Texas that they know are violative of federal criminal codes and Texas civil and penal codes. *See,* e.g., Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act). The program, which is administered by the United States Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for a significant sixty-six percent (66%) of the costs of operating their child-support enforcement programs. 42 U.S.C. §v655(a)(2)(C). In 1975, Congress adopted Title IV-D, 42 U.S.C. §v651 *et seq.*, and established the general statutory framework that exists today. See 1975 Act § 101(a), 88 Stat. 2351; *Blessing v. Freestone*, 520 U.S. 329, 333-335 (1997) (describing program). Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support. Therefore, the Defendants' illegal operations cannot be funded by Congressional appropriations.

30. Judge Smith's failure to self-execute his disqualification under 28 U.S.C. § 455 as well as Canon 3E of the Code of Judicial Conduct, then his subsequent refusal to recuse in the related case, <u>Seguin v, RI Office of Child Support Services et al Civil</u> No. 23-cv-34-WES-PAS (D.R.I. 2023), upon Plaintiff's request after she raised newly discovered discovery post judgment

on October 6, 2023 of his direct and past public sector law practice's contract legal representation of the Defendants, state courts, state agencies and other conflict entities, have the appearance, to the objective observer, of the Court's issuance of judgment in favor of the Defendants in error that contravenes established First Circuit case law on Younger Abstention as well as disqualification, calculated to benefit the interests of his former clients, as partner of his former firm that represents the Rhode Island Judiciary and the state government.

31. Moreover, the Court's judgment effectively functions as a denial of Plaintiff's access to this Court of law to redress her legal monetary damages claims and fraudulent inducement breach of contract damages claims. It is well-settled that even minimal loss of First Amendment freedoms, "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality)); *see also Elrod*, 427 U.S. at 373.; *N.Y. Times v. United States*, 403 U.S. 713, 715 (1971). Accordingly, Plaintiff has a strong likelihood of success on the merits, will suffer irreparable injury without a stay, and a stay will not injure others while furthering the public interest.

### III. CONCLUSION

27. For the foregoing reasons, Plaintiff has demonstrated a likelihood of success on appeal of the Judgment ordered, and has demonstrated that the balance of the equities favors a new trial or a stay. Plaintiff respectfully requests that the Court stay the final judgment for the duration of appellate proceedings relating to the related Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I. 2023).

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 16, 2023, I filed the within Motion with the

Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 16, 2023

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                    Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

*Defendants*

## **MARY SEGUIN'S DECLARATION IN SUPPORT OF PLAINTIFF'S RULE 60(b) MOTION**

     I, MARY SEGUIN, hereby declare under penalty of perjury, pursuant to 28 U.S.C. sec. 1746(2) that the following statements are true and correct:

1. That I am the Plaintiff, Pro Se, in the above captioned matter.

2. That I exercised, am exercising and continue to exercise my statutory right to appear pro se party in the above captioned civil matter in federal court by statute 28 U.S.C. sec. 1654.

3. That in state proceedings in Rhode Island, I am required to comply with Rhode Island Article X. Rules Governing Electronic Filing, Rule 2. Official Court Record, (a) Official Court Record. "Upon the implementation of the Electronic Filing System ("EFS") in each court, all documents shall be filed electronically and shall be the official court record."

4. That the state proceedings in which I am a party are public and are not about child custody nor involve a minor.

5. That the **Rhode Island Family Court**, through its adoption and promulgation of **Administrative Order 2021-01 A2)** mandated that all child support interest matters shall be heard remotely via WebEx. Further, **Administrative Order 2021-01 B1)** mandated that all non-emergency filings shall be filed using the electronic filing system in accordance with the Family Court Rules of Domestic Relations Procedure, which is the **Odyssey system**.

6. That the **"RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION, Rule 5. Access to Case Information, (c) Remote Access to Case Information. (1) Policy. To allow <u>limited</u> Remote Access to the Database through the Public Portal. Non-public case types shall not be remotely accessible except for certain case types to attorneys who have entered an appearance in a case. (2) Content. (a) The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall <u>not</u> have Remote Access to other Electronic Case Information"** bar, deny, violate, abridge, infringe and interfere with Pro Se Litigants' and the Public's fundamental rights to access public court records and Pro Se Litigants' fundamental right to meaningful access to the courts. See **"<u>RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION</u>"** Rule 5(c)(2)(a) **"<u>The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall not have Remote Access to other Electronic Case Information.</u>"** See also **"<u>RHODE ISLAND JUDICIARY, Access to Case Information, 2. Remote Access to Case Information A. The Public, Self-represented Litigants, and Parties to a Case, The public, self-represented litigants, and parties in a case shall have remote access to the register of actions or docket but shall not have remote access to other electronic case information</u>."**

7. That I, the Plaintiff, learned and verified on July 10, 2023 directly from the Rhode Island Judiciary itself through numerous (14) correspondences with the Rhode Island Judiciary from June 10, 2023 to July 10, 2023, pursuant to my RI Access to Public Records Act ("APRA") request for public records from the Rhode Island Judiciary, that as a matter of State policy, State Court Rule, and Judiciary Rule, in the digital courts implemented by the Rhode Island Judiciary, the State Court, the Rhode Island

Judiciary deny remote digital access of the Rhode Island Judiciary's monopolized publication of court and judicial records using the digital tool maintained and published by Tyler Technologies, Odyssey, including judge-created, judge-authored court decisions arising from state proceedings in the State's digital electronic courts, and digital court transcripts ordered by and paid by pro-se litigants that are published by the Judiciary digitally on Tyer Technologies' Odyssey are also denied access to the Public, pro-se litigants, and parties to the litigation (who are represented by counsel). The Rhode Island State Court only grants remote access to digital court and judicial records created by judges produced in digital courts to Rhode Island attorneys and state and federal agencies that are approved by the Rhode Island Judiciary's monopoly. On this matter, I corresponded in writing fourteen (14) APRA correspondence emails with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023.

8. That the State Defendants in this matter electronically file all notices using another electronic filing system that is even separate and different from the EFS (Odyssey).

9. That the State Defendants' court electronic filings are not noticed to me in Texas.

10. That the State Defendants' court electronic filings are not visible to me on the Rhode Island courts' EFS.

11. That the State Defendants' court electronic filing court records cannot be accessed remotely by me, solely because I am a self-represented litigant.

12. That the State Defendants' court electronic filing court records cannot be accessed remotely by the public, by self-represented litigants, nor by parties to the case, but can be accessed remotely and instantly through the internet by attorneys in Rhode Island and state and federal agencies.

13. That the Rhode Island Court Clerks state to me over the phone that they are prohibited from reading the contents of the court records over the phone to me.

14. That the Rhode Island Court virtual clerks state to me over the phone that even they are unable to see or access the court record information of filings by the State Defendants from the virtual clerks' access portals.

15. That the Rhode Island Electronic Filing System, case management system, rules and practices outright and unconstitutionally restrict and deny access to the court to three classes: (1) the public; (2) pro-se litigants; (3) parties to the case (who are represented by counsel), and is obviously outright reserved for only the government and Rhode Island attorneys.

16. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS.

17. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and

withdrew from my-initiated RI EOHHS agency appeal in 2022 in a scheme to procure a favorable judgment in a state proceeding that deny my federal constitutional and due process rights in Texas.

18. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and initiated the family court state proceeding on January 31, 2023 before the Covid Emergency Declaration was lifted.

19. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices that appear to **only allow remote, instant and full court access to a restricted club of R.I. lawyers and the government**, pose unconstitutional and undue burden on me, a citizen of Texas over 2,500 miles away.

20. That the State Defendant have full knowledge of the egregiously unfair due process violations of the Rhode Island state court EFS system/architecture/rules/practices that deny me access to the required **electronic court transcripts** prepared by the court reporter and electronically filed in the state EFS that **I ordered and paid for** for appeal, but the State Defendants have instant remote access by state court design.

21. That the State Defendants have full knowledge of the above unconstitutional restriction on access to court records and information to the public and non-lawyers is deliberate, by design and calculated to be unfair, violating constitutional guarantees of full and fair opportunity to raise claims in state proceedings.

22. That the above-raised unconstitutional restrictions are not exhaustive.

23. That my federal monetary damages claims on the unconstitutionality of the Rhode Island state court rules, practices and proceedings that violate the government edict doctrine and violate the pro-se litigants', such as my-self, federal constitutional rights: (1) federal constitutional right of equal access to the courts, (2) federal constitutional right to equal access to court records to receive information on the contents of all electronically filed notices, pleadings, court decisions, and transcripts that I myself ordered and paid for for appeal that are required to be electronically filed by state court rules and practices, (3) federal constitutional due process right and equal right to be given equal and timely notice of electronic filings and entries by the courts (including court decisions, court orders, court judgments, full docket entries, etc.) that the Rhode Island Judiciary deliberately deny by category all pro-se litigants access to court information, namely the contents of judicial/court records of cases to which I am the self-represented party, (4) federal constitutional due process right to be heard (Rhode Island Superior Court threatens me, the Texas pro-se plaintiff, with denial of my request to conduct WebEx hearings for the purpose of denying the Texas pro-se litigant access to the court and to be heard), (5) federal constitutional due process right to decision by a neutral decision-maker (the court that denies pro-se litigant

access to the court and the corollary opportunity to be heard fails the neutral decision-maker test).  This list is not exhaustive.

24. That I seek to sue in federal court the State Defendants and add additional defendants.

25. I am an out-of-state diversity and a pro-se litigant in two state proceedings in Rhode Island, and have been unconstitutionally singled out by the State Judiciary, by category "self-represented litigant," to be barred from accessing electronic case information authored by judges and which the Judiciary has a monopoly in the publication of the judge-created laws in which state court cases I am the pro-se party, and therefore have standing to raise claims against this unconstitutional state practice and unconstitutional state court practice and rules.  I understand the Rhode Island Judiciary's monopoly in the digital publication of judge-created laws in the Judiciary' implemented digital/electronic courts and the Judiciary's denial to the Public and to me from accessing the monopolized electronic publication of the judge-created laws in the court records violate the government edict doctrine.

26. Additionally, my fundamental First and Fourteenth Amendment constitutional right and common law right to equal, meaningful, and timely access to judicial records and public court records in litigation, given timely notice, adequate opportunity to be heard and to decision by a neutral decision-maker are fundamental First and Fourth Amendment and Fourteenth Amendment rights.  Critically, the unconstitutional abridgement, infringement, and denial of judicial and court records to out-of-state pro-se litigants by the Rhode Island State Courts, Rhode Island State Judiciary and the Rhode Island Superior Court Bench Bar Committee directly relate to Younger Abstention Exception.

27. The State Defendants deliberately file all the State's pleadings outside of the State's electronic filing system, "Odyssey," and deliberately use a wholly different un-named electronic filing system, different and separate from that ("Odyssey") provided for pro-se litigants, so that pro-se litigants do not receive any requisite automated electronic notices of court motions or pleadings the State Defendants file electronically, nor are pro se litigants able to electronically access the content information of the State Defendants' electronically-filed pleadings.  The only way the pro se litigant, such as me, the Texas Plaintiff, can access the court record is to personally go over 2,500 miles away to the courthouse in Rhode Island to access the court pleading information, or get a "courtesy notice" via email or get a "courtesy notice" through U.S. Mail sent by the State Defendants at whim.   The State Defendants deliberately fail to send the notices electronically or by U.S. Mail, and the state courts deliberately promulgated court rules disallowing the public, pro-se litigants and even the parties who are represented by lawyers, remote access to court records, and critically, deny access to crucial court decisions, judgments and orders of public cases, as well as deny remote access to the transcripts ordered by pro-se litigants for appeal.  Critically, the State court's abridgment and denial of access to court documents to the pro se litigant and the general public result in the

unconstitutional abridgment and denial of equal, timely and meaningful access to court complaints, decisions, judgments and orders. What is truly shocking is that the Rhode Island Judiciary even denies and/or bars pro-se litigants remote access of court transcripts that were ordered by pro-se litigants for appeal.

28. Thirdly, the Texas Pro-Se Plaintiff discovered and verified the fact, on or about July 7, 2023, that the Rhode Island Judiciary, using the aforesaid state court rule barring, by category, pro-se litigants from accessing court case information remotely, bars the Plaintiff by category ("self-represented litigant") from accessing state court proceeding transcripts that the Texas Plaintiff ordered and paid for, for appeal. In other words, the RI Supreme Court Clerk stated to the Texas Plaintiff that the Plaintiff, in Texas, is unconstitutionally barred from remotely accessing the transcripts of court proceedings that she ordered and paid for in her appeal to the RI Supreme Court in the Plaintiff-initiated APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215**, and yet the State Defendants are inequitably granted instant and free remote access to those very transcripts that the Texas Plaintiff ordered and paid for, for appeal. The federal Texas Plaintiff respectfully requests this Court the extension of time to present the new evidence and plead the verified facts.

29. Fourthly, the Texas Plaintiff discovered and verified the fact, on or about July 11, 2023, that, despite the Texas Plaintiff's several phone inquiries to the RI Superior Court in the past several weeks regarding the status of the appeal, the RI Superior Court, for undisclosed reasons, failed and continue to fail to relinquish jurisdiction and transfer the court case file of **Seguin v. RI Office of Child Support Services, PC-22-07215** to the RI Supreme Court within the requisite 60 days after Plaintiff's filing of Notice of Appeal on April 3, 2023, as required by the RI Supreme Court rules and procedures. At the same time, the Texas Plaintiff verified the fact that the Plaintiff-ordered transcripts of the state proceedings in the Federal Plaintiff-initiated state APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215** show the RI Superior Court further unconstitutionally sought to deny the Texas Plaintiff access to the state court and opportunity to be heard by outright threatening the Plaintiff in open court that the Judge, David Cruise, during the hearing of March 24, 2023 in that matter, shall use the state court's discretionary power in the future to deny all of the Texas pro-se Plaintiff's petitions for remote WebEx hearings to effectively deny her access to the state superior court. The state court that denies court access and the opportunity to be heard fails the neutral-decision-maker test required under the Fourteenth Amendment. I now specifically request further the Court to judicially notice that this court access denial and denial to be heard occurred on March 24, 2023, PRIOR to President Biden's lifting of the COVID-19 National Health Emergency Declaration. I, the Texas Plaintiff, aver this is a direct contributory reason for the RI Superior Court's failure to transfer the case file to the Supreme Court within 60 days (by June 3, 2023) of the Plaintiff's filing of Notice of Appeal on April 3, 2023 in **Seguin v. RI Office of Child Support Services, PC-22-07215**.

30. Fifthly, the Plaintiff presents to this Court and respectfully requests the Court to take judicial notice of the undisputed fact of the court rule-making process in Rhode Island. The 1966 Rules were promulgated by the justices of the superior court pursuant to section 8-6-2 of the General Laws of Rhode Island. This enabling act departed from the Federal Rules Enabling Act and most state enabling legislation conferring rule-making power on the supreme courts of the respective governments. The Rhode Island Enabling Act was adopted in 1940, 1940 R.I. Pub. Laws ch. 943, sec. 1. It conferred the power on the justices of the superior court and the 1966 reform was the product of that court. In 1969 an amendment to section 8-6-2 made the Rules thereafter adopted by the trial courts subject to the approval of the Supreme Court. 1969 R.I. Pub. Laws ch. 239, sec 2. Therefore, all public records relating to the adoption and promulgation of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION" are "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, judicial, regulatory, or administrative body of the state, or any political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to Public Records Act ("APRA"). Even though the Rhode Island Enabling Act conferred the power on the judiciary public body to promulgate and adopt court rules, a.k.a. rule-making process, the Rhode Island Judiciary, pursuant to the Plaintiff's APRA request for public records, denied the Plaintiff's APRA request within the 10 business day period, as well as denies it possesses public records, as defined by APRA, relating to the rule-making process by the judiciary of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," including denying possession of public records that show the intent of the rule-makers to promulgate and adopt court rules denying fundamental right of public access to electronic case information remotely to the public, to self-represented litigants, and to parties to a case. **See Exhibit D** fourteen (14) APRA correspondence emails between the Plaintiff and/with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023. The Texas pro-se Plaintiff respectfully requests the extension of time to present the new evidence and plead the newly verified facts and claims, and amend the complaint, which is further in the interest of judicial economy. The Plaintiff further seeks to appeal and file her claim against the implausible denial by the RI Judiciary, which is conferred by the Rhode Island Enabling Act to make rules of the court, that it possesses public records relating to the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," that the judiciary, conferred power by the Rhode Island Enabling Act, "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, judicial, regulatory, or administrative body of the state, or any political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to

Public Records Act ("APRA"). Because the RI Superior Court clearly ruled in **Seguin v. RI Office of Child Support Services, PC-22-07215** that it lacked subject matter jurisdiction to hear my/the Texas Plaintiff's APRA-related claims, I, the Texas Plaintiff, now exercise my statutory and constitutional rights to petition this Federal Court, invoking 28 U.S.C. § 1343(a)(3) (civil rights) and 28 U.S.C. § 1367 that provides supplemental jurisdiction over the state law tort claims that arose from the same common nuclei of facts, invoking 28 U.S.C. § 1331 (federal question), and invoking 42 U.S.C. § 1983 for violations of civil rights under the First, Fourth and Fourteenth Amendments to the United States Constitution. I, the Plaintiff, respectfully request this Court for the extension of time to file my claims.

31. Plaintiff discovered on October 6, 2023 that the Rhode Island Judiciary and Government Defendants are former clients of Judge Smith, a partner in his former firm, Edwards & Angell.

32. Plaintiff discovered on November 9, 2023 that the Rhode Isand Judiciary and Government Defendants are current clients of the firm Edwards & Angell, the former firm of Judge Smith, a partner in the firm.

33. A plain reading of 28 U.S.C. sec. 455 makes clear that Judge Smith is disqualified from this case, and a plain reading of case law makes clear that 28 U.S.C. sec. 455 is self-executing, without necessitating any party's request.

Respectfully submitted,

Date: November 16, 2023

MARY SEGUIN

*Mary Seguin*

Mary Seguin

P.O. Box 22022

Houston, TX 77019

maryseguin22022@gmail.com

**Meghan Kenny**

| | |
|---|---|
| **From:** | Mary Seguin <maryseguin22022@gmail.com> |
| **Sent:** | Friday, November 17, 2023 3:21 PM |
| **To:** | RID_ECF_INTAKE |
| **Subject:** | URGENT - TIME SENSITIVE - FILE TODAY NOTICE OF APPEAL in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS |
| **Attachments:** | CA 126 Notice of Appeal 111723.pdf |
| | |
| **Categories:** | Being Worked On MK |

<mark>**CAUTION - EXTERNAL:**</mark>

Dear Clerks of the Court,

I spoke with Clerk Meghan today regarding an update on the docketing of my motions and filing a Notice of Appeal in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Following our discussion, I emailed and filed today at 3:10 PM Eastern Time to the Clerk of the Court and respectfully requested the Clerk of the Court to docket today my Rule 60(b)(1) Motion, dated November 17, 2023, that is time-sensitive, per my email below.

**Please make sure that my previously filed Rule 60(b)(1) Motion referred in my below email is docketed as ECF 32.**

Please make sure that the law is followed so that my attached Rule 60(b)(1) Motion is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Rule 60(b)(1) Motion. No Chamber interference should be taking place to prevent the docketing of my attached Rule 60(b)(1) Motion.

Additionally, subsequent to my filing of the aforementioned Rule 60(b)(1) Motion referenced in my email below that I had requested be docketed as ECF 32, I am herewith filing my attached **Notice of Appeal** in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

**Please make sure that my Notice of Appeal filed herewith that is attached to this email is docketed today as ECF 33.**

Please make sure that the law is followed so that my attached Notice of Appeal docketed immediately upon receipt and is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Notice of Appeal. No Chamber interference should be taking place to prevent the docketing of my attached Notice of Appeal.

Thank you for your assistance.

Respectfully Submitted,
Mary Seguin
Houston, Texas

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Fri, Nov 17, 2023 at 2:10 PM
Subject: URGENT - TIME SENSITIVE - FILE TODAY RULE 60(b)(1) MOTION in Seguin v. Ri Dept of Human Services et al, Civil

Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>


Dear Clerks of the Court,

I spoke with Clerk Meghan today regarding an update on the docketing of my motions.

Following our discussion, I respectfully request the Clerk of the Court to docket today my attached Rule 60(b)(1) Motion, dated November 17, 2023, that is time-sensitive.

**Please make sure that my attached Rule 60(b)(1) Motion is docketed as ECF 32.**

Please make sure that the law is followed that my attached Rule 60(b)(1) Motion is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Rule 60(b)(1) Motion. No Chamber interference should be taking place to prevent the docketing of my attached Rule 60(b)(1) Motion.

Thank you for your assistance.

Respectfully Submitted,
Mary Seguin
Houston, Texas

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Fri, Nov 17, 2023 at 12:33 PM
Subject: Fwd: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>


Dear Clerks of the Court,

I am respectfully following up on my Rule 59 Motion filing.

Yesterday, November 16, 2023, at 1:31 PM Central Time, I filed via email below, my Rule 59 Motion in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS. As indicated in my email below, I emphasized that docketing the Rule 59 Motion on November 16, 2023 is urgent, to comply with the 28 day filing post-judgment deadline, which my filing meets - November 16, 2023 is within the 28 day deadline of Fed. R. of Civ. P. 59 that tolls the time for filing an appeal.

I followed up with telephone calls to the Clerk's Office at 1:32 PM Central Time, and at 3:42 PM Central Time to request timely docket of my Rule 59 Motion, and the Clerk's Office assured me each time that a deputy clerk is working on it and that it will be docketed on the day it was received and that the docket will reflect the email date stamp of the day the Rule 59 Motion is received by email. Further, I was told that **all filings** I email to the Clerk's Office will be docketed and considered by the Court as having been filed on the day that the motion was emailed to the Clerk's Office.

Therefore, my Rule 59 Motion emailed on November 16, 2023 should be accordingly docketed as **ECF 32** with the **entry of/stating filing on November 16, 2023**, in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

However, as of this time, on November 17, 2023 almost 24 hours later, my Rule 59 Motion is still not docketed.

I would like to respectfully clarify that the Text Order dated October 19, 2023 in this matter states that only my electronic filing privilege was revoked, but there is **no** order requiring that I need to file for leave of Court to file any post-judgment motions, such as my Rule 59 Motion.

Today, November 17, 2023, I telephoned the Clerk's Office first thing at 8:00 AM Central Time, and spoke with Clerk Meghan, who informed me that yesterday she had forwarded my Rule 59 Motion to Chambers upon receipt, but has yet to hear back from Chambers, but did not know what was causing the hold up when I asked why Chambers' response is taking almost 24 hours which impacts the docketing date of the Rule 59 Motion.  I expressed my concern of the Rule 59 deadline, emphasizing that it tolls the time for filing an appeal, therefore I respectfully requested that the docket accurately reflects my timely filing of my Rule 59 Motion on November 16, 2023 (at 1:31 PM Central Time).

Additionally, I informed Clerk Meghan that I relied on the Clerk's Office's information provided above, and I had also filed a timely **Rule 60** Motion yesterday, **November 16, 2023**, at **4:39 PM Central Time**, similarly requesting docketing to reflect it was timely filed via email to on November 16, 2023.  I emphasized to Clerk Meghan that timeliness is critical, as Rule 60 Motion filed within 28 days post-judgment tolls the time for filing an appeal.  Clerk Meghan told me that my Rule 60 Motion was forwarded to Chambers as well.  According to the Clerk's Office's information, my **Rule 60 Motion** needs to be docketed/filed as **ECF 33, dated stamped filed on November 16, 2023**.

Due to the above information regarding the processing of my post-judgment motions, I expressed to Clerk Megghan my concern regarding the Court's procedure of forwarding my time-sensitive post-judgment motions to Chambers without docketing/filing, and then those time-sensitive motions seemingly to languish in Chambers past the date of the 28-day deadline stipulated by Rule 59, and Rule 60 as they relate to tolling the time for filing an appeal.  I expressed my explicit concern that I seek to preserve my right of appeal, and that I respectfully seek to preserve on the record the issues contained in my Rule 59 and Rule 60 Motions that are currently before Chambers, without docketing, by law within the jurisdiction of the U.S. District Court of Rhode Island.  My Rule 59 and Rule 60 Motions are not ex-parte or emergency motions.

Moreover, I expressed to Clerk Meghan my concern that the processing of my post-judgment motions forwarded to Chambers and seemingly pending before Chambers without the motions being docketed, impacts my right of appeal 30-days post judgment, and today, Friday, is Day 29.  I told the Clerk that under the circumstances in this matter, I seek to preserve for appeal the issues raised in my timely filed Rule 59 Motion and Rule 60 Motion, and that I seek to preserve my right to appeal within the 30-day postjudgment period.

I also discussed with the Clerk that my timely filed but undocketed Rule 59 Motion and Rule 60 Motion that were forwarded to and currently before Chambers cause an uncertain effect, impacting the date of my filing of Notice of Appeal, the deadline of which is November 18, 2023, a Saturday.   Based on the current facts and issues regarding simply docketing my filings on the record, I am concerned my rights of access to the Courts are impacted, and that my Notice of Appeal may also languish I do not believe any pro se litigant should be made to be uncertain of the timeliness of filing a Notice of Appeal as a matter of right that is caused by inaction by Chambers on timely-filed Rule 59 and Rule 60 Motions that toll the time to file an appeal. I explicitly expressed my concern on the effect on my access to the Courts.

I respectfully request that this email communication regarding the filing/docketing of my Rule 59 Motion be docketed to accurately reflect the record on appeal along with the Rule 59 Motion at the time the Rule 59 Motion is docketed by the Clerk.

Thank you in advance for you assistance.

Respectfully submitted,
Mary Seguin

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Thu, Nov 16, 2023 at 1:31 PM
Subject: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk of the Court,

Kindly urgently file today, November 16, 2023, my attached Rule 59 Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 59 Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023.  I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX  77019
(281) 244-2016

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

```
MIME-Version:1.0
From:cmecf@rid.uscourts.gov
To:cmecfnef@rid.uscourts.gov
Bcc:
--Case Participants: Joanna M. Achille (jachille@burnslev.com), Marissa D. Pizana
(ddiaz@riag.ri.gov, mpizana@riag.ri.gov), Mary Seguin (maryseguin22022@gmail.com),
District Judge William E. Smith (breegan_semonelli@rid.uscourts.gov,
john_hindley@rid.uscourts.gov, judge_smith@rid.uscourts.gov,
kathryn_alfus@rid.uscourts.gov, mitchell_kosht@rid.uscourts.gov,
patrick_mcgourty@rid.uscourts.gov, wesnef2@rid.uscourts.gov, wesnef@rid.uscourts.gov),
Magistrate Judge Patricia A. Sullivan (juliana_mckittrick@rid.uscourts.gov,
mag_judge_sullivan@rid.uscourts.gov, pasnef@rid.uscourts.gov,
patrick_cunningham@rid.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:1900843@rid.uscourts.gov
Subject:Activity in Case 1:23-cv-00126-WES-PAS Seguin v. Rhode Island Department of Human
Services et al Order
```
Content−Type: text/html

## U.S. District Court

## District of Rhode Island

## Notice of Electronic Filing


The following transaction was entered on 11/17/2023 at 3:39 PM EST and filed on 11/17/2023

| | |
|---|---|
| **Case Name:** | Seguin v. Rhode Island Department of Human Services et al |
| **Case Number:** | 1:23−cv−00126−WES−PAS |
| **Filer:** | |

**WARNING: CASE CLOSED on 10/19/2023**

**Document Number:** No document attached

**Docket Text:**
**TEXT ORDER: The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra)**


**1:23−cv−00126−WES−PAS Notice has been electronically mailed to:**

Joanna M. Achille &nbsp &nbsp jachille@burnslev.com

Marissa D. Pizana &nbsp &nbsp mpizana@riag.ri.gov, ddiaz@riag.ri.gov

Mary Seguin &nbsp &nbsp maryseguin22022@gmail.com

**1:23−cv−00126−WES−PAS Notice has been delivered by other means to:**

```
MIME-Version:1.0
From:cmecf@rid.uscourts.gov
To:cmecfnef@rid.uscourts.gov
Bcc:
--Case Participants: Joanna M. Achille (jachille@burnslev.com), Marissa D. Pizana
(ddiaz@riag.ri.gov, mpizana@riag.ri.gov), Mary Seguin (maryseguin22022@gmail.com),
District Judge William E. Smith (breegan_semonelli@rid.uscourts.gov,
john_hindley@rid.uscourts.gov, judge_smith@rid.uscourts.gov,
kathryn_alfus@rid.uscourts.gov, mitchell_kosht@rid.uscourts.gov,
patrick_mcgourty@rid.uscourts.gov, wesnef2@rid.uscourts.gov, wesnef@rid.uscourts.gov),
Magistrate Judge Patricia A. Sullivan (juliana_mckittrick@rid.uscourts.gov,
mag_judge_sullivan@rid.uscourts.gov, pasnef@rid.uscourts.gov,
patrick_cunningham@rid.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:1900703@rid.uscourts.gov
Subject:Activity in Case 1:23-cv-00126-WES-PAS Seguin v. Rhode Island Department of Human
Services et al Order
```
Content−Type: text/html

## U.S. District Court

## District of Rhode Island

## Notice of Electronic Filing

The following transaction was entered on 11/17/2023 at 1:26 PM EST and filed on 11/17/2023

| | |
|---|---|
| **Case Name:** | Seguin v. Rhode Island Department of Human Services et al |
| **Case Number:** | 1:23−cv−00126−WES−PAS |
| **Filer:** | |

**WARNING: CASE CLOSED on 10/19/2023**

**Document Number:** No document attached

**Docket Text:**
**EXT ORDER: The Court is in receipt of Plaintiff's two recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra)**

**1:23−cv−00126−WES−PAS Notice has been electronically mailed to:**

Joanna M. Achille &nbsp &nbsp jachille@burnslev.com

Marissa D. Pizana &nbsp &nbsp mpizana@riag.ri.gov, ddiaz@riag.ri.gov

Mary Seguin &nbsp &nbsp maryseguin22022@gmail.com

**1:23−cv−00126−WES−PAS Notice has been delivered by other means to:**

Exhibit A

## SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

January 25, 2011
N:\CSB\Specifications\OCS Interest\Adjust OCS Interest.doc

Exhibit B

No. 23-1967

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,


Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official
capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their
individual and official capacities; Rhode Island OFFICE OF Child Support
Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK
DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN,
LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN,
JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities;
RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A.
SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF
RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND
ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity;
RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in
its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official
capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE
JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL,
MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their
individual and official capacities; RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF
THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual
capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Appellants-Appellees.


Appeal from the United States District Court

for the District of Rhode Island

_____

**APPELLANT'S OBJECTION TO APPELLEES' MOTION TO STRIKE Fed. R. App. 8(a)(2)(A) and Fed. R. App. 8(a)(2)(B) SUBMISSIONS IN A PENDING FED. R. APP. P 8(a)(2)(D) MOTION, THE APPELLANT'S NOTICE OF APPELLANT'S NOTICE TO THE JUDGES OF THE UNITED STATES OF THE COMMISSION OF ACTIVITIES BY PERSONS OR WHOEVER INVOLVING RECORD TAMPERING; KNOWING PRESENTATION, OR CAUSING TO BE PRESENTED OR CERTIFICATION OF A FALSE OR FRAUDULENT CLAIM TO THE UNITED STATES, TO THE STATE OF TEXAS, FOR PAYMENT OR APPROVAL; KNOWINGLY MAKING, USING OR CAUSING TO BE MADE OR USED, A FALSE RECORD OR STATEMENT MATERIAL TO A FALSE OR FRAUDULENT CLAIM; CONSPIRING TO COMMIT A VIOLATION OF THE AFORESAID TO PROCURE TITLE IV-D FUNDING, THAT INVOLVE VIOLATIONS OF 42 U.S.C. § 654 WHICH ARE**

**PENALTY-INCURRING AND FINES INCURRING UNDER 42 U.S.C. § 654, COMMITTED BY INDIVIDUAL APPELLEE PERSONS, WHOEVER, AND AGENTS OF TITLE IV SOCIAL SECURITY ACT RHODE ISLAND STATE PLAN**

**Pursuant to**

**18 U.S.C. § 4**
**18 U.S.C. § 666**

**18 U.S.C. § 287 - making false, fictitious claims,**

**18 U.S.C. § 371 - conspiracy to defraud the United States,**

**18 U.S.C. § 1001 - false documents or false statements to a federal agency,**

**18 U.S.C. § 1341 - mail fraud,**

**18 U.S.C. § 1343 - wire fraud,**

**18 U.S.C. § 641 - Public money, property or records,**

**31 U.S.C. § 3279 - federal civil false claims act**

**Et al.**

**AND**

**APPELLANT'S REQUEST FOR A HEARING PURSUANT TO FED. R. EVID. 201(e)**

———————————————

**ORGANIZED FRAUD, THEFT OF PUBLIC MONEY AND GOVERNMENT PROGRAMS INVOLVING BILLIONS OF DOLLARS**

Appellant, MARY SEGUIN, hereby objects to State Appellees' Motion to Strike dated March 29, 2024, Document: 00118126195 and requests a hearing of Appellant's Objection pursuant to **Rule 201[e]**.

Appellant's Fed. R. App. P 8(a)(a)(D) Motion filing is supported by Appellant's Declaration of the truths of Appellant's Notice of the Commission of the Facts submitted pursuant to Fed. R. Evid. 201 Document number: 00118123623. Appellant was not aware of the Rhode Island State Policy that prohibits the charging of interest rate in interstate cases until 2024, see Appellee Rhode Island Office of Child Support Services **Policy Exhibit A**. Therefore, this evidence was not available at the time final judgment was issued on October 19, 2023 in this matter. Judicial Notice, in aid of the court, is respectfully requested of it. Whether requesting or opposing judicial notice, litigants have a right to be heard

on the issue under **Rule 201[e], therefore, Appellant requests a hearing on the issue under Rule 201(e).**

**Under Fed. R. Evid. 201[f]**, judicial notice of adjudicative facts may be taken at any stage of the proceedings, including on appeal. In practice, appellate courts frequently take judicial notice of both adjudicative and legislative facts presented for the first time on appeal, whether requested by a party or on their own initiative. See, e.g., *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 [2d Cir. 2002]; In *re Indian Palms Assoc. Ltd* ., 61 F.3d 197, 205 [3d Cir. 1995].

Judicial Notice in practice is taken at any time of a proceeding, including for the first time on appeal, of legislative history, to wit the legislative history of 42 U.S.C. sec. 654 regarding Congress's Amendment in 1996.  This similarly applies to the State of Rhode Island's legislative history, to wit, the failure of Rhode Island Gen. Law. 15-5-16.5 to comply with the 1996 Amendment of 42 U.S.C. sec. 654. 42 U.S.C. sec. 654 makes it explicitly clear that such failures incur penalties.  The fact that Rhode Island family court is a court of limited jurisdiction, as prescribed by R.I. Gen. Law. 8-10-3 where limited relief is authorized by State legislation is a matter of legislative fact, that in practice is judicially noted at any time of a proceeding, including for the first time on appeal.

Appellant re-attaches these legislative copies hereto this Objection.  These legislations and the pre-emptive effect of the explicit language in the statutory provisions under Amendment 1996 of 42 U.S.C. sec. 654 make clear that the State of Rhode Island is operating an unlawful State Plan that unlawfully charges 12% compound interest on overdue support under color of state law, the basis of the current "State enforcement" of its "court orders" charging 12% compound interest without jurisdiction.  Since a trial did not occur in this matter, at this juncture the Court must take all factual allegations in the Amended Complaint in this matter as true, and it plainly pleads that the State Appellee represented to the Appellant in Texas that if Appellant paid $104,185.98 in one lump sum, Appellee Gero Meyersiek waived interest, and that the $104,185.98 is a pay-off amount that does not include interest.

Therefore, Appellee Gero Meyersiek changed his mind after Texas Appellant accepted the offer in Texas, performed and paid the lump sum $104,185.98.  The "changed his mind" entailed the action of "putting interest back on the system" that consists of 12% compound interest (see attached R.I.G.L. sec. 15-5-16.5.)

Since the State Plan that charges 12% compound interest, takes interest off the system only during certifications to the TEXAS and UNITED STATES authorities, and then puts interest back on the system when Appellee Gero

Meyersiek "changed his mind" waiving interest after Texas Appellant performed on the terms of the agreement, it is abundantly clear that the Appellees, government and private persons operate a criminally unlawful State Plan. Since all Appellees participate in the "take interest off the system" when certifying to TEXAS and when certifying to the UNITED STATES the total support due, and since the State Policy provides for the creation of "two reports," Fed. R.Evidence 201 evidence is abundantly clear before this Court and before a panel of "some judges" that of organized criminal fraud and the lack of jurisdiction of the limited jurisdiction state family court to issue orders for 12% compound interest on overdue support that 42 U.S.C. 654(21)(A) explicitly prohibits.

Appellees' request to strike Fed. R. Evid. 201 evidence of crimes made known to "some judges" under 18 U.S.C. sec. 4 from the record in a matter that involves Appellees' organized criminal activity that violates, inter alia, 18 U.S.C. sec. 666 and 18 U.S.C. sec. 641, 18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false documents or false statements to a federal agency,18 U.S.C. § 1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud by the Appellees is an obstruction of an official proceeding and an obstruction of justice.

Finally, undisputed Appellees' operational evidence that includes unlawful redactions made sense only after the availability in 2024 of the State Policy that

evidences the State Plan operating an unlawful Child Support enforcement program by policy of creating "two reports" in interstate cases, one with the unlawful 12% compound interest to enforce under color of law, and one report for the purposes of making false claims, false certifications, and falsifying official government documents to unlawfully apply for Federal Title IV Program funding that the Appellees knew Rhode Island is ineligible for.  That amounts to billions of dollars of theft against the United States.

Emphatically, Congress intended, by making "some judge(s)"…"of the United States" to whom the commission of crimes is mandated to be made known, explicitly conferred the duty on Judges of the United States under Federal Criminal Law the same duty, obligations and responsibility acting as authorities under the United States, as the "other persons in civil or military authority under the United States" explicitly named in the federal criminal statute 18 U.S.C. sec. 4.  Appellant requested Judicial Notice under 18 U.S.C. sec. 4 to the "some judges" as the "person in authority under the United States" under 18 U.S.C. sec. 4.   Striking from the record Congressional legislation history of 42 U.S.C. sec. 654, State legislation history, Rhode Island State Plan 42 U.S.C. sec. 654(3) State operating and disbursement unit's Policy that are neither classified information nor confidential or privileged information to the United States are further not in the interest of the United States.

Striking evidence that shows $0.00 interest on a December 6, 2021 screenshot of the Appellee-operated 42 U.S.C. sec. 654a automated data processing and information retrieval system accomplishes nothing other than taking as true the factual allegations in the Amended Complaint that details Appellant being shown the $0.00 Under Interest generated by the automated data processing and information retrieval system. The Fed. R. Evid. visual evidence aids the court to visualize the truth of Appellant's factual allegations.

Striking evidence of a screenshot of the Appellee-operated 42 U.S.C. sec. 654a automated data processing and information retrieval system that shows $0.00 Payment for Appellant's whopping lump sum $104,185.98 December 7, 2021 payment accomplishes nothing, when the screenshot is a visual evidence of the "two reports" explicitly stated in the Appellee State Policy to create "two reports" that consist of falsified records – these are evidence in the aid of the court of Appellant's 18 U.S.C. sec. 4 and Fed. R. Evid. request to take judicial notice of activities that harm the United States and steal from Federal Program Funds.

This case is related to Appeal No. 23-1967 and Appeal No. 23-1978.

**Under Fed. R. Evid. 201[f]**, judicial notice of adjudicative facts may be taken at any stage of the proceedings, including on appeal. In practice, appellate courts frequently take judicial notice of both adjudicative and legislative facts

presented for the first time on appeal, whether requested by a party or on their own initiative. See, e.g., *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 [2d Cir. 2002]; In *re Indian Palms Assoc. Ltd* ., 61 F.3d 197, 205 [3d Cir. 1995].

Appellate courts take judicial notice of facts that were not available to litigants at trial and events that occurred after judgment was entered. For example, courts have taken judicial notice of guilty pleas entered in a related criminal case after judgment in the civil case was entered. See, e.g., *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 [4th Cir. 1989]. Similarly, appellate courts have taken judicial notice of post-judgment changes in the conditions in a foreign country relevant to an immigration appeal, *Ivezaj v. INS* , 84 F.3d 215, 218-19 [6th Cir. 1996], as well as post-trial changes in the racial composition of a state's judiciary in a discrimination suit. *Southern Christian Leadership Conference of Alabama v. Sessions*, 56 F.3d 1281, 1288 n.13 [11th Cir. 1995].

Certain categories of facts have long been the subject of judicial notice on appeal. Courts routinely take judicial notice of pleadings and records in other court cases [see, e.g., *Green v. Warden*, U.S. Penitentiary, 699 F.2d 364, 369 [7th Cir. 1983]; *E.I. du Pont de Nemours & Co. Inc. v. Cullen*, 791 F.2d 5, 7 [1st Cir. 1986]] and in administrative agency proceedings [see, e.g., *Opeka v. INS*, 194 F.3d 392,

394-95 [7th Cir. 1996]], Courts are generally willing to take judicial notice of data, pronouncements and publications issued by the government, such as Environmental Protection Agency research [*Nebraska v. EPA*, 331 F.3d 995, 998 n.3 [D.C. Cir. 2003]]; State Department travel warnings [*Parsons v. United Tech. Corp* ., 700 A.2d 655, 665 n.18 [Conn. 1997]]; and a federal fisheries management plan approved by formal rule [*City of Charleston v. A Fisherman's Best Inc*., 310 F.3d 155, 172 [4th Cir. 2002], cert. denied, 123 S.Ct. 2573 [2003]]. Appellate courts are also likely to take judicial notice of relevant newspaper articles [see, e.g., *The Washington Post v. Robinson*, 935 F.2d 282, 291-92 [D.C. Cir. 1991]] and historical information contained in authoritative publications, such as a text on the history of Lincoln Center [see, e.g., Hotel Employees, 311 F.3d at 540 n.1.].

Courts take judicial notice of online information.  Appellate courts have increasingly cited information found on the Internet. As with hard-copy publications, courts are most willing to take judicial notice of information found on government Web sites, such as the time of sunrise found on the Web site of the U.S. Naval Observatory [*U.S. v. Bervaldi*, 226 F.3d 1256, 1266 n.9 [11th Cir. 2000]]; the prime interest rate on the Federal Reserve Board Web site [*Levan v. Capital Cities/ABC Inc*., 190 F.3d 1230, 1235 n.12 [11th Cir. 1999]]; and records of retired military personnel on a federal Web site [*Denius*, 330 F.3d at 926]. Courts have even been willing to take judicial notice of information on arguably

less reliable commercial Internet sites, including mileage information on Mapquest [*In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 731 n.12 [W.D. La. 1999]]; historical information on Liberia on the "Geocities" Web site [*Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 278 n.2 [S.D.N.Y. 1999]]; and information regarding a bank's ownership from the bank's Web site [see *Laborers' Pension Fund v. Blackmore Sewer Constr. Inc.*, 298 F.3d 600, 607 [7th Cir. 2002]].

The use of judicial notice spans a wide spectrum of cases, from the most historically significant-such as Chief Justice Earl Warren's reliance in *Brown v. Board of Ed.*, 347 U.S. 483, 494 n.11 [1954], on scholarly publications documenting the effect of segregated schools on minority children-to the most mundane, such as the 2d U.S. Circuit Court of Appeals' judicial notice of the "traditional features of a snowman." *Eden Toys Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 n.1 [2d Cir. 1982].

In general, courts are free to take notice of legislative facts, including research data and writings like those cited in the famous "Brandeis briefs." Appellate courts are understandably more willing to take judicial notice of such legislative facts, because they help them develop reasonable rules of law that will apply in future cases. "Legislative facts," which are facts of general "relevance to legal reasoning and the lawmaking process" [Fed. R. Evid. 201[a] Advisory Committee's note] or are "established truths, facts or pronouncements that do not

change from case to case" and "do not relate specifically to the…litigants." [*United States v. Gould*, 536 F.2d 216, 220 [8th Cir. 1976]]. 42 U.S.C. sec. 654 relates to all interested parties and the United States, and are established truths and facts that do not change from case to case, and do not specifically only apply just to this matter. Likewise R.I. Gen. Laws. Sec, 15-5-16.5 relates to all interested parties and the United States, not just to this matter. Likewise the Appellees' State Policy prohibiting the charging of interest in interstate cases and creating "two reports" from the policy adjustments to the 42 U.S.C. sec. 654a automated data processing and information retrieval system is established truths and facts that do not change from case to case, and do not specifically only apply just to this matter. The resultant Screenshot evidence of the resulting false records created by the "two reports" do not change because Rhode Island creates two reports in intrastate cases in order to evade detection of the unlawful 12% compound interest under color of state law, one for enforcement under color of law, one for false certification of State Plan compliance to the United States Title IV Program. While full suite of issues concerning State noncompliance with 42 U.S.C. sec. 654 this Court notices under the *Turner v. Rogers Amicus Brief* submitted by the United States can be noticed on the Court's own initiative, however, the full suite of the issues contained therein made sense of the State Policy that was not available to the Appellant until 2024 – nevertheless, Appellant makes known this evidence to the

judges of the First Circuit Court of Appeals under 18 U.S.C. sec. 4 and Fed. R. Evid. 201.

As such, all public truths and facts and publications "made known" to this Court under **18 U.S.C. sec. 4** and **Fed. R. Evid. 201** should be judicially noticed.

Appellant separately filed a Notice requesting judicial notice on March 29, 2024 Document: **00118126217**, specifically invoking **Fed. R. Evid. 201** and **18 U.S.C. sec. 4**.

Whether requesting or opposing judicial notice, litigants have a right to be heard on the issue under **Rule 201[e].**

**WHEREFORE**, Under Fed. R. Evid. 201[f], judicial notice of adjudicative facts may be taken at any stage of the proceedings, including on appeal. In practice, appellate courts frequently take judicial notice of both adjudicative and legislative facts presented for the first time on appeal, whether requested by a party or on their own initiative. See, e.g., *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 [2d Cir. 2002]; In re *Indian Palms Assoc. Ltd* ., 61 F.3d 197, 205 [3d Cir. 1995]. Appellant respectfully requests Judicial Notice of the herein Made known to "some judges"… "of the United States" under **Fed. R. Evid. 201** and pursuant to **18 U.S.C. sec. 4.** Appellant

requests to be heard on the issue pursuant to **Rule 201[e].** Appellant requests any and all Relief deemed just pursuant to protections accorded to actions taken to make known to some judges of the United States in compliance with **18 U.S.C. sec. 4**. Appellees' motion to strike the aforesaid 18 U.S.C. sec. 4 and Fed. R. Evid. 201 offered evidence from an official federal proceeding in which Fed. R. App. P 8(a)(2) and 8(a)(2)(D) and Fed. R. App. P 27(b) are specifically invoked and pending subsequent to a series of adverse effects on Appellant's right to file an amended Notice of Appeal since the Court's Order issued on March 1, 2024 revoking the Court's prior January 22, 2024 Briefing Schedule Order, run afoul of the explicit statutory texts of 18 U.S.C. sec. 1-4 *et al*, the texts of Fed. R. App. P 8(a)(2) and 8(a)(2)(D) and Fed. R. App. P 27(b), and Fed. R. Evid. 201.

Respectfully submitted,

Mary Seguin
Pro Se
/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: March 29, 2024

# CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system on March 29, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/ _Mary Seguin_

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Exhibit A

## SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

**42 USC 654: State plan for child and spousal support**
Text contains those laws in effect on March 25, 2024

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
CHAPTER 7-SOCIAL SECURITY
SUBCHAPTER IV-GRANTS TO STATES FOR AID AND SERVICES TO NEEDY FAMILIES WITH
CHILDREN AND FOR CHILD-WELFARE SERVICES
Part D-Child Support and Establishment of Paternity
**Jump To:**
**Source Credit**
**Miscellaneous**
**References In Text**
**Codification**
**Amendments**
**Effective Date**

# §654. State plan for child and spousal support

A State plan for child and spousal support must-

(1) provide that it shall be in effect in all political subdivisions of the State;

(2) provide for financial participation by the State;

(3) provide for the establishment or designation of a single and separate organizational unit, which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan;

(4) provide that the State will-

(A) provide services relating to the establishment of paternity or the establishment, modification, or enforcement of child support obligations, as appropriate, under the plan with respect to-

(i) each child for whom (I) assistance is provided under the State program funded under part A of this subchapter, (II) benefits or services for foster care maintenance are provided under the State program funded under part E of this subchapter, (III) medical assistance is provided under the State plan approved under subchapter XIX, or (IV) cooperation is required pursuant to section 2015(l)(1) of title 7, unless, in accordance with paragraph (29), good cause or other exceptions exist;

(ii) any other child, if an individual applies for such services with respect to the child (except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the State to request the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application); and

(B) enforce any support obligation established with respect to-

(i) a child with respect to whom the State provides services under the plan; or

(ii) the custodial parent of such a child;

(5) provide that (A) in any case in which support payments are collected for an individual with respect to whom an assignment pursuant to section 608(a)(3) of this title is effective, such payments shall be made to the State for distribution pursuant to section 657 of this title and shall not be paid directly to the family, and the individual will be notified on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden) of the amount of the support payments collected, and (B) in any case in which support payments are collected for an individual pursuant to the assignment made under section 1396k of this title, such payments shall be made to the State for distribution pursuant to section 1396k of this title, except that this clause shall not apply to such payments for any month after the month

in which the individual ceases to be eligible for medical assistance;

(6) provide that-

(A) services under the plan shall be made available to residents of other States on the same terms as to residents of the State submitting the plan;

(B)(i) an application fee for furnishing such services shall be imposed on an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section 2015 of title 7, and shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (I) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (II) may vary among such individuals on the basis of ability to pay (as determined by the State); and

(ii) in the case of an individual who has never received assistance under a State program funded under part A and for whom the State has collected at least $550 of support, the State shall impose an annual fee of $35 for each case in which services are furnished, which shall be retained by the State from support collected on behalf of the individual (but not from the first $550 so collected), paid by the individual applying for the services, recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and the fees shall be considered income to the program);

(C) a fee of not more than $25 may be imposed in any case where the State requests the Secretary of the Treasury to withhold past-due support owed to or on behalf of such individual from a tax refund pursuant to section 664(a)(2) of this title;

(D) a fee (in accordance with regulations of the Secretary) for performing genetic tests may be imposed on any individual who is not a recipient of assistance under a State program funded under part A; and

(E) any costs in excess of the fees so imposed may be collected-

(i) from the parent who owes the child or spousal support obligation involved; or

(ii) at the option of the State, from the individual to whom such services are made available, but only if such State has in effect a procedure whereby all persons in such State having authority to order child or spousal support are informed that such costs are to be collected from the individual to whom such services were made available;


(7) provide for entering into cooperative arrangements with appropriate courts and law enforcement officials and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering the plan, including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;

(8) provide that, for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title the agency administering the plan will establish a service to locate parents utilizing-

(A) all sources of information and available records; and

(B) the Federal Parent Locator Service established under section 653 of this title,


and shall, subject to the privacy safeguards required under paragraph (26), disclose only the information described in sections 653 and 663 of this title to the authorized persons specified in such sections for the purposes specified in such sections;

(9) provide that the State will, in accordance with standards prescribed by the Secretary, cooperate with any other State-

(A) in establishing paternity, if necessary;

(B) in locating a noncustodial parent residing in the State (whether or not permanently) against

whom any action is being taken under a program established under a plan approved under this part in another State;

(C) in securing compliance by a noncustodial parent residing in such State (whether or not permanently) with an order issued by a court of competent jurisdiction against such parent for the support and maintenance of the child or children or the parent of such child or children with respect to whom aid is being provided under the plan of such other State;

(D) in carrying out other functions required under a plan approved under this part; and

(E) not later than March 1, 1997, in using the forms promulgated pursuant to section 652(a)(11) of this title for income withholding, imposition of liens, and issuance of administrative subpoenas in interstate child support cases;

(10) provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;

(11)(A) provide that amounts collected as support shall be distributed as provided in section 657 of this title; and

(B) provide that any payment required to be made under section 656 or 657 of this title to a family shall be made to the resident parent, legal guardian, or caretaker relative having custody of or responsibility for the child or children;

(12) provide for the establishment of procedures to require the State to provide individuals who are applying for or receiving services under the State plan, or who are parties to cases in which services are being provided under the State plan-

(A) with notice of all proceedings in which support obligations might be established or modified; and

(B) with a copy of any order establishing or modifying a child support obligation, or (in the case of a petition for modification) a notice of determination that there should be no change in the amount of the child support award, within 14 days after issuance of such order or determination;

(13) provide that the State will comply with such other requirements and standards as the Secretary determines to be necessary to the establishment of an effective program for locating noncustodial parents, establishing paternity, obtaining support orders, and collecting support payments and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan;

(14)(A) comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

(B) maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them to conceal in the accounting records the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

(15) provide for-

(A) a process for annual reviews of and reports to the Secretary on the State program operated under the State plan approved under this part, including such information as may be necessary to measure State compliance with Federal requirements for expedited procedures, using such standards and procedures as are required by the Secretary, under which the State agency will determine the extent to which the program is operated in compliance with this part; and

(B) a process of extracting from the automated data processing system required by paragraph (16) and transmitting to the Secretary data and calculations concerning the levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 652(g) and 658a of this title;

(16) provide for the establishment and operation by the State agency, in accordance with an (initial and annually updated) advance automated data processing planning document approved under section 652(d) of this title, of a statewide automated data processing and information retrieval system meeting the requirements of section 654a of this title designed effectively and efficiently to assist management in

the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan;

(17) provide that the State will have in effect an agreement with the Secretary entered into pursuant to section 663 of this title for the use of the Parent Locator Service established under section 653 of this title, and provide that the State will accept and transmit to the Secretary requests for information authorized under the provisions of the agreement to be furnished by such Service to authorized persons, will impose and collect (in accordance with regulations of the Secretary) a fee sufficient to cover the costs to the State and to the Secretary incurred by reason of such requests, will transmit to the Secretary from time to time (in accordance with such regulations) so much of the fees collected as are attributable to such costs to the Secretary so incurred, and during the period that such agreement is in effect will otherwise comply with such agreement and regulations of the Secretary with respect thereto;

(18) provide that the State has in effect procedures necessary to obtain payment of past-due support from overpayments made to the Secretary of the Treasury as set forth in section 664 of this title, and take all steps necessary to implement and utilize such procedures;

(19) provide that the agency administering the plan-

(A) shall determine on a periodic basis, from information supplied pursuant to section 508 of the Unemployment Compensation Amendments of 1976, whether any individuals receiving compensation under the State's unemployment compensation law (including amounts payable pursuant to any agreement under any Federal unemployment compensation law) owe child support obligations which are being enforced by such agency; and

(B) shall enforce any such child support obligations which are owed by such an individual but are not being met-

(i) through an agreement with such individual to have specified amounts withheld from compensation otherwise payable to such individual and by submitting a copy of any such agreement to the State agency administering the unemployment compensation law; or

(ii) in the absence of such an agreement, by bringing legal process (as defined in section 659(i)(5) of this title) to require the withholding of amounts from such compensation;


(20) provide, to the extent required by section 666 of this title, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws;

(21)(A) at the option of the State, impose a late payment fee on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; and

(B) assure that the fee will be collected in addition to, and only after full payment of, the overdue support, and that the imposition of the late payment fee shall not directly or indirectly result in a decrease in the amount of the support which is paid to the child (or spouse) to whom, or on whose behalf, it is owed;

(22) in order for the State to be eligible to receive any incentive payments under section 658a of this title, provide that, if one or more political subdivisions of the State participate in the costs of carrying out activities under the State plan during any period, each such subdivision shall be entitled to receive an appropriate share (as determined by the State) of any such incentive payments made to the State for such period, taking into account the efficiency and effectiveness of the activities carried out under the State plan by such political subdivision;

(23) provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services and a telephone number or postal address at which further information may be obtained and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate;

(24) provide that the State will have in effect an automated data processing and information retrieval system-

(A) by October 1, 1997, which meets all requirements of this part which were enacted on or before October 13, 1988; and

(B) by October 1, 2000, which meets all requirements of this part enacted on or before August 22, 1996, except that such deadline shall be extended by 1 day for each day (if any) by which the Secretary fails to meet the deadline imposed by section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996;

(25) provide that if a family with respect to which services are provided under the plan ceases to receive assistance under the State program funded under part A, the State shall provide appropriate notice to the family and continue to provide such services, subject to the same conditions and on the same basis as in the case of other individuals to whom services are furnished under the plan, except that an application or other request to continue services shall not be required of such a family and paragraph (6)(B) shall not apply to the family;

(26) have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the parties, including-

(A) safeguards against unauthorized use or disclosure of information relating to proceedings or actions to establish paternity, or to establish, modify, or enforce support, or to make or enforce a child custody determination;

(B) prohibitions against the release of information on the whereabouts of 1 party or the child to another party against whom a protective order with respect to the former party or the child has been entered;

(C) prohibitions against the release of information on the whereabouts of 1 party or the child to another person if the State has reason to believe that the release of the information to that person may result in physical or emotional harm to the party or the child;

(D) in cases in which the prohibitions under subparagraphs (B) and (C) apply, the requirement to notify the Secretary, for purposes of section 653(b)(2) of this title, that the State has reasonable evidence of domestic violence or child abuse against a party or the child and that the disclosure of such information could be harmful to the party or the child; and

(E) procedures providing that when the Secretary discloses information about a parent or child to a State court or an agent of a State court described in section 653(c)(2) or 663(d)(2)(B) of this title, and advises that court or agent that the Secretary has been notified that there is reasonable evidence of domestic violence or child abuse pursuant to section 653(b)(2) of this title, the court shall determine whether disclosure to any other person of information received from the Secretary could be harmful to the parent or child and, if the court determines that disclosure to any other person could be harmful, the court and its agents shall not make any such disclosure;

(27) provide that, on and after October 1, 1998, the State agency will-

(A) operate a State disbursement unit in accordance with section 654b of this title; and

(B) have sufficient State staff (consisting of State employees) and (at State option) contractors reporting directly to the State agency to-

(i) monitor and enforce support collections through the unit in cases being enforced by the State pursuant to paragraph (4) (including carrying out the automated data processing responsibilities described in section 654a(g) of this title); and

(ii) take the actions described in section 666(c)(1) of this title in appropriate cases;

(28) provide that, on and after October 1, 1997, the State will operate a State Directory of New Hires in accordance with section 653a of this title;

(29) provide that the State agency responsible for administering the State plan-

(A) shall make the determination (and redetermination at appropriate intervals) as to whether an individual who has applied for or is receiving assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, is cooperating in good faith with the State in establishing the paternity of, or in establishing, modifying, or enforcing a support order for, any child of the individual by providing the State agency with the name of, and such other information as the State agency may require with respect to, the noncustodial parent of the child, subject to good cause and other exceptions which-

(i) in the case of the State program funded under part A, the State program under part E, or the State program under subchapter XIX shall, at the option of the State, be defined, taking into account the best interests of the child, and applied in each case, by the State agency administering such program; and

(ii) in the case of the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, shall be defined and applied in each case under that program in accordance with section 2015(l)(2) of title 7;

(B) shall require the individual to supply additional necessary information and appear at interviews, hearings, and legal proceedings;

(C) shall require the individual and the child to submit to genetic tests pursuant to judicial or administrative order;

(D) may request that the individual sign a voluntary acknowledgment of paternity, after notice of the rights and consequences of such an acknowledgment, but may not require the individual to sign an acknowledgment or otherwise relinquish the right to genetic tests as a condition of cooperation and eligibility for assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7; and

(E) shall promptly notify the individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, of each such determination, and if noncooperation is determined, the basis therefor;

(30) provide that the State shall use the definitions established under section 652(a)(5) of this title in collecting and reporting information as required under this part;

(31) provide that the State agency will have in effect a procedure for certifying to the Secretary, for purposes of the procedure under section 652(k) of this title, determinations that individuals owe arrearages of child support in an amount exceeding $2,500, under which procedure-

(A) each individual concerned is afforded notice of such determination and the consequences thereof, and an opportunity to contest the determination; and

(B) the certification by the State agency is furnished to the Secretary in such format, and accompanied by such supporting documentation, as the Secretary may require;

(32)(A) provide that any request for services under this part by a foreign reciprocating country, a foreign treaty country, or a foreign country with which the State has an arrangement described in section 659a(d) of this title shall be treated as a request by a State;

(B) provide, at State option, notwithstanding paragraph (4) or any other provision of this part, for services under the plan for enforcement of a spousal support order not described in paragraph (4)(B) entered by such a country (or subdivision) and

(C) provide that no applications will be required from, and no costs will be assessed for such services against, the foreign reciprocating country, foreign treaty country, or foreign individual (but costs may at State option be assessed against the obligor);

(33) provide that a State that receives funding pursuant to section 628 of this title and that has within its borders Indian country (as defined in section 1151 of title 18) may enter into cooperative agreements with an Indian tribe or tribal organization (as defined in subsections (e) and (l) of section 5304 of title 25), if the Indian tribe or tribal organization demonstrates that such tribe or organization has an established tribal court system or a Court of Indian Offenses with the authority to establish paternity, establish, modify, or enforce support orders, or to enter support orders in accordance with child support guidelines established or adopted by such tribe or organization, under which the State and tribe or organization shall provide for the cooperative delivery of child support enforcement services in Indian country and for the forwarding of all collections pursuant to the functions performed by the tribe or organization to the State agency, or conversely, by the State agency to the tribe or organization, which shall distribute such collections in

accordance with such agreement; and

(34) include an election by the State to apply section 657(a)(2)(B) of this title or former section 657(a)(2)(B) of this title (as in effect for the State immediately before the date this paragraph first applies to the State) to the distribution of the amounts which are the subject of such sections and, for so long as the State elects to so apply such former section, the amendments made by subsection (b)(1) of section 7301 of the Deficit Reduction Act of 2005 shall not apply with respect to the State, notwithstanding subsection (e) of such section 7301.

The State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21). Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25.

(Aug. 14, 1935, ch. 531, title IV, §454, as added Pub. L. 93–647, §101(a), Jan. 4, 1975, 88 Stat. 2354 ; amended Pub. L. 94–88, title II, §208(b), (c), Aug. 9, 1975, 89 Stat. 436 ; Pub. L. 95–30, title V, §502(a), May 23, 1977, 91 Stat. 162 ; Pub. L. 96–265, title IV, §405(b), June 9, 1980, 94 Stat. 463 ; Pub. L. 96–611, §9(a), Dec. 28, 1980, 94 Stat. 3571 ; Pub. L. 97–35, title XXIII, §§2331(b), 2332(d), 2333(a), (b), 2335(a), Aug. 13, 1981, 95 Stat. 860 , 862, 863; Pub. L. 97–248, title I, §§171(a), (b)(1), 173(a), Sept. 3, 1982, 96 Stat. 401 , 403; Pub. L. 98–369, div. B, title VI, §2663(c)(14), (j)(2)(B)(x), July 18, 1984, 98 Stat. 1166 , 1170; Pub. L. 98–378, §§3(a), (c)–(f), 5(b), 6(a), 11(b)(1), 12(a), (b), 14(a), 21(d), Aug. 16, 1984, 98 Stat. 1306 , 1310, 1311, 1314, 1318, 1319, 1320, 1324; Pub. L. 100–203, title IX, §§9141(a)(2), 9142(a), Dec. 22, 1987, 101 Stat. 1330–321 ; Pub. L. 100–485, title I, §§104(a), 111(c), 123(a), (d), Oct. 13, 1988, 102 Stat. 2348 , 2349, 2352, 2353; Pub. L. 104–35, §1(a), Oct. 12, 1995, 109 Stat. 294 ; Pub. L. 104–193, title I, §108(c)(11), (12), title III, §§301(a), (b), 302(b)(2), 303(a), 304(a), 312(a), 313(a), 316(g)(1), 324(b), 332, 333, 342(a), 343(b), 344(a)(1), (4), 370(a)(2), 371(b), 375(a), (c), 395(d)(1)(D), (2)(B), Aug. 22, 1996, 110 Stat. 2166 , 2199, 2204, 2205, 2207, 2209, 2218, 2223, 2230, 2233, 2234, 2236, 2252, 2254, 2256, 2259, 2260; Pub. L. 105–33, title V, §§5531(a), 5542(c), 5545, 5546(a), 5548, 5552, 5556(b), Aug. 5, 1997, 111 Stat. 625 , 631, 633, 635, 637; Pub. L. 106–169, title IV, §401(g), (h), Dec. 14, 1999, 113 Stat. 1858 ; Pub. L. 109–171, title VII, §§7301(b)(1)(C), 7303(b), 7310(a), Feb. 8, 2006, 120 Stat. 143 , 145, 147; Pub. L. 110–234, title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), May 22, 2008, 122 Stat. 1095–1097 , 1110; Pub. L. 110–246, §4(a), title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), June 18, 2008, 122 Stat. 1664 , 1857, 1858, 1871; Pub. L. 113–79, title IV, §4030(v), Feb. 7, 2014, 128 Stat. 815 ; Pub. L. 113–183, title III, §301(c), Sept. 29, 2014, 128 Stat. 1943 ; Pub. L. 115–123, div. E, title XII, §53117(a), Feb. 9, 2018, 132 Stat. 307 .)

<div align="center">

### Editorial Notes

### References in Text

</div>

Section 508 of the Unemployment Compensation Amendments of 1976, referred to in par. (19), is section 508 of Pub. L. 94–566, Oct. 20, 1976, 90 Stat. 2689 , which enacted section 603a of this title and amended section 49b of Title 29, Labor.

Section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, referred to in par. (24), is section 344(a)(3) of Pub. L. 104–193, which is set out as a Regulations note under section 654a of this title.

Section 2012(l) of title 7, referred to in par. (29), was struck out, and a new section 2012(t) of title 7 similarly defining "supplemental nutrition assistance program" was enacted, by Pub. L. 113–79, title IV, §4030(a)(3), (5), Feb. 7, 2014, 128 Stat. 813 .

Section 7301 of the Deficit Reduction Act of 2005, referred to in par. (34), is section 7301 of Pub. L. 109–171, title VII, Feb. 8, 2006, 120 Stat. 141 . Subsec. (b)(1) of section 7301 of Pub. L. 109–171 amended this section and section 657 of this title. Subsec. (e) of section 7301 of Pub. L. 109–171 is set out as an Effective Date of 2006 Amendment note under section 608 of this title.

## CODIFICATION

Pub. L. 110–234 and Pub. L. 110–246 made identical amendments to this section. The amendments by Pub. L. 110–234 were repealed by section 4(a) of Pub. L. 110–246.

## AMENDMENTS

**2018**-Par. (6)(B)(ii). Pub. L. 115–123 substituted "$35" for "$25" and, in two places, substituted "$550" for "$500".

**2014**-Par. (4)(A)(ii). Pub. L. 113–183, §301(c)(1), inserted before semicolon "(except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the individual to request the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application)".

Par. (29)(A), (D), (E). Pub. L. 113–79, §4030(v), amended Pub. L. 110–246, §4115(c)(2)(H). See 2008 Amendment note below.

Par. (32)(A). Pub. L. 113–183, §301(c)(2)(A), inserted ", a foreign treaty country," after "a foreign reciprocating country".

Par. (32)(C). Pub. L. 113–183, §301(c)(2)(B), substituted ", foreign treaty country, or foreign individual" for "or foreign obligee".

**2008**-Pars. (4)(A)(i)(IV), (6)(B)(i). Pub. L. 110–246, §4002(b)(1)(B), (2)(V), made technical amendment to references in original act which appear in text as references to sections 2015(l)(1) and 2015 of title 7.

Par. (29)(A), (D), (E). Pub. L. 110–246, §4115(c)(2)(H), as amended by Pub. L. 113–79, §4030(v), substituted "section 2012(l)" for "section 2012(h)" wherever appearing.

Pub. L. 110–246, §4002(b)(1)(A), (B), (2)(V), substituted "supplemental nutrition assistance program" for "food stamp program" wherever appearing and made technical amendment to references in original act which appear in text as references to sections 2012(h) and 2015(l)(2) of title 7.

**2006**-Par. (6)(B). Pub. L. 109–171, §7310(a), designated existing provisions as cl. (i), redesignated former cls. (i) and (ii) as subcls. (I) and (II), respectively, of cl. (i), and added cl. (ii).

Par. (31). Pub. L. 109–171, §7303(b), substituted "$2,500" for "$5,000" in introductory provisions.

Par. (34). Pub. L. 109–171, §7301(b)(1)(C), added par. (34).

**1999**-Par. (6)(E)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (9)(A) to (C). Pub. L. 106–169, §401(g)(2), substituted semicolon for comma at end.

Par. (19)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (19)(B)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (24)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (24)(B). Pub. L. 106–169, §401(h), made technical amendment to reference in original act which appears in text as reference to August 22, 1996.

**1997**-Par. (4)(A)(i)(IV). Pub. L. 105–33, §5548(a), added subcl. (IV).

Par. (6)(B). Pub. L. 105–33, §5531(a), substituted "an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section

2015 of title 7, and" for "individuals not receiving assistance under any State program funded under part A, which".

Par. (8). Pub. L. 105–33, §5552(1)(D), inserted concluding provisions.

Pub. L. 105–33, §5552(1)(A), in introductory provisions, inserted ", for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title" after "provide that" and struck out "noncustodial" before "parents".

Par. (8)(A). Pub. L. 105–33, §5552(1)(B), substituted "records; and" for "records, and".

Par. (8)(B). Pub. L. 105–33, §5552(1)(C), substituted "title," for "title;".

Par. (16). Pub. L. 105–33, §5556(b), made technical amendment to directory language of Pub. L. 104–193, §344(a)(1)(F). See 1996 Amendment note below.

Par. (17). Pub. L. 105–33, §5552(2), substituted "provide that the State will have" for "in the case of a State which has" and inserted "and" after "section 653 of this title,".

Par. (19)(B)(ii). Pub. L. 105–33, §5542(c), substituted "section 659(i)(5)" for "section 662(e)".

Par. (26). Pub. L. 105–33, §5552(3)(A), struck out "will" before "have in effect" in introductory provisions.

Par. (26)(A). Pub. L. 105–33, §5552(3)(B), inserted ", modify," after "or to establish" and ", or to make or enforce a child custody determination" after "support".

Par. (26)(B). Pub. L. 105–33, §5552(3)(C)(i), (ii), inserted "or the child" after "1 party" and after "former party".

Par. (26)(C). Pub. L. 105–33, §5552(3)(D), inserted "or the child" after "1 party", substituted "another person" for "another party", inserted "to that person" after "release of the information", and substituted "party or the child" for "former party".

Par. (26)(D), (E). Pub. L. 105–33, §5552(3)(C)(iii), (E), added subpars. (D) and (E).

Par. (29)(A). Pub. L. 105–33, §5548(b)(1)(B), substituted cls. (i) and (ii) for

"(i) shall be defined, taking into account the best interests of the child, and

"(ii) shall be applied in each case,

by, at the option of the State, the State agency administering the State program under part A of this subchapter, this part, or subchapter XIX;".

Pub. L. 105–33, §5548(b)(1)(A), in introductory provisions, substituted "part A, the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7," for "part A of this subchapter or the State program under subchapter XIX".

Par. (29)(D). Pub. L. 105–33, §5548(b)(2), substituted "the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7" for "or the State program under subchapter XIX".

Par. (29)(E). Pub. L. 105–33, §5548(b)(3), substituted "individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the food stamp program, as defined under section 2012(h) of title 7," for "individual, the State agency administering the State program funded under part A, and the State agency administering the State program under subchapter XIX,".

Par. (32)(A). Pub. L. 105–33, §5545, substituted "section 659a(d)" for "section 659a(d)(2)".

Par. (33). Pub. L. 105–33, §5546(a), substituted "or enforce support orders, or" for "and enforce support orders, and", "guidelines established or adopted by such tribe or organization"

for "guidelines established by such tribe or organization", "all collections" for "all funding collected", and "such collections" for "such funding".

**1996**-Pub. L. 104–193, §375(a)(4), inserted at end of closing provisions "Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25."

Par. (4). Pub. L. 104–193, §301(a)(1), amended par. (4) generally. Prior to amendment, par. (4) read as follows: "provide that such State will undertake-

"(A) in the case of a child born out of wedlock with respect to whom an assignment under section 602(a)(26) of this title or section 1396k of this title is effective, to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so, or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and

"(B) in the case of any child with respect to whom such assignment is effective, including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter, to secure support for such child from his parent (or from any other person legally liable for such support), and from such parent for his spouse (or former spouse) receiving aid to families with dependent children or medical assistance under a State plan approved under subchapter XIX of this chapter (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan), utilizing any reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A or E of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so), except that when such arrangements and other means have proven ineffective, the State may utilize the Federal courts to obtain or enforce court orders for support;".

Par. (5)(A). Pub. L. 104–193, §108(c)(11), substituted "pursuant to section 608(a)(3) of this title" for "under section 602(a)(26) of this title" and "payments collected," for "payments collected; except that this paragraph shall not apply to such payments for any month following the first month in which the amount collected is sufficient to make such family ineligible for assistance under the State plan approved under part A of this subchapter;".

Par. (6). Pub. L. 104–193, §301(a)(2)(A), substituted "provide that-" for "provide that" in introductory provisions.

Par. (6)(A). Pub. L. 104–193, §301(a)(2)(B), added subpar. (A) and struck out former subpar. (A) which read as follows: "the child support collection or paternity determination services established under the plan shall be made available to any individual not otherwise eligible for such services upon application filed by such individual with the State, including support collection services for the spouse (or former spouse) with whom the absent parent's child is living (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan),".

Par. (6)(B). Pub. L. 104–193, §301(a)(2)(C), (D), inserted "on individuals not receiving assistance under any State program funded under part A" after "such services shall be imposed", realigned margins, and substituted semicolon for comma at end.

Par. (6)(C). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma at end.

Par. (6)(D). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma before "and" at end.

Pub. L. 104–193, §108(c)(12), substituted "assistance under a State program funded" for "aid under a State plan approved".

Par. (6)(E). Pub. L. 104–193, §301(a)(2)(D)(i), (E), realigned margins.

Pub. L. 104–193, §301(a)(2)(D)(ii), which directed substitution of a semicolon for the final comma, could not be executed because subpar. (E) already ended in a semicolon and not a comma.

Par. (7). Pub. L. 104–193, §375(c), inserted "and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25)" after "law enforcement officials".

Par. (8). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial" for "absent" in introductory provisions.

Par. (8)(B). Pub. L. 104–193, §316(g)(1)(A), amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: "the Parent Locator Service in the Department of Health and Human Services;".

Par. (9)(B), (C). Pub. L. 104–193, §395(d)(2)(B), substituted "a noncustodial parent" for "an absent parent".

Par. (9)(E). Pub. L. 104–193, §324(b), added subpar. (E).

Par. (11). Pub. L. 104–193, §302(b)(2), designated existing provisions as subpar. (A), inserted "and" after semicolon at end, and redesignated par. (12) as subpar. (B).

Par. (12). Pub. L. 104–193, §304(a), added par. (12). Former par. (12) redesignated (11)(B).

Pub. L. 104–193, §302(b)(2)(B), redesignated par. (12) as (11)(B).

Par. (13). Pub. L. 104–193, §§316(g)(1)(B), 395(d)(1)(D), substituted "noncustodial parents" for "absent parents" and inserted before semicolon at end "and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan".

Par. (14). Pub. L. 104–193, §342(a)(1), (2), designated existing provisions as subpar. (A) and redesignated par. (15) as subpar. (B).

Par. (15). Pub. L. 104–193, §342(a)(3), added par. (15). Former par. (15) redesignated (14)(B).

Pub. L. 104–193, §342(a)(2), redesignated par. (15) as (14)(B).

Par. (16). Pub. L. 104–193, §344(a)(1), as amended by Pub. L. 105–33, §5556(b), struck out ", at the option of the State," before "for the establishment", inserted "and operation by the State agency" after "for the establishment" and "meeting the requirements of section 654a of this title" after "information retrieval system", substituted "so as to control" for "in the State and localities thereof, so as (A) to control", struck out "(i)" before "all the factors in the support enforcement collection", and struck out before semicolon at end "(including, but not limited to, (I) identifiable correlation factors (such as social security numbers, names, dates of birth, home addresses and mailing addresses (including postal ZIP codes) of any individual with respect to whom support obligations are sought to be established or enforced and with respect to any person to whom such support obligations are owing) to assure sufficient compatibility among the systems of different jurisdictions to permit periodic screening to determine whether such

individual is paying or is obligated to pay support in more than one jurisdiction, (II) checking of records of such individuals on a periodic basis with Federal, intra- and inter-State, and local agencies, (III) maintaining the data necessary to meet the Federal reporting requirements on a timely basis, and (IV) delinquency and enforcement activities), (ii) the collection and distribution of support payments (both intra- and inter-State), the determination, collection, and distribution of incentive payments both inter- and intra-State, and the maintenance of accounts receivable on all amounts owed, collected and distributed, and (iii) the costs of all services rendered, either directly or by interfacing with State financial management and expenditure information, (B) to provide interface with records of the State's aid to families with dependent children program in order to determine if a collection of a support payment causes a change affecting eligibility for or the amount of aid under such program, (C) to provide for security against unauthorized access to, or use of, the data in such system, (D) to facilitate the development and improvement of the income withholding and other procedures required under section 666(a) of this title through the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur, and (E) to provide management information on all cases under the State plan from initial referral or application through collection and enforcement".

Par. (21)(A). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent".

Par. (23). Pub. L. 104–193, §332, inserted "and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate" before semicolon.

Par. (24). Pub. L. 104–193, §344(a)(4), amended par. (24) generally. Prior to amendment, par. (24) read as follows: "provide that if the State, as of October 13, 1988, does not have in effect an automated data processing and information retrieval system meeting all of the requirements of paragraph (16), the State-

"(A) will submit to the Secretary by October 1, 1991, for review and approval by the Secretary within 9 months after submittal an advance automated data processing planning document of the type referred to in such paragraph; and

"(B) will have in effect by October 1, 1997, an operational automated data processing and information retrieval system, meeting all the requirements of that paragraph, which has been approved by the Secretary;".

Par. (25). Pub. L. 104–193, §301(b), added par. (25).

Par. (26). Pub. L. 104–193, §303(a), added par. (26).

Par. (27). Pub. L. 104–193, §312(a), added par. (27).

Par. (28). Pub. L. 104–193, §313(a), added par. (28).

Par. (29). Pub. L. 104–193, §333, added par. (29).

Par. (30). Pub. L. 104–193, §343(b), added par. (30).

Par. (31). Pub. L. 104–193, §370(a)(2), added par. (31).

Par. (32). Pub. L. 104–193, §371(b), added par. (32).

Par. (33). Pub. L. 104–193, §375(a)(1)–(3), added par. (33).

**1995**-Par. (24)(B). Pub. L. 104–35 substituted "1997" for "1995".

**1988**-Par. (5)(A). Pub. L. 100–485, §104(a), substituted "on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden)" for "at least

annually".

Par. (6)(D), (E). Pub. L. 100–485, §111(c), added cl. (D) and redesignated former cl. (D) as (E).

Par. (16). Pub. L. 100–485, §123(d), substituted "advance automated" for "advance automatic" in introductory provisions.

Pub. L. 100–485, §123(a)(2), substituted "a statewide automated" for "an automatic".

Par. (24). Pub. L. 100–485, §123(a)(1), added par. (24).

**1987**-Par. (4)(A). Pub. L. 100–203, §9142(a)(1)(A), (B), substituted "an assignment under section 602(a)(26) of this title or section 1396k of this title" for "an assignment under section 602(a)(26) of this title" and ", or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and" for ", and".

Par. (4)(B). Pub. L. 100–203, §9142(a)(1)(C), inserted "or medical assistance under a State plan approved under subchapter XIX of this chapter" after "children".

Par. (5). Pub. L. 100–203, §9142(a)(2), substituted "provide that (A)" for "provide that," and added cl. (B).

Pub. L. 100–203, §9141(a)(2), struck out "(except as provided in section 657(c) of this title)" after "apply to such payments".

**1984**-Par. (4)(B). Pub. L. 98–378, §11(b)(1), inserted "including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter," after "such assignment is effective," and inserted "or E" after "part A".

Par. (4)(B). Pub. L. 98–378, §12(a), substituted ", and" for "and, at the option of the State," before "from such parent" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (5). Pub. L. 98–378, §3(e), inserted ", and the individual will be notified at least annually of the amount of the support payments collected;".

Par. (6)(A). Pub. L. 98–378, §12(b), struck out ", at the option of the State," before "support collection services" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (6)(B). Pub. L. 98–378, §3(c), substituted "shall be imposed, which shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (i) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (ii) may vary among such individuals on the basis of ability to pay (as determined by the State), and" for "may be imposed, except that the amount of any such application fee shall be reasonable, as determined under regulations of the Secretary,".

Par. (6)(C). Pub. L. 98–378, §21(d)(1), (3), added cl. (C). Former cl. (C) redesignated (D).

Par. (6)(D). Pub. L. 98–378, §21(d)(1), (2), redesignated former cl. (C) as (D) and substituted "fees" for "fee" before "so imposed".

Par. (8)(B). Pub. L. 98–369, §2663(j)(2)(B)(x), substituted "Health and Human Services" for "Health, Education, and Welfare".

Par. (9)(C). Pub. L. 98–369, §2663(c)(14)(A), struck out "of such parent" before "with respect to whom aid".

Par. (16)(A)(ii). Pub. L. 98–369, §2663(c)(14)(B), substituted "collection, and distribution" for "collection and distribution," before "of incentive payments".

Par. (16)(D), (E). Pub. L. 98–378, §6(a), added cl. (D) and redesignated former cl. (D) as (E).

Par. (17). Pub. L. 98–378, §2663(c)(14)(C), realigned margin, substituted "provide that the State will accept" for "to accept", "will impose" for "and to impose", "will transmit" for "to transmit", and "will otherwise comply" for ", otherwise to comply".

Par. (20). Pub. L. 98–378, §3(a), added par. (20).

Par. (21). Pub. L. 98–378, §3(d), added par. (21).

Par. (22). Pub. L. 98–378, §5(b), added par. (22).

Par. (23). Pub. L. 98–378, §14(a), added par. (23).

Pub. L. 98–378, §3(f), inserted after numbered paragraphs provision that the State may allow the jurisdiction which makes the collection involved to retain any application fee under par. (6)(B) or any late payment fee under par. (21).

**1982**-Par. (5). Pub. L. 97–248, §173(a), inserted "following the first month" after "for any month".

Par. (6). Pub. L. 97–248, §171(a), in cl. (A) inserted provisions relating to inclusion of, at the option of the State, support collection services for the spouse or former spouse, in cl. (B) substituted "such services" for "services under the State plan (other than collection of support)", and in cl. (C) substituted provisions relating to collection of any costs in excess of the fee imposed, for provisions relating to the State retaining any fee imposed under State law as required under former par. (19).

Pars. (18) to (20). Pub. L. 97–248, §171(b)(1), inserted "and" at end of par. (18), struck out par. (19) relating to imposition of a fee on an individual who owes child or spousal support obligation, and redesignated par. (20) as (19).

**1981**-Pub. L. 97–35, §2332(d)(2), substituted in provision preceding par. (1) "child and spousal support" for "child support".

Par. (4)(B). Pub. L. 97–35, §2332(d)(3), substituted "such support) and, at the option of the State, from such parent for his spouse (or former spouse) receiving aid to families with dependent children (but only if a support obligation has been established with respect to such spouse), utilizing" for "such support), utilizing".

Par. (5). Pub. L. 97–35, §2332(d)(4), substituted "support payments" for "child support payments" and "collected for an individual" for "collected for a child".

Par. (6)(B). Pub. L. 97–35, §2333(a)(1), substituted "services under the State plan (other than collection of support)" for "such services".

Par. (6)(C). Pub. L. 97–35, §2333(a)(2), substituted "the State will retain, but only if it is the State which makes the collection, the fee imposed under State law as required under paragraph (19)" for "any costs in excess of the fee so imposed may be collected from such individual by deducting such costs from the amount of any recovery made".

Par. (9)(C). Pub. L. 97–35, §2332(d)(5), substituted "of the child or children or the parent of such child or children" for "of a child or children".

Par. (11). Pub. L. 97–35, §2332(d)(6), substituted "collected as support" for "collected as child support".

Par. (16). Pub. L. 97–35, §2332(d)(7), substituted "support enforcement" for "child support enforcement", "whom support obligations" for "whom child support obligations", and "obligated to pay support" for "obligated to pay child support".

Par. (18). Pub. L. 97–35, §2331(b), added par. (18).

Par. (19). Pub. L. 97–35, §2333(b), added par. (19).

Par. (20). Pub. L. 97–35, §2335(a), added par. (20).

**1980**-Par. (16). Pub. L. 96–265 added par. (16).

Par. (17). Pub. L. 96–611 added par. (17).

**1977**-Pars. (14), (15). Pub. L. 95–30 added pars. (14) and (15).

**1975**-Par. (4)(A). Pub. L. 94–88, §208(b), substituted "to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so" for "to establish the paternity of such child".

Par. (4)(B). Pub. L. 94–88, §208(c), substituted "reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so)" for "reciprocal arrangements adopted with other States".

### Statutory Notes and Related Subsidiaries

### Effective Date of 2018 Amendment

Pub. L. 115–123, div. E, title XII, §53117(b), Feb. 9, 2018, 132 Stat. 307 , provided that:

"(1) In general.-The amendments made by subsection (a) [amending this section] shall take effect on the 1st day of the 1st fiscal year that begins on or after the date of the enactment of this Act [Feb. 9, 2018], and shall apply to payments under part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) for calendar quarters beginning on or after such 1st day.

"(2) Delay permitted if state legislation required.-If the Secretary of Health and Human Services determines that State legislation (other than legislation appropriating funds) is required in order for a State plan developed pursuant to part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) to meet the requirements imposed by the amendment made by subsection (a), the plan shall not be regarded as failing to meet such requirements before the 1st day of the 1st calendar quarter beginning after the first regular session of the State legislature that begins after the date of the enactment of this Act. For purposes of the preceding sentence, if the State has a 2-year legislative session, each year of the session is deemed to be a separate regular session of the State legislature."

### Effective Date of 2008 Amendment

Amendment of this section and repeal of Pub. L. 110–234 by Pub. L. 110–246 effective May 22, 2008, the date of enactment of Pub. L. 110–234, except as otherwise provided, see section 4 of Pub. L. 110–246, set out as an Effective Date note under section 8701 of Title 7, Agriculture.

Amendment by sections 4002(b)(1)(A), (B), (2)(V), and 4115(c)(2)(H) of Pub. L. 110–246 effective Oct. 1, 2008, see section 4407 of Pub. L. 110–246, set out as a note under section 1161 of Title 2, The Congress.

### Effective Date of 2006 Amendment

Amendment by section 7301(b)(1)(C) of Pub. L. 109–171 effective Oct. 1, 2009, and applicable to payments under parts A and D of this subchapter for calendar quarters beginning on or after such date, subject to certain State options, see section 7301(e) of Pub. L. 109–171, set out as a note under section 608 of this title.

Amendment by section 7303(b) of Pub. L. 109–171 effective Oct. 1, 2006, see section 7303(c) of Pub. L. 109–171, set out as a note under section 652 of this title.

Pub. L. 109–171, title VII, §7310(c), Feb. 8, 2006, 120 Stat. 148 , provided that: "The amendments made by this section [amending this section and section 657 of this title] shall take effect on October 1, 2006."

### Effective Date of 1999 Amendment

Amendment by Pub. L. 106–169 effective as if included in the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 401(q) of Pub. L. 106–169, set out as a note under section 602 of this title.

### Effective Date of 1997 Amendment

Amendment by Pub. L. 105–33 effective as if included in the enactment of title III of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 5557 of Pub. L. 105–33, set out as a note under section 608 of this title.

### Effective Date of 1996 Amendment

Amendment by section 108(c)(11), (12) of Pub. L. 104–193 effective July 1, 1997, with transition rules relating to State options to accelerate such date, rules relating to claims, actions, and proceedings commenced before such date, rules relating to closing out of accounts for terminated or substantially modified programs and continuance in office of Assistant Secretary for Family Support, and provisions relating to termination of entitlement under AFDC program, see section 116 of Pub. L. 104–193, as amended, set out as an Effective Date note under section 601 of this title.

Amendment by section 302(b)(2) of Pub. L. 104–193 effective Aug. 22, 1996, see section 302(c)(2) of Pub. L. 104–193, set out as a note under section 657 of this title.

Pub. L. 104–193, title III, §303(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Pub. L. 104–193, title III, §304(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Amendment by section 312(a) of Pub. L. 104–193 effective Oct. 1, 1998, with limited exception for States which, as of Aug. 22, 1996, were processing the receipt of child support payments through local courts, see section 312(d) of Pub. L. 104–193, set out as an Effective Date note under section 654b of this title.

Amendment by section 342(a) of Pub. L. 104–193 effective with respect to calendar quarters beginning 12 months or more after Aug. 22, 1996, see section 342(c) of Pub. L. 104–193, set out as a note under section 652 of this title.

Amendment by section 370(a)(2) of Pub. L. 104–193 effective Oct. 1, 1997, see section 370(b) of Pub. L. 104–193, set out as a note under section 652 of this title.

Pub. L. 104–193, title III, §395(a)–(c), Aug. 22, 1996, 110 Stat. 2259 , provided that:

"(a) In General.-Except as otherwise specifically provided (but subject to subsections (b) and (c))-

"(1) the provisions of this title [see Tables for classification] requiring the enactment or amendment of State laws under section 466 of the Social Security Act [42 U.S.C. 666], or revision of State plans under section 454 of such Act [this section], shall be effective with

respect to periods beginning on and after October 1, 1996; and

"(2) all other provisions of this title shall become effective upon the date of the enactment of this Act [Aug. 22, 1996].

"(b) Grace Period for State Law Changes.-The provisions of this title shall become effective with respect to a State on the later of-

"(1) the date specified in this title, or

"(2) the effective date of laws enacted by the legislature of such State implementing such provisions,

but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2-year legislative session, each year of such session shall be deemed to be a separate regular session of the State legislature.

"(c) Grace Period for State Constitutional Amendment.-A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of-

"(1) 1 year after the effective date of the necessary State constitutional amendment; or

"(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]."

### Effective Date of 1988 Amendment

Pub. L. 100–485, title I, §104(b), Oct. 13, 1988, 102 Stat. 2348 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on the first day of the first calendar quarter which begins 4 or more years after the date of the enactment of this Act [Oct. 13, 1988]."

Pub. L. 100–485, title I, §111(f)(2), Oct. 13, 1988, 102 Stat. 2350 , provided that: "The amendments made by subsections (b) and (c) [amending this section and section 666 of this title] shall become effective on the first day of the first month beginning one year or more after the date of the enactment of this Act [Oct. 13, 1988]."

### Effective Date of 1987 Amendment

Pub. L. 100–203, title IX, §9141(b), Dec. 22, 1987, 101 Stat. 1330–321 , provided that: "The amendments made by subsection (a) [amending this section and section 657 of this title] shall become effective upon enactment [Dec. 22, 1987]."

Pub. L. 100–203, title IX, §9142(b), Dec. 22, 1987, 101 Stat. 1330–322 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective on July 1, 1988."

### Effective Date of 1984 Amendment

Pub. L. 98–378, §3(g), Aug. 16, 1984, 98 Stat. 1311 , provided that:

"(1) Except as provided in paragraphs (2) and (3), the amendments made by this section [enacting section 666 of this title and amending this section] shall become effective on October 1, 1985.

"(2) Section 454(21) of the Social Security Act [42 U.S.C. 654(21)] (as added by subsection (d) of this section), and section 466(e) of such Act [42 U.S.C. 666(e)] (as added by subsection (b) of this section), shall be effective with respect to support owed for any month beginning after the date of the enactment of this Act [Aug. 16, 1984].

"(3) In the case of a State with respect to which the Secretary of Health and Human Services

has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this section, the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the beginning of the fourth month beginning after the end of the first session of the State legislature which ends on or after October 1, 1985. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

Pub. L. 98–378, §5(c)(1), Aug. 16, 1984, 98 Stat. 1314 , provided that: "The amendments made by the preceding provisions of this section [amending this section and section 658 of this title] shall become effective on October 1, 1985."

Pub. L. 98–378, §6(c), Aug. 16, 1984, 98 Stat. 1315 , provided that: "The amendments made by this section [amending this section and section 655 of this title] shall apply with respect to quarters beginning on or after October 1, 1984."

Pub. L. 98–378, §11(e), Aug. 16, 1984, 98 Stat. 1318 , provided that: "The amendments made by this section [amending this section and sections 656, 657, 664, and 671 of this title] shall become effective October 1, 1984, and shall apply to collections made on or after that date."

Pub. L. 98–378, §12(c), Aug. 16, 1984, 98 Stat. 1319 , provided that: "The amendments made by this section [amending this section] shall become effective October 1, 1985."

Pub. L. 98–378, §14(b), Aug. 16, 1984, 98 Stat. 1320 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective October 1, 1985."

Amendment by section 21(d) of Pub. L. 98–378 applicable with respect to refunds payable under section 6402 of Title 26, Internal Revenue Code, after Dec. 31, 1985, see section 21(g) of Pub. L. 98–378, set out as a note under section 6103 of Title 26.

Amendment by Pub. L. 98–369 effective July 18, 1984, but not to be construed as changing or affecting any right, liability, status, or interpretation which existed (under the provisions of law involved) before that date, see section 2664(b) of Pub. L. 98–369, set out as a note under section 401 of this title.

### Effective Date of 1982 Amendment

Amendment by section 171(a), (b)(1) of Pub. L. 97–248 effective on and after Aug. 13, 1981, see section 171(c) of Pub. L. 97–248, set out as a note under section 503 of this title.

Pub. L. 97–248, title I, §173(b), Sept. 3, 1982, 96 Stat. 403 , provided that: "The amendment made by this section [amending this section] shall become effective on October 1, 1982."

### Effective Date of 1981 Amendment

Amendments by sections 2331(b), 2332(d)(2)–(7), and 2333(a), (b) of Pub. L. 97–35 effective Oct. 1, 1981, except as otherwise specifically provided, see section 2336 of Pub. L. 97–35, set out as a note under section 651 of this title.

Amendment by section 2335(a) of Pub. L. 97–35 effective Aug. 13, 1981, except that such amendment shall not be requirements under this section or section 503 of this title before Oct. 1, 1982, see section 2335(c) of Pub. L. 97–35, set out as a note under section 503 of this title.

### Effective Date of 1980 Amendment

Amendment by Pub. L. 96–265 effective July 1, 1981, and to be effective only with respect to expenditures, referred to in section 655(a)(3) of this title, made on or after such date, see section 405(e) of Pub. L. 96–265, set out as a note under section 652 of this title.

## Effective Date of 1977 Amendment

Pub. L. 95–30, title V, §502(b), May 23, 1977, 91 Stat. 162 , provided that: "The amendments made by this section [amending this section] shall take effect on the first day of the first calendar month which begins after the date of enactment of this Act [May 23, 1977]."

## Effective Date of 1975 Amendment

Pub. L. 94–88, title II, §210, Aug. 9, 1975, 89 Stat. 437 , provided that: "The amendments made by this title [amending this section and sections 602, 603, and 655 of this title and enacting provisions set out as notes under sections 602 and 655 of this title] shall, unless otherwise specified therein, become effective August 1, 1975."

## Exception to General Effective Date for State Plans Requiring State Law Amendments

Pub. L. 109–171, title VII, §7311, Feb. 8, 2006, 120 Stat. 148 , provided that: "In the case of a State plan under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] which the Secretary determines requires State legislation in order for the plan to meet the additional requirements imposed by the amendments made by this subtitle [subtitle C (§§7301–7311) of title VII of Pub. L. 109–171, amending this section, sections 608, 652, 653, 655, 657, 664, and 666 of this title, section 6402 of Title 26, Internal Revenue Code, and provisions set out as a note under section 1169 of Title 29, Labor], the effective date of the amendments imposing the additional requirements shall be 3 months after the first day of the first calendar quarter beginning after the close of the first regular session of the State legislature that begins after the date of the enactment of this Act [Feb. 8, 2006]. For purposes of the preceding sentence, in the case of a State that has a 2-year legislative session, each year of the session shall be considered to be a separate regular session of the State legislature."

## State Commissions on Child Support

Pub. L. 98–378, §15, Aug. 16, 1984, 98 Stat. 1320 , provided that:

"(a) As a condition of the State's eligibility for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] for quarters beginning more than 30 days after the date of the enactment of this Act [Aug. 16, 1984] and ending prior to October 1, 1985, the Governor of each State, on or before December 1, 1984, shall (subject to subsection (f)) appoint a State Commission on Child Support.

"(b) Each State Commission appointed under subsection (a) shall be composed of members appropriately representing all aspects of the child support system, including custodial and non-custodial parents, the agency or organizational unit administering the State's plan under part D of such title IV [42 U.S.C. 651 et seq.], the State judiciary, the executive and legislative branches of the State government, child welfare and social services agencies, and others.

"(c) It shall be the function of each State Commission to examine, investigate, and study the operation of the State's child support system for the primary purpose of determining the extent to which such system has been successful in securing support and parental involvement both for children who are eligible for aid under a State plan approved under part A of title IV of such Act [42 U.S.C. 601 et seq.] and for children who are not eligible for such aid, giving particular attention to such specific problems (among others) as visitation, the establishment of appropriate objective standards for support, the enforcement of interstate obligations, the availability, cost, and effectiveness of services both to children who are eligible for such aid and to children who are not, and the need for additional State or Federal legislation to obtain

support for all children.

"(d) Each State Commission shall submit to the Governor of the State and make available to the public, no later than October 1, 1985, a full and complete report of its findings and recommendations resulting from the examination, investigation, and study under this section. The Governor shall transmit such report to the Secretary of Health and Human Services along with the Governor's comments thereon.

"(e) None of the costs incurred in the establishment and operation of a State Commission under this section, or incurred by such a Commission in carrying out its functions under subsections (c) and (d), shall be considered as expenditures qualifying for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] or be otherwise payable or reimbursable by the United States or any agency thereof.

"(f) If the Secretary determines, at the request of any State on the basis of information submitted by the State and such other information as may be available to the Secretary, that such State-

"(1) has placed in effect and is implementing objective standards for the determination and enforcement of child support obligations,

"(2) has established within the five years prior to the enactment of this Act [Aug. 16, 1984] a commission or council with substantially the same functions as the State Commissions provided for under this section, or

"(3) is making satisfactory progress toward fully effective child support enforcement and will continue to do so,

then such State shall not be required to establish a State Commission under this section and the preceding provisions of this section shall not apply."

### DELAYED EFFECTIVE DATE IN CASES REQUIRING STATE LEGISLATION

Pub. L. 97–248, title I, §176, Sept. 3, 1982, 96 Stat. 403 , provided that: "In the case of a State with respect to which the Secretary of Health and Human Services has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this subtitle [subtitle E (§§171–176) of title I of Pub. L. 97–248, see Tables for classification], the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the end of the first session of the State legislature which begins after October 1, 1982, or which began prior to October 1, 1982, and remained in session for at least twenty-five calendar days after such date. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

[1] See References in Text note below.

# Title 15
# Domestic Relations

## Chapter 5
## Divorce and Separation

### R.I. Gen. Laws § 15-5-16.5

**§ 15-5-16.5. Interest on arrearages.**

Interest at the rate of twelve percent (12%) per annum on any support debt due or owing, child or spousal support, shall be assessed unless the responsible party shall, for good cause shown, be relieved of the obligation to pay interest by the family court.

History of Section.
P.L. 1980, ch. 308, § 1; P.L. 1984, ch. 167, § 1; P.L. 2001, ch. 155, § 1.

Case Number: PC-2016-1234   Document: 1113129227   Page: 510   Date Filed: 09/26/2024   Entry ID: 666245490
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22    11:28           C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY                U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (██████████████████████
████████████████████████████████). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:           SEGUIN       MARY        CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK    GERO    K   PNL:
```

Case Number K2007032116
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

```
12/13/22    11:20        C A S E   T R A C K I N G         CSCL   ASMXA201
            TRAC.00           CASE HISTORY                 U024   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED_____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES____

RL: 80  12 22 ABSP:          SEGUIN        MARY           CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK     GERO     K     PNL:
```

Case Number: 123-1999
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

Document: 00111312993257    Page: 512    Date Filed: 09/25/2024    Entry ID: 6668268986

11:29:01 Tuesday, December 13, 2022

12/13/22    11:29        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
     FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
     FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: 80  12 22 ABSP:              SEGUIN      MARY         CMD:
FWX: TRAC  D CLIENT:             MEYERSIEK   GERO    X    PNL:

Case Number: 223-18872A Document: 001118139000237 Page: 513 Date Filed: 09/05/2024 Entry ID: 6668789
Filed in Providence/Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria G.

11:29:55 Tuesday, December 13, 2022

| 12/13/22 | 11:29 | C A S E   T R A C K I N G | CSCL | ASMXA201 |
|---|---|---|---|---|

TRAC.00                     CASE HISTORY                U824   PROD

**STARTING DATE**   09 01 2021
**SELECTION**   COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

| RL: 80  12 22 ABSP: | SEGUIN | MARY | | CMD: _____ |
|---|---|---|---|---|
| FNX: TRAC  D CLIENT: | MEYERSIEK | GERO | K | PNL: |

ed in Providence/Bristol County Family Court
ibmitted 6/1/2023 10.13 PM
ivelope: 4132704
viewer: Maria O.
11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G      CSCL  ASMXA201
           TRAC.00            CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR. RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
      TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
      58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:           SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK   GERO    K    PNL:
```

Case Number: 23901XXXX    Document: 0001118312882537    Page: 305    Date Filed: 09/25/2024    Entry ID: 6662459B
Filed in Providence/Bristol County Family Court
Submitted: 5/1/2023 10:13 PM
Envelope 4132704
Reviewer: Maya

11:29:09 Tuesday, December 13, 2022

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
      TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
      58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

RL: 80  12 22 ABSP:                  SEGUIN        MARY           CMD: _____
FNX: TRAC  D CLIENT:                 MEYERSIEK     GERO      K    PNL:

Case Number: K20210520M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

```
12/13/22   11:28         C A S E    T R A C K I N G      CSCL  ASMXA201
           TRAC.00              CASE HISTORY             UB24  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

RL: 80  12 22 ABSP:              SEGUIN      MARY       CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK   GERO    K  PNL:
```

d in Providence/Bristol County Family Court
bmitted: 6/1/2023 10:13 PM
velope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00             CASE HISTORY              U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

```
RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:          SEGUIN       MARY          CMD: _____
                             MEYERSIEK     GERO     K    PNL:
```



12:38 PM Mon Dec 6

AA                         cseinfo.dhs.ri.gov

ADCB Internet Banking    Community Health Choice |...    Sign In - Community Healt...    Case Manager Portal | Offi...    RI OCSS Payment

RI.gov                                              R.I. Government Agencies | Privacy policy | Search RI.gov:

**State of Rhode Island**
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Dugan                                    Home  My Profile  Contact Us  Site Map  Log

**Menu**

▼ Case Information
  ► Last 5 Payments
  ► Last 13 Months
  Current Orders/ Past
  Due Balances
  ► Court Dates/
    Appointments
  ► Enforcement Actions
  ► PIN Lookup

Home > Current Orders and Past Due Balances

### Case Manager

## Current Orders / Past Due Balances

**Custodial Parent:** Gero K Meyersiek    **CSE ID:** 1689817

**Current Orders**

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

Note: Medical orders and medical arrears are not listed on this screen.

**Past Due Balances**

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |



State of Rhode Island
# Office of Child Support Services
DEPARTMENT OF HUMAN SERVICES

Home > Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek          CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|--------|--------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**No. 10-10**

# In the Supreme Court of the United States

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

*ON WRIT OF CERTIORARI
TO THE SUPREME COURT OF SOUTH CAROLINA*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING REVERSAL**

NEAL KUMAR KATYAL
  *Acting Solicitor General*
  *Counsel of Record*
TONY WEST
  *Assistant Attorney General*
LEONDRA R. KRUGER
  *Acting Deputy Solicitor*
  *General*
JOSEPH R. PALMORE
  *Assistant to the Solicitor*
  *General*
LEONARD SCHAITMAN
EDWARD HIMMELFARB
  *Attorneys*

SALLY A. HOWARD
  *Acting General Counsel*
ROBERT E. KEITH
  *Associate General Counsel*
LISETTE PEDRE MESTRE
  *Attorney*
  *Department of Health and*
  *Human Services*
  *Washington, D.C. 20201*

  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## QUESTIONS PRESENTED

1.  Whether the Court has jurisdiction to review the decision of the South Carolina Supreme Court.

2.  Whether due process requires that the State provide counsel, at its expense, to an indigent parent in a child-support proceeding, when the parent is subject to a civil-contempt order for non-payment that may lead to confinement.

(I)

**TABLE OF CONTENTS**

Page

Interest of the United States .............................. 1
Statement ............................................. 2
Summary of argument ................................ 10
Argument:
   I.   The Court has jurisdiction to review the decision of
      the South Carolina Supreme Court ............... 13
  II.  The absence of adequate procedures necessary
      to secure an accurate adjudication of civil
      contempt violated due process ................... 16
      A.  Confinement for civil contempt is
         permitted only when the contemnor is
         presently able to comply with the
         underlying order ......................... 16
      B.  The Family Court's procedures were
         inadequate to ensure an accurate
         determination of present ability to pay ........ 19
      C.  Due Process can be satisfied by a variety of
         procedures intended to assure an accurate
         determination of present ability to pay in a
         civil contempt proceeding ................... 23
         1.  Courts can comply with Due Process by
            providing a meaningful opportunity for an
            alleged contemnor to establish his present
            ability to pay ......................... 24
         2.  There is no basis for an inflexible right to
            counsel rule in civil contempt proceedings ... 25
Conclusion .......................................... 33

(III)

**TABLE OF AUTHORITIES**

Cases:

*Alvarez* v. *Smith*, 130 S. Ct. 576 (2009) . . . . . . . . . . . . . . . 15

*Blessing* v. *Freestone*, 520 U.S. 329 (1997) . . . . . . . . . . . . . 3

*Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886
    (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Carlson* v. *Landon*, 342 U.S. 524 (1952) . . . . . . . . . . . . . . 32

*City of L.A.* v. *Lyons*, 461 U.S. 95 (1983) . . . . . . . . . . 14, 15

*DeFunis* v. *Odegaard*, 416 U.S. 312 (1975) . . . . . . . . . . . . 14

*First Nat'l Bank* v. *Bellotti*, 435 U.S. 765 (1978) . . . . . . . . 14

*Foucha* v. *Louisiana*, 504 U.S. 71 (1992) . . . . . . . . . . . . . . 20

*Gagnon* v. *Scarpelli*, 411 U.S. 778
    (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25, 26, 27, 28, 29

*Gault, In re*, 387 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . 26

*Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418
    (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Hicks* v. *Feiock*, 485 U.S. 624 (1988) . . . . . . . . . . . . . . 17, 18

*Hodges* v. *Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000),
    aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied,
    540 U.S. 811 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*INS* v. *Lopez-Mendoza*, 468 U.S. 1032 (1984) . . . . . . . . . 32

*International Union, United Mine Workers* v.
    *Bagwell*, 512 U.S. 821 (1994) . . . . . . . . . . . . . . . . 18, 19, 26

*Landon* v. *Plasencia*, 459 U.S. 21 (1982) . . . . . . . . . . . . . . 31

*Lassiter* v. *Department of Soc. Servs.*, 452 U.S. 18
    (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189
    (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Maggio* v. *Zeitz*, 333 U.S. 56 (1948) . . . . . . . . . . . . . . . 17, 18

*Mathews* v. *Eldridge*, 424 U.S. 319
    (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19, 20, 25, 26, 29

V

Cases—Continued:                                                Page

*Middendorf* v. *Henry*, 425 U.S. 25 (1976) ..... 12, 26, 29, 31

*Mohammed* v. *Gonzales*, 400 F.3d 785 (9th Cir. 2005) ... 32

*Morrissey* v. *Brewer*, 408 U.S. 471 (1972) ........... 19, 26

*Moseley* v. *Mosier*, 306 S.E.2d 624 (S.C. 1983) ........ 17

*Murphy* v. *Hunt*, 455 U.S. 478 (1982) .............. 13, 14

*Nazakat* v. *INS*, 981 F.2d 1146 (10th Cir. 1992) ....... 33

*Olmstead* v. *L.C.*, 527 U.S. 581 (1999) ................ 15

*Shillitani* v. *United States*, 384 U.S. 364 (1966) ..... 11, 17

*Spencer* v. *Kemna*, 523 U.S. 1 (1998) .............. 13, 14

*United States* v. *Bauer*, 956 F.2d 693 (7th Cir.),
    cert. denied, 506 U.S. 882 (1992) ................... 28

*United States* v. *Campos-Asencio*, 822 F.2d 506
    (5th Cir. 1987) ................................... 33

*United States* v. *Gasca-Kraft*, 522 F.2d 149 (9th Cir.
    1975) ............................................ 32

*United States* v. *Rylander*, 460 U.S. 752 (1983) ........ 18

*United States* v. *Torres-Sanchez*, 68 F.3d 227 (8th Cir.
    1995) ............................................ 33

*United States Parole Comm'n* v. *Geraghty*,
    445 U.S. 388 (1980) .............................. 13

*Vitek* v. *Jones*, 445 U.S. 480 (1980) ............... 26, 27

*Walters* v. *National Ass'n of Radiation Survivors*,
    473 U.S. 305 (1985) ........................ 29, 30, 31

*Weinstein* v. *Bradford*, 423 U.S. 147 (1975) ........... 14

*Wilkinson* v. *Austin*, 545 U.S. 209 (2005) ............. 19

*Yee* v. *City of Escondido*, 503 U.S. 519 (1992) .......... 24

VI

Constitution, statutes and regulations:                    Page

U.S. Const.:

Amend. V (Due Process Clause) . . . . . . . . . . . . . . . . 9, 19

Amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 26, 27

Amend. XIV (Due Process Clause) . . . . . . . . . . . . . . 19

Social Services Amendments of 1974, Pub. L.
No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651
*et seq.*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

§ 101(c)(5)(C), 88 Stat. 2360 . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 654(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 654(6) (1976) . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 654(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 654(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. 654(24) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. 654a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 654a(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 654a(e)(4) . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 654a(e)(5) . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 654a(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 655(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. 655(a)(2)(C) . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. 655(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. 655(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 656(a)(1) (1976) . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 657(a)(4)(B) (1976) . . . . . . . . . . . . . . . . 3

42 U.S.C. 657(b) (1976) . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 666(a)(1)-(8) . . . . . . . . . . . . . . . . . . . . . . 4

Statutes and regulations—Continued:                                Page

    42 U.S.C. 666(a)(3)(A) ........................ 30

    42 U.S.C. 666(a)(7)(B)(i) ..................... 30

    42 U.S.C. 666(a)(8)(A)(iv) ................... 30

    42 U.S.C. 666(b) ............................. 4

    42 U.S.C. 666(c) ............................ 6

    42 U.S.C. 666(c)(1)(H) ....................... 30

Child Support Enforcement Amendments of 1984,
    Pub. L. No. 98-378,  98 Stat. 1329:

    § 6, 98 Stat. 1314 ............................ 4

    § 23(a)(2), 98 Stat. 1329 ..................... 4

    § 23(a)(5), 98 Stat. 1329 ..................... 4

Family Support Act of 1988, Pub. L. No. 100-485,
    102 Stat. 2343 ................................... 4

    § 123(a)(C), 102 Stat. 2352 ................... 5

Personal Responsibility and Work Opportunity
    Reconciliation Act of 1996, Pub. L. No. 104-193,
    110 Stat. 2105 ................................... 5

    § 344(a)(2), 110 Stat. 2235 ................... 6

Social Security Act Amendments of 1950, ch. 809,
    § 321(b), 64 Stat. 550 .......................... 2

Social Security Amendments of 1967, Pub. L.
    No. 90-248, § 201(a)(1), 81 Stat. 877-879 ............. 2

    § 201(a)(1), 81 Stat. 879 ..................... 3

8 U.S.C. 1229a(b)(4)(A) .......................... 32

8 U.S.C. 1362 ................................... 31

18 U.S.C. 3006A(b) ............................... 28

28 U.S.C. 1257(a) ............................... 13

42 U.S.C. 602(a)(26) (1976) ...................... 3

VIII

Statutes and regulations—Continued:                         Page

    42 U.S.C. 608(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7
    42 U.S.C. 608(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    45 C.F.R.:
        Section 302.70(a)(5)(iii) . . . . . . . . . . . . . . . . . . . . . . . . 30
        Section 303.5(g)(2)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Section 303.6 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        Section 303.6 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        Section 303.20(c)(7) (1975) . . . . . . . . . . . . . . . . . . . . . . 4
        Section 303.20(c)(7) (1989) . . . . . . . . . . . . . . . . . . . . . . 5
        Section 303.100(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Section 303.100(f)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Section 303.101(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Section 303.102(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Section 303.104(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Section 304.20(b)(3)(iv) . . . . . . . . . . . . . . . . . . . . . . . . 5
        Section 304.23(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        Section 304.23(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
    Sup. Ct. R. 14.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
    S.C. Rule of Family Ct.:
        R. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        R. 24(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        R. 24(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    S.C. Code Ann. (West):
        § 43-5-220(c) (Supp. 2009) . . . . . . . . . . . . . . . . . . . . . . 25
        § 43-5-235 (Supp. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 7
        § 63-3-620 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

IX

Miscellaneous:                                                Page

    52 Fed. Reg. 32,130 (1987) ......................... 31

    U.S. Dep't of Health & Human Servs.:

        National Child Support Enforcement, *Strategic
            Plan: FY 2005-2009*, http://www.acf.hhs.gov/
            programs/cse/pubs/2004/Strategic_Plan_
            FY2005-2009.pdf ...................... 21, 22, 23

        Office of Child Support Enforcement, *National
            Status of Automated Child Support Systems*,
            http://www.acf.hhs.gov/programs/
            cse/stsys/certmap.htm ......................... 6

    Elizabeth G. Patterson, *Civil Contempt & the
        Indigent Child Support Obligor: The Silent
        Return of Debtor's Prison*, 18 Cornell J.L. & Pub.
        Pol'y 95 (2008) ............................... 21, 22

    S. Rep. No. 387, 98th Cong., 2d Sess. (1984) .......... 30

    Elaine Sorensen et al., *Assessing Child Support
        Arrears in Nine Large States & the Nation* (2007)
        http://aspe.hhs.gov/hsp/07/assessing-CS-debt/
        report.pdf .................................. 22, 23

    South Carolina Dep't of Social Servs., *Response to
        Budget Proviso 13.27* (Aug. 31, 2007),
        http://www.scstatehouse.gov/reports/DSS/
        Provisoresponse1327_083107.doc .................. 6

# In the Supreme Court of the United States

---

No. 10-10

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

---

*ON WRIT OF CERTIORARI*
*TO THE SUPREME COURT OF SOUTH CAROLINA*

---

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**
**SUPPORTING REVERSAL**

---

## INTEREST OF THE UNITED STATES

This case concerns the due process protections that apply in a state civil contempt proceeding for non-payment of court-ordered child support. The state child-support enforcement program at issue in the case, like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 *et seq.*) (adding Title IV-D to the Social Security Act). The program, which is administered by the Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for 66% of the costs of operating their child-support enforcement programs. 42 U.S.C.

(1)

655(a)(2)(C). The United States has a substantial interest in the effective and equitable operation of such child-support programs.

## STATEMENT

1. This case involves proceedings in South Carolina family court to enforce a child-support order entered against petitioner for the support of his and respondent Rogers' minor child. South Carolina, like every other State, maintains a child-support enforcement program as a condition of receiving federal funding for its Temporary Assistance for Needy Families program. Since Congress first required States receiving federal funds to undertake child-support enforcement efforts, it has shifted its emphasis from a localized, court-based enforcement approach to centralized and automated efforts. South Carolina, however, maintains a localized, court-based approach to child-support enforcement.

a. Congress first required States receiving federal funds to establish child-support enforcement programs in 1950, pursuant to the Aid to Families with Dependent Children (AFDC) program. See Social Security Act Amendments of 1950, ch. 809, § 321(b), 64 Stat. 550 (requiring States receiving AFDC funds to "provide for prompt notice to appropriate law-enforcement officials of the furnishing of aid to dependent children in respect of a child who has been deserted or abandoned by a parent"). In 1968, Congress required States participating in AFDC to create statewide or local "organizational unit[s]" for establishing paternity and collecting child support. Social Security Amendments of 1967, Pub. L. No. 90-248, § 201(a)(1), 81 Stat. 877-879. It also required States to "provide for entering into cooperative arrangements with appropriate courts and law enforce-

ment officials * * * to assist" with administration of the program. *Id.* § 201(a)(1), 81 Stat. 879.

b. In 1975, Congress adopted Title IV-D, 42 U.S.C. 651 *et seq.*, and established the general statutory framework that exists today. See 1975 Act § 101(a), 88 Stat. 2351; *Blessing* v. *Freestone*, 520 U.S. 329, 333-335 (1997) (describing program). The 1975 Act required States participating in AFDC to "have in effect a plan approved" by the Secretary under Title IV-D and to "operate a child support program in conformity with such plan." 1975 Act § 101(c)(5)(C), 88 Stat. 2360. In particular, each State was required to provide services to locate noncustodial parents and to establish the paternity of, and secure support for, children receiving AFDC benefits. 42 U.S.C. 654(4).

Under the 1975 Act, AFDC recipients were required to assign their support rights to the State and cooperate in enforcement efforts. 42 U.S.C. 602(a)(26) (1976). Amounts recovered generally were retained by the State to reimburse it and the federal government for AFDC assistance provided to the child's family. 42 U.S.C. 657(b) (1976). Once assigned, the support obligation was owed to the State and was collectible under all applicable state processes. 42 U.S.C. 656(a)(1) (1976).[1]

The Secretary's regulations implementing the 1975 Act reflected a localized, court-centered approach to enforcement. States' efforts to collect past-due child support were required to include ("as applicable and necessary"): "[c]ontempt proceedings to enforce an extant court order," court-ordered wage garnishment, and

---

[1] Congress required States to provide services to non-AFDC families as well, 42 U.S.C. 654(6) (1976), although those families were not required to assign their support rights and any child support the State collected was paid to the family, 42 U.S.C. 657(a)(4)(B) (1976).

4

attachment of real and personal property. 45 C.F.R. 303.6 (1975). States were also required to maintain sufficient staff (either statewide or locally) to "enforce collection of support" by "executing contempt proceedings, wage assignments, obtaining garnishment orders, attaching real and personal property, criminal prosecution and executing judgments." 45 C.F.R. 303.20(c)(7) (1975).

c. In 1984, Congress found that there remained "a critical lack of child support enforcement," which had "a critical impact on the health and welfare of the children of the Nation." Child Support Enforcement Amendments of 1984 (1984 Amendments), Pub. L. No. 98-378, § 23(a)(2) and (5), 98 Stat. 1329. The 1984 Amendments required States to adopt laws and procedures providing for, among other things, (i) mandatory wage withholding; (ii) expedited processes for obtaining and enforcing support orders; (iii) state income tax refund intercepts; and (iv) reporting overdue support to consumer credit agencies. 42 U.S.C. 666(a)(1)-(8) and (b).

Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for (optional) State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur." 1984 Amendments § 6, 98 Stat. 1314; 42 U.S.C. 654(16); 655(a)(3)(A).

d. Congress amended Title IV-D again in 1988 to improve the rate of child-support collection. Family Support Act of 1988 (1988 Act), Pub. L. No. 100-485,

5

102 Stat. 2343. Because effective child-support enforcement "had long been thwarted by localized enforcement systems that were unable to quickly and effectively track delinquent parents who crossed county and state lines," *Hodges* v. *Shalala*, 121 F. Supp. 2d 854, 874 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003), Congress in the 1988 Act emphasized centralized, automated record-keeping and information retrieval in order to improve collection rates. In particular, Congress mandated "automated data processing and information retrieval system[s]" that had previously been optional. 1988 Act § 123(a)(C), 102 Stat. 2352; 42 U.S.C. 654(24).

The Title IV-D regulations were amended after adoption of the 1988 Act. As amended, the regulations omitted specific references to contempt proceedings as required means for enforcing child-support obligations. See 45 C.F.R. 303.6, 303.20(c)(7) (1989);[2] cf. pp. 3-4, *supra*.

e. Finally, Congress made further changes to the child-support enforcement system in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (1996 Act), Pub. L. No. 104-193, 110 Stat. 2105, which, among other things, replaced AFDC with the block-grant program called Temporary Assistance for Needy Families (TANF).[3] Those changes again emphasized a centralized, automated approach to child-support

---

[2] Federal financial support remained available for "[e]nforcement of a support obligation" through a variety of means, including contempt citations. 45 C.F.R. 304.20(b)(3)(iv).

[3] The 1996 Act also imposed a five-year cap on benefits. 42 U.S.C. 608(a)(7). As before, a custodial parent is required to assign her rights to child support to the State as part of the application for TANF assistance. 42 U.S.C. 608(a)(3)(A).

enforcement. The amended statute established detailed requirements for the "statewide automated data processing and information retrieval systems" made mandatory in 1988. *Id.* § 344(a)(2), 110 Stat. 2235, 42 U.S.C. 654a(a). Among other things, the system must include a state case registry that includes every child-support case in the State, including the amount of monthly support owed and collected in all cases administered by the state agency. 42 U.S.C. 654a(e)(1) and (4); see 42 U.S.C. 654a(e)(5) (States must "promptly * * * update" case records when circumstances change). The States are required to use their centralized databases "to the maximum extent feasible, to assist and facilitate the collection and disbursement of support payments," including by establishing wage-withholding orders and sending wage-withholding notices to employers. 42 U.S.C. 654a(g)(1); see 42 U.S.C. 666(c).

f. Despite the changes in federal law, South Carolina maintains a localized, court-based approach to child-support enforcement. It is the only State that does not have a certified automated system. See Office of Child Support Enforcement, U.S. Dep't of Health & Human Servs., *National Status of Automated Child Support Systems*, http://www.acf.hhs.gov/programs/cse/stsys/certmap.htm.[4]

---

[4] In the 1996 Act, Congress determined that any State that failed to automate its child-support program should incur substantial penalties. 42 U.S.C. 655(a)(4). In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges* v. *Shalala*, *supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., *Response to Budget Proviso 13.27* at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

7

Acting pursuant to express statutory authority, S.C. Code Ann. § 43-5-235 (West Supp. 2009), the State's Department of Social Services has contracted with county clerks of court across the State to administer its program. The South Carolina courts have in turn adopted a special rule governing child-support enforcement. See S.C. Rule of Family Ct. 24 (S.C. Rule 24). The rule requires clerks of court to review on a monthly basis "all child support and periodic alimony accounts paid through the clerk of court," as are all accounts for children whose custodial parent receives TANF assistance. S.C. Rule 24(a); see 42 U.S.C. 608(a)(3)(A). When any such account is in arrears, the clerk is required to "issue a rule to show cause and an affidavit identifying the order of the court which requires such payments to be made and the amount of the arrearage [and] directing the party in arrears to appear in court at a specific time and date" to face contempt proceedings. S.C. Rule 24(b).

A "wilful[]" violation of a "lawful order" of a South Carolina court constitutes contempt and may subject the contemnor to up to 12 months confinement. S.C. Code Ann. § 63-3-620 (West 2010).

2. Respondent Rogers and petitioner are the parents of a minor child, B.L.P. In 2003, the family court in Oconee County, South Carolina, entered an Order of Financial Responsibility against petitioner. Although the order noted that petitioner was unemployed, the court imputed a gross monthly income of $1386 to him and ordered him to pay $59.72 a week in child support through the court. Pet. App. 22a; see *id.* at 19a-24a, 25a.

---

083107.doc. We are informed by HHS that the State has now paid a total of more than $72 million in penalties to date and currently owes an additional incurred penalty of more than $10 million for fiscal year 2010.

8

Because respondent Rogers was receiving public assistance, she assigned her right to collect child support to the Department of Social Services. Pet. Br. 8; see *id.* at 9 n.6 (payments were remitted to respondent Rogers starting in 2004 because her benefits had ended but her case continued to be administered as a Title IV-D case). Petitioner fell behind on his payments, received a number of rules to show cause from the court clerk why he should not be held in contempt, and was jailed three times as a result. *Id.* at 9-10.

By 2007, petitioner was $5728.76 behind on his child-support payments, and a judge of the Oconee County Family Court issued a bench warrant for his arrest. Pet. App. 6a; Pet. Br. 8-9. A hearing was held on January 3, 2008. After noting petitioner's outstanding balance and stating that he had not made a payment since August 2006, the judge asked petitioner, "[i]s there anything you want to say?" *Id.* at 17a. Petitioner responded:

> Well, when I first got out, I got back on dope. I done meth, smoked pot and everything else, and I paid a little bit here and there. And, when I finally did get to working, I broke my back, back in September. I filed for disability and SSI. And, I didn't get straightened out off the dope until I broke my back and laid up for two months. And, now I'm off the dope and everything. I just hope that you give me a chance. I don't know what else to say. I mean, I know I done wrong, and I should have been paying and helping her, and I'm sorry. I mean, dope had a hold to me.

*Ibid.*

After a brief exchange between petitioner and respondent about his SSI application, the court said:

> If there's nothing else, this will be the Order of the Court. I find the Defendant in willful contempt. I'm gonna sentence him to twelve months in the Oconee County Detention Center. He may purge himself of the contempt and avoid the sentence by having a zero balance on or before his release.

Pet. App. 18a. The court made no finding that petitioner was capable of paying the arrears while incarcerated. See *id.* at 17a-18a.

At this hearing, neither petitioner nor respondent Rogers was represented by counsel. Pet. App. 6a. However, pro bono counsel filed an appeal on petitioner's behalf, alleging that petitioner had a right under the Sixth Amendment and the Due Process Clause to have appointed counsel in the contempt proceeding. *Id.* at 10a-15a. Before the intermediate state court could rule, the South Carolina Supreme Court granted discretionary review and affirmed the family court. *Id.* at 1a-5a.

The court noted that the "purpose of civil contempt is to coerce the defendant to comply with the court's order," while criminal contempt's purpose is "to punish a party for disobedience or disrespect." Pet. App. 2a-3a. "Civil contempt sanctions are conditioned on compliance with the court's order. * * * A contemnor imprisoned for civil contempt is said to hold the keys to his cell because he may end the imprisonment and purge himself of the sentence at any time." *Id.* at 3a. The court recognized that the "distinction between civil and criminal contempt is crucial because criminal contempt triggers additional constitutional safeguards not mandated in civil contempt proceedings." *Ibid.*

The court noted that in this case the family court had said that petitioner could "purge himself of the contempt" by achieving a "zero balance" on his arrearage. Pet. App. 3a. Reasoning that "[t]his conditional sentence is a classic civil contempt sanction," the court concluded that petitioner had no right to appointed counsel. *Ibid.*

## SUMMARY OF ARGUMENT

1. The Court has jurisdiction to review the decision of the South Carolina Supreme Court. Petitioner has completed his term of confinement for civil contempt and has not identified any collateral consequences flowing from the contempt. Those facts would ordinarily render his case moot. Petitioner, however, qualifies for a narrow exception to the mootness doctrine because the controversy is capable of repetition yet evading review. Sentences for civil contempt in South Carolina are limited to 12 months, and it is highly unlikely that petitioner would be able to secure plenary review by this Court within any future period of confinement. In addition, the constitutional violation petitioner asserts is capable of repetition because he remains subject to the underlying child-support order and still has substantial arrears. There is thus a reasonable expectation that he will receive automatically-generated rules to show cause for contempt in the future. Indeed, since the contempt at issue in this case, petitioner has been jailed again for civil contempt.

2. Petitioner's confinement for civil contempt violated due process, not because he lacked counsel, but because the procedures employed by the family court were inadequate to ensure the accurate determination of petitioner's present ability to pay his child-support ar-

11

rears.  That ability to pay was a necessary predicate to the civil contempt sanction.

The defining feature of confinement for civil contempt is its purpose to coerce compliance with a court order.  Such confinement must therefore end upon discharge of the contemnor's obligations; he is said to hold "the keys of [his] prison in [his] own pocket[]."  *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted).  Such confinement may not be imposed, however, where the contemnor demonstrates his inability to comply with the order.  In such cases, he does not truly hold the keys to the prison; to confine him nonetheless would render the confinement punitive and thus a sanction that may be imposed only after compliance with criminal case safeguards.

The question of petitioner's ability to pay his child-support arrears therefore should have been a focus of the civil contempt proceeding, but it was not.  Pro se petitioner was afforded no meaningful opportunity to establish his indigency, and even after he made a statement that could have easily been understood to mean he had no present ability to pay nearly $6000 to avoid jail, the family court judge made no further inquiry on the matter before committing him to a nominally conditional term of confinement.

The proceeding did not comply with due process because there was a serious risk of erroneous deprivation of petitioner's liberty through the procedures employed and because additional procedures would have enhanced the accuracy of the proceeding without materially impinging on any governmental interest.  See *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976).  Provision of counsel would have been a sufficient, but not a necessary, means of satisfying due process in this case.  There were other

means of providing petitioner with a meaningful opportunity to establish his present inability to pay, such as asking him to complete an understandable form seeking his financial information, or asking him questions on the topic as necessary at a hearing. In the typical case, providing basic information about one's personal finances is not the kind of undertaking that requires assistance of counsel, and due process protections are based on the requirements of the mine-run case, not the exceptional one.

There is no basis for petitioner's proposed categorical due process right to appointed counsel in civil contempt proceedings where confinement is imposed. The Court has declined to recognize a categorical constitutional right to appointed counsel in the context of other non-criminal proceedings that can result in confinement. *Gagnon* v. *Scarpelli*, 411 U.S. 778, 782-790 (1973) (probation revocation); *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (summary court-martial). Civil contempt proceedings in child-support cases are relatively brief; the custodial parent may not be represented by counsel; and the issues in dispute are generally not complex. Given those circumstances, there is no warrant for recognizing a categorical right to defense counsel in such proceedings. Finally, recognizing a due process right to counsel in such proceedings would upset the balance struck by Title IV-D and its implementing regulations, both of which stress the importance of due process protections in child-support proceedings but neither of which permit federal funding for provision of counsel.

13

**ARGUMENT**

**I. THE COURT HAS JURISDICTION TO REVIEW THE DE-CISION OF THE SOUTH CAROLINA SUPREME COURT**

Although petitioner has completed his term of confinement for the civil contempt at issue here, his claim is not moot because he remains subject to the underlying child-support order and because there is a reasonable expectation that he will face future contempt proceedings. His claim thus avoids mootness because it is capable of repetition yet evading review. This Court thus has jurisdiction to review the final judgment of the South Carolina Supreme Court. See 28 U.S.C. 1257(a).

1. "In general a case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy* v. *Hunt*, 455 U.S. 478, 481 (1982) (internal quotation marks omitted) (quoting *United States Parole Comm'n* v. *Geraghty*, 445 U.S. 388, 396 (1980)). While a currently confined individual's challenge to his confinement generally presents no question of mootness, an individual who has been released from confinement ordinarily may continue to press his challenge only if he suffers some "collateral consequence" that constitutes a "concrete and continuing injury." *Spencer* v. *Kemna*, 523 U.S. 1, 7 (1998). Because this Court "ha[s] been willing to presume that a wrongful conviction has continuing collateral consequences," the Court ordinarily will not dismiss as moot a criminal defendant's challenge to his conviction once the defendant has completed his term of imprisonment. *Id.* at 8. But the Court has not employed that presumption in other contexts, instead requiring a party not in custody to demonstrate that he will actually face collateral consequences if he does not secure relief

14

on appeal. See *id.* at 14 (no presumption of collateral consequences for parole revocation); see also *id.* at 14-16 (reviewing party's claimed collateral consequences).

Petitioner has completed his term of confinement for civil contempt. Because he challenges a civil order, not a criminal conviction, no presumption of collateral consequences applies. Moreover, petitioner has not identified any collateral consequences flowing from the finding of civil contempt. Ordinarily, petitioner's challenge to that finding would be considered moot and beyond this Court's jurisdiction.

2. Petitioner's claim in this case, however, avoids mootness because his is one of the "exceptional situations" in which a claim is capable of repetition, yet evading review. *City of L.A.* v. *Lyons*, 461 U.S. 95, 109 (1983). In non-class actions, this doctrine requires satisfaction of two elements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy*, 455 U.S. at 482 (quoting *Weinstein* v. *Bradford*, 423 U.S. 147, 149 (1975) (per curiam)). Petitioner satisfies both elements.

First, confinement for civil contempt in South Carolina is limited to 12 months, S.C. Code Ann. § 63-3-620 (West 2010), and it is exceedingly unlikely that a contemnor could appeal through the South Carolina court system, petition this Court for a writ of certiorari, and receive a decision on his claim within such a limited time period. See, *e.g.*, *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765, 774 (1978) (18 months was "too short a period of time for appellants to obtain complete judicial review"); cf. *DeFunis* v. *Odegaard*, 416 U.S. 312, 319 (1975) (per curiam) (future challenge to law school

15

admission procedure could likely come to this Court for decision within three-year period of law school matriculation). Indeed, in this case, petitioner had completed his term of imprisonment for civil contempt more than a year before the South Carolina Supreme Court rendered its decision. Compare Pet. App. 8a with *id.* at 1a.

Second, petitioner "can make a reasonable showing that he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109. Petitioner is still subject to the underlying order for child support, and he is nearly $14,000 in arrears. Pet. Br. 15; J.A. 104a. Given that clerks of court in South Carolina automatically issue rules to show cause when a non-custodial parent is late on a required payment, there is a reasonable expectation that petitioner will again be subject to contempt proceedings. Indeed, after he was released from jail for the contempt at issue here, petitioner was again held in contempt and reincarcerated. In May 2010 yet another rule to show cause for contempt issued due to failure to pay support to respondent. Pet. Br. 13-15; see *id.* at 15 (May 2010 rule to show cause is still outstanding); see also *Olmstead* v. *L.C.*, 527 U.S. 581, 594 n.6 (1999) (suit by plaintiffs seeking community-based services rather than institutionalization not moot even though they were then receiving desired services, because of "the multiple institutional placements [they] ha[d] experienced"). This is thus far from "an abstract dispute about the law" that might be thought "unlikely to affect [petitioner] any more than it affects other [South Carolina] citizens." *Alvarez* v. *Smith*, 130 S. Ct. 576, 580 (2009).[5]

---

[5] That petitioner was represented by pro bono counsel in a subsequent contempt proceeding involving a different support order, see Pet. Br. 15 n.10, does not mean his claim is incapable of repetition. Were pro bono counsel bound to represent petitioner in every future contempt

16

## II. THE ABSENCE OF ADEQUATE PROCEDURES NECESSARY TO SECURE AN ACCURATE ADJUDICATION OF CIVIL CONTEMPT VIOLATED DUE PROCESS

The validity of the civil contempt order against petitioner turned on a critical fact: his present ability to purge himself of contempt by paying off his past-due child support. The family court's procedures in this case violated due process because they were inadequate to ensure an accurate determination of that fact and thus prevent an erroneous deprivation of petitioner's liberty. Although provision of government-provided counsel would have been a sufficient means of complying with due process requirements in this case, it was not a necessary one. Other mechanisms, such as requiring an affidavit for disclosure of financial information and a preliminary assessment of petitioner's current ability to pay child support, would have satisfied the requirements of due process.

### A. Confinement For Civil Contempt Is Permitted Only When The Contemnor Is Presently Able To Comply With The Underlying Order

Both civil and criminal contempt can lead to confinement, but this Court has long distinguished the two based on the "character and purpose" of the sanction imposed. *Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911). In civil contempt, the "punishment * * * [is] remedial," in that it is intended to "coerc[e]

---

proceeding, then his claim of entitlement to the assistance of counsel would be moot. There is no indication in the record, however, that pro bono counsel is under any such obligation, and, in fact, counsel did not appear in a 2009 contempt proceeding involving support owed respondent, *see id.* at 13-14 (noting that petitioner appeared pro se in 2009 and served six months for civil contempt).

the defendant to do what he had refused to do." *Id.* at 442. Punishment for criminal contempt, on the other hand, is "punitive" and is imposed "to vindicate the authority of the court." *Id.* at 441.

Because of that fundamental distinction, confinement imposed for civil contempt is conditional. The sentence must include a purge clause under which the contemnor will be immediately released upon compliance with the underlying court order. *Hicks* v. *Feiock*, 485 U.S. 624, 634 (1988). When confined under such a civil contempt order, the contemnor holds "the keys of [his] prison in [his] own pocket[ ]." *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted); see *id.* at 370 ("While any imprisonment, of course, has punitive and deterrent effects, it must be viewed as remedial if the court conditions release upon the contemnor's willingness" to comply with a court order.).

A purge clause by itself, however, will not render the contemnor's confinement remedial rather than punitive because "the justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order." *Shillitani*, 384 U.S. at 370-371. Accordingly, "punishment may not be imposed in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." *Hicks*, 485 U.S. at 638 n.9; see *Maggio* v. *Zeitz*, 333 U.S. 56, 72 (1948) ("[T]o jail one for a contempt for omitting an act he is powerless to perform would * * * make the proceeding purely punitive, to describe it charitably."); see also *Moseley* v. *Mosier*, 306 S.E.2d 624, 626 (S.C. 1983)

18

("When the parent is *unable* to make the required payments, he is not in contempt.").[6]

The burdens of production and persuasion may be placed on the defendant to demonstrate his present inability to comply with an order. See *Hicks*, 485 U.S. at 637; *United States* v. *Rylander*, 460 U.S. 752, 757 (1983). Accordingly, if the defendant "offers no evidence as to his inability to comply," "stands mute," or is disbelieved by the court, then he fails to carry his burden and may be held in contempt. *Maggio*, 333 U.S. at 75. But the trial court "is obliged" to consider "all the evidence properly before it in the contempt proceeding in determining whether or not there is actually a present ability to comply and whether failure so to do constitutes deliberate defiance which a jail term will break." *Id.* at 76.

If, upon examination, a contempt penalty is considered punitive rather than remedial, it will be vacated unless all "the protections that the Constitution requires of * * * criminal proceedings" were provided. *International Union, United Mine Workers* v. *Bagwell*, 512 U.S. 821, 826 (1994) (quoting *Hicks*, 485 U.S. at 632).

---

[6] A defendant may not avoid a finding of civil contempt for violating an order by collaterally attacking that order in the contempt proceeding. See *Maggio*, 333 U.S. at 74-75. The defendant may, however, make the distinct assertion that he has a "*present* inability to comply with the order in question." *United States* v. *Rylander*, 460 U.S. 752, 757 (1983); see *ibid.* ("While the court is bound by the enforcement order, it will not be blind to evidence that compliance is now factually impossible. Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."); *Maggio*, 333 U.S. at 74-75.

19

### B. The Family Court's Procedures Were Inadequate To Ensure An Accurate Determination Of Present Ability To Pay

The procedures employed by the family court violated petitioner's due process rights because they were inadequate to ensure that petitioner was not erroneously confined as an inducement to perform a task he was powerless to perform, while additional procedures to ensure petitioner's present ability to pay his child-support arrears would have been minimally burdensome.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews* v. *Eldridge*, 424 U.S. 319, 332 (1976). Confinement for civil contempt is a deprivation of liberty, and the alleged contemnor is thus entitled to procedural due process protections before its imposition. Cf. *Morrissey* v. *Brewer*, 408 U.S. 471, 482 (1972) (termination of parole triggers due process protections); see also *Bagwell*, 512 U.S. at 827 (civil contempt requires "notice and an opportunity to be heard").

The conclusion that due process applies is the beginning of the inquiry, not its end, because "the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands.'" *Wilkinson* v. *Austin*, 545 U.S. 209, 224 (2005) (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The Court has "generally * * * declined to establish rigid rules and instead ha[s] embraced a framework to evaluate the sufficiency of particular procedures." *Ibid.* That framework involves "consideration of three distinct factors:

20

> First, the private interest that will be affected by the
> official action; second, the risk of an erroneous depri-
> vation of such interest through the procedures used,
> and the probable value, if any, of additional or substi-
> tute procedural safeguards; and finally, the Govern-
> ment's interest, including the function involved and
> the fiscal and administrative burdens that the addi-
> tional or substitute procedural requirements would
> entail.

*Mathews*, 424 U.S. at 335.

Application of the *Mathews* factors here demon-
strates that the family court proceeding did not comply
with the requirements of procedural due process. First,
petitioner's private interest in avoiding incarceration
was significant. See *Foucha* v. *Louisiana*, 504 U.S. 71,
80 (1992).

Second, there was a serious "risk of an erroneous
deprivation" of petitioner's liberty interest under the
procedures employed by the family court, and there
would have been value in additional procedures.
*Mathews*, 424 U.S. at 335. Petitioner did not dispute
that he had failed to comply with his child-support or-
der, so the propriety of his confinement for civil con-
tempt thus turned on his present ability to do so. See
pp. 17-18, *supra*; Pet. Br. 3-4 (petitioner's ability to pay
"was the precise question before the family court"); *id.*
at 17. But South Carolina automatically referred peti-
tioner for contempt proceedings without considering
whether petitioner was employed or had assets. At the
contempt hearing, the court solicited no financial infor-
mation from petitioner, nor was there apparently any
mechanism in place for him to provide it on his own. Pe-
titioner's statement at the hearing that he had been un-

21

able to work because he broke his back, Pet. App. 17a, could reasonably be understood to constitute a claim that he had no present ability to pay nearly $6000. The court did not explore this question, however; it made no inquiry into petitioner's income or assets. Instead, the court imposed a jail sentence unaccompanied by any finding that petitioner had the ability to pay off his outstanding balance from a jail cell.[7] Taking additional modest steps to determine whether petitioner had the present ability to discharge his obligation, see pp. 24-25, *infra*, would have improved the accuracy of the proceeding.

Finally, the government's interests also favor additional procedural safeguards to ensure that only those parents with a present ability to pay are confined for civil contempt. While the State has a strong interest in enforcing child-support orders, it secures no benefit from jailing a non-custodial parent who cannot discharge his obligation. The period of incarceration makes it less, rather than more, likely that such parent will be able to pay child support. See Elizabeth G. Patterson, *Civil Contempt & the Indigent Child Support Obligor: The Silent Return of Debtor's Prison*, 18 Cornell J.L. & Pub. Pol'y 95, 126 (2008) (*Civil Contempt*). Meanwhile, the State incurs the substantial expense of confinement.

Moreover, as a general matter, the routine use of contempt for non-payment of child support is likely to be an ineffective strategy for enforcing support orders. See National Child Support Enforcement, U.S. Dep't of Health & Human Servs., *Strategic Plan: FY 2005-2009*, at 2, 10 (*Strategic Plan*), http://www.acf.hhs.gov/

---

[7] The judge told petitioner, "[i]f you've got a job, I'll make you eligible for work release," Pet. App. 18a, but petitioner states he was ineligible for work release, Pet. Br. 12 n.8.

programs/cse/pubs/2004/Strategic_Plan_FY2005-2009. pdf. While child-support recovery efforts once "followed a business model predicated on enforcement" that "intervened only after debt, at times substantial, accumulated and often too late for collection to be successful, let alone of real value to the child," experience has shown that alternative methods—such as order modifications, increased contact with non-custodial parents, and use of "automation to detect non-compliance as early as possible"—are more effective. *Id.* at 2.

A substantial portion of child-support obligors have no or low reported income. Elaine Sorensen et al., *Assessing Child Support Arrears in Nine Large States & the Nation* 22 (2007) (*Assessing Child Support Arrears*), http://aspe.hhs.gov/hsp/07/assessing-CS-debt/report.pdf (obligors with $10,000 or less in annual income constituted half of the child-support obligors and owed 70% of the arrears in a nine-state study). Such individuals' child-support obligations are often substantial. See *id.* at 54 ("For obligors with reported income of $10,000 a year or less, the median percent of reported income that was due as current support was 83[%]."). A low-income individual in arrears on child-support payments is "rarely a candidate for civil incarceration because of the likelihood that he or she is unable to pay the hefty sum represented by the accumulated arrears, or even a portion thereof that may be set by the court as the purge amount." *Civil Contempt* 116.[8]

---

[8] To be sure, coercive enforcement remedies, such as contempt, have a role to play in child-support enforcement efforts, such as with non-custodial parents who are hiding assets or unreported self-employment or under-the-table income. See *Strategic Plan* 2; *Assessing Child Support Arrears* 4-5, 22-23, 25; *Civil Contempt* 97. There is no evi-

23

Many States have taken alternative steps to avoid child-support arrears, such as establishing more realistic support orders, "increas[ing] parental participation in the order establishment process," providing employment services to non-custodial parents, or using automation tools to improve wage withholding. *Assessing Child Support Arrears* 10-11, 80-89; see *id.* at 85 (study of Florida program that provides employment services and case management to non-custodial parents found that program participants paid nearly five dollars in child support for every dollar spent on the program). Such alternatives, which focus on early intervention rather than after-the-fact efforts to collect substantial accumulated arrears, are more likely to be effective means of enforcing the child-support obligations of the substantial number of low-income obligors. See *Strategic Plan* 2.

### C. Due Process Can Be Satisfied By A Variety Of Procedures Intended To Assure An Accurate Determination Of Present Ability To Pay In A Civil Contempt Proceeding

Petitioner argues that, in order to ensure that his civil contempt proceeding "remain[ed] civil," Pet. Br. 39, due process required the appointment of counsel to assist him in establishing his inability to comply with the court's order, see *id.* at 41. Although we agree that petitioner's due process rights were violated, we disagree that the State's failure to appoint counsel was itself the basis of the violation. Appointment of counsel is certainly one way to help ensure an accurate determination of the obligor's current ability to pay—the determination on which the "civil" nature of a civil contempt sanction rests—but it is not the only way. It was the State's

---

dence, however, that routine use of contempt among low-income non-custodial parents is generally effective. See *Civil Contempt* 126.

failure to provide any meaningful mechanism for making that determination in this case, and not its failure to provide counsel in particular, that violated petitioner's due process rights.[9]

> 1. **Courts can comply with due process by providing a meaningful opportunity for an alleged contemnor to establish his present ability to pay**

While there is no basis for a constitutional rule categorically requiring appointment of counsel in all civil contempt that could lead to deprivation of physical liberty, see pp. 25-32, *infra*, due process does require procedures sufficient to ensure fundamental fairness. In the context of a civil contempt proceeding for non-payment of child support that could lead to confinement, this means procedures adequate to allow a pro se contemnor to attempt to carry his burden of establishing his present inability to pay.

Such procedures may include requiring a non-paying parent to complete an understandable form seeking financial information. South Carolina already requires

---

[9] Although petitioner's submissions below and in this Court have focused on the value of appointed counsel in ensuring that indigent child-support obligors are not erroneously jailed as a means of inducing them to comply with their obligations, see, *e.g.*, Pet. i, Pet. App. 13a, fairly encompassed in those submissions is the proposition that due process demands an appropriate procedure to evaluate an obligor's present ability to pay. See Sup. Ct. R. 14.1(a); *Yee* v. *City of Escondido*, 503 U.S. 519, 534 (1992). In conducting that inquiry, it should be open to the Court to consider whether there are alternative procedures, other than the specific procedure petitioner has proposed, that would satisfy constitutional requirements. To the extent the Court concludes otherwise, however, the proper course would be to dismiss the writ of certiorari as improvidently granted and await a case that expressly raises a broader due process claim.

noncustodial parents to fill out such a form when a support order is originally sought in a Title IV-D case, see S.C. Code Ann. § 43-5-220(c) (West Supp. 2009), but apparently does not do so in subsequent contempt proceedings. Requiring that such forms be completed at the outset of a contempt proceeding would impose little expense on the State or burden on the proceeding while materially advancing the accuracy of the court's determination. Such information could by itself establish the contemnor's present inability to pay his arrears or, conversely, demonstrate his ability to pay. To the extent the court had questions about the information on the form or disbelieved it, the court could question the contemnor about his finances at the contempt hearing. Such simple, minimally burdensome procedures would enable the court to evaluate whether the alleged contemnor has the ability to pay his arrears and is thus an appropriate candidate for a civil contempt sanction.

### 2. There is no basis for an inflexible right to counsel rule in civil contempt proceedings

Although the constitutional inadequacy of the family court's procedures could have been cured by appointment of counsel (who presumably would have addressed petitioner's inability to pay his arrears and urged the court not to jail him for that reason), appointment of counsel was not constitutionally compelled.

a. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001) (quoting *Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886, 895 (1961)); see *Mathews*, 424 U.S. at 334 ("[D]ue process is flexible and calls for such procedural protections as the particular

situation demands.") (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The question in a due process case is how to ensure a fundamentally fair proceeding, taking into account the importance of the private interest at issue, the risk of error and value of additional procedures, and the government's interest. See *id.* at 335. This is not an inquiry that typically lends itself to the kind of categorical approach advocated by petitioner. See *Gagnon* v. *Scarpelli*, 411 U.S. 778, 789 (1973) (contrasting categorical Sixth Amendment right to counsel in criminal prosecution "with the more limited due process right" in other contexts).[10]

In fact, in areas outside traditional criminal prosecutions where an individual's liberty is nonetheless at stake, the Court has declined to recognize a categorical right to counsel, instead relying on alternative procedural safeguards to ensure due process. See *Gagnon*, 411 U.S. at 782-790; see also *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (no due process right to counsel for summary courts-martial).[11] For example, in *Gagnon*,

---

[10] The Sixth Amendment right to counsel is inapplicable to a civil contempt proceeding because it is not a "criminal prosecution[ ]." U.S. Const. Amend. VI; see *Bagwell*, 512 U.S. at 826-827.

[11] In *In re Gault*, 387 U.S. 1 (1967), the Court recognized a due process right to appointed counsel in a juvenile delinquency proceeding, but, as the Court later explained, that was because the proceeding "while denominated civil, was functionally akin to a criminal trial." *Gagnon*, 411 U.S. at 789 n.12. In *Vitek* v. *Jones*, 445 U.S. 480 (1980), a plurality would have held that there is a due process right to counsel before a State involuntarily transfers a prisoner to a state mental hospital for psychiatric treatment. See *id.* at 497. Justice Powell's controlling concurrence, however, disagreed, concluding that "the fairness of an informal hearing designed to determine a medical issue" does not "require[] participation by lawyers." *Id.* at 500. Justice Powell agreed that a prisoner "required assistance" in such a proceeding to ensure

27

the Court held that due process required the government to provide a preliminary and final hearing before it could incarcerate an individual for violating the terms of his probation. See 411 U.S. at 782; see also *id.* at 785-786 (hearings necessary in order to provide notice of the alleged probation violation and ensure "accurate finding of fact and the informed use of discretion"). At the same time, however, the Court rejected the "contention that the State is under a constitutional duty to provide counsel for indigents in all probation or parole revocation cases." *Id.* at 787; see *id.* at 790 (stating that due process may require appointment of counsel in exceptional cases). The Court recognized that "such a rule has the appeal of simplicity" but concluded that "it would impose direct costs and serious collateral disadvantages without regard to the need or the likelihood in a particular case for a constructive contribution by counsel." *Id.* at 787.

The Court in *Gagnon* noted that in many cases a probationer's mitigating evidence may be "so simple as not to require either investigation or exposition by counsel." 411 U.S. at 787. Here too, with the provision of easy-to-understand forms on assets and income and, if necessary, a colloquy with the trial court, it will often be simple for a delinquent child-support obligor to demonstrate his present inability to discharge his obligation without the assistance of appointed counsel. Indeed, even in criminal cases to which the Sixth Amendment right of counsel applies, defendants are not entitled to government-appointed counsel for the purpose of filling out the forms routinely used to establishing their financial eligibility for government-appointed counsel. See

---

fairness, but said that it could be "rendered by competent laymen in some cases." *Ibid.*

18 U.S.C. 3006A(b) (counsel will be appointed only after court is "satisfied after appropriate inquiry that the person is financially unable to obtain counsel"); *United States* v. *Bauer*, 956 F.2d 693, 695 (7th Cir.) ("Under the Criminal Justice Act, the public fisc need not contribute one penny unless the accused first establishes that he cannot afford counsel. Nothing in the statute directs the Treasury to assist the accused in making this determination."), cert. denied, 506 U.S. 882 (1992). Just as "[n]o legal expertise is needed to participate effectively in hearings under the Criminal Justice Act," *ibid.*, no legal expertise is generally required to establish inability to pay child-support arrears.

*Gagnon* also expressed concern that "[t]he introduction of counsel into a revocation proceeding will alter significantly the nature of the proceeding," since the States typically relied on probation officers to conduct revocation hearings but might turn to attorneys if all probationers were represented. 411 U.S. at 787. "[T]he decisionmaking process will be prolonged, and the financial cost to the State * * * will not be insubstantial." *Id.* at 788. In the context of civil contempt for child support as well, automatic appointment of counsel could delay the proceedings, create an asymmetry in representation between non-custodial parents and custodial parents who may appear pro se, see, *e.g.*, Pet. App. 16a, and impose considerable financial cost on the government without an automatic increase in accuracy.

*Lassiter* v. *Department of Social Services*, 452 U.S. 18 (1981), upon which petitioner relies, see, *e.g.*, Pet. Br. 32-33, is not to the contrary. In that decision, the Court held that there was no due process right to counsel in a parental-rights termination proceeding. See *Lassiter*, 452 U.S. at 32-33. In dictum, the Court said its cases

29

had established a "presumption" that an indigent had a right to appointed counsel "when, if he loses, he may be deprived of his physical liberty." *Id.* at 26-27. The Court has not subsequently relied on any such presumption derived from the *Lassiter* dictum, and *Lassiter* itself recognized that *Gagnon*, which involved a deprivation of physical liberty, had held that "due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed" through appointment of counsel. *Id.* at 31 (quoting *Gagnon*, 411 U.S. at 788).

That there may be atypical cases with "complex factual and legal issues" (Pet. Br. 46) in which counsel would provide a significant benefit beyond what could be obtained through other procedural safeguards does not mean there should be a right to counsel. "[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." *Walters* v. *National Ass'n of Radiation Survivors*, 473 U.S. 305, 321 (1985) (quoting *Mathews*, 424 U.S. at 344); see *id.* at 331 ("existence of complexity in some cases" was not "sufficient to warrant a conclusion that the right to retain and compensate an attorney in [Veterans Administration] cases is a necessary element of procedural fairness under the Fifth Amendment").

b. A recognition that due process requires fair proceedings before a child-support obligor can be held in civil contempt but that this due process right does not encompass appointment of government-funded counsel is also consistent with the balance struck by Congress and the Secretary in enacting and administering the Title IV-D program. Cf. *Middendorf*, 425 U.S. at 43 ("[W]e must give particular deference to the determina-

30

tion of Congress, made under its authority to regulate the land and naval forces, U.S. Const., Art. I, § 8, that counsel should not be provided in summary courts-martial."); *Walters*, 473 U.S. at 319-320 ("This deference to congressional judgment must be afforded even though the claim is that a statute Congress has enacted effects a denial of the procedural due process guaranteed by the Fifth Amendment.").

Congress and the Secretary have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program.[12] At the same time, however, they have declined to reimburse the States for the cost of providing counsel to non-custodial parents. See S. Rep. No. 387, 98th Cong., 2d Sess. 23 (1984) (statute does not provide federal funding for "defense counsel for absent parents" or "incarceration of delinquent obligors"); 45 C.F.R. 304.23 (i) and (j) (no federal funding for "[t]he costs of counsel for indigent defendants in

---

[12] See, *e.g.*, 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, including notice and a reasonable opportunity to contest the accuracy of such information."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for notice, opportunity to contest the action, and opportunity for an appeal on the record to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

31

IV-D actions" or "[a]ny expenditure for jailing of parents in child-support enforcement cases"); see also 52 Fed. Reg. 32,130 (1987) (Federal "policy since the inception of the [Title IV-D] program has been that costs of incarceration of delinquent obligors and costs of defense counsel are not necessary and reasonable costs associated with the proper and efficient administration of the Title IV-D program.").

Finally, at its broadest, the categorical rule petitioner suggests—that there is a right to government-appointed counsel in all "proceedings denominated as 'civil' where an individual nonetheless faces the prospect of confinement to state custody," Pet. Br. 30—conflicts with Congress's express judgment that provision of government-funded counsel is not warranted in all such areas. See *Middendorf*, 425 U.S. at 43 (deferring to such a judgment); *Walters*, 473 U.S. at 319-320 (same); see also *Landon* v. *Plasencia*, 459 U.S. 21, 34-35 (1982) ("The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy.").

For example, while aliens are sometimes detained during removal proceedings or pending enforcement of removal orders, Congress has long explicitly provided that there is no obligation to provide government payment for counsel in such proceedings. See 8 U.S.C. 1362 ("In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (*at no expense to the Government*) by such counsel, authorized to practice in such proceedings,

32

as he shall choose.") (emphasis added); 8 U.S.C.
1229a(b)(4)(A). Congress's judgment is consistent with
this Court's repeated holdings that removal proceedings
are civil and non-punitive, see, *e.g.*, *INS* v. *Lopez-
Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation
proceeding is a purely civil action to determine eligibil-
ity to remain in this country, not to punish an unlawful
entry, though entering or remaining unlawfully in this
country is itself a crime."), and its conclusion that deten-
tion of an alien during the removal process is permissi-
ble because it is incidental to the proceedings, and not
their purpose or goal, see, *e.g.*, *Carlson* v. *Landon*,
342 U.S. 524, 538 (1952) ("Detention is necessarily a part
of this deportation procedure.").  As the Court has
also noted, removal proceedings—whose purpose is re-
moval of aliens from the country, not deprivation of their
physical liberty—are "streamlined" administrative pro-
ceedings held before administrative personnel, immigra-
tion judges, under rules offering the aliens more limited
procedural rights than are available in court.  *Lopez-
Mendoza*, 468 U.S. at 1039; see *ibid.* ("a deportation
hearing is intended to provide a streamlined determina-
tion of eligibility to remain in this country, nothing
more").  The due process guarantee of fundamental fair-
ness does not mandate the appointment of counsel in
such proceedings, which would be contrary to the judg-
ment of Congress.[13]

---

[13] For these reasons, the lower courts have held that aliens in removal
proceedings have no constitutional right to appointment of counsel at
government expense.  *United States* v. *Gasca-Kraft*, 522 F.2d 149, 152
(9th Cir. 1975) ("courts have uniformly held in this circuit and elsewhere
that in light of the non-criminal nature of both the proceedings and the
order which may be a result, that respondents are not entitled to have
counsel appointed at government expense") (citing cases); see *Moham-*

33

## CONCLUSION

The judgment of the Supreme Court of South Carolina should be reversed.

Respectfully submitted.

NEAL KUMAR KATYAL
*Acting Solicitor General*

TONY WEST
*Assistant Attorney General*

SALLY A. HOWARD
*Acting General Counsel*

ROBERT E. KEITH
*Associate General Counsel*

LISETTE PEDRE MESTRE
*Attorney*
*Department of Health and
Human Services*

LEONDRA R. KRUGER
*Acting Deputy Solicitor
General*

JOSEPH PALMORE
*Assistant to the Solicitor
General*

LEONARD SCHAITMAN
EDWARD HIMMELFARB
*Attorneys*

JANUARY 2011

---

*med* v. *Gonzales*, 400 F.3d 785, 793 (9th Cir. 2005); *United States* v. *Torres-Sanchez*, 68 F.3d 227, 230 (8th Cir. 1995); *Nazakat* v. *INS*, 981 F.2d 1146, 1148 (10th Cir. 1992); *United States* v. *Campos-Asencio*, 822 F.2d 506, 509 (5th Cir. 1987).

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JIM HODGES, in his official capacity
as Governor of the State of South
Carolina; JEAN HOEFER TOAL, in her
official capacity as Chief Justice of
South Carolina; SOUTH CAROLINA
DEPARTMENT OF SOCIAL SERVICES;
STATE OF SOUTH CAROLINA; PEOPLE OF
SC, on Behalf of the State of South
Carolina; JOHN DOE; JANE DOE, and
those similarly situated,

              *Plaintiffs-Appellants,*

      v.                                                    No. 00-2512

TOMMY G. THOMPSON, SECRETARY,
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; WADE
F. HORN, Ph.D. in his official
capacity as Assistant Secretary of
the United States Department of
Health and Human Services for
Children and Families; U.S.
DEPARTMENT OF HEALTH & HUMAN
SERVICES,

            *Defendants-Appellees.*

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Julian Abele Cook, Jr., Senior District Judge, sitting by designation.
(CA-00-2048-3-17)

Argued: December 6, 2001

Decided: November 15, 2002

Before WIDENER, NIEMEYER, and MOTZ, Circuit Judges.

---

Affirmed by published per curiam opinion.

---

## COUNSEL

**ARGUED:** Marcus Angelo Manos, NEXSEN, PRUET, JACOBS & POLLARD, L.L.C., Columbia, South Carolina, for Appellants. Gregory George Katsas, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Wilburn Brewer, Jr., NEXSEN, PRUET, JACOBS & POLLARD, L.L.C., Columbia, South Carolina; A.E. Dick Howard, Charlottesville, Virginia, for Appellants. Stuart E. Schiffer, Acting Assistant Attorney General, Scott N. Schools, United States Attorney, Jacob M. Lewis, Peter J. Smith, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

## OPINION

PER CURIAM:

The Governor of South Carolina appeals the grant of summary judgment to the Secretary of the United States Department of Health and Human Services in the State's action seeking injunctive and declaratory relief from conditions imposed for federal funding of the Temporary Assistance to Needy Families (TANF) program.

South Carolina challenges the district court finding that Congress acted within its Spending Clause authority when it conditioned States' receipt of federal funds under the child support enforcement program and the TANF program on compliance with the requirement that States develop and maintain automated child support enforcement systems and that such a condition was not so coercive as to violate the Tenth Amendment. The State further alleges the district court

erred when it found that the Secretary did not have the discretion to amend the statutory penalty structure for a State's noncompliance with the child support systems requirements. In addition, South Carolina contends the court erred in finding that the State could not invoke the protections of the Due Process Clause. After considering the parties' briefs and the record, and following oral argument, we affirm substantially on the reasoning of the district court.

## I.

The district court opinion contains a comprehensive history, the details of which need not be repeated here, of the federal government's longstanding involvement in child support enforcement programs and related federal efforts to work with the States to solve the serious problem of nonpayment of child support. See *Hodges v. Shalala*, 121 F.Supp.2d 854 (D.S.C. 2000). Currently, as a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements that the State establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A). South Carolina concedes that it has neither a federally certifiable statewide automated system for child support nor an SDU. See *Hodges*, 121 F. Supp. 2d at 861.

Without an approved state plan, a State may lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). See 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2). Alternatively, a State may opt for an alternative penalty in lieu of disapproval of their state plan and the withholding of federal funds if the State is making a good faith effort to comply with the program's requirements and the State has submitted a corrective compliance plan. See 42 U.S.C. § 655(a)(4). South Carolina has elected to incur the alternative penalty.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and review a district court's grant of summary judgment *de novo*. See *United States v. Kanasco, Ltd.*, 123 F.3d 209, 210 (4th Cir. 1997).

## II.

We turn first to South Carolina's contention that the federal government's requirements and penalties associated with the state-wide automated systems, which South Carolina failed to provide, exceed Congressional authority under the Spending Clause and the Tenth Amendment.

Consistent with its Spending Power, Congress may attach conditions on the receipt of federal funds. See *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Spending Power is not unlimited, of course, and the Supreme Court has recognized four general limitations: spending must be in pursuit of the general welfare; any attached conditions must be unambiguous; conditions must also be related to a federal interest; and, the obligations imposed by Congress may not violate any independent constitutional provisions. See *Dole*, 483 U.S. at 207-08.

The district court found that "Congress made a considered judgment that the American people would benefit significantly from the enhanced enforcement of child-support decrees and the diminution of the number of parents who are able to avoid their obligations simply by moving across local or state lines." *Hodges*, 121 F. Supp. 2d at 873. Thus, like the district court, we are satisfied that Congress acted in the general welfare when it enacted the child support enforcement programs and the associated funding conditions under Title IV-D.

South Carolina's contention that the Title IV-D conditions are ambiguous is without merit. The statute expressly provides that compliance with the automated system and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A. We agree with the district court that the clear and unequivocal statement of the required conditions in the statute enabled South Carolina to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted).

A third limitation on the Spending Power requires that conditions "bear some relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992) (citing *Dole*, 483 U.S. at 207-08, n.3). Here, there is a complementary relationship

between efficient child support enforcement and the broader goals of providing assistance to needy families through the TANF program. Establishing paternity and collecting child support may enable families to reduce their dependence on the welfare system, and both programs are intended to reduce the incidence of poverty among children and families. The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely to provide uniform levels of support for children of equal need").[1]

South Carolina does not contend that the Title IV-D conditions violate the fourth limitation on the Spending Power — that the conditions violate any independent Constitutional prohibition, rather it raises a Tenth Amendment[2] challenge. As we have recently reconfirmed, "the Tenth Amendment itself *does not* act as a constitutional bar to Congress's spending power; rather, the fourth restriction on Congress's spending power stands for the more general proposition that Congress may not induce the states to engage in activities that would themselves be unconstitutional." *James Island Pub. Serv. Dist. v. City of Charleston*, 249 F.3d 323, 327 (4th Cir. 2001) (citing *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000)) (italics in original). We therefore next consider South Carolina's Tenth Amendment argument, not as a limitation related to the Spending Clause, but as an independent constitutional challenge.

South Carolina argues that the coercive effect of the Title IV-D conditions run afoul of the protections of the Tenth Amendment. The Supreme Court has recognized that the Tenth Amendment may be implicated when the financial incentives offered by the federal government to the States cross the impermissible line where "pressure

---

[1] *Sullivan* considered the relationship between child enforcement programs and Aid to Families with Dependent Children (AFDC). 496 U.S. at 478. TANF is a block grant program established in 1996 as the successor to the AFDC program. See 42 U.S.C. §§ 601-618.

[2] The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

turns into compulsion." See *Dole*, 483 U.S. at 211 (citations omitted). Congress may use its Spending Power to influence a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, but Congress, under the Commerce Clause, may offer the States a choice of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

The district court found that, based on the State's own admission, the alternative penalty, which South Carolina has now elected, would result in the loss of a small fraction of the State's TANF funds and that such a proportion was noncoercive. Given the linkages between child support enforcement and aid to needy families and the level of the alternative penalty, we agree with the district court's conclusion that "the Title IV-D conditions are not so overbearing as to create an unconstitutional compulsion." *Hodges*, 121 F.2d at 875.

South Carolina next contends that the Secretary of the Department of Health and Human Services (HHS) has the discretion to deviate from the alternative penalty structure of Title VI-D in order to respond to the peculiar circumstances that led to South Carolina's noncompliance. Specifically, South Carolina argues that its inability to comply with the automated system and SDU requirements was caused by the failure of its prime contractor, Unisys, to deliver on its contract with the State. South Carolina maintains that because its noncompliance was no fault of its own and its alternative systems are in substantial compliance with the goals of the statute, the Secretary abused her discretion by refusing to grant South Carolina an evidentiary hearing and waive or amend the alternative penalty for noncompliance.

We have examined the penalty provisions of the statute and, like the district court, cannot find the discretion South Carolina envisions. The wording of the statute is plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submit-

ted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and *the Secretary shall reduce the amount otherwise payable to the State* [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). Again, we agree with the district court that "[b]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges*, 121 F.2d at 879. Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, South Carolina's assertion that it is entitled to an evidentiary hearing must also fail.[3]

### III.

For the foregoing reasons, we are of opinion that the Title IV-D provisions are constitutionally valid under the Spending Clause and the Tenth Amendment and that the Secretary lacks discretion under Title IV-D to deviate from the penalty provisions.

The judgment of the district court is accordingly

*AFFIRMED.*

---

[3] In the district court, South Carolina asserted a Due Process claim which the district court denied. The court concluded that the "State cannot invoke the protections of the Fifth Amendment with claims that [the State] has been harmed." *Hodges*, 121 F.2d at 865. South Carolina does not take issue with the district court's holding, but rather, on appeal it asserts that the State is entitled to assert a Due Process claim on behalf of its citizens. Because this contention was never properly presented to the district court, we do not consider it now. See *McGowan v. Gillenwater*, 429 F.2d 586, 587 (4th Cir. 1970).

No. 23-1851

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official
capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY
FOBERT, KARLA CABALLEROS and TIMOTHY FLYNN in their individual
and official capacities; GERO MEYERSIEK; BARBARA GRADY

Defendants-Appellees.

Appeal from the United States District Court
for the District of Rhode Island

_____

**APPELLANT'S OBJECTION TO APPELLEES' MOTION TO STRIKE
APPELLANT'S NOTICE TO THE JUDGES OF THE UNITED STATES OF
THE COMMISSION OF ACTIVITIES BY PERSONS OR WHOEVER
INVOLVING RECORD TAMPERING; KNOWING PRESENTATION, OR
CAUSING TO BE PRESENTED OR CERTIFICATION OF A FALSE OR
FRAUDULENT CLAIM TO THE UNITED STATES, TO THE STATE OF
TEXAS, FOR PAYMENT OR APPROVAL; KNOWINGLY MAKING,
USING OR CAUSING TO BE MADE OR USED, A FALSE RECORD OR
STATEMENT MATERIAL TO A FALSE OR FRAUDULENT CLAIM;
CONSPIRING TO COMMIT A VIOLATION OF THE AFORESAID TO
PROCURE TITLE IV-D FUNDING, THAT INVOLVE VIOLATIONS OF 42
U.S.C. § 654 WHICH ARE**

**PENALTY-INCURRING AND FINES INCURRING UNDER 42 U.S.C. §
654, COMMITTED BY INDIVIDUAL APPELLEE PERSONS, WHOEVER,**

**AND AGENTS OF TITLE IV SOCIAL SECURITY ACT RHODE ISLAND STATE PLAN**

**Under Fed. R. Evid. 201**

**and**

**Pursuant to**

**18 U.S.C. § 4**
**18 U.S.C. § 666**

**18 U.S.C. § 287 - making false, fictitious claims,**

**18 U.S.C. § 371 - conspiracy to defraud the United States,**

**18 U.S.C. § 1001 - false documents or false statements to a federal agency,**

**18 U.S.C. § 1341 - mail fraud,**

**18 U.S.C. § 1343 - wire fraud,**

**18 U.S.C. § 641 - Public money, property or records,**

**31 U.S.C. § 3279 - federal civil false claims act**

**Et al.**

**AND**

**APPELLANT'S REQUEST FOR A HEARING PURSUANT TO FED. R. EVID. 201(e)**

_____

**ORGANIZED FRAUD, THEFT OF PUBLIC MONEY AND GOVERNMENT PROGRAMS INVOLVING BILLIONS OF DOLLARS**

Appellant, MARY SEGUIN, hereby objects to State Appellees' Motion to Strike dated March 29, 2024, Document: 00118126183 and requests a hearing of Appellant's Objection pursuant to **Rule 201[e]**.   Appellant was not aware of the

Rhode Island State Policy that prohibits the charging of interest rate in interstate cases until 2024, see Appellee Rhode Island Office of Child Support Services **<mark>Policy Exhibit A</mark>**.  Therefore, this evidence was not available at the time final judgment was issued on September 28, 2023 in this matter.  Judicial Notice, in aid of the court, is respectfully requested of it. Whether requesting or opposing judicial notice, litigants have a right to be heard on the issue under **Rule 201[e], therefore, Appellant requests a hearing on the issue under Rule 201(e).**

**Under Fed. R. Evid. 201[f]**, judicial notice of adjudicative facts may be taken at any stage of the proceedings, including on appeal. In practice, appellate courts frequently take judicial notice of both adjudicative and legislative facts presented for the first time on appeal, whether requested by a party or on their own initiative. See, e.g., *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 [2d Cir. 2002]; In *re Indian Palms Assoc. Ltd* ., 61 F.3d 197, 205 [3d Cir. 1995].

Judicial Notice in practice is taken at any time of a proceeding, including for the first time on appeal, of legislative history, to wit the legislative history of 42 U.S.C. sec. 654 regarding Congress's Amendment in 1996.  This similarly applies to the State of Rhode Island's legislative history, to wit, the failure of Rhode Island Gen. Law. 15-5-16.5 to comply with the 1996 Amendment of 42 U.S.C. sec. 654.

42 U.S.C. sec. 654 makes it explicitly clear that such failures incur penalties. The fact that Rhode Island family court is a court of limited jurisdiction, as prescribed by R.I. Gen. Law. 8-10-3 where limited relief is authorized by State legislation is a matter of legislative fact, that in practice is judicially noted at any time of a proceeding, including for the first time on appeal.

Appellant re-attaches these legislative copies hereto this Objection. These legislations and the pre-emptive effect of the explicit language in the statutory provisions under Amendment 1996 of 42 U.S.C. sec. 654 make clear that the State of Rhode Island is operating an unlawful State Plan that unlawfully charges 12% compound interest on overdue support under color of state law, the basis of the current "State enforcement" of its "court orders" charging 12% compound interest without jurisdiction. Since a trial did not occur in this matter, at this juncture the Court must take all factual allegations in the Amended Complaint in this matter as true, and it plainly pleads that the State Appellee represented to the Appellant in Texas that if Appellant paid $104,185.98 in one lump sum, Appellee Gero Meyersiek waived interest, and that the $104,185.98 is a pay-off amount that does not include interest.

Therefore, Appellee Gero Meyersiek changed his mind after Texas Appellant accepted the offer in Texas, performed and paid the lump sum $104,185.98. The "changed his mind" entailed the action of "putting interest back

on the system" that consists of 12% compound interest (see attached R.I.G.L. sec. 15-5-16.5.)

Since the State Plan that charges 12% compound interest, takes interest off the system only during certifications to the TEXAS and UNITED STATES authorities, and then puts interest back on the system when Appellee Gero Meyersiek "changed his mind" waiving interest after Texas Appellant performed on the terms of the agreement, it is abundantly clear that the Appellees, government and private persons operate a criminally unlawful State Plan. Since all Appellees participate in the "take interest off the system" when certifying to TEXAS and when certifying to the UNITED STATES the total support due, and since the State Policy provides for the creation of "two reports," Fed. R.Evidence 201 evidence is abundantly clear before this Court and before a panel of "some judges" that of organized criminal fraud and the lack of jurisdiction of the limited jurisdiction state family court to issue orders for 12% compound interest on overdue support that 42 U.S.C. 654(21)(A) explicitly prohibits.

Appellees' request to strike Fed. R. Evid. 201 evidence of crimes made known to "some judges" under 18 U.S.C. sec. 4 from the record in a matter that involves Appellees' organized criminal activity that violates, inter alia, 18 U.S.C. sec. 666 and 18 U.S.C. sec. 641, 18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false

documents or false statements to a federal agency, 18 U.S.C. § 1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud by the Appellees is an obstruction of an official proceeding and an obstruction of justice.

Finally, undisputed Appellees' operational evidence that includes unlawful redactions made sense only after the availability in 2024 of the State Policy that evidences the State Plan operating an unlawful Child Support enforcement program by policy of creating "two reports" in interstate cases, one with the unlawful 12% compound interest to enforce under color of law, and one report for the purposes of making false claims, false certifications, and falsifying official government documents to unlawfully apply for Federal Title IV Program funding that the Appellees knew Rhode Island is ineligible for. That amounts to billions of dollars of theft against the United States.

Emphatically, Congress intended, by making "some judge(s)"…"of the United States" to whom the commission of crimes is mandated to be made known, explicitly conferred the duty on Judges of the United States under Federal Criminal Law the same duty, obligations and responsibility acting as authorities under the United States, as the "other persons in civil or military authority under the United States" explicitly named in the federal criminal statute 18 U.S.C. sec. 4. Appellant requested Judicial Notice under 18 U.S.C. sec. 4 to the "some judges" as the "person in authority under the United States" under 18 U.S.C. sec. 4. Striking

from the record Congressional legislation history of 42 U.S.C. sec. 654, State

legislation history, Rhode Island State Plan 42 U.S.C. sec. 654(3) State operating

and disbursement unit's Policy that are neither classified information nor

confidential or privileged information to the United States are further not in the

interest of the United States.

Striking evidence that shows $0.00 interest on a December 6, 2021

screenshot of the Appellee-operated 42 U.S.C. sec. 654a automated data

processing and information retrieval system accomplishes nothing other than

taking as true the factual allegations in the Amended Complaint that details

Appellant being shown the $0.00 Under Interest generated by the automated data

processing and information retrieval system. The Fed. R. Evid. visual evidence

aids the court to visualize the truth of Appellant's factual allegations.

Striking evidence of a screenshot of the Appellee-operated 42 U.S.C. sec.

654a automated data processing and information retrieval system that shows $0.00

Payment for Appellant's whopping lump sum $104,185.98 December 7, 2021

payment accomplishes nothing, when the screenshot is a visual evidence of the

"two reports" explicitly stated in the Appellee State Policy to create "two reports"

that consist of falsified records – these are evidence in the aid of the court of

Appellant's 18 U.S.C. sec. 4 and Fed. R. Evid. request to take judicial notice of

activities that harm the United States and steal from Federal Program Funds.

This case is related to Appeal No. 23-1967 and Appeal No. 23-1978.

**==Under Fed. R. Evid. 201[f]==**, judicial notice of adjudicative facts may be taken at any stage of the proceedings, including on appeal. In practice, appellate courts frequently take judicial notice of both adjudicative and legislative facts presented for the first time on appeal, whether requested by a party or on their own initiative. See, e.g., *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 [2d Cir. 2002]; In re *Indian Palms Assoc. Ltd .*, 61 F.3d 197, 205 [3d Cir. 1995].

Appellate courts take judicial notice of facts that were not available to litigants at trial and events that occurred after judgment was entered. For example, courts have taken judicial notice of guilty pleas entered in a related criminal case after judgment in the civil case was entered. See, e.g., *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 [4th Cir. 1989]. Similarly, appellate courts have taken judicial notice of post-judgment changes in the conditions in a foreign country relevant to an immigration appeal, *Ivezaj v. INS* , 84 F.3d 215, 218-19 [6th Cir. 1996], as well as post-trial changes in the racial composition of a state's judiciary in a discrimination suit. *Southern Christian Leadership Conference of Alabama v. Sessions*, 56 F.3d 1281, 1288 n.13 [11th Cir. 1995].

Certain categories of facts have long been the subject of judicial notice on appeal. Courts routinely take judicial notice of pleadings and records in other court cases [see, e.g., *Green v. Warden*, U.S. Penitentiary, 699 F.2d 364, 369 [7th Cir. 1983]; *E.I. du Pont de Nemours & Co. Inc. v. Cullen*, 791 F.2d 5, 7 [1st Cir. 1986]] and in administrative agency proceedings [see, e.g., *Opeka v. INS*, 194 F.3d 392, 394-95 [7th Cir. 1996]], Courts are generally willing to take judicial notice of data, pronouncements and publications issued by the government, such as Environmental Protection Agency research [*Nebraska v. EPA*, 331 F.3d 995, 998 n.3 [D.C. Cir. 2003]]; State Department travel warnings [*Parsons v. United Tech. Corp* ., 700 A.2d 655, 665 n.18 [Conn. 1997]]; and a federal fisheries management plan approved by formal rule [*City of Charleston v. A Fisherman's Best Inc*., 310 F.3d 155, 172 [4th Cir. 2002], cert. denied, 123 S.Ct. 2573 [2003]]. Appellate courts are also likely to take judicial notice of relevant newspaper articles [see, e.g., *The Washington Post v. Robinson*, 935 F.2d 282, 291-92 [D.C. Cir. 1991]] and historical information contained in authoritative publications, such as a text on the history of Lincoln Center [see, e.g., Hotel Employees, 311 F.3d at 540 n.1.].

Courts take judicial notice of online information.  Appellate courts have increasingly cited information found on the Internet. As with hard-copy publications, courts are most willing to take judicial notice of information found on government Web sites, such as the time of sunrise found on the Web site of the

U.S. Naval Observatory [*U.S. v. Bervaldi*, 226 F.3d 1256, 1266 n.9 [11th Cir. 2000]]; the prime interest rate on the Federal Reserve Board Web site [*Levan v. Capital Cities/ABC Inc.*, 190 F.3d 1230, 1235 n.12 [11th Cir. 1999]]; and records of retired military personnel on a federal Web site [*Denius*, 330 F.3d at 926]. Courts have even been willing to take judicial notice of information on arguably less reliable commercial Internet sites, including mileage information on Mapquest [*In re Extradition of Gonzalez*, 52 F. Supp. 2d 725, 731 n.12 [W.D. La. 1999]]; historical information on Liberia on the "Geocities" Web site [*Bridgeway Corp. v. Citibank*, 45 F. Supp. 2d 276, 278 n.2 [S.D.N.Y. 1999]]; and information regarding a bank's ownership from the bank's Web site [see *Laborers' Pension Fund v. Blackmore Sewer Constr. Inc.*, 298 F.3d 600, 607 [7th Cir. 2002]].

The use of judicial notice spans a wide spectrum of cases, from the most historically significant-such as Chief Justice Earl Warren's reliance in *Brown v. Board of Ed.*, 347 U.S. 483, 494 n.11 [1954], on scholarly publications documenting the effect of segregated schools on minority children-to the most mundane, such as the 2d U.S. Circuit Court of Appeals' judicial notice of the "traditional features of a snowman." *Eden Toys Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 n.1 [2d Cir. 1982].

In general, courts are free to take notice of legislative facts, including research data and writings like those cited in the famous "Brandeis briefs."

Appellate courts are understandably more willing to take judicial notice of such legislative facts, because they help them develop reasonable rules of law that will apply in future cases. "Legislative facts," which are facts of general "relevance to legal reasoning and the lawmaking process" [Fed. R. Evid. 201[a] Advisory Committee's note] or are "established truths, facts or pronouncements that do not change from case to case" and "do not relate specifically to the…litigants." [*United States v. Gould*, 536 F.2d 216, 220 [8th Cir. 1976]]. 42 U.S.C. sec. 654 relates to all interested parties and the United States, and are established truths and facts that do not change from case to case, and do not specifically only apply just to this matter. Likewise R.I. Gen. Laws. Sec, 15-5-16.5 relates to all interested parties and the United States, not just to this matter. Likewise the Appellees' State Policy prohibiting the charging of interest in interstate cases and creating "two reports" from the policy adjustments to the 42 U.S.C. sec. 654a automated data processing and information retrieval system is established truths and facts that do not change from case to case, and do not specifically only apply just to this matter. The resultant Screenshot evidence of the resulting false records created by the "two reports" do not change because Rhode Island creates two reports in intrastate cases in order to evade detection of the unlawful 12% compound interest under color of state law, one for enforcement under color of law, one for false certification of State Plan compliance to the United States Title IV Program. While full suite of

issues concerning State noncompliance with 42 U.S.C. sec. 654 this Court notices under the *Turner v. Rogers Amicus Brief* submitted by the United States can be noticed on the Court's own initiative, however, the full suite of the issues contained therein made sense of the State Policy that was not available to the Appellant under 2024 – nevertheless, Appellant makes known this evidence to the judges of the First Circuit Court of Appeals under 18 U.S.C. sec. 4 and Fed. R. Evid. 201.

As such, all public truths and facts and publications "made known" to this Court under **18 U.S.C. sec. 4** and **Fed. R. Evid. 201** should be judicially noticed.

Appellant separately filed a Notice requesting judicial notice on March 29, 2024 Document: **00118126217**, specifically invoking **Fed. R. Evid. 201** and **18 U.S.C. sec. 4**.

Whether requesting or opposing judicial notice, litigants have a right to be heard on the issue under **Rule 201[e].**

**WHEREFORE**, Under Fed. R. Evid. 201[f], judicial notice of adjudicative facts may be taken at any stage of the proceedings, including on appeal. In practice, appellate courts frequently take judicial notice of both adjudicative and legislative facts presented for the first time on appeal, whether requested by a party or on their own initiative. See, e.g., *Hotel Employees & Rest. Employees Union,*

*Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 [2d Cir. 2002]; In *re Indian Palms Assoc. Ltd* ., 61 F.3d 197, 205 [3d Cir. 1995]. Appellant respectfully requests Judicial Notice of the herein Made known to "some judges"… "of the United States" under **Fed. R. Evid. 201** and pursuant to **18 U.S.C. sec. 4.** Appellant requests to be heard on the issue pursuant to **Rule 201[e].** Appellant requests any and all Relief deemed just pursuant to protections accorded to actions in compliance with **18 U.S.C. sec. 4**.

Respectfully submitted,

Mary Seguin
Pro Se
/s/    *Mary Seguin*
Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: March 29, 2024

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing instrument has been served via the Court's ECF filing system on March 29, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/      *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Exhibit A

## SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

---

**42 USC 654: State plan for child and spousal support**
Text contains those laws in effect on March 25, 2024

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
CHAPTER 7-SOCIAL SECURITY
SUBCHAPTER IV-GRANTS TO STATES FOR AID AND SERVICES TO NEEDY FAMILIES WITH
CHILDREN AND FOR CHILD-WELFARE SERVICES
Part D-Child Support and Establishment of Paternity
**Jump To:**
**Source Credit**
**Miscellaneous**
**References In Text**
**Codification**
**Amendments**
**Effective Date**

---

# §654. State plan for child and spousal support

A State plan for child and spousal support must-

(1) provide that it shall be in effect in all political subdivisions of the State;

(2) provide for financial participation by the State;

(3) provide for the establishment or designation of a single and separate organizational unit, which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan;

(4) provide that the State will-

(A) provide services relating to the establishment of paternity or the establishment, modification, or enforcement of child support obligations, as appropriate, under the plan with respect to-

(i) each child for whom (I) assistance is provided under the State program funded under part A of this subchapter, (II) benefits or services for foster care maintenance are provided under the State program funded under part E of this subchapter, (III) medical assistance is provided under the State plan approved under subchapter XIX, or (IV) cooperation is required pursuant to section 2015(l)(1) of title 7, unless, in accordance with paragraph (29), good cause or other exceptions exist;

(ii) any other child, if an individual applies for such services with respect to the child (except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the individual to request the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application); and

(B) enforce any support obligation established with respect to-

(i) a child with respect to whom the State provides services under the plan; or

(ii) the custodial parent of such a child;

(5) provide that (A) in any case in which support payments are collected for an individual with respect to whom an assignment pursuant to section 608(a)(3) of this title is effective, such payments shall be made to the State for distribution pursuant to section 657 of this title and shall not be paid directly to the family, and the individual will be notified on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden) of the amount of the support payments collected, and (B) in any case in which support payments are collected for an individual pursuant to the assignment made under section 1396k of this title, such payments shall be made to the State for distribution pursuant to section 1396k of this title, except that this clause shall not apply to such payments for any month after the month

in which the individual ceases to be eligible for medical assistance;

(6) provide that-

(A) services under the plan shall be made available to residents of other States on the same terms as to residents of the State submitting the plan;

(B)(i) an application fee for furnishing such services shall be imposed on an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section 2015 of title 7, and shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (I) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (II) may vary among such individuals on the basis of ability to pay (as determined by the State); and

(ii) in the case of an individual who has never received assistance under a State program funded under part A and for whom the State has collected at least $550 of support, the State shall impose an annual fee of $35 for each case in which services are furnished, which shall be retained by the State from support collected on behalf of the individual (but not from the first $550 so collected), paid by the individual applying for the services, recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and the fees shall be considered income to the program);

(C) a fee of not more than $25 may be imposed in any case where the State requests the Secretary of the Treasury to withhold past-due support owed to or on behalf of such individual from a tax refund pursuant to section 664(a)(2) of this title;

(D) a fee (in accordance with regulations of the Secretary) for performing genetic tests may be imposed on any individual who is not a recipient of assistance under a State program funded under part A; and

(E) any costs in excess of the fees so imposed may be collected-

(i) from the parent who owes the child or spousal support obligation involved; or

(ii) at the option of the State, from the individual to whom such services are made available, but only if such State has in effect a procedure whereby all persons in such State having authority to order child or spousal support are informed that such costs are to be collected from the individual to whom such services were made available;


(7) provide for entering into cooperative arrangements with appropriate courts and law enforcement officials and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering the plan, including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;

(8) provide that, for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title the agency administering the plan will establish a service to locate parents utilizing-

(A) all sources of information and available records; and

(B) the Federal Parent Locator Service established under section 653 of this title,


and shall, subject to the privacy safeguards required under paragraph (26), disclose only the information described in sections 653 and 663 of this title to the authorized persons specified in such sections for the purposes specified in such sections;

(9) provide that the State will, in accordance with standards prescribed by the Secretary, cooperate with any other State-

(A) in establishing paternity, if necessary;

(B) in locating a noncustodial parent residing in the State (whether or not permanently) against

whom any action is being taken under a program established under a plan approved under this part in another State;

(C) in securing compliance by a noncustodial parent residing in such State (whether or not permanently) with an order issued by a court of competent jurisdiction against such parent for the support and maintenance of the child or children or the parent of such child or children with respect to whom aid is being provided under the plan of such other State;

(D) in carrying out other functions required under a plan approved under this part; and

(E) not later than March 1, 1997, in using the forms promulgated pursuant to section 652(a)(11) of this title for income withholding, imposition of liens, and issuance of administrative subpoenas in interstate child support cases;

(10) provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;

(11)(A) provide that amounts collected as support shall be distributed as provided in section 657 of this title; and

(B) provide that any payment required to be made under section 656 or 657 of this title to a family shall be made to the resident parent, legal guardian, or caretaker relative having custody of or responsibility for the child or children;

(12) provide for the establishment of procedures to require the State to provide individuals who are applying for or receiving services under the State plan, or who are parties to cases in which services are being provided under the State plan-

(A) with notice of all proceedings in which support obligations might be established or modified; and

(B) with a copy of any order establishing or modifying a child support obligation, or (in the case of a petition for modification) a notice of determination that there should be no change in the amount of the child support award, within 14 days after issuance of such order or determination;

(13) provide that the State will comply with such other requirements and standards as the Secretary determines to be necessary to the establishment of an effective program for locating noncustodial parents, establishing paternity, obtaining support orders, and collecting support payments and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan;

(14)(A) comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

(B) maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them to conceal in the accounting records the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

(15) provide for-

(A) a process for annual reviews of and reports to the Secretary on the State program operated under the State plan approved under this part, including such information as may be necessary to measure State compliance with Federal requirements for expedited procedures, using such standards and procedures as are required by the Secretary, under which the State agency will determine the extent to which the program is operated in compliance with this part; and

(B) a process of extracting from the automated data processing system required by paragraph (16) and transmitting to the Secretary data and calculations concerning the levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 652(g) and 658a of this title;

(16) provide for the establishment and operation by the State agency, in accordance with an (initial and annually updated) advance automated data processing planning document approved under section 652(d) of this title, of a statewide automated data processing and information retrieval system meeting the requirements of section 654a of this title designed effectively and efficiently to assist management in

the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan;

(17) provide that the State will have in effect an agreement with the Secretary entered into pursuant to section 663 of this title for the use of the Parent Locator Service established under section 653 of this title, and provide that the State will accept and transmit to the Secretary requests for information authorized under the provisions of the agreement to be furnished by such Service to authorized persons, will impose and collect (in accordance with regulations of the Secretary) a fee sufficient to cover the costs to the State and to the Secretary incurred by reason of such requests, will transmit to the Secretary from time to time (in accordance with such regulations) so much of the fees collected as are attributable to such costs to the Secretary so incurred, and during the period that such agreement is in effect will otherwise comply with such agreement and regulations of the Secretary with respect thereto;

(18) provide that the State has in effect procedures necessary to obtain payment of past-due support from overpayments made to the Secretary of the Treasury as set forth in section 664 of this title, and take all steps necessary to implement and utilize such procedures;

(19) provide that the agency administering the plan-

(A) shall determine on a periodic basis, from information supplied pursuant to section 508 of the Unemployment Compensation Amendments of 1976, whether any individuals receiving compensation under the State's unemployment compensation law (including amounts payable pursuant to any agreement under any Federal unemployment compensation law) owe child support obligations which are being enforced by such agency; and

(B) shall enforce any such child support obligations which are owed by such an individual but are not being met-

(i) through an agreement with such individual to have specified amounts withheld from compensation otherwise payable to such individual and by submitting a copy of any such agreement to the State agency administering the unemployment compensation law; or

(ii) in the absence of such an agreement, by bringing legal process (as defined in section 659(i)(5) of this title) to require the withholding of amounts from such compensation;


(20) provide, to the extent required by section 666 of this title, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws;

(21)(A) at the option of the State, impose a late payment fee on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; and

(B) assure that the fee will be collected in addition to, and only after full payment of, the overdue support, and that the imposition of the late payment fee shall not directly or indirectly result in a decrease in the amount of the support which is paid to the child (or spouse) to whom, or on whose behalf, it is owed;

(22) in order for the State to be eligible to receive any incentive payments under section 658a of this title, provide that, if one or more political subdivisions of the State participate in the costs of carrying out activities under the State plan during any period, each such subdivision shall be entitled to receive an appropriate share (as determined by the State) of any such incentive payments made to the State for such period, taking into account the efficiency and effectiveness of the activities carried out under the State plan by such political subdivision;

(23) provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services and a telephone number or postal address at which further information may be obtained and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate;

(24) provide that the State will have in effect an automated data processing and information retrieval system-

(A) by October 1, 1997, which meets all requirements of this part which were enacted on or before October 13, 1988; and

(B) by October 1, 2000, which meets all requirements of this part enacted on or before August 22, 1996, except that such deadline shall be extended by 1 day for each day (if any) by which the Secretary fails to meet the deadline imposed by section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996;

(25) provide that if a family with respect to which services are provided under the plan ceases to receive assistance under the State program funded under part A, the State shall provide appropriate notice to the family and continue to provide such services, subject to the same conditions and on the same basis as in the case of other individuals to whom services are furnished under the plan, except that an application or other request to continue services shall not be required of such a family and paragraph (6)(B) shall not apply to the family;

(26) have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the parties, including-

(A) safeguards against unauthorized use or disclosure of information relating to proceedings or actions to establish paternity, or to establish, modify, or enforce support, or to make or enforce a child custody determination;

(B) prohibitions against the release of information on the whereabouts of 1 party or the child to another party against whom a protective order with respect to the former party or the child has been entered;

(C) prohibitions against the release of information on the whereabouts of 1 party or the child to another person if the State has reason to believe that the release of the information to that person may result in physical or emotional harm to the party or the child;

(D) in cases in which the prohibitions under subparagraphs (B) and (C) apply, the requirement to notify the Secretary, for purposes of section 653(b)(2) of this title, that the State has reasonable evidence of domestic violence or child abuse against a party or the child and that the disclosure of such information could be harmful to the party or the child; and

(E) procedures providing that when the Secretary discloses information about a parent or child to a State court or an agent of a State court described in section 653(c)(2) or 663(d)(2)(B) of this title, and advises that court or agent that the Secretary has been notified that there is reasonable evidence of domestic violence or child abuse pursuant to section 653(b)(2) of this title, the court shall determine whether disclosure to any other person of information received from the Secretary could be harmful to the parent or child and, if the court determines that disclosure to any other person could be harmful, the court and its agents shall not make any such disclosure;

(27) provide that, on and after October 1, 1998, the State agency will-

(A) operate a State disbursement unit in accordance with section 654b of this title; and

(B) have sufficient State staff (consisting of State employees) and (at State option) contractors reporting directly to the State agency to-

(i) monitor and enforce support collections through the unit in cases being enforced by the State pursuant to paragraph (4) (including carrying out the automated data processing responsibilities described in section 654a(g) of this title); and

(ii) take the actions described in section 666(c)(1) of this title in appropriate cases;

(28) provide that, on and after October 1, 1997, the State will operate a State Directory of New Hires in accordance with section 653a of this title;

(29) provide that the State agency responsible for administering the State plan-

(A) shall make the determination (and redetermination at appropriate intervals) as to whether an individual who has applied for or is receiving assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, is cooperating in good faith with the State in establishing the paternity of, or in establishing, modifying, or enforcing a support order for, any child of the individual by providing the State agency with the name of, and such other information as the State agency may require with respect to, the noncustodial parent of the child, subject to good cause and other exceptions which-

(i) in the case of the State program funded under part A, the State program under part E, or the State program under subchapter XIX shall, at the option of the State, be defined, taking into account the best interests of the child, and applied in each case, by the State agency administering such program; and

(ii) in the case of the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, shall be defined and applied in each case under that program in accordance with section 2015(l)(2) of title 7;

(B) shall require the individual to supply additional necessary information and appear at interviews, hearings, and legal proceedings;

(C) shall require the individual and the child to submit to genetic tests pursuant to judicial or administrative order;

(D) may request that the individual sign a voluntary acknowledgment of paternity, after notice of the rights and consequences of such an acknowledgment, but may not require the individual to sign an acknowledgment or otherwise relinquish the right to genetic tests as a condition of cooperation and eligibility for assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7; and

(E) shall promptly notify the individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, of each such determination, and if noncooperation is determined, the basis therefor;

(30) provide that the State shall use the definitions established under section 652(a)(5) of this title in collecting and reporting information as required under this part;

(31) provide that the State agency will have in effect a procedure for certifying to the Secretary, for purposes of the procedure under section 652(k) of this title, determinations that individuals owe arrearages of child support in an amount exceeding $2,500, under which procedure-

(A) each individual concerned is afforded notice of such determination and the consequences thereof, and an opportunity to contest the determination; and

(B) the certification by the State agency is furnished to the Secretary in such format, and accompanied by such supporting documentation, as the Secretary may require;

(32)(A) provide that any request for services under this part by a foreign reciprocating country, a foreign treaty country, or a foreign country with which the State has an arrangement described in section 659a(d) of this title shall be treated as a request by a State;

(B) provide, at State option, notwithstanding paragraph (4) or any other provision of this part, for services under the plan for enforcement of a spousal support order not described in paragraph (4)(B) entered by such a country (or subdivision); and

(C) provide that no applications will be required from, and no costs will be assessed for such services against, the foreign reciprocating country, foreign treaty country, or foreign individual (but costs may at State option be assessed against the obligor);

(33) provide that a State that receives funding pursuant to section 628 of this title and that has within its borders Indian country (as defined in section 1151 of title 18) may enter into cooperative agreements with an Indian tribe or tribal organization (as defined in subsections (e) and (l) of section 5304 of title 25), if the Indian tribe or tribal organization demonstrates that such tribe or organization has an established tribal court system or a Court of Indian Offenses with the authority to establish paternity, establish, modify, or enforce support orders, or to enter support orders in accordance with child support guidelines established or adopted by such tribe or organization, under which the State and tribe or organization shall provide for the cooperative delivery of child support enforcement services in Indian country and for the forwarding of all collections pursuant to the functions performed by the tribe or organization to the State agency, or conversely, by the State agency to the tribe or organization, which shall distribute such collections in

accordance with such agreement; and

(34) include an election by the State to apply section 657(a)(2)(B) of this title or former section 657(a)(2)(B) of this title (as in effect for the State immediately before the date this paragraph first applies to the State) to the distribution of the amounts which are the subject of such sections and, for so long as the State elects to so apply such former section, the amendments made by subsection (b)(1) of section 7301 of the Deficit Reduction Act of 2005 shall not apply with respect to the State, notwithstanding subsection (e) of such section 7301.

The State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21). Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25.

(Aug. 14, 1935, ch. 531, title IV, §454, as added Pub. L. 93–647, §101(a), Jan. 4, 1975, 88 Stat. 2354 ; amended Pub. L. 94–88, title II, §208(b), (c), Aug. 9, 1975, 89 Stat. 436 ; Pub. L. 95–30, title V, §502(a), May 23, 1977, 91 Stat. 162 ; Pub. L. 96–265, title IV, §405(b), June 9, 1980, 94 Stat. 463 ; Pub. L. 96–611, §9(a), Dec. 28, 1980, 94 Stat. 3571 ; Pub. L. 97–35, title XXIII, §§2331(b), 2332(d), 2333(a), (b), 2335(a), Aug. 13, 1981, 95 Stat. 860 , 862, 863; Pub. L. 97–248, title I, §§171(a), (b)(1), 173(a), Sept. 3, 1982, 96 Stat. 401 , 403; Pub. L. 98–369, div. B, title VI, §2663(c)(14), (j)(2)(B)(x), July 18, 1984, 98 Stat. 1166 , 1170; Pub. L. 98–378, §§3(a), (c)–(f), 5(b), 6(a), 11(b)(1), 12(a), (b), 14(a), 21(d), Aug. 16, 1984, 98 Stat. 1306 , 1310, 1311, 1314, 1318, 1319, 1320, 1324; Pub. L. 100–203, title IX, §§9141(a)(2), 9142(a), Dec. 22, 1987, 101 Stat. 1330–321 ; Pub. L. 100–485, title I, §§104(a), 111(c), 123(a), (d), Oct. 13, 1988, 102 Stat. 2348 , 2349, 2352, 2353; Pub. L. 104–35, §1(a), Oct. 12, 1995, 109 Stat. 294 ; Pub. L. 104–193, title I, §108(c)(11), (12), title III, §§301(a), (b), 302(b)(2), 303(a), 304(a), 312(a), 313(a), 316(g)(1), 324(b), 332, 333, 342(a), 343(b), 344(a)(1), (4), 370(a)(2), 371(b), 375(a), (c), 395(d)(1)(D), (2)(B), Aug. 22, 1996, 110 Stat. 2166 , 2199, 2204, 2205, 2207, 2209, 2218, 2223, 2230, 2233, 2234, 2236, 2252, 2254, 2256, 2259, 2260; Pub. L. 105–33, title V, §§5531(a), 5542(c), 5545, 5546(a), 5548, 5552, 5556(b), Aug. 5, 1997, 111 Stat. 625 , 631, 633, 635, 637; Pub. L. 106–169, title IV, §401(g), (h), Dec. 14, 1999, 113 Stat. 1858 ; Pub. L. 109–171, title VII, §§7301(b)(1)(C), 7303(b), 7310(a), Feb. 8, 2006, 120 Stat. 143 , 145, 147; Pub. L. 110–234, title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), May 22, 2008, 122 Stat. 1095–1097 , 1110; Pub. L. 110–246, §4(a), title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), June 18, 2008, 122 Stat. 1664 , 1857, 1858, 1871; Pub. L. 113–79, title IV, §4030(v), Feb. 7, 2014, 128 Stat. 815 ; Pub. L. 113–183, title III, §301(c), Sept. 29, 2014, 128 Stat. 1943 ; Pub. L. 115–123, div. E, title XII, §53117(a), Feb. 9, 2018, 132 Stat. 307 .)

### EDITORIAL NOTES

## REFERENCES IN TEXT

Section 508 of the Unemployment Compensation Amendments of 1976, referred to in par. (19), is section 508 of Pub. L. 94–566, Oct. 20, 1976, 90 Stat. 2689 , which enacted section 603a of this title and amended section 49b of Title 29, Labor.

Section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, referred to in par. (24), is section 344(a)(3) of Pub. L. 104–193, which is set out as a Regulations note under section 654a of this title.

Section 2012(l) of title 7, referred to in par. (29), was struck out, and a new section 2012(t) of title 7 similarly defining "supplemental nutrition assistance program" was enacted, by Pub. L. 113–79, title IV, §4030(a)(3), (5), Feb. 7, 2014, 128 Stat. 813 .

Section 7301 of the Deficit Reduction Act of 2005, referred to in par. (34), is section 7301 of Pub. L. 109–171, title VII, Feb. 8, 2006, 120 Stat. 141 . Subsec. (b)(1) of section 7301 of Pub. L. 109–171 amended this section and section 657 of this title. Subsec. (e) of section 7301 of Pub. L. 109–171 is set out as an Effective Date of 2006 Amendment note under section 608 of this title.

## CODIFICATION

Pub. L. 110–234 and Pub. L. 110–246 made identical amendments to this section. The amendments by Pub. L. 110–234 were repealed by section 4(a) of Pub. L. 110–246.

## AMENDMENTS

**2018**-Par. (6)(B)(ii). Pub. L. 115–123 substituted "$35" for "$25" and, in two places, substituted "$550" for "$500".

**2014**-Par. (4)(A)(ii). Pub. L. 113–183, §301(c)(1), inserted before semicolon "(except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the individual to request the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application)".

Par. (29)(A), (D), (E). Pub. L. 113–79, §4030(v), amended Pub. L. 110–246, §4115(c)(2)(H). See 2008 Amendment note below.

Par. (32)(A). Pub. L. 113–183, §301(c)(2)(A), inserted ", a foreign treaty country," after "a foreign reciprocating country".

Par. (32)(C). Pub. L. 113–183, §301(c)(2)(B), substituted ", foreign treaty country, or foreign individual" for "or foreign obligee".

**2008**-Pars. (4)(A)(i)(IV), (6)(B)(i). Pub. L. 110–246, §4002(b)(1)(B), (2)(V), made technical amendment to references in original act which appear in text as references to sections 2015(l)(1) and 2015 of title 7.

Par. (29)(A), (D), (E). Pub. L. 110–246, §4115(c)(2)(H), as amended by Pub. L. 113–79, §4030(v), substituted "section 2012(l)" for "section 2012(h)" wherever appearing.

Pub. L. 110–246, §4002(b)(1)(A), (B), (2)(V), substituted "supplemental nutrition assistance program" for "food stamp program" wherever appearing and made technical amendment to references in original act which appear in text as references to sections 2012(h) and 2015(l)(2) of title 7.

**2006**-Par. (6)(B). Pub. L. 109–171, §7310(a), designated existing provisions as cl. (i), redesignated former cls. (i) and (ii) as subcls. (I) and (II), respectively, of cl. (i), and added cl. (ii).

Par. (31). Pub. L. 109–171, §7303(b), substituted "$2,500" for "$5,000" in introductory provisions.

Par. (34). Pub. L. 109–171, §7301(b)(1)(C), added par. (34).

**1999**-Par. (6)(E)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (9)(A) to (C). Pub. L. 106–169, §401(g)(2), substituted semicolon for comma at end.

Par. (19)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (19)(B)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (24)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (24)(B). Pub. L. 106–169, §401(h), made technical amendment to reference in original act which appears in text as reference to August 22, 1996.

**1997**-Par. (4)(A)(i)(IV). Pub. L. 105–33, §5548(a), added subcl. (IV).

Par. (6)(B). Pub. L. 105–33, §5531(a), substituted "an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section

2015 of title 7, and" for "individuals not receiving assistance under any State program funded under part A, which".

Par. (8). Pub. L. 105–33, §5552(1)(D), inserted concluding provisions.

Pub. L. 105–33, §5552(1)(A), in introductory provisions, inserted ", for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title" after "provide that" and struck out "noncustodial" before "parents".

Par. (8)(A). Pub. L. 105–33, §5552(1)(B), substituted "records; and" for "records, and".

Par. (8)(B). Pub. L. 105–33, §5552(1)(C), substituted "title," for "title;".

Par. (16). Pub. L. 105–33, §5556(b), made technical amendment to directory language of Pub. L. 104–193, §344(a)(1)(F). See 1996 Amendment note below.

Par. (17). Pub. L. 105–33, §5552(2), substituted "provide that the State will have" for "in the case of a State which has" and inserted "and" after "section 653 of this title,".

Par. (19)(B)(ii). Pub. L. 105–33, §5542(c), substituted "section 659(i)(5)" for "section 662(e)".

Par. (26). Pub. L. 105–33, §5552(3)(A), struck out "will" before "have in effect" in introductory provisions.

Par. (26)(A). Pub. L. 105–33, §5552(3)(B), inserted ", modify," after "or to establish" and ", or to make or enforce a child custody determination" after "support".

Par. (26)(B). Pub. L. 105–33, §5552(3)(C)(i), (ii), inserted "or the child" after "1 party" and after "former party".

Par. (26)(C). Pub. L. 105–33, §5552(3)(D), inserted "or the child" after "1 party", substituted "another person" for "another party", inserted "to that person" after "release of the information", and substituted "party or the child" for "former party".

Par. (26)(D), (E). Pub. L. 105–33, §5552(3)(C)(iii), (E), added subpars. (D) and (E).

Par. (29)(A). Pub. L. 105–33, §5548(b)(1)(B), substituted cls. (i) and (ii) for

"(i) shall be defined, taking into account the best interests of the child, and

"(ii) shall be applied in each case,

by, at the option of the State, the State agency administering the State program under part A of this subchapter, this part, or subchapter XIX;".

Pub. L. 105–33, §5548(b)(1)(A), in introductory provisions, substituted "part A, the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7," for "part A of this subchapter or the State program under subchapter XIX".

Par. (29)(D). Pub. L. 105–33, §5548(b)(2), substituted "the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7" for "or the State program under subchapter XIX".

Par. (29)(E). Pub. L. 105–33, §5548(b)(3), substituted "individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the food stamp program, as defined under section 2012(h) of title 7," for "individual, the State agency administering the State program funded under part A, and the State agency administering the State program under subchapter XIX,".

Par. (32)(A). Pub. L. 105–33, §5545, substituted "section 659a(d)" for "section 659a(d)(2)".

Par. (33). Pub. L. 105–33, §5546(a), substituted "or enforce support orders, or" for "and enforce support orders, and", "guidelines established or adopted by such tribe or organization"

for "guidelines established by such tribe or organization", "all collections" for "all funding collected", and "such collections" for "such funding".

**1996**–Pub. L. 104–193, §375(a)(4), inserted at end of closing provisions "Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25."

Par. (4). Pub. L. 104–193, §301(a)(1), amended par. (4) generally. Prior to amendment, par. (4) read as follows: "provide that such State will undertake-

"(A) in the case of a child born out of wedlock with respect to whom an assignment under section 602(a)(26) of this title or section 1396k of this title is effective, to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so, or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and

"(B) in the case of any child with respect to whom such assignment is effective, including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter, to secure support for such child from his parent (or from any other person legally liable for such support), and from such parent for his spouse (or former spouse) receiving aid to families with dependent children or medical assistance under a State plan approved under subchapter XIX of this chapter (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan), utilizing any reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A or E of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so), except that when such arrangements and other means have proven ineffective, the State may utilize the Federal courts to obtain or enforce court orders for support;".

Par. (5)(A). Pub. L. 104–193, §108(c)(11), substituted "pursuant to section 608(a)(3) of this title" for "under section 602(a)(26) of this title" and "payments collected," for "payments collected; except that this paragraph shall not apply to such payments for any month following the first month in which the amount collected is sufficient to make such family ineligible for assistance under the State plan approved under part A of this subchapter;".

Par. (6). Pub. L. 104–193, §301(a)(2)(A), substituted "provide that-" for "provide that" in introductory provisions.

Par. (6)(A). Pub. L. 104–193, §301(a)(2)(B), added subpar. (A) and struck out former subpar. (A) which read as follows: "the child support collection or paternity determination services established under the plan shall be made available to any individual not otherwise eligible for such services upon application filed by such individual with the State, including support collection services for the spouse (or former spouse) with whom the absent parent's child is living (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan),".

Par. (6)(B). Pub. L. 104–193, §301(a)(2)(C), (D), inserted "on individuals not receiving assistance under any State program funded under part A" after "such services shall be imposed", realigned margins, and substituted semicolon for comma at end.

Par. (6)(C). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma at end.

Par. (6)(D). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma before "and" at end.

Pub. L. 104–193, §108(c)(12), substituted "assistance under a State program funded" for "aid under a State plan approved".

Par. (6)(E). Pub. L. 104–193, §301(a)(2)(D)(i), (E), realigned margins.

Pub. L. 104–193, §301(a)(2)(D)(ii), which directed substitution of a semicolon for the final comma, could not be executed because subpar. (E) already ended in a semicolon and not a comma.

Par. (7). Pub. L. 104–193, §375(c), inserted "and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25)" after "law enforcement officials".

Par. (8). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial" for "absent" in introductory provisions.

Par. (8)(B). Pub. L. 104–193, §316(g)(1)(A), amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: "the Parent Locator Service in the Department of Health and Human Services;".

Par. (9)(B), (C). Pub. L. 104–193, §395(d)(2)(B), substituted "a noncustodial parent" for "an absent parent".

Par. (9)(E). Pub. L. 104–193, §324(b), added subpar. (E).

Par. (11). Pub. L. 104–193, §302(b)(2), designated existing provisions as subpar. (A), inserted "and" after semicolon at end, and redesignated par. (12) as subpar. (B).

Par. (12). Pub. L. 104–193, §304(a), added par. (12). Former par. (12) redesignated (11)(B).

Pub. L. 104–193, §302(b)(2)(B), redesignated par. (12) as (11)(B).

Par. (13). Pub. L. 104–193, §§316(g)(1)(B), 395(d)(1)(D), substituted "noncustodial parents" for "absent parents" and inserted before semicolon at end "and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan".

Par. (14). Pub. L. 104–193, §342(a)(1), (2), designated existing provisions as subpar. (A) and redesignated par. (15) as subpar. (B).

Par. (15). Pub. L. 104–193, §342(a)(3), added par. (15). Former par. (15) redesignated (14)(B).

Pub. L. 104–193, §342(a)(2), redesignated par. (15) as (14)(B).

Par. (16). Pub. L. 104–193, §344(a)(1), as amended by Pub. L. 105–33, §5556(b), struck out ", at the option of the State," before "for the establishment", inserted "and operation by the State agency" after "for the establishment" and "meeting the requirements of section 654a of this title" after "information retrieval system", substituted "so as to control" for "in the State and localities thereof, so as (A) to control", struck out "(i)" before "all the factors in the support enforcement collection", and struck out before semicolon at end "(including, but not limited to, (I) identifiable correlation factors (such as social security numbers, names, dates of birth, home addresses and mailing addresses (including postal ZIP codes) of any individual with respect to whom support obligations are sought to be established or enforced and with respect to any person to whom such support obligations are owing) to assure sufficient compatibility among the systems of different jurisdictions to permit periodic screening to determine whether such

individual is paying or is obligated to pay support in more than one jurisdiction, (II) checking of records of such individuals on a periodic basis with Federal, intra- and inter-State, and local agencies, (III) maintaining the data necessary to meet the Federal reporting requirements on a timely basis, and (IV) delinquency and enforcement activities), (ii) the collection and distribution of support payments (both intra- and inter-State), the determination, collection, and distribution of incentive payments both inter- and intra-State, and the maintenance of accounts receivable on all amounts owed, collected and distributed, and (iii) the costs of all services rendered, either directly or by interfacing with State financial management and expenditure information, (B) to provide interface with records of the State's aid to families with dependent children program in order to determine if a collection of a support payment causes a change affecting eligibility for or the amount of aid under such program, (C) to provide for security against unauthorized access to, or use of, the data in such system, (D) to facilitate the development and improvement of the income withholding and other procedures required under section 666(a) of this title through the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur, and (E) to provide management information on all cases under the State plan from initial referral or application through collection and enforcement".

Par. (21)(A). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent".

Par. (23). Pub. L. 104–193, §332, inserted "and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate" before semicolon.

Par. (24). Pub. L. 104–193, §344(a)(4), amended par. (24) generally. Prior to amendment, par. (24) read as follows: "provide that if the State, as of October 13, 1988, does not have in effect an automated data processing and information retrieval system meeting all of the requirements of paragraph (16), the State-

"(A) will submit to the Secretary by October 1, 1991, for review and approval by the Secretary within 9 months after submittal an advance automated data processing planning document of the type referred to in such paragraph; and

"(B) will have in effect by October 1, 1997, an operational automated data processing and information retrieval system, meeting all the requirements of that paragraph, which has been approved by the Secretary;".

Par. (25). Pub. L. 104–193, §301(b), added par. (25).

Par. (26). Pub. L. 104–193, §303(a), added par. (26).

Par. (27). Pub. L. 104–193, §312(a), added par. (27).

Par. (28). Pub. L. 104–193, §313(a), added par. (28).

Par. (29). Pub. L. 104–193, §333, added par. (29).

Par. (30). Pub. L. 104–193, §343(b), added par. (30).

Par. (31). Pub. L. 104–193, §370(a)(2), added par. (31).

Par. (32). Pub. L. 104–193, §371(b), added par. (32).

Par. (33). Pub. L. 104–193, §375(a)(1)–(3), added par. (33).

**1995**-Par. (24)(B). Pub. L. 104–35 substituted "1997" for "1995".

**1988**-Par. (5)(A). Pub. L. 100–485, §104(a), substituted "on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden)" for "at least

annually".

Par. (6)(D), (E). Pub. L. 100–485, §111(c), added cl. (D) and redesignated former cl. (D) as (E).

Par. (16). Pub. L. 100–485, §123(d), substituted "advance automated" for "advance automatic" in introductory provisions.

Pub. L. 100–485, §123(a)(2), substituted "a statewide automated" for "an automatic".

Par. (24). Pub. L. 100–485, §123(a)(1), added par. (24).

**1987**-Par. (4)(A). Pub. L. 100–203, §9142(a)(1)(A), (B), substituted "an assignment under section 602(a)(26) of this title or section 1396k of this title" for "an assignment under section 602(a)(26) of this title" and ", or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and" for ", and".

Par. (4)(B). Pub. L. 100–203, §9142(a)(1)(C), inserted "or medical assistance under a State plan approved under subchapter XIX of this chapter" after "children".

Par. (5). Pub. L. 100–203, §9142(a)(2), substituted "provide that (A)" for "provide that," and added cl. (B).

Pub. L. 100–203, §9141(a)(2), struck out "(except as provided in section 657(c) of this title)" after "apply to such payments".

**1984**-Par. (4)(B). Pub. L. 98–378, §11(b)(1), inserted "including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter," after "such assignment is effective," and inserted "or E" after "part A".

Par. (4)(B). Pub. L. 98–378, §12(a), substituted ", and" for "and, at the option of the State," before "from such parent" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (5). Pub. L. 98–378, §3(e), inserted ", and the individual will be notified at least annually of the amount of the support payments collected;".

Par. (6)(A). Pub. L. 98–378, §12(b), struck out ", at the option of the State," before "support collection services" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (6)(B). Pub. L. 98–378, §3(c), substituted "shall be imposed, which shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (i) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (ii) may vary among such individuals on the basis of ability to pay (as determined by the State), and" for "may be imposed, except that the amount of any such application fee shall be reasonable, as determined under regulations of the Secretary,".

Par. (6)(C). Pub. L. 98–378, §21(d)(1), (3), added cl. (C). Former cl. (C) redesignated (D).

Par. (6)(D). Pub. L. 98–378, §21(d)(1), (2), redesignated former cl. (C) as (D) and substituted "fees" for "fee" before "so imposed".

Par. (8)(B). Pub. L. 98–369, §2663(j)(2)(B)(x), substituted "Health and Human Services" for "Health, Education, and Welfare".

Par. (9)(C). Pub. L. 98–369, §2663(c)(14)(A), struck out "of such parent" before "with respect to whom aid".

Par. (16)(A)(ii). Pub. L. 98–369, §2663(c)(14)(B), substituted "collection, and distribution" for "collection and distribution," before "of incentive payments".

Par. (16)(D), (E). Pub. L. 98–378, §6(a), added cl. (D) and redesignated former cl. (D) as (E).

Par. (17). Pub. L. 98–378, §2663(c)(14)(C), realigned margin, substituted "provide that the State will accept" for "to accept", "will impose" for "and to impose", "will transmit" for "to transmit", and "will otherwise comply" for ", otherwise to comply".

Par. (20). Pub. L. 98–378, §3(a), added par. (20).

Par. (21). Pub. L. 98–378, §3(d), added par. (21).

Par. (22). Pub. L. 98–378, §5(b), added par. (22).

Par. (23). Pub. L. 98–378, §14(a), added par. (23).

Pub. L. 98–378, §3(f), inserted after numbered paragraphs provision that the State may allow the jurisdiction which makes the collection involved to retain any application fee under par. (6)(B) or any late payment fee under par. (21).

**1982**-Par. (5). Pub. L. 97–248, §173(a), inserted "following the first month" after "for any month".

Par. (6). Pub. L. 97–248, §171(a), in cl. (A) inserted provisions relating to inclusion of, at the option of the State, support collection services for the spouse or former spouse, in cl. (B) substituted "such services" for "services under the State plan (other than collection of support)", and in cl. (C) substituted provisions relating to collection of any costs in excess of the fee imposed, for provisions relating to the State retaining any fee imposed under State law as required under former par. (19).

Pars. (18) to (20). Pub. L. 97–248, §171(b)(1), inserted "and" at end of par. (18), struck out par. (19) relating to imposition of a fee on an individual who owes child or spousal support obligation, and redesignated par. (20) as (19).

**1981**-Pub. L. 97–35, §2332(d)(2), substituted in provision preceding par. (1) "child and spousal support" for "child support".

Par. (4)(B). Pub. L. 97–35, §2332(d)(3), substituted "such support) and, at the option of the State, from such parent for his spouse (or former spouse) receiving aid to families with dependent children (but only if a support obligation has been established with respect to such spouse), utilizing" for "such support), utilizing".

Par. (5). Pub. L. 97–35, §2332(d)(4), substituted "support payments" for "child support payments" and "collected for an individual" for "collected for a child".

Par. (6)(B). Pub. L. 97–35, §2333(a)(1), substituted "services under the State plan (other than collection of support)" for "such services".

Par. (6)(C). Pub. L. 97–35, §2333(a)(2), substituted "the State will retain, but only if it is the State which makes the collection, the fee imposed under State law as required under paragraph (19)" for "any costs in excess of the fee so imposed may be collected from such individual by deducting such costs from the amount of any recovery made".

Par. (9)(C). Pub. L. 97–35, §2332(d)(5), substituted "of the child or children or the parent of such child or children" for "of a child or children".

Par. (11). Pub. L. 97–35, §2332(d)(6), substituted "collected as support" for "collected as child support".

Par. (16). Pub. L. 97–35, §2332(d)(7), substituted "support enforcement" for "child support enforcement", "whom support obligations" for "whom child support obligations", and "obligated to pay support" for "obligated to pay child support".

Par. (18). Pub. L. 97–35, §2331(b), added par. (18).

Par. (19). Pub. L. 97–35, §2333(b), added par. (19).

Par. (20). Pub. L. 97–35, §2335(a), added par. (20).

**1980**-Par. (16). Pub. L. 96–265 added par. (16).

Par. (17). Pub. L. 96–611 added par. (17).

**1977**-Pars. (14), (15). Pub. L. 95–30 added pars. (14) and (15).

**1975**-Par. (4)(A). Pub. L. 94–88, §208(b), substituted "to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so" for "to establish the paternity of such child".

Par. (4)(B). Pub. L. 94–88, §208(c), substituted "reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so)" for "reciprocal arrangements adopted with other States".

### STATUTORY NOTES AND RELATED SUBSIDIARIES

## EFFECTIVE DATE OF 2018 AMENDMENT

Pub. L. 115–123, div. E, title XII, §53117(b), Feb. 9, 2018, 132 Stat. 307 , provided that:

"(1) IN GENERAL.-The amendments made by subsection (a) [amending this section] shall take effect on the 1st day of the 1st fiscal year that begins on or after the date of the enactment of this Act [Feb. 9, 2018], and shall apply to payments under part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) for calendar quarters beginning on or after such 1st day.

"(2) DELAY PERMITTED IF STATE LEGISLATION REQUIRED.-If the Secretary of Health and Human Services determines that State legislation (other than legislation appropriating funds) is required in order for a State plan developed pursuant to part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) to meet the requirements imposed by the amendment made by subsection (a), the plan shall not be regarded as failing to meet such requirements before the 1st day of the 1st calendar quarter beginning after the first regular session of the State legislature that begins after the date of the enactment of this Act. For purposes of the preceding sentence, if the State has a 2-year legislative session, each year of the session is deemed to be a separate regular session of the State legislature."

## EFFECTIVE DATE OF 2008 AMENDMENT

Amendment of this section and repeal of Pub. L. 110–234 by Pub. L. 110–246 effective May 22, 2008, the date of enactment of Pub. L. 110–234, except as otherwise provided, see section 4 of Pub. L. 110–246, set out as an Effective Date note under section 8701 of Title 7, Agriculture.

Amendment by sections 4002(b)(1)(A), (B), (2)(V), and 4115(c)(2)(H) of Pub. L. 110–246 effective Oct. 1, 2008, see section 4407 of Pub. L. 110–246, set out as a note under section 1161 of Title 2, The Congress.

## EFFECTIVE DATE OF 2006 AMENDMENT

Amendment by section 7301(b)(1)(C) of Pub. L. 109–171 effective Oct. 1, 2009, and applicable to payments under parts A and D of this subchapter for calendar quarters beginning on or after such date, subject to certain State options, see section 7301(e) of Pub. L. 109–171, set out as a note under section 608 of this title.

Amendment by section 7303(b) of Pub. L. 109–171 effective Oct. 1, 2006, see section 7303(c) of Pub. L. 109–171, set out as a note under section 652 of this title.

Pub. L. 109–171, title VII, §7310(c), Feb. 8, 2006, 120 Stat. 148 , provided that: "The amendments made by this section [amending this section and section 657 of this title] shall take effect on October 1, 2006."

### Effective Date of 1999 Amendment

Amendment by Pub. L. 106–169 effective as if included in the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 401(q) of Pub. L. 106–169, set out as a note under section 602 of this title.

### Effective Date of 1997 Amendment

Amendment by Pub. L. 105–33 effective as if included in the enactment of title III of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 5557 of Pub. L. 105–33, set out as a note under section 608 of this title.

### Effective Date of 1996 Amendment

Amendment by section 108(c)(11), (12) of Pub. L. 104–193 effective July 1, 1997, with transition rules relating to State options to accelerate such date, rules relating to claims, actions, and proceedings commenced before such date, rules relating to closing out of accounts for terminated or substantially modified programs and continuance in office of Assistant Secretary for Family Support, and provisions relating to termination of entitlement under AFDC program, see section 116 of Pub. L. 104–193, as amended, set out as an Effective Date note under section 601 of this title.

Amendment by section 302(b)(2) of Pub. L. 104–193 effective Aug. 22, 1996, see section 302(c)(2) of Pub. L. 104–193, set out as a note under section 657 of this title.

Pub. L. 104–193, title III, §303(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Pub. L. 104–193, title III, §304(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Amendment by section 312(a) of Pub. L. 104–193 effective Oct. 1, 1998, with limited exception for States which, as of Aug. 22, 1996, were processing the receipt of child support payments through local courts, see section 312(d) of Pub. L. 104–193, set out as an Effective Date note under section 654b of this title.

Amendment by section 342(a) of Pub. L. 104–193 effective with respect to calendar quarters beginning 12 months or more after Aug. 22, 1996, see section 342(c) of Pub. L. 104–193, set out as a note under section 652 of this title.

Amendment by section 370(a)(2) of Pub. L. 104–193 effective Oct. 1, 1997, see section 370(b) of Pub. L. 104–193, set out as a note under section 652 of this title.

Pub. L. 104–193, title III, §395(a)–(c), Aug. 22, 1996, 110 Stat. 2259 , provided that:

"(a) In General.-Except as otherwise specifically provided (but subject to subsections (b) and (c))-

"(1) the provisions of this title [see Tables for classification] requiring the enactment or amendment of State laws under section 466 of the Social Security Act [42 U.S.C. 666], or revision of State plans under section 454 of such Act [this section], shall be effective with

respect to periods beginning on and after October 1, 1996; and

"(2) all other provisions of this title shall become effective upon the date of the enactment of this Act [Aug. 22, 1996].

"(b) Grace Period for State Law Changes.-The provisions of this title shall become effective with respect to a State on the later of-

"(1) the date specified in this title, or

"(2) the effective date of laws enacted by the legislature of such State implementing such provisions,

but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2-year legislative session, each year of such session shall be deemed to be a separate regular session of the State legislature.

"(c) Grace Period for State Constitutional Amendment.-A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of-

"(1) 1 year after the effective date of the necessary State constitutional amendment; or

"(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]."

## Effective Date of 1988 Amendment

Pub. L. 100–485, title I, §104(b), Oct. 13, 1988, 102 Stat. 2348 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on the first day of the first calendar quarter which begins 4 or more years after the date of the enactment of this Act [Oct. 13, 1988]."

Pub. L. 100–485, title I, §111(f)(2), Oct. 13, 1988, 102 Stat. 2350 , provided that: "The amendments made by subsections (b) and (c) [amending this section and section 666 of this title] shall become effective on the first day of the first month beginning one year or more after the date of the enactment of this Act [Oct. 13, 1988]."

## Effective Date of 1987 Amendment

Pub. L. 100–203, title IX, §9141(b), Dec. 22, 1987, 101 Stat. 1330–321 , provided that: "The amendments made by subsection (a) [amending this section and section 657 of this title] shall become effective upon enactment [Dec. 22, 1987]."

Pub. L. 100–203, title IX, §9142(b), Dec. 22, 1987, 101 Stat. 1330–322 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective on July 1, 1988."

## Effective Date of 1984 Amendment

Pub. L. 98–378, §3(g), Aug. 16, 1984, 98 Stat. 1311 , provided that:

"(1) Except as provided in paragraphs (2) and (3), the amendments made by this section [enacting section 666 of this title and amending this section] shall become effective on October 1, 1985.

"(2) Section 454(21) of the Social Security Act [42 U.S.C. 654(21)] (as added by subsection (d) of this section), and section 466(e) of such Act [42 U.S.C. 666(e)] (as added by subsection (b) of this section), shall be effective with respect to support owed for any month beginning after the date of the enactment of this Act [Aug. 16, 1984].

"(3) In the case of a State with respect to which the Secretary of Health and Human Services

has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this section, the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the beginning of the fourth month beginning after the end of the first session of the State legislature which ends on or after October 1, 1985. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

Pub. L. 98–378, §5(c)(1), Aug. 16, 1984, 98 Stat. 1314 , provided that: "The amendments made by the preceding provisions of this section [amending this section and section 658 of this title] shall become effective on October 1, 1985."

Pub. L. 98–378, §6(c), Aug. 16, 1984, 98 Stat. 1315 , provided that: "The amendments made by this section [amending this section and section 655 of this title] shall apply with respect to quarters beginning on or after October 1, 1984."

Pub. L. 98–378, §11(e), Aug. 16, 1984, 98 Stat. 1318 , provided that: "The amendments made by this section [amending this section and sections 656, 657, 664, and 671 of this title] shall become effective October 1, 1984, and shall apply to collections made on or after that date."

Pub. L. 98–378, §12(c), Aug. 16, 1984, 98 Stat. 1319 , provided that: "The amendments made by this section [amending this section] shall become effective October 1, 1985."

Pub. L. 98–378, §14(b), Aug. 16, 1984, 98 Stat. 1320 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective October 1, 1985."

Amendment by section 21(d) of Pub. L. 98–378 applicable with respect to refunds payable under section 6402 of Title 26, Internal Revenue Code, after Dec. 31, 1985, see section 21(g) of Pub. L. 98–378, set out as a note under section 6103 of Title 26.

Amendment by Pub. L. 98–369 effective July 18, 1984, but not to be construed as changing or affecting any right, liability, status, or interpretation which existed (under the provisions of law involved) before that date, see section 2664(b) of Pub. L. 98–369, set out as a note under section 401 of this title.

### Effective Date of 1982 Amendment

Amendment by section 171(a), (b)(1) of Pub. L. 97–248 effective on and after Aug. 13, 1981, see section 171(c) of Pub. L. 97–248, set out as a note under section 503 of this title.

Pub. L. 97–248, title I, §173(b), Sept. 3, 1982, 96 Stat. 403 , provided that: "The amendment made by this section [amending this section] shall become effective on October 1, 1982."

### Effective Date of 1981 Amendment

Amendments by sections 2331(b), 2332(d)(2)–(7), and 2333(a), (b) of Pub. L. 97–35 effective Oct. 1, 1981, except as otherwise specifically provided, see section 2336 of Pub. L. 97–35, set out as a note under section 651 of this title.

Amendment by section 2335(a) of Pub. L. 97–35 effective Aug. 13, 1981, except that such amendment shall not be requirements under this section or section 503 of this title before Oct. 1, 1982, see section 2335(c) of Pub. L. 97–35, set out as a note under section 503 of this title.

### Effective Date of 1980 Amendment

Amendment by Pub. L. 96–265 effective July 1, 1981, and to be effective only with respect to expenditures, referred to in section 655(a)(3) of this title, made on or after such date, see section 405(e) of Pub. L. 96–265, set out as a note under section 652 of this title.

### EFFECTIVE DATE OF 1977 AMENDMENT

Pub. L. 95–30, title V, §502(b), May 23, 1977, 91 Stat. 162 , provided that: "The amendments made by this section [amending this section] shall take effect on the first day of the first calendar month which begins after the date of enactment of this Act [May 23, 1977]."

### EFFECTIVE DATE OF 1975 AMENDMENT

Pub. L. 94–88, title II, §210, Aug. 9, 1975, 89 Stat. 437 , provided that: "The amendments made by this title [amending this section and sections 602, 603, and 655 of this title and enacting provisions set out as notes under sections 602 and 655 of this title] shall, unless otherwise specified therein, become effective August 1, 1975."

### EXCEPTION TO GENERAL EFFECTIVE DATE FOR STATE PLANS REQUIRING STATE LAW AMENDMENTS

Pub. L. 109–171, title VII, §7311, Feb. 8, 2006, 120 Stat. 148 , provided that: "In the case of a State plan under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] which the Secretary determines requires State legislation in order for the plan to meet the additional requirements imposed by the amendments made by this subtitle [subtitle C (§§7301–7311) of title VII of Pub. L. 109–171, amending this section, sections 608, 652, 653, 655, 657, 664, and 666 of this title, section 6402 of Title 26, Internal Revenue Code, and provisions set out as a note under section 1169 of Title 29, Labor], the effective date of the amendments imposing the additional requirements shall be 3 months after the first day of the first calendar quarter beginning after the close of the first regular session of the State legislature that begins after the date of the enactment of this Act [Feb. 8, 2006]. For purposes of the preceding sentence, in the case of a State that has a 2-year legislative session, each year of the session shall be considered to be a separate regular session of the State legislature."

### STATE COMMISSIONS ON CHILD SUPPORT

Pub. L. 98–378, §15, Aug. 16, 1984, 98 Stat. 1320 , provided that:

"(a) As a condition of the State's eligibility for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] for quarters beginning more than 30 days after the date of the enactment of this Act [Aug. 16, 1984] and ending prior to October 1, 1985, the Governor of each State, on or before December 1, 1984, shall (subject to subsection (f)) appoint a State Commission on Child Support.

"(b) Each State Commission appointed under subsection (a) shall be composed of members appropriately representing all aspects of the child support system, including custodial and non-custodial parents, the agency or organizational unit administering the State's plan under part D of such title IV [42 U.S.C. 651 et seq.], the State judiciary, the executive and legislative branches of the State government, child welfare and social services agencies, and others.

"(c) It shall be the function of each State Commission to examine, investigate, and study the operation of the State's child support system for the primary purpose of determining the extent to which such system has been successful in securing support and parental involvement both for children who are eligible for aid under a State plan approved under part A of title IV of such Act [42 U.S.C. 601 et seq.] and for children who are not eligible for such aid, giving particular attention to such specific problems (among others) as visitation, the establishment of appropriate objective standards for support, the enforcement of interstate obligations, the availability, cost, and effectiveness of services both to children who are eligible for such aid and to children who are not, and the need for additional State or Federal legislation to obtain

support for all children.

"(d) Each State Commission shall submit to the Governor of the State and make available to the public, no later than October 1, 1985, a full and complete report of its findings and recommendations resulting from the examination, investigation, and study under this section. The Governor shall transmit such report to the Secretary of Health and Human Services along with the Governor's comments thereon.

"(e) None of the costs incurred in the establishment and operation of a State Commission under this section, or incurred by such a Commission in carrying out its functions under subsections (c) and (d), shall be considered as expenditures qualifying for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] or be otherwise payable or reimbursable by the United States or any agency thereof.

"(f) If the Secretary determines, at the request of any State on the basis of information submitted by the State and such other information as may be available to the Secretary, that such State-

"(1) has placed in effect and is implementing objective standards for the determination and enforcement of child support obligations,

"(2) has established within the five years prior to the enactment of this Act [Aug. 16, 1984] a commission or council with substantially the same functions as the State Commissions provided for under this section, or

"(3) is making satisfactory progress toward fully effective child support enforcement and will continue to do so,

then such State shall not be required to establish a State Commission under this section and the preceding provisions of this section shall not apply."

### Delayed Effective Date in Cases Requiring State Legislation

Pub. L. 97–248, title I, §176, Sept. 3, 1982, 96 Stat. 403 , provided that: "In the case of a State with respect to which the Secretary of Health and Human Services has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this subtitle [subtitle E (§§171–176) of title I of Pub. L. 97–248, see Tables for classification], the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the end of the first session of the State legislature which begins after October 1, 1982, or which began prior to October 1, 1982, and remained in session for at least twenty-five calendar days after such date. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

[1] *See References in Text note below.*

# Title 15
# Domestic Relations

## Chapter 5
## Divorce and Separation

### R.I. Gen. Laws § 15-5-16.5

**§ 15-5-16.5. Interest on arrearages.**

Interest at the rate of twelve percent (12%) per annum on any support debt due or owing, child or spousal support, shall be assessed unless the responsible party shall, for good cause shown, be relieved of the obligation to pay interest by the family court.

History of Section.
P.L. 1980, ch. 308, § 1; P.L. 1984, ch. 167, § 1; P.L. 2001, ch. 155, § 1.

Case Number: ...
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

```
12/13/22   11:28         C A S E   T R A C K I N G      CSCL  ASMXA201
           TRAC.00            CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP
WANTS THE INTEREST PUT BACK ON THE CASE (▮▮▮▮▮▮▮▮▮▮▮). WE REMOVED THE INTEREST WHEN
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-.
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED
FOR PASSPORT PURPOSES IN ANY EVENT.

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

```
RL: 80  12 22 ABSP:            SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK   GERO    K   PNL:
```

Case Number K30010521M
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10 13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

12/13/22   11:20        C A S E   T R A C K I N G        CSCL   ASMXA201
           TRAC.00              CASE HISTORY              U024   PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSMENTS SO WE CAN GET THIS SORTED____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.___
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL___
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES___

RL: 80  12 22 ABSP:           SEGUIN       MARY         CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK    GERO    K    PHL:

Case Number: 23-1955
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

Document: 0011831200837    Page: 608    Date Filed: 09/28/2024    Entry ID: 6662899

11:29:01 Tuesday, December 13, 2022

| | | | |
|---|---|---|---|
| 12/13/22 | 11:29 | **C A S E   T R A C K I N G** | CSCL   ASMXA201 |
| | TRAC.00 | **CASE HISTORY** | U824   PROD |

STARTING DATE  09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
        FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
        FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

| | | | | |
|---|---|---|---|---|
| RL: SO  12 22 ABSP: | SEGUIN | MARY | | CMD: |
| FNX: TRAC  D CLIENT: | MEYERSIEK | GERO | X | PNL: |

Case Number: 233-19227
Filed in Providence/Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria G.

11:29:25 Tuesday, December 13, 2022

| 12/13/22 | 11:29 | **C A S E   T R A C K I N G** | CSCL | ASMXA201 |
| | TRAC.00 | **CASE HISTORY** | U824 | PROD |

**STARTING DATE**   09 01 2021
**SELECTION**   COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

| RL: 80  12 22 ABSP: | SEGUIN | MARY | | CMD: ____ |
| FXX: TRAC  D CLIENT: | MEYERSIEK | GERO | X | PNL: |

ed in Providence/Bristol County Family Court
ibmitted 6/1/2023 10.13 PM
ivelope: 4132704
viewer: Maria O
11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00           CASE HISTORY               U824   PROD
STARTING DATE  09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR. RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
     TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
     58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:          SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K   PNL:
```

```
12/13/22   11:28        C A S E    T R A C K I N G       CSCL  ASMXA201
           TRAC.00             CASE HISTORY               U824   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
       TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
       58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

```
RL: 80  12 22 ABSP:              SEGUIN       MARY          CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK    GERO     K    PNL:
```

Case Number: XX2021XXXXM
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

```
12/13/22   11:28          C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00               CASE HISTORY             UB24  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS___

```
RL: 80  12 22 ABSP:            SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK   GERO    K    PNL:
```

Filed in Providence/Bristol County Family Court    Document: 613    Page: 613    Date Filed: 09/28/2024    Entity ID: 9d28b891ef
Submitted: 8/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

12/13/22    11:28        C A S E    T R A C K I N G        CSCL   ASMXA201
            TRAC.00              CASE HISTORY              U824   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:            SEGUIN        MARY              CMD: _____
                               MEYERSIEK     GERO      K       PNL:



12:30 PM Mon Dec 6

cseinfo.dhs.ri.gov

ADCB Internet Banking · Community Health Choice | ... · Sign In - Community Healt... · Case Manager Portal | Offi... · RI OCSS Payment

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov

**State of Rhode Island**
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Home   My Profile   Contact Us   Site Map   Log

**Menu**

**Case Information**
- Last 5 Payments
- Last 13 Months
- Current Orders/ Past Due Balances
- Court Dates/ Appointments
- Enforcement Actions
- PIN Lookup

Home > Current Orders and Past Due Balances

**Case Manager**

### Current Orders / Past Due Balances

**Custodial Parent:** Gero K Meyersiek          **CSE ID:** 1689817

**Current Orders**

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

Note: Medical orders and medical arrears are not listed on this screen.

**Past Due Balances**

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |

State of Rhode Island
# Office of Child Support Services
### DEPARTMENT OF HUMAN SERVICES

Welcome Mary Seguin

Home  My Profile  Contact Us  Site Map  Log Out

**Menu**
- **Case Information**
  - Last 5 Payments
  - Last 13 Months
  - Current Orders/ Past Due Balances
  - Court Dates/ Appointments
  - Enforcement Actions
- PIN Lookup

Home > Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek          CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|--------|--------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**No. 10-10**

# In the Supreme Court of the United States

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

*ON WRIT OF CERTIORARI*
*TO THE SUPREME COURT OF SOUTH CAROLINA*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**
**SUPPORTING REVERSAL**

SALLY A. HOWARD
  *Acting General Counsel*
ROBERT E. KEITH
  *Associate General Counsel*
LISETTE PEDRE MESTRE
  *Attorney*
  *Department of Health and*
    *Human Services*
  *Washington, D.C. 20201*

NEAL KUMAR KATYAL
  *Acting Solicitor General*
    *Counsel of Record*
TONY WEST
  *Assistant Attorney General*
LEONDRA R. KRUGER
  *Acting Deputy Solicitor*
    *General*
JOSEPH R. PALMORE
  *Assistant to the Solicitor*
    *General*
LEONARD SCHAITMAN
EDWARD HIMMELFARB
  *Attorneys*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

### QUESTIONS PRESENTED

1.  Whether the Court has jurisdiction to review the decision of the South Carolina Supreme Court.

2.  Whether due process requires that the State provide counsel, at its expense, to an indigent parent in a child-support proceeding, when the parent is subject to a civil-contempt order for non-payment that may lead to confinement.

(I)

**TABLE OF CONTENTS**

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Argument:
  I.   The Court has jurisdiction to review the decision of
      the South Carolina Supreme Court . . . . . . . . . . . . . . . 13
  II.  The absence of adequate procedures necessary
      to secure an accurate adjudication of civil
      contempt violated due process . . . . . . . . . . . . . . . . . . . 16
      A.  Confinement for civil contempt is
          permitted only when the contemnor is
          presently able to comply with the
          underlying order . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      B.  The Family Court's procedures were
          inadequate to ensure an accurate
          determination of present ability to pay . . . . . . . . 19
      C.  Due Process can be satisfied by a variety of
          procedures intended to assure an accurate
          determination of present ability to pay in a
          civil contempt proceeding . . . . . . . . . . . . . . . . . . . 23
          1.  Courts can comply with Due Process by
              providing a meaningful opportunity for an
              alleged contemnor to establish his present
              ability to pay . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          2.  There is no basis for an inflexible right to
              counsel rule in civil contempt proceedings . . . 25
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

(III)

IV

## TABLE OF AUTHORITIES

Cases:

*Alvarez* v. *Smith*, 130 S. Ct. 576 (2009) . . . . . . . . . . . . . . . 15

*Blessing* v. *Freestone*, 520 U.S. 329 (1997) . . . . . . . . . . . . . 3

*Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886
(1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Carlson* v. *Landon*, 342 U.S. 524 (1952) . . . . . . . . . . . . . . 32

*City of L.A.* v. *Lyons*, 461 U.S. 95 (1983) . . . . . . . . . . . 14, 15

*DeFunis* v. *Odegaard*, 416 U.S. 312 (1975) . . . . . . . . . . . . 14

*First Nat'l Bank* v. *Bellotti*, 435 U.S. 765 (1978) . . . . . . . . 14

*Foucha* v. *Louisiana*, 504 U.S. 71 (1992) . . . . . . . . . . . . . . 20

*Gagnon* v. *Scarpelli*, 411 U.S. 778
(1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25, 26, 27, 28, 29

*Gault, In re*, 387 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . 26

*Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418
(1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Hicks* v. *Feiock*, 485 U.S. 624 (1988) . . . . . . . . . . . . . . . 17, 18

*Hodges* v. *Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000),
aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied,
540 U.S. 811 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*INS* v. *Lopez-Mendoza*, 468 U.S. 1032 (1984) . . . . . . . . . 32

*International Union, United Mine Workers* v.
*Bagwell*, 512 U.S. 821 (1994) . . . . . . . . . . . . . . . . 18, 19, 26

*Landon* v. *Plasencia*, 459 U.S. 21 (1982) . . . . . . . . . . . . . . 31

*Lassiter* v. *Department of Soc. Servs.*, 452 U.S. 18
(1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189
(2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Maggio* v. *Zeitz*, 333 U.S. 56 (1948) . . . . . . . . . . . . . . . 17, 18

*Mathews* v. *Eldridge*, 424 U.S. 319
(1976) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19, 20, 25, 26, 29

V

Cases—Continued:                                                Page

*Middendorf* v. *Henry*, 425 U.S. 25 (1976) . . . . . 12, 26, 29, 31

*Mohammed* v. *Gonzales*, 400 F.3d 785 (9th Cir. 2005) . . . 32

*Morrissey* v. *Brewer*, 408 U.S. 471 (1972) . . . . . . . . . . . 19, 26

*Moseley* v. *Mosier*, 306 S.E.2d 624 (S.C. 1983) . . . . . . . . 17

*Murphy* v. *Hunt*, 455 U.S. 478 (1982) . . . . . . . . . . . . . 13, 14

*Nazakat* v. *INS*, 981 F.2d 1146 (10th Cir. 1992) . . . . . . . 33

*Olmstead* v. *L.C.*, 527 U.S. 581 (1999) . . . . . . . . . . . . . . . 15

*Shillitani* v. *United States*, 384 U.S. 364 (1966) . . . . . 11, 17

*Spencer* v. *Kemna*, 523 U.S. 1 (1998) . . . . . . . . . . . . . . 13, 14

*United States* v. *Bauer*, 956 F.2d 693 (7th Cir.),
    cert. denied, 506 U.S. 882 (1992) . . . . . . . . . . . . . . . . . . . 28

*United States* v. *Campos-Asencio*, 822 F.2d 506
    (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States* v. *Gasca-Kraft*, 522 F.2d 149 (9th Cir.
    1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Rylander*, 460 U.S. 752 (1983) . . . . . . . . 18

*United States* v. *Torres-Sanchez*, 68 F.3d 227 (8th Cir.
    1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States Parole Comm'n* v. *Geraghty*,
    445 U.S. 388 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Vitek* v. *Jones*, 445 U.S. 480 (1980) . . . . . . . . . . . . . . . 26, 27

*Walters* v. *National Ass'n of Radiation Survivors*,
    473 U.S. 305 (1985) . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

*Weinstein* v. *Bradford*, 423 U.S. 147 (1975) . . . . . . . . . . . 14

*Wilkinson* v. *Austin*, 545 U.S. 209 (2005) . . . . . . . . . . . . . 19

*Yee* v. *City of Escondido*, 503 U.S. 519 (1992) . . . . . . . . . . 24

VI

Constitution, statutes and regulations:                    Page

U.S. Const.:
    Amend. V (Due Process Clause) . . . . . . . . . . . . . . . . . 9, 19
    Amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 26, 27
    Amend. XIV (Due Process Clause) . . . . . . . . . . . . . . . 19
Social Services Amendments of 1974, Pub. L.
No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651
*et seq.*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3
    § 101(c)(5)(C), 88 Stat. 2360 . . . . . . . . . . . . . . . . . . . . . 3
        42 U.S.C. 654(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        42 U.S.C. 654(6) (1976) . . . . . . . . . . . . . . . . . . . . . 3
        42 U.S.C. 654(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        42 U.S.C. 654(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        42 U.S.C. 654(24) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        42 U.S.C. 654a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        42 U.S.C. 654a(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . 6
        42 U.S.C. 654a(e)(4) . . . . . . . . . . . . . . . . . . . . . . . . 6
        42 U.S.C. 654a(e)(5) . . . . . . . . . . . . . . . . . . . . . . . . 6
        42 U.S.C. 654a(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . 6
        42 U.S.C. 655(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . 4
        42 U.S.C. 655(a)(2)(C) . . . . . . . . . . . . . . . . . . . . . . 2
        42 U.S.C. 655(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . 4
        42 U.S.C. 655(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . 6
        42 U.S.C. 656(a)(1) (1976) . . . . . . . . . . . . . . . . . . . . 3
        42 U.S.C. 657(a)(4)(B) (1976) . . . . . . . . . . . . . . . . 3
        42 U.S.C. 657(b) (1976) . . . . . . . . . . . . . . . . . . . . . 3
        42 U.S.C. 666(a)(1)-(8) . . . . . . . . . . . . . . . . . . . . . . 4

VII

Statutes and regulations—Continued:                     Page

         42 U.S.C. 666(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . 30
         42 U.S.C. 666(a)(7)(B)(i) . . . . . . . . . . . . . . . . . . . . 30
         42 U.S.C. 666(a)(8)(A)(iv) . . . . . . . . . . . . . . . . . . . 30
         42 U.S.C. 666(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
         42 U.S.C. 666(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
         42 U.S.C. 666(c)(1)(H) . . . . . . . . . . . . . . . . . . . . . . 30

Child Support Enforcement Amendments of 1984,
   Pub. L. No. 98-378,  98 Stat. 1329:

         § 6, 98 Stat. 1314 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
         § 23(a)(2), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . 4
         § 23(a)(5), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . 4

Family Support Act of 1988, Pub. L. No. 100-485,
   102 Stat. 2343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

         § 123(a)(C), 102 Stat. 2352 . . . . . . . . . . . . . . . . . . . 5

Personal Responsibility and Work Opportunity
   Reconciliation Act of 1996, Pub. L. No. 104-193,
   110 Stat. 2105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

         § 344(a)(2), 110 Stat. 2235 . . . . . . . . . . . . . . . . . . . 6

Social Security Act Amendments of 1950, ch. 809,
   § 321(b), 64 Stat. 550 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Social Security Amendments of 1967, Pub. L.
   No. 90-248, § 201(a)(1), 81 Stat. 877-879 . . . . . . . . . . . . . 2

         § 201(a)(1), 81 Stat. 879 . . . . . . . . . . . . . . . . . . . . . . . 3

8 U.S.C. 1229a(b)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . 32
8 U.S.C. 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
18 U.S.C. 3006A(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
28 U.S.C. 1257(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
42 U.S.C. 602(a)(26) (1976) . . . . . . . . . . . . . . . . . . . . . . . 3

VIII

Statutes and regulations—Continued:                Page

    42 U.S.C. 608(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

    42 U.S.C. 608(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    45 C.F.R.:

        Section 302.70(a)(5)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.5(g)(2)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.6 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        Section 303.6 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        Section 303.20(c)(7) (1975) . . . . . . . . . . . . . . . . . . . . . 4

        Section 303.20(c)(7) (1989) . . . . . . . . . . . . . . . . . . . . . 5

        Section 303.100(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.100(f)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.101(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.102(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.104(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 304.20(b)(3)(iv) . . . . . . . . . . . . . . . . . . . . . . . . 5

        Section 304.23(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 304.23(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Sup. Ct. R. 14.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    S.C. Rule of Family Ct.:

        R. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        R. 24(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        R. 24(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    S.C. Code Ann. (West):

        § 43-5-220(c) (Supp. 2009) . . . . . . . . . . . . . . . . . . . . . 25

        § 43-5-235 (Supp. 2009) . . . . . . . . . . . . . . . . . . . . . . . 7

        § 63-3-620 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

IX

Miscellaneous:                                        Page

   52 Fed. Reg. 32,130 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

   U.S. Dep't of Health & Human Servs.:

    National Child Support Enforcement, *Strategic
     Plan: FY 2005-2009*, http://www.acf.hhs.gov/
     programs/cse/pubs/2004/Strategic_Plan_
     FY2005-2009.pdf . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

    Office of Child Support Enforcement, *National
     Status of Automated Child Support Systems*,
     http://www.acf.hhs.gov/programs/
     cse/stsys/certmap.htm . . . . . . . . . . . . . . . . . . . . . . . . . . 6

   Elizabeth G. Patterson, *Civil Contempt & the
    Indigent Child Support Obligor: The Silent
    Return of Debtor's Prison*, 18 Cornell J.L. & Pub.
    Pol'y 95 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

   S. Rep. No. 387, 98th Cong., 2d Sess. (1984) . . . . . . . . . . 30

   Elaine Sorensen et al., *Assessing Child Support
    Arrears in Nine Large States & the Nation* (2007)
    http://aspe.hhs.gov/hsp/07/assessing-CS-debt/
    report.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

   South Carolina Dep't of Social Servs., *Response to
    Budget Proviso 13.27* (Aug. 31, 2007),
    http://www.scstatehouse.gov/reports/DSS/
    Provisoresponse1327_083107.doc . . . . . . . . . . . . . . . . . . . 6

# In the Supreme Court of the United States

No. 10-10

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

---

*ON WRIT OF CERTIORARI
TO THE SUPREME COURT OF SOUTH CAROLINA*

---

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING REVERSAL**

---

**INTEREST OF THE UNITED STATES**

This case concerns the due process protections that apply in a state civil contempt proceeding for non-payment of court-ordered child support. The state child-support enforcement program at issue in the case, like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 *et seq.*) (adding Title IV-D to the Social Security Act). The program, which is administered by the Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for 66% of the costs of operating their child-support enforcement programs. 42 U.S.C.

(1)

2

655(a)(2)(C).  The United States has a substantial interest in the effective and equitable operation of such child-support programs.

## STATEMENT

1.  This case involves proceedings in South Carolina family court to enforce a child-support order entered against petitioner for the support of his and respondent Rogers' minor child.  South Carolina, like every other State, maintains a child-support enforcement program as a condition of receiving federal funding for its Temporary Assistance for Needy Families program.  Since Congress first required States receiving federal funds to undertake child-support enforcement efforts, it has shifted its emphasis from a localized, court-based enforcement approach to centralized and automated efforts.  South Carolina, however, maintains a localized, court-based approach to child-support enforcement.

a.  Congress first required States receiving federal funds to establish child-support enforcement programs in 1950, pursuant to the Aid to Families with Dependent Children (AFDC) program.  See Social Security Act Amendments of 1950, ch. 809, § 321(b), 64 Stat. 550 (requiring States receiving AFDC funds to "provide for prompt notice to appropriate law-enforcement officials of the furnishing of aid to dependent children in respect of a child who has been deserted or abandoned by a parent").  In 1968, Congress required States participating in AFDC to create statewide or local "organizational unit[s]" for establishing paternity and collecting child support.  Social Security Amendments of 1967, Pub. L. No. 90-248, § 201(a)(1), 81 Stat. 877-879.  It also required States to "provide for entering into cooperative arrangements with appropriate courts and law enforce-

3

ment officials * * * to assist" with administration of
the program. *Id.* § 201(a)(1), 81 Stat. 879.

b. In 1975, Congress adopted Title IV-D, 42 U.S.C.
651 *et seq.*, and established the general statutory frame-
work that exists today. See 1975 Act § 101(a), 88 Stat.
2351; *Blessing* v. *Freestone*, 520 U.S. 329, 333-335 (1997)
(describing program). The 1975 Act required States
participating in AFDC to "have in effect a plan ap-
proved" by the Secretary under Title IV-D and to "op-
erate a child support program in conformity with such
plan." 1975 Act § 101(c)(5)(C), 88 Stat. 2360. In particu-
lar, each State was required to provide services to locate
noncustodial parents and to establish the paternity of,
and secure support for, children receiving AFDC bene-
fits. 42 U.S.C. 654(4).

Under the 1975 Act, AFDC recipients were required
to assign their support rights to the State and cooperate
in enforcement efforts. 42 U.S.C. 602(a)(26) (1976).
Amounts recovered generally were retained by the State
to reimburse it and the federal government for AFDC
assistance provided to the child's family. 42 U.S.C.
657(b) (1976). Once assigned, the support obligation was
owed to the State and was collectible under all applica-
ble state processes. 42 U.S.C. 656(a)(1) (1976).[1]

The Secretary's regulations implementing the 1975
Act reflected a localized, court-centered approach to
enforcement. States' efforts to collect past-due child
support were required to include ("as applicable and
necessary"): "[c]ontempt proceedings to enforce an ex-
tant court order," court-ordered wage garnishment, and

---

[1] Congress required States to provide services to non-AFDC families
as well, 42 U.S.C. 654(6) (1976), although those families were not requi-
red to assign their support rights and any child support the State collec-
ted was paid to the family, 42 U.S.C. 657(a)(4)(B) (1976).

4

attachment of real and personal property. 45 C.F.R. 303.6 (1975). States were also required to maintain sufficient staff (either statewide or locally) to "enforce collection of support" by "executing contempt proceedings, wage assignments, obtaining garnishment orders, attaching real and personal property, criminal prosecution and executing judgments." 45 C.F.R. 303.20(c)(7) (1975).

c. In 1984, Congress found that there remained "a critical lack of child support enforcement," which had "a critical impact on the health and welfare of the children of the Nation." Child Support Enforcement Amendments of 1984 (1984 Amendments), Pub. L. No. 98-378, § 23(a)(2) and (5), 98 Stat. 1329. The 1984 Amendments required States to adopt laws and procedures providing for, among other things, (i) mandatory wage withholding; (ii) expedited processes for obtaining and enforcing support orders; (iii) state income tax refund intercepts; and (iv) reporting overdue support to consumer credit agencies. 42 U.S.C. 666(a)(1)-(8) and (b).

Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for (optional) State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur." 1984 Amendments § 6, 98 Stat. 1314; 42 U.S.C. 654(16); 655(a)(3)(A).

d. Congress amended Title IV-D again in 1988 to improve the rate of child-support collection. Family Support Act of 1988 (1988 Act), Pub. L. No. 100-485,

5

102 Stat. 2343. Because effective child-support enforcement "had long been thwarted by localized enforcement systems that were unable to quickly and effectively track delinquent parents who crossed county and state lines," *Hodges* v. *Shalala*, 121 F. Supp. 2d 854, 874 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003), Congress in the 1988 Act emphasized centralized, automated record-keeping and information retrieval in order to improve collection rates. In particular, Congress mandated "automated data processing and information retrieval system[s]" that had previously been optional. 1988 Act § 123(a)(C), 102 Stat. 2352; 42 U.S.C. 654(24).

The Title IV-D regulations were amended after adoption of the 1988 Act. As amended, the regulations omitted specific references to contempt proceedings as required means for enforcing child-support obligations. See 45 C.F.R. 303.6, 303.20(c)(7) (1989);[2] cf. pp. 3-4, *supra*.

e. Finally, Congress made further changes to the child-support enforcement system in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (1996 Act), Pub. L. No. 104-193, 110 Stat. 2105, which, among other things, replaced AFDC with the block-grant program called Temporary Assistance for Needy Families (TANF).[3] Those changes again emphasized a centralized, automated approach to child-support

---

[2] Federal financial support remained available for "[e]nforcement of a support obligation" through a variety of means, including contempt citations. 45 C.F.R. 304.20(b)(3)(iv).

[3] The 1996 Act also imposed a five-year cap on benefits. 42 U.S.C. 608(a)(7). As before, a custodial parent is required to assign her rights to child support to the State as part of the application for TANF assistance. 42 U.S.C. 608(a)(3)(A).

6

enforcement. The amended statute established detailed requirements for the "statewide automated data processing and information retrieval systems" made mandatory in 1988. *Id.* § 344(a)(2), 110 Stat. 2235, 42 U.S.C. 654a(a). Among other things, the system must include a state case registry that includes every child-support case in the State, including the amount of monthly support owed and collected in all cases administered by the state agency. 42 U.S.C. 654a(e)(1) and (4); see 42 U.S.C. 654a(e)(5) (States must "promptly * * * update" case records when circumstances change). The States are required to use their centralized databases "to the maximum extent feasible, to assist and facilitate the collection and disbursement of support payments," including by establishing wage-withholding orders and sending wage-withholding notices to employers. 42 U.S.C. 654a(g)(1); see 42 U.S.C. 666(c).

f. Despite the changes in federal law, South Carolina maintains a localized, court-based approach to child-support enforcement. It is the only State that does not have a certified automated system. See Office of Child Support Enforcement, U.S. Dep't of Health & Human Servs., *National Status of Automated Child Support Systems*, http://www.acf.hhs.gov/programs/cse/stsys/certmap.htm.[4]

---

[4] In the 1996 Act, Congress determined that any State that failed to automate its child-support program should incur substantial penalties. 42 U.S.C. 655(a)(4). In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges* v. *Shalala*, *supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., *Response to Budget Proviso 13.27* at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

7

Acting pursuant to express statutory authority, S.C. Code Ann. § 43-5-235 (West Supp. 2009), the State's Department of Social Services has contracted with county clerks of court across the State to administer its program. The South Carolina courts have in turn adopted a special rule governing child-support enforcement. See S.C. Rule of Family Ct. 24 (S.C. Rule 24). The rule requires clerks of court to review on a monthly basis "all child support and periodic alimony accounts paid through the clerk of court," as are all accounts for children whose custodial parent receives TANF assistance. S.C. Rule 24(a); see 42 U.S.C. 608(a)(3)(A). When any such account is in arrears, the clerk is required to "issue a rule to show cause and an affidavit identifying the order of the court which requires such payments to be made and the amount of the arrearage [and] directing the party in arrears to appear in court at a specific time and date" to face contempt proceedings. S.C. Rule 24(b).

A "wilful[]" violation of a "lawful order" of a South Carolina court constitutes contempt and may subject the contemnor to up to 12 months confinement. S.C. Code Ann. § 63-3-620 (West 2010).

2. Respondent Rogers and petitioner are the parents of a minor child, B.L.P. In 2003, the family court in Oconee County, South Carolina, entered an Order of Financial Responsibility against petitioner. Although the order noted that petitioner was unemployed, the court imputed a gross monthly income of $1386 to him and ordered him to pay $59.72 a week in child support through the court. Pet. App. 22a; see *id.* at 19a-24a, 25a.

---

083107.doc. We are informed by HHS that the State has now paid a total of more than $72 million in penalties to date and currently owes an additional incurred penalty of more than $10 million for fiscal year 2010.

Because respondent Rogers was receiving public assistance, she assigned her right to collect child support to the Department of Social Services. Pet. Br. 8; see *id.* at 9 n.6 (payments were remitted to respondent Rogers starting in 2004 because her benefits had ended but her case continued to be administered as a Title IV-D case). Petitioner fell behind on his payments, received a number of rules to show cause from the court clerk why he should not be held in contempt, and was jailed three times as a result. *Id.* at 9-10.

By 2007, petitioner was $5728.76 behind on his child-support payments, and a judge of the Oconee County Family Court issued a bench warrant for his arrest. Pet. App. 6a; Pet. Br. 8-9. A hearing was held on January 3, 2008. After noting petitioner's outstanding balance and stating that he had not made a payment since August 2006, the judge asked petitioner, "[i]s there anything you want to say?" *Id.* at 17a. Petitioner responded:

> Well, when I first got out, I got back on dope. I done meth, smoked pot and everything else, and I paid a little bit here and there. And, when I finally did get to working, I broke my back, back in September. I filed for disability and SSI. And, I didn't get straightened out off the dope until I broke my back and laid up for two months. And, now I'm off the dope and everything. I just hope that you give me a chance. I don't know what else to say. I mean, I know I done wrong, and I should have been paying and helping her, and I'm sorry. I mean, dope had a hold to me.

*Ibid.*

After a brief exchange between petitioner and respondent about his SSI application, the court said:

> If there's nothing else, this will be the Order of the Court. I find the Defendant in willful contempt. I'm gonna sentence him to twelve months in the Oconee County Detention Center. He may purge himself of the contempt and avoid the sentence by having a zero balance on or before his release.

Pet. App. 18a. The court made no finding that petitioner was capable of paying the arrears while incarcerated. See *id.* at 17a-18a.

At this hearing, neither petitioner nor respondent Rogers was represented by counsel. Pet. App. 6a. However, pro bono counsel filed an appeal on petitioner's behalf, alleging that petitioner had a right under the Sixth Amendment and the Due Process Clause to have appointed counsel in the contempt proceeding. *Id.* at 10a-15a. Before the intermediate state court could rule, the South Carolina Supreme Court granted discretionary review and affirmed the family court. *Id.* at 1a-5a.

The court noted that the "purpose of civil contempt is to coerce the defendant to comply with the court's order," while criminal contempt's purpose is "to punish a party for disobedience or disrespect." Pet. App. 2a-3a. "Civil contempt sanctions are conditioned on compliance with the court's order. * * * A contemnor imprisoned for civil contempt is said to hold the keys to his cell because he may end the imprisonment and purge himself of the sentence at any time." *Id.* at 3a. The court recognized that the "distinction between civil and criminal contempt is crucial because criminal contempt triggers additional constitutional safeguards not mandated in civil contempt proceedings." *Ibid.*

The court noted that in this case the family court had said that petitioner could "purge himself of the contempt" by achieving a "zero balance" on his arrearage. Pet. App. 3a. Reasoning that "[t]his conditional sentence is a classic civil contempt sanction," the court concluded that petitioner had no right to appointed counsel. *Ibid.*

### SUMMARY OF ARGUMENT

1. The Court has jurisdiction to review the decision of the South Carolina Supreme Court. Petitioner has completed his term of confinement for civil contempt and has not identified any collateral consequences flowing from the contempt. Those facts would ordinarily render his case moot. Petitioner, however, qualifies for a narrow exception to the mootness doctrine because the controversy is capable of repetition yet evading review. Sentences for civil contempt in South Carolina are limited to 12 months, and it is highly unlikely that petitioner would be able to secure plenary review by this Court within any future period of confinement. In addition, the constitutional violation petitioner asserts is capable of repetition because he remains subject to the underlying child-support order and still has substantial arrears. There is thus a reasonable expectation that he will receive automatically-generated rules to show cause for contempt in the future. Indeed, since the contempt at issue in this case, petitioner has been jailed again for civil contempt.

2. Petitioner's confinement for civil contempt violated due process, not because he lacked counsel, but because the procedures employed by the family court were inadequate to ensure the accurate determination of petitioner's present ability to pay his child-support ar-

11

rears. That ability to pay was a necessary predicate to the civil contempt sanction.

The defining feature of confinement for civil contempt is its purpose to coerce compliance with a court order. Such confinement must therefore end upon discharge of the contemnor's obligations; he is said to hold "the keys of [his] prison in [his] own pocket[]." *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted). Such confinement may not be imposed, however, where the contemnor demonstrates his inability to comply with the order. In such cases, he does not truly hold the keys to the prison; to confine him nonetheless would render the confinement punitive and thus a sanction that may be imposed only after compliance with criminal case safeguards.

The question of petitioner's ability to pay his child-support arrears therefore should have been a focus of the civil contempt proceeding, but it was not. Pro se petitioner was afforded no meaningful opportunity to establish his indigency, and even after he made a statement that could have easily been understood to mean he had no present ability to pay nearly $6000 to avoid jail, the family court judge made no further inquiry on the matter before committing him to a nominally conditional term of confinement.

The proceeding did not comply with due process because there was a serious risk of erroneous deprivation of petitioner's liberty through the procedures employed and because additional procedures would have enhanced the accuracy of the proceeding without materially impinging on any governmental interest. See *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976). Provision of counsel would have been a sufficient, but not a necessary, means of satisfying due process in this case. There were other

12

means of providing petitioner with a meaningful opportunity to establish his present inability to pay, such as asking him to complete an understandable form seeking his financial information, or asking him questions on the topic as necessary at a hearing. In the typical case, providing basic information about one's personal finances is not the kind of undertaking that requires assistance of counsel, and due process protections are based on the requirements of the mine-run case, not the exceptional one.

There is no basis for petitioner's proposed categorical due process right to appointed counsel in civil contempt proceedings where confinement is imposed. The Court has declined to recognize a categorical constitutional right to appointed counsel in the context of other non-criminal proceedings that can result in confinement. *Gagnon* v. *Scarpelli*, 411 U.S. 778, 782-790 (1973) (probation revocation); *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (summary court-martial). Civil contempt proceedings in child-support cases are relatively brief; the custodial parent may not be represented by counsel; and the issues in dispute are generally not complex. Given those circumstances, there is no warrant for recognizing a categorical right to defense counsel in such proceedings. Finally, recognizing a due process right to counsel in such proceedings would upset the balance struck by Title IV-D and its implementing regulations, both of which stress the importance of due process protections in child-support proceedings but neither of which permit federal funding for provision of counsel.

## ARGUMENT

### I. THE COURT HAS JURISDICTION TO REVIEW THE DE-CISION OF THE SOUTH CAROLINA SUPREME COURT

Although petitioner has completed his term of confinement for the civil contempt at issue here, his claim is not moot because he remains subject to the underlying child-support order and because there is a reasonable expectation that he will face future contempt proceedings. His claim thus avoids mootness because it is capable of repetition yet evading review. This Court thus has jurisdiction to review the final judgment of the South Carolina Supreme Court. See 28 U.S.C. 1257(a).

1. "In general a case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy* v. *Hunt*, 455 U.S. 478, 481 (1982) (internal quotation marks omitted) (quoting *United States Parole Comm'n* v. *Geraghty*, 445 U.S. 388, 396 (1980)). While a currently confined individual's challenge to his confinement generally presents no question of mootness, an individual who has been released from confinement ordinarily may continue to press his challenge only if he suffers some "collateral consequence" that constitutes a "concrete and continuing injury." *Spencer* v. *Kemna*, 523 U.S. 1, 7 (1998). Because this Court "ha[s] been willing to presume that a wrongful conviction has continuing collateral consequences," the Court ordinarily will not dismiss as moot a criminal defendant's challenge to his conviction once the defendant has completed his term of imprisonment. *Id.* at 8. But the Court has not employed that presumption in other contexts, instead requiring a party not in custody to demonstrate that he will actually face collateral consequences if he does not secure relief

on appeal. See *id.* at 14 (no presumption of collateral consequences for parole revocation); see also *id.* at 14-16 (reviewing party's claimed collateral consequences).

Petitioner has completed his term of confinement for civil contempt. Because he challenges a civil order, not a criminal conviction, no presumption of collateral consequences applies. Moreover, petitioner has not identified any collateral consequences flowing from the finding of civil contempt. Ordinarily, petitioner's challenge to that finding would be considered moot and beyond this Court's jurisdiction.

2. Petitioner's claim in this case, however, avoids mootness because his is one of the "exceptional situations" in which a claim is capable of repetition, yet evading review. *City of L.A.* v. *Lyons*, 461 U.S. 95, 109 (1983). In non-class actions, this doctrine requires satisfaction of two elements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy*, 455 U.S. at 482 (quoting *Weinstein* v. *Bradford*, 423 U.S. 147, 149 (1975) (per curiam)). Petitioner satisfies both elements.

First, confinement for civil contempt in South Carolina is limited to 12 months, S.C. Code Ann. § 63-3-620 (West 2010), and it is exceedingly unlikely that a contemnor could appeal through the South Carolina court system, petition this Court for a writ of certiorari, and receive a decision on his claim within such a limited time period. See, *e.g.*, *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765, 774 (1978) (18 months was "too short a period of time for appellants to obtain complete judicial review"); cf. *DeFunis* v. *Odegaard*, 416 U.S. 312, 319 (1975) (per curiam) (future challenge to law school

15

admission procedure could likely come to this Court for decision within three-year period of law school matriculation). Indeed, in this case, petitioner had completed his term of imprisonment for civil contempt more than a year before the South Carolina Supreme Court rendered its decision. Compare Pet. App. 8a with *id.* at 1a.

Second, petitioner "can make a reasonable showing that he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109. Petitioner is still subject to the underlying order for child support, and he is nearly $14,000 in arrears. Pet. Br. 15; J.A. 104a. Given that clerks of court in South Carolina automatically issue rules to show cause when a non-custodial parent is late on a required payment, there is a reasonable expectation that petitioner will again be subject to contempt proceedings. Indeed, after he was released from jail for the contempt at issue here, petitioner was again held in contempt and reincarcerated. In May 2010 yet another rule to show cause for contempt issued due to failure to pay support to respondent. Pet. Br. 13-15; see *id.* at 15 (May 2010 rule to show cause is still outstanding); see also *Olmstead* v. *L.C.*, 527 U.S. 581, 594 n.6 (1999) (suit by plaintiffs seeking community-based services rather than institutionalization not moot even though they were then receiving desired services, because of "the multiple institutional placements [they] ha[d] experienced"). This is thus far from "an abstract dispute about the law" that might be thought "unlikely to affect [petitioner] any more than it affects other [South Carolina] citizens." *Alvarez* v. *Smith*, 130 S. Ct. 576, 580 (2009).[5]

---

[5]  That petitioner was represented by pro bono counsel in a subsequent contempt proceeding involving a different support order, see Pet. Br. 15 n.10, does not mean his claim is incapable of repetition. Were pro bono counsel bound to represent petitioner in every future contempt

16

## II. THE ABSENCE OF ADEQUATE PROCEDURES NECES-SARY TO SECURE AN ACCURATE ADJUDICATION OF CIVIL CONTEMPT VIOLATED DUE PROCESS

The validity of the civil contempt order against peti-tioner turned on a critical fact: his present ability to purge himself of contempt by paying off his past-due child support. The family court's procedures in this case violated due process because they were inadequate to ensure an accurate determination of that fact and thus prevent an erroneous deprivation of petitioner's liberty. Although provision of government-provided counsel would have been a sufficient means of complying with due process requirements in this case, it was not a nec-essary one. Other mechanisms, such as requiring an affidavit for disclosure of financial information and a preliminary assessment of petitioner's current ability to pay child support, would have satisfied the requirements of due process.

### A. Confinement For Civil Contempt Is Permitted Only When The Contemnor Is Presently Able To Comply With The Underlying Order

Both civil and criminal contempt can lead to confine-ment, but this Court has long distinguished the two based on the "character and purpose" of the sanction imposed. *Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911). In civil contempt, the "punishment * * * [is] remedial," in that it is intended to "coerc[e]

---

proceeding, then his claim of entitlement to the assistance of counsel would be moot. There is no indication in the record, however, that pro bono counsel is under any such obligation, and, in fact, counsel did not appear in a 2009 contempt proceeding involving support owed respon-dent, see *id.* at 13-14 (noting that petitioner appeared pro se in 2009 and served six months for civil contempt).

17

the defendant to do what he had refused to do." *Id.* at 442. Punishment for criminal contempt, on the other hand, is "punitive" and is imposed "to vindicate the authority of the court." *Id.* at 441.

Because of that fundamental distinction, confinement imposed for civil contempt is conditional. The sentence must include a purge clause under which the contemnor will be immediately released upon compliance with the underlying court order. *Hicks* v. *Feiock*, 485 U.S. 624, 634 (1988). When confined under such a civil contempt order, the contemnor holds "the keys of [his] prison in [his] own pocket[ ]." *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted); see *id.* at 370 ("While any imprisonment, of course, has punitive and deterrent effects, it must be viewed as remedial if the court conditions release upon the contemnor's willingness" to comply with a court order.).

A purge clause by itself, however, will not render the contemnor's confinement remedial rather than punitive because "the justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order." *Shillitani*, 384 U.S. at 370-371. Accordingly, "punishment may not be imposed in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." *Hicks*, 485 U.S. at 638 n.9; see *Maggio* v. *Zeitz*, 333 U.S. 56, 72 (1948) ("[T]o jail one for a contempt for omitting an act he is powerless to perform would * * * make the proceeding purely punitive, to describe it charitably."); see also *Moseley* v. *Mosier*, 306 S.E.2d 624, 626 (S.C. 1983)

18

("When the parent is *unable* to make the required payments, he is not in contempt.").[6]

The burdens of production and persuasion may be placed on the defendant to demonstrate his present inability to comply with an order. See *Hicks*, 485 U.S. at 637; *United States* v. *Rylander*, 460 U.S. 752, 757 (1983). Accordingly, if the defendant "offers no evidence as to his inability to comply," "stands mute," or is disbelieved by the court, then he fails to carry his burden and may be held in contempt. *Maggio*, 333 U.S. at 75. But the trial court "is obliged" to consider "all the evidence properly before it in the contempt proceeding in determining whether or not there is actually a present ability to comply and whether failure so to do constitutes deliberate defiance which a jail term will break." *Id.* at 76.

If, upon examination, a contempt penalty is considered punitive rather than remedial, it will be vacated unless all "the protections that the Constitution requires of * * * criminal proceedings" were provided. *International Union, United Mine Workers* v. *Bagwell*, 512 U.S. 821, 826 (1994) (quoting *Hicks*, 485 U.S. at 632).

---

[6]  A defendant may not avoid a finding of civil contempt for violating an order by collaterally attacking that order in the contempt proceeding. See *Maggio*, 333 U.S. at 74-75. The defendant may, however, make the distinct assertion that he has a "*present* inability to comply with the order in question." *United States* v. *Rylander*, 460 U.S. 752, 757 (1983); see *ibid.* ("While the court is bound by the enforcement order, it will not be blind to evidence that compliance is now factually impossible. Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."); *Maggio*, 333 U.S. at 74-75.

### B. The Family Court's Procedures Were Inadequate To Ensure An Accurate Determination Of Present Ability To Pay

The procedures employed by the family court violated petitioner's due process rights because they were inadequate to ensure that petitioner was not erroneously confined as an inducement to perform a task he was powerless to perform, while additional procedures to ensure petitioner's present ability to pay his child-support arrears would have been minimally burdensome.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews* v. *Eldridge*, 424 U.S. 319, 332 (1976). Confinement for civil contempt is a deprivation of liberty, and the alleged contemnor is thus entitled to procedural due process protections before its imposition. Cf. *Morrissey* v. *Brewer*, 408 U.S. 471, 482 (1972) (termination of parole triggers due process protections); see also *Bagwell*, 512 U.S. at 827 (civil contempt requires "notice and an opportunity to be heard").

The conclusion that due process applies is the beginning of the inquiry, not its end, because "the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands.'" *Wilkinson* v. *Austin*, 545 U.S. 209, 224 (2005) (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The Court has "generally * * * declined to establish rigid rules and instead ha[s] embraced a framework to evaluate the sufficiency of particular procedures." *Ibid.* That framework involves "consideration of three distinct factors:

20

> First, the private interest that will be affected by the
> official action; second, the risk of an erroneous depri-
> vation of such interest through the procedures used,
> and the probable value, if any, of additional or substi-
> tute procedural safeguards; and finally, the Govern-
> ment's interest, including the function involved and
> the fiscal and administrative burdens that the addi-
> tional or substitute procedural requirements would
> entail.

*Mathews*, 424 U.S. at 335.

Application of the *Mathews* factors here demon-
strates that the family court proceeding did not comply
with the requirements of procedural due process. First,
petitioner's private interest in avoiding incarceration
was significant. See *Foucha* v. *Louisiana*, 504 U.S. 71,
80 (1992).

Second, there was a serious "risk of an erroneous
deprivation" of petitioner's liberty interest under the
procedures employed by the family court, and there
would have been value in additional procedures.
*Mathews*, 424 U.S. at 335. Petitioner did not dispute
that he had failed to comply with his child-support or-
der, so the propriety of his confinement for civil con-
tempt thus turned on his present ability to do so. See
pp. 17-18, *supra*; Pet. Br. 3-4 (petitioner's ability to pay
"was the precise question before the family court"); *id.*
at 17. But South Carolina automatically referred peti-
tioner for contempt proceedings without considering
whether petitioner was employed or had assets. At the
contempt hearing, the court solicited no financial infor-
mation from petitioner, nor was there apparently any
mechanism in place for him to provide it on his own. Pe-
titioner's statement at the hearing that he had been un-

able to work because he broke his back, Pet. App. 17a, could reasonably be understood to constitute a claim that he had no present ability to pay nearly $6000. The court did not explore this question, however; it made no inquiry into petitioner's income or assets. Instead, the court imposed a jail sentence unaccompanied by any finding that petitioner had the ability to pay off his outstanding balance from a jail cell.[7] Taking additional modest steps to determine whether petitioner had the present ability to discharge his obligation, see pp. 24-25, *infra*, would have improved the accuracy of the proceeding.

Finally, the government's interests also favor additional procedural safeguards to ensure that only those parents with a present ability to pay are confined for civil contempt. While the State has a strong interest in enforcing child-support orders, it secures no benefit from jailing a non-custodial parent who cannot discharge his obligation. The period of incarceration makes it less, rather than more, likely that such parent will be able to pay child support. See Elizabeth G. Patterson, *Civil Contempt & the Indigent Child Support Obligor: The Silent Return of Debtor's Prison*, 18 Cornell J.L. & Pub. Pol'y 95, 126 (2008) (*Civil Contempt*). Meanwhile, the State incurs the substantial expense of confinement.

Moreover, as a general matter, the routine use of contempt for non-payment of child support is likely to be an ineffective strategy for enforcing support orders. See National Child Support Enforcement, U.S. Dep't of Health & Human Servs., *Strategic Plan: FY 2005-2009*, at 2, 10 (*Strategic Plan*), http://www.acf.hhs.gov/

---

[7] The judge told petitioner, "[i]f you've got a job, I'll make you eligible for work release," Pet. App. 18a, but petitioner states he was ineligible for work release, Pet. Br. 12 n.8.

programs/cse/pubs/2004/Strategic_Plan_FY2005-2009.
pdf. While child-support recovery efforts once "followed
a business model predicated on enforcement" that "intervened only after debt, at times substantial, accumulated and often too late for collection to be successful, let alone of real value to the child," experience has shown that alternative methods—such as order modifications, increased contact with non-custodial parents, and use of "automation to detect non-compliance as early as possible"—are more effective. *Id.* at 2.

A substantial portion of child-support obligors have no or low reported income. Elaine Sorensen et al., *Assessing Child Support Arrears in Nine Large States & the Nation* 22 (2007) (*Assessing Child Support Arrears*), http://aspe.hhs.gov/hsp/07/assessing-CS-debt/report.pdf (obligors with $10,000 or less in annual income constituted half of the child-support obligors and owed 70% of the arrears in a nine-state study). Such individuals' child-support obligations are often substantial. See *id.* at 54 ("For obligors with reported income of $10,000 a year or less, the median percent of reported income that was due as current support was 83[%].". A low-income individual in arrears on child-support payments is "rarely a candidate for civil incarceration because of the likelihood that he or she is unable to pay the hefty sum represented by the accumulated arrears, or even a portion thereof that may be set by the court as the purge amount." *Civil Contempt* 116.[8]

---

[8] To be sure, coercive enforcement remedies, such as contempt, have a role to play in child-support enforcement efforts, such as with non-custodial parents who are hiding assets or unreported self-employment or under-the-table income. See *Strategic Plan* 2; *Assessing Child Support Arrears* 4-5, 22-23, 25; *Civil Contempt* 97. There is no evi-

23

Many States have taken alternative steps to avoid child-support arrears, such as establishing more realistic support orders, "increas[ing] parental participation in the order establishment process," providing employment services to non-custodial parents, or using automation tools to improve wage withholding. *Assessing Child Support Arrears* 10-11, 80-89; see *id.* at 85 (study of Florida program that provides employment services and case management to non-custodial parents found that program participants paid nearly five dollars in child support for every dollar spent on the program). Such alternatives, which focus on early intervention rather than after-the-fact efforts to collect substantial accumulated arrears, are more likely to be effective means of enforcing the child-support obligations of the substantial number of low-income obligors. See *Strategic Plan* 2.

### C. Due Process Can Be Satisfied By A Variety Of Procedures Intended To Assure An Accurate Determination Of Present Ability To Pay In A Civil Contempt Proceeding

Petitioner argues that, in order to ensure that his civil contempt proceeding "remain[ed] civil," Pet. Br. 39, due process required the appointment of counsel to assist him in establishing his inability to comply with the court's order, see *id.* at 41. Although we agree that petitioner's due process rights were violated, we disagree that the State's failure to appoint counsel was itself the basis of the violation. Appointment of counsel is certainly one way to help ensure an accurate determination of the obligor's current ability to pay—the determination on which the "civil" nature of a civil contempt sanction rests—but it is not the only way. It was the State's

---

dence, however, that routine use of contempt among low-income non-custodial parents is generally effective. See *Civil Contempt* 126.

24

failure to provide any meaningful mechanism for making that determination in this case, and not its failure to provide counsel in particular, that violated petitioner's due process rights.[9]

> ### 1. Courts can comply with due process by providing a meaningful opportunity for an alleged contemnor to establish his present ability to pay

While there is no basis for a constitutional rule categorically requiring appointment of counsel in all civil contempt that could lead to deprivation of physical liberty, see pp. 25-32, *infra*, due process does require procedures sufficient to ensure fundamental fairness. In the context of a civil contempt proceeding for non-payment of child support that could lead to confinement, this means procedures adequate to allow a pro se contemnor to attempt to carry his burden of establishing his present inability to pay.

Such procedures may include requiring a non-paying parent to complete an understandable form seeking financial information. South Carolina already requires

---

[9] Although petitioner's submissions below and in this Court have focused on the value of appointed counsel in ensuring that indigent child-support obligors are not erroneously jailed as a means of inducing them to comply with their obligations, see, *e.g.*, Pet. i, Pet. App. 13a, fairly encompassed in those submissions is the proposition that due process demands an appropriate procedure to evaluate an obligor's present ability to pay. See Sup. Ct. R. 14.1(a); *Yee* v. *City of Escondido*, 503 U.S. 519, 534 (1992). In conducting that inquiry, it should be open to the Court to consider whether there are alternative procedures, other than the specific procedure petitioner has proposed, that would satisfy constitutional requirements. To the extent the Court concludes otherwise, however, the proper course would be to dismiss the writ of certiorari as improvidently granted and await a case that expressly raises a broader due process claim.

25

noncustodial parents to fill out such a form when a support order is originally sought in a Title IV-D case, see S.C. Code Ann. § 43-5-220(c) (West Supp. 2009), but apparently does not do so in subsequent contempt proceedings. Requiring that such forms be completed at the outset of a contempt proceeding would impose little expense on the State or burden on the proceeding while materially advancing the accuracy of the court's determination. Such information could by itself establish the contemnor's present inability to pay his arrears or, conversely, demonstrate his ability to pay. To the extent the court had questions about the information on the form or disbelieved it, the court could question the contemnor about his finances at the contempt hearing. Such simple, minimally burdensome procedures would enable the court to evaluate whether the alleged contemnor has the ability to pay his arrears and is thus an appropriate candidate for a civil contempt sanction.

### 2. There is no basis for an inflexible right to counsel rule in civil contempt proceedings

Although the constitutional inadequacy of the family court's procedures could have been cured by appointment of counsel (who presumably would have addressed petitioner's inability to pay his arrears and urged the court not to jail him for that reason), appointment of counsel was not constitutionally compelled.

a. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001) (quoting *Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886, 895 (1961)); see *Mathews*, 424 U.S. at 334 ("[D]ue process is flexible and calls for such procedural protections as the particular

situation demands.") (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The question in a due process case is how to ensure a fundamentally fair proceeding, taking into account the importance of the private interest at issue, the risk of error and value of additional procedures, and the government's interest. See *id.* at 335. This is not an inquiry that typically lends itself to the kind of categorical approach advocated by petitioner. See *Gagnon* v. *Scarpelli*, 411 U.S. 778, 789 (1973) (contrasting categorical Sixth Amendment right to counsel in criminal prosecution "with the more limited due process right" in other contexts).[10]

In fact, in areas outside traditional criminal prosecutions where an individual's liberty is nonetheless at stake, the Court has declined to recognize a categorical right to counsel, instead relying on alternative procedural safeguards to ensure due process. See *Gagnon*, 411 U.S. at 782-790; see also *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (no due process right to counsel for summary courts-martial).[11] For example, in *Gagnon*,

---

[10] The Sixth Amendment right to counsel is inapplicable to a civil contempt proceeding because it is not a "criminal prosecution[ ]." U.S. Const. Amend. VI; see *Bagwell*, 512 U.S. at 826-827.

[11] In *In re Gault*, 387 U.S. 1 (1967), the Court recognized a due process right to appointed counsel in a juvenile delinquency proceeding, but, as the Court later explained, that was because the proceeding "while denominated civil, was functionally akin to a criminal trial." *Gagnon*, 411 U.S. at 789 n.12. In *Vitek* v. *Jones*, 445 U.S. 480 (1980), a plurality would have held that there is a due process right to counsel before a State involuntarily transfers a prisoner to a state mental hospital for psychiatric treatment. See *id.* at 497. Justice Powell's controlling concurrence, however, disagreed, concluding that "the fairness of an informal hearing designed to determine a medical issue" does not "require[ ] participation by lawyers." *Id.* at 500. Justice Powell agreed that a prisoner "required assistance" in such a proceeding to ensure

27

the Court held that due process required the government to provide a preliminary and final hearing before it could incarcerate an individual for violating the terms of his probation. See 411 U.S. at 782; see also *id.* at 785-786 (hearings necessary in order to provide notice of the alleged probation violation and ensure "accurate finding of fact and the informed use of discretion"). At the same time, however, the Court rejected the "contention that the State is under a constitutional duty to provide counsel for indigents in all probation or parole revocation cases." *Id.* at 787; see *id.* at 790 (stating that due process may require appointment of counsel in exceptional cases). The Court recognized that "such a rule has the appeal of simplicity" but concluded that "it would impose direct costs and serious collateral disadvantages without regard to the need or the likelihood in a particular case for a constructive contribution by counsel." *Id.* at 787.

The Court in *Gagnon* noted that in many cases a probationer's mitigating evidence may be "so simple as not to require either investigation or exposition by counsel." 411 U.S. at 787. Here too, with the provision of easy-to-understand forms on assets and income and, if necessary, a colloquy with the trial court, it will often be simple for a delinquent child-support obligor to demonstrate his present inability to discharge his obligation without the assistance of appointed counsel. Indeed, even in criminal cases to which the Sixth Amendment right of counsel applies, defendants are not entitled to government-appointed counsel for the purpose of filling out the forms routinely used to establishing their financial eligibility for government-appointed counsel. See

---

fairness, but said that it could be "rendered by competent laymen in some cases." *Ibid.*

28

18 U.S.C. 3006A(b) (counsel will be appointed only after court is "satisfied after appropriate inquiry that the person is financially unable to obtain counsel"); *United States* v. *Bauer*, 956 F.2d 693, 695 (7th Cir.) ("Under the Criminal Justice Act, the public fisc need not contribute one penny unless the accused first establishes that he cannot afford counsel. Nothing in the statute directs the Treasury to assist the accused in making this determination."), cert. denied, 506 U.S. 882 (1992). Just as "[n]o legal expertise is needed to participate effectively in hearings under the Criminal Justice Act," *ibid.*, no legal expertise is generally required to establish inability to pay child-support arrears.

*Gagnon* also expressed concern that "[t]he introduction of counsel into a revocation proceeding will alter significantly the nature of the proceeding," since the States typically relied on probation officers to conduct revocation hearings but might turn to attorneys if all probationers were represented. 411 U.S. at 787. "[T]he decisionmaking process will be prolonged, and the financial cost to the State  *  *  *  will not be insubstantial." *Id.* at 788. In the context of civil contempt for child support as well, automatic appointment of counsel could delay the proceedings, create an asymmetry in representation between non-custodial parents and custodial parents who may appear pro se, see, *e.g.*, Pet. App. 16a, and impose considerable financial cost on the government without an automatic increase in accuracy.

*Lassiter* v. *Department of Social Services*, 452 U.S. 18 (1981), upon which petitioner relies, see, *e.g.*, Pet. Br. 32-33, is not to the contrary. In that decision, the Court held that there was no due process right to counsel in a parental-rights termination proceeding. See *Lassiter*, 452 U.S. at 32-33. In dictum, the Court said its cases

29

had established a "presumption" that an indigent had a right to appointed counsel "when, if he loses, he may be deprived of his physical liberty." *Id.* at 26-27. The Court has not subsequently relied on any such presumption derived from the *Lassiter* dictum, and *Lassiter* itself recognized that *Gagnon*, which involved a deprivation of physical liberty, had held that "due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed" through appointment of counsel. *Id.* at 31 (quoting *Gagnon*, 411 U.S. at 788).

That there may be atypical cases with "complex factual and legal issues" (Pet. Br. 46) in which counsel would provide a significant benefit beyond what could be obtained through other procedural safeguards does not mean there should be a right to counsel. "[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." *Walters* v. *National Ass'n of Radiation Survivors*, 473 U.S. 305, 321 (1985) (quoting *Mathews*, 424 U.S. at 344; see *id.* at 331 ("existence of complexity in some cases" was not "sufficient to warrant a conclusion that the right to retain and compensate an attorney in [Veterans Administration] cases is a necessary element of procedural fairness under the Fifth Amendment").

b. A recognition that due process requires fair proceedings before a child-support obligor can be held in civil contempt but that this due process right does not encompass appointment of government-funded counsel is also consistent with the balance struck by Congress and the Secretary in enacting and administering the Title IV-D program. Cf. *Middendorf*, 425 U.S. at 43 ("[W]e must give particular deference to the determina-

30

tion of Congress, made under its authority to regulate the land and naval forces, U.S. Const., Art. I, § 8, that counsel should not be provided in summary courts-martial."); *Walters*, 473 U.S. at 319-320 ("This deference to congressional judgment must be afforded even though the claim is that a statute Congress has enacted effects a denial of the procedural due process guaranteed by the Fifth Amendment.").

Congress and the Secretary have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program.[12]  At the same time, however, they have declined to reimburse the States for the cost of providing counsel to non-custodial parents. See S. Rep. No. 387, 98th Cong., 2d Sess. 23 (1984) (statute does not provide federal funding for "defense counsel for absent parents" or "incarceration of delinquent obligors"); 45 C.F.R. 304.23 (i) and (j) (no federal funding for "[t]he costs of counsel for indigent defendants in

---

[12] See, *e.g.*, 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, including notice and a reasonable opportunity to contest the accuracy of such information."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for notice, opportunity to contest the action, and opportunity for an appeal on the record to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

31

IV-D actions" or "[a]ny expenditure for jailing of parents in child-support enforcement cases"); see also 52 Fed. Reg. 32,130 (1987) (Federal "policy since the inception of the [Title IV-D] program has been that costs of incarceration of delinquent obligors and costs of defense counsel are not necessary and reasonable costs associated with the proper and efficient administration of the Title IV-D program.").

Finally, at its broadest, the categorical rule petitioner suggests—that there is a right to government-appointed counsel in all "proceedings denominated as 'civil' where an individual nonetheless faces the prospect of confinement to state custody," Pet. Br. 30—conflicts with Congress's express judgment that provision of government-funded counsel is not warranted in all such areas. See *Middendorf*, 425 U.S. at 43 (deferring to such a judgment); *Walters*, 473 U.S. at 319-320 (same); see also *Landon* v. *Plasencia*, 459 U.S. 21, 34-35 (1982) ("The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy.").

For example, while aliens are sometimes detained during removal proceedings or pending enforcement of removal orders, Congress has long explicitly provided that there is no obligation to provide government payment for counsel in such proceedings. See 8 U.S.C. 1362 ("In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (*at no expense to the Government*) by such counsel, authorized to practice in such proceedings,

32

as he shall choose.") (emphasis added); 8 U.S.C. 1229a(b)(4)(A). Congress's judgment is consistent with this Court's repeated holdings that removal proceedings are civil and non-punitive, see, *e.g.*, *INS* v. *Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime."), and its conclusion that detention of an alien during the removal process is permissible because it is incidental to the proceedings, and not their purpose or goal, see, *e.g.*, *Carlson* v. *Landon*, 342 U.S. 524, 538 (1952) ("Detention is necessarily a part of this deportation procedure."). As the Court has also noted, removal proceedings—whose purpose is removal of aliens from the country, not deprivation of their physical liberty—are "streamlined" administrative proceedings held before administrative personnel, immigration judges, under rules offering the aliens more limited procedural rights than are available in court. *Lopez-Mendoza*, 468 U.S. at 1039; see *ibid.* ("a deportation hearing is intended to provide a streamlined determination of eligibility to remain in this country, nothing more"). The due process guarantee of fundamental fairness does not mandate the appointment of counsel in such proceedings, which would be contrary to the judgment of Congress.[13]

---

[13] For these reasons, the lower courts have held that aliens in removal proceedings have no constitutional right to appointment of counsel at government expense. *United States* v. *Gasca-Kraft*, 522 F.2d 149, 152 (9th Cir. 1975) ("courts have uniformly held in this circuit and elsewhere that in light of the non-criminal nature of both the proceedings and the order which may be a result, that respondents are not entitled to have counsel appointed at government expense") (citing cases); see *Moham-*

33

## CONCLUSION

The judgment of the Supreme Court of South Carolina should be reversed.

Respectfully submitted.

|  |  |
|---|---|
|  | NEAL KUMAR KATYAL<br>   *Acting Solicitor General* |
|  | TONY WEST<br>   *Assistant Attorney General* |
| SALLY A. HOWARD<br>   *Acting General Counsel* | LEONDRA R. KRUGER<br>   *Acting Deputy Solicitor*<br>     *General* |
| ROBERT E. KEITH<br>   *Associate General Counsel* | JOSEPH PALMORE<br>   *Assistant to the Solicitor*<br>     *General* |
| LISETTE PEDRE MESTRE<br>   *Attorney*<br>   *Department of Health and*<br>     *Human Services* | LEONARD SCHAITMAN<br>EDWARD HIMMELFARB<br>   *Attorneys* |

JANUARY 2011

---

*med* v. *Gonzales*, 400 F.3d 785, 793 (9th Cir. 2005); *United States* v. *Torres-Sanchez*, 68 F.3d 227, 230 (8th Cir. 1995); *Nazakat* v. *INS*, 981 F.2d 1146, 1148 (10th Cir. 1992); *United States* v. *Campos-Asencio*, 822 F.2d 506, 509 (5th Cir. 1987).

No. 23-1851

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS and TIMOTHY FLYNN in their individual and official capacities; GERO MEYERSIEK; BARBARA GRADY

Defendants-Appellees.

Appeal from the United States District Court
for the District of Rhode Island

_____

**APPELLANT'S NOTICE TO THE JUDGES OF THE UNITED STATES OF THE COMMISSION OF ACTIVITIES BY PERSONS OR WHOEVER INVOLVING RECORD TAMPERING; KNOWING PRESENTATION, OR CAUSING TO BE PRESENTED OR CERTIFICATION OF A FALSE OR FRAUDULENT CLAIM TO THE UNITED STATES, TO THE STATE OF TEXAS, FOR PAYMENT OR APPROVAL; KNOWINGLY MAKING, USING OR CAUSING TO BE MADE OR USED, A FALSE RECORD OR STATEMENT MATERIAL TO A FALSE OR FRAUDULENT CLAIM; CONSPIRING TO COMMIT A VIOLATION OF THE AFORESAID TO PROCURE TITLE IV-D FUNDING, THAT INVOLVE VIOLATIONS OF 42 U.S.C. § 654 WHICH ARE**

**PENALTY-INCURRING AND FINES INCURRING UNDER 42 U.S.C. § 654, COMMITTED BY INDIVIDUAL APPELLEE PERSONS, WHOEVER,**

## AND AGENTS OF TITLE IV SOCIAL SECURITY ACT RHODE ISLAND STATE PLAN

### Under Fed. R. Evid. 201

### and

### Pursuant to

### 18 U.S.C. § 4
### 18 U.S.C. § 666

### 18 U.S.C. § 287 - making false, fictitious claims,

### 18 U.S.C. § 371 - conspiracy to defraud the United States,

### 18 U.S.C. § 1001 - false documents or false statements to a federal agency,

### 18 U.S.C. § 1341 - mail fraud,

### 18 U.S.C. § 1343 - wire fraud,

### 18 U.S.C. § 641 - Public money, property or records,

### 31 U.S.C. § 3279 - federal civil false claims act

### Et al.

_____

## ORGANIZED FRAUD, THEFT OF PUBLIC MONEY AND GOVERNMENT PROGRAMS INVOLVING BILLIONS OF DOLLARS

Judicial Notice, in aid of the court, is respectfully requested of the following:

This case is related to Appeal No. 23-1967 and Appeal No. 23-1978.

Under Fed. R. Evid. 201[f], judicial notice of adjudicative facts may be taken at any stage of the proceedings, including on appeal. In practice, appellate courts frequently take judicial notice of both adjudicative and legislative facts presented

for the first time on appeal, whether requested by a party or on their own initiative. See, e.g., *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 [2d Cir. 2002]; In *re Indian Palms Assoc. Ltd* ., 61 F.3d 197, 205 [3d Cir. 1995].

In 2010, Appellee Gero Meyersiek (who is a non-welfare recipient and independently wealthy person, was represented by his private counsel, Barbara Grady, whose law firm partner, Paul Dugan, was formerly a Deputy Chief Counsel of State Appellee) paid Appellee Rhode Island Office of Child Support Services $25 under 42 U.S.C. §654(6)(B) for legal services that entailed, *inter alia*, establishing and enforcement of interest on overdue support.  In return for Appellee Gero Meyersiek's $25 payment, State Appellee's Deputy Chief Counsel Priscilla Glucksman provided dedicated, individualized and customized services beyond those prescribed by 42 U.S.C. §654(6)(B), to wit Glucksman appeared on behalf of the State at *all non-welfare non-paternity family court* hearings in (over 12) 2010, (over 12) 2011, (over 12) 2012 and 2013 concerning *private custody matters* relating to *Appellant's application to move her young daughters whom she had physical custody up until she moved to TEXAS in 2010 when Appellant remarried* in TEXAS.

Rhode Island Executive Office of Health and Human Services's Budget for this Fiscal Year is $3,419,217,779.00 ($3.42 Billion) that consists of Federal Funding. Penalties and fines incurred as of and accrued from the year 1996 when Congress amended Title IV-D of the Social Security Act providing for penalties and fines levied against States' noncompliance with Title IV-D. The amount of penalties and fines incurred by Rhode Island under 42 U.S.C. § 654 and other applicable federal laws, and the amount of funding Title IV-A TANF disgorgement owed and due from Rhode Island to the United States pursuant to Congress linking State eligibility for TANF funding to State compliance with Title IV-D date back to 1996 through 2024.

Pursuant to **18 U.S.C. § 4,** APPELLANT, proceeding from TEXAS and as a citizen of TEXAS, in aid of the Court, respectfully in good faith makes known to the Judges of the United States in the United States Court of Appeals for the First Circuit of United States of America, the commission of penalties-incurring and fines-incurring, both civil and criminal, (negligent and intentional) violations by Appellee persons or whoever acting as agents of the **42 U.S.C. § 654(1) political subdivisions of the State Plan of the State of Rhode Island** and Appellee persons, pursuant to **18 U.S.C. § 666, 18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false documents or false statements to a federal agency, 18 U.S.C. §**

1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud, 18 U.S.C. § 641 - Public money, property or records, 31 U.S.C. § 3279 - federal civil false claims act *et al.* (a non-exhaustive list of Appellee-violated federal codes is invoked in the Conclusion Section of this Notice), and respectfully requests review by a panel of judges in this United States Court of Appeals for the First Circuit under **Fed. R. App. P 27(b).** Certain aspects of the fraud made known herein were also made known to the judges of the United States in the related case **Appeal Case No. 23-1967** pending before a panel of judges **pursuant to Appellant's motions invoked under Fed. R. App. P 8(a)(2)(D) and Fed. R. App. P 27(b) pending in that matter**.

 **Please take Judicial Notice that Appellant, in Appeals No. 23-1967, respectfully requested a hearing by a panel of Judges on the Federal Question matters raised herein under Fed. R. App. P 8(a)(2)(D) and Fed. R. App. P 27(b)**.

I. **APPELLANT'S LIMITED SCOPE PROSECUTION OF THE APPELLEES AND STATE OPERATIONS UNDER THE STATE PLAN UNDER 42 U.S.C. § 654 IN THE <mark>LIMITED</mark> JURISDICTION 42 U.S.C. § 654(1) STATE FAMILY COURT TITLE IV CASE PROCEEDINGS**

The TEXAS Appellant, a victim of the Appellees' organized commission of organized Title IV-D and Title IV-A Program interstate fraud defrauding Appellant (and TEXAS because Rhode Island's official policy and practice to conceal any

and all interest by removing it from the automated data processing system when certifying to Texas for collections under 42 U.S.C. § 666(14) in a scheme calculated to deny Texas's ability to request in sharing legitimate interest under Title IV-D's enforcement and collection states cooperative program scheme) of 42 U.S.C. § 654(21)(A) prohibited 12% compound interest on overdue support fraud, fraudulent liens in TEXAS on TEXAS properties consisting of 42 U.S.C. § 654(21)(A) violative 12% COMPOUND INTEREST on overdue support, fraud, theft, and accounting fraud, respectfully requests judicial notice, in aid of the Court, of the TEXAS Appellant's concurrent limited scope prosecution of the Appellees in the Rhode Island State Plan's 42 U.S.C. **§ 654(1)** political subdivision, Rhode Island Judiciary limited jurisdiction family court, where certain symbiotic state judicial actors, such as state judge John McCann III, state judge Haiganush Bedrosian and state magistrate Susan Nahabedian, routinely establish and enforce under color of Rhode Island state law 12% compound interest on overdue support, upon information, since 1980, when the Rhode Island General Assembly enacted R.I. Gen. Laws § 15-5-16.5 on "support owing."  Appellant respectfully attached hereto this Notice the publication by **Congress** of **42 U.S.C. § 654,** Appellant's motion to dismiss for lack of jurisdiction and close the case dated March 27, 2024; motions to compel compliance with subpoena filed on March 26, 2024 and March 21, 2024 to compel enforcement of that family court's properly

issued subpoena for Appellant's Title IV-D case records including records showing the Appellee-Rhode Island Office of Child Support Service's accounting alterations and false support certifications to TEXAS involving any and all records as they relate to the removal of 12% compound interest in the amount of tens of thousands of dollars from the automated data processing system and putting the 12% compound interest in the amount of tens of thousands of dollars back on the system whether it be for certification of a compliant approved State Plan to the UNITED STATES for claims under Title IV-D and Title IV-A programs funding under 42 U.S.C. §§ 654(7), 654(10), 654(14), 654(15), 654(16), 654a, 654b; or certified to financial institutions or property-holding entities for the purpose of placing or perfecting liens on Appellant's TEXAS properties, or certified to the State of TEXAS for enforcement against the Appellant (e.g., to TEXAS for cooperation under the State Plan Congressionally prescribed under 42 U.S.C. §666 (14) certifying the accuracy and legal sufficiency of Rhode Island's automated data processing system accounted amount) that must obviously exactly corroborate with the amounts directly represented to and demanded from the Appellant during the course of the Appellees' support collection activities – Appellant prosecuted judicial compulsion of Rhode Island Appellees' compliance with the subpoena **and compliance with 42 U.S.C. §654b's** requirement to furnish the information upon the noncustodial parent's information request by filing the motion to compel using

the State's electronic court filing system, Odyssey, and attached hereto under

**Exhibit A**.  This federal appellate Court is requested to scrutinize the attached

Congressionally published Statutory Text as well as the Statutory Notes and

Related Subsidiaries of all Congress's Amendments, especially the **1996**

**Amendments to 42 U.S.C. §654.**

      As a threshold matter, Appellant respectfully requests Judicial Notice of

**the Explicit Preemptive Effect of 42 U.S.C. sec. 654 that** Congress offered to

Rhode Island under the **Commerce Clause and the Spending Clause** of the

United States Constitution as a condition for receiving Federal Funds under the

Title IV Programs.

> **A.  The Statutory Text and Statutory Notes and Related Subsidiaries of Congress's 1996 Amendment to 42 U.S.C. §654 Make Clear that Under the United States Constitution's Commerce Clause, Congress conditioned State Participation in 42 U.S.C. §654 with State Acceptance of 42 U.S.C. §654 Preemption of State Laws and State Constitutions**

      Appellant respectfully requests Judicial Notice of the attached 42 U.S.C. §

654.  The Statutory text, Statutory Notes and Related Subsidiaries of Congress's

1996 Amendment to 42 U.S.C. § 654 makes clear that Under the United States

Constitution's Commerce Clause, Congress conditioned State Participation in Title

IV-D, as prescribed in 42 U.S.C. § 654, with State Acceptance of 42 U.S.C. § 654

Preemption of State Laws and State Constitutions.  Appellant requests Judicial

Notice of the text under  "Effective Date of 1996" that states as follows:

### "**Effective Date of 1996**

"(a) In General.-Except as otherwise specifically provided (but subject to subsections (b) and (c))-

"(1) the provisions of this title [see Tables for classification] requiring the enactment or amendment of State laws under **section 466 of the Social Security Act [42 U.S.C. 666], or revision of State plans under section 454 of such Act [this section], shall be effective** with respect to periods beginning on and after **October 1, 1996**; and

"(2) **all other provisions of this title shall become effective upon** the date of the enactment of this Act **[Aug. 22, 1996]**.

"(b) <mark>**Grace Period for State Law Changes**</mark>.-The provisions of this title shall become effective with respect to a State on the later of-

"(1) the date specified in this title, or

"(2) the effective date of laws enacted by the legislature of such State implementing such provisions,

but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2-year legislative session, each year of such session shall be deemed to be a separate regular session of the State legislature.

"(c) <mark>**Grace Period for State Constitutional Amendment.-**</mark>A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of-

"(1) 1 year after the effective date of the necessary State constitutional amendment; or

"(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]."

## Specific 1996 Amendments to 42 U.S.C. §654b and 42 U.S.C. §654(21)(A).

Appellant respectfully requests Judicial Notice of Congress' specific 1996 Amendments to 42 U.S.C. § 654b and 42 U.S.C. §654(21)(A):

"Amendment by section 312(a) of Pub. L. 104–193 **effective Oct. 1, 1998, with limited exception for States which, as of Aug. 22, 1996, were processing the receipt of child support payments through local courts**, see section 312(d) of Pub. L. 104–193, set out as an Effective Date note under **section 654b of this title**."

Further the **1996 Amendments made changes to Par. (21)(A). Pub. L. 104**–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent".

*Therefore, Congress makes it unequivocally clear that States are <u>required as a condition of State participation</u>, to **change State Laws**, and if necessary, **<u>amend State Constitutions</u>**, to comply with the 1996 Amendments to Title IV-D.  See, e.g., "b) **Grace Period for State Law Changes**. - The provisions of this title shall become effective with respect to a State on the later of the effective date of laws enacted by the legislature of such State implementing such provisions."*

Therefore, in 1996, Congress made clear that States, such as Rhode Island, that fail to enact by the legislature of such States implementing provisions of Title

IV-D, are no longer eligible to participate in Title IV-D, resulting in ineligibility to receive federal funding, as of 1996.

Under 42 U.S.C. § 655(a)(4)(A) and 42 U.S.C. § 655(a)(5), by the text of the Title IV-D statute, the Appellant respectfully requests Judicial Notice that the legislature has prescribed **penalties** and that this penalty **shall** be **enforced**.

Here, in the case of Rhode Island, **noncompliance is through *deliberate* and *willful* fault of Rhode Island – Appellant respectfully requests Judicial Notice of One of the Reports entitled "TRAC Record" generated by Appellee Rhode Island Office of Child Support Services in Appellant's case that Appellant was denied under 42 U.S.C.** § 654b(b)(4), but produced pursuant to Appellant's Rhode Island Access to Public Records Act (APRA) showing an entry made on December 6, 2021 by Appellee Kevin Tighe, Deputy Legal Chief Counsel of Appellee Rhode Island Office of Child Support Services stating that "interest was removed from the system in 2018 when we sent to Texas when case was made IU" then blacked out REDACTION.  Appellant is prosecuting Rhode Island in the state family court to produce the unredacted copy of the said public records that were produced pursuant to APRA regarding this entry "interest was removed from the system in 2018 when we sent to Texas when case was made IU."  *See* attached **TRAC Records <mark>Exhibit C</mark>**. As it turned out, the alleged interest amount is in the tens of thousands of dollars, for which the Appellees continue to refuse to furnish

the complete accounting books of their offline manual accounting of how much was removed in 2018.

The State Appellees' removal of the interest from the automated data processing and information retrieval system is material to this matter as the evidence herein presented goes to show proof towards the willful and deliberate noncompliance by Rhode Island of Title IV-D.   Congress made clear in its 1996 Amendment of Title IV to require the implementation of an automated data processing and information retrieval system as a condition of eligibility because the legacy manual computation, collection and disbursement of child and spousal support were fraught with inaccuracies, that essentially ran afoul of safeguards against false accounting and falsified records by unscrupulous persons like the Appellees.  Congress made explicitly clear that accuracy was so central to the federal government's involvement in Title IV-D that It enacted punitive penalties and fines under 42 U.S.C. § 655 for States' noncompliance of 42 U.S.C. §§ 654, 666.

Therefore, the Appellees' knowing removal of tens of thousands of dollars representing Rhode Island's unlawful 12% compound interest prohibited under 42 U.S.C. § 654(21)(A) "when sent to Texas" makes clear Appellees knew the 12% compound interest was fraudulent and unlawful, and sought to cover it up from TEXAS authorities through the manual removal of the entire interest amount

(consisting of tens of thousands of dollars) from the automated data processing and information retrieval system that is prohibited by 42 U.S.C. §§ 651-669.  The system is intended to certify the integrity and accuracy of the entire support amount in any given account.

Therefore, it is clearly established that Rhode Island covers up its noncompliance and it is clearly established that Rhode Island's noncompliance is willful and deliberate **because Rhode Island knowingly failed to comply with numerous provisions of 42 U.S.C. § 654 as follows**:

(1) Failed to enact State laws in 1996 implementing provisions clearly prescribed in 42 U.S.C. § 654(21)(A) that makes clear that States may opt to impose interest on overdue support, **but** no less than 3 percent and no more than 6 percent;  See attached **Exhibit D**. R.I. Gen. Law§15-5-16.5 legislating 12% compound interest on overdue child and spousal support that is explicitly prohibited by 42 U.S.C. § 654(21)(A) (and contract to the selective violation of RIGL § 15-5-16.5 that Appellee-Rhode Island Child Support Services official policy states to *prohibit* charging interest on overdue support in *interstate* cases **only**. – See **Policy** attached in **Exhibit B**)

(2) Failed to enact State codes and procedures to comply with 42 U.S.C. § 654(21)(A) requirement "at the option of the State, impose a late

payment fee on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, **in an amount equal to a <mark>uniform</mark> percentage** determined by the State **(not less than 3 percent nor more than 6 percent**) of the overdue support" that would prohibit the State's Title IV-D operational policy saying, "it is desirable" to prohibit the State's Office of Child Support Services charging interest in interstate cases (implying in *intrastate* cases 12% compound interest is routinely established and enforced by State policy in violation of the "not less than 3 percent nor more than 6 percent" explicitly prescribed under 42 U.S.C. § 654(21)(A).

(3) Failed to disclose by deliberate omission (by concealment) to the United States when certifying to the United States Secretary of the Department of Health and Human Services for federal reimbursement payment and incentive payment funding under the Title IV Programs Part D, 42 U.S.C. §§ 651-669, and Part A, TANF.

(4) Falsified accounting and falsified certifications sent to the United States and other support enforcement cooperating States, like TEXAS, under, *inter alia*, 42 U.S.C. §§ 651-669, through the State's official Policy and official Practice of creating multiple accounting records and books of accounts for the same support case through the manual removal of the

Section 654(21)(A) noncompliant (and incriminating) 12% compound interest amount from the automated data processing system consisting of tens of thousands of dollars for example, and putting the removed interest back on the system by manually issuing fraudulent (based on illegal 12% compound interest) liens on properties, for example, fraudulent liens on Texas properties in TEXAS that further violated TEXAS PENAL and CIVIL CODES.  *See* Appellee Rhode Island Office of Child Support Services's Official Policy that states, "**It is desirable for RI OCSS to prohibit the charging of interest in Interstate Cases**."  The Policy goes on to state regarding operations of the automated data processing system, "Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest."  Additionally the Policy states, "Two reports will be created.  The first will detail the interstate cases for which a support order….. for which one or more interest adjustment were created."  In Exhibit B.

(5) Concealment of the State's noncompliance with 42 U.S.C. **§ 654(21)(A)** by Cover Up and by Fraud, through the routine practice of illegal manual removal by Appellee Rhode Island Office of Child Support Services of Rhode Island's fraudulent and unlawful 12% compound

interest from the 42 U.S.C. **§ 654(24) mandated** *automated data*

*processing* **and** *information retrieval system* mandated and legislated

under *inter alia* 42 U.S.C. **§ 654(24) and 42 U.S.C. §654a and 42**

**U.S.C. §654b to be** *accurate***,** thereby deliberately and willfully

violating, *inter alia*, 42 U.S.C. **§ 654b,** 42 U.S.C. **§654(20), 42 U.S.C.**

**§666(14), 42 U.S.C. §654(24) and Congressional Requirements for**

**accuracy of support calculations be performed by the automated**

**data processing system, from which information is retrieved for all**

**support certifications sent to the United States and to cooperative**

**enforcement States like TEXAS for 42 U.S.C. § 654(21)(A) fund**

**sharing, Title IV-D Program federal fund reimbursements, and**

**Title IV-A TANF federal fund procurement.**

(6) The illegal manual removal of the unlawful 12% compound interest
from the automated data processing system is augmented by the illegal
manual inputting back on the system the illegal 12% compound interest
when Rhode Island generates fraudulent liens under the guise of support
collection for the unlawful 12% compound interest.

(7) Operating a scheme of collecting unlawful 12% compound interest that
Rhode Island converts to unlawful State revenue because under 42
U.S.C. **§§ 651-669** this "ordered" 12% compound interest is assigned by

the welfare recipient to the State, thus the 12% compound interest

represents a debt to the State owed by the noncustodial parent.

(8) Appellee Cover up of the illegal scheme from unsuspecting noncustodial

parent victims like Appellant, by refusing or deny furnishing

noncustodial parents "information upon request, timely information on

the current status of support payments under an order requiring

payments to be made by or to the parent – the timely information

generated by the Appellee Rhode Island Office of Child Support

Services must comply with 42 U.S.C. **§ 654b(b) Required procedures**

**mandating "**The State disbursement unit shall use automated

procedures, electronic processes, and computer-driven technology to the

maximum extent feasible, efficient, and economical, for the collection

and disbursement of support payments, including procedures that

furnish noncustodial parents their case files upon request.

(9) Appellee Rhode Island Office of Child Support Service's unlawful

policy and practice of manually removing support amounts through

fraud from the automated data process system resulted in the generation

of fraudulent and false accounting and false ledgers published in

Appellant's online child support account maintained by State Appellees

fraudulently showing "$0 payment" for Appellant's large sum of

$104,185.98 payoff payment in full paid in Texas on December 7, 2021
– See screenshot taken of online account on December 3, 2022 that says
**"$0.00"** under Payments for December 2021, attached hereto as **Exhibit E**.

(10)   Similarly, State Appellees concealed from through deceit that the
"$0.00" Under Interest Due on the Appellant's online account shown on
December 6, 2021 was in part because State Appellees unlawfully took
interest off the automated data processing system and information
retrieval system in 2018 when they sent the support to TEXAS – this
tampering with federal Title IV records in Appellant's case file was
covered up by State Appellees.  See **Exhibit F**, Screen shot of
Appellant's online support account taken on **December 6, 2021**, which
shows **$0.00** under **Interest Due**.

(11)   **Appellee Rhode Island Office of Child Support Services Deputy
Chief Counsel Kevin Tighe further violated Appellant's privacy
rights protected under 42 U.S.C. §654(26)(A) by discussing in detail
with Barbara Grady, Appellee Gero Meyersiek's private attorney,
information and strategies regarding "taking interest off the
system" and "keeping interest off the system" as they relate to
support enforcement which is prohibited by the statutory text of 42**

U.S.C. sec.,654(26)(A) mandating that the State Plan "have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the parties, including-(A) safeguards against unauthorized use or disclosure of information relating to proceedings or actions to enforce support. – See **Exhibit C**, **TRAC records for December 6, 2021** showing Kevin Tighe's unauthorized disclosure to Barbara Grady of enforcement information regarding taking interest off the system in 2018 when sending to Texas in in violation of Appellant's privacy rights protected by 42 U.S.C. sec. 654(26)(A).  This disclosure was calculated to scheme with Barbara Grady on how to defraud the Appellant through "leaving the interest off the system" so as to cover up from the Appellant the unenforceable 12% compound interest rate as well as to deceive the Appellant through inducement, to accept Appellee's offer and to agree to pay off the large lump sum principle amount by representing to the Appellant that Appellee Gero Meyersiek waived interest if Appellant paid off support in full in one lump sum $104,185.98.

(12)  In addition to Appellee Rhode Island Office of Child Support Services, the State is culpable of a deliberate and willful failure to

comply with 42 U.S.C. **§654(1) requiring "A State plan for child and spousal support must-(1) provide that it shall be in effect in ==all political subdivisions== of the State:**

    a. **Political subdivision limited jurisdiction Rhode Island state family court judiciary and justices routinely establish and enforce under color of state law and through fraud on the court absent jurisdiction the unlawful 12% compound interest in violation of 42 U.S.C. §654(21)(A)**

    b. **Political subdivision Office of the Attorney General knowingly aids and abets in and enforces the unlawful 12% compound interest**

    c. **Political subdivision Rhode Island Executive Office of Health and Human Services that has an annual budget of $3.42 Billion knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and participates in the consequentially unlawful collection of reimbursement of federal funds and federal grant money from the United States under Title IV-D Program.**

    d. **Political subdivision Rhode Island Office of the Treasurer knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and participates in the consequentially unlawful collection of reimbursement of federal funds and federal grant money from the United States under Title IV-D Program.**

    e. **Political subdivision Rhode Island Office of the Governor knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and participates in the consequentially unlawful collection of reimbursement of federal funds and federal grant money from the United States under Title IV-D Program.**

    f.  **Political subdivision Appropriations Committee knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and causes to appropriate public funds in the consequentially unlawful State financial participation of the noncompliant State Plan, appropriating the State's public funds to the illegal Title IV-D operation that defrauds unsuspecting noncustodial parents and spousal support obligors for 12% compound interest on overdue support under color of state law.**

    **B.  Hodel v. Virginia Surface Mining & Reclamation Assn., Inc. and Hodges v. Shalala, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003) - U.S. Supreme Court Affirms 42 U.S.C. §654 Preemption over State Laws and State Constitutions under the United States Spending Clause and Commerce Clause**

    Congress prescribed both civil and criminal penalties for violations of Title IV of the Social Security Act.  Firstly, consistent with its ==Spending Power==, Congress has the authority to attach conditions on the receipt of federal funds. *See **South Dakota v. Dole**,* 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16), (20), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See **Sullivan v. Stroop**,* 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."   The penalty

provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at 879. Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1]

Congress also enacted several criminal codes punishing actors, such as the Plaintiffs, who commit federal crimes, including cover up of unlawful activities.

The federal government has a longstanding involvement in child support enforcement programs. See *Hodges v. Shalala*, 121 F.Supp.2d 854 (D.S.C. 2000), *Hodges v. Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina paid $75 million as of 2009 and was set to pay another $10 million for 2010. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
   Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

Cir. 2002), cert. denied, 540 U.S. 811 (2003) As a condition of receipt of any federal

funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must

have an approved state plan for child and spousal support that meets all the

requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D

Plan are the requirements under 42 U.S.C. sec. 654(21)(A) that the State, at the option

of the State, impose a late payment fee ('interest") on all overdue support (as defined

in section 666(e) of this title) under any obligation being enforced under this part, in an

amount equal to a uniform percentage determined by the State (not less than 3 percent

nor more than 6 percent) of the overdue support, which shall be payable by the

noncustodial parent owing the overdue support; establish and operate an automated

data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state

child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A), among others

While Rhode Island submits to the United States that it has a federally certifiable

statewide automated data processing system for child support, Office of Child Support

Services produced APRA Public Records consisting of Title IV Public Records showing

Rhode Island taking off from the automated data processing system tens of thousands of

dollars allegedly representing the 42 U.S.C. sec. 654(21)(A) prohibited 12% compound

interest late payment fee "interest" prior to certifying to TEXAS and the United States,

and showing Rhode Island falsely certified to the amount's accuracy under 42 U.S.C.

sec. 666(14) when in fact Rhode Island removed significant tens of thousands of dollars

(See TRAC records in attached Exhibit).

The Title IV-D statute expressly provides that compliance with ALL 42 U.S.C. 654 requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A.

Again, the clear and unequivocal statement of the required conditions in the statute enabled South Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted).  The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop,* 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."

Emphatically, Congress may use its **Spending Power** to **influence** a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, **but** Congress, under the **Commerce Clause**, **may offer the States a choice of regulation under federal control or preemption under federal regulation**. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc*., 452 U.S. 264, 288 (1981).  It is crystal clear that upon Rhode Island's State Plan entering into agreement with the United States under the **Commerce Clause**, Rhode Island accepted the agreement terms of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc*., 452 U.S. 264, 288 (1981).

*See* United States Congress's publication of cited applicable federal law:
https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUSC-prelim-title42-

section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRp
b25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

**Appellant requests judicial Notice of attached <mark>Exhibit G.</mark>** *Hodges v.*

*Shalala*, **311 F.3d 316 (4th Cir. 2002)**

**C. Rhode Island's Defraud of TEXAS – Under 42 U.S.C. §654, "State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21)" and Rhode Island Removed Tens of Thousands of "paragraph (21)"**

The last provision after  Provision (34) of 42 U.S.C. sec. 654 states as follows:

"The State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21). Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25."

 See link:

**https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=gra
nuleid%3AUSC-prelim-title42-
section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJl
Z3VsYXRpb25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull**

Appellee Rhode Island Office of Child Support Service's routine practice of

removal of tens of thousands of dollars of interest from the automated system

before sending to other states like Texas in 2018 makes clear that the Appellees

schemed to defraud TEXAS "who makes the collection to retain any late payment

fee under paragraph (21)" – except TEXAS, a paragraph (21) compliant State that

set 6% simple interest, would have known the 12% compound interest is unlawful and unenforceable in Texas.

### D. Rhode Island's Defraud of the UNITED STATES in Scheme Involving Routine Removals of 42 U.S.C. §654(21)

Appellant in good faith relies on the straightforward and clearly worded ruling of the United States Court of Appeals for the 4th Circuit in ***Hodges v. Shalala***, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003), that makes clear Congress's intent to prescribe both civil *and* criminal penalties and fines for violations.  Consistent with its Spending Power, Congress has the authority to attach conditions on the receipt of federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements are conditions of approval of a state plan. See 42 U.S.C. §§ 654(7), (10), (14), (15), (16), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."

The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at 879. Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[2]    Congress also enacted several criminal codes punishing persons, whoever who act as agents, such as the Appellees, who commit federal crimes, including cover up of unlawful activities under federal criminal

---

[2] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

        Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to TEXAS and to the United States in order to conceal the unlawful 12% compound interest from the noncustodial parent and from TEXAS and Federal authorities in the false amounts certified to TEXAS and to the United States for incentive claims, cooperation claims and Title IV-D and Title IV-A funding claims.

codes, e.g., *see* **8 U.S.C. § 666, 18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false documents or false statements to a federal agency, 18 U.S.C. § 1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud, 31 U.S.C. § 3279 - federal civil false claims act *et al.*** (a non-exhaustive list of Appellee-violated federal codes is invoked in the Conclusion Section of this Notice).  Penalties and fines against the State for noncompliance (including due process violations provided in 42 U.S.C. §654(20) and corresponding §666) is explicit under federal codes Title IV-D, Title IV-A, and 18 U.S.C. § 666**,** and upheld.

Appellant attaches the 4th Circuit's ruling (***Hodges v. Shalala***, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003) herewith under **Exhibit G**.

Appellant  moreover in good faith relies on the straightforward and clearly worded Brief filed by the United States Department of Justice and Secretary of the United States Department of Health and Human Services in the seminal United States Supreme Court case ***Turner v. Rogers***, 564 U.S. 431 (2011) that showed South Carolina (found by the 4th Circuit Court of Appeals) liable for $75 million in penalties for that state's 42 U.S.C. § 654 violations that did not even involve, *inter alia*, fraud and tampering with the record or unlawful 12% compound interest put into, then taken off, then put back on, the automated data processing system as here

in Rhode Island by the political subdivision Appellees.  The TEXAS Appellant, the victim of fraud and organized fraud by Rhode Island's political subdivisions under 42 U.S.C. **§ 654(1),** in good faith made known the above activities to "some judges" of "the United States" such as the judges sitting in the Court of Appeals for the First Circuit and other relevant federal authorities under 18 U.S.C. **§ 4.**

Appellant attaches the aforesaid Brief filed in the U.S. Supreme Court by the United States in ***Turner v. Rogers***, 564 U.S. 431 (2011) herewith under **Exhibit H.**

**Relying on the Turner v. Rogers United States Amicus Brief, it is crystal clear from Appellant's making known, *inter alia*, to judges of the United States the routine false certifications to United States and other States under 42 U.S.C. sec. 654, 655, 658a, 666 et al to defraud the federal Title IV Program funding of ineligible funds under Title IV-D and TANF, the defraud of noncustodial parents and grandparents through the 42 U.S.C. sec. 654 legal framework under color of state law, the defraud of State public funds of Rhode Island and of Texas to enforce fraudulent void and voidable support orders targeting noncustodial victims that established unlawful 12% compound interest on overdue support, and the defraud of cooperative States like Texas from sharing the "late fee" provided by 42 U.S.C. sec. 654 by Appellees' removal of the interest amount from the automated system prior to certification to Texas for enforcement, Rhode Island has accrued billions of**

==dollars in penalties and fines== under both civil and criminal statutes, both

federal and state.

II.    **STATE JUDICIARY'S VIOLATION OF GOVERNMENT EDICTS DOCTRINE, CALCULATED FAILURE TO INTEGRATE TITLE IV-D AGENCY ELECTRONIC FILING SYSTEM WITH ODYSSEY MAKING THEIR FILINGS INVISIBLE TO ALL E-COURT USERS OTHER THAN THE JUDGE AND THEMSELVES AND VIOLATION OF ACCESS TO COURT INFORMATION OF PUBLIC TITLE IV-D PROCEEDINGS IN RHODE ISLAND'S STATEWIDE ELECTRONIC COURTS**

**a. DENIAL OF PUBLIC AND PRO SE-LITIGANT ACCESS TO COURT INFORMATION INCLUDING JUDGE-CREATED LAWS BY 42 USC 654(1) POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY**

The Rhode Island Judiciary is a political subdivision of the State of Rhode

Island under 42 USC 654(1).  While publicizing during the implementation of the

$6 million installation of Odyssey (the statewide electronic filing system) in 2014

that the electronic courts will enable ALL court users to pull up court record

information with ease from their phones, the Rhode Island Judiciary quietly

implemented Rule 5 of the Rhode Island Rules and Practice denying the Public,

pro-se litigants and all parties to a case in Rhode Island remote access to court

record information including judge-created orders and laws, including their own.

Through this deceit, the Rhode Island Judiciary lied to the Public, while denying

access and thereby covering up the routine ordering of unenforceable body of

judge-created laws ordering 12% compound interest in public cases and public

hearings under 42 USC 654 in public Title IV-D cases, such as Appellant's, by

symbiotic pliant judges like Judge McCann and Magistrate Nahabedian. The

denial of access to pro-se litigants of their own cases' court records containing

support orders violates, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16),

(20), (21), (23), (24), (27), 666, 655, 658a. The denial of public access to public

court records documenting the routine systemic violations of 42 USC 654(21)(A)

in electronic courts violates the First Amendment and the public's right to know

the law, even if these fraud on the court unenforceable judge-created laws are

unenforceable in both Rhode Island and elsewhere Title IV Part D reaches. The

denial of public access to judge-created laws that is also motivated by cover-up

fundamentally violates the established Government Edicts Doctrine that the United

States Supreme Court specifically held applies to electronic formats of government

doctrines, such as judge-created laws in digital courts. See ***Georgia v. Public

Resource.Org, Inc***., No. 18-1150, 590 U.S. ___ (2020). The Appellant has been

denied access by the political subdivision Rhode Island Judiciary to her court

records and information regarding the orders in question that must be furnished

pursuant to 42 USC 654b thus in violation of 42 USC 654. The Appellant has been

denied access by the political subdivision Rhode Island Judiciary to unenforceable

and impeachable judge-created fraud on the court void laws that routinely establish

unenforceable 12% compound interest by certain symbiotic pliant judges, like

Judge McCann and Magistrate Nahabedian, who work hand-in-hand with the

Rhode Island Office of Child Support Services in Title IV-D cases, in violation of

Appellant's Due Process and Equal Protection rights to know the law to be

meaningfully heard and right to meaningful access to justice – they are in violation

of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23),

(24), (27), 666, 655, 658a.

The family court held at the hearing in this matter scheduled on March 6,

2023 that the Rhode Island Office of Child Support Services is ordered to show

that the alleged arrears is accurate.  See attached March 6, 2023 hearing transcript.

Explicitly stated throughout 42 USC 654, "accuracy" requires no accounting

alterations generated offline then unsubstantiated hard inputs into the automated

system, no fraud, no inducements, no interstate extortion under color of state law,

and for certain no 12% compound interest on overdue support.

### b. CALCULATED FAILURE BY THE JUDICIARY TO INTEGRATE THE TITLE IV-D AGENCIES' ELECTRONIC FILING SYSTEM INTO ODYSSEY RESULTING IN AGENCY FILINGS BEING INVISIBLE TO ALL COURT USERS EXCEPT THE JUDGE AND THE AGENCIES THEMSELVES – COVER UP

Because under the State's Plan the Title IV-D agencies routinely file in the

Rhode Island court system for the illegal enforcement of illegal 12% compound

interest disallowed under 42 USC 654(21)(A), the political subdivision Rhode

Island Judiciary deliberately failed to integrate the Title IV-D Agencies' electronic filing system with the State's electronic filing system Odyssey in order to make Title IV-D Agency electronic filings invisible to all court users except the judge and the agencies  themselves, calculated to cover up the 12% compound interest from audit by the federal authorities and from the Public.  This came to light at the WebEx hearing in this Title IV-D matter before family court Judge Merola on June 8, 2023 scheduled at 2PM, where Judge Merola, showing he was unaware of the failure of systems integration, questioned Appellee Paul Gould of Rhode Island Office of Child Support Services, why the Appellant is unable to see the agency's electronic filings that the judge can see in the system.  Without hesitation, Appellee Paul Gould explained that this is due to the electronic court implementation process that was supposed to integrate the agency's legacy system to Odyssey, demonstrating conclusively that Gould, the Lead Counsel of the Rhode Island Office of Child Support Services responsible and overseeing agency court filings in all Title IV-D cases under the State Plan, undisputedly was in the know and part of the conspiracy involving the deliberate failure of filing system integration and its continuing perpetration in Title IV proceedings that made Title IV agencies' filings invisible as part of the cover up.

### c. CRIMINAL VIOLATIONS REPORTED TO SOME JUDGE OF THE UNITED STATES AND OTHER LISTED AUTHORITIES UNDER 18 U.S.C. § 4

The Appellant, in good faith and reliant on the plain language of 18 USC § 4, misprision of felony, as well as the Brief filed in the United States Supreme Court by the United States of America in the Supreme Court case, ***Turner v. Rogers***, 564 U.S. 431 (2011) that showed South Carolina (found by the 4th Circuit Court of Appeals) liable for $88 million in penalties for that state's 42 U.S.C. sec. 654 violations that did not even involve, inter alia, fraud and tampering with the record or unlawful 12% compound interest put into then taken off then put back on the automated data processing system as here in Rhode Island, made known the above activities to "some judges" of "the United States" and other relevant federal authorities – counting among the United States judges Appellant made known publicly in the Amended Complaint filed in the United States District Court for the District of Rhode Island, Judge William E. Smith.  The issue of what Judge Smith has done with the information "made known to him" is pending before the United States Court of Appeals for the First Circuit before a requested panel of judges under the federal appellate law of civil procedure in Appeal Case No. 23-1967. Therefore, under 18 U.S.C. Sec. 4, the above reported activities have been "made known" to several high ranking Judges of the United States, including the Judge in this case.

## III.   VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Appellant made known to the panel of judges of the United States allegations contained in the Amended Complaint filed in Federal Court of the commission of acts by the Rhode Island political subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein in this motion, the afore-described acts violating **31 U.S.C. § 3279,** 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968  – such violative acts by the Appellees in this matter, and/or Judge Smith on this list are not exhaustive.  It is undisputable, among others, that Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-D and Title IV-A disgorgement is due from the applicable State of Rhode Island's political subdivisions.

## IV. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in UNITED STATES OF

AMERICA v. DONALD J. TRUMP, DC Circuit, the DC Circuit United States

Court of Appeals reminds the Public and all applicable tribunals that Judges are

similarly liable to the criminal laws for their official acts.  A notable example is *Ex*

*parte Commonwealth of Virginia*, in which the Supreme Court affirmed the

criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A

county judge was indicted in federal court for violating a federal statute that

prohibited discriminating on the basis of race in jury selection. Id. at 340, 344. The

Supreme Court began by observing the principle that officers are bound to follow

the law: "We do not perceive how holding an office under a State, and claiming to

act for the State, can relieve the holder from obligation to obey the Constitution of

the United States, or take away the power of Congress to punish his

disobedience." *Id.* at 348. The Court then addressed the judge's argument that the

Court lacked the authority to punish a state judge for "his official acts." *Id.* Its

response was twofold. First, the Court described juror selection as "merely a

ministerial act, as much so as the act of a sheriff holding an execution, in

determining upon what piece of property he will make a levy, or the act of a

roadmaster in selecting laborers to work upon the roads." *Id.* The Court then

explained that even if juror selection is considered a "judicial act," the judge had a

legal duty to obey the criminal laws:

"But if the selection of jurors could be considered in any case a judicial act, can the act charged against the petitioner be considered such when he acted outside of his authority and in direct violation of the spirit of the State statute? That statute gave him no authority, when selecting jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the

requested injunction was not the only available remedy because both judges
remained answerable to the federal criminal laws:

> [W]e have never held that the performance of
> the duties of judicial, legislative, or executive
> officers, requires or contemplates the
> immunization of otherwise criminal deprivation
> of constitutional rights. On the contrary, the
> judicially fashioned doctrine of official
> immunity does not reach 'so far as to immunize
> criminal conduct proscribed by an Act of
> Congress . . . .'

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting
Gravel, 408 U.S. at 627). Similarly, in *Dennis v. Sparks,* the Court affirmed
judicial immunity from civil money damages in the context of bribery allegations
but explained that judges "are subject to criminal prosecutions as are other
citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity
because "the challenged conduct" — allegedly issuing an injunction corruptly after
accepting bribes as part of a conspiracy — was "an official judicial act within his
statutory jurisdiction, broadly construed." *Id*. at 29. The scope of civil judicial
immunity thus aligns with civil Presidential immunity under *Fitzgerald*, but a
judge has no criminal immunity for the same "official act." See also *Imbler v.*

*Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock,* 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. See *United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings,* 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not immune, and employees of the political subdivisions of Rhode Island under 42 USC  § 654(1) similarly are not immune.  Barbara Grady and Gero Meyersiek are undisputedly liable.

IV.   **LACK OF JURISDICTION – APPELLEE 42 U.S.C. § 654(1) STATE PLAN POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (CREATED UNDER RIGL 8-6-3) LACKS JURISDICTION**

A. **RI'S 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY LACKS JURISDICTION TO ESTABLISH OR ENFORCE 42 USC § 654(21)(A) VIOLATIVE 12% COMPOUND INTEREST ON OVERDUE SUPPORT – DOING SO INCURS PENALTY UNDER 42 USC 654(24) AND REINFORCES ITS STATE PLAN'S INELIGIBILITY FOR FEDERAL FUNDING UNDER BOTH TITLE IV-D AND TITLE IV-A, WARRANTING DISGORGEMENT OF TANF AND TITLE IV-D FUNDING – SEE HODGES v. SHALALA**

The statutory provision of 42 U.S.C. 654(21)(A) makes it

explicitly clear that Title IV-D and Title IV-A participating 42

USC 654(1) state political subdivisions, such as the political

subdivision Rhode Island Judiciary, lack the authority to establish

12% compound interest.


To do so "routinely" simply incurs more penalties, more fines

constituting more false claim consequences, and imprisonment of

the culpable persons and agents.


B. **RI's 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY'S LIMITED JURISDICTION FAMILY COURT**

**(See RIGL 8-6-3) LACKS JURISDICTION OVER QUESTIONS AND MATTERS OF FEDERAL CRIMINAL VIOLATIONS BY RHODE ISLAND SDU OF ROUTINE RECORD TAMPERING WITH 42 U.S.C. 654a AUTOMATED DATA PROCESSING SYSTEM COMMITTING ACCOUNTING FRAUD (e.g., REMOVAL OF UNLAWFUL 12% COMPOUND INTEREST IN ORDER TO CONCEAL IT WHEN CERTIFYING TO OTHER STATE AUTHORITIES AND FEDERAL AUTHORITIES) AND THE CRIMINAL CERTIFICATION OF FRAUDULENT ACCOUNTS THAT CONTAIN MANUALLY REMOVED UNLAWFUL FRAUDULENT 12% COMPOUND INTEREST (UNDER COLOR OF RI'S PREEMPTED STATE LAW) FROM THE SYSTEM**

Title IV-D 42 USC 651-669, 31 U.S.C. § 3279, 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968

also make clear that the State Plan's 42 USC 654(1) political

subdivision limited jurisdiction Rhode Island family court

lacks jurisdiction over FEDERAL CRIMINAL

VIOLATIONS BY RHODE ISLAND SDU OF ROUTINE

RECORD TAMPERING WITH 42 U.S.C. 654a

AUTOMATED DATA PROCESSING SYSTEM

COMMITTING ACCOUNTING FRAUD (e.g.,

REMOVAL OF UNLAWFUL 12% COMPOUND

INTEREST IN ORDER TO CONCEAL IT WHEN

CERTIFYING TO OTHER STATE AUTHORITIES AND

FEDERAL AUTHORITIES) AND THE CRIMINAL

CERTIFICATION OF FRAUDULENT ACCOUNTS

THAT CONTAIN MANUALLY REMOVED

UNLAWFUL FRAUDULENT 12% COMPOUND

INTEREST (UNDER COLOR OF RI'S PREEMPTED

STATE LAW) FROM THE SYSTEM.  Appellant attaches

herewith in **Exhibit I.** Rhode Island Gen. Laws Sec. 8-10-3

that makes clear family court is a court of limited

jurisdiction that lacks jurisdiction over the Appellees'

criminal violations.

**C. RI's 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (See RIGL 8-6-3) LACKS JURISDICTION OVER FEDERAL CRIMINAL VIOLATIONS COMMITTED BY ITSELF INVOLVING CERTAIN SYMBIOTIC RHODE ISLAND FAMILY COURT JUSTICES, SUCH AS JUDGE JOHN McCANN AND MAGISTRATE SUSAN NAHABEDIAN, WHO KNOWINGLY AND ROUTINELY FRAUDULENTLY ESTABLISH AND ENFORCE UNLAWFUL 12% COMPOUND INTEREST TARGETING UNSUSPECTING NONCUSTODIAL PARENT VICTIMS**

Title IV-D 42 USC 651-669, 31 U.S.C. § 3279, 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 also make clear that the State Plan's 42 USC 654(1) political subdivision Rhode Island family court lacks jurisdiction over

FEDERAL CRIMINAL VIOLATIONS COMMITTED BY

ITSELF INVOLVING CERTAIN SYMBIOTIC RHODE

ISLAND FAMILY COURT JUSTICES, SUCH AS JUDGE

JOHN McCANN AND MAGISTRATE SUSAN NAHABEDIAN,

WHO KNOWINGLY AND ROUTINELY FRAUDULENTLY

ESTABLISH AND ENFORCE UNLAWFUL 12% COMPOUND

INTEREST TARGETING UNSUSPECTING NONCUSTODIAL

PARENT VICTIMS.


**CONCLUSION**

**WHEREFORE**, Under Fed. R. Evid. 201[f], judicial notice of adjudicative

facts may be taken at any stage of the proceedings, including on appeal. In

practice, appellate courts frequently take judicial notice of both adjudicative and

legislative facts presented for the first time on appeal, whether requested by a party

or on their own initiative. See, e.g., *Hotel Employees & Rest. Employees Union,*

*Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of New York Dep't of*

*Parks & Recreation*, 311 F.3d 534, 540 n.1 [2d Cir. 2002]; In re *Indian Palms*

*Assoc. Ltd* ., 61 F.3d 197, 205 [3d Cir. 1995]. Appellant respectfully requests

Judicial Notice of the herein Made known to "some judges"… "of the United

States" under Fed. R. Evid. 201 and pursuant to 18 U.S.C. sec. 1851.  Appellant

requests any and all Relief deemed just pursuant to protections accorded to persons acting in compliance with 18 U.S.C. sec. 4.

Respectfully submitted,

Mary Seguin
Pro Se
/s/        *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: March 29, 2024

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system on March 29, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/        *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

No. 23-1851

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official
capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY
FOBERT, KARLA CABALLEROS and TIMOTHY FLYNN in their individual
and official capacities; GERO MEYERSIEK; BARBARA GRADY

Defendants-Appellees.

Appeal from the United States District Court
for the District of Rhode Island

_____

**APPELLANT'S NOTICE TO THE JUDGES OF THE UNITED STATES OF
THE COMMISSION OF ACTIVITIES BY PERSONS OR WHOEVER
INVOLVING RECORD TAMPERING; KNOWING PRESENTATION, OR
CAUSING TO BE PRESENTED OR CERTIFICATION OF A FALSE OR
FRAUDULENT CLAIM TO THE UNITED STATES, TO THE STATE OF
TEXAS, FOR PAYMENT OR APPROVAL; KNOWINGLY MAKING,
USING OR CAUSING TO BE MADE OR USED, A FALSE RECORD OR
STATEMENT MATERIAL TO A FALSE OR FRAUDULENT CLAIM;
CONSPIRING TO COMMIT A VIOLATION OF THE AFORESAID TO
PROCURE TITLE IV-D FUNDING, THAT INVOLVE VIOLATIONS OF 42
U.S.C. § 654 WHICH ARE**

**PENALTY-INCURRING AND FINES INCURRING UNDER 42 U.S.C. §
654, COMMITTED BY INDIVIDUAL APPELLEE PERSONS, WHOEVER,**

**AND AGENTS OF TITLE IV SOCIAL SECURITY ACT RHODE ISLAND STATE PLAN**

**Pursuant to**

**18 U.S.C. § 4**
**18 U.S.C. § 666**

**18 U.S.C. § 287 - making false, fictitious claims,**

**18 U.S.C. § 371 - conspiracy to defraud the United States,**

**18 U.S.C. § 1001 - false documents or false statements to a federal agency,**

**18 U.S.C. § 1341 - mail fraud,**

**18 U.S.C. § 1343 - wire fraud,**

**18 U.S.C. § 641 - Public money, property or records,**

**31 U.S.C. § 3279 - federal civil false claims act**

**Et al.**

_____

**ORGANIZED FRAUD, THEFT OF PUBLIC MONEY AND GOVERNMENT PROGRAMS INVOLVING BILLIONS OF DOLLARS**

Judicial Notice, in aid of the court, is respectfully requested of the following:

This case is related to Appeal No. 23-1967 and Appeal No. 23-1978.

In 2010, Appellee Gero Meyersiek (who is a non-welfare recipient and independently wealthy person, was represented by his private counsel, Barbara Grady, whose law firm partner, Paul Dugan, was formerly a Deputy Chief Counsel of State Appellee) paid Appellee Rhode Island Office of Child Support Services $25 under 42 U.S.C. §654(6)(B) for legal services that entailed, *inter alia*,

establishing and enforcement of interest on overdue support.  In return for
Appellee Gero Meyersiek's $25 payment, State Appellee's Deputy Chief Counsel
Priscilla Glucksman provided dedicated, individualized and customized services
beyond those prescribed by 42 U.S.C. §654(6)(B), to wit Glucksman appeared on
behalf of the State at *all non-welfare non-paternity family court* hearings in (over
12) 2010, (over 12) 2011, (over 12) 2012 and 2013 concerning *private custody
matters* relating to *Appellant's application to move her young daughters whom she
had physical custody up until she moved to TEXAS in 2010 when Appellant
remarried* in TEXAS.

Rhode Island Executive Office of Health and Human Services's Budget for
this Fiscal Year is $3,419,217,779.00 ($3.42 Billion) that consists of Federal
Funding.  Penalties and fines incurred as of and accrued from the year 1996 when
Congress amended Title IV-D of the Social Security Act providing for penalties
and fines levied against States' noncompliance with Title IV-D.  The amount of
penalties and fines incurred by Rhode Island under 42 U.S.C. § 654 and other
applicable federal laws, and the amount of funding Title IV-A TANF disgorgement
owed and due from Rhode Island to the United States pursuant to Congress linking
State eligibility for TANF funding to State compliance with Title IV-D date back
to 1996 through 2024.

Pursuant to **18 U.S.C. § 4,** APPELLANT, proceeding from TEXAS and as a citizen of TEXAS, in aid of the Court, respectfully in good faith makes known to the Judges of the United States in the United States Court of Appeals for the First Circuit of United States of America, the commission of penalties-incurring and fines-incurring, both civil and criminal, (negligent and intentional) violations by Appellee persons or whoever acting as agents of the **42 U.S.C. § 654(1) political subdivisions of the State Plan of the State of Rhode Island** and Appellee persons, pursuant to **18 U.S.C. § 666, 18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false documents or false statements to a federal agency, 18 U.S.C. § 1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud,  18 U.S.C. § 641 - Public money, property or records, 31 U.S.C. § 3279 - federal civil false claims act *et al.*** (a non-exhaustive list of Appellee-violated federal codes is invoked in the Conclusion Section of this Notice), and respectfully requests review by a panel of judges in this United States Court of Appeals for the First Circuit under **Fed. R. App. P 27(b).**  Certain aspects of the fraud made known herein were also made known to the judges of the United States in the related case **Appeal Case No. 23-1967** pending before a panel of judges **pursuant to Appellant's motions invoked under Fed. R. App. P 8(a)(2)(D) and Fed. R. App. P 27(b) pending in that matter**.

Please take Judicial Notice that Appellant, in Appeals No. 23-1967, respectfully requested a hearing by a panel of Judges on the Federal Question matters raised herein under Fed. R. App. P 8(a)(2)(D) and Fed. R. App. P 27(b).

I.    APPELLANT'S LIMITED SCOPE PROSECUTION OF THE APPELLEES AND STATE OPERATIONS UNDER THE STATE PLAN UNDER 42 U.S.C. § 654 IN THE LIMITED JURISDICTION 42 U.S.C. § 654(1) STATE FAMILY COURT TITLE IV CASE PROCEEDINGS

The TEXAS Appellant, a victim of the Appellees' organized commission of organized Title IV-D and Title IV-A Program interstate fraud defrauding Appellant (and TEXAS because Rhode Island's official policy and practice to conceal any and all interest by removing it from the automated data processing system when certifying to Texas for collections under 42 U.S.C. § 666(14) in a scheme calculated to deny Texas's ability to request in sharing legitimate interest under Title IV-D's enforcement and collection states cooperative program scheme) of 42 U.S.C. § 654(21)(A) prohibited 12% compound interest on overdue support fraud, fraudulent liens in TEXAS on TEXAS properties consisting of 42 U.S.C. § 654(21)(A) violative 12% COMPOUND INTEREST on overdue support, fraud, theft, and accounting fraud, respectfully requests judicial notice, in aid of the Court, of the TEXAS Appellant's concurrent limited scope prosecution of the Appellees in the Rhode Island State Plan's 42 U.S.C. § 654(1) political

subdivision, Rhode Island Judiciary limited jurisdiction family court, where certain

symbiotic state judicial actors, such as state judge John McCann III, state judge

Haiganush Bedrosian and state magistrate Susan Nahabedian, routinely establish

and enforce under color of Rhode Island state law 12% compound interest on

overdue support, upon information, since 1980, when the Rhode Island General

Assembly enacted R.I. Gen. Laws § 15-5-16.5 on "support owing."  Appellant

respectfully attached hereto this Notice the publication by **Congress** of **42 U.S.C. §

654,** Appellant's motion to dismiss for lack of jurisdiction and close the case dated

March 27, 2024; motions to compel compliance with subpoena filed on March 26,

2024 and March 21, 2024 to compel enforcement of that family court's properly

issued subpoena for Appellant's Title IV-D case records including records showing

the Appellee-Rhode Island Office of Child Support Service's accounting

alterations and false support certifications to TEXAS involving any and all records

as they relate to the removal of 12% compound interest in the amount of tens of

thousands of dollars from the automated data processing system and putting the

12% compound interest in the amount of tens of thousands of dollars back on the

system whether it be for certification of a compliant approved State Plan to the

UNITED STATES for claims under Title IV-D and Title IV-A programs funding

under 42 U.S.C. §§ 654(7), 654(10), 654(14), 654(15), 654(16), 654a, 654b; or

certified to financial institutions or property-holding entities for the purpose of

placing or perfecting liens on Appellant's TEXAS properties, or certified to the
State of TEXAS for enforcement against the Appellant (e.g., to TEXAS for
cooperation under the State Plan Congressionally prescribed under 42 U.S.C. §666
(14) certifying the accuracy and legal sufficiency of Rhode Island's automated data
processing system accounted amount) that must obviously exactly corroborate with
the amounts directly represented to and demanded from the Appellant during the
course of the Appellees' support collection activities – Appellant prosecuted
judicial compulsion of Rhode Island Appellees' compliance with the subpoena **and
compliance with 42 U.S.C. §654b's** requirement to furnish the information upon
the noncustodial parent's information request by filing the motion to compel using
the State's electronic court filing system, Odyssey, and attached hereto under
**Exhibit A**.  This federal appellate Court is requested to scrutinize the attached
Congressionally published Statutory Text as well as the Statutory Notes and
Related Subsidiaries of all Congress's Amendments, especially the **1996
Amendments to 42 U.S.C. §654.**

    As a threshold matter, Appellant respectfully requests Judicial Notice of
the Explicit Preemptive Effect of 42 U.S.C. sec. 654 that** Congress offered to
Rhode Island under the **Commerce Clause and the Spending Clause** of the
United States Constitution as a condition for receiving Federal Funds under the
Title IV Programs.

**A.  The Statutory Text and Statutory Notes and Related Subsidiaries of Congress's 1996 Amendment to 42 U.S.C. §654 Make Clear that Under the United States Constitution's Commerce Clause, Congress conditioned State Participation in 42 U.S.C. §654 with State Acceptance of 42 U.S.C. §654 Preemption of State Laws and State Constitutions**

Appellant respectfully requests Judicial Notice of the attached 42 U.S.C. § 654.  The Statutory text, Statutory Notes and Related Subsidiaries of Congress's 1996 Amendment to 42 U.S.C. § 654 makes clear that Under the United States Constitution's Commerce Clause, Congress conditioned State Participation in Title IV-D, as prescribed in 42 U.S.C. § 654, with State Acceptance of 42 U.S.C. § 654 Preemption of State Laws and State Constitutions.  Appellant requests Judicial Notice of the text under  "Effective Date of 1996" that states as follows:

"**Effective Date of 1996**

"(a) In General.-Except as otherwise specifically provided (but subject to subsections (b) and (c))-

"(1) the provisions of this title [see Tables for classification] requiring the enactment or amendment of State laws under **section 466 of the Social Security Act [42 U.S.C. 666], or revision of State plans under section 454 of such Act [this section], shall be effective** with respect to periods beginning on and after **October 1, 1996**; and

"(2) **all other provisions of this title shall become effective upon** the date of the enactment of this Act **[Aug. 22, 1996**].

"(b) ==**Grace Period for State Law Changes**==.-The provisions of this title shall become effective with respect to a State on the later of-

"(1) the date specified in this title, or

"(2) the effective date of laws enacted by the legislature of such State implementing such provisions,

but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2-year legislative session, each year of such session shall be deemed to be a separate regular session of the State legislature.

"(c) **Grace Period for State Constitutional Amendment.-**A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of-

"(1) 1 year after the effective date of the necessary State constitutional amendment; or

"(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]."

## Specific 1996 Amendments to 42 U.S.C. §654b and 42 U.S.C. §654(21)(A).

Appellant respectfully requests Judicial Notice of Congress' specific 1996 Amendments to 42 U.S.C. § 654b and 42 U.S.C. §654(21)(A):

"Amendment by section 312(a) of Pub. L. 104–193 **effective Oct. 1, 1998, with limited exception for States which, as of Aug. 22, 1996, were processing the receipt of child support payments through local courts**, see section 312(d) of Pub. L. 104–193, set out as an Effective Date note under **section 654b of this title**."

Further the **1996 Amendments made changes to Par. (21)(A). Pub. L. 104**–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent".

==*Therefore, Congress makes it unequivocally clear that States are required as a condition of State participation, to change State Laws, and if necessary, amend State Constitutions, to comply with the 1996 Amendments to Title IV-D.*== *See, e.g.,* "*b) **Grace Period for State Law Changes**. - The provisions of this title shall become effective with respect to a State on the later of the effective date of laws enacted by the legislature of such State implementing such provisions.*"

Therefore, in 1996, Congress made clear that States, such as Rhode Island, that fail to enact by the legislature of such States implementing provisions of Title IV-D, are no longer eligible to participate in Title IV-D, resulting in ineligibility to receive federal funding, as of 1996.

Under 42 U.S.C. § 655(a)(4)(A) and 42 U.S.C. § 655(a)(5), by the text of the Title IV-D statute, the Appellant respectfully requests Judicial Notice that the legislature has prescribed **penalties** and that this penalty **shall** be **enforced**.

Here, in the case of Rhode Island, **noncompliance is through *deliberate* and *willful* fault of Rhode Island – Appellant respectfully requests Judicial Notice of One of the Reports entitled "TRAC Record" generated by Appellee Rhode Island Office of Child Support Services in Appellant's case that**

Appellant was denied under 42 U.S.C. § 654b(b)(4), but produced pursuant to Appellant's Rhode Island Access to Public Records Act (APRA) showing an entry made on December 6, 2021 by Appellee Kevin Tighe, Deputy Legal Chief Counsel of Appellee Rhode Island Office of Child Support Services stating that "interest was removed from the system in 2018 when we sent to Texas when case was made IU" then blacked out REDACTION.  Appellant is prosecuting Rhode Island in the state family court to produce the unredacted copy of the said public records that were produced pursuant to APRA regarding this entry "interest was removed from the system in 2018 when we sent to Texas when case was made IU." *See* attached **TRAC Records** ==**Exhibit C**==. As it turned out, the alleged interest amount is in the tens of thousands of dollars, for which the Appellees continue to refuse to furnish the complete accounting books of their offline manual accounting of how much was removed in 2018.

The State Appellees' removal of the interest from the automated data processing and information retrieval system is material to this matter as the evidence herein presented goes to show proof towards the willful and deliberate noncompliance by Rhode Island of Title IV-D.   Congress made clear in its 1996 Amendment of Title IV to require the implementation of an automated data processing and information retrieval system as a condition of eligibility because the legacy manual computation, collection and disbursement of child and spousal

support were fraught with inaccuracies, that essentially ran afoul of safeguards against false accounting and falsified records by unscrupulous persons like the Appellees.  Congress made explicitly clear that accuracy was so central to the federal government's involvement in Title IV-D that It enacted punitive penalties and fines under 42 U.S.C. § 655 for States' noncompliance of 42 U.S.C. §§ 654, 666.

Therefore, the Appellees' knowing removal of tens of thousands of dollars representing Rhode Island's unlawful 12% compound interest prohibited under 42 U.S.C. § 654(21)(A) "when sent to Texas" makes clear Appellees knew the 12% compound interest was fraudulent and unlawful, and sought to cover it up from TEXAS authorities through the manual removal of the entire interest amount (consisting of tens of thousands of dollars) from the automated data processing and information retrieval system that is prohibited by 42 U.S.C. §§ 651-669.  The system is intended to certify the integrity and accuracy of the entire support amount in any given account.

Therefore, it is clearly established that Rhode Island covers up its noncompliance and it is clearly established that Rhode Island's noncompliance is willful and deliberate **because Rhode Island knowingly failed to comply with numerous provisions of 42 U.S.C. § 654 as follows**:

(1) Failed to enact State laws in 1996 implementing provisions clearly prescribed in 42 U.S.C. § 654(21)(A) that makes clear that States may opt to impose interest on overdue support, **but** no less than 3 percent and no more than 6 percent;  See attached ==Exhibit D==. R.I. Gen. Law§15-5-16.5 legislating 12% compound interest on overdue child and spousal support that is explicitly prohibited by 42 U.S.C. § 654(21)(A) (and contract to the selective violation of RIGL § 15-5-16.5 that Appellee-Rhode Island Child Support Services official policy states to *prohibit* charging interest on overdue support in *interstate* cases **only**. – See ==Policy== attached in ==Exhibit B==)

(2) Failed to enact State codes and procedures to comply with 42 U.S.C. § 654(21)(A) requirement "at the option of the State, impose a late payment fee on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, **in an amount equal to a ==uniform== percentage** determined by the State **(not less than 3 percent nor more than 6 percent**) of the overdue support" that would prohibit the State's Title IV-D operational policy saying, "it is desirable" to prohibit the State's Office of Child Support Services charging interest in interstate cases (implying in *intrastate* cases 12% compound interest is routinely established and enforced by State policy

in violation of the "not less than 3 percent nor more than 6 percent" explicitly prescribed under 42 U.S.C. § 654(21)(A).

(3) Failed to disclose by deliberate omission (by concealment) to the United States when certifying to the United States Secretary of the Department of Health and Human Services for federal reimbursement payment and incentive payment funding under the Title IV Programs Part D, 42 U.S.C. §§ 651-669, and Part A, TANF.

(4) Falsified accounting and falsified certifications sent to the United States and other support enforcement cooperating States, like TEXAS, under, *inter alia*, 42 U.S.C. §§ 651-669, through the State's official Policy and official Practice of creating multiple accounting records and books of accounts for the same support case through the manual removal of the Section 654(21)(A) noncompliant (and incriminating) 12% compound interest amount from the automated data processing system consisting of tens of thousands of dollars for example, and putting the removed interest back on the system by manually issuing fraudulent (based on illegal 12% compound interest) liens on properties, for example, fraudulent liens on Texas properties in TEXAS that further violated TEXAS PENAL and CIVIL CODES.  *See* Appellee Rhode Island Office of Child Support Services's Official Policy that states, "**It is**

**desirable for RI OCSS to prohibit the charging of interest in
Interstate Cases**.”  The Policy goes on to state regarding operations of
the automated data processing system, “Entry of the N not only prohibits
the charging of future interest but automatically creates adjustments to
zero out any existing interest.”  Additionally the Policy states, “Two
reports will be created.  The first will detail the interstate cases for
which a support order….. for which one or more interest adjustment
were created.”  In <mark>**Exhibit B**</mark>.

(5) Concealment of the State’s noncompliance with 42 U.S.C. **§ 654(21)(A)**
by Cover Up and by Fraud, through the routine practice of illegal
manual removal by Appellee Rhode Island Office of Child Support
Services of Rhode Island’s fraudulent and unlawful 12% compound
interest from the 42 U.S.C. **§ 654(24) mandated *automated data
processing* and *information retrieval system*** mandated and legislated
under *inter alia* 42 U.S.C. **§ 654(24) and 42 U.S.C. §654a and 42
U.S.C. §654b to be *accurate*,** thereby deliberately and willfully
violating, *inter alia*, 42 U.S.C. **§ 654b,** 42 U.S.C. **§654(20), 42 U.S.C.
§666(14), 42 U.S.C. §654(24) and Congressional Requirements for
accuracy of support calculations be performed by the automated
data processing system, from which information is retrieved for all**

**support certifications sent to the United States and to cooperative enforcement States like TEXAS for 42 U.S.C. § 654(21)(A) fund sharing, Title IV-D Program federal fund reimbursements, and Title IV-A TANF federal fund procurement.**

(6) The illegal manual removal of the unlawful 12% compound interest from the automated data processing system is augmented by the illegal manual inputting back on the system the illegal 12% compound interest when Rhode Island generates fraudulent liens under the guise of support collection for the unlawful 12% compound interest.

(7) Operating a scheme of collecting unlawful 12% compound interest that Rhode Island converts to unlawful State revenue because under 42 U.S.C. **§§ 651-669** this "ordered" 12% compound interest is assigned by the welfare recipient to the State, thus the 12% compound interest represents a debt to the State owed by the noncustodial parent.

(8) Appellee Cover up of the illegal scheme from unsuspecting noncustodial parent victims like Appellant, by refusing or deny furnishing noncustodial parents "information upon request, timely information on the current status of support payments under an order requiring payments to be made by or to the parent – the timely information generated by the Appellee Rhode Island Office of Child Support

Services must comply with 42 U.S.C. **§ 654b(b) Required procedures mandating "**The State disbursement unit shall use automated procedures, electronic processes, and computer-driven technology to the maximum extent feasible, efficient, and economical, for the collection and disbursement of support payments, including procedures that furnish noncustodial parents their case files upon request.

(9)  Appellee Rhode Island Office of Child Support Service's unlawful policy and practice of manually removing support amounts through fraud from the automated data process system resulted in the generation of fraudulent and false accounting and false ledgers published in Appellant's online child support account maintained by State Appellees fraudulently showing "$0 payment" for Appellant's large sum of $104,185.98 payoff payment in full paid in Texas on December 7, 2021 – See screenshot taken of online account on December 3, 2022 that says **"$0.00"** under Payments for December 2021, attached hereto as **Exhibit E**.

(10)  Similarly, State Appellees concealed from through deceit that the "$0.00" Under Interest Due on the Appellant's online account shown on December 6, 2021 was in part because State Appellees unlawfully took interest off the automated data processing system and information

retrieval system in 2018 when they sent the support to TEXAS – this
tampering with federal Title IV records in Appellant's case file was
covered up by State Appellees.  See **Exhibit F**, Screen shot of
Appellant's online support account taken on **December 6, 2021**, which
shows **$0.00** under **Interest Due**.

(11)  **Appellee Rhode Island Office of Child Support Services Deputy
Chief Counsel Kevin Tighe further violated Appellant's privacy
rights protected under 42 U.S.C. §654(26)(A) by discussing in detail
with Barbara Grady, Appellee Gero Meyersiek's private attorney,
information and strategies regarding "taking interest off the
system" and "keeping interest off the system" as they relate to
support enforcement which is prohibited by the statutory text of 42
U.S.C. sec.,654(26)(A) mandating that the State Plan "have in effect
safeguards, applicable to all confidential information handled by the
State agency, that are designed to protect the privacy rights of the
parties, including-(A) safeguards against unauthorized use or
disclosure of information relating to proceedings or actions to
enforce support. – See Exhibit C, TRAC records for December 6,
2021 showing Kevin Tighe's unauthorized disclosure to Barbara
Grady of enforcement information regarding taking interest off the**

**system in 2018 when sending to Texas in in violation of Appellant's privacy rights protected by 42 U.S.C. sec. 654(26)(A). This disclosure was calculated to scheme with Barbara Grady on how to defraud the Appellant through "leaving the interest off the system" so as to cover up from the Appellant the unenforceable 12% compound interest rate as well as to deceive the Appellant through inducement, to accept Appellee's offer and to agree to pay off the large lump sum principle amount by representing to the Appellant that Appellee Gero Meyersiek waived interest if Appellant paid off support in full in one lump sum $104,185.98.**

(12)   In addition to Appellee Rhode Island Office of Child Support Services, the State is culpable of a deliberate and willful failure to comply with 42 U.S.C. **§654(1) requiring "A State plan for child and spousal support must-(1) provide that it shall be in effect in <mark>all political subdivisions</mark> of the State:**

   a.   **Political subdivision limited jurisdiction Rhode Island state family court judiciary and justices routinely establish and enforce under color of state law and through fraud on the court absent jurisdiction the unlawful 12% compound interest in violation of 42 U.S.C. §654(21)(A)**

   b.   **Political subdivision Office of the Attorney General knowingly aids and abets in and enforces the unlawful 12% compound interest**

c.  **Political subdivision Rhode Island Executive Office of Health and Human Services that has an annual budget of $3.42 Billion knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and participates in the consequentially unlawful collection of reimbursement of federal funds and federal grant money from the United States under Title IV-D Program.**

d.  **Political subdivision Rhode Island Office of the Treasurer knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and participates in the consequentially unlawful collection of reimbursement of federal funds and federal grant money from the United States under Title IV-D Program.**

e.  **Political subdivision Rhode Island Office of the Governor knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and participates in the consequentially unlawful collection of reimbursement of federal funds and federal grant money from the United States under Title IV-D Program.**

f.  **Political subdivision Appropriations Committee knowingly falsely certifies the State's Title IV-D compliance when it knows or should have known that Rhode Island is not in compliance of multiple provisions of Title IV-D, and causes to appropriate public funds in the consequentially unlawful State financial participation of the noncompliant State Plan, appropriating the State's public funds to the illegal Title IV-D operation that defrauds unsuspecting noncustodial parents and spousal support obligors for 12% compound interest on overdue support under color of state law.**

**B.  Hodel v. Virginia Surface Mining & Reclamation Assn., Inc. and Hodges v. Shalala, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th**

**Cir. 2002), cert. denied, 540 U.S. 811 (2003) - U.S. Supreme Court Affirms 42 U.S.C. §654 Preemption over State Laws and State Constitutions under the United States Spending Clause and Commerce Clause**

Congress prescribed both civil and criminal penalties for violations of Title IV of the Social Security Act. Firstly, consistent with its ==Spending Power==, Congress has the authority to attach conditions on the receipt of federal funds. *See **South Dakota v. Dole***, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16), (20), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See **Sullivan v. Stroop***, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely." The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." ***Hodges v. Shalala***, 121 F.2d at 879. Absent any discretion available to the Secretary to impose a

lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1]

Congress also enacted several criminal codes punishing actors, such as the Plaintiffs, who commit federal crimes, including cover up of unlawful activities.

The federal government has a longstanding involvement in child support enforcement programs. See ***Hodges v. Shalala***, 121 F.Supp.2d 854 (D.S.C. 2000), ***Hodges v. Shalala***, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003) As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements under 42 U.S.C. sec. 654(21)(A) that the State, at the option of the State, impose a late payment fee ('interest") on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina paid $75 million as of 2009 and was set to pay another $10 million for 2010.  South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
    Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A), among others

While Rhode Island submits to the United States that it has a federally certifiable statewide automated data processing system for child support, Office of Child Support Services produced APRA Public Records consisting of Title IV Public Records showing Rhode Island taking off from the automated data processing system tens of thousands of dollars allegedly representing the 42 U.S.C. sec. 654(21)(A) prohibited 12% compound interest late payment fee "interest" prior to certifying to TEXAS and the United States, and showing Rhode Island falsely certified to the amount's accuracy under 42 U.S.C. sec. 666(14) when in fact Rhode Island removed significant tens of thousands of dollars (See TRAC records in attached Exhibit).

The Title IV-D statute expressly provides that compliance with ALL 42 U.S.C. 654 requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A.

Again, the clear and unequivocal statement of the required conditions in the statute enabled South Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted).  The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop,* 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."

Emphatically, Congress may use its **Spending Power** to **influence** a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, **but** Congress, under the **Commerce Clause**, may **offer the States a choice of regulation under federal control or preemption under federal regulation**. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc*., 452 U.S. 264, 288 (1981). It is crystal clear that upon Rhode Island's State Plan entering into agreement with the United States under the **Commerce Clause**, Rhode Island accepted the agreement terms of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

*See* United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUSC-prelim-title42-section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRpb25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

**Appellant requests judicial Notice of attached Exhibit G.** *Hodges v. Shalala*, **311 F.3d 316 (4th Cir. 2002)**

**C. Rhode Island's Defraud of TEXAS – Under 42 U.S.C. §654, "State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21)" and Rhode Island Removed Tens of Thousands of "paragraph (21)"**

The last provision after Provision (34) of 42 U.S.C. sec. 654 states as follows:

"The State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21). Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25."

See link:

**https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUSC-prelim-title42-section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRpb25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull**

Appellee Rhode Island Office of Child Support Service's routine practice of removal of tens of thousands of dollars of interest from the automated system before sending to other states like Texas in 2018 makes clear that the Appellees schemed to defraud TEXAS "who makes the collection to retain any late payment fee under paragraph (21)" – except TEXAS, a paragraph (21) compliant State that set 6% simple interest, would have known the 12% compound interest is unlawful and unenforceable in Texas.

**D. Rhode Island's Defraud of the UNITED STATES in Scheme Involving Routine Removals of 42 U.S.C. §654(21)**

Appellant in good faith relies on the straightforward and clearly worded ruling of the United States Court of Appeals for the 4th Circuit in ***Hodges v. Shalala***, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003), that makes clear Congress's intent to prescribe

both civil *and* criminal penalties and fines for violations.  Consistent with its

Spending Power, Congress has the authority to attach conditions on the receipt of

federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Title IV-D

statute expressly provides that compliance with the 3-6% simple interest on

overdue support, operating the automated system for accuracy and SDU

requirements are conditions of approval of a state plan. See 42 U.S.C. §§ 654(7),

(10), (14), (15), (16), (21)(A), (24), (27)A, § 654a, § 654b. The clear and

unequivocal statement of the required conditions in the statute enabled Rhode

Island to "exercise [her] choice knowingly, cognizant of the consequences of [her]

participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court

has recognized that Congress intended the linkages between child support

programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990)

(concluding Congress intended the two programs to "operate together closely."

The penalty provisions of the statute and the wording of the statute are plain.

Where the Secretary determines that a state plan would be disapproved, and where

the State has made and continues to make a good faith effort to comply and has

submitted a corrective compliance plan, "the Secretary shall not disapprove the

State plan . . . and the Secretary shall reduce the amount otherwise payable to the

State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II)

(emphasis added). "[B]y the text of the statute, the legislature has prescribed that

the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at 879.

Absent any discretion available to the Secretary to impose a lesser penalty than the

alternative penalty as outlined in the statute, Rhode Island is liable for the

statutorily prescribed penalties.[2]    Congress also enacted several criminal codes

punishing persons, whoever who act as agents, such as the Appellees, who commit

federal crimes, including cover up of unlawful activities under federal criminal

codes, e.g., *see* **8 U.S.C. § 666, 18 U.S.C. § 287 - making false, fictitious claims,**

**18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 -**

**false documents or false statements to a federal agency, 18 U.S.C. § 1341 -**

**mail fraud, 18 U.S.C. § 1343 - wire fraud, 31 U.S.C. § 3279 - federal civil false**

**claims act *et al*.** (a non-exhaustive list of Appellee-violated federal codes is

invoked in the Conclusion Section of this Notice).    Penalties and fines against the

State for noncompliance (including due process violations provided in 42 U.S.C.

---

[2] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

       Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to TEXAS and to the United States in order to conceal the unlawful 12% compound interest from the noncustodial parent and from TEXAS and Federal authorities in the false amounts certified to TEXAS and to the United States for incentive claims, cooperation claims and Title IV-D and Title IV-A funding claims.

§654(20) and corresponding §666) is explicit under federal codes Title IV-D, Title IV-A, and 18 U.S.C. § 666**,** and upheld.

Appellant attaches the 4th Circuit's ruling (***Hodges v. Shalala***, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003) herewith under **Exhibit G**.

Appellant  moreover in good faith relies on the straightforward and clearly worded Brief filed by the United States Department of Justice and Secretary of the United States Department of Health and Human Services in the seminal United States Supreme Court case ***Turner v. Rogers***, 564 U.S. 431 (2011) that showed South Carolina (found by the 4th Circuit Court of Appeals) liable for $75 million in penalties for that state's 42 U.S.C. § 654 violations that did not even involve, *inter alia*, fraud and tampering with the record or unlawful 12% compound interest put into, then taken off, then put back on, the automated data processing system as here in Rhode Island by the political subdivision Appellees.  The TEXAS Appellant, the victim of fraud and organized fraud by Rhode Island's political subdivisions under 42 U.S.C. **§ 654(1),** in good faith made known the above activities to "some judges" of "the United States" such as the judges sitting in the Court of Appeals for the First Circuit and other relevant federal authorities under 18 U.S.C. **§ 4.**

Appellant attaches the aforesaid Brief filed in the U.S. Supreme Court by the United States in ***Turner v. Rogers***, 564 U.S. 431 (2011) herewith under **Exhibit H**.

**Relying on the Turner v. Rogers United States Amicus Brief, it is crystal clear from Appellant's making known, *inter alia*, to judges of the United States the routine false certifications to United States and other States under 42 U.S.C. sec. 654, 655, 658a, 666 et al to defraud the federal Title IV Program funding of ineligible funds under Title IV-D and TANF, the defraud of noncustodial parents and grandparents through the 42 U.S.C. sec. 654 legal framework under color of state law, the defraud of State public funds of Rhode Island and of Texas to enforce fraudulent void and voidable support orders targeting noncustodial victims that established unlawful 12% compound interest on overdue support, and the defraud of cooperative States like Texas from sharing the "late fee" provided by 42 U.S.C. sec. 654 by Appellees' removal of the interest amount from the automated system prior to certification to Texas for enforcement, Rhode Island has accrued billions of dollars in penalties and fines under both civil and criminal statutes, both federal and state.**

      **II.    STATE JUDICIARY'S VIOLATION OF GOVERNMENT EDICTS DOCTRINE, CALCULATED FAILURE TO INTEGRATE TITLE IV-D AGENCY ELECTRONIC FILING SYSTEM WITH ODYSSEY MAKING THEIR FILINGS INVISIBLE TO ALL E-COURT USERS OTHER THAN THE**

**JUDGE AND THEMSELVES AND VIOLATION OF ACCESS
TO COURT INFORMATION OF PUBLIC TITLE IV-D
PROCEEDINGS IN RHODE ISLAND'S STATEWIDE
ELECTRONIC COURTS**

**a. DENIAL OF PUBLIC AND PRO SE-LITIGANT ACCESS TO
COURT INFORMATION INCLUDING JUDGE-CREATED LAWS BY 42
USC 654(1) POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY**

The Rhode Island Judiciary is a political subdivision of the State of Rhode

Island under 42 USC 654(1). While publicizing during the implementation of the

$6 million installation of Odyssey (the statewide electronic filing system) in 2014

that the electronic courts will enable ALL court users to pull up court record

information with ease from their phones, the Rhode Island Judiciary quietly

implemented Rule 5 of the Rhode Island Rules and Practice denying the Public,

pro-se litigants and all parties to a case in Rhode Island remote access to court

record information including judge-created orders and laws, including their own.

Through this deceit, the Rhode Island Judiciary lied to the Public, while denying

access and thereby covering up the routine ordering of unenforceable body of

judge-created laws ordering 12% compound interest in public cases and public

hearings under 42 USC 654 in public Title IV-D cases, such as Appellant's, by

symbiotic pliant judges like Judge McCann and Magistrate Nahabedian. The

denial of access to pro-se litigants of their own cases' court records containing

support orders violates, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16),

(20), (21), (23), (24), (27), 666, 655, 658a. The denial of public access to public

court records documenting the routine systemic violations of 42 USC 654(21)(A) in electronic courts violates the First Amendment and the public's right to know the law, even if these fraud on the court unenforceable judge-created laws are unenforceable in both Rhode Island and elsewhere Title IV Part D reaches. The denial of public access to judge-created laws that is also motivated by cover-up fundamentally violates the established Government Edicts Doctrine that the United States Supreme Court specifically held applies to electronic formats of government doctrines, such as judge-created laws in digital courts. See *Georgia v. Public Resource.Org, Inc*., No. 18-1150, 590 U.S. ___ (2020). The Appellant has been denied access by the political subdivision Rhode Island Judiciary to her court records and information regarding the orders in question that must be furnished pursuant to 42 USC 654b thus in violation of 42 USC 654. The Appellant has been denied access by the political subdivision Rhode Island Judiciary to unenforceable and impeachable judge-created fraud on the court void laws that routinely establish unenforceable 12% compound interest by certain symbiotic pliant judges, like Judge McCann and Magistrate Nahabedian, who work hand-in-hand with the Rhode Island Office of Child Support Services in Title IV-D cases, in violation of Appellant's Due Process and Equal Protection rights to know the law to be meaningfully heard and right to meaningful access to justice – they are in violation

of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

The family court held at the hearing in this matter scheduled on March 6, 2023 that the Rhode Island Office of Child Support Services is ordered to show that the alleged arrears is accurate.  See attached March 6, 2023 hearing transcript. Explicitly stated throughout 42 USC 654, "accuracy" requires no accounting alterations generated offline then unsubstantiated hard inputs into the automated system, no fraud, no inducements, no interstate extortion under color of state law, and for certain no 12% compound interest on overdue support.

### b. CALCULATED FAILURE BY THE JUDICIARY TO INTEGRATE THE TITLE IV-D AGENCIES' ELECTRONIC FILING SYSTEM INTO ODYSSEY RESULTING IN AGENCY FILINGS BEING INVISIBLE TO ALL COURT USERS EXCEPT THE JUDGE AND THE AGENCIES THEMSELVES – COVER UP

Because under the State's Plan the Title IV-D agencies routinely file in the Rhode Island court system for the illegal enforcement of illegal 12% compound interest disallowed under 42 USC 654(21)(A), the political subdivision Rhode Island Judiciary deliberately failed to integrate the Title IV-D Agencies' electronic filing system with the State's electronic filing system Odyssey in order to make Title IV-D Agency electronic filings invisible to all court users except the judge and the agencies  themselves, calculated to cover up the 12% compound interest

from audit by the federal authorities and from the Public. This came to light at the WebEx hearing in this Title IV-D matter before family court Judge Merola on June 8, 2023 scheduled at 2PM, where Judge Merola, showing he was unaware of the failure of systems integration, questioned Appellee Paul Gould of Rhode Island Office of Child Support Services, why the Appellant is unable to see the agency's electronic filings that the judge can see in the system. Without hesitation, Appellee Paul Gould explained that this is due to the electronic court implementation process that was supposed to integrate the agency's legacy system to Odyssey, demonstrating conclusively that Gould, the Lead Counsel of the Rhode Island Office of Child Support Services responsible and overseeing agency court filings in all Title IV-D cases under the State Plan, undisputedly was in the know and part of the conspiracy involving the deliberate failure of filing system integration and its continuing perpetration in Title IV proceedings that made Title IV agencies' filings invisible as part of the cover up.

### c. CRIMINAL VIOLATIONS REPORTED TO SOME JUDGE OF THE UNITED STATES AND OTHER LISTED AUTHORITIES UNDER 18 U.S.C. § 4

The Appellant, in good faith and reliant on the plain language of 18 USC § 4, misprision of felony, as well as the Brief filed in the United States Supreme Court by the United States of America in the Supreme Court case, *Turner v. Rogers*, 564 U.S. 431 (2011) that showed South Carolina (found by the 4th Circuit

Court of Appeals) liable for $88 million in penalties for that state's 42 U.S.C. sec.

654 violations that did not even involve, inter alia, fraud and tampering with the

record or unlawful 12% compound interest put into then taken off then put back on

the automated data processing system as here in Rhode Island, made known the

above activities to "some judges" of "the United States" and other relevant federal

authorities – counting among the United States judges Appellant made known

publicly in the Amended Complaint filed in the United States District Court for the

District of Rhode Island, Judge William E. Smith.  The issue of what Judge Smith

has done with the information "made known to him" is pending before the United

States Court of Appeals for the First Circuit before a requested panel of judges

under the federal appellate law of civil procedure in Appeal Case No. 23-1967.

Therefore, under 18 U.S.C. Sec. 4, the above reported activities have been "made

known" to several high ranking Judges of the United States, including the Judge in

this case.

### III.   VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Appellant

made known to the panel of judges of the United States allegations contained in the

Amended Complaint filed in Federal Court of the commission of acts by the Rhode

Island political subdivisions and employees thereof, Barbara Grady and Gero

Meyersiek named herein in this motion, the afore-described acts violating **31**

**U.S.C. § 3279,** 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18

U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a),

18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18

U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18

U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285,

18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C.

§1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18

U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18

U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C.

§1968  – such violative acts by the Appellees in this matter, and/or Judge Smith on

this list are not exhaustive.  It is undisputable, among others, that Title IV-D

penalties were incurred by, Criminal penalties were incurred by, and Title IV-D

and Title IV-A disgorgement is due from the applicable State of Rhode Island's

political subdivisions.

## IV. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in UNITED STATES OF

AMERICA v. DONALD J. TRUMP, DC Circuit, the DC Circuit United States

Court of Appeals reminds the Public and all applicable tribunals that Judges are

similarly liable to the criminal laws for their official acts.  A notable example is *Ex

parte Commonwealth of Virginia*, in which the Supreme Court affirmed the

criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for violating a federal statute that prohibited discriminating on the basis of race in jury selection. Id. at 340, 344. The Supreme Court began by observing the principle that officers are bound to follow the law: "We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the holder from obligation to obey the Constitution of the United States, or take away the power of Congress to punish his disobedience." *Id.* at 348. The Court then addressed the judge's argument that the Court lacked the authority to punish a state judge for "his official acts." *Id.* Its response was twofold. First, the Court described juror selection as "merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads." *Id.* The Court then explained that even if juror selection is considered a "judicial act," the judge had a legal duty to obey the criminal laws:

> "But if the selection of jurors could be considered in any case a judicial act, can the act charged against the petitioner be considered such when he acted outside of his authority and in direct violation of the spirit of the State statute? That statute gave him no authority, when selecting

jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

[W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation

of constitutional rights. On the contrary, the
judicially fashioned doctrine of official
immunity does not reach 'so far as to immunize
criminal conduct proscribed by an Act of
Congress . . . .'

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting

Gravel, 408 U.S. at 627). Similarly, in *Dennis v. Sparks,* the Court affirmed

judicial immunity from civil money damages in the context of bribery allegations

but explained that judges "are subject to criminal prosecutions as are other

citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity

because "the challenged conduct" — allegedly issuing an injunction corruptly after

accepting bribes as part of a conspiracy — was "an official judicial act within his

statutory jurisdiction, broadly construed." *Id*. at 29. The scope of civil judicial

immunity thus aligns with civil Presidential immunity under *Fitzgerald*, but a

judge has no criminal immunity for the same "official act." See also *Imbler v.

Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil

immunity for centuries, could be punished criminally for willful deprivations of

constitutional rights . . . ."); *United States v. Gillock,* 445 U.S. 360, 372 (1980)

("[T]he cases in this Court which have recognized an immunity from civil suit for

state officials have presumed the existence of federal criminal liability as a

restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. See *United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings,* 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not immune, and employees of the political subdivisions of Rhode Island under 42 USC § 654(1) similarly are not immune.  Barbara Grady and Gero Meyersiek are undisputedly liable.

**IV.   LACK OF JURISDICTION – APPELLEE 42 U.S.C. § 654(1) STATE PLAN POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (CREATED UNDER RIGL 8-6-3) LACKS JURISDICTION**

   **A. RI'S 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY LACKS JURISDICTION TO ESTABLISH OR ENFORCE 42 USC § 654(21)(A) VIOLATIVE 12% COMPOUND INTEREST ON OVERDUE SUPPORT – DOING SO INCURS PENALTY UNDER 42 USC 654(24) AND REINFORCES ITS STATE PLAN'S INELIGIBILITY**

**FOR FEDERAL FUNDING UNDER BOTH TITLE IV-D AND TITLE IV-A, WARRANTING DISGORGEMENT OF TANF AND TITLE IV-D FUNDING – SEE HODGES v. SHALALA**

The statutory provision of 42 U.S.C. 654(21)(A) makes it

explicitly clear that Title IV-D and Title IV-A participating 42

USC 654(1) state political subdivisions, such as the political

subdivision Rhode Island Judiciary, lack the authority to establish

12% compound interest.


To do so "routinely" simply incurs more penalties, more fines

constituting more false claim consequences, and imprisonment of

the culpable persons and agents.


**B. RI's 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (See RIGL 8-6-3) LACKS JURISDICTION OVER QUESTIONS AND MATTERS OF FEDERAL CRIMINAL VIOLATIONS BY RHODE ISLAND SDU OF ROUTINE RECORD TAMPERING WITH 42 U.S.C. 654a AUTOMATED DATA PROCESSING SYSTEM COMMITTING ACCOUNTING FRAUD (e.g., REMOVAL OF UNLAWFUL 12% COMPOUND INTEREST IN ORDER TO CONCEAL IT WHEN CERTIFYING TO OTHER STATE AUTHORITIES AND FEDERAL AUTHORITIES) AND THE CRIMINAL CERTIFICATION OF FRAUDULENT ACCOUNTS THAT CONTAIN MANUALLY REMOVED UNLAWFUL FRAUDULENT 12%**

**COMPOUND INTEREST (UNDER COLOR OF RI'S PREEMPTED STATE LAW) FROM THE SYSTEM**

Title IV-D 42 USC 651-669, 31 U.S.C. § 3279, 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 also make clear that the State Plan's 42 USC 654(1) political subdivision limited jurisdiction Rhode Island family court lacks jurisdiction over FEDERAL CRIMINAL VIOLATIONS BY RHODE ISLAND SDU OF ROUTINE RECORD TAMPERING WITH 42 U.S.C. 654a AUTOMATED DATA PROCESSING SYSTEM

COMMITTING ACCOUNTING FRAUD (e.g., REMOVAL OF UNLAWFUL 12% COMPOUND INTEREST IN ORDER TO CONCEAL IT WHEN CERTIFYING TO OTHER STATE AUTHORITIES AND FEDERAL AUTHORITIES) AND THE CRIMINAL CERTIFICATION OF FRAUDULENT ACCOUNTS THAT CONTAIN MANUALLY REMOVED UNLAWFUL FRAUDULENT 12% COMPOUND INTEREST (UNDER COLOR OF RI'S PREEMPTED STATE LAW) FROM THE SYSTEM.  Appellant attaches herewith in **Exhibit I.** Rhode Island Gen. Laws Sec. 8-10-3 that makes clear family court is a court of limited jurisdiction that lacks jurisdiction over the Appellees' criminal violations.

**C.  RI's 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (See RIGL 8-6-3) LACKS JURISDICTION OVER FEDERAL CRIMINAL VIOLATIONS COMMITTED BY ITSELF INVOLVING CERTAIN SYMBIOTIC RHODE ISLAND FAMILY COURT JUSTICES, SUCH AS JUDGE JOHN McCANN AND MAGISTRATE SUSAN NAHABEDIAN, WHO KNOWINGLY AND ROUTINELY FRAUDULENTLY ESTABLISH AND ENFORCE UNLAWFUL 12% COMPOUND INTEREST TARGETING UNSUSPECTING NONCUSTODIAL PARENT VICTIMS**

Title IV-D 42 USC 651-669, 31 U.S.C. § 3279, 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 also make clear that the State Plan's 42 USC 654(1) political subdivision Rhode Island family court lacks jurisdiction over FEDERAL CRIMINAL VIOLATIONS COMMITTED BY ITSELF INVOLVING CERTAIN SYMBIOTIC RHODE ISLAND FAMILY COURT JUSTICES, SUCH AS JUDGE JOHN McCANN AND MAGISTRATE SUSAN NAHABEDIAN, WHO KNOWINGLY AND ROUTINELY FRAUDULENTLY ESTABLISH AND ENFORCE UNLAWFUL 12% COMPOUND

INTEREST TARGETING UNSUSPECTING NONCUSTODIAL

PARENT VICTIMS.

## CONCLUSION

**WHEREFORE**, this Court should hold Oral Arguments regarding the

Federal Questions and serious criminal matters raised herein.  This Court should

reverse the district court's judgement and remand for further proceedings.

Appellant requests Oral Argument on all issues raised herein before the Court.

Appellant requests any and all Relief deemed just.

Respectfully submitted,

Mary Seguin
Pro Se
/s/          *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: March 29, 2024

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system on March 29, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Exhibit A

---

**42 USC 654: State plan for child and spousal support**
Text contains those laws in effect on March 25, 2024

**From Title 42-THE PUBLIC HEALTH AND WELFARE**
  CHAPTER 7-SOCIAL SECURITY
  SUBCHAPTER IV-GRANTS TO STATES FOR AID AND SERVICES TO NEEDY FAMILIES WITH
  CHILDREN AND FOR CHILD-WELFARE SERVICES
  Part D-Child Support and Establishment of Paternity
**Jump To:**
  **Source Credit**
  **Miscellaneous**
  **References In Text**
  **Codification**
  **Amendments**
  **Effective Date**

---

# §654. State plan for child and spousal support

A State plan for child and spousal support must-

(1) provide that it shall be in effect in all political subdivisions of the State;

(2) provide for financial participation by the State;

(3) provide for the establishment or designation of a single and separate organizational unit, which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan;

(4) provide that the State will-

(A) provide services relating to the establishment of paternity or the establishment, modification, or enforcement of child support obligations, as appropriate, under the plan with respect to-

(i) each child for whom (I) assistance is provided under the State program funded under part A of this subchapter, (II) benefits or services for foster care maintenance are provided under the State program funded under part E of this subchapter, (III) medical assistance is provided under the State plan approved under subchapter XIX, or (IV) cooperation is required pursuant to section 2015(l)(1) of title 7, unless, in accordance with paragraph (29), good cause or other exceptions exist;

(ii) any other child, if an individual applies for such services with respect to the child (except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application); and

(B) enforce any support obligation established with respect to-

(i) a child with respect to whom the State provides services under the plan; or

(ii) the custodial parent of such a child;

(5) provide that (A) in any case in which support payments are collected for an individual with respect to whom an assignment pursuant to section 608(a)(3) of this title is effective, such payments shall be made to the State for distribution pursuant to section 657 of this title and shall not be paid directly to the family, and the individual will be notified on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden) of the amount of the support payments collected, and (B) in any case in which support payments are collected for an individual pursuant to the assignment made under section 1396k of this title, such payments shall be made to the State for distribution pursuant to section 1396k of this title, except that this clause shall not apply to such payments for any month after the month

in which the individual ceases to be eligible for medical assistance;

(6) provide that-

(A) services under the plan shall be made available to residents of other States on the same terms as to residents of the State submitting the plan;

(B)(i) an application fee for furnishing such services shall be imposed on an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section 2015 of title 7, and shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (I) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (II) may vary among such individuals on the basis of ability to pay (as determined by the State); and

(ii) in the case of an individual who has never received assistance under a State program funded under part A and for whom the State has collected at least $550 of support, the State shall impose an annual fee of $35 for each case in which services are furnished, which shall be retained by the State from support collected on behalf of the individual (but not from the first $550 so collected), paid by the individual applying for the services, recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and the fees shall be considered income to the program);

(C) a fee of not more than $25 may be imposed in any case where the State requests the Secretary of the Treasury to withhold past-due support owed to or on behalf of such individual from a tax refund pursuant to section 664(a)(2) of this title;

(D) a fee (in accordance with regulations of the Secretary) for performing genetic tests may be imposed on any individual who is not a recipient of assistance under a State program funded under part A; and

(E) any costs in excess of the fees so imposed may be collected-

(i) from the parent who owes the child or spousal support obligation involved; or

(ii) at the option of the State, from the individual to whom such services are made available, but only if such State has in effect a procedure whereby all persons in such State having authority to order child or spousal support are informed that such costs are to be collected from the individual to whom such services were made available;


(7) provide for entering into cooperative arrangements with appropriate courts and law enforcement officials and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering the plan, including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;

(8) provide that, for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title the agency administering the plan will establish a service to locate parents utilizing-

(A) all sources of information and available records; and

(B) the Federal Parent Locator Service established under section 653 of this title,


and shall, subject to the privacy safeguards required under paragraph (26), disclose only the information described in sections 653 and 663 of this title to the authorized persons specified in such sections for the purposes specified in such sections;

(9) provide that the State will, in accordance with standards prescribed by the Secretary, cooperate with any other State-

(A) in establishing paternity, if necessary;

(B) in locating a noncustodial parent residing in the State (whether or not permanently) against

whom any action is being taken under a program established under a plan approved under this part in another State;

(C) in securing compliance by a noncustodial parent residing in such State (whether or not permanently) with an order issued by a court of competent jurisdiction against such parent for the support and maintenance of the child or children or the parent of such child or children with respect to whom aid is being provided under the plan of such other State;

(D) in carrying out other functions required under a plan approved under this part; and

(E) not later than March 1, 1997, in using the forms promulgated pursuant to section 652(a)(11) of this title for income withholding, imposition of liens, and issuance of administrative subpoenas in interstate child support cases;

(10) provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;

(11)(A) provide that amounts collected as support shall be distributed as provided in section 657 of this title; and

(B) provide that any payment required to be made under section 656 or 657 of this title to a family shall be made to the resident parent, legal guardian, or caretaker relative having custody of or responsibility for the child or children;

(12) provide for the establishment of procedures to require the State to provide individuals who are applying for or receiving services under the State plan, or who are parties to cases in which services are being provided under the State plan-

(A) with notice of all proceedings in which support obligations might be established or modified; and

(B) with a copy of any order establishing or modifying a child support obligation, or (in the case of a petition for modification) a notice of determination that there should be no change in the amount of the child support award, within 14 days after issuance of such order or determination;

(13) provide that the State will comply with such other requirements and standards as the Secretary determines to be necessary to the establishment of an effective program for locating noncustodial parents, establishing paternity, obtaining support orders, and collecting support payments and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan;

(14)(A) comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

(B) maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them to conceal in the accounting records the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

(15) provide for-

(A) a process for annual reviews of and reports to the Secretary on the State program operated under the State plan approved under this part, including such information as may be necessary to measure State compliance with Federal requirements for expedited procedures, using such standards and procedures as are required by the Secretary, under which the State agency will determine the extent to which the program is operated in compliance with this part; and

(B) a process of extracting from the automated data processing system required by paragraph (16) and transmitting to the Secretary data and calculations concerning the levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 652(g) and 658a of this title;

(16) provide for the establishment and operation by the State agency, in accordance with an (initial and annually updated) advance automated data processing planning document approved under section 652(d) of this title, of a statewide automated data processing and information retrieval system meeting the requirements of section 654a of this title designed effectively and efficiently to assist management in

the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan;

(17) provide that the State will have in effect an agreement with the Secretary entered into pursuant to section 663 of this title for the use of the Parent Locator Service established under section 653 of this title, and provide that the State will accept and transmit to the Secretary requests for information authorized under the provisions of the agreement to be furnished by such Service to authorized persons, will impose and collect (in accordance with regulations of the Secretary) a fee sufficient to cover the costs to the State and to the Secretary incurred by reason of such requests, will transmit to the Secretary from time to time (in accordance with such regulations) so much of the fees collected as are attributable to such costs to the Secretary so incurred, and during the period that such agreement is in effect will otherwise comply with such agreement and regulations of the Secretary with respect thereto;

(18) provide that the State has in effect procedures necessary to obtain payment of past-due support from overpayments made to the Secretary of the Treasury as set forth in section 664 of this title, and take all steps necessary to implement and utilize such procedures;

(19) provide that the agency administering the plan-

(A) shall determine on a periodic basis, from information supplied pursuant to section 508 of the Unemployment Compensation Amendments of 1976, whether any individuals receiving compensation under the State's unemployment compensation law (including amounts payable pursuant to any agreement under any Federal unemployment compensation law) owe child support obligations which are being enforced by such agency; and

(B) shall enforce any such child support obligations which are owed by such an individual but are not being met-

(i) through an agreement with such individual to have specified amounts withheld from compensation otherwise payable to such individual and by submitting a copy of any such agreement to the State agency administering the unemployment compensation law; or

(ii) in the absence of such an agreement, by bringing legal process (as defined in section 659(i)(5) of this title) to require the withholding of amounts from such compensation;


(20) provide, to the extent required by section 666 of this title, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws;

(21)(A) at the option of the State, impose a late payment fee on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; and

(B) assure that the fee will be collected in addition to, and only after full payment of, the overdue support, and that the imposition of the late payment fee shall not directly or indirectly result in a decrease in the amount of the support which is paid to the child (or spouse) to whom, or on whose behalf, it is owed;

(22) in order for the State to be eligible to receive any incentive payments under section 658a of this title, provide that, if one or more political subdivisions of the State participate in the costs of carrying out activities under the State plan during any period, each such subdivision shall be entitled to receive an appropriate share (as determined by the State) of any such incentive payments made to the State for such period, taking into account the efficiency and effectiveness of the activities carried out under the State plan by such political subdivision;

(23) provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services and a telephone number or postal address at which further information may be obtained and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate;

(24) provide that the State will have in effect an automated data processing and information retrieval system-

(A) by October 1, 1997, which meets all requirements of this part which were enacted on or before October 13, 1988; and

(B) by October 1, 2000, which meets all requirements of this part enacted on or before August 22, 1996, except that such deadline shall be extended by 1 day for each day (if any) by which the Secretary fails to meet the deadline imposed by section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996;

(25) provide that if a family with respect to which services are provided under the plan ceases to receive assistance under the State program funded under part A, the State shall provide appropriate notice to the family and continue to provide such services, subject to the same conditions and on the same basis as in the case of other individuals to whom services are furnished under the plan, except that an application or other request to continue services shall not be required of such a family and paragraph (6)(B) shall not apply to the family;

(26) have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the parties, including-

(A) safeguards against unauthorized use or disclosure of information relating to proceedings or actions to establish paternity, or to establish, modify, or enforce support, or to make or enforce a child custody determination;

(B) prohibitions against the release of information on the whereabouts of 1 party or the child to another party against whom a protective order with respect to the former party or the child has been entered;

(C) prohibitions against the release of information on the whereabouts of 1 party or the child to another person if the State has reason to believe that the release of the information to that person may result in physical or emotional harm to the party or the child;

(D) in cases in which the prohibitions under subparagraphs (B) and (C) apply, the requirement to notify the Secretary, for purposes of section 653(b)(2) of this title, that the State has reasonable evidence of domestic violence or child abuse against a party or the child and that the disclosure of such information could be harmful to the party or the child; and

(E) procedures providing that when the Secretary discloses information about a parent or child to a State court or an agent of a State court described in section 653(c)(2) or 663(d)(2)(B) of this title, and advises that court or agent that the Secretary has been notified that there is reasonable evidence of domestic violence or child abuse pursuant to section 653(b)(2) of this title, the court shall determine whether disclosure to any other person of information received from the Secretary could be harmful to the parent or child and, if the court determines that disclosure to any other person could be harmful, the court and its agents shall not make any such disclosure;

(27) provide that, on and after October 1, 1998, the State agency will-

(A) operate a State disbursement unit in accordance with section 654b of this title; and

(B) have sufficient State staff (consisting of State employees) and (at State option) contractors reporting directly to the State agency to-

(i) monitor and enforce support collections through the unit in cases being enforced by the State pursuant to paragraph (4) (including carrying out the automated data processing responsibilities described in section 654a(g) of this title); and

(ii) take the actions described in section 666(c)(1) of this title in appropriate cases;

(28) provide that, on and after October 1, 1997, the State will operate a State Directory of New Hires in accordance with section 653a of this title;

(29) provide that the State agency responsible for administering the State plan-

(A) shall make the determination (and redetermination at appropriate intervals) as to whether an individual who has applied for or is receiving assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, is cooperating in good faith with the State in establishing the paternity of, or in establishing, modifying, or enforcing a support order for, any child of the individual by providing the State agency with the name of, and such other information as the State agency may require with respect to, the noncustodial parent of the child, subject to good cause and other exceptions which-

(i) in the case of the State program funded under part A, the State program under part E, or the State program under subchapter XIX shall, at the option of the State, be defined, taking into account the best interests of the child, and applied in each case, by the State agency administering such program; and

(ii) in the case of the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, shall be defined and applied in each case under that program in accordance with section 2015(l)(2) of title 7;

(B) shall require the individual to supply additional necessary information and appear at interviews, hearings, and legal proceedings;

(C) shall require the individual and the child to submit to genetic tests pursuant to judicial or administrative order;

(D) may request that the individual sign a voluntary acknowledgment of paternity, after notice of the rights and consequences of such an acknowledgment, but may not require the individual to sign an acknowledgment or otherwise relinquish the right to genetic tests as a condition of cooperation and eligibility for assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7; and

(E) shall promptly notify the individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, of each such determination, and if noncooperation is determined, the basis therefor;

(30) provide that the State shall use the definitions established under section 652(a)(5) of this title in collecting and reporting information as required under this part;

(31) provide that the State agency will have in effect a procedure for certifying to the Secretary, for purposes of the procedure under section 652(k) of this title, determinations that individuals owe arrearages of child support in an amount exceeding $2,500, under which procedure-

(A) each individual concerned is afforded notice of such determination and the consequences thereof, and an opportunity to contest the determination; and

(B) the certification by the State agency is furnished to the Secretary in such format, and accompanied by such supporting documentation, as the Secretary may require;

(32)(A) provide that any request for services under this part by a foreign reciprocating country, a foreign treaty country, or a foreign country with which the State has an arrangement described in section 659a(d) of this title shall be treated as a request by a State;

(B) provide, at State option, notwithstanding paragraph (4) or any other provision of this part, for services under the plan for enforcement of a spousal support order not described in paragraph (4)(B) entered by such a country (or subdivision); and

(C) provide that no applications will be required from, and no costs will be assessed for such services against, the foreign reciprocating country, foreign treaty country, or foreign individual (but costs may at State option be assessed against the obligor);

(33) provide that a State that receives funding pursuant to section 628 of this title and that has within its borders Indian country (as defined in section 1151 of title 18) may enter into cooperative agreements with an Indian tribe or tribal organization (as defined in subsections (e) and (l) of section 5304 of title 25), if the Indian tribe or tribal organization demonstrates that such tribe or organization has an established tribal court system or a Court of Indian Offenses with the authority to establish paternity, establish, modify, or enforce support orders, or to enter support orders in accordance with child support guidelines established or adopted by such tribe or organization, under which the State and tribe or organization shall provide for the cooperative delivery of child support enforcement services in Indian country and for the forwarding of all collections pursuant to the functions performed by the tribe or organization to the State agency, or conversely, by the State agency to the tribe or organization, which shall distribute such collections in

accordance with such agreement; and

(34) include an election by the State to apply section 657(a)(2)(B) of this title or former section 657(a)(2)(B) of this title (as in effect for the State immediately before the date this paragraph first applies to the State) to the distribution of the amounts which are the subject of such sections and, for so long as the State elects to so apply such former section, the amendments made by subsection (b)(1) of section 7301 of the Deficit Reduction Act of 2005 shall not apply with respect to the State, notwithstanding subsection (e) of such section 7301.

The State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21). Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25.

(Aug. 14, 1935, ch. 531, title IV, §454, as added Pub. L. 93–647, §101(a), Jan. 4, 1975, 88 Stat. 2354 ; amended Pub. L. 94–88, title II, §208(b), (c), Aug. 9, 1975, 89 Stat. 436 ; Pub. L. 95–30, title V, §502(a), May 23, 1977, 91 Stat. 162 ; Pub. L. 96–265, title IV, §405(b), June 9, 1980, 94 Stat. 463 ; Pub. L. 96–611, §9(a), Dec. 28, 1980, 94 Stat. 3571 ; Pub. L. 97–35, title XXIII, §§2331(b), 2332(d), 2333(a), (b), 2335(a), Aug. 13, 1981, 95 Stat. 860 , 862, 863; Pub. L. 97–248, title I, §§171(a), (b)(1), 173(a), Sept. 3, 1982, 96 Stat. 401 , 403; Pub. L. 98–369, div. B, title VI, §2663(c)(14), (j)(2)(B)(x), July 18, 1984, 98 Stat. 1166 , 1170; Pub. L. 98–378, §§3(a), (c)–(f), 5(b), 6(a), 11(b)(1), 12(a), (b), 14(a), 21(d), Aug. 16, 1984, 98 Stat. 1306 , 1310, 1311, 1314, 1318, 1319, 1320, 1324; Pub. L. 100–203, title IX, §§9141a(2), 9142(a), Dec. 22, 1987, 101 Stat. 1330–321 ; Pub. L. 100–485, title I, §§104(a), 111(c), 123(a), (d), Oct. 13, 1988, 102 Stat. 2348 , 2349, 2352, 2353; Pub. L. 104–35, §1(a), Oct. 12, 1995, 109 Stat. 294 ; Pub. L. 104–193, title I, §108(c)(11), (12), title III, §§301(a), (b), 302(b)(2), 303(a), 304(a), 312(a), 313(a), 316(g)(1), 324(b), 332, 333, 342(a), 343(b), 344(a)(1), (4), 370(a)(2), 371(b), 375(a), (c), 395(d)(1)(D), (2)(B), Aug. 22, 1996, 110 Stat. 2166 , 2199, 2204, 2205, 2207, 2209, 2218, 2223, 2230, 2233, 2234, 2236, 2252, 2254, 2256, 2259, 2260; Pub. L. 105–33, title V, §§5531(a), 5542(c), 5545, 5546(a), 5548, 5552, 5556(b), Aug. 5, 1997, 111 Stat. 625 , 631, 633, 635, 637; Pub. L. 106–169, title IV, §401(g), (h), Dec. 14, 1999, 113 Stat. 1858 ; Pub. L. 109–171, title VII, §§7301(b)(1)(C), 7303(b), 7310(a), Feb. 8, 2006, 120 Stat. 143 , 145, 147; Pub. L. 110–234, title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), May 22, 2008, 122 Stat. 1095–1097 , 1110; Pub. L. 110–246, §4(a), title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), June 18, 2008, 122 Stat. 1664 , 1857, 1858, 1871; Pub. L. 113–79, title IV, §4030(v), Feb. 7, 2014, 128 Stat. 815 ; Pub. L. 113–183, title III, §301(c), Sept. 29, 2014, 128 Stat. 1943 ; Pub. L. 115–123, div. E, title XII, §53117(a), Feb. 9, 2018, 132 Stat. 307 .)

<div align="center">

Editorial Notes

## References in Text

</div>

Section 508 of the Unemployment Compensation Amendments of 1976, referred to in par. (19), is section 508 of Pub. L. 94–566, Oct. 20, 1976, 90 Stat. 2689 , which enacted section 603a of this title and amended section 49b of Title 29, Labor.

Section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, referred to in par. (24), is section 344(a)(3) of Pub. L. 104–193, which is set out as a Regulations note under section 654a of this title.

Section 2012(l) of title 7, referred to in par. (29), was struck out, and a new section 2012(t) of title 7 similarly defining "supplemental nutrition assistance program" was enacted, by Pub. L. 113–79, title IV, §4030(a)(3), (5), Feb. 7, 2014, 128 Stat. 813 .

Section 7301 of the Deficit Reduction Act of 2005, referred to in par. (34), is section 7301 of Pub. L. 109–171, title VII, Feb. 8, 2006, 120 Stat. 141 . Subsec. (b)(1) of section 7301 of Pub. L. 109–171 amended this section and section 657 of this title. Subsec. (e) of section 7301 of Pub. L. 109–171 is set out as an Effective Date of 2006 Amendment note under section 608 of this title.

<h2 style="text-align:center">CODIFICATION</h2>

Pub. L. 110–234 and Pub. L. 110–246 made identical amendments to this section. The amendments by Pub. L. 110–234 were repealed by section 4(a) of Pub. L. 110–246.

<h2 style="text-align:center">AMENDMENTS</h2>

**2018**-Par. (6)(B)(ii). Pub. L. 115–123 substituted "$35" for "$25" and, in two places, substituted "$550" for "$500".

**2014**-Par. (4)(A)(ii). Pub. L. 113–183, §301(c)(1), inserted before semicolon "(except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the individual to request the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application)".

Par. (29)(A), (D), (E). Pub. L. 113–79, §4030(v), amended Pub. L. 110–246, §4115(c)(2)(H). See 2008 Amendment note below.

Par. (32)(A). Pub. L. 113–183, §301(c)(2)(A), inserted ", a foreign treaty country," after "a foreign reciprocating country".

Par. (32)(C). Pub. L. 113–183, §301(c)(2)(B), substituted ", foreign treaty country, or foreign individual" for "or foreign obligee".

**2008**-Pars. (4)(A)(i)(IV), (6)(B)(i). Pub. L. 110–246, §4002(b)(1)(B), (2)(V), made technical amendment to references in original act which appear in text as references to sections 2015(l)(1) and 2015 of title 7.

Par. (29)(A), (D), (E). Pub. L. 110–246, §4115(c)(2)(H), as amended by Pub. L. 113–79, §4030(v), substituted "section 2012(l)" for "section 2012(h)" wherever appearing.

Pub. L. 110–246, §4002(b)(1)(A), (B), (2)(V), substituted "supplemental nutrition assistance program" for "food stamp program" wherever appearing and made technical amendment to references in original act which appear in text as references to sections 2012(h) and 2015(l)(2) of title 7.

**2006**-Par. (6)(B). Pub. L. 109–171, §7310(a), designated existing provisions as cl. (i), redesignated former cls. (i) and (ii) as subcls. (I) and (II), respectively, of cl. (i), and added cl. (ii).

Par. (31). Pub. L. 109–171, §7303(b), substituted "$2,500" for "$5,000" in introductory provisions.

Par. (34). Pub. L. 109–171, §7301(b)(1)(C), added par. (34).

**1999**-Par. (6)(E)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (9)(A) to (C). Pub. L. 106–169, §401(g)(2), substituted semicolon for comma at end.

Par. (19)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (19)(B)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (24)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (24)(B). Pub. L. 106–169, §401(h), made technical amendment to reference in original act which appears in text as reference to August 22, 1996.

**1997**-Par. (4)(A)(i)(IV). Pub. L. 105–33, §5548(a), added subcl. (IV).

Par. (6)(B). Pub. L. 105–33, §5531(a), substituted "an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section

2015 of title 7, and" for "individuals not receiving assistance under any State program funded under part A, which".

Par. (8). Pub. L. 105–33, §5552(1)(D), inserted concluding provisions.

Pub. L. 105–33, §5552(1)(A), in introductory provisions, inserted ", for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title" after "provide that" and struck out "noncustodial" before "parents".

Par. (8)(A). Pub. L. 105–33, §5552(1)(B), substituted "records; and" for "records, and".

Par. (8)(B). Pub. L. 105–33, §5552(1)(C), substituted "title," for "title;".

Par. (16). Pub. L. 105–33, §5556(b), made technical amendment to directory language of Pub. L. 104–193, §344(a)(1)(F). See 1996 Amendment note below.

Par. (17). Pub. L. 105–33, §5552(2), substituted "provide that the State will have" for "in the case of a State which has" and inserted "and" after "section 653 of this title,".

Par. (19)(B)(ii). Pub. L. 105–33, §5542(c), substituted "section 659(i)(5)" for "section 662(e)".

Par. (26). Pub. L. 105–33, §5552(3)(A), struck out "will" before "have in effect" in introductory provisions.

Par. (26)(A). Pub. L. 105–33, §5552(3)(B), inserted ", modify," after "or to establish" and ", or to make or enforce a child custody determination" after "support".

Par. (26)(B). Pub. L. 105–33, §5552(3)(C)(i), (ii), inserted "or the child" after "1 party" and after "former party".

Par. (26)(C). Pub. L. 105–33, §5552(3)(D), inserted "or the child" after "1 party", substituted "another person" for "another party", inserted "to that person" after "release of the information", and substituted "party or the child" for "former party".

Par. (26)(D), (E). Pub. L. 105–33, §5552(3)(C)(iii), (E), added subpars. (D) and (E).

Par. (29)(A). Pub. L. 105–33, §5548(b)(1)(B), substituted cls. (i) and (ii) for

"(i) shall be defined, taking into account the best interests of the child, and

"(ii) shall be applied in each case,

by, at the option of the State, the State agency administering the State program under part A of this subchapter, this part, or subchapter XIX;".

Pub. L. 105–33, §5548(b)(1)(A), in introductory provisions, substituted "part A, the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7," for "part A of this subchapter or the State program under subchapter XIX".

Par. (29)(D). Pub. L. 105–33, §5548(b)(2), substituted "the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7" for "or the State program under subchapter XIX".

Par. (29)(E). Pub. L. 105–33, §5548(b)(3), substituted "individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the food stamp program, as defined under section 2012(h) of title 7," for "individual, the State agency administering the State program funded under part A, and the State agency administering the State program under subchapter XIX,".

Par. (32)(A). Pub. L. 105–33, §5545, substituted "section 659a(d)" for "section 659a(d)(2)".

Par. (33). Pub. L. 105–33, §5546(a), substituted "or enforce support orders, or" for "and enforce support orders, and", "guidelines established or adopted by such tribe or organization"

for "guidelines established by such tribe or organization", "all collections" for "all funding collected", and "such collections" for "such funding".

**1996**-Pub. L. 104–193, §375(a)(4), inserted at end of closing provisions "Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25."

Par. (4). Pub. L. 104–193, §301(a)(1), amended par. (4) generally. Prior to amendment, par. (4) read as follows: "provide that such State will undertake-

"(A) in the case of a child born out of wedlock with respect to whom an assignment under section 602(a)(26) of this title or section 1396k of this title is effective, to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so, or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and

"(B) in the case of any child with respect to whom such assignment is effective, including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter, to secure support for such child from his parent (or from any other person legally liable for such support), and from such parent for his spouse (or former spouse) receiving aid to families with dependent children or medical assistance under a State plan approved under subchapter XIX of this chapter (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan), utilizing any reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A or E of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so), except that when such arrangements and other means have proven ineffective, the State may utilize the Federal courts to obtain or enforce court orders for support;".

Par. (5)(A). Pub. L. 104–193, §108(c)(11), substituted "pursuant to section 608(a)(3) of this title" for "under section 602(a)(26) of this title" and "payments collected," for "payments collected; except that this paragraph shall not apply to such payments for any month following the first month in which the amount collected is sufficient to make such family ineligible for assistance under the State plan approved under part A of this subchapter;".

Par. (6). Pub. L. 104–193, §301(a)(2)(A), substituted "provide that-" for "provide that" in introductory provisions.

Par. (6)(A). Pub. L. 104–193, §301(a)(2)(B), added subpar. (A) and struck out former subpar. (A) which read as follows: "the child support collection or paternity determination services established under the plan shall be made available to any individual not otherwise eligible for such services upon application filed by such individual with the State, including support collection services for the spouse (or former spouse) with whom the absent parent's child is living (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan),".

Par. (6)(B). Pub. L. 104–193, §301(a)(2)(C), (D), inserted "on individuals not receiving assistance under any State program funded under part A" after "such services shall be imposed", realigned margins, and substituted semicolon for comma at end.

Par. (6)(C). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma at end.

Par. (6)(D). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma before "and" at end.

Pub. L. 104–193, §108(c)(12), substituted "assistance under a State program funded" for "aid under a State plan approved".

Par. (6)(E). Pub. L. 104–193, §301(a)(2)(D)(i), (E), realigned margins.

Pub. L. 104–193, §301(a)(2)(D)(ii), which directed substitution of a semicolon for the final comma, could not be executed because subpar. (E) already ended in a semicolon and not a comma.

Par. (7). Pub. L. 104–193, §375(c), inserted "and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25)" after "law enforcement officials".

Par. (8). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial" for "absent" in introductory provisions.

Par. (8)(B). Pub. L. 104–193, §316(g)(1)(A), amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: "the Parent Locator Service in the Department of Health and Human Services;".

Par. (9)(B), (C). Pub. L. 104–193, §395(d)(2)(B), substituted "a noncustodial parent" for "an absent parent".

Par. (9)(E). Pub. L. 104–193, §324(b), added subpar. (E).

Par. (11). Pub. L. 104–193, §302(b)(2), designated existing provisions as subpar. (A), inserted "and" after semicolon at end, and redesignated par. (12) as subpar. (B).

Par. (12). Pub. L. 104–193, §304(a), added par. (12). Former par. (12) redesignated (11)(B).

Pub. L. 104–193, §302(b)(2)(B), redesignated par. (12) as (11)(B).

Par. (13). Pub. L. 104–193, §§316(g)(1)(B), 395(d)(1)(D), substituted "noncustodial parents" for "absent parents" and inserted before semicolon at end "and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan".

Par. (14). Pub. L. 104–193, §342(a)(1), (2), designated existing provisions as subpar. (A) and redesignated par. (15) as subpar. (B).

Par. (15). Pub. L. 104–193, §342(a)(3), added par. (15). Former par. (15) redesignated (14)(B).

Pub. L. 104–193, §342(a)(2), redesignated par. (15) as (14)(B).

Par. (16). Pub. L. 104–193, §344(a)(1), as amended by Pub. L. 105–33, §5556(b), struck out ", at the option of the State," before "for the establishment", inserted "and operation by the State agency" after "for the establishment" and "meeting the requirements of section 654a of this title" after "information retrieval system", substituted "so as to control" for "in the State and localities thereof, so as (A) to control", struck out "(i)" before "all the factors in the support enforcement collection", and struck out before semicolon at end "(including, but not limited to, (I) identifiable correlation factors (such as social security numbers, names, dates of birth, home addresses and mailing addresses (including postal ZIP codes) of any individual with respect to whom support obligations are sought to be established or enforced and with respect to any person to whom such support obligations are owing) to assure sufficient compatibility among the systems of different jurisdictions to permit periodic screening to determine whether such

individual is paying or is obligated to pay support in more than one jurisdiction, (II) checking of records of such individuals on a periodic basis with Federal, intra- and inter-State, and local agencies, (III) maintaining the data necessary to meet the Federal reporting requirements on a timely basis, and (IV) delinquency and enforcement activities), (ii) the collection and distribution of support payments (both intra- and inter-State), the determination, collection, and distribution of incentive payments both inter- and intra-State, and the maintenance of accounts receivable on all amounts owed, collected and distributed, and (iii) the costs of all services rendered, either directly or by interfacing with State financial management and expenditure information, (B) to provide interface with records of the State's aid to families with dependent children program in order to determine if a collection of a support payment causes a change affecting eligibility for or the amount of aid under such program, (C) to provide for security against unauthorized access to, or use of, the data in such system, (D) to facilitate the development and improvement of the income withholding and other procedures required under section 666(a) of this title through the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur, and (E) to provide management information on all cases under the State plan from initial referral or application through collection and enforcement".

Par. (21)(A). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent".

Par. (23). Pub. L. 104–193, §332, inserted "and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate" before semicolon.

Par. (24). Pub. L. 104–193, §344(a)(4), amended par. (24) generally. Prior to amendment, par. (24) read as follows: "provide that if the State, as of October 13, 1988, does not have in effect an automated data processing and information retrieval system meeting all of the requirements of paragraph (16), the State-

"(A) will submit to the Secretary by October 1, 1991, for review and approval by the Secretary within 9 months after submittal an advance automated data processing planning document of the type referred to in such paragraph; and

"(B) will have in effect by October 1, 1997, an operational automated data processing and information retrieval system, meeting all the requirements of that paragraph, which has been approved by the Secretary;".

Par. (25). Pub. L. 104–193, §301(b), added par. (25).

Par. (26). Pub. L. 104–193, §303(a), added par. (26).

Par. (27). Pub. L. 104–193, §312(a), added par. (27).

Par. (28). Pub. L. 104–193, §313(a), added par. (28).

Par. (29). Pub. L. 104–193, §333, added par. (29).

Par. (30). Pub. L. 104–193, §343(b), added par. (30).

Par. (31). Pub. L. 104–193, §370(a)(2), added par. (31).

Par. (32). Pub. L. 104–193, §371(b), added par. (32).

Par. (33). Pub. L. 104–193, §375(a)(1)–(3), added par. (33).

**1995**-Par. (24)(B). Pub. L. 104–35 substituted "1997" for "1995".

**1988**-Par. (5)(A). Pub. L. 100–485, §104(a), substituted "on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden)" for "at least

annually".

Par. (6)(D), (E). Pub. L. 100–485, §111(c), added cl. (D) and redesignated former cl. (D) as (E).

Par. (16). Pub. L. 100–485, §123(d), substituted "advance automated" for "advance automatic" in introductory provisions.

Pub. L. 100–485, §123(a)(2), substituted "a statewide automated" for "an automatic".

Par. (24). Pub. L. 100–485, §123(a)(1), added par. (24).

**1987**–Par. (4)(A). Pub. L. 100–203, §9142(a)(1)(A), (B), substituted "an assignment under section 602(a)(26) of this title or section 1396k of this title" for "an assignment under section 602(a)(26) of this title" and ", or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and" for ", and".

Par. (4)(B). Pub. L. 100–203, §9142(a)(1)(C), inserted "or medical assistance under a State plan approved under subchapter XIX of this chapter" after "children".

Par. (5). Pub. L. 100–203, §9142(a)(2), substituted "provide that (A)" for "provide that," and added cl. (B).

Pub. L. 100–203, §9141(a)(2), struck out "(except as provided in section 657(c) of this title)" after "apply to such payments".

**1984**–Par. (4)(B). Pub. L. 98–378, §11(b)(1), inserted "including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter," after "such assignment is effective," and inserted "or E" after "part A".

Par. (4)(B). Pub. L. 98–378, §12(a), substituted ", and" for "and, at the option of the State," before "from such parent" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (5). Pub. L. 98–378, §3(e), inserted ", and the individual will be notified at least annually of the amount of the support payments collected;".

Par. (6)(A). Pub. L. 98–378, §12(b), struck out ", at the option of the State," before "support collection services" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (6)(B). Pub. L. 98–378, §3(c), substituted "shall be imposed, which shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (i) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (ii) may vary among such individuals on the basis of ability to pay (as determined by the State), and" for "may be imposed, except that the amount of any such application fee shall be reasonable, as determined under regulations of the Secretary,".

Par. (6)(C). Pub. L. 98–378, §21(d)(1), (3), added cl. (C). Former cl. (C) redesignated (D).

Par. (6)(D). Pub. L. 98–378, §21(d)(1), (2), redesignated former cl. (C) as (D) and substituted "fees" for "fee" before "so imposed".

Par. (8)(B). Pub. L. 98–369, §2663(j)(2)(B)(x), substituted "Health and Human Services" for "Health, Education, and Welfare".

Par. (9)(C). Pub. L. 98–369, §2663(c)(14)(A), struck out "of such parent" before "with respect to whom aid".

Par. (16)(A)(ii). Pub. L. 98–369, §2663(c)(14)(B), substituted "collection, and distribution" for "collection and distribution," before "of incentive payments".

Par. (16)(D), (E). Pub. L. 98–378, §6(a), added cl. (D) and redesignated former cl. (D) as (E).

Par. (17). Pub. L. 98–378, §2663(c)(14)(C), realigned margin, substituted "provide that the State will accept" for "to accept", "will impose" for "and to impose", "will transmit" for "to transmit", and "will otherwise comply" for ", otherwise to comply".

Par. (20). Pub. L. 98–378, §3(a), added par. (20).

Par. (21). Pub. L. 98–378, §3(d), added par. (21).

Par. (22). Pub. L. 98–378, §5(b), added par. (22).

Par. (23). Pub. L. 98–378, §14(a), added par. (23).

Pub. L. 98–378, §3(f), inserted after numbered paragraphs provision that the State may allow the jurisdiction which makes the collection involved to retain any application fee under par. (6)(B) or any late payment fee under par. (21).

**1982**–Par. (5). Pub. L. 97–248, §173(a), inserted "following the first month" after "for any month".

Par. (6). Pub. L. 97–248, §171(a), in cl. (A) inserted provisions relating to inclusion of, at the option of the State, support collection services for the spouse or former spouse, in cl. (B) substituted "such services" for "services under the State plan (other than collection of support)", and in cl. (C) substituted provisions relating to collection of any costs in excess of the fee imposed, for provisions relating to the State retaining any fee imposed under State law as required under former par. (19).

Pars. (18) to (20). Pub. L. 97–248, §171(b)(1), inserted "and" at end of par. (18), struck out par. (19) relating to imposition of a fee on an individual who owes child or spousal support obligation, and redesignated par. (20) as (19).

**1981**–Pub. L. 97–35, §2332(d)(2), substituted in provision preceding par. (1) "child and spousal support" for "child support".

Par. (4)(B). Pub. L. 97–35, §2332(d)(3), substituted "such support) and, at the option of the State, from such parent for his spouse (or former spouse) receiving aid to families with dependent children (but only if a support obligation has been established with respect to such spouse), utilizing" for "such support), utilizing".

Par. (5). Pub. L. 97–35, §2332(d)(4), substituted "support payments" for "child support payments" and "collected for an individual" for "collected for a child".

Par. (6)(B). Pub. L. 97–35, §2333(a)(1), substituted "services under the State plan (other than collection of support)" for "such services".

Par. (6)(C). Pub. L. 97–35, §2333(a)(2), substituted "the State will retain, but only if it is the State which makes the collection, the fee imposed under State law as required under paragraph (19)" for "any costs in excess of the fee so imposed may be collected from such individual by deducting such costs from the amount of any recovery made".

Par. (9)(C). Pub. L. 97–35, §2332(d)(5), substituted "of the child or children or the parent of such child or children" for "of a child or children".

Par. (11). Pub. L. 97–35, §2332(d)(6), substituted "collected as support" for "collected as child support".

Par. (16). Pub. L. 97–35, §2332(d)(7), substituted "support enforcement" for "child support enforcement", "whom support obligations" for "whom child support obligations", and "obligated to pay support" for "obligated to pay child support".

Par. (18). Pub. L. 97–35, §2331(b), added par. (18).

Par. (19). Pub. L. 97–35, §2333(b), added par. (19).

Par. (20). Pub. L. 97–35, §2335(a), added par. (20).

**1980**-Par. (16). Pub. L. 96–265 added par. (16).

Par. (17). Pub. L. 96–611 added par. (17).

**1977**-Pars. (14), (15). Pub. L. 95–30 added pars. (14) and (15).

**1975**-Par. (4)(A). Pub. L. 94–88, §208(b), substituted "to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so" for "to establish the paternity of such child".

Par. (4)(B). Pub. L. 94–88, §208(c), substituted "reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so)" for "reciprocal arrangements adopted with other States".

### Statutory Notes and Related Subsidiaries

### Effective Date of 2018 Amendment

Pub. L. 115–123, div. E, title XII, §53117(b), Feb. 9, 2018, 132 Stat. 307 , provided that:

"(1) In general.-The amendments made by subsection (a) [amending this section] shall take effect on the 1st day of the 1st fiscal year that begins on or after the date of the enactment of this Act [Feb. 9, 2018], and shall apply to payments under part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) for calendar quarters beginning on or after such 1st day.

"(2) Delay permitted if state legislation required.-If the Secretary of Health and Human Services determines that State legislation (other than legislation appropriating funds) is required in order for a State plan developed pursuant to part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) to meet the requirements imposed by the amendment made by subsection (a), the plan shall not be regarded as failing to meet such requirements before the 1st day of the 1st calendar quarter beginning after the first regular session of the State legislature that begins after the date of the enactment of this Act. For purposes of the preceding sentence, if the State has a 2-year legislative session, each year of the session is deemed to be a separate regular session of the State legislature."

### Effective Date of 2008 Amendment

Amendment of this section and repeal of Pub. L. 110–234 by Pub. L. 110–246 effective May 22, 2008, the date of enactment of Pub. L. 110–234, except as otherwise provided, see section 4 of Pub. L. 110–246, set out as an Effective Date note under section 8701 of Title 7, Agriculture.

Amendment by sections 4002(b)(1)(A), (B), (2)(V), and 4115(c)(2)(H) of Pub. L. 110–246 effective Oct. 1, 2008, see section 4407 of Pub. L. 110–246, set out as a note under section 1161 of Title 2, The Congress.

### Effective Date of 2006 Amendment

Amendment by section 7301(b)(1)(C) of Pub. L. 109–171 effective Oct. 1, 2009, and applicable to payments under parts A and D of this subchapter for calendar quarters beginning on or after such date, subject to certain State options, see section 7301(e) of Pub. L. 109–171, set out as a note under section 608 of this title.

Amendment by section 7303(b) of Pub. L. 109–171 effective Oct. 1, 2006, see section 7303(c) of Pub. L. 109–171, set out as a note under section 652 of this title.

Pub. L. 109–171, title VII, §7310(c), Feb. 8, 2006, 120 Stat. 148 , provided that: "The amendments made by this section [amending this section and section 657 of this title] shall take effect on October 1, 2006."

<h3 align="center">Effective Date of 1999 Amendment</h3>

Amendment by Pub. L. 106–169 effective as if included in the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 401(q) of Pub. L. 106–169, set out as a note under section 602 of this title.

<h3 align="center">Effective Date of 1997 Amendment</h3>

Amendment by Pub. L. 105–33 effective as if included in the enactment of title III of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 5557 of Pub. L. 105–33, set out as a note under section 608 of this title.

<h3 align="center">Effective Date of 1996 Amendment</h3>

Amendment by section 108(c)(11), (12) of Pub. L. 104–193 effective July 1, 1997, with transition rules relating to State options to accelerate such date, rules relating to claims, actions, and proceedings commenced before such date, rules relating to closing out of accounts for terminated or substantially modified programs and continuance in office of Assistant Secretary for Family Support, and provisions relating to termination of entitlement under AFDC program, see section 116 of Pub. L. 104–193, as amended, set out as an Effective Date note under section 601 of this title.

Amendment by section 302(b)(2) of Pub. L. 104–193 effective Aug. 22, 1996, see section 302(c)(2) of Pub. L. 104–193, set out as a note under section 657 of this title.

Pub. L. 104–193, title III, §303(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Pub. L. 104–193, title III, §304(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Amendment by section 312(a) of Pub. L. 104–193 effective Oct. 1, 1998, with limited exception for States which, as of Aug. 22, 1996, were processing the receipt of child support payments through local courts, see section 312(d) of Pub. L. 104–193, set out as an Effective Date note under section 654b of this title.

Amendment by section 342(a) of Pub. L. 104–193 effective with respect to calendar quarters beginning 12 months or more after Aug. 22, 1996, see section 342(c) of Pub. L. 104–193, set out as a note under section 652 of this title.

Amendment by section 370(a)(2) of Pub. L. 104–193 effective Oct. 1, 1997, see section 370(b) of Pub. L. 104–193, set out as a note under section 652 of this title.

Pub. L. 104–193, title III, §395(a)–(c), Aug. 22, 1996, 110 Stat. 2259 , provided that:

"(a) In General.-Except as otherwise specifically provided (but subject to subsections (b) and (c))-

"(1) the provisions of this title [see Tables for classification] requiring the enactment or amendment of State laws under section 466 of the Social Security Act [42 U.S.C. 666], or revision of State plans under section 454 of such Act [this section], shall be effective with

respect to periods beginning on and after October 1, 1996; and

"(2) all other provisions of this title shall become effective upon the date of the enactment of this Act [Aug. 22, 1996].

"(b) Grace Period for State Law Changes.-The provisions of this title shall become effective with respect to a State on the later of-

"(1) the date specified in this title, or

"(2) the effective date of laws enacted by the legislature of such State implementing such provisions,

but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2-year legislative session, each year of such session shall be deemed to be a separate regular session of the State legislature.

"(c) Grace Period for State Constitutional Amendment.-A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of-

"(1) 1 year after the effective date of the necessary State constitutional amendment; or

"(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]."

### Effective Date of 1988 Amendment

Pub. L. 100–485, title I, §104(b), Oct. 13, 1988, 102 Stat. 2348 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on the first day of the first calendar quarter which begins 4 or more years after the date of the enactment of this Act [Oct. 13, 1988]."

Pub. L. 100–485, title I, §111(f)(2), Oct. 13, 1988, 102 Stat. 2350 , provided that: "The amendments made by subsections (b) and (c) [amending this section and section 666 of this title] shall become effective on the first day of the first month beginning one year or more after the date of the enactment of this Act [Oct. 13, 1988]."

### Effective Date of 1987 Amendment

Pub. L. 100–203, title IX, §9141(b), Dec. 22, 1987, 101 Stat. 1330–321 , provided that: "The amendments made by subsection (a) [amending this section and section 657 of this title] shall become effective upon enactment [Dec. 22, 1987]."

Pub. L. 100–203, title IX, §9142(b), Dec. 22, 1987, 101 Stat. 1330–322 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective on July 1, 1988."

### Effective Date of 1984 Amendment

Pub. L. 98–378, §3(g), Aug. 16, 1984, 98 Stat. 1311 , provided that:

"(1) Except as provided in paragraphs (2) and (3), the amendments made by this section [enacting section 666 of this title and amending this section] shall become effective on October 1, 1985.

"(2) Section 454(21) of the Social Security Act [42 U.S.C. 654(21)] (as added by subsection (d) of this section), and section 466(e) of such Act [42 U.S.C. 666(e)] (as added by subsection (b) of this section), shall be effective with respect to support owed for any month beginning after the date of the enactment of this Act [Aug. 16, 1984].

"(3) In the case of a State with respect to which the Secretary of Health and Human Services

has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this section, the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the beginning of the fourth month beginning after the end of the first session of the State legislature which ends on or after October 1, 1985. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

Pub. L. 98–378, §5(c)(1), Aug. 16, 1984, 98 Stat. 1314 , provided that: "The amendments made by the preceding provisions of this section [amending this section and section 658 of this title] shall become effective on October 1, 1985."

Pub. L. 98–378, §6(c), Aug. 16, 1984, 98 Stat. 1315 , provided that: "The amendments made by this section [amending this section and section 655 of this title] shall apply with respect to quarters beginning on or after October 1, 1984."

Pub. L. 98–378, §11(e), Aug. 16, 1984, 98 Stat. 1318 , provided that: "The amendments made by this section [amending this section and sections 656, 657, 664, and 671 of this title] shall become effective October 1, 1984, and shall apply to collections made on or after that date."

Pub. L. 98–378, §12(c), Aug. 16, 1984, 98 Stat. 1319 , provided that: "The amendments made by this section [amending this section] shall become effective October 1, 1985."

Pub. L. 98–378, §14(b), Aug. 16, 1984, 98 Stat. 1320 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective October 1, 1985."

Amendment by section 21(d) of Pub. L. 98–378 applicable with respect to refunds payable under section 6402 of Title 26, Internal Revenue Code, after Dec. 31, 1985, see section 21(g) of Pub. L. 98–378, set out as a note under section 6103 of Title 26.

Amendment by Pub. L. 98–369 effective July 18, 1984, but not to be construed as changing or affecting any right, liability, status, or interpretation which existed (under the provisions of law involved) before that date, see section 2664(b) of Pub. L. 98–369, set out as a note under section 401 of this title.

### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by section 171(a), (b)(1) of Pub. L. 97–248 effective on and after Aug. 13, 1981, see section 171(c) of Pub. L. 97–248, set out as a note under section 503 of this title.

Pub. L. 97–248, title I, §173(b), Sept. 3, 1982, 96 Stat. 403 , provided that: "The amendment made by this section [amending this section] shall become effective on October 1, 1982."

### EFFECTIVE DATE OF 1981 AMENDMENT

Amendments by sections 2331(b), 2332(d)(2)–(7), and 2333(a), (b) of Pub. L. 97–35 effective Oct. 1, 1981, except as otherwise specifically provided, see section 2336 of Pub. L. 97–35, set out as a note under section 651 of this title.

Amendment by section 2335(a) of Pub. L. 97–35 effective Aug. 13, 1981, except that such amendment shall not be requirements under this section or section 503 of this title before Oct. 1, 1982, see section 2335(c) of Pub. L. 97–35, set out as a note under section 503 of this title.

### EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–265 effective July 1, 1981, and to be effective only with respect to expenditures, referred to in section 655(a)(3) of this title, made on or after such date, see section 405(e) of Pub. L. 96–265, set out as a note under section 652 of this title.

## Effective Date of 1977 Amendment

Pub. L. 95–30, title V, §502(b), May 23, 1977, 91 Stat. 162 , provided that: "The amendments made by this section [amending this section] shall take effect on the first day of the first calendar month which begins after the date of enactment of this Act [May 23, 1977]."

## Effective Date of 1975 Amendment

Pub. L. 94–88, title II, §210, Aug. 9, 1975, 89 Stat. 437 , provided that: "The amendments made by this title [amending this section and sections 602, 603, and 655 of this title and enacting provisions set out as notes under sections 602 and 655 of this title] shall, unless otherwise specified therein, become effective August 1, 1975."

## Exception to General Effective Date for State Plans Requiring State Law Amendments

Pub. L. 109–171, title VII, §7311, Feb. 8, 2006, 120 Stat. 148 , provided that: "In the case of a State plan under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] which the Secretary determines requires State legislation in order for the plan to meet the additional requirements imposed by the amendments made by this subtitle [subtitle C (§§7301–7311) of title VII of Pub. L. 109–171, amending this section, sections 608, 652, 653, 655, 657, 664, and 666 of this title, section 6402 of Title 26, Internal Revenue Code, and provisions set out as a note under section 1169 of Title 29, Labor], the effective date of the amendments imposing the additional requirements shall be 3 months after the first day of the first calendar quarter beginning after the close of the first regular session of the State legislature that begins after the date of the enactment of this Act [Feb. 8, 2006]. For purposes of the preceding sentence, in the case of a State that has a 2-year legislative session, each year of the session shall be considered to be a separate regular session of the State legislature."

## State Commissions on Child Support

Pub. L. 98–378, §15, Aug. 16, 1984, 98 Stat. 1320 , provided that:

"(a) As a condition of the State's eligibility for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] for quarters beginning more than 30 days after the date of the enactment of this Act [Aug. 16, 1984] and ending prior to October 1, 1985, the Governor of each State, on or before December 1, 1984, shall (subject to subsection (f)) appoint a State Commission on Child Support.

"(b) Each State Commission appointed under subsection (a) shall be composed of members appropriately representing all aspects of the child support system, including custodial and non-custodial parents, the agency or organizational unit administering the State's plan under part D of such title IV [42 U.S.C. 651 et seq.], the State judiciary, the executive and legislative branches of the State government, child welfare and social services agencies, and others.

"(c) It shall be the function of each State Commission to examine, investigate, and study the operation of the State's child support system for the primary purpose of determining the extent to which such system has been successful in securing support and parental involvement both for children who are eligible for aid under a State plan approved under part A of title IV of such Act [42 U.S.C. 601 et seq.] and for children who are not eligible for such aid, giving particular attention to such specific problems (among others) as visitation, the establishment of appropriate objective standards for support, the enforcement of interstate obligations, the availability, cost, and effectiveness of services both to children who are eligible for such aid and to children who are not, and the need for additional State or Federal legislation to obtain

support for all children.

"(d) Each State Commission shall submit to the Governor of the State and make available to the public, no later than October 1, 1985, a full and complete report of its findings and recommendations resulting from the examination, investigation, and study under this section. The Governor shall transmit such report to the Secretary of Health and Human Services along with the Governor's comments thereon.

"(e) None of the costs incurred in the establishment and operation of a State Commission under this section, or incurred by such a Commission in carrying out its functions under subsections (c) and (d), shall be considered as expenditures qualifying for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] or be otherwise payable or reimbursable by the United States or any agency thereof.

"(f) If the Secretary determines, at the request of any State on the basis of information submitted by the State and such other information as may be available to the Secretary, that such State-

"(1) has placed in effect and is implementing objective standards for the determination and enforcement of child support obligations,

"(2) has established within the five years prior to the enactment of this Act [Aug. 16, 1984] a commission or council with substantially the same functions as the State Commissions provided for under this section, or

"(3) is making satisfactory progress toward fully effective child support enforcement and will continue to do so,

then such State shall not be required to establish a State Commission under this section and the preceding provisions of this section shall not apply."

### Delayed Effective Date in Cases Requiring State Legislation

Pub. L. 97–248, title I, §176, Sept. 3, 1982, 96 Stat. 403 , provided that: "In the case of a State with respect to which the Secretary of Health and Human Services has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this subtitle [subtitle E (§§171–176) of title I of Pub. L. 97–248, see Tables for classification], the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the end of the first session of the State legislature which begins after October 1, 1982, or which began prior to October 1, 1982, and remained in session for at least twenty-five calendar days after such date. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

*1* *See References in Text note below.*

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                    FAMILY COURT

| | | |
|---|---|---|
| State of Rhode Island ex rel. | : | |
| GERO MEYERSIEK | : | |
| *Plaintiff* | : | |
| | : | |
| VS. | : | DOCKET NO: K20010521M |
| | : | Title IV Part D Case under |
| | : | 42 U.S.C. §§ 651-669 |
| MARY SEGUIN | : | |
| *Defendant* | : | |

## DEFENDANT'S EMERGENCY MOTION TO DISMISS FOR LACK OF JURISDICTION

## And

## CLOSE THE CASE

The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby respectfully moves the Court to **Dismiss for Lack of Jurisdiction** over the State's Motion to Set Arrears that is in violation of 42 U.S.C. sec. 654. The Defendant respectfully moves to close the case based on the plain fact that the Defendant paid off in full all "principle" support. The child in question was emancipated in April 2018.

This motion to dismiss relies on the plain Federal statutory requirements of Title IV of the Social Security Act binding the Rhode Island Plaintiffs, binding the State Plan, binding the limited jurisdiction Family Court, and binding the Witness Rhode Island Executive Office of Health and Human Services.

The Defendant reserves the right to raise all other multiple jurisdiction defect and nullity issues at the appropriate time in accordance with all applicable the laws of civil

procedure governing federal questions of the Title IV Program, the Commerce Clause and jurisdiction over the falsification of Title IV records certified to Texas and to the United States, among others.

The Defendant respectfully requests that the Court issues a written opinion stating the Court's reasoning.

If the Court wishes to hold a hearing on the matter, the Defendant respectfully requests the Court give priority to and settles the threshold jurisdiction challenge, in accordance with the law.

## I.  Lack of Jurisdiction under 42 U.S.C. sec. 654

Congress enacted and offered the State of Rhode Island along with all states in the Union participation in Title IV of the Social Security Act attaching conditions to states' participation under the **Commerce Clause** and **Spending Clause** of the United States Constitution.  The conditional requirements mandate that participating States must amend their respective state constitutions to comply with Congressional amendments to 42 U.S.C. sec. 654.  See, e.g., STATUTORY NOTES AND RELATED SUBSIDIARIES, Effective Date of 1996 Amendment, "(b) **GRACE PERIOD FOR STATE LAW CHANGES**.-The provisions of this title shall become effective with respect to a State on the later of- "(1) the date specified in this title, or "(2) the effective date of laws enacted by the legislature of such State implementing such provisions, but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2- year legislative session, each year of such session shall be deemed to be a

separate regular session of the State legislature. "**(c) GRACE PERIOD FOR STATE CONSTITUTIONAL AMENDMENT**.-A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of- "(1) 1 year after the effective date of the necessary State constitutional amendment; or "(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]." *See also*, Amendments for 1996 Par. (21)(A). Pub. L. 104−193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent." Therefore, it is abundantly and explicitly clear that as of the 1996 Amendment to 42 U.S.C. sec. 654 legislating penalties for state noncompliance, Congress explicitly required participating states like Rhode Island to amend its state constitution for compliance with 42 U.S.C. sec. 654. Therefore, Congress explicitly mandates that **Rhode Island general laws that are out of compliance with 42 U.S.C. sec. 654(21)(A)** that was moreover highlighted in the statutory notes for the Amendments in 1996, are **<u>required</u>** to be changed. See **<u>Exhibit A</u>**. **The United States Congress publication of 42 U.S.C. sec. 654**.

Therefore, it is firmly and unequivocally established that **Rhode Island's R.I. Gen. Laws § 15-5-16.5 that legislates 12% compound interest** on overdue support is **out of compliance**. **The plain statutory text of 42 U.S.C. sec. 654(21)(A) states 3 to 6 percent** and requires the State to set a **<u>uniform</u>** rate for all, not 12% compound interest in intrastate cases but 0% by policy in interstate cases, complicated by setting yet another category of 12% compound interest in targeted interstate cases, such as TEXAS Defendant's interstate case. The fact that Rhode Island certifies that its State laws, such as R.I.

Gen. Laws § 15-5-16.5, are in compliance with 42 U.S.C. sec. 654(21)(A) shows *prima facie* false certification, and the grace period for the change of law expired in August 1996, 28 years ago.  See **Exhibit B**. **R.I. Gen. Laws § 15-5-16.**5.

Per the Rhode Island State Government publication of the History of Section for R.I. Gen. Laws § 15-5-16.5, the Rhode Island General Assembly Public Legislature actually amended and reviewed R.I. Gen. Laws § 15-5-16.5in 2001, showing the Public the knowing noncompliance by the Rhode Island General Assembly.  *See*, "History of Section. P.L. 1980, ch. 308, § 1; P.L. 1984, ch. 167, § 1; P.L. 2001, ch. 155, § 1."

Therefore, the limited jurisdiction court lacks jurisdiction to preempt 42 U.S.C. sec. 654, when 42 U.S.C. sec. 654 plainly requires unequivocally that "the State is required to so comply by amending the State constitution."

## II.    Family Court is a court of Limited Jurisdiction created under RIGL 8-10-3 and Rhode Island, Having Participated in Title IV, lacks jurisdiction to preempt 42 U.S.C. sec. 654

Moreover, Rhode Island state family court is a court of limited jurisdiction created by the General Assembly under **RIGL 8-10-3**.  See, **Exhibit C**.  Plainly, the limited jurisdiction conferred to the state family court lacks the authority to preempt 42 U.S.C. sec. 654.  When the judge violates federal law or aids in the violation of federal criminal laws, the judge has no immunity.  See section below entitled "No Immunity."

For example, RIGL 8-10-3 plainly confers the limited jurisdiction family court the authority to hear motions on support establishment and enforcement, but does NOT

confer the family court the authority to preempt 42 U.S.C. sec. 654. Indeed the statutory terms in the Statutory Notes Section and the language of 42 U.S.C. sec. 654 plainly conditions Title IV preemption of State constitutions for State acceptance of participation. The Defendant reserves all rights to raise the other multiple other jurisdictional defects as they apply to this matter, but the basic jurisdictional threshold regarding the authority to preempt 42 U.S.C. sec. 654(21)(A) must fundamentally be met – and this court lacks jurisdiction.

The clearly established lack of authority of this court to preempt 42 U.S.C. sec. 654 leads the court to address the question of the court's lack of jurisdiction over the Rhode Island Office of Child Support's written policy, "**It is desirable for RI OCSS to prohibit the charging of interest in Interstate Cases**." See **Exhibit D**, Rhode Island Office of Child Support Services Written Policy stating, "**It is desirable for RI OCSS to prohibit the charging of interest in Interstate Cases**."

III. **RI OCSS Policy that States "It is desirable for RI OCSS to prohibit the charging of interest in Interstate Cases" – This Court lacks jurisdiction over the Policy and lacks jurisdiction hear legal actions at law regarding the effect and the motive behind establishing this policy**

A plain reading of RIGL 8-10-3 concludes that the limited jurisdiction family court lacks jurisdiction over the RI OCSS Policy attached Exhibit D that states, ""**It is desirable for RI OCSS to prohibit the charging of interest in Interstate Cases**." The Policy goes on to state regarding operations of the automated data processing system, "Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest." Additionally the

Policy states, "Two reports will be created.  The first will detail the interstate cases for which a support order….. for which one or more interest adjustment were created."  For the purposes of this motion, it suffices to raise that it is documented unequivocally the Office of Child Support Services creates multiple books of account reports for the completely un-uniform interest rates applied to support cases and that routinely "one or more interest adjustment were created" – 42 U.S.C. sec. 654 emphatically forbids all the policy practices enumerated in the Policy and the egregious issue of certifying a support record under 42 U.S.C. sec. 666(14), for example, that involves one or more interest adjustments and "two reports will be created" as it relates to compliance with 42 U.S.C. sec. 654 *et al* is a matter over which this court plainly lacks jurisdiction.

Applying the aforesaid RI OCSS Policy to this court's order dated September 25, 2012 that allegedly "established interest" in this interstate Title IV case, that this court also judicially noticed on February 2, 2024, the court **must scrutinize** the September 25, 2012 Order prepared by RI OCSS and signed and entered by Judge John McCann III that is challenged.

### IV.    This Court Lacks Jurisdiction Over any Legal Action in Law Regarding the Violation of 42 U.S.C. sec. 654 By This Court

Subsequent to the review of the Title IV-D **TRAC** records selectively only produced by RI OCSS for December 2021 to April 2022 (see **Exhibit F**) (and the aforesaid RI OCSS Policy), the TEXAS Defendant filed legal actions in law in Federal courts that have jurisdiction over the Federal question and Federal matters in this interstate case.  Furthermore, subsequent to Defendant raising in court at the WebEx hearing in this matter scheduled on October 18, 2023 that Defendant is denied access to

her own case records by the Rhode Island Rules and Practice 5 denying the public and

pro se litigants remote access to court information (except the docket), the Defendant

was emailed a copy of the September 25, 2012 court order allegedly establishing 12%

compound interest between December 2023 and January 2024, the delayed access

(Defendant has been denied access to information regarding the court orders and the

ordered interest since November 2021 to January 2023) of which is already <u>egregiously</u>

<u>outrageous</u> and the delay itself constituted countless multiple penalty-incurring

compliance failure violations.

For the purpose of this motion, a strict scrutiny of the First Amendment access-

denied September 25, 2012 order is plainly required.

On a Rhode Island Office of Child Support presented order by Deputy Chief

Counsel Priscilla Glucksman, in this interstate non-welfare Title IV-D case, in which

Plaintiff Gero Plaintiff (who is additionally represented by his own private attorney

Barbara E. Grady, whose husband and law firm partner Paul Dugan was formerly

Deputy Chief Legal Counsel for RI OCSS) paid RI OCSS under 42 U.S.C. sec. 654 a

whopping $25 application fee that acquired for him the entire suite of full and complete

individualized customized and dedicated child support interest establishment and

enforcement legal services involving at least seven (7) Deputy Chief Legal Counsels and

Chief Legal Counsel (e.g., 1. Priscilla Glucksman, 2. Kevin Tighe, 3. Frank DiBiaise, 4.

Paul Gould, 5. John Langlois, 6. Lisa Pinnsonneault, 7. Carl Beauregard) from 2010 to

the present from RI OCSS, Item 4 of the September 25, 2024 Order states, "The State's

Oral request to clarifying whether or not interest was to run o n the child support and

medical arrears as found in the May 24, 2012 court order is addressed.  Interest will continue to run on the money due."

It is plainly explicit that 12% compound interest rate is not expressly provided in the text of the order.

It is plainly explicit that 42 U.S.C. sec. 654(21)(A) preempts RIGL 15-16-15.5.

It is plainly explicit that the RI OCSS Policy states RI OCSS is prohibit from charging interest in interstate cases, meaning in interstate cases, the interest is 0%.

It is plainly explicit that the plain statutory text of 42 U.S.C. sec. 654(21)(A) requires that the State must set uniform interest and if the State opts to set interest, it **must** be "**no less than 3 percent and no more than 6 percent**."

**Accordingly, this court has jurisdiction to set the only lawful rate set by State Policy as stated in the RI OCSS Policy, which is zero percent (0%), uniformly, be it interstate or intrastate, given the plain statutory text of 42 U.S.C. sec. 654(21)(A).**

The TEXAS Defendant explicitly requests respectfully that this Court take judicial notice of the fact that the Rhode Island Office of Child Support claims multiple times under Oath that, although the September 25, 2012 Order plainly omits the percent being charged for overdue support, Judge McCann ordered 12% compound interest that he knew or should have known, be it interstate or intrastate, is unlawful under 42 U.S.C. sec. 654 and preempted by the plain statutory language of 42 U.S.C. sec. 654(21)(A).

Based on the aforesaid obvious effect of ordering 12% compound interest, Judge John McCann III knew or should have known that "two reports" will be created in the

automated data processing system and the resulting removal of the interest amount from the automated system resulting in Rhode Island certifying "no interest" when sending to Texas and to Federal authorities for enforcement under 42 U.S.C. sec. 666(14). Judge McCann's knowing aiding in the false certification of Title IV records via wire and via Mail interstate to Texas and to the United States plainly violates Federal criminal law. **The judge had a legal duty to obey the criminal laws.**

### V.    Any Order Now Re-Establishing 12% Compound Interest Simply Results in the Creation of "zero interest" in Certifications to Texas under 42 U.S.C. sec. 666(14)

Enforceability of any order now re-establishing 12% compound interest simply results in the creation of "zero interest" in enforcement certifications to Texas under 42 U.S.C. sec. 666(14). With the child emancipated since 2018, the Office of Child Support Services claiming in the TRAC Record it certified to TEXAS child support amount due with ZERO INTEREST also in 2018, and the fact that principle was paid off by the Defendant three years ago in December 2021 per representations by the Office of Child Support Services, the Court lacks jurisdiction to establish or modify or re-set or set arrears or whatever legal moniker that essentially dresses up organized fraud based on this set of circumstances raised herein in this motion alone.

The fact that the Office of Child Support Services filed a motion before this court to set interest "arrears" in January 2023 a year after Defendant paid off the principle in December 2021 reeks of fraud. If lawful and legitimate interest is actually due, logic dictates the State's support enforcement political subdivision under 42 U.S.C. sec. 654(3) simply enforces it without necessitating this court to "set interest arrears." This

court's addressment of this issue was punting it from Magistrate Monaco to Judge Merola to Magistrate Nahabedian who showed her colors by stating on the record affirming that the Rhode Island judiciary orders 12% compound interest that it knows is preempted by 42 U.S.C. sec. 654, thereby necessitating the aforesaid RI OCSS Policy "it is **desirable** for RI OCSS to prohibit the charging of interest in interstate cases." Why? Because it is plain under 42 U.S.C. 654 that Rhode Island's "effective enforcement" of interest in interstate cases may necessitate certifying to another state, like to TEXAS, an "interest-removed-from-the-system" consisting of zero interest, to better keep track of their several "reports" that "will be created." In other words, the no interest in interstate cases policy better helps to keep RI OCSS's lies and fraud straight.

Although Defendant reserves the right to fully raise the issue of fraud by the certain symbiotic judges and by RI OCSS at the right time, Defendant raises the fact that t**he judge has a legal duty to obey the criminal laws. Obviously RI OCSS has a legal duty to obey criminal laws.**

### VI.    Statutory and Federal Authority

Certainly, among others, in order to avoid yet another penalty-incurring violation of 42 U.S.C. sec. 654, the court must dismiss for lack of jurisdiction and close the case.

Congress prescribed both civil and criminal penalties for violations of Title IV of the Social Security Act. Firstly, consistent with its **Spending Power**, Congress has the authority to attach conditions on the receipt of federal funds. *See **South Dakota v. Dole***, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See

42 U.S.C. §§ 654(10), (14), (15), (16), (20), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See **Sullivan v. Stroop***, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."  The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." ***Hodges v. Shalala***, 121 F.2d at 879.  Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1]

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina paid $75 million as of 2009 and was set to pay another $10 million for 2010.  South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
    Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the

Congress also enacted several criminal codes punishing actors, such as the Plaintiffs, who commit federal crimes, including cover up of unlawful activities.

The federal government has a longstanding involvement in child support enforcement programs. See ***Hodges v. Shalala***, 121 F.Supp.2d 854 (D.S.C. 2000). As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements under 42 U.S.C. sec. 654(21)(A) that the State, at the option of the State, impose a late payment fee ('interest") on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A), among others

While Rhode Island submits to the United States that it has a federally certifiable statewide automated data processing system for child support, Office of Child Support Services produced APRA Public Records consisting of Title IV Public Records showing Rhode Island taking off from the automated data processing system tens of thousands of dollars allegedly representing the 42 U.S.C. sec. 654(21)(A) prohibited 12% compound

---

automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

interest late payment fee "interest" prior to certifying to TEXAS and the United States, and showing Rhode Island falsely certified to the amount's accuracy under 42 U.S.C. sec. 666(14) when in fact Rhode Island removed significant tens of thousands of dollars (See TRAC records in attached Exhibit).

The Title IV-D statute expressly provides that compliance with ALL 42 U.S.C. 654 requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A.

Again, the clear and unequivocal statement of the required conditions in the statute enabled South Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted).  The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop,* 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."

Emphatically, Congress may use its **Spending Power** to **influence** a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, **but** Congress, under the ==**Commerce Clause**, **may offer the States a choice of regulation under federal control or preemption under federal regulation**. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc*==., 452 U.S. 264, 288 (1981).  It is crystal clear that upon Rhode Island's State Plan entering into agreement with the United States under the ==**Commerce Clause**==, Rhode Island accepted the agreement terms of

regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

*See* United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUS
C-prelim-title42-
section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRp
b25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

## A. VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Defendant made known to the panel of judges of the United States allegations contained in the Amended Complaint filed in Federal Court of the commission of acts by the Rhode Island political subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein in this motion, the afore-described acts violating 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968  – such violative acts by the Plaintiffs in this matter, along with the political subdivisions and employees thereof named in the federal matter on this list are not exhaustive.  It is undisputable, among others, that

Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-D and Title IV-A disgorgement is due from the applicable State of Rhode Island's Title IV political subdivisions.

## B. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF AMERICA v. DONALD J. TRUMP*, DC Circuit, the DC Circuit United States Court of Appeals reminds the Public and all applicable tribunals that Judges are similarly liable to the criminal laws for their official acts.  A notable example is *Ex parte Commonwealth of Virginia*, in which the Supreme Court affirmed the criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for violating a federal statute that prohibited discriminating on the basis of race in jury selection. *Id.* at 340, 344. The Supreme Court began by observing the principle that officers are bound to follow the law: "We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the holder from obligation to obey the Constitution of the United States, or take away the power of Congress to punish his disobedience." *Id.* at 348. The Court then addressed the judge's argument that the Court lacked the authority to punish a state judge for "his official acts." *Id*. Its response was twofold. First, the Court described juror selection as "merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads." *Id*. The Court then explained that even if juror selection is considered a "judicial act," the judge had a legal duty to obey the criminal laws:

"But if the selection of jurors could be considered

> in any case a judicial act, can the act charged
> against the petitioner be considered such when
> he acted outside of his authority and in direct
> violation of the spirit of the State statute? That
> statute gave him no authority, when selecting
> jurors, from whom a panel might be drawn for
> a circuit court, to exclude all colored men
> merely because they were colored. Such an
> exclusion was not left within the limits of his
> discretion. It is idle, therefore, to say that the
> act of Congress is unconstitutional because it
> inflicts penalties upon State judges for their
> judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

> *[W]e have never held that the performance of*
> *the duties of judicial, legislative, or executive*

> *officers, requires or contemplates the*
> *immunization of otherwise criminal deprivation*
> *of constitutional rights. On the contrary, the*
> *judicially fashioned doctrine of official*
> *immunity does not reach 'so far as to immunize*
> *criminal conduct proscribed by an Act of*
> *Congress . . . .'*

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id*. at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See* also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of

bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not immune, and employees of the political subdivisions of Rhode Island under 42 USC 654(1) similarly are not immune.  Barbara Grady and Gero Meyersiek are unquestionably liable.

### VII.   CONCLUSION

**Under 42 USC sec. 654 this court only has jurisdiction to set the only lawful rate set by State, articulated in writing in the State's Policy as stated in the RI OCSS Policy, which is zero percent (0%), uniformly, be it interstate or intrastate, given the plain statutory text of 42 U.S.C. sec. 654(21)(A).  Defendant paid off the principle in full as of December 7, 2021.  This Court must dismiss for lack of jurisdiction and close the case.**

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or designee-Judge Merola of this Honorable Court to:

1. Grant Defendant's Motion to Dismiss for Lack of Jurisdiction and Close the Case.

2. Order the Title IV case closed.

3. Order appropriate sanctions against Rhode Island Office of Child Support Services and Plaintiff, for *among others* fraud on the court, including ordering referral of the matters raised herein to the Office of Inspector General, both state and federal.

4. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request.

5. Declare that Defendant's child support file maintained by the Rhode Island Office of Child Support Services under the supervision of RI EOHHS must be produced to the Defendant Noncustodial Parent upon request.

6. Issue a written decision on the Court's decision.

7. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here:

   https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

8. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

March 27, 2024

FOR DEFENDANT

MARY SEGUIN, Pro Se.

By: _Mary Seguin_

Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

## NOTICE OF HEARING

Please take notice that if necessary, the foregoing Emergency Motion to Dismiss for Lack of Jurisdiction and Close the Case will be called for hearing on a priority basis to determine the threshold jurisdiction challenge before the Rhode Island Family Court, One Dorrance Plaza, Providence, RI 02903 at 10:00 AM on March 28, 2024 (case is already scheduled for that date/time) by WebEx hearing https://ricourts.webex.com/meet/garrahy5F

## CERTIFICATION

I hereby certify that a copy of the within Emergency Motion was filed on March 27, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

_Mary Seguin_

Exhibit A

> **42 USC 654: State plan for child and spousal support**
> Text contains those laws in effect on March 25, 2024
>
> **From Title 42-THE PUBLIC HEALTH AND WELFARE**
> > CHAPTER 7-SOCIAL SECURITY
> > SUBCHAPTER IV-GRANTS TO STATES FOR AID AND SERVICES TO NEEDY FAMILIES WITH
> > CHILDREN AND FOR CHILD-WELFARE SERVICES
> > Part D-Child Support and Establishment of Paternity
> **Jump To:**
> > **Source Credit**
> > **Miscellaneous**
> > **References In Text**
> > **Codification**
> > **Amendments**
> > **Effective Date**

# §654. State plan for child and spousal support

A State plan for child and spousal support must-

(1) provide that it shall be in effect in all political subdivisions of the State;

(2) provide for financial participation by the State;

(3) provide for the establishment or designation of a single and separate organizational unit, which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan;

(4) provide that the State will-

(A) provide services relating to the establishment of paternity or the establishment, modification, or enforcement of child support obligations, as appropriate, under the plan with respect to-

(i) each child for whom (I) assistance is provided under the State program funded under part A of this subchapter, (II) benefits or services for foster care maintenance are provided under the State program funded under part E of this subchapter, (III) medical assistance is provided under the State plan approved under subchapter XIX, or (IV) cooperation is required pursuant to section 2015(l)(1) of title 7, unless, in accordance with paragraph (29), good cause or other exceptions exist;

(ii) any other child, if an individual applies for such services with respect to the child (except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application); and

(B) enforce any support obligation established with respect to-

(i) a child with respect to whom the State provides services under the plan; or

(ii) the custodial parent of such a child;

(5) provide that (A) in any case in which support payments are collected for an individual with respect to whom an assignment pursuant to section 608(a)(3) of this title is effective, such payments shall be made to the State for distribution pursuant to section 657 of this title and shall not be paid directly to the family, and the individual will be notified on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden) of the amount of the support payments collected, and (B) in any case in which support payments are collected for an individual pursuant to the assignment made under section 1396k of this title, such payments shall be made to the State for distribution pursuant to section 1396k of this title, except that this clause shall not apply to such payments for any month after the month

in which the individual ceases to be eligible for medical assistance;

(6) provide that-

(A) services under the plan shall be made available to residents of other States on the same terms as to residents of the State submitting the plan;

(B)(i) an application fee for furnishing such services shall be imposed on an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section 2015 of title 7, and shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (I) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (II) may vary among such individuals on the basis of ability to pay (as determined by the State); and

(ii) in the case of an individual who has never received assistance under a State program funded under part A and for whom the State has collected at least $550 of support, the State shall impose an annual fee of $35 for each case in which services are furnished, which shall be retained by the State from support collected on behalf of the individual (but not from the first $550 so collected), paid by the individual applying for the services, recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and the fees shall be considered income to the program);

(C) a fee of not more than $25 may be imposed in any case where the State requests the Secretary of the Treasury to withhold past-due support owed to or on behalf of such individual from a tax refund pursuant to section 664(a)(2) of this title;

(D) a fee (in accordance with regulations of the Secretary) for performing genetic tests may be imposed on any individual who is not a recipient of assistance under a State program funded under part A; and

(E) any costs in excess of the fees so imposed may be collected-

(i) from the parent who owes the child or spousal support obligation involved; or

(ii) at the option of the State, from the individual to whom such services are made available, but only if such State has in effect a procedure whereby all persons in such State having authority to order child or spousal support are informed that such costs are to be collected from the individual to whom such services were made available;


(7) provide for entering into cooperative arrangements with appropriate courts and law enforcement officials and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering the plan, including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;

(8) provide that, for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title the agency administering the plan will establish a service to locate parents utilizing-

(A) all sources of information and available records; and

(B) the Federal Parent Locator Service established under section 653 of this title,


and shall, subject to the privacy safeguards required under paragraph (26), disclose only the information described in sections 653 and 663 of this title to the authorized persons specified in such sections for the purposes specified in such sections;

(9) provide that the State will, in accordance with standards prescribed by the Secretary, cooperate with any other State-

(A) in establishing paternity, if necessary;

(B) in locating a noncustodial parent residing in the State (whether or not permanently) against

whom any action is being taken under a program established under a plan approved under this part in another State;

(C) in securing compliance by a noncustodial parent residing in such State (whether or not permanently) with an order issued by a court of competent jurisdiction against such parent for the support and maintenance of the child or children or the parent of such child or children with respect to whom aid is being provided under the plan of such other State;

(D) in carrying out other functions required under a plan approved under this part; and

(E) not later than March 1, 1997, in using the forms promulgated pursuant to section 652(a)(11) of this title for income withholding, imposition of liens, and issuance of administrative subpoenas in interstate child support cases;

(10) provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;

(11)(A) provide that amounts collected as support shall be distributed as provided in section 657 of this title; and

(B) provide that any payment required to be made under section 656 or 657 of this title to a family shall be made to the resident parent, legal guardian, or caretaker relative having custody of or responsibility for the child or children;

(12) provide for the establishment of procedures to require the State to provide individuals who are applying for or receiving services under the State plan, or who are parties to cases in which services are being provided under the State plan-

(A) with notice of all proceedings in which support obligations might be established or modified; and

(B) with a copy of any order establishing or modifying a child support obligation, or (in the case of a petition for modification) a notice of determination that there should be no change in the amount of the child support award, within 14 days after issuance of such order or determination;

(13) provide that the State will comply with such other requirements and standards as the Secretary determines to be necessary to the establishment of an effective program for locating noncustodial parents, establishing paternity, obtaining support orders, and collecting support payments and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan;

(14)(A) comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

(B) maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them to conceal in the accounting records the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

(15) provide for-

(A) a process for annual reviews of and reports to the Secretary on the State program operated under the State plan approved under this part, including such information as may be necessary to measure State compliance with Federal requirements for expedited procedures, using such standards and procedures as are required by the Secretary, under which the State agency will determine the extent to which the program is operated in compliance with this part; and

(B) a process of extracting from the automated data processing system required by paragraph (16) and transmitting to the Secretary data and calculations concerning the levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 652(g) and 658a of this title;

(16) provide for the establishment and operation by the State agency, in accordance with an (initial and annually updated) advance automated data processing planning document approved under section 652(d) of this title, of a statewide automated data processing and information retrieval system meeting the requirements of section 654a of this title designed effectively and efficiently to assist management in

the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan;

(17) provide that the State will have in effect an agreement with the Secretary entered into pursuant to section 663 of this title for the use of the Parent Locator Service established under section 653 of this title, and provide that the State will accept and transmit to the Secretary requests for information authorized under the provisions of the agreement to be furnished to such Service to authorized persons, will impose and collect (in accordance with regulations of the Secretary) a fee sufficient to cover the costs to the State and to the Secretary incurred by reason of such requests, will transmit to the Secretary from time to time (in accordance with such regulations) so much of the fees collected as are attributable to such costs to the Secretary so incurred, and during the period that such agreement is in effect will otherwise comply with such agreement and regulations of the Secretary with respect thereto;

(18) provide that the State has in effect procedures necessary to obtain payment of past-due support from overpayments made to the Secretary of the Treasury as set forth in section 664 of this title, and take all steps necessary to implement and utilize such procedures;

(19) provide that the agency administering the plan-

(A) shall determine on a periodic basis, from information supplied pursuant to section 508 of the Unemployment Compensation Amendments of 1976, whether any individuals receiving compensation under the State's unemployment compensation law (including amounts payable pursuant to any agreement under any Federal unemployment compensation law) owe child support obligations which are being enforced by such agency; and

(B) shall enforce any such child support obligations which are owed by such an individual but are not being met-

(i) through an agreement with such individual to have specified amounts withheld from compensation otherwise payable to such individual and by submitting a copy of any such agreement to the State agency administering the unemployment compensation law; or

(ii) in the absence of such an agreement, by bringing legal process (as defined in section 659(i)(5) of this title) to require the withholding of amounts from such compensation;


(20) provide, to the extent required by section 666 of this title, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws;

(21)(A) at the option of the State, impose a late payment fee on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; and

(B) assure that the fee will be collected in addition to, and only after full payment of, the overdue support, and that the imposition of the late payment fee shall not directly or indirectly result in a decrease in the amount of the support which is paid to the child (or spouse) to whom, or on whose behalf, it is owed;

(22) in order for the State to be eligible to receive any incentive payments under section 658a of this title, provide that, if one or more political subdivisions of the State participate in the costs of carrying out activities under the State plan during any period, each such subdivision shall be entitled to receive an appropriate share (as determined by the State) of any such incentive payments made to the State for such period, taking into account the efficiency and effectiveness of the activities carried out under the State plan by such political subdivision;

(23) provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services and a telephone number or postal address at which further information may be obtained and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate;

(24) provide that the State will have in effect an automated data processing and information retrieval system-

(A) by October 1, 1997, which meets all requirements of this part which were enacted on or before October 13, 1988; and

(B) by October 1, 2000, which meets all requirements of this part enacted on or before August 22, 1996, except that such deadline shall be extended by 1 day for each day (if any) by which the Secretary fails to meet the deadline imposed by section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996;

(25) provide that if a family with respect to which services are provided under the plan ceases to receive assistance under the State program funded under part A, the State shall provide appropriate notice to the family and continue to provide such services, subject to the same conditions and on the same basis as in the case of other individuals to whom services are furnished under the plan, except that an application or other request to continue services shall not be required of such a family and paragraph (6)(B) shall not apply to the family;

(26) have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the parties, including-

(A) safeguards against unauthorized use or disclosure of information relating to proceedings or actions to establish paternity, or to establish, modify, or enforce support, or to make or enforce a child custody determination;

(B) prohibitions against the release of information on the whereabouts of 1 party or the child to another party against whom a protective order with respect to the former party or the child has been entered;

(C) prohibitions against the release of information on the whereabouts of 1 party or the child to another person if the State has reason to believe that the release of the information to that person may result in physical or emotional harm to the party or the child;

(D) in cases in which the prohibitions under subparagraphs (B) and (C) apply, the requirement to notify the Secretary, for purposes of section 653(b)(2) of this title, that the State has reasonable evidence of domestic violence or child abuse against a party or the child and that the disclosure of such information could be harmful to the party or the child; and

(E) procedures providing that when the Secretary discloses information about a parent or child to a State court or an agent of a State court described in section 653(c)(2) or 663(d)(2)(B) of this title, and advises that court or agent that the Secretary has been notified that there is reasonable evidence of domestic violence or child abuse pursuant to section 653(b)(2) of this title, the court shall determine whether disclosure to any other person of information received from the Secretary could be harmful to the parent or child and, if the court determines that disclosure to any other person could be harmful, the court and its agents shall not make any such disclosure;

(27) provide that, on and after October 1, 1998, the State agency will-

(A) operate a State disbursement unit in accordance with section 654b of this title; and

(B) have sufficient State staff (consisting of State employees) and (at State option) contractors reporting directly to the State agency to-

(i) monitor and enforce support collections through the unit in cases being enforced by the State pursuant to paragraph (4) (including carrying out the automated data processing responsibilities described in section 654a(g) of this title); and

(ii) take the actions described in section 666(c)(1) of this title in appropriate cases;

(28) provide that, on and after October 1, 1997, the State will operate a State Directory of New Hires in accordance with section 653a of this title;

(29) provide that the State agency responsible for administering the State plan-

(A) shall make the determination (and redetermination at appropriate intervals) as to whether an individual who has applied for or is receiving assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, is cooperating in good faith with the State in establishing the paternity of, or in establishing, modifying, or enforcing a support order for, any child of the individual by providing the State agency with the name of, and such other information as the State agency may require with respect to, the noncustodial parent of the child, subject to good cause and other exceptions which-

(i) in the case of the State program funded under part A, the State program under part E, or the State program under subchapter XIX shall, at the option of the State, be defined, taking into account the best interests of the child, and applied in each case, by the State agency administering such program; and

(ii) in the case of the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, shall be defined and applied in each case under that program in accordance with section 2015(l)(2) of title 7;

(B) shall require the individual to supply additional necessary information and appear at interviews, hearings, and legal proceedings;

(C) shall require the individual and the child to submit to genetic tests pursuant to judicial or administrative order;

(D) may request that the individual sign a voluntary acknowledgment of paternity, after notice of the rights and consequences of such an acknowledgment, but may not require the individual to sign an acknowledgment or otherwise relinquish the right to genetic tests as a condition of cooperation and eligibility for assistance under the State program funded under part A, the State program under part E, the State program under subchapter XIX, or the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7; and

(E) shall promptly notify the individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the supplemental nutrition assistance program, as defined under section 2012(l) [1] of title 7, of each such determination, and if noncooperation is determined, the basis therefor;

(30) provide that the State shall use the definitions established under section 652(a)(5) of this title in collecting and reporting information as required under this part;

(31) provide that the State agency will have in effect a procedure for certifying to the Secretary, for purposes of the procedure under section 652(k) of this title, determinations that individuals owe arrearages of child support in an amount exceeding $2,500, under which procedure-

(A) each individual concerned is afforded notice of such determination and the consequences thereof, and an opportunity to contest the determination; and

(B) the certification by the State agency is furnished to the Secretary in such format, and accompanied by such supporting documentation, as the Secretary may require;

(32)(A) provide that any request for services under this part by a foreign reciprocating country, a foreign treaty country, or a foreign country with which the State has an arrangement described in section 659a(d) of this title shall be treated as a request by a State;

(B) provide, at State option, notwithstanding paragraph (4) or any other provision of this part, for services under the plan for enforcement of a spousal support order not described in paragraph (4)(B) entered by such a country (or subdivision); and

(C) provide that no applications will be required from, and no costs will be assessed for such services against, the foreign reciprocating country, foreign treaty country, or foreign individual (but costs may at State option be assessed against the obligor);

(33) provide that a State that receives funding pursuant to section 628 of this title and that has within its borders Indian country (as defined in section 1151 of title 18) may enter into cooperative agreements with an Indian tribe or tribal organization (as defined in subsections (e) and (l) of section 5304 of title 25), if the Indian tribe or tribal organization demonstrates that such tribe or organization has an established tribal court system or a Court of Indian Offenses with the authority to establish paternity, establish, modify, or enforce support orders, or to enter support orders in accordance with child support guidelines established or adopted by such tribe or organization, under which the State and tribe or organization shall provide for the cooperative delivery of child support enforcement services in Indian country and for the forwarding of all collections pursuant to the functions performed by the tribe or organization to the State agency, or conversely, by the State agency to the tribe or organization, which shall distribute such collections in

accordance with such agreement; and

(34) include an election by the State to apply section 657(a)(2)(B) of this title or former section 657(a)(2)(B) of this title (as in effect for the State immediately before the date this paragraph first applies to the State) to the distribution of the amounts which are the subject of such sections and, for so long as the State elects to so apply such former section, the amendments made by subsection (b)(1) of section 7301 of the Deficit Reduction Act of 2005 shall not apply with respect to the State, notwithstanding subsection (e) of such section 7301.

The State may allow the jurisdiction which makes the collection involved to retain any application fee under paragraph (6)(B) or any late payment fee under paragraph (21). Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25.

(Aug. 14, 1935, ch. 531, title IV, §454, as added Pub. L. 93–647, §101(a), Jan. 4, 1975, 88 Stat. 2354 ; amended Pub. L. 94–88, title II, §208(b), (c), Aug. 9, 1975, 89 Stat. 436 ; Pub. L. 95–30, title V, §502(a), May 23, 1977, 91 Stat. 162 ; Pub. L. 96–265, title IV, §405(b), June 9, 1980, 94 Stat. 463 ; Pub. L. 96–611, §9(a), Dec. 28, 1980, 94 Stat. 3571 ; Pub. L. 97–35, title XXIII, §§2331(b), 2332(d), 2333(a), (b), 2335(a), Aug. 13, 1981, 95 Stat. 860 , 862, 863; Pub. L. 97–248, title I, §§171(a), (b)(1), 173(a), Sept. 3, 1982, 96 Stat. 401 , 403; Pub. L. 98–369, div. B, title VI, §2663(c)(14), (j)(2)(B)(x), July 18, 1984, 98 Stat. 1166 , 1170; Pub. L. 98–378, §§3(a), (c)–(f), 5(b), 6(a), 11(b)(1), 12(a), (b), 14(a), 21(d), Aug. 16, 1984, 98 Stat. 1306 , 1310, 1311, 1314, 1318, 1319, 1320, 1324; Pub. L. 100–203, title IX, §§9141a(2), 9142(a), Dec. 22, 1987, 101 Stat. 1330–321 ; Pub. L. 100–485, title I, §§104(a), 111(c), 123(a), (d), Oct. 13, 1988, 102 Stat. 2348 , 2349, 2352, 2353; Pub. L. 104–35, §1(a), Oct. 12, 1995, 109 Stat. 294 ; Pub. L. 104–193, title I, §108(c)(11), (12), title III, §§301(a), (b), 302(b)(2), 303(a), 304(a), 312(a), 313(a), 316(g)(1), 324(b), 332, 333, 342(a), 343(b), 344(a)(1), (4), 370(a)(2), 371(b), 375(a), (c), 395(d)(1)(D), (2)(B), Aug. 22, 1996, 110 Stat. 2166 , 2199, 2204, 2205, 2207, 2209, 2218, 2223, 2230, 2233, 2234, 2236, 2252, 2254, 2256, 2259, 2260; Pub. L. 105–33, title V, §§5531(a), 5542(c), 5545, 5546(a), 5548, 5552, 5556(b), Aug. 5, 1997, 111 Stat. 625 , 631, 633, 635, 637; Pub. L. 106–169, title IV, §401(g), (h), Dec. 14, 1999, 113 Stat. 1858 ; Pub. L. 109–171, title VII, §§7301(b)(1)(C), 7303(b), 7310(a), Feb. 8, 2006, 120 Stat. 143 , 145, 147; Pub. L. 110–234, title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), May 22, 2008, 122 Stat. 1095–1097 , 1110; Pub. L. 110–246, §4(a), title IV, §§4002(b)(1)(A), (B), (2)(V), 4115(c)(2)(H), June 18, 2008, 122 Stat. 1664 , 1857, 1858, 1871; Pub. L. 113–79, title IV, §4030(v), Feb. 7, 2014, 128 Stat. 815 ; Pub. L. 113–183, title III, §301(c), Sept. 29, 2014, 128 Stat. 1943 ; Pub. L. 115–123, div. E, title XII, §53117(a), Feb. 9, 2018, 132 Stat. 307 .)

<div align="center">Editorial Notes</div>

<div align="center">References in Text</div>

Section 508 of the Unemployment Compensation Amendments of 1976, referred to in par. (19), is section 508 of Pub. L. 94–566, Oct. 20, 1976, 90 Stat. 2689 , which enacted section 603a of this title and amended section 49b of Title 29, Labor.

Section 344(a)(3) of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, referred to in par. (24), is section 344(a)(3) of Pub. L. 104–193, which is set out as a Regulations note under section 654a of this title.

Section 2012(l) of title 7, referred to in par. (29), was struck out, and a new section 2012(t) of title 7 similarly defining "supplemental nutrition assistance program" was enacted, by Pub. L. 113–79, title IV, §4030(a)(3), (5), Feb. 7, 2014, 128 Stat. 813 .

Section 7301 of the Deficit Reduction Act of 2005, referred to in par. (34), is section 7301 of Pub. L. 109–171, title VII, Feb. 8, 2006, 120 Stat. 141 . Subsec. (b)(1) of section 7301 of Pub. L. 109–171 amended this section and section 657 of this title. Subsec. (e) of section 7301 of Pub. L. 109–171 is set out as an Effective Date of 2006 Amendment note under section 608 of this title.

## CODIFICATION

Pub. L. 110–234 and Pub. L. 110–246 made identical amendments to this section. The amendments by Pub. L. 110–234 were repealed by section 4(a) of Pub. L. 110–246.

## AMENDMENTS

**2018**-Par. (6)(B)(ii). Pub. L. 115–123 substituted "$35" for "$25" and, in two places, substituted "$550" for "$500".

**2014**-Par. (4)(A)(ii). Pub. L. 113–183, §301(c)(1), inserted before semicolon "(except that, if the individual applying for the services resides in a foreign reciprocating country or foreign treaty country, the State may opt to require the individual to request the services through the Central Authority for child support enforcement in the foreign reciprocating country or the foreign treaty country, and if the individual resides in a foreign country that is not a foreign reciprocating country or a foreign treaty country, a State may accept or reject the application)".

Par. (29)(A), (D), (E). Pub. L. 113–79, §4030(v), amended Pub. L. 110–246, §4115(c)(2)(H). See 2008 Amendment note below.

Par. (32)(A). Pub. L. 113–183, §301(c)(2)(A), inserted ", a foreign treaty country," after "a foreign reciprocating country".

Par. (32)(C). Pub. L. 113–183, §301(c)(2)(B), substituted ", foreign treaty country, or foreign individual" for "or foreign obligee".

**2008**-Pars. (4)(A)(i)(IV), (6)(B)(i). Pub. L. 110–246, §4002(b)(1)(B), (2)(V), made technical amendment to references in original act which appear in text as references to sections 2015(l)(1) and 2015 of title 7.

Par. (29)(A), (D), (E). Pub. L. 110–246, §4115(c)(2)(H), as amended by Pub. L. 113–79, §4030(v), substituted "section 2012(l)" for "section 2012(h)" wherever appearing.

Pub. L. 110–246, §4002(b)(1)(A), (B), (2)(V), substituted "supplemental nutrition assistance program" for "food stamp program" wherever appearing and made technical amendment to references in original act which appear in text as references to sections 2012(h) and 2015(l)(2) of title 7.

**2006**-Par. (6)(B). Pub. L. 109–171, §7310(a), designated existing provisions as cl. (i), redesignated former cls. (i) and (ii) as subcls. (I) and (II), respectively, of cl. (i), and added cl. (ii).

Par. (31). Pub. L. 109–171, §7303(b), substituted "$2,500" for "$5,000" in introductory provisions.

Par. (34). Pub. L. 109–171, §7301(b)(1)(C), added par. (34).

**1999**-Par. (6)(E)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (9)(A) to (C). Pub. L. 106–169, §401(g)(2), substituted semicolon for comma at end.

Par. (19)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (19)(B)(i). Pub. L. 106–169, §401(g)(1), substituted "; or" for ", or" at end.

Par. (24)(A). Pub. L. 106–169, §401(g)(3), substituted "; and" for ", and" at end.

Par. (24)(B). Pub. L. 106–169, §401(h), made technical amendment to reference in original act which appears in text as reference to August 22, 1996.

**1997**-Par. (4)(A)(i)(IV). Pub. L. 105–33, §5548(a), added subcl. (IV).

Par. (6)(B). Pub. L. 105–33, §5531(a), substituted "an individual, other than an individual receiving assistance under a State program funded under part A or E, or under a State plan approved under subchapter XIX, or who is required by the State to cooperate with the State agency administering the program under this part pursuant to subsection (l) or (m) of section

2015 of title 7, and" for "individuals not receiving assistance under any State program funded under part A, which".

Par. (8). Pub. L. 105–33, §5552(1)(D), inserted concluding provisions.

Pub. L. 105–33, §5552(1)(A), in introductory provisions, inserted ", for the purpose of establishing parentage, establishing, setting the amount of, modifying, or enforcing child support obligations, or making or enforcing a child custody or visitation determination, as defined in section 663(d)(1) of this title" after "provide that" and struck out "noncustodial" before "parents".

Par. (8)(A). Pub. L. 105–33, §5552(1)(B), substituted "records; and" for "records, and".

Par. (8)(B). Pub. L. 105–33, §5552(1)(C), substituted "title," for "title;".

Par. (16). Pub. L. 105–33, §5556(b), made technical amendment to directory language of Pub. L. 104–193, §344(a)(1)(F). See 1996 Amendment note below.

Par. (17). Pub. L. 105–33, §5552(2), substituted "provide that the State will have" for "in the case of a State which has" and inserted "and" after "section 653 of this title,".

Par. (19)(B)(ii). Pub. L. 105–33, §5542(c), substituted "section 659(i)(5)" for "section 662(e)".

Par. (26). Pub. L. 105–33, §5552(3)(A), struck out "will" before "have in effect" in introductory provisions.

Par. (26)(A). Pub. L. 105–33, §5552(3)(B), inserted ", modify," after "or to establish" and ", or to make or enforce a child custody determination" after "support".

Par. (26)(B). Pub. L. 105–33, §5552(3)(C)(i), (ii), inserted "or the child" after "1 party" and after "former party".

Par. (26)(C). Pub. L. 105–33, §5552(3)(D), inserted "or the child" after "1 party", substituted "another person" for "another party", inserted "to that person" after "release of the information", and substituted "party or the child" for "former party".

Par. (26)(D), (E). Pub. L. 105–33, §5552(3)(C)(iii), (E), added subpars. (D) and (E).

Par. (29)(A). Pub. L. 105–33, §5548(b)(1)(B), substituted cls. (i) and (ii) for

"(i) shall be defined, taking into account the best interests of the child, and

"(ii) shall be applied in each case,

by, at the option of the State, the State agency administering the State program under part A of this subchapter, this part, or subchapter XIX;".

Pub. L. 105–33, §5548(b)(1)(A), in introductory provisions, substituted "part A, the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7," for "part A of this subchapter or the State program under subchapter XIX".

Par. (29)(D). Pub. L. 105–33, §5548(b)(2), substituted "the State program under part E, the State program under subchapter XIX, or the food stamp program, as defined under section 2012(h) of title 7" for "or the State program under subchapter XIX".

Par. (29)(E). Pub. L. 105–33, §5548(b)(3), substituted "individual and the State agency administering the State program funded under part A, the State agency administering the State program under part E, the State agency administering the State program under subchapter XIX, or the State agency administering the food stamp program, as defined under section 2012(h) of title 7," for "individual, the State agency administering the State program funded under part A, and the State agency administering the State program under subchapter XIX,".

Par. (32)(A). Pub. L. 105–33, §5545, substituted "section 659a(d)" for "section 659a(d)(2)".

Par. (33). Pub. L. 105–33, §5546(a), substituted "or enforce support orders, or" for "and enforce support orders, and", "guidelines established or adopted by such tribe or organization"

for "guidelines established by such tribe or organization", "all collections" for "all funding collected", and "such collections" for "such funding".

**1996**-Pub. L. 104–193, §375(a)(4), inserted at end of closing provisions "Nothing in paragraph (33) shall void any provision of any cooperative agreement entered into before August 22, 1996, nor shall such paragraph deprive any State of jurisdiction over Indian country (as so defined) that is lawfully exercised under section 1322 of title 25."

Par. (4). Pub. L. 104–193, §301(a)(1), amended par. (4) generally. Prior to amendment, par. (4) read as follows: "provide that such State will undertake-

"(A) in the case of a child born out of wedlock with respect to whom an assignment under section 602(a)(26) of this title or section 1396k of this title is effective, to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so, or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and

"(B) in the case of any child with respect to whom such assignment is effective, including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter, to secure support for such child from his parent (or from any other person legally liable for such support), and from such parent for his spouse (or former spouse) receiving aid to families with dependent children or medical assistance under a State plan approved under subchapter XIX of this chapter (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan), utilizing any reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A or E of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so), except that when such arrangements and other means have proven ineffective, the State may utilize the Federal courts to obtain or enforce court orders for support;".

Par. (5)(A). Pub. L. 104–193, §108(c)(11), substituted "pursuant to section 608(a)(3) of this title" for "under section 602(a)(26) of this title" and "payments collected," for "payments collected; except that this paragraph shall not apply to such payments for any month following the first month in which the amount collected is sufficient to make such family ineligible for assistance under the State plan approved under part A of this subchapter;".

Par. (6). Pub. L. 104–193, §301(a)(2)(A), substituted "provide that-" for "provide that" in introductory provisions.

Par. (6)(A). Pub. L. 104–193, §301(a)(2)(B), added subpar. (A) and struck out former subpar. (A) which read as follows: "the child support collection or paternity determination services established under the plan shall be made available to any individual not otherwise eligible for such services upon application filed by such individual with the State, including support collection services for the spouse (or former spouse) with whom the absent parent's child is living (but only if a support obligation has been established with respect to such spouse, and only if the support obligation established with respect to the child is being enforced under the plan),".

Par. (6)(B). Pub. L. 104–193, §301(a)(2)(C), (D), inserted "on individuals not receiving assistance under any State program funded under part A" after "such services shall be imposed", realigned margins, and substituted semicolon for comma at end.

Par. (6)(C). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma at end.

Par. (6)(D). Pub. L. 104–193, §301(a)(2)(D), realigned margins and substituted semicolon for comma before "and" at end.

Pub. L. 104–193, §108(c)(12), substituted "assistance under a State program funded" for "aid under a State plan approved".

Par. (6)(E). Pub. L. 104–193, §301(a)(2)(D)(i), (E), realigned margins.

Pub. L. 104–193, §301(a)(2)(D)(ii), which directed substitution of a semicolon for the final comma, could not be executed because subpar. (E) already ended in a semicolon and not a comma.

Par. (7). Pub. L. 104–193, §375(c), inserted "and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25)" after "law enforcement officials".

Par. (8). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial" for "absent" in introductory provisions.

Par. (8)(B). Pub. L. 104–193, §316(g)(1)(A), amended subpar. (B) generally. Prior to amendment, subpar. (B) read as follows: "the Parent Locator Service in the Department of Health and Human Services;".

Par. (9)(B), (C). Pub. L. 104–193, §395(d)(2)(B), substituted "a noncustodial parent" for "an absent parent".

Par. (9)(E). Pub. L. 104–193, §324(b), added subpar. (E).

Par. (11). Pub. L. 104–193, §302(b)(2), designated existing provisions as subpar. (A), inserted "and" after semicolon at end, and redesignated par. (12) as subpar. (B).

Par. (12). Pub. L. 104–193, §304(a), added par. (12). Former par. (12) redesignated (11)(B).

Pub. L. 104–193, §302(b)(2)(B), redesignated par. (12) as (11)(B).

Par. (13). Pub. L. 104–193, §§316(g)(1)(B), 395(d)(1)(D), substituted "noncustodial parents" for "absent parents" and inserted before semicolon at end "and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan".

Par. (14). Pub. L. 104–193, §342(a)(1), (2), designated existing provisions as subpar. (A) and redesignated par. (15) as subpar. (B).

Par. (15). Pub. L. 104–193, §342(a)(3), added par. (15). Former par. (15) redesignated (14)(B).

Pub. L. 104–193, §342(a)(2), redesignated par. (15) as (14)(B).

Par. (16). Pub. L. 104–193, §344(a)(1), as amended by Pub. L. 105–33, §5556(b), struck out ", at the option of the State," before "for the establishment", inserted "and operation by the State agency" after "for the establishment" and "meeting the requirements of section 654a of this title" after "information retrieval system", substituted "so as to control" for "in the State and localities thereof, so as (A) to control", struck out "(i)" before "all the factors in the support enforcement collection", and struck out before semicolon at end "(including, but not limited to, (I) identifiable correlation factors (such as social security numbers, names, dates of birth, home addresses and mailing addresses (including postal ZIP codes) of any individual with respect to whom support obligations are sought to be established or enforced and with respect to any person to whom such support obligations are owing) to assure sufficient compatibility among the systems of different jurisdictions to permit periodic screening to determine whether such

individual is paying or is obligated to pay support in more than one jurisdiction, (II) checking of records of such individuals on a periodic basis with Federal, intra- and inter-State, and local agencies, (III) maintaining the data necessary to meet the Federal reporting requirements on a timely basis, and (IV) delinquency and enforcement activities), (ii) the collection and distribution of support payments (both intra- and inter-State), the determination, collection, and distribution of incentive payments both inter- and intra-State, and the maintenance of accounts receivable on all amounts owed, collected and distributed, and (iii) the costs of all services rendered, either directly or by interfacing with State financial management and expenditure information, (B) to provide interface with records of the State's aid to families with dependent children program in order to determine if a collection of a support payment causes a change affecting eligibility for or the amount of aid under such program, (C) to provide for security against unauthorized access to, or use of, the data in such system, (D) to facilitate the development and improvement of the income withholding and other procedures required under section 666(a) of this title through the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur, and (E) to provide management information on all cases under the State plan from initial referral or application through collection and enforcement".

Par. (21)(A). Pub. L. 104–193, §395(d)(1)(D), substituted "noncustodial parent" for "absent parent".

Par. (23). Pub. L. 104–193, §332, inserted "and will publicize the availability and encourage the use of procedures for voluntary establishment of paternity and child support by means the State deems appropriate" before semicolon.

Par. (24). Pub. L. 104–193, §344(a)(4), amended par. (24) generally. Prior to amendment, par. (24) read as follows: "provide that if the State, as of October 13, 1988, does not have in effect an automated data processing and information retrieval system meeting all of the requirements of paragraph (16), the State-

"(A) will submit to the Secretary by October 1, 1991, for review and approval by the Secretary within 9 months after submittal an advance automated data processing planning document of the type referred to in such paragraph; and

"(B) will have in effect by October 1, 1997, an operational automated data processing and information retrieval system, meeting all the requirements of that paragraph, which has been approved by the Secretary;".

Par. (25). Pub. L. 104–193, §301(b), added par. (25).

Par. (26). Pub. L. 104–193, §303(a), added par. (26).

Par. (27). Pub. L. 104–193, §312(a), added par. (27).

Par. (28). Pub. L. 104–193, §313(a), added par. (28).

Par. (29). Pub. L. 104–193, §333, added par. (29).

Par. (30). Pub. L. 104–193, §343(b), added par. (30).

Par. (31). Pub. L. 104–193, §370(a)(2), added par. (31).

Par. (32). Pub. L. 104–193, §371(b), added par. (32).

Par. (33). Pub. L. 104–193, §375(a)(1)–(3), added par. (33).

**1995**-Par. (24)(B). Pub. L. 104–35 substituted "1997" for "1995".

**1988**-Par. (5)(A). Pub. L. 100–485, §104(a), substituted "on a monthly basis (or on a quarterly basis for so long as the Secretary determines with respect to a State that requiring such notice on a monthly basis would impose an unreasonable administrative burden)" for "at least

annually".

Par. (6)(D), (E). Pub. L. 100–485, §111(c), added cl. (D) and redesignated former cl. (D) as (E).

Par. (16). Pub. L. 100–485, §123(d), substituted "advance automated" for "advance automatic" in introductory provisions.

Pub. L. 100–485, §123(a)(2), substituted "a statewide automated" for "an automatic".

Par. (24). Pub. L. 100–485, §123(a)(1), added par. (24).

**1987**—Par. (4)(A). Pub. L. 100–203, §9142(a)(1)(A), (B), substituted "an assignment under section 602(a)(26) of this title or section 1396k of this title" for "an assignment under section 602(a)(26) of this title" and ", or, in the case of such a child with respect to whom an assignment under section 1396k of this title is in effect, the State agency administering the plan approved under subchapter XIX of this chapter determines pursuant to section 1396k(a)(1)(B) of this title that it is against the best interests of the child to do so, and" for ", and".

Par. (4)(B). Pub. L. 100–203, §9142(a)(1)(C), inserted "or medical assistance under a State plan approved under subchapter XIX of this chapter" after "children".

Par. (5). Pub. L. 100–203, §9142(a)(2), substituted "provide that (A)" for "provide that," and added cl. (B).

Pub. L. 100–203, §9141(a)(2), struck out "(except as provided in section 657(c) of this title)" after "apply to such payments".

**1984**—Par. (4)(B). Pub. L. 98–378, §11(b)(1), inserted "including an assignment with respect to a child on whose behalf a State agency is making foster care maintenance payments under part E of this subchapter," after "such assignment is effective," and inserted "or E" after "part A".

Par. (4)(B). Pub. L. 98–378, §12(a), substituted ", and" for "and, at the option of the State," before "from such parent" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (5). Pub. L. 98–378, §3(e), inserted ", and the individual will be notified at least annually of the amount of the support payments collected;".

Par. (6)(A). Pub. L. 98–378, §12(b), struck out ", at the option of the State," before "support collection services" and inserted ", and only if the support obligation established with respect to the child is being enforced under the plan".

Par. (6)(B). Pub. L. 98–378, §3(c), substituted "shall be imposed, which shall be paid by the individual applying for such services, or recovered from the absent parent, or paid by the State out of its own funds (the payment of which from State funds shall not be considered as an administrative cost of the State for the operation of the plan, and shall be considered income to the program), the amount of which (i) will not exceed $25 (or such higher or lower amount (which shall be uniform for all States) as the Secretary may determine to be appropriate for any fiscal year to reflect increases or decreases in administrative costs), and (ii) may vary among such individuals on the basis of ability to pay (as determined by the State), and" for "may be imposed, except that the amount of any such application fee shall be reasonable, as determined under regulations of the Secretary,".

Par. (6)(C). Pub. L. 98–378, §21(d)(1), (3), added cl. (C). Former cl. (C) redesignated (D).

Par. (6)(D). Pub. L. 98–378, §21(d)(1), (2), redesignated former cl. (C) as (D) and substituted "fees" for "fee" before "so imposed".

Par. (8)(B). Pub. L. 98–369, §2663(j)(2)(B)(x), substituted "Health and Human Services" for "Health, Education, and Welfare".

Par. (9)(C). Pub. L. 98–369, §2663(c)(14)(A), struck out "of such parent" before "with respect to whom aid".

Par. (16)(A)(ii). Pub. L. 98–369, §2663(c)(14)(B), substituted "collection, and distribution" for "collection and distribution," before "of incentive payments".

Par. (16)(D), (E). Pub. L. 98–378, §6(a), added cl. (D) and redesignated former cl. (D) as (E).

Par. (17). Pub. L. 98–378, §2663(c)(14)(C), realigned margin, substituted "provide that the State will accept" for "to accept", "will impose" for "and to impose", "will transmit" for "to transmit", and "will otherwise comply" for ", otherwise to comply".

Par. (20). Pub. L. 98–378, §3(a), added par. (20).

Par. (21). Pub. L. 98–378, §3(d), added par. (21).

Par. (22). Pub. L. 98–378, §5(b), added par. (22).

Par. (23). Pub. L. 98–378, §14(a), added par. (23).

Pub. L. 98–378, §3(f), inserted after numbered paragraphs provision that the State may allow the jurisdiction which makes the collection involved to retain any application fee under par. (6)(B) or any late payment fee under par. (21).

**1982**–Par. (5). Pub. L. 97–248, §173(a), inserted "following the first month" after "for any month".

Par. (6). Pub. L. 97–248, §171(a), in cl. (A) inserted provisions relating to inclusion of, at the option of the State, support collection services for the spouse or former spouse, in cl. (B) substituted "such services" for "services under the State plan (other than collection of support)", and in cl. (C) substituted provisions relating to collection of any costs in excess of the fee imposed, for provisions relating to the State retaining any fee imposed under State law as required under former par. (19).

Pars. (18) to (20). Pub. L. 97–248, §171(b)(1), inserted "and" at end of par. (18), struck out par. (19) relating to imposition of a fee on an individual who owes child or spousal support obligation, and redesignated par. (20) as (19).

**1981**–Pub. L. 97–35, §2332(d)(2), substituted in provision preceding par. (1) "child and spousal support" for "child support".

Par. (4)(B). Pub. L. 97–35, §2332(d)(3), substituted "such support) and, at the option of the State, from such parent for his spouse (or former spouse) receiving aid to families with dependent children (but only if a support obligation has been established with respect to such spouse), utilizing" for "such support), utilizing".

Par. (5). Pub. L. 97–35, §2332(d)(4), substituted "support payments" for "child support payments" and "collected for an individual" for "collected for a child".

Par. (6)(B). Pub. L. 97–35, §2333(a)(1), substituted "services under the State plan (other than collection of support)" for "such services".

Par. (6)(C). Pub. L. 97–35, §2333(a)(2), substituted "the State will retain, but only if it is the State which makes the collection, the fee imposed under State law as required under paragraph (19)" for "any costs in excess of the fee so imposed may be collected from such individual by deducting such costs from the amount of any recovery made".

Par. (9)(C). Pub. L. 97–35, §2332(d)(5), substituted "of the child or children or the parent of such child or children" for "of a child or children".

Par. (11). Pub. L. 97–35, §2332(d)(6), substituted "collected as support" for "collected as child support".

Par. (16). Pub. L. 97–35, §2332(d)(7), substituted "support enforcement" for "child support enforcement", "whom support obligations" for "whom child support obligations", and "obligated to pay support" for "obligated to pay child support".

Par. (18). Pub. L. 97–35, §2331(b), added par. (18).

Par. (19). Pub. L. 97–35, §2333(b), added par. (19).

Par. (20). Pub. L. 97–35, §2335(a), added par. (20).

**1980**-Par. (16). Pub. L. 96–265 added par. (16).

Par. (17). Pub. L. 96–611 added par. (17).

**1977**-Pars. (14), (15). Pub. L. 95–30 added pars. (14) and (15).

**1975**-Par. (4)(A). Pub. L. 94–88, §208(b), substituted "to establish the paternity of such child, unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so" for "to establish the paternity of such child".

Par. (4)(B). Pub. L. 94–88, §208(c), substituted "reciprocal arrangements adopted with other States (unless the agency administering the plan of the State under part A of this subchapter determines in accordance with the standards prescribed by the Secretary pursuant to section 602(a)(26)(B) of this title that it is against the best interests of the child to do so)" for "reciprocal arrangements adopted with other States".

### STATUTORY NOTES AND RELATED SUBSIDIARIES

### EFFECTIVE DATE OF 2018 AMENDMENT

Pub. L. 115–123, div. E, title XII, §53117(b), Feb. 9, 2018, 132 Stat. 307 , provided that:

"(1) IN GENERAL.-The amendments made by subsection (a) [amending this section] shall take effect on the 1st day of the 1st fiscal year that begins on or after the date of the enactment of this Act [Feb. 9, 2018], and shall apply to payments under part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) for calendar quarters beginning on or after such 1st day.

"(2) DELAY PERMITTED IF STATE LEGISLATION REQUIRED.-If the Secretary of Health and Human Services determines that State legislation (other than legislation appropriating funds) is required in order for a State plan developed pursuant to part D of title IV of the Social Security Act (42 U.S.C. 651 et seq.) to meet the requirements imposed by the amendment made by subsection (a), the plan shall not be regarded as failing to meet such requirements before the 1st day of the 1st calendar quarter beginning after the first regular session of the State legislature that begins after the date of the enactment of this Act. For purposes of the preceding sentence, if the State has a 2-year legislative session, each year of the session is deemed to be a separate regular session of the State legislature."

### EFFECTIVE DATE OF 2008 AMENDMENT

Amendment of this section and repeal of Pub. L. 110–234 by Pub. L. 110–246 effective May 22, 2008, the date of enactment of Pub. L. 110–234, except as otherwise provided, see section 4 of Pub. L. 110–246, set out as an Effective Date note under section 8701 of Title 7, Agriculture.

Amendment by sections 4002(b)(1)(A), (B), (2)(V), and 4115(c)(2)(H) of Pub. L. 110–246 effective Oct. 1, 2008, see section 4407 of Pub. L. 110–246, set out as a note under section 1161 of Title 2, The Congress.

### EFFECTIVE DATE OF 2006 AMENDMENT

Amendment by section 7301(b)(1)(C) of Pub. L. 109–171 effective Oct. 1, 2009, and applicable to payments under parts A and D of this subchapter for calendar quarters beginning on or after such date, subject to certain State options, see section 7301(e) of Pub. L. 109–171, set out as a note under section 608 of this title.

Amendment by section 7303(b) of Pub. L. 109–171 effective Oct. 1, 2006, see section 7303(c) of Pub. L. 109–171, set out as a note under section 652 of this title.

Pub. L. 109–171, title VII, §7310(c), Feb. 8, 2006, 120 Stat. 148 , provided that: "The amendments made by this section [amending this section and section 657 of this title] shall take effect on October 1, 2006."

### Effective Date of 1999 Amendment

Amendment by Pub. L. 106–169 effective as if included in the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 401(q) of Pub. L. 106–169, set out as a note under section 602 of this title.

### Effective Date of 1997 Amendment

Amendment by Pub. L. 105–33 effective as if included in the enactment of title III of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104–193, see section 5557 of Pub. L. 105–33, set out as a note under section 608 of this title.

### Effective Date of 1996 Amendment

Amendment by section 108(c)(11), (12) of Pub. L. 104–193 effective July 1, 1997, with transition rules relating to State options to accelerate such date, rules relating to claims, actions, and proceedings commenced before such date, rules relating to closing out of accounts for terminated or substantially modified programs and continuance in office of Assistant Secretary for Family Support, and provisions relating to termination of entitlement under AFDC program, see section 116 of Pub. L. 104–193, as amended, set out as an Effective Date note under section 601 of this title.

Amendment by section 302(b)(2) of Pub. L. 104–193 effective Aug. 22, 1996, see section 302(c)(2) of Pub. L. 104–193, set out as a note under section 657 of this title.

Pub. L. 104–193, title III, §303(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Pub. L. 104–193, title III, §304(b), Aug. 22, 1996, 110 Stat. 2205 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on October 1, 1997."

Amendment by section 312(a) of Pub. L. 104–193 effective Oct. 1, 1998, with limited exception for States which, as of Aug. 22, 1996, were processing the receipt of child support payments through local courts, see section 312(d) of Pub. L. 104–193, set out as an Effective Date note under section 654b of this title.

Amendment by section 342(a) of Pub. L. 104–193 effective with respect to calendar quarters beginning 12 months or more after Aug. 22, 1996, see section 342(c) of Pub. L. 104–193, set out as a note under section 652 of this title.

Amendment by section 370(a)(2) of Pub. L. 104–193 effective Oct. 1, 1997, see section 370(b) of Pub. L. 104–193, set out as a note under section 652 of this title.

Pub. L. 104–193, title III, §395(a)–(c), Aug. 22, 1996, 110 Stat. 2259 , provided that:

"(a) In General.-Except as otherwise specifically provided (but subject to subsections (b) and (c))-

"(1) the provisions of this title [see Tables for classification] requiring the enactment or amendment of State laws under section 466 of the Social Security Act [42 U.S.C. 666], or revision of State plans under section 454 of such Act [this section], shall be effective with

respect to periods beginning on and after October 1, 1996; and

"(2) all other provisions of this title shall become effective upon the date of the enactment of this Act [Aug. 22, 1996].

"(b) Grace Period for State Law Changes.-The provisions of this title shall become effective with respect to a State on the later of-

"(1) the date specified in this title, or

"(2) the effective date of laws enacted by the legislature of such State implementing such provisions,

but in no event later than the 1st day of the 1st calendar quarter beginning after the close of the 1st regular session of the State legislature that begins after the date of the enactment of this Act [Aug. 22, 1996]. For purposes of the previous sentence, in the case of a State that has a 2-year legislative session, each year of such session shall be deemed to be a separate regular session of the State legislature.

"(c) Grace Period for State Constitutional Amendment.-A State shall not be found out of compliance with any requirement enacted by this title if the State is unable to so comply without amending the State constitution until the earlier of-

"(1) 1 year after the effective date of the necessary State constitutional amendment; or

"(2) 5 years after the date of the enactment of this Act [Aug. 22, 1996]."

## Effective Date of 1988 Amendment

Pub. L. 100–485, title I, §104(b), Oct. 13, 1988, 102 Stat. 2348 , provided that: "The amendment made by subsection (a) [amending this section] shall become effective on the first day of the first calendar quarter which begins 4 or more years after the date of the enactment of this Act [Oct. 13, 1988]."

Pub. L. 100–485, title I, §111(f)(2), Oct. 13, 1988, 102 Stat. 2350 , provided that: "The amendments made by subsections (b) and (c) [amending this section and section 666 of this title] shall become effective on the first day of the first month beginning one year or more after the date of the enactment of this Act [Oct. 13, 1988]."

## Effective Date of 1987 Amendment

Pub. L. 100–203, title IX, §9141(b), Dec. 22, 1987, 101 Stat. 1330–321 , provided that: "The amendments made by subsection (a) [amending this section and section 657 of this title] shall become effective upon enactment [Dec. 22, 1987]."

Pub. L. 100–203, title IX, §9142(b), Dec. 22, 1987, 101 Stat. 1330–322 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective on July 1, 1988."

## Effective Date of 1984 Amendment

Pub. L. 98–378, §3(g), Aug. 16, 1984, 98 Stat. 1311 , provided that:

"(1) Except as provided in paragraphs (2) and (3), the amendments made by this section [enacting section 666 of this title and amending this section] shall become effective on October 1, 1985.

"(2) Section 454(21) of the Social Security Act [42 U.S.C. 654(21)] (as added by subsection (d) of this section), and section 466(e) of such Act [42 U.S.C. 666(e)] (as added by subsection (b) of this section), shall be effective with respect to support owed for any month beginning after the date of the enactment of this Act [Aug. 16, 1984].

"(3) In the case of a State with respect to which the Secretary of Health and Human Services

has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this section, the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the beginning of the fourth month beginning after the end of the first session of the State legislature which ends on or after October 1, 1985. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

Pub. L. 98–378, §5(c)(1), Aug. 16, 1984, 98 Stat. 1314 , provided that: "The amendments made by the preceding provisions of this section [amending this section and section 658 of this title] shall become effective on October 1, 1985."

Pub. L. 98–378, §6(c), Aug. 16, 1984, 98 Stat. 1315 , provided that: "The amendments made by this section [amending this section and section 655 of this title] shall apply with respect to quarters beginning on or after October 1, 1984."

Pub. L. 98–378, §11(e), Aug. 16, 1984, 98 Stat. 1318 , provided that: "The amendments made by this section [amending this section and sections 656, 657, 664, and 671 of this title] shall become effective October 1, 1984, and shall apply to collections made on or after that date."

Pub. L. 98–378, §12(c), Aug. 16, 1984, 98 Stat. 1319 , provided that: "The amendments made by this section [amending this section] shall become effective October 1, 1985."

Pub. L. 98–378, §14(b), Aug. 16, 1984, 98 Stat. 1320 , provided that: "The amendments made by subsection (a) [amending this section] shall become effective October 1, 1985."

Amendment by section 21(d) of Pub. L. 98–378 applicable with respect to refunds payable under section 6402 of Title 26, Internal Revenue Code, after Dec. 31, 1985, see section 21(g) of Pub. L. 98–378, set out as a note under section 6103 of Title 26.

Amendment by Pub. L. 98–369 effective July 18, 1984, but not to be construed as changing or affecting any right, liability, status, or interpretation which existed (under the provisions of law involved) before that date, see section 2664(b) of Pub. L. 98–369, set out as a note under section 401 of this title.

### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by section 171(a), (b)(1) of Pub. L. 97–248 effective on and after Aug. 13, 1981, see section 171(c) of Pub. L. 97–248, set out as a note under section 503 of this title.

Pub. L. 97–248, title I, §173(b), Sept. 3, 1982, 96 Stat. 403 , provided that: "The amendment made by this section [amending this section] shall become effective on October 1, 1982."

### EFFECTIVE DATE OF 1981 AMENDMENT

Amendments by sections 2331(b), 2332(d)(2)–(7), and 2333(a), (b) of Pub. L. 97–35 effective Oct. 1, 1981, except as otherwise specifically provided, see section 2336 of Pub. L. 97–35, set out as a note under section 651 of this title.

Amendment by section 2335(a) of Pub. L. 97–35 effective Aug. 13, 1981, except that such amendment shall not be requirements under this section or section 503 of this title before Oct. 1, 1982, see section 2335(c) of Pub. L. 97–35, set out as a note under section 503 of this title.

### EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–265 effective July 1, 1981, and to be effective only with respect to expenditures, referred to in section 655(a)(3) of this title, made on or after such date, see section 405(e) of Pub. L. 96–265, set out as a note under section 652 of this title.

### Effective Date of 1977 Amendment

Pub. L. 95–30, title V, §502(b), May 23, 1977, 91 Stat. 162 , provided that: "The amendments made by this section [amending this section] shall take effect on the first day of the first calendar month which begins after the date of enactment of this Act [May 23, 1977]."

### Effective Date of 1975 Amendment

Pub. L. 94–88, title II, §210, Aug. 9, 1975, 89 Stat. 437 , provided that: "The amendments made by this title [amending this section and sections 602, 603, and 655 of this title] and enacting provisions set out as notes under sections 602 and 655 of this title] shall, unless otherwise specified therein, become effective August 1, 1975."

### Exception to General Effective Date for State Plans Requiring State Law Amendments

Pub. L. 109–171, title VII, §7311, Feb. 8, 2006, 120 Stat. 148 , provided that: "In the case of a State plan under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] which the Secretary determines requires State legislation in order for the plan to meet the additional requirements imposed by the amendments made by this subtitle [subtitle C (§§7301–7311) of title VII of Pub. L. 109–171, amending this section, sections 608, 652, 653, 655, 657, 664, and 666 of this title, section 6402 of Title 26, Internal Revenue Code, and provisions set out as a note under section 1169 of Title 29, Labor], the effective date of the amendments imposing the additional requirements shall be 3 months after the first day of the first calendar quarter beginning after the close of the first regular session of the State legislature that begins after the date of the enactment of this Act [Feb. 8, 2006]. For purposes of the preceding sentence, in the case of a State that has a 2-year legislative session, each year of the session shall be considered to be a separate regular session of the State legislature."

### State Commissions on Child Support

Pub. L. 98–378, §15, Aug. 16, 1984, 98 Stat. 1320 , provided that:

"(a) As a condition of the State's eligibility for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] for quarters beginning more than 30 days after the date of the enactment of this Act [Aug. 16, 1984] and ending prior to October 1, 1985, the Governor of each State, on or before December 1, 1984, shall (subject to subsection (f)) appoint a State Commission on Child Support.

"(b) Each State Commission appointed under subsection (a) shall be composed of members appropriately representing all aspects of the child support system, including custodial and non-custodial parents, the agency or organizational unit administering the State's plan under part D of such title IV [42 U.S.C. 651 et seq.], the State judiciary, the executive and legislative branches of the State government, child welfare and social services agencies, and others.

"(c) It shall be the function of each State Commission to examine, investigate, and study the operation of the State's child support system for the primary purpose of determining the extent to which such system has been successful in securing support and parental involvement both for children who are eligible for aid under a State plan approved under part A of title IV of such Act [42 U.S.C. 601 et seq.] and for children who are not eligible for such aid, giving particular attention to such specific problems (among others) as visitation, the establishment of appropriate objective standards for support, the enforcement of interstate obligations, the availability, cost, and effectiveness of services both to children who are eligible for such aid and to children who are not, and the need for additional State or Federal legislation to obtain

support for all children.

"(d) Each State Commission shall submit to the Governor of the State and make available to the public, no later than October 1, 1985, a full and complete report of its findings and recommendations resulting from the examination, investigation, and study under this section. The Governor shall transmit such report to the Secretary of Health and Human Services along with the Governor's comments thereon.

"(e) None of the costs incurred in the establishment and operation of a State Commission under this section, or incurred by such a Commission in carrying out its functions under subsections (c) and (d), shall be considered as expenditures qualifying for Federal payments under part A or D of title IV of the Social Security Act [42 U.S.C. 601 et seq., 651 et seq.] or be otherwise payable or reimbursable by the United States or any agency thereof.

"(f) If the Secretary determines, at the request of any State on the basis of information submitted by the State and such other information as may be available to the Secretary, that such State-

"(1) has placed in effect and is implementing objective standards for the determination and enforcement of child support obligations,

"(2) has established within the five years prior to the enactment of this Act [Aug. 16, 1984] a commission or council with substantially the same functions as the State Commissions provided for under this section, or

"(3) is making satisfactory progress toward fully effective child support enforcement and will continue to do so,

then such State shall not be required to establish a State Commission under this section and the preceding provisions of this section shall not apply."

### DELAYED EFFECTIVE DATE IN CASES REQUIRING STATE LEGISLATION

Pub. L. 97–248, title I, §176, Sept. 3, 1982, 96 Stat. 403 , provided that: "In the case of a State with respect to which the Secretary of Health and Human Services has determined that State legislation is required in order to conform the State plan approved under part D of title IV of the Social Security Act [42 U.S.C. 651 et seq.] to the requirements imposed by any amendment made by this subtitle [subtitle E (§§171–176) of title I of Pub. L. 97–248, see Tables for classification], the State plan shall not be regarded as failing to comply with the requirements of such part solely by reason of its failure to meet the requirements imposed by such amendment prior to the end of the first session of the State legislature which begins after October 1, 1982, or which began prior to October 1, 1982, and remained in session for at least twenty-five calendar days after such date. For purposes of the preceding sentence, the term 'session' means a regular, special, budget, or other session of a State legislature."

*1* *See References in Text note below.*

Exhibit B

# Title 15
# Domestic Relations

## Chapter 5
## Divorce and Separation

### R.I. Gen. Laws § 15-5-16.5

**§ 15-5-16.5. Interest on arrearages.**

Interest at the rate of twelve percent (12%) per annum on any support debt due or owing, child or spousal support, shall be assessed unless the responsible party shall, for good cause shown, be relieved of the obligation to pay interest by the family court.

History of Section.
P.L. 1980, ch. 308, § 1; P.L. 1984, ch. 167, § 1; P.L. 2001, ch. 155, § 1.

Exhibit C

# Title 8
# Courts and Civil Procedure — Courts

## Chapter 10
## Family Court

### R.I. Gen. Laws § 8-10-3

**§ 8-10-3. Establishment of court — Jurisdiction — Seal — Oaths.**

**(a)** There is hereby established a family court, consisting of a chief judge and eleven (11) associate justices, to hear and determine all petitions for divorce from the bond of marriage and from bed and board; all motions for allowance, alimony, support and custody of children, allowance of counsel and witness fees, and other matters arising out of petitions and motions relative to real and personal property in aid thereof, including, but not limited to, partitions, accountings, receiverships, sequestration of assets, resulting and constructive trust, impressions of trust, and such other equitable matters arising out of the family relationship, wherein jurisdiction is acquired by the court by the filing of petitions for divorce, bed and board and separate maintenance; all motions for allowance for support and educational costs of children attending high school at the time of their eighteenth (18th) birthday and up to ninety (90) days after high school graduation, but in no case beyond their nineteenth (19th) birthday; enforcement of any order or decree granting alimony and/or child support, and/or custody and/or visitation of any court of competent jurisdiction of another state; modification of any order or decree granting alimony and/or custody and/or visitation of any court of competent jurisdiction of another state on the ground that there has been a change of circumstances; modification of any order or decree granting child support of any court of competent jurisdiction of another state provided: (1) the order has been registered in Rhode Island for the purposes of modification pursuant to § 15-23.1-611, or (2) Rhode Island issued the order and has continuing exclusive jurisdiction over the parties; antenuptial agreements, property settlement agreements and all other contracts between persons, who at the time of execution of the contracts, were husband and wife or planned to enter into that relationship; complaints for support of parents and children; those matters relating to delinquent, wayward, dependent, neglected, or children with disabilities who by reason of any disability requires special education or treatment and other related services; to hear and determine all petitions for guardianship of any child who has been placed in the care, custody, and control of the department for children, youth, and families pursuant to the provisions of chapter 1 of title 14 and chapter 11 of title 40; adoption of children under eighteen (18) years of age; change of names of children under the age of eighteen (18) years; paternity of children born out of wedlock and provision for the support and disposition of such children or their mothers; child marriages; those matters referred to the court in accordance with the provisions of § 14-1-28; those matters relating to adults who shall be involved with paternity of children born out of wedlock; responsibility for or contributing to the delinquency, waywardness, or neglect of children under sixteen (16) years of age; desertion, abandonment, or failure to provide subsistence for any children dependent upon such adults for support; neglect to send

any child to school as required by law; bastardy proceedings and custody to children in proceedings, whether or not supported by petitions for divorce or separate maintenance or for relief without commencement of divorce proceedings; and appeals of administrative decisions concerning setoff of income tax refunds for past due child support in accordance with §§ 44-30.1-5 and 40-6-21. The holding of real estate as tenants by the entirety shall not in and of itself preclude the family court from partitioning real estate so held for a period of six (6) months after the entry of final decree of divorce.

**(b)** The family court shall be a court of record and shall have a seal which shall contain such words and devices as the court shall adopt.

**(c)** The judges and clerk of the family court shall have power to administer oaths and affirmations.

**(d)** The family court shall have exclusive initial jurisdiction of all appeals from any administrative agency or board affecting or concerning children under the age of eighteen (18) years and appeals of administrative decisions concerning setoff of income tax refunds, lottery set offs, insurance intercept, and lien enforcement provisions for past due child support, in accordance with §§ 44-30.1-5 and 40-6-21, and appeals of administrative agency orders of the department of human services to withhold income under chapter 16 of title 15.

**(e)** The family court shall have jurisdiction over those civil matters relating to the enforcement of laws regulating child care providers and child placing agencies.

**(f)** The family court shall have exclusive jurisdiction of matters relating to the revocation or nonrenewal of a license of an obligor due to noncompliance with a court order of support, in accordance with chapter 11.1 of title 15.

    [See § 12-1-15 of the General Laws.]

**(g)** Notwithstanding any general or public law to the contrary, the family court shall have jurisdiction over all protective orders provided pursuant to the Rhode Island general laws, when either party is a juvenile.

History of Section.
P.L. 1961, ch. 73, § 1; P.L. 1972, ch. 30, § 1; P.L. 1973, ch. 125, § 1; P.L. 1974, ch. 85, § 1; P.L. 1975, ch. 3, § 1; P.L. 1976, ch. 252, § 1; P.L. 1977, ch. 89, § 1; P.L. 1980, ch. 54, § 1; P.L. 1981, ch. 319, § 1; P.L. 1984, ch. 167, § 3; P.L. 1984, ch. 281, § 1; P.L. 1987, ch. 163, § 2; P.L. 1988, ch. 84, § 7; P.L. 1992, ch. 326, § 1; P.L. 1994, ch. 158, § 2, P.L. 1994, ch. 195, § 3; P.L. 1994, ch. 244, § 1; P.L. 1994, ch. 263, § 3; P.L. 1995, ch. 370, art. 29, § 10; P.L. 1995, ch. 374, § 10; P.L. 1996, ch. 129, § 1; P.L. 1996, ch. 131, § 1; P.L. 1996, ch. 132, § 1; P.L. 1996, ch. 133, § 1; P.L. 1997, ch. 170, § 23; P.L. 1999, ch. 83, § 6; P.L. 1999, ch. 130, § 6; P.L. 2007, ch. 73, art. 3, § 9; P.L. 2010, ch. 216, § 1; P.L. 2010, ch. 236, § 1.

Exhibit D

## SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

EXHIBIT E

Case Number: PC-2018-03M    Document: 00118100093    Page: 805    Date Filed: 09/30/2024    Entry ID: 6682500

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22   11:28          C A S E   T R A C K I N G         CSCL  ASMXA201
           TRAC.00                CASE HISTORY                U824  PROD
STARTING DATE   09 01 2021
SELECTION     COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓). WE REMOVED THE INTEREST WHEN____
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $_____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:           SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK   GERO    K   PNL:
```

Case Number: PC00102XM
Case: 23-1953   Document: 00118120823   Page: 803   Date Filed: 09/26/2024   Entry ID: 6662600
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10 13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

```
12/13/22   11:20        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00            CASE HISTORY               U024  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSMENTS SO WE CAN GET THIS SORTED____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.___
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL___
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES___

RL: 80  12 22 ABSP:         SEGUIN       MARY        CMD: _____
FNX: TRAC  D CLIENT:        MEYERSIEK    GERO    K   PHL:
```

Case 23-1073    Document: 00118120933    Page: 820    Date Filed: 09/26/2024    Entry ID: 6667890
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

12/13/22    11:29         C A S E   T R A C K I N G         CSCL   ASMXA201
            TRAC 00                CASE HISTORY              U824    PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
        FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
        FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: SO  12 22 ABSP:              SEGUIN        MARY         CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK     GERO    X    PNL:

11:29:05 Tuesday, December 13, 2022

| 12/13/22 | 11:29 | C A S E   T R A C K I N G | CSCL | ASMXA201 |
| | TRAC.00 | CASE HISTORY | U824 | PROD |

**STARTING DATE** 09 01 2021
**SELECTION** COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

| RL: 80  12 22 ABSP: | | SEGUIN | MARY | | CMD: _____ |
| FXX: TRAC  D CLIENT: | | MEYERSIEK | GERO | K | PNL: |

ed in Providence/Bristol County Family Court
ibmitted 6/17/2023 10.13 PM
velope: 4132704
viewer: Maria O

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:            SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK   GERO    K   PNL:
```

```
12/13/22   11:28        C A S E   T R A C K I N G       CSCL  ASMXA201
           TRAC.00            CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42
```

```
12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)
```

```
12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY
```

```
12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.
```

```
RL: 80  12 22 ABSP:           SEGUIN       MARY            CMD:
FNX: TRAC  D CLIENT:          MEYERSIEK    GERO      K     PNL:
```

Case Number: PK20910524M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

```
12/13/22    11:28          C A S E   T R A C K I N G       CSCL  ASMXA201
            TRAC.00              CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

```
RL: 80  12 22 ABSP:              SEGUIN       MARY         CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK    GERO    K    PNL:
```

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

```
     11:29:17 Tuesday, December 13, 2022


    12/13/22    11:28        C A S E    T R A C K I N G        CSCL  ASMXA201
                TRAC.00                CASE HISTORY            U824  PROD
    STARTING DATE    09 01 2021
    SELECTION    COMPREHENSIVE CASE HISTORY

    01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
    PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
    A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
    THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
    NOTICE NCP VIA MAIL AT THE TEN DAY MARK

    02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
    MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
    REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

    03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
    KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
    ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
    CLAIM NUMBER: TX027985


    RL: 80  12 22 ABSP:
    FNX: TRAC  D CLIENT:              SEGUIN      MARY         CMD: _____
                                     MEYERSIEK   GERO    K    PNL:
```

EXHIBIT F

STATE OF RHODE ISLAND                    FAMILY COURT

PROVIDENCE, SC                    FAMILY COURT NO. K01-521M

---

State of Rhode Island ex rel.
GERO K MEYERSIEK

   vs

MARY SEGUIN

## JUDGMENT / ORDER

This matter came for hearing on September 25, 2012 before Justice
JOHN E. MCCANN upon the Private Motion for Custody, Support & Atty
Fees filed by the Plaintiff and after hearing thereon, it is hereby:

### ORDERED, ADJUDGED, AND DECREED

1) That this matter is continued to November 13, 2012 for
hearing on private issues only with all subpoenas to remain in full
force and effect.

2) The Defendant filed a private Motion for Visitation.

3) The court enters order relative to private issues of
visitation, attorney fees and other numerous private issues.

4) The State's oral request to clarify whether or not interest
was to run on the child support and medical arrears as found in the
May 24, 2012 court order is addressed. Interest will continue to run
on the money due.

5) If there is an arrears when the youngest child is
emancipated - the child support order, medical order and arrears
order will be added together and applied towards the arrears until it
is paid in full.

6) Pursuant to Federal Law, either party has a right to request

398



a review and modification of their child support order by filing a
motion with Family Court.  State law requires both parties to notify
the child support agency within ten (10) days of any address change
or change of employment.

Presented by: _____

                    PRISCILLA B. GLUCKSMAN ESQUIRE    Bar No.: 5701
                    Legal Counsel - Office of Child Support Services

## CERTIFICATION

I hereby certify that on October 8, 2012 I delivered by mail a copy
of the within order to THOMAS R. DESIMONE ESQUIRE, 735 SMITH STREET
PROVIDENCE RI 02908.

I hereby certify that on October 8, 2012 I delivered by mail a copy
of the within order to MARY SEGUIN,

I hereby certify that on October 8, 2012 I delivered by mail a copy
of the within order to GERO K. MEYERSIEK,

I hereby certify that on October 8, 2012 I delivered by mail a copy
of the within order to BARBARA E. GRADY ESQUIRE, 975 SMITH STREET
PROVIDENCE RI 02908.

RECEIVED

OCT 15 2012

R.I. FAMILY COURT
RONALD J. PAGLIARINI
ADMINISTRATOR / CLERK

ENTERED  10.23.12

ADMINISTRATOR/CLERK

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                     FAMILY COURT

| | | |
|---|---|---|
| State of Rhode Island ex rel. | : | |
| GERO MEYERSIEK | : | |
| *Plaintiff* | : | |
| | : | |
| VS. | : | DOCKET NO: K20010521M |
| | : | Title IV Part D Case under |
| | : | 42 U.S.C. §§ 651-669 |
| MARY SEGUIN | : | |
| *Defendant* | : | |

## DEFENDANT'S MOTION TO COMPEL RI EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVICES ("EOHHS") COMPLIANCE WITH SUBPOENA

The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby moves to compel compliance with Defendant's Subpoena (attached hereto as **Exhibit A**) served upon the **Rhode Island Executive Office of Health and Human Services ("RI EOHHS")**.  On March 26, 2024, RI EOHHS filed a motion to quash subpoena.

## I.    Defendant Does NOT Compel Production of or Testimony on Deliberations of November 29, 2022 Agency Dismissal That Cites Loss of Jurisdiction Which Speaks for Itself

The Title IV records for Rhode Island Executive Office of Health and Human Services ("RI EOHHS") show that in the RI EOHHS **Appeal case Docket# 22-2116** a hearing was scheduled for December 1, 2022.   However no hearing or trial took place on December 1, 2022.  Emphatically, a hearing never took place in that matter.

As the RI EOHHS November 29, 2022 decision dismissing the Defendant-initiated appeals case for lack of jurisdiction clearly states, upon the Office of Child Support Service's withdrawal of the enforcement instrument Notice of Lien on October 14, 2022, the RI EOHHS determined it lost jurisdiction over the matter before any hearing was conducted and before the December 1, 2022 scheduled hearing that never took place as a result of the dismissal based on its determination of loss of jurisdiction. The decision regarding loss of jurisdiction speaks for itself.  The subpoena clearly does not seek production of documents relating to the November 29, 2022 Agency decision relating to loss of jurisdiction.

The subpoena seeks production and testimony relating to the facts evidenced in the Rhode Island Office of Child Support produced PUBLIC RECORDS TRAC records that RI EOHHS in its supervisory capacity over Department of Human Services and Office of Child Support Serviced caused to be produced in response to Defendant's APRA Request for public records filed with RI EOHHS on December 1, 2022.

## I.    Title IV-D Records and Facts relating to Public Records Produced by RI EOHHS's Response to Defendant's APRA (Rhode Island Access to Public Records) Record Request are Obviously Open to the Public and Obviously Not Privileged

Subsequent to the aforesaid RI EOHHS issuance of its November 29, 2022 decision citing loss of jurisdiction, TEXAS Defendant MARY SEGUIN filed a Rhode Island Access to Public Records Act ("APRA") request for Defendant's Title IV case records on December 1, 2022 emailed to then Acting Secretary Ana Novais of RI EOHHS.

On December 16, 2022, Ms. Lisa Martinelli, Esq., Chief Legal Counsel for RI EOHHS sent an APRA response letter to TEXAS Defendant MARY SEGUIN informing the Defendant that public records are being produced.  However TEXAS Defendant's Title IV records are maintained, Rhode Island Executive Office of Health and Human Services by and through its Chief Legal Counsel Ms. Lisa Martinelli confirmed its own oversight over Department of Human Services (and Office of Child Support Services) as a Title IV Agency.  See **Exhibit B**.  Letter from Ms. Lisa Martinelli.

On December 22, 2022 Rhode Island Department of Human Services and Rhode Island Office of Child Support Services produced under Rhode Island's Access to Public Records ("APRA")  public records of Defendant's Title IV-D case TRAC records that show the taking off from the 42 U.S.C. sec. 654a automated data processing system Rhode Island's 12% compound interest when Rhode Island Office of Child Support Services prior to Rhode Island sending to and certifying to TEXAS under 42 U.S.C. sec. 666(14).  APRA Public Records TRAC records attached **Exhibit C**.

This APRA-produced TRAC records are not only Public records in Rhode Island, they also consist of Public Records in TEXAS and consist of Public Records of the United States of America.

As such, there is nothing privileged about Rhode Island EOHHS's first-hand knowledge of the public records being maintained by the Rhode Island Office of Child Support Services under the Rhode Island Department of Human Services all of which the Rhode Island EOHHS oversees and exercises supervisory responsibility and control under 42 U.S.C. sections 651-669.

II. **APRA Public Records Show RI EOHHS and Ms. Lisa Martinelli has First Hand Knowledge or Should Have First Hand Knowledge of Facts Documented in the RI EOHHS Produced APRA Public Records Relating to the Rhode Island Office of Child Support Services Practice of Taking Interest Amounts off from the 42 U.S.C. sec. 654a automated data processing system when certifying to TEXAS under 42 U.S.C. sec. 666(14) in 2018, and Putting An Ever-Changing Interest Amount Back on the 42 U.S.C. sec. 654a automated system**

The APRA Public Records produced pursuant to Defendant's December 1, 2022 APRA Record Request show that RI EOHHS, Chief Counsel Ms. Debra Barclay, and Chief Counsel Ms. Lisa Martinelli (and Chief Counsel Ms. Jennifer Buckley) have First Hand Knowledge or Should Have First Hand Knowledge of Facts Documented in the RI EOHHS-Produced APRA Public Records Relating to the Rhode Island Office of Child Support Services' Practice of Taking Interest Amounts off from the 42 U.S.C. sec. 654a automated data processing system when certifying to other states, and in Defendant's case, when certifying to TEXAS under 42 U.S.C. sec. 666(14) in 2018, and Putting back the Ever-Changing Interest Amount Back on the 42 U.S.C. sec. 654a automated system in the amount of tens of thousands of dollars.  Office of Child Support Service's taking the interest amount off the automated system and putting the interest back on the automated system is so public and routine that they not only form part of transcripts of public hearings in this Title IV proceeding, they also form the basis of written public court orders entered in this Title IV case from February 10, 2023 to the present.

**A RI EOHHS Officer testifying** to the RI EOHHS's First Hand Knowledge and testifying to Whether the RI EOHHS Knew Or Should Have Known that the Rhode Island Office of Child Support Services routinely certifies and submits child support

records that entails the removals or adding back on to the system tens of thousands of dollars in interest amounts that are documented in the APRA public records produced on December 22, 2022, which <mark>corroborate</mark> with all the information, materials, evidence, filings and facts presented during the course of the RI EOHHS Appeal Docket# 22-2116 in which NO FORMAL HEARING ever took place, simply and straightforwardly **complies with DUE PROCESS** requirements prescribed by 42 U.S.C. sec. 666 that 42 U.S.C. sec. 654(20) requires as a condition of Rhode Island's participating in Title IV-D and as a condition of receiving Title IV-A TANF federal funding.

### III.    <u>Statutory and Federal Authority</u>

In order to avoid yet another penalty-incurring violation of 42 U.S.C. sec. 654, the RI EOHHS and Ms. Debra DeStefano must produce subpoenaed information and testify to facts and any and all first-hand knowledge of the APRA public records that RI EOHHS caused to be produced relating to Rhode Island Office of Child Support Service's Practice of taking tens of thousands of dollars of alleged interest amounts off the 42 U.S.C. sec. 654a automated data processing system when certifying and sending to TEXAS under 42 U.S.C. sec. 666(14) documented in the TRAC records in Defendant's Title IV-D case.

Congress prescribed both civil and criminal penalties for violations. Consistent with its Spending Power, Congress has the authority to attach conditions on the receipt of federal funds. *See **South Dakota v. Dole***, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a

condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16), (20), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See **Sullivan v. Stroop***, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."   The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." ***Hodges v. Shalala***, 121 F.2d at 879.  Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1]   Congress also enacted several criminal codes

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
        Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the

punishing actors, such as the Plaintiffs, who commit federal crimes, including cover up of unlawful activities.

The federal government has a longstanding involvement in child support enforcement programs. See ***Hodges v. Shalala***, 121 F.Supp.2d 854 (D.S.C. 2000). As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements under 42 U.S.C. sec. 654(21)(A) that the State, at the option of the State, impose a late payment fee ('interest") on all overdue support (as defined in section 666(e) of this title) under any obligation being enforced under this part, in an amount equal to a uniform percentage determined by the State (not less than 3 percent nor more than 6 percent) of the overdue support, which shall be payable by the noncustodial parent owing the overdue support; establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A), among others

While Rhode Island submits to the United States that it has a federally certifiable statewide automated data processing system for child support, RI EOHHS caused Office of Child Support Services to produce APRA Public Records consisting of Title IV Public Records showing Rhode Island taking off from the automated data processing system tens of thousands of dollars allegedly representing the 42 U.S.C. sec. 654(21)(A)

---

automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

prohibited 12% compound interest late payment fee "interest" prior to certifying to TEXAS and the United States, and showing Rhode Island falsely certified to the amount's accuracy under 42 U.S.C. sec. 666(14) when in fact Rhode Island removed significant tens of thousands of dollars (See TRAC records in Exhibit C).

RI EOHHS is being called as a witness in this Title IV hearing matter to testify to the facts, furthermore in its supervisory capacity, relating to the APRA records RI EOHHS caused to be produced, and Ms. Debra DeStefano to testify, among others, her first-hand knowledge of said facts relating to Office of Child Support Services taking off the 42 U.S.C. sec. 654(21)(A) interest from the automated data processing system and then putting it back on the system that is corroborated by the APRA Public Records produced as a result of RI EOHHS's response to TEXAS Defendant's RI APRA public records request.

Defendant reiterates that failure to furnish information regarding the State Plan's and the SDU's Title IV-D operations relating to the tens of thousands of dollars removed from the automated system prior to certifying to Texas and the United States and then put back on the system tens of thousands of dollars shown in Defendant's case file public records is penalty incurring and shows the state plan fails to meet all requirements under 42 U.S.C. sec. 654.  Without an approved state plan, a State may lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). See 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2). Alternatively, a State may opt for an alternative penalty in lieu of disapproval of their state plan and the withholding of federal funds if the State is making a good faith effort to comply with the

program's requirements and the State has submitted a corrective compliance plan. See 42 U.S.C. § 655(a)(4).

The Title IV-D statute expressly provides that compliance with ALL 42 U.S.C. 654 requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A.

The clear and unequivocal statement of the required conditions in the statute enabled South Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop,* 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."

Emphatically, Congress may use its **Spending Power** to **influence** a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, but Congress, under the **Commerce Clause**, **may offer the States a choice of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc*.**, 452 U.S. 264, 288 (1981). It is crystal clear that upon Rhode Island's State Plan entering into agreement with the United States, Rhode Island accepted the agreement terms of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

Defendant filed a Motion to Dismiss Interest Arrears on February 4, 2024 and Defendant's Motion is scheduled on the Court's calendar to be heard on March 28, 2024.  For the hearing, the Defendant served the attached Subpoena, attached hereto as Exhibit A, upon the witness RI EOHHS, the entity that further supervises the Rhode Island Office of Child Support Services, both acting and designated as the State agency under the State Plan pursuant to **42 U.S.C. § 654.** *See* United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUSC-prelim-title42-

section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRpb25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

### V. RI EOHHS Has Access to and Has Supervisory Access to Pursuant Its Supervisory Control of Rhode Island Office of Child Support Services, Title IV-D records related to Defendant Mary Seguin

Defendant subpoenaed "(1) All records relating to Administrative Appeal Docket # 22-2116 CSE ID: 1689817, including notes taken, messages generated and received through Microsoft teams meeting at the pre-hearing conference call with Appellant Mary Seguin and John Langlois of Rhode Island Office of Chiild Support Services on October 5, 2022; (2) All records relating to Mary Seguin."

*See* attached **subpoena**, **Exhibit A**.

The RI EOHHS has pursuant to its supervisory control access to records of Rhode Island Office of Child Support Services' actions in this Title IV-D case's proceedings since 2010 evidence by the entries of orders in this matter prepared and submitted in her official and individual capacities, Priscilla Glucksman – they make clear the Office of

Child Support Services is one of the State Plan's key "organizational unit which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan" under **42 U.S.C. § 654(3), and the RI EOHHS has supervisory responsibility over Office of Child Support Services, and is a 42 U.S.C. § 654(3) entity itself and is further a 42 U.S.C. § 654(1) entity in which all requirements of 42 U.S.C. § 654 must be in effect.**

  **Rhode Island EOHHS' refusal** *to comply with the Subpoena to produce Title IV-D records relating to the above to the requesting noncustodial parent is a prima facie* **42 U.S.C. § 654b violation that incurs penalties** in this **fiscal year under 42 U.S.C. § 655(a)(5) as well as 42 U.S.C. § 655(a)(4), and represents complicit cover-up,** which penalty-incurring violations the Defendant had reported, is reporting and will continue to report to relevant law enforcement authorities at the federal and state levels.  (Judicial notice is respectfully requested that the Defendant in January 2023 reported Office of Child Support's violations to the Rhode Island Office of Attorney General that is further directed by the December 16, 2022 Letter sent by Ms. Lisa Martinelli, Esq., Chief Counsel of RI EOHHS, who instead of enforcing the requirements of the State Plan as the Attorney General is similarly a political subdivision under 42 USC 654(1), opted to reinforce, aid, shield and protect Rhode Island political subdivisions' unlawful activities – this is reported to United States authorities).  As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654.  Among the prerequisites for approval of a Title IV-D Plan are the requirements that the State

may only uniformly charge 3-6% simple interest on overdue support, *see* 42 U.S.C. § 654(21)(A), and a State must establish and operate an automated data processing and information retrieval system ***without*** taking computer calculated amounts off and then put other numbers back on the system or hardcoding/inputting new numbers computed offline onto the system, see 42 U.S.C. § 654(24), and the State **must** have a state child support disbursement unit (SDU) that complies with all the requirements of 42 U.S.C. § 654, 42 U.S.C. § 654a, 42 U.S.C. § 654b, *see* 42 U.S.C. § 654(27)(A). Rhode Island deliberately fails to meet all the requirements, including continuously inputting 12% compound interest on overdue support and the Rhode Island Office of Child Support Services covers up their noncompliance with accounting fraud inputting into the system and taking off from the automated data processing system amounts that are inflated, unlawful, and submitting false books of accounts that removed the unlawful inflated amounts to the Federal authorities to make it look like Rhode Island is in compliance so as to procure federal funding for which Rhode Island is ineligible.

The deliberate fraud makes clear the State operates an unlawful plan, in fact a criminally unlawful plan, and does not have an approved state plan under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, and should lose and disgorge unlawfully procured federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). *See* 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2). *See*, *Hodges v. Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).

**Any attempt interfering with the Defendant's reporting, pursuant to 18 U.S.C. § 4, to law enforcement authorities the commission of crimes by**

**political subdivisions of the State within this Title IV-D proceeding is**

**unenforceable.**  Any and all failures to comply with 18 U.S.C. § 4 constitutes

misprision of a felony.

## A. VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Defendant made

known to the panel of judges of the United States allegations contained in the Amended

Complaint filed in Federal Court of the commission of acts by the Rhode Island political

subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein

in this motion, the afore-described acts violating 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C.

§13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18

U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. §

241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18

U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C.

§1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C.

§1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C.

§1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18

U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968  – such violative acts by the Plaintiffs in

this matter, along with the political subdivisions and employees thereof named in the

federal matter on this list are not exhaustive.  It is undisputable, among others, that

Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-

D and Title IV-A disgorgement is due from the applicable State of Rhode Island's

political subdivisions.

## B. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF AMERICA v. DONALD J. TRUMP*, DC Circuit, the DC Circuit United States Court of Appeals reminds the Public and all applicable tribunals that Judges are similarly liable to the criminal laws for their official acts.  A notable example is *Ex parte Commonwealth of Virginia*, in which the Supreme Court affirmed the criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for violating a federal statute that prohibited discriminating on the basis of race in jury selection. *Id.* at 340, 344. The Supreme Court began by observing the principle that officers are bound to follow the law: "We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the holder from obligation to obey the Constitution of the United States, or take away the power of Congress to punish his disobedience." *Id.* at 348. The Court then addressed the judge's argument that the Court lacked the authority to punish a state judge for "his official acts." *Id*. Its response was twofold. First, the Court described juror selection as "merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads." *Id.* The Court then explained that even if juror selection is considered a "judicial act," ==the judge had a legal duty to obey the criminal laws==:

> "But if the selection of jurors could be considered
> in any case a judicial act, can the act charged
> against the petitioner be considered such when
> he acted outside of his authority and in direct
> violation of the spirit of the State statute? That
> statute gave him no authority, when selecting

jurors, from whom a panel might be drawn for
a circuit court, to exclude all colored men
merely because they were colored. Such an
exclusion was not left within the limits of his
discretion. It is idle, therefore, to say that the
act of Congress is unconstitutional because it
inflicts penalties upon State judges for their
judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute" is to
the Virginia law charging the county judge with the duty to select jurors in the circuit
and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are
not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed
the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief
brought against a county magistrate and associate judge of a county circuit. 414 U.S.
488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction
was not the only available remedy because both judges remained answerable to the
federal criminal laws:

[W]e have never held that the performance of
the duties of judicial, legislative, or executive
officers, requires or contemplates the
immunization of otherwise criminal deprivation
of constitutional rights. On the contrary, the
judicially fashioned doctrine of official
immunity does not reach 'so far as to immunize

> *criminal conduct proscribed by an Act of*
> *Congress . . . .'*

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See* also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493

F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled

on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not

immune, and employees of the political subdivisions of Rhode Island under 42 USC

654(1) similarly are not immune.  Barbara Grady and Gero Meyersiek are

unquestionably liable.

## I.    CONCLUSION

**Under 42 USC 654b, the Defendant is entitled to be furnished all subpoenaed records – conversely, the Rhode Island Executive Office of Health and Human Services, the SDU under the State's Plan under 42 USC 654, must furnish all subpoenaed information and RI EOHHS Hearing Officer must testify to first-hand knowledge of information related to factual information furnished by Rhode Island Office of Child Support Services that are corroborated by the Title IV-D public records RI EOHHS caused to be produced in response to Defendant's RI APRA public records request – refusal of which incurs yet another penalty.**

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or

designee-Judge Merola of this Honorable Court to:

1. Grant the Defendant's Motion to Compel.

2. Grant the Defendant's request for any and all records relating to her Title IV record information that includes record information relating to the "TRAC notes of 12/6/2021 and 12/7/2021" that records taking interest off the system when sending to Texas then REDACTION, as well as relating to the substance of John Langlois's audio recorded October 5, 2022 statements regarding "what happened in this case" that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the Child Support Services that Gero Meyersiek

said yes, he "agreed to waive the $73k or $75k that are in arrears" as of December 6, 2021 and October 5, 2022 which are part of Defendant's child support case file.

3. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request.

4. Declare that Defendant's child support file maintained by the Rhode Island Office of Child Support Services under the supervision of RI EOHHS must be produced to the Defendant Noncustodial Parent upon request.

5. Order a hearing on the herein issues raised in this matter.

6. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here:

   https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

7. Order testimony and document production by Ms. Jennifer Lynch Buckley who replaced Ms. Lisa Martinelli as they relate to RI EOHHS Agency's APRA public records production in response to Defendant's December 1, 2022 APRA request sent to RI EOHHS requesting Defendant's Title IV records.

8. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

March 26, 2024

FOR DEFENDANT

MARY SEGUIN, Pro Se.

By: _____ *Mary Seguin* _____
Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

## NOTICE OF HEARING

    Please take notice that the foregoing Motion will be called for hearing before the Rhode Island Family Court, One Dorrance Plaza, Providence, RI 02903 at 10:00 AM on March 28, 2024 (case is already scheduled for that date/time) by WebEx hearing https://ricourts.webex.com/meet/garrahy5F

## CERTIFICATION

    I hereby certify that a copy of the within Motion was filed on March 26, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov, Jennifer.buckley@ohhs.ri.gov and dhs.courtfile@dhs.ri.gov

*Mary Seguin*

Exhibit A



# STATE OF RHODE ISLAND

## FAMILY COURT

### SUBPOENA - CIVIL

| Plaintiff STATE OF RHODE ISLAND EX REL. GERO MEYERSIEK | Civil Action File Number K2001-0521M |
|---|---|
| Defendant MARY SEGUIN | |

| ☐ Murray Judicial Complex Newport County 45 Washington Square Newport, Rhode Island 02840-2913 *(401) 841-8340 | ☐ Noel Judicial Complex Kent County 222 Quaker Lane Warwick, Rhode Island 02886-0107 *(401) 822-6725 |
|---|---|
| ☐ McGrath Judicial Complex Washington County 4800 Tower Hill Road Wakefield, Rhode Island 02879-2239 *(401) 782-4111 | ☑ Garrahy Judicial Complex Providence/Bristol County One Dorrance Plaza Providence, Rhode Island 02903-2719 *(401) 458-3200 |

TO: DEBRA DESTEFANO

of RHODE ISLAND EXECUTIVE OFFICE OF HEALTH AND HUMAN SERVICES APPEALS OFFICE 3 WEST RD. CRANSTON, RI 02920

☑ **YOU ARE HEREBY COMMANDED** to appear in the Family Court listed above at the date, time, and courtroom specified below to testify in the above-entitled case and bring with you:

(1) ALL RECORDS RELATING TO ADMINISTRATIVE APPEAL DOCKET # 22-2116 CSE ID: 1689817, INCLUDING NOTES TAKEN MESSAGES GENERATED AND RECEIVED THROUGH MICROSOFT TEAMS MEETING AT THE PRE-HEARING CONFERENCE CALL WITH APPELLANT MARY SEGUIN AND JOHN LANGLOIS OF RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICE ON OCTOBER 5, 2022

(2) ALL RECORDS RELATING TO MARY SEGUIN

TRUE COPY ATTEST
DEPUTY SHERIFF #1L

| Courtroom | Date | Time |
|---|---|---|
| GARRAHY COURTROOM 5F | MARCH 28, 2024 | 9:30 AM |

If you need language assistance, please contact the Office of Court Interpreters at (401) 222-8710 or by email at interpreterfeedback@courts.ri.gov before your court appearance.

* If an accommodation for a disability is necessary, please contact the Family Court Clerk's Office at the telephone number listed above as soon as possible. TTY users can contact the District Court through Rhode Island Relay at 7-1-1 or 1-800-745-5555 (TTY) to voice number.

Page 1 of 2

FC-73 (revised June 2020)



# STATE OF RHODE ISLAND

## FAMILY COURT

☐ **YOU ARE HEREBY COMMANDED** to appear at the location, date, and time specified below to testify at the taking of a deposition in the above-entitled case.

| Location of Deposition | Date | Time |
|---|---|---|
|  |  |  |

☑ **YOU ARE HEREBY COMMANDED** to produce and permit inspection and copying of the following documents or objects at location, date, and time specified below (list documents or objects):

_SEE ITEMIZED ① AND ② ON PAGE 1 OF THIS SUBPOENA - BRING / PRODUCE ALL RECORDS FOR INSPECTION AND COPYING AND EMAIL TO MARYSEGUIN22022@GMAIL.COM_

| Location | Date | Time |
|---|---|---|
| GARRAHY COURTROOM 5F | MARCH 28, 2024 | 9:30 AM |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf and may set forth, for each person designated, the matters on which the person will testify (R.Dom.Rel.P. 30(b)(6)).

Failure to comply with this Subpoena may result in a finding of contempt under R.Dom.Rel.P. 45 or the imposition of sanctions under R.Dom.Rel.P. 37.

| /s/ | Rhode Island Bar Number: |
|---|---|
| Attorney for the ☐ Plaintiff ☐ Defendant or the ☐ Plaintiff ☐ Defendant | Date: |
| Telephone Number: | |

| Issued by ☐ Clerk, ☑ Notary, or ☐ Issuing Official pursuant to G.L. 1956 § 9-17-3 | Date: _3/4/2024_ |
|---|---|

/s/ _____
**Clerk**

_Cassandra Dominguez_
Name of Notary

_Cassandra Dominguez CL Dominguez_
Signature of Notary

Notary commission expires: **01-13-2026**　Notary identification number: **133533272**

> CASSANDRA DOMINGUEZ
> Notary Public, State of Texas
> Comm. Expires 01-13-2026
> Notary ID 133533272

_____
Name of Issuing Official

_____
Signature of Issuing Official

Page 2 of 2

FC-73 (revised June 2020)



# STATE OF RHODE ISLAND

## FAMILY COURT

| Plaintiff STATE OF RHODE ISLAND EX.REL. GERO MEYERSIEK | Civil Action File Number K2001-0521M |
|---|---|
| **Defendant** MARY SEGUIN | |

## PROOF OF SERVICE

☑ I hereby certify that on the date below I served a copy of this Subpoena on
_____ personally.

☐ I hereby certify that I was unable to make service after the following reasonable attempts:
_____

| SERVICE DATE: 3 / 15 / 24 | SERVICE FEE $_____ |
| Month   Day   Year | |

Signature of SHERIFF or DEPUTY SHERIFF or CONSTABLE

*Russell D Emley #42*

SIGNATURE OF PERSON OTHER THAN A SHERIFF or DEPUTY SHERIFF or CONSTABLE MUST BE NOTARIZED.

_____
Signature

State of _____
County of _____

On this _____ day of _____, 20____, before me, the undersigned notary public, personally appeared _____
☐ personally known to the notary or ☐ proved to the notary through satisfactory evidence of identification, which was _____, to be the person who signed above in my presence, and who swore or affirmed to the notary that the contents of the document are truthful to the best of his or her knowledge.

Notary Public: _____
My commission expires: _____
Notary identification number: _____

FC-73 (revised June 2020)

Exhibit B



Rhode Island Executive Office of Health and Human Services
Legal Office, Three West Road, Virks Building, 4th Floor, Cranston, RI 02920
phone: 401.462.2326   fax: 401.462.1678

December 16, 2022

**VIA EMAIL and US Mail:** marylive22022@gmail.com

Ms. Mary Seguin
2303 Elmen Street
Houston, TX 77019

**Re:  Response to Correspondence dated December 1, 2022**

Dear Ms. Seguin:

I am responding on behalf of Secretary Novais to your correspondence of December 1, 2022.  It is my understanding that you have been seeking records related to a matter pending with the Office of Child Support Services (OCSS).  I have contacted OCSS Chief Legal Counsel Attorney Paul Gould and he assured me that records relating to your file will be forwarded to you in the next couple of days.  Attorney Gould is copied on this correspondence.

In reply to your correspondence/petition of December 1, 2022, the Executive Office of Health and Human Services (EOHHS) and its Appeals Office do not have any documents responsive to your request regarding your file with OCSS.   You may not be aware that the OCSS is part of the Rhode Island Department of Human Services (DHS) and file documents are not commingled between agencies.   This response is solely on behalf of EOHHS and not any other agency or branch of state government.  Further, the Appeals Office never received any documents from your file from the OCSS when the appeal was pending.  When DHS OCSS withdrew the adverse action (the Notice of Lien), which gave rise to your appeal, there was no longer an underlying case for the Appeals Office to adjudicate, and the appeal was dismissed for lack of jurisdiction. (See attached Final Notice of Dismissal and Order).

If you are seeking an appeal of an Access to Public Records request, that action is governed by R.I. Gen. Laws § 38-2-8 and is answered by the Chief Administrative Officer for the agency that has custody of the requested records.   The Chief Administrative Officer for the DHS OCSS is the Director of the Rhode Island Department of Human Services, Acting Director Kimberly Brito or you may elect to directly appeal a decision to the Rhode Island Office of the Attorney General, 150 South Main Street, Providence, RI 02903.

Very truly yours,

Lisa M. Martinelli, Esq.
Executive Legal Counsel

cc:  Deb Barclay, Esq., Paul Gould, Esq.

Exhibit C

Case Number: K20161522M   Document: 0011810092   Page: 806   Date Filed: 09/30/2024   Entry ID: 6662890

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00             CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $_____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:          SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K   PNL:

Case Number P2001632TM
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10 13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

```
12/13/22    11:20        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY             U024  PROD
STARTING DATE    09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSMENTS SO WE CAN GET THIS SORTED____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.___
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL___
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES___

RL: 80  12 22 ABSP:        SEGUIN      MARY      CMD: _____
FNX: TRAC  D CLIENT:       MEYERSIEK   GERO   K  PNL:
```

Case 23-1073   Document: 00118120547   Page: 858   Date Filed: 09/28/2024   Entry ID: 6667500
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

12/13/22   11:29         C A S E   T R A C K I N G         CSCL   ASMXA201
           TRAC.00            CASE HISTORY                U824   PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
    FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
    FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: 80  12 22 ABSP:              SEGUIN      MARY        CMD: _____
FWX: TRAC  D CLIENT:             MEYERSIEK   GERO    X   FNL:

Case Number: 23-1003A   Document: 00118190823   Page: 859   Date Filed: 09/26/2024   Entry ID: 6682600
Filed: Providence/Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maja G.
11:29:03 Tuesday, December 13, 2022

```
12/13/22   11:29          C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY                U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

RL: 80  12 22 ABSP:              SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK   GERO    R   PNL:
```

ed in Providence/Bristol County Family Court
ibmitted 6/17/2023 10.13 PM
ivelope: 4132704
iviewer: Maria O

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G       CSCL  ASMXA201
           TRAC.00              CASE HISTORY            U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:          SEGUIN       MARY         CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK     GERO    K    PNL:
```

Case Number 22-01893M    Document: 00118120933    Page: 860    Date Filed: 09/26/2024    Entry ID: 6682690
Filed in Providence/Bristol County Family Court
Submitted: 5/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maya P.
11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28         C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00              CASE HISTORY                U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL____
$2296.42
_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
       TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
       58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75.
_____

RL: 80  12 22 ABSP:              SEGUIN        MARY           CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK     GERO      K    PNL:
```

Case Number: K20910833M    Document: 00118190833    Page: 862    Date Filed: 09/28/2024    Entry ID: 6682690
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E    T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY              UB24   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_
DOOR AND BRING THE CHECK DOWN TO HER._

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE__
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

RL: 80  12 22 ABSP:            SEGUIN      MARY       CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK   GERO    K  PNL:
```

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

```
                11:29:17 Tuesday, December 13, 2022


         12/13/22   11:28      C A S E   T R A C K I N G      CSCL  ASMXA201
                    TRAC.00            CASE HISTORY           U824  PROD
         STARTING DATE   09 01 2021
         SELECTION   COMPREHENSIVE CASE HISTORY

         01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
         PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
         A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
         THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
         NOTICE NCP VIA MAIL AT THE TEN DAY MARK

         02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
         MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
         REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

         03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
         KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
         ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
         CLAIM NUMBER: TX027985


     RL: 80  12 22 ABSP:
     FNX: TRAC  D CLIENT:          SEGUIN       MARY         CMD: _____
                                   MEYERSIEK    GERO    K    PNL:
```

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                    FAMILY COURT

| | | |
|---|---|---|
| State of Rhode Island ex rel. | : | |
| GERO MEYERSIEK | : | |
| *Plaintiff* | : | |
| | : | |
| VS. | : | DOCKET NO: K20010521M |
| | : | Title IV Part D Case under |
| | : | 42 U.S.C. §§ 651-669 |
| MARY SEGUIN | : | |
| *Defendant* | : | |

## DEFENDANT'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENA

The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby moves to compel compliance with Defendant's Subpoena (attached hereto as **Exhibit A**) served upon the Rhode Island Office of Child Support Services, which is acting on behalf of the State of Rhode Island ex. rel. GERO MEYERSIEK, and acting as the "State Agency" under the Rhode Island State Plan under **42 U.S.C. § 654**, **42 U.S.C. § 654a**, **42 U.S.C. § 654b**, **42 U.S.C. § 666 *et al*.**, and all applicable state and Federal Laws, both civil and criminal, regulating Plaintiffs' actions and omissions under the legal framework of **Title IV-D of the Social Security Act**.  Defendant respectfully **requests and moves for a hearing on Defendant's herein Motion to Compel Compliance with Subpoena** – the Rhode Island Office of Child Support Services refuses to respond to and refuses to comply with the Subpoena, and filed a motion to quash the subpoena on March 20, 2024 - the requested information is further regulated and mandated to be produced under the State Plan in compliance under **42 U.S.C. § 654b**, therefore those

**requested documents must be produced by the State within this proceeding as well as without judicial compulsion**. The Subpoena further summons Kevin Tighe, Paul Gould and John Langlois to appear to Court to testify at the hearing scheduled in this matter on March 28, 2024 at 10:00 AM.

## I. RHODE ISLAND'S STATE PLAN'S PENALTY-INCURRING VIOLATIONS OF TITLE IV-D

### AND

### ORGANIZED CRIMINAL COMMISSION OF INTERSTATE FRAUD

Congress prescribed both civil and criminal penalties for violations. Consistent with its Spending Power, Congress has the authority to attach conditions on the receipt of federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely." The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not

disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at 879.  Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1]  Congress also enacted several criminal codes punishing actors, such as the Plaintiffs, who commit federal crimes, including cover up of unlawful activities.

Defendant filed a Motion to Dismiss Interest Arrears on February 4, 2024 and Defendant's Motion is scheduled on the Court's calendar to be heard on March 28, 2024.  For the hearing, the Defendant served the attached Subpoena, attached hereto as Exhibit A, upon the State ex. rel. Plaintiff, Rhode Island Office of Child Support Services, the State agency under the State Plan pursuant to **42 U.S.C. § 654.** *See* United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUS

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007),
http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
    Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

C-prelim-title42-

section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRp

b25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

Defendant subpoenaed "(1) All records, files, notes, public records, documents, films, materials generated in the course of administration and enforcement of relating to Defendant Mary Seguin, from 2010 to the present in this Title IV-D Case under the Social Security Act; (2) All records relating to Defendant Mary Seguin from 2010to the present, including notes and messages taken and generated on October 5, 2022."

*See* attached **subpoena**, **Exhibit A**.

The Rhode Island Office of Child Support Services' actions in this Title IV-D case's proceedings since 2010 with the entries of orders prepared and submitted in her official and individual capacities, Priscilla Glucksman, make clear the Office of Child Support Services is one of the State Plan's key "organizational unit which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan" under **42 U.S.C. § 654(3).**

**Rhode Island Office of Child Support Services' refusal** *to comply with the Subpoena is a prima facie* **42 U.S.C. § 654b violation that incurs penalties** in this **fiscal year under 42 U.S.C. § 655(a)(5) as well as 42 U.S.C. § 655(a)(4),** which penalty-incurring violations the Defendant had reported, is reporting and will continue to report to relevant law enforcement authorities at the federal and state levels. (Judicial notice is respectfully requested that the Defendant in January 2023 reported Office of Child Support's violations to the Rhode Island Office of Attorney General, who instead of enforcing the requirements of the State Plan as the Attorney General is

similarly a political subdivision under 42 USC 654(1), opted to reinforce, aid, shield and protect Rhode Island political subdivisions' unlawful activities – this is reported to United States authorities).  As a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654.  Among the prerequisites for approval of a Title IV-D Plan are the requirements that the State may only uniformly charge 3-6% simple interest on overdue support, *see* 42 U.S.C. § 654(21)(A), and a State must establish and operate an automated data processing and information retrieval system ***without*** taking computer calculated amounts off and then put other numbers back on the system or hardcoding/inputting new numbers computed offline onto the system, see 42 U.S.C. § 654(24), and the State **must** have a state child support disbursement unit (SDU) that complies with all the requirements of 42 U.S.C. § 654, 42 U.S.C. § 654a, 42 U.S.C. § 654b, *see* 42 U.S.C. § 654(27)(A).  Rhode Island deliberately fails to meet all the requirements, including continuously inputting 12% compound interest on overdue support and the Rhode Island Office of Child Support Services covers up their noncompliance with accounting fraud inputting into the system and taking off from the automated data processing system amounts that are inflated, unlawful, and submitting false books of accounts that removed the unlawful inflated amounts to the Federal authorities to make it look like Rhode Island is in compliance so as to procure federal funding for which Rhode Island is ineligible.

The deliberate fraud makes clear the State operates an unlawful plan, in fact a criminally unlawful plan, and does not have an approved state plan under Title IV-D of

the Social Security Act, 42 U.S.C. §§ 651-669, and should lose and disgorge unlawfully procured federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). *See* 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).  *See*, *Hodges v. Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).

**Any attempt interfering with the Defendant's reporting, pursuant to 18 U.S.C. § 4, to law enforcement authorities the commission of crimes by political subdivisions of the State within this Title IV-D proceeding is unenforceable.**   Any and all failures to comply with 18 U.S.C. § 4 constitutes misprision of a felony.

### A. THIS PROCEEDING IS GOVERNED by 42 U.S.C. § 654 et al. UNDER TITLE IV-D THAT REGULATE <u>ALL POLITICAL SUBDIVISIONS</u> OF THE STATE OF RHODE ISLAND

The Political Subdivision of the State of Rhode Island under <mark>42 U.S.C. § 654(1),</mark> namely by and through the **Office of Child Support Services' Lead Legal Counsel Paul Gould,** Esq., made several claims before this Court under Oath throughout this Title IV-D case hearings and proceedings that **the laws of Congress do not matter, only this court orders matter and they do not need to conform to Congressional prescribed federal statutes.** *E.g.*,  See <u>Exhibit B</u> Transcript **of February 2, 2024** Hearing in this matter**.  Rhode Island is wrong and Paul Gould is wrong, and both know it.  That flagrant lawlessness is at the heart of the violations of federal law under color of state law in this interstate**

Title IV-D case.  **Rhode Island participates in Title IV-D, and** in so participating **through its State Plan, <u>must</u> comply** with **Title IV-D.  *See, <mark>Hodges v. Shalala</mark>, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).  *See New York v. United States*, 505 U.S. at 161, Congress, under the Commerce Clause, may offer the States a choice of regulation under federal control or preemption under federal regulation. *See <mark>Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.</mark>*, 452 U.S. 264, 288 (1981).  The Title IV-D statute expressly provides that compliance with 42 U.S.C. sec. 654, and compliance with the automated data processing system and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted);  *See South Dakota v. Dole, 483 U.S. 203, 206 (1987). The textual language of <mark>42 U.S.C. § 654(1)</mark> states,**

> "A State plan for child and spousal support must—
> (1)    provide that it shall be in effect in <mark>all political subdivisions of the State</mark>"

The facts and established law thus make it crystal clear *all political subdivisions* of Rhode Island, including the **Rhode Island Department of Human Services**, the **Office of Child Support Services <u>AND</u>** the **Rhode Island Judiciary political subdivisions of the State of Rhode Island <u>MUST</u> comply** with <mark>**42 U.S.C. § 654**</mark>.  However, because the Rhode Island Office of Child Support Services,

**the State Plan's SDU unit, flagrantly and expressly states in this Title IV-D case that Title IV-D statute and Congressionally prescribed federal statutes do not apply in this case nor in Rhode Island, the State of Rhode Island's political subdivisions have flagrantly flouted 42 USC sec. 654 and then adjusted and tampered with the automated data processing system accounting to defraud the United States of federal funding, and to defraud the Defendant of her Texas properties.**

Therefore the Defendant respectfully reminds all participants involved in this Title IV proceeding and gives notice to the applicable State political subdivisions (*e.g.*, Rhode Island Judiciary) and agencies, including the SDU under the State Plan under ==42 U.S.C. § 654(1)==, *e.g.*, the **Rhode Island Office of Child Support Services,** that this yet again noncompliance by the State of Rhode Island with the Subpoenaed information egregiously constitutes yet another of the many numerous failures of Rhode Island agencies and its State Plan during this fiscal year to comply with the requirements of section 654b, as well as 654, 654a and 666 of Title IV which shall be considered yet another of the many numerous failures of the State to comply with subparagraphs (A) and (B)(i) of section 654(27) of this title during the fiscal year, that is clearly stipulated in 42 U.S.C. **§ 655(a)(5)(A)(ii) by a penalty amount of up to 30 percent of the penalty base, in the case of the fifth or any subsequent such fiscal year in which such a failure by the State occurs (regardless of whether a penalty is imposed under this paragraph with respect to the failure). (ii) The term "penalty base" means, with respect to a failure of a State to comply with a subparagraph of section 654(24) of this title during a fiscal**

year, the amount otherwise payable to the State under paragraph (1)(A) of this subsection for the preceding fiscal year.

Additionally, the deliberate noncompliance motivated by cover up makes clear the State knowingly and intentionally operates an illegal plan, the State knows Rhode Island does not have an approved state plan under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, and therefore should lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). *See* 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).

### B. FRAUD

In this Title IV case, serial noncompliance, motivated by fraud, and their resulting incurred penalties, both civil and criminal, accrued since the initiation of this Title IV case fourteen years ago in **2010, upon Plaintiff Gero Meyersiek's application for services under Title IV through his own private attorney, *Barbara Grady*, whose former law firm partner and diseased husband *Paul Dugan*, was himself a former Senior Counsel of the Rhode Island Office of Child Support Services, one of the key Title IV-D agencies under Rhode Island's State Plan charged under 42 U.S.C. § 654(3) with State compliance with 42 U.S.C. § 654, 654a, 654b, 655, 658a, among others – Barbara Grady through Paul Dugan has intimate knowledge of and is a knowing participant in the State's accounting fraud reporting to the United States for federal funding reimbursement and federal funding Incentive Payment payouts (658a) worth hundreds of millions of dollars under the Title IV Program to the Secretary and Department of Health and Human Services, among**

others.  Upon information and belief, the Plaintiff Gero Meyersiek and Barbara Grady and the Rhode Island Office of Child Support Services have a series of unlawfully obtained "12% compound interest" money receipt sharing arrangements involving the fraudulent procurement through the Title IV framework of exorbitant 12% compound interest interstate targeting Defendant's Texas properties on overdue support enabled through accounting fraud, among others – this arrangement involving interstate defraud of the Texas Defendant and simultaneous theft of the United States of ineligible Title IV funding entails, *inter alia*, the Rhode Island Office of Child Support Services discussing in great detail at length with Barbara Grady the agency's fraudulent removal from the 42 U.S.C. § 654(24), 42 U.S.C. § 654(27) and 42 U.S.C. § 654a mandated automated data processing system of 12% compound interest when sending to Texas in 2018 thus creating fraudulent books of accounts under 42 U.S.C. § 666(14)(A)(ii)(I) and (II) *fraudulently certifying to Texas via wire and via mail inaccurate support due accounts* – discussions of this scheme further violated the Defendant's privacy rights, that are documented in the TRAC record of the Defendant's Title IV case file for December 2021 recording the agency's discussions with Barbara Grady at length regarding taking interest off when sending to Texas, and keeping it off the system when communicating to Defendant that Gero Meyersiek waived interest, and then putting interest back on the system after they defrauded the Defendant inducing the Defendant to payoff support that comprised of the principle in one lump sum of $104,185.98 in consideration of Gero Meyersiek waiving

interest – the agency discussing its illegal and criminal enforcement information with Barbara Grady is in itself a violation of 42 U.S.C. 654 (26)(A) that mandates the State Plan to have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the <mark>privacy rights of the parties</mark>, such as this Texas Defendant, including—

(A)<mark>safeguards against unauthorized use or disclosure of information relating to</mark> proceedings or <mark>actions to</mark> establish paternity, or to establish, modify, or <mark>enforce support</mark>.

See Exhibit B. Rhode Island Office of Child Support **TRAC** document for December 2021 attached hereto as <mark>**EXHIBIT**</mark> B.

Under **Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669**, the Texas Defendant has the **protected** right to be furnished under Subpoena with all TRAC records in Defendant's Title IV-D case file from 2010 to the present to establish the accuracy of the alleged Rhode Island computations mandated to be performed by the automated data processing system, but has instead been hard-programmed numbers created offline that are then manually input into the automated data processing system several times, thus fabricating several different Rhode Island-certified false books of accounts of amounts due transmitted by mail and by wire to Texas and the Texas Defendant and to the United States for the purposes of procuring federal funding under Title IV-D and Title IV-A that violate Federal and Texas State civil and criminal codes.  The Rhode Island Office of Child Support Services refuses to

produce any TRAC records for 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021 January to November, 2023 and 2024.

This violation of, among others, 42 U.S.C. 654(26)(A) constitutes a violation of 42 U.S.C. 654(27) that counts as a penalty in the many violations in fiscal year 2021 alone which exceeds 30% of the penalty base in 2021 – and that's just civil penalties under Title IV – numerous other federal criminal and civil violations incurring additional penalties are applicable, including Texas criminal and civil code violations.

### C. 42 U.S.C. § 654b(4)

Under Rhode Island's State Plan, the Rhode Island Office of Child Support Services is mandated to **"furnish to any parent, upon request, timely information on the current status of support payments under an order requiring payments to be made by or to the parent."**

Therefore, information relating to the Orders in question and relevant information relating to those orders **must** be furnished. Information relating to the putting of 12% compound interest on the automated data processing system from 2010 to the present must be furnished. Information relating to the removal of any alleged computed online or offline related to 12% compound interest from the automated data processing system in 2018 and at any and all times from 2010 to the present must be furnished. Information relating to the waiver by the Plaintiff by and through his private attorney Barbara Grady of the 12% compound interest that was represented to Defendant as the $0.00 showing under interest calculated by the automated data processing system in Defendant's case file on December 6, 2021 must be furnished. Information relating to the Rhode Island Office of Child Support Services calculated

total due showing $92,214,56 calculated by the automated data processing system in

Defendant's case file on December 6, 2021 that calculates arrears from 2010 must be

furnished.  See attached hereto **December 6, 2021 screen shot of the Defendant's**

**online OCSS account** showing the calculated amounts of which is mandated by Title

IV-D to be populated by the automated data processing system as **EXHIBIT C**.

Information relating to the interest amount before it was taken off the automated data

processing system in 2018 must be furnished, as well as any time interest was taken off

the system from 2010 to the present.  Information relating to the interest put back on

the automated data processing system in 2021 after Defendant accepted the

$104,185.98 payoff number given by Office of Child Support Services by wire via email

must be furnished.  Information relating to how $104,185.98 was computed by the

automatic data processing system on December 7, 2021 must be furnished, when the

automated data processing system calculated $92k just the day before on December 6,

2021 must be furnished.  Information relating to how $75,658.00 was calculated by the

automated data processing system on March 3, 2022 that was then issued to Texas to

lien Texas properties by Mail and by wire must be furnished.  And this is not exhaustive

– see Subpoena attached hereto as Exhibit A.


**D. 2012 JUDGE McCANN (and 2024 MAGISTRATE NAHABEDIAN)
VIOLATIONS of 42 U.S.C. § 654(21)(A) – EIGHT FAILURES AND
PENALTIES (FOUR IN 2012 and FOUR IN 2024 by and through POLITICAL
SUBDIVISION RI FAMILY COURT) – (THIS DOES NOT INCLUDE
CRIMINAL AND CIVIL PENALTIES UNDER APPLICABLE CRIMINAL AND
CIVIL CODES UNDER FEDERAL LAWS AND TEXAS LAWS)**

This Court took judicial notice on February 10, 2023of the *issuance* of two Orders issued by Judge McCann in 2012.  Magistrate Monaco clarified at the hearing on March 6, 2023 he did NOT take judicial notice of the contents of the orders, only the issuance of the orders.   See attached transcript of March 6, 2023 hearing. **Exhibit D**.

Those 2012 orders were issued by Judge McCann of the Rhode Island Family Court, a political subdivision of the State, in which the State Plan must be in effect under 42 U.S.C. **§ 654(1).**  Therefore, it is crystal clear that **the Rhode Island Family Court and its justices under the State Plan MUST comply with all provisions of Title IV-D, including** U.S.C. **§ 654(21)(A)** that makes it crystal clear **interest on overdue support must be between 3-6% simple interest.**  However, **Judge McCann knowingly ordered 12% compound interest in this interstate Title IV-D on overdue support to be illegally put into the** State Plan's **automated data processing system mandated under** U.S.C. **§ 654a and** U.S.C. **§ 654b in knowing violation of 42 U.S.C. § 654(21)(A).  Certainly, the Rhode Island Office of Child Support Services today claims 12% compound interest was what Judge McCann ordered, undisputedly making Judge McCann an accomplice.**  The knowing violation of the political subdivision Rhode Island Family Court by and through Justice **McCann of 42 U.S.C. § 654(21)(A) through fraud on the court and under color of state law violates 42 U.S.C. § 654(24), 42 U.S.C. § 654a and 42 U.S.C. § 654b  and incurs <mark>FOUR</mark> failures and penalties in this case alone for the fiscal year <mark>2012</mark> under 42 U.S.C. § 655(a)(4) and 42 U.S.C. § 655(a)(5), through just the State family court political subdivision alone.**

In 2024, the Rhode Island political subdivision of the family court by and through Magistrate Nahabedian flagrantly declared at the February 2, 2024 hearing in this matter that the State knowingly orders to be put into the automated data processing system 12% compound interest in Rhode Island under color of state law and through fraud on the court in knowing violation of the Rhode Island certified approved State Plan that mandates 3-6% simple interest under 42 U.S.C. § 654(21)(A), with her actions representing **four** failures and penalties in fiscal year **2024**.  See transcript **Exhibit F.**  Failure of compliance with all provisions of Title IV-D results in the State's loss of federal funding for Title IV-D and Title IV-A under Federal Law.  **See Exhibit E, Court Reporter Certified Transcripts of February 2, 2024 Title IV case hearing in this matter.**

**E. 2012 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES (and 2012 Priscilla Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and 42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 – OVER TWENTY FAILURES AND INCURRED PENALTIES in 2012 by and through POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES THROUGH FRAUD AND UNDER COLOR OF STATE LAW**

In order to cover up the flagrantly unlawful 12% compound interest that represents unlawful and fraudulently obtained and extorted under color of law Rhode Island State revenue through the Social Security Act in welfare cases, **Rhode Island Office of Child Support Services adopted the Official Policy not to pursue interest in interstate cases (in order to cover it up from federal authorities and other state authorities see 42 USC sec. 666(14) – cooperation with other states – EXHIBIT F  Attached hereto Rhode Island Office of Child**

Support Services **Official Written Policy** that was produced by RI OCSS during February 10, 2023 court ordered discovery. This policy document evidences the official policy of criminal and civil fraud by the State of Rhode Island's political subdivisions applicable under 42 U.S.C. § 654(1).

This policy evidences the routine extortions of noncustodial parents through the enforcement of 12% compound interest in-state under color of state law that incur penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences the political subdivisions of Rhode Island's concealment and cover up from out-of-state and federal authorities of the State's illegal extortion of 12% compound interest under color of state law by adopting an official policy <u>not to pursue interest</u> in out of state interstate cases that incurs penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences accounting fraud concealing 12% compound interest applied to certain selected out-of-state cases such as the Defendant's, as well as accounting fraud adjustments that conceal the 12% compound interest in in-state cases when submitting for Title IV-D and Title IV-A reimbursement to the United States.

The pattern of agency discussions and considerations of its illegal and criminal enforcement information with Barbara Grady is in itself an organized scheme involving schemes to commit accounting fraud and false

certification of Title IV-D accounts, in violation of, inter alia, **42 U.S.C. 654 (26)(A) that mandates the State Plan to have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the** <mark>**privacy rights of the**</mark> **Texas Defendant.**

In 2012, Priscilla Glucksman, individually and on behalf of the Rhode Island Office of Child Support Services, **under 42 U.S.C. 654(1), on oral motion moved for 12% compound interest, that by Rhode Island's official policy should not be pursued in this interstate Title IV-D case, with the intent and scheme to commit accounting fraud and fraudulent certification of amounts due by removing the 12% compound interest from the automated data processing system in the anticipated event Rhode Island sends it to Texas authorities and Federal authorities for enforcement under 42 U.S.C. 666 (14)**. Priscilla Glucksman schemed with Barbara Grady and Gero Meyersiek to orally move for interest in order to minimize a paper trail of paper filings in this interstate Title IV case so that a written record of the ordered 12% compound interest is buried within a one line of the order, with no documentation of a written paper motion that would otherwise contain or omit the State's legal justification moving for 12% compound interest in this interstate Title IV-D case. In 2012, Paul Dugan was alive and participated in the arrangement. The symbiotic pliant Judge McCann readily complied under color of state law, knowing fully well 12% compound interest is not enforceable in any state and definitely not enforceable in Texas under Title IV-D, and knowing that Rhode Island Office of Child Support Services intended to remove the interest amount if and when Rhode Island sends to Texas for collection while falsely certifying the total amount due and then put

the interest back on the system and then file a subsequent motion to set interest arrears

back in Rhode Island through the symbiotic pliant family court political subdivision of

the State of Rhode Island before a symbiotic pliant judge like Judge McCann,

committing interstate fraud in violation of, *inter alia*, 42 U.S.C. sections 652-669, RICO,

wire fraud, mail fraud, tampering with government records and accounting fraud.  This

list of criminal codes violated by the Plaintiffs is not exhaustive.  Defendant shall

present a list of the violated federal criminal codes later in this motion under Section IV

of this motion.

**F. 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES (and 2012 Priscilla Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and 42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 and Title IV-A – OVER TWENTY ANNUAL FAILURES AND INCURRED PENALTIES in 2013-2024 by and through POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES THROUGH FRAUD AND UNDER COLOR OF STATE LAW**

Title IV-A TANF benefits are conditioned upon the State's compliance with ***all***

requirements of **42 U.S.C. § 654,** and from 2012 to 2024 and on-going, based on

violations in this case alone, Rhode Island has been and continues to be ineligible and

the State is receiving funds through false representations and alteration of government

records to procure federal funding.  From 2012 to 2024, Defendant has the information

to aver that the State of Rhode Island's political subdivisions under **42 U.S.C. § 654(1)**

sent by mail and by wire false accounts of amount due and of liens that contained Title

IV-D violative illegal and unenforceable 12% compound interest fraudulently

misrepresented as "child support due" to multiple institutions, including banks, credit

bureaus to Texas in violation of Texas Penal Codes that carry additional fines and jail

time.  Then Rhode Island Office of Child Support Services and the financial comptroller

of the Rhode Island Judiciary and the State Treasurer's Office fraudulently concealed

through removal and other false accounting itemizations the 12% compound interest

when sending to United States Department of Health and Human Services for federal

incentive payments payouts and federal funding payments under Title IV-D and Title

IV-A.

The total Title IV penalties incurred, disgorgement due back to the United States

for ineligible Title IV-D and Title IV-A funding, and criminal fines incurred by Rhode

Island in this case alone from 2012 to 2024 run upwards of hundreds of millions of

dollars.  From 2012 to 2024, Rhode Island's Title IV-D political subdivisions conspired

to violate, in addition to 42 U.S.C. 654(21)(A), among others, several requirements

under 42 U.S.C. 654 whose plain textual requirements requires the State Plan **MUST**:

**(7)**provide for entering into cooperative arrangements with appropriate courts

and law enforcement officials and Indian tribes or tribal organizations (as defined in

subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering

the plan, including the entering into of financial arrangements with such courts and

officials in order to assure optimum results under such program, and (B) with respect to

any other matters of common concern to such courts or officials and the agency

administering the plan;

**(10)** provide that the State will maintain a full record of collections and

disbursements made under the plan and have an adequate reporting system;

**(14)**

**(A)**

comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

**(B)**

maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them **to conceal in the accounting records** the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

**(15)** provide for—

**(A)**

a process for annual reviews of and reports to the Secretary on the State program operated under the State plan approved under this part, including such information as may be necessary to measure State compliance with Federal requirements for expedited procedures, using such standards and procedures as are required by the Secretary, under which the State agency will determine the extent to which the program is operated in compliance with this part; and

**(B)**

a process of extracting from the automated data processing system required by paragraph (16) and transmitting to the Secretary data and calculations concerning the

levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 652(g) and 658a of this title;

**(16)**

provide for the establishment and operation by the State agency, in accordance with an (initial and annually updated) advance automated data processing planning document approved under section 652(d) of this title, of a statewide automated data processing and information retrieval system meeting the requirements of section 654a of this title designed effectively and efficiently to assist management in the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan

**(20)**

**provide, to the extent required by section 666 of this title,** particularly the Due Process protections, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws.

**(23)**

provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services

and a telephone number or postal address at which further information may be obtained

and will publicize the availability and encourage the use of procedures for voluntary

establishment of paternity and child support by means the State deems appropriate

## G. COVER UP AND FRAUD

In 2012, the child in question was 12 years old.  From 2012 to 2018, Defendant

does not have any records (due to several prior Title IV-D information denials by the

Rhode Island Office of Child Support Services for purposes of cover-up, that further

incurred penalties and fines for each and every information denial under 42 USC

654(24) and 42 USC 654(27) and 42 USC 655) of Rhode Island's political subdivisions

under 42 USC 654(1) sending to Texas or to federal authorities the support amount for

enforcement under 42 USC 654(7) or 42 USC 666(14).  Obviously, sending the support

amount in the automated data processing system without the removal of the interest

from the system exposes the illegal 12% compound interest disallowed under 42 USC

654(21)(A), which would incur Title IV-D and Title IV-A penalties, disgorgement of

ineligible federal funds and incur criminal fines.  It is for this very reason that the Rhode

Island political subdivisions adopted the written official policy not to pursue interest in

interstate cases, that moreover runs afoul of 42 USC 654(21)(A) plain language that the

State Plan must apply UNIFORM interest on overdue support, not State-targeted 0% in

some interstate cases and then 12% compound interest in all other cases, such as in this

case.  Moreover, if the State claims they actually did send notices of support due to the

Defendant in Texas, each transmission would constitute patterns of federal crimes,

including Mail Fraud, since the 12% compound interest in this Title IV-D case is illegal

and fraudulent and unenforceable.  This scheme is in violation of 42 USC §§ 654(7), (10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions under 42 USC 654(1) also transmitted by wire and by mail to the United States Department of State a hold on the renewal of Defendant's passport, again omitting and concealing the principle amount as well as the fact that the State attempts to enforce interstate an illegal 12% compound interest on overdue support.  This scheme is in violation of 42 USC §§ 654(7), (10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions made the illegal decision between top management employees of the Rhode Island SDU unit, dressed up as "administrative decision," to illegally and criminally remove the illegal 12% compound interest from the automated accounting data processing system that clearly is required to prevent activities "**to conceal in the accounting records" Rhode Island's** illegal 12% compound interest prescribed under 42 U.S.C. § 654(14). *See* TRAC records attached hereto in **Exhibit B**.

Upon information, Rhode Island routinely removes the illegal 12% compound interest from the automated data processing system when reporting to the Secretary of the United States Department of Health and Human Services in violation of 42 USC §§ 654(10), (14), (15), (16), (20), (21), (23), (24), (27), and applicable federal criminal codes.  See TRAC records attached hereto in Exhibit B of the routine practice of illegal accounting adjustments of the automated data processing system in the hundreds of thousands of dollars in December 2021 alone.  In this case alone, the aforesaid accounting fraud and record tampering violations motivated by theft of the Title IV-D

and Title IV-A programs and defraud of the Texas Defendant targeting Texas properties occurred in 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021, 2022, 2023, and 2024.

## II.    FACTUAL ALLEGATIONS

The child in question was emancipated in April 2018 and is now an adult 24 years old.  Therefore accrued "interest on overdue support" stopped in April 2018.

Due to the hold placed on Defendant's passport renewal, Defendant discovered on and around November 2021 there is alleged support due.  Defendant retained a lawyer in Texas to contact the Rhode Island Office of Child Support Services to obtain information on the amount due.  The Rhode Island Office of Child Support Services refused to provide information to Defendant's Texas attorney, in violation of 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), and concealed the fact that the agency illegally removed the illegal 12% compound interest amount from the automated data processing system from 2018 to December 2021.  To this day, the Rhode Island Office of Child Support Services covers up and refuses to furnish information to the Defendant the amount of interest that was removed from the system.  Continuing refusal to furnish requested information motivated by cover up is in violation of, *inter alia*, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).  The Office of Child Support Services and Barbara Grady and Gero Meyersiek schemed to deprive Defendant of counsel that would facilitate defrauding the Defendant and to conceal from Texas counsel the accounting fraud relating to the illegal 12% compound interest that is unenforceable in Texas as well as legally unenforceable in Rhode Island (however

routinely enforced through fraud under color of state law) under Title IV-D, and refused

to deal with Defendant's Texas attorney, fraudulently claiming it is the State's policy to

deal with the noncustodial parent directly.  This is obviously a blatant lie because the

TRAC record shows Kevin Tighe initiating phone calls directly to Barbara Grady, Gero

Meyersiek's private attorney (and not contacting Gero Meyersiek directly) to discuss

enforcement actions in detail involving the Rhode Island Office of Child Support

Service's fraudulent accounting that entailed the agency's removal in 2018 (when it

planned to send to Texas) of the interest from the automated system in December 2021.

This is in violation of, *inter alia*, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21),

(23), (24), (27).  The Defendant avers and declares, under oath, the following facts:

1. On December 6, 2021, the State/Plaintiff showed the Defendant her OCSS

    online account that showed $0.00 under interest.  Further the online account

    that is populated by the automated data processing system shows $93,214.56

    Total Due, and $0.00 under Interest on December 6, 2021, published online

    in the State's OCSS online account for Defendant, as of November 30, 2021.

    See attached Screen Shot attached hereto this motion.  (The Office of Child

    Support Services told the Defendant that the $0.00 under interest shows that

    Gero Meyersiek waived interest.  The Office of Child Support Services

    deliberately misrepresented by omission that the interest amount was taken

    off the system illegally in 2018 and that the interest amount was calculated

    pursuant to an illegal 12% compound interest that is unenforceable under

    Title IV-D.  Therefore in reality there was no consideration given to the

    Defendant, as falsely represented, calculated to induce the Defendant into

paying a large lump sum amount. The Office of Child Support Services

brokered a settlement deal between the Defendant and Gero Meyersiek where

Meyersiek waived interest in consideration of the Defendant paying a lump

sum payoff amount of $104,185.98 from Texas, which the State, under its

authority, agreed to the deal with the Defendant on December 7, 2021, having

calculated the $104,185.98 figure by and through its accountant(s) manually

offline and not by the mandated automated data processing system, and

actively brokered the terms of the deal itself, namely, Deputy Legal Counsel

Kevin Tigue who reports to Mr. Paul Gould, the attorney of record who filed

the State's/Plaintiff's Motion to Set Arrears.   The Defendant requests this

Court to take notice of the fact that the State also failed to provide this Court

as well as to the Defendant an accounting now and upon Defendant's request

at the time in 2021 of how this figure $104,185.98 was calculated nor how the

alleged $81k is calculated.  This is in violation of, *inter alia*, 42 USC §§ 654b,

654(10), (14), (15), (16), (20), (21), (23), (24), (27).

2. The State's/Plaintiff's' authority to forgive arrears debts is an official policy
   and authority reported to the Office of the U.S. Commissioner Tangular Gray
   of the Office of Child Support Enforcement of the U.S. Department of Health
   and Human Services.

3. The Defendant in Texas good faith accepted and paid the $104,185.98 on
   December 7, 2021.

4. From December 6, 2021 to the present, the State/Plaintiff has represented to
   the Defendant at least seven (7) sets of books of very large arrears and interest

calculations, which the State/Plaintiff has either failed or refused to provide the Defendant with requested documentation of debt validation and verification records supporting the State's calculation (in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27)):

a. $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Defendant, as of November 30, 2021. (Screenshot of this taken on December 6, 2021 is attached to this Motion).

b. $104,185.98 Total Payoff Amount on December 7, 2021.

c. $75,638.00 on a Notice of Intent to Lien dated March 3, 2022.  RI OCSS rescinded this figure based on alleged unspecified errors on October 14, 2022.

d. $73,000.00 per RI OCSS Deputy Chief Counsel John Langlois's (staff counsel who also reports to Mr. Paul Gould, who was also the attorney of record for the State at the Appeals Hearing) representation at the agency RI EOHHS (Rhode Island Executive Office of Human and Health Services) administrative appeal Pre-hearing held on October 5, 2022.

e. $55,000.00 on RI OCSS correspondence with Meyersiek on October 13, 2022.

    f.    $75,623.71 Total Due for "Interest," online on the afordsaid OCSS

online account, as of November 30, 2022.  A screenshot taken on

December 3, 2022 thereof is attached to this Motion.

    g.    $81,652.46 on the Motion as of December 22, 2022.

5.  Maintaining at least seven books of account in Defendant's case file, while

obstructing the Defendant's 42 USC 654b and all Title IV-D protected due

process right to documents of accounting validation and verification depriving

the Defendant's right to meaningfully refute the State's claim is unlawful,

covers up the illegal 12% compound interest that is also ballooned through

several fraudulent manual accounting calculations NOT USING the Title IV-D

mandated automated data processing system.  There are pending breach of

contract, fraud and Civil RICO et al actions in Federal Courts regarding the

conduct of the Plaintiffs.

6.  The Defendant respectfully requests the Court to take notice of the fact that

the alleged interest published online by the State/Plaintiff as of November 30,

2022 that states the very specific number of $75,623.71 ballooned to

$81,652.46 as of December 22, 2022, by a whopping $6,028.75 in a matter of

22 days as stated in the State's/Plaintiff's Motion, is usurious, and clearly

shows the falsity of the State's/Plaintiff's Motion, paragraph numbered 8 that

says, "That, because interest only accrues on principal balances and not on

interest balances, the interest balance owed on arrears has not changed since

the principal balance was paid in full on December 9, 2021."  This is in

violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

7. The Defendant avers it is nigh on impossible for the Defendant to be able to respond to the State's/Plaintiff's Motion and their unverified and unvalidated seven (7) books of accounts represented by the State/Plaintiff since December 6, 2021 to as of December 22, 2022, where the State's/Plaintiff's calculations of very large amounts have been clearly either refuted and rescinded or have shown to be inaccurate or false.  This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

8. The Defendant respectfully requests the Court to take notice of the fact that after the Defendant accepted the deal in Texas and paid the payoff amount of $104,185.98 from Texas on December 7, 2021, the State/Plaintiff sent to the Defendant in Texas by Mail a Notice of Intent to Lien dated March 3, 2022 for $75,638.00 without any information justifying the fraudulent interest lien on Defendant's Texas properties – the $75,638.00 amount on the fraudulent lien on Defendant's Texas properties was deliberately calculated manually then hard input into the automated data processing system in violation of Title IV-D.  This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Defendant appealed this fraudulent lien to the Appeals Office of Rhode Island Executive Office of Health and Human Services ("RI EOHHS"), a political subdivision of the State of Rhode Island applicable under 42 USC 654(1), on April 1, 2022. Throughout the procedurally defective appeals process where the Defendant was denied by the

State/Plaintiff to access her case file, the State/Plaintiff refused or ignored the Defendant's over ten(10) record requests for the legal and accounting basis of the $75,638.00 lien. Each record information denial is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Defendant also submitted to the Appeals Office records of the written email advisement by the State/Plaintiff that "accounting says" to pay $104,185.98 and records of the Defendant's bank wire transfer payment. The Appeals Office continued the hearing for the maximum 3 times due to the State/Plaintiff's refusal to comply with discovery that would render the proceeding procedurally defective. Paul Gould and John Langlois were listed as representing the State. Their collective violations incur penalties and fines under, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 655, 658a, Title IV-A. To resolve the discovery issues, the Executive Hearing Officer ("EHO"), Debra DeStefano, scheduled a telephonic Prehearing Conference on October 5, 2022, and only when told by the EHO the burden of proof lies on the State/Plaintiff to show arrears are due (as applies here), did John Langlois (who attended the Prehearing Conference) state the following, which the Defendant in Texas recorded as a party of the call:

"EHO: The agency will have to submit proof of the allegation for arrears to support their position.

Langlois: The reason why I asked earlier whether Mary spoke to Karla after she made the payment was because there was a change of circumstances right after that.  I don't know if anyone in my agency had ever explained that to Mary.

Seguin: Wait a minute, wait a minute,

EHO: Wait Mary, I know what you asked for, let me get to what John just said, so John, you said there was a change in circumstances subsequent to her making a payment but before the notice of lien went out?

Langlois: Yeah.

EHO: OK, so…

Langlois: Can I just back up and explain what happened, 99% of this is a misunderstanding…

EHO: OK?

Seguin: Including what was on the screenshot, was that a misunderstanding??

Langlois: Can I speak without being shouted over?

Seguin: I am flabbergasted, really.

Langlois: What happened in this case is when Mary's representative, her attorney, called us in late November 2021, and said she wants her passport released and what does she have to do to release her passport, they put her in touch with Karla who gave her the $104,185.98  number.  Where that number came from, was one of our attorneys contacted the custodial parent, Gero Meyersiek, so we contacted his attorney, it wasn't me, it was someone in my office, and said if she's willing to make a $104K to

pay off the principle, would you agree to waive the $73K in interest? He said yes.  So Karla notified Mary that if she paid the $104K, it would be paid in full because he was willing to waive the interest and accept just the principal.  What happened was the day after Karla spoke to Mary to wire in the $104K the attorney for Mr. Meyersiek contacted us again and said he changed his mind, please put the interest back on the system, so we did.  So the number that was given to her on the day it was given to her was correct, the $104K, because he was waiving the interest, but then changed his mind, so we put the interest back on the system, because he was waiving the interest, and that interest was put back on the system and that's why the system is now saying she owes $73K.  That's why in March when the system saw that she had some sort of personal injury insurance in the system, our system was showing she owed $73K so we issued the lien.  But that was what happened, he changed his mind the next day and that's what messed up the numbers. So that's how all this happened, it was a pure misunderstanding, I don't know whether anyone has ever explained that to Mary how that happened.

EHO: OK, Mary, did anyone ever explain that to you before?

Seguin: No. No one ever explained any of that.  This is why I am asking for my case file, I think this is more basis to ask for my entire case file from 2020.  It's news to me for example and its new information to me that your office's lawyer would not talk to me directly but would be picking up the phone and calling the attorney for the custodial parent.  And then not saying you were doing this deal.  I never offered $104K.  You had determined this number, and that's why I am looking for documentation as to whether this is something you guys do in every case.

EHO: OK, John, are you intending to submit then, the documentation showing the full balance, which would include the principle and the interest before she paid the $104k, and then what happened after, you're prepared to submit documentation to show everything that you said just happened.

Langlois: Yes.  I can show the account balance before he agreed to waive the interest.  And I can show you the account balance after she made the payment. And then when we put the interest back on the system.

EHO: And you're going to testify as to why it all occurred, I mean basically what you just told us.

Langlois: Yes.

Seguin: But the screenshot on December 6th showed $93K."

A true copy of the recording evidence has been submitted by the Defendant to this court, a Rhode Island political subdivision under Title IV-D proceeding in June 2023 and in February 2024.

However, instead of going forward with the testimony and providing the alleged debt validation and verification accounting records promised by John Langlois to the EHO at the upcoming RI EOHHS scheduled Appeal Hearing at the time on December 1, 2022, the State/Plaintiff opted to rescind the Notice of Lien that states there are unspecified errors on October 14, 2022, and emailed the RI EOHHS Appeals Office that the State/Plaintiff will litigate the issue in Family Court.  This showed the intent of the State/Plaintiff to deprive the agency Appeals Office of jurisdiction by withdrawing the enforcement instrument that vests the Appeals Office's jurisdiction by regulation, in the

clear hope of a more favorable outcome to the State/Plaintiff, in the hopes of symbiotic and pliant judge shopping, in the hopes of getting a judge like McCann who ordered the illegal and unenforceable 12% compound in a Title IV-D case to rubber stamp the fraudulent 12% compound interest arrears due, and thereby needlessly increasing litigation.  Mr. Paul Gould is the co-counsel of record for the State/Plaintiff in the RI EOHHS agency appeal. This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 655, 658a.

9. The State's/Plaintiffs' actions and the State's/Plaintiff's Motion needlessly extending the agency appeal to Family Court litigation and obstructing Defendant's discovery rights for debt validation and verification as well as documentation of the Plaintiffs' waiver of interest are violative of Family Ct. R. Dom. Rel. P. 11 and are in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.  It is in criminal violation of 18 USC § 666 and a scheme to commit fraud on the court and interstate fraud through unenforceable Title IV-D orders that appear to be routinely issued by pliant Title IV-D judges like Judge John McCann III and Magistrate Susan Nahabedian.

10. Due to the State's/Plaintiff's conduct of obstructing the Defendant's right to access debt validation and verification records of publicly noticed liens of alleged arrears issued by the State/Plaintiff throughout the agency appeal, the Defendant filed an Access to Public Records ("APRA") request to the then Secretary Ana Novais of the RI EOHHS that manages the State/Plaintiff

agency OCSS.   These are all political subdivisions of the State of Rhode Island under 42 USC 654(1).

11. The RI EOHHS Office in its management capacity required the State/Plaintiff OCSS to respond to the APRA request, but even then the State/Plaintiff **denied the Defendant's APRA request for accounting records**, again refused to release the requested debt validation accounting records, but released the Case History Tracking records in the Defendant's case file, which showed entries made by Kevin Tigue and RI OCSS staff between December 6, 2021 to April 2022 of activity that corroborated John Langlois's representations of taking interest off the system, interest waiver at the agency Prehearing Conference on October 5, 2022 that is outlined above in paragraph 10, then putting interest back on the system after Defendant accepted the offer in Texas, and performed on the contract in Texas paying off all due support from Texas, through Defendant's Texas bank account, namely Texas properties.  Plaintiffs' record denials are violations of *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

12. Both the RI OCSS counsel who denied the Defendant's APRA request and the Executive Legal Counsel of the Secretary of RI EOHHS, Lisa Martinelli (to whom Ms. Deb Barclay reports and to whom Mr. Paul Gould reports, per organization charts supplied by the Secretary of State of the State of Rhode Island) informed the Defendant via official written letter correspondence to appeal RI OCSS's APRA request denial to the Attorney General pursuant to

R.I.G.L. sec. 38-2-8.  Their collective denials are in violation of *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.  Following their collective official written advisement, the Defendant appealed the RI OCSS APRA denial under R.I.G.L. sec. 38-2-8 to the Office of the Attorney General and the Superior Court as provided by R.I.G.L. sec. 38-2-8.  The Office of the Attorney General and the Superior Court of are political subdivisions of the State of Rhode Island under 42 USC 654(1).  Instead of releasing the Defendant's Title IV-D alleged debt validation and verification records information, the State/Plaintiff continues to resist releasing alleged arrears/debt verification accounting records in Superior Court, including failing to comply with the Defendant's Court-issued subpoena for said records and resisting subpoena compliance with extended litigation in Superior Court in violation of *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

   a.  The Defendant served the State/Plaintiff by email Defendant's Request for Production of Documents for the same accounting records and interest waiver records pursuant to Family Ct. R. Dom. Rel. P. 34, to which the State/Plaintiff has so far produced one set of book of accounts of the seven different books of accounts.  However, the numbers do not corroborate with any of the seven official legal representations of alleged arrears due, e.g., $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Defendant, as of November 30, 2021;

$104,185.98 Total Payoff Amount on December 7, 2021; $75,638.00 on

a Notice of Intent to Lien dated March 3, 2022 that RI OCSS rescinded

based on alleged unspecified errors on October 14, 2022; $73,000.00

per RI OCSS Deputy Chief Counsel John Langlois's (staff counsel who

also reports to Mr. Paul Gould, who was also the attorney of record for

the State at the Appeals Hearing) representation at the agency RI

EOHHS (Rhode Island Executive Office of Human and Health

Services) administrative appeal Pre-hearing held on October 5, 2022;

$55,000.00 on RI OCSS correspondence with Meyersiek on October

13, 2022; $75,623.71 Total Due for "Interest," online on the aforesaid

OCSS online account, as of November 30, 2022.  A screenshot taken on

December 3, 2022 thereof is attached to this Motion; $81,652.46 on

the Motion as of December 22, 2022; this is in violation of, *inter alia*,

42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24),

(27), 666, 655, 658a that is consistent with the State/Plaintiff's pattern

of obstructing the Defendant of due process right access to her case file

records of RI OCSS's debt verification itemized accounting calculations

of very large sums of alleged arrearages of at least 7 books of accounts

from December 6, 2021 to the present in Title IV-D proceedings.

III.   **JUDICIARY VIOLATION OF GOVERNMENT EDICTS DOCTRINE, CALCULATED FAILURE TO INTEGRATE TITLE IV-D AGENCY ELECTRONIC FILING SYSTEM WITH ODYSSEY MAKING THEIR FILINGS INVISIBLE TO ALL E-COURT USERS OTHER THAN THE JUDGE AND THEMSELVES AND VIOLATION OF ACCESS TO COURT INFORMATION OF PUBLIC TITLE IV-D PROCEEDINGS IN RHODE ISLAND'S STATEWIDE ELECTRONIC COURTS**

**A. DENIAL OF PUBLIC AND PRO SE-LITIGANT ACCESS TO COURT INFORMATION INCLUDING JUDGE-CREATED LAWS BY 42 USC 654(1) POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY**

The Rhode Island Judiciary is a political subdivision of the State of Rhode Island under 42 USC 654(1). While publicizing during the implementation of the $6 million installation of Odyssey (the statewide electronic filing system) in 2014 that the electronic courts will enable ALL court users to pull up court record information with ease from their phones, the Rhode Island Judiciary quietly implemented Rule 5 of the Rhode Island Rules and Practice denying the Public, pro-se litigants and all parties to a case in Rhode Island remote access to court record information including judge-created orders and laws, including their own. Through this deceit, the Rhode Island Judiciary lied to the Public, while denying access and thereby covering up the routine ordering of unenforceable body of judge-created laws ordering 12% compound interest in public cases and public hearings under 42 USC 654 in public Title IV-D cases, such as this one, by symbiotic pliant judges like Judge McCann and Magistrate Nahabedian. The denial of access to pro-se litigants of their own cases' court records containing support orders violates, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a. The denial of public access to public court records documenting the routine systemic violations of 42 USC 654(21)(A) in electronic courts violates the First Amendment and the public's right to know the law, even if these fraud on the court unenforceable judge-created laws are unenforceable in both Rhode Island and elsewhere Title IV Part D reaches. The denial of public access to judge-created laws that is also motivated by cover-up fundamentally violates the established Government Edicts Doctrine that the United States Supreme Court specifically held applies to electronic

formats of government doctrines, such as judge-created laws in digital courts. *See*

**Georgia v. Public Resource.Org, Inc**., No. 18-1150, 590 U.S. ____ (2020).  The

Defendant has been denied access by the political subdivision Rhode Island Judiciary to

her court records and information regarding the orders in question that must be

furnished pursuant to 42 USC 654b thus in violation of 42 USC 654.  The Defendant has

been denied access by the political subdivision Rhode Island Judiciary to unenforceable

judge-created laws that routinely establish unenforceable 12% compound interest by

certain symbiotic pliant judges, like Judge McCann and Magistrate Nahabedian, who

work hand-in-hand with the Rhode Island Office of Child Support Services in Title IV-D

cases, in violation of Defendant's Due Process and Equal Protection rights to know the

law to be meaningfully heard and right to meaningful access to justice – they are in

violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23),

(24), (27), 666, 655, 658a.

This Court held at the hearing in this matter scheduled on March 6, 2023 that the

Rhode Island Office of Child Support Services is ordered to show that the alleged arrears

is accurate.  *See* attached March 6, 2023 hearing transcript.   Explicitly stated

throughout 42 USC 654, "accuracy" requires no accounting alterations generated offline

then hard input into the automated system, no fraud, no inducements, no interstate

extortion under color of state law, and for certain no 12% compound interest on overdue

support.

**B. CALCULATED FAILURE BY THE JUDICIARY TO INTEGRATE THE
TITLE IV-D AGENCIES' ELECTRONIC FILING SYSTEM INTO ODYSSEY
RESULTING IN AGENCY FILINGS BEING INVISIBLE TO ALL COURT
USERS EXCEPT THE JUDGE AND THE AGENCIES THEMSELVES – COVER
UP**

Because under the State's Plan the Title IV-D agencies routinely file in the Rhode Island court system for the illegal enforcement of illegal 12% compound interest disallowed under 42 USC 654(21)(A), the political subdivision Rhode Island Judiciary deliberately failed to integrate the Title IV-D Agencies' electronic filing system with the State's electronic filing system Odyssey in order to make Title IV-D Agency electronic filings invisible to all court users except the judge and the agencies themselves, calculated to cover up the 12% compound interest from audit by the federal authorities and from the Public. This came to light at the WebEx hearing in this Title IV-D matter before Judge Merolla on June 8, 2023 scheduled at 2PM, where Judge Merolla, showing he was unaware of the failure of systems integration, questioned Paul Gould of Rhode Island Office of Child Support Services, why Defendant is unable to see the agency's electronic filings that the judge can see in the system. Without hesitation, Paul Gould explained that this is due to the electronic court implementation process that was supposed to integrate the agency's legacy system to Odyssey, demonstrating conclusively that Gould, the Lead Counsel of the Rhode Island Office of Child Support Services responsible and overseeing agency court filings in Title IV-D cases, undisputedly was in the know and part of the conspiracy involving the deliberate failure of filing system integration and its continuing perpetration in Title IV proceedings that made Title IV agencies' filings invisible as part of the cover up.

**C. FALSIFYING ACCOUNTING TO SHOW $0.00 PAYMENT IN DECEMBER 2021 in DEFENDANT'S TITLE IV-D ACCOUNT POWERED BY THE AUTOMATED DATA PROCESSING SYSTEM IN ORDER TO DEFRAUD DEFENDANT IN THE FUTURE**

Defendant attaches hereto **EXHIBIT G**, that shows the Defendant's online Title IV-D OCSS account which is powered by the Automated Data Processing System, as of November 2022 at the time of the RI EOHHS Appeal, which showed **$0.00 Payment for December 2021**.  Therefore, the Rhode Island Office of Child Support Services through accounting fraud never recorded, as late as November 2022, in the Automated Data Processing System Defendant's large lump sum payoff of $104,185.98 bank wired from Texas on December 7, 2021, showing prima facie accounting fraud.  This shows a scheme to defraud the Texas Defendant in the future.  This shows that the Rhode Island Office of Child Support Services received Defendant's wired funds and treated it as a cash receipt, without ever recording in the automated data processing system such a large lump sum payment.  Kevin Tighe, Barbara Grady, Gero Meyersiek, John Langlois, Paul Gould, and Priscilla Glucksman, among others, distributed the $104,185.98 among themselves in their organized conspiracy to defraud.  Defendant's lump sum payment was distributed allegedly via a check, not through the usual cash card on December 9, 2021, (see attached hereto TRAC record for December 2021) record information of which check that was allegedly issued by the Office of Child Support Services the agency refuses to furnish the Defendant, and which are under subpoena now.  Further, the Office of Child Support Service's maintaining a separate offline accounting system in this case constitutes fraud and accounting fraud, targeting the Defendant in Texas, targeting Texas properties and targeting the United States of America.  This is why they never utilized the 42 USC 654(7), (14), (20) and 42 USC 666(14) cooperative system with Texas, so as to enable them to divide the defrauded cash spoils offline among the members participating in the scheme.  This accounting fraud and scheme to defraud

violate mail fraud, wire fraud, honest services fraud, RICO, record tampering, theft of the United States, and felonious fraud, among others.

In reality, under 42 USC 651-669, employees who engage in, aid and abet and facilitate the above must be terminated and must not be permitted to continue criminal activities of record tampering, accounting fraud, fraud, theft under color of state law and cover up.

### IV.    CRIMINAL VIOLATIONS REPORTED TO SOME JUDGE OF THE UNITED STATES AND OTHER LISTED AUTHORITIES UNDER 18 U.S.C. sec. 4

The Defendant, in good faith and reliant on the plain language of 18 USC § 4, misprision of felony, as well as the Brief filed in the United States Supreme Court by the United States of America in the Supreme Court case, *Turner v. Rogers*, 564 U.S. 431 (2011) that showed South Carolina (found by the 4th Circuit Court of Appeals) liable for $75 million in penalties for that state's 42 USC 654 violations that did not even involve, *inter alia*, fraud and tampering with the record or unlawful 12% compound interest put into then taken off then put back on the automated data processing system as here in Rhode Island, made known the above activities to "some judges" of "the United States" and other relevant federal authorities – counting among the United States judges Defendant made known publicly in the Amended Complaint filed in the United States District Court for the District of Rhode Island, Judge William E. Smith.  The issue of what Judge Smith has done with the information "made known to him" is pending before the United States Court of Appeals for the First Circuit before a requested panel of judges under the federal law of civil procedure.  Therefore, under 18 USC 4, the above

reported activities have been "made known" to several high ranking judges of the United States.

## A. VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Defendant made known to the panel of judges of the United States allegations contained in the Amended Complaint filed in Federal Court of the commission of acts by the Rhode Island political subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein in this motion, the afore-described acts violating 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 – such violative acts by the Plaintiffs in this matter, along with the political subdivisions and employees thereof named in the federal matter, and/or Judge Smith on this list are not exhaustive.  It is undisputable, among others, that Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-D and Title IV-A disgorgement is due from the applicable State of Rhode Island's political subdivisions.

## B. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF AMERICA v.*
*DONALD J. TRUMP*, DC Circuit, the DC Circuit United States Court of Appeals reminds
the Public and all applicable tribunals that Judges are similarly liable to the criminal
laws for their official acts.  A notable example is *Ex parte Commonwealth of Virginia*, in
which the Supreme Court affirmed the criminal indictment of a judge based on an
official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for
violating a federal statute that prohibited discriminating on the basis of race in jury
selection. *Id*. at 340, 344. The Supreme Court began by observing the principle that
officers are bound to follow the law: "We do not perceive how holding an office under a
State, and claiming to act for the State, can relieve the holder from obligation to obey the
Constitution of the United States, or take away the power of Congress to punish his
disobedience." *Id*. at 348. The Court then addressed the judge's argument that the Court
lacked the authority to punish a state judge for "his official acts." *Id*. Its response was
twofold. First, the Court described juror selection as "merely a ministerial act, as much
so as the act of a sheriff holding an execution, in determining upon what piece of
property he will make a levy, or the act of a roadmaster in selecting laborers to work
upon the roads." *Id*. The Court then explained that even if juror selection is considered a
"judicial act," the judge had a legal duty to obey the criminal laws:

> "But if the selection of jurors could be considered
> in any case a judicial act, can the act charged
> against the petitioner be considered such when
> he acted outside of his authority and in direct
> violation of the spirit of the State statute? That
> statute gave him no authority, when selecting

jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing.

*Id.* at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

[W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation of constitutional rights. On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize

> *criminal conduct proscribed by an Act of*
> *Congress . . . .'*

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See* also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493

F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled

on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not

immune, and employees of the political subdivisions of Rhode Island under 42 USC

654(1) similarly are not immune.  Barbara Grady and Gero Meyersiek are

unquestionably liable.

### V.     CONCLUSION

**Under 42 USC 654b, the Defendant is entitled to be furnished all subpoenaed records – conversely, the Rhode Island Office of Child Support Services, the SDU under the State's Plan under 42 USC 654, must furnish all subpoenaed information – refusal of which incurs another penalty.**

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or designee-Judge Merolla of this Honorable Court to:

1. Grant the Defendant's Motion to Compel.

2. Grant the Defendant's request for her Title IV record information that includes record information relating to the "TRAC notes of 12/6/2021 and 12/7/2021" as well as relating to the substance of John Langlois's audio recorded October 5, 2022 statements regarding "what happened in this case" that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the Child Support Services that Gero Meyersiek said yes, he "agreed to waive the $73k or $75k that are in arrears" as of December 6, 2021 and October 5, 2022 which are part of Defendant's child support case file.

3. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request.

4. Order a hearing on the herein issues raised in this matter.

5. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here:

   https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

6. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

March 21, 2024

FOR DEFENDANT

MARY SEGUIN, Pro Se.

By: *Mary Seguin*

Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

## NOTICE OF HEARING

Please take notice that the foregoing Motion will be called for hearing before the Rhode Island Family Court, One Dorrance Plaza, Providence, RI 02903 at 10:00 AM on March 28, 2024 (case is already scheduled for that date/time) by WebEx hearing https://ricourts.webex.com/meet/garrahy5F

## CERTIFICATION

I hereby certify that a copy of the within Motion was filed on March 21, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

*Mary Seguin*

Exhibit A



# STATE OF RHODE ISLAND

## FAMILY COURT

### SUBPOENA - CIVIL

| Plaintiff | Civil Action File Number |
|---|---|
| STATE OF RHODE ISLAND EX REL. GERO MEYERSIEK | K2001- 0521M |
| **Defendant** MARY SEGUIN | |

| ☐ **Murray Judicial Complex** Newport County 45 Washington Square Newport, Rhode Island 02840-2913 *(401) 841-8340 | ☐ **Noel Judicial Complex** Kent County 222 Quaker Lane Warwick, Rhode Island 02886-0107 *(401) 822-6725 |
|---|---|
| ☐ **McGrath Judicial Complex** Washington County 4800 Tower Hill Road Wakefield, Rhode Island 02879-2239 *(401) 782-4111 | ☑ **Garrahy Judicial Complex** Providence/Bristol County One Dorrance Plaza Providence, Rhode Island 02903-2719 *(401) 458-3200 |

TO: JOHN LANGLOIS, KEVIN TIGHE, PAUL GOULD, FRANK DIBIASE

of RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES 77 DORRANCE ST PROVIDENCE RI 02903

☑ **YOU ARE HEREBY COMMANDED** to appear in the Family Court listed above at the date, time, and courtroom specified below to testify in the above-entitled case and bring with you:

① ALL RECORDS, FILES NOTES, PUBLIC RECORDS, DOCUMENTS, FILMS, MATERIALS GENERATED IN THE COURSE OF ADMINISTRATION OF AND ENFORCEMENT OF RELATING TO DEFENDANT MARY SEGUIN, FROM 2010 TO THE PRESENT, IN THIS TITLE IV-D CASE UNDER THE SOCIAL SECURITY ACT

② ALL RECORDS RELATING TO DEFENDANT MARY SEGUIN FROM 2010 TO THE PRESENT, INCLUDING NOTES AND MESSAGES TAKEN AND GENERATED ON OCTOBER 5, 2022.

| Courtroom | Date | Time |
|---|---|---|
| GARRAHY COURTROOM 5F | MARCH 28, 2024 | 9:30 AM |

If you need language assistance, please contact the Office of Court Interpreters at (401) 222-8710 or by email at interpreterfeedback@courts.ri.gov before your court appearance.

* If an accommodation for a disability is necessary, please contact the Family Court Clerk's Office at the telephone number listed above as soon as possible. TTY users can contact the District Court through Rhode Island Relay at 7-1-1 or 1-800-745-5555 (TTY) to voice number.

Page 1 of 2

FC-73 (revised June 2020)

Exhibit B

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22   11:28         C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I_____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (████████████████████). WE REMOVED THE INTEREST WHEN____
████████████████████████████). WE REMOVED THE INTEREST WHEN____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BY NCP____
AS NCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:            SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK   GERO    K   PNL:
```

Case Number PC00162CTM
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

```
12/13/22   11:20          C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00             CASE HISTORY                   U024  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSMENTS SO WE CAN GET THIS SORTED_____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.___
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL___
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES___

RL: 80  12 22 ABSP:        SEGUIN        MARY        CMD: _____
FNX: TRAC  D CLIENT:       MEYERSIEK     GERO    K   PNL:
```

Case 23-1873
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

12/13/22   11:29        C A S E   T R A C K I N G        CSCL   ASMXA201
           TRAC.00              CASE HISTORY             U824   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
     FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
     FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: 80  12 22 ABSP;          SEGUIN       MARY      CMD:
FWX: TRAC  D CLIENT:         MEYERSIEK    GERO    X  PNL:

Case Number: 23-1063A   Document: 00118190323   Page: 903   Date Filed: 09/26/2024   Entry ID: 6682600
Filed in Providence-Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria G.
11:29:05 Tuesday, December 13, 2022

```
12/13/22    11:29          C A S E   T R A C K I N G        CSCL  ASMXA201
              TRAC.00               CASE HISTORY            U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

RL: 80  12 22 ABSP:           SEGUIN       MARY            CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK    GERO      K     PNL:
```

ed in Providence/Bristol County Family Court
ibmitted 6/1/2023 10.13 PM
welope: 4132704
viewer: Maria O
11:29:09 Tuesday, December 13, 2022

```
12/13/22    11:28          C A S E   T R A C K I N G        CSCL   ASMXA201
            TRAC.00                 CASE HISTORY            U824   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR. RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
    TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
    58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

```
RL: 80  12 22 ABSP:          SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K    PNL:
```

Case Number: 22001833 Document: 00118120893 Page: 920 Date Filed: 09/26/2024 Entry ID: 6682690
Filed in Providence/Bristol County Family Court
Submitted: 5/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maya P.
11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY             U824   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42
_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75.

RL: 80  12 22 ABSP:            SEGUIN       MARY          CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK     GERO     K    PNL:
```

Case Number: K20010820M Document: 00118180323 Page: 922 Date Filed: 09/30/2024 Entry ID: 6682600
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL   ASMXA201
           TRAC.00              CASE HISTORY            U824   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO___
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE___
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT___
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS__

```
RL: 80  12 22 ABSP:          SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K   PNL:
```

Filed in Providence/Bristol County Family Court Document: 00118120823 Page: 923 Date Filed: 09/26/2024 Entry ID: 6662600
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28       C A S E   T R A C K I N G          CSCL  ASMXA201
            TRAC.00              CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985


RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:          SEGUIN       MARY         CMD: _____
                             MEYERSIEK    GERO    K    PNL:
```

Exhibit C



12:38 PM Mon Dec 6

cseinfo.dhs.ri.gov

ADCB Internet Banking    Community Health Choice |...    Sign In - Community Healt...    Case Manager Portal | Offi...    RI OCSS Payment

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov:

**State of Rhode Island**
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Home   My Profile   Contact Us   Site Map   Log

Menu

**Case Information**
- Last 5 Payments
- Last 13 Months
- Current Orders/ Past Due Balances
- Court Dates/ Appointments
- Enforcement Actions
- PIN Lookup

Home > Current Orders and Past Due Balances

**Case Manager**

### Current Orders / Past Due Balances

**Custodial Parent:** Gero K Meyersiek      **CSE ID:** 1689817

**Current Orders**

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

⚠ Note: Medical orders and medical arrears are not listed on this screen.

**Past Due Balances**

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |

Exhibit D

State of Rhode Island and Providence Plantations


PROVIDENCE, Sc.                         FAMILY COURT




*******************************
GERO MEYERSIEK



Vs.                         F.C. FILE NO. K2001-0521M



MARY SEGUIN
*******************************


Heard Before:

The Honorable Magistrate Armando O. Monaco

On March 6, 2023


**APPEARANCES:**


FOR MS. SEGUIN. . . . . Pro se

FOR THE STATE. . . . .. Paul Gould, Esq.


1

I HEREBY CERTIFY THAT THE

FOLLOWING IS A TRUE AND ACCURATE

TRANSCRIPT IN THE CASE OF

GERO MEYERSIEK VS. MARY SEGUIN

HEARD BEFORE

MAGISTRATE ARMANDO O. MONACO

ON MARCH 6,2023.

STEVEN FAZIO
ELECTRONIC COURT REPORTER

1          **GERO MEYERSIEK V. MARY SEGUIN**

2                **F.C. NO. K2001-0521M**

3                **MARCH 6, 2023**

4

5               **MARY SEGUIN:** Having been

6     duly sworn testifies as follows:

7                      THE COURT: After the

8     February 12th hearing two orders were submitted

9     one by each side, objections were filed through

10    your order being entered, ma'am.

11                     MS. SEGUIN: Thank you Your

12    Honor. I am sorry. Could you repeat that again?

13    Sorry.

14                     THE COURT: Subsequent to the

15    hearing of February 10,2023, two separate orders

16    were submitted for my signature. One you

17    submitted and one the State submitted. The State

18    filed an objection to the submission of your

19    order on the basis that they alleged, I believe,

20    that it is not what I said.

21                     MS. SEGUIN: And I also filed

22    an objection to their proposed order that also

23    clearly states a lot of additional items that

24    were never before the Court. Including the

25    number now that they have now, they submitted a

                              3

1    $75,623.71 and then another one for $6028.75.

2    These two numbers were not even in their

3    original motion to establish arrears that was up

4    before the court on February the 10th and those

5    two numbers were never brought up as well. And

6    without a clear understanding and audit of what

7    those numbers represent. Because they

8    unilaterally of their own volition without any

9    court approval.

10                    ATTORNEY GOULD: Judge,

11    objection.

12                    MS. SEGUIN: Took off the

13    interest.

14                    THE COURT: Let me interrupt

15    you, ma'am. Where are you getting these two

16    numbers from? I do not see them anywhere.

17                    MS. SEGUIN: Exactly. That is

18    the order proposed order that the State had

19    filed. You are absolutely right. Your Honor.

20    Those two numbers--

21                    THE COURT: I am looking at

22    the proposed state order that has different

23    numbers then what you are saying.

24                    MS. SEGUIN: The proposed

25    order that they submitted to me, on #4 it says

4

1   $75,623.71 for interest. And then a medical

2   support interest for $6028.75. Now these two

3   numbers were never before the Court before on

4   February the 10th. On February the 10th they

5   brought up a motion that mentioned $81,000.

6              THE COURT: Well, maybe that

7   is a combination of the two numbers.

8              ATTORNEY GOULD: Yeah, Judge.

9   That is the combination.

10              MS. SEGUIN: So sorry, go

11   ahead.

12              ATTORNEY GOULD: There was an

13   objection, Judge.

14              THE COURT: Yeah, what is

15   your objection, Paul?

16              ATTORNEY GOULD: We are off

17   the subject. The subject is whether this order

18   should enter or not.

19              THE COURT: Right.

20              ATTORNEY GOULD: Not about

21   any agreements, not about anything else other

22   than the numbers and Judge if I may or I will

23   let the defendant continue Judge.

24              THE COURT: I thought my

25   order was very simply was to set the arrears as

5

1      they appear on the State computer but without

2      prejudice and then there will be a subsequent

3      hearing to determine whether or not those

4      numbers are in fact accurate. As I am reading

5      the order, they put two numbers in and it is

6      clearly, let me read the paragraph. Yeah,

7      paragraph six, the Court finds that the total

8      the arrears of $81,000, which is the combined

9      number is placed on the Child Support ledger

10      without prejudice to the June 8, 2023 hearing.

11      The State agrees it shall respond to the

12      defendant's first request for production of

13      documents forthwith.

14              MS. SEGUIN: Yes, Your Honor.

15      So therefore, you had not made any kind of

16      findings of fact of whatever they might be. You

17      simply said put the interest back--

18              THE COURT: Yeah, I said

19      whatever the computer says is the balance. Put

20      it on the computer without prejudice, which

21      means that we need a starting point. You need to

22      know what they allege you owe and that is what

23      they are alleging you owe. You disagree with

24      that number. You asked them for the

25      documentation to substantiate that number. That

1     is why I continued it out all the way to June so

2     that you would have an opportunity to get their

3     materials, for you to you digest their

4     materials, provide counter materials back to

5     them. So that in June, a full hearing can be

6     held with everyone totally prepared as to argue

7     either position. Either there is no money due or

8     there is a balance due. I never made any finding

9     whatsoever there is in fact a balance due. If I

10    did, I would not have continued the hearing.

11              MS. SEGUIN: Thank you, Your

12    Honor. That is exactly what my understanding as

13    well.

14              THE COURT: Right. That is

15    what the order says. It says put the number on

16    the computer, but without prejudice, which means

17    both sides have to argue and convince the Judge

18    that that is in fact the number. Or you are

19    going to argue it is an incorrect number and you

20    are going to substantiate it by whatever

21    arguments you present. They going to

22    substantiate it by whatever arguments they

23    present. And then whoever hears it in June will

24    decide which side is correct.

25              MS. SEGUIN: Thank you, Your

7

1    Honor. I wanted to make sure that, you know,

2    that all parties understand that because at this

3    point, the State is saying that you already

4    found that I had—-

5            THE COURT: No, no. The State

6    is not saying that because the order clearly

7    says those numbers or that number is without

8    prejudice, which means I did not establish that

9    number. We do it in many of these cases to get

10   the ball rolling, so either side knows what they

11   need to produce to substantiate their positions.

12   The same way they can come in now and say, Oh,

13   no, we made a mistake. She actually owes

14   $185,000.

15           MS. SEGUIN: You are giving

16   me a heart attack, Your Honor.

17           THE COURT: It puts a cap on

18   what they can argue.

19           ATTORNEY GOULD: Judge, can I

20   respond now?

21           MS. SEGUIN: So, Your Honor,

22   with that in mind, just to clarify, that is what

23   they are saying in 2018 when they first took

24   off--

25           ATTORNEY GOULD: Objection.

8

1                  THE COURT: Just a minute.

2    The order speaks for itself. It says the balance

3    on the computer as of whatever dates in there. I

4    cannot read it now quickly, whatever dates in

5    there, that is the balance on the computer. They

6    have to substantiate it. They are going to send

7    you documentation supposedly to substantiate it.

8    If they cannot substantiate, then they are not

9    going to get that number.

10                ATTORNEY GOULD: Judge, I

11    disagree with that. Judge, we have no obligation

12    to substantiate this. There is a Child Support

13    number that was established by Judge McCann. You

14    took judicial notice of that.

15              THE COURT: I took judicial

16    notice that there was no appeal of his order.

17    That is what the judicial notice of.

18              MS. SEGUIN: Thank you, Your

19    Honor. Thank you, Your Honor. That is my

20    understanding as well that you took judicial

21    notice of the orders themselves. But what is in

22    dispute is how the child support office has

23    handled this computation.

24             THE COURT: That's the

25    argument for June, ma'am. That is the argument

1    for June.

2                    MS. SEGUIN: Taking that off

3    the system without your approval. Now, put it

4    that way--

5                    THE COURT: What you are

6    arguing now is what you need to argue in June. I

7    am satisfied that the order that has been

8    presented by the State that breaks down the two

9    balances that the total is $81,000 is in fact

10   the appropriate order from the hearing. It is

11   without prejudice. They are going to provide

12   documents that you requested so that you can

13   then decide whether or not you agree or

14   disagree. And if you disagree with their method

15   of calculating it, you need to present why you

16   think that method is incorrect and what should

17   be the correct number if any.

18                   MS. SEGUIN: Yes, and

19   including a waiver of interest –

20                   THE COURT: You are arguing

21   whether the number is correct or not. That is

22   the whole purpose of making it without

23   prejudice.

24                   MS. SEGUIN: Yes, and that

25   would include the waiver of interest that had

1      occurred.

2                  THE COURT: No, that is the

3      subject of the hearing. That is the subject of

4      the hearing. I am making no finding about

5      whether there was or was not a waiver of

6      interest.

7                  MS. SEGUIN: Thank you, Your

8      Honor. So that is part of the discovery that

9      needs to happen.

10                  THE COURT: Well, that is

11     what I assume you are asking for. Is to get the

12     documentation that would have substantiate your

13     belief that there was the waiver of the

14     interest.

15                  MS. SEGUIN: Thank you, Your

16     Honor.

17                  THE COURT: So, if you can

18     substantiate that there was a waiver of

19     interest, that balance disappears.

20                  MS. SEGUIN: So, the State is

21     objecting to producing those protected

22     documents—

23                  THE COURT: No, no. They are

24     not objecting to producing any documents. The

25     line paragraph says in paragraph 10, The State

1      agrees it shall respond to the defendant's first

2      request for production of documents forthwith.

3      So, whatever you asked them for, they are going

4      to they are going to provide to you. If you do

5      not think they provided everything you asked

6      for, you file a supplemental request.

7                          ATTORNEY GOULD: The State

8      filed its answer in response to her request for

9      production, Judge. And I will stand by that. And

10     I will argue those issues that we refuse to

11     answer, or we objected on procedural grounds or

12     we objected on legal grounds for what we did.

13     And I will respond to that when it is

14     appropriate.

15                          THE COURT: That would be

16     June 8th. That will be done on June 8th. So, you

17     can be prepared to go forward on whatever your

18     objections are and whoever hears it will decide

19     whether the objections were valid or not.

20                          MS. SEGUIN: Your Honor, Mr.

21     Gould had said something to me, emailed

22     something to me to the affect that he said you

23     will be retiring June the 8th. I just wanted to

24     know why he emailed me something like that.

25                          THE COURT: It has been

1    projected that I am to retire sometime before

2    July 1st. They are dealing with my successor and

3    I sit until my successor is appointed and

4    qualified. And the projection is by the end of

5    the by end of June, the latest could be earlier.

6    I do not think it could be later, but it is

7    possible.

8              ATTORNEY GOULD: And Judge,

9    because we, I guess, we like making these

10   artificial records, I will make this record

11   here. I did not say that snd I resent the

12   defendant putting words in my mouth.

13             MS. SEGUIN: I indicated the

14   email that you wrote to me.

15             THE COURT: Listen, just a

16   minute, just a minute. Whether I sit or I do not

17   sit is an immaterial situation, it has nothing

18   to do with what is before me today. I am ruling

19   on the order they sent you breaking down the

20   balances between the child support and medical

21   arrears is valid as to what I said the last time

22   we were here. I am going to sign that order and

23   proceed with their discovery. Whatever

24   objections you have relative to the discovery

25   and whoever sits here, whether it is me or

13

1    someone else, they will be prepared to address

2    the situation. Okay.

3                 MS. SEGUIN: Thank you, Your

4    Honor. Thank you. One last question about number

5    11 and 12. I mean, those elements—

6                 THE COURT:  11 and 12?

7                 MS. SEGUIN: Yeah, 11 and 12.

8                 THE COURT: 11 tells you how

9    to contact us. 11 is how to contact us and 12 is

10   a standard paragraph that they put in indicating

11   that, I don't know why it's here, but they that

12   the standard paragraph they stick in every case

13   has no bearing on this one. Other than it says

14   that until it is paid in full, you know, the

15   order will continue to run. But there is no

16   order running in terms of what your obligation

17   to pay that is.

18                 MS. SEGUIN: Okay, okay. So

19   that is something that is boilerplate.

20                 THE COURT: That is

21   boilerplate and 11 is how you get in touch with

22   us.

23                 MS. SEGUIN: Sure.

24                 THE COURT: We do not put

25   that in, we will never have any hearings.

14

1              MS. SEGUIN: Thank you, Your

2      Honor.

3              ATTORNEY GOULD: If I could

4      talk this time a little bit. Maybe just for the

5      record. Those same paragraphs were in the

6      September 25th, 2012 orders. And that same

7      boilerplate languages in a July 11, 2012 orders

8      and any other order that she would receive.

9      August 15, 2012. That same identical language

10     was contained in those. It is boilerplate.

11             THE COURT: Yeah,

12     boilerplate. All right, we will see you on June

13     8th at 2:30. Wait a minute. Daylight savings

14     time is starting soon.

15             MS. SEGUIN: Oh, yeah.

16             THE COURT: All right. Do you

17     go on daylight saving time? Pay attention.

18             MS. SEGUIN: Okay.

19             THE COURT: This coming

20     Saturday, our clocks jump forward an hour. So,

21     your clock does not jump forward. You are going

22     to have to call in an hour earlier.

23             MS. SEGUIN: All right.

24             THE COURT: I have friends

25     that live in Arizona, and they told me that in

15

1    Arizona, there were three different time zones

2    in the summer.

3               MS. SEGUIN: Yeah, every

4    county is allowed to do that out here.

5               THE COURT: I know that. That

6    is why that is why I pay attention to it because

7    they tell me that people have trouble. They

8    think, Oh, I am going to be on time, I am going

9    to Court. They said, No, you are an hour late.

10    What do you mean? This is the time across the

11    street. No, that is an hour different than us.

12               MS. SEGUIN: It really is

13    crazy. That they have marked it off, not a

14    county, but across the street. You are

15    absolutely right.

16               THE COURT:  All right. So,

17    pay attention. It is 2:30 our time.

18               ATTORNEY GOULD: Judge, if I

19    may. The order I submitted that contains 12

20    paragraphs.

21               THE COURT: Yes.

22               ATTORNEY GOULD: February 10,

23    2023, starting with paragraph one, the matter is

24    continued.

25               THE COURT: Yes.

```
 1                        ATTORNEY GOULD: That order

 2       is going to be accepted by the Court. That will

 3       be the order of the Court for that day?

 4                        THE COURT: Right.

 5                        ATTORNEY GOULD: The order

 6       that she submitted will be stricken, correct?

 7                        THE COURT: Right.

 8                        MS. SEGUIN: Yes, that is my

 9       understanding, too. Yes.

10                        ATTORNEY GOULD: Thank you,

11       Judge.

12                        THE COURT:  All right. We

13       will see you in June.

14                        ATTORNEY GOULD: One more

15       thing. I am sorry. Judge, if I may, can the

16       defendant place her address on the record?

17       Because we sent some correspondence that was

18       sent back to us. Now we have used her email as a

19       courtesy to her and we also need an actual

20       street address so that we can send her

21       documents.

22                        MS. SEGUIN: Your Honor, I

23       think this is, I do not really understand why --

24                        THE COURT: Let me just

25       interrupt. Let me interrupt. When you enter your
```

17

1       appearance, you need to provide under the rules

2       your address, your phone number, and your email

3       address.

4                    MS. SEGUIN: Yes.

5                    THE COURT: And if you were

6       an attorney, obviously your bar number. Okay so

7       if you change any of those addresses or emails,

8       you are under an obligation to keep updating it

9       because if they send anything to the address or

10      the email that you provided, it's not a defense

11      later on, Oh, it's not my address or email, I

12      changed it. So that is why they are asking to be

13      sure they get the right method to contact you,

14      depending on what they have to send. It is a

15      part of the Court order that you provide your

16      address and email address.

17                 MS. SEGUIN: Your Honor, may

18      I also then ask that the State sent me a or e-

19      file any notices? Because they have been mailing

20      things to me in Texas, which takes 10 to 12 days

21      for me to receive by regular mail. So, could you

22      also please, I am going to ask you please to

23      ask, to make them, to order them to notice me by

24      electronic means as well.

25                 THE COURT: Well, that's part

1      of the rules, too.

2                    MS. SEGUIN: Okay.

3                    THE COURT: All right?

4                    MS. SEGUIN: Okay. Thank you,

5      Your Honor. I appreciate you telling me.

6                    THE COURT: All right, June

7      8th.

8                    ATTORNEY GOULD: I do not

9      have an address, Judge.

10                   THE COURT: Oh, that is

11     right. What is your updated address?

12                   MS. SEGUIN: My address is on

13     the on file is P. O. Box 22022 Houston, Texas,

14     77019.

15                   THE COURT: What about email?

16                   MS. SEGUIN: That's Mary

17     Seguin 22022 at Gmail.com. They are also in my

18     pleadings as well.

19                   THE COURT: Slow down. Slow

20     down. We do not type that fast.

21                   THE CLERK: I did not get

22     that P. O. Box. Can you give it to me again,

23     please?

24                   MS. SEGUIN: Yes, it is,

25     22022.

```
 1                              THE COURT: That is the P. O.

 2      Box number?

 3                              MS. SEGUIN: Yes, Your Honor.

 4                              THE COURT: Making sure it

 5      was not the zip or area code.

 6                              MS. SEGUIN: It is one too

 7      many numbers.

 8                              THE COURT: What is the zip

 9      in Houston?

10                              MS. SEGUIN: It is 77019.

11                              THE COURT: All right, all

12      set?

13                              MS. SEGUIN: Thank you, Your

14      Honor.

15                              THE COURT: Okay, June 8.

16                              ATTORNEY GOULD: Thank you,

17      Judge.

18                              MS. SEGUIN: Thank you, Your

19      Honor.

20

21

22
```

EXHIBIT E

I HEREBY CERTIFY THAT THE FOLLOWING

IS A TRUE AND ACCURATE TRANSCRIPT

IN THE CASE OF MEYERSIEK VS. SEGUIN

BEFORE THE HONORABLE MAGISTRATE

SUSAN NAHABEDIAN ON FEBRUARY 2ND,

2024.

*A.B. Kuski*

AMANDA B. KUSKI
ELECTRONIC COURT REPORTER

1          THE COURT: Good afternoon.

2          PLAINTIFF: Good afternoon.

3          THE COURT: This is K20010521, Gero

4    Meyersiek versus Mary Seguin. Both parties are present. Mr. Meyersiek's

5    Attorney, um, Achille, she's here. Um, the Clerk will swear you both in.

6          CLERK: Miss Seguin, Mr. Meyersiek,

7    raise your right hands, please. You do solemnly swear that the testimony you

8    shall give to the Court in the matter now in hearing shall be the truth, the whole

9    truth and nothing but the truth, so help you God?

10          PLAINTIFF: I do.

11          DEFENDANT: I do.

12          CLERK: Miss, Miss Seguin, just state your

13    name for the record.

14          DEFENDANT: Mary Seguin.

15          CLERK: Mr. Meyersiek, your name,

16    please, for the record.

17          PLAINTIFF: Gero Meyersiek.

18          CLERK: Thank you.

19          THE COURT: Okay, good afternoon,

20    folks. This matter was continued from December 15th in order for the, uh, Court

21    Clerk to, uh, copy Court filings and other documents that were requested by

22    Miss Seguin. It's my understanding that those documents were sent to her

23    electronically, um, in various emails, uh, in December and the remainder of

24    those were sent at the beginning of January. Um, Miss Seguin, were you able to

25    review those and are you satisfied that you received everything that you request-

1

1   ed?

2               DEFENDANT: Um, thank you, Your

3   Honor. I had, uh, received, as you said, in two batches, uh, the Court records

4   that, um, Mr. Santamarina had, um, had emailed. Uh, the last several batches,

5   uh, were, sorry, batch was several documents, um, were only emailed about a

6   couple weeks ago. Uh, there, there were sent in separately about fifteen emails. I

7   think Your Honor was copied on all of them, as well as Mr. Gould, um, on those

8   emails, um, and so the records themselves, um, you know, that were sent to me

9   or emailed to me, um, the, the Court has a copy of those. Um-

10             THE COURT: I, I, so my question is, are,

11   are you, did, were you able to review them and are you satisfied that everything

12   that you requested, you received?

13             DEFENDANT: Um, I have not, uh,

14   received the actual audio recordings of the, that's part of the record.  Um, those

15   were-

16             THE COURT: Did you request, did you

17   request the audio recording from Mr. Santamaria?

18             DEFENDANT: Well, I requested all the

19   records. So, one of the paper documents had said that the, there was, uh,

20   attached to it, an audio recording of the State saying that Gero waived interest,

21   and I think that's very relevant to this case-

22             THE COURT: Okay-

23             DEFENDANT: -especially as it links to-

24             THE COURT: -let me just stop you-

25             DEFENDANT: -(inaudible)-

1          THE COURT: -let me just stop you, let me

2     just stop you for a minute, please. I'm new to this case, so I'm not familiar with

3     the audio recordings request. I'm not aware that you made that type of request.

4     Can you tell me the date of the audio recording and when you made that

5     request?

6          DEFENDANT: I made the request for all

7     Court information in this case. All Court information encompasses all

8     documents and all forms of records. Uh, that's, um, that's the, I believe, legal

9     understanding of all Court information of records.

10         THE COURT: Alright, Mr.-

11         DEFENDANT: So, that was part, that was-

12         THE COURT: -excuse me, excuse me one

13     minute. Mr. Gould, I'm trying to unmute you and I'm not able to do it from my

14     end. So, if you need to be unmuted, you'll have to do it yourself.

15         DEFENDANT: I had to, so I had

16     submitted those and this, uh, audio recording ha-, uh, is part of the Court records

17     as of, um, June 2023. That was emailed to me in a rel-, in a paper document

18     referring to attached, attached audio recording that is, um, that, that was emailed

19     by Mr. Santamaria. So, that recording, I want to make sure, uh, and, and that's

20     also copied to you by the way, Your Honor-

21         THE COURT: Alright, so-

22         DEFENDANT: -(inaudible).

23         THE COURT: -just, just, just going back

24     to December, okay, you provided, um, a request for documentation to be copied

25     by the Court Clerk, Mr. Santamaria, and all of those documents were scanned

1    and sent to you in an electronic form. Did you specifically request anything that

2    referred to an audio recording?

3                              DEFENDANT: I specifically record, uh,

4    requested all Court information, any and all Court information in the records of

5    my, of this particular case file. Those are the wording that I used, because I, I

6    don't know what's being, what's on, what's, what the Court record has. You

7    know, this is the reason why we went through this process, is, the, the, um,

8    Rhode Island Judiciary has set up this, uh, uh-

9                              THE COURT: So, Miss Seguin-

10                             DEFENDANT: -electronic Court system-

11                             THE COURT: -we're not-

12                             DEFENDANT: -where the (inaudible)-

13                             THE COURT: -so, Miss Seguin, we're not

14   gonna get into the Judiciary's access to the, um, to the portal. We're not gonna

15   get into that. We made every effort to make electronic copies of every Court

16   document pertinent to this case and sent them to you, at no cost, in an electronic

17   version. You did not, at any point, follow up with Mr. Santamaria to request an

18   audio recording.

19                             DEFENDANT: I'm just in a process of

20   reviewing this. That was part of your question, uh, Your Honor, is have I had a

21   chance to review all of these materials. It's, it's, it's, as, as you can see, several

22   because you've been covered, uh, copied on all the emails. There were several

23   emails, uh, you know, all together, probably thirty-something emails. Uh, I do

24   appreciate that. I, you know, I thank Your Honor for ordering that, um, and I

25   also, um, you know, am, am reviewing, have been reviewing. So, I came across,

1    to answer your question to the best of my ability, is I came across that doc-,

2    document where it refers to the audio file, uh, that's being submitted into the

3    record. I've asked for the Court records. So, um-

4                                    THE COURT: You received every Court

5    record, every document going back to-

6                                    DEFENDANT: Paper. I, I, I think what,

7    what-

8                                    THE COURT: Correct.

9                                    DEFENDANT: -wanted to, you know,

10    just, just to have a basic understanding of document is, in paper form, but Court

11    rec-, information as the Court record encompasses various different formats. All

12    public records encompasses various different formats. Uh, you know, that's,

13    that's written by statute and, you know, as I understand it what public records is.

14    Court records are a form of public records and, and it forms the basis of, um,

15    Judge created laws, and therefore, those are critical in my, uh, uh, you know,

16    access and that's the basis of this process that we're going through is accessing

17    those public records, Court information records, and, uh, accessing the laws that

18    were created, Judge created laws that were created, in this particular case or

19    relevant to this particular case. So, I, I'm just trying to, um, respond to your

20    question, uh, Your Honor, as to if I had a chance to review those, am I satisfied,

21    and so, these are the, what I'm raising to the Court, to Your Honor, to, in

22    response to your question is, I received the paper document, uh, I'm, I'm in the

23    process of reviewing them, um, because they, they form a chronology, they form

24    a, a, a background chronological, uh, reasoning behind, you know, uh, Judge

25    created laws, which are the orders, uh, issued. And in so doing, there are refer-

1    ences to a, a Court document that was sent to me, actually a couple of them, that

2    talks about an audio recording of the State saying that Gero waived interest, and,

3    uh, also the document, uh, there are documents that say Gero did not ask for

4    interest, but the State on oral motion asked for interest, but then the State's

5    policy is not to ask for interest in interstate cases-

6                                         ATTORNEY GOULD: Judge, Judge, if I

7    may-

8                                         DEFENDANT: -that is why. So-

9                                         ATTORNEY GOULD: -Judge, can I be

10   heard?

11                                        DEFENDANT: -that's why I need to

12   understand and get a full-

13                                        ATTORNEY GOULD: If I may, Judge?

14                                        THE COURT: Hold, just one, one minute,

15   Mr., Mr. Gould. So, the answer, so, your answer is, you're not satisfied with

16   what was sent?

17                                        DEFENDANT: I'm explaining to you

18   what's missing.

19                                        THE COURT: So, you are, you-

20                                        DEFENDANT: And I'm trying to identify

21   to you what is missing-

22                                        THE COURT: So, this Court-

23                                        DEFENDANT: -and the Court records,

24   already are, are showing-

25                                        THE COURT: -this Court, alright, ex-,

1    excuse me, Miss Seguin. Mr. Santamaria spent hours with a coworker manually

2    scanning and copying those files during a period of time that the Court was very

3    short handed. All of that documentation, okay, every pertinent document related

4    to this case, going back decades, two decades, was scanned and sent to you,

5    okay. We do not have a copy of an audio recording. So, we're not able to

6    provide that to you. There is no such audio recording in the Court record that

7    you, you are referring to. So, now I'm gonna give Mr. Gould an opportunity to

8    respond. Mr. Gould?

9                           ATTORNEY GOULD: Judge, like,

10    likewise, if she's requesting a transcript, then she has to go through the normal

11    process of paying for a transcript, ordering the specific date of the transcript she

12    wants. This is a Defendant who has failed to come to this Court with clean

13    hands, Judge. I've stayed silent-

14                           DEFENDANT: I object! I object, Your

15    Honor!

16                           ATTORNEY GOULD: -the whole time-

17                           THE COURT: Your objection is noted and

18    Miss Seguin, no one interrupted, you're muted. You're muted. You're muted

19    and you're going to stay muted. You're muted. Mr. Gould?

20                           ATTORNEY GOULD: Thank you, Judge.

21    We've let this go on for months after months. She brought up an issue relative

22    to, uh, the Court system. State of Rhode Island Child Support Enforcement, the

23    Magistrate hearing this case, has no control over that. She's now filed a Federal

24    lawsuit in the, uh, District of Texas, Judge. That's gonna play it's course 'cause

25    she'll file and follow through on that. This is a simple case of whether or not

1    interest is to accrue on this case and what payments were made. It's simple

2    math, it's simple, in, in fact, Judge, there's maybe five questions I have for the

3    Defendant, uh, of the Plaintiff relative to this, uh, inquiry. It would be a short

4    hearing. Uh, whether or not there was any monies paid, what was received, and

5    the fact that the Court can take Judicial notice of two orders. The fact that

6    there's a child support order that continues to run, and two, the fact that interest

7    has continued to run pursuant to Mag-, pursuant to Judge, uh, John McCann's

8    order dated 9/25/2012.

9                              THE COURT: Okay, the original support

10   order was entered May 24th of 2012?

11                             ATTORNEY GOULD: That's when it was

12   allowed to run on the Child Support system. That was at a period of time when

13   the arrears were set somewhere in the amount of $30,000.00. I have a copy of

14   the order. Paragraph four of the May 24th, 2012 order indicates that there was an

15   arrears of $30,458.00, as of May 24th, 2012. September-

16                             THE COURT: And am I, am-

17                             ATTORNEY GOULD: Sorry.

18                             THE COURT: -there were, there was no

19   appeal taken from that order.

20                             ATTORNEY GOULD: Correct.

21                             THE COURT: Just a minute, Miss Seguin.

22   I'm giving Mr. Gould an opportunity to speak, just like I gave you an

23   opportunity to speak. In that October 23rd, 2012 order, um, there is language that

24   indicates that interest would continue to run.

25                             ATTORNEY GOULD: Correct.

1          THE COURT: And nothing has changed

2    since then?

3          ATTORNEY GOULD: There's been no

4    order from the Rhode Island Family Court suspending interest. Correct.

5          THE COURT: Miss Seguin?

6          DEFENDANT: I object to every, uh,

7    statement that Mr. Gould had, uh, stated because they are, um, uh, perjurious.

8          THE COURT: You (inaudible), excuse

9    me-

10          DEFENDANT: Mr. Gould and Mr.

11    Langlois-

12          THE COURT: Excuse me, they're what?

13          DEFENDANT: They are perjuries. Mr.

14    Gould and Mr. Langlois and the State of Rhode Island representing the Rhode

15    Island Child Support Office, had, um, per this Court record, there is a document

16    that say's that they, that they had said that Gero had waived interest. (Inaudible)

17    2021 and they made that statement in 2022.

18          THE COURT: Ma'am, there's no Court

19    order that ever suspended-

20          DEFENDANT: (Inaudible).

21          THE COURT: -there's no Court order that

22    ever set the interest to zero. There's no Court order. You've received everything,

23    I've reviewed the file. There is nothing in the system where it, it was ever

24    waived or set to zero. The interest has stayed on the system.

25          DEFENDANT: We're, we're talking, uh,

1    actually on, on February the 10ᵗʰ, 2023, the first Court order of this, of this

2    decade that was issued has clearly, um, proven as evidence that interest was

3    taken off of the system. Mr. Gould had taken the interest off of the system, he

4    said in Court, in 2018. That is what he had said, and so, in, in Court, and

5    therefore, he has asked the Judge, or the Magistrate, uh, Monaco to put it back

6    on the record or, uh, Mr., and then Judge, um, uh, Monaco had only put it on

7    there with prejudice because he said that there's, that doesn't mean, that's just a

8    placeholder.

9                                         ATTORNEY GOULD: Objection.

10                                        DEFENDANT: So, Mr. Gould had lied,

11    just now, that's perjury on-

12                                        THE COURT: Uh-

13                                        DEFENDANT: -I'm deeply concerned

14    about this. These, these are documented in the order. The February 10ᵗʰ order

15    cannot be refuted. It was, it was prepared by Mr. Gould himself. It said that the

16    Court-

17                                        THE COURT: I don't see it.

18                                        CLERK: I don't see anything-

19                                        DEFENDANT: -(inaudible)-

20                                        THE COURT: -hold on, hold on. I'd, I'd

21    like to review that order and I, I don't see it.

22                                        CLERK: I don't see anything filed from

23    2013-

24                                        ATTORNEY GOULD: I'd like to be heard

25    on the objection, Judge.

1       CLERK: -to '22. I see nothing.

2       DEFENDANT: Well, that's a problem.

3       THE COURT: Are you saying that, excuse

4    me, just let me just clarify this. Again, I'm new to the case-

5       DEFENDANT: That was-

6       THE COURT: -you just made-

7       DEFENDANT: -that was-

8       THE COURT: -you just mentioned

9    Magistrate Monaco heard this and I'm looking for an order from that hearing

10    and I don't see one.

11       ATTORNEY GOULD: Since I was

12    accused of perjury, Judge, can I clarify something?

13       THE COURT: Yeah, Miss Seguin, I'm

14    gonna give Mr. opportunity, uh, Mr. Gould an opportunity to reply.

15       ATTORNEY GOULD: See, Miss Seguin

16    is a little confused about how the process is running. That there is an agency and

17    the Child Support Office is an agency charged with running the child support on

18    our system. The Court is in charge of ordering parties to pay child support and in

19    this case, pursuant to the order of Judge McCann back in 2012, he ordered child

20    support paid. Again in 2012, he ordered interest paid. Our system in 2018, our

21    system, the Child Support system, not a Court order, our system removed

22    interest because of an administrative decision, because this case had become an

23    interstate case, the Plaintiff was out of, the Defendant mother was out of state.

24    There was a decision to remove interest from cases running on our system. That

25    doesn't mean that the interest doesn't run. It meant that the interest was removed

1 from our system, so that other jurisdictions were not confused, and it had to do

2 with, a lot of it, the, the fact that jurisdictions had different interest rates running.

3 So, in order to alleviate any confusion, our Administrator made a determination

4 to stop interest on all, uh, stop interest running on our system, not stop interest

5 pursuant to a Court order. So, that's the distinction. So, when I said earlier today

6 that there's no order that, uh, stopped the interest on the case, there is no order,

7 and then the other statement that, uh, the Plaintiff made, uh, Defendant made

8 relative to, um, the issue of prejudice of Judge Monaco's order, that's an

9 outright lie, Judge. Judge Monaco never said in Court, there's no Court order

10 that is without, or with prejudice, Judge. So, that's just an outright lie. I'll leave

11 it at that because I know I'll have another twenty minutes of, of rambling on by

12 the Defendant. So, I'll (inaudible)-

13       THE COURT: Well, just, just to be clear, I

14 just want both sides to, to, to know, I don't see anything in the system reflecting,

15 um, any, any decision by Magistrate Monaco in May of this year. I don't see-

16       DEFENDANT: Uh, February, February,

17 February of this year. So, February the 10th. February the 10th. This I why at the

18 same time the discovery was ordered, and this is why we are here on discovery

19 issues, as well, because it was ordered without, sorry, it was placed on the

20 system and the interest is WITH prejudice.

21       ATTORNEY GOULD: No, Judge, I object

22 to that, that is not true. That is as far as the truth can be, Judge.

23       DEFENDANT: Perjury, perjury-

24       THE COURT: So, excuse me, hold on,

25 hold on, folks. I just found the order now that I just see that. It's February 10th,

1  paragraph four, "The Court finds the arrears of $81,652.46 that'll be placed on

2  the ledger without prejudice to the June 8th hearing. The arrears reflect interest

3  on the child support in the amount of $75,623.71 and interest of the medical

4  support in the amount of $6028.75".

5              ATTORNEY GOULD: So, Judge, is her

6  comments about prejudice, is that perjury? So, did she just commit perjury,

7  Judge, because I wasn't under oath, but I'll let that go.

8              DEFENDANT: The order, the order

9  clearly says that the-

10             THE COURT: That it was placed, that it

11  was placed on the ledger without prejudice. That's all, that's all it says. It was-

12             DEFENDANT: Which means-

13             THE COURT: -placed on the ledger-

14             DEFENDANT: -it means, it means it's not

15  owed.

16             THE COURT: No, it means, it doesn't

17  mean it's not owed. It, it, it's, it's, let's see, motion to set arrears and discovery

18  motions were not concluded on that date. Okay, so it was placed on the ledger

19  without prejudice because it was still an issue that was left open. Am I correct,

20  Mr., Mr. Gould?

21             ATTORNEY GOULD: Yes, Your Honor.

22             THE COURT: And with that, you may

23  inquire of Mr. Meyersiek. Thank you.

24             ATTORNEY GOULD: Thank you. First of

25  all, Judge-

1        THE COURT: You're muted. You're

2   muted.

3        ATTORNEY GOULD: I'd ask the Court,

4   I'd ask the Court to take judicial notice of the May 24th, 2012 order by Judge

5   McCann, in which he established the child support order, in which he establishes

6   an arrears of $30,458.00. That order was not appealed. That is the order of this

7   Court.

8        THE COURT: The Court takes judicial

9   notice entered on May 24th, 2012, from which no appeal was taken.

10        ATTORNEY GOULD: I'd ask the Court

11   to take judicial notice for the September 25th, 2012 order of Justice John

12   McCann in which the paragraph four indicates, "Interest will continue to run on

13   monies due".

14        THE COURT: Likewise, the Court takes

15   judicial notice of the September 25th, 2012 order, again, in which no appeal was

16   taken.

17        ATTORNEY GOULD: Thank you, Judge.

18   If I could inquire of the Plaintiff?

19        THE COURT: Yes.

20        ATTORNEY GOULD: Mr. Meyersiek,

21   you had a child support order that ran to your, uh, ran to your benefit in the

22   amount of $218.00 per week. Is that correct?

23        THE COURT: Can't hear you, Sir.

24        PLAINTIFF: (Inaudible).

25        THE COURT: Very, very faint. It's hard to

14

1    hear you.

2                                    PLAINTIFF: Is this better?

3                                    THE COURT: Perfect.

4                                    PLAINTIFF: Okay, good. Sorry. Yes, to

5    the best of my recollection, that was the amount.

6                                    ATTORNEY GOULD: Did you ever

7    receive child support from the Defendant mother directly, after May 24th, 2012?

8                                    PLAINTIFF: I only received two

9    payments. I believe one was in 2019 and one was in 2021.

10                                   ATTORNEY GOULD: So, from-

11                                   PLAINTIFF: I never, I never received

12   anything directly.

13                                   ATTORNEY GOULD: From 2012 to

14   2018, you received nothing in child support, correct?

15                                   PLAINTIFF: Not a single penny.

16                                   ATTORNEY GOULD: And that was a

17   time when the child was a minor, correct?

18                                   PLAINTIFF: Correct.

19                                   ATTORNEY GOULD: That was during a

20   period of time when you could've used the money for the child, correct?

21                                   PLAINTIFF: That is absolutely correct.

22                                   ATTORNEY GOULD: And you received

23   nothing, correct?

24                                   PLAINTIFF: That is correct, and I

25   should've had, I had to send my daughter to a school, I had to pay for every

1    meal, I had to pay for her clothing, I had to pay for everything.

2                                  ATTORNEY GOULD: You received a

3    payment sometime in 2018 in the amount of $6,461.95, correct?

4                                  PLAINTIFF: That is correct.

5                                  ATTORNEY GOULD: And then you

6    received a payment in 2021, on or about 12/9 for 2021, in the amount of

7    $4,185.98, is that correct?

8                                  PLAINTIFF: I don't recall the exact

9    amount.

10                                 ATTORNEY GOULD: Does that number

11   refresh your memory somewhat?

12                                 PLAINTIFF: Yes, it does.

13                                 ATTORNEY GOULD: Are you looking to

14   collect interest that accrued on that money from, from, I'm sorry, from May

15   202-, May 24th, 2012 up until today's date?

16                                 PLAINTIFF: Yes.

17                                 ATTORNEY GOULD: Did you make any

18   contracts, agreements with Miss Seguin outside Court that indicated that you

19   were going to waive interest?

20                                 PLAINTIFF: Absolutely not.

21                                 ATTORNEY GOULD: I have no further

22   questions of the Plaintiff.

23                                 PLAINTIFF: Thank you.

24                                 DEFENDANT: Uh, Your Honor, I have

25   been unable to object to anything because, uh, I was put on mute, but-

1          THE COURT: Okay, well, we can note

2     your objection now.

3          DEFENDANT: The, the, uh, at the last

4     hearing, uh, as well as, uh, the, uh, hearing before you were, uh, appointed, uh,

5     by the, uh, Judge, uh, in June 2023, we were on a motion to compel. So,

6     therefore, I do not have, based on discovery, discovery has not been completed.

7     Therefore, I am not ready to present the, uh, evidence and present the

8     arguments.

9          THE COURT: What, uh, what specifically,

10    what are you seeking in discovery that you haven't received yet?

11         DEFENDANT: I have, uh, as you can see,

12    I have that motion, uh, that is pending, that has been pending since June of 2023,

13    to compel production relative to my, uh, request for documents. I, I have a

14    pending motion-

15         THE COURT: You, you, you received all

16    of the Court documents.

17         DEFENDANT: No-

18         THE COURT: What out, what outside of

19    the Court documents are you seeking in discovery?

20         DEFENDANT: I'm seeking based on my,

21    uh, on the Court record that would show that I'm seeking my case file.

22         THE COURT: You have-

23         DEFENDANT: I'm entitled-

24         THE COURT: -you, no, no.

25         DEFENDANT: I do not have a, my case

1    file-

2                                    THE COURT: You do have your case file.

3                                    DEFENDANT: -I do not have my-

4                                    THE COURT: It was scanned-

5                                    DEFENDANT: I do not!

6                                    THE COURT: -and sent to you as you

7    already acknowledged by Mr. Santamaria in numerous emails. The entire Court

8    file was scanned in and sent to you.

9                                    DEFENDANT: Oh, you're talking about

10   the Court file. I'm talking about my child support case file. I'm entitled under

11   Federal law to have access to my Federal, my child support case file, and that's

12   the discovery that's being ordered. I have not been able, they have denied, on

13   paper, which is submitted within this Court record. The Court record shows that

14   they have, uh, refused, uh, uh, raising all kinds of issues to produce my child

15   support case record.

16                                   ATTORNEY GOULD: Objection.

17                                   DEFENDANT: Under Federal law, under

18   the Federal law, under Title IV of the Social Security Act, which is what this

19   process and this legal hearing is under-

20                                   ATTORNEY GOULD: Objection.

21                                   DEFENDANT: -(inaudible) under-

22                                   THE COURT: Alright, what's-

23                                   DEFENDANT: I have rights.

24                                   THE COURT: -what's the basis of your

25   objection-

1          DEFENDANT: -I have a Federal rights-

2          THE COURT: -Mr. Gould?

3          DEFENDANT: -(inaudible), I have a

4    Federal right to my child support case file.

5          THE COURT: Hold on, Ma'am. He

6    objected and I wanna know the basis of his objection.

7          ATTORNEY GOULD: Relevance to the

8    issue before the Court, Judge. The issue before the Court is interest. The motions

9    that she's alleging that she's pursuing, the State file appropriate objections to her

10   discovery request. So, she needs a hearing on it instead of her other diversions

11   that she's had at the last nine months. We could've addressed these, Judge, but

12   we wanna keep pushing this off and pushing this off. So, the State has filed, the

13   State has responded to the discovery. I've had a conference with Miss Seguin, at

14   one point, to try to go over some of our disputes with regard to, with regard to

15   discovery. Uh, that did not turn out to be very productive. Uh, I have stated, uh,

16   on my, on her requests, uh, all the basis for our objections and I'm ready to

17   argue those objections, when she puts forth specific allegations, specific

18   documents in the specific request that she's looking for, but until then, Judge,

19   this is a real simple case of about whether or not this lady paid child support and

20   whether or not this gentleman is entitled to interest-

21          DEFENDANT: Objection.

22          ATTORNEY GOULD: -the Court has-

23          DEFENDANT: Objection.

24          ATTORNEY GOULD: -the Court has-

25          THE COURT: (Inaudible).

1          ATTORNEY GOULD: -filed-

2          DEFENDANT: Fundamentally, in order to

3   claim that I owe anything, I have a right to my child support case file under

4   Federal law.

5          THE COURT: Ma'am, what's this-

6          DEFENDANT: I have-

7          THE COURT: -what's specific document-

8          DEFENDANT: -(inaudible)-

9          THE COURT: -what specific document-

10          DEFENDANT: -since '21-

11          THE COURT: Ma'am, Ma'am, Ma'am, if

12   you keep yelling over me and over the Attorneys, this is not going to be

13   productive. I'm trying to just narrow this down to the specific piece of

14   information that you're seeking.

15          DEFENDANT: I am, Your Honor, I need

16   to have my entire case file. I, I have, the Court order-

17          THE COURT: Do you, do you-

18          DEFENDANT: -on February the 10th

19   ordered discovery. There were, by law, my right is to have my entire case file,

20   and, and by Federal Court, Federal law, I am entitled to have my entire case file.

21   Child support interstate encompasses, and this is an interstate case, encompasses

22   Federal law. It encompasses Texas law, because you are reaching your, your

23   long arm into the State of Texas. Therefore, I am entitled, by Federal law, and

24   by Texas law, as well as Rhode Island law, to have access to my child support

25   file.

1           THE COURT: Thank you Miss, Thank

2    you, Miss Seguin. Mr. Gould-

3           DEFENDANT: (Inaudible) Mr. Gould-

4           THE COURT: -what, what is the, what is

5    the State's objection-

6           ATTORNEY GOULD: Rel-, well for the

7    most part-

8           THE COURT: -to give-

9           ATTORNEY GOULD: -relevance, Judge.

10   She's, she is not gonna use the documents that she's requesting, in this case,

11   when she, when the documents you're requesting is what she is the target for in

12   her Federal case. So, she's not gonna use me as a pawn to get, to do her

13   discovery in her Federal case. This is a simple issue of child support, simple

14   issue of payments, but what she's trying to do is she tried to do her discovery,

15   her Federal discovery in this child support case. So, what I did is I laid out in, in

16   our responses, our objections, based on relevance. So, again, again, we went

17   another ten minutes of her for asking for certain, a multitude of documents

18   without her saying one specific document that she wants, one specific item, one

19   specific request for production that she's, we can do this, Judge. We can go for

20   another twenty minutes and do the same thing, but until she gets her eyes on a

21   piece of paper and looking at her motions and going word by word, and until we

22   can do that, Judge, I, we can't go anywhere. I've, I've stated our objection-

23           THE COURT: Well, that, I'm, I'm trying,

24   you know, I'm trying to work with you, Miss Seguin, to see if you can narrow it

25   down to a specific, a specific issue or a specific document that you believe

1  supports you and your contention that at some point, there was an agreement or

2  there was an order that waived the interest, but to be going on a fishing

3  expedition and insist that the State, uh, provide you with your case file, um, you

4  know-

5                              DEFENDANT: Your, Your Honor,

6  discovery is to get my entire case file. I think that is something Federal law

7  guarantees, and it says so from 42 USC Section 654, all the way to 666. That

8  law luminous, uh, Federal law, codified by Congress, provides everyone in the

9  country the right to access all the case file, child support case file, maintained by

10 every and any State Government, and that is, I'm not the, eh, the, Congress has

11 never said that's sufficient expedition (?). Congress has said, you're allowed to

12 have your entire case file and from there on, you're even allowed to ask

13 questions. Why was this, why was, that's the due process and that is the equal

14 protection, and that is the Privileges and Immunities Clause that we're all

15 guaranteed and living under. This is an interstate case. I am entitled by the

16 Constitution and by Federal laws 654 to 666 to have access to my entire file. I

17 cannot, I am unable, no custodial parent or non-custodial parent is able, that's

18 mentioned in the Social Security Act, would be un-,would be able to actually

19 identify, say this is the document I'm asking for, but they don't have access to,

20 to the file.

21                              THE COURT: Ma'am, you have access to

22 all of the Court orders.

23                              DEFENDANT: I-

24                              THE COURT: The Court-

25                              DEFENDANT: But I-

1           THE COURT: -the Court, the Court is

2    what establishes the, the child support order, the arrears order, and interest goes

3    along with that, Ma'am. So-

4           DEFENDANT: You're talking about this

5    agreement that we're deal, talking about. Agreement that you just mentioned

6    that, Your Honor, deals with my case file and this is the case file I am, by law,

7    by the (inaudible), by Federal law, by Texas law, and by Rhode Island law,

8    entitled to have access to, and Mr. Gould and the Child Support, uh, Services

9    and, uh, of Human Services denies me both, all denying me access to those. So,

10   I am again, asking for that. I will ask in every possible jurisdiction for those

11   because I am entitled, by law, at least three jurisdictions. By Texas law, by

12   Federal law-

13          THE COURT: Thank you.

14          DEFENDANT: -and by Rhode Island law.

15          THE COURT: Thank you-

16          DEFENDANT: Nevermore-

17          THE COURT: -Mr. Gould? Thank you.

18   Okay, you've, you've you've made your point. I understand what your argument

19   is. Mr. Gould?

20          ATTORNEY GOULD: Judge, I went

21   another, I think, ten minutes, maybe nine minutes that time. I still don't know

22   what she's looking for. Uh, it's a motion to compel. If, if that's what she wanted,

23   then let's have the motion to compel. Let's hear that. Maybe, maybe she could

24   put those thoughts into words again and maybe come up with a plan that she

25   wants for this discovery, Judge, but what we're doing now is wasting your time,

1    and wasting my time, and we're not getting anywhere. So, we've provided her

2    volumes upon volumes of documents relative to her case. She had specific

3    questions that I objected to. The, the objections were timely. We had a

4    conference, we went through them. After the conference, I had not heard

5    anything from Miss, uh, Seguin. We've gone through, I think, since February,

6    five or six appearances, a couple before you. I, I could, that, that could be an

7    exaggeration. It could've been four, uh, but we've been before the Court and,

8    and we've come with other issues every time and we continue this and continue

9    this. Judge, again, in order to have equity, you have to have clean hands, and this

10    is a person who has failed to comply with THIS Court's orders. Not the

11    Constitution, not the Texas law, not the, not the Congress law. This is someone

12    who has failed to comply with your orders, with your Court's orders on a

13    specific matter-

14                DEFENDANT: Objection.

15                ATTORNEY GOULD: -with child support

16    with a very-

17                DEFENDANT: Ob, objection.

18                ATTORNEY GOULD: -very basic needs

19    of a child-

20                DEFENDANT: Objection.

21                ATTORNEY GOULD: -and we're gonna

22    give-

23                THE COURT: I'm gonna, I'm gonna, I'm

24    going to allow him to speak, just like I allowed you to speak. Mr., Mr. Gould,

25    continue.

1          ATTORNEY GOULD: I, I've said

2    enough, Judge.

3          DEFENDANT: Objection.

4          THE COURT: Again, the Court, the Court

5    takes judicial notice of both the May 24th, 2012 Court order, as well as the

6    subsequent September 25th, 2012 Court order. Um, there was, um, no appeal,

7    um, taken from either one of those Court orders. With respect to, um-

8          DEFENDANT: Objection. Objection,

9    Your Honor.

10          THE COURT: Your objection is noted,

11    thank you very, thank you, your objection is noted.

12          DEFENDANT: He, he-

13          THE COURT: Mr. Gould, what is the

14    specific, uh, amount of interest that, um, is, uh, should be on the system? Is it

15    $81,652.49?

16          ATTORNEY GOULD: Yes, Judge.

17          THE COURT: Okay, and was that the

18    amount that was, um, placed on the system back in February?

19          ATTORNEY GOULD: Correct, Judge.

20          THE COURT: The Court finds-

21          ATTORNEY GOULD: That number

22    (inaudible)-

23          THE COURT: -the Court finds that that is,

24    based on no, absolutely no evidence to the contrary, that that is the amount, um,

25    that should be set on this as of today, today's date.

1      ATTORNEY GOULD: Thank you, Your

2   Honor.

3      DEFENDANT: Objection.

4      THE COURT: Your objection is noted. I

5   gave my ruling.

6      DEFENDANT: May, Your Honor, Your

7   Honor-

8      THE COURT: I've made my ruling.

9      DEFENDANT: - I would like to place on

10   the record that I have not been able to complete the discovery that there, that the,

11   uh, the, uh, Child Support Agency had placed on the record that there is an

12   agree-, asking about an agreement. I have not been able to cross examine the

13   Defendant. That is a violative of due process-

14      THE COURT: Sir, you can, Sir-

15      DEFENDANT: -because my, I have-

16      THE COURT: Ma'am, Ma'am, Ma'am-

17      DEFENDANT: -the right to examine-

18      THE COURT: -if you have any questions-

19      DEFENDANT: -(inaudible)-

20      THE COURT: -for Mr. Meyersiek, feel

21   free to, feel free to ask him.

22      DEFENDANT: So, therefore, we are now

23   vacating your prior decision-

24      THE COURT: No, we're not! No, we're

25   not!

1          DEFENDANT: -because we, because we

2    are, we have not gone through due process in terms of my asking, be able to

3    cross examine the Defendant. I'm sorry, the Plaintiff, the opposing party. I, I

4    would like to ask for my witness, Mr. Gould, to be, to the witness stand.

5          THE COURT: Mr. Gould-

6          ATTORNEY GOULD: Objection, Judge.

7          THE COURT: Mr. Gould is not, is not a

8    witness.

9          DEFENDANT: The State. The State, on

10   the State of Rhode Island and he represents the State of Rhode Island. He was

11   instrumen-, he had communicated with me prior to this particular proceeding,

12   the start of proceeding in 2022, by email, by conversation, and with John

13   Langlois. So, that's my witness. I'd like to put on the stand, as my witness-

14         THE COURT: Today, the matter before-

15         DEFENDANT: -regarding-

16         THE COURT: -the matter before the

17   Court-

18         DEFENDANT: -regarding-

19         THE COURT: -is a motion to set-

20         DEFENDANT: -the waiver of interest-

21         THE COURT: -to set arrears-

22         DEFENDANT: -regarding-

23         THE COURT: Ma'am, Ma'am-

24         DEFENDANT: -the waiver of interest-

25         THE COURT: Ma'am, I'm gonna mute

1    you again. The matter before the Court today is simply a motion to set arrears.

2    We set the arrears, there's nothing further before the Court. If you wanna file a

3    different motion, feel free to do so, but this matter is concluded with your arrears

4    being set at $81,652.49.

5                                              DEFENDANT: Your, unmute, am I

6    unmuted?

7                                              THE COURT: No. Yeah.

8                                              DEFENDANT: Am I unmuted? Uh, I am

9    filing, I am asking for, um, uh, reconsideration because there is, I have not, I've

10   been, uh, uh, barred, obstructed from presenting evidence. I'd like to play, uh,

11   the audio recording of the waiver of interest.

12                                             THE COURT: Today is the motion to set

13   the, to set the interest.

14                                             DEFENDANT: And that's my defense-

15                                             THE COURT: The motion to set arrears,

16                                             DEFENDANT: -my defense is, I would

17   like to play the recording of the waiver of interest that the State had represented

18   that Gero had done. If I'm obstructed from, uh, providing evidence and we have

19   a due process issue in this proceeding. I have not been, I want to present

20   evidence, I want to cross examine the witness, I want to pro-, I want to call my

21   witness and I have a right to do so-

22                                             THE COURT: Ma'am, if you want to do

23   that, this is not, this is not the forum for that. I can do that in another proceeding.

24                                             DEFENDANT: Yes, it is! Yes, it is-

25                                             THE COURT: Uh, well, I respectfully dis-

1    agree with you.

2                                    DEFENDANT: -because we are here-

3                                    THE COURT:  I respectfully disagree-

4                                    DEFENDANT: -to establish, we are here

5    to establish, we're here supposedly to establish interest and I am presenting

6    evidence that interest was waived.

7                                    THE COURT: Interest was not waived in

8    any Court order and that is the basis upon which-

9                                    DEFENDANT: It was waived-

10                                   THE COURT: -I made my decision today.

11                                   DEFENDANT: -(inaudible)-

12                                   THE COURT: Ma'am, Ma'am-

13                                   DEFENDANT: -it was waived-

14                                   THE COURT: -I'm muting you because

15   you don't let me speak. There is no Court order by this Court by any Magistrate

16   or Judge that waived or set the interest to zero. It is still in the system, and that is

17   why today I am going to establish that the interest owed by you on this account

18   is set at $81,652.49. There was no Court order to the contrary. This matter is

19   now concluded.

20                                   DEFENDANT: I am now, I am now

21   raising the issue, uh, that interest was waived by contract and agreement-

22                                   THE COURT: Ma'am, I, Ma'am-

23                                   DEFENDANT: -with Gero Meyersiek-

24                                   THE COURT: -I, I just, Ma'am-

25                                   DEFENDANT: -and this is all part of the-

1                              THE COURT: -I just gave you the

2     reasoning-

3                              DEFENDANT: -(inaudible) process-

4                              THE COURT: -for the Court's decision is

5     based on the fact that the Court file is void of any order or judgement that

6     waived the interest of set it to zero.

7                              DEFENDANT: Also, the interest rate of

8     12% compounding interest is illegal under, uh, Social Security Act. They have

9     put out-

10                             THE COURT: Well, that's the interest rate

11    that-

12                             DEFENDANT: -12% compound interest-

13                             THE COURT:  -that's been established-

14                             DEFENDANT: -that is illegal under-

15                             THE COURT: -by the State of Rhode

16    Island.

17                             DEFENDANT: -Federal law, which

18    preempts Rhode Island law.

19                             THE COURT: Thank you very much, Miss

20    Seguin-

21                             DEFENDANT: I just wanna make sure

22    that-

23                             THE COURT: Your objection is moted.

24                             DEFENDANT: -(inaudible)-

25                             THE COURT: Thank you very much-

1            DEFENDANT: -(inaudible)-

2            THE COURT: -Mr. Meyersiek-

3            DEFENDANT: -also entitled-

4            THE COURT: -Attorney Gould-

5            DEFENDANT: -to see Judge created laws

6    on these, this issue. I have been prevented from accessing those. There's

7    (inaudible) public records (inaudible)-

8            THE COURT: Ma'am, we gave you every

9    Court record you requested.

10           DEFENDANT: -Federal-

11           THE COURT: You requested-

12           DEFENDANT: -that was all Judge

13   created-

14           THE COURT: -you requested the Court

15   file-

16           DEFENDANT: -laws. (Inaudible) 12%

17   compounding interest-

18           THE COURT: -for a number of years. I'm

19   not going to let you yell at me.

20           DEFENDANT: Why-

21           THE COURT: You're not going to talk

22   over me.

23           DEFENDANT: Why-

24           THE COURT: This hearing is concluded.

25   Thank you very much.

1        ATTORNEY GOULD: Thank you, Judge.

2        DEFENDANT: I object and raise that the-

3        THE COURT: Thank you-

4        DEFENDANT: -interest, as well-

5        THE COURT: Thank you.

6        DEFENDANT: -and compound interest is

7 illegal-

8        ATTORNEY GOULD: Thank you, Judge.

9        DEFENDANT: I'm looking to appeal this

10 to the Judge, Miss, uh, Your Honor, Magistrate-

11        THE COURT: And you're, and you're free

12 to do so.

13        DEFENDANT: And I'm doing that on an

14 oral basis, so here are-

15        THE COURT: You can file that with the

16 Clerk-

17        DEFENDANT: -I am doing that orally-

18        THE COURT: You can file that with the

19 Clerk. I will make a notation.

20        DEFENDANT: -this is an oral motion, an

21 oral motion, this is an oral motion-

22        THE COURT: Thank you.

23        DEFENDANT: -to-

24        THE COURT: It's noted.

25        DEFENDANT: -appeal the Magistrate's

1    order-

2                              THE COURT: Your appeal from my

3    decision is noted. It will be put in the order.

4                              DEFENDANT: -for a hearing, there was

5    no hearing on this, there was no trial on this, no trial was provided. I was

6    prevented from, uh, from, uh, from, uh, from presenting evidence-

7                              THE COURT: And you may appeal my

8    decision-

9                              DEFENDANT: -(inaudible) audio

10   recording-

11                             THE COURT: -to a Famiy Court Justice.

12   Thank you very much.

13                             DEFENDANT: I'm appealing it. I, I have

14   appealed it orally, now.

15                             CLERK: Nope, can't do that.

16                             THE COURT: You have to file an appeal

17   yourself in the Clerk's office.

18                             CLERK: And she has to pay for a

19   transcript-

20                             DEFENDANT: According to Turner

21   versus Rodgers, another U.S. Supreme Court case, I am entitled to not have to

22   do a, uh, a written motion. I can do an oral motion for an appeal to a, uh, to, to

23   the Jus-, Judge, uh, at iss-, that's, uh, of issue and I'm requesting a hearing date

24   for that appeal.

25                             CLERK: Sorry, that goes before a Judge.

1           DEFENDANT: Clerk (inaudible)-

2           THE COURT: That has to go before a

3   Family Court Judge.

4           CLERK: Only the Office can give appeal

5   dates, and there's a process and she has to order a transcript, and pay for it,

6   before that transcript will even be typed out.

7           THE COURT: Miss Seguin, did you hear

8   the Clerk?

9           DEFENDANT: Who is the, uh, who is the,

10  uh, the Scribe for this, the, uh, Stenographer? So, today, I wanna make very

11  clear, you all know you're establishing this Court, um, establishing interest and

12  what you're also saying is that the, the, uh, the interest was supposedly

13  established but you're reestablishing interest?

14          THE COURT: I've made my ruling-

15          DEFENDANT: There's no-

16          THE COURT: -I've made my ruling-

17          DEFENDANT: -(inaudible)-

18          THE COURT: -Miss Seguin, I've made

19  my ruling. You've indicated you're interest in appealing. That is noted for the

20  record. We have other cases that are waiting to be heard. Thank you very much

21  and-

22          DEFENDANT: I'm looking to-

23          THE COURT: -you're free to follow up-

24          DEFENDANT: -as a pro se litigant-

25          THE COURT: -however you see fit. Thank

1    you so much.

2                                    DEFENDANT: -I'm looking to-

3                                    THE COURT: I understand that and thank

4    you.

5                                    DEFENDANT: -understand what the

6    Court order will say.

7                                    THE COURT: Thank-

8                                    DEFENDANT: What will the Court order

9    say? What will the Court order say?

10                                   THE COURT: Mr. Gould will draft the

11   Court order for my signature, and you'll receive a copy of it. Thnak you very

12   much.

13                                   DEFENDANT: Now, what would it, what

14   would it, so that we're all clear, so I can also put on the record any objections.

15   The objection, so, you're-

16                                   THE COURT: Miss Seguin-

17                                   DEFENDANT: -ordering reestablishment

18   because that's the motion. The motion is to reestablish interest.

19                                   THE COURT: It's not reestablish.

20                                   DEFENDANT: And-

21                                   THE COURT: It's set arrears. That was the

22   motion, to set arrears. The arrears are the interest that you owe on the case,

23   Ma'am, and this hearing is over.

24                                   DEFENDANT: So, you are-

25                                   THE COURT: I'm going to end the

35

1   hearing-

2                    DEFENDANT: -you are (inaudible)-

3                    THE COURT: You are not going to talk

4   over me. The hearing is over. You can file your appeal. Thank you very much.

5   Have a good day.

6                    DEFENDANT: I would like to put on the

7   record-

8                    THE COURT: The hearing is over,

9   Ma'am.

10                   DEFENDANT: -um, my appeal.

11                   THE COURT: The hearing is over. You

12   can't cont-

13                   DEFENDANT: I would like to put on the

14   record for the appeal, because the appeal is critically important.

15                   THE COURT: I understand that.

16                   DEFENDANT: The appeal basically-

17                   THE COURT: We're not, no, we're not

18   going to hear your appeal now.

19                   DEFENDANT: You don't have-

20                   THE COURT: We're not going to hear

21   your appeal now.

22                   DEFENDANT: You don't have, this Court

23   does not have jurisdiction-

24                   THE COURT: You've noted you're

25   objection, you've noted your objection, you're not going to argue your appeal

1    now and you're not gonna talk over me, okay. I've made my ruling. You

2    disagree with it. You have a right to appeal and the hearing is over, okay. You're

3    not going to argue your appeal here. You don't like my decision, you don't

4    agree with my decision, and the hearing is over, because there's nothing left to

5    discuss. I'm ending this meeting for everyone. I'm ending-

6                                    DEFENDANT: You-

7                                    THE COURT: I'm ending the meeting for

8    everyone.

9                                    DEFENDANT: The Family Court does not

10   have jurisdiction-

11                                   THE COURT: Thank you.

12                                   DEFENDANT: -over agreements between

13   Gero and myself-

14                                   THE COURT: Thank you. I'm ending, I'm

15   ending the meeting. Thank you.

16                                   DEFENDANT: I'm putting that on the

17   record. The Family Court lacks subject matter-

18                                   THE COURT: Okay.

19                                   DEFENDANT: -jurisdiction, nor personal

20   jurisdiction regarding agreements-

21                                   THE COURT: I'm ending the meeting-

22                                   DEFENDANT: -between Gero Meyersiek-

23                                   THE COURT: -for everyone.

24                                   DEFENDANT: -and myself-

25                                   THE COURT: Thank you, Mr. Meyersiek-

1              DEFENDANT: -and that was a question-

2              THE COURT: -thank you, Mr. Gould-

3              DEFENDANT: -Mr. Gould had posed-

4              THE COURT: Thank you very much. I'm

5    ending the meeting for everyone.

6              DEFENDANT: In-

7

8

9              **HEARING CONCLUDED.**

10

11

12

13

14

EXHIBIT F

# SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

EXHIBIT G



State of Rhode Island
# Office of Child Support Services
DEPARTMENT OF HUMAN SERVICES

R.I. Government Agencies | Privacy policy | Search RI.gov:

Welcome Mary Seguin

Home  My Profile  Contact Us  Site Map  Log Out

**Menu**
▼ Case Information
  ▶ Last 5 Payments
  ▶ Last 13 Months
  ▶ Current Orders/ Past Due Balances
  ▶ Court Dates/ Appointments
  ▶ Enforcement Actions
  ▶ PIN Lookup

Home > Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek          CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|---|---|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Exhibit B

## SPECIFICATION FOR OCSS CHANGE ORDER
### Auto Adjustment of Interstate Interest

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

January 25, 2011
N:\CSB\Specification\OCS Interest\Adjust OCS Interest.doc

Exhibit C

Case Number: K2016-1077M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22   11:28          C A S E    T R A C K I N G       CSCL  ASMXA201
           TRAC.00               CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP
WANTS THE INTEREST PUT BACK ON THE CASE (███████████████). WE REMOVED THE INTEREST WHEN
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-.
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BY NCP
AS NCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED
FOR PASSPORT PURPOSES IN ANY EVENT.

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

```
RL: 80  12 22 ABSP:            SEGUIN     MARY        CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK  GERO    K   PNL:
```

Case Number PC001052TM
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10 13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

12/13/22   11:20      C A S E   T R A C K I N G      CSCL  ASMXA201
           TRAC.00           CASE HISTORY            U024  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT.

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES

RL: 80  12 22 ABSP:        SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:       MEYERSIEK   GERO    K    PNL:

Case: 23-1053   Document: 00118120583   Page: 995   Date Filed: 09/28/2024   Entry ID: 6667800
Case: 23-1053   Document: 00118120583   Page: 995   Date Filed: 09/28/2024   Entry ID: 6667800
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

```
12/13/22    11:29        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00                CASE HISTORY            U824  PROD
STARTING DATE  09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/03/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
     FROM CASE DATA PANEL

12/03/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
     FROM OFST PANEL

12/03/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: SO  12 22 ABSP:            SEGUIN      MARY        CMD: _____
FWX: TRAC  D CLIENT:           MEYERSIEK   GERO    X   PNL:
```

Case Number: 23-1069A   Document: 00118190923   Page: 999   Date Filed: 09/26/2024   Entry ID: 6682600
Filed: Providence/Bristol County Family Court
Submitted: 8/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria G.

11:29:53 Tuesday, December 13, 2022

```
12/13/22   11:29          C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY               U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

RL: 80  12 22 ABSP:          SEGUIN        MARY        CMD: _____
FXX: TRAC  D CLIENT:         MEYERSIEK     GERO     X  PNL:
```

ed in Providence/Bristol County Family Court
ibmitted 6/7/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00           CASE HISTORY               U824   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR. RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
          TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
          58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:           SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK   GERO    K     PNL:
```

Case Number 23904552A1 Document: 00011138192073213 Page: 10601 Date Filed: 09/26/2024 Entry ID: 666627458103
Filed in Providence/Bristol County Family Court
Submitted: 5/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maya P.
11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28          C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00                CASE HISTORY               U824    PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

RL: 80  12 22 ABSP:              SEGUIN      MARY           CMD: _____
FNX: TRAC  D CLIENT:            MEYERSIEK    GERO      K    PNL:
```

Case Number: N20010324M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

```
12/13/22    11:28         C A S E    T R A C K I N G      CSCL  ASMXA201
            TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

RL: 80  12 22 ABSP:          SEGUIN       MARY         CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK    GERO     K   PNL:
```

Filed in Providence/Bristol County Family Court. Submitted: 8/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

| 12/13/22 | 11:28 | **C A S E   T R A C K I N G** | CSCL | ASMXA201 |
|---|---|---|---|---|

**TRAC.00**                **CASE HISTORY**            U824    PROD

**STARTING DATE**    09 01 2021
**SELECTION**    COMPREHENSIVE CASE HISTORY

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:              SEGUIN       MARY        CMD: _____
                                  MEYERSIEK    GERO    K   PNL:

Exhibit D

# Title 15
# Domestic Relations

## Chapter 5
## Divorce and Separation

### R.I. Gen. Laws § 15-5-16.5

**§ 15-5-16.5. Interest on arrearages.**

Interest at the rate of twelve percent (12%) per annum on any support debt due or owing, child or spousal support, shall be assessed unless the responsible party shall, for good cause shown, be relieved of the obligation to pay interest by the family court.

History of Section.
P.L. 1980, ch. 308, § 1; P.L. 1984, ch. 167, § 1; P.L. 2001, ch. 155, § 1.

Exhibit E



cseinfo.dhs.ri.gov

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov:

State of Rhode Island
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Seguin

Home   My Profile   Contact Us   Site Map   Log Out

**Menu**
- **Case Information**
  - Last 5 Payments
  - Last 13 Months
  - Current Orders/ Past Due Balances
  - Court Dates/ Appointments
  - Enforcement Actions
- PIN Lookup

Home > Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek        CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|--------|--------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Office of Child Support Services | RI Department of Human Services
Version 2.1.0 – OCSS Case Manager (JRA, NKB-4k) – Last Updated: June 17, 2020

EXHIBIT F



12:39 PM Mon Dec 6

AA    cseinfo.dhs.ri.gov 🔒

ADCB Internet Banking    Community Health Choice |...    Sign In - Community Healt...    Case Manager Portal | Offi...    RI OCSS Payment

RI.gov    R.I. Government Agencies | Privacy policy | Search RI.gov:

**State of Rhode Island**
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Home  My Profile  Contact Us  Site Map  Log

**Menu**

▼ **Case Information**
  ▸ Last 5 Payments
  ▸ Last 13 Months
  ▸ Current Orders/ Past Due Balances
  ▸ Court Dates/ Appointments
  ▸ Enforcement Actions
  ▸ PIN Lookup

Home > Current Orders and Past Due Balances

**Case Manager**

## Current Orders / Past Due Balances

**Custodial Parent:** Gero K Meyersiek    **CSE ID:** 1689817

### Current Orders

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

↑ Note: Medical orders and medical arrears are not listed on this screen.

### Past Due Balances

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |

EXHIBIT G

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JIM HODGES, in his official capacity
as Governor of the State of South
Carolina; JEAN HOEFER TOAL, in her
official capacity as Chief Justice of
South Carolina; SOUTH CAROLINA
DEPARTMENT OF SOCIAL SERVICES;
STATE OF SOUTH CAROLINA; PEOPLE OF
SC, on Behalf of the State of South
Carolina; JOHN DOE; JANE DOE, and
those similarly situated,

     *Plaintiffs-Appellants,*

    v.          No. 00-2512

TOMMY G. THOMPSON, SECRETARY,
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; WADE
F. HORN, Ph.D. in his official
capacity as Assistant Secretary of
the United States Department of
Health and Human Services for
Children and Families; U.S.
DEPARTMENT OF HEALTH & HUMAN
SERVICES,

     *Defendants-Appellees.*

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Julian Abele Cook, Jr., Senior District Judge, sitting by designation.
(CA-00-2048-3-17)

Argued: December 6, 2001

Decided: November 15, 2002

Before WIDENER, NIEMEYER, and MOTZ, Circuit Judges.

---

Affirmed by published per curiam opinion.

---

## COUNSEL

**ARGUED:** Marcus Angelo Manos, NEXSEN, PRUET, JACOBS & POLLARD, L.L.C., Columbia, South Carolina, for Appellants. Gregory George Katsas, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Wilburn Brewer, Jr., NEXSEN, PRUET, JACOBS & POLLARD, L.L.C., Columbia, South Carolina; A.E. Dick Howard, Charlottesville, Virginia, for Appellants. Stuart E. Schiffer, Acting Assistant Attorney General, Scott N. Schools, United States Attorney, Jacob M. Lewis, Peter J. Smith, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

## OPINION

PER CURIAM:

The Governor of South Carolina appeals the grant of summary judgment to the Secretary of the United States Department of Health and Human Services in the State's action seeking injunctive and declaratory relief from conditions imposed for federal funding of the Temporary Assistance to Needy Families (TANF) program.

South Carolina challenges the district court finding that Congress acted within its Spending Clause authority when it conditioned States' receipt of federal funds under the child support enforcement program and the TANF program on compliance with the requirement that States develop and maintain automated child support enforcement systems and that such a condition was not so coercive as to violate the Tenth Amendment. The State further alleges the district court

erred when it found that the Secretary did not have the discretion to amend the statutory penalty structure for a State's noncompliance with the child support systems requirements. In addition, South Carolina contends the court erred in finding that the State could not invoke the protections of the Due Process Clause. After considering the parties' briefs and the record, and following oral argument, we affirm substantially on the reasoning of the district court.

## I.

The district court opinion contains a comprehensive history, the details of which need not be repeated here, of the federal government's longstanding involvement in child support enforcement programs and related federal efforts to work with the States to solve the serious problem of nonpayment of child support. See *Hodges v. Shalala*, 121 F.Supp.2d 854 (D.S.C. 2000). Currently, as a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements that the State establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A). South Carolina concedes that it has neither a federally certifiable statewide automated system for child support nor an SDU. See *Hodges*, 121 F. Supp. 2d at 861.

Without an approved state plan, a State may lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). See 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2). Alternatively, a State may opt for an alternative penalty in lieu of disapproval of their state plan and the withholding of federal funds if the State is making a good faith effort to comply with the program's requirements and the State has submitted a corrective compliance plan. See 42 U.S.C. § 655(a)(4). South Carolina has elected to incur the alternative penalty.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and review a district court's grant of summary judgment *de novo*. See *United States v. Kanasco, Ltd.*, 123 F.3d 209, 210 (4th Cir. 1997).

## II.

We turn first to South Carolina's contention that the federal government's requirements and penalties associated with the state-wide automated systems, which South Carolina failed to provide, exceed Congressional authority under the Spending Clause and the Tenth Amendment.

Consistent with its Spending Power, Congress may attach conditions on the receipt of federal funds. See *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Spending Power is not unlimited, of course, and the Supreme Court has recognized four general limitations: spending must be in pursuit of the general welfare; any attached conditions must be unambiguous; conditions must also be related to a federal interest; and, the obligations imposed by Congress may not violate any independent constitutional provisions. See *Dole*, 483 U.S. at 207-08.

The district court found that "Congress made a considered judgment that the American people would benefit significantly from the enhanced enforcement of child-support decrees and the diminution of the number of parents who are able to avoid their obligations simply by moving across local or state lines." *Hodges*, 121 F. Supp. 2d at 873. Thus, like the district court, we are satisfied that Congress acted in the general welfare when it enacted the child support enforcement programs and the associated funding conditions under Title IV-D.

South Carolina's contention that the Title IV-D conditions are ambiguous is without merit. The statute expressly provides that compliance with the automated system and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A. We agree with the district court that the clear and unequivocal statement of the required conditions in the statute enabled South Carolina to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted).

A third limitation on the Spending Power requires that conditions "bear some relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992) (citing *Dole*, 483 U.S. at 207-08, n.3). Here, there is a complementary relationship

between efficient child support enforcement and the broader goals of providing assistance to needy families through the TANF program. Establishing paternity and collecting child support may enable families to reduce their dependence on the welfare system, and both programs are intended to reduce the incidence of poverty among children and families. The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely to provide uniform levels of support for children of equal need").[1]

South Carolina does not contend that the Title IV-D conditions violate the fourth limitation on the Spending Power — that the conditions violate any independent Constitutional prohibition, rather it raises a Tenth Amendment[2] challenge. As we have recently reconfirmed, "the Tenth Amendment itself *does not* act as a constitutional bar to Congress's spending power; rather, the fourth restriction on Congress's spending power stands for the more general proposition that Congress may not induce the states to engage in activities that would themselves be unconstitutional." *James Island Pub. Serv. Dist. v. City of Charleston*, 249 F.3d 323, 327 (4th Cir. 2001) (citing *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000)) (italics in original). We therefore next consider South Carolina's Tenth Amendment argument, not as a limitation related to the Spending Clause, but as an independent constitutional challenge.

South Carolina argues that the coercive effect of the Title IV-D conditions run afoul of the protections of the Tenth Amendment. The Supreme Court has recognized that the Tenth Amendment may be implicated when the financial incentives offered by the federal government to the States cross the impermissible line where "pressure

---

[1] *Sullivan* considered the relationship between child enforcement programs and Aid to Families with Dependent Children (AFDC). 496 U.S. at 478. TANF is a block grant program established in 1996 as the successor to the AFDC program. See 42 U.S.C. §§ 601-618.

[2] The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

turns into compulsion." See *Dole*, 483 U.S. at 211 (citations omitted). Congress may use its Spending Power to influence a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, but Congress, under the Commerce Clause, may offer the States a choice of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

The district court found that, based on the State's own admission, the alternative penalty, which South Carolina has now elected, would result in the loss of a small fraction of the State's TANF funds and that such a proportion was noncoercive. Given the linkages between child support enforcement and aid to needy families and the level of the alternative penalty, we agree with the district court's conclusion that "the Title IV-D conditions are not so overbearing as to create an unconstitutional compulsion." *Hodges*, 121 F.2d at 875.

South Carolina next contends that the Secretary of the Department of Health and Human Services (HHS) has the discretion to deviate from the alternative penalty structure of Title VI-D in order to respond to the peculiar circumstances that led to South Carolina's noncompliance. Specifically, South Carolina argues that its inability to comply with the automated system and SDU requirements was caused by the failure of its prime contractor, Unisys, to deliver on its contract with the State. South Carolina maintains that because its noncompliance was no fault of its own and its alternative systems are in substantial compliance with the goals of the statute, the Secretary abused her discretion by refusing to grant South Carolina an evidentiary hearing and waive or amend the alternative penalty for noncompliance.

We have examined the penalty provisions of the statute and, like the district court, cannot find the discretion South Carolina envisions. The wording of the statute is plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submit-

ted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and *the Secretary shall reduce the amount otherwise payable to the State* [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). Again, we agree with the district court that "[b]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges*, 121 F.2d at 879. Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, South Carolina's assertion that it is entitled to an evidentiary hearing must also fail.[3]

### III.

For the foregoing reasons, we are of opinion that the Title IV-D provisions are constitutionally valid under the Spending Clause and the Tenth Amendment and that the Secretary lacks discretion under Title IV-D to deviate from the penalty provisions.

The judgment of the district court is accordingly

*AFFIRMED.*

---

[3]In the district court, South Carolina asserted a Due Process claim which the district court denied. The court concluded that the "State cannot invoke the protections of the Fifth Amendment with claims that [the State] has been harmed." *Hodges*, 121 F.2d at 865. South Carolina does not take issue with the district court's holding, but rather, on appeal it asserts that the State is entitled to assert a Due Process claim on behalf of its citizens. Because this contention was never properly presented to the district court, we do not consider it now. See *McGowan v. Gillenwater*, 429 F.2d 586, 587 (4th Cir. 1970).

EXHIBIT H

No. 10-10

# In the Supreme Court of the United States

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

*ON WRIT OF CERTIORARI*
*TO THE SUPREME COURT OF SOUTH CAROLINA*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**
**SUPPORTING REVERSAL**

SALLY A. HOWARD
  *Acting General Counsel*
ROBERT E. KEITH
  *Associate General Counsel*
LISETTE PEDRE MESTRE
  *Attorney*
  *Department of Health and*
    *Human Services*
  *Washington, D.C. 20201*

NEAL KUMAR KATYAL
  *Acting Solicitor General*
    *Counsel of Record*
TONY WEST
  *Assistant Attorney General*
LEONDRA R. KRUGER
  *Acting Deputy Solicitor*
    *General*
JOSEPH R. PALMORE
  *Assistant to the Solicitor*
    *General*
LEONARD SCHAITMAN
EDWARD HIMMELFARB
  *Attorneys*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

## QUESTIONS PRESENTED

1.   Whether the Court has jurisdiction to review the decision of the South Carolina Supreme Court.

2.   Whether due process requires that the State provide counsel, at its expense, to an indigent parent in a child-support proceeding, when the parent is subject to a civil-contempt order for non-payment that may lead to confinement.

(I)

# TABLE OF CONTENTS

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Argument:
   I.  The Court has jurisdiction to review the decision of
      the South Carolina Supreme Court . . . . . . . . . . . . . . . 13
  II.  The absence of adequate procedures necessary
      to secure an accurate adjudication of civil
      contempt violated due process . . . . . . . . . . . . . . . . . . . 16
      A.  Confinement for civil contempt is
          permitted only when the contemnor is
          presently able to comply with the
          underlying order . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
      B.  The Family Court's procedures were
          inadequate to ensure an accurate
          determination of present ability to pay . . . . . . . . 19
      C.  Due Process can be satisfied by a variety of
          procedures intended to assure an accurate
          determination of present ability to pay in a
          civil contempt proceeding . . . . . . . . . . . . . . . . . . 23
          1.  Courts can comply with Due Process by
             providing a meaningful opportunity for an
             alleged contemnor to establish his present
             ability to pay . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          2.  There is no basis for an inflexible right to
             counsel rule in civil contempt proceedings . . . 25
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

(III)

IV

## TABLE OF AUTHORITIES

Cases:

*Alvarez* v. *Smith*, 130 S. Ct. 576 (2009) . . . . . . . . . . . . . . . 15

*Blessing* v. *Freestone*, 520 U.S. 329 (1997) . . . . . . . . . . . . . 3

*Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886
    (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Carlson* v. *Landon*, 342 U.S. 524 (1952) . . . . . . . . . . . . . . 32

*City of L.A.* v. *Lyons*, 461 U.S. 95 (1983) . . . . . . . . . . 14, 15

*DeFunis* v. *Odegaard*, 416 U.S. 312 (1975) . . . . . . . . . . . . 14

*First Nat'l Bank* v. *Bellotti*, 435 U.S. 765 (1978) . . . . . . . . 14

*Foucha* v. *Louisiana*, 504 U.S. 71 (1992) . . . . . . . . . . . . . . 20

*Gagnon* v. *Scarpelli*, 411 U.S. 778
    (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25, 26, 27, 28, 29

*Gault, In re*, 387 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . 26

*Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418
    (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Hicks* v. *Feiock*, 485 U.S. 624 (1988) . . . . . . . . . . . . . . 17, 18

*Hodges* v. *Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000),
    aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied,
    540 U.S. 811 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*INS* v. *Lopez-Mendoza*, 468 U.S. 1032 (1984) . . . . . . . . . 32

*International Union, United Mine Workers* v.
    *Bagwell*, 512 U.S. 821 (1994) . . . . . . . . . . . . . . . 18, 19, 26

*Landon* v. *Plasencia*, 459 U.S. 21 (1982) . . . . . . . . . . . . . 31

*Lassiter* v. *Department of Soc. Servs.*, 452 U.S. 18
    (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189
    (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Maggio* v. *Zeitz*, 333 U.S. 56 (1948) . . . . . . . . . . . . . . . 17, 18

*Mathews* v. *Eldridge*, 424 U.S. 319
    (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19, 20, 25, 26, 29

V

Cases—Continued:                                        Page

*Middendorf* v. *Henry*, 425 U.S. 25 (1976) . . . . . 12, 26, 29, 31

*Mohammed* v. *Gonzales*, 400 F.3d 785 (9th Cir. 2005) . . . 32

*Morrissey* v. *Brewer*, 408 U.S. 471 (1972) . . . . . . . . . . . 19, 26

*Moseley* v. *Mosier*, 306 S.E.2d 624 (S.C. 1983) . . . . . . . . 17

*Murphy* v. *Hunt*, 455 U.S. 478 (1982) . . . . . . . . . . . . . 13, 14

*Nazakat* v. *INS*, 981 F.2d 1146 (10th Cir. 1992) . . . . . . . 33

*Olmstead* v. *L.C.*, 527 U.S. 581 (1999) . . . . . . . . . . . . . . . 15

*Shillitani* v. *United States*, 384 U.S. 364 (1966) . . . . . 11, 17

*Spencer* v. *Kemna*, 523 U.S. 1 (1998) . . . . . . . . . . . . . . 13, 14

*United States* v. *Bauer*, 956 F.2d 693 (7th Cir.),
    cert. denied, 506 U.S. 882 (1992) . . . . . . . . . . . . . . . . . . 28

*United States* v. *Campos-Asencio*, 822 F.2d 506
    (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States* v. *Gasca-Kraft*, 522 F.2d 149 (9th Cir.
    1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Rylander*, 460 U.S. 752 (1983) . . . . . . . . 18

*United States* v. *Torres-Sanchez*, 68 F.3d 227 (8th Cir.
    1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States Parole Comm'n* v. *Geraghty*,
    445 U.S. 388 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Vitek* v. *Jones*, 445 U.S. 480 (1980) . . . . . . . . . . . . . . . 26, 27

*Walters* v. *National Ass'n of Radiation Survivors*,
    473 U.S. 305 (1985) . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

*Weinstein* v. *Bradford*, 423 U.S. 147 (1975) . . . . . . . . . . . 14

*Wilkinson* v. *Austin*, 545 U.S. 209 (2005) . . . . . . . . . . . . . 19

*Yee* v. *City of Escondido*, 503 U.S. 519 (1992) . . . . . . . . . . 24

VI

Constitution, statutes and regulations:                     Page

U.S. Const.:
Amend. V (Due Process Clause) . . . . . . . . . . . . . . . . . 9, 19
Amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 26, 27
Amend. XIV (Due Process Clause) . . . . . . . . . . . . . . . 19
Social Services Amendments of 1974, Pub. L.
No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651
*et seq.*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

§ 101(c)(5)(C), 88 Stat. 2360 . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 654(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
42 U.S.C. 654(6) (1976) . . . . . . . . . . . . . . . . . . . . . 3
42 U.S.C. 654(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
42 U.S.C. 654(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
42 U.S.C. 654(24) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
42 U.S.C. 654a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
42 U.S.C. 654a(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . 6
42 U.S.C. 654a(e)(4) . . . . . . . . . . . . . . . . . . . . . . . . 6
42 U.S.C. 654a(e)(5) . . . . . . . . . . . . . . . . . . . . . . . . 6
42 U.S.C. 654a(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . 6
42 U.S.C. 655(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . 4
42 U.S.C. 655(a)(2)(C) . . . . . . . . . . . . . . . . . . . . . . 2
42 U.S.C. 655(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . 4
42 U.S.C. 655(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . 6
42 U.S.C. 656(a)(1) (1976) . . . . . . . . . . . . . . . . . . . . 3
42 U.S.C. 657(a)(4)(B) (1976) . . . . . . . . . . . . . . . . 3
42 U.S.C. 657(b) (1976) . . . . . . . . . . . . . . . . . . . . . 3
42 U.S.C. 666(a)(1)-(8) . . . . . . . . . . . . . . . . . . . . . . 4

VII

Statutes and regulations—Continued:                          Page

    42 U.S.C. 666(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . 30

    42 U.S.C. 666(a)(7)(B)(i) . . . . . . . . . . . . . . . . . . . . 30

    42 U.S.C. 666(a)(8)(A)(iv) . . . . . . . . . . . . . . . . . . . 30

    42 U.S.C. 666(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    42 U.S.C. 666(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    42 U.S.C. 666(c)(1)(H) . . . . . . . . . . . . . . . . . . . . . . 30

Child Support Enforcement Amendments of 1984,
    Pub. L. No. 98-378, 98 Stat. 1329:

    § 6, 98 Stat. 1314 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    § 23(a)(2), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . 4

    § 23(a)(5), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . 4

Family Support Act of 1988, Pub. L. No. 100-485,
    102 Stat. 2343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    § 123(a)(C), 102 Stat. 2352 . . . . . . . . . . . . . . . . . . . . . 5

Personal Responsibility and Work Opportunity
    Reconciliation Act of 1996, Pub. L. No. 104-193,
    110 Stat. 2105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    § 344(a)(2), 110 Stat. 2235 . . . . . . . . . . . . . . . . . . . . . 6

Social Security Act Amendments of 1950, ch. 809,
    § 321(b), 64 Stat. 550 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Social Security Amendments of 1967, Pub. L.
    No. 90-248, § 201(a)(1), 81 Stat. 877-879 . . . . . . . . . . . . . 2

    § 201(a)(1), 81 Stat. 879 . . . . . . . . . . . . . . . . . . . . . . . 3

8 U.S.C. 1229a(b)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . 32

8 U.S.C. 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. 3006A(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

28 U.S.C. 1257(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. 602(a)(26) (1976) . . . . . . . . . . . . . . . . . . . . . . 3

VIII

Statutes and regulations—Continued:                     Page

  42 U.S.C. 608(a)(3)(A) .............................. 5, 7
  42 U.S.C. 608(a)(7) ................................. 5
  45 C.F.R.:
    Section 302.70(a)(5)(iii) ......................... 30
    Section 303.5(g)(2)(iii) ........................... 30
    Section 303.6 (1975) .............................. 4
    Section 303.6 (1989) .............................. 5
    Section 303.20(c)(7) (1975) ....................... 4
    Section 303.20(c)(7) (1989) ....................... 5
    Section 303.100(a)(6) ............................. 30
    Section 303.100(f)(4) ............................. 30
    Section 303.101(c)(2) ............................. 30
    Section 303.102(c)(1) ............................. 30
    Section 303.104(b) ............................... 30
    Section 304.20(b)(3)(iv) .......................... 5
    Section 304.23(i) ................................. 30
    Section 304.23(j) ................................. 30
  Sup. Ct. R. 14.1(a) ................................ 24
  S.C. Rule of Family Ct.:
    R. 24 ............................................ 7
    R. 24(a) .......................................... 7
    R. 24(b) .......................................... 7
  S.C. Code Ann. (West):
    § 43-5-220(c) (Supp. 2009) ........................ 25
    § 43-5-235 (Supp. 2009) ........................... 7
    § 63-3-620 (2010) ................................ 7, 14

IX

Miscellaneous:                                            Page

52 Fed. Reg. 32,130 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . 31

U.S. Dep't of Health & Human Servs.:

National Child Support Enforcement, *Strategic
Plan: FY 2005-2009*, http://www.acf.hhs.gov/
programs/cse/pubs/2004/Strategic_Plan_
FY2005-2009.pdf . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

Office of Child Support Enforcement, *National
Status of Automated Child Support Systems*,
http://www.acf.hhs.gov/programs/
cse/stsys/certmap.htm . . . . . . . . . . . . . . . . . . . . . . . . . 6

Elizabeth G. Patterson, *Civil Contempt & the
Indigent Child Support Obligor: The Silent
Return of Debtor's Prison*, 18 Cornell J.L. & Pub.
Pol'y 95 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

S. Rep. No. 387, 98th Cong., 2d Sess. (1984) . . . . . . . . . . 30

Elaine Sorensen et al., *Assessing Child Support
Arrears in Nine Large States & the Nation* (2007)
http://aspe.hhs.gov/hsp/07/assessing-CS-debt/
report.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

South Carolina Dep't of Social Servs., *Response to
Budget Proviso 13.27* (Aug. 31, 2007),
http://www.scstatehouse.gov/reports/DSS/
Provisoresponse1327_083107.doc . . . . . . . . . . . . . . . . . 6

# In the Supreme Court of the United States

No. 10-10

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

*ON WRIT OF CERTIORARI
TO THE SUPREME COURT OF SOUTH CAROLINA*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING REVERSAL**

### INTEREST OF THE UNITED STATES

This case concerns the due process protections that apply in a state civil contempt proceeding for non-payment of court-ordered child support. The state child-support enforcement program at issue in the case, like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 *et seq.*) (adding Title IV-D to the Social Security Act). The program, which is administered by the Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for 66% of the costs of operating their child-support enforcement programs. 42 U.S.C.

(1)

655(a)(2)(C). The United States has a substantial interest in the effective and equitable operation of such child-support programs.

## STATEMENT

1. This case involves proceedings in South Carolina family court to enforce a child-support order entered against petitioner for the support of his and respondent Rogers' minor child. South Carolina, like every other State, maintains a child-support enforcement program as a condition of receiving federal funding for its Temporary Assistance for Needy Families program. Since Congress first required States receiving federal funds to undertake child-support enforcement efforts, it has shifted its emphasis from a localized, court-based enforcement approach to centralized and automated efforts. South Carolina, however, maintains a localized, court-based approach to child-support enforcement.

a. Congress first required States receiving federal funds to establish child-support enforcement programs in 1950, pursuant to the Aid to Families with Dependent Children (AFDC) program. See Social Security Act Amendments of 1950, ch. 809, § 321(b), 64 Stat. 550 (requiring States receiving AFDC funds to "provide for prompt notice to appropriate law-enforcement officials of the furnishing of aid to dependent children in respect of a child who has been deserted or abandoned by a parent"). In 1968, Congress required States participating in AFDC to create statewide or local "organizational unit[s]" for establishing paternity and collecting child support. Social Security Amendments of 1967, Pub. L. No. 90-248, § 201(a)(1), 81 Stat. 877-879. It also required States to "provide for entering into cooperative arrangements with appropriate courts and law enforce-

ment officials * * * to assist" with administration of the program. *Id.* § 201(a)(1), 81 Stat. 879.

b. In 1975, Congress adopted Title IV-D, 42 U.S.C. 651 *et seq.*, and established the general statutory framework that exists today. See 1975 Act § 101(a), 88 Stat. 2351; *Blessing* v. *Freestone*, 520 U.S. 329, 333-335 (1997) (describing program). The 1975 Act required States participating in AFDC to "have in effect a plan approved" by the Secretary under Title IV-D and to "operate a child support program in conformity with such plan." 1975 Act § 101(c)(5)(C), 88 Stat. 2360. In particular, each State was required to provide services to locate noncustodial parents and to establish the paternity of, and secure support for, children receiving AFDC benefits. 42 U.S.C. 654(4).

Under the 1975 Act, AFDC recipients were required to assign their support rights to the State and cooperate in enforcement efforts. 42 U.S.C. 602(a)(26) (1976). Amounts recovered generally were retained by the State to reimburse it and the federal government for AFDC assistance provided to the child's family. 42 U.S.C. 657(b) (1976). Once assigned, the support obligation was owed to the State and was collectible under all applicable state processes. 42 U.S.C. 656(a)(1) (1976).[1]

The Secretary's regulations implementing the 1975 Act reflected a localized, court-centered approach to enforcement. States' efforts to collect past-due child support were required to include ("as applicable and necessary"): "[c]ontempt proceedings to enforce an extant court order," court-ordered wage garnishment, and

---

[1] Congress required States to provide services to non-AFDC families as well, 42 U.S.C. 654(6) (1976), although those families were not required to assign their support rights and any child support the State collected was paid to the family, 42 U.S.C. 657(a)(4)(B) (1976).

4

attachment of real and personal property. 45 C.F.R. 303.6 (1975). States were also required to maintain sufficient staff (either statewide or locally) to "enforce collection of support" by "executing contempt proceedings, wage assignments, obtaining garnishment orders, attaching real and personal property, criminal prosecution and executing judgments." 45 C.F.R. 303.20(c)(7) (1975).

c. In 1984, Congress found that there remained "a critical lack of child support enforcement," which had "a critical impact on the health and welfare of the children of the Nation." Child Support Enforcement Amendments of 1984 (1984 Amendments), Pub. L. No. 98-378, § 23(a)(2) and (5), 98 Stat. 1329. The 1984 Amendments required States to adopt laws and procedures providing for, among other things, (i) mandatory wage withholding; (ii) expedited processes for obtaining and enforcing support orders; (iii) state income tax refund intercepts; and (iv) reporting overdue support to consumer credit agencies. 42 U.S.C. 666(a)(1)-(8) and (b).

Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for (optional) State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur." 1984 Amendments § 6, 98 Stat. 1314; 42 U.S.C. 654(16); 655(a)(3)(A).

d. Congress amended Title IV-D again in 1988 to improve the rate of child-support collection. Family Support Act of 1988 (1988 Act), Pub. L. No. 100-485,

5

102 Stat. 2343. Because effective child-support enforce-ment "had long been thwarted by localized enforcement systems that were unable to quickly and effectively track delinquent parents who crossed county and state lines," *Hodges* v. *Shalala*, 121 F. Supp. 2d 854, 874 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003), Congress in the 1988 Act emphasized centralized, automated record-keeping and information retrieval in order to improve collection rates. In particular, Congress mandated "automated data processing and information retrieval system[s]" that had previously been optional. 1988 Act § 123(a)(C), 102 Stat. 2352; 42 U.S.C. 654(24).

The Title IV-D regulations were amended after adoption of the 1988 Act. As amended, the regulations omitted specific references to contempt proceedings as required means for enforcing child-support obligations. See 45 C.F.R. 303.6, 303.20(c)(7) (1989);[2] cf. pp. 3-4, *supra*.

e. Finally, Congress made further changes to the child-support enforcement system in the Personal Re-sponsibility and Work Opportunity Reconciliation Act of 1996 (1996 Act), Pub. L. No. 104-193, 110 Stat. 2105, which, among other things, replaced AFDC with the block-grant program called Temporary Assistance for Needy Families (TANF).[3] Those changes again empha-sized a centralized, automated approach to child-support

---

[2] Federal financial support remained available for "[e]nforcement of a support obligation" through a variety of means, including contempt citations. 45 C.F.R. 304.20(b)(3)(iv).

[3] The 1996 Act also imposed a five-year cap on benefits. 42 U.S.C. 608(a)(7). As before, a custodial parent is required to assign her rights to child support to the State as part of the application for TANF assis-tance. 42 U.S.C. 608(a)(3)(A).

6

enforcement.  The amended statute established detailed requirements for the "statewide automated data processing and information retrieval systems" made mandatory in 1988.  *Id.* § 344(a)(2), 110 Stat. 2235, 42 U.S.C. 654a(a).  Among other things, the system must include a state case registry that includes every child-support case in the State, including the amount of monthly support owed and collected in all cases administered by the state agency.  42 U.S.C. 654a(e)(1) and (4); see 42 U.S.C. 654a(e)(5) (States must "promptly * * * update" case records when circumstances change).  The States are required to use their centralized databases "to the maximum extent feasible, to assist and facilitate the collection and disbursement of support payments," including by establishing wage-withholding orders and sending wage-withholding notices to employers.  42 U.S.C. 654a(g)(1); see 42 U.S.C. 666(c).

f.   Despite the changes in federal law, South Carolina maintains a localized, court-based approach to child-support enforcement.  It is the only State that does not have a certified automated system.  See Office of Child Support Enforcement, U.S. Dep't of Health & Human Servs., *National Status of Automated Child Support Systems*,  http://www.acf.hhs.gov/programs/cse/stsys/certmap.htm.[4]

---

[4]  In the 1996 Act, Congress determined that any State that failed to automate its child-support program should incur substantial penalties. 42 U.S.C. 655(a)(4).  In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges* v. *Shalala*, *supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998.  The State paid more than $55 million in penalties through 2007.  South Carolina Dep't of Social Servs., *Response to Budget Proviso 13.27* at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

7

Acting pursuant to express statutory authority, S.C. Code Ann. § 43-5-235 (West Supp. 2009), the State's Department of Social Services has contracted with county clerks of court across the State to administer its program. The South Carolina courts have in turn adopted a special rule governing child-support enforcement. See S.C. Rule of Family Ct. 24 (S.C. Rule 24). The rule requires clerks of court to review on a monthly basis "all child support and periodic alimony accounts paid through the clerk of court," as are all accounts for children whose custodial parent receives TANF assistance. S.C. Rule 24(a); see 42 U.S.C. 608(a)(3)(A). When any such account is in arrears, the clerk is required to "issue a rule to show cause and an affidavit identifying the order of the court which requires such payments to be made and the amount of the arrearage [and] directing the party in arrears to appear in court at a specific time and date" to face contempt proceedings. S.C. Rule 24(b).

A "wilful[]" violation of a "lawful order" of a South Carolina court constitutes contempt and may subject the contemnor to up to 12 months confinement. S.C. Code Ann. § 63-3-620 (West 2010).

2. Respondent Rogers and petitioner are the parents of a minor child, B.L.P. In 2003, the family court in Oconee County, South Carolina, entered an Order of Financial Responsibility against petitioner. Although the order noted that petitioner was unemployed, the court imputed a gross monthly income of $1386 to him and ordered him to pay $59.72 a week in child support through the court. Pet. App. 22a; see *id.* at 19a-24a, 25a.

---

083107.doc. We are informed by HHS that the State has now paid a total of more than $72 million in penalties to date and currently owes an additional incurred penalty of more than $10 million for fiscal year 2010.

Because respondent Rogers was receiving public assistance, she assigned her right to collect child support to the Department of Social Services. Pet. Br. 8; see *id.* at 9 n.6 (payments were remitted to respondent Rogers starting in 2004 because her benefits had ended but her case continued to be administered as a Title IV-D case). Petitioner fell behind on his payments, received a number of rules to show cause from the court clerk why he should not be held in contempt, and was jailed three times as a result. *Id.* at 9-10.

By 2007, petitioner was $5728.76 behind on his child-support payments, and a judge of the Oconee County Family Court issued a bench warrant for his arrest. Pet. App. 6a; Pet. Br. 8-9. A hearing was held on January 3, 2008. After noting petitioner's outstanding balance and stating that he had not made a payment since August 2006, the judge asked petitioner, "[i]s there anything you want to say?" *Id.* at 17a. Petitioner responded:

> Well, when I first got out, I got back on dope. I done meth, smoked pot and everything else, and I paid a little bit here and there. And, when I finally did get to working, I broke my back, back in September. I filed for disability and SSI. And, I didn't get straightened out off the dope until I broke my back and laid up for two months. And, now I'm off the dope and everything. I just hope that you give me a chance. I don't know what else to say. I mean, I know I done wrong, and I should have been paying and helping her, and I'm sorry. I mean, dope had a hold to me.

*Ibid.*

9

After a brief exchange between petitioner and respondent about his SSI application, the court said:

> If there's nothing else, this will be the Order of the Court. I find the Defendant in willful contempt. I'm gonna sentence him to twelve months in the Oconee County Detention Center. He may purge himself of the contempt and avoid the sentence by having a zero balance on or before his release.

Pet. App. 18a. The court made no finding that petitioner was capable of paying the arrears while incarcerated. See *id.* at 17a-18a.

At this hearing, neither petitioner nor respondent Rogers was represented by counsel. Pet. App. 6a. However, pro bono counsel filed an appeal on petitioner's behalf, alleging that petitioner had a right under the Sixth Amendment and the Due Process Clause to have appointed counsel in the contempt proceeding. *Id.* at 10a-15a. Before the intermediate state court could rule, the South Carolina Supreme Court granted discretionary review and affirmed the family court. *Id.* at 1a-5a.

The court noted that the "purpose of civil contempt is to coerce the defendant to comply with the court's order," while criminal contempt's purpose is "to punish a party for disobedience or disrespect." Pet. App. 2a-3a. "Civil contempt sanctions are conditioned on compliance with the court's order. * * * A contemnor imprisoned for civil contempt is said to hold the keys to his cell because he may end the imprisonment and purge himself of the sentence at any time." *Id.* at 3a. The court recognized that the "distinction between civil and criminal contempt is crucial because criminal contempt triggers additional constitutional safeguards not mandated in civil contempt proceedings." *Ibid.*

The court noted that in this case the family court had said that petitioner could "purge himself of the contempt" by achieving a "zero balance" on his arrearage. Pet. App. 3a.  Reasoning that "[t]his conditional sentence is a classic civil contempt sanction," the court concluded that petitioner had no right to appointed counsel. *Ibid.*

## SUMMARY OF ARGUMENT

1.  The Court has jurisdiction to review the decision of the South Carolina Supreme Court.  Petitioner has completed his term of confinement for civil contempt and has not identified any collateral consequences flowing from the contempt.  Those facts would ordinarily render his case moot.  Petitioner, however, qualifies for a narrow exception to the mootness doctrine because the controversy is capable of repetition yet evading review. Sentences for civil contempt in South Carolina are limited to 12 months, and it is highly unlikely that petitioner would be able to secure plenary review by this Court within any future period of confinement.  In addition, the constitutional violation petitioner asserts is capable of repetition because he remains subject to the underlying child-support order and still has substantial arrears.  There is thus a reasonable expectation that he will receive automatically-generated rules to show cause for contempt in the future.  Indeed, since the contempt at issue in this case, petitioner has been jailed again for civil contempt.

2.  Petitioner's confinement for civil contempt violated due process, not because he lacked counsel, but because the procedures employed by the family court were inadequate to ensure the accurate determination of petitioner's present ability to pay his child-support ar-

11

rears.  That ability to pay was a necessary predicate to the civil contempt sanction.

The defining feature of confinement for civil contempt is its purpose to coerce compliance with a court order.  Such confinement must therefore end upon discharge of the contemnor's obligations; he is said to hold "the keys of [his] prison in [his] own pocket[]."  *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted).  Such confinement may not be imposed, however, where the contemnor demonstrates his inability to comply with the order.  In such cases, he does not truly hold the keys to the prison; to confine him nonetheless would render the confinement punitive and thus a sanction that may be imposed only after compliance with criminal case safeguards.

The question of petitioner's ability to pay his child-support arrears therefore should have been a focus of the civil contempt proceeding, but it was not.  Pro se petitioner was afforded no meaningful opportunity to establish his indigency, and even after he made a statement that could have easily been understood to mean he had no present ability to pay nearly $6000 to avoid jail, the family court judge made no further inquiry on the matter before committing him to a nominally conditional term of confinement.

The proceeding did not comply with due process because there was a serious risk of erroneous deprivation of petitioner's liberty through the procedures employed and because additional procedures would have enhanced the accuracy of the proceeding without materially impinging on any governmental interest.  See *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976).  Provision of counsel would have been a sufficient, but not a necessary, means of satisfying due process in this case.  There were other

means of providing petitioner with a meaningful opportunity to establish his present inability to pay, such as asking him to complete an understandable form seeking his financial information, or asking him questions on the topic as necessary at a hearing. In the typical case, providing basic information about one's personal finances is not the kind of undertaking that requires assistance of counsel, and due process protections are based on the requirements of the mine-run case, not the exceptional one.

There is no basis for petitioner's proposed categorical due process right to appointed counsel in civil contempt proceedings where confinement is imposed. The Court has declined to recognize a categorical constitutional right to appointed counsel in the context of other non-criminal proceedings that can result in confinement. *Gagnon* v. *Scarpelli*, 411 U.S. 778, 782-790 (1973) (probation revocation); *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (summary court-martial). Civil contempt proceedings in child-support cases are relatively brief; the custodial parent may not be represented by counsel; and the issues in dispute are generally not complex. Given those circumstances, there is no warrant for recognizing a categorical right to defense counsel in such proceedings. Finally, recognizing a due process right to counsel in such proceedings would upset the balance struck by Title IV-D and its implementing regulations, both of which stress the importance of due process protections in child-support proceedings but neither of which permit federal funding for provision of counsel.

13

**ARGUMENT**

**I. THE COURT HAS JURISDICTION TO REVIEW THE DECISION OF THE SOUTH CAROLINA SUPREME COURT**

Although petitioner has completed his term of confinement for the civil contempt at issue here, his claim is not moot because he remains subject to the underlying child-support order and because there is a reasonable expectation that he will face future contempt proceedings. His claim thus avoids mootness because it is capable of repetition yet evading review. This Court thus has jurisdiction to review the final judgment of the South Carolina Supreme Court. See 28 U.S.C. 1257(a).

1. "In general a case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy* v. *Hunt*, 455 U.S. 478, 481 (1982) (internal quotation marks omitted) (quoting *United States Parole Comm'n* v. *Geraghty*, 445 U.S. 388, 396 (1980)). While a currently confined individual's challenge to his confinement generally presents no question of mootness, an individual who has been released from confinement ordinarily may continue to press his challenge only if he suffers some "collateral consequence" that constitutes a "concrete and continuing injury." *Spencer* v. *Kemna*, 523 U.S. 1, 7 (1998). Because this Court "ha[s] been willing to presume that a wrongful conviction has continuing collateral consequences," the Court ordinarily will not dismiss as moot a criminal defendant's challenge to his conviction once the defendant has completed his term of imprisonment. *Id.* at 8. But the Court has not employed that presumption in other contexts, instead requiring a party not in custody to demonstrate that he will actually face collateral consequences if he does not secure relief

on appeal. See *id.* at 14 (no presumption of collateral consequences for parole revocation); see also *id.* at 14-16 (reviewing party's claimed collateral consequences).

Petitioner has completed his term of confinement for civil contempt. Because he challenges a civil order, not a criminal conviction, no presumption of collateral consequences applies. Moreover, petitioner has not identified any collateral consequences flowing from the finding of civil contempt. Ordinarily, petitioner's challenge to that finding would be considered moot and beyond this Court's jurisdiction.

2. Petitioner's claim in this case, however, avoids mootness because his is one of the "exceptional situations" in which a claim is capable of repetition, yet evading review. *City of L.A.* v. *Lyons*, 461 U.S. 95, 109 (1983). In non-class actions, this doctrine requires satisfaction of two elements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy*, 455 U.S. at 482 (quoting *Weinstein* v. *Bradford*, 423 U.S. 147, 149 (1975) (per curiam)). Petitioner satisfies both elements.

First, confinement for civil contempt in South Carolina is limited to 12 months, S.C. Code Ann. § 63-3-620 (West 2010), and it is exceedingly unlikely that a contemnor could appeal through the South Carolina court system, petition this Court for a writ of certiorari, and receive a decision on his claim within such a limited time period. See, *e.g.*, *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765, 774 (1978) (18 months was "too short a period of time for appellants to obtain complete judicial review"); cf. *DeFunis* v. *Odegaard*, 416 U.S. 312, 319 (1975) (per curiam) (future challenge to law school

15

admission procedure could likely come to this Court for decision within three-year period of law school matriculation).  Indeed, in this case, petitioner had completed his term of imprisonment for civil contempt more than a year before the South Carolina Supreme Court rendered its decision.  Compare Pet. App. 8a with *id.* at 1a.

Second, petitioner "can make a reasonable showing that he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109.  Petitioner is still subject to the underlying order for child support, and he is nearly $14,000 in arrears.  Pet. Br. 15; J.A. 104a.  Given that clerks of court in South Carolina automatically issue rules to show cause when a non-custodial parent is late on a required payment, there is a reasonable expectation that petitioner will again be subject to contempt proceedings.  Indeed, after he was released from jail for the contempt at issue here, petitioner was again held in contempt and reincarcerated.  In May 2010 yet another rule to show cause for contempt issued due to failure to pay support to respondent.  Pet. Br. 13-15; see *id.* at 15 (May 2010 rule to show cause is still outstanding); see also *Olmstead* v. *L.C.*, 527 U.S. 581, 594 n.6 (1999) (suit by plaintiffs seeking community-based services rather than institutionalization not moot even though they were then receiving desired services, because of "the multiple institutional placements [they] ha[d] experienced").  This is thus far from "an abstract dispute about the law" that might be thought "unlikely to affect [petitioner] any more than it affects other [South Carolina] citizens." *Alvarez* v. *Smith*, 130 S. Ct. 576, 580 (2009).[5]

---

[5]  That petitioner was represented by pro bono counsel in a subsequent contempt proceeding involving a different support order, see Pet. Br. 15 n.10, does not mean his claim is incapable of repetition.  Were pro bono counsel bound to represent petitioner in every future contempt

## II. THE ABSENCE OF ADEQUATE PROCEDURES NECES-
SARY TO SECURE AN ACCURATE ADJUDICATION OF
CIVIL CONTEMPT VIOLATED DUE PROCESS

The validity of the civil contempt order against peti-
tioner turned on a critical fact: his present ability to
purge himself of contempt by paying off his past-due
child support. The family court's procedures in this case
violated due process because they were inadequate to
ensure an accurate determination of that fact and thus
prevent an erroneous deprivation of petitioner's liberty.
Although provision of government-provided counsel
would have been a sufficient means of complying with
due process requirements in this case, it was not a nec-
essary one. Other mechanisms, such as requiring an
affidavit for disclosure of financial information and a
preliminary assessment of petitioner's current ability to
pay child support, would have satisfied the requirements
of due process.

### A. Confinement For Civil Contempt Is Permitted Only
When The Contemnor Is Presently Able To Comply With
The Underlying Order

Both civil and criminal contempt can lead to confine-
ment, but this Court has long distinguished the two
based on the "character and purpose" of the sanction
imposed. *Gompers* v. *Buck's Stove & Range Co.*, 221
U.S. 418, 441 (1911). In civil contempt, the "punishment
* * * [is] remedial," in that it is intended to "coerc[e]

---

proceeding, then his claim of entitlement to the assistance of counsel
would be moot. There is no indication in the record, however, that pro
bono counsel is under any such obligation and, in fact, counsel did not
appear in a 2009 contempt proceeding involving support owed respon-
dent, see *id.* at 13-14 (noting that petitioner appeared pro se in 2009 and
served six months for civil contempt).

the defendant to do what he had refused to do." *Id.* at 442. Punishment for criminal contempt, on the other hand, is "punitive" and is imposed "to vindicate the authority of the court." *Id.* at 441.

Because of that fundamental distinction, confinement imposed for civil contempt is conditional. The sentence must include a purge clause under which the contemnor will be immediately released upon compliance with the underlying court order. *Hicks* v. *Feiock*, 485 U.S. 624, 634 (1988). When confined under such a civil contempt order, the contemnor holds "the keys of [his] prison in [his] own pocket[ ]." *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted); see *id.* at 370 ("While any imprisonment, of course, has punitive and deterrent effects, it must be viewed as remedial if the court conditions release upon the contemnor's willingness" to comply with a court order.).

A purge clause by itself, however, will not render the contemnor's confinement remedial rather than punitive because "the justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order." *Shillitani*, 384 U.S. at 370-371. Accordingly, "punishment may not be imposed in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." *Hicks*, 485 U.S. at 638 n.9; see *Maggio* v. *Zeitz*, 333 U.S. 56, 72 (1948) ("[T]o jail one for a contempt for omitting an act he is powerless to perform would * * * make the proceeding purely punitive, to describe it charitably."); see also *Moseley* v. *Mosier*, 306 S.E.2d 624, 626 (S.C. 1983)

("When the parent is *unable* to make the required payments, he is not in contempt.").[6]

The burdens of production and persuasion may be placed on the defendant to demonstrate his present inability to comply with an order. See *Hicks*, 485 U.S. at 637; *United States* v. *Rylander*, 460 U.S. 752, 757 (1983). Accordingly, if the defendant "offers no evidence as to his inability to comply," "stands mute," or is disbelieved by the court, then he fails to carry his burden and may be held in contempt. *Maggio*, 333 U.S. at 75. But the trial court "is obliged" to consider "all the evidence properly before it in the contempt proceeding in determining whether or not there is actually a present ability to comply and whether failure so to do constitutes deliberate defiance which a jail term will break." *Id.* at 76.

If, upon examination, a contempt penalty is considered punitive rather than remedial, it will be vacated unless all "the protections that the Constitution requires of * * * criminal proceedings" were provided. *International Union, United Mine Workers* v. *Bagwell*, 512 U.S. 821, 826 (1994) (quoting *Hicks*, 485 U.S. at 632).

---

[6] A defendant may not avoid a finding of civil contempt for violating an order by collaterally attacking that order in the contempt proceeding. See *Maggio*, 333 U.S. at 74-75. The defendant may, however, make the distinct assertion that he has a "*present* inability to comply with the order in question." *United States* v. *Rylander*, 460 U.S. 752, 757 (1983); see *ibid.* ("While the court is bound by the enforcement order, it will not be blind to evidence that compliance is now factually impossible. Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."); *Maggio*, 333 U.S. at 74-75.

### B. The Family Court's Procedures Were Inadequate To Ensure An Accurate Determination Of Present Ability To Pay

The procedures employed by the family court violated petitioner's due process rights because they were inadequate to ensure that petitioner was not erroneously confined as an inducement to perform a task he was powerless to perform, while additional procedures to ensure petitioner's present ability to pay his child-support arrears would have been minimally burdensome.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews* v. *Eldridge*, 424 U.S. 319, 332 (1976). Confinement for civil contempt is a deprivation of liberty, and the alleged contemnor is thus entitled to procedural due process protections before its imposition. Cf. *Morrissey* v. *Brewer*, 408 U.S. 471, 482 (1972) (termination of parole triggers due process protections); see also *Bagwell*, 512 U.S. at 827 (civil contempt requires "notice and an opportunity to be heard").

The conclusion that due process applies is the beginning of the inquiry, not its end, because "the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands.'" *Wilkinson* v. *Austin*, 545 U.S. 209, 224 (2005) (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The Court has "generally * * * declined to establish rigid rules and instead ha[s] embraced a framework to evaluate the sufficiency of particular procedures." *Ibid.* That framework involves "consideration of three distinct factors:

20

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews*, 424 U.S. at 335.

Application of the *Mathews* factors here demonstrates that the family court proceeding did not comply with the requirements of procedural due process. First, petitioner's private interest in avoiding incarceration was significant. See *Foucha* v. *Louisiana*, 504 U.S. 71, 80 (1992).

Second, there was a serious "risk of an erroneous deprivation" of petitioner's liberty interest under the procedures employed by the family court, and there would have been value in additional procedures. *Mathews*, 424 U.S. at 335. Petitioner did not dispute that he had failed to comply with his child-support order, so the propriety of his confinement for civil contempt thus turned on his present ability to do so. See pp. 17-18, *supra*; Pet. Br. 3-4 (petitioner's ability to pay "was the precise question before the family court"); *id.* at 17. But South Carolina automatically referred petitioner for contempt proceedings without considering whether petitioner was employed or had assets. At the contempt hearing, the court solicited no financial information from petitioner, nor was there apparently any mechanism in place for him to provide it on his own. Petitioner's statement at the hearing that he had been un-

able to work because he broke his back, Pet. App. 17a, could reasonably be understood to constitute a claim that he had no present ability to pay nearly $6000. The court did not explore this question, however; it made no inquiry into petitioner's income or assets. Instead, the court imposed a jail sentence unaccompanied by any finding that petitioner had the ability to pay off his outstanding balance from a jail cell.[7] Taking additional modest steps to determine whether petitioner had the present ability to discharge his obligation, see pp. 24-25, *infra*, would have improved the accuracy of the proceeding.

Finally, the government's interests also favor additional procedural safeguards to ensure that only those parents with a present ability to pay are confined for civil contempt. While the State has a strong interest in enforcing child-support orders, it secures no benefit from jailing a non-custodial parent who cannot discharge his obligation. The period of incarceration makes it less, rather than more, likely that such parent will be able to pay child support. See Elizabeth G. Patterson, *Civil Contempt & the Indigent Child Support Obligor: The Silent Return of Debtor's Prison*, 18 Cornell J.L. & Pub. Pol'y 95, 126 (2008) (*Civil Contempt*). Meanwhile, the State incurs the substantial expense of confinement.

Moreover, as a general matter, the routine use of contempt for non-payment of child support is likely to be an ineffective strategy for enforcing support orders. See National Child Support Enforcement, U.S. Dep't of Health & Human Servs., *Strategic Plan: FY 2005-2009*, at 2, 10 (*Strategic Plan*), http://www.acf.hhs.gov/

---

[7] The judge told petitioner, "[i]f you've got a job, I'll make you eligible for work release," Pet. App. 18a, but petitioner states he was ineligible for work release, Pet. Br. 12 n.8.

programs/cse/pubs/2004/Strategic_Plan_FY2005-2009.
pdf. While child-support recovery efforts once "followed
a business model predicated on enforcement" that "in-
tervened only after debt, at times substantial, accumu-
lated and often too late for collection to be successful, let
alone of real value to the child," experience has shown
that alternative methods—such as order modifications,
increased contact with non-custodial parents, and use of
"automation to detect non-compliance as early as possi-
ble"—are more effective. *Id.* at 2.

A substantial portion of child-support obligors have
no or low reported income. Elaine Sorensen et al., *As-
sessing Child Support Arrears in Nine Large States &
the Nation* 22 (2007) (*Assessing Child Support Arrears*),
http://aspe.hhs.gov/hsp/07/assessing-CS-debt/report.pdf
(obligors with $10,000 or less in annual income consti-
tuted half of the child-support obligors and owed 70% of
the arrears in a nine-state study). Such individuals'
child-support obligations are often substantial. See *id.*
at 54 ("For obligors with reported income of $10,000 a
year or less, the median percent of reported income that
was due as current support was 83[%]."). A low-income
individual in arrears on child-support payments is
"rarely a candidate for civil incarceration because of the
likelihood that he or she is unable to pay the hefty sum
represented by the accumulated arrears, or even a por-
tion thereof that may be set by the court as the purge
amount." *Civil Contempt* 116.[8]

---

[8]  To be sure, coercive enforcement remedies, such as contempt, have
a role to play in child-support enforcement efforts, such as with non-
custodial parents who are hiding assets or unreported self-employment
or under-the-table income. See *Strategic Plan* 2; *Assessing Child
Support Arrears* 4-5, 22-23, 25; *Civil Contempt* 97. There is no evi-

Many States have taken alternative steps to avoid child-support arrears, such as establishing more realistic support orders, "increas[ing] parental participation in the order establishment process," providing employment services to non-custodial parents, or using automation tools to improve wage withholding. *Assessing Child Support Arrears* 10-11, 80-89; see *id.* at 85 (study of Florida program that provides employment services and case management to non-custodial parents found that program participants paid nearly five dollars in child support for every dollar spent on the program). Such alternatives, which focus on early intervention rather than after-the-fact efforts to collect substantial accumulated arrears, are more likely to be effective means of enforcing the child-support obligations of the substantial number of low-income obligors. See *Strategic Plan* 2.

### C. Due Process Can Be Satisfied By A Variety Of Procedures Intended To Assure An Accurate Determination Of Present Ability To Pay In A Civil Contempt Proceeding

Petitioner argues that, in order to ensure that his civil contempt proceeding "remain[ed] civil," Pet. Br. 39, due process required the appointment of counsel to assist him in establishing his inability to comply with the court's order, see *id.* at 41. Although we agree that petitioner's due process rights were violated, we disagree that the State's failure to appoint counsel was itself the basis of the violation. Appointment of counsel is certainly one way to help ensure an accurate determination of the obligor's current ability to pay—the determination on which the "civil" nature of a civil contempt sanction rests—but it is not the only way. It was the State's

---

dence, however, that routine use of contempt among low-income non-custodial parents is generally effective. See *Civil Contempt* 126.

24

failure to provide any meaningful mechanism for making that determination in this case, and not its failure to provide counsel in particular, that violated petitioner's due process rights.[9]

> 1. **Courts can comply with due process by providing a meaningful opportunity for an alleged contemnor to establish his present ability to pay**

While there is no basis for a constitutional rule categorically requiring appointment of counsel in all civil contempt that could lead to deprivation of physical liberty, see pp. 25-32, *infra*, due process does require procedures sufficient to ensure fundamental fairness. In the context of a civil contempt proceeding for non-payment of child support that could lead to confinement, this means procedures adequate to allow a pro se contemnor to attempt to carry his burden of establishing his present inability to pay.

Such procedures may include requiring a non-paying parent to complete an understandable form seeking financial information. South Carolina already requires

_____

[9] Although petitioner's submissions below and in this Court have focused on the value of appointed counsel in ensuring that indigent child-support obligors are not erroneously jailed as a means of inducing them to comply with their obligations, see, *e.g.*, Pet. i, Pet. App. 13a, fairly encompassed in those submissions is the proposition that due process demands an appropriate procedure to evaluate an obligor's present ability to pay. See Sup. Ct. R. 14.1(a); *Yee* v. *City of Escondido*, 503 U.S. 519, 534 (1992). In conducting that inquiry, it should be open to the Court to consider whether there are alternative procedures, other than the specific procedure petitioner has proposed, that would satisfy constitutional requirements. To the extent the Court concludes otherwise, however, the proper course would be to dismiss the writ of certiorari as improvidently granted and await a case that expressly raises a broader due process claim.

25

noncustodial parents to fill out such a form when a support order is originally sought in a Title IV-D case, see S.C. Code Ann. § 43-5-220(c) (West Supp. 2009), but apparently does not do so in subsequent contempt proceedings. Requiring that such forms be completed at the outset of a contempt proceeding would impose little expense on the State or burden on the proceeding while materially advancing the accuracy of the court's determination. Such information could by itself establish the contemnor's present inability to pay his arrears or, conversely, demonstrate his ability to pay. To the extent the court had questions about the information on the form or disbelieved it, the court could question the contemnor about his finances at the contempt hearing. Such simple, minimally burdensome procedures would enable the court to evaluate whether the alleged contemnor has the ability to pay his arrears and is thus an appropriate candidate for a civil contempt sanction.

### 2. There is no basis for an inflexible right to counsel rule in civil contempt proceedings

Although the constitutional inadequacy of the family court's procedures could have been cured by appointment of counsel (who presumably would have addressed petitioner's inability to pay his arrears and urged the court not to jail him for that reason), appointment of counsel was not constitutionally compelled.

a. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001) (quoting *Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886, 895 (1961)); see *Mathews*, 424 U.S. at 334 ("[D]ue process is flexible and calls for such procedural protections as the particular

situation demands.") (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The question in a due process case is how to ensure a fundamentally fair proceeding, taking into account the importance of the private interest at issue, the risk of error and value of additional procedures, and the government's interest. See *id.* at 335. This is not an inquiry that typically lends itself to the kind of categorical approach advocated by petitioner. See *Gagnon* v. *Scarpelli*, 411 U.S. 778, 789 (1973) (contrasting categorical Sixth Amendment right to counsel in criminal prosecution "with the more limited due process right" in other contexts).[10]

In fact, in areas outside traditional criminal prosecutions where an individual's liberty is nonetheless at stake, the Court has declined to recognize a categorical right to counsel, instead relying on alternative procedural safeguards to ensure due process. See *Gagnon*, 411 U.S. at 782-790; see also *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (no due process right to counsel for summary courts-martial).[11] For example, in *Gagnon*,

---

[10] The Sixth Amendment right to counsel is inapplicable to a civil contempt proceeding because it is not a "criminal prosecution[ ]." U.S. Const. Amend. VI; see *Bagwell*, 512 U.S. at 826-827.

[11] In *In re Gault*, 387 U.S. 1 (1967), the Court recognized a due process right to appointed counsel in a juvenile delinquency proceeding, but, as the Court later explained, that was because the proceeding "while denominated civil, was functionally akin to a criminal trial." *Gagnon*, 411 U.S. at 789 n.12. In *Vitek* v. *Jones*, 445 U.S. 480 (1980), a plurality would have held that there is a due process right to counsel before a State involuntarily transfers a prisoner to a state mental hospital for psychiatric treatment. See *id.* at 497. Justice Powell's controlling concurrence, however, disagreed, concluding that "the fairness of an informal hearing designed to determine a medical issue" does not "require[] participation by lawyers." *Id.* at 500. Justice Powell agreed that a prisoner "required assistance" in such a proceeding to ensure

the Court held that due process required the government to provide a preliminary and final hearing before it could incarcerate an individual for violating the terms of his probation. See 411 U.S. at 782; see also *id.* at 785-786 (hearings necessary in order to provide notice of the alleged probation violation and ensure "accurate finding of fact and the informed use of discretion"). At the same time, however, the Court rejected the "contention that the State is under a constitutional duty to provide counsel for indigents in all probation or parole revocation cases." *Id.* at 787; see *id.* at 790 (stating that due process may require appointment of counsel in exceptional cases). The Court recognized that "such a rule has the appeal of simplicity" but concluded that "it would impose direct costs and serious collateral disadvantages without regard to the need or the likelihood in a particular case for a constructive contribution by counsel." *Id.* at 787.

The Court in *Gagnon* noted that in many cases a probationer's mitigating evidence may be "so simple as not to require either investigation or exposition by counsel." 411 U.S. at 787. Here too, with the provision of easy-to-understand forms on assets and income and, if necessary, a colloquy with the trial court, it will often be simple for a delinquent child-support obligor to demonstrate his present inability to discharge his obligation without the assistance of appointed counsel. Indeed, even in criminal cases to which the Sixth Amendment right of counsel applies, defendants are not entitled to government-appointed counsel for the purpose of filling out the forms routinely used to establishing their financial eligibility for government-appointed counsel. See

---

fairness, but said that it could be "rendered by competent laymen in some cases." *Ibid.*

28

18 U.S.C. 3006A(b) (counsel will be appointed only after court is "satisfied after appropriate inquiry that the person is financially unable to obtain counsel"); *United States* v. *Bauer*, 956 F.2d 693, 695 (7th Cir.) ("Under the Criminal Justice Act, the public fisc need not contribute one penny unless the accused first establishes that he cannot afford counsel. Nothing in the statute directs the Treasury to assist the accused in making this determination."), cert. denied, 506 U.S. 882 (1992). Just as "[n]o legal expertise is needed to participate effectively in hearings under the Criminal Justice Act," *ibid.*, no legal expertise is generally required to establish inability to pay child-support arrears.

*Gagnon* also expressed concern that "[t]he introduction of counsel into a revocation proceeding will alter significantly the nature of the proceeding," since the States typically relied on probation officers to conduct revocation hearings but might turn to attorneys if all probationers were represented. 411 U.S. at 787. "[T]he decisionmaking process will be prolonged, and the financial cost to the State * * * will not be insubstantial." *Id.* at 788. In the context of civil contempt for child support as well, automatic appointment of counsel could delay the proceedings, create an asymmetry in representation between non-custodial parents and custodial parents who may appear pro se, see, *e.g.*, Pet. App. 16a, and impose considerable financial cost on the government without an automatic increase in accuracy.

*Lassiter* v. *Department of Social Services*, 452 U.S. 18 (1981), upon which petitioner relies, see, *e.g.*, Pet. Br. 32-33, is not to the contrary. In that decision, the Court held that there was no due process right to counsel in a parental-rights termination proceeding. See *Lassiter*, 452 U.S. at 32-33. In dictum, the Court said its cases

29

had established a "presumption" that an indigent had a
right to appointed counsel "when, if he loses, he may be
deprived of his physical liberty." *Id.* at 26-27. The
Court has not subsequently relied on any such presump-
tion derived from the *Lassiter* dictum, and *Lassiter* it-
self recognized that *Gagnon*, which involved a depriva-
tion of physical liberty, had held that "due process is not
so rigid as to require that the significant interests in
informality, flexibility and economy must always be sac-
rificed" through appointment of counsel. *Id.* at 31 (quot-
ing *Gagnon*, 411 U.S. at 788).

That there may be atypical cases with "complex fac-
tual and legal issues" (Pet. Br. 46) in which counsel
would provide a significant benefit beyond what could be
obtained through other procedural safeguards does not
mean there should be a right to counsel. "[P]rocedural
due process rules are shaped by the risk of error inher-
ent in the truth-finding process as applied to the gener-
ality of cases, not the rare exceptions." *Walters* v. *Na-
tional Ass'n of Radiation Survivors*, 473 U.S. 305, 321
(1985) (quoting *Mathews*, 424 U.S. at 344); see *id.* at 331
("existence of complexity in some cases" was not "suffi-
cient to warrant a conclusion that the right to retain and
compensate an attorney in [Veterans Administration]
cases is a necessary element of procedural fairness un-
der the Fifth Amendment").

b.  A recognition that due process requires fair pro-
ceedings before a child-support obligor can be held in
civil contempt but that this due process right does not
encompass appointment of government-funded counsel
is also consistent with the balance struck by Congress
and the Secretary in enacting and administering the
Title IV-D program. Cf. *Middendorf*, 425 U.S. at 43
("[W]e must give particular deference to the determina-

30

tion of Congress, made under its authority to regulate the land and naval forces, U.S. Const., Art. I, § 8, that counsel should not be provided in summary courts-martial."); *Walters*, 473 U.S. at 319-320 ("This deference to congressional judgment must be afforded even though the claim is that a statute Congress has enacted effects a denial of the procedural due process guaranteed by the Fifth Amendment.").

Congress and the Secretary have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program.[12] At the same time, however, they have declined to reimburse the States for the cost of providing counsel to non-custodial parents. See S. Rep. No. 387, 98th Cong., 2d Sess. 23 (1984) (statute does not provide federal funding for "defense counsel for absent parents" or "incarceration of delinquent obligors"); 45 C.F.R. 304.23 (i) and (j) (no federal funding for "[t]he costs of counsel for indigent defendants in

_____

[12] See, *e.g.*, 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, including notice and a reasonable opportunity to contest the accuracy of such information."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for notice, opportunity to contest the action, and opportunity for an appeal on the record to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

IV-D actions" or "[a]ny expenditure for jailing of parents in child-support enforcement cases"); see also 52 Fed. Reg. 32,130 (1987) (Federal "policy since the inception of the [Title IV-D] program has been that costs of incarceration of delinquent obligors and costs of defense counsel are not necessary and reasonable costs associated with the proper and efficient administration of the Title IV-D program.").

Finally, at its broadest, the categorical rule petitioner suggests—that there is a right to government-appointed counsel in all "proceedings denominated as 'civil' where an individual nonetheless faces the prospect of confinement to state custody," Pet. Br. 30—conflicts with Congress's express judgment that provision of government-funded counsel is not warranted in all such areas. See *Middendorf*, 425 U.S. at 43 (deferring to such a judgment); *Walters*, 473 U.S. at 319-320 (same); see also *Landon* v. *Plasencia*, 459 U.S. 21, 34-35 (1982) ("The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy.").

For example, while aliens are sometimes detained during removal proceedings or pending enforcement of removal orders, Congress has long explicitly provided that there is no obligation to provide government payment for counsel in such proceedings. See 8 U.S.C. 1362 ("In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (*at no expense to the Government*) by such counsel, authorized to practice in such proceedings,

32

as he shall choose.") (emphasis added); 8 U.S.C. 1229a(b)(4)(A). Congress's judgment is consistent with this Court's repeated holdings that removal proceedings are civil and non-punitive, see, *e.g.*, *INS* v. *Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime."), and its conclusion that detention of an alien during the removal process is permissible because it is incidental to the proceedings, and not their purpose or goal, see, *e.g.*, *Carlson* v. *Landon*, 342 U.S. 524, 538 (1952) ("Detention is necessarily a part of this deportation procedure."). As the Court has also noted, removal proceedings—whose purpose is removal of aliens from the country, not deprivation of their physical liberty—are "streamlined" administrative proceedings held before administrative personnel, immigration judges, under rules offering the aliens more limited procedural rights than are available in court. *Lopez-Mendoza*, 468 U.S. at 1039; see *ibid*. ("a deportation hearing is intended to provide a streamlined determination of eligibility to remain in this country, nothing more"). The due process guarantee of fundamental fairness does not mandate the appointment of counsel in such proceedings, which would be contrary to the judgment of Congress.[13]

---

[13] For these reasons, the lower courts have held that aliens in removal proceedings have no constitutional right to appointment of counsel at government expense. *United States* v. *Gasca-Kraft*, 522 F.2d 149, 152 (9th Cir. 1975) ("courts have uniformly held in this circuit and elsewhere that in light of the non-criminal nature of both the proceedings and the order which may be a result, that respondents are not entitled to have counsel appointed at government expense") (citing cases); see *Moham-*

## CONCLUSION

The judgment of the Supreme Court of South Carolina should be reversed.

Respectfully submitted.

| | |
|---|---|
| | NEAL KUMAR KATYAL<br>*Acting Solicitor General* |
| | TONY WEST<br>*Assistant Attorney General* |
| SALLY A. HOWARD<br>*Acting General Counsel* | LEONDRA R. KRUGER<br>*Acting Deputy Solicitor General* |
| ROBERT E. KEITH<br>*Associate General Counsel* | JOSEPH PALMORE<br>*Assistant to the Solicitor General* |
| LISETTE PEDRE MESTRE<br>*Attorney*<br>*Department of Health and Human Services* | LEONARD SCHAITMAN<br>EDWARD HIMMELFARB<br>*Attorneys* |

JANUARY 2011

---

*med* v. *Gonzales*, 400 F.3d 785, 793 (9th Cir. 2005); *United States* v. *Torres-Sanchez*, 68 F.3d 227, 230 (8th Cir. 1995); *Nazakat* v. *INS*, 981 F.2d 1146, 1148 (10th Cir. 1992); *United States* v. *Campos-Asencio*, 822 F.2d 506, 509 (5th Cir. 1987).

EXHIBIT I.

# Title 8
# Courts and Civil Procedure — Courts

## Chapter 10
## Family Court

### R.I. Gen. Laws § 8-10-3

#### § 8-10-3. Establishment of court — Jurisdiction — Seal — Oaths.

**(a)** There is hereby established a family court, consisting of a chief judge and eleven (11) associate justices, to hear and determine all petitions for divorce from the bond of marriage and from bed and board; all motions for allowance, alimony, support and custody of children, allowance of counsel and witness fees, and other matters arising out of petitions and motions relative to real and personal property in aid thereof, including, but not limited to, partitions, accountings, receiverships, sequestration of assets, resulting and constructive trust, impressions of trust, and such other equitable matters arising out of the family relationship, wherein jurisdiction is acquired by the court by the filing of petitions for divorce, bed and board and separate maintenance; all motions for allowance for support and educational costs of children attending high school at the time of their eighteenth (18th) birthday and up to ninety (90) days after high school graduation, but in no case beyond their nineteenth (19th) birthday; enforcement of any order or decree granting alimony and/or child support, and/or custody and/or visitation of any court of competent jurisdiction of another state; modification of any order or decree granting alimony and/or custody and/or visitation of any court of competent jurisdiction of another state on the ground that there has been a change of circumstances; modification of any order or decree granting child support of any court of competent jurisdiction of another state provided: (1) the order has been registered in Rhode Island for the purposes of modification pursuant to § 15-23.1-611, or (2) Rhode Island issued the order and has continuing exclusive jurisdiction over the parties; antenuptial agreements, property settlement agreements and all other contracts between persons, who at the time of execution of the contracts, were husband and wife or planned to enter into that relationship; complaints for support of parents and children; those matters relating to delinquent, wayward, dependent, neglected, or children with disabilities who by reason of any disability requires special education or treatment and other related services; to hear and determine all petitions for guardianship of any child who has been placed in the care, custody, and control of the department for children, youth, and families pursuant to the provisions of chapter 1 of title 14 and chapter 11 of title 40; adoption of children under eighteen (18) years of age; change of names of children under the age of eighteen (18) years; paternity of children born out of wedlock and provision for the support and disposition of such children or their mothers; child marriages; those matters referred to the court in accordance with the provisions of § 14-1-28; those matters relating to adults who shall be involved with paternity of children born out of wedlock; responsibility for or contributing to the delinquency, waywardness, or neglect of children under sixteen (16) years of age; desertion, abandonment, or failure to provide subsistence for any children dependent upon such adults for support; neglect to send

any child to school as required by law; bastardy proceedings and custody to children in proceedings, whether or not supported by petitions for divorce or separate maintenance or for relief without commencement of divorce proceedings; and appeals of administrative decisions concerning setoff of income tax refunds for past due child support in accordance with §§ 44-30.1-5 and 40-6-21. The holding of real estate as tenants by the entirety shall not in and of itself preclude the family court from partitioning real estate so held for a period of six (6) months after the entry of final decree of divorce.

**(b)** The family court shall be a court of record and shall have a seal which shall contain such words and devices as the court shall adopt.

**(c)** The judges and clerk of the family court shall have power to administer oaths and affirmations.

**(d)** The family court shall have exclusive initial jurisdiction of all appeals from any administrative agency or board affecting or concerning children under the age of eighteen (18) years and appeals of administrative decisions concerning setoff of income tax refunds, lottery set offs, insurance intercept, and lien enforcement provisions for past due child support, in accordance with §§ 44-30.1-5 and 40-6-21, and appeals of administrative agency orders of the department of human services to withhold income under chapter 16 of title 15.

**(e)** The family court shall have jurisdiction over those civil matters relating to the enforcement of laws regulating child care providers and child placing agencies.

**(f)** The family court shall have exclusive jurisdiction of matters relating to the revocation or nonrenewal of a license of an obligor due to noncompliance with a court order of support, in accordance with chapter 11.1 of title 15.

[See § 12-1-15 of the General Laws.]

**(g)** Notwithstanding any general or public law to the contrary, the family court shall have jurisdiction over all protective orders provided pursuant to the Rhode Island general laws, when either party is a juvenile.

History of Section.
P.L. 1961, ch. 73, § 1; P.L. 1972, ch. 30, § 1; P.L. 1973, ch. 125, § 1; P.L. 1974, ch. 85, § 1; P.L. 1975, ch. 3, § 1; P.L. 1976, ch. 252, § 1; P.L. 1977, ch. 89, § 1; P.L. 1980, ch. 54, § 1; P.L. 1981, ch. 319, § 1; P.L. 1984, ch. 167, § 3; P.L. 1984, ch. 281, § 1; P.L. 1987, ch. 163, § 2; P.L. 1988, ch. 84, § 7; P.L. 1992, ch. 326, § 1; P.L. 1994, ch. 158, § 2, P.L. 1994, ch. 195, § 3; P.L. 1994, ch. 244, § 1; P.L. 1994, ch. 263, § 3; P.L. 1995, ch. 370, art. 29, § 10; P.L. 1995, ch. 374, § 10; P.L. 1996, ch. 129, § 1; P.L. 1996, ch. 131, § 1; P.L. 1996, ch. 132, § 1; P.L. 1996, ch. 133, § 1; P.L. 1997, ch. 170, § 23; P.L. 1999, ch. 83, § 6; P.L. 1999, ch. 130, § 6; P.L. 2007, ch. 73, art. 3, § 9; P.L. 2010, ch. 216, § 1; P.L. 2010, ch. 236, § 1.

Appeal No. 23-1967

In The United States Court of Appeals

First Circuit

MARY SEGUIN

Plaintiff-Appellant

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official
capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their
individual and official capacities; Rhode Island OFFICE OF Child Support
Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK
DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN,
LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN,
JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities;
RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A.
SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF
RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND
ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity;
RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in
its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official
capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE
JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL,
MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their
individual and official capacities; RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF
THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual
capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Defendant-Appellees.

Appeal from the United States District Court

for the District of Rhode Island


**DECLARATION OF MARY SEGUIN**


Pursuant Fed. R. App. P 8, and pursuant to o 28 U.S.C. sec. 1746(2), I, MARY SEGUIN, declare that all the facts "made known" to the United States Panel of Judges invoking Fed. R. App. 8(a)(2)(D) in Document: 0011812363 Appellant's Notice of the Commission of Facts are true to the best of my knowledge.


Respectfully submitted,

Date: March 29, 2024

MARY SEGUIN


*Mary Seguin*
_____

Mary Seguin

No. 23-1967

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official
capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their
individual and official capacities; Rhode Island OFFICE OF Child Support
Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK
DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN,
LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN,
JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities;
RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A.
SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF
RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND
ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity;
RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in
its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official
capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE
JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL,
MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their
individual and official capacities; RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF
THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual
capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Appellants-Appellees.

Appeal from the United States District Court

for the District of Rhode Island

_____

## APPELLANT'S NOTICE TO THE JUDGES OF THE UNITED STATES OF THE COMMISSION OF ACTIVITIES BY PERSONS OR WHOEVER INVOLVING RECORD TAMPERING; KNOWING PRESENTATION, OR CAUSING TO BE PRESENTED, A FALSE OR FRAUDULENT CLAIM FOR PAYMENT OR APPROVAL; KNOWINGLY MAKING, USING OR CAUSING TO BE MADE OR USED, A FALSE RECORD OR STATEMENT MATERIAL TO A FALSE OR FRAUDULENT CLAIM; CONSPIRING TO COMMIT A VIOLATION OF THE AFORESAID TO PROCURE TITLE IV-D FUNDING, THAT INVOLVE VIOLATIONS OF 42 U.S.C. § 654 WHICH ARE

## PENALTY-INCURRING AND FINES INCURRING UNDER 42 U.S.C. § 654, COMMITTED BY APPELLEE AGENTS OF TITLE IV SOCIAL SECURITY ACT STATE PLAN POLITICAL SUBDIVISIONS OF THE STATE OF RHODE ISLAND AND APPELLEE PERSONS

**Pursuant to**

**18 U.S.C. § 4**

**18 U.S.C. § 666**

**18 U.S.C. § 287 - making false, fictitious claims,**

**18 U.S.C. § 371 - conspiracy to defraud the United States,**

**18 U.S.C. § 1001 - false documents or false statements to a federal agency,**

**18 U.S.C. § 1341 - mail fraud,**

**18 U.S.C. § 1343 - wire fraud,**

**31 U.S.C. § 3279 - federal civil false claims act**

**Et al.**

———————————————

Pursuant to **18 U.S.C. § 4,** Appellant, proceeding from Texas and as a citizen of Texas, in aid of the Court, respectfully in good faith makes known to the Judges of the United States in the United States Court of Appeals for the First Circuit of United States of America, the commission of penalties-incurring and fines-incurring, both civil and criminal, (negligent and intentional) violations by Appellee persons or whoever acting as agents of the **42 U.S.C. § 654(1) political subdivisions of the State Plan of the State of Rhode Island** and Appellee persons, pursuant to **18 U.S.C. § 666, 18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false documents or false statements to a federal agency, 18 U.S.C. § 1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud, 31 U.S.C. § 3279 - federal civil false claims act *et al.* (a non-exhaustive list of Appellee-violated federal codes is invoked in the Conclusion Section of this Notice), and respectfully requests review by a panel of judges in this United States Court of Appeals for the First Circuit under **Fed. R. App. P 27(b) and Fed. R. App. P 8(a)(2)(D) invoked in the pending Fed. R. App. P 27(b) motion and Fed. R. App. P 8(a)(2)(D) motion pending in this matter**.

**Appellant respectfully requests a hearing on the matters raised herein**.

## I. APPELLANT'S LIMITED SCOPE PROSECUTION OF THE APPELLEES IN ==LIMITED== JURISDICTION 42 U.S.C. § 654(1) STATE FAMILY COURT TITLE IV CASE PROCEEDING

The Texas Appellant, a victim of the Appellees' organized commission of Title IV-D and Title IV-A violative interstate 12% compound interest on overdue support fraud, fraudulent liens consisting of 42 U.S.C. § 654(21)(A) violative 12% COMPOUND INTEREST on overdue support on Texas properties, fraud, theft, and accounting fraud, respectfully requests judicial notice, in aid of the Court, of the Texas Appellant's concurrent limited scope prosecution of the Appellees in the Rhode Island State Plan's 42 U.S.C. **§ 654(1)** political subdivision, Rhode Island Judiciary limited jurisdiction family court, where certain symbiotic state judicial actors, such as state judge John McCann III, state judge Haiganush Bedrosian and state magistrate Susan Nahabedian, routinely establish and enforce under color of Rhode Island state law 12% compound interest on overdue support, upon information, since 1988, with the possibility of since 1974. Appellant respectfully attached hereto this Notice Appellant's February 4, 2024 and March 21, 2024 electronic filings moving to compel enforcement of that court's properly issued subpoena for Appellant's Title IV-D case records including records showing the Appellee-Rhode Island Office of Child Support Service's accounting alterations involving any and all records as they relate to the removal of 12% compound interest from the automated data processing system and putting the 12% compound

interest back on the system whether it be for certification of a compliant approved State Plan to the United States for claims under Title IV-D and Title IV-A programs funding under 42 U.S.C. §§ 654(7), 654(10), 654(14), 654(15), 654(16), 654a, 654b; or certified to financial institutions or property-holding entities for the purpose of placing or perfecting liens on Appellant's Texas properties, or certified to Texas for enforcement against the Appellant (e.g., to Texas for cooperation under 42 U.S.C. §666 (14) certifying the accuracy and legal sufficiency of Rhode Island's automated data processing system accounted amount) that must obviously exactly corroborate with the amounts directly represented to and demanded from the Appellant during the course of the Appellees' support collection activities – Appellant prosecuted judicial compulsion of Rhode Island Appellees' compliance with the subpoena and compliance with 42 U.S.C. §654b's requirement to furnish the information upon the noncustodial parent's information request by filing the motion to compel using the State's electronic court filing system, Odyssey, attached hereto under **Exhibit A**.

Appellant in good faith relies on the straightforward and clearly worded ruling of the United States Court of Appeals for the 4th Circuit in ***Hodges v. Shalala***, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003), that makes clear Congress's intent to prescribe both civil *and* criminal penalties and fines for violations. Consistent with its

Spending Power, Congress has the authority to attach conditions on the receipt of federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements are conditions of approval of a state plan. See 42 U.S.C. §§ 654(7), (10), (14), (15), (16), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely." The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at 879.

Absent any discretion available to the Secretary to impose a lesser penalty than the

alternative penalty as outlined in the statute, Rhode Island is liable for the

statutorily prescribed penalties.[1]  Congress also enacted several criminal codes

punishing persons, whoever who act as agents, such as the Appellees, who commit

federal crimes, including cover up of unlawful activities under federal criminal

codes, e.g., *see* **8 U.S.C. § 666, 18 U.S.C. § 287 - making false, fictitious claims,**

**18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 -**

**false documents or false statements to a federal agency, 18 U.S.C. § 1341 -**

**mail fraud, 18 U.S.C. § 1343 - wire fraud, 31 U.S.C. § 3279 - federal civil false**

**claims act *et al.*** (a non-exhaustive list of Appellee-violated federal codes is

invoked in the Conclusion Section of this Notice).  Penalties and fines against the

State for noncompliance (including due process violations provided in 42 U.S.C.

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

       Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the unlawful 12% compound interest from the noncustodial parent and from Texas and Federal authorities in the false amounts certified to Texas and to the United States for incentive claims, cooperation claims and Title IV-D and Title IV-A funding claims.

§654(20) and corresponding §666) is explicit under federal codes Title IV-D, Title

IV-A, and 18 U.S.C. § 666, and upheld.

Appellant attaches the 4th Circuit's ruling (***Hodges v. Shalala***, 121 F. Supp.

2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S.

811 (2003) herewith under **Exhibit B**.

Appellant  moreover in good faith relies on the straightforward and clearly

worded Brief filed by the United States Department of Justice and Secretary of the

United States Department of Health and Human Services in the seminal United

States Supreme Court case ***Turner v. Rogers***, 564 U.S. 431 (2011) that showed

South Carolina (found by the 4th Circuit Court of Appeals) liable for $75 million in

penalties for that state's 42 U.S.C. § 654 violations that did not even involve, *inter*

*alia*, fraud and tampering with the record or unlawful 12% compound interest put

into, then taken off, then put back on, the automated data processing system as here

in Rhode Island by the political subdivision Appellees.  The Texas Appellant, the

victim of fraud and organized fraud by Rhode Island's political subdivisions under

42 U.S.C. **§ 654(1),** in good faith made known the above activities to "some

judges" of "the United States" such as the judges sitting in the Court of Appeals for

the First Circuit and other relevant federal authorities under 18 U.S.C. **§ 4.**

Appellant attaches the aforesaid Brief filed in the U.S. Supreme Court by the

United States in **_Turner v. Rogers_**, 564 U.S. 431 (2011) herewith under **Exhibit C.**

I. **SUA SPONTE RECUSAL OF RHODE ISLAND'S TITLE IV POLITICAL SUBDIVISION STATE MAGISTRATE SUSAN NAHABEDIAN WHO OPENLY DECLARED ON THE RECORD RHODE ISLAND LAW SAYS 12% COMPOUND INTEREST ON FEBRUARY 2, 2024 – THE 12% COMPOUND INTEREST RATE WAS DELIBERATELY OMITTED AND CONCEALED BY APPELLEES (BOTH JUDICIAL AND SDU) SINCE 2010 IN APPELLANT'S TITLE IV CASE ALONE**

Appellant, similar to Michael Turner in **_Turner v. Rogers_**, 564 U.S. 431

(2011), is a victim of unconstitutional unlawful seizures, here of Appellant's Texas

properties for fraudulent and unlawful 12% compound interest on overdue support

liens (and their refusal to release fraudulent liens in violation of Texas Penal

Codes) under Rhode Island fraud on the court under color of Rhode Island state

law within the Title IV legal framework. The United State's Brief elaborating the

incentive structure of the Title IV legal framework against the implemented due

process violative enforcement structure in South Carolina in _Turner_ makes clear

that South Carolina's unlawful and unconstitutional deprivation of Turner's liberty

is calculated to show improved "enforcement" rates (unconstitutionally and

unlawfully induced) in order to make claims for, _inter alia_, enforcement incentive

payments under 42 U.S.C. § 658a.

Here, Rhode Island's Title IV political subdivisions operate a sophisticated accounting fraud 42 U.S.C. § 654 non-compliant data processing system that is clearly not "automated" that involves, *inter alia*, routine removals of the 12% compound interest from the automated data processing system whenever Rhode Island risks detection when making certifications to other states such as Texas (under 42 U.S.C§666(14)) and emphatically when submitting certifications to the United States when making claims for Title IV-D and Title IV-A funding under, inter alia, 42 U.S.C. §§654(7), (10), (14), (15), (16), 42 U.S.C. §654a, 42 U.S.C. § 654b, 42 U.S.C. § 658a,  42 U.S.C. § 658b. among others.  Aiding these agents of the state subdivisions are certain symbiotic judicial persons that operate a minimized paper trail system that involves omitting stating 12% compound interest rate on overdue support orders for the purpose of covering up the State Plan's violation of 42 U.S.C. § 654(21)(A) that explicitly permits **UNFORMLY** either 0% or if interest is set, a 3-6% simple interest on overdue support.  Symbiotic to the collective aim to conceal the State Plan's noncompliance, the Appellee-Rhode Island Office of Child Support's adopted official policy that explicitly states in writing NOT to pursue interest in interstate cases ONLY.  For three long years, since November 2021, Appellant has been diligently and exhaustingly, and with outrageously exorbitant undue burden, seeking through three Rhode Island state Title IV-D proceedings and two federal actions at law in the district of Rhode

Island presided by a judge (Smith) who built his entire law practice representing

Rhode Island 42 U.S.C. § 654(1) political subdivisions and their employees, for

information regarding that rate of interest input into the 42 U.S.C. §§  654 (7),

(10), (14), (15), (16) (24), (27), §654a, § 654b  mandated automated system, with

every legal maneuvering thrown at Appellant at every turn to thwart and obstruct

furnishing the accounting information that is mandated to be produced by statute

under 42 U.S.C. §654b to the noncustodial parent Appellant anyway, without

judicial compulsion.  The language of Title IV-D makes clear that the permitted 42

U.S.C. 654(21) 3-6% interest represents an "incentive" fee to the States, and

stipulates that in welfare (Title IV-A) cases the established support order is

assigned to the State, making clear that the interest on overdue support represents a

form of revenue for the State in the form of debt owed to the State by the

noncustodial parent.

Through court ordered discovery in the state family court, yet through

continuing refusals by Appellees to produce requested information relating to the

accounting and removals from the automated data process system, Appellant

nevertheless diligently obtained evidence of the Appellee-Rhode Island Office of

Child Support Service's policy of not pursuing interest in interstate support cases

only, in violation of 42 U.S.C. § 654(21)(A) explicit requirement to set UNIFORM

rates, attached hereto as **Exhibit D.**

Among others, because Appellees Barbara Grady, Gero Meyersiek and Priscilla Glucksman and certain employees of political subdivision state family court believe that the Appellant "married a rich oil man" in Texas, they schemed to defraud the Appellant in this interstate Title IV-D case since 2010, to wit the guardian ad litem's demand to pay the outrageous $55,000.00 per visitation, even though the State has been receiving through filing claims for grants at a minimum $10,000,000.00 in grants under 42 U.S.C. §669b to facilitate visitation etc. In retaliation for Appellant's federal lawsuits in 2012 against the Appellees for their racketeering Appellee Priscilla Glucksman on "oral" motion secured from Judge McCann an unspecified "interest" on overdue support in Appellant's interstate case, against written policy (see policy Exhibit D) with the intent to remove from the automated data process system the 12% compound interest when certifying to Texas under 42 U.S.C. § 666(14) to conceal from Texas and federal authorities the disallowed therefore fraudulent 12% compound interest. Similarly, Appellees routinely remove the 12% compound interest amount from the automated system in instate cases whenever it certifies to the United States for federal claims under Title IV-D and Title IV-A to conceal the State Plan's noncompliance with 42 U.S.C. §654(21)(A), and then put the interest back on the system again after obtaining federal funding or after a federal audit, similarly to how Appellee Rhode Island Office of Child Support Services put interest back on the system in

December 2021 after inducing the Appellant by agreement in Texas to pay off the principle in one lump sum in consideration of Appellee Gero Meyersiek waiving interest (interest that was in reality unenforceable, null and void under 42 U.S.C. §654(21)(A)).

Since November 2021, for thirty (30) months, several times each month, Appellant in good faith diligently and unwaveringly requested for her own case accounting and all information relating to the alleged interest and support due, and was denied each time, each denial constituted a failure and incurred penalties explicitly provided by Congress under, inter alia, 42 U.S.C. §§654(24), (27), § 654a, § 654b, § 658a, § 658b, and because the denials were motivated by <mark>**cover up**</mark> of criminal fraud, accounting fraud and false certifications to Texas and the United States to claim funds from federal funding programs involving the taking off and putting back onto the automated data processing system noncompliant and fraudulent 12% compound interest, the explicit penalties under 42 U.S.C. § 654, 658 and as they relate to Rhode Island's ineligibility for Title IV-A funding are penalty and fine incurring also under 18 U.S.C. §666, **18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false documents or false statements to a federal agency, 18 U.S.C. § 1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud, 31 U.S.C. § 3279 - federal civil false claims act *et al.*,** among others.  Congress is adamantly

explicit on the conditioning of federal funding claimed under Title IV-D and Title IV-A and explicit on the punitive penalties and fines specifically liable by the States, agents of the States, including employees and persons in conspiracy with whomever, explicit and reinforced under 18 U.S.C. **§ 666, 18 U.S.C. § 287 - making false, fictitious claims, 18 U.S.C. § 371 - conspiracy to defraud the United States, 18 U.S.C. § 1001 - false documents or false statements to a federal agency, 18 U.S.C. § 1341 - mail fraud, 18 U.S.C. § 1343 - wire fraud, 31 U.S.C. § 3279 - federal civil false claims act** *et al.*

Appellant finally obtained evidence of the illegal 12% compound interest on overdue support Appellee-Rhode Island Office of Child Support Services routinely input into the automated data processing system through propounding interrogatories.  Appellant attaches hereto the Appellees' Answers to Interrogatories as **Exhibit E** - see Interrogatory Answer 11(c) on page 5 "Plaintiff's Answers to Appellants' Interrogatories" that states, "ANSWER 11(c) Rhode Island General Laws 15-5-16.5; 12% per annum on any support debt due and owing for child support and/or spousal support."

Rhode Island evades detection and falsely certifies to the Secretary under Title IV through accounting fraud.  Appellant's case file for December 2021 to April 2022 shows over a dozen instances of unsubstantiated by any accepted accounting standards inflationary manual upward "adjustments" to the automated

data process system that balloons the interest arrears due by tens of thousands of

dollars within weeks each time, which is clearly unclearly unlawful when Title IV

mandates by 42 U.S.C. 654(24), 42 U.S.C. 654(27) and 42 USC 654a and 42 USC

654b that the automated data process system must be used for calculating support

to ensure accuracy and to prevent accounting fraud or theft.  *E.g.*, see 42 U.S.C.

sec. 654(7),(10), (14), (15), (16), (20) clearly requiring accounting and reporting

controls involving the automated accounting data processing system and

compliance with 42 U.S.C. sec. 654a and 654b.  It is crystal clear that, just like

how the Appellees routinely manually altered the amounts due Appellant's account

that is mandated to be calculated by the automated data processing system in

Appellant's case file, in order to cover up detection by Federal authorities of the

unlawful and fraudulent 12% compound interest, Rhode Island flagrantly and

routinely and **criminally** removes the unlawful 12% compound interest amounts

from the 42 U.S.C. 654a required automated data processing system when

reporting to the Secretary under 42 U.S.C. secs. 654(10), (14), (15), (16) for

example, then put the interest back on the system after reportings to the Secretary

and subsequent to the Title IV three-year audit cycle.  This way, Rhode Island

fraudulently falsifies accounting in order to make it appear that the State Plan is in

compliance with 42 U.S.C. sec. 654(21)(A).  As the payouts involve hundreds of

millions of dollars, and due to the possibility of kick back arrangement to look the

other way by federal delegated authorities, Appellant in good faith "made known" the possibility to Congressional Oversight officials.

For the purpose of this matter at hand, the Appellant respectfully requests the Judges of this United States Court of Appeals to take proper steps to ensure that official federal judicial proceeding review on the merits of the accuracy of the accounting reporting of Appellant's account that is central to this matter is conducted in accordance with all applicable Federal Law where theft of the United States has occurred and is occurring and is clearly implicated, and where theft of the Appellant has occurred and is occurring and concretely established by evidence.

**A. MAGISTRATE SUSAN NAHABEDIAN FALSIFYING AND TAMPERING WITH TITLE IV RECORDS BY MUTING THE APPELLANT THROUGHOUT WEBEX TITLE IV-D PROCEEDING SO AS TO OBSTRUCT APPELLANT FROM BEING HEARD, SPECIFICALLY OBSTRUCTING APPELLANT FROM SUBMITTING INTO EVIDENCE TRAC RECORDS AND AUDIO RECORDING SHOWING THE REMOVAL OF FRAUDUELNT 12% COMPOUND INTEREST AND PUTTING INTEREST BACK ON THE SYSTEM ACCOUNTING FRAUD AND OBSTRUCT APPELLANT FROM CROSS-EXAMINING PERJUROUS TESTIMONY BY WITNESS APPELLEE GERO MEYERSIEK AND ATTEMPTS TO SET 12% COMPOUND INTEREST IN VIOLATION OF 42 U.S.C. sec. 654(21)(A) – Multiple Failures that are Penalty Incurring Fraud on the Court**

On February 2, 2024, in the Title IV-D State Plan hearing conducted by political subdivision limited jurisdiction family court, Appellee Rhode

Island Office of Child Support Services Chief Legal Counsel Paul Gould attempted to set 12% compound interest arrears of over $81k in Appellant's interstate case but not in certain other interstate cases, constituting multiple violations of 42 U.S.C. sec. 654(21)(A).  Appellee Paul Gould also stated that in the Title IV-D proceeding, what Congress says does not matter, what the U.S. Supreme Court says does not matter, what the Constitution says does not matter, only what the limited jurisdiction family court's orders matter.  Appellee Paul Gould is wrong. Appellee Rhode Island Office of Child Support Services is wrong. Attempting and conspiring to seek 12% compound interest violates 42 U.S.C. sec. 654(21)(A), and counts as one failure in the fiscal year, and incurs the penalty for one failure for Appellee Paul Gould's actions under 42 U.S.C. sec. 655, 658a, 658b.

Attempting and conspiring to not seek uniform interest, targeting Texas Appellant in an interstate case for illegal 12% compound interest while not pursing interest in other interstate cases also violates 42 U.S.C. sec. 654(21)(A) and counts as two failures in the fiscal year, and incurs the penalty for two failures.

Attempting and conspiring to openly flout Title IV-D regulations in a
Title IV-D proceeding by the Chief Legal Counsel of the Title IV-D SDU
counts as at least three failures and incur penalties for at least five
failures.

Attempting and conspiring to openly flout Congress and the United
States Supreme Court in a Title IV-D proceeding count as at least three
failures and incur penalties for at least eight failures, as well as
disbarment and other fines and penalties.

Attempting and conspiring to openly flout the Constitution in a Title IV-
D proceeding by the Chief Legal Counsel of the State Plan's SDU should
count as treason to the Constitution.

Attempting by any 42 U.S.C. sec. 654(1) political subdivision to establish
12% compound interest, be it judicial political subdivisions or
administrative political subdivisions, Consistent with its Spending Power,
Congress has the authority to attach conditions on the receipt of federal
funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Title IV-
D statute expressly provides that compliance with the 3-6% simple

interest on overdue support, operating the automated system for accuracy and SDU requirements are conditions of approval of a state plan. See 42 U.S.C. §§ 654(7), (10), (14), (15), (16), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."   The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at 879.  Absent any discretion available to the

Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.

Magistrate Nahabedian proceeded to mute the Appellant from the point of Paul Gould calling Appellee Gero Meyersiek as his only witness ALL THE WAY TO THE reading of the ruling into the record constituted deprivation of due process, obstruction of an official Title IV-D proceeding and record tampering; it made the record falsely look as if Appellant did not mount any arguments, defense or objections nor sought to be heard.  Magistrate Nahabedian's falsification using Webex muting of the 42 U.S.C. sec. 666-protected Appellant in a remote hearing for the entire phase of the "trial towards the merits" of the Title IV-D hearing, thus falsifying the record, falsifying the record for appeal is criminal in nature, obstructs the official proceeding, obstructs justice, and are impeachable offenses, especially when it is clearly established her impeachable actions are motivated by the scheme to set 12% compound interest arrears that she knew are unlawful, unenforceable, fraudulent, and are preempted by 42 U.S.C. sec. 654(21)(A) – the political subdivision lacks jurisdiction to set 12% compound interest having

willingly entered into contract with the United States to participate in

Title IV-D.  The clear and unequivocal statement of the required

conditions in the Title IV-D statute enabled Rhode Island to "exercise

[her] choice knowingly, cognizant of the consequences of [her]

participation." *See Dole*, 483 U.S. at 207 (citations omitted).

As far as 42 USC 655 penalties are concerned, at least twenty failures

occurred under 42 USC 654 alone, along with other federal and Texas

criminal codes.

Appellee Gero Meyersiek committed perjury and falsification of Title

IV-D records.  Appellee Paul Gould and counsel Achille for Appellee

Gero Meyersiek are persons whomever committing subornation of

perjury and aiding in certifying false claims to the United States and

falsifying Title IV-D records.


## B. APPELLANT FILED MOTIONS TO DISQUALIFY, MOTION FOR VIDEO RECORDING OF WEBEX HEARING AND MOTION TO DISMISS INTEREST ARREARS; APPELLANT EMAILED CLERKS OF TITLE IV-D PROCEEDING AUDIO RECORDING AS EVIDENCE SUBMISSIONS

Appellant diligently prosecuted the Rhode Island State Plan's legitimacy,

prosecuted the impeachable magistrate and Title IV-D proceeding which

was conducted under criminal racketeering motivated fraud on the court.

Appellant filed a motion to disqualify Magistrate Nahabedian.  See

Attached **Exhibit F**.


Appellant filed a motion for Video Audio Recording of Webex Hearing.

See Attached **Exhibit G**.


Appellant filed a motion to Dismiss Interest Arrears.  See Attached

**Exhibit H**.


## C. APPELLANT FILED IN THIS COURT FED. R. App. P. 8(a)(2)(D) MOTION ON MARCH 11, 2024

On March 11, 2024, Appellant filed in this Court Appellant's Fed. R.

App. P. 8(a)(2) Motion; See, (Case:23-1967 Document:00118118391

Date Filed 03/11/2024  Entry ID: 6628012)  Appellant attaches it hereto

as **Exhibit I**.


On March 11, 2024 Appellant further caused to issue a family court

subpoena for Appellant's Title IV-D case file information onto 42 U.S.C.

sec. 654(1) political subdivisions of the State Plan and properly served on

to their agents and persons, e.g., Appellees Rhode Island Office of Child

Support Services, Paul Gould, John Langlois, Kevin Tighe, Frank

DiBiase and others.

### D. MAGISTRATE SUSAN NAHABEDIAN SUA SPONTE RECUSAL NEVER SIGNING NOR ENTERING THE 12% COMPOUND INTEREST ORDER, WHICH IS VOID AND IMPEACHABLE

Sometime between March 11, 2024 and March 21, 2024, Magistrate

Susan Nahabedian sua sponte recused herself, never signing nor entering

any orders for the illegal and fraudulent 12% compound interest.

Nobody notified the Appellant. Appellant only discovered the fact when

Appellant sought to obtain information from the state family court

supervisor clerk, Rhonda, as to procedures submitting audio recording

evidence during trial for Appellant's filed Motion to Dismiss.

Bewilderingly, the state family court clerk for a Title IV-D proceeding

stated that their office of the clerk does not have a procedure for

submitting audio recording evidence for Webex hearings in Title IV-D

proceedings, which are administratively ordered by the Chief Judge of

Rhode Island Family Court for remote hearings only, further claiming in

the state's $6 million digital court, digital formats of audio files, such as

saved on a flash drive, or google drive, or attached to email are

disallowed.  Further, there is judiciary-operated cloud drive for parties to upload digital audio recording evidence either.

In this digital day and age, old fashioned audio cassettes are technologically obsolete and no longer available for sale; nor are cassette recorders.

Appellant avers this is yet another failure, or deliberate ruse, calculated to obstruct Appellant's submission of damning evidence incriminating to the Appellees.  This constitutes more penalty-incurring failures under Title IV-D and Title IV-A alone.

### E. RHODE ISLAND'S STATE PLAN'S PENALTY-INCURRING VIOLATIONS OF TITLE IV-D AND ORGANIZED CRIMINAL COMMISSION OF INTERSTATE FRAUD

Congress prescribed both civil and criminal penalties for violations. Consistent with its Spending Power, Congress has the authority to attach conditions on the receipt of federal funds. See South Dakota v. Dole, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16),

(21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely."   The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges v. Shalala,* 121 F.2d at 879.  Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily

prescribed penalties.[2]   Congress also enacted several criminal codes punishing actors, such as the Appellees who commit federal crimes, including cover up of unlawful activities.

See Title IV-D 42 U.S.C. § 651-669. See United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3

AUSC-prelim-title42-

section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3V

sYXRpb25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

Appellant subpoenaed "(1) All records, files, notes, public records, documents, films, materials generated in the course of administration and enforcement of relating to Appellant Mary Seguin, from 2010 to the present in this Title IV-D Case under the Social Security Act; (2) All records relating to Appellant

---

[2] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
    Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

Mary Seguin from 2010 to the present, including notes and messages taken and generated on October 5, 2022."

See attached subpoena, Exhibit J.

The Appellee Rhode Island Office of Child Support Services' actions in the Title IV-D case's proceedings in question since 2010 with the entries of orders prepared and submitted in her official and individual capacities, Appellee Priscilla Glucksman, make clear the Office of Child Support Services is one of the State Plan's key "organizational unit which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan" under 42 U.S.C. § 654(3).

Rhode Island Office of Child Support Services' refusal to comply with the Subpoena is a *prima facie* 42 U.S.C. § 654b violation that incurs penalties in this fiscal year under 42 U.S.C. § 655(a)(5) as well as 42 U.S.C. § 655(a)(4), which penalty-incurring violations resulting in making false federal claims under federal funding programs the Appellant had reported, is reporting and will continue to report to relevant law enforcement authorities at the federal and state levels. (Judicial notice is respectfully requested that the Appellant in January 2023 reported Appellee Office of Child Support's violations to the Rhode Island Office of Attorney General, who instead of enforcing the requirements of the State Plan as

the Appellee Attorney General is similarly a political subdivision under 42 USC

654(1), opted to reinforce, aid, shield and protect Appellee Rhode Island political

subdivisions' unlawful activities – this is reported to United States authorities).  As

a condition of receipt of any federal funding under Title IV-D of the Social

Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for

child and spousal support that meets <mark>**all the requirements of 42 U.S.C. § 654**</mark>.

Among the prerequisites for approval of a Title IV-D Plan are the requirements

that the State may only uniformly charge 3-6% simple interest on overdue support,

see 42 U.S.C. § 654(21)(A), and a State must establish and operate an automated

data processing and information retrieval system without taking computer

calculated amounts off and then put other numbers back on the system or

hardcoding/inputting new numbers computed offline onto the system, see 42

U.S.C. § 654(24), and the State must have a state child support disbursement unit

(SDU) that complies with all the requirements of 42 U.S.C. § 654, 42 U.S.C. §

654a, 42 U.S.C. § 654b, see 42 U.S.C. § 654(27)(A).  Rhode Island deliberately

fails to meet all the requirements, including continuously inputting 12% compound

interest on overdue support and the Rhode Island Office of Child Support Services

covers up their noncompliance with accounting fraud inputting into the system and

taking off from the automated data processing system amounts that are inflated,

unlawful, and submitting false books of accounts that  removed the unlawful

inflated amounts falsely certified to the Federal authorities to make it look like Rhode Island is in compliance so as to procure false claims for federal funding for which Rhode Island is ineligible.

The deliberate fraud makes clear the State operates an unlawful plan, in fact a criminally unlawful plan, and does not have an approved state plan under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, and should lose and disgorge unlawfully procured federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). See 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2). See, *Hodges v. Shalala,* 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).

Appellant respectfully reminded the Appellees that any attempt interfering with, chilling, thwarting and dismissive of the Appellant's prosecuting, reporting, pursuant to 18 U.S.C. § 4 and other federal statutes, to law enforcement authorities the commission of crimes by political subdivisions of the State involved in the Title IV-D proceeding is unenforceable. Any and all failures to comply with 18 U.S.C. § 4 constitutes misprision of a felony.

## F. ALL PROCEEDINGS CONCERNING RHODE ISLAND'S 42 USC 654(21)(A) DISALLOWED 12% COMPOUND INTEREST ARE GOVERNED by 42 U.S.C. § 654 et al. UNDER TITLE IV-D THAT

**REGULATE ALL POLITICAL SUBDIVISIONS OF THE STATE OF RHODE ISLAND**

The Appellant respectfully reminded the state family court that the Political Subdivision of the State of Rhode Island under 42 U.S.C. § 654(1), namely by and through the Office of Child Support Services' Lead Legal Counsel Paul Gould, Esq., made several claims before the limited jurisdiction family court under Oath throughout the Title IV-D case hearings and proceedings in question that the laws of Congress, the Constitution and Title IV-D do not matter, only that court's orders matter and they do not need to conform to Congressional prescribed federal statutes. Appellant submitted as an Exhibit B to the state family court the Transcript of February 2, 2024 Hearing in that matter.  Rhode Island is wrong and Paul Gould is wrong, and both know it.  That flagrant lawlessness is at the heart of the violations of federal law under color of state law in this interstate Title IV-D case.  Rhode Island participates in Title IV-D, and in so participating through its State Plan, must comply with Title IV-D.  See, Hodges v. Shalala, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).  *See* ***New York v. United States***, 505 U.S. at 161, Congress, under the Commerce Clause, may offer the States a choice of regulation under federal control or preemption under federal regulation. See ***Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,*** 452 U.S. 264, 288 (1981).  The Title IV-D

statute expressly provides that compliance with 42 U.S.C. sec. 654, and

compliance with the automated data processing system and SDU requirements are

conditions of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A. The

clear and unequivocal statement of the required conditions in the statute enabled

Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences

of [her] participation." See Dole, 483 U.S. at 207 (citations omitted);  See ***South***

***Dakota v. Dole***, 483 U.S. 203, 206 (1987). The textual language of 42 U.S.C. §

654(1) states,

> "A State plan for child and spousal support must—
>
> (1)    provide that it shall be in effect in all political subdivisions of the
>        State"

The facts and established law thus make it crystal clear all political

subdivisions of Rhode Island, including the Rhode Island Department of Human

Services, the Office of Child Support Services AND the Rhode Island Judiciary

political subdivisions of the State of Rhode Island MUST comply with 42 U.S.C. §

654.  However, because the Rhode Island Office of Child Support Services, the

State Plan's SDU unit, flagrantly and expressly states in a Title IV-D case that

Title IV-D statute and Congressionally prescribed federal statutes do not apply in

Title IV-D cases nor in  Rhode Island, the State of Rhode Island's political

subdivisions have flagrantly flouted 42 USC sec. 654 and then adjusted and

tampered with the automated data processing system accounting to defraud the United States of federal funding, and to defraud the Appellant of her Texas properties.

Therefore the Appellant respectfully reminds all participants involved in this official federal proceeding concerning the federal question of federal law involving state non-compliance, fraud against the Appellant using the Title IV legal framework that further involves false claims for Title IV funding and gives notice to the applicable State political subdivisions (e.g., Rhode Island Judiciary) and agencies, including the SDU under the State Plan under 42 U.S.C. § 654(1), e.g., the Rhode Island Office of Child Support Services, that this yet again noncompliance by the State of Rhode Island with the Subpoenaed information egregiously constitutes yet another of the many numerous failures of Rhode Island agencies and its State Plan during this fiscal year to comply with the requirements of section 654b, as well as 654, 654a and 666 of Title IV which shall be considered yet another of the many numerous failures of the State to comply with subparagraphs (A) and (B)(i) of section 654(27) of this title during the fiscal year, that is clearly stipulated in 42 U.S.C. § 655(a)(5)(A)(ii) by a penalty amount of up to 30 percent of the penalty base, in the case of the fifth or any subsequent such fiscal year in which such a failure by the State occurs (regardless of whether a penalty is imposed under this paragraph with respect to the failure). (ii) The term

"penalty base" means, with respect to a failure of a State to comply with a subparagraph of section 654(24) of this title during a fiscal year, the amount otherwise payable to the State under paragraph (1)(A) of this subsection for the preceding fiscal year.

Additionally, the deliberate noncompliance motivated by cover up makes clear the State knowingly and intentionally operates an illegal plan, the State knows Rhode Island does not have an approved state plan under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, and therefore should lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). See 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).

### G. FRAUD

In this Title IV case at issue, serial noncompliance, motivated by fraud, and their resulting incurred penalties, both civil and criminal, accrued since the initiation of the Title IV case fourteen years ago in 2010, upon Appellee Gero Meyersiek's application for services under Title IV through his own private attorney, Appellee Barbara Grady, whose former law firm partner and diseased husband Paul Dugan, was himself a former Senior Counsel of the Appellee Rhode Island Office of Child Support Services, one of the key Title IV-D agencies under Rhode Island's State Plan charged under 42 U.S.C. § 654(3) with State compliance

with 42 U.S.C. § 654, 654a, 654b, 655, 658a, among others – Appellee Barbara

Grady through Paul Dugan has intimate knowledge of and is a knowing participant

in the State's accounting fraud reporting to the United States for federal funding

reimbursement and federal funding Incentive Payment payouts (658a) worth

hundreds of millions of dollars under the Title IV Program to the Secretary and

Department of Health and Human Services, among others.  Upon information and

belief, the Appellee Gero Meyersiek and Barbara Grady and the Rhode Island

Office of Child Support Services have a series of unlawfully obtained "12%

compound interest" money receipt sharing arrangements involving the fraudulent

procurement through the Title IV framework of exorbitant and unenforceable 12%

compound interest interstate targeting Appellant's Texas properties on overdue

support enabled through accounting fraud, among others – this arrangement

involving interstate defraud of the Texas Appellant and simultaneous theft of the

United States of ineligible Title IV funding entails, inter alia, the Rhode Island

Office of Child Support Services discussing in great detail at length with Barbara

Grady the agency's fraudulent removal from the 42 U.S.C. § 654(24), 42 U.S.C. §

654(27) and 42 U.S.C. § 654a mandated automated data processing system of 12%

compound interest when sending to Texas in 2018 thus creating fraudulent books

of accounts under 42 U.S.C. § 666(14)(A)(ii)(I) and (II) fraudulently certifying to

Texas via wire and via mail inaccurate support due accounts – discussions of this

scheme further violated the Appellant's privacy rights, that are documented in the TRAC record of the Appellant's Title IV case file for December 2021 recording the agency's discussions with Barbara Grady at length regarding taking interest off when sending to Texas, and keeping it off the system when communicating to Appellant that Gero Meyersiek waived interest, and then putting interest back on the system after they defrauded the Appellant inducing the Appellant to payoff support that comprised of the principle in one lump sum of $104,185.98 in consideration of Gero Meyersiek waiving interest – the agency discussing its illegal and criminal enforcement information with Barbara Grady is in itself a violation of 42 U.S.C. 654 (26)(A) that mandates the State Plan to have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the parties, such as this Texas Appellant, including—

(A)safeguards against unauthorized use or disclosure of information relating to proceedings or actions to establish paternity, or to establish, modify, or enforce support.

See **Exhibit K**. Rhode Island Office of Child Support TRAC document for December 2021 attached hereto as **Exhibit K**.

Under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, the Texas Appellant has the protected right to be furnished under Subpoena with all TRAC records in Appellant's Title IV-D case file from 2010 to the present to establish the accuracy of the alleged Rhode Island computations mandated to be performed by the automated data processing system, but has instead been hard-programmed numbers created offline that are covered up, which are then manually input into the automated data processing system several times, thus fabricating several different Rhode Island-certified false books of accounts of amounts due transmitted by mail and by wire to Texas and the Texas Appellant and to the United States for the purposes of procuring federal funding under Title IV-D and Title IV-A that violate Federal and Texas State civil and criminal codes. The Rhode Island Office of Child Support Services refuses to produce any TRAC records for 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021 January to November, 2023 and 2024.

This violation of, among others, 42 U.S.C. 654(26)(A) constitutes a violation of 42 U.S.C. 654(27) that counts as a penalty in the many violations in fiscal year 2021 alone which exceeds 30% of the penalty base in 2021 – and that's just civil penalties under Title IV – numerous other federal criminal and civil violations incurring additional penalties are applicable, including Texas criminal and civil code violations.

### H. 42 U.S.C. § 654b(4)

Under Rhode Island's State Plan, the Rhode Island Office of Child Support Services is mandated to "furnish to any parent, upon request, timely information on the current status of support payments under an order requiring payments to be made by or to the parent."

Therefore, information relating to the Orders in question and relevant information relating to those orders must be furnished. Information relating to the putting of 12% compound interest on the automated data processing system from 2010 to the present must be furnished. Information relating to the removal of any alleged computed online or offline related to 12% compound interest from the automated data processing system in 2018 and at any and all times from 2010 to the present must be furnished. Information relating to the waiver by the Appellee Gero Meyersiek by and through his private attorney Appellee Barbara Grady of the 12% compound interest that was represented to Appellant as the "$0.00" showing under interest calculated by the automated data processing system in Appellant's case file on December 6, 2021 must be furnished. Information relating to the Rhode Island Office of Child Support Services calculated total due showing $92,214,56 calculated by the automated data processing system in Appellant's case file on December 6, 2021 that calculates arrears from 2010 must be furnished. See attached hereto December 6, 2021 screen shot of the Appellant's online OCSS

account showing the calculated amounts of which is mandated by Title IV-D to be populated by the automated data processing system as **EXHIBIT L**.  Information relating to the interest amount before it was taken off the automated data processing system in 2018 must be furnished, as well as any time interest was taken off the system from 2010 to the present.  Information relating to the interest put back on the automated data processing system in 2021 after Appellant accepted the $104,185.98 payoff number given by Office of Child Support Services by wire via email must be furnished.  Information relating to how $104,185.98 was computed by the automatic data processing system on December 7, 2021 must be furnished, when the automated data processing system calculated $92k just the day before on December 6, 2021 must be furnished.  Information relating to how $75,658.00 was calculated by the automated data processing system on March 3, 2022 that was then issued to Texas to lien Texas properties by Mail and by wire must be furnished.  And this is not exhaustive.

**I. 2012 JUDGE McCANN (and 2024 MAGISTRATE NAHABEDIAN) VIOLATIONS of 42 U.S.C. § 654(21)(A) – EIGHT FAILURES AND PENALTIES (FOUR IN 2012 and FOUR IN 2024 by and through POLITICAL SUBDIVISION RI FAMILY COURT) – (THIS DOES NOT INCLUDE CRIMINAL AND CIVIL PENALTIES UNDER APPLICABLE CRIMINAL AND CIVIL CODES UNDER FEDERAL LAWS AND TEXAS LAWS)**

This state family court took judicial notice on February 10, 2023 of the issuance of two Orders issued by Judge McCann in 2012.  Magistrate Monaco clarified at the hearing on March 6, 2023 he did NOT take judicial notice of the contents of the orders, only the issuance of the orders and that there was no appeal of those orders.   See attached transcript of March 6, 2023 hearing. ==**Exhibit M**==.

Those 2012 orders were issued by Judge McCann of the Rhode Island Family Court, a political subdivision of the State, in which the State Plan must be in effect under 42 U.S.C. § 654(1).  Therefore, it is crystal clear that the Rhode Island Family Court and its justices under the State Plan MUST comply with all provisions of Title IV-D, including U.S.C. § 654(21)(A) that makes it crystal clear interest on overdue support must be between 3-6% simple interest.  However, Judge McCann knowingly ordered 12% compound interest in interstate Title IV-D on overdue support to be illegally put into the State Plan's automated data processing system mandated under U.S.C. § 654a and U.S.C. § 654b in knowing violation of 42 U.S.C. § 654(21)(A).  Certainly, the Rhode Island Office of Child Support Services today claims 12% compound interest was what Judge McCann ordered, undisputedly making Judge McCann an accomplice and complicit.  The knowing violation of the political subdivision Rhode Island Family Court by and through Justice McCann of 42 U.S.C. § 654(21)(A) through fraud on the court and under color of state law violates 42 U.S.C. § 654(24), 42 U.S.C. § 654a and 42

U.S.C. § 654b  and incurs FOUR failures and penalties in Appellant's case alone
for the fiscal year 2012 under 42 U.S.C. § 655(a)(4) and 42 U.S.C. § 655(a)(5),
through just the State family court political subdivision alone.

In 2024, the Rhode Island political subdivision of the family court by and
through Magistrate Nahabedian flagrantly declared at the February 2, 2024 webex
hearing  that the State knowingly orders to be put into the automated data
processing system 12% compound interest in Rhode Island under color of state law
and through fraud on the court in knowing violation of the Rhode Island certified
approved State Plan that mandates 3-6% simple interest under 42 U.S.C. §
654(21)(A), with her actions representing four failures and penalties in fiscal year
2024.  Failure of compliance with all provisions of Title IV-D results in the State's
loss of federal funding for Title IV-D and Title IV-A under Federal Law.

**J. 2012 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES
(and 2012 Priscilla Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and
42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 – OVER TWENTY
FAILURES AND INCURRED PENALTIES in 2012 by and through
POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES
THROUGH FRAUD AND UNDER COLOR OF STATE LAW**

In order to cover up the flagrantly unlawful 12% compound interest that
represents unlawful and fraudulently obtained and extorted under color of law
Rhode Island State revenue through the Social Security Act in welfare cases,
Rhode Island Office of Child Support Services adopted the Official Policy not to

pursue interest in interstate cases (in order to cover it up from federal authorities and other state authorities see 42 USC sec. 666(14) – cooperation with other states – Attached hereto Rhode Island Office of Child Support Services Official Written Policy that was produced by RI OCSS during February 10, 2023 court ordered discovery.  This policy document evidences the official policy of criminal and civil fraud by the State of Rhode Island's political subdivisions applicable under 42 U.S.C. § 654(1).

This policy evidences the routine extortions of noncustodial parents through the enforcement of 12% compound interest in-state under color of state law that incur penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences the political subdivisions of Rhode Island's concealment and cover up from out-of-state and federal authorities of the State's illegal extortion of 12% compound interest under color of state law by adopting an official policy not to pursue interest in out of state interstate cases that incurs penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences accounting fraud adjustments concealing 12% compound interest applied to certain selected out-of-state cases such as the Appellant's, as well as accounting fraud adjustments that conceal the 12% compound interest in in-state cases when submitting for Title IV-D and Title IV-A

reimbursement to the United States.  It also evidences that interest is not set uniformly, further violating 42 USC 654(21)(A) requirement that interest must be uniform.

The pattern of Appellee agency discussions and considerations of its illegal and criminal enforcement information with Appellee Barbara Grady is in itself an organized scheme involving schemes to commit accounting fraud and false certification of Title IV-D accounts, in violation of, inter alia, 42 U.S.C. 654 (26)(A) that mandates the State Plan to have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the privacy rights of the Texas Appellant.

In 2012, Priscilla Glucksman, individually and on behalf of the Rhode Island Office of Child Support Services, under 42 U.S.C. 654(1), on oral motion moved for 12% compound interest, that by Rhode Island's official policy should not be pursued in Appellant's interstate Title IV-D case, with the intent and scheme to commit accounting fraud and fraudulent certification of amounts due by removing the 12% compound interest from the automated data processing system in the anticipated event Rhode Island sends it to Texas authorities and Federal authorities for enforcement under 42 U.S.C. 666 (14) and for certifying for false claims for federal funding under Title IV-D and Title IV-A neither for which is Rhode Island's noncompliant State Plan eligible.  Appellee Priscilla Glucksman schemed

with Appellee Barbara Grady and Appellee Gero Meyersiek to orally move for

interest in order to minimize a paper trail of paper filings so that a written record of

the ordered 12% compound interest is buried within a one line of the order,

deliberately omitting the interest rate in order to cover up that it is the

unenforceable 12% compound rate, and with no documentation of a written paper

motion that would otherwise contain or omit the State's legal justification moving

for 12% compound interest.  In 2012, Paul Dugan was alive and participated in the

arrangement.  The symbiotic pliant Judge McCann readily complied under color of

state law, knowing fully well Rhode Island's illegal 12% compound interest is not

enforceable in any state and definitely not enforceable in Texas under Title IV-D,

and knowing that Rhode Island Office of Child Support Services intended to

remove the interest amount if and when Rhode Island sends to Texas for collection

while falsely certifying the total amount due and then put the interest back on the

system and then file a subsequent motion to set interest arrears back in Rhode

Island through the symbiotic pliant family court political subdivision of the State

of Rhode Island before a symbiotic pliant judge like Judge McCann, committing

interstate fraud in violation of, inter alia, 42 U.S.C. sections 652-669, RICO, wire

fraud, mail fraud, tampering with government records, accounting fraud and false

claims.  This list of criminal codes violated by the Appellees is not exhaustive.

Appellant shall present a list of the violated federal criminal codes later in this

Notice.

**K. 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES (and 2012 Priscila Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and 42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 and Title IV-A – OVER TWENTY ANNUAL FAILURES AND INCURRED PENALTIES in 2013-2024 by and through POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES THROUGH FRAUD AND UNDER COLOR OF STATE LAW**

Title IV-A TANF benefits are conditioned upon the State's compliance with

all requirements of 42 U.S.C. § 654, and from 2012 to 2024 and on-going, based

on violations in this case alone, Rhode Island has been and continues to be

ineligible and the State is receiving funds through false representations and

alteration of government records to procure false claims for federal funding. From

2012 to 2024, Appellant has the information to aver that the State of Rhode

Island's political subdivisions under 42 U.S.C. § 654(1) sent by mail and by wire

false accounts of amount due and of liens that contained Title IV-D violative

illegal and unenforceable 12% compound interest fraudulently misrepresented as

"child support due" to multiple institutions, including banks, credit bureaus to

Texas in violation of Texas Penal Codes that carry additional fines and jail time.

Then Rhode Island Office of Child Support Services and the financial comptroller

of the Rhode Island Judiciary and the State Treasurer's Office fraudulently

concealed through removal and other false accounting itemizations the 12% compound interest when certifying to United States Department of Health and Human Services for federal incentive payments claims and federal funding claims under Title IV-D and Title IV-A.

The total Title IV penalties incurred, disgorgement due back to the United States for ineligible Title IV-D and Title IV-A funding, and criminal fines incurred by Rhode Island in Appellant's case alone from 2012 to 2024 run upwards of hundreds of millions of dollars.   From 2012 to 2024, Rhode Island's Title IV-D political subdivisions conspired to violate, in addition to 42 U.S.C. 654(21)(A), among others, several requirements under 42 U.S.C. 654 whose plain textual requirements requires the State Plan MUST:

(7)provide for entering into cooperative arrangements with appropriate courts and law enforcement officials and Indian tribes or tribal organizations (as defined in subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering the plan, including the entering into of financial arrangements with such courts and officials in order to assure optimum results under such program, and (B) with respect to any other matters of common concern to such courts or officials and the agency administering the plan;

(10) provide that the State will maintain a full record of collections and disbursements made under the plan and have an adequate reporting system;

(14)

(A)

comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

(B)

maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them to conceal in the accounting records the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

(15)provide for—

(A)

a process for annual reviews of and reports to the Secretary on the State

program operated under the State plan approved under this part, including such

information as may be necessary to measure State compliance with Federal

requirements for expedited procedures, using such standards and procedures as are

required by the Secretary, under which the State agency will determine the extent

to which the program is operated in compliance with this part; and

(B)

a process of extracting from the automated data processing system required

by paragraph (16) and transmitting to the Secretary data and calculations

concerning the levels of accomplishment (and rates of improvement) with respect

to applicable performance indicators (including paternity establishment

percentages) to the extent necessary for purposes of sections 652(g) and 658a of

this title;

(16)

provide for the establishment and operation by the State agency, in

accordance with an (initial and annually updated) advance automated data

processing planning document approved under section 652(d) of this title, of a

statewide automated data processing and information retrieval system meeting the

requirements of section 654a of this title designed effectively and efficiently to

assist management in the administration of the State plan, so as to control, account

for, and monitor all the factors in the support enforcement collection and paternity

determination process under such plan

(20)

provide, to the extent required by section 666 of this title, particularly the

Due Process protections, that the State (A) shall have in effect all of the laws to

improve child support enforcement effectiveness which are referred to in that

section, and (B) shall implement the procedures which are prescribed in or

pursuant to such laws.

(23)

provide that the State will regularly and frequently publicize, through public

service announcements, the availability of child support enforcement services

under the plan and otherwise, including information as to any application fees for

such services and a telephone number or postal address at which further

information may be obtained and will publicize the availability and encourage the

use of procedures for voluntary establishment of paternity and child support by

means the State deems appropriate

## L. COVER UP AND FRAUD

In 2012, the child in question was 12 years old.  From 2012 to 2018, Appellant does not have any records (due to several prior Title IV-D information denials by the Rhode Island Office of Child Support Services for purposes of cover-up, that further incurred penalties and fines for each and every information denial under 42 USC 654(24) and 42 USC 654(27) and 42 USC 655) of Rhode Island's political subdivisions under 42 USC 654(1) sending to Texas or to federal authorities the support amount for enforcement under 42 USC 654(7) or 42 USC 666(14).  Obviously, sending the support amount in the automated data processing system without the removal of the interest from the system exposes the illegal 12% compound interest disallowed under 42 USC 654(21)(A), which would incur Title IV-D and Title IV-A penalties, disgorgement of ineligible federal funds and incur criminal fines.  It is for this very reason that the Rhode Island political subdivisions adopted the written official policy not to pursue interest in interstate cases, that moreover runs afoul of 42 USC 654(21)(A) plain language that the State Plan must apply UNIFORM interest on overdue support, not State-targeted 0% in some interstate cases and then 12% compound interest in all other cases, such as in this case.  Moreover, if the State claims they actually did send notices of support due to the Appellant in Texas, each transmission would constitute patterns of federal crimes, including Mail and Wire Fraud, since the 12% compound interest in this

Title IV-D case is illegal and fraudulent and unenforceable. This scheme is in violation of 42 USC §§ 654(7), (10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions under 42 USC 654(1) also transmitted by wire and by mail to the United States Department of State a hold on the renewal of Appellant's passport, again omitting and concealing the principle amount as well as the fact that the State attempts to enforce interstate an illegal 12% compound interest on overdue support within the Title IV-D legal framework. This scheme is in violation of 42 USC §§ 654(7), (10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions made the illegal decision between top management employees of the Rhode Island SDU unit, dressed up as "administrative decision," to illegally and criminally remove the illegal 12% compound interest from the automated accounting data processing system that clearly is required to prevent activities "to conceal in the accounting records" Rhode Island's illegal 12% compound interest prescribed under 42 U.S.C. § 654(14). See TRAC records attached hereto in **Exhibit K.**

Upon information, Rhode Island routinely removes the illegal 12% compound interest from the automated data processing system when certifying to and reporting to and making false claims for federal funding to the Secretary of the

United States Department of Health and Human Services in violation of 42 USC §§ 654(10), (14), (15), (16), (20), (21), (23), (24), (27), and applicable federal criminal codes.  See TRAC records attached hereto in **<mark>Exhibit K</mark>** of the routine practice of illegal accounting adjustments of the automated data processing system in the hundreds of thousands of dollars in December 2021 alone.  In this case alone, the aforesaid accounting fraud and record tampering violations motivated by theft of and false claims for funding of the Title IV-D and Title IV-A programs and defraud of the Texas Appellant targeting Texas properties occurred in 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021, 2022, 2023, and 2024.

## M. FACTUAL ALLEGATIONS

The child in question was emancipated in April 2018 and is now an adult 24 years old.  Therefore accrued "interest on overdue support" stopped in April 2018.

Due to the hold placed on Appellant's passport renewal, Appellant discovered on and around November 2021 there is alleged support due.  Appellant retained a lawyer in Texas to contact the Rhode Island Office of Child Support Services to obtain information on the amount due.  The Rhode Island Office of Child Support Services refused to provide information to Appellant's Texas attorney, in violation of 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23),

(24), (27), and concealed the fact that the agency illegally removed the illegal 12%

compound interest amount from the automated data processing system from 2018

to December 2021.  To this day, the Rhode Island Office of Child Support Services

covers up and refuses to furnish information to the Appellant the amount of interest

that was removed from the system.  Continuing refusal to furnish requested

information motivated by cover up is in violation of, inter alia, 42 USC §§ 654b,

654(10), (14), (15), (16), (20), (21), (23), (24), (27).   The Office of Child Support

Services and Barbara Grady and Gero Meyersiek schemed to deprive Appellant of

counsel that would facilitate defrauding the Appellant and to conceal from Texas

counsel the accounting fraud relating to the illegal 12% compound interest that is

unenforceable in Texas as well as legally unenforceable in Rhode Island (however

routinely enforced through fraud under color of state law) under Title IV-D, and

refused to deal with Appellant's Texas attorney, fraudulently claiming it is the

State's policy to deal with the noncustodial parent directly.  This is obviously a

blatant lie because the TRAC record shows Kevin Tighe initiating phone calls

directly to Barbara Grady, Gero Meyersiek's private attorney (and not contacting

Gero Meyersiek directly) to discuss enforcement actions in detail involving the

Rhode Island Office of Child Support Service's fraudulent accounting that entailed

the agency's removal in 2018 (when it planned to send to Texas) of the interest

from the automated system in December 2021.  This is in violation of, inter alia, 42

USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).  The Appellant

avers and declares, under oath, the following facts:

1. On December 6, 2021, the State/Plaintiff showed the Appellant her

   OCSS online account that showed $0.00 under interest.  Further the

   online account that is populated by the automated data processing system

   shows $93,214.56 Total Due, and $0.00 under Interest on December 6,

   2021, published online in the State's OCSS online account for Appellant,

   as of November 30, 2021.  See attached Screen Shot attached hereto this

   motion.  (The Office of Child Support Services told the Appellant that

   the $0.00 under interest shows that Gero Meyersiek waived interest.  The

   Office of Child Support Services deliberately misrepresented by omission

   that the interest amount was taken off the system illegally in 2018 and

   that the interest amount was calculated pursuant to an illegal 12%

   compound interest that is unenforceable under Title IV-D.  Therefore in

   reality there was no consideration given to the Appellant, as falsely

   represented, calculated to induce the Appellant into paying a large lump

   sum amount. The Office of Child Support Services brokered a settlement

   deal between the Appellant and Gero Meyersiek where Meyersiek

   waived interest in consideration of the Appellant paying a lump sum

   payoff amount of $104,185.98 from Texas, which the State, under its

authority, agreed to the deal with the Appellant on December 7, 2021, having calculated the $104,185.98 figure by and through its accountant(s) manually offline and not by the mandated automated data processing system, and actively brokered the terms of the deal itself, namely, Deputy Legal Counsel Kevin Tigue who reports to Mr. Paul Gould, the attorney of record who filed the State's/Plaintiff's Motion to Set Arrears.    The Appellant requests this Court to take notice of the fact that the State also failed to provide this Court as well as to the Appellant an accounting now and upon Appellant's request at the time in 2021 of how this figure $104,185.98 was calculated nor how the alleged $81k is calculated.  This is in violation of, inter alia, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

2.  The State's/Plaintiff's' authority to forgive arrears debts is an official policy and authority reported to the Office of the U.S. Commissioner Tangular Gray of the Office of Child Support Enforcement of the U.S. Department of Health and Human Services.

3.  The Appellant in Texas good faith accepted and paid the $104,185.98 on December 7, 2021.

4. From December 6, 2021 to the present, the State/Plaintiff has represented to the Appellant at least seven (7) sets of books of very large arrears and interest calculations, which the State/Plaintiff has either failed or refused to provide the Appellant with requested documentation of debt validation and verification records supporting the State's calculation (in violation of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27)):

    a. $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Appellant, as of November 30, 2021. (Screenshot of this taken on December 6, 2021 is attached to this Notice).

    b. $104,185.98 Total Payoff Amount on December 7, 2021.

    c. $75,638.00 on a Notice of Intent to Lien dated March 3, 2022. RI OCSS rescinded this figure based on alleged unspecified errors on October 14, 2022.

    d. $73,000.00 per RI OCSS Deputy Chief Counsel John Langlois's (staff counsel who also reports to Mr. Paul Gould, who was also the attorney of record for the State at the Appeals Hearing) representation at the agency RI EOHHS (Rhode Island Executive

Office of Human and Health Services) administrative appeal Pre-

hearing held on October 5, 2022.

e.  $55,000.00 on RI OCSS correspondence with Meyersiek on

October 13, 2022.

f.  $75,623.71 Total Due for "Interest," online on the afordsaid OCSS

online account, as of November 30, 2022.  A screenshot taken on

December 3, 2022 thereof is attached to this Notice.

g.  $81,652.46 on the Motion as of December 22, 2o22.

5.  Maintaining at least seven books of account in Appellant's case file,

while obstructing the Appellant's 42 USC 654b and all Title IV-D

protected due process right to documents of accounting validation and

verification depriving the Appellant's right to meaningfully refute the

State's claim is unlawful, covers up the illegal 12% compound interest

that is also ballooned through several fraudulent manual accounting

calculations NOT USING the Title IV-D mandated automated data

processing system.  There are pending breach of contract, fraud and Civil

RICO et al actions in Federal Courts regarding the conduct of the

Appellees.

6. The Appellant respectfully requests the Court to take notice of the fact that the alleged interest published online by the State/Plaintiff as of November 30, 2022 that states the very specific number of $75,623.71 ballooned to $81,652.46 as of December 22, 2022, by a whopping $6,028.75 in a matter of 22 days as stated in the State's/Plaintiff's Motion, is usurious, and clearly shows the falsity of the State's/Plaintiff's Motion, paragraph numbered 8 that says, "That, because interest only accrues on principal balances and not on interest balances, the interest balance owed on arrears has not changed since the principal balance was paid in full on December 9, 2021." This is in violation of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

7. The Appellant respectfully requests the Court to take notice of the fact that after the Appellant accepted the deal in Texas and paid the payoff amount of $104,185.98 from Texas on December 7, 2021, the State sent to the Appellant in Texas by Mail a Notice of Intent to Lien dated March 3, 2022 for $75,638.00 without any information justifying the fraudulent interest lien on Appellant's Texas properties – the $75,638.00 amount on the fraudulent lien on Appellant's Texas properties was deliberately calculated manually without any substantiated records then hard input into the automated data processing system in violation of Title IV-D.

This is in violation of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Appellant appealed this fraudulent lien to the Appeals Office of Rhode Island Executive Office of Health and Human Services ("RI EOHHS"), a political subdivision of the State of Rhode Island applicable under 42 USC 654(1), on April 1, 2022. Throughout the procedurally defective appeals process where the Appellant was denied by the State/Plaintiff to access her case file, the State/Plaintiff refused or ignored the Appellant's over ten(10) record requests for the legal and accounting basis of the $75,638.00 lien. Each record information denial is in violation of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Appellant also submitted to the Appeals Office records of the written email advisement by the State that "accounting says" to pay $104,185.98 and records of the Appellant's bank wire transfer payment. The Appeals Office continued the hearing for the maximum 3 times due to the State/Plaintiff's refusal to comply with discovery that would render the proceeding procedurally defective. Paul Gould and John Langlois were listed as representing the State. Their collective violations incur penalties and fines under, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 655, 658a, disgorgement of all ineligible

funding under Title IV-A that were received through false claims. To resolve the discovery issues, the Executive Hearing Officer ("EHO"), Debra DeStefano, scheduled a telephonic Prehearing Conference on October 5, 2022, and only when told by the EHO the burden of proof lies on the State/Plaintiff to show arrears are due (as applies here), did John Langlois (who attended the Prehearing Conference) state the following, which the Appellant in Texas recorded as a party of the call:

"EHO: The agency will have to submit proof of the allegation for arrears to support their position.

Langlois: The reason why I asked earlier whether Mary spoke to Karla after she made the payment was because there was a change of circumstances right after that. I don't know if anyone in my agency had ever explained that to Mary.

Seguin: Wait a minute, wait a minute,

EHO: Wait Mary, I know what you asked for, let me get to what John just said, so John, you said there was a change in circumstances subsequent to her making a payment but before the notice of lien went out?

Langlois: Yeah.

EHO: OK, so…

Langlois: Can I just back up and explain what happened, 99% of this is a misunderstanding…

EHO: OK?

Seguin: Including what was on the screenshot, was that a misunderstanding??

Langlois: Can I speak without being shouted over?

Seguin: I am flabbergasted, really.

Langlois: What happened in this case is when Mary's representative, her attorney, called us in late November 2021, and said she wants her passport released and what does she have to do to release her passport, they put her in touch with Karla who gave her the $104,185.98  number.  Where that number came from, was one of our attorneys contacted the custodial parent, Gero Meyersiek, so we contacted his attorney, it wasn't me, it was someone in my office, and said if she's willing to make a $104K to pay off the principle, would you agree to waive the $73K in interest? He said yes.  So Karla notified Mary that if she paid the $104K, it would be paid in full because he was willing to waive the interest and accept just the principal.  What happened was the day after Karla spoke to Mary to wire in the $104K the attorney for Mr. Meyersiek contacted us again and said he changed his mind, please put the interest back on the system, so we did.  So the number that

was given to her on the day it was given to her was correct, the $104K, because he was waiving the interest, but then changed his mind, so we put the interest back on the system, because he was waiving the interest, and that interest was put back on the system and that's why the system is now saying she owes $73K.  That's why in March when the system saw that she had some sort of personal injury insurance in the system, our system was showing she owed $73K so we issued the lien.  But that was what happened, he changed his mind the next day and that's what messed up the numbers. So that's how all this happened, it was a pure misunderstanding, I don't know whether anyone has ever explained that to Mary how that happened.

EHO: OK, Mary, did anyone ever explain that to you before?

Seguin: No. No one ever explained any of that.  This is why I am asking for my case file, I think this is more basis to ask for my entire case file from 2020.  It's news to me for example and its new information to me that your office's lawyer would not talk to me directly but would be picking up the phone and calling the attorney for the custodial parent.  And then not saying you were doing this deal.  I never offered $104K.  You had determined this number, and that's why I am looking for documentation as to whether this is something you guys do in every case.

EHO: OK, John, are you intending to submit then, the documentation showing the full balance, which would include the principle and the interest before she paid the $104k, and then what happened after, you're prepared to submit documentation to show everything that you said just happened.

Langlois: Yes.  I can show the account balance before he agreed to waive the interest.  And I can show you the account balance after she made the payment. And then when we put the interest back on the system.

EHO: And you're going to testify as to why it all occurred, I mean basically what you just told us.

Langlois: Yes.

Seguin: But the screenshot on December 6th showed $93K."

A true copy of the recording evidence has been submitted by the Appellant to this court, a Rhode Island political subdivision under Title IV-D proceeding in June 2023 and in February 2024.

However, instead of going forward with the testimony and providing the alleged debt validation and verification accounting records promised by John Langlois to the EHO at the upcoming RI EOHHS scheduled Appeal Hearing at the time on December 1, 2022, the State opted to rescind the Notice of Lien that states there are unspecified errors on October 14, 2022, and emailed the RI EOHHS

Appeals Office that the State will litigate the issue in Family Court. This showed the intent of the State to deprive the agency Appeals Office of jurisdiction by withdrawing the enforcement instrument that vests the Appeals Office's jurisdiction by regulation, in the clear hope of a more favorable outcome to the State, in the hopes of symbiotic and pliant judge shopping, in the hopes of getting a judge like McCann who ordered the illegal and unenforceable 12% compound in a Title IV-D case to rubber stamp the fraudulent 12% compound interest arrears due, and thereby needlessly increasing litigation. Mr. Paul Gould is the co-counsel of record for the State in the RI EOHHS agency appeal. These activities are in violation of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 655, 658a.

8. The State's actions obstructing Appellant's discovery rights for debt validation and verification as well as documentation of the Plaintiffs' waiver of interest are violative of Family Ct. R. Dom. Rel. P. 11 and are in violation of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a. It is in criminal violation of 18 USC § 666 and a scheme to commit fraud on the court and interstate fraud through unenforceable Title IV-D orders that appear to be routinely issued by pliant Title IV-D judges like Judge John McCann III and Magistrate Susan Nahabedian.

9. Due to the State's conduct of obstructing the Appellant's right to access debt validation and verification records of publicly noticed liens of alleged arrears issued by the State throughout the agency appeal, the Appellant filed an Access to Public Records ("APRA") request to the then Secretary Ana Novais of the RI EOHHS that manages the State/Plaintiff agency OCSS.  These are all political subdivisions of the State of Rhode Island under 42 USC 654(1).

10. The RI EOHHS Office in its management capacity required the State OCSS to respond to the APRA request, but even then the State denied the Appellant's APRA request for accounting records, again refused to release the requested debt validation accounting records, but released the Case History Tracking records in the Appellant's case file, which showed entries made by Kevin Tigue and RI OCSS staff between December 6, 2021 to April 2022 of activity that corroborated John Langlois's representations of taking interest off the system, interest waiver at the agency Prehearing Conference on October 5, 2022 that is outlined above in paragraph 10, then putting interest back on the system after Appellant accepted the offer in Texas, and performed on the contract in Texas paying off all due support from Texas, through Appellant's Texas bank account, namely Texas properties.  Appellees' record denials are

violations of inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16),

(20), (21), (23), (24), (27), 666, 655, 658a.

11. Both the RI OCSS counsel who denied the Appellant's APRA request

and the Executive Legal Counsel of the Secretary of RI EOHHS, Lisa

Martinelli (to whom Ms. Deb Barclay reports and to whom Mr. Paul

Gould reports, per organization charts supplied by the Secretary of State

of the State of Rhode Island) informed the Appellant via official written

letter correspondence to appeal RI OCSS's APRA request denial to the

Attorney General pursuant to R.I.G.L. sec. 38-2-8.  Their collective

denials are in violation of inter alia, 42 USC §§ 654a, 654b, 654(10),

(14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.  Following

their collective official written advisement, the Appellant appealed the RI

OCSS APRA denial under R.I.G.L. sec. 38-2-8 to the Office of the

Attorney General and the Superior Court as provided by R.I.G.L. sec. 38-

2-8.  The Office of the Attorney General and the Superior Court of Rhode

Island are political subdivisions of the State of Rhode Island under 42

USC 654(1).  Instead of releasing the Appellant's Title IV-D alleged debt

validation and verification records information, the State continues to

resist releasing alleged arrears/debt verification accounting records in

Superior Court, including failing to comply with the Appellant's Court-

issued subpoena for said records and resisting subpoena compliance with extended litigation in Superior Court in violation of inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

a. The Appellant served the State by email Appellant's Request for Production of Documents for the same accounting records and interest waiver records pursuant to Family Ct. R. Dom. Rel. P. 34, to which the State/Plaintiff has so far produced one set of book of accounts out of the seven different books of accounts. However, the numbers do not corroborate with any of the seven official legal representations of alleged arrears due, e.g., $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Appellant, as of November 30, 2021; $104,185.98 Total Payoff Amount on December 7, 2021; $75,638.00 on a Notice of Intent to Lien dated March 3, 2022 that RI OCSS rescinded based on alleged unspecified errors on October 14, 2022; $73,000.00 per RI OCSS Deputy Chief Counsel John Langlois's (staff counsel who also reports to Mr. Paul Gould, who was also the attorney of record for the State at the Appeals Hearing) representation at the agency RI EOHHS (Rhode Island

Executive Office of Human and Health Services) administrative

appeal Pre-hearing held on October 5, 2022; $55,000.00 on RI

OCSS correspondence with Meyersiek on October 13, 2022;

$75,623.71 Total Due for "Interest," online on the aforesaid OCSS

online account, as of November 30, 2022.  A screenshot taken on

December 3, 2022 thereof is attached to this Motion; $81,652.46

on the Motion as of December 22, 2022; this is in violation of,

inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20),

(21), (23), (24), (27), 666, 655, 658a that is consistent with the

State/Plaintiff's pattern of obstructing the Appellant of due process

right access to her case file records of RI OCSS's debt verification

itemized accounting calculations of very large sums of alleged

arrearages of at least 7 books of accounts from December 6, 2021

to the present in Title IV-D proceedings.

**N. JUDICIARY VIOLATION OF GOVERNMENT EDICTS DOCTRINE, CALCULATED FAILURE TO INTEGRATE TITLE IV-D AGENCY ELECTRONIC FILING SYSTEM WITH ODYSSEY MAKING THEIR FILINGS INVISIBLE TO ALL E-COURT USERS OTHER THAN THE JUDGE AND THEMSELVES AND VIOLATION OF ACCESS TO COURT INFORMATION OF PUBLIC TITLE IV-D PROCEEDINGS IN RHODE ISLAND'S STATEWIDE ELECTRONIC COURTS**

**a. DENIAL OF PUBLIC AND PRO SE-LITIGANT ACCESS TO COURT INFORMATION INCLUDING JUDGE-CREATED LAWS BY 42 USC 654(1) POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY**

The Rhode Island Judiciary is a political subdivision of the State of Rhode Island under 42 USC 654(1).  While publicizing during the implementation of the $6 million installation of Odyssey (the statewide electronic filing system) in 2014 that the electronic courts will enable ALL court users to pull up court record information with ease from their phones, the Rhode Island Judiciary quietly implemented Rule 5 of the Rhode Island Rules and Practice denying the Public, pro-se litigants and all parties to a case in Rhode Island remote access to court record information including judge-created orders and laws, including their own. Through this deceit, the Rhode Island Judiciary lied to the Public, while denying access and thereby covering up the routine ordering of unenforceable body of judge-created laws ordering 12% compound interest in public cases and public hearings under 42 USC 654 in public Title IV-D cases, such as Appellant's, by symbiotic pliant judges like Judge McCann and Magistrate Nahabedian.  The denial of access to pro-se litigants of their own cases' court records containing support orders violates, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.  The denial of public access to public court records documenting the routine systemic violations of 42 USC 654(21)(A) in electronic courts violates the First Amendment and the public's right to know the law, even if these fraud on the court unenforceable judge-created laws are unenforceable in both Rhode Island and elsewhere Title IV Part D reaches.  The

denial of public access to judge-created laws that is also motivated by cover-up

fundamentally violates the established Government Edicts Doctrine that the United

States Supreme Court specifically held applies to electronic formats of government

doctrines, such as judge-created laws in digital courts. See *Georgia v. Public*

*Resource.Org, Inc*., No. 18-1150, 590 U.S. ___ (2020).  The Appellant has been

denied access by the political subdivision Rhode Island Judiciary to her court

records and information regarding the orders in question that must be furnished

pursuant to 42 USC 654b thus in violation of 42 USC 654.  The Appellant has been

denied access by the political subdivision Rhode Island Judiciary to unenforceable

and impeachable judge-created fraud on the court void laws that routinely establish

unenforceable 12% compound interest by certain symbiotic pliant judges, like

Judge McCann and Magistrate Nahabedian, who work hand-in-hand with the

Rhode Island Office of Child Support Services in Title IV-D cases, in violation of

Appellant's Due Process and Equal Protection rights to know the law to be

meaningfully heard and right to meaningful access to justice – they are in violation

of, inter alia, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23),

(24), (27), 666, 655, 658a.

The family court held at the hearing in this matter scheduled on March 6,

2023 that the Rhode Island Office of Child Support Services is ordered to show

that the alleged arrears is accurate.  See attached March 6, 2023 hearing transcript.

Explicitly stated throughout 42 USC 654, "accuracy" requires no accounting

alterations generated offline then unsubstantiated hard inputs into the automated

system, no fraud, no inducements, no interstate extortion under color of state law,

and for certain no 12% compound interest on overdue support.

### b. CALCULATED FAILURE BY THE JUDICIARY TO INTEGRATE THE TITLE IV-D AGENCIES' ELECTRONIC FILING SYSTEM INTO ODYSSEY RESULTING IN AGENCY FILINGS BEING INVISIBLE TO ALL COURT USERS EXCEPT THE JUDGE AND THE AGENCIES THEMSELVES – COVER UP

Because under the State's Plan the Title IV-D agencies routinely file in the

Rhode Island court system for the illegal enforcement of illegal 12% compound

interest disallowed under 42 USC 654(21)(A), the political subdivision Rhode

Island Judiciary deliberately failed to integrate the Title IV-D Agencies' electronic

filing system with the State's electronic filing system Odyssey in order to make

Title IV-D Agency electronic filings invisible to all court users except the judge

and the agencies  themselves, calculated to cover up the 12% compound interest

from audit by the federal authorities and from the Public.  This came to light at the

WebEx hearing in this Title IV-D matter before family court Judge Merola on June

8, 2023 scheduled at 2PM, where Judge Merola, showing he was unaware of the

failure of systems integration, questioned Appellee Paul Gould of Rhode Island

Office of Child Support Services, why the Appellant is unable to see the agency's

electronic filings that the judge can see in the system.  Without hesitation, Appellee

Paul Gould explained that this is due to the electronic court implementation

process that was supposed to integrate the agency's legacy system to Odyssey,

demonstrating conclusively that Gould, the Lead Counsel of the Rhode Island

Office of Child Support Services responsible and overseeing agency court filings

in all Title IV-D cases under the State Plan, undisputedly was in the know and part

of the conspiracy involving the deliberate failure of filing system integration and

its continuing perpetration in Title IV proceedings that made Title IV agencies'

filings invisible as part of the cover up.

### c. FALSIFYING ACCOUNTING TO SHOW $0.00 PAYMENT IN DECEMBER 2021 in APPELLANT'S TITLE IV-D ACCOUNT POWERED BY THE AUTOMATED DATA PROCESSING SYSTEM IN ORDER TO DEFRAUD APPELLANT IN THE FUTURE

Appellant attaches hereto **EXHIBIT N**, that shows the Appellant's online

Title IV-D OCSS account which is powered by the Automated Data Processing

System, as of November 2022 at the time of the RI EOHHS Appeal, which showed

$0.00 Payment for December 2021.  Therefore, the Rhode Island Office of Child

Support Services through accounting fraud never recorded, as late as November

2022, in the Automated Data Processing System Appellant's large lump sum

payoff of $104,185.98 bank wired from Texas on December 7, 2021, showing

prima facie accounting fraud.  This shows a scheme to defraud the Texas Appellant

in the future.  This shows that the Rhode Island Office of Child Support Services

received Appellant's wired funds and treated it as a cash receipt, without ever recording in the automated data processing system such a large lump sum payment. Appellees Kevin Tighe, Barbara Grady, Gero Meyersiek, John Langlois, Paul Gould, and Priscilla Glucksman, among others, distributed the $104,185.98 among themselves in their organized conspiracy to defraud.  Appellant's lump sum payment was distributed allegedly via a check, not through the usual cash card on December 9, 2021, (see attached hereto TRAC record for December 2021) record information of which check that was allegedly issued by the Office of Child Support Services the agency refuses to furnish the Appellant, and which are under subpoena now.  Further, the Office of Child Support Service's maintaining a separate offline accounting system in this case constitutes fraud and accounting fraud, targeting the Appellant in Texas, targeting Texas properties and targeting the United States of America.  This is why they never utilized the 42 USC 654(7), (14), (20) and 42 USC 666(14) cooperative system with Texas, so as to enable them to divide the defrauded cash spoils offline among the members participating in the scheme.  This accounting fraud and scheme to defraud violate mail fraud, wire fraud, honest services fraud, RICO, record tampering, theft of the United States, false claims and felonious fraud, among others.

In reality, under 42 USC 651-669, employees who engage in, aid and abet and facilitate the above must be terminated and must not be permitted to continue

criminal activities of record tampering, accounting fraud, fraud, theft under color

of state law and cover up.

### f. CRIMINAL VIOLATIONS REPORTED TO SOME JUDGE OF THE UNITED STATES AND OTHER LISTED AUTHORITIES UNDER 18 U.S.C. sec. 4

The Appellant, in good faith and reliant on the plain language of 18 USC §

4, misprision of felony, as well as the Brief filed in the United States Supreme

Court by the United States of America in the Supreme Court case, ***Turner v.***

***Rogers***, 564 U.S. 431 (2011) that showed South Carolina (found by the 4th Circuit

Court of Appeals) liable for $75 million in penalties for that state's 42 USC 654

violations that did not even involve, inter alia, fraud and tampering with the record

or unlawful 12% compound interest put into then taken off then put back on the

automated data processing system as here in Rhode Island, made known the above

activities to "some judges" of "the United States" and other relevant federal

authorities – counting among the United States judges Appellant made known

publicly in the Amended Complaint filed in the United States District Court for the

District of Rhode Island, Judge William E. Smith. The issue of what Judge Smith

has done with the information "made known to him" is pending before the United

States Court of Appeals for the First Circuit before a requested panel of judges

under the federal law of civil procedure. Therefore, under 18 USC 4, the above

reported activities have been "made known" to several high ranking judges of the United States.

## A. VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Appellant made known to the panel of judges of the United States allegations contained in the Amended Complaint filed in Federal Court of the commission of acts by the Rhode Island political subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein in this motion, the afore-described acts violating **31 U.S.C. § 3279,** 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 – such violative acts by the Appellees in this matter, and/or Judge Smith on this list are not exhaustive.  It is undisputable, among others, that Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-D

and Title IV-A disgorgement is due from the applicable State of Rhode Island's political subdivisions.

## O. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in UNITED STATES OF AMERICA v. DONALD J. TRUMP, DC Circuit, the DC Circuit United States Court of Appeals reminds the Public and all applicable tribunals that Judges are similarly liable to the criminal laws for their official acts.  A notable example is *Ex parte Commonwealth of Virginia*, in which the Supreme Court affirmed the criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for violating a federal statute that prohibited discriminating on the basis of race in jury selection. Id. at 340, 344. The Supreme Court began by observing the principle that officers are bound to follow the law: "We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the holder from obligation to obey the Constitution of the United States, or take away the power of Congress to punish his

disobedience." *Id.* at 348. The Court then addressed the judge's argument that the Court lacked the authority to punish a state judge for "his official acts." *Id.* Its response was twofold. First, the Court described juror selection as "merely a ministerial act, as much so as the act of a sheriff holding an execution, in

determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads." *Id.* The Court then explained that even if juror selection is considered a "judicial act," the judge had a legal duty to obey the criminal laws:

> "But if the selection of jurors could be considered in any case a judicial act, can the act charged against the petitioner be considered such when he acted outside of his authority and in direct violation of the spirit of the State statute? That statute gave him no authority, when selecting jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing.

*Id*. at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

> [W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation of constitutional rights. On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress . . . .'

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting Gravel, 408 U.S. at 627). Similarly, in *Dennis v. Sparks,* the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity

because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id*. at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under *Fitzgerald*, but a judge has no criminal immunity for the same "official act." See also *Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock,* 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. See *United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings,* 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not immune, and employees of the political subdivisions of Rhode Island under 42 USC § 654(1) similarly are not immune.  Barbara Grady and Gero Meyersiek are undisputedly liable.

II.    **LACK OF JURISDICTION – APPELLEE 42 U.S.C. sec. 654(1) STATE PLAN POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (CREATED UNDER RIGL 8-6-3) LACKS JURISDICTION**

A. **RI'S 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY LACKS JURISDICTION TO ESTABLISH OR ENFORCE 42 USC sec. 654(21)(A) VIOLATIVE 12% COMPOUND INTEREST ON OVERDUE SUPPORT – DOING SO INCURS PENALTY UNDER 42 USC 654(24) AND REINFORCES ITS STATE PLAN'S INELIGIBILITY FOR FEDERAL FUNDING UNDER BOTH TITLE IV-D AND TITLE IV-A, WARRANTING DISGORGEMENT OF TANF AND TITLE IV-D FUNDING – SEE HODGES v. SHALALA**

The statutory provision of 42 U.S.C. 654(21)(A) makes it explicitly clear that Title IV-D and Title IV-A participating 42 USC 654(1) state political subdivisions, such as the political subdivision Rhode Island Judiciary, lack the authority to establish 12% compound interest.

To do so "routinely" simply incurs more penalties, more fines constituting more false claim consequences, and imprisonment of the culpable persons and agents.

**B. RI's 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (See RIGL 8-6-3) LACKS JURISDICTION OVER QUESTIONS AND MATTERS OF FEDERAL CRIMINAL VIOLATIONS BY RHODE ISLAND SDU OF ROUTINE RECORD TAMPERING WITH 42 U.S.C. 654a AUTOMATED DATA PROCESSING SYSTEM COMMITTING ACCOUNTING FRAUD (e.g., REMOVAL OF UNLAWFUL 12% COMPOUND INTEREST IN ORDER TO CONCEAL IT WHEN CERTIFYING TO OTHER STATE AUTHORITIES AND FEDERAL AUTHORITIES) AND THE CRIMINAL CERTIFICATION OF FRAUDULENT ACCOUNTS THAT CONTAIN MANUALLY REMOVED UNLAWFUL FRAUDULENT 12% COMPOUND INTEREST (UNDER COLOR OF RI'S PREEMPTED STATE LAW) FROM THE SYSTEM**

Title IV-D 42 USC 651-669, 31 U.S.C. § 3279, 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512,

18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18
U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C.
§1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513,
RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C.
§1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968
also make clear that the State Plan's 42 USC 654(1) political
subdivision limited jurisdiction Rhode Island family court
lacks jurisdiction over FEDERAL CRIMINAL
VIOLATIONS BY RHODE ISLAND SDU OF ROUTINE
RECORD TAMPERING WITH 42 U.S.C. 654a
AUTOMATED DATA PROCESSING SYSTEM
COMMITTING ACCOUNTING FRAUD (e.g.,
REMOVAL OF UNLAWFUL 12% COMPOUND
INTEREST IN ORDER TO CONCEAL IT WHEN
CERTIFYING TO OTHER STATE AUTHORITIES AND
FEDERAL AUTHORITIES) AND THE CRIMINAL
CERTIFICATION OF FRAUDULENT ACCOUNTS
THAT CONTAIN MANUALLY REMOVED
UNLAWFUL FRAUDULENT 12% COMPOUND

INTEREST (UNDER COLOR OF RI'S PREEMPTED

STATE LAW) FROM THE SYSTEM.


**C.  RI's 42 USC 654(1) POLITICAL SUBDIVISION JUDICIARY'S LIMITED JURISDICTION FAMILY COURT (See RIGL 8-6-3) LACKS JURISDICTION OVER FEDERAL CRIMINAL VIOLATIONS COMMITTED BY ITSELF INVOLVING CERTAIN SYMBIOTIC RHODE ISLAND FAMILY COURT JUSTICES, SUCH AS JUDGE JOHN McCANN AND MAGISTRATE SUSAN NAHABEDIAN, WHO KNOWINGLY AND ROUTINELY FRAUDULENTLY ESTABLISH AND ENFORCE UNLAWFUL 12% COMPOUND INTEREST TARGETING UNSUSPECTING NONCUSTODIAL PARENT VICTIMS**

Title IV-D 42 USC 651-669, 31 U.S.C. § 3279, 18 U.S.C. §2, 18

U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C.

§285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18

U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C.

§ 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18

U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18

U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506,

18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C.

§1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18

U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C.

§1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C.

§1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 also

make clear that the State Plan's 42 USC 654(1) political

subdivision Rhode Island family court lacks jurisdiction over

FEDERAL CRIMINAL VIOLATIONS COMMITTED BY

ITSELF INVOLVING CERTAIN SYMBIOTIC RHODE

ISLAND FAMILY COURT JUSTICES, SUCH AS JUDGE

JOHN McCANN AND MAGISTRATE SUSAN NAHABEDIAN,

WHO KNOWINGLY AND ROUTINELY FRAUDULENTLY

ESTABLISH AND ENFORCE UNLAWFUL 12% COMPOUND

INTEREST TARGETING UNSUSPECTING NONCUSTODIAL

PARENT VICTIMS.


## CONCLUSION

**WHEREFORE**, this Court should GRANT Appellant's herein motion to

stay the district court's Fed. R. App. P 4(a)(5) denials and to stay the tolling of

time to file a Notice of Appeal pending the Court's resolution of the pending

Appellant's March 8, 2024 Fed. R. App. P 27(b) Motion to Reconsider and extend

the time to file Appellant's Notice of Appeal or amended Notice of Appeal to April

2, 2024.  This Court should GRANT Appellant's March 8, 2024 Fed. R. App. P

27(b) Motion to Reconsider and extend the time to file Appellant's Notice of

Appeal or amended Notice of Appeal to April 2, 2024.  This Court should instruct

the clerks of the courts to correct the falsely altered record.  This Court should

order divestiture of jurisdiction of the district court throughout the pendency of the

appeal and the trial court is *functus officio*. This Court should appropriately and

fittingly sanction the district court actors involved in falsifying the record for

misconduct.  Appellant requests Oral Argument on all issues raised herein before

the Court.  Appellant requests any and all Relief deemed just.

<div style="margin-left:2em">

Respectfully submitted,

Mary Seguin
Pro Se
/s/     *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: March 24, 2024

</div>

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the
Court's ECF filing system on March 24, 2024, on all registered counsel of record,
and has been transmitted to the Clerk of the Court.

<div style="margin-left:2em">

Mary Seguin

</div>

Pro Se  *Mary Seguin*

/s/_____

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Exhibit A

 Gmail

**Mary Seguin <maryseguin22022@gmail.com>**

---

## Filing Submitted for Case: K20010521M; GERO MEYERSIEK vs. MARY SEGUIN; Envelope Number: 4544999
1 message

**no-reply@efilingmail.tylertech.cloud** <no-reply@efilingmail.tylertech.cloud>
To: maryseguin22022@gmail.com

Thu, Mar 21, 2024 at 6:49 PM



# Filing Submitted

Envelope Number: 4544999
Case Number: K20010521M
Case Style: GERO MEYERSIEK vs. MARY SEGUIN

The filing below has been submitted to the clerk's office for review. Please allow twenty-four (24) to forty-eight (48) hours for the clerk's office to process your filing.

| Filing Details | |
|---|---|
| **Court** | Family Court |
| **Date/Time Submitted** | 3/21/2024 7:47 PM EST |
| **Filing Type** | Motion to Compel |
| **Filing Description** | Defendant's Motion to Compel Compliance with Subpoena |
| **Type of Filing** | EFileAndServe |
| **Filed By** | Mary Seguin |
| **Filing Attorney** | |

| Fee Details |
|---|
| Your account is never charged until your filing is accepted. If you see any pending charges on your account prior to acceptance, the pending charges are an authorization hold to ensure that the funds are available so your filing can be accepted without delay. |
| If the filing is canceled or rejected, the funds will be released and will return to your account according to your financial institution's policies (typically three (3) to ten (10) business days). |

This envelope is pending review and fees may change.

| | |
|---|---|
| Case Fee Information | $0.00 |
| Motion to Compel | $0.00 |

**Total:**$0.00 (The envelope still has pending filings and the fees are subject to change)

| Document Details | |
|---|---|
| **Lead Document** | RI Family Court Motion to Compel Compliance with EXHIBITS OF Subpoena and 42 USC 654 and 654b and 655 FINAL 032124.pdf |
| **Lead Document Page Count** | 129 |
| **File Copy** | [Download Document](Download Document) |
| This link is active for forty-five (45) days. | |

For technical assistance, contact your service provider

Need Help? Help
Visit: https://rhodeisland.tylertech.cloud/ofsweb
Email: efiling.support@tylertech.com

Please do not reply to this email. It was automatically generated.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                    FAMILY COURT

| | | |
|---|---|---|
| State of Rhode Island ex rel. | : | |
| GERO MEYERSIEK | : | |
| *Plaintiff* | : | |
| | : | |
| VS. | : | DOCKET NO: K20010521M |
| | : | Title IV Part D Case under |
| | : | 42 U.S.C. §§ 651-669 |
| MARY SEGUIN | : | |
| *Defendant* | : | |

### DEFENDANT'S MOTION TO COMPEL COMPLIANCE WITH SUBPOENA

The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby moves to compel compliance with Defendant's Subpoena (attached hereto as **Exhibit A**) served upon the Rhode Island Office of Child Support Services, which is acting on behalf of the State of Rhode Island ex. rel. GERO MEYERSIEK, and acting as the "State Agency" under the Rhode Island State Plan under **42 U.S.C. § 654**, **42 U.S.C. § 654a**, **42 U.S.C. § 654b**, **42 U.S.C. § 666 *et al*.**, and all applicable state and Federal Laws, both civil and criminal, regulating Plaintiffs' actions and omissions under the legal framework of **Title IV-D of the Social Security Act**.  Defendant respectfully **requests and moves for a hearing on Defendant's herein Motion to Compel Compliance with Subpoena** – the Rhode Island Office of Child Support Services refuses to respond to and refuses to comply with the Subpoena, and filed a motion to quash the subpoena on March 20, 2024 - the requested information is further regulated and mandated to be produced under the State Plan in compliance under **42 U.S.C. § 654b**, therefore those

**requested documents must be produced by the State within this proceeding as well as without judicial compulsion**. The Subpoena further summons Kevin Tighe, Paul Gould and John Langlois to appear to Court to testify at the hearing scheduled in this matter on March 28, 2024 at 10:00 AM.

## I. RHODE ISLAND'S STATE PLAN'S PENALTY-INCURRING VIOLATIONS OF TITLE IV-D
## AND
## ORGANIZED CRIMINAL COMMISSION OF INTERSTATE FRAUD

Congress prescribed both civil and criminal penalties for violations. Consistent with its Spending Power, Congress has the authority to attach conditions on the receipt of federal funds. *See South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Title IV-D statute expressly provides that compliance with the 3-6% simple interest on overdue support, operating the automated system for accuracy and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. §§ 654(10), (14), (15), (16), (21)(A), (24), (27)A, § 654a, § 654b. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted). The Supreme Court has recognized that Congress intended the linkages between child support programs and the TANF program. *See Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely." The penalty provisions of the statute and the wording of the statute are plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submitted a corrective compliance plan, "the Secretary shall not

disapprove the State plan . . . and the Secretary shall reduce the amount otherwise payable to the State [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). "[B]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges v. Shalala*, 121 F.2d at 879.  Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, Rhode Island is liable for the statutorily prescribed penalties.[1]  Congress also enacted several criminal codes punishing actors, such as the Plaintiffs, who commit federal crimes, including cover up of unlawful activities.

Defendant filed a Motion to Dismiss Interest Arrears on February 4, 2024 and Defendant's Motion is scheduled on the Court's calendar to be heard on March 28, 2024.  For the hearing, the Defendant served the attached Subpoena, attached hereto as Exhibit A, upon the State ex. rel. Plaintiff, Rhode Island Office of Child Support Services, the State agency under the State Plan pursuant to **42 U.S.C. § 654.** *See* United States Congress's publication of cited applicable federal law:

https://uscode.house.gov/view.xhtml?hl=false&edition=prelim&req=granuleid%3AUS

---

[1] In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges v. Shalala, supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998. The State paid more than $55 million in penalties through 2007. South Carolina Dep't of Social Servs., Response to Budget Proviso 13.27 at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_
    Emphatically, note that South Carolina's violations and penalties do not involve deliberate alterations of and tampering with government records involved in accounting fraud, knowingly inputting 42 USC 654(21)(A) violative 12% compound interest into the automated system, then manually removing or adjusting them for purposes of certification purposes to Texas and to the United States in order to conceal the 12% compound interest from the noncustodial parent and to Texas and Federal authorities.

C-prelim-title42-

section654&f=treesort&num=0&saved=%7CY29kZSBvZiBmZWRlcmFsIHJlZ3VsYXRp

b25z%7CdHJlZXNvcnQ%3D%7C%7C1862%7Cfalse%7Cnull

Defendant subpoenaed "(1) All records, files, notes, public records, documents, films, materials generated in the course of administration and enforcement of relating to Defendant Mary Seguin, from 2010 to the present in this Title IV-D Case under the Social Security Act; (2) All records relating to Defendant Mary Seguin from 2010to the present, including notes and messages taken and generated on October 5, 2022."

*See* attached **subpoena**, **Exhibit A**.

The Rhode Island Office of Child Support Services' actions in this Title IV-D case's proceedings since 2010 with the entries of orders prepared and submitted in her official and individual capacities, Priscilla Glucksman, make clear the Office of Child Support Services is one of the State Plan's key "organizational unit which meets such staffing and organizational requirements as the Secretary may by regulation prescribe, within the State to administer the plan" under **42 U.S.C. § 654(3).**

**Rhode Island Office of Child Support Services' refusal** *to comply with the Subpoena is a prima facie* **42 U.S.C. § 654b violation that incurs penalties** in this **fiscal year under 42 U.S.C. § 655(a)(5) as well as 42 U.S.C. § 655(a)(4),** which penalty-incurring violations the Defendant had reported, is reporting and will continue to report to relevant law enforcement authorities at the federal and state levels. (Judicial notice is respectfully requested that the Defendant in January 2023 reported Office of Child Support's violations to the Rhode Island Office of Attorney General, who instead of enforcing the requirements of the State Plan as the Attorney General is

similarly a political subdivision under 42 USC 654(1), opted to reinforce, aid, shield and

protect Rhode Island political subdivisions' unlawful activities – this is reported to

United States authorities).  As a condition of receipt of any federal funding under Title

IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved

state plan for child and spousal support that meets all the requirements of 42 U.S.C. §

654.  Among the prerequisites for approval of a Title IV-D Plan are the requirements

that the State may only uniformly charge 3-6% simple interest on overdue support, *see*

42 U.S.C. § 654(21)(A), and a State must establish and operate an automated data

processing and information retrieval system ***without*** taking computer calculated

amounts off and then put other numbers back on the system or hardcoding/inputting

new numbers computed offline onto the system, see 42 U.S.C. § 654(24), and the State

**must** have a state child support disbursement unit (SDU) that complies with all the

requirements of 42 U.S.C. § 654, 42 U.S.C. § 654a, 42 U.S.C. § 654b, *see* 42 U.S.C. §

654(27)(A).  Rhode Island deliberately fails to meet all the requirements, including

continuously inputting 12% compound interest on overdue support and the Rhode

Island Office of Child Support Services covers up their noncompliance with accounting

fraud inputting into the system and taking off from the automated data processing

system amounts that are inflated, unlawful, and submitting false books of accounts that

removed the unlawful inflated amounts to the Federal authorities to make it look like

Rhode Island is in compliance so as to procure federal funding for which Rhode Island

is ineligible.

The deliberate fraud makes clear the State operates an unlawful plan, in fact a

criminally unlawful plan, and does not have an approved state plan under Title IV-D of

the Social Security Act, 42 U.S.C. §§ 651-669, and should lose and disgorge unlawfully procured federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). *See* 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).  *See*, *Hodges v. Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).

**Any attempt interfering with the Defendant's reporting, pursuant to 18 U.S.C. § 4, to law enforcement authorities the commission of crimes by political subdivisions of the State within this Title IV-D proceeding is unenforceable.**   Any and all failures to comply with 18 U.S.C. § 4 constitutes misprision of a felony.


**A. THIS PROCEEDING IS GOVERNED by 42 U.S.C. § 654 et al. UNDER TITLE IV-D THAT REGULATE <u>ALL POLITICAL SUBDIVISIONS</u> OF THE STATE OF RHODE ISLAND**


The Political Subdivision of the State of Rhode Island under **42 U.S.C. § 654(1)**, namely by and through the **Office of Child Support Services' Lead Legal Counsel Paul Gould,** Esq., made several claims before this Court under Oath throughout this Title IV-D case hearings and proceedings that **the laws of Congress do not matter, only this court orders matter and they do not need to conform to Congressional prescribed federal statutes.** *E.g.*,  See <u>Exhibit B</u> Transcript **of February 2, 2024** Hearing in this matter**.  Rhode Island is wrong and Paul Gould is wrong, and both know it.  That flagrant lawlessness is at the heart of the violations of federal law under color of state law in this interstate**

Title IV-D case.  **Rhode Island participates in Title IV-D, and** in so participating **through its State Plan, <u>must</u> comply** with **Title IV-D.  *See, <mark>Hodges v. Shalala</mark>*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003).  *See New York v. United States*, 505 U.S. at 161, Congress, under the Commerce Clause, may offer the States a choice of regulation under federal control or preemption under federal regulation. *See <mark>Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.</mark>*, 452 U.S. 264, 288 (1981).  The Title IV-D statute expressly provides that compliance with 42 U.S.C. sec. 654, and compliance with the automated data processing system and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A. The clear and unequivocal statement of the required conditions in the statute enabled Rhode Island to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." *See Dole*, 483 U.S. at 207 (citations omitted);  *See* South Dakota v. Dole, 483 U.S. 203, 206 (1987). The textual language of <mark>42 U.S.C. § 654(1)</mark> states,**

> **"A State plan for child and spousal support must—**
> **(1)    provide that it shall be in effect in <mark>all political subdivisions of the State"</mark>**

The facts and established law thus make it crystal clear *all political subdivisions* of Rhode Island, including the **Rhode Island Department of Human Services**, the **Office of Child Support Services <u>AND</u>** the **Rhode Island Judiciary political subdivisions of the State of Rhode Island <u>MUST</u> comply** with <mark>**42 U.S.C. § 654**</mark>.  However, because the Rhode Island Office of Child Support Services,

**the State Plan's SDU unit, flagrantly and expressly states in this Title IV-D case that Title IV-D statute and Congressionally prescribed federal statutes do not apply in this case nor in  Rhode Island, the State of Rhode Island's political subdivisions have flagrantly flouted 42 USC sec. 654 and then adjusted and tampered with the automated data processing system accounting to defraud the United States of federal funding, and to defraud the Defendant of her Texas properties.**

Therefore the Defendant respectfully reminds all participants involved in this Title IV proceeding and gives notice to the applicable State political subdivisions (*e.g.*, Rhode Island Judiciary) and agencies, including the SDU under the State Plan under ==**42 U.S.C. § 654(1)**==, *e.g.*, the **Rhode Island Office of Child Support Services,** that this yet again noncompliance by the State of Rhode Island with the Subpoenaed information egregiously constitutes yet another of the many numerous failures of Rhode Island agencies and its State Plan during this fiscal year to comply with the requirements of section 654b, as well as 654, 654a and 666 of Title IV which shall be considered yet another of the many numerous failures of the State to comply with subparagraphs (A) and (B)(i) of section 654(27) of this title during the fiscal year, that is clearly stipulated in 42 U.S.C. **§ 655(a)(5)(A)(ii) by a penalty amount of up to 30 percent of the penalty base, in the case of the fifth or any subsequent such fiscal year in which such a failure by the State occurs (regardless of whether a penalty is imposed under this paragraph with respect to the failure). (ii) The term "penalty base" means, with respect to a failure of a State to comply with a subparagraph of section 654(24) of this title during a fiscal**

year, the amount otherwise payable to the State under paragraph (1)(A) of this subsection for the preceding fiscal year.

Additionally, the deliberate noncompliance motivated by cover up makes clear the State knowingly and intentionally operates an illegal plan, the State knows Rhode Island does not have an approved state plan under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, and therefore should lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). *See* 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2).

## B. FRAUD

In this Title IV case, serial noncompliance, motivated by fraud, and their resulting incurred penalties, both civil and criminal, accrued since the initiation of this Title IV case fourteen years ago in **2010, upon Plaintiff Gero Meyersiek's application for services under Title IV through his own private attorney, *Barbara Grady*, whose former law firm partner and diseased husband *Paul Dugan*, was himself a former Senior Counsel of the Rhode Island Office of Child Support Services, one of the key Title IV-D agencies under Rhode Island's State Plan charged under 42 U.S.C. § 654(3) with State compliance with 42 U.S.C. § 654, 654a, 654b, 655, 658a, among others – Barbara Grady through Paul Dugan has intimate knowledge of and is a knowing participant in the State's accounting fraud reporting to the United States for federal funding reimbursement and federal funding Incentive Payment payouts (658a) worth hundreds of millions of dollars under the Title IV Program to the Secretary and Department of Health and Human Services, among**

others.  Upon information and belief, the Plaintiff Gero Meyersiek and Barbara Grady and the Rhode Island Office of Child Support Services have a series of unlawfully obtained "12% compound interest" money receipt sharing arrangements involving the fraudulent procurement through the Title IV framework of exorbitant 12% compound interest interstate targeting Defendant's Texas properties on overdue support enabled through accounting fraud, among others – this arrangement involving interstate defraud of the Texas Defendant and simultaneous theft of the United States of ineligible Title IV funding entails, *inter alia*, the Rhode Island Office of Child Support Services discussing in great detail at length with Barbara Grady the agency's fraudulent removal from the 42 U.S.C. § 654(24), 42 U.S.C. § 654(27) and 42 U.S.C. § 654a mandated automated data processing system of 12% compound interest when sending to Texas in 2018 thus creating fraudulent books of accounts under 42 U.S.C. § 666(14)(A)(ii)(I) and (II) *fraudulently certifying to Texas via wire and via mail inaccurate support due accounts* – discussions of this scheme further violated the Defendant's privacy rights, that are documented in the TRAC record of the Defendant's Title IV case file for December 2021 recording the agency's discussions with Barbara Grady at length regarding taking interest off when sending to Texas, and keeping it off the system when communicating to Defendant that Gero Meyersiek waived interest, and then putting interest back on the system after they defrauded the Defendant inducing the Defendant to payoff support that comprised of the principle in one lump sum of $104,185.98 in consideration of Gero Meyersiek waiving

interest – the agency discussing its illegal and criminal enforcement information with Barbara Grady is in itself a violation of 42 U.S.C. 654 (26)(A) that mandates the State Plan to have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the **privacy rights of the parties**, such as this Texas Defendant, including—

(A)**safeguards against unauthorized use or disclosure of information relating to** proceedings or **actions to** establish paternity, or to establish, modify, or **enforce support**.

See Exhibit B. Rhode Island Office of Child Support **TRAC** document for December 2021 attached hereto as **EXHIBIT B**.

Under **Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669**, the Texas Defendant has the **protected** right to be furnished under Subpoena with all TRAC records in Defendant's Title IV-D case file from 2010 to the present to establish the accuracy of the alleged Rhode Island computations mandated to be performed by the automated data processing system, but has instead been hard-programmed numbers created offline that are then manually input into the automated data processing system several times, thus fabricating several different Rhode Island-certified false books of accounts of amounts due transmitted by mail and by wire to Texas and the Texas Defendant and to the United States for the purposes of procuring federal funding under Title IV-D and Title IV-A that violate Federal and Texas State civil and criminal codes.  The Rhode Island Office of Child Support Services refuses to

produce any TRAC records for 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021 January to November, 2023 and 2024.

This violation of, among others, 42 U.S.C. 654(26)(A) constitutes a violation of 42 U.S.C. 654(27) that counts as a penalty in the many violations in fiscal year 2021 alone which exceeds 30% of the penalty base in 2021 – and that's just civil penalties under Title IV – numerous other federal criminal and civil violations incurring additional penalties are applicable, including Texas criminal and civil code violations.

### C. 42 U.S.C. § 654b(4)

Under Rhode Island's State Plan, the Rhode Island Office of Child Support Services is mandated to **"furnish to any parent, upon request, timely information on the current status of support payments under an order requiring payments to be made by or to the parent."**

Therefore, information relating to the Orders in question and relevant information relating to those orders **must** be furnished. Information relating to the putting of 12% compound interest on the automated data processing system from 2010 to the present must be furnished. Information relating to the removal of any alleged computed online or offline related to 12% compound interest from the automated data processing system in 2018 and at any and all times from 2010 to the present must be furnished. Information relating to the waiver by the Plaintiff by and through his private attorney Barbara Grady of the 12% compound interest that was represented to Defendant as the $0.00 showing under interest calculated by the automated data processing system in Defendant's case file on December 6, 2021 must be furnished. Information relating to the Rhode Island Office of Child Support Services calculated

total due showing $92,214,56 calculated by the automated data processing system in

Defendant's case file on December 6, 2021 that calculates arrears from 2010 must be

furnished.  See attached hereto **December 6, 2021 screen shot of the Defendant's**

**online OCSS account** showing the calculated amounts of which is mandated by Title

IV-D to be populated by the automated data processing system as **EXHIBIT C**.

Information relating to the interest amount before it was taken off the automated data

processing system in 2018 must be furnished, as well as any time interest was taken off

the system from 2010 to the present.  Information relating to the interest put back on

the automated data processing system in 2021 after Defendant accepted the

$104,185.98 payoff number given by Office of Child Support Services by wire via email

must be furnished.  Information relating to how $104,185.98 was computed by the

automatic data processing system on December 7, 2021 must be furnished, when the

automated data processing system calculated $92k just the day before on December 6,

2021 must be furnished.  Information relating to how $75,658.00 was calculated by the

automated data processing system on March 3, 2022 that was then issued to Texas to

lien Texas properties by Mail and by wire must be furnished.  And this is not exhaustive

– see Subpoena attached hereto as Exhibit A.


**D. 2012 JUDGE McCANN (and 2024 MAGISTRATE NAHABEDIAN)
VIOLATIONS of 42 U.S.C. § 654(21)(A) – EIGHT FAILURES AND
PENALTIES (FOUR IN 2012 and FOUR IN 2024 by and through POLITICAL
SUBDIVISION RI FAMILY COURT) – (THIS DOES NOT INCLUDE
CRIMINAL AND CIVIL PENALTIES UNDER APPLICABLE CRIMINAL AND
CIVIL CODES UNDER FEDERAL LAWS AND TEXAS LAWS)**

This Court took judicial notice on February 10, 2023 of the *issuance* of two Orders issued by Judge McCann in 2012. Magistrate Monaco clarified at the hearing on March 6, 2023 he did NOT take judicial notice of the contents of the orders, only the issuance of the orders. See attached transcript of March 6, 2023 hearing. **Exhibit D**.

Those 2012 orders were issued by Judge McCann of the Rhode Island Family Court, a political subdivision of the State, in which the State Plan must be in effect under 42 U.S.C. **§ 654(1).** Therefore, it is crystal clear that **the Rhode Island Family Court and its justices under the State Plan MUST comply with all provisions of Title IV-D, including** U.S.C. **§ 654(21)(A)** that makes it crystal clear **interest on overdue support must be between 3-6% simple interest.** However, **Judge McCann knowingly ordered 12% compound interest in this interstate Title IV-D on overdue support to be illegally put into the** State Plan's **automated data processing system mandated under** U.S.C. **§ 654a and** U.S.C. **§ 654b in knowing violation of 42 U.S.C. § 654(21)(A). Certainly, the Rhode Island Office of Child Support Services today claims 12% compound interest was what Judge McCann ordered, undisputedly making Judge McCann an accomplice.** The knowing violation of the political subdivision Rhode Island Family Court by and through Justice **McCann of 42 U.S.C. § 654(21)(A) through fraud on the court and under color of state law violates 42 U.S.C. § 654(24), 42 U.S.C. § 654a and 42 U.S.C. § 654b and incurs FOUR failures and penalties in this case alone for the fiscal year 2012 under 42 U.S.C. § 655(a)(4) and 42 U.S.C. § 655(a)(5), through just the State family court political subdivision alone.**

In 2024, the Rhode Island political subdivision of the family court by and through Magistrate Nahabedian flagrantly declared at the February 2, 2024 hearing in this matter that the State knowingly orders to be put into the automated data processing system 12% compound interest in Rhode Island under color of state law and through fraud on the court in knowing violation of the Rhode Island certified approved State Plan that mandates 3-6% simple interest under 42 U.S.C. § 654(21)(A), with her actions representing **four** failures and penalties in fiscal year **2024**.  See transcript **Exhibit F.**  Failure of compliance with all provisions of Title IV-D results in the State's loss of federal funding for Title IV-D and Title IV-A under Federal Law.  **See Exhibit E, Court Reporter Certified Transcripts of February 2, 2024 Title IV case hearing in this matter.**

**E. 2012 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES (and 2012 Priscilla Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and 42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 – OVER TWENTY FAILURES AND INCURRED PENALTIES in 2012 by and through POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES THROUGH FRAUD AND UNDER COLOR OF STATE LAW**

In order to cover up the flagrantly unlawful 12% compound interest that represents unlawful and fraudulently obtained and extorted under color of law Rhode Island State revenue through the Social Security Act in welfare cases, **Rhode Island Office of Child Support Services adopted the Official Policy not to pursue interest in interstate cases (in order to cover it up from federal authorities and other state authorities see 42 USC sec. 666(14) – cooperation with other states – EXHIBIT F  Attached hereto Rhode Island Office of Child**

Support Services **<mark>Official Written Policy</mark>** that was produced by RI OCSS during February 10, 2023 court ordered discovery. This policy document evidences the official policy of criminal and civil fraud by the State of Rhode Island's political subdivisions applicable under 42 U.S.C. § 654(1).

This policy evidences the routine extortions of noncustodial parents through the enforcement of 12% compound interest in-state under color of state law that incur penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences the political subdivisions of Rhode Island's concealment and cover up from out-of-state and federal authorities of the State's illegal extortion of 12% compound interest under color of state law by adopting an official policy <u>not to pursue interest</u> in out of state interstate cases that incurs penalties under Title IV-D and Title IV-A, and all applicable criminal codes.

This policy evidences accounting fraud concealing 12% compound interest applied to certain selected out-of-state cases such as the Defendant's, as well as accounting fraud adjustments that conceal the 12% compound interest in in-state cases when submitting for Title IV-D and Title IV-A reimbursement to the United States.

The pattern of agency discussions and considerations of its illegal and criminal enforcement information with Barbara Grady is in itself an organized scheme involving schemes to commit accounting fraud and false

certification of Title IV-D accounts, in violation of, inter alia, **42 U.S.C. 654 (26)(A) that mandates the State Plan to have in effect safeguards, applicable to all confidential information handled by the State agency, that are designed to protect the <mark>privacy rights of the</mark>** Texas Defendant.

In 2012, Priscilla Glucksman, individually and on behalf of the Rhode Island Office of Child Support Services, **under 42 U.S.C. 654(1), on oral motion moved for 12% compound interest, that by Rhode Island's official policy should not be pursued in this interstate Title IV-D case, with the intent and scheme to commit accounting fraud and fraudulent certification of amounts due by removing the 12% compound interest from the automated data processing system in the anticipated event Rhode Island sends it to Texas authorities and Federal authorities for enforcement under 42 U.S.C. 666 (14)**. Priscilla Glucksman schemed with Barbara Grady and Gero Meyersiek to orally move for interest in order to minimize a paper trail of paper filings in this interstate Title IV case so that a written record of the ordered 12% compound interest is buried within a one line of the order, with no documentation of a written paper motion that would otherwise contain or omit the State's legal justification moving for 12% compound interest in this interstate Title IV-D case. In 2012, Paul Dugan was alive and participated in the arrangement. The symbiotic pliant Judge McCann readily complied under color of state law, knowing fully well 12% compound interest is not enforceable in any state and definitely not enforceable in Texas under Title IV-D, and knowing that Rhode Island Office of Child Support Services intended to remove the interest amount if and when Rhode Island sends to Texas for collection while falsely certifying the total amount due and then put

the interest back on the system and then file a subsequent motion to set interest arrears

back in Rhode Island through the symbiotic pliant family court political subdivision of

the State of Rhode Island before a symbiotic pliant judge like Judge McCann,

committing interstate fraud in violation of, *inter alia*, 42 U.S.C. sections 652-669, RICO,

wire fraud, mail fraud, tampering with government records and accounting fraud.  This

list of criminal codes violated by the Plaintiffs is not exhaustive.  Defendant shall

present a list of the violated federal criminal codes later in this motion under Section IV

of this motion.

**F. 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021, 2022, 2023, 2024 RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES (and 2012 Priscilla Glucksman) VIOLATIONS of 42 U.S.C. § 654(21)(A) and 42 U.S.C. 654 (26)(A) and 42 U.S.C. § § 652-669 and Title IV-A – OVER TWENTY ANNUAL FAILURES AND INCURRED PENALTIES in 2013-2024 by and through POLITICAL SUBDIVISION RI OFFICE OF CHILD SUPPORT SERVICES THROUGH FRAUD AND UNDER COLOR OF STATE LAW**

Title IV-A TANF benefits are conditioned upon the State's compliance with ***all***

requirements of **42 U.S.C. § 654,** and from 2012 to 2024 and on-going, based on

violations in this case alone, Rhode Island has been and continues to be ineligible and

the State is receiving funds through false representations and alteration of government

records to procure federal funding.  From 2012 to 2024, Defendant has the information

to aver that the State of Rhode Island's political subdivisions under **42 U.S.C. § 654(1)**

sent by mail and by wire false accounts of amount due and of liens that contained Title

IV-D violative illegal and unenforceable 12% compound interest fraudulently

misrepresented as "child support due" to multiple institutions, including banks, credit

bureaus to Texas in violation of Texas Penal Codes that carry additional fines and jail

time.  Then Rhode Island Office of Child Support Services and the financial comptroller
of the Rhode Island Judiciary and the State Treasurer's Office fraudulently concealed
through removal and other false accounting itemizations the 12% compound interest
when sending to United States Department of Health and Human Services for federal
incentive payments payouts and federal funding payments under Title IV-D and Title
IV-A.

The total Title IV penalties incurred, disgorgement due back to the United States
for ineligible Title IV-D and Title IV-A funding, and criminal fines incurred by Rhode
Island in this case alone from 2012 to 2024 run upwards of hundreds of millions of
dollars.   From 2012 to 2024, Rhode Island's Title IV-D political subdivisions conspired
to violate, in addition to 42 U.S.C. 654(21)(A), among others, several requirements
under 42 U.S.C. 654 whose plain textual requirements requires the State Plan **MUST**:

**(7)**provide for entering into cooperative arrangements with appropriate courts
and law enforcement officials and Indian tribes or tribal organizations (as defined in
subsections (e) and (l) of section 5304 of title 25) (A) to assist the agency administering
the plan, including the entering into of financial arrangements with such courts and
officials in order to assure optimum results under such program, and (B) with respect to
any other matters of common concern to such courts or officials and the agency
administering the plan;

**(10)** provide that the State will maintain a full record of collections and
disbursements made under the plan and have an adequate reporting system;

**(14)**

**(A)**

comply with such bonding requirements, for employees who receive, disburse, handle, or have access to, cash, as the Secretary shall by regulations prescribe;

**(B)**

maintain methods of administration which are designed to assure that persons responsible for handling cash receipts shall not participate in accounting or operating functions which would permit them **to conceal in the accounting records** the misuse of cash receipts (except that the Secretary shall by regulations provide for exceptions to this requirement in the case of sparsely populated areas where the hiring of unreasonable additional staff would otherwise be necessary);

**(15)**provide for—

**(A)**

a process for annual reviews of and reports to the Secretary on the State program operated under the State plan approved under this part, including such information as may be necessary to measure State compliance with Federal requirements for expedited procedures, using such standards and procedures as are required by the Secretary, under which the State agency will determine the extent to which the program is operated in compliance with this part; and

**(B)**

a process of extracting from the automated data processing system required by paragraph (16) and transmitting to the Secretary data and calculations concerning the

levels of accomplishment (and rates of improvement) with respect to applicable performance indicators (including paternity establishment percentages) to the extent necessary for purposes of sections 652(g) and 658a of this title;

**(16)**

provide for the establishment and operation by the State agency, in accordance with an (initial and annually updated) advance automated data processing planning document approved under section 652(d) of this title, of a statewide automated data processing and information retrieval system meeting the requirements of section 654a of this title designed effectively and efficiently to assist management in the administration of the State plan, so as to control, account for, and monitor all the factors in the support enforcement collection and paternity determination process under such plan

**(20)**

**provide, to the extent required by <u>section 666 of this title</u>,** particularly the Due Process protections, that the State (A) shall have in effect all of the laws to improve child support enforcement effectiveness which are referred to in that section, and (B) shall implement the procedures which are prescribed in or pursuant to such laws.

**(23)**

provide that the State will regularly and frequently publicize, through public service announcements, the availability of child support enforcement services under the plan and otherwise, including information as to any application fees for such services

and a telephone number or postal address at which further information may be obtained

and will publicize the availability and encourage the use of procedures for voluntary

establishment of paternity and child support by means the State deems appropriate

## G. COVER UP AND FRAUD

In 2012, the child in question was 12 years old.  From 2012 to 2018, Defendant

does not have any records (due to several prior Title IV-D information denials by the

Rhode Island Office of Child Support Services for purposes of cover-up, that further

incurred penalties and fines for each and every information denial under 42 USC

654(24) and 42 USC 654(27) and 42 USC 655) of Rhode Island's political subdivisions

under 42 USC 654(1) sending to Texas or to federal authorities the support amount for

enforcement under 42 USC 654(7) or 42 USC 666(14).  Obviously, sending the support

amount in the automated data processing system without the removal of the interest

from the system exposes the illegal 12% compound interest disallowed under 42 USC

654(21)(A), which would incur Title IV-D and Title IV-A penalties, disgorgement of

ineligible federal funds and incur criminal fines.  It is for this very reason that the Rhode

Island political subdivisions adopted the written official policy not to pursue interest in

interstate cases, that moreover runs afoul of 42 USC 654(21)(A) plain language that the

State Plan must apply UNIFORM interest on overdue support, not State-targeted 0% in

some interstate cases and then 12% compound interest in all other cases, such as in this

case.  Moreover, if the State claims they actually did send notices of support due to the

Defendant in Texas, each transmission would constitute patterns of federal crimes,

including Mail Fraud, since the 12% compound interest in this Title IV-D case is illegal

and fraudulent and unenforceable.  This scheme is in violation of 42 USC §§ 654(7), (10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions under 42 USC 654(1) also transmitted by wire and by mail to the United States Department of State a hold on the renewal of Defendant's passport, again omitting and concealing the principle amount as well as the fact that the State attempts to enforce interstate an illegal 12% compound interest on overdue support.  This scheme is in violation of 42 USC §§ 654(7), (10), (14), (15), (16), (20), (21), (23), (24), (27).

Upon information, the State of Rhode Island's political subdivisions made the illegal decision between top management employees of the Rhode Island SDU unit, dressed up as "administrative decision," to illegally and criminally remove the illegal 12% compound interest from the automated accounting data processing system that clearly is required to prevent activities "**to conceal in the accounting records" Rhode Island's** illegal 12% compound interest prescribed under 42 U.S.C. § 654(14). *See* TRAC records attached hereto in ==**Exhibit B**==.

Upon information, Rhode Island routinely removes the illegal 12% compound interest from the automated data processing system when reporting to the Secretary of the United States Department of Health and Human Services in violation of 42 USC §§ 654(10), (14), (15), (16), (20), (21), (23), (24), (27), and applicable federal criminal codes.  See TRAC records attached hereto in Exhibit B of the routine practice of illegal accounting adjustments of the automated data processing system in the hundreds of thousands of dollars in December 2021 alone.  In this case alone, the aforesaid accounting fraud and record tampering violations motivated by theft of the Title IV-D

and Title IV-A programs and defraud of the Texas Defendant targeting Texas properties occurred in 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2021, 2022, 2023, and 2024.

## II.   FACTUAL ALLEGATIONS

The child in question was emancipated in April 2018 and is now an adult 24 years old.  Therefore accrued "interest on overdue support" stopped in April 2018.

Due to the hold placed on Defendant's passport renewal, Defendant discovered on and around November 2021 there is alleged support due.  Defendant retained a lawyer in Texas to contact the Rhode Island Office of Child Support Services to obtain information on the amount due.  The Rhode Island Office of Child Support Services refused to provide information to Defendant's Texas attorney, in violation of 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), and concealed the fact that the agency illegally removed the illegal 12% compound interest amount from the automated data processing system from 2018 to December 2021.  To this day, the Rhode Island Office of Child Support Services covers up and refuses to furnish information to the Defendant the amount of interest that was removed from the system.  Continuing refusal to furnish requested information motivated by cover up is in violation of, *inter alia*, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).  The Office of Child Support Services and Barbara Grady and Gero Meyersiek schemed to deprive Defendant of counsel that would facilitate defrauding the Defendant and to conceal from Texas counsel the accounting fraud relating to the illegal 12% compound interest that is unenforceable in Texas as well as legally unenforceable in Rhode Island (however

routinely enforced through fraud under color of state law) under Title IV-D, and refused to deal with Defendant's Texas attorney, fraudulently claiming it is the State's policy to deal with the noncustodial parent directly.  This is obviously a blatant lie because the TRAC record shows Kevin Tighe initiating phone calls directly to Barbara Grady, Gero Meyersiek's private attorney (and not contacting Gero Meyersiek directly) to discuss enforcement actions in detail involving the Rhode Island Office of Child Support Service's fraudulent accounting that entailed the agency's removal in 2018 (when it planned to send to Texas) of the interest from the automated system in December 2021. This is in violation of, *inter alia*, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).  The Defendant avers and declares, under oath, the following facts:

1. On December 6, 2021, the State/Plaintiff showed the Defendant her OCSS online account that showed $0.00 under interest.  Further the online account that is populated by the automated data processing system shows $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Defendant, as of November 30, 2021. See attached Screen Shot attached hereto this motion.  (The Office of Child Support Services told the Defendant that the $0.00 under interest shows that Gero Meyersiek waived interest.  The Office of Child Support Services deliberately misrepresented by omission that the interest amount was taken off the system illegally in 2018 and that the interest amount was calculated pursuant to an illegal 12% compound interest that is unenforceable under Title IV-D.  Therefore in reality there was no consideration given to the Defendant, as falsely represented, calculated to induce the Defendant into

paying a large lump sum amount. The Office of Child Support Services brokered a settlement deal between the Defendant and Gero Meyersiek where Meyersiek waived interest in consideration of the Defendant paying a lump sum payoff amount of $104,185.98 from Texas, which the State, under its authority, agreed to the deal with the Defendant on December 7, 2021, having calculated the $104,185.98 figure by and through its accountant(s) manually offline and not by the mandated automated data processing system, and actively brokered the terms of the deal itself, namely, Deputy Legal Counsel Kevin Tigue who reports to Mr. Paul Gould, the attorney of record who filed the State's/Plaintiff's Motion to Set Arrears.   The Defendant requests this Court to take notice of the fact that the State also failed to provide this Court as well as to the Defendant an accounting now and upon Defendant's request at the time in 2021 of how this figure $104,185.98 was calculated nor how the alleged $81k is calculated.  This is in violation of, *inter alia*, 42 USC §§ 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

2. The State's/Plaintiff's' authority to forgive arrears debts is an official policy and authority reported to the Office of the U.S. Commissioner Tangular Gray of the Office of Child Support Enforcement of the U.S. Department of Health and Human Services.

3. The Defendant in Texas good faith accepted and paid the $104,185.98 on December 7, 2021.

4. From December 6, 2021 to the present, the State/Plaintiff has represented to the Defendant at least seven (7) sets of books of very large arrears and interest

calculations, which the State/Plaintiff has either failed or refused to provide the Defendant with requested documentation of debt validation and verification records supporting the State's calculation (in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27)):

a.  $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Defendant, as of November 30, 2021. (Screenshot of this taken on December 6, 2021 is attached to this Motion).

b.  $104,185.98 Total Payoff Amount on December 7, 2021.

c.  $75,638.00 on a Notice of Intent to Lien dated March 3, 2022. RI OCSS rescinded this figure based on alleged unspecified errors on October 14, 2022.

d.  $73,000.00 per RI OCSS Deputy Chief Counsel John Langlois's (staff counsel who also reports to Mr. Paul Gould, who was also the attorney of record for the State at the Appeals Hearing) representation at the agency RI EOHHS (Rhode Island Executive Office of Human and Health Services) administrative appeal Pre-hearing held on October 5, 2022.

e.  $55,000.00 on RI OCSS correspondence with Meyersiek on October 13, 2022.

      f.   $75,623.71 Total Due for "Interest," online on the afordsaid OCSS

online account, as of November 30, 2022.  A screenshot taken on

December 3, 2022 thereof is attached to this Motion.

      g.   $81,652.46 on the Motion as of December 22, 2022.

5.   Maintaining at least seven books of account in Defendant's case file, while

obstructing the Defendant's 42 USC 654b and all Title IV-D protected due

process right to documents of accounting validation and verification depriving

the Defendant's right to meaningfully refute the State's claim is unlawful,

covers up the illegal 12% compound interest that is also ballooned through

several fraudulent manual accounting calculations NOT USING the Title IV-D

mandated automated data processing system.  There are pending breach of

contract, fraud and Civil RICO et al actions in Federal Courts regarding the

conduct of the Plaintiffs.

6.   The Defendant respectfully requests the Court to take notice of the fact that

the alleged interest published online by the State/Plaintiff as of November 30,

2022 that states the very specific number of $75,623.71 ballooned to

$81,652.46 as of December 22, 2022, by a whopping $6,028.75 in a matter of

22 days as stated in the State's/Plaintiff's Motion, is usurious, and clearly

shows the falsity of the State's/Plaintiff's Motion, paragraph numbered 8 that

says, "That, because interest only accrues on principal balances and not on

interest balances, the interest balance owed on arrears has not changed since

the principal balance was paid in full on December 9, 2021."  This is in

violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

7.  The Defendant avers it is nigh on impossible for the Defendant to be able to respond to the State's/Plaintiff's Motion and their unverified and unvalidated seven (7) books of accounts represented by the State/Plaintiff since December 6, 2021 to as of December 22, 2022, where the State's/Plaintiff's calculations of very large amounts have been clearly either refuted and rescinded or have shown to be inaccurate or false.  This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27).

8.  The Defendant respectfully requests the Court to take notice of the fact that after the Defendant accepted the deal in Texas and paid the payoff amount of $104,185.98 from Texas on December 7, 2021, the State/Plaintiff sent to the Defendant in Texas by Mail a Notice of Intent to Lien dated March 3, 2022 for $75,638.00 without any information justifying the fraudulent interest lien on Defendant's Texas properties – the $75,638.00 amount on the fraudulent lien on Defendant's Texas properties was deliberately calculated manually then hard input into the automated data processing system in violation of Title IV-D.  This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27). The Defendant appealed this fraudulent lien to the Appeals Office of Rhode Island Executive Office of Health and Human Services ("RI EOHHS"), a political subdivision of the State of Rhode Island applicable under 42 USC 654(1), on April 1, 2022. Throughout the procedurally defective appeals process where the Defendant was denied by the

State/Plaintiff to access her case file, the State/Plaintiff refused or ignored the

Defendant's over ten(10) record requests for the legal and accounting basis of

the $75,638.00 lien.  Each record information denial is in violation of, *inter*

*alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24),

(27). The Defendant also submitted to the Appeals Office records of the

written email advisement by the State/Plaintiff that "accounting says" to pay

$104,185.98 and records of the Defendant's bank wire transfer payment.  The

Appeals Office continued the hearing for the maximum 3 times due to the

State/Plaintiff's refusal to comply with discovery that would render the

proceeding procedurally defective.   Paul Gould and John Langlois were listed

as representing the State.  Their collective violations incur penalties and fines

under, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21),

(23), (24), (27), 655, 658a, Title IV-A. To resolve the discovery issues, the

Executive Hearing Officer ("EHO"), Debra DeStefano, scheduled a telephonic

Prehearing Conference on October 5, 2022, and only when told by the EHO

the burden of proof lies on the State/Plaintiff to show arrears are due (as

applies here), did John Langlois (who attended the Prehearing Conference)

state the following, which the Defendant in Texas recorded as a party of the

call:

"EHO: The agency will have to submit proof of the allegation for arrears to

support their position.

Langlois: The reason why I asked earlier whether Mary spoke to Karla after she made the payment was because there was a change of circumstances right after that.  I don't know if anyone in my agency had ever explained that to Mary.

Seguin: Wait a minute, wait a minute,

EHO: Wait Mary, I know what you asked for, let me get to what John just said, so John, you said there was a change in circumstances subsequent to her making a payment but before the notice of lien went out?

Langlois: Yeah.

EHO: OK, so...

Langlois: Can I just back up and explain what happened, 99% of this is a misunderstanding...

EHO: OK?

Seguin: Including what was on the screenshot, was that a misunderstanding??

Langlois: Can I speak without being shouted over?

Seguin: I am flabbergasted, really.

Langlois: What happened in this case is when Mary's representative, her attorney, called us in late November 2021, and said she wants her passport released and what does she have to do to release her passport, they put her in touch with Karla who gave her the $104,185.98  number.  Where that number came from, was one of our attorneys contacted the custodial parent, Gero Meyersiek, so we contacted his attorney, it wasn't me, it was someone in my office, and said if she's willing to make a $104K to

pay off the principle, would you agree to waive the $73K in interest? He said yes.  So Karla notified Mary that if she paid the $104K, it would be paid in full because he was willing to waive the interest and accept just the principal.  What happened was the day after Karla spoke to Mary to wire in the $104K the attorney for Mr. Meyersiek contacted us again and said he changed his mind, please put the interest back on the system, so we did.  So the number that was given to her on the day it was given to her was correct, the $104K, because he was waiving the interest, but then changed his mind, so we put the interest back on the system, because he was waiving the interest, and that interest was put back on the system and that's why the system is now saying she owes $73K.  That's why in March when the system saw that she had some sort of personal injury insurance in the system, our system was showing she owed $73K so we issued the lien.  But that was what happened, he changed his mind the next day and that's what messed up the numbers. So that's how all this happened, it was a pure misunderstanding, I don't know whether anyone has ever explained that to Mary how that happened.

EHO: OK, Mary, did anyone ever explain that to you before?

Seguin: No. No one ever explained any of that.  This is why I am asking for my case file, I think this is more basis to ask for my entire case file from 2020.  It's news to me for example and its new information to me that your office's lawyer would not talk to me directly but would be picking up the phone and calling the attorney for the custodial parent.  And then not saying you were doing this deal.  I never offered $104K.  You had determined this number, and that's why I am looking for documentation as to whether this is something you guys do in every case.

EHO: OK, John, are you intending to submit then, the documentation showing the full balance, which would include the principle and the interest before she paid the $104k, and then what happened after, you're prepared to submit documentation to show everything that you said just happened.

Langlois: Yes.  I can show the account balance before he agreed to waive the interest.  And I can show you the account balance after she made the payment. And then when we put the interest back on the system.

EHO: And you're going to testify as to why it all occurred, I mean basically what you just told us.

Langlois: Yes.

Seguin: But the screenshot on December 6th showed $93K."

A true copy of the recording evidence has been submitted by the Defendant to this court, a Rhode Island political subdivision under Title IV-D proceeding in June 2023 and in February 2024.

However, instead of going forward with the testimony and providing the alleged debt validation and verification accounting records promised by John Langlois to the EHO at the upcoming RI EOHHS scheduled Appeal Hearing at the time on December 1, 2022, the State/Plaintiff opted to rescind the Notice of Lien that states there are unspecified errors on October 14, 2022, and emailed the RI EOHHS Appeals Office that the State/Plaintiff will litigate the issue in Family Court.  This showed the intent of the State/Plaintiff to deprive the agency Appeals Office of jurisdiction by withdrawing the enforcement instrument that vests the Appeals Office's jurisdiction by regulation, in the

clear hope of a more favorable outcome to the State/Plaintiff, in the hopes of symbiotic and pliant judge shopping, in the hopes of getting a judge like McCann who ordered the illegal and unenforceable 12% compound in a Title IV-D case to rubber stamp the fraudulent 12% compound interest arrears due, and thereby needlessly increasing litigation. Mr. Paul Gould is the co-counsel of record for the State/Plaintiff in the RI EOHHS agency appeal. This is in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 655, 658a.

9. The State's/Plaintiffs' actions and the State's/Plaintiff's Motion needlessly extending the agency appeal to Family Court litigation and obstructing Defendant's discovery rights for debt validation and verification as well as documentation of the Plaintiffs' waiver of interest are violative of Family Ct. R. Dom. Rel. P. 11 and are in violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a. It is in criminal violation of 18 USC § 666 and a scheme to commit fraud on the court and interstate fraud through unenforceable Title IV-D orders that appear to be routinely issued by pliant Title IV-D judges like Judge John McCann III and Magistrate Susan Nahabedian.

10. Due to the State's/Plaintiff's conduct of obstructing the Defendant's right to access debt validation and verification records of publicly noticed liens of alleged arrears issued by the State/Plaintiff throughout the agency appeal, the Defendant filed an Access to Public Records ("APRA") request to the then Secretary Ana Novais of the RI EOHHS that manages the State/Plaintiff

agency OCSS. These are all political subdivisions of the State of Rhode Island under 42 USC 654(1).

11. The RI EOHHS Office in its management capacity required the State/Plaintiff OCSS to respond to the APRA request, but even then the State/Plaintiff **denied the Defendant's APRA request for accounting records**, again refused to release the requested debt validation accounting records, but released the Case History Tracking records in the Defendant's case file, which showed entries made by Kevin Tigue and RI OCSS staff between December 6, 2021 to April 2022 of activity that corroborated John Langlois's representations of taking interest off the system, interest waiver at the agency Prehearing Conference on October 5, 2022 that is outlined above in paragraph 10, then putting interest back on the system after Defendant accepted the offer in Texas, and performed on the contract in Texas paying off all due support from Texas, through Defendant's Texas bank account, namely Texas properties. Plaintiffs' record denials are violations of *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

12. Both the RI OCSS counsel who denied the Defendant's APRA request and the Executive Legal Counsel of the Secretary of RI EOHHS, Lisa Martinelli (to whom Ms. Deb Barclay reports and to whom Mr. Paul Gould reports, per organization charts supplied by the Secretary of State of the State of Rhode Island) informed the Defendant via official written letter correspondence to appeal RI OCSS's APRA request denial to the Attorney General pursuant to

R.I.G.L. sec. 38-2-8. Their collective denials are in violation of *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a. Following their collective official written advisement, the Defendant appealed the RI OCSS APRA denial under R.I.G.L. sec. 38-2-8 to the Office of the Attorney General and the Superior Court as provided by R.I.G.L. sec. 38-2-8. The Office of the Attorney General and the Superior Court of are political subdivisions of the State of Rhode Island under 42 USC 654(1). Instead of releasing the Defendant's Title IV-D alleged debt validation and verification records information, the State/Plaintiff continues to resist releasing alleged arrears/debt verification accounting records in Superior Court, including failing to comply with the Defendant's Court-issued subpoena for said records and resisting subpoena compliance with extended litigation in Superior Court in violation of *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a.

a.  The Defendant served the State/Plaintiff by email Defendant's Request for Production of Documents for the same accounting records and interest waiver records pursuant to Family Ct. R. Dom. Rel. P. 34, to which the State/Plaintiff has so far produced one set of book of accounts of the seven different books of accounts. However, the numbers do not corroborate with any of the seven official legal representations of alleged arrears due, e.g., $93,214.56 Total Due, and $0.00 under Interest on December 6, 2021, published online in the State's OCSS online account for Defendant, as of November 30, 2021;

$104,185.98 Total Payoff Amount on December 7, 2021; $75,638.00 on

a Notice of Intent to Lien dated March 3, 2022 that RI OCSS rescinded

based on alleged unspecified errors on October 14, 2022; $73,000.00

per RI OCSS Deputy Chief Counsel John Langlois's (staff counsel who

also reports to Mr. Paul Gould, who was also the attorney of record for

the State at the Appeals Hearing) representation at the agency RI

EOHHS (Rhode Island Executive Office of Human and Health

Services) administrative appeal Pre-hearing held on October 5, 2022;

$55,000.00 on RI OCSS correspondence with Meyersiek on October

13, 2022; $75,623.71 Total Due for "Interest," online on the aforesaid

OCSS online account, as of November 30, 2022.  A screenshot taken on

December 3, 2022 thereof is attached to this Motion; $81,652.46 on

the Motion as of December 22, 2022; this is in violation of, *inter alia*,

42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24),

(27), 666, 655, 658a that is consistent with the State/Plaintiff's pattern

of obstructing the Defendant of due process right access to her case file

records of RI OCSS's debt verification itemized accounting calculations

of very large sums of alleged arrearages of at least 7 books of accounts

from December 6, 2021 to the present in Title IV-D proceedings.

III.    **JUDICIARY VIOLATION OF GOVERNMENT EDICTS DOCTRINE, CALCULATED FAILURE TO INTEGRATE TITLE IV-D AGENCY ELECTRONIC FILING SYSTEM WITH ODYSSEY MAKING THEIR FILINGS INVISIBLE TO ALL E-COURT USERS OTHER THAN THE JUDGE AND THEMSELVES AND VIOLATION OF ACCESS TO COURT INFORMATION OF PUBLIC TITLE IV-D PROCEEDINGS IN RHODE ISLAND'S STATEWIDE ELECTRONIC COURTS**

## A. DENIAL OF PUBLIC AND PRO SE-LITIGANT ACCESS TO COURT INFORMATION INCLUDING JUDGE-CREATED LAWS BY 42 USC 654(1) POLITICAL SUBDIVISION RHODE ISLAND JUDICIARY

The Rhode Island Judiciary is a political subdivision of the State of Rhode Island under 42 USC 654(1). While publicizing during the implementation of the $6 million installation of Odyssey (the statewide electronic filing system) in 2014 that the electronic courts will enable ALL court users to pull up court record information with ease from their phones, the Rhode Island Judiciary quietly implemented Rule 5 of the Rhode Island Rules and Practice denying the Public, pro-se litigants and all parties to a case in Rhode Island remote access to court record information including judge-created orders and laws, including their own. Through this deceit, the Rhode Island Judiciary lied to the Public, while denying access and thereby covering up the routine ordering of unenforceable body of judge-created laws ordering 12% compound interest in public cases and public hearings under 42 USC 654 in public Title IV-D cases, such as this one, by symbiotic pliant judges like Judge McCann and Magistrate Nahabedian. The denial of access to pro-se litigants of their own cases' court records containing support orders violates, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23), (24), (27), 666, 655, 658a. The denial of public access to public court records documenting the routine systemic violations of 42 USC 654(21)(A) in electronic courts violates the First Amendment and the public's right to know the law, even if these fraud on the court unenforceable judge-created laws are unenforceable in both Rhode Island and elsewhere Title IV Part D reaches. The denial of public access to judge-created laws that is also motivated by cover-up fundamentally violates the established Government Edicts Doctrine that the United States Supreme Court specifically held applies to electronic

formats of government doctrines, such as judge-created laws in digital courts. *See*

**_Georgia v. Public Resource.Org, Inc_**., No. 18-1150, 590 U.S. ____ (2020).  The

Defendant has been denied access by the political subdivision Rhode Island Judiciary to

her court records and information regarding the orders in question that must be

furnished pursuant to 42 USC 654b thus in violation of 42 USC 654.  The Defendant has

been denied access by the political subdivision Rhode Island Judiciary to unenforceable

judge-created laws that routinely establish unenforceable 12% compound interest by

certain symbiotic pliant judges, like Judge McCann and Magistrate Nahabedian, who

work hand-in-hand with the Rhode Island Office of Child Support Services in Title IV-D

cases, in violation of Defendant's Due Process and Equal Protection rights to know the

law to be meaningfully heard and right to meaningful access to justice – they are in

violation of, *inter alia*, 42 USC §§ 654a, 654b, 654(10), (14), (15), (16), (20), (21), (23),

(24), (27), 666, 655, 658a.

This Court held at the hearing in this matter scheduled on March 6, 2023 that the

Rhode Island Office of Child Support Services is ordered to show that the alleged arrears

is accurate.  *See* attached March 6, 2023 hearing transcript.   Explicitly stated

throughout 42 USC 654, "accuracy" requires no accounting alterations generated offline

then hard input into the automated system, no fraud, no inducements, no interstate

extortion under color of state law, and for certain no 12% compound interest on overdue

support.

**B. CALCULATED FAILURE BY THE JUDICIARY TO INTEGRATE THE
TITLE IV-D AGENCIES' ELECTRONIC FILING SYSTEM INTO ODYSSEY
RESULTING IN AGENCY FILINGS BEING INVISIBLE TO ALL COURT
USERS EXCEPT THE JUDGE AND THE AGENCIES THEMSELVES – COVER
UP**

Because under the State's Plan the Title IV-D agencies routinely file in the Rhode Island court system for the illegal enforcement of illegal 12% compound interest disallowed under 42 USC 654(21)(A), the political subdivision Rhode Island Judiciary deliberately failed to integrate the Title IV-D Agencies' electronic filing system with the State's electronic filing system Odyssey in order to make Title IV-D Agency electronic filings invisible to all court users except the judge and the agencies themselves, calculated to cover up the 12% compound interest from audit by the federal authorities and from the Public.  This came to light at the WebEx hearing in this Title IV-D matter before Judge Merolla on June 8, 2023 scheduled at 2PM, where Judge Merolla, showing he was unaware of the failure of systems integration, questioned Paul Gould of Rhode Island Office of Child Support Services, why Defendant is unable to see the agency's electronic filings that the judge can see in the system.  Without hesitation, Paul Gould explained that this is due to the electronic court implementation process that was supposed to integrate the agency's legacy system to Odyssey, demonstrating conclusively that Gould, the Lead Counsel of the Rhode Island Office of Child Support Services responsible and overseeing agency court filings in Title IV-D cases, undisputedly was in the know and part of the conspiracy involving the deliberate failure of filing system integration and its continuing perpetration in Title IV proceedings that made Title IV agencies' filings invisible as part of the cover up.

### C. FALSIFYING ACCOUNTING TO SHOW $0.00 PAYMENT IN DECEMBER 2021 in DEFENDANT'S TITLE IV-D ACCOUNT POWERED BY THE AUTOMATED DATA PROCESSING SYSTEM IN ORDER TO DEFRAUD DEFENDANT IN THE FUTURE

Defendant attaches hereto **EXHIBIT G**, that shows the Defendant's online Title IV-D OCSS account which is powered by the Automated Data Processing System, as of November 2022 at the time of the RI EOHHS Appeal, which showed **$0.00 Payment for December 2021**.  Therefore, the Rhode Island Office of Child Support Services through accounting fraud never recorded, as late as November 2022, in the Automated Data Processing System Defendant's large lump sum payoff of $104,185.98 bank wired from Texas on December 7, 2021, showing prima facie accounting fraud.  This shows a scheme to defraud the Texas Defendant in the future.  This shows that the Rhode Island Office of Child Support Services received Defendant's wired funds and treated it as a cash receipt, without ever recording in the automated data processing system such a large lump sum payment.  Kevin Tighe, Barbara Grady, Gero Meyersiek, John Langlois, Paul Gould, and Priscilla Glucksman, among others, distributed the $104,185.98 among themselves in their organized conspiracy to defraud.  Defendant's lump sum payment was distributed allegedly via a check, not through the usual cash card on December 9, 2021, (see attached hereto TRAC record for December 2021) record information of which check that was allegedly issued by the Office of Child Support Services the agency refuses to furnish the Defendant, and which are under subpoena now.  Further, the Office of Child Support Service's maintaining a separate offline accounting system in this case constitutes fraud and accounting fraud, targeting the Defendant in Texas, targeting Texas properties and targeting the United States of America.  This is why they never utilized the 42 USC 654(7), (14), (20) and 42 USC 666(14) cooperative system with Texas, so as to enable them to divide the defrauded cash spoils offline among the members participating in the scheme.  This accounting fraud and scheme to defraud

violate mail fraud, wire fraud, honest services fraud, RICO, record tampering, theft of

the United States, and felonious fraud, among others.

In reality, under 42 USC 651-669, employees who engage in, aid and abet and

facilitate the above must be terminated and must not be permitted to continue criminal

activities of record tampering, accounting fraud, fraud, theft under color of state law and

cover up.

## IV.    CRIMINAL VIOLATIONS REPORTED TO SOME JUDGE OF THE UNITED STATES AND OTHER LISTED AUTHORITIES UNDER 18 U.S.C. sec. 4

The Defendant, in good faith and reliant on the plain language of 18 USC § 4,

misprision of felony, as well as the Brief filed in the United States Supreme Court by the

United States of America in the Supreme Court case, *Turner v. Rogers*, 564 U.S. 431

(2011) that showed South Carolina (found by the 4th Circuit Court of Appeals) liable for

$75 million in penalties for that state's 42 USC 654 violations that did not even involve,

*inter alia*, fraud and tampering with the record or unlawful 12% compound interest put

into then taken off then put back on the automated data processing system as here in

Rhode Island, made known the above activities to "some judges" of "the United States"

and other relevant federal authorities – counting among the United States judges

Defendant made known publicly in the Amended Complaint filed in the United States

District Court for the District of Rhode Island, Judge William E. Smith.  The issue of

what Judge Smith has done with the information "made known to him" is pending

before the United States Court of Appeals for the First Circuit before a requested panel

of judges under the federal law of civil procedure.  Therefore, under 18 USC 4, the above

reported activities have been "made known" to several high ranking judges of the United States.

## A. VIOLATIONS OF FEDERAL CRIMINAL CODES

Pending before the official Federal Court of Appeals proceeding, Defendant made known to the panel of judges of the United States allegations contained in the Amended Complaint filed in Federal Court of the commission of acts by the Rhode Island political subdivisions and employees thereof, Barbara Grady and Gero Meyersiek named herein in this motion, the afore-described acts violating 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 – such violative acts by the Plaintiffs in this matter, along with the political subdivisions and employees thereof named in the federal matter, and/or Judge Smith on this list are not exhaustive.  It is undisputable, among others, that Title IV-D penalties were incurred by, Criminal penalties were incurred by, and Title IV-D and Title IV-A disgorgement is due from the applicable State of Rhode Island's political subdivisions.

## B. NO IMMUNITY

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF AMERICA v. DONALD J. TRUMP*, DC Circuit, the DC Circuit United States Court of Appeals reminds the Public and all applicable tribunals that Judges are similarly liable to the criminal laws for their official acts.  A notable example is *Ex parte Commonwealth of Virginia*, in which the Supreme Court affirmed the criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for violating a federal statute that prohibited discriminating on the basis of race in jury selection. *Id*. at 340, 344. The Supreme Court began by observing the principle that officers are bound to follow the law: "We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the holder from obligation to obey the Constitution of the United States, or take away the power of Congress to punish his disobedience." *Id*. at 348. The Court then addressed the judge's argument that the Court lacked the authority to punish a state judge for "his official acts." *Id*. Its response was twofold. First, the Court described juror selection as "merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads." *Id.* The Court then explained that even if juror selection is considered a "judicial act," the judge had a legal duty to obey the criminal laws:

> "But if the selection of jurors could be considered
> in any case a judicial act, can the act charged
> against the petitioner be considered such when
> he acted outside of his authority and in direct
> violation of the spirit of the State statute? That
> statute gave him no authority, when selecting

> jurors, from whom a panel might be drawn for
> a circuit court, to exclude all colored men
> merely because they were colored. Such an
> exclusion was not left within the limits of his
> discretion. It is idle, therefore, to say that the
> act of Congress is unconstitutional because it
> inflicts penalties upon State judges for their
> judicial action. It does no such thing.

*Id.* at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

> [W]e have never held that the performance of
> the duties of judicial, legislative, or executive
> officers, requires or contemplates the
> immunization of otherwise criminal deprivation
> of constitutional rights. On the contrary, the
> judicially fashioned doctrine of official
> immunity does not reach 'so far as to immunize

> *criminal conduct proscribed by an Act of*
> *Congress . . . .'*

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See also Imbler v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372 (1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842, 845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493

F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled

on other grounds by *United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

The political subdivisions of Rhode Island under 42 USC 654(1) similarly are not

immune, and employees of the political subdivisions of Rhode Island under 42 USC

654(1) similarly are not immune. Barbara Grady and Gero Meyersiek are

unquestionably liable.

### V.    CONCLUSION

**Under 42 USC 654b, the Defendant is entitled to be furnished all
subpoenaed records – conversely, the Rhode Island Office of
Child Support Services, the SDU under the State's Plan under 42
USC 654, must furnish all subpoenaed information – refusal of
which incurs another penalty.**

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or

designee-Judge Merolla of this Honorable Court to:

1. Grant the Defendant's Motion to Compel.

2. Grant the Defendant's request for her Title IV record information that

   includes record information relating to the "TRAC notes of 12/6/2021 and

   12/7/2021" as well as relating to the substance of John Langlois's audio

   recorded October 5, 2022 statements regarding "what happened in this case"

   that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the

   Child Support Services that Gero Meyersiek said yes, he "agreed to waive the

   $73k or $75k that are in arrears" as of December 6, 2021 and October 5, 2022

   which are part of Defendant's child support case file.

3. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request.

4. Order a hearing on the herein issues raised in this matter.

5. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here:

   https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

6. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

March 21, 2024

FOR DEFENDANT

MARY SEGUIN, Pro Se.

By: _Mary Seguin_

Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

**NOTICE OF HEARING**

Please take notice that the foregoing Motion will be called for hearing before the Rhode Island Family Court, One Dorrance Plaza, Providence, RI 02903 at 10:00 AM on March 28, 2024 (case is already scheduled for that date/time) by WebEx hearing https://ricourts.webex.com/meet/garrahy5F

## CERTIFICATION

I hereby certify that a copy of the within Motion was filed on March 21, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

*Mary Seguin*

Exhibit A



# STATE OF RHODE ISLAND

## FAMILY COURT

### SUBPOENA - CIVIL

| Plaintiff | Civil Action File Number |
|---|---|
| STATE OF RHODE ISLAND EX REL. GERO MEYERSIEK | K2001 - 0521M |
| Defendant | |
| MARY SEGUIN | |

| | |
|---|---|
| ☐ Murray Judicial Complex<br>Newport County<br>45 Washington Square<br>Newport, Rhode Island 02840-2913<br>*(401) 841-8340 | ☐ Noel Judicial Complex<br>Kent County<br>222 Quaker Lane<br>Warwick, Rhode Island 02886-0107<br>*(401) 822-6725 |
| ☐ McGrath Judicial Complex<br>Washington County<br>4800 Tower Hill Road<br>Wakefield, Rhode Island 02879-2239<br>*(401) 782-4111 | ☑ Garrahy Judicial Complex<br>Providence/Bristol County<br>One Dorrance Plaza<br>Providence, Rhode Island 02903-2719<br>*(401) 458-3200 |

TO: JOHN LANGLOIS, KEVIN TIGHE; PAUL GOULD, FRANK DIBIASE
of RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES 77 DORRANCE ST, PROVIDENCE RI 02903

☑ YOU ARE HEREBY COMMANDED to appear in the Family Court listed above at the date, time, and courtroom specified below to testify in the above-entitled case and bring with you:

① ALL RECORDS, FILES NOTES, PUBLIC RECORDS, DOCUMENTS, FILMS, MATERIALS GENERATED IN THE COURSE OF ADMINISTRATION OF AND ENFORCEMENT OF RELATING TO DEFENDANT MARY SEGUIN, FROM 2010 TO THE PRESENT, IN THIS TITLE IV-D CASE UNDER THE SOCIAL SECURITY ACT
② ALL RECORDS RELATING TO DEFENDANT MARY SEGUIN FROM 2010 TO THE PRESENT, INCLUDING NOTES AND MESSAGES TAKEN AND GENERATED ON OCTOBER 5, 2022.

| Courtroom | Date | Time |
|---|---|---|
| GARRAHY COURTROOM 5F | MARCH 28, 2024 | 9:30 AM |

If you need language assistance, please contact the Office of Court Interpreters at (401) 222-8710 or by email at interpreterfeedback@courts.ri.gov before your court appearance.

* If an accommodation for a disability is necessary, please contact the Family Court Clerk's Office at the telephone number listed above as soon as possible. TTY users can contact the District Court through Rhode Island Relay at 7-1-1 or 1-800-745-5555 (TTY) to voice number.

Page 1 of 2

FC-73 (revised June 2020)

Exhibit B

Case Number: 23-0103337    Document: ID 1181928223    Page: 1246    Date Filed: 03/26/2024    Entry ID: 6663268008
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22   11:28         C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00               CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION       COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (████████████████████
███████████████████████████████). WE REMOVED THE INTEREST WHEN_____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:          SEGUIN      MARY       CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K  PNL:
```

Case Number 23-190022   Document: 0011181936383   Page: 13935   Date Filed: 03/26/2024   Entry ID: 6663269888
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10 13 PM
Envelope 4132704
Reviewer Maria O.

11:20:56 Tuesday, December 13, 2022

12/13/22   11:20        C A S E   T R A C K I N G        CSCL   ASMXA201
           TRAC.00              CASE HISTORY              U024   PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED_____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES____

RL: 80  12 22 ABSP:          SEGUIN        MARY         CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK     GERO     K   PNL:

Case Number: 22-410007  Document: 0111819000033  Page: 1208  Date Filed: 03/26/2024  Entry ID: 6653089
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:01 Tuesday, December 13, 2022

12/13/22   11:29        C A S E   T R A C K I N G        CSCL   ASMXA201
           TRAC.00             CASE HISTORY              U824   PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
     FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
     FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: SO  12 22 ABSP:              SEGUIN        MARY        CMD: _____
FWX: TRAC  D CLIENT:             MEYERSIEK     GERO     X  PNL:

Case Number: 232-1908202A Document: 0001113192000283 Page: 1209 Date Filed: 03/26/2024 Entry ID: 6663079038
Filed in Providence/Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria G.

11:29:53 Tuesday, December 13, 2022

| 12/13/22 | 11:29 | C A S E   T R A C K I N G | CSCL | ASMXA201 |
| | TRAC.00 | CASE HISTORY | U824 | PROD |

**STARTING DATE** 09 01 2021
**SELECTION** COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

| RL: 80  12 22 ABSP: | SEGUIN | MARY | | CMD: |
| FXX: TRAC  D CLIENT: | MEYERSIEK | GERO | K | PNL: |

ed in Providence/Bristol County Family Court
ibmitted 07/17/2023 10:13 PM
velope: 4132704
viewer: Maria O.

Case Number: CD0111831922000243    Page: 1210    Date Filed: 03/26/2024    Entry ID: 6663276908

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28      C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00            CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
      TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
      58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:           SEGUIN       MARY          CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK    GERO    K     PNL:
```

Case Number 23-01093994 Document: 001118199008283 Page: 1300 Date Filed: 03/05/2024 Entry ID: 6663269908
Filed in Providence/Bristol County Family Court
Submitted: 5/1/2023 10:13 PM
Envelope 4132704
Reviewer: Maria Doe

11:28:09 Tuesday, December 13, 2022

12/13/22   11:28          C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00             CASE HISTORY                   U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

RL: 80  12 22 ABSP:              SEGUIN        MARY          CMD:
FNX: TRAC  D CLIENT:            MEYERSIEK      GERO      K   PNL:

Case Number: N20200820M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

Document: 0001118319200283 Page: 1212 Date Filed: 03/24/2024 Entry ID: 666670908

11:29:13 Tuesday, December 13, 2022

```
12/13/22    11:28          C A S E    T R A C K I N G          CSCL  ASMXA201
            TRAC.00                  CASE HISTORY              U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

RL: 80  12 22 ABSP:          SEGUIN       MARY           CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK    GERO      K    PNL:
```

Submitted to Providence/Bristol County Family Court
Submitted: 8/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

| | | | | | | |
|---|---|---|---|---|---|---|
| 12/13/22 | 11:28 | C A S E | T R A C K I N G | | CSCL | ASMXA201 |
| | TRAC.00 | | CASE HISTORY | | U824 | PROD |

**STARTING DATE**    09 01 2021
**SELECTION**    COMPREHENSIVE CASE HISTORY

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:                    SEGUIN       MARY          CMD: _____
                                        MEYERSIEK    GERO    K     PNL:

Exhibit C



12:38 PM Mon Dec 6

cseinfo.dhs.ri.gov

ADCB Internet Banking    Community Health Choice |...    Sign In - Community Healt...    Case Manager Portal | Offi...    RI OCSS Payment

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov:

**State of Rhode Island**
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Home | My Profile | Contact Us | Site Map | Log

**Menu**

**Case Information**
- Last 5 Payments
- Last 13 Months
- Current Orders/ Past Due Balances
- Court Dates/ Appointments
- Enforcement Actions
- PIN Lookup

Home > Current Orders and Past Due Balances

**Case Manager**

**Current Orders / Past Due Balances**

**Custodial Parent:** Gero K Meyersiek    **CSE ID:** 1689817

**Current Orders**

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

⚠ Note: Medical orders and medical arrears are not listed on this screen.

**Past Due Balances**

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |

Exhibit D

State of Rhode Island and Providence Plantations


PROVIDENCE, Sc.                          FAMILY COURT






\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
GERO MEYERSIEK



Vs.                          F.C. FILE NO. K2001-0521M



MARY SEGUIN
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


Heard Before:

The Honorable Magistrate Armando O. Monaco

On March 6, 2023


**APPEARANCES:**


FOR MS. SEGUIN. . . . . Pro se

FOR THE STATE. . . . .. Paul Gould, Esq.


1

I HEREBY CERTIFY THAT THE

FOLLOWING IS A TRUE AND ACCURATE

TRANSCRIPT IN THE CASE OF

GERO MEYERSIEK VS. MARY SEGUIN

HEARD BEFORE

MAGISTRATE ARMANDO O. MONACO

ON MARCH 6,2023.

STEVEN FAZIO
ELECTRONIC COURT REPORTER

| | |
|---|---|
| 1 | **GERO MEYERSIEK V. MARY SEGUIN** |
| 2 | **F.C. NO. K2001-0521M** |
| 3 | **MARCH 6, 2023** |
| 4 | |
| 5 | **MARY SEGUIN:** Having been |
| 6 | duly sworn testifies as follows: |
| 7 | THE COURT: After the |
| 8 | February 12th hearing two orders were submitted |
| 9 | one by each side, objections were filed through |
| 10 | your order being entered, ma'am. |
| 11 | MS. SEGUIN: Thank you Your |
| 12 | Honor. I am sorry. Could you repeat that again? |
| 13 | Sorry. |
| 14 | THE COURT: Subsequent to the |
| 15 | hearing of February 10,2023, two separate orders |
| 16 | were submitted for my signature. One you |
| 17 | submitted and one the State submitted. The State |
| 18 | filed an objection to the submission of your |
| 19 | order on the basis that they alleged, I believe, |
| 20 | that it is not what I said. |
| 21 | MS. SEGUIN: And I also filed |
| 22 | an objection to their proposed order that also |
| 23 | clearly states a lot of additional items that |
| 24 | were never before the Court. Including the |
| 25 | number now that they have now, they submitted a |

```
1      $75,623.71 and then another one for $6028.75.

2      These two numbers were not even in their

3      original motion to establish arrears that was up

4      before the court on February the 10th and those

5      two numbers were never brought up as well. And

6      without a clear understanding and audit of what

7      those numbers represent. Because they

8      unilaterally of their own volition without any

9      court approval.

10                     ATTORNEY GOULD: Judge,

11     objection.

12                     MS. SEGUIN: Took off the

13     interest.

14                     THE COURT: Let me interrupt

15     you, ma'am. Where are you getting these two

16     numbers from? I do not see them anywhere.

17                     MS. SEGUIN: Exactly. That is

18     the order proposed order that the State had

19     filed. You are absolutely right. Your Honor.

20     Those two numbers--

21                     THE COURT: I am looking at

22     the proposed state order that has different

23     numbers then what you are saying.

24                     MS. SEGUIN: The proposed

25     order that they submitted to me, on #4 it says
```

4

| | |
|---|---|
| 1 | $75,623.71 for interest. And then a medical |
| 2 | support interest for $6028.75. Now these two |
| 3 | numbers were never before the Court before on |
| 4 | February the 10th. On February the 10th they |
| 5 | brought up a motion that mentioned $81,000. |
| 6 | THE COURT: Well, maybe that |
| 7 | is a combination of the two numbers. |
| 8 | ATTORNEY GOULD: Yeah, Judge. |
| 9 | That is the combination. |
| 10 | MS. SEGUIN: So sorry, go |
| 11 | ahead. |
| 12 | ATTORNEY GOULD: There was an |
| 13 | objection, Judge. |
| 14 | THE COURT: Yeah, what is |
| 15 | your objection, Paul? |
| 16 | ATTORNEY GOULD: We are off |
| 17 | the subject. The subject is whether this order |
| 18 | should enter or not. |
| 19 | THE COURT: Right. |
| 20 | ATTORNEY GOULD: Not about |
| 21 | any agreements, not about anything else other |
| 22 | than the numbers and Judge if I may or I will |
| 23 | let the defendant continue Judge. |
| 24 | THE COURT: I thought my |
| 25 | order was very simply was to set the arrears as |

```
 1        they appear on the State computer but without

 2        prejudice and then there will be a subsequent

 3        hearing to determine whether or not those

 4        numbers are in fact accurate. As I am reading

 5        the order, they put two numbers in and it is

 6        clearly, let me read the paragraph. Yeah,

 7        paragraph six, the Court finds that the total

 8        the arrears of $81,000, which is the combined

 9        number is placed on the Child Support ledger

10        without prejudice to the June 8, 2023 hearing.

11        The State agrees it shall respond to the

12        defendant's first request for production of

13        documents forthwith.

14                    MS. SEGUIN: Yes, Your Honor.

15        So therefore, you had not made any kind of

16        findings of fact of whatever they might be. You

17        simply said put the interest back--

18                    THE COURT: Yeah, I said

19        whatever the computer says is the balance. Put

20        it on the computer without prejudice, which

21        means that we need a starting point. You need to

22        know what they allege you owe and that is what

23        they are alleging you owe. You disagree with

24        that number. You asked them for the

25        documentation to substantiate that number. That
```

```
1        is why I continued it out all the way to June so

2        that you would have an opportunity to get their

3        materials, for you to you digest their

4        materials, provide counter materials back to

5        them. So that in June, a full hearing can be

6        held with everyone totally prepared as to argue

7        either position. Either there is no money due or

8        there is a balance due. I never made any finding

9        whatsoever there is in fact a balance due. If I

10       did, I would not have continued the hearing.

11              MS. SEGUIN: Thank you, Your

12       Honor. That is exactly what my understanding as

13       well.

14              THE COURT: Right. That is

15       what the order says. It says put the number on

16       the computer, but without prejudice, which means

17       both sides have to argue and convince the Judge

18       that that is in fact the number. Or you are

19       going to argue it is an incorrect number and you

20       are going to substantiate it by whatever

21       arguments you present. They going to

22       substantiate it by whatever arguments they

23       present. And then whoever hears it in June will

24       decide which side is correct.

25              MS. SEGUIN: Thank you, Your
```

```
 1        Honor. I wanted to make sure that, you know,

 2        that all parties understand that because at this

 3        point, the State is saying that you already

 4        found that I had—-

 5                          THE COURT: No, no. The State

 6        is not saying that because the order clearly

 7        says those numbers or that number is without

 8        prejudice, which means I did not establish that

 9        number. We do it in many of these cases to get

10        the ball rolling, so either side knows what they

11        need to produce to substantiate their positions.

12        The same way they can come in now and say, Oh,

13        no, we made a mistake. She actually owes

14        $185,000.

15                          MS. SEGUIN: You are giving

16        me a heart attack, Your Honor.

17                          THE COURT: It puts a cap on

18        what they can argue.

19                          ATTORNEY GOULD: Judge, can I

20        respond now?

21                          MS. SEGUIN: So, Your Honor,

22        with that in mind, just to clarify, that is what

23        they are saying in 2018 when they first took

24        off--

25                          ATTORNEY GOULD: Objection.
```

8

1　　　　　　　　　THE COURT: Just a minute.

2　　　The order speaks for itself. It says the balance

3　　　on the computer as of whatever dates in there. I

4　　　cannot read it now quickly, whatever dates in

5　　　there, that is the balance on the computer. They

6　　　have to substantiate it. They are going to send

7　　　you documentation supposedly to substantiate it.

8　　　If they cannot substantiate, then they are not

9　　　going to get that number.

10　　　　　　　　ATTORNEY GOULD: Judge, I

11　　　disagree with that. Judge, we have no obligation

12　　　to substantiate this. There is a Child Support

13　　　number that was established by Judge McCann. You

14　　　took judicial notice of that.

15　　　　　　　　THE COURT: I took judicial

16　　　notice that there was no appeal of his order.

17　　　That is what the judicial notice of.

18　　　　　　　　MS. SEGUIN: Thank you, Your

19　　　Honor. Thank you, Your Honor. That is my

20　　　understanding as well that you took judicial

21　　　notice of the orders themselves. But what is in

22　　　dispute is how the child support office has

23　　　handled this computation.

24　　　　　　　　THE COURT: That's the

25　　　argument for June, ma'am. That is the argument

9

```
 1    for June.

 2                    MS. SEGUIN: Taking that off

 3    the system without your approval. Now, put it

 4    that way--

 5                    THE COURT: What you are

 6    arguing now is what you need to argue in June. I

 7    am satisfied that the order that has been

 8    presented by the State that breaks down the two

 9    balances that the total is $81,000 is in fact

10    the appropriate order from the hearing. It is

11    without prejudice. They are going to provide

12    documents that you requested so that you can

13    then decide whether or not you agree or

14    disagree. And if you disagree with their method

15    of calculating it, you need to present why you

16    think that method is incorrect and what should

17    be the correct number if any.

18                    MS. SEGUIN: Yes, and

19    including a waiver of interest –

20                    THE COURT: You are arguing

21    whether the number is correct or not. That is

22    the whole purpose of making it without

23    prejudice.

24                    MS. SEGUIN: Yes, and that

25    would include the waiver of interest that had
```

10

1    occurred.

2                    THE COURT: No, that is the

3    subject of the hearing. That is the subject of

4    the hearing. I am making no finding about

5    whether there was or was not a waiver of

6    interest.

7                    MS. SEGUIN: Thank you, Your

8    Honor. So that is part of the discovery that

9    needs to happen.

10                    THE COURT: Well, that is

11    what I assume you are asking for. Is to get the

12    documentation that would have substantiate your

13    belief that there was the waiver of the

14    interest.

15                    MS. SEGUIN: Thank you, Your

16    Honor.

17                    THE COURT: So, if you can

18    substantiate that there was a waiver of

19    interest, that balance disappears.

20                    MS. SEGUIN: So, the State is

21    objecting to producing those protected

22    documents—

23                    THE COURT: No, no. They are

24    not objecting to producing any documents. The

25    line paragraph says in paragraph 10, The State

11

1    agrees it shall respond to the defendant's first

2    request for production of documents forthwith.

3    So, whatever you asked them for, they are going

4    to they are going to provide to you. If you do

5    not think they provided everything you asked

6    for, you file a supplemental request.

7                    ATTORNEY GOULD: The State

8    filed its answer in response to her request for

9    production, Judge. And I will stand by that. And

10   I will argue those issues that we refuse to

11   answer, or we objected on procedural grounds or

12   we objected on legal grounds for what we did.

13   And I will respond to that when it is

14   appropriate.

15                    THE COURT: That would be

16   June 8th. That will be done on June 8th. So, you

17   can be prepared to go forward on whatever your

18   objections are and whoever hears it will decide

19   whether the objections were valid or not.

20                    MS. SEGUIN: Your Honor, Mr.

21   Gould had said something to me, emailed

22   something to me to the affect that he said you

23   will be retiring June the 8th. I just wanted to

24   know why he emailed me something like that.

25                    THE COURT: It has been

1    projected that I am to retire sometime before

2    July 1st. They are dealing with my successor and

3    I sit until my successor is appointed and

4    qualified. And the projection is by the end of

5    the by end of June, the latest could be earlier.

6    I do not think it could be later, but it is

7    possible.

8                    ATTORNEY GOULD: And Judge,

9    because we, I guess, we like making these

10    artificial records, I will make this record

11    here. I did not say that snd I resent the

12    defendant putting words in my mouth.

13                    MS. SEGUIN: I indicated the

14    email that you wrote to me.

15                    THE COURT: Listen, just a

16    minute, just a minute. Whether I sit or I do not

17    sit is an immaterial situation, it has nothing

18    to do with what is before me today. I am ruling

19    on the order they sent you breaking down the

20    balances between the child support and medical

21    arrears is valid as to what I said the last time

22    we were here. I am going to sign that order and

23    proceed with their discovery. Whatever

24    objections you have relative to the discovery

25    and whoever sits here, whether it is me or

1    someone else, they will be prepared to address

2    the situation. Okay.

3              MS. SEGUIN: Thank you, Your

4    Honor. Thank you. One last question about number

5    11 and 12. I mean, those elements—

6              THE COURT:  11 and 12?

7              MS. SEGUIN: Yeah, 11 and 12.

8              THE COURT: 11 tells you how

9    to contact us. 11 is how to contact us and 12 is

10   a standard paragraph that they put in indicating

11   that, I don't know why it's here, but they that

12   the standard paragraph they stick in every case

13   has no bearing on this one. Other than it says

14   that until it is paid in full, you know, the

15   order will continue to run. But there is no

16   order running in terms of what your obligation

17   to pay that is.

18             MS. SEGUIN: Okay, okay. So

19   that is something that is boilerplate.

20             THE COURT: That is

21   boilerplate and 11 is how you get in touch with

22   us.

23             MS. SEGUIN: Sure.

24             THE COURT: We do not put

25   that in, we will never have any hearings.

14

```
 1                      MS. SEGUIN: Thank you, Your

 2     Honor.

 3                      ATTORNEY GOULD: If I could

 4     talk this time a little bit. Maybe just for the

 5     record. Those same paragraphs were in the

 6     September 25th, 2012 orders. And that same

 7     boilerplate languages in a July 11, 2012 orders

 8     and any other order that she would receive.

 9     August 15, 2012. That same identical language

10     was contained in those. It is boilerplate.

11                      THE COURT: Yeah,

12     boilerplate. All right, we will see you on June

13     8th at 2:30. Wait a minute. Daylight savings

14     time is starting soon.

15                      MS. SEGUIN: Oh, yeah.

16                      THE COURT: All right. Do you

17     go on daylight saving time? Pay attention.

18                      MS. SEGUIN: Okay.

19                      THE COURT: This coming

20     Saturday, our clocks jump forward an hour. So,

21     your clock does not jump forward. You are going

22     to have to call in an hour earlier.

23                      MS. SEGUIN: All right.

24                      THE COURT: I have friends

25     that live in Arizona, and they told me that in
```

```
 1      Arizona, there were three different time zones

 2      in the summer.

 3                    MS. SEGUIN: Yeah, every

 4      county is allowed to do that out here.

 5                    THE COURT: I know that. That

 6      is why that is why I pay attention to it because

 7      they tell me that people have trouble. They

 8      think, Oh, I am going to be on time, I am going

 9      to Court. They said, No, you are an hour late.

10      What do you mean? This is the time across the

11      street. No, that is an hour different than us.

12                    MS. SEGUIN: It really is

13      crazy. That they have marked it off, not a

14      county, but across the street. You are

15      absolutely right.

16                    THE COURT:  All right. So,

17      pay attention. It is 2:30 our time.

18                    ATTORNEY GOULD: Judge, if I

19      may. The order I submitted that contains 12

20      paragraphs.

21                    THE COURT: Yes.

22                    ATTORNEY GOULD: February 10,

23      2023, starting with paragraph one, the matter is

24      continued.

25                    THE COURT: Yes.
```

16

```
1              ATTORNEY GOULD: That order

2   is going to be accepted by the Court. That will

3   be the order of the Court for that day?

4              THE COURT: Right.

5              ATTORNEY GOULD: The order

6   that she submitted will be stricken, correct?

7              THE COURT: Right.

8              MS. SEGUIN: Yes, that is my

9   understanding, too. Yes.

10             ATTORNEY GOULD: Thank you,

11  Judge.

12             THE COURT:  All right. We

13  will see you in June.

14             ATTORNEY GOULD: One more

15  thing. I am sorry. Judge, if I may, can the

16  defendant place her address on the record?

17  Because we sent some correspondence that was

18  sent back to us. Now we have used her email as a

19  courtesy to her and we also need an actual

20  street address so that we can send her

21  documents.

22             MS. SEGUIN: Your Honor, I

23  think this is, I do not really understand why --

24             THE COURT: Let me just

25  interrupt. Let me interrupt. When you enter your
```

```
 1        appearance, you need to provide under the rules

 2        your address, your phone number, and your email

 3        address.

 4                        MS. SEGUIN: Yes.

 5                        THE COURT: And if you were

 6        an attorney, obviously your bar number. Okay so

 7        if you change any of those addresses or emails,

 8        you are under an obligation to keep updating it

 9        because if they send anything to the address or

10        the email that you provided, it's not a defense

11        later on, Oh, it's not my address or email, I

12        changed it. So that is why they are asking to be

13        sure they get the right method to contact you,

14        depending on what they have to send. It is a

15        part of the Court order that you provide your

16        address and email address.

17                        MS. SEGUIN: Your Honor, may

18        I also then ask that the State sent me a or e-

19        file any notices? Because they have been mailing

20        things to me in Texas, which takes 10 to 12 days

21        for me to receive by regular mail. So, could you

22        also please, I am going to ask you please to

23        ask, to make them, to order them to notice me by

24        electronic means as well.

25                        THE COURT: Well, that's part
```

18

```
 1    of the rules, too.

 2                    MS. SEGUIN: Okay.

 3                    THE COURT: All right?

 4                    MS. SEGUIN: Okay. Thank you,

 5    Your Honor. I appreciate you telling me.

 6                    THE COURT: All right, June

 7    8th.

 8                    ATTORNEY GOULD: I do not

 9    have an address, Judge.

10                    THE COURT: Oh, that is

11    right. What is your updated address?

12                    MS. SEGUIN: My address is on

13    the on file is P. O. Box 22022 Houston, Texas,

14    77019.

15                    THE COURT: What about email?

16                    MS. SEGUIN: That's Mary

17    Seguin 22022 at Gmail.com. They are also in my

18    pleadings as well.

19                    THE COURT: Slow down. Slow

20    down. We do not type that fast.

21                    THE CLERK: I did not get

22    that P. O. Box. Can you give it to me again,

23    please?

24                    MS. SEGUIN: Yes, it is,

25    22022.
```

```
 1                              THE COURT: That is the P. O.

 2      Box number?

 3                              MS. SEGUIN: Yes, Your Honor.

 4                              THE COURT: Making sure it

 5      was not the zip or area code.

 6                              MS. SEGUIN: It is one too

 7      many numbers.

 8                              THE COURT: What is the zip

 9      in Houston?

10                              MS. SEGUIN: It is 77019.

11                              THE COURT: All right, all

12      set?

13                              MS. SEGUIN: Thank you, Your

14      Honor.

15                              THE COURT: Okay, June 8.

16                              ATTORNEY GOULD: Thank you,

17      Judge.

18                              MS. SEGUIN: Thank you, Your

19      Honor.

20

21

22
```

EXHIBIT E

I HEREBY CERTIFY THAT THE FOLLOWING

IS A TRUE AND ACCURATE TRANSCRIPT

IN THE CASE OF MEYERSIEK VS. SEGUIN

BEFORE THE HONORABLE MAGISTRATE

SUSAN NAHABEDIAN ON FEBRUARY 2ND,

2024.

*A.B. Kuski*

AMANDA B. KUSKI
ELECTRONIC COURT REPORTER

1       THE COURT: Good afternoon.

2       PLAINTIFF: Good afternoon.

3       THE COURT: This is K20010521, Gero

4   Meyersiek versus Mary Seguin. Both parties are present. Mr. Meyersiek's

5   Attorney, um, Achille, she's here. Um, the Clerk will swear you both in.

6       CLERK: Miss Seguin, Mr. Meyersiek,

7   raise your right hands, please. You do solemnly swear that the testimony you

8   shall give to the Court in the matter now in hearing shall be the truth, the whole

9   truth and nothing but the truth, so help you God?

10      PLAINTIFF: I do.

11      DEFENDANT: I do.

12      CLERK: Miss, Miss Seguin, just state your

13  name for the record.

14      DEFENDANT: Mary Seguin.

15      CLERK: Mr. Meyersiek, your name,

16  please, for the record.

17      PLAINTIFF: Gero Meyersiek.

18      CLERK: Thank you.

19      THE COURT: Okay, good afternoon,

20  folks. This matter was continued from December 15th in order for the, uh, Court

21  Clerk to, uh, copy Court filings and other documents that were requested by

22  Miss Seguin. It's my understanding that those documents were sent to her

23  electronically, um, in various emails, uh, in December and the remainder of

24  those were sent at the beginning of January. Um, Miss Seguin, were you able to

25  review those and are you satisfied that you received everything that you request-

1    ed?

2                                    DEFENDANT: Um, thank you, Your

3    Honor. I had, uh, received, as you said, in two batches, uh, the Court records

4    that, um, Mr. Santamarina had, um, had emailed. Uh, the last several batches,

5    uh, were, sorry, batch was several documents, um, were only emailed about a

6    couple weeks ago. Uh, there, there were sent in separately about fifteen emails. I

7    think Your Honor was copied on all of them, as well as Mr. Gould, um, on those

8    emails, um, and so the records themselves, um, you know, that were sent to me

9    or emailed to me, um, the, the Court has a copy of those. Um-

10                                   THE COURT: I, I, so my question is, are,

11   are you, did, were you able to review them and are you satisfied that everything

12   that you requested, you received?

13                                   DEFENDANT: Um, I have not, uh,

14   received the actual audio recordings of the, that's part of the record.  Um, those

15   were-

16                                   THE COURT: Did you request, did you

17   request the audio recording from Mr. Santamaria?

18                                   DEFENDANT: Well, I requested all the

19   records. So, one of the paper documents had said that the, there was, uh,

20   attached to it, an audio recording of the State saying that Gero waived interest,

21   and I think that's very relevant to this case-

22                                   THE COURT: Okay-

23                                   DEFENDANT: -especially as it links to-

24                                   THE COURT: -let me just stop you-

25                                   DEFENDANT: -(inaudible)-

1    THE COURT: -let me just stop you, let me

2    just stop you for a minute, please. I'm new to this case, so I'm not familiar with

3    the audio recordings request. I'm not aware that you made that type of request.

4    Can you tell me the date of the audio recording and when you made that

5    request?

6    DEFENDANT: I made the request for all

7    Court information in this case. All Court information encompasses all

8    documents and all forms of records. Uh, that's, um, that's the, I believe, legal

9    understanding of all Court information of records.

10    THE COURT: Alright, Mr.-

11    DEFENDANT: So, that was part, that was-

12    THE COURT: -excuse me, excuse me one

13    minute. Mr. Gould, I'm trying to unmute you and I'm not able to do it from my

14    end. So, if you need to be unmuted, you'll have to do it yourself.

15    DEFENDANT: I had to, so I had

16    submitted those and this, uh, audio recording ha-, uh, is part of the Court records

17    as of, um, June 2023. That was emailed to me in a rel-, in a paper document

18    referring to attached, attached audio recording that is, um, that, that was emailed

19    by Mr. Santamaria. So, that recording, I want to make sure, uh, and, and that's

20    also copied to you by the way, Your Honor-

21    THE COURT: Alright, so-

22    DEFENDANT: -(inaudible).

23    THE COURT: -just, just, just going back

24    to December, okay, you provided, um, a request for documentation to be copied

25    by the Court Clerk, Mr. Santamaria, and all of those documents were scanned

1   and sent to you in an electronic form. Did you specifically request anything that

2   referred to an audio recording?

3                          DEFENDANT: I specifically record, uh,

4   requested all Court information, any and all Court information in the records of

5   my, of this particular case file. Those are the wording that I used, because I, I

6   don't know what's being, what's on, what's, what the Court record has. You

7   know, this is the reason why we went through this process, is, the, the, um,

8   Rhode Island Judiciary has set up this, uh, uh-

9                          THE COURT: So, Miss Seguin-

10                         DEFENDANT: -electronic Court system-

11                         THE COURT: -we're not-

12                         DEFENDANT: -where the (inaudible)-

13                         THE COURT: -so, Miss Seguin, we're not

14  gonna get into the Judiciary's access to the, um, to the portal. We're not gonna

15  get into that. We made every effort to make electronic copies of every Court

16  document pertinent to this case and sent them to you, at no cost, in an electronic

17  version. You did not, at any point, follow up with Mr. Santamaria to request an

18  audio recording.

19                         DEFENDANT: I'm just in a process of

20  reviewing this. That was part of your question, uh, Your Honor, is have I had a

21  chance to review all of these materials. It's, it's, it's, as, as you can see, several

22  because you've been covered, uh, copied on all the emails. There were several

23  emails, uh, you know, all together, probably thirty-something emails. Uh, I do

24  appreciate that. I, you know, I thank Your Honor for ordering that, um, and I

25  also, um, you know, am, am reviewing, have been reviewing. So, I came across,

1    to answer your question to the best of my ability, is I came across that doc-,

2    document where it refers to the audio file, uh, that's being submitted into the

3    record. I've asked for the Court records. So, um-

4               THE COURT: You received every Court

5    record, every document going back to-

6               DEFENDANT: Paper. I, I, I think what,

7    what-

8               THE COURT: Correct.

9               DEFENDANT: -wanted to, you know,

10    just, just to have a basic understanding of document is, in paper form, but Court

11    rec-, information as the Court record encompasses various different formats. All

12    public records encompasses various different formats. Uh, you know, that's,

13    that's written by statute and, you know, as I understand it what public records is.

14    Court records are a form of public records and, and it forms the basis of, um,

15    Judge created laws, and therefore, those are critical in my, uh, uh, you know,

16    access and that's the basis of this process that we're going through is accessing

17    those public records, Court information records, and, uh, accessing the laws that

18    were created, Judge created laws that were created, in this particular case or

19    relevant to this particular case. So, I, I'm just trying to, um, respond to your

20    question, uh, Your Honor, as to if I had a chance to review those, am I satisfied,

21    and so, these are the, what I'm raising to the Court, to Your Honor, to, in

22    response to your question is, I received the paper document, uh, I'm, I'm in the

23    process of reviewing them, um, because they, they form a chronology, they form

24    a, a, a background chronological, uh, reasoning behind, you know, uh, Judge

25    created laws, which are the orders, uh, issued. And in so doing, there are refer-

1   ences to a, a Court document that was sent to me, actually a couple of them, that

2   talks about an audio recording of the State saying that Gero waived interest, and,

3   uh, also the document, uh, there are documents that say Gero did not ask for

4   interest, but the State on oral motion asked for interest, but then the State's

5   policy is not to ask for interest in interstate cases-

6                                   ATTORNEY GOULD: Judge, Judge, if I

7   may-

8                                   DEFENDANT: -that is why. So-

9                                   ATTORNEY GOULD: -Judge, can I be

10  heard?

11                                  DEFENDANT: -that's why I need to

12  understand and get a full-

13                                  ATTORNEY GOULD: If I may, Judge?

14                                  THE COURT: Hold, just one, one minute,

15  Mr., Mr. Gould. So, the answer, so, your answer is, you're not satisfied with

16  what was sent?

17                                  DEFENDANT: I'm explaining to you

18  what's missing.

19                                  THE COURT: So, you are, you-

20                                  DEFENDANT: And I'm trying to identify

21  to you what is missing-

22                                  THE COURT: So, this Court-

23                                  DEFENDANT: -and the Court records,

24  already are, are showing-

25                                  THE COURT: -this Court, alright, ex-,

6

1   excuse me, Miss Seguin. Mr. Santamaria spent hours with a coworker manually

2   scanning and copying those files during a period of time that the Court was very

3   short handed. All of that documentation, okay, every pertinent document related

4   to this case, going back decades, two decades, was scanned and sent to you,

5   okay. We do not have a copy of an audio recording. So, we're not able to

6   provide that to you. There is no such audio recording in the Court record that

7   you, you are referring to. So, now I'm gonna give Mr. Gould an opportunity to

8   respond. Mr. Gould?

9                           ATTORNEY GOULD: Judge, like,

10   likewise, if she's requesting a transcript, then she has to go through the normal

11   process of paying for a transcript, ordering the specific date of the transcript she

12   wants. This is a Defendant who has failed to come to this Court with clean

13   hands, Judge. I've stayed silent-

14                           DEFENDANT: I object! I object, Your

15   Honor!

16                           ATTORNEY GOULD: -the whole time-

17                           THE COURT: Your objection is noted and

18   Miss Seguin, no one interrupted, you're muted. You're muted. You're muted

19   and you're going to stay muted. You're muted. Mr. Gould?

20                           ATTORNEY GOULD: Thank you, Judge.

21   We've let this go on for months after months. She brought up an issue relative

22   to, uh, the Court system. State of Rhode Island Child Support Enforcement, the

23   Magistrate hearing this case, has no control over that. She's now filed a Federal

24   lawsuit in the, uh, District of Texas, Judge. That's gonna play it's course 'cause

25   she'll file and follow through on that. This is a simple case of whether or not

7

1    interest is to accrue on this case and what payments were made. It's simple

2    math, it's simple, in, in fact, Judge, there's maybe five questions I have for the

3    Defendant, uh, of the Plaintiff relative to this, uh, inquiry. It would be a short

4    hearing. Uh, whether or not there was any monies paid, what was received, and

5    the fact that the Court can take Judicial notice of two orders. The fact that

6    there's a child support order that continues to run, and two, the fact that interest

7    has continued to run pursuant to Mag-, pursuant to Judge, uh, John McCann's

8    order dated 9/25/2012.

9                              THE COURT: Okay, the original support

10    order was entered May 24th of 2012?

11                              ATTORNEY GOULD: That's when it was

12    allowed to run on the Child Support system. That was at a period of time when

13    the arrears were set somewhere in the amount of $30,000.00. I have a copy of

14    the order. Paragraph four of the May 24th, 2012 order indicates that there was an

15    arrears of $30,458.00, as of May 24th, 2012. September-

16                              THE COURT: And am I, am-

17                              ATTORNEY GOULD: Sorry.

18                              THE COURT: -there were, there was no

19    appeal taken from that order.

20                              ATTORNEY GOULD: Correct.

21                              THE COURT: Just a minute, Miss Seguin.

22    I'm giving Mr. Gould an opportunity to speak, just like I gave you an

23    opportunity to speak. In that October 23rd, 2012 order, um, there is language that

24    indicates that interest would continue to run.

25                              ATTORNEY GOULD: Correct.

1        THE COURT: And nothing has changed

2    since then?

3        ATTORNEY GOULD: There's been no

4    order from the Rhode Island Family Court suspending interest. Correct.

5        THE COURT: Miss Seguin?

6        DEFENDANT: I object to every, uh,

7    statement that Mr. Gould had, uh, stated because they are, um, uh, perjurious.

8        THE COURT: You (inaudible), excuse

9    me-

10        DEFENDANT: Mr. Gould and Mr.

11    Langlois-

12        THE COURT: Excuse me, they're what?

13        DEFENDANT: They are perjuries. Mr.

14    Gould and Mr. Langlois and the State of Rhode Island representing the Rhode

15    Island Child Support Office, had, um, per this Court record, there is a document

16    that say's that they, that they had said that Gero had waived interest. (Inaudible)

17    2021 and they made that statement in 2022.

18        THE COURT: Ma'am, there's no Court

19    order that ever suspended-

20        DEFENDANT: (Inaudible).

21        THE COURT: -there's no Court order that

22    ever set the interest to zero. There's no Court order. You've received everything,

23    I've reviewed the file. There is nothing in the system where it, it was ever

24    waived or set to zero. The interest has stayed on the system.

25        DEFENDANT: We're, we're talking, uh,

1      actually on, on February the 10th, 2023, the first Court order of this, of this

2      decade that was issued has clearly, um, proven as evidence that interest was

3      taken off of the system. Mr. Gould had taken the interest off of the system, he

4      said in Court, in 2018. That is what he had said, and so, in, in Court, and

5      therefore, he has asked the Judge, or the Magistrate, uh, Monaco to put it back

6      on the record or, uh, Mr., and then Judge, um, uh, Monaco had only put it on

7      there with prejudice because he said that there's, that doesn't mean, that's just a

8      placeholder.

9                  ATTORNEY GOULD: Objection.

10                DEFENDANT: So, Mr. Gould had lied,

11      just now, that's perjury on-

12                THE COURT: Uh-

13                DEFENDANT: -I'm deeply concerned

14      about this. These, these are documented in the order. The February 10th order

15      cannot be refuted. It was, it was prepared by Mr. Gould himself. It said that the

16      Court-

17                THE COURT: I don't see it.

18                CLERK: I don't see anything-

19                DEFENDANT: -(inaudible)-

20                THE COURT: -hold on, hold on. I'd, I'd

21      like to review that order and I, I don't see it.

22                CLERK: I don't see anything filed from

23      2013-

24                ATTORNEY GOULD: I'd like to be heard

25      on the objection, Judge.

1    CLERK: -to '22. I see nothing.

2    DEFENDANT: Well, that's a problem.

3    THE COURT: Are you saying that, excuse

4    me, just let me just clarify this. Again, I'm new to the case-

5    DEFENDANT: That was-

6    THE COURT: -you just made-

7    DEFENDANT: -that was-

8    THE COURT: -you just mentioned

9    Magistrate Monaco heard this and I'm looking for an order from that hearing

10    and I don't see one.

11    ATTORNEY GOULD: Since I was

12    accused of perjury, Judge, can I clarify something?

13    THE COURT: Yeah, Miss Seguin, I'm

14    gonna give Mr. opportunity, uh, Mr. Gould an opportunity to reply.

15    ATTORNEY GOULD: See, Miss Seguin

16    is a little confused about how the process is running. That there is an agency and

17    the Child Support Office is an agency charged with running the child support on

18    our system. The Court is in charge of ordering parties to pay child support and in

19    this case, pursuant to the order of Judge McCann back in 2012, he ordered child

20    support paid. Again in 2012, he ordered interest paid. Our system in 2018, our

21    system, the Child Support system, not a Court order, our system removed

22    interest because of an administrative decision, because this case had become an

23    interstate case, the Plaintiff was out of, the Defendant mother was out of state.

24    There was a decision to remove interest from cases running on our system. That

25    doesn't mean that the interest doesn't run. It meant that the interest was removed

1   from our system, so that other jurisdictions were not confused, and it had to do

2   with, a lot of it, the, the fact that jurisdictions had different interest rates running.

3   So, in order to alleviate any confusion, our Administrator made a determination

4   to stop interest on all, uh, stop interest running on our system, not stop interest

5   pursuant to a Court order. So, that's the distinction. So, when I said earlier today

6   that there's no order that, uh, stopped the interest on the case, there is no order,

7   and then the other statement that, uh, the Plaintiff made, uh, Defendant made

8   relative to, um, the issue of prejudice of Judge Monaco's order, that's an

9   outright lie, Judge. Judge Monaco never said in Court, there's no Court order

10  that is without, or with prejudice, Judge. So, that's just an outright lie. I'll leave

11  it at that because I know I'll have another twenty minutes of, of rambling on by

12  the Defendant. So, I'll (inaudible)-

13                          THE COURT: Well, just, just to be clear, I

14  just want both sides to, to, to know, I don't see anything in the system reflecting,

15  um, any, any decision by Magistrate Monaco in May of this year. I don't see-

16                          DEFENDANT: Uh, February, February,

17  February of this year. So, February the 10th. February the 10th. This I why at the

18  same time the discovery was ordered, and this is why we are here on discovery

19  issues, as well, because it was ordered without, sorry, it was placed on the

20  system and the interest is WITH prejudice.

21                          ATTORNEY GOULD: No, Judge, I object

22  to that, that is not true. That is as far as the truth can be, Judge.

23                          DEFENDANT: Perjury, perjury-

24                          THE COURT: So, excuse me, hold on,

25  hold on, folks. I just found the order now that I just see that. It's February 10th,

1    paragraph four, "The Court finds the arrears of $81,652.46 that'll be placed on

2    the ledger without prejudice to the June 8th hearing. The arrears reflect interest

3    on the child support in the amount of $75,623.71 and interest of the medical

4    support in the amount of $6028.75".

5              ATTORNEY GOULD: So, Judge, is her

6    comments about prejudice, is that perjury? So, did she just commit perjury,

7    Judge, because I wasn't under oath, but I'll let that go.

8              DEFENDANT: The order, the order

9    clearly says that the-

10             THE COURT: That it was placed, that it

11   was placed on the ledger without prejudice. That's all, that's all it says. It was-

12             DEFENDANT: Which means-

13             THE COURT: -placed on the ledger-

14             DEFENDANT: -it means, it means it's not

15   owed.

16             THE COURT: No, it means, it doesn't

17   mean it's not owed. It it, it it's, it's, let's see, motion to set arrears and discovery

18   motions were not concluded on that date. Okay, so it was placed on the ledger

19   without prejudice because it was still an issue that was left open. Am I correct,

20   Mr., Mr. Gould?

21             ATTORNEY GOULD: Yes, Your Honor.

22             THE COURT: And with that, you may

23   inquire of Mr. Meyersiek. Thank you.

24             ATTORNEY GOULD: Thank you. First of

25   all, Judge-

1    THE COURT: You're muted. You're

2    muted.

3    ATTORNEY GOULD: I'd ask the Court,

4    I'd ask the Court to take judicial notice of the May 24th, 2012 order by Judge

5    McCann, in which he established the child support order, in which he establishes

6    an arrears of $30,458.00. That order was not appealed. That is the order of this

7    Court.

8    THE COURT: The Court takes judicial

9    notice entered on May 24th, 2012, from which no appeal was taken.

10    ATTORNEY GOULD: I'd ask the Court

11    to take judicial notice for the September 25th, 2012 order of Justice John

12    McCann in which the paragraph four indicates, "Interest will continue to run on

13    monies due".

14    THE COURT: Likewise, the Court takes

15    judicial notice of the September 25th, 2012 order, again, in which no appeal was

16    taken.

17    ATTORNEY GOULD: Thank you, Judge.

18    If I could inquire of the Plaintiff?

19    THE COURT: Yes.

20    ATTORNEY GOULD: Mr. Meyersiek,

21    you had a child support order that ran to your, uh, ran to your benefit in the

22    amount of $218.00 per week. Is that correct?

23    THE COURT: Can't hear you, Sir.

24    PLAINTIFF: (Inaudible).

25    THE COURT: Very, very faint. It's hard to

14

1    hear you.

2                              PLAINTIFF: Is this better?

3                              THE COURT: Perfect.

4                              PLAINTIFF: Okay, good. Sorry. Yes, to

5    the best of my recollection, that was the amount.

6                              ATTORNEY GOULD: Did you ever

7    receive child support from the Defendant mother directly, after May 24th, 2012?

8                              PLAINTIFF: I only received two

9    payments. I believe one was in 2019 and one was in 2021.

10                             ATTORNEY GOULD: So, from-

11                             PLAINTIFF: I never, I never received

12   anything directly.

13                             ATTORNEY GOULD: From 2012 to

14   2018, you received nothing in child support, correct?

15                             PLAINTIFF: Not a single penny.

16                             ATTORNEY GOULD: And that was a

17   time when the child was a minor, correct?

18                             PLAINTIFF: Correct.

19                             ATTORNEY GOULD: That was during a

20   period of time when you could've used the money for the child, correct?

21                             PLAINTIFF: That is absolutely correct.

22                             ATTORNEY GOULD: And you received

23   nothing, correct?

24                             PLAINTIFF: That is correct, and I

25   should've had, I had to send my daughter to a school, I had to pay for every

1    meal, I had to pay for her clothing, I had to pay for everything.

2                                  ATTORNEY GOULD: You received a

3    payment sometime in 2018 in the amount of $6,461.95, correct?

4                                  PLAINTIFF: That is correct.

5                                  ATTORNEY GOULD: And then you

6    received a payment in 2021, on or about 12/9 for 2021, in the amount of

7    $4,185.98, is that correct?

8                                  PLAINTIFF: I don't recall the exact

9    amount.

10                                 ATTORNEY GOULD: Does that number

11   refresh your memory somewhat?

12                                 PLAINTIFF: Yes, it does.

13                                 ATTORNEY GOULD: Are you looking to

14   collect interest that accrued on that money from, from, I'm sorry, from May

15   202-, May 24th, 2012 up until today's date?

16                                 PLAINTIFF: Yes.

17                                 ATTORNEY GOULD: Did you make any

18   contracts, agreements with Miss Seguin outside Court that indicated that you

19   were going to waive interest?

20                                 PLAINTIFF: Absolutely not.

21                                 ATTORNEY GOULD: I have no further

22   questions of the Plaintiff.

23                                 PLAINTIFF: Thank you.

24                                 DEFENDANT: Uh, Your Honor, I have

25   been unable to object to anything because, uh, I was put on mute, but-

16

1    THE COURT: Okay, well, we can note

2    your objection now.

3    DEFENDANT: The, the, uh, at the last

4    hearing, uh, as well as, uh, the, uh, hearing before you were, uh, appointed, uh,

5    by the, uh, Judge, uh, in June 2023, we were on a motion to compel. So,

6    therefore, I do not have, based on discovery, discovery has not been completed.

7    Therefore, I am not ready to present the, uh, evidence and present the

8    arguments.

9    THE COURT: What, uh, what specifically,

10    what are you seeking in discovery that you haven't received yet?

11    DEFENDANT: I have, uh, as you can see,

12    I have that motion, uh, that is pending, that has been pending since June of 2023,

13    to compel production relative to my, uh, request for documents. I, I have a

14    pending motion-

15    THE COURT: You, you, you received all

16    of the Court documents.

17    DEFENDANT: No-

18    THE COURT: What out, what outside of

19    the Court documents are you seeking in discovery?

20    DEFENDANT: I'm seeking based on my,

21    uh, on the Court record that would show that I'm seeking my case file.

22    THE COURT: You have-

23    DEFENDANT: I'm entitled-

24    THE COURT: -you, no, no.

25    DEFENDANT: I do not have a, my case

```
 1   file-
 2                              THE COURT: You do have your case file.
 3                              DEFENDANT: -I do not have my-
 4                              THE COURT: It was scanned-
 5                              DEFENDANT: I do not!
 6                              THE COURT: -and sent to you as you
 7   already acknowledged by Mr. Santamaria in numerous emails. The entire Court
 8   file was scanned in and sent to you.
 9                              DEFENDANT: Oh, you're talking about
10   the Court file. I'm talking about my child support case file. I'm entitled under
11   Federal law to have access to my Federal, my child support case file, and that's
12   the discovery that's being ordered. I have not been able, they have denied, on
13   paper, which is submitted within this Court record. The Court record shows that
14   they have, uh, refused, uh, uh, raising all kinds of issues to produce my child
15   support case record.
16                              ATTORNEY GOULD: Objection.
17                              DEFENDANT: Under Federal law, under
18   the Federal law, under Title IV of the Social Security Act, which is what this
19   process and this legal hearing is under-
20                              ATTORNEY GOULD: Objection.
21                              DEFENDANT: -(inaudible) under-
22                              THE COURT: Alright, what's-
23                              DEFENDANT: I have rights.
24                              THE COURT: -what's the basis of your
25   objection-
```

1        DEFENDANT: -I have a Federal rights-

2        THE COURT: -Mr. Gould?

3        DEFENDANT: -(inaudible), I have a

4    Federal right to my child support case file.

5        THE COURT: Hold on, Ma'am. He

6    objected and I wanna know the basis of his objection.

7        ATTORNEY GOULD: Relevance to the

8    issue before the Court, Judge. The issue before the Court is interest. The motions

9    that she's alleging that she's pursuing, the State file appropriate objections to her

10   discovery request. So, she needs a hearing on it instead of her other diversions

11   that she's had at the last nine months. We could've addressed these, Judge, but

12   we wanna keep pushing this off and pushing this off. So, the State has filed, the

13   State has responded to the discovery. I've had a conference with Miss Seguin, at

14   one point, to try to go over some of our disputes with regard to, with regard to

15   discovery. Uh, that did not turn out to be very productive. Uh, I have stated, uh,

16   on my, on her requests, uh, all the basis for our objections and I'm ready to

17   argue those objections, when she puts forth specific allegations, specific

18   documents in the specific request that she's looking for, but until then, Judge,

19   this is a real simple case of about whether or not this lady paid child support and

20   whether or not this gentleman is entitled to interest-

21       DEFENDANT: Objection.

22       ATTORNEY GOULD: -the Court has-

23       DEFENDANT: Objection.

24       ATTORNEY GOULD: -the Court has-

25       THE COURT: (Inaudible).

1    ATTORNEY GOULD: -filed-

2    DEFENDANT: Fundamentally, in order to

3    claim that I owe anything, I have a right to my child support case file under

4    Federal law.

5    THE COURT: Ma'am, what's this-

6    DEFENDANT: I have-

7    THE COURT: -what's specific document-

8    DEFENDANT: -(inaudible)-

9    THE COURT: -what specific document-

10    DEFENDANT: -since '21-

11    THE COURT: Ma'am, Ma'am, Ma'am, if

12    you keep yelling over me and over the Attorneys, this is not going to be

13    productive. I'm trying to just narrow this down to the specific piece of

14    information that you're seeking.

15    DEFENDANT: I am, Your Honor, I need

16    to have my entire case file. I, I have, the Court order-

17    THE COURT: Do you, do you-

18    DEFENDANT: -on February the 10th

19    ordered discovery. There were, by law, my right is to have my entire case file,

20    and, and by Federal Court, Federal law, I am entitled to have my entire case file.

21    Child support interstate encompasses, and this is an interstate case, encompasses

22    Federal law. It encompasses Texas law, because you are reaching your, your

23    long arm into the State of Texas. Therefore, I am entitled, by Federal law, and

24    by Texas law, as well as Rhode Island law, to have access to my child support

25    file.

1           THE COURT: Thank you Miss, Thank

2    you, Miss Seguin. Mr. Gould-

3           DEFENDANT: (Inaudible) Mr. Gould-

4           THE COURT: -what, what is the, what is

5    the State's objection-

6           ATTORNEY GOULD: Rel-, well for the

7    most part-

8           THE COURT: -to give-

9           ATTORNEY GOULD: -relevance, Judge.

10   She's, she is not gonna use the documents that she's requesting, in this case,

11   when she, when the documents you're requesting is what she is the target for in

12   her Federal case. So, she's not gonna use me as a pawn to get, to do her

13   discovery in her Federal case. This is a simple issue of child support, simple

14   issue of payments, but what she's trying to do is she tried to do her discovery,

15   her Federal discovery in this child support case. So, what I did is I laid out in, in

16   our responses, our objections, based on relevance. So, again, again, we went

17   another ten minutes of her for asking for certain, a multitude of documents

18   without her saying one specific document that she wants, one specific item, one

19   specific request for production that she's, we can do this, Judge. We can go for

20   another twenty minutes and do the same thing, but until she gets her eyes on a

21   piece of paper and looking at her motions and going word by word, and until we

22   can do that, Judge, I, we can't go anywhere. I've, I've stated our objection-

23          THE COURT: Well, that, I'm, I'm trying,

24   you know, I'm trying to work with you, Miss Seguin, to see if you can narrow it

25   down to a specific, a specific issue or a specific document that you believe

21

1    supports you and your contention that at some point, there was an agreement or

2    there was an order that waived the interest, but to be going on a fishing

3    expedition and insist that the State, uh, provide you with your case file, um, you

4    know-

5                               DEFENDANT: Your, Your Honor,

6    discovery is to get my entire case file. I think that is something Federal law

7    guarantees, and it says so from 42 USC Section 654, all the way to 666. That

8    law luminous, uh, Federal law, codified by Congress, provides everyone in the

9    country the right to access all the case file, child support case file, maintained by

10   every and any State Government, and that is, I'm not the, eh, the, Congress has

11   never said that's sufficient expedition (?). Congress has said, you're allowed to

12   have your entire case file and from there on, you're even allowed to ask

13   questions. Why was this, why was, that's the due process and that is the equal

14   protection, and that is the Privileges and Immunities Clause that we're all

15   guaranteed and living under. This is an interstate case. I am entitled by the

16   Constitution and by Federal laws 654 to 666 to have access to my entire file. I

17   cannot, I am unable, no custodial parent or non-custodial parent is able, that's

18   mentioned in the Social Security Act, would be un-,would be able to actually

19   identify, say this is the document I'm asking for, but they don't have access to,

20   to the file.

21                               THE COURT: Ma'am, you have access to

22   all of the Court orders.

23                               DEFENDANT: I-

24                               THE COURT: The Court-

25                               DEFENDANT: But I-

1                  THE COURT: -the Court, the Court is

2    what establishes the, the child support order, the arrears order, and interest goes

3    along with that, Ma'am. So-

4                  DEFENDANT: You're talking about this

5    agreement that we're deal, talking about. Agreement that you just mentioned

6    that, Your Honor, deals with my case file and this is the case file I am, by law,

7    by the (inaudible), by Federal law, by Texas law, and by Rhode Island law,

8    entitled to have access to, and Mr. Gould and the Child Support, uh, Services

9    and, uh, of Human Services denies me both, all denying me access to those. So,

10    I am again, asking for that. I will ask in every possible jurisdiction for those

11    because I am entitled, by law, at least three jurisdictions. By Texas law, by

12    Federal law-

13                  THE COURT: Thank you.

14                  DEFENDANT: -and by Rhode Island law.

15                  THE COURT: Thank you-

16                  DEFENDANT: Nevermore-

17                  THE COURT: -Mr. Gould? Thank you.

18    Okay, you've, you've you've made your point. I understand what your argument

19    is. Mr. Gould?

20                  ATTORNEY GOULD: Judge, I went

21    another, I think, ten minutes, maybe nine minutes that time. I still don't know

22    what she's looking for. Uh, it's a motion to compel. If, if that's what she wanted,

23    then let's have the motion to compel. Let's hear that. Maybe, maybe she could

24    put those thoughts into words again and maybe come up with a plan that she

25    wants for this discovery, Judge, but what we're doing now is wasting your time,

1    and wasting my time, and we're not getting anywhere. So, we've provided her

2    volumes upon volumes of documents relative to her case. She had specific

3    questions that I objected to. The, the objections were timely. We had a

4    conference, we went through them. After the conference, I had not heard

5    anything from Miss, uh, Seguin. We've gone through, I think, since February,

6    five or six appearances, a couple before you. I, I could, that, that could be an

7    exaggeration. It could've been four, uh, but we've been before the Court and,

8    and we've come with other issues every time and we continue this and continue

9    this. Judge, again, in order to have equity, you have to have clean hands, and this

10   is a person who has failed to comply with THIS Court's orders. Not the

11   Constitution, not the Texas law, not the, not the Congress law. This is someone

12   who has failed to comply with your orders, with your Court's orders on a

13   specific matter-

14                              DEFENDANT: Objection.

15                              ATTORNEY GOULD: -with child support

16   with a very-

17                              DEFENDANT: Ob, objection.

18                              ATTORNEY GOULD: -very basic needs

19   of a child-

20                              DEFENDANT: Objection.

21                              ATTORNEY GOULD: -and we're gonna

22   give-

23                              THE COURT: I'm gonna, I'm gonna, I'm

24   going to allow him to speak, just like I allowed you to speak. Mr., Mr. Gould,

25   continue.

1    ATTORNEY GOULD: I, I've said

2    enough, Judge.

3                                    DEFENDANT: Objection.

4                                    THE COURT: Again, the Court, the Court

5    takes judicial notice of both the May 24th, 2012 Court order, as well as the

6    subsequent September 25th, 2012 Court order. Um, there was, um, no appeal,

7    um, taken from either one of those Court orders. With respect to, um-

8                                    DEFENDANT: Objection. Objection,

9    Your Honor.

10                                   THE COURT: Your objection is noted,

11   thank you very, thank you, your objection is noted.

12                                   DEFENDANT: He, he-

13                                   THE COURT: Mr. Gould, what is the

14   specific, uh, amount of interest that, um, is, uh, should be on the system? Is it

15   $81,652.49?

16                                   ATTORNEY GOULD: Yes, Judge.

17                                   THE COURT: Okay, and was that the

18   amount that was, um, placed on the system back in February?

19                                   ATTORNEY GOULD: Correct, Judge.

20                                   THE COURT: The Court finds-

21                                   ATTORNEY GOULD: That number

22   (inaudible)-

23                                   THE COURT: -the Court finds that that is,

24   based on no, absolutely no evidence to the contrary, that that is the amount, um,

25   that should be set on this as of today, today's date.

1          ATTORNEY GOULD: Thank you, Your

2   Honor.

3          DEFENDANT: Objection.

4          THE COURT: Your objection is noted. I

5   gave my ruling.

6          DEFENDANT: May, Your Honor, Your

7   Honor-

8          THE COURT: I've made my ruling.

9          DEFENDANT: - I would like to place on

10  the record that I have not been able to complete the discovery that there, that the,

11  uh, the, uh, Child Support Agency had placed on the record that there is an

12  agree-, asking about an agreement. I have not been able to cross examine the

13  Defendant. That is a violative of due process-

14         THE COURT: Sir, you can, Sir-

15         DEFENDANT: -because my, I have-

16         THE COURT: Ma'am, Ma'am, Ma'am-

17         DEFENDANT: -the right to examine-

18         THE COURT: -if you have any questions-

19         DEFENDANT: -(inaudible)-

20         THE COURT: -for Mr. Meyersiek, feel

21  free to, feel free to ask him.

22         DEFENDANT: So, therefore, we are now

23  vacating your prior decision-

24         THE COURT: No, we're not! No, we're

25  not!

26

1    DEFENDANT: -because we, because we

2    are, we have not gone through due process in terms of my asking, be able to

3    cross examine the Defendant. I'm sorry, the Plaintiff, the opposing party. I, I

4    would like to ask for my witness, Mr. Gould, to be, to the witness stand.

5    THE COURT: Mr. Gould-

6    ATTORNEY GOULD: Objection, Judge.

7    THE COURT: Mr. Gould is not, is not a

8    witness.

9    DEFENDANT: The State. The State, on

10    the State of Rhode Island and he represents the State of Rhode Island. He was

11    instrumen-, he had communicated with me prior to this particular proceeding,

12    the start of proceeding in 2022, by email, by conversation, and with John

13    Langlois. So, that's my witness. I'd like to put on the stand, as my witness-

14    THE COURT: Today, the matter before-

15    DEFENDANT: -regarding-

16    THE COURT: -the matter before the

17    Court-

18    DEFENDANT: -regarding-

19    THE COURT: -is a motion to set-

20    DEFENDANT: -the waiver of interest-

21    THE COURT: -to set arrears-

22    DEFENDANT: -regarding-

23    THE COURT: Ma'am, Ma'am-

24    DEFENDANT: -the waiver of interest-

25    THE COURT: Ma'am, I'm gonna mute

1   you again. The matter before the Court today is simply a motion to set arrears.

2   We set the arrears, there's nothing further before the Court. If you wanna file a

3   different motion, feel free to do so, but this matter is concluded with your arrears

4   being set at $81,652.49.

5                                       DEFENDANT: Your, unmute, am I

6   unmuted?

7                                       THE COURT: No. Yeah.

8                                       DEFENDANT: Am I unmuted? Uh, I am

9   filing, I am asking for, um, uh, reconsideration because there is, I have not, I've

10   been, uh, uh, barred, obstructed from presenting evidence. I'd like to play, uh,

11   the audio recording of the waiver of interest.

12                                       THE COURT: Today is the motion to set

13   the, to set the interest.

14                                       DEFENDANT: And that's my defense-

15                                       THE COURT: The motion to set arrears,

16                                       DEFENDANT: -my defense is, I would

17   like to play the recording of the waiver of interest that the State had represented

18   that Gero had done. If I'm obstructed from, uh, providing evidence and we have

19   a due process issue in this proceeding. I have not been, I want to present

20   evidence, I want to cross examine the witness, I want to pro-, I want to call my

21   witness and I have a right to do so-

22                                       THE COURT: Ma'am, if you want to do

23   that, this is not, this is not the forum for that. I can do that in another proceeding.

24                                       DEFENDANT: Yes, it is! Yes, it is-

25                                       THE COURT: Uh, well, I respectfully dis-

1    agree with you.

2                                    DEFENDANT: -because we are here-

3                                    THE COURT:  I respectfully disagree-

4                                    DEFENDANT: -to establish, we are here

5    to establish, we're here supposedly to establish interest and I am presenting

6    evidence that interest was waived.

7                                    THE COURT: Interest was not waived in

8    any Court order and that is the basis upon which-

9                                    DEFENDANT: It was waived-

10                                   THE COURT: -I made my decision today.

11                                   DEFENDANT: -(inaudible)-

12                                   THE COURT: Ma'am, Ma'am-

13                                   DEFENDANT: -it was waived-

14                                   THE COURT: -I'm muting you because

15   you don't let me speak. There is no Court order by this Court by any Magistrate

16   or Judge that waived or set the interest to zero. It is still in the system, and that is

17   why today I am going to establish that the interest owed by you on this account

18   is set at $81,652.49. There was no Court order to the contrary. This matter is

19   now concluded.

20                                   DEFENDANT: I am now, I am now

21   raising the issue, uh, that interest was waived by contract and agreement-

22                                   THE COURT: Ma'am, I, Ma'am-

23                                   DEFENDANT: -with Gero Meyersiek-

24                                   THE COURT: -I, I just, Ma'am-

25                                   DEFENDANT: -and this is all part of the-

1    THE COURT: -I just gave you the

2    reasoning-

3    DEFENDANT: -(inaudible) process-

4    THE COURT: -for the Court's decision is

5    based on the fact that the Court file is void of any order or judgement that

6    waived the interest of set it to zero.

7    DEFENDANT: Also, the interest rate of

8    12% compounding interest is illegal under, uh, Social Security Act. They have

9    put out-

10    THE COURT: Well, that's the interest rate

11    that-

12    DEFENDANT: -12% compound interest-

13    THE COURT:  -that's been established-

14    DEFENDANT: -that is illegal under-

15    THE COURT: -by the State of Rhode

16    Island.

17    DEFENDANT: -Federal law, which

18    preempts Rhode Island law.

19    THE COURT: Thank you very much, Miss

20    Seguin-

21    DEFENDANT: I just wanna make sure

22    that-

23    THE COURT: Your objection is moted.

24    DEFENDANT: -(inaudible)-

25    THE COURT: Thank you very much-

1       DEFENDANT: -(inaudible)-

2       THE COURT: -Mr. Meyersiek-

3       DEFENDANT: -also entitled-

4       THE COURT: -Attorney Gould-

5       DEFENDANT: -to see Judge created laws

6 on these, this issue. I have been prevented from accessing those. There's

7 (inaudible) public records (inaudible)-

8       THE COURT: Ma'am, we gave you every

9 Court record you requested.

10      DEFENDANT: -Federal-

11      THE COURT: You requested-

12      DEFENDANT: -that was all Judge

13 created-

14      THE COURT: -you requested the Court

15 file-

16      DEFENDANT: -laws. (Inaudible) 12%

17 compounding interest-

18      THE COURT: -for a number of years. I'm

19 not going to let you yell at me.

20      DEFENDANT: Why-

21      THE COURT: You're not going to talk

22 over me.

23      DEFENDANT: Why-

24      THE COURT: This hearing is concluded.

25 Thank you very much.

1            ATTORNEY GOULD: Thank you, Judge.

2            DEFENDANT: I object and raise that the-

3            THE COURT: Thank you-

4            DEFENDANT: -interest, as well-

5            THE COURT: Thank you.

6            DEFENDANT: -and compound interest is

7    illegal-

8            ATTORNEY GOULD: Thank you, Judge.

9            DEFENDANT: I'm looking to appeal this

10   to the Judge, Miss, uh, Your Honor, Magistrate-

11           THE COURT: And you're, and you're free

12   to do so.

13           DEFENDANT: And I'm doing that on an

14   oral basis, so here are-

15           THE COURT: You can file that with the

16   Clerk-

17           DEFENDANT: -I am doing that orally-

18           THE COURT: You can file that with the

19   Clerk. I will make a notation.

20           DEFENDANT: -this is an oral motion, an

21   oral motion, this is an oral motion-

22           THE COURT: Thank you.

23           DEFENDANT: -to-

24           THE COURT: It's noted.

25           DEFENDANT: -appeal the Magistrate's

1  order-

2                                    THE COURT: Your appeal from my

3  decision is noted. It will be put in the order.

4                                    DEFENDANT: -for a hearing, there was

5  no hearing on this, there was no trial on this, no trial was provided. I was

6  prevented from, uh, from, uh, from, uh, from presenting evidence-

7                                    THE COURT: And you may appeal my

8  decision-

9                                    DEFENDANT: -(inaudible) audio

10 recording-

11                                   THE COURT: -to a Famiy Court Justice.

12 Thank you very much.

13                                   DEFENDANT: I'm appealing it. I, I have

14 appealed it orally, now.

15                                   CLERK: Nope, can't do that.

16                                   THE COURT: You have to file an appeal

17 yourself in the Clerk's office.

18                                   CLERK: And she has to pay for a

19 transcript-

20                                   DEFENDANT: According to Turner

21 versus Rodgers, another U.S. Supreme Court case, I am entitled to not have to

22 do a, uh, a written motion. I can do an oral motion for an appeal to a, uh, to, to

23 the Jus-, Judge, uh, at iss-, that's, uh, of issue and I'm requesting a hearing date

24 for that appeal.

25                                   CLERK: Sorry, that goes before a Judge.

1         DEFENDANT: Clerk (inaudible)-

2         THE COURT: That has to go before a

3   Family Court Judge.

4         CLERK: Only the Office can give appeal

5   dates, and there's a process and she has to order a transcript, and pay for it,

6   before that transcript will even be typed out.

7         THE COURT: Miss Seguin, did you hear

8   the Clerk?

9         DEFENDANT: Who is the, uh, who is the,

10  uh, the Scribe for this, the, uh, Stenographer? So, today, I wanna make very

11  clear, you all know you're establishing this Court, um, establishing interest and

12  what you're also saying is that the, the, uh, the interest was supposedly

13  established but you're reestablishing interest?

14        THE COURT: I've made my ruling-

15        DEFENDANT: There's no-

16        THE COURT: -I've made my ruling-

17        DEFENDANT: -(inaudible)-

18        THE COURT: -Miss Seguin, I've made

19  my ruling. You've indicated you're interest in appealing. That is noted for the

20  record. We have other cases that are waiting to be heard. Thank you very much

21  and-

22        DEFENDANT: I'm looking to-

23        THE COURT: -you're free to follow up-

24        DEFENDANT: -as a pro se litigant-

25        THE COURT: -however you see fit. Thank

1  you so much.

2                          DEFENDANT: -I'm looking to-

3                          THE COURT: I understand that and thank

4  you.

5                          DEFENDANT: -understand what the

6  Court order will say.

7                          THE COURT: Thank-

8                          DEFENDANT: What will the Court order

9  say? What will the Court order say?

10                          THE COURT: Mr. Gould will draft the

11  Court order for my signature, and you'll receive a copy of it. Thnak you very

12  much.

13                          DEFENDANT: Now, what would it, what

14  would it, so that we're all clear, so I can also put on the record any objections.

15  The objection, so, you're-

16                          THE COURT: Miss Seguin-

17                          DEFENDANT: -ordering reestablishment

18  because that's the motion. The motion is to reestablish interest.

19                          THE COURT: It's not reestablish.

20                          DEFENDANT: And-

21                          THE COURT: It's set arrears. That was the

22  motion, to set arrears. The arrears are the interest that you owe on the case,

23  Ma'am, and this hearing is over.

24                          DEFENDANT: So, you are-

25                          THE COURT: I'm going to end the

1    hearing-

2                                        DEFENDANT: -you are (inaudible)-

3                                        THE COURT: You are not going to talk

4    over me. The hearing is over. You can file your appeal. Thank you very much.

5    Have a good day.

6                                        DEFENDANT: I would like to put on the

7    record-

8                                        THE COURT: The hearing is over,

9    Ma'am.

10                                       DEFENDANT: -um, my appeal.

11                                       THE COURT: The hearing is over. You

12   can't cont-

13                                       DEFENDANT: I would like to put on the

14   record for the appeal, because the appeal is critically important.

15                                       THE COURT: I understand that.

16                                       DEFENDANT: The appeal basically-

17                                       THE COURT: We're not, no, we're not

18   going to hear your appeal now.

19                                       DEFENDANT: You don't have-

20                                       THE COURT: We're not going to hear

21   your appeal now.

22                                       DEFENDANT: You don't have, this Court

23   does not have jurisdiction-

24                                       THE COURT: You've noted you're

25   objection, you've noted your objection, you're not going to argue your appeal

1  now and you're not gonna talk over me, okay. I've made my ruling. You

2  disagree with it. You have a right to appeal and the hearing is over, okay. You're

3  not going to argue your appeal here. You don't like my decision, you don't

4  agree with my decision, and the hearing is over, because there's nothing left to

5  discuss. I'm ending this meeting for everyone. I'm ending-

6                                    DEFENDANT: You-

7                                    THE COURT: I'm ending the meeting for

8  everyone.

9                                    DEFENDANT: The Family Court does not

10  have jurisdiction-

11                                    THE COURT: Thank you.

12                                    DEFENDANT: -over agreements between

13  Gero and myself-

14                                    THE COURT: Thank you. I'm ending, I'm

15  ending the meeting. Thank you.

16                                    DEFENDANT: I'm putting that on the

17  record. The Family Court lacks subject matter-

18                                    THE COURT: Okay.

19                                    DEFENDANT: -jurisdiction, nor personal

20  jurisdiction regarding agreements-

21                                    THE COURT: I'm ending the meeting-

22                                    DEFENDANT: -between Gero Meyersiek-

23                                    THE COURT: -for everyone.

24                                    DEFENDANT: -and myself-

25                                    THE COURT: Thank you, Mr. Meyersiek-

1    DEFENDANT: -and that was a question-

2    THE COURT: -thank you, Mr. Gould-

3    DEFENDANT: -Mr. Gould had posed-

4    THE COURT: Thank you very much. I'm

5    ending the meeting for everyone.

6    DEFENDANT: In-

7

8

9    **HEARING CONCLUDED.**

10

11

12

13

14

EXHIBIT F

## SPECIFICATION FOR OCSS CHANGE ORDER
*Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

EXHIBIT G



cseinfo.dhs.ri.gov

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov:

## State of Rhode Island
# Office of Child Support Services
### DEPARTMENT OF HUMAN SERVICES

Welcome Mary Seguin

Home   My Profile   Contact Us   Site Map   Log Out

**Menu**

- ▼ Case Information
  - ▶ Last 5 Payments
  - ▶ Last 13 Months
  - Current Orders/ Past Due Balances
  - Court Dates/ Appointments
  - ▶ Enforcement Actions
- ▶ PIN Lookup

Home > Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek        CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|---------|--------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Exhibit B

PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JIM HODGES, in his official capacity
as Governor of the State of South
Carolina; JEAN HOEFER TOAL, in her
official capacity as Chief Justice of
South Carolina; SOUTH CAROLINA
DEPARTMENT OF SOCIAL SERVICES;
STATE OF SOUTH CAROLINA; PEOPLE OF
SC, on Behalf of the State of South
Carolina; JOHN DOE; JANE DOE, and
those similarly situated,
            *Plaintiffs-Appellants,*

            v.                                    No. 00-2512

TOMMY G. THOMPSON, SECRETARY,
UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES; WADE
F. HORN, Ph.D. in his official
capacity as Assistant Secretary of
the United States Department of
Health and Human Services for
Children and Families; U.S.
DEPARTMENT OF HEALTH & HUMAN
SERVICES,
            *Defendants-Appellees.*

Appeal from the United States District Court
for the District of South Carolina, at Columbia.
Julian Abele Cook, Jr., Senior District Judge, sitting by designation.
(CA-00-2048-3-17)

Argued: December 6, 2001

Decided: November 15, 2002

Before WIDENER, NIEMEYER, and MOTZ, Circuit Judges.

---

Affirmed by published per curiam opinion.

---

## COUNSEL

**ARGUED:** Marcus Angelo Manos, NEXSEN, PRUET, JACOBS & POLLARD, L.L.C., Columbia, South Carolina, for Appellants. Gregory George Katsas, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Wilburn Brewer, Jr., NEXSEN, PRUET, JACOBS & POLLARD, L.L.C., Columbia, South Carolina; A.E. Dick Howard, Charlottesville, Virginia, for Appellants. Stuart E. Schiffer, Acting Assistant Attorney General, Scott N. Schools, United States Attorney, Jacob M. Lewis, Peter J. Smith, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

## OPINION

PER CURIAM:

The Governor of South Carolina appeals the grant of summary judgment to the Secretary of the United States Department of Health and Human Services in the State's action seeking injunctive and declaratory relief from conditions imposed for federal funding of the Temporary Assistance to Needy Families (TANF) program.

South Carolina challenges the district court finding that Congress acted within its Spending Clause authority when it conditioned States' receipt of federal funds under the child support enforcement program and the TANF program on compliance with the requirement that States develop and maintain automated child support enforcement systems and that such a condition was not so coercive as to violate the Tenth Amendment. The State further alleges the district court

erred when it found that the Secretary did not have the discretion to amend the statutory penalty structure for a State's noncompliance with the child support systems requirements. In addition, South Carolina contends the court erred in finding that the State could not invoke the protections of the Due Process Clause. After considering the parties' briefs and the record, and following oral argument, we affirm substantially on the reasoning of the district court.

## I.

The district court opinion contains a comprehensive history, the details of which need not be repeated here, of the federal government's longstanding involvement in child support enforcement programs and related federal efforts to work with the States to solve the serious problem of nonpayment of child support. See *Hodges v. Shalala*, 121 F.Supp.2d 854 (D.S.C. 2000). Currently, as a condition of receipt of any federal funding under Title IV-D of the Social Security Act, 42 U.S.C. §§ 651-669, States must have an approved state plan for child and spousal support that meets all the requirements of 42 U.S.C. § 654. Among the prerequisites for approval of a Title IV-D Plan are the requirements that the State establish and operate an automated data processing and information retrieval system, see 42 U.S.C. § 654(24), and a state child support disbursement unit (SDU), see 42 U.S.C. § 654(27)(A). South Carolina concedes that it has neither a federally certifiable statewide automated system for child support nor an SDU. See *Hodges*, 121 F. Supp. 2d at 861.

Without an approved state plan, a State may lose federal funding under both Title IV-D (child support enforcement) and Title IV-A (TANF). See 42 U.S.C. § 655(a)(1)(A); 42 U.S.C. § 602(a)(2). Alternatively, a State may opt for an alternative penalty in lieu of disapproval of their state plan and the withholding of federal funds if the State is making a good faith effort to comply with the program's requirements and the State has submitted a corrective compliance plan. See 42 U.S.C. § 655(a)(4). South Carolina has elected to incur the alternative penalty.

We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and review a district court's grant of summary judgment *de novo*. See *United States v. Kanasco, Ltd.*, 123 F.3d 209, 210 (4th Cir. 1997).

## II.

We turn first to South Carolina's contention that the federal government's requirements and penalties associated with the state-wide automated systems, which South Carolina failed to provide, exceed Congressional authority under the Spending Clause and the Tenth Amendment.

Consistent with its Spending Power, Congress may attach conditions on the receipt of federal funds. See *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Spending Power is not unlimited, of course, and the Supreme Court has recognized four general limitations: spending must be in pursuit of the general welfare; any attached conditions must be unambiguous; conditions must also be related to a federal interest; and, the obligations imposed by Congress may not violate any independent constitutional provisions. See *Dole*, 483 U.S. at 207-08.

The district court found that "Congress made a considered judgment that the American people would benefit significantly from the enhanced enforcement of child-support decrees and the diminution of the number of parents who are able to avoid their obligations simply by moving across local or state lines." *Hodges*, 121 F. Supp. 2d at 873. Thus, like the district court, we are satisfied that Congress acted in the general welfare when it enacted the child support enforcement programs and the associated funding conditions under Title IV-D.

South Carolina's contention that the Title IV-D conditions are ambiguous is without merit. The statute expressly provides that compliance with the automated system and SDU requirements is a condition of approval of a state plan. See 42 U.S.C. § 654(16), (24)(27)A. We agree with the district court that the clear and unequivocal statement of the required conditions in the statute enabled South Carolina to "exercise [her] choice knowingly, cognizant of the consequences of [her] participation." See *Dole*, 483 U.S. at 207 (citations omitted).

A third limitation on the Spending Power requires that conditions "bear some relationship to the purpose of the federal spending." *New York v. United States*, 505 U.S. 144, 167 (1992) (citing *Dole*, 483 U.S. at 207-08, n.3). Here, there is a complementary relationship

between efficient child support enforcement and the broader goals of providing assistance to needy families through the TANF program. Establishing paternity and collecting child support may enable families to reduce their dependence on the welfare system, and both programs are intended to reduce the incidence of poverty among children and families. The Supreme Court has recognized that Congress intended these linkages between child support programs and the TANF program. See *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990) (concluding Congress intended the two programs to "operate together closely to provide uniform levels of support for children of equal need").[1]

South Carolina does not contend that the Title IV-D conditions violate the fourth limitation on the Spending Power — that the conditions violate any independent Constitutional prohibition, rather it raises a Tenth Amendment[2] challenge. As we have recently reconfirmed, "the Tenth Amendment itself *does not* act as a constitutional bar to Congress's spending power; rather, the fourth restriction on Congress's spending power stands for the more general proposition that Congress may not induce the states to engage in activities that would themselves be unconstitutional." *James Island Pub. Serv. Dist. v. City of Charleston*, 249 F.3d 323, 327 (4th Cir. 2001) (citing *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000)) (italics in original). We therefore next consider South Carolina's Tenth Amendment argument, not as a limitation related to the Spending Clause, but as an independent constitutional challenge.

South Carolina argues that the coercive effect of the Title IV-D conditions run afoul of the protections of the Tenth Amendment. The Supreme Court has recognized that the Tenth Amendment may be implicated when the financial incentives offered by the federal government to the States cross the impermissible line where "pressure

---

[1] *Sullivan* considered the relationship between child enforcement programs and Aid to Families with Dependent Children (AFDC). 496 U.S. at 478. TANF is a block grant program established in 1996 as the successor to the AFDC program. See 42 U.S.C. §§ 601-618.

[2] The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

turns into compulsion." See *Dole*, 483 U.S. at 211 (citations omitted). Congress may use its Spending Power to influence a State's legislative choices by providing incentives for States to adopt certain policies, but may not compel or coerce a State, or go so far as to "commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." See *New York v. United States*, 505 U.S. at 161, but Congress, under the Commerce Clause, may offer the States a choice of regulation under federal control or preemption under federal regulation. See *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288 (1981).

The district court found that, based on the State's own admission, the alternative penalty, which South Carolina has now elected, would result in the loss of a small fraction of the State's TANF funds and that such a proportion was noncoercive. Given the linkages between child support enforcement and aid to needy families and the level of the alternative penalty, we agree with the district court's conclusion that "the Title IV-D conditions are not so overbearing as to create an unconstitutional compulsion." *Hodges*, 121 F.2d at 875.

South Carolina next contends that the Secretary of the Department of Health and Human Services (HHS) has the discretion to deviate from the alternative penalty structure of Title VI-D in order to respond to the peculiar circumstances that led to South Carolina's noncompliance. Specifically, South Carolina argues that its inability to comply with the automated system and SDU requirements was caused by the failure of its prime contractor, Unisys, to deliver on its contract with the State. South Carolina maintains that because its noncompliance was no fault of its own and its alternative systems are in substantial compliance with the goals of the statute, the Secretary abused her discretion by refusing to grant South Carolina an evidentiary hearing and waive or amend the alternative penalty for noncompliance.

We have examined the penalty provisions of the statute and, like the district court, cannot find the discretion South Carolina envisions. The wording of the statute is plain. Where the Secretary determines that a state plan would be disapproved, and where the State has made and continues to make a good faith effort to comply and has submit-

ted a corrective compliance plan, "the Secretary shall not disapprove the State plan . . . and *the Secretary shall reduce the amount otherwise payable to the State* [by the designated alternative penalty]." 42 U.S.C. § 655(a)(4)(A)(i)(II) (emphasis added). Again, we agree with the district court that "[b]y the text of the statute, the legislature has prescribed that the Secretary shall enforce this penalty." *Hodges*, 121 F.2d at 879. Absent any discretion available to the Secretary to impose a lesser penalty than the alternative penalty as outlined in the statute, South Carolina's assertion that it is entitled to an evidentiary hearing must also fail.[3]

## III.

For the foregoing reasons, we are of opinion that the Title IV-D provisions are constitutionally valid under the Spending Clause and the Tenth Amendment and that the Secretary lacks discretion under Title IV-D to deviate from the penalty provisions.

The judgment of the district court is accordingly

*AFFIRMED.*

---

[3]In the district court, South Carolina asserted a Due Process claim which the district court denied. The court concluded that the "State cannot invoke the protections of the Fifth Amendment with claims that [the State] has been harmed." *Hodges*, 121 F.2d at 865. South Carolina does not take issue with the district court's holding, but rather, on appeal it asserts that the State is entitled to assert a Due Process claim on behalf of its citizens. Because this contention was never properly presented to the district court, we do not consider it now. See *McGowan v. Gillenwater*, 429 F.2d 586, 587 (4th Cir. 1970).

Exhibit C

No. 10-10

# In the Supreme Court of the United States

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

---

*ON WRIT OF CERTIORARI
TO THE SUPREME COURT OF SOUTH CAROLINA*

---

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
SUPPORTING REVERSAL**

---

SALLY A. HOWARD
  *Acting General Counsel*
ROBERT E. KEITH
  *Associate General Counsel*
LISETTE PEDRE MESTRE
  *Attorney*
  *Department of Health and
  Human Services
  Washington, D.C. 20201*

NEAL KUMAR KATYAL
  *Acting Solicitor General
  Counsel of Record*
TONY WEST
  *Assistant Attorney General*
LEONDRA R. KRUGER
  *Acting Deputy Solicitor
  General*
JOSEPH R. PALMORE
  *Assistant to the Solicitor
  General*
LEONARD SCHAITMAN
EDWARD HIMMELFARB
  *Attorneys*
  *Department of Justice
  Washington, D.C. 20530-0001
  SupremeCtBriefs@usdoj.gov
  (202) 514-2217*

**QUESTIONS PRESENTED**

1.  Whether the Court has jurisdiction to review the decision of the South Carolina Supreme Court.

2.  Whether due process requires that the State provide counsel, at its expense, to an indigent parent in a child-support proceeding, when the parent is subject to a civil-contempt order for non-payment that may lead to confinement.

(I)

**TABLE OF CONTENTS**

Page

Interest of the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
Summary of argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Argument:
   I.   The Court has jurisdiction to review the decision of
       the South Carolina Supreme Court . . . . . . . . . . . . . . . 13
  II.   The absence of adequate procedures necessary
       to secure an accurate adjudication of civil
       contempt violated due process . . . . . . . . . . . . . . . . . . 16
       A.  Confinement for civil contempt is
           permitted only when the contemnor is
           presently able to comply with the
           underlying order . . . . . . . . . . . . . . . . . . . . . . . . . . 16
       B.  The Family Court's procedures were
           inadequate to ensure an accurate
           determination of present ability to pay . . . . . . . . 19
       C.  Due Process can be satisfied by a variety of
           procedures intended to assure an accurate
           determination of present ability to pay in a
           civil contempt proceeding . . . . . . . . . . . . . . . . . . 23
           1.  Courts can comply with Due Process by
               providing a meaningful opportunity for an
               alleged contemnor to establish his present
               ability to pay . . . . . . . . . . . . . . . . . . . . . . . . . . 24
           2.  There is no basis for an inflexible right to
               counsel rule in civil contempt proceedings . . . 25
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

(III)

**TABLE OF AUTHORITIES**

Cases:

*Alvarez* v. *Smith*, 130 S. Ct. 576 (2009) . . . . . . . . . . . . . . . 15

*Blessing* v. *Freestone*, 520 U.S. 329 (1997) . . . . . . . . . . . . . 3

*Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Carlson* v. *Landon*, 342 U.S. 524 (1952) . . . . . . . . . . . . . . 32

*City of L.A.* v. *Lyons*, 461 U.S. 95 (1983) . . . . . . . . . . 14, 15

*DeFunis* v. *Odegaard*, 416 U.S. 312 (1975) . . . . . . . . . . . . 14

*First Nat'l Bank* v. *Bellotti*, 435 U.S. 765 (1978) . . . . . . . . 14

*Foucha* v. *Louisiana*, 504 U.S. 71 (1992) . . . . . . . . . . . . . . 20

*Gagnon* v. *Scarpelli*, 411 U.S. 778 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25, 26, 27, 28, 29

*Gault, In re*, 387 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . 26

*Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418 (1911) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

*Hicks* v. *Feiock*, 485 U.S. 624 (1988) . . . . . . . . . . . . . . 17, 18

*Hodges* v. *Shalala*, 121 F. Supp. 2d 854 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*INS* v. *Lopez-Mendoza*, 468 U.S. 1032 (1984) . . . . . . . . . 32

*International Union, United Mine Workers* v. *Bagwell*, 512 U.S. 821 (1994) . . . . . . . . . . . . . . . 18, 19, 26

*Landon* v. *Plasencia*, 459 U.S. 21 (1982) . . . . . . . . . . . . . 31

*Lassiter* v. *Department of Soc. Servs.*, 452 U.S. 18 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Maggio* v. *Zeitz*, 333 U.S. 56 (1948) . . . . . . . . . . . . . . . 17, 18

*Mathews* v. *Eldridge*, 424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . 11, 19, 20, 25, 26, 29

V

Cases—Continued:                                                    Page

*Middendorf* v. *Henry*, 425 U.S. 25 (1976) . . . . . 12, 26, 29, 31

*Mohammed* v. *Gonzales*, 400 F.3d 785 (9th Cir. 2005) . . . 32

*Morrissey* v. *Brewer*, 408 U.S. 471 (1972) . . . . . . . . . . . 19, 26

*Moseley* v. *Mosier*, 306 S.E.2d 624 (S.C. 1983) . . . . . . . . 17

*Murphy* v. *Hunt*, 455 U.S. 478 (1982) . . . . . . . . . . . . . 13, 14

*Nazakat* v. *INS*, 981 F.2d 1146 (10th Cir. 1992) . . . . . . . 33

*Olmstead* v. *L.C.*, 527 U.S. 581 (1999) . . . . . . . . . . . . . . . 15

*Shillitani* v. *United States*, 384 U.S. 364 (1966) . . . . . 11, 17

*Spencer* v. *Kemna*, 523 U.S. 1 (1998) . . . . . . . . . . . . . . 13, 14

*United States* v. *Bauer*, 956 F.2d 693 (7th Cir.),
  cert. denied, 506 U.S. 882 (1992) . . . . . . . . . . . . . . . . . . 28

*United States* v. *Campos-Asencio*, 822 F.2d 506
  (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States* v. *Gasca-Kraft*, 522 F.2d 149 (9th Cir.
  1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States* v. *Rylander*, 460 U.S. 752 (1983) . . . . . . . . 18

*United States* v. *Torres-Sanchez*, 68 F.3d 227 (8th Cir.
  1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*United States Parole Comm'n* v. *Geraghty*,
  445 U.S. 388 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Vitek* v. *Jones*, 445 U.S. 480 (1980) . . . . . . . . . . . . . . . 26, 27

*Walters* v. *National Ass'n of Radiation Survivors*,
  473 U.S. 305 (1985) . . . . . . . . . . . . . . . . . . . . . . . . 29, 30, 31

*Weinstein* v. *Bradford*, 423 U.S. 147 (1975) . . . . . . . . . . . 14

*Wilkinson* v. *Austin*, 545 U.S. 209 (2005) . . . . . . . . . . . . . 19

*Yee* v. *City of Escondido*, 503 U.S. 519 (1992) . . . . . . . . . . 24

Constitution, statutes and regulations:                    Page

U.S. Const.:

Amend. V (Due Process Clause) . . . . . . . . . . . . . . . . . 9, 19

Amend. VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 26, 27

Amend. XIV (Due Process Clause) . . . . . . . . . . . . . . . 19

Social Services Amendments of 1974, Pub. L.
No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651
*et seq.*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

§ 101(c)(5)(C), 88 Stat. 2360 . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 654(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 654(6) (1976) . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 654(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 654(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. 654(24) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

42 U.S.C. 654a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 654a(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 654a(e)(4) . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 654a(e)(5) . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 654a(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 655(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. 655(a)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . 2

42 U.S.C. 655(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . 4

42 U.S.C. 655(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . 6

42 U.S.C. 656(a)(1) (1976) . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 657(a)(4)(B) (1976) . . . . . . . . . . . . . . . . . 3

42 U.S.C. 657(b) (1976) . . . . . . . . . . . . . . . . . . . . . . 3

42 U.S.C. 666(a)(1)-(8) . . . . . . . . . . . . . . . . . . . . . . 4

VII

Statutes and regulations—Continued:                                Page

42 U.S.C. 666(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . 30
42 U.S.C. 666(a)(7)(B)(i) . . . . . . . . . . . . . . . . . . . . 30
42 U.S.C. 666(a)(8)(A)(iv) . . . . . . . . . . . . . . . . . . . 30
42 U.S.C. 666(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 4
42 U.S.C. 666(c) . . . . . . . . . . . . . . . . . . . . . . . . . . 6
42 U.S.C. 666(c)(1)(H) . . . . . . . . . . . . . . . . . . . . . . 30

Child Support Enforcement Amendments of 1984,
  Pub. L. No. 98-378,  98 Stat. 1329:

§ 6, 98 Stat. 1314 . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
§ 23(a)(2), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . 4
§ 23(a)(5), 98 Stat. 1329 . . . . . . . . . . . . . . . . . . . . . 4

Family Support Act of 1988, Pub. L. No. 100-485,
  102 Stat. 2343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

§ 123(a)(C), 102 Stat. 2352 . . . . . . . . . . . . . . . . . . . . 5

Personal Responsibility and Work Opportunity
  Reconciliation Act of 1996, Pub. L. No. 104-193,
  110 Stat. 2105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

§ 344(a)(2), 110 Stat. 2235 . . . . . . . . . . . . . . . . . . . . 6

Social Security Act Amendments of 1950, ch. 809,
  § 321(b), 64 Stat. 550 . . . . . . . . . . . . . . . . . . . . . . . . . 2

Social Security Amendments of 1967, Pub. L.
  No. 90-248, § 201(a)(1), 81 Stat. 877-879 . . . . . . . . . . . . . 2

§ 201(a)(1), 81 Stat. 879 . . . . . . . . . . . . . . . . . . . . . . 3

8 U.S.C. 1229a(b)(4)(A) . . . . . . . . . . . . . . . . . . . . . . 32
8 U.S.C. 1362 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
18 U.S.C. 3006A(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 28
28 U.S.C. 1257(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
42 U.S.C. 602(a)(26) (1976) . . . . . . . . . . . . . . . . . . . . . 3

VIII

Statutes and regulations—Continued:                    Page

    42 U.S.C. 608(a)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 7

    42 U.S.C. 608(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    45 C.F.R.:

        Section 302.70(a)(5)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.5(g)(2)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.6 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        Section 303.6 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        Section 303.20(c)(7) (1975) . . . . . . . . . . . . . . . . . . . . . . . 4

        Section 303.20(c)(7) (1989) . . . . . . . . . . . . . . . . . . . . . . . 5

        Section 303.100(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.100(f)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.101(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.102(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 303.104(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 304.20(b)(3)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . 5

        Section 304.23(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        Section 304.23(j) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    Sup. Ct. R. 14.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    S.C. Rule of Family Ct.:

        R. 24 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        R. 24(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

        R. 24(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    S.C. Code Ann. (West):

        § 43-5-220(c) (Supp. 2009) . . . . . . . . . . . . . . . . . . . . . . 25

        § 43-5-235 (Supp. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 7

        § 63-3-620 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 14

IX

Miscellaneous:                                                   Page

52 Fed. Reg. 32,130 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

U.S. Dep't of Health & Human Servs.:

National Child Support Enforcement, *Strategic
Plan: FY 2005-2009*, http://www.acf.hhs.gov/
programs/cse/pubs/2004/Strategic_Plan_
FY2005-2009.pdf . . . . . . . . . . . . . . . . . . . . . . . 21, 22, 23

Office of Child Support Enforcement, *National
Status of Automated Child Support Systems*,
http://www.acf.hhs.gov/programs/
cse/stsys/certmap.htm . . . . . . . . . . . . . . . . . . . . . . . . . 6

Elizabeth G. Patterson, *Civil Contempt & the
Indigent Child Support Obligor: The Silent
Return of Debtor's Prison*, 18 Cornell J.L. & Pub.
Pol'y 95 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

S. Rep. No. 387, 98th Cong., 2d Sess. (1984) . . . . . . . . . . 30

Elaine Sorensen et al., *Assessing Child Support
Arrears in Nine Large States & the Nation* (2007)
http://aspe.hhs.gov/hsp/07/assessing-CS-debt/
report.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

South Carolina Dep't of Social Servs., *Response to
Budget Proviso 13.27* (Aug. 31, 2007),
http://www.scstatehouse.gov/reports/DSS/
Provisoresponse1327_083107.doc . . . . . . . . . . . . . . . . . . 6

# In the Supreme Court of the United States

No. 10-10

MICHAEL D. TURNER, PETITIONER

*v.*

REBECCA L. ROGERS, ET AL.

*ON WRIT OF CERTIORARI*
*TO THE SUPREME COURT OF SOUTH CAROLINA*

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE**
**SUPPORTING REVERSAL**

**INTEREST OF THE UNITED STATES**

This case concerns the due process protections that apply in a state civil contempt proceeding for non-payment of court-ordered child support. The state child-support enforcement program at issue in the case, like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 *et seq.*) (adding Title IV-D to the Social Security Act). The program, which is administered by the Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for 66% of the costs of operating their child-support enforcement programs. 42 U.S.C.

(1)

2

655(a)(2)(C). The United States has a substantial interest in the effective and equitable operation of such child-support programs.

### STATEMENT

1. This case involves proceedings in South Carolina family court to enforce a child-support order entered against petitioner for the support of his and respondent Rogers' minor child. South Carolina, like every other State, maintains a child-support enforcement program as a condition of receiving federal funding for its Temporary Assistance for Needy Families program. Since Congress first required States receiving federal funds to undertake child-support enforcement efforts, it has shifted its emphasis from a localized, court-based enforcement approach to centralized and automated efforts. South Carolina, however, maintains a localized, court-based approach to child-support enforcement.

a. Congress first required States receiving federal funds to establish child-support enforcement programs in 1950, pursuant to the Aid to Families with Dependent Children (AFDC) program. See Social Security Act Amendments of 1950, ch. 809, § 321(b), 64 Stat. 550 (requiring States receiving AFDC funds to "provide for prompt notice to appropriate law-enforcement officials of the furnishing of aid to dependent children in respect of a child who has been deserted or abandoned by a parent"). In 1968, Congress required States participating in AFDC to create statewide or local "organizational unit[s]" for establishing paternity and collecting child support. Social Security Amendments of 1967, Pub. L. No. 90-248, § 201(a)(1), 81 Stat. 877-879. It also required States to "provide for entering into cooperative arrangements with appropriate courts and law enforce-

ment officials * * * to assist" with administration of the program. *Id.* § 201(a)(1), 81 Stat. 879.

b. In 1975, Congress adopted Title IV-D, 42 U.S.C. 651 *et seq.*, and established the general statutory framework that exists today. See 1975 Act § 101(a), 88 Stat. 2351; *Blessing* v. *Freestone*, 520 U.S. 329, 333-335 (1997) (describing program). The 1975 Act required States participating in AFDC to "have in effect a plan approved" by the Secretary under Title IV-D and to "operate a child support program in conformity with such plan." 1975 Act § 101(c)(5)(C), 88 Stat. 2360. In particular, each State was required to provide services to locate noncustodial parents and to establish the paternity of, and secure support for, children receiving AFDC benefits. 42 U.S.C. 654(4).

Under the 1975 Act, AFDC recipients were required to assign their support rights to the State and cooperate in enforcement efforts. 42 U.S.C. 602(a)(26) (1976). Amounts recovered generally were retained by the State to reimburse it and the federal government for AFDC assistance provided to the child's family. 42 U.S.C. 657(b) (1976). Once assigned, the support obligation was owed to the State and was collectible under all applicable state processes. 42 U.S.C. 656(a)(1) (1976).[1]

The Secretary's regulations implementing the 1975 Act reflected a localized, court-centered approach to enforcement. States' efforts to collect past-due child support were required to include ("as applicable and necessary"): "[c]ontempt proceedings to enforce an extant court order," court-ordered wage garnishment, and

---

[1] Congress required States to provide services to non-AFDC families as well, 42 U.S.C. 654(6) (1976), although those families were not required to assign their support rights and any child support the State collected was paid to the family, 42 U.S.C. 657(a)(4)(B) (1976).

4

attachment of real and personal property. 45 C.F.R. 303.6 (1975). States were also required to maintain sufficient staff (either statewide or locally) to "enforce collection of support" by "executing contempt proceedings, wage assignments, obtaining garnishment orders, attaching real and personal property, criminal prosecution and executing judgments." 45 C.F.R. 303.20(c)(7) (1975).

c. In 1984, Congress found that there remained "a critical lack of child support enforcement," which had "a critical impact on the health and welfare of the children of the Nation." Child Support Enforcement Amendments of 1984 (1984 Amendments), Pub. L. No. 98-378, § 23(a)(2) and (5), 98 Stat. 1329. The 1984 Amendments required States to adopt laws and procedures providing for, among other things, (i) mandatory wage withholding; (ii) expedited processes for obtaining and enforcing support orders; (iii) state income tax refund intercepts; and (iv) reporting overdue support to consumer credit agencies. 42 U.S.C. 666(a)(1)-(8) and (b).

Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for (optional) State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support, and the prompt provision of notice to appropriate officials with respect to any arrearages in support payments which may occur." 1984 Amendments § 6, 98 Stat. 1314; 42 U.S.C. 654(16); 655(a)(3)(A).

d. Congress amended Title IV-D again in 1988 to improve the rate of child-support collection. Family Support Act of 1988 (1988 Act), Pub. L. No. 100-485,

102 Stat. 2343. Because effective child-support enforcement "had long been thwarted by localized enforcement systems that were unable to quickly and effectively track delinquent parents who crossed county and state lines," *Hodges* v. *Shalala*, 121 F. Supp. 2d 854, 874 (D.S.C. 2000), aff'd, 311 F.3d 316 (4th Cir. 2002), cert. denied, 540 U.S. 811 (2003), Congress in the 1988 Act emphasized centralized, automated record-keeping and information retrieval in order to improve collection rates. In particular, Congress mandated "automated data processing and information retrieval system[s]" that had previously been optional. 1988 Act § 123(a)(C), 102 Stat. 2352; 42 U.S.C. 654(24).

The Title IV-D regulations were amended after adoption of the 1988 Act. As amended, the regulations omitted specific references to contempt proceedings as required means for enforcing child-support obligations. See 45 C.F.R. 303.6, 303.20(c)(7) (1989);[2] cf. pp. 3-4, *supra*.

e. Finally, Congress made further changes to the child-support enforcement system in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (1996 Act), Pub. L. No. 104-193, 110 Stat. 2105, which, among other things, replaced AFDC with the block-grant program called Temporary Assistance for Needy Families (TANF).[3] Those changes again emphasized a centralized, automated approach to child-support

---

[2] Federal financial support remained available for "[e]nforcement of a support obligation" through a variety of means, including contempt citations. 45 C.F.R. 304.20(b)(3)(iv).

[3] The 1996 Act also imposed a five-year cap on benefits. 42 U.S.C. 608(a)(7). As before, a custodial parent is required to assign her rights to child support to the State as part of the application for TANF assistance. 42 U.S.C. 608(a)(3)(A).

6

enforcement.  The amended statute established detailed requirements for the "statewide automated data processing and information retrieval systems" made mandatory in 1988.  *Id.* § 344(a)(2), 110 Stat. 2235, 42 U.S.C. 654a(a).  Among other things, the system must include a state case registry that includes every child-support case in the State, including the amount of monthly support owed and collected in all cases administered by the state agency.  42 U.S.C. 654a(e)(1) and (4); see 42 U.S.C. 654a(e)(5) (States must "promptly * * * update" case records when circumstances change).  The States are required to use their centralized databases "to the maximum extent feasible, to assist and facilitate the collection and disbursement of support payments," including by establishing wage-withholding orders and sending wage-withholding notices to employers.  42 U.S.C. 654a(g)(1); see 42 U.S.C. 666(c).

f.  Despite the changes in federal law, South Carolina maintains a localized, court-based approach to child-support enforcement.  It is the only State that does not have a certified automated system.  See Office of Child Support Enforcement, U.S. Dep't of Health & Human Servs., *National Status of Automated Child Support Systems*,  http://www.acf.hhs.gov/programs/cse/stsys/certmap.htm.[4]

---

[4]  In the 1996 Act, Congress determined that any State that failed to automate its child-support program should incur substantial penalties. 42 U.S.C. 655(a)(4).  In 2000, South Carolina unsuccessfully challenged the Department of Health and Human Services' (HHS) authority to impose a penalty for its non-compliance, see *Hodges* v. *Shalala*, *supra*, and subsequently submitted a corrective-action plan and accepted imposition of a penalty retroactive to 1998.  The State paid more than $55 million in penalties through 2007.  South Carolina Dep't of Social Servs., *Response to Budget Proviso 13.27* at 4 (Aug. 31, 2007), http://www.scstatehouse.gov/reports/DSS/Provisoresponse1327_

7

Acting pursuant to express statutory authority, S.C. Code Ann. § 43-5-235 (West Supp. 2009), the State's Department of Social Services has contracted with county clerks of court across the State to administer its program. The South Carolina courts have in turn adopted a special rule governing child-support enforcement. See S.C. Rule of Family Ct. 24 (S.C. Rule 24). The rule requires clerks of court to review on a monthly basis "all child support and periodic alimony accounts paid through the clerk of court," as are all accounts for children whose custodial parent receives TANF assistance. S.C. Rule 24(a); see 42 U.S.C. 608(a)(3)(A). When any such account is in arrears, the clerk is required to "issue a rule to show cause and an affidavit identifying the order of the court which requires such payments to be made and the amount of the arrearage [and] directing the party in arrears to appear in court at a specific time and date" to face contempt proceedings. S.C. Rule 24(b).

A "wilful[]" violation of a "lawful order" of a South Carolina court constitutes contempt and may subject the contemnor to up to 12 months confinement. S.C. Code Ann. § 63-3-620 (West 2010).

2. Respondent Rogers and petitioner are the parents of a minor child, B.L.P. In 2003, the family court in Oconee County, South Carolina, entered an Order of Financial Responsibility against petitioner. Although the order noted that petitioner was unemployed, the court imputed a gross monthly income of $1386 to him and ordered him to pay $59.72 a week in child support through the court. Pet. App. 22a; see *id.* at 19a-24a, 25a.

---

083107.doc. We are informed by HHS that the State has now paid a total of more than $72 million in penalties to date and currently owes an additional incurred penalty of more than $10 million for fiscal year 2010.

Because respondent Rogers was receiving public assistance, she assigned her right to collect child support to the Department of Social Services. Pet. Br. 8; see *id.* at 9 n.6 (payments were remitted to respondent Rogers starting in 2004 because her benefits had ended but her case continued to be administered as a Title IV-D case). Petitioner fell behind on his payments, received a number of rules to show cause from the court clerk why he should not be held in contempt, and was jailed three times as a result. *Id.* at 9-10.

By 2007, petitioner was $5728.76 behind on his child-support payments, and a judge of the Oconee County Family Court issued a bench warrant for his arrest. Pet. App. 6a; Pet. Br. 8-9. A hearing was held on January 3, 2008. After noting petitioner's outstanding balance and stating that he had not made a payment since August 2006, the judge asked petitioner, "[i]s there anything you want to say?" *Id.* at 17a. Petitioner responded:

> Well, when I first got out, I got back on dope. I done meth, smoked pot and everything else, and I paid a little bit here and there. And, when I finally did get to working, I broke my back, back in September. I filed for disability and SSI. And, I didn't get straightened out off the dope until I broke my back and laid up for two months. And, now I'm off the dope and everything. I just hope that you give me a chance. I don't know what else to say. I mean, I know I done wrong, and I should have been paying and helping her, and I'm sorry. I mean, dope had a hold to me.

*Ibid.*

9

After a brief exchange between petitioner and respondent about his SSI application, the court said:

> If there's nothing else, this will be the Order of the Court. I find the Defendant in willful contempt. I'm gonna sentence him to twelve months in the Oconee County Detention Center. He may purge himself of the contempt and avoid the sentence by having a zero balance on or before his release.

Pet. App. 18a. The court made no finding that petitioner was capable of paying the arrears while incarcerated. See *id.* at 17a-18a.

At this hearing, neither petitioner nor respondent Rogers was represented by counsel. Pet. App. 6a. However, pro bono counsel filed an appeal on petitioner's behalf, alleging that petitioner had a right under the Sixth Amendment and the Due Process Clause to have appointed counsel in the contempt proceeding. *Id.* at 10a-15a. Before the intermediate state court could rule, the South Carolina Supreme Court granted discretionary review and affirmed the family court. *Id.* at 1a-5a.

The court noted that the "purpose of civil contempt is to coerce the defendant to comply with the court's order," while criminal contempt's purpose is "to punish a party for disobedience or disrespect." Pet. App. 2a-3a. "Civil contempt sanctions are conditioned on compliance with the court's order. * * * A contemnor imprisoned for civil contempt is said to hold the keys to his cell because he may end the imprisonment and purge himself of the sentence at any time." *Id.* at 3a. The court recognized that the "distinction between civil and criminal contempt is crucial because criminal contempt triggers additional constitutional safeguards not mandated in civil contempt proceedings." *Ibid.*

The court noted that in this case the family court had said that petitioner could "purge himself of the contempt" by achieving a "zero balance" on his arrearage. Pet. App. 3a.  Reasoning that "[t]his conditional sentence is a classic civil contempt sanction," the court concluded that petitioner had no right to appointed counsel. *Ibid.*

## SUMMARY OF ARGUMENT

1.  The Court has jurisdiction to review the decision of the South Carolina Supreme Court.  Petitioner has completed his term of confinement for civil contempt and has not identified any collateral consequences flowing from the contempt.  Those facts would ordinarily render his case moot.  Petitioner, however, qualifies for a narrow exception to the mootness doctrine because the controversy is capable of repetition yet evading review. Sentences for civil contempt in South Carolina are limited to 12 months, and it is highly unlikely that petitioner would be able to secure plenary review by this Court within any future period of confinement.  In addition, the constitutional violation petitioner asserts is capable of repetition because he remains subject to the underlying child-support order and still has substantial arrears.  There is thus a reasonable expectation that he will receive automatically-generated rules to show cause for contempt in the future.  Indeed, since the contempt at issue in this case, petitioner has been jailed again for civil contempt.

2.  Petitioner's confinement for civil contempt violated due process, not because he lacked counsel, but because the procedures employed by the family court were inadequate to ensure the accurate determination of petitioner's present ability to pay his child-support ar-

rears. That ability to pay was a necessary predicate to the civil contempt sanction.

The defining feature of confinement for civil contempt is its purpose to coerce compliance with a court order. Such confinement must therefore end upon discharge of the contemnor's obligations; he is said to hold "the keys of [his] prison in [his] own pocket[]." *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted). Such confinement may not be imposed, however, where the contemnor demonstrates his inability to comply with the order. In such cases, he does not truly hold the keys to the prison; to confine him nonetheless would render the confinement punitive and thus a sanction that may be imposed only after compliance with criminal case safeguards.

The question of petitioner's ability to pay his child-support arrears therefore should have been a focus of the civil contempt proceeding, but it was not. Pro se petitioner was afforded no meaningful opportunity to establish his indigency, and even after he made a statement that could have easily been understood to mean he had no present ability to pay nearly $6000 to avoid jail, the family court judge made no further inquiry on the matter before committing him to a nominally conditional term of confinement.

The proceeding did not comply with due process because there was a serious risk of erroneous deprivation of petitioner's liberty through the procedures employed and because additional procedures would have enhanced the accuracy of the proceeding without materially impinging on any governmental interest. See *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976). Provision of counsel would have been a sufficient, but not a necessary, means of satisfying due process in this case. There were other

means of providing petitioner with a meaningful opportunity to establish his present inability to pay, such as asking him to complete an understandable form seeking his financial information, or asking him questions on the topic as necessary at a hearing. In the typical case, providing basic information about one's personal finances is not the kind of undertaking that requires assistance of counsel, and due process protections are based on the requirements of the mine-run case, not the exceptional one.

There is no basis for petitioner's proposed categorical due process right to appointed counsel in civil contempt proceedings where confinement is imposed. The Court has declined to recognize a categorical constitutional right to appointed counsel in the context of other non-criminal proceedings that can result in confinement. *Gagnon* v. *Scarpelli*, 411 U.S. 778, 782-790 (1973) (probation revocation); *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (summary court-martial). Civil contempt proceedings in child-support cases are relatively brief; the custodial parent may not be represented by counsel; and the issues in dispute are generally not complex. Given those circumstances, there is no warrant for recognizing a categorical right to defense counsel in such proceedings. Finally, recognizing a due process right to counsel in such proceedings would upset the balance struck by Title IV-D and its implementing regulations, both of which stress the importance of due process protections in child-support proceedings but neither of which permit federal funding for provision of counsel.

## ARGUMENT

### I. THE COURT HAS JURISDICTION TO REVIEW THE DE-CISION OF THE SOUTH CAROLINA SUPREME COURT

Although petitioner has completed his term of confinement for the civil contempt at issue here, his claim is not moot because he remains subject to the underlying child-support order and because there is a reasonable expectation that he will face future contempt proceedings. His claim thus avoids mootness because it is capable of repetition yet evading review. This Court thus has jurisdiction to review the final judgment of the South Carolina Supreme Court. See 28 U.S.C. 1257(a).

1. "In general a case becomes moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy* v. *Hunt*, 455 U.S. 478, 481 (1982) (internal quotation marks omitted) (quoting *United States Parole Comm'n* v. *Geraghty*, 445 U.S. 388, 396 (1980)). While a currently confined individual's challenge to his confinement generally presents no question of mootness, an individual who has been released from confinement ordinarily may continue to press his challenge only if he suffers some "collateral consequence" that constitutes a "concrete and continuing injury." *Spencer* v. *Kemna*, 523 U.S. 1, 7 (1998). Because this Court "ha[s] been willing to presume that a wrongful conviction has continuing collateral consequences," the Court ordinarily will not dismiss as moot a criminal defendant's challenge to his conviction once the defendant has completed his term of imprisonment. *Id.* at 8. But the Court has not employed that presumption in other contexts, instead requiring a party not in custody to demonstrate that he will actually face collateral consequences if he does not secure relief

on appeal. See *id.* at 14 (no presumption of collateral consequences for parole revocation); see also *id.* at 14-16 (reviewing party's claimed collateral consequences).

Petitioner has completed his term of confinement for civil contempt. Because he challenges a civil order, not a criminal conviction, no presumption of collateral consequences applies. Moreover, petitioner has not identified any collateral consequences flowing from the finding of civil contempt. Ordinarily, petitioner's challenge to that finding would be considered moot and beyond this Court's jurisdiction.

2. Petitioner's claim in this case, however, avoids mootness because his is one of the "exceptional situations" in which a claim is capable of repetition, yet evading review. *City of L.A.* v. *Lyons*, 461 U.S. 95, 109 (1983). In non-class actions, this doctrine requires satisfaction of two elements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy*, 455 U.S. at 482 (quoting *Weinstein* v. *Bradford*, 423 U.S. 147, 149 (1975) (per curiam)). Petitioner satisfies both elements.

First, confinement for civil contempt in South Carolina is limited to 12 months, S.C. Code Ann. § 63-3-620 (West 2010), and it is exceedingly unlikely that a contemnor could appeal through the South Carolina court system, petition this Court for a writ of certiorari, and receive a decision on his claim within such a limited time period. See, *e.g.*, *First Nat'l Bank* v. *Bellotti*, 435 U.S. 765, 774 (1978) (18 months was "too short a period of time for appellants to obtain complete judicial review"); cf. *DeFunis* v. *Odegaard*, 416 U.S. 312, 319 (1975) (per curiam) (future challenge to law school

15

admission procedure could likely come to this Court for decision within three-year period of law school matriculation). Indeed, in this case, petitioner had completed his term of imprisonment for civil contempt more than a year before the South Carolina Supreme Court rendered its decision. Compare Pet. App. 8a with *id.* at 1a.

Second, petitioner "can make a reasonable showing that he will again be subjected to the alleged illegality." *Lyons*, 461 U.S. at 109. Petitioner is still subject to the underlying order for child support, and he is nearly $14,000 in arrears. Pet. Br. 15; J.A. 104a. Given that clerks of court in South Carolina automatically issue rules to show cause when a non-custodial parent is late on a required payment, there is a reasonable expectation that petitioner will again be subject to contempt proceedings. Indeed, after he was released from jail for the contempt at issue here, petitioner was again held in contempt and reincarcerated. In May 2010 yet another rule to show cause for contempt issued due to failure to pay support to respondent. Pet. Br. 13-15; see *id.* at 15 (May 2010 rule to show cause is still outstanding); see also *Olmstead* v. *L.C.*, 527 U.S. 581, 594 n.6 (1999) (suit by plaintiffs seeking community-based services rather than institutionalization not moot even though they were then receiving desired services, because of "the multiple institutional placements [they] ha[d] experienced"). This is thus far from "an abstract dispute about the law" that might be thought "unlikely to affect [petitioner] any more than it affects other [South Carolina] citizens." *Alvarez* v. *Smith*, 130 S. Ct. 576, 580 (2009).[5]

---

[5] That petitioner was represented by pro bono counsel in a subsequent contempt proceeding involving a different support order, see Pet. Br. 15 n.10, does not mean his claim is incapable of repetition. Were pro bono counsel bound to represent petitioner in every future contempt

## II. THE ABSENCE OF ADEQUATE PROCEDURES NECESSARY TO SECURE AN ACCURATE ADJUDICATION OF CIVIL CONTEMPT VIOLATED DUE PROCESS

The validity of the civil contempt order against petitioner turned on a critical fact: his present ability to purge himself of contempt by paying off his past-due child support. The family court's procedures in this case violated due process because they were inadequate to ensure an accurate determination of that fact and thus prevent an erroneous deprivation of petitioner's liberty. Although provision of government-provided counsel would have been a sufficient means of complying with due process requirements in this case, it was not a necessary one. Other mechanisms, such as requiring an affidavit for disclosure of financial information and a preliminary assessment of petitioner's current ability to pay child support, would have satisfied the requirements of due process.

### A. Confinement For Civil Contempt Is Permitted Only When The Contemnor Is Presently Able To Comply With The Underlying Order

Both civil and criminal contempt can lead to confinement, but this Court has long distinguished the two based on the "character and purpose" of the sanction imposed. *Gompers* v. *Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911). In civil contempt, the "punishment * * * [is] remedial," in that it is intended to "coerc[e]

---

proceeding, then his claim of entitlement to the assistance of counsel would be moot. There is no indication in the record, however, that pro bono counsel is under any such obligation, and, in fact, counsel did not appear in a 2009 contempt proceeding involving support owed respondent, see *id.* at 13-14 (noting that petitioner appeared pro se in 2009 and served six months for civil contempt).

the defendant to do what he had refused to do." *Id.* at 442. Punishment for criminal contempt, on the other hand, is "punitive" and is imposed "to vindicate the authority of the court." *Id.* at 441.

Because of that fundamental distinction, confinement imposed for civil contempt is conditional. The sentence must include a purge clause under which the contemnor will be immediately released upon compliance with the underlying court order. *Hicks* v. *Feiock*, 485 U.S. 624, 634 (1988). When confined under such a civil contempt order, the contemnor holds "the keys of [his] prison in [his] own pocket[]." *Shillitani* v. *United States*, 384 U.S. 364, 368 (1966) (citation omitted); see *id.* at 370 ("While any imprisonment, of course, has punitive and deterrent effects, it must be viewed as remedial if the court conditions release upon the contemnor's willingness" to comply with a court order.).

A purge clause by itself, however, will not render the contemnor's confinement remedial rather than punitive because "the justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order." *Shillitani*, 384 U.S. at 370-371. Accordingly, "punishment may not be imposed in a civil contempt proceeding when it is clearly established that the alleged contemnor is unable to comply with the terms of the order." *Hicks*, 485 U.S. at 638 n.9; see *Maggio* v. *Zeitz*, 333 U.S. 56, 72 (1948) ("[T]o jail one for a contempt for omitting an act he is powerless to perform would * * * make the proceeding purely punitive, to describe it charitably."); see also *Moseley* v. *Mosier*, 306 S.E.2d 624, 626 (S.C. 1983)

18

("When the parent is *unable* to make the required payments, he is not in contempt.").[6]

The burdens of production and persuasion may be placed on the defendant to demonstrate his present inability to comply with an order. See *Hicks*, 485 U.S. at 637; *United States* v. *Rylander*, 460 U.S. 752, 757 (1983). Accordingly, if the defendant "offers no evidence as to his inability to comply," "stands mute," or is disbelieved by the court, then he fails to carry his burden and may be held in contempt. *Maggio*, 333 U.S. at 75. But the trial court "is obliged" to consider "all the evidence properly before it in the contempt proceeding in determining whether or not there is actually a present ability to comply and whether failure so to do constitutes deliberate defiance which a jail term will break." *Id.* at 76.

If, upon examination, a contempt penalty is considered punitive rather than remedial, it will be vacated unless all "the protections that the Constitution requires of * * * criminal proceedings" were provided. *International Union, United Mine Workers* v. *Bagwell*, 512 U.S. 821, 826 (1994) (quoting *Hicks*, 485 U.S. at 632).

---

[6]  A defendant may not avoid a finding of civil contempt for violating an order by collaterally attacking that order in the contempt proceeding. See *Maggio*, 333 U.S. at 74-75. The defendant may, however, make the distinct assertion that he has a "*present* inability to comply with the order in question." *United States* v. *Rylander*, 460 U.S. 752, 757 (1983); see *ibid.* ("While the court is bound by the enforcement order, it will not be blind to evidence that compliance is now factually impossible. Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."); *Maggio*, 333 U.S. at 74-75.

**B. The Family Court's Procedures Were Inadequate To Ensure An Accurate Determination Of Present Ability To Pay**

The procedures employed by the family court violated petitioner's due process rights because they were inadequate to ensure that petitioner was not erroneously confined as an inducement to perform a task he was powerless to perform, while additional procedures to ensure petitioner's present ability to pay his child-support arrears would have been minimally burdensome.

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews* v. *Eldridge*, 424 U.S. 319, 332 (1976). Confinement for civil contempt is a deprivation of liberty, and the alleged contemnor is thus entitled to procedural due process protections before its imposition. Cf. *Morrissey* v. *Brewer*, 408 U.S. 471, 482 (1972) (termination of parole triggers due process protections); see also *Bagwell*, 512 U.S. at 827 (civil contempt requires "notice and an opportunity to be heard").

The conclusion that due process applies is the beginning of the inquiry, not its end, because "the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands.'" *Wilkinson* v. *Austin*, 545 U.S. 209, 224 (2005) (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The Court has "generally * * * declined to establish rigid rules and instead ha[s] embraced a framework to evaluate the sufficiency of particular procedures." *Ibid.* That framework involves "consideration of three distinct factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail.

*Mathews*, 424 U.S. at 335.

Application of the *Mathews* factors here demonstrates that the family court proceeding did not comply with the requirements of procedural due process. First, petitioner's private interest in avoiding incarceration was significant. See *Foucha* v. *Louisiana*, 504 U.S. 71, 80 (1992).

Second, there was a serious "risk of an erroneous deprivation" of petitioner's liberty interest under the procedures employed by the family court, and there would have been value in additional procedures. *Mathews*, 424 U.S. at 335. Petitioner did not dispute that he had failed to comply with his child-support order, so the propriety of his confinement for civil contempt thus turned on his present ability to do so. See pp. 17-18, *supra*; Pet. Br. 3-4 (petitioner's ability to pay "was the precise question before the family court"); *id.* at 17. But South Carolina automatically referred petitioner for contempt proceedings without considering whether petitioner was employed or had assets. At the contempt hearing, the court solicited no financial information from petitioner, nor was there apparently any mechanism in place for him to provide it on his own. Petitioner's statement at the hearing that he had been un-

able to work because he broke his back, Pet. App. 17a, could reasonably be understood to constitute a claim that he had no present ability to pay nearly $6000. The court did not explore this question, however; it made no inquiry into petitioner's income or assets. Instead, the court imposed a jail sentence unaccompanied by any finding that petitioner had the ability to pay off his outstanding balance from a jail cell.[7]  Taking additional modest steps to determine whether petitioner had the present ability to discharge his obligation, see pp. 24-25, *infra*, would have improved the accuracy of the proceeding.

Finally, the government's interests also favor additional procedural safeguards to ensure that only those parents with a present ability to pay are confined for civil contempt.  While the State has a strong interest in enforcing child-support orders, it secures no benefit from jailing a non-custodial parent who cannot discharge his obligation.  The period of incarceration makes it less, rather than more, likely that such parent will be able to pay child support.  See Elizabeth G. Patterson, *Civil Contempt & the Indigent Child Support Obligor: The Silent Return of Debtor's Prison*, 18 Cornell J.L. & Pub. Pol'y 95, 126 (2008) (*Civil Contempt*).  Meanwhile, the State incurs the substantial expense of confinement.

Moreover, as a general matter, the routine use of contempt for non-payment of child support is likely to be an ineffective strategy for enforcing support orders.  See National Child Support Enforcement, U.S. Dep't of Health & Human Servs., *Strategic Plan: FY 2005-2009*, at 2, 10 (*Strategic Plan*), http://www.acf.hhs.gov/

---

[7]  The judge told petitioner, "[i]f you've got a job, I'll make you eligible for work release," Pet. App. 18a, but petitioner states he was ineligible for work release, Pet. Br. 12 n.8.

22

programs/cse/pubs/2004/Strategic_Plan_FY2005-2009.
pdf. While child-support recovery efforts once "followed
a business model predicated on enforcement" that "in-
tervened only after debt, at times substantial, accumu-
lated and often too late for collection to be successful, let
alone of real value to the child," experience has shown
that alternative methods—such as order modifications,
increased contact with non-custodial parents, and use of
"automation to detect non-compliance as early as possi-
ble"—are more effective. *Id.* at 2.

A substantial portion of child-support obligors have
no or low reported income. Elaine Sorensen et al., *As-
sessing Child Support Arrears in Nine Large States &
the Nation* 22 (2007) (*Assessing Child Support Arrears*),
http://aspe.hhs.gov/hsp/07/assessing-CS-debt/report.pdf
(obligors with $10,000 or less in annual income consti-
tuted half of the child-support obligors and owed 70% of
the arrears in a nine-state study). Such individuals'
child-support obligations are often substantial. See *id.*
at 54 ("For obligors with reported income of $10,000 a
year or less, the median percent of reported income that
was due as current support was 83[%]."). A low-income
individual in arrears on child-support payments is
"rarely a candidate for civil incarceration because of the
likelihood that he or she is unable to pay the hefty sum
represented by the accumulated arrears, or even a por-
tion thereof that may be set by the court as the purge
amount." *Civil Contempt* 116.[8]

---

[8] To be sure, coercive enforcement remedies, such as contempt, have
a role to play in child-support enforcement efforts, such as with non-
custodial parents who are hiding assets or unreported self-employment
or under-the-table income. See *Strategic Plan* 2; *Assessing Child
Support Arrears* 4-5, 22-23, 25; *Civil Contempt* 97. There is no evi-

Many States have taken alternative steps to avoid child-support arrears, such as establishing more realistic support orders, "increas[ing] parental participation in the order establishment process," providing employment services to non-custodial parents, or using automation tools to improve wage withholding. *Assessing Child Support Arrears* 10-11, 80-89; see *id.* at 85 (study of Florida program that provides employment services and case management to non-custodial parents found that program participants paid nearly five dollars in child support for every dollar spent on the program). Such alternatives, which focus on early intervention rather than after-the-fact efforts to collect substantial accumulated arrears, are more likely to be effective means of enforcing the child-support obligations of the substantial number of low-income obligors. See *Strategic Plan* 2.

### C. Due Process Can Be Satisfied By A Variety Of Procedures Intended To Assure An Accurate Determination Of Present Ability To Pay In A Civil Contempt Proceeding

Petitioner argues that, in order to ensure that his civil contempt proceeding "remain[ed] civil," Pet. Br. 39, due process required the appointment of counsel to assist him in establishing his inability to comply with the court's order, see *id.* at 41. Although we agree that petitioner's due process rights were violated, we disagree that the State's failure to appoint counsel was itself the basis of the violation. Appointment of counsel is certainly one way to help ensure an accurate determination of the obligor's current ability to pay—the determination on which the "civil" nature of a civil contempt sanction rests—but it is not the only way. It was the State's

---

dence, however, that routine use of contempt among low-income non-custodial parents is generally effective. See *Civil Contempt* 126.

failure to provide any meaningful mechanism for making that determination in this case, and not its failure to provide counsel in particular, that violated petitioner's due process rights.[9]

> **1. Courts can comply with due process by providing a meaningful opportunity for an alleged contemnor to establish his present ability to pay**

While there is no basis for a constitutional rule categorically requiring appointment of counsel in all civil contempt that could lead to deprivation of physical liberty, see pp. 25-32, *infra*, due process does require procedures sufficient to ensure fundamental fairness. In the context of a civil contempt proceeding for non-payment of child support that could lead to confinement, this means procedures adequate to allow a pro se contemnor to attempt to carry his burden of establishing his present inability to pay.

Such procedures may include requiring a non-paying parent to complete an understandable form seeking financial information. South Carolina already requires

---

[9] Although petitioner's submissions below and in this Court have focused on the value of appointed counsel in ensuring that indigent child-support obligors are not erroneously jailed as a means of inducing them to comply with their obligations, see, *e.g.*, Pet. i, Pet. App. 13a, fairly encompassed in those submissions is the proposition that due process demands an appropriate procedure to evaluate an obligor's present ability to pay. See Sup. Ct. R. 14.1(a); *Yee* v. *City of Escondido*, 503 U.S. 519, 534 (1992). In conducting that inquiry, it should be open to the Court to consider whether there are alternative procedures, other than the specific procedure petitioner has proposed, that would satisfy constitutional requirements. To the extent the Court concludes otherwise, however, the proper course would be to dismiss the writ of certiorari as improvidently granted and await a case that expressly raises a broader due process claim.

noncustodial parents to fill out such a form when a support order is originally sought in a Title IV-D case, see S.C. Code Ann. § 43-5-220(c) (West Supp. 2009), but apparently does not do so in subsequent contempt proceedings. Requiring that such forms be completed at the outset of a contempt proceeding would impose little expense on the State or burden on the proceeding while materially advancing the accuracy of the court's determination. Such information could by itself establish the contemnor's present inability to pay his arrears or, conversely, demonstrate his ability to pay. To the extent the court had questions about the information on the form or disbelieved it, the court could question the contemnor about his finances at the contempt hearing. Such simple, minimally burdensome procedures would enable the court to evaluate whether the alleged contemnor has the ability to pay his arrears and is thus an appropriate candidate for a civil contempt sanction.

### 2. *There is no basis for an inflexible right to counsel rule in civil contempt proceedings*

Although the constitutional inadequacy of the family court's procedures could have been cured by appointment of counsel (who presumably would have addressed petitioner's inability to pay his arrears and urged the court not to jail him for that reason), appointment of counsel was not constitutionally compelled.

a. "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." *Lujan* v. *G&G Fire Sprinklers, Inc.*, 532 U.S. 189, 196 (2001) (quoting *Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886, 895 (1961)); see *Mathews*, 424 U.S. at 334 ("[D]ue process is flexible and calls for such procedural protections as the particular

situation demands.") (brackets in original) (quoting *Morrissey*, 408 U.S. at 481). The question in a due process case is how to ensure a fundamentally fair proceeding, taking into account the importance of the private interest at issue, the risk of error and value of additional procedures, and the government's interest. See *id.* at 335. This is not an inquiry that typically lends itself to the kind of categorical approach advocated by petitioner. See *Gagnon* v. *Scarpelli*, 411 U.S. 778, 789 (1973) (contrasting categorical Sixth Amendment right to counsel in criminal prosecution "with the more limited due process right" in other contexts).[10]

In fact, in areas outside traditional criminal prosecutions where an individual's liberty is nonetheless at stake, the Court has declined to recognize a categorical right to counsel, instead relying on alternative procedural safeguards to ensure due process. See *Gagnon*, 411 U.S. at 782-790; see also *Middendorf* v. *Henry*, 425 U.S. 25, 43 (1976) (no due process right to counsel for summary courts-martial).[11] For example, in *Gagnon*,

---

[10] The Sixth Amendment right to counsel is inapplicable to a civil contempt proceeding because it is not a "criminal prosecution[ ]." U.S. Const. Amend. VI; see *Bagwell*, 512 U.S. at 826-827.

[11] In *In re Gault*, 387 U.S. 1 (1967), the Court recognized a due process right to appointed counsel in a juvenile delinquency proceeding, but, as the Court later explained, that was because the proceeding "while denominated civil, was functionally akin to a criminal trial." *Gagnon*, 411 U.S. at 789 n.12. In *Vitek* v. *Jones*, 445 U.S. 480 (1980), a plurality would have held that there is a due process right to counsel before a State involuntarily transfers a prisoner to a state mental hospital for psychiatric treatment. See *id.* at 497. Justice Powell's controlling concurrence, however, disagreed, concluding that "the fairness of an informal hearing designed to determine a medical issue" does not "require[] participation by lawyers." *Id.* at 500. Justice Powell agreed that a prisoner "required assistance" in such a proceeding to ensure

the Court held that due process required the government to provide a preliminary and final hearing before it could incarcerate an individual for violating the terms of his probation. See 411 U.S. at 782; see also *id.* at 785-786 (hearings necessary in order to provide notice of the alleged probation violation and ensure "accurate finding of fact and the informed use of discretion"). At the same time, however, the Court rejected the "contention that the State is under a constitutional duty to provide counsel for indigents in all probation or parole revocation cases." *Id.* at 787; see *id.* at 790 (stating that due process may require appointment of counsel in exceptional cases). The Court recognized that "such a rule has the appeal of simplicity" but concluded that "it would impose direct costs and serious collateral disadvantages without regard to the need or the likelihood in a particular case for a constructive contribution by counsel." *Id.* at 787.

The Court in *Gagnon* noted that in many cases a probationer's mitigating evidence may be "so simple as not to require either investigation or exposition by counsel." 411 U.S. at 787. Here too, with the provision of easy-to-understand forms on assets and income and, if necessary, a colloquy with the trial court, it will often be simple for a delinquent child-support obligor to demonstrate his present inability to discharge his obligation without the assistance of appointed counsel. Indeed, even in criminal cases to which the Sixth Amendment right of counsel applies, defendants are not entitled to government-appointed counsel for the purpose of filling out the forms routinely used to establishing their financial eligibility for government-appointed counsel. See

fairness, but said that it could be "rendered by competent laymen in some cases." *Ibid.*

18 U.S.C. 3006A(b) (counsel will be appointed only after court is "satisfied after appropriate inquiry that the person is financially unable to obtain counsel"); *United States* v. *Bauer*, 956 F.2d 693, 695 (7th Cir.) ("Under the Criminal Justice Act, the public fisc need not contribute one penny unless the accused first establishes that he cannot afford counsel. Nothing in the statute directs the Treasury to assist the accused in making this determination."), cert. denied, 506 U.S. 882 (1992). Just as "[n]o legal expertise is needed to participate effectively in hearings under the Criminal Justice Act," *ibid.*, no legal expertise is generally required to establish inability to pay child-support arrears.

*Gagnon* also expressed concern that "[t]he introduction of counsel into a revocation proceeding will alter significantly the nature of the proceeding," since the States typically relied on probation officers to conduct revocation hearings but might turn to attorneys if all probationers were represented. 411 U.S. at 787. "[T]he decisionmaking process will be prolonged, and the financial cost to the State * * * will not be insubstantial." *Id.* at 788. In the context of civil contempt for child support as well, automatic appointment of counsel could delay the proceedings, create an asymmetry in representation between non-custodial parents and custodial parents who may appear pro se, see, *e.g.*, Pet. App. 16a, and impose considerable financial cost on the government without an automatic increase in accuracy.

*Lassiter* v. *Department of Social Services*, 452 U.S. 18 (1981), upon which petitioner relies, see, *e.g.*, Pet. Br. 32-33, is not to the contrary. In that decision, the Court held that there was no due process right to counsel in a parental-rights termination proceeding. See *Lassiter*, 452 U.S. at 32-33. In dictum, the Court said its cases

29

had established a "presumption" that an indigent had a right to appointed counsel "when, if he loses, he may be deprived of his physical liberty." *Id.* at 26-27. The Court has not subsequently relied on any such presumption derived from the *Lassiter* dictum, and *Lassiter* itself recognized that *Gagnon*, which involved a deprivation of physical liberty, had held that "due process is not so rigid as to require that the significant interests in informality, flexibility and economy must always be sacrificed" through appointment of counsel. *Id.* at 31 (quoting *Gagnon*, 411 U.S. at 788).

That there may be atypical cases with "complex factual and legal issues" (Pet. Br. 46) in which counsel would provide a significant benefit beyond what could be obtained through other procedural safeguards does not mean there should be a right to counsel. "[P]rocedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions." *Walters* v. *National Ass'n of Radiation Survivors*, 473 U.S. 305, 321 (1985) (quoting *Mathews*, 424 U.S. at 344); see *id.* at 331 ("existence of complexity in some cases" was not "sufficient to warrant a conclusion that the right to retain and compensate an attorney in [Veterans Administration] cases is a necessary element of procedural fairness under the Fifth Amendment").

b. A recognition that due process requires fair proceedings before a child-support obligor can be held in civil contempt but that this due process right does not encompass appointment of government-funded counsel is also consistent with the balance struck by Congress and the Secretary in enacting and administering the Title IV-D program. Cf. *Middendorf*, 425 U.S. at 43 ("[W]e must give particular deference to the determina-

30

tion of Congress, made under its authority to regulate the land and naval forces, U.S. Const., Art. I, § 8, that counsel should not be provided in summary courts-martial."); *Walters*, 473 U.S. at 319-320 ("This deference to congressional judgment must be afforded even though the claim is that a statute Congress has enacted effects a denial of the procedural due process guaranteed by the Fifth Amendment.").

Congress and the Secretary have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program.[12] At the same time, however, they have declined to reimburse the States for the cost of providing counsel to non-custodial parents. See S. Rep. No. 387, 98th Cong., 2d Sess. 23 (1984) (statute does not provide federal funding for "defense counsel for absent parents" or "incarceration of delinquent obligors"); 45 C.F.R. 304.23 (i) and (j) (no federal funding for "[t]he costs of counsel for indigent defendants in

---

[12] See, *e.g.*, 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, including notice and a reasonable opportunity to contest the accuracy of such information."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for notice, opportunity to contest the action, and opportunity for an appeal on the record to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

IV-D actions" or "[a]ny expenditure for jailing of parents in child-support enforcement cases"); see also 52 Fed. Reg. 32,130 (1987) (Federal "policy since the inception of the [Title IV-D] program has been that costs of incarceration of delinquent obligors and costs of defense counsel are not necessary and reasonable costs associated with the proper and efficient administration of the Title IV-D program.").

Finally, at its broadest, the categorical rule petitioner suggests—that there is a right to government-appointed counsel in all "proceedings denominated as 'civil' where an individual nonetheless faces the prospect of confinement to state custody," Pet. Br. 30—conflicts with Congress's express judgment that provision of government-funded counsel is not warranted in all such areas. See *Middendorf*, 425 U.S. at 43 (deferring to such a judgment); *Walters*, 473 U.S. at 319-320 (same); see also *Landon* v. *Plasencia*, 459 U.S. 21, 34-35 (1982) ("The role of the judiciary is limited to determining whether the procedures meet the essential standard of fairness under the Due Process Clause and does not extend to imposing procedures that merely displace congressional choices of policy.").

For example, while aliens are sometimes detained during removal proceedings or pending enforcement of removal orders, Congress has long explicitly provided that there is no obligation to provide government payment for counsel in such proceedings. See 8 U.S.C. 1362 ("In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (*at no expense to the Government*) by such counsel, authorized to practice in such proceedings,

as he shall choose.") (emphasis added); 8 U.S.C. 1229a(b)(4)(A). Congress's judgment is consistent with this Court's repeated holdings that removal proceedings are civil and non-punitive, see, *e.g.*, *INS* v. *Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984) ("A deportation proceeding is a purely civil action to determine eligibility to remain in this country, not to punish an unlawful entry, though entering or remaining unlawfully in this country is itself a crime."), and its conclusion that detention of an alien during the removal process is permissible because it is incidental to the proceedings, and not their purpose or goal, see, *e.g.*, *Carlson* v. *Landon*, 342 U.S. 524, 538 (1952) ("Detention is necessarily a part of this deportation procedure."). As the Court has also noted, removal proceedings—whose purpose is removal of aliens from the country, not deprivation of their physical liberty—are "streamlined" administrative proceedings held before administrative personnel, immigration judges, under rules offering the aliens more limited procedural rights than are available in court. *Lopez-Mendoza*, 468 U.S. at 1039; see *ibid.* ("a deportation hearing is intended to provide a streamlined determination of eligibility to remain in this country, nothing more"). The due process guarantee of fundamental fairness does not mandate the appointment of counsel in such proceedings, which would be contrary to the judgment of Congress.[13]

---

[13] For these reasons, the lower courts have held that aliens in removal proceedings have no constitutional right to appointment of counsel at government expense. *United States* v. *Gasca-Kraft*, 522 F.2d 149, 152 (9th Cir. 1975) ("courts have uniformly held in this circuit and elsewhere that in light of the non-criminal nature of both the proceedings and the order which may be a result, that respondents are not entitled to have counsel appointed at government expense") (citing cases); see *Moham-*

## CONCLUSION

The judgment of the Supreme Court of South Carolina should be reversed.

Respectfully submitted.

NEAL KUMAR KATYAL
*Acting Solicitor General*

TONY WEST
*Assistant Attorney General*

SALLY A. HOWARD
*Acting General Counsel*

ROBERT E. KEITH
*Associate General Counsel*

LISETTE PEDRE MESTRE
*Attorney*
*Department of Health and Human Services*

LEONDRA R. KRUGER
*Acting Deputy Solicitor General*

JOSEPH PALMORE
*Assistant to the Solicitor General*

LEONARD SCHAITMAN
EDWARD HIMMELFARB
*Attorneys*

JANUARY 2011

---

*med* v. *Gonzales*, 400 F.3d 785, 793 (9th Cir. 2005); *United States* v. *Torres-Sanchez*, 68 F.3d 227, 230 (8th Cir. 1995); *Nazakat* v. *INS*, 981 F.2d 1146, 1148 (10th Cir. 1992); *United States* v. *Campos-Asencio*, 822 F.2d 506, 509 (5th Cir. 1987).

Exhibit D

## SPECIFICATION FOR OCSS CHANGE ORDER
### *Auto Adjustment of Interstate Interest*

This specification will outline the process by which interstate cases are selected, automatic adjustments are created, and support orders are modified all for the purpose of removing interest from interstate cases.

## FUNCTIONAL REQUIREMENTS

It is desirable for the Rhode Island Office of Child Support Services (OCSS) to prohibit the charging of interest on interstate cases. This is manually done by placing an N in the interest field on page 2 of the support order. Entry of the N not only prohibits the charging of future interest but automatically creates adjustments to zero out any existing interest.

There currently exists on the InRhodes system interstate cases for which the interest field is not an N and for which there is interest due. It is these cases that the system will process.

If on an interstate case, the interest field on the support order is blank, the system will automatically place an N in the interest field and create non-cash adjustments to zero out any existing interest. No support order modification or interest adjustments will be done on interstate cases without a support order or for which the interest field is already an N or is a Y, B or P.

Two reports will be created. The first will detail the interstate cases for which a support order modification was done and for which one or more interest adjustments were created. The second report will detail interstate cases for which the interest field is Y, B or P. A Y in the interest field is an order to accrue interest while B and P are orders to stay future interest but to keep any interest that has accrued to date.

EXHIBIT E

STATE OF RHODE ISLAND

PROVIDENCE, S.C.                                   FAMILY COURT

State of Rhode Island ex rel.          :
GERO MEYERSIEK                        :
     Plaintiff                          :
                                      :
VS.                                   :          DOCKET NO: K010521M
                                      :
MARY SEGUIN                           :
     Defendant                         :

<u>PLAINTIFF'S ANSWERS TO DEFENDANT'S</u>
<u>*REVISED* (on or about May 9, 2023) FIRST SET OF INTERROGATORIES</u>

NOW COMES PLAINTIFF the Rhode Island Office of Child Support Services ("OCSS") and hereby responds to Defendant's First Set of Interrogatories revised and amended on May 9, 2023, following negotiations with Defendant.

1. Separately for 2012 and each subsequent year to the present, describe in detail and quantify each separate arrear calculation for interest by month, relating to the interest arrears your agency seeks to establish in your Motion to Establish Arrears.

ANSWER: The interest is a calculation pursuant to Rhode Island statute. This calculation of interest has previously been produced to the Defendant in this case.

2. State all reasons, include events and occurrences or otherwise by date and time since 2012 to the present, identify actions by persons, organizations, groups, or entities that caused your agency to seek to establish interest arrears by motion at this time.

ANSWER: Objection, overly broad and not relevant. Without waiving said objections, the foregoing interest was to run pursuant to Court Orders dated May 24, 2012, and September 25, 2012 and Rhode Island statute. Seeking Court adjudication of arrears due under Court orders and securing Court orders for repayment of same is a routine function of OCSS.

3. Name all experts and witnesses you propose to call as witnesses and for each describe the nature of their specialties, involvement, participation, expertise, training and affiliations, all opinions which they have reached/rendered to give at in the case at bar and the factual basis for each such opinion. Attach to your answers copies of all written reports made by each expert and the expert's CV or

resume.

ANSWER:  None at this time other than the parties to this case.  The OCSS expects the parties to testify to their factual knowledge.  Objection to the reference to "attach" as improper because it is a Request for Production of Documents.

4. State the name, address, email and telephone number of each person having knowledge of facts material to this case and indicate the content of their knowledge and what you expect them to testify to at trial.

ANSWER:  Objection, overly broad. OCSS asserts that the parties and current and former employees of the OCSS have knowledge of this case in that this case has been pending for over 20 years.  At this time, the Plaintiff does not know which employees will be called to testify at the hearing. The phrases "content of their knowledge" and "what you expect them to testify at trial" call for hearsay and speculation.

5. State the factual basis of your substantiation for each and every claim that you raised in your Motion to Establish Arrears.

ANSWER:  Objection, prepared in anticipation of litigation.  The support obligation of the Defendant was established by the Order of the Court.  The Court ordered interest to accrue per state statute.  The records indicate the Defendant failed to make payments when due.  Further, the factual basis is pursuant to state statute and the fundamental principles of mathematics.

6. State the factual basis for and describe in detail the conversation, communication, discussion or otherwise of the telephone call Kevin Tighe made to the attorney or agent or representative of GERO MEYERSIEK on December 6, 2021, to advise and to discuss interest.  Include information of, regarding, on, relating to any and all notes, recordings, records Kevin Tighe made of the telephone conversation and call he made to the attorney or agent or representative of GERO MEYERSIEK on December 6, 2021.  *Question 6 is a compound question and is being answered as two separate interrogatories.*

6(a) State the factual basis for and describe in detail the conversation, communication, discussion or otherwise of the telephone call Kevin Tighe made to the attorney or agent or representative of GERO MEYERSIEK on December 6, 2021, to advise and to discuss interest.

ANSWER 6(a): See TRAC note of 12/6/21, pursuant to Rule 33(d), previously provided to the Defendant.

6(b) Include information of, regarding, on, relating to any and all notes, recordings, records Kevin Tighe made of the telephone conversation and call he

2

made to the attorney or agent or representative of GERO MEYERSIEK on December 6, 2021.

ANSWER 6(b): See TRAC note of 12/6/21, pursuant to Rule 33(d), previously provided to the Defendant.

7. State the factual basis for, including identifying the person who instructed Timothy Flynn to do so and describe in detail the subpoena Timothy Flynn mailed and request for information regarding the Defendant to Bank of America by Timothy Flynn on December 14, 2021. Attach to your answer a copy of the subpoena and all records related to Timothy Flynn's request for information. *Question 7 is a compound question and is being answered as two separate interrogatories.*

7(a) State the factual basis for, including identifying the person who instructed Timothy Flynn to do so.

ANSWER 7(a): Objection, not relevant to the Motion to Establish Arrears.

7(b). Describe in detail the subpoena Timothy Flynn mailed and request for information regarding the Defendant to Bank of America by Timothy Flynn on December 14, 2021.

ANSWER 7(b): Objection, not relevant to the Motion to Establish Arrears. Objection to the reference to "attach" as improper because it is a Request for Production of Documents.

8. State the factual basis and describe in detail the conversation, communication, discussion or otherwise of the telephone or otherwise conversation Timothy Flynn made on January 4, 2022, to Marie at Bank of America regarding a subpoena that Timothy Flynn had sent to Bank of America regarding the Defendant. Attach to your answer a copy of the subpoena and request for information.

ANSWER: Objection, not relevant to the Motion to Establish Arrears. Objection to the reference to "attach" as improper because it is a Request for Production of Documents.

9. State the factual basis and describe in detail all actions, discussions, notes made of conversations, communication, or otherwise made by Timothy Flynn as they relate to Defendant's case from December 2021 to the present.

ANSWER: Objection, not relevant to the Motion to Establish Arrears.

10. Identify the name, address, phone number and email of all persons Timothy Flynn contacted, spoke to, discussed, communicated, and interacted in any and all forms regarding the Defendant from December 2021 to the present. Attach

3

to your answer all documents and records as they relate to Timothy Flynn's conversations regarding the subject matter.

ANSWER: Objection, not relevant to the Motion to Set Arrears. Objection to the reference to "attach" as improper because it is a Request for Production of Documents.

11. Describe in detail and state the factual basis for all documents that set forth, describe, reflect, contain, refer, or relate to the legal authority by the Rhode Island Office of Child Support Services to calculate child support interest per annum, and the method interest per annum is calculated by the agency in the Defendant's case. Cite the specific statute, regulation or any law by which the Rhode Island Office of Child Support Services uses to compute interest and the specific rate. *Question 11 is a compound question and is being answered as three separate interrogatories.*

11(a) Describe in detail and state the factual basis for all documents that set forth, describe, reflect, contain, refer, or relate to the legal authority by the Rhode Island Office of Child Support Services to calculate child support interest per annum.

ANSWER 11(a): Objection, not relevant to the Motion to Set Arrears. Without waiving said objection, including, but not limited to, the following citations:

42 USC 651, et seq.
45 CFR 200 et seq.
45 CFR 300 et seq.
RIGL 15-5 et seq.
RIGL 15-8.1 et seq.
RIGL 15-9 et seq.
RIGL 15-11.1 et seq.
RIGL 15-12 et seq.
RIGL 15-13 et seq.
RIGL 15-21 et seq.
RIGL 15-22 et seq.
RIGL 15-23.1 et seq.
RIGL 15-24 et seq.
RIGL 15-25 et seq.
RIGL 15-26 et seq.
RIGL 15-28 et seq.
RIGL 15-29 et seq.
RIGL 15-30 et seq.
218-RICR-30-00-1 et seq.
Rhode Island State Plan promulgated pursuant to 45 CFR 200 et seq.

IRS Publication 1075

11(b) and the method interest per annum is calculated by the agency in the Defendant's case.

ANSWER 11(b): Interest is calculated at 1% per month on the ending principal balance of the preceding month.

11(c) Cite the specific statute, regulation or any law by which the Rhode Island Office of Child Support Services uses to compute interest and the specific rate.

ANSWER 11(c) Rhode Island General Laws 15-5-16.5; 12% per annum on any support debt due and owning for child support and/or spousal support.

12. Describe in detail and state the factual basis for all documents that set forth, describe, reflect, contain, refer, or relate to the legal authority by the Rhode Island Office of Child Support Services to deny noncustodial parents access to any portion of their case files, including the agency's accounting calculations and method of calculation of alleged arrears. Attach to your answer all documents that relate to the relevant calculations of interest arrears in the Defendant's case file.

ANSWER: Objection, not relevant to lead to the discovery of admissible evidence, not relevant to the Motion to Establish Arrears and lastly, the attaching of documents is in the nature of a Request for Production of Documents. Without waiving said objections, see the statutes listed *supra*.

13. Describe in detail and state the factual basis for the creation, faxing and mailing offline of the Notice of Intent to Lien receipt of letter, communication or correspondence by Timothy Flynn from Bank of America regarding the Defendant from January 12, 2022, to January 22, 2023. Attach to your answer a copy of documents created and sent offline by Timothy Flynn related to the Defendant.

ANSWER: Objection, not relevant to the Motion to Establish Arrears. Objection to the reference to "attach" as improper because it is a Request for Production of Documents.

14. Describe in detail and state the factual basis for not mailing to the Defendant a copy of the Notice of Intent to Lien on January 12, 2022. State and identify the person or persons who authorized, instructed, directed or otherwise caused Timothy Flynn to do so. State the factual basis and describe in detail the legal authority for Timothy Flynn to do so. *Question 14 is a compound question and is being answered as three separate interrogatories.*

14(a)  Describe in detail and state the factual basis for not mailing to the Defendant a copy of the Notice of Intent to Lien on January 12, 2022.

ANSWER 14(a): Objection, not relevant to the Motion to Set Arrears.

14(b) State and identify the person or persons who authorized, instructed, directed or otherwise cause Timothy Flynn to do so.

ANSWER 14(b): Objection, not relevant to the Motion to Set Arrears.

14(c)  State the factual basis and describe in detail the legal authority for Timothy Flynn to do so.

ANSWER 14(c): Objection, not relevant to the Motion to Set Arrears.

15. Describe in detail and state the factual basis for all actions and system input by any and all employees or former employees of your agency that caused the system at your agency to generate a Notice of Intent to Lien on or about March 3, 2023.  Attached to your answer all documents that set forth, describe, reflect, contain, refer, or relate to your answer.

ANSWER: Objection, not relevant to the Motion to Set Arrears. Objection to the reference to "attach" as improper because it is a Request for Production of Documents.

16. Describe in detail and state the factual basis for your agency's failure to remove, suspend or otherwise stop the issuance of the notice of perfected lien subsequent to receipt of appeal from the Defendant on or about April 1, 2022.  Attached to your answer all documents that set forth, describe, reflect, contain, refer, or relate to your answer.

ANSWER: Objection, not relevant to the Motion to Establish Arrears and further the reference to "attach" as improper because it is a Request for Production of Documents.

17. Describe in detail the two emails in the possession of Frank DiBiase as they relate to the Defendant.  Attach to your answer a copy of each email and all documents as they relate to the authorship of each and every email, and the persons set to, sent from and copied on each and every email.

ANSWER:  Objection, not relevant to the Motion to Establish Arrears and further the reference to "attach" as improper because it is a Request for Production of Documents.

6

18. Describe in detail the job function, job title, job tasks and every day-to-day function of Kevin Tighe at your agency from January 2021 to the present. Attach to your answer all documents as they relate to the duties, obligations, responsibilities, services and code of conduct as they relate to Kevin Tighe.

ANSWER: See job description for Deputy Chief of Legal Services as described on the State of Rhode Island – Division of Human Services – Department of Administration website. See Rhode Island Supreme Court Rule of Professional Conduct.

19. Set forth in detail the following information pertaining to all policies or agreements of liability insurance covering or pertaining to acts or omissions committed by or on your behalf as a result of enforcing child support interest ordered by the Family Court in 2012 at the time of occurrence referenced in the Case Tracking Case History from 2018 to the present, designating which, if any are primary coverage and which are excess coverage: name and address of the insurance carrier, all limits of liability coverage, name and address of the named insured and policy number, full description of the acts or omissions to which coverage extends, full description of any and all exclusions, the dates of coverage, and the present custodian of the policy.

ANSWER: Objection, not relevant to the Motion to Establish Arrears.

20. Identify in detail and give the substance of each statement, action or omission, or declaration relating to interest, or satisfied with no receipt of interest or satisfied with receipt of less interest, or waived interest, whether oral or written, by conduct, silence or otherwise, which you contend was made by or on behalf of the Plaintiff, GERO MEYERSIEK, and provided the place and date when each such statement was made and any witnesses to same.

ANSWER: See TRAC note of 12/6/21, and emails dated October 11, 2022 and October 13, 2022 pursuant to Rule 33(d), previously provided to the Defendant.

21. Identify the name, address, telephone number and email address of the person or persons responsible for publishing the Total Due and Interest Due, payments made, and history of all payments in Defendant's online OCSS account each and every month from 2012 to the present.

ANSWER: Objection, not relevant to the Motion to Establish Arrears..

22. State the name, address, telephone number, and position of each person having personal knowledge of facts material to this case. Include your own full name, address, phone number, email, employer, title and position.

ANSWER: Objection, overly broad in that this case has been pending since 2001, has

7

had multiple hearings in RI Family Court, has been appealed to the RI Supreme Court, and has had litigation in Federal District Court. Currently, OCSS is aware of the current Family Court proceedings as well as actions in Federal District Court and the RI Supreme Court.

23. If you have obtained any written or recorded statements concerning the dispute in this matter, set forth the name and address, phone number and email of the person who gave the statement/recording, the date the statement was made, the content of the statement, and the present custodian of the statement.

ANSWER:  None.

24. If you are aware of the existence of any evidence relative to the dispute in this matter, then identify each such item, state the date produced or obtained, and the name, address, telephone number and email of the present custodian of each such demonstrative item

.

ANSWER:  See Rhode Island Family Court Orders in this case from hearing dates on May 24, 2012 and September 25, 2012 currently in the custody of the Rhode Island Family Court.  The child support ledger currently in the custody of OCSS. The interest calculation currently in the custody of OCSS.

25. Describe in detail any and all policies, guidelines, protocols, standards, and orders your agency relied on in the administrations and enforcement of Defendant's case from 2012 to the present.  Attach to your answers all documents as they relate to said policies, protocols, standards and orders.

ANSWER:  The State hereby objects to Interrogatory Number 25.  Pursuant to Rule 33(b) of the Rules of Civil Procedure, this Interrogatory exceeds the number of allowable interrogatories.  Eleazer v. Ted Reed Thermal, Inc., 576 A. 2d 1217 (1990).
.

26. If you claim any of Defendant's agency case file records are missing information, contain an incorrect or false information or any information was modified in any way, shape or form, identify the specific page of the record, the date and time of the entry, identify the information which is missing, identify which information is false/incorrect, and state which information has been modified or changed.

ANSWER: The State hereby objects to Interrogatory Number 26.  Pursuant to Rule 33(b) of the Rules of Civil Procedure, this Interrogatory exceeds the number of allowable interrogatories.  Eleazer v. Ted Reed Thermal, Inc., 576 A. 2d 1217 (1990).

27. Did you and any and all employees at your agency have the knowledge, training, and education to accurately issue any and all notices of intent to lien, notices of

8

perfected notice of lien and notices of levy against the Defendant's property? Attach to your answer supporting documentation substantiating your answer.

ANSWER:  The State hereby objects to Interrogatory Number 27.  Pursuant to Rule 33(b) of the Rules of Civil Procedure, this Interrogatory exceeds the number of allowable interrogatories.  <u>Eleazer v. Ted Reed Thermal, Inc.</u>, 576 A. 2d 1217 (1990).

28. State based on factual basis and described in detail the errors alleged in your agency's October 14, 2022 Recission of Liens issued by John Langlois. Attach to your answer all documents as they relate to and support your answer.

ANSWER: The State hereby objects to Interrogatory Number 28.  Pursuant to Rule 33(b) of the Rules of Civil Procedure, this Interrogatory exceeds the number of allowable interrogatories.  <u>Eleazer v. Ted Reed Thermal, Inc.</u>, 576 A. 2d 1217 (1990).

29. State based on factual basis and describe in detail the basis of your agency's allegation that it will continue to enforce arrears owed stated in your agency's October 14, 2022, Recission of Liens issued by John Langlois. Attach to your answer all documents as they relate to and support your answer.

ANSWER:  The State hereby objects to Interrogatory Number 29.  Pursuant to Rule 33(b) of the Rules of Civil Procedure, this Interrogatory exceeds the number of allowable interrogatories.  <u>Eleazer v. Ted Reed Thermal, Inc.</u>, 576 A. 2d 1217 (1990).

30. State based on factual basis and describe in detail the documentary information John Langlois agreed to produce at the October 5, 2022 Prehearing held by the Rhode Island Executive Office of Health and Human Services Office of Appeals. Attach to your answer all documents John Langlois agreed to produce.  State based on factual basis and describe in detail the account balance before Gero Meyersiek agreed to waive the interest, the account balance after Defendant made the payment, and the account balance when your agency put the interest back on the system.  Attach to your answer all documents as they relate to and support your answer.

ANSWER:  The State hereby objects to Interrogatory Number 30.  Pursuant to Rule 33(b) of the Rules of Civil Procedure, this Interrogatory exceeds the number of allowable interrogatories.  <u>Eleazer v. Ted Reed Thermal, Inc.</u>, 576 A. 2d 1217 (1990).

Respectfully submitted,

<u>/s/ *Lisa Pinsonneault*</u>, Esquire (#5979)
Department of Human Services
Office of Child Support Services
77 Dorrance Street
Providence, Rhode Island 02903

Lisa.Pinsonneault@dhs.ri.gov
401-458-4404

<u>CERTIFICATION</u>

I hereby certify that on May 30, 2023, I mailed a copy of this Response to Mary Seguin P.O. Box 22022 Houston, Texas 77019 postage pre-paid and via email marylive22022@gmail.com.

*/s/ Lisa Pinsonneault*

EXHIBIT F

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                    FAMILY COURT

State of Rhode Island ex rel.          :
GERO MEYERSIEK                         :
    *Plaintiff*                       :
                                       :
VS.                                    :          DOCKET NO: K20010521M
                                       :
                                       :
MARY SEGUIN                            :
    *Defendant*                      :

## DEFENDANT'S MOTION TO DISQUALIFY MAGISTRATE NAHABEDIAN

      The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby requests the Chief Judge or the Chief Judge's designee-judge the Honorable Judge Merolla that this Honorable Court disqualify Magistrate Susan Nahabedian from this matter. The Magistrate is prejudiced against the Defendant by her prejudicial muzzle of the Defendant using the WebEx Host/Administrator's capability to mute the Defendant throughout the entire time allocated to the trial hearing on the State's Motion to Set Arrears, from the point State counsel Paul Gould called the Plaintiff as the State's witness, all the way to the point where the Magistrate read her decision into the record. Magistrate Nahabedian muted the Defendant to prevent the Defendant from mounting her defense, which the record shows has all along been the Defendant's intent to mount her defense. The aforesaid public court hearing was streamed by the Rhode Island Courts and was heard remotely via WebEx hearing on February 2, 2024 scheduled at 2 PM Eastern Time.

      The amount of and whether the arrears that comprises solely of interest are in dispute. The accuracy of the alleged arrears that is computed by the State is in dispute.

      The Court had ordered **discovery (against the State)** a year ago at the **February 10, 2023** court hearing on the State's Motion to Set Arrears, and the court

records in this matter shows Defendant's pending discovery motions had been continued to the February 2, 2024 hearing.

Discovery was not completed.

Magistrate Nahabedian, who presided over the remote hearing, using the WebEx Host/Administrator's capability to mute any WebEx hearing participant, but without any warning to Defendant, muted the Defendant effectively muzzling the Defendant in a remote hearing several times (approximately 8) before the decision was read into the record – **but the undisputed prejudice to the Defendant is the Magistrate's muting the Defendant the entire time from the point of the State's calling of its witness, to the subsequent entire duration of the State's witness testimony of the Plaintiff, GERO MEYERSIEK, that included posing to the Gero Meyersiek 5-6 questions that were irrelevant, leading or lacked timeframe, that were additionally not about Defendant's pending discovery motions, but on the State's Motion to Set Arrears.**

Magistrate's Nahabedian's WebEx muting of Defendant prevented the Defendant from objecting after each question be it on grounds, on relevance, it's leading, or timeframe or personal knowledge, etc.

**Magistrate Nahabedian continued to mute the Defendant at the conclusion of State's witness testimony. Continuing to place the Defendant on mute, Magistrate Nahabedian went straight to read into the record her decision. Only at the close of reading the decision into the record did Magistrate Nahabedian unmute the Defendant**.

During the entirety of the State's witness testimony Defendant was muted/prevented from putting on the record objections or objecting to State's questions immediately after each question. After the State finished questioning Plaintiff's witness, Magistrate Nahabedian continued to mute the Defendant to prevent the Defendant from cross-examining the State's witness.

Using WebEx's mute mechanism, Magistrate Nahabedian prevented the Defendant from presenting Defendant's evidence, be it calling Defendant's witnesses or

proffering documentary evidence that were already submitted into the record in 2023 via attachments to motions, affidavits, objections and filings into the record in this matter.

Using WebEx's mute mechanism, Magistrate Nahabedian prevented Defendant from presenting arguments, effectively prevented from lodging a defense.

After the State finished putting on its case, the Defendant was continuously muted to prevent her from being heard, be it to cross-examine State's evidence or present Defendant's evidence and arguments.

To unilaterally reach a decision by proactively using WebEx's mute capability to muzzle the Defendant without affording the opportunity to Defendant to object to the State's questions, nor cross-examine the State's witness, nor present Defendant's case by muzzling/muting the Defendant in a remote WebEx hearing, when **the amount of or arrears is in dispute** shows prejudice against the Defendant, is prejudicial to the Defendant, and is a gross miscarriage of justice, especially when the amount in dispute is a substantial $81,000.00 +.   The ruling in favor of the State was a foregone conclusion.

In the WebEx hearing, Magistrate Nahabedian sought to create a false record, denying Defendant her right to a meaningful appeal, through using the WebEx mute against the Defendant to falsely make it look like Defendant failed to mount any defense, when in reality Defendant was muzzled and muted by Magistrate Nahabedian from presenting evidence and arguing her case, and denied Defendant's right to object to the line of questioning or object to or cross-examine the State's claim of over $81,000.00 in interest arrears.

Through continuous muting the Defendant throughout the State's examination of its witness, continuing to the rendering of the Court's decision in the aforesaid manner, Magistrate Nahabedian denied the Defendant her constitutional rights to present evidence and present arguments because Defendant could not lodge objections nor present evidence while Defendant was muted.   The WebEx mute cannot serve as an excuse to deny a defendant due process, thwart the right to present arguments, object to

the State's witness questions, cross-examine the State's witness, present the evidence, or silence the Defendant.

Defendant's exclusion from participation in the hearing through Magistrate Nahabedian's use of the WebEx mute function to silence the Defendant during the presentation of evidence and arguments throughout the entirety of the trial phase (that proceeded without conclusion of discovery, without resolution of pending motions to compel discovery) placed the Defendant at a "total and complete disadvantage" and showed bias that requires that she be removed.

**<u>Demonstrated Lack of Competence to Preside</u>**

After the Magistrate read her decision into the record, Defendant was finally unmuted. Only at that time after the decision was read did the Magistrate give the Defendant permission to cross examine the State's witness, with the caveat that any cross-examination is not going to change her decision. It is plainly obvious that unmuting and giving the Defendant permission to cross-examine the witness after the decision was read into the record is futile and renders the decision void, as it was decided without due process. Defendant also called Paul Gould representing the State as her first witness, as is Defendant's right, to testify on the alleged interest arrears amount. Without any basis in law, Magistrate Nahabedian denied Defendant her right to call the State as a witness as well, the central witness who stated on the record had prepared and administered the amount of the alleged arrears. After preventing the Defendant from calling her first witness, Magistrate Nahabedian prevented the Defendant from presenting an audio recording of the State's deputy chief counsel John Langlois stating the Plaintiff Gero Meyersiek had waived interest, which the Defendant had already submitted and filed into the record in this matter as early as June 6, 2023 (See **<u>Exhibit A</u>**). Magistrate Nahabedian prevented Defendant from presenting any evidence at all, effectively preventing the Defendant from litigating by presenting her evidence and defense, stating that the Magistrate's decision is just based on there is no other court order in the record that brings interest to zero, so there is no need for the Defendant to mount a defense disputing the alleged arrears with evidence.

The Magistrate clearly shows her own confusion and reasonably calls into question her competence by stating that <mark>a hearing on the motion to set arrears brought by the State is restricted to only hearing what court orders issued twelve and eleven years ago in 2012 and 2013 say in the court record in this matter</mark>. The Magistrate shows she is in effect either flouting or <mark>lacks understanding of the intent of the Court's February 2023 Order that ordered discovery</mark>. The Magistrate then instructed the Defendant to file a Motion if the Defendant disagrees.

The Magistrate's insistence that Defendant has to file another motion in order to litigate Defendant's dispute of the State's alleged interest arrears violates the pro-se Defendant's right to a speedy trial, efficiency and economy, prejudicing the Defendant.

The aforesaid spectacle of: (1) declaring the Magistrate is restricting the scope of the hearing on the State's motion to set arrears to only taking judicial notice of a twelve-year old 2012 court order, (2) while muzzling/muting the Defendant throughout the State's calling and examination of Its witness, and then (3) upon the conclusion of the State's direct questions, going straight to reading her decision while continuously muting the Defendant preventing the Defendant from lodging objections/cross-examination/presenting evidence and present arguments, reasonably calls into question the Magistrate's competence.

Under ***Turner v. Rogers, et al.*, 564 U.S. 431 (2011)**, the pro-se Texas Defendant has the due process and equal protection right to (1) identify the central issues; (2) present evidence; (3) present arguments. Magistrate Nahabedian shows she is confused about the central issues, restricts the scope of the hearing to just take judicial notice of what the prior court orders say, and flouts the Title IV-D Program statutory provisions of the Social Security Act.

1. The above is violative of Title IV-D Program mandates that govern this child support interest related matter. *See* **Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act)**

The issue of paramount concern, among others, is the due process protections that apply. The state child-support enforcement program at issue in this matter (which

is an **interstate** child support case), like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act).

2.  Congress and the Secretary of the U.S. Department of Health and Human Services have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program. (E.g. See, e.g., 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, **including notice and a reasonable opportunity to contest the accuracy of such information**."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for **notice**, **opportunity to contest the action**, and **opportunity for an appeal on the record** to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

3.  It is therefore no doubt and unequivocal that due process in any State tribunal in the United States must provide **the opportunity to contest the accuracy** of the information, **the accuracy of the alleged arrears** put forth by the State Agency, a Title IV-D Program State Agency, as here.  Yet, Magistrate Nahabedian restricts the scope of a hearing to set the arrears brought by the State to only determining whether there exists a prior court

order that set interest, and disallowing litigation challenging the accuracy of the alleged arrears put forth by the State Agency.

4. Having chosen to participate in the Title IV-D Program, the Rhode Island State here is mandated to comply with the clearly defined meaning of due process in 42 U.S.C. 666(a)(7)(B)(i). Federal law preempts all State customs, preempts State practices, preempts State policies or interests, and preempts State laws that go contrary to the statutory provisions of the Federal Title IV-D Program.

The Magistrate's WebEx muting of the Defendant for the entire duration of: (1) the State's questioning of its witness obstructing her from objecting to the questions, (2) denying the Defendant the opportunity to cross-examine the witness, (3) denying the Defendant the opportunity to challenge the accuracy of the State's information, (4) denying the Defendant the opportunity to present evidence and present arguments. The Magistrate's statement after unmuting the Defendant after reading into the record the decision that the Defendant's then-allowed post-judgment cross-examination of the State's witness "won't change her decision" unequivocally demonstrates prejudice against the Defendant and calls into question her competence.

The American Bar Association, ("ABA") in its seminal report produced for remote hearings and technology integration into the courts that further address court procedures during the COVID-19 Pandemic states that 60% to 100% of the approximately 30 million cases annually in the United States have a pro se litigant as a party, and that holds especially true in state family courts across the country. This implies that the Magistrate's muting of the Texas pro-se Defendant that obstructs her from lodging objections during the State's examination of its witness showing due process violations irreparably injure the vast majority of the pro se public in this Court, such as the Defendant proceeding pro se, and from Texas, by knowingly muting the Defendant and stating after rendering her decision and unmuting the Defendant that any of the Defendant's post-judgment cross-examination of the witness "won't change

her decision" is an abuse of the electronic technology system to disadvantage the pro-se
Defendant in the digital court.  *See* ABA Report here:
https://www.srln.org/system/files/attachments/AppendixA.ABA%20remote.117-
annual-2020.pdf

**Implication of Violating Due Process Mandates Under  *Turner v. Rogers, et
al.*, 564 U.S. 431 (2011) on State Eligibility of Participation in Title IV-D
Program**

1. It is in the Public's interest AND the State's interest to disqualify Magistrate
   Nahabedian who uses the WebEx mute function to muzzle the pro-se
   Defendant, failing to comply with ***Turner v. Rogers, et al.*, 564 U.S. 431
   (2011).**

2. In this matter, on motion to re-establish child support interest brought by
   under Title IV-D Program, the State and the Plaintiff and all persons etc., are
   mandated by ***Turner v. Rogers, et al.*, 564 U.S. 431 (2011) to comply
   with due process safeguards Congress intended.**  Specific to the due
   process requirement Congress intended is the requirement to develop a
   record that allows for appeal.  Here, the record development requirement is
   violative of due process.

   *See* **Congressional Intent at eg. 42 U.S.C. 666(c)(1)(H) (expedited
   State agency procedures "shall be subject to due process safeguards,
   including (as appropriate) requirements for notice, opportunity to contest
   the action, and opportunity for an appeal on the record to an independent
   administrative or judicial tribunal") (Emphasis added)**

3. As Congress, the United States Department of Justice, and the Secretary of
   the U.S. Department of Health and Human Services have demonstrated their
   concern that child-support-related proceedings be conducted fairly by

**repeatedly making compliance with procedural due process rules a requirement of State participation in the program**, it is further in the State's interest to disqualify Magistrate Nahabedian.

4. The Defendant seeks to preserve this important issue on the record, for appeal.

5. After the conclusion of the hearing on February 2, 2024, the Defendant sent a formal written email request to the Clerk of the Court, Magistrate Nahabedian's Clerk, copying the State counsel, Paul Gould, requesting an electronic recording copy of the WebEx hearing, a public hearing that was also livestreamed. Defendant is informed by WebEx that WebEx hearings are recorded. A record of the muting, periods of muting, Defendant's repeated press of the "raise hand button" when she was muted to show her intent to object but could not lodge them audibly on the record because she was muted, is requested.

6. In support of the above, the Defendant attaches herein a copy of the aforesaid Defendant email request made on February 2, 2024.

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or designee-Judge Merolla of this Honorable Court to:

1. Grant the Defendant's Motion to Disqualify Magistrate Nahabedian.
2. Stay proceedings in this matter to investigate the raised due process violations raised herein as well as due process violation matters relating to Title IV-D Programs that mandate due process proceedings, in order to enforce Title IV-D Program requirements and to enforce the State to comply with Title IV-D Program participation eligibility requirements.
3. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

February 4, 2024

FOR DEFENDANT
MARY SEGUIN, Pro Se.

By: _Mary Seguin_
Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

**CERTIFICATION**

I hereby certify that a copy of the within Motion was filed on February 4, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

_Mary Seguin_

Exhibit A

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                    FAMILY COURT

State of Rhode Island ex rel.              :
GERO MEYERSIEK                            :
        *Plaintiff*                               :
                                                  :
VS.                                             :          DOCKET NO: K010521M
                                                  :
                                                  :
MARY SEGUIN                               :
        *Defendant*                           :

### MARY SEGUIN'S DECLARATION PURSUANT TO RULE 37(a)(2) IN SUPPORT OF DEFENDANT'S THIRD RULE 7(b)(3)(G) MOTION TO COMPEL PRODUCTION UNDER RULE 34(b), RULE 37(a)(2)(3), RULE 26(b)((1), RULE 26(b)(5)

I, MARY SEGUIN ("Plaintiff"), resident of the State of Texas, in good faith,

certify, declare, verify and state pursuant to 28 U.S. Code sec 1746, under penalty of

perjury that the foregoing is true and correct:

1.   I received in the mail a Notice of Lien for the amount of $75,638.00 dated

     March 3, 2022 issued by the Rhode Island Office of Child Support Services on

     and around mid-March 2022.  In April 2022, I filed a written appeal of the

     lien.  My written appeal was docketed on April 4, 2022 at the Office of

     Appeals of the Rhode Island Executive Office of Health and Human Services,

     Docket#22-2116.   The Administrative Hearing was continued to the

     maximum of three times by the Appeals Office due to the failure of the Office

     of Child Support Services to grant me, the Appellant, access to my case file.

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 001131200023    Page: 1360    Date Filed: 03/16/2024    Entry ID: 6636299

On October 5, 2022 a telephonic conference took place prior to the Administrative Hearing. The participants of the telephone call were John Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode Island, Debra DeStefano, Esq., the Hearing Officer of the Rhode Island Executive Office of Health and Human Services Office of Appeals in Rhode Island, and myself in Texas. I, in Texas, recorded the phone call starting at 12:30PM Central Time, or 1:30PM Eastern Time. The recording of the telephone call is 1 hour 35 minutes and 38 seconds long. I am admitting into evidence the recording.

2. Because the entire recording is over one and half hour long, I admit into evidence the attached true and accurate part of the recording where John Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode Island stated to me and Debra DeStefano "what happened in this case is when Mary's representative, her attorney, called us in later November 2021 and said she wants her passport released, what does she have to do to release her passport, they put her in touch with Karla, who gave her the $104k number. Where that number came from was the department attorney contacted the custodial parent, Mr. MEYERSIEK. So, we contacted his attorney, it wasn't me, it was somebody else in my office, and said, if she was willing to make a $104k payment to pay off the principal, would you be willing to waive the $75k or $73k in arrears. At that time, he said yes. So Karla notified Mary that if she paid the $104k, it would be paid in full because he was willing to waive the interest, that was just the principal. What happened was the day after Karla told Mary to wire the $104k the attorney for Mr. Meyersiek contacted us

again and said he changed his mind. Please put the interest back on the

system. So we did."

3. I attempted to attach the audio file recording to the Rhode Island Courts e-

filing Tyler Technologies system but was informed by the system that audio

files cannot be uploaded as attachments.

4. Therefore, I uploaded the audio file to Google Drive and shared it with

DomesticExhibits@Courts.ri.gov and paul.gould@dhs.ri.gov

5. I further attach here the link of the shared Audio File on Google Drive as

https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-

hBMaEg9/view?usp=sharing

6. I granted access to this audio file on Google Drive to

DomesticExhibits@courts.ri.gov and paul.gould@dhs.ri.gov

7. I further emailed DomesticExhibits@courts.ri.gov and paul.gould@dhs.ri.gov

that this is the audio file attached to my affidavit filed herein in Court to

Admit the audio file into evidence in the above captioned matter in Family

Court, K20010521M.

8. The Family Court Clerk told me to email my exhibits and evidence along with

the case number K20010521M to DomesticExhibits@courts.ri.gov

9. Karla Caballeros of the Rhode Island Office of Child Support Services notified

me on December 7, 2021 that if I paid the $104,185.98 it would be paid in full

because Gero Meyersiek waived the interest. I agreed, and on December 7,

2021, on the same day of Karla Caballeros' notification, I paid the $104,185.98

through bank wire. After I paid the full amount through bank wire, I emailed

Karla Caballeros also on the same day on December 7, 2021 that I wired it.

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 00111812007997    Page: 1362    Date Filed: 09/26/2024    Entry ID: 6663499

10. Rhode Island Office of Child Support Services also emailed and mailed through regular mail to me during litigation the TRAC note of 12/06/2021 and 12/07/2021 that says, "Agent contacted me that NCP wants to pay all arrears to obtain passport. I called CP private attorney Barbara Grady to advise, and to discuss if CP wants the interest put back on the case (REDACTED). We removed the interest when case was made UI when we were filing to Texas. Atty Grady checked with CP and CP is satisfied with the lump sum payment of principle of $104k+/-. After conference with Monique and Frank Dibiase, it was decided to require payment in more secure/less reversable form than credit card, so $ will need to be wired by bank check. Agent will be contacted back by NCP as NCP won't give phone number or email address. Agent is not even sure if NCP is in country. Interest is not included in amount that is considered for passport purposes in any event."

11. The statements contained in the Defendant's Second Rule 7(b)(3)(G) Motion to Compel Production filed on March 27 3, 2023 in the Family Court and Defendant's Third Rule 7(b)(3)(G) Motion to Compel filed on June 1, 2023 are, to my knowledge, true and correct.

12. I filed my/Defendant's First Rule 7(b)(3)(G) Motion to Compel Production on February 3, 2023 and the Court heard this motion at the hearing in this matter on February 10, 2023.

13. The Court ruled at the February 10, 2023 and March 6, 2023 hearings in this matter that the State ex. Rel. GERO MEYERSIEK, Plaintiff, shall comply with discovery forthwith.

14. At the hearing held on February 10, 2023 in this matter, the State through and by Paul Gould, Esq., represented to the Court that the State on its own removed interest from the system in Defendant's case file in 2018.  TRAC notes dated 12/06/2021 and 12/07/2021 also state that the State on its own removed interest from the system in Defendant's case file in October 2018.

15. At the hearing held on February 10, 2023 in this matter, the Court ordered the State to put interest back on the system without prejudice to the Defendant.

16. The Court ruled at the March 6, 2023 hearing in this matter that the interest number put back on the system without prejudice to the Defendant is only a "starting point" for the sole purpose of having a number to start with, without prejudice to the Defendant. The Court elucidates to the Defendant, "You have to have a number to start with.  The State is not saying you owe this number."

17. The Court ruled at the March 6, 2023 hearing in this matter that the State ex. Rel. GERO MEYERSIEK, Plaintiff, shall substantiate the interest number which the Court ordered to put back on the system without prejudice to the Defendant.

18. I, the Defendant in this matter, in good faith, attempted to confer with the State/Plaintiff, by and through Paul Gould, Esq., in Court at the March 6, 2023 hearing to make discovery in an effort to secure the information and documents requested in my/Defendant's Request for Product of Documents without court action in the form of a formal Motion to Compel.  However, the State/ Plaintiff replied in Court that the State stands by the responses propounded by the State/Plaintiff in the Plaintiff's Response to Defendant's Request for Production of Documents dated February 16, 2023 and continues

to stand by those said responses up to June 8, 2023, the date this matter is
continued for hearing on the State/Plaintiff's DHS Motion.

19. I, the Defendant in this matter, in good faith, again attempted to confer with
the State/Plaintiff, by and through Paul Gould, Esq., since April 14, 2023,
including sending more than 12 email confer attempts to make discovery in an
effort to secure the information and documents requested in my/Defendant's
Requests for Production of Documents without court action in the form of a
formal Motion to Compel.  However, the State/Plaintiff again replied during a
May 9, 2023 telephone conference with the Defendant that the State/Plaintiff
stands by the responses propounded by the State/Plaintiff in the Plaintiff's
Responses to Defendant's Requests for Production of Documents in February
and April of 2023.  The Defendant further revised Defendant's First Set of
Interrogatories pursuant to discussions at the aforesaid May 9, 2023
discovery telephone conference, as well as asked the State/Plaintiff in writing
via email to reply to the Defendant if the State/Plaintiff has any further
questions or issues to discuss without court action, but again, the
State/Plaintiff failed to communicate any objections or issues with the
Defendant.

20. I certify that the above is true and correct.

Declaration Executed on June 1, 2023 by Mary Seguin

_____
Mary Seguin

Exhibit B



Mary Seguin <maryseguin22022@gmail.com>

---

# Request for Audio Recording of Remote WebEx hearing

**Mary Seguin** <maryseguin22022@gmail.com>                                    Fri, Feb 2, 2024 at 7:21 PM
To: virtualfamilyclerk@courts.ri.gov
Cc: Richard Santamaria <Rdsantamaria@courts.ri.gov>, "Nahabedian, Susan" <snahabedian@courts.ri.gov>

Dear Clerk of the Family Court,

I am respectfully requesting the audio recording of the WebEx hearing in this matter, Gero Meyersiek v. Mary Seguin, K2001-0521M that was scheduled on February 2, 2024 at 2PM EST.

Please email the audio recording to me as soon as possible.

Thank you.

Respectfully Submitted,
Mary Seguin

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Fri, Feb 2, 2024 at 2:38 PM
Subject: Request for Audio Recording of Remote WebEx hearing
To: Santamaria, Richard <rdsantamaria@courts.ri.gov>
Cc: Gould, Paul (DHS) <Paul.Gould@dhs.ri.gov>, Nahabedian, Susan <snahabedian@courts.ri.gov>

Dear Clerk of the Court,

I am respectfully requesting the WebEx hearing audio recording of the hearing in this matter, Gero Meyersiek v Mary Seguin, K-0521M that was scheduled on February 2, 2024 at 2PM EST.

Please email the audio recording to me.

Thank you.

Respectfully submitted,
Mary Seguin

On Jan 18, 2024, at 2:18 PM, Santamaria, Richard <rdsantamaria@courts.ri.gov> wrote:

Ms. Seguin,

We have finished scanning the entire file.   I will be emailing you the documents In increments, as I did before.

Thank you for your patience during this process.

Regards,

Richard

---


<image001.jpg>

**Richard Santamaria, Jr.**

Deputy Clerk

Domestic Clerk's Office

Rhode Island Family Court

One Dorrance Plaza

Providence, RI 02903

Phone: 401-458-3122

rdsantamaria@courts.ri.gov |
www.courts.ri.gov

<Order Entered.tif>
<Motion to Adjudge in Contempt.pdf>
<Motion to Adjudge in Contempt 1.pdf>
<Order Entered.pdf>
<Order Entered 1.pdf>
<Order Entered 2.pdf>
<Order Entered 3.pdf>

EXHIBIT G

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                    FAMILY COURT

| | | |
|---|---|---|
| State of Rhode Island ex rel. | : | |
| GERO MEYERSIEK | : | |
| *Plaintiff* | : | |
| | : | |
| VS. | : | DOCKET NO: K010521M |
| | : | |
| | : | |
| MARY SEGUIN | : | |
| *Defendant* | : | |

### DEFENDANT'S MOTION FOR A VIDEO RECORDING OF TITLE IV-D WEBEX HEARING

Now comes the Texas Defendant, MARY SEGUIN ("Seguin") and hereby respectfully moves the Chief Judge of Family Court, the Honorable Michael Forte, to send the Defendant **a sound recording and video recording** of the public court hearing heard via WebEx scheduled on February 2, 2024 at 2 PM Eastern Time in the above-captioned matter, a **Title IV-D Case**.

Defendant requests a hearing on this matter.

Defendant proceeds pro-se in Texas.  The State alleges a substantial <u>but unsubstantiated</u> **$81,652.46 in <u>interest</u> arrears without any evidentiary substantiation of the validity and accuracy of the alleged arrears on the record** in this **interstate** <u>Title IV-D Program case</u>.

During the entirety of the trial phase of the Title IV-D case WebEx hearing on the State's alleged $81,852.46 in interest arrears, the WebEx Host/Magistrate forcibly muted the Defendant for the entire "trial phase" all the way to and through the Magistrate's reading the decision into the record.  Only after the decision was read into the record was the Defendant unmuted by the WebEx Host/Magistrate.  Defendant was unable to unmute the Host's/Magistrate's mute, and repeatedly pushed the "raise hand" button to signal Defendant's intent to speak to present Defendant's case, but to no avail.

I. **Background**

While the court records lacks documentary evidence substantiating the State's allegation of the $81,654.62 in interest arrears, on the other hand, Defendant has filed several motions and submitted evidence into the record from February 3, 2023 to August 2023 documentary evidence of screen shots taken on December 6, 2021 showing "$0.00 interest" reflected on the Defendant's online account as of November 30, 2021 which Office of Child Support Services represented to the Texas Defendant showed that interest was waived by the Plaintiff. Defendant's online account screenshot on December 6, 2021 showing "$0.00 interest" coupled with Office of Child Support Services representation that the "$0.00 interest" showed interest was waived by the Plaintiff led the Texas Plaintiff to reasonably rely on the accuracy of the State's representation that interest was waived, in consideration of the Defendant agreeing to pay off the principle in one lump sum. Defendant in Texas accepted and paid in full IN ONE LUMP SUM the pay off of $104,185.98 that Office of Child Support sent to Defendant in writing by email to pay off arrears in full via bank wire on December 7, 2021, in consideration of the Plaintiff GERO MEYERSIEK waiving interest. The agreement was brokered by the State, by Deputy Legal Counsel Kevin Tigue ("Tigue") of Office of Child Support Services and Attorney Barbara Grady on behalf of Plaintiff GERO MEYERSIEK. This is documented in the Defendant's Title IV-D Child Support case file on the "TRAC dated 12/06/2021 and 12/07/2021" that shows Tigue brokering the interest waiver with Attorney Barbara Grady on behalf of Gero Meyersiek in consideration of Defendant paying a lump sum payment of $104, 185.98 in principle as payoff. Defendant submitted the aforesaid documents into the record, attached to Defendant's affidavits. Defendant again attaches the aforesaid online account screen shot showing "$0.00 interest" as of November 30, 2021 and the "TRAC for 12/06/2021 and 12/07/2021" as **Exhibit A** to this Motion.

Additionally, at a Prehearing telephonic conference that took place on October 5, 2022, The participants of the telephone call were John Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode Island, Debra DeStefano, Esq., the Hearing Officer of the Rhode Island Executive Office of Health and Human Services Office of Appeals in Rhode Island, and Defendant in Texas. Defendant, in Texas,

recorded the phone call starting at 12:30PM Central Time, or 1:30PM Eastern Time. The recording of the telephone call is 1 hour 35 minutes and 38 seconds long.  Defendant is admitting into evidence the recording.  Listen to the audio recording at the link here:

https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

Because the entire recording is over one and half hour long, Defendant admitted into evidence the attached true and accurate part of the recording where John Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode Island stated to Defendant and Debra DeStefano "what happened in this case is when Mary's representative, her attorney, called us in later November 2021 and said she wants her passport released, what does she have to do to release her passport, they put her in touch with Karla, who gave her the $104k number. Where that number came from was the department attorney contacted the custodial parent, Mr. MEYERSIEK. So, we contacted his attorney, it wasn't me, it was somebody else in my office, and said, if she was willing to make a $104k payment to pay off the principal, would you be willing to waive the $75k or $73k in arrears. At that time, he said yes. So Karla notified Mary that if she paid the $104k, it would be paid in full because he was willing to waive the interest, that was just the principle. What happened was the day after Karla told Mary to wire the $104k the attorney for Mr. Meyersiek contacted us again and said he changed his mind. Please put the interest back on the system. So we did."

https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

The above are but some of the many evidence the Defendant had already submitted into the record on file, but not formally admitted into evidence by a trial justice at a hearing.  Therefore, the record is amply clear that Defendant intends and seeks to exercise her right to the opportunity to be heard (not muted in a WebEx hearing by the Magistrate the duration of the trial phase of the hearing).

## II.    **Defendant was forcibly Muted for the Entire Duration of the Trial Phase of the Hearing**

1. The WebEx Host/Magistrate had put Defendant on mute throughout the duration of the State's witness testimony all the way through to reading into the record the decision using a new WebEx Mute function. Defendant was unable as an individual participant to unmute the WebEx Host's mute of the Defendant.

2. For the duration of the opposing party's testimony and then through to the end of the reading of the decision into the record, Defendant was forcibly put on mute.

3. Defendant pressed the "raise hand" button repeatedly seeking to be heard, but to no avail.

4. If the act of forcibly muting Defendant is not on the appeal record in the WebEx hearing, the record is inaccurate, falsely making it look like Defendant didn't mount a defense/present evidence before the decision, when in fact Defendant was forcibly muted and used the "raise hand" button repeatedly to signal Defendant's intent to speak/present evidence/present argument throughout the "trial evidence and argument" phase, but to no avail.

5. The transcript must accurately reflect the fact that the WebEx Host/Magistrate had forcibly put the Defendant on mute throughout the duration of the trial, resulting in the trial consisted only of the State's witness testimony, all the way through to the reading into the record the court's decision using a new WebEx Host mute function. Defendant was unable as an individual participant to unmute the WebEx Host's mute of the Defendant.

6. The Host's/Magistrate's mute of the Defendant was not explicitly verbalized on the record beforehand or after unmuting. But the act of the forcible Host/Magistrate muting of the Defendant, when said muting occurred during the State's testimony/evidence/argument, is crucial to the accuracy of the record, that is guaranteed by the due process provisions of Federal Title IV-D.

7. Defendant was forcibly muted from raising objections to the opposing party's questions on their direct.

8. Defendant was forcibly muted from cross-examining the State's witness.

9.  Defendant was forcibly muted from presenting Defendant's evidence, *inter alia* the above-mentioned evidence.

10. Defendant was forcibly muted from presenting Defendant's arguments regarding the State's insufficiency/lack of evidence substantiating or supporting the accuracy of alleged arrears calculated and alleged owed.

11. Defendant was forcibly muted from being heard on evidence and arguments.

12. Then, going straight to reading a judgment into the record while still keeping Defendant on mute makes the alleged judgement read into the record lack due process. The record must reflect the act of muting the Defendant for the entire trial phase of the hearing.

13. If the act of forcibly muting the Defendant is not on the record in the WebEx hearing, the record is inaccurate, making it look like Defendant did not mount a defense/present evidence before the decision, when in fact Defendant was forcibly muted and vigorously used the "raise hand" button repeatedly to signal Defendant's intent to speak and present Defendant's evidentiary case throughout the "trial evidence and argument" phase, but to no avail.

14. From the start of mute to the time of unmuting must be part of the record.

15. The Texas Defendant was summoned to a WebEx hearing where Defendant was forcibly muted and prevented from being heard for the crucial entire phase of the "trial, evidence and argument" of the hearing all the way through to the reading of the decision into the record, which must be preserved in the record to reflect a true/accurate record of the proceeding.

16. The Defendant respectfully requests to obtain a complete and true video record of the WebEx hearing that appeared on the computer screen replete with being forcibly muted as is indicated by a crossed out microphone icon at the bottom-right corner of the participant's window, replete with showing the "raising hand" icon pressed and all the crucial records showing the suppression of Defendant's intent to be heard that must be preserved on the record.

17. This was a public hearing which was live-streamed.

18. Defendant requests a sound and video recording of the above WebEx hearing.

19. The issue of paramount concern, among others, is the due process protections that apply.   The state child-support enforcement program at issue in this matter (which is an **interstate** child support case), like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act).

20. Congress and the Secretary of the U.S. Department of Health and Human Services have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program. (E.g. See, e.g., 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, **including notice and a reasonable opportunity to contest the accuracy of such information**."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for **notice**, **opportunity to contest the action**, and **opportunity for an appeal on the record** to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

21. It is therefore unequivocal that due process in any and all tribunal(s) must provide **the Defendant Noncustodial Parent the opportunity to contest the accuracy** of the information **and/or the accuracy of the alleged arrears** put forth by the State Agency, a Title IV-D Program State Agency, as in this instant case here.

22. Under ***Turner v. Rogers, et al.***, **564** U.S. **431 (2011)**, the pro-se Texas Defendant has the due process and equal protection right to (1) identify the central issues; (2) present evidence; (3) present arguments.

23. Defendant further sent a written letter request to the Office of the Chief Judge of the Family Court for the same audio and video recordings.

24. In support of this motion, the Defendant attaches to this herein motion the following evidence ( just a portion of the total evidence) that Defendant was prevented from presenting at the WebEx hearing – these were also previously submitted into the record by the Defendant from February 2023 to June 2023:

> (1) A copy of the screen shots of Noncustodial Parent Defendant's online child support account statement of total arrears owed that shows "$0.00" under "Interest" as of November 30, 2021 which Karla Cabelleros of Office of Child Support Services told the Defendant showing Gero Meyersiek waived interest and to rely on the arrears amount figures on the screen stating "$93,214.56 of principle arrears, $0.00 of interest."
>
> (2) A copy of the TRAC notes of 12/6/2021 and 12/7/2021
>
> (3) A copy of the emails between Defendant and Karla Caballeros on December 6, 2021 and December 7, 2021.

**WHEREFORE**, the Defendant respectfully requests the Chief Judge of this Honorable Court to:

1. Grant the Defendant's Motion for an audio recording and Video recording of the February 2, 2024 Title IV-D WebEx Hearing on this matter.
2. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request, including the factual events in this case relating to the waiver of interest that is material to the accuracy of the alleged interest arrears.
3. Order a hearing.
4. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here: https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

5. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

February 5, 2024

FOR DEFENDANT
MARY SEGUIN, Pro Se.

By: _Mary Seguin_
Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

## CERTIFICATION

I hereby certify that a copy of the within Motion was filed on February 5, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

_Mary Seguin_



12:38 PM Mon Dec 6

cseinfo.dhs.ri.gov 🔒

ADCB Internet Banking    Community Health Choice |...    Sign In - Community Healt...    Case Manager Portal | Offi...    RI OCSS Payment

RI.gov

R.I. Government Agencies | Privacy policy | Search RI.gov:

State of Rhode Island
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Home   My Profile   Contact Us   Site Map   Log

**Menu**

Home > Current Orders and Past Due Balances

▼ Case Information
▶ Last 5 Payments
▶ Last 13 Months
  Current Orders/ Past Due Balances
▶ Court Dates/ Appointments
▶ Enforcement Actions
▶ PIN Lookup

**Case Manager**

## Current Orders / Past Due Balances

**Custodial Parent:** Gero K Meyersiek       **CSE ID:** 1689817

**Current Orders**

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

⚠ Note: Medical orders and medical arrears are not listed on this screen.

**Past Due Balances**

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |



**M** Gmail                                        Mary Roberts <marylive22022@gmail.com>

---

## Request for administrative hearing of Notice dated March 3, 2022 : Re: K01-521M Child Support Payment Schedule Information

**Mary Roberts** <marylive22022@gmail.com>                          Fri, Apr 1, 3:12 PM
To: <karla.samayoa@dhs.ri.gov>

Karla,

I am writing to request an administrative hearing in the above matter, and am attaching to this email the written request (in pdf file named "Request for Administrative Hearing April 1, 2022") that I had also sent via regular mail.  On March 15, 2022, I received the attached notice which was sent from child support office.

As indicated in my attached request, I am pro-se at this time and out-of-state, and further due to surging Covid, I respectfully request instructional materials on how to proceed for hearing, such as date(s) to submit my written petition/brief/motion/memorandum in support of my request for hearing, and the date of hearing via zoom (including dial-in information) for individuals/the general public without counsel, to be emailed to me as soon as possible.

Sincerely,
Mary

Cc: via regular mail Tracy Gedris, PO Box 480, Elmford, NY 10523

On Tue, Dec 7, 2021 at 11:14 AM Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov> wrote:

> ## Yes, that is correct.
>
> **From:** Mary Roberts <marylive22022@gmail.com>
> **Sent:** Tuesday, December 7, 2021 12:09 PM
> **To:** Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov>
> **Subject:** [EXTERNAL] : Re: K01-521M Child Support Payment Schedule Information
>
> Thank you Karla!
>
> The child support case number is 0366029181, correct?  Just wanted to confirm.
>
> Thank you!
>
> Mary
>
> On Tue, Dec 7, 2021 at 10:40 AM Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov> wrote:
>
> > Hi Mary:
> >
> > This is the response I received from accounting:

include her child support case #, the routing and account numbers, her name obviously, and name of account: Child Support

*Bank name : Citizens Bank*

*Account name: Child Support*

*Routing number is 011500120*

*Account number is 11076461*

**She should wire the 104,185.98 and cancel the 12/06 payment if possible.**

[google.com]

Karla Caballeros

Child Support Administrative Officer

Office of Child Support Services

77 Dorrance Street [google.com]

Providence, RI 02903 [google.com]

401-458-4519

401-458-4410 fax

Karla.Caballeros@dhs.ri.gov

**From:** Mary Roberts <marylive22022@gmail.com>
**Sent:** Tuesday, December 7, 2021 10:48 AM
**To:** Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov>
**Subject:** Re: [EXTERNAL] : Fwd: 88298: Child Support Payment Schedule Information

Good morning Karla,

Thank you so much for the information!

And do I remit $104,185.98 and cancel the $9991 I scheduled for 12/13/2021?

Thanks again for your help.

Mary

On Tue, Dec 7, 2021 at 8:47 AM Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov> wrote:

Good Morning Mary:

Please see below information received by our accounting office as to the transferring of funds to pay the arrears:

She will need to know the following information for the wire transfer:

**Bank name : Citizens Bank**

**Account name: Child Support**

**ABA# 011500120011076461**

If you have any other questions, please do not hesitate to reach out to me.

[google.com]

Karla Caballeros

Child Support Administrative Officer

Office of Child Support Services

77 Dorrance Street [google.com]

Providence, RI 02903 [google.com]

401-458-4519

401-458-4410 fax

Karla.Caballeros@dhs.ri.gov

Case Number: 23-4567M    Document: 0011312233    Page: 1360    Date Filed: 03/20/2024    Entry ID: 666328899
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22    11:28          C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00                  CASE HISTORY           U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (███████████████████
████████████████████████████). WE REMOVED THE INTEREST WHEN_____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP_____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-._____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO_____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF_____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

RL: 80  12 22 ABSP:              SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK   GERO    K    PNL:
```

Case Number: 23-1997      Document: 00111813198883      Page: 1382      Date Filed: 09/26/2024      Entry ID: 6663208993

Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer: Maria O.

11:20:56 Tuesday, December 13, 2022

12/13/22    11:20        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY             U024  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED_____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES____

RL: 80  12 22 ABSP:        SEGUIN        MARY          CMD: _____
FNX: TRAC  D CLIENT:       MEYERSIEK     GERO      K   PHL:

Case Number: 22-1050RI   Document: 0011181290023   Page: 1383   Date Filed: 09/26/2024   Entry ID: 6665355

Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

| 12/13/22 | 11:29 | C A S E   T R A C K I N G | CSCL | ASMXA201 |
| | TRAC.00 | CASE HISTORY | U824 | PROD |

STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSIDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTEREST
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
        FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
        FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

| RL: SO  12 22 ABSP: | SEGUIN | MARY | | CMD: |
| FWK: TRAC  D CLIENT: | MEYERSIEK | GERO | X | PNL: |

Case Number: 23-1002A
Providence/Bristol County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maia G.

11:29:53 Tuesday, December 13, 2022

```
12/13/22   11:29          C A S E   T R A C K I N G        CSCL  ASMXA201
              TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION     COMPREHENSIVE CASE HISTORY
```

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

```
RL: 80  12 22 ABSP:          SEGUIN        MARY           CMD: _____
PXX: TRAC  D CLIENT:         MEYERSIEK     GERO      K    PNL:
```

ed in Providence/Bristol County Family Court
ibmitted 07/7/2023 10.13 PM
Document: 000111881299993333
Page: 13886
Date Filed: 03/246/220244
Entry ID: 6666382999999
velope: 4132704
viewer Maria O.

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G       CSCL  ASMXA201
           TRAC.00            CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN___
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
   TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
   58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

RL: 80  12 22 ABSP:              SEGUIN       MARY          CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK    GERO     K    PNL:
```

Case Number 2304195074   Document: 000111831946283   Page: 1386   Date Filed: 03/06/2024   Entry ID: 6663246895
Filed in Providence/Bristol County Family Court
Submitted 5/1/2023 10:13 PM
Envelope 4132704
Reviewer: Maya
11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G         CSCL   ASMXA201
           TRAC.00             CASE HISTORY               U824   PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
         TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
         58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

RL: 80  12 22 ABSP:                SEGUIN      MARY             CMD: _____
FNX: TRAC  D CLIENT:               MEYERSIEK   GERO      K      PNL:
```

Case Number: N20000824M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:29:13 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G      CSCL  ASMXA201
            TRAC.00              CASE HISTORY           UB24  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

```
RL: 80  12 22 ABSP:          SEGUIN      MARY       CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO   K   PNL:
```

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28       C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY            U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985


RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:            SEGUIN      MARY          CMD: _____
                               MEYERSIEK   GERO     K    PNL:
```

EXHIBIT H

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                    FAMILY COURT

State of Rhode Island ex rel.          :
GERO MEYERSIEK                         :
    *Plaintiff*                        :
                                       :
VS.                                    :          DOCKET NO: K20010521M
                                       :
                                       :
MARY SEGUIN                            :
    *Defendant*                       :

### DEFENDANT'S MOTION TO DISMISS INTEREST ARREARS

The Texas Defendant, MARY SEGUIN ("Seguin"), proceeding pro-se, hereby moves to dismiss interest arrears. Defendant respectfully **requests and moves for a hearing on Defendant's herein Motion to Dismiss Interest Arrears**.

Defendant separately filed accompanying this motion Defendant's Motion to Disqualify Magistrate Nahabedian, that is related to this herein motion. As facts fully alleged herein, Defendant incorporates all the facts averred to in Defendant's Motion to Disqualify that outlines the fact at the WebEx Hearing scheduled at 2 PM Eastern Time on February 2, 2024, Magistrate Nahabedian instructed the Defendant to file a separate Motion to challenge the accuracy of the information presented on the record in this matter by the Office of Child Support Services ("the State") of the alleged interest owed and to challenge whether interest is owed. Additionally, the Defendant requests and moves for a hearing to present evidence showing that the Plaintiff's private attorney Barbara Grady provided oral representation and sent written statements representing to the Office of Child Support Services that Gero Meyersiek waived interest.

In support of Defendant's herein Motion to Dismiss Interest Arrears, the Defendant again re-attaches Defendant's Affidavit of the Facts filed and submitted into the record in this matter on June 1, 2023 (see **Exhibit A**) and states the following facts:

1. The State (Rhode Island Office of Child Support Services) computation of alleged interest arrears of over $81k is inaccurate and the Defendant moves for a hearing to challenge and question the State on the State's information and computation.

2. The child in question turned 18 years old and was emancipated on April 21, 2018, and is now a 24 year old adult.

3. Further, Defendant received in the mail a Notice of Lien for the amount of $75,638.00 dated March 3, 2022 issued by the Rhode Island Office of Child Support Services without supporting documentation justifying the lien amount on and around mid-March 2022.

4. In April 2022, Defendant filed a written appeal of the lien. Defendant's written appeal was docketed on April 4, 2022 at the Office of Appeals of the Rhode Island Executive Office of Health and Human Services, Docket#22-2116. The Administrative Hearing was continued to the maximum of three times by the Appeals Office due to the failure of the Office of Child Support Services to grant Defendant access to Defendant's child support case file.

5. On October 5, 2022 a telephonic conference took place prior to the Administrative Hearing. The participants of the telephone call were John Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode Island, Debra DeStefano, Esq., the Hearing Officer of the Rhode Island Executive Office of Health and Human Services Office of Appeals in Rhode Island, and Defendant in Texas. Defendant, in Texas, recorded the phone call starting at 12:30PM Central Time, or 1:30PM Eastern Time. The recording of the telephone call is 1 hour 35 minutes and 38 seconds long.  Defendant is admitting into evidence the recording, **Exhibit A. Listen to the audio recording at the link here:** https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

6. Because the entire recording is over one and half hour long, Defendant admits into evidence the attached true and accurate part of the recording where John Langlois, Esq., of the Rhode Island Office of Child Support

Services in Rhode Island stated to Defendant and Debra DeStefano "what happened in this case is when Mary's representative, her attorney, called us in later November 2021 and said she wants her passport released, what does she have to do to release her passport, they put her in touch with Karla, who gave her the $104k number. Where that number came from was the department attorney contacted the custodial parent, Mr. MEYERSIEK. So, we contacted his attorney, it wasn't me, it was somebody else in my office, and said, if she was willing to make a $104k payment to pay off the principal, would you be willing to waive the $75k or $73k in arrears. At that time, he said yes. So Karla notified Mary that if she paid the $104k, it would be paid in full because he was willing to waive the interest, that was just the principal. What happened was the day after Karla told Mary to wire the $104k the attorney for Mr. Meyersiek contacted us again and said he changed his mind. Please put the interest back on the system. So we did."

https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

7. Karla Caballeros of the Rhode Island Office of Child Support Services notified the Texas Defendant Seguin on December 7, 2021 that if the Defendant paid the $104,185.98 it would be paid in full because Gero Meyersiek waived the interest. Defendant agreed, and on December 7, 2021, on the same day of Karla Caballeros' notification, Defendant paid the $104,185.98 through bank wire in Texas. After Defendant paid the full amount through bank wire, Defendant emailed Karla Caballeros also on the same day on December 7, 2021 that Defendant wired it.

8. Rhode Island Office of Child Support Services also emailed and mailed through regular mail to Defendant on or about February 2023 during Court ordered discovery the Office of Child Support's "TRAC note" of 12/06/2021 and 12/07/2021 that states, "Agent contacted me that NCP wants to pay all arrears to obtain passport. I called CP private attorney Barbara Grady to advise, and to discuss if CP wants the interest put back on the case (REDACTED). We removed the interest when case was made

UI when we were filing to Texas. Atty Grady checked with CP and CP is satisfied with the lump sum payment of principle of $104k+/-. After conference with Monique and Frank Dibiase, it was decided to require payment in more secure/less reversable form than credit card, so $ will need to be wired by bank check. Agent will be contacted back by NCP as NCP won't give phone number or email address. Agent is not even sure if NCP is in country. Interest is not included in amount that is considered for passport purposes in any event." The statements contained in the Defendant's Second Rule 7(b)(3)(G) Motion to Compel Production filed on March 27 3, 2023 in the Family Court and Defendant's Third Rule 7(b)(3)(G) Motion to Compel filed on June 1, 2023 are, to Defendant's knowledge, true and correct.

9. Defendant filed Defendant's First Rule 7(b)(3)(G) Motion to Compel Production on February 3, 2023 and the Court heard this motion at the hearing in this matter on February 10, 2023.

10. The Court ruled at the February 10, 2023 and March 6, 2023 hearings in this matter that the State ex. Rel. GERO MEYERSIEK, Plaintiff, shall comply with discovery forthwith.

11. At both the WebEx hearing held on February 10, 2023 in this matter and at the February 2, 2024 WebEx hearing in this matter, the State through and by Paul Gould, Esq., represented to the Court that the State on its own removed interest from the system in Defendant's case file in 2018. TRAC notes dated 12/06/2021 and 12/07/2021 also state that the State on its own removed interest from the system in Defendant's case file in October 2018.

12. At the hearing held on February 10, 2023 in this matter, the Court ordered the State to put interest back on the system without prejudice to the Defendant.

13. The Court ruled at the March 6, 2023 hearing in this matter that the interest number put back on the system without prejudice to the Defendant is only a "starting point" for the sole purpose of having a number to start with, without prejudice to the Defendant. The Court

elucidates to the Defendant, "You have to have a number to start with. The State is not saying you owe this number."

14. The Court ruled at the March 6, 2023 hearing in this matter that the State ex. Rel. GERO MEYERSIEK, Plaintiff, shall substantiate the interest number which the Court ordered to put back on the system without prejudice to the Defendant.

15. The Defendant in this matter, in good faith, attempted to confer with the State/Plaintiff, by and through Paul Gould, Esq., in Court at the March 6, 2023 hearing to make discovery in an effort to secure the information and documents requested in Defendant's Request for Product of Documents without court action in the form of a formal Motion to Compel. However, the State/ Plaintiff replied in Court that the State stands by the responses propounded by the State/Plaintiff in the Plaintiff's Response to Defendant's Request for Production of Documents dated February 16, 2023 and continues to stand by those said responses up to June 8, 2023.

16. The Defendant requested any and all documents in Defendant's child support case file relating to the TRAC notes of 12/6/2021 and 12/7/2021 as well as relating the substance of John Langlois's statements regarding "what happened in this case" that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the Child Support Services that Gero Meyersiek said yes, he "agreed to waive the $73k or $75k that are in arrears," which are part of Defendant's child support case file.  (audio recording of John Langlois is here https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing But, the Office of the Child Support Services refused to produce those records, claiming Client-Attorney Privilege. However, the State never produced any Privilege Log, as is required by law.

17. The Defendant in good faith again attempted to confer with the State/Plaintiff, by and through Paul Gould, Esq., since April 14, 2023, including sending more than 12 email confer attempts to make discovery in an effort to secure the information and documents requested in

my/Defendant's Requests for Production of Documents without court action in the form of a formal Motion to Compel. However, the State/Plaintiff again replied during a May 9, 2023 telephone conference with the Defendant that the State/Plaintiff stands by the responses propounded by the State/Plaintiff in the Plaintiff's Responses to Defendant's Requests for Production of Documents in February and April of 2023. The Defendant further revised Defendant's First Set of Interrogatories pursuant to discussions at the aforesaid May 9, 2023 discovery telephone conference, as well as asked the State/Plaintiff in writing via email to produce Defendant's requested documents in Defendant's child support case file relating to "TRAC notes of 12/6/2021 and 12/7/2021" as well as relating to the substance of John Langlois's audio recorded October 5, 2022 statements regarding "what happened in this case" that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the Child Support Services that Gero Meyersiek said yes, he "agreed to waive the $73k or $75k that are in arrears," which are part of Defendant's child support case file.

18. The issue of paramount concern, among others, is the due process protections that apply.   The state child-support enforcement program at issue in this matter (which is an **interstate** child support case), like that in every other State, is part of one of the largest cooperative federal-state programs, established under the Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act).

19. Congress and the Secretary of the U.S. Department of Health and Human Services have demonstrated their concern that child-support-related proceedings be conducted fairly by repeatedly making compliance with procedural due process rules a requirement of State participation in the program. (E.g. See, e.g., 42 U.S.C. 666(a)(3)(A) (reduction of non-custodial parents' state income tax refunds to pay overdue support permitted only "after full compliance with all procedural due process

requirements of the State"); 42 U.S.C. 666(a)(7)(B)(i) (States must report child-support delinquency to credit bureaus "only after [the] parent has been afforded all due process required under State law, **including notice and a reasonable opportunity to contest the accuracy of such information**."); 42 U.S.C. 666(a)(8)(B)(iv) (income withholding "must be carried out in full compliance with all procedural due process requirements of the State"); 42 U.S.C. 666(c)(1)(H) (expedited State agency procedures "shall be subject to due process safeguards, including (as appropriate) requirements for **notice**, **opportunity to contest the action**, and **opportunity for an appeal on the record** to an independent administrative or judicial tribunal"); see also 45 C.F.R. 302.70(a)(5)(iii), 303.5(g)(2)(iii), 303.100(a)(6) & (f)(4), 303.101(c)(2), 303.102(c)(1), 303.104(b).

20. It is therefore unequivocal that due process in any and all State tribunal(s) in the United States must provide **the Defendant Noncustodial Parent the opportunity to contest the accuracy** of the information **and/or the accuracy of the alleged arrears** put forth by the State Agency, a Title IV-D Program State Agency, as in this instant case here.

21. In support of this motion, the Defendant attaches to this herein motion the following:

(1) A copy of the screen shots of Noncustodial Parent Defendant's online child support account statement of total arrears owed that shows "$0.00" under "Interest" as of November 30, 2021 which Karla Cabelleros of Office of Child Support Services told the Defendant showing Gero Meyersiek waived interest and to rely on the arrears amount figures on the screen stating "$93,214.56 of principle arrears, $0.00 of interest." Marked as **Exhibit B**

(2) A copy of the TRAC notes of 12/6/2021 and 12/7/2021 marked as **Exhibit C**

(3) A copy of the letter from Executive Office of Health and Human Services Appeals Officer, Debra DeStefano, sent to the Defendant in Texas outlining agreements made at the pre-hearing conference held on October 5, 2022, where John Langlois stated, "So, we contacted his attorney, it wasn't me, it was somebody else in my office, and said, if she was willing to make a $104k payment to pay off the principal, would you be willing to waive the $75k or $73k in arrears. At that time, he said yes. So Karla notified Mary that if she paid the $104k, it would be paid in full because he was willing to waive the interest, that was just the principal."  Listen to the audio recording here:

https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing   Marked as **Exhibit D**.

(4) A copy of the emails between Defendant and Karla Caballeros on December 6, 2021 and December 7, 2021. Marked as **Exhibit E**.

**WHEREFORE**, the Defendant respectfully requests the Chief Judge or designee-Judge Merolla of this Honorable Court to:

1. Grant the Defendant's Motion to Dismiss Interest Arrears.
2. Grant the Defendant's request for her records relating to the "TRAC notes of 12/6/2021 and 12/7/2021" as well as relating to the substance of John Langlois's audio recorded October 5, 2022 statements regarding "what happened in this case" that discuss Gero Meyersiek's lawyer Barbara Grady phoning the Office of the Child Support Services that Gero Meyersiek said yes, he "agreed to waive the $73k or $75k that are in arrears" as of December 6, 2021 and October 5, 2022 which are part of Defendant's child support case file.
3. Declare that Defendant's child support record file maintained by the Rhode Island Office of Child Support Services that by law codified in Title IV-D Program of the Social Security Act must be produced to the Defendant Noncustodial Parent upon request.
4. Order a hearing on the herein issues raised in this matter.
5. Listen to and admit into evidence the audio recording of John Langlois of Office of Child Support Services here:
https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-hBMaEg9/view?usp=sharing

6. For further relief as the Court deems reasonable and fair under the circumstances.

Respectfully submitted,

February 4, 2024

<div style="margin-left:40%">

FOR DEFENDANT
MARY SEGUIN, Pro Se.

By: _Mary Seguin_
Mary Seguin
P.O. Box 22022
Houston, TX 77019
maryseguin22022@gmail.com

</div>

## CERTIFICATION

I hereby certify that a copy of the within Motion was filed on February 4, 2024 electronically using the Court's Odyssey File and Serve, with service to paul.gould@dhs.ri.gov and dhs.courtfile@dhs.ri.gov

_Mary Seguin_

Exhibit A

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE, S.C.                                    FAMILY COURT

| | | |
|---|---|---|
| State of Rhode Island ex rel. | : | |
| GERO MEYERSIEK | : | |
| *Plaintiff* | : | |
| | : | |
| VS. | : | DOCKET NO: K010521M |
| | : | |
| | : | |
| MARY SEGUIN | : | |
| *Defendant* | | |

### MARY SEGUIN'S DECLARATION PURSUANT TO RULE 37(a)(2) IN SUPPORT OF DEFENDANT'S THIRD RULE 7(b)(3)(G) MOTION TO COMPEL PRODUCTION UNDER RULE 34(b), RULE 37(a)(2)(3), RULE 26(b)((1), RULE 26(b)(5)

I, MARY SEGUIN ("Plaintiff"), resident of the State of Texas, in good faith,

certify, declare, verify and state pursuant to 28 U.S. Code sec 1746, under penalty of

perjury that the foregoing is true and correct:

1.   I received in the mail a Notice of Lien for the amount of $75,638.00 dated

March 3, 2022 issued by the Rhode Island Office of Child Support Services on

and around mid-March 2022.  In April 2022, I filed a written appeal of the

lien.  My written appeal was docketed on April 4, 2022 at the Office of

Appeals of the Rhode Island Executive Office of Health and Human Services,

Docket#22-2116.   The Administrative Hearing was continued to the

maximum of three times by the Appeals Office due to the failure of the Office

of Child Support Services to grant me, the Appellant, access to my case file.

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 001131249393     Page: 1380     Date Filed: 03/26/2024     Entry ID: 6663249393

On October 5, 2022 a telephonic conference took place prior to the Administrative Hearing. The participants of the telephone call were John Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode Island, Debra DeStefano, Esq., the Hearing Officer of the Rhode Island Executive Office of Health and Human Services Office of Appeals in Rhode Island, and myself in Texas. I, in Texas, recorded the phone call starting at 12:30PM Central Time, or 1:30PM Eastern Time. The recording of the telephone call is 1 hour 35 minutes and 38 seconds long. I am admitting into evidence the recording.

2. Because the entire recording is over one and half hour long, I admit into evidence the attached true and accurate part of the recording where John Langlois, Esq., of the Rhode Island Office of Child Support Services in Rhode Island stated to me and Debra DeStefano "what happened in this case is when Mary's representative, her attorney, called us in later November 2021 and said she wants her passport released, what does she have to do to release her passport, they put her in touch with Karla, who gave her the $104k number. Where that number came from was the department attorney contacted the custodial parent, Mr. MEYERSIEK. So, we contacted his attorney, it wasn't me, it was somebody else in my office, and said, if she was willing to make a $104k payment to pay off the principal, would you be willing to waive the $75k or $73k in arrears. At that time, he said yes. So Karla notified Mary that if she paid the $104k, it would be paid in full because he was willing to waive the interest, that was just the principal. What happened was the day after Karla told Mary to wire the $104k the attorney for Mr. Meyersiek contacted us

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

again and said he changed his mind.  Please put the interest back on the

system.  So we did."

3. I attempted to attach the audio file recording to the Rhode Island Courts e-

filing Tyler Technologies system but was informed by the system that audio

files cannot be uploaded as attachments.

4. Therefore, I uploaded the audio file to Google Drive and shared it with

DomesticExhibits@Courts.ri.gov and paul.gould@dhs.ri.gov

5. I further attach here the link of the shared Audio File on Google Drive as

https://drive.google.com/file/d/11701n42KYv21NHK3FJ4jN4l_-

hBMaEg9/view?usp=sharing

6. I granted access to this audio file on Google Drive to

DomesticExhibits@courts.ri.gov and paul.gould@dhs.ri.gov

7. I further emailed DomesticExhibits@courts.ri.gov and paul.gould@dhs.ri.gov

that this is the audio file attached to my affidavit filed herein in Court to

Admit the audio file into evidence in the above captioned matter in Family

Court, K20010521M.

8. The Family Court Clerk told me to email my exhibits and evidence along with

the case number K20010521M to DomesticExhibits@courts.ri.gov

9. Karla Caballeros of the Rhode Island Office of Child Support Services notified

me on December 7, 2021 that if I paid the $104,185.98 it would be paid in full

because Gero Meyersiek waived the interest.  I agreed, and on December 7,

2021, on the same day of Karla Caballeros' notification, I paid the $104,185.98

through bank wire.  After I paid the full amount through bank wire, I emailed

Karla Caballeros also on the same day on December 7, 2021 that I wired it.

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 001113129988337    Page: 1403    Date Filed: 03/26/2024    Entry ID: 663249993

10. Rhode Island Office of Child Support Services also emailed and mailed through regular mail to me during litigation the TRAC note of 12/06/2021 and 12/07/2021 that says, "Agent contacted me that NCP wants to pay all arrears to obtain passport. I called CP private attorney Barbara Grady to advise, and to discuss if CP wants the interest put back on the case (REDACTED). We removed the interest when case was made UI when we were filing to Texas. Atty Grady checked with CP and CP is satisfied with the lump sum payment of principle of $104k+/-. After conference with Monique and Frank Dibiase, it was decided to require payment in more secure/less reversable form than credit card, so $ will need to be wired by bank check. Agent will be contacted back by NCP as NCP won't give phone number or email address. Agent is not even sure if NCP is in country. Interest is not included in amount that is considered for passport purposes in any event."

11. The statements contained in the Defendant's Second Rule 7(b)(3)(G) Motion to Compel Production filed on March 27 3, 2023 in the Family Court and Defendant's Third Rule 7(b)(3)(G) Motion to Compel filed on June 1, 2023 are, to my knowledge, true and correct.

12. I filed my/Defendant's First Rule 7(b)(3)(G) Motion to Compel Production on February 3, 2023 and the Court heard this motion at the hearing in this matter on February 10, 2023.

13. The Court ruled at the February 10, 2023 and March 6, 2023 hearings in this matter that the State ex. Rel. GERO MEYERSIEK, Plaintiff, shall comply with discovery forthwith.

Case Number: K20010521M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 7:15 PM
Envelope: 4132664
Reviewer: Doris O.

Document: 00118129988987    Page: 1392    Date Filed: 03/26/2024    Entry ID: 6668249993

14. At the hearing held on February 10, 2023 in this matter, the State through and by Paul Gould, Esq., represented to the Court that the State on its own removed interest from the system in Defendant's case file in 2018. TRAC notes dated 12/06/2021 and 12/07/2021 also state that the State on its own removed interest from the system in Defendant's case file in October 2018.

15. At the hearing held on February 10, 2023 in this matter, the Court ordered the State to put interest back on the system without prejudice to the Defendant.

16. The Court ruled at the March 6, 2023 hearing in this matter that the interest number put back on the system without prejudice to the Defendant is only a "starting point" for the sole purpose of having a number to start with, without prejudice to the Defendant. The Court elucidates to the Defendant, "You have to have a number to start with. The State is not saying you owe this number."

17. The Court ruled at the March 6, 2023 hearing in this matter that the State ex. Rel. GERO MEYERSIEK, Plaintiff, shall substantiate the interest number which the Court ordered to put back on the system without prejudice to the Defendant.

18. I, the Defendant in this matter, in good faith, attempted to confer with the State/Plaintiff, by and through Paul Gould, Esq., in Court at the March 6, 2023 hearing to make discovery in an effort to secure the information and documents requested in my/Defendant's Request for Product of Documents without court action in the form of a formal Motion to Compel. However, the State/ Plaintiff replied in Court that the State stands by the responses propounded by the State/Plaintiff in the Plaintiff's Response to Defendant's Request for Production of Documents dated February 16, 2023 and continues

to stand by those said responses up to June 8, 2023, the date this matter is continued for hearing on the State/Plaintiff's DHS Motion.

19. I, the Defendant in this matter, in good faith, again attempted to confer with the State/Plaintiff, by and through Paul Gould, Esq., since April 14, 2023, including sending more than 12 email confer attempts to make discovery in an effort to secure the information and documents requested in my/Defendant's Requests for Production of Documents without court action in the form of a formal Motion to Compel. However, the State/Plaintiff again replied during a May 9, 2023 telephone conference with the Defendant that the State/Plaintiff stands by the responses propounded by the State/Plaintiff in the Plaintiff's Responses to Defendant's Requests for Production of Documents in February and April of 2023. The Defendant further revised Defendant's First Set of Interrogatories pursuant to discussions at the aforesaid May 9, 2023 discovery telephone conference, as well as asked the State/Plaintiff in writing via email to reply to the Defendant if the State/Plaintiff has any further questions or issues to discuss without court action, but again, the State/Plaintiff failed to communicate any objections or issues with the Defendant.

20. I certify that the above is true and correct.

Declaration Executed on June 1, 2023 by Mary Seguin

_____
Mary Seguin

Exhibit B



12:38 PM Mon Dec 6

AA          cseinfo.dhs.ri.gov

ADCB Internet Banking    Community Health Choice |...    Sign In - Community Healt...    Case Manager Portal | Offi...    RI OCSS Payment

RI.gov                                                    R.I. Government Agencies | Privacy policy | Search RI.gov:

**State of Rhode Island**
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Logan                                        Home   My Profile   Contact Us   Site Map   Log

**Menu**

**Case Information**
- Last 5 Payments
- Last 13 Months
- Current Orders/ Past Due Balances
- Court Dates/ Appointments
- Enforcement Actions
- PIN Lookup

Home > Current Orders and Past Due Balances

**Case Manager**

## Current Orders / Past Due Balances

**Custodial Parent:** Gero K Meyersiek        **CSE ID:** 1689817

### Current Orders

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

⚠ Note: Medical orders and medical arrears are not listed on this screen.

### Past Due Balances

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |

Exhibit C

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

11:28:47 Tuesday, December 13, 2022

```
12/13/22   11:28           C A S E   T R A C K I N G          CSCL  ASMXA201
           TRAC.00                  CASE HISTORY                U824  PROD
STARTING DATE   09 01 2021
SELECTION     COMPREHENSIVE CASE HISTORY
```

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I_____
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP_____
WANTS THE INTEREST PUT BACK ON THE CASE (████████████████████
████████████████████████████████). WE REMOVED THE INTEREST WHEN_____
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP____
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-.____
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO____
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $____
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP____
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF____
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED_____
FOR PASSPORT PURPOSES IN ANY EVENT._____

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

```
RL: 80  12 22 ABSP:          SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK   GERO    K   PNL:
```

Case Number: PC-2007-0211M
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer: Maria O.

11:29:56 Tuesday, December 13, 2022

```
12/13/22   11:28         C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY              U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSEMENTS SO WE CAN GET THIS SORTED_____
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED_____
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO_____
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT._____
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL_____
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM_____
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT._____

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST_____

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES_____

RL: 80  12 22 ABSP:          SEGUIN        MARY         CMD: _____
FNX: TRAC  D CLIENT:         MEYERSIEK     GERO     K   PHL:
```

Case Number: 22-1000T Document: 01118129003337 Page: 1410 Date Filed: 03/20/2024 Entry ID: 6663299899
Filed in Providence/Bristol County Family Court
Submitted 6/1/2023 10:13 PM
Envelope 4132704
Reviewer Maria O.

11:29:01 Tuesday, December 13, 2022

12/13/22    11:29        C A S E   T R A C K I N G        CSCL  ASMXA2G1
                TRAC.00              CASE HISTORY            U824    PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE
        FROM CASE DATA PANEL

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y
FROM CASE ID:
        FROM OFST PANEL

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

RL: 80  12 22 ABSP:               SEGUIN        MARY           CMD:
FMX: TRAC  D CLIENT:              MEYERSIEK     GERO      X    PNL:

Case Number: 23-1982A Document: 001118199988 Page: 1412 Date Filed: 03/20/2024 Entry ID: 6663089
File: Providence County Family Court
Submitted: 9/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maya G.

11:29:35 Tuesday, December 13, 2022

```
12/13/22    11:29         C A S E   T R A C K I N G      CSCL  ASMXA201
            TRAC.00             CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS
CONCERNED ABOUT MAILING THE CHECK.

12/09/21 WENDY FOBERT (WAF2343) ENTERED COMMENT

```
RL: 80  12 22 ABSP:         SEGUIN      MARY         CMD: _____
FNX: TRAC  D CLIENT:        MEYERSIEK   GERO     K   PNL:
```

ed in Providence/Bristol County Family Court
ibmitted 6/17/2023 10:13 PM
Document: 001118912006287    Page: 1413    Date Filed: 03/24/2024    Entry ID: 6636288
velope: 4132704
viewer Maria O.

11:29:09 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00            CASE HISTORY              U824    PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN____
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP_____
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL_____
$2296.42_____

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:_____
    TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)_____

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS_____
    58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY_____

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT_____
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS____
ED TO BE $6028.75._____

```
RL: 80  12 22 ABSP:            SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK   GERO    K   PNL:
```

Case Number 2304109974  Document: 0011181246833  Page: 1414  Date Filed: 09/06/2024  Entry ID: 6616266986
Filed in Providence/Bristol County Family Court
Submitted: 5/1/2023 10:13 PM
Envelope 4132704
Reviewer: Maya P.

11:28:09 Tuesday, December 13, 2022

```
12/13/22   11:28         C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00                CASE HISTORY            U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
        TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
        58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

```
RL: 80  12 22 ABSP:              SEGUIN        MARY          CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK     GERO     K    PNL:
```

Case Number: N20200221M
Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Reviewer: Maria O.

Document: 0001118101888287    Page: 1415    Date Filed: 03/24/2021    Entry ID: 6662889

11:29:13 Tuesday, December 13, 2022

```
12/13/22    11:28          C A S E   T R A C K I N G        CSCL   ASMXA201
            TRAC.00              CASE HISTORY               UB24   PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS_____

RL: 80  12 22 ABSP:              SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:             MEYERSIEK   GERO    K   PNL:
```

Filed in Providence/Bristol County Family Court
Submitted: 6/1/2023 10:13 PM
Envelope: 4132704
Viewer: Maria O.

11:29:17 Tuesday, December 13, 2022

```
12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

```
RL: 80  12 22 ABSP:
FNX: TRAC  D CLIENT:            SEGUIN       MARY          CMD: _____
                               MEYERSIEK    GERO     K    PNL:
```

Exhibit D



Executive Office of Health and Human Services
Appeals Office, Virks Building, 3 West Road, Cranston, RI 02920
Phone: 401.462.2132  Fax: 401.462.0458
Email: OHHS.AppealsOffice@ohhs.ri.gov

October 6, 2022

Mary Seguin
2303 Elmen Street
Houston, TX 77019
(marylive22022@gmail.com)

John Langlois, Esq.
R.I. OCSS
77 Dorrance Street
Providence, RI 02903
(John.Langlois@dhs.ri.gov)

Dear Mary Seguin and John Langlois, Esq.,

By agreement of the parties during a pre-hearing conference held telephonically on October 5, 2022, in the matter of Mary Sequin, Administrative Appeal, Docket#22-2116:

- o Attorney Langlois will immediately begin the process to rescind the Perfected Notice of Lien issued by the R.I. Office of Child Support Services (hereinafter "OCSS") on April 4, 2022, and notify the EOHHS Appeals Office when the process has been completed. Upon receipt, the Appeals Office will forward a copy of that notification to the Appellant by email.

- o The OCSS will refrain from perfecting the lien pending the outcome of the Administrative Appeal.

- o Both parties will send to the EOHHS Appeals Office, before the close of business on Wednesday October 26, 2022, all documentary evidence they intend to offer as exhibits during the Administrative Hearing. The Agency's submission will include documentation of the Appellant's child support account from June 2018 going forward

- o Copies of all documentary evidence received by the Appeals Office will be provided to the opposing party by email.

This letter confirms the above understanding.

/s/Debra DeStefano
EOHHS Appeals Officer

Exhibit E



**Mary Roberts <marylive22022@gmail.com>**

---

# Request for administrative hearing of Notice dated March 3, 2022 : Re: K01-521M Child Support Payment Schedule Information

**Mary Roberts <marylive22022@gmail.com>**                                   Fri, Apr 1, 3:12 PM
To: <karla.samayoa@dhs.ri.gov>

Karla,

I am writing to request an administrative hearing in the above matter, and am attaching to this email the written request (in pdf file named "Request for Administrative Hearing April 1, 2022") that I had also sent via regular mail.  On March 15, 2022, I received the attached notice which was sent from child support office.

As indicated in my attached request, I am pro-se at this time and out-of-state, and further due to surging Covid, I respectfully request instructional materials on how to proceed for hearing, such as date(s) to submit my written petition/brief/motion/memorandum in support of my request for hearing, and the date of hearing via zoom (including dial-in information) for individuals/the general public without counsel, to be emailed to me as soon as possible.

Sincerely,
Mary

Cc: via regular mail Tracy Gedris, PO Box 480, Elmford, NY 10523

On Tue, Dec 7, 2021 at 11:14 AM Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov> wrote:

> ## Yes, that is correct.
>
> **From:** Mary Roberts <marylive22022@gmail.com>
> **Sent:** Tuesday, December 7, 2021 12:09 PM
> **To:** Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov>
> **Subject:** [EXTERNAL] : Re: K01-521M Child Support Payment Schedule Information
>
> Thank you Karla!
>
> The child support case number is 0366029181, correct?  Just wanted to confirm.
>
> Thank you!
>
> Mary
>
> On Tue, Dec 7, 2021 at 10:40 AM Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov> wrote:
>
>> Hi Mary:
>>
>> This is the response I received from accounting:

include her child support case #, the routing and account numbers, her name obviously, and name of account: Child Support

**Bank name : Citizens Bank**

**Account name: Child Support**

**Routing number is 011500120**

**Account number is 11076461**

**She should wire the 104,185.98 and cancel the 12/06 payment if possible.**

[google.com]

Karla Caballeros

Child Support Administrative Officer

Office of Child Support Services

77 Dorrance Street [google.com]

Providence, RI 02903 [google.com]

401-458-4519

401-458-4410 fax

Karla.Caballeros@dhs.ri.gov

**From:** Mary Roberts <marylive22022@gmail.com>
**Sent:** Tuesday, December 7, 2021 10:48 AM
**To:** Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov>
**Subject:** Re: [EXTERNAL] : Fwd: 88298: Child Support Payment Schedule Information

Good morning Karla,

Thank you so much for the information!

And do I remit $104,185.98 and cancel the $9991 I scheduled for 12/13/2021?

Thanks again for your help.

Mary

On Tue, Dec 7, 2021 at 8:47 AM Caballeros, Karla (DHS) <karla.caballeros@dhs.ri.gov> wrote:

Good Morning Mary:

Please see below information received by our accounting office as to the transferring of funds to pay the arrears:

She will need to know the following information for the wire transfer:

Bank name : Citizens Bank

Account name: Child Support

ABA# 011500120 11076461

If you have any other questions, please do not hesitate to reach out to me.

[google.com]

Karla Caballeros

Child Support Administrative Officer

Office of Child Support Services

77 Dorrance Street [google.com]

Providence, RI 02903 [google.com]

401-458-4519

401-458-4410 fax

Karla.Caballeros@dhs.ri.gov

EXHIBIT I

No. 23-1967

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
UNITED STATES OF AMERICA,

Plaintiff-Appellant,

MARY SEGUIN

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official
capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their
individual and official capacities; Rhode Island OFFICE OF Child Support
Services in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK
DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN,
LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN,
JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities;
RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A.
SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF
RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND
ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity;
RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in
its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official
capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE
JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL,
MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their
individual and official capacities; RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF
THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual
capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

Defendants-Appellees.

Appeal from the United States District Court

for the District of Rhode Island

_____

**APPELLANT'S MOTION TO STAY PURSUANT TO Fed. R. App. P 8(a)(2)**

_____

Pursuant to **Fed. R. App. P 8(a)(2),** and pursuant to **Fed. R. App. P 8(a)(2)(D),** Appellant, proceeding from Texas and as a citizen of Texas, respectfully requests review by a panel of judges in this United States Court of Appeals for the First Circuit under **Fed. R. App. P 8(a)(2)(D)**, and requests the Court, under **Fed. R. App. P 8(a)(2)**, to stay the district court's two denials of Appellant's two requests for time extensions to file an amended Notice of Appeal (and requests the Court to stay the respective tolling of time to file to file Notice of Appeal of said denials), which the district court issued on March 7, 2024 and March 8, 2024 denying Appellant's **03/01/2024** and 03/07/2024 **Fed. R. App. P 4(a)(5) motions for extensions of time (ECF 49, ECF 50)** which were filed in the district court in order to comply with *this* Court's March 1, 2024 Court Order that explicitly states, "The appellant shall inform this court whether or not she intends to file a notice of appeal or amended notice of appeal from the district court's post-judgment order," and " <u>See also</u> Fed. R. App. P. 4(a)(5) (allowing the district court to grant an extension of time to file a notice of appeal if the party so moved no

later than 30 days after the time prescribed by Rule 4(a) expires)" (Case: 23-1967 Document: 00118115155 Page: 2 Date Filed: 03/01/2024 Entry ID: 6626341). Appellant attaches this Court's Order herewith as **EXHIBIT A**.

It is self-evident that this Court's March 1, 2024 Order in this matter explicitly instructed the Appellant, MARY SEGUIN, to file a Fed. R. App. 4(a)(5) motion in district court, *see* ("See also Fed. R. App. P. 4(a)(5) (allowing the district court to grant an extension of time to file a notice of appeal if the party so moved no later than 30 days after the time prescribed by Rule 4(a) expires)") because this Court's March 1, 2024 was issued at the late hour at **4:39 PM** on **Friday March 1**, 2024, a mere 30 hours prior to the "30 days after the time prescribed by Rule 4(a) expires" at midnight Saturday March 2, 2024.

At issue is a post-appeal Order issued in the district court by Judge William Smith dated February 1, 2024. At issue also is the fact that this Court had on January 22, 2024 set the Briefing schedule setting the due date of Appellant Brief for Monday March 4, 2024. Therefore, Saturday, March 2, 2024 was the deadline to file an amended Notice of Appeal, and Monday March 4, 2024 was the deadline to file the Appellant Brief.

As the Court can see, **the Court's** late hour **4:39 PM Friday March 1**, **2024 Court Order** ordered the Appellant to RESPOND to the Court and is an external

factor beyond the Appellant's control that materially affects the following timing beyond Appellant's control:

(1) The ability to meet the deadline to file an amended Notice of Appeal by right under Fed. R. App. P 4 by burdening the Appellant to review, consider and respond to the Court's March 1, 2024 Order

(2) Vacating the Briefing schedule, in recognition that the Court's March 1, 2024 *could* materially alter the scope of the appeal

(3) Instructs the Appellant to RESPOND to the Court whether the Appellant intends to file an amended notice of appeal or notice of appeal of the district court's February 1, 2024 post-appeal order.

(4) Instructs the Appellant explicitly to extend the time to do the above, explicitly citing "See also Fed. R. App. P. 4(a)(5) (allowing the district court to grant an extension of time to file a notice of appeal if the party so moved no later than 30 days after the time prescribed by Rule 4(a) expires)"

(5) Explicitly instructs the Court and the district court by way of Court Order regarding **Fed. R. App. P. 4(a)(5)**, explicitly protecting constitutional safeguards of and in compliance with **DUE PROCESS – that the district court (Judge Smith), which is devoid of jurisdiction, violates with calculated and deliberate intent**.

Therefore, Appellant respectfully files this motion to stay under **Fed. R. App. P 8(a)(2)** and demonstrates the following:

(1) It is impracticable to file in the district court before a disqualified judge.

(2) It is impracticable to file in the district court that violates due process.

(3) It is impracticable to file in the district court that is devoid of jurisdiction post-appeal.

(4) It is impracticable to file in the district court that altered the record of appeal, tampered with the record of appeal, and obstructed the docketing of pre-appeal motions that were also denied pre-appeal that raise issues of disqualification and tampering with the record of appeal by obstructing the docketing of three motions.

(5) It is impracticable to file in the district court/judge Smith that/who engages in a pattern of obstruction of a federal proceeding and tampering with the record of appeal in a federal proceeding.

## I. DISQUALIFICATION – DEFENDANTS-APPELLEES ARE JUDGE SMITH'S FORMER CLIENTS AND JUDGE SMITH HAS KNOWLEDGE OF APPELLEES' EMPLOYMENT PERFORMANCES TIED TO STATE REVENUE GENERATED FROM ILLEGAL 12% COMPOUND INTEREST COLLECTIONS THROUGH ACCOUNTING FRAUD AND DEFRAUDING THE UNITED STATES AND NONCUSTODIAL PARENTS THROUGH, inter alia, ALTERING THE AUTOMATED ACCOUNTING RECORD SYSTEM MANDATED BY 42 U.S.C. 654a, 42 U.S.C. 655 OF TITLE IV OF THE SOCIAL SECURITY ACT

**A. The Amended Complaint (ECF 25) makes known to a Judge of the United States of the commissions of federal crimes That Incur Penalties under 42 U.S.C. § 655(a)(5)(A)(ii) for the Defendants-Appellees' Systemic violations of, inter alia, 42 U.S.C. 654b and Their Cover-up Thereof Through Accounting Fraud Submitted to Federal Authorities**

Relying on and with 18 U.S.C. § 4 applicable to this matter, Appellant in good faith drafted the Amended Complaint (ECF 25) to make known to "some judge of the United States" the commission of federal crimes including theft of the United States in violation of 18 U.S.C. § 666 using the framework of Title IV of the Social Security Act for monetary gain and defraud of the United the States and defrauding the Appellant by the Defendants-Appellees. The "some judge" of the United States in question is district court Judge William Smith sitting in this matter. The Amended Complaint reports organized criminal activities of systemic Rhode Island establishment and collection of 12% compound interest for overdue support that is disallowed under 42 U.S.C. § 654 (21)(A) that makes clear the Rhode Island State Plan **must** strict interest to simple 3-6%. Rhode Island's 12% compound interest is motivated by Title IV-D's provision that the interest represents incentivized state revenue in welfare cases, as the support order is assigned to the State by the welfare recipient. Establishing and collecting the 42 U.S.C. § 654 (21)(A) disallowed 12% compound interest under color of state law is criminal and entails accounting fraud ballooning the support amount due that is mandated to be

calculated by the automated record system stipulated in 42 U.S.C. 654a and disbursed and paid and accounted for and reported to the United States for reimbursement of federal funds under Title IV-D Program through mandated accurate administration and calculations using the automated record system that is mandated under 42 U.S.C. § 654b.  Therefore, for example, illegal record alterations that entails "taking unlawful 12% compound interest off the system" or "putting unlawful 12% compound interest back on the system" or "not accounting for any payments made by the noncustodial parent" or "removal from the system any payments made by the noncustodial parent" are explicit violations of, *inter alia*, 42 U.S.C. § 654b.    42 U.S.C. § 655 (a)(5)(A)(ii) states, "All failures of a State during a fiscal year to comply with any of the requirements of section 654b of this title shall be considered a single failure of the State to comply with subparagraphs (A) and (B)(i) of section 654(27) of this title during the fiscal year for purposes of this paragraph."  Needless to say, these organized defrauding targeting Texas properties and defrauding Appellant in Texas of illegal 12% compound interest, when the Defendants-Appellees recorded in Appellant's Title IV support case file that they removed the illegal 12% compound interest when sending to Texas in order to cover up from out-of-state and federal authorities the illegal 12% compound interest (via wire and via mail, constituting wire and mail fraud), defrauded and fraudulently induced the Appellant that the resulting 0%

interest shown on the automated system online is because Appellee Gero

Meyersiek waived interest if Appellant paid off the entire principle due in one

lump sum (wire fraud), then clandestinely put the illegal 12% compound interest

back onto the automated system when Appellant accepted the offer and performed

on the contract paying off support in one lump sum in Texas, then lien Texas

properties using fraudulent liens (by email and by mail constituting wire and mail

fraud), then submitting to the United States for the cost of collection of fraudulent

12% compound interest that are thus untraceable to a principle base that would

otherwise have exposed the illegal 12% compound interest all constitute a pattern

of criminal interstate accounting fraud in order to defraud the Appellant, the State

of Texas, and the United States of America (*inter alia*, wire and mail fraud).  In the

period of just 2021 to 2023 alone, Defendants-Appellees sent by wire and by mail

to the Appellant at least **eight** **different** sets of books of accounts of alleged arrears

owed (resulting from the aforesaid alterations of the records through the illegal

taking off interest from the system or putting it back on the system or manually

adding alleged medical support arrears twice onto the system) that allegedly were

generated by the automated record keeping system mandated by 42 U.S.C. § 654a

and 42 U.S.C. § 654b to be accurate.  And this scheme of altering the 42 U.S.C. §

654a and 42 U.S.C. § 654b mandated automated record system and manipulating

its accounting is routine to this day, from the time Rhode Island installed the 42

U.S.C. § 654a  mandated automated record system, and before that, from the time
Rhode Island participated in the Title IV Program, because Rhode Island had
always routine established and collected, and continues to illegally establish and
collect the 12% compound interest under color of state law, defrauding the
noncustodial parents and defrauding the United States through accounting fraud,
with or without the automated system.  In 1996, Congress explicitly authorized
penalties under 42 U.S.C. § 655 for States' noncompliance with 42 U.S.C. § 654a
and 42 U.S.C. § 654b.  Therefore, Rhode Island's intentional noncompliance
penalties under 42 U.S.C. § 655 provisions relating to its deliberate accounting
fraud altering records that Congress mandated to be maintained by the States in
order to keep ACCURATE records using the automated record system accrues
since 1996.  Defendants-Appellees' Record alterations/tampering with/falsifying
federal government records, and with the intent to defraud, incur other criminal
penalties too numerous to discuss for the purposes of this motion, so accordingly,
Appellant reserves the right to raise them at the right time in accordance with
proper procedures in this federal proceeding.  Moreover, in sending falsified
records in 2018, 2021, 2022 and 2023, and fraudulent liens to Texas on Texas
properties, Defendants-Appellees violated Texas Penal Codes and incurred Texas
penalties. (Rhode Island civil and criminal laws were violated as well, but the
Rhode Island Attorney General chooses to represent and engage in cover up, aiding

and abetting and subornation of perjury instead). The cumulative penalties accrued

alone run upwards of hundreds of millions of dollars, potentially billions.

**Appellant respectfully requests Oral Argument on this important issue**.

### B. Defendants-Appellees' Financial and Employment Incentives are tied to successful collection of illegal 12% compound interest to boost State revenue through Fraud and Judge Smith has knowledge of the scheme as former counsel of the Defendants-Appellees, including representing Appellees in Employment disputes

Appellant states that it is appropriate to present at Oral Argument the

incentives tied to the successful collection of illegal 12% compound interest,

as that, while important, is not the basis of this motion; however it suffices

now to raise in this motion under Fed. R. App. P 8 that the Appellant

presents the basis of Judge Smith's disqualification. **28 U.S.C. § 455** deals

with the disqualification of district court judges and it states in part:

Any justice, judge, or magistrate, of the United States shall disqualify

himself/herself in any proceeding in which his/her impartiality might

reasonably be questioned. *See also* 28 U.S.C. Sec. 144; Code of Judicial

Conduct, Canon 3.C(1)(a). *In re Martinez-Catala,* 129 F.3d 213, 220 (1st

Cir. 1998) makes clear that disqualification is self-executing, and that the

standard is whether there is an appearance of bias by an objective observer.

The district court judge is disqualified if the objective observer in **28**

**U.S.C. § 455(a)** having possession of all the facts in this case might question

the judge's impartiality, *See*, "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality **might** reasonably be questioned." That objective observer, for starters, needs to look no further than the district court's website of Judge Smith's Public Relations biography that clearly summarizes the depth of client relationship and his former firm's existing client relationship with (both formerly and presently) with the Defendants-Appellees, including the Rhode Island Judiciary and Rhode Island state employees, including representing the them in employment disputes where he has intimate knowledge of the employment incentive schemes. *See*, **Exhibit B**, and weblink – he built the Edwards & Angell firm's Public Law (Defense) Practice based on acquiring and representing key government clients like the **state courts (and employees thereof)** and representations of employees within the state's major political subdivision such as the **governor's office (and employees thereof)**, the **state secretary (and employees thereof)**, the **state treasurer (and employees thereof)**, various **state agencies (and employees thereof)**, negotiated through the then-novel **flat fee contracts** that were designed to generate high volumes to increase the number of representations in all areas; *see*

https://www.rid.uscourts.gov/sites/rid/files/documents/judges/articles/FBA%20Profile%2009-14%20Smith-Hon-William-E.pdf

Records of these representations are a matter of public records since attorney's fees are funded by Rhode Island's public funds.

To the objective observer, this judge, William Smith, shall disqualify himself in this proceeding as his impartiality **might** reasonably be questioned under 28 U.S.C. **§ 455**(a).

**C. Judge Smith did nothing and failed to act on the filed Amended Complaint Allegations of federal and state criminal activities made known to him in an official federal proceeding, then Obstructed the district court clerk's docketing of Appellant's filed motions, then Altered the record of appeal in order to Aid the Defendants-Appellees by cover up and Interfere with the On-going Appeal Proceeding Under Color of Law**

A play-by-play review of the record of this case requires Judge Smith's disqualification and shows his bias protecting, aiding and abetting and covering up the criminal acts by the Defendants-Appellees "made known to him" in the Amended Complaint (ECF 25) and interference of appellate review including jurisdictionally devoid attempts to interfere with the appeal.

After the filing of the Amended Complaint on September 1, 2023 (ECF 25), that alleges details of, *inter alia*, the Defendants-Appellees'

attempts to cover up, *inter alia*, their significant federal civil and criminal penalty-incurring schemes under, *inter-alia*, 42 U.S.C. **§** 655, entailing, among others, fraudulent accounting and theft of the United States using the 42 USC **§** 654a automated record system, Judge Smith *did nothing* to conduct the requisite federal proceeding getting to the merits of the Amended Complaint's alleged egregious interstate federal crimes.  Nor did Judge Smith refer the alleged egregious interstate federal crimes to appropriate law enforcement authorities, including to a United States Attorney General.  Nor did Judge Smith take actions required of "some judge of the United States" when allegations of egregious interstate federal crimes are officially filed in a United States District Court of Law in an official federal proceeding "made known to him" under 18 U.S.C. **§** 4.  Nor did Judge Smith make a report to Congress, be it the House Congressional Oversight Committee or House Congressional Judiciary Committee or another applicable Congressional Committee.  Nor did Judge Smith make a report to the Secretary of the U.S. Department of Health and Human Services or an appropriate federal authority.

Instead, Judge Smith *sua sponte* dismissed the case claiming the United States District Court for the District of Rhode Island **lacks subject matter jurisdiction over, inter alia, violations of 42 U.S.C. § 654, 655,**

**1983, and 18 U.S.C. § 1964 (and revoking Appellant's electronic filing privileges thus attempting to muzzle the Appellant in a scheme to obstruct future filings)** on **October 19, 2023 entering final judgment**.

Fed. R. of App. P 4 makes clear that the Notice of Appeal must be filed in 30 days, Saturday November 18, 2023.

In the afternoon of **November 16, 2023,** Appellant from Texas filed with the district court clerk via email a timely Rule 59 motion within 28 days of the final judgment. Appellant followed up the filing of the November 16, 2023 Rule 59 motion with filing a Rule 60(b) motion on the same day via email on November 16, 2023. *See* ECF 32, ECF 32-1. This is preserved in the Clerk Certified Record of Appeal transmitted to the Court of Appeals on November 17, 2023 in ECF 33, 33-1. *See* Attachment **Exhibit C**, **ECF 33-1**.

On November 16, 2023, Appellant called from Texas to Rhode Island's federal clerk's office to confirm that the clerks are in receipt of Appellant's two November 16, 2023 motion filings, and the clerks confirmed in the affirmative. Timely motions under Rule 59 and Rule 60 are treated as Rule 59(e) motions if filed within 28 days post-judgment, which suspend the finality of the judgment. *See*, *Gonzalez-Arroyo v.*

*Doctors' Ctr. Hosp. Bayamon, Inc.*, 54 F.4th 7, 19 (1st Cir. 2022) "A Rule 59(e) motion briefly suspends finality" of a judgment so the district court can "fix any mistakes and thereby perfect its judgment before a possible appeal." quoting *Banister v. Davis*, 140 S.Ct. 1698, 1708 (2020)."

On the morning of November 17, 2023, Appellant still not seeing the docketing of her timely November 16, 2023 filed two motions which by law are treated as Rule 59(e) motions, called the district court clerk's office and was told that Judge Smith obstructed the docketing of Appellant's timely November 16, 2023 rule 59 motions, in violation of, among others, Fed. R. Civ. P 79.  District Court Clerk Meghan Kenny told the Appellant that the clerk cannot do what the Appellant tells the clerk to do and the clerk is going to do what the judge tells her to do, then hung up the phone.

Subsequent to the disturbing phone exchange, the district court issued the first of the two denials that states,

"TEXT ORDER The Court is in receipt of Plaintiff' **two** recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders."

Appellant quickly filed via email with the district clerk's office the only motion Appellant filed on November 17, 2023, a rule 60(b)(1) motion

requesting relief from Judge Smith's obstruction of docketing of Appellant's properly filed motions, moving the Court to order the clerks to docket Appellant's motions.

Approximately two hours thereafter, Judge Smith issued the second of the two text order denials dated November 17, 2023 that states,

"TEXT ORDER The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders."

Deeply disturbed by the continuous obstruction of docketing of Appellant's properly filed motions, then denying those motions thus tampering with the record of appeal, Appellant called the clerk's office again.  This time clerk Meghan Kenny again informed Appellant Judge Smith was obstructing the docketing of Appellant's motions and then screamed, "File your notice of appeal……. appeal everything!"  Then, the clerk hung up the phone.

Within a few minutes, Appellant filed her Notice of Appeal in this matter, ECF 32, 32-1, that is over 83 pages long, detailing the above obstruction of docketing timely November 16, 2023 Rule 50(e) motions that critically raise issues, among others, of Judge Smith's disqualification, and tampering with the record of appeal.

Before the end of the day on November 17, 2023, the Clerk of the Court of the District Court transmitted the clerk certified record of appeal, ECF 33, and sent up to this Court ECF 33-1, where the docket sheet critically showed only THREE entries under November 17, 2023:

- TEXT ORDER The Court is in receipt of Plaintiff' **two** recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders.
- TEXT ORDER The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders.
- ECF 32, NOTICE OF APPEAL by Mary Seguin as to Text Order, Text Order (Attachments #1 Envelope)(Kenny, Meghan)(Entered: 11/17/2023).

ECF 33-1 demonstrates with concrete evidence that as of the time of the notice of appeal filed in this matter on November 17, 2023, the only three entries on the docket for November 17, 2023 that listed above.

However, that is not what is shown today, with several **revisions** instructed by Judge Smith on November 20, 2023, who as of November 17, 2023 was divested of jurisdiction.

### D. As of November 20, 2023, the District Court has been and remains DIVESTED OF JURISDICTION

ECF 33-1 proves beyond a reasonable doubt that Appellant did not file any motions subsequent to the second TEXT ORDER that says, "TEXT ORDER The

Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders." On the heals of this second text order entered on November 17, 2023, Appellant filed the Notice of Appeal, ECF 32, 32-1, demonstrating that **there were no pending motions at the time of the filing of the Notice of Appeal, ECF 32**.

Judge Smith's second November 17, 2023 text order makes clear that "The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court **construes this email as a motion for leave to file the motion attached to the email** and **denies** leave to file**." Judge Smith's first November 17, 2023 text order similarly makes clear that "The Court is in receipt of Plaintiff' **two** recent emails to the Clerk's Office. The Court **construes these emails as motions for leave to file the motions attached to those emails** and **denies** leave to file** for the reasons given in its earlier text orders." Judge Smith made it crystal clear that the district court **reviewed** and **considered on the merits** and **denied** "**motions attached to those emails.**" Therefore, when Appellant filed her Notice of Appeal on November 17, 2023, ECF 32, ==**THERE WAS NOTHING PENDING BEFORE THE COURT**==.

The filing of a notice of appeal "divests" the district court of jurisdiction over the case, *See Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam).

**Nothing was pending before the court when Appellant filed her November 17, 2023 appeal, as evidenced in the proof preserved in ECF 33-1** docketed on **November 17, 2023**. *See* attached **Exhibit C**.

However, because Appellant's November 17, 2023 Notice of Appeal documents preserves evidence of Judge Smith's obstruction of docketing Appellant's timely two Rule 59(e) motions filed on November 16, 2023 and Appellant's Rule 60(b)(1) motion filed on November 17, 2023, Judge Smith attempts to cover up his docket obstructions that not only violate Fed. R. Civ. P 79, but also violates several federal criminal codes as they relate to government record alterations, obstructing an official federal proceeding and falsifying/tampering with government records – therefore Judge Smith actively tampered with the docket and the record of appeal in this case starting November 20, 2023 to date.

Without any pending motion before the district court after his own two denial TEXT ORDER disposals of Appellant's post-judgment motions, Judge Smith instructed the district court clerk to falsify and alter the record on November 20, 2023, when the district court was **divested of jurisdiction**.

**Firstly**, as an initial step, Judge Smith sought to fraudulently fabricate the false appearance of retention of jurisdiction for himself/district court, thus deliberately ordered the district court clerk to falsify the record by docketing on the record all of Appellant's "motions attached to the emails" the district court received from November 16, 2023 to November 17, 2023, as entries ECF 34, 35, 37 under the date November 17, 2023 entered **AFTER** the Notice of Appeal (ECF 32) in order to falsely make it appear as if Appellant filed three motions subsequent to her filing of the Notice of Appeal (ECF 32), thus fraudulently fabricating "retaining jurisdiction" over pending motions filed after the Notice of Appeal, when in reality, Judge Smith had already in two text orders "denied all the motions attached to Plaintiff's emails" **before** the docketing of the November 17, 2023 Notice of Appeal (ECF 32).

**Secondly**, after thus fraudulent fabricating the appearance of jurisdiction retention, Judge Smith ordered the district court clerk to falsely enter Appellant's timely 28 day November 16, 2023 Rule 59 motions under entries dated November 17, 2023 in order to fraudulently make them appear filed out of time (*see*, entries ECF 34, ECF 35 entered under docket entry date November 17, 2023. But, *see* ECF 34-1 and ECF 35-1 Envelopes consisting of Appellant's gmail emails' filings date-stamped by Gmail showing **November 16, 2023**.) **Thus, Judge Smith**

sought to also falsify the record to make timely filed Rule 59 motions to falsely appear out-of-time.

**Thirdly**, after thus **fraudulently** and **falsely "retaining jurisdiction"** through the tampering of government records, Judge Smith sought to *interfere with*, *obstruct* and *subvert* appellate review by his very **delayed disposition of the falsely-appearing pending motions** _until after_ **this Court** _set the briefing schedule_.  Therefore, Judge Smith <u>waited almost 75 days until February 1, 2024</u> to issue a foregone conclusion denial that further deceptively misapplied and quoted out-of-context *Gonzalez-Arroyo v. Doctors' Ctr. Hosp. Bayamon, Inc.*, 54 F.4th 7, 19 (1st Cir. 2022), when in reality the *Gonzalez-Arroyo* Court made clear that <mark><u>**the Notice of Appeal divests the district court of jurisdiction**</u></mark> if there <mark><u>**isn't any outstanding pending motions at the time of the filing of the Notice of Appeal**</u></mark>, as <mark><u>**is the case here**</u></mark>.  *See* **docket sheet transmitted to this Court** on **November 17, 2023, ECF 33-1**.  The truth of the matter is Judge Smith fabricated through fraudulent falsification of  the appeal record abusing his Office using the text order November 20, 2023 to falsely make it appear as if there were pending motions filed post-appeal by the Appellant by falsely docketing pre-appeal filed and previously obstructed and denied motions misleadingly labeled as ECF 34, 35 and 37 as entries <u>after</u> the entry of the ECF 32 Notice of Appeal.

**E. Judge Smith's February 1, 2024 is similarly Void**

Having established the above undisputable facts supported by record evidence, this Court must find that Judge Smith's February 1, 2024 is similarly devoid of jurisdiction. The district court orders entered from November 20, 2023 to March 8, 2024 are null and void and of **no force and effect** as they are issued by fraud, without jurisdiction, result of unlawful rulings, are unconstitutional and violate due process and obstruct justice – they obstruct this official federal proceeding and are criminal in nature.  An order that exceeds the jurisdiction of the court is void, and can be attacked in any proceeding in any court where the validity of the judgment comes into issue. (*See  Pennoyer v. Neff*, 95 U.S. 714 (1878)).

Thus, the objective observer is left with the disturbing appearance that not only did the judge do nothing, he sought to cover up the Defendants-Appellees' crimes alleged in the Amended Complaint (ECF 25) and evidence of his own association with the Appellees-scheme after the docketing of the Amended Complaint (ECF 25) on September 1, 2023.

## II.    DISTRICT COURT DENIALS OF COURT COMPLIANT TIMELY Fed. R. App. P 4(a)(5) MOTION CONSISTENTLY WRONGLY APPLYING "EXCUSABLE NEGLECT"

### A. FACTUAL TRAVEL OF THE GOOD CAUSE Fed. R. App. P 4(a)(5)(A) motions filed in District Court

At 4:39 PM on March 1, 2024, this Court issued its Order, *See,* (Case: 23-1967 Document: 00118115155 Page: 2 Date Filed: 03/01/2024 Entry ID: 6626341).  The Court's March 1, 2024 Court Order states, "The appellant shall inform this court whether or not she intends to file a notice of appeal or amended notice of appeal from the district court's post-judgment order," and " <u>See also</u> Fed. R. App. P. 4(a)(5) (allowing the district court to grant an extension of time to file a notice of appeal if the party so moved no later than 30 days after the time prescribed by Rule 4(a) expires)."  *See* paragraph 3 of Order (Case: 23-1967 Document: 00118115155 Page: 2 Date Filed: 03/01/2024 Entry ID: 6626341). This Court instructs the Appellant to file Fed. R. App. P 4(a)(5) motion in order to be **DUE PROCESS** compliant because the Court vacated its Briefing Schedule a mere 3 days prior to the due date of Appellant's Brief set for March 4, 2024, as well as instructed the Appellant to respond to the Court as to Appellant's intentions whether Appellant will file a Notice of Appeal or Amended Notice of Appeal to incorporate the February 1, 2024 district court order to the Notice of Appeal Appellant filed on November 17, 2023 (ECF 32), while the Court is cognizant of the March 2, 2024 deadline next day on a Saturday to file said Notice of Appeal or Amended Notice of Appeal.  Therefore, it is crystal clear and explicit that this Court instructs the Appellant to file the Fed. R. App. P 4(a)(5) motion in order to be **DUE PROCESS** compliant allowing the Appellant an adequate opportunity to

review, consider and respond to this Court.  All indications show that this Court on March 1, 2024 did not anticipate a biased, disqualified and criminally compromised district court judge involved in record tampering to deny the Fed. R. App. P 4(a)(5) that this Court itself instructed filing by Court Order.

Under Fed. R. App. P 4(a)(5)(A), this Court's issuance of the March 1, 2024 Court Order that vacated the Court's previously issued January 22, 2024 briefing schedule, and explicitly stating in the text of the Order directing the Appellant to "inform this court whether or not she intends to file a notice of appeal or amended notice of appeal from the district court's post-judgment order," and " See also Fed. R. App. P. 4(a)(5) (allowing the district court to grant an extension of time to file a notice of appeal if the party so moved no later than 30 days after the time prescribed by Rule 4(a) expires)" makes clear that this Court's March 1, 2024 Order is the GOOD CAUSE basis to move for extension of time under **Fed. R. App. P. 4(a)(5)** that this Court ***explicitly instructed the Appellant***, since the Order affects any and all preparation of the filing of an amended Notice of Appeal or a Notice of Appeal.

Accordingly, in compliance with the Court's March 1, 2024 Order, Appellant diligently and in good faith filed in the district court on March 1, 2024 the Order prescribed Fed. R. App. P 4(a)(5) Motion for Extension of Time, and immediately afterwards, filed here in this Court Appellant's Notice dated March 1,

2024 notifying this Court Appellant complied with the Court's Order by filing the explicitly instructed Fed. R. App. P 4(a)(5) motion for an extension of time in the district court and informing the Court that Appellant intends to file a notice of appeal or an amended notice of appeal.  *See* Appellant's March 1, 2024 Notice (*See, e.g.*, (Case: 23-1967 Document: 00118115266 Page: 2 Date Filed: 03/01/2024 Entry ID: 6626396) – "APPELLANT'S NOTICE OF PLAINTIFF-APPELLANT'S SUBMISSION/FILING MOTION FOR EXTENSION OF TIME PURSUANT TO Fed. R. App. P 4(a)(5)"); *See also*, *e.g.*, ECF 49.  Friday, March 1, 2024 is **29** days after the district court's jurisdictionally devoid February 1, 2024 order.

## PLAIN READING OF THE TEXT OF Fed. R. App. P 4(a)(5)

**Fed. R. App. P 4(a)(5) Motion for Extension of Time** states as follows:

Fed. R. App. P 4(a)(5)(A)(i) states, "a party so moves no later than 30 days after the time prescribed by this Rule 4(a) expires; and"

Fed R. App. P 4(a)(5)(A)(ii) states, "regardless of whether its motion is filed before or during the 30 days after the time prescribed by this Rule 4(a) expires, that party shows excusable neglect or good cause."

Fed. R. App. P 4(a)(5)(C) states, "No extension under this Rule 4(a)(5) may exceed 30 days after the prescribed time or 14 days after the date when the order granting the motion is entered, whichever is later."

Therefore, a plain textual reading of Fed. R. App. P 4(a)(5) Motion for Extension of Time makes clear that **<mark>good cause</mark>** is the standard of review to be applied by the district court of Appellant's Fed. R. App. P 4(a)(5) Motion for Extension of Time filed on Friday, March 1, 2024 that is 29 days from the district court February 1, 2024 order.  Appellant **<mark>showed good cause</mark>** for a 30 day extension **based on the this Court's aforesaid March 1, 2024 Court Order** *that explicitly says to the Appellant to file a Fed. R. App. P 4(a)(5) motion for extension of time if necessary, since the Court's Order affects the Appellant's "intent to file a Notice of Appeal or an amended Notice of Appeal" and the preparation of the Notice of Appeal* – therefore pursuant to the appellate rule's prescribed **good cause showing**, Appellant requested the 30 days extension to adequately review and consider this Court's March 1, 2024 Court Order that affects Appellant's preparation of the Notice of Appeal. *See* this Court's 03/01/2024 Court Order (Case: 23-1967 Document: 00118115155 Page: 2 Date Filed: 03/01/2024 Entry ID: 6626341)

However, the district court <u>did not</u> review Appellant's timely 29 day Fed. R. App. P 4(a)(5) motion for extension of time applying the appellate rule's standard of <u>good cause</u> that is explicitly prescribed by Fed. R. App. P 4(a)(5)(A)(ii).

On March 7, 2024 the district court denied Appellant's timely 29 day Fed. R. App. P 4(a)(5) motion for extension of time showing good cause this Court's March 1, 2024 Court Order that affects Appellant's preparation of Appellant's Notice of Appeal.

Wrongly, the district court denied Appellant's timely 29 day Fed. R. App. P 4(a)(5) motion for extension of time filed on March 1, 2024 wrongly applying "excusable neglect" relying on "extraordinary circumstances" deliberately omitting mention of this Court's "good cause" March 1, 2024 Court Order and instead falsely accusing the Appellant of "not knowing the rules" that caused the Appellant to file a notice of appeal out of time.  That is categorically a false, fraudulent distortion of the facts, calculated to deliberately omit this Court's March 1, 2024 Order, to make it "disappear" – consistent with Judge Smith's track record of "making Appellant's motions disappear" from the record by obstructing the docketing of Appellant's motions from November 16, 2023 to November 17, 2023, AND consistent with his Defendants-Appellees-former clients' record tampering methodology of removing from the automated record system Rhode Island's illegal

12% compound interest to cover up criminal activity.  Record tampering and falsifying the records are their *modus operandi*.

Accordingly, Appellant filed with the district court clerk on Thursday, March 7, 2024, Appellant's motion for reconsideration and Appellant's Motion for Extension of Time pursuant to Fed. R. App. P 4(a)(5)(A)(i), Fed. R. App. P 4(a)(5)(A)(ii), and Fed. R. App. P 4(a)(5)(C) moving the district court to apply the good cause standard because Appellant already filed on March 1st Appellant's timely Fed. R. App. P 4(a)(5) Motion for Extension of time within **29 days**, that had **already shown good cause** that Appellant *required the 30 day extension to adequately review and consider this Appellate Court's March 1, 2024 Order that affects Appellant's preparation of Notice of Appeal*. For example, Paragraph one (1) of Appellant's March 1, 2024 FRAP 4(a)(5) Motion clearly states as <u>good cause</u> that "Plaintiff only received the Appellate Court March 1, 2024 Court Order on the afternoon of March 1, 2024, and has not had an adequate opportunity to adequately review, consider or respond."  *See*, ECF 49, first paragraph.

The district court docketed the Appellant's district court motion for reconsideration as ECF 53.

Appellant immediately filed here into this case her Response to the Court's March 1, 2024 Order again responding that the Appellant intends to file a notice of

appeal or an amended notice of appeal, and noticed the Court Appellant's filing in the district court the March 7, 2024 motion for reconsideration.  (*See*,  (Case: 23-1967 Document: 00118117753 Page: 2 Date Filed: 03/07/2024 Entry ID: 6627688)

On Friday, March 8, 2024 the district court denied Appellant's March 7, 2024 motion for reconsideration (ECF 53) with a curt TEXT ORDER, saying the second denial is on the same basis as the district court's March 7, 2024 denial, again wrongly applying an "excusable neglect" standard by distorting the facts through omission of this Court's March 1, 2024 Court Order, then falsely accusing the Appellant of not knowing the rules and filing a Notice of Appeal out of time.

At this juncture, Appellant can file a Notice of Appeal of the district court March 7th and 8th, 2024 denials, incorporating those orders into the final judgment.  However, Appellant respectfully reminds the Court that Judge Smith's post-appeal orders dated November 20, 2023, February 1, 2024, and the resulting March 7, 2024 and March 8, 2024 denial orders have already resulted in the creation of two appeal cases, Appeal No. 23-1967 and 23-1978.  A third appeal case created under these circumstances is not in the interest of judicial economy.

Accordingly, Appellant respectfully filed in this Court a motion for reconsideration before this Court, pursuant to a reading of the rules' texts under Fed. R. App. P **27(b), 26(b)(1) and 4(a)(5)(A).**

Appellant in good faith and with diligence filed in the district court on March 8, 2024 a Fed. R. App. P 8(a)(1)(A) to stay the denials and to stay the tolling of time to file Appellant's Notice of Appeal pending this Court's resolution of this herein motion for reconsideration.  In so doing, in the interest of judicial economy, the Appellant in good faith afforded the district court a third opportunity to reconsider its Fed. R. App. P 4 extension of time denials, prior to filing a Fed. R. App. P 8(a)(2) motion before this Court. Appellants asked the district court to <u>resolve</u> Appellant's Fed. R. App. P 8(a)(1)(A) motion to stay <u>by the end of day on March 8, 2024</u>, based on the district court's record of speedy two denials throughout this week.  However, the district court failed to resolve it by the requested time.

Consequently, Appellant filed in the district court a Notice of <u>Withdrawal</u> of Appellant's Fed. R. App. P 8(a)(1)(A) motion to stay on March 11, 2024.

Subsequently, with no pending motions before the district court, Appellant files this Fed. R. App. P 8(a)(2) motion to stay the district court's denials and to stay the tolling of time to file a Notice of Appeal, pending the resolution by this Court of Appellant's Fed. R. App. P 27(b), 26(b)(1) and 4 motion to reconsider. Appellant, in complying with and responding to the Court's March 1, 2024 Order that instructed the Appellant to respond and to file with the district court the Fed.

R. App. P 4(a)(5) motion for extension of time, has been adversely affected by a jurisdictionally devoid district court and this appeal proceeding has been interfered with through his tampering of the record of appeal criminally by the disqualified bias judge in district court, William Smith.

### THE COMMISION BY DEFENDANTS-APPELLEES and JUDGE SMITH of FEDERAL CRIMINAL VIOLATIONS MADE KNOWN TO A JUDGE OF THE UNITED STATES HEREIN

Herein, Appellant, in filing this motion and raising before the Court the filing of the Amended Complaint (ECF 25) in this matter, made known to judges of the United States, pursuant to 18 U.S.C. §4, in the official proceeding allegations of the commission of acts by Defendants-Appellees violating 18 U.S.C. §2, 18 U.S.C. §3, 18 U.S.C. §13, 18 U.S.C. §21, 18 U.S.C. §35, 18 U.S.C. §285, 18 U.S.C. §286, 18 U.S.C. §287, 18 U.S.C. § 2071(a), 18 U.S.C. § 2071(b), 18 U.S.C. § 1512(k), 18 U.S.C. § 371, 18 U.S.C. § 241, 18 U.S.C. § 242, 18 U.S.C. § 1519, 18 U.S.C. §666, 18 U.S.C. §641, Wire Fraud 18 U.S.C. §1343, 18 U.S.C. § 201, 18 U.S.C. §205, 18 U.S.C. §225, 18 U.S.C. §285, 18 U.S.C. §1506, 18 U.S.C. § 1512, 18 U.S.C. § 1515, 18 U.S.C. §1001, 18 U.S.C. §1002,  18 U.S.C. §1031, 18 U.S.C. §1341, 18 U.S.C. §1344, 18 U.S.C. §1346, 18 U.S.C. §1349, 18 U.S.C. §1510, 18 U.S.C. §1513, RICO: 18 U.S.C. §1961,  18 U.S.C. §1962, 18 U.S.C. §1963, 18 U.S.C. §1964, 18 U.S.C. §1965, 18 U.S.C. §1968 – such violative acts by the Defendants-Appellees and/or Judge Smith on this list is not exhaustive.

## <u>No Immunity</u>

On February 6, 2024 in case No. 23-3228 in *UNITED STATES OF AMERICA v. DONALD J. TRUMP*, DC Circuit, the DC Circuit Court reminds the Court that Judges are similarly liable to the criminal laws for their official acts. A notable example is *Ex parte Commonwealth of Virginia*, in which the Supreme Court affirmed the criminal indictment of a judge based on an official act. 100 U.S. 339 (1879). A county judge was indicted in federal court for violating a federal statute that prohibited discriminating on the basis of race in jury selection. *Id*. at 340, 344. The Supreme Court began by observing the principle that officers are bound to follow the law: "We do not perceive how holding an office under a State, and claiming to act for the State, can relieve the holder from obligation to obey the Constitution of the United States, or take away the power of Congress to punish his disobedience." *Id*. at 348. The Court then addressed the judge's argument that the Court lacked the authority to punish a state judge for "his official acts." *Id*. Its response was twofold. First, the Court described juror selection as "merely a ministerial act, as much so as the act of a sheriff holding an execution, in determining upon what piece of property he will make a levy, or the act of a roadmaster in selecting laborers to work upon the roads." *Id*. The Court then

explained that even if juror selection is considered a "judicial act," the judge had a legal duty to obey the criminal laws:

> "But if the selection of jurors could be considered in any case a judicial act, can the act charged against the petitioner be considered such when he acted outside of his authority and in direct violation of the spirit of the State statute? That statute gave him no authority, when selecting jurors, from whom a panel might be drawn for a circuit court, to exclude all colored men merely because they were colored. Such an exclusion was not left within the limits of his discretion. It is idle, therefore, to say that the act of Congress is unconstitutional because it inflicts penalties upon State judges for their judicial action. It does no such thing.

*Id.* at 348–49 (emphasis added). The Court's reference to "the State statute" is to the Virginia law charging the county judge with the duty to select jurors in the circuit and county courts. *Ex parte Virginia*, 100 U.S. at 340.

More recent case law on the judicial immunity doctrine affirms that judges are not immune from criminal liability for their official acts. *O'Shea v. Littleton* confirmed the holding of *Ex parte Virginia* in dismissing a civil rights action for

equitable relief brought against a county magistrate and associate judge of a county circuit. 414 U.S. 488, 490–91, 503 (1974). The Supreme Court concluded that the requested injunction was not the only available remedy because both judges remained answerable to the federal criminal laws:

> [W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation of constitutional rights. On the contrary, the judicially fashioned doctrine of official immunity does not reach 'so far as to immunize criminal conduct proscribed by an Act of Congress . . . .'

*Id.* at 503 (citation to *Ex parte Virginia*, 100 U.S. 339, omitted; quoting *Gravel*, 408 U.S. at 627). Similarly, in *Dennis v. Sparks*, the Court affirmed judicial immunity from civil money damages in the context of bribery allegations but explained that judges "are subject to criminal prosecutions as are other citizens." 449 U.S. at 31. Crucially, the judge in *Dennis* retained civil immunity because "the challenged conduct" — allegedly issuing an injunction corruptly after accepting bribes as part of a conspiracy — was "an official judicial act within

his statutory jurisdiction, broadly construed." *Id.* at 29. The scope of civil judicial immunity thus aligns with civil Presidential immunity under Fitzgerald, but a judge has no criminal immunity for the same "official act." *See also Imbler*

*v. Pachtman*, 424 U.S. 409, 429 (1976) ("Even judges, cloaked with absolute civil immunity for centuries, could be punished criminally for willful deprivations of constitutional rights . . . ."); *United States v. Gillock*, 445 U.S. 360, 372

(1980) ("[T]he cases in this Court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials.").

When considering the criminal prosecutions of judges, other circuits have repeatedly rejected judicial criminal immunity for official acts, largely in the context of bribery prosecutions. *See United States v. Claiborne*, 727 F.2d 842,

845 (9th Cir.) (per curiam), cert. denied, 469 U.S. 829 (1984); *United States v. Hastings*, 681 F.2d 706, 709–11 (11th Cir. 1982), cert. denied, 459 U.S. 1203 (1983); *United States v. Isaacs*, 493 F.2d 1124, 1143–44 (7th Cir.) (per curiam), cert. denied, 417 U.S. 976 (1974), overruled on other grounds by

*United States v. Gimbel*, 830 F.2d 621 (7th Cir. 1987).

## CONCLUSION

**WHEREFORE**, this Court should GRANT Appellant's herein motion to stay the district court's Fed. R. App. P 4(a)(5) denials and to stay the tolling of time to file a Notice of Appeal pending the Court's resolution of the pending Appellant's March 8, 2024 Fed. R. App. P 27(b) Motion to Reconsider and extend the time to file Appellant's Notice of Appeal or amended Notice of Appeal to April 2, 2024. This Court should GRANT Appellant's March 8, 2024 Fed. R. App. P 27(b) Motion to Reconsider and extend the time to file Appellant's Notice of Appeal or amended Notice of Appeal to April 2, 2024. This Court should instruct the clerks of the courts to correct the falsely altered record. This Court should order divestiture of jurisdiction of the district court throughout the pendency of the appeal and the trial court is *functus officio*. This Court should appropriately and fittingly sanction the district court actors involved in falsifying the record for misconduct. Appellant requests Oral Argument on all issues raised herein before the Court. Appellant requests any and all Relief deemed just.

Respectfully submitted,

Mary Seguin
Pro Se
/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: March 11, 2024

## CERTIFICATE OF SERVICE

    This is to certify that the foregoing instrument has been served via the Court's ECF filing system on March 11, 2024, on all registered counsel of record, and has been transmitted to the Clerk of the Court.

Mary Seguin
Pro Se
/s/    *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Exhibit A

# United States Court of Appeals
## For the First Circuit
_____

No. 23-1967

MARY SEGUIN,

Plaintiff - Appellant,

v.

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES, in its official capacity; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES, in its official capacity; GERO MEYERSIEK, in his individual and official capacity; PRISCILLA GLUCKSMAN; JOHN A. LANGLOIS; PAUL GOULD; MICHAEL D. COLEMAN, in his individual and official capacity; DEBORAH A. BARCLAY, in her individual and official capacity; LISA PINSONNEAULT, in her individual and official capacity; CARL BEAUREGARD, in his individual and official capacity; KEVIN TIGHE; MONIQUE BONIN; FRANK DIBIASE; WENDY FOBERT; KARLA CABALLEROS; TIMOTHY FLYNN; RHODE ISLAND COURT SYSTEM; MARISA BROWN; PAUL A. SUTTELL, in his individual and official capacity as Executive Head of Rhode Island State Court System; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT; RHODE ISLAND JUDICIAL COUNCIL; RHODE ISLAND SUPERIOR COURT; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL; THE JUDICIAL TECHNOLOGY CENTER; JULIE HAMIL; JOHN JOSEPH BAXTER, JR.; JUSTIN CORREA; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT; ADAM D. ROACH; PETER F. NERONHA; TYLER TECHNOLOGIES, INC.,

Defendants - Appellees.
_____

**ORDER OF COURT**

Entered: March 1, 2024
Pursuant to 1st Cir. R. 27.0(d)

The briefing schedule entered on January 22, 2024 is hereby vacated as entered in error.

In 1:23-cv-00126-WES-PAS (D.R.I), Plaintiff-appellant Mary Seguin filed three post-judgment motions pursuant to Rule 59, Rule 60(b) and Rule 60(b)(1) (Docket Entries #34, #35 and #37) which, per Fed. R. App. P. 4(a)(4)(B)(i), tolled the effectiveness of her November 17, 2023 notice of appeal until the district court disposed of the post-judgment motions. On February 1, 2024, the district court entered an order denying the post judgment motions. (D.E. # 48)

The appellant shall inform this court whether or not she intends to file a notice of appeal or amended notice of appeal from the district court's post-judgment order. <u>See</u> Fed. R. App. P. 4(a)(4)(B)(ii) (noting that if appellant seeks appeal an order disposing of a post-judgment motion or incorporate it into a prior appeal, they must file a notice of appeal or amended notice of appeal within the 30 day period after the order enters). <u>See also</u> Fed. R. App. P. 4(a)(5) (allowing the district court to grant an extension of time to file a notice of appeal if the party so moved no later than 30 days after the time prescribed by Rule 4(a) expires).

A briefing schedule will enter in due course.

By the Court:

Maria R. Hamilton, Clerk

cc:
Mary Seguin
Marissa D. Pizana
Joanna M. Achille
Peter F. Neronha

Exhibit B

Published September 2014

**Judicial Profile**

by Amy E. Moses



# Hon. William E. Smith
# Chief Judge, U.S. District Court for the District of Rhode Island

**B**orn and raised in Boise, Idaho, Chief Judge William E. Smith of the U.S. District Court for the District of Rhode Island got a taste of both politics and the judiciary at a young age. His late father, Walter E. "Bill" Smith, was a successful candidate for the Ada County Probate Court in the 1950s. Chief Judge Smith recalls many fall days during his childhood handing out palm cards and walking in parades for his father's campaigns.

Judge W.E. Smith was an early champion of court reform, and his efforts ultimately led to merit-selection for state judges in Idaho. Selected by the governor for a seat on the Idaho District Court, the trial court of general jurisdiction, W.E. Smith was the first member of Idaho's judiciary appointed under the new merit selection process.

Chief Judge Smith considers his father to be his earliest and most influential judicial mentor. His father was a devoted public servant who spent the vast majority of his legal career as a judge; he was committed to following the highest ethical standards and dedicated to the rule of law. Chief Judge Smith recalls frequently walking from his elementary school to the county courthouse to get a ride home; he would do homework while his father drafted opinions or sit in the courtroom and watch trials. The late W.E. Smith's devotion to the law appears to have influenced all of his children's professional paths: Stephen is in private practice in Idaho; Tom is a law professor in California; and Trish is a district attorney in Utah.

Chief Judge Smith left Idaho to study at Georgetown University, following in his brother Stephen's footsteps. Thanks to Idaho's Democratic Sen. Frank Church, he worked during college as a messenger in the U.S. Senate Foreign Relations Committee, of which Sen. Church was



Chief Judge Smith and Court Security Officer Charlie Penelton standing in front of a portrait of Senior Judge Lagueux. Penelton worked for both judges.

chair. He worked upward of 30 hours a week to help support himself and pay for his undergraduate education.

During the summer of 1980, Chief Judge Smith returned

*Amy E. Moses served as Chief Judge Smith's law clerk during the 2005 – 2006 term. She is a member of the board of the Rhode Island Chapter of the Federal Bar Association.© 2014 Amy E. Moses. All rights reserved.*



home to work on Sen. Church's re-election campaign. He coordinated volunteers, drafted issue papers, and occasionally drove the senator to campaign events across Idaho. Although close, the campaign did not survive the "Reagan Revolution," which unseated numerous long-serving democratic senators and left Chief Judge Smith without a job. Through Sen. Church's former Chief of Staff Peter Fenn, he secured a position at the newly formed Democrats for the '80s, a political action committee. There he worked as a research assistant helping to draft two fact books for democratic candidates running in 1982 and 1984. While at Georgetown, Chief Judge Smith met his future wife, classmate Christine Boris, a native of Westerly, R.I.; he occasionally traveled with her to Rhode Island to visit her family in the summer.

Shortly after graduating from Georgetown in 1982, Chief Judge Smith enrolled in the night program at Georgetown's Law School. By taking courses at night, he was able to work full time during the day to pay for his education. Thanks to his connections at Democrats for the '80s, he secured a paralegal/law clerk position at Akin Gump Strauss Hauer & Feld and worked there through much of law school (taking time off in summers to clerk in several other firms). During his third year, he and Christine married.

In 1987, after considering law firms in Portland, Maine, and Providence, R.I., Chief Judge Smith accepted a position at Edwards & Angell, then Providence's largest and most prestigious law firm. Other than Christine's family down in Westerly, he "didn't know a soul in Rhode Island," but his instincts told him that Rhode Island was a place where a young lawyer could have an impact and make a name for himself. As a young associate, Chief Judge Smith built a practice focused on labor law and pubic-sector law. In his new hometown of West Warwick, he served as an assistant solicitor and later became the municipal judge. In neighboring Warwick, after now-Governor Lincoln Chafee (D) was elected mayor in 1992, Chief Judge Smith competed for and won a contract to consolidate all of the city's legal services and was designated as the city solicitor. Revolutionary at the time, he convinced Mayor Chafee that his firm could handle the city's legal work efficiently and effectively for a flat fee, saving the city $100,000 per year. Under this contract, Chief Judge Smith represented Warwick in numerous matters involving police officers, firefighters, and municipal unions; civil rights cases; utility rate cases; tax and zoning matters; and cases regarding the interpretation of the city charter, to name a few. This experience led to a similar flat-fee contract representing the Rhode Island Secretary of State. In due course, Chief Judge Smith's burgeoning public-sector practice expanded to include representing the governor, a

**Outside of the courthouse, you might catch a glimpse of Chief Judge Smith peddling through downtown Providence or on the East Bay bike path. Weather permitting, he occasionally rides his bike the almost 25 miles from home to work.**

public library, and the Rhode Island State Courts in a variety of high-profile labor-related legal battles. At the same time, Chief Judge Smith continued to represent an increasing variety of private sector and nonprofit clients on labor and employment matters, including grocery chains, banks, and manufacturing companies, as well as colleges.

While in private practice, Chief Judge Smith also became politically active. Although a Democrat in his college days, he found himself more at home with Rhode Island's small Republican party. Early on, he was active with the 1988 Bob Dole (R) presidential campaign,. Through his legal work for the town of Warwick, he became good friends with Mayor Chafee and supported his re-election campaigns.

In late 1999, following the sudden death of U.S. Sen. John Chafee, Mayor Lincoln Chafee was appointed by the governor to serve the remaining year of his father's term. The following November, Sen. Chafee ran for the seat. He was the clear underdog going into the 2000 race, campaigning against the much more seasoned Rep. Robert Weygand (D). Bringing his campaign experience from a U.S. Senate race 20 years prior, Chief Judge Smith left his partnership at Edwards & Angell to serve as the staff director in Sen. Chafee's Rhode Island office. From 9 to 5, Chief Judge Smith worked on Senate matters, but all of his spare time was devoted to the campaign, overseeing everything from staffing to scheduling, media, and debate preparation.

After serving for a year as staff director and seeing Chafee to victory in November, Chief Judge Smith returned to Edwards & Angell. Shortly thereafter, U.S. District Judge Ronald R. Lagueux announced he would take senior status, opening up a seat on the federal bench. Sen. Chafee suggested Chief Judge Smith to President George W. Bush, and after a relatively uneventful process, he was confirmed by the U.S. Senate on Nov. 14, 2002. Looking back, Chief Judge Smith appreciates that the stars unexpectedly aligned: but for both Sen. Chafee and President Bush winning close and perhaps unexpected victories in 2000, he would not have been appointed to the federal bench.

Taking the bench in his early forties, Chief Judge Smith brought with him innovative ideas about the work of judging. In one high-stakes patent case involving complex computer algorithms, for example, he broke new ground by combining the digital audio of testimony with the demonstrative video used by the witness to create a movie that he embedded into his decision; readers can click on the embedded link to watch the movie.[1] In another case, when it came time to award attorneys' fees in a securities class-action matter,[2] he adopted a market-based approach championed by Judges Vaughn Walker and Milton Shadur in the post-settlement context using available data about fee awards.[3]

Early on in his judicial career, Chief Judge Smith became focused on issues of fundamental fairness. In the wake of *Booker*[4] and disturbed by the disparity between crack and cocaine sentences, he conducted extensive research on the scientific differences between the two substances and the history of the 100-to-1 sentencing ratio in use at the time. His thoughtful and comprehensive opinion on this issue, *United States v. Perry*,[5] was used by other judges

considering rejecting the 100-to-1 ratio and got a shout out from the U.S. Supreme Court in the *United States v. Spears*[6] opinion, which upheld the discretion of district court judges to vary from the sentencing guidelines based on policy disagreements. On another topic, Chief Judge Smith chastised law enforcement's persistent failure to record custodial interrogations, warning that in future cases he would take remedial measures, including instructing the jury to treat with caution testimony of law enforcement officers about statements made during custodial interrogations where recording equipment was not utilized.[7] These efforts, along with those of many other judges and commentators, arguably have contributed to a sea change in practices on custodial recording.[8]

Chief Judge Smith has taught at Roger Williams University School of Law, the state's only law school, since 2007. He believes that the law school plays a unique role in Rhode Island's legal community by educating many of the state's lawyers, fostering intellectual exchanges through seminars and conferences, and expanding legal services through its clinics and Pro Bono Collaborative. His courses have included a year-long capstone course of his own design in federal practice, which mimics an actual federal civil case from start to finish; a course in expert and scientific evidence; and a seminar in judicial process, which explores how judges decide cases with an emphasis on the psychological and less well understood influences in decision-making. Chief Judge Smith greatly enjoys mentoring students and interacting with faculty and staff. He recently accepted appointment as chair of the law school's board of directors and looks forward to helping the school navigate the changing seas of legal education.

During his tenure as a district judge, Chief Judge Smith has accepted numerous invitations to sit with the First and Ninth Circuit Courts of Appeals. He enjoys the sparring and camaraderie in the appellate bench. Indeed, Chief Judge Smith was nominated by President Bush to a seat on the First Circuit in December of 2007, but (somewhat ironically given his early political background) was "blue-slipped" by Rhode Island's Democratic senators in the waning months of the Bush administration.

Outside of the courthouse, you might catch a glimpse of Chief Judge Smith peddling through downtown Providence or on the East Bay bike path. Weather permitting, he occasionally rides his bike the almost 25 miles from home to work. During lunch, he usually catches a game of competitive squash. And on the weekends, he enjoys hiking, tennis, and mountain biking. He is an avid reader, mostly of nonfiction, with a particular interest in history, policy, and science.

In December 2013, Chief Judge Smith began his seven-year term as chief judge. The youngest person ever to serve as chief judge in the District of Rhode Island,[9] he brings new energy and enthusiasm to the position. While he continues to innovate and focus on fairness, Chief Judge Smith is committed broadening his effort to make the court a friendlier and more welcoming place for litigants, lawyers, and the public. During his first few months as chief, he established a court Twitter account, modernized the *pro hac vice* process, issued an order permitting the electronic filing of complaints, and initiated a protocol to allow reporters to use electronic devices in the courtroom (with the judge's approval) to report via Twitter, blogs, or otherwise. Currently he is overseeing an initiative to make admission to practice in the District of Rhode Island more practical for new lawyers, a program to provide *pro bono* counsel in civil cases, the development of a re-entry court to offer an alternative to supervised release, and a litigation academy to help train young lawyers (at low cost) in some of the basic skills of litigation. (The academy is a partnership between the court, the Federal Bar Association, and the Roger Williams University School of Law.)

Looking forward, Chief Judge Smith is not certain if he will retire or take senior status when eligible, but he does not think of himself as the kind of judge who has to be on the bench. While he cherishes his judicial position, he has numerous interests and enjoys traveling. And while that decision is still a long ways off, he says it might be interesting to do some "completely different" kind of public service. That, above all, is what he learned from his father: a life of devoted public service is its own reward. ⊙

## Endnotes

[1] *Uniloc USA, Inc. v. Microsoft Corp.*, 640 F. Supp. 2d 150 (D.R.I. 2009).

[2] *In re Cabletron Systems, Inc. Securities Litigation*, 239 F.R.D. 30 (D.N.H. 2006).

[3] *See, e.g.*, *In re Oracle Securities Litig.*, 131 F.R.D. 688 (N.D. Cal. 1990) (Walker, J.); *In re Amino Acid Lysine Antitrust Litig.*, 918 F. Supp. 1190 (N.D. Ill. 1996) (Shadur, J.); Report of the Third Circuit Task Force on Selection of Class Counsel, 208 F.R.D. 340, 354 n.31 (2002).

[4] *United States v. Booker*, 543 U.S. 220 (2005).

[5] *United States v. Perry*, 389 F. Supp. 2d 278 (D.R.I. 2005).

[6] *Spears v. United States*, 555 U.S. 261, 261, 266 (2009).

[7] *United States v. Mason*, 497 F. Supp. 2d 328, 336 (D.R.I. 2007) ("It is for this reason that continued indifference (or resistance) by the Providence Police Department to practices aimed at curing the problems discussed above risks this Court's use of corrective measures."); *see also United States v. Mejia*, Cr. No. 07-005S, Jury Instructions, p. 36, www.rid. uscourts.gov/menu/judges/jurycharges/CRdocs/07-05S%20 US%20v%20Tejada-Pichardo%20et%20al%20(Ricardo%20 Mejia).pdf ("Testimony regarding unrecorded statements, particularly in circumstances where recording equipment is available, must be viewed with caution."); Katie Mulvaney, Police resist judge's call that they record interrogations, PROVIDENCE JOURNAL, March 18, 2009.

[8] *See* Thomas P. Sullivan, *Recording Custodial Interrogations*, THE CHAMPION, April 2014.

[9] *See* Federal Judicial Center, Biographical Directory of Federal Judges, 1789 present, www.fjc.gov/history/home. nsf/page/judges.html (containing dates of birth and years of service as District of Rhode Island Chief Judge).

Exhibit C

APPEAL,Pro Se ECF Filer,Pro Se Plaintiff

# U.S. District Court
## District of Rhode Island (Providence)
## CIVIL DOCKET FOR CASE #: 1:23−cv−00126−WES−PAS

Seguin v. Rhode Island Department of Human Services et al

Assigned to: District Judge William E. Smith

Referred to: Magistrate Judge Patricia A. Sullivan

Demand: $3,000,000

Cause: 18:1962 Racketeering (RICO) Act

Date Filed: 03/30/2023

Date Terminated: 10/19/2023

Jury Demand: Both

Nature of Suit: 440 Civil Rights: Other

Jurisdiction: Federal Question

**Plaintiff**

**Mary Seguin**

represented by **Mary Seguin**
P.O. Box 22022
Houston, TX 77019
281−744−2016
Email: maryseguin22022@gmail.com
PRO SE

V.

**Defendant**

**Rhode Island Department of Human
Services**
*In its official capacity*

represented by **Marissa D. Pizana**
RI Department of Attorney General
Civil Division
150 South Main Street
Providence, RI 02903
401−274−4400
Email: mpizana@riag.ri.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rhode Island Department of Human
Services Office Of Child Support
Services**
*In its official capacity*

represented by **Marissa D. Pizana**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Gero Meyersiek**
*In his individual and official capacity*

represented by **Joanna M. Achille**
Burns & Levinson LLP
1 Citizens Plaza
Providence, RI 02903
(401) 831−8330
Fax: (617) 345−3299
Email: jachille@burnslev.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

1

**Michael D. Coleman**
*In his individual and official capacity*

<u>Defendant</u>

**Deborah A. Barclay**
*In her individual and official capacity*

<u>Defendant</u>

**Lisa Pinsoneault**
*In her individual and official capacity*

<u>Defendant</u>

**Carl Beauregard**
*In his individual and official capacity*

<u>Defendant</u>

**Kevin Tighe**

<u>Defendant</u>

**Monique Bonin**

<u>Defendant</u>

**Frank Dibiase**

<u>Defendant</u>

**Wendy A. Fobert**

<u>Defendant</u>

**Karla Caballeros**

<u>Defendant</u>

**Timothy Flynn**

<u>Defendant</u>

**Rhode Island Court System**

<u>Defendant</u>

**Paul A Suttell**
*L in his individual and official capacity*
*as Executive Head OF Rhode Island State*
*Court System*

<u>Defendant</u>

**Rhode Island Administrative Office of
State Courts**

<u>Defendant</u>

2

**Rhode Island Administrative Office of the Superior Court**

<u>Defendant</u>

**Rhode Island Judicial Council**

<u>Defendant</u>

**Rhode Island Superior Court**

<u>Defendant</u>

**Rhode Island Superior Court Judicial Council**

<u>Defendant</u>

**The Judicial Technology Center**

<u>Defendant</u>

**Julie Hamil**

<u>Defendant</u>

**Marisa P. Brown**

<u>Defendant</u>

**John Joseph Baxter, Jr.**

<u>Defendant</u>

**Justin Correa**

<u>Defendant</u>

**Rhode Island Office of the Attorney General**

<u>Defendant</u>

**Rhode Island Office of the Attorney General Open Government Unit**

<u>Defendant</u>

**Adam Roach**

<u>Defendant</u>

**Peter Neronha**

<u>Defendant</u>

**Tyler Technologies, Inc.**

| Date Filed | # | Docket Text |
|---|---|---|
| 03/30/2023 | 1 | COMPLAINT ( filing fee paid $ 402.00 receipt number ARIDC−1855567 ), filed by Mary Seguin.(DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | | <span style="color:red">CORRECTIVE DOCKET ENTRY Regarding: <u>1</u> Complaint. **CORRECTIVE DOCKET ENTRY:** This case has been electronically filed and processed, however, after a quality control review the following deficiencies were found:</span><span style="color:blue">Civil Cover Sheet not attached.</span> <span style="color:red">The filer is directed to file a Civil Cover Sheet within one day.</span> (DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | 2 | Civil Cover Sheet filed by Mary Seguin. Regarding New Case: <u>1</u> Complaint. (Attachments: # <u>1</u> Email)(DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | 3 | Summons Request filed by Mary Seguin. (Attachments: # <u>1</u> Rhode Island Department of Human Services Office of Child Support Services Summons, # <u>2</u> Gero Meyersiek Summons)(DaCruz, Kayla) (Additional attachment(s) added on 3/30/2023: # <u>3</u> Email) (DaCruz, Kayla). (Entered: 03/30/2023) |
| 03/30/2023 | 4 | MOTION for Leave to Proceed as Pro Se Electronic Filer filed by Mary Seguin. (Attachments: # <u>1</u> Email)(DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | | CASE CONDITIONALLY ASSIGNED to District Judge William E. Smith and Magistrate Judge Patricia A. Sullivan. Related Case Number 23cv34 based upon a related case previously assigned to the presiding judge. The assignment is subject to the presiding judge's determination that the cases, in fact, are related. (DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | 5 | CASE OPENING NOTICE ISSUED (DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | 6 | Summons Issued as to Gero Meyersiek, Rhode Island Department of Human Services, Rhode Island Department of Human Services Office of Child Support Services. (Attachments: # <u>1</u> Rhode Island Department of Human Services Office Of Child Support Services Summons, # <u>2</u> Gero Meyersiek Summons)(DaCruz, Kayla) (Entered: 03/30/2023) |
| 03/30/2023 | | TEXT ORDER granting <u>4</u> Motion for Leave to Proceed as Pro Se Electronic Filer. So Ordered by District Judge William E. Smith on 3/30/2023. (Urizandi, Nissheneyra) (Entered: 03/30/2023) |
| 07/07/2023 | 7 | ORDER TO SHOW CAUSE entered. Show Cause Response due by 7/21/2023. So Ordered by District Judge William E. Smith on 7/7/2023. (Urizandi, Nissheneyra) (Entered: 07/07/2023) |
| 07/07/2023 | | CASE PERMANENTLY ASSIGNED: Since District Judge William E. Smith has determined that this case is in fact related to CA 22−cv−34 this case is permanently assigned to District Judge William E. Smith for all further proceedings. (Urizandi, Nissheneyra) (Entered: 07/07/2023) |
| 07/20/2023 | 8 | AFFIDAVIT re <u>7</u> Order to Show Cause *Rule 4(m) Show Cause Declaration* by Mary Seguin. (Attachments: # <u>1</u> Exhibit Exhibits A to B attached to Plaintiff's Rule 4(m) Show Cause Declaration)(Seguin, Mary) (Entered: 07/20/2023) |
| 08/07/2023 | 9 | NOTICE of Appearance by Marissa D. Pizana on behalf of Rhode Island Department of Human Services, Rhode Island Department of Human Services Office Of Child Support Services (Pizana, Marissa) (Entered: 08/07/2023) |

| 08/07/2023 | 10 | MOTION for an Extension of Time to File Answer re 1 Complaint *or Otherwise Respond to the Complaint* filed by Rhode Island Department of Human Services, Rhode Island Department of Human Services Office Of Child Support Services. **Responses due by 8/21/2023.** (Pizana, Marissa) (Entered: 08/07/2023) |
| --- | --- | --- |
| 08/07/2023 | 11 | EXHIBIT IN SUPPORT by Rhode Island Department of Human Services, Rhode Island Department of Human Services Office Of Child Support Services in support of 10 MOTION for an Extension of Time to File Answer re 1 Complaint *or Otherwise Respond to the Complaint* . (Pizana, Marissa) (Entered: 08/07/2023) |
| 08/08/2023 | 12 | MOTION for an Extension of Time to Amend 1 Complaint *Pursuant to Rule 15* filed by Mary Seguin. **Responses due by 8/22/2023.** (Attachments: # 1 Exhibit Exhibit A to E attached to Plaintiff Motion for Extension of Time To Amend Complaint 080823, # 2 Affidavit Affidavit in Support of Plaintiff Motion for Extension of Time to Amend Complaint 080823, # 3 Exhibit Exhibit A to D attached to Affidavit in Support of Plaintiff Motion for Extension of Time to Amend Complaint 080823)(Seguin, Mary) (Entered: 08/08/2023) |
| 08/10/2023 | 13 | NOTICE of Appearance by Joanna M. Achille on behalf of Gero Meyersiek (Achille, Joanna) (Entered: 08/10/2023) |
| 08/10/2023 | 14 | First MOTION for an Extension of Time to File Answer re 1 Complaint filed by Gero Meyersiek. **Responses due by 8/24/2023.** (Achille, Joanna) (Entered: 08/10/2023) |
| 08/15/2023 | | TEXT ORDER granting 10 Motion for Extension of Time to Answer. Rhode Island Department of Human Services answer due 10/9/2023; Rhode Island Department of Human Services Office of Child Support Services answer due 10/9/2023. So Ordered by District Judge William E. Smith on 8/15/2023. (Urizandi, Nissheneyra) (Entered: 08/15/2023) |
| 08/16/2023 | 15 | RESPONSE In Opposition to 12 MOTION for an Extension of Time to Amend 1 Complaint *Pursuant to Rule 15* filed by Rhode Island Department of Human Services, Rhode Island Department of Human Services Office Of Child Support Services. **Replies due by 8/23/2023.** (Pizana, Marissa) (Entered: 08/16/2023) |
| 08/16/2023 | 16 | REPLY to Response re 15 Response to Motion, *Plaintiff's Motion for Extension of Time to Amend Complaint* filed by Mary Seguin. (Seguin, Mary) (Entered: 08/16/2023) |
| 08/17/2023 | 17 | MOTION for Temporary Restraining Order filed by Mary Seguin. (Attachments: # 1 Supporting Memorandum Memorandum In Support of Motion for Preliminary Injunction and Temporary Restraining Order, # 2 Affidavit Affidavit in Support of Plaintiff Motion for TRO, # 3 Exhibit Exhibits Attached to Plaintiff Motion for TRO and Preliminary Injunction)(Seguin, Mary) (Entered: 08/17/2023) |
| 08/17/2023 | 18 | AFFIDAVIT re 17 MOTION for Temporary Restraining Order *and Motion for Preliminary Injunction* by Mary Seguin. (Seguin, Mary) (Entered: 08/17/2023) |
| 08/18/2023 | 19 | AFFIDAVIT re 17 MOTION for Temporary Restraining Order *and Rule 65(a) Motion for Injunctive Relief* by Mary Seguin. (Attachments: # 1 Exhibit Rhode Island Family Court Emergency Motion to Stay Proceedings)(Seguin, Mary) (Entered: 08/18/2023) |
| 08/18/2023 | 20 | EXHIBIT IN SUPPORT by Mary Seguin in support of 18 Affidavit, 17 MOTION for Temporary Restraining Order , 1 Complaint, 19 Affidavit *Affidavit in Support of Evidence Submitted for Complaint and Motion for Temporary Restraining Order*. (Seguin, Mary) (Entered: 08/18/2023) |

| 08/18/2023 | 21 | EXHIBIT IN SUPPORT by Mary Seguin in support of 1 Complaint . (Attachments: # 1 Exhibit Documentary Evidentiary Support, # 2 Exhibit Evidentiary Support, # 3 Exhibit Evidentiary Support, # 4 Exhibit Evidentiary Support, # 5 Exhibit Evidentiary Support, # 6 Exhibit Evidentiary Support, # 7 Exhibit Audio Recording Evidentiary Support)(Seguin, Mary) (Entered: 08/18/2023) |
| --- | --- | --- |
| 08/18/2023 | 22 | DOCKET NOTE: Audio file was received and will be maintained in the Clerk's Office. Regarding: 20 Exhibit in Support, 21 Exhibit in Support, 18 Affidavit, 17 MOTION for Temporary Restraining Order , 1 Complaint, 19 Affidavit. (Kenny, Meghan) (Entered: 08/18/2023) |
| 08/18/2023 | 23 | Emergency MOTION for Hearing re 17 MOTION for Temporary Restraining Order filed by Mary Seguin. **Responses due by 9/1/2023.** (Seguin, Mary) (Entered: 08/18/2023) |
| 08/18/2023 | 24 | Second MOTION for Hearing re 17 MOTION for Temporary Restraining Order filed by Mary Seguin. **Responses due by 9/1/2023.** (Kenny, Meghan) (Entered: 08/18/2023) |
| 08/18/2023 | | TEXT ORDER denying Plaintiff's 17 Motion for Temporary Restraining Order and Preliminary Injunction. Because the ongoing proceedings in state court implicate a significant state interest, the Younger abstention doctrine applies, requiring this Court to abstain from enjoining ongoing state proceedings. See Younger v. Harris, 401 U.S. 37 (1971); Sirva Relocation, LLC v. Richie, 794 F.3d 185, 191−93 (1st Cir. 2015). The ongoing proceeding in Family Court implicates the State's interest in enforcing the orders and judgments of its courts and in its ability to collect child support payments, the state court is fully competent to adjudicate Plaintiff's claims, and no Younger abstention exceptions apply. See Sirva, 794 F.3d at 192. Accordingly, Plaintiff's 17 Motion for Temporary Restraining Order and Preliminary Injunction is DENIED. So Ordered by District Judge William E. Smith on 8/18/2023. (Urizandi, Nissheneyra) (Entered: 08/18/2023) |
| 08/18/2023 | | TEXT ORDER granting Plaintiff's 12 Motion for an Extension of Time to Amend Complaint and Defendant Gero Meyersiek's 14 First Motion for an Extension of Time to File Answer. Because Defendants have not yet filed a responsive pleading, Plaintiff is permitted to amend her Complaint pursuant to Federal Rule of Civil Procedure 15(a). Plaintiff is directed to file her amended complaint within fourteen days from the date of this order. In light of this extension, Defendant Gero Meyersieks request for an extension of time is also granted, and he is directed to respond to Plaintiff's amended complaint within 60 days of its filing. So Ordered by District Judge William E. Smith on 8/18/2023. (Urizandi, Nissheneyra) (Entered: 08/18/2023) |
| 08/18/2023 | | TEXT ORDER denying Plaintiff's 23 Emergency Motion for Hearing and 24 Second Motion for Hearing. In light of the denial of Plaintiff's 17 Motion for Temporary Restraining Order and Preliminary Injunction, Plaintiff's requests for a hearing on that motion are DENIED as MOOT. So Ordered by District Judge William E. Smith on 8/18/2023. (Urizandi, Nissheneyra) (Entered: 08/18/2023) |
| 09/01/2023 | 25 | AMENDED COMPLAINT against All Defendants, filed by Mary Seguin.(Seguin, Mary) (Entered: 09/01/2023) |
| 09/05/2023 | 26 | NOTICE by Mary Seguin *Notice and Demand of Claims Against Defendants' Liability Insurance Policies and Coverage* (Seguin, Mary) (Entered: 09/05/2023) |
| 09/06/2023 | 27 | MOTION for an Extension of Time to File Answer re 25 Amended Complaint filed by Rhode Island Department of Human Services, Rhode Island Department of Human |

| | | Services Office Of Child Support Services. **Responses due by 9/20/2023.** (Pizana, Marissa) (Entered: 09/06/2023) |
|---|---|---|
| 09/08/2023 | 28 | RESPONSE In Opposition to 27 MOTION for an Extension of Time to File Answer re 25 Amended Complaint filed by Mary Seguin. **Replies due by 9/15/2023.** (Seguin, Mary) (Entered: 09/08/2023) |
| 09/19/2023 | | TEXT ORDER granting 27 Motion for an Extension of Time to File Answer. Rhode Island Department of Human Services' answer is due November 17, 2023; Rhode Island Department of Human Services Office of Child Support Services' answer is due November 17, 2023. So Ordered by District Judge William E. Smith on 9/19/2023. (Urizandi, Nissheneyra) (Entered: 09/19/2023) |
| 09/30/2023 | 29 | First MOTION for Recusal *Pursuant to 28 U.S.C. § 455* filed by Mary Seguin. **Responses due by 10/16/2023.** (Seguin, Mary) (Entered: 09/30/2023) |
| 10/02/2023 | | TEXT ORDER denying Plaintiff's 29 Motion for Recusal. Plaintiff "moves to recuse and/or disqualify" me and "all justices, judges, or magistrate judges... in the U.S. District Court of Rhode Island." A judge may be disqualified from a case if "(1) the judges impartiality may reasonably be questioned; or (2) the judge may have a personal bias or prejudice concerning a party." United States v. Kelley, 712 F.2d 884, 889 (1st Cir. 1983); see 28 U.S.C. § 455. Plaintiff argues that I and the other judges of this Court should disqualify ourselves because we did so sua sponte in her past lawsuits. Plaintiff does not identify any other facts to support her argument that I should recuse myself from this case. Plaintiffs argument is plainly insufficient to justify recusal and disqualification. See United States v. Houston, No. 3:13−10−DCR, 2013 WL 3975405, at *10 (E.D. Tenn. July 29, 2013) ("A judges recusal in a prior case does not alone require disqualification in a subsequent case."). Accordingly, Plaintiffs motion for Recusal is DENIED. So Ordered by District Judge William E. Smith on 10/2/2023. (Urizandi, Nissheneyra) (Entered: 10/02/2023) |
| 10/17/2023 | 30 | Summons Request filed by Mary Seguin. (Attachments: # 1 Summons Request, # 2 Summons Request)(Kenny, Meghan) (Entered: 10/17/2023) |
| 10/19/2023 | | TEXT ORDER dismissing the action under Younger abstention. Though not raised by the parties, the Court has the power and obligation to dismiss an action if the principles of abstention so require. See Guillemard−Ginorio v. Contreras−Gomez, 585 F.3d 508, 517−18 (1st Cir. 2009); see also Bellotti v. Baird, 428 U.S. 132, 14344 n.10 (1976) (recognizing that "abstention may be raised by the court sua sponte"). Plaintiff filed a 91−page Amended Complaint asking the Court to address the child support payments for which she alleges she is being wrongfully charged and her perceived grievance that she is being denied access to court records under the Rhode Island Access to Public Records Act ("APRA"). See generally Am. Compl., ECF No. 25 . Plaintiff seeks to impede both the child support proceedings before the Rhode Island Family Court ("Family Court") and her action before the Rhode Island Superior Court ("Superior Court") concerning her alleged denial of access to court records. The telltale signs that Plaintiff is attempting to encumber state court proceedings are the facts that Plaintiff, in her Amended Complaint, included as parties, among others, the Superior Court, various state court clerks, and the Chief Justice of the Rhode Island Supreme Court; Plaintiff filed a Motion for Temporary Restraining Order and Preliminary Injunction seeking to "enjoin[] and restrain[] the Defendants from continuing prosecution of the family court proceeding against the Plaintiff," Mot. for TRO and Prelim. Inj. 16, ECF No. 17 ; and Plaintiff asked the Court, in her Amended Complaint, to "[e]njoin the Defendants'[] enforcement and practices of rules, practices, and/or policies" of the state courts, Am. |

Compl. 90. The issues being considered before the Family Court directly relate to this case because, according to the Amended Complaint, Defendant Rhode Island Department of Human Services ("RIDHS") is seeking child support arrearage interest from Plaintiff. See Am. Compl.&para&para 135−37 (recognizing that RIDHS is seeking compound interest). Moreover, Plaintiff admits that she has a pending case before the Superior Court where she alleges violations of the APRA. See Am. Compl. &para 2; see also Seguin v. R.I. Dept of Human Servs., PC−2022−07215 (R.I. Super. Ct.). The Court takes judicial notice of the proceedings before both state tribunals. See Meyersiek v. Seguin, K−2001−0521M (R.I. Fam. Ct.); see also Fed. R. Evid. 201 (permitting, "at any stage of the proceeding," sua sponte judicial notice of facts "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). The Younger abstention doctrine, derived from Younger v. Harris, 401 U.S. 37 (1971), "counsels federal−court abstention when there is a pending state proceeding." Moore v. Sims, 442 U.S. 415, 423 (1979). For the doctrine to apply, certain elements must be met. "First, the pending state [court] proceeding must fall into one of three categories: 1) criminal prosecutions, 2) civil proceedings that are 'akin to criminal prosecutions' ('quasi−criminal proceedings') or 3) civil proceedings that 'implicate a State's interest in enforcing the orders and judgments of its courts.'" Credit Acceptance Corp. v. Healey, 544 F. Supp. 3d 139, 143 (D. Mass. 2021) (quoting Sirva Relocation, LLC v. Richie, 794 F.3d 185, 192 (1st Cir. 2015)). Here, relief for Plaintiff in the pending Family Court case would implicate the state's interest in enforcing the orders and judgments of its courts concerning the payment and collection of child support. See Seguin v. Bedrosian, No. 12−cv−614−JD, 2013 WL 367722, at *2 (D.R.I. Jan. 30, 2013). Moreover, the state has an asserted interest in having appeals under the APRA be heard before the Superior Court. See R.I. Gen. Laws § 38−2−9. Second, the state court case must satisfy the factors identified in Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423 (1982): "1) the state proceeding is ongoing, 2) it involves significant state interests and 3) it provides an adequate opportunity for the plaintiff to raise his federal claims in state court." Credit Acceptance Corp., 544 F. Supp. 3d at 143; see also Middlesex, 457 U.S. at 432. The first factor is satisfied because the proceedings are ongoing. The second factor is satisfied because the state has an interest in family relations and the payment and collection of child support, see Eastman v. New Hampshire, No. 11−cv−316−SM, 2012 WL 405487, at *3 (D.N.H. Jan. 17, 2012), report and recommendation adopted, No. 11−cv−316−SM, 2012 WL 405507 (D.N.H. Feb. 8, 2012), and an interest in the "fair and orderly administration of justice" that includes maintaining sensitive and confidential judicial records, see Courthouse News Serv. v. Quinlan, 32 F.4th 15, 21 (1st Cir. 2022). As for the third factor, "[e]xcept in the most extraordinary cases, a federal court must presume that state courts, consistent with the imperatives of the Supremacy Clause, see U.S. Const. art. VI, are fully competent to adjudicate federal constitutional and statutory claims properly presented by the parties." Casa Marie, Inc. v. Super. Ct. of P.R., 988 F.2d 252, 262 (1st Cir. 1993) (footnote omitted). Nothing suggests that the Family Court and the Superior Court cannot hear Plaintiff's federal claims. Third, none of the Younger abstention exceptions apply. See Sirva, 794 F.3d at 192 (finding abstention inappropriate if 1) the state proceeding is brought "in bad faith" to harass, 2) the state forum cannot adequately protect federal rights, or 3) the state statute is "flagrantly and patently violative of express constitutional prohibitions" (citations omitted)). Accordingly, because the Court does not have jurisdiction over Plaintiff's case, it is DISMISSED in its entirety. Because Plaintiff has a history of filing frivolous and repetitive motions following decisions of the Court of which she disapproves, see Seguin v. R.I. Office of Child Support Servs., No. 1:23−cv−00034−WES−PAS

| | | |
|---|---|---|
| | | (D.R.I.), it is further ORDERED that the Courts March 30, 2023, Text Order granting Plaintiff Leave to Proceed as a Pro Se Electronic Filer is VACATED. Plaintiff's Electronic Filer privileges are revoked. <u>See</u> LR Gen 302(b). So Ordered by District Judge William E. Smith on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 10/19/2023 | <u>31</u> | JUDGMENT. So Ordered by Clerk of Court on 10/19/2023. (Simoncelli, Michael) (Entered: 10/19/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's two recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) Modified on 11/17/2023 to correct a typo. (Urizandi, Nissheneyra). (Entered: 11/17/2023) |
| 11/17/2023 | | TEXT ORDER: The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra) (Entered: 11/17/2023) |
| 11/17/2023 | <u>32</u> | NOTICE OF APPEAL by Mary Seguin as to Text Order, Text Order, <br><br>**NOTICE TO COUNSEL: Counsel should register for a First Circuit CM/ECF Appellate Filer Account at <u>http://pacer.psc.uscourts.gov/cmecf/</u>. Counsel should also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at <u>http://www.ca1.uscourts.gov/cmecf</u>** Appeal Record due by 11/24/2023. (Attachments: # <u>1</u> Envelope)(Kenny, Meghan) (Entered: 11/17/2023) |

# Form 1A

## Notice of Appeal to a Court of Appeals From a Judgment of a District Court

United States District Court for the
District of Rhode Island
Docket Number 1:23-cv-126-WES-PAS

| | |
|---|---|
| MARY SEGUIN, Plaintiff<br><br>v.<br><br>RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official | **Notice of Appeal** |

capacity; RHODE ISLAND
SUPERIOR COURT JUDICIAL
COUNCIL in its official capacity;
THE JUDICIAL TECHNOLOGY
CENTER in its official capacity;
JULIE HAMIL, MARISA BROWN,
JOHN JOSEPH BAXTER, JR.,
JUSTIN CORREA in their
individual and official capacities;
RHODE ISLAND OFFICE OF THE
ATTORNEY GENERAL in its
official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY
GENERAL OPEN GOVERNMENT
UNIT in its official capacity; ADAM
D. ROACH, PETER NERONHA in
their official and individual
capacities; TYLER
TECHNOLOGIES, INC.; GERO
MEYERSIEK, Defendants

MARY SEGUIN (name all parties taking the appeal)* appeals to the United States Court of Appeals for the FIRST Circuit from the final judgment entered on October 19, 2023 (state the date the judgment was entered).

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX 77019

Dated: November 17, 2023

---

* See Rule 3(c) for permissible ways of identifying appellants.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                      Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

    *Defendants*

### **PLAINTIFF'S DOCKETING STATEMENT TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT AND THE UNITED STATES DISTRICT COURT OF THE DISTRICT OF RHODE ISLAND**

1. Plaintiff, proceeding pro se from and as a citizen of Texas, respectfully states to the U.S. Court of Appeals for the First Circuit and the United States District Court of the District of Rhode Island that this case is related to the pending appellate case, *Mary Seguin v. Rhode Island Office of Child Support Services, et al*, Case Number 23-1851.

2. Plaintiff respectfully requests the U.S. Court of Appeals for the First Circuit to review Plaintiff's timely filed Rule 59 Motion and Rule 60 Motion that were filed in the U.S. District Court of the District of Rhode Island on November 16, 2023 as proper part of the record of appeal.  Prior to filing this Notice of Appeal, Plaintiff also filed a Rule 60(b)(1) Motion regarding the District Court's interference with Plaintiff's right to file Rule 59 and Rule 60 post judgement in which Plaintiff sought to preserve issues for appeal on the record.  Plaintiff attaches all relevant documentation, including all relevant emails to the Clerk of the Court of the District Court and Plaintiff's properly filed post judgment motions pursuant to Rule 59 and Rule 60 herein to this Notice of Appeal and Docket Statement.

3. Plaintiff's Rule 59 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

4. Plaintiff's first Rule 60 Motion was filed on November 16, 2023, which the District Court of Rhode Island refused to docket on the record, pursuant to instructions by Judge Smith.

5. Plaintiff attaches the aforesaid post judgment Motions and requests appellate review under these extraordinary and troubling factual circumstances that violate and obstruct the fundamental First Amendment right of access to the Court of Record, due process and obstruction to justice in the First Circuit, and *inter alia*, interference with the accuracy of the court's record for appeal in this matter.


**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 16, 2023, I filed the within Motion with the

Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX 77019

Dated: November 17, 2023



## URGENT - TIME SENSITIVE - FILE TODAY RULE 60(b)(1) MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS

**Mary Seguin** <maryseguin22022@gmail.com>
Draft

Fri, Nov 17, 2023 at 1:38 PM

Dear Clerks of the Court,

I spoke with Clerk Meghan today regarding an update on the docketing of my motions.

Following our discussion, I respectfully request the Clerk of the Court to docket today my attached Rule 60(b)(1) Motion, dated November 17, 2023, that is time-sensitive.

Please make sure that my attached Rule 60(b)(1) Motion is docketed as ECF 32.

Please make sure that the law is followed that my attached Rule 60(b)(1) Motion is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Rule 60(b)(1) Motion. No Chamber interference should be taking place to prevent the docketing of my attached Rule 60(b)(1) Motion.

Thank you for your assistance.

Respectfully Submitted,
Mary Seguin
Houston, Texas

---------- Forwarded message ----------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Fri, Nov 17, 2023 at 12:33 PM
Subject: Fwd: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>


Dear Clerks of the Court,

I am respectfully following up on my Rule 59 Motion filing.

Yesterday, November 16, 2023, at 1:31 PM Central Time, I filed via email below, my Rule 59 Motion in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS. As indicated in my email below, I emphasized that docketing the Rule 59 Motion on November 16, 2023 is urgent, to comply with the 28 day filing post-judgment deadline, which my filing meets - November 16, 2023 is within the 28 day deadline of Fed. R. of Civ. P. 59 that tolls the time for filing an appeal.

I followed up with telephone calls to the Clerk's Office at 1:32 PM Central Time, and at 3:42 PM Central Time to request timely docket of my Rule 59 Motion, and the Clerk's Office assured me each time that a deputy clerk is working on it and that it will be docketed on the day it was received and that the docket will reflect the email date stamp of the day the Rule 59 Motion is received by email. Further, I was told that **all filings** I email to the Clerk's Office will be docketed and considered by the Court as having been filed on the day that the motion was emailed to the Clerk's Office.

Therefore, my Rule 59 Motion emailed on November 16, 2023 should be accordingly docketed as **ECF 32** with the **entry of/stating filing on November 16, 2023**, in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

However, as of this time, on November 17, 2023 almost 24 hours later, my Rule 59 Motion is still not docketed.

I would like to respectfully clarify that the Text Order dated October 19, 2023 in this matter states that only my electronic filing privilege was revoked, but there is **no** order requiring that I need to file for leave of Court to file any post-judgment motions, such as my Rule 59 Motion.

Today, November 17, 2023, I telephoned the Clerk's Office first thing at 8:00 AM Central Time, and spoke with Clerk Meghan, who informed me that yesterday she had forwarded my Rule 59 Motion to Chambers upon receipt, but has yet to hear back from Chambers, but did not know what was causing the hold up when I asked why Chambers' response is taking almost 24 hours which impacts the docketing date of the Rule 59 Motion. I expressed my concern of the Rule 59 deadline, emphasizing that it tolls the time for filing an appeal, therefore I respectfully requested that the docket accurately reflects my timely filing of my Rule 59 Motion on November 16, 2023 (at 1:31 PM Central Time).

Additionally, I informed Clerk Meghan that I relied on the Clerk's Office's information provided above, and I had also filed a timely **Rule 60** Motion yesterday, **November 16, 2023**, at **4:39 PM Central Time**, similarly requesting docketing to reflect it was timely filed via email to on November 16, 2023. I emphasized to Clerk Meghan that timeliness is critical, as Rule 60 Motion filed within 28 days post-judgment tolls the time for filing an appeal. Clerk Meghan told me that my Rule 60 Motion was forwarded to Chambers as well. According to the Clerk's Office's information, my **Rule 60 Motion** needs to be docketed/filed as **ECF 33**, dated stamped filed on **November 16, 2023**.

Due to the above information regarding the processing of my post-judgment motions, I expressed to Clerk Megghan my concern regarding the Court's procedure of forwarding my time-sensitive post-judgment motions to Chambers without docketing/filing, and then those time-sensitive motions seemingly to languish in Chambers past the date of the 28-day deadline stipulated by Rule 59, and Rule 60 as they relate to tolling the time for filing an appeal. I expressed my explicit concern that I seek to preserve my right of appeal, and that I respectfully seek to preserve on the record the issues contained in my Rule 59 and Rule 60 Motions that are currently before Chambers, without docketing, by law within the jurisdiction of the U.S. District Court of Rhode Island. My Rule 59 and Rule 60 Motions are not ex-parte or emergency motions.

Moreover, I expressed to Clerk Meghan my concern that the processing of my post-judgment motions forwarded to Chambers and seemingly pending before Chambers without the motions being docketed, impacts my right of appeal 30-days post judgment, and today, today, Friday, is Day 29. I told the Clerk that under the circumstances in this matter, I seek to preserve for appeal the issues raised in my timely filed Rule 59 Motion and Rule 60 Motion, and that I seek to preserve my right to appeal within the 30-day postjudgment period.

I also discussed with the Clerk that my timely filed but undocketed Rule 59 Motion and Rule 60 Motion that were forwarded to and currently before Chambers cause an uncertain effect, impacting the date of my filing of Notice of Appeal, the deadline of which is November 18, 2023, a Saturday. Based on the current facts and issues regarding simply docketing my filings on the record, I am concerned my rights of access to the Courts are impacted, and that my Notice of Appeal may also languish I do not believe any pro se litigant should be made to be uncertain of the timeliness of filing a Notice of Appeal as a matter of right that is caused by inaction by Chambers on timely-filed Rule 59 and Rule 60 Motions that toll the time to file an appeal. I explicitly expressed my concern on the effect on my access to the Courts.

I respectfully request that this email communication regarding the filing/docketing of my Rule 59 Motion be docketed to accurately reflect the record on appeal along with the Rule 59 Motion at the time the Rule 59 Motion is docketed by the Clerk.

Thank you in advance for you assistance.

Respectfully submitted,
Mary Seguin

--------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Thu, Nov 16, 2023 at 1:31 PM
Subject: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk of the Court,

Kindly urgently file today, November 16, 2023, my attached Rule 59 Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 59 Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023.  I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX  77019
(281) 244-2016

_____

**CA 126 Rule 60(b)(1) Motion with Attachments FINAL 111723.pdf**
679K

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                    Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

*Defendants*

## PLAINTIFF'S RULE 60(b)(1) MOTION

1. Plaintiff, proceeding from and as a citizen of Texas, respectfully requests pursuant to

Fed. R. Civ. P. Rule 60(b)(1), (3), (4) and (6) for a new trial.  Judge Smith had obstructed

Plaintiff access to the Court, by instructing the Clerk of the Court, Meghan, to not docket

Plaintiff's timely filed Rule 59 and Rule 60 Motions filed with the Clerk via email on November

16, 2023, as to obstruct Plaintiff's right to access the Court to preserve the issues for appeal.

Plaintiff avers the following, supported by affidavit attached:

Page 1 of 4

(1) On November 16, 2023, at 1:31 PM Central Time, Plaintiff filed via email to the Office of the Clerk In-Take email, Plaintiff's timely-filed Rule 59 Motion, requesting a new trial as Rule 59(e) provides. Plaintiff requested in her email that the Clerk timely docket the time-sensitive Rule 59 Motion on November 16, 2023. Plaintiff telephoned the Clerk's Office twice on November 16, 2023 to make sure of the Clerk's receipt of Plaintiff's filings, and was confirmed, and told that all motions emailed to the Clerk's Office are docketed as filed on the date stamp receipt by the Court's Clerk's Office. <u>See attached email and email-attached Motion</u>.

(2) On November 16, 2023, at 4:39 PM Central Time, Plaintiff filed via email to the Office of the Clerk In-Take email, Plaintiff's timely-filed Rule 60(b) Motion, requesting a new trial. Plaintiff requested in her email that the Clerk timely docket the time-sensitive Rule 60 Motion on November 16, 2023. <u>See attached email and email-attached Motion</u>.

(3) However, neither motions were docketed by the Clerk of the Court, and Plaintiff followed up first thing on November 17, 2023 at 8:00 AM Central Time. Plaintiff spoke to Clerk Meghan who informed Plaintiff that she had forwarded Plaintiff's Rule 59 and Rule 60 Motion to Chambers because the Court told her to, without docketing Plaintiff's Motions. Clerk Meghan told Plaintiff she will email Chambers to "find out what is going on." No Order in this matter requires Plaintiff to file for leave of Court to file any post judgement motions, and even if leave is required, Plaintiff's court-submitted Rule 59 and Rule 60 Motions seeking to preserve issues for appeal are required by law to be docketed in all courts of law to complete an accurate record for appeal.

(4) Plaintiff expressed to Clerk Meghan Plaintiff's concern that the irregular forwarding of timely filed Rule 59 Motion and Rule 60 Motion languishing in Chambers without being docketed on the record adversely impede and obstruct Plaintiff's right of access to the Court, as

well as obstructs Plaintiff's right to preserve legal issues for appeal, and fabricating an inaccurate record for appeal, as well as violates due process.

(5) At 12:20 PM, Plaintiff followed up by telephone, and was told that there were no updates from Chambers and Plaintiff's Rule 59 and Rule 60 Motions are still not docketed. Plaintiff emailed the Clerk's office documenting in writing the irregularity described above. At the very same moment, Judge Smith entered a text order stating that the Court is in receipt of two emails sent by the Plaintiff and construes them as motion for leave to file, that are denied. Plaintiff's Rule 59 and Rule 60 Motions continue to be not docketed. Plaintiff phoned the Office of the Clerk again, and the Clerk informed Plaintiff that the Court is telling her not to docket Plaintiff's Rule 59 and Rule 60 motions. This is *prima facie* judicial obstruction of Plaintiff's right to file Rule 59 and Rule 60 Motions against the Plaintiff to preserve issues on the record for appeal. Plaintiff attaches herewith the aforesaid November 17, 2023 email for the record.

WHEREFORE, Plaintiff requests the Court to docket Plaintiff's timely filed Rule 59 and Rule 60 Motions and the aforesaid three emails to preserve the record accurately. Plaintiff requests the Court treat Plaintiff's timely filed Rule 59 Motion and Rule 60 Motion filed on November 16, 2023 as timely filed. Plaintiff requests the disqualification of Judge Smith by the Court. Plaintiff requests any and all such relief deemed just under the circumstances.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 17, 2023, I filed the within Motion with the Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 17, 2023



Mary Seguin <maryseguin22022@gmail.com>

---

## URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS

2 messages

---

**Mary Seguin** <maryseguin22022@gmail.com>                          Thu, Nov 16, 2023 at 1:31 PM
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk of the Court,

Kindly urgently file today, November 16, 2023, my attached Rule 59 Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 59 Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023. I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX 77019
(281) 244-2016

---

 **CA 126 Plaintiff Rule 59 Motion with Affidavit 111623.pdf**
387K

---

**Mary Seguin** <maryseguin22022@gmail.com>                          Fri, Nov 17, 2023 at 12:33 PM
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerks of the Court,

I am respectfully following up on my Rule 59 Motion filing.

Yesterday, November 16, 2023, at 1:31 PM Central Time, I filed via email below, my Rule 59 Motion in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS. As indicated in my email below, I emphasized that docketing the Rule 59 Motion on November 16, 2023 is urgent, to comply with the 28 day filing post-judgment deadline, which my filing meets - November 16, 2023 is within the 28 day deadline of Fed. R. of Civ. P. 59 that tolls the time for filing an appeal.

I followed up with telephone calls to the Clerk's Office at 1:32 PM Central Time, and at 3:42 PM Central Time to request timely docket of my Rule 59 Motion, and the Clerk's Office assured me each time that a deputy clerk is working on it and that it will be docketed on the day it was received and that the docket will reflect the email date stamp of the day the Rule 59 Motion is received by email. Further, I was told that **all filings** I email to the Clerk's Office will be docketed and considered by the Court as having been filed on the day that the motion was emailed to the Clerk's Office.

Therefore, my Rule 59 Motion emailed on November 16, 2023 should be accordingly docketed as **ECF 32** with the **entry of/stating filing on November 16, 2023**, in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

However, as of this time, on November 17, 2023 almost 24 hours later, my Rule 59 Motion is still not docketed.

I would like to respectfully clarify that the Text Order dated October 19, 2023 in this matter states that only my electronic filing privilege was revoked, but there is **no** order requiring that I need to file for leave of Court to file any post-judgment motions, such as my Rule 59 Motion.

Today, November 17, 2023, I telephoned the Clerk's Office first thing at 8:00 AM Central Time, and spoke with Clerk Meghan, who informed me that yesterday she had forwarded my Rule 59 Motion to Chambers upon receipt, but has yet to hear back from Chambers, but did not know what was causing the hold up when I asked why Chambers' response is taking almost 24 hours which impacts the docketing date of the Rule 59 Motion.  I expressed my concern of the Rule 59 deadline, emphasizing that it tolls the time for filing an appeal, therefore I respectfully requested that the docket accurately reflects my timely filing of my Rule 59 Motion on November 16, 2023 (at 1:31 PM Central Time).

Additionally, I informed Clerk Meghan that I relied on the Clerk's Office's information provided above, and I had also filed a timely **Rule 60** Motion yesterday, **November 16, 2023**, at **4:39 PM Central Time**, similarly requesting docketing to reflect it was timely filed via email to on November 16, 2023.  I emphasized to Clerk Meghan that timeliness is critical, as Rule 60 Motion filed within 28 days post-judgment tolls the time for filing an appeal.  Clerk Meghan told me that my Rule 60 Motion was forwarded to Chambers as well.  According to the Clerk's Office's information, my **Rule 60 Motion** needs to be docketed/filed as **ECF 33, dated stamped filed on November 16, 2023**.

Due to the above information regarding the processing of my post-judgment motions, I expressed to Clerk Megghan my concern regarding the Court's procedure of forwarding my time-sensitive post-judgment motions to Chambers without docketing/filing, and then those time-sensitive motions seemingly to languish in Chambers past the date of the 28-day deadline stipulated by Rule 59, and Rule 60 as they relate to tolling the time for filing an appeal.  I expressed my explicit concern that I seek to preserve my right of appeal, and that I respectfully seek to preserve on the record the issues contained in my Rule 59 and Rule 60 Motions that are currently before Chambers, without docketing, by law within the jurisdiction of the U.S. District Court of Rhode Island.  My Rule 59 and Rule 60 Motions are not ex-parte or emergency motions.

Moreover, I expressed to Clerk Meghan my concern that the processing of my post-judgment motions forwarded to Chambers and seemingly pending before Chambers without the motions being docketed, impacts my right of appeal 30-days post judgment, and today, Friday, is Day 29.  I told the Clerk that under the circumstances in this matter, I seek to preserve for appeal the issues raised in my timely filed Rule 59 Motion and Rule 60 Motion, and that I seek to preserve my right to appeal within the 30-day postjudgment period.

I also discussed with the Clerk that my timely filed but undocketed Rule 59 Motion and Rule 60 Motion that were forwarded to and currently before Chambers cause an uncertain effect, impacting the date of my filing of Notice of Appeal, the deadline of which is November 18, 2023, a Saturday.   Based on the current facts and issues regarding simply docketing my filings on the record, I am concerned my rights of access to the Courts are impacted, and that my Notice of Appeal may also languish I do not believe any pro se litigant should be made to be uncertain of the timeliness of filing a Notice of Appeal as a matter of right that is caused by inaction by Chambers on timely-filed Rule 59 and Rule 60 Motions that toll the time to file an appeal.  I explicitly expressed my concern on the effect on my access to the Courts.

I respectfully request that this email communication regarding the filing/docketing of my Rule 59 Motion be docketed to accurately reflect the record on appeal along with the Rule 59 Motion at the time the Rule 59 Motion is docketed by the Clerk.

Thank you in advance for you assistance.


Respectfully submitted,
Mary Seguin
[Quoted text hidden]

---

&#128196; **CA 126 Plaintiff Rule 59 Motion with Affidavit 111623.pdf**
387K



Mary Seguin <maryseguin22022@gmail.com>

---

## URGENT - TIME SENSITIVE - FILE TODAY RULE 60 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS

1 message

---

**Mary Seguin** <maryseguin22022@gmail.com>                    Thu, Nov 16, 2023 at 4:39 PM
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk/Deputy Clerk of the Court,

Kindly urgently file and docket today, November 16, 2023, my attached Rule 60(b) Motion in the above captioned case, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 60(b) Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023.  I do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX  77019
(281) 244-2016

---



**CA 126 Rule 60(b) Motion with Affidavit 111623.pdf**
379K

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                          Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

   *Defendants*

**<u>PLAINTIFF'S RULE 59 MOTION FOR A NEW TRIAL</u>**

1. Plaintiff, proceeding from and as a citizen of Texas, respectfully requests pursuant to

Fed. R. Civ. P. Rule 59 for a new trial.  Plaintiff avers the following, supported by affidavit

attached: The 91-page First Amended Complaint [ECF 25] filed on September 1, 2023 seeks

monetary damages against the Rhode Island State Defendants and the private actor Defendants

for:

(1) The Rhode Island Judiciary and Tyler Technologies' monopoly of publication of law.

(2) The Rhode Island Judiciary and Tyler Technologies' denial to the Public and to all Pro Se Litigants all access and the denial of free access to the contents of the law created, authored, and deliberated by the Rhode Island Judiciary.

(3) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to knowingly fail to properly integrate the legacy electronic court case management systems used by Rhode Island Department of Human Services and Office of Child Support Services during the implementation of Odyssey from 2013 to 2014 (the State's official electronic court filing and electronic case management system), so that these state agencies' filings are discriminately invisible only to the Public, to Pro Se Litigants and to the Rhode Island Virtual Clerk of the Courts in the Rhode Island Family Court, a limited jurisdiction court of record. The State's filings are only visible to the judges and to the State filers, thus manipulating the proceeding towards a foregone conclusion in favor of the State filers.

(4) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to misrepresent to the Public and to the Pro Se Litigants that the implemented electronic court case records of judge created laws are available to *all* court users, in order to cover up their monopolization of the publication of law denies the Public and the Pro Se Litigant access to the judge-created laws.

(5) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services that the State routinely establishes and enforces 12% compound interest on child and spousal support in Title IV of the Social Security Act state family court proceedings, in violation of the uniform statutory requirement of 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and

*if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest, targeting noncustodial parents victims. In welfare cases, support are assigned by the custodial parent to the State, and the 12% compound interest represents a fee for the State's "services" in the support's establishment and enforcement paid to the State, which at 12% compound interest represents lucrative, illegally obtained revenue to the State actors, who are financially incentivized to obtain as much as possible.

(6) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services and Tyler Technologies to knowingly fail to properly integrate Odyssey with the State's legacy electronic court filing system resulting in the State's filings seeking illegal 12% compound interest, as well as to deny the Public and to Pro Se Litigants' access to their publication of judge-created law records for the purpose of cover up of this wholesale illegal defraud of the court, extortionary defraud under color of state law targeting the unsuspecting noncustodial parents victims, and defraud of the United States (66% of the cost of these child support "operations" is funded by the U.S. Department of Health and Human Services through Title IV of the Social Security Act through funds appropriated by Congress through the annual budget appropriations.)

(7) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Tyler Technologies to operate the Title IV Program of the Social Security Act in all manners violative of due process, in prima facie due process violative State Electronic Courts, for the purpose of generating state revenue through fraud and deceit, through conspired tortious interference of rights of access to the courts, rights of

access to state case documents, and rights of access to judge-created laws targeting

litigants, targeting the Public and targeting Pro Se Litigants.

(8) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of

Human Services and Tyler Technologies to cover up their public-access-denied

publication of state judge-created laws of illegal 12% compound interest benefiting the

state's revenue by adopting a State policy not to establish nor enforce any interest in

*interstate* support cases only, calculated to cover up the collective fraud from federal

enforcement officials and other states' enforcement officials of court orders (laws)

showing 12% compounded interest established and funded under Title IV that are facially

illegally violative of 42 U.S.C. § 654(21)(A) which explicitly provides States *may* opt to

charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12%

compound interest.  The federal Title IV Program regulation by Congressional intent

explicitly preempts any related state laws of all participating states.

(9) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of

Human Services and Office of Child Support Services and Barbara Grady and Gero

Meyersiek to use the fraudulent, First Amendment-, Fourth Amendment-, Fifth

Amendment-, Seventh Amendment-, and Fourteenth Amendment violative state court

machinery weaponizing Title IV Program of the Social Security Act to target the Plaintiff

*pro se* noncustodial parent in Texas to retaliate against Plaintiff for her past lawsuits

against them, namely ten years ago in <u>Seguin v. Chafee et al</u>., Civil No. 12-cv-708-JD

(D.R.I. 2013), <u>Seguin v. Bedrosian et al,</u> Civil No. 12-cv-614-JD (D.R.I. 2013), and

<u>Seguin v. Suttell et al,</u> Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued

them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state

court's under color of state law abuse of the legal frame work of another federal-funded

human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*,

through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00

per visitation if Plaintiff wanted to see her children in Rhode Island, because the state

court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent

any other legally sufficient basis. Plaintiff had reported this *prima facie* extortion under

color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal

law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S.

Department of Justice in Texas. Here, Plaintiff's ==retaliation== damages claims have been

issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge

Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455,

additionally given the fact Judge Smith had also self-recused from Seguin v. Chafee et

al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-

614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I.

2013) ten years ago. *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998)

("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no

party has requested it").

(10) The Rhode Island Judiciary continues the pattern of cover up by denying Plaintiff's

request for public judicial records related to the monopoly of publication of judge-created

records submitted to the State Judiciary pursuant to the Rhode Island Access to Public

Records Act ("RI APRA").

4. Plaintiff obtained new evidence on October 6, 2023 that the Rhode Island Judiciary is a

former client of Judge Smith, and on November 9, 2023, Plaintiff obtained new evidence that the

Rhode Island Judiciary remains a major client of Judge Smith's former law firm. Plaintiff's due diligence search for conflict of interest has been impeded by the Rhode Island Judiciary and Tyler Technologies monopoly of publication of judge-created laws in the state's electronic court system and their denial of access to the judge-created laws, and Plaintiff, as a member of the Public and proceeding pro se without a Rhode Island Attorney license, the issuance of which is also monopolized by the Rhode Island Judiciary, has further been denied access to official records, including through the Rhode Island Access to Public Records Act, consistent with a pattern of civil conspiracy cover up.

5. A new trial or a stay of the Judgment is necessary to prevent irreparable harm to Plaintiff, and to Americans across the First Circuit who would be needlessly deprived of access to the federal courts of law in the First Circuit for monetary damages redress - the judicially created doctrine of Younger Abstention that functioned as a court of equity - regarding Plaintiff's monetary damages claims against the Rhode Island Judiciary and Tyler Technologies' scheme to monopolize the publication of judge-created laws that denies, tortiously interferes, tortiously abridges and tortiously obstruct the Public access to those very laws; regarding Defendant Rhode Island Office of Child Support Services' unlawful seizures of interstate Texas properties outside of Rhode Island under color of Rhode Island state law based on legally insufficient interest charge on overdue support based on the unlawful rate of 12% compound interest that is disallowed under Title IV-D Program of the Social Security Act, specifically 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest. And this is on top of Defendants' breach of contract that was brokered by Defendant Rhode Island Office of Child Support Services on behalf of the agency's client; the contract between the custodial parent client, defendant Gero

Meyersiek and the Texas Plaintiff stipulated that the custodial parent waived interest upon the

Texas Plaintiff paying a lump sum of $104,185.98 pay-off amount, which Plaintiff performed

from Texas on December 7, 2021.  Even at the point of contractual agreement, Defendant Rhode

Island Office of Child Support Services in conjunction with Defendant Gero Meyersiek,

misrepresented there was lawful and enforceable interest to be waived, as they removed the

accrued interest from the Title IV-D Program mandated support record system in order to cover

up from the Plaintiff, and from federal and Texas authorities the unlawful 12% compound rate.

After fraudulently inducing Plaintiff in Texas to agree to and to perform on the contract, the

Defendants immediately put the interest back into the Title IV-D Program-mandated automated

support record system and started to seize Plaintiff's properties in Texas under color of Rhode

Island state law.

6. The final judgment is on its face violative of binding First Circuit caselaw that

mandates lower courts to *stay* monetary damages claims when applying Younger Abstention.

*See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997) (relying on *Quackenbush v. Allstate*

*Ins. Co.,* 517 U.S. 706 (1996) in holding that abstention does not allow for dismissal of damages

claim).

7. 42 U.S.C. § 654(21)(A) has been in effect since the enactment of the Title IV-D

Program of the Social Security Act several decades ago, and Congress's original intent was to

combat poverty within the populace of single mothers and children in welfare cases; Congress at

no time intended to shift the undue burden of Rhode Island's 12% compound interest on overdue

support under color of Rhode Island state law to noncustodial parents, whether targeting Texas

or across the country, which in welfare cases Rhode Island converts the 12% compound interest

to assigned debts owed by noncustodial parents to Rhode Island's state agencies and state

government, representing underhanded unlawful state revenue unlawfully obtained through the

legal framework of Title IV-D Program of the Social Security Act, targeting unsuspecting

noncustodial parents victims.  As a legal point of a state's lawful application of 42 U.S.C. §

654(21)(A) within the First Circuit, New Hampshire, in compliance with the letter of federal law,

opts into Title IV-D Program and opts not to charge any interest whatsoever, as per the letter of

law and the original intent of Congress, 42 U.S.C. § 654(21)(A).  Similarly, Texas charges 6% in

compliance with 42 U.S.C. § 654(21)(A).

8. Defendant Rhode Island Office of Child Support Service's illegal denial and

obstruction of access to Plaintiff's own child support case file that contains the incriminating

illegal and arguably criminal scheme of removing the interest rate from the Title IV-D Program

mandated and federally funded support record system to cover up the unlawful 12% compound

interest from federal and Texas authorities, as well as from the Plaintiff in Texas, violates due

process, obstructs justice, obstructs a federally funded and federal program proceeding, and the

legal framework of Title IV-D of the Social Security Act, specifically, 42 U.S.C. § 654 and 42

U.S.C. § 666.

9. Judge Smith's dismissal of Texas Plaintiff's legal remedy monetary damages and

breach of contract fraudulent inducement damages claims under Younger Abstention in this

Court of law represents irreparable harm violative of the First Amendment, Fourth Amendment,

Fifth Amendment, the Fourteenth Amendment, the Seventh Amendment and the First

Amendment access to the Court.  The undisputable fact remains, Plaintiff's legal remedy request

for monetary damages in this court of law consisting of twenty-two causes of action that cannot

be dismissed under Younger Abstention, namely monetary damages claims of breach of contract

fraudulent inducement, breach of implied contract, unjust enrichment, misrepresentation,

negligent misrepresentation, intentional/fraudulent misrepresentation, common law bad faith, breach of the covenant of good faith and fair dealings, tortious breach of the covenant of good faith and fair dealings, breach of fraudulent concealment/common law fraud, concealed fraud, tort of deceit, reckless indifference to the rights of Plaintiff, deliberate indifference to the rights of Plaintiff, abuse of process, breach of duty, accounting fraud, fraud cover up, RI Government Tort Liability (R.I. Gen. Laws 9-31-1, *et seq.*), 42 U.S.C. § 1983 Claim for Reckless Indifference of Plaintiff's Clearly Established Constitutional Rights, 42 U.S.C. § 1983 claim of Fourth Amendment Illegal Seizure of Plaintiff's Texas Property, state tort of liability against defendants under 42 U.S.C. § 1983, Civil RICO [ECF 25].

10. Judge Smith's legally-unsupported and factually-unsupported, and "legally insufficient" opinion that the limited jurisdiction family court is an adequate forum to raise Plaintiff's federal legal damages claims of breach of contract et al., contravenes Rhode Island law: R.I. Gen Laws 8-10-3 makes clear that family court is not a court of general jurisdiction, can only conduct bench trials functioning as a court of equity, not of law, and prohibits family court from exercising jurisdiction over breach of contract claims et al between the Texas Plaintiff and the Defendants; family court lacks jurisdiction over the Plaintiff's federal causes of actions; lacks the jurisdiction to summon a jury for jury trial in a court of law.

11. Finally, but equally critically, twenty-one days post judgment Plaintiff discovered troubling new evidence on November 9, 2023, that Judge Smith appears to have impermissibly acted in favor of the interests of the defendants – he is automatically disqualified under 28 U.S.C. § 455, because as a partner in his past practice and firm, the state government and the Rhode Island Judiciary were not only his clients, but continue to be that firm's major client under a flat fee contract and he has knowledge of the defendants' actions in this action – as a major

partner in his firm, the Rhode Island Judiciary is his and his form's past and current clients, the

state government actors and the state courts actors, cooperate in the routine establishment and

enforcement of 12% compound interest under the legal framework of Title IV-D Program of the

Social Security Act, where 12% compound interest is disallowed under 42 U.S.C. § 654(21)(A).

To the objective observer, having knowledge of the facts and circumstances of this case, and

being a partner in his past firm that continues to have the Rhode Island Judiciary as a client,

Judge Smith appears biased in favor of the defendants' interest to continue raking in state

revenue under the auspices of 42 U.S.C. § 654(21))(A) that explicitly disallows state debts of

12% compound interest assigned to Rhode Island that the state actors who cover up the 12%

compound rate by obstructing the noncustodial parent's access to her own child support case file

that is further violative of the due process provisions under 42 U.S.C. § 654 and §666, in Rhode

Island's federally funded operation with funds appropriated by Congress intended for the *lawful*

operation of Title IV-D of the Social Security Act. Although under the judicial self-executing

expectation under 28 U.S.C. §455, the Texas Plaintiff is not expected to cull court records in the

Rhode Island state courts for judicial conflict of interest, nevertheless the Plaintiff in good faith

and diligently attempted to perform a remote search of Rhode Island's electronic court case

management system, Odyssey in 2023. In so doing, Plaintiff discovered troubling newly-

discovered evidence that the Rhode Island Judiciary, while publicly representing that the 2014 $6

million state transition from paper courts to electronic courts promises *all court users* will be

able to call up court documents remotely from their mobile devices, in reality Rhode Island

adopted rules only denying the public and pro se litigants remote access to court case

information, including pro-se litigants' own case records, that both the public and all litigants

had equal statutory, common law and constitutional rights of access in paper courts – Judge

Smith's firm's clients, the Rhode Island Judiciary, therefore implemented electronic court public access denials that obstructed Plaintiff's and the public's discovery of Judge Smith's judicial disqualification regarding his former clients such as the state courts, the defendant state actors and other conflict entities.

## I. LEGAL STANDARD

11. The United States Supreme Court in 2020 reaffirmed, in *GEORGIA, ET AL., PETITIONERS v. PUBLIC.RESOURCE.ORG, INC*, 590 U.S. ___ (2020), the century-old government edicts doctrine, making clear that officials empowered to speak with the force of law cannot be the authors of—and therefore cannot monopolize access—the works they create in the course of their official duties. The U.S. Supreme Court previously applied that doctrine to hold that non-binding, explanatory legal materials when created by judges who possess the authority to make and interpret the law shall not monopolize access to it. *See Banks v. Manchester*, 128 U. S. 244 (1888). Tyler Technologies is a for profit organization that aims to facilitate public access to government judge-created records and legal materials. Tyler Technologies is contracted by the Rhode Island Judiciary to implement the State's electronic courts in 2013 and together, they both publicly represented that access to the contents of judge-created laws records will be readily called on mobile devices to *all* court users, namely, to the Public and to pro se litigants.

12. Under the government edicts doctrine, judges may not be considered the "authors" of the works they produce in the course of their official duties as judges. That rule applies regardless of whether a given material carries the force of law. In *Banks v. Manchester,* 128 U. S. 244 (1888) the Supreme Court concluded that "the judge who, in his judicial capacity, prepares the opinion or decision, the statement of the case and the syllabus or head note" cannot "be regarded as their author or their proprietor. *Banks*, 128 U. S, at 253 (emphasis in original).

Rather, "[t]he whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all." *Ibid.* (citing *Nash v. Lathrop*, 142 Mass. 29, 6 N. E. 559 (1886)). These cases establish a straightforward rule: Because judges are vested with the authority to make and interpret the law, they cannot be the "author" of the works they prepare "in the discharge of their judicial duties." Banks, 128 U. S., at 253. This rule applies both to binding works (such as opinions) and to non-binding works (such as headnotes and syllabi). *Ibid.* The animating principle behind this rule is that no one can own the law. "Every citizen is presumed to know the law," and "it needs no argument to show . . . that all should have free access" to its contents. *Nash,* 142 Mass., at 35, 6 N. E., at 560 (cited by *Banks*, 128 U. S., at 253–254). Rather than attempting to catalog the materials that constitute "the law," the doctrine bars the officials responsible for creating the law from being considered the "author[s]" of "whatever work they perform in their capacity" as lawmakers. *Ibid.* (emphasis added). Because these officials are generally empowered to make and interpret law, their "whole work" is deemed part of the "authentic exposition and interpretation of the law" and must be "free for publication to all." *Ibid.*

13.  Rhode Island Judiciary and Tyler Technologies monopoly of publication of the judge-created laws and their "whole works" making and interpreting the law that explicitly by design deny access to the Public and to the Pro Se Litigant runs afoul of the government edicts doctrine.

14. Courts have long understood the government edicts doctrine to apply to legislative materials. See, e.g., *Nash*, 142 Mass., at 35, 6 N. E., at 560 (judicial opinions and statutes stand "on substantially the same footing" for purposes of the government edicts doctrine); moreover, just as the doctrine applies to "whatever work [judges] perform in their capacity as judges,"

*Banks*, 128 U. S., at 253, it applies to whatever work judges perform in their capacity as judges.

*Banks*, following *Wheaton* and the "judicial consensus" it inspired, denied publication monopoly protection to judicial opinions without excepting concurrences and dissents that carry no legal force. 128 U. S., at 253 (emphasis deleted). As every judge learns the hard way, "comments in [a] dissenting opinion" about legal principles and precedents "are just that: comments in a dissenting opinion." *Railroad Retirement Bd. v. Fritz,* 449 U. S. 166, 177, n. 10 (1980). Yet such comments are covered by the government edicts doctrine because they come from an official with authority to make and interpret the law. Indeed, *Banks* went even further and withheld publication monopoly protection from headnotes and syllabi produced by judges. 128 U. S., at 253. Surely these supplementary materials do not have the force of law, yet they are covered by the doctrine. The simplest explanation is the one *Banks* provided: These non-binding works are not copyrightable because of who creates them—judges acting in their judicial capacity. *See ibid.* The textual basis for the doctrine is the "authorship" requirement, which unsurprisingly focuses on—the author, the judges. The Supreme Court long ago interpreted the 'author" to be officials empowered to speak with the force of law. The doctrine distinguishes between some authors (who are empowered to speak with the force of law) and others (who are not). The Supreme Court explicitly rejects allowing the States to "monetize its entire suite of legislative and judicial history. With today's *digital tools*, States might even launch a subscription or pay-per-law service." See *Georgia v, Public Resources Org.* at 590 U. S. ____ (2020) It is obviously explicitly clear that the Supreme Court refers to the prohibition against the Rhode Island Judiciary and Tyler Technology's monopolization of the digital publication of DIGITAL COURT JUDICIAL COURT RECORDS that denies publication access of judge-created laws and their work materials to the Public and to Pro Se Litigants.

15. There is no legitimate Rhode Island government interest in the knowing illegal denial of access to the public and to pro se litigants the digital records of the Rhode Island Judiciary's and Tyler Technologies' illegal monopolization of digital publication of judge-created laws involving the establishment nor enforcement of unlawful 12% compound interest violative of explicitly clear 42 U.S.C. § 654(21)(A) within the legal framework of Title IV-D Program targeting noncustodial parties in Texas who are outside of Rhode Island that Rhode Island already knows is unenforceable in Texas, and thus had removed the 12% compound interest in 2018 calculated to cover it up from federal and Texas authorities. Rhode Island's abuse of the legal framework of the government edict doctrine and the legal framework of Title IV-D Program are diametrically at odds with the intent of Congress and binding caselaws of the U.S. Supreme Court. The civil conspiracy to cover up the illegal machinery of the digital electronic courts in Rhode Island is clear. *See Turner v. Rogers*, 131 S. Ct. 2507, 2518 (2011). *See Georgia v, Public Resources Org.* at 590 U. S. ____ (2020); *See* HOUSE COMM. WAYS & MEANS, Section 8: Child Support Enforcement Program, in 2004 GREEN BOOK: BACKGROUND MATERIAL AND DATA ON THE PROGRAMS WITHIN THE JURISDICTION OF THE COMMITTEE ON WAYS AND MEANS 8-1, 8-2 (2004). *See* Social Services Amendments of 1974, Pub. L. No. 93-647, § 101, 88 Stat. 2337, 2351. Where the mother receives public aid, federal and state governments will provide the child support payment to the mother and hold the father indebted to the government for that amount. In cases where the mother is not dependent on welfare, the government has largely stayed out of the fray. *See* HOUSE COMM. WAYS & MEANS, *supra* note 38. Yet, this case does not involve a welfare case, as the custodial father is wealthy, but the Defendants are motivated by retaliation against the Plaintiff for suing them ten years ago in <u>Seguin v. Chafee et al</u>., Civil No. 12-cv-708-JD (D.R.I. 2013), <u>Seguin v. Bedrosian</u>

et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and <u>Seguin v. Suttell et al</u>, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state court's under color of state law abuse of the legal frame work of another federal-funded human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00 per visitation if she wanted to see her children in Rhode Island, because the state court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other legally sufficient basis.  Plaintiff had reported this *prima facie* extortion under color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas. Here, Plaintiff's retaliation damages claims have been issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455, additionally given the fact Judge Smith had also self-recused from <u>Seguin v. Chafee et al.</u>, Civil No. 12-cv-708-JD (D.R.I. 2013), <u>Seguin v. Bedrosian et al,</u> Civil No. 12-cv-614-JD (D.R.I. 2013), and <u>Seguin v. Suttell et al</u>, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013) ten years ago.  *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998) ("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no party has requested it").

## II. ARGUMENT

16. Plaintiff has appealed the Court's/Judge Smith's judgment in its entirety in the related case, <u>Seguin v, RI Office of Child Support Services et al Civil</u> No. 23-cv-34-WES-PAS (D.R.I. 2023) and respectfully submits that she is likely to secure a complete reversal of this Court's

holding that the judicially created doctrine of Younger Abstention applies to the *dismissal* of her monetary damages and breach of contract damages claims.

17. Plaintiff further submits that she is likely to secure a complete reversal of this Court's in this case.

18. Conducting state proceedings funded by federal funding appropriated by Congress under Title IV of the Social Security Act in state monopolized electronic courts that violate the long-established government edict doctrine as it related to the Public's access of the digital publication of judge-created laws and violate the Constitution targeting Texas assets and Texas parties for illegal 12% compound interest involving fraudulent inducement that cannot be enforceable in Texas is the prima facie example of government fraud and government waste, warranting cut off from federal funding at the very minimum. Not even Judge Smith, friend of the Rhode Island Judiciary, can punt these egregious state activities to later addressment via the attention of the Supreme Court and to Congress Appropriation Committees, wrongfully using Younger Abstention.

19. Judge Smith's holding is defect in claiming without a shred of factual basis that Plaintiff can raise her federal monetary damages claims and fraudulent inducement breach of contract claims in the jurisdictionally defective Rhode Island family court, that R.I. Gen. Laws 8-10-3 plainly states the family court is *not* a court of general jurisdiction, and which lacks the jurisdiction over the controversy for legal relief of monetary damages tort claims and fraudulent inducement breach of contract damages claims over both the Plaintiff and all the named defendants.

20.   Plaintiff seeks a new trial or a stay pending appeal as Plaintiff's likelihood of success

on appeal, together with the lopsided balance of hardships, weigh heavily in favor of granting the

stay being sought pending appellate review.

**A. Plaintiff is Likely To Succeed On Appeal Of the Judgment Ordered By the**

**Court:**

21. Although Plaintiff recognizes that the Court has ruled against her as to the scope of

relief, Plaintiff is likely to succeed on appeal of those issues, and has raised serious legal

questions and presented a substantial case. *See Arnold v. Garlock, Inc.*, 278 F.3d 426,

438-39 (5th Cir. 2001).

22. Plaintiff incorporates by reference her prior remedy arguments.  Plaintiff reserves the

right to make any and all arguments on appeal.

23. Among the substantial questions raised by Plaintiff is whether the Court erred in

awarding Defendants dismissal of Plaintiff's monetary damages claim in this First Circuit under

Younger Abstention and erred in failing to self-execute 28 U.S.C. § 455. And Plaintiff

respectfully submits that she is likely to succeed on appeal in arguing that, in these

circumstances, dismissal was not properly ordered in the particular circumstances of this case

pursuant to established binding First Circuit caselaws on both the Court's errors applying

Younger Abstention as well as judicial disqualification. *See DeMauro v. DeMauro,* 115 F.3d 94,

98 (1st Cir. 1997)**;** *In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998); *Quackenbush v.*

*Allstate Ins. Co.*, 517 U.S. 706 (1996).  *See* also *Allen v. La. State Bd. of Dentistry*, 835 F.2d 100,

104 (5th Cir. 1988). ("Younger abstention does not apply to claims for monetary damages.")

24. Absence of a new trial or a stay of the judgment will erode confidence in the Judiciary in the First Circuit by creating an impression that it is violating national law regarding the government edict doctrine and setting illegal new national policy regarding the Title IV-D Program. It may also have the effect of "encouraging forum shopping." *Trump v. Hawaii,* 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). It further "undermines the judicial system's goals of allowing the 'airing of competing views' and permitting multiple judges and circuits to weigh in on significant issues." *See* also *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (traditional remedial principles account for "the public interest" and "the balance of equities"); *EME Homer City Generation, LP v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) (Kavanaugh, J.) (declining to vacate unlawful agency action under the APA because "vacatur could cause substantial disruption"). In this context, the dismissal of Plaintiff's state government tort monetary damages claims entered by the Court could cause substantial disruption to the *uniform* application of the legal framework of the Title IV-D Program Congress explicitly intended.

25. The serious legal questions raised in this case regarding the scope of remedy go beyond the questions of whether a Younger abstention is applicable to federal monetary damages claims and or the feeble assertion of *comity* applied to the Rhode Island Judiciary and Tyler Technology's gross violation of the government edict doctrine—and indeed, those questions should not have even entered into this case. Here, among Plaintiff's challenges was to state Judiciary, Tyler Technologies and agency actions, and Plaintiff pursued fraudulent inducement breach of contract damages claims and tort monetary damages claims. Instead, the Court at law cannot vacate a federal statute—i.e., cannot "delete a previously enacted statute from the books" such as 42 U.S.C. § 1983. *See* also Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va.

L. Rev. 933, 936 (2018) ("The federal courts have no authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute. The power of judicial review is more limited." (footnotes omitted). Legal monetary damages relief under 42 U.S.C. § 1983 that would hold the Rhode Island state government accountable under the Rhode Island Government Tort Act for Rhode Island government actors' tortious actions violating the legal framework of the Title IV-D Program federal statutes targeting the Plaintiff in Texas was a legal remedy conferred by Congress to federal courts to grant legal relief appropriate in this case. The Court has an unflagging obligation to exercise jurisdiction conferred to it by Congress. *See Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013)

26. With respect, although the Court has entered a judgment otherwise, Plaintiff has demonstrated a likelihood of success on appeal of the Final Judgment sufficient to justify a stay of the judgment.

**B. The Balance of the Equities Overwhelmingly Favors the Requested New Trial or Stay**

27. The balance of the equities overwhelmingly favors a new trial or stay: The State of Rhode Island plainly lacks any legitimate interest in the State's systemic knowing violation of the government edict doctrine and violation of 42 U.S.C. § 654(21)(A) that they now target Plaintiff in Texas, and which they sought to cover up from federal and Texas authorities, as well as from Plaintiff, by knowingly and unlawfully removing interest from the automated support record system. Americans outside of Rhode Island re fraudulently, unlawfully and systemically fleeced by Rhode Island's illegal scheme that is illegally funded through the State's defrauding of the United States lying to the United States that these activities are eligible for federal funds

appropriated by Congress for the legal administration of Title IV Program of the Social Security Act.

28. Defendants will face no harm from Plaintiff's requested new trial or stay. The judgment that is specifically directed to and protects the prevailing Defendants from legal accountability of their illegal actions, is further issued by a disqualified judge, Judge Smith, who was the former counsel for the Defendants and a partner of the firm whose major client is the Rhode Island Judiciary, *e.g.*, Rhode Island state government entities, including the state courts and state agencies. The requested new trial or stay will thus impose no hardship on the prevailing Defendants at all.

29. By contrast, the public and the Plaintiff face significant harm if now new trial is ordered or the judgment is not stayed. As an initial matter, "any time a [government]" violates "statutes enacted by representatives of its people," the people "suffer a form of irreparable injury." *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). But the harm here is much greater and more far-reaching. The government edict doctrine is willfully violated by the Rhode Island Judiciary and Tyler Technology in a civil conspiracy to cover up the illegal state family court creating judge-created laws ordering and enforcing 12% compound interest, aided and abetted by the Department of Human Services - Title IV-D requires the uniform application and compliance by participating States with the Social Security Act. Congress's as well as the United States through the Secretary of the U.S. Department of Health and Human Services' interest in the uniform compliance of 42 U.S.C. § 654(21)(A), § 654 and 42 U.S.C. § 666 are well established. The States are reimbursed 66% of the cost of operations through federal funding appropriated by Congress under Title IV-D of the Social Security Act. The Defendants' arbitrary illegal removal of the illegal unenforceable 12%

compound interest from the automated support record system and cover up of their illegal 12% compound interest scheme from the federal and Texas authorities targeting Texas properties and targeting the Plaintiff in Texas demonstrates Rhode Island government agencies (who are former clients of Judge Smith) knowingly committed criminal schemes illegally seizing Plaintiff's properties interstate in Texas that they know are violative of federal criminal codes and Texas civil and penal codes. *See,* e.g., Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act). The program, which is administered by the United States Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for a significant sixty-six percent (66%) of the costs of operating their child-support enforcement programs. 42 U.S.C. §v655(a)(2)(C).  In 1975, Congress adopted Title IV-D, 42 U.S.C. §v651 *et seq*., and established the general statutory framework that exists today. See 1975 Act § 101(a), 88 Stat. 2351; *Blessing v. Freestone*, 520 U.S. 329, 333-335 (1997) (describing program).  Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support.  Therefore, the Defendants' illegal operations cannot be funded by Congressional appropriations.

30. Judge Smith's failure to self-execute his disqualification under 28 U.S.C. § 455 as well as Canon 3E of the Code of Judicial Conduct, then his subsequent refusal to recuse in the related case, <u>Seguin v, RI Office of Child Support Services et al Civil</u> No. 23-cv-34-WES-PAS (D.R.I. 2023), upon Plaintiff's request after she raised newly discovered discovery post judgment

on October 6, 2023 of his direct and past public sector law practice's contract legal representation of the Defendants, state courts, state agencies and other conflict entities, have the appearance, to the objective observer, of the Court's issuance of judgment in favor of the Defendants in error that contravenes established First Circuit case law on Younger Abstention as well as disqualification, calculated to benefit the interests of his former clients, as partner of his former firm that represents the Rhode Island Judiciary and the state government.

31. Moreover, the Court's judgment effectively functions as a denial of Plaintiff's access to this Court of law to redress her legal monetary damages claims and fraudulent inducement breach of contract damages claims. It is well-settled that even minimal loss of First Amendment freedoms, "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality)); *see also Elrod*, 427 U.S. at 373.; *N.Y. Times v. United States*, 403 U.S. 713, 715 (1971). Accordingly, Plaintiff has a strong likelihood of success on the merits, will suffer irreparable injury without a stay, and a stay will not injure others while furthering the public interest.

### III. CONCLUSION

27. For the foregoing reasons, Plaintiff has demonstrated a likelihood of success on appeal of the Judgment ordered, and has demonstrated that the balance of the equities favors a new trial or a stay. Plaintiff respectfully requests that the Court stay the final judgment for the duration of appellate proceedings relating to the related Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I. 2023).

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 16, 2023, I filed the within Motion with the

Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 16, 2023

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                    Civil Action No. 1:23-cv-126-WES-PAS

RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities; RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD, PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities; TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

*Defendants*

## <u>MARY SEGUIN'S DECLARATION IN SUPPORT OF PLAINTIFF'S RULE 59 MOTION</u>

I, MARY SEGUIN, hereby declare under penalty of perjury, pursuant to 28 U.S.C. sec. 1746(2) that the following statements are true and correct:

1. That I am the Plaintiff, Pro Se, in the above captioned matter.

2. That I exercised, am exercising and continue to exercise my statutory right to appear pro se party in the above captioned civil matter in federal court by statute 28 U.S.C. sec. 1654.

3. That in state proceedings in Rhode Island, I am required to comply with Rhode Island Article X. Rules Governing Electronic Filing, Rule 2. Official Court Record, (a) Official Court Record. "Upon the implementation of the Electronic Filing System ("EFS") in each court, all documents shall be filed electronically and shall be the official court record."

4. That the state proceedings in which I am a party are public and are not about child custody nor involve a minor.

5. That the **Rhode Island Family Court**, through its adoption and promulgation of **Administrative Order 2021-01 A2)** mandated that all child support interest matters shall be heard remotely via WebEx. Further, **Administrative Order 2021-01 B1)** mandated that all non-emergency filings shall be filed using the electronic filing system in accordance with the Family Court Rules of Domestic Relations Procedure, which is the **Odyssey system**.

6. That the **"RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION, Rule 5. Access to Case Information, (c) Remote Access to Case Information. (1) Policy. To allow** <u>limited</u> **Remote Access to the Database through the Public Portal. Non-public case types shall not be remotely accessible except for certain case types to attorneys who have entered an appearance in a case. (2) Content. (a) The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall** <u>not</u> **have Remote Access to other Electronic Case Information"** bar, deny, violate, abridge, infringe and interfere with Pro Se Litigants' and the Public's fundamental rights to access public court records and Pro Se Litigants' fundamental right to meaningful access to the courts. See "<u>RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION</u>" Rule 5(c)(2)(a) "<u>The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall not have Remote Access to other Electronic Case Information.</u>" See also "<u>RHODE ISLAND JUDICIARY, Access to Case Information, 2. Remote Access to Case Information A. The Public, Self-represented Litigants, and Parties to a Case, The public, self-represented litigants, and parties in a case shall have remote access to the register of actions or docket but shall not have remote access to other electronic case information</u>."

7. That I, the Plaintiff, learned and verified on July 10, 2023 directly from the Rhode Island Judiciary itself through numerous (14) correspondences with the Rhode Island Judiciary from June 10, 2023 to July 10, 2023, pursuant to my RI Access to Public Records Act ("APRA") request for public records from the Rhode Island Judiciary, that as a matter of State policy, State Court Rule, and Judiciary Rule, in the digital courts implemented by the Rhode Island Judiciary, the State Court, the Rhode Island

Judiciary deny remote digital access of the Rhode Island Judiciary's monopolized publication of court and judicial records using the digital tool maintained and published by Tyler Technologies, Odyssey, including judge-created, judge-authored court decisions arising from state proceedings in the State's digital electronic courts, and digital court transcripts ordered by and paid by pro-se litigants that are published by the Judiciary digitally on Tyer Technologies' Odyssey are also denied access to the Public, pro-se litigants, and parties to the litigation (who are represented by counsel). The Rhode Island State Court only grants remote access to digital court and judicial records created by judges produced in digital courts to Rhode Island attorneys and state and federal agencies that are approved by the Rhode Island Judiciary's monopoly. On this matter, I corresponded in writing fourteen (14) APRA correspondence emails with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023.

8. That the State Defendants in this matter electronically file all notices using another electronic filing system that is even separate and different from the EFS (Odyssey).

9. That the State Defendants' court electronic filings are not noticed to me in Texas.

10. That the State Defendants' court electronic filings are not visible to me on the Rhode Island courts' EFS.

11. That the State Defendants' court electronic filing court records cannot be accessed remotely by me, solely because I am a self-represented litigant.

12. That the State Defendants' court electronic filing court records cannot be accessed remotely by the public, by self-represented litigants, nor by parties to the case, but can be accessed remotely and instantly through the internet by attorneys in Rhode Island and state and federal agencies.

13. That the Rhode Island Court Clerks state to me over the phone that they are prohibited from reading the contents of the court records over the phone to me.

14. That the Rhode Island Court virtual clerks state to me over the phone that even they are unable to see or access the court record information of filings by the State Defendants from the virtual clerks' access portals.

15. That the Rhode Island Electronic Filing System, case management system, rules and practices outright and unconstitutionally restrict and deny access to the court to three classes: (1) the public; (2) pro-se litigants; (3) parties to the case (who are represented by counsel), and is obviously outright reserved for only the government and Rhode Island attorneys.

16. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS.

17. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and

withdrew from my-initiated RI EOHHS agency appeal in 2022 in a scheme to procure a favorable judgment in a state proceeding that deny my federal constitutional and due process rights in Texas.

18. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and initiated the family court state proceeding on January 31, 2023 before the Covid Emergency Declaration was lifted.

19. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices that appear to **only allow remote, instant and full court access to a restricted club of R.I. lawyers and the government**, pose unconstitutional and undue burden on me, a citizen of Texas over 2,500 miles away.

20. That the State Defendant have full knowledge of the egregiously unfair due process violations of the Rhode Island state court EFS system/architecture/rules/practices that deny me access to the required **electronic court transcripts** prepared by the court reporter and electronically filed in the state EFS that **I ordered and paid for** for appeal, but the State Defendants have instant remote access by state court design.

21. That the State Defendants have full knowledge of the above unconstitutional restriction on access to court records and information to the public and non-lawyers is deliberate, by design and calculated to be unfair, violating constitutional guarantees of full and fair opportunity to raise claims in state proceedings.

22. That the above-raised unconstitutional restrictions are not exhaustive.

23. That my federal monetary damages claims on the unconstitutionality of the Rhode Island state court rules, practices and proceedings that violate the government edict doctrine and violate the pro-se litigants', such as my-self, federal constitutional rights: (1) federal constitutional right of equal access to the courts, (2) federal constitutional right to equal access to court records to receive information on the contents of all electronically filed notices, pleadings, court decisions, and transcripts that I myself ordered and paid for for appeal that are required to be electronically filed by state court rules and practices, (3) federal constitutional due process right and equal right to be given equal and timely notice of electronic filings and entries by the courts (including court decisions, court orders, court judgments, full docket entries, etc.) that the Rhode Island Judiciary deliberately deny by category all pro-se litigants access to court information, namely the contents of judicial/court records of cases to which I am the self-represented party, (4) federal constitutional due process right to be heard (Rhode Island Superior Court threatens me, the Texas pro-se plaintiff, with denial of my request to conduct WebEx hearings for the purpose of denying the Texas pro-se litigant access to the court and to be heard), (5) federal constitutional due process right to decision by a neutral decision-maker (the court that denies pro-se litigant

access to the court and the corollary opportunity to be heard fails the neutral decision-maker test). This list is not exhaustive.

24. That I seek to sue in federal court the State Defendants and add additional defendants.

25. I am an out-of-state diversity and a pro-se litigant in two state proceedings in Rhode Island, and have been unconstitutionally singled out by the State Judiciary, by category "self-represented litigant," to be barred from accessing electronic case information authored by judges and which the Judiciary has a monopoly in the publication of the judge-created laws in which state court cases I am the pro-se party, and therefore have standing to raise claims against this unconstitutional state practice and unconstitutional state court practice and rules. I understand the Rhode Island Judiciary's monopoly in the digital publication of judge-created laws in the Judiciary' implemented digital/electronic courts and the Judiciary's denial to the Public and to me from accessing the monopolized electronic publication of the judge-created laws in the court records violate the government edict doctrine.

26. Additionally, my fundamental First and Fourteenth Amendment constitutional right and common law right to equal, meaningful, and timely access to judicial records and public court records in litigation, given timely notice, adequate opportunity to be heard and to decision by a neutral decision-maker are fundamental First and Fourth Amendment and Fourteenth Amendment rights. Critically, the unconstitutional abridgement, infringement, and denial of judicial and court records to out-of-state pro-se litigants by the Rhode Island State Courts, Rhode Island State Judiciary and the Rhode Island Superior Court Bench Bar Committee directly relate to Younger Abstention Exception.

27. The State Defendants deliberately file all the State's pleadings outside of the State's electronic filing system, "Odyssey," and deliberately use a wholly different un-named electronic filing system, different and separate from that ("Odyssey") provided for pro-se litigants, so that pro-se litigants do not receive any requisite automated electronic notices of court motions or pleadings the State Defendants file electronically, nor are pro se litigants able to electronically access the content information of the State Defendants' electronically-filed pleadings. The only way the pro se litigant, such as me, the Texas Plaintiff, can access the court record is to personally go over 2,500 miles away to the courthouse in Rhode Island to access the court pleading information, or get a "courtesy notice" via email or get a "courtesy notice" through U.S. Mail sent by the State Defendants at whim. The State Defendants deliberately fail to send the notices electronically or by U.S. Mail, and the state courts deliberately promulgated court rules disallowing the public, pro-se litigants and even the parties who are represented by lawyers, remote access to court records, and critically, deny access to crucial court decisions, judgments and orders of public cases, as well as deny remote access to the transcripts ordered by pro-se litigants for appeal. Critically, the State court's abridgment and denial of access to court documents to the pro se litigant and the general public result in the

unconstitutional abridgment and denial of equal, timely and meaningful access to court complaints, decisions, judgments and orders. What is truly shocking is that the Rhode Island Judiciary even denies and/or bars pro-se litigants remote access of court transcripts that were ordered by pro-se litigants for appeal.

28. Thirdly, the Texas Pro-Se Plaintiff discovered and verified the fact, on or about July 7, 2023, that the Rhode Island Judiciary, using the aforesaid state court rule barring, by category, pro-se litigants from accessing court case information remotely, bars the Plaintiff by category ("self-represented litigant") from accessing state court proceeding transcripts that the Texas Plaintiff ordered and paid for, for appeal. In other words, the RI Supreme Court Clerk stated to the Texas Plaintiff that the Plaintiff, in Texas, is unconstitutionally barred from remotely accessing the transcripts of court proceedings that she ordered and paid for in her appeal to the RI Supreme Court in the Plaintiff-initiated APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215**, and yet the State Defendants are inequitably granted instant and free remote access to those very transcripts that the Texas Plaintiff ordered and paid for, for appeal. The federal Texas Plaintiff respectfully requests this Court the extension of time to present the new evidence and plead the verified facts.

29. Fourthly, the Texas Plaintiff discovered and verified the fact, on or about July 11, 2023, that, despite the Texas Plaintiff's several phone inquiries to the RI Superior Court in the past several weeks regarding the status of the appeal, the RI Superior Court, for undisclosed reasons, failed and continue to fail to relinquish jurisdiction and transfer the court case file of **Seguin v. RI Office of Child Support Services, PC-22-07215** to the RI Supreme Court within the requisite 60 days after Plaintiff's filing of Notice of Appeal on April 3, 2023, as required by the RI Supreme Court rules and procedures. At the same time, the Texas Plaintiff verified the fact that the Plaintiff-ordered transcripts of the state proceedings in the Federal Plaintiff-initiated state APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215** show the RI Superior Court further unconstitutionally sought to deny the Texas Plaintiff access to the state court and opportunity to be heard by outright threatening the Plaintiff in open court that the Judge, David Cruise, during the hearing of March 24, 2023 in that matter, shall use the state court's discretionary power in the future to deny all of the Texas pro-se Plaintiff's petitions for remote WebEx hearings to effectively deny her access to the state superior court. The state court that denies court access and the opportunity to be heard fails the neutral-decision-maker test required under the Fourteenth Amendment. I now specifically request further the Court to judicially notice that this court access denial and denial to be heard occurred on March 24, 2023, PRIOR to President Biden's lifting of the COVID-19 National Health Emergency Declaration. I, the Texas Plaintiff, aver this is a direct contributory reason for the RI Superior Court's failure to transfer the case file to the Supreme Court within 60 days (by June 3, 2023) of the Plaintiff's filing of Notice of Appeal on April 3, 2023 in **Seguin v. RI Office of Child Support Services, PC-22-07215**.

30. Fifthly, the Plaintiff presents to this Court and respectfully requests the Court to take judicial notice of the undisputed fact of the court rule-making process in Rhode Island. The 1966 Rules were promulgated by the justices of the superior court pursuant to section 8-6-2 of the General Laws of Rhode Island. This enabling act departed from the Federal Rules Enabling Act and most state enabling legislation conferring rule-making power on the supreme courts of the respective governments. The Rhode Island Enabling Act was adopted in 1940, 1940 R.I. Pub. Laws ch. 943, sec. 1. It conferred the power on the justices of the superior court and the 1966 reform was the product of that court. In 1969 an amendment to section 8-6-2 made the Rules thereafter adopted by the trial courts subject to the approval of the Supreme Court. 1969 R.I. Pub. Laws ch. 239, sec 2. Therefore, all public records relating to the adoption and promulgation of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION" are "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, judicial, regulatory, or administrative body of the state, or any political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to Public Records Act ("APRA"). Even though the Rhode Island Enabling Act conferred the power on the judiciary public body to promulgate and adopt court rules, a.k.a. rule-making process, the Rhode Island Judiciary, pursuant to the Plaintiff's APRA request for public records, denied the Plaintiff's APRA request within the 10 business day period, as well as denies it possesses public records, as defined by APRA, relating to the rule-making process by the judiciary of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," including denying possession of public records that show the intent of the rule-makers to promulgate and adopt court rules denying fundamental right of public access to electronic case information remotely to the public, to self-represented litigants, and to parties to a case. **See __Exhibit D__** fourteen (14) APRA correspondence emails between the Plaintiff and/with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023. The Texas pro-se Plaintiff respectfully requests the extension of time to present the new evidence and plead the newly verified facts and claims, and amend the complaint, which is further in the interest of judicial economy. The Plaintiff further seeks to appeal and file her claim against the implausible denial by the RI Judiciary, which is conferred by the Rhode Island Enabling Act to make rules of the court, that it possesses public records relating to the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," that the judiciary, conferred power by the Rhode Island Enabling Act, "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, judicial, regulatory, or administrative body of the state, or any political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to

Public Records Act ("APRA"). Because the RI Superior Court clearly ruled in **Seguin v. RI Office of Child Support Services, PC-22-07215** that it lacked subject matter jurisdiction to hear my/the Texas Plaintiff's APRA-related claims, I, the Texas Plaintiff, now exercise my statutory and constitutional rights to petition this Federal Court, invoking 28 U.S.C. § 1343(a)(3) (civil rights) and 28 U.S.C. § 1367 that provides supplemental jurisdiction over the state law tort claims that arose from the same common nuclei of facts, invoking 28 U.S.C. § 1331 (federal question), and invoking 42 U.S.C. § 1983 for violations of civil rights under the First, Fourth and Fourteenth Amendments to the United States Constitution. I, the Plaintiff, respectfully request this Court for the extension of time to file my claims.

31. Plaintiff discovered on October 6, 2023 that the Rhode Island Judiciary and Government Defendants are former clients of Judge Smith, a partner in his former firm, Edwards & Angell.

32. Plaintiff discovered on November 9, 2023 that the Rhode Isand Judiciary and Government Defendants are current clients of the firm Edwards & Angell, the former firm of Judge Smith, a partner in the firm.

33. A plain reading of 28 U.S.C. sec. 455 makes clear that Judge Smith is disqualified from this case, and a plain reading of case law makes clear that 28 U.S.C. sec. 455 is self-executing, without necessitating any party's request.


Respectfully submitted,

Date: November 16, 2023

MARY SEGUIN


*Mary Seguin*
_____

Mary Seguin

P.O. Box 22022

Houston, TX 77019

maryseguin22022@gmail.com

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                      Civil Action No. 1:23-cv-126-WES-PAS


RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

*Defendants*

### PLAINTIFF'S RULE 60(b) MOTION

1. Plaintiff, proceeding from and as a citizen of Texas, respectfully requests pursuant to

Fed. R. Civ. P. Rule 60(b)(1), (3), (4) and (6) for a new trial.  Plaintiff avers the following,

supported by affidavit attached: The 91-page First Amended Complaint [ECF 25] filed on

September 1, 2023 seeks monetary damages against the Rhode Island State Defendants and the

private actor Defendants for:

(1) The Rhode Island Judiciary and Tyler Technologies' monopoly of publication of law.

(2) The Rhode Island Judiciary and Tyler Technologies' denial to the Public and to all Pro Se Litigants all access and the denial of free access to the contents of the law created, authored, and deliberated by the Rhode Island Judiciary.

(3) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to knowingly fail to properly integrate the legacy electronic court case management systems used by Rhode Island Department of Human Services and Office of Child Support Services during the implementation of Odyssey from 2013 to 2014 (the State's official electronic court filing and electronic case management system), so that these state agencies' filings are discriminately invisible only to the Public, to Pro Se Litigants and to the Rhode Island Virtual Clerk of the Courts in the Rhode Island Family Court, a limited jurisdiction court of record. The State's filings are only visible to the judges and to the State filers, thus manipulating the proceeding towards a foregone conclusion in favor of the State filers.

(4) The civil conspiracy by the Rhode Island Judiciary and Tyler Technologies to misrepresent to the Public and to the Pro Se Litigants that the implemented electronic court case records of judge created laws are available to *all* court users, in order to cover up their monopolization of the publication of law denies the Public and the Pro Se Litigant access to the judge-created laws.

(5) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services that the State routinely establishes and enforces 12% compound interest on child and spousal support in Title IV of the Social Security Act state family court proceedings, in violation of the uniform statutory requirement of 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and

Page 2 of 23

*if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest, targeting noncustodial parents victims. In welfare cases, support are assigned by the custodial parent to the State, and the 12% compound interest represents a fee for the State's "services" in the support's establishment and enforcement paid to the State, which at 12% compound interest represents lucrative, illegally obtained revenue to the State actors, who are financially incentivized to obtain as much as possible.

(6) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services and Tyler Technologies to knowingly fail to properly integrate Odyssey with the State's legacy electronic court filing system resulting in the State's filings seeking illegal 12% compound interest, as well as to deny the Public and to Pro Se Litigants' access to their publication of judge-created law records for the purpose of cover up of this wholesale illegal defraud of the court, extortionary defraud under color of state law targeting the unsuspecting noncustodial parents victims, and defraud of the United States (66% of the cost of these child support "operations" is funded by the U.S. Department of Health and Human Services through Title IV of the Social Security Act through funds appropriated by Congress through the annual budget appropriations.)

(7) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Tyler Technologies to operate the Title IV Program of the Social Security Act in all manners violative of due process, in prima facie due process violative State Electronic Courts, for the purpose of generating state revenue through fraud and deceit, through conspired tortious interference of rights of access to the courts, rights of

access to state case documents, and rights of access to judge-created laws targeting litigants, targeting the Public and targeting Pro Se Litigants.

(8) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Tyler Technologies to cover up their public-access-denied publication of state judge-created laws of illegal 12% compound interest benefiting the state's revenue by adopting a State policy not to establish nor enforce any interest in *interstate* support cases only, calculated to cover up the collective fraud from federal enforcement officials and other states' enforcement officials of court orders (laws) showing 12% compounded interest established and funded under Title IV that are facially illegally violative of 42 U.S.C. § 654(21)(A) which explicitly provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest. The federal Title IV Program regulation by Congressional intent explicitly preempts any related state laws of all participating states.

(9) The civil conspiracy by the Rhode Island Judiciary and the Defendant Department of Human Services and Office of Child Support Services and Barbara Grady and Gero Meyersiek to use the fraudulent, First Amendment-, Fourth Amendment-, Fifth Amendment-, Seventh Amendment-, and Fourteenth Amendment violative state court machinery weaponizing Title IV Program of the Social Security Act to target the Plaintiff *pro se* noncustodial parent in Texas to retaliate against Plaintiff for her past lawsuits against them, namely ten years ago in Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state

court's under color of state law abuse of the legal frame work of another federal-funded

human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*,

through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00

per visitation if Plaintiff wanted to see her children in Rhode Island, because the state

court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent

any other legally sufficient basis.  Plaintiff had reported this *prima facie* extortion under

color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal

law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S.

Department of Justice in Texas.  Here, Plaintiff's ==retaliation== damages claims have been

issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge

Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455,

additionally given the fact Judge Smith had also self-recused from <u>Seguin v. Chafee et</u>

<u>al</u>., Civil No. 12-cv-708-JD (D.R.I. 2013), <u>Seguin v. Bedrosian et al</u>, Civil No. 12-cv-

614-JD (D.R.I. 2013), and <u>Seguin v. Suttell et al</u>, Civil No. 13-cv-95-JNL-LM (D.R.I.

2013) ten years ago.  *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998)

("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no

party has requested it").

(10) The Rhode Island Judiciary continues the pattern of cover up by denying Plaintiff's

request for public judicial records related to the monopoly of publication of judge-created

records submitted to the State Judiciary pursuant to the Rhode Island Access to Public

Records Act ("RI APRA").

4. Plaintiff obtained new evidence on October 6, 2023 that the Rhode Island Judiciary is a

former client of Judge Smith, and on November 9, 2023, Plaintiff obtained new evidence that the

Rhode Island Judiciary remains a major client of Judge Smith's former law firm.  Plaintiff's due diligence search for conflict of interest has been impeded by the Rhode Island Judiciary and Tyler Technologies monopoly of publication of judge-created laws in the state's electronic court system and their denial of access to the judge-created laws, and Plaintiff, as a member of the Public and proceeding pro se without a Rhode Island Attorney license, the issuance of which is also monopolized by the Rhode Island Judiciary, has further been denied  access to official records, including through the Rhode Island Access to Public Records Act, consistent with a pattern of civil conspiracy cover up.

5.  A new trial or a stay of the Judgment is necessary to prevent irreparable harm to Plaintiff, and to Americans across the First Circuit who would be needlessly deprived of access to the federal courts of law in the First Circuit for monetary damages redress - the judicially created doctrine of Younger Abstention that functioned as a court of equity - regarding Plaintiff's monetary damages claims against the Rhode Island Judiciary and Tyler Technologies' scheme to monopolize the publication of judge-created laws that denies, tortiously interferes, tortiously abridges and tortiously obstruct the Public access to those very laws; regarding Defendant Rhode Island Office of Child Support Services' unlawful seizures of interstate Texas properties outside of Rhode Island under color of Rhode Island state law based on legally insufficient interest charge on overdue support based on the unlawful rate of 12% compound interest that is disallowed under Title IV-D Program of the Social Security Act, specifically 42 U.S.C. § 654(21)(A) that provides States *may* opt to charge a fee, and *if* the State opts to do so, between *3% to 6% simple interest*, *not* 12% compound interest.  And this is on top of Defendants' breach of contract that was brokered by Defendant Rhode Island Office of Child Support Services on behalf of the agency's client; the contract between the custodial parent client, defendant Gero

Meyersiek and the Texas Plaintiff stipulated that the custodial parent waived interest upon the

Texas Plaintiff paying a lump sum of $104,185.98 pay-off amount, which Plaintiff performed

from Texas on December 7, 2021.  Even at the point of contractual agreement, Defendant Rhode

Island Office of Child Support Services in conjunction with Defendant Gero Meyersiek,

misrepresented there was lawful and enforceable interest to be waived, as they removed the

accrued interest from the Title IV-D Program mandated support record system in order to cover

up from the Plaintiff, and from federal and Texas authorities the unlawful 12% compound rate.

After fraudulently inducing Plaintiff in Texas to agree to and to perform on the contract, the

Defendants immediately put the interest back into the Title IV-D Program-mandated automated

support record system and started to seize Plaintiff's properties in Texas under color of Rhode

Island state law.

     6. The final judgment is on its face violative of binding First Circuit caselaw that

mandates lower courts to *stay* monetary damages claims when applying Younger Abstention.

*See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997) (relying on *Quackenbush v. Allstate*

*Ins. Co.,* 517 U.S. 706 (1996) in holding that abstention does not allow for dismissal of damages

claim).

     7. 42 U.S.C. § 654(21)(A) has been in effect since the enactment of the Title IV-D

Program of the Social Security Act several decades ago, and Congress's original intent was to

combat poverty within the populace of single mothers and children in welfare cases; Congress at

no time intended to shift the undue burden of Rhode Island's 12% compound interest on overdue

support under color of Rhode Island state law to noncustodial parents, whether targeting Texas

or across the country, which in welfare cases Rhode Island converts the 12% compound interest

to assigned debts owed by noncustodial parents to Rhode Island's state agencies and state

government, representing underhanded unlawful state revenue unlawfully obtained through the

legal framework of Title IV-D Program of the Social Security Act, targeting unsuspecting

noncustodial parents victims.  As a legal point of a state's lawful application of 42 U.S.C. §

654(21)(A) within the First Circuit, New Hampshire, in compliance with the letter of federal law,

opts into Title IV-D Program and opts not to charge any interest whatsoever, as per the letter of

law and the original intent of Congress, 42 U.S.C. § 654(21)(A).  Similarly, Texas charges 6% in

compliance with 42 U.S.C. § 654(21)(A).

8. Defendant Rhode Island Office of Child Support Service's illegal denial and

obstruction of access to Plaintiff's own child support case file that contains the incriminating

illegal and arguably criminal scheme of removing the interest rate from the Title IV-D Program

mandated and federally funded support record system to cover up the unlawful 12% compound

interest from federal and Texas authorities, as well as from the Plaintiff in Texas, violates due

process, obstructs justice, obstructs a federally funded and federal program proceeding, and the

legal framework of Title IV-D of the Social Security Act, specifically, 42 U.S.C. § 654 and 42

U.S.C. § 666.

9. Judge Smith's dismissal of Texas Plaintiff's legal remedy monetary damages and

breach of contract fraudulent inducement damages claims under Younger Abstention in this

Court of law represents irreparable harm violative of the First Amendment, Fourth Amendment,

Fifth Amendment, the Fourteenth Amendment, the Seventh Amendment and the First

Amendment access to the Court.  The undisputable fact remains, Plaintiff's legal remedy request

for monetary damages in this court of law consisting of twenty-two causes of action that cannot

be dismissed under Younger Abstention, namely monetary damages claims of breach of contract

fraudulent inducement, breach of implied contract, unjust enrichment, misrepresentation,

negligent misrepresentation, intentional/fraudulent misrepresentation, common law bad faith, breach of the covenant of good faith and fair dealings, tortious breach of the covenant of good faith and fair dealings, breach of fraudulent concealment/common law fraud, concealed fraud, tort of deceit, reckless indifference to the rights of Plaintiff, deliberate indifference to the rights of Plaintiff, abuse of process, breach of duty, accounting fraud, fraud cover up, RI Government Tort Liability (R.I. Gen. Laws 9-31-1, *et seq.*), 42 U.S.C. § 1983 Claim for Reckless Indifference of Plaintiff's Clearly Established Constitutional Rights, 42 U.S.C. § 1983 claim of Fourth Amendment Illegal Seizure of Plaintiff's Texas Property, state tort of liability against defendants under 42 U.S.C. § 1983, Civil RICO [ECF 25].

10. Judge Smith's legally-unsupported and factually-unsupported, and "legally insufficient" opinion that the limited jurisdiction family court is an adequate forum to raise Plaintiff's federal legal damages claims of breach of contract et al., contravenes Rhode Island law: R.I. Gen Laws 8-10-3 makes clear that family court is not a court of general jurisdiction, can only conduct bench trials functioning as a court of equity, not of law, and prohibits family court from exercising jurisdiction over breach of contract claims et al between the Texas Plaintiff and the Defendants; family court lacks jurisdiction over the Plaintiff's federal causes of actions; lacks the jurisdiction to summon a jury for jury trial in a court of law.

11. Finally, but equally critically, twenty-one days post judgment Plaintiff discovered troubling new evidence on November 9, 2023, that Judge Smith appears to have impermissibly acted in favor of the interests of the defendants – he is automatically disqualified under 28 U.S.C. § 455, because as a partner in his past practice and firm, the state government and the Rhode Island Judiciary were not only his clients, but continue to be that firm's major client under a flat fee contract and he has knowledge of the defendants' actions in this action – as a major

partner in his firm, the Rhode Island Judiciary is his and his form's past and current clients, the

state government actors and the state courts actors, cooperate in the routine establishment and

enforcement of 12% compound interest under the legal framework of Title IV-D Program of the

Social Security Act, where 12% compound interest is disallowed under 42 U.S.C. § 654(21)(A).

To the objective observer, having knowledge of the facts and circumstances of this case, and

being a partner in his past firm that continues to have the Rhode Island Judiciary as a client,

Judge Smith appears biased in favor of the defendants' interest to continue raking in state

revenue under the auspices of 42 U.S.C. § 654(21))(A) that explicitly disallows state debts of

12% compound interest assigned to Rhode Island that the state actors who cover up the 12%

compound rate by obstructing the noncustodial parent's access to her own child support case file

that is further violative of the due process provisions under 42 U.S.C. § 654 and §666, in Rhode

Island's federally funded operation with funds appropriated by Congress intended for the *lawful*

operation of Title IV-D of the Social Security Act.  Although under the judicial self-executing

expectation under 28 U.S.C. §455, the Texas Plaintiff is not expected to cull court records in the

Rhode Island state courts for judicial conflict of interest, nevertheless the Plaintiff in good faith

and diligently attempted to perform a remote search of Rhode Island's electronic court case

management system, Odyssey in 2023.  In so doing, Plaintiff discovered troubling newly-

discovered evidence that the Rhode Island Judiciary, while publicly representing that the 2014 $6

million state transition from paper courts to electronic courts promises *all court users* will be

able to call up court documents remotely from their mobile devices, in reality Rhode Island

adopted rules only denying the public and pro se litigants remote access to court case

information, including pro-se litigants' own case records, that both the public and all litigants

had equal statutory, common law and constitutional rights of access in paper courts – Judge

Smith's firm's clients, the Rhode Island Judiciary, therefore implemented electronic court public access denials that obstructed Plaintiff's and the public's discovery of Judge Smith's judicial disqualification regarding his former clients such as the state courts, the defendant state actors and other conflict entities.

## I. LEGAL STANDARD

11. The United States Supreme Court in 2020 reaffirmed, in *GEORGIA, ET AL., PETITIONERS v. PUBLIC.RESOURCE.ORG, INC*, 590 U.S. ___ (2020), the century-old government edicts doctrine, making clear that officials empowered to speak with the force of law cannot be the authors of—and therefore cannot monopolize access—the works they create in the course of their official duties. The U.S. Supreme Court previously applied that doctrine to hold that non-binding, explanatory legal materials when created by judges who possess the authority to make and interpret the law shall not monopolize access to it. *See Banks v. Manchester*, 128 U. S. 244 (1888). Tyler Technologies is a for profit organization that aims to facilitate public access to government judge-created records and legal materials. Tyler Technologies is contracted by the Rhode Island Judiciary to implement the State's electronic courts in 2013 and together, they both publicly represented that access to the contents of judge-created laws records will be readily called on mobile devices to *all* court users, namely, to the Public and to pro se litigants.

12. Under the government edicts doctrine, judges may not be considered the "authors" of the works they produce in the course of their official duties as judges. That rule applies regardless of whether a given material carries the force of law. In *Banks v. Manchester,* 128 U. S. 244 (1888) the Supreme Court concluded that "the judge who, in his judicial capacity, prepares the opinion or decision, the statement of the case and the syllabus or head note" cannot "be regarded as their author or their proprietor. *Banks*, 128 U. S, at 253 (emphasis in original).

Rather, "[t]he whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all." *Ibid.* (citing *Nash v. Lathrop*, 142 Mass. 29, 6 N. E. 559 (1886)). These cases establish a straightforward rule: Because judges are vested with the authority to make and interpret the law, they cannot be the "author" of the works they prepare "in the discharge of their judicial duties." Banks, 128 U. S., at 253. This rule applies both to binding works (such as opinions) and to non-binding works (such as headnotes and syllabi). *Ibid.* The animating principle behind this rule is that no one can own the law. "Every citizen is presumed to know the law," and "it needs no argument to show . . . that all should have free access" to its contents. *Nash,* 142 Mass., at 35, 6 N. E., at 560 (cited by *Banks*, 128 U. S., at 253–254). Rather than attempting to catalog the materials that constitute "the law," the doctrine bars the officials responsible for creating the law from being considered the "author[s]" of "whatever work they perform in their capacity" as lawmakers. *Ibid.* (emphasis added). Because these officials are generally empowered to make and interpret law, their "whole work" is deemed part of the "authentic exposition and interpretation of the law" and must be "free for publication to all." *Ibid.*

13.  Rhode Island Judiciary and Tyler Technologies monopoly of publication of the judge-created laws and their "whole works" making and interpreting the law that explicitly by design deny access to the Public and to the Pro Se Litigant runs afoul of the government edicts doctrine.

14. Courts have long understood the government edicts doctrine to apply to legislative materials. See, e.g., *Nash*, 142 Mass., at 35, 6 N. E., at 560 (judicial opinions and statutes stand "on substantially the same footing" for purposes of the government edicts doctrine); moreover, just as the doctrine applies to "whatever work [judges] perform in their capacity as judges,"

*Banks*, 128 U. S., at 253, it applies to whatever work judges perform in their capacity as judges. *Banks*, following *Wheaton* and the "judicial consensus" it inspired, denied publication monopoly protection to judicial opinions without excepting concurrences and dissents that carry no legal force. 128 U. S., at 253 (emphasis deleted). As every judge learns the hard way, "comments in [a] dissenting opinion" about legal principles and precedents "are just that: comments in a dissenting opinion." *Railroad Retirement Bd. v. Fritz,* 449 U. S. 166, 177, n. 10 (1980). Yet such comments are covered by the government edicts doctrine because they come from an official with authority to make and interpret the law. Indeed, *Banks* went even further and withheld publication monopoly protection from headnotes and syllabi produced by judges. 128 U. S., at 253. Surely these supplementary materials do not have the force of law, yet they are covered by the doctrine. The simplest explanation is the one *Banks* provided: These non-binding works are not copyrightable because of who creates them—judges acting in their judicial capacity. *See ibid.* The textual basis for the doctrine is the "authorship" requirement, which unsurprisingly focuses on—the author, the judges. The Supreme Court long ago interpreted the 'author" to be officials empowered to speak with the force of law. The doctrine distinguishes between some authors (who are empowered to speak with the force of law) and others (who are not). The Supreme Court explicitly rejects allowing the States to "monetize its entire suite of legislative and judicial history. With today's *digital tools*, States might even launch a subscription or pay-per-law service." See *Georgia v, Public Resources Org.* at 590 U. S. ____ (2020) It is obviously explicitly clear that the Supreme Court refers to the prohibition against the Rhode Island Judiciary and Tyler Technology's monopolization of the digital publication of DIGITAL COURT JUDICIAL COURT RECORDS that denies publication access of judge-created laws and their work materials to the Public and to Pro Se Litigants.

15. There is no legitimate Rhode Island government interest in the knowing illegal denial of access to the public and to pro se litigants the digital records of the Rhode Island Judiciary's and Tyler Technologies' illegal monopolization of digital publication of judge-created laws involving the establishment nor enforcement of unlawful 12% compound interest violative of explicitly clear 42 U.S.C. § 654(21)(A) within the legal framework of Title IV-D Program targeting noncustodial parties in Texas who are outside of Rhode Island that Rhode Island already knows is unenforceable in Texas, and thus had removed the 12% compound interest in 2018 calculated to cover it up from federal and Texas authorities. Rhode Island's abuse of the legal framework of the government edict doctrine and the legal framework of Title IV-D Program are diametrically at odds with the intent of Congress and binding caselaws of the U.S. Supreme Court. The civil conspiracy to cover up the illegal machinery of the digital electronic courts in Rhode Island is clear. *See Turner v. Rogers*, 131 S. Ct. 2507, 2518 (2011). *See Georgia v, Public Resources Org.* at 590 U. S. ____ (2020); *See* HOUSE COMM. WAYS & MEANS, Section 8: Child Support Enforcement Program, in 2004 GREEN BOOK: BACKGROUND MATERIAL AND DATA ON THE PROGRAMS WITHIN THE JURISDICTION OF THE COMMITTEE ON WAYS AND MEANS 8-1, 8-2 (2004). *See* Social Services Amendments of 1974, Pub. L. No. 93-647, § 101, 88 Stat. 2337, 2351. Where the mother receives public aid, federal and state governments will provide the child support payment to the mother and hold the father indebted to the government for that amount. In cases where the mother is not dependent on welfare, the government has largely stayed out of the fray. *See* HOUSE COMM. WAYS & MEANS, *supra* note 38. Yet, this case does not involve a welfare case, as the custodial father is wealthy, but the Defendants are motivated by retaliation against the Plaintiff for suing them ten years ago in <u>Seguin v. Chafee et al</u>., Civil No. 12-cv-708-JD (D.R.I. 2013), <u>Seguin v. Bedrosian</u>

et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013), in which Plaintiff sued them, *inter alia*, for monetary damages claims for extortion by the Rhode Island state court's under color of state law abuse of the legal frame work of another federal-funded human services program Violence Against Women Act, 34 U.S.C. § 12471 *et seq.*, through which Rhode Island demanded that Plaintiff pay the state court actor $55,000.00 per visitation if she wanted to see her children in Rhode Island, because the state court stated in writing they believed Plaintiff married "a rich oil man" in Texas, absent any other legally sufficient basis. Plaintiff had reported this *prima facie* extortion under color of state law and under color of federal law 34 U.S.C. § 12471 *et seq.*, to the federal law enforcement authorities, *e.g.*, the F.B.I. in Texas and the Office of the U.S. Department of Justice in Texas. Here, Plaintiff's retaliation damages claims have been issues pending before the Court since September 1, 2023 [ECF 25], at which point Judge Smith was disqualified under the self-executing expectation under 28 U.S.C. § 455, additionally given the fact Judge Smith had also self-recused from Seguin v. Chafee et al., Civil No. 12-cv-708-JD (D.R.I. 2013), Seguin v. Bedrosian et al, Civil No. 12-cv-614-JD (D.R.I. 2013), and Seguin v. Suttell et al, Civil No. 13-cv-95-JNL-LM (D.R.I. 2013) ten years ago. *See In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998) ("[under §455] the judge is expected to recuse sua sponte, where necessary, even if no party has requested it").

## II. ARGUMENT

16. Plaintiff has appealed the Court's/Judge Smith's judgment in its entirety in the related case, Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I. 2023) and respectfully submits that she is likely to secure a complete reversal of this Court's

holding that the judicially created doctrine of Younger Abstention applies to the *dismissal* of her monetary damages and breach of contract damages claims.

17. Plaintiff further submits that she is likely to secure a complete reversal of this Court's in this case.

18. Conducting state proceedings funded by federal funding appropriated by Congress under Title IV of the Social Security Act in state monopolized electronic courts that violate the long-established government edict doctrine as it related to the Public's access of the digital publication of judge-created laws and violate the Constitution targeting Texas assets and Texas parties for illegal 12% compound interest involving fraudulent inducement that cannot be enforceable in Texas is the prima facie example of government fraud and government waste, warranting cut off from federal funding at the very minimum. Not even Judge Smith, friend of the Rhode Island Judiciary, can punt these egregious state activities to later addressment via the attention of the Supreme Court and to Congress Appropriation Committees, wrongfully using Younger Abstention.

19. Judge Smith's holding is defect in claiming without a shred of factual basis that Plaintiff can raise her federal monetary damages claims and fraudulent inducement breach of contract claims in the jurisdictionally defective Rhode Island family court, that R.I. Gen. Laws 8-10-3 plainly states the family court is *not* a court of general jurisdiction, and which lacks the jurisdiction over the controversy for legal relief of monetary damages tort claims and fraudulent inducement breach of contract damages claims over both the Plaintiff and all the named defendants.

20. Plaintiff seeks a new trial or a stay pending appeal as Plaintiff's likelihood of success on appeal, together with the lopsided balance of hardships, weigh heavily in favor of granting the stay being sought pending appellate review.

## A. Plaintiff is Likely To Succeed On Appeal Of the Judgment Ordered By the Court:

21. Although Plaintiff recognizes that the Court has ruled against her as to the scope of relief, Plaintiff is likely to succeed on appeal of those issues, and has raised serious legal questions and presented a substantial case. *See Arnold v. Garlock, Inc*., 278 F.3d 426, 438-39 (5th Cir. 2001).

22. Plaintiff incorporates by reference her prior remedy arguments. Plaintiff reserves the right to make any and all arguments on appeal.

23. Among the substantial questions raised by Plaintiff is whether the Court erred in awarding Defendants dismissal of Plaintiff's monetary damages claim in this First Circuit under Younger Abstention and erred in failing to self-execute 28 U.S.C. § 455. And Plaintiff respectfully submits that she is likely to succeed on appeal in arguing that, in these circumstances, dismissal was not properly ordered in the particular circumstances of this case pursuant to established binding First Circuit caselaws on both the Court's errors applying Younger Abstention as well as judicial disqualification. *See DeMauro v. DeMauro,* 115 F.3d 94, 98 (1st Cir. 1997)**;** *In re Martinez-Catala,* 129 F.3d 213, 220 (1st Cir. 1998); *Quackenbush v. Allstate Ins. Co*., 517 U.S. 706 (1996). *See also Allen v. La. State Bd. of Dentistry*, 835 F.2d 100, 104 (5th Cir. 1988). ("Younger abstention does not apply to claims for monetary damages.")

24. Absence of a new trial or a stay of the judgment will erode confidence in the

Judiciary in the First Circuit by creating an impression that it is violating national law regarding

the government edict doctrine and setting illegal new national policy regarding the Title IV-D

Program.  It may also have the effect of "encouraging forum shopping."  *Trump v. Hawaii,* 138

S. Ct. 2392, 2425 (2018) (Thomas, J., concurring). It further "undermines the judicial system's

goals of allowing the 'airing of competing views' and permitting multiple judges and circuits to

weigh in on significant issues."  *See* also *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

(2008) (traditional remedial principles account for "the public interest" and "the balance of

equities"); *EME Homer City Generation, LP v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015)

(Kavanaugh, J.) (declining to vacate unlawful agency action under the APA because "vacatur

could cause substantial disruption"). In this context, the dismissal of Plaintiff's state government

tort monetary damages claims entered by the Court could cause substantial disruption to the

*uniform* application of the legal framework of the Title IV-D Program Congress explicitly

intended.

25. The serious legal questions raised in this case regarding the scope of remedy go

beyond the questions of whether a Younger abstention is applicable to federal monetary damages

claims and or the feeble assertion of *comity* applied to the Rhode Island Judiciary and Tyler

Technology's gross violation of the government edict doctrine—and indeed, those questions

should not have even entered into this case. Here, among Plaintiff's challenges was to state

Judiciary, Tyler Technologies and agency actions, and Plaintiff pursued fraudulent inducement

breach of contract damages claims and tort monetary damages claims.  Instead, the Court at law

cannot vacate a federal statute—i.e., cannot "delete a previously enacted statute from the books"

such as 42 U.S.C. § 1983.  *See* also Jonathan F. Mitchell, The Writ-of-Erasure Fallacy, 104 Va.

L. Rev. 933, 936 (2018) ("The federal courts have no authority to erase a duly enacted law from the statute books, and they have no power to veto or suspend a statute. The power of judicial review is more limited." (footnotes omitted). Legal monetary damages relief under 42 U.S.C. § 1983 that would hold the Rhode Island state government accountable under the Rhode Island Government Tort Act for Rhode Island government actors' tortious actions violating the legal framework of the Title IV-D Program federal statutes targeting the Plaintiff in Texas was a legal remedy conferred by Congress to federal courts to grant legal relief appropriate in this case. The Court has an unflagging obligation to exercise jurisdiction conferred to it by Congress. *See Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013)

26. With respect, although the Court has entered a judgment otherwise, Plaintiff has demonstrated a likelihood of success on appeal of the Final Judgment sufficient to justify a stay of the judgment.

## **B. The Balance of the Equities Overwhelmingly Favors the Requested New Trial or Stay**

27. The balance of the equities overwhelmingly favors a new trial or stay: The State of Rhode Island plainly lacks any legitimate interest in the State's systemic knowing violation of the government edict doctrine and violation of 42 U.S.C. § 654(21)(A) that they now target Plaintiff in Texas, and which they sought to cover up from federal and Texas authorities, as well as from Plaintiff, by knowingly and unlawfully removing interest from the automated support record system. Americans outside of Rhode Island re fraudulently, unlawfully and systemically fleeced by Rhode Island's illegal scheme that is illegally funded through the State's defrauding of the United States lying to the United States that these activities are eligible for federal funds

appropriated by Congress for the legal administration of Title IV Program of the Social Security Act.

28. Defendants will face no harm from Plaintiff's requested new trial or stay. The judgment that is specifically directed to and protects the prevailing Defendants from legal accountability of their illegal actions, is further issued by a disqualified judge, Judge Smith, who was the former counsel for the Defendants and a partner of the firm whose major client is the Rhode Island Judiciary, *e.g.*, Rhode Island state government entities, including the state courts and state agencies. The requested new trial or stay will thus impose no hardship on the prevailing Defendants at all.

29. By contrast, the public and the Plaintiff face significant harm if now new trial is ordered or the judgment is not stayed. As an initial matter, "any time a [government]" violates "statutes enacted by representatives of its people," the people "suffer a form of irreparable injury." *Maryland v. King,* 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). But the harm here is much greater and more far-reaching. The government edict doctrine is willfully violated by the Rhode Island Judiciary and Tyler Technology in a civil conspiracy to cover up the illegal state family court creating judge-created laws ordering and enforcing 12% compound interest, aided and abetted by the Department of Human Services - Title IV-D requires the uniform application and compliance by participating States with the Social Security Act. Congress's as well as the United States through the Secretary of the U.S. Department of Health and Human Services' interest in the uniform compliance of 42 U.S.C. § 654(21)(A), § 654 and 42 U.S.C. § 666 are well established. The States are reimbursed 66% of the cost of operations through federal funding appropriated by Congress under Title IV-D of the Social Security Act. The Defendants' arbitrary illegal removal of the illegal unenforceable 12%

compound interest from the automated support record system and cover up of their illegal 12% compound interest scheme from the federal and Texas authorities targeting Texas properties and targeting the Plaintiff in Texas demonstrates Rhode Island government agencies (who are former clients of Judge Smith) knowingly committed criminal schemes illegally seizing Plaintiff's properties interstate in Texas that they know are violative of federal criminal codes and Texas civil and penal codes. *See,* e.g., Social Services Amendments of 1974 (1975 Act), Pub. L. No. 93-647, § 101(a), 88 Stat. 2351 (42 U.S.C. 651 et seq.) (adding Title IV-D to the Social Security Act). The program, which is administered by the United States Secretary of Health and Human Services (Secretary), provides that States with approved plans for child and spousal support that meet federal requirements are reimbursed by the federal government for a significant sixty-six percent (66%) of the costs of operating their child-support enforcement programs. 42 U.S.C. §v655(a)(2)(C).  In 1975, Congress adopted Title IV-D, 42 U.S.C. §v651 *et seq*., and established the general statutory framework that exists today. See 1975 Act § 101(a), 88 Stat. 2351; *Blessing v. Freestone*, 520 U.S. 329, 333-335 (1997) (describing program).  Congress ultimately set the federal share of reimbursable expenditures at 66%, 42 U.S.C. 655(a)(2), but expanded the availability of matching funds at the 90% level for State expenditures for automating data processing systems to improve "the monitoring of support payments, the maintenance of accurate records regarding the payment of support.  Therefore, the Defendants' illegal operations cannot be funded by Congressional appropriations.

     30. Judge Smith's failure to self-execute his disqualification under 28 U.S.C. § 455 as well as Canon 3E of the Code of Judicial Conduct, then his subsequent refusal to recuse in the related case, <u>Seguin v, RI Office of Child Support Services et al Civil</u> No. 23-cv-34-WES-PAS (D.R.I. 2023), upon Plaintiff's request after she raised newly discovered discovery post judgment

on October 6, 2023 of his direct and past public sector law practice's contract legal representation of the Defendants, state courts, state agencies and other conflict entities, have the appearance, to the objective observer, of the Court's issuance of judgment in favor of the Defendants in error that contravenes established First Circuit case law on Younger Abstention as well as disqualification, calculated to benefit the interests of his former clients, as partner of his former firm that represents the Rhode Island Judiciary and the state government.

31. Moreover, the Court's judgment effectively functions as a denial of Plaintiff's access to this Court of law to redress her legal monetary damages claims and fraudulent inducement breach of contract damages claims.  It is well-settled that even minimal loss of First Amendment freedoms, "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (plurality)); *see also Elrod*, 427 U.S. at 373.; *N.Y. Times v. United States*, 403 U.S. 713, 715 (1971). Accordingly, Plaintiff has a strong likelihood of success on the merits, will suffer irreparable injury without a stay, and a stay will not injure others while furthering the public interest.

### III. CONCLUSION

27.  For the foregoing reasons, Plaintiff has demonstrated a likelihood of success on appeal of the Judgment ordered, and has demonstrated that the balance of the equities favors a new trial or a stay.  Plaintiff respectfully requests that the Court stay the final judgment for the duration of appellate proceedings relating to the related Seguin v, RI Office of Child Support Services et al Civil No. 23-cv-34-WES-PAS (D.R.I. 2023).

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 16, 2023, I filed the within Motion with the

Clerk of the Court via email.

Respectfully submitted,

Mary Seguin

Pro Se

/s/ *Mary Seguin*

Email: maryseguin22022@gmail.com
Phone: (281)744-2016
P.O. Box 22022
Houston, TX  77019

Dated: November 16, 2023

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND

MARY SEGUIN,
*pro se*

*Plaintiff,*

VS.                                        Civil Action No. 1:23-cv-126-WES-PAS


RHODE ISLAND DEPARTMENT OF HUMAN SERVICES in its official capacity; MICHAEL
D. COLEMAN, DEBORAH A. BARCLAY in their individual and official capacities;
RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES in its official capacity; KEVIN
TIGHE, MONIQUE BONIN, FRANK DIBIASE, WENDY FOBERT, KARLA
CABALLEROS, TIMOTHY FLYNN, LISA PINSONNEAULT, CARL BEAUREGARD,
PRISCILLA GLUCKSMAN, JOHN LANGLOIS, PAUL GOULD, in their individual and
official capacities; RHODE ISLAND STATE COURT SYSTEM in its official capacity; PAUL
A. SUTTELL in his individual and official capacity as EXECUTIVE HEAD OF RHODE
ISLAND STATE COURT SYSTEM; RHODE ISLAND ADMINISTRATIVE OFFICE OF
STATE COURTS in its official capacity; RHODE ISLAND ADMINISTRATIVE OFFICE OF
THE SUPERIOR COURT in its official capacity; RHODE ISLAND JUDICIAL COUNCIL in
its official capacity; RHODE ISLAND SUPERIOR COURT in its official capacity; RHODE
ISLAND SUPERIOR COURT JUDICIAL COUNCIL in its official capacity; THE JUDICIAL
TECHNOLOGY CENTER in its official capacity; JULIE HAMIL, MARISA BROWN, JOHN
JOSEPH BAXTER, JR., JUSTIN CORREA in their individual and official capacities; RHODE
ISLAND OFFICE OF THE ATTORNEY GENERAL in its official capacity; RHODE ISLAND
OFFICE OF THE ATTORNEY GENERAL OPEN GOVERNMENT UNIT in its official
capacity; ADAM D. ROACH, PETER NERONHA in their official and individual capacities;
TYLER TECHNOLOGIES, INC.; GERO MEYERSIEK

*Defendants*

### **MARY SEGUIN'S DECLARATION IN SUPPORT OF PLAINTIFF'S RULE 60(b) MOTION**


    I, MARY SEGUIN, hereby declare under penalty of perjury, pursuant to 28 U.S.C. sec.
1746(2) that the following statements are true and correct:

1. That I am the Plaintiff, Pro Se, in the above captioned matter.

2. That I exercised, am exercising and continue to exercise my statutory right to appear
   pro se party in the above captioned civil matter in federal court by statute 28 U.S.C.
   sec. 1654.

3. That in state proceedings in Rhode Island, I am required to comply with Rhode Island Article X. Rules Governing Electronic Filing, Rule 2. Official Court Record, (a) Official Court Record. "Upon the implementation of the Electronic Filing System ("EFS") in each court, all documents shall be filed electronically and shall be the official court record."

4. That the state proceedings in which I am a party are public and are not about child custody nor involve a minor.

5. That the **Rhode Island Family Court**, through its adoption and promulgation of **Administrative Order 2021-01 A2)** mandated that all child support interest matters shall be heard remotely via WebEx. Further, **Administrative Order 2021-01 B1)** mandated that all non-emergency filings shall be filed using the electronic filing system in accordance with the Family Court Rules of Domestic Relations Procedure, which is the **Odyssey system**.

6. That the **"RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION, Rule 5. Access to Case Information, (c) Remote Access to Case Information. (1) Policy. To allow <u>limited</u> Remote Access to the Database through the Public Portal. Non-public case types shall not be remotely accessible except for certain case types to attorneys who have entered an appearance in a case. (2) Content. (a) The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall <u>not</u> have Remote Access to other Electronic Case Information"** bar, deny, violate, abridge, infringe and interfere with Pro Se Litigants' and the Public's fundamental rights to access public court records and Pro Se Litigants' fundamental right to meaningful access to the courts. See **"<u>RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION</u>"** Rule 5(c)(2)(a) **"<u>The Public, Self-represented Litigants and Parties. The Public, self-represented litigants, and parties shall have Remote Access to the register of actions or Docket but shall not have Remote Access to other Electronic Case Information.</u>"** See also **"<u>RHODE ISLAND JUDICIARY, Access to Case Information, 2. Remote Access to Case Information A. The Public, Self-represented Litigants, and Parties to a Case, The public, self-represented litigants, and parties in a case shall have remote access to the register of actions or docket but shall not have remote access to other electronic case information</u>."**

7. That I, the Plaintiff, learned and verified on July 10, 2023 directly from the Rhode Island Judiciary itself through numerous (14) correspondences with the Rhode Island Judiciary from June 10, 2023 to July 10, 2023, pursuant to my RI Access to Public Records Act ("APRA") request for public records from the Rhode Island Judiciary, that as a matter of State policy, State Court Rule, and Judiciary Rule, in the digital courts implemented by the Rhode Island Judiciary, the State Court, the Rhode Island

Judiciary deny remote digital access of the Rhode Island Judiciary's monopolized publication of court and judicial records using the digital tool maintained and published by Tyler Technologies, Odyssey, including judge-created, judge-authored court decisions arising from state proceedings in the State's digital electronic courts, and digital court transcripts ordered by and paid by pro-se litigants that are published by the Judiciary digitally on Tyer Technologies' Odyssey are also denied access to the Public, pro-se litigants, and parties to the litigation (who are represented by counsel). The Rhode Island State Court only grants remote access to digital court and judicial records created by judges produced in digital courts to Rhode Island attorneys and state and federal agencies that are approved by the Rhode Island Judiciary's monopoly. On this matter, I corresponded in writing fourteen (14) APRA correspondence emails with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023.

8. That the State Defendants in this matter electronically file all notices using another electronic filing system that is even separate and different from the EFS (Odyssey).

9. That the State Defendants' court electronic filings are not noticed to me in Texas.

10. That the State Defendants' court electronic filings are not visible to me on the Rhode Island courts' EFS.

11. That the State Defendants' court electronic filing court records cannot be accessed remotely by me, solely because I am a self-represented litigant.

12. That the State Defendants' court electronic filing court records cannot be accessed remotely by the public, by self-represented litigants, nor by parties to the case, but can be accessed remotely and instantly through the internet by attorneys in Rhode Island and state and federal agencies.

13. That the Rhode Island Court Clerks state to me over the phone that they are prohibited from reading the contents of the court records over the phone to me.

14. That the Rhode Island Court virtual clerks state to me over the phone that even they are unable to see or access the court record information of filings by the State Defendants from the virtual clerks' access portals.

15. That the Rhode Island Electronic Filing System, case management system, rules and practices outright and unconstitutionally restrict and deny access to the court to three classes: (1) the public; (2) pro-se litigants; (3) parties to the case (who are represented by counsel), and is obviously outright reserved for only the government and Rhode Island attorneys.

16. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS.

17. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and

withdrew from my-initiated RI EOHHS agency appeal in 2022 in a scheme to procure a favorable judgment in a state proceeding that deny my federal constitutional and due process rights in Texas.

18. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices, and initiated the family court state proceeding on January 31, 2023 before the Covid Emergency Declaration was lifted.

19. That the State Defendants have full knowledge of the egregious due process violations of the Rhode Island state court EFS system/architecture/rules/practices that appear to **only allow remote, instant and full court access to a restricted club of R.I. lawyers and the government**, pose unconstitutional and undue burden on me, a citizen of Texas over 2,500 miles away.

20. That the State Defendant have full knowledge of the egregiously unfair due process violations of the Rhode Island state court EFS system/architecture/rules/practices that deny me access to the required **electronic court transcripts** prepared by the court reporter and electronically filed in the state EFS that **I ordered and paid for** for appeal, but the State Defendants have instant remote access by state court design.

21. That the State Defendants have full knowledge of the above unconstitutional restriction on access to court records and information to the public and non-lawyers is deliberate, by design and calculated to be unfair, violating constitutional guarantees of full and fair opportunity to raise claims in state proceedings.

22. That the above-raised unconstitutional restrictions are not exhaustive.

23. That my federal monetary damages claims on the unconstitutionality of the Rhode Island state court rules, practices and proceedings that violate the government edict doctrine and violate the pro-se litigants', such as my-self, federal constitutional rights: (1) federal constitutional right of equal access to the courts, (2) federal constitutional right to equal access to court records to receive information on the contents of all electronically filed notices, pleadings, court decisions, and transcripts that I myself ordered and paid for for appeal that are required to be electronically filed by state court rules and practices, (3) federal constitutional due process right and equal right to be given equal and timely notice of electronic filings and entries by the courts (including court decisions, court orders, court judgments, full docket entries, etc.) that the Rhode Island Judiciary deliberately deny by category all pro-se litigants access to court information, namely the contents of judicial/court records of cases to which I am the self-represented party, (4) federal constitutional due process right to be heard (Rhode Island Superior Court threatens me, the Texas pro-se plaintiff, with denial of my request to conduct WebEx hearings for the purpose of denying the Texas pro-se litigant access to the court and to be heard), (5) federal constitutional due process right to decision by a neutral decision-maker (the court that denies pro-se litigant

access to the court and the corollary opportunity to be heard fails the neutral decision-maker test). This list is not exhaustive.

24. That I seek to sue in federal court the State Defendants and add additional defendants.

25. I am an out-of-state diversity and a pro-se litigant in two state proceedings in Rhode Island, and have been unconstitutionally singled out by the State Judiciary, by category "self-represented litigant," to be barred from accessing electronic case information authored by judges and which the Judiciary has a monopoly in the publication of the judge-created laws in which state court cases I am the pro-se party, and therefore have standing to raise claims against this unconstitutional state practice and unconstitutional state court practice and rules. I understand the Rhode Island Judiciary's monopoly in the digital publication of judge-created laws in the Judiciary' implemented digital/electronic courts and the Judiciary's denial to the Public and to me from accessing the monopolized electronic publication of the judge-created laws in the court records violate the government edict doctrine.

26. Additionally, my fundamental First and Fourteenth Amendment constitutional right and common law right to equal, meaningful, and timely access to judicial records and public court records in litigation, given timely notice, adequate opportunity to be heard and to decision by a neutral decision-maker are fundamental First and Fourth Amendment and Fourteenth Amendment rights. Critically, the unconstitutional abridgement, infringement, and denial of judicial and court records to out-of-state pro-se litigants by the Rhode Island State Courts, Rhode Island State Judiciary and the Rhode Island Superior Court Bench Bar Committee directly relate to Younger Abstention Exception.

27. The State Defendants deliberately file all the State's pleadings outside of the State's electronic filing system, "Odyssey," and deliberately use a wholly different un-named electronic filing system, different and separate from that ("Odyssey") provided for pro-se litigants, so that pro-se litigants do not receive any requisite automated electronic notices of court motions or pleadings the State Defendants file electronically, nor are pro se litigants able to electronically access the content information of the State Defendants' electronically-filed pleadings. The only way the pro se litigant, such as me, the Texas Plaintiff, can access the court record is to personally go over 2,500 miles away to the courthouse in Rhode Island to access the court pleading information, or get a "courtesy notice" via email or get a "courtesy notice" through U.S. Mail sent by the State Defendants at whim. The State Defendants deliberately fail to send the notices electronically or by U.S. Mail, and the state courts deliberately promulgated court rules disallowing the public, pro-se litigants and even the parties who are represented by lawyers, remote access to court records, and critically, deny access to crucial court decisions, judgments and orders of public cases, as well as deny remote access to the transcripts ordered by pro-se litigants for appeal. Critically, the State court's abridgment and denial of access to court documents to the pro se litigant and the general public result in the

unconstitutional abridgment and denial of equal, timely and meaningful access to court complaints, decisions, judgments and orders. What is truly shocking is that the Rhode Island Judiciary even denies and/or bars pro-se litigants remote access of court transcripts that were ordered by pro-se litigants for appeal.

28. Thirdly, the Texas Pro-Se Plaintiff discovered and verified the fact, on or about July 7, 2023, that the Rhode Island Judiciary, using the aforesaid state court rule barring, by category, pro-se litigants from accessing court case information remotely, bars the Plaintiff by category ("self-represented litigant") from accessing state court proceeding transcripts that the Texas Plaintiff ordered and paid for, for appeal. In other words, the RI Supreme Court Clerk stated to the Texas Plaintiff that the Plaintiff, in Texas, is unconstitutionally barred from remotely accessing the transcripts of court proceedings that she ordered and paid for in her appeal to the RI Supreme Court in the Plaintiff-initiated APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215**, and yet the State Defendants are inequitably granted instant and free remote access to those very transcripts that the Texas Plaintiff ordered and paid for, for appeal. The federal Texas Plaintiff respectfully requests this Court the extension of time to present the new evidence and plead the verified facts.

29. Fourthly, the Texas Plaintiff discovered and verified the fact, on or about July 11, 2023, that, despite the Texas Plaintiff's several phone inquiries to the RI Superior Court in the past several weeks regarding the status of the appeal, the RI Superior Court, for undisclosed reasons, failed and continue to fail to relinquish jurisdiction and transfer the court case file of **Seguin v. RI Office of Child Support Services, PC-22-07215** to the RI Supreme Court within the requisite 60 days after Plaintiff's filing of Notice of Appeal on April 3, 2023, as required by the RI Supreme Court rules and procedures. At the same time, the Texas Plaintiff verified the fact that the Plaintiff-ordered transcripts of the state proceedings in the Federal Plaintiff-initiated state APRA action **Seguin v. RI Office of Child Support Services, PC-22-07215** show the RI Superior Court further unconstitutionally sought to deny the Texas Plaintiff access to the state court and opportunity to be heard by outright threatening the Plaintiff in open court that the Judge, David Cruise, during the hearing of March 24, 2023 in that matter, shall use the state court's discretionary power in the future to deny all of the Texas pro-se Plaintiff's petitions for remote WebEx hearings to effectively deny her access to the state superior court. The state court that denies court access and the opportunity to be heard fails the neutral-decision-maker test required under the Fourteenth Amendment. I now specifically request further the Court to judicially notice that this court access denial and denial to be heard occurred on March 24, 2023, PRIOR to President Biden's lifting of the COVID-19 National Health Emergency Declaration. I, the Texas Plaintiff, aver this is a direct contributory reason for the RI Superior Court's failure to transfer the case file to the Supreme Court within 60 days (by June 3, 2023) of the Plaintiff's filing of Notice of Appeal on April 3, 2023 in **Seguin v. RI Office of Child Support Services, PC-22-07215**.

30. Fifthly, the Plaintiff presents to this Court and respectfully requests the Court to take judicial notice of the undisputed fact of the court rule-making process in Rhode Island. The 1966 Rules were promulgated by the justices of the superior court pursuant to section 8-6-2 of the General Laws of Rhode Island. This enabling act departed from the Federal Rules Enabling Act and most state enabling legislation conferring rule-making power on the supreme courts of the respective governments. The Rhode Island Enabling Act was adopted in 1940, 1940 R.I. Pub. Laws ch. 943, sec. 1. It conferred the power on the justices of the superior court and the 1966 reform was the product of that court. In 1969 an amendment to section 8-6-2 made the Rules thereafter adopted by the trial courts subject to the approval of the Supreme Court. 1969 R.I. Pub. Laws ch. 239, sec 2. Therefore, all public records relating to the adoption and promulgation of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION" are "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, judicial, regulatory, or administrative body of the state, or any political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to Public Records Act ("APRA"). Even though the Rhode Island Enabling Act conferred the power on the judiciary public body to promulgate and adopt court rules, a.k.a. rule-making process, the Rhode Island Judiciary, pursuant to the Plaintiff's APRA request for public records, denied the Plaintiff's APRA request within the 10 business day period, as well as denies it possesses public records, as defined by APRA, relating to the rule-making process by the judiciary of the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," including denying possession of public records that show the intent of the rule-makers to promulgate and adopt court rules denying fundamental right of public access to electronic case information remotely to the public, to self-represented litigants, and to parties to a case. **See Exhibit D** fourteen (14) APRA correspondence emails between the Plaintiff and/with Mr. Justin Correa, Esq. and Ms. Alexandra Kriss of the Rhode Island Judiciary from June 10, 2023 to July 10, 2023. The Texas pro-se Plaintiff respectfully requests the extension of time to present the new evidence and plead the newly verified facts and claims, and amend the complaint, which is further in the interest of judicial economy. The Plaintiff further seeks to appeal and file her claim against the implausible denial by the RI Judiciary, which is conferred by the Rhode Island Enabling Act to make rules of the court, that it possesses public records relating to the "RHODE ISLAND JUDICIARY RULES OF PRACTICE GOVERNING PUBLIC ACCESS TO ELECTRONIC CASE INFORMATION," that the judiciary, conferred power by the Rhode Island Enabling Act, "made in the course of, made or received pursuant to law or ordinance or in connection with the transaction of official business by any agency, ""agency" or "public body" means any executive, legislative, judicial, regulatory, or administrative body of the state, or any political subdivision thereof" as per R.I. Gen. Laws § 38-2-2, a.k.a. RI Access to

Public Records Act ("APRA"). Because the RI Superior Court clearly ruled in **Seguin v. RI Office of Child Support Services, PC-22-07215** that it lacked subject matter jurisdiction to hear my/the Texas Plaintiff's APRA-related claims, I, the Texas Plaintiff, now exercise my statutory and constitutional rights to petition this Federal Court, invoking 28 U.S.C. § 1343(a)(3) (civil rights) and 28 U.S.C. § 1367 that provides supplemental jurisdiction over the state law tort claims that arose from the same common nuclei of facts, invoking 28 U.S.C. § 1331 (federal question), and invoking 42 U.S.C. § 1983 for violations of civil rights under the First, Fourth and Fourteenth Amendments to the United States Constitution. I, the Plaintiff, respectfully request this Court for the extension of time to file my claims.

31. Plaintiff discovered on October 6, 2023 that the Rhode Island Judiciary and Government Defendants are former clients of Judge Smith, a partner in his former firm, Edwards & Angell.

32. Plaintiff discovered on November 9, 2023 that the Rhode Isand Judiciary and Government Defendants are current clients of the firm Edwards & Angell, the former firm of Judge Smith, a partner in the firm.

33. A plain reading of 28 U.S.C. sec. 455 makes clear that Judge Smith is disqualified from this case, and a plain reading of case law makes clear that 28 U.S.C. sec. 455 is self-executing, without necessitating any party's request.

Respectfully submitted,

Date: November 16, 2023

MARY SEGUIN

*Mary Seguin*

Mary Seguin

P.O. Box 22022

Houston, TX 77019

maryseguin22022@gmail.com

## Meghan Kenny

| | |
|---|---|
| **From:** | Mary Seguin <maryseguin22022@gmail.com> |
| **Sent:** | Friday, November 17, 2023 3:21 PM |
| **To:** | RID_ECF_INTAKE |
| **Subject:** | URGENT - TIME SENSITIVE - FILE TODAY NOTICE OF APPEAL in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS |
| **Attachments:** | CA 126 Notice of Appeal 111723.pdf |
| | |
| **Categories:** | Being Worked On MK |

<mark>CAUTION - EXTERNAL:</mark>

Dear Clerks of the Court,

I spoke with Clerk Meghan today regarding an update on the docketing of my motions and filing a Notice of Appeal in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Following our discussion, I emailed and filed today at 3:10 PM Eastern Time to the Clerk of the Court and respectfully requested the Clerk of the Court to docket today my Rule 60(b)(1) Motion, dated November 17, 2023, that is time-sensitive, per my email below.

**Please make sure that my previously filed Rule 60(b)(1) Motion referred in my below email is docketed as ECF 32.**

Please make sure that the law is followed so that my attached Rule 60(b)(1) Motion is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Rule 60(b)(1) Motion. No Chamber interference should be taking place to prevent the docketing of my attached Rule 60(b)(1) Motion.

Additionally, subsequent to my filing of the aforementioned Rule 60(b)(1) Motion referenced in my email below that I had requested be docketed as ECF 32, I am herewith filing my attached **Notice of Appeal** in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

**Please make sure that my Notice of Appeal filed herewith that is attached to this email is docketed today as ECF 33.**

Please make sure that the law is followed so that my attached Notice of Appeal docketed immediately upon receipt and is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Notice of Appeal. No Chamber interference should be taking place to prevent the docketing of my attached Notice of Appeal.

Thank you for your assistance.

Respectfully Submitted,
Mary Seguin
Houston, Texas


---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Fri, Nov 17, 2023 at 2:10 PM
Subject: URGENT - TIME SENSITIVE - FILE TODAY RULE 60(b)(1) MOTION in Seguin v. Ri Dept of Human Services et al, Civil

Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerks of the Court,

I spoke with Clerk Meghan today regarding an update on the docketing of my motions.

Following our discussion, I respectfully request the Clerk of the Court to docket today my attached Rule 60(b)(1) Motion, dated November 17, 2023, that is time-sensitive.

**Please make sure that my attached Rule 60(b)(1) Motion is docketed as ECF 32.**

Please make sure that the law is followed that my attached Rule 60(b)(1) Motion is NOT forwarded to Chambers prior to docketing. I am NOT requesting the Court leave to file, since it is my right to file the attached Rule 60(b)(1) Motion. No Chamber interference should be taking place to prevent the docketing of my attached Rule 60(b)(1) Motion.

Thank you for your assistance.

Respectfully Submitted,
Mary Seguin
Houston, Texas

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Fri, Nov 17, 2023 at 12:33 PM
Subject: Fwd: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerks of the Court,

I am respectfully following up on my Rule 59 Motion filing.

Yesterday, November 16, 2023, at 1:31 PM Central Time, I filed via email below, my Rule 59 Motion in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS. As indicated in my email below, I emphasized that docketing the Rule 59 Motion on November 16, 2023 is urgent, to comply with the 28 day filing post-judgment deadline, which my filing meets - November 16, 2023 is within the 28 day deadline of Fed. R. of Civ. P. 59 that tolls the time for filing an appeal.

I followed up with telephone calls to the Clerk's Office at 1:32 PM Central Time, and at 3:42 PM Central Time to request timely docket of my Rule 59 Motion, and the Clerk's Office assured me each time that a deputy clerk is working on it and that it will be docketed on the day it was received and that the docket will reflect the email date stamp of the day the Rule 59 Motion is received by email. Further, I was told that **all filings** I email to the Clerk's Office will be docketed and considered by the Court as having been filed on the day that the motion was emailed to the Clerk's Office.

Therefore, my Rule 59 Motion emailed on November 16, 2023 should be accordingly docketed as **ECF 32** with the **entry of/stating filing on November 16, 2023**, in the above captioned matter, Seguin v. Ri Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

However, as of this time, on November 17, 2023 almost 24 hours later, my Rule 59 Motion is still not docketed.

2

I would like to respectfully clarify that the Text Order dated October 19, 2023 in this matter states that only my electronic filing privilege was revoked, but there is **no** order requiring that I need to file for leave of Court to file any post-judgment motions, such as my Rule 59 Motion.

Today, November 17, 2023, I telephoned the Clerk's Office first thing at 8:00 AM Central Time, and spoke with Clerk Meghan, who informed me that yesterday she had forwarded my Rule 59 Motion to Chambers upon receipt, but has yet to hear back from Chambers, but did not know what was causing the hold up when I asked why Chambers' response is taking almost 24 hours which impacts the docketing date of the Rule 59 Motion. I expressed my concern of the Rule 59 deadline, emphasizing that it tolls the time for filing an appeal, therefore I respectfully requested that the docket accurately reflects my timely filing of my Rule 59 Motion on November 16, 2023 (at 1:31 PM Central Time).

Additionally, I informed Clerk Meghan that I relied on the Clerk's Office's information provided above, and I had also filed a timely **Rule 60** Motion yesterday, **November 16, 2023**, at **4:39 PM Central Time**, similarly requesting docketing to reflect it was timely filed via email to on November 16, 2023. I emphasized to Clerk Meghan that timeliness is critical, as Rule 60 Motion filed within 28 days post-judgment tolls the time for filing an appeal. Clerk Meghan told me that my Rule 60 Motion was forwarded to Chambers as well. According to the Clerk's Office's information, my **Rule 60 Motion** needs to be docketed/filed as **ECF 33, dated stamped filed on November 16, 2023**.

Due to the above information regarding the processing of my post-judgment motions, I expressed to Clerk Megghan my concern regarding the Court's procedure of forwarding my time-sensitive post-judgment motions to Chambers without docketing/filing, and then those time-sensitive motions seemingly to languish in Chambers past the date of the 28-day deadline stipulated by Rule 59, and Rule 60 as they relate to tolling the time for filing an appeal. I expressed my explicit concern that I seek to preserve my right of appeal, and that I respectfully seek to preserve on the record the issues contained in my Rule 59 and Rule 60 Motions that are currently before Chambers, without docketing, by law within the jurisdiction of the U.S. District Court of Rhode Island. My Rule 59 and Rule 60 Motions are not ex-parte or emergency motions.

Moreover, I expressed to Clerk Meghan my concern that the processing of my post-judgment motions forwarded to Chambers and seemingly pending before Chambers without the motions being docketed, impacts my right of appeal 30-days post judgment, and today, Friday, is Day 29. I told the Clerk that under the circumstances in this matter, I seek to preserve for appeal the issues raised in my timely filed Rule 59 Motion and Rule 60 Motion, and that I seek to preserve my right to appeal within the 30-day postjudgment period.

I also discussed with the Clerk that my timely filed but undocketed Rule 59 Motion and Rule 60 Motion that were forwarded to and currently before Chambers cause an uncertain effect, impacting the date of my filing of Notice of Appeal, the deadline of which is November 18, 2023, a Saturday. Based on the current facts and issues regarding simply docketing my filings on the record, I am concerned my rights of access to the Courts are impacted, and that my Notice of Appeal may also languish I do not believe any pro se litigant should be made to be uncertain of the timeliness of filing a Notice of Appeal as a matter of right that is caused by inaction by Chambers on timely-filed Rule 59 and Rule 60 Motions that toll the time to file an appeal. I explicitly expressed my concern on the effect on my access to the Courts.

I respectfully request that this email communication regarding the filing/docketing of my Rule 59 Motion be docketed to accurately reflect the record on appeal along with the Rule 59 Motion at the time the Rule 59 Motion is docketed by the Clerk.

Thank you in advance for you assistance.

Respectfully submitted,
Mary Seguin

---------- Forwarded message ---------
From: **Mary Seguin** <maryseguin22022@gmail.com>
Date: Thu, Nov 16, 2023 at 1:31 PM
Subject: URGENT - TIME SENSITIVE - FILE TODAY RULE 59 MOTION in Seguin v. Ri Dept of Human Services et al, Civil
Action No. 1:23-cv-126-WES-PAS
To: RID_ECF_INTAKE <RID_ECF_INTAKE@rid.uscourts.gov>

Dear Clerk of the Court,

Kindly urgently file today, November 16, 2023, my attached Rule 59 Motion in the above captioned case, Seguin v. Ri
Dept of Human Services et al, Civil Action No. 1:23-cv-126-WES-PAS.

Because this Rule 59 Motion is time sensitive, kindly make sure that it is filed and docketed today, November 16, 2023.  I
do not have access to electronic filing, it appears.

Thank you in advance for your assistance.

Respectfully Submitted,
Mary Seguin
PO Box 22022
Houston, TX  77019
(281) 244-2016

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening
attachments or clicking on links.

```
MIME-Version:1.0
From:cmecf@rid.uscourts.gov
To:cmecfnef@rid.uscourts.gov
Bcc:
--Case Participants: Joanna M. Achille (jachille@burnslev.com), Marissa D. Pizana
(ddiaz@riag.ri.gov, mpizana@riag.ri.gov), Mary Seguin (maryseguin22022@gmail.com),
District Judge William E. Smith (breegan_semonelli@rid.uscourts.gov,
john_hindley@rid.uscourts.gov, judge_smith@rid.uscourts.gov,
kathryn_alfus@rid.uscourts.gov, mitchell_kosht@rid.uscourts.gov,
patrick_mcgourty@rid.uscourts.gov, wesnef2@rid.uscourts.gov, wesnef@rid.uscourts.gov),
Magistrate Judge Patricia A. Sullivan (juliana_mckittrick@rid.uscourts.gov,
mag_judge_sullivan@rid.uscourts.gov, pasnef@rid.uscourts.gov,
patrick_cunningham@rid.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:1900843@rid.uscourts.gov
Subject:Activity in Case 1:23-cv-00126-WES-PAS Seguin v. Rhode Island Department of Human
Services et al Order
```
Content−Type: text/html

## U.S. District Court

## District of Rhode Island

## Notice of Electronic Filing

The following transaction was entered on 11/17/2023 at 3:39 PM EST and filed on 11/17/2023

| | |
|---|---|
| **Case Name:** | Seguin v. Rhode Island Department of Human Services et al |
| **Case Number:** | 1:23−cv−00126−WES−PAS |
| **Filer:** | |

**WARNING: CASE CLOSED on 10/19/2023**

**Document Number:** No document attached

**Docket Text:**
 **TEXT ORDER: The Court is in receipt of Plaintiff's email to the Clerk's Office this afternoon. As with its order issued earlier today, the Court construes this email as a motion for leave to file the motion attached to the email and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra)**

**1:23−cv−00126−WES−PAS Notice has been electronically mailed to:**

Joanna M. Achille &nbsp &nbsp jachille@burnslev.com

Marissa D. Pizana &nbsp &nbsp mpizana@riag.ri.gov, ddiaz@riag.ri.gov

Mary Seguin &nbsp &nbsp maryseguin22022@gmail.com

**1:23−cv−00126−WES−PAS Notice has been delivered by other means to:**

```
MIME-Version:1.0
From:cmecf@rid.uscourts.gov
To:cmecfnef@rid.uscourts.gov
Bcc:
--Case Participants: Joanna M. Achille (jachille@burnslev.com), Marissa D. Pizana
(ddiaz@riag.ri.gov, mpizana@riag.ri.gov), Mary Seguin (maryseguin22022@gmail.com),
District Judge William E. Smith (breegan_semonelli@rid.uscourts.gov,
john_hindley@rid.uscourts.gov, judge_smith@rid.uscourts.gov,
kathryn_alfus@rid.uscourts.gov, mitchell_kosht@rid.uscourts.gov,
patrick_mcgourty@rid.uscourts.gov, wesnef2@rid.uscourts.gov, wesnef@rid.uscourts.gov),
Magistrate Judge Patricia A. Sullivan (juliana_mckittrick@rid.uscourts.gov,
mag_judge_sullivan@rid.uscourts.gov, pasnef@rid.uscourts.gov,
patrick_cunningham@rid.uscourts.gov)
--Non Case Participants:
--No Notice Sent:

Message-Id:1900703@rid.uscourts.gov
Subject:Activity in Case 1:23-cv-00126-WES-PAS Seguin v. Rhode Island Department of Human
Services et al Order
```
Content−Type: text/html

## U.S. District Court

## District of Rhode Island

## Notice of Electronic Filing


The following transaction was entered on 11/17/2023 at 1:26 PM EST and filed on 11/17/2023

| | |
|---|---|
| **Case Name:** | Seguin v. Rhode Island Department of Human Services et al |
| **Case Number:** | 1:23−cv−00126−WES−PAS |
| **Filer:** | |

**WARNING: CASE CLOSED on 10/19/2023**

**Document Number:** No document attached

**Docket Text:**
**EXT ORDER: The Court is in receipt of Plaintiff's two recent emails to the Clerk's Office. The Court construes these emails as motions for leave to file the motions attached to those emails and denies leave to file for the reasons given in its earlier text orders. So Ordered by District Judge William E. Smith on 11/17/2023. (Urizandi, Nissheneyra)**


**1:23−cv−00126−WES−PAS Notice has been electronically mailed to:**

Joanna M. Achille &nbsp &nbsp jachille@burnslev.com

Marissa D. Pizana &nbsp &nbsp mpizana@riag.ri.gov, ddiaz@riag.ri.gov

Mary Seguin &nbsp &nbsp maryseguin22022@gmail.com

**1:23−cv−00126−WES−PAS Notice has been delivered by other means to:**

EXHIBIT J



# STATE OF RHODE ISLAND

## FAMILY COURT

### SUBPOENA - CIVIL

| Plaintiff<br>STATE OF RHODE ISLAND EX REL. GERO MEYERSIEK | Civil Action File Number<br>K2001-0521M |
|---|---|
| Defendant<br>MARY SEGUIN | |

| ☐ Murray Judicial Complex<br>Newport County<br>45 Washington Square<br>Newport, Rhode Island 02840-2913<br>*(401) 841-8340 | ☐ Noel Judicial Complex<br>Kent County<br>222 Quaker Lane<br>Warwick, Rhode Island 02886-0107<br>*(401) 822-6725 |
|---|---|
| ☐ McGrath Judicial Complex<br>Washington County<br>4800 Tower Hill Road<br>Wakefield, Rhode Island 02879-2239<br>*(401) 782-4111 | ☑ Garrahy Judicial Complex<br>Providence/Bristol County<br>One Dorrance Plaza<br>Providence, Rhode Island 02903-2719<br>*(401) 458-3200 |

TO: JOHN LANGLOIS, KEVIN TIGHE, PAUL GOULD, FRANK DIBIASE
of RHODE ISLAND OFFICE OF CHILD SUPPORT SERVICES 77 DORRANCE ST PROVIDENCE RI 02903

☑ **YOU ARE HEREBY COMMANDED** to appear in the Family Court listed above at the date, time, and courtroom specified below to testify in the above-entitled case and bring with you:

① ALL RECORDS, FILES NOTES, PUBLIC RECORDS, DOCUMENTS, FILMS, MATERIALS GENERATED IN THE COURSE OF ADMINISTRATION OF AND ENFORCEMENT OF RELATING TO DEFENDANT MARY SEGUIN, FROM 2010 TO THE PRESENT, IN THIS TITLE IV-D CASE UNDER THE SOCIAL SECURITY ACT

② ALL RECORDS RELATING TO DEFENDANT MARY SEGUIN FROM 2010 TO THE PRESENT, INCLUDING NOTES AND MESSAGES TAKEN AND GENERATED ON OCTOBER 5, 2022.

| Courtroom | Date | Time |
|---|---|---|
| GARRAHY COURTROOM 5F | MARCH 28, 2024 | 9:30 AM |

If you need language assistance, please contact the Office of Court Interpreters at (401) 222-8710 or by email at interpreterfeedback@courts.ri.gov before your court appearance.

* If an accommodation for a disability is necessary, please contact the Family Court Clerk's Office at the telephone number listed above as soon as possible. TTY users can contact the District Court through Rhode Island Relay at 7-1-1 or 1-800-745-5555 (TTY) to voice number.

Page 1 of 2

FC-73 (revised June 2020)

EXHIBIT K

11:28:47 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
AGENT CONTACTED ME THAT NCP WANTS TO PAY ALL ARREARS TO OBTAIN PASSPORT. I
CALLED CP PRIVATE ATTORNEY BARBARA GRADY TO ADVISE, AND TO DISCUSS IF CP
WANTS THE INTEREST PUT BACK ON THE CASE (███████████████████████████
████████████████████████). WE REMOVED THE INTEREST WHEN
CASE WAS MADE UI WHEN WE WERE FILING TO TEXAS. ATTY GRADY CHECKED WITH CP
AND CP IS STATISFIED WITH THE LUMP SUM PAYMENT OF PRINCIPLE OF $104K +/-.
AFTER CONFERENCE WITH MONIQUE BONIN AND FRANK DIBIASE, IT WAS DECIDED TO
REQUIRE PAYMENT IN MORE SECURE/LESS REVERSABLE FORM THAN CREDIT CARD, SO $
WILL NEED TO BE WIRED OR BY BANK CHECK. AGENT WILL BE CONTACTED BACK BYNCP
ASNCP WON'T GIVE PHONE NUMBER OR EMAIL ADDRESS. AGENT IS NOT EVEN SURE IF
NCP IS IN COUNTRY. INTEREST IS NOT INCLUDED IN AMOUNT THAT IS CONSIDERED
FOR PASSPORT PURPOSES IN ANY EVENT.

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT

```
RL: 80  12 22 ABSP:        SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:       MEYERSIEK   GERO    K   PNL:
```

11:28:56 Tuesday, December 13, 2022

```
12/13/22    11:28         C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00               CASE HISTORY             U824   PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/06/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
BUSINESS OFFICE HAS PUT A FLAG ON DISBURSMENTS SO WE CAN GET THIS SORTED
OUT. ADVISED AGENT THAT WHILE THERE IS NO BODY ATTACHMENT FOR NCP ISSUED
FOR OCSS, THERE MAY BE A BODY ATTACHMENT THAT ISSUED PRIVATELY, SO WE DO
NOT WANT TO TELL THE NCP ANY MORE THAN THAT. NCP CAN CHECK WITH THE COURT.
ATTY GRADY SAID THAT SHE DOES NOT RECALL WHETHER OR NOT BA ISSUED PRIVATEL
Y FOR NCP. ONCE WE ARE SATISFIED THAT PAYMENT HAS BEEN MADE AND THE FORM
OF IT, WE CAN NOTIFY SYSTEMS TO RELEASE THE BLOCK ON PASSPORT.

12/07/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
PER ATTY KDT AT CP REQUEST REINSTATING INTEREST

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES

```
RL: 80  12 22 ABSP:            SEGUIN        MARY           CMD: _____
FNX: TRAC  D CLIENT:           MEYERSIEK     GERO     K     PNL:
```

11:29:01 Tuesday, December 13, 2022

```
12/13/22    11:28         C A S E   T R A C K I N G        CSCL  ASMXA201
            TRAC.00                CASE HISTORY             U824  PROD
STARTING DATE    09 01 2021
SELECTION     COMPREHENSIVE CASE HISTORY
```

12/07/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
REC'D CALL FROM ATTY GRADY THAT CP HAD RECONSISDERED AND WANTED INTEREST_____
TO BE PUT BACK UP ON SYSTEM. EMAIL TO ACCOUNTING OFFICE TO PUT THE INTERES____
T THAT WAS REMOVED IN 10/18 BACK UP ON SYSTEM AND TO RUN INTEREST FORWARD.____

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____
SUSPEND DISBURSEMENT FLAG WAS CHANGED FROM B TO SPACE_____
      FROM CASE DATA PANEL_____

12/09/21 KATHLEEN MCCUSKER (KMM8623) ENTERED COMMENT_____
SUSPEND PASSPORT OFFSET WAS CHANGED FROM (BLANK) TO Y_____
FROM CASE ID: _____
      FROM OFST PANEL_____    .

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____

```
RL: .80  12 22 ABSP:              SEGUIN      MARY          CMD: _____
FNX: TRAC  D CLIENT:              MEYERSIEK   GERO    K     PNL:
```

11:29:05 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
.          TRAC.00              CASE HISTORY             U824  PROD
STARTING DATE    09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
ACCOUNTING HAS CONFIRMED WITH TREASURY THAT THE $104,000 PAYMENT HAS BEEN____
RECEIVED AND THAT THAT ACCOUNT WILL NOT ALLOW THE MONEY TO BE REVERSED OUT____
OF THE ACCOUNT. BASED ON THAT INFORMATION, I ASKED SYSTEMS TO RELEASE THE_____
PASSPORT BLOCK. ACCOUNTING HAS GIVEN ME THE BANK INFORMATION THAT CAME IN_____
WITH THE WIRE TRANSFER. I AM REFERRING THIS TO T. FLYNN TO RESEARCH IF WE_____
CAN MATCH ACCOUNT TO NCP AND TO LIEN IT IF POSSIBLE. ATTY GRADY, WHO REP-_____
RESENTS CP HAS ASKED THAT THE PAYMENT BE MADE BY CHECK RATHER THAN ON THE_____
KIDSCARD. ACCOUNTING WILL DO THIS, BUT I TOLD ATTY THAT IT MAY TAKE A FEW_____
DAYS TO EFFECTUATE. ATTY GRADY ALSO SENT EMAIL TODAY CONFIRMING THAT SHE_____
REPRESENTS CP AND IS AUTHORIZED TO TAKE POSSESSION OF THE CHECK. CP IS_____
BLIND SO COMING TO THE OFFICE TO PICK UP IS A HARDSHIP AND ACCOUNTING IS_____
CONCERNED ABOUT MAILING THE CHECK._____

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT_____

RL: 80  12 22 ABSP:        SEGUIN      MARY        CMD: _____
FNX: TRAC  D CLIENT:       MEYERSIEK   GERO     K  PNL:
```

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28      C A S E    T R A C K I N G      CSCL  ASMXA201
           TRAC.00            CASE HISTORY            U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
     TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
     58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

RL: 80  12 22 ABSP:            SEGUIN       MARY          CMD:
FNX: TRAC  D CLIENT:           MEYERSIEK    GERO      K   PNL:
```

Case: 23-1967   Document: 00118129823   Page: 1569   Date Filed: 09/26/2024   Entry ID: 6668899

11:29:09 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
           TRAC.00            CASE HISTORY              U824  PROD
STARTING DATE   09 01 2021
SELECTION   COMPREHENSIVE CASE HISTORY
```

12/09/21 WENDY FOBERT (WAF2363) ENTERED COMMENT
CORRECT CP MEDCL ARREARS AS INTEREST OF $6028.75 WAS ADDED TO PRINCIPAL IN
ERROR.  RELEASED $104185.98 WIRE TRANSFER RECEIVED 12/8/21 TO NON FIP
PRINCIPAL $93214.56, CP MEDCL PRINCIPAL $8675.00 AND MEDICAID PRINCIPAL
$2296.42

12/09/21 18:32 ASPXEND (ASPXEND) DEACTIVATED THE CODE:
    TF61 (IN ARREARS - SEND OOS REQUEST FOR CONTEMPT ACTION)

12/09/21 SYSTEM CLOSED ENFORCEMENT EPISODE WITH FINAL STATUS
    58 COMPLETED - RECEIPTS/ADJUSTMENT ENDED DELINQUENCY

12/10/21 ADAM DIAS (ACD2457) ENTERED COMMENT
MADE ADJ TO CORRECT ACCIDENTAL ADJ THAT MADE CP MED NEGATIVE. IT IS SUPPOS
ED TO BE $6028.75.

```
RL: 80  12 22 ABSP:              SEGUIN       MARY            CMD:
FNX: TRAC  D CLIENT:             MEYERSIEK    GERO      K     PNL:
```

11:29:13 Tuesday, December 13, 2022

```
12/13/22    11:28          C A S E    T R A C K I N G          CSCL   ASMXA201
            TRAC.00               CASE HISTORY                  U824   PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

12/14/21 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
MAILED ADMIN. SUBPOENA AND REQ. FOR INFO TO BANK OF AMERICA_____

12/14/21 KEVIN TIGHE (KDT5558) ENTERED COMMENT_____
CONTACTED CP'S ATTY TO ADVISE THAT CHECK IS READY TO BE PICKED UP AND TO_____
PLEASE LET ME KNOW WHEN SHE WILL COME BY SO I CAN ALERT THE GUARD AT THE_____
DOOR AND BRING THE CHECK DOWN TO HER._____

01/04/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
SPOKE WITH MARIE AT BANK OF AMERICA REGARDING A SUBPOENA THAT I HAD SENT_____
TO THEM REGARDING THE NCP. SHE WILL NOTIFY AN EMPLOYEE THERE TO DO MORE_____
RESEARCH_____

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT_____
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS____

```
RL: 80  12 22 ABSP:           SEGUIN       MARY          CMD: _____
FNX: TRAC D CLIENT:           MEYERSIEK    GERO     K    PNL:
```

11:29:17 Tuesday, December 13, 2022

```
12/13/22   11:28        C A S E    T R A C K I N G        CSCL  ASMXA201
           TRAC.00                CASE HISTORY            U824  PROD
STARTING DATE   09 01 2021
SELECTION    COMPREHENSIVE CASE HISTORY
```

01/12/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
PER SI RECEIVED LETTER TODAY FROM BANK OF AMERICA STATING THAT THE NCP HAS
A CHECKING ACCOUNT WITH THEM. CREATED AN OFFLINE NOTICE OF INTENT TO LIEN
THE NCP'S ACCOUNT. FAXED AND MAILED COPIES TO BANK OF AMERICA TODAY. WILL
NOTICE NCP VIA MAIL AT THE TEN DAY MARK

02/21/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
MAILED AND FAXED OFFLINE PERFECTED NOTICE OF LIEN TO BANK OF AMERICA
REGARDING NCP.'S ACCOUNT. COPY MAILED TO NCP

03/04/22 SYSTEM (SYSTEM) ENTERED COMMENT
KWS1263 CREATED THE LIEN OF INSURANCE ASSETS FORM
ON 03/03/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
CLAIM NUMBER: TX027985

```
RL: 80  12 22 ABSP:           SEGUIN        MARY        CMD: _____
FNX: TRAC  D CLIENT:          MEYERSIEK     GERO    K   PNL:
```

11:29:27 Tuesday, December 13, 2022

```
   12/13/22    11:28        C A S E   T R A C K I N G        CSCL  ASMXA201
               TRAC.00                CASE HISTORY            U824  PROD
   STARTING DATE   09 01 2021
   SELECTION    COMPREHENSIVE CASE HISTORY

   04/05/22 SYSTEM (SYSTEM) ENTERED COMMENT
   KWS1263 CREATED THE PERFECTED LIEN OF INSURANCE ASSETS FORM
   ON 04/04/2022 FOR: PRIVILEGE UNDERWRITERS RECIPROCAL EXCHANGE (PURE)
   CLAIM NUMBER: TX027985

   04/28/22 TIMOTHY FLYNN (TWF3296) ENTERED COMMENT
   MAILED NOTICE OF LEVY TO BANK OF AMERICA REGARDING A LIEN ON NCP.'S
   ACCOUNT. COPY MAILED TO NCP

   11/29/22 FORM, NOTICE OR LETTER GENERATED
        2310 LEGAL FORMS: MOTIONS INITIAL MOTION

   11/29/22 KARLA SAMAYOA (KWS1263) ENTERED COMMENT
   PER ATTY JL REQUEST TO SET ARREARS; PROCESSED FIRST PART OF MOTION TO SET
   ARREARS.

   RL: 80  12 22 ABSP:          SEGUIN      MARY          CMD:
   FNX: TRAC  D CLIENT:         MEYERSIEK   GERO     K    PNL:
```

11:29:32 Tuesday, December 13, 2022

```
   12/13/22    11:28         C A S E    T R A C K I N G         CSCL  ASMXA201
                TRAC.00                CASE HISTORY             U824   PROD
   STARTING DATE    09 01 2021
   SELECTION    COMPREHENSIVE CASE HISTORY

   12/09/22 RICHARD MULCAHEY (RJM3553) ENTERED COMMENT
   PARTIES HAD TWO CASES ON SYSTEM ONE WITH DASH DUE TO CHANGE OF
   CUSTODY.
   THE CASE WITH THE - ALSO OMITTED A 0 IN THE CASE DOCKET NUMBER.
   THIS PREVENTED ANYTHING FROM BEING SENT OR RCVD FROM RIFC, AND MADE
   OUR DOCKET NUMBER APPEAR INCORRECT WHEN IT IS GENERATED ON FORMS.
   THE K010521M CASE WAS A CLOSED CASE. DEACTIVATED THAT DOCKET, AND PLACED
   THE CLOSED CASE ON A NEW RECIPROCAL NUMBER ▬▬▬▬▬▬ - 22R????.
   THE K01-521M CASE HAS BEEN CHANGED TO THE CORRECT DOCKET, IT IS NOW
   K010521M IN ACCORDANCE WITH THE DOCKET THAT THE FC HAS FOR THE CASE.


   12/09/22 FORM, NOTICE OR LETTER GENERATED
        2310 LEGAL FORMS: MOTIONS INITIAL MOTION




   RL: 80  12 22 ABSP:              SEGUIN        MARY             CMD:
   FNX: TRAC  D CLIENT:             MEYERSIEK     GERO     K       PNL:
```

## Langlois, John (DHS)

| | |
|---|---|
| **From:** | Barbara Grady <bgrady@dugangradylaw.com> |
| **Sent:** | Thursday, October 13, 2022 2:53 PM |
| **To:** | Langlois, John (DHS) |
| **Subject:** | [EXTERNAL] : RE: Meyersiek v. Seguin; K01-521M |

John

I finally connected with my client and as I suspected he is not willing to waive 100% of the interest. Mary NEVER paid a single dollar in child support or any other expenses for Julia so he is not particularly warm to the idea of wiping out the interest that is owed to him. However in an effort to resolve this he is willing to accept $55,000 which is approx. 50% of what is owed. Please advise if that will do it. Thanks

*Barbara E. Grady, Attorney*
**Dugan Grady Law Offices**
303 Jefferson Boulevard
Suite 3
Warwick, RI (401) 351-4800
(401) 351-4802 Fax

THIS TRANSMITTAL IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE TRANSMITTAL TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND DELETE THE ORIGINAL MESSAGE. THANK YOU.

**From:** Langlois, John (DHS) <John.Langlois@dhs.ri.gov>
**Sent:** Tuesday, October 11, 2022 2:57 PM
**To:** Barbara Grady <bgrady@dugangradylaw.com>
**Subject:** Meyersiek v. Seguin; K01-521M

Hi Barbara, have you had a chance to speak to Mr. Meyersiek yet? Is he willing to waive the interest to resolve the case?

John A. Langlois
Deputy Chief Legal Counsel
Executive Offices of Health and Human Services
77 Dorrance Street
Providence, RI 02903
Telephone (401) 458-4481
Facsimile (401) 458-4409

This message and all attachments are confidential or proprietary to DHS, and disclosures, or distribution to anyone other than the intended recipient without the prior written permission of DHS is prohibited. This message and any attachments may contain confidential health information and/or confidential and/or proprietary information that is protected by law. This information is intended only for the use of the individual or entity names above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, or distribution is strictly prohibited. If you think you have received this message in error, please notify the sender by replying to the e-mail and delete the message without disclosure. Thank you.

EXHIBIT L



12:30 PM  Mon Dec 6

cseinfo.dhs.ri.gov

ADCB Internet Banking       Community Health Choice |...       Sign in - Community Healt...       Case Manager Portal | Offi...       RI OCSS Payment

RI.gov                                                    R.I. Government Agencies | Privacy policy | Search RI.gov

**State of Rhode Island**
**Office of Child Support Services**
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Segan                                        Home  My Profile  Contact Us  Site Map  Log

**Menu**

▼ Case Information
▶ Last 5 Payments
▶ Last 13 Months
  Current Orders/ Past
  Due Balances
▶ Court Dates/
  Appointments
▶ Enforcement Actions
▶ PIN Lookup

Home > Current Orders and Past Due Balances

**Case Manager**

## Current Orders / Past Due Balances

**Custodial Parent:** Gero K Meyersiek       **CSE ID:** 1689817

**Current Orders**

| Court Order | Amount | Frequency | Begin Date | End Date |
|---|---|---|---|---|
| Child Support | $218.00 | Weekly | 05/28/2012 | 06/30/2018 |
| Arrears | $21.80 | Weekly | 07/17/2012 | |
| Past Liability | $0.00 | None | | |
| Spousal Support | $0.00 | None | | |

Note: Medical orders and medical arrears are not listed on this screen.

**Past Due Balances**

| As Of | Total Due | Arrears | Interest | Spousal |
|---|---|---|---|---|
| 11/30/2021 | $93,214.56 | $93,214.56 | $0.00 | $0.00 |

EXHIBIT M

State of Rhode Island and Providence Plantations

PROVIDENCE, Sc.                          FAMILY COURT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

GERO MEYERSIEK

Vs.                          F.C. FILE NO. K2001-0521M

MARY SEGUIN
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Heard Before:

The Honorable Magistrate Armando O. Monaco

On March 6, 2023

**APPEARANCES:**

FOR MS. SEGUIN. . . . . Pro se

FOR THE STATE. . . . .. Paul Gould, Esq.

1

I HEREBY CERTIFY THAT THE

FOLLOWING IS A TRUE AND ACCURATE

TRANSCRIPT IN THE CASE OF

GERO MEYERSIEK VS. MARY SEGUIN

HEARD BEFORE

MAGISTRATE ARMANDO O. MONACO

ON MARCH 6,2023.




STEVEN FAZIO
ELECTRONIC COURT REPORTER

1   **GERO MEYERSIEK V. MARY SEGUIN**

2   **F.C. NO. K2001-0521M**

3   **MARCH 6, 2023**

4

5   **MARY SEGUIN:** Having been

6   duly sworn testifies as follows:

7   THE COURT: After the

8   February 12th hearing two orders were submitted

9   one by each side, objections were filed through

10  your order being entered, ma'am.

11  MS. SEGUIN: Thank you Your

12  Honor. I am sorry. Could you repeat that again?

13  Sorry.

14  THE COURT: Subsequent to the

15  hearing of February 10,2023, two separate orders

16  were submitted for my signature. One you

17  submitted and one the State submitted. The State

18  filed an objection to the submission of your

19  order on the basis that they alleged, I believe,

20  that it is not what I said.

21  MS. SEGUIN: And I also filed

22  an objection to their proposed order that also

23  clearly states a lot of additional items that

24  were never before the Court. Including the

25  number now that they have now, they submitted a

3

1    $75,623.71 and then another one for $6028.75.

2    These two numbers were not even in their

3    original motion to establish arrears that was up

4    before the court on February the 10th and those

5    two numbers were never brought up as well. And

6    without a clear understanding and audit of what

7    those numbers represent. Because they

8    unilaterally of their own volition without any

9    court approval.

10                   ATTORNEY GOULD: Judge,

11    objection.

12                   MS. SEGUIN: Took off the

13    interest.

14                   THE COURT: Let me interrupt

15    you, ma'am. Where are you getting these two

16    numbers from? I do not see them anywhere.

17                   MS. SEGUIN: Exactly. That is

18    the order proposed order that the State had

19    filed. You are absolutely right. Your Honor.

20    Those two numbers--

21                   THE COURT: I am looking at

22    the proposed state order that has different

23    numbers then what you are saying.

24                   MS. SEGUIN: The proposed

25    order that they submitted to me, on #4 it says

4

```
 1        $75,623.71 for interest. And then a medical

 2        support interest for $6028.75. Now these two

 3        numbers were never before the Court before on

 4        February the 10th. On February the 10th they

 5        brought up a motion that mentioned $81,000.

 6                        THE COURT: Well, maybe that

 7        is a combination of the two numbers.

 8                        ATTORNEY GOULD: Yeah, Judge.

 9        That is the combination.

10                        MS. SEGUIN: So sorry, go

11        ahead.

12                        ATTORNEY GOULD: There was an

13        objection, Judge.

14                        THE COURT: Yeah, what is

15        your objection, Paul?

16                        ATTORNEY GOULD: We are off

17        the subject. The subject is whether this order

18        should enter or not.

19                        THE COURT: Right.

20                        ATTORNEY GOULD: Not about

21        any agreements, not about anything else other

22        than the numbers and Judge if I may or I will

23        let the defendant continue Judge.

24                        THE COURT: I thought my

25        order was very simply was to set the arrears as
```

1    they appear on the State computer but without

2    prejudice and then there will be a subsequent

3    hearing to determine whether or not those

4    numbers are in fact accurate. As I am reading

5    the order, they put two numbers in and it is

6    clearly, let me read the paragraph. Yeah,

7    paragraph six, the Court finds that the total

8    the arrears of $81,000, which is the combined

9    number is placed on the Child Support ledger

10   without prejudice to the June 8, 2023 hearing.

11   The State agrees it shall respond to the

12   defendant's first request for production of

13   documents forthwith.

14                    MS. SEGUIN: Yes, Your Honor.

15   So therefore, you had not made any kind of

16   findings of fact of whatever they might be. You

17   simply said put the interest back--

18                    THE COURT: Yeah, I said

19   whatever the computer says is the balance. Put

20   it on the computer without prejudice, which

21   means that we need a starting point. You need to

22   know what they allege you owe and that is what

23   they are alleging you owe. You disagree with

24   that number. You asked them for the

25   documentation to substantiate that number. That

6

```
1        is why I continued it out all the way to June so
2        that you would have an opportunity to get their
3        materials, for you to you digest their
4        materials, provide counter materials back to
5        them. So that in June, a full hearing can be
6        held with everyone totally prepared as to argue
7        either position. Either there is no money due or
8        there is a balance due. I never made any finding
9        whatsoever there is in fact a balance due. If I
10       did, I would not have continued the hearing.
11               MS. SEGUIN: Thank you, Your
12       Honor. That is exactly what my understanding as
13       well.
14               THE COURT: Right. That is
15       what the order says. It says put the number on
16       the computer, but without prejudice, which means
17       both sides have to argue and convince the Judge
18       that that is in fact the number. Or you are
19       going to argue it is an incorrect number and you
20       are going to substantiate it by whatever
21       arguments you present. They going to
22       substantiate it by whatever arguments they
23       present. And then whoever hears it in June will
24       decide which side is correct.
25               MS. SEGUIN: Thank you, Your
```

7

```
1        Honor. I wanted to make sure that, you know,

2        that all parties understand that because at this

3        point, the State is saying that you already

4        found that I had--

5                        THE COURT: No, no. The State

6        is not saying that because the order clearly

7        says those numbers or that number is without

8        prejudice, which means I did not establish that

9        number. We do it in many of these cases to get

10       the ball rolling, so either side knows what they

11       need to produce to substantiate their positions.

12       The same way they can come in now and say, Oh,

13       no, we made a mistake. She actually owes

14       $185,000.

15                        MS. SEGUIN: You are giving

16       me a heart attack, Your Honor.

17                        THE COURT: It puts a cap on

18       what they can argue.

19                        ATTORNEY GOULD: Judge, can I

20       respond now?

21                        MS. SEGUIN: So, Your Honor,

22       with that in mind, just to clarify, that is what

23       they are saying in 2018 when they first took

24       off--

25                        ATTORNEY GOULD: Objection.
```

8

1      THE COURT: Just a minute.

2   The order speaks for itself. It says the balance

3   on the computer as of whatever dates in there. I

4   cannot read it now quickly, whatever dates in

5   there, that is the balance on the computer. They

6   have to substantiate it. They are going to send

7   you documentation supposedly to substantiate it.

8   If they cannot substantiate, then they are not

9   going to get that number.

10      ATTORNEY GOULD: Judge, I

11   disagree with that. Judge, we have no obligation

12   to substantiate this. There is a Child Support

13   number that was established by Judge McCann. You

14   took judicial notice of that.

15      THE COURT: I took judicial

16   notice that there was no appeal of his order.

17   That is what the judicial notice of.

18      MS. SEGUIN: Thank you, Your

19   Honor. Thank you, Your Honor. That is my

20   understanding as well that you took judicial

21   notice of the orders themselves. But what is in

22   dispute is how the child support office has

23   handled this computation.

24      THE COURT: That's the

25   argument for June, ma'am. That is the argument

9

1      for June.

2                        MS. SEGUIN: Taking that off

3      the system without your approval. Now, put it

4      that way--

5                        THE COURT: What you are

6      arguing now is what you need to argue in June. I

7      am satisfied that the order that has been

8      presented by the State that breaks down the two

9      balances that the total is $81,000 is in fact

10     the appropriate order from the hearing. It is

11     without prejudice. They are going to provide

12     documents that you requested so that you can

13     then decide whether or not you agree or

14     disagree. And if you disagree with their method

15     of calculating it, you need to present why you

16     think that method is incorrect and what should

17     be the correct number if any.

18                        MS. SEGUIN: Yes, and

19     including a waiver of interest –

20                        THE COURT: You are arguing

21     whether the number is correct or not. That is

22     the whole purpose of making it without

23     prejudice.

24                        MS. SEGUIN: Yes, and that

25     would include the waiver of interest that had

1    occurred.

2            THE COURT: No, that is the

3    subject of the hearing. That is the subject of

4    the hearing. I am making no finding about

5    whether there was or was not a waiver of

6    interest.

7            MS. SEGUIN: Thank you, Your

8    Honor. So that is part of the discovery that

9    needs to happen.

10           THE COURT: Well, that is

11   what I assume you are asking for. Is to get the

12   documentation that would have substantiate your

13   belief that there was the waiver of the

14   interest.

15           MS. SEGUIN: Thank you, Your

16   Honor.

17           THE COURT: So, if you can

18   substantiate that there was a waiver of

19   interest, that balance disappears.

20           MS. SEGUIN: So, the State is

21   objecting to producing those protected

22   documents—

23           THE COURT: No, no. They are

24   not objecting to producing any documents. The

25   line paragraph says in paragraph 10, The State

```
1    agrees it shall respond to the defendant's first
2    request for production of documents forthwith.
3    So, whatever you asked them for, they are going
4    to they are going to provide to you. If you do
5    not think they provided everything you asked
6    for, you file a supplemental request.
7              ATTORNEY GOULD: The State
8    filed its answer in response to her request for
9    production, Judge. And I will stand by that. And
10   I will argue those issues that we refuse to
11   answer, or we objected on procedural grounds or
12   we objected on legal grounds for what we did.
13   And I will respond to that when it is
14   appropriate.
15             THE COURT: That would be
16   June 8th. That will be done on June 8th. So, you
17   can be prepared to go forward on whatever your
18   objections are and whoever hears it will decide
19   whether the objections were valid or not.
20             MS. SEGUIN: Your Honor, Mr.
21   Gould had said something to me, emailed
22   something to me to the affect that he said you
23   will be retiring June the 8th. I just wanted to
24   know why he emailed me something like that.
25             THE COURT: It has been
```

1    projected that I am to retire sometime before

2    July 1st. They are dealing with my successor and

3    I sit until my successor is appointed and

4    qualified. And the projection is by the end of

5    the by end of June, the latest could be earlier.

6    I do not think it could be later, but it is

7    possible.

8                ATTORNEY GOULD: And Judge,

9    because we, I guess, we like making these

10   artificial records, I will make this record

11   here. I did not say that snd I resent the

12   defendant putting words in my mouth.

13               MS. SEGUIN: I indicated the

14   email that you wrote to me.

15               THE COURT: Listen, just a

16   minute, just a minute. Whether I sit or I do not

17   sit is an immaterial situation, it has nothing

18   to do with what is before me today. I am ruling

19   on the order they sent you breaking down the

20   balances between the child support and medical

21   arrears is valid as to what I said the last time

22   we were here. I am going to sign that order and

23   proceed with their discovery. Whatever

24   objections you have relative to the discovery

25   and whoever sits here, whether it is me or

13

1     someone else, they will be prepared to address

2     the situation. Okay.

3                    MS. SEGUIN: Thank you, Your

4     Honor. Thank you. One last question about number

5     11 and 12. I mean, those elements—

6                    THE COURT:  11 and 12?

7                    MS. SEGUIN: Yeah, 11 and 12.

8                    THE COURT: 11 tells you how

9     to contact us. 11 is how to contact us and 12 is

10    a standard paragraph that they put in indicating

11    that, I don't know why it's here, but they that

12    the standard paragraph they stick in every case

13    has no bearing on this one. Other than it says

14    that until it is paid in full, you know, the

15    order will continue to run. But there is no

16    order running in terms of what your obligation

17    to pay that is.

18                    MS. SEGUIN: Okay, okay. So

19    that is something that is boilerplate.

20                    THE COURT: That is

21    boilerplate and 11 is how you get in touch with

22    us.

23                    MS. SEGUIN: Sure.

24                    THE COURT: We do not put

25    that in, we will never have any hearings.

```
 1                    MS. SEGUIN: Thank you, Your

 2      Honor.

 3                    ATTORNEY GOULD: If I could

 4      talk this time a little bit. Maybe just for the

 5      record. Those same paragraphs were in the

 6      September 25th, 2012 orders. And that same

 7      boilerplate languages in a July 11, 2012 orders

 8      and any other order that she would receive.

 9      August 15, 2012. That same identical language

10      was contained in those. It is boilerplate.

11                    THE COURT: Yeah,

12      boilerplate. All right, we will see you on June

13      8th at 2:30. Wait a minute. Daylight savings

14      time is starting soon.

15                    MS. SEGUIN: Oh, yeah.

16                    THE COURT: All right. Do you

17      go on daylight saving time? Pay attention.

18                    MS. SEGUIN: Okay.

19                    THE COURT: This coming

20      Saturday, our clocks jump forward an hour. So,

21      your clock does not jump forward. You are going

22      to have to call in an hour earlier.

23                    MS. SEGUIN: All right.

24                    THE COURT: I have friends

25      that live in Arizona, and they told me that in
```

15

1    Arizona, there were three different time zones

2    in the summer.

3              MS. SEGUIN: Yeah, every

4    county is allowed to do that out here.

5              THE COURT: I know that. That

6    is why that is why I pay attention to it because

7    they tell me that people have trouble. They

8    think, Oh, I am going to be on time, I am going

9    to Court. They said, No, you are an hour late.

10   What do you mean? This is the time across the

11   street. No, that is an hour different than us.

12             MS. SEGUIN: It really is

13   crazy. That they have marked it off, not a

14   county, but across the street. You are

15   absolutely right.

16             THE COURT:  All right. So,

17   pay attention. It is 2:30 our time.

18             ATTORNEY GOULD: Judge, if I

19   may. The order I submitted that contains 12

20   paragraphs.

21             THE COURT: Yes.

22             ATTORNEY GOULD: February 10,

23   2023, starting with paragraph one, the matter is

24   continued.

25             THE COURT: Yes.

16

1       ATTORNEY GOULD: That order

2 is going to be accepted by the Court. That will

3 be the order of the Court for that day?

4       THE COURT: Right.

5       ATTORNEY GOULD: The order

6 that she submitted will be stricken, correct?

7       THE COURT: Right.

8       MS. SEGUIN: Yes, that is my

9 understanding, too. Yes.

10      ATTORNEY GOULD: Thank you,

11 Judge.

12      THE COURT:  All right. We

13 will see you in June.

14      ATTORNEY GOULD: One more

15 thing. I am sorry. Judge, if I may, can the

16 defendant place her address on the record?

17 Because we sent some correspondence that was

18 sent back to us. Now we have used her email as a

19 courtesy to her and we also need an actual

20 street address so that we can send her

21 documents.

22      MS. SEGUIN: Your Honor, I

23 think this is, I do not really understand why --

24      THE COURT: Let me just

25 interrupt. Let me interrupt. When you enter your

17

1     appearance, you need to provide under the rules

2     your address, your phone number, and your email

3     address.

4               MS. SEGUIN: Yes.

5               THE COURT: And if you were

6     an attorney, obviously your bar number. Okay so

7     if you change any of those addresses or emails,

8     you are under an obligation to keep updating it

9     because if they send anything to the address or

10    the email that you provided, it's not a defense

11    later on, Oh, it's not my address or email, I

12    changed it. So that is why they are asking to be

13    sure they get the right method to contact you,

14    depending on what they have to send. It is a

15    part of the Court order that you provide your

16    address and email address.

17             MS. SEGUIN: Your Honor, may

18    I also then ask that the State sent me a or e-

19    file any notices? Because they have been mailing

20    things to me in Texas, which takes 10 to 12 days

21    for me to receive by regular mail. So, could you

22    also please, I am going to ask you please to

23    ask, to make them, to order them to notice me by

24    electronic means as well.

25             THE COURT: Well, that's part

```
 1    of the rules, too.

 2                    MS. SEGUIN: Okay.

 3                    THE COURT: All right?

 4                    MS. SEGUIN: Okay. Thank you,

 5    Your Honor. I appreciate you telling me.

 6                    THE COURT: All right, June

 7    8th.

 8                    ATTORNEY GOULD: I do not

 9    have an address, Judge.

10                    THE COURT: Oh, that is

11    right. What is your updated address?

12                    MS. SEGUIN: My address is on

13    the on file is P. O. Box 22022 Houston, Texas,

14    77019.

15                    THE COURT: What about email?

16                    MS. SEGUIN: That's Mary

17    Seguin 22022 at Gmail.com. They are also in my

18    pleadings as well.

19                    THE COURT: Slow down. Slow

20    down. We do not type that fast.

21                    THE CLERK: I did not get

22    that P. O. Box. Can you give it to me again,

23    please?

24                    MS. SEGUIN: Yes, it is,

25    22022.
```

```
 1                          THE COURT: That is the P. O.

 2      Box number?

 3                          MS. SEGUIN: Yes, Your Honor.

 4                          THE COURT: Making sure it

 5      was not the zip or area code.

 6                          MS. SEGUIN: It is one too

 7      many numbers.

 8                          THE COURT: What is the zip

 9      in Houston?

10                          MS. SEGUIN: It is 77019.

11                          THE COURT: All right, all

12      set?

13                          MS. SEGUIN: Thank you, Your

14      Honor.

15                          THE COURT: Okay, June 8.

16                          ATTORNEY GOULD: Thank you,

17      Judge.

18                          MS. SEGUIN: Thank you, Your

19      Honor.

20

21

22
```

EXHIBIT N



State of Rhode Island
# Office of Child Support Services
DEPARTMENT OF HUMAN SERVICES

Welcome Mary Seguin                                    Home  My Profile  Contact Us  Site Map  Log Out

**Menu**
- **Case Information**
  - Last 5 Payments
  - Last 13 Months
  - Current Orders/ Past Due Balances
  - Court Dates/ Appointments
  - Enforcement Actions
  - PIN Lookup

Home > Last 13 Months

Case Manager

## Last 13 Months

Custodial Parent: Gero K Meyersiek          CSE ID:

### Payment Made By The Non-Custodial Parent

| Period | Payment Made |
|--------|--------------|
| 12/2021 | $0.00 |
| 09/2018 | $6,461.95 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |